IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 12, 2024 at 1:00 p.m ET** |

**OPPOSITION TO DEBTORS' OBJECTION TO
PROOFS OF CLAIM [D.I. 20051, 20052]**

Seth Melamed ("**Melamed**") hereby submits this opposition ("**Opposition**") to the Objection filed by FTX Trading Ltd. ("**FTX**"), FTX Japan Holdings K.K. ("**FTX Japan Holdings**"), FTX Japan K.K. ("**FTX Japan**") and Quoine Pte Ltd. ("**FTX Singapore**") to proofs of claim numbers 3244, 3353, 3385, 3956, 4470 and 4578 (collectively, the "**Claims**" and each a "**Claim**") filed by Melamed. In connection with this Opposition, Melamed submits the Declaration of Seth Melamed ("**Melamed Declaration**") and the Declaration of Takane Hori ("**Hori Declaration**") and the Exhibits attached thereto. In support of the Opposition, Melamed respectfully states as follows:

**Background**

1.  On and after November 11, 2022, the Debtors filed voluntary petitions for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (collectively, the "Debtors"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX

1

2.  On November 22, 2022, the Court entered the *Interim Order (I) Authorizing the Debtors To (A) Pay Prepetition Compensation And Benefits And (B) Continue Compensation And Benefits And (II) Granting Certain Related Relief* [D.I. 138]

3.  On December 15, 2022, the U.S. Trustee appointed an official committee of unsecured creditors (the "**Committee**"). [D.I. 231.]

4.  On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519] (the "**Non-Customer Bar Date Order**"). The Non-Customer Bar Date Order established, among other things, the deadline of June 30, 2023 to file non-Customer Claims against the Debtors.

5.  On June 26, 2023, the Debtors filed the *Notice of Filing Second Interim Report of John J. Ray III to the Independent Directors: the Commingling and Misuse of Customer Deposits at FTX.Com* [D.I. 1704].

6.  On June 30, 2023, Melamed filed six (6) proofs of claim (the "**Claims**") in this case as follows:

| Claim Number | Claim Amount | Debtor | Nature of Claim |
|---|---|---|---|
| Claim 3385 | $35,613,112.19 | FTX Trading | Sale of Liquid Shares to FTX |
| Claim 3353 Claim 3956 Claim 4578 | $52,500.00 | FTX Singapore FTX Japan FTX Japan Holdings | Services fee from September and October of 2022 |
| Claim 3244 Claim 4470 | $200,000 | FTX Japan Holdings FTX Japan | Bonus Payment |

7.  On July 10, 2024, the Debtors filed their *Objection to Proofs of Claim Filed by Seth Melamed* [D.I. 20051] along with the *Declaration of Steven P. Coverick* [D.I. 20052] (collectively, the "**Objection**"). The Objection seeks to "(i) disallow and expunge Claim 3385 in its entirety, or in the alternative reduce Claim 3385 to reflect the dollar value of

cryptocurrencies determined in this Court's Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets [D.I. 7090] (the "**Estimation Order**") and subordinate Claim 3385 as an equity claim under section 510(b) of the Bankruptcy Code; and (ii) disallow and expunge Claims 3244, 3353, 3956, 4470, and 4578 in their entirety, or in the alternative reduce the five Claims to reflect the reasonable value of services provided by Melamed." Objection at pp. 1-2.

8. On July 16, 2024, the Court entered an *Order (I) Authorizing and Approving Sale of Debtors' Interests in FTX Japan K.K. Free and Clear of All Liens, Claims, Interests and Encumbrances; (II) Authorizing and Approving FTX Japan Holding K.K.'S Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Dismissing the Chapter 11 Case of FTX Japan K.K. Effective as of Closing; and (IV) Granting Related Relief* [D.I. 20560].

**Jurisdiction**

9. The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), Melamed does not consent to the entry of a final order or judgment by the Court in connection with the Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Background Relating to the Claims**

**A.  Quoine**

10. Melamed was employed at Goldman Sachs for 11 years (from 2006 to 2017) where he acquired an interest in cryptocurrency.  Declaration at ¶7.   In September of 2017, Melamed joined Quoine Corporation ("**Quoine**") as Head of Operations in Tokyo. *Id.*  Melamed was later promoted to Chief Operating Officer of Liquid in November 2019. *Id.*

11. Liquid Group, Inc. ("**Liquid**" or "**LGI**") was a holding company that owned two successful cryptocurrency exchange operating entities with difficult-to-obtain licenses: Quoine and Quoine Pte. Ltd. in Singapore ("**Quoine Singapore**"). *Id.* at 8.  Melamed began acquiring shares in Liquid from October 1, 2019 to February 8, 2021.  *Id.*

12. Quoine provided various cryptocurrency exchange services, including crypto derivatives trading, to Japanese residents. *Id.* at 9.  Starting from 2018, Quoine operated with a strict process for segregating customer funds for both *fiat* and cryptocurrencies.  *Id.* As COO of  Quoine, it was Melamed's responsibility to ensure that customers' *fiat* assets were stored in a Trust company account and each customer's crypto assets were stored in segregated, cold wallets.

13. Shortly after Melamed joined Quoine, it received a license for the exchange of cryptocurrencies under the Japanese Payment Services Act ("**PSA**"). *Id.* at 10.  The PSA license was an important step for Quoine to serve Japan residents in a legal, compliant manner and facilitated its work with local banks in Japan to handle customer fiat deposits and withdrawals. *Id.*  In 2020, Quoine applied to the Japan Financial Services Agency ("**JFSA**") for a Type 1 Financial Instruments Business License. *Id.* at 11.  This license was important to the company in order to continue to offer a crypto exchange platform for Customers who wanted to trade in crypto derivatives.

14. After nearly two years of effort by Melamed and others at the company at the company, Quoine was granted the Type 1 license on October 31, 2021. *Id.* at 12. Among other requirements, as a cryptocurrency exchange licensed under the JFSA, Quoine was required to maintain asset segregation and perform a daily reconciliation of its assets under custody with customer obligations. *Id.*

15. The license provided enormous value to Quoine because less than six (6) crypto-related businesses in Japan have been granted a Type 1 license for offering services for crypto derivatives trading and **no** crypto-related Type 1 licenses have been issued since Quoine received its license.[2] *Id.* at 13.

16. For the full year ending in 2021, Liquid monthly revenue (from its subsidiaries Quoine (Japan) and Quoine Singapore)) averaged $2,400,000 per month. *Id.* at 15. The company also reached profitability in 2021 and strengthened its balance sheet with net assets of over $40,000,000 by June of 2021. *Id.*

17. The expectation that Quoine was going to receive a Type 1 license sparked interest from other cryptocurrency exchanges in part because these entities either were or risked being publicly sanctioned by the JFSA for providing cryptocurrency exchange services without registering with the JFSA. *Id.* at 17, 19. A collaboration between Liquid and these operators would allow them relatively fast and legally compliant access to these two key markets in which Liquid already had licensing in place, in particular in Japan. *Id.* In April of 2021, the company received indicative valuations from the investment banks Nomura and Deutsche Bank with valuations of Liquid ranging from $600,000,000 to $1,000,000,000. *Id.* at 18.

---

[2] Quoine Singapore operated under an exemption to the Singapore Payment Services Act for the exchange of digital payment tokens. While under the exemption, Quoine Singapore was regulated by the Monetary Authority in Singapore (MAS). *Id.* at 14.

18.     In August 2021, Quoine suffered a breach of some of its hot wallets, which was attributed to North Korean state actors. To repair this breach, Liquid borrowed $120,000,000 from FTX under a Loan Agreement which was executed on August 30, 2021. *Id.* at 20. On Sept 2, 2021, a nonbinding term sheet "MOU for acquisition of LGI" was executed to sell Liquid to FTX. *Id.* at 21. On October 12, 2021, an amendment to the MOU was executed. *Id.* Shareholders of Liquid agreed to sell their interests to FTX for a lower price due to the certainty and timing of a transaction with FTX. *Id.* Acquiring the shares of Liquid for its licenses and existing user base would allow FTX to grow its business in a compliant and sustainable manner. *Id.* at 22.

**B. The Liquid Transaction**

19.     On November 19, 2021, Melamed signed the Agreement for the Sale and Purchase of Shares, Stock Options, and Warrants in Liquid Group Inc. (Major Shareholders) as modified by that certain Side Letter Agreement of the same date (the "**November 19th Side Letter**"; collectively, the "**SPA**"). *Id.* at 23.[3]

20.     The November 19th Side Letter provides in relevant part that:

> The total amount of consideration to be paid by the Purchaser to Mr. Melamed (the "Consideration") shall be paid ratably on the Completion Date, the Second Completion Date and the Last Completion Date, **provided, that the total amount of Crypto Consideration of Mr. Melamed,** which shall be withheld in its entirety by the Purchaser as Retained Consideration in accordance with clause 4 of the Major Shareholders SPA, **shall be paid on the Completion Date**.

*Id.* (emphasis supplied).

21.     The SPA is governed by the laws of Japan. *Id*. at 25. Moreover, Section 19.2 of the SPA provides that any disputes are to be resolved by binding arbitration:

> *[a]ny dispute*, controversy or claim arising *in any way* out of or in connection with *this Agreement* (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore

---

[3] The SPA was amended on March 31, 2022. *Id.* at 24.

SWDocID ME1 47657999v.1

> International Arbitration Centre ("SIAC") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "Rules"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

*Id. (*emphasis supplied).

23. Closing conditions under the SPA were completed on April 4, 2022. On that date (the Completion Date), all of Melamed's shares and options in Liquid were transferred and registered to FTX. *Id.* at 26. In exchange, FTX agreed to pay Melamed $44,516,390.24, consisting of:

- 1,019,070 shares of FTX common stock valued for purposes of the SPA at $26,709,834.14 (the "**FTX Consideration Shares**");
- $8,903,278.05 in cash (the "**Cash Payment**"), and
- $8,903,278.05 worth of cryptocurrency (the "**Retained Consideration**").

*Id.*

23. The Retained Consideration (consisting of four different cryptocurrencies) was paid to Melamed on the Completion Date but held as security against his indemnification obligations under the SPA. *Id.* at 27. Section 2.4 of the SPA described the manner in which the Retained Consideration would be held by FTX:

> At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "Retained Cash Consideration") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

*Id.* at 28. Prior to the April 4, 2022 Completion Date, Melamed informed FTX on multiple occasions to hold the Retained Consideration in segregated wallets, not commingled with FTX assets. *Id.*

24. On the Completion Date, Liquid became FTX Japan Holdings, Quoine became FTX Japan and Quoine Singapore became FTX Singapore. *Id.* at 30. As a condition to the closing, Melamed was required to sign a Management Agreement which was thereafter amended on June 30, 2022, and on October 19, 2022 (as amended, the "**Management Agreement**") pursuant to which Melamed was appointed Representative Director (RD) and

7

Chief Operating Officer (COO) of FTX Japan. *Id*. The Management Agreement is governed by the "laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement." Management Agreement, ¶16. *Id.*

25. Under Japanese law, a Representative Director is a type of Director with the company's highest authority with the right to enter into business and sign legal contracts on behalf of the corporation in Japan. *Id.* at 31. As the highest-ranking executive, the Representative Director carries significant legal responsibilities and potential personal liability for the company's violations of law and financial injury to customers. *Id.*

26. After the Petition Date, Melamed continued in his role as Representative Director and COO of FTX Japan up until the sale of FTX Japan to BitFlyer Holdings on 26 July 2024. On July 30, 2024, Melamed was terminated without cause by the FTX Debtor as Representative Director of FTX Japan Holdings.

C. **Melamed's Claims**

27. Melamed filed six (6) Claims as follows: (a) Claim #3385 in the amount of not less than $35,613,112.19 against FTX Trading for damages in connection with the Liquid Transaction; (b) Claims 3353, 3956 and 4578 for $52,500.00 on account of unpaid directors' fees for September and October of 2022 against FTX Japan Holdings, FTX Japan and FTX Singapore (the "**Unpaid Services Claim**"); and (c) Claims 3244 and 4470 for $200,000 bonus payment against FTX Japan Holdings and FTX Japan (the "**Unpaid Bonus Claim**").

28. Claim 3385 is a claim for breach of contract and fraud against FTX Trading. As noted above, this claim is governed by the laws of Japan and subject to arbitration in Singapore. Melamed submits the Hori Declaration pursuant to Bankruptcy Rule 9017.[4] The

---

[4] Bankruptcy Rule 9017 incorporates Rule 44.1 of the Federal Rules of Civil Procedure and provides that: "[a]party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony,

8

Hori Declaration concludes that, under the laws of Japan, Melamed can assert both a breach of contract claim and a fraud claim under the laws of Japan. Hori Declaration, ¶8

29. As set forth in greater detail in the Melamed Declaration, FTX made numerous misrepresentations to Melamed in connection with the Liquid Transaction. Those misrepresentations included:

- False FTX audited, consolidated financial statements.
- FTX false representations of customer asset segregation.
- Concealment of extraordinary privileges given to Alameda Research.
- False 31 March 2021 FTX Trading Balance Sheet.
- Fraud in connection with FTX' B-1 Round of External Financing.

30. Each of these misrepresentations supports a cause of action under the laws of Japan for both breach of contract and fraud. *See* Hori Declaration, ¶24; Melamed Decl ¶ 39, ¶ 59

31. With respect to the Unpaid Services Claim, Melamed has attached an email string dated Nov 23, 2022, documenting the unpaid Directors fees owed to Melamed by FTX Singapore.

32. With respect to the Unpaid Bonus Claim, Melamed has attached to his declaration contemporaneous emails that reflect that Melamed was awarded his bonus on Sep 15, 2022, nearly two months before the Petition Date.

**Argument**

**A. Melamed's Claims should be adjudicated through Arbitration**

33. In the Objection, the Debtors fail to note that the SPA has an exceptionally broad arbitration provision that applies to:

---

whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."

> [a]ny dispute, controversy or claim arising in any way out of or in connection with this Agreement (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential. SPA, 19.2.P.37

34. Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes— but only those disputes — that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943,115 S. Ct. 1920, 131 L.Ed.2d 985 (1995). It is a "fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication." *DDK Hotels v. Williams Sonoma, Inc*, 6 F.4th 308, 318 (2d Cir. 2020) (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019).

35. In *In re Mintze*, 434 F.3d 222 (3d Cir. 2006), the Third Circuit reversed the bankruptcy court decision in where the bankruptcy court had exercised its discretion in denying a motion to compel arbitration. The Third Circuit stated:

> Before we can determine whether the Bankruptcy Court abused its discretion, we must determine whether the Bankruptcy Court had any discretion to exercise. *See Hays*, 885 F.2d at 1156 (refusing to address the abuse of discretion issue because the court "committed a more fundamental error in determining that it had discretion to exercise").

36. *Mintze* concludes that in order for the court to exercise its discretion, the *McMa*hon standard must first be satisfied:

> If a party opposing arbitration can demonstrate that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue," the FAA will not compel courts to enforce an otherwise applicable arbitration agreement. *McMahon*, 482 U.S. at 227, 107 S.Ct. 2332. To overcome enforcement of arbitration, a party must establish congressional intent to create an exception to the FAA's mandate with respect to the party's statutory claims. Congressional intent can be discerned in one of three ways: (1) the statute's text, (2) the statute's legislative history, or (3) "an inherent conflict between arbitration and the statute's underlying purposes."

*McMahon*, 482 U.S. at 227, 107 S.Ct. 2332 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 628, 632-37, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

37. *Mintze* concluded that the *McMahon* standard would be met in very limited circumstances:

> We find that the standard we articulated in *Hays* applies equally to core and non-core proceedings. *See Nat'l Gypsum*, 118 F.3d at 1067 ("[W]e believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceedings, i.e., whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether the arbitration proceeding would conflict with the purposes of the Code."). *See also Pardo v. Pacificare of Tex., Inc. (In re APF)*, 264 B.R. 344, 362 (Bankr.D.Del. 2001) (citing *Nat'l Gypsum*, 118 F.3d at 1067; *Selcke v. New England Ins. Co*., 995 F.2d 688, 691 (7th Cir. 1993)) (holding that in a core proceeding, the *McMahon* standard must be satisfied before the bankruptcy court has the discretion to deny arbitration). **Where an otherwise applicable arbitration clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement, unless the party opposing arbitration can establish congressional intent, under the *McMahon* standard, to preclude waiver of judicial remedies for the statutory rights at issue.**

*In re Mintze*, 434 F.3d at 231.

38. Recently, in *In re Yellow Corp.*, this court denied a motion to compel arbitration. *In re Yellow Corporation, et. al*., Case No. 23-11069 (CTG), D.I. 2765 at 1. In *Yellow*, the bankruptcy court found that *Hays* stands for the principle that "to defeat arbitration one would need to show a conflict between the Bankruptcy Code and arbitration," and the "Bankruptcy Code generally contemplates the centralization of disputes before a bankruptcy court is insufficient to defeat arbitration." *Id*. at 16–17 (citing *Hays*, 885 F.2d 1149).

39. In *Yellow*, the bankruptcy court noted that the decision in *Hays* was "carefully [to] determine whether any underlying purpose of the Bankruptcy Code would be adversely affected" by enforcing an arbitration clause." *Hays*, 885 F.2d at 1161. While no prior cases applied this principle in the claims allowance context, the bankruptcy court found the "closest case" is *Mintze*. *In re Yellow Corp*. D.I. 2765 at 18–19. The bankruptcy court noted that in *Mintze*, the Third Circuit held that, even though "the outcome of Mintze's rescission claim

11

would affect her bankruptcy plan and distribution of monies," *Mintze*, 434 F.3d at 227 that was an insufficient basis to decline to enforce an arbitration provision. *Yellow* at 19. Based on Mintze and subsequent cases, the bankruptcy court held that, given the "strong policy in favor of arbitration," one must find an "inherent conflict between arbitration and another federal statute's underlying purpose" to decline to enforce an arbitration clause. *Mintze*, 434 F.3d at 229 (citing *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220 (1985); and *Shearson/American Exp. v. McMahon*, 482 U.S. 220, 226 (1987)).

40. Nonetheless, the bankruptcy court declined to read *Mintze* to hold that the existence of a contractual or statutory arbitration provision required that such claim determination be arbitrated. *Yellow* at 21. In particular, the bankruptcy court found that the arbitration provision created a strong presumption in favor of granting stay relief to permit the claim to be liquidated through arbitration—one that nevertheless may still be overcome "in appropriate circumstances where the imperatives of the bankruptcy case … so require." *Id.* at 25, 27

41. Ultimately, the bankruptcy court concluded that "the unusual circumstances of this case" weighed heavily in favor of allowing the court to oversee the claims allowance, including that an arbitral process could potentially exclude other parties in interest from participating, that the dispute was one of the most important issues in the case, and that there was a risk of delay associated with arbitration. *Id.* at 28–29.

42. With respect to Melamed's Claims, there are no such "unusual circumstances". Melamed's Claims are insignificant in relation to the aggregate amount of claims in this case. As such, the presumption of liquidating the claim through arbitration is not overcome and Melamed's claims should be arbitrated pursuant to the SPA.

## II. IF THE COURT DECLINES TO COMPEL ARBITRATION, THE DEBTORS' OBJECTION SHOULD BE DISMISSED

43. Should the Court determine that Melamed's Claims should not be arbitrated, the Debtors' Objection should be denied.

### A. Section 510(b) does not subordinate Claim 3385

44. The Debtors' Objection asserts that Claim 3385 should be disallowed because it is an impermissible attempt to raise a subordinated equity claim as a non-Customer Claim. Alternatively, the Debtors assert that Claim 3385 should be reduced to reflect the dollar values of cryptocurrencies determined in the Estimation Order. Objection, ¶17.

45. Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from recission of a purchase and sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security …. shall be subordinate to all claims or interests that are senior to or equal the claim or interest represented by such security . . .

46. Initially, the Debtors repeatedly misconstrue the SPA and misleadingly characterize it as an agreement to purchase equity in FTX. Opposition at ¶24 ("Melamed's breach of contract claim arises from the sale of equity . . ."). It was not. The SPA was an agreement for **FTX** to purchase the **equity** of **Liquid.**

47. Secondly, in *In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002), the Third Circuit acknowledged that Section 510(b) does have its limits and does not automatically apply to all claims asserted by shareholders:

> in enacting S 510(b), Congress did not intend to subordinate every claim brought by a shareholder, regardless of the nature of the claim. We disagree with claimants, however, that the subordination of all claims brought by shareholders is a logical consequence of our holding that claims for the breach of a stock purchase agreement requiring the issuer to use its best efforts to register its stock must be subordinated pursuant to S 510(b). *Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying S 510(b)*, which was intended to prevent shareholders from recovering their equity investment in parity with general unsecured creditors.

13

*Id*. at 142 (emphasis supplied). *See Kit Digital, Inc. v. Invigor Grp. Ltd. (In re Kit Digital, Inc.)*, 497 B.R. 170 (Bankr. S.D.N.Y. 2013)(where Debtor acquired stock and other assets from creditor, bankruptcy court denied Section 510(b) subordination as to other components of claim); *In re Nationsrent, Inc*., 381 B.R. 83 (Bankr. D. Del. 2008)(make whole premium not subject to subordination under Section 510(b)).

48. Finally, the FTX Consideration Shares were at best incidental in connection with the transaction.

**B. Claim 3385 Asserts a Claim For Breach of Contract**

49. In the Objection, the Debtors assert that Claim 3385 fails to state a claim for breach of contract. Objection, ¶¶ 21-25. Claim 3385 plainly asserts s a breach of contract claim:

> Claimant was damaged as a proximate result of the following breaches and torts by FTX Trading Ltd., by its affiliated debtors in the Bankruptcy Proceeding, by said Sam Bankman-Fried, and by various other principals, officers and employees of FTX Trading Ltd. and/or of its affiliated debtors in the Bankruptcy Proceeding: (a) breach of contract, including the SPA; (b) multiple breaches of warranties and representations contained in the SPA and elsewhere; (c) failure to pay retained consideration as defined and promised in the SPA; (d) failure to indemnify Claimant for damages from breaches of contract and breaches of warranties and representations as provided in the SPA; and (e) fraud in the inducement of Claimant to sign the SPA and in the execution, performance and breach of the SPA.

Claim 3385, ¶4.

50. In addition, the Hori Declaration concludes that under Japanese Law, FTX breached the SPA when it withheld the payment of the Retained Consideration on April 4, 2022.

- Based on my review of the SPA and the facts as I understand them, the SPA as modified by the Side Letter does not provide FTX any right under Japanese law to refuse or withhold the payment of the entirety of the Retained Consideration from Melamed after the Completion Date on April 4, 2022, and in addition, there has been no timely Purchaser's Warranty Claim or other claim relating to the Indemnification Obligations was made by FTX as required by Clause 4 of the SPA.

14

- Given the Retained Consideration was not paid to Melamed on the Completion Date of April 4, 2022, and there were no claims by the Purchaser, under Japanese law, FTX was obligated to pay Melamed the entirety of the Retained Consideration as set forth in Item 4 of Schedule 2, page 37 of the SPA and Item 4 of Schedule 1 of the Side Letter, without discount, deduction, or other withholding. *By failing to pay the entirety of the Retained Consideration on April 4, 2022, FTX was in breach of contract.*

Hori Declaration, ¶14-15 (emphasis supplied).

51.     The Debtors incorrectly assert that damages on account of the Retained Consideration would be limited to the value of the cryptocurrency in the Retained Consideration as determined by the Digital Estimation Motion.  Objection, ¶25.  The Hori Declaration concludes that FTX breached the SPA on April 4, 2022. Hori Decl. ¶14,15.  As a result, damages would be determined on that date -- not the Petition Date.  Hori Decl ¶26.  As a result, the Digital Estimation Order is not applicable in determining the amount of damages.

### C. Claim 3385 Adequately Pleads A Claim For Fraudulent Inducement

52.     The Debtors Object to Claim 3385 on the basis that Delaware law requires distinguishing fraud claims from breach of contract claims and on the pleading standard required under Rule 9(b).  But the SPA is governed by Japanese law, not Delaware law.

- In my experience, parties in Japan may plead claims based on multiple legal theories, and when two or more claims with different legal theories are pleaded with identical evidence, the court or an arbitration panel applying Japanese law will decide whether there is sufficient evidence to support one or more of the claims.

- Under Japanese law, a plaintiff is not barred from pleading multiple legal theories in separate claims to pursue relief based on the same set of facts to the extent the elements of each claim are satisfied, whether or not the damages sought by the various claims are identical. If Melamed pleaded and proved both fraud and breach of contract, a Japanese court or an arbitration panel applying Japanese law would grant Melamed damages according to the proof of each theory Melamed submitted to the court or arbitration panel. If proven, a Japanese court or an arbitration panel applying Japanese law would permit only a single recovery where identical damages under different legal theories or claims are pleaded.

- Under the Japanese Civil Code, Melamed would be entitled to plead claims for fraud (including fraudulent inducement) in connection with his sale of his shares in Liquid under Article 709 (damages in tort) and Article 96 (providing a separately actionable

15

remedy for fraud) as well as for breach of contract under Article 415 (compensation for nonperformance of an obligation).

Hori Declaration, ¶¶22-24.

### D. Claim 3385 does not seek multiple recoveries

53. The Debtors also object to Claim 3385 on the basis that it asserts both a claim for damages and a claim for the Retained Consideration to be returned in kind. Objection, ¶31. The Debtors seek to disallow that portion of the claim that seeks the return of the Retained Consideration on the basis that it could result in double damages and Melamed is only entitled to a single satisfaction. *Id.*

54. In making this argument, the Debtors conflate the assertion of alternative claims against recovery. Under Japanese law, alternative pleading is permitted but the plaintiff is only entitled to a single recovery.:

- parties in Japan may plead claims based on multiple legal theories, and when two or more claims with different legal theories are pleaded with identical evidence, the court or an arbitration panel applying Japanese law will decide whether there is sufficient evidence to support one or more of the claims.

- Under Japanese law, a plaintiff is not barred from pleading multiple legal theories in separate claims to pursue relief based on the same set of facts to the extent the elements of each claim are satisfied, whether or not the damages sought by the various claims are identical. If Melamed pleaded and proved both fraud and breach of contract, a Japanese court or an arbitration panel applying Japanese law would grant Melamed damages according to the proof of each theory Melamed submitted to the court or arbitration panel. If proven, a Japanese court or an arbitration panel applying Japanese law would permit only a single recovery where identical damages under different legal theories or claims are pleaded.

Hiro Declaration, ¶¶22-23. Accordingly, Melamed is not precluded from pleading alternative claims.

### III. THE UNPAID SALARY CLAIMS AND BONUS CLAIMS SHOULD BE ALLOWED

55. The Debtors Object to the Unpaid Salary Claims and Bonus Claims and seek their disallowance on the basis that: (i) they lack evidentiary support; (ii) they are not

16

permitted under the Management Agreement; and (iii) because Melamed is an insider, his claim is limited to the reasonable value of his services.

56. Initially, it should be noted that because the chapter 11 case of FTX Japan has been dismissed and the Objection of FTX Japan is now moot. As per the Management Agreement, Melamed served as Representative Director of FTX Japan until July 26, 2024, when he resigned concurrently with the sale of FTX Japan's sale to Bitflyer Holdings.

57. Melamed was terminated without cause as Representative Director of FTX Japan Holdings on 30 July 2024.

58. Melamed seeks payment, with interest, of September and October 2022 Director's fees of $26,250/month due from FTX Singapore, as required by ¶4.2(b) of the October 19, 2022, Management Agreement. Melamed was appointed as a Director of FTX Singapore on 26 August 2022. These sums were due to Melamed prior to the Petition Date.

59. The Objection states that "Claim 3353 should be disallowed and expunged because FTX Singapore is not a party to the Management Agreement." Objection, ¶36 This argument conveniently ignores that FTX Japan Holdings is a party to the Management Agreement, and FTX Japan Holdings is a 100% shareholder of FTX Singapore. As the sole shareholder of FTX Singapore, FTX Japan Holdings is able to and must cause FTX Singapore to make payments of Melamed's $26,250/month Director's fees, as required by ¶4.2(b) of the Management Agreement.

    a. The Objection states that Melamed's Unpaid Compensation and Bonus Claims should be disallowed on the basis that Melamed is a "quintessential insider." Objection, ¶38. Melamed takes issue with being characterized as a "quintessential insider" of FTX which intimates that he was involved in the FTX scandal. Melamed had no knowledge of actions taken by FTX executives that precipitated

SWDocIDME1 47657999v.1

>FTX's decision to file its Chapter 11 petition and Melamed's roles, responsibilities and compensation were at FTX Japan, FTX Japan Holdings and FTX Singapore, not at FTX Trading.

60. To the extent that Melamed is required to demonstrate the reasonable value of his services, Melamed welcomes that invitation. In determining the "reasonable value of Melamed's services", Melamed notes that customers of FTX Japan received 100% of their crypto back in kind, rather than a fraction of their coins dollarized as of the Petition Date. Melamed Decl, ¶76.

61. In addition, FTX Japan resumed withdrawal service for customers of FTX Japan on February 21, 2023, roughly 102 days after the petition filing, FTX Japan. This was accomplished thanks to the efforts of the FTX Japan team who regularly worked 6 days a week to restore the withdrawal service and by virtue of the fact that FTX Japan never commingled its customer assets. As of July 2024, approximately 13,000 customers of FTX Japan had been able to withdraw their funds from FTX Japan. The total dollar value of funds (crypto and *fiat*) withdrawn by customers reached approximately $200,000,000. As a result of resuming customer withdrawals, FTX Japan was able to keep both its PSA license for spot trading and Type 1 license for crypto derivatives trading in good standing thus facilitating a sale to a disinterested third party. FTX Japan properly segregated client assets and has subsequently been dismissed from the Chapter 11 proceedings via a sale. See D.I. 17923. Melamed Decl ¶76;

62. Melamed filed Claims 3244 (FTX Japan Holdings) and 4470 (FTX Japan) for the Bonus Payment. In their objection, the Debtors state that "Melamed alleges, without substantiation, that on or around October 3, 2022, either FTX Japan Holdings or FTX Japan agreed to pay Melamed a $200,000 bonus payment (the "**Bonus Payment**")."

63. Had the Debtors reviewed their records (which presumably was done when the schedules were prepared) they would have discovered an email dated September 15, 2022 (nearly two months prior to the Petition Date) from Jen Chan, Chief of Staff of FTX Trading Ltd. to Nakajima and Mori of Mirai (the payroll agent for FTX Japan) which states:

> Thu, Sep 15, 2022 at 5:58 PM Jen Chan <jen@ftx.com> wrote:
>
> My name is Jen Chan and I am the Chief of Staff for FTX, I understand from Seth that you are our payroll agent. We would need your kind help to distribute bonuses to the below employees of FTX JP. The amount below are the gross amounts in USD…. Seth Melamed 200,000

64. Debtors were also notified by the FTX Japan HR representative via email in December 2022 and January 2023 of the unpaid bonus awarded 15 September 2022 due to Melamed.

## **RESERVATION OF RIGHTS**

Melamed reserves all rights to supplement this Opposition.

**CONCLUSION**

For the reasons stated herein, Melamed respectfully requests that the Court deny the Objection and provide such other relief as is just and proper.

                Respectfully submitted,

Dated: August 16, 2024
       Wilmington, Delaware

**McCARTER & ENGLISH, LLP**

/s/ *Shannon D. Humiston*
Shannon D. Humiston (No. 5740)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE I 9801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
shumiston@mccarter.com

-    and  -

David Adler, Esq. (admitted *pro hac vice*)
250 West 55th Street, 13th Floor
New York, NY 10019
Telephone: (212) 609-6847
Facsimile:    (212) 609-6921
dadler@mccarter.com
*Counsel to Seth Melamed*