## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 12, 2024 at 1:00 p.m ET** |

### DECLARATION OF SETH MELAMED IN SUPPORT OF OPPOSITION TO DEBTORS' OBJECTION TO PROOFS OF CLAIM [D.I. 20051, 20052]

Seth Melamed, being duly sworn, hereby declares as follows:

1.      I submit this declaration (the "**Declaration**") in opposition to the Debtors'[2] Objection to my Proofs of Claim (the "**Objection**").

2.      The Objection seeks to: "(i) disallow and expunge Claim 3385 in its entirety, or in the alternative reduce Claim 3385 to reflect the dollar value of cryptocurrencies determined in this Court's Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets [D.I. 7090] (the "**Estimation Order**") and subordinate Claim 3385 as an equity claim under section 510(b) of the Bankruptcy Code; and (ii) disallow and expunge Claims 3244, 3353, 3956, 4470, and 4578 in their entirety, or in the alternative reduce the five Claims to reflect the reasonable value of services provided by Melamed." Motion, pp 1-2.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (collectively, the "Debtors"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX
[2] The Objection identifies FTX Trading, Ltd ("**FTX**")., FTX Japan Holdings K.K ("**FTX Japan Holding**s")., FTX Japan K.K ("**FTX Japan**"). and Quoine Pte Ltd. ("**FTX Singapore**") as the moving Debtors.

3.      Except as otherwise indicated herein, all of the facts set forth in this

Declaration are based upon my personal knowledge and my review of relevant documents. If

called upon to testify, I could and would testify to the facts set forth herein on that basis.

4.      I have filed six (6) proofs of claim (the "**Claims**") in this case as follows:[3]

| Claim Number | Claim Amount | Debtor | Nature of Claim |
|---|---|---|---|
| Claim 3385 | $35,613,112.19 | FTX Trading | Sale of Liquid Shares to FTX |
| Claim 3353 Claim 3956 Claim 4578 | $52,500.00 | FTX Singapore FTX Japan FTX Japan Holdings | Services fee from September and October of 2022 |
| Claim 3244 Claim 4470 | $200,000 | FTX Japan Holdings FTX Japan | Bonus Payment |

5.      Attached hereto are true and correct copies of the following documents:

| | |
|---|---|
| Exhibit 1 | Nomura Valuation as of April 3, 2021 |
| Exhibit 2 | Deutsche Bank Valuation as of March 24, 2021 |
| Exhibit 3 | MOU for Acquisition of Liquid dated September 2, 2021 |
| Exhibit 4 | MOU for Acquisition of Liquid Part II dated as of October 12, 2021 |
| Exhibit 5 | Confidential - FTX Presentation December 6, 2021 |
| Exhibit 6 | Management Agreement (Mr. Melamed) Part I dated as of March 31, 2022 |
| Exhibit 7 | First Amendment to the Management Agreement dated as of June 30, 2022 |
| Exhibit 8 | Amended and Restated Management Agreement dated October 13, 2022 |
| Exhibit 9 | Side Letter Agreement 31 Mar 2022 |
| Exhibit 10 | Side Letter Agreement 19 Nov 2021 |
| Exhibit 11 | FTX Trading Ltd. Balance Sheet as of March 31, 2021 |
| Exhibit 12 | Email string dated August 30, 2021 re: FTX  Liquid - Term Sheet |
| Exhibit 13 | FTX B1 Round Terms |
| Exhibit 14 | Major Shareholders Stock Purchase Agreement |
| Exhibit 15 | First Amendment to Major Shareholders Stock Purchase Agreement |
| Exhibit 16 | FTX Trading Ltd. Financial Statement December 31, 2020 and 2019 |
| Exhibit 17 | Quoine Business Profile as of May 16, 2024 |
| Exhibit 18 | email  re  Liquid - Payroll for Nov'22 |
| Exhibit 19 | Sep 15 2022 email re FTX Japan Bonus |
| Exhibit 20 | Jan 5 2023 Email string re Payment which Seth has not received yet |
| Exhibit 21 | Omitted |
| Exhibit 22 | Corporate Structure chart |

---

[3] In addition to the Claims, I am owed $940,000 as a result of being terminated with out cause.

| Exhibit 23 | Omitted |
| Exhibit 24 | FTX Singapore payroll |
| Exhibit 25 | July 26, 2024 Letter of resignation from FTX Japan |
| Exhibit 26 | July 30, 2024 Letter Terminating Employment FTX Holdings |
| Exhibit 27 | FTX Presentation December 6 2021 |
| Exhibit 28 | Customer funds used to purchase shares from Binance |

## PERSONAL BACKGROUND

6.      I graduated from UC Davis in 1996 with a BA in international relations and a minor in Japanese. .I speak, read and write Japanese. Japanese.  In 2006, I started working at Goldman Sachs ("**Goldman Sachs**") in Tokyo, Japan. While at Goldman Sachs, I worked in various departments including Derivatives, Prime Brokerage, Foreign Exchange, Treasury, and Equity Derivatives operations. I was promoted to Senior Vice President in the Operations division in 2012. My area of focus at Goldman Sachs included cash management, reconciliations, payment controls, treasury management, and financial reporting.

7.      I was employed at Goldman Sachs for 11 years (from 2006 to 2017) working in the Tokyo, New York, Moscow, and Salt Lake City offices during this period.  My interest in cryptocurrency began in 2014 when I first experimented with acquiring Bitcoin and sending it to a friend.  I subsequently attended Bitcoin conferences where I deepened my understanding of the underlying blockchain technology.  While at Goldman Sachs in 2015, I wrote a presentation comparing Bitcoin, gold, and fiat and circulated it to colleagues and certain Managing Directors. In 2016 I completed an online course on cryptography.  I was invited to join Quoine Corporation ("**Quoine**") as Head of Operations in Tokyo in September 2017 and decided to focus my professional life on developing a cryptocurrency exchange business.  I was later promoted to Chief Operating Officer of Liquid in November 2019.

## BACKGROUND ON LIQUID

8.      Liquid Group, Inc. ("**Liquid**" or "**LGI**") was a holding company that owned (among other non-operating entities) two successful cryptocurrency exchange operating

3

entities with difficult-to-obtain licenses: Quoine and Quoine Pte. Ltd. in Singapore ("**Quoine Singapore**").   I started acquiring shares in Liquid on October 1, 2019 when I purchased 2,430 shares.  I purchased an additional 1,350 shares of Liquid on December 31,  2020 and finally another purchase of 6,366 shares on February 8, 2021.

9.      Dating back to its founding in 2014,  Quoine provided various cryptocurrency exchange services, including crypto derivatives trading, to Japanese residents.  Starting from 2018 shortly after I joined, Quoine operated with a strict process for segregating customer funds for both *fiat* and cryptocurrencies. This asset segregation process was audited both internally and by external auditors, under detailed written procedures for daily monitoring. As COO of  Quoine, it was my responsibility to ensure that customers' *fiat* assets were stored in a Trust company account and each customer's crypto assets were stored in segregated, cold wallets.  In Japan, cold wallets are defined as wallets where the Private Key that controls the wallet address is never connected to the internet. I supervised a daily reconciliation process to ensure the asset balances held at the Trust account and cold wallets were either equal to or exceeded the aggregated customer balances.[4]

10.      Shortly after I began my employment at Quoine, the company received a license for the exchange of cryptocurrencies under the Japanese Payment Services Act ("**PSA**").   The PSA license was an important step for the company to serve Japan residents in a legal, compliant manner.  The PSA license also facilitated the company's work with local banks in Japan to handle customer fiat deposits and withdrawals.

11.      In 2020, Quoine applied to Japan Financial Services Agency ("**JFSA**") for  a Type 1 Financial Instruments Business License.  This license is required for a business that engages in the trading in capital-market products, including securities, stocks, bonds, and

---

[4] Post-acquisition of LGI by FTX, the asset segregation process at FTX Japan KK (previously Quoine) continued largely unchanged in both procedure and personnel.

4

derivatives. The JFSA regulates this Type I license under the Financial Instruments and Exchange Act. The license was important to the company in order to continue to offer a crypto exchange platform for Customers who wanted to trade in crypto derivatives. Historically crypto derivatives made up a majority of the revenue and trade volumes for the company.

12.     After nearly two years of effort by myself and others, Quoine was granted the Type 1 license on October 31, 2021. Among other requirements, as a cryptocurrency exchange licensed under the JFSA, Quoine was required to maintain asset segregation and perform a daily reconciliation of its own assets with customer obligations.

13.     The value of this license can not be overstated. Less than six (6) crypto-related businesses in Japan have been granted a Type 1 license for offering services for crypto derivatives trading and **no** crypto-related Type 1 licenses have been issued since Quoine received its license. In the 2018-2021 time frame, the JFSA began imposing sanctions on non-licensed entities offering exchange services to Japanese residents. Binance had received two such sanctions in 2018 and 2021.[5] I and others in the company were working on obtaining the Type 1 license throughout 2020 and 2021. By the spring of 2021, we had certain indications the Type 1 license process was on track for approval by late summer or early fall of 2021.

14.     Quoine Singapore operated under an exemption to the Singapore Payment Services Act for the exchange of digital payment tokens. While under the exemption, Quoine Singapore was regulated by the Monetary Authority in Singapore (MAS).

15.     For the full year ending in 2021, Liquid monthly revenue (from its subsidiaries Quoine (Japan) and Quine Singapore) averaged $2,400,000 per month. Liquid also reached

---

[5] See "Japan's Financial Services Regulator Issues Binance Warning" available at
https://www.coindesk.com/markets/2021/06/25/japans-financial-services-regulator-issues-binance-warning/

profitability in 2021 while growing its active users and reducing its operating expenses compared to 2020. The balance sheet of Liquid strengthened with net assets over $40,000,000 by June of 2021.

16.     In summary, the businesses operated by Liquid were extremely valuable because they were profitable and had the necessary licenses that allowed them to operate cryptocurrency exchange businesses in two important regions in Asia.

## SUITORS; OVERTURES TO ACQUIRE LIQUID

17.     Beginning in the spring of 2021 and extending into the summer, I had discussions with several well-known derivative cryptocurrency exchanges and investment funds about potentially investing in Liquid.   The exchanges I met with included BitMex, Deribit, and FTX.   The catalyst for their interest was the growing indications that FTX Japan was going to receive the Type 1 license authorizing crypto derivatives trading services.  The Type 1 license presented opportunities for non-licensed entities offering these services in the Japanese market to become compliant with JFSA regulations.  A collaboration between Liquid and these operators would allow them relatively fast and legally compliant access to these two key markets in which Liquid already had licensing in place, in particular in Japan with the Type 1 license for crypto derivatives.

18.     In early 2021, Liquid began engaging with investors and investment banks in raising capital.  Different options were considered including public listing and SPAC transactions.  By April of 2021, the company received indicative valuations from the investment banks Nomura (Exhibit 1) and Deutsche Bank (Exhibit 2) with valuations of Liquid ranging from $600,000,000 to $1,000,000,000.  In 2021 crypto markets saw increased interest including a rise in market value of crypto assets.  Along with this there was a rise in investor interest in the companies in the industry.  In April of 2021, Coinbase went public

with a valuation of $86,000,0000,000. In general, there was a considerable amount of capital raising being done by crypto currency exchanges.

19.     By September 2021, several cryptocurrency exchanges, including rivals to FTX such as Binance and ByBit, were publicly sanctioned by the JFSA for providing crypto currency exchange services without registering with the JFSA. I was told by FTX executives Sam Bankman Fried and Can Sun that the Japanese market was one of FTX's top markets globally for trade revenues and volumes.  I learned from FTX Executives that in  the month of October 2021, FTX derived over $2,000,000 in revenue from Japanese users of the FTX exchange despite FTX not being registered with the JFSA.  This was 6 times higher than in the year earlier period.

20.     In August 2021, Quoine suffered a breach of some of its hot wallets, which the US FBI later, upon investigation, attributed to North Korean state actors.  To repair this breach, Liquid borrowed $120,000,000 from FTX under a Loan Agreement (LA) which was executed on August 30, 2021.

### FTX'S ACQUISITION OF LIQUID

21.     On Sept 2, 2021, a nonbinding term sheet "MOU for acquisition of LGI" (Exhibit 3) was executed to sell Liquid to FTX.  On October 12, 2021, an amendment to the MOU was executed (Exhibit 4).  Shareholders of Liquid agreed to sell their interests to FTX for a lower price due to the certainty and timing of a transaction with FTX.  At that point in time FTX had a stellar reputation and appeared to have sufficient resources to make the deal happen in a short period of time.  Going public or pursuing a SPAC was seen as taking longer which was less attractive for the Venture Capital investors such as JAFCo which were approaching their mandated time of 5 years to exit from their investment in Liquid.   For myself, I saw FTX as a fast growing, innovative business that according to its public facing representations had a company focus on compliance to protect customers.  FTX's assurances

7

of its compliance and innovation were important factors for me in thinking of FTX as a place aligned with my own values where I could continue to develop my career.  After Quoine had been issued its JFSA Type 1 license on October 31, 2021, negotiations over the details of an FTX acquisition of Liquid commenced.  The values of Liquid stock are reflected on pages 36-37 of the SPA (hereinafter defined), which valued all the shares of Liquid at $200,000,000[6]

    22.    Acquiring shares of Liquid for its licenses and existing user base was necessary to allow FTX to continue to grow its business in a compliant and sustainable manner. FTX's acquisition of  Liquid shares to obtain the Type 1 license was a prelude to obtaining licenses in other regulated, regional markets around the world.  FTX used its acquisition of licenses including those of FTX Japan as a key point in its materials provided to equity investors during the Series C funding round which was completed in January 2022. (Exhibit 27).  This Series C funding presentation was made to prospective investors in December 2021, in which  FTX prominently featured its pending acquisition of FTX Japan with its focus on compliance and regulation.  In January 2022, FTX was able to raise additional capital by selling FTX common shares to investors in a Series C funding round valuing the company at $32,000,000,000.  This valuation was significantly higher than the B-1 funding only a few months earlier in late 2021, which had valued FTX  at $17,900,000,000. (Exhibit 13).

    23.    On November 19, 2021, I signed the Agreement for the Sale and Purchase of Shares, Stock Options, and Warrants in Liquid Group Inc. (Major Shareholders) (Exhibit 14) as modified by that certain Side Letter Agreement between myself and FTX of the same date

---

[6] It should be noted that $147,203,152 of the $200 million paid to the shareholders of Liquid, consisted of cash and cryptocurrency, representing ~74% of the value of the Liquid securities sold to FTX.   The FTX "consideration shares" were incidental to the overall transaction because they represented 26% of the $200,000,000 total value of Liquid shares sold to FTX.

(the "**November 19th Side Letter**"; collectively, the **"SPA"**) (Exhibit 10).  The November 19th Side Letter provides in relevant part that:

> The total amount of consideration to be paid by the Purchaser to Mr. Melamed (the "Consideration") shall be paid ratably on the Completion Date, the Second Completion Date and the Last Completion Date, provided, that the total amount of Crypto Consideration of Mr. Melamed, which shall be withheld in its entirety by the Purchaser as Retained Consideration in accordance with clause 4 of the Major Shareholders SPA, shall be paid on the Completion Date.

24.     Through the SPA, I conveyed 12,203 common shares and 510 stock options of Liquid to FTX.

25.     The SPA was executed under Japanese law with any disputes to be resolved by binding arbitration, administered by the Singapore International Arbitration Centre (SIAC) 19.2, SPA.  Section 19.1 of the SPA provides that: "[t]his Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan."

26.     The "Completion" or closing date of the SPA was subject to certain closing conditions on both the Purchaser (FTX) and Seller (Liquid).  Closing conditions were completed on April 4, 2022, which became the "Completion" date.  On the April 4, 2022, Completion date, all of my Liquid shares and options were transferred and registered to FTX. In exchange, FTX agreed to pay me consideration worth a total of $44,516,390.24, consisting of:

- 1,019,070 shares of FTX common stock valued for purposes of the SPA at $26,709,834.14 (the "**FTX Consideration Shares**");
- $8,903,278.05 in cash (the "**Cash Payment**"), and
- $8,903,278.05 worth of cryptocurrency (the "**Retained Consideration**").

27.     The Retained Consideration consisted of four types of cryptocurrencies, in kind: 39.132 BTC, 560.48 ETH, 11,844.98 SOL, and 47,532 FTT.  SPA, Schedule 2, item 4 at p. 37. The Retained Consideration was to be transferred to me on the April 4, 2022,

Completion Date. The Retained Consideration was paid to me but was to be held as security against my share of any indemnification obligations under the SPA.

28.    Section 2.4 of the SPA described the manner in which the Retained Consideration would be held by FTX:

> At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "Retained Cash Consideration") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

29.    Prior to the April 4, 2022 Completion Date, I requested FTX on numerous occasions to hold the Retained Consideration in segregated wallets.  Sam Bankman-Fried and other FTX management Can Sun and Nishad Singh executives repeatedly and falsely assured me that my Retained Consideration would be segregated from FTX's own assets, breaching FTX's warranties found in 7.2, SPA.

30.    As a condition of FTX's acquisition of the Liquid Shares, I was required to sign a Management Agreement (Exhibit 6) which was amended on 30 June 2022 (Exhibit 7 ) and then again on 19 October 2022 (Exhibit 8)  (as amended, the "**Management Agreement**")  under which I was appointed Representative Director (RD) and Chief Operating Officer (COO) of FTX Japan KK, the operating subsidiary of the Liquid holding company,  renamed FTX Japan Holdings KK (Holdings). The Management Agreement specified my roles and responsibilities as COO, which included wallet management, new product development,  integration of existing products into the FTX ecosystem, and business development. I was required to sign a second Side Letter Agreement dated 31 March 2022. (Exhibit 9) which is governed by the laws of Japan and requires arbitration of any disputes under SIAC. The Management Agreement is governed by the "laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement." Para.16.

10

31.     Under Japanese law, my understanding is a Representative Director is a type of Director with the company's highest authority with the right to enter into business and sign legal contracts on behalf of the corporation in Japan. As the highest-ranking executive, the Representative Director carries significant legal responsibilities and potential personal liability for the company's violations of law and financial injury to customers.

32. As per the Management Agreement, I served as COO and Representative Director of FTX Japan until July 26, 2024, when I resigned concurrently with the sale of FTX Japan to Bitflyer Holdings. (Exhibit 25). Following this sale, the chapter 11 case of FTX Japan was dismissed, [D.I. 20560].

33.     On July 30, 2024, I was terminated without cause by the Debtor as Representative Director of FTX Holdings (Exhibit 26).

**I.**
**CLAIM FROM FTX'S ACQUISITION OF**
**LIQUID SHARES (CLAIM #3385)**

34.     At the outset, it should be noted that Claim #3385 is for damages that I have incurred on account of my sale of shares in Liquid to FTX.

35. In connection with my Opposition to the Objection, we are filing the Declaration of Takane Hori of the law firm Mori, Hamada, and Matsumoto based in Tokyo, Japan to explain basic principles of Japanese law that would be applicable in connection with the Liquid sale to FTX  as expressed in the SPA. The Declaration of Takane Hori is being filed concurrently herewith.

36.     As previously noted the SPA is governed by Japanese law.  In addition, the target company (Liquid) being acquired was domiciled in Japan. I was resident in Japan at the time FTX acquired Liquid, of which I then owned  ~22% of the shares.  Pursuant to the SPA, any disputes or claims around the acquisition of Liquid are to be resolved by binding

arbitration administered by the Singapore International Arbitration Centre ("SIAC").  SPA, 19.2.

37. Under Japanese law, per the SPA, the Retained Consideration I received for selling my shares in Liquid to FTX was required to be paid to me and became my property on the April 4, 2022, completion date of the SPA. Hori Decl.¶14,15. (Filed concurrently herewith). Pursuant to 2.4 of the SPA, the Retained Consideration was to be held,  "in a manner to be agreed in good faith by the Purchaser and the Management Shareholders."  Although the Retained Consideration was paid to me on the completion date, FTX held it as security for any Indemnification Obligation.

38.    Over 2 years have passed since the April 4, 2022, completion date but no warranty claim was made by the Purchaser (FTX).

39.    As set forth below, FTX made a multitude of misrepresentations to me to induce me to sell my entire interest in Liquid, a successful cryptocurrency exchange with relevant JFSA licenses, a large and growing user base, and profitable operations in the full year before FTX s acquisition of Liquid was completed on April 4, 2022.  The misrepresentations included, among other things, (i) false and misleading audited financial statements,  (ii) misstatements as to how FTX was operated, (iii) fabricated public-facing warranties on FTX's risk management controls, and (iv) false statements concerning  FTX's relationship with related entities. These misrepresentations breached the Purchaser, FTX's warranties spelled out in 7.2 SPA because FTX warranted the statements it made to me were "true, accurate and not misleading at the date of this agreement." SPA 7.2.

40.    In my experience at Goldman Sachs and FTX Japan KK, asset segregation had an important role in protecting customers from the risk of insolvency by the exchange or broker. A crucial step in protecting customers is segregating the customer assets in their

accounts from the assets of the operating entity by storing customers' assets in the hands of legally independent custodians and/or in segregated wallets or accounts.

41.     My knowledge of the importance of customer asset segregation, in both crypto and conventional finance, combined with FTX s published claims that FTX protected and segregated customer assets, gave me confidence FTX was not only a fast-growing but a well-governed exchange with appropriate levels of control over customer assets, to protect its customers both outside and inside the regime of bankruptcy that it is now enduring.

42.     FTX's published its Key Principles on December 3, 2021, prior to the April 4, 2022 completion date, which assured me that FTX would segregate my own Retained Consideration from FTX's assets as conscientiously as FTX segregated customers' crypto assets.

**A. False FTX audited, consolidated financial statements**

43.     Prior to execution of  the SPA, FTX management and Sam Bankman Fried provided Liquid's management audited, consolidated financial statements of FTX and its subsidiaries from Prager Metis CPAs, LLC Hackensack, NJ, (the "**Prager Audited Financials**").  On or about September 3, 2021, Sam Bankman Fried, CEO of FTX, provided to Liquid management  the  consolidated balance sheets of FTX for December 31, 2019 and 2020, related consolidated statements of operations, shareholders' equity, and cash flows for the period April 2, 2019 to December 31, 2019, and year ended December 31, 2020, and the related notes to the financial statements.  (Exhibit 16).  These documents were deposited in a Virtual Data Room [VDR] to which Liquid's executives were given access in September 2021 via an email sent by Can Sun, the then Chief Legal Officer of FTX, on September 17, 2021.

44.     These financial statements were incomplete and false in material respects when I received them. In particular, The Prager audited, financial statements did not disclose

shortfalls of customer balances.   As stated in the Second Interim Report of John J. Ray III To

The Independent Directors [D.I. 1704-1] (the "**Second Interim Report**"):[7]

> At times, the FTX Senior Executives, with Caroline Ellison and certain other
> employees, estimated their growing liabilities in internal communications. By August
> 2022, the FTX Senior Executives and Ellison privately estimated that the FTX.com
> exchange owed customers over $8 billion in fiat currency that it did not have.

Second Interim Report at 18.

45.     No FTX employee or representative disclosed this shortfall in public or in

direct communications to me or other Liquid shareholders during the exchange of due

diligence information between September and November of 2021, thereby breaching its

warranties. 7.2 SPA

46.     FTX's audited financial statements were intended to"fairly present in all

material respects the financial condition and operating results of" FTX, but do not include

information about Alameda's undocumented "line of credit" from FTX and other information

discussed herein.  I read and analyzed the materially misleading Prager Audited Financials in

the VDR, which evidenced  FTX was a sound financial entity, on which I relied, before I sold

my LGI stock and warrants to FTX on November 19, 2021. Nothing in FTX's consolidated

financial statements revealed the fraudulent and criminal activity of FTX's management later

exposed in criminal trials and plea agreements.  The criminal dockets of  Nishad Singh and

Gary Wang are available []

**FTX false representations of  customer asset segregation**

47.     During the due diligence process conducted before Liquid was sold to  FTX,  I

explained FTX Japan's adherence to the regulations which required daily reconciliation and

customer asset segregation.    FTX executives Sam Bankman-Fried and Can Sun assured me

that FTX also maintained sound risk management and daily customer reconciliations as part

---

[7] The Second Interim Report is available at https://restructuring.ra.kroll.com/FTX/Home-Download
PDF?id1=MTUzNzc0OA==&id2=-1

of its operating framework.  In its "Key Principles"[8] published on the FTX website on

December 3, 2021, FTX expounded on its innovations to reduce risk and ensure that

customer accounts did not go negative:

- "Second, FTX and other crypto platforms have brought important innovations to trading, and a sound framework should preserve these innovations.  This is because they minimize risk, promote capital efficiency, and protect investors, all of which better serve the public. Some of the key innovations include: automated risk-management systems that ensure customer accounts trading multiple different assets do not go net negative across customer positions; 24/7 trading hours, which also reduces risk; permissioning a non-intermediated market structure that gives all investors the same equal access to the market and helps minimize conflicts of interest; and free-market data that aligns the platform operator's interest with the investor's."

48.    The Key Principles went on to state:

- FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms . . . .

49.    FTX's Key Principles, made public in December 2021, were a confirmation of

what I had already been told by FTX executives about how customer protections were

implemented at FTX.  The misleading, inaccurate representations of Sam Bankman Fried and

Can Sun  that customer asset segregation was institutionalized and that no commingling of

customer assets was permitted at FTX occurred between August 31, 2021 and November

2021, which predated the sale of Liquid to FTX.  FTX warranties about risk management,

customer protections, and segregation of customers' funds indicated to me an alignment at

FTX with how I had operated FTX Japan.  This illustrates the pervasive breach of warranties

that existed during the due diligence process culminating in the sale of LGI to FTX

**B.  False assurances of exchange "insurance funds"**

---

8

https://www.prnewswire.com/news-releases/ftx-issues-key-principles-for-market-regulation-of-crypto-trading-platforms-301437175.html

ME1 47657999v.1ME1 47657999v.1

50.     An "insurance fund" at a derivatives exchange like FTX is a reserve of capital used to cover losses when traders' positions are liquidated and their losses exceed their initial margin. Such a fund ensures that an exchange remains solvent so that market participants are compensated for losses even in highly volatile market conditions.

51.     The claims made by FTX about insurance funds in their Key Principles, which I relied upon, were also materially false.  As per the FTX report dated June 26, 2023 Page 17 paragraph D: "Falsity of Claim to Reconcile Trading Balances:"

> The FTX Group lied in its Key Principles that it 'regularly reconcile[d] customers' trading balances against funds held by the exchanges. In fact, Debtors identify no evidence that the FTX Group performed any meaningful reconciliation prior to making this claim on its website and in materials provided to Congress, federal agencies, and other third parties.

52.     On October 6, 2023, Gary Wang, who was FTX's Co-Founder and Chief Technology Officer, testified at Sam Bankman-Fried's criminal trial that FTX's insurance fund values published by FTX on its website and on social media were fabricated.   On February 13, 2021, FTX represented in a generally published Tweet (on Twitter)  the insurance fund was  worth "over 100,000,000 USD."

https://x.com/FTX_Official/status/1360858165802197003

53.     In his criminal trial testimony, Wang admitted insurance fund values published by FTX were actually created using a random number generator and did not represent actual reserves held by FTX.  When the Prosecution asked Wang at Bankman-Fried's criminal trial whether this "insurance fund" amount was accurate, he replied with a single word: "No."

54.     Wang went on to testify,  "For one, there is no FTT (tokens) in the insurance fund. It's just the USD number. And, two, the number listed here does not match what was in the database."  Wang testified that a random figure, roughly 7,500, was multiplied by the exchange's daily trade volume in order to generate the insurance fund value that was

ME1 47657999v.1ME1 47657999v.1

published by FTX.  Thus, FTX materially overstated the value of its insurance fund in its Tweet and on its website by claiming a value of $100 million.

55.     The portion of FTX's website that revealed the volatile insurance fund value has been withdrawn from FTX's website post-petition. Based on my own experience running a cryptocurrency exchange as the COO of Liquid Group Inc., I was aware that the insurance fund provides a safety net for users in case of unforeseen events like hacking, fraud, or failures in risk management of derivatives trading. The false assurances of the existence of a large insurance fund, which FTX touted to customers and the general public, gave me confidence FTX was a well-run, financially stable firm with solid risk management controls in place. The baseless and fraudulent insurance-fund representations also led me to believe FTX had profitable operations and significant resources available because FTX was able to set aside nearly $100 million from its operating capital to protect FTX.com exchange users. The overstated insurance fund data, in addition to my reliance on FTX's inaccurate Prager consolidated financial statements, were factors in inducing me (and the other shareholders) to sell the shares of LGI holdings to FTX.

**C.  Concealment of extraordinary privileges given to Alameda Research**

56.     FTX hid the extraordinary privileges extended to Alameda Research on the FTX.com platform from its customers, LGI shareholders and myself.   These privileges included, but were not limited to, the no-liquidation feature and a change in the configuration files that extended a $65 *billion* credit line to Alameda Research.

57.     As per the Debtor's report on CONTROL FAILURES AT THE FTX EXCHANGES on April 9, 2023 P.18 ¶ 6:

> The FTX Group configured the codebase of FTX.com and associated customer databases to grant Alameda an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers. Any number of different controls routinely implemented by financial institutions and exchanges in established financial markets

would be expected to have prevented, detected, and escalated these secret privileges to personnel in control functions with sufficient independence and authority to address the issue.

58.     At Sam Bankman-Fried's criminal trial, Gary Wang testified about the undisclosed line of credit to Alameda as follows: "The first time, we picked a number so high that it would never be hit, the number we picked was $1 billion, and then it was hit again, and then the number picked was $65 billion."

59.     The exceptions granted to Alameda Research with an undisclosed line of credit were critical departures from the requirements for a sound cryptocurrency exchange. The changes to the FTX codebase allowed for the large negative balance at Alameda Research account at FTX.com. This enabled Alameda Research to drain funds from FTX, making FTX insolvent. There was no disclosure of the Alameda Research credit line in the Prager Metis audited financial statements for FTX covering 2019 and 2020 provided to Liquid management, nor in the March 2021 FTX Trading Balance Sheet (Exhibit 11) presented to Liquid and its shareholders.

60.     Since the founding of FTX, Sam Bankman-Fried had repeatedly claimed in public forums that FTX and Alameda Research were managed separately.  Sam Bankman Fried and Can Sun told me in September of 2021 that Alameda Research was not given special privileges on the FTX exchange.  The FTX Terms of Service also clarified that Alameda had no special privileges.   "Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution." During his testimony at the criminal trial of Sam Bankman-Fried, Wang testified that Alameda Research:  "had the ability to place orders slightly faster than other accounts."

61.     The omission of this fact caused me to have an incorrect understanding of the integrity of FTX operations. Had it been generally known, this special access would discourage customers from using the FTX exchange and risk a loss of operating licenses were

18

it made known to Regulators.  The deception regarding Alameda's special market access hid a major red flag which led to Liquid's sale to FTX.

**D.  False 31 March 2021 FTX Trading Balance Sheet**

62.      FTX provided LGI shareholders the March 31, 2021, FTX Trading Ltd. Balance sheet.  (Exhibit 11).  This balance sheet was provided via the VDR to Liquid management in September 2021. The FTX Balance Sheet omitted mention of the line of credit with Alameda Research or the existence of any negative customer balances.  The March 31, 2021 balance sheet provided by debtors showed that as of March 31, 2021 the total intercompany receivables equaled $997,063.61.  There was no mention of the line of credit with Alameda Research in the balance sheet, leading me to believe that there was no large or hidden liability of or risk to FTX Trading Ltd. in its dealings with Alameda Research or any other entity.  Based on my experience operating a cryptocurrency exchange, the March 31, 2021 FTX Balance Sheet gave the impression of being a well-run exchange that was profitable with no significant payables or liabilities that would impact its liquidity or solvency.

**E.  Fraud in connection with FTX' B-1 Round of External Financing**

63.      During the negotiations for the sale of Liquid in 2021, FTX executive Can Sun shared an email with me and other LGI management on 31 August 2021 (Exhibit 12) with an attached document titled **FTX B-1 Round Terms** (Exhibit 13) Paragraph  3 b) of the FTX B-1 Round Terms highlights the repurchase price of FTX shares from Binance:

> "Secondary common shares at $23.658/share (~$16.15B valuation). This is the same price at which Alameda Research bought Binance's common stock in FTX Trading LTD last month (~$2.3B total purchase), reducing Binance's ownership stake in FTX Trading LTD to zero."

64.      The repurchase of FTX common shares by an entity [Alameda Research] effectively controlled by the FTX CEO indicated to me that FTX was making progress in

cleaning up its shareholder table. Binance was sanctioned by regulators around the world in 2021 including, UK, Germany, and Japan.  There were also ongoing investigations by US regulatory agencies into the operational practices at Binance.

65.     As someone who had worked on licensing initiatives in Singapore and Japan, I knew  removing Binance from the FTX shareholder registry was an important step forward for FTX to achieve its strategic goals of gaining operating licenses in global jurisdictions. Most, if not all, regulators will do a "fit and proper," assessment of shareholders of the parent company.  Based on our experience in  regulatory licensing of Liquid's subsidiaries in Singapore and Japan, I shared FTX's stated belief that cryptocurrency exchange businesses that were licensed had a clearer path for sustainable growth. The removal of Binance from the FTX shareholder registry indicated to me  FTX was taking the necessary steps in the direction of compliance and licensing.  FTX's strategy of working with regulators on obtaining licenses and seeking to develop regulatory frameworks for the growth of crypto as an asset class appealed to me and made a potential FTX acquisition of Liquid an attractive proposition.

66.     However, aspects of this supposedly salubrious "clearing of the share registry" were materially fraudulent.  During the criminal trial of Sam Bankman-Fried, Professor Easton's analysis submitted to the court showed that $1.2bn of the $2.3bn purchase of FTX shares from Binance had been sourced from FTX customer funds (Exhibit 28).  The use of client funds to re-purchase the FTX shares from Binance in July 2021 was a material misappropriation of client funds, which was known to the FTX  executives (including Sam Bankman-Fried) but not myself when I was induced to sell my share of Liquid to FTX in the fall of 2021.

67.     In addition to fraud, the undisclosed use of customer assets to acquire Binance shares in FTX  breached the warranty provisions of paragraph 7.2 of the SPA. SPA's ¶9.2, P.

21, states that the remedies available to me as Seller for FTX furnishing inaccurate

information  include recovering "all losses" for ""any breach of representations and

warranties made by Purchaser [FTX] under clause (¶) 7.2 … under this (SPA) agreement."

Under  ¶7.2,  FTX as Purchaser "represents and warrants" . . . "that each warranty is true,

accurate and not misleading . . . ."

68.    The Prager Metis Audited Financials failed to reveal:

"FTX Group commingled customer deposits and corporate funds," facts upon which I
relied in selling my LGI holdings to FTX.  Together with FTX's inaccurate insurance
fund representations, FTX's financial statements did not reveal that Alameda
Resources had access to FTX cash and customer assets, as evidenced by Debtor's 6-
23-23 Report and by the February 28, 2023, criminal dockets of Caroline Ellison
(CEO of Alameda Research), Gary Wang, the co-founder and former Chief
Technology Officer, Nishad Singh, the former director of engineering at FTX, who
pleaded guilty to conspiracy to commit wire and securities fraud. Ex. 4.

69.    Prager Metis' audited, FTX consolidated financial statements constituted a ¶7.2 SPA

breach of warranty, causing Liquid shareholders, including myself, to suffer the losses claimed."  In

addition to liability for fraud in the inducement, simple common-law fraud, and breach of

contract/warranty, FTX is liable for those losses for failing to indemnify me for them as required by

the SPA.  See  ¶9.23 SPA, P. 21. (requiring FTX to reimburse "all Losses incurred by any of the

Sellers Indemnified Parties resulting from, relating to or arising out of any breach of the

representations and warranties made by the Purchaser…").  See also id., ¶9.3 (requiring Purchasers,

including FTX indemnify  Sellers (Liquid shareholders) from losses and attorney's fees they incur

from "fraud, intentional misrepresentations or wilful misconduct"),

## II.
## CLAIMS FOR UNPAID COMPENSATION
## (CLAIMS 3353, 3956 AND 4578)

70.    As noted above, I was the Chief Operating Officer (COO) and Representative

Director of FTX Japan Holdings KK (formerly Liquid prior to the FTX acquisition), the

holding company of FTX Japan KK and Quoine Pte. Ltd. (FTX Singapore), before I signed

the SPA on Nov 19, 2021, which contract closed with "Completion" on April 4, 2022.  Until

July 30, 2024, I continued to be the Representative Director of FTX Japan Holdings KK and Director of FTX Singapore.

71.     I seek payment, with interest, of my September and October 2022 Director's fees of $26,250/month due from FTX Singapore as required by ¶4.2(b) of the October 19, 2022, Amended and Restated Management Agreement (hereafter referred to as "MA". (Exhibit 8). These sums were due to me prior to the Petition Date.

72. I was appointed Director of FTX Singapore (Quoine Pte. Ltd) on August 26, 2022. (Exhibit 17). In conjunction with this appointment, the Management Agreement was amended on 19 Oct 2022 effective September 1, 2022, re-apportioning the payment of my Directors' fees between FTX Singapore and FTX Japan. (Exhibit 8). My pre- and post-petition Directors fees are justified because I operated FTX Singapore in my capacity as COO and Director both before and after FTX filed its bankruptcy petition. Paragraph 4.2(b) of the MA states FTX Japan Holdings "shall cause" FTX Singapore to pay 70% of my Director's fees in the amount of $26,250/month.

73. FTX Japan Holdings caused FTX Singapore to pay my $26,500/mo Directors fees post-petition pursuant to this court's November 22, 2022 Order through July 2024, acknowledging I performed critical and necessary services for both entities.

74.     The Objection states that "Claim 3353 should be disallowed because FTX Singapore is not a party to the Management Agreement." Debtors' Objection¶36 This argument conveniently ignores that FTX Japan Holdings, KK is a party to the Management Agreement, and FTX Japan Holdings, KK is the 100% shareholder of FTX Singapore. As the exclusive shareholder of FTX Singapore, FTX Japan Holdings KK is able to and must

cause  FTX Singapore to make payments of my  $26,250/mo. Director's fees, as required by ¶4.2(b) of the Management Agreement.

75.    The Objection states that my Unpaid Compensation and Bonus Claims should be disallowed on the basis that I am a "quintessential insider."  Objection ¶ 38.  I take issue with this characterization because it insinuates I was somehow involved in the FTX scandal. The Management Agreement defined my roles, responsibilities and compensation at FTX Japan, FTX Japan Holdings and FTX Singapore, not at FTX Trading Ltd., the parent company.  The Management Agreement gave executives at FTX the power to dismiss me at will, at any time.  I had **no** knowledge of actions taken by FTX executives that precipitated FTX's decision to file its Chapter 11 petition.   Most of the actions taken by FTX executives that led to the downfall of FTX Trading Ltd. and its subsidiaries began before Liquid was acquired by FTX in April 2022.  FTX Japan, which was FTX Trading Ltd.'s subsidiary at which I served as COO, never filed bankruptcy in Japan, its country of domicile. FTX Japan properly segregated client assets and has subsequently been dismissed from the Chapter 11 proceedings via a sale, Doc 17923, filed July 20, 2024.

76.    The Objection further states that my Unpaid Compensation and Bonus Claims be limited to the reasonable value of the services.  As reflected above,  the reasonable value of my services is in excess of the amount claimed for Unpaid Compensation and Bonus. In my capacity as a director of these entities, I ensured that FTX Japan customers received 100% of their fiat and crypto customer balances back in kind. Due to the efforts of myself and my team, approximately 13,000 customers of FTX Japan were able to withdraw all of their crypto (in kind) and fiat currency valued at $200,000,000 beginning February 21, 2023, 102 days after the bankruptcy filing of the FTX Group. In contrast, Customers of other FTX entities have had their their cryptocurrency balances dollarized as of petition date filing.

These customers were unable to participate in the subsequent increase in cryptocurrency valuations thereafter.

77.    Paragraph 4.2(b) of the MA states FTX Japan Holdings "shall cause" FTX Singapore to pay 70% of my Director's fees in the amount of $26,250/month.  FTX Japan Holdings has caused FTX Singapore to pay my $26,500/mo salary post-petition pursuant to this court's November 22, 2022 Order through July 2024, acknowledging  I performed useful services to both entities.

78.    Attached is an email exchange dated November 23, 2022, from Bao Vuong to Soo Yin Kue, the person in charge of payroll at FTX Singapore.  It documents  I was not paid Directors fees of $26,250 in September and October 2022. (Exhibit 24). Advisors to the FTX Debtor were included in this email.

79.    The Debtor caused FTX Singapore to fulfill its obligations for my Director' fees under this Court's November 22, 2022 *Interim Order (I) Authorizing the Debtors To (A) Pay Prepetition Compensation And Benefits And (B) Continue Compensation And Benefits And (II) Granting Certain Related Relief* [D.I. 138][9]. Debtor has caused  FTX Singapore to fulfill its obligations to pay my monthly Director fees of $26,250 without comment, objection, or reservation of rights for 19 months post-petition. Debtor's objection to the payment of my September and October, 2022 Director's fees  which accrued pre-petition followed by Debtors' subsequent, post petition payment of my  monthly Directors' fees in the exact same amount is inconsistent and arguably irrational.

### III
### CLAIM FOR OCTOBER 2022 BONUS
### (CLAIMS 3244 AND 4470)

---

[9] A copy of the order can be accessed at https://restructuring.ra.kroll.com/FTX/Home-DownloadPDF?id1=MTM1MjQ0NA==&id2=-1

80.     I filed Claims 3244 (FTX Japan Holdings) and 4470 (FTX Japan) for my

$200,000 Bonus Payment.  In their objection, the Debtors state that "Melamed's claim for his

purported Bonus Payment are baseless"  Objection at 35.  Had the Debtors reviewed their

records (which presumably was done when the schedules were prepared) they would have

discovered an email dated September 15, 2022 (nearly two months prior to the Petition Date)

from Jen Chan, Chief of Staff of FTX Trading Ltd. to Nakajima Moriat (the payroll agent)

which states:

> My name is Jen Chan and I am the Chief of Staff for FTX,  I understand from Seth
> that you are our payroll agent.  We would need your kind help to distribute bonuses to
> the below employees of FTX JP. The amount below are the gross amounts in USD….
> Seth Melamed 200,000

(Exhibit 19)

81.   FTX Debtors including employees of Alvarez and Marsal (Nicole Simoneaux and

Hudson Trent) and Kathy Schultea were notified by the FTX Japan HR representative

(Madoka Kagimoto) via emails in January 2023 of the unpaid bonus awarded to me

on 15 September 2022. (Exhibit 20).

82.     As COO of FTX Japan Holdings K.K, I know that all bonuses to those

employees and Directors listed in Jen Chan's attached September 15, 2022, email were paid,

except for my bonus of $200,000 as  FTX Japan, KK's Representative Director.


Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing is true

and correct except as to those matters stated on information and belief, and as to those matters,

I believe them to be true.

ME1 47657999v.1ME1 47657999v.1

Executed on August 16,  2024, at Berkeley, CA.

_____

Seth Melamed

SWDocID ME1 47657999v.1