## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 12, 2024 at 1:00 p.m ET** |

**CORRECTED**
**DECLARATION OF SETH MELAMED IN SUPPORT OF OPPOSITION TO**
**DEBTORS' OBJECTION TO PROOFS OF CLAIM [D.I. 20051, 20052]**

Seth Melamed, being duly sworn, hereby declares as follows:

1.      I submit this declaration (the "**Declaration**") in opposition to the Debtors'[2] Objection to my Proofs of Claim (the "**Objection**").

2.      The Objection seeks to: "(i) disallow and expunge Claim 3385 in its entirety, or in the alternative reduce Claim 3385 to reflect the dollar value of cryptocurrencies determined in this Court's Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets [D.I. 7090] (the "**Estimation Order**") and subordinate Claim 3385 as an equity claim under section 510(b) of the Bankruptcy Code; and (ii) disallow and expunge Claims 3244, 3353, 3956, 4470, and 4578 in their entirety, or in the alternative reduce the five Claims to reflect the reasonable value of services provided by Melamed."  Motion, 1-2.

3.      Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge and my review of relevant documents. If called upon to testify, I could and would testify to the facts set forth herein on that basis.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (collectively, the "Debtors"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX

[2] The Objection identifies FTX Trading, Ltd ("**FTX**")., FTX Japan Holdings K.K ("**FTX Japan Holding**s")., FTX Japan K.K ("**FTX Japan**"). and Quoine Pte Ltd. ("**FTX Singapore**")  as the moving Debtors.

1

4.      I have filed six (6) proofs of claim (the "**Claims**") in this case as follows:[3]

| Claim Number | Claim Amount | Debtor | Nature of Claim |
|---|---|---|---|
| Claim 3385 | $35,613,112.19 | FTX Trading | Sale of Liquid Shares to FTX |
| Claim 3353 Claim 3956 Claim 4578 | $52,500.00 | FTX Singapore FTX Japan FTX Japan Holdings | Services fee from September and October of 2022 |
| Claim 3244 Claim 4470 | $200,000 | FTX Japan Holdings FTX Japan | Bonus Payment |

5.      Attached hereto are true and correct copies of the following documents:

| | |
|---|---|
| Exhibit 1 | Nomura Valuation as of April 3, 2021 |
| Exhibit 2 | Deutsche Bank Valuation as of March 24, 2021 |
| Exhibit 3 | MOU for Acquisition of Liquid dated September 2, 2021 |
| Exhibit 4 | MOU for Acquisition of Liquid Part II dated as of October 12, 2021 |
| Exhibit 5 | Confidential - FTX Presentation December 6, 2021 |
| Exhibit 6 | Management Agreement (Mr. Melamed) Part I dated as of March 31, 2022 |
| Exhibit 7 | First Amendment to the Management Agreement dated as of June 30, 2022 |
| Exhibit 8 | Amended and Restated Management Agreement dated October 13, 2022 |
| Exhibit 9 | Side Letter Agreement 31 Mar 2022 |
| Exhibit 10 | Side Letter Agreement 19 Nov 2021 |
| Exhibit 11 | FTX Trading Ltd. Balance Sheet as of March 31, 2021 |
| Exhibit 12 | Email string dated August 30, 2021 re: FTX  Liquid -Term Sheet |
| Exhibit 13 | FTX B1 Round Terms |
| Exhibit 14 | Major Shareholders Stock Purchase Agreement |
| Exhibit 15 | First Amendment to Major Shareholders Stock Purchase Agreement |
| Exhibit 16 | FTX Trading Ltd. Financial Statement December 31, 2020 and 2019 |
| Exhibit 17 | Quoine Business Profile as of May 16, 2024 |
| Exhibit 18 | Email  re  Liquid - Payroll for Nov'22 |
| Exhibit 19 | Sep 15 2022 email re FTX Japan Bonus |
| Exhibit 20 | Jan 5 2023 Email string re Payment which Seth has not received yet |
| Exhibit 21 | Omitted |
| Exhibit 22 | Corporate Structure chart |
| Exhibit 23 | Omitted |
| Exhibit 24 | FTX Singapore payroll |
| Exhibit 25 | July 26, 2024 Letter of resignation from FTX Japan |
| Exhibit 26 | July 30, 2024 Letter Terminating Employment FTX Holdings |
| Exhibit 27 | Omitted |
| Exhibit 28 | Customer funds used to purchase shares from Binance |

---

[3] In addition to the Claims, I am owed $940,000 as a result of being terminated without cause.

## PERSONAL BACKGROUND

6.      I graduated from UC Davis in 1996 with a BA in international relations and a minor in Japanese.  I speak, read and write Japanese. Japanese.  In 2006, I started working at Goldman Sachs ("**Goldman Sachs**") in Tokyo, Japan. While at Goldman Sachs, I worked in various departments including Derivatives, Prime Brokerage, Foreign Exchange, Treasury, and Equity Derivatives operations. I was promoted to Senior Vice President in the Operations division in 2012. My area of focus at Goldman Sachs included cash management, reconciliations, payment controls, treasury management, and financial reporting.

7.      I was employed at Goldman Sachs for 11 years (from 2006 to 2017) working in the Tokyo, New York, Moscow, and Salt Lake City offices during this period.  My interest in cryptocurrency began in 2014 when I first experimented with acquiring Bitcoin and sending it to a friend.  I subsequently attended Bitcoin conferences where I deepened my understanding of the underlying blockchain technology.  While at Goldman Sachs in 2015, I wrote a presentation comparing Bitcoin, gold, and fiat and circulated it to colleagues and certain Managing Directors. In 2016 I completed an online course on cryptography.  I was invited to join Quoine Corporation ("**Quoine**") as Head of Operations in Tokyo in September 2017 and decided to focus my professional life on developing a cryptocurrency exchange business.  I was later promoted to Chief Operating Officer of Liquid in November 2019.

## BACKGROUND ON LIQUID

8.      Liquid Group, Inc. ("**Liquid**" or "**LGI**") was a holding company that owned (among other non-operating entities) two successful cryptocurrency exchange operating entities with difficult-to-obtain licenses: Quoine and Quoine Pte. Ltd. in Singapore ("**Quoine Singapore**").  I started acquiring shares in Liquid on October 1, 2019 when I purchased 2,430 shares.  I purchased an additional 1,350 shares of Liquid on December 31, 2020 and finally another purchase of 6,366 shares on February 8, 2021.

3

9.      Dating back to its founding in 2014, Quoine provided various cryptocurrency exchange services, including crypto derivatives trading, to Japanese residents.  Starting from 2018 shortly after I joined, Quoine operated with a strict process for segregating customer funds for both *fiat* and cryptocurrencies. This asset segregation process was audited both internally and by external auditors, under detailed written procedures for daily monitoring. As COO of Quoine, it was my responsibility to ensure that customers' *fiat* assets were stored in a Trust company account and each customer's crypto assets were stored in segregated, cold wallets.  In Japan, cold wallets are defined as wallets where the Private Key that controls the wallet address is never connected to the internet. I supervised a daily reconciliation process to ensure the asset balances held at the Trust account and cold wallets were either equal to or exceeded the aggregated customer balances.[4]

10.      Shortly after I began my employment at Quoine, the company received a license for the exchange of cryptocurrencies under the Japanese Payment Services Act ("**PSA**").   The PSA license was an important step for the company to serve Japan residents in a legal, compliant manner.  The PSA license also facilitated the company's work with local banks in Japan to handle customer fiat deposits and withdrawals.

11.      In 2020, Quoine applied to Japan Financial Services Agency ("**JFSA**") for a Type 1 Financial Instruments Business License.  This license is required for a business that engages in the trading in capital-market products, including securities, stocks, bonds, and derivatives.  The JFSA regulates this Type I license under the Financial Instruments and Exchange Act.  The license was important to the company in order to continue to offer a crypto exchange platform for Customers who wanted to trade in crypto derivatives.

---

[4] Post-acquisition of Liquid by FTX, the asset segregation process at FTX Japan KK (previously Quoine) continued largely unchanged in both procedure and personnel.

Historically crypto derivatives made up a majority of the revenue and trade volumes for the company.

12.    After nearly two years of effort by myself and others, Quoine was granted the Type 1 license on October 31, 2021.  Among other requirements, as a cryptocurrency exchange licensed under the JFSA, Quoine was required to maintain asset segregation and perform a daily reconciliation of its own assets with customer obligations.

13.    The value of this license can not be overstated.  Less than six (6) crypto-related businesses in Japan have been granted a Type 1 license for offering services for crypto derivatives trading and **no** crypto-related Type 1 licenses have been issued since Quoine received its license.  In the 2018 to 2021 timeframe, the JFSA began imposing sanctions on non-licensed entities offering exchange services to Japanese residents.  Binance had received two such sanctions in 2018 and 2021.[5]  I and others in the company were working on obtaining the Type 1 license throughout 2020 and 2021.  By the spring of 2021, we had certain indications the Type 1 license process was on track for approval by late summer or early fall of 2021.

14.    Quoine Singapore operated under an exemption to the Singapore Payment Services Act for the exchange of digital payment tokens.  While under the exemption, Quoine Singapore was regulated by the Monetary Authority in Singapore (MAS).

15.    For the full year ending in 2021, Liquid monthly revenue (from its subsidiaries Quoine (Japan) and Quine Singapore) averaged $2,400,000 per month.  Liquid also reached profitability in 2021 while growing its active users and reducing its operating expenses compared to 2020. The balance sheet of Liquid strengthened with net assets over $40,000,000 by June of 2021.

---

[5] *See* "Japan's Financial Services Regulator Issues Binance Warning" available at
https://www.coindesk.com/markets/2021/06/25/japans-financial-services-regulator-issues-binance-warning/

16.     In summary, the businesses operated by Liquid were extremely valuable because they were profitable and had the necessary licenses that allowed them to operate cryptocurrency exchange businesses in two important regions in Asia.

## SUITORS; OVERTURES TO ACQUIRE LIQUID

17.     Beginning in the spring of 2021 and extending into the summer, I had discussions with several well-known derivative cryptocurrency exchanges and investment funds about potentially investing in Liquid.   The exchanges I met with included BitMex, Deribit, and FTX.   The catalyst for their interest was the growing indications that FTX Japan was going to receive the Type 1 license authorizing crypto derivatives trading services.  The Type 1 license presented opportunities for non-licensed entities offering these services in the Japanese market to become compliant with JFSA regulations.  A collaboration between Liquid and these operators would allow them relatively fast and legally compliant access to these two key markets in which Liquid already had licensing in place, in particular in Japan with the Type 1 license for crypto derivatives.

18.     In early 2021, Liquid began engaging with investors and investment banks in raising capital.  Different options were considered including public listing and SPAC transactions.  By April of 2021, the company received indicative valuations from the investment banks Nomura (Exhibit 1) and Deutsche Bank (Exhibit 2) with valuations of Liquid ranging from $600,000,000 to $1,000,000,000.  In 2021 crypto markets saw increased interest including a rise in market value of crypto assets.  Along with this there was a rise in investor interest in the companies in the industry.  In April of 2021, Coinbase went public with a valuation of $86,000,0000,000. In general, there was a considerable amount of capital raising being done by crypto currency exchanges.

19.     By September 2021, several cryptocurrency exchanges, including rivals to FTX such as Binance and ByBit, were publicly sanctioned by the JFSA for providing crypto

currency exchange services without registering with the JFSA. I was told by FTX executives
Sam Bankman Fried and Can Sun that the Japanese market was one of FTX's top markets
globally for trade revenues and volumes.  I learned from FTX Executives that in the month of
October 2021, FTX derived over $2,000,000 in revenue from Japanese users of the FTX
exchange despite FTX not being registered with the JFSA.  This was 6 times higher than in
the year earlier period.

20.    In August 2021, Quoine suffered a breach of some of its hot wallets, which the
US FBI later, upon investigation, attributed to North Korean state actors.  To repair this
breach, Liquid borrowed $120,000,000 from FTX under a Loan Agreement (LA) which was
executed on August 30, 2021.

## FTX'S ACQUISITION OF LIQUID

21.    On Sept 2, 2021, a nonbinding term sheet "MOU for acquisition of LGI"
(Exhibit 3) was executed to sell Liquid to FTX.  On October 12, 2021, an amendment to the
MOU was executed (Exhibit 4).  Shareholders of Liquid agreed to sell their interests to FTX
for a lower price due to the certainty and timing of a transaction with FTX.  At that point in
time FTX had a stellar reputation and appeared to have sufficient resources to make the deal
happen in a short period of time.  Going public or pursuing a SPAC was seen as taking longer
which was less attractive for the Venture Capital investors such as JAFCo which were
approaching their mandated time of 5 years to exit from their investment in Liquid.   For
myself, I saw FTX as a fast growing, innovative business that according to its public facing
representations had a company focus on compliance to protect customers.  FTX's assurances
of its compliance and innovation were important factors for me in thinking of FTX as a place
aligned with my own values where I could continue to develop my career.  After Quoine had
been issued its JFSA Type 1 license on October 31, 2021, negotiations over the details of an
FTX acquisition of Liquid commenced.  The values of Liquid stock are reflected on pages

36-37 of the SPA (hereinafter defined), which valued all the shares of Liquid at
$200,000,000[6]

22.     Acquiring shares of Liquid for its licenses and existing user base was
necessary to allow FTX to continue to grow its business in a compliant and sustainable
manner. FTX's acquisition of Liquid shares to obtain the Type 1 license was a prelude to
obtaining licenses in other regulated, regional markets around the world.  FTX used its
acquisition of licenses including those of FTX Japan as a key point in its materials provided
to equity investors during the Series C funding round which was completed in January 2022.
(Exhibit 5).  This Series C funding presentation was made to prospective investors in
December 2021, in which FTX prominently featured its pending acquisition of FTX Japan
with its focus on compliance and regulation.  In January 2022, FTX was able to raise
additional capital by selling FTX common shares to investors in a Series C funding round
valuing the company at $32,000,000,000.  This valuation was significantly higher than the B-
1 funding only a few months earlier in late 2021, which had valued FTX at $17,900,000,000.
(Exhibit 13).

23.     On November 19, 2021, I signed the Agreement for the Sale and Purchase of
Shares, Stock Options, and Warrants in Liquid Group Inc. (Major Shareholders) (Exhibit 14)
as modified by that certain Side Letter Agreement between myself and FTX of the same date
(the "**November 19th Side Letter**"; collectively, the **"SPA"**) (Exhibit 10).  The November
19th Side Letter provides in relevant part that:

> The total amount of consideration to be paid by the Purchaser to Mr. Melamed (the
> "Consideration") shall be paid ratably on the Completion Date, the Second
> Completion Date and the Last Completion Date, provided, that the total amount of
> Crypto Consideration of Mr. Melamed, which shall be withheld in its entirety by the
> Purchaser as Retained Consideration in accordance with clause 4 of the Major
> Shareholders SPA, shall be paid on the Completion Date.

---

[6] It should be noted that $147,203,152 of the $200 million paid to the shareholders of Liquid, consisted of cash
and cryptocurrency, representing ~74% of the value of the Liquid securities sold to FTX.   The FTX
"consideration shares" were incidental to the overall transaction because they represented 26% of the
$200,000,000 total value of Liquid shares sold to FTX.

24.    Through the SPA, I conveyed 12,203 common shares and 510 stock options of Liquid to FTX.

25.    The SPA was executed under Japanese law with any disputes to be resolved by binding arbitration, administered by the Singapore International Arbitration Centre (SIAC) 19.2, SPA.  Section 19.1 of the SPA provides that: "[t]his Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan."

26.    The "Completion" or closing date of the SPA was subject to certain closing conditions on both the Purchaser (FTX) and Seller (Liquid).  Closing conditions were completed on April 4, 2022, which became the "Completion" date.  On the April 4, 2022, Completion date, all of my Liquid shares and options were transferred and registered to FTX. In exchange, FTX agreed to pay me consideration worth a total of $44,516,390.24, consisting of:

- 1,019,070 shares of FTX common stock valued for purposes of the SPA at $26,709,834.14 (the "**FTX Consideration Shares**");
- $8,903,278.05 in cash (the "**Cash Payment**"), and
- $8,903,278.05 worth of cryptocurrency (the "**Retained Consideration**").

27.    The Retained Consideration consisted of four types of cryptocurrencies, in kind: 39.132 BTC, 560.48 ETH, 11,844.98 SOL, and 47,532 FTT.  SPA, Schedule 2, item 4 at p. 37. The Retained Consideration was to be transferred to me on the April 4, 2022, Completion Date. The Retained Consideration was paid to me but was to be held as security against my share of any indemnification obligations under the SPA.

28.    Section 2.4 of the SPA described the manner in which the Retained Consideration would be held by FTX:

At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "Retained Cash Consideration") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

9

29.    Prior to the April 4, 2022 Completion Date, I requested FTX on numerous occasions to hold the Retained Consideration in segregated wallets.  Sam Bankman-Fried and other FTX management Can Sun and Nishad Singh executives repeatedly and falsely assured me that my Retained Consideration would be segregated from FTX's own assets, breaching FTX's warranties found in 7.2, SPA.

30.    As a condition of FTX's acquisition of the Liquid Shares, I was required to sign a Management Agreement (Exhibit 6) which was amended on 30 June 2022 (Exhibit 7) and then again on 19 October 2022 (Exhibit 8)  (as amended, the "**Management Agreement**")  under which I was appointed Representative Director (RD) and Chief Operating Officer (COO) of FTX Japan KK, the operating subsidiary of the Liquid holding company,  renamed FTX Japan Holdings KK (Holdings). The Management Agreement specified my roles and responsibilities as COO, which included wallet management, new product development, integration of existing products into the FTX ecosystem, and business development. I was required to sign a second Side Letter Agreement dated 31 March 2022. (Exhibit 9) which is governed by the laws of Japan and requires arbitration of any disputes under SIAC. The Management Agreement is governed by the "laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement." Para.16.

31.    Under Japanese law, my understanding is a Representative Director is a type of Director with the company's highest authority with the right to enter into business and sign legal contracts on behalf of the corporation in Japan. As the highest-ranking executive, the Representative Director carries significant legal responsibilities and potential personal liability for the company's violations of law and financial injury to customers.

32.    As per the Management Agreement, I served as COO and Representative Director of FTX Japan until July 26, 2024, when I resigned concurrently with the sale of FTX

10

Japan to Bitflyer Holdings. (Exhibit 25). Following this sale, the chapter 11 case of FTX

Japan was dismissed.

33.     On July 30, 2024, I was terminated without cause by the Debtor as

Representative Director of FTX Holdings (Exhibit 26).

**I.**
**CLAIM FROM FTX'S ACQUISITION OF**
**LIQUID SHARES (CLAIM #3385)**

34.     At the outset, it should be noted that Claim #3385 is for damages that I have

incurred on account of my sale of shares in Liquid to FTX.

35.     In connection with my Opposition to the Objection, we are filing the

Declaration of Takane Hori of the law firm Mori, Hamada, and Matsumoto based in Tokyo,

Japan to explain basic principles of Japanese law that would be applicable in connection with

the Liquid sale to FTX  as expressed in the SPA. The Declaration of Takane Hori is being

filed concurrently herewith.

36.     As previously noted the SPA is governed by Japanese law.  In addition, the

target company (Liquid) being acquired was domiciled in Japan. I was resident in Japan at the

time FTX acquired Liquid, of which I then owned  ~22% of the shares.  Pursuant to the SPA,

any disputes or claims around the acquisition of Liquid are to be resolved by binding

arbitration administered by the Singapore International Arbitration Centre ("SIAC").  SPA,

19.2.

37.     Under Japanese law, per the SPA, the Retained Consideration I received for

selling my shares in Liquid to FTX was required to be paid to me and became my property on

the April 4, 2022, completion date of the SPA. Hori Decl.¶14,15. (Filed concurrently

herewith). Pursuant to 2.4 of the SPA, the Retained Consideration was to be held, "in a

manner to be agreed in good faith by the Purchaser and the Management Shareholders."

11

Although the Retained Consideration was paid to me on the completion date, FTX held it as security for any Indemnification Obligation.

38.    Over 2 years have passed since the April 4, 2022, completion date but no warranty claim was made by the Purchaser (FTX).

39.    As set forth below, FTX made a multitude of misrepresentations to me to induce me to sell my entire interest in Liquid, a successful cryptocurrency exchange with relevant JFSA licenses, a large and growing user base, and profitable operations in the full year before FTX s acquisition of Liquid was completed on April 4, 2022.  The misrepresentations included, among other things, (i) false and misleading audited financial statements, (ii) misstatements as to how FTX was operated, (iii) fabricated public-facing warranties on FTX's risk management controls, and (iv) false statements concerning  FTX's relationship with related entities. These misrepresentations breached the Purchaser, FTX's warranties spelled out in 7.2 SPA because FTX warranted the statements it made to me were "true, accurate and not misleading at the date of this agreement." SPA 7.2.

40.    In my experience at Goldman Sachs and FTX Japan KK, asset segregation had an important role in protecting customers from the risk of insolvency by the exchange or broker. A crucial step in protecting customers is segregating the customer assets in their accounts from the assets of the operating entity by storing customers' assets in the hands of legally independent custodians and/or in segregated wallets or accounts.

41.    My knowledge of the importance of customer asset segregation, in both crypto and conventional finance, combined with FTX s published claims that FTX protected and segregated customer assets, gave me confidence FTX was not only a fast-growing but a well-governed exchange with appropriate levels of control over customer assets, to protect its customers both outside and inside the regime of bankruptcy that it is now enduring.

42.     FTX's published its Key Principles on December 3, 2021, prior to the April 4, 2022 completion date, which assured me that FTX would segregate my own Retained Consideration from FTX's assets as conscientiously as FTX segregated customers' crypto assets.

**A.  False FTX audited, consolidated financial statements**

43.     Prior to execution of the SPA, FTX management and Sam Bankman Fried provided Liquid's management audited, consolidated financial statements of FTX and its subsidiaries from Prager Metis CPAs, LLC Hackensack, NJ, (the "**Prager Audited Financials**").  On or about September 3, 2021, Sam Bankman Fried, CEO of FTX, provided to Liquid management the consolidated balance sheets of FTX for December 31, 2019 and 2020, related consolidated statements of operations, shareholders' equity, and cash flows for the period April 2, 2019 to December 31, 2019, and year ended December 31, 2020, and the related notes to the financial statements.  (Exhibit 16).  These documents were deposited in a Virtual Data Room [VDR] to which Liquid's executives were given access in September 2021 via an email sent by Can Sun, the then Chief Legal Officer of FTX, on September 17, 2021.

44.     These financial statements were incomplete and false in material respects when I received them.  In particular, the Prager audited, financial statements did not disclose shortfalls of customer balances.   As stated in the Second Interim Report of John J. Ray III To The Independent Directors [D.I. 1704-1] (the "**Second Interim Report**"):[7]

> At times, the FTX Senior Executives, with Caroline Ellison and certain other employees, estimated their growing liabilities in internal communications. By August 2022, the FTX Senior Executives and Ellison privately estimated that the FTX.com exchange owed customers over $8 billion in fiat currency that it did not have.

Second Interim Report at 18.

_____

[7] The Second Interim Report is available at https://restructuring.ra.kroll.com/FTX/Home-Download PDF?id1=MTUzNzc0OA==&id2=-1

ME1 47657999v.1ME1 47657999v.1

45.    No FTX employee or representative disclosed this shortfall in public or in direct communications to me or other Liquid shareholders during the exchange of due diligence information between September and November of 2021, thereby breaching its warranties. 7.2 SPA

46.    FTX's audited financial statements were intended to"fairly present in all material respects the financial condition and operating results of" FTX, but do not include information about Alameda's undocumented "line of credit" from FTX and other information discussed herein.  I read and analyzed the materially misleading Prager Audited Financials in the VDR, which evidenced FTX was a sound financial entity, on which I relied, before I sold my LGI stock and warrants to FTX on November 19, 2021. Nothing in FTX's consolidated financial statements revealed the fraudulent and criminal activity of FTX's management later exposed in criminal trials and plea agreements.[8]

**FTX false representations of customer asset segregation**

47.    During the due diligence process conducted before Liquid was sold to  FTX,  I explained FTX Japan's adherence to the regulations which required daily reconciliation and customer asset segregation.   FTX executives Sam Bankman-Fried and Can Sun assured me that FTX also maintained sound risk management and daily customer reconciliations as part of its operating framework.  In its "Key Principles"[9] published on the FTX website on December 3, 2021, FTX expounded on its innovations to reduce risk and ensure that customer accounts did not go negative:

- "Second, FTX and other crypto platforms have brought important innovations to trading, and a sound framework should preserve these innovations.  This is because they minimize risk, promote capital efficiency, and protect investors, all of which better serve the public. Some of the key innovations include: automated risk-

---

[8] The criminal dockets Nishad Singh and Gary (*United States v. Bankman-Fried et al,* 22-CR-00673 (LAK)) are available at https://www.courtlistener.com/docket/66631291/united-states-v-bankman-fried/
[9] https://www.prnewswire.com/news-releases/ftx-issues-key-principles-for-market-regulation-of-crypto-trading-platforms-301437175.html

management systems that ensure customer accounts trading multiple different assets do not go net negative across customer positions; 24/7 trading hours, which also reduces risk; permissioning a non-intermediated market structure that gives all investors the same equal access to the market and helps minimize conflicts of interest; and free-market data that aligns the platform operator's interest with the investor's."

48.    The Key Principles went on to state:

- FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms . . . .

49.    FTX's Key Principles, made public in December 2021, were a confirmation of what I had already been told by FTX executives about how customer protections were implemented at FTX.  The misleading, inaccurate representations of Sam Bankman Fried and Can Sun that customer asset segregation was institutionalized and that no commingling of customer assets was permitted at FTX occurred between August 31, 2021 and November 2021, which predated the sale of Liquid to FTX.  FTX warranties about risk management, customer protections, and segregation of customers' funds indicated to me an alignment at FTX with how I had operated FTX Japan.  This illustrates the pervasive breach of warranties that existed during the due diligence process culminating in the sale of LGI to FTX

**B.  False assurances of exchange "insurance funds"**

50.    An "insurance fund" at a derivatives exchange like FTX is a reserve of capital used to cover losses when traders' positions are liquidated and their losses exceed their initial margin. Such a fund ensures that an exchange remains solvent so that market participants are compensated for losses even in highly volatile market conditions.

51.    The claims made by FTX about insurance funds in their Key Principles, which I relied upon, were also materially false.  As per the FTX report dated June 26, 2023 Page 17 paragraph D: "Falsity of Claim to Reconcile Trading Balances:"

The FTX Group lied in its Key Principles that it 'regularly reconcile[d] customers' trading balances against funds held by the exchanges. In fact, Debtors identify no evidence that the FTX Group performed any meaningful reconciliation prior to

making this claim on its website and in materials provided to Congress, federal agencies, and other third parties.

52.    On October 6, 2023, Gary Wang, who was FTX's Co-Founder and Chief Technology Officer, testified at Sam Bankman-Fried's criminal trial that FTX's insurance fund values published by FTX on its website and on social media were fabricated.   On February 13, 2021, FTX represented in a generally published Tweet (on Twitter) the insurance fund was  worth "over 100,000,000 USD."

https://x.com/FTX_Official/status/1360858165802197003

53.    In his criminal trial testimony, Wang admitted insurance fund values published by FTX were actually created using a random number generator and did not represent actual reserves held by FTX.  When the Prosecution asked Wang at Bankman Fried's criminal trial whether this "insurance fund" amount was accurate, he replied with a single word: "No."

54.    Wang went on to testify, "For one, there is no FTT (tokens) in the insurance fund. It's just the USD number. And, two, the number listed here does not match what was in the database."  Wang testified that a random figure, roughly 7,500, was multiplied by the exchange's daily trade volume in order to generate the insurance fund value that was published by FTX.  Thus, FTX materially overstated the value of its insurance fund in its Tweet and on its website by claiming a value of $100 million.

55.    The portion of FTX's website that revealed the volatile insurance fund value has been withdrawn from FTX's website post-petition. Based on my own experience running a cryptocurrency exchange as the COO of Liquid Group Inc., I was aware that the insurance fund provides a safety net for users in case of unforeseen events like hacking, fraud, or failures in risk management of derivatives trading. The false assurances of the existence of a large insurance fund, which FTX touted to customers and the general public, gave me confidence FTX was a well-run, financially stable firm with solid risk management controls

16

in place. The baseless and fraudulent insurance-fund representations also led me to believe

FTX had profitable operations and significant resources available because FTX was able to

set aside nearly $100 million from its operating capital to protect FTX.com exchange users.

The overstated insurance fund data, in addition to my reliance on FTX's inaccurate Prager

consolidated financial statements, were factors in inducing me (and the other shareholders) to

sell the shares of LGI holdings to FTX.

### C. Concealment of extraordinary privileges given to Alameda Research

56.      FTX hid the extraordinary privileges extended to Alameda Research on the

FTX.com platform from its customers, LGI shareholders and myself.   These privileges

included, but were not limited to, the no-liquidation feature and a change in the configuration

files that extended a $65 *billion* credit line to Alameda Research.

57.      As per the Debtor's report on CONTROL FAILURES AT THE FTX

EXCHANGES on April 9, 2023 P.18 ¶ 6:

> The FTX Group configured the codebase of FTX.com and associated customer databases to
> grant Alameda an effectively limitless ability to trade and withdraw assets from the exchange
> regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-
> liquidation process that applied to other customers. Any number of different controls
> routinely implemented by financial institutions and exchanges in established financial markets
> would be expected to have prevented, detected, and escalated these secret privileges to
> personnel in control functions with sufficient independence and authority to address the issue.

58.      At Sam Bankman-Fried's criminal trial, Gary Wang testified about the

undisclosed line of credit to Alameda as follows: "The first time, we picked a number so high

that it would never be hit, the number we picked was $1 billion, and then it was hit again, and

then the number picked was $65 billion."

59.      The exceptions granted to Alameda Research with an undisclosed line of

credit were critical departures from the requirements for a sound cryptocurrency exchange.

The changes to the FTX codebase allowed for the large negative balance at Alameda

Research account at FTX.com. This enabled Alameda Research to drain funds from FTX,

making FTX insolvent. There was no disclosure of the Alameda Research credit line in the

ME1 47657999v.1

Prager Metis audited financial statements for FTX covering 2019 and 2020 provided to Liquid management, nor in the March 2021 FTX Trading Balance Sheet (Exhibit 11) presented to Liquid and its shareholders.

60.     Since the founding of FTX, Sam Bankman-Fried had repeatedly claimed in public forums that FTX and Alameda Research were managed separately.  Sam Bankman Fried and Can Sun told me in September of 2021 that Alameda Research was not given special privileges on the FTX exchange.  The FTX Terms of Service also clarified that Alameda had no special privileges.   "Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution." During his testimony at the criminal trial of Sam Bankman-Fried, Wang testified that Alameda Research:  "had the ability to place orders slightly faster than other accounts."

61.     The omission of this fact caused me to have an incorrect understanding of the integrity of FTX operations. Had it been generally known, this special access would discourage customers from using the FTX exchange and risk a loss of operating licenses were it made known to Regulators.  The deception regarding Alameda's special market access hid a major red flag which led to Liquid's sale to FTX.

**D.  False 31 March 2021 FTX Trading Balance Sheet**

62.     FTX provided Liquid shareholders the March 31, 2021, FTX Trading Ltd. Balance sheet.  (Exhibit 11).  This balance sheet was provided via the VDR to Liquid management in September 2021. The FTX Balance Sheet omitted mention of the line of credit with Alameda Research or the existence of any negative customer balances.  The March 31, 2021 balance sheet provided by debtors showed that as of March 31, 2021 the total intercompany receivables equaled $997,063.61.  There was no mention of the line of credit with Alameda Research in the balance sheet, leading me to believe that there was no large or hidden liability of or risk to FTX Trading Ltd. in its dealings with Alameda Research or any

18

other entity.  Based on my experience operating a cryptocurrency exchange, the March 31,

2021 FTX Balance Sheet gave the impression of being a well-run exchange that was

profitable with no significant payables or liabilities that would impact its liquidity or

solvency.

**E.  Fraud in connection with FTX' B-1 Round of External Financing**

63.    During the negotiations for the sale of Liquid in 2021, FTX executive Can Sun

shared an email with me and other LGI management on 31 August 2021 (Exhibit 12) with an

attached document titled **FTX B-1 Round Terms** (Exhibit 13).  Paragraph  3(b) of the FTX

B-1 Round Terms highlights the repurchase price of FTX shares from Binance:

> "Secondary common shares at $23.658/share (~$16.15B valuation). This is the same
> price at which Alameda Research bought Binance's common stock in FTX Trading
> LTD last month (~$2.3B total purchase), reducing Binance's ownership stake in FTX
> Trading LTD to zero."

64.    The repurchase of FTX common shares by an entity [Alameda Research]

effectively controlled by the FTX CEO indicated to me that FTX was making progress in

cleaning up its shareholder table. Binance was sanctioned by regulators around the world in

2021 including, UK, Germany, and Japan.  There were also ongoing investigations by US

regulatory agencies into the operational practices at Binance.

65.    As someone who had worked on licensing initiatives in Singapore and Japan, I

knew removing Binance from the FTX shareholder registry was an important step forward

for FTX to achieve its strategic goals of gaining operating licenses in global jurisdictions.

Most, if not all, regulators will do a "fit and proper," assessment of shareholders of the parent

company.  Based on our experience in regulatory licensing of Liquid's subsidiaries in

Singapore and Japan, I shared FTX's stated belief that cryptocurrency exchange businesses

that were licensed had a clearer path for sustainable growth. The removal of Binance from the

FTX shareholder registry indicated to me FTX was taking the necessary steps in the direction

of compliance and licensing.  FTX's strategy of working with regulators on obtaining

licenses and seeking to develop regulatory frameworks for the growth of crypto as an asset class appealed to me and made a potential FTX acquisition of Liquid an attractive proposition.

66.     However, aspects of this supposedly salubrious "clearing of the share registry" were materially fraudulent.  During the criminal trial of Sam Bankman-Fried, Professor Easton's analysis submitted to the court showed that $1.2bn of the $2.3bn purchase of FTX shares from Binance had been sourced from FTX customer funds (Exhibit 28).  The use of client funds to re-purchase the FTX shares from Binance in July 2021 was a material misappropriation of client funds, which was known to the FTX executives (including Sam Bankman-Fried) but not myself when I was induced to sell my share of Liquid to FTX in the fall of 2021.

67.     In addition to fraud, the undisclosed use of customer assets to acquire Binance shares in FTX breached the warranty provisions of paragraph 7.2 of the SPA. SPA's ¶9.2, P. 21, states that the remedies available to me as Seller for FTX furnishing inaccurate information include recovering "all losses" for "any breach of representations and warranties made by Purchaser [FTX] under clause (¶) 7.2 … under this (SPA) agreement."  Under ¶7.2 of the SPA, FTX as Purchaser "represents and warrants" . . . "that each warranty is true, accurate and not misleading . . . ."

68.     The Prager Metis Audited Financials failed to reveal:

"FTX Group commingled customer deposits and corporate funds," facts upon which I relied in selling my LGI holdings to FTX.  Together with FTX's inaccurate insurance fund representations, FTX's financial statements did not reveal that Alameda Resources had access to FTX cash and customer assets, as evidenced by Debtor's 6-23-23 Report and by the February 28, 2023, criminal dockets of Caroline Ellison (CEO of Alameda Research), Gary Wang, the co-founder and former Chief Technology Officer, Nishad Singh, the former director of engineering at FTX, who pleaded guilty to conspiracy to commit wire and securities fraud. Ex. 4.

69.     Prager Metis' audited, FTX consolidated financial statements constituted a ¶7.2 SPA breach of warranty, causing Liquid shareholders, including myself, to suffer the

losses claimed."  In addition to liability for fraud in the inducement, simple common-law fraud, and breach of contract/warranty, FTX is liable for those losses for failing to indemnify me for them as required by the SPA.  *See* ¶9.23 SPA, P. 21. (requiring FTX to reimburse "all Losses incurred by any of the Sellers Indemnified Parties resulting from, relating to or arising out of any breach of the representations and warranties made by the Purchaser…").  *See also id.*, ¶9.3 (requiring Purchasers, including FTX indemnify Sellers (Liquid shareholders) from losses and attorney's fees they incur from "fraud, intentional misrepresentations or willful misconduct"),

## II.
## CLAIMS FOR UNPAID COMPENSATION
## (CLAIMS 3353, 3956 AND 4578)

70.    As noted above, I was the Chief Operating Officer (COO) and Representative Director of FTX Japan Holdings KK (formerly Liquid prior to the FTX acquisition), the holding company of FTX Japan KK and Quoine Pte. Ltd. (FTX Singapore), before I signed the SPA on Nov 19, 2021, which contract closed with "Completion" on April 4, 2022.  Until July 30, 2024, I  continued to be the Representative Director of FTX Japan Holdings KK and Director of FTX Singapore.

71.    I seek payment, with interest, of my September and October 2022 Director's fees of $26,250/month due from FTX Singapore as required by ¶4.2(b) of the October 19, 2022, Amended and Restated Management Agreement (hereafter referred to as "MA". (Exhibit 8).  These sums were due to me prior to the Petition Date.

72.    I was appointed Director of FTX Singapore (Quoine Pte. Ltd) on  August 26, 2022. (Exhibit 17).  In conjunction with this appointment, the Management Agreement was amended on 19 Oct 2022 effective September 1, 2022, re-apportioning the payment of my Directors' fees between FTX Singapore and FTX Japan.  (Exhibit 8).  My pre- and post-petition Directors fees are justified because I operated FTX Singapore in my capacity as COO

21

and Director both before and after FTX filed its bankruptcy petition.  Paragraph 4.2(b) of the MA states FTX Japan Holdings "shall cause" FTX Singapore to pay 70% of my Director's fees in the amount of $26,250/month.

73.    FTX Japan Holdings caused FTX Singapore to pay my $26,500/mo Directors fees post-petition pursuant to this court's November 22, 2022 Order through July 2024, acknowledging  I performed critical and necessary services for both entities.

74.    The Objection states that "Claim 3353 should be disallowed because FTX Singapore is not a party to the Management Agreement." Debtors' Objection¶36 This argument conveniently ignores that FTX Japan Holdings, KK is a party to the Management Agreement, and FTX Japan Holdings, KK is the 100% shareholder of FTX Singapore.  As the exclusive shareholder of FTX Singapore,  FTX Japan Holdings KK is able to and must cause  FTX Singapore to make payments of my  $26,250/mo. Director's fees, as required by ¶4.2(b) of the Management Agreement.

75.    The Objection states that my Unpaid Compensation and Bonus Claims should be disallowed on the basis that I am a "quintessential insider."  Objection ¶ 38.  I take issue with this characterization because it insinuates that I was somehow involved in the FTX scandal.  The Management Agreement defined my roles, responsibilities and compensation at FTX Japan, FTX Japan Holdings and FTX Singapore, not at FTX Trading Ltd., the parent company.  The Management Agreement gave executives at FTX the power to dismiss me at will, at any time.  I had **no** knowledge of actions taken by FTX executives that precipitated FTX's decision to file its Chapter 11 petition.   Most of the actions taken by FTX executives that led to the downfall of FTX Trading Ltd. and its subsidiaries began before Liquid was acquired by FTX in April 2022.  FTX Japan, which was FTX Trading Ltd.'s subsidiary at which I served as COO, never filed bankruptcy in Japan, its country of domicile. FTX Japan

properly segregated client assets and has subsequently been dismissed from the Chapter 11

proceedings via a sale, Doc 17923, filed July 20, 2024.

76.    The Objection further states that my Unpaid Compensation and Bonus Claims

be limited to the reasonable value of the services.  As reflected above, the reasonable value of

my services is in excess of the amount claimed for Unpaid Compensation and Bonus. In my

capacity as a director of these entities, I ensured that FTX Japan customers received 100% of

their fiat and crypto customer balances back in kind. Due to the efforts of myself and my

team, approximately 13,000 customers of FTX Japan were able to withdraw all of their

crypto (in kind) and fiat currency valued at $200,000,000 beginning February 21, 2023, 102

days after the bankruptcy filing of the FTX Group. In contrast, Customers of other FTX

entities have had their their cryptocurrency balances dollarized as of petition date filing.

These customers were unable to participate in the subsequent increase in cryptocurrency

valuations thereafter.

77.    Paragraph 4.2(b) of the MA states FTX Japan Holdings "shall cause" FTX

Singapore to pay 70% of my Director's fees in the amount of $26,250/month.  FTX Japan

Holdings has caused FTX Singapore to pay my $26,500/mo salary post-petition pursuant to

this court's November 22, 2022 Order through July 2024, acknowledging I performed useful

services to both entities.

78.    Attached is an email exchange dated November 23, 2022, from Bao Vuong to

Soo Yin Kue, the person in charge of payroll at FTX Singapore.  It documents that I was not

paid Directors fees of $26,250 in September and October 2022. (Exhibit 24). Advisors to the

FTX Debtor were included in this email.

79.    The Debtor caused FTX Singapore to fulfill its obligations for my Director'

fees under this Court's November 22, 2022 *Interim Order (I) Authorizing the Debtors To (A)*

*Pay Prepetition Compensation And Benefits And (B) Continue Compensation And Benefits*

23

*And (II) Granting Certain Related Relief* [D.I. 138][10]. Debtor has caused FTX Singapore to fulfill its obligations to pay my monthly Director fees of $26,250 without comment, objection, or reservation of rights for 19 months post-petition. Debtor's objection to the payment of my September and October, 2022 Director's fees which accrued pre-petition followed by Debtors' subsequent, post petition payment of my monthly Directors' fees in the exact same amount is inconsistent and arguably irrational.

### III
### CLAIM FOR OCTOBER 2022 BONUS
### (CLAIMS 3244 AND 4470)

80.     I filed Claims 3244 (FTX Japan Holdings) and 4470 (FTX Japan) for my $200,000 Bonus Payment.  In their objection, the Debtors state that "Melamed's claim for his purported Bonus Payment are baseless"  Objection at 35.  Had the Debtors reviewed their records (which presumably was done when the schedules were prepared) they would have discovered an email dated September 15, 2022 (nearly two months prior to the Petition Date) from Jen Chan, Chief of Staff of FTX Trading Ltd. to Nakajima Moriat (the payroll agent) which states:

> My name is Jen Chan and I am the Chief of Staff for FTX,  I understand from Seth that you are our payroll agent.  We would need your kind help to distribute bonuses to the below employees of FTX JP. The amount below are the gross amounts in USD…. Seth Melamed 200,000

(Exhibit 19)

81.     FTX Debtors including employees of Alvarez and Marsal (Nicole Simoneaux and Hudson Trent) and Kathy Schultea were notified by the FTX Japan HR representative (Madoka Kagimoto) via emails in January 2023 of the unpaid bonus awarded to me on 15 September 2022. (Exhibit 20).

---

[10] A copy of the order can be accessed at https://restructuring.ra.kroll.com/FTX/Home-DownloadPDF?id1=MTM1MjQ0NA==&id2=-1

82.    As COO of FTX Japan Holdings K.K, I know that all bonuses to those employees and Directors listed in Jen Chan's attached September 15, 2022, email were paid, except for my bonus of $200,000 as FTX Japan, KK's Representative Director.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing is true and correct except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on August 16,  2024, at Berkeley, CA.

_____

Seth Melamed

SWDocID ME1 47657999v.1

Exhibit 1

## RE: Nomura Liquid Meeting

**carlos.cheng@nomura.com**                                                    Saturday, April 3, 2021 at 11:22:28 AM Indochina Time
To: mike.kayamori@liquid.com

Hi Mike,

Currently we are planning to propose a US$600-1000mn range for Liquid.

Please note this will be highly depended on the assumption that Improvement Order is removed and new business initiatives can bring in more retail customers, resulting in higher fee take rate.

Best regards,

Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Saturday, April 3, 2021 11:01 AM
**To:** Cheng, Carlos (IB/HK)
**Subject:** Re: Nomura Liquid Meeting

**CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Hi Carlos

Actually can you unofficially share a high level valuation range if possible?
I am trying to triangulate to draft the convertible bond terms so that it does not hurt our SPAC opportunity.

kindest regards

mike k

On Fri, Apr 2, 2021 at 5:47 PM <carlos.cheng@nomura.com> wrote:

Hi Mike,

All is well with Nomura. Not much impact on Asia side of business.

We are having Easter holiday in HK and while the drafted answers are ready, will subject to senior comments.

Should be with you after holiday next week.

Hope it works.

Carlos Cheng

**From:** "Mike Kayamori" <mike.kayamori@liquid.com>
**Date:** Friday, 2 April 2021 at 5:13:20 PM
**To:** "Cheng, Carlos (IB/HK)" <carlos.cheng@nomura.com>
**Subject:** Re: Nomura Liquid Meeting

**CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Hi Carlos

when do you think you can get back to me?

I hope things are ok at Nomura.

have a great weekend.

kindest regards,

Mike k

On Wed, Mar 31, 2021 at 10:21 AM Mike Kayamori <mike.kayamori@liquid.com> wrote:

Thank you Carlos

kindest regards

mike k

On Wed, Mar 31, 2021 at 12:29 AM <carlos.cheng@nomura.com> wrote:

Hi Mike,

Let us discuss internally and revert to you soon.

Carlos Cheng

**From:** "Mike Kayamori" <mike.kayamori@liquid.com>
**Date:** Tuesday, 30 March 2021 at 9:07:43 PM
**To:** "Cheng, Carlos (IB/HK)" <carlos.cheng@nomura.com>
**Cc:** "Wang, Charles (IB/HK)" <charles.wang@nomura.com>, "Chung, Jason (IB/HK)" <jason.chung@nomura.com>, "Noguchi, Ken (IB/HK)" <ken.noguchi@nomura.com>, "Ren, Helen (IB/HK)" <helen.ren@nomura.com>
**Subject:** Re: Nomura Liquid Meeting

> **CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS.
> IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Dear Carlos

Once again, thank you so much for the call yesterday.
I was able to catch up with IDG and have a few additional questions.

Can you help me on the following?

- List of SPACS (including all fintech deals) over the past year that Nomura has led and success rate + post merger performance
- List of potential PIPE investors (Top 20 or 30) in order of the amount raised per investor?
- What is the preliminary valuation range of Liquid

Once again, thank you so much in advance.

kindest regards,

mike k

On Sun, Mar 28, 2021 at 9:08 PM <carlos.cheng@nomura.com> wrote:

Dear Mike,

For tomorrow's meeting, we have put together attached based on 1) execution timetable as we have already discussed and 2) additional information around SPACs in the appendix in case of any questions you may have around SPAC concepts.

Thanks!

Best regards,

Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Thursday, March 25, 2021 11:42 PM
**To:** Cheng, Carlos (IB/HK)
**Cc:** Wang, Charles (IB/HK)
**Subject:** Re: Nomura Follow-up Questions to Liquid

> **CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Hi Carlos

this is very helpful thank you.

lets discuss more monday.

kindest regards,

mike k

On Thu, Mar 25, 2021 at 9:35 PM <carlos.cheng@nomura.com> wrote:

> Hi Mike,
>
> Let me clarify. De-SPAC and PIPE are two separate parts of the transaction:
>
> -    De-SPAC meaning that Nomura will act as your sell-side advisor, and sell your company to an existing SPAC at an enterprise value of say US$1bn. We will charge a sell-side advisory fee based on certain % of this US$1bn
>
> -    PIPE meaning that after signing LOI with SPAC, before announcement and SEC approval process, Nomura will reach out to other public market investors (say Blackrock, Fidelity, etc.), and see if they are interested in investing into the SPAC through PIPE
>
>    o  This PIPE financing provides additional cash into the SPAC, and is more of an Equity Capital Market product
>
>    o  If Nomura secured say an additional US$200mn PIPE investment, we will charge another % of this US$200mn (higher than the M&A fee scale, as USIPO fund raising charged 7% of proceeds as market practice)
>
>    o  PIPE may or may not happen, subject to investor appetite and shareholder redemption of the transaction
>
> You can refer to the below case studies "deal metrics" in our previous material of relative size of Enterprise value of the transaction versus PIPE size:

Hope this helps, we can discuss in more detail online next Monday.


Best regards,

Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Thursday, March 25, 2021 8:40 PM
**To:** Cheng, Carlos (IB/HK)
**Cc:** Wang, Charles (IB/HK)
**Subject:** Re: Nomura Follow-up Questions to Liquid

| CAUTION EXTERNAL EMAIL: DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS. |
| --- |

Hi Carlos


Lets do 2:30pm SG/HK time next monday.


when you say deSPAC part only, I am a bit confused as I thought PIPE was part of SPAC.


if possible, can you kindly prepare an end to end illustrative SPAC transaction process/framework with all costs highlighted?
we can theoretically make assumptions on current expected valuation of Liquid, potential SPAC amount, PIPE amount, etc.


kindest regards,


mike k


you can

On Thu, Mar 25, 2021 at 8:22 PM <carlos.cheng@nomura.com> wrote:

Hi Mike,

PIPE fee will be separately charged from the below % fee quotes, the % fee I mentioned only apply to the DeSPAC part.

Team will be available for the below slots HKT:

- Monday 29 March:  2-4:30pm
- Tuesday 30 March: 10-12am; 2-5pm

Please let me know which slot of an hour works for you.

Best regards,

Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Thursday, March 25, 2021 7:56 PM
**To:** Cheng, Carlos (IB/HK)
**Cc:** Wang, Charles (IB/HK)
**Subject:** Re: Nomura Follow-up Questions to Liquid

> **CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Hi Carlos

Yes, we just finished our board meeting today.

Unfortunately, Young Guo was not able to participate and we have not made the final decision on our advisory.

And yes, if possible can we set up a zoom call soon?

I have some follow up questions.

Also, can you also qualify what the following means?

does this mean SPAC investment and PIPE?
or a % of enterprise value.
===
 total valuation injected into SPAC
===

kindest regards,

mike k

On Thu, Mar 25, 2021 at 12:35 PM <carlos.cheng@nomura.com> wrote:

Thanks Mike.

Again we believe our proposed fee is at a relative lower range if compared with other global investment banks. Our entire Nomura team will be strongly dedicated to your firm and this potential transaction, also forging long term collaborative relationship in Japan, Asia and beyond.

As we are discussing internally on the right strategy for market / investor management in face of the Improvement Order, Charles and team are looking forward to further discussion on CB plans with you as well through ZOOM soon.

Hope you have a great board meeting!

Many thanks!

Best regards,

Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Tuesday, March 23, 2021 7:58 PM
**To:** Cheng, Carlos (IB/HK)
**Cc:** Wang, Charles (IB/HK)
**Subject:** Re: Nomura Follow-up Questions to Liquid

> **CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Yes, thank you

we will absolutely come out of the improvement order by the time we start serious marketing to SPACs based on the schedule you shared.

As I am planning to bring all the proposals to the board this thursday, I wanted to know the fee range from every bank.

but this is helpful in terms of ball park figure.

kindest regards

mike k

On Tue, Mar 23, 2021 at 7:53 PM <carlos.cheng@nomura.com> wrote:

> Dear Mike,
>
> We will need internal committee approval before any official fee proposal, so we did not include them in our material.
>
> In general, Nomura M&A charges lower than average fees when compared to other large global investment banks. For example, if transaction deal size is below US$500mn, a fee around 1.25% applies, and if size increases to US$500-1,000mn range, we normally charge below 1.0% fee (of the total valuation injected into SPAC in our particular case).
>
> Also, we are currently in close discussion among global SPAC team in US, AeJ and Japan, with preliminary view that coming out of the Improvement Order can be critical to your growth potential and visibility, valuation, investment story which highlights regulatory compliance and therefore investor action speed.
>
> If you have time, after receiving your answers on the latest questionaire, Charles, Jason and I can have a quick catch up to further discuss our thoughts and plans.
>
> Many thanks!
>
> Best regards,
>
> Carlos

---

**From:** Mike Kayamori <mike.kayamori@liquid.com>
**Sent:** Tuesday, March 23, 2021 6:36 PM
**To:** Cheng, Carlos (IB/HK)
**Subject:** Re: Nomura Follow-up Questions to Liquid

CAUTION EXTERNAL EMAIL: DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Hi Carlos

Did you ever include the fees in the presentation?

If not can you share them here?

We are rounding out the other proposals and need to understand what your fees look like

kindest regards,

mike k

On Sun, Mar 21, 2021 at 9:06 PM Mike Kayamori <mike.kayamori@liquid.com> wrote:

Hi Carlos

I apologize for my late reply as I was under the weather.

Allow me to get back to you early this week.

kindest regards,

mike k

On Sat, Mar 20, 2021 at 4:40 PM <carlos.cheng@nomura.com> wrote:

Dear Mike,

Following our discussion last Thursday, we understand that apart from the audited financials, the Improvement Order clearance will be a key defining factor in Company's execution of future growth plans, thus has directly impact on our financing plans and schedule.

We have attached further follow-up questions so as to understand more about the history, latest and future of Improvement Order's impact on Liquid.

Many thanks in advance for your answers.

Best regards,

Carlos

From: Mike Kayamori <mike.kayamori@liquid.com>
Sent: Friday, March 19, 2021 9:28 PM
To: Wang, Charles (IB/US)
Cc: Pearson, Adam (IB/US); ben.spitz@liquid.com; Cheng, Carlos (IB/HK); Bain, David (IB/US); Tung, Erik (IB/HK); Ren, Helen (IB/HK); Chung, Jason (IB/HK); Noguchi, Ken (IB/HK); LeConey, Morgan (IB/US); Bhutani, Sarab (IB/SG); McKernan, Sean (CFS/US); seth@liquid.com; Zhou, Weilong (IB/HK)
Subject: Re: Nomura RFP to Liquid

CAUTION EXTERNAL EMAIL: DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Thank you so much Charles

Please have a wonderful weekend

Mike k

On Fri, 19 Mar 2021 at 20:30, <charles.wang@nomura.com> wrote:

Dear Mike, Seth, and Ben,

Thanks very much for discussing with you yesterday.  Look forward to hearing from you about the next steps after your internal discussion.

In the meantime, regarding the pre-SPAC CB issuance, we will analyse and go through what it needs to get it done in parallel. We will revert soon.

Regards,

Charles Wang

---

**From:** "Mike Kayamori" <mike.kayamori@liquid.com>
**Date:** Friday, 19 March 2021 at 6:28:09 PM
**To:** "Cheng, Carlos (IB/HK)" <carlos.cheng@nomura.com>
**Cc:** "Wang, Charles (IB/HK)" <charles.wang@nomura.com>, "Ren, Helen (IB/HK)" <helen.ren@nomura.com>, "Seth Melamed" <seth@liquid.com>, "Ben Spitz" <ben.spitz@liquid.com>
**Subject:** Re: Nomura RFP to Liquid

> **CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS THAT ARE UNEXPECTED OR SENT FROM UNKNOWN SENDERS. IF IN DOUBT REPORT TO SPAM SUBMISSIONS.

Dear Charles and Nomura team

Thank you so much for your presentation yesterday.

Your presentation was clear and powerful.

Also being able to meet your senior bankers was wonderful and at the same time impressive.

It was also helpful how you highlighted what we need to do on our side (Audited Financials, etc.) and that Timing is everything.

We are humble and grateful to potentially work with you.

Regarding next steps, kindly allow us to confirm internally and come back to you.

At the same time, I would like to seriously look into a pre-SPAC convertible bond opportunity in parallel.

I heard from my internal source (whom we mutually know) that Circle has agreed on a SPAC + CB and the terms are below (not announced yet).

They also said that Circle's financial performance is similar to Liquid.

And that the CB was done in 1 week and already $50M is in the bank.

====

- Convertible Bond $50-100M (50M initial close, 2 weeks to fill the rest)
- 20% discount from PIPE, pari passu with PIPE investors on other terms
- $4B valuation cap
- If we don't' complete deSPAC in 7 months, 25% discount
- If we don't do a PIPE, they get 20% discount from Private Round, and if we don't do a private round or PIPE in 12 months, converts to Series E Preferred Shares at 2.9B valuation.

====

Again, our business model is different from that of Circle and they are based in US but I was just blown away by this.

And obviously our shareholder believes we are leaving things on the table if we don't pursue now.

Once again, thank you so much for your time.


kindest regards,


Mike Kayamori




On Wed, Mar 17, 2021 at 8:53 PM <carlos.cheng@nomura.com> wrote:

> Dear Mike,
>
>
> Looking forward to speak with you tomorrow morning.
>
>
> As discussed, please find attached material prepared by Nomura's global team together for your reference.
>
>
> For tomorrow's meeting, key presenters from our side are listed below for your reference.
>
>
> -    Charles Wang, Managing Director, Chairman of China Investment Banking
>
> -    Sarab Bhutani, Managing Director, Head of SEA IBD and SPAC Coverage
>
> -    Jason Chung, Managing Director, SPAC, Mergers & Acquisitions, Asia ex-Japan
>
> -    Sean Minnihan, Managing Director, Head of Financial Technology, Americas
>
> -    David Bain, Managing Director, Joint-Head of M&A and Head of TMT M&A, Americas
>
> -    Ken Noguchi, Executive Director, AeJ TMT
>
> -    Adam Pearson, Executive Director, US SPAC Coverage
>
>
> Please feel free to let us know if any other colleagues joining from Liquid side. Thanks!
>
>
> Kind regards,
>
>
> Carlos Cheng
>
> Vice President | China IBD
> **Nomura International (Hong Kong) Limited**
>
> Phone: +852 2252 1029
> Mobile: +852 6275 6969 / +86 155 0757 4345
>
> Email: carlos.cheng@nomura.com
>
> *Connecting Markets East & West*
>
> www.nomura.com
>
>
> PLEASE READ: The information contained in this e-mail is confidential
> and intended for the named recipient(s) only. If you are not an
> intended recipient of this e-mail you must not copy, distribute or take
> any further action in reliance upon it and you should delete it and
> notify the sender immediately. E-mail is not a secure method of
> communication. Nomura International (Hong Kong) Limited cannot accept
> responsibility for the accuracy or completeness of this message or any
> attachment(s). This transmission could contain viruses, be corrupted,
> destroyed, incomplete, intercepted, lost or arrive late. If
> verification of this e-mail is sought then please request a hard copy.
> Unless otherwise stated any views or opinions presented are solely
> those of the author and do not represent those of Nomura International
> (Hong Kong) Limited. This e-mail is intended for information purposes
> only and is not a solicitation or offer to buy or sell securities or
> related financial instruments.


--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455
Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--
**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--
**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,

destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential
and intended for the named recipient(s) only. If you are not an
intended recipient of this e-mail you must not copy, distribute or take
any further action in reliance upon it and you should delete it and
notify the sender immediately. E-mail is not a secure method of
communication. Nomura International (Hong Kong) Limited cannot accept
responsibility for the accuracy or completeness of this message or any
attachment(s). This transmission could contain viruses, be corrupted,
destroyed, incomplete, intercepted, lost or arrive late. If
verification of this e-mail is sought then please request a hard copy.
Unless otherwise stated any views or opinions presented are solely
those of the author and do not represent those of Nomura International
(Hong Kong) Limited. This e-mail is intended for information purposes
only and is not a solicitation or offer to buy or sell securities or
related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this e-mail you must not copy, distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately. E-mail is not a secure method of communication. Nomura International (Hong Kong) Limited cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). This transmission could contain viruses, be corrupted, destroyed, incomplete, intercepted, lost or arrive late. If verification of this e-mail is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Nomura International (Hong Kong) Limited. This e-mail is intended for information purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments.

--

**Mike Kayamori**
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom : https://zoom.us/j/2511399455

Singapore :  80RR, 80 Robinson Road 9F Singapore 068898
Japan : 〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam : 22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



PLEASE READ: The information contained in this e-mail is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this e-mail you must not copy, distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately. E-mail is not a secure method of communication. Nomura International (Hong Kong) Limited cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). This transmission could contain viruses, be corrupted, destroyed, incomplete, intercepted, lost or arrive late. If verification of this e-mail is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Nomura International (Hong Kong) Limited. This e-mail is intended for information purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments.

**Attachments:**
**image002.png** 330k

Exhibit 2

Deutsche Bank
Investment Bank



# Value maximization in deSPAC M&A combination

DB reply to Liquid Group RFP



Deutsche Bank Securities Inc., a subsidiary of Deutsche Bank AG, conducts investment banking and securities activities in the United States.

March 24, 2021

# Contents

Section
1    Deutsche Bank credentials                                    3
2    Market update                                               6
3    Liquid deSPAC considerations                                9
4    deSPAC process                                             14
5    Proposed engagement terms                                  23

Appendix
I    Select Deutsche Bank transactions                          24
II   Additional deal team experience                            35



# Deutsche Bank's dedicated team for Liquid

| Senior Leadership | SPAC Investment Banking |
|---|---|

| Drew Goldman | Eric Hackel | Ravi Raghunathan | Brandon Sun  |
|---|---|---|---|



*Global Head, IB Coverage and Advisory*
+1 (212) 250-3002
drew.goldman@db.com

 *Global Head of Alternative Equity Solutions Origination*
+1 (212) 250-2714
eric.hackel@db.com

– 20+ years of investment banking experience
– Founded and ran his own investment boutique, Legend Merchant Group, before selling to Deutsche Bank in 2007
– Leads the global SPAC franchise for Deutsche Bank and has pioneered the SPAC product since its inception
– Maintains strong connectivity with leading SPAC investors and an unequalled working relationship with premier sponsors
– 10 left lead deSPAC transactions totaling $37bn in deal value since 2020
– 35 left lead SPAC IPOs totaling $13bn since 2019

 *Head of SPAC Investment Banking*
+1 (212) 250-5952
ravi.raghunathan@db.com

– 13 years of investment banking experience
– Joined Deutsche Bank in 2011, following career at JP Morgan
– BA from William & Mary
– Leads global SPAC franchise for Deutsche Bank
– 10 left lead deSPAC transactions totaling $37bn in deal value since 2020
– 35 left lead SPAC IPOs totaling $13bn since 2019
– Select recent representative transactions:
  – Gores Holdings IV's $425mm IPO and its acquisition of United Wholesale Mortgage (UWM) for $16.0bn
  – GMHI's $400mm IPO and its acquisition of Luminar for $2.9bn
  – Conyers Park II's $450mm IPO and its acquisition of Advantage Solutions for $5.2bn

*Head of De-SPAC Advisory*
+1 (212) 250-8175
brandon.sun@db.com

– 11 years of investment banking experience
– Joined Deutsche Bank in 2012, following career at UBS
– MBA from Yale's School of Management and BA from Carleton College
– Leads global SPAC franchise for Deutsche Bank
– Completed / announced 56 deSPAC transactions totaling $116bn in deal value
– 70 SPAC IPOs and most of them left-led
– Select recent representative transactions:
  – Gores Holdings IV's $425mm IPO and its acquisition of United Wholesale Mortgage (UWM) for $16.0bn
  – GMHI's $400mm IPO and its acquisition of Luminar for $2.9bn
  – Conyers Park II's $450mm IPO and its acquisition of Advantage Solutions for $5.2bn

## Asia Pacific coverage

| Leon Foong  | Rohit Satsangi | Alexandra Yang | David Xiong |
|---|---|---|---|

 *Co-Head of TMT APAC*
+852 22038096
leon.foong@db.com

 *Co-Head of M&A and Head of Financial Sponsors APAC*
+852 22037463
rohit.satsangi@db.com

 *Head of China Financial Sponsors*
+852 22035103
alexandra.yang@db.com

*Director M&A*
+852 22035165
david.xiong@db.com

| US FIG Coverage | | | M&A |
|---|---|---|---|

| Stephen Valentino | Daniel Jacobowitz | Matthew Hallisey | Michael Karafiol |
|---|---|---|---|

 *Global Co-Head of FIG*
+1 (212) 250-3288
stephen.valentino@db.com

 *Head of Exchanges & Market Infrastructure*
+1 (212) 250-6810
daniel.jacobowitz@db.com

 *Director Exchanges & Market Infrastructure*
+1 (212) 250-1459
matthew.hallisey@db.com

 *Head of SPAC M&A Americas*
+1 (212) 250-0889
michael.karafiol@db.com

 Liquid deSPAC execution team



# Why Deutsche Bank? Highest quality SPACs, maximum valuation

Deutsche Bank seeks to be Liquid's trusted advisor and is pleased to present our proposal on a potential $1.5bn - $2.0bn deSPAC of Liquid Group, Inc.

We believe Liquid's unique position in APAC and quality of services offered can achieve management's valuation objectives in raising funds to field further growth in the region

**Highest left-lead deSPACs since 2020**

- DB: $37bn M&A volume, 10 completed deals
  - More than double DB's nearest competitor

**Outperformance in after-market L3Y**

- 123% return on 16 DB-led deSPAC M&A transactions in the last 3 years[a] vs. 82% return of next competitor over same period

**Highest quality SPAC access / intros**

- Top quality SPAC sponsor access to ensure fastest, most seamless execution
  - Horizon (Eldridge / Boehly)
  - Independence (FT Partners / McLaughlin)
  - Freedom (PIMCO, Thiam)
  - Fortress (FIG)
  - Thunder Bridge (Simanson)
  - SVF (SoftBank)

**Fastest time to market**

- 60 day targeted announcement subject to market conditions and approvals

2

Deutsche Bank
Investment Bank

(a)    Based on current trading levels compared to the IPO price.



# Deutsche Bank credentials

# 1

Deutsche Bank
Investment Bank



# Deutsche Bank is the unequivocal market and thought leader in the SPAC sector, an area we have been committed to for over 10 years



SPAC M&A league table since 2010 ($bn)[a]
Announced and completed deSPACs



IPO league table since 2010 ($bn)[b]
Completed IPOs

**Deutsche Bank led SPACs have announced and completed some of the most prominent deSPAC transactions since 2020**



Deutsche Bank
Investment Bank

Note:   Market data as of March 12, 2021, includes IPOs over $100 million.
(a)      Ranked by M&A deal TEV. Announced transactions in dashed boxes.
(b)      Ranked by IPO offering volume.
*Source: Dealogic, Company Filings*




# Deutsche Bank precedent deSPAC transactions
## Since 2020



**$4,197 million TEV**
DeSPAC
*January 2020*
Financial & Capital Markets Advisor



**$1,552 million TEV**
DeSPAC
*February 2020*
Financial & Capital Markets Advisor



**$5,318 million TEV**
DeSPAC
*February 2020*
Capital Markets Advisor



**$2,700 million TEV**
DeSPAC
*April 2020*
Lead Capital Markets Advisor



**$3,324 million TEV**
DeSPAC
*June 2020*
Capital Markets Advisor



**$1,080 million TEV**
DeSPAC
*June 2020*
Financial & Capital Markets Advisor



**$2,600 million TEV**
DeSPAC
*August 2020*
Financial Advisor



**$16,052 million equity value**
DeSPAC
*January 2021*
Financial & Capital Markets Advisor

**hims**
**$1,592 million TEV**
Announced DeSPAC
*October 2020*
Financial & Capital Markets Advisor

**LORDSTOWN**
**$965 million TEV**
DeSPAC
*October 2020*
Capital Markets Advisor

---



**$5,200 million TEV**
DeSPAC
*October 2020*
Financial & Capital Markets Advisor

**MP MATERIALS**
**$1,044 million TEV**
DeSPAC
*November 2020*
Financial & Capital Markets Advisor

**LUMINAR**
**$2,900 million TEV**
DeSPAC
*December 2020*
Financial & Capital Markets Advisor



**$969 million TEV**
Announced DeSPAC
*December 2020*
Capital Markets Advisor



**$450 million TEV**
Announced DeSPAC
*December 2020*
Capital Markets Advisor



**$1,392 million TEV**
Announced DeSPAC
*December 2020*
Capital Markets Advisor



**$692 million TEV**
Announced DeSPAC
*December 2020*
Capital Markets Advisor



**$1,405 million TEV**
Announced DeSPAC
*January 2021*
Financial & Capital Markets Advisor

**ASTRA**
**$2,123 million TEV**
Announced DeSPAC
*February 2021*
Lead Financial & Capital Markets Advisor

**Rover**
**$1,355 million TEV**
Announced DeSPAC
*February 2021*
Lead Financial & Capital Markets Advisor, Placement Agent

---



**Matterport**
**$2,260 million TEV**
Announced DeSPAC
*February 2021*
Financial Advisor, Capital Markets Advisor and Placement Agent



**$8,552 million TEV**
Announced DeSPAC
*February 2021*
Lead Financial & Capital Markets Advisor, Placement Agent



**ATI PHYSICAL THERAPY**
**$2,450 million TEV**
Announced DeSPAC
*February 2021*
Financial Advisor & Placement Agent



**ROCKET LAB**
**$4,082 million TEV**
Announced DeSPAC
*March 2021*
Lead Financial & Capital Markets Advisor, Placement Agent

**doma**
**$3,030 million TEV**
Announced DeSPAC
*March 2021*
Capital Markets Advisor

**KORE**
**$1,014 million TEV**
Announced DeSPAC
*March 2021*
Capital Markets Advisor & Financial Advisor



**$827 million TEV**
DeSPAC
*January 2021*
Financial & Capital Markets Advisor



**$982 million TEV**
Announced DeSPAC
*December 2020*
Financial & Capital Markets Advisor



**$900 million TEV**
Announced DeSPAC
*March 2021*
Capital Markets Advisor & Financial Advisor to the target, Placement Agent to SPAC

**Consumer / Technology**
Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

---

**Electric Vehicle**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Renewable Energy**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Consumer / Technology**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Industrial Technology**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Real Estate Tech**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Renewable Energy**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Consumer / Technology**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Wellness / PropTech**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Clean Energy / AirTech**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

**Electric Vehicle**

Sell-side to a SPAC
*On-going*
Capital Markets Advisor & Financial Advisor to the target

---

Deutsche Bank
Investment Bank

Note:
(a)    As of March 2021.
       PIPE role is dependent upon the SPAC and is a role we look to serve to support our client.

 Represents Deutsche Bank sell-side role



# Deutsche Bank has been able to complete more transactions than its competitors while maintaining unparalleled performance



Sell-side to a SPAC
**$706mm equity value**

Completed July 2017

Capital Markets
& Financial Advisor



Sell-side to a SPAC
**$1,148mm equity value / $436mm proceeds**

Completed January 2021

Sell-side Financial
& Capital Markets
Advisor



Sell-side to a SPAC
**$1,447mm equity value / $495mm proceeds**

Announced December 2020

Sell-side Financial & Capital Markets Advisor, Private Placement Agent



Sell-side to a SPAC
**$1,105mm equity value / $240mm proceeds**

Announced March 2021

Sell-side Financial & Capital Markets advisor, Private Placement Agent

**Consumer / Digital**

Sell-side to a SPAC

~$1.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Renewable Energy**

Sell-side to a SPAC

~$1.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Digital Marketplace**

Sell-side to a SPAC

~$2.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

---

**Consumer Tech**

Sell-side to a SPAC

~$5bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Digital Marketplace**

Sell-side to a SPAC

~$1.5bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Semiconductor**

Sell-side to a SPAC

~$1.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Auto Tech**

Sell-side to a SPAC

~$1.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Clean Tech**

Sell-side to a SPAC

~$1.5bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Healthcare Tech**

Sell-side to a SPAC

~$1.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

**Electric Vehicle**

Sell-side to a SPAC

~$5.0bn

Ongoing

Sell-side Financial
& Capital Markets
Advisor

---

**Deutsche Bank deSPAC transactions have outperformed competitors in the public markets meaningfully over the last three years[a]**



| | 16 | 6 | 10 | 12 | 1 |

150.4%
104.5%
86.3%
42.0%
(94.1%)

Deutsche Bank, Goldman Sachs, Credit Suisse, Citi, Morgan Stanley

**Deutsche Bank executed the largest volume of left lead deSPAC transactions since 2020[b]**

| Lead left underwriter | Deal value ($mm) | Deal count | Unit performance | |
|---|---|---|---|---|
| | | | Average | Median |
| Deutsche Bank | $36,732.8 | 10 | 203.3% | 70.6% |
| Citigroup | $16,649.0 | 5 | 87.2% | 102.3% |
| Goldman Sachs & Co. | $16,463.0 | 6 | 104.5% | 77.8% |
| Cantor Fitzgerald | $14,378.9 | 14 | 39.4% | 38.4% |
| Credit Suisse | $12,662.0 | 4 | 81.1% | 52.9% |
| Cowen & Co. | $6,100.3 | 3 | 96.9% | 114.8% |
| EarlyBird Capital | $4,922.8 | 7 | 54.8% | 61.3% |
| Jefferies | $3,537.8 | 7 | 139.5% | 72.9% |
| UBS | $3,321.0 | 1 | 716.9% | 716.9% |
| B. Riley FBR | $3,159.9 | 6 | 30.2% | 13.4% |
| Nomura | $1,841.0 | 1 | 86.0% | 86.0% |
| BTIG | $1,570.0 | 1 | 26.4% | 26.4% |
| Barclays | $1,097.0 | 1 | 58.8% | 58.8% |
| Oppenheimer & Co. | $845.0 | 1 | (18.7%) | (18.7%) |
| Bank of America | $706.9 | 1 | 12.8% | 12.8% |
| Chardan | $553.3 | 2 | 51.9% | 51.9% |
| Wells Fargo | $337.0 | 1 | (32.8%) | (32.8%) |

Deutsche Bank
Investment Bank

Note:    Market data as of March 12, 2021.
(a)    Represents the average performance of all completed left-led deSPACs in the last three years based on current trading levels compared to the IPO price
(b)    Represents completed deals since 2020 by lead left bookrunner
*Source: Company Filings, Factset*



# Market update



Deutsche Bank
Investment Bank



# Northern Star Investment Corp. II announces its acquisition of Apex Clearing at an enterprise value of ~$4.7bn

**APEX | Clearing™**

On February 22, 2021, Apex Clearing entered into a definitive agreement to be acquired by Northern Star Investment Corp. II for ~$4.7bn

Northern Star Investment Corp. II is the 2nd SPAC formed by Joanna Coles, previously Chief Content Officer of Hearst Magazine and Editor-in-Chief of Cosmopolitan, and SPAC veteran Jonathan Ledecky, Chairman of Ironbound Partners and co-owner of the NHL's New York Islanders

## Transaction overview

– On February 22, 2021, Apex Clearing entered into a definitive agreement to be acquired by Northern Star Investment Corp. II, a publicly traded special purpose acquisition company (NYSE: NSTB)

– Transaction values Apex at an EV of ~$4.7bn (20x Revenues and 55x EBITDA) post-money and is expected to provide up to $850mm of gross cash proceeds at closing
  – includes an upsized, fully-committed $450mm PIPE at $10.00 per share led by Fidelity Management & Research Company, Baron Capital Group, Coatue, and Winslow Capital Management

– Apex shareholders and management are rolling over 100% of their equity into the combined company

– Following the closing of the transaction, Apex CEO, Bill Capuzzi, and Apex President, Tricia Rothschild, will continue to serve in their current roles at the combined company

– The Northern Star and Apex Board of Directors have unanimously approved the proposed transaction, which is expected to close in Q2 2021

## Investment highlights

 **Significant and expanding addressable market**: $100bn+ estimated TAM

 **Track record of product innovation and risk management** including integrated crypto experience

 **Deep competitive moat:** deep domain knowledge and regulatory expertise, high barriers to entry, cost structure advantage, high switching cost and network effect

 **Robust financial model:** accelerating growth and operating leverage backed by an attractive initial valuation relative to peers

## Management commentary

"Our merger will provide Apex with the resources and flexibility to accelerate our growth, scale our platform, and expand our offerings and market share alongside our clients. We are pleased to partner with Joanna Coles and Jon Ledecky at this incredibly exciting time for Apex as we strive to bring financial services into the 21st century and make investing accessible for everyone"

*Bill Capuzzi, CEO of Apex Clearing*

"Apex is the independent, invisible architecture that has helped launch many of the most notable fintech disruptors of our time. The Company is constantly innovating by offering solutions like fractional share trading and crypto trading in real time that is leading the democratization of investing. The Company's unique combination of strong growth potential, leading technology, and proven management team is extremely attractive, and I am thrilled to help play a part in the Company's long-term success"

*Joanna Coles, Chairwoman and CEO of Northern Star II*

## Valuation, sources and uses

| PF valuation ($mm) | |
| --- | --- |
| PF shares outstanding | 565 |
| Price/share ($) | $10.00 |
| Equity value | $5,650 |
| Cash to balance sheet | (1,108) |
| Debt | 120 |
| **Enterprise value** | **$4,662** |
| **Sources & uses ($mm)** | |
| **Sources of cash** | |
| Apex rollover equity[a] | $4,700 |
| SPAC cash in trust | 400 |
| PIPE Capital | 450 |
| **Total sources** | **$5,550** |
| **Uses of cash** | |
| Apex rollover equity[a] | $4,700 |
| Repayment of existing debt | 120 |
| Cash to balance sheet[b] | 690 |
| Illustrative transaction fees[b] | 40 |
| **Total uses** | **$5,550** |

(a)    Includes equity issuable to Apex parent upon conversion of debt
(b)    Includes existing cash and working capital on balance sheet as of Dec 2020. Debt includes expected issuance of up to $120mm of convertible senior notes
*Source: Company information, press*

Deutsche Bank
Investment Bank



# FinTech Acquisition Corp. V announces its acquisition of eToro at an enterprise value of ~$9.6bn



On March 16, 2021, eToro entered into a definitive agreement to be acquired by FinTech Acquisition Corp. V for an enterprise value of ~$9.6bn (9.7x 2022E net revenue)

FinTech Acquisition Corp. V is led by Betsy Z. Cohen as Chairman of the Board and Daniel G. Cohen as CEO

## Transaction overview

– On March 16, 2021, eToro entered into a definitive agreement to be acquired by FinTech Acquisition Corp. V, a publicly traded special purpose acquisition company (NYSE: FTCV)
– Transaction values eToro at an EV of ~$9.6bn post-money and 9.7x 2022E net revenue. It is expected to provide up to $250mm of gross cash proceeds at closing
  – includes an upsized, fully-committed $650mm PIPE at $10.00 per share led by ION Investment Group, Softbank Vision Fund 2, Third Point LLC, Fidelity Management & Research Company and Wellington Management
– Existing eToro equity holders, including current investors and employees of the firm, will remain the largest investors in the combined company retaining ~91% ownership
– The Fintech Acquisition Corp. V and eToro Board of Directors have unanimously approved the proposed transaction, which is expected to close in Q3 2021

## eToro's financial overview

| ($mm) | 2018 | 2019 | 2020 |
|---|---|---|---|
| Revenue | $369 | $244 | $605 |
| % growth | 40% | (34%) | 147% |
| Trading income | 19 | 8 | (61) |
| Net revenue | $389 | $252 | $544 |
| Marketing cost | 96 | 120 | 229 |
| Revenue net of marketing | $293 | $132 | $315 |
| Salary | $49 | $67 | $99 |
| Overheads | 27 | 38 | 56 |
| Payment processing fees | 23 | 16 | 65 |
| Total operating expenses | $100 | $121 | $220 |
| EBITDA | $193 | $11 | $95 |

## PF valuation ($mm)

| PF valuation ($mm) | |
|---|---|
| Implied market capitalization[a] | $10,391 |
| Net cash[b] | (796) |
| Enterprise value | $9,595 |

| Sources & uses ($mm) | |
|---|---|
| Sources of cash | |
| Existing eToro shareholder equity[c] | $9,466 |
| Cash held in trust | 250 |
| Proceeds from PIPE | 650 |
| Total sources | $10,366 |
| Uses of cash | |
| Existing eToro shareholder equity | $9,466 |
| Cash consideration | 300 |
| Cash to balance sheet | 525 |
| Estimated transaction expenses | 75 |
| Total uses | $10,366 |

## Management commentary

"Today, eToro is the world's leading social investment network. Our users come to eToro to invest, but also to communicate with each other; to see, follow, and automatically copy successful investors from all around the world. We created a new category of wealth management – social investing – and we are dominating the market as evidenced by our rapid expansion."

*Yoni Assia, CEO of eToro*

"As a pioneer in the evolution of SPACs, Fintech Masala, our sponsor platform, seeks out companies with outsized growth, effective controls and excellent management teams. eToro meets all three of these criteria. In the last few years, eToro has solidified its position as the leading online social trading platform outside the U.S., outlined its plans for the U.S. market, and diversified its income streams. It is now at an inflection point of growth, and we believe eToro is exceptionally positioned to capitalize on this opportunity."

*Betsy Cohen, Chairman of the Board of Directors of FinTech V*

## eToro's net revenue mix ($mm)



(a) Reflects the forfeiture of 1.28mm SPAC sponsor shares in connection with the transaction. Includes (i) 640K private placement shares and (ii) 1.82mm SPAC sponsor shares (25% of the retained 7.26mm SPAC sponsor shares) that are not subject to price based transfer restrictions following closing
(b) Net cash includes $50mm of outstanding loans, $71mm of cash on balance sheet as of December 31, 2020, $250mm of SAFE cash proceeds and $525mm of cash to eToro balance sheet following the transaction
(c) Total equity consideration to eToro includes any shares to be issued in respect of (i) eToro options and (ii) SAFE that converts into equity at $5.38/share.
Source: Company information, press

7

Deutsche Bank
Investment Bank



# Coinbase valued at an enterprise value of ~$68bn ahead of its planned direct listing



Coinbase plans to go public during H1 2021 via a direct listing

To determine a reference price, in Q1 2021 the company launched a secondary sale via Nasdaq private markets where it was most recently valued at $68bn

## Coinbase highlights

– Coinbase Global, Inc. is a digital currency exchange and provider of financial infrastructure and technology to the cryptoeconomy

– It serves retail users, institutions, and ecosystem partners (i.e. developers, merchants and asset issuers)

– 2020 revenue split was 75% US and 25% rest of the world

– The company has ~43mm verified users and serves ~7,000 institutions and ~115,000 ecosystem partners in over 100 countries

– $455bn+ in total volume traded and ~$90bn assets on its platform

– The company has 1,200+ employees

– Founded in 2012 and based in San Francisco, CA

## Historical financials

| (in millions) | 2019 | 2020 |
|---|---|---|
| Transaction revenue, retail | $433 | $1,040 |
| Transaction revenue, institutional | $30 | $56 |
| Subscription revenue | $20 | $45 |
| Other revenue | $51 | $136 |
| Total revenue | $534 | $1,278 |
| Transaction expense | $82 | $136 |
| Tech and development | $185 | $272 |
| Other operating expense | $312 | $461 |
| Total operating expense | $580 | $869 |
| Net income | ($30) | $322 |
| Adj. EBITDA | $24 | $527 |

## Funding rounds

| Date | Lead investors | Amount raised ($mm) | Post-money valuation ($mm) |
|---|---|---|---|
| Oct-18 | TIGERGLOBAL | $300 | $8,040 |
| Aug-17 | IVP | $108 | $1,710 |
| Jul-16 | MUFG — Mitsubishi UFJ Capital, SOZO VENTURES | $11 | $501 |
| Jan-15 | DFJ GROWTH | $75 | $490 |
| Dec-13 | ANDREESSEN HOROWITZ | $25 | $150 |
| Apr-13 | Union Square Ventures | $6 | $23 |

## Direct listing developments

– On February 25, 2021 Coinbase filed an S-1 ahead of its planned direct listing, which is expected during H1 2021

– The company said it plans to sell up to 114.9mm shares

– Coinbase will list on the Nasdaq with the ticker "COIN"

– During January 2021, Coinbase launched a secondary sale via Nasdaq private markets, offering 1.8mm shares

– Purpose was to help determine reference price for upcoming direct listing

– Coinbase reported its shares traded at an average price of $343.58 during Q1 2021 through March 15

– Targeting a valuation of up to $100bn at listing

Deutsche Bank
Investment Bank

*Source: Coinbase S-1, PitchBook, Reuters*



# Liquid deSPAC considerations



Deutsche Bank
Investment Bank



# Liquid equity story and key selling points



| | Comment | Evidence |
|---|---|---|
| **Dominant competitive position** | – Uniquely positioned to win and dominate in most desirable APAC digital asset markets<br>– Well positioned to service the entire digital asset ecosystem, driving significant incremental volume growth<br>– Shift to global users will continue to drive AuM growth through Altcoins (untradeable in Japan) | – #1 regulated Bitcoin-Fiat exchange in the world by transaction volume<br>– Spot volume accounts for 50%+ of the domestic Japan market share<br>– Largest institutional traders attracted to Liquid's low fees, fast execution, and deep liquidity |
| **Clean reputable platform** | – Pristine regulatory track record<br>– Commitment to risk management and compliance with all relevant regulatory frameworks<br>– Secure and fast automated KYC / AML process | – First global exchange to be licensed by the JFSA<br>– AML & suspicious transaction monitoring capability covering fiat & crypto |
| **Innovative tech stack** | – High functionality with HFTs providing low latency aspects<br>– Quality wallet security using multi party computing (MPC) technology | – First exchange to fully implement Secure MPC technology custody of digital assets.<br>– 100% of Japan client assets secured in cold wallets |
| **New product pipeline** | – Well positioned for growth through roll out of products in 2021<br>– Long-term view to expand beyond the exchange business through yield products and custody services | – QEX B2B2C, Perpetuals and Stablecoin exchange rolled out during H1 2021<br>– Roll out of staking / baking and lending products expected in Q2 2021<br>– Roll out of custody offering expected for Q3 2021 |

Deutsche Bank
Investment Bank



# Liquid growth





'18A –'22E
Revenue CAGR:
~17%

'20A –'22E
Revenue CAGR:
~58%

■ Revenue    ■ EBITDA

**Deutsche Bank**
Investment Bank

*Source: Company information*



# Liquid preliminary, indicative valuation range



## Summary valuation

| | Key assumptions | Metric ($mm) | Applied range | ($ in mm) | Implied EV $1,500mm | Implied EV $1,900mm |
|---|---|---|---|---|---|---|
| **EV / Revenue** | 2021E Revenue | 61 | Based on Apex Clearing and Coinbase EV / 21E revenue[a] median: 16.2x - 22.2x | $985 ▬ $1,352 | | |
| | 2022E Revenue | 99 | Based on Apex Clearing and Coinbase EV / 22E revenue[a] median: 13.6x - 16.0x | $1,345 ▬ $1,581 | | |
| **EV / EBITDA** | 2021E EBITDA | 27 | Based on Apex Clearing and Coinbase EV / 21E EBITDA[b] median: 44.3x - 53.9x | $1,183 ▬ $1,439 | | |
| | 2022E EBITDA | 59 | Based on Apex Clearing and Coinbase EV / 22E EBITDA[b] median: 22.5x - 35.3x | $1,335 ▬ $2,094 | | |

## Multiples analysis at various prices

| Total EV ($mm) | 1,100 | 1,300 | 1,500 | 1,700 | 1,900 | 2,100 | 2,300 |
|---|---|---|---|---|---|---|---|
| Implied Liquid EV / 2022E Revenue | 8.2x | 11.5x | 14.8x | 18.1x | 21.4x | 24.7x | 28.0x |
| deSPAC Comparables EV / 2022E Revenue | | APEX\|Clearing™ 13.6x | coinbase 16.0x[a] | | | | |
| Implied Liquid EV / 2022E EBITDA | 18.5x | 21.9x | 25.3x | 28.7x | 32.0x | 35.4x | 38.8x |
| deSPAC Comparables EV / 2022E EBITDA | | coinbase 22.5x[a, b] | | | | APEX\|Clearing™ 35.3x | |

Deutsche Bank Investment Bank

(a)  Coinbase estimated revenue based on $68bn valuation reported in private markets trading ahead of Coinbase direct listing in April 2021; Assumes '21E and '22E revenue growth consistent with 2020A of 139%.
(b)  Coinbase EBITDA assumes '21E and '22E EBITDA margin consistent with 2020A of 41%.
(c)  USD 1.5-1.9 bn preliminary, indicative valuation range with reference to 21E and 22E multiples. Our valuation case assumes full execution on plan and is subject to business dd given limited information.
*Source: DB estimates, company filings, press, Coinbase S-1*



# Liquid deSPAC perimeter



Investment will be made in the holding company, Liquid Group Inc



**Liquid Group Inc (JP)**
– Holding Company
– Japan, 2019

**50% — Liquid Financial USA Inc[a] (US)**
– Joint Venture
– Delaware, 2018

**100% — Liquid Securities Singapore Pte Ltd (SS)**
– Dormant
– Singapore, 2019

**100% — Analisya Pte Ltd (SG)**
– Singapore, 2013

**100% — Quoine Corporation (JP)**
– Licensed in Japan
– Japan, 2014

**100% — Quoine Pte Ltd (SG)**
– Global business
– PSA Applicant
– Singapore, 2014

**100% — LiquidEX LLC (US)**

**100% — Quoine Vietnam Co Ltd (VN)**
– Technology and customer support operations
– Ho Chi Minh, 2017

**99.99% — Quoine India Pte Ltd[b] (IN)**
– Dormant
– India, 2017

Deutsche Bank
Investment Bank

(a)  Liquid Financial USA – joint venture that is 50% owned by Virtual Currency Partners, L.P. (US) and operated by an independent management team.
(b)  Quoine India - there are 300,000 shares, of which Fair Consulting India Private Ltd owns 1 share.



# Business due diligence questions investors may ask



Investors will have a number of key questions for management on Liquid's strategy, growth, prospects, regulation in new target markets



**International expansion strategy**
– Which key markets of focus
– Timetable of de novo build in markets? Which ones?
– Which key products are targeted to each country?
– Who are product partners?

**Validation of B2B2C strategy**
– Which core retail, B2B2C products is Liquid targeting
– Who are core end-customers (institutional, retail / day traders, HFs, HFTB)

**Growth trajectory**
– Group level US GAAP revenue and EBITDA forecasts and financial model underlying drivers, 2018 -26E
– Net capital requirements / balance sheet requirements
– Breakdown of transaction revenues by cryptocurrency volume, spread; Commissions by B2B2C products
– Cost breakdown

**Regulation**
– Crypto licensing requirements in new target markets
– Changes in the regulatory landscape for cryptoassets

Deutsche Bank
Investment Bank

# deSPAC process



Deutsche Bank
Investment Bank



# Key considerations to establish a SPAC valuation framework

## Public market valuation drivers

| Positioning vs. key comparables | • Key comparables usually establish initial value range<br>• Positioning the transformation story essential to achieve some "look-through" value |
|---|---|
| Scarcity value of asset | • Assets with scarcity value tend to price at the higher end of the range<br>• Order book demand usually multiple times oversubscribed for high quality assets |
| Equity story | • Investors looking for clear growth story with value creation opportunities<br>• Transformational plans underpinned by historical track record provide a clear strategy |
| Stories with breakout-growth potential | • Category leaders in emerging technologies that are at an inflection point of broad adoption across diverse end markets<br>• Clear story connecting the dots between proceeds and path to accelerating scale |

## SPAC economic and negotiating considerations

| Sponsor promote | • SPAC Sponsor receives 'promote' shares (equivalent to 20% of the pro forma SPAC entity)<br>• Represents a source of dilution to the seller, although this is a point of negotiation and often sponsors are willing to forfeit or defer a portion of the promote into an earn-out |
|---|---|
| PIPE | • Often times, a PIPE is raised alongside the SPAC cash-in-trust to provide incremental capital depending on the uses of proceeds<br>• Key marketing step via gaining the support of a premier long-only investor |
| IPO discount | • SPAC transaction is priced at a slight discount to where we expect the pro forma company to trade in markets<br>• This helps to limit the number of redemptions and generate demand in the stock |
| Warrants  | • Each unit sold in a SPAC IPO consists of 1 common share and a fraction of one warrant, exercisable for a share of the pro forma company<br>• This represents potential dilution to the existing shareholders down the line as the company trades up |
| Redemptions  | • All SPAC investors have a right to redeem their shares at the time of the business combination vote for a pro rata portion of trust<br>• The number of redemptions will impact the amount of cash that the SPAC will ultimately provide |

 Key negotiating levers     Key structural consideration

Deutsche Bank
Investment Bank



# Potential SPAC partners for Liquid

| | Company | Sponsor | Offering size ($mm) | Offering date | Warrant coverage | Target focus | Acquisition deadline |
|---|---|---|---|---|---|---|---|
| ⭐ 1. | ScION Tech Growth II | ION Investment Group | $345.0 | 2/10/2021 | 1/3 | FinTech | 2/12/2023 |
| 2. | Golden Falcon Acquisition Corp. | Makram Azar, Scott Freidheim, Eli Muraidekh | 345.0 | 12/18/2020 | 1/2 | TMT / FinTech | 12/22/2022 |
| 3. | LMF Acquisition Opportunities, Inc. | Bruce Rodgers, Richard Russell | 310.5 | 1/26/2021 | 1/3 | FinTech | 7/29/2022 |
| ⭐ 4. | FinServ Acquisition Corp. II | Lee Einbinder | 300.0 | 2/18/2021 | 1/4 | FinTech | 2/22/2023 |
| 5. | Catcha Investment Corp | Catcha Group | 300.0 | 2/12/2021 | 1/3 | Tech Asia | 2/16/2023 |
| 6. | COVA Acquisition Corp. | Jun Hong Heng | 300.0 | 2/5/2021 | 1/2 | Technology - Asia | 2/9/2023 |
| 7. | Figure Acquisition Corp. I | Michael Cagney, Thomas J. Milani | 287.5 | 2/19/2021 | 1/4 | FinTech | 2/23/2023 |
| 8. | Concord Acquisition Corp. | Bob Diamond, David Schamis, Jeff Tudor | 276.0 | 12/8/2020 | 1/2 | FinTech | 6/10/2022 |
| 9. | Tiga Acquisition Corp. | G. Raymond Zage III, Ashish Gupta | 276.0 | 11/24/2020 | 1/2 | Asia | 5/28/2021 |
| 10. | CITIC Capital Acquisition Corp | CITIC Capital | 276.0 | 2/11/2020 | 1/2 | Clean Tech and Sustainability in Asia | 2/13/2022 |
| 11. | FinTech Evolution Acquisition Group | Rohit Bhagat, Michael Latham | 274.1 | 3/2/2021 | 1/3 | FinTech | 3/4/2023 |
| ⭐ 12. | VPC Impact Acquisition Holdings II | Victory Park Capital Advisors | 255.8 | 3/5/2021 | 1/4 | FinTech | 3/9/2023 |
| ⭐ 13. | VPC Impact Acquisition Holdings III, Inc. | Victory Park Capital Advisors | 253.8 | 3/5/2021 | 1/4 | FinTech | 3/9/2023 |
| ⭐ 14. | FTAC Athena Acquisition Corp. | Betsy Cohen, Amanda Abrams | 250.0 | 2/23/2021 | 1/4 | FinTech | 2/25/2023 |
| 15. | Provident Acquisition Corp. | Provident Group | 230.0 | 1/8/2021 | 1/2 | Technology - Asia, Southeast Asia | 1/12/2023 |
| 16. | Lefteris Acquisition Corp. | Mark Casady | 207.1 | 10/21/2020 | 1/3 | FinTech | 10/23/2022 |
| 17. | Deep Lake Capital Acquisition Corp | Mark Lavelle, Gary Marino, Michael Cyrus | 207.0 | 1/13/2021 | 1/2 | FinTech | 1/15/2023 |
| 18. | Quantum FinTech Acquisition Corporation | Joehn Schaible, Daniel Caamano, V, Sandip I. Patel | 201.3 | 2/5/2021 | 1 | FinTech | 8/10/2022 |

15

Deutsche Bank
Investment Bank

*Note: Sorted by SPAC IPO size.*
*Source: Company information, SEC filings*

 Represents repeat issuers

# Liquid illustrative transaction framework

## $300mm gross proceeds: $200mm SPAC, $100mm PIPE

*($mm, except per share data)*

### Illustrative transaction assumptions

| | |
|---|---|
| SPAC size | $200 |
| SPAC price per share | $10.00 |
| SPAC shares (mm) | 20.0 |
| SPAC warrants (mm)(a) | 6.7 |
| SPAC promote shares (mm) | 5.0 |
| PIPE size | $100 |
| PIPE shares (mm) | 10.0 |
| IPO discount | 15% |
| Existing net debt | -- |
| Transaction expenses | $30 |
| 2021E revenue | $61 |

### Multiple evolution

| 23.1x | 24.4x | 28.7x |
|---|---|---|
| Purchase TEV multiple | IPO TEV Multiple | Fully distributed TEV mulitple |
| A | B | C |

### Sources & Uses

| Sources ($mm) | |
|---|---|
| SPAC cash in trust | $200 |
| PIPE investor cash | $100 |
| **Total sources** | **$300** |

| Uses ($mm) | |
|---|---|
| Cash to balance sheet | $270 |
| Transaction expenses | $30 |
| **Total uses** | **$300** |

### Pro forma ownership

| Illustrative ownership breakdown | | |
|---|---|---|
| *(mm)* | **PF Shares** | **Ownership** |
| SPAC shareholders | 20.0 | *11.4%* |
| Seller rollover | 140.7 | *80.1%* |
| PIPE shareholders | 5.0 | *2.8%* |
| SPAC sponsor | 10.0 | *5.7%* |
| **Total shares outstanding** | **175.7** | *100%* |

### Enterprise value to equity value bridge

| | | |
|---|---|---|
| Fully distributed enterprise value | $1,750 | C |
| Add: PF net cash | $270 | |
| **Fully distributed equity value** | **$2,020** | |
| *Per share(b)* | *$11.50* | |
| Less: 15% IPO discount | (263) | |
| **Equity value @ IPO** | **$1,757** | |
| *Per share(b)* | *$10.00* | |
| Less: PF net cash | (270) | |
| **Enterprise value @ IPO** | **$1,487** | B |
| Less: sponsor promote | (50) | |
| Less: transaction expenses | (30) | |
| **Purchase enterprise value** | **$1,407** | A |
| Less: existing net debt | -- | |
| **Purchase equity value** | **$1,407** | |

Deutsche Bank
Investment Bank

(a)  Assumes units consist of 1 share and 1/3 warrants.
(b)  Assumes pro forma shares outstanding of 175.7mm.

# Raising a PIPE is a critical element of a successful deSPAC transaction
## Precedent Deutsche Bank PIPE transactions & track record of raising incremental capital

Deutsche Bank firmly believes that raising a PIPE alongside the SPAC cash-in-trust is critical to a successful business combination

The PIPE process acts to vet the transaction with external investors and provide external validation of the transaction and valuation

**Average stock price change since SPAC IPO [1] [2]**



- Deals with PIPE: 177%
- Deals without PIPE: 32%

**Average redemption % [1]**



- Deals with PIPE: 25%
- Deals without PIPE: 57%

| SPAC (size ($mm)) | Target (completion date) | PIPE size ($mm) | Subscription price / share | Selected key PIPE investors | Redemptions |
|---|---|---|---|---|---|
| HOLICITY $300.0mm | ASTRA February 2, 2021* | $200 | $10.00 | • BlackRock<br>• Other leading, long-term institutional shareholders | N/A |
| TPG TECH OPPORTUNITIES $450.0mm | nerdy January 29, 2021* | $150 | $10.00 | • Franklin Templeton<br>• Healthcare of Ontario Pension Plan<br>• Koch Industries<br>• Learn Capital | N/A |
| DEERFIELD Healthcare Technology Acquisitions Corp $143.8mm | CareMax IMC HEALTH MEDICAL CENTERS December 18, 2020* | $405 | $10.00 | • Deerfield Management<br>• Fidelity Management & Research Company<br>• Blackrock<br>• Eminence Capital<br>• Maverick | N/A |
| NEW PROVIDENCE MANAGEMENT COMPANY $230.0mm | AST SpaceMobile December 16, 2020* | $230 | $10.00 | • Vodafone<br>• Rakuten<br>• American Tower<br>• UBS O'Connor | N/A |
| EXPERIENCE INVESTMENT CORP. $275.0mm | BLADE December 15, 2020* | $125 | $10.00 | • HG Vora Capital Management<br>• Hedosophia<br>• KSL Capital Partners<br>• Other institutional and original investors | N/A |
| Thunder Bridge Acquisition II $345.0mm | indie December 15, 2020* | $150 | $10.00 | • Leading, long-term institutional shareholders | N/A |
| TPG PACE BENEFICIAL FINANCE $350.0mm | EVBOX GROUP December 10, 2020* | $225 | $10.00 | • Blackrock<br>• Inclusive Capital Partners<br>• Neuberger Berman<br>• Wellington Management | N/A |
| GORES HOLDINGS IV $425.0mm | UWM January 21, 2021 | $500 | $10.00 | • Alec Gores<br>• Other institutional investors | 0.0% |
| OAKTREE $201.3mm | hims January 20, 2021 | $75 | $10.00 | • Franklin Templeton<br>• Other institutional investors | 0.0% |

**Deutsche Bank Investment Bank**

Source: Company filings
* Represents announcement date
(1)    Represents all DeSPAC transactions closed during CY2020 (66 transactions); Data as of March 5, 2020
(2)    Assumes SPAC IPO price of $10 per share and equity consideration at time of merger of $10 per share.

# Targeted investor outreach for Liquid

During investor outreach, we will target separate pools of investors to build a strong shareholder base that will be supportive of the SPAC during and after the initial business combination process

This outreach will be concentrated on traditional SPAC investors that are familiar with the product, long-only, fundamental investors who will be attracted to Liquid and financial services / FinTech investors who will be familiar with the space

## Key SPAC investors

✓ Understand the product and are able to make expedited investments

✓ Key accounts for back-end TTW process as internal wall-cross requirements are less stringent

✓ Focuses on investors who indicate a strong interest to retain equity in the pro-forma company post business combination



## Key PIPE investors

✓ Provides upfront validation and cements a "public mark" for existing stakeholders rolling over their equity as well as the new investors

✓ Participation will be announced alongside the transaction to garner increased demand

✓ Raising a PIPE alongside the SPAC cash-in-trust is critical to a successful business combination

  
  
  
  
  
 

18

Deutsche Bank
Investment Bank



# Deutsche Bank has consistently provided its deSPACs with long-term research coverage, helping these companies grow in the public markets

| Transaction | | Close date | TEV ($mm) | DB Analyst |
|---|---|---|---|---|
| Thunder Bridge Acquisition Corp. II | indie | TBD | $1,447 | – Ross Seymore (Semiconductor Devices) |
| NEBULA Acquisition Corp | OpenLending | 6/10/2020 | $1,080 | – Ashish Sabadra (Business & Information Services) |
| VectoIQ | NIKOLA MOTOR COMPANY | 6/3/2020 | $3,324 | – Emmanuel Rosner (US Autos & Auto Technology) |
| | DRAFT KINGS  SBTech | 4/23/2020 | $2,700 | – Carlo Santarelli (US Gaming & Lodging) |
| GORES HOLDINGS III | PAE | 2/10/2020 | $1,552 | – Ashish Sabadra (Business & Information Services) |
| GS Acquisition Holdings Corp. | VERTIV | 2/10/2020 | $5,318 | – Nicole DeBlase (Electrical Equipment) |
| MOSAIC Acquisition Corp  FORTRESS SoftBank | vivint | 1/17/2020 | $4,197 | – Kunal Madhukar (Internet & Direct Marketing Retail) |
| TPG PACE HOLDINGS | ACCEL ENTERTAINMENT. | 11/20/2019 | $985 | – Steven Pizella (US Gaming & Lodging) |
| DFB HEALTHCARE | adapthealth | 11/8/2019 | $1,041 | – Pito Chickering (Medical Device & Healthcare Facilities) |
| CAPITOL IV | nesco | 7/31/19 | $1,086 | – Nicole DeBlase (Trading Companies & Distributors) |
| | TARGET LODGING | 3/18/19 | $1,314 | – Ashish Sabadra (Hotels, Restaurants & Leisure) |
| GORES HOLDINGS II | VERRA MOBILITY | 10/17/18 | $2,404 | – Ashish Sabadra (IT Services) |
| | WILLIAMS SCOTSMAN | 11/29/17 | $1,159 | – Ashish Sabadra (Construction & Engineering) |
| CONYERS PARK | ATKINS | 7/17/17 | $856 | – Faiza Alwy (Food Products) |
| PHC | PLAYA | 3/10/17 | $1,753 | – Chris Woronka (Hotels, Restaurants & Leisure) |
| GORES HOLDINGS | Hostess | 11/4/16 | $2,292 | – Faiza Alwy (Food Products) |

**Deutsche Bank has a strong track record of supporting its deSPAC transactions with comprehensive research coverage post close, given the firm view these companies as key corporate clients and potential long-term partners**
**Across the entire institutional platform, we are laser-focused on committing the full scope of the firm's resources to companies we take public through DB-led SPACs (given the opportunity for DB to be a market leader in future corporate finance, M&A and capital raising initiatives)**

19

Deutsche Bank
Investment Bank

*Sources: Deutsche Bank Research*



# The SPAC process can be broken down into four key phases, ultimately culminating in the target company becoming public



**Confidential Phase**

**Initial SPAC sponsor outreach** — ~2-3 weeks
- At the start of the process, we would approach a select group of Tier 1 SPACs to socialize the opportunity
- This will take the form of introductory banker calls using a short teaser on the investment opportunity
- SPACs willing to sign an NDA will then move forward with management presentations and be encouraged to submit an LOI

**Exclusive negotiation with selected SPAC partner** — ~1 week
- Based on the LOIs received, the target will select a SPAC to move forward with on an exclusive basis, taking into account valuation, cultural fit, among other criteria
- Together, the SPAC and the target will work to craft the marketing materials and finalize the company model
- While the SPAC is conducting its confirmatory DD, lawyers will work on the merger documentation so that all of these work streams can occur concurrently

**PIPE marketing process** — ~2-3 weeks
- The SPAC sponsor and target company management will go on a joint roadshow to market the transaction to existing investors, as well as potential PIPE investors
- This process is confidential and occurs prior to the public announcement of the transaction
- This is critical to the SPAC process, as it allows us to validate the company story and valuation prior to publicly announcing
- It can also be a strong marketing point to highlight the participation of leading institutional investors

**Key go / no-go decision, where the transaction can be abandoned with no public taint, or can move ahead with a public announcement**

**Public Phase**

**Public marketing process** — ~2-3 months
- The investor presentation and merger proxy will be filed publicly for the benefit of the investors
- The SPAC and target will hold investor meetings during the SEC review process, to ensure that supportive long-only investors come into stock
- Once the merger proxy is declared effective, there will be a SPAC shareholder vote to approve the business combination

20

Deutsche Bank
Investment Bank

# Illustrative deSPAC timeline
## Key milestones and processes



| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kick-off meeting | ★ | | | | | | | | | | | | | | | | | | | |
| Finalize teaser / marketing materials and prepare high-level diligence items / data room | | | | | | | | | | | | | | | | | | | | |
| Contact selected & additional SPACs and execute NDAs | | | | | | | | | | | | | | | | | | | | |
| Finalize model and management presentation | | | | | | | | | | | | | | | | | | | | |
| Management presentations with select SPACs | | | | | | | | | | | | | | | | | | | | |
| Follow-up with SPACs and engage in Q&A | | | | | | | | | | | | | | | | | | | | |
| Draft / distribute LOI framework | | | | | | | | | | | | | | | | | | | | |
| Receive draft LOI mark-ups | | | | | | | | | | | | | | | | | | | | |
| Draft LOI clarifications / negotiations | | | | | | | | | | | | | | | | | | | | |
| Finalize negotiations and choose SPAC partner to go into mutual exclusivity with | | | | | | | | ★ | | | | | | | | | | | | |
| Confirmatory due diligence | | | | | | | | | | | | | | | | | | | | |
| Launch PIPE process | | | | | | | | | ★ | | | | | | | | | | | |
| PIPE process | | | | | | | | | | | | | | | | | | | | |
| Draft and negotiate PIPE documentation | | | | | | | | | | | | | | | | | | | | |
| Execute PIPE documentation | | | | | | | | | | | ★ | | | | | | | | | |
| Draft and negotiate merger agreement | | | | | | | | | | | | | | | | | | | | |
| Execute merger agreement and announce transaction | | | | | | | | | | | ★ | | | | | | | | | |
| Draft merger proxy | | | | | | | | | | | | | | | | | | | | |
| File merger proxy | | | | | | | | | | ★ | | | | | | | | | | |
| SEC review period | | | | | | | | | | | | | | | | | | | | |
| Conduct investor roadshow / follow-up calls | | | | | | | | | | | | | | | | | | | | |
| Proxy declared effective | | | | | | | | | | | | | | | | | | ★ | | |
| Shareholder vote / deal close | | | | | | | | | | | | | | | | | | | | ★ |

21

Deutsche Bank
Investment Bank



# Recommended and experienced third party contacts for SPAC IPO executions

DB recommends a select set of highly-experienced and expeditious SPAC vendors that can help streamline the process towards an efficient deSPAC process

| Legal firms | | |
|---|---|---|
| **Paul Tropp**<br>*Partner*<br>**Firm:** Ropes & Gray | Tel: (212) 596-9515<br>Mobile: (917) 494-2569 | E-mail: paul.tropp@ropesgray.com |
| **Gregg Noel**<br>*Partner*<br>**Firm:** Skadden Arps Slate Meagher & Flom | Tel: (650) 470-4540 | E-mail: gregg.noel@skadden.com |
| **Alexander Lynch**<br>*Partner*<br>**Firm:** Weil Gotschal & Manges | Tel: (212) 310-8971 | E-mail: alex.lynch@weil.com |
| **Christian Nagler**<br>*Partner*<br>**Firm:** Kirkland & Ellis | Tel: (212) 446-4660 | E-mail: christian.nagler@kirkland.com |
| **Joel Rubinstein**<br>*Partner*<br>**Firm:** White & Case | Tel: (212) 819-7642 | E-mail: joel.rubinstein@whitecase.com |
| **Stuart Neuhauser**<br>*Partner*<br>**Firm:** Ellenoff Grossman & Schole | Tel: (212) 370-1300<br>Ext. 7116 | E-mail: sneuhauser@egsllp.com |

| Accounting Firms | | |
|---|---|---|
| **Jay C. Shepulski**<br>*Partner*<br>**Firm:** Withum | Tel: (973) 867-7483<br>Mobile: (973) 214-3360 | E-mail: jshepulski@withum.com |
| **John Klenner**<br>*Partner*<br>**Firm:** Marcum LLP | Tel: (212) 485-5548<br>Fax: (212) 485-5501 | E-mail: john.klenner@marcumllp.com |
| **Joseph Puglisi**<br>*Partner*<br>**Firm:** Citrin Cooperman | Tel: (212) 697-1000<br>Ext. 1537 | E-mail: jpuglisi@citrincooperman.com |
| **Rachel Laureno**<br>*Relationship Director*<br>**Firm:** BDO USA, LLP | Mobile: (917) 565-4177 | E-mail: rlaureno@bdo.com |

Deutsche Bank
Investment Bank



# Proposed engagement terms

# 5

Deutsche Bank
Investment Bank

# Deutsche Bank proposed engagement terms

Subject to conflict clearing

| Key terms | Overview |
|---|---|
| **Advisory services** | ▪ Sellside advisory services, including a sale to a SPAC as well as a sale to a financial or strategic acquirer<br>▪ Advisory services includes (but not limited to):<br>  – Help Liquid evaluate considerations related to a sale transaction, including a SPAC sale, the desirability of effecting a transaction, and in developing and implementing a general strategy for accomplishing such transaction<br>  – Assist in the preparation of marketing materials including a teaser, investor presentation, etc.<br>  – Help in the development and maintenance of Liquid's financial model and projections<br>  – Identify and engage with potential SPAC sponsors including "testing the waters" conversations<br>  – Provide valuation advocacy from a coverage and capital markets perspective<br>  – Negotiate optimal transaction structure including sponsor promote and warrant concession considerations<br>  – Coordinate roadshow and outreach to existing SPAC investors<br>  – Facilitate the rotation of supportive, long-only investors into the shareholder base<br>  – PIPE agent services[a]<br>    – Cultivate a list of appropriate and targeted investors for PIPE investment<br>    – Provide introduction and feedback from investors<br>    – Assist in coordination between lawyers and investors |
| **Right of First Refusal** | ▪ ROFR to serve as a sole advisor on future advisory transactions including a private equity placement or trade sale with fees no less than any other financial advisor |
| **Tail term** | ▪ Tail period of 18 months post-termination |
| **Fees** | ▪ Success fee: 1.00% of Transaction EV (based on 100%) payable upon closing<br>  – We are fully committed as we are only paid if a successful deal is consummated, no retainer<br>▪ Cost coverage: Reimbursement for all reasonable fees, expenses, and disbursements (including legal) of Deutsche Bank in connection with the transaction |

23

Deutsche Bank
Investment Bank

(a) Services to be provided if Liquid requests and the SPAC sponsor agrees under a separate agreement
(b) Our indicative proposal is still subject to internal approvals including RepRisk approval before we can commit at this early stage. If we need to send a written proposal we need to ensure appropriately caveated as per DB policy.



# Select Deutsche Bank transactions

Deutsche Bank
Investment Bank



# Capitol Investment Corp. V announces its $3,030mm acquisition of Doma (formerly States Title)



Deutsche Bank acted as capital markets advisor to Capitol Investment Corp. V

Deutsche Bank also acted as joint bookrunner on Capitol Investment Corp. V's $345mm IPO in December 2020

| PF capitalization ($mm)[a] | |
|---|---|
| PF shares (mm) | 355 |
| **Total equity value** | **$3,550** |
| Less: Net cash | ($520) |
| **PF enterprise value** | **$3,030** |
| 2022 Adj. Gross Profit Multiple | 17.7x |

| Sources & uses ($mm)[a] | |
|---|---|
| **Sources of cash** | |
| Existing shareholders | $2,836 |
| Capitol cash in trust | $345 |
| PIPE proceeds | $300 |
| **Total sources** | **$3,481** |
| **Uses of cash** | |
| Existing shareholders | $2,836 |
| Cash to balance sheet | $510 |
| Secondary proceeds | $81 |
| Estimated fees | $55 |
| **Total uses** | **$3,481** |

## Transaction overview

– On March 2nd, 2021, Capitol Investment Corp. V (NYSE: CAP) announced its acquisition of Doma Holdings Inc. (formerly States Title Holding) at an estimated post-transaction enterprise valuation of $3.0bn

– Capitol Investment Corp. V is a $345mm SPAC led by Chairman and Chief Executive Officer, Mark D. Ein

– Up to approximately $510 million of cash proceeds are expected to be retained by Doma, and existing Doma shareholders are estimated to own no less than approximately 80 percent of the equity of the new combined company

– Top-tier investors anchoring the PIPE overall include funds and accounts managed by BlackRock, Fidelity Management & Research Company LLC, The Gores Group, Hedosophia, SB Management, a subsidiary of SoftBank Group Corp., and Wells Capital. Existing Doma shareholder, Lennar, has also committed to the PIPE and Spencer Rascoff, co-founder and former CEO of Zillow Group, has committed a personal investment to the PIPE

## Doma is redefining the entire go-to-market approach

*Doma technology provides a game changing experience, replacing large chunks of the process with instant technology*





## Doma overview

– Doma, formerly known as States Title, is architecting the future of residential real estate transactions by overhauling the current system and building a better one based on what today's consumers expect: a simple, digital, and frictionless experience

– Founded in 2016, Doma uses machine intelligence to replace large portions of the antiquated residential real estate closing process with instant technology solutions

– Doma and its family of brands - States Title, North American Title Company (NATC) and North American Title Insurance Company (NATIC) - offer solutions for lenders, real estate agents, title agents, and homeowners that make closings vastly more simple and efficient, reducing cost and increasing customer satisfaction

– Doma's platform is built on 30 years of historical data that accelerates title and closing timelines while also greatly benefiting lenders, real estate professionals and title agents with significant time and cost savings

## Positioned to redefine residential real estate transactions







Deutsche Bank
Investment Bank

(a)    Per March 2021 Investor Presentation; assumes no redemptions
*Source: Company filings, Press release*



# Vector Acquisition Corp announces its $4,082mm acquisition of Rocket Lab USA, Inc.



Deutsche Bank acted as sole financial advisor and capital markets advisor to Vector and placement agent on the PIPE

Deutsche Bank also acted as left bookrunner on Vector's SPAC IPO in September 2020

| PF capitalization ($mm)(a) | |
| --- | --- |
| PF shares (mm) | 483 |
| **Total equity value** | **$4,827** |
| Less: Cash | ($745) |
| **PF enterprise value** | **$4,082** |

| Sources & uses ($mm)(a) | |
| --- | --- |
| **Sources of cash** | |
| Existing shareholders | $3,960 |
| Vector cash in trust | $320 |
| Additional PIPE equity | $467 |
| Rocket Lab existing cash | $48 |
| **Total sources** | **$4,795** |
| **Uses of cash** | |
| Existing shareholders | $3,960 |
| Cash to balance sheet | $745 |
| Cash to existing shareholders | $40 |
| Estimated fees | $50 |
| **Total uses** | **$4,795** |

## Transaction overview

– On March 1, 2021, Vector Capital Acquisition Corp ("VACQ") announced its acquisition of Rocket Lab USA, Inc. ("Rocket Lab"), at an estimated post-transaction enterprise valuation of $4,082mm or 5.4x 2025E revenue of ~$750mm

– Vector Acquisition Corp is a $320mm SPAC that IPO'd in September 2020 and is led by Chairman and Chief Executive Officer Alex Slusky

– Rocker Lab's current equity holders are rolling 100% of their existing stake and are expected to own approximately 82% of the combined company

– The transaction includes a $467mm fully committed PIPE at $10.00 per share with 39 total investors including Vector Capital, BlackRock, and Neuberger Berman

– Post-closing, the company will maintain the Rocket Lab name and will be listed on NASDAQ under a new ticker symbol "RKLB"

## Rocket Lab is uniquely positioned to exploit a growing market



**Launch (Electron & Neutron)** TAM: ~$10bn(b)

**Space Systems (Photon)** TAM: ~$20bn(b)

**Space Applications** TAM: ~$320bn(c)

$350bn+ TAM forecast to grow to $1.4tn by 2030(c)

 
**Capable of lifting 98% of all satellites through 2029**


**Earth observation, weather, GPS & others**

  
**Satellites and spacecrafts as a service**

**Space data analytics**

**Deep space missions**

## Rocket Lab overview

– Rocket Lab is a vertically integrated provider of small launch services, satellites and spacecraft components

– Delivers end-to-end space solutions through it's three operating segments
  – **Launch:** Proven rocket delivering dedicated access to orbit for 3+ years
    – **Electron:** Dedicated small launch vehicle
    – **Neutron:** New rocket development with 8-ton payload capacity
  – **Space Systems:** Manufacturing satellites and best-in-class heritage spacecraft components
  – **Space Applications:** Uniquely positioned to leverage launch and satellite capabilities and infrastructure to build and operate our own constellations

– Proven business execution through the following achievements in under 6 years
  – **18** launches to space
  – **97** satellites deployed to orbit
  – **3** launch pads build
  – **2nd** most frequently launched U.S. rocket (Electron)

## Generational space leader with world leading technology

 One of only two commercial companies delivering regular access to orbit

 Strong first-mover advantage in the small launch category

 Rocket Lab-built satellites and components on orbit

 Aggressive organic and inorganic expansion of Space Systems business

 Missions scheduled to the Moon and Mars for NASA

25



(a) Per February 2021 Investor Presentation; assumes no redemptions
(b) Allied Market Research
(c) Wall Street Research
Source: Company filings, Wall Street Research, Press release



# Gores Holdings V announces its $8.5bn acquisition of Ardagh Metal Packaging




DB is acting as Lead Financial Advisor and Capital Markets Advisor to Gores on its acquisition of AMP, Placement Agent to Gores on the PIPE raise and provided committed financing in support of the transaction

DB also acted as Lead Bookrunner on Gores Holdings V's $525m IPO in August 2020

DB has long-term relationship with Ardagh, including having acted as Global Coordinator on Ardagh's 2017 IPO

### PF capitalization ($m)

| | |
|---|---|
| PF shares (m) | 607.3 |
| Equity value | $6,073 |
| Plus: net debt[a] | (2,449) |
| PF enterprise value | $8,522 |

### Sources & Uses ($m)

| Sources | |
|---|---|
| Cash in trust | $525 |
| PIPE proceeds | 600 |
| Net debt raise | 2,315 |
| Ardagh rollover | 4,850 |
| Total sources | $8,290 |
| Uses | |
| Ardagh rollover | $4,850 |
| Cash to Ardagh | 3,400 |
| GH V est. expenses | 40 |
| Total uses | $8,290 |

## Transaction overview

- On February 23, 2021, Gores Holdings V announced the acquisition of Ardagh Metal Packaging ("AMP"), the aluminum Beverage Cans business of the Ardagh Group ("ARD"), for TEV of $8.5bn
  - Representing 13.0x 2021E Adj. EBITDA of $654m, 12.1x 2021E PF Adj. EBITDA of $704m and 10.5x 2022E Adj. EBITDA of $813m
  - $1.1bn new equity from $525m GH V cash in trust and $600m PIPE proceeds
  - Additionally, AMP will raise $2.3bn in new net debt, delivering a total cash proceeds of $3.4bn to Ardagh Group
- Prior to the transaction, ARD was comprised of two segments (Glass and Beverage Cans) and owned a 42% interest in the Trivium food can joint venture
  - Ardagh Group trades on NYSE under the ticker ARD
  - ARD reported revenues of $6.7bn and EBITDA of $1.2bn ($610m from Glass and $545m from Beverage Cans) in 2020
- Post the transaction, ARD will own 80% of AMP, while retaining 100% of Glass and the 42% stake in Trivium
  - AMP intends to list on NYSE under the ticker AMBP

## AMP is a compelling investment opportunity



**Business highlights**

**100%** Infinitely recyclable products   **100%** Pure play beverage can   **#2 / #3** Player across geographies   **5+ years** Contract length on new capacity

**Financial highlights**

**$3.8bn** '21E Revenue   **$654 – $1,117m** '21E – '24E Adj. EBITDA   **20%** '21E – '24E Adj. EBITDA CAGR   **+52%** '24E volume growth backed by contracts

Supported by $1.8bn Business Growth Investment (BGI)

## The transaction unlocks significant shareholder value




Deutsche Bank
Investment Bank

(a) Includes estimated capital leases
(b) Ardagh Group unaffected share price as of 2/12/2021, prior to the publication of the Bloomberg article "Ardagh Considers Listing Cans Unit Via Alec Gores SPAC"
(c) Glass segment estimate based on selected Wall Street Research; includes corporate cost allocation
(d) Trivium is not consolidated in ARD's EBITDA; it is reported below the EBITDA line using the equity investment method in ARD's filings
Source:    Company filings, Gores press release, Ardagh Group Investor Presentation 02/23/2021, Wall Street Research, Interim reports to bondholders on Trivium's website



# indie Semiconductor signs definitive agreement to merge with Thunder Bridge II to become a publicly listed company with market cap of approximately $1.4bn



Deutsche Bank Securities is serving as lead financial advisor and lead capital markets advisor to indie Semiconductor and joint private placement agent to Thunder Bridge II

## Transaction overview

– On December 15, 2020, indie Semiconductor ("indie") announced that it will become a publicly traded company through a business combination with Thunder Bridge Acquisition II, Ltd. ("THBR" or "Thunder Bridge II") (Nasdaq: THBR) at an estimated pro forma enterprise value of $982 million

– Valued on the basis of CY25E revenue and EBITDA metrics, implying a 10.8x CY22E revenue multiple

– Thunder Bridge II is a $345mm SPAC led by Gary Simanson and Pete Kight

– Transaction creates a publicly-traded pureplay Autotech semiconductor company focused on EDGE Sensors for ADAS and Autonomous driving including LiDAR, Electrification, Connected car and User Experience applications

– Transaction includes an upsized $150mm fully committed PIPE including anchor investments from leading long-term institutional shareholders

– Up to $495mm in cash proceeds will accelerate the deployment of solutions to existing customers via investment in R&D and pre-identified M&A and fund pent-up demand for additional programs

## indie Semiconductor overview

– Co-Founded by CEO Donald McClymont, President Ichiro Aoki, and CTO Scott Kee, indie is an innovator of high performance mixed signal system-on-chip (SoC) semiconductor and software Autotech solutions, powering ADAS/Autonomous, Connectivity, User Experience and Vehicle Electrification applications

– indie's automotive semiconductor portfolio addresses a $16bn market, according to IHS, which is expected to reach $38bn by 2025 driven by the accelerated demand for silicon content in vehicles

– indie is on the approved vendor list for 12 top Tier 1 OEMs including Magna, Valeo, Continental, Aptiv and others across a variety of safety, user experience and connectivity engine products

– indie has $2bn+ in strategic backlog[3] underpinned by 28 customer contracts across a diverse portfolio with additional $2.5bn in identified opportunity pipeline[4]

– indie is targeting to deliver 60% gross margin and 30% operating margin by 2025

### PF capitalization ($mm)

| | |
|---|---|
| PF shares (mm) | 144.7 |
| Total equity value[1] | $1,447 |
| Less: Net cash | ($465) |
| PF enterprise value | $982 |

### Sources & uses ($mm)[2]

| | |
|---|---|
| **Sources of cash** | |
| THBR cash-in-trust | $345 |
| PIPE | $150 |
| **Total sources** | **$495** |
| **Uses of cash** | |
| Cash to balance sheet | $465 |
| Deal expenses | $30 |
| **Total uses** | **$495** |

## Key competitive differentiation

✓ Best-in-class mixed signal SoC solutions

✓ Leveraging manufacturing technologies and proprietary packaging techniques to drive integration up and cost down

✓ Innovative product roadmaps

✓ Reliable / geographically diverse / highly scalable supply chain

✓ Meet / exceed all key quality standards

### 12 Tier 1 approved vendor lists

   
   
   

## Investment highlights

 **1** *Next-Gen Automotive Semiconductor and Software Platform - Solving the Most Complex and Demanding Challenges*

 **2** *$2bn+ of Strategic Backlog[3] and Revenue Visibility through 2025+ Driven by Deep Relationships with Top Tier 1 Automotive Suppliers*

 **3** *Well Positioned in Massive Secular Growth Market with High-Growth, Margin-Rich $38bn SAM by 2025*

 **4** *Proven Leadership Team with Track Record of Extraordinary Value Creation*

 **5** *Transaction Accelerates Roadmap and Drives Substantial Growth & Profitability*

Deutsche Bank
Investment Bank

(1) Based on $10.00 share price
(2) Per December 2020 Investor Presentation; assumes no redemptions
(3) Strategic Backlog means projected future revenues based on existing contracts setting forth design and pricing terms and historic production trends of our customers
(4) Pipeline means identified opportunities to sell our products and services to existing customers in our industry
Source: Company filings, press release



# Gores Holdings VI announces its $2.9bn acquisition of Matterport, Inc.




Deutsche Bank acted as Financial Advisor, Capital Markets Advisor and Placement Agent to Gores VI

Deutsche Bank also acted as Lead Left Bookrunner on Gores VI's $345m IPO in December 2020

Demonstrates strength of Deutsche Bank's software franchise and continued role in technology-industry defining transactions

## Transaction & Matterport overview

– From offline to online, Matterport's market leading technology platform turns buildings into data to deliver unparalleled property insights and analysis

– With more than 250K customers in 150 countries, the transaction will enable Matterport to accelerate global enterprise growth across industry verticals, while continuing to invest in Matterport's AI and platform technology strategy

– Combined company to have an estimated post-transaction equity value of up to $2.9bn and will remain listed on the NASDAQ under the ticker symbol "MTTR" following the expected close of the transaction in Q2 2021

– Transaction to provide up to $640m in gross proceeds comprised of $345m of cash held in trust from Gores Holdings VI and a $295m fully committed common stock PIPE at $10.00 per share, anchored by top tier institutional investors including Tiger Global, Senator, Dragoneer, Miller Value, Reinvent Capital, Untitled Investments, Darlington, and Lux Capital

– All Matterport shareholders will retain their equity holdings through Matterport's transition into the publicly listed company

## Investment highlights

✓ Massive, unpenetrated $240bn+ total available market

✓ Market leader fueling the digital transformation of the built world

✓ Unrivaled software & data platform with significant expansion opportunities

✓ Global, blue chip customers spanning diverse end markets

✓ Rapid growth, efficient customer acquisition, and expanding margins

✓ Proven leadership team with large-scale platform experience

### PF capitalization ($m)

| | |
|---|---|
| PF shares (m) | 291.5 |
| **Equity value** | **$2,915** |
| Less: Net cash(a) | ($655) |
| **PF enterprise value** | **$2,260** |

### Sources & uses ($m)

| Sources ($m) | |
|---|---|
| Cash in Trust(b) | $345 |
| Proceeds from PIPE Raise | 295 |
| Seller Rollover | 2,189 |
| **Total sources** | **$2,829** |

| Uses ($m) | |
|---|---|
| Seller Rollover | $2,189 |
| Cash to Matterport's Balance Sheet(b) | 615 |
| GH VI Estimated Deal Expenses | 25 |
| **Total uses** | **$2,829** |

## Matterport delivers value across the property lifecycle for diverse end markets



## Global customer base with low customer concentration



28

**Deutsche Bank**
Investment Bank

(a) Based on estimated pre-transaction close net cash position of $40m and $615m net cash injection to company's balance sheet
(b) Assumes no Gores Holdings VI stockholder has exercised its redemption rights to receive cash from the trust account. This amount will be reduced by the amount of cash used to satisfy any redemptions
*Source: Company filings, press release*

# Property Solutions Acquisition Corp. $2.6bn acquisition of Faraday Future




Deutsche Bank acted as Financial Advisor to Property Solutions Acquisitions Corp on the transaction

| PF capitalization ($m) | |
|---|---|
| PF shares[a] (mm) | 337 |
| Price per share | $10.00 |
| **Total equity value** | **$3,370** |
| Less: cash | ($748) |
| **PF enterprise value** | **$2,622** |

| Sources ($m) | |
|---|---|
| FF rollover equity | $1,625 |
| PIPE shareholders[b] | $775 |
| Rollover existing net debt | $671 |
| SPAC cash-in-trust[c] | $230 |
| **Total sources** | **$3,301** |

| Uses ($m) | |
|---|---|
| FF rollover equity | $1,625 |
| Cash to balance sheet | $748 |
| Debt converted to equity | $671 |
| Debt paydown | $182 |
| Deal expenses | $75 |
| **Total sources** | **$3,301** |

## PF ownership structure



SPAC shareholders 7%
SPAC sponsor 2%
Debt converted to equity 17%
Seller rollover equity 51%
PIPE shareholders 23%

## Transaction overview

– On January 28, 2021, Property Solutions Acquisition Corp. (NASDAQ: "PSAC") announced its acquisitions of Faraday Future (FF) at an estimated pro forma enterprise value of $2,622m, 0.2x 2024E revenue of $10,555m and 2.9x 2024E EBITDA of $914m

– Property Solutions Acquisition Corp. is a $230m special purpose acquisition company ("SPAC") that went public in August 2020

– Total net proceeds of $748m, including $230m[a] of expected cash-in-trust and $775[b]m of private investment in public equity ("PIPE") proceeds

– The PIPE includes over 30 leading long-term institutional shareholders from the U.S., Europe and China; anchor investors in the PIPE include a Top 3 Chinese OEM, long-term long-only institutional shareholders, and a tier-1 Chinese city

– Existing FF shareholders will roll over their existing equity, retaining 51% of the combined company's pro forma equity ownership[b]

– Existing FF shareholders to receive $250m earn-out in 2 tranches of 12.5m shares each earned at price targets of $13.50 and $15.50, respectively

– Proceeds from the transaction expected to fully fund launch and sales of FF 91, expected 12 months after funding

– Transaction is expected to close in second quarter of 2021

## The FF 91 is built with innovative, class redefining features



– 378 miles EPA / 700km NEDC range from 130kwh battery
– DC fast charging capability among industry leaders
– 0-60 mph in 2.39 seconds
– 1050HP powered by 3 high performance electric motors
– All-wheel drive, all-wheel steer and rear-wheel torque vectoring
– Truly mobile connectivity with fixed broadband internet speed
– Over 100" of high-resolution viewing area across 11 displays
– Fully certified to meet US and China government regulations
– Named one of the Best Cars of CES 2020

## Faraday Future overview

– Founded in May 2014, Faraday is a California-based global shared intelligent mobility ecosystem company

– Developed the FF 91, an ultra-high end luxury electric vehicle with Bugatti Veyron-rivaling power and Rolls Royce-rivaling luxury

– Led by Dr. Carsten Breitfeld, who spent the vast majority of his career at BMW and led the i8 program

– $2bn invested to-date; 29 prototype and 13 pre-production vehicles have been manufactured; 14,000+ reservations to-date; expects to sell 400k units over next 5 years

– Battery, drivetrain and related technology competitiveness supported by 900 filed or issued patents and independently validated by Roland Berger

– After production and commercialization of the FF91, Faraday plans to produce both a premium mass market (FF81) in 2023 and a mass market electric vehicle (FF71) in 2024 as well as a Smart Last Mile Delivery ("SLMD") vehicle in 2023

– Production facilities: Hanford, CA, South Korea (through a joint venture) and China (currently negotiating JV (MOU executed) with top 3 Chinese automotive OEM partner and a tier-1 Chinese city)

– FF's strategic partners include one of China's top three OEMs which the company believes will help establish FF's presence in the Chinese vehicle market and further solidify FF's unique US-China dual home market advantage

## Revolutionary, all-new digital-first connected driving experience



– Designed from the ground up with the driver top of mind
  – Seamless entry technology that identifies user upon approach and reconfigures vehicles preferences and setting
  – Six driver specific screens ; ultra-large HUD
  – 3D touch steering wheel
  – Gesture controls and voice-commands
  – Autonomous driving ready
– Third Internet Living Space powered by I.A.I (Internet, autonomous driving and intelligence)
  – Unique rear internet system for ultimate passenger experience
  – Facial recognition; individual sound and climate zones
  – NASA-inspired zero gravity seats

**Deutsche Bank**
Investment Bank

(a) Assumes new shares are issued at a price of $10 per share and includes SPAC sponsor promote
(b) $175m of $775m is from a tier-1 Chinese City and is subject to customary regulatory approvals
(c) Estimated PSAC cash-in-trust at closing. Assumes no PSAC stockholder has exercised its redemption rights. This amount will be reduced by the amount of cash used to satisfy any redemptions
*Source: Company filings, Press releases*



# Gores Holdings IV, Inc. completed its $16,052mm acquisition of United Wholesale Mortgage



Deutsche Bank acted as lead financial advisor, lead capital markets advisor, and exclusive placement agent to Gores IV

Deutsche Bank also acted as lead left bookrunner on Gores IV's $425mm IPO in January 2020

## Transaction overview

– On January 21, 2021, Gores Holdings Iv, Inc. ("Gores IV") completed its acquisition of United Wholesale Mortgage ("UWM"), at an estimated post-transaction equity value of approximately $16.1 billion, or 9.5x the Company's estimated 2021 Adjusted Net Income of approximately $1.7 billion
– Gores IV is a $425mm SPAC sponsored by Alec Gores, Founder, Chairman and CEO of The Gores Group
– Transaction includes a $500 million private placement, led by Alec Gores and anchored by top tier institutional investors
– Transaction proceeds will enable UWM to accelerate implementation of its business plan focused on providing superior service to its broker-clients and capitalizing on growth opportunities
– Current UWM management will continue to lead the combined company post-closing, and existing shareholders will retain a 94% stake in the combined company

## United Wholesale Mortgage overview

– Founded in 1986 and based in Pontiac, Michigan, United Wholesale Mortgage ("UWM") is the largest wholesale mortgage originator in the United States with nearly 7,000 dedicated team members
– Operating under parent company United Shore, UWM is known for its highly efficient, accurate and expeditious lending support, UWM underwrites and provides closing documentation for residential mortgage loans originated by independent mortgage brokers, correspondents, small banks and local credit unions
– UWM's differentiated business model focuses exclusively on providing mortgage broker clients superior service through proprietary technology that enables them to process mortgage applications at faster speeds and provide lower rates than competitors
– UWM is the #2 mortgage originator and the #1 wholesale originator in the U.S. and is expected to originate ~$200 billion in mortgages in 2020

| PF capitalization ($mm) | |
|---|---|
| PF shares (mm) | 1,605.2 |
| Share price | $10.00 |
| Total equity value | $16,052 |
| 2021E adj. NI multiple | 9.5x |

| Sources & uses ($mm)(a) | |
|---|---|
| Sources of cash | |
| GHIV cash in trust | $425 |
| PIPE | $500 |
| Seller rollover | $15,021 |
| Total sources | $15,946 |
| Uses of cash | |
| Seller rollover | $15,021 |
| Proceeds to seller | $895 |
| Fees and expenses | $30 |
| Total uses | $15,946 |

## The wholesale channel is a win, win, win

**UWM is a dominant leader in a growing market, which benefits both brokers and borrowers alike**



**Benefits to borrowers**

✓ Broker serves as a trusted advisor
✓ Interests align to secure best outcome for the borrower
✓ Provides multiple options



**Benefits to brokers**

✓ Eliminates risk of disintermediation
✓ Can compete with largest competitors due to benefits of scale
✓ Reduce turn times and through rates



**Benefits to UWM**

✓ Limited fixed cost base and higher marginal profitability
✓ Positioned for massive scale with minimal incremental investment

## Investment highlights



✓ Leading player in a massive market with structural tailwinds

✓ Best-in-class broker experience leading to #1 wholesale market position

✓ Technology and data & analytics support continued pole position



✓ Accelerating scale drives faster speed, better service and lower cost

✓ Resilient platform with ability to scale in every rate environment

✓ Compelling financial profile with multiple growth levers

✓ Organization built on strong culture and an exceptional leadership team

Deutsche Bank
Investment Bank

(a) Per September Investor Presentation; assumes no redemptions
Source: Company filings, press release



# Acamar Partners completed its $827m acquisition of CarLotz



Deutsche Bank acted as Lead Financial Advisor and Lead Capital Markets Advisor to CarLotz on the transaction

Deutsche Bank also acted as Joint Bookrunner on ACAM's $306mm IPO in February 2019

Deutsche Bank was able to provide significant depth and breadth of industry, advisory, SPAC and equity capital markets expertise to assist CarLotz in finding the right SPAC partner and structuring a highly attractive transaction for CarLotz's existing shareholders, including helping obtain a PIPE investment from institutional and strategic investors

Transaction represents Deutsche Bank's 2nd completed deSPAC business combination in 2021, highlighting Deutsche Bank's continued leadership in the SPAC market

### Transaction overview

- On January 21, 2021, Acamar Partners Acquisition Corp. (NASDAQ: "ACAM") completed its $827m acquisition of CarLotz ("CarLotz"), representing 0.88x 2022E revenue of $945m and 6.8x 2022E gross profit of $121m
- Acamar Partners Acquisition Corp. is a $306m special purpose acquisition company ("SPAC") that went public in February 2019
- Total proceeds of $436 million, including $311 million of expected cash-in-trust and $125 million of private investment in public equity ("PIPE") proceeds
- Fully-committed PIPE from investors such as Fidelity Management & Research Company LLC, McLarty Diversified Holdings, founded by Franklin McLarty, former CEO of one of the largest U.S. automotive dealership groups, Rick Wagoner, former CEO of General Motors, and TRP Capital, an existing CarLotz investor
- Existing CarLotz shareholders will roll over the vast majority of their existing equity, retaining 59% of the combined company's pro forma equity ownership(a)
- Existing CarLotz shareholders to receive $75m earnout(b)
- Acamar is deferring 50% of its promote worth $34m into an earnout(b)
- CarLotz will retain $321m in cash at transaction close to fund growth initiatives including investments in core technology and nationwide hub expansion

### CarLotz overview

- CarLotz is one of the largest privately-held used vehicle retail disruptors with the industry's only consignment-to-retail sales platform
- Coupled with its asset-light inventory sourcing model, CarLotz offers a compelling value proposition for both vehicle buyers and sellers, resulting in significant market share expansion opportunities in the massive and highly fragmented used vehicle industry
- Proprietary technology and omni-channel marketplace provide consumers a seamless, worry- and hassle-free user experience that eliminates the frustrations often experienced in the car buying and selling process
- Also serves many of the largest corporate vehicle remarketers in banking, rental, fleet management, original equipment manufacturers and other markets
- Pioneered Retail Remarketing™, enabling corporate sellers of vehicles to access the financial benefits of direct-to-retail sales opportunities vs. wholesale prices in vehicle auctions
- Key investment highlights:
  - Massive, underpenetrated market supporting multiple market-leading players
  - Proprietary, technology-enabled buying, sourcing and selling model
  - Superior unit economics and capital efficiency
  - Entrenched foundation with tremendous growth opportunity
  - Visionary leadership team and strong corporate culture

### Sources & uses, PF valuation & ownership at announcement

| Sources ($m) | | Uses ($m) | |
|---|---|---|---|
| SPAC cash-in-trust | $311 | Cash to balance sheet | $321 |
| PIPE shareholders | $125 | Preferred stock liquidation preference | $37 |
| | | Cash to existing shareholders | $33 |
| | | Transaction expenses | $45 |
| **Total sources** | **$436** | **Total uses** | **$436** |

| PF valuation ($m) | | PF ownership (%) | |
|---|---|---|---|
| PF shares(a) (mm) | 114.8 | Existing CarLotz shareholders | 59% |
| Price per share | $10.00 | Acamar SPAC shareholders | 27% |
| Total equity value | $1,148 | PIPE investors | 11% |
| Less: cash | ($321) | Acamar sponsor | 3% |
| **PF enterprise value** | **$827** | **Total** | **100%** |

### Compelling value for used vehicle sellers and buyers...



| Value to seller | carlotz Serves as a marketplace | Value to buyer |
|---|---|---|
| *Sellers list cars via CarLotz* | | *Buyer chooses from nationwide inventory* |
| *Higher average price to seller* | **Asset-light model** *Minimal inventory held, leading to limited capital risk* | *Significant savings* |
| | **Non-competitively sourced inventory** *Structurally lower CACs* | *Ease of shopping, financing and closing entirely online* |
| *No haggling or negotiating* | **Increased profits and lower risk** *Increase profit by lowering costs, fast inventory turns and growing F&I profits* | *Buying with confidence backed by CarLotz brand* |
| *Always in control from start to finish* | | |

### Share price development

Announcement $10.00 → Closing $11.35 (13.5%)

31

Deutsche Bank
Investment Bank





(a) Total shares includes 68.0 rollover equity shares from existing CarLotz shareholders, 30.6 million Acamar public shares, 12.5 million shares from PIPE and 3.8 million Acamar sponsor shares. Assumes no redemptions. Assumes that all SPAC proceeds remain in trust. Excludes the impact of any earn-out shares and warrants
(b) CarLotz existing shareholders to receive an earn-out of 7.5M shares once CarLotz share price trades above $12.50, and the remaining 50% once it trades above $15.00, for 20 out of any 30 consecutive trading day period post-business combination. Acamar Partners to receive 50% of its promote or 3.8mm shares, on the same terms as the existing CarLotz shareholders' earn-out
Source: Company filings, Press releases

# Oaktree Acquisition Corp. completed its $1.6bn acquisition of Hims & Hers




DB acted as Sole Financial Advisor, Joint Capital Markets Advisor and Joint Private Placement Agent to Oaktree Acquisition Corp. in connection with the transaction

DB also acted as Left Lead Bookrunner on OAC's $201mm IPO in July 2019 and Left Lead Bookrunner on Oaktree's second SPAC in September 2020

### Pro forma valuation ($mm)(a)

| | |
|---|---|
| PF shares (mm) | 192.7 |
| Share price | $10.00 |
| **Total equity value** | **$1,927** |
| Net debt | ($334) |
| **PF enterprise value** | **$1,592** |

### Sources & uses ($mm)(a)

| | |
|---|---|
| **Sources of cash** | |
| OAC cash in trust | $205 |
| PIPE | $75 |
| Seller's equity | $1,600 |
| **Total sources** | **$1,880** |
| **Uses of cash** | |
| Cash to balance sheet | $245 |
| Seller's equity | $1,600 |
| Transaction fees | $35 |
| **Total uses** | **$1,880** |

## Transaction overview

– On January 20, 2021, Oaktree Acquisition Corp. ("OAC") completed its acquisition of Hims & Hers ("Hims"), creating a $1.6bn consumer-focused telehealth platform

– The transaction implies a Hims & Hers valuation at 8.9x 2021E Revenue and 12.2x 2021E Gross Profit

– Oaktree Acquisition Corp. is a $201mm SPAC led by Oaktree Capital Management

– Alongside the transaction, OAC and Hims & Hers raised a $75mm PIPE from new and existing investors, with top-tier institutional investors including Franklin Templeton and Oaktree clients anchoring the new PIPE

– Existing Hims & Hers shareholders will maintain approximately 84% ownership of the Company

## Hims & Hers overview

– Platform comprises an integrated telehealth solution combining access to a distributed provider network, clinically-focused EMR system, digital prescriptions, cloud pharmacy, and innovative consumer engagement strategies

– Core offerings comprised of five categories: sexual health, hair loss, dermatology, primary care and behavioral health

– Offers affordable medications, prescribed by physicians on the Hims platform, with a 50-state prescription delivery network and 24/7 in house coverage and support

– Launched in 2017, the Company has driven 100%+ growth CAGR over the last two years and has more than doubled gross margins to 70%+

  – Expected to deliver $138mm in revenue and $98mm of gross profit in 2020E with ~90% recurring revenue

– Headquartered in San Francisco, CA, with a 300,000 square foot pharmacy in Columbus, OH

## Creating the new front door to healthcare

✓ **First digitally native, fully verticalized multi-condition health platform**

✓ **Purpose-built platform and brand with a massive disruption opportunity**

✓ **Attractive financial profile with a visible path to profitability**

✓ **Highly attractive valuation relative to peers**

✓ **Multiple avenues for logical product offering expansion**

✓ **High quality management team with significant technology and healthcare experience**

## Key DB takeaways

– Company well positioned to take advantage of major trends in healthcare including increased consumerism, drive to lower cost settings, pricing transparency, technology proliferation and rapidly evolving telehealth regulatory landscape

– Backdrop of COVID-19 accelerating the market drive toward seamless, consumer-focused healthcare models

– Heightened valuations for virtual care reflective of disruptive nature of telehealth models

– Company operates in multiple large, expanding chronic care markets with significant opportunity to address unmet clinical needs

Deutsche Bank
Investment Bank

(a)    As disclosed in the investor presentation as of October 2020.
*Source: Public filings, press releases*



# Far Point Acquisition Corp. completed its acquisition of Global Blue for $2.6bn



Deutsche Bank acted as financial advisor to Silver Lake on Global Blue's completed business combination with Far Point Acquisition Corporation

Deutsche Bank was the only non-SPAC advisor or financing bank involved in the transaction and was brought in post-announcement to help restructure the deal

The business combination was approved by FPAC's stockholders on August 24, 2020 and completed on August 28, 2020

| PF capitalization ($mm) | |
|---|---|
| PF shares (mm)(a) | ~188 |
| Total equity value(b) | $1,885 |
| Plus: Net debt | $665 |
| PF enterprise value | $2,550 |

## Transaction overview

– On August 28, 2020, Far Point Acquisition Corp. ("Far Point") completed its acquisition of Global Blue at a total enterprise valuation of $2.6bn

– Existing Global Blue owners, including Silver Lake and Partners Group, will remain significant investors, owning approximately 81.1% of Global Blue's outstanding shares and Ant Group made a significant investment in Global Blue, becoming one of its main shareholders, owning approximately 6.5%

– Thomas Farley will become Chairman of the combined company, with current Global Blue management remaining in their roles

– On August 17th, 2020 Global Blue and Far Point jointly announced a number of agreements to facilitate the closing of the business combination including:
   – Third Point would fund into escrow $61mm to partially satisfy the forward purchase agreement
   – Global Blue sellers would not enforce any rights under the forward purchase agreement so long as Third Point purchased at least $61mm of shares
   – FPAC has agreed not to object to the termination of the existing financing arrangements as long as alternatives are available on equal terms
   – Numerous other conditions to facilitate closing

## Strategic technology and payments partner



## Global Blue overview

– Global Blue is a strategic technology and payments partner empowering merchants to capture the full potential of international shoppers

– The company was founded in 1980, and is headquartered in Switzerland with approximately 2,000 employees worldwide

– Global Blue's offering includes Tax Free Shopping Technology Solutions, enabling international shoppers to claim VAT refunds in 43 countries, and Added-Value Payment Solutions, partnering with 50+ merchant acquirers to process international traveler payments in 34 countries

– Global Blue's Tax Free Shopping business serves ~13 million shoppers and generates ~85% of total revenue, while its Added-Value Payment Solutions business serves ~16 million travelers and generates ~15% of total revenue

– Every year, Global Blue connects worldwide 29 million international travelers and more than 200 payment providers and acquirers

– Global Blue recorded FY2019 revenues of more than $440mm with EBITDA margins of 40%+

## Investment highlights

| | |
|---|---|
| **1** | Strong macro driven historical growth expected to continue |
| **2** | Clear competitive differentiation through market & technology leadership |
| **3** | Business strategy creating value and well positioned for strategic M&A |
| **4** | Powerful financial model delivering earnings growth and cash flow generation |
| **5** | International management team with relevant expertise |

Deutsche Bank
Investment Bank

Assumes a Euro to USD exchange rate of 1.09 USD to 1 Euro. Numbers may not tie exactly due to rounding.
(a)      Assumes zero redemptions by Far Point shareholders
(b)      Assumes shares trade at $10.00 post transaction close
Source:   Company filings, press release



# Nebula Acquisition Corp. completed its $1,080mm acquisition of Open Lending



Deutsche Bank acted as financial advisor, capital markets advisor, and placement agent to Nebula

Deutsche Bank also acted as joint bookrunner on Nebula's $275mm IPO in January 2018

## PF capitalization ($mm)

| | |
|---|---|
| PF shares (mm) | 93.5 |
| Total equity value(a) | $935 |
| Plus: Net debt | $145 |
| PF enterprise value | $1,080 |

## Sources & uses ($mm)(b)

| Sources of cash | |
|---|---|
| NEBU cash in trust | $275 |
| PIPE | $200 |
| Debt facility | $170 |
| Total sources | $645 |
| Uses of cash | |
| Cash to balance sheet | $25 |
| Cash to existing shareholders | $585 |
| Fees and expenses | $35 |
| Total uses | $645 |

## Transaction overview

- On June 10, 2020, Nebula Acquisition Corp. ("Nebula") completed its acquisition of Open Lending, LLC ("Open Lending"), at a valuation of $1,080mm, representing 7.4x updated 2021E EBITDA (as announced in May 2020)

- Nebula is a $275mm SPAC led by Adam Clammer and Jamie Greene, who have together served on 20+ public company boards for a combined total of 125+ years

- DB raised a $200mm PIPE prior to deal announcement. True Wind Capital committed $85mm and an additional PIPE of $115mm was raised from several noteworthy and leading fundamental investors, all at $10.00 per share

- 50% of sponsor shares will be deferred into a performance-based earnout, plus an additional 1.25mm shares, paid out in two tranches at $12.00 and $14.00 / share, in addition to seller performance earnout of 22.5mm shares paid out in three equal tranches at $12.00, $14.00 and $16.00 / share

- Management rolled 70% of existing equity into the new entity

## Revenue model





## Open Lending overview

- Founded in 2006 and headquartered in Austin, TX, Open Lending is a lending enablement platform for the automotive finance market powered by proprietary data, advanced decisioning analytics, an innovative insurance structure and scaled distribution

- Enables near-prime consumers to finance their vehicles at more attractive rates when compared to traditional lending alternatives, while maintaining a similar risk profile to the lender as that of a prime borrower

- Significant opportunity for organic growth, particularly for further penetration into the OEM space

- Majority owned by management, with friends and family and Bregal Sagemount accounting for remaining ownership

- 35%+ historical revenue CAGR (2017-2019); 90%+ gross margins; 65%+ 2019 EBITDA margin

- 100%+ net certified loan retention

## Investment highlights

- Substantial, underserved market opportunity with strong secular drivers
- Attractive business model with considerable barriers to entry and no balance sheet risk
- Significant growth opportunities, both near-term and in adjacent markets
- Recession-resilient business model with no loss exposure
- Experienced and visionary management team with deep domain expertise
- Compelling financial profile with highly visible future performance

Deutsche Bank
Investment Bank

(a)   Based on a $10.00 share price.
(b)   Per May Investor Presentation; assumes no redemptions
Source:  Company filings, press release



# Additional deal team experience



Deutsche Bank
Investment Bank



# Brandon Sun

## Director, SPAC Investment Banking

| Team Member | Biography |
|---|---|
|  **Brandon Sun**<br>*Head of De-SPAC Advisory*<br>Email: brandon.sun@db.com<br><br>Tel:    (212) 250-8175 | – 11 years of investment banking experience<br>– Joined Deutsche Bank in 2012, following career at UBS<br>– Completed / announced 56 deSPAC transactions totaling $116bn in deal value; 70 SPAC IPOs and most of them left-led<br>– MBA from Yale's School of Management and BA from Carleton College<br>– Supports global SPAC franchise for Deutsche Bank |

**Key transactions include:**

- $20bn+ merger between Invitation Homes and Starwood Waypoint Homes
- Capitol Investment Corp. V's $3.0bn acquisition of Doma
- Vector Acquisition Corp's $4.1bn acquisition of Rocket Lab USA, Inc
- Gores Holdings V's $8.5bn acquisition of Ardagh Metal Packaging
- Gores Holdings VI's $2.9bn acquisition of Matterport, Inc.
- Pershing Square Holdings's $2.8bn IPO / structuring
- Gores Holdings $375mm IPO and its acquisition of Hostess Brands
- TPG Pace Energy Holdings's $650m IPO and its acquisition of EnerVest
- Gores Holdings II's $400m IPO and its acquisition of Verra Mobility
- Nebula Acquisition Corp's $275mm IPO and its acquisition of Open Lending
- Conyers Park II's $450mm IPO and its acquisition of Advantage Solutions
- Gores Holdings IV's $425mm IPO and its acquisition of UWM

- Gores Metropoulos's $400m IPO and its acquisition of Luminar
- Diamond Eagle Acquisition Corp's $400mm IPO and its acquisition of DraftKings & SBTech
- Mosaic Acquisition Corp's $345mm IPO and its acquisition of Vivint
- Oaktree Acquisition Corp.'s $200mm IPO and its acquisition of Hims & Hers
- Fortress Value Acquisition Corp.'s $345mm IPO and its acquisition of MP Materials
- DiamondPeak Holdings Corp.'s $280mm IPO and its acquisition of Lordstown Motors Corp.
- TPG Pace Beneficial Finance's $350mm IPO and its acquisition of EVBox Group
- $1.4bn acquisition of Indie Semi
- $1.1bn acquisition of CarLotz
- Experience Investment Corp's $275mm IPO and its aquisition of Blade
- VectoIQ Acquisition Corp's $230mm IPO and its acquisition of Nikola Corporation
- Pace Holdings Cop's $450mm IPO and its acquisition of Playa Hotels & Resorts
- Property Solutions Acquisition Corp's $2.6bn acquisition of Faraday Future

- Double Eagle Acquisition Corp's $500mm IPO and its acquisition of William Scotsman
- $856mm acquisition of Atkins Nutritional
- WL Ross Holdings Corp's $500mm IPO and its acquisition of Nexeo
- DFB Healthcare Acquisition Corp's $250mm IPO and its acquisition of AdaptHealth
- Capitol Acquisition Corp III's $325mm IPO and its acquisition of Cision
- Silver Run Acquisition Corp's $500mm IPO and its acquisition of Centennial Resource Development
- Silver Run Acquisition Corp II's $1,035mm IPO and its acquisition of Alta Mesa and Kingfisher Midstream
- Platinum Eagle Acquisition Corp's $325m IPO and its acquisition of Target Hospitality
- Capitol Investment Corp IV's $403mm IPO and its acquisition of NESCO
- Gores Holdings III's $400m IPO and its acquisition of PAE
- $985mm acquisition of AccelEntertainment $502mm acquisition of Purple Innovation
- Far Point Acquisition Corp's acquisition of Global Blue for $2.6bn

"IMPORTANT: This presentation (the "**Presentation**") has been prepared by Deutsche Bank's investment banking department exclusively for the benefit and internal use of the recipient (the "**Recipient**") to whom it is addressed. Neither Deutsche Bank AG New York Branch, Deutsche Bank Trust Company Americas ("DBTCA") nor any of their banking affiliates is responsible for the obligations of Deutsche Bank Securities Inc. or any U.S. Broker-dealer affiliate. Unless specified otherwise, deposit products are provided by DBTCA, Member FDIC. The Recipient is not permitted to reproduce in whole or in part the information provided in this Presentation (the "**Information**") or to communicate the Information to any third party without our prior written consent. No party may rely on this Presentation without our prior written consent. Deutsche Bank and its affiliates, officers, directors, employees and agents do not accept responsibility or liability for this Presentation or its contents (except to the extent that such liability cannot be excluded by law).

This Presentation is (i) for discussion purposes only; and (ii) speaks only as of the date it is given, reflecting prevailing market conditions and the views expressed are subject to change based upon a number of factors, including market conditions and the Recipient's business and prospects. The Information, whether taken from public sources, received from the Recipient or elsewhere, has not been verified and Deutsche Bank has relied upon and assumed without independent verification, the accuracy and completeness of all information which may have been provided directly or indirectly by the Recipient. No representation or warranty is made as to the Information's accuracy or completeness and Deutsche Bank assumes no obligation to update the Information. The Presentation is incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by Deutsche Bank. The analyses contained in the Presentation are not, and do not purport to be, appraisals of the assets, stock, or business of the Recipient. The Information does not take into account the effects of a possible transaction or transactions involving an actual or potential change of control, which may have significant valuation and other effects.

The Presentation is not exhaustive and does not serve as legal, accounting, tax, investment or any other kind of advice. This Presentation is not intended to provide, and must not be taken as, the basis of any decision and should not be considered as a recommendation by Deutsche Bank. Recipient must make its own independent assessment and such investigations as it deems necessary. In preparing this presentation Deutsche Bank has acted as an independent contractor and nothing in this presentation is intended to create or shall be construed as creating a fiduciary or other relationship between the Recipient and Deutsche Bank."

Deutsche Bank
Investment Bank

Exhibit 3

**EXECUTION VERSION**

<div align="center">

**PROJECT NEW DAWN**

**TERM SHEET**

</div>

This preliminary term sheet (this "***Term Sheet***") summarizes the principal terms and conditions of the proposed transaction involving FTX Trading Ltd. (the "***Acquiror***"), Liquid Group Inc. (the "***Company***"), Kariya Kayamori ("***Mr. Kayamori***") and Seth Melamed ("***Mr. Melamed***") (the Acquiror, the Company, Mr. Kayamori and Mr. Melamed are hereinafter collectively referred to as the "***Parties***"). Except as otherwise set forth under the headings "Exclusivity" "Term" "Confidentiality" "Fees and Expenses" "Governing Law" and "Jurisdiction" (the "***Binding Terms***"), this Term Sheet shall not be legally binding and is not intended to create or evidence any intention to create legally binding obligations on the Parties.

| | |
|---|---|
| **Transaction Structure** | The Acquiror intends to acquire (directly or through one or more subsidiaries) all of the outstanding capital stock (the "***Shares***") and other equity interests (including options and warrants) of the Company (collectively, the "***Target Security Interests***") that have not been exercised as of immediately prior to the Closing (as defined below) (the "***Transaction***"). |
| | The Parties will use reasonable best efforts to close the Transaction as quickly as possible following the execution of the Definitive Agreements (as defined below). |
| | In relation to the Transaction, the Acquiror will enter into the following share purchase agreements: |
| | (i) the share purchase agreement to be entered into between the Acquiror and the major shareholders of the Company (namely, Mr. Kayamori, Mr. Melamed, JAFCO and the IDG entities (collectively, the "***Major Shareholders***")) (the "***Major Shareholders SPA***"); and |
| | (ii) share purchase agreements to be entered into between the Acquiror and each of the remaining minority shareholders of the Company selling their Shares in the Transaction (the "***Minority Shareholders***") (each, a "***Minority Shareholders SPA***," and collectively and together with the Major Shareholders SPA, hereinafter referred to as the "***Definitive Agreements***"). |
| | The purchase price per share of each Share (on an as converted basis) under the Major Shareholders SPA and the Minority Shareholders SPAs shall be the same in all material respects. |
| **Consideration** | At the closing of the Transaction (the "***Closing***"), in exchange for all of the outstanding Shares and other equity interests (including options and warrants) of the Company that have not been exercised as of immediately prior to the Closing, the Acquiror will pay total consideration of US$200,000,000, consisting of cash (the "***Cash Consideration***") and Acquiror's common shares (determined based on a valuation of US$23.658 per share) (the "***Stock Consideration***"). The allocation of Cash Consideration and Stock Consideration (collectively, the "***Consideration***") with respect to each Major Shareholder shall be mutually agreed to among the Parties in good faith, and will also be subject to the Holdback (as defined below), conditions of forfeiture and other adjustments as described below. The Minority Shareholders shall receive their consideration in cash only; provided, that, in the event any Minority Shareholder desires to receive in part or in whole such Minority Shareholder's consideration in the form of Stock Consideration, the Acquiror |

and the Major Shareholder will discuss separately in good faith to determine whether to accommodate any such Minority Shareholders.

**Consideration Adjustments**

The Consideration assumes a cash-free, debt-free (other than certain indebtedness specified in the Major Shareholders SPA, including the loan in the principal amount of US$ 120 million made from the Acquiror to the Company under that certain Loan Agreement between the Acquiror and the Company dated August 30, 2021) transaction, provided that, as of the Closing, the Company will have no less than a specified amount of net working capital to be mutually agreed by the Acquiror and the Company.

**Key Employees**

Before the Closing, Mr. Kayamori, Mr. Melamed and any other employees of the Company (or a subsidiary of the Company) to be identified by the Acquiror in consultation with the Major Shareholders prior to signing the Definitive Agreements as the key employees of the Company (or a subsidiary of the Company) (collectively, the "***Key Employees***"), will enter into a management agreement ("***Management Agreement***") and a non-competition agreement (for the term of employment and for one year thereafter, but in no event less than three years in the aggregate from Closing) ("***Non-competition Agreement***") with the Acquiror or a Group (as defined below) company, in each case, to become effective upon the Closing.

Mr. Kayamori and Mr. Melamed (the "***Management Shareholders***") will agree that a portion (to be mutually agreed to between the Acquiror and the respective Management Shareholder) of the Stock Consideration to be received by them will be in the form of shares of restricted common stock of the Acquiror ("***Restricted Stock***") that will be subject to vesting over a period of two years commencing as of the Closing with certain acceleration conditions, subject to their continued service to the Acquiror.

Shares of unvested Restricted Stock will be forfeited by a Management Shareholder in the event of the termination of his Management Agreement for cause or resignation by such Management Shareholder without good reason. In the event that a Management Shareholder's Management Agreement is terminated without cause or such Management Shareholder resigns with good reason, then the shares of Restricted Stock of such Management Shareholder that have not vested as of such termination shall vest in their entirety as of such termination.

**Other Employees**

Subject to further diligence, the Acquiror expects to retain all other existing employees of the Company and its subsidiaries (collectively, the "***Group***") on the same terms as their existing terms of employment.

**Company Stock Options and Equity**

The Acquiror will purchase all stock options of the Company (the "***Stock Options***") in exchange for cash paid or reserved at the Closing for such purchases.

**Representations, Warranties and Covenants**

The Major Shareholders SPA will include customary limited representations, warranties and covenants for an acquisition of this nature, and a representation and warranty with respect to the crypto asset breach of the Company's subsidiaries that occurred on August 19, 2021 (the "***Asset Breach***") that the amounts of (i) the out of pocket costs of the Group to replace any of the crypto assets lost in the Asset Breach and not otherwise recovered or in the process of recovery from frozen assets by the Group as of or prior to the Closing (the "***Lost Assets***"), including any premium paid by a Group company for such replacement and (ii) the market value of any Lost Assets that are not replaced

by the Group as of or prior to the Closing, do not, in the aggregate, exceed US$100 million as of the date of the Major Shareholders SPA and as of the Closing.

The representations, warranties and covenants included in the Minority Shareholders SPA shall be limited in order to obtain the approval of the Minority Shareholders as soon as possible.

The Acquiror shall provide commercially reasonable cooperation to the Company and its subsidiaries to consummate the Closing, including structuring incentive plans to the employees of the Company and its subsidiaries and accommodating inquiries from regulatory authorities of competent jurisdiction made to the Company or its subsidiaries.

**Closing Conditions**

The Acquiror's obligation to effect the Closing under the Major Shareholders SPA will be subject to the closing conditions that are customary for an acquisition of this nature, including, but not limited to:

(i) the representations and warranties of the Major Shareholders being true and correct in all material respects (with representations relating to organization, due authorization, title to the Shares, non-contravention, capitalization, organization and existence of the subsidiaries, taxes and brokers (collectively, the "*Fundamental Representations*") being true and correct in all respects);

(ii) all covenants of the Major Shareholders having been complied with in all material respects;

(iii) no regulatory authority (including but not limited to the Financial Services Agency of Japan) having notified, whether verbally or in writing, prior to the Closing that the **crypto-asset exchange** business registration issued by the Financial Services Agency of Japan to **Quoine Corporation** on September 29, 2017 will be suspended, cancelled, revoked or withdrawn after Closing, whether or not for reasons related to **or arising from the Transaction;**

(iv) there being no applicable laws which shall, or which shall reasonably be expected to, forbid, restrict or impose conditions or restrictions on Closing of the Transaction;

(v) no pending or threatened injunctions or similar restraints applicable to the Closing, and no pending or threatened litigation seeking an injunction, restraint or material damages in connection with the Transaction;

(vi) all requisite corporate approvals having been obtained;

(vii) no material adverse change with respect to the financial, operating and regulatory condition of the Company and its subsidiaries (taken as a whole) having occurred;

(viii) the Management Agreement and the Non-competition Agreements with the Key Employees having been executed and remaining effective;

3

(ix)    the employment agreements of at least 80% of the employees of the Group (other than the Key Employees) remaining effective;

(x)    the delivery by the Management Shareholders to the Acquiror of a certificate (the "***Final Customer Balance Statement***") setting forth a true and complete account, on a digital asset by digital asset basis (including all delisted digital assets), of all digital asset balances held by the customers of the Company (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) as of the date that is two days prior to the date of Closing, which shall include a certification by the Chief Executive Officer of the Company that such Final Customer Balance Statement is true and complete in all material respects;

(xi)    all third party consents, amendments and terminations to be specified by the Acquiror based on diligence, the absence of which would have a material adverse effect on the Group and/or the ability of the Parties to consummate the Closing, having been executed and/or effectuated;

(xii)    execution of the Minority Shareholders SPA(s) by all Minority Shareholders, or the exercise of the drag-along rights of the majority of the shareholders of the Company under the relevant shareholders agreements for those Minority Shareholders who refuse to execute the Minority Shareholders SPA(s);

(xiii)    completion of a detailed spreadsheet setting out the allocation of the Consideration (the "***Spreadsheet***"), including the allocation of the Stock Consideration, the Cash Consideration, the Restricted Stock and the Holdback (as applicable) among the Major Shareholders;

(xiv)    conversion of the Class A Preference Shares, Class B Preference Share and Class C-1 Preference Shares constituting the Target Security Interests into Common Shares or the waiver of any liquidation preference, right of first refusal and any other rights and consents required under the Articles of Association and/or the Shareholders' Agreement for the transfer of the Target Security Interests (i) from the Major Shareholders to the Acquiror under Major Shareholders SPA and (ii) from the Minority Shareholders to the Acquiror under the Minority Shareholders SPA(s) having been obtained; and

(xv)    other closing conditions agreed by the Parties following diligence.

| | |
|---|---|
| **Board Approval** | The Company's board of directors shall approve the Transaction and necessary board resolutions shall be provided to the Acquiror. |
| **Indemnity and Holdback** | The Acquiror will be indemnified by the Major Shareholders of the Company for claims, damages, liabilities, costs, expenses, etc. (i) arising from breaches of representations, warranties and covenants (including, but not limited to, the representation and warranty with respect to the Asset Breach), (ii) resulting from any inaccuracies as to the allocation of the Consideration between the equity holders of the Company as reflected in the Spreadsheet or Company transaction expenses that are unpaid as of the Closing (to the extent not taken into account in the calculation of the Consideration) and (iii) for other specified |

matters determined during due diligence and agreed upon by the Parties (the "**Indemnification Obligations**").

The survival period for the Indemnification Obligations will be 24 months following the Closing, except for claims arising out of, resulting from or in connection with (a) breaches of Fundamental Representations, (b) breaches of covenants, and (c) clause (ii) of the Indemnification Obligations (collectively, "**Fundamental Claims**").  The survival period for Fundamental Claims shall be the applicable subject matter statute of limitations.  Claims arising out of, resulting from or in connection with fraud, intentional misrepresentation or willful misconduct shall survive indefinitely.

The indemnification obligations of the Major Shareholders will be several and not joint, and in accordance with each such Major Shareholders' pro rata share of the Consideration.

With respect to each Major Shareholder, a cash amount equal to 20% of the value of the total Consideration payable to such Major Shareholder will be held back at the Closing for a period of 24 months as partial security for such Indemnification Obligations (the "**Holdback**"), with 50% of such Holdback amount released one year after Closing, the remaining 50% released two years after Closing, and any acceleration terms agreed by the Parties. Other than in the case of fraud, intentional misrepresentation or willful misconduct, the right of the Acquiror after the Closing to assert indemnification claims and receive indemnification from the Holdback amount shall be subject to de minimis and basket limitations and shall be limited to 20% of the Consideration received by each Major Shareholder, and shall be the sole and exclusive right and remedy of the Acquiror in relation to the Indemnification Obligations.

**Exclusivity**

Each of the Management Shareholders and the Company undertakes that such person will not, and shall not authorize or permit any of such person's representatives, officers, employees, directors, agents, stockholders, subsidiaries or affiliates to, at any time during the period of 45 days following the date of this Term Sheet (the "**Exclusivity Period**"):

(i)   solicit, seek, initiate, encourage or facilitate the making of any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Alternative Proposal (as defined below);

(ii)  disclose to any person any non-public information relating to the Company and its subsidiaries (the "**Group**") in connection with, or enter into, participate in, maintain or continue any discussions or negotiations regarding, any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Alternative Proposal; or

(iii) agree to or accept (or publicly propose or announce any intention or desire to agree to or accept) any Alternative Proposal.

For the purposes of this provision, the term "**Alternative Proposal**" means any agreement, offer or proposal for, or any indication of interest in, any direct or indirect acquisition of the Group, or all or any material portion of the Group's assets or any equity interest in the Group, in each case, whether by way of a merger, consolidation, asset sale, stock purchase, tender offer, recapitalization or other business combination or otherwise, or any material, non-ordinary

course exclusive license or joint venture transaction, other than any offer, proposal or indication of interest made by or on behalf of the Acquiror and its affiliates and representatives.

During the Exclusivity Period, each of the Management Shareholders and the Company, to the extent not in conflict with any confidentiality obligations to which they are respectively subject as of the date hereof, agrees to promptly (and in any event within 48 hours) notify the Acquiror if such Management Shareholder or the Company, respectively, receives an Alternative Proposal, including the identity of the person making such Alternative Proposal and a summary (and if available, a copy) of such Alternative Proposal. Immediately following the execution of this Term Sheet, each of the Management Shareholders and the Company agrees to terminate all existing discussions or negotiations with any person or group of persons (other than the Acquiror and its affiliates and representatives) regarding any Alternative Proposal.

| | |
|---|---|
| **Term** | (a) As of the execution of the Major Shareholders SPA or, (b) if the parties thereto fail to enter into the Major Shareholders SPA on or before the date that is 45 days following the date of this Term Sheet, the agreements and understandings contained in this Term Sheet, unless extended by mutual written agreement of the Parties, shall terminate and be of no further force or effect, except for the Binding Terms, which shall survive any termination of this Term Sheet in accordance with their terms. |
| **Confidentiality** | The existence of this Term Sheet, its contents and any discussions regarding the Transaction constitute confidential information covered by the Mutual Confidentiality Agreement between the Acquiror, the Company, Mr. Kayamori and Mr. Melamed dated August 26, 2021, (the "***Confidentiality Agreement***"). |
| **Fees and Expenses** | The Acquiror and the Company will each pay their own fees and expenses (including legal, accounting, investment banking and financial advisory fees and expenses) with respect to the Transaction. |
| **Governing Law** | This Term Sheet and the Definitive Agreements shall be governed by the laws of Japan. |
| **Jurisdiction** | The Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Term Sheet. |

*[SIGNATURE PAGE FOLLOWS]*

The Parties understand and acknowledge that this Term Sheet is for discussion purposes only and, except as set forth in the Binding Terms, is not a legally binding agreement and that the failure to execute and deliver the Definitive Agreements shall impose no liability on the Parties.

**FTX TRADING LTD**

By: _Sam Bankman-Fried_

Name: Sam Bankman-Fried

Title: CEO

Date: 9/2/2021

**AGREED AND ACCEPTED:**

**LIQUID GROUP INC.**

By: _____

Name: Kariya Kayamori

Title: CEO & Representative Director

Date: 9/2/2021

**KARIYA KAYAMORI**

By: _____

Name: Kariya Kayamori

Date: 9/2/2021

**SETH MELAMED**

By: _Seth Melamed_

Name: Seth Melamed

Date: 9/2/2021

[Signature Page to Project New Dawn Term Sheet]

Exhibit 4

DocuSign Envelope ID: 79E73A67-C9E2-45C5-A28F-09BB8EFD8AA5

**AMENDMENT AGREEMENT TO THE TERM SHEET**

This amendment agreement to the term sheet (this "**Agreement**"), dated as of October 12, 2021 (the "**Effective Date**"), is entered into between FTX Trading Ltd. (the "**Acquiror**"), Liquid Group Inc. (the "**Company**"), Kariya Kayamori ("**Mr. Kayamori**") and Seth Melamed ("**Mr. Melamed**") (the Acquiror, the Company, Mr. Kayamori and Mr. Melamed are hereinafter collectively referred to as the "**Parties**").

**WHEREAS**, the Parties entered into the term sheet dated as of September 2, 2021, relating to, among other things, the intention of the Acquiror to acquire all of the outstanding capital stock (the "**Shares**") and other equity interests (including options and warrants) of the Company (the "**Term Sheet**"); and

**WHEREAS**, the Parties have agreed to amend and supplement the Term Sheet, upon the terms and conditions hereinafter described.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.      <u>Definitions</u>. All capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to them in the Term Sheet.

2.      <u>Amendments to the Term Sheet</u>. The Term Sheet is hereby amended as follows:

(a)      The section headed "Exclusivity" in the Term Sheet is hereby amended by deleting the words "during the period of 45 days following the date of this Term Sheet" in such section and substituting in lieu thereof the words "on or before December 1, 2021".

(b)      The section headed "Term" in the Term Sheet is hereby amended by deleting the words "the date that is 45 days following the date of this Term Sheet" in such section and substituting in lieu thereof the words "December 1, 2021".

3.      <u>Effect of the Amendments</u>. Except as expressly provided in this Agreement, all of the terms and provisons of the Term Sheet that are legally binding are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the date hereof, each reference in the Term Sheet to "this Term Sheet", "the Term Sheet", "hereunder", "hereof", "herein" or words of like import will mean and be a reference to the Term Sheet as amended by this Agreement.

4.      <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties with respect to the matters being amended as contained herein.

5.      <u>Confidentiality</u>. Each party agrees to keep the terms of this Agreement confidential and the existence of this Agreement, its contents and any discussions regarding the Transaction constitute confidential information covered by the Confidentiality Agreement.

DocuSign Envelope ID: 79E73A67-C9E2-45C5-A28F-09BB8EFD8AA5

6.    <u>Miscellaneous</u>.

(a)    This Agreement shall be governed by the laws of Japan.

(b)    The Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

(c)    This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but all of which when taken together shall constitute one and the same instrument. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

DocuSign Envelope ID: 79E73A67-C9E2-45C5-A28F-09BB8EFD8AA5

The Parties have executed this Agreement as of the Effective Date.

**FTX TRADING LTD**

By: _Sam Bankman-Fried_
672DA88132804B9
Name: Sam Bankman-Fried
Title: CEO
Date: 10/12/2021

**LIQUID GROUP INC.**

By: _____
Name: Kariya Kayamori
Title: CEO & Representative Director
Date: 10/12/2021

**KARIYA KAYAMORI**

By: _____
Name: Kariya Kayamori
Date: 10/12/2021

**SETH MELAMED**

By: _Seth Melamed_
Name: Seth Melamed
Date: 10/12/2021

Exhibit 5



# Introduction to FTX

## December 6, 2021

# Background

We are the largest non-Chinese crypto exchange, the third largest crypto exchange, and the fastest growing crypto exchange in the world by volume.

**FTX launched May 2019**

**Goal: combine the best practices of crypto and finance**

- Crypto-native, full-stack product

**Solve serious issues with existing crypto derivatives platforms**

- ~$300m of customer losses in 2018 on existing platforms
- Risky, fragmented margin
- Lack of compliance



# Location

- Headquartered in Bahamas

- Incorporated in Antigua

- Offices in Australia, Hong Kong, Gibraltar, and other jurisdictions

- Client base is global
  - No jurisdiction is > 15% revenue

~60% of volume is institutional
  - The vast majority is sophisticated users





3

# Regulatory Status

**Crypto licenses obtained or pending:**

- Bahamas (DARE Act digital assets business)
- Australia (AUSTRAC and AFSL licensee)
- Gibraltar (DLT Provider)
- Japan (pending acquisition of Liquid)
- European Economic Area + Switzerland (acquisition pending)
- Germany (tokenized stock)

**License applications pending in:**

- Hong Kong
- Singapore
- Antigua



4

# AML/KYC



**FTX has always conducted AML/KYC screening**

**Based on global standards**

- KYC controls include photo ID, sanctions screening, etc.

- IP block restricted jurisdictions

- Verification of mobile phone number from submitted jurisdiction

- Liveness check / selfie

**Automated system to conduct checks**

**Dedicated staff to follow up on any flags**



# Team



**Sam Bankman-Fried**
CEO

Before founding FTX, Sam was a trader on Jane Street Capital's international ETF desk. He traded a variety of ETFs, futures, currencies, and equities, and designed their automated OTC trading system. He graduated from MIT with a degree in physics.



**Gary Wang**
CTO

Gary was a software engineer at Google prior to founding FTX. There, he built systems to aggregate prices across millions of flights, decreasing latency and memory usage by over 50%. He graduated from MIT with a degree in Mathematics with Computer Science.



**Nishad Singh**
Head of Engineering

Nishad joined Alameda Research in 2017 and is now the Director of Engineering in FTX. Prior to joining FTX, Nishad was a software engineer on Facebook's Applied Machine Learning team. He graduated summa cum laude from Berkeley with a degree in Electrical Engineering and Computer Science.



**Dan Friedberg**
Chief Regulatory Officer

Prior to joining FTX, Dan was a partner at Fenwick & West LLP. There, he was the chair of the Payment Systems group, counseling clients from entrepreneurs and startup companies to publicly traded companies in various industries including manufacturing, consumer products and services, biotechnology, gaming and software. Dan received his J.D. from the University of Wisconsin, cum laude.



**Ramnik Arora**
Head of Product

Ramnik joined FTX from Facebook where he built ads products. He was also on the Facebook Libra team and was a co-author of the whitepaper. Prior to Facebook, Ramnik was at Investment Management at Goldman Sachs. He is an alum of IIT Kanpur, NYU and Stanford.



**Can Sun**
General Counsel

Prior to joining FTX, Can was Co-Chair of the Blockchain practice group at Fenwick & West LLP, where he provided strategic and practical counseling to hundreds of players in the blockchain ecosystem, ranging from early-stage cryptocurrency developers to mature blockchain businesses, as well as cryptocurrency exchanges and investors. Can holds a J.D. from Yale Law School.

## Investors

Temasek

Ontario Teachers' Pension Plan

Softbank

BlackRock

Sequoia

Ribbit Paradigm

Thoma Bravo

ThirdPoint

Insight

…



**~150 total employees**

What Makes FTX Unique?

7

# Products

**Spot crypto vs USD**

- ~$7B/day of volume

**Tokenized stocks**

- Through German B/D license
- Backed by stocks

**Futures on crypto**

- Perpetuals: ~$10B/day of volume
- Quarterly futures: ~$1B/day of volume

**Other**

- Prediction markets, generalized futures
- Less than 1% of volume



# FTX is a *Full Stack* Product

**Matching engine**

- Bilateral matching of orders of third party customers

- Open, fair and transparent order book

- FTX does not trade with its customers or set prices on the platform

**Risk engine**

- Cross-collateral, margin, liquidation engine

**Custody**

- Necessary for 24/7 deposits/withdrawals/risk engine/cross collateral

**Compliance**

- Bank-standard KYC for AML purposes

- Individual products can be turned off in each jurisdiction for compliance purposes

**Mobile app, website, API**



# FTX vs Traditional Derivatives

**Open, transparent and fair**

| | FTX | Traditional Derivatives Exchange |
|---|---|---|
| Market hours | 24/7 | 9:30-4, weekdays |
| Funding time | Minutes | Days |
| Risk engine | Automated | Semi-manual |
| Intermediaries | None | Executing broker, prime broker, clearing, payment processor, ... |
| Middlemen fees | None | Many |
| Market data cost | Free | Expensive--only large firms can afford |
| Market access cost | Everyone uses same API | Pay billions for closer access |



10

# FTX vs other Crypto Derivatives Exchanges

|  | FTX | Other Crypto Derivatives Exchange |
|---|---|---|
| Downtime | Minutes per year | Hours per month |
| Client losses from risk engine | Never | Hundreds of millions |
| Leverage | Average 2x; higher for institutions | 100x + |


# FTX vs other Crypto Exchanges

On May 19, 2021, almost all major exchanges including Coinbase, Binance, Gemini, Huobi, and others went offline, resulting in significant liquidations.





# FTX vs other Crypto Exchanges

FTX experienced no shutdown.

Compared to other exchanges with significant liquidations, FTX's rate was 2.3%

**Exchange Liquidations**

| | | | | | Symbol | Time |
| | | | | | ALL ⌄ | 24H ⌄ |

| Site | Liquidation($) | Longs($) | Shorts($) | Rate | Rate |
|---|---|---|---|---|---|
| All | 8.15B | 7.32B | 831.08M | 100% | 89.81%Long |
| Huobi | 3.06B | 2.92B | 135.86M | 37.52% | 95.56%Long |
| Bybit | 1.54B | 1.42B | 120.10M | 18.83% | 92.18%Long |
| Okex | 1.19B | 1.11B | 73.96M | 14.56% | 93.77%Long |
| Binance | 974.79M | 846.91M | 127.88M | 11.96% | 86.88%Long |
| Deribit | 619.23M | 357.54M | 261.68M | 7.6% | 57.74%Long |
| Bitmex | 481.75M | 469.13M | 12.62M | 5.91% | 97.38%Long |
| FTX | 187.79M | 109.72M | 78.07M | 2.3% | 58.42%Long |



13

# FTX Liquidation Rates Generally Lowest in Industry



About $3.72B of Positions Liquidated Due to BTC Drop Below $47,000

| Exchange | Amount |
|----------|--------|
| Huobi | $1.19B |
| Bybit | $1.00B |
| Binance | $517.7M |
| OKex | $517.6M |
| Bitfinex | $230.3M |
| BitMex | $136.6M |
| Deribit | $68.1M |
| FTX | $66.5M |

DATA SOURCE: BYBT

Total Liquidations $3.72B



About $8.13B of Positions Liquidated Due to BTC Drop Below $31,000

| Exchange | Amount |
|----------|--------|
| Huobi | $3.05B |
| Bybit | $1.53B |
| OKex | $1.18B |
| Binance | $970.1M |
| Deribit | $618.2M |
| BitMex | $482.1M |
| FTX | $185.8M |
| Bitfinex | $105.8M |

DATA SOURCE: BYBT

Total Liquidations $8.13B



14

# Concluding Message

FTX is a crypto derivatives exchange built
on blockchain technology.

FTX puts customers and compliance first .

Our highest goal is to leave the world a better place
than we inherited it.

1% of all net revenues are donated to the world's most
effective charities, and many of our members have
given substantially more.



15

Exhibit 6

**EXECUTION VERSION**

**LIQUID GROUP INC.**

AND

**SETH MELAMED**

---

**MANAGEMENT AGREEMENT**

---

# CONTENTS

**Clause**                                                                                                   **Page**

1.    Interpretation................................................................................................................1

2.    Appointment .................................................................................................................4

3.    Executive's Duties and Responsibilities ....................................................................4

4.    Remuneration and Other Benefits..............................................................................5

5.    Indemnification.............................................................................................................6

6.    Expenses ........................................................................................................................8

7.    Deductions; Return of Materials................................................................................8

8.    Confidentiality ..............................................................................................................8

9.    Intellectual Property Rights .......................................................................................9

10.   Executive's Warranties and Undertakings ..............................................................10

11.   Termination .................................................................................................................11

12.   Notice ...........................................................................................................................12

13.   Legal Representation ..................................................................................................13

14.   Entire Agreement .......................................................................................................13

15.   Miscellaneous ..............................................................................................................13

16.   Governing Law and Jurisdiction ..............................................................................14

**THIS AGREEMENT** is made on _____.

**BETWEEN**:

(1)     **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**"); and

(2)     **SETH MELAMED**, a United States of America national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 (the "**Executive**").

**WHEREAS**:

(A)     The Company is a subsidiary of FTX Trading Ltd., a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda ("**FTX**").

(B)     The Company has agreed to appoint the Executive and the Executive has agreed to serve the Company as a Representative Director and COO of the Company on the terms and conditions set out hereinafter.

**THE PARTIES AGREE** as follows:

**1.     INTERPRETATION**

**1.1     Definitions**

In this Agreement:

"**Accrued Amounts**" means, collectively, the items set forth in Clause 11.5.

"**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such specified person. For the purposes of this definition, "**control**" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Agreement**" means this Management Agreement, as amended or supplemented in accordance with the terms hereof from time to time.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Board of Directors**" means the board of directors (*torishimariyakukai*) of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cause**" means any of the following: (a) the Executive willfully engages in conduct that is in bad faith and materially injurious to the Company, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (b) the Executive commits a material breach of this Agreement, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach; (c) the Executive willfully refuses to implement or follow a reasonable and lawful directive by the Board of Directors, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (d) the Executive engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with his position, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (e) is disqualified from serving as a director under any applicable law; (f) the Executive engages in a course of vexatious comment or conduct towards employees or consultants of the Company, that is known or ought reasonably to be known to be unwelcome, and such course of comment or conduct persists despite warnings from the Company; or (g) the Executive resigns from his position as a Representative Director and/or COO without the prior approval of the Board of Directors.

"**Childcare Allowance**" has the meaning given in Clause 4.1.

"**Companies Act**" means the Companies Act of Japan (Act No. 86 of 2005), as amended from time to time.

"**Confidential Information**" means any information including, but not limited to, trade secrets, disclosed to the Executive or known by the Executive as a consequence of or through his performance of services hereunder, concerning the business or finances of any member of the Group or any of its dealings, transactions or affairs, including without limitation, lists or details of customers, suppliers, information relating to the working of any process of invention carried on or used by the Company or any member of the Group, information relating to research projects, know-how, technology, trade secrets, prototypes, prices, discounts, mark-ups, future business strategy, marketing and price-sensitive information.

"**COO**" means the chief operating officer of the Company.

"**Crypto Trading Business**" means the development and operations of an exchange trading platform for the sale and purchase of crypto-assets, crypto asset-based derivatives, margin lending, non-fungible tokens, and other crypto asset-based financial products, as carried on by the Company or any member of the Group from time to time.

"**Directors' and Officers' Insurance**" has the meaning given in Clause 5.6.

"**Effective Date**" means the Completion Date as provided for and defined in the Major Shareholders SPA.

"**Expenses**" has the meaning give in Clause 5.1.

"**FTX Board of Directors**" means the board of directors of FTX.

"**FTX Common Shares**" means shares of the common stock of FTX.

"**Good Reason**" means any of the following actions by the Company without the written prior consent of the Executive: (a) a material reduction in the Executive's duties or responsibilities that is inconsistent with the Executive's position, provided that a mere change of title alone shall not constitute such a material reduction; (b) a greater than 10% aggregate reduction (that is, a material reduction) by the Company in the Services Fee or a material reduction in his employee benefits (namely, the Housing Allowance, the Childcare Allowance, medical, dental, insurance, short-term and long-term disability insurance and retirement plan benefits, collectively, the "**Employee Benefits**") to which such Executive is entitled immediately prior to such reduction (other than in connection with a general decrease in the salary or Employee Benefits of substantially all employees of the Company); (c) a relocation of the Executive's principal office to a location that increases the Executive's commute by more than 80 kilometers, except for required travel by the Executive on business for the Company, an Affiliate of the Company, or any other member of the Group; or (d) a failure to maintain the Executive's concurrent appointment as both Representative Director and COO at any time during the Term.

"**Group**" means FTX and its Affiliates from time to time and "**member(s) of the Group**" shall be construed accordingly.

"**Housing Allowance**" has the meaning given in Clause 4.1.

"**Intellectual Property Rights**" means all rights in or to any patent, copyright, database rights, registered design or other design right, utility model, trade mark, brand name, service mark, trade name, eligible layout right, chip topography right, trade secrets, know-how and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registrable or not and wherever existing, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights.

"**Major Shareholders SPA**" means the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated 19 November 2021 entered into between the Executive, the Company and certain other parties thereto, as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022.

"**Notice**" has the meaning given in Clause 12.1.

"**Option**" has the meaning given in Clause 4.4.

"**Proceeding**" has the meaning given in Clause 5.1.

"**Representative Director**" means a representative director (*daihyo torishimariyaku*) of the Company.

"**Services Fee**" has the meaning given in Clause 4.1.

"**Shareholders**" means the shareholders of the Company.

"**Term**" has the meaning given in Clause 2.2.

- 3 -

"**USD**" means United States dollars, the lawful currency of the United States of America.

1.2 **References to certain general terms**

    (a)    References herein to Clauses are to Clauses in this Agreement.

    (b)    Headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

    (c)    References to this Agreement are to this management agreement as amended, varied, modified or supplemented from time to time.

    (d)    Unless the context requires otherwise, words importing the singular only shall include the plural and vice versa and words importing natural persons shall include corporations and unincorporated associations and words importing the masculine gender only shall include the feminine gender and the neuter gender and vice versa.

    (e)    The expressions the "Company" and the "Executive" shall, where the context permits, include their respective successors, personal representations, executors, administrators, estates and permitted assigns.

**2. APPOINTMENT**

2.1 The Company shall appoint the Executive and the Executive shall serve the Company concurrently as a Representative Director and COO, subject to the terms and conditions of this Agreement.

2.2 This Agreement shall be effective as of the Effective Date and continue until such time as this Agreement is terminated in accordance with Clause 11 (the "**Term**").

2.3 The Company shall take all necessary procedures to promptly effect, and maintain during the Term of this Agreement, the Executive's appointment as a Representative Director and COO in accordance with the Companies Act, the Articles of Incorporation, and other organizational documents of the Company.

**3. EXECUTIVE'S DUTIES AND RESPONSIBILITIES**

3.1 The Executive shall, during the Term of this Agreement:

    (a)    serve the Company as a Representative Director and COO and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, perform such services for the Company, which duties, authority, and responsibilities are consistent with the Executive's position, and (without further remuneration unless otherwise agreed) accept such offices and positions as the Board of Directors may from time to time reasonably require, and he will perform those duties at such place or places as the Board of Directors may from time to time reasonably determine;

     (b)    comply with and conform to any lawful instructions or directions from time to time given or made by the Board of Directors, and:

          (i)    maintain the confidentiality of all Confidential Information he acquires by virtue of his appointment;

          (ii)    carry out his responsibilities with care, skill and diligence which the Company is reasonably entitled to expect from someone of his experience and expertise;

          (iii)    act in good faith and diligently serve the Company and use his best endeavours to promote the business and interests thereof;

          (iv)    to act at all times for the proper purposes of the Company; and

     (c)    to act only with the proper authority of the Board of Directors;

     (d)    keep the Board of Directors promptly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or the Group and provide such explanations as the Board of Directors may require in connection therewith;

     (e)    carry out his duties and exercise his powers jointly and collectively with any other director or executive of the Company as shall from time to time be appointed by the Board of Directors; and

     (f)    comply with (and use his best endeavours to procure the Company's compliance with) the Articles of Incorporation and all laws, rules, regulations and guidelines which are applicable to the Company or the Executive from time to time.

3.2    Without prejudice to Clause 3.1, the Executive's responsibilities shall also include directing on behalf of the Company and each of its subsidiaries:

     (a)    the development of wallet management;

     (b)    new product development;

     (c)    the integration of existing products into the FTX ecosystem; and

     (d)    business development.

## 4.    REMUNERATION AND OTHER BENEFITS

4.1    During the Term of this Agreement, the Executive shall be entitled to the following remuneration and allowances:

     (a)    a monthly services fee of USD37,500.00 (the "**Services Fee**");

     (b)    a monthly housing allowance of USD3,500.00 (the "**Housing Allowance**"); and

     (c)    a monthly childcare allowance of USD6,000.00 (the "**Childcare Allowance**"),

payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that the Services Fee, the Housing Allowance and the Childcare Allowance shall be prorated for any partial month of services during the Term of this Agreement. All payments made pursuant to this Section 4.1 shall be made in the corresponding currencies set forth in this Section, or such other currency as the parties may agree upon from time to time. In the event another currency is so agreed upon, then the amount to be paid shall be calculated using the foreign exchange selling rate for that other currency for the Business Day preceding the payment due date as published in the Wall Street Journal, or such other method as the parties may agree upon from time to time.

4.2    During the Term of this Agreement, the Board of Directors may, within the limits of the amounts approved by the Shareholders at the general meeting of the Company, at its sole and absolute discretion, pay the Executive an annual bonus (the "**Bonus**") with a target amount equal to 100% of the annual Services Fee, which shall be prorated for any partial year of services during the Term of this Agreement, and subject to such conditions as the Board of Directors may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and the Company and such other factors as the Board of Directors may in its sole and absolute discretion consider necessary or appropriate.

4.3    During the Term of this Agreement, the Executive shall be entitled to the Employee Benefits, including the benefits under any medical insurance scheme and any employee benefit plan adopted by the Company for its directors and employees from time to time.

4.4    As soon as practicable following the Effective Date, the Company shall recommend to the FTX Board of Directors that the Executive be granted an option (the "**Option**") to purchase 28,000 shares of the FTX Common Shares under FTX's 2020 Equity Incentive Plan, as amended from time to time. The Option shall be subject to monthly vesting over four years with a one-year cliff, and shall be evidenced by FTX's standard form of option agreement. The exercise price of the Option shall be the fair market value of the FTX Common Shares on the date of grant, as determined by the FTX Board of Directors in its sole and absolute discretion.

## 5.    INDEMNIFICATION

5.1    Subject to Clause 5.4, to the fullest extent permitted by applicable law, in the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**") by reason of the fact that the Executive is or was a director or officer of the Company, any Affiliate of the Company, or any other member of the Group, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses reasonably incurred in defence of any Proceeding (including attorneys' fees) (collectively, the "**Expenses**").

5.2    The Expenses reasonably incurred by the Executive in defence of the Proceeding shall be paid by the Company in advance of the final disposition of such litigation upon receipt by the Company from time to time of:

(a)    a written request for payment;

(b)    appropriate documentation evidencing the incurrence, amount, and nature of the Expenses for which payment is being sought; and

(c)    an undertaking adequate under applicable law made by or on behalf of the Executive to repay the Company:

    (i)    all amounts paid by the Company if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Company under this Agreement; and

    (ii)    all amounts paid to or recovered by the Executive from any person (including but not limited to the insurance carrier under the Directors' and Officers' Insurance) with respect to the Proceeding.

5.3    No determination as to entitlement to indemnification (including in respect of advanced payments) under this Agreement shall be required to be made prior to the final disposition of a Proceeding.

5.4    Notwithstanding any provision in this Agreement to the contrary, the Company shall not be obligated to indemnify the Executive for Expenses:

(a)    to the extent prohibited by any applicable laws and regulations;

(b)    to the extent such Expenses have been paid directly to the Executive by the insurance carrier under the Directors' and Officers' Insurance and/or any other person;

(c)    in respect of a Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its Affiliates with respect to this Agreement or the Executive's performance of services under this Agreement;

(d)    in respect of any liabilities relating to any taxation payable by the Executive in connection with his remuneration or other payments or benefits received from the Company;

(e)    in respect of any liabilities incurred by, or any Proceeding made against, the Executive arising from the Executive's fraud, wilful default, wilful misconduct or gross negligence; or

(f)    in respect of any liabilities arising out of, relating to or in connection with any actions taken or inactions by the Executive prior to the Effective Date (except to the extent that any Expenses incurred thereto are recoverable from the insurance carrier under the Directors' and Officers' Insurance by the Company).

5.5    The Company shall, at the sole and absolute discretion of the Board of Directors, be entitled to (i) participate in the Proceeding and/or (ii) assume the defence of the Proceeding; provided, however, that the Company shall be required to obtain the Executive's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant the Executive a complete release

of liability, (2) would impose any penalty or limitation on the Executive, or (3) would admit any liability or misconduct by the Executive.

5.6     During the Term of this Agreement and for a period of six (6) years thereafter, the Company or any successor to the Company shall use commercially reasonable efforts to maintain, at its own expense, directors' and officers' liability insurance (the "**Directors' and Officers' Insurance**") providing coverage to the Executive in amounts and on terms reasonable and customary for similarly situated companies.

5.7     The Executive shall fully assist, at the Company's sole expense, the Company to the extent reasonably necessary in any claims or lawsuits between the Company and the insurance carrier under the Directors' and Officers' Insurance in respect to a Proceeding.

5.8     In the event any Expenses paid by the Company to the Executive are recovered by the Executive from the insurance carrier under the Directors' and Officers' Insurance, the Executive shall repay the Company such recovered amounts.

5.9     For the avoidance of doubt, the provisions of this Clause 5 shall survive the termination or expiration of this Agreement.

## 6.     EXPENSES

The Company shall reimburse the Executive for all reasonable expenses properly incurred in the performance of his duties hereunder and the Executive shall, if so required, provide the Company with receipts or other evidence of the payment of such expenses.

## 7.     DEDUCTIONS; RETURN OF MATERIALS

7.1     The Company shall be entitled at any time to deduct from the Executive's remuneration hereunder (including but not limited to the Services Fee, the Housing Allowance, the Childcare Allowance and the Bonus) any monies due from him to the Company for outstanding loans, advances and any other monies lent to him by the Company.

7.2     The Executive will return all equipment that he borrowed from the Company in the same condition (other than for normal wear and tear) in which it was received within five (5) days after the termination or expiration of this Agreement, however occurring.

## 8.     CONFIDENTIALITY

8.1     The Executive shall not during or after the Term of this Agreement use or divulge to any person any Confidential Information which may have come to his knowledge.

8.2     Clause 8.1 does not apply to any use or disclosure of Confidential Information:

(a)     as required during the Term of this Agreement in performance of the Executive's authorized duties to the Company (such disclosures to be made within the limits and to the extent of such duties);

(b)     to the extent that such Confidential Information is generally known to the public not as a result of a breach of the Executive's duty of confidentiality to a member of the Group;

(c)    to the extent that such Confidential Information is required to be disclosed by law, provided that to the extent permitted by law (i) the disclosure shall be made after consultation with the Company and after allowing the Company, at the Company's sole cost and expense, the opportunity to contest such disclosure and after taking into account the Company's requirements as to its timing, content and manner of disclosure, (ii) such disclosure shall only be made to the extent legally required, and (iii) following such disclosure such disclosed Confidential Information shall continue to be treated as Confidential Information hereunder; or

(d)    as permitted by the Company's prior written consent.

## 9.    INTELLECTUAL PROPERTY RIGHTS

9.1    The Executive acknowledges that as between the Company and the Executive any and all Intellectual Property Rights which are owned by the Company at the Effective Date and/or which are created or developed from time to time in connection with the Executive's service hereunder and the business or the operation of the Company are owned by the Company. The Executive:

(a)    hereby assigns, and agrees to assign, all such Intellectual Property to the Company, and undertakes to, forthwith and from time to time both during and after the Term of this Agreement and at the request of the Company, at the Company's sole cost and expense, render all reasonable assistance to the Company (or any other member of the Group as the case may be) for obtaining letters patent or other protection or registration for any such Intellectual Property Rights and shall vest such letters patent or other protection in the Company (or any other member of the Group as the case may be) or its nominees; and

(b)    irrevocably authorises the Company and any member of the Group for the purposes aforesaid to make use of the name of the Executive and execute any document or do anything on his behalf. The Executive agrees to confirm and ratify all such acts and instruments.

9.2    The Executive shall not during or after the Term of this Agreement, directly or indirectly, except with the prior written consent of the Company or in the ordinary course of the Company's business:

(a)    use the name "Liquid", "Quoine" or "FTX" or any name similar to that of the Company, FTX or any member of the Group or any colourable imitation thereof in connection with any business; and

(b)    use any Intellectual Property Rights of the Group in connection with any business not belonging to the Group.

**10.    EXECUTIVE'S WARRANTIES AND UNDERTAKINGS**

10.1    The Executive represents, warrants and undertakes during the Term of this Agreement that:

(a)    he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or from performing his duties hereunder;

(b)    to the Executive's knowledge there is no circumstance in respect of which there is, or is likely to be, a conflict of interest between the Executive or any of his Affiliates and the Company; and

(c)    he shall notify the Company promptly in writing of any change to the information referred to in Clause 10.1.

10.2    Subject to Clause 10.3 and Clause 10.5, the Executive shall not, unless he acts on behalf of the Company or any other member of the Group, (i) at any time during the Term of this Agreement, and for a period of one (1) year following termination of this Agreement, or (ii) for a period of three (3) years following the Effective Date (whichever is longer), either on his own or in conjunction with or on behalf of any body corporate, partnership, joint venture or other contractual agreement, whether directly or indirectly, whether for profit or not:

(a)    carry on or be engaged or interested in or assist a business in Japan, Singapore, and Vietnam, which competes, directly or indirectly, with the Crypto Trading Business as operated during the Term of this Agreement;

(b)    make, publish, or communicate, whether verbally or in any written format, to any person or entity any defamatory or untrue disparaging remarks, comments, or statements concerning the Group, the Group's products, services, directors, officers, or employees;

(c)    solicit, contact, attempt to contact, or meet a current customer or former customer of a member of the Group located in Japan, Singapore, and Vietnam, for the purposes of offering or accepting goods or services similar to or competitive with those offered by any members of the Group;

(d)    engage, employ, solicit or contact with a view to his engagement or employment by another person, a director, officer, employee or manager of the Company or any other member of the Group or a person who was a director, officer, employee or manager of the Company or any other member of the Group at any time in the six (6) month period preceding such engagement, employment or solicitation, provided, however, that the restrictions contained in this Clause 10.2(d) shall not apply to general solicitation or contact not specifically directed to any person mentioned above; or

(e)    solicit, motivate aid, abet, or otherwise encourage a third party to do any of the foregoing.

10.3    In the event of the termination of this Agreement by the Company without Cause or by the Executive for Good Reason, the restrictive covenants set forth in Clause 10.2 shall

remain effective for a period of four (4) months from the date of termination of this Agreement, but shall otherwise cease to have any force or effect upon expiry of such four-month period.

10.4    The Company shall compensate the Executive during the non-compete period established in Clause 10.3 at a rate equal to the monthly Services Fee effective as of immediately before the date of termination, payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that such compensation shall be prorated for any partial month during the non-compete period established in Clause 10.3.

10.5    Notwithstanding any provision in this Agreement to the contrary, the Executive may;

(a)    own, directly or indirectly, solely as an investment, up to three percent (3%) of any class of "publicly traded securities" of any business that competes with any of the members of the Group; or

(b)    own securities, solely as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in an entity that may compete with any of the members of the Group.

## 11.    TERMINATION

11.1    Subject to Clause 11.2 and Clause 11.3, either the Company or the Executive may terminate this Agreement by three (3) month's prior notice in writing to the other party.

11.2    Notwithstanding Clause 11.1, the Company may terminate this Agreement immediately upon written notice to the Executive:

(a)    for Cause;

(b)    if the Executive is convicted of any criminal offence involving his integrity or honesty; or

(c)    if the Executive is declared of bankruptcy or makes any arrangements or composition with his creditors generally.

11.3    Notwithstanding Clause 11.1, the Executive may terminate this Agreement for Good Reason immediately upon written notice to the Company.

11.4    In the event of the termination of this Agreement, the Executive shall:

(a)    where he serves as a director of the Company and/or as a director of any other member of the Group, forthwith resign from such directorship(s) and acknowledges that he has no claims against the Company or as the case may be, the relevant member of the Group for loss of office;

(b)    deliver to the Company or as the Company may direct all documents (including books, records, document, papers, accounts, correspondence, lists of customers, notes, memoranda, plans, drawing and other documents of whatsoever nature) credit cards, models or samples and other property concerning the business,

finances or affairs of any member of the Group which may then be in his possession or control;

(c)    not at any time thereafter represent himself to be connected with the Group; and

(d)    cease to be entitled to any further benefits or payments under this Agreement other than those set forth in this Clause 11, Clause 5 and Clause 10.4.

11.5    In the event of the termination of this Agreement for Cause or without Good Reason, the Executive shall be entitled to receive:

(a)    any accrued but unpaid Services Fees;

(b)    any Bonus with respect to any completed fiscal year immediately preceding the termination date that has been awarded to him in writing by the Board of Directors but remains unpaid as at the termination date;

(c)    reimbursement for unreimbursed business expenses properly incurred by the Executive; and

(d)    such Employee Benefits, if any, to which the Executive may be entitled under the Company's benefit plans as of the date of termination.

11.6    In the event of the termination of this Agreement without Cause or for Good Reason:

(a)    the Executive shall be entitled to receive the Accrued Amounts; and

(b)    with respect to the Option granted to the Executive following the Effective Date, 100% of the outstanding unvested Options shall become fully vested and exercisable for the remainder of their full term.

11.7    Any termination of this Agreement shall be communicated by a written notice of termination specifying: (i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date.

## 12.    NOTICE

12.1    Each notice, demand or other communication given or made under this Agreement (a "**Notice**") shall be in writing and delivered or sent to the relevant party at its address and email address set out below (or such other address or email address as the addressee has by seven (7) days' prior written notice specified to the other party):

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Company** | Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | sam@ftx.com | N/A |
| | with a copy (which shall not constitute notice) to: FTX Trading Ltd. c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint John's Antigua and Barbuda | can@ftx.com | General Counsel |
| **The Executive** | 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 | seth@liquid.com check_raize@yahoo.com and sethm19@mac.com | Seth Melamed |

12.2    Any Notice so addressed to the relevant party shall be deemed to have been delivered (a) if sent by courier, two (2) Business Days after the date of posting; (b) if given by personal delivery, when actually delivered to the relevant address; and (c) if sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 12.2 within one (1) Business Day of sending the email.

**13.    LEGAL REPRESENTATION**

The Executive hereby acknowledges that the Executive has been duly advised to seek independent legal advice and to obtain separate legal representation.

**14.    ENTIRE AGREEMENT**

14.1    This Agreement, as well as the Major Shareholders SPA and agreements referred to therein, constitutes the entire agreement and understanding of the parties hereto relating to the subject matter hereof and shall be in substitution for any subsisting agreement or arrangement (oral or otherwise) made between the Company and the Executive which shall be deemed to have been terminated by mutual consent as of the Effective Date.

14.2    The terms of this Agreement may only be varied in writing (excluding email) signed by the Executive and a duly appointed representative of the Company.

**15.    MISCELLANEOUS**

15.1    Nothing in this Agreement shall be construed as creating among the parties hereto an employment, partnership, agency, or similar relationship. The provision of services by

the Executive shall not be governed by the Labour Contract Act (Act No.128 of 2007, as amended), the Labour Standards Law (Act No. 49 of 1947, as amended) and other laws of Japan otherwise applicable to employees in their capacity as employees.

15.2 The rights and remedies of the parties under this Agreement are not exclusive of or limited by or in limitation of any other rights or remedies (including without limitation any right of set-off) which each party may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative.

15.3 No failure or delay by any party hereto in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

15.4 The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions hereof as in accordance with their terms are expressed to operate or have effect thereafter.

15.5 In the event of any variation of the remuneration payable to the Executive hereunder being made by consent of the parties hereto such variation shall not constitute a new agreement but (subject to any express agreement to the contrary) the appointment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

15.6 If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.7 The parties to this Agreement shall pay their own legal professional and other costs in connection with the preparation and completion of this Agreement.

15.8 No party to this Agreement shall assign, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, any of its rights or obligations under this Agreement.

15.9 The Company's rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the Company's successors and assigns.

15.10 This Agreement may be executed in any number of counterparts each of which is an original and all of which together evidence the same agreement.

**16.    GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by the laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

*[Signature Page Follows]*

**EXECUTED** by the parties:

**Company**

| | |
|---|---|
| Signed by Kariya Kayamori | ) |
| as the representative director of | ) |
| and for and on behalf of | ) |
| **LIQUID GROUP INC.** | ) |

**Executive**

Signed by **SETH MELAMED**                    )                    *Seth Melamed*

Exhibit 7

# FIRST AMENDMENT TO
# MANAGEMENT AGREEMENT

This First Amendment to the Management Agreement (this "**Agreement**") dated as of June 30, 2022 is by and between Seth Melamed and FTX Japan Holdings K.K. (formerly known as Liquid Group Inc.), and amends that certain Management Agreement by and between the foregoing parties (the "**MA**"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the MA.

The parties hereto, intending to be legally bound, hereby agree as follows:

1.      Clause 3.1 of the MA is hereby amended by inserting immediately following Clause 3.1(a) the following new Clause 3.1(a-1):

"(a-1)      serve as a director or officer of any Affiliate of the Company or any other member of the Group and perform such services as requested by such member's board of directors, in each case subject to (i) the prior approval of the Board of Directors of the Company, (ii) the written consent of the Executive, and (iii) the Executive's appointment as a director or officer of such member of the Group in accordance with applicable law;"

2.      Clause 4 of the MA is hereby amended by inserting immediately following Clause 4.1 the following new Clause 4.1-A:

"4.1-A      Notwithstanding Clause 4.1, in the event that the Executive performs services as a director or officer in accordance with Clause 3.1(a-1) to FTX Japan K.K. ("**FTX Japan**"), the Company shall cause FTX Japan to pay to the Executive one hundred (100%) of the Services Fees, Housing Allowance, and Childcare Allowance, each in arrears.

For the avoidance of doubt, all fees set forth in this Clause 4.1-A, once paid to the Executive in respect to a given month during the Term of this Agreement by FTX Japan will offset the corresponding Services Fees, Housing Allowance, and Childcare Allowance payable by the Company to the Executive during such month."

3.      This Agreement will be deemed effective as of the date first written above. Except as expressly provided in this Agreement, all of the terms and provisions of the MA are and will remain in full force and effect and are hereby ratified and confirmed by the parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the MA or as a waiver of or consent to any further or future action on the part of either party that would require the waiver or consent of the other party.

4.      Clauses 12 to 16 of the MA are incorporated by reference herein and shall apply *mutatis mutandis*.

*[Signature Page Follows]*

The parties hereto have caused this Agreement to be executed as of the date first above written.

**EXECUTED** by the parties:

<u>**Company**</u>

| | | |
|---|---|---|
| Signed by Samuel Bankman-Fried | ) | |
| as the representative director of | ) | |
| and for and on behalf of | ) | *Samuel Bankman-Fried* |
| **FTX JAPAN HOLDINGS K.K.** | ) | |

DocuSigned by:

672DA88132804B9...

Signature Page for the Company
(First Amendment to Management Agreement)

**<u>Executive</u>**

Signed by **SETH MELAMED**                    )

Exhibit 8

DocuSign Envelope ID: FBB95EB6-EA72-4BB4-AD43-5E9DBACDD315

# FTX JAPAN HOLDINGS K.K.

AND

# SETH MELAMED

---

## AMENDED AND RESTATED

## MANAGEMENT AGREEMENT

---

DocuSign Envelope ID: FB995FB6-5A72-4BB4-AD43-559DBACDD315

# CONTENTS

**Clause**                                                          **Page**

1.  Interpretation ..................................................................................................... 1
2.  Appointment ....................................................................................................... 4
3.  Executive's Duties and Responsibilities ........................................................... 4
4.  Remuneration and Other Benefits ..................................................................... 6
5.  Indemnification ................................................................................................. 8
6.  Expenses ........................................................................................................... 10
7.  Deductions; Return of Materials ...................................................................... 10
8.  Confidentiality ................................................................................................. 10
9.  Intellectual Property Rights ............................................................................. 11
10. Executive's Warranties and Undertakings ...................................................... 12
11. Termination ...................................................................................................... 13
12. Notice ............................................................................................................... 14
13. Legal Representation ........................................................................................ 15
14. Entire Agreement ............................................................................................. 15
15. Miscellaneous .................................................................................................. 15
16. Governing Law and Jurisdiction ...................................................................... 16

**THIS AGREEMENT** is made on ___10/19/2022___.

**BETWEEN**:

(1)     **FTX JAPAN HOLDINGS K.K.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan and which was formerly named Liquid Group Inc. (the "**Company**"), on behalf of itself and its wholly owned subsidiary FTX Japan K.K. ("**FTX Japan**"); and

(2)     **SETH MELAMED**, a United States of America national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 (the "**Executive**").

**WHEREAS**:

(A)     The Company is a subsidiary of FTX Trading Ltd., a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda ("**FTX**").

(B)     The Company and the Executive previously entered into a Management Agreement dated March 31, 2022 (the "**Prior Agreement**") pursuant to which the Company agreed to appoint the Executive and the Executive agreed to serve the Company as a Representative Director and COO of the Company on the terms and conditions set out in the Prior Agreement.

(C)     The Company and the Executive wish to clarify the terms of certain concurrent appointments of the Executive to FTX Japan and Quoine Pte. Ltd. ("**FTX Singapore**"), a subsidiary of the Company, and have agreed to amend and restate the Prior Agreement on the term and conditions set out below.

**THE PARTIES AGREE** as follows:

**1.     INTERPRETATION**

1.1     **Definitions**

In this Agreement:

"**Accrued Amounts**" means, collectively, the items set forth in Clause 11.5.

"**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such specified person. For the purposes of this definition, "**control**" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Agreement**" means this Management Agreement, as amended or supplemented in accordance with the terms hereof from time to time.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) or other analogous constitutional documents of the applicable member of the Group.

"**Board of Directors**" means the board of directors (*torishimariyakukai*, in the case of the Company or FTX Japan) of the applicable member of the Group.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cause**" means any of the following: (a) the Executive willfully engages in conduct that is in bad faith and materially injurious to the Company or a member of the Group, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (b) the Executive commits a material breach of this Agreement, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach; (c) the Executive willfully refuses to implement or follow a reasonable and lawful directive by the Board of Directors of a member of the Group to which the Executive provides services under this Agreement, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the applicable member of the Group; (d) the Executive engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with his position, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the applicable member of the Group; (e) the Executive becomes disqualified from serving as a director under any applicable law; (f) the Executive engages in a course of vexatious comment or conduct towards employees or consultants of the Company or any member of the Group, that is known or ought reasonably to be known to be unwelcome, and such course of comment or conduct persists despite warnings from the Company or the applicable member of the Group; or (g) the Executive resigns from any position to which he is appointed under Clause 3.1 without the prior approval of the applicable Board of Directors.

"**Childcare Allowance**" has the meaning given in Clause 4.1.

"**Companies Act**" means the Companies Act of Japan (Act No. 86 of 2005), as amended from time to time.

"**Confidential Information**" means any information including, but not limited to, trade secrets, disclosed to the Executive or known by the Executive as a consequence of or through his performance of services hereunder, concerning the business or finances of any member of the Group or any of its dealings, transactions or affairs, including without limitation, lists or details of customers, suppliers, information relating to the working of any process of invention carried on or used by the Company or any member of the Group, information relating to research projects, know-how, technology, trade secrets, prototypes, prices, discounts, mark-ups, future business strategy, marketing and price-sensitive information.

"**COO**" means the chief operating officer of the Company.

"**Crypto Trading Business**" means the development and operations of an exchange trading platform for the sale and purchase of crypto-assets, crypto asset-based derivatives, margin lending, non-fungible tokens, and other crypto asset-based financial products, as carried on by the Company or any member of the Group from time to time.

- 2 -

"**Directors' and Officers' Insurance**" has the meaning given in Clause 5.6.

"**Effective Date**" means the Completion Date as provided for and defined in the Major Shareholders SPA.

"**Expenses**" has the meaning give in Clause 5.1.

"**FTX Board of Directors**" means the board of directors of FTX.

"**FTX Common Shares**" means shares of the common stock of FTX.

"**Good Reason**" means any of the following actions by the Group without the written prior consent of the Executive: (a) a material reduction in the Executive's duties or responsibilities that is inconsistent with the Executive's position, provided that a mere change of title alone shall not constitute such a material reduction; (b) a greater than 10% aggregate reduction (that is, a material reduction) in the Services Fee and his employee benefits (namely, the Housing Allowance, the Childcare Allowance, medical, dental, insurance, short-term and long-term disability insurance and retirement plan benefits, collectively, the "**Employee Benefits**") to which such Executive is entitled immediately prior to such reduction (other than in connection with a general decrease in the salary or Employee Benefits of substantially all employees of the applicable member of the Group); (c) a relocation of the Executive's principal office to a location that increases the Executive's commute by more than 80 kilometers, except for required travel by the Executive on business for the Company, an Affiliate of the Company, or any other member of the Group; (d) a failure to maintain the Executive's concurrent appointment as both Representative Director and COO at any time during the Term; (e) a requirement for the Executive have or adopt a principal place of work, residence or principal residence that, in the opinion of Executive's counsel, would materially increase Executive's tax liability to any nation or jurisdiction, or would cause Executive's total collective tax liability to exceed that which would exist were the Executive a resident of Japan; or (f) a requirement for the Executive to work in a place other than where his spouse and children are located for more than 6 months in total in any period of twelve consecutive months.

"**Group**" means FTX and its Affiliates from time to time and "**member(s) of the Group**" shall be construed accordingly.

"**Housing Allowance**" has the meaning given in Clause 4.1.

"**Intellectual Property Rights**" means all rights in or to any patent, copyright, database rights, registered design or other design right, utility model, trade mark, brand name, service mark, trade name, eligible layout right, chip topography right, trade secrets, know-how and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registrable or not and wherever existing, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights.

"**Major Shareholders SPA**" means the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated 19 November 2021 entered into between the Executive, the Company and certain other parties thereto.

DocuSign Envelope ID: FB895FB6-5A72-4BB4-AD43-5F9DBACDD315

"**Notice**" has the meaning given in Clause 12.1.

"**Option**" has the meaning given in Clause 4.6.

"**Proceeding**" has the meaning given in Clause 5.1.

"**Representative Director**" means a representative director (*daihyo torishimariyaku*) of the Company.

"**Services Fee**" has the meaning given in Clause 4.1.

"**Shareholders**" means the shareholders of the Company.

"**Term**" has the meaning given in Clause 2.2.

1.2    **References to certain general terms**

(a)    References herein to Clauses are to Clauses in this Agreement.

(b)    Headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

(c)    References to this Agreement are to this management agreement as amended, varied, modified or supplemented from time to time.

(d)    Unless the context requires otherwise, words importing the singular only shall include the plural and vice versa and words importing natural persons shall include corporations and unincorporated associations and words importing the masculine gender only shall include the feminine gender and the neuter gender and vice versa.

(e)    The expressions the "Company" and the "Executive" shall, where the context permits, include their respective successors, personal representations, executors, administrators, estates and permitted assigns.

## 2.    APPOINTMENT

2.1    The Company shall appoint the Executive and the Executive shall serve the Company concurrently as a Representative Director and COO, subject to the terms and conditions of this Agreement.

2.2    This Agreement shall be effective as of the Effective Date and continue until such time as this Agreement is terminated in accordance with Clause 11 (the "**Term**").

2.3    The Company shall take all necessary procedures to promptly effect, and maintain during the Term of this Agreement, the Executive's appointment as a Representative Director and COO in accordance with the Companies Act, the Articles of Incorporation, and other organizational documents of the Company.

## 3.    EXECUTIVE'S DUTIES AND RESPONSIBILITIES

3.1    The Executive shall, during the Term of this Agreement:

(a)     serve the Company as a Representative Director and COO and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, perform such services for the Company, which duties, authority, and responsibilities are consistent with the Executive's position, and (without further remuneration unless otherwise agreed) accept such offices and positions as the Board of Directors may from time to time reasonably require, and he will perform those duties at such place or places as the Board of Directors may from time to time reasonably determine;

(b)     for so long as requested by the Company, serve as a representative director and the chief operating officer of FTX Japan and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, and perform such services for FTX Japan, which duties, authority, and responsibilities are consistent with the Executive's position;

(c)     for so long as requested by the Company, serve as a director of FTX Singapore and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors, the constitutional documents of FTX Singapore, or the Companies Act 1967 of Singapore in pursuance of his duties hereunder, and perform such services for FTX Singapore, which duties, authority, and responsibilities are consistent with the Executive's position;

(d)     serve as a director or officer of any other Affiliate of the Company or any other member of the Group and perform such services as requested by such member's board of directors, in each case subject to (i) the prior approval of the Board of Directors of the Company, (ii) the written consent of the Executive, and (iii) the Executive's appointment as a director or officer of such member of the Group in accordance with applicable law;

(e)     comply with and conform to any lawful instructions or directions from time to time given or made by the Board of Directors of the applicable member of the Group, and:

    (i)     maintain the confidentiality of all Confidential Information he acquires by virtue of his appointment;

    (ii)     carry out his responsibilities with care, skill and diligence which the Company or the applicable member of the Group is reasonably entitled to expect from someone of his experience and expertise;

    (iii)     act in good faith and diligently serve the Company and each member of the Group, as applicable, and use his best endeavours to promote the business and interests thereof;

    (iv)     to act at all times for the proper purposes of the Company and each member of the Group, as applicable; and

DocuSign Envelope ID: FBB05EB6-5A72-4BB4-AD43-5F9DBACDD31E

(f)    to act only with the proper authority of the Board of Directors of the applicable member of the Group;

(g)    keep the Board of Directors of the applicable member of the Group promptly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or the Group and provide such explanations as the Board of Directors of the applicable member of the Group may require in connection therewith;

(h)    carry out his duties and exercise his powers jointly and collectively with any other director or executive of the Company or applicable member of the Group as shall from time to time be appointed by the Board of Directors of the applicable member or the Group; and

(i)    comply with (and use his best endeavours to procure the Company's or the applicable member of the Group's compliance with) the Articles of Incorporation and all laws, rules, regulations and guidelines which are applicable to the Company, the applicable member of the Group, or the Executive from time to time.

3.2    Without prejudice to Clause 3.1, the Executive's responsibilities shall also include directing on behalf of the Company and each of its subsidiaries:

(a)    the development of wallet management;

(b)    new product development;

(c)    the integration of existing products into the FTX ecosystem; and

(d)    business development.

**4.    REMUNERATION AND OTHER BENEFITS**

4.1    During the Term of this Agreement, the Executive shall be entitled to the following remuneration and allowances:

(a)    a monthly services fee of USD37,500.00 (the "**Services Fee**");

(b)    a monthly housing allowance of USD3,500.00 (the "**Housing Allowance**"); and

(c)    a monthly childcare allowance of USD6,000.00 (the "**Childcare Allowance**"),

payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that the Services Fee, the Housing Allowance and the Childcare Allowance shall be prorated for any partial month of services during the Term of this Agreement. All payments made pursuant to this Section 4.1 shall be made in the corresponding currencies set forth in this Section, or such other currency as the parties may agree upon from time to time. In the event another currency is so agreed upon, then the amount to be paid shall be calculated using the foreign exchange selling rate for that other currency for the Business Day preceding the payment due date as published in the Wall Street Journal, or such other method as the parties may agree upon from time to time.

4.2    Notwithstanding Clause 4.1, with effect from September 1, 2022 and for so long as the Executive performs services:

    (a)    to FTX Japan as a representative director in accordance with Clause 3.1(b), FTX Japan shall pay the Executive in respect of such role thirty percent (30%) of the Services Fees and one hundred percent (100%) of the Housing Allowance and Childcare Allowance, in each case payable monthly in arrears;

    (b)    to FTX Singapore as a director in accordance with Clause 3.1(c), the Company shall cause FTX Singapore to pay to the Executive in respect of such role seventy percent (70%) of the Services Fees, payable monthly in arrears; and

    (c)    to any other member of the Group as a director or officer in accordance with Clause 3.1(d), the Company and the Executive may agree separately to cause such member of the Group to pay to the Executive in respect of such role(s) any portion or all of the Services Fees, the Housing Allowance, or the Childcare Allowance, and to adjust the amounts paid by FTX Japan and FTX Singapore under Clauses 4.2(a) and 4.2(b) accordingly.

For the avoidance of doubt, all fees set forth in this Clause 4.2, once paid to the Executive in respect to a given month during the Term of this Amendment by FTX Japan and/or FTX Singapore, will offset the corresponding Services Fees, Housing Allowance, and Childcare Allowance payable by the Company to the Executive during such month.

4.3    During the Term of this Agreement, the Board of Directors may, within the limits of the amounts approved by the Shareholders at the general meeting of the Company, at its sole and absolute discretion, pay the Executive an annual bonus (the "**Bonus**") in one or more installments with an aggregate target amount equal to 100% of the annual Services Fee, which shall be prorated for any partial year of services during the Term of this Agreement, and subject to such conditions as the Board of Directors may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and the Company and such other factors as the Board of Directors may in its sole and absolute discretion consider necessary or appropriate.

4.4    Notwithstanding Clause 4.3, for so long as the Executive performs services:

    (a)    to FTX Japan as a representative director in accordance with Clause 3.1(b), FTX Japan may, within the limits of the amounts approved at a general meeting of the shareholders of FTX Japan, at its sole and absolute discretion, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's role as a director, and subject to such conditions as the board of directors of FTX Japan may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and FTX Japan and such other factors as the board of directors of FTX Japan may in its sole and absolute discretion consider necessary or appropriate;

    (b)    to FTX Singapore as its director in accordance with Clause 3.1(c), FTX Singapore may, at its sole and absolute discretion, subject to the prior approval by the Company as shareholder of FTX Singapore, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's

DocuSign Envelope ID: FB895FB6-5A72-4BB4-8D43-559DBACDD31E

role as director, and subject to such conditions as the board of directors of FTX Singapore may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and FTX Singapore and such other factors as the board of directors of FTX Singapore may in its sole and absolute discretion consider necessary or appropriate; and

(c)     to any other member of the Group as a director or officer in accordance with Clause 3.1(d), such member of the Group may, at its sole and absolute discretion, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's role as a director or officer, and subject to such conditions as the board of directors of such member of the Group may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and such member of the Group and other such factors as the board of directors of such member of the group may in its sole and absolute discretion consider necessary or appropriate.

For the avoidance of doubt, it is the parties' intention that any Bonus payments made to the Executive under Clause 4.4 will be in place of, not in addition to, corresponding payments under Clause 4.3, such that there is no increase to the target amount of the Bonus specified in Clause 4.3.

4.5     During the Term of this Agreement, the Executive shall be entitled to the Employee Benefits, including the benefits under any medical insurance scheme and any employee benefit plan adopted by the Company or the applicable member of the Group for its directors and employees from time to time.

4.6     As soon as practicable following the Effective Date, the Company shall recommend to the FTX Board of Directors that the Executive be granted an option (the "**Option**") to purchase 28,000 shares of the FTX Common Shares under FTX's 2020 Equity Incentive Plan, as amended from time to time. The Option shall be subject to monthly vesting over four years with a one-year cliff, and shall be evidenced by FTX's standard form of option agreement. The exercise price of the Option shall be the fair market value of the FTX Common Shares on the date of grant, as determined by the FTX Board of Directors in its sole and absolute discretion.

## 5.     INDEMNIFICATION

5.1     Subject to Clause 5.4, to the fullest extent permitted by applicable law, in the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**") by reason of the fact that the Executive is or was a director or officer of the Company, any Affiliate of the Company, or any other member of the Group, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company (or other member of the Group designated by the Company) (the "**Indemnifying Party**") from and against any liabilities, costs, claims, and expenses, including all costs and expenses reasonably incurred in defence of any Proceeding (including attorneys' fees) (collectively, the "**Expenses**").

5.2     The Expenses reasonably incurred by the Executive in defence of the Proceeding shall be paid by the Indemnifying Party in advance of the final disposition of such litigation upon receipt by the Indemnifying Party from time to time of:

(a)     a written request for payment;

(b)     appropriate documentation evidencing the incurrence, amount, and nature of the Expenses for which payment is being sought; and

(c)     an undertaking adequate under applicable law made by or on behalf of the Executive to repay the Indemnifying Party:

(i)     all amounts paid by the Indemnifying Party if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Indemnifying Party under this Agreement; and

(ii)     all amounts paid to or recovered by the Executive from any person (including but not limited to the insurance carrier under the Directors' and Officers' Insurance) with respect to the Proceeding.

5.3     No determination as to entitlement to indemnification (including in respect of advanced payments) under this Agreement shall be required to be made prior to the final disposition of a Proceeding.

5.4     Notwithstanding any provision in this Agreement to the contrary, the Indemnifying Party shall not be obligated to indemnify the Executive for Expenses:

(a)     to the extent prohibited by any applicable laws and regulations;

(b)     to the extent such Expenses have been paid directly to the Executive by the insurance carrier under the Directors' and Officers' Insurance and/or any other person;

(c)     in respect of a Proceeding initiated by the Executive or the Indemnifying Party related to any contest or dispute between the Executive and the Indemnifying Party or any of its Affiliates with respect to this Agreement or the Executive's performance of services under this Agreement;

(d)     in respect of any liabilities relating to any taxation payable by the Executive in connection with his remuneration or other payments or benefits received from the Indemnifying Party;

(e)     in respect of any liabilities incurred by, or any Proceeding made against, the Executive arising from the Executive's fraud, wilful default, wilful misconduct or gross negligence; or

(f)     in respect of any liabilities arising out of, relating to or in connection with any actions taken or inactions by the Executive prior to the Effective Date (except to the extent that any Expenses incurred thereto are recoverable from the insurance carrier under the Directors' and Officers' Insurance by the Indemnifying Party).

5.5     The Indemnifying Party shall, at the sole and absolute discretion of its board of directors, be entitled to (i) participate in the Proceeding and/or (ii) assume the defence of the Proceeding; provided, however, that the Indemnifying Party shall be required to obtain the Executive's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant the Executive a complete release of liability, (2) would impose any penalty or limitation on the Executive, or (3) would admit any liability or misconduct by the Executive.

5.6     During the Term of this Agreement and for a period of six (6) years thereafter, the Company or any successor to the Company shall use commercially reasonable efforts to maintain, at its own expense, directors' and officers' liability insurance (the "**Directors' and Officers' Insurance**") providing coverage to the Executive in amounts and on terms reasonable and customary for similarly situated companies.

5.7     The Executive shall fully assist, at the Group's sole expense, the applicable member of the Group to the extent reasonably necessary in any claims or lawsuits between the applicable member of the Group and the insurance carrier under the Directors' and Officers' Insurance in respect to a Proceeding.

5.8     In the event any Expenses paid by the Group to the Executive are recovered by the Executive from the insurance carrier under the Directors' and Officers' Insurance, the Executive shall repay the applicable member of the Group such recovered amounts.

5.9     For the avoidance of doubt, the provisions of this Clause 5 shall survive the termination or expiration of this Agreement.

## 6.    EXPENSES

The Company or the applicable member of the Group shall reimburse the Executive for all reasonable expenses properly incurred in the performance of his duties hereunder and the Executive shall, if so required, provide the Company or the applicable member of the Group with receipts or other evidence of the payment of such expenses.

## 7.    DEDUCTIONS; RETURN OF MATERIALS

7.1     The Company or the applicable member of the Group shall be entitled at any time to deduct from the Executive's remuneration hereunder (including but not limited to the Services Fee, the Housing Allowance, the Childcare Allowance and the Bonus) any monies due from him to the Company or the applicable member of the Group for outstanding loans, advances and any other monies lent to him by the Company or the applicable member of the Group.

7.2     The Executive will return all equipment that he borrowed from the Company or the applicable member of the Group in the same condition (other than for normal wear and tear) in which it was received within five (5) days after the termination or expiration of this Agreement, however occurring.

## 8.    CONFIDENTIALITY

8.1     The Executive shall not during or after the Term of this Agreement use or divulge to any person any Confidential Information which may have come to his knowledge.

8.2 Clause 8.1 does not apply to any use or disclosure of Confidential Information:

(a) as required during the Term of this Agreement in performance of the Executive's authorized duties to the Company or an applicable member of the Group (such disclosures to be made within the limits and to the extent of such duties);

(b) to the extent that such Confidential Information is generally known to the public not as a result of a breach of the Executive's duty of confidentiality to a member of the Group;

(c) to the extent that such Confidential Information is required to be disclosed by law, provided that to the extent permitted by law (i) the disclosure shall be made after consultation with the Company or the applicable member of the Group and after allowing the Company or the applicable member of the Group, at the Company's or applicable member of the Group's sole cost and expense, the opportunity to contest such disclosure and after taking into account the Company's or applicable member of the Group's requirements as to its timing, content and manner of disclosure, (ii) such disclosure shall only be made to the extent legally required, and (iii) following such disclosure such disclosed Confidential Information shall continue to be treated as Confidential Information hereunder; or

(d) as permitted by the Company's prior written consent.

## 9. INTELLECTUAL PROPERTY RIGHTS

9.1 The Executive acknowledges that as between the Company or any member of the Group, on the one hand, and the Executive, on the other hand, any and all Intellectual Property Rights which are owned by the Company or such member of the Group at the Effective Date and/or which are created or developed from time to time in connection with the Executive's service hereunder and the business or the operation of the Company or a member of the Group are owned by the Company or the applicable member of the Group. The Executive:

(a) hereby assigns, and agrees to assign, all such Intellectual Property to the Company or the applicable member of the Group, and undertakes to, forthwith and from time to time both during and after the Term of this Agreement and at the request of the Company or the applicable member of the Group, at the Company's or the applicable member of the Group's sole cost and expense, render all reasonable assistance to the Company (or any other member of the Group as the case may be) for obtaining letters patent or other protection or registration for any such Intellectual Property Rights and shall vest such letters patent or other protection in the Company (or any other member of the Group as the case may be) or its nominees; and

(b) irrevocably authorises the Company and any member of the Group for the purposes aforesaid to make use of the name of the Executive and execute any document or do anything on his behalf. The Executive agrees to confirm and ratify all such acts and instruments.

9.2    The Executive shall not during or after the Term of this Agreement, directly or indirectly, except with the prior written consent of the Company or in the ordinary course of the Company's or the Group's business:

(a)    use the name "Liquid", "Quoine" or "FTX" or any name similar to that of the Company, FTX or any member of the Group or any colourable imitation thereof in connection with any business; and

(b)    use any Intellectual Property Rights of the Group in connection with any business not belonging to the Group.

## 10.    EXECUTIVE'S WARRANTIES AND UNDERTAKINGS

10.1    The Executive represents, warrants and undertakes during the Term of this Agreement that:

(a)    he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or from performing his duties hereunder;

(b)    to the Executive's knowledge there is no circumstance in respect of which there is, or is likely to be, a conflict of interest between the Executive or any of his Affiliates and the Company; and

(c)    he shall notify the Company promptly in writing of any change to the information referred to in Clause 10.1.

10.2    Subject to Clause 10.3 and Clause 10.5, the Executive shall not, unless he acts on behalf of the Company or any other member of the Group, (i) at any time during the Term of this Agreement, and for a period of one (1) year following termination of this Agreement, or (ii) for a period of three (3) years following the Effective Date (whichever is longer), either on his own or in conjunction with or on behalf of any body corporate, partnership, joint venture or other contractual agreement, whether directly or indirectly, whether for profit or not:

(a)    carry on or be engaged or interested in or assist a business in Japan, Singapore, and Vietnam, which competes, directly or indirectly, with the Crypto Trading Business as operated during the Term of this Agreement;

(b)    make, publish, or communicate, whether verbally or in any written format, to any person or entity any defamatory or disparaging remarks, comments, or statements concerning the Group, the Group's products, services, directors, officers, employees, or advisers;

(c)    solicit, contact, attempt to contact, or meet a current customer or former customer of a member of the Group located in Japan, Singapore, and Vietnam, for the purposes of offering or accepting goods or services similar to or competitive with those offered by any members of the Group;

(d)    engage, employ, solicit or contact with a view to his engagement or employment by another person, a director, officer, employee or manager of the Company or any other member of the Group or a person who was a director, officer,

employee or manager of the Company or any other member of the Group at any time in the six (6) month period preceding such engagement, employment or solicitation, provided, however, that the restrictions contained in this Clause 10.2(d) shall not apply to general solicitation or contact not specifically directed to any person mentioned above; or

(e)    solicit, motivate aid, abet, or otherwise encourage a third party to do any of the foregoing.

10.3    In the event of the termination of this Agreement by the Company without Cause or by the Executive for Good Reason, the restrictive covenants set forth in Clause 10.2 shall remain effective for a period of four (4) months from the date of termination of this Agreement, but shall otherwise cease to have any force or effect upon expiry of such four-month period.

10.4    The Company shall compensate the Executive during the non-compete period established in Clause 10.3 at a rate equal to the monthly Services Fee effective as of immediately before the date of termination, payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that such compensation shall be prorated for any partial month during the non-compete period established in Clause 10.3.

10.5    Notwithstanding any provision in this Agreement to the contrary, the Executive may;

(a)    own, directly or indirectly, solely as an investment, up to three percent (3%) of any class of "publicly traded securities" of any business that competes with any of the members of the Group; or

(b)    own securities, solely as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in an entity that may compete with any of the members of the Group.

## 11.    TERMINATION

11.1    Subject to Clause 11.2 and Clause 11.3, either the Company or the Executive may terminate this Agreement by three (3) month's prior notice in writing to the other party.

11.2    Notwithstanding Clause 11.1, the Company may terminate this Agreement immediately upon written notice to the Executive:

(a)    for Cause;

(b)    if the Executive is convicted of any criminal offence involving his integrity or honesty; or

(c)    if the Executive is declared of bankruptcy or makes any arrangements or composition with his creditors generally.

11.3    Notwithstanding Clause 11.1, the Executive may terminate this Agreement for Good Reason immediately upon written notice to the Company.

11.4    In the event of the termination of this Agreement, the Executive shall:

(a)   where he serves as a director of the Company and/or as a director of any other member of the Group, forthwith resign from such directorship(s) and acknowledges that he has no claims against the Company or as the case may be, the relevant member of the Group for loss of office;

(b)   deliver to the Company or as the Company may direct all documents (including books, records, document, papers, accounts, correspondence, lists of customers, notes, memoranda, plans, drawing and other documents of whatsoever nature) credit cards, models or samples and other property concerning the business, finances or affairs of any member of the Group which may then be in his possession or control;

(c)   not at any time thereafter represent himself to be connected with the Group; and

(d)   cease to be entitled to any further benefits or payments under this Agreement other than those set forth in this Clause 11, Clause 5 and Clause 10.4.

11.5   In the event of the termination of this Agreement for Cause or without Good Reason, the Executive shall be entitled to receive:

(a)   any accrued but unpaid Services Fees;

(b)   any Bonus with respect to any completed fiscal year immediately preceding the termination date that has been awarded to him in writing by the applicable Board of Directors but remains unpaid as at the termination date;

(c)   reimbursement for unreimbursed business expenses properly incurred by the Executive; and

(d)   such Employee Benefits, if any, to which the Executive may be entitled under the Company's or any member of the Group's benefit plans as of the date of termination.

11.6   In the event of the termination of this Agreement without Cause or for Good Reason:

(a)   the Executive shall be entitled to receive the Accrued Amounts; and

(b)   with respect to the Option granted to the Executive following the Effective Date, 100% of the outstanding unvested Options shall become fully vested and exercisable for the remainder of their full term.

11.7   Any termination of this Agreement shall be communicated by a written notice of termination specifying: (i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date.

## 12.   NOTICE

12.1   Each notice, demand or other communication given or made under this Agreement (a "**Notice**") shall be in writing and delivered or sent to the relevant party at its address

and email address set out below (or such other address or email address as the addressee has by seven (7) days' prior written notice specified to the other party):

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Company; FTX Japan** | Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | sam@ftx.com | N/A |
| | with a copy (which shall not constitute notice) to: FTX Trading Ltd. c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint John's Antigua and Barbuda | can@ftx.com | General Counsel |
| **The Executive** | 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 | seth@liquid.com and check_raize@yahoo.com | Seth Melamed |

12.2    Any Notice so addressed to the relevant party shall be deemed to have been delivered (a) if sent by courier, two (2) Business Days after the date of posting; (b) if given by personal delivery, when actually delivered to the relevant address; and (c) if sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 12.2 within one (1) Business Day of sending the email.

**13.    LEGAL REPRESENTATION**

The Executive hereby acknowledges that the Executive has been duly advised to seek independent legal advice and to obtain separate legal representation.

**14.    ENTIRE AGREEMENT**

14.1    This Agreement, as well as the Major Shareholders SPA and agreements referred to therein, constitutes the entire agreement and understanding of the parties hereto relating to the subject matter hereof and shall be in substitution for any subsisting agreement or arrangement (oral or otherwise) made between the Company, FTX Japan, or FTX Singapore, on the one hand, and the Executive, on the other hand, which shall be deemed to have been terminated by mutual consent as of the Effective Date.

14.2    The terms of this Agreement may only be varied in writing (excluding email) signed by the Executive and a duly appointed representative of the Company.

**15.    MISCELLANEOUS**

15.1    Nothing in this Agreement shall be construed as creating among the parties hereto an employment, partnership, agency, or similar relationship. The provision of services by the Executive shall not be governed by the Labour Contract Act (Act No.128 of 2007, as amended), the Labour Standards Law (Act No. 49 of 1947, as amended) and other laws of Japan otherwise applicable to employees in their capacity as employees.

15.2    The rights and remedies of the parties under this Agreement are not exclusive of or limited by or in limitation of any other rights or remedies (including without limitation any right of set-off) which each party may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative.

15.3    No failure or delay by any party hereto in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

15.4    The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions hereof as in accordance with their terms are expressed to operate or have effect thereafter.

15.5    In the event of any variation of the remuneration payable to the Executive hereunder being made by consent of the parties hereto such variation shall not constitute a new agreement but (subject to any express agreement to the contrary) the appointment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

15.6    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.7    The parties to this Agreement shall pay their own legal professional and other costs in connection with the preparation and completion of this Agreement.

15.8    No party to this Agreement shall assign, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, any of its rights or obligations under this Agreement.

15.9    The Company's rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the Company's successors and assigns.

15.10   This Agreement may be executed in any number of counterparts each of which is an original and all of which together evidence the same agreement.

**16.    GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by the laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

*[Signature Page Follows]*

**EXECUTED** by the parties:

<u>**Company**</u>

Signed by Samuel Bankman-Fried         )
as representative director of                      )
and for and on behalf of                          )
**FTX JAPAN HOLDINGS K.K. and**     )
**FTX JAPAN K.K.,**                                )

DocuSigned by:

Samuel Bankman-Fried

672DA88132804B9...

Signature Page for the Company
(Amended and Restated Management Agreement)

**Executive**

Signed by **SETH MELAMED**                              )

DocuSigned by:

*Seth Melamed*

FB8DD985AAA84EA...

Signature Page for the Executive
(Amended and Restated Management Agreement)

Exhibit 9

EXECUTION VERSION

## SIDE LETTER AGREEMENT

**THIS SIDE LETTER AGREEMENT** to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) (the "**Side Letter**") is made on March 31, 2022.

**BETWEEN:**

(1)  **SETH MELAMED**, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 ("**Mr. Melamed**"); and

(2)  **FTX TRADING LTD.**, an Antigua and Barbuda corporation having its principal place of business at Lower Factory Rd, Saint John's, Antigua and Barbuda (the "**Purchaser**").

**WHEREAS**:

(A)  Mr. Melamed, Mr. Kayamori, JAFCO, IDG China, IDG Bitmain and IDG Investors (collectively, the "**Major Shareholders**"), the Purchaser and Liquid Group Inc. have entered into the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated November 19, 2021, as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022 (the "**Major Shareholders SPA**"), pursuant to which, among other things, the Major Shareholders agreed to sell and the Purchaser agreed to purchase the Target Security Interests.

(B)  Pursuant to clause 2.1 of the Major Shareholders SPA, at Completion, the Sellers, including Mr. Melamed, agree to sell and the Purchaser agrees to purchase the Target Security Interests held by such Seller and each right attaching to such Target Security Interests free from any Encumbrance.

(C)  Pursuant to clause 2.2(a) and schedule 2 of the Major Shareholders SPA, USD26,709,834.14 of the consideration for the Target Security Interests held by Mr. Melamed will be satisfied by the allotment and issue of 1,019,070 Consideration Shares to Mr. Melamed, credited as fully paid at Completion.

**THE PARTIES AGREE** as follows:

## 1.    INTERPRETATION

1.1  Capitalized terms used in this Side Letter (including in the recitals) and not otherwise defined shall have the respective meanings ascribed to them in the Major Shareholders SPA.

1.2  The provisions of clauses 1.2 to 1.4 of the Major Shareholders SPA shall be incorporated into this Side Letter as if set out in full in this Side Letter and as if references in those clauses to "this Agreement" are references to this Side Letter.

1.3  For purposes of this Side Letter:

"**Common Stock**" means the common stock of the Purchaser, $0.0000026 par value per share.

"**FTX Board of Directors**" means the board of directors of the Purchaser.

## 2.    REGULATION S

Mr. Melamed makes the following representations, warranties and agreements:

(a)    Mr. Melamed is not a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act.   The allotment and issue of the Consideration Shares to Mr. Melamed was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and Mr. Melamed is not acquiring the Consideration Shares for the account or benefit of any U.S. Person;

(b)    The Consideration Shares are being issued as consideration for the Target Security Interests held by Mr. Melamed and are not issued in connection with the offer or sale of securities in a capital-raising transaction;

(c)    Mr. Melamed will not, during the Restricted Period applicable to the Consideration Shares included in the legend set forth in Section 8.4(b) below (the "**Restricted Period**") and on any certificate representing the Consideration Shares, offer or sell any of the foregoing securities (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S;

(d)    Mr. Melamed will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Consideration Shares (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws; and

(e)    Mr. Melamed acknowledges and agrees that the Purchaser may decline to register the transfer of any Consideration Shares pursuant to Section 8.3 of this Side Letter.

## 3.    RESTRICTIONS ON TRANSFER

3.1    **Disposition of Consideration Shares.**   Mr. Melamed hereby agrees that, for as long as the Consideration Shares remain subject to the Right of First Refusal, he shall make no disposition of any of the Consideration Shares (other than as permitted by this Side Letter) unless and until:

(a)    Mr. Melamed shall have notified the Purchaser of the proposed disposition and provided a written summary of the terms and conditions of the proposed disposition;

(b)   Mr. Melamed shall have complied with all requirements of this Side Letter applicable to the disposition of the Consideration Shares;

(c)   Mr. Melamed shall have provided the Purchaser with written assurances, in form and substance satisfactory to counsel for the Purchaser, that (i) the proposed disposition does not require registration of the Consideration Shares under the Securities Act or under any applicable state securities laws or (ii) all appropriate actions necessary for compliance with the registration requirements of the Securities Act or of any exemption from registration available under the Securities Act (including Rule 144) or applicable state securities laws have been taken; and

(d)   Mr. Melamed shall have provided the Purchaser with written assurances, in form and substance satisfactory to the Purchaser, that the proposed disposition will not result in the contravention of any transfer restrictions applicable to the Consideration Shares under any other applicable securities laws or adversely affect the Purchaser's ability to rely on the exemption(s) from registration under the Securities Act or under any other applicable securities laws for the issuance of the Consideration Shares.

3.2   **Restriction on Transfer.**   Mr. Melamed shall not transfer, assign, grant a lien or security interest in, pledge, hypothecate, encumber or otherwise dispose of any of the Consideration Shares which are subject to the Purchaser's Right of First Refusal described below, except as permitted by this Side Letter.

3.3   **Transferee Obligations.**   Each person (other than the Purchaser) to whom the Consideration Shares are transferred by means of one of the permitted transfers specified in this Side Letter must, as a condition precedent to the validity of such transfer, acknowledge in writing to the Purchaser that such person is bound by the provisions of this Side Letter and that the transferred Consideration Shares are subject to (i) the Purchaser's Right of First Refusal granted hereunder and (ii) the market stand-off provisions of Section 4 below, to the same extent such Consideration Shares would be so subject if retained by Mr. Melamed.

## 4.   MARKET STANDOFF AGREEMENT

4.1   Mr. Melamed agrees that, subject to any early release provisions that apply pro rata to stockholders of the Purchaser according to their holdings of Common Stock (determined on an as-converted into Common Stock basis), Mr. Melamed will not, for a period of up to three hundred sixty-five (365) days (plus up to an additional thirty-five (35) days to the extent reasonably requested by the Purchaser or such underwriter(s) to accommodate regulatory restrictions on the publication or other distribution of research reports or earnings releases by the Purchaser, including NASD and NYSE rules) following the effective date of the registration statement filed with the SEC relating to either (x) the initial underwritten sale of Common Stock of the Purchaser to the public under the Securities Act (the "**IPO**"), or (y) a Direct Listing (as defined below) of the Purchaser, directly or indirectly sell, offer to sell, grant any option for the sale of, or otherwise dispose of any Common Stock or securities convertible into Common Stock, <u>except</u> <u>for:</u> (i) transfers of Consideration Shares permitted under Section 5.6 hereof so long as such transferee furnishes to the Purchaser and the

3

managing underwriter their written consent to be bound by this Section 4 as a condition precedent to such transfer; and (ii) sales of any securities to be included in the registration statement for the IPO or Direct Listing.   For the avoidance of doubt, the provisions of this Section shall only apply to the IPO or Direct Listing.   In order to enforce the foregoing covenant, the Purchaser shall have the right to place restrictive legends on the certificates representing the Consideration Shares subject to this Section and to impose stop transfer instructions with respect to the Consideration Shares until the end of such period.   Mr. Melamed further agrees to enter into any agreement reasonably required by the underwriters to implement the foregoing restrictions on transfer.   For the avoidance of doubt, the foregoing provisions of this Section shall not apply to any registration of securities of the Purchaser (a) under an employee benefit plan or (b) in a merger, consolidation, business combination or similar transaction.

4.2     For purposes of this Side Letter, "**Direct Listing**" means the Purchaser's initial listing of its Common Stock on a national securities exchange by means of a registration statement on Form S-1 filed by the Purchaser with the Securities Exchange Commission that registers shares of existing capital stock of the Purchaser for resale.   For the avoidance of doubt, a Direct Listing shall not be deemed to be an IPO or an underwritten offering and shall not involve any underwriting services.   Any and all mentions of an underwritten offering or underwriters contained herein shall not apply to a Direct Listing.

4.3     Mr. Melamed further agrees to execute such other agreements, including a market standoff agreement, that are consistent with the terms of this Section 4 with respect to any equity in another issuer that Mr. Melamed may receive in exchange for their Consideration Shares and to agree to such other restrictions on transfer or other terms, as may be requested by the Purchaser, in connection with any transaction with a special purpose acquisition company or any similar entity or transaction structure that directly or indirectly results in Mr. Melamed holding securities of any issuer that are listed on a national exchange.

## 5.     PURCHASER'S RIGHT OF FIRST REFUSAL

Before any Consideration Shares held by Mr. Melamed or any transferee of such Consideration Shares (either sometimes referred to herein as the "**Holder**") may be sold or otherwise transferred (including, without limitation, a transfer by gift or operation of law), the Purchaser and/or its assignee(s) will have a right of first refusal to purchase the Consideration Shares to be sold or transferred (the "**Offered Shares**") on the terms and conditions set forth in this Section (the "**Right of First Refusal**").

5.1     **Notice of Proposed Transfer.**   The Holder of the Offered Shares will deliver to the Purchaser a written notice (the "**Notice**") stating: (i) the Holder's bona fide intention to sell or otherwise transfer the Offered Shares; (ii) the name and address of each proposed purchaser or other transferee (the "**Proposed Transferee**"); (iii) the number of Offered Shares to be transferred to each Proposed Transferee; (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Offered Shares (the "**Offered Price**"); and (v) that the Holder acknowledges this Notice is an offer to sell the Offered Shares to the Purchaser and/or its assignee(s) pursuant to the Purchaser's Right of First Refusal at the Offered Price as provided for in this Side Letter.

5.2    **Exercise of Right of First Refusal.**   At any time within thirty (30) days after the date of the Notice, the Purchaser and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all (or, with the consent of the Holder, less than all) the Offered Shares proposed to be transferred to any one or more of the Proposed Transferees named in the Notice, at the purchase price, determined as specified below.

5.3    **Purchase Price.**   The purchase price for the Offered Shares purchased under this Section will be the Offered Price, *provided* that if the Offered Price consists of no legal consideration (as, for example, in the case of a transfer by gift) then the purchase price will be the fair market value of the Offered Shares as determined in good faith by the FTX Board of Directors.   If the Offered Price includes consideration other than cash, then the value of the non-cash consideration, as determined in good faith by the FTX Board of Directors, will conclusively be deemed to be the cash equivalent value of such non-cash consideration.

5.4    **Payment.**   Payment of the purchase price for the Offered Shares will be payable, at the option of the Purchaser and/or its assignee(s) (as applicable), by check or by cancellation of all or a portion of any outstanding purchase money indebtedness owed by the Holder to the Purchaser (or to such assignee, in the case of a purchase of Offered Shares by such assignee) or by any combination thereof.   The purchase price will be paid without interest within sixty (60) days after the Purchaser's receipt of the Notice, or, at the option of the Purchaser and/or its assignee(s), in the manner and at the time(s) set forth in the Notice.

5.5    **Holder's Right to Transfer.**   If all of the Offered Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Purchaser and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Offered Shares to each Proposed Transferee at the Offered Price or at a higher price, *provided* that (i) such sale or other transfer is consummated within ninety (90) days after the date of the Notice, (ii) any such sale or other transfer is effected in compliance with all applicable securities laws, and (iii) each Proposed Transferee agrees in writing that the provisions of this Section will continue to apply to the Offered Shares in the hands of such Proposed Transferee.   If the Offered Shares described in the Notice are not transferred to each Proposed Transferee within such ninety (90) day period, then a new Notice must be given to the Purchaser pursuant to which the Purchaser will again be offered the Right of First Refusal before any Consideration Shares held by the Holder may be sold or otherwise transferred.

5.6    **Exempt Transfers.**   Notwithstanding anything to the contrary in this Section, the following transfers of Consideration Shares will be exempt from the Right of First Refusal: (i) the transfer of any or all of the Consideration Shares during Mr. Melamed's lifetime by gift or on Mr. Melamed's death by will or intestacy to any member(s) of Mr. Melamed's "Immediate Family" (as defined below) or to a trust for the benefit of Mr. Melamed and/or member(s) of Mr. Melamed's Immediate Family, *provided* that each transferee or other recipient agrees in a writing satisfactory to the Purchaser that the provisions of this Section will continue to apply to the transferred Consideration Shares in the hands of such transferee or other recipient; (ii) any transfer of Consideration Shares made pursuant to a statutory merger, statutory consolidation of the Purchaser with or into another corporation or corporations or a conversion of the Purchaser into another form of legal entity (except that the Right of First Refusal will continue to apply

5

thereafter to such Consideration Shares, in which case the surviving corporation of such merger or consolidation or the resulting entity of such conversion shall succeed to the rights of the Purchaser under this Section unless the agreement of merger or consolidation or conversion expressly otherwise provides); or (iii) any transfer of Consideration Shares pursuant to the winding up and dissolution of the Purchaser.    As used herein, the term "**Immediate Family**" will mean Mr. Melamed's spouse, the lineal descendant or antecedent, father, mother, brother or sister, child, adopted child, grandchild or adopted grandchild of Mr. Melamed or Mr. Melamed's spouse, or the spouse of any of the above or Spousal Equivalent, as defined herein.    As used herein, a person is deemed to be a "**Spousal Equivalent**" provided the following circumstances are true: (i) irrespective of whether or not Mr. Melamed and the Spousal Equivalent are the same sex, they are the sole spousal equivalent of the other for the last twelve (12) months, (ii) they intend to remain so indefinitely, (iii) neither are married to anyone else, (iv) both are at least 18 years of age and mentally competent to consent to contract, (v) they are not related by blood to a degree of closeness that which would prohibit legal marriage in the state in which they legally reside, (vi) they are jointly responsible for each other's common welfare and financial obligations, and (vii) they reside together in the same residence for the last twelve (12) months and intend to do so indefinitely.

5.7    **Termination of Right of First Refusal.**    The Right of First Refusal will terminate as to all Consideration Shares: (i) on the effective date of the first sale of Common Stock of the Purchaser to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Securities Act (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan); (ii) on any transfer or conversion of Consideration Shares made pursuant to a statutory merger or statutory consolidation of the Purchaser with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Exchange Act; or (iii) on any transfer or conversion of Consideration Shares made pursuant to a statutory conversion of the Purchaser into another form of legal entity if the common equity (or comparable equity security) of entity resulting from such conversion is registered under the Exchange Act. Upon termination of such transfer restrictions, the Purchaser will remove any stop-transfer notices referred to in Section 8 and related to the restrictions in this Section 5 and a new stock certificate or, in the case of uncertificated securities, notice of issuance, for the Consideration Shares not repurchased by the Purchaser shall be issued, on request, without the legend referred to in Section 8.1(b) and Section 8.1(d) below and delivered to Mr. Melamed.

5.8    **Encumbrances on Consideration Shares.**    Mr. Melamed may grant a lien or security interest in, or pledge, hypothecate or encumber Consideration Shares only if each party to whom such lien or security interest is granted, or to whom such pledge, hypothecation or other encumbrance is made, agrees in a writing satisfactory to the Purchaser that: (i) such lien, security interest, pledge, hypothecation or encumbrance will not adversely affect or impair the Right of First Refusal or the rights of the Purchaser and/or its assignee(s) with respect thereto and will not apply to such Consideration Shares after they are acquired by the Purchaser and/or its assignees under this Section; and (ii) the provisions of this Side Letter will continue to apply to such Consideration Shares in the hands of such party and any transferee of such party.

6

## 6.    RIGHTS AS A STOCKHOLDER

6.1    **General Rights.**    Mr. Melamed shall not have any of the rights of a stockholder with respect to any Consideration Shares unless and until such Consideration Shares are issued to Mr. Melamed. Subject to the terms and conditions of this Side Letter and the Proxy Agreement (as defined below), Mr. Melamed will have all of the rights of a stockholder of the Purchaser with respect to the Consideration Shares from and after the date that Consideration Shares are issued to Mr. Melamed pursuant to, and in accordance with, the terms of the Major Shareholders SPA until such time as Mr. Melamed disposes of the Consideration Shares or the Purchaser and/or its assignee(s) exercise(s) the Right of First Refusal.   Upon an exercise of the Right of First Refusal, Mr. Melamed will have no further rights as a holder of the Consideration Shares so purchased upon such exercise, other than the right to receive payment for the Consideration Shares so purchased in accordance with the provisions of this Side Letter, and Mr. Melamed will promptly surrender the stock certificate(s) evidencing the Consideration Shares so purchased to the Purchaser for transfer or cancellation.

6.2    **Agreement to Vote Consideration Shares**.    Mr. Melamed shall execute the form of Proxy Agreement attached hereto as Annex A (the "**Proxy Agreement**") concurrently with the Completion.

## 7.    ESCROW

For purposes of facilitating the enforcement of the provisions of Section 5, Mr. Melamed agrees, immediately upon receipt of the stock certificate(s) evidencing the Consideration Shares, to deliver such certificate(s) to the Secretary of the Purchaser or other designee of the Purchaser (the "**Escrow Holder**"), who is hereby appointed to hold such certificate(s) in escrow and to take all such actions and to effectuate all such transfers and/or releases of such Consideration Shares as are in accordance with the terms of this Side Letter.    Mr. Melamed and the Purchaser agree that Escrow Holder will not be liable to any party to this Side Letter (or to any other party) for any actions or omissions unless Escrow Holder is grossly negligent or intentionally fraudulent in carrying out the duties of Escrow Holder under this Side Letter.    Escrow Holder may rely upon any letter, notice or other document executed with any signature purported to be genuine and may rely on the advice of counsel and obey any order of any court with respect to the transactions contemplated by this Side Letter and will not be liable for any act or omission taken by Escrow Holder in good faith reliance on such documents, the advice of counsel or a court order.    The Consideration Shares will be released from escrow upon termination of the Right of First Refusal.

## 8.    RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS

8.1    **Legends.**    Mr. Melamed understands and agrees that the Purchaser will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Consideration Shares, together with any other legends that may be required by state or U.S. Federal securities laws, the Purchaser's Certificate of Incorporation or Bylaws, any other agreement between Mr. Melamed and the Purchaser, or any agreement between Mr. Melamed and any third party (and any other legend(s) that the Purchaser may become obligated to place on the stock certificate(s) evidencing the Consideration

Shares under the terms of any agreement to which the Purchaser is or may become bound or obligated):

(a)     THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.    THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.    THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

(b)     THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON RESALE AND TRANSFER, INCLUDING THE RIGHT OF FIRST REFUSAL HELD BY THE ISSUER AND/OR ITS ASSIGNEE(S) AS SET FORTH IN A SIDE LETTER AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.    SUCH SALE AND TRANSFER RESTRICTIONS, INCLUDING THE RIGHT OF FIRST REFUSAL, ARE BINDING ON TRANSFEREES OF THESE SHARES.

(c)     THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MARKET STANDOFF RESTRICTION AS SET FORTH IN A CERTAIN SIDE LETTER AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.    AS A RESULT OF SUCH AGREEMENT, THESE SHARES MAY NOT BE TRADED PRIOR TO 180 DAYS AFTER THE EFFECTIVE DATE OF CERTAIN PUBLIC OFFERINGS OF THE COMMON STOCK OF THE ISSUER HEREOF. SUCH RESTRICTION IS BINDING ON TRANSFEREES OF THESE SHARES.

(d)     THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A PROXY AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. AS A RESULT OF SUCH AGREEMENT, THESE SHARES MAY NOT BE VOTED BY THE HOLDER OF THESE SHARES AND SHALL INSTEAD BY VOTED IN ACCORDANCE WITH THE PROXY AGREEMENT. SUCH PROXY AGREEMENT AND THE VOTING RESTRICTIONS CONTAINED THEREIN ARE BINDING ON TRANSFEREES OF THESE SHARES.

8.2 **Stop-Transfer Instructions.** Mr. Melamed agrees that, to ensure compliance with the restrictions imposed by this Side Letter, the Purchaser may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Purchaser transfers its own securities, it may make appropriate notations to the same effect in its own records.

8.3 **Refusal to Transfer.** The Purchaser will not be required (i) to transfer on its books any Consideration Shares that have been sold or otherwise transferred in violation of any of the provisions of this Side Letter or (ii) to treat as owner of such Consideration Shares, or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Consideration Shares have been so transferred.

8.4 **Regulation S.** Mr. Melamed understands and agrees that the certificates evidencing the Consideration Shares will bear the legend set forth below or similar legends:

(a) THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND THE ISSUER DOES NOT INTEND TO REGISTER THEM.

(b) PRIOR TO A DATE THAT IS ONE YEAR STARTING FROM THE DATE OF SALE OF THE STOCK, THE SHARES MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH SECURITIES) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(K) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE SHARES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. HOLDERS OF SHARES PRIOR TO ONE YEAR STARTING FROM THE DATE OF SALE OF THE STOCK MAY RESELL SUCH SECURITIES ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES, PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PARTICIPANTS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT.

(c) A HOLDER OF THE SECURITIES WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT, PRIOR TO ONE YEAR STARTING FROM THE DATE OF SALE OF THE STOCK, RESELL THE SECURITIES TO A U.S. PERSON AS DEFINED BY RULE 902(K) OF REGULATION S UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

9.      **RESERVATION OF RIGHTS**

Save as set out in this Side Letter, the Major Shareholders SPA shall remain in full force and effect.

10.     **COSTS**

Each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Side Letter.

11.     **ENTIRE AGREEMENT**

This Side Letter, the side letter to the Major Shareholders SPA dated November 19, 2021 entered into between Mr. Melamed and the Purchaser, and together with the Major Shareholders SPA and any other agreements referenced within the Major Shareholders SPA and this Side Letter (including but not limited to the Proxy Agreement), constitute the entire understanding and agreement among the parties with respect to the subject matter hereof and supersede any and all prior or contemporaneous discussions, agreements and understandings, whether written or oral.

12.     **ASSIGNMENT**

Each of the parties to this Side Letter shall not assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Side Letter, whether in whole or in part, without the prior written consent of each other party.

13.     **GOVERNING LAW AND JURISDICTION**

13.1    This Side Letter (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

13.2    Any dispute, controversy or claim arising in any way out of or in connection with this Side Letter (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Side Letter) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Section and as may be amended by the rest of this Section. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

13.3    The arbitration tribunal ("**Tribunal**") shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

13.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Section 13 shall be governed by the laws of Singapore.

13.5   The language of the arbitration proceedings shall be English.

13.6   Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

13.7   Nothing in this Section 13 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

**14.    COUNTERPARTS**

This Side Letter may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

**EXECUTED** by the parties:

**<u>Mr. Melamed</u>**

Signed by **SETH MELAMED**               )          *Seth Melamed*

**<u>Purchaser</u>**

| | |
|---|---|
| Signed by Sam Bankman-Fried | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **FTX TRADING LTD.** | ) |

DocuSigned by:

Sam Bankman-Fried

672DA88132804B9...

## <u>ANNEX A</u>

**FORM OF PROXY AGREEMENT**

## PROXY AGREEMENT

This Proxy Agreement (this "**_Agreement_**") is made as of _____ , by and among FTX Trading Ltd, a company organized under the laws of Antigua and Barbuda having its principal place of business at Lower Factory Rd, Saint John's, Antigua and Barbuda (the "**_Proxy Holder_**"), and Seth Melamed, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 (together with his successors and assigns, "**_Stockholder_**"). Capitalized terms not otherwise defined in this Agreement shall have the same meanings ascribed to them in the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated _____ entered into between the Proxy Holder and the Stockholder (the "**_Side Letter_**").

## RECITALS

WHEREAS, this Agreement is being entered into in connection with (i) the allotment and issue of ordinary shares, $0.0000026 par value per share (the "**_Shares_**"), of the Proxy Holder to the Stockholder pursuant to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated November 19, 2021 entered into between Stockholder, Mr. Kayamori, JAFCO, IDG China, IDG Bitmain and IDG Investors, the Proxy Holder and Liquid Group Inc., as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022 (the "**_Major Shareholders SPA_**") and (ii) the Side Letter.

## AGREEMENT

The parties agree as follows:

1.     **Voting Arrangements for the Shares.**  Stockholder hereby agrees that the Proxy Holder shall have the right to vote the Shares in its sole discretion, on all matters submitted to a vote of stockholders of the Proxy Holder at a meeting of stockholders or through the solicitation of a written consent of stockholders (whether of any individual class of stock or of multiple classes of stock voting together) and for any contractual voting rights that may be applicable to the Shares.

2.     **Further Assurances**.  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

3.     **Stockholder to Abstain from Voting**.  Except as mutually agreed upon between Stockholder and the Proxy Holder, Stockholder shall abstain from voting any of the Shares (in person, by proxy or by action by written consent, as applicable) on all matters.

4.     **Irrevocable Proxy and Power of Attorney**.  Stockholder hereby appoints the Proxy Holder, or its designees, as Stockholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote or act by written consent with respect to all the Shares in accordance with the provisions set forth in this Agreement, and to execute all appropriate instruments consistent with this Agreement on behalf of Stockholder.  The proxy and

power granted by Stockholder pursuant to this Section 4 are coupled with an interest and are given to secure the performance of Stockholder's duties under this Agreement.  The proxy and power will be irrevocable for the term hereof.  The proxy and power will survive the merger, consolidation, conversion or reorganization of Stockholder or any other entity holding the Shares.

5.     **Transfers by Stockholder**.   Prior to a Public Offering (as defined in Section 7.12), any transferee of Shares, as a condition precedent to the validity of such transfer, must assume this Agreement and acknowledge in writing to the Proxy Holder that such person is bound by the provisions of this Agreement.

6.     **Legends and Stock Certificates**.   The Proxy Holder shall cause each certificate representing the Shares to bear the following legend, in addition to any legends that may be required by state or federal securities laws or the terms of any voting or other agreements that apply:

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A PROXY AGREEMENT BY AND AMONG THE ISSUER AND THE ORIGINAL HOLDER (COPIES OF WHICH MAY BE OBTAINED FROM THE ISSUER) WHICH INCLUDES PROVISIONS POTENTIALLY RESTRICTING THE STOCKHOLDER'S RIGHT TO VOTE OR TRANSFER AN INTEREST IN THE SHARES EVIDENCED HEREBY, AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID PROXY AGREEMENT.

7.     **Miscellaneous**.

7.1     **Additional Voting Securities; Stock Splits, Dividends, Etc**.   This Agreement and the proxy provided herein shall automatically apply to all voting securities of the Proxy Holder held by the Stockholder, whether such shares or any such securities are owned by the Stockholder prior to, as of the date of the execution hereof, or are thereafter acquired and the term "Shares" as used herein shall include any additional voting securities of the Proxy Holder, mutatis mutandis. Any voting securities of the Proxy Holder issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the Shares shall automatically become subject to this Agreement and shall be endorsed with the foregoing legends.

7.2     **Proxy Holder's Liability**.   In voting the Shares in accordance with Section 1 hereof, the Proxy Holder shall not be liable for any error of judgment nor for any act done or omitted, nor for any mistake of fact or law nor for anything which the Proxy Holder may do or refrain from doing in good faith, nor shall the Proxy Holder have any accountability hereunder, except for his own bad faith or willful misconduct.  Furthermore, upon any judicial or other inquiry or investigation of or concerning the Proxy Holder's acts pursuant to his rights and powers as the Proxy Holder, such acts shall be deemed reasonable and in the best interests of Stockholder unless proved to the contrary by clear and convincing evidence.

7.3 **Interpretation**.   Any dispute regarding the interpretation of this Agreement shall be submitted by Stockholder or the Proxy Holder to the Committee for review. The resolution of such a dispute by the Committee shall be final and binding on the Proxy Holder and Stockholder.

7.4 **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersede all prior undertakings and agreements with respect to such subject matter.

7.5 **Notices**.   Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement shall be delivered in accordance with the terms of the Major Shareholders SPA.

7.6 **Successor and Assigns**.   This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Proxy Holder.   Subject to the restrictions on transfer set forth herein, this Agreement shall be binding upon Stockholder and Stockholder's heirs, executors, administrators, legal representatives, successors and assigns.

7.7 **Governing Law**.  This Agreement shall be governed by and construed in accordance with the internal laws of Antigua and Barbuda as such laws are applied to contracts entered into and performed in Antigua and Barbuda.  If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions will remain fully effective and enforceable.

7.8 **Further Assurances**.   The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

7.9 **Titles and Headings**.   The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.   Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

7.10 **Counterparts**.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

7.11 **Severability**.   If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.   Notwithstanding the forgoing, if the value of this Agreement based upon the

substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

7.12    **Amendments, Waivers and Termination**.    Any term hereof may be amended or waived only with the written consent of Stockholder and the Proxy Holder; provided, however that any waiver by the Proxy Holder of its rights hereunder shall not require the written consent of the Stockholder.   This Agreement shall terminate in the sole discretion of the Proxy Holder, upon the express written consent of the Proxy Holder (which he shall be under no obligation to provide); provided, however, that immediately following a Public Offering, (i) a new stock certificate or, in the case of uncertificated securities, notice of issuance, for any Shares then held by the Stockholder shall be issued, on request, without the legend referred to in Section 6 and delivered to the Stockholder; and (ii) this Agreement shall terminate in respect to any Shares that the Stockholder transfers to a third party. For the purposes of this Agreement, a "**Public Offering**" means (a) the effective date of the first sale of common stock of the Proxy Holder ("**Common Stock**") to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Securities Act (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan); (b) any transfer or conversion of Common Stock made pursuant to a statutory merger or statutory consolidation of the Proxy Holder with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Exchange Act; or (c) any transfer or conversion of Common Stock made pursuant to a statutory conversion of the Proxy Holder into another form of legal entity if the common equity (or comparable equity security) of entity resulting from such conversion is registered under the Exchange Act.

7.13    **Dispute Resolution**.    Any dispute, controversy or claim arising out of, relating to, or having any connection with this Agreement, including any dispute as to its existence validity, interpretation, performance, breach or termination shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("**ICC**"), to the extent that such arbitration is administered in Hong Kong.   The Emergency Arbitrator Provisions of the ICC Rules of Arbitration shall not apply.   Such arbitration shall be administered in Hong Kong by the Hong Kong International Arbitration Centre ("**HKIAC**") under the HKIAC Administered Arbitration Rules.   The arbitrators shall have the authority to grant specific performance, and to allocate between the parties to the arbitration the costs of arbitration in such equitable manner as the arbitrators may determine.   Judgment upon the award so rendered may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of any award and an order of enforcement, as the case may be.   Further, to the fullest extent permitted by law, Stockholder agrees that no class or collective actions can be asserted in arbitration or otherwise.

*[Signature page follows]*

IN WITNESS WHEREOF the parties have executed this Proxy Agreement as of the date first set forth above.

**<u>PROXY HOLDER</u>:**

FTX TRADING LTD

By:      _____

Name:   _____

Title:   _____

IN WITNESS WHEREOF the parties have executed this Proxy Agreement as of the date first set forth above.

**<u>STOCKHOLDER</u>:**

By:    _____

Name:    _____

Title:    _____

Exhibit 10

Execution Version

## SIDE LETTER AGREEMENT

**THIS SIDE LETTER AGREEMENT** to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) (the "**Side Letter**") is made on November 19, 2021

**BETWEEN:**

(1)   **SETH MELAMED**, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 ("**Mr. Melamed**"); and

(2)   **FTX Trading Ltd.**, an Antigua and Barbuda corporation having its principal place of business at Lower Factory Rd, Saint John's, Antigua and Barbuda (the "**Purchaser**").

**WHEREAS**:

(A)   Mr. Kayamori, Mr. Melamed, JAFCO, IDG China, IDG Bitmain and IDG Investors (collectively, the "**Major Shareholders**"), the Purchaser and Liquid Group Inc. have entered into the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated November 19, 2021 (the "**Major Shareholders SPA**"), pursuant to which, among other things, the Major Shareholders agreed to sell and the Purchaser agreed to purchase the Target Security Interests.

(B)   Pursuant to clause 2.1 of the Major Shareholders SPA, at Completion, each of the Sellers agrees to sell and the Purchaser agrees to purchase the Target Security Interests held by such Seller and each right attaching to such Target Security Interests free from any Encumbrance.

(C)   Mr. Melamed purchased the following numbers of the Target Shares or received the following number of the Target Options on the following dates:

(i)    2,430 Target Shares on October 1, 2019 (the "**October 1, 2019 Target Shares**");

(ii)   1,350 Target Shares on December 31, 2020 (the "**December 31, 2020 Target Shares**");

(iii)  8,000 Target Shares and simultaneously sold 1,634 Target Shares on February 8, 2021, netting 6,366 Target Shares received on February 8, 2021 (the "**February 8, 2021 Target Shares**");

(iv)   2,057 Target Shares on March 25, 2021 (the "**March 25, 2021 Target Shares**"); and

(v)    510 Target Options on various dates (the "**510 Target Options**").

1

DocuSign Envelope ID: 48F8A9E1-0C4O-4D7E-A3ZF-F77533141326B

**THE PARTIES AGREE** as follows:

1.    **INTERPRETATION**

1.1    Capitalized terms used in this Side Letter (including in the recitals) and not otherwise defined shall have the respective meanings ascribed to them in the Major Shareholders SPA.

1.2    The provisions of clauses 1.2 to 1.4 of the Major Shareholders SPA shall be incorporated into this Side Letter as if set out in full in this Side Letter and as if references in those clauses to "this Agreement" are references to this Side Letter.

2.    **STAGGERED COMPLETIONS**

2.1    Notwithstanding clauses 2.3, 6.1, 6.2 and 6.3 of the Major Shareholders SPA, in the event that Completion under the Major Shareholder SPA occurs, Mr. Melamed and the Purchaser hereby agree that:

    (a)    the Completion with respect to the October 1, 2019 Target Shares, the December 31, 2020 Target Shares, and the 510 Target Options held by Mr. Melamed shall take place at the offices of the Purchaser's Solicitors, or if the parties agree otherwise, remotely via the electronic exchange of documents and signatures (the "**Completion Venue**"), on the Completion Date;

    (b)    the Completion with respect to the February 8, 2021 Target Shares held by Mr. Melamed shall take place at the Completion Venue on the later of (i) the Completion Date and (ii) February 9, 2022 (such date on which Completion under this Clause 2.1(b) occurs, the "**Second Completion Date**"); and

    (c)    the Completion with respect to the March 25, 2021 Target Shares held by Mr. Melamed shall take place at the Completion Venue on the later of (i) the Completion Date and (ii) March 26, 2022 (such date on which Completion under this Clause 2.1(c) occurs, the "**Last Completion Date**").

    (d)    The total amount of consideration to be paid by the Purchaser to Mr. Melamed (the "**Consideration**") shall be paid ratably on the Completion Date, the Second Completion Date and the Last Completion Date, provided, that the total amount of Crypto Consideration of Mr. Melamed, which shall be withheld in its entirety by the Purchaser as Retained Consideration in accordance with clause 4 of the Major Shareholders SPA, shall be paid on the Completion Date. Detailed allocation of the Consideration is set forth in Schedule 1 hereto.

2.2    The Purchaser and Mr. Melamed agree that: (A) the "Target Security Interests" provided under clause 6.2(b)(i) and clause 6.3(b)(i) of the Major Shareholders SPA shall be deemed to exclude (i) the February 8, 2021 Target Shares in the event that the Second Completion Date will be on a date that is later than the Completion Date and (ii) the March 25, 2021 Target Shares in the event that the Last Completion Date will be on a date that is later than the Completion Date; and (B) the "Completion Date" provided under paragraphs 1.1(e) and 1.1(f) of schedule 5 of the Major Shareholders SPA with respect to Mr. Melamed shall be deemed to refer to the Second Completion

Date with respect to the February 8, 2021 Target Shares and to the Last Completion Date with respect to the March 25, 2021 Target Shares.

**3.      RESERVATION OF RIGHTS**

Save as set out in this Side Letter, the Major Shareholders SPA shall remain in full force and effect.

**4.      COSTS**

Each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Side Letter.

**5.      CONFIDENTIALITY**

Each party shall keep the existence and contents of this Side Letter confidential, unless required to disclose it by applicable laws or regulations or unless the other parties give their prior written consent to the disclosure.

**6.      ENTIRE AGREEMENT**

This Side Letter constitutes the entire agreement between the parties. It supersedes any previous agreements relating to the subject matter of this Side Letter, and sets out the complete legal relationship of the parties arising from or connected with that subject matter.

**7.      ASSIGNMENT**

Each of the parties to this Side Letter shall not assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Side Letter, whether in whole or in part, without the prior written consent of each other party.

**8.      GOVERNING LAW AND JURISDICTION**

8.1     This Side Letter (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

8.2     Any dispute, controversy or claim arising in any way out of or in connection with this Side Letter (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Side Letter) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

DocuSign Envelope ID: 48F8A9E10C4O4D7B-A37F-F7753314326B

8.3    The arbitration tribunal ("**Tribunal**") shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

8.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Clause 8 shall be governed by the laws of Singapore.

8.5    The language of the arbitration proceedings shall be English.

8.6    Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

8.7    Nothing in this Clause 8 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

## 9.    COUNTERPARTS

This Side Letter may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

## SCHEULE 1
## ALLOCATION OF CONSIDERATION

**1.    Total Consideration**

| Date | Type of Target Security Interest | Number of Target Security Interests | Price per Target Security Interest | Total Consideration |
|---|---|---|---|---|
| **Completion Date** | **Common Shares** | 3,780 | $3,510.41 | $13,269,349.80 |
| | **Stock Options** | 180 | $3,509.54 | $631,717.20 |
| | **Stock Options** | 30 | $3,103.16 | $93,094.80 |
| | **Stock Options** | 300 | $3,180.15 | $954,045.00 |
| **Second Completion Date** | **Common Shares** | 6,366 | $3,510.41 | $22,347,270.06 |
| **Last Completion Date** | **Common Shares** | 2,057 | $3,510.41 | $7,220,913.37 |
| **Total** | **Common Shares** | 12,203 | $3,510.41 | $42,837,533.23 |
| | **Stock Options** | 180 | $3,509.54 | $631,717.20 |
| | **Stock Options** | 30 | $3,103.16 | $93,094.80 |
| | **Stock Options** | 300 | $3,180.15 | $954,045.00 |

**2.    Allocation of Total Consideration**

| Date | Cash Consideration | Crypto Consideration | Consideration Shares |
|---|---|---|---|
| **Completion Date** | $1,511,232.19 | $8,903,278.05 | $4,533,696.57 |
| **Second Completion Date** | $5,586,817.52 | - | $16,760,452.55 |
| **Last Completion Date** | $1,805,228.34 | - | $5,415,685.03 |
| **Total** | $8,903,278.05 | $8,903,278.05 | $26,709,834.14 |

**3.    Consideration Paid at Completion**

| Date | Number of Consideration Shares | Initial Cash Consideration |
|---|---|---|
| **Completion Date** | 172,976 | $1,511,232.19 |
| **Second Completion Date** | 639,468 | $5,586,817.52 |
| **Last Completion Date** | 206,627 | $1,805,228.34 |
| **Total** | 1,019,070 | $8,903,278.05 |

4.    **Retained Consideration**

| Date | Bitcoin (BTC) | Ether (ETH) | Solana (SOL) | FTX Token (FTT) |
|---|---|---|---|---|
| **Completion Date** | BTC 39.132 | ETH 560.48 | SOL 11,884.98 | FTT 47,532 |
| **Total** | BTC 39.132 | ETH 560.48 | SOL 11,884.98 | FTT 47,532 |

6

**EXECUTED** by the parties:

**Mr. Melamed**

Signed by **SETH MELAMED**                )

DocuSigned by:

Seth Melamed

AB51C4F394AE497...

Signature Page for
Mr. Melamed

4146-9644-9586.5

**<u>Purchaser</u>**

Signed by Sam Bankman-Fried          )
as duly authorised representative of   )
and for and on behalf of              )
**FTX TRADING LTD.**                  )

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

Signature Page for Purchaser

Exhibit 11

## FTX Trading Ltd.
## Balance Sheet
### As of March 31, 2021

|  | Total |
|---|---|
| **ASSETS** | |
|   Current Assets | |
|     Bank Accounts | |
|       PrimeTrust | 1,486,252.47 |
|     Total Bank Accounts | $ 1,486,252.47 |
|     Other Current Assets | |
|       Digital Assets | |
|         Digital assets and stable coins | 226,857,895.75 |
|       Total Digital Assets | $ 226,857,895.75 |
|       Intercompany receivable | -697,063.81 |
|       Prepaid Expenses | 307,260.23 |
|     Total Other Current Assets | $ 228,162,169.59 |
|   Total Current Assets | $ 229,648,442.06 |
|   Other Assets | |
|     Intangibles acquired | 330,000.00 |
|     Investment in subsidiary | 0.00 |
|       Customer Acquisition | 10,000,000.00 |
|       Developed technology | 10,000,000.00 |
|       Goodwill | 139,609,584.05 |
|       Trademarks and tradenames | 10,000,000.00 |
|     Total Investment in subsidiary | $ 169,609,584.05 |
|   Total Other Assets | $ 169,939,584.05 |
| **TOTAL ASSETS** | $ 399,588,026.11 |
| **LIABILITIES AND EQUITY** | |
|   Liabilities | |
|     Current Liabilities | |
|       Accounts Payable | |
|         Accounts payable and accrued liabilities | 4,976,077.95 |
|         Accounts payable and accrued liability, related party | 6,035,000.00 |
|       Total Accounts Payable | $ 11,011,077.95 |
|     Total Current Liabilities | $ 11,011,077.95 |
|     Long-Term Liabilities | |
|       FTT liability for Blockfolio acquisition | 65,203,620.86 |
|     Total Long-Term Liabilities | $ 65,203,620.86 |
|   Total Liabilities | $ 96,214,698.81 |
|   Mezzanine equity non-controlling interest liability for Blockfolio acquisition | 80,768,080.93 |
|   Equity | |
|     Additional Paid-In Capital | 25,342,807.00 |
|     Binance Series A preferred stock | 250.00 |
|     Common Stock | 1,012.00 |
|     Retained Earnings | 18,498,429.85 |
|     Net Income | 172,794,544.52 |
|   Total Equity | $ 297,373,127.30 |
| **TOTAL LIABILITIES AND EQUITY** | $ 393,588,026.11 |

Monday, May 03, 2021 06:01:01 PM GMT-7 - Accrual Basis

Exhibit 12

 **Gmail**

**Seth Melamed <sethmm19@gmail.com>**

___

## Fwd: FTX <> Liquid - Term Sheet

___

**Seth Melamed** <seth@liquid.com>                                   Wed, Jul 24 at 5:36 PM
To: <sethmm19@gmail.com>


---------- Forwarded message ---------
From: **Ben Spitz** <ben.spitz@liquid.com>
Date: Mon, Aug 30, 2021 at 7:20 PM
Subject: Fwd: FTX <> Liquid - Term Sheet
To: Mike Kayamori <mike.kayamori@liquid.com>, Seth Melamed <seth@liquid.com>,
Satoshi Kitahama <satoshi.kitahama@liquid.com>, Sugita, Hiroki <hsugita@orrick.com>,
Huang, Kane <khuang@orrick.com>, Kuramoto, Sakon <skuramoto@orrick.com>,
Reisenburg, Nathaniel <nathaniel.reisenburg@orrick.com>


It looks like an entity controlled by Sam called Paper Bird Inc. holds 70% of FTX's shares,
as common shares.

In the Series B-1 round, FTX is issuing preferred shares at $36.41 per share ($24.87B
valuation) and Paper Bird is selling common shares at $23.658 per share ($16.15B
valuation).  The ratio is 1 preferred to 4 common shares, so the blended price is $26.21
(valuation of $17.9B).

The common share price in our term sheet is also $23.658.

Ben


---------- Forwarded message ---------
From: <can@ftx.com>
Date: Tue, 31 Aug 2021 at 10:56
Subject: RE: FTX <> Liquid - Term Sheet
To: Sugita, Hiroki <hsugita@orrick.com>, Douma, Shinichi <shinichi.douma@amt-
law.com>, Raku, Raku <raku.raku@amt-law.com>, Ben Spitz <ben.spitz@liquid.com>
Cc: Suzuki, Yosuke <yosuke.suzuki@amt-law.com>, Kawai, Ken <ken.kawai@amt-

law.com>, Mike Kayamori <mike.kayamori@liquid.com>, Seth Melamed
<seth@liquid.com>, <sam@ftx.com>, Nagase, Takeshi <takeshi.nagase@amt-law.com>,
Daniel Friedberg <dan@ftx.com>, Satoshi Kitahama <satoshi.kitahama@liquid.com>,
Huang, Kane <khuang@orrick.com>, Kuramoto, Sakon <skuramoto@orrick.com>,
pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>


Dear Liquid and Orrick teams,


I am attaching the following documents relating to the valuation of FTX's common stock:


- Current cap table (does not reflect the Series B-1)
- Our Series B-1 terms which describes the price of Series B-1 shares and common shares being sold together in the round
- A spreadsheet showing our Series B-1 allocations (with names of investors redacted). While we have not yet closed the round, we currently have commitments for ~$500M.
- The stock purchase agreement for the common shares


Please let us know if you have any questions.


Best,

Can




---

**From:** Sugita, Hiroki <hsugita@orrick.com>
**Sent:** Monday, August 30, 2021 9:05 PM

**To:** Douma, Shinichi <shinichi.douma@amt-law.com>; Raku, Raku <raku.raku@amt-law.com>; 'Ben Spitz' <ben.spitz@liquid.com>; 'can@ftx.com' <can@ftx.com>
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; 'Mike Kayamori' <mike.kayamori@liquid.com>; 'Seth Melamed' <seth@liquid.com>; 'sam@ftx.com' <sam@ftx.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; 'Daniel Friedberg' <dan@ftx.com>; 'Satoshi Kitahama' <satoshi.kitahama@liquid.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid – Term Sheet

Dear Douma-sensei,

Thanks for your revised draft, we will discuss internally.  Yes, it would be extremely helpful to get us valuation related materials for FTX common stock at your earliest convenience to move things forward.

Best regards,

Hiroki

---

**From:** Douma, Shinichi <shinichi.douma@amt-law.com>
**Sent:** Monday, August 30, 2021 9:59 PM
**To:** Sugita, Hiroki <hsugita@orrick.com>; Raku, Raku <raku.raku@amt-law.com>; 'Ben Spitz' <ben.spitz@liquid.com>; 'can@ftx.com' <can@ftx.com>
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; 'Mike Kayamori' <mike.kayamori@liquid.com>; 'Seth Melamed' <seth@liquid.com>; 'sam@ftx.com' <sam@ftx.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; 'Daniel Friedberg' <dan@ftx.com>; 'Satoshi Kitahama' <satoshi.kitahama@liquid.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-

law.com>
**Subject:** RE: FTX <> Liquid – Term Sheet

Dear Ben, dear Sugita-sensei,

Please find attached our comments to the revised term sheet with a redline version for ease of reference.

We'll make sure to follow up with materials relating to the valuation of FTX's common stock.

Kind regards,

Shinichi

**Shinichi Douma** | Associate

(admitted in the Netherlands only/not qualified in Japan)

T: +81-3-6775-1579 | F: +81-3-6775-2579 | M: +81-80-4323-2671

E: shinichi.douma@amt-law.com

**Anderson Mori & Tomotsune**

Otemachi Park Building

1-1-1 Otemachi, Chiyoda-ku, Tokyo 100-8136, Japan

www.amt-law.com

This e-mail message is confidential and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.

---

**From:** Sugita, Hiroki <hsugita@orrick.com>
**Sent:** Monday, August 30, 2021 7:48 PM
**To:** Raku, Raku <raku.raku@amt-law.com>; 'Ben Spitz' <ben.spitz@liquid.com>; 'can@ftx.com' <can@ftx.com>
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; 'Mike Kayamori' <mike.kayamori@liquid.com>; 'Seth Melamed' <seth@liquid.com>; 'sam@ftx.com' <sam@ftx.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; 'Daniel Friedberg' <dan@ftx.com>; 'Satoshi Kitahama' <satoshi.kitahama@liquid.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid - Term Sheet

Dear Can, Raku-sensei and all,

Thank you for waiting, attached please find the revised term sheet with track-changes in PDF.

We added some notes in the draft so it should be self-explanatory but please let us know if you require any clarification or have questions.

Best regards,


Hiroki

---

**From:** Raku, Raku <raku.raku@amt-law.com>
**Sent:** Monday, August 30, 2021 12:49 AM
**To:** Sugita, Hiroki <hsugita@orrick.com>; 'Ben Spitz' <ben.spitz@liquid.com>;
'can@ftx.com' <can@ftx.com>
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; 'Mike Kayamori' <mike.kayamori@liquid.com>; 'Seth Melamed'
<seth@liquid.com>; 'sam@ftx.com' <sam@ftx.com>; Nagase, Takeshi
<takeshi.nagase@amt-law.com>; 'Daniel Friedberg' <dan@ftx.com>; 'Satoshi Kitahama'
<satoshi.kitahama@liquid.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon
<skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid – Term Sheet


Dear Ben, Sugita-sensei, and all,


Attached please find our revised term sheet, along with a redline for your reference.

Please let us know if you have any comments or questions.


Best Regards,

Raku

--------------------

**Raku Raku / Partner**

T: +81-3-6775-1163 | M: +81-80-4733-5248

E: raku.raku@amt-law.com


**Anderson Mori & Tomotsune**

Otemachi Park Building, 1-1-1, Otemachi, Chiyoda-ku, Tokyo 100-8136, Japan

www.amt-law.com


This e-mail message is confidential and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.

---

**From:** Sugita, Hiroki <hsugita@orrick.com>
**Sent:** Sunday, August 29, 2021 4:43 PM
**To:** Ben Spitz <ben.spitz@liquid.com>; can@ftx.com
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid - Loan Agreement


Dear Can and all,


As per Ben's email below, attached please find our comments on the draft term sheet.


Best regards,

Hiroki

---

**From:** Ben Spitz <ben.spitz@liquid.com>
**Sent:** Sunday, August 29, 2021 1:13 PM
**To:** can@ftx.com
**Cc:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>; Kawai, Ken <ken.kawai@amt-law.com>; Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki <hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** Re: FTX <> Liquid - Loan Agreement

Thanks Yosuke and Can.  We agree that the acquisition should be completed very quickly and that once Liquid becomes a wholly-owned subsidiary, the repayment date should become irrelevant.  For this reason, we thought that setting a later repayment date would not be problematic for FTX.  In the unlikely case that the closing doesn't happen, this would give us flexibility in case we can't immediately find alternative financing arrangements to pay back FTX's loan in full.

On the term sheet, yes, we expect to send comments later today.

Regards,
Ben

On Sun, 29 Aug 2021 at 11:23, <can@ftx.com> wrote:

> Thanks Yosuke. Ben and team – you'll see that the big change we've made from a

commercial perspective is that we'd like to reduce the date for demanding payment. In our view, six months should be ample time for us to complete the acquisition, after which Liquid will be a wholly owned subsidiary, and the loan can simply be treated as an intercompany agreement. If you have a different view, please do let us know.

Relatedly, we'd love to get the term sheet signed ASAP. Would you be able to send comments later today?

Best,

Can

---

**From:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>
**Sent:** Sunday, August 29, 2021 9:42 AM
**To:** Ben Spitz <ben.spitz@liquid.com>; Suzuki, Yosuke <yosuke.suzuki@amt-law.com>
**Cc:** Kawai, Ken <ken.kawai@amt-law.com>; can@ftx.com; Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki <hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid – Loan Agreement

Ben,

Thank you very much for your comments on the Loan Agreement.  Attached please find our comments on the draft.

Should you have any questions, please feel free to contact us.


Best regards,

Yosuke


--------------------------------------------------------------


**Yosuke Suzuki** | Associate

T: +81-3-6775-1254| F: +65-6536-7175

M: +65-8284-6574

E: yosuke.suzuki@amt-law.com


**Anderson Mori & Tomotsune (Singapore) LLP**

9 Raffles Place, #16-01 Republic Plaza, Singapore 048619

http://www.amt-law.com/en/


This e-mail message is confidential and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.


AMT Singapore is pleased to be a member of *Anderson Mori & Tomotsune - DOP Law*, a Formal Law Alliance with DOP Law Corporation licensed by the Singapore Ministry of Law under the Legal Profession (Legal Practice Entities) Rules. For more information on *Anderson Mori & Tomotsune - DOP Law*, please see here.

**From:** Ben Spitz <ben.spitz@liquid.com>
**Sent:** Saturday, August 28, 2021 8:06 PM
**To:** Suzuki, Yosuke <yosuke.suzuki@amt-law.com>
**Cc:** Kawai, Ken <ken.kawai@amt-law.com>; can@ftx.com; Mike Kayamori
<mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com;
Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>;
Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki
<hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon
<skuramoto@orrick.com>; pj_license_KWK2021AMT
<pj_license_KWK2021AMT@amt-law.com>
**Subject:** Re: FTX <> Liquid - Loan Agreement


AMT team,


A revised draft of the Loan Agreement is attached.  Please let us know if there are any
questions or comments.


Best regards,
Ben


**Ben Spitz**

Chief Legal Officer

Liquid Group Inc. | Quoine Corporation | Quoine Pte. Ltd.

HQ: Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054

www.liquid.com

On Thu, 26 Aug 2021 at 19:50, Suzuki, Yosuke <yosuke.suzuki@amt-law.com> wrote:

> Ben,
>
> Attached please find our comments on the Loan Agreement.
>
> Should you have any questions, please feel free to contact us.
>
> Best regards,
>
> AMT team
>
> ---------------------------------------------------------------
>
> **Yosuke Suzuki** | Associate
>
> T: +81-3-6775-1254| F: +65-6536-7175
>
> M: +65-8284-6574
>
> E: yosuke.suzuki@amt-law.com
>
> **Anderson Mori & Tomotsune (Singapore) LLP**
>
> 9 Raffles Place, #16-01 Republic Plaza, Singapore 048619
>
> http://www.amt-law.com/en/
>
> This e-mail message is confidential and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have

received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.

AMT Singapore is pleased to be a member of *Anderson Mori & Tomotsune - DOP Law*, a Formal Law Alliance with DOP Law Corporation licensed by the Singapore Ministry of Law under the Legal Profession (Legal Practice Entities) Rules. For more information on *Anderson Mori & Tomotsune - DOP Law*, please see here.

---

**From:** Kawai, Ken <ken.kawai@amt-law.com>
**Sent:** Tuesday, August 24, 2021 9:45 PM
**To:** Ben Spitz <ben.spitz@liquid.com>
**Cc:** can@ftx.com; Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Kawai, Ken <ken.kawai@amt-law.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki <hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>; pj_license_KWK2021AMT <pj_license_KWK2021AMT@amt-law.com>
**Subject:** RE: FTX <> Liquid

Hi Ben,

Thank you for the meeting today. I am on the same page.

We will review the draft loan agreement.

Kind regards,

Ken

**From:** Ben Spitz <ben.spitz@liquid.com>

**Sent:** Tuesday, August 24, 2021 10:31 PM
**To:** Nagase, Takeshi (THN) <thn@amt-law.com>
**Cc:** can@ftx.com; Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Kawai, Ken <ken.kawai@amt-law.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki <hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>
**Subject:** Re: FTX <> Liquid

FTX and AMT teams:

Thanks very much for your time today.  We're looking forward to working with you.

As discussed, I understand that our next steps are:

1.  FTX/AMT to send NDA to Liquid
2.  AMT to send a simple DD request list to help us prioritize data room contents
3.  AMT to prepare and send MOU with exclusivity and high-level deal terms, after reviewing Liquid's capitalization structure
4.  Liquid to confirm timing of call on Thursday/Friday to walk through data room items

Separately, I'm attaching a simple draft loan agreement to document FTX's completed loan to LGI, which we'll need internally to support our accounting treatment of the funds.  In the interest of time we've focused on capturing just the essential terms.  Please let us know if you have comments, as we'd like to square away this piece as soon as we can.

Best regards,
Ben

**Ben Spitz**

Chief Legal Officer

Liquid Group Inc. | Quoine Corporation | Quoine Pte. Ltd.

HQ: Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054

www.liquid.com

On Tue, 24 Aug 2021 at 13:58, Ben Spitz <ben.spitz@liquid.com> wrote:

> Thanks, everyone.
>
> Looking forward to discussing.
>
> Best regards,
>
> Ben
>
> **Ben Spitz**
>
> Chief Legal Officer
>
> Liquid Group Inc. | Quoine Corporation | Quoine Pte. Ltd.
>
> HQ: Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054
>
> www.liquid.com
>
> On Tue, 24 Aug 2021 at 13:55, Nagase, Takeshi (THN) <thn@amt-law.com> wrote:
>
>> Dear all,

Yes, AMT team is also available on 430pm HKT/530pm JST.

Please use the following Zoom link:

https://amt-law.zoom.us/j/82588709815

Kind regards,

AMT Team

---

**From:** can@ftx.com <can@ftx.com>
**Sent:** Tuesday, August 24, 2021 1:50 PM
**To:** 'Ben Spitz' <ben.spitz@liquid.com>
**Cc:** 'Mike Kayamori' <mike.kayamori@liquid.com>; 'Seth Melamed' <seth@liquid.com>; sam@ftx.com; Kawai, Ken <ken.kawai@amt-law.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; 'Daniel Friedberg' <dan@ftx.com>; 'Satoshi Kitahama' <satoshi.kitahama@liquid.com>; 'Sugita, Hiroki' <hsugita@orrick.com>; 'Huang, Kane' <khuang@orrick.com>; 'Kuramoto, Sakon' <skuramoto@orrick.com>
**Subject:** RE: FTX <> Liquid

Thanks Ben. Orrick team – pleasure to meet you.

430pm HKT works for me. AMT team – would that work for you? If so, I can update the invite.

**From:** Ben Spitz <ben.spitz@liquid.com>
**Sent:** Tuesday, August 24, 2021 11:46 AM
**To:** can@ftx.com
**Cc:** Mike Kayamori <mike.kayamori@liquid.com>; Seth Melamed <seth@liquid.com>; sam@ftx.com; Kawai, Ken <ken.kawai@amt-law.com>; Nagase, Takeshi <takeshi.nagase@amt-law.com>; Daniel Friedberg <dan@ftx.com>; Satoshi Kitahama <satoshi.kitahama@liquid.com>; Sugita, Hiroki <hsugita@orrick.com>; Huang, Kane <khuang@orrick.com>; Kuramoto, Sakon <skuramoto@orrick.com>
**Subject:** Re: FTX <> Liquid

Hi Can,

Thanks for arranging a kick-off call.  I'm looping in our outside counsel from Orrick - Hiroki, Kane, and Sakon - as well as our CFO, Satoshi.

If possible I'd like to move Mike's suggested time to 4:30pm HKT/SGT / 5:30pm JST, in anticipation of our board meeting running long.

Best regards,
Ben

Ben Spitz

Chief Legal Officer

Liquid Group Inc. | Quoine Corporation | Quoine Pte. Ltd.

HQ: Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054

www.liquid.com

On Tue, 24 Aug 2021 at 00:16, Mike Kayamori <mike.kayamori@liquid.com>
wrote:

> Hi Can
>
> Absolutely
>
> Tomorrow is quite packed as we have a meeting with the Japanese regulator as
> well as our board meeting until 4pm HKT/SGT time.
>
> Hence would 4pm work?
>
> kindest regards
>
> mike k
>
> On Mon, Aug 23, 2021 at 10:42 PM <can@ftx.com> wrote:
>
>> Mike, Seth, Ben,
>>
>> Pleasure to meet you. I'm copying Sam and our external counsel Ken and
>> Takeshi from Anderson Mori, whom I believe you've met (thanks for the
>> conflicts waiver!).
>>
>> Would you have some time tomorrow for a quick kick–off call to discuss next
>> steps? We very much look forward to working with you.

Best,

Can


---

Can Sun

General Counsel

FTX.com


--

Mike Kayamori
Co-Founder CEO, Liquid Group Inc.
(+65) 9457-5411 / (+81) 70-4170-7274
Zoom：https://zoom.us/j/2511399455

Singapore： 80RR, 80 Robinson Road 9F Singapore 068898
Japan：〒101-0054 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Hirose Building 4F

Vietnam：22F, Saigon Center 2 Tower, No. 67 Lê Lợi street, District 1, HCMC, Vietnam
mike.kayamori@liquid.com

www.liquid.com



**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

Series B-1 Allocations_Redacted.pdf, Secondary Share Purchase Agreement (Common).docx, FTX B1 Round Terms.pdf, FTX Trading Cap Table (Liquid).xlsx

Exhibit 13

FTX recently closed a $900m Series B fundraise.  Due to oversubscription in the Series B, we have decided to raise a Series B-1 of up to $500M.

The B-1 round will be a blend of primary preferred and secondary common shares, with the same blended average share price as the Series B (~$26.21 per share).

If you are interested in participating in the round, please email Ramnik at ramnik@ftx.com.

----------

 The details are as follows:

1)  As in the Series B, the entity raising is FTX Trading LTD, owner of ftx.com.
2)  The Series B shares were sold at ~$26.21 per share.  This implied a pre-money valuation of $17B and a post-money valuation of $17.9B.
3)  The Series B-1 round will be comprised of a sale of primary and secondary shares as follows:
    a)  Primary preferred shares at ~$36.41/share (~$24.87B valuation).  These shares will have the same rights as the Series B preferred shares.
    b)  **Secondary common shares at $23.658/share (~$16.15B valuation).  This is the same price at which Alameda Research bought Binance's common stock in FTX Trading LTD last month (~$2.3B total purchase), reducing Binance's ownership stake in FTX Trading LTD to zero.**
    c)  Participation in the Series B-1 will be at a ratio of 1:4 primary to secondary shares.  For instance,buying 10 shares would cost 2 [preferred shares] *$36.41+8 [common shares] *$23.658+ = $262.08, for a blended price of ~$26.21 per share, which equals the Series B share price. A $50M investment would purchase $13.9M of primary preferred and $36.1M of secondary common shares.
4)  The B-1 close will have the same blended share price as the Series B of ~$26.21 per share, implying a ~$17.9B post valuation
5)  Similar to the Series B, investors in this round will have the right to purchase up to 2.5% of the notional of their FTX investment in FTX US (close to pro-rata).  The valuation for FTX US will be the same post-money valuation as in the Series B, which is anticipated to be around $525m.
    a)  The legal entity for this transaction is West Realm Shires, owner of ftx.us

The deadline for requesting allocations in the B1 close is Wednesday, Sept 8th, 2021.  No one is guaranteed allocation in the B1 close; it is entirely up to FTX s discretion.  We anticipate closing post Labor Day.  Two funds from the Series B are anchoring the Series B-1 at the terms above.

Exhibit 14

**Execution Version**

**KARIYA KAYAMORI**

**SETH MELAMED**

**JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**

**IDG CHINA VENTURE CAPITAL FUND V L.P.**

**IDG BITMAIN FUND L.P.**

**IDG CHINA V INVESTORS L.P.**

**FTX TRADING LTD.**

**LIQUID GROUP INC.**

---

**AGREEMENT FOR
THE SALE AND PURCHASE OF
SHARES, STOCK OPTIONS AND WARRANTS IN
LIQUID GROUP INC.
(MAJOR SHAREHOLDERS)**

---

# CONTENTS

**Clause**                                                                                 **Page**

1.   Interpretation .................................................................. 1
2.   Sale and Purchase .......................................................... 11
3.   Management Agreements ............................................... 12
4.   Retained Consideration ................................................. 12
5.   Conditions ..................................................................... 13
6.   Completion .................................................................... 16
7.   Representations and Warranties ................................... 17
8.   The Purchaser's Remedies ........................................... 18
9.   The Sellers' Remedies .................................................. 20
10.  Limitations on the Sellers' Liability ............................ 21
11.  Undertakings by the Parties ......................................... 22
12.  Confidential Information .............................................. 24
13.  Announcements ............................................................. 25
14.  Costs ............................................................................. 25
15.  General .......................................................................... 26
16.  Entire Agreement .......................................................... 27
17.  Assignment ................................................................... 27
18.  Notices .......................................................................... 27
19.  Governing Law and Jurisdiction .................................. 32
20.  Governing Language ..................................................... 33
21.  Counterparts .................................................................. 33
Schedule 1 Information on the Sellers ................................. 34
Schedule 2 Allocation of Consideration .............................. 35
Schedule 3 Bank Account Information of the Sellers .......... 38
Schedule 4 Information on the Group Companies ................ 40
Schedule 5 Completion Requirements ................................. 41
Schedule 6 Warranties ......................................................... 44
Schedule 7 Seller Actions Pending Completion ................... 58
Schedule 8 Disclosure Schedules ........................................ 60

**THIS AGREEMENT** is made on November 19, 2021

**BETWEEN**:

(1)     **KARIYA KAYAMORI**, a Japanese national having his address at 8 Orange Grove Road #06-02, Singapore 258342 ("**Mr. Kayamori**");

(2)     **SETH MELAMED**, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 ("**Mr. Melamed**");

(3)     **JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**, a limited partnership incorporated in Japan whose principal place of business is at 1-23-1 Toranomon, Minato-ku, Tokyo 105-6324, Japan ("**JAFCO**");

(4)     **IDG CHINA VENTURE CAPITAL FUND V L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG China**");

(5)     **IDG BITMAIN FUND L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Bitmain**");

(6)     **IDG CHINA V INVESTORS L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Investors**", together with Mr. Kayamori, Mr. Melamed, JAFCO, IDG China and IDG Bitmain, the "**Sellers**" and each a "**Seller**");

(7)     **FTX TRADING LTD.**, a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda (the "**Purchaser**"); and

(8)     **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**").

**THE PARTIES AGREE** as follows:

**1.     INTERPRETATION**

1.1     In this Agreement:

"**Accounts**" means the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on the Last Accounting Date, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements.

- 1 -

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing. For the avoidance of doubt, none of Liquid Financial USA Inc. or any subsidiary thereof shall constitute an Affiliate of the Company or any of its Affiliates for purposes of this Agreement.

"**Agreement**" means this Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders), as amended or supplemented in accordance with the terms hereof from time to time.

"**Allocation List**" has the meaning given in Clause 5.1(l).

"**Applicable Exchange Rate**" means the median of the telegraphic transfer selling rate and the telegraphic transfer buying rate published on the website of MUFG Bank, Ltd. at https://www.bk.mufg.jp/ippan/kinri/list_j/kinri/kawase.html as of the end of the Business Day that immediately precedes the date of this Agreement.

"**Anti-Social Forces**" means any organised crime group (*boryokudan*), organised crime group member (*boryokudan-in*), quasi-member of an organised crime group (*boryokudan jun koseiin*), any corporation related to an organised crime group (*boryokudan kankei kigyo*), corporate racketeer (*sokaiya*) or any other force generally considered to seek to achieve a specific political, religious or other philosophical or economical purpose by means of violence, coercion, intimidation, threat or any other socially unacceptable action.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Bankruptcy Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Board of Directors**" means the board of directors of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cash Consideration**" has the meaning given in Clause 2.2(b).

"**Chief Executive Officer**" means the chief executive officer of the Company.

"**Class A Preference Shares**" means 6,000 class A preference shares (*A shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class B Preference Shares**" means 8,002 class B preference shares (*B shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares**" means 9,724 class C-1 preference shares (*C-1 shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares Warrants**" means 2,653 class C-1 preference shares warrants (*C-1 syu yusen kabushiki mokuteki gata shinkabu yoyakuken*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Common Shares**" means 26,704 ordinary shares (*futsu kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Completion**" means completion of the sale and purchase of the Target Security Interests in accordance with this Agreement.

"**Completion Date**" has the meaning given in Clause 6.1.

"**Condition**" means a condition set out in Clause 5.1 and "**Conditions**" means all those conditions.

"**Confidential Information**" means (i) the existence and the contents of this Agreement; (ii) all information relating to the Purchaser or any other Purchaser's Group Company which has not been made public by the Purchaser; and (iii) all information which is used in or otherwise relates to the Group's business, customers or financial or other affairs including, without limitation, information relating to:

(a)     the marketing of goods or services including, without limitation, customer names and lists and other details of customers, sales targets, sales statistics, market share statistics, prices, market research reports and surveys, and advertising or other promotional materials; or

(b)     Knowhow; or

(c)     future projects, business development or planning, commercial relationships and negotiations.

"**Consideration Shares**" means the ordinary shares in the capital of the Purchaser (adjusted to reflect fully the effect of any stock split, reverse stock split, combination, stock dividend (including any dividend or distribution of securities convertible into Purchaser common shares), or other distribution in respect of Purchaser common shares, reorganization, reclassifications or other like change with respect to Purchaser common shares occurring after the date hereof) to be allotted and issued in accordance with Schedule 2.

"**Conversion**" means the conversion of the Class A Preference Shares, Class B Preference Shares and Class C-1 Preference Shares constituting the Target Shares into Common Shares.

"**Crypto Asset Breach**" means the incident involving the unauthorised access to the warm wallet of the Group that took place on or around 19 August 2021.

"**Crypto-Asset Exchange Service Provider Registration**" means the crypto-asset exchange service provider registration with the Financial Services Agency to Quoine Corporation on 29 September 2017.

"**Crypto Consideration**" has the meaning given in Clause 2.2(c).

"**Data Protection Laws**" has the meaning given to it under Paragraph 18.1 of Part A of Schedule 6.

"**Disclosure Documents**" means all announcements and other information to be published in connection with the transactions contemplated under this Agreement in accordance with all applicable laws and regulations, and information supplied, procured or made available to the Financial Services Agency or any other regulatory authority as required by the Financial Services Agency or such other competent regulatory authority.

"**Disclosure Schedules**" means the disclosure schedules of the Sellers attached hereto as Schedule 8.

"**Due Diligence Review**" means the due diligence review on the Group's assets, Liabilities, legal, finance, operation, matters and other aspects which the Purchaser reasonably considers necessary or appropriate.

"**Encumbrance**" means a mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, third-party right or interest, assignment, deed of trust, other encumbrance or security interest of any kind, or another type of preferential arrangement (including, without limitation, a title transfer or retention arrangement) having similar effect, any proxy, power of attorney, voting trust arrangement, interest, right of first refusal or any adverse claim as to title, possession or use (other than those created under applicable laws, by the Purchaser or any of its Affiliates, or under the organizational documents of the Company).

"**Final Customer Balance Statement**" has the meaning given in Clause 5.1(q).

"**Financial Services Agency**" means the Financial Services Agency of Japan.

"**Gross-Up Amount**" has the meaning given in Clause 15.8.

"**Group**" means the Company and its Affiliates.

"**Group Company**" means the Company or a company which is, on the date of this Agreement, an Affiliate of the Company, and "**Group Companies**" means all of them.

"**IDG Entities**" means, collectively, IDG China, IDG Bitmain and IDG Investors, and "**IDG Entity**" means any of them.

"**Indemnification Obligations**" has the meaning given in Clause 8.3

"**Initial Cash Consideration**" has the meaning given in Clause 2.3.

"**Intellectual Property**" means:

(a)    patents, trade marks, service marks, registered designs, applications and rights to apply for any of those rights, trade, business and company names, internet domain names and e-mail addresses, unregistered trade marks and service marks, copyrights, database rights, rights in software, Knowhow, rights in designs and inventions;

(b)    rights under licences, consents, orders, statutes or otherwise in relation to a right in paragraph (a);

(c)    rights of the same or similar effect or nature as or to those in paragraphs (a) and (b) which now or in the future may subsist; and

(d)    the right to sue for past infringements of any of the foregoing rights.

"**Intellectual Property Rights**" means all Intellectual Property owned or used by the Company.

"**Japanese Companies Act**" means the Companies Act (*kaisha hou*) (Act No. 86 of 2005, as amended) in Japan.

"**JPY**" means Japanese yen, the lawful currency of Japan.

"**Knowhow**" means all technical information, knowledge and expertise (including, without limitation, trade secrets, information comprised in formulae, techniques, designs, specifications, drawings and associated data, design manuals, design rules, design standards, components, lists, manuals, instructions, catalogues, computation models, process descriptions, process manuals, recipes, ingredients, software (including object and source codes), inventions, trials, experiments, research and technology results, statistics and data) relating (without limitation) to the composition, formulation, design, development, production, manufacture, use, repair, maintenance, monitoring, recording, controlling, storage, delivery, sale or marketing of any product, process or service, including any such information relating to tooling design and quality control, but, in each case, excluding any information that is publicly available.

"**Last Accounting Date**" means 30 September 2020, provided, that, if the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on 30 September 2021, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements become available during the period between the date hereof and Completion, then "Last Accounting Date" means 30 September 2021.

"**Liabilities**" means any debt, obligation, duty or liability of any nature, regardless of whether such debt, obligation, duty or liability is immediately due and payable.

"**Longstop Date**" means 31 March 2022, or such later date as the parties may agree in writing.

"**Losses**" means all costs, losses, Liabilities, damages, claims, demands, proceedings, expenses, penalties and legal and other professional fees.

"**Major Shareholders**" means Mr. Kayamori, Mr. Melamed, JAFCO, IDG China, IDG Bitmain and IDG Investors.

"**Management Agreement**" means the management agreement to be entered into by each of the Management Shareholders with the Company effective as of Completion, and "**Management Agreements**" means all of them.

"**Management Shareholders**" means Mr. Kayamori and Mr. Melamed.

"**Material Adverse Effect**" means the occurrence of any matter or event (or series of matters or events) which is materially adverse to the financial condition, regulatory condition, or results of operations of a person or a group of persons taken as a whole; provided, however, that a "Material Adverse Effect" shall not include any matter or event (or series of matters or events) substantially arising out of, attributable to, or resulting from:

(a)     events or effects that generally affect the industries or segments in which the Group operates, including legal and regulatory conditions;

(b)     events or effects that generally affect business, economic or political conditions in which the Group operates;

(c)     events or effects affecting the financial, credit or securities markets in any country or region in which the Group operates, including changes in interest rates, foreign exchange rates, or credit ratings;

(d)     acts of armed hostility, sabotage, terrorism, national emergency or war (whether or not declared);

(e)     natural disasters, acts of God, or any force majeure events in any country or region in the world;

(f)     the COVID-19 pandemic;

(g)     material changes or modifications in U.S. or Japanese generally accepted accounting principles, other applicable accounting standards or applicable law or the interpretation or enforcement thereof; and

(h)     the negotiation, the announcement, the execution or the pendency of the transactions contemplated by this Agreement, or any actions taken in accordance with the terms of this Agreement or required hereunder, including the notification to the Monetary Authority of Singapore of the transactions contemplated by this Agreement,

except, in each case of clauses (a), (b) and (c) above, to the extent that such events or effects have a materially disproportionate effect on the Group, taken as a whole, as compared with other participants in the industries in which the Group operates, and except to the extent such events, circumstances, changes or effects are caused by the intentional or willful misconduct of the Company or the Sellers.

"**Minority Shareholders**" means, collectively, the holders of the Shares and the Stock Options of the Company (other than the Major Shareholders) as at the date of this Agreement.

"**Minority Shareholders SPA(s)**" means one or more sale and purchase agreement to be entered into as of or prior to Completion between the Purchaser, the Company and Minority Shareholders (whether executed by or on behalf of Minority Shareholders) for the sale and purchase of the Shares and the Stock Options held by such Minority Shareholders.

"**Notice**" has the meaning given in Clause 18.1.

"**Permit**" means:

(e)     a permit, licence, consent, approval, certificate, qualification, specification, registration or other authorisation (including provisional and temporary ones); and

(f)     a filing of a notification, report or assessment,

in each case necessary for the effective operation of the Company's business, its ownership, possession, occupation or use of an asset or the execution or performance of the transactions contemplated under this Agreement.

"**Person**" means any natural person, company, corporation, general partnership, limited partnership, proprietorship, joint venture, firm, trust, fund, union, government, statutory or public authority, or any entity or incorporated or unincorporated organization or association.

"**Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Purchaser Fundamental Representations**" means the representations and warranties made by the Purchaser under Clause 7.2 with respect to the Warranties set out in Paragraphs 1 (Incorporation), 2 (Right, power, authority and action), 3 (Anti-Social Forces), 4 (Binding agreements), 5 (Funds) and 6 (Share Issuance) of Part B of Schedule 6.

"**Purchaser's Group Company**" means the Purchaser or a company which is, on the date of this Agreement, an Affiliate of the Purchaser.

"**Purchaser Indemnified Parties**" has the meaning given in Clause 8.3.

"**Purchaser's Solicitors**" means Anderson Mori & Tomotsune of Otemachi Park Building, 1-1-1 Otemachi, Chiyoda-ku, Tokyo, Japan, and any other affiliates thereof.

"**Purchaser's Warranty Claim**" means a claim by the Purchaser under or pursuant to Clause 7.1.

"**Quoine Corporation**" means Quoine Corporation, of which all of its equity interests are, as at the date of this Agreement, held by the Company.

"**Relevant Employee**" has the meaning given in Paragraph 13.1of Part A of Schedule 6.

"**Representative**" means, in relation to a party, the directors, officers, employees, representatives, agents, advisers, accountants and consultants of that party;

"**Retained Cash Consideration**" has the meaning given in Clause 2.4.

"**Retained Consideration**" means the Retained Cash Consideration and the Crypto Consideration.

"**Rules**" has the meaning given in Clause 19.2.

"**Scheme**" has the meaning given in Paragraph 13.2 of Part A of Schedule 6.

"**Seller Fundamental Representations**" means the representations and warranties made by the Sellers under Clause 7.1 with respect to the Warranties set out in Paragraphs 1 (Capacity and Authority), 3 (Shares and Affiliates), 6 (Tax) and 20 (Brokerage or Commissions) of Part A of Schedule 6.

"**Seller Indemnified Parties**" has the meaning given in Clause 9.3.

"**Seller's Warranty Claim**" means a claim by a Seller under or pursuant to Clause 7.2.

"**Shareholder**" means a shareholder of the Company.

"**Shareholders' Agreement**" means each of: (i) the investor rights agreement dated 12 December 2019 by and among the Company, the Major Shareholders and the other parties thereto; and (ii) the agreement among shareholders dated 1 March 2019 by and among the Company, the Major Shareholders and the other parties thereto (including the amendments and ancillary agreements thereto), and "**Shareholders' Agreements**" means all of them.

"**Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares.

"**SIAC**" has the meaning given in Clause 19.2.

"**Squeeze-Out Procedure**" means any action under the Japanese Companies Act or pursuant to any of the Shareholders' Agreements that results in the Purchaser holding

100% of the Shares, Class C-1 Preference Shares Warrants and Stock Options of the Company.

"**Stock Options**" means (i) series 2 to 7, 9, 10, 12, 13, 15 to 19 stock options and (ii) series 1 and 2 officers' stock options issued by the Company to its employees and/or officer.

"**Sufficiency Representation**" has the meaning given in Paragraph 7.1(a) of Part A of Schedule 6.

"**Target Options**" means 180 series 3, 30 series 10 and 300 series 13 of Stock Options, which, as at the date of this Agreement, are held by Mr. Melamed, and "**Target Option**" means any of them.

"**Target Security Interests**" means the Target Shares, the Target Options and the Target Warrants.

"**Target Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares held by the Sellers (the number of which is set out opposite each Seller's name in Schedule 1), and "**Target Share**" means any of them.

"**Target Warrants**" means 2,625 Class C-1 Preference Shares Warrants, which, as at the date of this Agreement, are held by the IDG Entities (the number of which is set out opposite each IDG Entity's name in Schedule 1), and "**Target Warrant**" means any of them.

"**Tax**" means any form of taxation and any levy, duty, charge, contribution, withholding or impose in the nature of taxation (including any related fine, penalty, interest).

"**Tax Authority**" means any government, state or municipality or any local, state, federal or other authority, body, or official anywhere in the world exercising a fiscal, revenue, customs or excise function.

"**Total Consideration**" has the meaning given to it in Clause 2.2.

"**Transfer Agent**" means the transfer agent of the Purchaser in Antigua and Barbuda.

"**Tribunal**" has the meaning given in Clause 19.3.

"**USD**" or "**$**" means United States dollars, the lawful currency of the United States of America.

"**U.S.**" means United States of America.

"**Warranty**" means a statement contained in Schedule 6 and "**Warranties**" means all those statements.

"**%**" means per cent.

1.2     In this Agreement, a reference to:

(a)     a "**person**" includes a reference to any individual, firm, company, corporation or other body corporate, government, state or agency of a state or any joint venture, association or partnership, works council or employee representative body (whether or not having separate legal personality) and includes a reference to that person's legal personal representatives, successors and permitted assigns;

(b)     a "**party**" or "**parties**", unless the context otherwise requires, is a reference to a party or parties to this Agreement and includes a reference to that party's legal personal representatives, successors and permitted assigns;

(c)     a Clause, Paragraph, Schedule or Annex, unless the context otherwise requires, is a reference to a clause or paragraph of, or schedule or annex to, this Agreement;

(d)     a statutory provision includes a reference to:

(i)     the statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement; and

(ii)     any subordinate legislation made under the statutory provision (as so modified or re-enacted) whether before or after the date of this Agreement;

(e)     liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument;

(f)     all warranties, representations, indemnities, covenants, agreements and obligations given or entered into by more than one Seller are, unless otherwise specified, given or entered into severally and not jointly among such Sellers, and as used in this Agreement, the word "severally" or "several" when applying to an obligation means that such obligation is several (i.e., *bunkatsu saimu*), and the phrase "not jointly" when applying to an obligation means that such obligation is not joint (i.e., not *rentai saimu*);

(g)     a time of day is a reference to the time in Japan, unless a contrary indication appears;

(h)     the singular includes the plural and *vice versa*; and

(i)     one gender includes all genders.

1.3     The headings in this Agreement do not affect its interpretation.

1.4     The *ejusdem generis* principle of construction shall not apply to this Agreement. Accordingly, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class of acts, matters or

things or by examples falling within the general words. Any phrase introduced by the terms "other", "including", "include" and "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.5    A reference in Schedule 6 to the Sellers' knowledge, information and belief means the knowledge, information and belief of the Sellers of a particular fact where the Sellers are actually aware of or should have been aware of such fact.

## 2.    SALE AND PURCHASE

2.1    Each of the Sellers agrees to sell and the Purchaser agrees to purchase the Target Security Interests held by such Seller and each right attaching to such Target Security Interests at Completion, free from any Encumbrance.

2.2    The aggregate purchase price for the Target Security Interests shall be USD 151,919,670.93 (the "**Total Consideration**"), representing a purchase price of USD 3,510.41 per Target Share (on an as converted basis), USD 3,509.54 per Target Option with respect to 180 of the Target Options, USD 3,103.16 per Target Option with respect to 30 of the Target Options, USD 3,180.15 per Target Option with respect to 300 of the Target Options (in each such case, being the net amount of the purchase price per Target Share minus the exercise price in USD applying the Applicable Exchange Rate for the Target Option) and USD 1,605.63 per Target Warrant (being the net amount of the purchase price per Target Share minus the applicable exercise price for the Target Warrant), of which:

(a)    USD 52,796,848.94 will be satisfied by the allotment and issue of 2,014,377 Consideration Shares to the Sellers as set out in Schedule 2, credited as fully paid at Completion;

(b)    USD 81,197,790.25 will be satisfied by the payment of cash (the "**Cash Consideration**") to the Sellers as set out in Schedule 2; and

(c)    USD 17,925,031.75 will be satisfied by the payment of the types and amounts of digital assets (the "**Crypto Consideration**") as set out in Schedule 2.

2.3    At Completion, the Purchaser shall pay the aggregate amount of USD 68,738,887.81 as part payment of the Cash Consideration (the "**Initial Cash Consideration**") to the Sellers as set out in Schedule 2 by transfer of funds to the bank account of the respective Sellers as set out in Schedule 3 (or in such other manner or to any other bank account designated by such Seller and notified to the Purchaser in writing no later than three (3) Business Days prior to Completion).

2.4    At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "**Retained Cash Consideration**") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

2.5    Each of the Sellers and the Company waives all rights of first refusal and other rights in respect of (including any liquidation preference of the Shares), or restrictions on

transfer on the Target Security Interests to which it may be entitled to under the Articles of Incorporation, the Shareholders' Agreements or otherwise in relation to the sale and purchase of the Target Security Interests pursuant to this Agreement and shall procure that all such rights conferred on any other person are waived no later than Completion so as to permit the sale and purchase of all of the Target Security Interests.

2.6    At Completion, the Shareholders' Agreements shall terminate in their entirety as between the Major Shareholders, the Minority Shareholders who complete the sale of their respective security interests of the Company to the Purchaser as of Completion, and the Company.

2.7    Any Tax incurred in connection with the consummation of the sale and purchase of the Target Security Interests under this Agreement shall be borne and paid by the party incurring such Tax in accordance with applicable laws and regulations. For the avoidance of doubt, any capital gain tax or other Tax of similar nature that any Seller may be subject to under the applicable laws and regulations in Japan or anywhere else in the world shall be borne by such Seller, and the Purchaser shall not be responsible for any such Tax.

## 3.    MANAGEMENT AGREEMENTS

3.1    On or before Completion, each of the Management Shareholders shall enter into a Management Agreement with the Company on the terms and conditions reasonably satisfactory to the Purchaser and the respective Management Shareholder, and which shall be effective from the date of Completion and include, subject to certain exceptions as provided therein, non-competition undertakings by the relevant Management Shareholder in favour of the Company, and such non-competition undertakings shall remain effective from the date of Completion throughout the term of the Management Agreement, and shall remain effective until the expiry of the following period (whichever is later):

(a)    one (1) year after termination of the Management Agreement of the relevant Management Shareholder; or

(b)    three (3) years from the date of Completion.

## 4.    RETAINED CONSIDERATION

4.1    The Retained Consideration shall be used to fund any payment obligations of the Sellers to the Purchaser in respect of a Purchaser's Warranty Claim and/or reasonably necessary to serve as partial security for any Indemnification Obligation.

4.2    On each of the dates falling on (i) the first anniversary and (ii) the second anniversary of the Completion Date, the Purchaser shall pay (1) 50% of the Retained Cash Consideration less any amounts paid pursuant to Clause 4.1 to the respective Sellers and (2) 50% of the Crypto Consideration less any amounts paid pursuant to Clause 4.1 to the Management Shareholders in accordance with instructions to be provided by the Management Shareholders.

4.3     Any portion of the Retained Cash Consideration or the Crypto Consideration held by the Purchaser with respect to a pending but unresolved Purchaser's Warranty Claim and/or Indemnification Obligation shall be released to the Sellers within ten (10) days following resolution of such Purchaser's Warranty Claim and/or Indemnification Obligation.

## 5.     CONDITIONS

5.1     Completion is conditional on the following Conditions being satisfied, or waived by the Sellers or the Purchaser (as the case may be), in accordance with this Agreement:

(a)     all corporate approvals of the Purchaser necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(b)     all corporate approvals of the Sellers (if applicable) necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(c)     the Board of Directors having passed a resolution approving the transfer of the Target Security Interests;

(d)     the representations and warranties made by the Sellers under Clause 7.1 (except for the Seller Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(e)     the Seller Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(f)     all covenants of the Sellers having been complied with in all material respects;

(g)     the representations and warranties made by the Purchaser under Clause 7.2 (except for the Purchaser Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(h)     the Purchaser Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(i)     all covenants of the Purchaser having been complied with in all material respects;

(j)     all consents, approvals, amendments and terminations as specified by the Purchaser based on its Due Diligence Review, the absence of which would have

a Material Adverse Effect on the Group taken as a whole and/or a material adverse effect on the ability of the parties to consummate the Completion, having been obtained, executed and/or effectuated;

(k)     the Purchaser having made the filing to the relevant regulatory authorities (including but not limited to the Ministry of Economy, Trade and Industry) with respect to foreign direct investment in accordance with the Foreign Exchange and Foreign Trade Act of Japan, and the designated period for review by such regulatory authorities having lapsed and no such regulatory authorities having indicated, whether verbally or in writing, any objection to the transaction contemplated under this Agreement;

(l)     the completion of a detailed spreadsheet setting out the allocation of the Total Consideration (the "**Allocation List**"), including the allocation of the Consideration Shares, the Initial Cash Consideration, the Retained Cash Consideration and the Crypto Consideration (as applicable) among the Sellers;

(m)     the Conversion having been completed, or the waiver of the liquidation preference, right of first refusal and any other rights and consents required under the Articles of Incorporation, the Shareholders' Agreements and/or any other agreements among the Shareholders for the transfer of the Target Security Interests from the Major Shareholders to the Purchaser under this Agreement remaining effective;

(n)     the Minority Shareholders SPA(s) having been executed on behalf of all the Minority Shareholders, or the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreements;

(o)     the Management Agreements with the Management Shareholders having been executed as of Completion;

(p)     the employment agreements of at least 70% of the full-time employees of the Group remaining effective;

(q)     the delivery by the Management Shareholders to the Purchaser of a certificate (the "**Final Customer Balance Statement**") setting forth a true and complete account, on a digital asset by digital asset basis (including all delisted digital assets), of all digital asset balances held by the customers of the Company (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) as of the date that is two days prior to the Completion Date, which shall include a certification by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(r)     no Material Adverse Effect on the Group Companies taken as a whole having occurred and be continuing as of Completion, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take,

in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 5.1(r);

(s)     no regulatory authority (including but not limited to the Financial Services Agency) having notified, whether verbally or in writing that the Crypto-Asset Exchange Service Provider Registration will be suspended, cancelled, revoked or withdrawn after Completion, whether or not for reasons related to or arising from the transactions contemplated under this Agreement, except to the extent that any such suspension, cancellation, revocation or withdrawal arises substantially directly or indirectly as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement;

(t)     neither the Financial Services Agency nor the Kanto Local Financial Bureau of Japan having indicated, whether verbally or in writing, any objection to the transactions contemplated under this Agreement;

(u)     there being no applicable laws which shall, or which shall reasonably be expected to, forbid, restrict or impose conditions or restrictions on completion of the transactions contemplated under this Agreement; and

(v)     there being no pending or threatened injunctions or similar restraints applicable to the Completion, and no pending or threatened litigation seeking an injunction, restraint or material damages in connection with the transactions contemplated under this Agreement.

5.2     The Purchaser shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(a), 5.1(g), 5.1(h), 5.1(i), 5.1(k), and 5.1(o) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.3     Each Seller shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(b), 5.1(c), 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p) and 5.1(q) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.4     If, at any time, the Sellers or the Purchaser becomes aware of a fact, matter or circumstance that might prevent a Condition from being satisfied, it shall inform the other parties in writing as soon as reasonably practicable.

5.5     At any time on or before 5:00 p.m. on the Longstop Date, the Purchaser may waive a Condition set out in Clauses 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p), 5.1(q) and 5.1(r) (or any part thereof) by Notice to the Sellers on any terms it decides.

5.6     At any time on or before 5:00 p.m. on the Longstop Date, the Sellers holding a majority of the Shares may waive a Condition set out in Clause 5.1(g), 5.1(h), 5.1(i), 5.1(k) and 5.1(o) (or any part thereof) by Notice from such Sellers to the Purchaser on any terms it decides.

5.7    If a Condition set out in Clause 5.1:

    (a)    has not been waived by (i) the Sellers or the Purchaser (as the case may be) pursuant to Clause 5.5 or 5.6 or (ii) agreement of all of the parties; and

    (b)    has not been satisfied by 5:00 p.m. on the Longstop Date,

this Agreement shall automatically terminate with immediate effect.

5.8    The Longstop Date may be extended by mutual agreement of the Sellers and the Purchaser in writing, provided that the transaction shall be completed under the same terms and conditions hereunder.

5.9    Each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations as at the date of termination.

## 6.    COMPLETION

6.1    Upon the terms and subject to the conditions of this Agreement, Completion shall take place at the offices of the Purchaser's Solicitors, or if the parties agree otherwise, remotely via the electronic exchange of documents and signatures, on the date that is the fifth Business Day following the satisfaction or waiver of the Conditions (other than Conditions that by their nature are to be satisfied at Completion, and subject to the satisfaction or waiver of such Conditions), or such other time or location as agreed by the parties in writing (but in any event shall not be later than the Longstop Date nor sooner than 1 January 2022) (the date on which Completion occurs, the "**Completion Date**").

6.2    At Completion the Sellers and the Purchaser shall do all those things respectively required of them in Schedule 5. The Purchaser is not obliged to complete this Agreement unless:

    (a)    each Seller complies with all its respective obligations under Schedule 5;

    (b)    the purchase of: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof are completed simultaneously; and

    (c)    the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreement for those Minority Shareholders who have not executed the relevant Minority Shareholders SPA(s) and/or fails to complete transaction contemplated under the Minority Shareholders SPA(s).

6.3    The Sellers are not obliged to complete this Agreement unless:

    (a)    the Purchaser complies with all its obligations under Schedule 5;

(b)     the payments of consideration to purchase: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof    completed simultaneously; and

(c)     the payment of consideration to purchase the security interests payable to the Minority Shareholders in connection with the exercise of the drag-along rights under the Shareholders' Agreements is made to the Company or its designee simultaneously.

6.4     If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because any of the Sellers fails to comply with any of its material obligations under Schedule 5, the Purchaser may by Notice to the Sellers and the Company:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Purchaser may specify (being a date not later than the Longstop Date).

6.5     If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because the Purchaser fails to comply with any of its obligations under Schedule 5, the Sellers may by Notice to the Purchaser:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Sellers may specify (being a date not later than the Longstop Date).

6.6     If the Purchaser postpones Completion to another date in accordance with Clause 6.4(b), or if the Sellers postpone Completion to another date in accordance with Clause 6.5(b), the provisions of this Agreement apply as if that other date is the Completion Date.

## 7.     REPRESENTATIONS AND WARRANTIES

7.1     Each of the Sellers, severally and not jointly, represents and warrants to the Purchaser that except as disclosed in the Disclosure Schedules, (i) and except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part A of Schedule 6 (other than the Seller Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Seller Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, each Seller is deemed to represent and warrant to the Purchaser that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

- 17 -

7.2    The Purchaser represents and warrants to the Sellers that, (i) except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by any of the Sellers or any of their respective Representatives, or any actions that any of the Sellers or any of their respective Representatives takes or, notwithstanding reasonable written request by the Purchaser, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part B of Schedule 6 (other than the Purchaser Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Purchaser Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, the Purchaser is deemed to represent and warrant to the Sellers that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

7.3    Each of the parties represents and warrants to the other parties that, as of the date of this Agreement and the Completion Date, except for (i) this Agreement, (ii) the Minority Shareholders SPA(s), (iii) the Management Agreements, (iv) the mutual confidentiality agreement dated 26 August 2021 entered into between the Purchaser, the Company and the Management Shareholders, (v) the loan agreement dated 30 August 2021 entered into between the Purchaser and the Company, (vi) subject to Clause 2.6, the Shareholders' Agreements, (vii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between JAFCO, IDG China, IDG Bitmain, IDG Investors and the Purchaser, (viii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between Seth Melamed and the Purchaser, and any agreements expressly provided under or pursuant to the terms of any of the foregoing, there are no effective agreements or arrangements between such party and any of the other parties in connection with the transactions contemplated under this Agreement.

7.4    The Sellers agree and undertake to the Purchaser and to each person referred to in this Clause 7.4 that, except in the case of fraud, they will not make any claim against the Company or any director, officer, employee or agent of the Company on whom it may have relied before agreeing any term of this Agreement or any of the transactions contemplated by this Agreement which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by any such person for the purpose of assisting the Sellers to make a representation or give a Warranty.

7.5    Each Warranty is to be construed independently and (except where this Agreement provides otherwise) is not limited by a provision of this Agreement or another Warranty.

## 8.    THE PURCHASER'S REMEDIES

8.1    If, at any time before Completion:

(a)       any of the Sellers is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by the Purchaser to such Seller and (ii) the Longstop Date; or

(b)       the Purchaser becomes aware of any matter, fact or circumstance which in the Purchaser's opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Purchaser is aware that has a Material Adverse Effect on the Group taken as a whole, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 8.1(b),

then the Purchaser may by notice in writing to the Sellers elect to proceed to Completion or terminate this Agreement if the Purchaser is not, on the proposed date of termination, in material breach of this Agreement.

8.2     If the Purchaser terminates this Agreement pursuant to Clause 8.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

8.3     If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Sellers shall, severally and not jointly, indemnify and hold the Purchaser and its Affiliates (including, after Completion, the Group, the "**Purchaser Indemnified Parties**") harmless from, against and in respect of any and all Losses incurred or suffered by any of the Purchaser Indemnified Parties resulting from, relating to or arising out of:

(a)       any breach of the representations and warranties made by the Sellers under Clause 7.1 or covenants of the Sellers under this Agreement;

(b)       any inaccuracies as to the calculation of (i) the Total Consideration between the Major Shareholders as reflected in the Allocation List and (ii) the consideration between the Minority Shareholders; and

(c)       any unpaid transaction expenses of the Company incurred for the transactions contemplated under this Agreement (to the extent not taken into account in the calculation of the Total Consideration),

(collectively, the "**Indemnification Obligations**").

8.4     With effect from Completion, the Sellers release the Company from all claims and demands of the Sellers against the Company and all Liabilities of the Company to the Sellers in respect of any period prior to Completion under the organizational documents of the Company or any agreements between the applicable Seller and the Company terminated prior to Completion.

8.5    The Purchaser acknowledges and agrees that it shall not make a claim under this Clause 8 in respect of any fact, matter or circumstance of which the Purchaser was aware as at the date of this Agreement based on the information provided by the Company or the Sellers for the purposes of the Purchaser's Due Diligence Review, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.6    Except for the remedies stipulated under this Clause 8, the Purchaser shall not claim for any compensation from the Sellers in respect of any Purchaser's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.7    Any Purchaser Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 9.    THE SELLERS' REMEDIES

9.1    If, at any time before Completion,

(a)    the Purchaser is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by any Seller to the Purchaser and (ii) the Longstop Date; or

(b)    the Sellers become aware of any matter, fact or circumstance which in the Sellers' opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Sellers are aware that has a Material Adverse Effect on the Purchaser, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Sellers or any of their Representatives, or any actions that the Sellers or any of their Representatives take or, notwithstanding reasonable written request by the Purchaser, omit to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 9.1(b),

then the Sellers may by notice in writing to the Purchaser elect to proceed to Completion or terminate this Agreement if the Sellers are not, on the proposed date of termination, in material breach of this Agreement.

9.2    If the Sellers terminate this Agreement pursuant to Clause 9.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

DocuSign Envelope ID: 17282B8E-F560-4509-8A59-0F69678AD319

9.3   If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Purchaser shall indemnify and hold harmless the Sellers and their Affiliates (the "**Seller Indemnified Parties**") from, against and in respect of any and all Losses incurred or suffered by any of the Sellers Indemnified Parties resulting from, relating to or arising out of any breach of the representations and warranties made by the Purchaser under Clause 7.2 or covenants of the Purchaser under this Agreement.

9.4   Each Seller acknowledges and agrees that it shall not make a claim under this Clause 9 in respect of any fact, matter or circumstance of which the Sellers were aware as at the date of this Agreement, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.5   Except for the remedies stipulated under this Clause 9, the Sellers shall not claim for any compensation from the Purchaser in respect of any Seller's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.6   Any Seller Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 10.   LIMITATIONS ON THE SELLERS' LIABILITY

10.1   The Indemnification Obligations shall survive for a period of two (2) years from the Completion Date, except for claims arising out of, resulting from or in connection with:

(a)   breaches of the Seller Fundamental Representations;

(b)   breaches of Sellers' covenants; and

(c)   Clause 8.3(b),

which shall survive Completion and subject to the relevant limitation period under the applicable laws.

10.2   The Sellers are not liable in respect of a Purchaser's Warranty Claim:

(a)   unless the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim exceeds JPY10,000,000. For this purpose, a number of claims arising out of the same, related or similar matters, facts or circumstances shall be aggregated and form a single claim; and

(b)   unless and until the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim,

when aggregated with any other amount or amounts recoverable or that would otherwise be recoverable (but for Clause 10.2(a)) in respect of other Purchaser's Warranty Claims, exceeds JPY100,000,000 and in the event that the aggregated amounts exceed JPY100,000,000, the Sellers shall be liable in respect of the total aggregate amounts and not the excess only.

10.3   Each Seller's total liability in respect of all Indemnification Obligations shall be limited to 20% of the amount of Total Consideration allocated to such Seller.

10.4   Nothing in this Clause 10 shall have the effect of limiting or restricting any liability of any Seller in respect of an Indemnification Obligation arising as a result of any fraud, intentional misrepresentation or wilful misconduct of that Seller, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of that Seller.

## 11.   UNDERTAKINGS BY THE PARTIES

11.1   Until Completion or earlier termination of this Agreement, the Management Shareholders shall, to the extent permitted by law:

    (a)   remain liable to perform all of their obligations and to comply with all legal and regulatory requirements relating to the Group Companies;

    (b)   exercise all rights and powers available to them with a view to procuring that no Group Companies shall depart in any material respect from the ordinary course of their day-to-day business except with the prior written consent of the Purchaser, other than any activities by any of the Group Companies in connection with the replacement or recovery of the digital assets that were lost in the Crypto Asset Breach;

    (c)   provide material updates to the Purchaser regarding the businesses and affairs of the Group Companies;

    (d)   procure the Group Companies and their respective Representatives to (i) cooperate reasonably with the Purchaser and its Representatives to enable the Purchaser and its Representatives to conduct the Due Diligence Review, (ii) grant access to the books and records of or relating to the Group Companies, including but not limited to the statutory books, minute books, contracts, title deeds, details of receivables, tax records, accounts and other documentations of the Group Companies as the Purchaser may reasonably request and (iii) provide such other documents and information about or relating to the Group Companies as the Purchaser may reasonably request; and

    (e)   procure that the Purchaser and its Representatives are provided with reasonable opportunities to meet with the management, directors, officers and staff of the Group Companies.

11.2   Each Seller undertakes in favour of the Purchaser and the Company that it will make available and promptly supply, or procure to make available and promptly supply, to the Financial Services Agency or any other competent regulatory authority all

information in relation to such Sellers which may be required by the Financial Services Agency or any other competent regulatory authority.

11.3    Each Management Shareholder undertakes to the Purchaser that, no later than Completion, such Management Shareholder shall use reasonable efforts to procure all of the Minority Shareholders to enter into the Minority Shareholders SPA(s), failing which or if any Minority Shareholder does not sell its Shares or Stock Options in accordance with the Minority Shareholders SPA(s), then, after Completion, such Management Shareholder shall provide any reasonable assistance requested by the Purchaser to consummate the Squeeze-Out Procedure (including but not limited to the exercise of their drag-along rights under the Shareholders' Agreement).

11.4    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement:

(a)    the Sellers shall cause the Company to comply with Schedule 6;

(b)    the Management Shareholders shall procure the Company to file an application to change its commercial registration in order to reflect its latest corporate, shares and options issuance status;

(c)    the Purchaser shall provide commercially reasonable cooperation to the Sellers and the Company to consummate Completion, including structuring incentive plans to the employees of the Group Companies applicable after Completion and accommodating inquiries from competent regulatory authorities made to any Group Company;

(d)    the Purchaser, on the one hand, and the Management Shareholders, on the other hand, shall use reasonable best efforts to cooperate with each other to retain any employees of the Group Companies specified by the Purchaser;

(e)    the Sellers shall notify the Purchaser as soon as reasonably practicable if they becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.1 or which would or might cause a Warranty of the Sellers to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion; and

(f)    the Purchaser shall notify the Sellers as soon as reasonably practicable if it becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.2 or which would or might cause a Warranty of the Purchaser to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion.

11.5    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement, the Sellers shall not, directly or indirectly:

(a)    enter into or be involved in any discussion or negotiation with any person except the Purchaser in connection with the sale of the Company or the business or,

except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof;

(b)     enter into an agreement or arrangement with any person except the Purchaser or any person designated by the Purchaser in connection with the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof; or

(c)     other than in connection with the transactions contemplated under this Agreement, make available to any person except the Purchaser, its directors, officers, duly authorised representatives, advisers or agents, any information for the purpose of the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business.

11.6     The Purchaser hereby unconditionally and irrevocably agrees to guarantee the full and complete performance by the Company of all of the terms and obligations of the Company contained in the respective Management Agreements upon execution of the respective Management Agreements.

11.7     Each undertaking in Clauses 11.1 to 11.6 constitutes an entirely independent undertaking and if one or more of the undertakings is held to be against the public interest or unlawful or in any way an unreasonable restraint of trade the remaining undertakings shall continue to bind the Sellers.

## 12.     CONFIDENTIAL INFORMATION

12.1     Each party undertakes to the other parties that before and after Completion it shall:

(a)     not use or disclose to any person Confidential Information it has or acquires; and

(b)     make every effort to prevent the use or disclosure of Confidential Information.

12.2     Clause 12.1 does not apply to disclosure of Confidential Information:

(a)     to the extent that it is generally known to the public not as a result of a breach of any duty of confidentiality;

(b)     to a director, officer or employee of the parties whose function requires him to have the Confidential Information;

(c)     with respect to JAFCO, IDG China, IDG Bitmain and IDG Investors, to any existing limited or general partner of such entity as required by law or under the terms of their respective partnership agreements, provided that the recipient is informed of the confidential nature of the Confidential Information and is directed to maintain such confidentiality;

(d)     to the extent that it is required to be disclosed by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any

party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law provided that the disclosure shall be made after consultation with the other parties and after allowing the other parties the opportunity to contest such disclosure and after taking into account the other parties' requirements as to its timing, content and manner of making or despatch;

(e)     to an adviser for the purpose of advising the parties in connection with the transactions contemplated by this Agreement provided that such disclosure is essential for these purposes and is on the basis that Clause 12.1 applies to the disclosure by the adviser; or

(f)     as required or permitted by this Agreement (including the publication of any announcement or public disclosure made in accordance with the terms of Clause 13).

12.3     This Clause 12 shall survive the termination of this Agreement and the restriction on disclosure of Confidential Information shall continue to apply for a period of two years after the date of termination, except for information which ceases to be Confidential Information.

## 13.     ANNOUNCEMENTS

13.1     Subject to Clause 13.2, no party may, before or after Completion, make, issue or send a public announcement, communication or circular concerning the transactions referred to in this Agreement unless it has first consulted with the other parties and taken into account the requirements of the other parties as to its timing, content and manner of making or despatch.

13.2     Clause 13.1 does not apply to a public announcement, communication or circular required by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law, provided that the public announcement, communication or circular shall be made after consultation with the other parties and after taking into account the requirements of the other parties as to its timing, content and manner of making or despatch.

## 14.     COSTS

14.1     Except where this Agreement or the relevant document provides otherwise, each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Agreement and of each document referred to in it.

14.2     Any fees, charges, costs or commissions imposed by any bank, financial institution or intermediary on any payment by way of a bank or wire transfer under this Agreement shall be borne by the party making such transfer, provided that any fees, charges, costs

or commissions imposed by any bank, financial institution or intermediary of the party receiving such transfers shall be borne by the party receiving such payment.

## 15.    GENERAL

15.1    No amendment of this Agreement shall be valid unless it is in writing and duly executed by or on behalf of all of the parties to it.

15.2    No failure or delay by any party hereto in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. If either party breaches its obligations or its Warranties hereunder, the rights of the other parties shall be limited to the rights or remedies set forth in this Agreement.   Each party shall have no other entitlement, remedy or recourse, whether in contract, tort or otherwise, against the other parties with respect to the transactions contemplated by this Agreement, all of such other entitlements, remedies, and recourse being expressly waived by the parties to the fullest extent permitted by applicable law.

15.3    Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

15.4    If a party fails to pay a sum due from it under this Agreement on the due date of payment in accordance with the provisions of this Agreement, that party shall pay interest on the overdue sum from the due date of payment until the date on which its obligation to pay the sum is discharged at the rate of three (3) per cent per annum. Interest accrues and is payable from day to day.

15.5    All payments made by the Sellers or the Purchaser under Clauses 8 and 9 shall be made gross, free of right of counterclaim or set off and without deduction or withholding of any kind other than any deductions or withholding required by law.

15.6    Each of the parties agrees to perform (or procures the performance of) all such acts and things and/or to execute and deliver (or procure the execution and delivery of) all such documents, as may be required by law or as may be necessary or reasonably requested by the parties for giving full effect to this Agreement. Unless otherwise agreed, each party shall be responsible for its own costs and expenses incurred in connection with the provisions of this Clause 15.6.

15.7    Time shall be of the essence of this Agreement as regards any time or period specified herein or which may be varied with the agreement of all of the parties.

15.8    If any payment under this Agreement (except for the payment obligation under Clause 2) will be or has been subject to Tax, the Sellers or the Purchaser shall on demand from the Purchaser or the Sellers (as the case may be) pay to the Purchaser or the Sellers (as the case may be) the amount (after taking into account Tax payable in respect of the amount) (the "**Gross-Up Amount**") that will ensure that the Purchaser or the Sellers (as the case may be) receives and retains a net sum equal to the sum it would have received had the payment not been subject to Tax, provided, that, any Gross-Up

Amount paid shall count toward and be subject to the limitation of liability cap amount provided under Clause 10.3.

15.9    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.10   Any indemnity under this Agreement is independent and survives termination of this Agreement or Completion in accordance with the terms of this Agreement. Any other term by its nature intended to survive termination of this Agreement or Completion survives termination of this Agreement or Completion.

15.11   The parties agree that any indemnification payments made pursuant to this Agreement shall be treated for tax purposes as an adjustment to the Purchase Price, unless otherwise required by applicable laws and regulations.

## 16.    ENTIRE AGREEMENT

16.1    This Agreement constitutes the entire agreement between the parties. It supersedes any previous agreements relating to the subject matter of this Agreement, and sets out the complete legal relationship of the parties arising from or connected with that subject matter.

## 17.    ASSIGNMENT

17.1    Each of the parties to this Agreement shall not assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Agreement, whether in whole or in part, without the prior written consent of each other party.

## 18.    NOTICES

18.1    A notice or other communication under or in connection with this Agreement (a "**Notice**") shall be:

(a)     in writing;

(b)     in English; and

(c)     delivered personally or sent by courier by an internationally recognised courier company or by email, to the party due to receive the Notice at its address set out in Clause 18.3 or to such other address, person or email address as the party may specify by not less than seven (7) days' written notice to the other party received before the Notice was despatched provided that if the Notice is delivered by email it must also be delivered by one of the other methods specified in this Clause 18.1(c).

18.2    In the absence of evidence of earlier receipt, a Notice shall be deemed to have been duly given if:

(a)     delivered personally, when left at the address referred to in Clause 18.1(c);

(b)     sent by courier, two Business Days after posting it; and

(c)     sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 18.2 within one (1) Business Day of sending the email.

18.3    The address and email address referred to in Clause 18.1(c) are:

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Sellers** | Kariya Kayamori<br>8 Orange Grove Road<br>#06-02<br>Singapore 258342 | mike.kayamori@liquid.com | Kariya Kayamori |
| | Seth Melamed<br>2-3-7 Shimomeguro<br>#510<br>Meguro-ku<br>Tokyo<br>Japan 153-0064 | seth@liquid.com | Seth Melamed |
| | JAFCO SV4<br>Investment Limited<br>Partnership<br>c/o JAFCO Group Co.,<br>Ltd.<br>1-23-1 Toranomon,<br>Minato-ku, Tokyo 105-6324, Japan | Shozo.isaka@jafco.c0.jp | Shozo Isaka |
| | IDG China Venture<br>Capital Fund V L.P.<br>c/o IDG Capital<br>Management (HK) Ltd.<br>Unit 5505, 55/F., The<br>Center<br>99 Queen's Road<br>Central, Hong Kong | simon_ho@idgcapital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A,<br>COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R.<br>China | lydia_li@idgcapital.com | Ms. Jing Li |

| | | | |
|---|---|---|---|
| | IDG Bitmain Fund L.P.<br>c/o IDG Capital<br>Management (HK) Ltd.<br>Unit 5505, 55/F., The<br>Center<br>99 Queen's Road<br>Central, Hong Kong | simon_ho@idg<br>capital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A,<br>COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R.<br>China | lydia_li@idgca<br>pital.com | Ms. Jing Li |
| | IDG China V Investors<br>L.P.<br>c/o IDG Capital<br>Management (HK) Ltd.<br>Unit 5505, 55/F., The<br>Center<br>99 Queen's Road<br>Central, Hong Kong | simon_ho@idg<br>capital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A,<br>COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R.<br>China | lydia_li@idgca<br>pital.com | Ms. Jing Li |
| **The Purchaser** | FTX Trading Ltd<br>c/o Corporate & Trust<br>Services (Caribbean)<br>Limited Lower Factory<br>Rd<br>Saint John's<br>Antigua and Barbuda | sam@ftx.com | CEO |
| | with a copy (which<br>shall not constitute<br>notice) to:<br>Anderson Mori &<br>Tomotsune<br>Otemachi Park Building<br>1-1-1, Otemachi<br>Chiyoda-ku<br>Tokyo 100-8136<br>Japan | ken.kawai@am<br>t-law.com | Ken Kawai |

DocuSign Envelope ID: 17282B8E-F560-4B09-8A89-0F696784D819

|  |  |  |  |
|---|---|---|---|
| **The Company** | Liquid Group Inc. Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | mike.kayamori @liquid.com | CEO |
|  | with a copy (which shall not constitute notice) to: Liquid Group Inc. Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | legal@liquid.c om | Legal Department |

## 19.    GOVERNING LAW AND JURISDICTION

19.1    This Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

19.2    Any dispute, controversy or claim arising in any way out of or in connection with this Agreement (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

19.3    The arbitration tribunal ("**Tribunal**") shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

19.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Clause 19 shall be governed by the laws of Singapore.

19.5    The language of the arbitration proceedings shall be English.

19.6    Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

19.7    Nothing in this Clause 19 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-9F69679AD919

## 20.    GOVERNING LANGUAGE

20.1    This Agreement is drawn up in the English language. If this Agreement is translated into another language, the English language text prevails.

20.2    Each Notice, demand, request, statement, instrument, certificate or other communication given, delivered or made by a party to any other party under or in connection with this Agreement shall be:

   (a)    in English; or

   (b)    if not in English, accompanied by an English translation made by a translator, and certified by such translator to be accurate in all material aspects.

20.3    The receiving party shall be entitled to assume the accuracy of and rely upon any English translation of any document provided pursuant to Clause 20.2(b).

## 21.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

**SCHEDULE 1**
**INFORMATION ON THE SELLERS**

**SHARES, STOCK OPTIONS AND CLASS C-1 PREFERENCE SHARES WARRANTS HELD**

| Name | Common Shares | Class A Preference Shares | Class B Preference Shares | Class C-1 Preference Shares | Stock Options | | | Class C-1 Preference Shares Warrants |
|---|---|---|---|---|---|---|---|---|
| | | | | | Series 3 | Series 10 | Series 13 | |
| **Kariya Kayamori** | 12,800 | 50 | - | - | - | - | - | - |
| **Seth Melamed** | 12,203 | - | - | - | 180 | 30 | 300 | - |
| **JAFCO SV4 Investment Limited Partnership** | - | - | 5,778 (5,983 [Note 1]) | - | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | 1,363 | - | - | 7,445 | - | - | - | 2,484 |
| **IDG Bitmain Fund L.P.** | 192 | - | - | 1,054 | - | - | - | - |
| **IDG China V Investors L.P.** | 79 | - | - | 429 | - | - | - | 141 |

*Note 1: As converted*

**SCHEDULE 2**
**ALLOCATION OF CONSIDERATION**

1.      **Total Consideration**

| Seller | Type of Target Security Interest | Number of Target Security Interests | Price per Target Security Interest | Total Consideration |
|---|---|---|---|---|
| **Kariya Kayamori** | Common Shares | 12,800 | $3,510.41 | $45,108,768.50 |
| | Class A Preference Shares | 50 | $3,510.41 | |
| **Seth Melamed** | Common Shares | 12,203 | $3,510.41 | $44,516,390.23 |
| | Stock Options | 180 | $3,509.54 | |
| | Stock Options | 30 | $3,103.16 | |
| | Stock Options | 300 | $3,180.15 | |
| **JAFCO SV4 Investment Limited Partnership** | Class B Preference Shares | 5,778 (5,983 [Note 1]) | $3,510.41 | $21,002,783.03 |
| **IDG China Venture Capital Fund V L.P.** | Common Shares | 1,363 | $3,510.41 | $34,908,076.20 |
| | Class C Preference Shares | 7,445 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 2,484 | $1,605.63 | |
| **IDG Bitmain Fund L.P.** | Common Shares | 192 | $3,510.41 | $4,373,970.86 |
| | Class C Preference Shares | 1,054 | $3,510.41 | |
| **IDG China V Investors L.P.** | Common Shares | 79 | $3,510.41 | $2,009,682.11 |
| | Class C Preference Shares | 429 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 141 | $1,605.63 | |

*Note 1: As converted*

2.      **Allocation of Total Consideration**

| Seller | Cash Consideration | Crypto Consideration | Consideration Shares |
|---|---|---|---|
| **Kariya Kayamori** | $10,000,000 | $9,021,753.70 | $26,087,014.80 |
| **Seth Melamed** | $8,903,278.05 | $8,903,278.05 | $26,709,834.14 |
| **JAFCO SV4 Investment Limited Partnership** | $21,002,783.03 | - | - |
| **IDG China Venture Capital Fund V L.P.** | $34,908,076.20 | - | - |
| **IDG Bitmain Fund L.P.** | $4,373,970.86 | - | - |
| **IDG China V Investors L.P.** | $2,009,682.11 | - | - |

3.      **Consideration Paid at Completion**

| Seller | Number of Consideration Shares | Initial Cash Consideration |
|---|---|---|
| **Kariya Kayamori** | 995,307 | $10,000,000.00 |
| **Seth Melamed** | 1,019,070 | $8,903,278.05 |
| **JAFCO SV4 Investment Limited Partnership** | - | $16,802,226.42 |
| **IDG China Venture Capital Fund V L.P.** | - | $27,926,460.96 |
| **IDG Bitmain Fund L.P.** | - | $3,499,176.69 |
| **IDG China V Investors L.P.** | - | $1,607,745.69 |

4.      **Retained Consideration**

| Seller | Retained Cash Consideration | Bitcoin (BTC) | Ether (ETH) | Solana (SOL) | FTX Token (FTT) |
|---|---|---|---|---|---|
| **Kariya Kayamori** | - | BTC 52.870 | ETH 757.25 | - | FTT 64,219 |
| **Seth Melamed** | - | BTC 39.132 | ETH 560.48 | SOL 11,884.98 | FTT 47,532 |
| **JAFCO SV4 Investment Limited Partnership** | $4,200,556.61 | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | $6,981,615.24 | - | - | - | - |
| **IDG Bitmain Fund L.P.** | $874,794.17 | - | - | - | - |
| **IDG China V Investors L.P.** | $401,936.42 | - | - | - | - |

**SCHEDULE 3**
**BANK ACCOUNT INFORMATION OF THE SELLERS**

| Seller | Bank Account Details |
|---|---|
| **Kariya Kayamori** | [To be provided prior to Completion]<br><br>Bank Name     :<br>Branch         :<br>SWIFT Code   :<br>Address        :<br>Account No.   :<br>Account Name : |
| **Seth Melamed** | Bank Name     :  JPMorgan Chase<br>Branch         :  Shattuck and Channing<br>Routing       :  124001545<br>SWIFT Code   :  CHASUS33XX<br>Address        :  2390 Shattuck Ave. Berkeley, CA<br>Account No.   :  895866890<br>Account Name :  Seth Melamed |
| **JAFCO SV4 Investment Limited Partnership** | Bank Name     :  Mizuho Bank, Ltd.<br>Branch         :  KABUTOCHO CORPORATE BANKING AND SECURITIES BUSINESS DEPARTMENT<br>SWIFT Code   :  MHCBJPJT<br>Address        :  6-7 Nihombashikabutocho, Chuo-ku, Tokyo 103-0026, Japan<br>Account No.   :  113- 5449987 (Branch No. - Account No.)<br>Account Name :  JAFCO SV4 Investment Limited Partnership |

| Seller | Bank Account Details |
|---|---|
| **IDG China Venture Capital Fund V L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No. : 1001657806<br>Account Name : IDG China Venture Capital Fund V L.P. |
| **IDG Bitmain Fund L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, NC 27701<br>Account No. : 1001787223<br>Account Name : IDG Bitmain Fund L.P. |
| **IDG China V Investors L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No. : 1001658945<br>Account Name : IDG China V Investors L.P. |

**SCHEDULE 4**
**INFORMATION ON THE GROUP COMPANIES**

| Name | Place of Incorporation | Date of Incorporation | Registered Office |
|---|---|---|---|
| Liquid Group Inc. | Japan | 1 March 2019 | 3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan |
| Quoine Corporation | Japan | 25 November 2014 | 3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan |
| Liquid Securities Singapore Pte. Ltd. | Singapore | 3 January 2019 | 30 Cecil Street #19-08<br>Prudential Tower<br>Singapore 049712 |
| Quoine Pte. Ltd. | Singapore | 15 May 2019 | 8 Orange Grove Road #06-02<br>Singapore 258342 |
| Analisya Pte. Ltd. | Singapore | 11 July 2013 | 8 Orange Grove Road #06-02<br>Singapore 258342 |
| Quoine India Private Limited | India | 29 November 2017 | F-143, Richmond Park<br>DLF City, Phase-4<br>Gurugram, Haryana-HR<br>Gurgaon, 122001<br>India |
| Quoine Vietnam Company Limited | Vietnam | 18 August 2017 | Floor 1st, Empress Tower<br>No 138-142 Hai Ba Trung Street<br>Da Kao Ward, District 1<br>Ho Chi Minh City<br>Vietnam |

## SCHEDULE 5
## COMPLETION REQUIREMENTS

1. **Sellers' obligations**

1.1    At Completion, the Sellers shall deliver or procure to be delivered to the Purchaser:

(a)    evidence in a form reasonably satisfactory to the Purchaser of satisfaction of the Conditions set out in Clause 5.1;

(b)    with respect to each Seller that is not a natural person, as evidence of the authority of each person executing a document referred to in this Schedule 5 on such Seller's behalf (if applicable):

(i)    a copy of the relevant extract of the minutes of a duly held meeting of the directors of such Seller (or a duly constituted committee thereof) authorising the execution by such Seller of the document and, where such execution is authorised by a committee of the board of directors of such Seller, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

(ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the company secretary of such Seller.

(c)    the Final Customer Balance Statement, as certified by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(d)    an application and any other document required to change the Company's shareholders register (*kabunushi meibo*) and stock option holders register (*shinkabu yoyaku ken genbo*) with the Sellers' signatures (including electronic signatures) or corporate seals to reflect the transfer of the Target Security Interests;

(e)    a certified copy of the shareholders register (*kabunushi meibo*) of the Company reflecting the sale and purchase of the Target Shares dated as of the Completion Date;

(f)    a certified copy of the stock option holders register (*shinkabu yoyaku ken genbo*) of the Company reflecting the sale and purchase of the Target Options and the Target Warrants dated as of the Completion Date;

(g)    the Minority Shareholders SPA(s) duly executed on behalf of the Minority Shareholders who provided a power of attorney to any Seller or any of the Group Companies, or any other Person agreed by the Purchaser, for such execution, or evidence in a form reasonably satisfactory to the Purchaser that the Shareholders required under the Shareholders' Agreements to exercise the

- 41 -

drag-along rights under the Shareholders' Agreements have exercised such rights;

(h)    a letter to the Company and Quoine Corporation from the below directors resigning their office (*jinin todoke*) as directors of each of the Company and Quoine Corporation with effect on or prior to the Completion Date:

    (i)    Shozo Isaka; and

    (ii)    Toh Li;

(i)    the Management Agreements between each of the Management Shareholders and the Company duly executed by the parties thereto; and

(j)    evidence in a form reasonably satisfactory to the Purchaser that the employment agreements of at least 70% of the full-time employees of the Group remain effective.

1.2    The Sellers shall procure that at or prior to Completion a meeting of the Board of Directors is held at which the directors approve:

(a)    the transfer of the Target Security Interests; and

(b)    the entering into the Agreement or the Minority Shareholders SPA(s) (as applicable), and

at Completion the Sellers shall deliver to the Purchaser a certified copy of the above resolutions.

## 2.    Purchaser's obligations

2.1    At Completion, the Purchaser shall deliver to the Sellers:

(a)    evidence in a form reasonably satisfactory to the Sellers of satisfaction of the Conditions set out in Clause 5.1; and

(b)    as evidence of the authority of each person executing a document referred to in this Schedule on the Purchaser's behalf:

    (i)    a copy of the relevant extract of the minutes of a duly held meeting of the directors of the Purchaser (or a duly constituted committee thereof) authorising the execution by the Purchaser of the document and, where such execution is authorised by a committee of the board of directors of the Purchaser, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

    (ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the secretary of the Purchaser.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F59679AD919

2.2    At Completion, the Purchaser shall:

    (a)    allot and issue the Consideration Shares to the relevant Sellers; and

    (b)    subject to the provision by the relevant Sellers of applicable anti-money laundering and "know your customer" materials required by the Transfer Agent, provide a copy of the executed request to the Transfer Agent to effect the registration of the Consideration Shares, in the name of the relevant Sellers, in the register of members of the Purchaser; provided that if any such anti-money laundering and "know your customer" materials are not provided by the relevant Sellers on or prior to Completion, the Purchaser shall instruct the Transfer Agent to effect such registration promptly after such materials are provided by the relevant Sellers.

2.3    At Completion, the Purchaser shall:

    (a)    pay, in USD, the Initial Cash Consideration to the Company in accordance with Clause 2.3 of this Agreement;

    (b)    withhold, in USD, the Retained Cash Consideration in accordance with Clause 2.4 of this Agreement; and

    (c)    withhold the Crypto Consideration in a manner to be agreed in good faith in accordance with Clause 2.4 of this Agreement.

**SCHEDULE 6**
**WARRANTIES**


**PART A**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

1.    **CAPACITY AND AUTHORITY**

1.1    **Right, power, authority and action**

(a)    Such Seller has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed by such Seller at or before Completion in connection with the transactions contemplated under the Agreement.

(b)    The entry into and performance by such Seller of, and the transactions contemplated by, this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under this Agreement do not conflict with, or result in a breach of:

(i)    any law or regulation applicable to it; or

(ii)    any document which is binding upon it.

(c)    The Company has the right, power and authority to conduct its business as conducted at the date of this Agreement.

1.2    **Binding agreements**

Such Seller's obligations under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement are, or when the relevant document is executed will be, enforceable in accordance with their terms.

1.3    **Anti-Social Force**

Such Seller is not, and does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

2.    **INFORMATION**

2.1    **The Agreement**

All information provided by or on behalf of such Seller and/or the Company (including any information provided by such Seller to the Purchaser via the Company) in the course of the Due Diligence Review conducted by or on behalf of the Purchaser and in the course of negotiations leading to this Agreement by or on behalf of such Seller, and

the information set out in this Agreement with respect to such Seller is true, accurate and not misleading in all material respects.

2.2    **Material information**

All information about the Shares, the Stock Options and the Class C-1 Preference Shares Warrants and the Group's business which might be material for disclosure to a Purchaser of the Shares, the Stock Options and the Class C-1 Preference Shares Warrants has been disclosed by or on behalf of such Seller (including by the Company for itself and for and on behalf of such Seller) to the Purchaser in writing.

2.3    **Information for disclosure**

All statements in the Disclosure Documents in relation to such Seller and all documents and information provided or made available by or on behalf of such Seller for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

3.    **SHARES AND AFFILIATES**

3.1    The Target Shares, the Target Options and the Target Warrants

(a)    Such Seller is the sole legal and registered owner of the number of the Target Shares, the Target Options and Target Warrants set out opposite such Seller's name in Schedule 1as applicable.

(b)    The Shares comprise the whole of the Company's allotted and issued share capital, have been properly allotted and issued and are fully paid or credited as fully paid.

(c)    Other than the Shareholders' Agreements, there is no Encumbrance, and there is no agreement, arrangement or obligation to create or give an Encumbrance, in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller. No person has claimed to be entitled to an Encumbrance in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller.

(d)    Other than the Stock Options, Class C-1 Preference Shares Warrants, this Agreement and the Shareholders' Agreements, there is no agreement, arrangement or obligation requiring the creation, allotment, issue, transfer, redemption or repayment of, or the grant to a person of the right (conditional or not) to require the allotment, issue, transfer, redemption or repayment of, a share in the capital of the Company (including, without limitation, an option or right of pre-emption or conversion).

3.2    **Affiliates**

(a)    The Company does not have any subsidiaries other than the entities listed in Schedule 4.

(b)    The Company has no interest in, and has not agreed to acquire an interest in or merge or consolidate with, a corporate body or any other person.

## 4.    ACCOUNTS

### 4.1    General

(a)    The Accounts have been prepared and audited on a proper and consistent basis in accordance with the law and applicable standards, principles and practices generally accepted in Japan.

(b)    The Accounts show a true and fair view of the assets, liabilities and state of affairs of the Company as at the Last Accounting Date and of the profits and losses of the Company for the financial year ended on the Last Accounting Date.

### 4.2    Provision for Tax

The Accounts reserve or provide in accordance with applicable standards, principles and practices generally accepted in Japan for all Tax liable to be assessed on the Company, or for which it is or may become accountable, for all periods commencing on or before the Last Accounting Date (whether or not the Company has or may have a right of reimbursement against another person) in all material respects.    The Accounts reserve in accordance with applicable standards, principles and practices generally accepted in Japan for all contingent or deferred Liabilities to Tax for all periods commencing on or before the Last Accounting Date in all material respects.

### 4.3    Accounting records

The Company's accounting records are up-to-date, in its possession or under its control and are properly completed in accordance with the law and applicable standards, principles and practices generally accepted in Japan in all material respects.

## 5.    CHANGES SINCE THE LAST ACCOUNTING DATE

### 5.1    General

Since the Last Accounting Date, other than in connection with the Crypto Asset Breach:

(a)    the Group's business has been operated in the usual way in all material respects so as to maintain it as a going concern;

(b)    no matter, event or incident with Material Adverse Effect on the Group has occurred; and

(c)    no material change has occurred in the assets and Liabilities shown in the Accounts and there has been no reduction in the value of the net tangible assets of the Group on the basis of the valuations used in the Accounts.

5.2 **Specific**

Since the Last Accounting Date:

(a) the Group has not, other than in connection with the Crypto Asset Breach:

(i) made, or agreed to make, capital expenditure exceeding in total JPY100,000,000; or

(ii) incurred, or agreed to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000; and

(b) no resolution of the Shareholders (other than ordinary business conducted at an annual general meeting or the resolutions contemplated in this Agreement) has been passed.

6. **TAX**

6.1 **General**

(a) The Company is and has at all times been subject to or assessed on Taxes in Japan only and each of the Group (other than the Company) is and has at all times been subject to or assessed on Taxes in the jurisdiction where it was incorporated, except where it would not have a Material Adverse Effect on the Group taken as a whole.

(b) The Group has paid all Tax which it has become liable to pay and is not, and has not been, from the respective date of incorporation of each Group Company, liable to pay a penalty, surcharge, fine or interest in connection with Tax, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.2 **Tax Returns**

The Group has made all such returns, provided all such information and maintained all such records in relation to Tax as are required to be made or provided or maintained by it and to the knowledge of the Sellers, none of such returns is disputed by the Tax Authority concerned, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.3 **Disputes**

The Group is not, in relation to the business, involved in a dispute with any Tax Authority. To the best of such Seller's knowledge, information and belief, no Tax Authority has investigated or indicated that it intends to investigate the Tax affairs of the Group.

6.4 No Tax Authority has disputed the inclusion of taxable income from the Group in the Tax computations of the Group in respect of each of its financial years from the

respective date of incorporation of each Group Company. No such dispute is outstanding or pending and there are no circumstances known to such Seller which are likely to give rise to such dispute.

7.    **ASSETS**

7.1    **Sufficiency of Assets**

(a)    The amounts of digital assets actually held and controlled by the Company are, on a digital asset-by-digital asset basis (including all delisted digital assets), at least equal to the aggregate balances held by all customers of the Group (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) for each digital asset, other than up to USD 100,000,000 of deficiencies incurred in connection with the Crypto Asset Breach (measured at the time of such Crypto Asset Breach). The Company has good and valid title to all of such digital assets, free and clear of all Encumbrances (the "**Sufficiency Representation**").

(b)    The amounts of (i) the out of pocket costs of the Group to replace any of the crypto assets lost in the Crypto Asset Breach and not otherwise recovered by the Group as of or prior to Completion (the "**Lost Assets**"), including any premium paid by a Group Company for such replacement and (ii) the market value of any Lost Assets that are not replaced or recovered by the Group as of or prior to Completion, do not, in the aggregate, exceed USD100,000,000.

7.2    **Title and Condition**

(a)    Each material asset included in the Accounts or acquired by the Group since the Last Accounting Date (other than stock disposed of in the usual course of business) and each material asset used by the Group or which is in the reputed ownership of the Group is:

(i)    owned solely by the Group free from any Encumbrance;

(ii)    not subject to any agreement for lease, hire, hire purchase or sale on deferred, credit or conditional terms; and

(iii)    where capable of possession, in the possession or under the control of the Group.

(b)    The Company owns or has the right to use each asset necessary for the effective operation of its business.

7.3    **Debt**

(a)    No debt shown in the Accounts or the Group's accounting records greater than JPY100,000,000 is overdue by more than four weeks or is the subject of an arrangement.

(b)    The Group has not released a debt greater than JPY100,000,000 shown in the Accounts or its accounting records so that the debtor has paid or will pay less than the debt's book value. None of the debts greater than JPY100,000,000 shown in the Accounts or the Group's accounting records has been deferred, subordinated or written off or become irrecoverable to any extent.

8.    **INTELLECTUAL PROPERTY**

8.1    Each of the Intellectual Property Rights owned by the Group is:

(a)    valid and enforceable and nothing has been done or omitted to be done by which it may cease to be valid and enforceable;

(b)    owned by the Group alone, free from any licence, Encumbrance or restriction on use; and

(c)    to the best of such Seller's knowledge, information and belief, will not be, the subject of a claim or opposition from a person (including, without limitation, an employee of the Group) as to title, validity, enforceability, entitlement or otherwise.

8.2    Each of the Intellectual Property Rights used but not owned by the Group is validly licensed to the Group and which are not terminable as a result of any transaction contemplated in this Agreement, except where such termination would not have a Material Adverse Effect.

8.3    The Group has not granted and is not obliged to grant a licence, assignment, consent, undertaking, security interest or other right in respect of any of its material Intellectual Property Rights.

8.4    The Intellectual Property Rights comprise all the Intellectual Property necessary for the Group to operate its business as it has been operated before the date of this Agreement.

9.    **AGREEMENT**

9.1    **Validity of Agreements**

(a)    To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might invalidate or give rise to a ground for termination, avoidance or repudiation of an agreement to which any of the Group is a party, which would reasonably be likely to have a Material Adverse Effect on the Group, and no party to such an agreement has given notice of its intention to terminate, or has sought to repudiate or disclaim, such an agreement.

(b)    Neither the Group nor, to the best of such Seller's knowledge, information and belief, any party with whom any of the Group has entered into an agreement is in material breach of any such agreement, except where it would not have a Material Adverse Effect on the Group taken as a whole.

9.2    **Material Agreements**

DocuSign Envelope ID: 17282B8E-F560-4509-8AB9-9F69678AD81B

(a)     To the best of such Seller's knowledge, information and belief, the Group is not a party to, and is not liable under, any material long-term, onerous or unusual agreement, arrangement or obligation including, without limitation:

  (i)     an agreement, arrangement or obligation entered into other than in the usual course of its business exceeding JPY100,000,000;

  (ii)    an agreement, arrangement or obligation entered into other than at arm's length negotiation exceeding JPY100,000,000; or

  (iii)   an agreement, arrangement or obligation restricting the Group's freedom to operate the whole or part of its business or to use or exploit any of its assets.

(b)     The Group is not a member of a joint venture or partnership.

## 10.     TERMS OF TRADE AND BUSINESS

### 10.1    Creditors

No debt owed by the Company exceeding JPY100,000,000 has been overdue for more than four weeks.

## 11.     EFFECT OF SALE

Neither the execution nor the performance of this Agreement or any document to be executed at or before Completion will result in the Company losing the benefit of any material asset, grant, subsidy, right or privilege which it enjoys at the date of this Agreement or will conflict with, result in a breach of, give rise to an event of default under, require the consent of a person under, enable a person to terminate or relieve a person from an obligation under any material agreement or arrangement to which any of the Group is a party or any legal or administrative requirement by which the Group is bound.

## 12.     EMPLOYEES

### 12.1    General

(a)     The Group has not given notice of termination or received notice of resignation from any key employees.

(b)     The Group owes no more than JPY10,000,000 in the aggregate to any of its present or former directors, other officers or employees (or any of their respective dependants) other than for accrued remuneration or reimbursement of business expenses.

(c)     The Group has maintained up-to-date and accurate records regarding the employment of each of its employees and termination of employment. There

are no unpaid wages or other payments owing to any former or current directors, officers and employees.

(d)     There is no agreement or arrangement between such Seller and any of the Group's employees providing for any payments or other benefits in connection with the transactions contemplated under this Agreement.

(e)     None of the Group's employees is currently subject to disciplinary or grievance proceedings.

## 12.2    Compliance With Law

(a)     The Group has complied with all material obligations imposed on it under applicable labor or employment laws and regulations.

(b)     To the best of such Seller's knowledge, information and belief, there is no investigation or enquiry outstanding or anticipated by the Labor Standards Supervision Office (*roudou kijun kantoku sho*) or other governmental organisation or statutory body in connection with the Group.

(c)     There are no active, pending or, to the best of such Seller's knowledge, information and belief, threatened court, tribunal or arbitration proceedings in respect of any existing or former employees of the Group.

(d)     The Company has maintained adequate insurance including employer's liability insurance in respect of its existing and former employees and has been and is in compliance with the Employment Insurance Act (Act No. 116 of 1974, as amended) in Japan, except where it would not have a Material Adverse Effect on the Group taken as a whole.

## 12.3    Incentive Schemes

Other than the Stock Options, the Group does not have and is not proposing to introduce a share incentive, share option, profit sharing, bonus or other incentive scheme for any of its directors, other officers or employees.

## 13.    PENSIONS

13.1    For the purpose of this Paragraph 13, "**Relevant Employee**" means a director or officer or employee or former director or officer or employee of the Company.

13.2    Except for those provided in the Work Rules (*shugyo kisoku*) or any equivalent rules (the "**Scheme**"), the Group is not under any liability or obligation, and is not a party to any ex-gratia arrangement or promise, to pay any retirement benefit, pension, gratuity, annuity, superannuation allowance or the like, or life assurance, medical insurance or permanent health payments or the like, to or for any Relevant Employees or their dependants or other person; and there are no retirement benefits, or pension or death benefits, provident funds or schemes, life assurance or health insurance or health protection, or similar schemes or arrangements in relation to, or binding on, the Group

or to which the Group contributes or has contributed or proposes to contribute, except where it would not have a Material Adverse Effect on the Group taken as a whole.

13.3    Neither the Group nor any of the Relevant Employees is a party to any legal, arbitration, administrative or other proceedings in relation to the Scheme. There are no pending or threatened claims, investigations, lawsuits or arbitrations which have been or may be asserted or instituted against either the Group or any of the Relevant Employees in relation to the Schemes.

## 14.    LIABILITIES

### 14.1    Indebtedness

Except as disclosed in the Accounts, the Group does not have outstanding and has not agreed to create or incur loan capital, borrowings or indebtedness in the nature of borrowings in excess of JPY100,000,000.

### 14.2    Guarantees and Indemnities

(a)    The Group is not a party to and is not liable under a guarantee, indemnity or other agreement to secure or incur a financial or other obligation with respect to another person's obligation exceeding JPY100,000,000.

(b)    No part of the loan capital, borrowings or indebtedness in the nature of borrowings of the Group exceeding JPY100,000,000 is dependent on the guarantee or indemnity of, or security provided by, another person.

### 14.3    Events of Default

No event has occurred or been alleged to have occurred which:

(a)    constitutes an event of default, or otherwise gives rise to an obligation to repay, under an agreement relating to borrowing or indebtedness in the nature of borrowing (or will do so with the giving of notice or lapse of time or both) exceeding JPY100,000,000; or

(b)    will lead to any material Encumbrance constituted or created in connection with borrowing or indebtedness in the nature of borrowing, a guarantee, an indemnity or other obligation of the Group becoming enforceable (or will do so with the giving of notice or lapse of time or both).

## 15.    PERMITS

15.1    The Group has obtained, and has materially complied with the terms and conditions of, each Permit.

15.2    Each Permit is in force and unconditional or subject only to a condition that has been satisfied. To the best of such Seller's knowledge, information and belief, no Permit will be revoked, suspended, cancelled, varied or not renewed.

15.3    Each action required for the renewal or extension of each Permit has been taken.

15.4    To the best knowledge of such Seller, no Permit will be revoked, suspended, cancelled, varied or not renewed as a result of the execution or performance of this Agreement or any document to be executed at or before Completion.

## 16.    INSOLVENCY, WINDING UP, ETC.

16.1    For the purpose of this Paragraph 16, "**Proceeding**" means any claim, action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private), provisional attachment (*kari-sashiosae*), attachment (*sashiosae*), preservative disposition (*hozen-shobun*), protective attachment (*hozen-sashiosae*), procedure for collection of tax delinquency (*tainou-shobun*), compulsory execution (*kyosei-shikko*), provisional injunction (*kari-shobun*), other judicial or administrative proceeding and any other formal or informal inquiry, investigation or inspection commenced or threatened to be commenced, brought, heard or otherwise conducted by or before any governmental authority or arbitrator, and "**Bankruptcy Proceeding**" means bankruptcy proceedings (*hasan*), corporate reorganization proceedings (*kaisha kosei*), civil rehabilitation proceedings (*minji saisei*), special liquidation (*tokubetu seisan*), and other similar proceedings under applicable law or any rules or regulations of any governmental authority.

16.2    There is no pending Proceeding that has been commenced, or no threat of any Proceeding commencing, against the Group that challenges, or may prevent, delay or otherwise interfere with, the transaction contemplated under this Agreement.

16.3    No Bankruptcy Proceeding has been commenced, or no threat of any Bankruptcy Proceeding commencing, with respect to the Group, and the Group has not suspended its payments and is not insolvent.

## 17.    LITIGATION AND COMPLIANCE WITH LAW

17.1    **Litigation**

(a)    Neither the Group nor a person for whose acts or defaults the Group may be vicariously liable is involved, or has during the two years ending on the date of this Agreement been involved, in any material civil, criminal, arbitration, administrative or other proceeding. No material civil, criminal, arbitration, administrative or other proceeding is pending or, to the best of such Seller's knowledge, information and belief, threatened by or against the Group or a person for whose acts or defaults the Company may be vicariously liable.

(b)    To the best of the Sellers' knowledge, information and belief, no fact or circumstance exists which might give rise to any material civil, criminal, arbitration, administrative or other proceeding involving the Group or a person for whose acts or defaults the Group may be vicariously liable.

(c)     There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or governmental agency against the Group or a person for whose acts or defaults the Group may be vicariously liable.

## 17.2    Compliance With Law

The Group has conducted its business and dealt with its assets in all material respects in accordance with all applicable laws and regulations and legal and administrative requirements.

## 17.3    Investigations

There is not and has not been any governmental or other enquiry or disciplinary proceeding concerning the Group and none is pending or threatened.   To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might give rise to an investigation, enquiry or proceeding of that type.

## 17.4    Making Unlawful Payments

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Company may be vicariously liable has paid, offered, promised, given or authorised the payment of money or anything of value directly or indirectly to any person:

(a)     intending to induce a person to improperly perform a function or activity or to reward a person for any such performance; or

(b)     while knowing or believing that the acceptance by that person would constitute the improper performance of a function or activity.

## 17.5    Receiving Unlawful Payments

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Group may be vicariously liable has directly or indirectly requested, agreed to receive or accepted money or anything of value:

(a)     as a reward for the improper performance of a function or activity by any person;

(b)     in circumstances which amount to an improper performance of a function or activity; or

(c)     intending that as a consequence of any such request, agreement to receive or acceptance a function or activity will be performed improperly.

## 18.    DATA PROTECTION AND CYBERSECURITY

18.1    The Group has complied with the Personal Data Protection Act (Law No. 57 of 2003, as amended) in Japan and all other applicable laws and regulations regulating data protection, privacy or the recording, monitoring or interception of communications (the

"**Data Protection Laws**"), except where it would not have a Material Adverse Effect on the Group taken as a whole.

18.2 Other than in connection with the Crypto-asset Breach, to the knowledge of such Seller, no other unauthorized party has access to or has had access to any hot, cold and warm wallets associated with any customer digital assets of the Group.

## 19. ARTICLES OF INCORPORATION, REGISTERS AND RETURNS

### 19.1 Articles of Incorporation

The Group is operating and has always operated its business in all material respects in accordance with its Articles of Association or any constitutional documents at the relevant time.

### 19.2 Registers

Each register, minute book and other book which the Group is required by law to keep has been properly kept and contains a proper record of the matters which it is required by the relevant law to record, except where it would not have a Material Adverse Effect on the Group taken as a whole or the Purchaser. No notice has been received or allegation made that a register or book is incorrect or should be rectified.

### 19.3 Returns

All returns, particulars, resolutions and other documents required to be delivered by the Group to the Legal Affairs Bureau (*houmu kyoku*) or another governmental or other authority or agency have been properly prepared and delivered.

## 20. BROKERAGE OR COMMISSIONS

No person is entitled to receive a finder's fee, brokerage or commission from the Group in connection with this Agreement.

## PART B
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

1.   **Incorporation**

The Purchaser is a company duly incorporated and validly existing under the laws of Antigua and Barbuda.

2.   **Right, power, authority and action**

(a)   The Purchaser has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement.

(b)   The entry into and performance by the Purchaser of, and the transactions contemplated by this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement do not conflict with, or result in a breach of:

(i)    any law or regulation applicable to it;

(ii)   its constitutional documents (if applicable); or

(iii)   any document which is binding upon it.

(c)   The Purchaser has the right, power and authority to conduct its business as conducted at the date of this Agreement.

3.   **Anti-Social Forces**

The Purchaser is not, does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

4.   **Binding agreements**

The Purchaser's obligations under this Agreement and each document to be executed at or before Completion are, or when the relevant document is executed will be, enforceable in accordance with their terms.

5.   **Funds**

At Completion, the Purchaser will have adequate funds and assets sufficient to pay for the Initial Cash Consideration, the Retained Cash Consideration, the Crypto Consideration and other amounts to be paid by the Purchaser under this Agreement.

6.   **Share Issuance**

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F59679AD31B

At Completion, the Purchaser completes all necessary procedures to issue and allot the Consideration Shares to the Sellers in compliance with the applicable laws, regulations and rules. Upon issuance, the Consideration Shares are fully paid or credited as fully paid and free from all Encumbrances together with all rights attaching thereto.

7.    **Information**

All statements in the Disclosure Documents in relation to the Purchaser and all documents and information provided or made available by or on behalf of the Purchaser for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

8.    **Completeness of Disclosure**

All information contained in this Agreement and all other information furnished by or on behalf of the Purchaser to the Sellers or the Sellers' advisers before and during the negotiation leading up to this Agreement is true and accurate in all material respects.

## SCHEDULE 7
## SELLER ACTIONS PENDING COMPLETION

Unless otherwise directed or approved in advance by the Purchaser in writing or contemplated under this Agreement, the Sellers shall ensure that each Group Company will:

1.     not amend, or agree to amend, the Articles of Incorporation;

2.     not approve a transfer of Shares by any Shareholder except for the transfers contemplated under this Agreement and the Minority Shareholders SPA except for certain contemplated transfers as provided in the Disclosure Schedules;

3.     not create, allot, issue, acquire, repay or redeem any share or loan capital or agree, arrange or undertake to do any of those things or acquire or agree to acquire, an interest in a corporate body or merge or consolidate with a corporate body or any other person, enter into any demerger transaction or participate in any other type of corporate reconstruction;

4.     not pass any resolution for its dissolution, winding up or liquidation or enter into any composition, reconstruction or arrangement with its creditors generally;

5.     excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not acquire or dispose of, or agree to acquire or dispose of, any revenues, assets, business or undertakings exceeding in total JPY100,000,000;

6.     excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not to assume or incur, or agree to assume or incur, a liability, obligation or expense (actual or contingent) exceeding in total JPY100,000,000;

7.     excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not make, or agree to make, capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time) or incur, or agree to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time);

8.     not declare, pay or make a dividend or distribution or any reduction of capital;

9.     not create, or agree to create or amend, an Encumbrance over any property or asset or redeem, or agree to redeem, an existing Encumbrance over any property or asset;

10.    not enter into a long-term, onerous, unusual or material agreement, arrangement or obligation in each case, involving consideration, expenditure or Liabilities in excess of JPY500,000,000 other than in the ordinary course of business;

11.    not amend or terminate a material agreement, arrangement or obligation to which it is a party or terminate any contract or commitment which is not capable of being terminated without compensation or which is not in the ordinary course of business or which involves or may involve total annual expenditure of JPY500,000,000;

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69678AD818

12.     not amend the terms and conditions of employment or engagement of a director or officer or provide, or agree to provide, a gratuitous payment or benefit to a director or officer (or any of their dependants);

13.     not amend, or agree to amend, the terms of its borrowing or indebtedness in the nature of borrowing or create, incur, or agree to create or incur, borrowing or indebtedness in the nature of borrowing, in each case involving an amount of greater than JPY100,000,000;

14.     not give, or agree to give, a guarantee, indemnity or other agreement to secure, or incur financial or other obligations with respect to, another person's obligation;

15.     not make any material changes to its accounting or book-keeping practices or policies;

16.     not commence any claim or litigation or arbitration proceedings, nor compromise, settle, release, discharge or compound any claim or litigation or arbitration proceedings or any action, demand or dispute or waive a right in relation to any claim or litigation or arbitration proceedings;

17.     conduct its business in all material respects in accordance with all applicable legal and administrative requirements in any jurisdiction;

18.     not carry out any activities or actions which are likely to cause a Material Adverse Effect; and

19.     co-operate with the Purchaser to:

(a)     allow the Purchaser and its agents, upon reasonable request, access to, and to take copies of, the books and records of the Company to a reasonable extent; and

(b)     ensure the efficient continuation of management and operations of the Company after Completion.

## SCHEDULE 8
## DISCLOSURE SCHEDULES

These Disclosure Schedules (the "*Disclosure Schedules*") have been prepared and delivered in connection with the Agreement for the Sale and Purchase of Shares in Liquid Group Inc. (Major Shareholders) (the "*Agreement*"), dated as of November 19, 2021 among FTX Trading Ltd., Liquid Group Inc., IDG China Venture Capital Fund V L.P., IDG Bitmain Fund L.P., IDG China V Investors L.P., JAFCO SV4 Investment Limited Partnership, Kariya Kayamori, and Seth Melamed. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

In disclosing the information provided in these Disclosure Schedules, the Sellers expressly do not waive any attorney-client privilege associated with such information.

The information contained in any clause or paragraph of these Disclosure Schedules shall be deemed to be disclosed in any other clause or paragraph of these Disclosure Schedules to the extent the relevance of such information to such other clause or paragraph is reasonably apparent.

The inclusion of an item in these Disclosure Schedules as an exception to a representation or warranty made by any of the Sellers in the Agreement shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would have a Material Adverse Effect or that such item is required to be listed therein.

No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Certain agreements and other matters are listed in these Disclosure Schedules for informational purposes only and in no event shall the listing of such agreements or other matters be deemed or interpreted to broaden or otherwise amplify the scope of the representations and warranties or covenants of any of the Sellers in the Agreement.

Headings have been inserted in these Disclosure Schedules for convenience of reference only and shall not be deemed to modify or influence the interpretation of information contained in these Disclosure Schedules.

When a contract, agreement, instrument or other document is referred to herein and copies of such contract, agreement instrument or other document have been made available to the Purchaser, the disclosure contained herein shall be qualified in their entirety by reference to the terms thereof.

**Paragraph 2.2 of Part A of Schedule 6**

1.      Quoine Pte. Ltd. is the issuer of the QASH token, which it sold between 6 November 2017 and 8 November 2017 on the QRYPTOS exchange pursuant to the LIQUID by QUOINE Whitepaper in substantially the form disclosed to the Purchaser ("**Token Sale**"). Quoine Pte. Ltd. announces developments to the features and utilities of the QASH token via its blog located at https://blog.liquid.com/. Quoine Pte. Ltd. may have ongoing obligations to the purchasers and/or holders of the QASH token in connection with the Token Sale and the ongoing development of the QASH token and the Liquid exchange.

**Paragraph 3.1 of Part A of Schedule 6**
**The Target Shares, the Target Options and the Target Warrants**

**3.1(a)**

1.      Mr. Melamed has proposed to make some or all of the following share transfers prior to the Completion:

      a.      500 Common Shares to four individuals, including three members of the Group's management team and a former employee of the Group who currently provides blockchain services as an independent service provider; and

      b.      2400 Common Shares to immediate family members.

**3.1(d)**

1.      Each of the holders of the Company's Series A preferred stock has the right to purchase up to its pro rata share of any new shares proposed to be issued by the Company, pursuant to a stock subscription agreement dated May 25, 2016 by and between the Company and each such shareholder.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69679AD919

**Paragraph 3.2 of Part A of Schedule 6**
**Affiliates**

**3.2(b)**

1.    The Group has engaged in discussions with Chinh Nguyen, formerly an employee of Quoine Vietnam Company Limited and currently providing blockchain services to the Group as an independent service provider through an entity controlled by him, regarding the potential establishment of a new entity whose business would focus primarily on the development of a decentralized finance wallet product, among other things.  It is anticipated that the entity's management team, including Mr. Nguyen, would hold a minority ownership interest in the entity and that the remaining ownership interests would be held by the Group.

DocuSign Envelope ID: 17282B8E-F560-4509-8AB9-0F59679AD91B

**Paragraph 5.1 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – General**

**5.1(b)**

1.      Reference is made to the Crypto Asset Breach.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69679AD919

**Paragraph 5.2 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – Specific**


**5.2(b)**

1.      At the second ordinary general meeting of Shareholders held on December 30, 2020, the Shareholders approved resolutions on the following matters:
      a.      approval of financial statements for the Company's second fiscal year;
      b.      reappointment of five directors;
      c.      delegation of authority to issue stock options to employees;
      d.      partial amendment to the Articles of Incorporation; and
      e.      appointment of independent auditors.

2.      At a class meeting of holders of Common Shares held on December 30, 2020, the holders of Common Shares approved resolutions on the following matter:
      a.      delegation of authority to issue stock options to employees.

DocuSign Envelope ID: 17282B8F-F560-4B09-8AB9-0F69678AD818

### Paragraph 6.1 of Part A of Schedule 6
### General

**6.1(a)**

1.      Quoine Pte. Ltd. received a letter dated August 27, 2021 from a law firm representing the City of Philadelphia providing notice that anyone engaged in a business, profession, or other for-profit activity in Philadelphia must file and pay Business Income & Receipts Tax returns.   The letter does not provide an assessment of whether Quoine Pte. Ltd. is in fact required to file annual returns or make any tax payments to the City of Philadelphia.   Quoine Pte. Ltd. is evaluating the requirements to determine if any such annual returns or tax payments may be necessary.

**6.1(b)**

1.      The Group has deferred certain tax payments in accordance with the deferred tax payment schedule disclosed to the Purchaser.   The deferred amounts that remain outstanding are JPY 444,879,669 for Quoine Corporation and SGD 685,357 for Quoine Pte. Ltd., and the Group has sufficient cash on hand to pay such amounts.   Such amounts are subject to revision upon completion of audited financial statements.   The reason for this deferment is largely based on the necessity for the advance pricing agreement calculation to determine the percentage of transfer tax allocation to Quoine Corporation and Quoine Pte. Ltd.   This cannot be completed until the financial audit of Quoine Pte. Ltd. is completed.   More recently, the Group has taken advantage of the tax deferment allowed in Japan due to the COVID-19 pandemic.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69679AD919

**Paragraph 7.1 of Part A of Schedule 6**
**Assets – Sufficiency of Assets**


**7.1(a)**


1.      The Group intentionally has taken a short position on USDT.  As of November 17, 2021, the aggregate customer balance of USDT is 19,195,176.76 and the amount controlled by the Group (including wallets controlled directly by the Group and accounts at external exchanges is USDT 18,522,001.31, corresponding to a deficit of USDT 673,175.45.  The USDT deficit is offset by an excess of USDC, for which the amount controlled by the Group exceeds the aggregate customer balance by USDC 8,114,905.35.

**Paragraph 8.3 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. has granted a license to Liquid Financial USA Inc. to access Quoine Pte. Ltd.'s digital asset trading and exchange platform under the License and Support Agreement dated April 13, 2019 (the "**US License Agreement**") and to allow U.S. citizens and residents to engage in transactions supported by the System, all in accordance with the terms of such agreement.

## Paragraph 9.1 of Part A of Schedule 6
## Validity of Agreements

**9.1(b)**

1.  Quoine Pte. Ltd. and Salesforce.com Singapore Pte. Ltd. are parties to Contract 2360897 governed by Salesforce.com's standard Master Services Agreement.  Quoine Pte. Ltd. has not paid an outstanding balance of USD 1,046,001.16 under invoices 17534416 and 18134420 issued thereunder.  A settlement has been reached whereby Quoine Pte. Ltd. will pay 12 monthly payments of USD 37,500 beginning June 15, 2021 followed by 3 monthly payments of USD 50,000, for a total of USD 600,000 (the "**Settlement Amount**").  Pending the execution of a definitive settlement deed, the parties have agreed by email that "The entire unpaid Settlement Amount is accelerated and immediately due and payable in the event of a change in control or in the event Quoine is able to raise USD 20 million or more in additional capital or loan funding." Quoine Pte. Ltd. has not repaid the entire remainder of the Repayment Amount, but has continued to pay the agreed installments, following the Company's receipt of a loan in the amount of USD 120 million from the Purchaser and Quoine Pte. Ltd.'s subsequent capital increase of approximately USD 90 million through the allotment of shares to the Company.  The Group has sufficient cash on hand to pay the remainder of the Settlement Amount upon the Completion.

2.  The objectives of the joint venture described in paragraph 9.2(b) have not been achieved. The likelihood and validity of any potential breach of contract claims by Liquid Financial USA Inc. against Quoine Pte. Ltd. under the US License Agreement or by Venture Capital Partners against the Company under the Stockholders Agreement dated April 13, 2019 cannot be ruled out have not been assessed by the Group.

3.  Quoine Pte. Ltd. has contracted for annual licenses for Oracle ERP cloud services for the five-year period ending September 14, 2023 pursuant to a Statement of Work with Quoine Pte. Ltd. for Oracle ERP Cloud Implementation & Support dated October 16, 2018 and Master Services Agreement dated October 15, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.  Quoine Pte. Ltd. has not paid the annual license fee of USD 130,274 for each of the years beginning September 15, 2020, September 15, 2021, and September 15, 2022.  The Group ceased using the Oracle ERP cloud services in February 2021, except as necessary for the confirmation of audit adjustments, and expects to cease all usage after November 30, 2021.

**Paragraph 9.2 of Part A of Schedule 6**
**Material Agreements**

**9.2(a)**

1.  During the term of the US License Agreement, without the prior written consent of Liquid Financial USA Inc., Quoine Pte. Ltd. is not permitted to allow, authorize, license or permit any third party to use any of its trademarks, or use or access Quoine's existing digital asset trading and exchange platform, for the purpose of making available or providing to U.S. persons any asset trading or related services that are directly competitive to the business of Liquid Financial USA Inc. For the avoidance of doubt, the aforementioned restrictions in the US License Agreement does not prevent the Purchaser from licensing or making available (directly or indirectly) its own digital asset trading and exchange platform and associated technologies to any U.S. persons.

2.  Group Companies are parties to the following agreements with terms of at least two years:
    a.  The US License Agreement
    b.  Settlement Agreement dated 29 September 2020 between Quoine Pte. Ltd. and B2C2 Limited.
    c.  *Statement of Work for Oracle ERP Cloud Implementation & Support dated October 16, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.*
    d.  Order Form dated August 7,2020 between Quoine Corporation and Cloudflare, Inc.
    e.  Lease Agreement dated March 16, 2020 between Quoine Corporation and 株式会社 Mega (Fortinet)
    f.  Lease Agreement dated June 1, 2018 between Quoine Corporation and Fuji Xerox Tokyo Corporation
    g.  Order Form dated May 26, 2021 between Quoine Corporation and Reciprocity, Inc. (Zen GRC)
    h.  Order Form dated July 16, 2020 between Quoine Corporation and Sumo Logic, Inc.
    i.  Lease Agreement dated October 20, 2021 between Quoine Corporation and Plaza Home Corporation.
    j.  Agreement dated March 1, 2020 between Quoine Corporation and SOMPO Himawari Life Insurance Corporation.
    k.  Order Form date July 30,2019 between Quoine Vietnam and Nam Truong Son Integration Corp (Sophos)
    l.  Order Form dated August 1, 2020 between Quoine Pte Ltd and Intercom R&D Unlimited Company
    m.  Order Form dated April 1, 2020 between Quoine Pte and IVXS Technology SG Pte Ltd (Comply Advantage)
    n.  License Agreement dated December 15, 2018 as amended March 7, 2021 between Quoine Pte. Ltd. and Unbound Tech Ltd

     o.     Service Agreement dated January 1, 2019 between Quoine Pte. Ltd. and Pay Asia Pte Ltd

3.     Quoine Pte. Ltd. has sold to OP Sasco LLC ("**OP**") the underlying claim relating to BitSpread Ltd disclosed in item 1 of Paragraph 17.1(a) of Part A of Schedule 6 in exchange for a share of any amounts that may be recovered by OP from Bitspread Ltd., pursuant to an Assignment Agreement dated October 26, 2021.

**9.2(b)**

1.      The Company and Virtual Currency Partners, L.P. ("**VCP**") each own 50% of the shares of Liquid Financial USA Inc., an entity established for the purpose of operating a business (either itself or through a wholly-owned subsidiary) through which certain features of the Liquid exchange would be made available to users located in the U.S. Liquid Financial USA Inc. is not operational and is in the process of winding down. Under the Liquid Financial USA Inc. Stockholders Agreement dated April 13, 2019 by and among VCP, the Company, and Liquid Financial USA Inc., upon the occurrence of certain events Liquid USA is required to redeem a number shares of Liquid Financial USA Inc. calculated in accordance with the provisions of such agreement. To the Company's knowledge, Liquid Financial USA Inc. has not effected such redemption notwithstanding that the specified events requiring redemption have occurred.

**Paragraph 11 of Part A of Schedule 6**
**Effect of Sale**

1.      Reference is made to the disclosures in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2.      Reference is made to the disclosures in item 1 of Paragraph 15.4 of Part A of Schedule 6.

3.      The Monetary Authority of Singapore (the "**MAS**") has not been notified of the Agreement or the transactions contemplated thereby.   It is possible that the execution or the performance of the Agreement may negatively impact the license application (the "**Application**") submitted by Quoine Pte. Ltd. under the Payment Services Act 2019 (No. 2 of 2019) (the "**PS Act**"), which may result in the loss of Quoine Pte. Ltd.'s exemption under the Payment Services (Exemption for Specified Period) Regulations 2019 to operate part or all of its business in Singapore.   In particular, the case officer responsible for Quoine Pte. Ltd.'s Application has previously indicated that he expects that approval by the MAS is required under section 28 of the PS Act before there is any change in an applicant's controlling shareholders.   We also understand that this change of ownership constitutes a material change in Quoine Pte. Ltd.'s business plan.   It is uncertain whether the execution of this Agreement prior to obtaining approval from MAS may be deemed a breach of such requirement.

**Paragraph 12.1 of Part A of Schedule 6**
**General**

**12.1(d)**

1.    Due to perceived limitations in the Company's ability to amend the terms of its Stock Options, the Management Shareholders and certain holders of Stock Options entered into a Stock Options Equalization Agreement dated December 20, 2019.  The Management Shareholders agreed to make certain payments to such holders in connection with certain change of control transactions in accordance with the terms of such agreement.

## Paragraph 12.2 of Part A of Schedule 6
## Compliance With Law

**12.2(c)**

1.      By letter dated December 4, 2020, Quoine Corporation offered three available roles to a member of the Trading Technology team who was then on medical leave.  The employee informed the company of his resignation on or around December 15, 2020 and, in an email to all Group personnel, alleged that Quoine Corporation had violated his employment contract.  The employee has not made any claim against Quoine Corporation since his resignation.

2.      Three employees of Quoine Pte. Ltd. or Quoine Vietnam Company Limited were the subject of internal investigations due to suspicious account activities and personal behavior in connection with the Crypto Asset Breach:

   a.      An employee of Quoine Vietnam Company Limited under investigation agreed to resign from his position as a DevOps Engineer effective October 15, 2021. The Company intends to submit a denouncement of the employee to the Department of Cybersecurity and High-Tech Crime Prevention and Fighting (A05) under the Ministry of Public Security and Ho Chi Minh City Police for their verification and investigation under the Criminal Procedure Code.

   b.      An employee of Quoine Vietnam Company Limited under investigation will leave his position as Developer due to the expiration of his employment contract effective October 18, 2021.  The Company is assessing whether to initiate a criminal investigation.

   c.      An employee of Quoine Pte. Ltd. serving as Head of Product (Japan) was notified of the termination of her employment for cause, effective October 7, 2021, for failure to comply with management's instructions in connection with its investigation of the Crypto Asset Breach.  The Company is assessing whether to file criminal charges against the employee.  The Company anticipates that the employee may threaten the Group Companies with one or more claims, including for breach of the employment contract and breach of agreements pertaining to share subscription rights (i.e., stock options) held by the employee.

**Paragraph 12.3 of Part A of Schedule 6**
**Incentive Schemes**

1.  In March 2021 the Group announced to employees a revised compensation structure to be effective April 2022, which will contain a base salary component and a component based on individual performance as described in the Salary Policy provided to the Purchaser.

2.  On July 9, 2021, the Group announced to employees via a townhall meeting a one-time bonus in connection with the achievement of certain regulatory milestones, independent of annual performance bonuses that may be paid in the ordinary course of business. Only those employees with full-time employment status as of July 1, 2021 are eligible for the bonus. The amount of the one-time bonus has been fixed at one month of salary per employee and currently is anticipated to be paid in March 2022. The Group has made a provision of JPY 48,000,000 for the bonus payments.

3.  On July 27, 2021, the Company's board of directors approved amendments to the terms applicable to the Stock Options and to new stock option grants in substantially the form disclosed to the Purchaser. Holders of Stock Options who are currently employed by the Group Companies have entered into amendment agreements reflecting such amended terms.

4.  In April 2019, QASH retention awards were granted to Group employees such that QASH tokens would be distributed in four annual installments beginning April 2020. A maximum of 892,500 QASH tokens remain to be distributed in April 2022, and 892,500 QASH tokens remain to be distributed in April 2023, subject in each case to the applicable employees being employed by the Group at the time of distribution.

5.  Quoine Corporation has received notice of resignation from the Group's Head of Middle Office and Treasury Management, effective November 21, 2021.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69679AD919

**Paragraph 13.2 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. provides private health insurance to current employees who are Singapore residents.

2.    Quoine Vietnam Company Limited provides private health insurance and annual health check-ups to current employees in Vietnam.

3.    Quoine Corporation maintains a defined contribution plan, provides private insurance (*Himawari seimei*), and pays a work from home allowance and a transportation allowance for employees in Japan.

**Paragraph 14.1 of Part A of Schedule 6**
**Indebtedness**

1.    The Purchaser extended a loan in the principal amount of USD 120,000,000 to the Company pursuant to the Loan Agreement between the Purchaser and the Company dated August 30, 2021.

2.    Quoine Pte. Ltd. borrowed GYEN stablecoins in the principal amount of GYEN 300,000,000 from GMO-Z.com Wyoming LLC pursuant to a Master Loan Agreement and Loan Borrower Request dated June 29, 2021, as amended.   The principal amount and corresponding loan fee are due and payable in GYEN on November 30, 2021.

**Paragraph 15.1 of Part A of Schedule 6**

1.      Quoine Corporation maintains a crypto asset exchange operator license issued by the Financial Services Agency.   In June 2018 the Financial Services Agency issued business improvement orders to several licensed crypto asset exchange operators, including Quoine Corporation.   Quoine Corporation was required to provided monthly reports to the Financial Services Agency in connection with improvement efforts in specified business areas.   The Financial Services Agency notified Quoine Corporation on 30 June 2021 that it would no longer be subject to monthly reporting requirements.

2.      The Financial Services Agency issued a reporting order (報告徴求命令) to Quoine Corporation on 7 September 2021 in connection with the Crypto Asset Breach.

3.      Quoine Pte. Ltd. previously permitted residents of the U.S. to open accounts and trade on its cryptocurrency exchange. Quoine Pte. Ltd. does not hold any Permits from any U.S. state or national governmental authority. There are no longer any U.S. residents authorized to trade on its cryptocurrency exchange.

4.      Quoine Pte. Ltd. received a notice from the Korea Financial Intelligence Unit ("**KoFIU**") indicating that virtual asset service providers ("**VASP**") operating businesses in Korea should register with the KoFIU under the Act on Reporting and Using Specified Financial Transaction Information no later than 24 September 2021 and that the Group's business is deemed to meet the definition of a VASP outlined by such Act.   The Group has not registered with the KoFIU but has taken steps intended to take the Group out of the scope of the registration requirements in Korea, including to remove its Korean language materials.

5.      Quoine Pte. Ltd. operates globally and has not assessed the requirements, if any, for Permits in all jurisdictions where its customers may be located, domiciled, incorporated, or organized.

6.      Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

7.      Quoine Pte. Ltd. offers a crypto-asset contracts-for-difference trading product referred to as Liquid Infinity.   In the Consultation Response on MAS' consultation on the Proposed Regulatory Approach for Derivatives Contracts on Payment Tokens, the MAS defined "Payment Token Derivatives" as derivatives contracts that reference payment tokens as underlying assets and indicated that "The PS Act's requirements are right-sized to cover the risks posed by the payment activities of payment service providers. PS Act licensees therefore should not offer Payment Token Derivatives under its suite of activities as the risks associated with Payment Token Derivatives are not intended to be addressed by the PS Act."   Quoine Pte. Ltd. is currently evaluating options and may cease offering Liquid Infinity in light of these regulatory restrictions.

8.    Quoine Pte. Ltd. lends crypto assets and fiat currency to users for the purpose of margin trading.   We understand that there may be some regulatory restrictions in the scope of such offerings, and in particular, section 20(1) of the PS Act requires that "A licensee must not carry on a business of granting any credit facility to any individual in Singapore."   Quoine Pte. Ltd. is evaluating and may cease offering margin trading to individual customers in Singapore.

DocuSign Envelope ID: 17282B8E-F560-4B09-8AB9-0F69679AD919

## Paragraph 15.2 of Part A of Schedule 6

1.    Quoine Pte. Ltd. operates its business in Singapore under an exemption from holding a license under the Payment Services (Exemption for Specified Period) Regulations 2019 of Singapore.   The exemption will cease on the date that Quoine Pte. Ltd.'s license application under the Payment Services Act 2019 is approved or rejected by the Monetary Authority of Singapore or withdrawn by the applicant.

2.    Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

## Paragraph 15.4 of Part A of Schedule 6

1.   The Financial Services Agency has informed the Group and the Purchaser that the Purchaser must satisfy certain conditions, including with respect to its compliance with applicable laws, prior to the completion of the transactions contemplated by the Agreement.   The Financial Services Agency may revoke, suspend, cancel, or vary a Type I Financial Instruments Business Operation license (the "**Type I License**") or the Crypto-Asset Exchange Service Provider Registration held by Quoine Corporation or decline to grant a Type I License to Quoine Corporation if such conditions are not satisfied prior to the Completion.

2.   Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

## Paragraph 17.1 of Part A of Schedule 6
## Litigation

**17.1(a)**

1.  On 25 March 2019, Quoine Pte. Ltd. commenced a legal action against BitSpread Ltd in the Singapore High Court with case reference number HC/S 317/2019 claiming repayment of certain fiat currency and cryptocurrency loans and/or credit lines (plus interest and costs) previously extended to Bitspread Ltd for purposes of their trading activity on Quoine Pte. Ltd.'s exchange.   On 11 September 2020 default judgment was entered against BitSpread Ltd for the Claim Amount.

2.  On 7 January 2021 Quoine Pte. Ltd. filed a criminal complaint to the Delhi Cyber Crime Cell against Flying Saucer E-Commerce Private Limited ("**Flying Saucer**") and its directors, which has subsequently registered under FIR No. 98/2021.   The complaint related to Flying Saucer's failure to pay to Quoine Pte. Ltd. amounts in INR deposited by Indian customers to bank accounts controlled by Flying Saucer on Quoine Pte. Ltd.'s behalf.   On 23 June 2021 Flying Saucer and Quoine Pte. Ltd. entered into a settlement agreement under which Flying Saucer and its directors would pay a settlement amount of INR 330,070,000 to Liquid Group's Indian subsidiary, Quoine India Private Limited. Payments of the settlement amount were completed on or around 2 July 2021.   Pending Quoine India Private Limited's application to the Reserve Bank of India for the cross-border transfer of funds, Quoine India Private Limited has been unable to transfer the proceeds of the settlement to Quoine Pte. Ltd.   Approval of such transfer is subject to the discretion of the Reserve Bank of India and, if successful, is anticipated to take at least six months.

3.  Court proceedings were commenced by B2C2 Limited ("**B2C2**") against Quoine Pte. Ltd. in the Singapore High Court on 18 May 2017 with case reference number SIC/S 7/2017.  Those proceedings related to B2C2's claim that in April 2017 Quoine Pte. Ltd. had wrongfully reversed certain trades involving B2C2 which were carried out on its virtual currency exchange, QUOINEX. On 9 October 2020 Quoine Pte. Ltd. and B2C2 entered into a Settlement Agreement whereby B2C2 received a sum of USD 3,250,000 out of the sum of USD 4,000,000 previously paid into the court by Quoine Pte. Ltd. and Quoine Pte. Ltd. received the remainder of USD 750,000.   Such payments have been completed.   In addition, B2C2 is entitled to a refund of all trading fees it pays Quoine Pte. Ltd. in connection with its trading activities on the exchange platform operated by QE for a period of two years starting from 9 October 2020, up to a maximum amount of USD 250,000 or its equivalent. The action in SIC/S 7/2017 has been discontinued. B2C2 has not incurred any trading fees since such time, and no payments are owed to B2C2.

4.  A customer filed suit against Quoine Corporation alleging that following the plaintiff's instructions around April 12, 2017 for a withdrawal of BTC 41.91165919, Quoine Corporation erroneously transferred such BTC to a recipient other than the plaintiff.

The plaintiff sought the retransmission of BTC 41.91165919 to a wallet designated by the Plaintiff.   The parties settled the dispute for JPY 42 million, and such payment has been completed.

5.      Quoine Pte. Ltd. received a Notice of Default and Termination dated 22 November 2019 from a law firm representing SUKU Global in connection with the hosting, on Liquid, of an IEO and Listing for the SUKU Digital Asset. The letter demands a full refund of fees paid to Quoine Pte. Ltd. in the amount of USD 150,000, contains various allegations and claims against Quoine, and asserts SUKU Global's intent "to bring any necessary enforcement action in the United States and assert jurisdiction over you." Quoine Pte. Ltd. delivered a reply to the law firm dated 4 December 2019 in which it rejected the assertion of any U.S. court's jurisdiction over Quoine Pte. Ltd. and denied each allegation and claim set out in the 22 November 2019 letter.   There have been no further communications from the law firm since December 2019.

6.      In December 2017 a customer informed Quoine Pte. Ltd. that a third party allegedly gained unauthorized access to the email account associated with the customer's account login ID on the Qryptos exchange operated by Quoine Pte. Ltd.   Upon gaining control of the customer's Qryptos account, the third party sold QASH 140,143 for ETH 26.38360149 and BTC 3.99850070 and withdrew such amounts.   The customer alleged that Quoine Pte. Ltd. was negligent in the performance of its duties, including by allowing the bad actor to reset the account password and disable two-factor authentication.   Demand was made for USD 243,746.43 or, alternatively, ETH 26.38360149 and BTC 3.99850070.   On 19 May 2021, an agreement was reached whereby Quoine Pte. Ltd. would pay USD 50,000 in USDT in full settlement of the matter.   Such payment was completed on 26 May 2021.

7.      In May 2021 a customer made various allegations including that stop loss orders purportedly placed by him on the Liquid exchange disappeared and were not triggered as expected, and that another position was incorrectly liquidated.   The customer's estimation of losses was approximately SGD 130,000 and 0.45 BTC as of 21 July 2021. The customer has threatened to contact media outlets and to bring legal action against Quoine Pte. Ltd.   Quoine Pte. Ltd. denies all of the allegations, and the parties are in discussions to resolve amicably.

8.      Quoine Pte. Ltd. received a letter dated 13 November 2020 containing various allegations against Quoine Pte. Ltd. in connection with the customer's claim of having been defrauded by a third party and requesting reimbursement of USD 87,964.   Quoine Pte. Ltd. received a subsequent letter from the customer dated 13 January 2020 reasserting the allegations and the request for USD 87,964.

9.      Quoine Pte. Ltd. received a letter dated 23 July 2020 from Pepperstone Group alleging that Quoine Pte. Ltd. had come into possession of a list of Pepperstone Group's clients and used such information to solicit such clients' business without consent, and threatening legal action against Quoine Pte. Ltd.   Quoine Pte. Ltd. denied such

DocuSign Envelope ID: 17282B8E-F560-4509-8AB9-0F59679AD319

allegations.   There have been no communications with Pepperstone Group since 31 July 2020.

10.     Quoine Pte. Ltd. and Quoine Corporation receive complaints from customers in the ordinary course of business involving amounts in controversy of less than the equivalent of USD 100,000.   Various complaints have been settled through direct discussions with the respective customer or, in the case of Quoine Corporation, alternative dispute resolution procedures.

11.     A former employee of Quoine Corporation raised a claim for wrongful termination following his May 2020 dismissal.   Quoine corporation paid an amount of JPY 5 million in settlement of such claim.

12.     Quoine Pte. Ltd. experienced a personal data breach in November 2020.   Quoine Pte. Ltd. has entered into an Expedited Decision Agreement with the Singapore Personal Data Protection Commission ("**PDPC**"), under which Quoine Pte. Ltd. has acknowledged a prima facie breach of the Personal Data Protection Act and the PDPC is expected to expedite its review of the incident and reduce the amount of any penalty assessed.

## 17.1(b)

1.     Reference is made to the matters regarding Salesforce.com Singapore Pte. Ltd. described in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2.     Reference is made to the matters regarding Liquid Financial USA Inc. described in item 2 of Paragraph 9.1(b) of Part A of Schedule 6.

3.     Quoine Pte. Ltd. experienced a personal data breach in November 2020.   The Group reported such breach to the data privacy authorities in various jurisdictions. Authorities in certain jurisdictions have not confirmed whether any investigation has been or will be conducted.

4.     Reference is made to item 1 of the disclosures in Paragraph 18.2 of Part A of Schedule 6.   The Group reserves the right to pursue criminal or other proceedings against the former employee in question.

5.     In or around January 2017, Quoine Pte. Ltd. suspended the account of a customer and former employee for violation of the terms and conditions of the QUOINEX exchange. Quoine Pte. Ltd. received a letter dated 3 May 2018 from a law firm representing the customer, which demanded removal of the suspension and remittance of the account balance and threatened legal action in the case of Quoine Pte. Ltd.'s failure to comply. Following discussions in which Quoine Pte. Ltd. asserted claims against the customer for recovery of profits due to improper trading activities, a settlement offer was discussed but not agreed by the parties.   In June 2021, the customer contacted Quoine Pte. Ltd.'s customer support inquiring to reinstate the account.   As of 26 October 2021,

the customer's balance was equal to the equivalent of USD 326,806.61.   The parties have agreed on a settlement whereby Quoine Pte. Ltd. would return USD 98,000 to the customer and retain the remainder.   Quoine Pte. Ltd. has liquidated the customer's balance, completed the payment of USD 98,000, and retained the remaining balance.

6.      Reference is made to the disclosures in item 3 of Paragraph 9.1(b) of Part A of Schedule 6.

7.      Reference is made to the disclosures in item 1 of Paragraph 12.2(c) of Part A of Schedule 6.

8.      Reference is made to the disclosures in item 2 of Paragraph 12.2(c) of Part A of Schedule 6.

9.      In connection with the Crypto Asset Breach, the Group may in its discretion pursue civil, criminal, arbitration, administrative or other proceedings and the Group may be the subject of civil, criminal, arbitration, administrative or other proceedings.

**Paragraph 17.2 of Part A of Schedule 6**
**Compliance With Laws**

1.    Reference is made to the disclosures in item 3 of Paragraph 15.1 of Part A of Schedule 6.

2.    Reference is made to the disclosures in item 4 of Paragraph 15.1 of Part A of Schedule 6.

3.    Reference is made to the disclosures in item 7 of Paragraph 15.1 of Part A of Schedule 6.

4.    Reference is made to the disclosures in item 8 of Paragraph 15.1 of Part A of Schedule 6.

5.    Reference is made to the disclosures in item 5 of Paragraph 17.3 of Part A of Schedule 6.

6.    Reference is made to the disclosures in item 2 of Paragraph 18.1 of Part A of Schedule 6.

7.    Quoine Pte. Ltd. permits residents of China to open accounts and trade on its cryptocurrency exchange notwithstanding announcements from Chinese authorities characterizing cryptocurrency-related business activities as illegal financial activities.

8.    With respect to stock options awarded to employees by the Company, Quoine Vietnam Company Limited has not registered with the State Bank of Vietnam any stock option award program or offshore employee share ownership program ("**ESOP**") or complied with other requirements that may be applicable to an ESOP under Vietnamese law.

9.    Quoine Pte. Ltd. operates globally and has not assessed the laws and regulations, including requirements, if any, for Permits, in all jurisdictions where its customers may be located, domiciled, incorporated, or organized.

## Paragraph 17.3 of Part A of Schedule 6
### Investigations

1.  Reference is made to the disclosures made under Paragraph 15.1 of Part A of Schedule 6.

2.  Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

3.  Reference is made to the disclosures made in item 8 under Paragraph 17.2 of Part A of Schedule 6.

4.  Reference is made to the disclosures made in item 9 under Paragraph 17.2 of Part A of Schedule 6.

5.  Quoine Pte. Ltd. offers crypto asset rewards to users subscribed to its Liquid Earn product. Quoine Pte. Ltd. acquires the crypto assets used to pay such rewards by pooling the crypto assets of users subscribed to its Liquid Earn product, depositing these assets with Celsius Network LLC ("**Celsius**"), and earning crypto asset rewards from Celsius on such assets. U.S. residents are not permitted to use Quoine Pte. Ltd.'s services, including Liquid Earn. Quoine Pte. Ltd. received a letter dated October 8, 2021, from the Texas State Securities Board in connection with an enforcement act against Celsius and its affiliates, providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act, Tex. Rev. Civ. Stat. Ann. Arts. 581-1-581-45. Quoine Pte. Ltd. also received a letter dated October 26, 2021, from the Kentucky Public Protection Cabinet, Department of Financial Institutions, Division of Securities, Enforcement Branch, in connection with an Emergency Order to Cease and Desist against Celsius (the "**Order**"), providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act of Kentucky, KRS Chapter 292 and the Order.

**Paragraph 18.1 of Part A of Schedule 6**

1.      Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

2.      The Group has not conducted an analysis of all Data Protection Laws in each jurisdiction from which customers may have provided personal data, and there may be deficiencies with respect to compliance with applicable Data Protection Laws.

**Paragraph 18.2 of Part A of Schedule 6**

1.      In May 2021 Group staff discovered the unauthorized withdrawal of BTC from dormant client accounts that had occurred in April 2021.   All affected accounts were with Quoine Pte. Ltd.   During the course of an internal investigation, the Group's Head of DevOps admitted responsibility for the withdrawals and returned all missing assets. The employee was terminated for cause.

### Paragraph 19.3 of Part A of Schedule 6
### Returns

1.    The following items have not yet been registered with the Legal Affairs Bureau (*houmu kyoku*):

   a.    the Company's issuance of the 18th, 19th, and 20th Stock Options; and

   b.    the Company's extinguishment of certain Stock Options following the departure of Group employees.

2.    Quoine Pte. Ltd. has not filed annual returns or financial statements with the Accounting and Corporate Regulatory Authority of Singapore for the fiscal years that ended March 31, 2019 and March 31, 2020.

[END]

**EXECUTED** by the parties:

<u>**Sellers**</u>

Signed by **KARIYA KAYAMORI**                    )

DocuSigned by:
AF51D8AA2A454C9...

Signed by **SETH MELAMED**                    )

DocuSigned by:
*Seth Melamed*
AB51C4F394AE497...

Signed by Chi Sing HO                    )
as duly authorised representative of        )
and for and on behalf of                    )
**IDG CHINA VENTURE**                    )
**CAPITAL FUND V L.P.**                    )
By: IDG China Venture                    )
Capital Fund V Associates L.P.,            )
its General Partner                         )
By: IDG China Venture Capital            )
Fund GP V Associates Ltd.,                )
its General Partner                         )

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

Signed by Chi Sing HO                    )
as duly authorised representative of        )
and for and on behalf of                    )
**IDG BITMAIN FUND L.P.**                )
By: IDG Bitmain Fund Associates L.P.,    )
its General Partner                         )
By: IDG Bitmain Fund GP                )
Associates Ltd.,                        )
its General Partner                         )

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

Signed by Chi Sing HO                    )
as duly authorised representative of        )
and for and on behalf of                    )
**IDG CHINA V INVESTORS L.P.**        )
By: IDG China Venture Capital Fund        )
GP V Associates Ltd.                    )
its General Partner                         )

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

Signed by Shinichi Fuki )
as duly authorised representative of )
and for and on behalf of )
JAFCO Group Co., Ltd. )
as General Partner of )
**JAFCO SV4 INVESTMENT** )
**LIMITED PARTNERSHIP** )

DocuSigned by:

Shinichi Fuki

4B65754D3CAE46D...

**<u>Purchaser</u>**

| | |
|---|---|
| Signed by Sam Bankman-Fried | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **FTX TRADING LTD.** | ) |

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

**Company**

| | |
|---|---|
| Signed by Kariya Kayamori | ) |
| as the representative director of | ) |
| and for and on behalf of | ) |
| **LIQUID GROUP INC.** | ) |

DocuSigned by:

AF51D8AA2A454C9...

Exhibit 15

**FIRST AMENDMENT TO**
**AGREEMENT FOR THE SALE AND PURCHASE OF SHARES, STOCK OPTIONS**
**AND WARRANTS IN LIQUID GROUP INC. (MAJOR SHAREHOLDERS)**

This First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) (this "**Agreement**") dated as of March 31, 2022 is by and between Kariya Kayamori, Seth Melamed, JAFCO SV4 Investment Limited Partnership, IDG China Venture Capital Fund V L.P., IDG Bitmain Fund L.P., IDG China V Investors L.P., FTX Trading LTD. and Liquid Group Inc., and amends that certain Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) by and between the foregoing parties (the "**Major Shareholders SPA**"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Major Shareholders SPA.

The parties hereto desire to amend the Major Shareholders SPA in accordance with this Agreement.

NOW THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The definition of "Longstop Date" set forth in Clause 1.1 of the Major Shareholders SPA is hereby amended in its entirety to read as follows:

""**Longstop Date**" means 30 April 2022, or such later date as the parties may agree in writing."

2.      The definition of "Minority Shareholders" set forth in Clause 1.1 of the Major Shareholders SPA is hereby amended in its entirety to read as follows:

""**Minority Shareholders**" means, collectively, the holders of the Shares and the Stock Options of the Company (other than the Major Shareholders) as at the date of this Agreement, excluding such holders who cease to be holders of Shares or Stock Options of the Company from time to time."

3.      Paragraph 1.1(b) of Schedule 5 of the Major Shareholders SPA is hereby amended in its entirety to read as follows:

"(b)      with respect to each Seller that is not a natural person, as evidence of the authority of each person executing a document referred to in this Schedule 5 on such Seller's behalf (if applicable):

(i)      a certified copy of the relevant extract of the minutes of a duly held meeting of the directors of such Seller (or a duly constituted committee thereof) authorising the execution by such Seller of the document and, where such execution is authorised by a committee of the board of directors of such Seller, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee;

(ii)     a certified copy of the power of attorney conferring the authority, or

(iii)    such other documents or evidence of the authority reasonably acceptable to the Purchaser."

4.     Paragraph 2.1(b) of Schedule 5 of the Major Shareholders SPA is hereby amended in its entirety to read as follows:

"(b)    as evidence of the authority of each person executing a document referred to in this Schedule on the Purchaser's behalf:

(i)     a certified copy of the relevant extract of the minutes of a duly held meeting of the directors of the Purchaser (or a duly constituted committee thereof), or the written resolutions or consents of the directors of the Purchaser, authorising the execution by the Purchaser of the document and, where such execution is authorised by a committee of the board of directors of the Purchaser, a copy of the relevant extract of the minutes of a duly held meeting of the directors, or the written resolutions or consents of the directors, constituting such committee;

(ii)    a certified copy of the power of attorney conferring the authority, or

(iii)   such other documents or evidence of the authority reasonably acceptable to the Sellers."

5.     The Purchaser hereby approves that the Company will pay, as bonus or other consideration to certain employees (the "**Forfeiting Employees**") of Quoine Vietnam Company Limited, a subsidiary of the Company as at the date hereof, in exchange for forfeiture of the Stock Options held by them prior to Completion, a cash amount of up to USD2,537,552.29 in the aggregate (such amount being the aggregate net amount of the purchase price per Target Share represented by the corresponding Stock Option minus the exercise price in USD applying the Applicable Exchange Rate for the applicable Stock Options held by the Forfeiting Employees) (the "**Stock Option Forfeiture Payment**"), and hereby agrees that the Stock Option Forfeiture Payment shall not constitute any breach of any of the representations and warranties or covenants of the Sellers or of the Company under the Major Shareholders SPA.

6.     The parties hereto hereby agree pursuant to Clause 6.1 of the Major Shareholders SPA that, upon the terms and subject to the conditions of the Major Shareholders SPA, Completion shall take place remotely via the electronic exchange of documents and signatures, subject to the satisfaction or waiver of the Conditions (other than Conditions that by their nature are to be satisfied at Completion, and subject to the satisfaction or waiver of such Conditions), on April 4, 2022 or such other time or location as agreed by the parties in writing (but in any event shall not be later than the Longstop Date).

7.     The Major Shareholders SPA, as amended by this Agreement, shall remain in full force and effect.

8.      Clauses 13 to 21 of the Major Shareholders SPA are incorporated by reference herein and shall apply *mutatis mutandis*.


[*Remainder of page intentionally blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers hereunto duly authorized as of the date first above written.

**Sellers**

Signed by **KARIYA KAYAMORI**            )

Signed by **SETH MELAMED**            )

Signed by Shinichi Fuki            )
as duly authorised representative of            )
and for and on behalf of            )
JAFCO Group Co., Ltd.            )
as General Partner of            )
**JAFCO SV4 INVESTMENT**            )
**LIMITED PARTNERSHIP**            )

Signed by Chi Sing Ho            )
as duly authorised representative of            )
and for and on behalf of            )
**IDG CHINA VENTURE**            )
**CAPITAL FUND V L.P.**            )
By: IDG China Venture            )
Capital Fund V Associates L.P.,            )
its General Partner            )
By: IDG Capital Venture Capital            )
Fund GP V Associates Ltd.,            )
its General Partner            )

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers hereunto duly authorized as of the date first above written.

**Sellers**

Signed by **KARIYA KAYAMORI**          )

Signed by **SETH MELAMED**          )          *Seth Melamed* (signature)

Signed by Shinichi Fuki          )
as duly authorised representative of          )
and for and on behalf of          )
JAFCO Group Co., Ltd.          )
as General Partner of          )
**JAFCO SV4 INVESTMENT**          )
**LIMITED PARTNERSHIP**          )

Signed by Chi Sing Ho          )
as duly authorised representative of          )
and for and on behalf of          )
**IDG CHINA VENTURE**          )
**CAPITAL FUND V L.P.**          )
By: IDG China Venture          )
Capital Fund V Associates L.P.,          )
its General Partner          )
By: IDG Capital Venture Capital          )
Fund GP V Associates Ltd.,          )
its General Partner          )

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers hereunto duly authorized as of the date first above written.

**Sellers**

Signed by **KARIYA KAYAMORI**        )


Signed by **SETH MELAMED**        )


Signed by Shinichi Fuki        )
as duly authorised representative of        )
and for and on behalf of        )
JAFCO Group Co., Ltd.        )
as General Partner of        )
**JAFCO SV4 INVESTMENT**        )
**LIMITED PARTNERSHIP**        )

東京都港区虎ノ門一丁目23番1号
（ジャフコ グループ株式会社 内）
ジャフコSV4共有投資事業有限責任組合
無限責任組合員
ジャフコ グループ株式会社
代表取締役 豊 貴 伸 一


Signed by Chi Sing Ho        )
as duly authorised representative of        )
and for and on behalf of        )
**IDG CHINA VENTURE**        )
**CAPITAL FUND V L.P.**        )
By: IDG China Venture        )
Capital Fund V Associates L.P.,        )
its General Partner        )
By: IDG Capital Venture Capital        )
Fund GP V Associates Ltd.,        )
its General Partner        )


Signed by Chi Sing Ho        )
as duly authorised representative of        )
and for and on behalf of        )
**IDG BITMAIN FUND L.P.**        )
By: IDG Bitmain Fund Associates L.P.,        )
its General Partner        )
By: IDG Bitmain Fund GP        )
Associates Ltd.,        )
its General Partner        )

Signed by Chi Sing Ho                        )
as duly authorised representative of         )
and for and on behalf of                     )
**IDG CHINA VENTURE**                         )
**CAPITAL FUND V L.P.**                       )
By: IDG China Venture                        )
Capital Fund V Associates L.P.,              )
its General Partner                          )
By: IDG Capital Venture Capital              )
Fund GP V Associates Ltd.,                   )
its General Partner                          )


Signed by Chi Sing Ho                        )
as duly authorised representative of         )
and for and on behalf of                     )
**IDG BITMAIN FUND L.P.**                     )
By: IDG Bitmain Fund Associates L.P.,  )
its General Partner                          )
By: IDG Bitmain Fund GP                      )
Associates Ltd.,                             )
its General Partner                          )


Signed by Chi Sing Ho                        )
as duly authorised representative of         )
and for and on behalf of                     )
**IDG CHINA V INVESTORS L.P.**                )
By: IDG China Venture Capital Fund           )
GP V Associates Ltd.                         )
its General Partner                          )

**<u>Purchaser</u>**

Signed by                                                    )
as duly authorised representative of      )
and for and on behalf of                          )
**FTX TRADING LTD.**                           )

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

**Company**

Signed by **KARIYA KAYAMORI**    )
as the representative director of     )
and for and on behalf of       )
**LIQUID GROUP INC.**          )

Exhibit 16





**FTX Trading Ltd.**
**Consolidated Financial Statements**
**December 31, 2020 and 2019**

**FTX Trading Ltd.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Audited financial statements for the year ended December 31, 2020 and the period from April 2, 2019 to December 31, 2019: |  |
| Independent Auditor's Report | 1-2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Consolidated Statements of Shareholders' Equity | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 |



INDEPENDENT AUDITOR'S REPORT

To the Board of Directors and Shareholders
of FTX Trading Ltd.

*Prager Metis CPAs, LLC*

401 HACKENSACK AVENUE
4TH FLOOR
HACKENSACK, NJ 07601

T 201.342.7753
F 201.820.2691

www.pragermetis.com

We have audited the accompanying consolidated financial statements of FTX Trading Ltd. (the "Company") and subsidiaries, which comprise the consolidated balance sheets as of December 31, 2020 and 2019, and the related consolidated statements of operations, shareholders' equity, and cash flows for the year ended December 31, 2020 and the period from April 2, 2019 to December 31, 2019, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



1



**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of FTX Trading Ltd. and subsidiaries as of December 31, 2020 and 2019, and the results of their operations and their cash flows for the year ended December 31, 2020 and the period from April 2, 2019 to December 31, 2019 in accordance with accounting principles generally accepted in the United States of America.

*Prager Metis CPAs, LLC*

Prager Metis CPA's, LLC
Hackensack, New Jersey
July 30, 2021

**FTX Trading Ltd.**
**Consolidated Balance Sheets**

| | | December 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 706,514 | $ | - |
| USDC | | 21,830,242 | | 841,210 |
| Accounts receivable | | 12,200 | | - |
| Interest receivable, related party | | 2,401,967 | | 114,956 |
| Prepaid expenses and other current assets | | 640,173 | | - |
| Total current assets | | 25,591,096 | | 956,166 |
| Property and equipment, net | | 22,604 | | - |
| Intangible assets, net | | 19,591,000 | | - |
| Crypto assets held | | 586,008 | | - |
| BNB receivable, related party | | 15,978,051 | | 15,978,051 |
| Other non-current assets | | 547,632 | | - |
| Goodwill | | 138,477,045 | | - |
| Total assets | $ | 200,793,436 | $ | 16,934,217 |
| | | | | |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 2,231,084 | $ | 584,778 |
| Accounts payable, related party | | 10,876,641 | | 7,320,535 |
| Total current liabilities | | 13,107,725 | | 7,905,313 |
| Crypto assets owed | | 121,515,312 | | - |
| Total liabilities | | 134,623,037 | | 7,905,313 |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred shares: $0.0000026 par value, 96,456,750 shares authorized, 96,456,750 issued and outstanding as of December 31, 2020 and 2019 | | 250 | | 250 |
| Common shares: $0.0000026 par value, 635,457,069 shares authorized, 390,510,009 and 385,827,000 issued and outstanding as of December 31, 2020 and 2019, respectively | | 1,015 | | 1,003 |
| Additional paid-in capital | | 25,565,301 | | 15,976,798 |
| Receivable, related party | | (44,641,254) | | - |
| Retained earnings (accumulated deficit) | | 9,747,210 | | (6,949,147) |
| Total FTX Trading Ltd. shareholders' (deficit) equity | | (9,327,478) | | 9,028,904 |
| Non-controlling interest | | 75,497,877 | | - |
| Total shareholders' equity | | 66,170,399 | | 9,028,904 |
| Total liabilities and shareholders' equity | $ | 200,793,436 | $ | 16,934,217 |

The accompanying notes are an integral part of these consolidated financial statements.

3

**FTX Trading Ltd.**

**Consolidated Statements of Operations**

| | Year Ended December 31, 2020 | Period from April 2, 2019 to December 31, 2019 |
|---|---|---|
| Revenue: | | |
| Net revenue | $ 89,909,109 | $ 10,174,719 |
| | | |
| Operating expenses: | | |
| Transaction expenses | 24,823,963 | 4,996,67 |
| Sales and marketing | 5,971,424 | 345,220 |
| Engineering and product | 650,767 | - |
| Exchange software royalty, related party | 22,660,108 | 2,963,693 |
| Contractor services, related party | 5,571,140 | 4,930,494 |
| General and administrative | 15,821,226 | 4,002,807 |
| Total operating expenses | 75,498,628 | 17,238,821 |
| Operating income (loss) | 14,410,481 | (7,064,102) |
| Other income: | | |
| Interest income, net, related party | 2,285,876 | 114,955 |
| Income (loss) before provision for income tax | 16,696,357 | (6,949,147) |
| Provision for income tax | - | - |
| Net income (loss) | $ 16,696,357 | (6,949,147) |
| | | |
| Net income (loss) per share: | | |
| Basic | $ 0.03 | $ (0.02) |
| Diluted | $ 0.03 | $ (0.02) |
| | | |
| Weighted-average number of common shares outstanding: | | |
| Basic | 387,858,725 | 288,577,455 |
| Diluted | 491,173,970 | 288,577,455 |

The accompanying notes are an integral part of these consolidated financial statements.

4

## FTX Trading Ltd.

### Consolidated Statements of Shareholders' Equity

| | Preferred Shares | | Common Shares | | Additional Paid-in Capital | Receivable, Related Party | (Accumulated Deficit) Retained Earnings | Non-controlling Interest in Consolidated Subsidiary | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at April 2, 2019 | - | $ - | - | $ - | $ - | $ - | $ - | $ - | $ - |
| Issuance of common shares | - | - | 385,827,000 | 1,003 | (1,003) | - | - | - | - |
| Issuance of preferred shares | 96,456,750 | 250 | - | - | 15,977,801 | - | - | - | 15,978,051 |
| Net loss | - | - | - | - | - | - | (6,949,147) | - | (6,949,147) |
| Balance at December 31, 2019 | 96,456,750 | $ 250 | 385,827,000 | $ 1,003 | $ 15,976,798 | $ - | $ (6,949,147) | $ - | $ 9,028,904 |
| Issuance of common shares | - | - | 4,683,009 | 12 | 9,366,006 | - | - | - | 9,366,018 |
| Acquisition of Blockfolio, Inc. | - | - | - | - | - | - | - | 75,996,413 | 75,996,413 |
| Mark to market receivable, related party | - | - | - | - | - | (44,641,254) | - | - | (44,641,254) |
| Purchase of additional Blockfolio shares | - | - | - | - | 222,497 | - | - | (498,536) | (276,039) |
| Net income | - | - | - | - | - | - | 16,696,357 | - | 16,696,357 |
| Balance at December 31, 2020 | 96,456,750 | $ 250 | 390,510,009 | $ 1,015 | $ 25,565,301 | $ (44,641,254) | $ 9,747,210 | $ 75,497,877 | $ 66,170,399 |

The accompanying notes are an integral part of these consolidated financial statements.

**FTX Trading Ltd.**

**Consolidated Statements of Cash Flows**

| | Year Ended December 31, 2020 | | Period from April 2, 2019 to December 31, 2019 | |
|---|---:|---|---:|---|
| **Cash flows from operating activities** | | | | |
| Net income (loss) | $ | 16,696,357 | $ | (6,949,147) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | | | |
|   Depreciation and amortization | | 722,165 | | - |
|   Crypto assets received as revenue | | (20,724,047) | | (841,210) |
|   Changes in operating assets and liabilities: | | | | |
|     Accounts receivable | | 242,669 | | - |
|     Interest receivable | | (2,287,011) | | (114,956) |
|     Prepaid expenses and other assets | | (350,374) | | - |
|     Accounts payable and accrued expenses | | 1,830,226 | | 7,905,313 |
|     Net cash used in operating activities | | (3,870,015) | | - |
| **Cash flows from investing activities** | | | | |
| Purchase of Blockfolio, net of cash acquired | | (4,442,971) | | - |
| Purchase of website domain name | | (330,000) | | - |
| Purchase of property and equipment | | (16,518) | | - |
|   Net cash used in investing activities | | (4,789,489) | | - |
| **Cash flows from financing activities** | | | | |
| Issuance of common shares | | 9,366,018 | | - |
|   Net cash provided by financing activities | | 9,366,018 | | - |
| **Net increase in cash and cash equivalents** | | 706,514 | | - |
| Total cash and cash equivalents at beginning of period | | - | | - |
| Total cash and cash equivalents at end of period | $ | 706,514 | $ | - |
| | | | | |
| **Noncash investing and financing activities:** | | | | |
|   Shares issued in exchange for tokens | $ | - | $ | 15,978,051 |
|   Non-controlling interest purchased in accounts payable | $ | 276,039 | $ | - |
| | | | | |
| **Supplemental disclosure of cash flow information:** | | | | |
|   Cash paid for interest | $ | - | $ | - |
|   Cash paid for income taxes | $ | - | $ | - |

The accompanying notes are an integral part of these consolidated financial statements.

**FTX TRADING LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2020 AND THE PERIOD FROM APRIL 2, 2019 TO DECEMBER 31, 2019**

**1.   Nature of Operations**

FTX Trading Ltd. (together with its consolidated subsidiaries referred to herein as "the Company", "the Exchange", or "FTX") was incorporated in Antigua in 2019. The Company operates globally and is a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy, however it does not provide service to US customers and customers in other restricted jurisdictions.

The Company offers innovative products including industry-first derivatives, options, volatility products and leveraged tokens, on a platform utilized by professional trading firms and first-time users. The Company offers retail users the primary financial account for the cryptoeconomy, institutions a state-of-the-art marketplace with a deep pool of liquidity for transacting in crypto assets, and ecosystem partners technology and services that enable them to build crypto-based applications and securely accept crypto assets as payment.

**2. Summary of Significant Accounting Policies**

*Basis of presentation and principles of consolidation*

The accompanying consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP") and include the accounts of the Company and its subsidiaries. The Company's subsidiaries are entities in which the Company holds, directly or indirectly, more than 50% of the voting rights or where it exercises control. All intercompany accounts and transactions have been eliminated. Non-controlling interest represents the value of the minority shareholders' equity at the fair value on the date of acquisition. The Company has elected to not reduce its reported losses by allocating the non-controlling interest loss share to the minority interest balance because of the following substantive reasons: 1) the Company is funding 100% of the net losses of the acquired subsidiary, 2) the Company entered into a purchase option which sets the price of acquiring the non-controlling interest, regardless of continuing losses, and 3) the Company has control of and assumed substantially all of the risk and rewards of ownership of the acquired subsidiary as of the acquisition date. The Company's functional currency is the U.S. dollar.

*COVID-19 impact*

In March 2020, a novel strain of the coronavirus ("COVID-19") was characterized by the World Health Organization as a global pandemic. As a result of the COVID-19 pandemic, international governments implemented quarantine requirements and travel restrictions. As the Company's operations are conducted online, the Company has not been significantly impacted.

*Use of estimates*

The preparation of the consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions in the Company's consolidated financial statements and notes thereto. Significant estimates and assumptions include the useful lives of intangible assets; the useful lives of property and equipment; and the fair value of assets acquired and liabilities assumed in business combinations.

Actual results and outcomes may differ from management's estimates and assumptions due to risks and uncertainties, including uncertainty in the current economic environment due to COVID-19. To the extent that there are material differences between these estimates and actual results, the Company's consolidated financial statements will be affected. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable, the result of which forms the basis for making judgments about the carrying values of assets and liabilities.

*Business combinations*

The results of businesses acquired in a business combination are included in the Company's consolidated financial statements from the date of the acquisition. Purchase accounting results in assets and liabilities of an acquired business being recorded at their estimated fair values on the acquisition date.

Any excess consideration over the fair value of assets acquired and liabilities assumed is recognized as goodwill. Acquisition-related costs incurred by the Company are recognized as an expense in general and administrative expenses within the Consolidated Statements of Operations.

The Company uses its best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. The Company's estimates are inherently uncertain and subject to refinement. During the measurement period, which may be up to one year from the acquisition date, and to the extent that the value was not previously finalized, the Company may record adjustments to the fair value of these tangible and intangible assets acquired and liabilities assumed, with the corresponding offset to goodwill. In addition, uncertain tax positions and tax-related valuation allowances are initially recorded in connection with a business combination as of the acquisition date. The Company continues to collect information about facts and circumstances that existed at the date of acquisition and reevaluates these estimates and assumptions quarterly and records any adjustments to the Company's preliminary estimates to goodwill, provided that the Company is within the measurement period. Upon the conclusion of the measurement period or final determination of the fair value of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to the Company's Consolidated Statements of Operations.

*Fair value measurements*

The Company measures certain assets and liabilities at fair value. The Company defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

- Level 1: Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.
- Level 2: Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

*Cash and cash equivalents*

Cash and cash equivalents include cash and interest-bearing highly liquid investments held at financial institutions, cash on hand that is not restricted as to withdrawal or use with an initial maturity of three months or less.

*Accounts receivable and allowance for doubtful accounts*

Accounts receivables are contractual rights to receive cash either on demand, fixed or determinable dates, and are recognized as an asset on the Company's consolidated Balance Sheets.

The Company recognizes an allowance for doubtful accounts for receivables that are more than 90 days past due. Accounts receivable deemed uncollectible, which occurs once they reach 90 days past due and all collection efforts have been exhausted, are charged against the allowance for doubtful accounts when identified. As of December 31, 2020, and 2019, the Company has not recorded any bad debt expense or allowance.

*Concentration of credit risk*

The Company's cash, cash equivalents, and accounts receivable are potentially subject to concentration of credit risk. Cash and cash equivalents are placed with financial institutions which are of high credit quality.

The Company held $21.8 million and $0.8 million of US dollar-denominated stable coins ("USDC") as of December 31, 2020, and 2019, respectively. The Company considers USDC and other US dollar-denominated stable coins with underlying U.S. dollar collateralized to be a financial instrument with an equivalent value of US dollars.

*Crypto assets held and Crypto assets owed*

Crypto assets held by the Company, with no qualifying fair value hedge, are accounted for as intangible assets with indefinite useful lives and are initially measured at cost. Crypto assets held are assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired.

Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the crypto asset at the time its fair value is being measured. Impairment expense is reflected in other operating expense in the Consolidated Statements of Operations.

There was no impairment expense for the year ended December 31, 2020 and the period ended December 31, 2019, respectively. The Company assigns costs to transactions on a first-in, first-out basis. The Company held crypto assets of $0.6 million as of December 31, 2020. There were no crypto assets held as of December 31, 2019.

Crypto assets held or Crypto assets owed as a hedged item in qualifying fair value hedges are initially measured at cost. Subsequent changes in fair value attributable to the hedged risk are adjusted to the carrying amount of these crypto assets held or owed, with changes in fair value recorded in other operating expense in the Consolidated Statements of Operations.

Generally, the Company does not hold crypto assets and therefore does not receive airdrops for its benefit. Any crypto assets received through airdrops or forks would be recorded at their cost, however, as part of the treasury management agreement these assets would be converted to USD at the acquisition date. Crypto assets received through airdrops or forks for the benefit of exchange participants are distributed when received.

### *Property and equipment*

Property and equipment is stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful life of the asset. The estimated useful lives of the Company's computer equipment are generally two to five years.

### *Long-lived assets, including goodwill and acquired intangible assets*

The Company evaluates the recoverability of long-lived assets on an annual basis, or more frequently whenever circumstances indicate a long-lived asset may be impaired. When indicators of impairment exist, the Company estimates future undiscounted cash flows attributable to such assets. In the event future undiscounted cash flows do not exceed the carrying amount of the assets, the asset would be considered impaired. The impairment loss is measured based upon the difference between the carrying amount and the fair value of the assets.

Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired in a business combination. Goodwill is tested for impairment at the reporting unit level on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. For the periods presented, the Company had recorded no impairment charges.

Acquired intangible assets with a definite useful life are amortized over their estimated useful lives on a straight-line basis. Each period, the Company evaluates the estimated remaining useful life of its intangible assets and whether events or changes in circumstances warrant a revision to the remaining period of amortization. Intangible assets assessed as having indefinite lives are not amortized, but are assessed for indicators that the useful life is no longer indefinite or for indicators of impairment each period.

### *Derivative contracts*

Derivative contracts derive their value from underlying asset prices, other inputs or a combination of these factors.

As a result of the Company entering into an equity for crypto option transaction to satisfy a crypto asset owed liability, a derivative is recognized relating to the differences between the fair value of the amount owed, which is recognized on the borrowing effective date, and the fair value of the amount that will ultimately be repaid, based on changes in the spot price of the crypto asset over the term of the borrowing. This embedded derivative is accounted for as a forward contract to exchange at maturity the fixed amount of the crypto asset to be repaid.

### *Derivatives accounted for as fair value hedges*

The Company may apply hedge accounting to a derivative executed for price risk management purposes. To qualify for hedge accounting, a derivative must be highly effective at reducing the risk associated with the exposure being hedged. The Company may use a fair value hedge primarily to hedge the fair value exposure of crypto asset prices fluctuations for committed crypto assets owed. The changes in the fair value of the derivative and the fair value of the hedged item, the crypto assets owed, would be recognized in current-period earning in other operating expense in the Consolidated Statements of Operations. Derivative amounts affecting earnings would be recognized in the same line item as would the earnings effect of the hedged item thereby offsetting each other.

*Revenue recognition*

See note 4, Revenue, for information on the Company's accounting policies for revenue recognition.

*Transaction expense*

Transaction expense includes costs incurred to operate the Company's platform, process trades, and perform exchange operations. These costs include account verification fees, fees to process transactions on a blockchain network and other financial institutions for customer transaction activity, fees paid to web service providers, and unrecovered liquidation expenses and customer accommodations due to network issues. Fixed-fee costs are expensed over the term of the contract and transaction-level costs are expensed as incurred.

*Engineering and product*

Engineering and product expense includes costs incurred in operating, maintaining, and enhancing the FTX and Blockfolio platforms, including network and infrastructure costs. Engineering and product expense also includes costs incurred in developing new products and services and the amortization of acquired and internally developed technology.

*Sales and marketing*

Sales and marketing expense primarily includes costs related to customer acquisition, advertising and marketing programs, and the amortization of acquired customer relationships, trademarks and tradename intangible assets. Sales and marketing costs are expensed as incurred.

*Contractor services, related party*

The Company sources a majority of its personnel from related party entities. The costs included in the contractor services include personnel-related expenses such as salaries, bonuses, benefits, employer taxes, and share-based compensation as well as personnel administrative costs.

*General and administrative*

General and administrative expenses include costs incurred to support the Company's business, including legal, finance, compliance, human resources, customer experience and support operations, and other administrative services. General and administrative expenses also include non-contractor services, personnel-related expenses, software subscriptions for support services, facilities and equipment costs, depreciation, and other general overhead. General and administrative costs are expensed as incurred.

*Income taxes*

The Company accounts for income taxes using the asset and liability method whereby deferred tax asset and liability account balances are determined based on temporary differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to affect taxable income. A valuation allowance is established when management estimates that it is more likely than not that deferred tax assets will not be realized. Realization of deferred tax assets is dependent upon future pre-tax earnings, the reversal of temporary differences between book and tax income, and the expected tax rates in future periods.

The Company is required to evaluate the tax positions taken in the course of preparing its tax returns to determine whether tax positions are more likely than not of being sustained by the applicable tax authority. Tax benefits of positions not deemed to meet the "more-likely-than-not" threshold would be recorded as a tax expense in the current year. The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount that is initially recognized. It is the Company's practice to recognize interest and penalties related to income tax matters in income tax expense.

For U.S. Federal tax purposes, crypto asset transactions are treated on the same tax principles as property transactions. The Company recognizes a gain or loss when crypto assets are exchanged for other property, in the amount of the difference between the fair market value of the property received and the tax basis of the exchanged crypto assets. Receipts of crypto assets in exchange for goods or services are included in taxable income at the fair market value on the date of receipt.

10

As the Company is an Antiguan entity that does not operate in the United States, the above U.S. Federal tax policies do not apply.

*Net income (loss) per share*

The Company computes net income (loss) per share using the two-class method required for participating securities. The two-class method requires income available to common shareholders for the period to be allocated between common shares and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed.

Basic net income per share is computed using the weighted-average number of outstanding shares of common shares during the period. Diluted net income per share is computed using the weighted-average number of outstanding common shares and, when dilutive, potential shares of common shares outstanding during the period. Potential shares of common shares consist of incremental shares issuable related to the exercise of the option discussed in Note 3, as well as the shares of participating convertible preferred shares.

*Segment reporting*

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker (the "CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. While the Company does have revenue from multiple products and geographies, no measures of profitability by product or geography are available, so discrete financial information is not available for each such component. As such, the Company has determined that it operates as one operating segment and one reportable segment.

*Recent accounting pronouncements*

*Recently adopted accounting pronouncements*

On August 27, 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2018-13, Fair Value Measurement (Topic 820), Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13"). The guidance eliminates, adds, and modifies certain disclosure requirements for fair value measurements. The Company adopted the amendment as of January 1, 2019. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements and disclosures.

On August 26, 2016, the FASB issued Accounting Standards Update No. 2016-15, Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments ("ASU 2016-15"). These amendments provide cash flow statement classification guidance for: (1) Debt Prepayment or Debt Extinguishment Costs, (2) Settlement of Zero-Coupon Debt Instruments or Other Debt Instruments with Coupon Interest Rates That Are Insignificant in Relation to the Effective Interest Rate of the Borrowing, (3) Contingent Consideration Payments Made after a Business Combination, (4) Proceeds from the Settlement of Insurance Claims, (5) Proceeds from the Settlement of Corporate-Owned Life Insurance Policies, including Bank-Owned Life Insurance Policies, (6) Distributions Received from Equity Method Investees, (7) Beneficial Interests in Securitization Transactions, and (8) Separately Identifiable Cash Flows and Application of the Predominance Principle. The Company adopted the amendment as of January 1, 2019. Adoption of the guidance did not have a material impact on the Company's Consolidated Statements of Cash Flows.

On August 28, 2017, the FASB issued Accounting Standards Update No. 2017-12, Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities ("ASU 2017-12"). ASU 2017-12 expands component and fair value hedging, specifies the presentation of the effects of hedging instruments, eliminates the separate measurement and presentation of hedge ineffectiveness, and updates disclosure requirements related to hedging. The Company adopted the amendment as of January 1, 2020. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements.

*Accounting pronouncements pending adoption*

On June 16, 2016, the FASB issued Accounting Standards Update No. 2016-13, Financial Instruments - Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"), which significantly changes how entities will measure credit losses for most financial assets and certain other instruments that are not measured at fair value through net income. ASU 2016-13 will replace today's "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the

other-than-temporary impairment model. It also simplifies the accounting model for purchased credit-impaired debt securities and loans. The new standard is effective for the Company for its fiscal year beginning January 1, 2021. The adoption of the standard is not expected to have a material impact on the consolidated financial statements.

On December 18, 2019, the FASB issued Accounting Standards Update No. 2019-12, Income Taxes: Simplifying the Accounting for Income Taxes ("ASU 2019-12"), as part of its overall simplification initiative to reduce costs and complexity of applying accounting standards while maintaining or improving the usefulness of the information provided to users of financial statements. Among other things, the new guidance simplifies intraperiod tax allocation and reduces the complexity in accounting for income taxes with year-to-date losses in interim periods. The new standard is effective for the Company for its fiscal year beginning January 1, 2021. The adoption of the standard is not expected to have a material impact on the consolidated financial statements.

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform ("Topic 848"): Facilitation of the Effects of Reference Rate Reform on Financial Reporting.* ASU 2020-04 provides for temporary optional expedients and exceptions to the current guidance on certain contract modifications and hedging relationships to ease the burdens related to the expected market transition from the London Inter-bank Offered Rate ("LIBOR") or other reference rates to alternative reference rates. The guidance is effective upon issuance and can be applied through December 31, 2022. The Company does not have LIBOR-based transactions and is currently evaluating the impact of this standard on its consolidated financial statements.

## 3. Acquisitions

*Blockfolio, Inc.*

On October 15, 2020, the Company completed the acquisition of Blockfolio, LLC ("Blockfolio") by purchasing 52% of its outstanding common shares. Blockfolio operates an app for mobile cryptocurrency portfolio tracking and management.

The fair value of the consideration transferred in the acquisition was $83.6 million, representing a 52% equity interest of Blockfolio. The fair market value of the Company as of the date of the transaction was $159.6 million and the fair value of the equity interest retained by Blockfolio (48%) was determined to be $76.0 million. The following table sets for the total purchase price of $83.6 million.

| Purchase Consideration | Amount |
|---|---|
| Cash | $    4,893,923 |
| FTT Liability | 78,698,940 |
| Total purchase price | $  83,592,863 |

The $78.7 million of FTT Liability represents the obligation to deliver 20 million FTT cryptocurrency tokens valued at the fair value of the tokens at the purchase date.  FTT is an actively traded cryptocurrency with a market-quoted price. FTT was created by a related party to tokenize the royalty payments for the trading exchange technology platform licensed to FTX.   The FTT tokens will be delivered in 24 equal monthly installments beginning May 1, 2021.  The Company entered into an option with a related party, whereby the Company had the right to issue 32.5 million shares of the Company's common shares and $1 million in exchange for 20 million FTT tokens to be delivered in a manner concurrent with the Company's obligation to deliver FTT tokens to Blockfolio's selling shareholders. The Company immediately exercised this option and considers that the FTT Liability will be satisfied by the related party option in exchange for the FTX common shares.  See Note 5 for further discussion.

The Company also entered into a call option with Blockfolio shareholders which allows the Company to purchase the non-controlling minority interest (100% of the remaining outstanding shares of Blockfolio) for an agreed fixed number of FTX equity shares representing the original acquisition date transaction price within 24 months.  As of December 31, 2020, certain former Blockfolio shareholders requested to receive cash and the Company purchased their outstanding shares for $0.3 million, which reduced the non-controlling interest equity balance.

The following table summarizes the fair values of assets acquired and liabilities assumed as of the date of the acquisition:

| | |
|---|---:|
| Cash | $ 450,952 |
| Accounts receivable | 254,869 |
| Prepaid and other current assets | 289,799 |
| Crypto assets held | 850,993 |
| Property and equipment, net | 9,251 |
| Other assets | 547,632 |
| Developed technology | 8,780,000 |
| Customer list | 4,200,000 |
| Trademarks and tradenames | 7,000,000 |
| Goodwill | 138,477,045 |
| **Total assets** | 160,860,541 |
| | |
| Accounts payable | 131,272 |
| Accrued expenses | 1,139,992 |
| **Total liabilities** | 1,271,264 |
| | |
| **Non controlling interest** | 75,996,414 |
| | |
| **Net assets acquired** | $ 83,592,863 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill of $138.5 million.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition:

| | Amount | Useful Life in Years |
|---|---:|:---:|
| Developed technology | $ 8,780,000 | 10 |
| Customer list | 4,200,000 | 10 |
| Trade names and trademarks | 7,000,000 | 5 |
| | $ 19,980,000 | |

The developed technology, customer list, and trade names and trademarks represent the estimated fair value of Blockfolio's trading platform, existing relationships with customers, and money transmitter licenses held, respectively. Total acquisition costs of $1.0 million were incurred related to the acquisition, which were recorded in general and administrative expenses in the Consolidated Statements of Operations.

The following table sets forth supplemental Unaudited Pro forma Net Revenue and Unaudited Pro forma Net Income (Loss) of the combined entity had the acquisition date been January 1, 2019:

| | Year Ended December 31, | |
|---|---:|---:|
| | 2020 | 2019 |
| Pro forma revenue | $ 90,115,884 | $ 10,575,035 |
| Pro forma net income (loss) | $ 11,423,496 | $ (12,735,205) |

As it would be impractical to calculate Blockfolio's Proforma Net Revenue and Proforma Net Income (Loss) for the period of time in 2019 in which FTX was in operation, the full twelve months of Blockfolio's Net Revenue and Net Loss is included in the calculation of supplemental Unaudited Pro forma Net Revenue and Net Loss for the combined entity for the year ended December 31, 2019.

## 4. Revenue

The Company determines revenue recognition from contracts with customers through the following steps:

- identification of the contract, or contracts, with the customer;
- identification of the performance obligations in the contract;
- determination of the transaction price;
- allocation of the transaction price to the performance obligations in the contract; and
- recognition of the revenue when, or as, the Company satisfies a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to the customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. The Company primarily generates revenue through transaction fees and interest fees charged on the platform earned from customers that are individuals, or institutional customers, such as hedge funds, family offices, principal trading firms, and financial institutions.

The Company's service is comprised of a single performance obligation to provide a matching service when customers buy and sell crypto assets, tokenized funds, options, or futures, in addition to providing a platform for the creation, management, and redemption of leveraged tokens.  The Company is an agent in arranging transactions between customers and presents revenue for the fees earned on a net basis.  Certain customers, depending on their fee tiers and trading volumes, can earn negative fees on the maker side of transactions, however there is always a positive taker fee and every transaction is required to have a minimum net positive fee earned.

The Company evaluates the presentation of revenue on a gross or net basis based on whether it controls the assets before they are transferred to the customers (gross) or whether it acts as an agent by arranging for customers on the platform to create and/or exchange the crypto assets, options or futures contracts between customers (net). The Company does not control the crypto assets, futures or option contracts before they are created and/or exchanged between the maker and taker, does not have inventory risk related to the crypto assets, and is not responsible for the contract fulfillment of the underlying crypto assets. The Company also does not set the prices for the crypto assets, options, or futures, as the price is a market rate established by the participants on the platform. As a result, the Company acts as an agent in facilitating the ability for a customer to purchase from another customer.

The Company considers its performance obligation satisfied, and recognizes revenue, at the point in time the transaction is processed. Contracts with customers are usually open-ended and can be terminated by either party without a termination penalty. Therefore, contracts are defined at the transaction level and for each completed transaction.

The Company charges a fee at the transaction level. The transaction price, represented by the trading fee, is calculated based on a rate schedule and may vary depending on certain criteria.  The fee rate charged per transaction is adjusted up or down if the total volume of trades and cryptocurrency staked for a specific historical period meets established thresholds.  Fee rate changes are prospective.  The Company has concluded that this volume-based pricing approach does not constitute a future material right since the discount is within a range typically offered to a class of customers with similar volume. The transaction fee is collected from the customer at the time the transaction is executed. In certain instances, the transaction fee can be collected in crypto assets, with revenue measured based on the amount of crypto assets received and the fair value of the crypto assets at the time of the transaction.  All fees collected in non-USD crypto are immediately converted to USDC at the rate and time of the transaction, thereby resulting in USD revenue at the time of transaction.

The following table presents revenue of the Company disaggregated by revenue source:

|  | Year Ended December 31, 2020 | Period from April 2, 2019 to December 31, 2019 |
|---|---|---|
| Future fill fees | $ 65,616,890 | $ 9,359,983 |
| Insurance fund revenue | 3,086,981 | 267,542 |
| Leveraged token fees | 14,541,523 | 431,693 |
| Spot fill fees | 5,828,104 | 115,501 |
| Margin related fees | 686,352 | - |
| Other | 239,259 | - |
| Total revenue | $ 89,909,109 | $ 10,174,719 |

*Future fill fees*

Future fill revenue represents fees charged for transactions of net USDC settled crypto-based futures contracts. These counterparty contracts can either be perpetual or have expiration dates.

*Insurance fund revenue*

The Company provides the ability to leverage collateral for futures contacts. For certain contracts which are considered highly leveraged an additional fee is added to the transaction fee. This fee is earned at the time of the transaction and is generally representative of the increased liquidation risk associated with highly leveraged trades.

Liquidation risk losses are recorded when the exchange is unable to close a trade quickly enough to cover the losses with the available collateral. The Exchange will record uncovered losses related to these liquidations when it is certain that they have occurred and collection from customers is not available. Losses related to liquidation risks were $4.6 million and $0.5 million for the year ended December 31, 2020 and the period ended December 31, 2019, respectively, and are included as transaction expenses in the period they are considered non-recoverable.

*Leveraged token fees*

The users of the Exchange can create tokens that are designed to track indexes, benchmarks or certain crypto tokens. These leveraged tokens are listed on the Exchange and algorithmically managed with trading to continue to meet objectives. These tokens can be traded or withdrawn from the exchange. The Company generates fee revenue for the creation of, management of, and the redemption of the leveraged tokens. Revenue is measured based on the daily management fee percentage and token creation and redemption fees and earned when each transaction is completed.

*Spot fill fees*

Spot fill fees are generated when two parties on the Exchange agree to exchange crypto assets at an agreed price. The Company matches the orders and the assets are exchanged. The Company is not a principal to the transactions and the price is set by the customers. The Company receives fees based on the completion, or fill of each transaction.

*Margin related fees*

Spot margin - The Company earns fees and interest revenue for margin-related activities. When customers lend funds to each other utilizing the spot margin function, the Exchange charges a transaction fee based on each hourly borrowing.

Cross collateral borrowing – The Company recognizes interest revenue when a customer utilizes non-USD collateral for futures trades and the trade requires collateral funding. If the customer retains the non-USD-based collateral, then an amount equal to the funding requirement is functionally borrowed in USD with interest charged to the customer on an hourly basis.

*Contract acquisition costs*

The Company has elected to apply the practical expedient to recognize the incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset that would otherwise have been recognized is one year or less. As a result, no contract acquisition costs were capitalized.

## 5. Related Parties

The Company's primary shareholder is also the primary shareholder of several related entities which do business with the Company.

*Liquidity provider, market maker and trading* – Certain related party entities were the initial liquidity providers and participated in a majority of the market making transactions at the inception of the Exchange over time other liquidity providers have joined the Exchange and the percentage of trades involving related parties has decreased as a percentage of total revenue. The related entities do trade for their own proprietary purposes on non-market making transactions.

*Exchange software royalty* – The Exchange software was developed by entities and parties which are significant shareholders.  The Exchange software was licensed from a related entity for a royalty of approximately 30% of net exchange transaction revenues, depending on the revenue mix.  The Company has licensed the rights to the software code and the rights to further develop the technology.

*Currency management* – Certain related parties have provided currency management activities to the Company.  These services include that the entities serve as the primary conduits of fiat transactions, and provide the same day conversion of revenue and expense transactions of crypto to USD.  A significant percentage of the Company's bill-paying activities have been facilitated through these related party service transactions.

*Contractor services* – Many of the Company's personnel including the primary shareholder and the executive officers are employed by related party entities and contracted to the Company.  Costs of related party employed personnel are based on an allocation of actual payroll charges and other personnel-related expenses and include an 8% administrative overhead mark-up.  The majority of personnel related costs were paid to related parties for contracted services.

<u>Related party transactions</u>

Liquidity provider, market making, and trading exchange transactions with a related party represented approximately 11% and 45% of total exchange transaction volume for the year ended December 31, 2020 and the period ended December 31, 2019, respectively. Because the related parties were primarily market makers which therefore generated negative commissions, net revenues (negative) for the year ended December 31, 2020 and the period ended December 31, 2019 were $(13.4) million and $0.3 million, respectively, which represented approximately 14.9% and 3.2% of total exchange transaction revenue on an absolute basis.

Software royalties paid to a related party for the year ended December 31, 2020 and the period ended December 31, 2019 were $22.7 million and $3.0 million, respectively.  These royalties are currently calculated based on 33% of net FTX exchange trading revenues, 10% of net additions to the insurance fund, and 5% of net fees earned from others uses of FTX platform.

Currency management transactions comprised significantly all of the customer fiat transactions and expense payments to vendors in both fiat and crypto transactions.  As part of the currency management, these related companies also entered into an "FTX equity-for-FTT Crypto" option agreement related to the Blockfolio acquisition, whereby the Company agreed to exchange FTX equity for FTT crypto as described in the Blockfolio acquisition footnote. The FTT receivable and the FTT liability are settled in the same manner (24 equal installments), the Company has determined that the accounting for the assets and liabilities in this transaction should be marked to market. The FTT receivable and liability are marked to market based on the quoted price for the FTT tokens at the reporting date. As of December 31, 2020, the receivable of $44.6 million is presented as "Receivable, related party" in the Shareholders' Equity section on the Consolidated Balance Sheet.

Contractor services for the year ended December 31, 2020 and the period ended December 31, 2019 were $5.6 million and $4.9 million, respectively. Of the $5.6 million and $4.9 million expenses, 53% were allocated to sales and marketing, 12% were allocated to

engineering and product, and 35% were allocated to general and administrative expenses for the year ended December 31, 2020 and the period ended December 31, 2019, respectively, based on the functional purpose of the personnel.

During the period ended December 31, 2019, the Company issued 250 shares of Series A preferred shares in exchange for 1,002,739 cryptographic BNB tokens. The BNB tokens were recorded at fair value as of the transaction date. The BNB tokens were subsequently loaned to a related party and are presented as "BNB receivable, related party" in the Assets section of the Consolidated Balance Sheets as of December 31, 2020 and 2019. Interest is earned on the BNB receivable at a rate of 10% per year and the loan matures in November 2024. As of December 31, 2020 and 2019, interest receivables from related parties were approximately $2.4 million and $0.1 million, respectively.

## 6. Property and equipment, net

Property and equipment, net consisted of the following:

|  | December 31, | | | |
|  | 2020 | | 2019 | |
| --- | --- | --- | --- | --- |
| Computer and office equipment | $ | 54,495 | $ | - |
| Less accumulated depreciation | | (31,891) | | - |
| | $ | 22,604 | $ | - |

## 7. Goodwill and Intangible Assets

*Goodwill*

The following table reflects the changes in the carrying amount of goodwill:

|  | December 31, | | | |
|  | 2020 | | 2019 | |
| --- | --- | --- | --- | --- |
| Balance, beginning of period | $ | - | $ | - |
| Additions due to acquisitions | | 138,477,045 | | - |
| Balance, end of period | $ | 138,477,045 | $ | - |

*Intangible assets*

Intangible assets consisted of the following:

| | December 31, 2020 | | | | | | |
| | Useful Life in Years | Weighted Average Amortization Period in Years | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Developed technology | 5 | 5 | $ | 8,780,000 | $ | 439,000 | $ 8,341,000 |
| Customer list | 10 | 10 | | 4,200,000 | | 105,000 | 4,095,000 |
| Trade name and trademarks | 10 | 10 | | 7,000,000 | | 175,000 | 6,825,000 |
| Website domain name | n/a | n/a | | 330,000 | | - | 330,000 |
| Total | | | $ | 20,310,000 | $ | 719,000 | $ 19,591,000 |

Amortization expense of intangible assets was $0.7 million for the year ended December 31, 2020. There was no amortization expense for the period ended December 31, 2019. As the website domain name is indefinite-lived, the Company does not amortize this intangible asset. The Company estimates that there is no significant residual value related to its intangible assets.

**8. Fair Value Measurements**

The following table sets forth by level, within the fair value hierarchy, the Company's assets and liabilities measured and recorded at fair value on a recurring basis:

| | December 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 706,514 | $ - | $ - | $ 706,514 |
| **Total assets** | $ 706,514 | $ - | $ - | $ 706,514 |
| | | | | |
| **Liabilities** | | | | |
| Crypto assets owed | $ 121,515,312 | $ - | $ - | $ 121,515,312 |
| **Total liabilities** | $ 121,515,312 | $ - | $ - | $ 121,515,312 |
| | | | | |
| **Shareholders' Equity** | | | | |
| Receivable, related party | $ (44,641,254) | $ - | $ - | $ (44,641,254) |
| **Total shareholders' equity** | $ (44,641,254) | $ - | $ - | $ (44,641,254) |

| | December 31, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ - | $ - | $ - | $ - |
| **Total assets** | $ - | $ - | $ - | $ - |
| | | | | |
| **Liabilities** | | | | |
| Crypto assets owed | $ - | $ - | $ - | $ - |
| **Total liabilities** | $ - | $ - | $ - | $ - |
| | | | | |
| **Shareholders' Equity** | | | | |
| Receivable, related party | $ - | $ - | $ - | $ - |
| **Total shareholders' equity** | $ - | $ - | $ - | $ - |

The fair values of cash, accounts receivable, accounts payable, and certain other accrued expenses approximate carrying values because of their short-term nature. The Company applied Level 3 inputs to measure the fair value of the intangible assets arising from the Blockfolio acquisition.

**9. Preferred Shares**

During the period ended December 31, 2019, the Company issued 250 shares of Series A preferred shares. See Note 5 for a discussion of this transaction. There were no issuances of preferred shares during the year ended December 31, 2020. See Note 10 for a discussion of the share split which occurred during 2020. The number of preferred shares and amounts per share reported in the Company's consolidated financial statements and notes have been retrospectively updated to 96,456,750 to reflect the impact of the share split.

The holders of Series A preferred shares have certain rights, preferences and privileges as follows:

*Voting rights*

The holders of Series A preferred shares are subject to the Company's restated articles of incorporation and are entitled to the number of votes equal to the voting power of the number of shares of common shares into which their shares of convertible preferred shares can be directly converted.

*Dividends*

The holders of Series A preferred shares are entitled to receive dividends equal to the number of common shares into which their Series A preferred shares can be directly converted as of the date of record. The dividends are non-cumulative and are payable when, as and if declared by the Board of Directors.

*Liquidation rights*

In the event of any liquidation event of the Company (a voluntary or involuntary liquidation, a merger where the holders of common shares and convertible preferred shares own less than a majority of the resulting voting power of the surviving entity, or a sale of substantially all the assets of the Company), before any distribution or payment shall be made to the holders of common shares, the holders of Series A preferred shares shall be entitled to receive out of the assets legally available for distribution, liquidating distributions in the amount of the greater of (i) one times the Series A original issue price, plus any dividends declared but unpaid, or (ii) such amount per share as would have been payable had all shares of Series A preferred shares been converted into common shares immediately prior to such liquidation.

If upon any such liquidation of the Company or deemed liquidation event, the assets of the Company available for distribution to its shareholders shall be insufficient to pay the holders of Series A preferred shares the full amount to which they shall be entitled, the holders of Series A preferred shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

*Conversion*

Each share of Series A preferred shares shall be convertible, at the option of the holder at any time into such number of fully paid and nonassessable common shares as is determined by dividing the Series A preferred shares original issue price by the Series A conversion price in effect at the time of conversion.

*Redemption*

No shares of convertible preferred shares are unilaterally redeemable by either the shareholders or the Company.

**10. Common Shares**

Upon formation of the Company in April 2019, 1,000 common shares were issued to the founders. These shares were retrospectively restated to 385,827,000 to reflect the share split which occurred in April 2020.

During the year ended December 31, 2020, the Company issued 4,683,009 common shares at $2.00 per share for total proceeds of $9.4 million.

In April 2020, the Company effected a share split, whereby each outstanding share of common shares and Series A preferred shares was split into 385,827 shares. The number of authorized shares were also increased to account for the additional outstanding shares. The number of shares and amounts per share reported in the Company's consolidated financial statements and notes have been retrospectively updated to reflect the impact of the share split.

**11. Net Income (Loss) Per Share**

The computation of basic net income (loss) per share is as follows:

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Numerator:** | | |
| Net income (loss) | $ 16,696,357 | $ (6,949,147) |
| Less: Undistributed net income allocated to participating convertible preferred shares | 3,517,031 | - |
| Basic adjusted net income | $ 13,179,326 | $ (6,949,147) |
| | | |
| **Denominator:** | | |
| Basic weighted-average shares outstanding | 387,858,725 | 288,577,455 |
| | | |
| **Net income per common share:** | | |
| Basic earnings per share | $        0.03 | $       (0.02) |

The computation of diluted net income (loss) per share is as follows:

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Numerator:** | | |
| Net income (loss), basic | $ 13,179,326 | $ (6,949,147) |
| Add: Undistributed net income allocated to participating convertible preferred shares | 3,517,031 | - |
| Diluted net income | $ 16,696,357 | $ (6,949,147) |
| | | |
| **Denominator:** | | |
| Basic weighted-average shares outstanding | 387,858,725 | 288,577,455 |
| Add: Incremental shares for: | | |
| Dilutive effect of shares issuable to related party (Note 3) | 6,858,495 | - |
| Dilutive effect of participating convertible preferred shares | 96,456,750 | - |
| Diluted weighted-average shares outstanding | 491,173,970 | 288,577,455 |
| | | |
| **Net income per common share:** | | |
| Diluted earnings per share | $        0.03 | $       (0.02) |

Basic income per common share is computed by applying the two class method, where the numerator is adjusted for undistributed net income allocated to participating convertible preferred shares.

As the Company incurred a net loss for the period ended December 31, 2019, basic and diluted EPS are the same for this period as the effect of participating convertible preferred shares would be anti-dilutive. There were no excluded anti-dilutive securities for the year ended December 31, 2020.

To calculate the diluted weighted-average common shares outstanding for the year ended December 31, 2020, the number of incremental shares assumed outstanding from the shares issuable to a related party is calculated by applying the if-converted method. To calculate the incremental shares from the assumed conversion of participating convertible preferred shares, the Company applied the if-converted method. Under this method, the numerator is adjusted for undistributed net income allocated to participating convertible preferred shares for the year ended December 31, 2020.

**12. Commitments and Contingencies**

*Crypto asset wallets*

The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft. The Company has no reason to believe it will incur any expense associated with such potential liability because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within its control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss. Since the risk of loss is remote, no liability is recorded as of December 31, 2020 and 2019, respectively.

*Legal proceedings*

The Company is subject to various litigations, regulatory investigations, and other legal proceedings that arise in the ordinary course of its business. The Company is also subject to regulatory oversight by numerous regulatory and other governmental agencies. The Company reviews its lawsuits, regulatory investigations, and other legal proceedings on an ongoing basis and provides disclosure and records loss contingencies in accordance with the loss contingencies accounting guidance. In accordance with such guidance, the Company establishes accruals for such matters when potential losses become probable and can be reasonably estimated. If the Company determines that a loss is reasonably possible and the loss or range of loss can be estimated, the Company discloses the possible loss in the consolidated financial statements.

*Tax regulation*

Current promulgated tax rules related to crypto assets are unclear and require significant judgments to be made in interpretation of the law, including but not limited to the areas of income tax, information reporting and the withholding of tax at source. Additional guidance may be issued by the IRS, Department of the Treasury, or other governing bodies that may significantly differ from the Company's interpretation of the law, which could have unforeseen effects on our financial condition and results of operations, and as a result, the related impact on our financial condition and results of operations is not estimable.

**13. Subsequent Events**

The Company has evaluated subsequent events that occurred after the Consolidated Balance Sheet date through auditor's opinion date, which represents the date the consolidated financial statements were available to be issued. The Company is not aware of significant events that have not been disclosed herein that would have a material impact on these consolidated financial statements.

In February 2021, a related party company purchased the BNB receivable for approximately $130.1 million.

During 2021, prior to the date of issuance, the Company has initiated several long-term promotional relationships that either involve significant financial commitments or guarantees with various parties.  The length of the agreements' terms range up to 20 years and the aggregate amount of these commitments is approximately $350.0 million.

In May 2021, FTX acquired a Cyprus-based company, Innovatia Limited, that operates a Gibraltar-based company, Zubr Exchange Limited (Zubr).  Innovatia was acquired for $11.0 million, in cash with an earnout component. Zubr Exchange is in the process of applying for a Gibraltar cryptocurrency derivatives license, expected to be completed by the end of 2021.

In July 2021, the Company completed a Series B preferred share round of financing in which 34.1 million Series B Preferred shares were issued for approximately $900.0 million.

In July 2021, the Company's Series A preferred shares were purchased in a secondary transaction by a related party for $2.3 billion. No Company assets or liabilities were affected by the transaction, and no gains and losses were recorded as a result of the transaction.

Exhibit 17

**ACCOUNTING AND CORPORATE REGULATORY AUTHORITY (ACRA)**

bizfile+

Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

| | | |
|---|---|---|
| Name of Company | : | QUOINE PTE. LTD. |
| Former Name if any | : | |
| Date of Change of Name | : | |
| UEN | : | 201414068E |
| Incorporation Date | : | 15 MAY 2014 |
| Company Type | : | PRIVATE COMPANY LIMITED BY SHARES |
| Status of Company | : | LIVE COMPANY |
| Status Date | : | 15 MAY 2014 |
| Registered Office Address | : | 1 GEORGE STREET<br>#10-01<br>ONE GEORGE STREET<br>SINGAPORE (049145) |
| Date of Address | : | 25 JAN 2023 |
| Date of Last AGM | : | 03 DEC 2021 |
| Date of Last AR | : | 30 DEC 2021 |
| FYE As At Date of Last AR | : | 31 MAR 2019 |

## Business Activities

| | | |
|---|---|---|
| Primary Activity | : | SECURITY DEALINGS AND COMMODITY CONTRACTS BROKERAGE ACTIVITIES N.E.C.(66129) |
| Primary User-Described Activity | : | TRADING OF VIRTUAL CURRENCY, INCLUDING CRYPTOCURRENCY |

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt



ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

| | | |
|---|---|---|
| Secondary Activity | : | OTHER INFORMATION SERVICE ACTIVITIES N.E.C.(63909) |
| Secondary User–Described Activity | : | |

## Issued Share Capital

| Amount | Number of Shares [1] | Currency | Share Type |
|---|---|---|---|
| 122410000 | 122410000 | SINGAPORE, DOLLARS | ORDINARY |

[1] Number of Shares includes number of Treasury Shares

## Paid–Up Capital

| Amount | Number of Shares | Currency | Share Type |
|---|---|---|---|
| 122410000 | 122410000 | SINGAPORE, DOLLARS | ORDINARY |

## Company has the following Ordinary Shares held as Treasury Shares

| Number of Shares | Currency |
|---|---|

## Audit Firm(s)

| Name |
|---|
| CROWE HORWATH FIRST TRUST LLP |

## Charge(s)

| Charge Number | Date Registered | Currency | Amount Secured | Chargee(s) |
|---|---|---|---|---|

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt



ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)

biz*file*+

Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

## Officer(s)

| Name<br><br>Address | Identification Number | Nationality/ Citizenship | Position | Date of Appointment | Source of Address |
|---|---|---|---|---|---|
| TAVERNE PHILIPPE ARMAND HUBERT<br><br>1 GEORGE STREET<br>#10-01<br>ONE GEORGE STREET<br>SINGAPORE (049145) | S7481862E | FRENCH | DIRECTOR | 28 DEC 2022 | ACRA |
| KURT STEVEN KNIPP<br><br>87 E LONG LAKE RD, VALPARAISO, IN 46383-1187, USA | 599089090 | AMERICAN | DIRECTOR | 28 DEC 2022 | ACRA |
| SETH MICHAEL MELAMED<br><br>3 CHOME-17 NISHIKICHOU, KANDA, CHIYODA-KU HIROSE BLDG 4TH<br>TOKYO 010054 JAPAN | 505464504 | AMERICAN | DIRECTOR | 26 AUG 2022 | ACRA |
| JOHN JAMES RAY III<br><br>561 PALM CIR E, NAPLES, FL, 34102-5558 USA | 673364515 | AMERICAN | CHIEF EXECUTIVE OFFICER | 10 NOV 2022 | ACRA |

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt



ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)

bizfile+

Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

## Officer(s)

| Name<br><br>Address | Identification Number | Nationality/ Citizenship | Position | Date of Appointment | Source of Address |
|---|---|---|---|---|---|
| TOURNADRE EP GAUDECHON VANESSA DANIELE COLETTE<br><br>1 GEORGE STREET<br>#10-01<br>ONE GEORGE STREET<br>SINGAPORE (049145) | G6053692P | FRENCH | SECRETARY | 16 JAN 2023 | ACRA |

## Shareholder(s)

| Name<br><br>Address | Identification Number | Nationality[2]/ Place of origin[3] | Number of Shares | Currency | Address Changed<br><br>Source of Address |
|---|---|---|---|---|---|
| FTX JAPAN HOLDINGS K.K<br><br>3-17, KANDANISHIKI-CHO, CHIYODA-KU TOKYO, JAPAN | T19UF3279E | JAPAN | 122410000 (ORDINARY) | SINGAPORE, DOLLARS | ACRA |

[2] Includes nationality and citizenship
[3] Includes place of incorporation, place of origin and place of registration

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt



**ACCOUNTING AND CORPORATE REGULATORY AUTHORITY (ACRA)**

Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

## Abbreviation

| | | |
|---|---|---|
| UL | : | Local Entity not registered with ACRA |
| UF | : | Foreign Entity not registered with ACRA |
| AR | : | Annual Return |
| AGM | : | Annual General Meeting |
| FS | : | Financial Statements |
| FYE | : | Financial Year End |
| OSCARS | : | One Stop Change of Address Reporting Service by Immigration & Checkpoint Authority. |

## Notes

1 All the information provided above are extracted from lodgements filed with ACRA and/or from other government sources.

2 Please check to ensure that this document is issued by ACRA by:
   (a) scanning the verification QR code at the bottom of the page, or
   (b) visiting the verification URL at the bottom of the page, or
   (c) uploading the verifiable OpenAttestation file (e.g. Business_Profile.oa) on www.acratrustbar.gov.sg.

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt



ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



Whilst every endeavor is made to ensure that information provided is updated and correct, ACRA disclaims any liability for any damage or loss that may be caused as a result of any error of omission.

# Business Profile (Company) of QUOINE PTE. LTD. (201414068E)

Date: 16 May 2024

 

TAN YONG TAT

ASST REGISTRAR OF COMPANIES & BUSINESS NAMES
ACCOUNTING AND CORPORATE REGULATORY AUTHORITY (ACRA)
SINGAPORE

RECEIPT NO.  :  ACRA240516153261

DATE  :  16 MAY 2024

**Verify Document Instantly**

Check if this document is issued by ACRA.

https://www.acratrustbar.gov.sg/verify/Y5twtWAnkt

Exhiibit 18

| | |
|---|---|
| **件名:** | Re: Quoine (Liquid)- Payroll for Nov'22 |
| **日付:** | 2022年11月23日 水曜日 17時13分02秒 日本標準時 |
| **差出人:** | Bao Vuong |
| **宛先:** | Soo Yin Kue |
| **CC:** | htrent@alvarezandmarsal.com, Ben Spitz, Links SG Payroll, Sakiko Kojima, Satoshi Kitahama, Siti Norahayu, Louise Lau, Henry Le |
| **添付ファ イル:** | image001.jpg |

Hi Soo,

For point 1, please pay him 1 month salary on Nov 22 amounting at USD 26,250, do not pay him back.

Sorry for the inconvenient

On Wed, Nov 23, 2022 at 3:06 PM Bao Vuong <bao.vuong@liquid.com> wrote:

> Hello Soo Yin,
>
> In the meantime, I also update you on some points relating to this month's payroll in the template:
>
> 1. We add Seth's payroll in the payment. He is a director of Quoine Pte Ltd (referred to as FTX Singapore in the contract) but based in Japan. His contract starts on 1 Sep 22 but we have not paid him Sep and Oct 22 salaries. So please pay him Nov salary with Sep and Oct 22
>
> 2. I have noted the changes in Jered salary
>
> 3. Please pay salary of Yvone to 11 Nov 22
>
> On Wed, Nov 23, 2022 at 8:27 AM Bao Vuong <bao.vuong@liquid.com> wrote:
>
>> Hello Soo Yin,
>>
>> Could you please advise what I should do in both circumstances?
>>
>> On Wed, Nov 23, 2022 at 8:19 AM Soo Yin Kue <sooyin.kue@linksinternational.com> wrote:
>>
>>> Hi Bao
>>>
>>> Thanks for your email.
>>>
>>> May I clarify on below:
>>>
>>> 1. In your below email, you mentioned for the continue services. May I clarify if you are referring to continue services with Links to a certain year instead of until Dec 2022 that informed earlier?
>>> 2. Or do you mean that to continue the services till Dec22 as per the termination notice given to Links?
>>>
>>> Please correct me if my understanding is wrong.

Exhibit 19



**Madoka Kagimoto <madoka.kagimoto@quoine.com>**

---

## FW: Bonuses paying to FTX JP employees

**y-mori@mirai-sr.jp** <y-mori@mirai-sr.jp>　　　　　　　　　　　　　　Tue, Sep 20, 2022 at 4:32 PM
To: Madoka Kagimoto <madoka.kagimoto@quoine.com>
Cc: 中島　良太 <r-nakajima@mirai-sr.jp>, 宮腰　真弓 <m-miyakoshi@mirai-sr.jp>, 藤野　美奈子 <m-fujino@mirai-sr.jp>

FTX Japan株式会社

鍵本様


いつもお世話になっております。

みらい社会保険労務士法人　森です。


JEN CHAN様、SETH MELAMED様よりご依頼いただいておりました

賞与計算をいたしました。


支給控除一覧表および円換算表を送付いたします。


よろしくお願いいたします。


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

みらい社会保険労務士法人

　　　森　百合子


〒359-0038

埼玉県所沢市北秋津1167-7

TEL.04-2935-7373　FAX.04-2935-7372

E-mail:y-mori@mirai-sr.jp

**************************************************

---

**From:** Seth Melamed <seth@ftx.com>
**Sent:** Friday, September 16, 2022 1:22 AM
**To:** y-mori@mirai-sr.jp; r-nakajima@mirai-sr.jp
**Cc:** jen@ftx.com
**Subject:** Re: Bonuses paying to FTX JP employees



On Thu, Sep 15, 2022 at 5:58 PM Jen Chan <jen@ftx.com> wrote:

> Hi Nakajima san, Mori san,
>
> My name is Jen Chan and I am the Chief of Staff for FTX, I understand from Seth that you are our payroll agent. We would need your kind help to distribute bonuses to the below employees of FTX JP. The amount below are the gross amounts in USD. I think we can use exchange rate of USD:JPY at 140 to distribute the bonus.
>
> Will you calculate the withholding tax and other mandatory contributions before we pay the individuals?
>
> It would be great if you can kindly give me a brief description of the time you need, and how to calculate the net amount to be distributed to the employees, thank you!
>
> 
>
> Seth Melamed 200,000

Total is USD 467,000.

Best regards,

Jen

—

Jen Chan

---

**2 attachments**

 **2022.09.20　賞与支給控除一覧表(20名）.pdf**
67K

 **2022.09.20　賞与円換算（社員番号順）.pdf**
117K

Exhibit 20

7/17/24, 2:24 PM                    QUOINE Mail - Fwd: Seth - Payment which Seth has not received yet.

Case 22-11068-JTD    Doc 23173    Filed 08/17/24    Page 362 of 379



**Seth Melamed <seth.melamed@quoine.com>**

---

## Fwd: Seth - Payment which Seth has not received yet.

**Madoka Kagimoto** <madoka.kagimoto@liquid.com>                    Mon, Jul 15, 2024 at 6:26 PM
To: Seth Melamed <seth@liquid.com>

forwarded these messages.

Madoka

---------- Forwarded message ---------
From: **Madoka Kagimoto** <madoka.kagimoto@quoine.com>
Date: Thu, Jan 5, 2023 at 3:57 PM
Subject: Re: Seth - Payment which Seth has not received yet.
To: Trent, Hudson <htrent@alvarezandmarsal.com>, Simoneaux, Nicole <nsimoneaux@alvarezandmarsal.com>
Cc: Kathryn Schultea <kschultea@rlks.net>, Ben Spitz <ben.spitz@liquid.com>, Sakiko Kojima
<sakiko.kojima@liquid.com>


Hi Hudson and Nicole,
CC: Kathryn,

Thank you for your support.
May I ask you what is the plan to resolve these unpaid Directors Fees?

We highly appreciate your support on this matter, since we can not lose Seth's motivation now.

Thank you so much.

Best regards,
Madoka

On Mon, Jan 2, 2023 at 1:00 PM Madoka Kagimoto <madoka.kagimoto@liquid.com> wrote:
  Hi Hudson and Nicole,

  Happy new year to you!
  May I ask you again about Seth's payment which he has not received yet?

  Can you please tell me where we are with the following:
  1/ payment of Directors fees for Sept and Oct?
  2/ payment of the 200k USD bonus

  Thank you.

  Best regards,
  Madoka Kagimoto
  Manager, People & Culture Japan |FTX Japan K.K.
  101-0054  東京都千代田区神田錦町3-17 廣瀬ビル4F
  Email: madoka.kagimoto@liquid.com
  URL https://ftx.com/jp/

  

--
Madoka Kagimoto

Manager, People & Culture Japan | FTX Japan K.K.
101-0054 東京都千代田区神田錦町3-17 廣瀬ビル4F
Email: madoka.kagimoto@liquid.com
URL https://ftx.com/jp/



Exhibit 21

(Omitted)

Exhibit 22



**Corporate Structure**

FTX Japan K.K. Overview and History

- Seth was a Director of FTX Japan KK, FTX Japan Holdings, Quoine Pte. Ltd. prior to and post petition filing Nov 2022
- FTX Estate appointed Seth as a Director FTX Digital Holdings (Singapore) Pte. Ltd. post petition filing ~Oct 2023.  This entity was never part of the legacy LGI group of companies. Direct subsidiary of FTX Trading Ltd. See Slide #2 for Director appointment evidence

1

---------- Forwarded message ----------
From: **TLB CS Pte. Ltd.** <noreply@entitymgmt.com>
Date: Wed, Oct 18, 2023 at 1:30 AM
Subject: We have extended the document library for FTX DIGITAL HOLDINGS (SINGAPORE) PTE. LTD.
To: <seth@liquid.com>



Hello Seth Michael Melamed,

We have added new documents relating to **FTX DIGITAL HOLDINGS (SINGAPORE) PTE. LTD.** to your company's Console document library.

The following documents have been added:

- **FTX Digital Holdings (Singapore) Pte Ltd - Sole Shareholder Resolution - Appointment of Seth Melamed 4869-3837-5238 v.3[11].pdf**
  Vanessa Daniele Colette Tournadre Ep Gaudechon on 18th October 2023 04:24 pm

- **FTX Digital Holdings (Singapore) Pte Ltd - Sole Shareholder Resolution (directors appointments) [EXECUTED] (4887-7468-5254.1)[56].pdf**
  Vanessa Daniele Colette Tournadre Ep Gaudechon on 18th October 2023 04:24 pm

Exhibit 23

(Omitted)

Exhibit 24

**Wednesday, May 24, 2023 at 14:55:49 Japan Standard Time**

| | |
|---|---|
| **件名:** | Re: Quoine (Liquid)- Payroll for Nov'22 |
| **日付:** | 2022年11月23日 水曜日 17時13分02秒 日本標準時 |
| **差出人:** | Bao Vuong |
| **宛先:** | Soo Yin Kue |
| **CC:** | htrent@alvarezandmarsal.com, Ben Spitz, Links SG Payroll, Sakiko Kojima, Satoshi Kitahama, Siti Norahayu, Louise Lau, Henry Le |
| **添付ファ イル:** | image001.jpg |

Hi Soo,

For point 1, please pay him 1 month salary on Nov 22 amounting at  USD 26,250, do not pay him back.

Sorry for the inconvenient

On Wed, Nov 23, 2022 at 3:06 PM Bao Vuong <bao.vuong@liquid.com> wrote:

> Hello Soo Yin,
>
> In the meantime, I also update you on some points relating to this month's payroll in the template:
>
> 1. We add Seth's payroll in the payment. He is a director of Quoine Pte Ltd (referred to as FTX Singapore in the contract) but based in Japan. His contract starts on 1 Sep 22 but we have not paid him Sep and Oct 22 salaries. So please pay him Nov salary with Sep and Oct 22
>
> 2. I have noted the changes in Jered salary
>
> 3. Please pay salary of Yvone to 11 Nov 22
>
> On Wed, Nov 23, 2022 at 8:27 AM Bao Vuong <bao.vuong@liquid.com> wrote:
>
>> Hello Soo Yin,
>>
>> Could you please advise what I should do in both circumstances?
>>
>> On Wed, Nov 23, 2022 at 8:19 AM Soo Yin Kue <sooyin.kue@linksinternational.com> wrote:
>>
>>> Hi Bao
>>>
>>> Thanks for your email.
>>>
>>> May I clarify on below:
>>>
>>>   1. In your below email, you mentioned for the continue services. May I clarify if you are referring to continue services with Links to a certain year instead of until Dec 2022 that informed earlier?
>>>   2. Or do you mean that to continue the services till Dec22 as per the termination notice given to Links?
>>>
>>> Please correct me if my understanding is wrong.

Exhibit 25

辞　任　届

<u>RESIGNATION</u>

FTX Japan 株式会社 御中
To:　　　FTX Japan K.K.


　私は、2024年7月26日付をもって、FTX Japan株式会社の代表取締役を辞任いたしたく、ここに届出いたします。なお、本辞任届は、補償、費用の立替又は償還及び私の利益のために維持されている保険に関する権利、本日以前の未払の報酬又は賞与（未払の賞与20万ドルを含みます。）その他これらに類似するFTX Japan株式会社に関連して有するいかなる権利に係る利益を私が享受することを放棄する又は妨げるものと解釈されるものではありません。但し、辞任以後の期間に対する役員報酬を請求することはありません（本日以前の未払の報酬又は賞与は除きます。）。

　　　　I hereby tender my resignation as representative director of FTX Japan K.K. effective as of July 26, 2024. This resignation letter shall in no way be deemed to be a waiver of, or otherwise prevent me from receiving the benefit of, any rights to indemnification, advancement of or reimbursement of expenses or insurance maintained for my benefit, unpaid compensation or bonuses due or owed to me (including unpaid bonuses of USD 200,000) prior to the date hereof, or other similar rights I have in any capacity in connection with FTX Japan K.K. No claim for executive compensation may be made for periods after the resignation except for any unpaid compensation or bonuses due or owed to me prior to the date hereof.


2024 年7月26日
July 26, 2024


_____

セス・メラメド
Seth Melamed

Exhibit 26

July 30, 2024

Seth Melamed
2-3-7 Shimomeguro #510
Meguro-ku, Tokyo, Japan
153-0064

and

JL Bumbak
Gang p. Saubi Villa Palms
Kabupaten Badung Kuta Utara
Bali 80361
Indonesia

Email: seth@liquid.com; check_raize@yahoo.com; and sethm19@mac.com

Re: Termination of Employment

Dear Seth:

This letter (this "Letter") is to provide you with notice of and confirm your termination of employment with FTX Japan Holdings K.K. (formerly known as Liquid Group Inc.) ("FTX Japan") and its affiliates (collectively, the "FTX Group"). Reference is made in this Letter to that certain Management Agreement, by and between FTX Japan and you, dated March 31, 2022, as amended on June 30, 2022, and as further amended and restated by that certain Amended and Restated Management Agreement, by and between you and FTX Japan, dated October 19, 2022 (collectively, the "FTX Japan Management Agreement").

1.  Termination of Employment. Pursuant to Section 11.1 of the FTX Japan Management Agreement, your employment with the FTX Group will terminate effective as of the three-month anniversary of the date of this Letter (the "Termination Date"). On the Termination Date, you shall also be terminated from all other positions you hold as a director, officer or employee of any FTX Group entity (unless earlier terminated). During the period from the date of this Letter until the Termination Date (the "Garden Leave Period"), you will be on "garden leave" and, from the date of this Letter, shall not have any authority to act on behalf of the FTX Group. During the Garden Leave Period, you will continue to receive your compensation and benefits in accordance with the terms of your employment prior to the Termination Date, as set forth in the FTX Japan Management Agreement, subject to your continued cooperation with the FTX Group in handover (including transitioning books and records and bank accounts) and any other matters as requested from time to time by the FTX Group.

2.  No Further Payments. Except as provided in Section 1 with respect to payments during the Garden Leave Period , you will not be entitled to any other compensation or benefits pursuant to the FTX Japan Management Agreement or otherwise.

3.      <u>Cooperation</u>. We will inform you if any other documentation is necessary to properly effectuate such termination, and you will be required to cooperate reasonably and promptly in executing and delivering it at our request.

4.      <u>Governing Law</u>. This Letter will be governed by and construed in accordance with the laws of Japan, without reference to principles of conflicts of law.

*[Signature Page Follows]*

We thank you for your services.

FTX JAPAN HOLDINGS K.K.

By:   *Kurt S. Knipp*
_____

Name:  Kurt S. Knipp
Title:   Director
Date:   July 30, 2024

[*Signature Page to Termination Letter*]

Exhibit 27

(Omitted)

Exhibit 28

# Use of Customer Funds to Buy FTX Stock from Binance

**July 15, 2021**



**Source of Customer Funds:** Alameda FTX Account 9
**Balance of Account on 7/15/21:** -$1.8 B

