## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| | (Jointly Administered) |
| Debtors. | **Hearing Date: Oct. 7, 2024, at 10:00 a.m.** |
| | **Objections Due: Aug. 16, 2024, at 4:00 p.m.** |
| | **(extended for U.S. Trustee to Aug. 23 at 4:00** |
| | **p.m.)** |
| | **Re:  D.I. 22165** |

### OBJECTION OF THE UNITED STATES TRUSTEE
### TO CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF
### REORGANIZATION OF FTX TRADING, LTD. AND ITS DEBTOR AFFILIATES

Andrew R. Vara, the United States Trustee for Region 3 (the "U.S. Trustee"), through his undersigned attorneys, objects to confirmation of the *First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 22165] (the "Plan"), and in support of his objection respectfully states:

### PRELIMINARY STATEMENT

1.    The Court should deny confirmation of the Plan for ten separate and independent reasons:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

- The Plan grants the Debtors a discharge in contravention of section 1141(d)(3) of title 11, United States Code (the "<u>Bankruptcy Code</u>").

- To the extent that applicable law authorizes exculpation beyond section 1125(e) of the Bankruptcy Code, the Plan exculpates non-estate fiduciaries and provides exculpation for pre-petition and post-effective date acts and omissions in contravention of Third Circuit precedent.

- The Plan imposes non-consensual third-party releases on various entities in contravention of applicable law.

- The Plan does not "carve out" the Kroll data breach from the Plan's debtor releases and exculpation.

- The Plan, in its entirety, is impermissibly deemed to be a Rule 9019 settlement.

- The Plan enjoins all creditors from enforcing their setoff rights and from asserting recoupment as an affirmative defense, in contravention of section 553(a) and Third Circuit law.

- The Debtors have not shown that reserving the Supplemental Remission Fund for the largest 2% of customers by number is fair to convenience class customers.

- The Plan fails to provide for proper payment of required post-effective date quarterly fees.

- The Plan Supplement controls to the extent inconsistent with the Plan; however, the Plan Supplement, containing information necessary for a reasonable creditor to vote, was not filed until August 2, 2024, and could be amended up until the Effective Date.

- The Plan requires parties in interest to file renewed requests for notice after the Plan's Effective Date, even if relief sought from the Court affects those parties' rights.

2.      Unless the above issues are satisfactorily addressed, the Court should deny confirmation.

## <u>JURISDICTION & STANDING</u>

3.      Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C.

§ 157(b)(2)(A), this Court has jurisdiction to hear and determine Plan confirmation and this objection.

4.      Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has a duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

6.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on Plan confirmation.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

**FACTS**

7.      On November 11 and 14, 2022, the above-captioned debtors (the "Debtors") filed chapter 11 petitions in this Court.

8.      On August 25, 2023, Kroll Restructuring Administration LLC ("Kroll"), the Debtors' claims and noticing agent, stated in a filed notice that it had sent an e-mail to over 78,000 claimants notifying them that their personal information had been involved in a "security incident." D.I. 2251.  Since that time, the Debtors' professionals have billed millions of dollars of fees to respond to the data breach.  On March 14, 2024, the U.S. Trustee filed a reservation of rights regarding the professional fees that have been incurred responding to the data breach.  D.I. 9317. Katherine Stadler, the Court-appointed fee examiner in these cases, has concluded that "the

Debtors' estates should not bear ultimate responsibility for the fees and expenses associated with remediating the data breach."  D.I. 9157 at 2-3.

9.     On December 16, 2023, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation, and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 4863].

10.     On May 22, 2024, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 15520] and the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-in-Possession* [D.I. 15521] (as amended at D.I. 18976, the "Disclosure Statement").

11.     On May 30, 2024, the U.S. Trustee's counsel sent Debtors' counsel informal comments on the version of the Plan filed at D.I. 15520.  The Debtors agreed to revise the Plan to address some (but not all) of the U.S. Trustee's comments.

12.     On June 26, 2024, the Court entered an order approving the Disclosure Statement and the Debtors' proposed solicitation procedures.  *See* D.I. 19068.  Pursuant to the solicitation procedures, (a) Plan solicitation was required to commence by July 10; (b) the Plan Supplement was required to be filed by August 2; and (c) the Plan voting and confirmation objection deadline was August 16.  The Plan Supplement is the "initial compilation of documents and forms of documents, schedules and exhibits to the Plan . . . and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement."  Plan § 2.1.146.

13.    On August 2, 2024, the Debtors filed the plan supplement [D.I. 22163] (the "Plan Supplement").  Section 13.7 of the Plan incorporates the Plan Supplement "as if set forth in full in the Plan."

## ARGUMENT

### I.    Plan Proposes to Discharge Debtors in Violation of 11 U.S.C. § 1141(d)(3)

14.    The Court should deny confirmation because the Plan proposes to grant the Debtors a discharge in violation of section 1141(d)(3) of the Bankruptcy Code.

15.    Section 1129(a)(1) of the Bankruptcy Code provides that the Court shall confirm a plan only if the plan "complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).

16.    Section 1141(d)(3) of the Bankruptcy Code provides:

The confirmation of a plan does not discharge a debtor if—

>     (A) the plan provides for the liquidation of all or substantially
>         all of the property of the estate;
>     (B) the debtor does not engage in business after consummation
>         of the plan; and
>     (C) the debtor would be denied a discharge under section
>         727(a) of this title if the case were a case under chapter 7
>         of this title.

11 U.S.C. § 1141(d)(3).

17.    Section 10.2 of the Plan would give the Debtors a discharge:

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, the Plan Administrator or any property of the Wind Down Entities, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Proof of Interest based upon such Claim, debt, right, liability, obligation or Interest is filed or deemed filed pursuant to section 501 of

the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date. For the avoidance of doubt, any Claims arising pursuant to section 502(h) of the Bankruptcy Code following the conclusion of any adversary proceeding shall not be discharged on or after the Effective Date.

18.    In addition, section 10.9 of the Plan would establish an injunction to enforce the discharge.

19.    However, the Debtors are not eligible for a discharge because the elements of section 1141(d)(3) are satisfied.

20.    First, the Plan provides for the liquidation of all or substantially all of the Debtors' property.  The Plan defines "Plan Assets" to mean "all Causes of Action and other property of each Estate and any property retained by any Debtor under the Plan."  Plan § 2.1.145. "The Wind Down Entities shall manage and hold Plan Assets for sale; sell Plan Assets; administer, and close as necessary, the Chapter 11 Cases; administer, reconcile, resolve and settle claims; and liquidate the Debtors and their non-Debtor subsidiaries pursuant to the terms of the Plan Supplement."  Plan § 5.8.  Plan distributions "shall be funded from (a) Cash on hand, (b) Available NFTs, (c) Wind Down Cash Proceeds, and (d) any other Plan Assets, except as expressly set forth herein."  *Id.* § 5.9.  The Wind Down Board will be responsible for overseeing the "liquidation and Distribution of the Plan Assets."  *Id.* § 5.11.  The Debtors expect to have already liquidated the "overwhelming majority" of their assets by the Effective Date.  Disclosure Statement § 3.E.  Under the Plan, substantially all of the Debtors' assets will be liquidated.

21.    Second, the Debtors will not engage in business after consummation of the Plan.  "Business" means a "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain."  BLACK'S LAW

DICTIONARY (8th ed. 2004) at 211. An entity does not engage in business when its assets are liquidated and the entity is dissolved. *See Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018).

22. The Debtors will not engage in business because the Plan Supplement establishes a liquidating trust to succeed the Consolidated Debtors and prohibits the trust from engaging in business. The Plan Supplement establishes the FTX Recovery Trust "for the purpose of liquidating and distributing the FTX Recovery Trust Assets in accordance with the Plan on behalf, and for the benefit of the FTX Recovery Trust Beneficiaries and pursuant to Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose hereunder." Plan Supplement Ex. 2 § 2.2(a).[2] The FTX Recovery Trust "will be the representative of the Estates of the Consolidated Debtors as that term is used in section 1123(b)(3)(B) of the Bankruptcy Code[.]" *Id.* §§ 2.3(b). The Available Assets "shall vest in the FTX Recovery Trust and the FTX Recovery Trust shall succeed to all of the Consolidated Debtors' right, title and interest in the Available Assets, and the Consolidated Debtors will have no further rights or interest in or with respect to the Available Assets[.]" *Id.* § 2.6. The FTX

---

[2] "FTX Recovery Trust Assets" is defined to include "the Available Assets transferred to the FTX Recovery Trust on or after the Effective Date[.]" D.I. 22163 Ex. 2 § 1.2(cc). "Available Assets" is defined to mean "all Causes of Action and other property (including equity or other securities held in any non-Debtor Entities) of each Consolidated Debtor and any property retained by any Consolidated Debtor under the Plan." *Id.* § 1.2(e). Under Treas. Reg. § 301.7701-4(d),

> [a]n organization will be considered a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose. A liquidating trust is treated as a trust for purposes of the Internal Revenue Code because it is formed with the objective of liquidating particular assets and not as an organization having as its purpose the carrying on of a profit-making business which normally would be conducted through business organizations classified as corporations or partnerships.

Recovery Trust "shall wind down the affairs of, and dissolve the Consolidated Debtors and their subsidiaries[.]" *Id.* § 2.2(c).  "The Board, the FTX Recovery Trust Management and the FTX Recovery Trust Agents shall hold the FTX Recovery Trust out as a trust in the process of liquidation, whose activities are limited to the liquidation of the FTX Recovery Trust Assets on behalf, and for the benefit, of the FTX Recovery Trust Beneficiaries and the other purposes set forth in this Agreement.  Without limiting the foregoing, the FTX Recovery Trust shall not hold itself out as an investment company, and ***no part of the FTX Recovery Trust Assets shall be caused by the Board to be used or disposed of in furtherance of any trade or business***."  *Id.* § 8.1(a) (emphasis added).

23.     The Debtors will not be engaging in business because (i) they will have already liquidated the "overwhelming majority" of their assets by the Plan's proposed "Effective Date,"[3] (ii) they will not relaunch their exchanges,[4] and (iii) their assets will vest a liquidating trust that is prohibited from using those assets to engage in a trade or business.[5]  Fundamentally, the Plan is about monetizing remaining assets -- not engaging in business.  Section 1141(d)(3)(B) is satisfied.

24.     Third, the Debtors, as corporations, would not be eligible for a discharge if they were chapter 7 debtors pursuant to section 727(a)(1) of the Bankruptcy Code, which provides that the Court shall grant a debtor a discharge unless the debtor is not an individual.  *See*, *e.g.*, *In re Flintkote Co.*, 486 B.R. 99, 129 n.80 (Bankr. D. Del. 2012) ("Section 1141(d)(3)(C) is always satisfied for corporate debtors, as they cannot receive discharges in chapter 7.").

---

[3] Disclosure Statement § 3.E.

[4] Disclosure Statement § 3.D (Plan "contemplates cash distributions only, rather than the relaunch of the FTX.com Exchange[.]").

[5] Plan Supplement Ex. 2 §§ 2.2, 2.3, 2.5, 2.6 & 8.1.

25.     For these reasons, the Debtors are not eligible for a discharge under section 1141(d)(3) of the Bankruptcy Code.  Because Plan §§ 10.2 and 10.9 would give the Debtors a discharge regardless, the Plan violates section 1141(d)(3) and, by extension, does not satisfy section 1129(a)(1).  Unless the Plan provides that the Debtors shall not receive a discharge and removes any discharge injunction, the Court should deny confirmation.

## II.     Plan's Exculpation Contravenes Third Circuit Precedent

26.     The Court should deny confirmation because, to the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provisions contravene Third Circuit precedent.  *See In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000).

27.     Section 2.1.86 of the Plan defines "Exculpated Parties" to mean:

(a) the Debtors; (b) the Official Committee and its current and former members, solely in their capacities as members of the Committee; (c) the Fee Examiner; (d) to the extent determined to be acting as a fiduciary for the benefit of a Debtor, its estate, or its creditors, the Bahamas JOLs and FTX DM; (e) to the extent determined to be acting as a fiduciary for the benefit of a Debtor, its estate, or its creditors, the Ad Hoc Committee and the executive committee of the Ad Hoc Committee (as such executive committee is constituted from time to time); and (f) with respect to each Person or Entity named in (a) through (e), any Person or Entity to the extent acting as a member, shareholder, director, officer, employee, attorney (including solicitors or barristers acting for the benefit of such Person or Entity), financial advisor, restructuring advisor, investment banker, accountant and other professional or representative of such Person or Entity, in each case in (a) through (f), to the extent such Person or Entity is or was acting in such capacity. Notwithstanding anything to the contrary in the Plan or the Plan Supplement, no Excluded Party shall be an Exculpated Party.

28.     Section 10.8 of the Plan would exculpate the Exculpated Parties for "(d) any . . . transaction, agreement, event, or other occurrence related to these Chapter 11 Cases taking place on or before the Effective Date," excluding acts or omissions constituting gross negligence, willful misconduct, fraud, or a criminal act.

29.     In addition, the Plan Supplement would provide prospective exculpation post-Effective Date.  Section 8 of the Plan Administration Agreement would give exculpation to "the Debtors, the Wind Down Entities, and each of their respective current and former members, directors, officers, Affiliates, parents, subsidiaries, members, managers, predecessors, successors, executors, assigns, participants, partners, employees, independent contractors, advisors, consultants, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, experts and other professionals or representatives, in each case solely when acting in any such capacities" for effectuating the Plan and for "any act taken, or omission made, in connection with the affairs of the Debtors or the Wind Down Entities" except acts and omissions constituting fraud, gross negligence, or willful misconduct.  Plan Supplement Ex. 1 § 8.  Section 11.1 of the Liquidating Trust Agreement would give the Delaware Trustee, the FTX Recovery Trustees, the Plan Administrator, the FTX Recovery Trust Management, and members of the Advisory Committee and their respective principals, advisors, and professionals exculpation for their post-effective date acts and omissions.  *Id.* Ex. 2 § 11.1(a).  Further, "in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances."  *Id.*  The Delaware Trustee would receive similar immunity from punitive, exemplary, consequential, special or other damages under any circumstances.  *Id.* § 9.2(ix).

30.     The Third Circuit has held that the Code confers "a limited grant of immunity" on "committee members and the entities that provided services to the Committee" "within the scope of their duties."  *PWS Holding*, 228 F.3d at 246; *accord In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (directing that exculpation "must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers"); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (same); *In re PTL Holdings LLC*, 2011 WL 5509031 at *11-

10

12 (Bankr. D. Del. 2011) (BLS) (holding exculpation "must be reeled in to include only those parties who have acted as estate fiduciaries and their professionals"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (holding exculpation "limited so as to apply only to estate fiduciaries" was consistent with applicable law).

31.     Case law also counsels that exculpation must be limited to post-petition, pre-Effective Date acts and omissions.  *See In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 n.10 (observing that *PWS Holding* did not "cover more than immunity from liability under § 1103(c)."); *In re PWS Holding Corp.*, 228 F.3d 224, 245-46 (3d. Cir. 2000) (exculpation clause did not violate section 524(e) of the Bankruptcy Code because it did not "affect[] the liability of the members of the Committee and professionals who provided services to the Debtors to third parties."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 337 (Bankr. D. Del. 2004) (releases of chapter 11 trustee, equity committee and their professionals "are not permissible except to the extent they are limited to post-petition activity" and exclude gross negligence and willful misconduct); *In re Mallinckrodt PLC*, 639 B.R. 837, 882-83 (Bankr. D. Del. 2022) (holding exculpation was "temporally overbroad in that it improperly sweeps in prepetition conduct. . . . [Exculpation] only extends to conduct that occurs between the Petition Date and the effective date.").

32.     The exculpation provisions at issue are impermissibly broad in five ways. First, the definition of "Exculpated Parties" includes entities who are not estate fiduciaries.  For example, the ad hoc committee of non-U.S. customers (and various related entities) is being exculpated, even though the ad hoc committee "is not a fiduciary committee."  Disclosure Statement § 3.C.4.  Entities who are not estate fiduciaries are not eligible to receive exculpation.

33.     Second, the exculpation covers "the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases."  Plan § 10.8.  This specific language does not

appear in the provision which the Third Circuit examined in *PWS Holding*, which was centered on the limited immunity afforded by section 1103(c) of the Bankruptcy Code to the Committee and its professionals – entities which do not operate the Debtors' businesses.  *See PWS Holding*, 228 F.3d at 246-47.  28 U.S.C. § 959 makes debtors in possession and trustees subject to suit, without leave of court, for "acts or transactions in carrying on business connected with such property." The "operation of the Debtors' businesses" language runs counter to 28 U.S.C. § 959's purpose of subjecting the Debtors to suit for their post-petition business conduct and, by extension, having applicable federal and state law govern such conduct.  Additionally, it is unclear whether all parties potentially affected by the Debtors' post-petition acts or transactions in carrying on business received notice of the Plan.  If notice of the Plan was not given to all parties potentially affected, the exculpation clause has the same effect as an impermissible, non-consensual, third-party release under *Purdue*; the provision limits the DIP's liability for a range of business-related acts or transactions.  For example, the Exculpated Parties would be shielded from a post-petition breach of contract action under Plan § 10.8.  Similarly, Exculpated Parties would be shielded from post-petition personal injury claims sounding in simple negligence which arose at retail locations.

34.     Third, the Plan's exculpation extends to pre-petition acts and omissions. Plan § 10.8 (exculpating the Exculpated Parties for "(d) any . . . transaction, agreement, event, or other occurrence related to these Chapter 11 Cases taking place on or before the Effective Date," subject to required exceptions).  Exculpation must be limited to post-petition acts and omissions.

35.     Fourth, the Plan Supplement is prospectively exculpating various entities for post-Effective Date acts and omissions.  Plan Supplement Ex. 1 § 8 and Ex. 2 § 11.1(a).

36.     Fifth, the Delaware Trustee, the FTX Recovery Trustees, the Plan Administrator, the FTX Recovery Trust Management, the members of the Advisory Committee, and their principals and advisors are receiving immunity from "punitive, exemplary, consequential

or special damages under any circumstances."  Plan Supplement Ex. 2 §§ 9.2(ix) & 11.1(a).

Pragmatically, such immunity would negate the exceptions for gross negligence, willful

misconduct, and fraud.  Further, such immunity would far exceed the protections that estate

professionals whose employment and compensation are subject to Court approval and oversight

under Sections 327, 328, 330, and 1103 and Rule 2014 receive during the case.  *See In re Dailey*

*Int'l, Inc.*, 1999 WL 35140013 at *3 (Bankr. D. Del. July 1, 1999) (Walsh, J.) (provisions that

included waiver of liability for consequential, incidental, indirect, punitive, or special damages

were "not appropriate terms and conditions for the retention of professionals in bankruptcy

pursuant to 11 U.S.C. §§ 327 and 328."); *In re United Cos. Fin. Corp.*, 241 B.R. 521, 524 (Bankr.

D. Del. 1999) (Walrath, J.) ("We wholeheartedly agree with our colleague's reasoning and

conclusions in the *Dailey* opinion.").  There is no reason to give prospective immunity to post-

effective date professionals and others who will be subject to little, if any, Court oversight.

37.     Finally, the definition of "Exculpated Parties" should clarify that members

of the official committee are receiving exculpation only for the time of their tenure on the

committee and only with respect to acts taken as a committee member.  Six of the nine original

members of the official creditors' committee have resigned.  D.I. 231 & 19921.  Committee

members who resigned should not be exculpated for any acts or omissions that occurred after their

resignations.

38.     For the reasons stated above, the Court should deny confirmation.

**III.     The Plan Should Not Release or Exculpate Claims Relating to the Kroll Data Breach**

39.     Even if this Court were to confirm the Plan with the objectionable release

and exculpation provisions, this Court should deny confirmation unless claims relating to the Kroll

data breach are specifically excluded from them.

40.    Estate professionals have sought allowance of millions of dollars in compensation for responding to the Kroll data breach, described at D.I. 2251.  The Debtors' estates should not bear that cost.  The fee examiner shares this view.  *See* D.I. 9157 at 2-3.  The Plan should be revised to specify that nothing in the Plan is releasing any claims or causes of action relating to the Kroll data breach, and nothing in the Plan shall constitute the allowance of, nor prejudice the ability of parties in interest to object to, any professional fees relating to the data breach.  Further, any resolution of claims between the Debtors and Kroll should be subject to further notice and a hearing before this Court, as any potential claims relate to Kroll's service as claims agent.  Unless the Debtors agree to make these clarifications, the Court should deny confirmation.

## IV.    Plan Would Impose Nonconsensual Third-Party Releases on Various Entities

41.    The Court should deny confirmation because the Plan would impose nonconsensual third-party releases on various entities.

42.    Plan § 2.1.168 defines "Releasing Parties" to include: " . . . (c) the Holders of all Claims who vote to accept the Plan and do not opt out of granting the releases set forth herein; (d) the Holders of all Claims that are Unimpaired under the Plan; (e) the Holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein; (f) the Holders of all Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein; . . . and (h) all other Holders of Claims or Interests to the maximum extent permitted by law."

43.    Plan §§ 10.5 and 10.9 would impose nonconsensual third-party releases and an accompanying injunction on the Releasing Parties.

44.    The Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a

nondebtor without the consent of affected claimants." *Harrington v. Purdue Pharma L.P.*, 144 S.

Ct. 2071, 2088 (2024).

45.     In *Purdue*, the U.S. Supreme Court did not "express a view on what

qualifies as a consensual release." *Id*.  Although opt-out mechanisms were approved in some cases

before *Purdue*,[6] the prohibition on nonconsensual third-party releases in *Purdue* requires this Court

to evaluate whether this Plan's releases are consensual under contract law.[7]

46.     Contract principles govern whether a release is consensual.  *See In re*

*SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).  Under contract law,[8] silence does

not equal consent except under limited circumstances not applicable here.  *See, e.g., Hornberger*

---

[6] *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. at 304-05 (allowing third-party releases to be imposed on unimpaired parties and any voting party that did not check opt-out box on ballot); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (holding that affirmative consent was not required, but only as to releases being given by unimpaired classes); *In re Mallinckrodt PLC*, 639 B.R. at 873, 881 (allowing third-party releases to be imposed on mass tort claimants without the opportunity to opt out, as well as on certain other classes of creditors and equity holders who were provided the ability to opt out, and holding that imposing such releases was permissible under *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) because of mass tort posture of case); *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 674-77 (Bankr. D. Del. 2022) (approving opt-out process for third-party releases in mass tort case but noting definition of releasing parties *did not include any "claimant who abstains from voting"*) (emphasis added).

[7] At the confirmation hearing in *Chassix Holdings Inc.*, Judge Wiles explained why courts should be wary of deeming consent based on a party's inaction:

> [I]t's a legal fiction.  It's not consent in any real sense.  It's consent by inaction, knowing perfectly well, that the legal fiction that people have read it and decided, well, I'm just going to abide by this consequence is nonsense.  People throw these things away.  They pay no attention whatsoever, and so the question is, what business do the Courts have basically helping to expand the number of parties who are deemed to consent to these releases.

*In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW), ECF No. 654 (Bankr. S.D.N.Y. Jul. 21, 2015), Tr. 158:1-9.

[8] Plan § 2.3 has a Delaware choice-of-law clause.  However, this clause is not controlling for claims or settlements between non-debtors.

*Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000)

(quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)).

47.     As a general rule of contract construction:

> Acceptance by silence is exceptional. Ordinarily an offeror does not
> have power to cause the silence of the offeree to operate as acceptance.
> See Comment b to § 53. The usual requirement of notification is stated
> in § 54 on acceptance by performance and § 56 on acceptance by
> promise. The mere receipt of an unsolicited offer does not impair the
> offeree's freedom of action or inaction or impose on him any duty to
> speak. The exceptional cases where silence is acceptance fall into two
> main classes: those where the offeree silently takes offered benefits,
> and those where one party relies on the other party's manifestation of
> intention that silence may operate as acceptance. Even in those cases
> the contract may be unenforceable under the Statute of Frauds. See
> Chapter 5.

RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981).

48.     Silence and inaction, however, will generally not be deemed assent under

the "mirror image" rule, which requires the acceptance to be identical to the offer.  *See Urban*

*Green Techs., LLC v. Sustainable Strategies* 2050 LLC, No. N136-12-115, 2017 WL 527565, at

*3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R.

641, 686 (E.D. Va. 2022) (contract law does not support consent by failure to opt out).  "[E]ven

though the offer states that silence will be taken as consent, silence on the part of the offeree cannot

turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence

into acceptance." *See Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) (citations

omitted; quoting RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981):  "The mere fact that

an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege

to remain silent without accepting.").

49.     Merely voting on a plan without checking an opt-out box does not constitute

the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release

claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981).  Voting on

a chapter 11 plan is governed by the Bankruptcy Code, and voter support only reflects approval of

the plan's treatment of the voters' claims against the debtor.  Those voting on the chapter 11 plan

have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release

claims against non-debtors.  *Id.*  Nor are they "silently tak[ing] offered benefits" from the released

non-debtors, such that consent may be inferred.  *Id.*  The only benefits received are through

distributions from the debtor's chapter 11 plan — there are no benefits provided from the released

non-debtor to the releasing claimant in exchange for the release.  Further, because the plan's

distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent

from the acceptance of those distributions.

50.     Here, the Plan forces third-party releases on various parties without their

affirmative consent.  Such releases cannot be approved under *Purdue*.

51.     First, the Plan forces third-party releases on holders of claims in unimpaired

classes.  *See* Plan § 2.1.168(d).  Creditors in those classes are not entitled to vote on the Plan;

instead, they are simply receiving a distribution on their claims against the Debtors.  The notice

sent to holders in the unimpaired classes (Class 1 – Priority Tax Claims; Class 2 – Other Priority

Claims; Class 3B – Other Secured Claims; Class 4 – Separate Subsidiary Claims; Class 5C – NFT

Customer Entitlement Claims; and Class 8A – Propco Operating Expense Claims) does not solicit

their affirmative consent to the third-party releases; rather, they are deemed to have consented to

the releases if they do not object.  D.I. 19068 (Solicitation Procedures Order) Ex. 2A (Unimpaired

Notice).  Accordingly, unimpaired claimants have done nothing to manifest their assent to release

their claims against third parties.  In *In re Chassix Holdings*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015),

the United States Bankruptcy Court for the Southern District of New York observed:

> Normally a creditor is 'unimpaired' if a plan 'leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.' If a creditor must release a claim against a third party under a plan (as a condition to whatever payment or other treatment the plan provides for the creditor's claim against the debtor), it is difficult to understand how such a creditor could properly be considered to be 'unimpaired' by the Plan in the first place. . . . There are only two possibilities as to creditors whose claims are paid in full: either the releases only relate to the claims that the Debtors themselves are satisfying (in which case the releases serve no purpose), or the releases cover claims that the creditors might be able to pursue notwithstanding the satisfaction of their claims against the Debtors—in which case there is no good basis on which to say that the Debtors' satisfaction of the Debtors' own liabilities should constitute a deemed 'consent' by the creditors to the release of their claims against other parties. For these reasons, the Court concludes that unimpaired creditors should not be deemed to have consented to the third party releases set forth in the Plan.

*Id*. at 81-82 (citation omitted). The only way for creditors in unimpaired classes to consent to the Plan's third-party releases is by opting in to them.

52.    Second, the Plan forces third-party releases on holders of claims who are entitled to vote but do not return a ballot and do not opt out. Plan § 2.1.168(e). Creditors who take no action have done nothing to manifest their assent to release their claims against third parties. *See Patterson*, 636 B.R. at 688 (concluding that "the Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual. Failure to opt out, without more, cannot form the basis of consent to the release of a claim."); *Emerge Energy Servs. LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717, *52 (Bankr. D. Del. Dec. 5, 2019) (consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form."); *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017) (under principles of New York contract law, creditor could not be deemed to consent to third-party releases merely by failing to object to plan, even when disclosure statement made it clear that such consequence would result); *Chassix*, 533 B.R. at 79-80 (limiting third-party releases to those who

18

voted to accept plan, or affirmatively elected to provide releases); *Washington Mut.*, 442 B.R. at 355 (holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."); *Coram*, 315 B.R. at 335 (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of releasing party).

53.     Conspicuous warnings in the disclosure statement, ballots, or an opt-out form that silence or inaction will constitute consent to a release are not enough to transform a party's failure to opt out into consent.  *See SunEdison*, 576 B.R. at 458–61.  In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release.  *See id.* at 460–61.  The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes).  *See id.* The *SunEdison* debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak.  *See id.* at 460.

54.     While some courts have suggested that voting for a plan is consent if there is an option to opt out, it is not.  As an initial matter, voting for a plan does not reflect the unambiguous assent that should be required to find consent to a release.  *See*, *e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the release, "it

is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

55.     First, imputing consent from a vote in favor of a plan assumes that the creditor understands the plan's non-debtor release, which is a questionable assumption for the reasons discussed herein.  Thus, voting for a plan does not necessarily reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

56.     Second, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan.  That is not true consent.  In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A).  But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan).  Requiring a non-debtor release as a condition of receiving distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with Code section 1129(a)(7)(A).

57.     As to the Debtors' proposal that those who vote to reject must also check an opt-out box to avoid being deemed to consent to give third-party releases, the United States Bankruptcy Court for the Southern District of New York made the following observation in *Chassix*:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  The

> additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.

*Chassix*, 533 B.R. at 79 (emphasis added).

58.    The foregoing principles are especially germane in these cases given the magnitude of the creditor body: the Debtors had over 11,000,000 customer accounts as of the Petition Date.    Disclosure Statement § 3.C.9.    Further, a significant portion of the Debtors' customers are in foreign countries and may not read and write English as their first language. Creditors whose vote is solicited but take no action in response have not consented to the Plan's third-party releases.    The only way for such creditors to consent to the third-party releases is by opting into them.

59.    Third, the Plan forces third-party releases on holders of claims who vote to accept or reject the Plan and do not opt out.    Plan § 2.1.168(c) & (f).    For the reasons stated above, the U.S. Trustee submits that affirmative consent cannot be shown merely through a failure to opt out.    Nor can consent be shown merely by voting in favor of the Plan.[9]    As this Court observed in *In re TPC Grp., Inc. et al*., Case No. 22-10493 (CTG) (Sept. 22, 2022 Hrg. Tr. Pgs. 25-26):

> So to my mind, voting yes or no is an expression of the creditors' acceptance or rejection of the treatment of their claim under the plan. And that's all. And so I don't think it is necessarily tied to whether I agree to release my claims against a non-Debtor or not. I understand there are cases that say acceptance means accepting everything, and I -- I understand that as a sort of a shorthand .... And I just think paradigmatically, under the Bankruptcy Code, what it contemplates is creditors voting to agree or disagree to the terms of

---

[9] *But see SunEdison*, 576 B.R. at 458 ("Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release."); *Coram*, 315 B.R. at 336 ("a Plan is a contract that may bind those who vote in favor of it.  . . . Therefore, to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the Noteholders, they are bound by that."); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted terms of plan); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (permitting third-party releases by creditors who vote in favor of plan).

a plan that treats their claims a particular way. And this is their claims against the Debtor.

60.    Fourth, the Plan would impose third-party releases on "all other Holders of Claims or Interests to the maximum extent permitted by law."  Plan § 2.1.168(h).  In other words, claimants, creditors and interest holders who did not express affirmative consent by opting into the third-party releases would give them, regardless of their choices, "to the maximum extent permitted by law."  After *Purdue*, "to the maximum extent permitted by law" is a nullity.  The law does not permit such nonconsensual releases.  The Court should strike part (h) from the definition of Releasing Parties.

61.    Finally, this Court may not approve the injunction enforcing the "opt out" release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual third-party releases are not permitted by the Bankruptcy Code.  *See Purdue Pharma*, 144 S.Ct. at 2088.  As the *Purdue* Court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and this case is not asbestos-related.  *See Purdue Pharma*, 144 S.Ct. at 2085 (citing 11 U.S.C. § 524(e)).  Additionally, if the plan contained a consensual third-party release, there would be no need for an injunction to support same, as an injunction in support of a purely consensual release is, by definition, not necessary to prevent "immediate and irreparable harm" to either the estate or the released parties.  The consensual releases may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, and there is no reason for this Court to be involved with the post-effective date enforcement of those releases.

62.    The Plan does not satisfy section 1129(a)(1) because it would impose third-party releases and an injunction on various entities without their consent.  The Court should deny confirmation for the reasons stated above.

**V.    Plan Impermissibly Deemed to Be a Rule 9019 Settlement**

63.    The Court should deny confirmation because the Plan is impermissibly deemed to be a settlement under Federal Rule of Bankruptcy Procedure 9019.

64.    Section 5.2 of the Plan provides in relevant part:

In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against, by or among the Debtors, including without limitation: (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors or the Insiders of other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (k) all Causes of Action relating to any of the foregoing.

65.    Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

66.    Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 5.2 seeks to do.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers,*

*Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted).

67.    The resolution of claims against the Debtors is governed by sections 1129 and 1141.

68.    A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves.  A "settlement" is "an agreement ending a dispute or lawsuit."  BLACK'S LAW DICTIONARY (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  *Id.*

69.    Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

70.    The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *Washington Mut.*, 442 B.R. at 338 (quoting *In*

24

*re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).[10]  In contrast, chapter 11 plans are subject to

the requirements of Bankruptcy Code sections 1123 and 1129.  *See In re Armstrong World Indus.,*

*Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) ("Confirmation of a proposed Chapter 11 reorganization

plan is governed by 11 U.S.C. § 1129.").  What may be permissible under a negotiated settlement

agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the

plan context is different from what may be permissible under a plan.[11]

71.    Here, Plan § 5.2 purports to treat the Plan itself as if it were a Rule 9019

"settlement."  Further, it appears § 5.2 is not limited to settling claims belonging to the Debtors or

the estates.  Thus, § 5.2 exceeds the scope of what can be settled under section 1123(b)(3)(A).

Unless § 5.2 is narrowed so that (i) it pertains only to claims the Debtors are settling against others

and (ii) it provides the Plan itself is not a settlement, the Plan does not comply with section

1123(b)(3)(A) and does not satisfy section 1129(a)(1).

## VI.    The Plan Would Enjoin Setoff and Recoupment Rights in Contravention of Applicable Law

72.    The Court should deny confirmation because the Plan would enjoin setoff

and recoupment rights in contravention of applicable law.

73.    Plan § 10.9 would permanently enjoin "any Person who has held, holds or

may hold Claims, Interests or Causes of Action from . . . (d) asserting any right of setoff,

subrogation or recoupment of any kind on account of or in connection with or with respect to any

---

[10] The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

[11] Rule 9019 cannot authorize this Court to approve something the Supreme Court held no Bankruptcy Code provision permits.  28 U.S.C. § 2075 commands that bankruptcy rules shall not abridge substantive rights.  To the extent Rule 9019 might be read as permitting a *Purdue* violation, this reading would be both incorrect and prohibited by section 2075 and Supreme Court precedent.

such Claim or Interest, notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise, against any Plan Asset, the Wind Down Entities, any Holder of a Claim or Interest or any initial or subsequent transferee."

74.    The Plan Supplement provides in relevant part: "In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action or FTX Recovery Trust Cause of Action of a Debtor, the FTX Recovery Trust or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in the Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff."  Plan Supplement Ex. 2 § 3.4

75.    Section 553(a) of the Bankruptcy Code provides that, subject to certain exceptions, "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case[.]"  11 U.S.C. § 553(a); *see Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (Section 553(a) "provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.").  A creditor who fails to exercise setoff rights before confirmation loses them.  *See In re Continental Airlines*, 134 F.3d 536, 542 (3d Cir. 1998).  Recoupment is an affirmative defense, not a cause of action.  *See Folger Adam Security, Inc. v. DeMatteis/McGregor JV*, 209 F.3d 252, 261 (3d Cir. 2000).  A claim subject to recoupment "avoids the usual bankruptcy channels and thus, in essence, is given priority over other creditors' claims. . . . The trustee of a bankruptcy estate takes the property subject to rights of recoupment."  *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1035 (3d Cir. 1995) (internal quotation marks, citation omitted).

76.     The Plan should not enjoin creditors who, for example, have validly asserted setoff claims in a proof of claim from pursuing them.  Nor should the Plan enjoin creditors' recoupment rights.  Unless these changes are made to Plan § 10.9, the Plan does not satisfy applicable law and, by extension, section 1129(a)(1) of the Bankruptcy Code.

## VII.    Debtors Have Not Shown Plan Treats Smaller Creditors Fairly

77.     The Court should deny confirmation because the Debtors have not shown that the Plan treats all creditors fairly.  Specifically, the Plan would reserve the Supplemental Remission Fund for the largest 2% of creditors by number.  D.I. 18976 at 8 ("Through this convenience class mechanism, approximately 98% of customers by number will be eligible to receive early cash recoveries.") *and* Plan § 4.3.11-13 (Class 7A, 7B, and 7C would not share in Supplemental Remission Fund).  Under the Plan, convenience claimants in class 7 are projected to receive 119% on their claims, whereas customers in class 5 are projected to receive up to 143%.

78.     Section 1122 of the Bankruptcy Code provides:

(a)     Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)     A plan may designate a separate class of claims consisting only of every unsecured that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

79.     "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990).  "The Bankruptcy Code furthers the policy of 'equality of distribution among creditors' by requiring that a plan of reorganization provide similar treatment to similarly situated claims." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004).  Classification of claims "is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only

27

for a legitimate reason." *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996). Although similar claims can be grouped in different classes under section 1122(a), such classification "must be reasonable." *In re Jersey Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158 (3d Cir. 1993) ("it seems clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes."). Separate classification of substantially similar claims "[must not] offend one's sensibility of due process and fair play." *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993). Classification "should not do substantial violence to any claimant's interest." *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir. 1980).

80.     Here, customers in the "convenience" classes (7A and 7B) would receive a smaller percentage distribution (119%) than other customers (classes 5A and 5B) (up to 143%) simply because their claims are smaller (generally $50,000 or less). The Debtors will have enough cash on hand on the Effective Date to pay convenience claimants the same rate as other customer claims: customers in classes 7A and 7B are projected to have about $1 billion in claims, and the Debtors expect to have $12.6 billion cash on hand on the Plan's effective date. Disclosure Statement §§ 1.G & 1.H.1. Yet the Supplemental Remission Fund will be reserved only for the largest 2% of customers by number, in classes 5A and 5B. There is no discernible difference in the legal attributes of these customers' claims. Further, given that the Debtors will not have business operations going forward, reserving the Supplemental Remission Fund for the largest 2% of customers by number does not have a business-related justification. The Debtors should demonstrate how excluding classes 7A and 7B from the Supplemental Remission Fund is reasonable.

## VIII.    The Plan Does Not Properly Provide for Post-Confirmation Payment of Quarterly Fees

81.    The Court should deny confirmation because the Plan does not properly provide for the post-confirmation payment of quarterly fees.

82.    Section 3.5 of the Plan provides:

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date, including any applicable interest payable under section 3717 of Title 31 of the United States Code, shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Plan Administrator shall pay any and all such fees and interest when due and payable (including any fraction thereof) until the earliest of the Chapter 11 Cases being closed, dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

83.    Section 5.13 of the Plan provides:

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Plan Assets irrevocably shall be transferred and assigned to and automatically vested in the Wind Down Entities, for the benefit of Holders of Claims, free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 363 of the Bankruptcy Code. All property held for Distribution pursuant to the Plan shall be held in trust for the benefit of the Holders of Allowed Claims and Interests and to pay the expenses of the administration of the Wind Down Entities. Upon the vesting of the Plan Assets in the Wind Down Entities, no Debtor, Consolidated Debtor or any Person or Entity holding a Claim or Interest shall (a) have an interest in, or any right with respect to, any Plan Asset except as provided by the Plan or (b) take, without the written consent of the Plan Administrator or order of the Court, any action with respect to a Wind Down Entity or a Plan Asset if such action would not have been permitted to be taken by such Person or Entity with respect to a Debtor or its property under section 362 of the Bankruptcy Code.

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Wind Down Entities (i) shall not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising of any event or occurrence taking place on or before the Effective Date, (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date, and (iii) shall not have any successor or transferee liability of any kind or character.

84.     Section 1129(a)(12) of the Bankruptcy Code provides that the Court shall confirm a plan only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  28 U.S.C. § 1930(a)(6) provides that "[e]xcept as provided in subparagraph (B), in addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 other than under subchapter V for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first."

85.     Under 28 U.S.C. § 1930(a)(6), quarterly fees are based on "disbursements." As "disbursement" is not defined in the statute, it is interpreted "in accordance with its 'ordinary, contemporary, common meaning.'" *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 421 (3d Cir. 2005) (citations omitted).  "'Disburse' is defined as 'to expend' or 'to pay out.'"  *Id*. "Payments made on behalf of a debtor, whether made directly or indirectly through centralized disbursing accounts, constitute that particular debtor's disbursements for the purpose of quarterly fee calculations under § 1930(a)(6)."  *Id.* at 422.

86.     Section 5.13 is objectionable to the extent it excuses the payment of quarterly fees after the Effective Date or shelters the proceeds of unliquidated assets that are transferred to or vested in the Wind Down Entities (including the FTX Recovery Trust) on the Effective Date from being counted as "disbursements" under 28 U.S.C. § 1930(a)(6).  For example, section 5.13 provides that "Upon the vesting of the Plan Assets in the Wind Down Entities, no . . . Person or Entity holding a Claim . . . shall . . . have . . . any right with respect to[] any Plan Asset except as provided by the Plan[.]"  This language could be construed to except the distribution or payment of liquidated Plan Assets from the calculation of post-Effective Date disbursements under 28 U.S.C. § 1930(a)(6).

87.    The Debtors' financial projections anticipate that asset liquidation will yield $2 billion to $4 billion in proceeds in three years post-effective date.  *See* D.I. 18976 Ex. C at 8. The distribution or payment of such proceeds are "disbursements" for purposes of 28 U.S.C. § 1930(a)(6) because they will be made by or on behalf of the Debtors: proceeds of the Debtors' assets will be distributed or paid to, *inter alia*, (i) administrative creditors of the Wind Down Entities and (ii) the Debtors' creditors pursuant to the Debtors' Plan.  If initially unmonetized assets are later reduced to cash post-effective date, then the proceeds are disbursements when they are ultimately expended or paid out.  *See, e.g., In re Quality Truck & Diesel Injection Serv., Inc.*, 251 B.R. 682, 688-89 (S.D. W.Va. 2000) (reversing bankruptcy court ruling that disbursements were limited to disbursements made pursuant to confirmed plan, and holding that disbursements include ordinary-course disbursements post-confirmation); *In re Health Diagnostic Lab., Inc.*, 2023 WL 105586 at *4 (Bankr. E.D. Va. Jan. 4, 2023) (disbursements must include all distributions made by liquidating trustee pursuant to plan to debtors' creditors on account of their allowed claims against debtors' estates); *In re Pettibone Corp.*, 244 B.R. 906, 922 (Bankr. N.D. Ill. 2000) (despite plan not specifically providing for post-confirmation quarterly fees, such fees must be paid on plan distributions: "Congress plainly intended the statute to cover post-confirmation plan 'distributions[.]'"), *rev'd in part by U.S. Trustee v. Pettibone Corp.*, 251 B.R. 335, 340 (N.D. Ill. 2000) (bankruptcy court erred in limiting quarterly fees to payments made pursuant to confirmed plan; "The legislative history of the January 1996 amendment reveals that Congress intended the term 'disbursements' to include post-confirmation disbursements and that the term should be interpreted broadly."); *In re Wintersilks, Inc.*, 243 B.R. 351 (Bankr. W.D. Wis. 1999) (quarterly fees measured on plan distributions but not on ordinary-course disbursements post-effective date), *rev'd by In re Wintersilks, Inc.*, 2000 WL 34236011 at *6 (W.D. Wis. June 2, 2000) (disbursements not limited to plan distributions)); *In re CSC Indus., Inc.*, 226 B.R. 402, 404 (Bankr. N.D. Ohio

1998) (holding liquidating trustee responsible for paying quarterly fees despite plan and liquidating trust agreement not specifically addressing such payments; liquidating trust "has essentially stepped into the shoes of the original debtor and is therefore liable for any such [quarterly] fees which may be imposed."); *In re Betwell Oil and Gas Co.*, 204 B.R. 817, 819 (Bankr. S.D. Fla. 1997) (stating in dicta that "to give any meaning to the post-confirmation obligation imposed by Congress, [quarterly] fees should be calculated against disbursements made pursuant to a plan. The example of a liquidating plan demonstrates the logic of this approach. In a liquidating plan, it is not unusual for some assets to be liquidated post-confirmation to provide additional payments to creditors. In such a case, payments from assets liquidated pre-confirmation would clearly be disbursements subject to the UST quarterly fee. It makes no sense to hold that the post-confirmation payments made from the liquidation of the remaining assets are *not* disbursements just because the remaining assets were vested in a reorganized debtor or liquidating trust at confirmation.").

88.     The U.S. Trustee is not seeking to double-dip on quarterly fees. The transfer or vesting of unliquidated assets to or in a post-confirmation entity is not a "disbursement" under 28 U.S.C. § 1930(a)(6). The U.S. Trustee does not seek to count such a transfer or vesting of unliquidated assets as a disbursement now. Rather, the disbursement will occur for purposes of 28 U.S.C. § 1930(a)(6) when the cash proceeds of such assets are expended or paid out.[12]

---

[12] To the extent *In re Paragon Offshore plc*, 629 B.R. 227 (Bankr. D. Del. 2021) suggested that non-cash transfers can be included as "disbursements" for purposes of 28 U.S.C. § 1930(a)(6), it was wrong; only payments of money are included in calculating the statutorily-mandated quarterly fee. In a more recent case, Judge Huennekens of the Bankruptcy Court for the Eastern District of Virginia distinguished *Paragon* as not only "not binding" but "also factually distinguishable" because "[t]he decision in *Paragon* was based on a concern that the U.S. Trustee was 'double-dipping.'" *See In re Health Diagnostic Lab., Inc.*, No. 15-32919-KRH, 2023 WL 105586, at *4 (Bankr. E.D. Va. Jan. 4, 2023). In that case, the liquidating trustee argued that "distributions of moneys he holds in trust to the beneficiaries of the trust are not disbursements because the beneficiaries are the equitable owners of the trust's assets." *Id.* at *3. Judge Huennekens

89.    The Court should deny confirmation unless Plan § 3.5 is revised as follows:

All ~~fees due and payable pursuant to section 1930 of Title 28 of the United States Code~~ U.S. Trustee Fees payable on or before the Effective Date~~, including any applicable interest payable under section 3717 of Title 31 of the United States Code,~~ shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, ~~to the extent applicable,~~ the Plan Administrator and Wind Down Entities (including, for the avoidance of doubt, the FTX Recovery Trust, as applicable, shall pay any and all ~~such fees and interest when due and payable~~ U.S. Trustee Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of ~~the~~ such Chapter 11 Case~~s~~ being closed, dismissed or converted to a case~~s~~ under chapter 7 of the Bankruptcy Code. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR.  Notwithstanding anything to the contrary in the Plan, (i) U.S. Trustee Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to U.S. Trustee Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.  This section 3.5 shall govern and control to the extent it conflicts with or is in any way inconsistent with any other provision of the Plan or Plan Supplement.

## IX.    The Plan Should Control if Inconsistent with the Plan Supplement

90.    The Court should deny confirmation because the Plan provides that the Plan Supplement will control to the extent inconsistent with the Plan.

91.    Section 13.14 of the Plan provides in relevant part:

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement or any order of the Bankruptcy Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements or amendments to any of the foregoing), conflicts with or is in any

---

rejected that argument because, "as the U.S. Trustee observe[d], quarterly fees could be virtually eliminated by the simple expedient of transferring assets from the bankruptcy estate to a post-confirmation entity for subsequent payment."  *Id*. at *4.  Citing "[t]he majority of courts that have considered this issue" (which are also cases cited by the U.S. Trustee in this objection), Judge Huennekens "conclude[d] that the Liquidating Trustee is required to pay quarterly fees on the distributions he makes to the trust beneficiaries."  *Id*.  The U.S. Trustee is not aware of any published or electronically available decisions that have adopted *Paragon*'s reasoning.

way inconsistent with any provision of the Plan, the Plan Supplement shall govern
and control.

92.     The Plan defines "Plan Supplement" to mean the "initial compilation of
documents and forms of documents, schedules and exhibits to the Plan . . . and additional
documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan
Supplement."  Plan § 2.1.146.

93.     The Court should reverse section 13.14: the Plan should govern and control
the Plan Supplement.  Creditors are voting on the Plan, not the Plan Supplement.  The Debtors
filed the Plan Supplement on August 2, 2024, several weeks after votes were solicited.  *See* D.I.
22163.  Confirmation of the Plan would authorize the Debtors to amend the Plan Supplement until
the Effective Date.  Allowing the Plan Supplement to control and allowing it to be amended up
until the Effective Date invites gamesmanship and mischief: the Debtors could insert provisions
pre-confirmation that are prejudicial to other parties, who would have limited (if any) time to object
or change their vote.  Worse yet, the provision enables the Debtors to amend the Plan Supplement
post-confirmation to include provisions which conflict with and/or are inconsistent with the
confirmed Plan.  The Plan should control to the extent inconsistent with the Plan Supplement.

## X.     The Plan Would Require Parties to File New Requests for Service to Receive Future Notices

94.     The Court should deny confirmation because the Plan would require parties
in interest to file new notices of appearance in order to keep receiving notices in the cases.

95.     Section 13.17 of the Plan provides in relevant part:

After the Effective Date, the Debtors are authorized to limit the list of Entities
receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have
filed renewed requests for service after the Effective Date.

96.     This provision does not comport with due process.  "Due process requires
'notice reasonably calculated, under all the circumstances, to apprize interested parties of the

34

pendency of the action and afford them an opportunity to present their objections.'" *Folger Adam Security*, 209 F.3d 252 at 265 (citations omitted).

97.    The Debtors, Wind Down Entities, and Plan Administrator, as applicable, should be required to serve documents on all entities whose rights are affected by such documents.

98.    The Court should deny confirmation unless Section 13.17 is revised as follows:

> After the Effective Date, the Debtors, Wind Down Entities (including, for the avoidance of doubt, the FTX Recovery Trust), or Plan Administrator, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (a) those Entities that have filed renewed requests for service after the Effective Date; and (b) those Entities whose rights are affected by such documents.

## CONCLUSION

99.    The U.S. Trustee reserves all of his rights and objections regarding any and all future amendments to the Plan and Plan Supplement.  The U.S. Trustee reserves the rights to comment on and object to the proposed form of confirmation order.  The U.S. Trustee reserves the rights to amend and/or to supplement this objection.

**[Continued on next page – space intentionally left blank]**

WHEREFORE, the U.S. Trustee respectfully asks that this Court deny confirmation and grant such other relief as the Court deems fair and just.

Dated: August 23, 2024
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 & 9**

By: _/s/ Linda Richenderfer_
Benjamin A. Hackman
Linda Richenderfer (DE #4138)
Jonathan Lipshie
Trial Attorneys
Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
benjamin.a.hackman@usdoj.gov
linda.richenderfer@usdoj.gov
jon.lipshie@usdoj.gov

-and-

David Gerardi
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ 07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov