```
 1                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD.,           .
     et al.,                     .  (Jointly Administered)
 5                               .
            Debtors.             .
 6   . . . . . . . . . . . . . . .
                                 .
 7   ALAMEDA RESEARCH LLC, FTX   .  Adversary Proceeding
     TRADING LTD., WEST REALM    .  No. 23-50419 (JTD)
 8   SHIRES, INC., AND WEST      .
     REALM SHIRES SERVICES, INC. .
 9   (D/B/A FTX.US),             .
                                 .
10          Plaintiffs,          .
                                 .
11      v.                       .
                                 .
12   DANIEL FRIEDBERG,           .
                                 .
13          Defendant.           .
     . . . . . . . . . . . . . . .
14                               .
     FTX TRADING LTD., ALAMEDA   .  Adversary Proceeding
15   RESEARCH LTD., WEST REALM   .  No. 24-50066 (JTD)
     SHIRES, INC., WEST REALM    .
16   SHIRES SERVICES, INC., and  .
     and NORTH DIMENSION, INC.,  .
17                               .
            Plaintiffs,          .
18                               .
        -against-                .
19                               .
     CENTER FOR APPLIED          .
20   RATIONALITY, LIGHTCONE      .
     INFRASTRUCTURE, INC.,       .  Courtroom No. 5
21   LIGHTCONE ROSE GARDEN, LLC  .  824 Market Street
     And FTX FOUNDATION,         .  Wilmington, Delaware 19801
22                               .
            Defendant.           .  Thursday, September 12, 2024
23   . . . . . . . . . . . . . . .  1:00 p.m.

24

25                            (Cont'd)
```

```
 1   FTX TRADING LTD., et al.,    .  Adversary Proceeding
                                  .  No. 24-50072 (JTD)
 2            Plaintiffs,         .
                                  .
 3       -against-               .
                                  .
 4   ALEXANDER CHERNYAVSKY,       .
     BRANDON ORR, CHUKWUDOZIE     .
 5   EZEOKOLI, EDWIN GARRISON,    .
     GREGG PODALSKY, JULIE        .
 6   PAPADAKIS, KYLE RUPPRECHT,   .
     LEANDRO CABO, MICHAEL        .
 7   LIVIERATOS, MICHAEL NORRIS,  .
     RYAN HENDERSON, SHENGYUN     .
 8   HUANG, SUNIL KAVURI, VIJETH  .
     SHETTY, VITOR VOZZA, and     .
 9   WARREN WINTER,               .
                                  .
10            Defendants.         .
     . . . . . . . . . . . . .    .
11                                .
     ALAMEDA RESEARCH LTD., WEST  .  Adversary Proceeding
12   REALM SHIRES, INC., and      .  No. 23-50379 (JTD)
     WEST REALM SHIRES SERVICES,  .
13   INC.,                        .
                                  .
14            Plaintiffs,         .
                                  .
15       -against-               .
                                  .
16   ROCKET INTERNET CAPITAL      .
     PARTNERS II SCS, ROCKET      .
17   INTERNET CAPITAL PARTNERS    .
     (EURO) II SCS, GFC GLOBAL    .
18   FOUNDERS CAPITAL GMBH, GFC   .
     GLOBAL FOUNDERS CAPITAL      .
19   GMBH & CO. BETEILIGUNGS KG   .
     NR. 1, WILLIAM HOCKEY        .
20   LIVING TRUST, and 9YARDS     .
     CAPITAL INVESTMENTS II LP,   .
21                                .
              Defendants.         .
22   . . . . . . . . . . . . .    .

23

24

25                        (Cont'd)
```

```
 1  ALAMEDA RESEARCH LTD.,          .  Adversary Proceeding
    WEST REALM SHIRES, INC.,        .  No. 23-50380 (JTD)
 2  and WEST REALM SHIRES           .
    SERVICES, INC.,                 .
 3                                  .
              Plaintiffs,           .
 4                                  .
       - against -                  .
 5                                  .
    MICHAEL GILES, et al.,          .
 6                                  .
              Defendants.           .
 7  . . . . . . . . . . . . . . .   .
                                    .
 8  ALAMEDA RESEARCH LTD. and       .  Adversary Proceeding
    FTX TRADING LTD.,               .  No. 23-50444 (JTD)
 9                                  .
              Plaintiffs,           .
10                                  .
       - against -                  .
11                                  .
    PLATFORM LIFE SCIENCES          .
12  INC., LUMEN BIOSCIENCE,         .
    INC., GREENLIGHT                .
13  BIOSCIENCES HOLDINGS, PBC,      .
    RIBOSCIENCE LLC, GENETIC        .
14  NETWORKS LLC, 4J                .
    THERAPEUTICS INC., LATONA       .
15  BIOSCIENCES GROUP, FTX          .
    FOUNDATION, SAMUEL BANKMAN-     .
16  FRIED, ROSS RHEINGANS-YOO,      .
    and NICHOLAS BECKSTEAD,         .
17                                  .
              Defendants.           .
18  . . . . . . . . . . . . . . .   .

19

20                    TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
21               UNITED STATES BANKRUPTCY JUDGE

22

23

24

25                       (Cont'd)
```

1   APPEARANCES:

2   For the Debtors and
    Debtors-in-Possession:    Adam G. Landis, Esquire
3                             LANDIS RATH & COBB, LLP
                              919 Market Street
4                             Suite 1800
                              Wilmington, Delaware 19801
5
                              -and-
6
                              Brian D. Glueckstein, Esquire
7                             Justin J. DeCamp, Esquire
                              SULLIVAN & CROMWELL, LLP
8                             125 Broad Street
                              New York, New York 10004
9
    For the Litigation
10  Oversight Committee of
    Celsius Network, LLC,
11  *et al.*, and the
    Litigation Administrator
12  of Celsius Network,
    LLC, *et al.*:            Richard Levy, Jr., Esquire
13                            Andrew Richmond, Esquire
                              PRYOR CASHMAN, LLP
14                            7 Times Square
                              New York, New York 10036
15
    For the Media
16  Intervenors:             Adam A. Marshall, Esquire
                             THE REPORTERS COMMITTEE FOR FREEDOM
17                             OF THE PRESS
                             1156 15th Street NW
18                           Washington, DC 20005

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Jermaine Cooper, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Joint Official
   Liquidators of FTX
3  Digital Markets Ltd.:      John Christopher Shore, Esquire
                              WHITE & CASE, LLP
4                             1221 Avenue of the Americas
                              New York, New York 10020
5

6  For the U.S. Trustee:      Benjamin A. Hackman, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
7                             J. Caleb Boggs Federal Building
                              844 King Street
8                             Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
9

   For Seth Melamed:          David Adler, Esquire
10                            MCCARTER & ENGLISH, LLP
                              Worldwide Plaza
11                            825 Eighth Avenue
                              31st Floor
12                            New York, New York 10019

13 For Michael Giles,
   et al.:                    Lucian B. Murley, Esquire
14                            SAUL EWING, LLP
                              1201 North Market Street
15                            Suite 2300
                              Wilmington, Delaware 19899
16
                              -and-
17
                              Erica Richards, Esquire
18                            COOLEY, LLP
                              55 Hudson Yards
19                            New York, New York 10001

20 For the Official
   Committee of
21 Unsecured Creditors:       Siena Cerra, Esquire
                              MORRIS JAMES, LLP
22                            500 Delaware Avenue
                              Suite 1500
23                            Wilmington, Delaware 19801

24

25

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the Official
   Committee of
3  Unsecured Creditors:        Isaac Sasson, Esquire
                               PAUL HASTINGS, LLP
4                              200 Park Avenue
                               New York, New York 10166
5

6  For Defendants:             Gregory F. Laufer, Esquire
                               PAUL, WEISS, RIFKIND, WHARTON
7                                & GARRISON, LLP
                               1285 Avenue of the Americas
8                              New York, New York 10019

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
    Item 37:  The Celsius Litigation Administrator's Motion
4             for Relief from the Automatic Stay
              [D.I. 16815, filed on June 5, 2024]
5
              Court's Ruling:
6
    Agenda
7   Item 38:  The Celsius Litigation Administrator's Motion    61
              for Entry of an Order for Authority to File
8             Under Seal the Transfer Schedules Containing
              Confidential Information
9             [D.I. 17182, filed on June 10, 2024]

10            Court's Ruling:                                  71

11  Agenda
    Item 39:  Debtors' Objection to Proofs of Claim Filed by   11
12            Celsius Network LLC and Its Affiliated Debtors
              [D.I. 19795, filed on July 8, 2024]
13
              Court's Ruling:                                  58
14
    Agenda
15  Item 40:  Debtors' Objection to Proofs of Claim Filed by   72
              Seth Melamed
16            [D.I. 20051, filed on July 10, 2024]

17            Court's Ruling:                                  85

18  Agenda
    Item 42:  Motion of Morris James LLP to Withdraw as        10
19            Counsel to Genetic Networks LLC [Alameda
              Research Ltd., et al. v. Platform Life
20            Sciences Inc., et al., Adv. No. 23-50444 (JTD)
              - Adv. D.I. 121, filed on August 21, 2024]
21
              Court's Ruling:                                  11

22

23

24

25

1                              INDEX

2  MOTIONS:                                                PAGE

3  Agenda
   Item 44:   Defendants' Motion to Stay Adversary           86
4             Proceedings Nos. 23-50379 (JTD) and 23-50380
              (JTD) [Adv. D.I. 130 & 254, filed on August
5             23, 2024]

6             Court's Ruling:

7                            EXHIBITS

8  DECLARATIONS:                                           PAGE

9  1) Declaration of Kumanan Ramanathan                     66

10

11 Transcriptionists' Certificate                          121

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 1:00 p.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good afternoon, everyone.  Thank you.

4  Please be seated.

5               Mr. Landis?

6               MR. LANDIS:  Good afternoon, Your Honor, and may

7  it please the Court, Adam Landis, from Landis, Rath & Cobb,

8  on behalf of FTX Trading, Limited and its affiliated debtors.

9               Your Honor, we have a 44-item agenda today.

10              THE COURT:  Yes.

11              MR. LANDIS:  But, fortunately, only six matters

12 should be going forward.

13              Items 1 through 12 have been adjourned.  Item 13

14 was withdrawn.  Items 14 through 36, 41 and 43 have been

15 resolved.

16              That brings us to matters 37, 38, and 39, which

17 are related, relating to the Celsius Litigation

18 Administrator's claims and Motion for Relief from the

19 Automatic Stay.

20              We've had discussions with counsel to the Celsius

21 Litigation Administrator and have agreed that Item number 39,

22 the claim objection, debtors' claim objection, ought to go

23 forward first, as it presents a gating item in connection

24 with these matters, and depending on the ruling, we may not

25 need to go forward with numbers 37 and 38.

1              So, with that, I would cede the podium to

2   Mr. Glueckstein from Sullivan & Cromwell, and I'll be --

3              THE COURT:  Before we do that --

4              MR. LANDIS:  Oh.

5              THE COURT:  --  I want to deal with the motion of

6   Morris James to withdraw as counsel first so they don't have

7   to sit here for the whole hearing.

8              MR. LANDIS:  That's -- Your Honor, that's a

9   wonderful idea, so I will -- I know they're here in Court so

10  I will cede the podium to them.

11             THE COURT:  Okay.  Thank you.

12             MS. CERRA:  Good afternoon, Your Honor.

13             Siena Cerra, from Morris James.  We're here to

14  address Item number 42 on the agenda, Morris James' Motion to

15  Withdraw as Counsel, that was filed --

16             THE COURT:  Yeah, the only reason I put this on

17  the agenda is -- I always put motions to withdraw on the

18  agenda because -- especially if -- well, all of them I put on

19  the agenda, even if there's no objection filed just because I

20  want to make sure that if the client is available -- and I

21  don't know -- your client was Genetic Networks, LLC.

22             Is anyone from Genetic Networks, LLC in the

23  courtroom or on the Zoom call?

24      (No verbal response)

25             THE COURT:  Didn't hear anything.  Okay.

1            Because they are a corporation, they cannot appear

2    with counsel.  So -- and I don't know -- you know, so I'm

3    going to grant the motion, but I want you to make sure you

4    tell your client they have to get counsel or if -- they're

5    going to face a default judgment.

6            MS. CERRA:  Understood.

7            THE COURT:  Okay?

8            MS. CERRA:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           MR. GLUECKSTEIN:  Good morning, Your Honor.

11           THE COURT:  Good morning -- afternoon.

12           MR. GLUECKSTEIN:  Afternoon now.  So I apologize.

13           THE COURT:  Yeah.  We usually are in the morning,

14   but this time we're afternoon.

15           MR. GLUECKSTEIN:  Apologies.  I'm used to the

16   morning.  It is the afternoon.  Thank you, Your Honor.  Good

17   afternoon.

18           Brian Glueckstein, Sullivan & Cromwell, for the

19   debtors.

20           As Mr. Landis previewed, our position with respect

21   to the Celsius matters is that there's a gating threshold

22   issue that's presented both in our objection and as touched

23   on in the stay motion but is addressed fully in the objection

24   to the proofs of claim that we filed, and that issue is

25   whether the Celsius Administrator's new found preference

1  claims can be asserted against the debtors at all.

2       If we are right that they cannot be asserted, then

3  the motion seeking relief from the automatic stay would

4  become moot.  As a result, as previewed, we've agreed to

5  address this issue first.

6       Your Honor, the debtors filed their pending

7  objection to the duplicative claims that Celsius had filed

8  against each of the debtors.  In those claims, Celsius

9  asserted the same threadbare claims for disparagement and

10 defamation, seeking $2 billion in damages.

11      As we detailed in our objection, those claims were

12 based on unsubstantiated, unidentified alleged statements

13 made by FTX personnel pre-petition when Celsius was in the

14 midst of its own fraudulent contact.

15      The Celsius Administrator, apparently recognizing

16 that these claims were frivolous, subsequently abandoned them

17 entirely in their responsive pleadings to our objection.

18      That $2 billion alleged liability of the debtors

19 is now fixed at zero.  Those claims and the proofs of claims

20 in which they are asserted, in our view, should therefore be

21 expunged.

22      Celsius, however, is nonetheless attempting to

23 rely on those same claims to support its argument that those

24 proofs of claim somehow provide a basis to permit the

25 Administrator to file brand new claims to provide -- that

1  they styled as amendments, asserting approximately $445

2  million in preference claims, plus interest through a

3  combination of initial transferee and subsequent transferee

4  claims that seek to impose these brand new liabilities upon

5  the debtors at the expense of all other creditors.

6        Celsius argues that a single generic reference in

7  their proofs -- original proofs of claim, their

8  investigating potential Chapter 5 preference claims, permits

9  all of this to occur, and they asserted these claims more

10  than a year after the Court's non-customer claims bar date

11  that was established by order of this Court.

12        There can be no serious dispute that the Celsius

13  preference claims are time-barred standing alone, having been

14  filed more than a year after the bar date.

15        Celsius didn't even bother to obtain Court's

16  permission to amend its claims.  They simply submitted to our

17  Claims Agent the so-called amended claims and now argues that

18  they should be deemed timely.

19        They are not, and we submit are barred by the non-

20  customer claims bar date order of this Court.  We submit

21  there is no basis for this Court to permit these claims as

22  valid amendments in any event.

23        The Third Circuit is clear in a claim, it must

24  allege facts in the proof of claim sufficient to support a

25  legal liability.

1            And as Judge Ambro affirmed in an appeal of one of

2   this Court's <u>Mallinckrodt</u> decision, a claim can only amend a

3   prior claim in three circumstances, where it 1) corrects a

4   defect in the form of the original, if it describes the

5   original claim with greater particularity, or it pleads a new

6   theory of liability on facts that are set forth in the

7   original claim.

8            The amended claims that Celsius seeks that bring

9   forward here do none of these things.

10           The question fundamentally in the case law is

11  whether the initial claim provided the debtors notice of the

12  later claim.

13           Critically here, the original proofs of claim do

14  not allege a single fact that could form the basis of the

15  preference claims.

16           The only facts asserted there in the original

17  proofs of claim, such as they are, relate to the purported

18  disparaging statements and the claims that have since been

19  abandoned.

20           This is a classic example of an impermissible

21  post-bar date new claim that fundamentally changes a timely

22  filed claim.  It's a completely different claim.

23           Celsius, in its briefing, telling -- it does not

24  point to a single fact in the alleged -- that it alleged in

25  the original proofs of claim that could be relevant to its

1  preference claims because there are none.

2  Instead, Celsius repeatedly points to the broad

3  reservation of rights language.  That is the type of language

4  that courts in this Circuit, as we detail in our papers,

5  regularly determine cannot be relied upon to assert new

6  claims.

7  As the court -- Bankruptcy Court in <u>Calpine</u> held,

8  amendments based on this type of generic language would

9  render bar dates meaningless.

10  Celsius seems to retreat then to an argument that

11  the one sentence reservation in its original proof of claim,

12  which has nothing to do with the claim that was actually

13  asserted in those proofs of claim, was a protective filing

14  and thus sufficient, but that argument is a red herring,

15  claimed that amendments are rooted in Rule 15 of the Federal

16  Rules of Civil Procedure.

17  A protective filing of preference claims still

18  must provide the debtors facts sufficient to establish a

19  theory of liability under Section 547 or Section 550 of the

20  Bankruptcy Code, and the original proofs of claim that were

21  filed by Celsius prior to the bar date do nothing of the

22  sort.

23  Your Honor, the new Celsius claims also fail to

24  satisfy the second requirement for an amended claim, that it

25  would be equitable to permit it.

1        The debtors would have to start from scratch,

2  investigating hundreds of alleged transfers and determining

3  whether they passed through the FTX exchanges at any time.

4        I also want to put to rest the repeated statements

5  by the Celsius Administrator that their customer preference

6  claims somehow would not impose new liabilities on the

7  debtors.

8        Celsius is seeking to litigate preference claims

9  in order to establish liability directly against the debtors

10  as recipients of subsequent transferees of avoidable

11  transfers that, if established, would be collectible whether

12  or not the debtors ever had a corresponding or still have a

13  corresponding liability to the customer.

14        As we sit here today, the debtors are liable for

15  valid customer claims asserted by any of the Celsius

16  transferees because no preference judgments have been

17  obtained against those initial transferees in the Celsius

18  preference cases.

19        But, of course, the Celius Administrator is free

20  to pursue those initial transferee actions and we understand

21  that they are starting the process of going after those

22  initial -- alleged initial transferees.

23        Celsius' suggestion that, despite what their

24  claims are actually asserting and what actually is asserted

25  in the complaint that they seek to file, their stay motion,

1  that they are really only seeking to redirect distributions

2  from customers to Celsius, is not even a valid request at

3  this juncture.

4           If and when they actually obtain judgments against

5  initial transferees, Celsius would be free to come to this

6  Court and attempt to argue that distributions to that

7  judgment party should be paid over to Celsius.

8           We submit there's no prejudice to Celsius by not

9  being able to pursue the debtors on these facts.  It's simply

10 that they view litigating against us in one -- you know, one

11 forum more convenient than chasing the individual initial

12 transferees.

13          THE COURT:  Let me ask you a question about that

14 what you just said.

15          How is that going to work if they're going to come

16 back and say well, you -- we got a judgment against this

17 initial transferee so you should not distribute to that

18 initial transferee, you should distribute to us instead.  How

19 does that work?  How do I do that, especially if

20 distributions to FTX's customers are due before they get

21 their judgment?

22          MR. GLUECKSTEIN:  Well, I agree, Your Honor.  And

23 just to be clear, I said they could attempt to come do it.

24 We think there are legal hurdles to them actually prevailing.

25 But they have the ability to sue, and we understand they have

1  or will sue the initial transferees and are seeking to

2  recover from them directly.

3          They're seeking to now sue the debtors on the

4  subsequent transferee theory, which if they had reserved

5  those claims, they could try to do.  But our view is they

6  haven't.

7          The point I'm making simply is there are other

8  remedies available to Celsius.  This isn't a situation where

9  if their claim is disallowed, the Administrator is unable to

10 pursue these amounts in any shape or form.

11         I think, certainly, if we were to pay out

12 distributions to our customers on account of liabilities

13 prior to them obtaining a judgment against the initial

14 transferee, then we would argue, I think, that -- you know,

15 that that money, in one form or another, has been paid out.

16         But the problem here is if you look at it from

17 that perspective, what they're trying to do here is -- and we

18 address this in our papers, it sounds to us like some form of

19 kind of pre-judgment attachment.

20         What they want to do is ensure that we can't make

21 -- somehow can't make distributions to customers -- seems to

22 be what they're implying because they want to litigate

23 subsequent transferee claims.

24         And the issue here, Your Honor, simply is they

25 haven't preserved the right to do it and if you look at the

1  equities of this situation, we submit that it would be

2  fundamentally unfair to make an exception to the bar date

3  under these circumstances.

4  In addition, Your Honor, Celsius is indisputably

5  seeking to impose a new $67 million liability against the

6  debtors on account of a transfer directly against one of the

7  debtors in these Chapter 11 cases.

8  The debtor coin -- you know, nowhere has Celsius

9  offered any evidence to the Court justifying its delay in

10  filing the preference claims either before the bar date or at

11  any time for more than a year thereafter.

12  And as we detail in our papers, Celsius' own

13  schedules filed in its Chapter 11 case back in October of

14  2022, eight months before the bar date in this case,

15  identified very specifically -- we could look it up and find

16  it, the coin transfers at issue.

17  So all of the information necessary to assert the

18  claims by this Court's non-customer bar date was known and

19  available.  They could've filed that claim.  They didn't file

20  that claim.  They chose instead to file the claims that they

21  filed, which were these very large $2 billion face value that

22  sat on the record of this case for over a year, only to

23  abandon them when we started this process in order to assert

24  these alternative claims that are new and completely

25  different claims.

1          And, Your Honor, I'll just point out, we addressed

2   this more comprehensively in our papers.  It's not the first

3   time Celsius has failed to comply with a bar date in a

4   cryptocurrency bankruptcy.

5          They similarly try to do the same thing on a much

6   smaller claim by filing a late claim against Voyager to

7   assert preference claims without any justification and that

8   effort was rejected by Judge Wise.

9          FTX's creditors, Your Honor, should not have to

10  risk that their recoveries are potentially diluted by

11  Celsius' untimely preference claims and we submit that the

12  purported amendments should not be permitted.

13         As a result, the original claims, which should now

14  have been abandoned in substance, should be disallowed in

15  their entirety with no leave provided to amend those claims

16  to assert these new found priority claims.

17         THE COURT:  Okay.

18         MR. GLUECKSTEIN:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MR. RICHMOND:  Good afternoon, Your Honor.

21         Andrew Richmond, from Pryor Cashman, on behalf of

22  the Post-Confirmation Litigation Administrator for Celsius

23  Network, LLC and its affiliated debtors.

24         One line, Your Honor.  One line.  The entire claim

25  objection revolves around one line, namely the description

1   and the basis of the claim, which only needs to be one line.

2           Whether or not the proofs of claim are valid rests

3   on a single very simple question, whether they put the

4   debtors on notice of Celsius' intention to bring a preference

5   action.  The answer to that question is a resounding yes.

6           Before going into the sum and substance of the

7   claim objection, the requirements of a proof of claim and how

8   Celsius more than adequately complied with those requirements

9   in the original proofs of claim, let alone the amended proofs

10  of claim, it's important to pause and understand what was not

11  included in the objection.

12          One, the objection did not address the merits or

13  the substance of the preference claim.  Two, the objection

14  did not include any factual support to undermine the proofs

15  of claim.  Three, the objections do not dispute the

16  timeliness of the original proofs of claim.  And, four, the

17  moving papers make no reference to the amended proofs of

18  claim, even though they were unfiled before the debtors filed

19  their objection.

20          Now, what is in fact required in a proof of claim?

21  Bankruptcy Rule 3001 states a proof of claim shall conform

22  substantially to their appropriate official form, which as we

23  know is Official Form 410.  The bar date order for the non-

24  customer proofs of claim entered on May 19, 2023, which we

25  found at Docket Number 1519, is Exhibit FTX-3 on the exhibit

1 and witness list, echoes Rule 3001(a) and provides for each

2 proof of claim to "conform substantially to the proof of

3 claim form or Official Form 410."

4       Question 8 of the modified 410 form attached to

5 the bar date order asks for the basis of the claim and

6 provides examples, such as goods sold, money loaned, leased

7 services performed, et cetera.

8       The debtors' proof of claim form, which was

9 approved by this Court, includes one line to describe the

10 basis of the claim and includes various examples, many of

11 which are one or two words.

12       Rule 3001(c) and (d), which outline the additional

13 information that's required for proofs of claim makes no

14 reference to the need to provide additional supporting

15 information to claims based on preference claims or the need

16 to provide any detail laid to specific preferential

17 transfers.

18       In fact, as noted in our papers, the Third Circuit

19 in <u>Lampey</u> (phonetic) held that a proof of claim was

20 sufficient when it simply stated debtors were engaged in

21 fraud and breach of fiduciary duties.

22       The Circuit Court in <u>Ellis</u> and District Court in

23 <u>Mallinckrodt</u> found that even protective claims where the

24 creditor does not even know the amount or the validity of the

25 claim are sufficient.

1           Now, the debtors want this Court to forget all of

2    that, wants to change the standard for an adequate proof of

3    claim and recharacterize and rewrite what Celsius actually

4    stated in its proofs of claim.

5           Specifically, the debtors allege that the

6    reference to the preference claim was simple boilerplate

7    reservation of rights and Celsius made "no mention of the

8    transfers underlying the purported preference claims or any

9    other facts that can form the basis for the preference

10   claims, despite having the facts to do so."  This is found in

11   paragraph 23 of the debtors' objections and as mentioned

12   before.

13          However, the debtors fail to explain or

14   demonstrate how Celsius' description of the claim is simply a

15   boilerplate reservation of rights.

16          Similarly, they fail to provide any case law which

17   requires a claimant to include the specific underlying

18   transfers which form the basis of the preference claim.

19   Remember, question 8 of the debtors' modified 410 form is one

20   line long.  It isn't the time or place to include a detailed

21   explanation of the claim or a cause of action by cause of

22   action breakdown.

23          Now, what exactly was included in Celsius'

24   original proofs of claim?  I have here our original proof of

25   claim filed against FTX Trading, Limited, Claim Number 3938,

1 which is Exhibit CL-3 of the joint witness and exhibit list.

2          As mentioned in our papers, each of the proofs of

3 claim against all the various debtors are identical.  In

4 response to question number 8, what is the basis of the

5 claim, we state, see attached explanation of causes of

6 action.

7          In the accompanying attachment, which is attached

8 to each and every proof of claim, on the bottom of the first

9 page, the paragraph states, Celsius' cause of action against

10 FTX may include, but are not limited to -- then it goes into

11 a description -- a discussion of the libel and slander

12 actions.

13          And then the next -- excuse me.  The next

14 sentence, which is in the same paragraph, says -- and I --

15 and I'll quote, "Celsius is also investigating causes of

16 action against the FTX debtors under Chapter 5 of the

17 Bankruptcy Code, including preference and fraudulent transfer

18 actions."  End of discussion.

19          Does this provide the debtors with notice of

20 Celsius' intention to pursue preference actions?  Absolutely,

21 yes.

22          Now, how can this line be construed as a simpler

23 -- simple boilerplate reservation of rights?  The term

24 boilerplate means a standardized text.  There's nothing

25 standard about discussing Celsius' investigation into Chapter

1  5 causes of action.

2          The line is also not a reservation of rights.  In

3  fact, the next two paragraphs start with the words, Celsius

4  expressly reserves the right to assert additional claims and

5  Celsius expressly reserves all rights to seek stay relief.

6          The line at issue is found in the paragraph which

7  starts, Celsius' causes of action against FTX may include,

8  but are not limited to.

9          Your Honor, words matter and context matters.  And

10 from the words that were stated and the context of where they

11 were stated, it is clear that they are not a reservation of

12 rights.  It's clear that it's not boilerplate.  It is clear

13 that we complied with Bankruptcy Rule 3001, the bar date

14 order, and Third Circuit case law.

15         Now, the debtors point to our bankruptcy schedules

16 to demonstrate that we were on notice of the coin transfers,

17 we should have asserted them in our original proofs of claim.

18 However, we did.  We did exactly what was needed.  We stated

19 that we have preference actions.

20         The term preference actions means that there was a

21 preferential transfer on behalf of an antecedent debt in the

22 90 days leading up to the Celsius bankruptcy filing that was

23 transferred from Celsius to FTX.

24         We don't need to say anything more.  The argument

25 that we are a "habitual late filers", as allegedly

1  demonstrated in <u>Voyager</u>, is (a) not true and irrelevant.

2  In <u>Voyager</u>, Celsius never filed a proof of claim before the

3  bar date.  Here, we did.

4          Now, there was a discussion about the amended

5  proofs of claim and about whether or not they were an

6  abandonment or an amendment and I want to clear the record on

7  that.

8          For starters, as mentioned, the moving papers make

9  no reference to the original -- the amended proofs of claim

10  and, in fact, the first time that the debtors make reference

11  to the amended proofs of claim in their "initial claim

12  objection" was filed three days ago.

13         Rule 3007 requires a claim objection to be filed

14  30 days before a hearing.  The debtors knew before they even

15  filed their initial objection about our amended proofs of

16  claim, and even if you want to argue that they didn't and it

17  took them a week or two to get up to speed, they could've

18  easily withdrew the original objection, or at least amended

19  it to include in the original proofs of claim, but they

20  didn't.

21         Instead, they sat on their hands for two months,

22  from July 7th to September 9th, and 30 days from when we

23  filed our response to the claim objection to raise these

24  issues.

25         But besides that, turning to the -- what I'll call

 1   merits of the amended -- the objection to the amended proofs

 2   of claim, the debtors allege that we withdrew our original

 3   proofs of claim and that the amended claims are late-filed

 4   claims, but again that's not true.

 5           I want to turn to our amended proof of claim,

 6   which is Claim Number 95759, which was filed against FTX

 7   Trading, Limited on July 7, 2024, which is Exhibit CL-4 on

 8   our joint witness list, and question number 4 --

 9           THE COURT:  Do you have a copy of that one?  It's

10   not opening up on my -- for some reason, it says the

11   destination path is too long.  It won't open it for me.

12           MR. RICHMOND:  May I approach, Your Honor?

13           THE COURT:  Yes.  Thank you.

14           MR. RICHMOND:  Question 4, does this claim amend

15   one already filed?  We stated yes.  They made reference to

16   the Claim Number 3938, which is the same original proof of

17   claim that I made reference to earlier.  It's clearly an

18   amendment.

19           In the accompanying attachment, which again was

20   included in each of our amended proofs of claim, under

21   Section I, Basis of the Claim, question 4, we note that our

22   original proof of claim includes two causes -- two types of

23   causes of action.

24           The first is the slander and libel, which we are

25   no longer pursuing, and the other one is the avoidance

1  claims.  The next two paragraphs expand and further elaborate

2  on what was stated in the original proofs of claim and

3  reduced the total claim amount from no less than $2 billion

4  to no less than around $445 million.

5       There is nothing in the amended proofs of claim

6  which give any impression that they are new claims and they

7  are not simply to expand and elaborate on what was included

8  in the original proofs of claim.

9       Now, Your Honor, the debtors argue that it's

10  inequitable to allow the amended proofs of claim to go

11  forward.

12       I want Your Honor to pause for a second,

13  understand what the debtors are actually stating.  The

14  debtors, who have a fiduciary duty to all creditors, find it

15  inequitable to allow an amended proof of claim which reduces

16  the claim out by 78 percent from $2 billion to no less than

17  half a billion dollars.

18       While the debtors claim in their papers that we

19  are seeking a new claim totaling $445 million, and as I

20  previously noted that's plainly false, we are simply refining

21  our original proofs of claim, elaborating on the Chapter 5

22  causes of preference action, and reducing the claim for the

23  benefit of all creditors.

24       If the debtors want to pay us the $2 billion on

25  behalf of our original proof of claim, be my guest.  We're

1  certainly not going to say no to that.

2          Ultimately, as Celsius timely and properly filed

3  its original proofs of claim and, in fact, the amended proofs

4  of claim, the Celsius Litigation Administrator respectfully

5  asks the Court to deny the objection in its entirety.

6          Unless the Court has any questions, I have nothing

7  further, Your Honor.

8          THE COURT:  Why didn't you file a motion to amend

9  the proof of claim?

10         MR. RICHMOND:  Your Honor, it's our understanding

11 that the practice in this Court is that it's typically not

12 done to request.  But, ultimately, what's unique about this

13 amended claim is that we are reducing what was allowed --

14 what we initially sought.  We are not actually expanding on

15 anything further.

16         THE COURT:  Well, but it's a different claim.  I

17 mean it's --

18         MR. RICHMOND:  It's not, Your Honor.  The original

19 --

20         THE COURT:  Well, the original claim was for --

21 the 2 billion was for the libel and slander, right?

22         MR. RICHMOND:  No, Your Honor.  The $2 billion

23 included both the libel and slander and the preference

24 actions.

25         THE COURT:  Where --

1          MR. RICHMOND:  That was the total amount.

2          THE COURT:  Where does it say that in the proof of

3    claim?

4          MR. RICHMOND:  Well, the proof of claim just

5    sought $2 billion in total and included the two parts to it,

6    the causes of action, the libel and the preference actions.

7          THE COURT:  But --

8          MR. RICHMOND:  And, in total, it was around $2

9    billion.

10         THE COURT:  But it didn't say you were bringing or

11   that you had a claim for Article -- Subsection V causes of

12   action.  You said you were investigating whether you did or

13   didn't have them.

14         MR. RICHMOND:  Correct.  But --

15         THE COURT:  So why is that sufficient to allege a

16   cause of action?

17         MR. RICHMOND:  Because, Your Honor, the ultimate

18   question, as I mentioned earlier, is providing the debtors

19   with notice of a claim.  They had notice.  They had notice of

20   a libel claim and they had notice of a preference claim.

21         The fact that we said that we're investigating, we

22   would not be investigating a claim if we felt we didn't, in

23   fact, have one, or at least a colorable claim.

24         As previously mentioned and as noted in our

25   papers, even a protective filing where the cause of action is

1  not even known yet, is sufficient.  We did more than that.

2         THE COURT:  Give me an example of that, a cause --

3  where there's -- the cause of action isn't known and you're

4  filing a protective filing.  What does that mean?

5         MR. RICHMOND:  Your Honor, I know that -- and I

6  don't have it in front of me.  I know that the Court, in

7  <u>Mallinckrodt</u>, provided that it was a protective cause of --

8  protective proof of claim was sufficient.  I don't know the

9  exact details there but the Court definitely held that such a

10 cause of action is -- such of proof of claim is sufficient.

11        THE COURT:  All right.  Do you want to take a

12 second and see if you can find it?

13        MR. RICHMOND:  I don't know, Your Honor.  But I

14 would say that just the mere fact of stating those words are

15 sufficient enough for the original proofs of claim.

16        THE COURT:  Well, is there a difference between

17 saying in a proof of claim claimant believes it has

18 Subsection V causes of action against a debtor, different

19 from saying we're investigating whether we have Subsection V

20 claims?

21        MR. RICHMOND:  I don't think so, Your Honor,

22 because, ultimately, we wouldn't say such a statement if we

23 didn't have at least a colorable reason to believe that we

24 had such a cause of action.

25        We were conducting -- we were doing due diligence

 1    at the time.  There was billions of dollars of transfers that

 2    were done and there was funds moving in and out of Celsius at

 3    the time.

 4          We obviously had to file a proof of claim under

 5    the compulsion of the bar date order and at that point, that

 6    was what we knew and that's what we provided and, frankly,

 7    the debtors knew that we were potentially pursuing a proof of

 8    -- a preference action.

 9          THE COURT:  Okay.  All right.  Thank you.

10          MR. RICHMOND:  Thank you, Your Honor.

11          MR. GLUECKSTEIN:  Thank you, Your Honor.

12          Again, Brian Glueckstein, for the debtors.

13          Your Honor, Celsius acknowledges they filed the

14    proof of claim.  They acknowledge -- I didn't hear any

15    dispute that the information to assert the coin claim was in

16    their schedules.

17          They're doubling down saying that this language,

18    this one sentence that we are focused on here, that they are

19    investigating causes of action, is sufficient to allege

20    claims with respect to an excess of 500 different --

21    transfers with respect to 500 different customers --

22    transferees of -- potentially of our -- in our case to come

23    back and assert these claims at whatever time in whatever way

24    they wanted to.

25          Now, they're suggesting that somehow we had notice

1  of their amended claim and didn't object to it.  It's

2  preposterous.  They filed, apparently, these amended claims,

3  hours before we file -- and when we say filed in this case,

4  it's not on the docket.  They didn't send them to us.  They

5  apparently submitted them for portal, then went to our Claims

6  Agent, and there's -- those claims have not made their way to

7  us.

8          I think they probably suspected we would be filing

9  the claims against their frivolous $2 billion claim when we

10 did on the deadlines with respect to voting record date of

11 our plan.

12         And so they filed the amended claims.  They didn't

13 make a motion.  They didn't put us on notice of these claims

14 they submitted.  We filed our claims.  They have not taken

15 any issue.  They have not tried to defend the merits of the

16 objection that we filed with respect to the disparagement

17 claims.

18         A lot of semantics about whether this is a new

19 claim or an amended claim.  When I talk about it as a new

20 claim, our position is it's a new claim as a matter of law.

21 It's not what they called it.  I understand what they did.

22         They want it to be an amended claim because they

23 know it needs to relate back to this original proof of claim

24 and this singular sentence that Celsius is investigating

25 causes of action, that that somehow put us on notice that we

1 were going to be sued.

2      Either they first sought, through their stay

3 relief motion -- they want to file a lawsuit.  Then they come

4 in and they file these amended claims.  Either way, at some

5 later date and time, a year after the bar date, that these

6 debtors should defend $445 million of preference claims.

7      There is nothing about what they submitted in

8 their timely proof of claim that suggests that.  While their

9 original claim is deficient as to the defamation claim as we

10 -- on its face, as we set out in the objection, they at least

11 attempted to articulate that claim in some way.

12      There's nothing about this, as Your Honor points

13 out -- they didn't even say we have claims.  They just say

14 we're investigating.  This is boilerplate language.  It

15 cannot be -- somebody can file a proof of claim that says

16 we're investigating all sorts of things and they just list a

17 laundry list of everything claim that they can think of and

18 they can come back years later and say, you know, we're just

19 elaborating on our claim and now here's this detailed

20 schedule of what we want to pursue.

21      There's discussion both in their papers and by

22 counsel today about what was decided and what was said in the

23 Mallinckrodt case and Your Honor knows that better than

24 anybody here.

25      But the decision that then went up on appeal on

1  this question where protective claims are discussed, in that

2  decision, 2022 Westlaw 3545583, Judge Ambro, who decided that

3  appeal, sitting by designation, after discussing the

4  standards that we've been discussing this afternoon

5  concluded, "Here, the proofs of claim do not sufficiently

6  allege facts under the theory of antitrust liability" and

7  then goes on to say to allege any conduct by any of the non-

8  defendant debtors and it appears that proofs of claim were

9  filed out of an abundance of caution.

10        The decision to disallow those claims was

11  affirmed.

12        What we have -- there's a standard.  There has to

13  be some real notice based on facts that we are going to be

14  defending preference claims, some articulation of the

15  transfers at issue, the debtors at issue, that we're talking

16  about customer claims, we're talking about loan claims.  What

17  -- there's nothing.  There is literally nothing.  There is a

18  single sentence that says they're investigating causes of

19  action and, based on that, they want to come back and say

20  this all relates back and we filed these amended claims and

21  now we should engage on this burdensome litigation.

22        And so we submit, Your Honor, that the claims that

23  they now want to assert that could have been asserted prior

24  to the bar date are time-barred and the claim that they did

25  assert, the disparagement claim that is stated in that

1  original proof of claim and that was the basis of the $2

2  billion in our records, they have now abandoned and should be

3  expunged.

4        There has been no response on the substance of the

5  pleading deficiencies of that claim to the claim -- to the --

6  in the objection that we filed today.

7        Thank you, Your Honor.

8        THE COURT:  All right.  Thank you.

9        All right.  I know the parties saw this, and it is

10 a gating issue, but I'm not prepared to rule from the bench

11 on a half-a-billion dollar claim objection without taking

12 some time to think about it and perhaps write an opinion

13 about it because it certainly will go up on appeal and I want

14 to make sure if it does, either way, the appellate court has

15 an opportunity to understand what my thinking on all of this

16 was.

17        So I'm going to take this under advisement.  It

18 doesn't help the parties today.  We're going to have to go

19 forward with the remaining portions of what's on the agenda

20 for Celsius, but that is what it is at this point.

21        MR. GLUECKENSTIN:  Thank you, Your Honor.

22        I think the next issue then on -- with respect to

23 the Celsius matters is Celsius' Motion to Lift the Automatic

24 Stay.

25        THE COURT:  Okay.  Let me ask first -- I think I

1   saw it, but is there a tolling agreement in place because the

2   statute of limitations already ran, right?

3             MR. LEVY:  Yes, there is.

4             THE COURT:  All right.

5             MR. LEVY:  Your Honor, Richard Levy, of Pryor

6   Cashman, for the Celsius Litigation Administrator.

7             The original 546(a) bar date was mid-July.  The

8   parties agreed, and Your Honor entered an order in both the

9   Chapter 11 and the Chapter 15 case, to approve a tolling

10  agreement which extends the time to file for 546(a) purposes.

11  I believe it's seven days after Your Honor enters an order if

12  relief is granted from the stay.

13            THE COURT:  Okay.

14            MR. LEVY:  All right?

15            THE COURT:  Thank you.

16            MR. LEVY:  Your Honor, Richard Levy, of Pryor

17  Cashman, for the Celsius Litigation Administrator.

18            I'm going to refer to the -- use the word Celsius

19  to refer to my client.  My client is effectively running the

20  Celsius estate when we talk about what the rights of Celsius

21  are and what Celsius intends to do.

22            Your Honor, I'm also going to try not to -- so as

23  not to burden the Court today, there are commonalities

24  between both motions, the motion on the Celsius 11 and the

25  motion on the Celsius -- excuse me, on the FTX 11 and on the

1  FTX 15.  Both --

2           THE COURT:  Yeah, let's do that one first, the 15,

3  because --

4           MR. LEVY:  Pardon me?

5           THE COURT:  Let's do the 15 first because there

6  was a motion to adjourn that portion of the hearing, right?

7           MR. LEVY:  Your Honor, I didn't hear Your Honor.

8           THE COURT:  I said let's do the Chapter 15 issue

9  first because there was a motion to adjourn that particular

10 --

11          MR. LEVY:  Your Honor --

12          THE COURT:  -- part of the motion.

13          MR. LEVY:  -- we think that that should be heard

14 today.  We think that the matters both should be heard today

15 and, frankly, the issue that I was hoping to deal with in

16 order not to burden the record was to deal with the common

17 issues on the elements of relief, the cause that's been

18 shown, and the reason why there is none of the parade of

19 horribles that comes in either case.

20          In the Celsius -- in the Chapter 15 case, we're

21 really talking about -- I mean our view is, first, that that

22 -- the whole purpose here is a delay tactic.  It's designed

23 to prevent us from prosecuting our case.  It's designed to

24 prevent us from being in a position to assert before Your

25 Honor needs for relief, which are part of the substance of

1  the motion.

2         If this matter is delayed a long time, and the

3  Chapter 15 case -- actually, the Bahamian portion of the

4  liquidation proceeds and there's nothing left.  We are left

5  holding the bag.  That's exactly the scenario that they want

6  us to be in.

7         THE COURT:  Well, the problem I have or the issue

8  I have is you've now filed something in the Bahamas, which

9  the joint liquidators say now subjects you to jurisdiction of

10 the Bahamian courts, and I have to consider whether I'm

11 interfering with something that the Bahamian court has the

12 right to pursue as an initial matter, rather than me, because

13 they are the center of main interest for that case, not me.

14        MR. LEVY:  Your Honor, I understand.  I'm happy to

15 address that point.

16        THE COURT:  Okay.  Go ahead.

17        MR. LEVY:  So, Your Honor, the first point I want

18 to make is that the FTX party, the FTX foreign

19 representatives, came to this -- came to the United States,

20 exercised their right to invoke the jurisdiction of the

21 United States courts to seek Chapter 15 relief.

22        They started in New York.  They ended up here.

23 Your Honor granted them a motion which gave them Section 1520

24 relief, which makes the stay under Section 362 applicable,

25 applicable to the debtor and as -- property of the debtor

1   located in the United States.

2           Section 362 -- I'm going to start with the

3   language of Section 362, which now applies, and why Your

4   Honor should be dealing with it from that standpoint first.

5           Section 362 tells us what's stayed and how a party

6   gets relief from the stay and which court it goes to to get

7   relief from the stay.  And the old maxim, read the statute,

8   read the statute.  The statute tells us that Your Honor is

9   the person who should be making the decision with respect to

10  the United States issues that we are asserting.

11          And remember, Your Honor, that we are going to be

12  seeking relief, if we get that far, to the distributions that

13  are being made both to the Celsius clients and to the former

14  Celsius clients through FTX and the former Celsius clients

15  through FTXDM.

16          Your Honor, the reason why --

17          THE COURT:  Ask Mr. Glueckstein about that.

18  You're going to have to explain that one to me too as to how

19  it's possible that you're going to come in here and say,

20  Judge, you should not allow distributions under this plan to

21  these 500 claimants who are entitled to a distribution under

22  the plan because they are subjected to litigation unrelated

23  to this case in another jurisdiction.

24          What authority do I have to do that?

25          MR. LEVY:  Your Honor, we are asserting that --

1  and this is the basis of an objection to the plan that you're

2  going to hear about in not long from now, is that this is, in

3  effect, an interpleader situation.

4          There is a common fund.  The money that is coming

5  out of FTX to a group of FTX clients whose accounts were

6  funded, in whole or in part, with money as to which Celsius

7  has an ownership interest, that's the basis, Your Honor.

8          THE COURT:  Well, isn't that giving them -- isn't

9  that giving you a prejudgment attachment of these claimants'

10  funds --

11          MR. LEVY:  No, Your Honor.  We are not asking for

12  any --

13          THE COURT:  No.  Let me finish my question.

14          MR. LEVY:  I'm sorry, Your Honor.

15          THE COURT:  Go ahead.

16          MR. LEVY:  We are not asking for a prejudgment

17  attachment.  We are not asking for garnishment.  We are

18  suggesting to the Court, as we did in our plan objection,

19  which I'll read, that all that has to happen here is that the

20  funds be held back and the parties allowed to litigate who is

21  entitled to that money.

22          If we don't do that, the money disappears because

23  the debtor makes its distributions.  We are left -- again, to

24  use the phrase I used earlier, we have to hold the bag.

25          Now, if that means, Your Honor, that we have to

1  pursue our claim directly against FTX, the FTX debtors, I

2  guess we have to do it at that point and the risk is they're

3  going to end up paying again, even if they've already paid

4  back the customers because we are entitled, under 550, to one

5  single recovery from whatever source we can get, initial or

6  subsequent.

7          THE COURT:  Well, that doesn't answer my question

8  as to what authority are you relying on for me to tell these

9  claimants you're not entitled to your distribution because

10  you've been sued somewhere else.

11         MR. LEVY:  Your Honor, we are asserting that the

12  plan is defective because it needs to deal with the disputed

13  claims.  There are going to be, in effect, two sets of

14  disputed claims, the debtors' objections to our claim and our

15  objection to the Celsius claims in the New York -- to the

16  Celsius creditors in New York.

17         THE COURT:  So why am I dealing with this issue

18  now if this is a -- I mean that's a big issue for me.  And I

19  haven't looked at the -- your plan objection, so I don't know

20  --

21         MR. LEVY:  Of course.

22         THE COURT:  So, you know, how do I make a decision

23  today on whether to lift the stay on something I'm not even

24  sure what this is all about?

25         MR. LEVY:  Well, Your Honor, what it's about is

1  starting an action, asserting a right, making sure that the

2  rights are preserved.

3       Your Honor, we don't have any problem granting the

4  stay relief.  We'll start the action.  We'll stop right there

5  and deal with all of the other issues in the plan context

6  and, if need be, after.  We may ask you for the relief that

7  we're talking about, some kind of a provisional relief if it

8  were an interpleader type of -- I'm going to use the word

9  restraint.

10       We're not asserting -- we actually could assert

11  that we had an ownership interest because the accounts were

12  funded with our property.  Those Celsius creditors who now

13  come to FTX as FTX creditors are really not entitled to

14  receive distributions based on their preferential movement of

15  our property.

16       THE COURT:  But I don't have that before me.

17  You're just saying it.  But I don't have any papers that say

18  that.  You didn't file anything to say --

19       MR. LEVY:  The draft --

20       THE COURT:  -- you're not entitled to it.

21       MR. LEVY:  The draft --

22       THE COURT:  Wait.  You got to wait until I finish

23  talking before you try to talk.

24       You haven't filed anything that establishes this.

25  And this all gives me pause as -- that this is all related to

1  the FTX bankruptcy.  That's a major issue.  How do I do this

2  and allow you to say I'm going to freeze these funds until

3  you get your judgments somewhere else against people who

4  aren't before me.

5           MR. LEVY:  Well, Your Honor, I'll give you one

6  example, I suppose.

7           We'll file our complaint.  We'll prosecute our

8  plan objection.  We'll ask Your Honor to make appropriate --

9  to deal with appropriate modifications to the plan.

10          And if we don't -- if we get that far, or the

11  alternative, Judge, we will have a claim -- if Your Honor

12  sustains the claim that we have filed, the debtors are going

13  to object.  They're going to have to reserve.  They're going

14  to have to reserve funds and either they're going to pay once

15  or they're going to pay twice.

16          So Your Honor is going to be able to hear all of

17  that.  The question will be one of timing.

18          THE COURT:  Well, my point is this seems like it's

19  all related to this case, not Celsius.

20          MR. LEVY:  Sorry, Your Honor?

21          THE COURT:  This seems like this is all related to

22  the FTX case, not to Celsius.

23          MR. LEVY:  I disagree.

24          THE COURT:  And those are issues that I need to

25  decide, not the court in New York.

1        MR. LEVY:  Your Honor, I respectfully disagree

2   because the question of whose money is it travels through

3   from Celsius to FTX.

4        If Celsius' property was diverted to its customers

5   and then moved to FTX, the debtors got our property.

6        THE COURT:  But, again, you haven't --

7        MR. LEVY:  We're entitled --

8        THE COURT:  You haven't raised that issue before

9   me that it's your property.  I don't have that in front of

10  me.

11       Is that a part of your plan objection?

12       MR. LEVY:  Yes.

13       THE COURT:  All right.  Well, I don't -- I haven't

14  gotten to that yet.

15       MR. LEVY:  I understand that, Your Honor.

16       THE COURT:  So I'm still -- this still all seems

17  to be related to FTX, not Celsius, and you have a tolling

18  agreement in place that says seven days after I rule.  Why do

19  you need to file anything at this point?  Just wait until --

20       MR. LEVY:  Excuse me, Your Honor?  I missed the

21  last comment.

22       THE COURT:  I said I have -- you have a tolling

23  agreement in place so why do I need to decide this now?  Why

24  not wait until we get through plan confirmation?  You can

25  raise your issues you have about plan confirmation and then I

1  can decide whether or not I'm going to lift the stay to allow
2  you to pursue this in New York or bring it here.

3          MR. LEVY:  Your Honor, I obviously have to defer
4  to your sense of case management.

5          We think that we need relief because we don't want
6  to be left holding a bag.  We don't -- and by the same token,
7  Your Honor, we're trying to deal with responding to the
8  debtors' concern that we're looking for additive recoveries,
9  which we're not, but if we can't glom on to the distributions
10  -- and I'm using that word in a colloquial vernacular, then
11  we're going to have to come back and litigate our claim and
12  get recoveries from the debtor and we're going --

13          THE COURT:  Well, that's my point.  Why don't we
14  wait until we know if there's a plan confirmation process
15  whether or not you're right about the fact that you have this
16  intervenor-type situation where you have the right to prevent
17  claimants from being paid until your claims are liquidated?

18          MR. LEVY:  I understand the Court's concern.  I
19  can't say anything further than what I've presented thus far.

20          THE COURT:  All right.  Let me -- I want to hear
21  from the Joint Liquidators.

22          MR. LEVY:  Your Honor, before that, may I address
23  -- may I respond to points -- couple of points on the 15 that
24  I think are relevant to the whole question of whether we have
25  to go back to the other court first, or whether we're

1  properly here before Your Honor?

2        THE COURT:  Well, let me hear -- well, it's their

3  motion -- or their motion to adjourn.  So let me hear from

4  them and then you can respond to their argument.

5        MR. LEVY:  Thank you, Judge.

6        MR. SHORE:  Good afternoon, Your Honor.

7        Chris Shore, from White & Case, on behalf of the

8  Joint Official Liquidators.

9        You got it right.  We want to adjourn this.  We

10  asked multiple times.  We couldn't get them to agree, so we

11  all trotted down here for this hearing, and thank you for

12  hearing us, Your Honor, and thank you for allowing our

13  witnesses at least to appear through Zoom and not have to

14  come here.

15        I want to clarify a couple of things because we're

16  kind of aligning, to some extent, the two estates because

17  they started jointly.

18        The claims that are a subject of the lift stay

19  motion that I'm seeking to adjourn are claims related to

20  transfer -- alleged transfers from Celsius to FTXDM for

21  customer accounts held under the FTXDM terms of service, and

22  they lay out $327 million of claims.

23        They did file a proof of debt in the Bahamas for

24  that amount and, unlike saying I'm doing an investigation,

25  they did say we are asserting these claims, we have these

1   claims, and we have a process for dealing with those claims.

2           I do want to point out it is not a customer claim.

3   A lot of what they're saying is the -- this gets tied up in

4   the U.S. because of the customer claim election that is part

5   of the approved global settlement agreement.

6           I want to be clear they do not fit the definition

7   of customer claim.  It is not a customer claim.  It is a

8   general, unliquidated portion -- and partially liquidated

9   claim asserted in the Bahamas to be paid out of the Bahamian

10  liquidation.

11          That is a submission to jurisdiction to have the

12  court deal with all of those issues.  They have submitted to

13  that court.  They did not file a proof of claim in this Court

14  with respect to those particular transfers we're talking

15  about because those aren't claims against the U.S. debtors.

16  The only place those claims are pending is in the Bahamas.

17          Be clear about the scope of the stay and why we're

18  asking for the relief.

19          Your Honor has a 362 stay in place for properties

20  within the territorial jurisdiction of the United States.

21  The Bahamian court, as set forth in Ms. Rolle-Kap's

22  (phonetic) initial declaration, is worldwide.  So there are

23  two stays applying to assets within the United States, a stay

24  in the Bahamas -- sorry, a stay in the U.S. and a worldwide

25  stay in place.

1            So both courts need to sign off on that stay and

2     we believe, as a question of comity, the Court should be

3     deferring to that court to address it because if the Court

4     says I'm not lifting the stay and answers the question both

5     am I lifting the stay worldwide, including in the U.S., and

6     if we do it here, the only question we're answering is should

7     the stay be lifted in the United States.

8            As Mr. Greaves points out, there's nothing really

9     here in the United States but, nonetheless, we believe that

10    the court to whom the Celsius Administrator has submitted to

11    jurisdiction to resolve the substantive underlying issue

12    should be the first and, ultimately, the adjournment request,

13    which would be let's wait and see what the Bahamian court

14    does before Your Honor addresses it, is a question of comity

15    and comity, in my lay terms, it's always do unto the other

16    court as you would have done to yourself.

17           If we flip this, imagine that, instead, they had

18    decided that they wanted to prosecute the claims against the

19    U.S. debtors in the Bahamas and went to the Bahamian court

20    and said I would like you to lift the stay in the Bahamas to

21    allow me to sue the U.S. debtors in the Bahamas and execute

22    against Bahamian assets.

23           Your Honor would haul them in here and say you're

24    not allowed to do that.  You have to come to me.  You have

25    claims.  This is an attempt to recover a claim against a U.S.

1  debtor.  You got to come get the stay lifted here first.

2          So all we're asking -- it's not a delay tactic.

3  Every opposition to stay relief is a request for more time.

4  That's the point of a stay.  We're just saying they can start

5  -- they started the process there.  Ms. Rolle-Kap, in her

6  supplemental declaration, lays out the process by which

7  that's going to get done.

8          And if the Bahamian court lifts the stay -- I

9  can't imagine there would be a different result in the U.S.,

10 but if the Bahamian court doesn't lift the stay, even if Your

11 Honor were inclined to lift the stay with respect to the U.S.

12 assets, they still wouldn't be able to proceed because the

13 stay of the Bahamian court covers those assets as well.

14         THE COURT:  Okay.  Are the -- all of the assets of

15 the Bahamian debtor located in the Bahamas?

16         MR. SHORE:  No.

17         THE COURT:  Okay.

18         MR. SHORE:  The Bahamian debtors have, and as Mr.

19 Greaves leaves out, he -- they do have contingent assets in

20 the U.S.  It's just nothing that's liquidated at this point.

21 But, as I said, it is all still covered by the Bahamian stay.

22         There are -- the largest assets are in the Bahamas

23 in the forms of funds and crypto held and the properties that

24 we've talked about before.

25         THE COURT:  What's in the U.S.?

1    MR. SHORE:  There are -- there -- of the -- the

2  biggest assets in the U.S. are the Silvergate and Moonstone

3  accounts, but those have been seized by the Federal

4  Government as part of the claims -- the criminal claims.  So

5  we don't have access to those funds.

6    THE COURT:  Okay.  Thank you.

7    MR. SHORE:  But, nonetheless, the stay is in place

8  to protect our interest in it.

9    THE COURT:  Okay.

10    MR. SHORE:  It's just a police powers exception

11  for the -- you know --

12    THE COURT:  Got you.  Thank you.

13    MR. SHORE:  Thank you, Your Honor.

14    THE COURT:  All right.  Okay.

15    Mr. Levy?

16    MR. LEVY:  Thank you, Your Honor.

17    We find ourselves in a sort of a darned if you do

18  and darned if you don't situation.

19    When we started this, we filed our motion for

20  relief from the stay.  The foreign representative comes to us

21  and says no, you got to go to the Bahamas, so we did.

22    We filed a motion there.  We filed a proof of

23  claim.  That's not enough now, apparently.  We can't stay

24  here because, under Section 362, we are properly before Your

25  Honor, and I'll talk about some Bahamian law in one second.

1    It's not just the assets of the debtor.  It's the debtor and

2    property of the debtor in the United States under Section 362

3    as made subject to protection by 15 -- Chapter 15, Section

4    1520.

5              The debtor --

6              THE COURT:  Which you're asking me to lift the

7    stay --

8              MR. LEVY:  Yes, Your Honor.

9              THE COURT:  -- to allow you to pursue causes of

10   action against the Bahamian entities --

11             MR. LEVY:  Yes, Your Honor.

12             THE COURT:  -- and when you -- if and when you get

13   a judgment, you're going to go to the Bahamas to collect on

14   it?

15             MR. LEVY:  We may.

16             THE COURT:  So doesn't that kind of show that the

17   Bahamas have the initial interest in this, not me?

18             MR. LEVY:  No, Your Honor, I don't think so.

19             Two things.  Number one, the fact that -- the

20   Bahamian stay is not of extraterritorial application.  It

21   only applies to the Bahamas, and there's case law that says

22   that, a case called - - matter of Leadenhall Bank & Trust

23   Company, 2009 Supreme Court of the Bahamas, which says our

24   stay is not extraterritorial.

25             Somebody who is litigating in a foreign

1  jurisdiction against assets that are Bahamian or were made

2  into Bahamian can litigate there and can litigate to

3  judgment.

4          THE COURT:  Well, here's the problem I -- I know

5  the Joint Liquidators filed a -- was it a sur reply or reply

6  that raised these Bahamian law issues.

7          Now, you haven't had the opportunity to respond to

8  that, and I'm not going to be in a position to rule on

9  anything until I give you an opportunity to address the

10 Bahamian law issues so I can have an opportunity to review

11 that information and decide which way I'm supposed to go on

12 this.

13         So I mean we can stand here and we can talk -- you

14 can tell me what's in these opinions, but, you know, then Mr.

15 Shore is going to want to have an opportunity to respond to

16 that and I need to see it.  I need to see it.

17         So at this point, I just don't see how I can go

18 forward on deciding, as to the Bahamian entities, whether or

19 not I'm going to lift the stay.

20         I think I need to adjourn until I have full

21 briefing on these foreign law issues.

22         MR. LEVY:  All right.  Thank you, Your Honor.

23         THE COURT:  Okay?

24         So I'm going to grant the motion for adjournment.

25 So the parties should meet and confer.  Well, we'll talk

1  about it more, about what the scheduling is going to be on

2  all of this.

3          Do you want to go to the next issue?

4          MR. LEVY:  Yes, Your Honor.

5          On the Chapter 11 case, Your Honor, I'm going to

6  start by talking about what these motions address and what

7  they don't address.

8          We're not asking for permission to sue.  What

9  we're asking Your Honor is for leave to sue in another court,

10  and that's a signal, Your Honor, that if we can't sue in

11  another court, we'll do it here.

12          But we think we have a basis, a sufficient basis,

13  for relief from the stay to go to the New York court.

14          THE COURT:  Let me -- I want to go back to what we

15  talked about earlier with the -- your plan objection and how

16  that's going to impact all of this.

17          I think that's going to have a major impact on my

18  view as to whether or not I will lift the stay to allow you

19  to sue in New York or to sue here.

20          So my inclination at this point is to say I'm not

21  going to lift the stay at this point.  I want to see your

22  arguments at confirmation so that I can then make a decision

23  about, okay, how is this all going to play out at the end of

24  the day.

25          Can you effectively prevent claimants from getting

1  a distribution under the plan until your claims are

2  liquidated either here or somewhere else?  That's going to

3  have a major impact on how I view this whole thing.

4           I don't see any prejudice to anybody at this point

5  because you got the tolling agreement in place.  You got to

6  wait a little longer to pursue it but you got a tolling

7  agreement in place so the statute of limitations is not an

8  issue.

9           Eventually, you're going to sue either here or in

10  New York, assuming I don't dismiss your claim on the claim

11  objection.  So why don't we wait and see how all this plays

12  out before I make the decisions about lifting the stay?

13           MR. LEVY:  Your Honor, may I have a moment to

14  confer with counsel?

15           THE COURT:  Sure.

16           If you want to go out in the hallway for a little

17  bit, that's fine so you don't have people overhearing what

18  you're saying.

19           MR. LEVY:  Can we have five or ten minutes, Your

20  Honor?

21           THE COURT:  Yeah, that's fine.

22           We'll take a five --  we'll take a ten-minute

23  recess.

24           MR. LEVY:  Thank you, Your Honor.

25           THE COURT:  Let me know when you're ready.

1          (Recess taken at 2:03 p.m.)

2          (Proceedings resumed at 2:18 p.m.)

3              MR. LEVY:  Till the confirmation hearing.  On

4    October 7th, we would have the stay motion adjourned to the

5    same date.

6              And are we in agreement on that, Mr. Glueckstein,

7    on us having the stay motion the same day as the confirmation

8    hearing?

9              MR. GLUECKSTEIN:  That's fine, Your Honor.  If I

10   may, just -- can I briefly just be heard on our perspective

11   on this --

12             THE COURT:  Yeah, that's fair.

13             MR. GLUECKSTEIN:  -- because I'm a little

14   concerned that we have --

15             THE COURT:  Mr. Levy had the opportunity, so I'll

16   give you the same opportunity.

17             MR. GLUECKSTEIN:  I don't want to argue the

18   motion, but I'd like to just, so that the record is not

19   completely one-sided here.

20             We're fine adjourning the motion at Your Honor's

21   suggestion and we'll take guidance from the Court on that.

22   To be clear, we don't think there's any scenario where this

23   motion could be granted, regardless, and I think that the

24   plan issues, we will address, of course, their plan objection

25   in connection with plan confirmation, but -- and I want to be

1    clear that the debtors' position is, and Your Honor asked

2    this question, there is absolutely no basis by which the

3    Celsius administrator can come into this court without a

4    judgment or without prejudgment attachment and dictate that

5    we can't make distributions on allowed claims.  They have no

6    judgment in their cases.  They have -- they've -- they have

7    not sought any sort of prejudgment remedy.  They stated today

8    that they're not seeking that.  They've referenced this idea

9    of interpleader that is not applicable.

10            We do not agree with them that there is a dispute

11   as between them and the alleged Defendants in this

12   litigation.  And, of course, we go all the way back to where

13   we started this afternoon, we don't think any of these claims

14   can be asserted against these debtors as all.

15            So all of these issues, I do agree, though, Your

16   Honor, are interrelated.  Obviously, the claims issue is

17   dispositive.  The plan objection will be addressed and we

18   will seek to have that overruled at the confirmation hearing.

19   So we're fine to take guidance from Your Honor.

20            I do think, irrespective, if they did have a

21   claim, if Your Honor disagreed with us and their amended

22   claims were able to be pursued, there is no question that

23   they have submitted to the jurisdiction of this Court.  They

24   have now filed these claims.  They are now participating in

25   the plan process.  And as was discussed in connection with

 1  what would happen here and the ultimate remedy, they're

 2  seeking, effectively, distributions out of this estate to

 3  them, instead of our customers, and we think there's all

 4  kinds of problems with that.  And we will address this in the

 5  plan objection.  These are not customer claims; they are

 6  subsequent transferee claims that they want to assert.

 7          But, regardless, with respect to the matter for

 8  today, we're fine with Your Honor's -- however Your Honor

 9  wants to address scheduling of the matter.

10          THE COURT:  Okay.  Well, why don't we do that.

11  We'll adjourn this until the confirmation hearing.  You need

12  to work with Mr. Shore, though, on the Chapter 15 case if

13  we're going to have it on the same day to, get some

14  additional briefing to me on the foreign law issue.

15          MR. LEVY:  Your Honor, may I address that?

16          THE COURT:  Yes.

17          MR. LEVY:  So on the Chapter 15, as Your Honor

18  observed, we only received the affidavit of law barely 48

19  hours ago and Your Honor has invited us to take an

20  opportunity to respond to that so that Your Honor has a full

21  legal regard before you to decide whether or not we have a

22  basis for Your Honor to rule to lift the stay.

23          THE COURT:  Right.

24          MR. LEVY:  So, Your Honor, we appreciate the

25  opportunity to proceed in the manner that you suggest.  We

1   agree that this matter ought to be adjourned until the

2   confirmation date on October 7th.  We will supply

3   supplemental authority, in effect, our own surreply.

4            I assume, Your Honor, that -- Your Honor, to the

5   extent I need to, may I make this a motion to submit our own

6   surreply in the context of --

7            THE COURT:  Yes, that's granted.

8            MR. LEVY:  Thank you, Your Honor.

9            As I understand, Your Honor, we are not adjourning

10  -- Mr. Shore's motion asked for adjournment of this matter

11  until the Chapter -- until the Bahamian liquidation

12  proceeding is done.  We oppose that.

13           I construe Your Honor's invitation to carry the

14  stay motion until the confirmation hearing, with us having an

15  opportunity to supplement the record.

16           THE COURT:  That's correct.

17           MR. LEVY:  Your Honor, we agree that that's an

18  appropriate way to proceed.

19           THE COURT:  Okay.

20           MR. SHORE:  Just two points of clarification on

21  that, Your Honor, just so everybody is on the same page.  The

22  surreply, I take it, will be limited to issues that were

23  raised for the first time in our surreply, and not an

24  opportunity to raise issues.

25           It was an incorrect statement to say they only got

1  the declarations of law last night or yesterday or whenever.

2  They've had two declarations on file, in connection with our

3  objection.  So I take it that the surreply is limited to the

4  new material and not a re-hash?

5          THE COURT:  That's correct.

6          MR. LEVY:  That is correct, Your Honor; we agree.

7          THE COURT:  Okay.

8          MR. SHORE:  And then to the other thing, I take it

9  that the adjournment is not an invitation for the Celsius

10  administrator to just stop moving in the Bahamas.  They came

11  to the Court and they said, We're doing the right thing in

12  the Bahamas, but as we noticed -- noted, they haven't served

13  us with the papers.

14          And the way this works is as soon as they serve us

15  with the papers, we can go to the Bahamian Court, set up a

16  schedule for lifting the stay there and whatnot.  They can't

17  come in and say, We're proceeding in good faith and then hip

18  pocket this whole process while they play out in this court.

19          So I take it that Your Honor is not directing them

20  not to go forward in the Bahamas?

21          THE COURT:  No, not in any way, shape or form.

22          MR. SHORE:  Okay.  Thank you, Your Honor.

23          MR. LEVY:  And, Your Honor, I don't claim to know

24  anything about Bahamian law, so I don't know exactly what

25  happens with or without the summons being served.

1        We'll deal with the matters raised in the

2   surreply, which is, I think, the scope of what we're going to

3   talk about in several weeks.

4             THE COURT:  Okay.  Sounds good.  Thank you.

5             MR. LEVY:  Thank you, Your Honor.

6             THE COURT:  All right.  Next item?

7             MR. LANDIS:  Your Honor, for the record, Adam

8   Landis from Landis Rath & Cobb on behalf of the debtors.  I

9   was just going to make sure that he didn't omit,

10  inadvertently, the Celsius litigation administrator's motion

11  for authority to file under seal, the transfer schedules.

12  That's at Item 38.

13            THE COURT:  Yes, we do need to address that, I

14  guess.  Do we have -- has the U.S. Trustee objected to that

15  one for the Media Intervenors.

16            Yeah, okay.  Let me hear from the objectors first.

17            MR. HACKMAN:  Good afternoon, Your Honor.

18            May I please the Court?  Ben Hackman for the U.S.

19  Trustee.  Our office filed an objection to the seal motion at

20  Docket Item 24215 in the Chapter 11 case and then at Docket

21  Item 174 in FTX Digital Markets, Chapter 15 case.

22            The seal motions rely on Section 107(b)(1) of the

23  Bankruptcy Code, which is -- which addresses the sealing of a

24  trade secret or confidential research, development, or

25  commercial information.  In other words, the seal motions are

1   not based on 107(c) of the Code, as we read them, which deals

2   with protecting individuals from undo risk and identity theft

3   or other unlawful injuries to the individual or the

4   individual's property.

5          We respectfully submit that the Court should deny

6   the seal motions because the motions seek to seal the names

7   of Celsius customers, which have already been disclosed

8   publicly.

9          The Bankruptcy Court for the Southern District of

10  New York already considered and denied Celsius' request to

11  seal the names of its customers in a published decision in

12  September 2022.  We would submit that there's no basis to

13  seal information in this court that has already been

14  disclosed publicly elsewhere.

15         The public has a right to know what transfers were

16  made from Celsius, which the Celsius litigation administrator

17  now would seek to recover on.  If the Celsius liquidation

18  [sic] administrator were successful in pursuing its claim or

19  seeking stay relief, the FTX bankruptcy estates would have

20  fewer available assets to pay creditor claims than it would

21  currently and the amounts at issue here could be significant.

22         I believe the draft complaint that was attached to

23  the Celsius litigation administrator's lift-stay motion

24  alleges initial transferees withdrew over $516 million from

25  the Celsius Exchange and moved over $377 million of that onto

1   the FTX Exchanges; both of those numbers net of new value.

2   So whatever plan distribution the Celsius

3   litigation administrator would receive under the FTX plan

4   should not be a secret; it should be reported in the post-

5   confirmation quarterly reports for both debtors.

6   Two other points, Your Honor.  First, is that the

7   list of entities, Exhibit C to Mr. Ehrler's declaration, that

8   the parties, that the Celsius litigation administrator is

9   seeking to seal here is a very, very small sliver of the

10  total customer base for FTX.

11  I believe FTX has asserted in its disclosure

12  statement and elsewhere that as of the petition date, it had

13  about two million customer accounts with positive balances.

14  The number of entities listed in exhibit -- in the exhibit at

15  issue in Mr. Ehrler's declaration is a very, very small

16  fraction of that number.

17  The second thing, Your Honor, is, as we understand

18  it, the Celsius litigation administrator would want to bring

19  preference suits in the New York Bankruptcy Court.  We think

20  it would be anomalous for the New York Bankruptcy Court to

21  deny Celsius' seal motion in 2022, then have the Celsius

22  litigation administrator obtain sealing relief in the

23  Delaware Court in 2024 and somehow use the sealing relief

24  granted by the Delaware Court order to attempt to seal

25  information back in the New York Court, which the New York

1  Court had already considered and denied.  That would seem

2  like a revisiting of the New York Court's decision, which we

3  don't think would be appropriate.

4         Beyond that, Your Honor, we rest on our papers and

5  we'd respectfully submit that the seal motions before Your

6  Honor should be denied.  Unless Your Honor has any questions,

7  that's all I have.

8         THE COURT:  Okay.  Thank you.

9         MR. HACKMAN:  Thank you.

10        THE COURT:  Let me get the Media objectors first.

11        MR. MARSHALL:  Good afternoon, Your Honor.  Adam

12  Marshall for Media Intervenors.

13        I wanted to note at the outset, Your Honor, that

14  the Media Intervenors do, as you know, have a pending appeal

15  in the district court, with respect to the sealing of the FTX

16  customer creditor names.  That appeal is still pending and

17  we're reserving all of our arguments with respect to that.

18        With respect to the sealing motion from Celsius,

19  Media Intervenors have objected to sealing of the names of

20  customers, whether they're customers of Celsius or of debtors

21  or of both.

22        The Celsius administrator appears to believe that

23  this Court's prior sealing order and its underlying

24  rationale, with respect to the debtors' customers, applies to

25  Celsius and its customer names, but it does not.  First,

1  Celsius has submitted no evidence whatsoever to support its

2  argument that the names of its customers are confidential,

3  commercial information.

4            Under Third Circuit precedent, the proponent of

5  sealing any judicial record bears a heavy burden to show:

6            "That the material is the kind of information the

7  courts will protect and that disclosure will work a clearly

8  identified and serious injury to the party seeking closure."

9            Here, Celsius has proffered no evidence whatsoever

10  in support of its claim, that the names of its customers

11  qualify under Section 107(b)(1).  Has not demonstrated that

12  such names were confidential, that the customer names are

13  critical to its operations, or the disclosure would cause

14  Celsius commercial injury.  So, in the absence of evidence

15  alone, we would request that Celsius' motion be denied.

16            But second and more fundamentally, Celsius cannot

17  make such a showing.  As my colleague from the United States

18  Trustee's Office noted, these customer creditor names were

19  ordered to be made public and were, in fact, made public in

20  2022.  Celsius cites no precedent or rationale authorizing

21  the sealing of customer names that are already public.  That

22  the horse has long left the barn and has probably left the

23  state, at this point.

24            Given that prior disclosure, along with Celsius'

25  wind-down, there's no reason why these names would qualify as

1   confidential, commercial information.  The re-disclosure of

2   already-public information can't cause Celsius harm or

3   provide an unfair advantage to its competitors.  It has none

4   at this point.

5          So, Media Intervenors would respectfully request

6   the Court deny Celsius' motion, insofar as it applies to the

7   names, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          MR. MARSHALL:  Any questions?

10          THE COURT:  No questions, thank you.

11          MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein,

12   Sullivan & Cromwell, for the debtors.

13          Your Honor, the debtors filed a response to the

14   sealing motion at Docket 24458, which contained a declaration

15   of Kumanan Ramanathan of Alvarez & Marsal.  Mr. Ramanathan is

16   here today in the courtroom and we would ask that that

17   declaration be admitted into evidence.

18          THE COURT:  Is there any objection?

19      (No verbal response)

20          THE COURT:  It's admitted, without objection.

21      (Ramanathan Declaration received in evidence)

22          MR. GLUECKSTEIN:  Your Honor, the reason the

23   Celsius administrator submitted a list of customers to this

24   Court, as we've been talking about all afternoon, is because

25   it alleges those customers transferred assets onto the FTX

1  Exchanges and hold customer claims under our proposed plan of

2  reorganization, thus, Celsius is arguing that the transfers

3  at issue were made by customers of the FTX Exchanges.

4         Accordingly, our position is that in accordance

5  with this Court's prior orders, including the order entered

6  this morning, further extending the time for keeping FTX

7  customers' names redacted, the Celsius administrator is not

8  only overly authorized, but required to file Exhibit C, the

9  names on the transfer schedules, under seal.

10         The focus of the Media objectors and the United

11  States Trustee on the customers being customers of Celsius,

12  we submit, is misplaced.  The fact that certain customers of

13  Celsius are also customers of FTX has not been publicly

14  disclosed and those FTX customer names are protected from

15  public disclosure by order of this Court, both pursuant to

16  Section 107(d)(1) of the Bankruptcy Code and with respect to

17  the individual names on that list, the permanent sealing of

18  those individual names under Section 107(c) that was entered

19  by this Court many months ago.

20         As stated in Mr. Ramanathan's declaration, the

21  debtors' ongoing investigation has already revealed that many

22  of the names on the schedule match names with FTX customers

23  and that the debtors believe more of those names will be

24  confirmed to be customers.  We're starting with a list of

25  names, which is not the best way to do this confirmation,

1  without account-identifying information, but we're working

2  through the process.

3         As a result, Your Honor -- well, first, the

4  suggestion that there's no evidence in the record to support

5  sealing is clearly not true.  Mr. Ramanathan's declaration

6  has now been admitted into evidence, without objection.  And

7  so on the basis of the fact that we know a substantial

8  portion of this list is already confirmed to be FTX

9  customers, and we expect -- Celsius is alleging it --

10  certainly, that every one of the names on that list are FTX

11  customers.  That's why they're here before Your Honor seeking

12  to bring the claims with respect to the transfers at issue

13  that we've been talking about all afternoon.  And we have

14  every reason to believe that those customers will be

15  confirmed to be -- those names will be confirmed to be

16  customers, either all, or in substantial part.

17         And so, as a result, for all of the same reasons

18  that the Court has kept the FTX customer list sealed to date,

19  we submit it would be harmful to the debtors to reveal this

20  list of names now, again, because these Celsius customers are

21  alleged to be FTX customers and based on our ongoing

22  investigation, we expect that to be confirmed.

23         THE COURT:  Okay.  Thank you.

24         MR. GLUECKSTEIN:  Thank you, Your Honor.

25         THE COURT:  Mr. Levy?

1        MR. LEVY:  Your Honor, Richard Levy for the

2   Celsius litigation administrator.  I endorse everything that

3   Mr. Glueckstein just said.

4        I want to supplement for Your Honor, in a very

5   narrow sense.  Mr. Glueckstein is correct that we believe

6   that all of the roughly 500, give or take, actions that we've

7   commenced in New York are against former Celsius customers

8   and we believe are FTX customers today.

9        THE COURT:  So you've already initiated the

10  actions?

11       MR. LEVY:  We have started those actions, Your

12  Honor.  Roughly 2500 actions were started within the last

13  several weeks.  We believe we started with approximately 540

14  targets, former Celsius customers who would be the object of

15  the avoidance claims that we ultimately want to get through

16  to FTX.  That number is changing some, because there have

17  been some preliminary settlements.

18       THE COURT:  Do the -- I'm sorry to cut you off --

19  but do the complaints filed in the New York identify the

20  parties as FTX customers?

21       MR. LEVY:  That was exactly the point I was about

22  to get to, Your Honor.

23       So those 2500 preference targets, their names are

24  public.  There is not an iota of reference in any of the

25  complaints of the 500 or so relevant customers to any

1  connection to FTX.

2           THE COURT:  Okay.

3           MR. LEVY:  So it's public.  In that case, I agree

4  with Mr. Glueckstein that there's no reason for it to be

5  public in this case.

6           THE COURT:  All right.  Thank you.

7           All right.  Well, go ahead.  You can speak.

8           MR. MARSHALL:  Your Honor, may I be heard?

9           THE COURT:  Yep.

10          MR. MARSHALL:  Very quickly, Your Honor.

11          Adam Marshall for Media Intervenors.  Just a

12  couple of points.

13          This is the Celsius administrator's motion.  It's

14  not the debtors' motion.  They didn't join the motion.  They

15  filed something a couple of days ago, but it's the movant's

16  burden to show that sealing is proper.

17          I also want to note that the relationship between

18  the Celsius customers and FTX is not some secret thing.  If

19  you look at the Ehrler declaration at paragraph 8, he says

20  that they're -- he's using commercial, third-party sites to

21  trace these purported relationships between Celsius and FTX.

22  All the Celsius customer names are already public, so anyone

23  who wanted to do that same kind of tracing could do the same

24  thing.  So the relationship here is not secret and should not

25  be sealed.

1          THE COURT:  All right.  Okay.

2          Well, it's an unusual situation, because they're

3  not sealed in the Celsius case, but they are sealed here.

4  There's been -- when I first was looking at this, I thought,

5  well, if they've already been disclosed in Celsius, why am I

6  going to say they can be sealed here?

7          But they're not disclosed in the Celsius action as

8  FTX customers and FTX has -- and I've entered the order

9  sealing all the customer names, so I have to -- and I just

10 extended that again this morning -- so I'm going to grant the

11 motion to seal at this point and we'll go from there.

12     (Pause)

13          MR. LANDIS:  Your Honor, for the record, Adam

14 Landis from Landis Rath & Cobb on behalf of the debtors.

15          Now, before we move on to Item 40, I understand

16 that the Celsius litigation parties would like to be excused

17 from the remainder of the proceedings.

18          THE COURT:  Yes, that's fine.  Thank you.

19          UNIDENTIFIED SPEAKER:  Thank you, Judge.

20          MR. SHORE:  One other thing that didn't come off

21 on that.  There is, in the 15, also, a motion to stay or a

22 motion to seal, with respect to the same customer

23 information.

24          I assume that the same ruling will apply in that?

25          THE COURT:  Yes, I grant that motion, as well.

 1          MR. SHORE:  Okay.  And then permission to be

 2  excused, as well?

 3          THE COURT:  Yes, you may be excused.  Thank you.

 4          MR. SHORE:  Thank you, Judge.

 5          UNIDENTIFIED SPEAKER:  Take care, Chris.

 6          THE COURT:  Well, that emptied half the room.

 7      (Laughter)

 8          MR. LANDIS:  There are trains to catch, Your

 9  Honor.

10          UNIDENTIFIED SPEAKER:  Thank you, Judge.

11          THE COURT:  Take care.

12          MR. LANDIS:  All right.  Your Honor, I think we

13  are sufficiently on the move to continue the proceedings --

14          THE COURT:  All right.

15          MR. LANDIS:  -- if it pleases the Court?

16          THE COURT:  Go ahead.

17          MR. LANDIS:  Your Honor, with respect to Item 40,

18  this is the debtors' objection to proofs of claim filed by

19  Seth Melamed.  We had filed a motion to adjourn that on

20  September 9th and we would plan to proceed, first, with the

21  emergency motion to adjourn.

22          THE COURT:  Yes.

23          MR. LANDIS:  Mr. Glueckstein will address the

24  Court.

25          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

1  Brian Glueckstein for the debtors.

2          On this, Your Honor, we unfortunately needed, and

3  did file earlier this week, the emergency motion to adjourn

4  the hearing on our claims objection to Mr. Melamed's claims.

5  We were forced to do so because he and his counsel ultimately

6  refused to agree to what we see as a basic procedural step to

7  permit the parties to establish a schedule for any necessary

8  discovery and litigation, with respect to his contested

9  claims objection.

10          As noted in the motion to adjourn, Mr. Melamed

11 filed an objection to the debtors' claim objection, a

12 response to the claim objection that included two lengthy

13 declarations:  one from Mr. Melamed himself, which makes

14 numerous factual assertions if there are issues related to

15 the claims and attaches 28 exhibits.  That declaration raises

16 issues that may be subject to further discovery and we expect

17 that Mr. Melamed will be deposed.

18          The second declaration, submitted by a Japanese

19 lawyer makes several assertions about Japanese law and

20 foreign law issues that bar the claims and require a

21 responsive Japanese law considerations on our side.

22          Once Mr. Melamed joined issue on the claims

23 objection in filing his response to declarations, the debtors

24 began considering the additional discovery and responses, as

25 typical in such a situation, and as detailed in my partner

1  Mr. Dunne's declaration that was submitted with the

2  adjournment motion.

3         We reached out to Mr. Melamed's counsel to obtain

4  consent to adjourn the notice hearing date to today and to

5  have discussions about the appropriate schedule for

6  litigation on the merits of the claim.  There was a response

7  that was filed about 10 minutes before this hearing, as I

8  understand it, to the motion to adjourn, where I understand

9  concerns were expressed that relate to plan confirmation.

10         Mr. Melamed has raised with the debtors over the

11  last few days, concerns around his balloting and voting

12  papers.  We have addressed those issues.  We have made clear

13  Mr. Melamed will be able to, to the extent he hasn't already,

14  opt out of the releases and the ballots associated with these

15  claims.  There is certainly nothing about this claims

16  objection that's different than any other claims objection,

17  whereby it would have to be resolved substantively prior to

18  plan confirmation, which is what's suggested in the response

19  that was filed today.

20         And so what we have asked for is, you know, time

21  to ensure that this claim is prepared, now that it's a joint

22  issue on a contested matter, prepared to be litigated, and if

23  necessary, with evidence before Your Honor in considering the

24  issue.  Nonetheless, counsel for Mr. Melamed has insisted

25  that we act like we're going forward today.  His witnesses

1   are not here.  I don't know what -- why we were forced to

2   file this motion, but in any event, we would ask that the

3   motion to adjourn be granted and that the parties be directed

4   to discuss a schedule for litigating.

5          THE COURT:  Okay.  Thank you.

6          MR. GLUECKSTEIN:  Thank you.

7          MR. ADLER:  Good afternoon, Your Honor.  David

8   Adler on behalf of Seth Melamed.

9          I wanted to sort of step back and correct the

10  record a little bit, which was a plan objection was filed on

11  July 10th of this year; coincidentally, the same day that the

12  solicitation materials went out, and I might return to that

13  issue in a few minutes.  But the response date was August

14  16th.  We put in a response.  The first legal point was

15  there's a broad arbitration provision in the agreement that

16  says, well, first of all, the agreement is governed by

17  Japanese law and it says that in the event of any disputes

18  arising under this agreement, it is to be arbitrated in

19  Singapore and that's a straight, in my mind, legal issue that

20  the Court can decide on.

21         But with my discussions with debtors' counsel --

22  and I was perfectly amenable to giving an extension of time -

23  - I had no issues about giving an extension of time -- there

24  was one issue, which was, I don't want the extension of time

25  to go beyond the start of the confirmation hearing, because

1  Mr. Melamed has also objected to the confirmation hearing,

2  and some of those arguments are related to how they've

3  treated or how they propose to treat his claim.

4          So I said, when is the next omnibus date?  I was

5  told it's October 22.  I said that's beyond -- 15 days after

6  the start of confirmation and I asked specifically, could we

7  have this matter heard on October 7th at the start of the

8  confirmation?  I was told no.

9          And so, as a result, because Mr. Melamed suffers

10 potential prejudice by not having any determination on his

11 claim until after the confirmation hearing is over, I had to

12 object.

13         THE COURT:  Can you explain to me how there's

14 prejudice if -- I mean, claims get adjudicated after

15 confirmation all the time.

16         MR. ADLER:  Well, he's seeking to be subordinated

17 to that of an equity claim and he filed, as a Class 6A claim,

18 and if he were subordinated to a class -- to a 510(b) claim,

19 he would potentially raise issues concerning the treatment of

20 other classes that are above the 510(b) class in terms of

21 what the payout is and how the calculations were made.

22         THE COURT:  That's a completely separate issue

23 from his claim objection, though, from the claim and the

24 objection to the claim.

25         MR. ADLER:  Well, I mean, if his claim is

1  subordinated, I mean, he doesn't know.  I mean, he would be

2  put in the tenuous position of not knowing where his claim is

3  and having to raise issues that may not even be relevant to

4  what his claim is ultimately determined.

5          And so, from my perspective, I thought that the

6  best way to have it would be to have a hearing on October

7  7th, which is what Celsius just got, at least with respect to

8  this legal issue on whether this matter should be arbitrated

9  in Singapore, because to me, that's a straight legal issue

10 and the law of the Third Circuit is pretty clear on how those

11 actions or how those issues are treated.

12         THE COURT:  How's that going to -- if it's

13 arbitrated in Singapore, how is that going to affect whether

14 or not his claim is subordinated under the plan?

15         MR. ADLER:  Well, I mean, there's Japanese law at

16 issue here.  We don't know what -- whether -- we expect the

17 matter to be arbitrated in Singapore, but I think that if it

18 were arbitrated in Singapore, Mr. Melamed would not be

19 pursuing his -- the claims that he is thinking about, you

20 know, in terms of if he were subordinated; in other words, it

21 would be off the table, because it's all going off to

22 Singapore, whereas, if we're here, we're asking the Court to

23 interpret Japanese law.  And that's why we submitted

24 declarations of Japanese counsel.

25         We've, you know, pointed to the fact that

1    arbitration is -- is required under the agreement.  He has

2    claims -- I mean, stepping back for a second, Mr. Melamed was

3    a co-owner of a company called "Liquid," which was a crypto

4    company in Japan.  And it was a custodial crypto company that

5    got a license from Japan so they, you know, were legitimate.

6            And at some point, Mr. Melamed, in 2021, 2022 sold

7    his stake in his company to FTX.  But that agreement is all-

8    encompassing in terms of what happens if there are disputes.

9            THE COURT:  But -- so he's not going to get a

10   resolution on whether or not his claim exists or not, even if

11   -- he still has to come back here.  Even if I determine that

12   he has to go to Singapore, he's still got to come back here

13   to collect on the claim.

14           So how does -- where's the prejudice here?  I'm

15   missing something.

16           MR. ADLER:  I think the prejudice is that if he is

17   off in Singapore, his participation, at least with respect to

18   the higher claims, is not front and center.

19           THE COURT:  Well, couldn't the -- the arbitration

20   in Singapore could rule in a way that would result in his

21   claim being subordinated, couldn't it?

22           MR. ADLER:  It could.  It definitely could.

23           THE COURT:  So, again, what's the difference here?

24   Why do I need to decide this now, as opposed to later?

25           MR. ADLER:  Well, I mean, I think that --

1          THE COURT:  He's got to proceed as if his claim

2    might be subordinated and he's got to object to the plan if

3    he wants to object on that ground.

4          MR. ADLER:  We've objected to the plan, but we

5    reserved rights, with respect to objecting as to or what

6    claims would be raised if he were subordinated.  I mean, we

7    listed them, but we weren't taking discovery on them or -- I

8    think it would make a cleaner confirmation presentation if we

9    could focus on the legal issues that we raise in the

10   objection and not have us deal with the issue of potential

11   subordination.

12         And I think that Mr. Melamed would not be raising

13   those subordination issues if his matter was off to Singapore

14   at that point.

15         THE COURT:  Well, isn't that prejudicing himself?

16   If the Singapore Court rules in a way or the Singapore

17   arbitration rules in a way that would mean that I would

18   subordinate his claim under the plan, he's still got to

19   object to the plan.

20         MR. ADLER:  Again, he objected to the plan, but

21   he, you know, without knowing where he is in the scheme of

22   the waterfall, it creates problems.  I think the view is that

23   there are less problems if the matter is being adjudicated,

24   per the agreement, in Singapore.

25         THE COURT:  I still don't see why.  You lost me on

1   that one.  I'm not seeing it.

2           MR. ADLER:  I think, Your Honor, I mean, what I

3   would ask is that the -- and I should also note that there

4   are other claims, as well:  claims for salary.  Mr. Melamed

5   was at FTX, apparently, until the sale of FTX Japan was

6   consummated.  He hasn't been paid monies that have been owed

7   to him, director's fees.  He was a representative director of

8   FTX Japan until, I think, July 31st.  He has other related

9   claims, other than the claim under the SPA, which is the

10  stock purchase agreement.

11          I think that we would ask that the Court, I mean,

12  since it is a straight legal issue, make the determination on

13  whether or not the claim should be arbitrated.

14          THE COURT:  It's a legal issue, but it's under

15  Japanese law, right?

16          MR. ADLER:  Say it again.

17          THE COURT:  It's under Japanese law, I have to

18  determine, right, whether it's -- whether the arbitration

19  clause is enforceable?

20          MR. ADLER:  Well, the arbitration, the SPA is

21  governed by Japanese law and it states that an arbitration,

22  if there are any disputes -- any disputes under the

23  agreements or related documents, that the matter is to be

24  arbitrated in Singapore.

25          THE COURT:  Well, it still raises a factual

1   question about that and the question of Japanese law.  I

2   mean, you submitted a declaration of a Japanese attorney,

3   which, by the way, is not admissible, because it's not

4   properly executed under 1746, 20 U.S.C. 1746.

5           MR. ADLER:  Right.  We do -- Your Honor, we did

6   submit that under Rule 441, which basically gives the Court

7   the ability to do its own research.

8           THE COURT:  And I understand that, but, you know,

9   the declaration wouldn't be admissible.  So unless he's here

10  to testify about it.

11          MR. ADLER:  Right.

12          THE COURT:  And I'm kind of in the same situation

13  that it was with the Bahamian situation, where I want to hear

14  what the law is on both sides.  I want to give the debtors an

15  opportunity to say, No, their expert on Japanese law is

16  incorrect.

17          MR. ADLER:  Right.  So, I mean, I think that from

18  -- I mean, from our perspective, if the Court is inclined to

19  grant the extension -- and, I mean, again, we were not

20  opposed to the extension; we just wanted it heard on the

21  first day of confirmation, at least the arbitration issue --

22  that that go forward on October 7th.  And then to the extent

23  that there's discovery on other matters that is required, you

24  know, we can discuss what the second, you know, phase of that

25  hearing is.

1           THE COURT:  Okay.  Thank you.

2           MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

3   Glueckstein for the debtors.

4           So, as Your Honor was getting to, these two issues

5   are unrelated.  Counsel and Mr. Melamed under the debtors'

6   position; we've set it out in our objection.

7           He understands our position that if we litigate --

8   when we litigate the claim objection, that his claim on the

9   stock purchase agreement is an equity claim.  That will be

10  treated how it's treated under the plan.  Whether this Court

11  determines and liquidates his claim or that ultimately

12  happens in the Singapore arbitration, as Your Honor observed,

13  he has to come here to collect his distribution.

14          And so the claims process is not affected by

15  confirmation of the plan and vice-versa.  Mr. Melamed has

16  interposed a plan objection.  We will address that plan

17  objection at the confirmation hearing.

18          But I don't understand what's being -- you know,

19  this idea that we -- let's have argument on the arbitration

20  issue at the confirmation hearing on this question of how to

21  interpret a Japanese contract with potentially, you know,

22  dueling experts.  I'm fairly confident Your Honor is not

23  going to rule from the bench and we're going to proceed to

24  the confirmation hearing in any event.

25          And so I -- and if you do rule from the bench and

1 you rule in our favor and his claim -- and we're here, we

2 still have this issue of, is his claim equity or is it not?

3 And if it is equity, he's going to be treated how he's

4 treated under the plan.

5          So to the extent he has a plan objection, that has

6 been filed.  The date to file plan objections has long

7 passed.  We are in the process of responding to those

8 objections.  We will respond to Mr. Melamed's objection.

9 We'll address it at the confirmation hearing, and then the

10 plan, if it's confirmed, will provide for treatment both,

11 under Class A, as general unsecured claim, and as 510(b),

12 securities claim.

13          And then at some point in time, like many other

14 claims in this case, there will be an adjudication of the

15 merits of the claim, whether that be before Your Honor, as we

16 think it should be, or in some arbitration, and then the

17 claim, if it's allowed in any amount, in any particular form,

18 will then be treated under the plan.  That's how the claims

19 reconciliation process is going to work for every claim.

20          So there's nothing special about Mr. Melamed's

21 claim that requires action prior to the confirmation hearing.

22 So, from our perspective, the question is, what do we need to

23 do to get the record in front of Your Honor to litigate this

24 claim?  The same thing we're doing as we're working through

25 the multitude of claims that we have objected to and will be

1  objecting to as time goes on, both before and after

2  confirmation.  And I think it's pretty clear just from the

3  colloquy today that there are some things, at a minimum,

4  still need to happen, even if it was on the limited question

5  of, does the arbitration clause control, given that it's a

6  Japanese law agreement, before Your Honor can properly

7  address those issues.

8          And that's all we've been trying to do, and

9  there's nothing that about this that requires us to set a

10  false deadline for just one claim, either at or before the

11  confirmation hearing.

12          THE COURT:  All right.  Thank you.

13          MR. GLUECKSTEIN:  Thank you.

14          MR. ADLER:  Your Honor?

15          THE COURT:  Go ahead, Mr. Adler.

16          MR. ADLER:  I just did neglect to note what I said

17  I would come back to, which was one of the concerns, which is

18  -- and we actually filed something this morning -- was -- and

19  the lawyers got back to me yesterday, is Mr. Melamed never

20  received a ballot.  Apparently, on August 14th -- and this is

21  in the declaration -- a ballot was mailed to his former law

22  firm, which was received on August 16th, the day of the

23  voting deadline.  And we submitted the declaration with the

24  postmarks.  We also went crazy that day and got the ballot in

25  at 2:39 p.m., as I recall.  But we have issues with the

1  balloting, I guess, is just what I wanted to note.

2         And, again, I think that, you know, I understand

3  what Your Honor is saying, I think that from a sense of

4  honoring the agreement and conserving judicial resources to

5  some extent, it's better to be -- for this matter to be

6  arbitrated or for the decision to be made sooner, rather than

7  later.  And I know Your Honor is a little skeptical of that,

8  but, you know, we can have competing Japanese law

9  declarations here, but I think that, you know, the agreement

10 is pretty wide in scope in terms of the fact that everything

11 that Mr. Melamed has -- you know, all of his claims, which

12 include salary, bonus, director's fees, all, you know,

13 encompassed within that provision to arbitrate.

14         THE COURT:  Okay.  All right.

15         Well, as I've said, I simply don't see how it's

16 necessary to decide the question of whether or not Mr.

17 Melamed's claim should be arbitrated in Singapore or be

18 handled here, in this court, prior to the confirmation

19 hearing.  Even if we went forward at the confirmation

20 hearing, I think Mr. Glueckstein's prediction is probably

21 correct.  I'm not going to rule from the bench on that issue,

22 nor are we burdening the confirmation hearing with other

23 matters already.  And I learned my lesson no Mallinckrodt not

24 to add too many things to a confirmation hearing before we

25 get started.

1          So, I'm going to grant the motion to continue this

2    matter until the 22nd of October.  And I'm going to give the

3    debtors an opportunity to submit whatever additional Japanese

4    law experts they want to provide and it's going to be an

5    evidentiary hearing.  I mean, I'm going to want to hear from

6    these -- this isn't like -- earlier in this case, we had the

7    issue about whether English law was going to apply to some of

8    the things and I said, Well, in English, it doesn't matter.

9    I can read English.  I can understand English and I can read

10   the law and I can know what it says.

11          I'm not going to know what the Japanese law says.

12   I'm going to have to rely on the Japanese experts to tell me

13   what it says.  So I need to have those experts here to

14   testify about that.  So we'll continue the hearing until the

15   22nd and proceed that way.

16          MR. ADLER:  One last question, Your Honor.

17          Do you want us to agree on a discovery schedule?

18          THE COURT:  Yes, please.  Please do.

19          MR. ADLER:  Okay.  All right.

20          THE COURT:  Please meet and confer, come up with a

21   discovery schedule, and submit something under COC.

22          MR. ADLER:  Thank you, Your Honor.

23          MR. LANDIS:  Thank you, Your Honor.  Once again,

24   Adam Landis from Landis Rath & Cobb, on behalf of the

25   debtors.  That brings us to Item 44 on the agenda.

1          THE COURT:  You can leave, Mr. Adler.

2          MR. LANDIS:  Safe travels, Mr. Adler.

3          That brings us to Item 44 on the agenda, which is

4    the Defendants' motion to stay the adversary proceedings in

5    the Embed adversaries.  Let me turn the podium over to the

6    movants.

7          THE COURT:  Thank you.

8          MR. MURLEY:  Good afternoon, Your Honor.  Luke

9    Murley of Saul Ewing.  We're Delaware counsel to Michael

10   Giles, *et al.*, the list of parties that are attached to our

11   motion.

12         I rise to introduce Erica Richards of Cooley, who

13   will be handling the argument from our side, Your Honor.

14         THE COURT:  All right.  Thank you.

15         MS. RICHARDS:  Good afternoon, Your Honor.  Erica

16   Richards of Cooley, appearing today on behalf of all the

17   Defendants in both of the adversary proceedings, Giles and

18   Rocket.

19         It's been a little while before we were -- excuse

20   me -- it's been a little while since we were before Your

21   Honor.  If you tell me, you don't need it and I should skip

22   it, I will, but I was planning to reintroduce what the claims

23   are about and cover a little bit of background so you can

24   have some orientation before I get into the motion.

25         THE COURT:  Go ahead.  It has been awhile.  I was

1   hoping you guys would settle and I wouldn't have to deal with

2   this, but ...

3        (Laughter)

4        MS. RICHARDS:  I have some things to say about

5   that, Your Honor.

6        The Defendants in these cases, and there are

7   currently 103 of them from my count, individuals and

8   entities, they're all former investors, employees, and with

9   respect to Michael Giles, a founder and principal of Embed

10   Financial Technologies, a software firm that developed

11   software.  And its business, together with its subsidiary,

12   Embed Clearing, which was a licensed broker-dealer, clearing

13   from the custodian, they allowed customers to use a software-

14   enabled platform and execute conventional securities trading.

15   Conventional only, no crypto.

16        The debtor WRS acquired Embed in a merger

17   transaction that closed September 30th, 2022.  Six weeks

18   later, FTX collapsed and these cases were commenced.  These

19   two adversary proceedings were commenced approximately five

20   months later on May 17th, 2023.

21        The complaints are seeking to avoid the transfers

22   made to the Defendants in connection with the Embed

23   acquisition.  The complaints assert constructive fraudulent

24   transfer claims, actual fraudulent transfer claims, with

25   respect to one payment I'll address in a minute, a preference

1  claim.

2         The Plaintiffs are three of the debtors:  WRS,

3  which was the debtor that actually acquired Embed and is its

4  parent company, owns Embed, and two other of the debtors.

5  It's the FTX U.S. entity or WRSS and Alameda Research.

6         WRS is the debtor that actually made the payments

7  to the debtors.  The Plaintiffs' complaint alleges that those

8  amounts first transferred from Alameda to WRSS to WRS and

9  then to our clients.  And in very round numbers, the amounts

10 that are at issue are $243 million for payments made to

11 investors for their equity interests, a $55 million retention

12 award to Mr. Giles, that was made on the merger closing date,

13 and the avoidance of contractual obligations for unpaid,

14 post-closing retention awards they allege WRS is obligated to

15 make to a number of other employee Defendants and those

16 retention awards total $7.85 million.

17        So those are the parties and the claims, now, I'll

18 just give you a quick timeline, status of the case, how we

19 got here today, how things have unfolded.  As I said, there's

20 103 Defendants now.  A few have been dismissed and settled.

21 They are located in a wide variety of geographic locations.

22        So the cases filed in mid-May.  It took a couple

23 of months for everyone to get served, everyone to get

24 retained, everything to get settled.  That was largely

25 complete by July 18th and that's when the first case

1   management order was filed on the docket.  It set the

2   timeline for discovery, as agreed by the parties, from fact

3   discovery through summary judgment briefing.

4   And the deadline, the complete initial fact discovery under

5   that CMO was April 5th of this year.  That CMO was modified

6   and amended a number of times by agreement of the parties.

7   The last version was entered by the Court on February 22nd of

8   this year, and that had moved the final fact deadline,

9   deadline to complete fact discovery, to June 28th, 2024.

10          The briefing schedule for the motions to dismiss

11   never changed and, consistent with that schedule, the parties

12   filed briefings.  So our motions to dismiss were filed on

13   August 15th, 2023, all of the defendants either filed or

14   joined a motion to dismiss.  The briefing was completed by

15   October 20th, 2023.  The defendants requested oral argument

16   in a filing on October 27th.  There were lots of schedules to

17   coordinate, the Court's calendar, intervening holidays.  We

18   did not get a hearing date set until mid-January and the date

19   that was set was February 6th, and then it was adjourned two

20   more times because of illnesses, conflicts.

21          So when we finally had oral argument before Your

22   Honor it was approximately four months after the briefing.

23   It was Leap Day, if that matters, and we present our

24   arguments.  Your Honor took it under advisement, and you were

25   aware that documents regarding mediation had been filed on

1   the docket.  And we confirmed that we had all agreed we're

2   going to begin mediation shortly since we buttoned up a few

3   final things.  You advised that it would not be a good use of

4   judicial resources for you to be working on the ruling if we

5   were going to settle, so you let us know you would not start

6   working on the ruling unless and until the parties advised

7   you that mediation had not resolved the issue.

8            We also asked for a stay of discovery during that

9   period, the debtors didn't object.  So pencils down on

10  discovery at the beginning -- sorry, at the end of February.

11           Judge Chapman was approved as a mediator on March

12  8th, and mediation continued for the next five and a half

13  months.  No settlements were reached with any of the 103

14  defendants, all of whom participated in mediation with

15  counsel.  That was reflected in a final report filed by the

16  mediator on August 21st.

17           We promptly reached out to the debtors to ask if

18  they would consent to continue the stay that had already been

19  in place during the mediation.  They obviously didn't agree

20  and send us their proposed scheduling order, but they did

21  agree to hear this motion on shortened notice so we get this

22  issue resolved and move things forward.

23           So, unless you have questions about sort of where

24  we are, I'll go ahead and turn to the next --

25           THE COURT:  Where does discovery stand?  I saw in

1   the papers that there had been some exchange of documents.

2   Is document discovery completed already?

3               MS. RICHARDS:  No, no --

4               THE COURT:  What needs left --

5               MS. RICHARDS:  -- it's not, Your Honor.

6               THE COURT:  -- what's left -- what is left to be

7   done?

8               MS. RICHARDS:  So I can give you some broad

9   strokes.

10              THE COURT:  Just on documents, not on the rest of

11  it.

12              MS. RICHARDS:  Yeah.  So there were still two

13  months left of fact discovery when we went into mediation,

14  when you paused it.  So, much had been done.  I know that we

15  have documents, and we went pencils down and haven't reviewed

16  them.

17              There are a number of documents that -- and I

18  don't have quantity, I can get that for you -- a number of

19  documents that were in the custody of Embed's counsel, and

20  there were privilege issues because they were pre-merger and

21  other counsel was involved.  I believe they're the debtors'

22  documents, but we have to review them for privilege.  It's a

23  little complicated, we haven't gotten to that yet.

24              There are three other defendant counsel, I don't

25  know if they intend to serve any more discovery requests or

1    what is outstanding there.  Like I said, I know we have

2    responsive discovery that came in that we have not even

3    reviewed yet because we went pencils down and the discovery

4    period was paused.

5              That's just the document discovery, and then, of

6    course, there's expert discovery, depositions.  We anticipate

7    given the number of parties here, the number of entities,

8    that there could be, I mean, a dozen depositions, maybe more,

9    plus some third parties who get deposed.  So there's a lot to

10   be done still.

11             THE COURT:  Okay.

12             MS. RICHARDS:  Turning to our stay relief motion.

13   So, all the defendants support the relief.  And of course our

14   papers cite the three factors that Courts in Delaware

15   consider when deciding whether to grant a stay motion.  The

16   first is simplification of the issues; the second is what is

17   the status of the litigation, particularly has discovery been

18   completed and has a trial date been set -- neither of those

19   things is true here -- and, number three, would a stay cause

20   the non-movant or plaintiffs to suffer undue prejudice from

21   any delay or allow the movants to gain a clear tactical

22   advantage.  Our papers go through each of these factors and

23   explain why all of them in these cases weigh in favor of a

24   stay.

25             We cite cases explaining why that's the case.

1  Plaintiffs filed their objection, our reply responded to each

2  of the points they raised.  I don't want to repeat what's

3  already in the papers and that you have.

4          So, with that, I would go a little off-book and

5  hopefully address those factors in a way that may be of use

6  to you.  In particular, what I want to think about is we have

7  these three factors, but on top of all that it's up to the

8  Court's discretion how do you weight these factors against

9  each other, how much do they matter against the broader

10  context of the case.  These are fact-specific issues that are

11  not found in any other case, everything is specific.

12          So, rather than go through each specific issue

13  separately, I want to explain how all those factors fit

14  together and are even stronger when you consider them

15  together weighing in favor of a stay, and how they fit into

16  the larger context of these cases and how they compare to

17  some other rulings I know Your Honor has made in other

18  adversary proceedings where defendants sought a stay of

19  discovery and Your Honor denied those requests.

20          So to start, to cover that point, how do the three

21  factors in support of a stay fit together, because they

22  really do in this case.  I think the point in our motion that

23  illustrates this in a really elegant way is actually one that

24  the debtors, plaintiffs, didn't even respond to, and that is

25  a stay here will facilitate a settlement of these cases.

1   It's still possible before we engage in further litigation.

2            Your Honor, unfortunately, will have to do

3   something I'm sure you weren't wanting to do and going to

4   have to issue a ruling, but this issue that the stay will

5   facilitate a settlement, it doesn't fit into -- neatly,

6   right, into any of the three factors, it really goes to

7   overall judicial efficiency as sort of the umbrella

8   consideration.  And so it pulls in all those factors, they

9   all say settlement, the ability to get to a settlement should

10  be really important.

11           So the first point.  Obviously, what happens in

12  mediation stays in mediation.  I'm not going to disclose

13  anything parties said or what they did, but I will make

14  explicit what I know Your Honor can easily infer, which is

15  that no settlements among 103 defendants and the plaintiffs

16  were reached over five and a half months of mediation because

17  the parties have really different views.  And you can guess

18  what those views are, right?  The plaintiffs think their

19  claims are really strong and will survive the motions to

20  dismiss, the defendants do not share that view.  One or both

21  sides are wrong about something.  We're wrong, someone is

22  wrong.  The only way to sort that out is for you to issue

23  your ruling.

24           Someone is going to have to move, right?  Someone

25  will have a "Come to Jesus" moment, maybe everybody.  The gap

1  will close.  I don't know who will move, how close together

2  we get.  Things will change after the ruling happens.  That

3  doesn't mean we'll end up close enough to achieve a

4  settlement, it doesn't even mean we'll resume settlement

5  discussions, right?  But everyone will have to consider it;

6  will have to think about it.  So that ruling presents an

7  opportunity to still settle these cases before any more

8  resources are expended, time is wasted, discovery is

9  happening, we can stop it if the stay is put in place.

10         And why do I say that?  There are three reasons.

11  Number one, the parties are in violent agreement that a lot

12  of resources have already been spent on the discovery, on the

13  process.  But, as we just covered, there's still a lot to do,

14  it's going to cost a lot.  That doesn't matter so much to the

15  plaintiff, not only because, as we mention in our papers,

16  they have more resources, they just do.  But, even more

17  relevant, they're spending money to get what they think or

18  hope will be more money, and they control if that stops,

19  right?  They're the plaintiffs.  If they don't want to

20  prosecute the claims anymore, they can move to dismiss it.

21  It's up to them and they think they're going to make money at

22  the end of the day.

23         Contrast that with defendants.  They are never

24  getting money back from the plaintiffs, they're defending

25  claims.  At best, the claims will get dismissed and the

1  defendants will just be out legal costs, and they have no

2  decision to walk away, it's in the plaintiffs' control.  All

3  in, this means every dollar the defendants spend that they

4  don't want to be spending on discovery is a dollar that could

5  have been used to pay for a settlement.  So, if you stay

6  discovery and they are not pushing their limited resources

7  out the door to get nothing back, they can put that money

8  towards a settlement.  That's one reason why a stay would

9  really facilitate the possibility to still have a settlement.

10        The second point:  the plaintiffs here don't need

11 the discovery to reassess settlement.  In fact, they have

12 most of the documents that are going to be relevant because

13 it's about the Embed acquisition and aside from those

14 documents I mentioned that are at other counsel that need a

15 privilege review, everything else is in the debtors' contract

16 because WRS owns Embed.  So they have all the records, the

17 files, the emails, the communications, they've been able to

18 review those documents while we are in mediation and

19 everything is stayed that we haven't seen.  They haven't been

20 prejudiced by the stay yet and they won't be; they have what

21 they need.  The thing that will help facilitate a settlement,

22 again, is your ruling on the motion to dismiss.

23        The third point.  As I said, we think the

24 plaintiffs, they actually have most of the stuff that will be

25 relevant here and, despite that, the defendants and

1   plaintiffs respectively, the discovery has been relatively

2   reciprocal.  And I say that because the debtors had a

3   document production number in their objection.  We are

4   excluding a data dump of 162,000 documents that were already

5   on a DOJ database.  We attached the letter where they

6   explained what that was to our reply.  It was a bunch of

7   documents that they already had on a server, the just ran

8   like a key term search, which, if you look at it, obviously

9   pulled out 162,000 documents.  Most of those are not going to

10  be relevant.  They expended virtually no effort to pull those

11  out, right?  They ran a search, dumped it in a folder, gave

12  us access to the platform.

13          So if we're comparing the effort people have put

14  in, what they've expended, it's fair to exclude that because

15  the debtors didn't really work hard, that wasn't an effort

16  for them, and we didn't get anything because that was a huge

17  data dump with documents that were generally not responsive.

18  It would be more burdensome for the defendants to try to sort

19  through all those documents and find something good than

20  probably any benefit we would get.

21          So, putting aside those documents, the debtors

22  have cumulatively produced 62,200 documents, round numbers,

23  to us, we've produced collectively 64,000 documents to them.

24  It's pretty equal.  And maybe they can talk about timing and

25  when people put things in, there's more to do, sure, but so

1  far to date, when discovery is paused, the parties are on

2  equal footing.  If that remains the case, the case is stayed,

3  then, again, there's a better chance to facilitate a

4  settlement because status quo will have remained the same;

5  the parties know where they're at, we know the information we

6  have.  Your ruling is what we need.  Everyone will know where

7  we stand.  If the stay is lifted and defendants have, again,

8  incurred these costs that are a bigger burden for them, for

9  all these reasons, it shifts very quickly and where the

10  ruling might have enabled them to reach something in the

11  middle, it begins to skew.  And, again, it's disruptive and

12  makes it a little less likely that we would be able to still

13  settle before anything else goes forward.

14           Okay.  So that was just an illustration of how

15  these three factors all weigh in, right?  Where we are in the

16  discovery, what will be simplified?  These whole cases could

17  be resolved and the stay is really what will protect that.

18           Prejudice to the parties.  To really talk about

19  that point, I want to build some context and talk about the

20  two adversary proceedings where Your Honor has already ruled

21  on other motions to stay.  Those motions came up in the Lorem

22  Ipsum adversary proceeding, that's 23-50437, and the Kives --

23  I don't know if I'm saying that right -- Kives adversary

24  proceeding at 23-50411.

25           So in both of those cases -- reading the docket, I

1   wasn't -- no, I've read the pleadings, I wasn't involved, but

2   from what I've gleaned from the parties' filings and Your

3   Honor's ruling, in those cases, the defendants filed motions

4   to stay, they had either filed -- or produced very few

5   documents or none at all, and they were seeking to stay

6   discovery.  On the other hand, the plaintiff had already

7   produced lots of documents.  And they said the substantial

8   resources, right, we've already expended in discovery to date

9   weighs in favor -- or weighs against a stay because we would

10  be prejudiced, plaintiffs' argument.  The part that is

11  missing there is because it's one-sided.  You know, we've

12  expended resources, we've given discovery to the other side,

13  and the other side has just done nothing, right?  This is

14  different for all the reasons I discussed.

15         So in those cases, to the extent that was an

16  important factor, that unfairness, that prejudice, sort of

17  looking like bad faith and a tactic and the plaintiffs would

18  be harmed, that's not present here.

19         The second thing.  In both the Lorem and K5

20  adversary proceedings the plaintiffs made the point that the

21  defendants could have filed their motions earlier and the

22  fact that they didn't, were sort of filing it later, would

23  allow the Court to infer that the motions were filed in bad

24  faith.  That prejudice, tactical advantage point.  They made

25  that argument here too, but, again, these are different.  In

1  Lorem, looking at, again, the plaintiffs' papers, the

2  defendants' stay motion was accompanied by a new motion to

3  dismiss based on information that they could have pulled

4  together and objected to months before.  And both of those

5  pleadings were filed just before the discovery deadline, and

6  this is the defendant who had produced nothing.  So, not only

7  had they produced nothing, they had filed this late stay

8  motion coupled with what plaintiffs described as a frivolous

9  motion to dismiss that had not yet been fully briefed.  They

10 just filed the motion to dismiss, plaintiffs hadn't responded

11 yet.  Sort of a Hail Mary, a bomb throw.

12         That's not the case here, right, as we've just

13 discussed.  We filed when circumstances had changed, and it's

14 clear that it will help and it's clear that all the factors

15 support the stay.

16         I will also touch on the Kives point, the timing

17 there again.  In that case, the case management order was

18 different.  Fact discovery wasn't scheduled to start until

19 after the motion to dismiss briefing happened.  So whatever

20 was happening with timing there and whatever the arguments

21 were, it's just different.  Whatever the basis for that

22 ruling was shouldn't control here.

23         And that brings me to timing generally.  Both of

24 those cases, those motions to stay were filed November

25 (indiscernible) February, around the time when our discovery

1  was stayed because we went into mediation.  So we didn't have

2  to think about whether we were going to file a motion.

3  Candidly, we thought about it, and we were monitoring those

4  other rulings.  And then we finally got oral argument

5  started, went into mediation, it became a moot issue.

6        Since that time, our landscape has changed.  The

7  uncertainty about where those cases were headed has

8  substantially resolved.  We know confirmation is a little

9  less than a month away.  There's no guarantees.  I know we're

10 going to be very busy, it's going to be very busy.  There are

11 no guarantees, a lot of things can move.

12        It's clear that whatever recoveries are going to

13 come from the Embed plaintiffs -- excuse me, the Embed

14 defendants, they're not going to really move the needle,

15 they're not going to change timing for anything.  Plan

16 confirmation, the ability to confirm a plan, doesn't depend

17 on our litigation because it's happening whether the stay is

18 granted or not.  They're not tied together.  Whether the stay

19 is lifted or not, they've got their confirmation hearing

20 happening; whether the stay is lifted or not, they'll be able

21 to make whatever distributions they're going to make.

22 There's no meaningful prejudice to the plaintiffs, to the

23 estates, to the creditors if the stay is imposed, and

24 everything to gain because we could still settle this, the

25 clients will have potentially more money to fund a

1  settlement.  It is better for everyone to have things

2  holistically in terms of efficiency, in terms of prejudice,

3  in terms of the best use of the Court's time if the stay is

4  granted.

5            So, unless Your Honor has any questions --

6            THE COURT:  No questions.  Thank you.

7            MR. DECAMP:  Good afternoon, Your Honor, Justin

8  DeCamp for the debtor plaintiffs Alameda Research Ltd., West

9  Realm Shires, Inc., and West Realm Shires Services, Inc.

10            I think it's interesting, Your Honor I think began

11  in the right place here with the question of what remains to

12  be done in discovery because it's not clear at all from the

13  defendants' motion here what actually does remain to be done

14  and what kind of burden that's going to impose on them.  And

15  the answer is, as far as we were aware, in terms of document

16  discovery, not that much is left to be done.  Many of the

17  defendants told us they have little or few or no documents.

18  They've produced what they had or so they said.  Ms. Richards

19  is correct that the debtor, plaintiffs here have the Embed

20  documents, we have produced them a long time ago to the

21  defendants, they have those.  We also produced a lot of

22  documents that have been produced to DOJ because they were

23  responsive to the defendants' requests.

24            So, you know, from our perspective in terms of

25  document discovery, we may have a few follow-up requests to

1   make, we have to identify maybe some deficiencies in what's

2   been produced to us, some gaps to follow up on, but we think

3   document discovery is largely finished.

4   　　　　THE COURT:  Well, Ms. Richards said they still

5   have documents they need to review for privilege that they

6   haven't produced to you yet.

7   　　　　MR. DECAMP:  That's correct, Your Honor, but

8   that's -- I mean, frankly, that's their issue and those

9   documents, you know, we notified them about those documents a

10  long time ago.  It's a contractual provision in the sale

11  agreement that they own the privilege over some documents

12  that are actually in the possession of the debtors, we didn't

13  look at those.  And we told them about that provision, they

14  didn't get back to us for a long time.

15  　　　　We're ready and willing to make those documents

16  available any time they want them to look at, to come up with

17  an efficient way to look at them, but we don't think that's

18  an excuse for a stay here.

19  　　　　I want to address this issue that the defendants

20  rely very heavily on that somehow further delay and a stay of

21  discovery, an extension of the stay of discovery that's been

22  in place now for over six months is somehow going to

23  facilitate a settlement.  The best, you know, chance we had

24  for a settlement, an early settlement, was through mediation

25  before a highly qualified former Federal Bankruptcy Judge,

1   Judge Chapman, which we did and it was not successful.  And

2   it's really -- you know, if the long reprieve from discovery

3   that the defendants had during the mediation didn't, you

4   know, facilitate a settlement, I don't know how continuing

5   that stay now is going to do so.  You know, that argument

6   just really makes no sense.

7           In terms of the resources that have been spent and

8   this idea that somehow there's some kind of financial

9   disparity between the parties here that Counsel is in favor

10  of a stay, you know, both parties invested resources in

11  discovery.  That is a factor that courts consider on stay

12  motions.  The amount of discovery that took place here, the

13  fact discovery went on for six months, there was a scheduling

14  order put in place.  The parties exchanged initial

15  disclosures, they made numerous document requests on each

16  other, they provided -- hundreds of thousands documents were

17  exchanged in the course of that.  Interrogatories were

18  served, we were about to respond to those when the stay was

19  put into effect.

20          So a lot of fact discovery did take place and that

21  weighs against a stay.  But in terms of financial disparity,

22  that issue, you know, we saw that and we're puzzled by it

23  because, obviously, we are estate fiduciaries, we have to

24  maximize the value of the estate for the benefit of

25  creditors, and that's what we're doing here.  The idea that

1  we have a $10 billion, you know, quote-unquote, "war chest,"

2  and the defendants here are crying poverty that they can't

3  afford to litigate is just ridiculous.

4        The defendants here were the beneficiaries of cash

5  payments of almost $300 million that went out of the debtors

6  six weeks before the collapse of the FTX Group.  So, you

7  know, one of the last major expenditures that went out of the

8  estates, what became the estates just prior to the collapse.

9  And the defendant Michael Giles and his corporate entity,

10  whom Ms. Richards represents, personally received 157 million

11  of that himself, and then the remaining defendants received

12  the rest.

13        Apart from the fact that they received a

14  substantial payout in absolute terms, the pre-acquisition

15  investors in Embed who, if you read the briefing, come off as

16  like these little, you know, poor entities that can't afford

17  to litigate, they made a spectacular return when FTX bought

18  Embed at a wildly inflated price.  On average, they more than

19  tripled their short-term investment and, in the aggregate,

20  they made a profit of over $87 million, that's on top of the

21  principal, they got back their principal plus $87 million in

22  profit.  And as we've made clear in various filings, Embed

23  was a fledgling company with *de minimis* revenue, almost no

24  customers other than FTX itself, and buggy, unfinished

25  technology turned out to be essentially worthless.  And Mr.

1  Giles himself, again, who got 157 million out of the deal

2  shortly before the collapse of the FTX Group, when the

3  company was put up for auction, he said he would bid a

4  million dollars for it.

5            So, you know, one of the things that the

6  plaintiffs -- I'm sorry, the defendants focus on in their

7  papers -- Ms. Richards didn't really touch on it, but I did

8  want to mention it because it's in their papers -- is the

9  idea that somehow a ruling by the Court on the security safe

10 harbor in favor of the defendants would avoid the need for

11 discovery on the value of Embed.  And, you know, we thought

12 that was pretty telling.  We think they want to avoid that

13 discovery at all costs.  They don't want to deal with the

14 fact that this company really was essentially worthless and

15 that discovery is going to show that, expert discovery.

16           But in any case, even if the Court were to rule

17 that the security safe harbor applies here -- and we don't

18 think it does for all the reasons we argued at the motion to

19 dismiss -- that would not obviate the need for discovery on

20 the value of Embed, and in fact even the defendants here

21 don't argue that it would obviate the need for the

22 depositions that they say have to take place.  The

23 depositions of fact witnesses are going to take place

24 regardless.

25           On the security safe harbor issue, you know,

1   clearly the defendants here, even if the constructive fraud

2   claims were dismissed and, again, they shouldn't be, would --

3   they would certainly make an argument that they took in good

4   faith for value, and they'll make a defense based on that and

5   they'll try to get some credit for what they sold to FTX, and

6   that's going to require expert discovery on valuation in any

7   case on the actual fraud claim.  So that's not going away

8   either.

9          So it's not clear what exactly is going to go

10  away, why the defendants need this stay now when they

11  conducted discovery for six months, the scheduling order was

12  put in place over a year ago, fact discovery was more than

13  halfway over, what is it about now other than the fact that

14  the defendants have had a long vacation from discovery and

15  they're now faced with the prospect of having to litigate

16  again and engage in discovery, and they just don't want to do

17  it and that's not a basis for a stay.

18         THE COURT:  Well, Mr. Glueckstein in part argued

19  in the Celsius issue, Judge, don't lift the stay because it

20  will distract us from confirmation which is October 7th, so

21  why shouldn't I do the same thing here?

22         MR. DECAMP:  Well, Your Honor, I'm not working on

23  confirmation.

24     (Laughter)

25         MR. DECAMP:  Certainly these folks over here are

1  not working on confirmation --

2          THE COURT:  I don't think Mr. Glueckstein is going

3  to be working on the litigation matter up in New York either,

4  but --

5          MR. DECAMP:  Yeah, yeah -- no, but we want to

6  proceed with all of these avoidance actions expeditiously.

7  We think, you know, the mandate from Congress to Bankruptcy

8  Courts is to proceed with all matters affecting the estate

9  expeditiously.  We don't see any reason a stay should be put

10  in place here.  This is ordinary course litigation, it's an

11  ordinary course avoidance action, we're the plaintiffs,

12  they're the defendants; they have to litigate the case.  We

13  don't see any basis for a stay here.  Nothing is going to

14  change that's going to dramatically, you know, affect the

15  discovery that's got to be done.

16          And, you know, again, Ms. Richards didn't focus so

17  much on the factors here, but if you look at the narrowing-

18  of-the-case factor, which is something that courts do

19  consider, you know, that's not something where courts engage

20  in some kind of predictive analysis of how the motion to

21  dismiss is going to be decided.  There are certain outcomes

22  where the defendants benefit, there's outcomes, obviously,

23  where the case remains the same, plaintiffs benefit.  So that

24  we think is, at best, neutral.  We don't think that the stay

25  would simplify issues for trial for that reason.

1          And in terms of where the case is, I've mentioned

2   we engaged in substantial fact discovery already, we think

3   it's more than half over.  We're not sure, you know, why the

4   defendants here would argue that there's lots of documents

5   left to produce.  If they have them, they should produce

6   them.  But we think really all this is about is giving a

7   tactical advantage to the defendants or at least putting the

8   plaintiffs at a tactical disadvantage.  I think it's clear

9   from the papers that the defendants submitted and from Ms.

10  Richards' argument that, you know, they want to just run out

11  the clock as much as they possibly can.  They feel like, you

12  know, we've submitted a plan that provides for a substantial

13  payment to creditors, there's money that's being collected

14  that will go to creditors, and maybe if things go on long

15  enough, you know, we'll stop paying attention to them.  I can

16  assure Your Honor and the defendants that is not going to

17  happen.  We are going to vigorously prosecute this case for

18  as long as we can, and so it's not going anywhere.

19          We've asked Your Honor in our opposition that the

20  Court, as an alternative to a stay that you deny the stay,

21  obviously, but that you order a schedule and you schedule in

22  the case to take account of the time that was lost to

23  mediation.  We proposed a schedule as an exhibit to our

24  opposition brief, we're happy to confer with the defendants

25  about that schedule.  I would suggest that's probably the

1    best solution here is to find mutually-acceptable dates that

2    work for both sides that take account of the six months that

3    we lost when mediation was pending, but not that a stay be

4    issued.

5              THE COURT:  All right.

6              MR. DECAMP:  Thank you, Your Honor.

7              THE COURT:  Any response?

8              MS. RICHARDS:  Erica Richards, Cooley, Your Honor.

9    I'll just respond to the points that Mr. DeCamp raised.

10             So to revisit what still has to be done, it's not

11   just the document discovery, and we still had a period of

12   time to do that.  So to say, aren't you almost done, we still

13   had time, other parties still had time.  There is still work

14   to be done.  Beyond that, there are the depositions, there

15   are the expert reports.  That's a burden and --

16             THE COURT:  Other than the documents that you say

17   you need to do a privilege review on, how many -- well,

18   first, how many are there?  Do you know how many?

19             MS. RICHARDS:  I don't have that number.

20             THE COURT:  Do you have a guestimate of how many?

21   Are we talking thousands, tens of thousands?

22             MS. RICHARDS:  Yeah, I would say tens of

23   thousands.

24             THE COURT:  Okay.  And, other than those

25   documents, do you have any other documents that the

1  defendants need to produce?

2          MS. RICHARDS:  We have documents that have been

3  produced to us that we haven't reviewed yet and, because we

4  went pencils down, the attorneys who are staffed on the

5  matter, their availability has changed.  So we would need

6  time to re-staff, get potentially new parties up to speed,

7  and get that process started again.  So it's not push a

8  button and we're ready to go.  We have to ramp back up, pull

9  it together, bring some new parties up to speed.

10          As to burden, right, for having been stayed, that

11 is still worth it for the other reasons I discussed.  And

12 it's not about hoping plaintiffs will forget about us.  As I

13 said, we are aware that plaintiffs are the ones in control;

14 they'll decide if they want to drop it, I don't think they

15 will.  And the fact that they don't care if the discovery is

16 relevant based on the ruling you'll ultimately make, I think,

17 says everything you need to know.  Just because you're doing

18 something fast doesn't mean it's a good use of money, right?

19          THE COURT:  If I was to grant your motion to

20 dismiss in total, is that a complete dismissal of the case or

21 is anything still going?

22          MS. RICHARDS:  If you -- if you granted --

23          THE COURT:  If I were to grant your motion to

24 dismiss, does that completely resolve the case or is there

25 still issues outstanding?

1    MS. RICHARDS:  The motion to dismiss would dispose

2  of the claims in their entirety, all of them against every

3  party.  We have -- we've raised defenses to everything.

4    THE COURT:  Okay.  And that's mostly the 546(e)

5  defense?

6    MS. RICHARDS:  I wouldn't say it's mostly the

7  546(e) defense.  So the reason we highlighted that in our

8  papers is because it's one defense; it's not factual, it's a

9  pretty clear legal issue.  There's precedent in other

10  circuits, it's not ruled on in this circuit, but Your Honor

11  wouldn't have to reinvent the wheel, and it disposes of a

12  vast majority of the claims in --

13    THE COURT:  Oh, I've been doing 546(e) -- it seems

14  like that's all I do anymore is 546(e).

15    MS. RICHARDS:  My colleagues said why don't -- why

16  doesn't every deal just look like a securities transaction

17  and then nobody ever gets sued.  That's not really how it

18  works, right, but -- so it's an issue the Court is familiar

19  with.

20    It could take care of a lot of claims against a

21  lot of defendants.  And Mr. DeCamp said that doesn't matter,

22  it doesn't matter if you can't bring constructive fraud

23  claims, we're still going to get to take full discovery on

24  all your value, we're still going to depose everyone.  Why?

25  Because what he left out is we're not immediate transferees,

1   right?  This is another point in the motion to dismiss.  I

2   don't want to get into the merits, but we have an argument

3   that we're subsequent transferees.  If we paid one value and

4   Mr. Giles worked one day, if the employees who had

5   obligations stayed one day after the merger closing, that's

6   enough value for a good faith transferee.  Why do you have to

7   take valuation discovery in that case, why do you have to put

8   up an expert?

9           THE COURT:  How am I going to decide those on a

10  motion to dismiss?  I don't know how long they worked, if

11  they worked at all after the transaction.

12          MS. RICHARDS:  The -- it's clear from the

13  plaintiffs' complaint actually, Your Honor.

14          THE COURT:  Okay.

15          MS. RICHARDS:  Yeah.  They have --

16          THE COURT:  All right.

17          MS. RICHARDS:  -- they have the dates employees

18  quit.  Mr. Giles earned his retention bonus by staying

19  employed through closing, which he did.  The securities

20  investors gave up their equity investments.  Everyone gave

21  value under the plaintiffs' own allegations, but I don't want

22  to do what Mr. DeCamp did because you don't have to talk

23  about the merits, right?  This isn't about the merits.

24          I will say, Mr. DeCamp gave you his version, we

25  obviously have a different version, a different view of the

1  facts.  Our client would like very much to tell his story,

2  but we are hoping he doesn't have to.  We're hoping we get

3  your ruling and then we can go settle.  And Mr. DeCamp said

4  they've already had a stay for so long and we still didn't

5  settle.  A stay doesn't help settlement.  With due respect,

6  he's being a little disingenuous.  It's not the stay that

7  will make the settlement possible, it's the ruling on the

8  motion to dismiss that will cause the parties -- I mean, as I

9  said, someone or lots of people are wrong.  If defendants

10 have paid a bunch of money out the door in the meantime on

11 discovery, especially for claims that are dismissed, they

12 don't have much left to settle.  And it's not that we're

13 pleading poverty, but, as I said, defendants are never

14 getting money back and they don't have a bunch of other

15 people to go sue to get this money.  Yes, they got money from

16 the Embed transaction.  The amounts that Mr. DeCamp cited for

17 you are gross taxes.  The money that they got in their hands

18 years ago is not actually the money in the transactions.

19            And, again, if you want to get all those funds

20 back, that becomes harder and harder if our clients have been

21 paying for unnecessary discovery in the meantime.

22            Last point.  Mr. DeCamp called this an ordinary

23 course, run-of-the-mill avoidance action.  We think it's

24 anything but, Your Honor.  It sounds like it, which is why

25 they filed it so quickly, but the reason we feel strongly

1   about our motion to dismiss is because there are so many

2   issues.  Plaintiffs have problems.  They haven't even made

3   clear what the transfer is they're trying to recover.  They

4   can trace the funds, but they can't trace the funds, that

5   everything was commingled, but it wasn't.  You're immediate

6   transferee, but we're actually looking over at this debtor.

7   I mean, we think there are problems.  It's not just 546(e),

8   there are problems; they have lots of problems with their

9   claims.

10          So we don't think it's regular ordinary course.

11  We're not trying to run out the clock, we're trying to figure

12  out whose view is wrong and see if we can make something

13  happen once we get that ruling.  It's not that the stay will

14  make us settle, it's that the stay will make sure we still

15  have money to make that settlement happen.

16          THE COURT:  All right.  Thank you.

17          MR. LAUFER:  Your Honor, I am Greg Laufer from

18  Paul, Weiss, I represent some of the other defendants.  If I

19  just may be heard quickly?

20          THE COURT:  Sure.

21          MR. LAUFER:  Unless Mr. DeCamp wanted to speak

22  again, I wasn't sure.

23          MR. DECAMP:  Well, maybe I might after Mr. Laufer

24  since --

25          MR. LAUFER:  I didn't know if you wanted --

1          MR. DECAMP:  -- he didn't speak before, but --

2          MR. LAUFER:  -- after Ms. Richards.  I'm going to

3  be very quick.

4          THE COURT:  I thought she represented -- she said

5  she represented all the defendants.

6          MR. LAUFER:  She does -- well, no, she is speaking

7  on behalf of all of the defendants.  I represent about 40

8  percent of the defendants or so, Ms. Richards and Cooley

9  represent the other 60 percent.  We obviously sign onto and

10 adopt all of the arguments that Ms. Richards just made, we

11 joined the motion and we fully support it.

12          There was a lot of talk just now about factors and

13 all sorts of characterizations about motives and the facts.

14 Can I just boil this down to something very, very simple?

15 We're here on a stay motion.  We're not talking about

16 Bahamian law or Japanese arbitration law, it's really simple.

17 There is a lot to do in this case.  I don't have an exact

18 count for you, there are still, as Ms. Richards said, tens of

19 thousands of documents to produce from dozens and dozens of

20 individuals and venture capital firms and others who invested

21 in this company.  A lot of people to coordinate from, lots to

22 do.  And it's not just the documents, you then have

23 depositions and expert discovery.  So we can't whitewash that

24 or camouflage it; that is just a fact.

25          We have a very strong motion to dismiss.  They

1   obviously disagree, we had argument.  I stood here at this

2   podium and argued it.  If we win that motion to dismiss, the

3   case goes away and none of our clients have to open their

4   files any more than they already have -- and they have, by

5   the way, they've produced documents in response to the

6   requests -- but if this case goes away either in whole or in

7   part, the scope of discovery will be dramatically changed or

8   eliminated all together, and we think that that motion is so

9   meritorious that I think that there is a very, very strong

10  chance that the case will go together completely.  And, in

11  light of that, a stay is warranted.  I am not going to

12  presume.  You obviously have a very, very busy docket, I

13  don't know how long it will take you to rule on the motion,

14  but the fact of the matter is this case has been pending for

15  over a year.  The stay that they didn't object to on the

16  other side has been in force now for some five and half or

17  six months.  Another few months or even something beyond that

18  is not going to kill anybody.  There is just no reason for

19  our clients to spend time and money or, frankly, for the

20  estate to want to expend resources on a litigation that may

21  not be going anywhere.

22          So what we would ask is just keep the stay in

23  place for some period of months, and if you even want to put

24  a term on it, we can come back to you and see where things

25  stand in terms of your consideration of the motion.  But I

1  just don't think it makes any sense from an efficiency

2  standpoint, nor a judicial economy standpoint, for all of us

3  to reengage in a very, very robust, comprehensive discovery

4  exercise when the case might go by the wayside very soon.

5          Thank you.

6          THE COURT:  Thank you.

7          Mr. DeCamp, do you want to respond?

8          MR. DECAMP:  Just very briefly, Your Honor.  I'm

9  not going to rehash all the points, but we don't think the

10 factors weigh in favor of a stay here.

11         The one thing I did want to point out and just

12 make very clear is the timing of this motion is highly

13 unusual.  If you look at cases, usually a lot of the time

14 defendants make this kind of motion when they file their

15 motion to dismiss, here the motion to dismiss was filed I

16 think almost a year ago, you know, fully briefed even a year

17 ago.  So it's surprising to us that this motion was made now,

18 we don't see any basis for it now.  We just had a lengthy

19 stay of discovery, that did not facilitate a settlement, and

20 we think the best way to deal with this case is to get it

21 back on track and get discovery going again and we think that

22 actually may facilitate a settlement.

23         So that's all, Your Honor.  Thank you.

24         THE COURT:  Thank you.

25         All right, here's what I'm going to do.  We've had

1  a stay in place for five and a half, six months already, I'm

2  going to continue that stay for another 30 days only, and I

3  will endeavor to issue my ruling within that 30-day period

4  and I think that won't be a problem.

5         In the meantime, the parties should meet and

6  confer and come up with a new scheduling, order, assuming

7  that the discovery is going to go forward after that 30-day

8  period ends.  So you can get ramped up, you can get your

9  lawyers in place and be ready to go, and hit the ground

10 running in 30 days if I don't dismiss the case.  Does that

11 sense?

12        COUNSEL:  Yes, Your Honor.

13        THE COURT:  All right.  Anything else for today?

14        MR. LANDIS:  Your Honor, I don't think we have

15 anything else.

16        THE COURT:  Okay, all right.  I guess we need a

17 form of order on this one.  I guess the parties should meet

18 and confer and come up with a --

19        MR. LANDIS:  We'll meet and confer and something

20 will be submitted under certification, Your Honor.

21        THE COURT:  Okay, thank you.

22        All right, thank you all very much.  We are

23 adjourned.

24     (Proceedings concluded at 3:57 p.m.)

25

1                            CERTIFICATION

2
                    We certify that the foregoing is a correct
3
transcript from the electronic sound recording of the
4
proceedings in the above-entitled matter to the best of our
5
knowledge and ability.
6

7    /s/ William J. Garling                September 13, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                September 13, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 September 13, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25