# EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRANDON LEIDEL, individually,
And on behalf of All others Similarly Situated,

        Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a
CRYPTSY, a Florida corporation, and
PAUL VERNON, an individual,

        Defendants.
_____/

CASE NO. 9:16-cv-80060-KAM

**MOTION FOR ORDER TO SHOW CAUSE WHY CONTEMPT
SANCTIONS SHOULD NOT BE IMPOSED AGAINST THE REN PROJECT**

North Field Technology Ltd. ("North Field" or "Assignee"), assignee of the Plaintiff Class for the purposes of collecting on the Court's Amended Final Default Judgment, respectfully moves this Court for entry of an order to show cause why contempt sanctions should not be imposed against the Ren Project ("Ren") for its willful violation of the Order for Asset Freeze Injunction and to Transfer the Stolen Bitcoin to Assignee [ECF No. 177] ("Permanent Injunction"). North Field incorporates the following Memorandum of Law in support of the Motion.

**MEMORANDUM OF LAW**

**INTRODUCTION**

After the Court entered final judgment in this Action [ECF Nos. 123, 157], it entered a Permanent Injunction [ECF No. 177] to assist the Plaintiff Class in the difficult process of recovering the massive number of stolen digital assets ("Stolen Bitcoin" or "Stolen Bitcoin and Forked Digital Assets," as defined herein) that were stolen from the Plaintiff Class, and that are now being moved and laundered, by Defendant Paul Vernon ("Defendant Vernon"). The Permanent Injunction applies not only to the original wallets to which Defendant Vernon first

moved the Stolen Bitcoin, but also to the subsequent wallets to which Defendant Vernon and all those acting in concert with him continue to move the Stolen Bitcoin through transfers and micro-transactions in an effort to obfuscate and conceal them.

This is where a willful violation of the Permanent Injunction by Ren—a cryptocurrency exchange through which many of the Stolen Bitcoin and Forked Digital Assets have been laundered—comes into play. The Permanent Injunction applies to cryptocurrency exchanges, like Ren, that received notice of the Permanent Injunction (Ren received multiple notices), and it places unambiguous obligations on them. It mandates that any such exchange immediately freeze any of the Stolen Bitcoin transferred to the exchange. It mandates that the exchange freeze customer accounts related to the Stolen Bitcoin. Furthermore, it mandates that the exchange take all steps necessary to transfer the Stolen Bitcoin back to the Plaintiff Class by transferring them to a digital wallet or account held by the Assignee, North Field.

Ren—a cryptocurrency exchange and ongoing, knowing recipient of illicit transfers of the Stolen Bitcoin—has willfully violated each and every one of these requirements.

This is not a situation where Ren failed to receive notice of the Permanent Injunction or Defendant Vernon's illicit movements of the Stolen Bitcoin onto Ren's platform. Ren received multiple notices via email, a method of notice authorized by the Permanent Injunction, and has confirmed receipt of notice:

- On March 30, 2022, North Field emailed the Permanent Injunction to Ren's customer support address under a cover letter that informed Ren that Defendant Vernon had moved certain of the Stolen Bitcoin onto Ren's platform. The notice informed Ren that, under the Permanent Injunction, it must freeze those assets and all such future transfers onto its platform.

2

- On April 16, 2022, Ren received another notice that the Permanent Injunction's requirements applied to all wallet addresses, including those to which Stolen Bitcoin are subsequently transferred. On May 2, 2022, Ren's CEO and CTO received separate email notices of the Permanent Injunction and tracing reports from Coinfirm—the digital asset tracing company that appeared before, and was qualified as expert witnesses by, this Court—showing that certain of the Stolen Bitcoin had been accepted onto Ren's platform.

- On August 30, 2022, Ren's attorney, Clarence Guo at Jacque Law, also received notice, this time with a tracing update showing that Ren had taken receipt of hundreds more of the Stolen Bitcoin since it received the first notice. Ren's attorney confirmed receipt of this notice.

Thereafter, North Field and Ren's attorneys engaged in months of discussions focused on safeguarding the Stolen Bitcoin to allow for its eventual return to North Field in accordance with the Permanent Injunction.

Instead of taking action to comply with the Permanent Injunction, though, Ren did nothing to prevent Defendant Vernon's continuing illicit transfers of Stolen Bitcoin onto Ren's own platform. During the months that it has been on notice, it has failed to freeze any of the Stolen Bitcoin that it accepted onto its platform. And it fails to transfer the Stolen Bitcoin to North Field's digital wallet, as mandated by the Permanent Injunction. To the extent that it has done anything, it has paid mere lip service to North Field and the requirements of the Permanent Injunction, all while Defendant Vernon continues to rely on and use Ren's platform to transfer and launder the Plaintiff Class's Stolen Bitcoin. Between April 30, 2022 and the present, Defendant Vernon and/or others acting in concert with him transferred at least 685 Bitcoin to Ren in violation of this Court's Orders. Indeed, by failing to act, Ren is now complicit in Vernon's fraud.

Ren's business model involves fees charged to the user for depositing coins onto its platform. Thus, Ren benefits financially from Defendant Vernon's transfers and it has decided to pursue profits from Defendant Vernon's illicit conduct rather than to comply with this Court's Orders.

These illicit transactions using the Ren Protocol violate the Permanent Injunction and are now happening regularly. Without Court action, Ren will allow Defendant Vernon to further launder, hide and liquidate the proceeds of his theft.

Accordingly, the Court should utilize its inherent power and jurisdiction, as discussed below, to issue an order to show cause why Ren should not be held in contempt of this Court for willfully violating the Permanent Injunction and sanctioned for its conduct (the "Contempt Motion" or "Motion"). If Ren fails to show good cause, the Court should sanction Ren, including without limitation requiring Ren to immediately transfer the 685 Stolen Bitcoin in its custody and/or its equivalent in U.S. Dollars to North Field.

## FACTUAL BACKGROUND

I. The Amended Final Default Judgment and Assignment to North Field

### A. The Final Default Judgment

On July 27, 2017, the Court entered a Final Default Judgment against Defendant Vernon authorizing the Plaintiff Class to recover, among other things, the 11,325.0961 bitcoin that Defendant Vernon stole from Cryptsy customers on or before July 29, 2014 (the "Final Default Judgment") [ECF No. 123]. The Court's Final Default Judgment identified the number of stolen bitcoin (11,325.0961) ("Originally Identified Stolen Bitcoin") and the wallet addresses in which

those stolen bitcoin were stored at the time. The Court's Final Default Judgment also declared that the 11,325.0961 bitcoin belongs to the Plaintiff Class. [ECF No. 123].[1]

### B. The Amended Judgment

On May 23, 2021, the Plaintiff Class moved to amend and clarify the Final Default Judgment to include the Newly Discovered Bitcoin identified in the Amended TRO (discussed below). [ECF No. 156]. On May 24, 2021, this Court granted the motion and issued an Amended Judgment ("the Amended Judgment" or "Amended Final Default Judgment"), which added to the original Final Default Judgment the 500.052319 Newly Discovered Bitcoin identified in the Amended TRO and all associated forked assets ("the Newly Discovered Forked Assets"). [ECF No. 157]. Section 4(d)-(f) of the Amended Judgment declares that the 11,325.0961 Originally Identified Stolen Bitcoin and Original Forked Assets associated with this bitcoin are property of the Plaintiff Class. *Id.* Section 5 declares that the 500.052319 Newly Discovered Bitcoin and Newly Discovered Forked Assets are also "property of the Plaintiff Class." *Id.* Section 6 restates that the Amended Judgment includes all 11,825.1484 bitcoin ("the Stolen Bitcoin"), and the Original Forked Assets and the Newly Discovered Forked Assets (collectively, the "Stolen Bitcoin and Forked Digital Assets"). *Id.*

## II. Permanent Injunction

### A. The Permanent Injunction

On June 4, 2021, North Field and counsel for the Plaintiff Class moved for a permanent injunction ordering an asset freeze and transfer to Assignee of the Stolen Bitcoin and Forked

---

[1] On September 18, 2020, the Court entered an Order approving the terms and conditions of the Assignment Agreement, [ECF No. 139-1], pursuant to which the Plaintiff Class assigned all rights, title, and interest in Section 6 of the Final Default Judgment to North Field so that North Field could pursue collection of the Originally Identified Stolen Bitcoin on a contingency, non-recourse basis.

5

Digital Assets that were stolen on or before July 29, 2014, from customers of Cryptsy. [ECF No. 173]. On June 22, 2021, this Court issued an order granting the motion for a permanent injunction (the "Permanent Injunction"). [ECF No. 177].[2]

### III. Defendant Vernon's Continuing Illicit Transfers & Laundering of the Stolen Bitcoin, including His Ongoing Laundering of Hundreds of Stolen Bitcoin through Ren

Defendant Vernon fled the country at or about the time this action was commenced, never appeared in this Action, and has never returned to the United States. He has made no effort to make the Plaintiff Class whole or return the Stolen Bitcoin and Forked Digital Assets.

Now, however, Defendant Vernon is in the midst of trying to launder and hide from this Court, the Plaintiff Class, and North Field *all* of the Stolen Bitcoin and Forked Digital Assets. He has transferred the entire corpus of the Stolen Bitcoin into secondary wallet addresses, and continues to move significant portions of the Stolen Bitcoin to various cryptocurrency exchanges in an attempt to liquidate these assets and walk away with them. *See* Declaration of Roman Bieda In Support of Motion for Order to Show Cause ("Bieda Decl."), ¶¶ 10-11.

Indeed, on March 29, 2022, Defendant Vernon in a single day moved the entirety of the 11,325.0961 Originally Identified Stolen Bitcoin—originally held in the wallet addresses listed in Table 1 of the Amended Judgment and Permanent Injunction—to private secondary wallet addresses. *Id.* ¶¶ 8, 10. As a result, all of the Stolen Bitcoin and some of the Forked Digital Assets

---

[2] On April 8, 2022, North Field moved to clarify that the Permanent Injunction and Amended Judgment apply to all secondary wallet addresses into which Defendant Vernon and his conspirators have transferred and in the future may transfer the Stolen Bitcoin. [ECF No. 191]. On April 14, 2022, this Court issued an order granting the motion (the "Clarification Order"). [ECF No. 193]. In this Order, the Court clarified that "the Amended Judgment by its terms awards the 11,825.1484 Stolen Bitcoin and Forked Digital Assets to the Plaintiff Class as its property, regardless of which digital wallet addresses presently holds those assets[.]" *Id.* The Court likewise clarified "that all subparts of Paragraph 4 of the Permanent Injunction apply not only to the original wallet addresses listed in Tables 1 and 2 but also to any and all subsequent wallet addresses into which the Stolen Bitcoin and Forked Digital Assets have been or are in the future transferred." *Id.*

6

subject to the Amended Judgment and Permanent Injunction are now held in either private secondary wallet addresses or have been moved onto cryptocurrency exchanges. *Id.*

The identities of the wallet addresses where the Stolen Bitcoin and Forked Digital Assets are being shifted are a constantly moving target because Defendant Vernon is actively moving these assets on a daily basis into new secondary wallet addresses and onto cryptocurrency exchanges. The fact that Defendant Vernon is actively moving and breaking up the 11,325.0961 Originally Identified Stolen Bitcoin on a daily basis demonstrates that he has the private keys to the wallets in Table 1 and is actively violating this Court's Permanent Injunction and Amended Judgment.

Among the platforms on which Defendant Vernon has deposited and continues to actively deposit the Stolen Bitcoin is Ren. To deposit the Stolen Bitcoin with Ren, Defendant Vernon has entered into various smart contracts through the Ren protocol. Through these smart contracts, Defendant Vernon has deposited at least 685 BTC into the custody of Ren, and in exchange Ren has issued to Defendant Vernon an equivalent amount of Ethereum-based tokens ("Ren BTC") that are tradeable on the Ethereum blockchain. *See* Bieda Decl., ¶ 11. Ren receives a fee for every BTC deposited with the Ren platform for which an equivalent Ren BTC Ethereum token is minted.[3]

### IV. North Field's Multiple Notices to Ren Starting over Eight Months Ago

Among the exchanges that North Field immediately notified upon Defendant Vernon's movements at the end of March 2022 was Ren. North Field first sent notice to Ren on March 30, 2022. *See* Declaration of Kara L. Kapp In Support of Motion for Order to Show Cause ("Kapp

---

[3] RenBridge FAQ, https://docs.renproject.io/darknodes/faq/renbridge-faq ("What are the fees for RenBridge? There are three (3) fees: 1) 20 BPS (0.2%) per mint and 10 BPS (0.1%) burn. 2) There is also a network fee that is required to pay the miners of the respective blockchain. . . . 3) ETH GAS. This varies depending on network congestion.").

Decl."), ¶ 4 & Ex. 2. The notice was sent via email to support@renproject.io, Ren's customer support email address. Kapp Decl. ¶ 4 & Exs. 1 & 2.

The notice letter attached to the cover email informed Ren of Defendant Vernon's active movement of the Stolen Bitcoin onto the Ren Protocol platform and requested that Ren "immediately freeze certain assets subject to the Amended Judgment that have been recently transferred to [its] exchange, and to freeze any and all assets originating from the wallet addresses listed in the Amended Judgment and Permanent Injunction should they hereafter make their way to [its] exchange." Kapp Decl. Ex. 2, at 1. The letter also highlighted Ren's obligations under Paragraphs 2 and 4 of the Permanent Injunction to (i) refrain "from directly or indirectly transferring the Stolen Bitcoin . . . that were originally held in the wallet addresses identified in Tables 1 and 2 other than to a digital wallet or account held by North Field" (ii) to "freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin . . . held in or transferred from any wallet address listed in Tables 1 and 2 of this Order" (iii) to "freeze all customer accounts related to the Stolen Bitcoin . . . held in or transferred from any wallet addresses listed in Tables 1 or 2 of this Order" and (iv) to "take all steps necessary to transfer, assist in the transfer of, facilitate the transfer of, validate or assist in the validation of the transfer of the Stolen Bitcoin . . . to a digital wallet or account held by North Field." *Id.* at 3-4.

Two days after the Court issued its April 14, 2022, Clarification Order, on April 16, 2022, notice was provided to Ren of the Clarification Order. Kapp. Decl. Ex. 3.

After Ren failed to respond to North Field's original March 30, 2022, notice and the notice sent on April 16, 2022, on May 2, 222, North Field sent a follow-up notice directly to Ren's CEO (Taiyang Zhang) and Ren's Chief Technology Officer (Loong Wang) at their work email

8

addresses. Kapp Decl. Ex. 4. North Field attached to the notice a tracing report showing that as of May 1, 2022, 184 BTC of the Stolen Bitcoin had been deposited on Ren's platform.

After repeatedly notifying Ren of the need to freeze the Stolen Bitcoin belonging to the Class, counsel for North Field eventually made contact with counsel for Ren, Clarence Guo. Kapp Decl. ¶ 8 & Ex. 5. By the time that Ren's counsel responded to North Field's numerous notices of the Court's Orders, a total of 338 BTC of the Stolen Bitcoin had been deposited on Ren's platform. When North Field made contact with Ren's counsel, North Field immediately responded and provided updated notice, informing Ren that as of August 30, 2022, 338 BTC of the Stolen Bitcoin had been deposited on Ren's platform and reiterating North Field's earlier requests to immediately freeze these assets. *Id.* ¶ 8 & Ex. 6 On November 5, 2022, counsel for Ren replied and confirmed receipt of North Field's August 30, 2022 notice email. *Id.* ¶ 8.

**V. North Field's Efforts to Have Ren Comply with the Permanent Injunction**

Desiring to avoid having to bring the instant contempt motion, North Field engaged in discussions with Ren from September 2022 to November 2022 to obtain its voluntary compliance with the Permanent Injunction. During the course of these communications, Defendant Vernon continued to deposit more and more of the Class's Stolen Bitcoin on Ren's platform, and Ren continued to accept those deposits. Kapp Decl. ¶¶ 4-9; Bieda Decl. ¶ 11. As of November 10, 2022, at least 685 BTC from the Stolen Bitcoin had been deposited on Ren's platform, and North Field notified Ren of the same on November 10, 2022. Kapp Decl. ¶ 9. Subsequently, North Field and Ren reached an oral agreement to resolve the claims relating to the 685 BTC. *Id.* ¶ 10. However, after Ren had received a written draft of the agreement the parties had negotiated, Ren stopped responding to North Field's communications. *Id.* ¶ 11.

9

Ultimately, Ren was given a choice of concluding and performing the settlement or complying with the Court's Orders. At that juncture, Ren stopped engaging in further settlement communications with North Field.

## ARGUMENT

### I. The Court's Contempt Power

"Contempt of court is the disregard of judicial authority." *Popular Bank of Florida v. Banco Popular de Puerto Rico,* 180 F.R.D. 461, 465 (S.D. Fla. 1998) (citation omitted). The Eleventh Circuit has recognized that federal courts have inherent authority to enforce its decrees, orders and judgments by holding violators of those decrees, orders, and judgments in contempt of court. *See, e.g.*, *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 828-29 (11th Cir. 2010); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991) (federal "[c]ourts have inherent power to enforce compliance with their lawful orders through civil contempt"). "Frequently used in injunction actions, civil contempt proceedings are useful methods for enforcing judicial orders." *Popular Bank of Florida*, 180 F.R.D. at 465.

This authority extends to non-parties, both foreign and domestic, who are made aware of an injunction requiring them to take action or refrain from taking action and who, with knowledge of the injunction, continue to aid in its violation. Specifically, courts in the Eleventh Circuit have found personal jurisdiction over non-parties made aware of an injunction requiring them to take action or refrain from taking action and who, with knowledge of the injunction, have continued to aid in its violation. *See, e.g.*, *JTR Enters., LLC v. Colombian Emeralds*, 697 Fed. App'x 976, 988 (11th Cir. 2017) (affirming personal jurisdiction over non-party who lived outside the territorial jurisdiction of the forum state, concluding that the court had personal jurisdiction based on its inherent powers to issue sanctions); *Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 971-72 (11th

10

Cir. 2012) (concluding that the Delaware court that had issued order had personal jurisdiction over nonparty contemnors who lived outside territorial jurisdiction of Delaware to adjudicate compliance with order where the non-party had notice of the order and engaged in enjoined conduct that would frustrate the court's "ability to render a binding judgment" against the defendant); *E.A. Renfroe & Co. v. Moran*, No. 06-AR-1752-S, 2007 U.S. Dist. LEXIS 118287, at *9 (N.D. Ala. Jan. 19, 2007) (finding jurisdiction over non-party residing outside the territorial jurisdiction of the court where non-party had actual notice of the court's order and aided and abetted in its violation).

Under the court's inherent contempt authority, "[t]he court has the power to impose coercive and compensatory sanctions." *Citronelle-Mobile Gathering, Inc.*, 943 F.2d at 1304. Compensatory sanctions include a compensatory fine to make the party protected by the order whole. *Id.* These sanctions comport with due process as long as they are proportionate to the need to ensure compliance with the court's order. *Id.*

The sanction of civil contempt is appropriate for failure to comply with a valid court order where: (i) the order is clear and unambiguous, (ii) the alleged contemnor received actual notice of the order; (iii) clear and convincing proof is presented of the alleged contemnor's noncompliance, and (iv) the alleged contemnor has not "diligently attempt[ed] to comply." *Popular Bank of Florida*, 180 F.R.D. at 465. The movant has the burden to make a prima facie showing as to the first three of these elements—that the order is clear and unambiguous, that the alleged contemnor received actual notice, and to present clear and convincing proof of the alleged contemnor's noncompliance. *See Citronelle-Mobile Gathering*, 943 F.2d at 1301. Once those three prima facie showings are made, the burden shifts to the alleged contemnor to produce evidence regarding the

11

fourth element—the alleged contemnor bears the burden of proving that they made all reasonable efforts to comply. *Id.* In this present situation, all of the three prima facie criteria are satisfied.

## II. This Court Should Hold Ren in Contempt of Court and Issue Sanctions

Issuing contempt sanctions here is proper and necessary to protect the Stolen Bitcoins and Forked Digital Assets from Defendant Vernon's ongoing and active theft and liquidation of those assets, to stop Ren's facilitation of that theft and liquidation effort, and to return the Stolen Bitcoins and Forked Digital Assets to the Plaintiff Class.

### A. The Amended Judgment and Permanent Injunction Are Clear and Unambiguous.

First, the language of the Permanent Injunction is clear and unambiguous. In relevant part, the Amended Judgment "declares that the 11,325.0961 Bitcoin which were stolen from Cryptsy customers on July 29, 2014 and which, as of the date of the initial Final Judgment, were stored in the cryptocurrency or digital wallet addresses identified in Table 1 below, are property of the Plaintiff Class and subject to and encompassed within this Amended Final Default Judgment[.]" [ECF No. 157, ¶ 4(d)]. The Amended Judgment further "adds and includes as property of the Plaintiff Class an additional 500.052319 Bitcoin that were stolen from Cryptsy customers on July 29, 2014[.]" [ECF No. 157, ¶ 5]. By its terms, the Amended Judgment plainly protects the Stolen Bitcoin and Forked Digital Assets as the property of the Plaintiff Class, not simply the original wallet addresses in which those assets were once stored.

Furthermore, the Clarification Order makes clear that "the Amended Judgment by its terms awards the 11,825.1484 Stolen Bitcoin and Forked Digital Assets to the Plaintiff Class as its property, regardless of which digital wallet addresses presently holds those assets[.]" [ECF No. 193].

In addition, in relevant part, the Permanent Injunction provides in Paragraph 4 that:

12

> Any persons, firms, corporations, or other entities, including digital asset trading platforms, cryptocurrency exchanges, payment processors, digital cryptocurrency wallet providers, developers, mining pools, miners, other parties involved in validating transactions on the Bitcoin network or the networks for the Forked Digital Assets encompassed by the Amended Final Default Judgment, and other parties receiving notice of this order . . . shall immediately:
>
> a. locate the Stolen Bitcoin and Forked Digital Assets;
>
> b. freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin and Forked Digital Assets held in or transferred from any wallet address listed in Tables 1 and 2 of this Order, and (other than as Ordered in subsection (d) hereof) refrain from transferring, disbursing, assigning, dissipating, disposing of, validating, or participating in or assisting in the validation of, any transaction in the Stolen Bitcoin and Forked Digital Assets;
>
> c. freeze all customer accounts related to the Stolen Bitcoin and Forked Digital Assets held in or transferred from any wallet addresses listed in Tables 1 or 2 of [this] Order, and (other than as Ordered in subsection (d) hereof) refrain from transferring, disbursing, assigning, dissipating, disposing of, validating, or participating in or assisting in the validation of, any transaction in the Stolen Bitcoin and Forked Digital Assets; and
>
> d. take all steps necessary to transfer, assist in the transfer of, facilitate the transfer of, validate or assist in the validation of the transfer of the Stolen Bitcoin and Forked Digital Assets to a digital wallet or account held by North Field.

[ECF No. 177, at 7-8, ¶ 4].

Paragraph 4(a) explicitly requires all third-parties listed in Paragraph 4 to "locate the Stolen Bitcoin and Forked Digital Assets[,]" which, per the Court's Amended Judgment, are the "property of the Plaintiff Class[.]" *See* [ECF No. 157, ¶¶ 4(d), 5]. Thus, the Order plainly imposes an obligation on the third-parties listed in Paragraph 4 to identify the digital asset property itself, some of which had already begun moving through secondary wallet addresses at the time of the Order.

Paragraph 4(b) orders "the Stolen Bitcoin and Forked Digital Assets **held in or transferred from** any wallet address listed in Tables 1 and 2 of this Order" to be frozen. *Id.* (emphasis added). This language refers directly to the Stolen Bitcoin and Forked Digital Assets, which is the property of the Plaintiff Class. Paragraph 4(b) goes on to order third-parties to "refrain from transferring,

13

disbursing, assigning, dissipating, disposing of, validating, or participating in or assisting in the validation of, any transaction in the Stolen Bitcoin and Forked Digital Assets[.]" *Id.* This language requires these entities and individuals to refrain from facilitating any transfer of the Stolen Bitcoin and Forked Digital Assets. Thus, the Court's orders focus on protection and preservation of the Stolen Bitcoin and Forked Digital Assets themselves, not merely the original locations that at one point in time housed those stolen assets.

Moreover, in the Clarification Order, the Court confirmed the same, making clear "that all subparts of Paragraph 4 of the Permanent Injunction apply not only to the original wallet addresses listed in Tables 1 and 2 but also to any and all subsequent wallet addresses into which the Stolen Bitcoin and Forked Digital Assets have been or are in the future transferred." [ECF No. 193]. Thus, the Amended Judgment and Permanent Injunction plainly and unambiguously apply to the Stolen Bitcoin that has been deposited onto Ren's platform through secondary wallet addresses.

### B. Ren Received Repeated Notice of the Court's Order

Second, Ren has repeatedly received actual notice of the Court's Permanent Injunction and Clarification Order. North Field first provided Ren notice of the Permanent Injunction on March 30, 2022. *See* Kapp Decl., ¶ 4 & Ex. 2. The notice was sent via email to support@renproject.io, Ren's customer support email address. *Id.*

The notice letter attached to the cover email informed Ren of Defendant Vernon's active movement of the Stolen Bitcoin onto the Ren Protocol platform and requested that Ren "immediately freeze certain assets subject to the Amended Final Default Judgment that have been recently transferred to [its] exchange, and to freeze any and all assets originating from the wallet addresses listed in the Amended Final Default Judgment and Permanent Injunction should they hereafter make their way to [its] exchange." Kapp Decl. Ex. 2 at 1. The letter also highlighted

14

Ren's obligations under Paragraphs 2 and 4 of the Permanent Injunction to: (i) refrain "from directly or indirectly transferring the Stolen Bitcoin . . . that were originally held in the wallet addresses identified in Tables 1 and 2 other than to a digital wallet or account held by North Field" (ii) to "freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin . . . held in or transferred from any wallet address listed in Tables 1 and 2 of this Order" (iii) to "freeze all customer accounts related to the Stolen Bitcoin . . . held in or transferred from any wallet addresses listed in Tables 1 or 2 of this Order" and (iv) to "take all steps necessary to transfer, assist in the transfer of, facilitate the transfer of, validate or assist in the validation of the transfer of the Stolen Bitcoin . . . to a digital wallet or account held by North Field." *Id.* at 3-4.

Two days after the Court issued its April 14, 2022 Clarification Order, on April 16, 2022, notice was provided to Ren of the Clarification Order. Kapp. Decl. ¶ 6 & Ex. 3.

On May 2, 2022, after Ren failed to respond to North Field's original March 30, 2022, notice and the follow-up notice sent on April 16, 2022, North Field sent a second follow-up notice to Ren's CEO (Taiyang Zhang) and Ren's Chief Technology Officer (Loong Wang) at their work email addresses. Kapp Decl. ¶ 7 & Ex 4. North Field attached to the notice a tracing report showing that as of May 1, 2022, 184 BTC of Stolen Bitcoin had been deposited with Ren.

On August 30, 2022, after North Field finally made contact with Ren's counsel, North Field again provided Ren updated notice. At that time, North Field informed Ren's counsel that as of that date, a total of 524 BTC of the Stolen Bitcoin had been deposited on Ren's platform. Kapp Decl. ¶ 8 & Ex. 6. North Field further reiterated its request that Ren immediately freeze the Class's assets. *Id.* Counsel for Ren confirmed receipt of this email on September 5, 2022. *Id.*

### C. There is Clear Convincing Evidence of Ren's Non-Compliance

The Order, by its terms, plainly required Ren, upon actual notice of the Permanent Injunction and Amended Judgment, to "immediately": (i) "freeze, or assist in or facilitate the freezing of, the Stolen Bitcoin", (ii) "freeze all customer accounts related to the Stolen Bitcoin", and (iii) "take all steps necessary to transfer . . . the Stolen Bitcoin . . . to a digital wallet or account held by North Field." [ECF No. 177, at 7-8, ¶ 4].

Actual notice of the Permanent Injunction and Amended Judgment were provided to Ren on March 30, 2022, April 16, 2022, and May 2, 2022, among other instances. For its part, however, Ren made no effort at any time, then or now, to freeze the Stolen Bitcoin or take steps necessary to transfer the Stolen Bitcoin to a digital wallet or account held by North Field. During this time, Defendant Vernon and his cohorts deposited over 685 BTC on Ren's platform.

### D. Ren Has Not Been Reasonably Diligent In Attempting To Comply With The Court's Permanent Injunction

As demonstrated herein, North Field has satisfied its burden to establish the first three elements at issue. The burden now shifts to Ren to show that it has been reasonably diligent in attempting to comply with the Court's Permanent Injunction. *See Citronelle-Mobile Gathering*, 943 F.2d at 1301. Ren cannot meet this burden.

To date, Ren has still not turned over to North Field the 685 BTC of Stolen Bitcoin belonging to the *Cryptsy* Class, despite North Field's dogged efforts to recover these assets. Based upon Ren's refusal to turn over to North Field the 685 BTC belonging to the *Cryptsy* Class held in its custody, it is clear that Ren has made no effort, serious or otherwise, to comply with the Court's Order. Notably, "a violation of the order need not be willful for a party to be found in civil contempt." *Popular Bank of Florida*, 180 F.R.D. at 466. In light of Ren's manifest disregard of

16

this Court's Order, the only effective way that this Court can enforce it is by exercising its traditional right to hold Ren in civil contempt and impose appropriate sanctions.

## CONCLUSION

Therefore, North Field Technology Ltd., assignee of the Plaintiff Class for the purposes of collecting on the Court's Amended Final Default Judgment, respectfully requests that this Court enter an order requiring Ren to appear before the Court and show good cause why Ren should not be held in contempt for its willful disregard of this Court's Order. If Ren is unable to show good cause, North Field respectfully requests that contempt sanctions should be imposed against Ren, including without limitation, requiring Ren to immediately return to North Field the 685 Stolen Bitcoin in its custody and/or its equivalent value in U.S. Dollars.

Dated: December 27, 2022

Respectfully submitted,

By: _____*s/Samuel A. Lewis*_____
    Samuel A. Lewis / Fla. Bar No. 55360
    E-mail: slewis@cozen.com
    COZEN O'CONNOR
    Southeast Financial Center
    200 South Biscayne Blvd., Suite 3000
    Miami, Florida 33131
    Phone: 305-704-5940

    John Sullivan
    E-mail: jsullivan@cozen.com
    COZEN O'CONNOR
    3 World Trade Center
    175 Greenwich Street, 55th Fl
    New York, NY 10007
    Phone: 212-453-3729
    *Admitted Pro Hac Vice*

    - and -

17

L. Barrett Boss
E-mail: bboss@cozen.com
Jonathan Grossman
E-mail: jgrossman@cozen.com
Kara L. Kapp
E-mail: kkapp@cozen.com
COZEN O'CONNOR
1200 19th Street NW, 3rd Floor
Washington, D.C. 20036
Phone: 202-912-4818

*Counsel for North Field Tech*

18