**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | : | |
| | : | |
| *In re* | : | Chapter 11 |
| | : | |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-bk-11068 (JTD) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**PHASE II REPORT OF ROBERT J. CLEARY, EXAMINER**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these bankruptcy cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

Defined Terms ........................................................................................................................ iv

Executive Summary ............................................................................................................... 1

Part I:  Background and Methodology ................................................................................ 4

   I.   The History of the Examiner's Phase II Appointment and the Scope of the
       Examiner's Phase II Investigations ........................................................................... 4

   II.  The Examiner's Methodology .................................................................................... 5

Part II:  The Robinhood Transaction ................................................................................ 11

   I.   Background and the Examiner's Phase I Investigation ............................................ 11

      a.   The Quinn Emanuel Investigation ......................................................................... 12

      b.   The Additional S&C Materials ............................................................................... 14

   II.  Summary of Examiner's Phase II Investigative Steps .............................................. 14

   III.  Investigative Findings .............................................................................................. 16

      a.   History of S&C's Work on the Robinhood Transaction.......................................... 16

      b.   Analysis of the Scope of S&C's Work ................................................................... 24

   IV.  Conclusion ............................................................................................................... 28

Part III:  The LedgerX Transaction.................................................................................... 29

   I.   Overview of the LedgerX Transaction ...................................................................... 30

      a.   Background on LHI's Business ............................................................................... 30

      b.   FTX.US Offers to Buy LedgerX ............................................................................ 31

      c.   The Parties Negotiate Definitive Deal Terms ........................................................ 33

      d.   Evidence of Valuation............................................................................................. 36

         1.   LHI Valuations................................................................................................ 38

         2.   Other Sale Transactions .................................................................................. 40

   II.  Overview of Fraudulent Transfer Laws and Potential Defenses................................ 42

      a.   Power to Avoid Fraudulent Transfers..................................................................... 44

         1.   Intentional Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A)............................ 44

         2.   Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)......................... 47

            (i)   Insolvency ......................................................................................................... 51

            (ii)   Engaged in Business or a Transaction That Left the Debtor with Unreasonably
            Small Capital...................................................................................................... 52

            (iii)   Incur Debts That Would Be Beyond The Debtor's Ability To Pay.................. 52

         3.   Avoidance of Transfers under State Law................................................................. 53

      b.   The Section 546(e) Safe Harbor Defense to Fraudulent Transfer Claims .................. 54

1.   Qualifying Transfers ................................................................... 57
   (i)   Settlement Payments ........................................................... 57
   (ii)   In Connection With a Securities Contract .............................. 58
2.   Qualifying Participant ................................................................ 59
   (i)   Financial Institution ............................................................ 59
   (ii)   Financial Participant .......................................................... 61

**III.  Analysis of the Viability of Fraudulent Transfer Claims ........................... 62**
a.   Overview ................................................................................... 62
b.   Intentional Fraudulent Transfer Claims under 11 U.S.C. § 548(a)(1)(A) ................... 62
c.   Constructive Fraudulent Transfer Claims under 11 U.S.C. § 548(a)(1)(B) ................. 65
  1.   Less Than Reasonably Equivalent Value ....................... 65
  2.   Insolvency .......................................................................... 69
  3.   Avoidance of Transfers under State Law ........................ 71
d.   Section 546(e) – Safe Harbor ................................................... 72
  1.   Qualifying Transfer ........................................................... 73
  2.   Qualifying Participant ....................................................... 74
   (i)   Financial Institution ............................................................ 74
   (ii)   Financial Participant .......................................................... 75

**IV.  Conclusion ..................................................................................... 76**

**Part IV:  FTX.US ........................................................................................ 78**

**I.   Introduction ..................................................................................... 78**

**II.   Methodology ..................................................................................... 81**

**III.  Background ..................................................................................... 82**
a.   Overview of FTX.US Business ................................................. 82
b.   Relevant FTX.US Departments and Personnel .......................... 84
  1.   Accounting and Finance ................................................... 85
  2.   Administrative Services ..................................................... 85
  3.   Settlements ......................................................................... 85
  4.   Technology ......................................................................... 86
  5.   Compliance ........................................................................ 87
c.   November 2022 Collapse of FTX Group and Identification of the "Hole" at FTX.US 87

**IV.  Investigative Findings ..................................................................... 98**
a.   FTX.US Relied Significantly on Funding and Other Support From Other FTX Group Entities ................................................................................... 101
b.   Flaws in Management of Customer Cryptocurrency at FTX.US .............................. 104

c.   Flaws in Management of Customer Fiat Currency at FTX.US ................................... 107

d.   Poor Systems and Recordkeeping at FTX.US Before November 2022 .................... 110

e.   Inadequate Systems for Reconciling Customer Balances at FTX.US ........................ 113

**V.   Conclusion ................................................................................................................... 117**

## DEFINED TERMS

| | |
|---|---|
| Additional S&C Materials | Materials reviewed by the Examiner in conjunction with Quinn Emanuel's investigation regarding undisclosed conflicts or evidence of non-disinterestedness of S&C |
| Alameda | Alameda Research LLC and other entities in the "Alameda Silo," as set forth in the Ray First Day Declaration |
| Acquiom | Acquiom Financial LLC |
| bankruptcy cases | The jointly administered chapter 11 proceedings of FTX Trading, and certain of its affiliates captioned *In re FTX Trading Ltd*., No. 22-bk-11068 (Bankr. D. Del.) (JTD) |
| Bankruptcy Court | The United States Bankruptcy Court for the District of Delaware |
| Bankruptcy Code | Title 11 of the United States Code |
| Bankruptcy Rule(s) | Federal Rules of Bankruptcy Procedure |
| BDO | BDO USA, LLP |
| BDO Valuation | A valuation of LHI conducted by BDO after the LedgerX transaction closed |
| BDO Valuation Report | BDO, *ASC 805 Valuation of Certain Assets and Liabilities of West Realm Shires, Inc.*, Apr. 1, 2022 |
| Cboe | Cboe Global Markets, Inc. |
| CEO | Chief Executive Officer |
| CFTC | Commodity Futures Trading Commission |
| Coinbase | Coinbase Global, Inc. |
| DCM | A CFTC-designated contract market |
| DCO | A CFTC-regulated derivatives clearing organization |
| Debtors | FTX Trading, Ltd. and its affiliated entities that are debtors in the Chapter 11 bankruptcy cases |
| Dkt. No. | Citations to "Dkt. No." without a case name or number refer to docket entries in *In re FTX Trading Ltd*., No. 22-bk-11068 (Bankr. D. Del.) (JTD) |
| DGCL | General Corporation Law of the State of Delaware |
| DOJ | U.S. Department of Justice |
| Emergent | Emergent Fidelity Technologies Ltd, an entity controlled by Bankman-Fried and used for the Robinhood Transaction |
| Eris | Eris Digital Holdings, LLC |

| | |
|---|---|
| Examination | The Examiner's investigative methods and procedures underlying this Report |
| FairX | FairXchange, Inc. |
| FBO | For the Benefit Of |
| First Ray Report | The First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, Dkt. No. 1242-1 |
| FSRC | Financial Services Regulatory Commission of Antigua and Barbuda |
| FTC | Federal Trade Commission |
| FTX Group | FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries and affiliates |
| FTX.com | FTX Trading Ltd., which operated a cryptocurrency exchange |
| FTX.US | The FTX Group's exchange for spot trading of cryptocurrency and other digital assets in the United States.  FTX.US was the d/b/a name of WRSS, a subsidiary of WRS |
| HSR Act | Hart-Scott-Rodino Antitrust Improvements Act of 1976 |
| KYC | Know-your-customer |
| LedgerX | LedgerX LLC |
| Ledger Prime | Ledger Prime, LLC |
| LedgerX Transaction | The acquisition of LHI by WRS for $300 million |
| LHI | Ledger Holdings, Inc., a holding company for LedgerX |
| Merger Sub | FTX.US Pioneer, Inc., a subsidiary of WRS used for the acquisition of LHI |
| North Dimension | North Dimension Inc. and related entities |
| Oxford Valuation | A valuation of LHI conducted by Oxford Valuation Partners Inc. |
| Oxford Valuation Report | Oxford Valuation Partners, *Valuation of Common Stock of Ledger Holding, Inc. Final Report*, Apr. 12, 2021 |
| Petition Date | The dates that the bankruptcy cases were commenced, November 11 and 14, 2022 |
| Phase I Report | The Examiner's Report, Dkt. No. 15545 |
| Phase I Scope Order | *Order (I)(A) Establishing the Scope, Cost, Degree, and Duration of the Examination and (B) Granting Related Relief; and (II)* |

| | |
|---|---|
| | *Permitting the Filing of Certain Information Regarding Potential Parties in Interest Under Seal*, Dkt. No. 9883 |
| Phase II Scope Order | *Order (I) Granting the Examiner Authority to Conduct Additional Investigations and (II) Establishing the Scope, Cost, Degree, and Duration of the Second Phase of the Examination and Granting Related Relief*, Dkt. No. 19061 |
| Quinn Emanuel | Quinn Emanuel Urquhart & Sullivan, LLP, conflicts counsel to the Debtors |
| Ray First Day Declaration | Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, Dkt. No. 24 |
| Robinhood | Robinhood Markets, Inc. |
| Robinhood Shares | Approximately 55 million shares of Robinhood stock acquired by Bankman-Fried |
| Robinhood Transaction | Acquisition of Robinhood Shares by Bankman-Fried |
| S&C Employment Application | *Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 270 |
| SBF Criminal Case, Dkt. No. | Citations to "SBF Criminal Case, Dkt. No." refer to docket entries in *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y.) (LAK) |
| SEC | U.S. Securities and Exchange Commission |
| SEF | A CFTC-registered Swap Execution Facility |
| Second Ray Report | The Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com, Dkt. No. 1704-1 |
| S&C | Sullivan & Cromwell LLP, counsel to the Debtors |
| UFTA | Uniform Fraudulent Transfer Act |
| Unsecured Creditors' Committee | The official committee of unsecured creditors in the Debtors' bankruptcy cases |
| WRS | West Realm Shires Inc. |
| WRSS | West Realm Shires Services Inc. |

## EXECUTIVE SUMMARY

This is the Phase II Report (the "Report") of Examiner Robert J. Cleary in the Chapter 11 bankruptcy cases of FTX Trading, Ltd. ("FTX Trading") and certain of its affiliates (collectively, the "FTX Group" or the "Debtors"),[2] Case No. 22-bk-11068 (Bankr. D. Del.) (JTD).

Part I of the Report sets out the background of the Examiner's appointment to conduct Phase II investigations and the scope of the Examiner's investigations.  Pursuant to the Bankruptcy Court's June 26, 2024 Order, the Examiner was instructed to investigate: (1) Sullivan and Cromwell LLP's[3] representation of Samuel Bankman-Fried[4] in connection with his purchase of shares in Robinhood Markets, Inc.;[5] (2) potential claims against former shareholders of Ledger Holdings, Inc.[6] (the parent company of LedgerX) arising out of the FTX Group's acquisition of that company;[7] and (3) balance sheet shortfalls, or "holes" in customer assets, prior to the Petition Date[8] at FTX.US.  Part I concludes with a summary of the methodology the Examiner used to accomplish these tasks.

Part II addresses S&C's role in Bankman-Fried's purchase of Robinhood shares.  It outlines the facts of S&C's participation in that transaction.  Ultimately, it concludes that S&C

---

[2] This Report generally refers to these entities as the "FTX Group" when describing prepetition conduct or events, and as the "Debtors" when describing postpetition conduct or events.

[3] This Report will refer to Sullivan & Cromwell LLP as "S&C."

[4] This Report will refer to Samuel Bankman-Fried as "Bankman-Fried."  His father, Joseph Bankman, is referred to as "Joe Bankman."

[5] This Report will refer to Robinhood Markets, Inc. as "Robinhood."

[6] This Report will refer to Ledger Holdings, Inc. as "LHI."

[7] This Report will refer to the FTX Group's acquisition of LHI as the "LedgerX Transaction."

[8] This Report will refer to November 11, 2022 and November 14, 2022—the dates that the bankruptcy cases were commenced—collectively as the "Petition Date."

did not have a conflict of interest resulting from its participation in the Robinhood transaction.  It further concludes that S&C did not learn of any FTX Group misconduct as a result of its Robinhood-related work, and it did not ignore any "red flags" that would have alerted it to such misconduct.

Part III analyzes potential claims resulting from the LedgerX Transaction.  It begins by setting out the Examiner's factual findings regarding the LedgerX Transaction.  This Part then identifies potential claims that could be brought to unwind the transaction.  Finally, it analyzes whether any of those claims would be viable.  It concludes that the Debtors likely do not have any viable claims to avoid the LedgerX Transaction and recover value for the FTX Group bankruptcy estates arising out of the LHI transaction, but certain claims could survive a motion to dismiss.

Part IV examines the balance sheet shortfalls, or "holes," in FTX.US customer assets.  It analyzes the facts surrounding FTX.US's operations, the initial detection of an apparent hole in November 2022, and potential causes or contributors to balance sheet discrepancies.  It concludes that FTX.US, like other components of the FTX Group, maintained an egregiously poor internal control environment, including with regard to the maintenance, management, and reconciliation of customer assets.  Because of these fundamentally deficient practices, the Examiner was unable to definitely determine the specific causes that gave rise to the discrepancy in customer assets in November 2022, or whether shortfalls existed prior to November 2022.  The Examiner did not find evidence that FTX.US customer assets were misappropriated in the same manner as FTX.com customer assets.  That said, as discussed in this Part, the Examiner's investigation determined that, due in large part to these systemic deficiencies, FTX.US customer assets were at grave risk of loss and misuse and the business was wholly

unprepared to confirm that customer assets were sufficient to satisfy customer liabilities in a time of crisis.

## PART I:  BACKGROUND AND METHODOLOGY

Part I of this Report sets out the history of the Examiner's appointment to conduct the

Phase II investigations, the scope of the Examiner's Phase II investigations, and the Examiner's

methodology.

## I.   The History of the Examiner's Phase II Appointment and the Scope of the Examiner's Phase II Investigations

The Phase I Scope Order directed the Examiner to "file a report which (i) summarizes the

investigations of the Debtors conducted by the Debtors, the [Unsecured Creditors' Committee],

and any third parties[,] including any governmental units . . . [,] (ii) summarizes the findings or

status of such [i]nvestigations, and (iii) makes recommendations for additional investigations."[9]

Consistent with the Phase I Scope Order, the Examiner submitted his Phase I Report on May 20,

2024.[10]  The Phase I Report recommended three additional investigations:[11]

> 1.     S&C's representation of Bankman-Fried in connection with his
> purchase of the Robinhood Shares.  This inquiry would focus on (a) the
> scope and contours of that representation and (b) based on that
> representation, what, if anything, S&C knew or should have known about
> the FTX Group's fraud.[12]
>
> 2.     Potential claims against the former shareholders of LHI that sold
> their interests to WRS,[13] to the extent these claims were not released in the
> postpetition transaction.  This inquiry would (a) determine whether an

---

[9] Dkt. No. 9883, at 2 (the "Phase I Scope Order").

[10] The Phase I Report was initially filed under seal at Dkt. No. 15282.  In accordance with a Bankruptcy Court-authorized procedure, the Examiner gave counsel to the Debtors, counsel to the Unsecured Creditors' Committee, and the United States Trustee an opportunity to interpose any privilege objections to the Phase I Report and negotiate redactions before the Report was filed on the public docket.  *See* Dkt. No. 13627.  No party requested redactions to the Phase I Report, Dkt. No. 15537, and the Examiner filed the Phase I Report on the public docket on May 23, 2024.  Dkt. No. 15545 (the "Phase I Report").  The Examiner filed a list of supplemental annotations to the Phase I Report on June 20, 2024.  Dkt. No. 18091.

[11] Phase I Report, at 224.

[12] The Examiner's justification for this investigation may be found at Part 2, Section VI of the Phase I Report.

[13] West Realm Shires, Inc.

avoidance action is warranted against these unreleased shareholders, and (b) enable the Examiner to report on the underlying details of the prepetition sale of LHI to WRS.[14]

3.    The existence of balance sheet shortfalls or "holes" in FTX.US customer assets.  This inquiry would center on (a) the reasons these holes arose at FTX.US, (b) whether the balance sheet holes were the result of commingling of customer or corporate assets, (c) the frequency and magnitude of the holes, and (c) how they were resolved and by whom.[15]

On June 10, 2024, the Examiner moved for leave to conduct these three Phase II investigations.[16]  There were no objections to the Examiner's motion.[17]  The Bankruptcy Court entered the Phase II Scope Order on June 26, 2024, granting the Examiner's motion to conduct the three Phase II investigations.[18]

## II.    The Examiner's Methodology

To conduct the investigations outlined in the Phase II Scope Order, the Examiner obtained, reviewed, and analyzed thousands of FTX Group documents.  These documents were provided by S&C, which, in its role as counsel to the Debtors, maintains a comprehensive database of electronically stored information obtained from the FTX Group and its key employees.  The Examiner began the document review process by both (i) requesting specific documents, such as closing binders, valuation reports, and internal analyses (including key documents cited therein), and (ii) requesting documents that were captured by search terms

---

[14] The Examiner's justification for this investigation may be found at Part 2, Section VI of the Phase I Report.

[15] The Examiner's justification for this investigation may be found at Part 6, Section V of the Phase I Report.

[16] Dkt. No. 17166.

[17] Dkt. No. 18963.

[18] Dkt. No. 19061 (the "Phase II Scope Order").  The Phase II Scope Order obligates the Examiner to file a Phase II Report "no later than 70 days from the entry of th[e] Order," or by September 4, 2024.  However, the Examiner timely moved to extend the deadline for filing the Phase II Report to September 20, 2024.  Dkt. No. 22294.  After no party objected to the Examiner's motion, Dkt. No. 22964, the Court granted the extension.  Dkt. No. 23059.

developed by the Examiner based on key words associated with investigative topics outlined in the Phase II Scope Order.  The Examiner asked S&C to apply these search terms to different time periods tailored to the needs of each investigation.  For example, the Examiner asked S&C to produce documents elicited by Robinhood-related search terms from the time period surrounding Bankman-Fried's purchase of Robinhood shares, since documents elicited by those search terms from other periods would be less important and likely irrelevant.  By contrast, the Examiner asked S&C to produce documents related to FTX.US from a broader time frame, because the Phase II Scope Order does not impose a temporal limit on the Examiner's investigation into balance sheet shortfalls at FTX.US.  S&C timely produced all documents requested by the Examiner.

S&C provided over 50,000 documents for review by the Examiner.  Most of those documents related to FTX.US, with only about 1,000 documents applicable to the LedgerX and Robinhood investigations.  Members of the Examiner's team reviewed and analyzed every produced document that related to the LedgerX and Robinhood investigations.  Given the substantial volume of documents relating to FTX.US, members of the Examiner's team ran iterative targeted searches to identify key documents for review over the course of the investigation.  At various points in the investigation, the Examiner also requested specific additional documents from S&C.  S&C complied with each of these requests.

The Examiner's team also interviewed the following witnesses.  As noted, some witnesses were interviewed on only a single topic, whereas others were interviewed on two, or even all three, investigative topics.

| Witness | Role (as of November 1, 2022) | Topic(s) |
| --- | --- | --- |
| Fabrizio Cecchettini | Operations, FTX.US | FTX.US |
| Zach Dexter | CEO, LedgerX | FTX.US, LedgerX |
| Andrew Dietderich | Partner, S&C | LedgerX, Robinhood |
| Adrienne During | Senior Vice President, Compliance, FTX.US | FTX.US |
| Mitch Eitel | Partner, S&C | Robinhood |
| Caroline Ellison | CEO, Alameda | FTX.US |
| Dan Friedberg | General Counsel, Alameda and FTX Trading; Former Chief Compliance/Regulatory Officer, FTX Trading, FTX.US, and WRS | LedgerX, Robinhood |
| Brett Harrison | President, FTX.US (resigned prior to November 1, 2022) | FTX.US, LedgerX |
| Joseph Hearn | Partner, S&C | Robinhood |
| Trevor Levine | Associate Counsel, FTX.US | FTX.US, LedgerX, Robinhood |
| Jonathan Lipson | Professor, Temple University Beasley School of Law | LedgerX |
| Ryne Miller | General Counsel, FTX.US | FTX.US, LedgerX, Robinhood |
| Lynn Nguyen (a/k/a Phuong Linh Nguyen) | Head of Settlements, FTX.US | FTX.US |
| Delaney Ornelas | Head of Administration, FTX.US | FTX.US |
| Caroline Papadopoulos | Controller, FTX.US | FTX.US, LedgerX |
| Jayesh Peswani | Head of Finance, FTX.US and FTX.com[19] | FTX.US |
| Eric Queen | Partner, S&C | Robinhood |

---

[19] During this period, Peswani remained formally employed by Salameda, another FTX Group affiliate.

| Witness | Role (as of November 1, 2022) | Topic(s) |
|---------|-------------------------------|----------|
| Nishad Singh | Head of Engineering, Alameda; Lead Software Engineer, FTX.US | FTX.US |
| David Skeel | Professor, University of Pennsylvania Carey School of Law | LedgerX |
| Gary Wang | Chief Technical Officer, FTX.com and FTX.US | FTX.US |

The Examiner sought to compel the testimony of one witness, Lynn Nguyen, pursuant to Bankruptcy Rule 2004, due to her resistance to participating in an interview. However, after the Examiner filed a motion to compel her testimony, Ms. Nguyen agreed to be interviewed voluntarily, and the Examiner withdrew the motion. The Examiner also sought interviews with several other potential witnesses who declined to be interviewed or did not respond to the Examiner's outreach. Given the availability of other witnesses with overlapping roles, the Examiner did not seek to compel their testimony and does not believe that their unavailability compromised the Examiner's investigation in any way. All witnesses who spoke with the Examiner or members of his team appeared to be cooperative, forthcoming, and credible during the interviews.

In addition to reviewing FTX Group documents and interviewing percipient witnesses, the Examiner relied on other sources of information in completing the Phase II investigations. The Examiner's team reviewed interview memoranda and other investigative documentation prepared by S&C and its consultants, as well as (1) civil complaints against the FTX Group and associated individuals and organizations, (2) criminal informations and indictments filed against individuals affiliated with the FTX Group, (3) the transcripts of Bankman-Fried's criminal trial and sentencing, and related filings, (4) Bankman-Fried's Second Circuit brief on appeal of his conviction, (5) complaints and other filings that the Debtors have filed in adversary proceedings,

(6) select publicly available materials related to the collapse of the FTX Group (such as news articles and academic publications), and (7) all unsolicited documents submitted to the Examiner by members of the public.  The Examiner's team also met with some members of the public who offered unsolicited information on the Phase II investigative topics.  As was the case during the Examiner's Phase I investigation, the Examiner did not communicate with individuals who did not reveal their identities (although his team did review all documents they submitted), nor did he respond to every named individual or entity who provided unsolicited information.

In the Phase I Report, the Examiner explained that "examiners do not have free rein to investigate any matter of potential private or public interest related to a debtor," and accordingly, he "investigated only the matters assigned to him by the Scope Order."[20]  The Examiner abided by this principle during his Phase II investigations and investigated only the matters assigned to him by the Phase II Scope Order.  As was the case for the Phase I Report, this Phase II Report is not an "investigat[ion of] every matter related to the Debtors that has attracted public or press attention" and "should not be interpreted as a comment on any issues beyond the Examiner's remit."[21]

The Examiner seeks throughout the Report to balance the public interest in the fullest possible understanding of the Phase II investigation topics with the privacy interests of those who agreed voluntarily to provide information to the Examiner.  Accordingly, where FTX Group documents obtained by the Examiner refer to former FTX Group employees by name or attribute certain statements to former FTX Group employees, the Report does so, as well.  However, in instances in which witnesses provided information to the Examiner during interviews, the Report

---

[20] Phase I Report, at 10-11.

[21] *Id.*

does not attribute that information to the individual who provided that information to the Examiner.

Additional methodological information applicable to each of the three individual investigations discussed in this Report may be found at the beginning of each of the three Parts that follow this introduction.

## PART II:  THE ROBINHOOD TRANSACTION

### I.    Background and the Examiner's Phase I Investigation

In his Phase I Report, the Examiner recommended an investigation into S&C's representation of Bankman-Fried in connection with his purchase of shares of Robinhood Markets, Inc. ("Robinhood").[22]  The Court approved this recommendation and directed the Examiner to conduct an investigation focused primarily on "(1) the scope and contour of that representation, and (2) based on that representation, what, if anything, S&C knew or should have known about the FTX Group's misconduct and/or fraud."[23]  In this Part, the Examiner summarizes the relevant background from the Phase I Report.  The Examiner then discusses his investigative steps, key findings, and ultimate conclusions.

As detailed below, the Examiner finds:  (1) that S&C did not have a disqualifying conflict as a result of its work advising Bankman-Fried in connection with his purchase of shares of Robinhood; (2) no evidence that S&C had actual knowledge of any misconduct at the FTX Group; and (3) no evidence that S&C ignored any "red flag" that would have alerted it to the fraud perpetrated by the FTX Group.

As set forth in more detail in the Phase I Report, on December 21, 2022, the Debtors filed an application with this Court to retain S&C as counsel (the "S&C Employment Application").[24]  The S&C Employment Application was supported by two declarations by CEO John Ray,[25] three

---

[22] Phase I Report, at 209.

[23] Phase II Scope Order ¶ 3.

[24] Dkt. No. 270.

[25] Dkt. No. 270-2; Dkt. No. 511.

declarations by S&C partner Andrew G. Dietderich,[26] and one declaration by S&C partner Alexa J. Kranzley.[27]  The Court granted the S&C Employment Application, and in the Phase I Report, the Examiner concluded there was no error in the Court's decision to grant the application based on the record before the Court.

The Examiner also sought to determine whether there were conflicts or evidence of non-disinterestedness that were not before the Court when it ruled on the S&C Employment Application.  As part of this work, the Examiner analyzed (i) the investigation by Quinn Emanuel Urquhart & Sullivan, LLP[28] into S&C's prepetition work, and (ii) allegations made by former employees, third-party observers, and other parties in interest concerning S&C's alleged conflicts (the "Additional S&C Materials").[29]

a.    *The Quinn Emanuel Investigation*

The Quinn Emanuel investigation found no evidence that S&C advised on, had knowledge of, or ignored red flags relating to various areas of fraud and misconduct, including but not limited to:  (a) commingling of FTX Trading Ltd. ("FTX.com") customer deposits/funds with the corporate assets of Alameda Research LLC ("Alameda") or other entities in the FTX Group; (b) misappropriation of FTX.com customer deposits/funds to pay for various personal or corporate expenditures; (c) false or misleading statements and representations made to

---

[26] Dkt. No. 270-3; Dkt. No. 510; Dkt. No. 533.

[27] Dkt. No. 512.

[28] This Report refers to Quinn Emanuel Urquhart & Sullivan, LLP as "Quinn Emanuel."

[29] These materials include:  *Declaration of Daniel Friedberg in Support of Amended Objection of Warren Winter to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 530; *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1; Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; and *Vara v. FTX Trading (In re FTX Trading)*, No. 23-2297 (3d Cir.), Dkt. No. 27.

FTX.com's customers or other third parties; and (d) the lack of effective internal controls at FTX.com and FTX.US, among other FTX Group entities.[30]  The Examiner was satisfied with the process, methodology, and thoroughness of the Quinn Emanuel investigation and found no evidence suggesting he should not rely on Quinn Emanuel's conclusions.

Nevertheless, Quinn Emanuel's investigative mandate had certain built-in limitations because it was directed exclusively at S&C's prepetition representations of the FTX Group.  Yet, in addition to those engagements, S&C also represented Bankman-Fried individually in one instance.  During the Phase I investigation, the Examiner learned that Bankman-Fried misappropriated FTX Group customer funds to acquire approximately $500 million worth of shares of Robinhood (the "Robinhood Transaction").  As of the Petition Date, the Robinhood shares were held by an entity controlled by Bankman-Fried called Emergent Fidelity Technologies Ltd. ("Emergent").[31]  S&C provided legal services to Bankman-Fried in connection with this acquisition.  Specifically, in his January 17, 2023 declaration, Dietderich stated that "S&C advised Mr. Sam Bankman-Fried in connection with Hart-Scott-Rodino compliance and public reporting obligations arising out of a position that had been established in the stock of Robinhood[.]"[32]  For this matter, S&C received fees and expenses of approximately $195,000, which was paid for by Alameda, another entity owned and controlled by Bankman-Fried and used for his personal investments.[33]  Quinn Emanuel did not investigate this S&C

---

[30] Quinn Emanuel, *Report to CEO John Ray and the Independent Directors of the FTX Group Debtors Entities Regarding Sullivan & Cromwell LLP*, Feb. 2024, at 1.

[31] *United States v. Samuel Bankman-Fried* ("SBF Criminal Case"), No. 22-cr-00673 (S.D.N.Y.) (LAK), Dkt. No. 53; *see also* Robinhood Markets, Inc., Form SC 13D (May 12, 2022).

[32] Dkt. No. 510 ¶ 52.

[33] *Id.*  Alameda was owned 90% by Bankman-Fried and 10% by Gary Wang.  Alameda's purported business purpose was to invest the personal funds of both owners.  *See* First Ray Report, at 2-3.

engagement because it was a representation of Bankman-Fried as an individual, and Quinn Emanuel was only authorized to investigate S&C's prepetition representation of the entities in the FTX Group.

### b.    The Additional S&C Materials

The Additional S&C Materials contain allegations that S&C had disqualifying conflicts, including with respect to its work on the Robinhood Transaction.  The Additional S&C Materials also assert that S&C acted as both personal counsel for Bankman-Fried and primary counsel for Emergent in the Robinhood Transaction.[34]  These materials further contend that S&C advised on the structuring of the Robinhood Transaction.[35]  Finally, the materials allege that, through its work on the transaction, S&C knew that customer funds were misappropriated for the purchase of the Robinhood shares.[36]

## II.    Summary of Examiner's Phase II Investigative Steps

The Examiner began the Phase II investigation by reviewing 762 documents produced from a database of the Debtors' documents, which were mostly email communications between S&C and various FTX Group employees.  Given the focused nature of the inquiry, the searches that elicited those 762 documents were run over a limited date range and over the documents of nine FTX Group employees, including Bankman-Fried and in-house FTX Group attorneys Ryne

---

[34] Dkt. No. 530 ¶ 16; *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1 ¶ 176.

[35] *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1 ¶ 198 ("This was, therefore, no simple transaction, and despite S&C's expertise and advice to Bankman-Fried on the transaction, the purchase was not arranged through sophisticated financial institutions but rather over the course of 29 separate trading days over a period of two months via Emergent.").

[36] *Id.* ¶ 201 ("S&C represented at the same time both Emergent, the special purpose vehicle used to accomplish the share purchase (such that S&C knew how the shares were purchased and with what funds) and also Bankman-Fried who purchased the Robinhood shares.").

Miller, Trevor Levine, and Daniel Friedberg.[37]  The Examiner believes this date range and list of custodians was sufficient to capture the most relevant documents.  The nine employees include senior FTX Group employees as well as the FTX Group employees who worked directly with S&C on the Robinhood Transaction.  During the course of his investigation, the Examiner did not discern any additional FTX Group employees who were directly involved in the Robinhood Transaction.

In addition, for most of the keyword searches, the top email needed to contain one of seven S&C email addresses for an email to be responsive.  These email addresses included those of Joseph Hearn and Eric Queen, the S&C attorneys who led the work on the Robinhood Transaction.  They also included the email address of Mitch Eitel, the S&C partner primarily responsible for S&C's engagement on the Robinhood Transaction.  The Examiner believes the list of S&C email addresses included all key S&C attorneys and employees involved in the Robinhood Transaction.

After reviewing the initial document production, the Examiner also asked S&C to run one additional search and sent S&C additional, targeted document requests.  The Examiner also conducted witness interviews, including interviews of key S&C partners and former FTX Group executives and employees.  S&C cooperated throughout this investigation, including conducting all requested searches, providing all documents requested, and making available all witnesses the Examiner sought to interview.

---

[37] The searched date range was April 1, 2022 to August 15, 2022.  In one of his declarations, Andrew Dietderich stated that S&C's representation commenced on April 14, 2022, and ceased on August 5, 2022.  *See* Dkt. No. 510 ¶ 52.  Despite running searches that extended beyond this time frame, the Examiner did not see any relevant documents before April 14, 2022 or after August 5, 2022.

### III.    Investigative Findings

#### a.    *History of S&C's Work on the Robinhood Transaction*

During late winter and early spring 2022, Bankman-Fried began purchasing Robinhood stock in the public market through Alameda.[38]  As noted above, Alameda was an entity owned and controlled by Bankman-Fried, and was ostensibly used for his personal investments.[39]  In April 2022, Alameda transferred all of its Robinhood shares to Emergent, another entity owned and controlled by Bankman-Fried.[40]  After this transfer, Bankman-Fried continued to acquire Robinhood stock through Emergent.[41]  Based on the investigative efforts discussed above, the Examiner has constructed the following timeline of S&C's work related to Bankman-Fried's purchases of Robinhood stock.

On April 14, 2022, Miller emailed S&C partners Eitel and Hearn with several legal questions concerning the "hypothetical[]" acquisition of a large position in a publicly traded entity.[42]  The subject line of the email was "Sam trading question."  In the Examiner's witness interviews, S&C attorneys said they did not find it unusual that Miller—an FTX Group employee—contacted S&C in connection with Bankman-Fried's personal investments.  This is because they knew that the FTX Group was largely owned by Bankman-Fried, and that it is common for wealthy individuals to rely on their corporate employees in this manner.  The FTX Group employees interviewed similarly did not find the arrangement unusual.

---

[38] F10705-E016485485; F10705-E016485486; F10705-E016485487 (identifying February 2022 as the date of the first relevant transactions).

[39] *See* First Ray Report, at 6-7.

[40] F10705-E016487224.

[41] F10705-E001497314; F10705-E016485788.

[42] F10705-E016516818.

In response to Miller's inquiry, the S&C attorneys identified two key considerations: (1) Securities and Exchange Commission ("SEC") filing requirements, specifically, the obligation to file a Form 13D; and (2) Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") compliance.  A Form 13D must be filed by any person or entity that directly or indirectly acquires the beneficial ownership of more than 5% of a class of securities.[43]  The HSR Act requires companies to file a premerger notification with the Federal Trade Commission ("FTC") and the Antitrust Division of the U.S. Department of Justice ("DOJ").[44]  It also imposes a mandatory waiting period before any such acquisition can close.[45]  Over the next few days, Miller and the S&C attorneys discussed the 13D filing requirements.  During these preliminary conversations, Miller did not reveal Robinhood as the target company, and it is not clear when S&C first learned this fact.

At this time, the equity stake controlled by Bankman-Fried was held by Alameda.  S&C informed Miller that, as a result, SEC rules required that Alameda's ownership be disclosed as part of the 13D filing.  Miller explained that although Bankman-Fried was not concerned about being identified in a public filing himself, he did not want Alameda disclosed.[46]  S&C did not ask why Bankman-Fried did not want to reveal Alameda in the public filings, and the S&C attorneys told the Examiner they did not find this unusual because their clients often seek confidentiality for a variety of legitimate reasons.

---

[43] 17 C.F.R. § 240.13d-1.

[44] 15 U.S.C. § 18a.  Miller's email did not disclose (i) whether or not Bankman-Fried intended to acquire the target entity or (ii) the value of the transaction.  As such, S&C noted that it was important to determine "whether HSR gets triggered."  F10705-E016516818.  As noted below, S&C sent an HSR Act notice on behalf of Bankman-Fried even though Bankman-Fried did not firmly intend to buy a controlling interest in the company.  *See* F10705-E016484291.

[45] F10705-E016484291.

[46] F10705-E016487618.

During his criminal trial, Bankman-Fried explained that he wanted to prevent the disclosure of Alameda's interest in Robinhood in order to avoid the potential appearance of a conflict of interest.  According to his testimony, Alameda was in discussions with Robinhood about becoming a liquidity provider, and Bankman-Fried did not want anyone to view his investment into Robinhood as related to those discussions.[47]  At trial, Ellison was also asked about this and testified that, to her knowledge, Bankman-Fried "wanted to be able to talk about his Robinhood investment, but he didn't want his name associated with Alameda."[48]

On April 19, Miller asked S&C if they could avoid including Alameda in the 13D filing if Alameda transferred the shares to a new standalone entity, adding that the "answer must be yes."[49]  Hearn gave his preliminary view agreeing with Miller's assumption that Alameda could be omitted from the 13D if it transferred the shares to a new standalone entity, but the parties continued to discuss this potential structure throughout the day on April 20.[50]

Also on April 20, Corporate & Trust Services (Caribbean) Ltd. filed an Application for International Business Charter with the Financial Services Regulatory Commission of Antigua and Barbuda ("FSRC") seeking to incorporate Emergent.[51]  The Examiner has seen no evidence that S&C assisted with this application.  The form listed Bankman-Fried as the sole director of Emergent.[52]  On April 22, the FSRC issued a certificate of incorporation for Emergent.  That

---

[47] Transcript at 2264:6-16, SBF Criminal Case, Dkt. No. 374.

[48] Transcript at 732:24-733:3, SBF Criminal Case, Dkt. No. 358.

[49] F10705-E016487618, at 4.

[50] *Id*.

[51] F10705-E106487225.

[52] *Id*.

same day, Emergent issued 900 shares to Bankman-Fried and 100 shares to Wang, representing their ownership interests in Emergent of 90% and 10%, respectively.[53]

On April 22, after conferring with other S&C attorneys about the proposed structure, Hearn confirmed with Miller that, because Alameda did not yet own 5% of Robinhood's equity, Alameda's name could be left off the 13D filing under the circumstances.[54]  Over the next few days, Miller raised additional legal questions with S&C.  For example, he asked how different ownership structures could impact the reporting obligations of the new subsidiary, whether other regulatory rules may apply, and how preexisting holdings of employees would impact the analysis, if at all.[55]

On April 27, Miller asked Hearn and Eitel to prepare the required regulatory filings.  Eitel replied that S&C would first have to clear conflicts.[56]  Eitel submitted a conflicts check that searched only for conflicts involving Robinhood.  Thereafter, Eitel informed Miller that S&C could take on the representation.  Miller said Bankman-Fried would be the client, "understanding that may include the subsidiary too."[57]  As a result, Eitel asked Miller for know-your-customer ("KYC") materials on Bankman-Fried.

Robinhood also was a client of S&C in an unrelated matter, and S&C had obtained an advance conflicts waiver from Robinhood.  After Bankman-Fried retained S&C, S&C and

---

[53] F10705-E016487223.

[54] F10705-E016516261.

[55] F10705-E016487409.  This email communication did not specify whose "employees" would be relevant.

[56] *Id.* at 1-2.

[57] F10705-E016487398.

Robinhood discussed a potential revision to the advance conflicts waiver. [58]  Robinhood was represented by another law firm in the negotiation of this revised conflicts waiver.  S&C's view was that the advance waiver was sufficient and that a revision was unnecessary.[59]  In an interview with the Examiner, one S&C attorney said he thought at the time that Robinhood was attempting to narrow the existing waiver.  Ultimately, Robinhood and S&C did not sign a revised waiver.  In the conversations with S&C about this additional waiver, Miller explained to S&C that the relevant parties for conflicts purposes were Bankman-Fried, FTX.US, and FTX.com.[60]  Miller did not mention Emergent or Alameda.  In addition, during these discussions, Miller described the scope of the work as "preparing HSR…and then if things go a certain direction, deal counsel."[61]

On April 30, as chairman and sole member of the board of Emergent, Bankman-Fried signed a resolution approving Emergent's purchase of the Robinhood shares held by Alameda.[62]

On May 2, Miller sent S&C background documentation on Emergent, Bankman-Fried, and Wang for the purposes of client onboarding.[63]  Eitel asked Miller whether Bankman-Fried or Emergent would be S&C's client for the Robinhood Transaction.  Miller replied that Bankman-Fried should be the client because "this is all his money."[64]  Therefore, S&C drafted an engagement letter addressed to Bankman-Fried.  However, the Examiner has seen no evidence

---

[58] F10705-E016485834.

[59] *Id.*

[60] *Id.*

[61] F10705-E016486141, at 1.

[62] F10705-E016487224.

[63] F10705-E016487222-F10705-E016487227.

[64] F10705-E016487086.

that S&C ever sent the engagement letter or that Bankman-Fried signed it.  During their witness interviews, the S&C attorneys said they either did not know much about Emergent or that they believed it was simply a special purpose entity formed for the Robinhood investment.  Other former FTX Group employees have confirmed that Emergent did not have any separate business operations and that it was solely an investment vehicle.

On May 5, S&C began sending Miller drafts of the 13D filing.[65]  On May 9, S&C prepared and submitted an application to the SEC for EDGAR codes on behalf of Emergent and Bankman-Fried.[66]  In witness interviews, S&C attorneys explained that EDGAR access is required for entities and individuals to electronically file various forms with the SEC.[67]  Although they obtained the EDGAR codes for Emergent, in their interviews the S&C attorneys characterized this as an administrative task necessary for their representation of Bankman-Fried rather than legal work on behalf of Emergent.

On May 11, Miller instructed S&C to start expeditiously preparing the HSR Act notification.[68]

On May 12, S&C filed a Form 13D in connection with the Robinhood Transaction.[69]  The 13D was signed by Bankman-Fried in his individual capacity as well as in his role as a

---

[65] F10705-E016487696; F10705-E016487697.

[66] F10705-E001168805; F10705-E087690445; F10705-E087690446; F10705-E087690447.

[67] SEC, *Understand EDGAR and its Three Websites*, https://www.sec.gov/submit-filings/filer-support-resources/how-do-i-guides/understand-edgar-its-three-websites, *archived at* https://perma.cc/JVW7-79KH ("Apply for EDGAR access (Form ID). If you as an individual, another individual whom you represent, or a company that you represent wants to begin filing electronically with EDGAR, you must fill out the Form ID online and follow the accompanying instructions, including uploading a notarized copy of the form.").

[68] F10705-E016485834; F10705-E016486119.

[69] F10705-E001497314; F10705-E016485788.

director of Emergent.[70]  The schedule of transactions included in the filing reflected a series of

open-market purchases of Robinhood stock during the 60-day period before the filing (from

March 14, 2022 through May 11, 2022).[71]  The 13D disclosed that the purchases were made

"through an affiliate of the Reporting Persons that transferred such Shares to Emergent."[72]  In

total, the 13D reported that Bankman-Fried and Emergent had obtained 7.6% of Robinhood's

stock.[73]

That same day, on May 12, Miller asked S&C about Form 13H requirements.[74]  S&C

responded that 13H filings are used to register entities as large traders with the SEC.  On May

23, S&C filed a 13H form identifying Emergent as a large trader.[75]  Miller was listed as the

contact person and the "Authorized Person" for Emergent.[76]  The 13H filing represented that the

subject transactions first occurred on February 17, 2022.  These initial transactions were

purchases made by Alameda.  Emergent was not listed as engaging in any kind of business other

than "proprietary trading."

Throughout this time, S&C also continued to advise Bankman-Fried on the HSR Act

requirements.  To prepare the filing, S&C worked with both Miller and Trevor Levine.  In that

---

[70] F10705-E001497315.

[71] F10705-E001497316.

[72] *Id.*

[73] F10705-E001497317, at 5.

[74] F10705-E016485819; F10705-E016485803.

[75] F10705-E016485485; F10705-E016485486; F10705-E016485487.

[76] F10705-E016485486.

regard, S&C asked how much additional Robinhood stock Bankman-Fried intended to acquire.[77]

Miller responded that Bankman-Fried had no concrete plan for next steps.  Notwithstanding this

uncertainty, Miller insisted that S&C should still be able to finish and file the HSR Act

notification.[78]  In these conversations, S&C also advised Miller about the difficulty of acquiring

a substantial interest in Robinhood without first approaching Robinhood's management and its

board of directors.  This was because, at this time, more than 50% of Robinhood's voting stock

was held by two individuals.  S&C also advised Miller that buying a large block of Robinhood

shares would require navigating Robinhood's corporate governance documents as well as other

legal considerations.  In response, Miller told S&C that they "should assume that our team

knows every nook and cranny of the HOOD cap tables, the voting structure etc.  Our guys are

pretty good at due diligence."[79]  Around this time, Bankman-Fried was receiving presentations

from bankers about potential M&A opportunities for Robinhood.[80]  The Examiner has seen no

evidence that S&C was involved in these discussions.

On May 26, S&C submitted an HSR Act notification to the FTC and the Antitrust

Division of the DOJ concerning "Mr. Bankman-Fried's intention to acquire voting securities of

Robinhood."[81]  The notification was signed by Miller as "Personal Representative for Samuel

Bankman-Fried."[82]  That same day, S&C also sent a letter "on behalf of Samuel Bankman-Fried"

---

[77] F10705-E087691601.  The HSR Act has various notification thresholds.  According to the advice provided by S&C, filing for the 25% notification threshold would allow Bankman-Fried to acquire up to 49.9% of Robinhood's stock and filing for the 50% notification threshold would allow him to acquire 100% of Robinhood's stock.  *See id.*

[78] F10705-E016484290, at 1.

[79] *Id.*

[80] F10705-E000972005.

[81] F10705-E015247622, at 1.

[82] *Id.* at 10.

to the general counsel of Robinhood, stating that Bankman-Fried intended to acquire additional shares of Robinhood.[83]   On May 31, the Premerger Notification Office of the FTC and the Assistant Attorney General of the Antitrust Division confirmed receipt of the filing "relating to the proposed acquisition by Samuel Bankman-Fried of certain voting securities of Robinhood."[84]

During the 30-day HSR Act waiting period after the filing, Miller asked S&C "[c]an we buy" additional shares, and S&C advised Miller that Bankman-Fried should not do so.[85]   The 30-day waiting period expired on June 27, 2022.   After its expiration, Bankman-Fried was allowed to purchase additional shares through Emergent, subject to certain limitations.[86]   S&C also provided advice on those limitations and requirements.[87]   On July 6, Miller informed S&C that Bankman-Fried had purchased additional Robinhood shares.   This triggered an amended 13D filing.[88]

On August 5, Miller asked S&C which entity filed the 13H.   An S&C attorney replied that Emergent filed the 13H.[89]   This appears to be the last email communication between S&C and Miller or any other FTX Group employee regarding the Robinhood Transaction.

 *b. Analysis of the Scope of S&C's Work*

As noted above, the Additional S&C Materials make various allegations concerning S&C's role in the Robinhood Transaction.   First, they assert that S&C was conflicted because it

---

[83] F10705-E016484780; F10705-E016484781.

[84] F10705-E016485033.

[85] F10705-E016515208.

[86] F10705-E016513440; F10705-E016513503.

[87] F10705-E016513696.

[88] F10705-E016512819.

[89] F10705-E016422860.

served as counsel both to Bankman-Fried in his personal capacity and to Emergent.  Second, the materials allege that S&C assisted both Bankman-Fried and Emergent with how the Robinhood Transaction was structured.  Finally, they claim that S&C knew how the Robinhood shares were purchased, and therefore knew or should have known that customer funds were misappropriated in the process.  However, based on his Phase II investigation, the Examiner concludes that these allegations lack merit.

Whether or not S&C represented Emergent is of no significance.  The Examiner understands that Emergent was a special purpose entity established to hold the Robinhood shares purchased by Bankman-Fried.  Emergent was not an operating company.  Its only assets were the Robinhood shares, and Bankman-Fried owned 90% of Emergent's equity.  There is no reason why Emergent would have needed counsel, let alone counsel separate from Bankman-Fried.  To the extent any of S&C's legal services concerned Emergent, that work would not have created a conflict of interest.

The Examiner also has determined that S&C's work with respect to Robinhood was predominantly limited to preparing four regulatory filings:  (i) a Schedule 13D; (ii) an amended Schedule 13D; (iii) a Form 13H; and (iv) an HSR Act notification.  S&C also obtained EDGAR identification codes for both Bankman-Fried and Emergent and responded to questions by FTX Group employees regarding the overarching regulatory framework for the Robinhood Transaction.

The Examiner has seen no evidence that S&C developed, proposed, or encouraged the use of any particular structure for the Robinhood Transaction.  Before Bankman-Fried retained S&C, Alameda had already been buying shares of Robinhood in the public market.  But, as described above, Bankman-Fried did not want Alameda's name revealed in the 13D filing, and

25

therefore Emergent was created as a standalone entity to hold the Robinhood shares.  Miller asked S&C whether Alameda's name could be left off the 13D if Alameda's Robinhood shares were transferred to Emergent and Emergent (rather than Alameda) continued to buy additional shares.  S&C analyzed the issue and confirmed that the proposed structure would allow Alameda's name to be omitted from the 13D.  In sum, FTX.US personnel structured how the Robinhood shares would be purchased, including where the shares would be held, and S&C advised that, under that structure, the regulatory requirements could still be satisfied without identifying Alameda.  The Examiner's investigation has not uncovered any evidence that S&C had a larger role in the structuring of the Robinhood Transaction.

The Examiner also has seen no evidence that, as a result of its work on the Robinhood Transaction, S&C had actual knowledge of any misconduct at the FTX Group.  In particular, the Examiner has seen no evidence that, while working on this matter, S&C learned about:  (a) the commingling of FTX.com customer deposits/funds with the corporate assets of Alameda; (b) the misappropriation of FTX.com customer deposits; (c) any false or misleading statements made to, among others, FTX.com's customers, specific investors, outside auditors, or the investing public generally; or (d) any lack of internal controls at FTX.com or FTX.US.  In fact, FTX Group employees informed S&C's attorneys that the Robinhood investment was Bankman-Fried's personal investment being funded with Bankman-Fried's own money.[90]  S&C's work did not require any further information on the source of funds used to purchase the Robinhood shares.  Therefore, S&C did not know and had no reason to believe that the Robinhood shares were actually purchased with customer funds or that customer funds were being misappropriated for this purpose.

---

[90] F10705-E016487086.

In accordance with the Court's order, the Examiner also considered whether, in connection with the Robinhood Transaction, S&C "should have known about the FTX Group's misconduct and/or fraud."[91]  For example, the Examiner assessed whether S&C should have inquired further about Bankman-Fried's reticence to include Alameda on the 13D filing.  The Examiner has seen no evidence that Bankman-Fried's desire to avoid revealing Alameda was connected to the FTX Group's misconduct or fraud.  In fact, as noted above, the S&C attorneys were not suspicious of Bankman-Fried's reluctance to disclose Alameda because confidentiality is often of paramount importance to wealthy individual clients for completely legitimate reasons.  Based on his investigation as well as his own professional experience, the Examiner finds this explanation credible and does not believe S&C ignored a red flag by not inquiring further.

The Examiner also evaluated whether S&C should have questioned why FTX.US employees were assisting Bankman-Fried with this ostensibly personal investment.  As mentioned above, S&C attorneys told the Examiner that when a wealthy individual owns a company, it is not unusual for that individual to direct the company's employees to assist with personal matters.  Therefore, S&C did not find it suspicious that FTX.US employees were assisting with the acquisition because the S&C lawyers viewed Bankman-Fried as the principal for all FTX Group entities and, as such, all FTX Group employees were, in essence, Bankman-Fried's employees.  This explanation is supported by the fact that former FTX.US employees told the Examiner in witness interviews that they themselves did not find the arrangement curious or noteworthy at the time.  Based on his investigation as well as his own professional experience, the Examiner finds this explanation credible and does not believe S&C ignored a red flag by not inquiring further.

---

[91] Phase II Scope Order ¶ 3.

**IV.    Conclusion**

In sum, the Examiner believes that S&C sufficiently described its work for Bankman-Fried in the S&C Employment Application and related declarations.  S&C did not have a disqualifying conflict arising out of its representation of Bankman-Fried in connection with the Robinhood Transaction.  S&C provided regulatory advice to Bankman-Fried in his personal capacity.  S&C did not serve as Emergent's counsel.  However, to the extent S&C provided any legal services to Emergent, those legal services were in furtherance of S&C's representation of Bankman-Fried as an individual and did not create a conflict of interest.  S&C did not lead or direct the development of the structure of the Robinhood Transaction, although S&C did provide some advice on what became the final structure.  Finally, through its work on the Robinhood Transaction, S&C did not obtain actual knowledge of, or ignore any red flags suggesting, fraud or malfeasance occurring at the FTX Group.

## PART III:  THE LEDGERX TRANSACTION

As set forth in the Phase I Report, in October 2021, West Realm Shires, Inc. ("WRS") purchased Ledger Holdings, Inc. ("LHI") for $300 million (the "LedgerX Transaction").[92] FTX.US was a wholly-owned subsidiary of WRS.  FTX Group employees often referred to the LedgerX Transaction as an acquisition by or for the benefit of FTX.US.  In this section of the Report, the Examiner occasionally adopts that language when discussing, among other things, the business justifications for the purchase even though the purchase was actually made by WRS.

This section of the Report analyzes whether there are meritorious claims that may be brought to unwind this prepetition transaction and recover value for the bankruptcy estates. Section I describes the LHI business and the prepetition transaction.  Section II discusses potential causes of action.  Section III analyzes the viability of the possible causes of action.

As explained in this Part, the Debtors most likely do not have a viable intentional fraudulent transfer claim, due to insufficient evidence of actual intent.  *See infra* section III(b). They also do not appear to have a sustainable constructive fraudulent transfer claim, primarily due to the lack of persuasive evidence that they received in the transaction less than reasonably equivalent value for their purchase price.[93]  *See infra* section III(c).  Moreover, even if a constructive fraudulent transfer claim were availing, the LHI shareholders may be able to present a viable "safe harbor" defense, subject to additional factual development.  *See infra* section III(d).  That being said, the Debtors may be able to sufficiently plead a constructive fraudulent transfer claim that would survive a motion to dismiss.

---

[92] Phase I Report, at 60.

[93] The elements of the Delaware fraudulent transfer statutes parallel those of the Bankruptcy Code.  Accordingly, state law claims would also likely be unsuccessful.

## I.    Overview of the LedgerX Transaction

### a.    Background on LHI's Business

Founded in 2014, LHI was the holding company for two wholly owned operating subsidiaries:  Ledger X, LLC ("LedgerX") and Ledger Prime, LLC ("Ledger Prime").[94] LedgerX operated a regulated Bitcoin options exchange and clearinghouse and was the core business and main focus of operations.[95]  LedgerX was a CFTC-regulated derivatives clearing organization ("DCO"), a CFTC-designated contract market ("DCM"), and a CFTC-registered Swap Execution Facility ("SEF").  Ledger Prime operated as a market maker on the LedgerX exchange and many other crypto exchanges around the world.[96]

LHI completed its first round of financing in 2014, raising $4.7 million.[97]  LHI's second round of financing continued through 2018 and raised nearly $21 million.[98]  In 2020, however, the company had difficulties reserving sufficient cash to guarantee its clearinghouse operations, which created regulatory challenges.[99]  In early 2020, LHI raised emergency funding, mostly from shareholders.  By the end of 2020, LHI's cash had dwindled again,[100] prompting LHI to implement some modest restructuring.  The company negotiated an early lease termination and

---

[94] *See* Oxford Valuation Partners, *Valuation of Common Stock of Ledger Holding, Inc. Final Report*, Apr. 12, 2021 (the "Oxford Valuation Report"), at 8.

[95] *Id*. at 4, 11.

[96] *See id*. at 9.

[97] *See id*. at 10.

[98] *See id*. at 10.

[99] *See id*. at 10-11.

[100] *See id*. at 11.

instituted management changes.[101]  Moving into 2021, LHI's business improved as the company

focused on new product launches and winning additional business.[102]

### b.    *FTX.US Offers to Buy LedgerX*

In early 2021, Bankman-Fried began to consider offering licensed cryptocurrency

derivatives trading on the FTX.US platform.  At the time, the FTX Group offered derivative

products only outside the U.S.  FTX.US offered U.S. customers spot cryptocurrency trading, but

not licensed cryptocurrency derivatives trading.[103]  Bankman-Fried's goal was to bring the

derivatives business line to U.S. customers.[104]  According to one FTX.US executive, FTX.US

explored multiple options to build this business and obtain the necessary approvals.  Bankman-

Fried and Brett Harrison, the President of FTX.US, also began meeting with potential acquisition

targets.

On June 4, 2021, Bankman-Fried met with Zach Dexter, the CEO of LHI,[105] who was

looking for strategic business partnerships.  After this meeting, Dexter told Bankman-Fried how

LedgerX could accelerate FTX.US's ability to offer U.S. customers derivative products, such as

leveraged perpetual swaps, options, and futures.[106]  Specifically, LedgerX's existing DCM and

DCO licenses could accelerate CFTC approval for derivative offerings.[107]

---

[101] *See* Oxford Valuation Report, at 11.

[102] *See id*. at 11-12.

[103] *See infra* Part IV, Section III(a).

[104] F10705-E016444315.

[105] F10705-E000897825.

[106] F10705-E016425454, at 1.

[107] F10705-E009741126.  In witness interviews with the Examiner, former FTX.US executives stated that it would have taken FTX.US years to obtain the DCM and DCO licenses.

On July 21, Bankman-Fried, on behalf of WRS, made an official offer to acquire LedgerX.[108]  According to a former FTX.US executive, FTX.US sought to acquire LedgerX in part because it had both DCM and DCO licenses that would allow FTX.US to develop and own a vertically integrated exchange.  Bankman-Fried's first offer was $250 million, to be paid in a combination of cash, stock, and FTT tokens.  The offer specified that the parties would choose a future acquisition date "based on the most expedient method of enabling LedgerX products to trade on [the] FTX platform, based on requirements by the CFTC . . . ."[109]

The next day, after Dexter reported that the LHI shareholders believed the $250 million offer was too low, Bankman-Fried, on behalf of WRS, increased the offer to $300 million, subject to various conditions.[110]  One key condition was a 20% purchase price holdback to be paid after one year.  However, the holdback could be withheld by WRS if it determined that an LHI investor was not cooperative during the acquisition process, such as by failing to provide KYC information, or by refusing to vote to approve the deal.[111]

A few minutes after Bankman-Fried relayed the increased offer, Dexter replied that he supported the deal and would seek approval from the controlling shareholders.  The next day, July 23, Dexter confirmed approval of the proposed deal terms.[112]

---

[108] F10705-E016335561; F10705-E016335562.

[109] F10705-E016335562.

[110] F10705-E016335481, at 2.

[111] *Id.*

[112] *Id.* at 1-2.

c.      *The Parties Negotiate Definitive Deal Terms*

On July 22, Ryne Miller emailed Mitch Eitel and David Gilberg at S&C to engage the firm on the LedgerX Transaction.[113]  Miller said FTX.US wanted to do the deal quickly, including acquiring its DCM and DCO licenses, and noted that speed was more important to FTX.US than negotiating the deal.[114]

On July 23, Bankman-Fried circulated a non-binding draft term sheet which had a number of provisions.[115]  WRS or one of its subsidiaries would purchase outstanding shares of LHI for $300 million, subject to adjustments arising from a decrease in LHI's net working capital.  The sellers, *i.e.*, the existing LHI shareholders, would indemnify WRS as the buyer for various damages and expenses.  If indemnification was required, then WRS could utilize the 20% purchase price holdback as the first recourse for payment.[116]  Certain key LHI employees would be given new employment agreements.[117]  For a period of time LHI also would not solicit or seek competing proposals or offers.[118]  The parties negotiated the term sheet for one day and Dexter then signed the final version.[119]

The parties thereafter began due diligence and the negotiation of final deal documents. WRS's due diligence included, among other things, raising legal and regulatory questions,[120]

---

[113] F10705-E001014712.

[114] *Id.*

[115] F10705-E016335481; F10705-E016335482.

[116] F10705-E016335482, at 1, 3.

[117] *Id.* at 2.

[118] *Id*. at 4.

[119] F10705-E016425444.

[120] F10705-E016426642; F10705-E016445717.

reviewing LedgerX's financial statements,[121] analyzing existing employment agreements,[122] and discussing treatment of convertible financial instruments issued by LHI.[123]  S&C prepared the legal and regulatory diligence questions, focusing on the DCM and DCO licenses.  Miller had instructed S&C to keep the diligence requests short to avoid frustrating the LedgerX team.[124]  One former FTX Group employee characterized this request as a typical instruction that Bankman-Fried and Friedberg would issue for all acquisition transactions.  The parties also negotiated ancillary agreements, such as paying agent and escrow agent agreements.[125]  And FTX.US employees informed the CFTC about the proposed acquisition.[126]

On August 25, the parties executed an Agreement and Plan of Merger memorializing the sale terms.[127]  The sale of LedgerX to WRS was effectuated under the General Corporation Law of the State of Delaware ("DGCL"), through a merger of LHI and WRS's wholly owned subsidiary, FTX.US Pioneer, Inc. (the "Merger Sub"), with LHI as the surviving corporation.[128]  LHI's premerger shares were cancelled and, in exchange, existing LHI shareholders received cash.

---

[121] F10705-E001432932 (FTX.US requests call on LedgerX's balance sheet).

[122] F10705-E016446077.

[123] *Id.*

[124] F10705-E016483689, at 1.

[125] F10705-E016480399.

[126] F10705-E016482164; F10705-E000921365; F10705-E000921473.

[127] F10705-E001618639.

[128] *Id.*

On September 10, WRS submitted a filing to the Federal Trade Commission, as required by the Hart-Scott-Rodino Act.[129]  A mandatory 30-day waiting period followed[130] and, on October 13, the transaction closed.  A certificate of merger was filed with the Delaware Secretary of State.[131]  After adjustments were made for transaction expenses, WRS distributed approximately $277 million to LHI shareholders, and WRS also put $55 million into escrow for one year, representing the 20% purchase price holdback.[132]

On the day of the closing, the parties also executed a Payments Administration Agreement designating Acquiom Financial LLC ("Acquiom") as the payment administrator.[133] Acquiom was responsible for coordinating the payments to the LHI shareholders.  The Payments Administration Agreement required Acquiom to administer a regulated broker-dealer paying account as well as a trust or custodial account for unclaimed amounts.  Acquiom was also responsible for transmitting to LHI shareholders documents that made them eligible to receive payment along with documents WRS requested be delivered with the solicitation.

After the Debtors filed bankruptcy, their financial advisors tried to identify the source of funds WRS used for the LHI acquisition.  The advisors concluded that the funds likely came from a July 2021 class B equity raise conducted by FTX.com.  This is consistent with statements from witnesses who told the Examiner they believed the money came from a large fund-raising effort.  This conclusion is supported by the following facts:  (i) FTX.com raised at least $877

---

[129] F10705-E001436722, at 1.

[130] *Id*. at 1.

[131] F10705-E001235922.

[132] F10705-E001020116; F10705-E001018627.

[133] Payments Administration Agreement, dated October 13, 2021.

million from an equity raise in July 2021; (ii) shortly thereafter, in August 2021, FTX.com transferred approximately $786 million to Alameda via a North Dimension bank account; and (iii) on the day the Agreement and Plan of Merger was executed (August 25, 2021), Alameda transferred $431 million from the North Dimension account to FTX.US and recorded a corresponding account receivable.[134]

      *d.*     *Evidence of Valuation*

FTX.US purchased LHI to enter the crypto derivatives market in the U.S.[135]  FTX.US highly valued LedgerX's DCM and DCO licenses.[136]  One former FTX.US executive told the Examiner that FTX.US could have itself obtained CFTC authorization to offer crypto derivative products to U.S. customers, without acquiring another company that already had DCM and DCO licenses, for less than $300 million.  However, the CFTC authorization process would have taken a substantial amount of time to complete.  This same executive opined that it would have taken FTX.US approximately five years to obtain the DCO license and one year to get the DCM license.  This executive also said that time was of the essence in launching a U.S. crypto derivative exchange, as there was substantial value in being the first company to offer these products to U.S. customers.  Thus, the financial benefit to purchasing LedgerX was not just in acquiring the licenses, but in doing so quickly.

---

[134] However, this analysis is not without complication and uncertainty given the large amount of money that moved between the relevant bank accounts, as compared to the acquisition purchase price.

[135] As noted above, WRS purchased LHI, but the FTX Group often described the transaction as an acquisition by and for the benefit of FTX.US.

[136] F10705-E000921440; F10705-E009741126; F10705-E016444315; F10705-E001014712; BDO USA, LLP, *ASC 805 Valuation of Certain Assets and Liabilities of West Realm Shires, Inc.*, Apr. 1, 2022 (the "BDO Valuation Report"), at 5.

Unfortunately, the documents and correspondence obtained by the Examiner provide no insight into exactly how much value FTX.US placed on LedgerX's DCO and DCM licenses or the ability to enter the crypto derivatives market before any competitors.  The Examiner's investigation revealed differing views of how the initial $250 million offer was established. While some evidence suggested that Dexter told Bankman-Fried that, in his estimate, the LHI shareholders would probably accept a $250 million purchase offer, other evidence indicated that the $250 million offer was based on comparative asking prices from competitors with whom FTX.US had communicated, projections regarding expected revenue over the first two years, and the valuation of U.S. exchanges similar to LedgerX.  Regardless of how the initial price was determined, the LHI shareholders believed the $250 million offer was too low.  There is evidence that Dexter suggested to Bankman-Fried that he increase the offer to $300 million in order to get holdout shareholders on board.

Multiple witnesses interviewed by the Examiner explained that it was difficult to determine the value of LedgerX at the time the deal closed.  Although LHI generated only $17.2 million in revenue for the year-ending December 31, 2021, and had a negative EBITDA[137] in 2019 and 2020, LHI had substantial *potential* value.[138]  Some witnesses told the Examiner that, although they thought the purchase price was high, they believed the transaction was best assessed as a bet on LedgerX's future value rather than on its current value.  One witness discussed unique synergies that existed between LedgerX and FTX.US.  This included the fact that LedgerX had the DCM and DCO licenses while FTX.US had a much larger customer base— and, hence, many more customers who could avail themselves of the U.S. derivatives trading that

---

[137] Earnings before interest, taxes, depreciation, and amortization.

[138] *See generally* BDO Valuation Report.

those licenses enabled—making LedgerX extremely valuable to FTX.US.  As discussed below, in addition to witness testimony, the Examiner has also obtained other evidence concerning LHI's valuation in 2021.

1.    LHI Valuations

The Examiner has received two third-party valuations that were performed around the time of the acquisition.  First, in April 2021, Oxford Valuation Partners Inc. conducted a valuation of LHI (the "Oxford Valuation") and then prepared a report summarizing its findings.[139]  The purpose of this valuation was to determine the "fair market value" of LHI as of February 28, 2021.  Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller.[140]  But as acknowledged in the report, the Oxford Valuation had limitations.  First, the report observed that LHI was a closely held company not traded on public markets.  The report also noted the risks inherent in LHI's business given the "extremely volatile and unpredictable" nature of cryptocurrency.  And the report was not "intended to be a document suitable for use in selling this business" and was not "designed to adequately portray all the desirable qualities of the business."[141]

The Oxford Valuation was prepared in anticipation of the LHI board of directors determining the potential strike price for options,[142] and as such, the valuation sought to determine the value of LHI's common shares.  Witnesses interviewed by the Examiner said that because the purpose of the valuation was to value stock options issued to employees, there was

---

[139] *See* Oxford Valuation Report.

[140] Treas. Reg. § 20.2031-1(b).

[141] *See* Oxford Valuation Report, at 4, 37.

[142] The "strike price" for an option is the price at which an option holder can buy or sell the underlying security.

an incentive to value the company as low as possible. Lower strike prices on call options allow employees to make more money by purchasing equity at a low price and then selling the stock when it is worth more. In addition, because LHI was closely held, the Oxford Valuation valued the common shares as a minority interest in LHI rather than a controlling interest. A "controlling" interest, which means a majority (or close to majority) ownership stake, is generally more valuable than a minority interest because the controlling interest is able to have a greater impact on corporate decisions.[143] Overall, the Oxford Valuation determined that LHI had a final equity value of approximately $54.8 million.

The second valuation was conducted by BDO USA, LLP (the "BDO Valuation") after the LedgerX Transaction closed.[144] The report memorializing the BDO Valuation was dated April 1, 2022, but the valuation was provided as of the closing date, October 13, 2021. Witnesses told the Examiner that the BDO Valuation was done for audit purposes; the auditors needed to know how to allocate the acquisition value. The report stated that the purpose of the LedgerX Transaction was to enable FTX.US to enter the cryptocurrency derivatives space.[145]

The BDO Valuation identified approximately $46.2 million in tangible assets, consisting of net working capital and other fixed assets. The valuation also identified and valued LHI's key intangible assets, which included the DCM, DCO, and SEF operating licenses as well as Ledger Prime's customer relationships and trade name.[146] By far the greatest value—$166 million—was assigned to the operating licenses. Customer relationships were valued at $38.6 million, and the

---

[143] *See* Oxford Valuation Report, at 31.

[144] *See* BDO Valuation Report.

[145] *Id*. at 5.

[146] *Id*. at 6.

trade name was estimated to be worth $1.9 million.  This put the total value of the intangible assets at $206.5 million.  Together with the tangible assets, the BDO Valuation valued LHI at approximately $252.7 million.  The remaining consideration for the LedgerX Transaction—$25.399 million—was assigned to goodwill.[147]

Regarding industry conditions, the report found that "macroeconomic trends and industry outlooks appear to represent a positive environment."[148]  The report also noted that the "crypto market exploded in early 2021," when the price of certain cryptocurrencies reached record highs.[149]  In addition, the BDO Valuation credited an increasing familiarity among members of the public with crypto and blockchain technology, fueled by celebrity endorsements and participation by traditional Wall Street institutions, that would continue to open and expand trading.[150]

### 2.    Other Sale Transactions

Soon after WRS purchased LHI, two similar transactions involving other crypto derivative exchanges closed.  These transactions are not identical, but they serve as appropriate comparables to help determine LHI's fair valuation at that time.[151]

---

[147] The BDO Valuation attributed approximately $22 million of the remaining purchase price to transaction costs.

[148] BDO Valuation Report, at 10.

[149] *Id.* at 56.

[150] *Id*. at 56-57.

[151] *See* Richard R. Booth, *Financing the Corporation* § 2:14. Comparable Transaction Analysis (2024–2025 ed.) (discussing valuation methodology but noting that the comparable transaction approach and comparable company approach is often dismissed by courts in valuation proceedings).

First, Cboe Global Markets, Inc. ("Cboe") purchased Eris Digital Holdings, LLC ("ErisX") for approximately $564 million.[152]  This acquisition was announced on October 20, 2021, a week after the LedgerX Transaction.[153]  Similar to LedgerX, ErisX operated a U.S.-based digital asset spot market and was a CFTC-regulated futures exchange and clearinghouse.[154]  ErisX, like LedgerX, had both DCM and DCO licenses.  According to one FTX.US executive, FTX.US purchased LedgerX instead of ErisX because, in contrast to LedgerX, ErisX still relied on intermediation for its trade clearing process.  This would have set back FTX.US in its goal of offering margin products direct to consumers.  Cboe, however, pursued the ErisX transaction, in part, because it offered a "unique opportunity for Cboe to enter the digital asset spot and derivatives marketplaces."[155]

Second, Coinbase Global, Inc. ("Coinbase") acquired FairXchange, Inc. ("FairX") for approximately $330 million.[156]  This transaction was negotiated after the ErisX deal was announced, and this sale closed in January 2022.[157]  FairX operated a securities exchange designed to cater to commodity futures trading by retail investors.  At the time of the acquisition, FairX had a DCM license, but it did not have a DCO license and was just starting to enter the

---

[152] *See Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*, No. 2022-0344-JTL, 2024 WL 3579932, at *6 (Del. Ch. July 30, 2024).

[153] *Cboe Agrees to Acquire ErisX, Entering Digital Asset Space with Spot, Derivatives and Clearing Platform*, PR Newswire (Oct. 20, 2021), https://www.prnewswire.com/news-releases/cboe-agrees-to-acquire-erisx-entering-digital-asset-space-with-spot-derivatives-and-clearing-platform-301404516.html, *archived at* https://perma.cc/LAY5-VTNL.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *See FairXchange, LLC*, 2024 WL 3579932 at *7, 14.

crypto space.[158]  Similar to FTX.US's motivations for purchasing LedgerX and Cboe's

motivations in purchasing ErisX, Coinbase purchased FairX to "bring regulated crypto

derivatives to market."[159]

## II.    Overview of Fraudulent Transfer Laws and Potential Defenses

The Bankruptcy Code and state law permit a debtor, trustee, or other party appointed as a

representative of the estate to recover property from third parties by undoing, or "avoiding," a

transfer of the debtor's property.[160]  These avoidance powers help ensure the equal distribution of

assets among the debtor's creditors by clawing back assets that were preferentially, fraudulently,

or otherwise improperly transferred either prepetition or postpetition.[161]

When a transfer is avoided, the trustee or debtor-in-possession may recover "the property

transferred, or, if the court so orders, the value of such property" from "the initial transferee of

such transfer," "the entity for whose benefit such transfer was made," or "any immediate or

mediate transferee of such initial transferee."[162]

The Examiner has analyzed two common avoidance claims that could be considered in

the context of the LedgerX Transaction:  preferential transfer claims and fraudulent transfer

claims.  Other types of avoidance claims set forth in chapter 5 of the Bankruptcy Code are not

---

[158] *See Id.* at *4, 6.

[159] *Coinbase's Path to Creating a Robust and Regulated Crypto Derivatives Market*, Coinbase (Jan. 12, 2022), https://www.coinbase.com/blog/coinbases-path-to-creating-a-robust-and-regulated-crypto-derivatives-market, *archived at* https://perma.cc/LFW6-XHY7.

[160] 11 U.S.C. §§ 544-551.

[161] Hon. Joan N. Feeney et al., *2 Bankruptcy Law Manual* § 9:1. Introduction to the avoiding powers (5th ed. 2024); *see also In re Cybergenics Corp.*, 226 F.3d 237, 244 n.9 (3d Cir. 2000) ("The theoretical underpinning of all of [the avoidance powers] remains the equal treatment among creditors by forcing those who have received an unfair advantage to disgorge the ill gotten gains") (internal citation omitted).

[162] 11 U.S.C. § 550(a).

applicable here.[163]  In addition, the Examiner has concluded that a preference claim, under

Bankruptcy Code section 547, would not be viable because the LedgerX Transaction occurred

both outside the 90-day preference period for creditors in general and the one-year preference

period for insiders.[164]  Although the 20% holdback held in escrow was released less than a month

before the bankruptcy filing, courts have held that a transfer of funds out of escrow does not

constitute an avoidable preference.[165]

This section of the Report examines potential fraudulent transfer claims.  It analyzes the

legal requirements and viability of intentional and constructive fraudulent transfer claims under

federal and state law with respect to the LedgerX Transaction, as well as the legal requirements

of a key defense to constructive fraudulent transfer claims.  The Report also analyzes certain

pleading standards because, in civil litigation, plaintiffs sometimes obtain favorable settlements

from defendants following an unsuccessful motion to dismiss before a case proceeds to summary

judgment or trial.  As such, it may be sufficient to determine that a fraudulent transfer claim

could survive a motion to dismiss in order for a potential plaintiff to see value in asserting such a

claim.

---

[163] *See* 11 U.S.C. § 545 (this power to avoid statutory liens is not applicable as there was no statutory lien involved in the transaction); 11 U.S.C. § 549 (this power to avoid postpetition transactions is not relevant as the transaction was conducted prior to the Petition Date).

[164] *See* 11 U.S.C. § 547.  The term "preference period" refers to the 90-day or one year time period (as applicable) prior to the date a bankruptcy is commenced.  If a transaction occurs during the applicable preference period, then the transaction may be avoided pursuant to section 547 of the Bankruptcy Code.

[165] *See Matter of Napoleon*, 1990 WL 132223, at *4 (D.N.J. Sept. 11, 1990), *aff'd sub nom. Napoleon v. Colino*, 922 F.2d 832 (3d Cir. 1990) ("[T]he escrow cases are uniform in holding that it is the debtor's deposit of funds into escrow and not the award of judgment or subsequent release of the funds that is the controlling transfer for preference purposes . . . . Although a judgment or the release of the funds may very well constitute a transfer under the broad definition set out at 11 U.S.C. § 101(48), it is not the type of transfer that can be avoided."); *Matter of Newcomb*, 744 F.2d 621 (8th Cir. 1984) (finding that transfer of escrowed funds was non-avoidable because, after the escrow was created, the only interest that the debtor retained was a contingent right to funds that was worthless).

a.      *Power to Avoid Fraudulent Transfers*

Bankruptcy Code section 548 grants a debtor (or other appropriate party) the power to avoid actual and constructive fraudulent transfers.  Section 544(b) also enables such plaintiffs to avoid intentional and constructive transfers that are voidable by a creditor under state law.

1.      Intentional Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A)

In order to prove a transfer was intentionally fraudulent, the plaintiff must show:  (i) a transfer was made involving property of the estate; (ii) the transfer was made within two years before the petition date; and (iii) the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."[166]

Actual fraud claims must meet the heightened pleading standard of Federal Rule of Civil Procedure Rule 9(b).[167]  Complaints must set forth facts with sufficient particularity to apprise the defendant of the claims asserted,[168] and claims must be proven by clear and convincing evidence.[169]  However, the requirements of Rule 9(b) are "relaxed and interpreted liberally where a trustee . . . is asserting the fraudulent transfer claims."[170]  The relaxed pleading standard may also apply to debtors where personnel with first-hand knowledge of the relevant facts have left the company.[171]

---

[166] 11 U.S.C. § 548(a)(1)(A).

[167] *In re Aphton Corp.*, 423 B.R. 76, 84-85 (Bankr. D. Del. 2010); *In re Oakwood Homes Corp.*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy.").

[168] *Oakwood Homes*, 325 B.R. at 698; Fed. R. Civ. P. 9(b).

[169] *In re Metro Shippers, Inc.*, 78 B.R. 747, 751 (Bankr. E.D. Pa. 1987).

[170] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

[171] *In re Enron Corp.*, 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005).

Fraudulent intent can be challenging to prove, as direct evidence thereof is not common. Therefore, courts evaluate circumstantial evidence of intent for certain "badges of fraud."[172]  A non-exhaustive list of these "badges of fraud" is set out in the Uniform Fraudulent Transfer Act ("UFTA").  They include:

1. The transfer or obligation was to an insider;

2. The debtor retained possession or control of the property transferred after the transfer;

3. The transfer or obligation was undisclosed or concealed;

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. The transfer was of substantially all the debtor's assets;

6. The debtor absconded;

7. The debtor removed or concealed assets;

8. The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;[173]

10. The transfer occurred shortly before or after a substantial debt was incurred; and

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[174]

---

[172] *MSKP Oak Grove, LLC v. Venuto*, 839 F. App'x 708, 712 (3d Cir. 2020) ("Because debtors rarely admit fraudulent intent, courts must usually infer it.").

[173] A debtor is not presumed to be insolvent during the fraudulent transfer period.  In preference actions, 11 U.S.C. § 547(f) provides for a presumption of insolvency for the 90 days immediately preceding the bankruptcy filing.

[174] *See, e.g.*, Unif. Fraudulent Transfer Act § 4.  As noted, this list is not exhaustive and, therefore, the Debtors or another plaintiff may identify additional badges outside of these that are enumerated in the UFTA.

Courts hold that "[e]ven though one badge of fraud can trigger a presumption of fraud, one badge is not considered conclusive evidence of fraudulent intent."[175]  And courts have held that two badges are also insufficient.[176]  Instead, "it is the confluence of several badges in one transaction that generally provides conclusive evidence of an actual intent to defraud."[177]

Actual intent also can be established through the "Ponzi presumption," which holds that "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent."[178]  "The presumption is based on a recognition that a Ponzi scheme operator knows that the scheme will eventually collapse when the pool of investors runs dry and the remaining investors will lose their money."[179]

Some courts have used a four-factor test to determine whether a Ponzi scheme exists. The factors are:

> 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors.[180]

---

[175] *In re Maxus Energy Corp.*, 641 B.R. 467, 514 (Bankr. D. Del. 2022) (internal citations and quotations omitted).

[176] *In re J&M Sales, Inc.*, Adv. 2021 Bankr. LEXIS 2268, at *95 (Bankr. D. Del. Aug. 20, 2021) ("[T]he Complaint] can only be read to allege at most two badges of fraud . . . (I) inadequate consideration and (II) the insolvency of the debtors. These two alleged badges of fraud . . . however, are insufficient to support a claim for actual fraudulent conveyance.").

[177] *In re Maxus Energy Corp.*, 641 B.R. at 514 (internal citations and quotations omitted).

[178] *In re DBSI, Inc.*, 477 B.R. 504, 510 (Bankr. D. Del. 2012) (quoting *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002)).

[179] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 689 (Bankr. S.D.N.Y. 2019).

[180] *Sec. Inv. Prot. Corp.*, 603 B.R. at 689 (citing *Armstrong v. Collins*, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010), *reconsideration denied*, 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011)); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009).

Typically, courts find that a broad array of fraudulent schemes suffice to establish intent.[181]  "[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud."[182]  As such, courts have determined that "Ponzi-like schemes," in which a debtor's business operations do not precisely match the description of a Ponzi scheme, can nonetheless establish fraudulent intent.[183]  In order to benefit from this presumption, the plaintiff must also prove that the specific transfers at issue were made "in furtherance of" that scheme.[184]  For example, the plaintiff can benefit from this presumption by proving that the scheme was dependent upon the sale/transfer to generate cash flow.[185]

### 2.    Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)

As with an intentional fraudulent transfer, a constructive fraudulent transfer must occur within two years before the bankruptcy petition was filed.  However, a constructive fraudulent transfer claim does not require a showing of a transferor's fraudulent intent.  Instead, a crucial element is whether there was, at the time of the transfer, a disparity in value between what a debtor transferred and what it received.  In other words, the debtor must prove that it "received

---

[181] *In re Bayou Grp., LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ("Defendants' restricted definition of 'a true Ponzi scheme' (promise of high returns, no legitimate underlying business activity and the certainty that later investors cannot possibly be repaid) does not accord with the case law.").

[182] *Id.* (citing *Rosen v. Neilson (In re Slatkin)*, 310 B.R. 740, 743 n.3 (C.D. Cal.2004)); *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir.1988); *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 249 (Bankr. M.D. Fla. 2003).

[183] *See, e.g.*, *In re Equip. Acquisition Res., Inc.*, 2012 WL 4755028, at *6 (Bankr. N.D. Ill. Sept. 28, 2012) ("[Debtor's] leasing and financing transactions were a "Ponzi-like" scheme and, as such, establish [debtor's] actual fraudulent intent.").

[184] *In re DBSI, Inc.*, 477 B.R. at 510 (quoting *In re World Vision Entm't, Inc.*, 275 B.R. at 658).

[185] *In re DBSI, Inc.*, 476 B.R. 413, 423 (Bankr. D. Del. 2012).

less than a reasonably equivalent value" in the transaction.  In addition, the debtor must

demonstrate that it:

> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[186]

The Third Circuit has stated that "a party receives reasonably equivalent value for

what it gives up if it gets 'roughly the value it gave.'"[187]  Courts "have rejected the application

of any fixed mathematical formula to determine reasonable equivalence."[188]  A precise

calculation is not required.[189]

To determine whether a roughly equivalent exchange has occurred, courts will look to

the "totality of the circumstances."[190]  The Third Circuit has stated that specific factors courts

may consider include:  "(1) the 'fair market value' of the benefit received as a result of the

transfer, (2) 'the existence of an arm's-length relationship between the debtor and the

---

[186] 11 U.S.C. § 548(a)(1)(B).

[187] *In re Charys Holding Co.*, 443 B.R. 628, 637 (Bankr. D. Del. 2010) (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)).

[188] *In re Fedders North America, Inc*, 405 B.R. at 546.

[189] *In re Fruehauf Trailer Corp.*, 444 B.R. 203, 213 (3d Cir. 2006).

[190] *In re Parker Sch. Uniforms, LLC*, 2021 WL 4553016, at *7 (Bankr. D. Del. Oct. 5, 2021).

transferee,' and (3) the transferee's good faith."[191]  Importantly, courts have stated that "disputes over reasonably equivalent value are not appropriate for determination on a motion to dismiss."[192]

The first two factors—fair market value and arm's-length relationships—are closely related.  "A wealth of authority teaches that when a willing buyer and a willing seller transact, both being at arms' length, neither being under compulsion to buy or sell, and both having reasonable knowledge of relevant facts, the sale price establishes fair market value."[193]  Similarly, "[w]hen sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."[194]  Notably, courts have explicitly held that such an analysis of the fair value of the transaction itself is preferred to expert evidence, explaining that "[o]bjective evidence from the [] market is a more reliable measure of value than the subjective estimates of an expert witness[]."[195]

---

[191] *In re Fruehauf Trailer*, 444 F.3d at 213 n.55 (citing *In re R.M.L., Inc.*, 92 F.3d 139, 148-49, 153 (3d Cir.1996)).

[192] *In re Live Well Fin., Inc.*, 2023 WL 4025816, at *7 n.54 (Bankr. D. Del. June 14, 2023) (quoting *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 269 (Bankr. D. Del. 2019)).

[193] *In re Samson Res. Corp.*, 2023 WL 4003815, at *25 (Bankr. D. Del. June 14, 2023).

[194] *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *see also In re Samson*, 2023 WL 4003815, at *26 (court did not consider trustee's expert on fair market value as the properly conducted sale process provided overwhelming and dispositive evidence of the value of the stock).

[195] *In re ASHINC Corp.*, 640 B.R. 1, 51 (Bankr. D. Del. 2022); *Merlin Partners LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *17-18 (Del. Ch. Apr. 30, 2015) ("Where, as here, the market prices a company as the result of a competitive and fair auction, 'the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value.'").

As for the final factor, the Bankruptcy Code does not define a "good faith transferee." Courts evaluate good faith on a case-by-case basis.[196]  To do so, "federal courts have reached a consensus that 'good faith' under the Bankruptcy Code provisions is determined according to an 'objective' or 'reasonable person' standard.  Under this standard, the courts look to what the transferee objectively 'knew or should have known.'"[197]

Courts have found a transferee's lack of good faith based on a variety of factors, "including notice of (a) the transferor's fraudulent purpose, (b) an underlying fraud, (c) the transferor's unfavorable financial condition or insolvency, (d) the improper nature of a transaction, and/or (e) the voidability of the transfer."[198]  Courts have also found an absence of good faith when transferees do not perform sufficient due diligence when alerted to such circumstances.  Thus, "once on notice of suspicious circumstances regarding a transfer or potential infirmity as to the debtor, the transferee is obligated to conduct a 'diligent investigation' which 'must ameliorate the issues that placed the transferee on inquiry notice in the first place.'"[199]  Of course, when the transferee "actively participate[d] in the fraudulent scheme of the debtor," there can be no finding of good faith.[200]

As the statute quoted above demands, in addition to proving that a debtor received less than reasonably equivalent value, a plaintiff must show that the debtor (i) was insolvent or

---

[196] *In re Burry*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004).

[197] *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 WL 890583, at *5 (W.D. Pa. Mar. 26, 2009) (quoting *In re Bayou Grp.*, 396 B.R. 810, 844-45 (Bankr. S.D.N.Y. 2008)).

[198] *Ameriserv*, 2009 WL 890583, at *6 (collecting cases); *see also In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *20 (Bankr. D. Del. Oct. 9, 2012).

[199] *Ameriserv*, 2009 WL 890583, at *6 (quoting *In re Bayou Grp., LLC*, 396 B.R. at 844).

[200] *In re Atomica Design Grp., Inc.*, 556 B.R. 125, 173 (Bankr. E.D. Pa. 2016) (quoting 12 Pa. Cons. Stat. Ann. § 5108, cmt. 6 (1993)).

became insolvent as a result of the transfer, (ii) was left with unreasonably small capital, (iii) intended to incur debts beyond its ability to pay, or (iv) made the transfer for the benefit of an insider outside of the ordinary course of business.[201]  These requirements are discussed below.

(i)    Insolvency

The Bankruptcy Code states that an entity is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."[202]  Courts have held that "the appropriate premise of value must be applied: either the going concern premise of value or the liquidation premise of value."[203]  A pleading does not require a precise calculation.

Courts have held that "to enable a court to 'evaluate the sufficiency of a complaint's insolvency allegations' on a motion to dismiss, 'the court looks for some sort of balance sheet test or information provided that the [c]ourt can use to infer that [the transferor's] liabilities exceeded [its] assets at the time the transfers took place.'"[204]  For example, the Delaware Bankruptcy Court has held that insolvency was sufficiently pled when the complaint provided details of consolidated balance sheet numbers, including references to a working capital deficit and overvalued assets.[205]

---

[201] This final prong under section 548(a)(1)(B)—involving transfers to insiders—is not addressed below because the Examiner has seen no evidence suggesting that the former LHI shareholders were insiders of the FTX Group.

[202] 11 U.S.C. § 101(32)(A).

[203] *In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *21 (citing *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998); *EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.),* 380 B.R. 348, 355 (Bankr. D. Del. 2008), *aff'd,* 400 B.R. 13 (D. Del. 2009), *aff'd,* 382 F. App'x 135 (3d Cir. 2010)).

[204] *Ray v. Ray*, 2019 WL 1649981, at *8 (S.D.N.Y. Mar. 28, 2019), *aff'd,* 799 F. App'x 29 (2d Cir. 2020) (citing *In re Vivaro Corp.*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015) (internal citation omitted); *see also In re Troll Commc'ns, LLC*, 385 B.R. 110, 123-24 (Bankr. D. Del. 2008).

[205] *In re Charys Holding Co.,* 443 B.R. 628, 636 (Bankr. D. Del. 2010).

Proving insolvency is a highly fact-specific inquiry that typically requires expert testimony to analyze a debtor's balance sheet "at a fair valuation."[206]  Courts have held that such an analysis is not suitable for a motion to dismiss.[207]

> (ii)   Engaged in Business or a Transaction That Left the Debtor with Unreasonably Small Capital

"Unreasonably small capital" means "the inability to generate sufficient profits to sustain operations.  Because an inability to generate enough cash to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."[208]  Courts in the Third Circuit have named this the "inadequate capital" test, which determines "whether at the time of the transfer the debtor had insufficient capital, including access to credit, for operations."[209]

> (iii)   Incur Debts That Would Be Beyond The Debtor's Ability To Pay

The "inability-to-pay-debts" test, also known as the "cash flow" test, determines whether, at the time of a transfer, the debtor "intended to incur or believed that it would incur, debts that would be beyond [its] ability to pay as such debts matured."[210]  At least one court has held that this "prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not

---

[206] *In re DBSI, Inc.*, 447 B.R. 243, 248 n.2 (Bankr. D. Del. 2011).

[207] *Id*. at 248.

[208] *Peltz*, 279 B.R. at 744-45 (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992)).

[209] *In re Opus E., LLC*, 528 B.R. 30, 51 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).

[210] 11 U.S.C. § 548(a)(1)(B)(ii)(I-III).

be paid as their claims matured."[211]  "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."[212]

### 3.    Avoidance of Transfers under State Law

Bankruptcy Code section 544(b) "permits the trustee to step into the shoes of an existing unsecured creditor who could have avoided an action under state law."[213]  This power is derivative of the creditor's rights.  "[A] prerequisite to a Section 544(b) suit is the existence of an actual creditor holding an unsecured claim who could have avoided the transfer under state law."[214]  If no such creditor exists, a trustee or debtor-in-possession may not act under section 544(b).[215]  Moreover, "section 544(b)(1) confers . . . no greater rights of avoidance than the creditor would have if the creditor were asserting invalidity on its own behalf."[216]

The reach-back periods in state fraudulent transfer statutes are often longer than the Bankruptcy Code's two-year clawback period.  But as noted, the LedgerX transaction occurred within the two-year federal clawback period.  Absent any conflict of law issue concerning the applicability of more than one state's law (the Examiner is aware of none), it is likely that the

---

[211] *EBC I*, 380 B.R. at 359 (quoting *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defs. (In re WRT Energy Corp.)*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001)).

[212] *In re WRT Energy Corp.*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001).

[213] *In re DBSI, Inc.*, 477 B.R. at 512-13.

[214] *Schaps v. Bally's Park Place, Inc.,* 58 B.R. 581, 584 (E.D. Pa. 1986), *aff'd*, 815 F.2d 693 (3d Cir. 1987).

[215] *In re LSC Wind Down, LLC*, 610 B.R. 779, 784 (Bankr. D. Del. 2020); *In re Tzanides*, 574 B.R. 489, 512 (Bankr. D.N.J. 2017) ("[T]he Trustee has no cause of action under Section 544(b) if the creditor in whose place the Trustee stands could not have brought a timely action under state law at the commencement of the Debtor's bankruptcy proceeding.").

[216] *Tzanides*, 574 B.R. at 512 (citing 5 COLLIER ON BANKRUPTCY ¶ 544.09[3]).

law of the forum state, Delaware, would apply to any section 544(b) claim. Delaware's intentional fraudulent transfer statute has the same requirements as § 548(a)(1)(A).[217] Likewise, for constructive fraudulent transfer claims, the elements "under Delaware law are essentially identical to those of section 548(a)(1)(B)."[218]

  b. *The Section 546(e) Safe Harbor Defense to Fraudulent Transfer Claims*

Section 546 of the Bankruptcy Code imposes limitations on the avoidance powers available to a bankruptcy trustee (or other appropriate plaintiff).[219] Most relevant here is the safe harbor defense set forth in section 546(e), which shields from avoidance certain transfers or securities transactions.[220] "Section 546(e) was intended to promote stability and instill investor confidence in the commodities and securities markets."[221] The section 546(e) safe harbor does so by minimizing any ripple effects caused by a major bankruptcy filing and "protect[ing] the nation's financial markets from the instability caused by the reversal of settled securities transactions."[222] Section 546(e) provides, in relevant part, as follows:

---

[217] 6 Del. C. § 1304(a)(1).

[218] *In re Opus E., LLC*, 528 B.R. at 82; *see also In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at 5 (Bankr. D. Del. 2015). Delaware's fraudulent transfer statute has a four-year clawback period. *See* 6 Del. C. § 1309. But since the LedgerX transaction occurred within the two-year federal clawback period, the longer state period is not relevant to the Examiner's analysis.

[219] 11 U.S.C. § 546.

[220] Section 546(g) establishes a safe harbor for swap agreements, but the prepetition purchase of LedgerX does not qualify as a swap agreement.

[221] *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 267-68 (Bankr. S.D.N.Y. 2010) (citing H. Rep. No. 97-420, at 1 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583 (stating the purpose of section 546(e), as amended, is to protect "the stability of the market"); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) (stating that a goal of section 546(e) is to "promote investor confidence")).

[222] *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990); *see also In re Integra Realty Res, Inc.*, 198 B.R. 352 (Bankr. D. Colo. 1996), *subsequently aff'd*, 354 F.3d 1246 (10th Cir. 2004) (noting the purpose of the safe harbor is to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries").

> [T]he trustee may not avoid a transfer that is a margin payment . . . or settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . commodity contract . . . or forward contract, that is made before the commencement of the case . . . .[223]

Section 546(e) applies only to constructive fraudulent transfer claims, not intentional fraudulent transfer claims. This is "not because Section 546(e) contained any explicit good faith requirement—it does not—but rather because a transfer [. . .] with actual knowledge of the fraud would not fall under Section 546(e)'s express terms, as such a customer would have known that the transfer was not a settlement payment or made in connection with a securities contract."[224] In addition, "determinations under Section 546(e) require fact-intensive determinations that are not appropriate for resolution at the motion to dismiss stage."[225] The safe harbor is rarely applied in cases prior to summary judgment.[226]

Moreover, some courts have held that section 546(e) preempts a trustee's power to bring a state law constructive fraudulent transfer claim. For example, in *In re Tribune Company*

---

[223] 11 U.S.C. § 546. This Report does not address other arguments that could be raised in an actual litigation, arguments the Examiner believes would not be successful based on his investigation of the LedgerX Transaction and the facts available to him. For example, the Examiner does not believe that a defendant could successfully argue that there was a qualifying margin payment because the LedgerX Transaction was not accomplished through a forward contract. The Examiner also does not believe that any of the relevant participants would qualify as a registered securities clearing agency.

[224] *Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC v. Multi-Strategy Fund Ltd.*, 657 B.R. 325, 330-31 (S.D.N.Y. 2022).

[225] *In re Mallinckrodt PLC*, 2024 WL 206682, at *14 (Bankr. D. Del. Jan. 18, 2024); *see also In re Centaur, LLC*, 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013); *Zazzali v. AFA Fin. Grp., LLC*, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012) ("[I]t is premature to dismiss this count on the basis of the 546(e) defense. The application of the defense is a fact-based inquiry.") (citing *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 323-25 (Bankr. D. Del. 2007), *aff'd*, 590 F.3d 252, 254-56 (3d Cir. 2009)).

[226] *But see In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023) (granting motion to dismiss after taking judicial notice of SEC filings).

*Fraudulent Conveyance Litigation (Tribune II)*, the Second Circuit held that state-law

constructive fraudulent transfer laws were preempted by section 546(e).[227]  That court stated that

"[o]nce a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of

state laws regarding creditor's rights."[228]  But neither the Third Circuit nor the Delaware District

Court have ruled on this issue, and there is a split in authority at the Delaware Bankruptcy Court

level.[229]

Section 546(e) applies only when there is both a qualifying transfer and a qualifying

participant.[230]  At the outset of a section 546(e) analysis, courts will identify the relevant transfer

at issue.  In *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, the Supreme Court stated that "the

relevant transfer for purposes of the safe-harbor inquiry is the transfer the trustee seeks to

avoid."[231]  If a qualifying participant served "as a mere conduit or intermediary in connection

with the overarching transaction between non-qualifying participants," the safe harbor does not

apply.[232]

---

[227] 946 F.3d 66, 90 (2d Cir. 2019).

[228] *Id.* at 82.

[229]  In *In re Physiotherapy, Inc.*, one bankruptcy judge in Delaware held that section 546(e) does not always bar a creditor from bringing a state law constructive fraudulent transfer claim when:  "(1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant securities markets; (2) the transferees received payment for non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith."  2016 WL 3611831, at *10 (Bankr. D. Del. June 20, 2016).  On the other hand, in *In re Quorum Health Corp.*, a different bankruptcy judge in Delaware opted to follow the *Tribune II* reasoning that section 546(e) preempts state law.  2023 WL 2552399, at *11.

[230] *In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (internal citations and quotations omitted).

[231] 583 U.S. 366, 367 (2018).

[232] *Id.*; *In re SunEdison, Inc.*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020); *see also In re Centaur, LLC*, 595 B.R. 686, 698 (Bankr. D. Del. 2018) (finding that the safe harbor does not apply to transfers between two parties that were not financial institutions even if the transaction passed through financial intermediaries).

### 1.    Qualifying Transfers

Qualifying transfers under section 546(e) include transfers that are "settlement payments" and transfers made "in connection with a securities contract."

#### (i)    Settlement Payments

Bankruptcy Code section 741 defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[233]

"[T]he term 'settlement payment' is a broad one that includes almost all securities transactions," and it encompasses any "transfer of cash or securities made to complete a securities transaction."[234]  Settlement payments are not limited to transactions in publicly traded securities, but encompass privately traded shares as well.[235]

With respect to merger transactions, the Third Circuit has held that "payments made by a financial institution to shareholders as part of a leveraged buy-out or cash-out merger are 'settlement payments' within the meaning of section 546(e)."[236]  The court rejected the reasoning of other out-of-circuit courts that held section 546(e) should not apply to payments for which no clearing agency was involved in the disputed transfer.[237]  The Third Circuit also has held that

---

[233] 11 U.S.C. § 741.  Section 101(51A) also provides a definition of "settlement payment" but only "for purposes of the forward contract provisions of this title."  11 U.S.C. § 101(51A).  Because the LedgerX Transaction did not involve a forward contract, this definition is not discussed in detail.

[234] *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515-16 (3d Cir. 1999); *see also In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *11.

[235] *In re Plassein Int'l Corp.*, 590 F.3d at 258-59.

[236] *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 85 (D. Del. 2002) (quoting *In re Resorts Int'l, Inc.*, 181 F.3d at 516).

[237] *In re Resorts Int'l, Inc.*, 181 F.3d at 515.

"'[a] payment for shares during [a leveraged buyout] is [...] a settlement payment' for the purposes of section 546(e)."[238]

(ii)    In Connection With a Securities Contract

Bankruptcy Code section 741(7) defines "securities contract" and contains a long list of covered transactions, including:

> [A] (i) contract for the purchase, sale, or loan of a security, [...] or option on any of the foregoing [...]; (ii) any option entered into on a national securities exchange relating to foreign currencies; [...]; (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph [...]; (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph.[239]

Section 741(7) "defines 'securities contract' with extraordinary breadth."[240] "Security" in turn is also defined broadly in the Bankruptcy Code "to include a 'note,' 'stock,' 'transferable share,' or 'other claim or interest commonly known as a 'security.'"[241] Notably, courts have "no trouble" concluding that transactions as part of merger agreements were made "in connection with a securities contract."[242] Section 546(e) sets a "low bar for the required relationship between the securities contract and the transfer sought to be avoided."[243] The transfer must be

---

[238] *In re Plassein Int'l Corp.*, 590 F.3d at 258 (internal citations and quotations omitted). However, at least one Delaware bankruptcy judge has held that leveraged buyouts by which the debtor acquired assets of the selling companies—as opposed to a stock purchase—do not qualify as a "settlement payment." *In re OODC, LLC*, 321 B.R. 128, 144-45 (Bankr. D. Del. 2005).

[239] 11 U.S.C. § 741(7).

[240] *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417 (2d Cir. 2014).

[241] *In re Quorum Health Corp.*, 2023 WL 2552399, at *5.

[242] *See, e.g.*, *In Re: Nine W. LBO Sec. Litig.*, 87 F.4th 130, 149 (2d Cir. 2023), *cert. denied sub nom.*, *Stafiniak v. Kirschner as Tr. of NWHI Litig. Tr.*, 2024 WL 2116507 (U.S. May 13, 2024) (finding a merger agreement that provided for the cancellation of shares to be a securities agreement in part because "the Bankruptcy Code defines 'securities contract' with 'extraordinary breadth'"); *Tribune II*, 946 F.3d at 81.

[243] *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 390 (Bankr. D. Del. 2022) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 422); *see also In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("the words 'in connection with' are to be interpreted liberally").

58

merely "related to" that securities contract, rather than necessarily being between the debtor and its immediate transferee.[244]

2. Qualifying Participant

Section 546(e) also requires that the transaction be made "by," "to," or "for the benefit of" one of six qualifying participants: (i) a financial institution, (ii) a financial participant, (iii) a stockbroker, (iv) a commodity broker, (v) a forward contract merchant, or (vi) a securities clearing agency.[245]

The LHI shareholders would most likely argue that the LedgerX Transaction was a transfer by, to, or for the benefit of a financial institution or a financial participant. These two types of qualifying participants are discussed below.

(i) Financial Institution

A financial institution is defined in the Bankruptcy Code as:

An entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, [...] and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined

---

[244] *Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 657 B.R. at 336 (quoting *Secs. Inv. Prot. Corp. v. BLMIS ("Cohmad")*, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013)).

[245] 11 U.S.C. § 546(e). In order to allege that the transaction at issue was by or to a stockbroker, the LHI shareholders would have to assert that WRS was "engaged in the business of effecting transactions in securities." 11 U.S.C. § 101(53A). While the SEC considers most cryptocurrencies to be securities, this argument nonetheless may be challenging to assert given the uncertain status of the law. *See, e.g.*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023). WRS would not fit within any of the other categories of qualifying participants. WRS would not meet the definition of "commodity broker," which is a "futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer," or "commodity options dealer," which is a "person that extends credit to, or that accepts cash, a security, or other property from, a customer of such person for the purchase or sale of an interest in a commodity option." 11 U.S.C. § 761(6). A forward contract merchant means "a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts." 11 U.S.C. § 101(26). Finally, a "securities clearing agency" is a person "registered as a clearing agency" under the Securities Exchange Act or exempt from registration pursuant to an SEC order, or whose business includes the "performance of functions of a clearing agency with respect to exempted securities." 11 U.S.C. § 101(48).

in section 741) in connection with a securities contract (as defined in section 741) such customer.[246]

As noted above, the Supreme Court in *Merit* held that, if a qualifying participant (such as a financial institution) acts only as a conduit or intermediary within a component of the overarching transfer between non-qualifying participants, then the safe harbor of section 546(e) will not apply.[247]

But *Merit* left open the question of whether a party to the overarching transfer may qualify "as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A)."[248] In *Tribune II*, the Second Circuit ruled that Tribune (a multimedia corporation) was a "financial institution" on account of its customer relationship with Computershare, a trust company and bank that acted as a "depository" in connection with the LBO tender offer at issue.[249] Tribune and Computershare had both a customer relationship and an agency relationship: Tribune was deemed to have "manifested its intent to grant authority to Computershare by depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders. Computershare, in turn, manifested its assent by accepting the funds and effectuating the transaction."[250]

Other Circuits have subsequently applied *Tribune II's* reasoning to find that a customer of a financial institution may itself qualify as a financial institution for purposes of section 546(e)

---

[246] 11 U.S.C. § 101(22)(A).

[247] 583 U.S. at 367.

[248] *Kelley as Tr. of PCI Liquidating Tr. v. Safe Harbor Managed Acct. 101, Ltd.*, 31 F.4th 1058, 1065 (8th Cir. 2022).

[249]  946 F.3d at 78.

[250] *Id.* at 80.

if it meets the definition set forth under section 101(22)(A).[251]  However, it appears neither the

Third Circuit, the Delaware District Court, nor the Delaware Bankruptcy Court has addressed

this question or interpreted the operative ruling from *Tribune II*.

(ii)    Financial Participant

A financial participant is defined in the Bankruptcy Code as:

> [A]n entity that, at the time it enters into a securities contract, commodity contract,
> swap agreement […] or at the time of the date of the filing of the petition, has one
> or more agreements or transactions […] with the debtor or any other entity (other
> than an affiliate) of a total gross dollar value of not less than $1,000,000,000 . . . at
> such time or on any day during the 15-month period preceding the date of the filing
> of the petition, or has gross mark-to-market positions of not less than
> $100,000,000 . . . in one or more such agreements or transactions with the debtor
> or any other entity (other than an affiliate) at such time or on any day during the
> 15-month period preceding the date of the filing of the petition.[252]

Some courts have found that, because the definition of "financial participant" requires

"one or more agreements or transactions . . . with the debtor or any other entity" a debtor cannot

be a "financial participant" for the purposes of section 546(e).[253]  But courts in the Third Circuit

have held that a debtor may be the "financial participant," reasoning that "the safe harbor's

purpose is to protect securities and commodities markets in certain circumstances regardless of

whether the transfers targeted for avoidance were made by creditors or debtors."[254]

---

[251] *See, e.g.*, *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 202 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom.*, *In Re: Nine W. LBO Sec. Litig.*, 87 F.4th 130 (2d Cir. 2023); *Kelley as Tr. of PCI Liquidating Tr.*, 31 F.4th at 1065; *In re Bos. Generating LLC*, 617 B.R. 442, 489 (Bankr. S.D.N.Y. 2020), *aff'd sub nom.*, *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021).

[252] 11 U.S.C. § 101(22A)(A).

[253] *In re Tribune Co. Fraudulent Conveyance. Litig.*, 2019 WL 1771786, at *9 (S.D.N.Y. Apr. 23, 2019), *aff'd,* 10 F.4th 147 (2d Cir. 2021) (stating "[t]he clear text of the statute thus forecloses the Shareholders' argument that [Debtor] is a 'financial participant' as defined in 11 U.S.C. § 101(22A)").

[254] *In re Samson Res. Corp.*, 625 B.R. 291, 295 (Bankr. D. Del. 2020).

Therefore, as with the "financial institution," either the debtor or the transferee may be "qualified participants."  And given the fact-intensive analysis required, it can be difficult to determine whether the statutory requirements are met on a motion to dismiss.[255]

## III.    Analysis of the Viability of Fraudulent Transfer Claims

### a.    Overview

In this section of the Report, the Examiner analyzes the merits of potential fraudulent transfer claims arising from the prepetition LedgerX Transaction.  The Examiner considers whether the facts available to the Examiner are sufficient for a well-pleaded complaint to survive a motion to dismiss.  The Examiner also assesses whether fraudulent transfer claims could survive summary judgment or be successful at a trial.  The latter discussion has certain limitations.  Given the time constraints of the Phase II examination, the Examiner could not replicate the lengthy discovery process that would precede a motion for summary judgment or a trial.  In addition, the Examiner is mindful that the Debtors have financial advisors to determine, for instance, when WRS became insolvent.  The Examiner decided it would not have been prudent to engage a separate firm to replicate this work.  Conclusions reached by the Debtors' experts will ultimately inform whether federal or state constructive fraudulent transfer claims should be asserted.[256]

### b.    Intentional Fraudulent Transfer Claims under 11 U.S.C. § 548(a)(1)(A)

The LedgerX Transaction would meet the first two factors of the intentional fraudulent transfer claims analysis:  (i) that the transfer was made with property of the estate; and (ii) that

---

[255] *In re Mallinckrodt PLC*, 2024 WL 206682, at *16 (cannot determine if a qualified financial participant was involved in the transaction at the motion to dismiss stage, despite reference to the transaction descriptions in SEC filings).

[256] Intentional fraudulent transfer claims do not require such expert analysis.

the transfer was made within two years before the Petition Date.[257]  First, the $300 million that

WRS utilized for the transaction likely came from a class B equity raise conducted by FTX.com.

Second, the LedgerX Transaction closed on October 13, 2021, and the Debtors filed bankruptcy

in November 2022.[258]

     In determining whether the third factor is met—that WRS voluntarily or involuntarily

"made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud

any entity to which the debtor was or became […] indebted,"—a court may consider allegations

that the FTX Group leadership generally intended to defraud creditors.  However, the Examiner

has obtained evidence in support of a legitimate business purpose justifying the LedgerX

Transaction that would likely undercut these arguments.  For instance, the Examiner has seen

proof that the LedgerX Transaction was done with the valid financial objective of expanding into

the U.S. crypto derivatives market and doing so much more quickly than FTX.US could have

without this acquisition.

     Alternatively, the court may consider the "badges of fraud" listed in the UFTA.[259]

Although this list is non-exhaustive, if the LedgerX Transaction was marked by any of the 11

badges of fraud,[260] it would most likely be:  (i) that the debtor removed or concealed assets

(because, if there was a misappropriation of funds, WRS removed assets out of the reach of

---

[257] 11 U.S.C. § 548(a)(1)(A).

[258] WRS filed for bankruptcy on November 14, 2022.  *See* Case No. 22-11183, Dkt. No. 1.  The other Debtors, including LHI and certain subsidiaries of WRS, filed for bankruptcy on November 11, 2022. *See e.g.,* Case No. 22-11073, Dkt. No. 1; Case No. 22-11071, Dkt. No. 1.  The minor difference in filing dates does not affect this analysis.

[259] The UFTA has been adopted in 45 states including Delaware; therefore, under a state law analysis of intentional fraudulent transfer claims, these same badges would apply. *See* Uniform Law Commission, Enactment History (last visited Sept. 17, 2024), https://www.uniformlaws.org/committees/community-home?CommunityKey=64ee1ccc-a3ae-4a5e-a18f-a5ba8206bf49, *archived at* https://perma.cc/RB5S-XL27.

[260] *See supra* Section II(a)(1).

creditors);[261] and (ii) that the debtor was insolvent or became insolvent shortly after the transfer was made (for the insolvency analysis, *see infra* Section III(c)).

As noted above, "it is the confluence of several badges in one transaction that generally provides conclusive evidence of an actual intent to defraud."[262]  Therefore, even if discovery proves that the LedgerX Transaction satisfies these two badges of fraud, such a showing is likely insufficient to demonstrate the transfer was made with actual intent to hinder, delay, or defraud.[263]  This is true under the heightened pleading standard that plaintiffs alleging fraud must usually meet as well as the more relaxed pleading standard that applies to trustees and certain debtors alleging fraud claims.[264]

Similarly, although a fact-finder might conclude that the facts here are sufficient to plead or even prove a "Ponzi-like scheme," raising the presumption of fraudulent intent,[265] the plaintiff must also prove that the specific transfers at issue were made "in furtherance of" that scheme.

---

[261] *See In re Mallinckrodt PLC*, 2024 WL 206682, at *33 ("Covidien transferred approximately $867 million of cash out of Mallinckrodt to Covidien in the years leading up to the Spinoff.").

[262] *In re Maxus Energy Corp.*, 641 B.R. at 514 (internal citations and quotations omitted); *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 490 (N.J. 1999) ("Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."); *In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at *5 (finding that the trustee adequately stated a claim for avoidance of actual fraudulent transfers because "[u]nlike the plaintiffs in *Fedders* who simply pled a single badge of fraud . . . the Trustee in this case has alleged three badges of fraud").

[263] *See MSKP Oak Grove, LLC v. Venuto*, 839 F. App'x 708 (3d Cir. 2020) (finding that the presence of three badges of fraud provided evidence of fraudulent intent); *In re Zohar III, Corp.*, 631 B.R. 133 (Bankr. D. Del. 2021) (holding that allegations of at least four badges of fraud were sufficient to withstand dismissal); *In re J&M Sales, Inc.*, 2021 Bankr. LEXIS 2268, at *95 (two badges insufficient to support a claim for actual fraudulent transfer).

[264] *See In re Fedders N. Am., Inc.*, 405 B.R. at 544 (finding that, even under the relaxed pleading standard, the plaintiff had failed to adequately plead intent because it only asserted one badge of fraud).

[265] *In re Equip. Acquisition Res., Inc.*, 2012 WL 4755028, at *6 ("Courts have, in fact, recognized that 'even if Debtor's business operations do not exactly match the description of a Ponzi Scheme,' a trustee may 'still continue to characterize the business model as a Ponzi Scheme,' thereby meeting the intent prong of a fraudulent transfer claim.") (quoting *In re Norvergence, Inc.*, 405 B.R. at 730). The Ponzi scheme factors are (i) that deposits were made by investors; (ii) the debtor conducted little or no legitimate business operations as represented to investors; (iii) the purported business operation of the debtor produced little or no profits or earnings; and (iv) the source of payments to investors was from cash infused by new investors.

The Examiner has not seen any evidence that the LedgerX Transaction was in furtherance of the fraud occurring at the FTX Group.  Instead, the evidence suggests that the LedgerX Transaction was intended to generate legitimate business profits.

The Examiner concludes that, on the facts available, the Debtors (or other prospective plaintiff) are unlikely to have a viable claim for intentional fraudulent transfer with respect to the LedgerX Transaction.  This conclusion is based on the lack of compelling evidence of actual intent even if such intent were inferred through the badges of fraud.  This conclusion is also based on the lack of compelling evidence that the LedgerX Transaction furthered any fraudulent scheme, as would be required to infer intent in connection with the Ponzi presumption.

    *c.*    *Constructive Fraudulent Transfer Claims under 11 U.S.C. § 548(a)(1)(B)*

The LedgerX Transaction would meet the first requirement of a constructive fraudulent transfer claim because the transfer was made within two years before the Petition Date.[266]  But in order to prevail on such a claim, WRS must also have received less than reasonably equivalent value in the LedgerX Transaction and must have been insolvent, unable to pay its debts as they matured, or left with unreasonably small capital, as explained below.

    1.    Less Than Reasonably Equivalent Value

Typically, disputes over reasonably equivalent value are not appropriate for determination on a motion to dismiss.  As evidence that WRS did not receive reasonably equivalent value, a complaint could plead, among other things, the substantial difference between the prepetition purchase price ($300 million) and the postpetition sale price ($50 million), particularly when the postpetition transaction happened only a year and a half

---

[266] 11 U.S.C. § 548(a)(1)(B).

later.[267]  But even if a well-pleaded complaint would likely survive a motion to dismiss,[268] at the summary judgment or trial stage, the court would engage in a more substantive analysis of whether WRS received less than reasonably equivalent value in exchange for its prepetition transfer of $300 million to the LHI shareholders.  It would be difficult for a plaintiff to make such a showing.

To determine whether there was an exchange of reasonably equivalent value, a court will review the totality of the circumstances of the transaction at issue.[269]  The Third Circuit has enumerated three specific factors:  "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith."[270]  The first two of these factors are closely related:  specifically, should the transaction be deemed to have been conducted at arm's-length, a court would likely find that the sale price establishes a fair market value.[271]

The Examiner has seen no evidence the LedgerX Transaction was not conducted at arm's-length.  Indeed, the facts would support a finding of an arm's-length transaction:  (i) when the LHI shareholders deemed the initial price too low, they pushed WRS for an increase; (ii) WRS—not just willing but apparently eager to acquire the licenses—increased the price;

---

[267] According to a former FTX.US executive, the $50 million postpetition sale price reflected that a substantial portion of LedgerX's value was tied to the fact that it would be incorporated into the FTX.US exchange and bring immediate revenue through FTX.US's preexisting customer base.  Following the FTX Group's collapse, any other company's chance of receiving margin approval from the CFTC substantially decreased and, in general, the market's appetite for cryptocurrency companies and transactions significantly declined.

[268] *In re Live Well Fin., Inc.*, 2023 WL 4025816, at *7 n.54 (quoting *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 269).

[269] *See supra* Section II(a)(2).

[270] *In re Fruehauf Trailer*, 444 F.3d at 213 (citing *In re R.M.L., Inc.*, 92 F.3d at 148-49, 153).

[271] *In re Samson Res. Corp.*, 2023 WL 4003815, at *25.

and (iii) then the LHI shareholders accepted.  The Examiner has seen nothing to establish that either side exerted compulsion or undue influence on the other.[272]

Both parties also had sophisticated deal counsel and engaged in some level of due diligence, providing them with reasonable knowledge of the relevant facts.  WRS's due diligence included, among other things, raising legal and regulatory questions, reviewing LHI's financial statements, analyzing existing employment agreements, and discussing treatment of convertible financial instruments issued by LHI.[273]  The diligence focused on LedgerX's DCM and DCO licenses, which WRS deemed to be the true value of the acquisition.[274]

There is no evidence that, during the due diligence process, WRS received false or misleading information.  Rather, the evidence suggests that WRS was well-informed about LedgerX's potential value and recognized the acquisition of LedgerX would accelerate FTX.US's ability to offer derivative products to U.S. customers.[275]  While Miller told S&C to keep the list of diligence requests short, there is no evidence this instruction prevented WRS from conducting adequate due diligence or that more diligence would have uncovered information material to the transaction.

At first blush, the Oxford Valuation conducted near the time of the LedgerX Transaction may suggest that WRS did not receive reasonably equivalent value.  That is because that valuation determined that LHI had a final equity value of approximately $54.8

---

[272] *Id.* ("A wealth of authority teaches that when a willing buyer and a willing seller transact, both being at arms' length, neither being under compulsion to buy or sell, and both having reasonable knowledge of relevant facts, the sale price establishes fair market value.").

[273] *See supra* Section I(c).

[274] *Id.*

[275] F10705-E016425454.

million.  However, as discussed above, the valuation was prepared in anticipation of the LHI board of directors determining potential employee strike price options, where there was an incentive to depress the company value.  The valuation was expressly not intended to determine the price, or fair market value, at which the entire company could be sold.[276]

In contrast, the BDO Valuation—which was done after the LedgerX Transaction closed—valued LHI at approximately $252.7 million.  In large part, this was due to the valuation of LHI's intangible assets, in particular the DCM, DCO, and SEF operating licenses.[277]  The licenses alone—to which WRS attributed significant value—were estimated to be worth $166 million.

Moreover, it is likely a court would place more emphasis on market prices than on any firm's valuation.  This is because, "[o]bjective evidence from the [] market is a more reliable measure of value than the subjective estimates of an expert witness."[278]  And when "sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is [not appropriate] to reevaluate or question those transactions with the benefit of hindsight."[279]

The facts here reveal that two sophisticated parties—WRS and the LHI shareholders—made judgments regarding LHI's potential value based on the expected growth, estimated

---

[276] *See supra* Section I(d)(1).

[277] BDO Valuation Report, at 6.

[278] *In re ASHINC Corp.*, 640 B.R. at 51; *Merlin Partners LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *17-18 ("Where, as here, the market prices a company as the result of a competitive and fair auction, the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value." (internal citations omitted)).

[279] *Peltz*, 279 B.R. at 738.

risk, regulatory environment, and competition in the market.  Comparable companies were sold around the same time at greater prices than LHI.[280]  Thus, there is evidence that the market price of the LedgerX Transaction was, at that time, reasonably equivalent to the value transferred in the deal.

In addition, it would be difficult for a plaintiff asserting a constructive fraudulent transfer claim to show that the transferees lacked good faith.  Courts in the Third Circuit look to whether the transferee had complicity in or knowledge of the underlying fraud.[281]  The Examiner has seen nothing demonstrating Dexter, or any of the LHI shareholders, knew of or had any notice of the fraud at the FTX Group.

### 2.    Insolvency

A claim for constructive fraudulent transfer also requires a showing that the debtor (i) was insolvent on the date of the transfer or became insolvent as a result of the transfer, (ii) was left with unreasonably small capital, (iii) intended to incur debts beyond its ability to pay, or (iv) made the transfer for the benefit of an insider outside of the ordinary course of business.[282]  Because it would be challenging for a plaintiff to persuasively assert that there was not an exchange of reasonably equivalent value, a constructive fraudulent transfer claim likely is not viable regardless of the outcome of the insolvency analysis.  But the Examiner nonetheless addresses insolvency here for completeness. [283]

---

[280] *See supra* Section I(d)(2).

[281] *Ameriserv,* 2009 WL 890583, at *6  (collecting cases); *see also In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *20.

[282] 11 U.S.C. § 548(a)(1)(B).

[283] In addition to insolvency, the discussion below—regarding the availability of financial statements and the likely need for discovery—would be applicable to the second and third alternative factors:  unreasonably small capital and

As an initial matter, courts have held that "insolvency is generally a factual determination not appropriate for resolution in a motion to dismiss."[284]  At the motion to dismiss stage, courts often review the debtor's balance sheet or other financial information submitted in conjunction with a well-pleaded complaint.[285]  Courts examine whether the sum of an entity's debts is greater than all of its property at a fair valuation.[286]

But because the FTX Group's accounting records and controls were notoriously lacking and these failures likely effected WRS's records as well,[287] a balance sheet (or other financial information) created at the time of the LedgerX Transaction may not be the best evidence of insolvency due to the unreliability of the entire FTX Group's contemporaneous financial records.  It would be important for a court to allow the parties to develop a meaningful factual record with expert support.  And the Debtors' (or other plaintiff's) experts may be able to retrospectively assemble financial records to plead and prove insolvency.

In addition, the Examiner's investigation suggests that a plaintiff could allege that the FTX Group operated as a *de facto* Ponzi scheme.[288]  If so, a court might rely on *In re DBSI, Inc.*, 477 B.R. at 510, which held that allegations of a Ponzi scheme were alone sufficient to plead insolvency and defeat a motion to dismiss.  An entity perpetuating a Ponzi scheme is by

---

inability to pay debts. The fourth factor is not relevant as the transfer in the LedgerX Transaction was not made for the benefit of an insider.

[284] *In re DBSI, Inc.*, 447 B.R. at 248.

[285] *See supra* Section II(a)(2)(i).

[286] 11 U.S.C. § 101(32)(A).

[287] First Ray Report, at 14-15; *see also infra* Part IV.

[288] *In re Equip. Acquisition Res., Inc.*, 2012 WL 4755028, at *6 (noting that "even if Debtor's business operations do not exactly match the description of a Ponzi Scheme," a trustee may "still continue to characterize the business model as a Ponzi Scheme").

definition insolvent as it is "dependent on constant infusions of cash from new investors to satisfy obligations owed to prior ones."[289]

No doubt, certain entities in the FTX Group were dependent on constant infusions of cash from investors as well as misappropriated customer funds to continue operations.[290]  Typically insolvency needs to be shown at the transferor-entity, which in the LedgerX Transaction was WRS.  But because the Debtors have sought substantive consolidation of most entities within the FTX Group, including WRS, FTX.US, Alameda, and FTX.com, a court may consider allegations of a *de facto* Ponzi scheme across the FTX Group more generally.[291]

To be clear, however, the Examiner has not reached any conclusions concerning (i) if and when WRS or any other Debtor was insolvent, (ii) whether any Debtors were or were not insolvent on a consolidated or unconsolidated basis, and (iii) whether substantial consolidation is or is not necessary for a plaintiff to demonstrate insolvency.  Instead, the Examiner has identified factors a court might consider when analyzing insolvency in the context of a constructive fraudulent transfer claim.

3.      Avoidance of Transfers under State Law

As discussed above, Bankruptcy Code section 544(b) permits a trustee to use non-bankruptcy law, including state law, to avoid any fraudulent transfer that would be avoidable by any creditor holding an unsecured claim.  Because most states' fraudulent transfer statutes track

---

[289] *In re DBSI, Inc.*, 447 B.R. at 248.

[290] Dkt. No. 1704-1, at 23-30 (discussing uses of commingled customer funds to pay for various corporate expenses).

[291] *See, e.g.*, *In re DBSI, Inc.*, 447 B.R. at 248.

section 548 of the Bankruptcy Code,[292] there will likely not be a conflict of laws and, therefore, the DGCL—as the law of the forum state—would apply to fraudulent transfer claims.[293]

To assert a state law claim, the trustee would first need to identify an actual creditor holding an unsecured claim who could have avoided the transfer under state law.  Beyond that, both Delaware's intentional fraudulent transfer statute and constructive fraudulent transfer statute have the same requirements as those claims in the Bankruptcy Code.[294]  Accordingly, the actual pleading and proof of the state law claim would be guided by the analysis outlined above with respect to intentional and constructive fraudulent transfer claims under 11 U.S.C. § 548.

### d.      Section 546(e) – Safe Harbor

No doubt, defendants in a fraudulent transfer action would plead multiple affirmative defenses.[295]  In this Section of the Report, the Examiner addresses what would likely be the most noteworthy defense:  the safe harbor defense to constructive fraudulent transfer claims found in Bankruptcy Code section 546(e).[296]

---

[292] *See supra* Section II(a)(3).

[293] *See In re Mallinckrodt PLC*, 2024 WL 206682, at *35 (Trustee identified a government entity as its triggering creditor.  As New Jersey law held that governmental entities are not bound by the UFTA limitations period (as opposed to the other states' laws which could apply), the court was required to engage in a choice of law analysis.).

[294] 6 Del. C. § 1304(a)(1).

[295] Such defenses could include:  failure to state a claim, unclean hands, speculative damages, set off and recoupment, good faith and receipt of transfers for value; the doctrine of laches, the doctrine of estoppel, *in pari delicto*, the alleged transfers did not constitute estate property, lack of fraudulent intent, and more.  Avoidance actions are not typically dismissed, either on a motion to dismiss or at the summary judgment stage, on the basis of these defenses, and thus they are not analyzed here.

[296] *See supra* Section II(b).

Courts have held that determining the viability of a section 546(e) defense is not appropriate until after discovery due to the fact-intensive nature of the inquiry.[297]  As such, the defense would likely be evaluated at the summary judgment stage.

Section 546(e) has two required elements:  a qualifying transfer and a qualifying participant.

### 1.    Qualifying Transfer

To be a qualifying transfer under section 546(e), the LedgerX Transaction must have been a "settlement payment" made "in connection with a securities contract."[298]

The merger of LHI and the Merger Sub (through which LHI's premerger shares were cancelled in exchange for LHI shareholders' receipt of $300 million in cash) would most likely be found to constitute a settlement payment because it included a  "transfer of cash or securities made to complete a securities transaction."[299]  This is especially so because courts have held that settlement payments include payments made by a financial institution to shareholders as part of a leveraged buyout or cash-out merger and encompasses the cancellation of financial instruments, as well as transactions in privately traded shares.  The LedgerX Transaction includes each of these elements.

The "in connection with a securities contract" requirement is defined with "extraordinary breadth."[300]  Accordingly, courts have had "no trouble" concluding that transactions as part of

---

[297] *See supra* notes 222-223.

[298] 11 U.S.C. § 546.

[299] *In re Resorts Int'l, Inc.*, 181 F.3d at 515; *see also In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *11.

[300] *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 417.

merger agreements were made "in connection with a securities contract." Similarly, here, a court would likely determine that the LHI merger was made in connection with a securities contract.

### 2. Qualifying Participant

The qualifying participant requirement would be satisfied if the LedgerX Transaction had been made "by," "to," or "for the benefit of" a financial institution or a financial participant.[301]

#### (i) Financial Institution

Neither WRS nor the former LHI shareholders are a "commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity."[302] Thus, they would not constitute a qualifying financial institution on that basis.

As noted above, pursuant to the Payments Administration Agreement, Acquiom was designated as the payment administrator for the LedgerX Transaction and was responsible for coordinating the payments to the LHI shareholders. However, even if the court were to follow the Second Circuit's *Tribune II* decision , it could not find that WRS or the LHI shareholders were "financial institutions" due to their status as customers of Acquiom. This is because, based on publicly available information, Acquiom itself is not one of the enumerated entities that is considered to be a financial institution under the Bankruptcy Code.[303]

---

[301] As a technical matter, other market participants could also suffice. But none of them are relevant here. *See supra* Section II(b)(2).

[302] 11 U.S.C. § 101(22)(A).

[303] *See* FINRA, BrokerCheck Report, Acquiom Financial LLC, at 27, https://files.brokercheck.finra.org/firm/firm_170074.pdf, *archived at* https://perma.cc/LL6U-3MW8.

(ii)     Financial Participant

In order to qualify under the definition of a financial participant, WRS, or the former LHI shareholders, had to have one or more of the following agreements or transactions worth at least $1 billion at the time of the LedgerX Transaction or the Petition Date:  securities contracts or commodity contracts.[304]  Alternatively, WRS, or the former LHI shareholders, would meet the financial participant definition if they had gross mark-to-market positions of at least $100 million in one or more such agreements or transactions during the 15-month period preceding the date of the filing of the petition.[305]

To ascertain whether a party satisfies these requirements and thus qualifies as a financial participant, courts will often look to evidence such as SEC filings or declarations with audited financial statements.[306]  As noted above, however, the Examiner could not rely on WRS's financial records in his investigation due to the FTX Group's questionable accounting practices.[307]  For the same reason, it is difficult to assess whether WRS would qualify as a financial participant.  In addition, the Examiner did not have access to the LHI shareholders' financial records to make any determination as to whether they would qualify as financial participants.[308]

Nevertheless, courts have acknowledged that, because determining whether a party meets the financial participant requirements demands such a fact-intensive review of the evidence, it

---

[304] There are other qualifying types of transactions, but they are not applicable here.  11 U.S.C. § 101(22A)(A).

[305] *Id.*

[306] *See supra* Section II(b)(2)(ii).

[307] *See supra* Section III(c)(2).

[308] *See supra* Section III(a) regarding the constraints of the Phase II examination.

can be difficult to determine whether the statutory requirements are met on a motion to dismiss.[309]  As a result, the affirmative defense likely would not defeat a well-pleaded complaint at the motion to dismiss stage.  Afterwards, following a more fulsome discovery process and the retention of expert financial analysts, the former LHI shareholders may be able to show that either they or WRS qualified as a financial participant, such that the safe harbor should apply.

In sum, under the facts known to the Examiner, the LedgerX Transaction would most likely meet the qualifying transfer prong of the section 546(e) safe harbor, but it is less clear whether any of the relevant parties would meet the qualifying participant prong of the safe harbor.

## IV.    Conclusion

The Examiner's review suggests that, on the facts available to him, WRS (or another designated plaintiff) is unlikely to have an intentional fraudulent transfer claim that would survive a motion to dismiss, or further stages of litigation.  The Examiner has not seen sufficient evidence of actual intent or sufficient evidence of a confluence of the badges of fraud.  Although there is ample evidence of a Ponzi-like scheme, the Examiner has not seen sufficient evidence that the LedgerX Transaction was in furtherance of the FTX Group's fraudulent scheme, which is necessary for inferring intent based on the Ponzi scheme presumption.

On the other hand, a well-pleaded complaint asserting constructive fraudulent transfer claims would likely survive a motion to dismiss.  That is because courts typically hold that reasonably equivalent value and insolvency should not be determined at the motion to dismiss stage of litigation.  However, it is unlikely that a constructive fraudulent transfer claim could

---

[309] *In re Mallinckrodt PLC*, 2024 WL 206682, at *16 (cannot determine if a qualified financial participant was involved in the transaction at the motion to dismiss stage, despite reference to the transaction descriptions in SEC filings).

survive summary judgment or prevail at a trial because it would be challenging to prove that the Debtors "received less than a reasonably equivalent value" in this transaction.  Among the substantial impediments to such a showing are the facts that the transfer appears to have been at fair market value, there was an arm's-length relationship between the parties, and the transferees seem to have acted in good faith.

Furthermore, the LHI shareholders may be able to present a viable section 546(e) safe harbor defense.  However, the fact-intensive nature of the defense makes it unsuitable for determination on a motion to dismiss.  The facts available to the Examiner suggest that there was at least a qualifying transfer, but whether WRS or another relevant party could be considered a qualified participant would depend on further discovery and expert review.

The Examiner's conclusions are based on the parameters and limitations under which the Examiner was asked to do his investigation, including time constraints.  As a consequence, the Examiner's analysis is preliminary and based only on the facts as articulated in this section. Following a full-scale discovery process and with the benefit of time and further resources, the assessment of these claims and defenses may change.

**PART IV:  FTX.US**

## I.    Introduction

In January 2020, the FTX Group launched FTX.US, a United States-based exchange for spot trading of cryptocurrency and other digital assets.[310]  Unlike FTX.com, the international exchange of the FTX Group that purported to bar United States accounts, FTX.US was open to customers located in the United States.[311]  FTX.US operated as a subsidiary of Debtor entity WRS, which was principally owned by Bankman-Fried, Wang, and Singh.  Prior to November 2022, Bankman-Fried served as the Chief Executive Officer of FTX.US, Wang served as its Chief Technical Officer, and Singh served as a lead software engineer.  Bankman-Fried and Wang simultaneously owned Alameda Research and, together with Singh, controlled FTX.com.[312]

On November 8, 2022, FTX.com paused customer withdrawals amidst reports of substantial missing customer assets.  Bankman-Fried initially sought to assure the public that these issues did not extend to FTX.US.  However, on November 9, 2022, other representatives of FTX.US informed state and federal regulators that "FTX US . . . customer assets actually held are not immediately reconcilable with the customer assets reported."[313]  FTX.US thereafter filed for bankruptcy, together with many other FTX Group entities.

---

[310] First Ray Report, at 8.

[311] Ray First Day Declaration ¶¶ 12, 33.

[312] *Id*. ¶¶ 22, 33.

[313] F10705-E016496457; *see also* Letter from Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, U.S. House of Representatives, to Sam Bankman-Fried and John Ray (Nov. 18, 2022), at 3, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2022-11-18.RK%20to%20Bankman-Fried%20and%20Ray-FTX%20re%20FTX%20Crypto.pdf, *archived at* https://perma.cc/88G8-GEL8 (describing a similar report to the U.S. House of Representatives).

The Examiner's Phase I Report summarized the Debtors' investigation into the collapse of the FTX Group, including certain investigative work concerning FTX.US and the reported shortfall in customer assets.  As detailed further in the Phase I Report, S&C (as Debtors' counsel) found evidence that, in the days preceding the bankruptcy filing, FTX Group executives identified an apparent $46 million "hole"—or balance sheet shortfall—in customer assets at FTX.US.[314]  S&C investigated the hole as well as claims made by Bankman-Fried insisting that FTX.US was solvent on the Petition Date.  S&C further identified evidence that the purported balance sheet reconciliation performed shortly before the Petition Date by FTX.US personnel— and the associated calculation of the hole—was flawed in various respects.  Among other factors, certain asset inputs to the calculation appeared to have been captured at different times than the corresponding liability inputs, and there was uncertainty as to whether source data was limited to customer assets or also included operational funds.[315]  Accordingly, a proper reconciliation of customer assets had not been conducted.[316]  S&C further found that, as also alleged by the CFTC, Bankman-Fried in the final days had used Alameda's customer account on FTX.US to effectively extinguish a portion of FTX.US's liability to Alameda, without actually moving any funds, which created additional uncertainty.[317]  Through its investigation, S&C ultimately concluded that FTX.US was in fact insolvent on the Petition Date.[318]  Based on a retrospective financial analysis conducted after the Petition Date by the Debtors' advisors, AlixPartners and

---

[314] Phase I Report at 178.

[315] *Id.* at 180.

[316] *Id.*

[317] *Id.* at 179.

[318] *Id*. at 177.

Alvarez & Marsal, S&C further concluded that there was a shortfall in customer assets of approximately $141 million as of November 11, 2022 at 10am Eastern Time (the approximate time that FTX.US entered bankruptcy).[319]  This subsequent shortfall calculation did not include liabilities owed to Alameda as a customer of FTX.US, and reflected (as a reduction in assets) the loss of significant crypto assets that were misappropriated from FTX.US through the hack of FTX.US (as well as FTX.com) on November 11, 2022.

However, as articulated in the Phase I Report, the Debtors did not conduct a comprehensive investigation into the circumstances of FTX.US's inability to reconcile customer assets in the days before filing for bankruptcy, or whether similar anomalies existed prior to the November 2022 time period.[320]  To be sure, the Debtors identified many systemic issues at the FTX Group writ large; however, many of these findings were not specific to FTX.US.[321] Accordingly, the Examiner recommended that he conduct a targeted supplemental investigation into these questions for several reasons, including that:  it may identify additional misconduct or misuse of customer funds; it could promote public confidence in the bankruptcy process as it relates to FTX.US; and it could serve the public interest given the extensive scrutiny over FTX.US, an entity widely advertised to customers in the United States as a "US based and regulated" exchange that made "[c]rypto investing . . . simple."[322]  Accordingly, in the Court's Phase II Scope Order, the Court directed the Examiner to investigate:  "(1) the existence of and the reasons these holes arose at FTX.US, (2) whether the balance sheet holes were the result of

---

[319] Dkt. No. 22165 § 2.1.198.

[320] Phase I Report, at 181.

[321] *See generally* First Ray Report; Ray First Day Declaration.

[322] FTX.US, https://ftx.us (Feb. 10, 2022), *archived at* https://web.archive.org/web/20220210160911/https://ftx.us/.

commingling of customer or corporate assets, (3) the frequency and magnitude of the holes, and (4) how they were resolved and by whom."[323]

This Section of the Examiner's Phase II Report summarizes the Examiner's supplemental investigation and findings with respect to FTX.US.  As detailed below, the Examiner has found that FTX.US, like other components of the FTX Group, had poor and wholly inadequate internal controls and business processes to maintain, manage, and reconcile customer assets.[324]  Because of these substandard practices, and the deficient recordkeeping of the business, the Examiner was unable to definitively determine the direct causes of, or the specific transactions that gave rise to, the discrepancy in FTX.US customer assets observed in November 2022.  The Examiner was similarly unable to ascertain with certainty whether shortfalls existed at earlier points in time.

To be clear, the Examiner did not find evidence that FTX.US customer assets were misappropriated in the same manner as FTX.com customer assets.  However, the Examiner has found that, due in large part to the aforementioned inadequacies, FTX.US customer assets were at grave risk of loss or misuse.  Moreover, for the same reasons, any loss or misuse of customer assets at FTX.US would have likely gone undetected and unaddressed.  In a time of crisis, therefore, FTX.US was wholly unprepared, and indeed unable, to confirm that customer assets were protected and sufficient to satisfy all customer liabilities.

## II.    Methodology

The Examiner's investigation into FTX.US included an extensive review of documents, interviews with key FTX Group personnel, and a review of financial analyses performed by the Debtors' financial advisors, AlixPartners and Alvarez & Marsal.  The Examiner's team

---

[323] Phase II Scope Order, at 3.

[324] *See generally* First Ray Report (describing substandard internal controls at both FTX.com and FTX.US).

conducted interviews of 13 FTX Group employees (some of whom remain employed by Debtors), on subjects related to FTX.US.  The interviewees were from several departments of FTX.US, as well as other FTX Group entities, and included multiple senior executives.  The Examiner identified these witnesses through a review of interview memoranda prepared by S&C during S&C's prior investigation, the Examiner's review of voluminous source documents, and additional information obtained through the interviews themselves.  The findings below reflect the Examiner's review of documents and witness interviews.[325]

## III.    Background

### a.    Overview of FTX.US Business

FTX.US was a United States-based exchange for spot trading[326] of cryptocurrency and other digital assets.[327]  FTX.US was the trade name of West Realm Shires Services ("WRSS"), a wholly-owned subsidiary of WRS.[328]  As of the Petition Date, Bankman-Fried owned approximately 53% of the equity in WRS; Wang and Singh owned approximately 18% and 8%, respectively;[329] and the remaining equity was owned by third-party investors.[330]

The FTX Group created the FTX.US exchange to enable cryptocurrency trading by customers based in the United States.  The international exchange, FTX.com, was not open to

---

[325] As noted above, the Report does not attribute particular statements to specific witnesses interviewed by the Examiner.  *See supra* Part 1, Section II.

[326] Spot trading of an asset involves transactions in that asset at the prevailing market price for immediate delivery. *Spot trade*, NASDAQ, https://www.nasdaq.com/glossary/s/spot-trade (last visited Sept. 17, 2024), *archived at* https://perma.cc/CJD9-KV8R.

[327] First Ray Report, at 4.

[328] Ray First Day Declaration ¶¶ 9-17, Ex. A.

[329] *Id*. at Ex. A.

[330] *Id*.

U.S. customers because it facilitated derivatives trading that had not been licensed for use in the United States.[331]  By November 2022, FTX.US had over one million users.[332]

WRS additionally formed and acquired various subsidiaries to build a broader regulated financial services business in the United States.  Those businesses included LedgerX (also known as FTX.US Derivatives), FTX Capital Markets, Embed Financial Technologies ("Embed"), and FTX Value Trust Company.[333]  WRS acquired LedgerX, a CFTC-licensed entity, in order for WRS to offer derivatives trading (e.g., futures, options, and swaps contracts) of digital assets and other commodities to both U.S. and non-U.S. persons.[334]  Aspects of the derivatives trading platform, such as the ability to trade derivatives on margin, had not launched as of the Petition Date.  FTX Capital Markets and Embed were SEC-registered broker-dealers.[335]  Embed also was a SEC-registered securities clearing firm.[336]  FTX Value Trust Company offered custodial services.[337]

FTX.US ostensibly operated distinctly from its international counterparts, but in reality FTX.US was largely managed by, and intertwined with, the broader FTX Group.  FTX.US did have its own president, and dedicated legal, compliance, accounting, and settlements teams.  Brett Harrison served as the President of FTX.US until his departure in September 2022, and

---

[331]*See* First Ray Report, at 4; *CFTC v. Samuel Bankman-Fried*, No. 1:22-cv-10503-PKC (S.D.N.Y.), Dkt. No. 1 ¶¶ 40-42.

[332] First Ray Report, at 4.

[333] Ray First Day Declaration ¶¶ 12-17.

[334] *See id.* ¶ 13; *see also supra* Part III.

[335] Ray First Day Declaration ¶¶ 14-15.

[336] *Id.* ¶ 15.

[337] *Id.* ¶ 16.

Ryne Miller served as the General Counsel.  Ultimately, however, the core FTX Group executives, including Bankman-Fried, Wang, Singh, as well as Daniel Friedberg, exerted significant control over FTX.US.  Bankman-Fried was the CEO and had the final voice on the primary business considerations of spend, investments, and strategy.  Wang and Singh maintained control over the FTX.US code and cryptocurrency database.  And Friedberg served as Bankman-Fried's primary legal and compliance officer across the FTX Group, including FTX.US.[338]

Moreover, employees of other FTX Group entities, including FTX.com and Alameda, regularly worked on FTX.US-related projects and interacted with FTX.US employees.[339]  In particular, FTX.US had few dedicated technology employees and relied heavily on the FTX.com technology team in the Bahamas.  Likewise, employees of FTX.US routinely interacted with and even assisted on projects for other FTX Group entities.  FTX.US also relied on Alameda for processing conversions between USD[340] fiat currency and USD-equivalent stablecoins,[341] as discussed further below.

  *b.*  *Relevant FTX.US Departments and Personnel*

The Examiner's investigation concerning FTX.US focused on various departments with responsibility and oversight for the custody and accounting of both its fiat and its cryptocurrency assets.  However, as noted above, certain individuals who performed these functions for FTX.US

---

[338] *Alameda Rsch. LLC v. Daniel Friedberg*, No. 23-50419-JTD, (Bankr. D. Del), Dkt. No. 32 ¶¶ 2-3.

[339] *Id.* ¶ 109.

[340] U.S. dollar.

[341] A stablecoin is a digital asset "designed to maintain a stable value relative to a national currency or other reference asset."  President's Working Group on Financial Markets, et al., *Report on Stablecoins* (Nov. 2021), https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf, *archived at* https://perma.cc/6QA4-S5SU.

were not necessarily exclusive employees of FTX.US, and may have also been employed by and/or performed services for other FTX Group entities.  In addition, FTX.US tended to staff departments leanly and, as a consequence, FTX.US employees hired into one department were often given responsibilities across other departments—at times without having much relevant experience or expertise in those areas.

1. Accounting and Finance

FTX.US's accounting and finance department was overseen by Jen Chan, the former CFO of FTX.US and FTX.com, as well as Jayesh Peswani, the head of finance for both entities. Caroline Papadopoulos served as the controller.  The accounting and finance group was primarily responsible for maintaining FTX.US's books and records, including providing information to and managing FTX.US's regular outside accountants, Robert Lee & Associates, and coordinating consolidated financial statements for FTX.US and other WRS subsidiaries.  In addition, the accounting and finance department coordinated audits as well as an IPO-readiness assessment with other outside accountants and auditors.  Based on the Examiner's investigation, members of the accounting and finance department did not consider the management and reconciliation of FTX.US customer assets to fall within the scope of their responsibilities.

2. Administrative Services

Delaney Ornelas served as FTX.US's head of administration.  Ornelas was responsible for processing all accounts payable and payroll out of FTX.US accounts.  Ornelas also handled human resources matters for FTX.US.  Ornelas was the only individual in this department.

3. Settlements

The FTX.US settlements team was comprised of Lynn Nguyen, Scott Nagamine, and Austin Huff.  Among other things, the settlements team was responsible for processing customer fiat deposits and withdrawals.  It had primary responsibility for the accounts in which FTX.US

held fiat currency for the benefit of customers ("FBO" accounts), which FTX.US held at multiple different banks.  Notably, the processing of customer fiat deposits and withdrawals into and out of the FBO accounts was not entirely automated and sometimes required manual processing by the settlements team.  When FTX.US first launched, all fiat deposits and withdrawals needed to be manually processed by the settlements team.  While the technology team later implemented automatic processing for some fiat deposit and withdrawal transactions, others still needed to be manually processed by the settlements team.  As detailed further below, this manual processing periodically resulted in erroneous deposits and withdrawals, which could not always be rectified. The settlements team was also responsible for coordinating with Alameda on conversions between fiat currency and stablecoins as needed, which involved transferring assets to and from Alameda.[342]

### 4.    Technology

Wang and Singh managed technology for FTX.US, alongside their overlapping responsibilities with respect to the international exchange.  FTX.US had few dedicated technology team members.  This was at times a subject of contention raised by FTX.US leadership given the competing and often prioritized technology demands of FTX.com. Witnesses interviewed by the Examiner's team stated that, while the FTX.US exchange used much of the same underlying source code as FTX.com, the FTX.US exchange was run on a different server and maintained separate crypto wallets.

The technology team was responsible for maintaining FTX.US's exchange platform, including technology for processing intra-exchange transactions, as well as cryptocurrency deposits and withdrawals.  The exchange database also tracked customer account balances (i.e.,

---

[342] *See infra* Section IV(e).

FTX.US's liabilities to its customers) for both crypto and fiat (or fiat-equivalent stablecoins[343]), as well as the crypto assets held in FTX.US's wallets.  Wang and Singh created various tools that allowed individuals from other departments to pull certain data from the FTX.US exchange database, including a limited set of information about the status of underlying crypto accounts. But ultimately, only a small number of FTX.US executives had access to the underlying crypto wallets.[344]

        5.      Compliance

FTX.US's compliance department was managed by Friedberg.  Adrienne During, Alfarida Mohammad, and Marissa MacDonald were also members of the compliance team.  The compliance team was primarily responsible for responding to regulators' requests, handling KYC and anti-money laundering compliance, and managing reporting requirements in connection with FTX.US's money-transmitter licenses.

        *c.*      *November 2022 Collapse of FTX Group and Identification of the "Hole" at FTX.US*

S&C's investigation into the events and circumstances leading up to the collapse and bankruptcy of FTX Group in November 2022 are detailed in the Examiner's Phase I report.[345] This Phase II Report provides a brief summary of these broader events, as context for the subsequent questions that are addressed concerning FTX.US.

---

[343] As discussed further below in Section IV(e), FTX.US treated certain crypto stablecoins as equivalent to fiat currency (e.g., USDC as equivalent to USD fiat), and allowed customers to interchange the two in deposits and withdrawals.  In other words, and as one example, a customer could deposit fiat and then withdraw the equivalent amount in a stablecoin, or vice versa.

[344] *See* F107051BM3E001-9728-000007268 ("just Nishad and co" had access to crypto wallets).

[345] *See generally* Phase I Report, at Part 3, Section I.

In early November 2022, the cryptocurrency industry publication CoinDesk published an article about a leaked Alameda balance sheet, which revealed that FTT tokens (the "native" token of the FTX.com exchange) and other so-called "Sam Coins"[346] comprised a significant portion of Alameda's assets.[347]  In the wake of the CoinDesk report, Binance—another major cryptocurrency exchange—announced plans to liquidate its own FTT holdings.[348]  This sequence of events, which occurred against the backdrop of an ongoing downturn in the crypto industry, precipitated a collapse in the price of FTT.  This in turn led to a rush of asset withdrawals from FTX.com.[349]  As this process unfolded, senior FTX Group executives acknowledged an $8 billion shortfall in FTX.com customer assets, due to Alameda using (and losing) FTX.com customer assets in its own trading activities.[350]

This substantial shortfall in FTX.com customer assets soon raised questions concerning the security and adequacy of FTX.US customer assets.  On November 7, 2022, Joe Bankman contacted Miller to inform him that the FTX Group was attempting an emergency capital raise of several billion dollars to address a shortfall, and requested Miller's assistance.  Joe Bankman added Miller to a Signal group (named the "small group chat") where senior FTX Group executives were discussing the FTX.com shortfall and potential means of addressing it, including a capital raise or the sale of assets.[351]  In the early morning hours of November 8, Miller asked

---

[346] The term "Sam Coins" has been used to refer to four tokens—FTT, SRM, MAPS, and OXY—that had close associations with Sam Bankman-Fried.  Phase I Report, at 89.

[347] Phase I Report, at 92.

[348] *Id*. at 93.

[349] *Id*.

[350] First Ray Report, at 7.

[351] Signal small group chat at 1.

the group to "confirm [that] FTX US user assets [are] still there."[352]  Citing information from

Wang, both Ellison and Singh reported that FTX.US user assets were present.[353]

Also on November 8, Miller began to receive inquiries from U.S. regulators concerning

the status of FTX.US.[354]  Miller contacted LedgerX CEO Zach Dexter to inform him of the

shortfall at FTX.com and to enlist his assistance in communicating with the CFTC.  Although

LedgerX was a corporate affiliate of FTX.US, Dexter did not regularly work on issues related to

FTX.US.  Miller thereafter added Dexter to the Signal small group chat, and both Miller and

Dexter began to repeatedly demand further assurances concerning the status of FTX.US

customer assets.[355]  While Singh again claimed that FTX.US was "fully backed," based on

information provided by Wang, Singh at one point suggested that FTX.US might need to rely on

corporate assets—including the $250 million guarantee account of LedgerX[356]—to satisfy

customer liabilities.[357]  Singh later claimed that this "probably" would not be necessary, and

maintained that "US crypto balances" were "[a]ll in place" in separate wallets.[358]  However, the

lingering uncertainty as to the status of customer assets and potential conflation of customer and

corporate assets led Miller and Dexter to demand more specific information as to both crypto and

---

[352] *Id*. at 51.

[353] *Id*.

[354] *Id*. at 77-78.

[355] *Id.* at 84.

[356] As a derivatives exchange that was in the process of applying to provide margin services, LedgerX was required to maintain a segregated cash reserve.  F10705-000159939.0001, at 11.  This guarantee account was meant to satisfy LedgerX's regulatory obligations.  Singh's implication that it could be used to satisfy FTX.US customer liabilities raised concerns among other FTX.US executives.  After Singh made this suggestion, LedgerX executives locked this account.

[357] Signal small group chat, at 84.

[358] *Id*. at 85-87.

89

fiat assets of FTX.US and how those assets compared to customer liabilities recorded in the FTX.US database.[359]

In the early hours of November 9, Miller and Dexter told Singh that they "need[ed] to see right now . . . the explanation of where US customer crypto is."[360]  Singh responded by saying "you got it, adding in [G]ary [Wang], he's been digging into it."[361]  Bankman-Fried offered to "start pasting what we have here," but cautioned that more work needed to be done to "go[] through and confirm[] all the bank accounts etc."[362]  Shortly thereafter, Bankman-Fried shared a "prospective list of bank accounts, with fairly recent (i.e. last hour) snapped values" that he said had been prepared by Lynn Nguyen of the FTX.US settlements team.[363]  Bankman-Fried provided the caveat that "it's possible there are bank accounts not included there."[364]  About an hour later, Bankman-Fried wrote that they "think we have everything."[365]  Wang then followed up with an additional spreadsheet, entitled "wallet_balances."[366]

Critically, neither document on its own could answer the question of whether FTX.US had sufficient assets to satisfy customer liabilities.  The bank accounts spreadsheet, on the one hand, conveyed purported balances (or *assets*) in the various FTX.US FBO bank accounts, and also included balances of certain FTX.US corporate accounts.  The "wallet_balances"

---

[359] *Id.* at 84-85.

[360] F107051BM3E001-9729-000003152, at 2.

[361] *Id.*

[362] *Id.*

[363] *Id.* at 3.

[364] *Id.*

[365] *Id.* at 4.

[366] *Id.*

spreadsheet, on the other hand, conveyed the total amount of each crypto *asset* held in crypto wallets controlled by FTX.US. The "wallet_balances" spreadsheet also conveyed information concerning total *liabilities* owed to customers as recorded on the FTX.US exchange, which included dozens of different cryptocurrencies as well as a line for "USD." The "USD" liability line item captured FTX.US's total liability to customers in both fiat U.S. dollars and crypto assets intended to be equivalent to the U.S. dollar (e.g., USD stablecoins). For most individual crypto assets, the "wallet_balances" spreadsheet could theoretically present a complete picture of any discrepancy between assets and liabilities in that a given crypto asset (e.g., Bitcoin or Ether) would be held only in a crypto wallet. However, the "USD" row of the "wallet_balances" spreadsheet was necessarily incomplete, because while it presented <u>total</u> USD *liabilities* owed to customers (across both crypto and fiat), it included on the *asset* side <u>only</u> the portion of USD assets held in USD stablecoins, and did not include any USD assets held in fiat currency bank accounts.

Overall, the "wallet_balances" spreadsheet circulated by Wang on November 9 showed that total USD liabilities exceeded by $182,316,943.68 the amount of USD stablecoin assets held in FTX.US wallets at the time this data was pulled.[367] The "wallet_balances" spreadsheet also showed some discrepancies between total customer liabilities and total wallet holdings in various non-USD crypto assets. These non-USD crypto assets and liabilities were converted into a current USD-equivalent value, and in total amounted to a USD-equivalent net shortfall of $1,956,165.58.[368] In sum, the liabilities reflected on the "wallet_balances" spreadsheet exceeded

---

[367] F107051BM3E001-9728-000009647.0002.

[368] Witnesses told the Examiner that this discrepancy was likely attributable to FTX.US's failure to check for and sweep misdirected crypto deposits into its primary wallets on a routine basis. This issue is discussed in more detail *infra*, at Section IV(d).

total assets by $184,273,109.26—again, with the vast majority driven by the difference in "USD" itself.

In theory, FTX.US should have held in its FBO bank accounts enough USD fiat funds to account for at least the $182,316,943.68 shortfall between total recorded USD liabilities (across both fiat and stablecoins) and the portion of USD assets held in USD stablecoin wallets. However, the separate bank balances spreadsheet provided by Nguyen reflected total USD FBO account holdings that amounted to just $138,520,983.13 as of the time the balances were pulled.[369]

Relying on this documentation of customer fiat and crypto assets, Dexter calculated an overall shortfall (or "hole") of $45,752,126.14.[370]

Zach Dexter
is this math correct?

$$\$ (184,273,109.27)$$
$$138,520,983.13$$
$$\$ (45,752,126.14)$$

*Image: Screen Shot 2022-11-08 at 9.02.24 PM.png (12 KB)*

Early in the morning on November 9, Dexter brought this apparent hole in FTX.US customer assets to the attention of senior FTX Group executives, raising it in a Slack channel where he had been discussing FTX.US issues with Bankman-Fried, Wang, Singh, and Miller.[371]

---

[369] F107051BM3E001-9728-000009647.0001.

[370] F107051BM3E001-9728-000009647, at 5.  As shown, the top figure in this calculation included not only the approximately $182.3 million difference between USD liabilities and USD stablecoins reflected on the "wallet-balances" spreadsheet, but also the approximately $2 million additional net shortfall in the USD-equivalent values of other crypto assets reflected in the "wallet_balances" spreadsheet.

[371] F107051BM3E001-9728-000009647, at 5.

Bankman-Fried suggested that the discrepancy was the result of "laziness with FBO vs corporate, and/or more bank accounts we're missing – maybe both – still looking into that."[372] Dexter asked Bankman-Fried to provide an explanation for the discrepancy before a call with the CFTC, scheduled to occur at noon that day.[373]

Throughout the day, a group of senior FTX Group executives continued to discuss efforts to resolve the company's crisis via securing a capital injection or by selling FTX Group assets. Dexter continued to raise concerns regarding the discrepancy at FTX.US, writing at one point that he saw "a $45M deficit in customer assets based on Gary's spreadsheet, which could be, but has not been, plugged with operating cash."[374]  He urged other FTX Group executives "to determine where that $45M is, and if it doesn't exist, clearly effectuate a transfer of the same amount of operating cash to the FBO accounts and record that in the accounting system."[375]  At the same time, Dexter also raised questions concerning whether the earlier analyses had even encompassed all of FTX.US's FBO accounts.  At one point, Papadopoulos suggested that the bank account spreadsheet may have been incomplete—although, even as the controller, she did not herself have sufficient access to investigate this issue.[376]

Eventually, Bankman-Fried asked "how much exaclty [sic] is needed on US for FBO?"[377] Although uncertainties in the calculation persisted, Dexter responded with the $45,752,126.14

---

[372] *Id.*

[373] *Id.*

[374] Signal small group chat, at 101.

[375] *Id.*

[376] F107051BM3E001-9728-000009747.

[377] Signal small group chat, at 101-109.

93

figure that he had calculated earlier on November 9, noting that it was "based on Gary's snapshot yesterday."[378]  Bankman-Fried informed the group that he had "transferred 46m from info@alameda-research.com to expenses@ftx.us on ftx.us" within the FTX.US database.[379]  But this did not resolve the problem:  this transaction did not transfer any additional crypto into FTX.US's wallets or any additional fiat currency into FTX.US's FBO accounts to address the shortfall.  Rather, since Alameda was a customer that purported to have its own assets on FTX.US, Bankman-Fried's transfer reduced FTX.US's total customer liability by moving a $46M customer liability owed to Alameda (an Alameda "asset"), into an FTX.US corporate account.  This database transfer effectively extinguished the liability owed to Alameda.  In Bankman-Fried's words, "by database transferring 46m from info@ ('customer') liability to expenses@ ('corporate'), that means that customer liabilities decreased by 46m, and are thus below the FBO account assets."[380]

Although Bankman-Fried claimed to have resolved the hole in FTX.US's balance sheet by reducing FTX.US's liability to Alameda, other FTX.US executives were not comfortable with Bankman-Fried's actions.  Given that the FTX Group was, at this point, under significant regulatory scrutiny, some FTX.US executives had concerns about how regulators would respond to this database transaction.  Even if the database transfer by Alameda could remedy any shortfall for remaining FTX.US customers, the identification of an apparent discrepancy in customer assets raised questions about the underlying cause and the reliability of FTX.US's

---

[378] *Id.*

[379] *Id.*

[380] *Id.* at 110.

accounting system.[381]  On the afternoon of November 9, Miller informed regulators he was
"[learning] from our executive/founding team that the FTX US (West Realm Shires Services Inc)
customer assets actually held are not immediately reconcilable with the customer assets
reported."[382]

Over the ensuing days, FTX.US executives continued attempts to obtain adequate and
reliable information regarding assets and liabilities of FTX.US in order to determine the
existence and magnitude of any remaining deficit in customer accounts, as well as to assess the
viability of FTX.US as a whole.  Dexter and executives at FTX.US recognized that the bank and
database balance spreadsheets circulated in the early hours of November 9 were not time-
matched to one another.  Particularly since the spreadsheets had been produced in the midst of
elevated customer withdrawals, the time mismatch could have misrepresented FTX.US's
assets—and the discrepancy identified by Dexter could have been larger, smaller, or even
nonexistent.  For example, if the bank balances were pulled before a customer executed a fiat
withdrawal, but the database balances were pulled after that same withdrawal, the database
balances might reflect a reduction of customer liability based on a withdrawal not yet reflected in
the bank balances—resulting in an overstatement of assets relative to liabilities.  This or the
converse situation could be the case for any number of intervening transactions.  In addition,
there remained uncertainty as to whether the spreadsheets captured all crypto wallets and
included all FTX.US FBO accounts.[383]  FTX.US's executives concluded that the only way to

---

[381] F10705-E016466486, at 3; F10705-E016409193, at 2-3; F107051BM3E001-9728-000007266 ("[T]he only
possibility for the 45M is a withdrawal from the wallets or banks that was not recorded in the db"); Signal small
group chat, at 101 ("[T]he [FTX.US] accounting system is broken and we should not continue operating
[FTX.US]").

[382] *See* F10705-E016466486, at 3; F10705-E016409193, at 2-3.

[383] Signal small group chat, at 108-109.

accurately assess the state of FTX.US's finances was to run a true time-matched transactional reconciliation, in which they reassembled the balance sheet based on individual transaction records, in order to determine the exact state of FTX.US's assets at a given point in time.

On November 10, Wang prepared what he claimed were updated FTX.US crypto wallet and customer account balances and sent the new spreadsheet to a small group of FTX Group executives, including Bankman-Fried, Dexter, Singh, and Miller.[384]  Wang's spreadsheet again included FTX.US database assets and liabilities, as well as bank account balances that he said had been provided by a member of the settlements team.  This updated spreadsheet purported to show that the customer asset shortfall had been rectified—and may even have turned into a surplus.  According to this updated data, the value of all non-stablecoin cryptocurrency in FTX.US's wallets exactly matched FTX.US's customer liabilities, such that all prior discrepancies of non-stablecoin cryptocurrency had been eliminated.[385]  Additionally, it showed that FTX.US had a total USD (fiat and stablecoin) liability to customers of approximately $59.7 million, as compared to total USD assets of approximately $72 million (approximately $24 million in fiat currency in FBO accounts, and approximately $48 million in USD stablecoin wallets).[386]  In other words, Wang's new spreadsheet suggested that FTX.US now had approximately $12 million more in customer assets than it owed as liabilities to customers.

However, substantial uncertainty remained concerning the reliability of this data.  Among other things, it was still unclear whether the updated database balances and bank balances were

---

[384] F107051BM3E001-9728-000009645

[385] As discussed further below, but not disclosed in this Signal chat at the time, Wang eliminated these crypto discrepancies by first attempting to "sweep" in any crypto assets that had not been captured in the initial analysis, and then executing database transfers from Alameda to offset any remaining discrepancies.

[386] F107051BM3E001-9728-000009645.0001.

time-matched.  Moreover, it appeared that a shortfall would still exist absent the Alameda

customer liability database transfer of $46 million that Bankman-Fried had reported to the group

the prior day.

Early in the morning of November 11, Wang indeed confirmed that the updated data he

had provided on November 10 was not time-matched.[387]  He informed Dexter that he could not

perform a time-matched reconciliation because he did not have access to the FTX.US bank

accounts and needed assistance from the FTX.US settlements team.[388]  Shortly thereafter, Dexter

reached out to the settlements team to request their assistance in conducting a time-matched

reconciliation.[389]  This was never completed.[390]

FTX.US thereafter filed Chapter 11 bankruptcy along with many other FTX Group

entities.  After the filing, the Debtors' financial advisors, AlixPartners and Alvarez & Marsal,

investigated the state of FTX.US's balance sheet on the Petition Date and assessed, among other

things, the scale of the shortfall in customer assets at that time.  Based on this methodology, an

initial analysis conducted by Alvarez & Marsal and released to the public on March 2, 2023,

assessed that the shortfall at FTX.US was approximately $106 million as of 10:00 a.m. on

November 11, 2022, the approximate time the Debtors filed for bankruptcy.[391]  As the Debtors'

investigation progressed, Alvarez & Marsal continued to refine its analysis and released updated

estimates of the shortfall as of the Petition Date.  The latest estimate, which was released to the

---

[387] F107051BM3E001-9728-000009649.

[388] *Id.*

[389] F107051BM3E001-9728-00007080.

[390] F107051BM3E001-9728-000007266.

[391] *Preliminary Analysis of Shortfalls at FTX.COM and FTX.US,* March 2, 2023,
https://restructuring.ra.kroll.com/FTX/Home-DownloadPDF?id1=MTQ1MzA2Mw%3D%3D&id2=0, at 14.

public on May 7, 2024 in connection with the proposed Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates, is that the FTX.US customer asset shortfall as of the Petition Date was approximately $141 million.[392]  This retrospective assessment reflected, among other things, the loss of substantial crypto assets that were misappropriated from FTX.US due to a hack on November 11, 2022, subsequent to the aforementioned calculation performed by Dexter.  Moreover, this assessment did not include customer liabilities owed to Alameda by FTX.US, which had been included in the earlier Dexter analysis.

## IV.    Investigative Findings

As detailed in this Phase II Report, the Examiner investigated the circumstances that gave rise to the discrepancy in customer assets that was identified in November 2022, as well as the potential causes for any such hole, challenges associated with reconciliation efforts in November 2022, and whether such balance sheet shortfalls and reconciliation issues may have existed at earlier points in time.  The Examiner's investigative findings are summarized below, and then detailed further in the sections that follow.

*First*, the Examiner found that FTX.US was heavily intertwined with the broader FTX Group and relied extensively on funding and other support from those entities.  In general, witnesses across the FTX.US organization expressed uncertainty as to whether FTX.US would be a viable enterprise absent such support.  As with the other FTX Group entities, FTX.US relied significantly on capital infusions from its founders—Bankman-Fried, Wang, and Singh—which

---

[392] Dkt. No. 14300 § 2.1.194.  The Debtors filed a First Amended Plan of Reorganization on August 7, 2024, but the calculation of the shortfall did not change.  Dkt. No. 22165 § 2.1.198.  The Examiner has reviewed the methodology underlying the Debtors' calculation and has conferred with the Debtors' counsel and financial professionals regarding the analysis that produced the estimate.  In this investigation, the Examiner sought to investigate and understand the circumstances giving rise to FTX.US's inability to reconcile its balance sheet beginning on November 9, 2022—as the business was collapsing.  The analysis performed by AlixPartners and Alvarez & Marsal answered a different question at a different point in time.

often were structured as loans from Alameda.  Indeed, FTX.US appeared to operate under the

view that the monetary needs of the company would be satisfied with continuous access to

capital from the FTX Group.  Moreover, the close relationship between FTX.US and other FTX

Group entities, and general lack of adherence to strict corporate formalities and principles of

separateness, also appear to have led to various transfers of funds between FTX.US and other

FTX Group entities that were not always properly or timely recorded, including in ways that may

have contributed to reconciliation issues in November 2022.  Indeed, the aforementioned account

transfers by Alameda in November 2022, although arguably intended to rectify discrepancies in

customer assets at Alameda's expense, were endemic of this broader issue.

*Second*, the Examiner found several flaws with FTX.US's management of customer

crypto assets.  For instance, FTX.US did not always clearly delineate corporate and customer

crypto assets.  Rather, FTX.US maintained a single set of crypto wallets for all crypto assets of

FTX.US.  This included not only customer assets but also crypto belonging to FTX.US, such as

certain revenue generated by FTX.US.  The company also maintained various accounts on the

FTX.US exchange that were meant to track corporate assets and liabilities, but at times may have

been misidentified as customer accounts.  Additionally, the availability of information regarding

the status and amount of customer crypto at FTX.US was very limited.  Only a small number of

high-ranking executives, including Singh and Wang, had direct access to FTX.US's crypto

wallets; no member of the settlements or accounting teams had direct access to this information.

While the technology team developed software to facilitate certain accounting and reconciliation

tasks, the software was often unreliable.  These constraints—together with the deficiencies in

maintenance and oversight of customer FBO accounts—prevented anyone in the business from

having an accurate and complete picture of customers' assets at any point in time, including at the time of the collapse in November 2022.

*Third*, and relatedly, the Examiner's investigation also revealed several flaws in FTX.US's management of customer fiat that created risk to customer assets. For instance, FTX.US did not maintain centralized records of all corporate and customer fiat accounts, and no one person had sufficient access to all bank accounts in order to readily determine the total amount of available FTX.US fiat assets. Moreover, in the early days of FTX.US, the settlements team had to manually process customer fiat currency deposits and withdrawals, a system that was rife with error. And even when the company automated its processes, some manual intervention was still necessary.

*Fourth,* the Examiner identified other evidence of poor financial recordkeeping and management at FTX.US prior to November 2022. FTX.US had no systems in place to ensure that balance sheet, bookkeeping, and wallet discrepancies were detected and addressed. For instance, as described above, intercompany loans and transactions were poorly documented and sometimes not documented at all, resulting in reconciliation discrepancies. Also as noted above, FTX.US used various manual processes that were prone to error. Similarly, FTX.US relied on manual processes and Excel spreadsheets to process accounts payable transactions—a system that concededly yielded periodic errors. Ultimately, multiple FTX Group employees expressed a troubling view that while such accounting issues and discrepancies might exist, they ultimately would not be a problem so long as corporate assets exceeded any shortfall in customer assets.

*Fifth*, and relatedly, FTX.US lacked critical systems and controls for ensuring the security and amount of customer assets. Notably, based on the Examiner's work, no department at FTX.US was expressly charged with the responsibility for these matters. Some at FTX.US,

including members of the finance team, assumed this was the responsibility of the settlements team; whereas others at FTX.US, including members of the settlements team, assumed this was the responsibility of the finance team.  At the same time, FTX.US senior executives did not view themselves as being responsible for overseeing FTX.US's financial records or the status of FTX.US customer assets.  Consequently, FTX.US did not have any process in place to quickly and reliably verify the amount of all customer assets, across both crypto and fiat accounts, or to confirm such assets were sufficient to satisfy all then-existing liabilities.  Indeed, FTX.US did not maintain centralized records with all information necessary to undertake such an analysis, and no single department or individual appears to have had sufficient access to the information necessary to perform such an analysis on demand.

The various sources of potential discrepancies noted above, together with the absence of a centralized process or dedicated team for conducting a reconciliation of customer assets, left FTX.US unable to perform a reliable analysis of customer assets in a time of crisis.  These systemic and compounding issues also effectively preclude the Examiner from reaching reliable conclusions as to the existence and amount of any actual discrepancies in customer assets at any point prior to the events of November 2022.

     *a.*     *FTX.US Relied Significantly on Funding and Other Support From Other FTX Group Entities*

There is substantial evidence that FTX.US was heavily intertwined with the broader businesses of the FTX Group.  This close relationship manifested itself not just operationally, but financially as well.  FTX.US was not unique in this—the FTX Group overall "lacked an appropriate organizational structure" and operated as "a web of parallel corporate chains."[393]

---

[393] First Ray Report, at 8.

FTX.US was ultimately controlled by Bankman-Fried and other core FTX Group executives.  It relied on Wang and Singh for the technology to support its exchange platform, and there was a lack of adherence to strict corporate formalities and separation between the entities, with personnel frequently assisting outside their assigned entity.  Additionally, Alameda was one of FTX.US's largest customers; it traded on the platform to support volume and benefit the exchange, even when doing so may not have been optimal for Alameda individually.

Moreover, FTX.US was not yet profitable.  This fact alone was not a surprise to company leadership, as early-stage growth companies often spend aggressively and operate at a loss for several years before becoming profitable.  That said, witnesses across the FTX.US organization expressed uncertainty as to whether the business would be viable absent the support (financial and otherwise) from other FTX Group entities.  As with the other FTX Group entities, FTX.US relied heavily on capital infusions from its founders, Bankman-Fried, Wang, and Singh.[394]  These investments were often structured as loans from Alameda to the founders, who would in turn lend the funds to FTX.US with the opportunity to have the loans converted into equity.  In addition, and as discussed in more detail below, on at least one occasion, Alameda provided an intercompany transfer of funds to FTX.US of $195 million.[395]  As established by evidence presented at the trial of Bankman-Fried, Alameda had been misappropriating FTX.com customer assets through special privileges afforded to it on the FTX.com platform and its access to customer funds in Alameda bank accounts.[396]  To be clear, the Examiner's investigation has not

---

[394] F10705-E016421598, at 1-2.  FTX.US additionally relied on investments from third parties; however, Bankman-Fried, Wang, and Singh were the primary investors.  *See* Ray First Day Declaration, Ex. B.

[395] *See infra* Section IV(d).

[396] Second Ray Report, at 11.

revealed evidence that Alameda took advantage of similar special privileges on FTX.US.[397]
However, given FTX.US's reliance on funds from the founders and Alameda, it is likely that
FTX.US was at least indirectly propped up through FTX Group's misappropriation of FTX.com
customer assets.

FTX.US had several categories of significant expenditures.  FTX.US's largest expense
was marketing, including celebrity endorsements and partnerships.[398]  Some of these expenses
were divided among multiple FTX Group entities, although such intra-FTX Group obligations
were not always clearly recorded.

FTX.US also spent extensively on promotional rewards through the Earn Program.[399]
The Earn Program allowed FTX.US users to generate a financial return on their cryptocurrency
in order to incentivize more customer enrollments on FTX.US.[400]  The Earn Program was
promotional in nature; by contrast, it did not involve staking, placing user assets at "stake" in
order to generate a percentage yield return.[401]  Though it purportedly attracted additional
customers to the FTX.US trading platform, it was a large expense to the company.[402]  Initially,
the rewards that customers received through the Earn Program were paid by Alameda.  However,

---

[397] *See infra* Section IV(b).

[398] F10705-000645053.0001.  In 2021, FTX.US spent approximately $69 million in marketing expenses, while its total revenue was approximately $40 million.  *Id.*

[399] *Id.*

[400] F10705-E016422120, at 3.

[401] *Id.*  Crypto staking is the process that certain blockchain networks use to validate transactions on the blockchain in exchange for a reward.  Fidelity, *Crypto staking explained,* https://www.fidelity.com/learning-center/trading-investing/crypto/crypto-staking (last visited Aug. 31, 2024), *archived at* https://perma.cc/Y2X5-KSMC.  To ensure users do not validate improper transactions, some crypto networks impose penalties for improper validations, thereby placing user crypto assets at risk.  Coinbase, *Staking risks,* https://help.coinbase.com/en/coinbase/coinbase-staking/staking/staking-risks (last visited Sept. 11, 2024), *archived at* https://perma.cc/4FYD-57BJ.

[402] F10705-000645053.0001.

this expense eventually shifted to FTX.US, and in 2021 alone, amounted to approximately $12.25 million in expenses for FTX.US.[403]  According to FTX.US statements to regulators inquiring into whether the Earn Program constituted a securities offering,[404] FTX.US paid for the Earn Program as an operating expense through the marketing budget, which in turn was supported in large part by founder capital infusions, as opposed to actual revenue.

In general, FTX.US appeared to operate on the premise—untested until November 2022—that the monetary needs of the company would be met by continuous access to capital from the broader FTX Group enterprise.  This flawed assumption contributed to the business's deficient controls and recordkeeping.  Many FTX.US executives seemed completely indifferent to inadequate processes and records because any problems resulting from those shortcomings could easily be resolved by additional transfers or loans from Alameda or the founders.  These deficiencies, in turn, made it difficult for FTX.US leadership to obtain timely, accurate information about the status and classification of FTX.US assets in a time of crisis.

b.    *Flaws in Management of Customer Cryptocurrency at FTX.US*

The Examiner identified several problematic practices surrounding FTX.US's management of customer cryptocurrency.

*First*, the Examiner learned from several witnesses that FTX.US did not maintain separate wallets for customer cryptocurrency and corporate cryptocurrency.  Separation of customer and corporate assets is "a practice common in many industries that is designed to

---

[403] *Id.*

[404] The SEC and the Texas State Securities Board investigated whether the Earn Program constituted a securities offering, and whether it involved staking.  These investigations were ongoing at the time of the collapse.  F10705-E001565107; F10705-E016422120.

protect customers."[405]   The FTX Group appeared to recognize the importance of this practice, as it informed regulators and members of the public that "as a general principle FTX segregates customer assets from its own assets across our platforms."[406]   But as to FTX.US, this representation appears to have been false.   The consequent uncertainty as to exact amount of corporate versus customer assets also appears to have contributed to the troubling events of November 2022 discussed above.

*Second*, FTX.US did not abide by best practices for cybersecurity around the maintenance of customer cryptocurrency.   "Prudently-operated crypto exchanges keep the vast majority of crypto assets in cold wallets, which are not connected to the internet, and maintain in hot wallets only the limited amount necessary for daily operation, trading, and anticipated customer withdrawals."[407]   But FTX.US—like FTX.com—maintained customer cryptocurrency entirely in hot wallets, putting customer cryptocurrency at "higher risk of compromise."[408]   That said, the Examiner's investigation did not uncover any evidence that customer assets were actually misappropriated from hot wallets prior to November 2022, or that this security issue otherwise contributed to the apparent discrepancy in customer assets identified on November 9, 2022.[409]

---

[405] Second Ray Report, at 7.

[406] Examining Digital Assets - Risks, Regulation, and Innovation: Hearing Before the S. Comm. on Agric., Nutrition and Forestry, 117th Cong. (2022) (testimony of Bankman-Fried), at 34, https://www.agriculture.senate.gov/imo/media/doc/Testimony_BankmanFried_0209202211.pdf.

[407] First Ray Report, at 28-29.

[408] *Id.* at 27.

[409] Conversely, a significant hack and misappropriation of FTX.US crypto assets occurred on November 11, 2022, which is reflected in AlixPartners and Alvarez & Marsal's shortfall calculation as of the Petition Date.

*Third*, the availability of information regarding the status and amount of customer crypto at FTX.US was extremely limited.  Only a handful of high-ranking executives, including Singh and Wang, had direct access to the balances of FTX.US's crypto wallets.  To be sure, FTX.US needed to limit access to those wallets for security reasons.  However, given in part the interchangeability of USD fiat and USD stablecoins on FTX.US[410], these limitations impeded any department or personnel of FTX.US from having a complete and accurate view of FTX.US customer assets.  For example, based on the Examiner's investigation, no members of the FTX.US accounting or settlements teams had direct access to this information.  Moreover, while the technology team, overseen by Wang and Singh, built software to facilitate certain accounting and reconciliation tasks, these systems were often unreliable and could only be operated by Wang, Singh, or others on the technology team.[411]  Accordingly, when performing critical business functions—such as managing FTX.US's books and records and preparing for audits— FTX.US accounting and settlements employees did not have direct access to customer cryptocurrency balances.  Instead, they were reliant on information regarding customer cryptocurrency balances that could have only been provided by a small group of executives, some of whom (such as Wang and Singh) had significant responsibilities for other entities in the FTX Group.  This information gap exacerbated the challenges that FTX.US executives faced in early November 2022, when they sought to calculate customer assets held by FTX.US.  They had to rely on Wang and Singh for information about customer crypto balances, as there was

---

[410] *See infra* Section IV(e).

[411] F107051BM3E001-9728-000007268 ("Does that require a Nishad or Gary or can any other dev fix?").

uncertainty about which employees had access, and members of the settlements and accounting teams believed that only Wang and Singh had access.[412]

While the Examiner found evidence of significant flaws in how FTX.US managed customer crypto, he found no evidence that customer crypto at FTX.US was commingled with the crypto of customers of other FTX Group entities.  Witnesses who were privy to misuse of customer assets at FTX.com told the Examiner that FTX.US maintained its customer crypto in wallets separate from the wallets used by other entities in the FTX Group.  The Examiner has seen no evidence to the contrary.  In addition, as noted above, witnesses also told the Examiner that Alameda did not take advantage of special privileges on FTX.US, akin to those utilized by Alameda on FTX.com,[413] that would allow for unlawful access to and use of customer assets. The Examiner has seen no conflicting evidence in this regard either.

     c.     *Flaws in Management of Customer Fiat Currency at FTX.US*

FTX.US maintained a number of different fiat accounts across multiple banks.  Some of these accounts were designated as FBO accounts, and others were designated as corporate fiat accounts.  Unlike at FTX.com,[414] the distinction between customer and corporate fiat accounts appears to have been largely respected at FTX.US.  The Examiner's investigation showed that, at FTX.US, there was little, if any, intentional commingling of customer fiat currency with corporate fiat currency.  There were instances in which commingling, or use of customer fiat currency for corporate purposes, occurred.  But it was the result of human error by FTX.US

---

[412] F107051BM3E001-9728-000007268.

[413] Phase I Report, at 65 (describing Alameda's special privileges on FTX.com).

[414] *See generally* Second Ray Report.

employees, rather than the systemic, intentional commingling that occurred at FTX.com.[415] Moreover, several witnesses told the Examiner that FTX.US customers were directed to deposit fiat currency into FTX.US FBO accounts.  The Examiner did not find evidence that FTX.US customer fiat currency was routinely sent to non-FTX.US FBO accounts, unlike at FTX.com, where customers made deposits by sending fiat currency to Alameda and North Dimension bank accounts.[416]  On the other hand, the Examiner did identify significant deficiencies in FTX.US's practices around the management of customer fiat currency that could have created opportunities for loss or misappropriation of customer deposits.

Customer fiat currency was kept in one of several FBO accounts maintained by FTX.US across a handful of banks.[417]  Witnesses told the Examiner that FTX.US primarily kept customer fiat currency in FBO accounts at Signature Bank and Silvergate Bank.  However, FTX.US also maintained some FBO accounts for customer fiat currency at other banks, and the company's use and monitoring of these FBO accounts was seemingly haphazard.  For example, there was no automated means of monitoring the total balances of all of the FBO accounts:  the only way to do so was for one of the few FTX.US employees with access to the online bank accounts to check the balance of each account and total the balances.[418]  Moreover, it does not appear that FTX.US consistently maintained a single reliable, up-to-date list of FBO accounts or that any one person had access to all FBO accounts.  Rather, the Examiner uncovered evidence that, when FTX.US

---

[415] F107051BM3E001-9836-000018108 (discussing an "accident[al]" transfer of funds from an FBO account that should have been made from an FTX.US corporate account).

[416] Second Ray Report, at 9-12.

[417] *See* F107051BM3E001-9728-000009647.0001 (preliminary list of FBO accounts prepared by the FTX.US settlements team during the November 2022 crisis).

[418] F107051BM3E001-9728-000009747, at 5.

executives identified a possible shortfall in customer assets in November 2022, FTX.US

employees had difficulty identifying all FBO accounts, as well as determining who could access

each FBO account to determine the current balance.[419]

Management of customer fiat currency was overseen by a relatively small settlements

team, and some fiat settlements had to be executed through an error-prone manual process.

During the early period of FTX.US's operation—what an internal document called "the bad old

days" of fiat currency management in the FTX Group[420]—many of the banks that FTX.US used

required manual processing of customer fiat currency deposits and withdrawals.  This manual

processing requirement meant that when a user transferred fiat currency to FTX.US by

depositing it in one of FTX.US's bank accounts, a member of the settlements team needed to

manually identify the deposit, trace it to a customer account, and credit the customer account

with the funds.  This process occurred in reverse when a customer wished to withdraw funds—a

settlements team member would have to manually confirm the exchange withdrawal and transfer

those funds to the customer's bank account.  The "painfully manual" nature of settlements led to

"somewhat . . . dangerous" delays and errors in management of FTX.US customer fiat

currency.[421]  For instance, the FTX.US settlements team would sometimes execute a single user

deposit twice, thereby double crediting an FTX.US user's exchange account, or would execute a

single user withdrawal twice, thereby double crediting an FTX.US user's bank account.  Other

errors included transfers into or out of incorrect fiat and/or exchange accounts.  When these

errors involved improper transfers of fiat currency out of FTX.US bank accounts, the settlements

---

[419] *See* Signal small group chat, at 108 ("She is unsure but thinks there might be more FBO accounts and balances in Deltec[.]").

[420] F10705-E001050102, at 3.

[421] *Id.*

team often had no way of recovering the funds beyond asking the recipient to return them—and such requests were not always honored.  Based on the Examiner's investigation, it is unclear how—if at all—these errors (and the consequent imbalance in customer assets to liabilities) were ever reconciled.

By the end of 2021, FTX.US had implemented an automated fiat currency settlements process for at least the primary FBO bank accounts used by FTX.US.[422]  This automated fiat settlements process allowed the settlements team to handle most fiat currency transactions through the click of a button, rather than through the error-prone manual process that existed in the early days of the exchange.[423]  FTX.US continued to make improvements to fiat currency tracking and reconciliation through summer 2022.[424]  However, the automated settlements process could not be used in all cases.  For example, it would fail in the event that the name of an FTX.US account holder did not precisely match the name on that account holder's outside bank account.  Because the automated settlements process was imperfect, FTX.US relied on manual settlements of at least some customer fiat currency transactions daily until the Petition Date.

      *d.*      *Poor Systems and Recordkeeping at FTX.US Before November 2022*

In addition to the lack of controls and processes in the management of customer assets, the Examiner identified evidence reflecting the poor management of FTX.US's finances more generally.  Balance sheet, bookkeeping, and wallet discrepancies of various forms were undetected or left unaddressed for long periods of time, with no systems in place to ensure such issues were identified and remedied.

---

[422] F10705-E001050102, at 3.

[423] *Id*.

[424] F10705-000525984 (describing system improvements that would allow FTX.US "to have complete reconciliation of all accounts FBO and corporate").

As discussed above, FTX.US relied heavily on loans and other intercompany transactions between FTX.US and other entities in the FTX Group.  As was the case at other FTX Group entities,[425] these intercompany transactions were often poorly documented in FTX.US records— or omitted entirely—and FTX Group employees had difficulty reconciling them.  For instance, in mid-2021, Alameda made a $195 million loan to FTX.US, which it transferred in fiat currency via wire transfer.[426]  This loan was not recorded in FTX.US's records.[427]  Months later, in October 2022, a member of the Alameda settlements team identified the loan while working to reconcile Alameda's balance sheet, and brought it to the attention of the FTX.US settlements team.[428]  The Alameda settlements employee thereafter undertook an exercise to identify any other reconciliation issues at FTX.US.[429]

Moreover, while FTX.US's deficient processes left the company without a means to track loans, it also resulted in FTX.US failing to ensure that it was actually receiving assets to which it was entitled.  For instance, FTX.US did not have a mechanism to make sure it was transferring trading fees from customer accounts to corporate accounts.  As a cryptocurrency exchange, FTX.US earned revenue by charging trading fees to customers who made trades on the exchange.  Collection of trading fees should have been effectuated by periodically sweeping earned fees out of customer accounts and into corporate accounts.  Yet senior FTX.US executives informed the Examiner that this sweep process rarely, if ever, occurred.

---

[425] First Ray Report, at 17-18.

[426] F10705-E001103679.

[427] FTX.US Custodial Assets vs. Customer Liabilities (Aug. 21, 2024), at 4.

[428] F10705-1-BM3-E162-000023967.

[429] *Id.*; F10705-1-BM3-E162-000016845.

As another example, the evidence revealed that FTX.US employees failed to routinely ensure that customer cryptocurrency deposits were being sent to the correct accounts and incorporated into FTX.US's wallets.  Customers could deposit crypto at FTX.US by making a deposit into their database account and then transferring crypto to one of several deposit wallet addresses.  In some instances, customers would make deposits but send their crypto to an incorrect wallet address—for example, sending one type of crypto into the deposit wallet designated for a different type of crypto.  When this happened, the crypto would not automatically be swept into FTX.US's primary wallets or credited to the customer's account.  A customer who noticed the lack of credit could then call customer support, which, in turn, could credit the customer's account based on the crypto sitting in the incorrect deposit wallet.  Because crediting the customer's account increased the balance of the customer's account in the exchange database, doing so would increase total customer liabilities on the exchange.  However, the crypto would at least for a time remain in the incorrect deposit wallet and not be captured as a recorded asset of the exchange, creating an apparent shortfall in assets relative to liabilities in the amount of the misdirected deposit.  Although FTX.US was technologically capable of locating these misdirected assets and sweeping them into its crypto wallets, it did not do so regularly.[430] Rather, FTX.US undertook a manual process of reconciling misdirected crypto assets only a few times per year.  Based on the Examiner's investigation, this issue may have contributed to at least some of the initial mismatches in crypto assets observed as of the first November 9 attempted reconciliation discussed above.

Finally, the FTX.US database maintained both customer accounts and accounts used for internal corporate purposes.  For instance, FTX.US maintained a corporate "expenses@ftx.us"

---

[430] F107051BM3E001-9728-000009647.

account in the FTX.US database, which was used to pay out various forms of on-exchange expenses. This structure made it difficult to readily assess which accounts on the FTX.US database qualified as a customer liability, and which accounts qualified as corporate assets. During the Examiner's investigation, at least one witness suggested that certain of these corporate accounts on FTX.US may have been misclassified and contributed to discrepancies during the November 2022 reconciliation effort, although the magnitude and direction remains uncertain.

The Examiner has not found conclusive evidence that any of this poor financial management directly led to an actual shortfall in customer assets, in November 2022 or at any other time. However, these practices are indicative of an extremely poor internal control environment where customer assets could have been misused, or a shortfall in customer assets could have arisen inadvertently through mismanagement of accounts and wallets where they were stored. Moreover, they suggest that if a shortfall in customer assets had occurred, it may have been difficult to detect, either contemporaneously or retrospectively.

     *e.*     *Inadequate Systems for Reconciling Customer Balances at FTX.US*

The Examiner found that, as it related to FTX.US's systems and controls for reconciling and monitoring customer assets—the critical task that Dexter and other executives sought to perform as the crisis unfolded in November 2022— FTX.US's processes were woefully inadequate for several reasons. To begin, there was no single person or team at FTX.US that had real-time visibility into the status of all customer assets at FTX.US. As discussed above, responsibility for customer cryptocurrency and customer fiat currency was entrusted to different teams at FTX.US. Customer fiat currency was managed by the FTX.US settlements team. While some members of the settlements team had real-time access to certain FTX.US's bank accounts, members of the settlements team did not have real-time visibility into the FTX.US

cryptocurrency wallets or customer account balances on the exchange.  By contrast, customer cryptocurrency and customer account balances were overseen by a small group of FTX Group executives who were responsible for managing FTX.US's underlying technology, including Singh and Wang.  But these executives could not obtain information regarding FTX.US customer fiat currency without resorting to assistance from the settlements team.  The siloed nature of FTX.US's finance functions meant that no individual or team had a complete picture of FTX.US's financial status, nor did any individual or team have accountability for ensuring that all customer assets were in place.  Indeed, it was often unclear who was responsible for the exchange as a whole.  FTX.US President Brett Harrison resigned in September 2022 and was never replaced.  Some FTX.US employees who up to that point had ostensibly reported to the President told the Examiner that, after Harrison's resignation, it was unclear who was in charge or who they were supposed to report to.

While FTX.US was operationally siloed into teams responsible for customer cryptocurrency and customer fiat currency, the underlying exchange logic did not isolate cryptocurrency and fiat currency in the same way.  FTX.US relied on the premise that US dollars were equivalent to dollar-denominated stablecoins, such as USDC.  This framework had operational significance:  customers could deposit and withdraw USDC (and other dollar-denominated stablecoins) and US dollars (fiat) interchangeably.  In other words, a customer could increase USD assets on the exchange through a deposit of either fiat currency or stablecoins, and likewise could draw down USD assets on the exchange through a withdrawal of either fiat currency or stablecoins—irrespective of the form of the initial deposit.  Similarly, in tracking liabilities to customers, FTX.US's internal exchange collapsed both US dollar fiat and

dollar-denominated stablecoin liabilities into a single combined liability of USD.[431]  But, relevant

here, while FTX.US operated under the premise that dollars and dollar stablecoins were

equivalent, there was no single person or team responsible for ensuring that FTX.US maintained

an amount of dollar-denominated custodial assets—both crypto and fiat—equal to all of

FTX.US's dollar-denominated customer liabilities.  Indeed, FTX.US employees with

responsibility for customer cryptocurrency often had to rely on a mere assumption that customer

fiat currency balances in bank accounts were sufficient to account for any difference between

total USD stablecoin assets and total USD liabilities (across both fiat and stablecoin).

      Given the interchangeability between fiat currency and stablecoins for customer deposits

and withdrawals, FTX.US would at times need to convert a portion of its holdings of fiat

currency into USD-equivalent stablecoins, or vice versa, to satisfy customer demands.  FTX.US

relied on Alameda for these conversions.  Although members of the settlements team routinely

sent USD-equivalent stablecoin to Alameda for conversion to fiat, they did not have access to

FTX.US crypto wallet balances to know how much USD-equivalent stablecoin FTX.US had

available or how much would remain after the transaction was complete.  Nor did the settlements

team have visibility into the stablecoin conversion process once assets were transferred to

Alameda.  To be clear, the Examiner has seen no evidence that Alameda used the stablecoin

conversion process as an opportunity to misappropriate customer assets from FTX.US.  Nor has

the Examiner seen evidence that the stablecoin conversion process contributed to a shortfall in

customer assets, whether in November 2022 or at any prior point.  But uncertainty concerning

this process within key departments at FTX.US presented another source of potential confusion

and inaccuracies at a time of crisis.

---

[431] F107051BM3E001-9728-000009647.0002; *see also supra* Section IV(b).

In addition to being operationally siloed, FTX.US had deficient processes for internal control and analysis, including with regard to reconciliation.  FTX.US did not have a practice of routinely confirming that custodial assets on hand in its FBO accounts and crypto wallets corresponded to customer liabilities.  FTX.US employees, including those on key teams that should have been tasked with reconciling custodial assets and customer liabilities, were unable to identify who had been responsible for doing so.  Indeed, based on the Examiner's interviews, many FTX.US employees, including senior executives, had little insight into the functionality of the exchange beyond their specific job duties.  They ascribed responsibility—including for reconciling customer balances—to other teams without knowing with certainty whether those teams actually performed such tasks.  For example, members of the FTX.US finance team believed that reconciliation of customer assets was a responsibility of the settlements team, while a member of the FTX.US settlements team believed that reconciliation of customer assets was a responsibility of the finance team.  In 2022, there were some efforts to build software tools that would have facilitated reconciliation of FTX.US's customer assets.[432]  But they were incomplete at the time of the November 2022 collapse.

Because of these deficiencies, there was not an efficient process—or even an established, orderly process—for quickly and reliably validating the state of FTX.US's custodial assets and its ability to fulfill customer transactions.  When the crisis struck in the early days of November 2022, senior executives such as Miller and Dexter could not follow a set procedure to confirm that FTX.US remained capable of fulfilling its basic obligation to protect customer assets.[433]

---

[432] F10705-000525984.

[433] *See, e.g.*, F107051BM3E001-9728-000007266; F107051BM3E001-9728-000007080 (FTX.US executive soliciting help with a "transactional analysis" on Slack in an effort to assess the status of FTX.US assets).

Rather, they remained reliant on the manual work and personal knowledge of a handful of individuals with only partial, siloed information and access in order to accomplish the basic task of reconciling its custodial assets and customer liabilities.  And in turn, those individuals were not immediately prepared to provide reliable information and, yet, had to attempt to assemble it at a time of great stress and urgency.  These deficiencies inevitably resulted in uncertainty in the attempted reconciliation efforts and a substantial risk of human error at a time of crisis where confidence and certainty were necessary.

## V.  Conclusion

The Examiner's investigation revealed that FTX.US suffered from systemic flaws in internal processes, controls, and recordkeeping.  Among other things, FTX.US was heavily reliant on the broader FTX Group for operations, strategy, and funding.  FTX.US had wholly inadequate—and at times entirely lacking—systems for settling customer and intercompany transactions, and for tracking and reconciling customer assets.  Those processes often relied on the manual intervention of a handful of individuals with relevant knowledge.  FTX.US's deficiencies were further compounded by a corporate structure in which information was siloed; no individual or team at FTX.US had a complete picture of FTX.US's financial status, nor did any individual or team have accountability or processes for ensuring that all customer assets were in place.  Indeed, responsibility for such key tasks was not clear to even FTX.US's most senior executives, and there was a striking indifference to potential warning signs—so long as there was enough money somewhere in the FTX Group to fulfill the immediate need.  Thus, when crisis arose, senior executives could not follow any established process for quickly and reliably validating the state of FTX.US's custodial assets.  Rather, they had to rely on manual work and personal knowledge of a handful individuals with limited and flawed information to

accomplish a fundamental task of this business—reconciling its custodial assets and customer liabilities.

The Phase II Scope Order charged the Examiner with investigating (i) the cause of the observed November 2022 hole in customer assets at FTX.US; (ii) whether similar holes arose at other times; and (iii) how those holes were resolved.  Due to the substantial deficiencies in FTX.US's processes and recordkeeping, the Examiner was unable to determine with certainty the direct cause of the November 2022 hole or establish with certainty whether similar shortfalls in FTX.US customer assets occurred prior to November 2022.  However, FTX.US's deeply flawed practices created an environment where FTX.US customer assets were at risk of loss and misuse and could have readily gone undetected and unresolved.

Dated: September 20, 2024

Respectfully submitted,

By: _____/s/ Robert J. Cleary_____

Robert J. Cleary
*Chapter 11 Examiner*


**ASHBY & GEDDES, P.A.**

Michael D. DeBaecke (Bar No. 3186)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Tel: (302) 654-1888
Email: mdebaecke@ashbygeddes.com

*-and-*

**PATTERSON BELKNAP WEBB & TYLER LLP**

Daniel A. Lowenthal (admitted *pro hac vice*)
Kimberly A. Black (admitted *pro hac vice*)
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
Email: dalowenthal@pbwt.com
Email: kblack@pbwt.com


*Counsel to Robert J. Cleary in his capacity as Examiner appointed in the Chapter 11 Cases*

119