## Exhibit A

**Preferred Shareholder Agreement**

THIS SETTLEMENT AND PLAN SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ALL POTENTIAL PARTIES TO THIS AGREEMENT SHOULD CAREFULLY REVIEW THE COURT-APPROVED DISCLOSURE STATEMENT, WHICH CONTAINS MATERIAL INFORMATION.   NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

### *SETTLEMENT AND PLAN SUPPORT AGREEMENT*

This SETTLEMENT AND PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 10.2 hereof, this "**Agreement**") is made and entered into as of August 28, 2024 (the "**Execution Date**"), by and among FTX Trading Ltd. ("**FTX Trading**") and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"), and the undersigned Preferred Shareholders (as defined herein) that have executed and delivered counterpart signature pages to this Agreement, a Joinder or a Transfer Agreement, in each case, to counsel to the Debtors (the "**Supporting Preferred Shareholders**" and, collectively with the Debtors, the "**Parties**").

### *RECITALS*

**WHEREAS**, on November 11 and November 14, 2022 (as applicable, the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re FTX Trading Ltd.*, *et al.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2023) (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, on June 23, 2024, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 18536] (as amended, the "**Plan**");

**WHEREAS**, the Debtors, certain of the Supporting Preferred Shareholders and the United States Department of Justice (the "**DOJ**") have engaged in discussions regarding competing claims by the Debtors and the Preferred Shareholders to the property and proceeds recovered by the DOJ and claimed by the DOJ to be subject to forfeiture in connection with *United States* v. *Samuel Bankman-Fried*, Case No. 1:22-cr-00673 (LAK) and property and proceeds recovered or to be recovered by the DOJ and claimed by the DOJ to be subject to forfeiture in connection with other criminal actions against Insiders (as defined in the Plan) (such recovered property and proceeds, the "**Forfeiture Proceeds**");

**WHEREAS**, the Debtors have previously described the approximate expected value of the Forfeiture Proceeds in section 3.K of the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 19143];

**WHEREAS**, since the filing of the Plan, the Debtors and certain of the Preferred Shareholders also have engaged in good faith, arm's-length negotiations regarding the terms of amendments to the Plan to be proposed by the Debtors (as the Plan may be amended, modified or supplemented from time to time consistent with Section 4.1(b) of this Agreement, the "**Approved Plan**");

**WHEREAS**, the Debtors and the Preferred Shareholders each have an interest in avoiding the cost, expense and delay that would be associated with litigation in connection with the Plan and the Forfeiture Proceeds;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

1.      ***Definitions and Interpretation.***

1.1.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Affiliate**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with Section 10.2 hereof.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 hereof have been satisfied or waived in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to each Party, the period from the Agreement Effective Date to the Termination Date applicable to such Party.

"**Approved Plan**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means, with respect to any Debtor, the meaning ascribed to it in section 101(5) of the Bankruptcy Code. For the avoidance of doubt, "Claim" includes Customer Entitlement Claims and Dotcom Customer Entitlement Claims, as such terms are defined in the Plan.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Approved Plan.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code), including any issued, unissued, authorized or outstanding share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Forfeiture Proceeds**" has the meaning set forth in the preamble to this Agreement.

"**FTX Trading**" has the meaning set forth in the preamble to this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit B**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Maximum Recovery Amount**" means the lesser of (i) 18% of all Forfeiture Proceeds, whether or not distributed to the Debtors, and (ii) $230 million.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Preferred Equity Interest**" means the following Equity Interests to the extent issued and outstanding as of the Petition Date: (a) series A preferred stock issued by West Realm Shires Inc., (b) series B preferred stock issued by FTX Trading, (c) series B-1 preferred stock issued by FTX Trading, and (d) series C preferred stock issued by FTX Trading.

"**Preferred Shareholders**" means a holder of a Preferred Equity Interest that is not an Excluded Party (as defined in the Plan).

"**Preferred Shareholder Remission Fund**" has the meaning set forth in Section 4.1(b)(i) of this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims or Equity Interests (or enter with customers into long and short positions in Claims or Equity Interests), in its capacity as a dealer or market maker in Claims or Equity Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Requisite Preferred Shareholders**" means, at any time, Supporting Preferred Shareholders holding at least 50.01% of the Preferred Equity Interests held by all Supporting Preferred Shareholders as measured by aggregate liquidation preference.

"**Restricted Period**" means the period commencing as of the date each Supporting Preferred Shareholder, as applicable, executes this Agreement until the Termination Date as to such Supporting Preferred Shareholder.

"**Sufficient Preferred Shareholders**" means Preferred Shareholders holding at least 50.01% of all Preferred Equity Interests as measured by aggregate liquidation preference.

"**Supporting Preferred Shareholder**" has the meaning set forth in the Preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 8.1, 8.2 and 8.3 hereof.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, tokenization, forward sales, or other transactions).

"**Transfer Agreement**" means an executed transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached to this Agreement as **Exhibit A**.

"**Transferee Qualified Marketmaker**" has the meaning set forth in Section 5.3(b).

"**Voting Deadline**" means August 16, 2024, or any other date fixed by the Bankruptcy Court establishing the deadline for voting on a plan of reorganization proposed by the Debtors.

"**United States Trustee**" means the United States Trustee for Regions Three and Nine.

1.2.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    unless otherwise specified in this Agreement, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act or deadline under the Amended Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(f)    unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(g)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(j)      the use of "include" or "including" is without limitation, whether stated or not;

(k)      the word "or" shall not be exclusive;

(l)      the phrase: "counsel to the Debtors" refers in this Agreement to counsel specified in section 10.10(a); and

(m)      the phrase: "counsel to the Supporting Preferred Shareholders" refers in this Agreement to counsel specified in section 10.10(b).

2.            ***Effectiveness of this Agreement.***  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Supporting Preferred Shareholders; and

(b)      Sufficient Preferred Shareholders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Debtors.

3.            ***Commitments of the Supporting Preferred Shareholders.***

3.1.   <u>Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Supporting Preferred Shareholders severally, and not jointly, agrees to:

(a)      reasonably support and use commercially reasonable efforts to assist the request of the Debtors to the DOJ that all Forfeiture Proceeds be released to the Debtors for distribution as contemplated by this Agreement and the Approved Plan, including without limitation by providing such information and documents as may be reasonably requested by the Debtors (at the Debtors' sole cost and expense) or the DOJ (at the Supporting Preferred Shareholders' sole cost and expense);

(b)      use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Approved Plan and the release of Forfeiture Proceeds from other stakeholders, including the DOJ, and to reasonably consult with the Debtors regarding the status and the material terms of any negotiations with other stakeholders that are not party to this Agreement (including, for the avoidance of doubt, giving the Debtors notice and a reasonable opportunity to coordinate with the other Parties in advance of any outreach or communications to stakeholders that are not party to this Agreement);

(c)     negotiate in good faith upon reasonable request of the Debtors any modifications to the Approved Plan to the extent such modifications can be implemented without an adverse effect that is material with respect to such Supporting Preferred Shareholder;

(d)     reasonably cooperate in good faith with the Debtors to implement this Agreement and the terms of the Approved Plan in a tax efficient and cost-effective manner; and

(e)     to the extent that any such Supporting Preferred Shareholder receives Forfeiture Proceeds on account of any Equity Interest that would result in the recipient receiving an amount in excess of the Maximum Recovery Amount attributable to such recipient's Preferred Equity Interests on a pro rata basis , receive and hold such Forfeiture Proceeds in trust for the benefit of the Debtors and pay over to the Debtors such Forfeiture Proceeds on demand for application pursuant to this Agreement and the Approved Plan (the commitment contained in this section 3.1(e), the "**Turnover Commitment**").

3.2.   <u>Negative Commitments</u>.  During the Agreement Effective Period, each Supporting Preferred Shareholder severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to take any of the following actions without the prior written consent of the Debtors:

(a)     initiate or continue any litigation or proceeding of any kind with respect to the Chapter 11 Cases, the Forfeiture Proceeds, this Agreement, or the Plan against the Debtors, the DOJ or the other Parties, other than to enforce this Agreement or as otherwise expressly permitted under this Agreement;

(b)     object to, delay, impede, or take any other action to interfere with the release of the Forfeiture Proceeds to the Debtors as contemplated by this Agreement;

(c)     other than as explicitly set forth in this Agreement, directly or indirectly pursue or claim any right or entitlement to the Forfeiture Proceeds on account of any Equity Interest;

(d)     object to, delay, impede, withdraw, amend or revoke any vote to accept the Plan, or take any other action to interfere with acceptance, implementation, or confirmation of the Plan;

(e)     knowingly pursue, propose, file, support, solicit support for or vote for any plan of reorganization in these Chapter 11 Cases, other than the Plan; and

(f)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan.

4.        ***Commitments of the Debtors.***

4.1.   <u>Affirmative Commitments</u>.  Except as set forth in Section 4.3 hereof, during the Agreement Effective Period, the Debtors agree to:

(a)      use commercially reasonable efforts to cause the release of Forfeiture Proceeds to the Debtors for distribution as contemplated by this Agreement and the Approved Plan;

(b)      file an amended Plan containing the following mechanics on or prior to the 30th day following the Agreement Effective Date:

(i)      as, when and to the extent the Debtors receive Forfeiture Proceeds from the DOJ, the Debtors shall deposit 18% of such Forfeiture Proceeds into a segregated fund (the "**Preferred Shareholder Remission Fund**") for the exclusive benefit of the Preferred Shareholders, *provided* that the total amount of such Forfeiture Proceeds deposited in the Preferred Shareholder Remission Fund shall not exceed $230 million;

(ii)      the Debtors shall use reasonable efforts to apply the first $15 million of proceeds in the Preferred Shareholder Remission Fund to make pro rata distributions to those Preferred Shareholders who become Supporting Preferred Shareholders (A) on or prior to the Agreement Effective Date or (B) the Debtors determine were not offered the opportunity to become Supporting Preferred Shareholders as of the Agreement Effective Date but became Supporting Preferred Shareholders prior to entry of the Confirmation Order;

(iii)      the Debtors shall apply remaining funds in the Preferred Shareholder Remission Fund to make pro rata distributions to all Preferred Shareholders;

(iv)      in the event that any Preferred Shareholder directly or indirectly receives a distribution from the DOJ on account of such Preferred Shareholder's Equity Interest or any related investment losses (and does not pay over such distribution to the Debtors as contemplated by this Agreement), the Plan Administrator (as defined in the Plan) may, with the approval of the Bankruptcy Court, make such adjustment to the amount of Forfeiture Proceeds deposited in the Preferred Shareholder Remission Fund and/or distributable to such Preferred Shareholder under the Approved Plan as the Plan Administrator may determine appropriate to ensure that no Preferred Shareholder receives more than its pro rata share of the Maximum Recovery Amount;

(v)      to the extent any of the Forfeiture Proceeds are retained by the DOJ and distributed pursuant to a separate remission process, the Supporting Preferred Shareholders' rights to participate in such remission process solely with respect to their Preferred Equity Interests are preserved up to such Supporting Preferred Shareholder's pro rata share of the Maximum Recovery Amount; *provided* that, as a condition to recovering from the Preferred Shareholder Remission Fund, a Preferred Shareholder must agree to and comply with the Turnover Commitment;

(vi)      other than Forfeiture Proceeds deposited into the Preferred Shareholder Remission Fund, Preferred Shareholders shall have no right, title or interest in Forfeiture Proceeds received by the Debtors for their own benefit or the benefit of any stakeholder, and all such Forfeiture Proceeds shall constitute property of the estate of the Debtors and be deposited in the General Pool (as defined in the Plan) and available for distribution to

creditors and other stakeholders in accordance with Section 4.2.3 of the Plan (General Pool Waterfall);

(vii)    the Plan Administrator shall not charge fees, costs or expenses to the Preferred Shareholder Remission Fund or the beneficiaries thereof, *provided* that the Plan Administrator may charge to the Preferred Shareholder Remission Fund reasonable costs and expenses related to (i) the investment of the funds held in the Preferred Shareholder Remission Fund; (ii) the withholding taxes (if applicable) associated with the Preferred Shareholder Remission Fund or distributions therefrom; (iii) the reconciliation of Preferred Equity Interests held by Preferred Shareholders and any related disputes; (iv) the making of distributions to Preferred Shareholders; and (v) other matters to the extent relating specifically to the Preferred Shareholder Remission Fund or the Preferred Shareholders;

(viii)    distributions made from the Preferred Shareholder Remission Fund shall be made on a pro rata basis according to the liquidation preferences of the applicable Preferred Shareholders (without regard to accrued and unpaid dividends), subject to the satisfaction of "know your customer" requirements, tax information requests and any other requirement requested by the DOJ and agreed to by the Debtors; *provided*, for the avoidance of doubt, that all Preferred Equity Interests shall be treated as a single class for purposes of calculating pro rata distributions; and

(ix)    in addition to their interest in the Preferred Shareholder Remission Fund, Preferred Shareholders will retain their Preferred Equity Interests and Section 510(b) Preferred Equity Claims as contemplated by the Approved Plan (with distributions with respect thereto as contemplated by the Approved Plan); *provided* that any distribution from the Preferred Shareholder Remission Fund shall reduce on a dollar-for-dollar basis the amount otherwise distributable on account of the applicable Preferred Equity Interests under the Approved Plan.

(c)    use reasonable efforts to obtain entry of the Confirmation Order and implement the Approved Plan;

(d)    use reasonable efforts to obtain any Bankruptcy Court order or other approval that is required to effectuate the provisions of this Agreement;

(e)    use reasonable efforts to provide the Supporting Preferred Shareholders and their Affiliates (in each case, in their capacity as such) with the releases described in section 10.4 of the Plan to the same extent as such releases are generally provided to members of the Ad Hoc Committee (as such term is defined in the Plan) or any other supporting third party stakeholders receiving releases pursuant to section 10.4 of the Plan;

(f)    use commercially reasonable efforts to request and obtain Bankruptcy Court approval in connection with the confirmation of the Approved Plan for the reimbursement of all reasonable and documented out of pocket fees and expenses of each counsel to the Supporting Preferred Shareholders included in Section 10.10(b) in an amount not to exceed $250,000 per counsel (collectively, the "**Reimbursable Legal Fees**"), to be paid solely

from the Preferred Shareholder Remission Fund. The Debtors may make distributions to Preferred Shareholders out of the Preferred Shareholder Remission Fund prior to the reimbursement of any Reimbursable Legal Fees, so long as the Debtors have reserved an amount from the Preferred Shareholder Remission Fund sufficient to satisfy all Reimbursable Legal Fees;

(g)     provide counsel to the Supporting Preferred Shareholders on a "professional eyes only" basis a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than three (3) Business Days) to review draft copies of the Approved Plan and the Confirmation Order (and any modifications thereto that affects the rights or treatment of Preferred Shareholders); and

(h)     provide updates regarding the status and the material terms of any negotiations with the DOJ regarding the Forfeiture Proceeds upon reasonable request from counsel to the Supporting Preferred Shareholders.

4.2.     <u>Negative Commitments</u>.  Except as set forth in Section 4.3 hereof, during the Agreement Effective Period, the Debtors shall not directly or indirectly take any of the following actions without the prior written consent of Requisite Preferred Shareholders:

(a)     object to, delay, impede, or take any other action to interfere with the distribution or ownership of the Forfeiture Proceeds as contemplated by this Agreement;

(b)     enter into any settlement with any Preferred Shareholder, on account of such Preferred Shareholder's Preferred Equity Interest(s), on terms that are more favorable than the terms of this Agreement;

(c)     file any motion or pleading, with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement; or

(d)     directly or indirectly amend, alter, supplement, restate or otherwise modify the Approved Plan, in whole or in part, in a manner that is materially inconsistent with this Agreement, including, for the avoidance of doubt, through the Confirmation Order.

4.3.     <u>Additional Provisions Regarding Debtors' Commitments</u>.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor to take or refrain from taking any action (including terminating this Agreement under Section 8 hereof) to the extent such Debtor determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law or would require approval of this Agreement by the Bankruptcy Court.  The Debtors shall give prompt written notice to counsel to the Supporting Preferred Shareholders of any determination made in accordance with this Section 4.3.  This Section 4.3 shall not impede any Party's right to terminate this Agreement pursuant to Section 8 hereof.

5.                    ***Transfer of Preferred Equity Interests.***

5.1.    Except solely to the extent provided in Section 5.2 or Section 5.3 hereof, this Agreement shall not limit, restrict, or otherwise affect in any way a Supporting Preferred Shareholder's right, authority, or power to Transfer any Preferred Equity Interests, including any right, title, or interest in a Preferred Equity Interest.

5.2.    <u>Transfer Restrictions</u>.  During the Restricted Period, and subject to the terms and conditions of this Agreement, each Supporting Preferred Shareholder agrees, solely with respect to itself, as expressly identified and limited on its signature page or Joinder or Transfer Agreement, and not in any other manner or with respect to any affiliates, not to Transfer any right, title, or interest in a Preferred Equity Interest, unless (a)  the Transferee is a Party to this Agreement or (b) if the Transferee is not already a Party to this Agreement, the Transferee agrees in writing to be bound by the terms of this Agreement by executing a Transfer Agreement in the form attached to this Agreement by the date of that Transfer. Any Transfer in violation of this Section 5 or Section 5.3 hereof shall be void *ab initio*. The Transferee shall use commercially reasonable efforts to promptly provide notice of any Transfer made pursuant to this Section 5.2, including the amount and type of Preferred Equity Interests transferred, to counsel to the Debtors.

5.3.    <u>Qualified Marketmaker Exceptions</u>.

(a)    Notwithstanding Section 5.2 hereof, a Supporting Preferred Shareholder may Transfer any right, title, or interest in its Preferred Equity Interests to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a Transfer Agreement or be a Party to this Agreement, on the condition that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Preferred Equity Interest is to a Transferee that (A) is a Party to this Agreement at the time of such Transfer or (B) becomes a Party to this Agreement on or before the date of such Transfer by executing a Transfer Agreement pursuant to Section 5.2 hereof.  The Transferee (but not, for the avoidance of doubt, a Qualified Marketmaker) shall promptly provide notice of any Transfer made pursuant to this Section 5.3(a) hereof, including the amount and type of Preferred Equity Interests transferred, to counsel to the Debtors.

(b)    Notwithstanding Section 5.4 hereof, a Qualified Marketmaker may Transfer any right, title, or interest in any Preferred Equity Interest that it acquires from a Party to this Agreement to another Qualified Marketmaker (the "**<u>Transferee Qualified Marketmaker</u>**") without the requirement that the Transferee Qualified Marketmaker execute a Transfer Agreement or be a Party to this Agreement, on the condition that any subsequent Transfer by such Transferee Qualified Marketmaker of the right, title, or interest in such Preferred Equity Interests is to a Transferee that (A) is a Party to this agreement at the time of such Transfer or (B) becomes a Party to this Agreement by the date of settlement of such Transfer by executing a Transfer Agreement pursuant to Section 5.2 hereof.  The Transferee (but not, for the avoidance of doubt, a Qualified Marketmaker) shall promptly provide notice of any Transfer made pursuant to this

Section 5.3(b), including the amount and type of Preferred Equity Interests transferred, to counsel to the Debtors.

(c)      At the time of a Transfer of any Preferred Equity Interest to a Qualified Marketmaker:

> (i)      if such Preferred Equity Interest may be voted in favor of the Plan, the Party to this Agreement must first vote such Preferred Equity Interest in accordance with the requirements of this Agreement; and

> (ii)      to the extent that a Qualified Marketmaker that is not otherwise a Party to this Agreement is eligible and entitled to vote a Preferred Equity Interest acquired pursuant to this Section 5, is not otherwise precluded from voting such Preferred Equity Interest in favor of the Plan, and receives a separate ballot for such Preferred Equity Interest, such Qualified Marketmaker shall, before the expiration of the Voting Deadline, vote such Preferred Equity Interests in favor of the Plan as contemplated hereunder.

(d)      Notwithstanding Section 5.2 hereof, to the extent that a Party to this Agreement is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in any Preferred Equity Interest that the Qualified Marketmaker acquires from a holder of such Preferred Equity Interest that is not a Party to this Agreement without the requirement that the transferee execute a Transfer Agreement or be a Party hereto.

5.4.      <u>Transfer Agreement</u>.  A Transferee that becomes a Party to this Agreement as provided in this Section 5 shall deliver a copy of the executed Transfer Agreement to counsel to the Debtors in accordance with Section 10.10 hereof within three (3) business days after the date of the Transfer, so long as such Transfer Agreement was executed in accordance with this Agreement.  The Transfer Agreement shall be treated as confidential information and shall not be disclosed without the prior written consent of the Transferee.

5.5.      <u>Effect of Delivery of Transfer Agreement</u>.  By executing and delivering a Transfer Agreement as provided under Sections 5.2(b) and 5.4 hereof, a Transferee:

(a)      becomes and shall be treated for all purposes under this Agreement as a Supporting Preferred Shareholder with respect to the Transferred Preferred Equity Interests and with respect to all other Claims and Preferred Equity Interests that the Transferee holds and subsequently acquires, subject to Section 5.3(d) hereof;

(b)      agrees to be bound by all of the terms of this Agreement (as such terms may be amended from time to time in accordance with the terms hereof); and

(c)      is deemed, without further action, to make to the other Parties hereto the representations and warranties that the Parties to this Agreement make in Section 6 hereof, herein in each case as of the date of the Transfer Agreement.

5.6.    <u>Effect of Transfer; No Liability</u>.  A Party to this Agreement that Transfers any right, title, or interest in any Preferred Equity Interest in accordance with the terms of this Section 5 shall (a) be deemed to relinquish its rights and be released from its obligations under this Agreement solely to the extent of such Transferred Preferred Equity Interest and (b) not be liable to any party to this Agreement for the failure of the Transferee, whether or not a Qualified Marketmaker, to comply with the terms and conditions of this Agreement.

5.7.    <u>Additional Claims</u>.  This Agreement shall not limit, restrict, or otherwise affect in any way a Party's right, authority, or power to acquire any Preferred Equity Interests in addition to the Supporting Preferred Shareholder's Preferred Equity Interests and such acquired interests shall automatically and immediately upon acquisition by a Supporting Preferred Shareholder be deemed to be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Debtors, as described below), except as set forth in Section 5.4 above.  During the Restricted Period, upon the written request of the Debtors, a Supporting Preferred Shareholder to this Agreement that acquires additional Preferred Equity Interests from an entity that is not a Supporting Preferred Shareholder to this Agreement shall deliver a current list of its Preferred Equity Interests to counsel for the Debtors within five (5) Business Days after the receipt of such request, and such list shall be treated as confidential information and shall not be disclosed without the prior written consent of such Party to this Agreement.

5.8.    <u>Exception for Pending Trades</u>.  Notwithstanding anything to the contrary herein, any Preferred Equity Interest Transferred to or by a Supporting Preferred Shareholder prior to the Agreement Effective Date and that is an open trade on the Agreement Effective Date shall not be subject to, or bound by, the terms and conditions of this Agreement (it being understood that such interest so Transferred to and held by a Party to this agreement for its own account (i.e., not as part of a short transaction, or to be Transferred by the Supporting Preferred Shareholder under an open trade or any other transaction entered into by such Supporting Preferred Shareholder prior to, and pending as of the date of, such Supporting Preferred Shareholder's entry into this Agreement) shall be subject to the terms of this Agreement, as provided in Section 5.6 hereof).

5.9.    <u>Signature Page Limitation</u>.  The Parties understand that the Supporting Preferred Shareholders may be engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Supporting Preferred Shareholder expressly indicates on its signature page hereto or on a Joinder that it is executing this Agreement solely on behalf of specific trading desk(s) and/or business group(s) of the Supporting Preferred Shareholder, the obligations set forth in this Agreement shall apply only to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk, business group or affiliate of the Supporting Preferred Shareholder unless it separately becomes a party hereto.

6.      ***Representations and Warranties of Supporting Preferred Shareholders.***  Each Supporting Preferred Shareholder, severally, and not jointly, represents and warrants that, as of the

date such Supporting Preferred Shareholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)     to the extent a Supporting Preferred Shareholder is identified on the signature pages hereto (or any Transfer Agreement or Joinder) as a holder of a Preferred Equity Interest, it is the beneficial or record owner of the aggregate principal amount of the Preferred Equity Interests or is the nominee, investment manager, or advisor for beneficial holders of the Preferred Equity Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Preferred Equity Interests other than those reflected in, such Supporting Preferred Shareholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 5 hereof);

(b)     to the extent a Supporting Preferred Shareholder is identified on the signature pages hereto (or any Transfer Agreement or Joinder) as a holder of a Preferred Equity Interest, it has the full power and authority to act on behalf of, and vote and consent to matters concerning, such Preferred Equity Interests;

(c)     to the extent a Supporting Preferred Shareholder is identified on the signature pages hereto (or any Transfer Agreement or Joinder) as a holder of a Preferred Equity Interest, such Preferred Equity Interests are free and clear of any pledge, lien, security interest, charge, Preferred Equity Interest, equity, option, proxy, voting restriction (including due to tokenization), right of first refusal, "lock-ups" (including lock-ups in connection with a contractual transfer restriction) or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Supporting Preferred Shareholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     to the extent a Supporting Preferred Shareholder is identified on the signature pages hereto (or any Transfer Agreement or Joinder) as a holder of a Preferred Equity Interest, it has the full power to vote, approve changes to, and transfer all of its Preferred Equity Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)     it has reviewed, or had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for it to evaluate the financial risks inherent in the Approved Plan and accept the terms of this Agreement; and

(f)     to the extent a Supporting Preferred Shareholder is binding other Parties to this Agreement, such Supporting Preferred Shareholder has the full power and authority to bind such other Parties to this Agreement.

7.      ***Mutual Representations, Warranties, and Covenants.***  Each of the Parties, severally, and not jointly, represents, warrants and covenants to each other Party that, as of the date such Party executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    to extent applicable, it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting Party's rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Approved Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate and perform its respective obligations under this Agreement;

(c)    to extent applicable, the entry into this Agreement, and performance of its obligations hereunder, do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and perform its respective obligations under this Agreement; and

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

8.        ***Termination Events.***

8.1.    <u>Termination Events</u>.  This Agreement may be terminated by the Requisite Preferred Shareholders or the Debtors by the delivery to such other Party (or Parties) of a written notice in accordance with Section 10.10 hereof upon the occurrence of any of the following events:

(a)    the Debtors file a revised Plan that is not an Approved Plan;

(b)    the breach in any material respect by the Debtors (in the case of termination by the Requisite Preferred Shareholders) or one or more Supporting Preferred Shareholders (in the case of termination by the Debtors) of any covenant in this Agreement, which breach remains uncured for ten (10) Business Days after written notice by the Party seeking termination;

(c)    any representation or warranty in this Agreement made by the Debtors (in the case of termination by Requisite Preferred Shareholders) or one or more of the Supporting Preferred Shareholders (in the case of termination by the Debtors) shall have been untrue in any material respect when made or shall have become untrue in any material respect, and the underlying factual circumstances remain uncured for ten (10) Business Days after written notice by the Party seeking termination;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that

enjoins the consummation of a material portion of the Approved Plan in a manner materially adverse to the Supporting Preferred Shareholders and remains in effect for twenty (20) Business Days, it being understood that non-occurrence of the Effective Date is materially adverse to the Supporting Preferred Shareholders;

(e)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor or the Supporting Preferred Shareholders seeking an order, converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code;

(f)     either (i) the Bankruptcy Court denies confirmation of the Approved Plan, (ii) the Bankruptcy Court does not confirm the Approved Plan by December 31, 2024, or (iii) the Approved Plan does not become effective on or prior to March 31, 2025;

(g)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the Debtors and Requisite Preferred Shareholders within ten (10) Business Days;

(h)     it is agreed or finally determined judicially that none of the Forfeiture Proceeds will be released to the Debtors for distribution pursuant to this Agreement and the Approved Plan;

(i)     no Forfeiture Proceeds have been released to the Debtors for distribution pursuant to this Agreement and the Approved Plan as of September 30, 2025; or

(j)     the Debtors inform the Supporting Preferred Shareholders in writing that they have exercised their right, consistent with their fiduciary duties and after consultation with counsel, to not pursue the implementation of the Approved Plan or take any action in reliance on Section 4.3 hereof, which notice shall be provided within one Business Day of such exercise.

8.2.    <u>Mutual Termination</u>.  This Agreement and the obligations of the Parties hereunder may be mutually terminated by mutual written agreement among the Requisite Preferred Shareholders and the Debtors.

8.3.    <u>Effect of Termination</u>.

(a)     After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement. Nothing in this Agreement shall be construed as prohibiting the Debtors or Supporting Preferred Shareholder from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its

claims against any Supporting Preferred Shareholder.  No purported termination of this Agreement shall be effective under this Section 8.3 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 8.3 shall restrict the Parties' rights to terminate this Agreement in accordance with Section 8.2 hereof.

(b)     Following the Termination Date, nothing herein shall limit the Debtor or the Supporting Preferred Shareholders' ability to pursue Forfeiture Proceeds.

9.      *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 9.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, if in writing and signed by the Debtors and Requisite Preferred Shareholders; *provided* that any modification to the definition of "Requisite Preferred Shareholders" or this Section 9 shall require prior the written consent of each Supporting Preferred Shareholder.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 9 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

10.     *Miscellaneous.*

10.1.   <u>Acknowledgements</u>.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

10.2.   <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated into and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this

Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

10.3.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to obtain the entry of the Confirmation Order, as applicable.

10.4.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any confidentiality agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

10.5.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court.  Solely in connection with claims arising under this Agreement, each Party to this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

10.6.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10.7.  <u>Execution of Agreement.</u>  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

10.8.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Debtors and the Supporting Preferred Shareholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement,

shall not be effective in regard to the interpretation of this Agreement.  The Debtors and the Supporting Preferred Shareholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

10.9.    <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 5, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

10.10.    <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the Debtors, to:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attention:  Andrew G. Dietderich, Brian D. Glueckstein and Alexa J. Kranzley
E-mail address:  dietdericha@sullcrom.com, gluecksteinb@sullcrom.com and kranzleya@sullcrom.com

(b)      if to a Supporting Preferred Shareholder, to:

**Schulte, Roth & Zabel LLP**
555 13th Street, NW, Suite 6W
Washington, DC 20004
Attention: Douglas S. Mintz
E-mail address: <u>douglas.mintz@srz.com</u>

919 Third Avenue
New York, NY 10022
Attention: Reuben E. Dizengoff
Email address: <u>reuben.dizengoff@srz.com</u>

-and-

**Allen Overy Shearman Sterling US LLP**
599 Lexington Ave. New York, NY 10022
Attention: Mark Shapiro, Sara Coelho and William Holste
E-mail address: mark.shapiro@aoshearman.com; sara.coelho@aoshearman.com; william.holste@aoshearman.com

-and-

**Kirkland & Ellis LLP**

333 W Wolf Point Plaza
Chicago, IL 60654
Attention: Patrick J. Nash, Jr., P.C., John R. Luze and Gabriela Z. Hensley
E-mail address: patrick.nash@kirkland.com; john.luze@kirkland.com;
gabriela.hensley@kirkland.com

Any notice given by delivery, mail, or courier shall be effective when received.

10.11.  <u>Enforceability of Agreement</u>.  Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

10.12.  <u>Admissibility</u>.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

10.13.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

10.14.  <u>Several, Not Joint, Obligations</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

10.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

10.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

10.17.  <u>Capacities of Supporting Preferred Shareholder</u>.  Each Supporting Preferred Shareholder has entered into this agreement on account of all Preferred Equity Interests that it holds (directly or through discretionary accounts that it manages or advises) and,

except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Preferred Equity Interests.

10.18.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable, the Debtors and the Requisite Preferred Shareholders, submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

10.19.  <u>Fees and Expenses</u>.   Each of the Debtors and the Supporting Preferred Shareholders shall be responsible for their own fees and expenses incurred in connection with this Agreement, except as may be expressly contemplated hereby (including, for the avoidance of doubt, as set forth in Section 4.1) or separately ordered by the Court.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

* * *

[*Signature Pages Follow*]

**<u>Exhibit A</u>**

**Form of Transfer Agreement**

### *TRANSFER AGREEMENT*

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of August [•], 2024 (the "**Agreement**"),[1] by and among the Debtors and the Supporting Preferred Shareholders, including the transferor to the Transferee of any Claims or Equity Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a Supporting Preferred Shareholder under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this transfer agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| | *Aggregate Amounts in Dollars Beneficially Owned or Managed on Account of:* |
|---|---|
| Series A preferred stock issued by West Realm Shires Inc. | |
| Series B preferred stock issued by FTX Trading Ltd. | |
| Series B-1 preferred stock issued by FTX Trading Ltd. | |
| Series C preferred stock issued by FTX Trading Ltd. | |
| Other Preferred Equity Interest: [*Please Specify*] | |

---

[1]     Capitalized terms not used but not otherwise defined in this transfer agreement shall have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit B</u>**

**Form of Joinder**

*JOINDER*

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of August [•], 2024 (the "**Agreement**"),[1] by and among the Debtors and the Supporting Preferred Shareholders and agrees to be bound by the terms and conditions thereof to the extent the other Supporting Preferred Shareholders are thereby bound, and shall be deemed a Supporting Preferred Shareholder under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| | *Aggregate Amounts in Dollars Beneficially Owned or Managed on Account of:* |
|---|---|
| Series A preferred stock issued by West Realm Shires Inc. | |
| Series B preferred stock issued by FTX Trading Ltd. | |
| Series B-1 preferred stock issued by FTX Trading Ltd. | |
| Series C preferred stock issued by FTX Trading Ltd. | |
| Other Preferred Equity Interest: [*Please Specify*] | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

DOC ID - 46967346.2