**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  October 7, 2024 at 10:00 a.m. ET** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF FTX TRADING LTD. AND ITS DEBTOR AFFILIATES**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................v

PRELIMINARY STATEMENT ...........................................................................1

BACKGROUND ...................................................................................................3

    I.      History of the Chapter 11 Cases .............................................................3

    II.     Voting Status...........................................................................................7

    III.    The FTX Group.......................................................................................7

          A.     The Terms of Service Used by the FTX Exchanges....................................8

               i.     FTX.US Terms of Service ..............................................8

               ii.    FTX.com Terms of Service.............................................9

          B.     The Debtors' Management of Assets........................................................13

          C.     The Management of Exchange Assets and Their Movement Through the FTX Exchanges ....................................................................13

               i.     Cryptocurrency ............................................................14

               ii.    Fiat Currency ...............................................................16

               iii.   Stablecoin....................................................................16

    IV.   The Commingling of Assets and Lack of Recordkeeping Within the FTX Group ...................................................................................................17

    V.    The Misappropriation of Assets at the Direction of the FTX Insiders .................18

    VI.   The Customer Priority Settlement ........................................................18

ARGUMENT .......................................................................................................20

    I.      The Plan Satisfies Each Requirement for Confirmation.........................20

          A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1))................................................20

               i.     The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122................................................................21

i

ii.    The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123 (a)(1)–(a)(7). ...............................................23

B.    The Debtors, as Plan Proponents, Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). .............................................................24

i.    The Debtors Have Complied with the Disclosure Statement and Solicitation Requirements of 11 U.S.C. § 1125. .....................24

ii.    The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126. ................................................26

C.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)). .............................................27

D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)). ................................29

E.    The Requirements of § 1129(a)(5) Concerning Post-Emergence Directors Are Satisfied................................................................29

F.    The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)). ......................................30

G.    The Plan Is in the Best Interests of Creditors and Holders of Interests (11 U.S.C. § 1129(a)(7)). ...........................................30

H.    Acceptance by Certain Impaired Classes (11 U.S.C. § 1129(a)(8)). .........31

I.    The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Claims (11 U.S.C. § 1129(a)(9))..................32

J.    The Plan Was Accepted by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)). ..........................................................33

K.    The Plan Is Feasible (11 U.S.C. § 1129(a)(11)). .......................................34

L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)). ...........................................35

M.    The Debtors Do Not Owe Any Retiree Benefits (11 U.S.C. § 1129(a)(13)). ..........................................................36

N.    The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b)...............................................................36

i.    The Plan Does Not Discriminate Unfairly.....................................36

        ii.      The Plan Is Fair and Equitable.......................................................38

O.    The Principal Purpose of the Plan Is Not Avoidance of Taxes (11 U.S.C. § 1129(d))...........................................................................................39

II.    The Discretionary Contents of the Plan Are Appropriate and Should Be Approved....................................................................................................................40

A.    The Plan Provides for the Rejection or Assumption of Certain Executory Contracts and Unexpired Leases. ............................................40

B.    Substantive Consolidation of the Consolidated Debtors Should Be Approved.................................................................................................................41

C.    The Customer Priority Settlement Should Be Approved..........................46

        i.       All Exchange Assets Are Presumptively Property of the Debtors' Estates and the Burden Is on Creditors to Show Otherwise .......................................................................................48

        ii.      The Debtors Maintain That FTX Exchange Customers Are Unsecured Creditors.......................................................................50

        iii.    FTX.US Customers Could Not Prove the FTX.US Terms of Service Establish an Express Trust .................................................51

        iv.    FTX.US Customers Could Not Prove That a Resulting Trust Should Be Established............................................................54

        v.       FTX.US Customers Could Not Impose a Constructive Trust Over Exchange Assets Held by the Debtors .................................55

        vi.    FTX.US Customers Could Not Establish Property Rights Arising from a Bailment .............................................................56

        vii.   FTX.com Customers Could Not Prove the FTX.com Terms of Service Establish an Express Trust............................................58

        viii.  FTX.com Customers Could Not Establish Property Rights Arising From a Bailment Established by the Dotcom TOS...........60

        ix.    FTX.com Customers Could Not Obtain the Declaration of a Resulting Trust or Constructive Trust............................................62

        x.       The Earlier TOS Also Resulted in FTX Trading Owning Exchange Assets .....................................................................62

        xi.    Customers Could not Trace Assets in a Manner Sufficient to   Establish Property Rights........................................................63

D.     The Customer Preference Settlement Should Be Approved. .................67

E.     The Debtors' Releases, Voluntary Release by Holders of Claims and Interests, Mutual Release, Injunction and Exculpation Provision Should Be Approved. ................................................................69

     i.     The Debtors' Releases Are Appropriate and Should Be Approved. ........................................................................................69

     ii.     The Voluntary Release by Holders of Claims and Interests Is Appropriate and Should Be Approved. .....................................72

     iii.     The Injunction Is Appropriate and Should Be Approved. ............76

     iv.     The Plan Exculpation Provision Is Appropriate and Should Be Approved. ...............................................................................77

CONCLUSION ...................................................................................................79

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ....................................................34

*In re Adelphia Commc'ns, Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................31

*Airwork Corp.* v. *Markair Express, Inc. (In re Markair, Inc.)*,
  172 B.R. 638 (B.A.P. 9th Cir. 1994)....................................................55

*Alamitos Land Co.* v. *Texas Co.*,
  54 P.2d 489 (Cal. Dist. Ct. App. 1936)................................................57

*In re Alpha Latam Mgmt., LLC*,
  Case No. 21-11109 (JKS) (Bankr. D. Del. Mar. 16, 2022) ..................77

*Altura Partnership* v. *Breninc, Inc. (In re B.I. Fin. Servs. Grp., Inc.)*,
  854 F.2d 351 (9th Cir. 1988) ................................................49, 50, 52

*In re American Eagle Delaware Holding Co.*,
  Case No. 22-10028 (JKS) (Bankr. D. Del. Apr. 27, 2022)..................77

*In re Amyris, Inc.*,
  Case No. 23-11131 (TMH) (Bankr. D. Del. Feb. 7, 2024)..............76, 78

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (Bankr. D. Del. 2006) ....................................................37

*Bank of Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)........................................................................30, 38

*In re Blackhawk Mining LLC*,
  Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019)..................72

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985)....................................................37

*In re Boy Scouts of Am. & Del. BSA, LLC*,
  642 B.R. 504 (Bankr. D. Del. 2022) ..............................................20, 21

*BP W. Coast Prod., LLC* v. *Crossroad Petroleum, Inc.*,
  2013 WL 12377979 (S.D. Cal. Dec. 3, 2013).....................................52

*In re Brockway Pressed Metals, Inc.*,
    363 B.R. 431 (W.D. Pa. 2007) ........................................................................55

*In re Carestream Health, Inc., et al.*,
    Case No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) ...............................77

*In re Catholic Diocese of Wilmington, Inc.*,
    432 B.R. 135 (Bankr. D. Del. 2010) ...............................................49, 50, 64, 65

*In re Chaparral Energy Inc.*,
    Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) ...............................74

*In re Checkout Holding Corp.*,
    Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019)..................................72

*City of Hope Nat'l Med. Ctr.* v. *Genentech, Inc.*,
    181 P.3d 142 (Cal. 2008) .................................................................................53

*In re Clovis Oncology, Inc.*,
    Case No. 22-11292 (JKS) (Bankr. D. Del. June 16, 2023)...........................76, 78

*Connecticut Gen. Life Ins. Co.* v. *Universal Ins. Co.*,
    838 F.2d 612 (1st Cir. 1988) .........................................................................64, 65

*Cunningham* v. *Brown*,
    265 U.S. 1 (1924)..............................................................................................66

*In re Downey Fin. Corp.*,
    593 F. App'x 123 (3d Cir. 2015) .....................................................................52

*Danning* v. *Bozek (In re Bullion Rsrv. of N. Am.)*,
    836 F.2d 1214 (9th Cir. 1988) ......................................................................49, 64

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) .............................................................56

*In re Drexel Burnham Lambert*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)..............................................................31

*DT Floormasters, Inc.* v. *United States*,
    2008 WL 2705554 (S.D. Ind. July 10, 2008)................................................53, 58

*In re Eddington Thread Mfg. Co., Inc.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) ..............................................................34

*In re Edgemarc Energy Holdings, LLC,*
    Case No. 19-11104 (JTD) (Bankr. D. Del. Jun. 23, 2020) ...........................77, 79

*In re EV Energy Partners, L.P.*,
    Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) ....................................75

*In re Extraction Oil & Gas, Inc.*,
    Case No. 20-11548 (Bankr. D. Del. Dec. 23, 2020) ............................................74

*In re FBI Wind Down, Inc.*,
    581 B.R. 387 (Bankr. D. Del. 2018) .................................................................47, 49

*Foothill Capital Corp.* v. *Clare's Food Market, Inc.* (*In re Coupon Clearing Serv.*),
    113 F. 3d 1091 (9th Cir. 1997) ........................................................................51, 52

*In re Foster*,
    275 F.3d 924 (10th Cir. 2001) ................................................................................66

*Gebert* v. *Yank*,
    218 Cal. Rptr. 585 (Cal. Ct. App. 1985) ...............................................................56

*In re Glob. Eagle Entm't Inc.*,
    Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021)..........................74, 77, 78

*Goldberg* v. *N.J. Lawyers' Fund for Client Protection*,
    932 F.2d 273 (3d Cir. 1991)...................................................................................50

*In re Golden Triangle Capital*,
    171 B.R. 79 (B.A.P. 9th Cir. 1994).......................................................................54

*Gomez* v. *Cecena*,
    101 P.2d 477 (Cal. 1940) .......................................................................................54

*In re Greenfield Energy Servs., Inc.*,
    2018 WL 6191949 (Bankr. D. Del. November 28, 2018) ......................................56

*Grogan* v. *Garner*,
    498 U.S. 279 (1991)...............................................................................................20

*Gulfstream* v. *Calascibetta (In re Strategic Technologies, Inc.)*,
    142 Fed. App'x 562 (3d Cir. 2005)........................................................48, 50, 64, 66

*H.S. Crocker Co.* v. *McFaddin*,
    307 P.2d 429 (Cal. Dist. Ct. App. 1957)............................................................56, 57

*Harrington* v. *Purdue Pharma L.P.*,
    144 S. Ct. 2071 (2024)............................................................................................69

*Householder Group LLLP* v. *Fuss*,
    2007 WL 1650933 (N.D. Cal. June 4, 2007) ........................................................53

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ..................................................73, 75

*In re Indymac Bancorp, Inc.*,
2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012) ......................54, 55

*In re Indymac Bancorp, Inc.*,
554 F. App'x 668 (9th Cir. 2014) .............................................................52

*In re Insys Therapeutics, Inc.*,
Case No. 19-11292(KG) (Bankr. Del. January 16, 2020) ......................74

*In re Interlake Material Handling, Inc.*,
441 B.R. 437 (Bankr. D. Del. 2011) ......................................................55

*Matter of Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)....................................................................21

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assoc.*,
987 F.2d 154 (3d Cir. 1993).............................................................22, 36

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ......................................................31

*In re Legacy FSRD, Inc.*,
Case No. 22-11051 (Bankr. D. Del. Feb. 22, 2023) ........................77, 78

*In re Louise's, Inc.*,
211 B.R. 798 (D. Del. 1997)....................................................................46

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) ................................................35, 74

*In re Mallinckrodt PLC*,
Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) ......................72

*In re Martin*,
91 F.3d 389 (3d Cir. 1996).......................................................................47

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994).....................................................70

*Meoli* v. *Kendall Electric, Inc. (In re R.W. Leet Electric, Inc.)*,
372 B.R. 846 (6th Cir. 2007) ...................................................................50

*In re Neshaminy Office Bldg. Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ...................................................................46

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ...................................................................20

*In re One Aviation Corp.*,
    Case No. 18-12309 (CSS) (Bankr. D. Del. Sept. 18, 2019).....................................72

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)......................................................................41, 44, 45

*In re Panda Temple Power, LLC*,
    Case No. 17-10839 (LSS) (Bankr. D. Del. Jan. 23, 2018).....................................75

*In re PBS Brand Co. LLC*,
    Case No. 20-13157 (KSJ) (Bankr. D. Del. Apr. 28, 2021)....................................77

*Peachtree Special Risk Brokers* v. *Kartzman (In re Rocco Co.)*,
    2014 WL 7404566 (D.N.J. Dec. 19, 2014) ......................................................49, 64

*In re Petters Co.*,
    506 B.R. 784 (Bankr. D. Minn. 2013) ...................................................................44

*In re Polivnick*,
    8 B.R. 621 (Bankr. C.D. Cal. 1981).......................................................................58

*In re PQ New York*,
    Case No. 20-11266 (JTD) (Bankr. D. Del. Sept. 25, 2020)...................................74

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ...............................................78

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)........................................................................24, 27, 78

*Radnor Holdings Corp.* v. *PPT Consulting, LLC (In re Radnor Holdings Corp.)*,
    2009 WL 2004226 (Bankr. D. Del. July 9, 2009)..................................................49

*In re Samson Resources Corp.*,
    Case No. 15-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017)....................................72

*SEC* v. *Elliot*,
    953 F.2d 1560 (11th Cir. 1992) .............................................................................66

*In re SFP Franchise Corp.*,
    Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 13, 2020)...................................74

*Sharp* v. *FDIC (In re Vineyard Nat. Bancorp)*,
    508 B.R. 437 (Bankr. C.D. Cal. 2014)...................................................................52

*In re Skillsoft Corporation*,
　　Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) ...................................................75

*In re Spansion, Inc.*,
　　2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ...................................................78

*In re Spansion, Inc.*,
　　426 B.R. 114 (Bankr. D. Del. 2010) ...........................................................69, 71, 73

*Stoebner* v. *Consumers Energy Co. (In re LGI Energy Solutions, Inc.)*,
　　460 B.R. 720 (B.A.P. 8th Cir. 2011)...........................................................64

*Stopes* v. *Campos (In re Campos)*,
　　2012 WL 2324398 (N.D. Cal. June 18, 2012) ...........................................................53

*Superintendent of Ins. of N.Y.* v. *Ochs (In re First Central Fin. Corp.)*,
　　377 F.3d 209 (2d Cir. 2004)...........................................................55

*Swimmer* v. *Moeller (In re Moeller)*,
　　466 B.R. 525 (Bankr. S.D. Cal. 2012) ...........................................................51, 55

*Tawansy* v. *Leslie (In re Raymond Renaissance Theater, LLC)*,
　　583 B.R. 735 (C.D. Cal. 2018) ...........................................................52, 54

*Taylor* v. *Fields*,
　　224 Cal.Rptr. 186 (2nd Dist. 1986)...........................................................54

*In re TK Holdings Inc.*,
　　Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...................................................72

*In re Tribune Co.*,
　　464 B.R. 126 (Bankr. D. Del. 2011) ...........................................................70

*In re Tribune Co.*,
　　972 F.3d 228 (3d Cir. 2020)...........................................................37

*True Traditions, LC* v. *Wu*,
　　552 B.R. 826 (N.D. Cal. 2015) ...........................................................49

*In re United Cigar Stores Co. of Am.*,
　　70 F.2d 313 (2d Cir. 1934)...........................................................65

*United States* v. *Durham*,
　　86 F.3d 70 (5th Cir. 1996) ...........................................................64

*United States* v. *Lawson*,
　　925 F.2d 1207 (9th Cir. 1991) ...........................................................58

*United States* v. *Lequire*,
   672 F.3d 724 (9th Cir. 2012) ................................................................54

*USM Workers Comm.* v. *Decker (In re USM Tech. Corp.)*,
   158 B.R. 821 (Bankr. N.D. Cal. 1993) ..................................................55

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ...........................................................21, 27

*In re W.R. Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013) ................................................................34

*In re W.R. Grace & Co.*,
   446 B.R. 96 (Bankr. D. Del. 2011) .......................................................72

*In re W.T. Grant and Co.*,
   699 F.2d 599 (2d Cir. 1983) ................................................................46

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...................................47, 70, 73, 77

*Weststeyn Dairy* v. *Eades Commodities Co.*,
   280 F. Supp. 2d 1044 (E.D. Cal. 2003) .................................................54

*Windels Marx Lane & Mittendorf, LLP* v. *Source Enters. (In re Source Enters)*,
   392 B.R. 541 (S.D.N.Y. 2008) .............................................................44

*In re Woodbridge Grp. of Cos., LLC*,
   592 B.R. 761 (Bankr. D. Del. 2018) ..........................................41, 44, 45

*In re World Health Alternatives, Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) .....................................................46

*In re Worldcom, Inc.*,
   2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......................24, 37

*In re Z Gallerie, LLC*,
   Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) ......................75

*In re Zenith Electronics Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ...............................................70, 73

**Statutes**

11 U.S.C. § 541(a), (d) .............................................................................47

11 U.S.C. § 1122(a) ................................................................................21

11 U.S.C. § 1122(b) ................................................................................21

11 U.S.C. § 1123(b)(1)-(6) ...................................................................................40

11 U.S.C. § 1123(b)(3)(A) ....................................................................................69

11 U.S.C. § 1125(b) ..............................................................................................25

11 U.S.C. § 1126(c) .........................................................................................27, 32

11 U.S.C. § 1126(d) ........................................................................................27, 32

11 U.S.C. § 1126(f) ...............................................................................................32

11 U.S.C. § 1126(g) ..............................................................................................32

11 U.S.C. § 1129(a)(3) ..........................................................................................27

11 U.S.C. § 1129(a)(7) ..........................................................................................30

11 U.S.C. § 1129(a)(10) ........................................................................................34

11 U.S.C. § 1129(a)(11) ........................................................................................34

11 U.S.C. § 1129(b)(1) ..........................................................................................36

11 U.S.C. § 1129(b)(2)(B)(ii) ...........................................................................38, 39

11 U.S.C. § 1129(b)(2)(C)(ii) ...........................................................................38, 39

11 U.S.C. § 1129(d) ..............................................................................................39

Cal. Civ. Code § 1817 (West 2024) ..................................................................56, 57

Cal. Civ. Code § 1818 (West 2024) ......................................................................56

Cal. Civ. Code § 1878 (West 2024) ......................................................................57

## Other Authorities

Fed. R. Bankr. P. 9019(a) .....................................................................................46

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 1977 WL
    9628............................................................................................................21, 24

Restatement (Third) of Restitution and Unjust Enrichment § 59, Comment b. ...........66

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 1978 WL 8531...............21, 32

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") submit this memorandum of law (the "Plan Confirmation Brief") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26029] (including the Plan Supplement, and all other exhibits and schedules thereto, in each case, as may be further amended, modified or supplemented from time to time, the "Plan"),[2] pursuant to section 1129 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and approval of the settlements contained therein pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Plan is the culmination of a remarkable effort to build consensus, negotiate settlements of novel and complex issues, and recover and monetize assets such that customers and non-governmental creditors are projected to receive 100% of all distributable value and recoveries well in excess of par—a result inconceivable when the FTX Group collapsed into bankruptcy less than two years ago.  The Plan has overwhelming support from the Debtors' creditors, and should be confirmed.

2.      The Debtors' major creditor constituencies, including the Official Committee, the Ad Hoc Committee, the Bahamas JOLs, the Commodity Futures Trading Commission ("CFTC"), several state attorneys general, putative class action plaintiffs, Emergent Fidelity Technologies Ltd., BlockFi Inc. and its affiliated debtors, and the lead plaintiffs in the FTX multi-district litigation, as well as various offices within the United States Department of Justice, each had a role in negotiating and developing the complex set of transactions and

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

settlements that come together in the Plan.  The results are great news for creditors:  the Plan forecasts the payment in Cash *in full* of all allowed non-governmental creditor and customer claims against the Debtors, together with interest payments to creditors at the applicable rate.  In addition, the Plan provides for supplemental payments to certain customers and other creditors from the Supplemental Remission Fund.

3. The recoveries to non-governmental creditors are premised upon two central features:  (i) the formation of a Consolidated Wind Down Trust post-Effective Date through a substantive consolidation of the Consolidated Debtors, and (ii) the CFTC, IRS and Global (including the Customer Priority Settlement) Settlements, each of which is incorporated into the Plan.  Upon the Effective Date, the Consolidated Debtors will contribute substantially all of their remaining assets to the Consolidated Wind Down Trust free and clear of Liens, Claims, charges or other encumbrances or interests, and the Consolidated Wind Down Trust will fund Cash distributions to customers and other creditors.

4. The Debtors submit that the Plan is the best possible option for resolving these Chapter 11 Cases and maximizing recoveries for the Debtors' stakeholders.  The Debtors have navigated unprecedented legal and logistical challenges in these Chapter 11 Cases— including identifying and recording assets and liabilities for a disorganized group of over 100 legal entities across the globe.  There was a massive shortfall on the Petition Date of Digital Assets and fiat compared to the liabilities owed to Customers.  Notwithstanding these complexities, the Debtors have worked in close collaboration with their stakeholders before concluding that this Plan was the best path forward.  The consensus achieved is demonstrated by stakeholders voting overwhelmingly to accept the Plan.  The Plan, if confirmed and consummated, will permit the successful resolution of these Chapter 11 Cases and will bring

some measure of closure and compensation to victims of the fraud perpetrated by the FTX

Group.  As set forth in detail below and in the supporting declarations, the Plan satisfies all

applicable requirements under the Bankruptcy Code for confirmation and should therefore be

confirmed.

## **BACKGROUND**

### I.    **History of the Chapter 11 Cases**

5.    On November 11, 2022, for all Debtors except for West Realm Shires Inc.,

and on November 14, 2022, for West Realm Shires Inc. (as applicable, the "Petition Date"), each

of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the

Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to operate their businesses

and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.  The Debtors' cases are being jointly administered pursuant to the *Order*

*(I) Authorizing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Certain*

*Related Relief* [D.I. 128].

6.    On December 15, 2022, Andrew R. Vara, the United States Trustee for

Region 3 (the "U.S. Trustee"), appointed an official committee of unsecured creditors (the

"Official Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].[3]

7.    On October 16, 2023, the Debtors filed the *Notice of Proposed Settlement*

*of Customer Property Disputes* [D.I. 3291], attaching the Settlement and Plan Support

Agreement thereto, which is implemented through the Customer Priority Settlement (as defined

in the Disclosure Statement) contained in the Plan.

---

[3]    Following the resignations of six members of the Committee [D.I. 3685, 12036, 19221], the Official Committee
is currently comprised of the following members: (i) Pulsar Global Ltd.; (ii) Larry Qian; and (iii) Wincent
Investment Fund PCC Ltd.

8.      On December 16, 2023, the Debtors filed the (i) *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 4861]; (ii) *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* [D.I. 4862] (including all exhibits and schedules thereto, the "Disclosure Statement"); and (iii) *Motion of Debtors for Entry of an Order(I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 4863].

9.      On December 27, 2023, the Debtors filed the *Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 5202].  On February 7, 2024, the Court entered the *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090], which set the values of Claims based on Digital Assets and fiat currency as set forth in the Digital Assets Conversion Table.  On June 26, 2024, the Court entered the *Memorandum Opinion and Order* [D.I. 19069], setting the value of Claims regarding MAPS, OXY, SRM and BOBA tokens, and completing the Digital Assets Conversion Table.

10.      Between May 7, 2024 and June 25, 2024, the Debtors filed multiple revised versions of the Plan [D.I. 14300, 15520, 18536 and 18975] and the Disclosure Statement [D.I. 14301, 15521, 18437 and 18976], each reflecting additional updates and discussions with various parties-in-interest.

11.      On June 26, 2024, the Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and*

(V) *Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 19068] (the "Solicitation Procedures Order"), which approved, among other things, solicitation and voting procedures (the "Solicitation and Voting Procedures") and related materials, notices, forms and ballots to be provided to each Class (collectively, the "Solicitation Packages").

12.　　On June 27, 2024, the Debtors filed the solicitation versions of the Plan [D.I. 19139] and the Disclosure Statement [D.I. 19143].

13.　　In accordance with the Solicitation Procedures Order, the Debtors caused the Notice and Claims Agent to distribute the Solicitation Packages by July 10, 2024, as evidenced by the *Affidavit of Mailing of James Daloia* [D.I. 25841] (the "Kroll Affidavit of Service"). Additionally, in accordance with the Solicitation Procedures Order, the Debtors also caused the publication of the Confirmation Hearing Notice in *The New York Times* on July 3, 2024, the international edition of *The New York Times* on July 8, 2024, and on *Coindesk.com* from July 3 through July 10, 2024, as evidenced by the Certificate of Publication filed on August 28, 2024 [D.I. 23987] (the "Publication Certification").

14.　　On August 2, 2024, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 22165], reflecting additional updates and discussions with various parties-in-interest.

15.　　On August 2, 2024, the Debtors filed the Plan Supplement [D.I. 22163] (as amended and supplemented from time to time, the "Plan Supplement") in accordance with the Solicitation Procedures Order, containing the following documents: (i) the Draft Plan Administration Agreement (Exhibit 1 to the Plan Supplement); (ii) the Draft Liquidating Trust Agreement (Exhibit 2 to the Plan Supplement); (iii) the List of Wind Down Board Members (Exhibit 3 to the Plan Supplement); (iv) the List of Advisory Committee Members (Exhibit 4 to

the Plan Supplement); (v) the List of Excluded Customer Preference Actions (<u>Exhibit 5</u> to the Plan Supplement); (vi) the Wind Down Budget (<u>Exhibit 6</u> to the Plan Supplement); (vii) the List of Assumed Executory Contracts and Unexpired Leases (<u>Exhibit 7</u> to the Plan Supplement); (viii) the List of Excluded Entities (<u>Exhibit 8</u> to the Plan Supplement); (ix) the List of Separate Subsidiaries (<u>Exhibit 9</u> to the Plan Supplement); and (x) the Amended and Restated Rothschild Reimbursement Agreement (<u>Exhibit 10</u> to the Plan Supplement.)

16.     On September 23, 2024, the Debtors filed the *First Amended Plan Supplement* [D.I. 25649], consisting of the Amended and Restated List of Assumed Executory Contracts and Unexpired Leases.

17.     On September 30, 2024, the Debtors filed the proposed *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "<u>Plan Confirmation Order</u>").

18.     Contemporaneously with the filing of this Plan Confirmation Brief, the Debtors filed the *Declaration of James Daloia of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "<u>Kroll Declaration</u>").

19.     Contemporaneously with the filing of this Plan Confirmation Brief, the Debtors filed the *Declaration of Edgar W. Mosley II in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "<u>Mosley Declaration</u>") and the *Declaration of Steven P. Coverick in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "<u>Coverick Declaration</u>").

20.     Contemporaneously with the filing of this Plan Confirmation Brief, the

Debtors filed the *Declaration of The Rt. Hon. Lord Neuberger of Abbotsbury* (the "Neuberger

Declaration").

21.     Contemporaneously with the filing of this Plan Confirmation Brief, the

Debtors filed the *Debtors' Omnibus Reply to Objections to Confirmation of the Second Amended

Joint Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates*, which separately

addresses the remaining outstanding objections to Plan confirmation (the "Reply").

## II.     Voting Status

22.     The Plan was accepted by each Class entitled to vote on the Plan with

overwhelming support from stakeholders solicited to vote on the Plan.  As set forth in greater

detail in the Kroll Declaration, the voting results are as follows:

23.     Holders of Claims in Class 1, Class 2, Class 3B, Class 4, Class 5C and

Class 8A were unimpaired and deemed to accept the Plan.  Holders of Claims or Interests in

Class 3A, Class 5A, Class 5B, Class 6A, Class 6B, Class 7A, Class 7B, Class 7C, Class 8B,

Class 8C, Class 10A, Class 10B, Class 10C and Class 12 (collectively, the "Impaired Accepting

Classes") were impaired and voted to accept the Plan.  Holders of Claims or Interests in Class 9,

Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18 were impaired and

presumed to reject the Plan.  As discussed below, the Plan satisfies the requirements under

section 1129(b) of the Bankruptcy Code with respect to Class 9, Class 11, Class 13, Class 14,

Class 15, Class 16, Class 17 and Class 18.

## III.     The FTX Group

24.     Prepetition, the Debtors operated their businesses through a jumbled mass

of over 100 entities incorporated around the world (collectively, including non-Debtor affiliates,

the "FTX Group") that operated as a single entity controlled by Samuel Bankman-Fried and his

small inner circle.  Broadly, the FTX Group operated four businesses:  (1) a digital asset exchange centered around non-U.S. customers, marketed as FTX.com (the "<u>FTX.com Exchange</u>"); (2) a digital asset exchange centered around U.S. customers, marketed as FTX.US (the "<u>FTX.US Exchange</u>"); (3) a "crypto hedge fund" operated by Alameda Research LLC and its subsidiaries that traded and speculated in certain digital assets and related loans and securities for the account of its owners, Mr. Bankman-Fried (90%) and Mr. Wang (10%); and (4) an investment portfolio, which contained, among other investments, equity investments, token investments and loan investments in over 400 projects.  (Mosley Decl. ¶ 61.)

### A.    The Terms of Service Used by the FTX Exchanges

#### i.    FTX.US Terms of Service

25.    Debtor West Realm Shires Services Inc. d/b/a FTX.US ("<u>WRSS</u>" or "<u>FTX.US</u>") operated the FTX.US Exchange.  (Mosley Decl. ¶ 17.)  To access the exchange, customers agreed through the FTX.US User Agreement that they would be bound by the terms of service provided therein.  (Mosley Decl. Ex. 1 (the "<u>US TOS</u>") at § 1 ("By using our Services, you agree to be bound by these Terms.  If you don't agree to be bound by these Terms, do not use the Services.").)  As of the Petition Date, the operative terms of service were the US TOS, which were dated September 16, 2022.

26.    The US TOS specified that its "Terms and any action related thereto" would be governed by California law.  (US TOS § 29.)  The US TOS governed customers' use of the FTX.US Exchange's "cryptocurrency services," which, among other things, gave each customer the ability to "store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency."  (US TOS at 1, § 6.)  In providing these services, the TOS specified that WRSS was merely "an independent contractor for all purposes" and that "[n]othing in these Terms shall be deemed or is intended to be deemed, nor shall it cause, you

and FTX.US to be treated as partners, joint ventures, or otherwise as joint associates for profit, or either you or FTX.US to be treated as the agent of the other."  (US TOS § 31(m).)

27.    The US TOS described various of the services available to customers of the FTX.US Exchange.  As relevant here, it described each customer's individual account ("Customer Account").  The US TOS referred to customers as having "accounts" with the FTX.US Exchange that had a "balance" of assets that could be "credited" and "debited" from, and deposits of fiat currency and purchases of cryptocurrency were referred to as being "credited to your FTX.US Account."  (US TOS § 6; *see also* US TOS §§ 12-13.)

28.    Section 6 of the US TOS inconsistently described how assets deposited on the exchange and assets acquired on the exchange ("Exchange Assets") would be treated by WRSS by stating that FTX.US was not to "represent or treat assets in [the customer's] FTX.US Account as belonging to FTX.US" and said that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit."  (US TOS § 6.)  At the same time, the US TOS expressly stated that, "Your balances in your FTX.US Account are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable."  (*Id.* § 6.)  Section 6 provided that title to cryptocurrency was to remain with the customer and "shall not transfer to FTX.US."  (*Id.*)  There was no corresponding provision regarding title to fiat currency.  Nothing in the FTX.US terms of service suggested or guaranteed any assets associated with Customer Accounts be segregated and would not be commingled with the assets of WRSS and its affiliates when held in "shared addresses or accounts."  (*Id.*)

**ii.    FTX.com Terms of Service**

29.    Debtor FTX Trading Ltd. ("FTX Trading") operated the FTX.com Exchange.  (Mosley Decl. ¶ 16.)  All prospective customers who signed up for an account on the FTX.com Exchange agreed to be bound to certain terms of service, which governed the

relationship between these customers and FTX Trading.  (*Id.* Ex. 2 (the "<u>Dotcom TOS</u>") at 1 ("By registering for a[n Exchange] account or using the Services … you acknowledge and agree that you will be bound by and comply with the Terms.").)  As of the Petition Date, the governing terms of service were the Dotcom TOS, which were dated May 13, 2022.  (Mosley Decl. ¶ 21.) But there were two earlier versions of the terms of service for the FTX.com Exchange.  (Mosley Decl. ¶ 23, Ex. 3. and Ex. 4)  And these earlier terms of service (the "<u>Earlier TOS</u>") were worded differently than the Dotcom TOS in several relevant ways.

30.    ***The Dotcom TOS***.  The Dotcom TOS specified that it was a contract between FTX Trading and the customer (Dotcom TOS at 1), and that its "Terms and any Dispute shall be governed by, and construed in accordance with, English law"[4] (Dotcom TOS § 38.11.)  Like the US TOS, the Dotcom TOS governed a customer's ability to "buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in . . . or list Digital Assets" on the FTX.com Exchange.  (*Id.* at 1.)  The Dotcom TOS specified that, in providing services related to these activities, "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you."  (*Id.* § 2.1.3; *see also id.* § 2.2.2 (assuming "no fiduciary duty" to customers); § 38.6 ("[n]othing in the Terms or in any matter or arrangement contemplated by [them] … is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purposes whatsoever").)[5]

---

[4]    The Dotcom TOS defined "Dispute" to mean "any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services" of the FTX.com Exchange.  (Dotcom TOS § 1.1.)

[5]    The Dotcom TOS also listed FTX Digital Markets Ltd. as a "Service Provider" with respect to certain "Specified Services" that involved providing technology to facilitate certain transactions on the FTX.com

31.     In describing the assets handled by the FTX.com Exchange, the Dotcom TOS used a defined term "Digital Assets," which it defined as "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform." (*Id.*, Sched. 1 § 1.1.)  Notably, this definition excluded fiat currency.  But the Dotcom TOS stated that customers could "load fiat currency" into their accounts.  (*Id.* § 8.1.1; Schedule 1, § 1.1.)  This fiat currency was referred to as "E-Money."  (*Id.* § 8.3)  The Dotcom TOS defined E-Money as the "equivalent amount of electronic money . . . denominated in the relevant fiat currency, which represents the fiat currency that [an FTX customer has] loaded" and that "will be displayed in [the customer's] Account."  (*Id.* § 8.3.2.)

32.     Like the US TOS, the Dotcom TOS described Customer Accounts and Exchange Assets.  According to the Dotcom TOS, a customer could "deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance." (*Id.* § 8.2.1.)  The Dotcom TOS provided that "title to your Digital Assets shall at all times remain with you and shall not transfer to FTX"; that the customer is "the owner of the Digital Assets in your Account"; and that "none of the Digital Assets in your Account are the property of … FTX Trading."  (*Id.* § 8.2.6.)  And in fact, Exchange Assets were not held 1:1 to match customer liabilities, and on the Petition Date there was a massive shortfall in Exchange Assets that rendered this language meaningless as a practical matter.  (*See* Mosley Decl. ¶ 67.)

---

Exchange.  (Dotcom TOS Schedules 2-9.)  The Specified Services did not include trading as a principle or entering into privity of contract with any customer with respect to any transaction.  (*Id.*)

33.    There is no equivalent provision in relation to fiat currency or E-Money.
Nothing in the Dotcom TOS suggested or guaranteed any assets associated with Customer
Accounts would be segregated and would not be commingled with the assets of FTX Trading
and its affiliates.  Accordingly, the Dotcom TOS did not reference holding any assets as a trustee
or "on behalf of" customers, with the limited, express exception of "Unclaimed or Abandoned
Property."  (*Id.* § 9.2.)[6]

34.    ***The Earlier TOS***.  The Earlier TOS specified the terms of service for
FTX.com as of 2019 and 2020, respectively.  (Mosley Decl. ¶ 23.)  The Earlier TOS both state
that they are contracts between FTX Trading and the customer that are governed by the law of
Antigua and Barbuda, which is "virtually identical" to English law with respect to the "relevant
contractual and commercial law."  (*Id.* Ex. 3 at 1; *Id.* Ex. 4 at 1; Neuberger Decl. ¶ 94 & n.131.)
Like the Dotcom TOS, the Earlier TOS governed a customer's ability to "buy, sell, exchange,
hold, or otherwise transact in Digital Assets."  (Mosley Decl. Ex. 3 at 1; *Id.* Ex. 4 at 1.)  Unlike
the Dotcom TOS, however, the Earlier TOS made no express statements about title to Digital
Assets or any other assets.  (*See Id.* Ex. 3, *Id.* Ex. 4; *see also* Neuberger Decl. ¶ 95.)  Instead, the
Earlier TOS generally described how the FTX.com Exchange supported "deposits and
withdrawals for a number of Digital Assets."  (Mosley Decl. Ex. 3 § 5; *Id.* Ex. 4 § 5.)  Like the
Dotcom TOS, the Earlier TOS also disclaimed any "fiduciary duty to Users in connection with
the use of such Services," and stated that the Digital Assets reflected in a customer's account
"are not eligible for any public or private deposit insurance protection."  (*Id*. Ex. 3 § 12; *Id.* Ex. 4
§ 12.)

---

[6] "Unclaimed or Abandoned Property" is defined as "Assets in your Account" when FTX Trading is "unable to
contact you and [has] no record of your use of the Services for a prolonged period of time or your Account has been
closed."  (Dotcom TOS § 9.1.)

B.      **The Debtors' Management of Assets**

35.      FTX Exchange customers could each engage in a number of basic transactions on the FTX Exchanges, including:  deposits, transfers, trades, and withdrawals. (Mosley Decl. ¶¶ 28-29.)  When transactions took place, they were recorded in the ledgers maintained by the FTX Exchanges, and Customer Accounts were debited or credited.  (*Id*. ¶¶ 25, 27, 30.)  But most transactions did not trigger the movement of any assets whatsoever.  (*Id.* ¶ 31.)

36.      In fact, only two types of customer transactions actually corresponded to the movement of assets between addresses or bank accounts:  (i) where a FTX Customer transferred cryptocurrency, stablecoin, or fiat currency from an address or bank account outside of the FTX Group's control to an address or bank account owned and controlled by the FTX Group; and (ii) withdrawals, where assets from addresses or accounts owned and controlled by the FTX Group were sent to an address or account of a third party or a different FTX Exchange. (*Id.*)  Transfers of assets from one customer to another and trades of assets between customers on the FTX Exchanges did not result in the movement of assets.  (*Id.*)  Rather, these were ledger-only transactions that were simply recorded electronically in the records of the FTX Exchanges. (*Id.*)  Thus, Customer Accounts generally reflected entitlements to specific assets (*e.g.*, $500 USD, 25 BTC) that did not correspond to any quantity of identifiable assets in any specific location.  (*Id.* ¶ 26.)

C.      **The Management of Exchange Assets and Their Movement Through the FTX Exchanges**

37.      The Debtors maintained total control over all assets—including all deposits of cryptocurrency, stablecoin, and fiat currency—represented in Customer Accounts until those assets were withdrawn from the FTX.US Exchange or FTX.com Exchange.  (Mosley

Decl. ¶¶ 32, 35, 49, 53, 56.)  While assets were under the Debtors' control, they were commingled in aggregate addresses (for cryptocurrency and stablecoins) and bank accounts (for fiat currency).  (*Id.* ¶¶ 37, 47.)  Because individual coins and tokens of cryptocurrencies, stablecoins, and fiat currencies are fungible, when the Debtors commingled Exchange Assets, any ability to identify them was lost and they became part of a commingled mass.  (*Id.* ¶¶ 32-33, 39, 43, 48, 53, 56.)  Thus, determining the sources of assets withdrawn from the FTX Exchanges would be a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.  (*Id.* ¶¶ 33, 48, 52-55.)  Further, because most exchange transactions were ledger-only transactions, the same would be true of any effort to associate specific customer entitlements in Customer Accounts with specific assets held on the FTX Exchanges.  (*Id.*)

### i.      Cryptocurrency

38.      When an FTX Customer initiated a deposit of cryptocurrency onto an FTX Exchange, the relevant exchange responded by providing the FTX Customer with an address that the FTX Customer could transfer cryptocurrency into (a "Deposit Address").  (Mosley Decl. ¶ 34.)  Each Deposit Address was unique and was assigned to a specific Customer Account, but the private keys to each Deposit Address were held and controlled by the Debtors.  (*Id.* ¶¶ 34-35.)  Thus, once cryptocurrency was in a Deposit Address, the FTX Customer lost all control of it and the Debtors could freely direct the cryptocurrency to a different address using an on-chain transfer that would be visible on the public blockchain.  (*Id.* ¶ 35.)

39.      To facilitate ordinary course exchange operations, the Debtors aggregated cryptocurrency Exchange Assets.  (*Id.* ¶ 37.)  The predominant approach the Debtors adopted—such as for cryptocurrencies Ethereum ("ETH") and Solana ("SOL")—was to continuously sweep cryptocurrency of a given type (*e.g.*, ETH) from many Deposit Addresses into addresses where cryptocurrency assets of a specific type were aggregated and commingled ("Sweep

Address"). (*Id.* ¶ 38.) Once cryptocurrency deposited by a customer was transferred into a Sweep Address, it lost its individual identity and became part of a fungible mass which would, at any given time, contain the deposits of other customers as well as assets from other sources including entities within the FTX Group. (*Id.* ¶ 39.)

40.    The Exchanges generally funded withdrawals by pulling cryptocurrency from Sweep Addresses and transferring it to addresses specified by customers. (*Id.*) Thus, a withdrawal of cryptocurrency—whether it reflected a withdrawal based on an entitlement in a Customer Account derived from a deposit or trade—would typically come from a pool of fungible assets. (*Id.*) Accordingly, withdrawn cryptocurrency generally cannot be traced back to any particular source other than a Sweep Address owned and controlled by the Debtors. (*Id.* ¶¶ 38-39)

41.    For at least some cryptocurrencies, the Debtors deviated from their predominant approach of sweeping cryptocurrency into Sweep Addresses. An example of this is Bitcoin ("BTC") as managed by the FTX.US Exchange. (*Id.* ¶¶ 40-44.) The Debtors used the Bitcoin Core software package to manage deposits of Bitcoin on the FTX Exchanges. (*Id.* ¶ 40.) This software treated all Deposit Addresses as a pool of assets from which to fund withdrawals. (*Id.* ¶ 41.) Although the FTX.com Exchange periodically swept BTC into Sweep Addresses, the FTX.US Exchange funded withdrawals exclusively by emptying out BTC Deposit Addresses—without regard to any matching of transactions and customers—and depositing any leftover funds in "Change Addresses" where funds were commingled and which were also used as a source of BTC to fund further withdrawals. (*Id.* ¶¶ 42-44.) At the same time, a customer that used fiat currency to purchase BTC would have no BTC in any Deposit

Address associated with its Customer Account because purchases were ledger-only transactions. (*Id*. ¶ 45.)

### ii.    Fiat Currency

42.    As set forth in the *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1], fiat currency deposited by FTX Exchange customers into bank accounts controlled by various Debtors was commingled with fiat currency deposited by other FTX Exchange customers and the Debtors themselves.  (*Id.* at 15.)  FTX.com Exchange customers deposited fiat currency initially into bank accounts in the name of Alameda Research Ltd. ("Alameda"), and later into accounts established in the name of a new, wholly owned entity North Dimension Inc. ("North Dimension"), and FTX Trading.  (Mosley Decl. ¶¶ 49-50.)  Within these accounts, customer deposits were commingled together with funds transferred from various other FTX Group accounts.  (*Id*. ¶¶ 52-53.)  And these commingled funds were used to fund withdrawals. (*Id*. ¶¶ 48-50.)

43.    The Debtors maintained total control of fiat currency after FTX Customers deposited it with the Debtors, commingled it with other assets, and therefore, as a result, tracing any given deposit of customer funds through the FTX Group's various accounts to Exchange Assets or tracing any specific customer deposit to the funds used to purchase any specific asset would be a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.  (*Id*. ¶¶ 47-48, 52-55.)

### iii.    Stablecoin

44.    Stablecoin moved through the FTX Exchange in largely the same manner as cryptocurrency.  (*Id.* ¶ 56.)  Stablecoin deposited by FTX Exchange customers was generally placed into discrete Deposit Addresses that the Debtors controlled and then swept into aggregate

Sweep Addresses that the Debtors controlled where it was commingled with stablecoin deposited by other customers and entities within the FTX Group.  (*Id.* ¶ 56*.*)  Stablecoin held by the Debtors was commingled at least to the same extent as cryptocurrency held by the Debtors.  (*Id.*)  Because stablecoin is fungible like cryptocurrency, a specific customer's deposit cannot be identified within a Sweep Address that contains other stablecoin and any given withdrawal of stablecoin from a Sweep Address cannot be traced back to a specific customer's deposit.  (*Id.*)  Further, a customer's trades and transfers of stablecoin on the FTX Exchanges did not result in on-chain transactions.  As a result, tracing specific deposits of stablecoin to specific Exchange Assets or to stablecoin used to fund transactions would be a would be a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.  (*Id.* ¶¶ 33, 56-60.)

## IV.    The Commingling of Assets and Lack of Recordkeeping Within the FTX Group

45.    Although the business lines of the FTX Group can be described in general terms, the entities themselves were hopelessly intermingled.  (*See* Mosley Decl. ¶¶ 61-62.)  The FTX Group lacked appropriate management, governance and organizational structure, with control of the FTX Group concentrated in just three individuals:  Mr. Bankman-Fried, Mr. Singh and Mr. Wang.  (*Id.* ¶ 62.)  The same directors and officers managed nearly all entities within the FTX Group, which allowed Mr. Bankman-Fried, Mr. Singh and Mr. Wang to operate the FTX Group as a quasi-single organization.  (*Id.*)

46.    With a few limited exceptions, the FTX Group lacked independent or experienced finance, accounting, human resources, informational security, and cybersecurity personnel or leadership.  (*Id.*)  There was also no internal audit function, and virtually nonexistent board oversight.  (*Id.*)  Instead, the FTX Group relied on an assortment of Google documents, Slack communications, shared drives, Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities.  (*Id.*)

47.     Within the FTX Group, funds of one entity were routinely used as funds of another and relationships among entities were obscured by prepetition management.  (*Id.* ¶ 64.)  Agreements were often backdated, entered into between lenders and incorrect borrower entities, and entities pledged the assets of other entities.  (*Id.*)  Prepetition, Debtor Alameda Research Ltd. regularly provided funding for corporate expenditures, including, paying salaries and other business expenses for various other entities in the FTX Group.  (*Id.* ¶ 65.)

## V.    The Misappropriation of Assets at the Direction of the FTX Insiders

48.     Exchange Assets and customer liabilities were generally not held 1:1 prior to the Petition Date.  At the direction of Mr. Bankman-Fried, Mr. Singh and Mr. Wang, the FTX Group funneled billions of dollars of customer deposits and withdrawals in fiat currency through bank accounts of Debtor Alameda Research LLC and other Debtor and non-Debtor affiliates, commingling and misusing vast sums of customer and corporate funds in the process.  (*Id.* ¶ 67.)  As of the Petition Date, this resulted in a shortfall of both fiat and digital assets relative to customer entitlements on the FTX.com Exchange of more than $9 billion.  (*Id.*)

49.     These shortfalls reflected, among other things, the FTX Group's lack of controls, the absence of efforts to reconcile customer entitlements and Exchange Assets, and Alameda's taking of large quantities of cryptocurrency from the FTX.com Exchange through its undisclosed unlimited borrowing.  (*Id.*)

## VI.    The Customer Priority Settlement

50.     Due to the extensive commingling of funds among the Debtors, the Debtors and their advisors concluded that the substantive consolidation of the Consolidated Debtors would avoid a massive, costly, exceedingly challenging tracing exercise and that substantive consolidation was the most equitable remedy for all creditors.  (*See* Mosley Decl. ¶¶ 68-72.)

51.     At the same time, the Debtors and their advisors, the Official Committee, the Ad Hoc Committee and the Class Action Claimants engaged in protracted, good faith, arm's-length negotiations to determine the purported property entitlements of certain customers in assets held by the Debtors and the priorities of customer claims relative to other creditor claims. Over the course of protracted negotiations, the Debtors, the Official Committee, the Ad Hoc Committee, the Class Action Plaintiffs and other stakeholders agreed to the broad contours of a proposed plan, which was announced on October 16, 2023, and is set forth in a plan support agreement. *See Notice of Proposed Settlement of Customer Property Disputes* [Docket No. 3291], Ex. A (the "PSA").

52.     The Plan ultimately resolves the complex issues arising from the operations of the FTX.com Exchange, the FTX.US Exchange and the misappropriation of billions of dollars of assets deposited by customers at the direction of FTX management. Specifically, Section 5.2 of the Plan provides that the Plan shall constitute a good faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against the Debtors, including, among other things, issues relating to tracing of assets of individual Debtors and the effects and consequences of the Dotcom TOS and US TOS and whether Exchange Assets are property of the Debtors.  The Plan also provides for the prioritization of certain customer entitlement claims relative to certain other creditors by utilizing substantive consolidation and priority intercompany claims held by the Debtors associated with the Dotcom Exchange and the Debtors associated with the U.S. Exchange, in each case against the Debtors associated with the General Pool, as described in detail in the Plan.

## ARGUMENT

### I.      The Plan Satisfies Each Requirement for Confirmation.

53.      To confirm the Plan, the Court must find that the Debtors have satisfied

the provisions of section 1129 of the Bankruptcy Code by "a preponderance of the evidence."

*See In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 553 (Bankr. D. Del.

2022), *aff'd*, 650 B.R. 87 (D. Del. 2023).  A preponderance of the evidence has been described as

just enough evidence to make it more likely than not that the fact that the claimant seeks to prove

is true.  *See Grogan* v. *Garner*, 498 U.S. 279, 286 (1991) ("[T]he preponderance-of-the-evidence

standard results in a roughly equal allocation of the risk of error between litigants.").

54.      The Debtors respectfully submit that, based on the record of and filings in

these Chapter 11 Cases, the Mosley Declaration, the Coverick Declaration, the Neuberger

Declaration, the Kroll Declaration, the arguments set forth herein and in the Reply, and as may

be further demonstrated at the Confirmation Hearing, the Debtors have satisfied their burden for

Confirmation because the Plan complies with all relevant sections of the Bankruptcy Code.  Each

requirement is discussed below, along with the significant permissive elements of the Plan.

### A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).

55.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply

with the applicable provisions of chapter 11, including rules governing classification of claims

and interests and the contents of a plan.  *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824

(Bankr. D. Del. 2008) (noting that legislative history confirms that section 1129(a)(1) "requires

that a plan comply with 11 U.S.C. §§ 1122 and 1123 . . ."); *In re Boy Scouts*, 642 B.R. at

553 ("[section 1129(a)(1)] has been interpreted to mean that the plan complies with § 1122 and

§ 1123 of the Code"); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787,

1978 WL 8531 ("Paragraph (1) requires that the plan comply with the applicable provisions of

Chapter 11, such as Section 1122 and 1123, governing classification and contents of plan"); H.R.

Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 1977 WL 9628 (same).

Accordingly, determining whether the Plan complies with section 1129(a)(1) of the Bankruptcy

Code requires review of the Plan's compliance with sections 1122 and 1123 of the Bankruptcy

Code.  As explained below, the Plan complies with these sections in all respects.

> **i.      The Plan Satisfies the Classification Requirements of 11 U.S.C.
> § 1122.**

56.     The classification requirements of section 1122 provide:

i.      Except as provided in subsection (b) of this section, a plan may
place a claim or an interest in a particular class only if such claim
or interest is substantially similar to the other claims or interests of
such class.  11 U.S.C. § 1122(a).

ii.     A plan may designate a separate class of claims consisting only of
every unsecured claim that is less than or reduced to an amount
that the court approves as reasonable and necessary for
administrative convenience.  11 U.S.C. § 1122(b).

57.     Courts in the Third Circuit have determined that Congress intended to

afford bankruptcy courts, and plan proponents, considerably broad discretion in deciding how to

classify claims.  *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012), *aff'd*, 729 F.3d 332

(3d Cir. 2013) ("Plan proponents and bankruptcy courts have considerably broad discretion in

deciding how to classify claims"); *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d

Cir. 1987) ("[i]t remains clear that Congress intended to afford bankruptcy judges broad

discretion to decide the propriety of plans in light of the facts of each case").  Courts generally

permit separate classification of similar claims, so long as the separate classification is

reasonable, and not used for fraudulent purposes.  *See John Hancock Mut. Life Ins. Co.* v. *Route

37 Bus. Park Assoc.*, 987 F.2d 154, 159 (3d Cir. 1993).

58.     The Plan's classification of Claims and Interests satisfies the requirements
of section 1122 of the Bankruptcy Code because each of the Claims or Interests in a particular
Class is substantially similar to the other Claims or Interests in such Class.  (Coverick Decl.
¶ 16.)  Further, each Class differs from the other Classes based on legal attributes or other
relevant and objective criteria.  (*Id.*)  Class 1 contains all Priority Tax Claims.  Class 2 contains
all Other Priority Claims.  Class 3A contains all Secured Loan Claims.  Class 3B contains all
Other Secured Claims.  Class 4 contains Separate Subsidiary Claims.  Class 5A contains Dotcom
Customer Entitlement Claims.  Class 5B contains U.S. Customer Entitlement Claims.  Class 5C
contains NFT Customer Entitlement Claims.  Class 6A contains General Unsecured Claims.
Class 6B contains Digital Asset Loan Claims.  Class 7A contains Dotcom Convenience Claims.
Class 7B contains U.S. Convenience Claims.  Class 7C contains General Convenience Claims.
Class 8A contains PropCo Operating Expense Claims.  Class 8B contains the Priority DM Claim.
Class 8C contains PropCo General Unsecured Claims.  Class 9 contains Cancelled Intercompany
Claims.  Class 10A contains Senior Subordinated IRS Claims.  Class 10B contains Senior
Subordinated Governmental Claims.  Class 10C contains Junior Subordinated IRS Claims.  Class
11 contains Intercompany Interests.  Class 12 contains Preferred Equity Interests.  Class 13
contains section 510(b) Preferred Equity Claims.  Class 14 contains section 510(b) Other Equity
Claims.  Class 15 contains Equitably Subordinated Claims.  Class 16 contains Other Equity
Interests.  Class 17 contains FTT Claims and Interests.  Class 18 contains *De Minimis* Claims.

59.     There is no evidence that the classification structure was designed to
gerrymander the Classes to create an impaired consenting class.  (*Id.*)  Accordingly, the Debtors
submit that the Plan fully complies with and satisfies the requirements of section 1122 of the
Bankruptcy Code.

      **ii.**      **The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123 (a)(1)–(a)(7).**

60.      The Plan meets the seven mandatory requirements of section 1123(a) of

the Bankruptcy Code as follows:

      i.      as required by section 1123(a)(1) of the Bankruptcy Code, Section 4.1 of the Plan designates Classes of Claims and Interests;

      ii.      as required by section 1123(a)(2) of the Bankruptcy Code, Section 4.1 of the Plan specifies which Classes of Claims are Unimpaired under the Plan;

      iii.      as required by section 1123(a)(3) of the Bankruptcy Code, Section 4.3 of the Plan specifies the treatment of each Class of Claims and Interests that is Impaired under the Plan and the treatment for each such Impaired Class;

      iv.      as required by section 1123(a)(4) of the Bankruptcy Code, Section 4.3 of the Plan provides the same treatment for each Claim or Interest within a particular Class (unless the Holder of a particular Claim or Interest agrees to less favorable treatment of such particular Claim or Interest);

      v.      as required by section 1123(a)(5) of the Bankruptcy Code, the provisions of Article 5, and various other provisions of the Plan, provide adequate means for the Plan's implementation;

      vi.      as required by section 1123(a)(6) of the Bankruptcy Code, no new nonvoting equity securities are being issued by the Consolidated Wind Down Trust;

      vii.      as required by section 1123(a)(7) of the Bankruptcy Code, the Plan Supplement properly and adequately discloses the individuals proposed to serve as the initial directors of the Wind Down Board and the manner of their selection, consistent with the interests of Holders and with public policy.

61.      Accordingly, the Plan satisfies the mandatory plan requirements set forth

in section 1123(a) of the Bankruptcy Code.

**B.** **The Debtors, as Plan Proponents, Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

62.     The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponents of a plan comply with the applicable provisions of the Bankruptcy Code.  Case law and the legislative history of section 1129(a)(2) of the Bankruptcy Code reflect that this provision is intended to encompass the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125"); *In re Worldcom, Inc.*, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

63.     The Debtors have complied with these provisions, as well as Bankruptcy Rules 3017 and 3018, by causing the distribution of the Disclosure Statement and the Solicitation Packages and soliciting votes on the Plan through their Notice and Claims Agent in accordance with the Solicitation Procedures Order.

**i.** **The Debtors Have Complied with the Disclosure Statement and Solicitation Requirements of 11 U.S.C. § 1125.**

64.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

65.     The Debtors have satisfied section 1125 of the Bankruptcy Code.  Before the Debtors began soliciting votes on the Plan, the Court approved the Disclosure Statement as containing adequate information pursuant to section 1125, and further approved the Solicitation and Voting Procedures.  (*See* Solicitation Procedures Order ¶¶ 12-15.)

66.     The Solicitation Procedures Order specified the content of the Solicitation Packages that the Debtors provided to Holders and the timing and method of delivery of the Solicitation Packages.  (*Id*.)  As detailed further in the Kroll Affidavit of Service and the Kroll Declaration, the Debtors complied in all respects with the content and delivery requirements as outlined in the Solicitation Procedures Order.  (Kroll Decl. ¶ 6.)

67.     Specifically, as evidenced by the Kroll Affidavit of Service and the Kroll Declaration, the Solicitation Packages approved by this Court in the Solicitation Procedures Order were transmitted to and served on all Holders in Classes that were entitled to vote to accept or reject the Plan.  (*Id*.)  Non-voting notices, including Third-Party Release Election Forms, were transmitted to and served on Holders in Classes that were not entitled to accept or reject the Plan, and relevant portions of the Solicitation Package and other materials approved by the Solicitation Procedures Order were transmitted to and served on other parties-in-interest in these Chapter 11 Cases, each in compliance with section 1125 of the Bankruptcy Code, the Solicitation Procedures Order, the Solicitation and Voting Procedures, the Bankruptcy Rules and the Local Rules.  Additionally, the Debtors caused the Plan, the Disclosure Statement, the Solicitation Procedures Order, the Confirmation Hearing Notice, the Solicitation and Voting Procedures, the Plan Supplement, and other documents and information pertinent to voting on

the Plan and responding to confirmation of the Plan to appear conspicuously on the main page of

the website maintained by the Notice and Claims Agent in these Chapter 11 Cases.  *See FTX*

*Trading Ltd., et al.*, Kroll, https://restructuring.ra.kroll.com/FTX/Home-Index (last visited

Sep. 29, 2024).

> ii.     **The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126.**

68.     Section 1126 of the Bankruptcy Code provides that only holders of

allowed claims and equity interests in impaired Classes that will receive or retain property under

a plan on account of such claims or equity interests may vote to accept or reject a plan.

69.     Class 1, Class 2, Class 3B, Class 4, Class 5C and Class 8A are Unimpaired

under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in such

classes are thus not entitled to vote on the Plan and are conclusively presumed to have accepted

the Plan.

70.     The Debtors did not solicit votes from Class 9, Class 11, Class 13, Class

14, Class 15, Class 16, Class 17 and Class 18, which are Impaired under the Plan.  Holders of

Claims and Interests, as applicable, in Class 9, Class 11, Class 13, Class 14, Class 15, Class 16,

Class 17 or Class 18 are conclusively presumed to have rejected the Plan.

71.     With respect to Class 3A, Class 5A, Class 5B, Class 6A, Class 6B,

Class 7A, Class 7B, Class 7C, Class 8B, Class 8C, Class 10A, Class 10B, Class 10C and Class

12, the Debtors solicited votes on the Plan in accordance with the Bankruptcy Code.  Sections

1126(c) and (d) of the Bankruptcy Code provide, respectively:

> A class of claims has accepted a plan if such plan has been accepted
> by creditors, other than any entity designated under subsection (e) of
> section 1126, that hold at least two-thirds in amount and more than
> one-half in number of the allowed claims of such class held by
> creditors, other than any entity designated under subsection (e) of

[section 1126], that have accepted or rejected such plan.  11 U.S.C. § 1126(c).

A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interest, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.  11 U.S.C. § 1126(d).

72.    The Kroll Declaration details the results of the voting process.  (Kroll Decl. ¶ 9 and Ex. A.)  All Classes entitled to vote on the Plan accepted the Plan in accordance with section 1126 of the Bankruptcy Code, and did so with overwhelming support for the Plan among those voting within those Classes.  (*Id.*)

### C.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).

73.    Section 1129(a) of the Bankruptcy Code compels a bankruptcy court to reject a plan if it is not proposed in "good faith" or is "forbidden by law."  11 U.S.C. § 1129(a)(3).  While the Bankruptcy Code does not define "good faith," courts in the Third Circuit have interpreted the good faith standard as requiring the plan to "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *PWS Holding*, 228 F.3d at 242.  Moreover, courts in this Circuit have explained that the bankruptcy court should look to the "totality of the circumstances" surrounding the establishment of a chapter 11 plan and consider whether a plan would "achieve a result consistent with the standards prescribed under the Code."  *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013) (citing *In re Frascella Enter., Inc.*, 360 B.R. 435, 446 (E.D. Pa. 2007)).  Thus, the examination must be done on a case-by-case basis and the court is given "considerable discretion in finding good faith."  *Id.* (quoting *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).  In the Third Circuit, courts consider the following factors in determining whether a

plan was proposed in good faith: "(1) [the plan] fosters a result consistent with the Bankruptcy Code's objectives; (2) [the plan] has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [the plan proponents] exhibited a fundamental fairness in dealing with the creditors." *Id.* at 87-88 (citation omitted). Here, each of these factors is met.

74.     The Debtors have proposed the Plan in good faith with good intentions in order to effectuate an orderly wind down of the Debtors and the Debtors' remaining assets that maximizes value for all stakeholders. (*See* Coverick Decl. ¶ 42.) The Plan is not proposed for a purpose forbidden by law, but rather is consistent with the letter and policy of the Bankruptcy Code and the fiduciary duties of the Debtors and their directors and officers. (*Id.*) The Plan is also the culmination of good faith negotiations and arm's-length discussions among the Debtors, the Official Committee, the Ad Hoc Committee, the Bahamas JOLs, the Commodity Futures Trading Commission, several state attorneys general, putative class action plaintiffs, Emergent Fidelity Technologies Ltd., BlockFi Inc. and its affiliated debtors, the lead plaintiffs in the FTX multi-district litigation, various offices within the United States Department of Justice, and other stakeholders, over a period of more than a year. The Plan reflects an agreement among all key stakeholders regarding the proper allocation and process for distribution to the various Classes of the Debtors' assets. (*Id.*) That the Plan has such significant support from all key stakeholders including, but not limited to, the Debtors' major creditor constituencies demonstrates that the Plan is fundamentally fair to creditors. Accordingly, the Debtors submit that the Plan was proposed in good faith and satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)).**

75.    Section 1129(a)(4) of the Bankruptcy Code requires that any payment made or to be made by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, be subject to approval of the Court as reasonable.  All payments made or to be made by the Debtors for services rendered and expenses incurred by retained Professionals in connection with the Chapter 11 Cases have been approved by, or are subject to, approval by the Court.  In particular, Article 3 of the Plan provides for the Court-approved procedures by which Administrative Claims may be paid, and further provides that all final requests for payment of Professional Fee Claims shall be subject to the Court's determination of the Allowed amounts of such Professional Fee Claims.

76.    Article 12 of the Plan also provides that the Court shall retain jurisdiction to decide and resolve all matters related to the granting and denying of any applications of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.  Accordingly, the Plan complies with and satisfies all of the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.    The Requirements of § 1129(a)(5) Concerning Post-Emergence Directors Are Satisfied.**

77.    Section 1129(a)(5) of the Bankruptcy Code requires the disclosure of the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer, as well as the identity of any insider that will be employed or retained by the reorganized debtor.

78.    The Plan Supplement discloses the identities of the initial directors of the Consolidated Wind Down Trust.  (Plan Supplement Ex. 3.)  The Plan Supplement also discloses

that the officers of the Consolidated Wind Down Trust will consist of the Plan Administrator, a

secretary and such other officers as the board of the Consolidated Wind Down Trust shall deem

appropriate.  (*Id.* § 7.1.)  In accordance with the Liquidating Trust Agreement, the officers of the

Consolidated Wind Down Trust shall be authorized to hire employees as they deem appropriate,

subject to any limitations, conditions, and qualifications imposed by the board of the Wind Down

Trust.  (*Id.* § 7.2)  Therefore, the Plan satisfies section 1129(a)(5).

### F. The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)).

79.    Section 1129(a)(6) of the Bankruptcy Code requires any regulatory

commission that will have jurisdiction over the debtor after confirmation to approve any rate

change provided for in the plan.  The Plan does not provide for any rate change.  (Coverick Decl.

¶ 46.)  Accordingly, section 1129(a)(6) is inapplicable.

### G. The Plan Is in the Best Interests of Creditors and Holders of Interests (11 U.S.C. § 1129(a)(7)).

80.    Section 1129(a)(7) of the Bankruptcy Code—referred to as the best

interests test—requires that, with respect to each impaired class of claims or interests, each

holder of a claim or interest of such class has either accepted the plan or will receive or retain

under the plan property of a value, as of the effective date of the plan, that is not less than the

amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the

Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(7).  This test applies if a class of claims or interests

does not vote unanimously to accept a plan, even if the class as a whole votes to accept the plan.

*See Bank of Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13

(1999).  Under the best interests test, "the court must measure what is to be received by rejecting

creditors in the impaired classes under the plan against what would be received by them in the

event of liquidation under chapter 7," and "[i]n doing so, the court must take into consideration

the applicable rules of distribution of the estate under chapter 7, as well as the probable costs

incident to such liquidation." *In re Adelphia Commc'ns, Corp.*, 368 B.R. 140, 252 (Bankr.

S.D.N.Y. 2007); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (citation

omitted) ("Section 1129(a)(7)(A) requires a determination whether a prompt chapter 7

liquidation would provide a better return to particular creditors or interest holders than a chapter

11 reorganization.").  Section 1129(a)(7) of the Bankruptcy Code and case law make clear that

the best interests test applies only to each non-accepting holder of impaired claims or interests.

*See id.* at 251; *In re Drexel Burnham Lambert*, 138 B.R. 723, 761 (Bankr. S.D.N.Y.

1992) ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

81.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy

Code, the Debtors have prepared a liquidation analysis estimating and comparing the range of

proceeds generated under the Plan and a hypothetical chapter 7 liquidation (the "<u>Liquidation</u>

<u>Analysis</u>").  (*See* Disclosure Statement, Appendix D.)  As demonstrated by the Liquidation

Analysis and as explained in the Coverick Declaration, the Plan satisfies the best interests test

with respect to each non-accepting Holder in an impaired class because recoveries to such

Holders under the Plan equal or exceed the recoveries available to such parties in a hypothetical

chapter 7 liquidation.  (*See* Coverick Decl. ¶ 48; Disclosure Statement,

Appendix D.)  Accordingly, the Debtors submit that the Plan satisfies the requirements of section

1129(a)(7) of the Bankruptcy Code.

**H.     Acceptance by Certain Impaired Classes (11 U.S.C. § 1129(a)(8)).**

82.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of

claims or interests must either accept the plan or not be impaired thereby.  Pursuant to section

1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds

in amount and more than one-half in number of the allowed claims in that class vote to accept the

plan.  11 U.S.C. § 1126(c).  Pursuant to section 1126(d) of the Bankruptcy Code, a class of

interests accepts a plan if holders of at least two-thirds in amount of the allowed interests in that

class vote to accept the plan.  11 U.S.C. § 1126(d).  On the one hand, where a class is not

impaired under a plan, each holder of a claim or interest in such class is conclusively presumed

to have accepted the plan.  *See* 11 U.S.C. § 1126(f); *see also* S. Rep. No. 95-989, at 123 (stating

that section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any

class whose claims or interests are unimpaired under the Plan or in the order confirming the

plan").  On the other hand, a class is deemed to have rejected a plan if the plan provides that the

claims or interests of that class do not receive or retain any property under the plan on account of

such claims or interests.  11 U.S.C. § 1126(g).

        83.     Each of the Impaired Accepting Classes voted to accept the Plan.  (*See*

Kroll Decl. ¶ 9, Ex. A.)  Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and

Class 18 are Impaired, and votes from Holders in such Classes were not solicited.  Accordingly,

Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18 are presumed to

reject the Plan.  Thus, section 1129(a)(8) of the Bankruptcy Code has not been satisfied.

Nevertheless, as discussed more fully below, the Debtors meet the alternative requirement of

section 1129(b) with respect to Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class

17 and Class 18 and the Plan may be confirmed over their presumed rejection under the

alternative "cram down" requirements of section 1129(b) of the Bankruptcy Code.

    **I.      The Plan Complies with Statutorily Mandated Treatment of Administrative
            and Priority Claims (11 U.S.C. § 1129(a)(9)).**

        84.     Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to

priority under section 507(a) of the Bankruptcy Code be paid in full in cash, unless the holder

thereof agrees to a different treatment with respect to such claims.  In accordance therewith, the

Plan provides that:

      i.     Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Other Priority Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.  (Plan § 4.3.2.)

      ii.     Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.  (Plan § 3.2.)

      iii.     Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Priority Tax Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.  (Plan § 4.3.1.)

Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements

of section 1129(a)(9) of the Bankruptcy Code.

      **J.**      **The Plan Was Accepted by at Least One Impaired Class
(11 U.S.C. § 1129(a)(10)).**

      85.     Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of

claims is impaired under a plan, then at least one such impaired class of claims has accepted the

plan, "determined without including any acceptance of the plan by any insider."  11 U.S.C.

§ 1129(a)(10).

      86.     Here, each of the Impaired Accepting Classes voted to accept the Plan and

there is no indication that insiders hold Claims or Interests in any of these Classes sufficient to

alter that voting result.  Therefore, the Plan satisfies the requirements of section 1129(a)(10) of

the Bankruptcy Code.

> **K.**      **The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).**

87.      Section 1129(a)(11) of the Bankruptcy Code requires that a plan be

feasible to be confirmed.  Specifically, the Court must determine, in relevant part, that:

> [c]onfirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

88.      To satisfy the feasibility standard, a debtor need not warrant, or prove to a

mathematical certainty, the future success of the plan.  *In re W.R. Grace & Co.*, 729 F.3d 332,

349 (3d Cir. 2013) ("[Debtor] needed only to demonstrate a reasonable likelihood of success, not

an absolute certainty.").  Rather, a plan is feasible if it provides only a "reasonable assurance of

compliance with the plan terms."  *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 276 (Bankr. D. Del.

2016) (quoting *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *modified on recon*.

464 B.R. 208 (Bankr. D. Del. 2011)); *see also In re Eddington Thread Mfg. Co., Inc.*, 181 B.R.

826, 833 (Bankr. E.D. Pa. 1995).  ("[I]t is clear that there is a relatively low threshold of proof

necessary to satisfy the feasibility requirement.").  In evaluating feasibility, courts have

identified the following nonexclusive probative factors:

- the adequacy of a debtor's capital structure;

- the earning power of the business;

- economic conditions;

- whether the debtor will have the ability to meet its requirements for capital
expenditures;

- the ability of management, and the likelihood that the same management will continue; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re Mallinckrodt PLC*, 639 B.R. 837, 894 (Bankr. D. Del. 2022) (quoting *In re Trigona*, 2009 WL 8556810, at *4 (Bankr. W.D. Pa. July 24, 2009)).

89.     Application of these factors here indicates that the Plan is plainly feasible. The Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors and the distribution of the Debtors' remaining assets.  (Coverick Decl. ¶ 58.)  The Debtors, together with their advisors, have thoroughly analyzed the Debtors' ability to make distributions and meet their obligations under the Plan and have prepared projections for the Wind Down Entities based on a number of assumptions detailed in Appendix C to the Disclosure Statement (the "Financial Projections").  As set forth in the Financial Projections, an analysis of these factors in the context of these Chapter 11 Cases demonstrates that the Plan is feasible.  (*Id.*)

90.     For the foregoing reasons, the Debtors submit the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

**L.     The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)).**

91.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.  Section 3.5 of the Plan provides that the Debtors will pay all such fees and interest due and owing prior to the Effective Date on or before the Effective Date.  The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  On and after the Effective

Date, the Wind Down Entities shall pay these fees when due and owing and prepare and file all necessary quarterly reports and other reports required by the Court.

**M.     The Debtors Do Not Owe Any Retiree Benefits (11 U.S.C. § 1129(a)(13)).**

92.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not owe any "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).  (Coverick Decl. ¶ 60.)  Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable.

**N.     The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b).**

93.     Section 1129(b) of the Bankruptcy Code provides that if a Chapter 11 plan satisfies all applicable requirements of section 1129(a) except for the requirement in section 1129(a)(8) that all impaired classes accept the plan, the plan may be confirmed as long as it "does not discriminate unfairly" and is "fair and equitable" with respect to each class of claims and interests that is impaired and has not accepted the plan.  *See* 11 U.S.C. § 1129(b)(1); *John Hancock Mut. Life*, 987 F.2d at 157 n.5 ("Under [Section 1129(b)], the plan must also satisfy all of the requirements of [Section 1129(a)] except for subsection (a)(8) . . . and must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

94.     As discussed above, the Impaired Accepting Classes voted to accept the Plan, but Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18 are presumed to reject, thereby implicating section 1129(b) of the Bankruptcy Code.

**i.     The Plan Does Not Discriminate Unfairly.**

95.     The Bankruptcy Code does not set forth any one standard for determining if a plan discriminates unfairly against impaired, rejecting classes.  *See In re Tribune Co.*, 972

F.3d 228, 240 (3d Cir. 2020) ("The Bankruptcy Code does not define unfair discrimination.").

Courts typically examine the facts and circumstances of each case to determine whether "unfair

discrimination" exists. *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining

that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-

by-case basis"). Generally, a plan unfairly discriminates, in violation of section 1129(b)(1) of

the Bankruptcy Code, only if similar classes are treated differently without a reasonable basis for

the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (Bankr. D.

Del. 2006) ("The hallmarks of the various tests have been whether there is a reasonable basis for

the discrimination, and whether the debtor can confirm and consummate a plan without the

proposed discrimination."). The unfair discrimination standard generally prevents creditors and

interest holders with similar legal rights from receiving materially different treatment under a

proposed plan without a reasonable basis for doing so. *See, In re WorldCom, Inc.*, 2003 WL

23861928, at *59 ("[I]f under the facts and circumstances of a particular case, there is a

reasonable basis for disparate treatment of two similarly situated classes of claims or two

similarly situated classes of equity interests, there is no unfair discrimination.").

　　　　96.　　Here, the Plan's treatment of the Impaired Classes that are deemed to

reject the Plan is proper because the Plan's overall classification scheme is acceptable and all

similarly situated Claims and Interests will receive substantially similar treatment.

　　　　97.　　There is no unfair discrimination against Classes 9, 11, 13, 14, 15, 16, 17

and 18. There are no other Classes containing creditors or interest holders with Claims or

Interests, as applicable, similar to those in Class 9, Class 11, Class 13, Class 14, Class 15,

Class 16, Class 17 and Class 18, respectively, and each Class contains Claims or Interests that

are similarly situated.  (Coverick Decl. ¶ 62.)  For these reasons, the Debtors submit that the Plan does not discriminate unfairly with respect to any Impaired Class.

> ### ii.        The Plan Is Fair and Equitable.

98.        For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).  11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also Bank of Am. Nat'l Trust & Sav. Ass'n*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property.'").  Generally, this requires that the impaired rejecting class of claims or interests either be paid in full or that any class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.  *See id*.

99.        The proposed treatment of Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18 under the Plan satisfies the absolute priority rule.  Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan satisfies the absolute priority rule with respect to a class of claims that is not receiving full value where:

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 [11 U.S.C § 1115], subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B)(ii).  Section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a

plan satisfies the absolute priority rule with respect to a class of interests that is not receiving full

value where:

> the holder of any interest that is junior to the interests of such class
> will not receive or retain under the plan on account of such junior
> interest any property.

11 U.S.C. § 1129(b)(2)(C)(ii).

100.    The Plan satisfies the absolute priority rule with respect to all Impaired

Classes and Interests that are deemed to reject the Plan.  There is no Class junior to any of

Class 9, Class 11, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18 that is receiving

or retaining "any property" "on account" of such Claim or Interest under the Plan.  Holders of

Class 10B Claims will receive property on account of their claims, but such distributions are

pursuant to voluntary subordination in accordance with settlements reached in these Chapter 11

Cases, including the IRS Settlement.  Accordingly, the Plan satisfies the requirements of sections

1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code and is fair and equitable with

respect to all classes of Claims and Interests.

**O.    The Principal Purpose of the Plan Is Not Avoidance of Taxes (11 U.S.C. § 1129(d)).**

101.    Section 1129(d) of the Bankruptcy Code states that "the court may not

confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of

the application of section 5 of the Securities Act of 1933."  The purpose of the Plan is not to

avoid taxes or the application of section 5 of the Securities Act of 1933.  (Coverick Decl.

¶ 64.)  Moreover, no federal, state or local government unit, or any other party, has raised any

objection to the Plan on these or any other related grounds, and all Priority Tax Claims will be

paid in full pursuant to the Plan.  The Debtors therefore submit that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## II.      The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.

102.      Section 1123(b) of the Bankruptcy Code identifies additional provisions that may be included in a Chapter 11 plan.  For example, a plan may impair or leave unimpaired any class of claims or interests, provide for the assumption or rejection of executory contracts and unexpired leases, provide for the settlement or adjustment of claims or interests belonging to the debtor or to the estate, modify the rights of holders of claims, and include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(1)-(6).  The Plan includes certain such provisions.

### A.      The Plan Provides for the Rejection or Assumption of Certain Executory Contracts and Unexpired Leases.

103.      Section 6.1 of the Plan provides for the rejection, in accordance with sections 365 and 1123 of the Bankruptcy Code, of all Executory Contracts and Unexpired Leases of the Debtors other than Executory Contracts or Unexpired Leases (a) previously assumed or rejected pursuant to an order of the Court; (b) that, as of the Effective Date, are the subject of a pending motion to assume; or (c) that are specifically described in the Plan to be assumed in connection with the Plan.

104.      The Debtors and their advisors have reviewed the outstanding Executory Contracts and Unexpired Leases, and have determined that only those identified contracts listed in the Plan Supplement or otherwise assumed in accordance with Section 6.1 of the Plan should be assumed, and that rejection of all other Executory Contracts and Unexpired Leases is in the best interests of the Debtors, the Debtors' estates, and all stakeholders.  (Coverick Decl. ¶ 20.)

**B.      Substantive Consolidation of the Consolidated Debtors Should Be Approved.**

105.    As set forth in section 5.7 of the Plan, an integral part of the Global

Settlement pursuant to the Plan is, effective as of the Effective Date, the substantive

consolidation of all Estates of the Consolidated Debtors into a single Entity formed as a

Delaware trust for the purposes of effectuating and implementing the Plan.

106.    In *In re Owens Corning*, the Third Circuit established that a proponent of

substantive consolidation is required to show that "(i) prepetition, the debtors disregarded

separateness so significantly their creditors relied on the breakdown of entity borders and treated

them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that

separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211

(3d Cir. 2005).  Cases subsequent to *In re Owens Corning* have held that fraud may be a type of

compelling circumstance in which a court may disregard corporate separateness and

substantively consolidate different entities. *See, e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 592

B.R. 761, 778 (Bankr. D. Del. 2018).  The facts plainly support substantive consolidation here.

107.    Although the business lines of the FTX Group can be described in general

terms, the entities themselves were hopelessly commingled.  The FTX Group lacked appropriate

management, governance and organizational structure, with control of the FTX Group

concentrated in just three individuals:  Mr. Bankman-Fried, Mr. Singh and Mr. Wang.  The same

directors and officers managed nearly all entities within the FTX Group, which allowed

Mr. Bankman-Fried, Mr. Singh and Mr. Wang to operate the FTX Group as a quasi-single

organization.  (Mosley Decl. ¶ 62.)

108.    Since the commencement of these Chapter 11 Cases, the Debtors have

spent considerable time and effort attempting to understand the most basic of facts, such as the

number of employees the Debtors had, where the Debtors' assets were, and how money flowed

between entities. Attempts have been made to identify intercompany transactions, but the Debtors do not have the ability to do so comprehensively. The Debtors' financial recordkeeping deficiencies and pervasive pattern of fraudulent activity, encompassing public misrepresentations, fraudulent financial reporting, and misappropriation of assets, impede efforts to disentangle and reconstruct the Debtors' financial affairs. (*Id.* ¶ 63.)

109. Within the FTX Group, funds of one entity were routinely used as funds of another and relationships among entities were obscured by prepetition management. Agreements were backdated, entered into between lenders and incorrect borrower entities, and entities improperly pledged assets of other entities. (*Id.* ¶ 64.) In addition, lenders that requested financial information from Alameda were intentionally provided false or incomplete financial information, further obfuscating the separateness of each entity. These documents, for example, (i) concealed significant liabilities (*e.g.*, an intercompany liability to the FTX.com Exchange) and (ii) failed to correctly classify collateralized assets which allowed certain assets to be misappropriated. (*Id.* ¶ 66.) The fraud occurring at the FTX Group prepetition was pervasive and is well-documented.

110. Exchange Assets and customer liabilities were generally not held 1:1 prior to the Petition Date. (Mosley Decl. ¶ 67.) At the direction of Mr. Bankman-Fried, Mr. Singh and Mr. Wang, the FTX Group funneled billions of dollars of customer deposits and withdrawals in fiat currency through bank accounts of Alameda and other Debtor and non-Debtor affiliates, commingling and misusing vast sums of customer and corporate funds in the process. As of the Petition Date, this resulted in a shortfall of both fiat and digital assets relative to customer entitlements on the FTX.com Exchange of more than $9 billion. (*Id.*) These shortfalls reflected, among other things FTX Group's lack of controls, the absence of efforts to reconcile customer

entitlements and Exchange Assets, and Alameda's taking of large quantities of cryptocurrency from the FTX.com Exchange through its undisclosed unlimited borrowing. (*Id.*)

111.    The combination of the FTX Group's intercompany inaccuracies, commingling of assets, missing data, and lack of recordkeeping likely prohibits the timely creation of accurate financials by entity, regardless of cost.  Intercompany inaccuracies were a result of the failure to consistently record customer and non-customer transactions.  The FTX Group's failure to maintain accurate records while routinely commingling customer deposits with operating funds makes determining the Petition Date intercompany balances extraordinarily challenging.  The use of various entities' assets and customer assets to fund venture investments and pay expenses on behalf of other FTX Group entities further complicates the state of intercompany balances.  In many instances, no intercompany record was created to note the payment on behalf of a related entity. (*Id.* ¶ 68.)

112.    The financial impact of select intercompany agreements could not be calculated due to ambiguous, inconsistent, and routinely absent financial documentation.  For example, the Debtors' advisors identified that at least thirty-seven entities transacted with other entities without agreements and insufficient records to determine the nature of these arrangements.  Moreover, the FTX Group demonstrated a pattern of creating agreements to legitimize questionable arrangements which facilitated the commingling and misuse of assets.  When coupled with the FTX Group's inadequate internal controls, these practices resulted in over three years of customer and intercompany activity that remained unreconciled at the Petition Date. (*Id.* ¶ 69.)

113.    These facts overwhelmingly support the second prong of *In re Owens Corning*.  Postpetition, the Debtors' assets and liabilities are so scrambled that separating them is

prohibitive and doing so may be to the detriment of the Debtors' stakeholders.  As the Third

Circuit explained in *Owens Corning*, this rationale is implicated in situations when, "[w]ithout

substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be

reassembled or, even if so, the effort will threaten to reprise *Jarndyce* and *Jarndyce*, the fictional

suit in Dickens' *Bleak House* where only the professionals profited)."  *In re Owens Corning*, 419

F.3d at 211 n.20; *see also, e.g.*, *In re Woodbridge Grp.*, 592 B.R. at 778 (concluding that

substantive consolidation was warranted where the debtors engaged in a Ponzi scheme and

conducted thousands of inscrutable intercompany transactions); *Windels Marx Lane &*

*Mittendorf, LLP* v. *Source Enters. (In re Source Enters)*, 392 B.R. 541, 553 (S.D.N.Y.

2008) (concluding that bankruptcy court appropriately ordered substantive consolidation when

there was "pervasive" commingling that indicated "the debtors' books could not be untangled").

Furthermore, substantive consolidation is viewed as especially appropriate in circumstances

where "a high degree of commingling and intercompany transfers was among the abuses of the

corporate form" and "there is an incomplete, confusing, or facially unreliable documentary

record from which the tracing would be made."  *In re Petters Co.*, 506 B.R. 784, 816 (Bankr. D.

Minn. 2013).

   114. Due to the extensive commingling of funds among the Debtors, the

Debtors and their advisors concluded that the substantive consolidation of the Consolidated

Debtors would avoid a massive, costly, and extraordinarily challenging tracing exercise and that

substantive consolidation was the most equitable remedy for all creditors.  (Mosley Decl. ¶ 70.)

   115. Entity financial statements and the supporting documents and information

(*e.g.*, bank statements) for the FTX Group were either inaccurate, incomplete, or unavailable.

Thirty-five FTX Group entities, including those entities responsible for consolidated financial

reporting, utilized QuickBooks as their accounting system and relied on a patchwork of Google

documents, Slack communications, shared drives, Excel spreadsheets, and other non-enterprise

solutions.  QuickBooks was not designed to address the needs of a large, complex business like

the FTX Group and lacked any integration with the internal exchange platform, cryptocurrency

wallets or third-party exchange platforms.  At the Petition Date, the Debtors lacked complete

listings of bank accounts, cryptocurrency addresses and exchange accounts, which hindered asset

identification and attribution of accounts and wallets to legal entities.  Additionally, the

anonymity of cryptocurrency addresses and transactions prevents fulsome attribution of

cryptocurrency transactions to specific FTX Group entities.  (*Id.* ¶ 71.)

116.    Accordingly, the Debtors concluded that to fully unscramble the tangled

mess of assets and liabilities distributed among the FTX Group would be extraordinarily

challenging and prohibitively expensive, would reduce creditor recoveries, and would severely

delay distributions to creditors for these Chapter 11 Cases.  (*Id.* ¶ 72.)

117.    The facts and circumstances in these Chapter 11 Cases are archetypical of

the principles supporting substantive consolidation discussed by the Third Circuit in *In re Owens*

*Corning*: (i) the FTX Group's scheme is the type of compelling circumstance that overcomes the

general expectation of recognizing corporate separateness; (ii) substantive consolidation

effectively addresses the harm caused by the FTX Group to all stakeholders; (iii) the Plan's

proposed substantive consolidation accomplishes more than "administrative convenience"

because it results in equitable treatment of defrauded stakeholders; and (iv) substantive

consolidation is being used defensively to remedy the harm to stakeholders caused by the

commingling of assets and is not being used offensively to disadvantage a particular group of

creditors or Class.  *In re Owens-Corning*, 419 F.3d at 211; *see also In re Woodbridge Grp.*, 592

B.R. at 778 (applying the above factors to a Ponzi scheme and concluding that substantive consolidation was warranted).

118.     Finally, the Debtors' conclusion is validated by the fact that an overwhelming majority of voting Holders in each Class voted in favor of the Plan, which contemplates substantive consolidation, and no objections to the Debtors' proposed substantive consolidation have been interposed.  Accordingly, the Debtors submit that the substantive consolidation of the Debtors as described in the Plan is warranted and should be approved.

### C.     The Customer Priority Settlement Should Be Approved.

119.     Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  The compromise or settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is "generally favored."  *In re World Health Alternatives, Inc*., 344 B.R. 291, 296 (Bankr. D. Del. 2006).  "[T]he decision whether to approve a compromise under [Bankruptcy] Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."  *In re Louise's, Inc*., 211 B.R. 798, 801 (D. Del. 1997).  Courts should not, however, substitute their judgment for that of the debtor, but instead should canvas the issues to see whether the compromise falls below the lowest point in the range of reasonableness.  *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant and Co*., 699 F.2d 599, 608 (2d Cir. 1983).

120.     The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a compromise should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The test boils down to whether the terms of the proposed compromise fall "within a reasonable range of litigation possibilities." *In re Washington Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011).

121.    The Customer Priority Settlement plainly satisfies this standard because each *Martin* factor militates in favor of approval. In the absence of the Customer Priority Settlement, the Debtors would have been required to litigate against the Ad Hoc Committee, the Class Action Claimants and, potentially, other customers as to whether Exchange Assets are part of the Debtors' estates. (Coverick Decl. ¶ 23.) Section 541 of the Bankruptcy Code specifies that the Debtors' estates include "all legal or equitable interests of the debtor in property as of the commencement of the case," but do not include "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest." 11 U.S.C. § 541(a), (d). Accordingly, customers of FTX.US and FTX.com have alleged and/or could allege that Exchange Assets are not part of the Debtors' estates because they are the subject of (i) an express trust, (ii) a resulting trust, (iii) a constructive trust, or (iv) a bailment, and that any assets traceable to the Exchange Assets are also not part of the Debtors' estates.

122.    The Debtors, however, maintain that under "well-settled case law" all Exchange Assets are presumptively part of the Debtors' estates because they were commingled together with each other (including with deposits from Debtors trading on the Exchanges) and with other of the Debtors' assets, and held in addresses and accounts owned and controlled by the Debtors. *See, e.g.*, *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018) (property is presumptively the debtor's where it is commingled with the debtor's own assets in accounts controlled by the debtor). Further, the Debtors maintain that customers could

never satisfy their burden to (i) prove that they have property rights pursuant to any trust or bailment, and (ii) trace any assets that they purportedly own to any assets that are part of the Debtors' estates.

123.    It is, however, readily apparent that litigation of these customer property arguments individually to final judgment would be complex, burdensome, uncertain, and could delay the resolution of these Chapter 11 Cases and distributions to creditors.  (Coverick Decl. ¶ 24.)  The Customer Priority Settlement eliminates the need for any such litigation, and ensures that all customers are treated equally and fairly instead of favoring any group of customers.  The priority claims and shortfall amounts for the benefit of customers against the General Pool ensure that customers receive recoveries reflecting the relative risks and benefits of their Claims.

124.    Further, although Exchange Assets should be conclusively presumed to be part of the Debtors' estates, to the extent there are any doubts as to whether any Exchange Assets are property of the Debtors' estates, this Court has jurisdiction to distribute them equitably pursuant to the Plan.  *Gulfstream* v. *Calascibetta (In re Strategic Technologies, Inc.)*, 142 Fed. App'x 562, 566 (3d Cir. 2005) (holding that funds in a "commingled account" were "presumed to be part of the bankruptcy estate" and that the bankruptcy court "would still retain jurisdiction to return those funds to their rightful owners" even if they were not part of the estate).

125.    Accordingly, the Customer Priority Settlement should be approved because it is fair, equitable, and in the best interests of the Debtors and their stakeholders. (Coverick Decl. ¶ 25.)

> **i.    All Exchange Assets Are Presumptively Property of the Debtors' Estates and the Burden Is on Creditors to Show Otherwise**

126.    The Debtors presumptively have title to all Exchange Assets, which were commingled together and commingled with the Debtors' assets.  As explained in the Mosley

Declaration, Exchange Assets and customer liabilities were generally not held 1:1 prior to the

Petition Date.  (Mosley Decl. ¶ 67.)  Deposits of cryptocurrency assets and stablecoin were

aggregated in addresses and cash was aggregated in various bank accounts, which were owned

and controlled by the Debtors and contained commingled assets deposited by multiple customers

and the Debtors.  (*See* Mosley Decl. ¶¶ 37-42.)  It is "well-settled case law" that "any bank

accounts under the legal title of the debtor, as well as any deposits in such accounts credited to

the debtor, are presumptively considered property of the debtor's estate," including "where the

account contains commingled funds."  *FBI Wind Down, Inc.*, 581 B.R. at 400; *see also Danning*

v. *Bozek (In re Bullion Rsrv. of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988) (holding that gold

bullion "from comingled bank accounts under" the debtors' control was "presumptively . . .

property of the debtor's estate"); *True Traditions, LC* v. *Wu*, 552 B.R. 826, 840 (N.D. Cal.

2015) ("Funds from a commingled bank account in the debtor's control are presumed to be

property of the debtor's estate.").  Indeed, even "[m]oney paid from a bank account containing

commingled funds under a debtor's control is presumptively property of the debtor."  *Radnor*

*Holdings Corp.* v. *PPT Consulting, LLC (In re Radnor Holdings Corp.)*, 2009 WL 2004226, at

\*2 (Bankr. D. Del. July 9, 2009); *accord Peachtree Special Risk Brokers* v. *Kartzman (In re*

*Rocco Co.)*, 2014 WL 7404566, at \*5-6 (D.N.J. Dec. 19, 2014) (collecting cases and holding that

commingled funds in a trust account were presumptively property of the debtor's estate).

127.    Because Exchange Assets are "presumptively property of the [Debtors']

estate[s]," "it is the burden of [creditors] to establish otherwise."  *In re Catholic Diocese of*

*Wilmington*, *Inc.*, 432 B.R. 135, 162 n.93 (Bankr. D. Del. 2010); *see also Altura Partnership* v.

*Breninc, Inc. (In re B.I. Fin. Servs. Grp., Inc.)*, 854 F.2d 351, 354 (9th Cir. 1988) (explaining that

it is the creditor's burden to show that a fiduciary relationship, like a trust, had been created).

Indeed, "there is simply no authority for the conclusion that a trustee bears the burden of establishing a negative": that commingled funds in accounts controlled by the debtor are *not* owned by someone else.  *Meoli* v. *Kendall Electric, Inc. (In re R.W. Leet Electric, Inc.)*, 372 B.R. 846, 856 (6th Cir. 2007).  To hold otherwise would allow Debtors' estates to be readily dismembered and create a risk of "disparate treatment" among creditors.  *Id.* at 855.

### ii.    The Debtors Maintain That FTX Exchange Customers Are Unsecured Creditors

128.    To extract Exchange Assets from the Debtors' estates and obtain a preference over other creditors, a customer would bear the burden of (i) "demonstrating . . . a trust relationship" or bailment relationship "and its legal source exist," and (ii) "identifying and tracing" the assets that they purportedly own because "they have been commingled" with other assets.  *Catholic Diocese of Wilmington*, 432 B.R. at 147 (citing *City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994)); *accord Strategic Technologies, Inc.*, 142 Fed. App'x at 556 (explaining the burden on a purported trust beneficiary "[w]hen funds are commingled"). "Whereas the first showing is generally a question of state law, the second showing because it pertains to distribution of assets from an entity in federal bankruptcy proceeding, is exclusively a question of federal law."  *Goldberg* v. *N.J. Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991) (cleaned up).  Both the US TOS and the Dotcom TOS contain broadly worded choice-of-law provisions specifying both the law that governs the TOS and the law that governs disputes related to it.  (US TOS § 29; Dotcom TOS § 38.11, Sched. 1 § 1.1.)  Thus, FTX.US customers would bear the burden of establishing property rights arising from the US TOS under California law, *B.I. Fin. Servs. Grp., Inc.*, 854 F.2d at 354, and FTX.com customers would need to establish property rights arising from the Dotcom TOS under English law.

129. The Debtors maintain that customers could never meet this burden, but believe that the Customer Priority Settlement should be approved because litigation of these issues to final judgment would be burdensome and uncertain, and could delay the distribution of assets from the Debtors' estates. In contrast, the Plan, including the Customer Priority Settlement, provides a fair resolution of these issues by acknowledging the customer counterarguments, and is in the best interests of all customers and other creditors.

### iii. FTX.US Customers Could Not Prove the FTX.US Terms of Service Establish an Express Trust

130. Although the Customer Priority Settlement acknowledges the risks and costs associated with litigation of customer property arguments, the Debtors maintain that customers of the FTX.US Exchange could not establish that the US TOS created an express trust as a matter of California law for three principal reasons. *First*, nothing in the US TOS constitutes an "explicit declaration of trust." *Swimmer* v. *Moeller (In re Moeller)*, 466 B.R. 525, 536 (Bankr. S.D. Cal. 2012). *Second*, nothing in the US TOS required the segregation of Exchange Assets or prohibited the commingling of customer deposits with each other and with the Debtors' deposits and other assets. *See, e.g.*, *Foothill Capital Corp.* v. *Clare's Food Market, Inc.* (*In re Coupon Clearing Serv.)*, 113 F. 3d 1091, 1101 (9th Cir. 1997) (finding that there was no trust where there was no prohibition on "comingling funds and payments"). *Third*, the disclaimers in the US TOS are inconsistent with any intent to establish a fiduciary relationship between a trustee and beneficiary.

131. *First*, to establish an express trust under California law, "there must be an explicit declaration of trust followed by an actual conveyance or transfer of property to the trustee." *Moeller*, 466 B.R. at 535. Here, the US TOS are completely devoid of any language related to a declaration of trust. There is no provision stating that Exchange Assets would be

held in trust or that WRSS would act as a trustee.  This is "inconsistent with finding that an express trust agreement existed." *B.I. Financial*, 854 F.2d at 355; *see also Sharp* v. *FDIC (In re Vineyard Nat. Bancorp)*, 508 B.R. 437, 445 (Bankr. C.D. Cal. 2014) (holding that contract "did not create an express trust as it lacked the necessary language to create such a trust"); *In re Downey Fin. Corp.*, 593 F. App'x 123, 127 (3d Cir. 2015) (holding that the lack of any language relating to "trust," "trustee," or "beneficiary" indicated that no express trust existed).  Indeed, the absence of any language indicating an express intent to create a trust "is explicitly an indication of a debtor-creditor relationship in California." *In re Indymac Bancorp, Inc.,* 554 F. App'x 668, 670 (9th Cir. 2014).

132.    *Second*, "in the Ninth Circuit and in California, the absence of restrictions on the use or the commingling of funds has been found relevant and indicative of a debtor-creditor relationship." *Vineyard*, 508 B.R. at 445; *accord Coupon Clearing*, 113 F. 3d at 1101.  Rather than prohibiting the commingling of assets, the US TOS explicitly provided that "FTX.US Account[s] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable."  (US TOS § 6.)  This type of comingling is directly contrary to any intent to establish a trust.  *See, e.g.*, *Tawansy* v. *Leslie (In re Raymond Renaissance Theater, LLC)*, 583 B.R. 735, 747 (C.D. Cal. 2018) (finding a trust was not intended because of contractually permitted comingling).  Instead, it is indicative of a debtor-creditor relationship because it shows that withdrawals "were not required to be made from the same [deposits] received from" customers.  *Coupon Clearing*, 113 F.3d at 1101.

133.    *Third*, California courts will not imply a fiduciary relationship "where other legal relationships clearly exist between the parties that cover the transaction in suit and that are inconsistent with the existence of fiduciary duty."  *BP W. Coast Prod., LLC* v.

52

*Crossroad Petroleum, Inc.*, 2013 WL 12377979, at *10 (S.D. Cal. Dec. 3, 2013) (cleaned up).

Here, Section 31(m) of the US TOS expressly states that (i) "FTX.US is an independent

contractor for all purposes," and (ii) "[n]othing in these Terms shall be deemed or is intended to

be deemed, nor shall it cause, you and FTX.US to be treated as partners, joint ventures, or

otherwise as joint associates for profit, or either your or FTX.US to be treated as the agent of the

other." Under California law, "agency, joint venture, or partnership" relationships "are

categories in which fiduciary obligations are imposed by operation of law." *City of Hope Nat'l*

*Med. Ctr.* v. *Genentech, Inc.*, 181 P.3d 142, 152 (Cal. 2008).

      134.    Thus, this language is inconsistent with the establishment of a fiduciary

relationship between a trustee and beneficiary because it does "not indicate an intent to create a

relationship where one party is in ascendency over the other." *DT Floormasters, Inc.* v. *United*

*States*, 2008 WL 2705554, at *4 (S.D. Ind. July 10, 2008) (applying Indiana law and holding that

a contract with a payroll servicer did not create an express trust as to payroll funds, in part

because of an "independent contractor" provision). Moreover, nothing in the US TOS assured

customers that WRSS or any other FTX Group entity would be taking on fiduciary duties to

safeguard their assets. *Compare Householder Group LLLP* v. *Fuss*, 2007 WL 1650933, at *3-4

(N.D. Cal. June 4, 2007) (applying Arizona law and holding that an "independent contractor"

provision foreclosed a claim for breach of fiduciary duty), *with Stopes* v. *Campos (In re*

*Campos)*, 2012 WL 2324398, at *3 (N.D. Cal. June 18, 2012) (defendant's "signing [of] the

Agreement with 'Fiduciary' appearing under his name" showed intent to create an express trust).

      135.    Notwithstanding the weight of the evidence to the contrary, customers

could argue that the US TOS created an express trust because it provided that (i) "[a]ll

cryptocurrency or dollars (or other supported currencies) that are held in your account are held

by FTX.US for your benefit," and (ii) "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." (US TOS § 6.)  But these words are insufficient to demonstrate the intent to establish an express trust given the other provisions of the contract, particularly the provision in Section 6 of the US TOS providing that deposits are "not segregated and cryptocurrency or cash are held in shared addresses or accounts." *See, e.g.*, *Raymond Renaissance Theater*, 583 B.R. at 746 ("If . . . the agreement between the parties permits the co-mingling of payments with the transferee's general funds, such payments are not held in trust, even if the agreement uses" the word "trust" or the words "in trust."); *United States* v. *Lequire*, 672 F.3d 724, 730 (9th Cir. 2012) ("a clause prohibiting personal and corporate use of funds alone is insufficient to prove a trust").

### iv. FTX.US Customers Could Not Prove That a Resulting Trust Should Be Established

136.    The Debtors maintain that the lack of evidence of intent to establish a trustee-beneficiary relationship with WRSS forecloses any claim that a customer may seek to assert regarding a resulting trust.  Under California law, "a resulting trust is a trust implied by operation of law to enforce the inferred intent of the parties to establish a trust." *In re Golden Triangle Capital*, 171 B.R. 79, 82 (B.A.P. 9th Cir. 1994).  But "one who claims a resulting trust in property has the burden of proving the facts establishing his beneficial interest by clear and convincing evidence." *Gomez* v. *Cecena*, 101 P.2d 477, 478 (Cal. 1940).  Where, as here, there is no evidence that "the parties unequivocally intended to establish a trust," a resulting trust "is inapplicable." *Weststeyn Dairy* v. *Eades Commodities Co.,* 280 F. Supp. 2d 1044, 1086 (E.D. Cal. 2003); *see also In re IndyMac Bancorp, Inc.*, 2012 WL 1037481, at *29-30 (Bankr. C.D. Cal. Mar. 29, 2012) ("[T]he FDIC provides no evidence to support its resulting trust theory.  If such an intention existed, then evidence of such intent should be readily available.").

### v.    FTX.US Customers Could Not Impose a Constructive Trust Over Exchange Assets Held by the Debtors

137.    The Debtors also maintain that customers of the FTX.US Exchange could not carry their burden to prove the existence of a constructive trust "by clear and convincing evidence." *Taylor* v. *Fields*, 224 Cal.Rptr. 186, 194 (2nd Dist. 1986).  To establish a constructive trust, a party must show "that the defendant was unjustly enriched so that for the defendant to keep the money would be wrongful." *Moeller*, 466 B.R. at 537; *see also USM Workers Comm.* v. *Decker (In re USM Tech. Corp.)*, 158 B.R. 821, 827 n.9 (Bankr. N.D. Cal. 1993) (same).  But where, as here, the bankruptcy estate will not retain the property at issue, "no unjust enrichment is presented, and the basis for the remedy is dissipated." *Airwork Corp.* v. *Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638, 642 (B.A.P. 9th Cir. 1994); *see also IndyMac,* 2012 WL 1037481, at *27 (finding no unjust enrichment where the assets "would be used to pay allowed valid claims against the estate").  The post-Petition Date Debtors have engaged in no wrongdoing and have simply "marshal[ed] the assets of the estate[s] under judicial supervision, for distribution according to federal law" so they do not "hold property under such circumstances that in equity and good conscience [they] ought not to retain it." *Superintendent of Ins. of N.Y.* v. *Ochs (In re First Central Fin. Corp.)*, 377 F.3d 209, 216 (2d Cir. 2004) (applying New York law) (cleaned up); *see also In re Brockway Pressed Metals, Inc.*, 363 B.R. 431, 456 (W.D. Pa. 2007) ("There mere failure of a debtor in a Chapter 11 proceeding to pay its debts cannot provide the equitable basis for the imposition of a constructive trust.").[7]

---

[7]    Although the FTX.US TOS are governed by California law and courts often apply the law of the forum specified in disputed contracts when evaluating the potential imposition of a constructive trust, *see, e.g.*, *In re Interlake Material Handling, Inc.*, 441 B.R. 437, 441 (Bankr. D. Del. 2011) (applying Illinois state law to the "determination of whether a constructive trust should be imposed"), it is possible that customers could argue that Delaware law governs the imposition of a constructive trust.  The outcome here would, however, be the same because no customer could show the post-Petition Date Debtors have been "unjustly enriched" based on any "fraudulent, unfair or unconscionable conduct" as required to justify imposition of a constructive trust

Regardless, courts often exercise their discretion to decline to impose a constructive trust where, as here, the imposition of one would be highly inequitable because it would result in one customer or group of customers obtaining a preference at the expense of other similarly situated creditors.  *See, e.g.*, *In re Dreier LLP*, 429 B.R. 112, 137-38 (Bankr. S.D.N.Y. 2010) (declining to impose a constructive trust and describing the "principles limiting the imposition of constructive trusts in bankruptcy").

<strong>vi.    FTX.US Customers Could Not Establish Property Rights Arising<br>from a Bailment</strong>

138.    The Debtors further maintain that customers of the FTX.US Exchange could not meet their burden to establish any property rights arising out of a bailment relationship with WRSS based on the US TOS.  A "bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery."  *H.S. Crocker Co.* v. *McFaddin*, 307 P.2d 429, 432 (Cal. Dist. Ct. App. 1957). Unlike with a trust, there is no division of legal and equitable title; title remains with the bailor who deposits the property with the bailee.  *Id.*   "In [the California] Civil Code, bailments are referred to as deposits."  *See Gebert* v. *Yank*, 218 Cal. Rptr. 585, 588 (Cal. Ct. App. 1985).  And the common law concept of bailment is captured by the concept of "deposit for keeping," which is defined as a deposit "in which the depositary is bound to return the identical thing deposited." Cal. Civ. Code § 1817 (West 2024).  But, as recognized by the California Civil Code, property may be deposited with another without establishing a bailment.  Thus, a "deposit for exchange" is defined as a deposit "in which the depositary is only bound to return a thing corresponding in kind to that which is deposited."  Cal. Civ. Code § 1818 (West 2024).  And "[a] deposit for

---

under Delaware law.  *See In re Greenfield Energy Servs., Inc.*, 2018 WL 6191949, at 50 (Bankr. D. Del. November 28, 2018) (describing when Delaware law permits imposition of a constructive trust).

exchange transfers to the depositary the title to the thing deposited, and creates between him and the depositor the relation of debtor and creditor merely."  Cal. Civ. Code § 1878 (West 2024).

139.    Because the US TOS specified that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US," customers might argue that the US TOS established a deposit for keeping (*i.e.*, a bailment relationship).  (US TOS § 6.)  But "[t]he duties and obligations of a bailee ordinarily cannot be thrust on one against his consent—they must be voluntarily assumed as in every obligation founded on contract."  *H.S. Crocker*, 307 P.2d at 432-33.  And other provisions of the US TOS are wholly inconsistent with the establishment of a deposit for keeping.

140.    *First*, the US TOS expressly provided that "FTX.US Account[s] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." (US TOS § 6.)  This commingling of fungible assets necessarily would have prevented WRSS from returning "the identical thing deposited" as required for a deposit for keeping.  Cal. Civ. Code § 1817 (West 2024).  This is strong evidence that no bailment was created and that a "change of title" occurred when assets were deposited on the FTX.US Exchange.  *Alamitos Land Co*. v. *Texas Co*., 54 P.2d 489, 490-91 (Cal. Dist. Ct. App. 1936) ("[I]f the one to whom it is delivered may return another thing of the same kind, or an equivalent in the form of money, or otherwise, it will ordinarily constitute a sale, and effect a change of title.").

141.    *Second*, nothing in the US TOS expressly prohibited WRSS from commingling Deposits with its assets or the assets of other entities within the FTX Group, particularly those like Alameda trading on the FTX.US Exchange.  And nothing prevented WRSS from transferring one customer's assets to another to fund withdrawals before the depositor executed a sale or other transaction on the exchange.  Together with the expressly

disclosed commingling of deposits in "shared address or accounts," these facts demonstrate that assets deposited on the FTX.US Exchange were deposited pursuant to a deposit for exchange. *See In re Polivnick*, 8 B.R. 621, 623 (Bankr. C.D. Cal. 1981) (holding that a deposit of gold coins with a coin business was a deposit for exchange because "plaintiffs were aware that the 50 coins might be used by defendant in his business, and that different coins might be returned"); *United States* v. *Lawson*, 925 F.2d 1207, 1210 & n.3 (9th Cir. 1991) (holding that no bailment existed as to auction proceeds because the auctioneer was "allowed to commingle funds and merely required to pay the amount of net auction proceeds to the seller" rather than "the actual proceeds collected").

142.    *Third*, nothing in the US TOS indicates that WRSS voluntarily assumed the heightened duties of a bailee.  Indeed, the "independent contractor" provision in Section 31(m) of the US TOS undercuts any implication that customers were in a bailor-bailee relationship where customers had superior rights to WRSS because they indicate that the parties were meant to be on "equal footing."  *Cf. DT Floormasters*, 2008 WL 2705554, at *4.  Thus, it is apparent that WRSS and customers of the FTX.US Exchange were simply in a debtor-creditor relationship.

### vii.    FTX.com Customers Could Not Prove the FTX.com Terms of Service Establish an Express Trust

143.    The Debtors maintain that, as a matter of English law, customers of the FTX.com Exchange could not establish that the Dotcom TOS created an express trust.[8]  Under English law, the requirements for an express trust are "certainty as to" (i) "intention" to create a

---

[8]    The Debtors' understanding of English law is based on the authoritative opinions of The Rt. Hon. Lord Neuberger of Abbotsbury as set forth in the Neuberger Declaration.  Lord Neuberger is a former president of the United Kingdom Supreme Court and expert in English property law.  (Neuberger Decl. ¶¶ 6-9.)

trust, (ii) the "subject-matter" of the trust; and (iii) the "objects" of the trust "(i.e., [its] beneficiaries)." (Neuberger Decl. ¶ 33.) No customer of the FTX.com Exchange could make this showing because the terms of the Dotcom TOS are contrary to any intention to create an express trust.

144.    Under English law, a fiduciary relationship is "an essential part of a trustee-beneficiary relationship." (Neuberger Decl. ¶ 45.1.) But the Dotcom TOS repeatedly disclaim the existence of any fiduciary relationship between FTX Trading and customers. For example, Section 38.6 states that "[n]othing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever." And other provisions of the Dotcom TOS contain more targeted disclaimers that underscore this general disclaimer. (*See* Dotcom TOS § 2.1.3, 2.2.2.) These explicit statements are direct evidence that the parties did not intend to form an express trust. (Neuberger Decl. ¶¶ 45-46.)[9]

145.    The sole reference to FTX Trading acting as trustee applies only to situations where Digital Assets have been "unclaimed or abandoned." (*Id*. ¶ 45.5 (citing Dotcom TOS § 9).) This is the exception that proves the rule: it shows the parties *only* intended to create a trust if FTX Trading was "unable to contact" the customer and needed to handle "unclaimed or abandoned" assets. (Dotcom TOS § 9.2; *see also* Neuberger Decl. ¶ 45.5.)

146.    Further, an express trust cannot be created under English law without an expressed intention that the purported trustee hold legal title. (*Id*. ¶¶ 35.2, 45.4.) But the Dotcom TOS contemplates no such thing as to Digital Assets. Rather, it states that title to Digital Assets

---

[9]    Additional terms in the Dotcom TOS underscore that it would be impossible to conclude that the parties intended a trust as to deposits of fiat currency. (Neuberger Decl. ¶¶ 81-85.)

"shall not transfer to FTX" and that the customer is "the owner of [the] Digital Assets in [their] Account." (Dotcom TOS § 8.2.6.) These provisions undercut any argument in favor of an intent to create an express trust. (Neuberger Decl. ¶¶ 48-51.) Accordingly, it is clear that the Dotcom TOS did not create an express trust over Digital Assets in favor of customers. (*Id.* ¶ 11.1.)

### viii. FTX.com Customers Could Not Establish Property Rights Arising From a Bailment Established by the Dotcom TOS

147. The Debtors maintain that FTX.com Exchange customers could not establish property rights pursuant to a bailment relationship under English law based on the Dotcom TOS. While English law traditionally defines a bailment as a relationship "in relation to tangible goods that can be possessed," it is likely that an English court would extend the concept of bailment to Digital Assets and recognize a "quasi-bailment" as a "logical extension of the conclusion that digital assets are property." (*Id.* ¶¶ 53, 55.) A bailment under English law would require evidence that "(a) the parties intended to create a legal relationship whereby the bailee would obtain control of the digital assets but the bailor would have superior legal title; *and* (b) the bailor in fact had superior legal title." (*Id.* ¶ 57 (emphasis added).)

148. Because the Dotcom TOS state that "title to your Digital Assets will remain with you and shall not transfer to FTX" and that the customer is "the owner of the Digital Assets in your Account," a customer could argue that the Dotcom TOS intended to create a quasi-bailment as to "specific and ascertained Digital Assets associated with a customer's Account." (*Id.* ¶¶ 62.2-63 (citing Dotcom TOS § 8.2.6.).)[10] There is, however, no language in the Dotcom TOS that indicates any intent to create a broader quasi-bailment relationship as to all Digital Assets held on

---

[10] This argument does not even exist for fiat currency or E-Money because, among other reasons, there is no similar language in the Dotcom TOS regarding title and customers could not retain legal title to fiat currency "paid into a mixed account." (Neuberger Decl. ¶ 81.)

the FTX.com Exchange whereby individual customers would have title over some percentage of all Digital Assets held in Sweep Accounts. (Neuberger Decl. ¶¶ 64.) Thus, it is apparent that no quasi-bailment relationship with customers was actually established or maintained because of how the FTX.com Exchange functioned. (*Id.* ¶ 11.1(b).)

149. As an initial matter, customers who acquired assets on the FTX.com Exchange could never demonstrate that they obtained title over such assets as is necessary to establish a quasi-bailment relationship. (*Id*. ¶¶ 65.2-65.3.) Under English law, a transfer of title as to Digital Assets requires "both a change of control and an intention to pass title." (*Id*. ¶ 60.1.) To demonstrate a change of control, a Digital Asset on the FTX Exchange would need to be identified or segregated for the customer in an address specific to the customer (*i.e.*, an on-chain transaction would likely need to occur). (*Id*. ¶¶ 60.4-60.5.) But this never happened when customers acquired Digital Assets on the FTX.com Exchange. (Mosley Decl. ¶¶ 37-42.) No purchase or other transaction undertaken to acquire Digital Assets on the FTX.com Exchange was anything other than a ledger entry in a Customer Account. (*Id.* ¶¶ 31, 45-46, 56.) Digital Assets that were acquired on the exchange remained in the commingled Sweep Addresses controlled by FTX Trading until withdrawn (*id*. ¶¶ 39-44), so title was never transferred to purchasers unless and until they were withdrawn. (Neuberger Decl. ¶¶ 65.3-65.4.)

150. On the other hand, a customer who deposited Digital Assets on the FTX.com Exchange and then sold them or otherwise traded them away would have both (i) transferred control of their assets to FTX Trading, and (ii) expressed an intent to relinquish title. Thus, they would have necessarily surrendered title to such assets to FTX Trading. (*Id*. ¶ 65.5.) Indeed, even a customer who deposited Digital Assets on the exchange and had them swept into a Sweep Account would surrender title to such assets because the assets could no longer be

"followed" or "traced" as a matter of English law, and the Dotcom TOS contain no expression of intent to create any quasi-bailment over commingled assets in Sweep Accounts. (*Id*. ¶¶ 11.1(b), 65.5, 70-80.)

151.    Thus, to the extent it could be argued that the Dotcom TOS were meant to establish a quasi-bailment relationship, "the parties appear to have failed to achieve that result." (*Id*. ¶ 11.1(b).)  In other words, credits in Customer Accounts reflected Digital Assets to which customers either lost or never held legal title, and customers had only a "debtor-creditor relationship" with FTX Trading. (*Id*. ¶¶ 66-69.)

### ix.    FTX.com Customers Could Not Obtain the Declaration of a Resulting Trust or Constructive Trust

152.    The Debtors maintain that customers of the FTX.com Exchange could not establish property rights as a result of a resulting trust or constructive trust to avoid the conclusion that they are unsecured creditors with no property rights because of their inability to establish property rights pursuant to an express trust or bailment. (*See, e.g., id*. ¶ 69.)  An English court will not intercede to recharacterize the parties' relationship if the parties fail to properly establish an intended relationship (*i.e.*, express trust or bailment) unless the requirements of the alternative arrangement are satisfied. (*Id*. ¶ 67.4)  Thus, English law would not find a constructive or resulting trust in circumstances where the parties sought to create a bailment (or quasi-bailment) but there was a failure to ensure that a customer had a property right as to the assets in question. (*Id.* ¶ 68.) "English law does not recognise a 'remedial' constructive trust which is imposed by the court as a remedy." (*Id*.)

### x.    The Earlier TOS Also Resulted in FTX Trading Owning Exchange Assets

153.    The Earlier Terms are completely lacking provisions regarding title to Digital Assets and ownership that FTX.com Customers have latched onto in a futile effort to

establish property rights based on the Dotcom TOS.  (*Id*. ¶¶ 93-98.)  Thus, it is apparent that the Earlier Terms do not express any intent to establish an express trust or quasi-bailment relationship.  (*Id*.)  Indeed, the disclaimer of fiduciary duty in the Earlier Terms is inconsistent with any trust relationship.  (*Id*. ¶ 96.2(a).)  Thus, customers who deposited assets on the FTX Exchange under the Earlier Terms transferred title to those assets to FTX Trading and established debtor-creditor relationships with FTX Trading.  (*Id*.)  To the extent a customer traded on the FTX.com Exchange after May 13, 2022 and thereby accepted the Dotcom TOS (*id*. ¶¶ 99-100), that would not transfer title to any Digital Assets held in Sweep Addresses to customers (*id*. ¶ 102).  This is because a change of title requires a change of control, (*id*.) and FTX Trading did not relinquish control of any assets to customers unless and until they were withdrawn (Mosley Decl. ¶¶ 32-60).  Similarly, because the Dotcom TOS contain no provisions whatsoever indicating that customers own title to fiat currency or E-money (Neuberger Decl. ¶ 81), there would have been no transfer of title as to fiat currency or E-money after May 13, 2022.

### xi.   Customers Could not Trace Assets in a Manner Sufficient to Establish Property Rights

154.   Although the Debtors maintain that customers of the FTX.US Exchange and FTX.com Exchange are unsecured creditors who were in debtor-creditor relationships with WRSS and FTX Trading, respectively, the Debtors acknowledge that litigation of tracing issues, particularly on a large scale, would be burdensome, costly and time-consuming, and the outcome not without some risk.  Those were important considerations for the Debtors in agreeing to the Customer Priority Settlement.  The Debtors do, however, believe that any purported property rights that customers might establish would be eliminated by the inability to trace Exchange Assets within the Debtors' estates given the pervasive comingling prepetition of fungible assets.

155.    It is well established that the party seeking to assert property rights over commingled funds held by a debtor bears the "burden under federal law of identifying and tracing the . . . funds." *Catholic Diocese of Wilmington*, 432 B.R. at 149.  If the party cannot "sufficiently identify its funds in [a] commingled account, [then] all of the [account] funds are presumed to be part of the bankruptcy estate." *Strategic Techs.*, 142 Fed. App'x at 566.  And the purported trust beneficiary becomes a general unsecured creditor with "merely a personal claim against the" debtor.  *United States* v. *Durham*, 86 F.3d 70, 73 (5th Cir. 1996).  This unwavering rule "serves a vital role in ensuring a *pro rata* distribution of the bankruptcy estate." *Rocco*, 2014 WL 7404566, at *6; *accord Stoebner* v. *Consumers Energy Co. (In re LGI Energy Solutions, Inc.)*, 460 B.R. 720, 732 (B.A.P. 8th Cir. 2011) (finding that the tracing requirement is necessary to "equalize the playing field when a debtor is in trouble by preventing the strongest and fastest creditors from getting all the money").

156.    Exchange Assets were generally not held 1:1 prior to the Petition Date. (Mosley Decl. ¶ 67.)  In a case such as this, tracing presents an impossible burden for any customer because any property allegedly owned by a customer "must be clearly traced and identified in specific property." *Connecticut Gen. Life Ins. Co.* v. *Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988) (cleaned up).  In other words, a customer who deposited cryptocurrency or fiat currency on an FTX Exchange must be able to identify the exact address or bank account where their cryptocurrency or fiat currency currently resides or the exact substitute assets it was used to acquire.  *See, e.g.*, *Bullion Reserve*, 836 F.2d at 1218 (holding that a preference defendant asserting that gold bullion he withdrew from an account operated by the debtor was his property and not estate property had a "duty under federal bankruptcy law to trace his funds to the bullion he received" that he could not satisfy).  "It is insufficient to show [customer]

property went into the general estate and increased the amount and value thereof." *Connecticut Gen. Life*, 838 F.2d at 619 (cleaned up). This is because "[t]he point of tracing is to follow the *particular* entrusted assets, not simply to identify *some* assets." *Id*. at 620 (emphasis in original).

157.    Here, customers cannot satisfy their burden to trace assets by referring to their Customer Account entitlements because those ledger entries have nothing whatsoever to do with the location of any real assets, which were all fungible and are generally untraceable because they were either directly deposited into or moved into addresses or accounts where they were commingled with other customers' assets and FTX Group assets. (*See* Mosley Decl. ¶¶ 32-33.) Indeed, the commingling here is made all the more acute by operation of the Earlier Terms. Even if customers could lay claim to some property rights as to Exchange Assets deposited or acquired after the date of the Dotcom Terms, May 13, 2022, those assets would have been commingled with all Exchange Assets in existence prior to that date that were property of FTX Trading. Because tracing requires the following of specific assets across accounts, it is irrelevant even if "accounting records . . . meticulously recorded the investors' share" of disputed assets because such records do not allow for the identification of actual assets in accounts. *Catholic Diocese*, 432 B.R. at 158, 159 (holding that beneficiaries of a resulting trust were unsecured creditors because they could not actually trace their deposits into a pooled investment account); *see also In re United Cigar Stores Co. of Am.*, 70 F.2d 313, 314, 316 (2d Cir. 1934) (holding that trust funds allegedly commingled with other cash could not be traced despite records recording the amount of the alleged trust funds and the parties' stipulation as to the amount). Thus, the tracing challenges presented by the commingling of fungible assets in this case cannot be overcome by reference to credits recorded in Customer Accounts.

158.     When actual tracing is impossible, courts in equity have discretion to

permit claimants to employ a "tracing fiction" that eases their burden to trace.  *See* Restatement

(Third) of Restitution and Unjust Enrichment § 59, Comment b.  But "[i]f the commingled fund

consists of money derived from multiple restitution claimants, such as victims of a common

fraud, the claimants' rights inter se must be established by reference to actual transactions, rather

than by the presumptions (or marshaling rules) available against a wrongdoer."  *Id*.  Thus, it has

been held to be reversible error for a bankruptcy court to "fail[] to consider whether its use of a

tracing fiction was equitable."  *In re Foster*, 275 F.3d 924, 927 (10th Cir. 2001) (rejecting

application of the "lowest intermediate balance fiction" because it would have advantaged one

creditor at the expense of "similarly-situated fraud victims" of a Ponzi scheme).

159.     Courts will reject the use of tracing fictions where, as here, their use

would come "at the possible expense of other customers similarly situated."  *Strategic Techs.*,

142 Fed. App'x at 566-67 (refusing to apply the lowest intermediate balance fiction in a

bankruptcy case where one customer attempted to claim assets commingled with other

customers' assets).  Many creditors of the Debtors' Estates have or could have asserted that they

were defrauded by the pre-Petition Date Debtors into parting with assets underlying their claims.

Thus, this is "a case the circumstances of which call strongly for the principle that equality is

equity" and the rejection of tracing fictions that would provide customers with inequitable

preferences that are contrary to "the spirit of the bankrupt law."  *Cunningham* v. *Brown*, 265

U.S. 1, 13 (1924) (rejecting the use of the tracing fictions by preference defendants seeking to

retain payments from Charles Ponzi because "the case is different" when it involves "the fruits of

the frauds perpetrated against a myriad of victims"); *see also SEC* v. *Elliot*, 953 F.2d 1560, 1569-

66

70 (11th Cir. 1992) (following *Cunningham* and holding that a district court did not "abuse[] its discretion by disallowing tracing").

     **D.**    **The Customer Preference Settlement Should Be Approved.**

     160.    Section 5.5 of the Plan details the Debtors' settlement offer providing that the Debtors and the Wind Down Entities shall waive and not prosecute any Customer Preference Action against any Holder of Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims if such Holder duly executes and timely returns a valid Ballot by the Voting Deadline that (i) votes to accept the Plan, and (ii) consents and stipulates to the amount of such Holder's Claim set forth in such Holder's Ballot (the "Customer Preference Settlement").  The Customer Preference Settlement is separate from the Global Settlement but no less integral to the Plan, is consistent with section 1123(b) of the Bankruptcy Code, and should be approved because it satisfies the applicable *Martin* factors and falls well within the range of reasonableness.

     161.    In the absence of a settlement, the Debtors would be required to litigate to judgment each individual Customer Preference Action, which would be an immensely expensive and inefficient undertaking.  Customers may assert certain defenses to, or otherwise dispute, such Customer Preference Actions brought against them, including on the basis of (a) the safe harbor in section 546(e) of the Bankruptcy Code, (b) the ordinary course defense in section 547(c)(2) of the Bankruptcy Code and (c) the new value defense in section 547(c)(4) of the Bankruptcy Code. (Coverick Decl. ¶ 26.)  In addition, there could be various other defenses available to certain customers that are specific to the facts surrounding the underlying withdrawals.  (*Id.*)

     162.    Even if the Debtors were successful on the merits of the Customer Preference Actions, the Debtors recognize that the substantial recovery projected pursuant to the Financial Projections attached as Appendix C to the Disclosure Statement, subject to the assumption and limitations noted therein, reduces the net value of the uncertain recoveries on

account of Customer Preference Actions.  (Coverick Decl. ¶ 27.)  As a result, after consultation

with stakeholders, including the Creditors' Committee, the Debtors made the decision that they

would not pursue each and every Customer Preference Action and would make the offer of the

Customer Preference Settlement.  (*See id.* ¶ 28.)  Importantly, the Debtors benefit from not

needing to reconcile the amount of each customer's claim amount for those accepting and opting

into the Customer Preference Settlement.  (*Id.*)

163.    However, not every preference claim and potential preference claim

defendant are similarly situated.  Where the preference recipient was an insider, employee, had

knowledge of the fraud being perpetuated by Mr. Bankman-Fried, or otherwise is the subject of

litigation claims by the Debtors, the Debtors reasonably determined they were not willing to

make the settlement offer at this time and designated certain preference claims as Excluded

Customer Preference Actions.  (*See id.* ¶ 29.)

164.    The Debtors have considered the costs and benefits of generally pursuing

Customer Preference Claims and instead concluded that the Customer Preference Settlement is in

the best interest of the Debtors and their stakeholders.  (*Id.* ¶ 28.)  The Customer Preference

Settlement satisfies Bankruptcy Rule 9019 and the applicable *Martin* factors and should

therefore be approved.

**E.** **The Debtors' Releases, Voluntary Release by Holders of Claims and Interests, Mutual Release, Injunction and Exculpation Provision Should Be Approved.**

**i.** **The Debtors' Releases Are Appropriate and Should Be Approved.**

165. Pursuant to the terms of the Plan, the Debtors release the Released Parties[11] from certain claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities (the "Debtors' Releases"). (*See* Plan, § 10.3.) The law is well settled that debtors are authorized to settle or adjust any claim or interest belonging to the debtor or to the estate. 11 U.S.C. § 1123(b)(3)(A); *see also Harrington* v. *Purdue Pharma L.P.*, 144 S. Ct. 2071, 2082 (2024) (explaining that various provisions in section 1123(b), including section 1123(b)(3)(A), "permit a plan to address claims and property belonging to a debtor or its estate"). The Debtors may also release their claims in a chapter 11 plan, under section 1123(b)(A), "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *See In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

166. In reviewing releases in a plan, courts in this district generally consider the five following factors (the "*Zenith* Factors"):

    a. identity of interest between the debtor and the third party;

    b. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

    c. whether the release is essential to the debtor's reorganization;

    d. agreement by a substantial majority of creditors to support the release; and

---

[11] The Plan defines "Released Parties" as (a) the Exculpated Parties, (b) the Bahamas JOLs and FTX DM, (c) the Ad Hoc Committee, (d) any member of the executive committee of the Ad Hoc Committee (as constituted from time to time), and (e) with respect to each Person or Entity named in (b) through (d), any Person or Entity to the extent acting as a shareholder, director, officer, employee, attorney (including solicitors or barristers acting for the benefit of such Person or Entity), financial advisor, restructuring advisor, investment banker, accountant and other professional or representative of such Person or Entity, in each case, to the extent such Person or Entity is or was acting in such capacity. Notwithstanding anything to the contrary in the Plan or Plan Supplement, no Excluded Party shall be a Released Party.

e. whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.

*See In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994). Such five factors are "neither exclusive nor conjunctive requirements" but instead guide the courts in determining the fairness of the debtor's release. *See In re Washington Mut., Inc.*, 442 B.R.at 346 (Bankr. D. Del. 2011).

167.    *First*, an identity of interest exists between the Debtors and the Released Parties through their shared "common goal of confirming" the plan. Each of the Released Parties was involved in the extensive plan negotiations and is supportive of confirmation of the Plan and implementation of the various settlements therein. *See In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding an identity of interest existed between the debtors and the released parties because they "share[d] the common goal of confirming" the plan and implementing the global settlement). Furthermore, certain of the Released Parties may be entitled to indemnification, contribution, or reimbursement from the Debtors, whether pursuant to the Debtors' various theories of state or other applicable law. Therefore, a lawsuit against the Released Parties could result in litigation against the Debtors, which could deplete the Debtors' assets and their resources to the detriment of all stakeholders.

168.    *Second*, as required by the second *Zenith* Factor, each of the Released Parties' "substantial contribution" to the Debtors and their Estates was instrumental in the successful resolution of the Chapter 11 Cases. (*See* Coverick Decl. ¶ 33.) *See In re Zenith Elecs.*, 241 B.R. at 111 (concluding that parties who assisted with design, implementation, negotiation, and solicitation of voters "have made substantial contributions to the reorganization"). The Released Parties each played an important role in the formulation of the

Plan, and each has expended significant time and resources analyzing and negotiating the issues throughout these Chapter 11 Cases.  (Coverick Decl. ¶ 33.)

169.    *Third*, the Debtors' Releases are in the best interests of the Debtors' Estates and a sound exercise of the Debtors' business judgment.  (*See* Coverick Decl. ¶ 32.)  Critically, the Debtors' Releases do *not* include releases for conduct that occurred prior to the Petition Date.  The Released Parties are providing necessary contributions in exchange for the Debtors' Releases during these Chapter 11 Cases, such as, in the case of the Bahamas JOLs, agreeing to compromises to effectuate the Debtors' Plan, and providing other material support to the Debtors' overall chapter 11 efforts.  *See In re Spansion, Inc.*, 426 B.R. at 143 ("The Debtor Releases were actively involved in negotiating and formulating the Plan.  It is a valid exercise of the Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan.").  Without *ex ante* assurance of protection from liability, the Debtors' stakeholders would not have participated in the negotiations and compromises that led to the Plan.  (Coverick Decl. ¶ 32.)  The value contributed by the Debtors' Released Parties is more than sufficient to support the Debtors' Releases.

170.    *Fourth*, all Classes entitled to vote on the Plan accepted the Plan with nearly unanimous support for the Plan among those voting within those Classes.  (*See* Kroll Decl. Ex. A.)  Given the limited scope of the Debtors' Releases, the degree of consensus evidences the Debtors' stakeholders' support for the Debtors' Releases, and the Plan containing such releases, the Debtors' Releases should be approved.

171.    *Fifth*, the Plan provides for meaningful recoveries under the circumstances for substantially all creditors.  As demonstrated by the Liquidation Analysis, the ranges of recoveries for all Holders of Claims are higher than or equal to under the Plan than what they

would have been in a Chapter 7 liquidation scenario.  Additionally, the Debtors' Releases ensure that creditors can receive meaningful distributions in a timely manner.  The Plan maximizes value and projects greater than 100% recoveries for all customers and non-governmental creditors.

172.    The Debtors' Releases are fair and reasonable under the circumstances. *See In re W.R. Grace & Co.*, 446 B.R. 96, 138 (Bankr. D. Del. 2011).  The Debtors' Releases include a carve-out for willful misconduct, gross negligence, fraud and criminal acts so that the Debtors are not releasing any Released Parties for claims involving such acts.  Finally, the Debtors' Releases are similar to releases approved by courts in this circuit.  *See, e.g.*, *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) [D.I. 6347] (approving plan providing for definition of Released Parties, including, among others, the debtors' directors and officers); *In re One Aviation Corp.*, Case No. 18-12309 (CSS) (Bankr. D. Del. Sept. 18, 2019) [D.I. 707] (same); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) [D.I. 251] (same); *In re Checkout Holding Corp.*, Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) [D.I. 266] (same); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (same); *In re Samson Resources Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) [D.I. 2020] (same). For these reasons, the Debtors' Releases are justified, are in the best interests of creditors and all stakeholders, are an integral part of the Plan and satisfy key factors considered by courts in determining whether a debtor release is proper.  The Debtors' Releases should be approved.

**ii.    The Voluntary Release by Holders of Claims and Interests Is Appropriate and Should Be Approved.**

173.    Section 10.4 of the Plan provides for the voluntary release of the Released Parties (the "Voluntary Release by Holders of Claims and Interests") by (a) the Debtors; (b) each

of the Official Committee and the Supporting Parties; (c) the Holders of all Claims who vote to

accept the Plan and do not opt out of granting the releases set forth herein; (d) the Holders of all

Claims that are Unimpaired under the Plan; (e) the Holders of all Claims whose vote to accept or

reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of

granting the releases set forth therein; (f) the Holders of all Claims or Interests who vote to reject

the Plan but do not opt out of granting the releases set forth therein; (g) the Holders of all Claims

or Interests who are deemed to reject the Plan and opt in to the releases set forth therein; and

(h) all other Holders of Claims or Interests to the maximum extent permitted by law (collectively

(a) through (h), the "Releasing Parties"); *provided* that in each case Holders who were not

provided a Ballot or an Election Form and are not listed in clauses (a) through (h) above are not

Releasing Parties.  The Voluntary Release by Holders of Claims and Interests is necessary to

secure the significant benefits embodied in the Plan for the Debtors and their stakeholders, and

otherwise meets the requirements set forth by courts in this circuit.

> 174.   Courts in this circuit have consistently held that chapter 11 plans may

provide consensual third-party releases.  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286,

304-05 (Bankr. D. Del. 2013) (approving as consensual third-party release that applied to

unimpaired creditors deemed to accept the plan); *In re Spansion*, 426 B.R. at 144 (same); *In re*

*Washington Mut.*, 442 B.R. at 351-52 (observing that consensual third-party releases are

permissible); *In re Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors

that voted in favor of the plan).

> 175.   The Voluntary Release by Holders of Claims and Interests is a good faith

settlement and compromise, given in exchange for good and valuable consideration received

pursuant to the Plan.  Therefore, the Debtors submit that the Voluntary Release by Holders of

Claims and Interests is fair, equitable and reasonable and in the best interests of the Debtors and all Holders.

176.    Notably, all Holders that are Releasing Parties that were provided a Ballot or an Election Form were provided with the opportunity to affirmatively opt out of the Voluntary Release by Holders of Claims and Interests.  Thus, the Debtors submit that the Voluntary Release by Holders of Claims and Interests is fully consensual and consistent with the law in this circuit.  *See In re Mallinckrodt PLC*, 639 B.R. at 879 (approving certain third-party releases as consensual because, among others, the releases were conspicuously disclosed and releasing parties were given an opportunity to opt out); *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (Bankr. D. Del. Dec. 23, 2020) [D.I 1534 at 80:21] ("Very importantly, these are consensual releases, these are not nonconsensual releases.  I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release.").

177.    Courts in this district regularly approve third-party releases such as the Voluntary Release by Holders of Claims and Interests in circumstances, as here, where such releases are opt-out.  *See, e.g.*, *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 13, 2020) [D.I. 601] (confirmed plan provided for opt-out releases); *In re PQ New York*, Case No. 20-11266 (JTD) (Bankr. D. Del. Sept. 25, 2020) [D.I. 597] (same); *In re Glob. Eagle Enm't Inc.*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [D.I. 753] (same); *In re Insys Therapeutics, Inc.*, Case No. 19-11292(KG) (Bankr. Del. January 16, 2020) [D.I. 1115] (same).

178.    Further, courts in this district have permitted similar releases obtained through the balloting process.  *See, e.g.*, *In re Chaparral Energy Inc.*, Case No. 20-11947

(MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan that permitted holders of claims that voted to reject or abstained from voting to check a box on ballot opting out of third-party releases); *In re Skillsoft Corporation*, Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) [D.I. 274] (same); *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) [D.I. 384 at 48:9-11] ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots."); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [D.I. 238] (approving third-party releases with objection opt-out mechanism); *In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. Jan. 23, 2018) [D.I. 559] (same).

179.    Third-party releases are also determined to be consensual when adequate notice has been provided to stakeholders by, for example, bolding the language describing the third-party releases in the plan and disclosure statement and including language on the ballot and election form explaining the opt-out mechanism. *See, e.g., Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."). The Ballots distributed to Holders entitled to vote on the Plan—in Class 3A, Class 5A, Class 5B, Class 6A, Class 6B, Class 7A, Class 7B, Class 7C, Class 8B and Class 10B—and the Election Forms distributed to Holders entitled to opt out of the Voluntary Release by Holders of Claims and Interests quoted the entirety of the release to be given in bold and clearly informed Holders of the steps they should take to grant or not grant the release. (*See* Solicitation Procedure Order, Exhibit 3.)

180.    The Voluntary Release by Holders of Claims and Interests is an integral part of, and important to, the implementation of the Plan.  (Coverick Decl. ¶ 36.)  This release facilitated constructive participation in both the development of the Plan and the progression of the Chapter 11 Cases towards a successful conclusion.  (*Id*.)  The parties being released by the Voluntary Release by Holders of Claims and Interests provided significant contribution and support to the Chapter 11 Cases and the Plan.  (*Id*.)  In addition, the Voluntary Release by Holders of Claims and Interests is sufficiently narrow because it does not provide a blanket immunity:  it does not include a release of Causes of Action arising out of conduct that occurred prior to the Petition Date and provides a specific carve-out for omissions that constitute gross negligence, willful misconduct, fraud or criminal act.  (*See* Plan § 10.4.)  In light of all these factors, the Debtors submit that the Voluntary Release by Holders of Claims and Interests is appropriate and should be approved.

### iii.    The Injunction Is Appropriate and Should Be Approved.

181.    Section 10.8 of the Plan provides for a permanent injunction preventing certain Persons and Entities from bringing any action that is released pursuant to the Plan or the Plan Confirmation Order (the "Injunction").  (*See* Plan, § 10.8.)  The Injunction is necessary to effectuate the Plan's releases and to protect the Debtors from the potential of barred litigation from prepetition stakeholders as they implement the provisions of the Plan following the Effective Date.  Such litigation would increase the costs and hinder the efforts of the Debtors to effectively fulfill their responsibilities as contemplated in the Plan and thereby maximize recovery for all Holders.  (Coverick Decl. ¶ 40.)

182.    The Injunction is narrowly tailored to achieve its purpose, and similar injunctions have been approved by courts in other chapter 11 cases in this district.  *See, e.g.*, *In re Amyris, Inc.*, Case No. 23-11131 (TMH) (Bankr. D. Del. Feb. 7, 2024) [D.I. 1251]; *In re*

*Clovis Oncology, Inc.*, Case No. 22-11292 (JKS) (Bankr. D. Del. June 16, 2023) [D.I. 904]; *In re*

*Legacy FSRD, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Feb. 22, 2023) [D.I. 322]; *In re*

*Carestream Health, Inc., et al.*, Case No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) [D.I.

185]; *In re American Eagle Delaware Holding Co.*, Case No. 22-10028 (JKS) (Bankr. D. Del.

Apr. 27, 2022) [D.I. 328]; *In re Alpha Latam Mgmt., LLC*, Case No. 21-11109 (JKS) (Bankr. D.

Del. Mar. 16, 2022) [D.I. 652]; *In re PBS Brand Co. LLC*, Case No. 20-13157 (JKS) (Bankr. D.

Del. Apr. 28, 2021) [D.I. 552]; *In re Glob. Eagle Entm't Inc.*, Case No. 20-11835 (JTD) (Bankr.

D. Del. Jan. 29, 2021) [D.I. 753]; *In re Edgemarc Energy Holdings, LLC*, Case No. 19-11104

(JTD) (Bankr. D. Del. June 23, 2020) [D.I. 1085].  Accordingly, the Injunction should be

approved.

### iv.    The Plan Exculpation Provision Is Appropriate and Should Be Approved.

183.    In addition to the releases and Injunction, the Plan also contains an

exculpation for the Exculpated Parties.[12] in connection with any act or omission in connection

with, or arising from or relating in any way to the Chapter 11 Cases (the "Exculpation

Provision").  (*See* Plan § 10.7.)  Gross negligence, willful misconduct, fraud and criminal acts

are excluded from the Exculpation Provision.  (*Id.*)  Exculpation provisions that apply only to

estate fiduciaries and exclude claims not involving actual fraud, willful misconduct or gross

negligence are customary and generally approved in this district under appropriate

---

[12]    The Exculpated Parties include (a) the Debtors; (b) the Official Committee and its current and former members, solely in their capacities as members of the Committee; (c) the Fee Examiner; (d) to the extent determined to be acting as a fiduciary for the benefit of a Debtor, or its estate, the Bahamas JOLs and FTX DM; and (e) with respect to each Person or Entity named in (a) through (d), any Person or Entity to the extent acting as a member, shareholder, director, officer, employee, attorney (including solicitors or barristers acting for the benefit of such Person or Entity), financial advisor, restructuring advisor, investment banker, accountant and other professional or representative of such Person or Entity, in each case in (a) through (e), to the extent such Person or Entity is or was acting in such capacity.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement, no Excluded Party shall be an Exculpated Party.

circumstances. *In re Washington Mut.*, 442 B.R. at 350–51 (holding that an exculpation clause

that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate

professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was

appropriate). Exculpation is appropriate for estate fiduciaries in a bankruptcy case. *See, e.g.*,

*PWS Holding*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a

commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties,

but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings,

Inc.*, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation

provision as that provided for under the Plan); *In re Spansion, Inc.*, 2010 WL 2905001, at *16

(Bankr. D. Del. Apr. 16, 2010) (same).

184.    The scope of the Exculpation Provision is appropriately limited to the

Exculpated Parties and their professionals and representatives, who have contributed

significantly to the efforts in the Chapter 11 Cases and will guide the successful consummation

and implementation of the Plan, for any act or omission occurring on or after the Petition Date

and on or before the Effective Date.  (Coverick Decl. ¶ 39; *see also* Plan § 10.9.)  Moreover, the

scope of the Exculpation Provision and the Exculpated Parties is consistent with exculpation

provisions granted by courts in this circuit.  *See, e.g.*, *In re Amyris, Inc.*, Case No. 23-11131

(TMH) (Bankr. D. Del. Feb. 7, 2024) [D.I. 1251] (confirming a bankruptcy plan in which the

debtors, the unsecured creditors' committee and their professionals are exculpated parties); *In re

Clovis Oncology, Inc.*, Case No. 22-11292 (JKS) (Bankr. D. Del. June 16, 2023) [D.I. 904]

(same); *In re Legacy FSRD, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Feb. 23, 2023) [D.I.

322] (same); *In re Glob. Eagle Entm't Inc.*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29,

2021) [D.I. 753] (same); *In re Edgemarc Energy Holdings, LLC*, Case No. 19-11104 (JTD)

(Bankr. D. Del. June 23, 2020) [D.I. 1085] (same).

## <u>CONCLUSION</u>

For the reasons set forth herein, the Plan satisfies fully all applicable requirements

of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Court confirm the

Plan pursuant to section 1129 of the Bankruptcy Code, and approve the Customer Priority

Settlement and the Customer Preference Settlement pursuant to Bankruptcy Rule 9019.

| | |
|---|---|
| Dated:  September 30, 2024<br>Wilmington, Delaware | **LANDIS RATH & COBB LLP** |

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
           mcguire@lrclaw.com
           brown@lrclaw.com
           pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
           bromleyj@sullcrom.com
           gluecksteinb@sullcrom.com
           kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*