**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 22573, 22574, 22576 23047, 23048, 23049, 23139, 23140, 23145, 23146, 23147, 23148, 23158, 23159, 23162, 23167, 23169, 23178, 23366, 23610, 24028, 24511, 24568, 24572 & 25664.** |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF**
**THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF**
**FTX TRADING LTD. AND ITS DEBTOR AFFILIATES**

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

REPLY ..............................................................................................................................3

I.     The Plan's Treatment of FTT is Proper. ......................................................3

     A.     FTT Is Properly Valued at Zero. ............................................... 3

     B.     FTT Claims Are Properly Classified in the Plan ..................... 5

II.     The Plan is Confirmable, Does Not Discriminate, and Satisfies the Good Faith Requirement of Section 1129(a)(3). .......................................6

     A.     The Customer Preference Settlement Does Not Violate Section 1123(a)(4) of the Bankruptcy Code. ...................................... 7

     B.     The Plan Was Proposed in Good Faith. .................................. 10

     C.     The Plan Does Not Improperly Treat Liquidated Claims as Disputed Claims. ...................................................................... 13

III.     The Plan Does Not Seek to Disallow KYC-Deficient Claims...........................16

IV.     The Plan Properly Classifies the Celsius Claims as General Unsecured Claims. ............17

     A.     Celsius Lacks Standing to Challenge the Elements of the Plan Implicated in Its Objection Because the Time-Barred Preference Claims Should Be Disallowed. .................................................. 18

     B.     The Plan Properly Classifies the Celsius Claims. .................. 19

     C.     The Plan's Distribution Procedures Are Proper...................... 21

V.     The Plan Adequately Preserves Parties' Rights With Respect to a Disputed Claims Reserve. ................................................................................23

     A.     The Disputed Claims Reserve Provision in the Plan Complies with Section 1123(a)(4) of the Bankruptcy Code. ...................... 24

     B.     The Plan's Definition of "Disputed Claims" Is Proper........................ 25

VI.     The Plan's Voluntary Releases Are Consensual and Should Be Approved. ....................27

VII.     The Plan Does Not Extinguish ELD Capital LLC's Fraud Claims without their Consent. ................................................................................................33

VIII.   The Remaining Objections Should Be Overruled. ...........................................................33

     A.     In Kind Distributions Are Not Required Under the Bankruptcy Code................. 33

     B.     The Plan is a Permissible 9019 Settlement. ........................................................... 34

     C.     The Plan Provides Fair Treatment to the Convenience Classes. .......................... 35

     D.     The Information Provided in the Plan Administration Agreement and
         Liquidating Trust Agreement is Sufficient. ........................................................... 37

     E.     The Late Objection Filed By Mr. Gunawan Should be Overruled. ....................... 40

CONCLUSION......................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Cap. Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012)................................................................11

*In re Am. Elec. Tel. Co.,*
  211 F. 88 (7th Cir. 1914) .................................................................22

*In re Am. Solar King. Corp.,*
  90 B.R. 808 (Bankr. W.D. Tex. 1988)...................................................39

*In re AppOnline.com, Inc.,*
  315 B.R. 259 (Bankr. E.D.N.Y. 2004)..................................................12

*In re Berman & Co.,*
  378 F.2d 252 (6th Cir. 1967) ............................................................23

*In re Bowflex Inc.,*
  Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024)........................29

*In re Brickell,*
  292 B.R. 705 (Bankr. S.D. Fla. 2003)...................................................23

*In re Capmark Fin. Grp. Inc.,*
  2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011) ................................19

*In re Carbonlite Holdings LLC,*
  Case No. 21-10527 (JTD) (Bankr. D. Del. Sept. 7, 2021)........................25

*In re Chandler,*
  459 B.R. 215 (Bankr. E.D. Pa. 2011) ..................................................40

*In re Chaparral Energy Inc.,*
  Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) .......................28

*In re Chassix Holdings Inc.,*
  533 B.R. 64 (Bankr. S.D.N.Y. 2015)....................................................31

*In re Cir. City Stores, Inc.,*
  426 B.R. 560 (Bankr. E.D. Va. 2010)...................................................14

*Cohen* v. *KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),*
  432 F.3d 448 (3d Cir. 2006)................................................................5

*Cunningham* v. *Brown*,
  265 U.S. 1 (1924).........................................................................................12

*Danning* v. *Bozek (In re Bullion Reserve of N. Am.)*,
  836 F.2d 1214 (9th Cir. 1988) ....................................................................12

*In re Davis*,
  889 F.2d 658 (5th Cir. 1989) ...............................................................13, 14

*In re Energy Future Holdings Corp.*,
  648 Fed. App'x 277 (3d Cir. 2016)...............................................................9

*In re Enron Corp.*,
  340 B.R. 180 (Bankr. S.D.N.Y. 2006)...................................................15, 16

*In re Extraction Oil & Gas, Inc.*,
  Case No. 20-11548 (CSS) (Bankr. D. Del. Dec. 28, 2020) ......................27

*In re Global Eagle Entertainment Inc.*,
  Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021)...................25, 34

*Goldberg* v. *New Jersey Lawyers' Fund for Client Protection*,
  932 F.2d 273 (3d. Cir. 1991)........................................................................13

*Harrington* v. *Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024)..............................................................................2, 27

*Harrison* v. *Konfino (In re A.N. Frieda Diamonds, Inc.)*,
  616 B.R. 295 (Bankr. S.D.N.Y. 2020)........................................................14

*Hsin-Chi Su* v. *Offshore Grp. Inv. Ltd. (In re Vantage Drilling Int'l)*,
  603 B.R. 538 (D. Del. 2019)..................................................................18, 20

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...........................................................29

*In re Invitae Corp.*,
  Case No. 24-11362 (MBK) (Bankr. D.N.J. July 20, 2024) ......................29

*Matter of Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)......................................................................20

*In re LATAM Airlines Grp. SA*,
  2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)..................................32

*In re Lids Corp.*,
  260 B.R. 680 (Bankr. D. Del. 2001) ...........................................................15

*In re Lifeco Inv. Grp., Inc.*,
    173 B.R. 478 (Bankr. D. Del. 1994) ..................................................19

*In re Lighthouse Res. Inc.*,
    Case No. 20-13056 (JTD) (Bankr. D. Del. Mar. 10, 2021) .....................25

*In re Linda Vista Cinemas, L.L.C.*,
    442 B.R. 724 (Bankr. D. Ariz. 2010) .................................................38

*In re Logan*,
    2010 WL 1286651 (Bankr. E.D. Va. Mar. 29, 2010) ..............................23

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ...................................20, 27, 29

*In re Mallinckrodt PLC*,
    Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 18, 2022)......................34

*Meoli* v. *Kendall Electric, Inc. (In re R.W. Leet Electric, Inc.)*,
    372 B.R. 846 (6th Cir. 2007) .........................................................41

*Mesabi Metallics Co. LLC* v. *B. Riley FBR, Inc. (In re Essar Steel Minnesota, LLC)*,
    652 B.R. 709 (Bankr. D. Del. 2023) ..................................................4

*In re Motors Liquidation Co.*,
    447 B.R. 198 (Bankr. S.D.N.Y. 2011) ...........................................24, 26

*Myers* v. *Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996).............................................................9

*Official Comm. of the Unsecured Creditors of Color Tile, Inc.* v. *Blackstone Family Inv. Pshp. (In re Color Tile, Inc.)*,
    2000 WL 152129 (D. Del. Feb. 9, 2000) .............................................5

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)..........................................................10

*Peachtree Special Risk Brokers* v. *Kartzman (In re Rocco Co.)*,
    2014 WL 7404566 (D.N.J. Dec. 29, 2014) .........................................13

*Picard* v. *Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014).........................................................11

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).........................................................11

*In re Robertshaw US Holding Corp.*,
    2024 WL 3897812 (Bankr. S.D. Tex. Aug. 16, 2024)............................28

*In re Sentinel Mgmt. Group*,
    398 B.R. 281 (N.D. Ill. 2008) ............................................................39

*In re Sierra-Cal*,
    210 B.R. 168 (Bankr. E.D. Cal. 1997) ...............................................14

*In re SiO2 Medical Products, Inc.*,
    Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) ..................34

*In re Skillsoft Corporation*,
    Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) .................28

*In re Smallhold, Inc.*,
    2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024) ...........................32

*In re Southland Royalty Company, LLC*,
    Case No. 20-10158 (KBO) (Bankr. D. Del. May 20, 2021) .................26

*Stoebner* v. *Consumers Energy Co. (In re LGI Energy Solutions)*,
    460 B.R. 720 (8th Cir. 2011) .............................................................12

*Travelers Indemnity Co.* v. *Bailey*,
    557 U.S. 137 (2009).............................................................................4

*In re Trib. Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012) ...................................................26

*In re Ultimate Acquisition Partners, LP*,
    2012 WL 1556098 (Bankr. D. Del. May 1, 2012)..............................15

*Varela* v. *Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*,
    293 B.R. 489 (B.A.P. 9th Cir. 2003)..................................................35

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ................................................................11

*In re Z Gallerie, LLC*,
    Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019)..................28

**Statutes**

11 U.S.C. § 1122 ..................................................................................19

11 U.S.C. § 1123 ..................................................................................24

11 U.S.C. § 1129 .......................................................................37, 38, 39

11 U.S.C. § 502....................................................................................13

**Other Authorities**

Collier on Bankruptcy (16th ed. 2024) ...........................................................................38

Garnishment Definition, Black's Law Dictionary (12th Ed. 2024)...............................................22

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this reply (the "Reply") to objections to the confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26029] (as may be amended, supplemented or modified from time to time and including all appendices thereto, the "Plan" and all objections thereto collectively, the "Objections").  The Debtors have concurrently filed a memorandum setting forth their affirmative case in support of confirmation of the Plan (the "Confirmation Brief").[2]  In response to the Objections, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT

1.      The Plan satisfies all of the requirements of the Bankruptcy Code and is overwhelmingly supported by each class entitled to vote on the Plan.  The Plan provides for recoveries on Allowed Claims projected to be paid, *in full*, to all customers and certain other creditors.  Additionally, many customers and creditors are entitled to interest and additional payments from the Supplemental Remission Fund.

2.      This extraordinary result is made possible due to a determined and methodical effort by the Debtors to identify, locate, recover, and monetize assets, and to work with numerous stakeholders to achieve consensus on key issues one-by-one throughout these Chapter 11 Cases.  The Debtors have worked closely with their major creditor constituencies, including the Official Committee, the Ad Hoc Committee, the Bahamas JOLs, the Commodity Futures Trading Commission, several state attorneys general, putative class action plaintiffs, Emergent Fidelity Technologies Ltd., BlockFi Inc. and its affiliated debtors, and the lead

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and Confirmation Brief, as applicable.

plaintiffs in the FTX multi-district litigation, as well as various offices within the United States

Department of Justice, to develop and propose a nearly consensual Chapter 11 Plan that

maximizes recoveries to creditors.

3. The support for the Plan is evident from the overwhelmingly positive

voting results and relative paucity of objections received, despite this being one of the most

complex chapter 11 cases in history and the Debtors having millions of stakeholders worldwide.

A total of only 19 objections and other responses were filed.  The Debtors have worked, and

continue to work, in good faith to resolve the Objections, including with certain changes made to

the Plan or proposed Confirmation Order.

4. Nonetheless, a small number of parties have persisted in pursuing

objections that lack merit and are primarily designed to advance parochial interests in defending

or pursuing litigation unrelated to the Plan.  The Court should reject all of these efforts to

interfere with the approval of the Plan—a step of paramount importance in the Debtors' process

of returning value to creditors.

5. Certain of the Objections take issue with the release provisions contained

in the Plan in the wake of *Harrington* v. *Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).  But

*Purdue* is irrelevant.  As the U.S. Supreme Court itself made clear, nothing in the *Purdue*

decision "should be construed to call into question *consensual* third-party releases offered in

connection with a bankruptcy reorganization plan" or "express a view on what qualifies as a

consensual release." *Purdue*, 144 S. Ct. at 2087-88 (emphasis in original).  These Objections are

an overreaching and incorrect application of the law, especially in the context of these cases.

Other Objections come from parties engaged in litigation with the Debtors and are thinly veiled

attempts to advance their interests at the expense of all other creditors and stakeholders.  To the

extent any Objections have not been resolved or addressed via the Debtors' changes to the Plan and Confirmation Order, such Objections should be overruled on the merits and the Plan should be confirmed.

## **REPLY**

6.      As of the time of filing this Reply, there are only 10 parties remaining with portions of unresolved objections.  For ease of reference, the Debtors have attached a chart hereto as Exhibit 1, showing the status of the Objections received, how certain Objections were addressed and what remains outstanding (the "Omnibus Reply Chart").

## I.      **The Plan's Treatment of FTT is Proper.**

7.      Kihyuk Nam ("Nam") and those supporting his objection (the "Nam Parties") object to the Plan's classification and valuation of FTT tokens [D.I. 22573] (the "Nam Objection").  The Nam Parties argue that the Debtors have treated FTT holders unfairly, that FTT has been misclassified in the Plan, and that "the valuation of FTT has not been conclusively determined."  (Nam Obj. ¶ 22.)  In the Nam Parties' assessment, the Court's "initial valuation of FTT at $0 should not be considered final or binding."  (*Id.*)  But the valuation of FTT *was* conclusively determined in the Estimation Order following an evidentiary hearing, and thus any reclassification would be moot for practical purposes of distribution.  The Nam Parties merely seek to re-litigate the issue of FTT valuation—an issue that has already been decided by this Court and memorialized in a final order.

## A.      **FTT Is Properly Valued at Zero.**

8.      This Court has conclusively deemed the value of FTT as zero.  *See Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] (the "Estimation Order").  The Debtors' expert, Professor Sabrina Howell, in the *Declaration of Sabrina T. Howell in Support of the Motion of Debtors to Estimate Claims Based on Digital*

*Assets* [D.I. 5203] (the "Howell Report"), explained that FTT has no fundamental value because it has no utility outside of an operating FTX.com exchange.  FTT's key features, including token burn, voting rights, "airdrops," and investment rights are eliminated without such an exchange. (Howell Rep. ¶¶ 15, 43-44, 85-87.)  Based on the evidence presented, this Court held that FTT was valued appropriately at zero.  [D.I. 7090].

   9. The Court's Estimation Order establishing FTT's value is binding and *res judicata*, and cannot be collaterally attacked under the guise of a plan objection.  *Travelers Indemnity Co.* v. *Bailey*, 557 U.S. 137, 152 (2009) (final orders of bankruptcy court are "res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose") (internal quotations omitted); *see also Mesabi Metallics Co. LLC* v. *B. Riley FBR, Inc. (In re Essar Steel Minnesota, LLC)*, 652 B.R. 709, 720 (Bankr. D. Del. 2023) ("once a judgment becomes final and non-appealable, it is binding on all parties thereto that received constitutionally adequate notice thereof.").

   10. In attempting to avoid the Court's conclusive determination of the value of FTT, the Nam Parties point to a single sentence in the Estimation Order.  In the Estimation Order, the Court provided that:

> Notwithstanding anything to the contrary in the Motion or this Order, nothing in the Motion, this Order or the Digital Asset Conversion Table, or any evidence offered in support of the foregoing, shall determine the *classification* of FTT under any plan, and all parties' rights in this regard are expressly reserved.

(Estimation Order ¶ 7 (emphasis added).)  From that reservation of rights, the Nam Parties argue "the value of FTT has not been legally finalized."  (Nam Obj. ¶ 2.)  This is an obvious misreading of the Estimation Order.  Classification of a claim is distinct from its value, as noted in the preceding sentence in the Estimation Order:

> In the event that the Plan is modified such that there would be an operating exchange utilizing FTT as a utility token following confirmation of such Plan, nothing in the Motion, this Order or the Digital Asset Conversion Table, or any evidence offered in support of the foregoing, shall alter, affect, determine or estimate the *value* of FTT, and all parties' rights in such circumstances are expressly reserved.

(Estimation Order ¶ 6 (emphasis added).)

11.     Because there will be no operating exchange utilizing FTT as a utility token following the Confirmation Date, the value of FTT is conclusively determined to be zero. The reclassification of claims based on FTT from FTT Customer Entitlement Claims to Customer Entitlement Claims, as the Nam Parties seemingly request, would not change this fact, and would still result in holders of FTT receiving no value for claims based on FTT.[3]

**B.     FTT Claims Are Properly Classified in the Plan**

12.     Although the Nam Objection confused the classification of FTT in the Plan with its value, the Debtors nevertheless have a clear basis for grouping claims on account of FTT into a separate class in the Plan.  In determining whether a novel instrument is an equity security, courts view the "overarching inquiry" as essentially whether the party contributing funds "does so as a *banker* (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an *investor* (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)."  *Cohen* v. *KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006) (emphasis added).  This question may be answered by the characteristics of a particular instrument.  *See Official Comm. of the*

---

[3]   Each of the Nam Parties (other than Nam), like all holders of customer claims, were timely served with the Digital Assets Estimation Motion in December of 2023 and had ample opportunity to object.  Nam, who purchased an FTT claim as of June 26, 2024 (*see* [D.I. 19084]), was not on the claims register at the time of filing, and therefore did not receive service of the Estimation Motion (although the transferor of Nam's claim was served with such motion).  Nam purchased a claim for FTT long *after* the Estimation Motion was filed, *after* the well-publicized valuation of FTT was established in the Estimation Order, and *after* the Debtors had filed the first draft of the Plan treating FTT as equity.

*Unsecured Creditors of Color Tile, Inc.* v. *Blackstone Family Inv. Pshp. (In re Color Tile, Inc.)*, 2000 WL 152129, at *4 (D. Del. Feb. 9, 2000) (noting a seven-factor test that focuses, *inter alia*, on whether voting rights exist and certainty of payment).

13.     As described in the Howell Report, which was accepted into evidence and relied upon for the Court's Estimation Order, FTT had unique, equity-like features, such as token burn (akin to stock buybacks), voting and governance rights, and "airdrops" (akin to dividends). (Howell Rep. ¶¶ 15, 43-44, 85-87.)  Additionally, the Howell Report describes that, like regular stock in a corporation, the value of FTT derived from its enterprise's future cash flows.  (Howell Rep. ¶¶ 42-45.)  Because of these features, among others, the Debtors properly classified FTT as an equity class under the Plan.  Accordingly, the Nam Objection should be overruled.

## II.     The Plan is Confirmable, Does Not Discriminate, and Satisfies the Good Faith Requirement of Section 1129(a)(3).

14.     LayerZero Labs Ltd., Ari Litan, and Skip & Goose LLC (collectively, the "LayerZero Group") object to the Plan on the grounds that the Plan discriminates unfairly, was not proposed in good faith, and improperly treats liquidated claims as if they were unliquidated [D.I. 23158] (the "LayerZero Objection").  None of these objections has any merit.  The LayerZero Group's objection is part of their ongoing effort to gain some perceived tactical advantage in an adversary proceeding commenced by the Debtors against the LayerZero Group to recover the hundreds of millions of dollars' worth of assets the LayerZero Group wrongfully extracted from the Debtors estates shortly before the Petition Date (Adv. Proc. No. 23-50492, the "LayerZero Avoidance Action").  Accordingly, for the reasons set forth below, the LayerZero Objection should be overruled.

A.    **The Customer Preference Settlement Does Not Violate Section 1123(a)(4) of the Bankruptcy Code.**

15.    The LayerZero Group asserts that the Plan discriminates unfairly, in violation of section 1123(a)(4) of the Bankruptcy Code, because section 5.5 of the Plan may result in only certain creditors being eligible for the Customer Preference Settlement. (LayerZero Obj. ¶¶ 29-35.)  The first fatal flaw in the LayerZero Group's objection is their attempt to characterize the Customer Preference Settlement as part of a "grand bargain" extended to each creditor under the global settlement provisions contained in section 5.2 of the Plan (the "Global Settlement").  (LayerZero Obj. ¶ 30.)  The LayerZero Group therefore argues that the Plan offers some creditors, but not all creditors, different treatment in satisfaction of their Claims, in violation of section 1123(a)(4) of the Bankruptcy Code.  (*Id*. ¶¶ 29-30.)  This is wrong.  Contrary to the LayerZero Group's assertions, as with other settlements implemented through the Plan (*see, e.g.,* § 5.3 (discussing the FTX DM Global Settlement)), the Customer Preference Settlement is a completely separate and severable settlement contained within another section of the Plan, is not "integral to the settlement of customer property disputes" (LayerZero Obj. ¶ 12), and does not "implicate[] the same issues" (*id.* ¶ 30) as customer property disputes or the Global Settlement.

16.    The Customer Preference Settlement resulted from extensive discussions with the Official Committee, the Ad Hoc Committee, and other stakeholders, is presented separately in Section 5.5 of the Plan, and was detailed in the Disclosure Statement approved by this Court.  The Customer Preference Settlement is not a *plan* or *claim* treatment provided on account of Customer Entitlement Claims.  Rather, the Debtors determined they would make an offer to waive and not prosecute Customer Preference Actions, subject to acceptance of the offer's terms and as long as the Customer Entitlement Claim did not fall into certain categories

of Claims that the Debtors were not willing to include in the offer at this time.  (Coverick Decl. ¶ 29.)

17.     The Debtors used the plan solicitation process to communicate their offer to certain creditors whereby the Debtors would agree to waive and not prosecute Customer Preference Actions (other than any Excluded Customer Preference Action) against any Holder of Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims, if such Holder accepted the offer by duly executing and timely returning a valid Ballot by the Voting Deadline that, in return, (i) voted to accept the Plan and (ii) consented and stipulated to the amount of such Dotcom Customer Entitlement or U.S. Customer Entitlement Claim for voting, allowance and Distribution purposes.  (Plan § 5.5.)  This settlement offer is not on account of any creditors' claim against the Debtors.

18.     Nor could it be.  Every potential preference claim is different, has potentially different defenses to it, and constitutes a claim *by* the Debtors against a customer that is unrelated to that customer's Claim *against* the Debtors.  The Debtors, in consultation with their major stakeholders, determined which types of Customer Preference Actions should be preserved, and declined to make a settlement offer with respect to those Claims at this time.  The Debtors are not required to offer the opportunity to participate in the Customer Preference Settlement to each and every creditor.  The Debtors were well within their discretion to exclude Customer Preference Actions that satisfied their disclosed criteria, which the claims against the LayerZero Group met.  Preference defendants like the LayerZero Group who may have had knowledge of the commingling and misuse of customer deposits or are otherwise involved with the Debtors in other litigation regarding valuable assets, are clearly differently situated and it is prudent for the Debtors to retain those Customer Preference Actions.  (*Id*.)

19.     Since the Customer Preference Settlement is outside the scope of the

Plan's treatment of Claims, there can be no unfair discrimination and section 1123(a)(4) is

inapplicable.  "[U]nder its plain language," section 1123(a)(4) "applies only to a plan of

reorganization, and therefore not to pre-confirmation settlements."  *In re Energy Future*

*Holdings Corp.*, 648 Fed. App'x 277, 283 (3d Cir. 2016).  Accordingly, the correct standard by

which to judge the Customer Preference Settlement is the set of factors applicable to settlements

under Bankruptcy Rule 9019.  *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

As addressed in the Confirmation Brief, the Customer Preference Settlement easily satisfies each

applicable *Martin* factor.  (Confirmation Brief, Argument § II.D.)  And all Holders of Dotcom

Customer Entitlement Claims and U.S. Customer Entitlement Claims receive the same plan

treatment on account of Allowed Claims.

20.     The LayerZero Group further asserts that their exclusion from the

Customer Preference Settlement is improper because the Causes of Actions held by the Debtors

against the LayerZero Group are brought by "unrelated Debtors."  (LayerZero Obj. ¶ 35.)  But

this argument fails to acknowledge the impact that substantive consolidation under the Plan will

have on the Debtors.

21.     Substantive consolidation will effectively disregard the separate legal

identities of the various Debtors for Plan purposes, blending their assets and liabilities to create a

single, consolidated bankruptcy estate.  (Confirmation Brief, Argument § II.B.)  As a result, the

LayerZero Group's argument that the Causes of Actions against them are held by "unrelated

Debtors" is incorrect.  The Plan does not unfairly discriminate and satisfies the requirements of

Section 1123(a)(4) of the Bankruptcy Code.

22.     The LayerZero Group argues that the substantive consolidation under the

Plan and the Customer Preference Settlement are being used by the Debtors to "punish a creditor

for the relationship between that creditor and a wholly different debtor[.]"  (LayerZero Obj.

¶ 44.)  The LayerZero Group purports to rely on *In re Owens Corning*, 419 F.3d 195 (3d Cir.

2005) in its objection, stating that "substantive consolidation 'may not be used . . . to

disadvantage tactically a group of creditors or to alter creditor rights."  (LayerZero Obj. ¶ 44.)

This is misleading.  What *Owens Corning* actually held was that substantive consolidation "may

not be used *offensively* (for example, *having a primary purpose* to disadvantage tactically a

group of creditors in the plan process or to alter creditor rights)."  *In re Owens Corning*, 419 F.3d

at 211 (emphasis added).

23.     Here, substantive consolidation is not being used offensively, much less

with a primary purpose to tactically disadvantage a group of creditors.  (Confirmation Brief,

Argument § II.B.)  As described in detail in the Confirmation Brief and supporting declaration,

substantive consolidation was the best, and only realistic, path forward for maximizing creditor

recovery given the dearth of financial controls at the prepetition FTX Group.  (*Id.*; *see also*

Mosley Decl. § VII.)  Accordingly, LayerZero's objection with respect to substantive

consolidation and its relation to the Customer Preference Settlement should be overruled.

**B.     The Plan Was Proposed in Good Faith.**

24.     The LayerZero Group next argues that the Plan violates section 1129(a)(3)

of the Bankruptcy Code because it was not proposed "in good faith."  (LayerZero Obj. ¶¶ 36.)

This objection is baseless.  Nothing in the Bankruptcy Code compels the Debtors to give

credence to the meritless defenses asserted by the LayerZero Group in the LayerZero Avoidance

Action.  Nor does the Bankruptcy Code require the Debtors to toss the Plan aside in response to

an incorrect, unsupported assertion by the LayerZero Group "that the Debtors never had an

interest in the property of the FTX.com and FTX US customer deposits, and, therefore could not bring preference causes of action against" the LayerZero Group and others.  (LayerZero Obj. ¶ 5.)

25.     Although "good faith" is not defined in the Bankruptcy Code, a plan will be found in good faith if it "fairly achieve[s] a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156-57 (3d Cir. 2012) (noting that the objectives underlying the Bankruptcy Code include "maximizing property available to satisfy creditors," "discourag[ing] debtor misconduct" and "the expeditious liquidation and distribution of the bankruptcy estate to its creditors") (cleaned up).  Courts also consider whether the plan "has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected" and "[exhibits] a fundamental fairness in dealing with the creditors . . . ." *In re W.R. Grace & Co.*, 475 B.R. 34, 87-88 (D. Del. 2012) (internal quotations and citations omitted). Here, the Plan was clearly proposed in good faith.  (Coverick Decl. ¶¶ 6, 42-43.)  The Debtors have worked diligently since the beginning of these Chapter 11 Cases with key stakeholders to reach a value-maximizing resolution that provides a comprehensive path to effectiveness and distributions.

26.     The LayerZero Group cannot show bad faith by pointing to matters in dispute in the LayerZero Avoidance Action because the Plan does nothing to affect any assets that the LayerZero Group took from the Debtors before the Petition Date.  Such assets will "not become property of the [Debtors'] estate[s] under the Bankruptcy Code until the [Debtors] obtain[] a favorable judgment" in the LayerZero Avoidance Action.  *Picard* v. *Fairfield Greenwich Ltd.*, 762 F.3d 199, 212 (2d Cir. 2014).  The Plan addresses the distribution of

completely different assets than those at issue in the LayerZero Avoidance Action:  assets in the possession of the Debtors as of the Petition Date and those that have been subsequently acquired by the Debtors.

27.    Regardless, the LayerZero Group's arguments about what constitutes property of the Debtors' estates are baseless and directly contrary to black letter law.  (LayerZero Obj. ¶¶ 5, 37-41.)  Assets that customers deposited were commingled together and with the Debtors' assets in addresses and bank accounts controlled by the Debtors and, as a result, they are presumptively property of the Debtors' estates.  (*See* Confirmation Brief, Argument § II.C.i.) "Put another way, if funds are commingled, then even the existence of an escrow or other express trust will not protect the beneficiary in a preference action because the very fact of the commingling shows that the debtor had the ability to control the disposition of the funds at issue." *In re AppOnline.com, Inc.*, 315 B.R. 259, 277 (Bankr. E.D.N.Y. 2004).

28.    Accordingly, if the LayerZero Group wants to assert a defense in the LayerZero Avoidance Action based on purported property rights, it must (i) establish the property rights that it claims to have had over the assets it deposited, and (ii) fulfill its "duty under federal bankruptcy law to trace" *its deposits* into the assets *it received*.  *Danning* v. *Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217-18 (9th Cir. 1988).  The LayerZero Group cannot invoke the purported property rights of all customers in the abstract to justify retaining a specific preferential transfer that it received at the expense of those customers and other creditors.  *See, e.g.*, *Cunningham* v. *Brown*, 265 U.S. 1, 13 (1924) (sustaining preference claims asserted against victims of Charles Ponzi by bankruptcy trustees because the victims could not trace the funds they obtained to the funds they personally handed to Ponzi); *Stoebner* v. *Consumers Energy Co. (In re LGI Energy Solutions)*, 460 B.R. 720, 724, 732-33 (8th Cir.

2011) (holding that it was reversible error for a bankruptcy court to allow a preference defendant to assert a defense based on the property rights of others).

29.     As a result, the LayerZero Group's scattershot citations to different parts of the FTX.com Terms of Service (the "Dotcom TOS") and the FTX.US User Agreement (the "US TOS" and together with the Dotcom TOS, the "TOS") are irrelevant.  (LayerZero Obj. ¶¶ 39-40.)  These citations do nothing to establish that the LayerZero Group or any other customer had any property rights, which the Debtors address in the Confirmation Brief. (Confirmation Brief, Argument § II.C.)  More importantly, the LayerZero Group's citations do nothing to establish how any assets the LayerZero Group took from the Debtors are traceable to any assets over which the LayerZero Group asserts any property rights.  Where disputed assets come from commingled accounts controlled by the debtors, the party seeking to assert rights over them must "identify and trace" the funds.  *Goldberg* v. *New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d. Cir. 1991); *accord Peachtree Special Risk Brokers* v. *Kartzman (In re Rocco Co.)*, 2014 WL 7404566, at *5-6 (D.N.J. Dec. 29, 2014) (collecting cases).  LayerZero has not done this, nor would they or other customers be able to do so. (Confirmation Brief, Argument § II.C.x.)

   **C.     The Plan Does Not Improperly Treat Liquidated Claims as Disputed Claims.**

30.     The LayerZero Group alleges that the Plan improperly disallows distributions without a judicial determination, but they are mistaken.  (LayerZero Obj. ¶¶ 45-46.)  Section 502(d) of the Bankruptcy Code states that a court "shall disallow any claim" of a transferee of a voidable transfer if the transferee has not paid or turned over the property subject to the voidable transfer.  11 U.S.C. § 502(d).  The provision is designed to "insur[e] compliance with judicial orders."  *In re Davis*, 889 F.2d 658, 661 (5th Cir. 1989).  The LayerZero Group is correct that a court may not *permanently* disallow a claim under section 502(d) until there is a

judicial determination on the preference, but they are incorrect in their characterization of the Plan.

31.     The Plan simply defers distributions of the LayerZero Group's claims so that the LayerZero Avoidance Action may be adjudicated in order to determine disallowance pursuant to section 502(d), as it does with all other Disputed Claims.  Section 502(d) plainly contemplates such a pause. *See e.g.*, *In re Cir. City Stores, Inc.*, 426 B.R. 560, 571 (Bankr. E.D. Va. 2010) (holding that "§ 502(d) may be used to temporarily disallow the Claims filed under § 501(a) up to the amount of the alleged Preferential Transfers"); *In re Sierra-Cal*, 210 B.R. 168, 173 (Bankr. E.D. Cal. 1997) ("[W]hile actual adjudication of the avoidance status of the creditor ultimately is necessary, the mere assertion of a prima facie § 502(d) defense is sufficient to place the claim in a status in which it is neither allowed nor disallowed.") (citing *Katchen* v. *Landy*, 382 U.S. 323, 330 (1966)).  Indeed, bankruptcy courts often apply section 502(d) on an interim basis to delay allowance of an alleged transferee's claims that are subject to potential avoidance actions. *Harrison* v. *Konfino (In re A.N. Frieda Diamonds, Inc.)*, 616 B.R. 295, 321 (Bankr. S.D.N.Y. 2020), *aff'd*, 633 B.R. 190 (S.D.N.Y. 2021) ("It is true that section 502(d) often is applied on an interim basis to delay the allowance of a claim where the creditor is subject to a potential avoidance action.").  Pausing allowance delays distribution on such claim, which allows courts to adjudicate competing claims together and "ensure[s] that Claimants do not receive windfalls to the detriment of other creditors." *Cir. City Stores, Inc.*, 426 B.R. at 571.  If a court could only delay allowance of a claim after conclusively finding a voidable transfer, then debtors would be left in a situation where they potentially had to make distributions on claims with no assurance that preference actions successfully adjudicated after plan confirmation would be collectible, thus undermining the purpose of section 502(d). *See Davis*, 889 F.2d at 662-63

(finding that the "legislative history and purpose behind Section 502(d) to be assuring the bankruptcy estate that a creditor will not be allowed to assert a claim without first paying his own debts").

32.     The cases the LayerZero Group cites are inapposite.  In both *In re Lids Corp.*, 260 B.R. 680 (Bankr. D. Del. 2001) and *In re Ultimate Acquisition Partners, LP*, 2012 WL 1556098 (Bankr. D. Del. May 1, 2012), the debtors were seeking full *disallowance* of the claims by merely invoking section 502(d) of the Bankruptcy Code, not a temporary delay of distributions to the holders of such claims until the preference actions were resolved.  *See Ultimate Acquisition Partners, LP,* 2012 WL 1556098 at *2 ("The Trustee's Complaint also seeks to *disallow* Mitsubishi's claim and 503(b)(9) administrative expense request pursuant to section 502(d) of the Bankruptcy Code." (emphasis added)); *In re Lids Corp.,* 260 B.R. at 684 ("To *disallow* a claim under section 502(d) requires a judicial determination that a claimant is liable." (emphasis added)).  Here the Plan simply provides that a Claim shall not become an Allowed Claim if it remains subject to disallowance under section 502(d).  (*See* Plan § 2.1.8.)

33.     Moreover, the LayerZero Group merely asserts that some of their Claims are liquidated and that their distribution is potentially being delayed due to alleged separate preference claims.  (LayerZero Obj. ¶¶ 45-46.)  However, the liquidated status of the LayerZero Group's Claims is immaterial with regards to whether distributions can be delayed under section 502(d).  Courts have recognized that where there is a pending avoidance action, the defendant's claims "continue to be disputed claims" and distribution to the defendant "is temporarily prevented."  *In re Enron Corp.*, 340 B.R. 180, 192 (Bankr. S.D.N.Y. 2006) (vacated on other grounds).  In such circumstances, a distribution to the avoidance action defendant would be inefficient and could cause the needless transfer of funds between the debtor and the

claimant. *See, e.g.*, *id.* at n.5 ("If a debtor were required to make a distribution to a claimant, where a section 502(d) action were pending either by objection or by adversary proceeding, then the debtor would have to seek disgorgement, among other relief, from such claimant if the debtor were ultimately to prevail in the underlying avoidance action."). Thus, whether the LayerZero Group's claims are liquidated or not, they may still be delayed while a section 502(d) claim is pending.

### III.     The Plan Does Not Seek to Disallow KYC-Deficient Claims.

34.     Arceau 507 II LLC ("Arceau") argues that the Plan contains certain Know-Your-Customer ("KYC") provisions that purportedly impermissibly seek to disallow certain claims [D.I. 23148] (the "Arceau Objection"). Specifically, Arceau alleges that the Plan permits the Debtors to treat a Customer Entitlement Claim as a "Disputed Claim" on the basis of the original holder failing to adequately submit KYC information. (Arceau Obj. ¶ 1.)

35.     Arceau's objection is misplaced. In June 2023, the Court approved certain procedures for collecting KYC information from holders of Customer Entitlement Claims. (*See Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] (the "Customer Bar Date Order").) Under the Customer Bar Date Order, claims without proper KYC information were deemed "unverified" but not disallowed. (Customer Bar Date Order ¶ 18.) The Debtors certainly reserve the right to object to these claims on the basis of inadequate KYC information or otherwise, and Holders will then have an opportunity to respond.

36.     Arceau's stated concerns notwithstanding, its due process rights are protected by the claims objection process under the Bankruptcy Code and Bankruptcy Rules. The Debtors may seek a Court order addressing deficient KYC information and/or object to any

claim on the basis of deficient KYC information, at which point any claimant may file a response

and will be afforded the opportunity to exercise their "substantive or procedural rights with

respect to the allowance or disallowance of a claim." (Arceau Obj. at 6.)

37.     The Plan explains what is considered allowed—it does not purport to

determine someone's KYC status and does not summarily disallow any Claim.  All rights of

Arceau to contest any disallowance of its claims on this basis are reserved for such time, if ever,

that the Debtors actually seek to disallow its Claim.  Accordingly, the Arceau Objection does not

raise any valid Plan objection and should be overruled.

## IV.     The Plan Properly Classifies the Celsius Claims as General Unsecured Claims.

38.     Mohsin Meghji, as the post-confirmation Litigation Administrator (the

"Celsius Litigation Administrator") under the confirmed Chapter 11 plan for Celsius Network

LLC and its affiliated debtors (collectively, "Celsius"), filed an objection [D.I. 23147] (the

"Celsius Objection") raising issues relating to Celsius's unliquidated and disputed subsequent

transferee claims against the Debtors related to assets that 497 different Celsius customers (the

"Celsius Initial Transferees") purportedly withdrew from their Celsius accounts and transferred

to accounts on the FTX Exchanges (the "Time-Barred Preference Claims").  The Debtors have

objected to the Time-Barred Preference Claims [*see* D.I. 19795, 24408], and that objection

remains pending and *sub judice* before the Court [*see* D.I. 24899].

39.     Regardless, the Celsius Objection is meritless.  Celsius objects to the

Plan's classification of its Time-Barred Preference Claims as General Unsecured Claims rather

than Customer Entitlement Claims.  (Celsius Obj. ¶¶ 2, 16-24.)  But Celsius was not a customer

or account holder of the FTX Exchanges and has not asserted any claim arising from any

customer relationship it had with the FTX Exchanges.  Rather, Celsius has filed claims and,

through its motion to lift the automatic stay, seeks to file a complaint *against the Debtors*

seeking to obtain a judgment establishing subsequent transferee liability against the Debtors.

[D.I. 16815]. That is a claim separate and apart from the liability currently owed to any FTX

Exchange customer who is a target of Celsius's initial transferee claims. As a result, the separate

classification of claims held by FTX Exchange customers is entirely appropriate here. Celsius

also objects to the Debtors making any distributions pursuant to the Plan to Celsius Initial

Transferees that are otherwise entitled to such Plan distributions before the resolution of

Celsius's preference claims against such parties. (Celsius Obj. ¶¶ 2, 25-36.) Celsius is not,

however, entitled to unilaterally restrict distributions to customers with Allowed Claims through

a back-door pre-judgment garnishment of such distributions simply by asserting the Time-Barred

Preference Claims against the Debtors.

> **A.** **Celsius Lacks Standing to Challenge the Elements of the Plan Implicated in Its Objection Because the Time-Barred Preference Claims Should Be Disallowed.**

40. As fully briefed in relation to the *Debtors' Objection to Proofs of Claim Filed By Celsius Network LLC and Its Affiliated Debtors* [D.I. 19795] and the *Debtors' (I) Reply to the Celsius Litigation Administrator's Response to Debtors' Objection to Proofs of Claim Filed by Celsius Network LLC and its Affiliated Debtors; and (II) Initial Objection to Late-Filed Proofs of Claim Filed by Celsius Network LLC and its Affiliated Debtors* [D.I. 24408], and as argued before the Court on September 12, 2024 [D.I. 24899], the Time-Barred Preference Claims, along with all other claims purportedly asserted in Celsius's proofs of claim filed in these cases, should be disallowed with prejudice. Without any pending or valid claims against the Debtors, Celsius lacks any standing to object to the Plan because its interest in these proceedings is, at most, "purely derivative of another party's rights," specifically the rights of any customers with Allowed Claims against which Celsius has asserted preference claims. *See Hsin-Chi Su* v. *Offshore Grp. Inv. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 545-46 (D.

Del. 2019) (quoting *Krys* v. *Official Comm. of Unsecured Creditors (In re Refco, Inc.)*, 505 F.3d 109, 117 & n.10 (2d Cir. 2007)).  The fact that Celsius has asserted initial transferee preference claims against alleged FTX Exchange customers does not make Celsius a party in interest in these proceedings.  *See, e.g.*, *In re Lifeco Inv. Grp., Inc.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) (collecting cases and holding that there is "no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case").  As a result, the Court need not reach the merits of Celsius's fatally flawed Plan objection if it sustains the Debtors' objection to Celsius's Time-Barred Preference Claims.

> **B.      The Plan Properly Classifies the Celsius Claims.**

41.      To the extent not disallowed as requested by the Debtors, Celsius's argument that its Time-Barred Preference Claims have not been properly classified is factually baseless and legally meritless.  (Celsius Obj. ¶¶ 2, 16-24.)  Celsius does not argue that it has any direct right to participate in the Customer Priority Settlement, nor could it.  Celsius does not have any claim to Exchange Assets based on any disputed property rights that form the basis for the special treatment that Customer Entitlement Claims will receive pursuant to the Customer Priority Settlement.  Yet Celsius asks that its Time-Barred Preference Claims be classified as Customer Entitlement Claims rather than General Unsecured Claims so that it can try to extract more value from the Debtors' estates at the expense of other creditors.  (*Id.* ¶¶ 2, 16-24.)  This is wrong; nothing in the Bankruptcy Code compels such an inequitable result.

42.      Under 11 U.S.C. § 1122(a), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  But the "[t]he Bankruptcy Code does not require that all similar claims be placed in one class."  *In re Capmark Fin. Grp. Inc.*, 2011 WL 6013718, at *21 (Bankr. D. Del. Aug. 24, 2011).  Rather, where claims or interests within each class are "substantially

similar" to the other claims or interests in the class, a Debtor need only have "a legitimate

business reason to classify" claims as it sees fit.  *See In re Mallinckrodt PLC*, 639 B.R. 837, 857

(Bankr. D. Del. 2022) (citing *In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994)).

43.    Celsius does not challenge how the Plan generally distinguishes between

Customer Entitlement Claims and General Unsecured Claims.  (Celsius Obj. ¶¶ 19-20.)  Indeed,

it cannot because the Plan is wholly consistent with Third Circuit law.  *See Matter of Jersey City

Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (finding that it was "immediately" reasonable to

distinguish between multiple classes of general unsecured creditors with "similar" claims).

44.    Rather, Celsius argues that it is "arbitrary" to classify its Time-Barred

Preference Claims as General Unsecured Claims, rather than Customer Entitlement Claims,

because its "rights" "originate from the same basis" as Customer Claims.  (Celsius Obj. ¶¶ 18-

20.)  This is nonsensical.  The disputed statutory "rights" asserted by Celsius through its Time-

Barred Preference Claims are completely different from the disputed property rights that could

be asserted by FTX Exchange customers, which are being addressed through the Customer

Priority Settlement.  Celsius's Time-Barred Preference Claims are litigation claims asserted

*against the Debtors* arising under section 550 of the Bankruptcy Code.  (*Id.* ¶ 15.)  They are not

the same claims that FTX Exchange customers could assert based on purported property rights as

to assets on the FTX Exchanges.  (*See* Confirmation Brief, Argument § II.C); *see also Vantage

Drilling*, 603 B.R. at 547 ("[A]sserting a claim for monetary damages does not give a plaintiff a

property interest in defendant's assets.").)  There is nothing "discriminatory" about

acknowledging this obvious difference (Celsius Obj. ¶ 21) because there is a "legitimate business

reason" to acknowledge it:  the need to resolve disputes with customers as to ownership of

Exchange Assets.  *See Mallinckrodt*, 639 B.R. at 857.

45.     Indeed, Celsius itself adopted a similar distinction in its own confirmed and consummated chapter 11 plan, which distinguished between and separately classified claims held by an account holder for assets held in a "Celsius Account" (classified as "Account Holder Claims") from all other unsecured claims,[4] including any claims for damages relating to or arising from any Celsius Account (with such claims specifically classified as "General Unsecured Claims").[5]  Importantly, Celsius's plan made clear that "Claims for damages or other Unsecured Claims on account of Former Celsius Accounts," which would include avoidance action claims relating to Celsius Accounts, were General Unsecured Claims and not Account Holder Claims.[6]  For Celsius to take the diametrically opposite position with respect to the Debtors' classification is disingenuous at best and should be rejected.

### C.     The Plan's Distribution Procedures Are Proper.

46.     The Celsius Litigation Administrator further argues that the Plan cannot be confirmed because "it diverts funds" to FTX customers who (allegedly) "are not the rightful claimants of the funds."  (Celsius Obj. ¶ 29.)  The Celsius Litigation Administrator's solution is to expand the definition of "Disputed Claims" in Section 8.5 of the Plan to include Customer Entitlement Claims which are subject to the Time-Barred Preference Claims, to force the Debtors to withhold distributions until *both* Celsius's Time-Barred Preference Claims (that are not properly pending) and the claims against the Celsius Initial Transferees (pending in another

---

[4]   The separate classification in Celsius was based on a series of settlements between various "Account Holders" and Celsius—including a class action settlement which resulted in certain "Account Holder Claims" receiving enhanced payments.  (*See* Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023), ECF No. 3577 at 7 (defining a class based on a settlement with holders of claims based on Celsius "Custody" accounts); 25 (defining a class based on a settlement with holders of claims based on Celsius "Withhold" accounts).)

[5]   *Id.* at 12 ("For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims, but Claims for damages or other Unsecured Claims on account of Former Celsius Accounts shall be General Unsecured Claims.").

[6]   *Id.*

court) are resolved.  (*Id.* ¶¶ 35-36.)  There is no basis to impose such a requirement through the Plan.

47.     In essence, the Celsius Litigation Administrator wants to force the Debtors to withhold distributions to as many as 497 different FTX Exchange customers for an indefinite period of time based on preference claims against those customers that the Celsius Litigation Administrator has not reduced to judgment and may never reduce to judgment.  If the Court permits Celsius to assert the Time-Barred Preference Claims, the Debtors will need to consider them, like all Disputed Claims, in sizing the Disputed Claims Reserve.  But there is no basis for the Celsius Administrator to dictate how or when the Debtors make Distributions on Allowed Claims to the Debtors' own creditors based on claims asserted in another court on which Celsius has not obtained any judgment, and Celsius cites no case or other authority that would so permit.

48.     Although Celsius attempts to justify its arguments by invoking irrelevant principles of interpleader (*id.* ¶ 31), well-established law with respect to similar efforts to garnish distributions to creditors makes clear that Celsius is just a "parasite upon the[se] bankruptcy proceedings" that "should not be tolerated."  *In re Am. Elec. Tel. Co.*, 211 F. 88, 91 (7th Cir. 1914).

49.     Although Celsius has failed to comply with any applicable state law procedures to obtain such a remedy, Celsius is seeking a pre-judgment garnishment of payments that would be owed to FTX Exchange customers with Allowed Claims.[7]  But settled precedent dictates that "[a] bankruptcy trustee should not be subject to a pre-judgment garnishment which would unnecessarily complicate and delay the efficient administration of a bankruptcy estate."

---

[7]  *See, e.g.*, Garnishment Definition, Black's Law Dictionary (12th Ed. 2024) (defining a "garnishment" as "[a] judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to or is bailee for the debtor to turn over to the creditor any of the debtor's property (such as wages or bank accounts) held by that third party.")

*In re Brickell*, 292 B.R. 705, 709 (Bankr. S.D. Fla. 2003), *aff'd* 142 F. App'x 385 (11th Cir.

2005). Indeed, bankruptcy courts generally avoid entertaining even procedurally proper requests

for pre-judgment garnishments because they burden courts and debtors by turning Chapter 11

proceedings into a "collection forum for third-party claims against creditors." *See In re Logan*,

2010 WL 1286651, at *2 (Bankr. E.D. Va. Mar. 29, 2010).

50. The Celsius Litigation Administrator admits that, through his proposals to

amend the Plan, he seeks to delay the administration of these Chapter 11 cases by ensuring that

"distributions are not directed to Celsius-FTX Customers *absent resolution of the Customer*

*Preference Actions*" (*i.e.* the Time-Barred Preference Claims). (Celsius Obj. ¶ 35 (emphasis

added).) The Celsius Litigation Administrator is asking this Court to force the Plan to be

amended to prevent the payment to Customers who are alleged to be Celsius Initial Transferees

until preference claims relating to transfers to almost 500 different parties are fully litigated.

This is precisely the kind of delay from pre-judgment remedies that courts have held is

intolerable. *See, e.g., In re Berman & Co.*, 378 F.2d 252, 256-56 (6th Cir. 1967) (holding that

the district court erred by permitting an attachment because it delayed closure of the case by

"nearly two years"). Thus, the Celsius Litigation Administrator's objection should be overruled.

## V. The Plan Adequately Preserves Parties' Rights With Respect to a Disputed Claims Reserve.

51. Russell Crumpler and Christopher Farmer, in their joint capacities as the

duly authorized joint liquidators appointed in the British Virgin Islands' liquidation of Three

Arrows Capital, Ltd. (in liquidation) (the "3AC Liquidators") have objected to the Plan ([D.I.

23146], the "3AC Objection"), along with the Celsius Litigation Administrator, on the basis that

it fails to provide an adequate claims reserve. (3AC Obj. ¶ 16; Celsius Obj. ¶ 32.) The 3AC

Liquidators argue that any reserve should "include[] an amount sufficient to pay the 3AC

Claims" (3AC Obj. ¶ 23), while the Celsius Litigation Administrator argues that the definition of Disputed Claims Reserve in the Plan should be modified to include "Customer Entitlement Claims subject to the Customer Preference Actions." (Celsius Obj. ¶ 35.)

52.    At bottom, each of these objections allege that the Disputed Claims Reserve provision in the Plan should be enlarged to specifically address their Disputed Claims. But these objections are misplaced, and do not provide any legitimate basis to delay confirmation of the Plan.  The establishment and size of the Disputed Claims Reserve contemplated by the Plan will be subject to a separate motion before this Court, and the 3AC Liquidators' and Celsius Litigation Administrator's rights to object to that motion and the Debtors' Disputed Claims Reserve are fully preserved.  The Plan's Disputed Claims Reserve provision—which does not itself purport to establish a reserve or the size of any reserve—does not contravene any of the requirements of the Bankruptcy Code, and accordingly, these objections should be overruled.

**A.    The Disputed Claims Reserve Provision in the Plan Complies with Section 1123(a)(4) of the Bankruptcy Code.**

53.    The 3AC Liquidators allege that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Plan does not expressly commit to the establishment and funding of a Disputed Claims Reserve.  (3AC Obj. ¶ 17.)

54.    Section 1123(a)(4) of the Bankruptcy Code requires a Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  (*See* 11 U.S.C. § 1123(a)(4).)  While section 1123(a)(4), and the Bankruptcy Code generally, does not impose a requirement to establish a disputed claims reserve, case law generally requires that reserves be established for holders of disputed claims.  *See, e.g.*, *In re Motors Liquidation Co.*, 447 B.R. 198, 217 n.50 (Bankr. S.D.N.Y. 2011) ("The Code itself does not impose either

requirement, though without creating reserves of some kind, I have some difficulty seeing how one could provide the statutorily required equal treatment when dealing with the need to make later distributions on disputed claims that ultimately turn out to be allowed, especially in cases, like this one, with a liquidating plan.").

55.     The Plan requires the Plan Administrator to establish a Disputed Claims Reserve "if necessary."  (Plan § 8.5.)  There is no ambiguity with respect to this provision.  (3AC Obj. ¶ 16.)  The Plan is clear with respect to the circumstances in which the Plan Administrator will establish a claims reserve, and section 1123(a)(4) of the Bankruptcy Code is accordingly satisfied.  Given the sheer number and size of Disputed Claims in these Chapter 11 Cases, the Debtors will be establishing a Disputed Claims Reserve, and will do so by motion noticed appropriately to affected parties-in-interest.

56.     The Plan's Disputed Claims Reserve provision is nonetheless consistent with other plans of reorganization approved by this Court, which also allow for discretion in the establishment and sizing of such a reserve at a later date.  *See, e.g.*, *In re Carbonlite Holdings LLC*, Case No. 21-10527 (JTD) (Bankr. D. Del. Sept. 7, 2021) [D.I. 895] (establishing a disputed claims reserve without committing to any sort of sizing); *In re Lighthouse Res. Inc.,* Case No. 20-13056 (JTD) (Bankr. D. Del. Mar. 10, 2021) [D.I. 435] (same); *In re Global Eagle Entertainment Inc.*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [D.I. 753] (confirming the establishment of a disputed claims reserve only "to the extent necessary").

**B.     The Plan's Definition of "Disputed Claims" Is Proper.**

57.     The Celsius Litigation Administrator seeks to improperly rewrite the Plan's definition of "Disputed Claims" to include an express reservation of funds on account of its purported "competing claim" to the funds to be distributed to the FTX-Celsius Customers (as

defined in the Celsius Objection) on account of their Customer Entitlement Claims.  (Celsius Obj. ¶ 35.)

58.     Even assuming *arguendo* that the Celsius Litigation Administrator holds a valid and "competing" entitlement to these funds— a gating question pending before the Court— the Debtors still would not be required to expand the Plan's definition of "Disputed Claims." The Debtors have considerable discretion in describing any claims reserve in the Plan, and the Plan Administrator at this stage is not required to commit to reserving against any of the Celsius Litigation Administrator's claims.  *See In re Trib. Co.*, 476 B.R. 843, 865 (Bankr. D. Del. 2012) (not requiring a reserve for subordinated unsecured creditors where their claims were at an early stage of litigation); *In re Motors Liquidation Co.*, 447 B.R. 198, 216 (Bankr. S.D.N.Y. 2011) (finding it unreasonable to require the debtors to establish a segregated reserve for certain disputed claims, in addition to an already established general disputed claims reserve); Hr'g Tr. at 38:15-40:2, *In re Southland Royalty Company, LLC*, Case No. 20-10158 (KBO) (Bankr. D. Del. May 20, 2021) (requiring a reserve for specific claims only where disputed claims were likely to be successful and potentially irreparable harm would occur absent a reserve if the disputed claims were successful).

59.     Ultimately, as described above, given the magnitude of claims filed in these Chapter 11 Cases and the fact that claims reconciliation will certainly still be ongoing at the time of emergence, it will be necessary for the Plan Administrator to establish a Disputed Claims Reserve.  The establishment and size of such a reserve will be subject to a separate motion to be filed with this Court, and the 3AC Liquidators' and Celsius Litigation Administrator's rights to object to such motion are fully preserved.

**VI.      The Plan's Voluntary Releases Are Consensual and Should Be Approved.**

60.      The United States Trustee (the "U.S. Trustee"), Ahmed Abd El-Razek,

Sunil Kavuri, and Pat Rabbitte (the "Kavuri Parties"), and Seth Melamed each object to the

confirmation of the Plan on the basis that the releases provided for in Section 10.4 of the Plan

(the "Voluntary Release") are purportedly non-consensual.  ([D.I. 23610] the "UST Objection"

and [D.I. 23162] the "Kavuri Objection," respectively.)  These parties rely on *Purdue*, 144 S. Ct.

2071, to argue that "the prohibition on nonconsensual third-party releases in *Purdue* requires this

Court to evaluate whether this Plan's releases are consensual under contract law."  (UST Obj.

¶ 45; Kavuri Obj. ¶ 19.)  Each objector argues that the Voluntary Release is "non-consensual."

(UST Obj. ¶¶ 41-62; Kavuri Obj. ¶¶ 18-19.)  This is contrary to the holdings of this Court and

the law of this circuit, even following *Purdue*.

61.      The Supreme Court cautioned that nothing in *Purdue* "should be construed

to call into question *consensual* third-party releases."  *Purdue*, 144 S. Ct. at 2087-88.  Yet, that is

exactly what the U.S. Trustee and the Kavuri Parties seek to have this Court do.  To the contrary,

courts have expressly approved opt-out releases—such as the one included in the Plan—as

permissible consensual releases both before and after *Purdue.*

62.      Prior to *Purdue*, as the U.S. Trustee acknowledges (UST Obj. ¶ 45 n.6),

courts in this circuit have consistently held that Chapter 11 plans may provide ***consensual*** third-

party releases, including where such releases, as here, utilize an opt-out structure and are

obtained through the balloting process.  *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80

(Bankr. D. Del. 2022) (approving certain third party releases as consensual because, among other

things, the releases were conspicuously disclosed and releasing parties were given an opportunity

to opt out); Dec. 22, 2020 Hr'g Tr. at 80-81, *In re Extraction Oil & Gas, Inc.*, Case No. 20-

11548 (CSS) (Bankr. D. Del. Dec. 28, 2020) [D.I. 1534] ("[v]ery importantly, these are

consensual releases, these are not nonconsensual releases.  I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release."); *In re Chaparral Energy Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan that permitted holders of claims that voted to reject or abstained from voting to check a box on ballot opting out of third-party releases); *In re Skillsoft Corporation*, Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) [D.I. 274] (same); June 13, 2019 Hr'g Tr. 48:9-11, *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) [D.I. 384] ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots.").

63.     Furthermore, since the *Purdue* decision was issued, at least one court has specifically considered and overruled a similar objection.  In *In re Robertshaw US Holding Corp.*, 2024 WL 3897812 (Bankr. S.D. Tex. Aug. 16, 2024), the court considered a U.S. Trustee's objection to a plan which contained an opt-out mechanism for releases, and found such releases to be consensual.  The court held that "[c]ontrary to the Trustee's position … [t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan." *Id.* at *17.  As is the case here, in *Robertshaw*:

> Parties in interest were provided detailed notice about the Plan, the deadline to object to plan confirmation, the voting deadline, and the opportunity to opt out of the third-party releases.  The Disclosure Statement included a detailed description about the third-party releases and the opt-out . . . ballots were sent to holders of Claims in voting classes. . . .  All ballots provided claimants an opportunity to opt out. Non-voting parties . . . received a Notice of Non-Voting Status that offered a chance to opt out too.  The ballots and the Notice of Non-Voting Status allowed parties to carefully review and consider the terms of the third party release and the consequences of electing not to opt-out.

*Id.* at *18.

64.     Other courts in this circuit have also confirmed plans containing opt-out mechanisms for third-party releases since *Purdue*.  *See, e.g.*, *In re Invitae Corp.*, Case No. 24-11362 (MBK) (Bankr. D.N.J. July 20, 2024) [D.I. 858] (confirming plan with opt-out release); *In re Bowflex Inc.*, Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) [D.I. 614] (same).

65.     This Court considered the permissibility of opt-out consent in *In re Mallinckrodt* and held that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system . . . [and t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization."  639 B.R. at 879.  Even non-voting holders of claims may be deemed to have consensually released claims pursuant to an opt-out mechanism if the notices were widely published electronically and in major news sources, clearly emphasized the relevant sections, and were part of a very well-known case.  *Id.* at 879-81.

66.     Courts determine that third-party releases are consensual when adequate notice has been provided to stakeholders by, for example, bolding the language describing the third-party releases in the plan and disclosure statement and including language on the applicable ballot and election form explaining the opt out mechanism.  *See, e.g.*, *In re Indianapolis Downs*, *LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved.").

67.     The Debtors submit that the Voluntary Release is consensual and consistent with the law in this circuit.  The ballots as approved by this Court and distributed to

Holders entitled to vote on the Plan (in Class 3A, Class 5A, Class 5B, Class 6A, Class 6B, Class 7A, Class 7B, Class 7C, Class 8B, Class 8C, Class 10B, Class 10C, and Class 12) and the election forms distributed to holders entitled to opt out of the Voluntary Release (in Class 1, Class 2, Class 3B, Class 4, Class 5C and Class 8A) quoted the entirety of the release that would be given in bold and clearly informed holders of the implications they should grant the release. In each case, the ballots and election forms distributed to Holders entitled to opt out of the Voluntary Release contained boxed text in prominent format, informing recipients that "[they] will be deemed to have granted the [third-party releases] unless [they] affirmatively opt out and submit the election form with [their] election to the solicitation agent prior to the voting deadline."

68.     Furthermore, the Debtors ensured that the Voluntary Release is in fact voluntary for those Classes not entitled to vote and deemed to reject the Plan (Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18) by requiring Holders in those Classes to opt-in to the Voluntary Releases in order to be bound.

69.     In addition, much like in *Mallinckrodt*, these Chapter 11 Cases are high-profile cases, involving a very active body of creditors and stakeholders.  As this Court is well aware, the issues involved have garnered significant public interest and have been regularly reported on in a variety of publications around the world.  Additionally, the Debtors caused notice to be published broadly in national and international publications, including *The New York Times* and *Coindesk.com*, each of which prominently displayed the entirety of the release provisions.

70.     The Voluntary Release is an important part of the implementation of the Plan – but no broader than the circumstances warrant.  The beneficiaries of the Voluntary

Release are third party professional advisors, the JOLs and the FTX Digital Markets, all of whom participated constructively in the development of the Plan and the progression of the Chapter 11 Cases towards a successful conclusion.  To eliminate the Voluntary Release for this type of case participant would discourage similarly situated parties from participating in other cases in the future.  Additionally, the Voluntary Release is extraordinarily narrow and focused only on the legitimate purpose of facilitating participation in the Chapter 11 Cases by these identified parties.  The Voluntary Release does *not* provide a release of any Cause of Action to the extent arising out of conduct that occurred prior to the Petition Date or against any Control Person or other Excluded Party.  It also, even in its narrow scope, carves-out acts or omissions that constitute gross negligence, willful misconduct, fraud, or criminal acts.  (*See* Plan § 10.7.)  As a result, the narrowly tailored Voluntary Release here is distinguishable from the general releases provided in many plans and certainly does not provide a blanket immunity.  Therefore, the Debtors submit that the Voluntary Release is fair, equitable, and reasonable and in the best interests of the Debtors and all holders of claims and interests.

71.     The U.S. Trustee and the Kavuri Parties each cite *In re Chassix Holdings Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), for the proposition that the Plan's releases are not permitted.  (UST Obj. ¶ 51; Kavuri Obj. ¶ 18.)  Aside from the fact that it is not binding precedent in this circuit, *Chassix* stands for no such proposition.  In articulating why a plan's release provisions must be limited to those who voted to accept the Plan, or affirmatively opted-in, the *Chassix* court expressly acknowledged that "circumstances may justify a different approach in different cases."  *Chassix*, 533 B.R. at 79.

72.     In these Chapter 11 Cases, the Voluntary Releases are narrow in scope and Holders of Claims and Interests are expected to recover over 100% of the value of their claims,

whereas in *Chassix* the "relatively small recoveries . . . could easily have prompted an even higher-than-usual degree of inattentiveness or inaction." *Id.* at 80. As the more recent *LATAM Airlines Grp. S.A.* decision makes clear, the "projected meager recoveries" in *Chassix* made it "likely that unsecured creditors did not focus on the fact that the plan called for them to take action not to grant the non-debtor releases," and distinguished situations where, as here, releasing parties are "receiving exponentially greater recovery" than in *Chassix*. *In re LATAM Airlines Grp. SA*, 2022 WL 2206829, at \*46 n.88 (Bankr. S.D.N.Y. June 18, 2022).

73. Judge Goldblatt recently issued a decision in *In re Smallhold, Inc.*, relying, in part, on the reasoning in *Chassix* to conclude that consensual third-party releases require some level of affirmative step to indicate consent, such as returning a ballot. 2024 WL 4296938, at \*45-48 (Bankr. D. Del. Sept. 25, 2024). This decision, which is not binding on this Court, is both inconsistent with *Purdue* itself and distinguishable on the facts. Here, notice of the Voluntary Releases was widely disseminated to millions of creditors both via direct mailing and through publication notice approved by this Court (including in *The New York Times* and Coindesk.com). The notice in *Smallhold*, by contrast, involved "a form of notice of the confirmation hearing that would be sent to all creditors." *Id.* at \*4.

74. Additionally, Judge Goldblatt expressly declined to address a situation where the plan process builds in the protections of the class action mechanism under Rule 23(b)(3). *Id.* at \*15. Given the extensive negotiations with many constituencies, the extensive notice providing creditors "the opportunity to opt out," *id.*, and the unprecedented publicity for and attention to these proceedings, the process used here is akin to those used in class action

cases under Rule 23 of the Federal Rules of Civil Procedure.[8]  Any suggestion that more affirmative consent is necessary in these Chapter 11 Cases than was provided is wrong.

75.     Accordingly, the Debtors respectfully submit that the Voluntary Releases contained in the Plan are consensual and are in the best interests of the Debtors and its stakeholders.  The U.S. Trustee and Kavuri Parties' objections should be overruled.

## VII.   The Plan Does Not Extinguish ELD Capital LLC's Fraud Claims without their Consent.

76.     ELD Capital LLC ("ELD") has objected to the Plan [D.I. 23140] (the "ELD Objection") to express concern that its claims asserted in proofs of claim numbers 91933 and 96369 (the "ELD Claims") for prepetition fraud will be extinguished through the Plan. (ELD Obj. at 1.)  Although the Debtors disagree with ELD's substantive assertions that are the subject of a pending claims objection, for the avoidance of doubt, the ELD Claims will be resolved through the claims allowance process and are not extinguished by the plain language of the Plan.  All parties' rights, defenses and objections with respect to the ELD Claims are reserved.

## VIII.   The Remaining Objections Should Be Overruled.

### A.     In Kind Distributions Are Not Required Under the Bankruptcy Code.

77.     The Kavuri Parties baldly assert that the Plan should provide for "in kind" distributions.  (Kavuri Obj. ¶¶ 39-41.)  This argument falls flat because it fails to assert any legal basis for not distributing cryptocurrency to creditors as rendering the Plan unconfirmable.  The Kavuri Parties suggest that "the Debtors' refusal to even engage a distribution agent who could make distributions 'in kind' to customers reflects utter disregard to maximize recoveries to

---

[8]   The *Smallhold* court also did not expressly address the propriety of a release as to creditors who were solicited and received a ballot but failed to vote, nor address a situation where creditors are "paid in full."  *Id.* at *3, 5, 14.

creditors." (Kavuri Obj. ¶ 41.)  This baseless assertion is belied by the entire record of these

Chapter 11 Cases, which is replete with the Debtors' efforts to maximize the value of their assets

for creditors that has resulted in projections of customer and other non-governmental creditor

Claims being paid in full plus interest.

78.     The Plan contemplates Cash Distributions (as defined in the Plan).  As has

been well-documented in these Chapter 11 Cases, the Debtors were never in a position to make

in-kind distributions to creditors because there was a massive shortfall of Digital Assets held on

the Petition Date compared to customer liabilities.  (*See* Mosley Decl. ¶ 67.)  The Debtors have

taken great steps to avoid the volatile market fluctuations and other risks inherent in speculating

in Digital Assets during the pendency of these Chapter 11 Cases.  If individual creditors wish to

convert their Cash Distributions to other currencies or Digital Assets, those creditors should bear

the risks of doing so.  This objection should be overruled.

      **B.**      **The Plan is a Permissible 9019 Settlement.**

79.     The U.S. Trustee asserts that section 5.2 of the Plan impermissibly

"purports to treat the Plan itself as if it were a Rule 9019 'settlement.'"  (UST Obj. ¶ 71.)  The

U.S. Trustee cites no authority to support the proposition that a Plan cannot also be deemed a

settlement pursuant to Bankruptcy Rule 9019, and several plans approved by this Court contain

almost identical language to section 5.2 of the Plan.  *See, e.g.*, *In re Mallinckrodt PLC*, Case No.

20-12522 (JTD) (Bankr. D. Del. Feb. 18, 2022) [D.I. 6510]; *In re SiO2 Medical Products, Inc.*,

Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) [D.I. 466]; *In re Global Eagle

Entertainment*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [D.I. 753].

80.     There is no reason why a plan may not be used as a vehicle for

effectuating a global settlement of claims and interests, so long as it is complies with all

applicable bankruptcy rules.  The U.S. Trustee tacitly acknowledges this point, noting that "[a]

-34-

plan may incorporate one or more negotiated settlements" (UST Obj. ¶ 68.)  The Plan here complies with all applicable bankruptcy rules pertaining to settlements, including, as detailed in the Confirmation Brief (Argument §§ II.C-D), Bankruptcy Rule 9019 with respect to the Customer Priority Settlement and the Customer Preference Settlement because each satisfies the applicable *Martin* factors and is in the best interests of the Debtors, their creditors, and other stakeholders.

81.    The single case cited by the U.S. Trustee, *Varela* v. *Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) is completely irrelevant. (UST Obj. ¶ 66.)  In *Dynamic Brokers*, a debtor sought to modify the amount of a claim in a proposed plan instead of objecting to the amount of the claim in accordance with Bankruptcy Rule 3007.  293 B.R. at 496-497.  The court sustained the objections of the claimant, noting that the debtor needed to file a formal claims objection in respect of such claim because section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan.  *See id.*  This has nothing to do with the U.S. Trustee's objection. The Debtors are not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules.  As detailed in the Confirmation Brief (Argument § II), the Debtors satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Accordingly, the U.S. Trustee's objection should be overruled.

### C.    The Plan Provides Fair Treatment to the Convenience Classes.

82.    The U.S. Trustee next asks the Court to "deny confirmation because the Debtors have not shown that the Plan treats all creditors fairly." (UST Obj. ¶ 77.)  Specifically, the U.S. Trustee argues that the Supplemental Remission Fund must be made available to Holders of Dotcom and US Convenience Claims, and the Debtors fail to demonstrate how

excluding such classes from the Supplemental Remission Fund is reasonable. (UST Obj. ¶ 80.) This objection makes no sense.

83.     First, and foremost, the Holders of Dotcom Convenience Claims and U.S. Convenience Claims voted overwhelmingly in support of the Plan. As detailed in the Voting Report included in the Daloia Declaration, filed contemporaneously herewith, more than 95% in number and amount of voting Holders in Class 7A and Class 7B voted to accept the Plan. And not one single Holder of a Dotcom Convenience Claim or a U.S. Convenience Claim filed an objection to their Claims treatment under the Plan. The purpose of the Plan process is to permit the economic stakeholders to voice their opinions on the Plan, and here they have done so with their support.

84.     Second, this result is unsurprising because the treatment of Class 7A and Class 7B claims is very favorable to the creditors who hold those Claims. Holders of Allowed Claims in the convenience classes will receive payment of 100% of such Allowed Claim plus postpetition interest at the Consensus Rate on the Initial Distribution Date. (Plan § 4.3.11-12.) The benefits of being paid in full on the Initial Distribution Date and not having to wait for subsequent distributions as assets become available are immense. These creditors also bear no risk that the Debtors will be unable to pay claims in full over time because they are paid as a priority on the Initial Distribution Date.

85.     The purpose of the Supplemental Remission Fund in large part is to compensate certain customers for the time value of their money and the related investment losses they may have suffered as a result of having their digital assets and fiat currency locked on the FTX Exchanges. The Debtors will not be in a position to distribute all of their assets on the Initial Distribution Date (due to the need to maintain a Disputed Claims Reserve, reconcile and

resolve Claims, pursue litigation claims, and monetize assets, among other reasons), meaning that other creditors will have their Allowed Claims paid out over time.

86.     As detailed in Section 1.F of the Disclosure Statement, to compensate for this additional holding period, the Debtors, with the cooperation of certain subordinated governmental creditors, have agreed to facilitate a supplemental remission pool of assets. Naturally, convenience class claimants, who each will receive a distribution on the Initial Distribution Date, will not receive the additional payments associated with this delay, because they will have received the entire amount of their claims on the Initial Distribution Date and can re-deploy such funds as they wish.  There is also no assurance there will be assets sufficient to make distributions on account of Class 10B Senior Subordinated Governmental Claims that will flow to the Supplemental Remission Fund.  The economic effect of receiving a full distribution on the Initial Distribution Date compared with delayed distributions plus some uncertain supplemental recovery in the future is comparable.  Accordingly, the U.S. Trustee's objection is unfounded and should be overruled.

**D.    The Information Provided in the Plan Administration Agreement and Liquidating Trust Agreement is Sufficient.**

87.     The Kavuri Parties allege that the Plan Administration Agreement and Liquidating Trust Agreement fail to disclose adequate information with respect to the compensation of the Plan Administrator and the Wind Down Trust board members and assert that additional disclosure regarding compensation should "inform whether the Plan satisfies the best interests of creditors under section 1129(a)(7)."  (Kavuri Obj. ¶ 44.)  This objection is misplaced.  Section 1129(a)(7)—known as the best interests test—requires that creditor recoveries under the plan are not less than the amount that such creditors would receive or retain

if the debtors liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1129(a).  It does not require disclosure of compensation of directors or officers of post-emergence entities.

88.     Nonetheless, the disclosures set forth in the Plan and Plan Supplement (including the Plan Administration Agreement and Liquidating Trust Agreement) provide sufficient disclosure to satisfy the requirements of Section 1129(a)(5) of the Bankruptcy Code. Section 1129(a)(5)(A)(i) requires the disclosure of the identity and affiliations of any post-emergence directors.  These requirements are satisfied by the Debtors' Plan Supplement disclosures.  (Confirmation Brief, Argument § I.E.)  Separately, Section 1129 requires that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy[.]"  11 U.S.C. § 1129(a)(5)(A)(ii). This requirement is independent of the best interests test of Section 1129(a)(7) and is satisfied unless the proposed directors and officers to be appointed would perpetuate mismanagement of the estate or demonstrate incompetence.  *See*, *e.g.*, *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 735-36 (Bankr. D. Ariz. 2010) ("Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor."); *see also* 7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2024) ("[I]f the bankruptcy court is to have a role beyond the ministerial one of counting ballots, then the public policy requirement [of Section 1129(a)(5)(A)(ii)] would enable it to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management.").  The Kavuri Parties have alleged no mismanagement of the Debtors (nor could they).  Rather, the Kavuri Objection solely demands disclosure of compensation to be paid to the post-emergence directors and officers, and should be overruled.

89.     Separately, Section 1129 of the Bankruptcy Code requires disclosure of "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B).  But the disclosure requirement of Section 1129(a)(5)(B) of the Bankruptcy Code only applies to directors and officers of "the reorganized debtor."  Here, the Kavuri Objection takes issue with compensation disclosures for directors and officers of the Consolidated Wind Down Trust and the Plan Administrator, none of whom will be employed or retained by any reorganized debtor in such capacity.  Courts have interpreted the text of Section 1129(a)(5) narrowly, and at least one court has held that a liquidating trust is not subject to the requirements of Section 1129(a)(5).  *See, e.g., In re Sentinel Mgmt. Group*, 398 B.R. 281, 308 (N.D. Ill. 2008) ("Neither the Liquidation Trustee nor the Liquidation Trust Committee constitutes an individual who would serve as a director, officer, or voting trustee of Sentinel. Further, there is no affiliate of Sentinel participating in a joint plan with Sentinel, nor is there a successor to Sentinel under the Third Amended Plan.").

90.     To the extent Section 1129(a)(5)(B) applies, the Debtors have made sufficient disclosure with respect to the identities and affiliations of the post-emergence directors and officers, and to the extent that such directors and officers are insiders, have provided adequate disclosure regarding the nature of their compensation in the Plan Supplement and how that compensation will be determined by the Consolidated Wind Down Trust Board.  The actual compensation for the Plan Administrator has not yet been determined, nor could it be, because the Consolidated Wind Down Trust does not yet exist and its Board has not been seated.  *See In re Am. Solar King. Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible . . . .  If there is no proposed slate of

directors . . . there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).”).  The Kavuri Objection should be overruled.

**E.      The Late Objection Filed By Mr. Gunawan Should be Overruled.**

91.     The late objection submitted six weeks after the Plan objection deadline by Samuel Gunawan, a purported customer of FTX.com [D.I. 25664] (the “Gunawan Objection”), should be overruled because it is untimely and fails on the merits.  The Gunawan Objection asserts that the Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code because it does not respect the purported customer property rights of customers with respect to Exchange Assets.  (Gunawan Obj. ¶¶ 1-8, 11-16.)  The objection also asserts the Plan’s failure to acknowledge customers’ purported property rights means that it does not properly classify claims pursuant to section 1122(a) of the Bankruptcy Code.  (*Id.*)[9]

92.     As an initial matter, the Gunawan Objection should be overruled because it is untimely.  The Gunawan Objection is dated August 31, 2024 and was not received by either the Court or the Debtors until September 24, 2024—long after the expiration of the August 16, 2024 objection deadline set by this Court [D.I. 19143], without any explanation or justification.  The Gunawan Objection should be disregarded and overruled on this basis alone.  *See, e.g.*, *In re Chandler*, 459 B.R. 215, 219 (Bankr. E.D. Pa. 2011) (“A party’s failure to raise an objection to a proposed plan prior to the deadline fixed by this Court results in a waiver of a party’s right to object.”).

93.     Regardless, Mr. Gunawan’s arguments that the Plan was not proposed in good faith fail for many of the same reasons as LayerZero Group’s similarly flawed objection.

---

[9]     The Gunawan Objection also purports to incorporate by reference the U.S. Trustee Objection (Gunawan Obj. ¶¶ 9-10, 18.), which is addressed elsewhere throughout the Reply.

(*See* Section II.B, *supra*.)  Mr. Gunawan asserts that the Debtors' efforts to build consensus around the Plan rather than waste incalculable amounts of time and money litigating about ownership of all Exchange Assets is somehow a "sign" of the Debtors' "lack of good faith." (Gunawan Obj. ¶ 8.)  This is wrong, and the Gunawan Objection reflects a fundamental misunderstanding of the law.

94.    Because Exchange Assets were a commingled mix of customer deposits and the Debtors' assets, and they were held in addresses and accounts owned and controlled by the Debtors, the Exchange Assets are presumptively property of the Debtors' estates. (Confirmation Brief, Argument § II.C.i.)  The Debtors had no duty to embark on a litigation campaign to prove that others do not own Exchange Assets.  *Meoli* v. *Kendall Electric, Inc. (In re R.W. Leet Electric, Inc.)*, 372 B.R. 846, 855-56 (6th Cir. 2007) ("there is simply no authority for the conclusion that a trustee bears the burden of establishing a negative" as to property ownership).

95.    Further, Mr. Gunawan's summary arguments about ownership of Exchange Assets come nowhere close to carrying the burden that he bears as a party seeking to extract assets from the Debtors' estates.  (*See* Confirmation Brief, Argument § II.C.ii.)  As an initial matter, Mr. Gunawan's citations to what appears to be the Dotcom TOS are not coupled with any argument as to what property rights the Dotcom TOS purportedly granted customers (*e.g.*, the rights of a trust beneficiary or the rights of a bailor).  (Gunawan Obj. ¶¶ 3-4.)  And they are not supported by any evidence of English law sufficient to challenge the Neuberger Declaration and the Debtors' evidence and arguments establishing that FTX.com Exchange Customers are merely unsecured creditors.  (Confirmation Brief, Argument §§ II.C.vii-ix.) Further, there is no basis to impose some "constructive trust" over Exchange Assets "to prevent

unjust enrichment." (Gunawan Obj. ¶¶ 11-13.) There will be no unjust enrichment of the Debtors because the Debtors are not retaining Exchange Assets. (Confirmation Brief, Argument § II.C.v.) Lastly, because Mr. Gunawan has failed to show that FTX.com Exchange customers have any property rights at all, his arguments about how the Plan fails to properly classify customers' claims based on their property rights fail to state an objection. (Gunawan Obj. ¶ 14.)

## CONCLUSION

For the reasons stated above, the Court should overrule the Objections and confirm the Plan.

Dated: September 30, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
mcguire@lrclaw.com
brown@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
bromleyj@sullcrom.com
gluecksteinb@sullcrom.com
kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*