**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF THE RT. HON. LORD NEUBERGER OF ABBOTSBURY

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## Table of Contents

**I.   INTRODUCTION** .................................................................................................. **3**

**II.   PROFESSIONAL EXPERIENCE** ............................................................................ **4**

**III.   SUMMARY OF CONCLUSIONS ON THE EFFECT OF THE DOTCOM TERMS** ................ **5**

**IV.   CHOICE OF LAW CLAUSE AND THE INTERPRETATION OF CONTRACTS** .................. **6**

   IV(1)   CHOICE OF LAW CLAUSE ................................................................................ 6
   IV(2)   OBJECTIVE APPROACH TO INTERPRETATION OF CONTRACTS .......................... 6
   IV(3)   ADMISSIBLE EVIDENCE WHEN INTERPRETING CONTRACTS ............................ 8

**V.   PROPERTY LAW AS APPLIED TO DIGITAL ASSETS** ............................................. **9**

   V(1)   DIGITAL ASSETS AS PROPERTY ...................................................................... 9
   V(2)   TRANSFER OF LEGAL TITLE TO DIGITAL ASSETS ........................................ 11
   V(3)   INTERMEDIARIES ....................................................................................... 13

**VI.   RIGHTS IN DIGITAL ASSETS UNDER THE DOTCOM TERMS** .............................. **14**

   VI(1)   NO EXPRESS TRUST WAS ESTABLISHED ...................................................... 14
      *VI(1)(a)*   *Requirements to establish a trust* ............................................ 14
      *VI(1)(b)*   *Application of trust requirements to the Dotcom Terms* ............. 23
      *VI(1)(c)*   *Prior statements* .................................................................... 27
   VI(2)   TO THE EXTENT A QUASI-BAILMENT WAS INTENDED, IT WAS NOT EFFECTIVELY ESTABLISHED...
              .................................................................................................... 28
      *VI(2)(a)*   *Availability of quasi-bailment as a means to hold digital assets* ....... 28
      *VI(2)(b)*   *Requirements of quasi-bailment* ............................................... 29
      *VI(2)(c)*   *Intention to create a quasi-bailment under the Dotcom Terms* ....... 31
      *VI(2)(d)*   *Extent to which a quasi-bailment was successfully created* ............ 33
   VI(3)   OUTRIGHT TITLE TRANSFER IN THE ABSENCE OF A TRUST OR QUASI-BAILMENT ..................... 35

**VII.   REQUIREMENTS TO ASSERT PROPRIETARY CLAIMS** ...................................... **36**

   VII(1)   GENERAL PRINCIPLES OF FOLLOWING AND TRACING .......................... 37
   VII(2)   CUSTOMERS' ABILITY TO TRACE IN RELATION TO DIGITAL ASSETS ................ 42

**VIII.   APPLICATION TO FIAT CURRENCY AND E-MONEY** ........................................ **44**

   VIII(1)   FIAT CURRENCY AND E-MONEY ................................................................ 44
      *VIII(1)(a)*   *Fiat currency and E-Money under the Dotcom Terms* ................ 44
      *VIII(1)(b)*   *Statements outside the Dotcom Terms* .................................. 46
   VIII(2)   STABLECOIN ........................................................................................ 48

**IX.   EARLIER TERMS** ........................................................................................ **49**

I, Lord Neuberger of Abbotsbury, hereby make this declaration (**Declaration**)

under penalty of perjury pursuant to § 1746 and state as follows:

## I.     INTRODUCTION

1.     FTX Trading Ltd (**FTX Trading**) provided its customers (**customers**) with services which included the holding and trading of digital assets, on standard terms of service, which I have been asked to assume are set out in a document headed "FTX Terms of Service" dated May 13, 2022 (**the Dotcom Terms**).

2.     I have been asked by Sullivan & Cromwell LLP on behalf of FTX Trading and its affiliated debtors and debtors in possession (collectively, **the Debtors**) to give my opinion as to the meaning and effect of the Dotcom Terms, including as regards any proprietary rights, if any, which customers might have as a matter of English law, in digital assets and fiat currency deposited, held, received and/or acquired on the FTX.com platform.

3.     Capitalised expressions and references to sections in this Declaration are, respectively, references to expressions and sections of the Dotcom Terms.

4.     I am being remunerated at the rate of £2,000 per hour, which is my standard rate for providing opinions on English law. A junior barrister in my chambers working under my direction has assisted me in preparing this report. Although being paid by the Debtors, I understand that my role is to give my honest opinion, and I have done so. Neither my compensation nor the compensation of the junior barrister assisting me is contingent upon my findings, the testimony I may give, or the outcome of these proceedings.

5.     In reaching the conclusions set out in this Declaration, I have reviewed judicial decisions, publications from the Law Commission of England and Wales, learned articles and textbooks. I have also been provided with and have considered and taken into account certain documents provided by the Debtors.  A list of the documents I have considered is set out in Annex A to this Declaration.

## II.    PROFESSIONAL EXPERIENCE

6.    I was called to the bar of England and Wales (**England**) in 1974, and practised as a barrister from 1975, specialising in property law. I became Queen's Counsel in 1987. In 1996, I was made a Judge in the Chancery Division of the English High Court, where I tried cases, mostly involving the law of companies, commercial contracts, insolvency, intellectual property, tax, professional negligence, property, trusts and wills. In 2004, I was promoted to the English Court of Appeal, where I heard appeals in all areas of law except crime. In 2007, I was appointed a Lord of Appeal in Ordinary which meant that I joined what was effectively (and formally in 2009 became) the United Kingdom Supreme Court (**UKSC**), although at that time it was part of the House of Lords, where I heard appeals in all areas of law. In 2009, I became Master of the Rolls (effectively the senior Court of Appeal Judge). In 2012, I was made President of the UKSC, a role from which I retired in late 2017 as I was about to reach the mandatory retirement age. As a Lord of Appeal and then as President of the UKSC, I was a member of the Judicial Committee of the Privy Council, and, in that capacity, I also sat as a judge on final appeals from various former British colonies, including Antigua and Barbuda.

7.    Since standing down from the UKSC, I have been practising as an arbitrator, mediator and legal expert from One Essex Court (a leading set of barristers' chambers) located in Temple, London. I also sit on a part-time basis as an appeal Judge in the top courts of Singapore (where I only hear appeals in commercial cases) and Hong Kong.

8.    Throughout my career as a barrister, Judge and arbitrator, I have been involved in arguing and deciding cases on the interpretation of contracts and cases concerning proprietary interests. Over the past few years, I have developed an interest in the law of cryptocurrencies, and have read papers and attended seminars on the topic.

9.    I set out in Annex B, Annex C and Annex D to this Declaration respectively my curriculum vitae, a list of the cases in which I have testified as an expert, and a list of the lectures (most of which have or will have been published in some form) which I have given in the past ten years.

### III.   SUMMARY OF CONCLUSIONS ON THE EFFECT OF THE DOTCOM TERMS

10.   I appreciate that the issues relating to the meaning and effect of the Dotcom Terms are for this Court to determine, but I have been instructed to express a view on those issues in case it assists the Court.

11.   In summary, my conclusions as to the meaning and effect of the Dotcom Terms in the light of the relevant principles of English law are as follows:

11.1.   So far as digital assets as defined in the Dotcom Terms (**Digital Assets**) are concerned, and based on the information currently available to me, my view is that customers are likely to be unsecured creditors of FTX Trading. In particular:

(a)   I do not consider that the Dotcom Terms create a trust of Digital Assets in favour of customers;

(b)   To the extent it could be argued that the parties intended to establish a "quasi-bailment" relationship with respect to Digital Assets, the parties appear to have failed to have achieved that result. The use of pool addresses and the "sweeping" of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen.

11.2.   In respect of fiat currency and E-Money[2] my view is that:

(a)   The Dotcom Terms did not create a trust of fiat currency or E-Money in favour of the customers; and

---

[2] Section 8.3.2 of the Dotcom Terms defines "*E-Money*" as follows:  "*Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money ("E-Money"), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded.  This amount will be displayed in your Account*".

(b)  The effect of the Dotcom Terms is that customers will simply be unsecured creditors so far as fiat currency and E-Money are concerned.

11.3.  My view on stablecoin is the same as that on other Digital Assets, save that it would be even more difficult for a customer to claim any proprietary rights to select stablecoins which were treated as interchangeable with fiat currency and E-Money.

12.  I have also been asked to consider a number of specific statements made by FTX Trading outside the Dotcom Terms which concern the basis on which assets were held for customers. For the reasons set out below, I consider it to be highly unlikely that these statements will change the answers set out above.

## IV.  CHOICE OF LAW CLAUSE AND THE INTERPRETATION OF CONTRACTS

### IV(1)  *Choice of law clause*

13.  The Dotcom Terms contain in section 38.11 a provision which states that "[t]*he Terms and any Dispute shall be governed by, and construed in accordance with, English law*". "*Dispute*" is stated in para 1.1 of Schedule 1 to extend to "*any dispute, claim, controversy or difference arising out of or in connection with the Terms …*".

14.  That is a broadly stated choice of law clause. It would in my opinion cover any dispute as to the meaning and effect of the Dotcom Terms in any dispute between FTX Trading and its customers.

15.  I have been asked to assume that English law will also apply to the proprietary consequences of the Dotcom Terms.

### IV(2)  *Objective approach to interpretation of contracts*

16.  As set out further below, English law adopts an objective approach to the interpretation of contracts which, generally speaking, gives primacy to the wording used by the parties in the contract.

17.     The approach to the interpretation of written contracts is set out in three decisions of the United Kingdom Supreme Court: *Rainy Sky SA*[3], *Arnold v Britton*[4] and *Wood v Capita*[5].

18.     The relevant principles can be summarised as follows:

18.1.   The court's task is to identify the objective intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties to mean by the language used in the contract[6].

18.2.   The court identifies that objective intention by focusing on the meaning of the relevant words in their documentary, factual and commercial context. The meaning is to be assessed in the light of: (i) the natural and ordinary meaning of the section; (ii) other relevant provisions in the contract; (iii) the overall purpose of the section and the contract; (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed; (v) commercial common sense; but (vi) disregarding subjective evidence of any party's intentions[7].

18.3.   The court is engaged in a "*unitary exercise*" in which the court checks each of the rival meanings against the provisions of the contract and investigates their commercial consequences[8].

---

[3] *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 per Lord Clarke (with whom Lords Phillips Mance, Kerr and Wilson agreed).

[4] *Arnold v Britton* [2015] AC 1619 in a judgment of mine (with which Lords Sumption, Hughes and Hodge agreed).

[5] *Wood v Capita Insurance Services Ltd* [2017] AC 1173 per Lord Hodge (with whom Lords Mance, Clarke and Sumption, and I agreed).

[6] *Rainy Sky*, footnote 3, at [14]; *Arnold v Britton*, footnote 4, at [15].

[7] *Arnold v Britton*, footnote 4, at [15].

[8] *Rainy Sky*, footnote 3, at [21] and [28]; *Wood v Capita*, footnote 5, at [11]-[12].

18.4.  The meaning objectively intended by the parties is, save perhaps in a very unusual case, most obviously to be gleaned from the language they have used[9], but the weight to be given to the ordinary and natural meaning of the words will vary depending on the circumstances and is greatest where the language is in a sophisticated or complex document which has been prepared with the assistance of skilled professionals[10].

18.5.  Regard can be had to whether the meaning contended for is consistent with business common sense[11]. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense[12]; but where the language is unambiguous the court must apply it[13].

18.6.  However, commercial common sense is not to be invoked retrospectively[14]. The mere fact that a contract, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language[15].

### IV(3)   Admissible evidence when interpreting contracts

19.  The principles above impact the relevant and admissible materials which may be examined for the purposes of construing a contract. In particular:

---

[9] *Arnold v Britton*, footnote 4, at [17].

[10] *Wood v Capita*, footnote 5, at [10]-[11] and [13].

[11] *Wood v Capita*, footnote 5, at [11].

[12] *Rainy Sky*, footnote 3, at [21]-[22].

[13] *Rainy Sky*, footnote 3,  at [23].

[14] *Arnold v Britton*, footnote 4, at [19].

[15] *Arnold v Britton*, footnote 4, at [19].

19.1.  As identified above, evidence as to the parties' subjective intentions or understanding is not relevant or admissible and therefore cannot be taken into account when construing a contract[16].

19.2.  Similarly, evidence as to the parties' subsequent conduct is also not admissible and therefore cannot be taken into account when construing a contract[17].

19.3.  Additionally, evidence of the parties' pre-contractual negotiations is not admissible if it is relied on for the purposes of seeking to draw inferences as to what the contract means[18].

20.  However, the court can otherwise consider evidence as to the factual matrix in which the contract was agreed at the time it was formed (albeit, as stated above, the court will still give primary importance to the ordinary meaning of the words chosen by the parties to express their agreement).

## V.  PROPERTY LAW AS APPLIED TO DIGITAL ASSETS

### V(1)  Digital Assets as Property

21.  The current strongly prevailing view is that, in English law, digital assets are property, and I consider that view to be correct.

22.  The legal status of digital assets has been addressed in detail in Chapter 3 of the Final Report of the Law Commission into Digital Assets[19] (**the Final Report**). The Law

---

[16] *Arnold v Britton*, footnote 4, at [15].

[17] Sir Kim Lewison *The Interpretation of Contracts* (8th ed), at [3.184]*ff*.

[18] *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, at [41]-[42].

[19] Final Report of the Law Commission into Digital Assets (June 2023, Law Com No 412). Prior to this, the legal status of digital assets was considered by the UK Jurisdiction Taskforce in its Legal Statement on Cryptoassets and Smart Contracts (November 2019).

Commission is a respected independent statutory body, consisting of experienced academic and practising lawyers, which keeps English law under review and recommends reform where needed.

23.    It is the clear view of the Law Commission that digital assets can be the object of property rights, which is also the conclusion reached by common law courts around the world[20]. Indeed, with the exception of a recent article by Professor Robert Stevens[21], there appears to be universal judicial and academic support for the view that digital assets can be the object of property rights[22].

24.    Judicial decisions consistent with this conclusion include: the English Court of Appeal decision in *Tulip Trading*[23]; the English High Court decisions in *AA v Persons Unknown*, *Danisz v Persons Unknown*, *DPP v Briedis*, *Litecoin Foundation Ltd v Inshallah Ltd*, and

---

[20] *Ibid*, at [3.10]-[3.16] and [3.38]-[3.43].

[21] Robert Stevens, *Crypto is not property* (2023) 139 LQR 615. Professor Stevens' view was specifically considered and rejected in *Tippawan Boonyaem v Persons Unknown* [2023] EWHC 3180 (Comm), at [23] by Richard Salter KC, sitting as a Deputy High Court Judge, who cited with approval Sir Roy Goode's observation that the common law should move towards recognising as property anything that is of realisable commercial value.

[22] Duncan Sheehan, *Digital assets, blockchains and relativity of title* [2024] JBL 78 refers at p100 to the "*vanishingly unlikely*" possibility that digital assets will be held not to be property (notwithstanding Professor Stevens' article, footnote 21 above, which he cites). The Final Report, footnote 19 above, also acknowledges Professor Stevens' view at footnote 119.

[23] *Tulip Trading Ltd v van de Laan* [2023] EWCA Civ 83, at [16]-[25].

*D'Aloia v Persons Unknown*[24]; the New Zealand High Court case of *Ruscoe v Cryptopia*[25]; and the Singapore High Court case of *ByBit Fintech*[26].

25.      In its Final Report[27] and in a more recent Consultation Paper[28] and Supplemental Report[29], the Law Commission has also proposed legislation which would clarify that a thing is capable of being an object of property rights even though it is neither a thing in possession nor a thing in action. The intention is to "*lay to rest any lingering doubt about the existence of a third category of property*"[30] which would include digital assets. However, the Law Commission's view is that the proposed legislation would merely "*confirm and support what we consider to be the existing position at law*"[31], a view which is repeated in the Supplemental Report[32], and with which I agree.

### V(2)      Transfer of Legal Title to Digital Assets

26.      While not the subject of any judicial authority in England, in my view a transfer of legal title to digital assets would require both a change in control and an intention to pass title.

---

[24] *AA v Persons Unknown* [2019] EWHC 3556 (Comm), at [61], *Danisz v Persons Unknown* [2022] EWHC 280 (QB), at [13], *DPP v Briedis* [2021] EWHC 3155 (Admin), at [10], *Litecoin Foundation Ltd v Inshallah Ltd* [2021] EWHC 1998 (Ch), at [2], *D'Aloia v Persons Unknown* [2024] EWHC 2342 (Ch), at [173].

[25] *Ruscoe v Cryptopia (in liquidation)* [2020] NZHC 728.

[26] *ByBit Fintech Ltd v Xin* [2023] SGHC 199 at [29]-[39].

[27] Footnote 19, at [2.45]-[2.46].

[28] *Digital assets as personal property: Short consultation on draft clauses* (February 2024, Law Com Consultation Paper).

[29] *Digital assets as personal property: Supplemental report and draft Bill* (July 2024, Law Com No 416).

[30] *Ibid*, at [1.9].

[31] Final Report, footnote 19, at [2.17].

[32] Supplemental Report, footnote 29, at [2.83].

27.   The topics of how legal ownership of digital assets works and how it can be transferred have been the subject of detailed treatment, in the Law Commission's Final Report[33] and in an article by Hin Liu[34] (**Liu**).

28.   The analyses of both the Law Commission and Liu support the following conclusions, which, while they cannot be regarded as clear given the developing state of the law, appear to me to be correct because they are practical and in accordance with common law principles:

28.1.   Transfer of legal title should require a "change in control" of the digital asset[35]; this does not necessarily require a "state change", i.e., a change to the blockchain by transfer of the digital asset to a network address controlled by the transferee[36].

28.2.   It is not possible for there to be a transfer of legal title by contract alone without a change in control (in contrast to the position of movable tangible property)[37].

28.3.   However, a change in control is not sufficient to pass title. An intention to pass title is also required[38]. As a result, digital assets can be transferred to a "*custodian*" on terms that legal title is retained by the transferor, so that the custodian obtains a

---

[33] Footnote 19, Chapter 6.

[34] Hin Liu, *Transferring legal title to a digital asset* [2023] 5 Journal of International Banking and Financial Law, at p317.

[35] Final Report, footnote 19, at [2.77], [6.47]; Liu, footnote 34, at p317.

[36] Final Report, footnote 19, at [6.41]-[6.42]; Liu, footnote 34, at pp321-323.

[37] Liu, footnote 34, at pp320-321; Final Report, footnote 19, at [6.46], where the Law Commission does not specifically address the point, but refers to a change of control being a "*necessary (but not sufficient) condition for the transfer of title*".

[38] Final Report, footnote 19, at [5.45]*ff*; Liu, footnote 34, at pp323-324.

"*control-based legal proprietary interest*" in the digital asset, but the customer continues to have the superior title[39].

### V(3)  *Intermediaries*

29.  Digital assets can be held by individuals directly, in which case the individuals will control the private keys to the network addresses at which the assets in question are stored. However, digital assets can also be held by intermediaries, where the intermediary controls the network addresses and private keys.

30.  The nature of the relationship between the intermediary and its customers in the context of digital assets has been the subject of discussion by the Law Commission and by academic commentators[40]. There are three possible types of relationships that are potentially relevant to understanding the Dotcom Terms:

30.1.  A trustee-beneficiary relationship, whereby legal title to digital assets vests with the intermediary, which holds that title on trust for the customer, while beneficial title remains with the customer;

30.2.  A "quasi-bailor-bailee" or "quasi-bailment" relationship, whereby control of the digital assets passes to the intermediary but legal title remains with the customer;[41] and

30.3.  A relationship involving an outright title transfer (i.e., a debtor-creditor relationship), whereby any title to digital assets is held by the intermediary

---

[39] Final Report, footnote 19, at [7.26(1)], [7.102]-[7.115].

[40] Examples include Final Report, footnote 19, at Ch 7; Louise Gullifer, Henry Chong & Hin Liu, *Client-Intermediary Relations in the Crypto-Asset World* (Legal Studies Research Paper Series, Paper 18/2021, March 2021); and the UK Jurisdiction Taskforce's Legal Statement on Digital Assets and English Insolvency Law (April 2024) at [47]-[55].

[41] A bailee is not a trustee. See *Davis v Hueber* (1923) 31 CLR 583 (HCA) at p595 ("*a mere contract of bailment, or any contract of similar nature, does not create a trust*").

absolutely, with the customer only having a contractual entitlement to the digital assets or their value;

31. These possibilities are discussed in a helpful article by Professor Louise Gullifer and others[42] (**Gullifer**), which emphasises that the correct characterisation will turn on the terms of the custody agreement itself, albeit they suggest that most agreements are vague or silent as to the nature of the relationship. In those circumstances, they say, it is necessary to "*first ascertain what has been agreed between the parties, and then categorise such agreement in legal terms*"[43].

32. I consider each of the possible relationships below and express my conclusions as to whether the Dotcom Terms indicate an intention to establish a relationship of that type.

## VI.    RIGHTS IN DIGITAL ASSETS UNDER THE DOTCOM TERMS

### VI(1)   No Express Trust Was Established

<u>VI(1)(a)</u>        <u>Requirements to establish a trust</u>

33. An express trust requires certainty as to: (a) intention; (b) subject-matter; and (c) objects (i.e., as to beneficiaries). These requirements are usually addressed separately, but they are in practice closely linked[44].

*(1) Intention*

34. A trust will only be found to exist if there is a sufficiently certain intention to create a trust[45].

---

[42] Gullifer, footnote 40.

[43] *Ibid*, p14.

[44] *Wilkinson v North* [2018] 4 WLR 41, per David Richards LJ at [3].

[45] The principles regarding when a trust is intended and those regarding the proper approach to the interpretation of the terms of any such trust are closely connected and are addressed together below.

35.     The relevant principles can be summarised as follows:

35.1.   The overarching test was stated in a recent decision of the English Court of Appeal
        as follows: "*Although an intention to create a trust does not require the use of the
        word trust or similar language, there must be, as Scarman LJ said ...[46], 'a clear
        declaration of trust and that means there must be clear evidence from what is said
        or done of an intention to create a trust...* "[47]. This is consistent with what is said
        in *Underhill*[48], as well as in *Snell*[49] and *Hanbury*[50], all leading English textbooks on
        the law of Equity and Trusts.

35.2.   It is necessary for there to be an intention to create "*a trust*". As stated above, a trust
        involves a legal relationship whereby one person (Party A) holds legal title to the
        property on trust for another person (Party B). As a result, an intention that Party B
        retains legal title is necessarily inconsistent with an intention that legal title be held
        by Party A on trust for Party B[51]. I address this point further below at ¶67 below.

---

[46] In *Paul v Constance* [1977] 1 WLR 527, at p531.

[47] *Wilkinson v North*, footnote 44, at [48]. The textbooks on trusts are to the same effect.

[48] *Underhill and Hayton: Law of Trusts and Trustees* (20th ed), at [10.5] where it is stated that the
required intention is a "*composite intention*" in the sense that "*while the settlor must intend to
make an immediate disposition of those rights in favour of another, he intends to do so by retaining
them and assuming an obligation in respect of them to that other person*".

[49] *Snell's Equity* (34th ed), at [22-012] states that the necessary intention is one "*to impose legally
enforceable duties of trusteeship on the owner of the property*".

[50] *Hanbury and Martin: Modern Equity* (22nd ed), at [4-003] states that: "*The question is whether,
on the proper construction of the words used, the settlor or testator has shown a serious intention
to create a trust, in the sense of the legal relationship recognised as a trust*".

[51] *Snell,* footnote 49, at [22-048] ("*By attempting to transfer the property the settlor has shown an
intention to divest himself of it, and not to hold it as a trustee. The court will not strive to find an
intention that could not actually have existed*"); *Richards v Delbridge* (1874) LR 18 Eq 11, per Sir
G Jessel MR at p15.

35.3.   In determining whether a trust is intended (and if so on what terms) an objective approach is adopted. In *Wilkinson v North*[52], David Richards LJ said (emphasis added):

> "*The creation of a trust has significant, and generally irreversible, consequences. ... The law therefore requires certainty on three crucial elements: the intended beneficiaries, the property to be subject to the trust and the intention of the settlor to create the trust. **These elements must be established objectively by reference to the documents, words or conduct relied on as creating the trust. Statements as to the settlor's intention made subsequently are irrelevant.** There is a parallel with the approach adopted to determine whether a contract has been made*".

35.4.   As is made clear in *Underhill* (emphasis added)[53]:

> "*Whether an intention to create a trust is sufficiently evinced is in each case a question of **objective contextual interpretation**. As in interpreting a contract, the court concerned with an alleged trust seeks to find the intention of the party or parties. It does this by identifying the meaning of the relevant words (a) in the light of (i) the natural and ordinary meaning of those words, (ii) the overall purpose of the document, (iii) any other provisions of the document, (iv) the facts known and assumed by the party or parties at the time of execution of the document, and (v) common sense, but (b) ignoring subjective evidence of any party's intentions*".

adopting the same summary of principles as that in *Arnold* at ¶18.2 above. The same point is pithily made in the other leading textbook on Trust law, *Lewin*[54], namely "*What counts is the objective meaning that the words of the document convey to the court when considered as a whole in the light of the surrounding circumstances*".

---

[52] Footnote 44, at [2].

[53] Footnote 48, at [10.1].

[54] *Lewin on Trusts* (20th ed), at [7-004].

35.5.   As a result the position is, unsurprisingly, similar to the position as applies to the interpretation of contracts:

(a)   Evidence which pre-dates the declaration may be relevant as part of the factual matrix, but not for the purpose of determining what the declaration means (and documents such as "*drafts of a deed*" or "*preliminary negotiations*" or "*the written opinion of counsel who drafted the settlement*" are generally inadmissible)[55].

(b)   "*Evidence of conduct of the parties after the making of a settlement is not admissible to assist in its interpretation*"[56]. This includes evidence as to: (i) subsequent "*admissions made by an alleged settlor after the execution of a document alleged to create a trust showing his subjective intentions at the time of execution of that document*"[57], or (ii) "*how the alleged trust assets were subsequently treated by the settlor*"[58].

(c)   In *Pearson v Lehman*[59], it was said that "*the subjective assumptions of Group employees about the legal consequences of the parties' arrangements are not the same as the objective ascertainment of intention to be derived from the terms of those arrangements*".

---

[55] *Ibid*, at [7-006].

[56] *Ibid*, at [7-018].

[57] *Ibid*, at [7-005].

[58] *Underhill*, footnote 48, at [10.13].

[59] *Pearson v Lehman Brothers* [2010] EWHC 2914 (Ch), per Briggs J at [273].

35.6.   When the trust in question is said to arise in a commercial context, the primary object of interpretation should be the contractual documents[60]:

(a)   In *Pearson v Lehman*[61] it was also said that: "*the question whether B has a proprietary interest in the property acquired by A for B's account depends upon their mutual intention, to be ascertained by an objective assessment of **the terms of the agreement or relationship between A and B** with reference to that property*" (emphasis added).

(b)   In *National Stadium Project*, the issue was who as between a contractor and a sub-contractor was the beneficial owner of money in a bank, and the Privy Council[62] said (emphasis added):

> "*An objective approach to identification of intention where a trust is claimed is always appropriate, since a trustee and any beneficiary need to know what their rights and obligations are and need to ascertain this from the objective circumstances giving rise to the trust. **It is especially important in a commercial context like the present, where the trust which is claimed to exist is enmeshed in and is said to arise out of a network of agreements** put in place to accommodate the interests of a range of participants of the Project. All of these participants need to be able to understand clearly what were the rights and obligations of themselves and others, in particular in respect of any credit risk they were required to accept when participating in the Project. ... In a context like this, **a court will be astute to ensure that a trust relationship in respect of money held to fund the scheme is clearly indicated in the contractual documentation**".*

---

[60] See also Gullifer, footnote 40, at p2, where it is stated that the "*legal characterisation of the relationship ... will depend on the client-intermediary agreement itself*".

[61] Footnote 59, at [225(v)-(vi)].

[62] *National Stadium Project (Grenada) Corporation v NH International (Caribbean) Ltd* [2020] UKPC 25, at [38] per Lord Briggs and Lord Sales (with whom Lord Reed and Lord Lloyd-Jones agreed).

35.7.   In the commercial context, "*special care*" should therefore be exercised when considering whether a declaration of trust has been made, especially where purely personal rights are sufficient to achieve the parties' "commercial objectives"[63].

36.     These principles do not rule out the possibility of a separate declaration of trust by one of the parties to the agreement (either before or after the document being construed). However, this is likely to require quite extreme facts:

36.1.   An earlier statement or declaration would normally be displaced by the subsequent agreement, in which case it would no longer be effective. While an earlier statement or declaration may form part of the factual matrix by reference to which the subsequent agreement is to be construed, if the language of the subsequent agreement is clear that no trust is intended, the prior declaration will not affect that conclusion;

36.2.   A subsequent statement or declaration may simply demonstrate a misunderstanding of the earlier agreement, in which case there is unlikely to be a sufficiently clear intention to declare a new trust;

36.3.   Those two points are particularly telling where, as here, the relevant agreement contains an "entire agreement" provision, a "no reliance on any representations" provision, a "no oral variation" provision, and a "no oral waiver" provision[64], all of which demonstrate an intention that the agreement should be the document which would exclusively define the parties' relationship;

36.4.   The one relevant example of such a subsequent trust which I have identified in the law reports is *Re Kayford*[65]. A mail order company which received advance payments from customers was concerned about its solvency, and it repurposed a dormant account, which it retitled "Customer Trust Deposit Account", transferred

---

[63] *Pearson v Lehman,* footnote 59, at [225(ix)].

[64] Respectively, sections 38.1.1, 38.1.2, 38.5.1, and 38.5.2 of the Dotcom Terms.

[65] *Re Kayford Ltd* [1975] 1 WLR 279, per Megarry J.

into it all subsequent customer payments (so they could be returned to those customers in the event of insolvency), and informed its bank about this. A valid trust over the account was held to have been created in favour of those customers whose funds were paid into the account. In my view, this first instance case was correctly decided because there was a clear intention to create a new trust over subsequent receipts in favour of customers who paid money to the company, so there was certainty of intention, subject-matter and objects. In the present case concerning FTX Trading, I have not been made aware of any such subsequent statements of this nature.

*(2) Subject-matter*

37.    It is necessary for the subject matter of the trust and the beneficiaries' shares in it to be sufficiently certain[66].

38.    This topic has previously been the subject of controversy. However, in my view the position is now relatively clear and, given my conclusions below regarding the absence of an intention to create a trust, can be addressed quite briefly:

38.1.    A trust cannot be established in favour of one or more beneficiaries over a specific number of unascertained items of tangible property which form part of a bulk (e.g., of two of 100 sheep). The intended subject of the trust is two sheep, but it is impossible to identify from the declaration alone (and prior to segregation) which two sheep are subject to the trust[67].

38.2.    A trust can be established in favour of one or more beneficiaries over a bulk of unascertained property in respective shares as equitable tenants in common (e.g., of 2% of my flock of 100 sheep). The subject of the trust (the flock) is certain, as is

---

[66] As to the latter see *Pearson v Lehman*, footnote 59, at [243] ("*Subject matter certainty requires not only that the identity of the shared fund is certain, but also that the proportionate amount of each alleged beneficiary's share is also certain*").

[67] *Underhill*, footnote 48 at [10.27]-[10.28].

the beneficiary's share in it[68]. This was recognised as possible by the High Court in *Re London Wine*[69] and by the Privy Council in *Re Goldcorp*[70].

38.3.   Whether a case falls within the first or second category identified above depends on what the parties intended. The second category (i.e., a trust over the bulk as equitable tenants in common) is usually rejected as not being what the parties intended when dealing with tangible goods[71].

38.4.   In the case of intangibles (such as shares), the question remains what the parties intended. However, by reason of the nature of the property in question, it may be possible more readily to determine that the parties intended a trust over the bulk as tenants in common.

38.5.   For example, in *Hunter v Moss*[72], it was held that an oral declaration of trust in respect of "*5% of the issued shares*" in a particular company which had issued 1000 shares was effective on the basis that the settlor thereby held 50 of his 950 shares on trust. Although this gave rise to initial controversy[73], it has now been established[74] that:

---

[68] *Ibid*, at [10.26].

[69] *Re London Wine Co Ltd* [1986] PCC 121, at p137.

[70] *Re Goldcorp Exchange Ltd* [1995] 1 AC 74, at p91E.

[71] *London Wine*, footnote 69 , at p137, which noted that "*very clear words*" would likely be required; see also *Goldcorp*, footnote 70, at p71E.

[72] *Hunter v Moss* [1994] 1 WLR 452.

[73] See *Re Harvard Securities Ltd* [1998] BCC 567 and *Re CA Pacific Finance Ltd* [2000] 1 BCLC 494.

[74] By Professor Sir Roy Goode in *Are intangible assets fungible* [2003] LMCLQ 379 and by Campbell J in *White v Shortall* [2006] NSWSC 1379, who were then endorsed by Briggs J in *Pearson v Lehman*, footnote 59, at [232], and not doubted on appeal: *Pearson v Lehman Brothers Finance* [2011] EWCA Civ 1544 at [69]-[76].

(a) Shares in a company are simply a proportionate interest in the issued capital of the company. As a result, all shares represent a co-ownership interest in a single indivisible unit. A shareholder does not have separate rights in respect of each share owned, but rather has a single right to a particular co-ownership interest.

(b)  As a result, a declaration of trust in respect of "*50 of my 950 shares*" gives rise to no uncertainty, and the consequent trust may be seen as concerning the whole of the right (i.e., all 950 shares), in relation to which the trustee holds 50 shares for the beneficiary and 900 shares for himself, both as equitable tenants in common[75]. That is because, by reason of nature of the particular asset in question, the declaration of trust over "*50 of my 950 shares*" is necessarily and objectively an intention to declare a trust in which the beneficiary obtains an equitable tenancy in common in the undivided bulk[76].

39. As to how the above principles apply to digital assets:

39.1. It would be possible for a person (or an exchange) to declare a trust over all its network addresses in favour of a beneficiary in relation to a specific proportion of the total holdings.

39.2. However, that would depend on the interpretation of the relevant declaration of trust (i.e., here the Dotcom Terms) and in particular whether it was intended: (a) to create a trust over all the network addresses in which the beneficiary will have only a proportionate interest; or (b) to create a trust over specific digital assets at specific network addresses in favour of the beneficiary.

---

[75] *White v Shortall*, footnote 74, at [210]-[212].

[76] See *White v Shortall,* footnote 74,  at [192] and [210]-[212] ("*It is because the trust is construed as being of the entire shareholding that it is not necessary for the plaintiff to be able to point to some particular share and be able to say 'That share is mine'*").  The focus on intention is also evident in *Pearson v Lehman*, footnote 59, at [244].

39.3.   Thus, if the agreement made it clear that a trust relationship was intended and also that there would be sweeping and pooling of digital assets, a court might hold that there was a trust over all the pool addresses, in respect of which all customers were beneficiaries as tenants in common. However, this would be dependent on it being clear that such a trust relationship was intended[77]. For the reasons set out below, I do not consider there to be such an intention in this case.

*(3) Objects*

40.   The objects (i.e., beneficiaries) of the trust must also be certain.

41.   As *Lewin*[78] notes: "*[t]he declaration of trust must make it sufficiently clear who are the beneficiaries ... Where the trust is intended for the benefit of particular persons, the declaration will fail if the words used do not enable the trustees to draw up a complete list of all those intended to take an interest under the trust*".

42.   No issues appear to present themselves in the present context, so this aspect is not examined further. It should however be added that, as noted at ¶37 above, certainty of subject-matter does require that the beneficiaries' share of the property is certain[79].

VI(1)(b)   Application of trust requirements to the Dotcom Terms

43.   While ultimately a matter for this Court, I have considered whether the requirements for a trust to be established are met in the present case.

---

[77] This appears to have been the conclusion reached in *Ruscoe v Cryptopia*, footnote 25, [134]-[187], where the New Zealand High Court concluded that trusts were intended over all network addresses held by the exchange. This is explicable on the basis that it was made clear to customers that all digital assets might be "*pooled in our internal accounts with other users' Coins at any time*", and yet "*Each user's entry in the general ledger of ownership of Coins is held by us on trust for that user*". No such language is evident in the Dotcom Terms in the present case.

[78] *Lewin on Trusts*, footnote 54, at [5-045]-[5-046].

[79] See *Pearson v Lehman*, footnote 59, at [243].

44.     In my view there are very powerful indications in the Dotcom Terms that the parties did
        not intend a trustee-beneficiary relationship.

45.     The following provisions in the Dotcom Terms are inconsistent with an intention to create
        a trustee-beneficiary relationship (all emphasis added):

45.1.    Section 2.1.3 provides "***FTX Trading*** *is not your broker, intermediary, agent, or
         advisor and* ***has no fiduciary relationship or obligation to you in connection with***
         *any trades or other decisions or* ***activities effected by you using the Services***". This
         provision is inconsistent with the Dotcom Terms creating a trustee-beneficiary
         relationship because an essential part of a trustee-beneficiary relationship is that the
         trustee owes fiduciary duties to the beneficiary. The express exclusion of any
         "*fiduciary relationship*" in section 2.1.3 strongly suggests that no trustee-
         beneficiary relationship was intended.

45.2.    Section 2.2.2 provides "*...* ***We provide no warranty as to the suitability of the***
         *Digital Assets traded under the Terms and* ***assume no fiduciary duty to you in***
         ***connection with such use of the Services***". This provision is plainly inconsistent
         with the Dotcom Terms creating a trustee-beneficiary relationship for the same
         reasons as those set out immediately above.

45.3.    Section 2.10 provides "*Neither Digital Assets nor any fiat currency or E-Money
         held in your Account is eligible for any public or private deposit insurance
         protection*". This provision is inconsistent with the Dotcom Terms creating a
         trustee-beneficiary relationship because it suggests that the parties contemplated the
         risk of loss on insolvency, and there would be no risk of such loss and no need for
         deposit insurance if the Digital Assets or fiat currency are held on trust.

45.4.    Section 8.2.6 says that "***[t]itle to your Digital Assets shall at all times remain with***
         ***you and shall not transfer to FTX Trading***"; that the customer is "***the owner of***
         ***[the] Digital Assets in your Account***"; and that "***[n]one of the Digital Assets in***
         ***your Account are the property of … FTX Trading***". This provision is inconsistent
         with the Dotcom Terms creating a trustee-beneficiary relationship because no trust

can be created under English law without an intention that the purported trustee hold legal title. The language in this clause contrasts sharply with that usually used to indicate that a trust was intended: e.g., there is no suggestion that the Digital Assets will be held "*on behalf of*" or "*for*" the customer (or *"on trust"*, which were the terms used in *Cryptopia*[80]).

45.5. Section 9 relates to unclaimed or abandoned property. Significantly, in section 9.2 it is agreed that if FTX Trading is "*holding*" such property and is unable to contact the customer, then "*your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading,* **as Trustee of the Unclaimed or Abandoned Property**. *FTX Trading or the Affiliate of FTX Trading (as applicable),* **as Trustee, will hold the Unclaimed or Abandoned Property on your behalf** ...". This provision shows that, in the very limited circumstances in which they intended a trustee-beneficiary relationship to arise, the parties knew how to say so in clear terms. The contrast with the other provisions considered in this ¶45 would be regarded in English law as a reasonably strong indication that a trustee-beneficiary relationship was *not* intended in other circumstances.

45.6. Section 38.6 provides that "*Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture,* **fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever** *.... Each party confirms it is acting on its own behalf and not for the benefit of any other person*". This provision is plainly inconsistent with the Dotcom Terms creating a trustee-beneficiary relationship because, as set out above, a trustee-beneficiary relationship is a fiduciary relationship, which this section specifically excludes.

46. It appears to me to be clear that, whatever defects that they may be said to suffer from, the Dotcom Terms were drafted with some care and with the benefit of legal assistance.

---

[80] See footnote 77 above.

Accordingly, it is hard to justify departing from the natural meaning of the words which the parties have used[81]. The natural meaning of the provisions set out in ¶45 above, particularly when they are taken together, very strongly indicate, in my opinion, that a trustee-beneficiary relationship was not intended or contemplated by the Dotcom Terms, save in the limited exceptional circumstances referred to in section 9 concerning unclaimed or abandoned property.

47.    Although my view is that the Dotcom Terms do not justify the conclusion that a trustee-beneficiary relationship was intended in relation to Digital Assets, I should add that, even *if* a trust were intended, I do not consider it possible to construe the Dotcom Terms as creating a trust which extended over all of FTX Trading's network addresses for a particular type of Digital Asset such that all the customers would be entitled to a proportionate share as equitable tenants in common in all of FTX Trading's holdings of that type of Digital Asset:

47.1.    I consider such a construction to be wrong because, in addition to the reasons set forth above as to why the Dotcom Terms are inconsistent with an intent to create a trust, the Dotcom Terms refer to "*your Digital Assets*"[82] and they contemplate transfer into a customer-specific network address[83]. That is inconsistent with a customer having a proportionate share in the assets in the pool addresses.

47.2.    I am instructed that such use of pool addresses and the commingling of Digital Assets did in fact occur on the FTX platform and that related transfers of Digital Assets to and from pooled addresses would have been visible on publicly available blockchains. As to the relevance of such matters:

---

[81] See ¶18.4 above.

[82] See e.g., sections 8.2.1. and 8.2.6, quoted in ¶45 above and ¶62 below.

[83] See section 8.2.1, quoted in ¶62 below. See by analogy the reference to the customers being the "*sole*" owners of the goods in *London Wine*, footnote 69, at p127; and the reference to the goods being "*his*" in *Goldcorp*, footnote 70, p71E, both of which were held to show that the parties did not intend the customer to have a proportionate equitable interest in the bulk as a tenant in common.

(a) Anything which occurred after a contract was formed between FTX Trading and a customer is irrelevant for the purposes of construing the Dotcom Terms.

(b) If a customer could reasonably have been expected to know, prior to contracting with FTX Trading, that pooled addresses would be used and Digital Assets would or could be commingled, that could form part of the factual matrix against which the Dotcom Terms are to be construed.

(c) However, even if such matters were to be taken into account as part of the factual matrix in interpreting the Dotcom Terms, my answer above as to the intention of the parties would not change. In particular, in my view the Dotcom Terms are sufficiently clear in their meaning that it is not possible to construe them as constituting an agreement that a trust would be created over all of the exchange's network addresses (in relation to which each customer would have a proportionate share in all network addresses as equitable tenants in common).

VI(1)(c)        Prior statements

48.    As stated in ¶¶20 and 36.1 above, prior statements and prior declarations of trust can in principle form part of the factual matrix against which any subsequent contract is to be interpreted. However, as also stated above, an English Court would give primary importance to the language of the contract in determining the parties' objective intentions.

49.    I have been provided with certain statements made by FTX Trading or its officers which precede the Dotcom Terms and in which there was discussion of how Digital Assets were held and/or protected for customers.

50.    In particular, I have been made aware of statements made by Sam Bankman-Fried to a US Senate Committee on February 9, 2022[84]. It seems to me to be implausible that general statements made in that context were intended to constitute declarations of trust by FTX

---

[84] *Examining Digital Assets - Risks, Regulation, and Innovation: Hearing Before the S. Comm. on Agric., Nutrition and Forestry,* 117th Cong. (2022) (testimony of Sam Bankman-Fried), https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf.

Trading (as opposed to representations as to what it had in fact been doing, or statements as to its understanding as to what it had been, or (possibly) was, obliged to do).

51.    In any event, I consider that the language of the subsequently produced Dotcom Terms to be clear (as set out in ¶¶45-47 above). As a result, any prior statement which appeared to suggest a different relationship would be overtaken by the Dotcom Terms (see ¶36 above).

### VI(2)    *To the extent a quasi-bailment was intended, it was not effectively established*

VI(2)(a)        Availability of quasi-bailment as a means to hold digital assets

52.    A bailment is a legal relationship in which the person with superior legal title to the property (the "bailor") does not have possession of the property, but rather the property is possessed by another (the "bailee"). The bailee has a legal proprietary interest in the property based on possession, but this is inferior to the bailor's legal proprietary interest.

53.    Under English law, "bailment" as traditionally understood can only exist in relation to tangible goods that can be possessed. Consequently, Gullifer[85] refers to "*quasi-bailment*" and the Law Commission[86] refers to an "*analogous concept to bailment in which holding intermediaries acquire a control-based legal proprietary interest in assets held*" which is inferior to that of the customer.

54.    This reflects the fact that, if legal ownership of digital assets is retained when the putative owner ceded control of those assets to another, there would need to be some incremental development in the common law of bailment – i.e., it would need to recognise a "quasi-bailment".

55.    However, in agreement with Gullifer and the Law Commission, that does not appear to me to be a problem, as an extension or development to English law is required in relation to

---

[85] Footnote 40.

[86] Final Report, footnote 19, at [7.101]-[7.103] and [7.110]-[7.112].

almost all legal issues regarding digital assets, and indeed it seems to be a logical extension of the conclusion that digital assets are property.

56.    While one commentator has suggested that quasi-bailment of digital assets ought not to be possible, this is based on a view of legal title to digital assets, which was not adopted by the Law Commission[87]. Additionally, I note that in the Final Report[88], the Law Commission states that a "quasi-bailment" structure is "*conceptually coherent and would offer market participants a useful additional framework*". That appears to be correct to me.

VI(2)(b)         Requirements of quasi-bailment

57.    While the requirements for a "quasi-bailment" are not yet settled in English law, in my opinion it would be necessary to show that: (a) the parties intended to create a legal relationship whereby the bailee would obtain control of the digital assets but the bailor would have superior legal title; and (b) the bailor in fact had superior legal title.

58.    As to the first requirement (i.e., intention), this must be determined objectively by reference to the Dotcom Terms[89]. I address this in the following section.

59.    As to the second requirement (i.e., that the bailor must have superior legal title), this depends on the application of the principles regarding the passing of title to digital assets which are set out in ¶28 above. In particular, a "quasi-bailment" depends on the customer

---

[87] Sheehan, footnote 22. See further footnote 92 below.

[88] Footnote 19, at [7.102].

[89] Gullifer, footnote 40, at pp17-18. Gullifer suggests that the "*most likely characterisation*" is that of trustee-beneficiary and that such a relationship means that there is no practical need for quasi-bailments to be adopted in practice. However, Gullifer also notes that it will always turn on the wording of the relevant terms and that intermediaries may be reluctant to assume the role of trustee as in many jurisdictions it would require them to be licensed as a professional trustee. She also states that a trustee-beneficiary relationship would not be consistent with "*current market practice and expectations*". That is consistent with recent cases in which it was decided or was common ground that there was no trust relationship: *LMN v Bitflyer Holdings Inc* [2022] EWHC 2954 (Comm), at [4]; *Re Gatecoin Ltd (in liq)* [2023] HKCFI 914, especially at [41]-[43], [71]; and *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 02, at [144]-[149].

obtaining and then retaining legal title to the digital assets while the custodian has control over the relevant network address.

60. As to the situations in which that can occur, my opinion is as follows:

60.1. As concluded at ¶28 above, the passing of legal title to digital assets requires both a change of control and an intention to pass title.

60.2. As a result, if a customer has legal title to a digital asset and transfers that digital asset to an exchange, superior legal title will not pass if there is no intention to pass title. Accordingly, if a customer acquires a digital asset outside the exchange and then deposits that digital asset with the exchange on terms that the customer retains superior legal title, then a quasi-bailment would arise following the deposit of the digital asset with the exchange.

60.3. If the deposit was made to a pool address, it might be possible for all the customers depositing into that pool address to become legal tenants in common[90]. However, for this to occur it would be necessary to find an intention that the proprietary interest retained by the customer was only a proportionate interest in the bulk to which he has contributed (i.e., an intention for the user to have title to a percentage of all tokens in a pooled address as opposed to specified number of tokens)[91].

60.4. However, if a customer *acquires* a digital asset on the exchange but never obtains the necessary degree of control, then the customer would not ever obtain legal title

---

[90] See by analogy with tangible goods: *Mercer v Craven Storage* [1994] CLC 328 (HL); *Re Stapylton Fletcher Ltd* [1994] 1 WLR 1181 (Ch) at pp1198E-1199D.

[91] Final Report, footnote 19, at [7.113]: "*However, again, this would not be because of simple analogy to bailment but because that outcome best reflects party intention. Thus, where parties intended that users should be tenants in common of the total unallocated crypto-tokens deposited, a control-based holding structure might be recognised by the courts as arising*".

(superior or at all) to the digital asset required, but would simply be an unsecured creditor in relation to the asset in question[92].

60.5.   What degree of control is required on the part of the customer in order to obtain legal title is uncertain. The Law Commission notes that the types and degree of control which matter for particular purposes will need to be worked through by the common law (and it proposes that a body of experts consider the issues further)[93]. However, my view is that:

(a)   A customer would probably obtain sufficient control (and superior legal title could therefore pass to the customer) if a digital asset acquired on an exchange is identified and segregated for the customer. If the customer had the right to call for an identified and segregated digital asset to be conveyed to it, there would appear to be good arguments that it has the necessary degree of control.

(b)   However, a customer cannot have any control over a digital asset which has not been identified or segregated for such customer. As a result, if a customer "acquires" a digital asset on an exchange, but the relevant digital assets are held in pool addresses and no digital asset is ever identified or segregated for the customer, then superior legal title would not pass to the customer, who would remain an unsecured creditor.

VI(2)(c)    <u>Intention to create a quasi-bailment under the Dotcom Terms</u>

61.   The key sections of the Dotcom Terms are addressed at ¶45 above. As I conclude there, there are strong indications that a trust was not intended. Based on the provisions

---

[92] This point is made by Sheehan, footnote 22, at pp95-96. Sheehan also argues that there should be no "*relativity*" of legal title in digital assets, which would rule out the possibility of a custodian taking a custody-based legal proprietary interest but with the customer retaining a superior legal title. In that regard, Sheehan appears to be in a minority of commentators, and I prefer the views expressed by the Law Commission and Liu.

[93] Final Report, footnote 19, at [6.46] and [5.61].

suggesting that legal title would be held by customers, one could argue that the proper characterisation of any such intended arrangement was that of quasi-bailment.

62.     This is particularly apparent from the following provisions (all emphasis added).

62.1.   Section 8.2.1 provides *"... You may **deposit** Digital Assets that you already own into your Account by generating **an address within your Account** and sending your Digital Assets **to such address***, after which they should appear in your Account balance"*. This provision contemplates the creation of a specific network address unique to the customer and the deposit of Digital Assets into that specific network address.

62.2.   Section 8.2.6 says that "***title to your Digital Assets shall at all times remain with you and shall not transfer to FTX***"; that the customer is "***the owner of [the] Digital Assets in your Account***"; that "***none of the Digital Assets in your Account are the property of ... FTX Trading***"; and that "***you control the Digital Assets held in your Account***. *At any time ...* ***you may withdraw your Digital Assets by sending them to a different blockchain address*** *controlled by you or a third party*". This provision suggests an intention that legal title in the Digital Assets remains with the customer, which is consistent with a quasi-bailment relationship.

63.     To the extent a "quasi-bailment" was intended, in my view, it is limited to one over specific and ascertained Digital Assets associated with a customer's Account.

64.     I do not consider that it is possible to interpret the Dotcom Terms as creating a legal tenancy in common over all of FTX Trading's network addresses because there is no expressed intent for a customer to obtain title over a percentage of all of a Digital Asset held on the exchange. Even when one takes account of the use of pool addresses and FTX Trading's commingling of Digital Assets (whether or not they were known to any particular customer prior to their trading on the platform), it appears to me that the provisions of the Dotcom Terms are clear. The provisions do not say that customers will have a proportionate legal interest in all Digital Assets held by FTX Trading. Rather, the references in the Dotcom Terms to "*your Digital Assets*", which are "*in your Account*", and which the customer is

able to send "*to a different blockchain address*", all contemplate that a customer will only have legal title to those Digital Assets which have been identified and segregated as being owned by it. Any conclusion that the parties intended a legal tenancy in common would, in my opinion, constitute an impermissible re-writing of the clear provision in the Dotcom Terms.

VI(2)(d)    Extent to which a quasi-bailment was successfully created

65.    If the parties' intention was to create a "quasi-bailment" over particular Digital Assets, then on the basis of the principles identified at ¶60 above, the proprietary consequences would be as follows:

65.1.    If a customer owned Digital Assets outside the FTX.com platform and sent them to the deposit address specifically generated by FTX Trading for the customer, then the customer would retain a superior legal title to those Digital Assets while they were within the customer's deposit address. While control of the deposit address would be with FTX Trading, which had the private keys, there would be no intention to convey legal title, which would therefore remain with the customer.

65.2.    There would also be an arguable case for saying that the customer would obtain superior legal title to any Digital Assets which were subsequently acquired, whether on or outside the FTX.com platform, and transferred into the customer's specific network address. However, this would depend on whether the customer obtained sufficient "control" over the Digital Asset for title to pass[94], and I am instructed, it appears that this did not occur in practice.

65.3.    There would be no transfer to the customer of legal title to Digital Assets which were acquired on the platform, but which were never specifically identified and transferred to the customer's network address. In such a case, there will have been no transfer of control over any specific asset to the customer because the Digital Assets remained in the pool addresses under the sole control of FTX Trading.  No

---

[94] See ¶28 above.

Digital Assets would be transferred into any customer-specific address, with the customer Account receiving merely a book entry (i.e., a credit). In those circumstances, FTX Trading and the customer would stand in a debtor-creditor relationship as regards the "purchase" of the Digital Assets in question.

65.4.  Thus, based on my understanding of available information, legal title would not have rested with customers, as my understanding is that Digital Assets were generally deposited on the exchange so customers could trade and acquire other assets, and that the Digital Assets that were not withdrawn generally remained in the pool addresses controlled by FTX Trading and were never transferred to any acquiring customer's specific network address.

65.5.  The legal analysis where a Digital Asset has been deposited in the customer's network address but is then swept into the pool addresses, is discussed in ¶¶70-80 below (where it is concluded that any legal title to such Digital Asset retained by the customer is very likely to have been lost). A customer who sold or otherwise traded away the Digital Assets it deposited on the exchange, would necessarily have surrendered any ownership interest in those assets.

65.6.  In the case of "margin trading", the legal analysis may depend on how it was structured (and that is not clear from the Dotcom Terms). Assuming that all that occurred was trading in "positions" on the exchange with profit being either booked or deducted from margin, and without Digital Assets ever being transferred into the customer's specific network address, then in my view no legal title was transferred from FTX Trading to the customer.

65.7.  The same conclusion would follow for "futures trading". It was agreed that futures would be settled by U.S. dollar based E-Money, which includes Category 1 stablecoins, rather than by delivery of the underlying Digital Assets (schedule 5 of the Dotcom Terms). As a result, "futures trading" would appear never to have resulted in the acquisition of any Digital Assets (and the position in relation to Category 1 stablecoin is addressed below).

### VI(3)  *Outright title transfer in the absence of a trust or quasi-bailment*

66.     In my opinion, to the extent that no trust was established and a quasi-bailment was not achieved, the effect is that FTX Trading is the legal and beneficial owner of the Digital Assets and customers are merely creditors of FTX Trading (i.e., there will be a debtor-creditor relationship).

67.     An English court could not change that outcome by inventing and/or giving effect to an imputed intention to create a trust. In particular:

    67.1.    It is well established that where a person seeks to effect a particular transaction which is inconsistent with that person holding as trustee, and that transaction fails, the court will not find a trust to seek to rescue that transaction.

    67.2.    The rule in question derives from *Milroy v Lord*[95]. In that case, the settlor tried to establish a trust by transfer of shares to a trustee on trust for the beneficiary, but the transfer of legal title to the shares was never completed before the settlor died. It was argued that the shares were held by the settlor on trust for the beneficiary. This was rejected. Turner LJ said: "*if the settlement is intended to be effectuated by one of the modes to which I have referred, the court will not give effect to it by applying another of those modes*".

    67.3.    Similarly, if the settlor's intention is to transfer to a third party absolutely but the transfer is defective (e.g., for want of formality), then it is not possible to find, or to attribute, an intention on the part of the settlor to hold the asset on trust for the third party. Thus, it was said in *Richards v Delbridge*[96]: "*for a man to make himself a trustee there must be an expression of intention to become a trustee, whereas words of present gift shew an intention to give over property to another, and not retain it in the donor's own hands for any purpose, fiduciary or otherwise*".

---

[95] *Milroy v Lord* (1862) 4 De GF & J 264.

[96] *Richards v Delbridge* (1874) LR 18 Eq 11, per Sir G Jessel MR at p15.

67.4.    In my view, the same principles must apply where a party intends to become a bailee of goods. This accords with the view expressed by Gullifer, where it is stated that a "*crucial*" point when identifying the nature of the legal relationship between a custodian of digital assets and a customer is that: "*if the parties attempt to create one kind of arrangement but ultimately fail in doing so, the general approach is that the court will not recharacterise the arrangement into another 'bucket' unless the requirements of the alternative arrangement are satisfied*"[97].

68.    English law would also not find a constructive or resulting trust in circumstances where the parties sought to create a "quasi-bailment" but, for whatever reason, the "quasi-bailment" failed to ensure that a customer had a proprietary interest over any of the assets in question. In particular, English law does not recognise a "remedial" constructive trust which is imposed by the court as a remedy[98].

69.    As a result, in the absence of either a trust or a quasi-bailment, there will be an outright title transfer. In such circumstances, the customer would be in a debtor-creditor relationship with FTX Trading and would be an unsecured creditor with no proprietary rights in any Digital Assets.

## VII.    REQUIREMENTS TO ASSERT PROPRIETARY CLAIMS

70.    For the reasons set out above (and discussed in particular at ¶65 above), it appears to me that the scope for any customer to have retained or obtained a proprietary interest in Digital Assets is very limited. However, if customers did retain or obtain any proprietary interest in any Digital Assets which were transferred into their deposit addresses, it is necessary then to consider how they might assert that proprietary claim in circumstances where, as I understand the position, there was subsequent commingling of Digital Assets as a result of the sweeping operation.

---

[97] See *Gullifer,* footnote 40, p15.

[98] *FHR European Ventures LLP v Cedar Capital Partners LLC* [2015] AC 250 (SC), at [47].

71.     I first address the general principles of following and tracing before considering their application to this case. For the reasons set out below, I consider that any customer who did initially have any proprietary interest in Digital Assets is very unlikely to have retained such an interest in any Digital Assets as a result of the manner in which FTX Trading dealt with its Digital Assets.

## VII(1)   General principles of following and tracing

72.     A claimant who contends that his property has been dealt with or disposed of by another, can in some circumstances "follow" that property, or "trace" his rights in that property into other, substitute assets[99].

73.     A claimant is entitled to follow an asset in which he has a proprietary interest (either equitable or legal) into the hands of a third party.

    73.1.   However, this right can only be exercised where the identity of the asset has not been lost (e.g., where the asset has become part of a mixture) or where the asset has not been destroyed[100].

    73.2.   Where title to the asset is equitable (e.g., held on trust), it also cannot be followed in a case where the third party is a *bona fide* purchaser without notice of the

---

[99] The difference between "following" and "tracing" was explained in *Foskett v McKeown* [2001] 1 AC 102 at p127B as follows:  "*These are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership.  The processes of following and tracing are, however, distinct.  Following is the process of following the same asset as it moves from hand to hand.  Tracing is the process of identifying a new asset as the substitute for the old.  Where one asset is exchanged for another, a claimant can elect whether to follow the original asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner*".

[100] G. Virgo, *The Principles of Equity and Trusts* (5th ed), at [19.3.1(i) and (ii)]; see also *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548 (HL), at p572: "*at common law, property in money, like other fungibles is lost as such when it is mixed with other money*".

equitable interest[101]. That defence is not generally available at common law to a third party in the case of a legal asset, save where that asset is money[102].

74.     Where the original asset cannot be followed, it can in some circumstances be traced into <u>substitute</u> assets in the hands of a third party.

74.1.   Tracing has been described as "*the process by which a claimant seeks to show that an interest he had in an asset became represented by an interest in a different asset*"[103].

74.2.   The rules governing tracing depend on whether the original title to the asset was legal or equitable[104]. As it has been authoritatively expressed, "*for the equitable tracing rules to be engaged, the claimant must first establish an equitable proprietary base; it is not yet possible to rely on the equitable tracing rules where the claimant has only a legal proprietary base*"[105].  While there are calls to unify the laws of tracing in common law and equity, as a matter of authority that has not yet occurred[106].

74.3.   In the context of this case: (a) if the relationship was one of trustee-beneficiary, then the customer's title to the Digital Assets would be equitable and the equitable rules of tracing would apply; and (b) if the relationship was one of "quasi-bailment", the customer's title to the Digital Assets would be legal, and the common law rules of

---

[101] *Boscawen v Bawja* [1996] 1 WLR 328, at p334.

[102] *Miller v Race* (1758) 1 Burr. 452, at pp457-8.

[103] *Shalson v Russo* [2005] Ch 281, at [102].

[104] See Virgo, footnote 100, [19.3.1(iv)].

[105] *Ibid*, at [19.3.2(iii)].

[106] *Ibid*, at [19.3.4].

tracing would apply (unless, as addressed in ¶78 below there was supervening fraudulent misappropriation of those assets while held in "quasi-bailment").

74.4.   The equitable approach to tracing is relatively flexible, and as explained in *Foskett v McKeown*[107], "*[t]he claimant claims the new asset because it was acquired in whole or in part with the original asset. What he traces, therefore, is not the physical asset itself, but its value.*". Accordingly, not only premiums which were needed to maintain a policy, but other premiums, could be traced by A into the death benefit paid to B's executors under the policy, given that the premiums were paid by B with A's money. The other premiums could be traced on the ground that, if B had not died, it would only be because of those premiums that the policy would have continued. In other words, it was enough to justify tracing into the benefit that the subsequent premiums contributed to the potential value of the policy which produced the benefit.

74.5.   The common law approach to tracing has been described as "*logical but restrictive*"[108]. Like the equitable approach it requires a claimant to be able to identify the value of what was his property in the substitute property, but in addition to that, the substitute property, if it is fungible, must not have become mixed with other property so as to lose its identity[109], so that tracing money at common law into a mixed fund is not possible[110].

---

[107] *Foskett*, footnote 99, at p128.

[108] Virgo, footnote 100, [19.3.2(i)].

[109] See footnote 100.

[110] See *Agip (Africa) Ltd v Jackson* [1991] Ch 547 (CA), at p566; *Shalson v Russo* [2005] Ch 281 (Ch), at [103]-[104]; *FHR European Ventures LLP v Cedar Capital LLC* [2015] AC 250 (SC), at [44]

74.6.    Accordingly, it is not possible at common law to trace money once it is paid into an account where it is "mixed" with other money[111]. This is in sharp contrast with equitable tracing, which is possible in such a case[112].

75.    Where an equitable proprietary base exists (and equitable tracing is therefore available), difficulties can nonetheless arise in relation to equitable tracing into mixed funds, especially when the mixed funds are insufficient to pay all the persons whose property contributed to the fund, and/or where the mixed funds are frequently subtracted from and/or added to:

75.1.    Where there is insufficient money in a mixed fund account to pay all the contributors, there are a number of approaches which can be adopted. The *prima facie* rule in relation to current accounts is that found in *Clayton's Case*[113], which provided for a rule of "first in, first out". That rule is now often displaced in favour of a rule that the claimants in the same position are all paid at the same rate, i.e., *pari passu*[114]. In agreement with Professor Virgo[115], I consider that the *pari passu* approach is likely to be adopted wherever it would produce a fairer result (which I consider will be the case when everyone has contributed on equivalent terms to a common fund).

---

[111] See *Trustee of the Property of FC Jones v Jones* [1997] Ch 159 and *Agip (Africa)*, footnote 110. The position may be different with physical commodities such as oil or grain where, upon an accidental or wrongful mixing, the common law has recognised that the contributors to the mixture will hold the mixture as tenants in common in proportion to their contributions: Bridge, Gullifer, McMeel, and Low, *Law of Personal Property* (3rd ed, 2021), at [17-024]-[17-028]. Such rules have not, however, been applied to money or intangible assets: see the quotation above from *Lipkin Gorman v Karpnale*, footnote 100.

[112] *El Ajou v Dollar Land Holdings* [1993] BCLC 735, at pp752-3.

[113] (1817) 1 Mer 572.

[114] See e.g., *Russell-Cooke Trust Co v Prentis* [2003] 2 All ER 478, at [55], and *Charity Commissioners for England and Wales v Framjee* [2015] 1 WLR 16, at [48].

[115] See Virgo, footnote 100, [19.3.3.(iii).2(b)].

75.2.   If a court were to agree with my conclusions above (i.e., that only a limited class of customers of FTX Trading ever had any proprietary interest in Digital Assets, being those which deposited or received Digital Assets into their specific deposit addresses), it is not clear that there would be a sufficient basis to displace the rule of *Clayton's Case*, as this would not be a case where all customers contributed on equivalent terms to a common fund.

75.3.   If a *pari passu* approach were not adopted then:

(a)   Where the claimant's money is paid into an account from which money is subsequently paid out, the rule is that the claimant cannot trace for more than the lowest sum in the account after the payment in (the "lowest intermediate balance rule")[116];

(b)   The lowest intermediate balance rule will apply even where the account-holder subsequently pays in his own money into the account, unless it was clear from the circumstances that the account-holder intended the payment to be subject to the claimants' trusts[117].

75.4.   At least where there is a "*close causal and transactional link between the incurring of a debt and the use of trust funds to discharge it*", it is open to the beneficiary of the trust to trace into the assets which were acquired in return for the debt[118]; but there may be other cases where such "backward tracing" would be permitted[119].

---

[116] *James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch 62.

[117] See *James Roscoe*, footnote 116.

[118] *The Federal Republic of Brazil v Durant International Corporation* [2016] AC 297, at [34].

[119] See *Serious Fraud Office v Hotel Portfolio II Ltd* [2021] EWHC 1273 (Comm), at [45]-[48].

### VII(2)  Customers' ability to trace in relation to Digital Assets

76.     In relation to any Digital Assets to which the customer retained or obtained a superior legal title, but which was then "swept" into pool addresses, it appears to me that there are very significant difficulties in relation to any following or tracing analysis[120].

77.     In my opinion:

    77.1.   It would likely not be possible to <u>follow</u> any customer's Digital Asset because, once the Digital Asset was "swept" into pool addresses, the customer's Digital Asset is likely to have lost its identity once it became part of a mixture[121].

    77.2.   It would not be possible to <u>trace</u> into the mixture because, in such a case, the common law rules as to tracing would apply. As set out above, common law tracing cannot be effected into a mixed fund[122].

78.     Faced with this problem, a customer might attempt to rely on the principle that a person who dishonestly misappropriates property becomes a constructive trustee of that property in light of the principles set out in the *Westdeutsche* case[123]. This would then engage equitable rules as to tracing, which would ordinarily permit tracing into the mixed fund. But nothing in the Dotcom Terms expressly assured customers that assets on the

---

[120] The difference between following and tracing is addressed at footnote 99.

[121] See the Final Report, footnote 19, at [9.31] which notes that: "*Many transfers of crypto-tokens will involve crypto-tokens becoming "mixed" on transfer — that is, it is no longer possible to separate the pre-transfer components of the product from the post-transfer mixture. This will be the case where crypto-tokens are transferred to a public address which is already associated with a quantity of the same tokens, because the state of the relevant crypto-token generally only tracks amounts associated with a public address and not specific tokens*".  It is hard to see how this could be challenged, at least where the digital assets in question are fungible (cf. *D'Aloia*, footnote 24, at [210]-[212]).

[122] See ¶74.5-74.6 above.

[123] *Westdeutsche Landesbank v Islington LBC* [1996] AC 669, at p716C.

exchange would not be pooled, and, as noted above, I understand pooling of Digital Assets would have been apparent on the public blockchain.

79.     Even assuming that a customer could rely on equitable tracing, the application of the principles normally applicable would be an exercise which at best would be extremely complex, and could well be practically impossible. In this respect, it would appear that as a result of the intermingling of Digital Assets in pool addresses, identifying the traceable product of Digital Assets would be difficult or impossible. That point is supported by the reasoning in *Piroozzadeh*[124], where Trower J refused an injunction to protect a claimant's crypto-assets. One of his reasons was that the crypto-assets were:

> "*swept into a central unsegregated pool address known as a 'hot wallet' where they are treated as part of the [exchange owner's] general assets. They are not specifically segregated to be held for the sole benefit of the user from whose account they have been transferred. ...  Since that exercise was carried out, there have been hundreds of transactions an hour passing through each of the hot wallets which operate as a central pool. It is evident that, in those circumstances, any attempt to trace the [claimant's crypto-assets] swept into the pool from [his] accounts would have been ... over nine months later an essentially futile and close to impossible and possibly impossible exercise.*"

80.     Even assuming that the problem identified in ¶79 above could be overcome, it appears to me to be quite likely that any equitable interest in the pool addresses would be of limited value to customers because:

80.1.   Any interest would have been diluted as other Digital Assets were added to the pool addresses, and/or would have been reduced or destroyed when the balance in those pools fell (or even was reduced to zero). As I understand it, the Digital Assets available in the pool addresses were very few indeed by the time of the Petition;

---

[124] *Piroozzadeh v Persons Unknown* [2023] EWHC 1024 (Ch), at [8].

80.2.    The defence of bona fide purchase for value, if available on the facts, would effectively stop any onward following/tracing of title to the Digital Assets[125].

## VIII.    APPLICATION TO FIAT CURRENCY AND E-MONEY

### *VIII(1)        Fiat currency and E-Money*

81.    The possible characterisations of the relationship in connection with fiat currency and E-Money are only (a) debtor-creditor, or (b) trustee-beneficiary. A bailment or "quasi-bailment" relationship would not have been possible because, by the nature of electronic funds transfers, there is no possibility of the customers retaining "legal title" to the fiat currency once it is debited from their bank accounts and paid into a mixed account in the name of FTX Trading or an affiliate. Indeed, the parties cannot realistically have intended that impossibility.

VIII(1)(a)        Fiat currency and E-Money under the Dotcom Terms

82.    While ultimately a matter for this Court, there are very strong indications that the parties intended by the Dotcom Terms that fiat money and E-Money would be subject to a debtor-creditor relationship.

83.    The following provisions of the Dotcom Terms are, in my view, inconsistent with an intention to create a trustee-beneficiary relationship as to fiat currency and E-Money:

83.1.    As recorded above, sections 2.1.3, 2.2.2 and 38.6 contain express statements that no fiduciary relationship was intended.

83.2.    As recorded above, section 2.10 provides that fiat currency and E-Money are not eligible for deposit insurance protection. Section 8.3.3 also provides a capitalised warning that: "*E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY*". That clearly

---

[125] See ¶73.2 and footnotes 101 and 102 above.

highlights a risk to the customer in the event of FTX Trading's insolvency and can fairly be said to be inconsistent with a trust relationship.

83.3.  Section 8.3 (which deals with fiat currency) stands in stark contrast with section 8.2 which precedes it (which deals with Digital Assets). While section 8.2 addresses the issue of "*title*" and "*ownership*" of Digital Assets, there is no equivalent provision in relation to fiat currency.

83.4.  To the contrary, section 8.3.2 provides that once FTX Trading receives fiat currency that "*you load into your Account*", it may issue the customer with an "*equivalent amount of electronic money ... which represents the fiat currency that you have loaded. This amount will be displayed in your Account*". The use of the term "*loaded*" and the issue of replacement "*E-Money*" points against a trust over fiat currency (and indeed I am unclear as to how a trust over the E-Money created by FTX Trading would operate). So too do the statements in:

(a)  Section 8.3.5, that E-Money is "*credited*" to the account and described as being "*debit[ed]*" when Digital Assets are purchased; and

(b)  Section 8.3.8, which refers to E-Money being "*redeem[ed]*" by transferring "*the equivalent amount of fiat currency*" to the customer.

83.5.  The remainder of section 8.3 (and the Dotcom Terms more generally) uses ambiguous language. There are references throughout to fiat currency or E-Money being "*held*" in an account. However, this is not a particularly relevant indicator, as it is common to refer to money "*held*" in a bank account[126].

83.6.  Section 9 deals with "*Assets in your Account*" which are "*Unclaimed or Abandoned Property*". "*Assets*" is defined as Digital Assets, fiat currency and E-Money. Any such Unclaimed or Abandoned Property is to be "*transferred to FTX Trading ... as*

---

[126] As Briggs J noted in *Pearson v Lehman*, footnote 59, at [249]: "*Banking is fertile ground for the misuse of language in that context, as the habitual employment of phrases like 'money in a bank account' or references to banks 'looking after customers' money' demonstrates*".

> *Trustee*" if a customer is uncontactable, in which event, the assets will be held "*on your behalf*". As a result, the parties specifically provided for a trust relationship in particular circumstances but which do not apply here.

84.    In those circumstances, it is clear to me that the Dotcom Terms did not provide for fiat currency or E-Money to be held on trust, with the specific and clear exception of cases where section 9 applied.

85.    Accordingly, it follows that fiat currency and E-Money recorded in a customer's account are, like cash balances held in an ordinary bank account, unsecured debts owed by FTX Trading to the customer.

86.    In circumstances where no express trust was intended and the parties intended a debtor-creditor relationship, an English court would not override that intention by imposing or recognising a resulting or constructive trust (see ¶68 above).

VIII(1)(b)    Statements outside the Dotcom Terms

87.    I am instructed that FTX Trading or its affiliates did describe some bank accounts as accounts "for the benefit of" customers notwithstanding their widespread commingling of funds in a manner inconsistent with the maintenance of trust accounts[127].

88.    If it were suggested that the description of any account as "for the benefit of" customers amounted to a declaration of trust, the circumstances regarding the description would require investigation to determine whether it could potentially meet the requirements to establish a trust for the benefit of a particular customer or customers, which I have identified in section VI(1)(a) above. Based on the facts as I understand them, I expect that these requirements would represent material obstacles to any argument that a trust was created. In particular:

---

[127] Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com, *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del. June 26, 2023), ECF No. 1704-1 (**Second Interim Report**), at p9.

88.1.  Firstly, it would be necessary to show that any reference to an account being "for the benefit" of customers amounted to an objective intention to declare a trust in relation to those bank accounts. Given the clear effect of the Dotcom Terms, and given that such a trust would apparently benefit only customers with an entitlement to fiat currency and not those who had entitlements to Digital Assets (who were also, for the reasons set out in the preceding sections, in a debtor/creditor relationship and not a trustee/beneficiary relationship), it seems unlikely that such a trust would have been intended. Indeed, there is also a fair case for saying that any subsequent attempt to declare a trust would have been a breach of the Dotcom Terms given the clear provisions negating any trust relationship.

88.2.  Secondly, it would be necessary to show that the individuals who described the accounts as "for the benefit of" customers had authority to dispose of property beneficially owned by FTX Trading – and to do so in the way that they purported to do. If they did not, such a description would not be effective to bind FTX Trading.

88.3.  Thirdly, even if it was sufficiently clear that a new trust was intended by the mere description of an account as "for the benefit of" another, it would also be necessary for there to be sufficient certainty as to the identities of the intended beneficiaries – i.e., whether the trust was intended to be in favour of all customers of FTX Trading in proportion to their fiat currency holdings as shown in their accounts or only in favour of those customers who had made deposits which can be traced into the relevant bank accounts. If there was no indication either way, the trust will fail for uncertainty of objects[128].

88.4.  Fourthly, to the extent that any accounts were described as "for the benefit of" another prior to the Dotcom Terms coming into force, the Dotcom Terms would in principle have superseded any such description, given their clear wording that a trust over fiat currency was not intended.

---

[128] In the *Kayford* case, footnote 65, it was clear that the intention was to create a trust in favour of new customers whose money was paid into the designated account.

*VIII(2)*        *Stablecoin*

89.     The definition of Digital Assets in the Dotcom Terms expressly includes stablecoin (see schedule 1, section 1)[129]. As a matter of principle, the answer for stablecoin should therefore be the same as for Digital Assets.

90.     The Dotcom Terms provide that stablecoin will appear in the account balance as "USD stablecoins (USD)" (section 8.2.1). However, I understand that:

90.1.   Some types of stablecoin (namely TUSD, USDC, USDP, and BUSD ("Category 1" stablecoin)) were treated as interchangeable with U.S. dollar fiat currency and E-Money. In particular, if a customer deposited Category 1 stablecoin, it would just show in the account as E-Money. The customer could then choose to withdraw the E-Money either as fiat or as stablecoin[130].

90.2.   Other types of stablecoin (namely USDT and DAI ("Category 2" stablecoin)) were not treated as interchangeable with fiat currency or E-Money. If a customer deposited Category 2 stablecoin, it would be denominated separately in the customer's account balance.

91.     In the case of Category 2 stablecoin, no further issues appear to arise and they will be treated the same as all other Digital Assets (although, for the reasons already given, any proprietary interest on the part of customers is very likely to be lacking).

92.     In the case of Category 1 stablecoin, there appears to be a further significant hurdle in that it may now be impossible to determine what any customer's entitlement would be to the stablecoin (even assuming that the customers otherwise had some proprietary interest in Digital Assets). Certainly if the relevant proprietary interest was said to arise under a legal or equitable tenancy in common over all stablecoin in proportion to the customer's

---

[129] See also section 8.2.1 which makes clear that Digital Assets include stablecoin.

[130] Second Interim Report, at footnote 3 ("*The FTX exchanges did not distinguish or differentiate between cash and stablecoin held in customer accounts, but treated them collectively as "e-money." As a result of this lack of recordkeeping, the Debtors are unable to provide a breakdown of the cash and stablecoin in a customer account*").

entitlements as shown in his or her accounts, there would be no certainty as to each customer's share. Unless it is possible to remedy this uncertainty (e.g., by working out retrospectively what a customer's entitlement to stablecoin should be based on his or her orders to buy/sell stablecoin), the uncertainty is likely to make it impossible to give effect to any prima facie proprietary entitlement.

## IX.   EARLIER TERMS

93.    I have been provided with copies of two sets of previous standard Terms of Service, which I am told came into force in 2019 (**the 2019 Terms**) and 2020 (**the 2020 Terms**).The 2019 Terms and the 2020 Terms (together, **the Earlier Terms**) appear to be for present purposes materially identical, and I address them together below.

94.    The Earlier Terms are said by Article 27 to be governed by the laws of Antigua and Barbuda, which so far as the relevant contractual and commercial law is concerned is virtually identical to English law[131].

95.    By contrast with the Dotcom Terms, the Earlier Terms effectively say nothing expressly as to how Digital Assets are to be held as between the customer and FTX.

96.    However, my view is that no trust was created:

96.1.   There are no provisions in the Earlier Terms which positively suggest that a trust relationship is intended.

96.2.   Further, Article 12 provides expressly that:

---

[131] Antigua and Barbuda became an English colony, and so subject to English law, in 1632. The islands had their own local courts, but their final Appeal Court was the Judicial Committee of the Privy Council (**JCPC**) in London. In 1981, Antigua and Barbuda was granted independence. However, it continues to be a monarchy (with Charles III as its current King) and it continues to have English-based law, its own local courts, and the JCPC as its final appeal court.  The JCPC is now housed with the UK Supreme Court, and its benches consist solely or mainly of UK Supreme Court judges.

    (a)  FTX Trading *"assume*[s] *no fiduciary duty to Users in connection with such use of the Services"*, which is inconsistent with a trust relationship (as set out in ¶45.1 above, a trust relationship involves fiduciary duties); and

    (b)  Digital Assets reflected in a customer's account *"are not eligible for any public or private deposit insurance protection"*, which suggests that a trust relationship was not intended (as set out in ¶45.3, there would be no risk of such loss and no need for deposit insurance if the Digital Assets or fiat currency are held on trust).

97.    As to whether the Earlier Terms could potentially have created a quasi-bailment in relation to Digital Assets, there is no provision which states that title to the Digital Assets will remain with or vest with the customers. Accordingly, any argument that a quasi-bailment was intended is much weaker than under the Dotcom Terms. However, there are some terms which might suggest that title was or may have been intended to remain or vest with the customer:

    97.1.   Article 5 of the Earlier Terms provides that a customer may deposit stablecoin *"that* **you already own** *by generating an address within* **your Account** *and sending* **your Stablecoins** *to such address"* (emphasis added);

    97.2.   Article 22 of the 2020 Terms stipulates that the customer warrants that *"any Digital Assets* **used by you in connection with the Services** *are either* **owned by you** *or that you are validly authorized to carry out transactions using such Digital Assets…"* (emphasis added);

    97.3.   There are also references in Articles 5 and 12 to *"your"* Digital Assets.

98.    The Earlier Terms do not, however, clearly express an intention to create a quasi-bailment. As a result, the stronger argument is that the Earlier Terms are insufficient to demonstrate an objective intention to create a quasi-bailment and that they established a simple creditor-debtor relationship. But, if they were considered to be sufficient to show an intention to create a quasi-bailment, the reasoning and conclusions applicable to the Dotcom Terms would apply equally to the Earlier Terms.

99.     I also note that the Earlier Terms contained in Article 28 the right on FTX Trading to "*amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date*", on the basis that such an amendment "*become[s] effective ... the first time you use the Services after the ... posting*". Accordingly, at least provided that the "*revised version of these Terms*", i.e., the Dotcom Terms, was "*posted*", there is a powerful argument for saying that any customer who had been bound by, and entitled to the benefit of, the Earlier Terms and who then used the "*Services*" became bound by, and entitled to the benefit of, the Dotcom Terms in their place. The argument is reinforced by the fact that Article 28 goes on to say that if "*you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your account*".

100.    Indeed, even without Article 28, it seems to me that there would be a powerful case for saying that a customer who uses the "*Services*" after being told that FTX Trading is only prepared to conduct business with customers in accordance with the Dotcom Terms would become bound by the Dotcom Terms: such a customer would be accepting the change to the Earlier Terms.

101.    However, a customer who had been bound by, and entitled to the benefit of, the Earlier Terms and who thereafter never used the "*Services*" would in my view be bound by, and entitled to claim any benefit of, the Earlier Terms. In the absence of some act or statement by the customer which can fairly be said to amount to an acceptance that the Dotcom Terms apply to their relationship with FTX Trading in place of the Earlier Terms, the Earlier Terms continue to apply.

102.    Finally I note that, to the extent that customers who had previously been subject to the Earlier Terms became bound by the Dotcom Terms, that would not impact the previously established debtor-creditor relationships with respect to Digital Assets which those customers had previously deposited or acquired on the FTX.com exchange that remained in pooled addresses. This is because the requirements to transfer legal title to Digital Assets from FTX Trading to the customers (addressed at ¶¶28 and 65 above) would not be satisfied simply by the adoption of the Dotcom Terms (in particular because there would be no

change of control over identifiable assets sufficient to pass title to the customers).  In other words, acceptance of the Dotcom Terms by itself would generally not effect a transfer of title to Digital Assets that customers previously transferred to the FTX Trading under the Earlier Terms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in London, United Kingdom on 30th September, 2024

_____
   The Rt. Hon. Lord Neuberger of Abbotsbury