## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF EDGAR W. MOSLEY II IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF FTX TRADING LTD. AND ITS DEBTOR AFFILIATES

I, Edgar W. Mosley II, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

### I.       Personal Qualifications

1.       I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operation restructuring.

2.       I have more than 20 years of restructuring and distressed investment experience across various industries, including oil & gas, manufacturing, transportation, automotive, retail, industrial construction, telecommunications, healthcare, and consumer products.  I have a Bachelor's Degree from Harvard University, and have been recognized as a

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors, where I served on the board from 2019 until 2020.

3.        Since joining A&M, I have been involved in numerous Chapter 11 restructurings, including Seadrill Limited (2020 and 2017), Valaris plc, Diamond Offshore Drilling, Inc., Imerys Talc America, White Star Petroleum, Southcross Energy, Magnum Hunter Resources, Exide Technologies (where I served as the Chief Restructuring Officer), and Visteon Corporation.

4.        I submit this declaration (the "<u>Declaration</u>") in support of confirmation of the *Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* (including the Plan Supplement, and all other exhibits and schedules thereto, in each case, as may be further amended, modified or supplemented from time to time, the "<u>Plan</u>"),[2] and to place before the Court certain documents referred to in the Plan and this Declaration.

5.        I am not being compensated separately for this testimony other than through payments received by A&M as financial advisor retained by FTX Trading Ltd. ("<u>FTX Trading</u>") and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>").

6.        Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and the Debtors' books and records, information provided to me by professionals at A&M working under my supervision or other employees or advisors of the Debtors, and my opinion based upon my experience and knowledge related to the Debtors' operations, businesses, and financial condition.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in (a) the *Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "<u>Confirmation Brief</u>"), filed contemporaneously herewith or (b) the Plan, as applicable.

If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

## II. Fundamental Cryptocurrency Concepts

7. Cryptocurrencies are, at their most basic level, distributed digital ledger entries that associate a specific amount of a given digital asset with a specific network address. Once a given amount of a cryptocurrency is associated with a specific address on that cryptocurrency's distributed digital ledger, it remains at that address until it is transferred to another address.

8. There are many different types of cryptocurrency, which may be referred to as coins or tokens.[3] Cryptocurrency can generally be bought, sold, or held in different units, including in whole coins or fractions of coins.

9. The coins or tokens of a particular cryptocurrency are generally fungible, with the exception of non-fungible tokens ("NFTs"). In other words, one unit of a given cryptocurrency can be replaced by another unit of that cryptocurrency, and if they are associated with the same address, then there is no way to distinguish between them. Individual units of cryptocurrency do not have serial numbers or any other form of independent identification. They exist only as ledger entries associated with addresses.

10. Thus, for example, if two different addresses (Address A and Address B) each have one Bitcoin ("BTC") associated with them and those BTC are transferred to Address C, it is impossible to tell which BTC came from Address A and which came from Address B. The distributed digital ledger will simply show that there are two BTC associated with Address C. So

---

[3] Certain cryptocurrency coins (*e.g.*, Ethereum, Solana, or Bitcoin) operate on their own independent blockchains, while cryptocurrency tokens operate on top of existing blockchains (*e.g.*, Pyth, Worldcoin, Uniswap) and typically offer functions for applications or projects, such as governance or utility.

if one BTC is withdrawn from Address C, it is impossible to tell which BTC was withdrawn and which was left behind. The distributed digital ledger will simply show that there is now only one BTC associated with Address C.

11.     Every address has an associated private key. The cryptocurrency associated with an address cannot be moved without the relevant private key. Importantly, the individual(s) who control the private key to an address have absolute control over the cryptocurrency associated with that address.

12.     Holders of cryptocurrency generally hold and protect their private keys in wallets. Because access to a holder's wallet provides access to the holder's cryptocurrency via the private keys contained therein, cryptocurrency is often referred to as being held in a wallet even though it is actually held at an address.

13.     Distributed digital ledgers are a hallmark of cryptocurrency. Rather than transactions being cleared by a central source, such as a traditional financial institution, and recorded on centralized ledgers, cryptocurrency transactions are verified through a consensus mechanism and added to the distributed digital ledger also known as the blockchain. All network participants have access to the distributed digital ledger, and certain network participants verify the authenticity of each cryptocurrency transaction on the blockchain.

14.     When a cryptocurrency transaction is verified on the blockchain, it is publicly recorded to that cryptocurrency's distributed digital ledger. The result of this process is that all parties with access to the distributed digital ledger can see that one address received a quantity of cryptocurrency, and another address sent a quantity of cryptocurrency. A completed address-to-address movement of cryptocurrency is referred to as an on-chain transaction.

### III.    The FTX Exchanges

15.    Centralized cryptocurrency exchanges allow participants to buy, sell, and transfer cryptocurrency in a single location operated by a central entity.  The Debtors operated two primary centralized cryptocurrency exchanges (together, the "FTX Exchanges").

16.    First, FTX.com (the "FTX.com Exchange") was the exchange operated by Debtor FTX Trading.  The FTX.com Exchange commenced operations in May 2019, and was available to users in many jurisdictions around the world.

17.    Second, FTX.US (the "FTX.US Exchange") was the exchange operated by Debtor West Realm Shires Services Inc. ("WRSS").  The FTX.US Exchange commenced operations in March 2020.  The FTX.US Exchange had users primarily based in the United States.

18.    Customers of the FTX Exchanges were able to deposit, transfer, trade, and withdraw cryptocurrency, fiat currency, and stablecoin[4] on the FTX Exchanges.  The FTX Exchanges were generally operated in a similar manner with respect to the matters discussed herein.

### IV.    User Agreements

19.    Attached hereto as Exhibit 1 is a true and correct copy of a document titled "FTX.US User Agreement," dated September 16, 2022 (the "US TOS"), which was the user agreement that specified the terms of service for FTX.US Exchange customers as of the Petition Date.

---

[4]    "Stablecoin" is a term used to refer to cryptocurrencies whose value is pegged, or tied, to that of another currency, commodity, or financial instrument (*e.g.*, United States dollars).

20.     FTX.US Exchange customers were required to agree to the US TOS when signing up for an account on the exchange and the US TOS was available to anyone who visited the FTX.US website under a link titled "terms of service."

21.     Attached hereto as <u>Exhibit 2</u> is a true and correct copy of a document titled "FTX Terms of Service," dated May 13, 2022 (the "<u>Dotcom TOS</u>"), which was the user agreement that specified the terms of service for FTX.com Exchange customers as of the Petition Date.

22.     FTX.com Exchange customers were required to agree to the Dotcom TOS when signing up for an account on the exchange and the Dotcom TOS was available to anyone who visited the FTX.com website under a link titled "terms of service."

23.     At least two prior versions of the terms of service for the FTX.com Exchange have been identified.  Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a document titled "FTX Exchange:  Terms of Service," which I understand was the user agreement that specified the terms of service for the FTX.com Exchange beginning at some point in 2019. Attached hereto as <u>Exhibit 4</u> is a true and correct copy of a document titled "FTX Exchange: Terms of Service," which I understand was the user agreement that specified the terms of service for the FTX.com Exchange beginning at some point in 2020.

### V.    Customer Accounts

24.     Individuals who wished to transact on either of the FTX Exchanges were required to open an account (a "<u>Customer Account</u>").  A specific Customer Account was created in the name of each retail or institutional customer.  Each Customer Account was uniquely associated with a particular customer.

25.     Customer Accounts tracked the entitlements each customer had to assets—whether cryptocurrency, fiat currency, or stablecoin—held by the FTX.US Exchange or the FTX.com Exchange.  Each Customer Account had an associated balance of each cryptocurrency,

fiat currency, and stablecoin that reflected accumulated credits and debits from their exchange activity.

26.     It is, however, important to understand that Customer Accounts were *not* addresses, wallets, or bank accounts.  They were not capable of storing, and did not store, any cryptocurrency, fiat currency, or stablecoin.

27.     Customer Account balances were tracked in separate master ledgers associated with the FTX.US Exchange and FTX.com Exchange.  There was a master ledger for the FTX.com Exchange and a separate master ledger for the FTX.US Exchange.  The master ledgers tracked credits and debits related to cryptocurrency, fiat currency, and stablecoin for each Customer Account.

28.     There were three principal ways in which a customer could receive a credit for cryptocurrency in their Customer Account:  (i) the customer could deposit cryptocurrency with one of the FTX Exchanges; (ii) the customer could receive a transfer of cryptocurrency from another customer on an FTX Exchange; or (iii) the customer could enter into a trade on an FTX Exchange (*e.g.*, buying cryptocurrency with fiat currency, stablecoin, or a different cryptocurrency).

29.     There were three principal ways in which a customer could receive a debit for cryptocurrency in their Customer Account:  (i) the customer could withdraw cryptocurrency from one of the FTX Exchanges by directing that it be transferred to an external address; (ii) the customer could make a transfer of cryptocurrency to another customer on an FTX Exchange; or (iii) the customer could enter a trade with another customer on an FTX Exchange (*e.g.*, selling a cryptocurrency in exchange for fiat currency, stablecoin, or a different cryptocurrency).

30.     Credits and debits were similarly assigned for deposits, withdrawals, transfers, and trades involving cryptocurrency, fiat currency and stablecoin.  Thus, each Customer Account had a balance for each supported cryptocurrency, fiat currency, and stablecoin.

31.     As described further below, a deposit or withdrawal involved the movement of assets from one address and/or bank account to another address and/or bank account, but neither a transfer nor a trade conducted on the FTX Exchanges triggered the actual movement of assets. None of the transfers or trades of cryptocurrency or stablecoin conducted on the FTX Exchanges were verified on the blockchain.  All transfers and trades conducted on the FTX Exchanges were ledger-only transactions; in other words, they were *not* on-chain transactions. This was publicly described as a feature of the FTX Exchanges that provided benefits in terms of the significant energy savings that limited the environmental impact of cryptocurrency trading.

## VI.    The Debtors' Management of Assets

32.     When an asset was deposited with one of the FTX Exchanges by a customer, that asset moved from an external address or account into an address or account owned and controlled by an entity within FTX Group.  As set forth in further detail below, upon receiving a deposit, the Debtors stored the relevant asset in certain initial locations that differed depending on the type of asset.  Certain addresses were used for cryptocurrency and stablecoin, and certain bank accounts were used for fiat currency.  Cryptocurrency, fiat currency, and stablecoin were commingled either when deposited or as it moved between addresses and accounts owned and controlled by FTX Group.  Because units of cryptocurrency, fiat currency and stablecoin are fungible, it is impossible to identify a specific customer's assets within a commingled address or account.  Further, for reasons explained in further detail below, it appears that the commingling and misuse of FTX Group's customer deposits occurred for several years.

33.     Thus, tracing the source of funding for particular FTX Group transactions, or differentiating between FTX Group operating funds and customer deposits, would be a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.  The same would be true of any effort to trace an entitlement to cryptocurrency or stablecoin recorded in a Customer Account to any particular quantity of cryptocurrency, stablecoin, or other assets held by the Debtors.

A.     **Cryptocurrency**

1.     <u>Deposits of Cryptocurrency</u>

34.     Each time an FTX Exchange customer deposited cryptocurrency with the Debtors, the cryptocurrency moved through an on-chain transaction from an external address to a deposit address associated with a Customer Account on one of the FTX Exchanges ("<u>Deposit Address</u>").

35.     The Debtors owned and controlled the Deposit Addresses because they held the private keys for *all* the Deposit Addresses.  In the ordinary course of business, the Debtors were the only parties capable of removing assets from the Deposit Addresses.  No FTX Exchange customer could move any assets held in a Deposit Address.

36.     In practice, cryptocurrency deposits generally did not remain in Deposit Addresses for long before being swept out and commingled with other assets.

2.     <u>The Sweeping and Commingling of Cryptocurrency</u>

37.     The Debtors' general practice was to sweep cryptocurrency that had been deposited by FTX Exchange customers from Deposit Addresses through on-chain transactions into other addresses maintained by the Debtors where cryptocurrency assets of a specific type were aggregated and commingled ("<u>Sweep Address</u>").  The specific mechanisms through which this sweeping occurred differed between, for example, Ethereum ("<u>ETH</u>") and Solana ("<u>SOL</u>"), on the

-9-

one hand, and BTC, on the other hand.  Nonetheless, the consequences of these sweeping practices were the same: the Debtors commingled cryptocurrency deposited by customers with other assets in addresses created by the Debtors and controlled by the Debtors.

38.     *Ethereum (ETH) and Solana (SOL)*.  The Debtors' practice was to quickly sweep any ETH or SOL held in Deposit Addresses associated with each FTX Exchange into Sweep Addresses.  Thus, ETH from the FTX.com Exchange was continuously aggregated into Sweep Addresses, SOL from the FTX.com Exchange was continuously aggregated into another Sweep Address, and the FTX.US Exchange had its equivalent Sweep Addresses.  As with the Deposit Addresses, the private keys to the Sweep Addresses were held by the Debtors.

39.     As described above, individual ETH and SOL coins are fungible.  As a result, it is impossible to identify which customer's ETH or SOL was used to fund any given withdrawal of ETH or SOL from one of the Sweep Addresses or identify which customers' ETH or SOL remained following a withdrawal.

40.     *Bitcoin (BTC)*.  The Debtors used a different mechanism for managing Bitcoin that was deposited by customers on the FTX Exchanges, but the end result was a similar commingling of customer deposits.  The Debtors utilized the Bitcoin Core software program to manage the movement of BTC deposited by customers.  The software also facilitated the Debtors in meeting withdrawals requested by customers.

41.     Under the Bitcoin Core logic, deposits of BTC sitting in Deposit Addresses were treated as a single pool of BTC from which BTC could be drawn to satisfy a withdrawal request.  The FTX.com Exchange and FTX.US Exchange implemented the Bitcoin Core software through different methods.  On the FTX.com Exchange, BTC was periodically swept into Sweep

Addresses where it was aggregated and commingled similar to ETH and SOL, and then used to fund withdrawals.

42.     On the FTX.US Exchange, BTC was left in Deposit Addresses until it was removed by the Bitcoin Core software in response to a withdrawal request.  When there was a request to withdraw BTC on the FTX.US Exchange by any FTX.US customer, the software removed BTC sufficient to fund the withdrawal from one or more Deposit Addresses by completely emptying them, and then transferring the withdrawal amount to the external address. To the extent the Deposit Addresses used to fund the withdrawal had more BTC than necessary to fulfill a withdrawal request, the remaining BTC was transferred to a newly created change address ("Change Address").  The Debtors held the private keys to all of the Change Addresses, and no customers could access the Bitcoin held in Change Addresses.

43.     Thus, on the FTX.US Exchange, if three Deposit Addresses each containing two BTC were used to a fund a five BTC withdrawal, all six BTC would be cleared out of the Deposit Addresses, five BTC would be sent to an external address to fund the withdrawal, and one BTC would be sent a Change Address controlled by the exchange.  But, because BTC are fungible, it would be impossible to determine which customer's BTC was withdrawn and which remained in the Change Address.  And any given withdrawal transaction could have included BTC from a Change Address because they were treated as sources of BTC by the Bitcoin Core logic.  Thus, BTC on the FTX.US Exchange was constantly commingled.  This commingling was particularly acute because the Bitcoin Core logic did *not* seek to sweep BTC from the Deposit Address associated with the FTX.US customer who requested the withdrawal.

44.     On the FTX.com Exchange, withdrawals worked in a similar manner except BTC would first be commingled in temporary Sweep Addresses.  Those addresses would then be

emptied to fund a withdrawal and any excess BTC would be sent to a Change Address controlled by the exchange.

> 3.      Transfers and Trades of Cryptocurrency

45.      As described above, customers could acquire additional cryptocurrency by receiving a transfer or entering a trade on the FTX Exchanges.  The relevant Customer Accounts would reflect credits and debits in connection with such activity.  There was, however, no on-chain transfer that occurred when a customer received or made a transfer to another customer on the FTX Exchanges.  Similarly, there was no on-chain transaction when a customer bought (or sold) cryptocurrency from (or to) another customer on the FTX Exchanges.  The cryptocurrency involved in any transfer or trade on an FTX Exchange remained in the relevant Sweep Address or other location where it was stored.

46.      As a result, the pool of cryptocurrency in the Sweep Addresses and elsewhere was unaffected by transfers and trades on the FTX Exchanges.  The volume of activity on the FTX Exchanges was, however, significant.  For example, BTC on the FTX.com Exchange was traded over 190 million times and aggregated to nearly $3 trillion in value through the Petition Date, while all other tickers were traded over 5 billion times with a total aggregate trade volume exceeding $8 trillion.  For the FTX.US Exchange, BTC was traded over 10 million times and aggregated to over $50 billion in value through the Petition Date, with all other tickers being traded over 40 million times with a total aggregate trade volume exceeding $130 billion.  The extensive volume of trading activity on the FTX Exchanges illustrates one of the reasons why customer entitlements as recorded in relation to Customer Accounts cannot be used to trace the movement of cryptocurrency on the Exchanges and do not provide any information about where it was located.

### B.    Fiat Currency

47.    The Debtors followed different practices for managing fiat currency, which was deposited into various bank accounts and then moved between them.  The Debtors' cash management practices led to the commingling of fiat currency deposited by many different customers together with fiat currency from other sources in various bank accounts.

48.    Because fiat currency is fungible, particularly when it exists as a credit in a bank account, it is impossible to distinguish the original depositor of a quantity of fiat currency from within a commingled balance in a bank account.  Commingling also makes it generally impossible to determine which deposit of fiat currency was used to fund a specific withdrawal from a bank account.

### 1.    Deposits and Withdrawals of Fiat Currency

49.    As set forth in *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704] the ("Ray Report"), FTX.com Exchange customers deposited fiat currency initially into bank accounts in the name of Alameda Research Ltd. ("Alameda"), and later into accounts established in the name of a new, wholly owned entity, North Dimension Inc. ("North Dimension"), and FTX Trading.  (Ray Rpt. 8-12.)  Within these accounts, customer deposits were commingled together with funds transferred from various other FTX Group accounts.  (*Id*. at 9, 12.)  And these commingled funds were used to fund withdrawals.  (*Id*. at 8-9, 12.)

50.    In December 2021, FTX Digital Markets Ltd. ("FTX DM") opened various bank accounts and FTX.com Exchange customers were thereafter directed to wire deposits of fiat currency to these accounts.  (Ray Rept. at 13 & n.19.)  But the FTX.com Exchange continued to accept deposits in the North Dimension and Alameda accounts as well.  (*Id*. at 13 n.19.)  Because the FTX DM accounts were used for many purposes, customer deposits in these accounts were

commingled together and commingled with funds from other sources.  (*Id*. at 13.)  And these commingled funds were used to fund withdrawals.  (*Id*.)

51.     With respect to the FTX.US Exchange, customers were instructed to wire fiat currency to various bank accounts in the name of WRSS, which were used for many purposes and thus customer deposits in these accounts were commingled together and commingled with funds from other sources.

### 2.     Commingling of Fiat Currency

52.     The FTX Group routinely moved funds between and among the various bank accounts under its control.  For example, accounts used for customer deposits received both wire transfers from customers and deposits of corporate assets from other entities in the FTX Group.  The commingled funds held in the deposit accounts were then often transferred to other bank accounts controlled by the FTX Group, including to accounts that did not receive customer deposits directly.  The end result is a complex web of transactions that generally makes it impossible to trace any given deposit of customer funds through FTX Group's various accounts.

53.     Because deposited fiat currency lost any distinguishing characteristics the moment it was wired into accounts controlled by FTX Group and commingled with other funds, attempting to trace any specific customer deposit to the funds used to purchase any specific asset would be a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.

### 3.     Transfers and Trades of Fiat Currency

54.     As described above, FTX Exchange customers could acquire fiat currency through trades on the FTX Exchanges.  For example, one FTX Exchange customer could sell their BTC to another customer in return for U.S. dollars.  Just as the cryptocurrency did not move in connection with such a trade, fiat currency did not move in connection with such a trade.

55.     When an FTX Exchange customer received fiat currency in connection with a trade on an FTX Exchange, the amount of fiat currency stored in the bank accounts maintained by the Debtors did not change.  Thus, as with cryptocurrency, the volume of trading on the FTX Exchanges would make any attempt to draw inferences about which fiat currency assets could be associated with a particular Customer Account a highly uncertain, time consuming, and costly exercise that would, in most cases, be impossible.

**C.     Stablecoin**

56.     Stablecoin moved through the FTX Exchanges in largely the same manner as cryptocurrency.  Stablecoin deposited by FTX Exchange customers was generally placed into discrete Deposit Addresses that the Debtors controlled and then swept into aggregate Sweep Addresses that the Debtors controlled where it was commingled with stablecoin deposited by other customers and entities within FTX Group.  As a result, stablecoin held by the Debtors was commingled at least to the same extent as cryptocurrency held by the Debtors.  Because stablecoin is fungible like cryptocurrency, a specific customer's deposit cannot be identified within a Sweep Address that contains other stablecoin and any given withdrawal of stablecoin from a Sweep Address cannot be traced back to a specific customer's deposit.  Further, customers' trades and transfers of stablecoin on the FTX Exchanges did not result in on-chain transactions.  As with cryptocurrency, only deposits and withdrawals triggered on-chain transactions.

57.     There are, however, some aspects of how the FTX Exchanges treated stablecoin that distinguish it from cryptocurrency.  The FTX Exchanges grouped different stablecoins into two broad categories.  One group of select stablecoins supported by the FTX Exchanges was treated as interchangeable with one another and with U.S. dollars, as all were pegged to the U.S. dollar (the "Category 1 Stablecoin").

58.     Stablecoins in the other group were not interchangeable with one another, Category 1 Stablecoins, or any fiat currency.  Rather, they could only be traded using a central order book for that specific stablecoin that was operated by FTX Trading for the FTX.com Exchange and by WRSS for the FTX.US Exchange (the "Category 2 Stablecoin").  Included in Category 2 Stablecoins were certain stablecoins pegged to the U.S. dollar, other fiat currencies, and certain commodities.

59.     The FTX Exchanges did not distinguish or differentiate between U.S. dollars and Category 1 Stablecoin deposited in Customer Accounts.  As published by FTX on a page of the Help section of its website, depositing any type of Category 1 Stablecoin would credit the Customer Account 1:1 with U.S. dollar fiat currency and it would be displayed as a generic U.S. dollar amount in the FTX Exchange customer's account.  A printout of the relevant Help section of the FTX.com website is attached hereto as Exhibit 5, and is available at https://web.archive.org/web/20221006082048/https://help.ftx.com/hc/en-us/articles/360034865571-Blockchain-Deposits-and-Withdrawals.

60.     Because Category 1 Stablecoin was treated as fungible with U.S. dollars, entitlements to Category 1 Stablecoin within Customer Accounts are not distinguishable from entitlements to U.S. dollar fiat currency.  Further, a customer could elect to withdraw any Category 1 Stablecoin as U.S. dollars or as any other Category 1 Stablecoin.  Thus, the FTX Exchanges were required to purchase and sell Category 1 Stablecoin to manage amounts sufficient to fund customer withdrawals.  This further contributed to the commingling of stablecoin within Sweep Addresses.

### VII.    Substantive Consolidation of Debtors Is Proper

61.     Prepetition, the Debtors operated their businesses through a scrambled mass of over 100 entities incorporated around the world.  As discussed above, the FTX Group operated

-16-

two primary centralized digital asset exchanges: the FTX.com Exchange and the FTX.US

Exchange.  Together, the FTX Exchanges were among the world's largest digital asset exchanges,

where millions of customers bought, sold and traded certain digital assets.  The FTX Group also

operated a "crypto hedge fund," Alameda, which engaged in various trading and speculative

activities and was used to make investments on behalf of the FTX Group in a wide array of

businesses, ranging from digital asset startups to artificial intelligence.  Alameda was operated for

the benefit of its owners, Messrs. Bankman-Fried (90%) and Wang (10%).  As part of this activity,

the FTX Group owned, invested in or operated a number of different businesses, ranging from

drone manufacturing to video game development.  The FTX Group made further investments in

third-party, primarily early-stage, companies through a loose group of entities composed of Debtor

Clifton Bay Investments LLC, Debtor Maclaurin Investments Ltd., Debtor Paper Bird Inc., Debtor

Island Bay Ventures Inc. and Debtor FTX Ventures Ltd., among others.  This combined investment

portfolio contained, among other investments, equity investments, token investments and loan

investments in over 400 projects.

62.     Although the business lines of the FTX Group can be described in general

terms, the entities themselves were hopelessly commingled.  The FTX Group lacked appropriate

management, governance and organizational structure, with control of the FTX Group

concentrated in just three individuals:  Mr. Bankman-Fried, Mr. Singh and Mr. Wang.  The same

directors and officers managed nearly all entities within the FTX Group, which allowed

Mr. Bankman-Fried, Mr. Singh and Mr. Wang to operate the FTX Group as a quasi-single

organization.  With a few limited exceptions, the FTX Group lacked independent or experienced

finance, accounting, human resources, informational security, and cybersecurity personnel or

leadership.  There was also no internal audit function, and virtually non-existent independent

oversight.    Instead, the FTX Group relied on an assortment of Google documents, Slack communications, shared drives, Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities.

63.    Since the commencement of these Chapter 11 Cases, the Debtors have spent considerable time and effort attempting to understand the most basic of facts, such as the number of employees the Debtors had, where the Debtors' assets were, and how money flowed between entities.    Attempts have been made to identify intercompany transactions, but the Debtors do not have the ability to do so comprehensively.    The Debtors' financial recordkeeping deficiencies and pervasive pattern of fraudulent activity, encompassing public misrepresentations, fraudulent financial reporting, and misappropriation of assets, impede efforts to disentangle and reconstruct the Debtors' financial affairs.

64.    Within the FTX Group, funds of one entity were routinely used as funds of another and relationships among entities were obscured by prepetition management.    Agreements were backdated, entered into between lenders and incorrect borrower entities, and entities improperly pledged assets of other entities.

65.    For example, as discussed above, FTX.com Exchange customers were instructed to send fiat deposits to accounts tied to Alameda and North Dimension entities, and the development and maintenance of the exchange platform code was performed by employees across the FTX Group.    In addition, Alameda regularly provided funding for corporate expenditures, including paying salaries and other business expenses for various other Debtors and non-Debtor affiliates.

66.    In addition, lenders that requested financial information from Alameda were intentionally provided false or incomplete financial information, further obfuscating the

separateness of each entity.  These documents, for example, (i) concealed significant liabilities (*e.g.*, an intercompany liability to the FTX.com Exchange) and (ii) failed to correctly classify collateralized assets which allowed certain assets to be misappropriated.

67.     Exchange Assets and customer liabilities were generally not held 1:1 prior to the Petition Date.  At the direction of Mr. Bankman-Fried, Mr. Singh and Mr. Wang, the FTX Group funneled billions of dollars of customer deposits and withdrawals in fiat currency through bank accounts of Alameda and other Debtor and non-Debtor affiliates, commingling and misusing vast sums of customer and corporate funds in the process.  As of the Petition Date, this resulted in a shortfall of both fiat and digital assets relative to customer entitlements on the FTX.com Exchange of more than $9 billion.  For example, as of the Petition Date, the FTX.com Exchange had digital assets on addresses controlled by the FTX Group of approximately 105 BTC, 18,230 ETH and 148,518 SOL, compared to customer entitlements of nearly 100,000 BTC, 700,000 ETH and 6,700,000 SOL.  These shortfalls reflected, among other things, FTX Group's lack of controls, the absence of efforts to reconcile customer entitlements and Exchange Assets, and Alameda's taking of large quantities of cryptocurrency from the FTX.com Exchange through its undisclosed unlimited borrowing.

68.     The combination of the FTX Group's intercompany inaccuracies, commingling of assets, missing data, and lack of recordkeeping likely prohibits the timely creation of accurate financials by entity, regardless of cost.  Intercompany inaccuracies were a result of the failure to consistently record customer and non-customer transactions.  The FTX Group's failure to maintain accurate records while routinely commingling customer deposits with operating funds makes determining the Petition Date intercompany balances extraordinarily challenging.  The use of various entities' assets and customer assets to fund venture investments and pay expenses on

behalf of other FTX Group entities further complicates the state of intercompany balances.  In many instances, no intercompany record was created to note the payment on behalf of a related entity.

69.     The financial impact of select intercompany agreements could not be calculated due to ambiguous, inconsistent, and routinely absent financial documentation.  For example, the Debtors' advisors identified that at least thirty-seven entities transacted with other entities without agreements and insufficient records to determine the nature of these arrangements.  Moreover, the FTX Group demonstrated a pattern of creating agreements to legitimize questionable arrangements which facilitated the commingling and misuse of assets.  When coupled with the FTX Group's inadequate internal controls, these practices resulted in over three years of customer and intercompany activity that remained unreconciled at the Petition Date.

70.     Due to the extensive commingling of funds among the Debtors, the Debtors and their advisors concluded that the substantive consolidation of the Consolidated Debtors would avoid a massive, costly, and extraordinarily challenging tracing exercise and that substantive consolidation was the most equitable remedy for all creditors.

71.     Entity financial statements and the supporting documents and information (e.g., bank statements) for the FTX Group were either inaccurate, incomplete, or unavailable.  Thirty-five FTX Group entities, including those entities responsible for consolidated financial reporting, utilized QuickBooks as their accounting system and relied on a patchwork of Google documents, Slack communications, shared drives, Excel spreadsheets, and other non-enterprise solutions.  QuickBooks was not designed to address the needs of a large, complex business like the FTX Group and lacked any integration with the internal exchange platform, cryptocurrency wallets or third-party exchange platforms.  At the Petition Date, the Debtors lacked complete

listings of bank accounts, cryptocurrency addresses and exchange accounts, which hindered asset identification and attribution of accounts and wallets to legal entities.  Additionally, the anonymity of cryptocurrency addresses and transactions prevents fulsome attribution of cryptocurrency transactions to specific FTX Group entities.

72.    Accordingly, in my assessment, to fully unscramble the tangled mess of assets and liabilities distributed among the FTX Group would be extraordinarily challenging and prohibitively expensive, would reduce creditor recoveries, and would severely delay distributions to creditors for these Chapter 11 Cases.

73.    For these reasons and others, as it has been described to me, I believe substantive consolidation in accordance with the Plan is an appropriate remedy in these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 30, 2024                   /s/ *Edgar W. Mosley II*
                                                          Edgar W. Mosley II
                                                          Alvarez & Marsal North America, LLC
                                                          Managing Director