requirements imposed on them by any tax law, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms that are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable Holder. The Plan Administrator reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

149.    Any Holder entitled to receive any Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Plan Administrator Pre-Distribution Requirements, including a completed IRS Form W-9 or appropriate IRS Form W-8. If a request for Pre-Distribution Requirements has not been satisfied within 30 days thereafter, a second request shall be sent to such Holder. If the Holder fails to comply with the Pre-Distribution Requirements before the date that is 60 days after a second request is made, such Holder shall be deemed to have forfeited its right to receive Distributions, and shall be forever barred and enjoined from asserting any right to Distributions made prior to

the Plan Administrator receiving its executed Pre-Distribution Requirements. Any Distributions that are forfeited pursuant to this provision shall revest in the Consolidated Wind Down Trust as Plan Assets.

150.    Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.

## QQ.    Substantial Consummation

151.    On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## RR.    Debtors' Actions Post-Confirmation Through the Effective Date

152.    During the period from entry of this Confirmation Order through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to all applicable Final Orders, the Plan and any other Plan Documents.

## SS.    Governmental Units

153.    Nothing in the Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the post-Effective Date Debtors, the Wind Down Entities,

and/or any transferee or custodian under applicable law to maintain books and records that are subject to any governmental subpoena, document preservation letter, or other inquiry or investigative request from a governmental agency. The Debtors and the Liquidating Trust, as applicable, shall preserve and maintain the Debtors' books, records, documents, files, electronic data (in whatever format, including native format) and tangible objects, wherever stored (the "Debtor's Records"), and shall not destroy, abandon, or otherwise render them unavailable without providing at least sixty (60) days' advance written notice filed on the Bankruptcy Court's docket and served in accordance with Bankruptcy Rule 2002.

154.    Notwithstanding any language to the contrary contained in the Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order constitutes a finding under the federal securities laws as to whether crypto assets or transactions involving crypto assets are securities. Notwithstanding the foregoing or anything to the contrary in the Plan, Confirmation Order, or Plan Supplement, beneficial interests in the Consolidated Wind Down Trust will not be certificated and may not be transferred, sold, pledged or otherwise disposed of, or offered for sale. The Consolidated Wind Down Trust will operate in compliance with federal and state securities laws and SEC staff guidance, including those regarding liquidating trusts, if applicable.

155.    Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, as to the United States of America (the "United States"), nothing in the Plan or the Confirmation Order: (i) shall grant any relief to any entity that the court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. 2201(a), or the Anti-Injunction Act, 26 U.S.C. 7421(a) or (ii) shall expand the scope of the release or injunction to which the Debtors are entitled to under the Bankruptcy Code; *provided however*, for the avoidance of doubt, the Debtors shall not be released or discharged of any liabilities arising under subchapter III of

Chapter 37 of Title 31 of the United States code (the "<u>False Claims Act</u>") or any criminal or

federal tax laws (except as separately agreed with the United States). The exculpation, release

and injunction provisions contained in the Plan and the Confirmation Order are not intended, and

shall not be construed, to bar the United States or other Governmental Unit (as defined in section

101(27) of the Bankruptcy Code) from, subsequent to entry of the Confirmation Order,

exercising any criminal, police and or regulatory powers that would not be stayed pursuant to

section 362 of the Bankruptcy Code. Notwithstanding the foregoing, the automatic stay of

section 362 of the Bankruptcy Code shall no longer apply after the Effective Date of the Plan.

156.    Nothing in the Confirmation Order or the Plan shall release any non-

Debtor parties from any liability to any Governmental Unit, including the United States,

including but not limited to, any liabilities arising under the Internal Revenue Code, the

environmental laws, the False Claims Act or any criminal laws, nor shall anything in the

Confirmation Order or the Plan enjoin the United States from bringing any such claim, suit,

action or other proceeding against non-Debtor parties, in each case except as separately and

expressly agreed in writing by the United States.

157.    As to any Governmental Unit in the United States, except as separately and

expressly agreed in writing with such Governmental Unit (including, without limitation, the

settlement authorized by the Court's June 20, 2024 order (D.I. 18036) and the settlement

authorized by the Court's August 5, 2024 order (D.I. 22283)), nothing in the Plan, the

Confirmation Order, any Plan Supplement, the Definitive Documents, or other related documents

shall:

> 1.    discharge, release, exculpate, enjoin, bar, impair or otherwise
> preclude or affect (a) any obligation or liability to any
> Governmental Unit that is not a "claim" within the meaning of
> section 101(5) of the Bankruptcy Code, (b) any Claim of any

Governmental Unit arising after the Effective Date, (c) any obligation or liability of any of the Debtors or the Wind Down Entities accruing after the Effective Date under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, licensee, or operator of property or rights to property that such entity owns, operates, licenses, or leases after the Effective Date, (d) any right, defense, suit or cause of action of, or obligation or liability owed to, any Governmental Unit on behalf of any non-Debtor, or (e) any and all regulatory orders or non-monetary judgments issued to or against the Debtors prior to, during, or after the Effective Date;

2. release, exculpate, bar, enjoin, nullify, or preclude the enforcement of any Governmental Unit's criminal, police and regulatory powers, other than the enforcement of money judgment;

3. authorize the assumption, sale, assignment or other transfer of any federal or governmental (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property, data and patents, (v) leases, (vi) participation rights, (vii) agreements, (viii) applications, (ix) licenses, (x) permits, (xi) registrations, (xii) authorizations, (xiii) approvals, or (xiv) other interests of any Governmental Unit (collectively, "Governmental Interests"), without compliance with all terms of the Governmental Interests, as applicable, and with all applicable non-bankruptcy law;

4. be interpreted to set cure amounts or to require the United States or any Governmental Unit to novate, approve or otherwise consent to the assumption, sale, assignment or transfer of any Governmental Interests;

5. waive, alter or otherwise limit any Governmental Unit's property and other rights, including, but not limited to, an interest in the Debtors' accounts and cryptocurrency funds, whether now in existence or hereafter acquired, and all rights and interests of any Governmental Units, Debtors or Wind Down Entities are fully preserved;

6. confer exclusive jurisdiction to the Bankruptcy Court with respect to the Governmental Interests, claims, rights, defenses, obligations, liabilities, and causes of action, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

7. affect any setoff or recoupment rights and defenses of any Governmental Units and such rights and defenses are preserved;

8. affect any adversary proceeding by the Committee or the Debtors against any Governmental Units or any related litigation or appeals; or

9. expand the scope of section 525 of the Bankruptcy Code.

158. For the avoidance of doubt, the States of Texas, New Jersey, Wisconsin, Mississippi, and Tennessee, and their respective agencies, opt out of any and all releases provided in the Plan.

159. Notwithstanding any terms herein (except as provided in paragraph 157 above) or in the Plan, the treatment of the proofs of claim of the States of Texas, New Jersey, Wisconsin, Mississippi, and Tennessee, and other states participating as "State Governmental Claims" as defined therein, shall be treated pursuant to the *Stipulation By and Between the Debtors and Certain State Governmental Units* filed at Docket No. 25287.

## TT.    FTX DM Global Settlement Agreement

160. To the extent that the FTX DM Global Settlement Agreement is in full force and effect as of the Effective Date, the FTX DM Global Settlement Agreement will be incorporated into the Plan.

## UU.    Other Reservations of Rights

161. For the avoidance of doubt, notwithstanding anything contained herein to the contrary, nothing in this Confirmation Order, the Plan or Plan Supplement (1) pertaining to substantive consolidation, the elements thereof, or the insolvency of any Debtor or consolidated Debtors is intended to or shall be deemed to affect any rights, obligations, claims, defenses, counterclaims or cross-claims of any party to the pending adversary proceeding, *Alameda Research Ltd. and Clifton Bay Investments LLC* v. *Kives et al.* (Adv. Pro. No. 23-50411 (JTD)) or (2) is intended to impact the parties' rights or obligations in connection with agreements and investments that are related to that pending adversary proceeding.

162.    Nothing in this Confirmation Order, the Plan, or any documents or agreements relating thereto, shall be deemed to alter, limit, enjoin, or modify (i) Philadelphia Indemnity Insurance Company's ("Philadelphia") and the Debtors' rights and defenses under the prepetition surety bonds issued by Philadelphia on behalf of certain Debtors (collectively, the "Surety Bonds"), the related indemnity agreements and/or collateral agreements (the "Surety Indemnity Agreements"), and/or in any collateral in respect of the Surety Indemnity Agreements and Surety Bonds (the "Surety Collateral") or (ii) Philadelphia's subrogation rights with respect to any claim by third parties and any claims against any of Philadelphia's non-Debtor indemnitors. For the avoidance of doubt, the Debtors are not assuming, and, to the extent subject to rejection pursuant to section 365 of the Bankruptcy Code, expressly rejecting pursuant to the Plan, the Surety Bonds and the Surety Indemnity Agreements. Without the requirement of any action by Philadelphia, Philadelphia is deemed to have opted out of the third-party release provisions of the Plan, and Philadelphia is not a Releasing Party under the Plan.

163.    Notwithstanding anything in the Plan or Confirmation Order:  (i) any administrative expense claims of Mississippi Department of Revenue (the "MDOR") shall be subject to, and treated in accordance with, Sections 3.2 and 3.3 of the Plan and the MDOR, the Debtors' and the Plan Administrator's rights are reserved with respect to such claims; (ii) the MDOR shall provide notice to the Plan Administrator of such administrative claims (it being understood that the MDOR shall not be required to file any proofs of claim or requests for payment in the Chapter 11 Cases for the liabilities described in section 503(b)(1)(B) and (C) of the Bankruptcy Code as a condition to having an allowed administrative expense under subsection 503(b)(1)(B) or (C) of the Bankruptcy Code); (ii) the MDOR may amend any proof of claim with respect to (a) a pending audit or audit that may be performed, (b) within 60 days following the

filing of a tax return or (c) to liquidate an unliquidated claim; provided that the Debtors or the Plan Administrator's rights are reserved with respect to such claim and any amendment; (iv) any Allowed Priority Tax Claims of the MDOR shall be subject to, and treated in accordance with, Section 4.3.1 of the Plan except to the extent that the such claims, if any, are not paid in full in cash on the Initial Distribution Date, in which case such claims shall, at a minimum, be paid by regular installment payments in cash over a period beginning from the Initial Distribution Date not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, along with non-bankruptcy interest in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code and Mississippi state law, as applicable; and (v) the treatment of the MDOR Allowed Priority Tax Claims and/or any liabilities to the MDOR described in section 503(b)(1)(B) and (C) of the Bankruptcy Code described herein shall not be considered a settlement or compromise.

164.    Notwithstanding anything to the contrary in the Plan Documents, other than as explicitly provided for in the *Order (A) Authorizing the Debtors' Entry Into, and Performance Under, the Settlement Agreement With Kroll Restructuring Administration LLC, (B) Approving the Settlement Agreement, and (C) Granting Related Relief* [D.I. 24885] ("Kroll Settlement Order") nothing in the Plan or the Plan Documents shall release or exculpate Kroll Restructuring Administration LLC for claims relating to the Security Incident (as defined in the Kroll Settlement Order).

165.    For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, the damages suffered by any Customer and recoverable in another proceeding are not capped or otherwise limited by the amount Distributed on account of Allowed Claims in the Chapter 11 Cases.

166.    Notwithstanding anything to the contrary in the Plan, the Debtors shall not receive a discharge.

167.    Notwithstanding anything to the contrary in the Confirmation Order or the Plan, proofs of claim numbers 91933 and 96369 (the "ELD Claims") filed by ELD Capital LLC shall not be deemed settled pursuant to section 5.2 of the Plan, and shall not be deemed released under section 10.4 of the Plan and such claims shall be adjudicated through the claims objection process. The parties' rights, defenses and objections with respect to the ELD Claims are fully reserved.

168.    Distributions under the Plan shall not occur until after entry by the Bankruptcy Court of an order determining the amount of a Disputed Claims Reserve (the "Disputed Claims Reserve Amount"), which order shall be entered following a motion by the Debtors or the Plan Administrator, subject to notice and a hearing. All partiers' rights are reserved as to the Disputed Claims Reserve Amount.

**VV.    Interpretation**

169.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Confirmation Order, any bona fide, good faith dispute regarding the interpretation of an ambiguity in the Plan or the Plan Supplement in accordance with Section 2.2 of the Plan shall be resolved by the Court.

**WW.   Final Order**

170.    This Confirmation Order is intended to be a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

Dated: October 8th, 2024
Wilmington, Delaware

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Plan**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-11068 (JTD) |
| Debtors. | : | (Jointly Administered) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF FTX TRADING LTD. AND ITS DEBTOR AFFILIATES

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

Dated: September 30, 2024

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

Page

1.  INTRODUCTION ...................................................................................................1
    1.1.  Introduction...............................................................................................1
    1.2.  Dismissed Chapter 11 Cases and Excluded Entities.................................1

2.  DEFINITIONS AND RULES OF INTERPRETATION .......................................4
    2.1.  Defined Terms .........................................................................................4
    2.2.  Rules of Interpretation ...........................................................................26
    2.3.  Governing Law .......................................................................................27
    2.4.  Computation of Time .............................................................................27

3.  ADMINISTRATIVE EXPENSE CLAIMS..........................................................28
    3.1.  Administrative Claim Bar Date ..............................................................28
    3.2.  General Administrative Claims...............................................................28
    3.3.  503(b)(9) Claims ....................................................................................29
    3.4.  Professional Claims ...............................................................................29
    3.5.  Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 ...........................30
    3.6.  Expense Allocation ................................................................................30

4.  CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND
    INTERESTS .........................................................................................................31
    4.1.  Classification of Claims and Interests.....................................................31
    4.2.  Distributions Waterfalls .........................................................................32
    4.3.  Treatment of Claims and Interests ..........................................................36
    4.4.  Valuation of Claims ...............................................................................47
    4.5.  Special Provision Governing Unimpaired Claims ...................................47
    4.6.  Acceptance by Impaired Classes ............................................................47
    4.7.  Elimination of Vacant Classes ...............................................................48
    4.8.  Voting Classes; Presumed Acceptance by Non-Voting Classes...............48
    4.9.  Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy
          Code ......................................................................................................48

5.  IMPLEMENTATION OF THE PLAN ................................................................49
    5.1.  Operations Between the Confirmation Date and Effective Date ..............49
    5.2.  Global Settlement of Claims and Interests...............................................49
    5.3.  FTX DM Global Settlement....................................................................50
    5.4.  Setoff Against FTX DM .........................................................................50
    5.5.  Waiver of Customer Preference Actions .................................................50
    5.6.  Other Settlements ...................................................................................51
    5.7.  Substantive Consolidation .....................................................................51
    5.8.  Wind Down Entities................................................................................52
    5.9.  Plan Funding Mechanism .......................................................................53

5.10.   Dissolution of Boards of the Debtors......................................................... 53
5.11.   The Wind Down Board............................................................................... 53
5.12.   Plan Administrator and Plan Administration Agreement ........................... 53
5.13.   Vesting of Assets Free and Clear and No Successor Liability ................... 54
5.14.   D&O Policies............................................................................................. 54
5.15.   Cancellation of Existing Interests ............................................................. 55
5.16.   Section 1146 Exemption from Certain Transfer Taxes and Recording Fees........ 55
5.17.   Preservation of Causes of Action.............................................................. 55
5.18.   Effectuating Documents and Further Transactions..................................... 56
5.19.   Wind Down of Debtors, Wind Down Entities, Excluded Entities and Non-
        Debtor Subsidiaries ................................................................................... 56
5.20.   Creditor Advisory Committee.................................................................... 57
5.21.   Supplemental Remission Fund .................................................................. 58
5.22.   Preferred Shareholder Fund ...................................................................... 59

6.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........60
     6.1.   Rejection of Executory Contracts and Unexpired Leases........................... 60
     6.2.   Claims Against the Debtors upon Rejection............................................... 60
     6.3.   Modification, Amendments, Supplements, Restatements or Other
            Agreements ............................................................................................... 60
     6.4.   Reservation of Rights................................................................................ 61

7.   PROVISIONS GOVERNING DISTRIBUTIONS ................................................62
     7.1.    Accrual of Postpetition Interest on Certain Claims ................................... 62
     7.2.    Distributions Timing................................................................................. 62
     7.3.    Distributions to Holders of Customer Entitlement Claims ......................... 63
     7.4.    Record Date and Delivery of Distributions ............................................... 63
     7.5.    Distribution Agent .................................................................................... 64
     7.6.    Fractional and *De Minimis* Distributions.................................................. 65
     7.7.    Undeliverable Distributions ...................................................................... 65
     7.8.    Reversion ................................................................................................. 65
     7.9.    Surrender of Cancelled Instruments or Securities ...................................... 66
     7.10.   Setoffs ..................................................................................................... 66
     7.11.   The Bahamas Opt-In Election................................................................... 66
     7.12.   Anti-Double Dip ....................................................................................... 67
     7.13.   Compliance with Tax Requirements.......................................................... 67
     7.14.   Tax Identification, KYC and OFAC Certifications .................................... 68
     7.15.   Distribution of Available NFTs ................................................................. 69

8.   CLAIMS ADMINISTRATION PROCEDURES ..................................................70
     8.1.   Objections to Claims................................................................................. 70
     8.2.   Estimation of Claims................................................................................. 70
     8.3.   Expungement and Disallowance of Claims ................................................ 70
     8.4.   Amendments to Proofs of Claim................................................................ 71
     8.5.   Disputed Claims Reserve .......................................................................... 71
     8.6.   No Distributions Pending Allowance ........................................................ 71

8.7.    Distributions After Allowance ................................................................. 72
8.8.    Administration Responsibilities ............................................................. 72
8.9.    Claims Paid or Payable by Third Parties .............................................. 72

9.    CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ...................73
9.1.    Conditions Precedent to the Effective Date ........................................... 73
9.2.    Waiver of Conditions .............................................................................. 74
9.3.    Simultaneous Transactions ..................................................................... 74
9.4.    Effect of Non-Occurrence of the Effective Date ................................... 74
9.5.    Notice of Effective Date ......................................................................... 74

10.   SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ...............75
10.1.   Subordinated Claims .............................................................................. 75
10.2.   Release of Liens ..................................................................................... 75
10.3.   Debtors' Release .................................................................................... 75
10.4.   Voluntary Release by Holders of Claims and Interests ......................... 76
10.5.   FTX DM and JOL Releases ................................................................... 77
10.6.   Scope of Releases ................................................................................... 77
10.7.   Exculpation ............................................................................................ 77
10.8.   Injunction ............................................................................................... 78
10.9.   Limitations on Exculpations and Releases ............................................ 78

11.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ...................80
11.1.   Modification of Plan ............................................................................... 80
11.2.   Effect of Confirmation on Modification ................................................. 80
11.3.   Revocation of Plan ................................................................................. 80

12.   RETENTION OF JURISDICTION ............................................................................81
12.1.   Retention of Jurisdiction ........................................................................ 81

13.   MISCELLANEOUS PROVISIONS ...........................................................................84
13.1.   Immediate Binding Effect ....................................................................... 84
13.2.   Additional Documents; Further Assurances ........................................... 84
13.3.   Reservation of Rights ............................................................................. 84
13.4.   Successors and Assigns .......................................................................... 84
13.5.   Term of Injunction or Stays ................................................................... 84
13.6.   Entire Agreement ................................................................................... 85
13.7.   Exhibits .................................................................................................. 85
13.8.   Nonseverability of Plan Provisions upon Confirmation ........................ 85
13.9.   Dissolution of Official Committee ......................................................... 85
13.10.  Termination of Fee Examiner's Appointment ........................................ 86
13.11.  Debtors' Directors and Officers ............................................................. 86
13.12.  Closing of Chapter 11 Cases .................................................................. 86
13.13.  Conflicts ................................................................................................. 86
13.14.  No Stay of Confirmation Order .............................................................. 86

13.15.  Waiver or Estoppel ........................................................................... 86
13.16.  Post-Effective Date Service ................................................................ 87
13.17.  Notices .......................................................................................... 87

# 1.    INTRODUCTION

### 1.1.    Introduction

FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"), propose the following joint plan of reorganization (including the Plan Supplement and all other exhibits and schedules thereto, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code. These Chapter 11 Cases are being jointly administered pursuant to an order entered by the Court on November 22, 2022 [D.I. 128]. Each Debtor is a proponent of the Plan for purposes of section 1129 of the Bankruptcy Code.

### 1.2.    Dismissed Chapter 11 Cases and Excluded Entities

The following Entities were Debtors as of the Petition Date but are no longer Debtors and are not included in the Plan:

(a)    the chapter 11 case of FTX Turkey Teknoloji ve Ticaret Anonim Şirketi ("FTX Turkey") was dismissed on February 13, 2023 [D.I. 711];

(b)    the chapter 11 case of SNG Investments Yatırım ve Danışmanlık Anonim Şirketi ("SNG Investments") was dismissed on February 13, 2023 [D.I. 711];

(c)    the chapter 11 case of FTX Exchange FZE was dismissed on August 18, 2023 [D.I. 2207];

(d)    the chapter 11 case of Liquid Financial USA, Inc. was dismissed on November 13, 2023 [D.I. 3739];

(e)    the chapter 11 case of LiquidEX, LLC was dismissed on November 13, 2023 [D.I. 3739];

(f)    the chapter 11 case of Zubr Exchange Limited was dismissed on November 13, 2023 [D.I. 3739];

(g)    the chapter 11 case of DAAG Trading, DMCC was dismissed on November 13, 2023 [D.I. 3739];

(h)    the chapter 11 case of FTX Switzerland GmbH was dismissed on May 10, 2024 [D.I. 9585];

(i)    the chapter 11 case of FTX Trading GmbH was dismissed on May 24, 2024 [D.I. 9585];

(j)    the chapter 11 case of FTX EU Ltd. is pending dismissal [D.I. 9585];

(k)     the chapter 11 case of FTX Certificates GmbH was dismissed on May 10, 2024 [D.I. 9585];

(l)     the chapter 11 case of FTX Structured Products AG was dismissed on May 10, 2024 [D.I. 9585];

(m)     the chapter 11 case of FTX Crypto Services Ltd. was dismissed on March 18, 2024 [D.I. 9585];

(n)     the chapter 11 case of FTX Products (Singapore) Pte Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(o)     the chapter 11 case of Liquid Securities Singapore Pte Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(p)     the chapter 11 case of Analisya Pte Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(q)     the chapter 11 case of Quoine Vietnam Co. Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(r)     the chapter 11 case of Alameda Aus Pty Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(s)     the chapter 11 case of Alameda Research Pte Ltd was dismissed on April 19, 2024 [D.I. 12260];

(t)     the chapter 11 case of Innovatia Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(u)     the chapter 11 case of FTX Japan Services K.K. was dismissed on April 19, 2024 [D.I. 12260];

(v)     the chapter 11 case of Quoine India Pte Ltd. was dismissed on April 19, 2024 [D.I. 12260];

(w)     the chapter 11 case of FTX Japan K.K. was dismissed on July 25, 2024 [D.I. 20560]; and

(x)     the chapter 11 case of FTX Europe AG was designated as an Excluded Entity in the Plan Supplement [D.I. 22163].

Such Debtors and the Entities listed above shall constitute "Excluded Entities" for purposes of the Plan and shall be excluded from the Plan for all purposes, and the assets and liabilities of the Excluded Entities shall not be transferred to, or vest in, any of the Wind Down Entities.

The Debtors may determine, prior to or in connection with Confirmation of the Plan, to exclude any other Debtor from the Plan and treat such Debtor as an Excluded Entity for any reason, including in the event that regulatory, tax or other Claims presented against such Debtor render the continued inclusion of such Debtor in the Plan impractical or adverse to the interests of other Debtors.

The Debtors may determine, no later than 180 days after the Confirmation Date, to exclude Quoine Pte. Ltd. from the Plan and treat Quoine as an Excluded Entity in the event that the Singapore International Commercial Court has not entered orders in form and substance reasonably acceptable to the Debtors (i) recognizing the Chapter 11 Case of Quoine Pte. Ltd. in Singapore and (ii) granting full force and effect in Singapore to the Confirmation Order, the Digital Assets Estimation Order and the Claims Bar Date.

## 2.   DEFINITIONS AND RULES OF INTERPRETATION

### 2.1.   Defined Terms

Except as otherwise provided herein, each capitalized term used in the Plan shall have the meaning set forth below.

2.1.1    "503(b)(9) Claim" means a Claim arising under section 503(b)(9) of the Bankruptcy Code for which a Proof of Claim was filed on or before the Non-Customer Bar Date.

2.1.2    "Ad Hoc Committee" means the ad hoc group of individuals, funds, or accounts managed, advised, or sub-advised by funds that hold Dotcom Customer Entitlement Claims set forth on the Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019 [D.I. 1156], as supplemented by the Verified Sixth Supplemental Statement [D.I. 9794], and as further supplemented from time to time.

2.1.3    "Administrative Claim" means any Claim for costs and expenses of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code arising on or prior to the Effective Date and entitled to priority pursuant to sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including Professional Claims; *provided* that Administrative Claims shall not include 503(b)(9) Claims.

2.1.4    "Administrative Claim Bar Date" means:  (a) 4:00 p.m. (prevailing Eastern Time) on the 30th day after the Effective Date or (b) such other date established by order of the Bankruptcy Court by which Proofs of Claim in respect of Administrative Claims must be filed (other than Professional Claims).

2.1.5    "Advisory Committee" has the meaning set forth in Section 5.20.

2.1.6    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.7    "Alameda U.S. Customer Claim" means a U.S. Customer Entitlement Claim in the amount of $116,533,849.43.

2.1.8    "Allowed" means, with respect to any Claim or Interest, that the amount, priority and/or classification of such Claim or Interest has been:

(a)    (i) allowed by the Plan or the Confirmation Order, or by Final Order of the Bankruptcy Court, and (ii) is not subject to a valid and timely Bahamas Opt-In Election;

(b)    (i) allowed or stipulated in writing (x) prior to the Effective Date, by the Debtors in accordance with authority granted by an order of the Bankruptcy Court or (y) on or after the Effective Date, by the Plan

Administrator, and (ii) is not subject to a valid and timely Bahamas Opt-In Election;

(c)    listed in the Schedules as not disputed, not contingent, not unliquidated with respect to amount, secured status or priority and (i) no Proof of Claim in an amount greater than the amount set forth in the Schedules has been filed, (ii) no objection to allowance, priority or classification, request for estimation, motion to deem the Schedules amended or other challenge has been filed prior to the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules or as determined by the Bankruptcy Court, (iii) such Claim is not otherwise subject to disallowance under section 502(d) or bifurcation under section 506(a) of the Bankruptcy Code, (iv) such Claim is not an Unverified Customer Entitlement Claim, and (v) is not subject to a valid and timely Bahamas Opt-In Election;

(d)    evidenced by a valid and timely filed Proof of Claim and (i) no objection to allowance, priority or classification, request for estimation or other challenge has been filed prior to the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules or as determined by the Bankruptcy Court, (ii) such Claim is not otherwise subject to disallowance under section 502(d) or bifurcation under section 506(a) of the Bankruptcy Code, (iii) such Claim is not an Unverified Customer Entitlement Claim, and (iv) is not subject to a valid and timely Bahamas Opt-In Election;

(e)    in the case of an Other Administrative Claim, subject to a request for payment timely filed and served in accordance with Section 3.1 and no objection to such Claim has been timely filed and served pursuant to Article 3; or

(f)    in the case of any Professional Claim, allowed by an order of the Bankruptcy Court.

2.1.9    "Appointed Director" has the meaning set forth in Section 5.11.

2.1.10    "Available NFT" means a minted NFT that is in the custody of a Debtor on the Effective Date.

2.1.11    "Avoidance Actions" means any and all Causes of Action to subordinate, avoid or recover a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including, but not limited to, sections 105(a), 502(d), 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law, provided any DM-Controlled Recovery Actions shall not constitute Avoidance Actions.

2.1.12 "AWS Wallets" means Digital Asset wallets stored by the Debtors at Amazon Web Services.

2.1.13 "Bahamas Bar Date" means August 16, 2024, or such other date the Debtors and FTX DM may reasonably agree, as the deadline for proofs of debt to be filed in the FTX DM Liquidation.

2.1.14 "Bahamas Customer" means any Holder of a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim that has made a valid Bahamas Opt-In Election.

2.1.15 "Bahamas JOLs" means Brian C. Simms, KC, Peter Greaves and Kevin G. Cambridge, in their capacity as joint and several official liquidators of FTX DM (and in their capacity as joint and several provisional liquidators, where applicable), and any successor Person or Persons who take or hold office as joint official liquidators of FTX DM.

2.1.16 "Bahamas Opt-In Election" means an affirmative and irrevocable election on a properly executed Ballot timely delivered in the Chapter 11 Cases by the Voting Deadline or on a properly executed proof of debt timely filed in the FTX DM Liquidation by the Bahamas Bar Date to have all (but not less than all) Dotcom Customer Entitlement Claims, Dotcom Convenience Claims, and *De Minimis* Claims set forth in the relevant Ballot (if applicable) or proof of debt administered, reconciled, valued, settled, adjudicated, resolved, and satisfied in the FTX DM Liquidation, and to have such Claims withdrawn with prejudice from the Chapter 11 Cases.

2.1.17 "Bahamas Properties" means all interests of FTX Bahamas PropCo in the real estate assets listed in Exhibit A to the Exclusive Sales Agency Agreement.

2.1.18 "Bahamian Subsidiaries" means FTX DM and FTX Bahamas PropCo.

2.1.19 "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Solicitation Procedures Order, and which must be actually received on or before the Voting Deadline.

2.1.20 "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2.1.21 "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the District of Delaware.

2.1.22 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to these Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

2.1.23 "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

2.1.24    "Cancelled Intercompany Claim" means any Intercompany Claim other than (a) any Separate Subsidiary Intercompany Claim, (b) the Dotcom Intercompany Shortfall Claim, (c) the U.S. Intercompany Shortfall Claim and (d) the Alameda U.S. Customer Claim.

2.1.25    "Case Expenses" has the meaning set forth in Section 3.6.

2.1.26    "Cash" means the legal tender of the United States of America or the equivalents thereof, including U.S. Dollar pegged Stablecoin, bank deposits, checks and other similar items.

2.1.27    "Cause of Action" means any action, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, remedy, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including without limitation:  (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any Avoidance Action; (e) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state law fraudulent transfer claim; and (g) any claim against Persons or Entities that are not released under the Plan, including the Preserved Potential Claims, and such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities; *provided* that Cause of Action does not include any DM-Controlled Recovery Action.

2.1.28    "Certificate" means any instrument evidencing a Claim or an Equity Interest.

2.1.29    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for such Debtor and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court; *provided* that the Chapter 11 Cases shall not include (i) the chapter 11 case of any Excluded Entity, (ii) any chapter 11 case that has been closed pursuant to Section 13.13 or (iii) the chapter 11 case of Debtor Emergent Fidelity Technologies Ltd.

2.1.30    "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

2.1.31    "Claims Bar Date" means, as applicable, (a) the Non-Customer Bar Date; (b) the Customer Bar Date; (c) the Governmental Bar Date; or (d) such other date established by order of the Bankruptcy Court by which Proofs of Claim must have been filed.

2.1.32    "Claims Objection Deadline" means:  (a) the date that is the later of (i) one year after the Effective Date or (ii) as to Proofs of Claim filed after the applicable Claims Bar

Date, the 60th day after a Final Order is entered by the Bankruptcy Court deeming the late-filed Proof of Claim to be treated as timely filed or (b) such later date as may be established by order of the Bankruptcy Court upon a motion by the Plan Administrator, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

2.1.33    "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent.

2.1.34    "Class" means a class of Claims or Interests as set forth in Article 4 pursuant to section 1122(a) of the Bankruptcy Code.

2.1.35    "Confirmation" means the entry of the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.36    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.37    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.38    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.39    "Consensus Rate" means 9.0% or such lesser rate approved by the Bankruptcy Court.

2.1.40    "Consolidated Debtors" means all Debtors other than (a) the Separate Subsidiaries, (b) the Excluded Entities and (c) FTX Bahamas PropCo.

2.1.41    "Consolidated Wind Down Trust" has the meaning set forth in Section 5.7.

2.1.42    "Consummation" means the occurrence of the Effective Date.

2.1.43    "Contract Rate" means, with respect to any agreement obligating a Debtor to pay or repay money, Digital Assets or other property, the lowest stated rate of interest pursuant to the agreement applicable to outstanding payments, loans and advances without giving effect to any default interest, fees, penalties or similar fees, charges or costs.

2.1.44    "Control Persons" means (a) Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh and Caroline Ellison; (b) any Person with a familial relationship with any of the individuals listed in clause (a); or (c) any other Person or Entity designated by the Debtors in the Plan Supplement as a Control Person.

2.1.45    "Customer" means a Person or Entity that maintained an account on an FTX Exchange.

-8-

2.1.46        "Customer Bar Date" means 4:00 p.m. (prevailing Eastern Time) on September 29, 2023.

2.1.47        "Customer Entitlement Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors that compensates the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange.

2.1.48        "Customer Preference Action" means a Dotcom Customer Preference Action or a U.S. Customer Preference Action.

2.1.49        "D&O Policy" means any insurance policy and all agreements, documents or instruments relating thereto, issued to any of the Debtors covering defensive costs and other liabilities arising out of claims against current or former directors, members, trustees and officers of the Debtors, other than commercial general liability policies and cyber liability policies.

2.1.50        "Debtors" has the meaning set forth in Section 1.1; *provided* that Debtors shall not include (a) any Excluded Entity, (b) any Entity whose chapter 11 case has been closed pursuant to Section 13.13 or (c) Debtor Emergent Fidelity Technologies Ltd.

2.1.51        "*De Minimis* Claim" means any Claim in an amount equal to or less than $10.00.

2.1.52        "Digital Asset" means a DLT Digital Asset or a Pre-Launch Cryptocurrency.

2.1.53        "Digital Asset Loan Claim" means any Claim for loans of Digital Assets that is not a Secured Claim.

2.1.54        "Digital Assets Conversion Table" means the conversion table attached as Exhibit 1 to the Digital Assets Estimation Order and Appendix E to the Disclosure Statement.

2.1.55        "Digital Assets Estimation Order" means the *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] and the *Memorandum Opinion and Order* [D.I. 19069].

2.1.56        "Disclosure Statement" means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order, including all exhibits and schedules thereto and references therein that relate to the Plan.

2.1.57        "Disputed Claim" means any Claim that has not been Allowed and is not subject to a valid and timely Bahamas Opt-In Election.

2.1.58        "Disputed Claims Reserve" has the meaning set forth in Section 8.5.

2.1.59    "Distribution" means a distribution of property pursuant to the Plan, to take place as provided for herein, and "Distribute" shall have a correlative meaning.

2.1.60    "Distribution Agent" means one or more Entities chosen by the Debtors (and reasonably acceptable to the Supporting Parties) or the Plan Administrator (in consultation with the Advisory Committee), which may include the Notice and Claims Agent, to make any Distributions at the direction of the Plan Administrator.

2.1.61    "Distribution Date" means the Initial Distribution Date and each Subsequent Distribution Date.

2.1.62    "Distribution Record Date" means, for any Distribution Date, the record date determined by the Plan Administrator.

2.1.63    "DLT Digital Asset" means any digital representation of value or units that is issued or transferable using distributed ledger or blockchain technology, including Stablecoins, cryptocurrency and NFTs.

2.1.64    "DM-Controlled Recovery Action" has the meaning set forth in the FTX DM Global Settlement Agreement.

2.1.65    "DM Customer Entitlement Claim" has the meaning set forth in the FTX DM Global Settlement Agreement.

2.1.66    "DOJ" means the United States Department of Justice.

2.1.67    "Dotcom Convenience Claim" means (a) any Dotcom Customer Entitlement Claim that is Allowed in an amount equal to or less than $50,000 or (b) any Dotcom Customer Entitlement Claim that is Allowed in an amount greater than $50,000 but that is reduced to an amount equal to or less than $50,000 by an irrevocable written election of the Holder of such Customer Entitlement Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a Dotcom Customer Entitlement Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial Dotcom Customer Entitlement Claim for purposes of determining whether any portion of such Dotcom Customer Entitlement Claim qualifies as a Dotcom Convenience Claim.

2.1.68    "Dotcom Customer Entitlement Claim" means any (a) Customer Entitlement Claim against the FTX.com Exchange and (b) Preference Replacement Claim relating to a Dotcom Customer Preference Action that arises from a judgment entered in favor of a Debtor against a Customer of the FTX.com Exchange or any of such Customer's successors or assigns; *provided* that Dotcom Customer Entitlement Claims shall not include, FTT Customer Entitlement Claims, NFT Customer Entitlement Claims, Dotcom Convenience Claims or *De Minimis* Claims.

2.1.69    "Dotcom Customer Preference Action" means any and all Causes of Action to avoid any preferential payments or transfers of property from the FTX.com Exchange pursuant to section 547 of the Bankruptcy Code and any recovery action related

thereto under section 550 of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law.

2.1.70      "Dotcom Customer Priority Assets" means collectively:

(a)     all fiat currency in segregated accounts designated by the Debtors as accounts for the benefit of customers associated with the FTX.com Exchange held by the Debtors on the Petition Date;

(b)     all Digital Assets (other than Available NFTs) held by the Debtors and identified by the Debtors as held for customers in FTX.com AWS Wallets on the Petition Date and all proceeds relating to the sale, disposition or other monetization thereof;

(c)     all Dotcom Hacking Recovery Proceeds;

(d)     all proceeds from any Claim or Cause of Action against any Customer of the FTX.com Exchange or any of such Customer's successors or assigns and Dotcom Customer Preference Actions;

(e)     all proceeds from recoveries from the Bahamian Subsidiaries, of any sort, whether from the Debtors' equity interest in, or from claims against, such Bahamian Subsidiaries, including (1) the residual proceeds, if any, from the sale, disposition or other monetization of property of FTX Bahamas PropCo in accordance with the waterfall priority set forth in Section 4.2.4 and (2) proceeds, if any, from the Stipulated Debtors Property as defined in the FTX DM Global Settlement Agreement;

(f)     all proceeds from any sale, disposition or monetization of any property of the Debtors relating to the FTX.com Exchange; and

(g)     the Dotcom Intercompany Shortfall Claim.

2.1.71      "Dotcom Customer Priority Pool" means all Dotcom Customer Priority Assets and the proceeds thereof.

2.1.72      "Dotcom Exchange Shortfall Amount" means $9,244,590,039.23, subject to reduction on account of any Dotcom Hacking Recovery Proceeds.

2.1.73      "Dotcom Hacking Recovery Proceeds" means any proceeds relating to the recovery of Digital Assets subject to the Hacking Incident recovered by the Debtors to the extent that such proceeds are in respect of Digital Assets held in FTX.com AWS Wallets before, on or after the Petition Date.

2.1.74      "Dotcom Intercompany Shortfall Claim" means a Claim against the General Pool subject to the waterfall priorities set forth in Section 4.2 in an amount equal to the Dotcom Exchange Shortfall Amount.

-11-

2.1.75    "Effective Date" means, following the Confirmation Date, 12:01 a.m. (prevailing Eastern Time) on a Business Day selected by the Debtors, on which all conditions to the occurrence of the Effective Date set forth in Section 9.1 are satisfied or waived in accordance with the Plan.

2.1.76    "Election Form" means the election form regarding the Voluntary Release by Holders of Claims and Interests provided to Holders of Claims or Interests who are not entitled to vote on the Plan and which must be actually received on or before the Voting Deadline.

2.1.77    "Eligible DM Customer Entitlement Claims" has the meaning set forth in the FTX DM Global Settlement Agreement.

2.1.78    "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

2.1.79    "Equitably Subordinated Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Control Person against any of the Debtors as of the Petition Date.

2.1.80    "Equity Interest" means any Equity Security, including any issued, unissued, authorized or outstanding share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date; *provided* that Equity Interest does not include any Intercompany Interest.

2.1.81    "Equity Security" means an equity security as defined in section 101(16) of the Bankruptcy Code.

2.1.82    "Estate" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and/or as established by order of the Bankruptcy Court.

2.1.83    "Exchange Rate" means the closing exchange rate on the Petition Date, as published by *The Wall Street Journal*.

2.1.84    "Excluded Customer Preference Action" means any Customer Preference Action designated by the Debtors as an Excluded Customer Preference Action pursuant to Section 5.5.

2.1.85    "Excluded Entity" means any Entity listed in Section 1.2 or designated in the Plan Supplement as such and any other Entity that was a Debtor as of the Petition Date but which has been excluded from the Plan prior to or in connection with Confirmation of the Plan or, in the case of Quoine Pte. Ltd., no later than 180 days after the Confirmation Date.

2.1.86     "Excluded Party" means any (a) Control Person, (b) former director, officer or employee of any Debtor not incumbent as of the Confirmation Date, or (c) other Entity associated with the Debtors that is identified by the Debtors in the Plan Supplement as an Excluded Party.

2.1.87     "Exclusive Sales Agency Agreement" means the agreement among FTX Trading, FTX Bahamas PropCo and FTX DM, dated December 19, 2023, as may be amended, supplemented or modified from time to time.

2.1.88   "Exculpated Parties" means (a) the Debtors; (b) the Official Committee and its current and former members, solely for the duration of each member's service on the Official Committee and in their capacities as members of the Official Committee; (c) the Fee Examiner; (d) to the extent determined to be acting as a fiduciary for the benefit of a Debtor, or its estate, the Bahamas JOLs and FTX DM; and (e) with respect to each Person or Entity named in (a) through (d), any Person or Entity to the extent acting as a member, shareholder, director, officer, employee, attorney (including solicitors or barristers acting for the benefit of such Person or Entity), financial advisor, restructuring advisor, investment banker, accountant and other professional or representative of such Person or Entity, in each case in (a) through (e), to the extent such Person or Entity is or was acting in such capacity.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement, no Excluded Party shall be an Exculpated Party.

2.1.89     "Executory Contract" means a contract to which one or more of the Debtors is a party and that such Debtor may assume or reject under section 365 or 1123 of the Bankruptcy Code.

2.1.90     "Federal Judgment Rate" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

2.1.91     "Fee Examiner" means Katherine Stadler, as Fee Examiner appointed under the *Order (I) Appointing Fee Examiner and (II) Establishing Procedures for Consideration of Requested Fee Compensation and Reimbursement of Expenses* [D.I. 834].

2.1.92     "Final Distribution" has the meaning set forth in Section 7.3.3.

2.1.93     "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, vacated or amended, and as to which the time to appeal, seek *certiorari* or move for a new trial, stay, re-argument or rehearing has expired and no appeal, petition for *certiorari* or motion for a new trial, stay, re-argument or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for *certiorari*, or motion for a new trial, stay, re-argument or rehearing that has been or may be filed shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, stay, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided* that the possibility that a motion under rule

60 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 9024, may be filed relating to an order shall not by itself cause such order to not be a Final Order.

2.1.94      "Forfeiture Proceeds" means any property and proceeds recovered or to be recovered by the DOJ and claimed by the DOJ to be subject to forfeiture in connection with *United States* v. *Samuel Bankman-Fried*, Case No. 1:22-cr-00673 (LAK) or other criminal actions against other Insiders.

2.1.95      "FTT" means the token native to the FTX.com Exchange.

2.1.96      "FTT Customer Entitlement Claim" means a Customer Entitlement Claim in respect of an FTT.

2.1.97      "FTT Claim or Interest" means any FTT Customer Entitlement Claim, Claim or Interest, if any, of any kind or nature (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) in respect of an FTT, including any Section 510(b) FTT Claims.

2.1.98      "FTX Australia" means FTX Australia Pty Ltd and FTX Express Pty Ltd.

2.1.99      "FTX Bahamas PropCo" means FTX Property Holdings Ltd.

2.1.100      "FTX DM" means FTX Digital Markets Ltd.

2.1.101      "FTX DM Global Settlement Agreement" means the Global Settlement Agreement between the Debtors and FTX DM, dated December 19, 2023, as may be amended, supplemented or modified from time to time.

2.1.102      "FTX DM Liquidation" means FTX DM's liquidation or winding up proceeding in The Bahamas.

2.1.103      "FTX Exchange" means any exchange or trading platform operated by a Debtor as of the Petition Date.

2.1.104      "FTX Trading" has the meaning set forth in Article 1.

2.1.105      "FTX Turkey" has the meaning set forth in Section 1.2(a).

2.1.106      "FTX.com AWS Wallets" means the AWS Wallets associated with FTX.com Exchange.

2.1.107      "FTX.com Exchange" means the FTX.com trading platform including its over-the-counter (OTC) portal.

2.1.108      "FTX.US AWS Wallets" means the AWS Wallets associated with the FTX.US Exchange.

2.1.109      "FTX.US Exchange" means the FTX.US trading platform including its over-the-counter (OTC) portal.

2.1.110    "General Administrative Claim" means an Administrative Claim other than a Professional Claim.

2.1.111    "General Convenience Claim" means (a) any General Unsecured Claim Allowed in an amount equal to or less than $50,000 or (b) any General Unsecured Claim Allowed in an amount greater than $50,000 but that is reduced to an amount equal to or less than $50,000 by an irrevocable written election of the Holder of such General Unsecured Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a General Unsecured Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial General Unsecured Claim for purposes of determining whether any portion of such General Unsecured Claim qualifies as a General Convenience Claim.

2.1.112    "General Pool" means collectively,

(a)    all fiat and Digital Assets held by the Debtors that (i) are not Dotcom Customer Priority Assets or U.S. Customer Priority Assets or (ii) were not allocated to a Separate Subsidiary;

(b)    all excess distributable value of any non-Debtor subsidiary (other than FTX DM) after satisfaction of all claims against such non-Debtor subsidiary;

(c)    all excess distributable value of the Separate Subsidiaries after satisfaction of all Allowed Separate Subsidiary Claims in accordance with the waterfall priority set forth in Section 4.2.5;

(d)    all proceeds from all Avoidance Actions and litigation Claims of any Debtor other than the Dotcom Customer Preference Actions and the U.S. Customer Preference Actions;

(e)    all proceeds from the sale, disposition or other monetization of other property of the Debtors other than the Bahamian Subsidiaries;

(f)    the Alameda U.S. Customer Claim;

(g)    100 percent of the residual interest in the Dotcom Customer Priority Assets after all Dotcom Customer Entitlement Claims are satisfied in full;

(h)    100 percent of the residual interest in the U.S. Customer Priority Assets after all U.S. Customer Entitlement Claims are satisfied in full;

(i)    100 percent of the Forfeiture Proceeds received by the Debtors (other than Forfeiture Proceeds received by the Debtors on behalf of FTX DM) and available for distribution in the General Pool pursuant to Section 5.22; and

-15-