(j)    all other property of the Debtors or the Wind Down Entities, other than any Dotcom Customer Priority Asset or the U.S. Customer Priority Asset.

2.1.113    "General Unsecured Claim" means any Claim that is not a (a) Administrative Claim; (b) 503(b)(9) Claim; (c) Priority Tax Claim; (d) Other Priority Claim; (e) Secured Claim; (f) Separate Subsidiary Claim; (g) Dotcom Customer Entitlement Claim; (h) U.S. Customer Entitlement Claim; (i) NFT Customer Entitlement Claim; (j) Dotcom Convenience Claim; (k) U.S. Convenience Claim; (l) General Convenience Claim; (m) Digital Asset Loan Claim; (n) PropCo Operating Expense Claim; (o) Priority DM Claim; (p) PropCo General Unsecured Claim; (q) Intercompany Claim; (r) Senior Subordinated IRS Claim; (s) Senior Subordinated Governmental Claim; (t) Junior Subordinated IRS Claim; (u) Equitably Subordinated Claim; (v) FTT Claim or Interest; (w) Section 510(b) Preferred Equity Claim; (x) Section 510(b) Other Equity Claim; (y) *De Minimis* Claim; (z) Dotcom Intercompany Shortfall Claim; (aa) U.S. Intercompany Shortfall Claim; or (bb) Alameda U.S. Customer Claim.  A Claim for the return of an NFT that is not an Available NFT is a General Unsecured Claim.

2.1.114    "Global Settlement" has the meaning set forth in Section 5.2.

2.1.115    "Governmental Bar Date" means 4:00 p.m. (prevailing Eastern Time) on September 29, 2023.

2.1.116    "Governmental Unit" means governmental unit as defined in section 101(27) of the Bankruptcy Code.

2.1.117    "Hacking Incident" means the electronic attack against the Debtors and the FTX Exchanges in November 2022 that commenced before the Petition Date.

2.1.118    "Holder" means a Person or an Entity holding a Claim against or an Interest in any of the Debtors.

2.1.119    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

2.1.120    "Initial Distribution Date" means the date determined by the Plan Administrator in accordance with the Plan Administration Agreement to commence Distributions under the Plan.

2.1.121    "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code, and includes any non-statutory insiders of the Debtors and Affiliates of the Debtors, including, among others, Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh and Caroline Ellison.

2.1.122    "Intercompany Claim" means any Claim of whatever nature and arising at whatever time held by a Debtor against another Debtor.

2.1.123     "Intercompany Interest" means any Equity Security, including any issued or unissued share of common stock, preferred stock or other instrument, evidencing an ownership interest in a Debtor other than a Excluded Entity, FTX Bahamas PropCo or a subsidiary held by another Debtor.

2.1.124     "Interest" means any Equity Interest or Intercompany Interest.

2.1.125     "IRS" means the Internal Revenue Service.

2.1.126     "IRS Settlement" means the final settlement and compromise between the Debtors and the DOJ of all Claims of the IRS, whether arising out of or relating to the period prior to or after the Petition Date, as approved by the Bankruptcy Court.

2.1.127     "Joint Claims Hearing" has the meaning set forth in the DM Global Settlement Agreement.

2.1.128     "Junior Subordinated IRS Claim" means subject to the effectiveness of the IRS Settlement and the occurrence of the Effective Date, the Allowed Subordinated Tax Claim of the IRS against the Debtors for income tax years ending December 31, 2019, December 31, 2020, December 31, 2021, and October 31, 2022, and for employment tax for the taxable quarters ending March 31, 2018, through and including September 30, 2022, for the taxable years ending March 31, 2018, through and including December 31, 2021, plus liabilities for the taxable quarter ending December 31, 2022, and taxable year ending December 31, 2022, accruing through October 31, 2022, in an amount equal to $685,000,000.

2.1.129     "KYC Information" means the know-your-customer information requested by the Debtors.

2.1.130     "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

2.1.131     "NFT" means a non-fungible token.

2.1.132     "NFT Customer Entitlement Claim" means a Customer Entitlement Claim for the return of an Available NFT.

2.1.133     "Non-Customer Bar Date" means 4:00 p.m. (prevailing Eastern Time) on June 30, 2023.

2.1.134     "Notice and Claims Agent" means Kroll Restructuring Administration LLC, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, retained and approved by the Bankruptcy Court as the Debtors' notice and claims agent.

2.1.135     "Notice of Objection" has the meaning set forth in Section 5.20.

2.1.136     "Official Committee" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases on December 15, 2022 [D.I. 231] pursuant to section 1102 of the Bankruptcy Code, as reconstituted from time to time.

2.1.137    "Original Customer" means, with respect to a Customer Entitlement Claim, the Holder of such Customer Entitlement Claim on the Petition Date.

2.1.138    "Other Administrative Claim" means any Administrative Claim that is not a Professional Claim or Claim for U.S. Trustee Fees.

2.1.139    "Other Equity Interest" means any Equity Interest that is not a Preferred Equity Interest.

2.1.140    "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

2.1.141    "Other Secured Claim" means any Secured Claim other than a Secured Loan Claim.

2.1.142    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

2.1.143    "Petition Date" means (a) November 11, 2022, with respect to each Debtor other than West Realm Shires Inc. and (b) November 14, 2022, with respect to West Realm Shires Inc.

2.1.144    "Plan" has the meaning set forth in Section 1.1.

2.1.145    "Plan Administration Agreement" means the agreement between the Debtors and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Plan and Wind Down Entities, dated as of the Effective Date, which shall be filed as part of the Plan Supplement and shall be in form and substance reasonably acceptable to the Supporting Parties.

2.1.146    "Plan Administrator" means Mr. John J. Ray, III, or any successor appointed by the Debtors or the Wind Down Board.

2.1.147    "Plan Assets" means all Causes of Action and other property of each Estate and any property retained by any Debtor under the Plan.

2.1.148    "Plan Supplement" means the initial compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed and available on the Notice and Claims Agent's website at https://restructuring.ra.kroll.com/FTX/ no later than 14 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

2.1.149    "Pre-Distribution Requirements" has the meaning set forth in Section 7.14.

2.1.150    "Pre-Launch Cryptocurrency" means an asset that would have been a DLT Digital Asset but for the fact that such asset has not been issued and is not transferable using distributed ledger or blockchain technology as of the Petition Date.

2.1.151    "Preference Replacement Claim" means any Claim arising under section 502(h) of the Bankruptcy Code from a successful Dotcom Customer Preference Action or a U.S. Customer Preference Action.

2.1.152    "Preferred Equity Interest" means with respect to a Debtor, Equity Interest in such Debtor that is entitled to preference or priority over any other Equity Interest in such Debtor with respect to the payment of dividends or distribution of assets upon liquidation or both, including (a) series A preferred stock issued by West Realm Shires Inc., (b) series B preferred stock issued by FTX Trading, (c) series B-1 preferred stock issued by FTX Trading, and (d) series C preferred stock issued by FTX Trading.

2.1.153    "Preferred Shareholder Fund" has the meaning set forth in Section 5.22.

2.1.154    "Preferred Shareholder Settlement Agreement" means that certain Settlement and Plan Support Agreement, dated August 28, 2024, by and among the Debtors and the Holders of Preferred Equity Interests party thereto, as the same may be amended, supplemented or modified from time to time.

2.1.155    "Prepetition" means, with respect to each Debtor, prior to the Petition Date for such Debtor.

2.1.156    "Preserved Potential Claim" means the Causes of Action set out in the Plan Supplement.

2.1.157    "Priority DM Claim" means the Allowed unsecured prepetition Claim of FTX DM against FTX Bahamas PropCo in the amount of $256,291,221.47.

2.1.158    "Priority IRS Tax Claim" means subject to the effectiveness of the IRS Settlement and the occurrence of the Effective Date, the Allowed Claim of the IRS against the Debtors in the amount of $200,000,000.

2.1.159    "Priority Tax Claim" means a Claim of a Governmental Unit, including of the IRS, against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code, including the Priority IRS Tax Claim: provided that, notwithstanding the foregoing, no Senior Subordinated IRS Claim, or Junior Subordinated IRS Claim shall be a Priority Tax Claim.

2.1.160    "Pro Rata" means, with respect to an Allowed Claim, the percentage represented by a fraction (a) the numerator of which shall be an amount equal to such Claim and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed and estimated Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed Claims and estimated in such multiple Classes.

2.1.161    "Professional" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code, (b) subject to the *Order Authorizing the Debtors to Enter into, and Perform Their Obligations Under, the Reimbursement Agreements* [D.I. 3928] and the corresponding reimbursement agreements, as modified in the Plan Supplement, or (c) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.162    "Professional Claim" means an Administrative Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional from the Petition Date through and including the Confirmation Date.

2.1.163    "Professional Fee Escrow Account" means an account to be funded by the Debtors upon the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.164    "Professional Fee Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered by the Bankruptcy Court on January 9, 2023 [D.I. 435].

2.1.165    "Professional Fee Reserve Amount" means the aggregate amount of unpaid Professional Claims for all Professionals employed by the Debtors, the Official Committee and the Ad Hoc Committee through and including the Confirmation Date as estimated by the Debtors in accordance with Section 3.4.3.

2.1.166    "Proof of Claim" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

2.1.167    "Proof of Interest" means a proof of Interest filed against any of the Debtors in these Chapter 11 Cases.

2.1.168    "PropCo General Unsecured Claim" means any Claim against FTX Bahamas PropCo other than a PropCo Operating Expense Claim or the Priority DM Claim.

2.1.169    "PropCo Operating Expense Claim" means any Claim against FTX Bahamas PropCo arising in the ordinary course in respect of the ownership, use, sale or transfer of the property owned by FTX Bahamas PropCo.

2.1.170    "Rejected Contract Claims Bar Date" means, with respect to any Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, 4:00 p.m. (prevailing Eastern Time) on the earlier of (a) the 30th day after entry by the Bankruptcy Court of an order providing for the rejection of such Executory Contract or Unexpired Lease and (b) the 30th day after the Effective Date; *provided* that the deadline for filing any rejection damages claim in connection with any Executory Contract or Unexpired Lease rejected pursuant to a prior order of the Bankruptcy Court shall be the date set forth in the respective order authorizing such rejection.

-20-

2.1.171    "Released Parties" means the (a) Exculpated Parties, (b) the Bahamas JOLs and FTX DM, (c) the Ad Hoc Committee, (d) any member of the executive committee of the Ad Hoc Committee (as constituted from time to time), and (e) with respect to each Person or Entity named in (b) through (d), any Person or Entity to the extent acting as a shareholder, director, officer, employee, attorney (including solicitors or barristers acting for the benefit of such Person or Entity), financial advisor, restructuring advisor, investment banker, accountant and other professional or representative of such Person or Entity, in each case in (a) through (e), to the extent such Person or Entity is or was acting in such capacity. Notwithstanding anything to the contrary in the Plan or Plan Supplement, no Excluded Party shall be a Released Party.

2.1.172    "Releasing Parties" means (a) the Debtors; (b) each of the Official Committee and the Supporting Parties; (c) Holders who vote to accept the Plan and do not opt out of granting the releases set forth herein; (d) Holders of all Claims that are Unimpaired under the Plan; (e) Holders whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth therein; (f) Holders who vote to reject the Plan but do not opt out of granting the releases set forth therein; and (g) Holders who are deemed to reject the Plan and opt in to the releases set forth therein. Holders who were not provided a Ballot or an Election Form and are not listed in clauses (a) through (h) above are not Releasing Parties.

2.1.173    "Remission Fund Sponsors" has the meaning set forth in Section 5.21.

2.1.174    "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors in these Chapter 11 Cases, each as may be amended, supplemented or modified from time to time.

2.1.175    "Section 510(b) FTT Claim" means any Claim (a) arising from the rescission of a purchase or sale of FTT, (b) for damages arising from the purchase or sale of FTT, or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

2.1.176    "Section 510(b) Other Equity Claim" means any Claim (a) arising from the rescission of a purchase or sale of Other Equity Interest, (b) for damages arising from the purchase or sale of Other Equity Interest, or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

2.1.177    "Section 510(b) Preferred Equity Claim" means any Claim (a) arising from the rescission of a purchase or sale of Preferred Equity Interest, (b) for damages arising from the purchase or sale of Preferred Equity Interest, or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

2.1.178    "Secured Claim" means a Claim (a) secured by a Lien on property in which an Estate has an interest, to the extent such Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code and to the extent of the value of its

Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

2.1.179    "Secured Loan Claim" means the Allowed Secured Claims of BlockFi Lending LLC and BlockFi International Ltd. against Alameda Research Ltd. in the aggregate amount of $250,000,000.

2.1.180    "Securities Act" means the United States Securities Act of 1933, as amended.

2.1.181    "Security" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.182    "Senior Subordinated Governmental Claim" means (a) a Subordinated Tax Claim or (b) any other claim for regulatory fines and penalties, U.S. federal, state or local income or employment taxes, similar foreign taxes and any other Claim by a Governmental Unit that has been subordinated on the basis of structural subordination, equitable subordination, laws or policies subordinating recoveries to claims by victims of crime or fraud, or any other grounds available under applicable law, other than an Equitably Subordinated Claim, Senior Subordinated IRS Claim or Junior Subordinated IRS Claim.

2.1.183    "Senior Subordinated IRS Claim" means a Subordinated Tax Claim of the IRS arising for the Debtors' income tax and employment tax obligations for the period beginning November 1, 2022, and continuing through to future tax years through the Effective Date.

2.1.184    "Separate Subsidiaries" means the Debtors listed in the Plan Supplement, as may be updated, supplemented and amended from time to time in accordance with the terms of the Plan Supplement.

2.1.185    "Separate Subsidiary Claim" means any Claim against a Separate Subsidiary that is (a) not derivative of a Claim against another Debtor or (b) property of the estate of another Debtor under section 541 of the Bankruptcy Code, other than a Separate Subsidiary Intercompany Claim.

2.1.186    "Separate Subsidiary Intercompany Claim" means any Claim against a Separate Subsidiary that is derivative of a Claim against another Debtor or property of the estate of another Debtor under section 541 of the Bankruptcy Code.

2.1.187    "SNG Investments" has the meaning set forth in Section 1.2(b).

2.1.188    "Solicitation Procedures Order" means the order (a) approving the Disclosure Statement; (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of Ballots; (e) establishing procedures for voting on the Plan; and (f) establishing notice and objection procedures for the confirmation of the Plan entered by the Bankruptcy Court on

June 26, 2024 [D.I. 19068], together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

2.1.189    "Specially Designated Nationals and Blocked Persons" means individuals and companies owned or controlled by, or acting for or on behalf of, sanctioned countries as well as individuals, groups and entities, such as terrorists and narcotics traffickers designated under various sanctions programs as determined by the United States Treasury's Office of Foreign Assets Control.

2.1.190    "Stablecoin" means any Digital Asset designed to maintain a stable value relative to a reserve asset, such as a fiat currency or exchange-traded commodity.

2.1.191    "Subordinated Tax Claim" means any Claim for federal, state and local, taxes (including income or employment taxes), or similar foreign tax that is not a Priority Tax Claim.

2.1.192    "Subsequent Distribution Date" means a date after the Initial Distribution Date selected by the Plan Administrator for Distributions in accordance with Section 7.2.3.

2.1.193    "Supplemental Remission Fund" has the meaning set forth in Section 5.21.

2.1.194    "Supporting Parties" means the Official Committee, FTX DM and the Ad Hoc Committee, acting through its executive committee pursuant to such authority as may be delegated to such executive committee from time to time.

2.1.195    "Supporting Preferred Shareholder" means a Holder of Preferred Equity Interests that has executed the Preferred Shareholder Settlement Agreement.

2.1.196    "Terms of Service" means any contract between an FTX Exchange and its customers that governs the terms of use of such FTX Exchange by those customers.

2.1.197    "Unverified Customer Entitlement Claim" means a Customer Entitlement Claim in respect of which (a) the Original Customer or Holder of such Customer Entitlement Claim has failed to submit KYC Information of the Original Customer by a date determined by the Debtors and approved by order of the Court or (b) an objection by the Debtors to the KYC Information of the Original Holder has been sustained by order of the Court.

2.1.198    "U.S. Convenience Claim" means (a) any U.S. Customer Entitlement Claim that is Allowed in an amount equal to or less than $50,000 or (b) any U.S. Customer Entitlement Claim that is Allowed in an amount greater than $50,000 but that is reduced to an amount equal to or less than $50,000 by an irrevocable written election of the Holder of such Customer Entitlement Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a U.S. Customer Entitlement Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial U.S. Customer Entitlement Claim for purposes of determining whether any portion of such U.S. Customer Entitlement Claim qualifies as a U.S. Convenience Claim.

2.1.199    "U.S. Customer Entitlement Claim" means any (a) Customer Entitlement Claim against the FTX.US Exchange (including the Alameda U.S. Customer Claim) that is not a FTT Customer Entitlement Claim or a NFT Customer Entitlement Claim and (b) any Preference Replacement Claim relating to a U.S. Customer Preference Action that arises from a judgment entered in favor of a Debtor against a Customer of the FTX.US Exchange or any of such Customer's successors or assigns; *provided* that U.S. Customer Entitlement Claims shall not include NFT Customer Entitlement Claims, U.S. Convenience Claims or *De Minimis* Claims.

2.1.200    "U.S. Customer Preference Action" means any and all Causes of Action to avoid any preferential payments or transfers of property from the FTX.US Exchange pursuant to section 547 of the Bankruptcy Code and any recovery action related thereto under section 550 of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law.

2.1.201    "U.S. Customer Priority Assets" means collectively:

(a)    all fiat currency in segregated accounts designated by the Debtors as accounts for the benefit of customers associated with the FTX.US Exchange held by the Debtors on the Petition Date;

(b)    all Digital Assets (other than Available NFTs) held by the Debtors and identified by the Debtors as held for customers in FTX.US AWS Wallets on the Petition Date and all proceeds relating to the sale, disposition or other monetization thereof;

(c)    all U.S. Hacking Recovery Proceeds;

(d)    all proceeds from any Claim or Cause of Action against any Customer of the FTX.US Exchange or any of such Customer's successors or assigns and U.S. Customer Preference Actions;

(e)    all proceeds from any sale, disposition or monetization of any property of the Debtors relating to the FTX.US Exchange; and

(f)    the U.S. Intercompany Shortfall Claim.

2.1.202    "U.S. Customer Priority Pool" means all U.S. Customer Priority Assets and the proceeds thereof.

2.1.203    "U.S. Exchange Shortfall Amount" means $141,009,391.00, subject to reduction on account of any U.S. Hacking Recovery Proceeds.

2.1.204    "U.S. Hacking Recovery Proceeds" means any proceeds relating to the recovery of Digital Assets subject to the Hacking Incident recovered by the Debtors to the extent that such proceeds are in respect of Digital Assets held in FTX.US AWS Wallets before, on or after the Petition Date.

2.1.205    "U.S. Intercompany Shortfall Claim" means a Claim against the General Pool subject to the waterfall priorities set forth in Section 4.2 in an amount equal to the U.S. Exchange Shortfall Amount.

2.1.206    "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

2.1.207    "U.S. Trustee Fees" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.208    "Unclaimed Distribution" means any Distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular Distribution or, in the case of a Distribution made by check, negotiated such check; (b) given written notice to the Distribution Agent of an intent to accept a particular Distribution; (c) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular Distribution; or (d) taken any other action necessary to facilitate such Distribution.

2.1.209    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

2.1.210    "Unimpaired" means any Claim or Interest that is not Impaired.

2.1.211    "Voluntary Release by Holders of Claims and Interests" means the release by Holders of Claims and Interests as set forth in Section 10.5.

2.1.212    "Voting" means the process by which a Holder of a Claim may vote to accept or reject the Plan, pursuant to the conditions in Article 4.

2.1.213    "Voting Deadline" means 4:00 p.m. (prevailing Eastern Time) on August 16, 2024, by which time all Ballots must be actually received by the Notice and Claims Agent.

2.1.214    "Wind Down Board" means an oversight board consisting of the Plan Administrator and up to eight other members appointed to oversee the Wind Down Entities activities in accordance with the Plan and the Plan Administration Agreement.

2.1.215    "Wind Down Budget" means the budget to fund the Wind Down Entities, which shall be included in the Plan Supplement, as may be updated, supplemented and amended from time to time in accordance with the terms of the Plan Supplement.

2.1.216    "Wind Down Cash Proceeds" means all Cash proceeds from the sale, disposition or other monetization of Plan Assets available for Distribution by the Plan Administrator, other than Cash reserved or applied by the Plan Administrator (a) to make Distributions under the Plan to Holders of Allowed Administrative Claims, Allowed Other Priority Claims or Allowed Secured Claims or (b) to pay expenses and costs of administering the Wind Down Entities.

2.1.217    "Wind Down Entity" means (a) for each Consolidated Debtor, the Consolidated Wind Down Trust and (b) for each other Debtor, the Estate of such Debtor after the Effective Date of the Plan.

2.1.218    "Wind Down Reserve" means a reserve, if any, in the amount set forth in the Wind Down Budget to fund the Wind Down Entities.

2.2.    Rules of Interpretation

For the purposes of the Plan:  (a) any reference herein to the word "including" or word of similar import shall be read to mean "including without limitation"; (b) unless otherwise specified, all references herein to "Articles" are references to Articles herein, hereof or hereto; (c) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan; (d) captions and headings to Articles are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (g) all references to docket numbers of documents filed in these Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (h) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to these Chapter 11 Cases, unless otherwise stated; (i) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions; (j) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof; (k) any immaterial effectuating provisions may be interpreted by the Debtors and the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order; (l) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and permitted assigns; (m) except as otherwise expressly provided in the Plan or the Plan Supplement, after the Confirmation Date, where the Plan contemplates that any Debtor or the Plan Administrator shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon such Debtor and/or the Plan Administrator, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of any Debtor or any other Entity; (n) reference herein to the Plan Administrator, or any right of the Plan Administrator, shall be subject in all respects to the Plan Administration Agreement; and (o) except as otherwise provided in the Plan, anything required to be done by the Debtors or the Plan Administrator, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

2.3.    <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan.

2.4.    <u>Computation of Time</u>

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, and all dates and times shall be determined based on prevailing time in Wilmington, Delaware. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**3.**    **ADMINISTRATIVE EXPENSE CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims and Professional Claims, payment of which is provided for below.

3.1.    Administrative Claim Bar Date

Any request for payment of an Administrative Claim must be filed and served on the Plan Administrator pursuant to the procedures specified in the notice of entry of the Confirmation Order and the Confirmation Order on or prior to the Administrative Claim Bar Date; *provided* that no request for payment is required to be filed and served pursuant to this Section 3.1 with respect to any:

(a)    Administrative Claim that is Allowed as of the Administrative Claim Bar Date;

(b)    503(b)(9) Claim;

(c)    Professional Claim;

(d)    Claim for U.S. Trustee Fees; or

(e)    Senior Subordinated IRS Claim.

Any Holder of an Administrative Claim who is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claim against any Wind Down Entity and such Administrative Claim shall be deemed satisfied as of the Effective Date without the need for any objection from the Plan Administrator or any notice to or action, order or approval of the Bankruptcy Court.

Any objection to a request for payment of an Administrative Claim that is required to be filed and served pursuant to this Section 3.1 must be filed and served on the Plan Administrator and the requesting party creditor (a) no later than 90 days after the Administrative Claim Bar Date or (b) by such later date as may be established by order of the Bankruptcy Court upon a motion by the Plan Administrator, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

3.2.    General Administrative Claims

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.

3.3.    503(b)(9) Claims

Except to the extent that a Holder of an Allowed 503(b)(9) Claim agrees to less favorable treatment, the Holder of each Allowed 503(b)(9) Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed 503(b)(9) Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.

3.4.    Professional Claims

3.4.1    Final Fee Applications.  All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date, subject to any applicable procedures established under the Professional Fee Order and the Confirmation Order.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders.

3.4.2    Professional Fee Escrow Account.  The Debtors shall establish and fund the Professional Fee Escrow Account on or prior to the Effective Date.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Wind Down Entities.  The Plan Administrator shall pay Professional Claims in Cash no later than five Business Days after such Claims are Allowed by Final Order of the Bankruptcy Court.  Any funds remaining in the Professional Fee Escrow Account following the approval of all Professionals' final fee applications provided for in Section 3.4.1 and payment of all Professionals' Allowed Professional Claims shall be allocated between the Dotcom Customer Priority Assets, the U.S. Customer Priority Assets and the General Pool pursuant to the terms of Section 3.6 and shall be distributed by the Plan Administrator pursuant to the Plan.

3.4.3    Professional Fee Reserve Amount.  Professionals shall provide good-faith estimates of their Professional Claims for purposes of the Professional Fee Escrow Account and shall deliver such estimates to the Debtors no later than seven days prior to the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.  If a Professional does not provide such an estimate, the Debtors may estimate, in their reasonable discretion, the Professional Claims of such Professional.

3.4.4    Post-Confirmation Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Plan Administrator, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the

Debtors, the Plan Administrator, the Official Committee or the Ad Hoc Committee, as the case may be, in each case in accordance with the Wind Down Budget. Except as otherwise specifically provided in the Plan, upon the Confirmation Date, any requirement that Professionals comply with section 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Plan Administrator, or, solely with respect to the matters set forth in Section 13.9, the Official Committee, may employ and pay any Professional in the ordinary course of business, in each case subject to the Wind Down Budget.

3.5.    <u>Statutory Fees Payable Pursuant to 28 U.S.C. § 1930</u>

All U.S. Trustee fees payable on or before the Effective Date shall be paid in full in Cash on the Effective Date by the Debtors. After the Effective Date, the Plan Administrator shall pay any and all U.S. Trustee Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of the Chapter 11 Cases being closed, dismissed or converted to cases under chapter 7 of the Bankruptcy Code. The Debtors shall file all monthly operating reports when they become due, using UST Form 11-MOR. After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) U.S. Trustee Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to U.S. Trustee Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

3.6.    <u>Expense Allocation</u>

Unless otherwise specified herein, the Plan Administrator shall allocate Administrative Claims, professional or other fees and expenses related to the implementation and Consummation of the Plan and expenses and costs of administering the Wind Down Entities (collectively, "<u>Case Expenses</u>") as follows: (a) all Case Expenses related to FTX DM shall be allocated solely to the Dotcom Customer Priority Assets; (b) all Case Expenses related to FTX Bahamas PropCo or the sale, disposition or other monetization of property of FTX Bahamas PropCo shall be allocated solely to FTX Bahamas PropCo; and (c) all other Case Expenses shall be allocated between the Dotcom Customer Priority Assets, the U.S. Customer Priority Assets, the General Pool and the Separate Subsidiaries, on a Pro Rata basis, based on the Debtors' reasonable estimates of the relative distributable value in each pool as of the Effective Date, which estimates shall be set forth in the Plan Supplement.

## 4. CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND INTERESTS

### 4.1. Classification of Claims and Interests

All Claims and Interests except for Administrative Claims and 503(b)(9) Claims are classified in the Classes set forth in this Article 4. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

### 4.1.1 Summary of Classification and Treatment

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Tax Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3A | Secured Loan Claims | Impaired | Entitled to Vote |
| 3B | Other Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 5A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5C | NFT Customer Entitlement Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 6A | General Unsecured Claims | Impaired | Entitled to Vote |
| 6B | Digital Asset Loan Claims | Impaired | Entitled to Vote |
| 7A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 7B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 7C | General Convenience Claims | Impaired | Entitled to Vote |
| 8A | PropCo Operating Expense Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 8B | Priority DM Claim | Impaired | Entitled to Vote |
| 8C | PropCo General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Cancelled Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 10A | Senior Subordinated IRS Claims | Impaired | Entitled to Vote |
| 10B | Senior Subordinated Governmental Claims | Impaired | Entitled to Vote |
| 10C | Junior Subordinated IRS Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 11 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 13 | Section 510(b) Preferred Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Section 510(b) Other Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 15 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 16 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 17 | FTT Claims and Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 18 | *De Minimis* Claims | Impaired | Not Entitled to Vote, Deemed to Reject |

### 4.2. Distributions Waterfalls

#### 4.2.1 Dotcom Customer Waterfall

Proceeds in the Dotcom Customer Priority Pool shall be applied in the following manner:

(a) *first*, to pay Case Expenses allocated to the Dotcom Customer Priority Assets pursuant to Section 3.6;

(b) *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the Dotcom Customer Priority Assets;

(c) *third*, to pay and perform obligations owed to FTX DM under the FTX DM Global Settlement Agreement;

(d) *fourth*, to pay Allowed Dotcom Convenience Claims and postpetition interest accrued at the Consensus Rate on Allowed Dotcom Convenience Claims from the Petition Date through the Initial Distribution Date;

(e) *fifth*, to pay Allowed Dotcom Customer Entitlement Claims; and

(f) *sixth*, to transfer remaining proceeds to the General Pool.

#### 4.2.2 U.S. Customer Waterfall

Proceeds in the U.S. Customer Priority Pool shall be applied in the following manner:

(a)     *first*, to pay Case Expenses allocated to the U.S. Customer Priority Assets pursuant to <u>Section 3.6</u>;

(b)     *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the U.S. Customer Priority Assets;

(c)     *third*, to pay Allowed U.S. Convenience Claims and postpetition interest accrued at the Consensus Rate on Allowed U.S. Convenience Claims from the Petition Date through the Initial Distribution Date;

(d)     *fourth*, to pay Allowed U.S. Customer Entitlement Claims; and

(e)     *fifth*, to transfer remaining proceeds to the General Pool.

4.2.3    <u>General Pool Waterfall</u>

Proceeds in the General Pool shall be applied in the following manner:

(a)     *first*, to pay Allowed Administrative Claims allocated to the General Pool pursuant to <u>Section 3.6</u>;

(b)     *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims, other than Allowed Priority Tax Claims and Allowed Other Priority Claims (i) allocated to the Dotcom Customer Priority Assets or U.S. Customer Priority Assets, (ii) against FTX Bahamas PropCo or (iii) against any Separate Subsidiary;

(c)     *third*, to pay Allowed Secured Loan Claims and Allowed Other Secured Claims and any applicable interest accrued thereunder;

(d)     *fourth*, to pay Allowed General Convenience Claims and postpetition interest accrued at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on Allowed General Convenience Claims from the Petition Date through the Initial Distribution Date;

(e)     *fifth*, with respect to 66 percent of the amount next available for Distribution from the General Pool, to pay on a Pro Rata basis the Allowed Dotcom Intercompany Shortfall Claim and the Allowed U.S. Intercompany Shortfall Claim;

(f)     *sixth*, to pay on a Pro Rata basis Allowed General Unsecured Claims and Allowed Digital Asset Loan Claims, any unpaid balance of the Allowed Dotcom Intercompany Shortfall Claim and any unpaid balance of the Allowed U.S. Intercompany Shortfall Claim;

(g)   *seventh*, to pay on a Pro Rata basis any remaining portion of any Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims;

(h)   *eighth*, to pay on a Pro Rata basis (i) postpetition interest accrued at the Consensus Rate on Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims and (ii) postpetition interest accrued at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on Allowed General Unsecured Claims and Allowed Digital Asset Loan Claims from the Petition Date, in each case of clauses (i) and (ii) through the applicable Distribution Date in accordance with Section 7.1;

(i)   *ninth*, to pay Allowed Senior Subordinated IRS Claims and Allowed Senior Subordinated Governmental Claims as follows: (i) 25 percent of the proceeds from the General Pool available for such payment shall be made available first to pay Allowed Senior Subordinated IRS Claims until such Allowed Senior Subordinated IRS Claims are paid in full, after which any remaining funds shall be used to pay in full any unpaid Allowed Senior Subordinated Governmental Claims; and (ii) the remaining 75 percent of the proceeds from the General Pool available for such payment shall be made available first to pay all Allowed Senior Subordinated Governmental Claims until all such Allowed Senior Subordinated Governmental Claims are paid in full, after which any remaining funds shall be used to pay in full any unpaid Allowed Senior Subordinated IRS Claims;

(j)   *tenth*, to pay Allowed Junior Subordinated IRS Claims;

(k)   *eleventh*, to pay Allowed Preferred Equity Interests;

(l)   *twelfth*, to pay Allowed Section 510(b) Preferred Equity Claims;

(m)   *thirteenth*, to pay Allowed Section 510(b) Other Equity Claims; and

(n)   *fourteenth*, to pay Allowed Other Equity Interests.

4.2.4   <u>FTX Bahamas PropCo Waterfall</u>

Proceeds from the sale, disposition or other monetization of the Bahamas Properties shall be applied in the following manner:

(a)   *first*, to pay sale-related taxes and other charges or amounts owed by FTX Bahamas PropCo in respect of any Bahamas Property subject to any outstanding sale as of the Effective Date;

-34-

(b)    *second*, to pay any reasonable, documented and customary real estate agent commissions related to any outstanding sale of any Bahamas Property as of the Effective Date;

(c)    *third*, to pay the Administrative Expenses (as defined in the FTX DM Global Settlement Agreement) of FTX Bahamas PropCo pursuant to applicable Law in accordance with the FTX DM Global Settlement Agreement;

(d)    *fourth*, to pay or reimburse the Debtors for the total amount of Allowed PropCo Operating Expense Claims;

(e)    *fifth*, to satisfy the Priority DM Claim;

(f)    *sixth*, to pay Allowed PropCo General Unsecured Claims; and

(g)    *seventh*, to transfer remaining proceeds to the Dotcom Customer Priority Pool.

### 4.2.5    Separate Subsidiaries Waterfall

Proceeds from the sale, disposition or other monetization of property of any Separate Subsidiary shall be applied in the following manner:

(a)    *first*, to pay Case Expenses allocated to such Separate Subsidiary pursuant to Section 3.6;

(b)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims against such Separate Subsidiary;

(c)    *third*, to pay Allowed Separate Subsidiary Claims against such Separate Subsidiary;

(d)    *fourth*, postpetition interest accrued at the lower of the Consensus Rate, the applicable  Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on Allowed Separate Subsidiary Claims from the Petition Date through the applicable Distribution Date in accordance with Section 7.1;

(e)    *fifth*, to pay Allowed Separate Subsidiary Intercompany Claims; and

(f)    *sixth*, to transfer remaining proceeds to the General Pool.

### 4.2.6    Supplemental Remission Fund

Proceeds, if any, contributed to the Supplemental Remission Fund from Holders of Allowed Senior Subordinated Governmental Claims shall be paid on a Pro Rata basis to (a) Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer

Entitlement Claims, and Allowed Digital Asset Loan Claims, and (b) FTX DM for the benefit of Holders of Eligible DM Customer Entitlement Claims, in each case of clauses (a) and (b) unless an alternative allocation of such proceeds is established by the Debtors, in consultation with the Supporting Parties, as further described in Section 5.21.

4.3.  Treatment of Claims and Interests

4.3.1  Class 1 – Priority Tax Claims

(a)  *Classification*:  Class 1 consists of all Allowed Priority Tax Claims.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Priority Tax Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)  *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of a Priority Tax Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Priority Tax Claim is entitled to vote to accept or reject the Plan.

4.3.2  Class 2 – Other Priority Claims

(a)  *Classification*:  Class 2 consists of all Other Priority Claims.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Other Priority Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)  *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Other Priority Claim is entitled to vote to accept or reject the Plan.

4.3.3  Class 3A – Secured Loan Claims

(a)  *Classification*:  Class 3A consists of Secured Loan Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release of and in exchange for its Allowed Secured Loan Claim, each Holder of an Allowed Secured Loan Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Secured Loan Claim *plus* interest accrued at the Federal Judgment Rate on such Allowed Secured Loan Claim from the Petition Date through the Effective Date.

(c)    *Voting*:  Claims in Class 3A are Impaired.  Each Holder of a Secured Loan Claim is entitled to vote to accept or reject the Plan.

### 4.3.4    Class 3B – Other Secured Claims

(a)    *Classification*:  Class 3B consists of Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator:  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)    *Voting*:  Claims in Class 3B are Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

### 4.3.5    Class 4 – Separate Subsidiary Claims

(a)    *Classification*:  Class 4 consists of all Separate Subsidiary Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in Cash equal to (i) 100% of such Allowed Separate Subsidiary Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on such Allowed Separate Subsidiary Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with <u>Section 7.1</u> on or as soon as reasonably practicable after the latest of (i) the Initial Distribution Date; (ii) the date on which such Allowed Separate Subsidiary Claim

becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting*:  Claims in Class 4 are Unimpaired.  Each Holder of a Separate Subsidiary Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Separate Subsidiary Claim is entitled to vote to accept or reject the Plan.

### 4.3.6    Class 5A – Dotcom Customer Entitlement Claims

(a)    *Classification*:  Class 5A consists of all Dotcom Customer Entitlement Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Dotcom Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed Dotcom Customer Entitlement Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with Section 7.1, *plus* (iii) any proceeds from the Supplemental Remission Fund to which such Holder is entitled pursuant to Section 5.21; *provided* that no Holder of an Allowed Dotcom Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in Section 4.2.1 and Section 4.2.3.

(c)    *Voting*:  Claims in Class 5A are Impaired.  Each Holder of a Dotcom Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

### 4.3.7    Class 5B – U.S. Customer Entitlement Claims

(a)    *Classification*:  Class 5B consists of all U.S. Customer Entitlement Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed U.S. Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed U.S. Customer Entitlement Claims, each Holder of an Allowed U.S. Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed U.S. Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed U.S. Customer Entitlement Claim from the Petition Date

-38-

through the applicable Distribution Date to the extent of available funds in accordance with Section 7.1, *plus* (iii) any proceeds from the Supplemental Remission Fund to which such Holder is entitled pursuant to Section 5.21; *provided* that no Holder of an Allowed U.S. Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in Section 4.2.2 and Section 4.2.3.

(c)　　*Voting*:  Claims in Class 5B are Impaired.  Each Holder of a U.S. Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

### 4.3.8  Class 5C – NFT Customer Entitlement Claims

(a)　　*Classification*:  Class 5C consists of all NFT Customer Entitlement Claims.

(b)　　*Treatment*:  Except to the extent that a Holder of an Allowed NFT Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed NFT Customer Entitlement Claim, each Holder of an Allowed NFT Customer Entitlement Claim shall receive the Available NFT associated with such Allowed NFT Customer Entitlement Claim.

(c)　　*Voting*:  Claims in Class 5C are Unimpaired.  Each Holder of an NFT Customer Entitlement Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an NFT Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

### 4.3.9  Class 6A – General Unsecured Claims

(a)　　*Classification*:  Class 6A consists of all General Unsecured Claims.

(b)　　*Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed General Unsecured Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on such Allowed General Unsecured Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with Section 7.1; *provided* that no Holder of an Allowed General Unsecured Claim shall be entitled to receive any payment except to the extent of funds

-39-

available to make such payment in accordance with the waterfall priorities set forth in Section 4.2.3.

(c)   *Voting*:  Claims in Class 6A are Impaired.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### 4.3.10  Class 6B – Digital Asset Loan Claims

(a)   *Classification*:  Class 6B consists of all Digital Asset Loan Claims.

(b)   *Treatment*:  Except to the extent that a Holder of a Digital Asset Loan Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release of and in exchange for its Allowed Digital Asset Loan Claims, each Holder of an Allowed Digital Asset Loan Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Digital Asset Loan Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on such Allowed Digital Asset Loan Claim from the Petition Date through the Distribution Date on which such Allowed Digital Asset Loan Claim is paid to the extent of available funds, *plus* (iii) any proceeds from the Supplemental Remission Fund to which such Holder is entitled pursuant to Section 5.21; *provided* that no Holder of an Allowed Digital Asset Loan Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in Section 4.2.3.

(c)   *Voting*:  Claims in Class 6B are Impaired.  Each Holder of a Digital Asset Loan Claim is entitled to vote to accept or reject the Plan.

### 4.3.11  Class 7A – Dotcom Convenience Claims

(a)   *Classification*:  Class 7A consists of all Dotcom Convenience Claims.

(b)   *Treatment*:  In full and final satisfaction, settlement, release of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Dotcom Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in Section 4.2.1, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such Dotcom Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

-40-

(c)     *Voting*:  Claims in Class 7A are Impaired.  Each Holder of a Dotcom Convenience Claim is entitled to vote to accept or reject the Plan.

### 4.3.12   Class 7B – U.S. Convenience Claims

(a)     *Classification*:  Class 7B consists of all U.S. Convenience Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed U.S. Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in Section 4.2.2, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such U.S. Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Claims in Class 7B are Impaired.  Each Holder of a U.S. Convenience Claim is entitled to vote to accept or reject the Plan.

### 4.3.13   Class 7C – General Convenience Claims

(a)     *Classification*:  Class 7C consists of all General Convenience Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed General Convenience Claim *plus* postpetition interest at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in Section 4.2.3, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such General Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Claims in Class 7C are Impaired.  Each Holder of a General Convenience Claim is entitled to vote to accept or reject the Plan.