**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD., ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 24-_____(JTD) |
| GENESIS BLOCK LTD, BLUEBIRD CAPITAL LTD., KEY SOLUTION DEVELOPMENT LTD., MERCHANT OASIS LTD., CLEMENT IP, HUNG KA HO, TIN KA YU, CHARLES YANG, MYTH SUCCESS LTD., GB HOLDINGS, LTD., GBV CAPITAL, INC., NAI HIM LESLIE TAM, ABLE RISE CORPORATE DEVELOPMENT LTD., GBV TECHNOLOGIES LTD., and D21 SOLUTIONS LTD., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs FTX Trading Ltd. ("<u>FTX.com</u>"), Alameda Research Ltd. ("<u>Alameda</u>"),

North Dimension Inc. ("<u>North Dimension</u>"), and Maclaurin Investments Ltd. f/k/a Alameda

Ventures Ltd. ("<u>Alameda Ventures</u>," and together with FTX.com, Alameda and North

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Dimension, the ("Plaintiffs"), through their undersigned counsel, for their Complaint against

Genesis Block Ltd. ("Genesis Block"), Bluebird Capital Ltd. ("Bluebird"), Key Solution

Development Ltd. ("Key Solution"), Merchant Oasis Ltd. ("Merchant Oasis"), Clement Ip, Hung

Ka Ho ("Wincent Hung"), Tin Ka Yu ("Nicole Tin"), Charles Yang, Myth Success Ltd. ("Myth

Success"), GB Holdings, Ltd. ("GB Holdings"), GBV Capital, Inc. ("GBV Capital"), Nai Him

Leslie Tam ("Leslie Tam"), Able Rise Corporate Development Ltd. ("Able Rise"), GBV

Technologies Ltd. ("GBV Technologies"), and D21 Solutions Ltd. ("D21 Solutions") (together,

the "Defendants"), state as follows:

## NATURE OF THE CASE

1.      Genesis Block was a Hong Kong-based over-the-counter cryptocurrency trading

firm.  In 2021, unbeknownst to the public, Samuel Bankman-Fried and Genesis Block's

principals engineered a convoluted transaction whereby Alameda secretly took control of

Genesis Block.  From that point forward, Genesis Block functioned effectively as an Alameda

subsidiary, allowing Alameda to engage in certain trading and investing activities while

obscuring its involvement.  In total, Genesis Block and its affiliated entities and individuals

received nearly $100 million in Debtor assets that were used to fund trading accounts and

venture investments that are nominally owned by the Genesis Block entities.  In addition,

Genesis Block and its affiliated entities and individuals also have filed claims against the

Debtors' estates totaling more than $120 million, the bulk of which represents fraudulent

customer claims attributable to funds belonging to the Debtors.

2.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 502, 541, 542,

544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the

"Bankruptcy Code"), Section 2201 of the United States Code, 28 U.S.C. § 2201, and Sections

1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and

1305, for declaratory relief, to turnover estate property, and/or avoid and recover from the Defendants, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs and all obligations of Plaintiffs to the Defendants, prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case") by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").

3.        Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be subject to turnover, avoidable and/or recoverable.

4.        Pursuant to Section 502(b)(1) of the Bankruptcy Code, Plaintiffs also object to certain claims filed or held by Defendants in these Chapter 11 Cases that are unenforceable against Plaintiffs.

5.        On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for the Plaintiffs or any other Debtor in these Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

6.      Prior to the filing of the Chapter 11 Cases, Alameda engaged in cryptocurrency trading and other investing activities.  Alameda and its holding company, Alameda Research LLC, were both owned by Samuel Bankman-Fried and Zixiao "Gary" Wang and operated as part of the broader FTX Group.[2]  Caroline Ellison was co-CEO and later the sole CEO of both Alameda and Alameda Research LLC.

7.      At all relevant times, Defendant Genesis Block functioned as a Hong Kong-based over-the-counter trading firm for cryptocurrency assets.  Genesis Block also maintained a network of "cryptocurrency ATMs" throughout Asia that allowed users to exchange fiat currency for cryptocurrency.  In early 2020, eager to take advantage of Genesis Block's access to cash and connections in the Asian market, Bankman-Fried caused Alameda Ventures to acquire a 20% stake in Genesis Block.  Less than a year later, Bankman-Fried and Ip, the co-founder of Genesis Block, orchestrated a series of covert transactions in which millions of dollars of estate funds were transferred from the Debtors to Bluebird, a shell company owned by Ip, in exchange for Alameda taking nearly complete control of Genesis Block—without disclosing any of this to the market, regulators or the general public.  Following this transaction, Genesis Block and its affiliates were nominally owned by Bluebird and certain other Defendants, but Alameda controlled their operations, and Genesis Block and its affiliates effectively served as Alameda subsidiaries.

8.      Alameda used its control of Genesis Block for many purposes.  For example, following the acquisition, the FTX Group treated Genesis Block employees as its own

---

[2]     The FTX Group is comprised of four Silos: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX.com and its Debtor and non-Debtor subsidiaries.

employees, and certain FTX Group employees were nominally hired by Genesis Block, only to be seconded back to the FTX Group (likely to circumvent visa requirements in certain countries). Alameda also used Genesis Block, its affiliated entities, and their employees (and family members) to engage in cryptocurrency trading on other exchanges, operating on Alameda's behalf and using Debtor assets without disclosing Alameda's involvement.  The Debtors already have recovered certain assets held nominally by these Genesis Block-affiliated entities on other platforms, but to date have been unable to recover approximately $65 million in Debtor assets on other cryptocurrency platforms that are nominally held by these Genesis Block-affiliated entities. These Genesis Block-affiliated entities also maintained FTX.com accounts that were used for trading and other purposes—for example, the FTX Insiders[3] concealed approximately $8 billion in Alameda liabilities owed to FTX.com (as a result of Alameda's unlawful "borrowing") by transferring those liabilities to a customer account opened in the name of Genesis Block trader Charles Yang's father.  The FTX Insiders used this so-called "Korean friend" account to hide Alameda's liabilities from auditors and potential investors.

9.      Alameda also used Genesis Block and its affiliated entities to make venture investments on Alameda's behalf using Debtor assets.  For example, acting through a Genesis Block affiliate called GBV Capital, Alameda used nearly $20 million of Debtor assets to fund the acquisition of OMG Network Pte. Ltd ("OMG Network"), a cryptocurrency protocol with an accompanying token ("OMG").  Under Alameda's control, OMG Network was later rebranded as Boba Network and launched a new token ("BOBA") via OMG Foundation (later renamed Boba Foundation), a Panamanian shell company created by Alameda to conceal its involvement.

---

[3]     The FTX Insiders consisted of Samuel Bankman-Fried, Zixiao "Gary" Wang, Caroline Ellison, and Nishad Singh.

In addition to this OMG Network investment, Alameda transferred another $7.85 million in Debtor assets to GBV Capital to fund venture investments in 36 other companies, all of which were nominally owned by GBV Capital and its affiliates, not by Alameda.

10.     The Genesis Block shares currently in the possession of Bluebird, and the other assets and interests acquired using Debtor funds and nominally held by Genesis Block and its affiliates, constitute property of the Debtors' bankruptcy estates, and the Debtors seek a declaratory judgment granting the Debtors title to all of the assets and interests acquired with Debtor funds as described herein.  The Debtors further seek the turnover of the Genesis Block shares and other assets and interests acquired pursuant to 11 U.S.C. § 542.  In the alternative, the transfers and obligations that led to their acquisition are avoidable under Section 548 of the Bankruptcy Code and Title 6 of the Delaware Code.

11.     In addition, the FTX Group funneled millions of dollars to numerous individuals who played critical roles at Genesis Block-affiliated entities while also working on behalf of the broader FTX Group, as well as to shell companies controlled by those individuals.  This included Leslie Tam, a senior employee of GBV Capital who also owned GBV Technologies, a shell company that held venture investments funded by Alameda.  Tam received more than $500,000 directly from the Debtors in addition to more than $25 million from Genesis Block-affiliated entities controlled and funded by the Debtors, which included "bonuses" for Tam's work for FTX.com while employed by GBV Capital.  These transfers were fraudulent and avoidable under Section 548 of the Bankruptcy Code and Title 6 of the Delaware Code.  Further, Defendant Able Rise—a shell company controlled by Wincent Hung—received gross transfers of digital assets currently valued at approximately $15 million during the ninety-day period prior to the commencement of these Chapter 11 Cases (the "Preference Period"), the vast majority of

which was traceable to transfers from the Debtors or from Genesis Block-affiliated entities controlled and funded by the Debtors.  These transfers constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.

12.      Despite withholding assets and interests acquired with Debtor funds, Defendants have filed claims in these Chapter 11 Cases totaling approximately $120 million.  Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property subject to turnover or that they received in transfers and all obligations incurred that are determined by the Court to be avoidable and/or recoverable.  Pursuant to Section 502(b) of the Bankruptcy Code, Plaintiffs further object to the $65,801,218 claim filed by Myth Success and the $5,669,678 scheduled claim of GB Holdings, because Myth Success and GB Holdings are not entitled to payment on the claims.

13.      During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, the Defendants that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiffs intend to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## THE PARTIES

14.      Plaintiff FTX.com is a corporation registered in Antigua and Barbuda that operated a cryptocurrency trading exchange available to non-US customers.

15.      Plaintiff Alameda is a British Virgin Islands company limited by shares.

16.      Plaintiff North Dimension is a Delaware corporation.

17.      Plaintiff Alameda Ventures is a corporation registered in Seychelles wholly owned by Alameda.

18.     Defendant Genesis Block is a limited liability company incorporated in Hong Kong.  As stated above, Genesis Block is an over-the-counter trading firm that also provided retail services in the form of a network of cryptocurrency ATMs.

19.     Defendant Bluebird is a limited liability company incorporated in the British Virgin Islands.  Ip and the FTX Insiders used Bluebird to conceal Alameda's ownership of Genesis Block.

20.     Defendant Key Solution is a limited liability company incorporated in the British Virgin Islands, and was a shareholder of Genesis Block prior to Genesis Block's acquisition by Alameda.

21.     Defendant Merchant Oasis is a limited liability company incorporated in the British Virgin Islands, and was a shareholder of Genesis Block prior to Genesis Block's acquisition by Alameda.

22.     Defendant Clement Ip is a co-founder and former-CEO of Genesis Block.  Ip is the sole shareholder and director of Bluebird.  Ip also served as a director of Debtor Cottonwood Grove Ltd.

23.     Defendant Wincent Hung is a co-founder of Genesis Block.

24.     Defendant Nicole Tin was the CFO of Genesis Block.

25.     Defendant Charles Yang was Head Trader at Genesis Block.  Yang, Wincent Hung, and Nicole Tin are collectively the "Genesis Block Insiders."

26.     Myth Success is a limited liability company incorporated in the British Virgin Islands.  The sole director of Myth Success was Florence Antonia Matilda Lawrie, who is Ip's partner.  Ip is now the sole director of Myth Success.  On information and belief, all of Myth Success's assets were obtained from the Debtors.

27.     GB Holdings is a limited liability company incorporated in the Cayman Islands. Nicole Tin is the sole shareholder of GB Holdings.

28.     GBV Capital is a company incorporated in the Cayman Islands.  Ip is the Director and sole shareholder of GBV Capital.  On information and belief, GBV Capital was used to invest Debtor funds while obscuring any connection to the Debtors.

29.     Defendant Leslie Tam was a senior employee of GBV Capital, and later was also employed by the FTX Group.

30.     Defendant Able Rise was owned by Hung, and maintained an account on FTX.com.

31.     Defendant GBV Technologies was owned by Defendant Leslie Tam, and received interests in companies acquired with Debtor assets.

32.     Defendant D21 Solutions is affiliated with GBV Capital and received interests in companies acquired with Debtor assets.

## OTHER RELEVANT PERSONS

33.     Bankman-Fried was a co-founder of Plaintiff Alameda and was its sole director until September 6, 2022.  He controlled Alameda through his 90% ownership stake in its parent company, Alameda Research LLC.  Bankman-Fried also held a 67% ownership stake in and controlled Plaintiff Alameda Ventures.  Bankman-Fried co-founded FTX.com.

34.     Caroline Ellison was the co-CEO of Plaintiff Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

35.     Nishad Singh was FTX.com's former Director of Engineering and held ownership stakes in various FTX Group companies.

36.     Zixiao "Gary" Wang was a co-founder of FTX.com and its former Chief Technology Officer and held ownership stakes in various FTX Group companies.

37.     Each of Bankman-Fried, Wang, Singh and Ellison was an "<u>FTX Insider</u>."

<u>**JURISDICTION AND VENUE**</u>

38.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Plaintiffs' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

39.     This adversary proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.

40.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

41.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Bankruptcy Court may enter final orders herein.

42.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

43.     The statutory predicates for the relief requested herein are Sections 105(a), 502(b), 502(d), 542, 544, 547, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.  This Court is authorized to issue declaratory relief pursuant to 28 U.S.C. § 2201.

44.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), Plaintiffs consent to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**I.      Bankman-Fried Defrauded Customers and Other Creditors of the FTX Group.**

45.      Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].

46.      As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  The FTX Insiders used this deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.

47.      All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the Genesis Block transactions.  On

December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud,

conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to

commit securities fraud, and conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19,

2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  Singh pleaded guilty to

the same felonies on February 28, 2023.  *See* Min. Entry, Feb. 28, 2023, *United States* v.

*Bankman Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On November 2, 2023, a jury found Bankman-

Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including wire

fraud and conspiracies to commit wire fraud, commodities fraud, securities fraud and money

laundering.  *See* Jury Verdict, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673

(S.D.N.Y. 2022).  On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.  *See*

Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

48.       In connection with his plea, Wang admitted that in 2019 he made "certain

changes to [the FTX.com] code" to give Alameda and its affiliates "special privileges on the

FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange,

even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-

issued) currencies and cryptocurrencies.  Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*,

22-cr-00673 (S.D.N.Y. 2022); *see* Plea Tr. 27:5-18, ECF No. 19, *United States v. Ellison*, 22-cr-

00673 (S.D.N.Y. 2022).  Using these "special privileges," the FTX Insiders frequently caused

Alameda entities, including Plaintiffs, to misappropriate funds from the FTX.com exchange for

their own benefit, including to make speculative investments for which they overpaid.

49.       Before his conviction, Bankman-Fried repeatedly, and publicly, claimed that

Alameda operated as "a wholly separate entity" from FTX.com.  Annie Massa et al., *Sam

Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags At FTX 3 Months*

*Before It Collapsed. Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-

flags-ftx-3-months-before-it-collapsed-what-said-how-lied.  Ellison was quoted as saying that

"[w]e keep [FTX and Alameda] quite separate in terms of day-to-day operations."  *Id*.  In reality,

Alameda routinely looted "several billion dollar[s]" from FTX.com using its "special privileges,"

thereby defrauding FTX.com's creditors.  Plea Tr. 28:23-29:2, ECF No. 102, *United States* v.

*Singh*, 22-cr-00673 (S.D.N.Y. 2022); Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-

cr-00673 (S.D.N.Y. 2022).

50.    By approximately July 2022, Ellison had conspired with Bankman-Fried to

"provide materially misleading financial statements to Alameda's lenders," such as "balance

sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that

Alameda had made to FTX executives and to related parties."  Plea Tr. 28:9-16, ECF No. 19,

*United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022).  Ellison also agreed with Bankman-Fried

and others "not to publicly disclose the true nature of the relationship between Alameda and

FTX, including Alameda's credit arrangement."  *Id*. at 28:19-21.

51.    The FTX Insiders were aware at all relevant times of the "special privileges on the

FTX platform" and that Alameda was "borrowing" (*i.e.*, looting) billions of dollars from

FTX.com in order to, among other things, finance sham "loans" from Alameda to the FTX

Insiders.  Ellison admitted to being aware of this arrangement from 2019 through 2022, which

she described as "permitt[ing] Alameda access to an unlimited line of credit without being

required to post collateral, . . . pay interest . . . [or] being subject to margin calls or FTX.com's

liquidation protocols."  *Id*. at 27:11-15.

52.     Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the fraudulent relationship between Alameda and FTX, and the scheme pursuant to which the FTX Insiders misappropriated customer funds.  For example, Singh testified that he and Wang implemented the "allow negative feature" which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit."  Trial Tr. at 1362:25-1363:10.  When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main line plan remains, making FTX successful and growing it."  *Id.* at 1411:3-1412:10.  FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it.  The only thing we can do is grow the company and fill the hole." *Id.* at 1964:12-1965:5.

53.     Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could [get] from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments . . . in . . . relatively early-stage companies."  *Id.* at 693:4-17.  Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which "had been concealed from FTX's auditors."  *Id.* at 937:12-14. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare some alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad."  *Id.* at 786:13-22. When third party lenders sought repayment of open term loans, Alameda would repay them— often using commingled and misappropriated funds obtained through its "unlimited line of

credit"—so as to continue to project a façade of financial strength and solvency and prevent lenders from taking legal action that might cause the fraud to come to light.

54.     As described below, the FTX Insiders used these Alameda funds and privileges, including the "unlimited line of credit" and exemption from the liquidation protocol, to, among other things, fund acquisitions and venture investments—including Genesis Block.

## II.    Bankman-Fried's Initial Relationship With, and Investment In, Genesis Block.

### A.    Genesis Block Provides Bankman-Fried Early Assistance.

55.     Bankman-Fried first met Ip in November 2018 at a Hong Kong cryptocurrency conference.  Following the conference, Bankman-Fried wrote in an internal memo that he "really liked the people" at Genesis Block and that they "could be pretty valuable."  By December 2018, Alameda and Genesis Block each had begun trading over-the-counter on the other's platform.

56.     Bankman-Fried's relationship with Ip and Genesis Block soon blossomed.  Ip introduced Bankman-Fried's then-fledgling trading firm to already-established cryptocurrency players and "vouched" for the company.  In January 2019, Genesis Block sponsored a Hong Kong visa for Gary Wang via a letter signed by Wincent Hung, who had co-founded Genesis Block with Ip.

57.     Ip and Genesis Block not only afforded Bankman-Fried and Alameda business connections, but also an opportunity to circumvent fiat currency restrictions in Asian markets. According to a memo drafted by Bankman-Fried, Genesis Block had the ability to get Chinese yuan "out of [C]hina" and South Korean won "out of [K]orea."  Genesis Block also allowed Bankman-Fried to capitalize on the fact that during certain periods, cryptocurrency traded in South Korean markets at a premium to other markets.

**B.    Bankman-Fried Causes Alameda Ventures To Invest in Genesis Block.**

58.    By December 2019, Alameda and Genesis Block were well-established trading partners.  Bankman-Fried sought to capitalize on and deepen their relationship, including with the newly-founded FTX.com exchange, by entering into an investment deal and partnership agreement with Genesis Block.

59.    Bankman-Fried was particularly interested in Genesis Block's network of cryptocurrency ATMs throughout Asia, including in Hong Kong, Japan, Taiwan, and Thailand. These ATMs allowed Genesis Block customers to circumvent bank and regulatory scrutiny by depositing cash in exchange for instant transfers of cryptocurrency.  Media reports quote a former Genesis Block employee who claimed the ATM network was so successful that "[p]eople were literally lining up around the corner with bags of cash at Genesis Block" and "[s]ometimes [Genesis Block] shut the door saying they were out of bitcoin."

60.    Draft term sheets exchanged between Bankman-Fried and Genesis Block set out the transaction and partnership structure.  Alameda Ventures (an Alameda subsidiary) agreed to pay a total of $5 million (across multiple cryptocurrencies) for preferred shares in Genesis Block effectively representing a 20% ownership interest.  In addition, Genesis Block agreed to "help[] Alameda with FX onramps to FTX," while Alameda agreed to help Genesis Block "with various dev tasks, potentially including ATMs and an OTC portal whitelabel."  The term sheet was executed on February 16, 2020, Alameda Ventures transferred the consideration to Genesis Block on March 1, 2020, and the subscription agreement transferring Alameda Ventures its preferred shares was executed on November 3, 2020.

61.    Prior to the transaction, Genesis Block had seven shareholders:  Wincent Hung, Key Solution, Merchant Oasis, Bluebird, Gioia DA Ventures Limited ("Gioia DA Ventures"), KST Ventures Limited ("KST Ventures"), and Vision Keen Limited ("Vision Keen").  Upon

information and belief, Bluebird was a shell corporation wholly owned by Ip; Vision Keen was

wholly owned by Hung; KST Ventures was wholly owned by Yang; and Gioia DA Ventures was

wholly owned by Nicole Tin.  Following the transaction, the 280 shares of Genesis Block would

be split as follows:

| Holder | Ordinary Shares | Series A Preferred |
|---|---|---|
| Wincent Hung | 100 | 0 |
| Key Solution | 40 | 0 |
| Bluebird | 28 | 0 |
| Gioia DA Ventures | 18 | 0 |
| KST Ventures | 16 | 0 |
| Vision Keen | 12 | 0 |
| Merchant Oasis | 10 | 0 |
| Alameda Ventures | 0 | 56 |

**C.    The Companies Become Further Intertwined.**

*62.*    Shortly after Alameda Ventures' March 1, 2020 investment in Genesis Block,

Genesis Block began "employing" certain FTX Group personnel, who were "seconded" back to

the FTX Group.  For example, Genesis Block nominally employed Wang and Singh—two of the

FTX Insiders—which, upon information and belief, was designed in whole or in part to facilitate

their obtaining Hong Kong visas.  In April 2020, Singh signed an offer of employment with

Genesis Block to begin on April 27, 2020, subject to Hong Kong's Immigration Department

issuing him an employment visa.  Then, in July 2020, Singh signed an agreement with Genesis

Block to begin a "secondment" with its "client," Cottonwood Grove Ltd ("Cottonwood Grove"),

a wholly-owned subsidiary of Alameda.

63.    Genesis Block executives also made public comments about their close

relationship with the FTX Group.  On July 24, 2020, an episode of an FTX Group-produced

podcast featured an interview with Yang in which he stated, "[s]o there's obviously, you know,

maximum trust between Alameda/FTX with Genesis Block, just because we've been working

with [them] for so long.  You know, the details are not actually public but, like, you know

Alameda does have a stake in Genesis Block."  Yang also commented that Genesis Block

maintained a network of "50 to 100 linked bank accounts used by Alameda."

**III.    Alameda Secretly Acquires the Remaining Interests in Genesis Block.**

64.    In early 2021, Bankman-Fried, Ip and Hung agreed to a convoluted transaction

designed to allow Alameda to buy out nearly all of the remaining Genesis Block shareholders for

approximately $40 million and take complete control of Genesis Block, while also concealing

Alameda's acquisition of Genesis Block from regulators and the public (the "Bluebird

Buy-Out").  This transaction took place through two steps.

65.    *First*, all of the existing Genesis Block shareholders transferred their Genesis

Block shares to Bluebird, a shell company owned by Ip (with the only exception being Hung,

who transferred most of his shares but retained an approximately 11% stake in Genesis Block).

Those Genesis Block shareholders were compensated for those transfers in a variety of ways, all

of which were funded by Alameda.  For example, for Key Solution and Merchant Oasis, which

were the only Genesis Block shareholders that were not also Genesis Block Insiders, Bankman-

Fried and Ip arranged for Bluebird to execute agreements to purchase each of their shares.  Those

agreements were executed on January 27 and January 28, 2021, and provided that Bluebird

would pay $5,428,571.20 in USDT (a "stablecoin" cryptocurrency) to Key Solution and

$1,357,142.80 to Merchant Oasis in exchange for their Genesis Block shares.  Notwithstanding

that Bluebird, not Alameda, was party to these agreements, Alameda funded both purchases:  On

January 29, 2021, Bankman-Fried caused Alameda to transfer $5,428,571.20 in USDT and

$1,357,142.80 to Bluebird's FTX.com account, at which point those funds were then transferred

to the FTX.com accounts of Key Solution and Merchant Oasis in exchange for their Genesis

Block shares, respectively.

66.     *Second*, Bankman-Fried, Ip and Hung came up with another mechanism to fund the purchases of the other Genesis Block shares and to further obfuscate Alameda's ownership of Genesis Block.  As set forth in a draft "Token Purchase Agreement" between Genesis Block and Alameda dated February 18, 2021 (the "Token Agreement"), Genesis Block agreed to create a new cryptocurrency token, called the "GB dividends token" ("GBDT").  Genesis Block and Alameda agreed that "100% of [Genesis Block] dividends that are issuable to Bluebird" would be "tokenized" into GBDT, and that Alameda would receive 96% of all GBDT minted through this process, with the remaining 4% split evenly between Ip and Yang.

67.     In consideration for the GBDT, Alameda agreed to deliver to "such parties and pursuant to such methods as directed by [Bluebird]" the following:

- "$6,785,714 paid as a non-refundable deposit," which matches the amount that Alameda already had paid to Merchant Oasis and Key Solution for their Genesis Block shares;[4]

- $3,350,000 in USDC (another "stablecoin") once the GBDT tokens were minted and delivered;

- FTT tokens valued at $10,050,000 (to be delivered subject to a four-year lock-up schedule);

- Serum tokens ("SRM") valued at $10,050,000 (to be delivered subject to a seven-year lock-up schedule); and

- FTX.com equity valued at $10,050,000.

68.     As set forth in more detail below, Alameda complied with its obligations to deliver these forms of compensation "as directed by Bluebird," with Bluebird in turn transferring that compensation to the Genesis Block shareholders that had agreed to sell their shares to Bluebird.  The practical and intended effect of this structure was that Alameda agreed to transfer

---

[4]     In other words, the agreement appears to have enshrined the transaction that had already occurred on January 29, 2021, in which Alameda paid Merchant Oasis and Key Solution for their Genesis Block shares.

assets valued at approximately $40 million to acquire nearly all of the remaining shares of

Genesis Block, ensuring that Alameda obtained control over Genesis Block and would receive

nearly all of Genesis Block's profits, while also keeping nominal ownership of Genesis Block in

the hands of Ip (via Bluebird) and concealing the fact that Alameda was the true owner.

69.   Although Plaintiffs have not identified an executed copy of the Token Purchase

Agreement, the parties appear to have performed roughly according to its terms:

- On or around February 18, 2021, FTX.com issued Bluebird 1,300,659 shares of FTX Trading Ltd. common stock, then valued at $10,050,000 (the "FTX Trading Shares").

- In December 2021, Genesis Block issued a dividend of $29,852,580.61. $3,198,490.78 was distributed to Hung, representing his outstanding 11% interest in Genesis Block. The remaining $26,654,089.83 was transferred to Bluebird and "tokenized" per the Token Agreement. Genesis Block minted 26,654,089.83 GBDT, 25,587,926.24 of which were transferred to Alameda Ventures. The remaining 1,066,163.6 tokens were split evenly between Ip and Yang. Alameda Ventures, Ip, and Yang then "sold" their GBDT tokens back to Bluebird at a price of $1 per token, with Alameda Ventures receiving $25,587,926.24 and Ip and Yang each receiving $533,081.80 from Bluebird.

- On December 10, 2021, Alameda Ventures transferred 3,350,000 USDC from its FTX.com exchange account to Ip's FTX.com exchange account. That same day, Ip transferred the majority of those funds to other FTX.com accounts associated with Hung and Ip, as set forth in Appendix A. On information and belief, these transfers constituted payment for the shares that Hung and Ip had transferred to Bluebird on or around February 5, 2021.

- Alameda Ventures also established a payment schedule for delivery of FTT and SRM as set forth in the Token Purchase Agreement. For example, on August 26, 2022, Alameda Ventures transferred 121,408.48 FTT and 266,991.83 SRM from its FTX.com account to Ip's FTX.com account, representing the first installment of FTT and SRM. Ip then promptly transferred the bulk of that FTT and SRM to the FTX.com accounts of Genesis Block's former shareholders (as well as certain Genesis Block employees), as set forth in Appendix B. On October 10, 2022, Alameda Ventures transferred another 72,845.09 FTT and 160,195.10 SRM from its FTX.com account to Ip's FTX.com account, and Ip again promptly transferred the bulk of that FTT and SRM to the FTX.com accounts of Genesis Block's former shareholders (as well as certain Genesis Block employees), as set forth in Appendix B. On information and belief, these transfers constituted payment for the shares that the former shareholders had transferred to Bluebird on or around February 5, 2021.

**IV.    Genesis Block Effectively Operates as a Subsidiary of the FTX Group.**

**A.    Genesis Block Employees Begin Work for the FTX Group.**

70.    After the Bluebird Buy-Out, the FTX Group effectively integrated Genesis Block and its employees into the FTX Group's operations.  Ip remained the director of Bluebird and, for a period of time, the CEO of Genesis Block, but in reality functioned as an FTX Group employee.  An internal FTX Group spreadsheet titled "Employees – Source of Truth" listed Ip as an FTX.com employee, drawing a $200,000 salary in 2022.  Another internal FTX Group spreadsheet listed Ip's title as "Senior Ventures" and noted that he reported directly to Bankman-Fried.  That same document contained what appears to be Bankman-Fried's performance review of Ip, which stated:  "I'm really happy that we ended up joining forces, and really grateful to have you on the team."  On January 17, 2022, Ip was also appointed a director of Cottonwood Grove, where he had been tasked with "help[ing] FTX scale their operations globally," and Ip also served as a director of FTX Hong Kong from its establishment in September 2022 until November 2022.

71.    Although Yang was nominally employed by Genesis Block from January 2018 to December 2022 in various roles, internal FTX Group spreadsheets also identified Yang as an FTX Group employee beginning after the Bluebird Buy-Out.  One such spreadsheet identified Yang's title as "Senior OTC," drawing a salary of $150,000, and noted that (like Ip) Yang reported directly to Bankman-Fried.  Yang himself acknowledged his role at the FTX Group–in April 2022, Yang appeared as a panelist at a blockchain developer event and billed himself as a "Principal" of Alameda Ventures.

72.    Internal FTX Group records reflect that dozens of other Genesis Block personnel were in fact employed by the FTX Group.  For example, an internal FTX Group spreadsheet lists 42 Genesis Block employees based in Hong Kong and their 2022 salaries.  All of these purported

Genesis Block employees had "ftx.com" email addresses, and all but three reported to Ip, who in turn reported to Bankman-Fried.

73.     At one point, Bankman-Fried sought to reassign certain Genesis Block employees to another FTX Group subsidiary, FTX Digital Markets, Ltd. ("FDM").  The FTX Group sent these Genesis Block employees offer letters titled "Conditional Offer of Employment with FTX Digital Markets Ltd. and Resignation from Genesis Block Limited (HK)," which stated in relevant part:  "*As you will continue to remain an employee of an affiliate company of Genesis Block*, the Company may take into account your time at Genesis Block up to the Resignation Date for the purpose of any bonus award, which will be made on a pro-rata basis on the normal bonus payment date."  (emphasis added).  The letters also noted that there would be "no break in continuity of service," and that "any accrued but unused leave up to the Resignation Date may be carried over to [FDM]."

**B.     Genesis Block Employees Furthered the FTX Insiders' Fraudulent Scheme.**

74.     The FTX Insiders also utilized an account opened in the name of Yang's father to reallocate approximately $8 billion in Alameda liabilities owed to FTX.com as a result of its unlawful "borrowing."  The FTX Insiders did this in order to hide Alameda's liabilities from auditors and potential investors.  On February 8, 2022, a user associated with the e-mail "seoyuncharles88@gmail.com" registered an FTX.com account, and thereafter submitted KYC documentation which included the passport and bank statement of Yang's father.  FTX.com's internal records include the following note associated with this account:  "[A]lameda [was] gonna use this for deposits withdrawals – KYC requested by Charles Y."

75.     In August 2022, FTX.com's database records reflect the entry of a transaction that effectively "transferred" approximately $8 billion USD from the FTX.com account registered to seoyuncharles88@gmail.com to the FTX.com account registered to "fiat@ftx.com,"

notwithstanding that the seoyuncharles88@gmail.com account did not contain $8 billion USD to be transferred.  FTX.com's internal records reflect that this "transfer" included a note that it was "moving counterparty balances to [a] different account."  At Bankman-Fried's criminal trial, Wang referred to the seoyuncharles88@gmail.com account as the "Korean friend" account, and testified that the $8 billion "transfer" was in actuality an "Alameda subaccount" that was "reassociated in the database to fall under Seoyun Charles' account."  Trial Tr. at 454:19-22.  Wang further testified that the "Alameda subaccount" in question was reassigned to the "Korean Friend" account "so that [the Alameda subaccount's] balances would not be included in the line-of-credit interest payments that Alameda was paying."  *Id.* at 458:10-12.

###    C.    The FTX Group's Use of Genesis Block and Its Affiliates.

76.    On March 9, 2022, following the Bluebird Buyout, Genesis Block created an account on the FTX.com exchange that was registered to Myth Success, a BVI-registered entity that had been established in January 2022 and was at that time wholly owned by Florence Antonia Matilda Lawrie, who was Clement Ip's partner.  FTX.com's internal records reflect that this account (the "Myth Success Account") was labeled with an internal name of "ftx_genesis_block" and had been registered using a Genesis Block email address ("ftx@genesisblockhk.com").  The KYC documentation for the Myth Success Account was also submitted via the email account ftx@genesisblockhk.com.

77.    Upon information and belief, Myth Success had no income or operations of its own, and served only as one of the many shell companies that the FTX Group controlled and used for various purposes.  The Myth Success Account received hundreds of millions of dollars from Alameda and accounts associated with Genesis Block.  Alameda also used Myth Success and other Genesis Block-affiliated persons and entities to engage in cryptocurrency trading on other exchanges, with those entities operating on Alameda's behalf and using Debtor assets

without disclosing Alameda's involvement.  The Debtors already have recovered certain of the assets held in the name of these Genesis Block-affiliated entities on other platforms–for example, the Debtors previously filed a consensual turnover motion that included millions of dollars of Debtor assets held at OKX, a third-party cryptocurrency exchange, in the name of Myth Success [D.I. 1189], which was granted without objection [D.I. 1245].

78.     To date, the Debtors have been unable to recover certain other Debtor assets that were held at third-party cryptocurrency exchanges in accounts that were nominally registered to Genesis Block-affiliated entities or persons, but that were at all times funded, controlled and used by Alameda.  This includes an account at third-party exchange "Upbit" registered in the name of Yang's father under the alias "seoyuncharles," as well as an account at third-party exchange "Crypto.com" registered to Nicole Tin, using an e-mail address connected to GB Holdings, gbhl@genesisblockhk.com (together, the "Third-Party Exchange Accounts").

79.     As the declaration executed by Caroline Ellison, CEO of Alameda, attached hereto as Exhibit 1 makes clear, each of these accounts, and any right or entitlement associated with them, is the property of Alameda.  As of the Petition Date, the value of the assets in the Third Party Exchange Accounts was at least $64.8 million.

80.     The FTX Group also transferred extensive assets to a Genesis Block affiliate called GBV Capital in order to fund numerous investments, as described herein.  GBV Capital is nominally owned by Ip, who operates as the entity's sole director.  On its website, GBV Capital describes itself as a venture fund that invests in blockchain and digital asset companies, and lists approximately 160 entities in its investment portfolio.

81.     On November 30, 2020, a few weeks after GBV Capital was formed, Alameda granted GBV Capital a $20 million dollar, interest free, unsecured "loan" to purchase OMG

Network.  This "loan" was nothing of the kind.  In an email several days prior, the then-General

Counsel of Alameda wrote, "Our understanding between [Alameda] and GB is that [Alameda]

will finance this thing and that part is not Clement [Ip's] burden . . . ."  On November 30, 2020,

Alameda wired the "loan" directly to OMG Network's beneficial owner, SYNQA Pte. Ltd., to

fund the transaction.  The wire amount was $18,249,054, which was equal to the $20 million

loan amount less transaction fees and a 10% holdback.  A few days later, GBV Capital

announced that it would be taking over OMG Network entirely.  Despite funding GBV Capital's

acquisition of OMG Network, Alameda on paper received no ownership interest in OMG

Network.

82.    Following the acquisition, GBV Capital became OMG Network's sole

shareholder, and Ip became its director.  Under Ip's direction, OMG Network formed a Thai

subsidiary, GBV Tech Co. Ltd. ("GBV Tech"), in April 2021, and transferred the company to

FTX.com through a series of share transfers that obscured FTX.com's involvement.  On April 2,

2021, shortly after forming GBV Tech, OMG Network transferred its ownership interest in GBV

Tech to GBV Capital.  GBV Capital then transferred GBV Tech to a shell company owned by an

FTX.com employee on May 12, 2021.  This arrangement allowed FTX.com to exercise full

control over GBV Tech without alerting the Thailand Board of Investment.

**83.**    Genesis Block and GBV Capital employees were also operating out of the same

Hong Kong office space as FTX Group employees by April 2021.  An FTX Group spreadsheet

entitled "HK office floor planning" shows that the desks of Genesis Block and GBV Capital

employees, including Ip, were situated alongside the desks of other FTX Group employees, on

the same floor in the same Hong Kong office.

84.     As early as July 1, 2021, Ip, as director of both GBV Capital and OMG Network, began to oversee OMG Network's plans to release a new token, originally called "OMGX" and changed to "BOBA" before it was launched.  The BOBA token would be launched in conjunction with Boba Network, a rebranded version of OMG Network.  On September 6, 2021, Alameda Ventures invested $100,000 in the new BOBA token.  Ip noted that there would be no public announcement of Alameda Ventures' investment in Boba Network "unless permission is granted" and that the recent "genesis round cap table will not be disclosed at all."  As part of the transition from OMG Network to Boba Network, Alameda also created a new Panamanian shell company, OMG Foundation (later renamed "Boba Foundation"), to act as the holding company under which the new Boba Network would operate.  This arrangement further obscured Alameda's ownership of and involvement in the new Boba Network, allowing Alameda to use GBV Capital to avoid public and regulatory scrutiny at every step.

85.     After the OMG Network acquisition, between September 2021 and August 2022, Alameda Ventures transferred $7.95 million to GBV Capital through its exchange account for investment in at least 36 other portfolio companies (the "Portfolio Companies") for which GBV Capital or a related entity received the interest, as set forth below.

| # | GBV Portfolio Company | Alameda Ventures' Investment | Entity Receiving Interest |
|---|---|---|---|
| 1 | AdaSwap Corp, LLC | $150,000 | GBV Technologies |
| 2 | Atlas Research Inc. (d/b/a Atlas Dex) | $200,000 | GBV Capital |
| 3 | Aura Network Ltd. | $200,000 | GBV Technologies |
| 4 | Bitlocus LT, UAB | $50,000 | GBV Capital |
| 5 | Blockbets Corp. (d/b/a Blast) | $125,000 | GBV Technologies |
| 6 | Cantina Royale AG | $100,000 | GBV Technologies |
| 7 | CFC Inc. (d/b/a CryptoFightClub) | $100,000 | D21 Solutions |

| # | GBV Portfolio Company | Alameda Ventures' Investment | Entity Receiving Interest |
|---|---|---|---|
| 8 | Chainverse Foundation Ltd. (d/b/a Boba Brewery) | $50,000 | GBV Technologies |
| 9 | Chestr Labs Inc. | $250,000 | D21 Solutions |
| 10 | Degis Global Limited | $200,000 | GBV Technologies |
| 11 | Forward Enterprise Co. Ltd. (d/b/a FWX) | $360,000 | GBV Technologies |
| 12 | Imperium Empires Company Ltd. | $100,000 | GBV Capital |
| 13 | IQ Labs Ltd. (d/b/a IQ Protocol) | $125,000 | GBV Technologies |
| 14 | KnownOrigin Labs Limited | $650,000 | GBV Capital |
| 15 | Kryptonium Pte. Ltd. (d/b/a Beoble) | $290,000 | GBV Technologies |
| 16 | LewkLabs Inc. (d/b/a Lewk) | $200,000 | GBV Capital |
| 17 | Moonray PBC | $100,000 | GBV Capital[5] |
| 18 | Moonshade Limited (d/b/a SparkWorld) | $250,000 | GBV Technologies |
| 19 | MultiSig Labs Inc. (d/b/a GoGoPool) | $180,000 | GBV Technologies |
| 20 | MyMessage Foundation Pte. Ltd. | $100,000 | D21 Solutions |
| 21 | Neptune Tech Limited (d/b/a Neptune Mutual) | $400,000 | GBV Technologies |
| 22 | OneOOne Foundation (d/b/a DOKO) | $150,000 | GBV Technologies |
| 23 | OP Crypto Capital Management Limited | $200,000 | GBV Capital |
| 24 | Play It Fwd Pte Ltd. (d/b/a PIF Nation) | $300,000 | GBV Technologies |
| 25 | Sandstorm Media Inc. | $100,000 | GBV Technologies |
| 26 | SignalPlus Ltd. | $700,000 | GBV Capital |
| 27 | Smash Works Inc. (d/b/a ARCH Finance) | $100,000 | GBV Technologies |
| 28 | Snowflake Network Inc. | $260,000 | GBV Technologies |
| 29 | Starry Night Capital GP Limited | $100,000 | GBV Capital |
| 30 | Streamflow Tech Limited (d/b/a Streamflow Finance) | $100,000 | GBV Technologies |
| 31 | Tenka Labs (d/b/a Ignite Tournaments) | $385,000 | GBV Technologies |

[5] Plaintiffs have not identified an agreement between Moonray PBC and GBV Capital, but on information and belief, GBV Capital received the interest in Moonray PBC funded by Alameda Ventures' investment. *See* Andrew Hayward, *First Bitcoin Metaverse Game on Stacks, Moonray, Raises $3.5M*, DECRYPT (Dec. 14, 2021), https://decrypt.co/88230/first-bitcoin-metaverse-game-stacks-moonray-raises-3-5m.

| # | GBV Portfolio Company | Alameda Ventures' Investment | Entity Receiving Interest |
|---|---|---|---|
| 32 | TinyVerse Ltd. (d/b/a Tiny Colony) | $320,000 | GBV Technologies |
| 33 | Trader Joe | $300,000 | GBV Capital |
| 34 | Voltage Foundation Ltd. (f/k/a FuseFi Ltd. and FuseFi Foundation Ltd.) | $130,000 | GBV Technologies |
| 35 | Xenon Protocol Inc. | $325,000 | GBV Technologies |
| 36 | Yonemo Ltd. (d/b/a Hooga Gaming) | $300,000 | GBV Technologies |

86.     An additional $4 million was transferred to GBV Capital directly from Debtor bank accounts as follows:  $2,500,000 on May 20, 2021 from a North Dimension Silvergate account ending in -8738, and $1,500,000 on July 15, 2021 from an Alameda Silvergate account ending in -4456.

87.     Upon information and belief, Alameda Ventures received no direct equity interests in the 36 Portfolio Companies in exchange for its transfers.  In most instances, to obscure the nature of Alameda Ventures' involvement, GBV Capital initiated engagement with the Portfolio Companies.  Following execution of the agreements, GBV Capital disbursed investment funds to the Portfolio Companies via GBV Capital sub-accounts on the FTX.com exchange.  Alameda Ventures subsequently transferred funds to the corresponding GBV Capital sub-accounts to fund those same investments.  Despite funding GBV Capital's investments in at least 36 Portfolio Companies, Alameda Ventures received no nominal ownership interest in the Portfolio Companies.

88.     The FTX Group also sought to acquire or establish other entities, including businesses in Singapore, Philippines, and Mexico, which were to be operated by Genesis Block on the FTX Group's behalf.  Communications indicate that the FTX Group often sought to have Genesis Block operate these entities to avoid "expos[ing] FTX to regulators."

89.     For example, in August 2022, FTX.com and Genesis Block worked together to acquire Rebittance Inc., a crypto trading platform in the Philippines.  According to internal notes, Rebittance would rebrand as "FTX PH" via a licensing agreement with FTX.com, but would be formally owned by Genesis Block and "FTX [would have] NO ownership in Rebittance or Genesis Block."  The purpose of this arrangement apparently was to "reduce FTX Global's 'doing business' exposure" in the Philippines."  Despite having no formal ownership interest in Rebittance on paper, FTX.com "loaned" Genesis Block more than $6 million to fund its acquisition of Rebittance in early 2022 via FTX.com exchange transfers.  Following the acquisition, Ip was expected to serve as Rebittance's Chief Technology Officer and Hung as its Chief of Staff.  No payments were ever made on the loan, and upon information and belief the acquisition never closed.

90.     Alameda also funneled millions of dollars to numerous individuals who played senior roles at Genesis Block-affiliated entities while also working on behalf of the broader FTX Group, as well as to shell companies controlled by those individuals.  For example, Leslie Tam received approximately $540,000 on or around April 12, 2022 from Alameda through transfers from Alameda's FTX.com exchange account to one of Tam's FTX.com accounts.  Upon information and belief, Tam received these transfers as "bonus" payments in connection with Tam's work as a senior employee at GBV Capital while also working for the FTX Group.  The internal "Employees – Source of Truth" spreadsheet lists Tam as having the role of "Senior Ventures" at FTX.com and reporting directly to Bankman-Fried.  In addition to the "bonus" payments directly from Alameda, Tam received significant transfers from Genesis Block-related entities, including $20 million from GBV Capital and $6 million from GBV Technologies, a

shell company wholly owned by Tam that is holding investments purchased with Debtor assets that are subject to turnover.

**V.      Alameda Recalls "Loans" to Myth Success.**

91.    The Debtors' records also reflect significant additional transfers to Genesis Block and affiliated entities, with Alameda transferring those funds to Genesis Block through internal transfers on the FTX.com exchange as well as through transfers via Alameda's over-the-counter trading platform.

92.    In early November 2022, the FTX Insiders were frantically scrambling to "scrap[e] stuff together" to fund customer withdrawals and avoid triggering defaults, which would have revealed their fraud.  In connection with those efforts, FTX Group personnel asked Genesis Block to return the transferred assets, which they described as "loans."  In a Slack discussion in an "alameda-gb-trading" channel on November 9, 2022, an FTX Group employee asked Genesis Block to return assets collectively valued at approximately $62 million at that time, denominated in different cryptocurrencies as set forth below.

| Asset | Quantity | "Loan" Date |
|---|---|---|
| USD | 10,000,000 | 1/15/2021 |
| USD | 2,000,000 | 2/13/2021 |
| USD | 5,000,000 | 2/13/2021 |
| USD | 5,000,000 | 2/15/2021 |
| USD | 5,000,000 | 2/22/2021 |
| USD | 5,000,000 | 3/24/2021 |
| USD | 5,000,000 | 3/25/2021 |
| BTC | 15 | 3/26/2021 |
| BTC | 15 | 3/26/2021 |
| BTC | 30 | 4/5/2021 |
| XRP | 450,000 | 4/2/2021 |

| Asset | Quantity | "Loan" Date |
|-------|----------|-------------|
| XRP | 1,000,000 | 4/15/2021 |
| USD | 10,000,000 | 4/18/2021 |
| USD | 10,000,000 | 4/18/2021 |
| ETH | 500 | 6/22/2021 |
| AXS | 10,000 | 8/20/2021 |
| MANA | 200,000 | 11/1/2021 |
| GALA | 1,000,000 | 3/10/2022 |
| KNC | 65,000 | 7/27/2022 |

93.     Yang agreed to the request, and stated that the funds in question had been transferred to specified sub-accounts of the FTX.com accounts registered to Myth Success and GB Holdings.

94.     Ip appears to have hoped that the fact of these transfers would be lost in the chaos and disarray of the FTX Group's implosion, and—in a baffling act of hubris—filed a Customer Proof of Claim on behalf of Myth Success (Claim No. 69723), asserting a $65.8 million customer claim for the balance of the Myth Success Account, notwithstanding that Genesis Block had acknowledged just days prior to the Petition Date that the balances in the Myth Success Account reflected assets belonging to the Debtors.  Myth Success and Ip do not have a valid claim against the Debtors with respect to the balance of the Myth Success Account. Similarly, GB Holdings' scheduled claim (Scheduled Claim No. 5306218) for $5,669,678 also is based on an FTX.com customer account balance reflecting assets belonging to the Debtors, and GB Holdings likewise does not have a valid claim against the Debtors with respect to that customer account.

**VI.    Preferential Transfers Made by FTX.com to Able Rise.**

95.    Based on currently available information, during the Preference Period, Able Rise—an entity wholly owned by Wincent Hung—received the benefit of certain withdrawals of digital assets and fiat currency from its FTX.com exchange account as set forth in <u>Exhibit 2</u>. Based on pricing as of October 1, 2024, those assets are collectively valued at approximately $15,098,003.29.[6]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Able Rise may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Able Rise's FTX.com account subsequent to these preferential transfers.

96.    The remaining balance of Able Rise's FTX.com account—the approximately $2.5 million that Able Rise has claimed in Claim No. 10631—is attributable entirely to transfers from Myth Success on November 3 and 8, 2022, mere days before the Petition Date.  Able Rise attempted to withdraw these remaining assets but was unable to do so before withdrawals from the FTX.com exchange were halted.

*      *      *

97.    Section 542(a) of the Bankruptcy Code mandates that "an entity, other than a custodian, in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

98.    As the declaration executed by Caroline Ellison, CEO of Alameda, attached hereto as <u>Exhibit 1</u> makes clear, there is no bona fide dispute that the following are all property

---

[6]    The Debtors are continuing to investigate the degree to which various accounts were actually controlled by the entities and individuals to which they were registered.

of the Debtors' estates pursuant to Section 541(a)(1) of the Bankruptcy Code, which defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held," 11 U.S.C. § 541(a):[7]

     (i)     the Genesis Block shares held by Bluebird;

     (ii)    GBV Capital's rights and interests in the Boba Network and affiliated entities;

     (iii)   GBV Capital's, D21 Solutions', and GBV Technologies' rights and interests in the Portfolio Companies; and

     (iv)   the Third-Party Exchange Accounts.

99.    "Congress intended that property of the estate be broadly inclusive of all interests that the debtor has under state law." *In re Barksdale*, 281 B.R. 548, 551 (Bankr. D.N.J. 2002). "[T]he Bankruptcy Code is not concerned with the 'technicalities of title' when it comes to determining property of the estate." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *8 (Bankr. D.N.J. June 29, 2006) (cleaned up).  Instead, property belongs to the estate where the debtor controls the property or otherwise indicates its "legal or equitable interests" in the property.  *E.g.*, *In re Schwartz*, 2014 WL 2621114, at *5 (Bankr. D.N.J. June 12, 2014) (holding that bank account not in debtor's name was nevertheless property of the estate where debtor funded account, showed "ownership, control, and interest" in account, and money "functionally belonged" to debtor).

---

[7]    In addition, insofar as Genesis Block or Bluebird qualifies as a custodian under Bankruptcy Code section 543, it is obligated to "deliver to the [Debtors] any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case."  11 U.S.C. § 543(b).

100.    In the alternative, as set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers to Defendants described herein, including that:

    i.    The transfers were facilitated by the close relationship between Plaintiffs and Defendants Genesis Block, Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis, and GBV Capital;

    ii.    The transfers were concealed;

    iii.    The transfers were made by Plaintiffs, but the actual benefit of the transfers (*i.e.*, the Genesis Block shares, the Boba Network and related entities, the Portfolio Companies) went to Bluebird, D21 Solutions, GBV Technologies, and GBV Capital;

    iv.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

    v.    Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

    vi.    The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

## CAUSES OF ACTION

### COUNT ONE
### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
### (AGAINST DEFENDANTS GENESIS BLOCK AND BLUEBIRD)

101.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

102.    As alleged above, the acquisition of the Genesis Block shares by Bluebird was funded entirely by Plaintiffs.  The acquisition was structured in such a way as to obscure the Debtors' ownership of Genesis Block.  An actual controversy exists between the Debtors and Genesis Block and Bluebird regarding the rights to the shares of Genesis Block.  Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs are entitled to a judgment declaring that all shares of Genesis Block held by Bluebird are property of the Debtors.

**COUNT TWO**
**TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542(a)**
**(AGAINST DEFENDANT BLUEBIRD)**

103.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

104.    As alleged above, Bluebird continues to withhold the shares of Genesis Block paid for by Plaintiffs.  Plaintiffs seek an order from the Court directing Bluebird to turn over to Plaintiffs the Genesis Block shares, which are property of the Debtors' bankruptcy estates pursuant to Bankruptcy Code Section 542(a)(1).

105.    The relief requested also is authorized under the Court's equitable powers codified in Section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

**COUNT THREE**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST DEFENDANTS IP, HUNG, TIN, YANG, BLUEBIRD, KEY SOLUTION AND MERCHANT OASIS)**

106.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

107.    In the alternative to Counts One and Two, Plaintiffs made the transfers to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis addressed in paragraphs 64 through 69.  Each of these transfers was a transfer of property of Plaintiffs.

108.    Each of these transfers to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis was made with the intent to hinder, delay or defraud Plaintiffs' present or future creditors.

109.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS IP, HUNG, TIN, YANG, BLUEBIRD, KEY SOLUTION AND MERCHANT OASIS)**

110.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

111.    In the alternative to Counts One and Two, Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property by Plaintiffs that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq*.

112.    Plaintiffs made the transfers to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis set forth in paragraphs 64 through 69.  Each of these transfers was a transfer of property of Plaintiffs.

113.    Each of these transfers was made with the intent to hinder, delay or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims. Each of these transfers is avoidable by creditors who hold allowable unsecured claims.

114.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis the full amount of

such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST DEFENDANTS IP, HUNG, TIN, YANG, BLUEBIRD, KEY SOLUTION AND MERCHANT OASIS)**

115. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

116. In the alternative to Counts One and Two, Plaintiffs made the transfers to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis set forth in paragraphs 64 through 69. Each of these transfers was a transfer of property of Plaintiffs.

117. Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

118. Each of the Plaintiffs: (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

119. Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS IP, HUNG, TIN, YANG, BLUEBIRD, KEY SOLUTION AND**
**MERCHANT OASIS)**

120.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

121.    In the alternative to Counts One through Two, Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by Plaintiffs that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq*.

122.    Plaintiffs made the transfers to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis addressed in paragraphs 64 through 69.  Each of these transfers was a transfer of property of Plaintiffs.

123.    Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

124.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

125.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

126.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SEVEN**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C § 550(a)(1)**
**(AGAINST DEFENDANTS IP, HUNG, TIN, YANG, BLUEBIRD, KEY SOLUTION AND MERCHANT OASIS)**

127.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

128.     As alleged above, Plaintiffs are entitled to avoid each of the transfers with respect to Defendants Ip, Hung, Tin, Yang, Bluebird, Key Solution and Merchant Oasis under Sections 544 and 548 of the Bankruptcy Code.

129.     Because Defendants are transferees of such transfers or the individuals or entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT EIGHT**
**UNJUST ENRICHMENT**
**(AGAINST BLUEBIRD)**

130.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

131.     In the alternative to Counts One through Seven, as alleged above, Defendant Bluebird received the direct benefit of equity ownership of the majority of the shares of Genesis Block, notwithstanding that neither it, nor its sole owner Defendant Ip, provided any funding to

acquire the Genesis Block shares.  Accordingly, Defendant Bluebird has been enriched, while
Plaintiffs and their creditors have been impoverished as a result.

132.    Under the circumstances as alleged herein, allowing Defendant Bluebird to retain
the benefit of the Genesis Block shares would unjustly enrich Defendant Bluebird.  The unjust
enrichment of Defendant Bluebird, to the detriment of Plaintiffs who funded the procurement of
the Genesis Block shares, has caused Plaintiffs damages.

133.    Should the Court find that Plaintiffs have no remedy at law, Plaintiffs seek
recovery in equity.

## COUNT NINE
## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
## (AGAINST DEFENDANT GBV CAPITAL)

134.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if
fully set forth here.

135.    As alleged above, Plaintiffs entirely funded GBV Capital's acquisition of OMG
Network (now Boba Network and operating under Boba Foundation), and the acquisition was
structured in such a way as to obscure the Debtors' ownership and control of these entities.  An
actual controversy exists between Debtors and GBV Capital regarding the rights to the shares of
Boba Network and affiliated entities.  Accordingly, pursuant to the Declaratory Judgment Act,
28 U.S.C. § 2201, Plaintiffs are entitled to a judgment declaring that all of GBV Capital's rights
and interests in these entities are property of the Debtors.

## COUNT TEN
## TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542(a)
## (AGAINST DEFENDANT GBV CAPITAL)

136.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if
fully set forth here.

137.     As alleged above, GBV Capital continues to withhold the interests in Boba

Network and affiliated entities paid for by Plaintiffs, which comprise assets of the Debtors'

bankruptcy estates.  Plaintiffs seek an order from the Court directing GBV Capital to turn over to

Plaintiffs the interests in these entities, which are property of the Debtors' bankruptcy estates

pursuant to Bankruptcy Code Section 542(a)(1).

138.     The relief requested also is authorized under the Court's equitable powers

codified in Section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions"

of the Bankruptcy Code.  11 U.S.C. § 105(a).

**COUNT ELEVEN**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**
**(AGAINST DEFENDANTS GBV CAPITAL, D21 SOLUTIONS AND GBV**
**TECHNOLOGIES)**

139.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if

fully set forth here.

140.     As alleged above, Plaintiffs funded GBV Capital, D21 Solutions and GBV

Technologies' investments in the Portfolio Companies, and structured them in such a way as to

obscure the Debtors' ownership of them.  An actual controversy exists between Debtors and

GBV Capital, D21 Solutions and GBV Technologies regarding the rights to the interests in the

Portfolio Companies.  Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201,

Plaintiffs are entitled to a judgment declaring that all of GBV Capital, D21 Solutions and GBV

Technologies' rights and interests in the Portfolio Companies are property of the Debtors, and

disallowing any claims asserted on behalf of GBV Capital, D21 Solutions and GBV

Technologies until such rights and interests are transferred to the Debtors.

## COUNT TWELVE
## TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542(a)
## (AGAINST DEFENDANTS GBV CAPITAL, D21 SOLUTIONS AND GBV TECHNOLOGIES)

141.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

142.    As alleged above, GBV Capital, D21 Solutions and GBV Technologies continue to withhold the interests in the Portfolio Companies paid for by Plaintiffs, and which comprise assets of the Debtors' bankruptcy estates.  Plaintiffs seek an order from the Court directing GBV Capital, D21 Solutions and GBV Technologies to turn over to Plaintiffs the interests in the Portfolio Companies, which are property of the Debtors' bankruptcy estates pursuant to Bankruptcy Code Section 542(a)(1).

143.    The relief requested also is authorized under the Court's equitable powers codified in Section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

## COUNT THIRTEEN
## FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
## (AGAINST DEFENDANT GBV CAPITAL)

144.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

145.    In the alternative to Counts Eleven and Twelve, Alameda Ventures made the transfers to Defendant GBV Capital addressed in paragraphs 85 through 87 relating to the Portfolio Companies.  Each of these transfers was a transfer of property of Alameda Ventures.

146.    Each of these transfers to Defendant GBV Capital was made with the intent to hinder, delay or defraud Alameda Ventures' present or future creditors.

147.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Alameda Ventures may recover from Defendant GBV Capital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOURTEEN**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT GBV CAPITAL)**

148.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

149.     In the alternative to Counts Eleven and Twelve, Section 544(b) of the Bankruptcy Code authorizes Alameda Ventures to avoid any transfer of an interest in its property by Alameda Ventures that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq*.

150.     Alameda Ventures made the transfers to Defendant GBV Capital addressed in paragraphs 85 through 87 relating to the Portfolio Companies.  Each of these transfers to Defendant GBV Capital was a transfer of property of Alameda Ventures.

151.     Each of these transfers to Defendant GBV Capital was made with the intent to hinder, delay or defraud Alameda Ventures' present or future creditors, including creditors who hold allowable unsecured claims.  Each of these transfers is avoidable by creditors who hold allowable unsecured claims.

152.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from

Defendant GBV Capital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIFTEEN**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST DEFENDANT GBV CAPITAL)**

153.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

154.    In the alternative to Counts Eleven and Twelve, Alameda Ventures made the transfers to GBV Capital addressed in paragraphs 85 through 87 relating to the Portfolio Companies.  Each of these transfers to Defendant GBV Capital was a transfer of property of Alameda Ventures.

155.    Alameda Ventures did not receive reasonably equivalent value in exchange for any of the transfers.

156.    Alameda Ventures:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with Alameda Ventures was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond Alameda Ventures' ability to repay as such debts matured.

157.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Alameda Ventures may recover from Defendant GBV Capital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT SIXTEEN
## FRAUDULENT TRANSFERS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT GBV CAPITAL)

158.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

159.    In the alternative to Counts Eleven and Twelve, Section 544(b) of the Bankruptcy Code authorizes Alameda Ventures to avoid any transfer of an interest in its property or any obligation incurred by Alameda Ventures that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq*.

160.    Alameda Ventures made the transfers to Defendant GBV Capital addressed in paragraphs 85 through 87 relating to the Portfolio Companies.  Each of these transfers to Defendant GBV Capital was a transfer of property of Alameda Ventures.

161.    Alameda Ventures did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

162.    Alameda Ventures:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of Alameda Ventures were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond Alameda Ventures' ability to repay as such debts became due.

163.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

164.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Alameda Ventures may recover from Defendant GBV Capital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT SEVENTEEN
### PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)
### (AGAINST DEFENDANTS GBV CAPITAL, D21 SOLUTIONS AND GBV TECHNOLOGIES)

165.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

166.     As alleged above, Alameda Ventures is entitled to avoid each of the transfers with respect to Defendant GBV Capital addressed herein under Sections 544 and 548 of the Bankruptcy Code.

167.     Because GBV Capital is the transferee of such transfers or the entity for whose benefit such transfers were made, Alameda Ventures may recover from GBV Capital the full value of the transfers pursuant to 11 U.S.C. § 550(a), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT EIGHTEEN
### FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANT LESLIE TAM)

168.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

169.     Alameda made the transfers to Leslie Tam addressed in paragraph 90.  The transfers were transfers of property of Alameda.  The transfers were purported "bonus" payments made to Tam, who was a senior employee of both FTX.com and GBV Capital.

170.     The transfers to Tam were made with the intent to hinder, delay or defraud Alameda's present or future creditors.

171.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Alameda may recover from Tam the full amount of such transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT NINETEEN
### FRAUDULENT TRANSFERS PURSUANT TO
### DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
### (AGAINST DEFENDANT LESLIE TAM)

172.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

173.     Section 544(b) of the Bankruptcy Code authorizes Alameda to avoid any transfer of an interest in its property by Alameda that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq*.

174.     Alameda made the transfers to Leslie Tam addressed in paragraph 90.  The transfers were a transfer of property of Alameda.  The transfers were purported "bonus" payments made to Tam, who was a senior employee of both FTX.com and GBV Capital.

175.     The transfers were made with the intent to hinder, delay or defraud Alameda's present or future creditors, including creditors who hold allowable unsecured claims.  The transfers are avoidable by creditors who hold allowable unsecured claims.

176.     Accordingly, the transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Alameda may recover from Tam the full

amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWENTY**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST DEFENDANT LESLIE TAM)**

177.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

178.    As alleged above, Alameda is entitled to avoid the transfer addressed herein under Sections 544 and 548 of the Bankruptcy Code.

179.    Because Leslie Tam is a transferee of such transfer or for whose benefit such transfer was made, Alameda may recover from Tam the full value of the transfer pursuant to 11 U.S.C. § 550(a), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWENTY-ONE**
**FTX.COM PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST ABLE RISE)**

180.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

181.    FTX.com made the transfers addressed herein during the Preference Period, as more specifically described in Exhibit 2.

182.    Each of the transfers was a transfer of property of FTX.com.

183.    Each of the transfers was made to the benefit of Able Rise.

184.    With respect to each of the transfers, Able Rise was a creditor of FTX.com (within the meaning of 11 U.S.C. § 101(10)), or, alternately, Able Rise received such transfers for the benefit of a creditor or creditors of FTX.com.

185.     Each of the transfers was made on account of an antecedent debt, namely FTX.com's obligation to deliver to Able Rise the cryptocurrency or cash balances in Able Rise's FTX.com accounts.

186.     Each of the transfers was made within ninety days of the Petition Date.

187.     Each of the transfers was made while FTX.com was insolvent.

188.     Each of the transfers enabled Able Rise to receive more than it would have received if:  (i) FTX.com's Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to Able Rise on account of the debt were determined by the Bankruptcy Code.

189.     As of the date hereof, Able Rise has not returned any of the transfers to FTX.com.

190.     Pursuant to 11 U.S.C. § 547(b), FTX.com has undertaken reasonable due diligence in the circumstances of the case and has taken into account known or reasonably knowable affirmative defenses and believes that the transfers are avoidable.

191.     Accordingly, these transfers should be avoided as preferences pursuant to Section 547(b) of the Bankruptcy Code, and FTX.com may recover from Able Rise the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT TWENTY-TWO
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
## (AGAINST ABLE RISE)

192.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

193.     As alleged above, FTX.com is entitled to avoid each of the transfers addressed herein under Sections 547 of the Bankruptcy Code.

194.    Because Able Rise is the initial transferee of such transfers or the entity for whose

benefit such transfers were made, FTX.com may recover from Able Rise the full value of the

transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and

fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWENTY-THREE**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**
**(AGAINST ALL DEFENDANTS)**

195.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if

fully set forth here.

196.    Defendants have filed claims in these Chapter 11 Cases totaling approximately

$120 million, including Claim Nos. 10631, 12483, 16836, 24860, 24948, 35238, 45431, 49333,

56333, 69723, and 72574 and Scheduled Claim No. 5306218.

197.    As alleged above, Defendants are transferees of transfers avoidable under either

Sections 544, 547 or 548 of the Bankruptcy Code, and individuals or entities from which

property is recoverable under Sections 542 or 550 of the Bankruptcy Code.  As described above,

all of the Defendants operated in concert as part of an integrated fraudulent scheme.  The

nominal separateness of the individuals and entities described herein was intentionally designed

to obscure the reality that each formed part of a conspiracy whereby Debtor assets were

misappropriated.  The commonality between Defendants, including common ownership and

control of Bluebird, GBV Capital, Myth Success, GB Holdings, Able Rise, and GBV

Technologies, resulted in those entities operating as the alter egos of their nominal owners for the

benefit of the fraudulent scheme.

198.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy

Code, any claims of Defendants that have been or will in the future be asserted in these

Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to

50

Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property,

for which and to the extent that the Court has determined Defendants are liable pursuant to 11

U.S.C. §§ 542 or 550.

## COUNT TWENTY-FOUR
## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

199.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if

fully set forth here.

200.    As alleged above, Alameda operated and funded the Third-Party Exchange

Accounts through entities and individuals associated with Genesis Block, including Defendants

GB Holdings and Nicole Tin.  An actual controversy exists regarding the rights to the Third-

Party Exchange Accounts.  Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C.

§ 2201, Plaintiffs are entitled to a judgment declaring that all rights associated with the Third-

Party Exchange Accounts are property of the Debtors.

## COUNT TWENTY-FIVE
## OBJECTION TO CLAIM NO. 069723 AND SCHEDULED CLAIM NO. 5306218

201.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if

fully set forth here.

202.    On September 26, 2023, Clement Ip filed a Proof of Claim in the Debtors'

Chapter 11 cases on behalf of Myth Success seeking more than $65 million.  Ip filed the Proof of

Claim under penalty of a fine or imprisonment for filing a fraudulent claim.  GB Holdings holds

a scheduled claim of approximately $5.67 million.

203.    Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim

or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a

party in interest . . . objects." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the

Court, after notice and hearing, shall determine the allowed amount of the claim.  11 U.S.C.

§ 502(b).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b).

204.    While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  The burden of persuasion with respect to the claim is always on the claimant, *see id.* at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity.  *See, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).  Moreover, where, as here, the debtor submits evidence "capable of negating" the *prima facie* validity and "plac[ing] the claimant's entitlement at issue"—such as by submitting evidence "which, if believed, would refute at least one of the allegations that is essential to the claim's legal validity" then the burden reverts to the claimant, who must prove the validity of the claim by a preponderance of the evidence.  *In re Trib. Media Co.*, 2017 WL 2622743, at *7 (D. Del. June 16, 2017), *aff'd*, 902 F.3d 384 (3d Cir. 2018); *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014).

205.    As alleged above, in early November 2022, the FTX Insiders desperately sought to recall capital to satisfy customer withdrawals.  In connection with those efforts, FTX Group personnel asked Genesis Block to return eight loans totaling approximately $62 million, denominated in different cryptocurrencies, that it had extended to Myth Success.  Yang, on behalf of Myth Success, agreed to the request and indicated that the funds to repay the loans

were held in the account of Myth Success (ftx@genesisblockhk.com) and in the main account of

Genesis Block affiliate GB Holdings (gbhl@genesisblockhk.com).

206.    The funds held in the Myth Success and GB Holdings accounts constitute

repayments of the loans to Alameda and are Debtor funds to which Ip, Myth Success, and GB

Holdings are not entitled.  Accordingly, the Myth Success Claim No. 69723 and GB Holdings

Scheduled Claim No. 5306218, are invalid and unenforceable against the debtor and property of

the debtor.  11 U.S.C. § 502(b); 11 U.S.C. § 1111.

## COUNT TWENTY-SIX
## EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. 510
## (AGAINST ALL DEFENDANTS)

207.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if

fully set forth here.

208.    By reason of the foregoing facts and pursuant to Section 510(c) of the Bankruptcy

Code, the claims of Defendants in the Chapter 11 Cases should be equitably subordinated to the

claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of

customer funds.

209.    Equitable subordination as requested herein is consistent with the provisions and

purposes of the Bankruptcy Code.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

210.    Enter a judgment declaring that the rights and interests in Genesis Block, Boba

Network and affiliated entities, and the Portfolio Companies are property of the Debtors because

they were acquired using Debtor funds;

211.    Enter an order under 11 U.S.C. § 541(a) and 105(a) directing the turnover of

(a) Genesis Block shares held by Bluebird, (b) GBV Capital's rights and interests in Boba

Network and affiliated entities, and (c) GBV Capital's, GBV Technologies', and D21 Solutions'

rights and interests in the Portfolio Companies to Plaintiffs;

212.    Enter a judgment declaring that the funds held in the Third-Party Exchange

Accounts are property of the Debtors because the Third-Party Exchange Accounts were entirely

funded and controlled by Alameda;

213.    Enter an order that the transfers addressed herein are avoidable fraudulent

transfers under 11 U.S.C. §§ 544, 547, and 548 and Del. Code Ann. tit. 6, §§ 1304, 1305;

214.    Award Plaintiffs (a) the return of property to the Debtors' bankruptcy estates that

is the subject of the avoidable fraudulent transfers and preferential transfers alleged herein; or

(b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the

avoidable fraudulent and preferential transfers alleged herein (plus the value of any additional

avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to the

Defendants);

215.    On the eighth cause of action, establish a constructive trust over the Genesis

Block shares held by Bluebird for the benefit of Plaintiffs;

216.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or

held by the Defendants in these Chapter 11 Cases unless and until the Defendants relinquish to

Plaintiffs the amount ordered as an award for avoidable transfers and for property withheld;

217.    Enter an order disallowing Claim No. 69723 and Scheduled Claim No. 5306218

in their entirety on the basis of no liability;

218.    Enter an order under 11 U.S.C. § 510(c)(1) subordinating any and all claims filed

or held by Defendants in the Chapter 11 Cases to the claims of innocent creditors who had no

part in the illegal and fraudulent misuse of misappropriated customer funds;

219.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs

of suit; and

220.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated:  November 4, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ *Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:landis@lrclaw.com
       cobb@lrclaw.com
       mcguire@lrclaw.com
       robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: wheelers@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

**Appendix A**

| Transferred Amount (USDC) | Destination |
| --- | --- |
| 1,919,080 | Wincent Hung Account No. 0165 |
| 450,000.00 | Wincent Hung Account No. 2385 |
| 275,000.00 | Wincent Hung Account No. 4046 |
| 18,060.00 | Wincent Hung Account No. 3310 |
| 18,060.00 | Wincent Hung Account No. 2436 |
| 6,990.00 | Wincent Hung Account No. 2402 |
| 575,000.00 | Ip Account No. 7298 |

## Appendix B

August 2022 Transfers

| Transferred Amount (FTT) | Destination |
| --- | --- |
| 69,550.03 | Wincent Hung Account No. 4145 |
| 20,838.77 | Ip Account No. 4193 |
| 9,966.37 | Yang Account No. 5365 |
| 16,308.60 | Nicole Tin Account No. 8249 |
| 253.33 | Ip Account No. 3348 |

| Transferred Amount (SRM) | Destination |
| --- | --- |
| 152,948.86 | Wincent Hung Account No. 4145 |
| 45,826.96 | Ip Account No. 5467 |
| 21,917.24 | Yang Account No. 5365 |
| 35,864.57 | Nicole Tin Account No. 8249 |
| 557.10 | Ip Account No. 3348 |

October 2022 Transfers

| Transferred Amount (FTT) | Destination |
| --- | --- |
| 41,730.02 | Wincent Hung Account No. 4145 |
| 12,503.26 | Ip Account No. 5467 |
| 5,979.82 | Yang Account No. 5365 |
| 9,785.16 | Nicole Tin Account No. 8249 |
| 151.99 | Ip Account No. 3348 |

| Transferred Amount (SRM) | Destination |
| --- | --- |
| 91,769.32 | Wincent Hung Account No. 4145 |
| 27,496.17 | Ip Account No. 5467 |
| 13,150.34 | Yang Account No. 5365 |
| 21,518.74 | Nicole Tin Account No. 8249 |
| 334.27 | Ip Account No. 3348 |