## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | Adv. Pro. No. 24-_____(JTD) |
| -against- | |
| RYAN SALAME, | |
| Defendant. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548, AND 550, AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES, FOR KNOWING ASSISTANCE IN BREACHES OF FIDUCIARY DUTIES, FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502, AND FOR EQUITABLE SUBORDINATION OF CLAIMS PURSUANT TO 11 U.S.C. § 510(c)(1)

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research LLC ("Alameda LLC"),

Alameda Research Ltd. ("Alameda"), North Dimension Inc. ("North Dimension"), West Realm

Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (together, the

"Plaintiffs"), through their undersigned counsel, for their Complaint against Ryan Salame

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

("<u>Salame</u>"), allege the following based upon their personal knowledge and investigation to date as to themselves and their own acts, and upon information and belief as to all other matters.

## <u>NATURE OF THE CASE</u>

1.      Plaintiffs bring this action for aiding and abetting breaches of fiduciary duties, knowing assistance in breaches of fiduciary duties, intentional and constructive fraudulent transfers, and preferential transfers pursuant to Sections 105, 544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from Salame, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs and all obligations of Plaintiffs to Salame made prior to the commencement of the above-captioned bankruptcy cases (collectively, the "<u>Chapter 11 Cases</u>" and each a "<u>Chapter 11 Case</u>").  Plaintiffs additionally seek to disallow, or alternatively to equitably subordinate, any and all claims filed or held by Salame unless and until he has relinquished to Plaintiffs all property that Salame received in transfers, or all property that Salame acquired using property that he received in transfers, determined by the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") to be avoidable and recoverable under the Bankruptcy Code.

2.      On November 11 and November 14, 2022 (as applicable, the "<u>Petition Date</u>"), the Debtors filed with the Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022.

[D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this action.

3.      As detailed herein, Salame received approximately $98.8 million dollars in misappropriated funds from Plaintiffs' estates, *see* **Exhibits A and B**, and aided and abetted and/or knowingly assisted Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh, and Caroline Ellison (collectively, the "FTX Insiders") in breaching the fiduciary duties that they owed to the FTX Group.[2]

4.      Salame's liability is not in dispute.  On September 7, 2023, Salame pleaded guilty to (i) conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act ("FECA") and (ii) conspiracy to operate an unlicensed money transmitting business, through which FTX Group customers deposited and withdrew more than $1 billion using bank accounts in the names of Alameda and North Dimension.  Under the terms of his guilty plea, Salame also agreed to be held responsible in connection with sentencing for conspiring to make false statements to banks as part of the unlicensed money transmitting business; willfully making an excessive political contribution to Michelle Bond, his then-domestic partner, in connection with her failed Congressional campaign; and fraudulently misappropriating property of the Debtors' estates by withdrawing $5 million from his FTX.com exchange account on November 7, 2022 and subsequently spending those proceeds on, amongst other things, a public relations firm and paying off a $20,000 personal credit charge at Restoration Hardware that he incurred after the Petition Date.  *See* Gov't Sent'g Mem. ("Gov't Sent'g Mem.") at 10-11, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 21, 2024), ECF No. 436 (citing Presentence Investigation Report ("PSR") ¶ 41).

---

[2]    The term "FTX Group" means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

5.      Salame abused his senior positions at the FTX Group for personal gain.  He was the right-hand man of the FTX Insiders, conspiring with them to operate an unlicensed money transmitting business and aiding their abuse of control over the FTX Group and their perpetration of one of the largest financial frauds in history.  *See* Superseding Information ¶ 1, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 262.  Salame used misappropriated Debtor assets to finance political contributions—including to Bond's failed 2022 Congressional campaign—in violation of federal election law.  *See id*. ¶¶ 1, 14; Gov't's Sent'g Mem. at 2-3.

6.      Despite Salame's concerted efforts to obscure his receipt and expenditure of misappropriated Debtor assets, it is evident that Salame reaped substantial benefits from his role in "perpetrating aspects of the interrelated frauds that Bankman-Fried carried out at both companies."  *See* Gov't's Sent'g Mem. at 1.  Plaintiffs have determined, based on their analysis and investigation to date, that Salame received from the Debtors at least $7.7 million in salary and bonus payments.  He also received approximately 9 million FTT tokens; while knowing that FTT was severely inflated by the perpetration and concealment of a fraud on FTX customers, Salame sold 1.1 million FTT for approximately $24 million.   With these and other misappropriated Debtor assets, Salame financed a spending spree, purchasing, among other things, real estate, businesses, luxury cars, and a $2.3 million investment in RedBird Capital Partners Fund IV ("RedBird").

7.      In addition to their fraudulent transfer and aiding and abetting breach of fiduciary duty claims, Plaintiffs assert a preference claim against Salame with respect to wire transfers he received from Plaintiffs and certain withdrawals from his FTX.com and FTX.US exchange accounts during the one-year period prior to the commencement of the Chapter 11 cases (the

"<u>Preference Period</u>").  Based on currently available information, during the Preference Period, Salame received the benefit of at least $82.6 million in preferential transfers, including $52.9 million in wire transfers and approximately $29.8 million[3] in fiat and cryptocurrency exchange withdrawals, which are avoidable under Section 547 of the Bankruptcy Code.[4]  *See* **Exhibits A and C**.

8.      Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow, or alternatively to equitably subordinate, any and all claims filed or held by Salame in these Chapter 11 Cases unless and until Salame has relinquished to Plaintiffs all property Salame received in transfers determined by the Court to be avoidable and recoverable under the Bankruptcy Code.

9.      During the course of this proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Salame that are avoidable under the Bankruptcy Code.  Indeed, because of the state of the Debtors' records and the near-complete control that Salame and the FTX Insiders were able to exercise over those records prior to the filing of the Chapter 11 Cases, Plaintiffs expect to discover additional avoidable transfers and obligations, as well as other claims, and expressly reserve the right to amend this Complaint or file additional actions against Salame, as appropriate, to protect the interests of their estates.

---

[3]     This number excludes the $5 million withdrawal that Salame made on the eve of bankruptcy.  Salame repaid this amount to the Debtors as part of his restitution obligations.  *See Order Authorizing the Debtors to Enter Into a Stipulation Relating to the Satisfaction of the Restitution Amount That Ryan Salame Owes the Debtors Under His Plea Agreement* [D.I. 15504].

[4]     In accordance with section 550(a) of the Bankruptcy Code, Plaintiffs may seek either (i) recovery of the transferred cryptocurrencies or (ii) the higher of such cryptocurrencies' fair market value as of either (a) the time of payment resulting from any final resolution of the Complaint or (b) the date of such transfers to return their estates to the position that they would have enjoyed if the transfers had not occurred.  Given the volatility of cryptocurrency values, Plaintiffs reserve all rights with respect to the appropriate pricing date.

**THE PARTIES**

10.     Plaintiff FTX is a corporation registered in Antigua and Barbuda.  FTX did business as "FTX.com," a global exchange that offered customers the ability to trade cryptocurrencies and cryptocurrency-related derivatives.  FTX is owned 80% by Paper Bird Inc., a Delaware corporation that is wholly owned by Bankman-Fried.  The remaining 20% is owned by hundreds of minority shareholders.

11.     Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly owned subsidiary of Alameda LLC.

12.     Plaintiff Alameda LLC is a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

13.     Plaintiff North Dimension is a Delaware corporation.  It is a wholly owned subsidiary of Alameda LLC.

14.     Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other minority shareholders, including WRS employees and outside investors.

15.     Plaintiff WRSS, doing business as "FTX US," is a Delaware corporation and a wholly owned subsidiary of Plaintiff WRS.

16.     Defendant Ryan Salame was the Chief Executive Officer and Chairman of FTX Digital Markets Ltd. ("FDM"), a wholly owned subsidiary of FTX, from September 2021 to November 2022.  He was previously the Head of Over-the-Counter Trading at Alameda, FTX, and WRSS.  Salame was also a Director of FTX Property Holdings, a Bahamian entity through which the FTX Group companies purchased hundreds of millions of dollars of Bahamian luxury real estate for the use of FTX Insiders and other FTX Group employees.  On September 7, 2023, Salame pleaded guilty to conspiracy to defraud the United States and willfully violate FECA and

conspiracy to operate an unlicensed money transmitting business. He is currently serving his seven-and-a-half-year prison sentence.

## **OTHER RELEVANT PERSONS**

17.     Samuel Bankman-Fried, often referred to as "SBF," is one of the founders of the FTX Group. He co-founded Alameda LLC in 2017 and served as its Chief Executive Officer through late 2021. In 2019, he founded FTX. In 2020, he founded WRSS. At all relevant times, Bankman-Fried effectively controlled Plaintiffs through his majority ownership stakes in Plaintiffs and their ultimate parents. On November 2, 2023, following a jury trial, Bankman-Fried was convicted of wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. Jury Verdict, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Nov. 2, 2023). He is currently serving his 25-year prison sentence.

18.     Zixiao "Gary" Wang was a co-founder of FTX and its former Chief Technology Officer. Wang was also the Chief Technology Officer for WRS. On December 19, 2022, Wang pleaded guilty to wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. Min. Entry, *United States* v. *Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).

19.     Nishad Singh was the former Director of Engineering at FTX. Singh was also the Chief Security Officer and Chief Engineer of WRS. On February 28, 2023, Singh pleaded guilty to wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to make unlawful political contributions and defraud the Federal Election Commission ("FEC"). Min. Entry, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023). On October 30,

2024, he was sentenced to time served.  Min. Entry, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Oct. 30, 2024).

20.    Caroline Ellison was the Chief Executive Officer of Alameda LLC prior to its bankruptcy.  From September 6, 2022 to the Petition Date, Ellison also served as a director of Plaintiff Alameda.  On December 19, 2022, Ellison pleaded guilty to wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.  Min. Entry, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).  On September 24, 2024, she was sentenced to 24 months in prison.  Min. Entry, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Sept. 24, 2024).

21.    Michelle Bond is now Salame's wife who waged an unsuccessful Congressional primary campaign in 2022.  On August 22, 2024, the government unsealed an indictment charging Bond with one count of causing unlawful political contributions, one count of causing and accepting excessive campaign contributions, one count of causing and receiving an unlawful corporate contribution, and one count of causing and receiving a conduit contribution in violation of the Federal Election Law Act.  *See* Indictment, *United States* v. *Bond*, No. 24-cr-00494 (S.D.N.Y. Aug. 19, 2024), ECF No. 2.

22.    Gabriel Bankman-Fried is Sam Bankman-Fried's brother and at all relevant times was the founder and a director of the super-PAC Guarding Against Pandemics.

## JURISDICTION AND VENUE

23.    This is a proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to Plaintiffs' estates.  Fed. R. Bankr. P. 7001(1).

24.     This proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

25.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(a), and 1367(a), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

26.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

27.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

28.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 510, 544, 547, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

29.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **FACTUAL ALLEGATIONS**

### I.     **The FTX Insiders' Scheme to Defraud the FTX Group's Customers, Creditors, and Shareholders.**

30.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the

FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

31.    The FTX Insiders used their close control over the FTX Group's businesses and systems to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.  Much of this spending was funded through Alameda, which, at the FTX Insiders' direction, unlawfully diverted billions of dollars in FTX assets to the FTX Insiders' pet projects.  In doing so, the FTX Insiders defrauded the FTX Group's customers, creditors and shareholders, and violated their fiduciary duties and numerous laws.  Salame actively conspired with the FTX Insiders and was an integral participant in their scheme.

32.    Prior to the FTX Group's collapse, the FTX Insiders and Salame held virtually all of the top executive positions at the FTX Group, which did not have any independent board of directors or board of managers overseeing those executives.  Bankman-Fried was the CEO of FTX until the Petition Date, was the sole director of Alameda until September 6, 2022, and was previously the CEO and sole director of WRS.  Even after formally stepping down as the sole director of Alameda on September 6, 2022, Bankman-Fried continued to exercise substantial control over Alameda.  Wang served as the Chief Technology Officer at both FTX and WRS.  Singh served as the Director of Engineering at both FTX and WRS and as Chief Security Officer

at WRS.  Ellison was the co-CEO of Alameda LLC from August 2021 until September 2022, when she was named the sole CEO and director.  Ellison was also a director of Alameda from September 6, 2022 until the Petition Date.  Salame—who had, from November 2019 until September 2021, served as Head of Over-the-Counter ("OTC") Trading at Alameda, FTX and WRSS—was the CEO and Chairman of FDM.

33.    The FTX Insiders' conduct is the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the Commodity Futures Trading Commission, and other regulators.

34.    As discussed in paragraphs 16-20 above, the FTX Insiders and Salame have pleaded guilty to or, in the case of Bankman-Fried, been convicted by a jury of, multiple felonies perpetrated through the very practices that underlie this action.  On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison and ordered to forfeit more than $11 billion to the United States.  Min. Entry, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2024).  On May 28, 2024, Salame was sentenced to seven-and-a-half years in prison followed by three years of supervised release, ordered to forfeit to the United States more than $1.5 billion,[5] fined $500,000, and ordered to pay restitution to the Debtors of $5,593,177.91.[6] Min. Entry, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 28, 2024).  On September 24, 2024, Ellison was sentenced to two years in prison followed by three years of supervised release and ordered to forfeit more than $11 billion to the United States.  Min. Entry, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Sept. 24, 2024).  On October 30, 2024,

---

[5]    The Government accepted a smaller payment of about $6 million "in settlement of the outstanding [$1.5 billion] money judgement in lieu of continuing to seek Mr. Salame's assets wherever they may be."  Sent'g Tr. 4:1-3, 9-10, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 28, 2024), ECF No. 448.

[6]    In June 2024, Salame transferred Unit No. 3A in the Marina Residences at Albany Building 10 Condominium, an apartment purchased using Debtor funds, to the Debtors in satisfaction of the restitution he owed to the Debtors.  *See Order Authorizing the Debtors to Enter Into a Stipulation Relating to the Satisfaction of the Restitution Amount That Ryan Salame Owes the Debtors Under His Plea Agreement* [D.I. 15504].

Singh was sentenced to time served and three years of supervised release and ordered to forfeit more than $11 billion to the United States.  Min. Entry, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Oct. 30, 2024).

35.     In connection with Wang's plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.  Plea Tr. at 24:6-10, *United States* v. *Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 23, 2022), ECF No. 21.  Using these "special privileges," the FTX Insiders and Salame frequently caused Alameda to spend large amounts of Debtor funds for their own personal benefit.

36.     Bankman-Fried repeatedly, and publicly, stated that Alameda operated as "a wholly separate entity" from FTX.  *See*, *e.g.*, Annie Massa et al., *Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed. Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that "[w]e keep [FTX and Alameda] quite separate in terms of day-to-day operations." *Id.*  In reality, however, the FTX Insiders and Salame routinely, and secretly, used Alameda to loot "several billion dollars" from FTX using the "special privileges," thereby defrauding FTX Group customers.  Plea Tr. at 28:23-29:1, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Mar. 7, 2023), ECF No. 102; Plea Tr. at 24:6-10, *United States* v. *Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 23, 2022), ECF No. 21.

37.     Bankman-Fried also conspired with Ellison, Salame, and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange, so that the FTX Insiders could use those funds to benefit themselves.  Beginning in or around 2019 and continuing through 2022, Bankman-Fried, with Salame's participation and assistance, caused FTX.com customers to deposit funds into bank accounts controlled by Alameda and then North Dimension, without disclosing to the banks that held those accounts or to FTX.com customers the nature of the arrangement between FTX, Alameda, and North Dimension.  *See* Superseding Indictment ¶ 15, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), ECF No. 115.

38.     In the days leading up to the Petition Date, Bankman-Fried supplied potential investors with a purported FTX balance sheet that included a liability of $8 billion in a "[h]idden, poorly internally labled [sic] 'fiat@' account."  *Id.* ¶ 56.  However, Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX."  *Id.* ¶ 57.  The FTX Insiders used FTX customer fiat deposits "to make investments in the name of BANKMAN-FRIED and his associates, rather than in the name of Alameda."  *Id.* ¶ 26.  Salame was personally involved in many such "investments."

39.     The FTX Insiders and Salame were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda to "borrow" billions of dollars from FTX in order to, *inter alia*, finance "loans" from Alameda to the FTX Insiders.  Ellison admitted that from 2019 through 2022, she was aware of this arrangement, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . [or] being subject to margin calls or FTX.com's liquidation

protocols." Plea Tr. at 27:11-15, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF No. 19. Ellison also "understood that FTX would need to use customer funds" to make many of its investments, *id*. at 28:2-4, and admitted that many investments "were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds." *Id*. at 28:22–29:1. Salame was also aware of Alameda's special privileges, suggesting to Ellison in January 2021 that "alameda should start depositing / withdrawing USD the way everyone else does," "like integrate the silvergate SEN instant in / out," "and then just give the massive collateral on alameda account they can always borrow the USD the way its [sic] happening now but all above board."

40.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), ECF No. 115. On November 8 and 9, 2022, Salame messaged another insider that he felt "[s]o shitty" and was concerned that he could be "fucked." Recognizing the end was near and that there was a chance FTX would file for bankruptcy, Salame attempted to withdraw almost $20 million dollars from his FTX.com account, but he succeeded only in withdrawing $5 million on November 7, 2022. After learning on November 9, 2022 that there was a shortfall of approximately $46 million at FTX US, Salame emptied one of his FTX.US accounts of approximately $610,000 worth of cryptocurrency on November 11, 2022, hours before the Debtors filed for bankruptcy.

II.    **Salame, as Part of Bankman-Fried's Inner Circle, Facilitated the FTX Insiders' Scheme to Defraud the FTX Group's Creditors.**

41.    Salame was an integral member of Bankman-Fried's inner circle at the FTX Group.  Salame wrote that he was "incredibly intertwined with the firm, and [was] happy about this and ha[d] no desire to change that."  According to Bankman-Fried, Salame was a "trusted" and "loyal" employee, Trial Tr. at 2695:16-19, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 30, 2023), ECF No. 378, and was "one of the only people [he] d[id]n't need to have oversight of."  Salame wrote to Ellison that he "love[d] clearing some shit off sams plate specifically so he c[ould] focus on stuff" and "highly value[d] being a part of sams world / legacy."  On another occasion, Ellison wrote to Salame that he was "more in the loop than [she] [was]."  Ellison testified that Bankman-Fried said "he really valued Ryan [Salame] for his loyalty").  Trial Tr. at 689:22-24, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 10, 2023), ECF No. 358.

42.    Salame extolled on his LinkedIn profile that he "assisted Sam Bankman-Fried with the founding and creation of FTX Trading Ltd" prior to assuming various roles within the FTX Group.[7]  Bankman-Fried additionally noted that Salame's "work in The Bahamas was instrumental in getting [the FTX Group] set up well."[8]  According to Bankman-Fried, Salame "[took] responsibility for a bunch of trading things--trades, settlement, relationships, team structure, etc." and "add[ed] a ton" of value in these areas.  Salame had "primary responsibility

---

[7]    Ryan Salame, LINKEDIN, https://www.linkedin.com/in/ryansalame/?originalSubdomain=bs (last visited Oct. 11, 2024).  Salame's LinkedIn profile was current as of when Plaintiffs last accessed it.  *See e.g.*, Issy Ronald, *Former Top FTX Executive Ryan Salame Has Updated His LinkedIn Profile.  His New Role?  Prison Inmate*, CNN (Oct. 11, 2024), https://edition.cnn.com/2024/10/11/business/ryan-salame-ftx-linkedin-profile-prison-intl-scli/index.html.

[8]    Trial Tr. 2751:11-2752:24, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 31, 2024), ECF No. 380 (citing Gov't Ex. 2504, in which Bankman-Fried "joked that Ryan Salame . . . was effectively a member of the Bahamian government" when discussing who at the Bahamian government the FTX Group should approach to discuss a partnership opportunity between the FTX Group and the Bahamian government).

over other staff to process customer fiat deposits and withdrawals."  Superseding Information ¶ 4, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 262.

43.     Bankman-Fried also stated that Salame's "work in [Washington] DC ha[d] been awesome," and that he was a "core piece of accomplishing some pretty impressive things."  On a number of occasions, Salame and Bankman-Fried met with government officials and politicians.  For example, Salame accompanied Bankman-Fried to a meeting with the President of Kazakhstan to discuss a potential $1 billion investment in a cryptocurrency mining company.  *See* Trial Tr. at 1315:16-21, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 16, 2023), ECF No. 366; *see also* Def.'s Sent'g Mem. at 11, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 14, 2024), ECF No. 433 ("Ryan coupled [his] donations with substantial and sustained political activity and engagement.   Ryan met on multiple occasions with governmental leaders, including Senator Mitch McConnell and then-Congressman Kevin McCarthy. . . . Whatever the topic, Ryan's ultimate purpose for these meetings was eventually to influence cryptocurrency policy.").  Salame also played an active role in formulating the FTX Group's business and communications strategies, at one point even directing a subordinate to refrain from truthfully answering a customer's question regarding the relationship between FTX and Alameda in order to perpetuate his and the FTX Insiders' ongoing fraud.  He was "generally responsible for the banking setup of both Alameda and FTX," *see* Def.'s Sent'g Mem. at 42, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Oct. 16, 2024), ECF No. 523, and exercised control over the FTX Group's funds, frequently directing that funds be transferred from one entity to another.  Salame also took over from Bankman-Fried the task of preparing Alameda's balance sheets, before the role was eventually passed onto Ellison.  *See* Trial Tr. at 2402:17-21, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 27, 2023), ECF No. 376.

44.    In Salame's 2021 performance evaluation, Bankman-Fried wrote that Salame was someone who "get[s] shit done, even if it requires acting creatively."

45.    Salame used his high-ranking positions within the FTX Group to participate in a massive, wide-ranging fraud, enriching himself in the process.

46.    Through transfers of at least $98.8 million that he received from the FTX Group, Salame funded tens of millions of dollars in expenditures on, among other things, personal real estate, businesses, a jet, luxury cars, an investment in RedBird, and political contributions.  Much of these transfers were from Alameda and North Dimension accounts, which Salame knew contained commingled customer and corporate funds.  By knowingly receiving and/or causing Alameda and North Dimension to transfer commingled funds to him for his personal benefit and enjoyment, Salame aided the FTX Insiders in defrauding FTX Group creditors.

III.    **Salame Aided and Abetted and Knowingly Assisted the FTX Insiders' Breaches of Their Fiduciary Duties By Facilitating the Commingling and Misappropriation of Corporate and Customer Assets and Other Misconduct.**

47.    At the FTX Insiders' direction, the FTX Group portrayed itself as the vanguard of customer protection efforts in the crypto industry.  Bankman-Fried publicly claimed to support federal legislation to safeguard consumers' digital assets, and he touted the FTX exchanges' purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate.  *See Examining Digital Assets: Risks, Regulation, and Innovation Hearing Before the S. Comm. on Agric., Nutrition and Forestry*, 117th Cong. 600 (2022).  The image that the FTX Insiders sought to portray as the customer-focused leader of the digital age was a mirage.  Indeed, Bankman-Fried picked the name "Alameda Research" because it did not sound like a cryptocurrency firm.  *See* Trial Tr. at 313:1-10, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 5, 2023), ECF No. 356.  Like the FTX Insiders, Salame played a central role in orchestrating the commingling and misuse of customer deposits and corporate

funds, aiding and abetting the FTX Insiders' in breaching their fiduciary duties to the FTX
Group.

48.     For example, in April 2021, Salame and the FTX Insiders attempted to legitimize
their illegal conduct by creating a sham "Payment Agent Agreement" between Alameda and
FTX that was backdated by nearly two years.  The agreement had originated with Salame in late
January 2021.  In connection with a contemplated IPO, FTX retained an external auditor to
prepare an audited financial statement of FTX, and employees sought to document FTX's
internal controls, including preparing documents that could be shared with the auditor.  In one
such document, Salame addressed the question, "How does FTX ensure a wire is not sent to the
incorrect countarperty [sic] whether by accident or for nefarious purposes?"  Salame opined:  "as
im writing this I guess FTX mostly mitigates the responsibility to alameda? I guess at some point
FTX should be confirming in some way possible that adequate funds are held with alameda?"
That same day, in the private-ftx-accounting Slack channel, Salame proposed the drafting of a
"payment processing agreement for alameda to process customer payments on behalf of FTX
users and the passing of required information to make this possible."  On or around this time,
Salame and the FTX Insiders asked an outside law firm to prepare the intercompany agreement
to share with the external auditor.  An insider directed that the agreement state that "FTX gets
first dibs on Alameda's cash" in an apparent attempt to paper over the fact that there were no
existing limitations on Alameda's ability to spend FTX.com customers' cash for its own
purposes.  The draft agreement the law firm subsequently provided stated that Alameda provided
"cash management" services for FTX, and that assets of FTX held by Alameda pursuant to the
agreement would be deemed a loan to Alameda.  Beginning in March 2021, another version of
the sham agreement that did not reflect any loan to Alameda was prepared and stated that

Alameda provided mere "payment services" pursuant to which it would "complete payments . . . as directed by FTX from time to time" and receive assets from FTX "to be held and/or transferred . . . as quickly as commercially possible."  In reality, as Salame and the FTX Insiders well knew, Alameda never transferred and had no intention of transferring customer deposits to FTX at all.

49.     To evade restrictions and due diligence requirements imposed by banks, and to avoid registering as a money services business (which carried regulatory requirements which FTX sought to avoid), at the direction of the FTX Insiders and Salame, the FTX Group funneled customer deposits and withdrawals in fiat currency through Alameda's preexisting bank accounts and made misrepresentations to banks about the purpose for which it was using those Alameda accounts.

50.     Indeed, in his plea allocution, Salame admitted to violating federal law by using Alameda bank accounts "to help facilitate FTX customers' fiat transactions through a bank primarily located in California, which were then manually credited and debited on FTX customers' accounts by Alameda personnel acting under [his] management."  Plea Tr. at 23:6-18, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 283.

51.     By 2020, certain of Alameda's banks began raising questions about Alameda's wire activity and began rejecting wires to or from Alameda.  Rather than come clean, Salame and the FTX Insiders continued to lie to the banks.  At first, they falsely denied that FTX customers deposited funds into Alameda bank accounts.  Salame knew that "alameda d[id] a portion of FTX processing for various activities," including "process[ing] all fiat for OTC and for FTX."  Yet, when a bank representative asked whether one of Alameda's bank accounts was "being used to settle trades for their derivatives exchange platform (FTX trading)," Salame directed an

Alameda employee to respond that "[c]ustomers occasionally confuse[d] FTX and Alameda" but that "[a]ll incoming/outgoing wires are to settle trades with Alameda Research."

52.     After banks began rejecting wires to and from Alameda bank accounts, the FTX Group, at the FTX Insiders' direction, incorporated North Dimension as an entity whose sole purpose was to enable the FTX Group to obtain bank accounts through which it could operate the FTX exchanges.   Bankman-Fried and Salame "chose the name 'North Dimension,' in part to conceal from banks that there was a relationship between North Dimension, Alameda, and FTX." Gov't's Sent'g Mem. at 5 (citing PSR ¶ 29).

53.     Salame played an integral role in opening U.S. bank accounts for North Dimension.   On March 19, 2021, a bank manager wrote to Salame on Slack asking if he was available "[t]o discuss FTX and North Dimension."   The messages reflect a one-sided conversation, in which the bank manager wrote things like "Perfect," "Works for me," and "Gimme 2 minutes," without apparent responses from Salame.   Upon information and belief, Salame deleted his responses to the bank manager's questions.

54.     According to one Alameda employee, Salame also directed that employee to lie on due diligence questionnaires that were part of North Dimension's bank account applications. For example, Salame instructed an employee to falsely represent that North Dimension was a crypto trading firm with substantial operations.   In reality, North Dimension was a shell company that had no operations.   Salame also instructed an employee to mark "[n]o" in response to the question on a bank account application, "Is the business a money services business (MSB)?"   In fact, the FTX Group intended to—and did—use the North Dimension account to receive and pay funds to customers, and was thus acting as an unlicensed money services business, a crime to which Salame ultimately pleaded guilty.

55.    On March 25, 2021, the bank that received these misleading and inaccurate due diligence questionnaires approved the opening of an account for North Dimension.  One of the bank's account managers messaged Salame and Bankman-Fried, writing that "North Dimension is approved," which Salame, Bankman-Fried, and the abovementioned Alameda employee reacted to with a heart.  Weeks later, with the official opening of North Dimension's account still pending, Salame informed Bankman-Fried of reports that a banking services company was closing accounts of customers who were wiring fiat to Alameda bank accounts.  In reply, Bankman-Fried asked Salame for an update on "the status of north dimension," to which Salame replied he had "been pinging them every day for it for weeks" and noted that Alameda is "now blacklisted a lot of places sadly."  Just three days later, North Dimension's bank account was officially opened and was used to accept customer fiat deposits.

56.    Salame assisted in and/or was knowledgeable about the provision of false information to U.S. banks to try to satisfy their compliance requirements.  In talking points drafted by Salame in May 2021, he wrote:  "North Dimensions [sic] is a separate entity which I have done investments with and it is not related to Alameda Research, I'm happy to provide North Dimensions [sic] entity documents for review to satisfy your compliance requirements."

57.    By at least September 2021, certain customers' banks had begun questioning and sometimes rejecting wires to or from the North Dimension accounts, which caused Salame and Bankman-Fried to modify their scheme by opening bank accounts in the United States in the name of FDM.  Despite the fact that FDM had no contractual relationship with FTX customers with respect to the custody of fiat currency or the payment of fee revenue, Salame represented on FDM's application to open a U.S. bank account that it intended to open both an account to process FTX.com customer funds and an operating account that would be funded "from the

parent company and also internal transfers from the [] [c]ustodial account (fees from customers)."  By late-December 2021, Salame had successfully facilitated the opening of FDM's bank accounts, which, like the North Dimension accounts, contained commingled funds.  These accounts served as pass-through vehicles to funnel at least $5.4 billion in customer deposits onto the FTX.com exchange.[9]

58.    The FTX Group used the commingled funds in the Alameda, North Dimension, and FDM accounts for many purposes, including the cycling of money to and from customers to meet withdrawal requests, as well as to make political and charitable donations and expenditures for the benefit of Salame and the FTX Insiders.  Salame knew about and facilitated this commingling of customer funds, which enabled him to earn a reputation as an influential political donor and to live a lavish lifestyle.  On November 9, 2022, as the FTX Group was collapsing, Salame told another insider that he was "trying to see how fucked I am, if FDM held customer funds."

59.    In addition to facilitating the commingling and misappropriation of corporate assets, Salame engaged in various other misconduct at the FTX Group.[10]

60.    For example, in 2021, Salame participated in a deceptive scheme to transfer Alameda funds from Chinese exchanges.  The Chinese government was investigating a trader who had previously transacted with Alameda for money laundering.  Trial Tr. at 827:20-828:4,

---

[9]    *See Second Interim Report of John J. Ray III to the Independent Directors:  the Commingling and Misuse of Customer Deposits at FTX.com* ("Second Interim Report") at 12-14 [D.I. 1704-1].

[10]    *See, e.g.*, Mem. of USA in Opp. to Ryan Salame's Petition for a Writ of Error *Coram Nobis* Ex. 2 at 2, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 5, 2024), ECF No. 491-3 (describing "areas of criminal exposure" for Salame identified by the United States Attorney's Office for the Southern District of New York, which included:  (1) evidence of Salame's involvement in facilitating FTX Group employees' immigration to the Bahamas by supervising a scheme to bribe Bahamian immigration authorities, in violation of the Foreign Corrupt Practices Act; (2) evidence of distribution quantity narcotics trafficking; (3) paying for prostitutes, including for VIP clients; and (4) evidence that Salame arranged to obtain unauthorized preferential access to tokens on FTX.com).

*United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 11, 2023), ECF No. 360.  In the course of that investigation, the Chinese government had ordered Alameda's trading accounts on Chinese exchanges Huobi and OKX to be frozen.  *See id.*  Alameda's accounts on those exchanges held $1 billion in assets, which represented a "substantial amount of Alameda's trading capital at the time."  *Id.* at 828:13-18.  In an attempt to gain access to these frozen funds, Salame assisted in creating several fake accounts on OKX using the personal information of Thai prostitutes.  *Id.* at 830:4-12.  Salame planned for Alameda to enter into trades with these fake accounts that were highly profitable for the fake accounts, such that Alameda could transfer its otherwise inaccessible funds to these fake accounts for their subsequent withdrawal.  *Id.*  Salame was instrumental in establishing this scheme.  The strategy was ultimately unsuccessful; instead, Alameda was able to successfully unfreeze its accounts by paying over $100 million in bribes to the Chinese government officials.  *Id.* at 829:3-6.

## IV.    The Avoidable Transfers

61.    During the period November 2020 to November 2022, Salame received approximately $98.8 million in fraudulent transfers, *see* **Exhibits A and B**, and approximately $82.6 million in preferential transfers, *see* **Exhibits A and C**.

### A.    Salame Received Tens of Millions of Dollars from the FTX Group While Defrauding FTX Customers.

62.    During his three-year tenure at the FTX Group, Salame was compensated handsomely by the Debtors, receiving approximately $7.8 million in cash compensation and approximately 9 million FTT tokens.  He subsequently sold approximately 1.1 million FTT, receiving a $24 million windfall.

63.    On July 12, 2019, he received 1 million locked FTT from Alameda.  On July 22, 2019, he received an additional 7.94 million locked FTT from the OTC portal.  From 2019 to

2022, Salame periodically sold FTT, including approximately 434,100 FTT in 2021 at prices ranging from $7.77 to $78.50 for a total profit of $13 million, and 300,000 FTT in 2022 at prices ranging from $21.61 to $46.50 for a total profit of $10.6 million. Salame sold these FTT tokens while knowing that Alameda had "special privileges" on the FTX exchange. In other words, he sold FTT while knowing that FTT was severely inflated by the perpetration and concealment of a fraud on FTX customers and investors in which he was an active and knowing participant.

**B.      Salame Used Misappropriated Funds He Had Received from The FTX Group to Finance A Spending Spree.**

64.      In a recent interview by Tucker Carlson, Salame admitted that he "borrowed money [from Alameda], and then [he] went and did a lot of things with that money. And one of the big things [he] did was get involved in political contributions. But [he] also bought a house with that money. [He] lived off that money." *See* Interview of Ryan Salame, Tucker Carlson Show, at 00:06:38 (Oct. 9, 2024), https://tuckercarlson.com/tucker-show-ryan-salame ("Tucker Carlson Interview").

65.      Between November 2020 and November 2022, Salame went on an extravagant spending spree funded by his receipt of tens of millions of misappropriated Debtor funds—including funds he had "borrowed" from Alameda that "[he] never intended to repay." Plea Tr. at 21:21-22:1, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283.

66.      Salame took advantage of his senior position at the FTX Group to direct the transfer of approximately $98.8 million from Plaintiffs to his personal bank and his exchange accounts. These transfers were not justified by any legitimate business objectives of the FTX Group, and constituted the deliberate looting of Debtor assets, which Salame used to make

millions of dollars in donations to numerous politicians, purchase luxury real estate, and fund personal business ventures.

      **i.  *Salame funded political donations with assets misappropriated from the Debtors.***

67.     Salame, Bankman-Fried, and Singh collectively made more than $100 million in political donations with misappropriated FTX Group funds.  Salame himself made at least $43.5 million in political donations using misappropriated FTX Group funds.  In addition, as discussed below, Salame also financed the failed Congressional campaign of his then-domestic partner Bond using misappropriated Debtor funds in violation of the federal election laws.

68.     Salame and Singh have pleaded guilty to conspiring to make unlawful political contributions and defraud the FEC.[11]  In entering his plea, Salame admitted that "[b]etween the fall of 2021 and November of 2022 mid-term elections, [he] made political contributions in [his] name that were funded by transfers from the bank accounts of an Alameda subsidiary.  During this time [he] made tens of millions of dollars in campaign contributions to candidates for public office and political action committees."  Plea Tr. at 21:18-23, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283; *see also* Tucker Carlson Interview at 00:06:21 ("The campaign finance violations are because I borrowed money from Alameda, which was Sam [Bankman Fried']s company that he owned . . . . and g[o]t involved in political contributions.").

69.     At Salame's sentencing, the court stated that it is undisputed that Salame "knew that this straw donor operation in which he engaged was absolutely illegal," but he "went along with it" and was a "major figure in it, if not the person who conceived it," and "knowingly and

---

[11]   Bankman-Fried was charged with the same crime, although the charges against Bankman-Fried were later dropped after the Bahamian government informed the U.S. prosecutors that it had not intended to extradite Bankman-Fried on the campaign finance charge.

willfully assisted in destroying the limited transparency that the laws of the United States provide in this area." Sent'g Tr. at 20:23-21:4, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 28, 2024), ECF No. 448. He made millions of dollars in political contributions in his own name to Republican Party candidates and causes as a straw donor in order to conceal the identity of the true donor, Bankman-Fried, in violation of campaign finance laws. *See, e.g.*, Trial Tr. at 1422:19-1423:3, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 16, 2024), ECF No. 366; Tucker Carlson Interview at 00:08:00-00:08:09 ("I believe in total, I donated about 20 to $30 million throughout the cycle to Republican candidates."). Salame also coordinated the payment of donations made in Bankman-Fried's and Singh's names, and created a super-PAC to make contributions to Republican Party candidates.

70.     Salame explained the scheme plainly in a November 2, 2021 text message to a confidant: "Sam wants to donate to both democtratic [sic] and republican candidates in the US but cause the worlds frankly lost its mind if you dontate [sic] to a deomcrat [sic] no republicatns [sic] will speak to you and if you donate to a republican then no democrats will speak to you." Gov't's Sent'g Mem. at 8 (citing Gov't Ex. 505). Salame would be the face of Republican donations, with Bankman-Fried "rout[ing] money through [Salame]." *Id.*

71.     The funds Salame used to make political contributions were often transferred from the same Alameda and North Dimension bank accounts to which FTX customers sent funds to be credited to their accounts on the FTX exchanges. Salame knew that the FEC reporting of these contributions would "state that [he], rather than Alameda, made these political contributions" and that "it was prohibited by campaign finance laws to make contributions in [his] name with money that was not [his] own." Plea Tr. at 22:5-9, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283.

72.     In total, Plaintiffs have identified over 200 political contributions made by Salame, totaling $43.5 million.[12]

73.     Of note and as reflected in the chart below, at least 29 political contributions, totaling $28.1 million, were made from Salame's personal Signature Bank ("Signature") #0072 account, which was funded entirely by transfers from North Dimension's Silvergate Bank ("Silvergate") #8738 account—an account into which FTX.com customers were instructed to deposit fiat currency:

| Date | Value | Event |
|---|---|---|
| May 25, 2022 | $1,500,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| May 25, 2022 | $4,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| June 3, 2022 | $(500,000) | Transfer from Salame's Signature #0072 account to GMI PAC Inc. |
| June 13, 2022 | $(800,000) | Transfer from Salame's Signature #0072 account to American Action Network. |
| June 16, 2022 | $3,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| June 16, 2022 | $(3,000,000) | Transfer from Salame's Signature #0072 account to One Nation. |
| June 28, 2022 | $(313,544.32) | Transfer from Salame's Signature #0072 account to Michelle Bond. |
| June 30, 2022 | $(100,000) | Transfer from Salame's Signature #0072 account to Take Back the House 2022. |
| June 30, 2022 | $(500,000) | Transfer from Salame's Signature #0072 account to Stand for New York Committee. |
| June 30, 2022 | $(3,000,000) | Transfer from Salame's Signature #0072 account to American Dream Federal Action. |
| July 1, 2022 | $5,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| July 1, 2022 | $(1,000,000) | Transfer from Salame's Signature #0072 account to American Action Network. |

---

[12]     This number excludes the $400,000 that Salame caused FDM to transfer to Bond, discussed *infra* ¶¶ 103-05.

| Date | Value | Event |
|---|---|---|
| July 1, 2022 | $(1,600,000) | Transfer from Salame's Signature #0072 account to Common Sense Leadership Fund. |
| July 5, 2022 | $(500,000) | Transfer from Salame's Signature #0072 account to Heartland Resurgence Action. |
| July 11, 2022 | $5,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| July 11, 2022 | $(250,000) | Transfer from Salame's Signature #0072 account to Log Cabin Republicans. |
| July 11, 2022 | $(1,000,000) | Transfer from Salame's Signature #0072 account to American Action Network. |
| July 11, 2022 | $(1,500,000) | Transfer from Salame's Signature #0072 account to American Values Coalition Inc. |
| July 19, 2022 | $(160,000) | Transfer from Salame's Signature #0072 account to U.S. Right to Know. |
| August 9, 2022 | $(167,000) | Transfer from Salame's Signature #0072 account to Stand for New York Committee. |
| August 15, 2022 | $2,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| August 15, 2022 | $3,500,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| August 15, 2022 | $4,500,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| August 15, 2022 | $(1,000,000) | Transfer from Salame's Signature #0072 account to Graham Institute for Web3. |
| August 16, 2022 | $(200,000) | Transfer from Salame's Signature #0072 account to Stand for New York Committee. |
| August 16, 2022 | $(2,500,000) | Transfer from Salame's Signature #0072 account to Senate Leadership Fund. |
| August 16, 2022 | $(2,500,000) | Transfer from Salame's Signature #0072 account to One Nation. |
| August 19, 2022 | $(1,000,000) | Transfer from Salame's Signature #0072 account to Prosperity Through Enterprise Inc. |
| August 31, 2022 | $(215,000) | Transfer from Salame's Signature #0072 account to Michelle Bond. |
| September 7, 2022 | $3,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| September 7, 2022 | $(127,300) | Transfer from Salame's Signature #0072 account to New York Republican State Committee. |

| Date | Value | Event |
|---|---|---|
| September 8, 2022 | $(2,550,000) | Transfer from Salame's Signature #0072 account to American Prosperity. |
| September 23, 2022 | $(100,000) | Transfer from Salame's Signature #0072 account to Common Sense NC. |
| September 28, 2022 | $(2,000,000) | Transfer from Salame's Signature #0072 account to Congressional Leadership Fund. |
| October 3, 2022 | $1,000,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| October 3, 2022 | $(121,100) | Transfer from Salame's Signature #0072 account to Team McConnell. |
| October 3, 2022 | $(650,000) | Transfer from Salame's Signature #0072 account to American Prosperity Alliance. |
| October 4, 2022 | $(280,000) | Transfer from Salame's Signature #0072 account to Manhattan Institute for Policy Research. |
| October 12, 2022 | $1,500,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| October 14, 2022 | $(250,000) | Transfer from Salame's Signature #0072 account to Faithful & Strong Policies, Inc. |
| November 1, 2022 | $(250,000) | Transfer from Salame's Signature #0072 account to Better Tomorrow. |
| November 4, 2022 | $500,000 | Transfer from North Dimension's Silvergate #8738 account to Salame's Signature #0072 account. |
| November 4, 2022 | $(500,000) | Transfer from Salame's Signature #0072 account to Republican Governors Association. |

74. Although a small number of the above recipients of these political contributions have either returned the funds to the Debtors or turned them to over to the U.S. Department of Justice, other recipients have not returned the funds.

75. Salame's Signature #0072 account is the only personal bank account of Salame's for which the Debtors have account statements; the Debtors believe that discovery will reveal that Salame made additional contributions using Debtor funds through other his other bank accounts. For example, Paige Owens, a forensic accountant at the Federal Bureau of Investigations, testified at Bankman-Fried's trial that Salame's Greylock #1948 account, through

which Salame received $17.6 million in transfers from the Debtors, was used to send at least seven wires to political organizations from April 22, 2022 through May 23, 2022. *See* Trial Tr. at 1874:2:17, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 18, 2023), ECF No. 370.

76.     The FECA, 52 U.S.C. § 30101 *et seq.*, prohibits people from making conduit contributions, *i.e.*, those "in the name of another person" or "knowingly permit[ing] [their] name to be used to effect such a contribution," *id.* § 30122, and prohibits corporations from making contributions, *id.* § 30118.

77.     Salame "knew it was prohibited by campaign finance laws to make contributions in [his] name with money that was not [his] own." Plea Tr. at 22:7-9, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283. As an example that Salame knew it was illegal to make a campaign contribution using someone else's money, on or about June 27, 2022, Salame asked a friend to donate to Bond's campaign. Salame stated, "the whole thing is annoying cause you can only max donate $5,800 per person otherwise I would just cover the whole thing." Indictment ¶ 20, *United States* v. *Bond*, No. 24-cr-00494 (S.D.N.Y. Aug. 19, 2024), ECF No. 2. When the friend replied, "Lol if you venmo me I'll donate it," Salame responded, "lol don't type that, that's not allowed." *Id.* Salame nonetheless conspired with Bankman-Fried to violate FECA's prohibitions on conduit and corporate contributions.

78.     Salame and Bankman-Fried perpetuated this campaign finance scheme at least in part to improve their personal standing in Washington, D.C., increase the FTX Group's profile, and curry favor with candidates who could help pass legislation favorable to the FTX Group or Bankman-Fried's personal agenda, including legislation that would determine regulatory oversight of the FTX Group and its industry. *See* Superseding Indictment ¶ 38, *United States* v.

*Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), ECF No. 115.  At the time of their campaign finance scheme, "there were serious political disputes in Washington, D.C., about how cryptocurrency and related products should be regulated," and Salame and Bankman-Fried "took a massive, secretive shortcut, using corporate funds and straw donors to pour tens of millions of dollars to unlawfully support politicians they believed to be crypto friendly."  Gov't's Sent'g Mem. at 14.  Salame wrote in a message that the purpose of making bipartisan donations was "to weed out anti crypto dems for pro crypto dems and anti crypto repubs for pro crypto repubs."  *See* Superseding Information ¶ 13, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 262.  Donations routed through Salame would serve to "weed out that republican side."  *Id.*

79.    Bankman-Fried's indictment further states that because he did not want "to have his name publicly attached to Republican candidates," he conspired with others to have such contributions made in the names of others—including Salame—and to conceal that the Debtors were the source of the contributed funds.  *See* Superseding Indictment ¶¶ 38-39, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), ECF No. 115.

80.    In his guilty plea allocution, Salame stated that from the fall of 2021 to November of 2022, he made "tens of millions of dollars" in "political contributions in [his] name that were funded by transfers from the bank accounts of an Alameda subsidiary."  Plea Tr. at 21:18-23, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283.  Salame "understood throughout this process that the donations in question were for the benefit of initiatives primarily introduced to [him] by others, which were supported by Sam Bankman-Fried."  *Id.* 22:1-5.  He "further understood that FEC reporting would state that [he], rather than Alameda, made these political contributions."  *Id.* 22:5-7.

81.     By design of Bankman-Fried and Salame, Salame's contributions primarily went to Republican candidates or Republican-affiliated PACs or super-PACs.  Records identified by the Debtors show that Salame served as a conduit or "straw donor" for Bankman-Fried's donations to Republican Party candidates, which Bankman-Fried and Salame sought to obscure, and that Salame was rewarded for his participation in this scheme.

82.     In a memorandum Salame drafted on January 26, 2022, titled "Ryans plate / initiatives," Salame wrote that, under the heading of "Politics," he would "be spending a bit more time in DC" and that he "[w]ant[ed] to explore avenues that we can get more long term influence via the R[epublican] route with a few options in mind."  Salame shared this memorandum with Bankman-Fried via email.  A written review Bankman-Fried prepared in August 2022 concerning Salame's performance during 2022 stated that Salame's "work in DC has been awesome: you've been a core piece of accomplishing some pretty impressive things." Bankman-Fried further wrote that he "could see [Salame] adding a ton of value via . . . DC stuff, particularly on the Republican side."  To reward Salame's performance, Bankman-Fried wrote, Salame's bonus for the first half of 2022 would include $750,000 in cash, 21,900 options on FTX, and 154,000 options for WRS.

83.     Using funds misappropriated from the Debtors, Salame became an influential contributor to the Republican Party during the 2022 midterm election cycle.  The national press identified Salame as the 12th largest donor to Republicans in the 2022 midterm elections.  Luis Melgar, *Meet the mega-donors pumping millions into the 2022 midterms*, WASH. POST (Oct. 24, 2022, 4:31 PM), https://www.washingtonpost.com/politics/interactive/2022/top-election-donors-2022/.  His huge donations granted him access to meetings with powerful political figures, including U.S. Senate and House of Representatives leaders.  Gov't's Sent'g Mem. at 8 (citing

Def.'s Sent'g Mem. at 11, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 21, 2024), ECF No. 433).  Talking points prepared for Salame in connection with a dinner between Salame and a high-ranking Republican Senator in June 2022 stated that "SBF has been giving lots of money, mostly to Democrats," and Salame had "been giving lots of money to Republicans."

84.    Along with Salame, Sam Bankman-Fried's brother, Gabe Bankman-Fried, also participated in this scheme to influence American politics.  Gabe Bankman-Fried founded and served as director of Guarding Against Pandemics ("GAP"), a super-PAC that purported to advocate for the adoption of pandemic prevention policies and operated in close collaboration with Sam Bankman-Fried and the FTX Group.  As one employee of GAP wrote to various FTX employees in April 2022, "Guarding Against Pandemics is almost entirely funded—if not entirely funded—by Sam Bankman-Fried."

85.    Salame's political contributions were part of Sam Bankman-Fried's efforts to use GAP to as a way to direct political contributions.  GAP employees created and maintained an internal spreadsheet named "GAP+ Expenditures 2022 (& Beyond)" ("GAP+ Spreadsheet") which was last updated on November 9, 2022.  This spreadsheet stated that a total of $152,849,231 had been donated to multiple categories of donation recipients, including "R[epublican] leadership," "D[emocratic] leadership," and others.  A separate tab of this spreadsheet tracked donations each month of 2022 for different "Entity Helper[s]," with Salame, Sam Bankman-Fried, or one of nine PACs or super-PACs listed in this category.  The GAP+ Spreadsheet also listed "Wins" in a separate tab that included, among others, that "[s]everal dozen candidates, D[emocrat]s and R[epublican]s, are in congress and owe us favors. We picked the winner ~80% of the time."

86.     Salame made a substantial portion of his political contributions using Debtor funds transferred from North Dimension's Silvergate #8738 account.  During the period April 2022 through June 2022, Salame received wire transfers totaling at least $26 million from North Dimension's Silvergate #8738 account.  *See* Second Interim Report at 24.  During the three months preceding these transfers, the North Dimension Silvergate #8378 account received at least $360 million in customer deposits, as well as $330 million in deposits from other FTX Group accounts, many of which had previously received customer funds.  *Id.*  After commingled funds were transferred from North Dimension's Silvergate #8738 account to Salame's personal bank accounts, Salame used them to make at least $16.6 million in political contributions, $7.4 million of which Salame made using his Signature #0072 account, which was funded entirely by Plaintiffs.

87.     Salame made several political contributions to American Dream Federal Action ("ADFA"), a super-PAC that Salame himself founded.  A memorandum prepared for ADFA in August 2022 by an external public relations firm concerning press strategy stated that Salame "founded ADFA to elect forward-thinking Republican leaders who understand the importance of protecting America's national security from biological threats."  The memorandum explained that 13 Republican candidates whom ADFA had supported had won their primary election races.

88.     The same memorandum also listed answers to potential "[d]efensive questions for which Ryan and the team should be prepared" concerning ADFA's relationship with GAP and Sam Bankman-Fried.  The memorandum suggested that Salame misleadingly state that Sam Bankman-Fried "is not involved in ADFA and [Salame is] not involved in [Bankman-Fried's] activity on the Democratic side of the aisle."  In actuality, GAP also tracked ADFA's donations

in the GAP+ Spreadsheet, which stated that ADFA had donated $12,876,155 in 2022 to "R[epublican] champions."

89.    Salame made five donations totaling $15 million to ADFA in 2022.  The vast majority, if not all, of the funds donated to ADFA can be traced to Debtors' bank accounts.  For example, the Debtors' bank records reflect that on May 25, 2022, North Dimension's Silvergate #8738 account made two transfers of $1.5 million and $4 million to Salame's Signature #0072 account.  Records reflect that on June 30, 2022, Salame wired $3 million from his Signature #0072 account to ADFA.  An FEC Disclosure Form 3X was later filed with the FEC reflecting Salame's $3 million donation to ADFA.[13]

90.    Salame also made many smaller contributions.  From March 12, 2022 to November 2, 2022, Salame made at least 143 contributions of up to $2,900 each.  At that time, $2,900 was the legal limit on contributions to individual candidates for each of the primary and general elections.  Salame made many of these contributions via WinRed, an online platform for Republican Party fundraising.  Salame funded these donations with misappropriated Debtor funds.

91.    In addition to serving as a contributor, Salame facilitated Bankman-Fried's campaign finance scheme by coordinating wire transfers at the request of Gabe Bankman-Fried. For example, on July 23, 2021, Gabe Bankman-Fried emailed Salame concerning "urgent" political donations, stating that "Sam and I want him to donate $5,800 each (legal max) to various members of Congress, as well as potentially some related Political Action Committees (PACs)."  Gabe Bankman-Fried instructed Salame that "[t]he money has to come **directly from**

---

[13]    *See* Form 3X, American Dream Federal Action, FEC (June 20, 2022), https://docquery.fec.gov/cgi-bin/forms/C00809020/1604588/.

**Sam's personal account**," not a corporate entity, and that "Sam said you were the right person to coordinate these donations."

92.     Over the following months, Salame executed wire transfers at the instruction of Gabe and/or Sam Bankman-Fried to fund political contributions, including by transferring funds from Sam Bankman-Fried's personal bank account and corporate accounts of the Debtors.  Gabe Bankman-Fried wrote to Salame that Sam Bankman-Fried had instructed that Salame could "route things"—*i.e.*, move misappropriated Debtor funds—"through the prime trust account in his name"—*i.e.*, through Sam Bankman-Fried's personal bank account.

93.     Salame also sought to obscure the funds transferred to him by the Debtors for the purposes of making political donations by mischaracterizing the transfers as loans.

94.     In connection with his guilty plea, Salame admitted that the "tens of millions of dollars in campaign contributions to candidates for public office and political action committees" were "at the time. . . categorized in both [his] own and Alameda's ledgers as loans," but that he "understood then that the loans would eventually be forgiven and [he] never intended to repay them."  Plea Tr. at 21:21-22:1, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283.  Ellison testified at Bankman-Fried's trial that Alameda had loaned $35 million to Salame to make donations to Republican candidates.  *See* Trial Tr. at 689:20-690:3, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 10, 2023), ECF No. 358; Trial Tr. at 890:22-24 (Oct. 11, 2023), ECF No. 360.

95.     Salame's understanding regarding the loans being forgiven is supported by contemporaneous documents.  In a September 2022 email, for example, Joe Bankman, Sam Bankman-Fried's father, wrote, "Alameda has distributed a lot of money to Ryan, which he has

used to make political donations. (Ryan is the key employee who works on the other side of the aisle, as it were). Ryan and I talked about categorizing these as loans."

96.     The Debtors identified a single promissory note documenting a loan from Alameda to Salame for $4,993,520.55. Although this promissory note was executed on March 30, 2022, it was backdated to January 28, 2022. On April 2, 2022, Alameda transferred $4,993,520.55 to Salame's FTX.com exchange account, which Salame subsequently withdrew to his Greylock #1948 account. On April 3, 2022, Salame started a Signal thread with Ellison and a senior FTX Group lawyer titled "Ryan Theft." He wrote in a series of messages that he was "dropping [him]self" "about 5m" "from alameda" "meow." He then attached a pdf of the $4,993,520.55 promissory note. On March 31, 2022, Salame made a $1 million donation to the ADFA. Salame then contributed another $3,000,000 to ADFA on April 5, 2022. This loan was a sham, and Salame knew it. Salame testified during his plea allocution that "[w]hile at the time these funds were categorized in both [his] own and Alameda's ledgers as loans, [he] understood then that the loans would eventually be forgiven and [he] never intended to repay them." Plea Tr. at 21:23-22:1, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 18, 2023), ECF No. 283.

97.     Had the FTX Group not imploded in November 2022, Salame's participation in the illegal campaign finance scheme would have continued. The GAP+ Spreadsheet projected that Bankman-Fried, Singh, and Salame would make an additional $151 million of political contributions in 2023.

> ### ii. *Salame used Debtor assets to fund the congressional campaign of Michelle Bond.*

98.     In his plea agreement, Salame agreed to be held responsible in connection with his sentencing for "willfully making excessive political contributions to a candidate for federal

office [Bond] in an amount in excess of the then-applicable limitation on individual contributions, and exceeding $25,000 in the calendar year 2022, and conspiracy to do the same, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109 and 30116." *See* Plea Agreement at 2, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 5, 2024), ECF No. 491-2.  In 2022, Bond unsuccessfully ran in a Republican primary election seeking to serve as a Representative for New York's 1st Congressional District.  Salame funded Bond's failed Congressional campaign with misappropriated Debtor assets.

99.     On August 19, 2024, Bond was indicted on four counts of conspiring to cause unlawful political contributions and causing and receiving illegal political contributions, including a $400,000 donation that was funded entirely with misappropriated Debtor funds.  *See* Indictment ¶¶ 43-53, *United States* v. *Bond*, No. 24-cr-00494 (S.D.N.Y. Aug. 19, 2024), ECF No. 2.

100.    On each of June 13 and June 19, 2022, Salame donated $2,900 to Bond's campaign, thereby contributing the maximum amount that he could lawfully contribute.  Salame used misappropriated Debtor assets to fund the $5,800 that he contributed to Bond's campaign.

101.    Not content with the legal maximum, Salame conspired with Bond to cause unlawful donations to be made to the Bond campaign, which were funded with additional misappropriated Debtor assets.

102.    For example, on or about May 27, 2022, Salame arranged for FDM to enter into a sham Professional Services Agreement with Bond, which provided for a $400,000 sign on bonus to Bond as well as an annual payment of $100,000.  Salame signed the Professional Services Agreement on behalf of FDM.

103.    Bond did not perform any services for FDM pursuant to the Professional Services

Agreement.

104.    On or about June 1, 2022, Salame caused FDM to send a $400,000 wire transfer

from its Fidelity Bank (Bahamas) #0275 account to Bond's personal bank account.   The

$400,000 transfer was made from misappropriated Debtor funds, because prior to June 1, 2022,

FDM's Fidelity #0275 account was funded entirely by transfers from FTX's Signature #9018

account.   Bond used the $400,000 from the sham Professional Services Agreement with the FTX

Group affiliate to fund her congressional campaign, in violation of the FECA.

105.    In addition to the $400,000 she received from the Debtors, on or about June 28,

2022, Salame wired $313,544 from his personal Signature #0072 account to Bond's personal

bank account.   The $313,544 represented misappropriated Debtor funds because Salame's #0072

account was funded entirely by transfers from North Dimension's Silvergate #8738 account.   On

June 29, 2022, Bond wired $300,000 of that money to her campaign's bank account in two

separate wires.   Later that same day, Salame and Bond exchanged text messages, on which

members of the Bond campaign were included, that read:

Salame:    I can't see into campaign account, did 100K land today?

Bond:    I wired $100k (the max online) at about 7 pm last night and was told it
would hit today.   I just went into the branch and wired another $200k.
Can you guys monitor to make sure this $300k clears?

106.    In addition to sending wires from FTX Group entities and his own bank account

to fund Bond's campaign, FEC filings and the Debtors' records reflect that Salame also made

three contributions totaling $867,000 to the super-PAC Stand for New York Committee

("SNYC").   Salame is not identified on SNYC's Statement of Organization filed with the FEC,

and the Debtors have not been able to identify records establishing that Salame was involved in

creating SNYC.   Nevertheless, Salame is the only publicly disclosed donor to SNYC in FEC

filings, which also reflect that all of SNYC's political spending supported Bond or opposed Bond's opponent in the primary election.[14]  The Debtors' records reflect that all of the funds that Salame donated to SNYC were transferred from the North Dimension's Silvergate #8738 account to Salame's Signature bank account to SNYC.

107.    Salame also indirectly supported Bond's campaign through his contributions to GMI PAC.  Salame served as a director of GMI PAC and described GMI PAC in a January 2022 email to a reporter as a "Super PAC formed in September 2021 to elect pro-crypto members to the US Senate and US House of Representatives."  Bank records and fund transfer request forms that Salame submitted to Signature reflect that Salame contributed $1.5 million through three donations to GMI PAC between 2021 and 2022.  FEC filings reflect that in 2022, GMI PAC transferred $3.15 million to Crypto Innovation PAC, and that Crypto Innovation PAC in turn spent $1,287,089.70 to support Bond's campaign.[15]

108.    Even after Bond lost her Congressional primary, Salame made two additional unlawful contributions to Bond to retire her campaign debt.

109.    In or about July 2022, in text messages with Bond, Salame stated, in sum and substance, that Salame would give Bond money to cover her campaign's debt if she lost the primary election.

110.    On August 23, 2022, Bond lost the primary election and the Bond campaign had unpaid expenses.

---

[14]    *See* Stand for New York Committee, FEC, https://www.fec.gov/data/committee/C00819391/ (last accessed Oct. 10, 2024).

[15]    *See* GMI PAC, Inc., FEC, https://www.fec.gov/data/committee/C00788679/ (last accessed Oct. 30, 2024); Crypto Innovation, FEC, https://www.fec.gov/data/committee/C00804732/ (last accessed Oct. 30, 2024).

111.     On or about August 31, 2022, as promised, Salame wired approximately $215,000 from his Signature #0072 account to Bond's personal bank account.  The $215,000 represented misappropriated Debtor funds, because Salame's Signature #0072 was funded entirely by transfers from North Dimension's #8738 account.  Bond wired the $215,000 from her personal account to her campaign account.  The $215,000 was an illegal campaign contribution from Salame that was funded by the Debtors.

### iii. *Salame used assets misappropriated from the Debtors to purchase real-estate for himself, his family and his friends.*

112.     In 2021, Salame embarked on a real estate spending spree, deciding to "cash out and get more involved in real world things" by, among other things, buying up restaurants, condos, and other rental properties.  Tucker Carlson Interview at 00:06:01, 01:07:40.  Salame admitted during the Tucker Carlson interview that he "borrowed money [from Alameda], and then [he] went and did a lot of things with that money. . . [including] [buying] a house with that money." *Id.* at 00:06:21.

113.     Salame purchased at least 15 properties using more than $20 million in misappropriated Debtor funds, as reflected in the chart that follows:

| Date | Purchase Price | Property Purchased |
|---|---|---|
| April-July, 2021 | $422,855.62 | Jalan Raya Semer Pertokoan Kencana No. 1, Lingkungan Dukuh Sari, Kelurahan Kerobokan Kelod, Kecamatan Kuta Utara, Kabupaten Dalung, Bali, Indonesia |
| May 25, 2021 | $250,000 | 130 Padre Boulevard, Unit 611, South Padre Island, TX |
| May 28, 2021 | $1,250,000 | 29 Church Street, Lenox, MA |
| June 11, 2021 | $575,000 | 334 Padre Boulevard, Unit 1200, South Padre Island, TX |
| July 8, 2021 | $185,000 | 121 E. Scallop, Port Isabel, TX |
| August 27, 2021 | $1,300,000 | Airstrip and adjacent land, North Canaan, CT |
| October 5, 2021 | $1,175,000 | E11even Hotel & Residences, Unit 4503, 20 NE 11th St, Miami, FL |

| Date | Purchase Price | Property Purchased |
|---|---|---|
| October 15, 2021 | $625,000 | 9 Franklin Street, Lenox, MA |
| November 30, 2021 | $7,235,000 | Unit No. 3A, Marina Residences, Albany Building 10 Condominium, Bahamas |
| December 1, 2021 | $1,250,000 | 80 Church Street, Lenox, MA |
| December 3, 2021 | $300,000 | 6 Tucker Street, Lenox, MA |
| December 8, 2021 | $597,000 | 53 Rood Hill Road, Sandisfield, MA |
| April 1, 2022 | $1,200,000 | 27 Housatonic Street, Lenox, MA |
| May 1, 2022 | $680,000 | 122 E. Scallop, Port Isabel, TX |
| June 9, 2022 | $3,995,000 | 9800 Avenel Farm Drive, Potomac, MD |

114.    For example, on August 2, 2021, Salame withdrew US $1,200,000 from his FTX.com account to his personal Greylock #1948 account.  On August 27, 2021, he withdrew an additional 100,000 USDC from his FTX.com account.  On August 27, 2021, Salame purchased an airstrip and adjacent land, located at 543 and 547 West Main, North Canaan, CT, for $1,300,000.

115.    As another example, on October 2, 2021, Salame executed a purchase agreement and crypto addendum with 11th Street Condo Owner, LLC d/b/a E11even Hotel & Residences to purchase E11even Hotel & Residences, Unit 4503, 20 NE 11th St, Miami, FL, a 1,093 square foot, two-bedroom, two-bathroom apartment unit at the yet to be constructed luxury high rise condominium in Downtown Miami's Park West district.  On October 4, 2021, Salame received an invoice for USDC 1,175,000 from E11even.  On October 5, 2021, Salame withdrew USDC 1,175,000 from his FTX.Com account to fund the purchase of the property.

116.    Salame was also the beneficiary of a luxury real estate purchase made by the Debtors for Salame's personal benefit.  Specifically, on September 21, 2021, Salame executed an agreement to purchase a four-bedroom, four-and-a-half-bath apartment at the Marina Residences

at the Albany—a luxury resort community—in the Bahamas for $7,235,000. Although the deed was in Salame's name, the apartment purchase was funded by transfers from the Debtors. Salame returned this property to the Debtors in satisfaction of the approximately $5.6 million in restitution he owed under his plea agreement. [D.I. 15504]

117.    In addition to the abovementioned properties, on information and belief, Salame used misappropriated Debtor funds to acquire at least two properties post-petition. On approximately December 2, 2022, Salame purchased a three-bedroom, three-bathroom condo, 1098 E. Scallop, Port Isabel, TX for approximately $439,000, allegedly with the sale proceeds of another property he had purchased with Debtor funds. In 2023, Salame acquired a "tourist rental unit" located at Martinhal Residences, Praça Príncipe Perfeito, Numeros 1, 1a e 1b, Parque das Nações, Lisboa, Portugal. Martinhal Residences advertises that it provides apartment units to assist residents in obtaining "Golden Visa[s]." *Martinhal Residences* (last accessed Oct. 22, 2024), https://www.martinhalresidences.com/pt/investir-em-portugal/.

### iv. *Salame used millions of dollars in Debtor assets misappropriated from Plaintiffs to purchase businesses and fund investments.*

118.    Salame also used millions of dollars of misappropriated Debtor assets to fund his purchases of businesses and various investments.

119.    Between April 2021 and December 2021, Salame, often via holding companies he owned, purchased two full-service restaurants as well as an ice-cream parlor, and launched a catering and food truck businesses, a portfolio he styled as the "Lenox Eats Collective." In April 2021, Salame, via his holding company, North Sandy Brook, LLC, acquired The Olde Heritage Tavern at 12 Housatonic Street, Lenox, MA, together with the property on which the restaurant is located, for approximately $1.5 million. In approximately November 2021, Salame acquired for an undisclosed price The Scoop, an ice cream parlor at 51 Church Street, Lenox, MA, which

was reopened in February 2022 as a bakery and cafe named Sweet Dreams.  In December 2021, Salame, via North Sandy Brook, LLC, acquired Café Lucia, located at 80 Church Street, Lenox, MA as well as the real estate on which the café was located for approximately $1.25 million.  As a result of these transactions, Salame owned nearly half of the full-service restaurants in Lenox, Massachusetts by the end of 2021.[16]

120.    In December 2021, Salame invested a further $2.5 million to acquire a 40% ownership interest in JBK International Ltd., which operated a steakhouse in The Bahamas called Prime One, located at Windsor Field Road, Nassau, The Bahamas.

121.    Salame also acquired stakes in two Hong Kong gym entities:  TCD Fitness Limited and Flex Fitness Limited.  In April 2021, Salame purchased a 25% ownership in TCD Fitness, which owns a gym in Hong Kong (located at 7th Floor, Morrison Plaza, No. 9 Morrison Hill Road, Wan Chai, Hong Kong); his ownership increased to approximately 46% in June 2022, after he purchased newly issued shares in the entity.[17]  In June 2021, Salame purchased a 25% ownership in Flex Fitness Limited; at the end of 2021, Salame's ownership had increased to approximately 27%.

122.    In July and August 2022, using funds from his Signature #0072 account (which, again, was funded entirely by the Debtors), Salame invested $2.3 million in RedBird.

123.    The foregoing purchases coincided with Salame's receipt of tens of millions of dollars in fraudulent transfers from Plaintiffs to his personal accounts.  Upon information and belief, Salame made these purchases with misappropriated Debtor funds.

---

[16]    Clarence Fanto, *At 28, Bitcoin tycoon Ryan Salame owns nearly half the full-service restaurants in Lenox*, BERKSHIRE EAGLE (Nov. 30, 2021), https://www.berkshireeagle.com/business/sandisfield-native-ryan-salame-cryptocurrency-lenox-restaurant-empire/article_8d2a2cc2-5205-11ec-af1b-d769f18cf13c.html.

[17]    According to TCD Fitness's most recent annual filing from April 2024, Salame still owned approximately 46% of TCD Fitness.  Salame resigned as a director of TCD Fitness on August 30, 2024.

     **v.** ***Salame used assets misappropriated from the Debtors to make extravagant purchases, including a private jet.***

124.    In addition to purchasing homes and restaurants, Salame arranged for the purchase of a Bombardier Global 5000 private jet (the "Global") using funds provided by Alameda.  Salame made arrangements for the Global to be purchased in the name Island Air Capital ("IAC"), a holding company of Trans Island Airways ("TIA"), which is a company that provides private charter flights in the Bahamas.

125.    Salame facilitated the purchase of the Global in order to shield the FTX Group and Bankman-Fried from the negative publicity associated with owning such an extravagant asset.  Bankman-Fried wanted a private jet, but he did not want the public to know that the FTX Group owned one.  Internal records indicate that Bankman-Fried considered private jets an "extremely sensitive topic" that should not be "br[ought] [] up" because of "concern[s] about PR."  Therefore, instead of purchasing the jet himself, Bankman-Fried directed Salame to arrange the purchase of the $15.9 million Global for the use of Salame and the FTX Insiders.

126.    On February 1, 2022, TIA entered into a letter of intent to purchase the Global for $15.9 million.  On February 2, 2022, Paul Aranha, the owner of the TIA, wrote to Salame, "I have attached the LOI and escrow instructions for the Global 5000.  If you could send the $500,000 refundable deposit to the escrow agent and let me know when sent it would be great."  That same day, Salame caused Alameda to transfer $500,000 of commingled, misappropriated funds from Alameda's Silvergate #4456 account directly to the escrow agent.

127.    On February 28, 2022, Salame received another email from Aranha, this time stating, "We are ready to accept the aircraft.  Can you please arrange for the balance of $15,400,000.00" to be paid to the escrow agent.  The very next day, Salame caused Alameda to transfer 15.4 million USDC to Salame's account on the FTX.com exchange.  Bank records

reflect that on March 2, 2022, $15.4 million was withdrawn from North Dimension's Silvergate #8738 bank account with the memo field reflecting the name of the escrow agent. And on March 3, 2022, Salame initiated an on-exchange transfer of $15.4 million from his FTX.com account to the escrow agent to fund the purchase of the Global.[18]

128.    Additionally, in July 2022, using funds from his Signature #0072 account (which, again, was funded entirely by the Debtors), Salame purchased a car from Lincoln Motor Company, Ford Motor Company's luxury vehicle division, for $63,924.[19]

### vi. *Salame used Debtor assets to finance a Covid-19 documentary that was never made.*

129.    On June 30, 2022, Bankman-Fried engaged in a Slack conversation with an employee of the FTX Foundation about funding a Covid-19 documentary. The FTX Foundation employee described the project as "$637,674 for On Ten (production company) to make a documentary on the origins of SARS-CoV-2" and added "we'd like to fund via Ryan." Bankman-Fried responded "got it—no objections." On July 15, 2022, the same FTX Foundation employee raised an additional request to pay an Effective Altruist activist $118,590 for a year's work related to the documentary. Subsequently, on August 5, 2022, Salame transferred from his Signature #0072 account, which was funded entirely by transfers from North Dimension's Silvergate #8738 account, $756,264—the exact amount requested by the FTX Foundation employee, for the documentary and the individual's salary—to On Ten Productions Limited, a UK based company that had been incorporated less than a month earlier.

130.    On Ten never made the documentary. Plaintiffs have not identified any documentation justifying this transfer, for which the Debtors received no value.

---

[18]    The government has seized the Global.

[19]    Salame may have purchased additional luxury vehicles, such as his Porsche 911, with Debtor funds.

**C.    Salame Abused His Insider Knowledge as CEO of FDM to Make Withdrawals from his Personal FTX.com Exchange Account Just Prior to FTX.com Halting Customer Withdrawals.**

131.    On November 7, 2022, at 7:31 pm EST, after learning that FTX.com would be halting customer withdrawals imminently due to lack of funds, Salame abused his position of trust within the FTX Group by withdrawing $5 million from his personal FTX.com account, thereby directly benefitting himself at the expense of the FTX Group's creditors.  Salame tried to withdraw tens of millions more that evening, but the withdrawals were not successful.  He subsequently spent some of the withdrawn funds to hire a public relations firm and payoff personal credit expenses, including $20,000 in Restoration Hardware charges that he incurred after the Petition Date.  *See* Gov't's Sent'g Mem. at 11 (citing PSR ¶ 41).  During Salame's sentencing, Judge Kaplan rebuked Salame for his greed and self-interest, even as FTX was collapsing:

> I don't have to look that far for greed.  As the government has made clear, when it became apparent that FTX was on the brink of bankruptcy and was at the least a billion dollars in the hole, you pulled $5 million in cryptocurrency from an account you controlled at FTX into your own crypto wallet. You tried to withdraw tens of millions more that day, but the withdrawals failed, the further withdrawals. And you spent millions from the more than $5 million you got out just before the collapse came on hiring a public relations firm, paying off personal obligations, and the like.  It was me first, I'm getting in the life boat first, the heck with all those customers.

Sent'g Tr. at 22:3–17, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. May 28, 2024), ECF No. 448.  On the morning of November 11, the same day that the FTX Group voluntarily commenced Chapter 11 Proceedings in the District of Delaware, Salame emptied his FTX.US account balance of approximately $610,000.

132.    These improper withdrawals are paradigmatic preferential transfers that can and should be clawed back.[20]

## V.    The Transfers Were Made When Plaintiffs Were Insolvent, and Salame Knew It.

133.    "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

134.    Salame and the FTX Insiders failed to implement the systems or controls necessary for companies entrusted with large amounts of customer money or other assets.  At the direction of the FTX Insiders, and with material assistance from Salame, the FTX Group concealed its failing financial condition by misappropriating billions of dollars in cash, cryptocurrency, and other assets from customer accounts.  The FTX Insiders, working with Salame, accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the Debtors' capital structure and, ultimately, out of the Debtors' custody.  This "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Bankman-Fried and other FTX executives "to access and steal FTX customer deposits without detection."  *Id.* ¶ 4.

135.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited—with the FTX Insiders' and Salame's knowledge or assistance—in Alameda or North Dimension bank accounts.  At the same time,

---

[20]    In satisfaction of the restitution Salame owed the Debtors for a $5 million preferential transfer on the eve of the Bankruptcy, Salame provided the Debtors with title to the Bahamas Apartment.  *See Order Authorizing the Debtors to Enter Into a Stipulation Relating to the Satisfaction of the Restitution Amount That Ryan Salame Owes the Debtors Under His Plea Agreement* [D.I. 15504].

although FTX's software code base generally did not allow an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed Wang and Singh to modify the software to permit Alameda to maintain a negative balance in its account on the exchange. *Id.* ¶ 23.

136.    Through these schemes, the FTX Insiders caused Alameda to avoid collateralizing its position on the exchange.  The FTX Insiders also caused Alameda to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As a result of this tampering, the exchange began running very large deficits.  By March 2022, Ellison privately estimated that the exchange had a cash deficit alone of more than *$10 billion.  See, e.g.*, Trial Tr. at 1060:10-13, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 10, 2023) (responding to a question of when she first became concerned that Alameda might be insolvent, Ellison responded "I think this was in around May of 2022"); *id.* at 789:11-25 (regarding Gov't Ex. 44, a June 19, 2022 spreadsheet listing $9.9 billion in borrows from FTX customers, Ellison testified that it made "clear that Alameda was in a risky situation because if customers tried to withdraw those funds, then we wouldn't be able to pay them back").

137.    The FTX Insiders' misappropriation of funds, including the large transfers of fiat and cryptocurrency to Salame for no apparent legitimate business purpose, rendered the FTX Group insolvent.  Even without accounting for the distorting effects of the staggering fraud, the FTX Group's liabilities exceeded the fair value of their assets, and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditors'

claims.  The FTX Group continued to operate only by continually lying to customers and other creditors about their financial condition and their pervasive misuse of customer funds.

138.    Ellison admitted to this conduct in her plea allocution, stating that (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds.  Plea Tr. at 27:5-29:1, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF No. 19.   Singh made similar admissions during his plea allocution.  *See* Plea Tr. at 28:12-29:21, *United States* v. *Singh*, No.22-cr-00673 (S.D.N.Y. Mar. 7, 2023), ECF No. 102.

139.    On November 2, 2023, Bankman-Fried was found guilty of various felonies arising out of, among other things, Bankman-Fried's causing Alameda to misappropriate FTX.com funds and Bankman-Fried's misrepresenting to lenders and investors the financial condition of Alameda, FTX.com, and FTX US.

## VI.    The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay, or Defraud Creditors.

140.    As set forth above, multiple badges of fraud recognized by bankruptcy law and the Delaware code permeate the transfers made and obligations incurred, including that:

> a.  Salame was an insider of the FTX Group and a close associate of Bankman-Fried;
>
> b.  The transfers were part of a scheme to enrich and otherwise benefit Salame;
>
> c.  Numerous material facts relating to the transfers were concealed;
>
> d.  Salame removed or concealed Plaintiffs' assets;

e.  The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred; and

f.  Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made.

\*     \*     \*

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(A)(1)(A)

141.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 140 as if fully set forth here.

142.   Plaintiffs made the transfers to Salame addressed herein, including the transfers more specifically described in **Exhibits A and B**, from November 2020 to November 2022. Each of the transfers to Salame was a transfer of property of Plaintiffs.

143.   Each of these transfers to Salame was made with the intent to hinder, delay, or defraud present or future creditors.

144.   Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Salame the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT TWO
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

145.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 144 as if fully set forth here.

146.   Plaintiffs made the transfers to Salame addressed herein, including the transfers more specifically described in **Exhibits A and B**, from November 2020 to November 2022. Each of the transfers to Salame was a transfer of property of Plaintiffs.

147.   Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

148.   Each of the Plaintiffs:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond Plaintiffs' ability to repay as such debts matured.

149.   Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Salame the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)

150.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 149 as if fully set forth here.

151.   Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

152.    Plaintiffs made the transfers addressed herein, including the transfers more specifically described in **Exhibits A and B**, from November 2020 to November 2022 for the benefit of Salame.  Each of the transfers constituted a transfer of property of Plaintiffs.

153.    Each of these transfers was made with actual intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims. Each of the transfers is avoidable by creditors who hold allowable unsecured claims.

154.    Accordingly, each of the transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Salame the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FOUR
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)

155.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 154 as if fully set forth here.

156.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

157.    Plaintiffs made the transfers to Salame addressed herein, including the transfers more specifically described in **Exhibits A and B**, from November 2020 to November 2022. Each of the transfers was a transfer of property of Plaintiffs.

158.    Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers.

159.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

160.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

161.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§1304(a)(2) and 1305, and 11 U.S.C. §544(b), and Plaintiffs may recover from Salame the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates and/or other such remedies as necessary, to put the Debtors in the position they would have been in had the avoidable transfers alleged herein not occurred.

## COUNT FIVE
## PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)

162.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 161 as if fully set forth here.

163.    Plaintiffs transferred approximately $82.6 million to Salame during the Preference Period, including approximately $52.9 million in wire transfers from Debtor bank accounts to Salame's bank accounts as reflected in **Exhibit A**.    Salame also received the benefit of

approximately $29.8 million[21] in withdrawals from his FTX.com and FTX.US exchange accounts, which constituted transfers from FTX.com and FTX.US during the Preference Period, as more specifically described in **Exhibit C**. These transfers were transfers of property of Plaintiffs.

164.    The transfers were made solely to benefit Salame.

165.    With respect to the transfers, Salame was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternately, Salame received such transfers for the benefit of a creditor or creditors of Plaintiffs.

166.    The transfers to Salame were made on account of an antecedent debt.

167.    Salame is an insider for purposes of § 547(b), as he was a "person in control" of the Plaintiffs—having made management decisions of the Plaintiffs, directed payment of the Plaintiffs' expenses, and had more ability to assert control than other creditors—and/or had a close relationship with the Plaintiffs and the transactions the Plaintiffs are seeking to avoid were not conducted at arm's length.

168.    Each of the transfers was made while the transferor was insolvent.

169.    Each of the transfers enabled Salame to receive more than he would have received if: (i) Plaintiffs' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to Salame on account of the debt were determined by the Bankruptcy Code.

170.    Salame has not returned the approximately $82.6 million transferred to him during the Preference Period.

---

[21]    This number excludes the $5 million withdrawal that Salame made on the eve of bankruptcy that Salame was required to repay as restitution under his Plea Agreement. *See* Plea Agreement at 2-3, *United States* v. *Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 5, 2024), ECF No. 491-2; Gov't's Sent'g Mem. at 12.

171.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

172.     Accordingly, each of these transfers should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Salame the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**

173.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 172 as if fully set forth here.

174.     As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544, 547, and 548 of the Bankruptcy Code.

175.     Because Salame is the initial transferee for whose benefit such transfers were made, Plaintiffs may recover from Salame the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SEVEN**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES UNDER**
**DELAWARE LAW**

176.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 175 as if fully set forth here.

177.     The FTX Insiders breached their fiduciary duties by, among other things: (1) secretly diverting funds from FTX and FTX US for their own personal benefit; (2) orchestrating improper purported personal "loans" from the FTX Group for their own

-56-

personal benefit; and (3) using FTX Group funds to purchase assets for their own personal benefit or use.

178.    Salame aided and abetted these breaches of duties by, among other things:

    a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.    Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

    c.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that he and the FTX Insiders misappropriated for their personal benefit, including by instructing employees to convey false information to banks to open accounts for new entities to facilitate the commingling and misuse of customer deposits;

    d.    Authorizing and engaging in extensive self-dealing;

    e.    Abusing or allowing abuse of positions in various FTX Group entities—including Alameda LLC—for his personal gain and to the detriment of the FTX Group; and

    f.    Using funds from corporate bank accounts, at the direction of the FTX Insiders, to make political donations in his own name, and in so doing violating federal election laws.

179.    As a direct and proximate result of the foregoing, Plaintiffs Alameda LLC and WRS were damaged in an amount to be determined at trial.

## COUNT EIGHT
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES UNDER ANTIGUA AND BARBUDA LAW

180.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 179 as if fully set forth here.

181.    The FTX Insiders breached their fiduciary duties for the reasons set forth in paragraphs 31-40.

182.    Salame aided and abetted these breaches of duties by, among other things:

    a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.    Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

    c.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that he and the FTX Insiders misappropriated for their personal benefit, including by instructing employees to convey false information to banks to open accounts for new entities to facilitate the commingling and misuse of customer deposits;

    d.    Authorizing and engaging in extensive self-dealing; and

    e.    Abusing or allowing abuse of positions in various FTX Group entities—including FTX—for his personal gain and to the detriment of the FTX Group.

183.    As a direct and proximate result of the foregoing, the Plaintiff FTX was damaged in an amount to be determined at trial.

## COUNT NINE
## KNOWING ASSISTANCE IN BREACH OF FIDUCIARY DUTIES UNDER BRITISH VIRGIN ISLANDS LAW

184.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 183 as if fully set forth here.

185.    The FTX Insiders breached their fiduciary duties for the reasons set forth in paragraphs 31-40.

186.    Salame assisted in these breaches of fiduciary duties and acted with a dishonest mind by, among other things:

    a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.    Actively contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

    c.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that he and the FTX Insiders misappropriated for their

personal benefit, including by instructing employees to convey false information to banks to open accounts for new entities to facilitate the commingling and misuse of customer deposits;

d.  Authorizing and engaging in extensive self-dealing; and

e.  Abusing or allowing abuse of positions in various FTX Group entities—including FTX—for his personal gain and to the detriment of the FTX Group.

187.  As a direct and proximate result of the foregoing, Plaintiff Alameda was damaged in an amount to be determined at trial.

## COUNT TEN
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)

188.  Plaintiffs repeat and reallege the allegations in paragraphs 1 through 187 as if fully set forth here.

189.  By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, Salame's claims in these Chapter 11 Cases should be disallowed unless and until Salame has turned over to Plaintiffs the property transferred, or paid Plaintiffs the value of such transferred property, for which Salame is liable pursuant to Section 550 of the Bankruptcy Code.

## COUNT ELEVEN
## EQUITABLE SUBORDINATION OF CLAIMS PURSUANT TO 11 U.S.C. § 510(c)(1)

190.  Plaintiffs repeat and reallege the allegations in paragraphs 1 through 189 as if fully set forth here.

191.  By reason of the foregoing facts and pursuant to Section 510(c) of the Bankruptcy Code, the claims of Salame in these bankruptcy proceedings should be equitably subordinated to the claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of customer funds.

192.  Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully pray that this Court:

193.    Enter an order that the transfers addressed herein are avoidable fraudulent transfers and preferences under 11 U.S.C. §§ 544, 547, 548, and 550 and Del. Code Ann. tit. 6, §§ 1304, 1305;

194.    Award Plaintiffs (a) return of property to the Debtors' estates that is the subject of the avoidable transfers alleged herein, including but not limited to the real property located at (i) 9800 Avenel Farm Drive, Potomac, MD; (ii) 543 and 547 West Main, North Canaan, CT, (iii) E11even Hotel & Residences, Unit 4503, 20 NE 11th St, Miami, FL, (iv) the unit located at Martinhal Residences, Praça Príncipe Perfeito, Numeros 1, 1a e 1b, Parque das Nações, Lisboa, Portugal, (v) Salame's interests in 7th Floor, Morrison Plaza, No. 9 Morrison Hill Road, Wan Chai, Hong Kong, and (vi) Jalan Raya Semer Pertokoan Kencana No. 1, Lingkungan Dukuh Sari, Kelurahan Kerobokan Kelod, Kecamatan Kuta Utara, Kabupaten Dalung, Bali, Indonesia; (b) monetary damages under 11 U.S.C. § 550 reflecting the value of the avoidable transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to Salame during the Avoidance Period); and/or (c) equitable relief, as necessary, to put the Debtors in the position they would have been in had the avoidable transfers alleged herein not occurred;

195.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Salame in these bankruptcy proceedings unless and until Salame has turned over to Plaintiffs the amount ordered as an award, or, in the alternative, enter an order under 11 U.S.C. § 510(c)(1) subordinating any and all claims filed or held by Salame in these bankruptcy proceedings to the claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of customer funds;

196.    Award Plaintiffs monetary damages and/or other equitable relief resulting from Salame's aiding and abetting and/or knowing assistance in the FTX Insider's breach of fiduciary duties to Plaintiffs and other claims alleged herein;

197.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

198.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated:  November 4, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       cobb@lrclaw.com
       mcguire@lrclaw.com
       robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: wheelers@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com

*Counsel for the Plaintiffs*