## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD., ISLAND BAY VENTURES INC., and CLIFTON BAY INVESTMENTS LLC f/k/a ALAMEDA RESEARCH VENTURES LLC, | |
| Plaintiffs, | Adv. Pro. No. 24-____(JTD) |
| - against - | |
| SKYBRIDGE CAPITAL II, LLC, SKYBRIDGE GP HOLDINGS LLC, DIGITAL MACRO FUND LP f/k/a SKYBRIDGE COIN FUND LP, SALT VENTURE GROUP LLC, ANTHONY SCARAMUCCI, and BRETT MESSING, | |
| Defendants. | |

## COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550 AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, FOR UNJUST ENRICHMENT, FOR BREACH OF CONTRACT, FOR BREACH OF FIDUCIARY DUTIES, FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES, AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Plaintiffs FTX Trading Ltd. ("FTX"), Island Bay Ventures Inc. ("Island Bay"), and Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC ("Alameda Research Ventures"),[2] (together, "Plaintiffs"), through their undersigned counsel, for their Complaint against SkyBridge Capital II, LLC ("SkyBridge II"), SkyBridge GP Holdings LLC ("SkyBridge GP," and with SkyBridge II, "SkyBridge"), Digital Macro Fund LP f/k/a SkyBridge Coin Fund LP ("SkyBridge Coin Fund"),[3] SALT Venture Group LLC ("SALT"), Anthony Scaramucci, and Brett Messing (together, "Defendants"), allege the following based upon personal knowledge and upon their investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)–(2) and 1305, to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs and all obligations of Plaintiffs to Defendants made in 2022, prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").  Plaintiffs further bring claims against Defendant SkyBridge Capital II for unjust

---

[2]      Plaintiff Clifton Bay Investments LLC is referred to herein as Alameda Research Ventures because that was its name at the time of the relevant transactions.

[3]      Defendant Digital Macro Fund LP is referred to herein as SkyBridge Coin Fund because that was its name at the time of the relevant transactions.

enrichment, and against Defendants Anthony Scaramucci and Brett Messing for breach of contract, breach of fiduciary duties, and aiding and abetting breach of fiduciary duties. In addition, Defendants have filed certain proofs of claim against the Debtors' estates, the bulk of which arise from the avoidable transfers and obligations described herein.

2.      In total, Plaintiffs seek to recover in excess of $100 million for the damages they have suffered in connection with the transactions described below.

3.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128]. Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

4.      This Complaint concerns three transactions that occurred in 2022 between Plaintiffs and Defendants:

   i.   In January 2022, FTX and SALT executed a Sponsorship Agreement whereby FTX agreed to pay $12 million to sponsor a certain number of conferences and podcast episodes organized by SALT between 2022 and 2024 (the "SALT Sponsorship").

   ii.  In or around March 2022, Alameda Research Ventures invested $10 million in the SkyBridge Coin Fund (the "SCF Investment").

   iii. On September 7, 2022, Island Bay paid $45 million in return for 30% membership interests in both SkyBridge II and SkyBridge GP (the "SkyBridge Acquisition").

5.      Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and any related obligations incurred by Plaintiffs are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code.

6.      Throughout 2022, the massive fraud Samuel Bankman-Fried and others were perpetrating came under severe pressure.  Both external market forces and Bankman-Fried's own profligate spending were making it increasingly hard to meet cash flow needs at the FTX Group of companies.[4]

7.      In the face of these difficulties, Bankman-Fried doubled down, engaging in a campaign of influence-buying throughout the year and making lavish and showy "investments" using commingled and misappropriated Debtor funds to project financial strength and stability. These "investments" conveyed little to no benefit to Debtors, and instead served only to prop up Bankman-Fried's standing in the worlds of politics and traditional finance.  As the financial situation at the FTX Group eroded, Bankman-Fried attempted to capitalize on his newfound celebrity by working his new connections for potential sources of equity investment in FTX to fill the hole in the balance sheet and, therefore, keep his scheme afloat.

8.      One connection that Bankman-Fried poured significant time and money into developing was with Defendant Anthony Scaramucci.  By the start of 2022, Scaramucci—a hedge fund manager who had a brief stint as White House Communications Director—had been

---

[4]      The FTX Group is comprised of four silos.  These silos include:  (a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

attempting to position himself, and the network of companies he operated under the SkyBridge brand, in Bankman-Fried's orbit for nearly a year. Scaramucci had established a rapport with Bankman-Fried that Scaramucci hoped would give himself and his SkyBridge companies an edge in the cryptocurrency space.

9.      Scaramucci had established financial, political, and social connections which included high-profile celebrities and wealthy investors around the world.

10.     In January of 2022, Bankman-Fried formalized his relationship with Scaramucci with an agreement to sponsor Scaramucci's series of SALT conferences—multi-day affairs where leaders in tech and finance would meet to present on cutting-edge issues in their industries. This sponsorship came with a price tag of $12 million of Debtor funds,[5] but Bankman-Fried believed it would give him privileged access to a new platform where he would be able to build new connections with financial power players—a recurring theme in Bankman-Fried's relationship with Scaramucci.

11.     In March of 2022, Bankman-Fried deepened the FTX Group's ties with Scaramucci by directing Alameda Research Ventures to make a $10 million investment in a fund managed by SkyBridge II—the SkyBridge Coin Fund—that focused on trading in cryptocurrency assets. Employees at the FTX Group noted internally at the time that it made no economic sense for Alameda Research Ventures, which was itself in the business of trading in cryptocurrency assets, to place so much money with a third-party manager that was *less* experienced than it was in the same business.

---

[5]      As discussed further herein, Plaintiffs had paid two installments of the SALT Sponsorship, each for $1 million, prior to the Petition Date.

12.     By the summer of 2022, due to a general downturn in the cryptocurrency industry, it became increasingly challenging to sustain the fraud at the FTX Group.  In May 2022, the crash of Terra and LUNA triggered a precipitous decline in the industry.  Soon thereafter, hedge funds with large holdings in cryptocurrencies started to buckle.[6]  The FTX Group's lenders started demanding repayment of their open term loans.  Bankman-Fried knew he would need significant amounts of new outside money in order to keep his fraud from coming to light.

13.     As Caroline Ellison, the CEO of Alameda Research Ltd., testified at Bankman-Fried's criminal trial, by September 1, 2022, Alameda Research Ltd. was "borrowing" *$13.7 billion* from FTX that it had no meaningful ability to repay.  Trial Tr. at 813:16-17, ECF No. 360, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. 2022).  The same month, Bankman-Fried inked a deal with Scaramucci to lock in the relationship with the SkyBridge Acquisition, investing $45 million (the "Island Bay Purchase Price") in exchange for a 30% stake in the operating companies for Scaramucci's hedge funds, SkyBridge II and SkyBridge GP.  No meaningful due diligence was conducted prior to the SkyBridge Acquisition—the deal was proposed over a lunch in the Bahamas and finalized at an Andrea Bocelli concert in Italy a few weeks later.[7]  The transaction made no economic sense from FTX's perspective:  Bankman-Fried and Scaramucci agreed to commit nearly 90% of the acquisition price to purchase a basket of cryptocurrencies that the FTX Group could have easily purchased itself less expensively, in effect

---

[6]     Brian McGleenon, *How Crypto Fell to Earth in 2022: Eight Charts that Tell the Story of a Cruel Crash*, YAHOO FINANCE (Dec. 22, 2022), https://uk.finance.yahoo.com/news/how-crypto-fell-2022-eight-charts-story-of-cruel-crash-060058350.html.

[7]     Alexandra Semenova, *"I Think We'll Be Right": Scaramucci Dishes on SkyBridge Deal with FTX Inked During Andrea Bocelli Concert in Italy*, YAHOO FINANCE (Sept. 15, 2022), https://finance.yahoo.com/news/scaramucci-skybridge-ftx-investment-124735255.html.

trading $45 million in cash for a roughly $12 million interest (30% of $45 million) in cryptocurrencies.

14.     Bankman-Fried's and Scaramucci's relationship was a match made in heaven.  In 2022, SkyBridge was suffering significantly, with its assets under management dropping from a high of $9 billion to a mere $2.2 billion, partly due to the "crypto winter" that began in mid-2022. Seeking a bailout, Scaramucci correctly identified Bankman-Fried as someone willing to spend money while asking very few questions.

15.     Bankman-Fried, on the other hand, had started to realize the consequences of his lavish spending, and sought connections that could bring in new investors to bail him out and allow him to cover up his misappropriations.  Scaramucci, with his rich and influential connections, was exactly the connection Bankman-Fried needed to access outside money.  Bankman-Fried leaned heavily on the new partnership to attempt to raise equity investment in the FTX Group to fill the hole he had created in the balance sheet by misappropriating assets.

16.     Scaramucci proved to be an enthusiastic participant in Bankman-Fried's fundraising efforts.  In September and October of 2022, Scaramucci took Bankman-Fried on a whirlwind tour of the U.S. and the Middle East, using his connections to arrange meetings for Bankman-Fried with major financiers, former White House officials, and Middle Eastern heads of state.  Scaramucci was so invested in the success of Bankman-Fried's fundraising efforts that he lent Bankman-Fried his own suit and tie in advance of their meetings so that Bankman-Fried wouldn't show up to important meetings in his trademark shorts and a t-shirt.

17.     As detailed below, these fundraising efforts failed, and the FTX Group filed for Chapter 11 in November 2022.  Despite the FTX Group's bankruptcy and Bankman-Fried's arrest, conviction, and imprisonment, Defendants have continued to harm Plaintiffs.

18.    While the Debtor money that Bankman-Fried provided Scaramucci and SkyBridge came with virtually no control rights, Plaintiffs did insist on one concession as part of the SkyBridge Acquisition.  Plaintiffs required that a portion of the SkyBridge Acquisition funds be used to invest in a basket of cryptocurrency assets, which were to remain on SkyBridge II's books and which were not to be sold without Plaintiffs' consent.  Among these cryptocurrencies that were required to be purchased with Debtor funds were $10 million of Bitcoin ("BTC") and $10 million of Solana ("SOL").  At today's prices, those tokens are worth in excess of $120 million.

19.    Scaramucci and his partner, Defendant Brett Messing, both managers of SkyBridge II, ignored the bargained-for restrictions on Skybridge's ability to sell the tokens and raided Plaintiffs' segregated cryptocurrency account no later than December 2023, when SkyBridge Capital II LLC's balance sheet showed that it held only $20 million in digital assets. Based on market prices at the time, the basket of cryptocurrency assets in the segregated account should have been worth over $60 million.

20.    As a result of these actions, Plaintiffs now seek to recover and/or avoid:

    i.   The $12 million in fraudulently incurred obligations that Bankman-Fried caused the FTX Group to owe to Defendants as part of the SALT Sponsorship;

    ii.  The $10 million in fraudulently transferred assets that Bankman-Fried caused the FTX Group to pay to Defendants as part of the SCF Investment;

    iii. The $45 million in fraudulently transferred assets that Bankman-Fried caused the FTX Group to pay to Defendants as part of the SkyBridge Acquisition;

    iv.  Damages sufficient to remedy the profits that Defendants have unjustly enriched themselves with from the digital assets purchased with funds from Plaintiffs;

    v.   Damages sufficient to remedy Plaintiffs' injuries as a result of breaches of contract and fiduciary duty by Defendants Scaramucci and Messing, which, together with Defendant's unjust profits, may be in excess of $120 million; and

    vi.  Plaintiffs' attorneys' fees, pre- and post-judgment interests, costs of suit, and any other relief under law or equity to which they may be entitled.

21.     Defendants have also filed various proofs of claim in this bankruptcy proceeding, including:

> i.    Proof of Claim No. 4697 on behalf of SkyBridge II for an amount not less than $45 million, representing the amount of the Island Bay Purchase Price that Island Bay *paid to* SkyBridge II and SkyBridge GP; and
>
> ii.   Proof of Claim No. 5126 on behalf of SALT for an amount not less than $8 million, representing certain unpaid amounts on the SALT Sponsorship, even though SALT has successfully mitigated some or all of its damages.

22.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

23.     Pursuant to Section 502(b)(1) of the Bankruptcy Code, Plaintiffs also object to certain claims filed or held by Defendants in these Chapter 11 Cases that are unenforceable against Plaintiffs.

24.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## **THE PARTIES**

25.     Plaintiff FTX is a corporation registered in Antigua and Barbuda that operated FTX.com, a cryptocurrency trading exchange available to non-U.S. customers.

26.     Plaintiff Island Bay is a Delaware entity.  Island Bay is entirely owned by Paper Bird Inc., a Delaware entity, which was wholly owned by Samuel Bankman-Fried.

27.     Plaintiff Alameda Research Ventures is a limited liability company incorporated in Delaware that was 67% owned by Bankman-Fried, 23% owned by Wang, and 10% owned by Nishad Singh, all of whom were FTX Insiders, as defined below.

28.     Defendant SkyBridge II is a Delaware limited liability company.

29.     Defendant SkyBridge GP is a Delaware limited liability company.

30.     Defendant SkyBridge Coin Fund is a Delaware limited partnership.

31.     Defendant SALT is a "global investment platform connecting institutional asset owners with innovative asset managers and technology entrepreneurs." It was founded by SkyBridge but now "operates as a standalone entity."[8] SALT is a Delaware limited liability company.

32.     Defendant Anthony Scaramucci is the founder and Managing Partner of SkyBridge.

33.     Defendant Brett Messing is the President and Co-Chief Investment Officer of SkyBridge.

## OTHER RELEVANT PERSONS

34.     Samuel Bankman-Fried was a co-founder of FTX, and at all relevant times controlled Plaintiffs through his majority ownership stakes in their ultimate parent companies.

35.     Caroline Ellison was the co-CEO of Alameda Research Ltd. from August 2021 until September 2022, when she was named the sole CEO and director.

36.     Nishad Singh was a co-founder of West Realm Shires, Inc. and West Realm Shires Services, Inc.

---

[8]      *Who We Are*, SALT (last visited Nov. 8, 2024), https://www.salt.org/about.

37.     Gary Wang was a co-founder of Alameda Research Ltd., West Realm Shires, Inc., and West Realm Shires Services, Inc.

38.     Bankman-Fried, Wang, Singh, and Ellison are collectively referred to herein as the "FTX Insiders."

39.     Raymond Nolte is a manager of SkyBridge II and a member of SkyBridge.

40.     Prowes Holding S.A. ("Prowes") is a corporation organized and existing under the laws of the British Virgin Islands.   Prowes is a member of SkyBridge and controls a seat on SkyBridge II's Board of Managers.

## JURISDICTION AND VENUE

41.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.   Fed. R. Bankr. P. 7001(1).

42.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

43.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

44.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

45.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

46.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

-11-

47.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.     Bankman-Fried Defrauded Customers and Other Creditors of the FTX Group.

48.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].

49.     As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  The FTX Insiders used this deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive

fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.

50.     All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the SkyBridge transactions.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  Singh pleaded guilty to the same felonies on February 28, 2023.  *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On November 2, 2023, a jury found Bankman-Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including wire fraud and conspiracies to commit wire fraud, commodities fraud, securities fraud, and money laundering.  *See* Jury Verdict, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.  *See* Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

51.     In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda Research LLC and its affiliates ("Alameda") "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (i.e., government-issued) currencies and cryptocurrencies.  Plea Tr. at 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022); *see* Plea Tr. at 27:5-18, ECF No. 19, *United States v. Ellison*, 22-cr-00673 (S.D.N.Y. 2022).  Using these "special privileges," the FTX Insiders

frequently caused FTX Group entities, including Plaintiffs, to misappropriate funds from the FTX.com exchange for their own benefit, including to make speculative investments for which they overpaid.

52.     Before his conviction, Bankman-Fried repeatedly, and publicly, claimed that Alameda operated as "a wholly separate entity" from FTX.com.  Annie Massa et al., *Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed.  Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that "[w]e keep [FTX and Alameda ] quite separate in terms of day-to-day operations." *Id.*  In reality, Alameda routinely looted "several billion dollar[s] from FTX.com using its "special privileges," thereby defrauding FTX.com's creditors.  Plea Tr. at 28:23-29:2, ECF No. 102, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022); Plea Tr. at 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022).

53.     By approximately July 2022, Ellison had conspired with Bankman-Fried to "provide materially misleading financial statements to Alameda's lenders," such as "balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties."  Plea Tr. at 28:9-16, ECF No. 19, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022).  Ellison also agreed with Bankman-Fried and others "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement." *Id.* at 28:19-21.

54.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform," and that Alameda was "borrowing" (i.e., looting) billions of dollars from FTX.com

in order to, among other things, finance sham "loans" from Alameda to the FTX Insiders. Ellison admitted to being aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral, . . . pay interest . . . [or] being subject to margin calls or FTX.com's liquidation protocols." *Id.* at 27:11-15.

55. Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the fraudulent relationship between Alameda and FTX and the scheme pursuant to which the FTX Insiders misappropriated customer funds. For example, Singh testified that he and Wang implemented the "allow negative feature," which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit." Trial Tr. at 1362:25-1363:10, ECF No. 366, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main line plan remains, making FTX successful and growing it." *Id.* at 1411:3-1412:10. FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it. The only thing we can do is grow the company and fill the hole." *Id.* 1964:12-1965:5.

56. Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could [get] from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments . . . in . . . relatively early-stage companies." *Id.* at 693:4-17. Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which "had been concealed from FTX's auditors." *Id.* at 937:12-14. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare

some alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad." *Id.* at 786:13-22. When third-party lenders sought repayment of open term loans, Alameda would repay them—often using commingled and misappropriated funds obtained through its "unlimited line of credit"—so as to continue to project a façade of financial strength and solvency and prevent lenders from taking legal action that might cause the fraud to come to light.

57. As described below, the FTX Insiders used these Alameda funds and privileges, including the "unlimited line of credit" and exemption from the liquidation protocol, to, among other things, fund acquisitions and venture investments—including the SkyBridge Acquisition.

## II. Defendants Bet Big on Crypto.

58. Defendant Scaramucci founded SkyBridge in 2005. He previously served as the White House Director of Communications for a controversial eleven-day term in 2017 during the Trump administration. Scaramucci appears to remain well connected in social and political spheres following his dismissal from his White House position.

59. Scaramucci has operated SkyBridge as an asset manager of a fund of funds, investing client money in the funds of other managers. In the early 2010s, Scaramucci managed SkyBridge to great success. After acquiring Citigroup Inc.'s hedge fund unit in 2010, SkyBridge was able to double its assets under management by 2015, by then managing nearly $9 billion of client assets. Scaramucci brought in Defendant Brett Messing in 2017 as a partner in SkyBridge, with Messing purchasing a 25% stake in the business.

60. Trouble was on the horizon for SkyBridge, however. In November 2020, Scaramucci and Messing sought to reposition SkyBridge's investment approach to bet heavily on cryptocurrency. Scaramucci and Messing committed increasing amounts of investor money into the space, even to the point that SkyBridge began to exceed its own internal risk guidelines by

over-concentrating in BTC.[9]  Scaramucci and Messing also directed SkyBridge to increase its purchases of Ether ("ETH") and also invested in less established cryptocurrency tokens.

61.    Despite this increasing concentration, Scaramucci and Messing continued to pour money into cryptocurrency investments, placing nearly 70% of SkyBridge's investment inflows in 2021 into crypto and crypto-adjacent products.  By June of 2022 at least 33% of SkyBridge's assets were invested in digital assets, including exposure not just to crypto tokens themselves but also secondary exposure through investments in the private and public equities of digital asset companies.

62.    By September 2022, SkyBridge's good fortunes had come to an end, and the firm's assets under management dropped precipitously, from a high of $9 billion to $2.2 billion.

**III.    Defendants Are Introduced to Bankman-Fried.**

63.    Scaramucci and Bankman-Fried were first introduced via e-mail on March 22, 2021.  Within a month, Bankman-Fried had agreed to a one-off sponsorship of a SALT conference in New York City for $750,000.

64.    By September of 2021, Scaramucci and SkyBridge were introducing Bankman-Fried and FTX Group employees to CEOs and various firms, including LedgerX LLC, which was later acquired by the FTX Group.

65.    In January 2022, looking to further develop the FTX Group's relationship with Scaramucci, FTX and SALT agreed to the SALT Sponsorship, whereby FTX agreed to sponsor a

---

[9]    Katherine Burton & Francesca Maglione, *Scaramucci's SkyBridge Capital Was Spiraling, and Then Came FTX*, BLOOMBERG BUSINESSWEEK (Apr. 6, 2023), https://www.bloomberg.com/news/features/2023-04-06/anthony-scaramucci-s-skybridge-capital-woes-predate-ftx?srnd=premium&sref=MTy2GeXk.

certain number of conferences and podcast episodes organized by SALT between 2022 and 2024, for a total price of $12 million.

66.     Bankman-Fried caused Debtor funds to be spent on the SALT Sponsorship.  On January 12 and April 14 of 2022, FTX transferred a total of $2 million to SALT from its Signature bank account ending in 9018.

67.     On March 30, 2022, Scaramucci reached out to Debtor employees, requesting an investment in the SkyBridge Coin Fund.  FTX Group employees immediately flagged that the proposed SCF Investment did not make economic sense.  The head of FTX Ventures commented to Bankman-Fried and FTX's head of product, "They dont' [*sic*] have a crypto native GP running this, which I am not a fan of, don't find their strategy in this deck to be nuanced, and generally am not sure how they're distinctly competitive with the other liquid token funds out there who are run by experienced traders. That being said, Anthony is an awesome friend of the firm, think we should support him."  The head of product replied, "In general we should invest in Skybridge + AS. Probably $10M in liquid token fund directly?"  With no deeper discussion, Bankman-Fried approved the investment with a mere "sounds reasonable!" within a day of when Scaramucci made the request.

68.     Once again, Bankman-Fried caused Debtor funds to be spent on the SCF Investment.  The week preceding March 31, 2022, an Alameda Research Ltd. Silvergate bank account ending in 4456 received $9.4 million in intercompany transfers and $23 million in direct customer deposits.  On March 31, 2022, Alameda Research Ltd. transferred $10 million to Alameda Research Ventures' Signature bank account ending in 2677.  On April 1, 2022, that account transferred $10 million to the SkyBridge Coin Fund.

**IV.     Defendants Build a Strong Relationship With Bankman-Fried, Paving the Way For a Bail-Out of SkyBridge.**

69.     By late summer of 2022, Scaramucci and Messing's overconfident bets on cryptocurrency became a significant drag on SkyBridge's investment portfolio.  As growth in the cryptocurrency space slowed throughout 2022—punctuated by major failures of crypto-oriented investment managers and headline-making arrests of crypto fraudsters—this "crypto winter" began to seriously affect SkyBridge's overexposed business lines.

70.     The effects of this market contraction were rapid, and by the second half of 2022, SkyBridge was in decline.  New investment inflows were down from 2021, more than a third of SkyBridge's workforce had been eliminated, and the boards of SkyBridge's funds had begun to suspend redemptions in an attempt to stem the outflow of investor money.

71.     Scaramucci again came to lean on his new connection with Bankman-Fried.  On a vacation in the Bahamas, Scaramucci invited Bankman-Fried to lunch.  Over the course of this lunch, Scaramucci presented a much rosier view of SkyBridge's financial condition, telling Bankman-Fried that SkyBridge was "small, [but] still profitable," despite the pressure it had recently been under.[10]

72.     At the same time, just two months before the Petition Date, when the FTX Insiders' fraud was at severe and growing risk of being discovered, Bankman-Fried attempted to capitalize on Scaramucci's political and financial connections to give him an opportunity to cover up his actions, by using those connections to attract investors to the FTX Group.  With bare-bones due diligence, Bankman-Fried agreed to highly unfavorable terms in the SkyBridge Acquisition, all in

---

[10]     William D. Cohan, *The Odd Couple: S.B.F., The Mooch, & a Crypto Love Story*, PUCK, (Sept. 21, 2022), https://puck.news/the-odd-couple-sbf-anthony-scaramucci-a-crypto-love-story/.

an increasingly desperate attempt to locate potential sources of funds to fill the hole in the balance sheet that he had created.

73.     On September 7, 2022, as part of the SkyBridge Acquisition, SkyBridge II, SkyBridge GP, and Island Bay executed a Subscription Agreement[11] whereby Island Bay paid the $45 million Island Bay Purchase Price in return for 30% membership interests in both SkyBridge entities.  The Subscription Agreement noted that Island Bay "may be required to hold the SkyBridge Membership Interests indefinitely," and that "there is no established market for the SkyBridge Membership Interests and it is not anticipated that there will be any public market for the SkyBridge Membership Interests in the foreseeable future."

74.     On the same day of the SkyBridge Acquisition, SkyBridge II executed a Fifth Amended and Restated Limited Liability Company Agreement (the "SkyBridge II LLCA"), and SkyBridge GP executed a Third Amended and Restated Limited Liability Company Agreement (the "SkyBridge GP LLCA").

75.     The SkyBridge II LLCA directed SkyBridge II to use $40 million of the Island Bay Purchase Price to purchase cryptocurrency in the form of $10 million of each of BTC, SOL, FTT (FTX's native cryptocurrency token), and Serum ("SRM") (together, the "Purchased Cryptocurrencies").  Pursuant to this provision, SkyBridge purchased approximately 515 BTC and approximately 398,868 SOL, along with economically equivalent amounts of FTT and SRM.  The remaining $5 million in proceeds were to be used for "general working capital purposes."

76.     Further, the SkyBridge II LLCA provided that SkyBridge II was not permitted to "sell, transfer, assign, pledge, mortgage, hypothecate or otherwise dispose of" any Purchased

---

[11]     The Subscription Agreement is governed by the laws of Delaware.

Cryptocurrencies without the consent of Island Bay.  According to the LLCA, the Purchased Cryptocurrencies were required to remain in an account segregated from SkyBridge II's other assets.

77.    The SkyBridge II LLCA also gave Island Bay an option to purchase an additional 55% interest in SkyBridge II, for a total interest of 85%, for $137,500,000.  This option expires on December 7, 2025.

78.    Originally, Alameda Research Ventures was intended to be the purchaser for the SkyBridge Acquisition.  The Subscription Agreement, SkyBridge II LLC Agreement, and SkyBridge GP LLC Agreement were all originally signed by Bankman-Fried on behalf of Alameda Research Ventures.  On September 8, 2022, the day after the Subscription Agreement was executed, Alameda Research Ventures wired $45 million to SkyBridge.  Thereafter, a Debtor employee requested that Alameda Research Ventures be replaced with Island Bay for the purposes of the SkyBridge Acquisition, and SkyBridge agreed to the change.

79.    The SkyBridge Acquisition was, for all intents and purposes, a bailout of SkyBridge.  SkyBridge had been suffering from poor performance due to a drop in cryptocurrency prices, and Bankman-Fried provided a "cash injection."[12]  According to Scaramucci, "the FTX deal was a product of poor performance in a poor market."[13]  In Scaramucci's own words, "If I

---

[12]    Madison Darbyshire et al., *Sam Bankman-Fried Made $45mn Bet on SkyBridge with Crypto Strings Attached*, FINANCIAL TIMES (Sept. 13, 2022), https://www.ft.com/content/57407389-a4c6-4d93-91c4-014853748540.

[13]    *Id.*

was doing super well right now — our performance is mediocre, lackluster — who knows if we would be doing the transaction."[14]

**V.      Bankman-Fried Makes a Facially Uneconomic Investment in SkyBridge.**

80.     While the SkyBridge Acquisition ostensibly made Island Bay a partner in SkyBridge's operating business, the transaction terms overwhelmingly favored Scaramucci and Messing at the expense of the Debtors.

81.     The SkyBridge II LLCA gave Island Bay no voting rights in connection with its membership interests.   Island Bay was not entitled to withdraw any capital contributions. Distributions were to be made only "at such times and in such amounts as the Board of Managers may from time to time determine."

82.     Despite their 30% interest in the company, Island Bay did not receive any presence on the SkyBridge Board of Managers.   Instead, SkyBridge's four-member Board of Managers was to consist of Scaramucci, Messing, Raymond Nolte (a former associate of Scaramucci), and a designee of Prowes (another minority member in SkyBridge II).   Notably, the SkyBridge II LLCA guaranteed a Board seat to Prowes—a minority member holding a mere 6.993% interest in SkyBridge II—while denying one to Island Bay.

83.     The economics of the SkyBridge Acquisition were deeply flawed as well.   The transaction valued SkyBridge at $150 million, only slightly less than the $180 million that SkyBridge had been valued at in 2017 before its steep decline in revenues and assets.[15]

---

[14]     *Id.*

[15]     Katherine Burton & Francesca Maglione, *Scaramucci's SkyBridge Capital Was Spiraling, and Then Came FTX*, BLOOMBERG BUSINESSWEEK (Apr. 6, 2023), https://www.bloomberg.com/news/features/2023-04-06/anthony-scaramucci-s-skybridge-capital-woes-predate-ftx?srnd=premium&sref=MTy2GeXk.

84.     Even though the SkyBridge Acquisition gave Island Bay only a 30% interest in SkyBridge, the capital contribution that Island Bay made immediately represented over 92% of the assets that SkyBridge II had to its name.

85.     As discussed above, the SkyBridge II LLCA directed SkyBridge to spend $40 million of the Island Bay Purchase Price on purchasing cryptocurrencies.  Here again, the economics of the transaction defy logic.

86.     Island Bay had no need to purchase cryptocurrencies as a minority investor in an asset manager.  As part of the Debtors' group of cryptocurrency exchanges and trading businesses, Island Bay could have easily purchased $40 million of cryptocurrencies on its own, without the involvement of SkyBridge.

87.     In effect, Island Bay paid $45 million for a 30% interest in $40 million of cryptocurrency.  Worse still, the terms of the investment made it effectively impossible to withdraw any of Island Bay's money without Defendants' sign-off.

88.     In pursuing these transactions, Bankman-Fried cavalierly agreed to make multi-million-dollar investments using FTX Group assets, with no due diligence, and accepted terms that ensured little to no benefit to the FTX Group, its customers, and its creditors.  At Bankman-Fried's direction, Plaintiffs provided all funding for the transactions described herein, but Bankman-Fried and the FTX Insiders were intent on hoarding virtually all the benefit of those transactions—social sway, political influence, and a cover-up of the hole they had dug—at any cost.  As a consequence, Plaintiffs got far less than fair value for what they paid, all because Bankman-Fried wanted to perpetuate his fraudulent scheme.

## VI.     Scaramucci Uses His Connections to Assist Bankman-Fried's Fundraising.

89.     The poor economics of the SkyBridge Acquisition made no difference to Bankman-Fried.   More important to him was Scaramucci's Rolodex, with connections including world leaders and major figures from the Trump administration, as well as Wall Street power players.

90.     Bankman-Fried made use of Scaramucci's connections as soon as the ink dried on the SkyBridge Acquisition in September 2022, asking for Scaramucci's assistance in raising billions in fresh equity investments for FTX.

91.     Scaramucci promptly got to work lining up meetings for Bankman-Fried.  In late October 2022, Scaramucci brought Bankman-Fried as a guest to conferences throughout the Middle East, including at the FII Conference in Riyadh, Saudi Arabia, where Scaramucci was able to leverage his connections to introduce Bankman-Fried to the crown prince of Saudi Arabia.[16]

92.     The meeting with the crown prince—which also included Wall Street financial power brokers—resulted in an offer to have Saudi state capital funds invest up to $250 million in FTX.[17]

93.     At Bankman-Fried's request, Scaramucci set up an additional meeting with the President of the United Arab Emirates.[18]  Scaramucci set this meeting up through his connection with the U.A.E. Ambassador to the United States.[19]

---

[16]     William D. Cohan, *S.B.F. and The Mooch's Arabian Nights*, Puck, (Apr. 19, 2023), https://puck.news/sbf-and-the-moochs-arabian-nights/.

[17]     *Id.*

[18]     *Id.*

[19]     *Id.*

94.     Following the meeting with the U.A.E. President, an Abu Dhabi sovereign wealth fund expressed an interest in investing in FTX as well.[20]

95.     Scaramucci tutored Bankman-Fried in the art of fundraising throughout this Middle East tour.  Scaramucci was so committed to Bankman-Fried's fundraising scheme that at various points—concerned that Bankman-Fried's sloppy aesthetic would offend the sensibilities of FTX's potential investors—Scaramucci lent Bankman-Fried his own clothes to wear to meetings.[21]

96.     Scaramucci also had a personal relationship with Bankman-Fried's father, Joseph Bankman.  On November 7, 2022, just days before the Petition Date, Scaramucci received a call from Bankman, asking for "rescue funding."[22]   Scaramucci immediately flew down to the Bahamas on a private jet to try to help Bankman-Fried raise capital.

## VII.   Subsequent Looting by Scaramucci and Messing.

97.     On November 9, 2022, equipped with knowledge from the November 7, 2022 Bahamas meeting, Defendants attempted to untangle their web of relationships with Debtors. Messing sent an e-mail to Bankman-Fried, FTX's head of product, Ryne Miller, and Joseph Bankman, writing:   "Island Bay's stake in SkyBridge has become a substantial liability. . . . SkyBridge's survival is, in part, dependent upon unwinding Island Bay's investment."  Messing added, "Anthony [Scaramucci] and I feel like we have developed a genuine human connection with you (and [the head of FTX Ventures] and Ryan Salame) over the last year."  Messing finished

---

[20]     *Id.*

[21]     *Id.*

[22]     *Joseph Bankman Warned Scaramucci About FTX*, PROTOS (Sept. 7, 2023), https://protos.com/joseph-bankman-warned-scaramucci-about-ftx/.

the e-mail with: "PS– in the event the attached agreement is acceptable to you, Anthony executed the document on our behalf for convenience and expediency."

98.    Messing attached a letter agreement regarding the "Release and Unwinding of Certain Relationships" (the "Release").  The Release purportedly provided for (i) Island Bay's resignation from SkyBridge II and SkyBridge GP; (ii) the termination of the SALT Sponsorship; (iii) the release of all trading restrictions on the Purchased Cryptocurrencies; (iv) the redemption of Alameda Research Ventures' limited partnership interest in the SkyBridge Coin Fund; and (v) the release of all claims by Defendants against Plaintiffs.

99.    The Release was a naked attempt to squeeze a sweetheart deal out of the FTX Group in advance of its imminent collapse.  Under the Release's proposed terms, Island Bay would forfeit its interest in SkyBridge II entirely with no return of capital, and Alameda Research Ventures would be forced to redeem its SCF Investment.  On the other hand, SkyBridge II would keep the Purchased Cryptocurrencies *and* would be free to trade those assets without restrictions.  Messing clearly saw the collapse of the FTX Group as an opportunity to pocket the money the FTX Group had invested into Defendants.  No FTX Group employee responded to Messing's e-mail or proposal.

100.    Between November 2022 and January 2023, SkyBridge's outside counsel reached out to the Debtors' counsel to seek permission to dispose of the Purchased Cryptocurrencies.  The Debtors did not consent, but SkyBridge nevertheless liquidated its holdings of FTT and SRM for proceeds of approximately $3 million, in breach of Section 3.11 of the SkyBridge II LLCA.

101.    On June 29, 2023, SkyBridge filed multiple substantively identical claims purporting to be entitled to receive the entire Island Bay Purchase Price.  On the same day, SALT filed claim 5126 purporting to be entitled to $8 million arising from the SALT Sponsorship.

102.    This $8 million apparently represents the remaining sponsorship fees that FTX had yet to pay for future SALT conferences and podcasts.  However, SALT cancelled one of these conferences in 2022 and found new corporate sponsors for the seven conferences it has held or announced since then, thus fully and successfully mitigating any damages it allegedly suffered in connection with the SALT Sponsorship.

103.    By late 2023, it became apparent that Scaramucci and Messing at best grossly mismanaged SkyBridge's assets and, at worst, may have looted the assets for themselves.

104.    An unaudited December 2023 SkyBridge II Consolidated Balance Sheet showed total assets of only $28 million, including "Digital Assets" worth $20 million.  However, at this time, SkyBridge should have had in its possession BTC and SOL holdings purchased for $10 million each in September 2022.  Based on then-prevailing market prices, SkyBridge should have had at least $60 million on behalf of the Debtors in "Digital Assets" in its possession in December 2023, based only on its holdings of 515 BTC (trading at $42,265.19 as of December 31, 2023) and 398,868 SOL (trading at $101.51 as of December 31, 2023).  Today, those same assets are worth in excess of $117 million.

105.    As a result of this mismanagement, SkyBridge's value has plummeted.  Seventy percent of investors in SkyBridge's crypto-focused fund have sought to exit, even though cryptocurrency prices have rallied since 2022.[23]  Despite this collapse, Scaramucci and Messing have continued to pay themselves outsized salaries as officers of SkyBridge II.  In 2023, against revenues in "Management fees" of only $20.4 million, SkyBridge II paid out over $22 million in

---

[23]    *See* Katherine Burton, *Scaramucci's SkyBridge Limits Client Exits Even as Crypto Soars*, BLOOMBERG        BUSINESSWEEK        (July        11,        2024), https://www.bloomberg.com/news/articles/2024-07-11/scaramucci-s-skybridge-limits-client-exits-even-as-crypto-soars.

expenses for "Compensation and fringe benefits."   These massive salaries and missing assets suggest an attempt to empty the coffers of SkyBridge II.

## VIII.   The SkyBridge Transactions Were Made When Plaintiffs Were Insolvent, and the FTX Insiders Knew It.

106.   At the time of the SkyBridge Transactions, each of the Plaintiffs:   (1) was insolvent;  (2) became insolvent as a result of the transfers; (3) was engaged in a business or a transaction for which any property remaining with a Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond a Plaintiff's ability to repay as such debts matured.

107.   By the fall of 2021, Alameda's balance sheet was being propped up by assigning artificially high values to "Sam Coins" created or promoted by Bankman-Fried.  And as Singh admitted in his guilty plea, by "early September 2022," the same month the SkyBridge Acquisition closed, Alameda "could not repay what it owed."  *See* Plea Tr. at 29:2-3, ECF No. 102, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023).  As Ellison testified at Bankman-Fried's trial, as of September 2022, the amount of commingled customer assets that Alameda was "borrowing" had ballooned to nearly $14 billion, which Alameda had no way to repay.  Trial Tr. at 645:10-14, ECF No. 358, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 10, 2023); Trial Tr. at 896:19-897:2, ECF No. 750, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 11, 2023).  On September 7, 2022, Nishad Singh desperately pled with Bankman-Fried to cut back on expenses in an attempt to rectify the situation; that same day, the SkyBridge Acquisition closed.  Trial Tr. at 2992:23-2993:4, ECF No. 382, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Nov. 1, 2023).

108.   Ellison also admitted in her plea allocution:  (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least

October 2022, she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds. Plea Tr. at 27:5-18, 28:9-12, 28:22-29:1, *United States* v. *Ellison*, ECF No. 19, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).

109. It is undisputable that the SkyBridge Acquisition was paid for using FTX Group funds. The FTX Insiders have testified repeatedly that funds were diverted from FTX.com to Alameda Research entities. On September 7, 2022, Alameda Research Ltd. transferred $45 million from its bank account ending in 4464 to Alameda Research Ventures' bank account ending in 2677. *See* Trial. Tr. at 1734:17-1735:25, ECF No. 370, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 18, 2023). The next day, Alameda Research Ventures wired $45 million from its bank account ending in 2677 to SkyBridge. *See id.*

110. In October and November, 2023, Bankman-Fried was tried on seven counts including wire fraud and conspiracy to commit wire fraud, securities fraud, commodities fraud, and money laundering. On November 2, 2023, a jury found Bankman-Fried guilty on all counts. *See* Jury Verdict, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). On March 28, 2024, Bankman-Fried was sentenced to 25 years imprisonment for his crimes. *See* Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

## IX. The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay, or Defraud Creditors.

111. As set forth above, multiple badges of fraud recognized by the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act permeate the transfers made and obligations incurred in connection with the SkyBridge Transactions, including that:

> i. The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders by providing connections to additional funding to prevent the collapse

of their fraud, which would enable them to continue misappropriating assets of the FTX Group, including by overpaying their close associates Scaramucci and Messing, whom they perceived to have unique access to potential sources of new funding;

ii. The FTX Insiders removed or concealed Plaintiffs' assets, including funds paid to sponsor SALT, funds invested in the SkyBridge Coin Fund, and funds used to acquire an interest in SkyBridge;

iii. The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

iv. Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made;

v. The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts; and

vi. The transfers arose out of a close relationship between an officer of the Debtors, Sam Bankman-Fried, and transferees, including Scaramucci and Messing.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST SKYBRIDGE II, SKYBRIDGE GP, SKYBRIDGE COIN FUND, AND SALT)

112.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

113.    Plaintiffs made the transfers and incurred the obligations addressed herein in January, March, April, and September of 2022.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

114.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud present or future creditors.

115.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover

from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST SKYBRIDGE II, SKYBRIDGE GP, SKYBRIDGE COIN FUND, AND SALT)**

116.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

117.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code § 544(b) and other applicable law, including Del. Code Ann. tit. 6, § 1301, *et seq*.

118.    Plaintiffs made the transfers and incurred the obligations addressed herein in January, March, April, and September of 2022.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

119.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

120.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST SKYBRIDGE II, SKYBRIDGE GP, SKYBRIDGE COIN FUND, AND SALT)**

121.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

122.     Plaintiffs made the transfers and incurred the obligations addressed herein in January, March, April, and September of 2022.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

123.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and obligations.

124.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with a Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond a Plaintiff's ability to repay as such debts matured.

125.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305, AND 11 U.S.C. § 544(b)**
**(AGAINST SKYBRIDGE II, SKYBRIDGE GP, SKYBRIDGE COIN FUND, AND SALT)**

126.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

127.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including Del. Code Ann. tit. 6, § 1301, *et seq*.

128.    Plaintiffs made the transfers and obligations addressed herein in January, March, April, and September of 2022.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

129.    Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

130.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of a Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond a Plaintiff's ability to repay as such debts became due.

131.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

132.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**UNJUST ENRICHMENT**
**PURSUANT TO 11 U.S.C. § 105(a)**
**(AGAINST SKYBRIDGE II, SKYBRIDGE GP, SKYBRIDGE COIN FUND, AND SALT)**

133.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

134.    In the alternative to Counts One through Four, Plaintiffs seek recovery in equity.

135.    As a result of the transfers made and obligations incurred, as addressed herein, Defendants SkyBridge II, SkyBridge GP, SkyBridge Coin Fund, and SALT were enriched by their receipt of respective transferred assets and owed obligations.

136.    Plaintiffs were impoverished by the transfers made and obligations incurred, as addressed herein, which did not provide and had virtually no prospect of providing Plaintiffs with reasonably equivalent value.

**COUNT SIX**
**UNJUST ENRICHMENT**
**UNDER DELAWARE COMMON LAW**
**(AGAINST SKYBRIDGE II)**

137.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

138.    Defendant SkyBridge II has also been enriched by the appreciation in value of and/or the proceeds of trades it conducted with the Purchased Cryptocurrencies, in violation of the SkyBridge II LLCA.

139.    It would be inequitable for SkyBridge II to retain this increased value, even if they were to return the initial value of the Island Bay Purchase Price to Plaintiffs.

**COUNT SEVEN**
**BREACH OF CONTRACT**
**UNDER DELAWARE COMMON LAW**
**(AGAINST SCARAMUCCI AND MESSING)**

140.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

141.     Scaramucci, Messing, and Island Bay entered into the SkyBridge II LLCA on September 7, 2022.

142.     The SkyBridge II LLCA provided, among other things, that SkyBridge II may not dispose of any Purchased Cryptocurrencies without the consent of Island Bay.

143.     The relevant cryptocurrencies at issue are BTC, SOL, FTT, and SRM.

144.     In or around December 2022, Scaramucci and Messing caused SkyBridge II to dispose of its holdings of FTT and SRM, in violation of the restrictions described in the SkyBridge II LLCA.

145.     Upon information and belief, prior to December 2023, Scaramucci and Messing caused SkyBridge II to dispose of its holdings of BTC and SOL, in violation of the restrictions described in the SkyBridge II LLCA.

146.     As a direct and proximate result of SkyBridge II's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT EIGHT**
**BREACH OF FIDUCIARY DUTIES**
**UNDER DELAWARE COMMON LAW**
**(AGAINST SCARAMUCCI AND MESSING)**

147.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

148.     As a result of Scaramucci's role as the Managing Partner of SkyBridge II, and Messing's role as a manager of SkyBridge II, Scaramucci and Messing owed fiduciary duties—

including duties of care, loyalty, good faith, fair dealing, and oversight—to Island Bay as a

minority investor in SkyBridge II.  Scaramucci and Messing exercised control over SkyBridge II.

Scaramucci and Messing were also conflicted in their roles as managers of SkyBridge II.

149.    On information and belief, Scaramucci and Messing breached their fiduciary duties

by, among other things:

> i.   Utilizing their control of SkyBridge II to set excessive compensation as
> employees of SkyBridge II even while revenues and assets under management
> severely declined;
>
> ii.  Designing and implementing a process for determining Scaramucci's and
> Messing's compensation that was unfair to SkyBridge II and to Island Bay; and
>
> iii. Selling portions of the Purchased Cryptocurrencies without Island Bay's
> consent, as was required by the SkyBridge II LLCA.

150.    Scaramucci and Messing, in breaching their fiduciary duties as described herein,

acted in bad faith and showed a conscious disregard for the best interests of SkyBridge II and

Island Bay.

151.    As a direct and proximate result of Scaramucci and Messing's breaches of duty,

Island Bay has been damaged in an amount to be determined at trial.

**COUNT NINE**
**AIDING AND ABETTING BANKMAN-FRIED'S BREACH OF FIDUCIARY DUTY**
**UNDER DELAWARE COMMON LAW**
**(AGAINST SCARAMUCCI AND MESSING)**

152.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully

set forth here.

153.    At all relevant times, Bankman-Fried owed fiduciary duties—including duties of

care, loyalty, good faith, fair dealing, and oversight—to Island Bay under Delaware law.

Bankman-Fried was required to act in Island Bay's best interests, and not for his personal benefit.

Defendants Scaramucci and Messing knew that Bankman-Fried owed such duties to Island Bay.

154.     By causing Plaintiffs to make the SkyBridge Acquisition—in exchange for which Island Bay did not receive, and had virtually no prospect of receiving, reasonably equivalent value, and from which Bankman-Fried personally benefited—Bankman-Fried breached his fiduciary duties to Island Bay.

155.     Scaramucci and Messing knew that the SkyBridge Acquisition did not provide and had virtually no prospect of providing Plaintiffs with reasonably equivalent value, and that Bankman-Fried personally benefited from the SkyBridge Acquisition.  Scaramucci and Messing thus knowingly assisted in, and/or failed to prevent, Bankman-Fried's breaches of fiduciary duty to Island Bay.

156.     As a result of Bankman-Fried's breaches of fiduciary duty in connection with the SkyBridge Acquisition, and Scaramucci and Messing's aiding and abetting in those breaches, Island Bay suffered damages in the amount of the Island Bay Purchase Price.

**COUNT TEN**
**DISALLOWANCE OF CLAIMS**
**PURSUANT TO 11 U.S.C. § 502(d)**
**(AGAINST ALL DEFENDANTS)**

157.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

158.     As alleged above, Defendants are transferees of transfers and recipients of obligations avoidable under Sections 544 and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

159.     Defendants have filed over 150 claims in these Chapter 11 Cases.  The claims are listed in **Exhibit A**.

160.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter

11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

**COUNT ELEVEN**
**PROPERTY RECOVERY**
**PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST ALL DEFENDANTS)**

161.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

162.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

163.    Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWELVE**
**OBJECTION TO CLAIMS**
**PURSUANT TO 11 U.S.C. § 502(b)**
**(AGAINST SKYBRIDGE II AND SKYBRIDGE GP)**

164.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

165.    On June 29, 2023, SkyBridge II and SkyBridge GP filed over 150 nearly identical proofs of claim against multiple Debtors, each seeking more than $45 million, which represents the Island Bay Purchase Price that Island Bay *paid to* SkyBridge II and SkyBridge GP.  *See* **Exhibit A**.  SkyBridge asserted claims based in fraud, equity, unjust enrichment, the breach of the duty of good faith and fair dealing, civil conspiracy, and breach of contract.

-38-

166.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under Section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim.  11 U.S.C. § 502(b).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b).

167.     While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  The burden of persuasion with respect to the claim is always on the claimant, *id.* at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity.  *See, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).  Moreover, where, as here, the debtor submits evidence "capable of negating" the *prima facie* validity and "plac[ing] the claimant's entitlement at issue"—such as by submitting evidence "which, if believed, would refute at least one of the allegations that is essential to the claim's legal validity," then the burden reverts to the claimant, who must prove the validity of the claim by a preponderance of the evidence.  *In re Trib. Media Co.*, 2017 WL 2622743, at *7 (D. Del. June 16, 2017), *aff'd*, 902 F.3d 384 (3d Cir. 2018); *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014).

168.     First, SkyBridge's causes of action are largely duplicative.  Although the crux of SkyBridge's claims is the SkyBridge Acquisition, which is clearly governed by contract,

SkyBridge asserts various non-contract causes of action but fails to plead distinct damages for any of them.  SkyBridge thus fails to state a claim for its non-contract causes of action.

169.    Second, SkyBridge's claims should be disallowed because its theory of damages is senseless.  As detailed above, Island Bay transferred $45 million *to* SkyBridge.  SkyBridge now asserts a claim for the same $45 million it has already received.  Significantly, the portion of the money dedicated to investments in BTC and SOL—which SkyBridge was obligated to retain—is now valued at approximately $117 million.  In other words, SkyBridge, had it not improperly disposed of the BTC and SOL, would have recovered any damages more than two-fold.

170.    Plaintiffs reserve any and all other defenses and rights to object to the claims in **Exhibit A** on any other grounds.

**COUNT THIRTEEN**
**OBJECTION TO CLAIM**
**PURSUANT TO 11 U.S.C. § 502(b)**
**(AGAINST SALT)**

171.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 111 as if fully set forth here.

172.    On June 29, 2023, SALT filed proof of claim number 5126 against Debtor FTX, seeking at least $8 million arising from unpaid installments of the SALT Sponsorship.  *See* **Exhibit A**.

173.    Under New York law, which governs the SALT Sponsorship, SALT may not recover for damages that could be avoided through reasonable efforts.  *White* v. *Farrell*, 20 N.Y.3d 487, 499 (2013); *Hamilton* v. *McPherson*, 28 N.Y. 72, 76–77 (1863).  SALT has successfully mitigated all of its damages with respect to the SALT Sponsorship, and thus is not entitled to recover.

174.     Plaintiffs reserve any and all other defenses and rights to object to the claims in **Exhibit A** on any other grounds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

175.     Enter an order that the transfers and obligations addressed herein are avoidable fraudulent transfers and obligations under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

176.     Enter an order requiring Defendants Scaramucci and Messing to pay Plaintiffs compensatory damages for breach of the SkyBridge II LLCA and for breaches of their fiduciary duties owed to Plaintiffs, in an amount to be determined at trial;

177.     Enter an order that Defendants Scaramucci and Messing aided and abetted Bankman-Fried's breach of his fiduciary duties to Island Bay, and awarding damages to be paid in an amount to be determined by this Court;

178.     Enter an order requiring Defendants SkyBridge II, SkyBridge GP, SkyBridge Coin Fund, and SALT to provide restitution to Plaintiffs for their unjust enrichment;

179.     Award Plaintiffs (a) the return of property to the Debtors' estates that is the subject of the avoidable fraudulent transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable fraudulent transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to Defendants);

180.     Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these bankruptcy proceedings unless and until Defendants have turned over to Plaintiffs the amount ordered as an award for avoidable transfers and obligations;

181.    Enter an order disallowing proofs of claim filed by SkyBridge II, SkyBridge GP,

and SALT in their entity on the basis of no liability;

182.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs

of suit; and

183.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: November 8, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email:  wheelers@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*