**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD. and WEST REALM SHIRES SERVICES INC. | |
| Plaintiffs, | Adv. Pro. No. 24-_____(JTD) |
| -against- | |
| SILVER MILLER LAW, | |
| Defendant. | |

## <u>COMPLAINT</u>

Debtors and debtors in possession Alameda Research Ltd. ("Alameda") and West Realm Shires Services Inc. (d/b/a FTX.US) ("FTX US") (together, the "Plaintiffs") in the above-captioned chapter 11 cases (the "Chapter 11 Cases" and each a "Chapter 11 Case") file this complaint against Silver Miller Law ("Silver Miller" or "Defendant"), to, among other things, avoid and recover fraudulent transfers and preferential transfers of property of Plaintiffs made to

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Defendant.  Plaintiffs allege the following based upon personal knowledge and their investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.    Samuel Bankman-Fried ("Bankman-Fried") and a group of insiders, including Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh"), and Caroline Ellison ("Ellison") (collectively, the "FTX Insiders") orchestrated and implemented a vast fraudulent scheme to enrich themselves and profit at the expense of the Debtors in these Chapter 11 Cases and their creditors.

2.    As has been detailed extensively in criminal indictments, prior complaints filed in civil lawsuits, and reports filed and issued by the Debtors, the purported success of the FTX Group[2] was, in fact, fueled by a host of reckless and fraudulent practices perpetrated by, and for the benefit of, the FTX Insiders and their friends and family.

3.    These practices included, among other things, circumventing U.S. regulations and foreign laws; misleading investors, business partners, financial institutions, and government bodies; vastly overpaying for assets and investments for the purpose of enriching the FTX Insiders and perpetuating their fraud; and making wildly speculative and unhedged bets in cryptocurrency assets.  All of which was funded and paid for with commingled and misappropriated funds that were diverted from the FTX Group through customer exchange deposits and "loans" between FTX Debtors and the FTX Insiders that were never repaid.  Indeed, on November 2, 2023, having heard evidence of staggering embezzlement of billions of dollars of customer funds, it took a jury just three hours to find Bankman-Fried guilty on all counts.[3]

---

[2]    The term "FTX Group" means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

[3]    Trial Tr. 3252:3–3254:24.

4.      In connection with this wide-ranging con game, the FTX Insiders facilitated non-substantive engagements with law firms for unreasonable fees in an effort to prevent them from filing claims against the FTX Group in the future.

5.      This Complaint concerns one of those engagements and seeks to recover from Silver Miller, a U.S.-based law firm, transfers of Debtor funds (including commingled customer funds) that were funneled to Silver Miller as part of a scheme to defraud creditors and the public.

6.      The FTX Insiders retained Silver Miller on March 29, 2022.  Pursuant to the Engagement Agreement of the same date (the "Engagement Agreement"), Silver Miller was to be paid $70,000 per month for 24 months, a total of $1,680,000 over two years, in exchange for minimal legal work and an agreement not to pursue claims against the FTX Group.

7.      On November 9, 2022, as the FTX Group was collapsing, the FTX Insiders arranged for the FTX Group to pay an additional $200,000 retainer (the "Additional Retainer") to Silver Miller to secure representation for certain FTX Group executives in the wake of the FTX Group's collapse.  Silver Miller performed no work in connection with that representation.

8.       In total, Silver Miller received $760,000 from the FTX Group between March and December 2022.  This amount was paid from FTX Group accounts that held commingled funds, i.e., funds that had been deposited by customers of the FTX.com and FTX.US cryptocurrency exchanges, as well as corporate funds.

9.      As outside counsel to the FTX Group, Silver Miller owed duties of loyalty and good faith to its clients, *i.e.*, Plaintiffs.  Yet, in keeping the legal fees flowing for no or minimal work, Silver Miller deliberately elevated only its own interests over those of Plaintiffs.

10.      As with many dubious engagements orchestrated by FTX Insiders, the hundreds of thousands of dollars paid to Silver Miller bore no reasonable relationship to the value of the

services provided.  Specifically, Alameda paid Silver Miller $560,000 for high-level, sporadic conversations with FTX in-house counsel, and Silver Miller's known written work-product is limited to one document containing a list of recommendations for FTX.US's Terms of Service. Similarly, the Additional Retainer of $200,000 resulted in no discernable services or known work product.

11.     Plaintiffs bring this adversary proceeding pursuant to Sections 544, 547, 548, and 550 of the Bankruptcy Code, Section 1304 of Title 6 of the Delaware Code, Del. Code Ann. Tit. 6, §§ 1304(a)(1)-(2), and Section 726 of Title XLI of the Florida Code, Fla. Stat. Ann. Tit. XLI, § 726.105(a)(1)-(2), to avoid and recover from Silver Miller, or from any other person or entity for whose benefit the transfers were made, all transfers of property of the Plaintiffs to Silver Miller made prior to commencement of the Chapter 11 Cases.

12.     Plaintiffs have determined, based on their analysis and investigation to date, that the aforementioned transfers, as detailed in **Exhibit A**, are avoidable under Section 548 of the Bankruptcy Code.  In addition, Plaintiffs assert preference claims against Silver Miller with respect to certain transfers and withdrawals during the Preference Period, as detailed in **Exhibit B**, which are avoidable under Section 547 of the Bankruptcy Code.

13.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Silver Miller that are avoidable under the Bankruptcy Code.  Plaintiffs reserve the right to amend their pleading to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Silver Miller or any other transferee.

**RELEVANT PARTIES**

14.     Plaintiff and Debtor Alameda Research Ltd. is incorporated under the laws of the British Virgin Islands and is a wholly owned subsidiary of Alameda Research LLC (together, with Alameda, "Alameda Research"), a Delaware limited liability company that was 90% owned by Bankman-Fried and 10% owned by Wang.

15.     Plaintiff and Debtor West Realm Shires Services, Inc. (d/b/a FTX.US) is a Delaware corporation.  It is a wholly owned subsidiary of West Realm Shires, Inc. ("WRS"), which is a Delaware corporation that was 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.

16.     Defendant Silver Miller is a U.S.-based law firm registered in Florida, with office locations in Florida, Maryland, and Washington, D.C., and which advertises practice areas including Business Litigation, Digital Investments (Cryptocurrency), Investment Fraud, Professional Malpractice, and Class Actions.

**JURISDICTION AND VENUE**

17.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On October 8, 2024, the Court entered an order confirming The Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates.  Chapter 11 Cases, D.I. 26404.

18.     Following entry of that order, and until the Plan's effective date, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and Plaintiffs have the authority to

commence, and thereafter to prosecute, this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

19.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

20.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

21.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

22.     Venue in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

23.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the Court, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

## I.      THE FTX INSIDERS' FRAUDULENT SCHEME

24.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the

*Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "<u>First Day Declarations</u>").

25.     Bankman-Fried along with the other FTX Insiders, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, his self-aggrandizement, real estate, travel, and various pet projects and unsound investments.

26.     On November 2, 2023, a jury found Bankman-Fried guilty of (i) wire fraud of FTX customers, (ii) conspiracy to commit wire fraud of FTX customers, (iii) conspiracy to commit securities fraud against FTX investors, (iv) conspiracy to commit commodities fraud against FTX customers, and (v) conspiracy to commit money laundering.  *See* Superseding Indictment, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 202.  Bankman Fried was sentenced to 25 years in prison for his crimes.

27.     The other founders and CEOs of the FTX Group have pleaded guilty to similar crimes.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.  Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States v. Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022).  On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison and to conspiracy to make unlawful political contributions and defraud the Federal Election

7

Commission.  *See* Min. Entry, Feb. 28, 2023, *United States v. Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022).

## II.    SILVER MILLER'S ROLE IN THE FTX INSIDERS' FRAUD

28.    To protect and prevent their house of cards from collapsing, the FTX Insiders would monitor court filings and engage law firms that had recently filed cryptocurrency claims against their competitors.  On December 3, 2021, a document entitled "Law Firms and Crypto Class Actions," which tracked law firms pursuing cryptocurrency class actions, was circulated among in-house counsel to the FTX Group.  The FTX Insiders recognized that they needed to retain these outside lawyers to ensure that they would not be able to bring claims against the FTX Group or FTX Insiders—*i.e.,* to "conflict them out."  Silver Miller was listed in the document.

### A.    The Engagement

29.    On March 14, 2022—the same day Silver Miller filed a class action complaint against the FTX Group's competitor Binance—the FTX Group contacted Silver Miller for help on "some local matters as well as some arbitration provisions in our terms," and moved to fast-track the engagement.  The Engagement Agreement was signed just 15 days later, providing that Silver Miller was to be paid $70,000 per month for 24 months.  In the Engagement Agreement, Silver Miller specifically covenanted not to take any positions in conflict with the interests of the FTX Group for five years.

30.    From May to September 2022, Silver Miller provided one piece of known work product regarding FTX US's Terms of Service, and provided occasional, high-level counsel regarding a few isolated issues.

31.    The Silver Miller engagement conferred little to no benefit on the FTX Group, was a waste of corporate assets, and appears to have been nothing other than a mechanism to

compensate Silver Miller in exchange for it refraining from filing claims against the FTX Group for five years.

### B.      The Additional Retainer

32.      On November 9, 2022, Silver Miller received the Additional Retainer of $200,000 from FTX US, to secure representation for certain FTX Group executives in the wake of the FTX Group's collapse.  Even if this was an appropriate expenditure of corporate funds (which is doubtful), Silver Miller performed no work for these FTX Insiders after November 9, 2022.  The Additional Retainer conferred no benefit on the FTX Group, was a waste of corporate assets, and appears to have been nothing other than a mechanism to potentially protect its bad actors.

33.      The Debtors contacted Silver Miller to demand an invoice for any work allegedly performed and charged to the Additional Retainer and the return of any remaining funds.  The Debtors repeatedly made this demand on April 24, 2024, May 13, 2024, June 3, 2024, and July 22, 2024.  Counsel for Silver Miller acknowledged receipt of the first demand, but then failed to provide any substantive response or to return the Additional Retainer.

## III.      THE PLAINTIFFS WERE INSOLVENT AT ALL RELEVANT TIMES

34.      Plaintiffs were insolvent at all relevant times.  As alleged in the superseding indictment of Bankman-Fried, the FTX empire was built on a house of cards.  "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled ... through a pattern of fraudulent schemes ...."[4]

---

[4] *See* First Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

35.    The FTX Insiders failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.  The FTX Insiders concealed the FTX Group's failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets deposited by customers.  The FTX Insiders and FTX Group senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the FTX Group's capital structure and, ultimately, out of the FTX Group's custody.  As alleged in the superseding indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection."

36.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda Research.  At the same time, although the FTX Group's exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda Research to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

37.    Through these cheats, Alameda Research was not only able to evade collateralizing its position on the exchange; it also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of

the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda Research's "line of credit" to $65 billion. Alameda Research lacked the ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

38.    FTX Insiders' insatiable need for funds was not limited to propping up Alameda Research in the face of extreme risk and management failures. Bankman-Fried and other FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers. The FTX Group's improper outflows and expenditures are staggering. Billions of dollars were wasted on overpriced assets and investments that were worth only a fraction of the amounts invested. Billions of dollars were also spent on purported "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, political contributions, and, as alleged in this complaint, purported service providers who provided little to no significant value to the FTX Group.

39.    This FTX Insiders' misappropriation of customer funds rendered Plaintiffs insolvent at all relevant times, including when the subject transfers were made on April 6, 2022, May 17, 2022, June 2, 2022, June 24, 2022, July 1, 2022, August 1, 2022, September 1, 2022, October 3, 2022, and November 9, 2022.

40.    In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John J. Ray III.

41.    On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

42.    The FTX Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission ("SEC"),

the Commodity Futures Trading Commission ("CFTC"), and investigations by a host of regulators. Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the Debtors.  FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.

43.    On December 19, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.[5]  In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda Research "special privileges on the FTX platform," including to allow Alameda Research unfettered use of assets on the FTX.com exchange, even while Alameda Research maintained negative balances in its own holdings of fiat (i.e., government-issued) currencies and cryptocurrencies.[6]  Using these "special privileges," the FTX Insiders frequently caused Alameda Research to misappropriate funds from the FTX.com exchange for their own benefit.

44.    Also on December 19, 2022, Ellison pleaded guilty to two counts of wire fraud and aiding and abetting the same, two counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.[7]

---

[5]     Wang Plea Agreement (Information & Waiver of Indictment), *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7.

[6]     Plea Tr. 24:6-10, ECF No. 21, United States v. Wang, 22-cr-00673 (S.D.N.Y. 2022).

[7]     Ellison Plea Agreement (Information & Waiver of Indictment), *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

45.     The SEC charged Wang and Ellison in a parallel proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-issued exchange crypto security token.[8]  Ellison and Wang entered into consent orders with the CFTC as to their liability for engaging in fraud in violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[9]

46.     On February 28, 2023, Singh pleaded guilty to wire fraud and aiding and abetting the same, and five conspiracy charges, including conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to violate federal campaign finance laws.[10]

47.     On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire fraud, as well as four counts of conspiracy to commit wire fraud, securities, and commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[11]  As alleged in a Third Superseding Indictment, filed on August 14, 2023, Bankman-Fried conspired to and actually did commit wire fraud, and conspired to commit securities fraud, commodities fraud, and money laundering.[12]  On November 2, 2023, after approximately three

---

[8]     *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022); *Commodity Futures Trading Commission v. Bankman-Fried, Ellison, & Wang*, Case No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022).

[9]     *CFTC*, Press Release Caroline Ellison and Gary Wang Acknowledge Liability (Dec. 21, 2022), https://www.cftc.gov/PressRoom/PressReleases/8644-22.

[10]     Singh Plea Agreement (Superseding Information & Waiver of Indictment), *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

[11]     *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

[12]     *See* Third Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

hours of deliberation, the jury in the criminal case found Bankman-Fried guilty on all seven counts of fraud, conspiracy, and money laundering.[13]  Bankman-Fried was sentenced to 25 years in prison on March 28, 2024.

48.    Without accounting for the distorting effects of Bankman-Fried's and the FTX Insiders' staggering fraud, at all relevant times the FTX Group's liabilities far exceeded the fair value of its assets and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditors' claims, leaving it inadequately capitalized and with an inability to pay its debts as they came due.  This was an insolvency further deepened by the additional civil and criminal liabilities imposed on the FTX Group by Bankman-Fried and the FTX Insiders' fraudulent conduct.

49.    More specifically, Alameda's liabilities were enormous, and from at least early 2022 until the Petition Date, their value far exceeded the value of Alameda's assets.  As detailed herein, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators and individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the FTX exchange.  This gave Alameda a virtually unlimited "line of credit" to borrow customer deposits on the exchange.  By the first quarter of 2022, Alameda had abused this borrowing power to extract immense resources from customers, and owed substantial sums to other FTX Group entities and various third parties from which it had taken loans.

50.    By contrast, by the first quarter of 2022, Alameda's assets were smaller and overconcentrated in speculative crypto assets and strategies.  In some instances, it was unclear

---

[13]  Trial Tr. 3252:3–3254:24; *see, e.g.,* MacKenzie Sigalos, *Sam Bankman-Fried Found Guilty on All Seven Criminal Fraud Counts*, CNBC (Nov. 3, 2023), https://www.cnbc.com/2023/11/02/sam-bankman-fried-found-guilty-on-all-seven-criminal-fraud-counts.html.

whether Alameda's crypto assets could be liquidated for value. For example, Alameda was heavily invested in a token called Serum ("SRM"). Almost all of the SRM tokens in circulation, however, were held by Bankman-Fried and other FTX Insiders. Consequently, any large market-based sale of SRM tokens would have resulted in their market price falling substantially.

51.     In addition to being balance sheet insolvent, Alameda was also inadequately capitalized. Given the nature of its business and balance sheet, Alameda required a large capital cushion in order to ensure that it could make loan repayments and meet margin and collateral calls if asset values were to drop. In particular, Alameda owed substantial crypto assets to third parties on loan contracts, some of which were "open term" and could be called on demand, and others of which had variable collateral requirements. Alameda had nowhere near sufficient capital to reasonably protect against such risks.

52.     Like Alameda, FTX US was also insolvent during the second half of 2022. FTX US owed customers on the FTX.US exchange and other entities in the FTX Group more than it actually held in collectible assets. FTX US was also inadequately capitalized, and therefore it was constantly at risk of being unable to satisfy customer withdrawals, especially in light of the volatile nature of cryptocurrency assets.

**CAUSES OF ACTION**

**COUNT I**
**FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**

53.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

54.     Plaintiffs made the transfers to Silver Miller addressed herein on or around April 6, 2022; May 17, 2022; June 2, 2022; June 24, 2022; July 1, 2022; August 1, 2022; September 1, 2022; October 3, 2022; and November 9, 2022, as more specifically described in **Exhibit A**. Each

15

of the transfers to Silver Miller was of property of Plaintiffs, and each obligation to Silver Miller was incurred by Plaintiffs.

55.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

56.     The purpose of Silver Miller's retention was to preclude it from bringing a claim against the FTX Group and FTX Insiders in the future, which would have revealed the FTX Insiders' fraud.  The thousands of dollars paid to Silver Miller bore no reasonable relationship to the value of the services provided, and was simply part of a scheme to perpetuate the FTX Insider's fraud.  Therefore, each of these transfers were made with the actual intent to hinder, delay, or defraud present or future creditors.

57.     Accordingly, each of these transfers should be avoided as fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Silver Miller the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT II
## FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

58.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

59.     Plaintiffs made the transfers to Silver Miller addressed herein on or around April 6, 2022; May 17, 2022; June 2, 2022; June 24, 2022; July 1, 2022; August 1, 2022; September 1, 2022; October 3, 2022; and November 9, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Silver Miller was of property of Plaintiffs.

60.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers, as minimal legal work was completed by Silver Miller.

61.     Each of the Plaintiffs (a) was insolvent on the date that each transfer was made; (b) became insolvent as a result of the transfers; (c) was engaged in a business or a transaction for which any property remaining with the Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiffs' ability to repay as such debts matured.

62.     Accordingly, each of these transfers made by Plaintiffs to Silver Miller should be avoided as fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Silver Miller the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT III
## FRAUDULENT TRANSFER PURSUANT TO
## 11 U.S.C. § 544(b), AND APPLICABLE LAW INCLUDING
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND FLA. STAT. ANN. TIT. XLI § 726.105(a)(1)

63.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

64.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable laws, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq.*, and the Florida Uniform Fraudulent Transfer Act., Fla. Stat. Ann. tit. XLI, § 726.101 *et seq.*

65.     Plaintiffs made the transfers to Silver Miller addressed herein on or around April 6, 2022; May 17, 2022; June 2, 2022; June 24, 2022; July 1, 2022; August 1, 2022; September 1, 2022; October 3, 2022; and November 9, 2022, as more specifically described in **Exhibit A**.  Each

of the transfers to Silver Miller was of property of Plaintiffs, and each obligation to Silver Miller was incurred by Plaintiffs.

66.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

67.     The purpose of Silver Miller's retention was to preclude it from bringing a claim against the FTX Group and FTX Insiders in the future, which would have revealed the FTX Insiders' fraud.  The thousands of dollars paid to Silver Miller bore no reasonable relationship to the value of the services provided, and was simply part of a scheme to perpetuate the FTX Insider's fraud.  Therefore, each of these transfers were made with the actual intent to hinder, delay, or defraud present or future creditors.

68.     Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

69.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and applicable law including Del. Code Ann. tit. 6, § 1304(a)(1) and Fla. Stat. Ann. tit. XLI § 726.105(a)(1), and Plaintiffs may recover from Silver Miller the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT IV**
**FRAUDULENT TRANSFER PURSUANT TO**
**11 U.S.C. § 544(b), AND APPLICABLE LAW INCLUDING**
**DEL. CODE ANN. TIT. 6, § 1304(a)(2) AND FLA. STAT. ANN. TIT. XLI § 726.105(a)(2)**

70.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

71.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable

law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable laws, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq.*, and the Florida Uniform Fraudulent Transfer Act., Fla. Stat. Ann. tit. XLI, § 726.101 *et seq.*

72.    Plaintiffs made the transfers to Silver Miller addressed herein on or around April 6, 2022; May 17, 2022; June 2, 2022; June 24, 2022; July 1, 2022; August 1, 2022; September 1, 2022; October 3, 2022; and November 9, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Silver Miller was of property of Plaintiffs.

73.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers, as minimal legal work was completed by Silver Miller.

74.    Each of the Plaintiffs (a) was insolvent on the date that each transfer was made; (b) became insolvent as a result of the transfers; (c) was engaged in a business or a transaction for which any property remaining with the Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiffs' ability to repay as such debts matured.

75.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

76.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and applicable law including Del. Code Ann. tit. 6, § 1304(a)(2) and Fla. Stat. Ann. tit. XLI § 726.105(a)(2), and Plaintiffs may recover from Silver Miller the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT V**
**PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)**

77.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

78.    Plaintiffs made multiple transfers to Silver Miller within 90 days of the Petition Date, as addressed herein and specifically described in **Exhibit B**.

79.    On September 1, 2022, Plaintiffs transferred $70,000 to Silver Miller pursuant to the Engagement Agreement dated March 29, 2022, as described in **Exhibit B**.  This was a transfer of property of Alameda.

80.    On October 3, 2022, Plaintiffs transferred $70,000 to Silver Miller pursuant to the Engagement Letter dated March 29, 2022, as described in **Exhibit B**.  This was a transfer of property of Alameda.

81.    On November 9, 2022, Plaintiffs transferred $200,000 to Silver Miller pursuant to the Retainer Agreement, as described in **Exhibit B**.  This was a transfer of property of FTX US.

82.    Each of these transfers was made to benefit Silver Miller.

83.    With respect to these transfers, Silver Miller was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternately, Silver Miller received such transfers for the benefit of a creditor or creditors of Plaintiffs.

84.    These transfers were made on account of antecedent debts owed by Plaintiffs to Silver Miller pursuant to the Engagement Agreement or the agreement regarding the Additional Retainer.

85.    As explained above, each of the transfers was made while Plaintiffs were insolvent.

86.    Each of the transfers enabled Silver Miller to receive more than it would have received if: (a) the Plaintiffs' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy

Code; (b) the transfers had not been made; and (c) the amounts paid to Silver Miller on account of the debt was determined by the Bankruptcy Code.

87.     Silver Miller has not returned any portion of the transfers made to it by Alameda or FTX US during the Preference Period.

88.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case, have taken into account known or reasonably knowable affirmative defenses, and believe that these transfers are avoidable.

89.     Accordingly, each of these transfers should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Silver Miller the full amount of the transfer, plus interest from the transfer date, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT VI**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**

90.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

91.     As alleged above, Plaintiffs are entitled to avoid each of the transfers to Silver Miller addressed herein under Section 547 and 548 of the Bankruptcy Code.

92.     Because Silver Miller is the initial transferee or the entity for whose benefit such transfers were made, Plaintiffs may recover from Silver Miller the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Silver Miller and grant the following relief:

(a)     Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b)     Avoid the fraudulent transfers to or for the benefit of Silver Miller, and direct Silver Miller to return to Plaintiffs the transferred property and related expenses or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorneys' fees and costs;

(c)     Enter an order that the transfers addressed herein are avoidable fraudulent transfers and obligations, and/or preferences, under 11 U.S.C. §§ 547 and 548, and/or applicable non-bankruptcy law.

(d)     Award Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(e)     Award Plaintiffs' reasonable and necessary attorneys' fees and expenses, together with all costs of court, and investigation expenses; and

(f)     Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: November 8, 2024
    Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sascha N. Rand (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com

Anthony P. Alden (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-7000
anthonyalden@quinnemanuel.com

*Special Counsel to the Debtors*