## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD., | |
| Plaintiff, | |
| - against - | Adv. Pro. No. 24-_____(JTD) |
| ALEKSANDR "SASHA" IVANOV, NUMERIS LTD., DLTECH LTD., and JOHN DOES 1-20, | |
| Defendants. | |

**COMPLAINT FOR TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 542, VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362, CONVERSION AND FRAUD**

Plaintiff Alameda Research Ltd. ("Alameda"), through its undersigned counsel, for its complaint against Aleksandr "Sasha" Ivanov ("Ivanov"), Numeris Ltd. ("Numeris"), DLTech Ltd. ("DLTech"), and John Does (together, "Defendants"), alleges the following based upon personal knowledge and upon its investigation to date as to itself and its own acts, and upon information and belief as to all other matters:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## NATURE OF THE CASE

1.      Plaintiff brings this adversary proceeding ("Adversary Proceeding") pursuant to Sections 105 and 542 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") to seek the turnover of assets representing $90 million in value belonging to Alameda and/or their affiliated debtors and debtors-in-possession (each, a "Debtor" and collectively the "Debtors") that Alameda deposited with Vires.Finance ("Vires").  Plaintiff also asserts a claim for a violation of the automatic stay pursuant to Section 362 of the Bankruptcy Code for Defendants' actions affecting property of the estate and common law claims for conversion and fraud.

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiff or any other Debtor in the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On November 22, 2022, the Court entered an order authorizing joint administration of the Chapter 11 Cases [D.I. 128].  Accordingly, Plaintiff has the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3.      Prior to the filing of these Chapter 11 cases, Alameda engaged in cryptocurrency trading, venture investing, and other activities.  As part of its trading activities, Alameda participated in several cryptocurrency ecosystems, including those created and controlled by Ivanov.  Ivanov is the founder and owner of a blockchain ecosystem called Waves Tech ("Waves") and, at all relevant times, controlled Waves and its affiliated entities, including Numeris and

DLTech.[2]  Waves was comprised of, among other things, a decentralized cryptocurrency exchange called "Waves Exchange."  Waves also had its own native cryptocurrency token, eponymously called "WAVES," that users could trade on the Waves Exchange and elsewhere.  In addition to the WAVES token, Waves also offered an algorithmic stablecoin product, Neutrino USD ("USDN"), which was intended to be pegged 1:1 to the U.S. dollar and was collateralized by WAVES tokens.

4.      Individuals who had wallets on the Waves blockchain could transfer their assets from Waves to Vires, a liquidity platform and lending protocol that ran exclusively on the Waves blockchain.[3]  Vires users could act as both lenders and borrowers on the Waves blockchain.  Users could deposit digital assets via the Waves blockchain onto Vires to earn rewards (*i.e.* interest) and obtain governance rights in the Vires decentralized autonomous organization ("Vires DAO"), wherein users could ostensibly suggest and/or vote on governance proposals that would affect the Vires protocol (*i.e.* code).[4]  Vires users could also borrow and trade in other assets, including WAVES, by using the assets they deposited as collateral.

5.      In March 2022, Alameda deposited approximately $80 million in stablecoins, namely USD Coin ("USDC") and Tether ("USDT"), on Vires.

6.      While Ivanov marketed Waves and Vires as opportunities for lenders and other users to make substantial profits, Ivanov secretly orchestrated a series of transactions that inflated

---

[2]      *See* Tatiana Koffman, *Waves Trailblazes The Forex Market – Exclusive Interview with Sasha Ivanov*, FORBES (Dec. 15, 2020, 11:06 AM), https://www.forbes.com/sites/tatianakoffman/2020/12/15/waves-trailblazes-the-forex-marketexclusive-interview-with-sasha-ivanov.

[3]      Waves Tech, *DeFi Lending on Waves: the Power of Vires.Finance Liquidity Pools*, MEDIUM (Dec. 10, 2021), https://medium.com/wavesprotocol/defi-lending-on-waves-the-power-of-vires-finance-liquidity-pools-3ac02e48e426.

[4]      *See* Daniel Phillips, *What Is Vires Finance? A Decentralized Liquidity Protocol on Waves*, COINMARKETCAP (2022), https://coinmarketcap.com/academy/article/what-is-vires-finance-a-decentralized-liquidity-protocol-on-waves.

artificially the value of WAVES, while at the same time siphoning funds from Vires.  As the fraudulent scheme began to be uncovered, WAVES lost substantial market capitalization—losing over 95% of its value—and Vires users were saddled with $530 million in losses.[5]

7.      To divert attention from his involvement in the fraud, Ivanov attempted to publicly blame Alameda for destabilizing the Waves ecosystem, tweeting that Alameda had "manipulate[d] [the] $waves price and organize[d] FUD ["Fear, Uncertainty, and Doubt"] campaigns to trigger panic selling."[6]

8.      Privately, Ivanov sought to extort Alameda—demanding that it support Vires and Waves or he would cause Alameda's assets on Vires to be frozen.  When Alameda did not give in to his demands, Ivanov used his control of the Vires DAO to introduce and approve new proposals that blocked Alameda and other lenders from utilizing or withdrawing the assets that they had deposited to Vires, and then purported to convert all of Vires lenders' assets into the Ivanov-controlled USDN.[7]  Ivanov, again, sought to blackmail Alameda for capital and public support for Waves and USDN, promising to allow Alameda to withdraw its assets in fiat currency if it acquiesced, which Alameda again refused to do.

9.      Following the events that led to these Chapter 11 Cases, on November 14, 2022 Ivanov publicly acknowledged that Alameda had deposited "$90[ ]million worth of stablecoin collateral"—the $80 million of Alameda's trapped USDT/USDC collateral that purportedly had

---

[5]      Tim Craig & Isabel Hunter, *Waves Founder's Role in Lost $530m Raises Questions about Who's To Blame*, DL NEWS (Apr. 2, 2023, 7:01 PM), https://www.dlnews.com/articles/defi/waves-vires-finance-sasha-ivanov-role-in-crypto-530m.

[6]      @sasha35625, X (Apr. 3, 2022, 8:08 AM), https://x.com/sasha35625/status/1510589946926673920?lang=en.

[7]      *See* Jeffrey Gogo, *Waves Founder Accuses Alameda of Manipulation as USDN Stablecoin De-Pegs by 20%*, BEINCRYPTO (Apr. 5, 2022), https://beincrypto.com/waves-founder-accuses-alameda-of-manipulation-as-stablecoin-de-pegs; Jacob Oliver, *Waves Community Passes "Reset" Proposal for Vires.Finance*, CRYPTO BRIEFING (Aug. 2, 2022), https://cryptobriefing.com/waves-community-passes-reset-proposal-for-vires-finance/.

been converted to approximately $90 million worth of USDN—and Ivanov submitted yet another governance proposal to the Vires DAO seeking to freeze Alameda's funds "until such a time as the incoming liquidators are in contact with us, and guarantees can be made that the USDN will go to repaying FTX users affected by this insolvency."[8]

10.    Since the Petition Date, the Debtors have repeatedly attempted to regain custody of their frozen assets and engage Ivanov for assistance in gaining access to Alameda's assets.  Despite his prior commitments to return Alameda's assets for the benefit of the Debtors' creditors, Ivanov begrudgingly agreed to join only one call with the Debtors in January 2023, and has since ignored all other outreach from the Debtors and refused to cooperate in returning the Debtors' assets.

11.    In June 2023, Ivanov dissolved Numeris, the legal entity that operated Vires. Notwithstanding that Ivanov dissolved Numeris, Ivanov continued to publicly claim that nothing would "happen to [Alameda's locked] funds any time soon."[9]  In November 2023, Ivanov also dissolved DLTech, the legal entity that operated Waves.

12.    This Adversary Proceeding seeks (i) the turnover of the assets deposited by Alameda onto Vires or the value of those assets, (ii) damages for Defendants' flagrant violations of the automatic stay, (iii) damages for Defendants' conversion of Debtor property, and (iv) damages for fraud in connection with Defendants' actions.

13.    During the course of this Adversary Proceeding, Plaintiff may learn (through discovery or otherwise) of additional property of the Debtors subject to turnover under Section 542 of the Bankruptcy Code, or transfers made to Defendants that are avoidable under Sections 547 or

---

[8]    Waves Tech, *Waves Founder, Sasha Ivanov Statement on Alameda Insolvency*, MEDIUM (Nov. 14, 2022), https://medium.com/wavesprotocol/waves-founder-sasha-ivanov-statement-on-alameda-insolvency-ba17225d2675.

[9]    *AMA with Sasha 21/7/23*, WAVES BLOG (July 25, 2023), https://blog.waves.tech/ama-with-sasha-21-7-23.

548 of the Bankruptcy Code.  Plaintiff intends to avoid and recover all such property and all such transfers made to or for the benefit of Defendants or any other transferee.  Plaintiff reserves the right to further amend this Complaint to include, without limitation:  (i) further information regarding the property or additional transfers made, (ii) additional plaintiffs or defendants, and (iii) additional causes of action, if applicable (collectively, the "Amendments"), that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise, and intend for any such Amendments to relate back to this Complaint.

## JURISDICTION AND VENUE

14.     This Adversary Proceeding relates to the Plaintiff's Chapter 11 Cases filed with this Court on the Petition Date.  The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

15.     This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

16.     Venue of this Adversary Proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

17.     The statutory predicates for the relief requested herein are Sections 105, 362, and 542 of the Bankruptcy Code.

18.     This Adversary Proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estate.  Fed. R. Bankr. P. 7001(1).

19.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry

of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

20.     Plaintiff Alameda is a British Virgin Islands company limited by shares.

21.     Defendant Ivanov is, upon information and belief, domiciled in the United Arab Emirates.  Ivanov is the founder of Waves, and controls its associated products and services, including Vires.

22.     Defendant Numeris was a Seychelles company that operated Vires.  Ivanov caused Numeris to be dissolved on June 12, 2023.

23.     Defendant DLTech was a Seychelles company that operated Waves.  Ivanov caused DLTech to be dissolved on November 29, 2023.

24.     Defendant John Does are additional entities associated with Ivanov that may have custody or control over Plaintiff's assets deposited on Vires.  Because of the shell game orchestrated by Ivanov to obscure the entities that possessed or controlled Plaintiff's and other Vires users' assets—a game that has involved dissolving Defendants Numeris and DLTech—absent discovery, Plaintiff has not yet identified with certainty whether there are other entities possessing Plaintiff's assets.

## OTHER RELEVANT PERSONS

25.     Caroline Ellison was the co-Chief Executive Officer ("CEO") of Alameda from August 2021 until September 2022, at which point she was named the sole CEO.

**FACTUAL ALLEGATIONS**

**I.      Ivanov Founds and Develops Waves.**

26.      In or around 2016, Ivanov founded Waves, described as a decentralized, open-source blockchain-based network that allowed users to create custom crypto tokens.[10]   The network featured a decentralized exchange, wallet, and smart contract abilities.[11]

27.      The Waves blockchain had a number of associated products, including Neutrino, and Vires.[12]  Neutrino was described as an "algorithmic price-stable multi-asset protocol enabling the creation of stablecoins tied to real-world assets."[13]  Ivanov touted that users were able to deposit WAVES into a Neutrino smart contract in order to create or 'mint' newly-issued USDN in exchange.[14]  Once WAVES were deposited into the Neutrino smart contract, the deposited WAVES tokens were automatically staked and would generate 'rewards' (effectively interest on the staked WAVES tokens) that were distributed in USDN.[15]  USDN was intended to be a U.S. dollar-denominated stablecoin—*i.e.*, a cryptocurrency that is pegged 1:1 to the U.S. dollar.[16]  However, because USDN was backed by WAVES, USDN was susceptible to becoming "depegged" from the dollar in the event that the value of WAVES substantially declined.

---

[10]      *See* Koffman, *supra* note 2.

[11]      *See* WAVES.EXCHANGE, *https://waves.exchange* (last visited Oct. 9, 2024).  "WAVES" is a native cryptocurrency on the Waves ecosystem.  *See* Waves, COINMARKETCAP, https://coinmarketcap.com/currencies/waves (last visited Oct. 9, 2024).

[12]      *See* WAVES.EXCHANGE, *supra* note 11.

[13]      Koffman, *supra* note 2.

[14]      *Id.*

[15]      *See* Jeff Benson, *Waves Is Taking Crypto Traders on a Wild Ride. Here's What You Need to Know*, DECRYPT (Apr. 4, 2022), https://decrypt.co/96890/waves-taking-crypto-traders-wild-ride-what-you-need-know.

[16]      *See* Vladimir Zhuravlev, *Analyzing USDN and Dai*, MEDIUM (Jan. 22, 2021), https://medium.com/neutrinoteam/comparing-usdn-and-dai-52ea446849b4.

28.     Vires was a liquidity or lending protocol on the Waves blockchain that enabled users to deposit digital assets and generate yield via lending to other users or to use as collateral for borrowing.[17]  Ivanov publicly marketed Vires as enabling lenders to receive annual percentage yields ("<u>APYs</u>") of between "30 [and] 70%" on stablecoin collateral that they deposited on Vires.[18] For users that borrowed assets against collateral that they had deposited, the Vires smart contract would automatically liquidate the borrower's collateral if the collateral's value declined below the value of the borrowed assets.  Users that deposited assets to Vires to be lent would receive not only interest, but also the ability to participate in the Vires DAO to ostensibly "vote" on changes to the Vires protocol.  Although Ivanov represented that Vires was "fully decentralized and managed by a decentralized community,"[19] in reality, Ivanov controlled the Vires DAO and decided which governance proposals would or would not pass.

29.     To ensnare new users for his products, Ivanov touted Waves and Vires as "crazy profitable" and urged investors to "jump in before the imminent influx of thousands of new users."[20]

**II.    Alameda Deposits Collateral on Vires.**

30.     In March 2022, in reliance on Ivanov's representations, Alameda deposited approximately $80 million in stablecoins to Vires, as follows:

- On March 5, 2022, Alameda deposited 20,342,408.75 USDC and 20,173,525.67 USDT to Vires;

- On March 11, 2022, Alameda deposited 9,657,592 USDC and 9,822,473.77 USDT to Vires;

---

[17]    *See* Phillips, *supra* note 4.

[18]    @Sasha.Waves, X (Sep. 22, 2021, 5:31 AM), https://x.com/sasha35625/status/1440609781421535249.

[19]    Terms of Use (last updated Feb. 10, 2022), https://docs.vires.finance/g1/terms-of-use.

[20]    Craig & Hunter, *supra* note 5.

- On March 12, 2022, Alameda deposited 10,000,000 USDC and 10,000,000 USDT to Vires.

31.     Altogether, Alameda deposited 40,000,000.75 USDC and 39,995,999.44 USDT to Vires.  Between March 19 and April 1, 2022, Alameda borrowed 630,000 WAVES (then-valued at approximately $22 million), with Alameda's $80 million in stablecoins as collateral.   In connection with its market-making and liquidity providing activities, Alameda then transferred the borrowed WAVES to other exchanges, which it used to provide liquidity to other WAVES traders on those exchanges.

### III.    Ivanov Secretly Loots From Vires and Manipulates the Price of WAVES.

32.     Between January and March 2022, the price of WAVES had increased from approximately $15.78 to $50.53[21] and, as of the end of March 2022, Vires users had deposited to Vires approximately $1.2 billion in assets.[22]

33.     During this period, one or more individuals began engaging in a fraudulent scheme that ultimately drained Vires of approximately $530 million in user assets.[23]  The scheme involved several steps:

- *First*, the perpetrator would acquire large amounts of USDN;
- *Second*, the perpetrator would deposit that USDN to Vires and use it as collateral to borrow more established stablecoins such as USDC and USDT from other Vires users;
- *Third*, the perpetrator would send the borrowed USDC/USDT to a cryptocurrency exchange (which would obfuscate their activities and make it more challenging for others to trace), and then use the borrowed USDC/USDT to purchase significant amounts of WAVES, thus driving up the price of WAVES; and

---

[21]     *Waves Price History*, COINMARKETCAP, https://coinmarketcap.com/currencies/waves/historical-data/ (last visited Nov. 8, 2024).

[22]     *See id.*; Craig & Hunter, *supra* note 5.

[23]     Craig & Hunter, *supra* note 5.

- *Fourth*, the perpetrator would use the artificially inflated WAVES tokens to acquire an even larger amount of USDN and then repeat the process again (and again).

34.     This loop of transactions repeated at least from February through the end of March 2022.  As a result of this scheme, lenders of USDC and USDT on Vires accumulated more USDN, while the USDC and USDT they had deposited were siphoned off and sent elsewhere.

35.     So long as the price of WAVES and USDN remained stable, lenders on Vires would not face immediate losses.  But if the price of USDN dropped and the loans were not repaid, those lenders would be left holding "bad debt"—with the USDN collateral being worth less than the loaned USDC and USDT.[24]

36.     On March 31, 2022, market observers began publicizing allegations that Waves was effectively a Ponzi scheme, claiming that Ivanov and others associated with Waves had "recklessly engineered price spikes by borrowing USDC at 35% to buy its own token," that "WAVES market cap growth is needed to keep the system stable," and that "WAVES will eventually crash and USDN will break with it."[25]

37.     WAVES' price indeed began falling, declining from $50.53 on March 29, 2022 to $28.64 on April 6, 2022.[26]  USDN also briefly depegged from the U.S. dollar—dropping from $0.996 on March 30, 2022 to $0.783 on April 4, 2022 before ultimately rebounding on April 9, 2022.[27]

---

[24]     *Id.*

[25]     *See* INTERNET ARCHIVE, https://archive.org/details/0x-hamz-waves-thread/mode/2up (last visited Nov. 8, 2024).

[26]     *Waves Price History*, *supra* note 21.

[27]     *Neutrino Index Price History*, COINMARKETCAP, https://coinmarketcap.com/currencies/neutrino-usd/historical-data/ (last visited Nov. 8, 2024).

38.     On April 3, 2022, Ivanov, to prevent his Ponzi scheme from further unraveling, sought to redirect suspicion by alleging that Alameda was responsible for the rumors and associated market disruption, and accusing Alameda of manipulating the price of WAVES by secretly building short positions betting against WAVES and then creating "FUD" campaigns to "trigger panic selling" so as to profit from its short positions.[28]

39.     Although Ivanov had repeatedly sought to divert blame to Alameda, subsequent investigations and reporting determined that it was in fact *Ivanov* who had controlled many of the wallets that had engaged in the manipulative "looping" activity, enriching himself by "borrowing" increasing amounts of USDC and USDT in exchange for USDN.  Ultimately, when Ivanov's scheme collapsed, lenders on Vires were left with nothing but near-worthless USDN and bad debt, having collectively lost more than $530 million.[29]

**IV.     Defendants Lock and Misappropriate Alameda's Assets.**

**A.     Ivanov Attempts to Extort Alameda.**

40.     On April 3, 2022, Ivanov submitted a governance proposal to the Vires DAO that he claimed would help prevent price manipulation,[30] but was in reality an effort to lock investors' funds on the protocol.  The proposal called for limiting yield returns on borrowing to a 40% annual percentage rate and lowering the liquidation threshold for WAVES and USDN borrowing to 0.1%.[31]  A 0.1% liquidation threshold would affect any investors who had borrowed any material

---

[28]     *See* @sasha35625, *supra* note 6.

[29]     Craig & Hunter, *supra* note 5.  Ivanov represented that he was "assum[ing] full responsibility" for the situation; in a move to "take[ ] control of what many investors suspected were his own wallets to harvest goodwill from the shaken Waves community," Ivanov proposed to move the debt and remaining collateral to his own wallet—a proposal which was ultimately approved.  *Id.*

[30]     *See* Gogo, *supra* note 7.

[31]     *Id.*

amount of WAVES or USDN—their loans would automatically be liquidated when the amount they had borrowed was worth 0.1% of the collateral they had put on Vires. Accordingly, by reducing the liquidation threshold for WAVES and USDN borrowing to 0.1%, investors borrowing WAVES would in effect be forced to immediately return all of their borrowed collateral.[32] This proposal would effectively force Alameda to immediately return (or purchase as necessary) around 650,000 WAVES, at the time worth about $30 million, to avoid the liquidation of its position in WAVES.[33]

41.    The proposal was met with almost universal criticism. According to a contemporaneous article on DappRadar, "the overriding consensus [was] that, if passed, the proposal [would] be harmful to users of Vires."[34] One user wrote: "[j]ust because we don't like that a party [(Alameda)] took a big short position doesn't mean we should change the protocol to target them back. They are using the platform as intended."[35] Another user described the proposal as "go[ing] against the ethos of [decentralized finance], [ ] incredibly petty, and [ ] detrimental to the long term credible neutrality of Vires."[36]

42.    On April 3, 2022, several Alameda employees created a Telegram channel titled "Waves <> Alameda" with Ivanov and senior Waves employees in an effort to address Ivanov's baseless claims against Alameda. A senior Alameda trader wrote in the thread that he "[s]aw the tweet and wanted to reach out to check what's the reason for you targeting us both publicly and

---

[32]    *See* Ian Kane, *Waves CEO Fires Shots at Alameda Research Amidst Price Manipulation Allegations*, DAPPRADAR (Apr. 5, 2022), https://dappradar.com/blog/waves-ceo-fires-shots-at-alameda-research-amidst-price-manipulation-allegations.

[33]    *Id*.

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

via the governance proposal."  The trader further wrote that "this issue [ ] somewhat caught us as a surprise since we don't think we have ever done any harm to WAVES [that] could [not] be better resolved privately."  Ivanov responded that "it's all there" and that he saw "a coordinated campaign that harms us in a very bad way.  I can't see who else it could be."  Another senior Alameda trader explained that as a market-making firm, Alameda had borrowed WAVES on Vires because it needed WAVES tokens to "provide ample liquidity" for its trading activity.

43.    A senior Waves employee then presented Alameda with the following proposal:

> ***We want to unwind the situation***.  Let's have FTX list USDN and we can sell you USDN.  ***We can vote against or let the Vires DAO proposal die***.  We will supply an equivalent amount to the sold USDN on Vires to restore liquidity.  You guys can return the WAVES borrowed and receive stables back from Vires.  We can publicly state that the situation has resolved amicably and that there are no hard feelings and remove any accusations towards Alameda/FTX.

(emphasis added).  In essence, the "proposal" demanded that Alameda acquiesce to publicly support Waves, otherwise Ivanov would exercise his control over the Vires DAO to pass the governance proposals that would result in the liquidation of Alameda's Vires position if Alameda did not promptly repay its WAVES loan.  Since Alameda already had deployed those borrowed WAVES tokens in connection with its market-making activities, Alameda would have needed to quickly buy back enough WAVES to fully repay its loan—in effect, triggering a short squeeze.

44.    On April 6, 2022, after a call between Waves and Alameda, Ellison wrote in the same Telegram thread that Alameda was "open to doing an investment in WAVES as discussed."  On April 7, 2022, after a further call between Waves and Alameda, Ellison circulated a proposal that involved three steps:  (1) "we buy 6.6m WAVES tokens for $100m -> price of $15.15.  you deliver WAVES first, then we can deliver USD or stablecoins in a manner of your choice"; (2) "you use the proceeds from our trade to improve liquidity on vires . . . we can do 5.5m WAVES

tokens (price of $18.18) if we can pay in vires LP tokens instead of USD"; (3) "you vote down the proposal and tweet that you have discussed with Alameda and we were just borrowing tokens to engage in arbitrage and market making activity.  you no longer believe the proposal is necessary and are voting it down to help maintain a fair and orderly market"; (4) "Trabucco [the then co-CEO of Alameda] can retweet your announcement on this, but after internal discussion we've determined that we're not comfortable announcing that we've made an investment in WAVES"; (5) "we hold the WAVES tokens for at least one month, and after that sell at most 200k tokens a day."

45.     While a senior Waves employee expressed some initial enthusiasm for the proposal, writing that "we want to publicly make amends and resolve the situation," he and Ivanov continued to push for Alameda to publicly announce an investment in Waves, despite Ellison stating that "[Alameda] never offered to announce an investment and aren't comfortable doing so at this time, sorry."  The senior Waves employee suggested that Alameda publicly invest in either Vires or Neutrino because "public confidence is important to us so that is why we are asking for some sort of public statement."  Ivanov emphasized the importance of a public announcement, stating "our goal is to restore confidence [in] the first place" and "Caroline pls understand that we could sell 100 million worth of [WAVES] into the market easily, if we wanted to do so.  [W]e need something from you that could help us."

46.     Ellison maintained Alameda's unwillingness to publicly announce Alameda's investment.  In response, Ivanov rejected Alameda's proposal, stating, "[h]ey Caroline! thank you for your offer, but with all due respect it doesn't work for us.  I cannot sell [WAVES] tokens, it will not help us to restore the confidence in the ecosystem, and this is the only thing I care about. If you could help us with that somehow I think we would resolve this situation very fast.  I guess

all is needed is a public statement from you, without any investment or buying [WAVES] tokens." Alameda did not respond to Ivanov's final "counteroffer."

47.    Instead of acquiescing to Ivanov's demand, on April 8, 2022, Alameda, purchased an additional 634,000 WAVES in the open market and used those tokens to repay Alameda's outstanding WAVES loan (plus interest) on Vires.  After making this repayment, Alameda did not make any further trades or borrow against its deposited assets on Vires.

### B.    Ivanov Causes Alameda's Assets to be Locked on Vires.

48.    Just one day after Alameda had fully repaid its loan, on April 9, 2022, the Vires DAO, operating under Ivanov's control, passed Ivanov's proposal to limit the maximum borrower APR to 40%.[37]

49.    On April 16, 2022, Ivanov submitted another governance proposal to the Vires DAO to limit daily withdrawals of USDC and USDT to $1,000 a day.[38]  Ivanov claimed that the limit was necessary to prevent "bots" from draining all of the protocol's liquidity, and that 96.5% of users would be able to withdraw their funds within 10 days.[39]  Ivanov also promised the limits would be temporary and would be removed "[a]s the system starts working again."[40]  The Vires DAO, operating under Ivanov's control, approved the proposal, which was implemented on April 24, 2022.[41]

---

[37]    *See* INTERNET ARCHIVE, https://web.archive.org/web/20221228005027/https://forum.vires.finance/t/set-maximum-borrow-apr-to-40/375 (last visited Nov. 8, 2024).

[38]    *See* INTERNET ARCHIVE, https://web.archive.org/web/20220519050715/https://forum.vires.finance/t/set-daily-withdrawal-limits-for-usdt-and-usdc/474 (last visited Nov. 8, 2024).

[39]    *Id.*

[40]    *Id.*

[41]    *See id.*

50.    As a result of the two governance proposals proposed by Ivanov and approved by the Vires DAO, Alameda was unable to withdraw its assets from Vires—then valued at over $80 million—even though it had already repaid its WAVES loan, nor could Alameda borrow WAVES against its deposited USDC and USDT without risking automatic liquidation. Alameda traders began attempting to withdraw Alameda's assets on Vires via the Waves blockchain, which they internally opined was "not a great [block]chain" and was "unpleasant/slimy to deal with." From April 2022 to the Petition Date, Alameda slowly began withdrawing its assets—in small amounts because of the forced $1,000 daily withdrawal limit—from Vires. Alameda traders estimated that it would take roughly 200 years to fully withdraw Alameda's remaining assets because of the withdrawal limit.

51.    Waves, nevertheless, continued to face liquidity issues. From the beginning of April to the end of October 2022, WAVES dropped from trading at almost $50 a token to $3.43 a token.[42] Over that same period, USDN, intended to be pegged to the U.S. dollar, depegged on six instances, trading as low as $0.78 on April 4, 2022.[43]

52.    In August 2022, the Vires DAO, operating under Ivanov's control, passed a governance proposal that forced all users to convert their USDT and USDC positions to less valuable and riskier USDN.[44] The proposal, which Ivanov claimed was a "final step to stabilize the project and repay all affected users," gave users with USDT and USDC accounts the option to either exchange their positions for USDN with a 365-day vesting period and a 5% liquidation

---

[42]    *See Waves Price History*, *supra* note 21.

[43]    *See* Helen Partz, *Waves Founder Announces New Stablecoin as USDN Depegs*, COINTELEGRAPH (Dec. 20, 2022), https://cointelegraph.com/news/waves-founder-announces-new-stablecoin-as-usdn-depegs; *Neutrino Index Price History*, *supra* note 27.

[44]    Oliver, *supra* note 7.

bonus, or keep their positions with a 0% APY.  However, since Ivanov had already "borrowed" Alameda's deposited USDC and USDT and removed it from the Waves blockchain, Alameda did not have any USDC or USDT remaining at Vires.  Instead, Alameda had two options:  (i) keep its claim to receive USDC and USDT as repayment for its deposited assets, despite significant uncertainty as to when or whether Alameda would be able to withdraw its deposited USDC or USDT; or (ii) accept USDN instead in the hopes of eventually being able to withdraw USDN.  As a result of this proposal, Alameda was forced to give up its claim to receive approximately $80 million in USDC and USDT—and instead received USDN then-valued at $0.84 a token, or approximately 95.6 million USDN.

53.     Alameda continued its efforts to slowly withdraw assets from Vires.  Between August 7, 2022 and August 25, 2022, Alameda was able to withdraw approximately 4.25 million USDN and was able to convert an additional 1 million USDN to USDT and USDC, leaving Alameda with a remaining claim to receive approximately 90.4 million USDN.

### C.     Ivanov Again Attempts to Extort Alameda.

54.     On October 12, 2022, Ivanov and the senior Waves employees reengaged Alameda to demand that Alameda publicly support Waves in exchange for Waves' promise to reenable Alameda's ability to withdraw its locked funds from Vires.  A senior Waves employee privately reached out to a Senior Product Manager at Alameda with a "[h]igh level proposal to discuss."  The Waves employee proposed that Alameda "publicly show[ ] support and partner[ ] with Waves" in order to create demand for USDN.  With "public support of Neutrino, Alameda can earn favour from the community and benefit from being voted in as market maker using neutrino treasury."  In return, the Waves employee said that "Vires DAO can release Alameda's vested USDN + an additional bonus."  Additionally, "Vires DAO will distribute locked & staked USDN to all other USDN vesters, earning them 5-10% APY . . . with 100k unlocked daily."

55.     Alameda employees were highly skeptical of Waves' proposal.  In internal Slack communications that same day, an Alameda trader noted that the proposal "overall feels really gross lol, they stole our money and are holding it hostage in exchange for us doing some public stuff."  The employee questioned whether, even if Alameda agreed to the proposal, Waves "ha[d] any money," but even if Waves "magically ha[d] enough money to actually make [Alameda] whole/reasonable % of recovery," the employee did not "trust [Waves] to repay [Alameda] for real."   Another Alameda developer wrote that they were "pretty anti" Waves' proposal: "[T]hey've proven to be the least trustworthy team in crypto . . . . [W]e all know there is no demand for USDN because it stinks . . . . [T]his is essentially what they asked us to do 6 months ago except . . . they've scammed us a few more times since then[,] their users definitely hate them more . . . [and] USDN liquidity has gotten substantially worse."  Ellison remarked that she did not "really trust Waves to follow through with any of this . . . seems bad to publicly give in to blackmail."

56.     On October 14, 2022, after Vires published a strategic plan on Medium stating that the "Vires Team" intended to "negotiate terms with whales" to "create demand for USDN," an Alameda developer, citing the public statements, expressed concerns that, by publicizing their negotiations with "whales"—a term for influential and well-heeled crypto investors like Alameda—Waves was "planning to pin more [public relations] blame on [Alameda by saying] 'we tried negotiating with alameda but they told us they just want to short waves and make it die.'" Nevertheless, Alameda's Senior Product Manager agreed to participate in a call with Waves about the proposal.

57.     After the call, an Alameda employee circulated a summary of the discussion internally, writing that Waves had proposed implementing "[t]wo separate plans for retail and whale accounts" in an effort to return funds back to account holders.  The plan for retail accounts

was dependent on the price of USDN:  if the three-day average price of USDN was $0.98, rewards would vest and accounts would be permitted to withdraw up to $50,000 a day, with permitted maximum withdrawals increasing by $50,000 each subsequent day.  If, however, USDN's price dropped below $0.95, then vesting would cease for the next three days.  "Whale" accounts—those with large balances such as Alameda's—would receive a smart contract address that would allow them to sell USDN at a price above $0.99.

58.     Alameda employees were not enthusiastic about this proposal.  In addition to low withdrawal limits and price restrictions on potential sales of USDN, Alameda employees feared "bad PR risk from getting preferential treatment."

## V.   Alameda Declares Bankruptcy and Defendants Refuse to Return Alameda's Funds to the Debtors.

59.     On November 11, 2022 and November 14, 2022, FTX Trading Ltd., Alameda, and related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

60.     Ivanov, capitalizing on Alameda's collapse and regurgitating his allegations that Alameda engaged in "blatant market manipulation," issued a public statement on November 14, 2022 claiming to "put to rest questions about the position held by Alameda Research on Vires Finance."[45]  Ivanov contended that Alameda then had "$90,359,718.855452 held in the USDN vesting contract on Vires Finance awaiting repayment."[46]  Ivanov speculated that Alameda's funds on Vires may consist of customer funds and could, therefore, be used to repay "those users affected by what is being called the worst collapse in crypto history."[47]  Ivanov claimed that he and his

---

[45]     *See* Waves Tech, *supra* note 8.

[46]     *Id.*

[47]     *Id.*

advisors had, pre-petition, "approached Alameda as one of the largest accounts stuck [on Vires] to begin an open discussion of how to solve the [Vires liquidity] crisis" and falsely alleged that "Alameda refused to assist in any way."[48]  He further claimed that "[f]rom conversations with them, it's clear that Alameda was not concerned about the funds stuck in Vires."[49]

61.     Ivanov proposed that Vires "block the vesting of the Alameda account until such a time as the incoming liquidators are in contact with us, and guarantees can be made that the USDN will go to repaying FTX users affected by this insolvency."[50]  The Vires DAO (again, controlled by Ivanov) approved a proposal to block Alameda's vesting shortly thereafter.[51]

62.     In reference to Ivanov's public statement and the Vires DAO vote, counsel for the Debtors emailed Ivanov on December 22, 2022 requesting a call to discuss next steps for securing Alameda's assets.  Counsel for the Debtors followed up on January 5, 2023 and January 13, 2023.  On January 14, 2023, Ivanov responded, and a call between Ivanov and the Debtors was held on January 26, 2023.  During that call, the Debtors' cybersecurity advisors informed Ivanov that Alameda's account on Vires had been disabled and requested Ivanov's assistance in accessing the account and recovering the Debtors' assets.  Ivanov was noncommittal and suggested only that the Debtors should continue the process of attempting to reactivate their Vires account.  After the Debtors' cybersecurity advisors' continued efforts to access Alameda's Vires account were

---

[48]     *Id.*

[49]     *Id.*

[50]     *Id.*

[51]     *See* @wavesprotocol, X (Nov. 14, 2022, 8:12 AM), https://x.com/wavesprotocol/status/1592143327624929285; *AMA with Sasha 17/2/*23, WAVES BLOG (Feb. 21, 2023), https://blog.waves.tech/ama-with-sasha-17-2-23 ("Sasha:  Alameda accounts are waiting for bankruptcy trustee, and there's one actually, and there's some interaction, but it's not going to be released anytime soon."); WAVES BLOG, *supra* note 9 ("Sasha: . . . About six months ago, the liquidators already contacted us, and without coming to anything, communication with them was lost. I don't think anything will happen to these funds any time soon").

unsuccessful, they followed up with Ivanov on February 2, 2023 to request further assistance. Ivanov did not respond to that email or to any of the Debtors' numerous follow-up emails.

63.    On June 12, 2023, Ivanov dissolved Numeris, the legal entity that operated Vires.[52] On July 21, 2023, Ivanov posted an "Ask-Me-Anything Session" to the Waves Tech website where users could ask him various questions. During that session, Ivanov disclosed that "[a]bout six months ago, [the Debtors] already contacted us," but falsely claimed that, "without coming to anything, communication with them was lost,"[53] omitting the fact that he had refused to respond to the Debtors' repeated outreach. Notwithstanding that he had already caused the dissolution of Numeris, which operated Vires, Ivanov maintained that he did not think that "anything [would] happen to [Alameda's locked] funds any time soon,"[54] On November 29, 2023, Ivanov also caused DLTech, the legal entity operating Waves, to be dissolved.[55]

64.    As a result of Defendants' misappropriation of Alameda's assets, the Debtors have no choice but to seek judicial enforcement of their rights.

*      *      *

65.    Section 542(a) of the Bankruptcy Code mandates that "an entity, other than a custodian, in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such

---

[52]    *See* OFFICIAL GAZETTE OF THE REPUBLIC OF SEYCHELLES, Volume XLVIII, No. 32, June 20, 2023, at 399.

[53]    WAVES BLOG, *supra* note 9.

[54]    *Id.*

[55]    *See* OFFICIAL GAZETTE OF THE REPUBLIC OF SEYCHELLES, Volume XLVIII, No. 72, Dec. 11, 2023, at 899.

property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

66.    The assets Alameda deposited on Vires are property of the Debtors' estate pursuant to Section 541(a)(1) of the Bankruptcy Code, which defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a).[56]

67.    "Congress intended that property of the estate be broadly inclusive of all interests that the debtor has under state law." *In re Barksdale*, 281 B.R. 548, 551 (Bankr. D.N.J. 2002). "[T]he Bankruptcy Code is not concerned with the 'technicalities of title' when it comes to determining property of the estate." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *8 (Bankr. D.N.J. June 29, 2006) (cleaned up).  Instead, property belongs to the estate where the debtor controls the property or otherwise indicates its "legal or equitable interests" in the property. *E.g.*, *In re Schwartz*, 2014 WL 2621114, at *5 (Bankr. D.N.J. June 12, 2014) (holding that bank account not in debtor's name was nevertheless property of the estate where the debtor funded the account, showed "ownership, control, and interest" in the account, and money "functionally belonged" to the debtor).

68.    There is no bona fide dispute as to Alameda's ownership of the assets that were held on Vires.  Nevertheless, Defendants have continued to hold these assets hostage and Ivanov, despite his public commitments to return Alameda's assets for the benefit of its creditors, has

---

[56]    In addition, insofar as Defendants qualify as custodians under Bankruptcy Code Section 543, they are obligated to "deliver to the [Debtors] any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case." 11 U.S.C. § 543(b).

refused even to engage with the Debtors.  As a result, the Debtors have no choice but to seek judicial enforcement of their rights under the Bankruptcy Code.

69.    Moreover, by refusing to return Alameda's assets or the value of the assets, Defendants are depriving the Debtors of the value of their property and has caused the Debtors to incur significant costs in seeking to secure those assets.  Defendants' refusal to return estate assets constitutes a violation of the automatic stay.  By forcing the Debtors to expend estate resources in seeking the return of estate property, Defendants' conduct is in direct conflict with the primary purpose of the automatic stay:  "to prevent any creditor from becoming a self-determined arbiter of what constitutes property of the estate and what actions are permitted or prohibited by the stay." *In re Johnson*, 548 B.R. 770, 787 (Bankr. S.D. Ohio, 2016); *see also Maritime Elec. Co., Inc*. v. *United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991) ("[T]he stay protects creditors by preventing particular creditors from acting unilaterally in self-interest . . . to the detriment of other creditors.").

### CAUSES OF ACTION

### COUNT ONE
### TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542
### (AGAINST ALL DEFENDANTS)

70.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 69 as if fully set forth here.

71.    As alleged above, Defendants continue to hold Plaintiff's funds, which comprise estate assets, that were deposited on Vires.  Public comments by Ivanov make clear that Defendants have misappropriated the funds and continue to possess and exercise control over Alameda's assets.  The Debtors seek an order from the Court directing Defendants to turn over to the Debtors the assets, or the value thereof, which is estate property pursuant to Bankruptcy Code Section 541(a)(1).

72.     The relief requested also is authorized under the Court's equitable powers codified in section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

**COUNT TWO**
**VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(a)(3), (k)**
**(AGAINST ALL DEFENDANTS)**

73.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 72 as if fully set forth here.

74.     Section 362(a)(3) of the Bankruptcy Code provides, in relevant part, that a petition "filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

75.     Plaintiff's assets deposited on Vires and misappropriated by Defendants comprise property of the Debtors' estate under Section 541 of the Bankruptcy Code.  *See* 11 U.S.C. § 541(a)(1) (Estate property is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case").

76.     Section 362(k) of the Bankruptcy Code permits an individual injured by a willful violation of the automatic stay to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, [to] recover punitive damages."  *See* 11 U.S.C. § 362(k)(1).

77.     Plaintiff respectfully submits that the above circumstances warrant both actual and punitive damages to be determined by the Court based on the depletion of estate assets, including any losses in value of the Plaintiff's assets deposited on Vires and misappropriated by Defendants resulting from their actions, as well as costs and attorneys' fees.

**COUNT THREE**
**COMMON LAW CONVERSION UNDER BRITISH VIRGIN ISLANDS LAW**
**(AGAINST ALL DEFENDANTS)**

78.      Plaintiff repeats and realleges the allegations in paragraphs 1 through 77 as if fully set forth here.

79.      Under English common law, which is followed by the British Virgin Islands, conversion requires the defendant to have repudiated the owner's right to their assets, exercised dominion over those assets inconsistent with the owner's right, or engaged in an act which has the effect of changing the quality of the chattel.  *Heald* v. *Carey*, 11 C. B. 977; *Fouldes* v. *Willoughby*, 8 M. & W. 540.

80.      Plaintiff has a property right in the assets that were frozen in Vires, and, by freezing them, Defendants repudiated Plaintiff's right to access those assets, and have exercised dominion over those assets in a manner inconsistent with Plaintiff's right.

81.      Plaintiff respectfully submits that the above circumstances warrant both actual and punitive damages to be determined by the Court based on the depletion of estate assets due to the conversion, including any losses in value of the Plaintiff's assets resulting from Defendants' actions, as well as costs and attorneys' fees.

**COUNT FOUR**
**COMMON LAW FRAUD UNDER BRITISH VIRGIN ISLANDS LAW**
**(AGAINST DEFENDANTS IVANOV AND NUMERIS LTD.)**

82.      Plaintiff repeats and realleges the allegations in paragraphs 1 through 81 as if fully set forth here.

83.      Defendants Ivanov and Numeris intentionally made multiple material misrepresentations with respect to the Vires platform.   In particular, Ivanov and Numeris misrepresented the profitability of the platform, and the ability of Vires users to freely withdraw their assets from the protocol.  Ivanov and Numeris further misrepresented the extent to which

Vires was a decentralized protocol, when, in fact, in private Telegram chats with Alameda executives, Ivanov and his associates acknowledged they could influence the outcome of governance proposals submitted to the Vires DAO depending on if Alameda agreed to work with them.

84.     Plaintiff relied on Ivanov and Numeris's misrepresentations in depositing funds on Vires.

85.     Plaintiff suffered financial loss as a consequence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

86.     Enter an order under 11 U.S.C. § 542 and 105(a) directing the turnover of the Plaintiff's assets or the value thereof deposited by Plaintiff on Vires and misappropriated by Defendants;

87.     Enter an order under 11 U.S.C. § 362(k) awarding actual and punitive damages to Plaintiff for Defendants' violation of the automatic stay;

88.     Enter an order under British Virgin Islands law awarding monetary damages to the Plaintiff for Defendants' conversion of Plaintiff's assets;

89.     Enter an order under British Virgin Islands law awarding monetary damages to the Plaintiff for Defendants Ivanov and Numeris's fraud;

90.     Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

91.     Award Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:  November 10, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       cobb@lrclaw.com
       mcguire@lrclaw.com
       robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: wheelers@sullcrom.com
       ehrenbergs@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com

*Counsel for Plaintiff*