**Exhibit A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

|   |   |   |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-11068 (JTD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | **Re. D.I.** |

------------------------------------------------------- x

## ORDER GRANTING THE FOREIGN REPRESENTATIVES OF THREE ARROWS CAPITAL, LTD. (IN LIQUIDATION) FOR LEAVE TO AMEND PROOF OF CLAIM

Upon consideration of the *Motion of the Foreign Representatives of Three Arrows Capital, Ltd. (In Liquidation) for Leave to Amend Proof of Claim* (the "**Motion**");[2] and the Court having found that it has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. § 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that consideration of the Motion and the relief requested therein is a core proceeding under 28 U.S.C. § 157(b); and the Court having found that venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409; and the Court having found that due and proper notice of the Motion was provided and that such notice was adequate and appropriate under the particular circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these chapter 11 cases, a complete list of FTX Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of FTX's claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

for the relief granted herein; and any objections to the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      The 3AC Debtor is granted leave to amend the Original POC by filing the Amended POC attached hereto as <u>Exhibit 1</u>.

3.      The Amended POC shall relate back to the date of the filing of the Original POC and shall be deemed timely filed.

4.      Entry of this Order is without prejudice to the right of the 3AC Debtor to seek leave to further amend the Amended POC.

5.      This Order shall be effective and enforceable immediately upon its entry.

6.      This Court shall retain jurisdiction with respect to the implementation of this Order.

**<u>Exhibit 1</u>**

**Amended POC**

# Modified Form 410
# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.

Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.

## Part 1:   Identify the Claim

**1. Who is the current creditor?**

Three Arrows Capital Ltd (in liquidation)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

Email(s) the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| c/o Teneo (BVI) Limited | |
| Banco Popular Building, 3rd Floor, VG-1110 | |
| Road Town, Tortola | |
| Contact phone _____ | Contact phone _____ |
| Contact email  russell.crumpler@teneo.com | Contact email _____ |

**4. Does this claim amend one already filed?**

☐ No
☒ Yes.   Claim number on court claims registry (if known) 5319

Filed on  06/30/2023
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

## Part 2:   Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**   $ SEE ATTACHED

Does this amount include interest or other charges?

☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type _____; (ii) the amount in such currency _____; and (iii) a conversion rate to U.S. dollars _____.

**7b.   List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| | | | |
| | | | |

| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|
| | ## SEE ATTACHED |

| 9. **Is all or part of the claim secured?** | ☒ No |
|---|---|
| | ☐ Yes. The claim is secured by a lien on property. |
| | **Nature of property:** |
| | ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.* |
| | ☐ Motor vehicle |
| | ☐ Other. Describe: _____ |
| | **Basis for perfection:** _____ |
| | Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) |
| | **Value of property:** $_____ |
| | **Amount of the claim that is secured:** $_____ |
| | **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.) |
| | **Amount necessary to cure any default as of the date of the petition:** $_____ |
| | **Annual Interest Rate** (when case was filed)_____% |
| | ☐ Fixed |
| | ☐ Variable |

| 10. **Is this claim based on a lease?** | ☒ No |
|---|---|
| | ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| 11. **Is this claim subject to a right of setoff?** | ☒ No |
|---|---|
| | ☐ Yes. Identify the property: _____ |

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No | |
|---|---|---|
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a, and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.** | $_____ |

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
                  MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Russell Crumpler |
|------|------------------|
| | First name        Middle name        Last name |
| Title | Joint Liquidator of Three Arrows Capital Ltd |
| Company | Teneo (BVI) Limited |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | c/o Teneo (BVI) Limited, Banco Popular Building, 3rd Floor, VG-1110 |
| | Number        Street |
| | Road Town, Tortola, British Virgin Island |
| | City        State    ZIP Code |
| Contact phone | _____        Email    russell.crumpler@teneo.com |

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **On the first page of the form, check the box to identify the Debtor against whom you assert a claim. Select only one Debtor per claim form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)
  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Attach supporting documentation unless voluminous, in which case a summary must be attached. If documentation is unavailable, provide an explanation as to why documentation is not available.**

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A Proof of Claim form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.**

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

- **Any proof of claim asserting a 503(b)(9) Claim must also: (i) include the value of the goods delivered to and received by the Debtors in the 20 days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the 503(b)(9) Claim is being asserted; (iii) state whether the amount asserted represents a combination of goods and services and, if applicable, the portion that relates solely to the value of the goods; and (iv) set forth whether any portion of the 503(b)(9) Claim was satisfied by payments made by the Debtors pursuant to any order of the Court authorizing the Debtors to pay prepetition claims.**

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.ra.kroll.com/FTX.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. § 503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

If by first class mail:

FTX Trading Ltd. Claims Processing Center
c/o Kroll Restructuring Administration LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

If by overnight courier or hand delivery:

FTX Trading Ltd. Claims Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

You may also file your claim electronically at
https://restructuring.ra.kroll.com/FTX/EPOC-Index

**Do not file these instructions with your form**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FTX Trading, Ltd, *et al.*,[1] | ) | Case No. 22-11068 (JTD) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## ATTACHMENT TO AMENDED PROOF OF CLAIM FILED BY THE
## JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD

This attachment to the amended proof of claim (the "**Amended Proof of Claim**") is hereby filed by Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators and foreign representatives (the "**Joint Liquidators**") of Three Arrows Capital Ltd. (the "**3AC Debtor**"), against Debtor FTX Trading, Ltd. ("**FTX**"). This attachment is an integral part of the Amended Proof of Claim, which amends the claim previously filed under Claim No. 5319, and is incorporated by reference therein for all purposes.

### I.    Summary of the 3AC Debtor's Claims

1.    On June 12, 2022, the 3AC Debtor had assets on the FTX platform worth approximately $1.59 billion. By the end of the day on June 14, 2022 – just two weeks before the 3AC Debtor commenced its liquidation – those assets were transferred to, or otherwise liquidated by or for the benefit of FTX, while the 3AC Debtor's purported "negative USD balance" on the FTX platform was reduced from approximately $1.33 billion to approximately $23 million.

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/ftx.

2.      At a minimum, these facts give rise to a preference claim for the value of the lost assets under the laws of the British Virgin Islands ("**BVI**") (which law governs the 3AC Debtor's BVI liquidation proceedings).  In addition, depending on the ultimate facts revealed (including through evidence that the 3AC Debtor continues to request), claims in the same amount exist as well for turnover, undervalue transaction, breach of contract, unjust enrichment, proprietary restitution, conversion, and breach of trust and fiduciary duty.

## II.      **Background on the 3AC Debtor**

3.      The 3AC Debtor was incorporated in the BVI and operated a hedge fund with a focus on trading and investing in cryptocurrency and other digital assets.

4.      The 3AC Debtor's business collapsed in May and June 2022 in the wake of extreme fluctuations in the cryptocurrency markets.  On June 27, 2022, it commenced a liquidation proceeding (the "**BVI Proceeding**") before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division), and that court issued an order appointing Russell Crumpler and Christopher Farmer as the Joint Liquidators of Three Arrows.

5.      On July 1, 2022, the Joint Liquidators, acting as the foreign representatives of the 3AC Debtor, commenced Chapter 15 proceedings before the United States Bankruptcy Court for the Southern District of New York (*In re Three Arrows Capital Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y.)).  On July 28, 2022, that court granted recognition of the 3AC Debtor's foreign main proceeding pending in the BVI.

6.      Pursuant to BVI law, the Joint Liquidators are fiduciaries of the 3AC Debtor's estate created in the BVI Proceeding, with an obligation to conduct an orderly, fair liquidation of the 3AC Debtor and to maximize the value of its assets for the benefit of creditors.  In furtherance of those duties, BVI law empowers the Joint Liquidators, *inter alia*, with the sole authority to take

2

possession and control of the 3AC Debtor's assets, carry on its business and manage its affairs, and investigate the causes of its insolvency and any potential causes of action the estate may have.

### III.   Background on the Amended Proof of Claim

7.      On June 30, 2023, consistent with the Joint Liquidators' duty to maximize value for the estate, the 3AC Debtor timely filed proofs of claim (collectively, the "**Original Proofs of Claim**") against FTX and each of its affiliated Debtors.  The Original Proofs of Claim asserted, *inter alia*, claims in the nature of preference, conversion, and other avoidance actions under BVI, New York, Delaware, and other applicable law, as well as all other claims, whether known or unknown, based on acts, omissions, and transactions between the 3AC Debtor, FTX, and FTX's affiliated Debtors.[2]

8.      At the time of the filing of the Original Proofs of Claim, the Joint Liquidators had access to extremely limited information concerning the relationship between the 3AC Debtor and FTX.   Indeed, the Joint Liquidators faced extensive challenges obtaining documents and information necessary to conduct a comprehensive evaluation of the 3AC Debtor's claims against FTX and other entities.  These challenges were due to the destruction or other loss of the 3AC Debtor's books and records, and the complete failure of the 3AC Debtor's founders—who maintained day-to-day control over the 3AC Debtor prior to its collapse—to meaningfully cooperate with the Joint Liquidators.  As just one example, when the Joint Liquidators gained access to the 3AC Debtor's offices in Singapore, they found that hard drives had been removed from desktop computers, and that the offices contained no laptops and very few other records.  The

---

[2]      *See* claim nos. 5120, 5121, 5125, 5145, 5147, 5148, 5151, 5152, 5154, 5155, 5156, 5158, 5159, 5160, 5167, 5168, 5169, 5170, 5171, 5172, 5173, 5175, 5176, 5177, 5178, 5179, 5180, 5181, 5182, 5183, 5184, 5185, 5186, 5187, 5188, 5189, 5190, 5191, 5192, 5194, 5195, 5196, 5197, 5198, 5199, 5200, 5201, 5203, 5204, 5238, 5239, 5253, 5262, 5269, 5306, 5308, 5319, 5323, 5324, 5327, 5331, 5333, 5336, 5339, 5345, 5348, 5351, 5355, 5360, 5362, 5368, 5373, 5419, 5444, 5445, 5446, 5448, 5449, 5450, 5451, 5452, 5454, 5455, 5456, 5457, 5459, 5460, 5461, 5462, 5464, 5466, 5470, 5473, 5474, 5476, 5477, 5478, 5580, 5581.

3

Joint Liquidators essentially had no books or records, emails, or employees (former or current) to consult. As a result, the Joint Liquidators could only tediously recreate the 3AC Debtor's books and records from whole cloth, including through the pursuit of discovery from numerous parties in multiple jurisdictions.

9.     While not as extreme as the challenges the Joint Liquidators faced, the professionals overseeing the FTX estate also apparently had limited access to their founders and had "shoddy books and records," resulting in FTX having to "build—from scratch—a reliable balance sheet."[3] John J. Ray III, who was engaged on Enron, stated that he had "never" seen "such a complete absence of trustworthy financial information" as in FTX's case.[4]

10.     The Joint Liquidators initiated their post-bar date discovery efforts with FTX through an information sharing agreement reached in connection with the withdrawal of the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. for Coordination Among Courts*, which was filed on September 29, 2023 at ECF No. 2754.

11.     Pursuant to that agreement, the 3AC Debtor served informal information requests to FTX's advisors on October 27, 2023. Between two to three months later, FTX made four productions to the 3AC Debtor. Instead of producing a comprehensive set of the communications shedding light on the relationship and transactions between the 3AC Debtor and FTX or the legal documents governing the parties' dealings, FTX chose to produce an enormous amount of raw data in a format requiring extensive further work by the 3AC Debtor's liquidation team. FTX's productions contained vast volumes of raw and semi-raw data reflecting millions of line items that were too voluminous to be processed even in Microsoft Excel (which is capable of operating

---

[3]     *See Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-In-Possession* [ECF No. 19143] (the "**Disclosure Statement**"), Section I.B.

[4]     *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 24], at ¶ 5.

US-DOCS\155364246.2

spreadsheets with up to 1,048,576 rows and 16,384 columns), in addition to 13,663 pages of more typical materials.

12.     Analyzing a document production of this size and nature on an efficient basis and within the resources available for the 3AC Debtor's liquidation required several months of extensive efforts, indeed, even just to be able to process and organize the raw data.  Nevertheless, this effort enabled the Joint Liquidators to identify several issues that clearly merited further investigation, including the identification of key information and documents that had existed, but which FTX had not produced.

13.     Accordingly, on June 3, 2024, the 3AC Debtor sent additional informal information requests to FTX.  FTX did not respond.  On July 2, 2024, the 3AC Debtor sent FTX proposed formal discovery requests pursuant to Bankruptcy Rule 2004.

14.     Rather than respond to the requests, on July 8, 2024, FTX filed the *Debtors' Objection to Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* (the "**Objection**") [ECF No. 19797].  In the Objection, FTX argued that the claims set forth in the Original Proofs of Claim should be disallowed and expunged on the purely technical ground that the 3AC Debtor purportedly failed to allege facts and provide adequate support for its claims.  Of course, the Objection does not explain that FTX had failed to produce critical information and documents at the time of the Objection.

15.     Following this development, on July 10, the 3AC Debtor again provided its July 2, 2024 information requests to FTX pursuant to Federal Rules of Civil Procedure 33 and 34 and noticed the deposition of FTX pursuant to Federal Rule of Civil Procedure 36.  In response, FTX produced over the next few months various documents purporting to govern the relationships

between the 3AC Debtor and FTX.  FTX also responded to certain interrogatories and requests for admission that revealed new assertions by FTX.

16.     FTX finally produced a witness—Robert Gordon of Alvarez & Marsal (FTX's financial advisor)—to testify on FTX's behalf at a deposition on September 19, 2024.[5]  While this testimony clarified certain of FTX's positions reflected in their responses to interrogatories and requests for admission, it failed to answer basic questions—including, to mention a few of many glaring examples, who supposedly lent $1.3 billion to the 3AC Debtor on the FTX platform (since FTX asserted it was not FTX); what was the source of more than $700 million of the alleged $1.3 billion liabilities that the 3AC Debtor owed to FTX; where the 3AC Debtor's over $1.5 billion of digital assets were located on June 12, 2022; and whether FTX had sufficient digital assets to satisfy all claims against it on that date.  Importantly, these questions were all within the scope of the agreed-upon topics for the deposition.

17.     Contrary to Rule 30(b)(6)'s mandate that "[t]he persons designated must testify about information known or reasonably available to the organization," FTX's witness was not properly prepared: he had no personal knowledge and made no effort to speak with anyone who had personal knowledge of the deposition topics, even though FTX had identified several former employees who had personal knowledge of the 3AC relationship and the June 2022 transactions. The FTX deposition thus highlighted several additional issues for further development of the factual record, as well as key information and documents that have not been searched for or produced.  Those documents included Alvarez & Marsal's analyses of the 3AC Debtor's assets and liabilities that the FTX witness used to prepare, FTX materials on margin lending that the

---

[5]    The transcript of FTX's deposition (the "**Deposition Transcript**") is voluminous and already in FTX's possession.  Accordingly, it is not attached to this Amended Proof of Claim.  The transcript remains available to any party in interest that seeks to access it upon written request to the Joint Liquidators' counsel.

6

witness used to prepare and referred to repeatedly in the deposition but have not been produced or identified in discovery responses, FTX chat messages about the June 2022 transactions that have not been produced but were referenced in other documents, and the last known contact information for the former FTX employees that FTX failed to contact. The Joint Liquidators left the deposition open and requested on September 20, 2024 that FTX produce the missing information and documents.

18. FTX ignored that request and multiple follow-up communications for *three weeks*. FTX did not substantively engage until October 10, 2024, when the Joint Liquidators' counsel informed them of their intention to imminently file a motion to compel discovery production. Only after this threat, FTX was capable of making a further production the following day on October 11, 2024.

19. To this day, the Joint Liquidators continue to press FTX to produce relevant information and documents, as FTX's productions often revealed issues requiring further requests from the 3AC Debtor. The Joint Liquidators are also seeking to depose former FTX employees who, based on FTX's testimony and communications produced by FTX, have firsthand knowledge of transactions involving the 3AC Debtor's assets. And because the discovery process is still ongoing, the Joint Liquidators reserve the right to further amend this Amended Proof of Claim. Indeed, between October 28 and November 1, 2024, the 3AC Debtor served FTX with certain document requests, interrogatories, and a deposition notice, and requested that FTX (i) produce a privilege log and unredacted copies of materials that FTX's witness used to prepare for the September 19 deposition, and (ii) reconduct a thorough search in light of apparent deficiencies in FTX's search process. On November 4, FTX responded by email refusing to produce unredacted copies of the aforementioned materials on alleged work product grounds, and, other than

7

confirming receipt of the deposition notice served, FTX announced that it will not conduct any re-searches and does not intend on providing further discovery the 3AC Debtor's amendment request is resolved.

## IV.    The 3AC Debtor's Relationship with FTX

### a.    The 3AC Debtor's Assets and Governing Documents

20.    The limited information available to the Joint Liquidators at the time of the filing of the Original Proofs of Claim indicated that FTX or its affiliates appeared to have seized or foreclosed upon the 3AC Debtor's assets to satisfy a $120 million loan made by FTX to the 3AC Debtor.

21.    Information and documents obtained through discovery, however, have revealed that the relationship between the 3AC Debtor and FTX was much broader than just the $120 million loan.  According to FTX, that relationship was purportedly governed by the following documents (the "**Governing Documents**"):[6]

a.    that certain Terms of Service, dated May 13, 2022, which FTX produced with bates numbers FTX_3AC_000013695 through FTX_3AC_000013756, attached hereto as **Exhibit A** (the "**May 2022 TOS**");

b.    undated terms of service, which FTX produced with bates numbers FTX_3AC_000013670 through FTX_3AC_000013688, attached hereto as **Exhibit B** (the "**Undated TOS**");

c.    that certain Loan and Security Agreement, dated October 22, 2021, which FTX produced with bates numbers FTX_3AC_000000075 through

---

[6]    *See* (i) Response to Interrogatory No. 1, *Debtors' Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (I) First Set of Interrogatories; (II) First Set of Requests for the Production of Documents; and (III) Notice Of Deposition*, delivered to the 3AC Debtor on July 26, 2024 ("**July Discovery Response**", attached hereto as **Exhibit E**), and (ii) Response to First Set of Interrogatory No. 1, *Debtors' (I) Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (A) First Set of Requests for Admission; (B) Second Set of Interrogatories and (C) Second Set of Requests for Production and (II) Supplemental Responses And Objections To The Foreign Representatives' First Set Of Interrogatories* ("**September Discovery Response**", attached hereto as **Exhibit F**).

8

FTX_3AC_000000095, attached hereto as **Exhibit C** (the "**October 2021 LSA**"); and

d.     that certain Line of Credit Agreement, which FTX produced with bates number FTX_3AC_000000758 through FTX_3AC_000000763 (the "**LOC & Margin Document**"), attached hereto as **Exhibit D**. The LOC & Margin Document appears to include two separate agreements: a certain "FTX Line of Credit" dated March 30, 2022 (the "**March 2022 LOC**") and a certain undated FTX Institutional Customer Margin Line of Credit Agreement (the "**Margin Agreement**"). No provision in either agreement references the other, and each agreement appears to be a standalone contract having its own headings, different terms for FTX's counterparty ("Borrower" in the LOC Agreement and "Customer" for the Margin Agreement"), and different provisions governing choice of law, jurisdiction and defaults. The 3AC Debtor therefore views the LOC Agreement and the Margin Agreement as two separate contracts.

22.     The May 2022 TOS purportedly governed FTX's relationship with the 3AC Debtor as a customer with digital assets deposited on the FTX exchange.

23.     The May 2022 TOS (which FTX asserts governs) make clear that the 3AC Debtor, not FTX, owned those assets. Section 8.2.6 of the May 2022 TOS unambiguously states that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets", that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading", and that "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

24.     Publicly available testimony from Can Sun, FTX's former general counsel who personally took part in the drafting of the May 2022 TOS, further confirms the position that FTX's customers owned the assets they deposited on the FTX platform. Mr. Sun testified during the *United States v. Samuel Bankman-Fried* case that FTX's position has always been, even before

the introduction of the May 2022 TOS, that "that assets deposited on the exchange [by users] continued to be owned by them."[7]

25.     Despite such clear terms, FTX now denies that the 3AC Debtor owned those assets as of June 12, 2022.  Instead, FTX claims that *it* owned the assets because they "were held in wallets that the Debtors owned and controlled, and accordingly were owned by the Debtors" and that "no contract between the parties established any trustee-beneficiary or other similar relationship establishing the 3AC Debtor's ownership over the Assets held in such wallets."[8]  But these arguments are legally irrelevant to ownership.  FTX's mismanagement of its users' assets should not translate into FTX's deemed ownership of them in a manner that improves its litigation position as to prepetition customer rights and transactions.  Regardless, FTX admitted in its deposition that these arguments are without factual support as regards the 3AC Debtor.[9]  But if in violation of the agreement FTX's actions did destroy the 3AC Debtor's ownership interest, FTX is liable for the damages its breach of contract caused, as discussed further below.

26.     The Undated TOS were purportedly the predecessor to the May 2022 TOS.[10]  The Undated TOS also contain provisions confirming that FTX's users owned the assets they deposited on the FTX platform.  Section 22 of the Undated TOS provided, addressing FTX's prospective users, that "You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services *are either owned by you or that you are validly authorized to carry*

---

[7]    *See United States of America v. Samuel Bankman-Fried*, Case No. 22 CR 673 (LAK) (S.D.N.Y. Oct. 2023), October 19, 2023 Trial Transcript, at 1914–1:25; 1915–1:25; 1916–1.

[8]    September Discovery Response, Response to Interrogatory No. 1.

[9]    Deposition Transcript, at 80–16:19 ("**Q.** The commingling of assets you mentioned, as far as you know, did that involve Three Arrows? **A.** No.")

[10]   *See Declaration of Peter Greaves in Support of the Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief From Stay for Filing of the Application in the Supreme Court of the Commonwealth of the Bahamas Seeking Resolution of Non-U.S. Law and Other Issues* [Docket No. 1194], at ¶ 4.

*out transactions using such Digital Assets*" (emphasis added).  Likewise, Section 34 provides that FTX may report and deliver to the applicable jurisdiction "unclaimed property" that FTX holds in the accounts of customers it is unable to locate.  Such a provision would serve no purpose if those assets in fact were contemplated to be FTX's property.

b.   The 3AC Debtor's Alleged Liabilities

27.   Based on a document FTX produced with bates number FTX_3AC_000000038, the 3AC Debtor had an alleged "negative USD balance" on the FTX exchange of approximately $1,332,681,172 by the end of the day on June 12, 2022 (the "**June 12 USD Balance**").  FTX has asserted that the "negative USD balance" is some form of a liability owed by the 3AC Debtor. Based on a document FTX produced with bates number FTX_3AC_000000008, the 3AC Debtor's spot margin borrowings amounted to $631,287,133 by the end of the day on June 12, 2022 (the "**Margin Liability**").  By the end of the day on June 14, 2022, that amount was reduced to approximately $363,808.  In its deposition, however, FTX could only identify the Margin Liability (which, according to FTX, amounts to approximately $631,287,133), and could not identify any other liabilities that would support the remaining $701,394,039 negative USD balance left in the June 12 USD Balance (the "**Unknown Alleged Liability**").[11]  To the extent FTX took actions, whether seizing Lost Assets or failing to provide proceeds from the sales of any Lost Assets, based on the Unknown Alleged Liability, FTX is liable for several torts, undervalue transaction claims, and other liability theories as explained below.

28.   Moreover, FTX asserted in its deposition that FTX's customers, and not FTX, were the 3AC Debtor's lending counterparties.  According to FTX, the June 12 USD Balance was not in fact owed to FTX, but rather to FTX's customers who participated in providing loans to the

---

[11]   Deposition Transcript, at 256–2:17.

3AC Debtor through the FTX exchange platform.[12]  This assertion is contrary to the fact that the only agreements purportedly concerning the 3AC Debtor's margin borrowing and lines of credit are with FTX only, not with any of FTX's customers.  Further, FTX's assertion is also inconsistent with its own position that customer assets on the FTX exchange are property of the FTX estate (a position FTX took in its disclosure statement filed on June 27, 2024 at ECF No. 19143), *i.e.* that FTX (rather than other users) loaned property to the 3AC Debtor.[13]  Indeed, at its deposition FTX was unable to say whether there was a particular customer that loaned property to the 3AC Debtor, or if so who that customer was, and indeed indicated that its systems did not track who the supposed lender was at all.[14]

29.    According to FTX, FTX also extended a so-called "line of credit," first under an October 2021 LSA (which provided for a $100 million "line of credit"), and then under the March 2022 LOC Agreement (which provided for a "line of credit").[15]  But FTX admitted in its deposition that the so-called "line of credit" was not actually a debt that the 3AC Debtor had to repay; instead, it was simply a mechanism to reduce the 3AC Debtor's collateral requirements, in exchange for a fee paid by the 3AC Debtor.[16]  Based on a document FTX produced with Bates production number FTX_3AC_000000054, the "line of credit" equaled $100,868,666 by the end of the day on June

---

[12]    Deposition Transcript, at 199–7:23.

[13]    Disclosure Statement, Section I.B. ("The FTX.com Exchange user agreement included conclusory language stating the customers own their digital assets and it did not include the other provisions necessary to create a conventional custody or trust relationship under applicable law. . . . Nor did such "ownership" language cover the billions in fiat currency owed to customers.")

[14]    Deposition Transcript, at 211–7:23 ("**Q.** Would 3AC have any way of knowing what user in FTX's view lent money to [the 3AC Debtor]? **A.** No, and it could be multiple users. **Q.** Does FTX have a document that shows which users lent money to 3AC as of June 12th, 2022? **A.** I'm not certain. **Q.** In the -- the way the lending program works, do the lending users lend money to a particular user? **A.** No. **Q.** So there -- if I understand, there is no particular user who lent money to 3AC? **A.** Not to my knowledge.")

[15]    Deposition Transcript, at 122–11:14.

[16]    Deposition Transcript, at 123–24:25; 124–1:7.

US-DOCS\155364246.2

12, 2022 (the "**LOC Amount**").  By the end of the day on June 14, 2022, that amount was reduced to $0 after FTX chose to cancel the "line of credit".

        c.      FTX's Unsecured Status

30.      Based on the documents FTX produced, the June 12 USD Balance is unsecured, and indeed FTX has never asserted any security interest exists.[17]  As explained above, the June 12 USD Balance consists of two components: (i) the Unknown Alleged Liability and (ii) the Margin Liability.

31.      **The Unknown Alleged Liability.**  FTX is unable to explain the basis for the Unknown Alleged Liability.  In other words, FTX claims that the Unknown Alleged Liability of $701,394,039 was owed by the 3AC Debtor but cannot explain why.  According to FTX's discovery responses, the agreements that gave rise to the June 12 USD Balance are the Governing Documents.[18]  But among those the only document that purports to grant a security interest is the Margin Agreement, and that security interest, even if valid, only applies to the defined liabilities thereunder.  Because FTX cannot demonstrate what business activities (if any) supposedly generated the Unknown Alleged Liability, it cannot demonstrate that they fall within such defined liabilities and so could be secured.

32.      **The Margin Liability.**  FTX is also unsecured with respect to the Margin Liability. While FTX asserts that the Margin Agreement covers the loans to the 3AC Debtor, and the Margin

---

[17]    Deposition Transcript, at 187–23:25; 188–1:9 ("**Q.** You can't say whether the debtors think they had a security interest? **A.** I do not know. **Q.** So sitting here today, the debtors have not yet formed a view as to whether they have a security interest over these assets, right? **MR. GLUECKSTEIN:** Object to the form. **A.** Not to my knowledge.")

[18]    *See* September Discovery Response, Response to Interrogatory No. 1.  In addition to the Governing Documents, FTX points to a (i) *draft* Line of Credit Agreement between the 3AC Debtor and FTX, dated April 28, 2021, produced bearing production numbers FTX_3AC_000013664 through FTX_3AC_000013669, and (ii) an explanatory memorandum describing the utilization of the Debtors' lines of credit, previously produced bearing production numbers FTX_3AC_000013689 through FTX_3AC_000013694.  Because the former document is merely a draft Microsoft Word document and the latter does not purport to be an agreement between the parties, these documents are omitted from the list of Governing Documents provided herein.

Agreement purports to grant FTX a security interest in all assets of "the Customer" in FTX accounts as collateral for "Indebtedness" (defined as "margin trading and potentially discretionary line of credit facilities"), such purported security grant may not be enforced against the 3AC Debtor for numerous reasons.

33.     *First*, the term "Customer" under the Margin Agreement, which purportedly refers to the grantor of the security interest, is not defined to include the 3AC Debtor.  In fact, it is not defined at all, and so the Margin Agreement entirely fails to specify who purportedly granted a security interest.

34.     *Second*, there is no evidence that the Margin Agreement was properly executed.  The signature block included in the LOC & Margin Document (to which both the LOC Agreement and the Margin Agreement are affixed for no apparent reason) appears to relate to the LOC Agreement, not the Margin Agreement. Unlike the Margin Agreement, the LOC Agreement ends with the following sentence: "IN WITNESS WHEREOF, the parties hereto have executed this Line of Credit Agreement by their duly authorised officers or representatives."  The signature block in the LOC & Margin Document then lists as anticipated signatories the same entities listed as "parties" to the LOC Agreement: FTX and the 3AC Debtor.  By contrast, FTX's counterparty in the Margin Agreement is not even specified, nor does the Margin Agreement indicate it has been executed. In addition, FTX itself never executed the signature block.

35.     *Third*, Section 3 of the Margin Agreement only grants a security interest in "All assets in all of the FTX accounts of the Customer".  But according to FTX, there were no assets in the 3AC Debtor's account; instead, the 3AC Debtor's digital assets (including the Lost Assets)

14

were held in commingled wallets.[19]   Accordingly, the Margin Agreement does not grant a security interest over the Lost Assets.

36.     **Fourth**, FTX asserts that it (rather than the 3AC Debtor) owns the assets, in which case the 3AC Debtor could not legally have granted a security interest over them.

37.     **Fifth**, if in fact other FTX users were the lenders to the 3AC Debtor, they were not granted any security interest in the Margin Agreement, as they are not parties to or beneficiaries of the Margin Agreement.

38.     **Sixth**, the Margin Agreement was never registered with the appropriate authorities.

39.     At bottom, there is simply no indication in the Margin Agreement that its security grant applies to the 3AC Debtor, that the required formalities were followed, that it governs the Lost Assets at issue, or that it applies to the Unknown Alleged Liabilities.

## V.     <u>The Dissipation of the 3AC Debtor's Assets</u>

40.     As discussed, the documents obtained through discovery revealed that the 3AC Debtor's digital and other assets on the FTX platform amounted to $1,596,291,633.02 by the end of the day on June 12, 2022, and its negative USD balance was ostensibly $1,332,681,172.34. Through a series of liquidations, seizures, or other transfers on June 13, 2022 (the "**June 13 Takings**"), the 3AC Debtor's digital and other asset holdings were reduced to a value of $302,253,751.88, while its negative USD balance was reduced to $296,880,645.18.   Following another series of liquidations, seizures, or other transfers on June 14, 2022 (the "**June 14 Takings**", and together with the June 13 Takings, the "**June Takings**"), the 3AC Debtor's digital and other

---

[19]   Deposition Transcript, at 95–13:25; 96–1:3 ("**Q.** Do the debtors know which common wallets held Three Arrows' digital assets? **A.** Not that I'm aware of. **Q.** Is there any way to tell, based on the debtors' current business records, which -- which wallets held 3AC's digital assets as of June 12th? **A.** Not that I'm aware of. **Q.** Is there any way to tell, based on the debtors' business records, which customers have assets in a particular common wallet? **A.** There is not a tracking between a specific token and a specific customer. So they were a omnibus-type wallets.")

US-DOCS\155364246.2

asset holdings were further reduced to a value of $579,221.17 and the negative USD Balance was reduced to $23,505,083.92.[20]

41.    In sum, approximately $1.59 billion in the 3AC Debtor's digital assets on the FTX platform was lost, and the negative USD balance was reduced by approximately $1.3 billion, all within the span of two days, and **approximately two weeks** before the 3AC Debtor initiated its liquidation proceedings in the BVI.

42.    The chart below reflects the end of day of the 3AC Debtor's assets and alleged negative USD balance on the FTX platform for each day during the relevant time period.  Notably FTX admitted that at the beginning of June 12 the 3AC Debtor's net balance was "in the high 200s" (in millions of dollars), and that somehow the June Takings destroyed that positive value by June 14.[21]

---

[20]    The values and transactions referenced in this paragraph are derived from documents that FTX produced to the 3AC Debtor bearing production numbers FTX_3AC_000000002 and FTX_3AC_000000038.  Where documents produced by FTX do not include applicable asset pricing data, the Joint Liquidators have obtained this asset pricing data from public, online sources.  The documents that FTX produced to the Joint Liquidators through discovery that are not otherwise attached hereto are voluminous and already in FTX's possession.  Accordingly, those documents are not attached to this Amended Proof of Claim, but they remain available to any party in interest that seeks access to them upon written request to the Joint Liquidators' counsel.

[21]    Deposition Transcript, at 31–17:25; 32–1:25; 33–1:25; 34–1:7 ("**Q.** Okay. And so what did you learn about the account balance, including perpetuals and futures, at the end of June 12th? **A.** Could you be specific on what you're looking to understand? **Q.** What was the number? **A.** I – I don't recall the exact number for end of June 12th. **Q.** Do you remember roughly?   **MR. GLUECKSTEIN:** Object to the form. **A.** It was – it was under – I believe it was under 200. **Q.** Approximately 200 million? **A.** It was – it was – I believe it started the day at approximately 2 – high 200s and then decreased from there, but I don't recall the exact number ended up. **Q.** Okay. And the date you're referring to is June 12th? **A.** Correct. **Q.** Okay. And do you recall approximately what the account balance was at the end of June 13th? **A.** I believe it was between 30 and 40 million. **Q.** Okay. What did you learn about why the account balance dropped from high 200s at the beginning of June 12th to approximately 30 million at the end of June 13th?"   **A.** So, over the course of June 12th, you saw a change in value driven by, the majority of were driven by change in pricing. So I would say a profit and loss impact. **Q.** Okay. And what else caused the decline in value? **A.** I believe on -- on June 12th, the majority was related to the P&L change. I don't recall if there was other smaller balance changes. **Q.** Okay. Do you recall on June 13th FTX liquidated a number of the assets in the Three Arrows account? **A.** The liquidation -- on – there was not a liquidation on June 13th. **Q.** Do you recall there were assets that were no longer in Three Arrows' account on the end of June 13th that were in its account at the end of June 12th? **A.** There were -- there were positions closed and assets sold. **Q.** Okay. All right. **A.** And withdrawals -- **Q.** I just want to make sure you -- **A.** And withdrawals that took place on June 13th. **Q.** Positions closed, assets sold, okay.")

| Date | Total Value of Assets | Total Negative USD Balance | Net Balance |
|------|----------------------|----------------------------|-------------|
| 06/12/2022 | $1,596,291,633.02 | -$1,332,681,172.34 | $263,610,460.69 |
| 06/13/2022 | $302,253,751.88 | -$296,880,645.18 | $5,373,106.70 |
| 06/14/2022 | $579,221.17 | -$23,505,083.92 | -$22,925,862.75 |

43.     Of the $1,595,712,411.85 decline in value of assets on the days of the June Takings, the Joint Liquidators estimate (on the basis of a combination of Microsoft Excel spreadsheets that FTX produced and open-source price data) that $64,849,838 was on account of unrealized losses, withdrawals by the 3AC Debtor (including realized losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts[22].  The remaining $1,530,862,573.85 are considered lost assets (the digital assets and the other assets representing such amount are referred to herein as the "**Lost Assets**").

44.     FTX admits it liquidated on June 14 a subset of the Lost Assets worth, based on the Joint Liquidators' calculations, $82,107,599.82.[23]  Otherwise, FTX denies that it liquidated the remainder.[24]  Instead, FTX asserts that an unnamed person or program associated with the 3AC Debtor initiated the liquidation of the Lost Assets and transfers to FTX[25] to reduce the 3AC Debtor's alleged liabilities to FTX.  Because FTX failed to speak with anyone with actual knowledge to determine who initiated the liquidation of the Lost Assets on FTX's platform, the

---

[22]  The amounts applicable to each of these items has been calculated by the Joint Liquidators based on data provided in documents produced by FTX, namely documents bearing bates numbers FTX_3AC_000000001 (funding payments), FTX_3AC_000000002 (trading fees and unrealized losses on futures contracts), FTX_3AC_000000003 and FTX_3AC_000000008 (interest charges), FTX_3AC_000000010 (withdrawals) and FTX_3AC_000000038 (unrealized losses and unrealized losses on withdrawals).  Where documents produced by FTX do not include applicable asset pricing data (namely end-of-day prices for futures contracts), the Joint Liquidators have obtained such pricing data from public, online sources.

[23]  The Joint Liquidators' calculation of this amount is based on price data at the time of each transaction, as shown in the document FTX produced bearing bates number FTX_3AC_000000002.

[24]  September Discovery Response, Response to Interrogatory No. 2.

[25]  Deposition Transcript, at 35–14:25; 36–1:3.

Joint Liquidators are pursuing (and must pursue) further discovery related to this assertion. As explained below, regardless of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets, the 3AC Debtor has significant claims against FTX.

## VI.   **The 3AC Debtor's Claims**

45.    The 3AC Debtor's claims against FTX fall into two general categories: (i) preference claims under BVI law, and (ii) turnover, conversion, unjust enrichment, breach of trust/fiduciary duty, breach of contract, proprietary restitutionary, and undervalue transaction claims under BVI, U.S., Bahamian and English law, as applicable.

    a.    BVI Preference Claims

46.    Like in the U.S., BVI law recognizes unfair preference claims. The 3AC Debtor asserts unfair preference claims under section 245 of the BVI Insolvency Act to avoid and recover $1,530,862,573.85 in preferential transfers made by the 3AC Debtor to FTX while the 3AC Debtor was insolvent (the "**BVI Preference Claim**"). These claims exist regardless of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets.

47.    Pursuant to section 245 of the BVI Insolvency Act 2003, a transaction is subject to avoidance as an "unfair preference" if the transaction: (i) "is an insolvency transaction;" (ii) is "entered into within the vulnerability period;" and (iii) "has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into." BVI Insolvency Act 2003 (as amended), S.I. 47/2004 (the "**BVI Insolvency Act**"), § 245(1). Each of these three elements is satisfied here. If an unfair preference has occurred, recovery can be had against any entity that benefitted from the transaction.

        (1)    *The Transactions at Issue are "Insolvency Transaction"*

18

48.     Section 245 of the BVI Insolvency Act applies to "insolvency transactions." Under section 244(2) of the BVI Insolvency Act, an "insolvency transaction" is a transaction "entered into at a time when [a] company is insolvent" or that "causes a company to become insolvent." Insolvency Act 2003 (as amended), S.I. 47/2004, § 244(2).  A company is insolvent for these purposes if it is unable to pay its debts as they fall due, *i.e.* is cash-flow insolvent. Insolvency Act 2002 (as amended), S.I. 47/2004, § 244(3), § 8(1)(c).

49.     Among other reasons for insolvency, the deterioration of market conditions leading up to June 2022 constituted a material adverse effect, among other events of default, under certain of the master loan agreements under which the 3AC Debtor was a borrower.  Depending on the specific terms of each master loan agreement, those events of default either automatically accelerated the loans at issue or rendered them immediately callable, such that the 3AC Debtor was cash-flow insolvent.  Based on the Joint Liquidators' ongoing investigations, the net amounts (after deducting any posted collateral) of loans under six of the largest uncollateralized and/or under-collateralized master loan agreements totaled $3,208,970,388.23 as of June 12, 2022, $3,426,115,251.70 as of June 13, 2022, and $3,454,496,096.87 as of June 14, 2022.  The 3AC Debtor had only $1,565,013,093.95, $1,938,690,892.10 and $1,681,622,009.76 worth of liquid assets on those dates respectively, and was therefore cash-flow insolvent on all dates, with deficits of $1,643,957,294.28, $3,120,144,168.32 and $3,370,569,218.11 respectively.

(2)     *The Transactions Occurred within the "Vulnerability Period"*

50.     Under Section 244 of the BVI Insolvency Act, the "vulnerability period" for a voidable transfer under Section 245 is generally "the period commencing six months prior to the onset of insolvency and ending in the appointment of the administrator or, if the company is in liquidation, the liquidator."  When a company is in liquidation and a BVI court appoints a

liquidator, the "onset of insolvency" is generally "the date on which the application for the appointment of the liquidator was filed. Here, the application for the appointment of the Joint Liquidators was filed on June 27, 2022. The vulnerability period under BVI law with respect to the 3AC Debtor is therefore December 27, 2021 to June 27, 2022.

        (3)    *FTX Was Put In a Better Position Relative to an Insolvent Liquidation*

51.    As a result of the June Takings, FTX was repaid essentially all of its liabilities from the 3AC Debtor, resulting in an approximately 100% recovery to FTX. (Indeed, as discussed above, FTX appears to have been paid vastly more than any established liabilities.) This is far greater than any recovery rate that FTX could have achieved in the insolvent liquidation of the 3AC Debtor, particularly in light of FTX's unsecured status, as explained in paragraph IV.c. above.

52.    FTX cannot avoid preference liability by asserting that the liabilities were owed to other customers (as FTX now asserts) rather than to FTX. Even if those other customers (rather than FTX) were 3AC's creditors, those creditors were made better off as noted above, meeting the third element of an unfair preference claim under BVI law. And FTX would still be liable because it also benefited from the preferential transactions, for numerous reasons. For one, FTX admitted in its deposition that it does not know which of its customers were the 3AC Debtor's lenders. Consequently, when those loans were not repaid in full in a liquidation of the 3AC Debtor, FTX would have absorbed that loss because FTX would have no idea which customer to allocate the loss to. Additionally, as reflected in a document FTX produced bearing bates number FTX_3AC_000013862 (titled "Spot Margin Trading Explainer"), FTX appears to have extended certain guarantees with respect to loans provided through its margin trading program, stating that "[l]enders bear ***no counterparty risk***: FTX guarantees interest payments for however long your funds are borrowed, even if the borrower gets liquidates." (emphasis added) FTX was relieved of

this obligation as a result of the preferential transfer.  Accordingly, the preferential transaction put FTX in a better position than it would have been in an insolvent liquidation.

(4)    *Quantum of BVI Preference Claim*

53.    Based on the foregoing, the Joint Liquidators assert the BVI Preference Claims to recover the Lost Assets, all of which were seized, liquidated, or otherwise disposed of after June 12, 2022 (*i.e.*, while the 3AC Debtor was insolvent and within the vulnerability period), and which put FTX into a better position than it would have been in, in the 3AC Debtor's liquidation, if the June Takings had not occurred.

54.    The Joint Liquidators assert the BVI Preference Claim in the amount of the Lost Assets' value as of the time of the June Takings, which amounts to $1,530,862,573.85.

      b.    <u>The Non-Preference Claims</u>

55.    In addition, FTX may be liable for breach of contract and undervalue transactions.

(1)    *Breach of Contract Claim*

56.    Section 8.2.6(A) of the May 2022 TOS provides as follows:

All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

57.    If FTX's actions deprived the 3AC Debtor of its ownership of the Lost Assets as FTX now alleges, then FTX violated sections 8.2.6(A) and 8.2.6(B) and is liable for breach of contract.  The damages are any amounts that the 3AC Debtor does not recover from FTX due, in whole or in part, to the 3AC Debtor's purported lack of ownership of the Lost Assets, up to the $1,530,862,573.85 value of those Lost Assets.

(2)    *Undervalue Transaction Claim*

58.    Under section 246(1) of the BVI Insolvency Act, a company enters into an undervalue transaction with a person if "(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period."

59.    FTX appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability, despite failing to produce any evidence that the 3AC Debtor owed any particular obligations amounting to the Unknown Alleged Liability.  The 3AC Debtor did not receive any value in exchange for FTX's taking of the $701,394,039 in Lost Assets (or the proceeds thereof).

60.    As discussed above, under Section 244 of the BVI Insolvency Act, the "vulnerability period" for a voidable transfer under Section 245 is generally "the period commencing six months prior to the onset of insolvency and ending in the appoint of the administrator or, if the company is in liquidation, the liquidator."  The vulnerability period under BVI law with respect to the 3AC

Debtor is therefore December 27, 2021 to June 27, 2022.  As also discussed above, the 3AC Debtor

was insolvent for these purposes on June 13 and June 14, 2022.

61.     Based on the foregoing, the 3AC Debtor asserts an undervalue transaction claim in

the amount of $701,394,039, representing the value of Lost Assets taken purportedly on account

of the Unknown Alleged Liability.

> c.     <u>Additional Non-Preference Claims Related to FTX's Taking of the Lost Assets.</u>

62.     If the 3AC Debtor's ongoing discovery efforts reveal that the Lost Assets were

liquidated by FTX rather than unidentified persons associated with the 3AC Debtor, the Joint

Liquidators also assert claims in the amount of $1,530,862,573.85 for turnover, unjust enrichment,

breach of trust and fiduciary duty arising from the May 2022 TOS, breach of contract, conversion,

and proprietary restitution to recover the value of assets that FTX seized or purported to foreclose

upon in the absence of a valid and enforceable security interest.

> (1)     *BVI Turnover Claim*

63.     Pursuant to section 274A of the BVI Insolvency Act, "[w]here any person has in his

or her possession or control any assets or documents to which the company appears to be entitled,

the Court may, on the application of the office holder, require that person forthwith, or within such

period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or

documents to the office holder." Insolvency Act 2003 (as amended), S.I. 47/2004, § 274A.

64.     As explained above, (i) the 3AC Debtor owned the Lost Assets on June 12, 2022,

and (ii) FTX did not have a valid and enforceable security interest over those assets.  Accordingly,

such assets rightfully belong to the 3AC Debtor, and FTX's purported foreclosure, seizure, or

liquidation of them means that FTX took possession or control of the assets "to which the company

appears to be entitled."  This is a textbook turnover claim.

US-DOCS\155364246.2

65. Consequently, the Joint Liquidators assert claims pursuant to section 274(A) of the BVI Insolvency Act to recover the Lost Assets for the benefit of the 3AC Debtor's estate (the "**BVI Turnover Claims**").

66. The BVI Turnover Claims are valued at approximately $1,530,862,573.85, consisting of the value of the Lost Assets.

(2)     *U.S. Law Turnover Claim*

67. As a debtor with a pending Chapter 15 case, the 3AC Debtor may also invoke the Bankruptcy Code's turnover provisions pursuant to Section 1521(a)(7) of the Bankruptcy Code. Specifically, section 542 of the Bankruptcy Code provides, in relevant part, that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property . . . ." 11 U.S.C. § 542(a).

68. As explained above, the 3AC Debtor owned the Lost Assets as of June 12, 2022 and FTX did not have a valid and enforceable security interest in such assets at that time. FTX's subsequent seizure of those assets without a valid and enforceable security interest did not alter the 3AC Debtor's legal right to own such assets.

69. Accordingly, the Joint Liquidators assert claims pursuant to section 542 of the Bankruptcy Code to recover the Lost Assets for the benefit of the 3AC Debtor's estate (the "**U.S. Turnover Claims**").

70. The U.S. Turnover Claims are valued at $1,530,862,573.85, consisting of the value of the Lost Assets.

(3)     *Unjust Enrichment Claim*

71.     The basic requirements for a claim in unjust enrichment are that the claimant must show (i) the defendant has been enriched or has received a benefit; (ii) the enrichment of the defendant is "unjust"; and (iii) the enrichment of the defendant was at the expense of the claimant. These requirements do not vary meaningfully regardless of whether Delaware law,[26] English law,[27] Bahamian law, or BVI law[28] is applied.

72.     FTX has been enriched through the June Takings, such enrichment was unjust because FTX did not have a security interest or any other basis to seize the Lost Assets, and such enrichment was at the 3AC Debtor's expense as the rightful owner of the Lost Assets (or, even in the absence of ownership, as the holder of a claim against FTX for the return of the Lost Assets).

73.     The 3AC Debtor's unjust enrichment claim is valued at approximately $1,530,862,573.85, consisting of the value of the Lost Assets.

(4)     *Breach of Trust and Fiduciary Duty Claim Arising under the May 2022 TOS*

74.     FTX claims that the May 2022 TOS did not establish any trustee-beneficiary relationship between FTX and the 3AC Debtor, and that any such fiduciary or other similar relationship was expressly disclaimed in Section 2.1.3 of the May 2022 TOS.[29]  Section 2.1.3 of those terms of service stated that "FTX Trading is not your broker, intermediary, agent, or advisor

---

[26]    Under Delaware law, unjust enrichment is "'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal citation omitted)

[27]    *See Samsoondar v. Capital Insurance Co Ltd* [2020] UKPC 33 at [18].

[28]    *(1) Nissan Motor Company Ltd (2) Nissan Middle East Fze v (1) Carlos Ghosn (2) Carole Nahas Ghosn (3) Beauty Yachts Pty Ltd* BVIHCM2019/0121 at [113]: "Unjust enrichment (C1 v D1): The general requirements for a claim in unjust enrichment under BVI law are as follows: (i) that D was enriched; (ii) that D was enriched at C's expense; and (iii) that the Defendant's enrichment was unjust. See Goff & Jones: The Law of Unjust Enrichment (9th ed. Sweet & Maxwell 2016), §1-09…."

[29]    September Discovery Response, Response to Interrogatory No. 1.

25

and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."

75.    FTX ignores that Section 2.1.3 only disclaims FTX's fiduciary duties "*in connection with any trades or other decisions or activities effected by you using the Services*".  Importantly, the May 2022 TOS do not disclaim fiduciary duties in connection with FTX's capacity as a custodian of assets.

76.    Furthermore, as FTX admitted, the May 2022 TOS are a "self-contradictory mess",[30] and courts are required to consider the intent of the exclusion clause with reference to the rest of the contractual arrangement, including the clear provisions in the May 2022 TOS asserting that FTX's customers retain ownership of their digital assets.

77.    Under English law, a trustee owes "a duty to preserve the assets of the trust except in so far as the terms of the trust permit the trustee to do otherwise."[31]  Assuming that FTX seized, liquidated, or otherwise disposed of the Lost Assets, FTX violated that duty.

78.    Accordingly, the 3AC Debtor asserts a claim for breach of trust and fiduciary duty against FTX in the amount of $1,530,862,573.85, representing the value of the Lost Assets.

(5)    *Breach of Contract Claims*

79.    Assuming the May 2022 TOS govern as FTX alleges, FTX also violated sections 8.2.6(A), 8.2.6(B), and 8.2.6(C) of that agreement because it appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability, despite failing to provide any basis whatsoever for the Unknown Alleged Liability.  FTX presented no evidence that the 3AC Debtor owed FTX any particular obligations resulting in the Unknown

---

[30]   Disclosure Statement, Section I.B.

[31]   See *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58 at [51].

US-DOCS\155364246.2

Alleged Liability.  Accordingly, the 3AC Debtor asserts a breach of contract claim in the amount of $701,394,039, representing the value of the Lost Assets that FTX prevented the 3AC Debtor from owning, controlling or withdrawing as provided under section 8.2.6 of the May 2022 TOS.

80.    FTX also admitted that the 3AC Debtor was not in violation of any margin or collateral requirements before the end of the day on June 13, 2022.[32]  Accordingly, if outstanding evidence ultimately reveals that FTX (and not the 3AC Debtor) effected the June 13 Takings, FTX violated sections 8.2.6(A), 8.2.6(B), and 8.2.6(C) because it appropriated without justification the Lost Assets in the amount of $1,211,347,396.08, representing the value of the Lost Assets that were subject to the June 13 Takings.[33]

(6)    *Conversion Claim*

81.    The basic requirements for a conversion claim are that the claimant must show that (1) it has a superior possessory right, (2) it was deprived of the full benefit of that right, and the defendant assumed that right.  These elements are similar whether BVI law,[34] Bahamian law, or Delaware law[35] is applied.

---

[32]    Deposition Transcript, at 61–2:6 ("**Q.** Was the end of the day on June 13[th] the first time that the debtors were aware of Three Arrows being out of compliance? **A.** To my knowledge.").

[33]    The value of such Lost Assets is based on the Joint Liquidators' calculations using data provided in documents that FTX produced to the 3AC Debtor bearing bates numbers FTX_3AC_000000038 and other documents identified hereafter, and excludes (a) unrealized losses (calculated using document FTX_3AC_000000002), (b) the value (including realized losses) of any withdrawals by the 3AC Debtor (calculated using documents FTX_3AC_000000002 and FTX_3AC_000000010), (c) trading fees (calculated using document FTX_3AC_000000002), (d) interest charges (calculated using documents FTX_3AC_000000003 and FTX_3AC_000000008), and (e) funding payments on futures contracts (calculated using document FTX_3AC_000000001).  Where documents produced FTX do not include applicable asset pricing data (namely end-of-day prices for futures contracts), the Joint Liquidators have obtained such pricing data from public, online sources.

[34]    *Chiverton Construction Ltd v James Douglas Turnbull* BVIHCV 2015/0143 [2022] ECSC J0817-6 (defining conversion as occurring when "anyone who without authority receives or takes possession of another's goods with the intention of asserting some right or dominion over them, or deals with them in a manner inconsistent with the right of the true owner . . . , provided that there is an intention on the part of the person so dealing with them to negative the right of the true owner or to assert a right inconsistent therewith.")

[35]    *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, No. CV 2018-0783-PRW, 2021 WL 2588905, at *14 (Del. Ch. June 14, 2021) ("The necessary elements for a conversion under Delaware law are that a plaintiff: (1) had a

27

82.     As explained above, the 3AC Debtor owned the assets with the ability to withdraw or transfer them at any time.  If outstanding discovery reveals that the Lost Assets were liquidated or seized by FTX, then FTX deprived the 3AC Debtor of those rights and assumed them for itself. Accordingly, the 3AC Debtor asserts a claim for the tort of conversion in the amount of $1,530,862,573.85, representing the value of the converted Lost Assets.

(7)     <em>Proprietary Restitutionary Claim</em>

83.     Under BVI law, where title remained with the claimant, the claimant had a proprietary restitutionary claim at common law (distinct from a claim for restitution on the grounds of unjust enrichment).[36]

84.     The 3AC Debtor owned and retained title to the Lost Assets under the explicit terms of the May 2022 TOS.  As explained above, FTX did not have the benefit of a valid security interest or other justification to seize or otherwise liquidate the Lost Assets. Accordingly, if outstanding evidence reveals that FTX (and not the 3AC Debtor) seized or otherwise liquidated the Lost Assets, the 3AC Debtor asserts a proprietary restitutionary claim under BVI law in the amount of $1,530,862,573.85, representing the value of the Lost Assets taken by FTX.

## VII.    <u>RESERVATION OF RIGHTS</u>

85.     Following ongoing discovery, the Joint Liquidators may uncover additional causes of action against FTX based on conduct, acts, omissions, and transactions between the 3AC Debtor and FTX.  These additional claims may include, but are not limited to, claims for fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, or aiding and abetting.

---

property interest in the converted goods; (2) had a right to possession of the goods; and, (3) the property was converted.")

[36]    Armstrong DLW GmbH v Winnington Networks Ltd [2012] EWHC 10 (Ch), [2013] Ch 156

86.     This Amended Proof of Claim is without prejudice to claims, if any, that the 3AC Debtor or its estate has or may have for payment of any additional administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Amended Proof of Claim, and the Joint Liquidators right to file such claims or any similar claims on behalf of the 3AC Debtor and its estate at an appropriate time is expressly reserved.

87.     The Joint Liquidators, on behalf of the 3AC Debtor's estate, further reserve all of their rights of setoff, recoupment, bankers' lien, and all similar such rights, as well as any equitable rights, and nothing herein shall be construed as a waiver thereof.

88.     The Joint Liquidators, on behalf of themselves and the 3AC Debtor's estate, reserve all of their respective procedural and substantive defenses and rights, including a right to a jury trial, with respect to any claim that may be asserted against them by FTX or any of its affiliates, any trustee for the estates of FTX and its affiliate debtors, any other party in interest in these chapter 11 cases, or any other person or entity whatsoever.

89.     The filing of this Amended Proof of Claim and the assertion of the claims herein are not and shall not be deemed or construed as a consent or admission with respect to the validity or accuracy of any valuation proposed by FTX, any of its affiliates, or any third party.  The Joint Liquidators and the 3AC Debtor do not waive or release any rights with respect thereto.

90.     The execution and filing of this Amended Proof of Claim is not (i) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights against any entity or person liable for all or part of the claims herein, (ii) a consent by the Joint Liquidators or the 3AC Debtor to the jurisdiction of this Court with respect to any proceeding commenced in these chapter 11 cases against or otherwise involving the Joint Liquidators, (iii) a waiver of the Joint Liquidators'

29

or the 3AC Debtor's right to have any and all final orders in any and all non-core matters entered after de novo review by a United States District Court judge or their respective right to a trial by jury in any proceeding as to any and all matters so triable, whether designated legal or private rights, or in any case or controversy or proceeding related thereto, notwithstanding the designation of such matters as "core proceedings" pursuant to section 157(b) of the Bankruptcy Code or otherwise, and whether such jury trial is pursuant to statute or the United States Constitution, (iv) a waiver of the right to withdraw the reference with respect to the subject matter of the claims herein, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Joint Liquidators or the 3AC Debtor, (v) an election of remedy or choice of law that waives or otherwise affects any other remedy or choice of law, (vi) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights and remedies under applicable law, including BVI law, (vii) a waiver of any right of action that the Joint Liquidators or the 3AC Debtor have or may have against FTX or any other person or entity, (viii) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights against any third party, and/or (ix) a waiver of any right to the subordination, in favor of the 3AC Debtor and its estate, of indebtedness or liens held by creditors of FTX or any of its debtor affiliates.

91.    To the extent that FTX, any of its debtor affiliates or any other party takes any action that would give rise to a counterclaim or other rights or claims that the 3AC Debtor or its estate may have against FTX or any of its debtor affiliates, the Joint Liquidators reserve all of their and 3AC's rights.

92.    The Joint Liquidators reserve the right to attach, produce and/or rely upon additional documentation that supports the 3AC Debtor's and its estate's claims against FTX, and any additional documents that may become available after further investigation or discovery, or upon

FTX's request.  Nothing contained in this Amended Proof of Claim shall limit the rights of the

Joint Liquidators to file papers or pleadings, or commence any proceedings, or take any actions

concerning the 3AC Debtor's and its estate's claims against FTX or any of its debtor affiliates.

## VIII.    <u>Notices</u>

93.    All notices to the Joint Liquidators concerning this Amended Proof of Claim should

be sent to:

> **c/o Teneo (BVI) Limited**
> Banco Popular Building, 3rd Floor
> Road Town, Tortola, VG-1110
> British Virgin Islands
> Attn: Russell Crumpler
> Email: russell.crumpler@teneo.com and 3acliquidation@teneo.com

Copies of all notices to the Joint Liquidators concerning this Amended Proof of Claim should be
sent to:

> **LATHAM & WATKINS LLP**
> Attn: Christopher Harris, Adam J. Goldberg, and Nacif Taousse
> 1271 Avenue of the Americas
> New York, NY 10020
> Emails: chris.harris@lw.com, adam.goldberg@lw.com, and nacif.taousse@lw.com

94.    The request for copies of notices to be sent to Latham & Watkins LLP will not be

deemed authorization of Latham & Watkins LLP to accept service of process on behalf of the Joint

Liquidators.

US-DOCS\155364246.2

# EXHIBIT A

May 2022 TOS

US-DOCS\154233869.7

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

        (together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.      **STRUCTURE OF TERMS**

1.1     The Terms comprise:

        1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

1

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2    the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3    the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2    To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3    **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2.    **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1    **No advice and no reliance**

2.1.1    FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2    You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3    FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2    **Digital Asset transfers and volatility**

2.2.1    Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

2

FTX_3AC_000013696
FTX_3AC_000013695

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below) (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

3

FTX_3AC_000013697
FTX_3AC_000013695

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

2.6    **Blacklisted addresses and forfeited Assets**

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms **("Blacklisted Addresses")**. In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

2.7    **Software protocols and operational challenges**

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

4

FTX_3AC_000013698
FTX_3AC_000013695

2.7.5   Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8   Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9   Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10   No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11   Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12   Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3.   APPLICABLE LAWS AND REGULATIONS

## 3.1   Compliance with Applicable Laws

3.1.1   You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2   Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

5

FTX_3AC_000013699
FTX_3AC_000013695

3.2   **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3   **Export controls**

3.3.1   The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

  (A)   you are in a prohibited jurisdiction as set forth at <u>Location Restrictions</u> (**"Restricted Territories"**);

  (B)   you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

  (C)   you intend to transact with any Restricted Territories or Restricted Persons;

  (D)   you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

  (E)   the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2   We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4.   **ELIGIBILITY**

4.1   In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1   If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2   If you are registering to use the Services on behalf of a legal entity, then:

  (A)   you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

  (B)   the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

  (C)   the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

6

FTX_3AC_000013700
FTX_3AC_000013695

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

5.    **REGISTRATION PROCESS; IDENTITY VERIFICATION**

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

7

FTX_3AC_000013701
FTX_3AC_000013695

6.    **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1    You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2    You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3    You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4    FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5    In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.    **ORDER BOOK AND CONVERT**

7.1    FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2    The Convert function on the Platform also allows you to submit instructions (**"Convert Instructions"**) to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

8

FTX_3AC_000013702
FTX_3AC_000013695

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.    **ACCOUNT FUNDING**

8.1    **Funding - General**

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

9

FTX_3AC_000013703
FTX_3AC_000013695

8.2     **Digital Assets**

8.2.1   The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2   You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3   The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4   You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5   FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6   All Digital Assets are held in your Account on the following basis:

(A)     Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)     None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)     You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7   FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8   It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

10

FTX_3AC_000013704
FTX_3AC_000013695

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10    When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11    You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12    It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

### 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

11

FTX_3AC_000013705
FTX_3AC_000013695

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

FTX_3AC_000013706
FTX_3AC_000013695

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10.   **DEBIT ACCOUNT BALANCE**

10.1   If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2   If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3   If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1   you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2   you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3   you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11.   **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12.   **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1   FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1   refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2   decline to process any instruction or Order submitted by you; and/or

12.1.3   limit, suspend or terminate your use of one or more, or part of, the Services.

12.2   Such actions will not relieve you from your obligations pursuant to the Terms.

12.3   Such actions may be taken as a result of a number of factors, including without limitation:

13

FTX_3AC_000013707
FTX_3AC_000013695

12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10   Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.   **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

14

FTX_3AC_000013708
FTX_3AC_000013695

13.1.5   distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6   use a web crawler or similar technique to access our Services or to extract data;

13.1.7   reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8   perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9   take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10   transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11   otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12   transfer any rights granted to you under the Terms;

13.1.13   engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14   engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15   assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.   ELECTRONIC TRADING TERMS

14.1   FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2   A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3   In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4   We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

15

CONFIDENTIAL

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5    FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6    Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7    The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

## 15.    STAKING

15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

## 16.    MARGIN TRADING

16.1    This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

16

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3   When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4   Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5   The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.   FORKS AND DISTRIBUTIONS

17.1   As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2   FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3   If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4   The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

17

FTX_3AC_000013711
FTX_3AC_000013695

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5 In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.   ATTACKS ON BLOCKCHAIN NETWORKS

18.1 FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2 Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.   SITE; THIRD PARTY CONTENT

19.1 FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2 The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3 We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.   AVAILABILITY

20.1 We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

18

FTX_3AC_000013712
FTX_3AC_000013695

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

## 21.    RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

## 22.    UPDATES TO THE TERMS

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

## 23.    FEES

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

CONFIDENTIAL

FTX_3AC_000013713
FTX_3AC_000013695

24. **TAXES**

24.1 You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2 FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25. **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1 **License**

25.1.1 FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2 Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3 "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2 **API use**

25.2.1 Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2 FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3 FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3 **Third Party Applications**

25.3.1 We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

20

FTX_3AC_000013714
FTX_3AC_000013695

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2   If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3   You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4   In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

26.   **PRIVACY POLICY**

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

27.   **CONFIDENTIALITY**

27.1   You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2   You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3   The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1   in the public domain through no breach of the Terms;

27.3.2   known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3   required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4   If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5   Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6   Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

21

FTX_3AC_000013715
FTX_3AC_000013695

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7 The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8 The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9 The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28. **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29. **INDEMNIFICATION; RELEASE**

29.1 You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2 You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3 You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30. **LIMITATION OF LIABILITY; NO WARRANTY**

30.1 NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

22

FTX_3AC_000013716
FTX_3AC_000013695

30.1.1   FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2   FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3   TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1   INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2   INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3   YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4   YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1   THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2   THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3   THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

23

FTX_3AC_000013717
FTX_3AC_000013695

30.5   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER
INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS
AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY
USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES
OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS,
INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET
ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR
CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY
ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING,
BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR
ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.   **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions
will apply to your use of the Services as set forth in the Schedules attached hereto.

32.   **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in
English for all matters related to your use of our Services unless we elect, in our sole
discretion, to provide support for other languages.

33.   **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions,
comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative
materials or other information or commentary you provide to us or one of our social media
accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you,
whether by email, posting to the Site or social channels, or otherwise, are non-confidential
and will become the sole property of FTX Trading. FTX Trading will own exclusive rights,
including all intellectual property rights, in and to such Feedback, and will be entitled to the
unrestricted use and dissemination of such Feedback for any purpose, commercial or
otherwise, without acknowledgment or compensation to you.

34.   **QUESTIONS AND CONTACT INFORMATION**

34.1   We often post notices and relevant Services information in our Telegram channel and on
our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2   To contact us, please visit one of the links or channels above. For support with your
Account, you may submit a support ticket at https://ftx.com/support. For legal and media
inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide
all relevant information, including your Account username and transaction IDs of any
related deposits. Although we make no representations or provide no warranties as to the
speed of response, we will endeavour to get back to you as soon as possible.

35.   **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official
pronouncement, either on the Site or elsewhere. You shall obtain prior written approval
prior to releasing any statements, written media releases, public announcements and
public disclosures, including promotional or marketing materials, relating to the Platform.

24

FTX_3AC_000013718
FTX_3AC_000013695

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1 FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

    36.1.1    any Force Majeure Event; or

    36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1 You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2 FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1 **Entire agreement**

    38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

    38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

    38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2 **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3 **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4 **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

25

FTX_3AC_000013719
FTX_3AC_000013695

assigns.

38.5    **Variation and waiver**

38.5.1    Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2    No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

38.6    **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

38.7    **Set off**

38.7.1    Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2    FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

38.8    **Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

38.9    **Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1    the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2    no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

38.10    **Electronic signature**

The Terms may be entered into by electronic means.

26

FTX_3AC_000013720
FTX_3AC_000013695

38.11 **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12 **Arbitration**

38.12.1 Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2 This arbitration agreement shall be governed by English law.

38.12.3 The seat of the arbitration shall be Singapore.

38.12.4 The language of the arbitration shall be English.

38.12.5 The number of arbitrators shall be one.

38.12.6 Each party agrees that:

(A) any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B) combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7 This agreement to arbitrate shall:

(A) be binding upon the parties, their successors and assigns;

(B) survive the termination of these Terms.

38.12.8 Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13 **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

27

FTX_3AC_000013721
FTX_3AC_000013695

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)    acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)    terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)    nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)    collapse of buildings, fire, explosion or accident; and

(vii)    any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

28

FTX_3AC_000013722
FTX_3AC_000013695

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2. **INTERPRETATION**

2.1 **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1     a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2     a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3     the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4     a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5     a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2 **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

CONFIDENTIAL

2.3 **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1    a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2    a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3    a reference to an individual includes that individual's estate and personal representatives.

2.4 **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5 **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6 **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1    the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2    general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7 **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8 **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

CONFIDENTIAL

FTX_3AC_000013724
FTX_3AC_000013695

## SCHEDULE 2

### SERVICE SCHEDULE

| Specified Service | Spot Market |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

31

FTX_3AC_000013725
FTX_3AC_000013695

SCHEDULE 3

SERVICE SCHEDULE

| Specified Service | Spot Margin Trading |
|---|---|
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

32

CONFIDENTIAL

| **Risk disclosures** | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
| --- | --- |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

33

FTX_3AC_000013727
FTX_3AC_000013695

**SCHEDULE 4**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | OTC / Off-exchange Portal (OEP Portal) |
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal. The Service Provider reserves the right to final interpretation of this Specified Service. |

34

CONFIDENTIAL

**SCHEDULE 5**

**SERVICE SCHEDULE**

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

35

FTX_3AC_000013729
FTX_3AC_000013695

| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
|---|---|
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

36

FTX_3AC_000013730
FTX_3AC_000013695

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

CONFIDENTIAL

|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| --- | --- |
| **Risk disclosures** | See Section 2 of the General Terms. |

CONFIDENTIAL

FTX_3AC_000013732
FTX_3AC_000013695

**SCHEDULE 7**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. <br><br> 1. Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. <br><br> 2. Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. <br><br> 3. Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. <br><br> You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. <br><br> **IMPORTANT**: Section 16 of the General Terms applies to this service. <br><br> MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

39

FTX_3AC_000013733
FTX_3AC_000013695

| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
| --- | --- |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

40

FTX_3AC_000013734
FTX_3AC_000013695

**SCHEDULE 8**

**SERVICE SCHEDULE**

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

41

FTX_3AC_000013735
FTX_3AC_000013695

ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specific Service.

| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to: |
| --- | --- |

- **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.

- **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.

- **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.

- **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets.

42

FTX_3AC_000013736
FTX_3AC_000013695

## SCHEDULE 9
### SERVICE SCHEDULE

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| Specified Service description | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.<br><br>In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:<br><br>&bull;  Tomorrow's MOVE Volatility contract<br>&bull;  Next weeks' MOVE contract, and the two weeks after that<br>&bull;  Next Quarter's MOVE contract, and the quarter after that<br>and<br><br>&bull;  -1x BTC-PERP (Short)<br><br>IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).<br><br>BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.<br><br>YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

43

FTX_3AC_000013737
FTX_3AC_000013695

| | REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM. |
|---|---|
| | BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors. |
| | By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account. |
| | If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to: |
| | • **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors. |
| | • **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens. |
| | • **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

44

CONFIDENTIAL

Case 22-11068-JTD    Doc 27901-2    Filed 11/12/24    Page 86 of 103

| | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |
|---|---|

CONFIDENTIAL

FTX_3AC_000013739
FTX_3AC_000013695

## SCHEDULE 10
## SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider. |
| | Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index. |
| | Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
| | You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins. |
| | You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform. |
| | You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins. |
| | Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable). |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

46

FTX_3AC_000013740
FTX_3AC_000013695

**SCHEDULE 11**

**SERVICE SCHEDULE**

| Specified Service | NFT Market |
| --- | --- |
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. |
| | Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. |
| | NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. |
| | NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. |
| | While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. |
| | You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. |
| | There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. |
| | NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

47

FTX_3AC_000013741
FTX_3AC_000013695

PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING.

48

CONFIDENTIAL

**SCHEDULE 12**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **NFT Listing** |
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms.<br><br>If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail.<br><br>Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise.<br><br>**Intellectual property**<br><br>You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content.<br><br>By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates.<br><br>You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork.<br><br>**Prohibited activities**<br><br>You will not: |

49

FTX_3AC_000013743
FTX_3AC_000013695

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

CONFIDENTIAL

FTX_3AC_000013744
FTX_3AC_000013695

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) **("NFT Losses"** or **"NFT Loss")** which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

51

CONFIDENTIAL

FTX_3AC_000013745
FTX_3AC_000013695

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

52

CONFIDENTIAL

**SCHEDULE 13**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**

**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

### 1.    FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)    your deposit of fiat currency to Digital Assets; and

b)    your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

### 2.    FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or financial products.

---

53

FTX_3AC_000013747
FTX_3AC_000013695

3.    **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.    **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.    **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

54

CONFIDENTIAL

**SCHEDULE 14**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

55

**SCHEDULE 15**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO JAPAN USERS ONLY**

**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

CONFIDENTIAL

FTX_3AC_000013750
FTX_3AC_000013695

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are **non-recourse** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

CONFIDENTIAL

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

CONFIDENTIAL

FTX_3AC_000013752
FTX_3AC_000013695

別紙 15

### サービスに関する別紙

#### 日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

FTX トレーディングは、P2P 貸借暗号資産の貸出人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

59

FTX_3AC_000013753
FTX_3AC_000013695

## 貸出し

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

## 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

60

FTX_3AC_000013754
FTX_3AC_000013695

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身のリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

61

CONFIDENTIAL

## SCHEDULE 16
### SERVICE SCHEDULE
### TERMS APPLICABLE TO UK USERS ONLY
#### (Updated September 29, 2022)

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

CONFIDENTIAL

FTX_3AC_000013756
FTX_3AC_000013695