**EXHIBIT B**

Undated TOS

US-DOCS\154233869.7

## FTX EXCHANGE: TERMS OF SERVICE

The following terms and conditions of service (the "**Terms**") constitute an agreement between you and FTX Trading LTD ("**FTX Trading**," "**we**," or "**us**"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("**FTX**" or the "**Exchange**") as a user ("**User**", "**you**" or "**your**") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("**API**"), or use any other services offered through the FTX website (ftx.com) (the "**Site**") (together, the "**Services**").  By registering for an FTX account ("**Account**") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange and "fiat currency" means any government issued national currency.  FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons.  Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

### 1.  APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("**AML**") and counter-terrorist financing ("**CTF**") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.  For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

### 2.  ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

FTX_3AC_000013670
FTX_3AC_000013670

If you are registering to use the Services on behalf of a legal entity, you represent and warrant that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

### 3. REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name.  You are the only person authorized to use your Account and you may not share your Account credentials with any other person.  You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill.  You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries.  When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "**Enhanced Due Diligence**").  You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect.  If any such information changes, it is your obligation to update such information as soon as possible.  Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account.

We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

## 4. AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the FTX platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

## 5. INITIAL FUNDING; THIRD PARTY TRANSFERS

In order to fund your Account and begin trading, you must first procure Digital Assets. FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar-pegged Digital Assets (each a "**Stablecoin**"). You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance. The Exchange may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods. A partial list of fiat currencies supported by the Exchange can be found here.

FTX enables you to exchange ("**Convert**") one Digital Asset for another Digital Asset. When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion. The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you. FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever. If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset). FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets. If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed. Please also be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your funds may not be automatically credited, and may take time to recover. Should you encounter any of these issues, you may contact us us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.

FTX_3AC_000013672
FTX_3AC_000013670

When you elect to transfer Digital Assets from your Account to a third party wallet or other location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

## 6. FUTURES CONTRACTS

The futures listed by FTX include three contracts for each Digital Asset or index (each a "**Futures Contract**"). These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk. In order to trade Futures Contracts on FTX, you must post collateral. Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets. This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time. If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage. If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform. In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses. The use of leverage can lead to large losses as well as gains.

## 7. LEVERAGED TOKENS

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("**Leveraged Tokens**"). FTX offers Leveraged Tokens for each underlying Digital Asset or index ("**Underlying**"). Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins. The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption. Users are charged or

FTX_3AC_000013673
FTX_3AC_000013670

credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("**BULL**"), -100% or -1x ("**HEDGE**"), or -300% or -3x ("**BEAR**") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns.

## 8.  FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("**Forks**") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "**Dominant Digital Asset**") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "**Non-Dominant Digital Asset**").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX. When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support.   If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

FTX_3AC_000013674
FTX_3AC_000013670

FTX does not generally offer support for the distribution of assets based on a triggering fact or event, such as the possession of another asset (each an "**Airdrop**"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("**Staking Rewards**"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "**Digital Asset Distributions**"). FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("**Downtime**"). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

### 9. ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trades, deposits, and withdrawals for such Digital Asset. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

### 10. API USE

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX. You agree to not use the API or data provided through the API for any other commercial purpose. You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion. FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in

FTX_3AC_000013675
FTX_3AC_000013670

violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

### 11. ACCOUNT SUSPENSION AND CLOSURE

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services. Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms. We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms. In order to do so, you should contact us for assistance in closing your Account. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account. Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

### 12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

**No advice**

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services. To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.

FTX_3AC_000013676
FTX_3AC_000013670

You accept the risk of trading Digital Assets.  In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset.  You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

**Digital Asset transfers and volatility**

Trading in Digital Assets can be extremely risky and volatile.  Digital Assets may have unique features that make them more or less likely to fluctuate in value.  Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset.  Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons.  As a general matter, Users with limited trading experience and low risk tolerance should not engage in active trading on FTX. Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge.  Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks.  The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset.  We provide no warranty as to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely.  For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

**Futures and leveraged products**

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately.  If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin.  If your Account is under the minimum

FTX_3AC_000013677
FTX_3AC_000013670

margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- *Market Price Variance Risk:* Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset. The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- *Inverse Correlation Risk:* Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.

- *Portfolio Turnover Risk:* Leveraged Tokens may incur high portfolio turnover to manage the exposure to the underlying Digital Asset. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.

- *Interest Rates:* Leveraged Tokens take positions in futures contracts to achieve their desired leverage. These futures might trade at a premium or discount to spot markets in the applicable Digital Asset as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Digital Asset's returns due to a divergence between the two markets.

**Supply and value of Digital Assets**

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

You acknowledge and agree that Digital Assets and/or FTX features available in one jurisdiction may not be available for trading or to access, as applicable, in another.

**Blacklisted addresses and forfeited funds**

Leveraged Tokens are Digital Assets built on the Ethereum blockchain. FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Leveraged Tokens (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates these Terms ("**Blacklisted Addresses**"). In the event that you send Leveraged Tokens to a Blacklisted Address, or receive Leveraged Tokens from a

FTX_3AC_000013678
FTX_3AC_000013670

Blacklisted Address, FTX Trading may freeze such Leveraged Tokens and take steps to terminate your Account.

In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and you may forfeit any rights associated with your Leveraged Tokens, including the ability to redeem your Leveraged Tokens for U.S. Dollars. FTX Trading may also be forced to freeze Leveraged Tokens in the event that we receive a legal order from a valid government authority requiring us to do so.

**Software protocols and operational challenges**

The software protocols that underlie Digital Assets are typically open source projects, which means that (i) the development and control of such Digital Assets is outside of FTX's control and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

You are aware of and accept the risk of operational challenges.  FTX may experience sophisticated cyber attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services.  You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks.  You agree not to hold FTX Trading accountable for any related losses.

All Users understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your assets stored on our platform.  You claim full responsibility for monitoring such technological changes and understanding their consequences for your Digital Assets.  Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks involved associated with Digital Assets use generally or your use of our Services

**Compliance**

You are responsible for complying with applicable law.  You agree that FTX is not responsible for determining whether or which laws may apply to your transactions, including but not limited to tax law.  You are solely responsible for reporting and paying any taxes arising from your use of the Services.

**Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, exchange, and value of Digital Assets.

**No deposit protection**

CONFIDENTIAL

Neither Digital Assets nor any fiat currency held in your Account is eligible for any public or private deposit insurance protection.

**Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions, including, but not limited to, Forks, Staking Rewards and Airdrops (as defined in Section 8 above).  FTX Trading is not obligated to support any such Digital Asset Distributions for Users.  If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX.  If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you.  Staking may subject your Digital Assets to additional risks and FTX is not responsible for losses you may incur related to staking.

## 13. RIGHT TO CHANGE OR REMOVE FEATURES AND SUSPEND OR DELAY TRANSACTIONS

We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability.  We may decline to process any order and may limit or suspend your use of one or more Services at any time, in our sole discretion.  Suspension of your use of any of the Services will not affect your rights and obligations pursuant to these Terms.

We may, in our sole discretion, decline to process orders if (i) we believe the transaction is suspicious; (ii) the transaction may involve fraud or misconduct; (iii) it violates applicable laws; or (vi) it violates these Terms.  Where permitted by law, we will notify you by the end of the business day if we have suspended processing your orders and, if possible, provide our reasons for doing so and anything you can do to correct any errors leading to the stoppage.

## 14. FEES

In consideration for the use of the Services, you agree to pay to FTX the appropriate fees, as set forth in our fee schedule displayed on the Site ("**Fee Schedule**"), which FTX Trading may revise or update in its sole discretion from time to time.  On request, FTX may make available an alternative fee schedule ("**Alternative Fee Schedule**") to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX in its sole discretion from time to time.  You authorize FTX to deduct any applicable fees from your Account at the time you make a given transaction.  Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

## 15. PROMOTIONS

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere.  You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to FTX.

FTX_3AC_000013680
FTX_3AC_000013670

## 16. SECURITY OF USER INFORMATION

You are responsible for maintaining the confidentiality and security of any and all account names, User IDs, passwords, and any other security feature that you use to access the Services.  You are responsible for (i) keeping your email address up to date in your Account profile and (ii) maintaining the confidentiality of your User information and the security of your Account, which includes the enabling of all relevant security features.  You agree to notify FTX immediately if you become aware of any unauthorized use of the Services or any other breach of security regarding the Services.  FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information.

We shall not bear any liability for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack.  If you question the authenticity of a communication purporting to be from FTX, you should login to your Account through the Site, not by clicking links contained in emails.

## 17. PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used.  You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 18. RESTRICTED ACTIVITIES

In connection with your use of the Services, you will not:

- violate or assist any party in violating any law, statute, ordinance, regulation or any rule of any self-regulatory or similar organization of which you are or are required to be a member through your use of the Services;
- provide false, inaccurate, incomplete or misleading information;
- infringe upon FTX's or any third party's copyright, patent, trademark, or intellectual property rights;
- engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;
- distribute unsolicited or unauthorized advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;
- use a web crawler or similar technique to access our Services or to extract data;
- reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;
- perform any unauthorized vulnerability, penetration or similar testing on the API;

FTX_3AC_000013681
FTX_3AC_000013670

- take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;
- transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;
- otherwise attempt to gain unauthorized access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;
- transfer any rights granted to you under these Terms;
- engage in any other activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct; or
- engage in any behavior which is unlawful, violates these Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion.

## 19. ELECTRONIC TRADING TERMS

FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset, Leveraged Token, or Futures Contract at any time, based on a number of factors, including changes in characteristics.

A transaction on FTX may fail for several reasons, including without limitation to change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. We are under no circumstances liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures on the Site. You have full responsibility to determine and inquire into the failure of any transaction which you initiate.

In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to these Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

We may refuse to execute a trade, or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, or the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on FTX, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in these Terms. FTX Trading reserves the right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorization to make a transaction, except with respect to partially filled orders.

FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to

FTX_3AC_000013682
FTX_3AC_000013670

seeking to cancel an order or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

FTX provides Users with a platform that allows their orders to be matched with the orders of other Users. Orders may be partially filled or may be filled by a number of orders, depending on the trading activity at the time an order is placed. FTX's relationship with you under these Terms is as a trading platform provider only and does not act as principal or counterparty with respect to trades entered into on the platform. Notwithstanding the foregoing, (i) FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades, and (ii) affiliates of FTX may execute trades on the platform; provided, however, that such affiliates shall not be afforded any priority in trade execution.

The Digital Assets available for purchase through the Services may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide exchange rate information to you through our Services, the exchange rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated prevailing rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in actual versus indicated rates.

### 20. COMMUNICATIONS

These Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

### 21. FEEDBACK

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide on our platform or one of our social media accounts, regarding FTX or the Services (collectively, "**Feedback**") that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

### 22. OWNERSHIP OF DIGITAL ASSETS

You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity.

FTX_3AC_000013683
FTX_3AC_000013670

### 23. TAXES

You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments.  It is your responsibility to determine what, if any, taxes apply to your activities on the Exchange, and to collect, report, and remit the correct tax to the appropriate tax authority. FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

### 24. INDEMNIFICATION; RELEASE

You agree to indemnify and hold FTX Trading, its affiliates, and service providers, and each of their officers, directors, agents, joint venturers, employees, and representatives harmless from any claim or demand (including attorneys' fees and any losses, fines, fees, or penalties imposed by any regulatory authority) arising out of your breach of these Terms, or your violation of any law or regulation.

For the purpose of this Section 24, the term "**losses**" means all net costs reasonably incurred by us or the other persons referred to in this Section which are the result of the matters set out in this Section 24 and which may relate to any claims, demands, causes of action, debt, cost, expense or other liability, including reasonable legal fees (without duplication).

If you have a dispute with one or more Users or third parties, you release FTX Trading (and its affiliates and service providers, and each of their officers, directors, agents, joint ventures, employees, and representatives) from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes.  If you have a dispute with anyone other than FTX Trading, you release us from liability associated with that dispute.

### 25. LIMITATION OF LIABILITY; NO WARRANTY

YOU EXPRESSLY UNDERSTAND AND AGREE THAT FTX TRADING AND OUR AFFILIATES AND SERVICE PROVIDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND REPRESENTATIVES WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, OR DAMAGES FOR LOSS OF PROFITS INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES (EVEN IF FTX TRADING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, RESULTING FROM: (I) THE USE OR THE INABILITY TO USE THE SERVICES; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES.

FTX_3AC_000013684
FTX_3AC_000013670

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, SOME OF THE LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU. IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR WITH THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES AND CLOSE YOUR ACCOUNT. THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED. FTX TRADING, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. FTX TRADING MAKES NO WARRANTY THAT (I) THE SERVICES WILL MEET YOUR REQUIREMENTS, (II) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, OR (III) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

### 26. FORCE MAJEURE

FTX Trading shall have no liability for any failure or delay resulting from any abnormal or unforeseeable circumstances outside our reasonable control, the consequences of which would have been unavoidable despite all efforts to the contrary, including without limitation governmental action or acts of terrorism, earthquake, fire, flood, or other acts of God, labor conditions, delays or failures caused by problems with another system or network, mechanical breakdown or data-processing failures or where we are bound by other legal obligations.

### 27. GOVERNING LAW; VENUE AND ARBITRATION

The laws of Antigua and Barbuda shall govern these Terms. Except as otherwise required by local law, any dispute between you and FTX Trading related in any way to, or arising in any way from, our Services or these Terms ("**Dispute**") shall be finally settled on an individual, non-representative basis in binding arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33), as modified by these Terms or in accordance with rules on which we may mutually agree. Any arbitration shall take place in Antigua and Barbuda. The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law.

### 28. AMENDMENTS

We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date. In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms.

FTX_3AC_000013685
FTX_3AC_000013670

### 29. ASSIGNMENT

You may not transfer or assign these Terms or any rights or obligations you have under these Terms without our prior written consent or otherwise and any such attempted assignment shall be void.  We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent.  If you object to such transfer or assignment, you may stop using our Services and terminate this agreement by contacting us and requesting to close your account.

### 30. SURVIVAL

Upon termination of your Account or this agreement for any other reason, all rights and obligations of the parties that by their nature are continuing will survive such termination.

### 31. THIRD PARTY APPLICATIONS

If you grant express permission to a third party to connect to your Account, either through the third party's product or through FTX, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under this agreement.  Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

### 32. SITE; THIRD PARTY CONTENT

FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date.  FTX Trading will update the information on the Site as necessary to provide you with the most up to date information, but you should always independently verify such information.  The Site may also contain links to third party websites, applications, events or other materials ("**Third Party Content**").  Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services.  FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

### 33. LIMITED LICENSE; IP RIGHTS

FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to these Terms, to access and use the Services solely for approved purposes as determined by FTX Trading.  Any other use of the Services is expressly prohibited.  FTX Trading and its licensors reserve all rights in the Services and you agree that these Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part.  If you violate any portion of these Terms, your permission to access and use the Services may be terminated pursuant to these Terms.  "FTX.com," "FTX"

FTX_3AC_000013686
FTX_3AC_000013670

and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors.  You may not copy, imitate, or use them without FTX Trading's prior written consent.  All right, title, and interest in and to the Site, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

## 34. UNCLAIMED OR ABANDONED PROPERTY

If FTX Trading is holding funds in your Account, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time, applicable law may require us to report these funds as unclaimed property to the applicable jurisdiction.  If this occurs, FTX Trading will try to locate you at the address shown in our records, but if FTX Trading is unable to locate you, we may be required to deliver any such funds to the applicable jurisdiction as unclaimed property.  FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by applicable law.

## 35. LEGAL COMPLIANCE

The Services are subject to all applicable export control restrictions, and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if (i) you are in a prohibited jurisdiction as set forth at Location Restrictions ("**Restricted Territories"**); (ii) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government or by the European Union ("**Restricted Persons**"); (iii) you intend to transact with any Restricted Territories or Restricted Persons; (iv) you you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or (v) the publication or availability of the Services is prohibited or contrary to local law or regulation, or could subject FTX to any local registration or licensing requirements.

## 36. ENTIRE AGREEMENT; THIRD PARTY RIGHTS

The failure of FTX Trading to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision.  If any provision of these Terms shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and remain enforceable between the parties.

The headings and any explanatory text are for reference purposes only and in no way define, limit, construe, or describe the scope or extent of such section.  These Terms, including FTX's policies governing the Services referenced herein, the Privacy Policy, and the Security Policy, constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

These Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and other affiliates of FTX Trading, which each shall

FTX_3AC_000013687
FTX_3AC_000013670

be a third party beneficiary of these Terms, and no other person shall assert any rights as a third party beneficiary hereunder.  If some future court judgment deems any particular provision of these Terms unenforceable, the rest of the Agreement is still valid.

### 37. QUESTIONS AND CONTACT INFORMATION

We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise Users to check those channels before contacting support.

Telegram: https://t.me/FTX_Official
Twitter: https://twitter.com/FTX_Official
WeChat: ftexchange
Blog: https://blog.ftx.com/
Email: support@ftx.com

To contact us, please visit one of the links or channels above.  For support with your Account, you may email us at support@ftx.com.  Please provide all relevant information, including your FTX username and transaction IDs of any related deposits.  Although we make no representations or provide no warranties as to the speed of response, we will get back to you as soon as possible.

CONFIDENTIAL

**EXHIBIT C**

October 2021 LSA

US-DOCS\154233869.7

LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made and dated as of 22 October, 2021 and is entered into by and between Three Arrows Capital Ltd a limited company registered in BVI having its registered address at ABM Chambers 2283, Road Town, Tortola, BVI VG1110 ("**Borrower**"), and FTX Trading Limited ("**Lender**").

## RECITALS

WHEREAS, Borrower has requested that Lender make available to Borrower a line of credit (the "**Line of Credit**") pursuant to which Lender may make Advances denominated in USD, USDT, USDC, BTC or ETH to Borrower;

WHEREAS, Lender is willing to make the Advances on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained in this Agreement, Borrower and Lender agree as follows:

### SECTION 1.    DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Unless otherwise defined herein, the following capitalized terms have the following meanings:

"**Advance(s)**" means any loan advanced by Lender to Borrower pursuant to the Line of Credit under this Agreement.

"**Advance Date**" means the date on which an Advance is funded to Borrower hereunder.

"**Advance Request**" means a written request for an Advance submitted by Borrower to Lender as provided for in Section 2.1(b), using the form attached as Exhibit A, together with any additional documents or information requested by Lender.

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Bankruptcy Laws**" means, collectively, all liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor-relief laws of applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

"**BTC**" means the cryptocurrency Bitcoin.

"**Business Day**" means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in Hong Kong.

"**Change in Control**" means (a) at any time, any "person" or "group", shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner", directly or indirectly, of forty-nine percent (49.0%) or more of the ordinary voting power for the election of directors of Borrower (determined on a fully diluted basis).

"**Closing Date**" means the date of this Agreement.

"**Collateral**" means the property described in Section 4.

"**Copyrights**" means all copyrights, whether registered or unregistered and published or unpublished, including copyrights in software, internet web sites, databases and the content thereof, held pursuant to the laws of any country.

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived hereunder, become an Event of Default.

"**Depository**" means the Exchange and any other exchange or otc desks used by the Borrower.

"**End Date**" means the earlier to occur of: (i) the Maturity Date; or (ii) any other date on which the Outstanding Balance becomes due and payable in full under the terms of this Agreement.

"**ETH**" means the cryptocurrency Ether.

"**Event of Default**" has the meaning set forth in Section 9.

"**Exchange**" means the FTX digital asset trading platform.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Insolvency Proceeding**" is any case by or against any Person under any proceeding under bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Indemnified Person**" means has the meaning set forth in Section 7.1.

"**Intellectual Property**" means all of Borrower's (i) rights anywhere in the world in and to Copyrights; Trademarks; Patents; trade secrets, confidential and proprietary information, including know-how, manufacturing and production processes and techniques, research and

2

development information, databases and data, customer and supplier lists and information; inventions; mask works; domain names; all other intellectual and industrial property rights of any type; and the rights to sue for past, present and future infringement, misappropriation or other violation of any of the foregoing and any harm to the goodwill associated therewith, and (ii) all tangible embodiments of the foregoing.

"**Laws**" means any federal, state, local and foreign statute, law, treaty, judicial decision, regulation, guidance, guideline, ordinance, rule, judgment, order, decree, code, injunction, permit, concession, grant, franchise, governmental (or quasi-governmental) agreement, governmental (or quasi-governmental) restriction or determination of an arbitrator, court or other Governmental Authority (whether or not having the force of law), whether now or hereafter in effect.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Loan Documents**" means this Agreement, the Security Documents, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"**Material Adverse Effect**" means a material adverse effect upon: (i) the business, operations, properties, assets, prospects or condition (financial or otherwise) of Borrower; or (ii) the ability of Borrower to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Lender's Liens on the Collateral or the priority of such Liens.

"**Maturity Date**" means two years from the date of this Agreement; provided however, that the Maturity Date shall automatically be extended for additional consecutive one-year periods thereafter unless Lender provides notice of termination at least sixty (60) days prior to the applicable Maturity Date.

"**Outstanding Balance**" means, at the applicable time, the sum of (i) the then unpaid principal amount of all Advances, plus (ii) all then accrued but unpaid interest on all Advances, plus (iii) all other amounts then payable under this Agreement.

"**Patents**" means all letters patent of, or rights corresponding thereto, in any country, all applications (including provisional, continuation (in-whole or in-part), and divisional applications) of the foregoing and any other pre-grant variations thereof, and all reissues, reexaminations, renewals, extensions and other post-grant variations thereof in any country.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"**Secured Obligations**" means all of Borrower's obligations and liabilities under each Loan Document, including any obligation to pay any amount whether arising by reason of an

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_3AC_000000077
FTX_3AC_000000075

extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Security Documents**" means each of this Agreement, all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, control agreements, financing statements and other documents as shall from time to time secure or relate to the Secured Obligations or any other obligation arising under any Loan Document or any part thereof, in each case, authenticated, or executed by Borrower.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Total Line of Credit Commitment**" means the obligation of Lender to make Advances to Borrower on or after the Closing Date in an aggregate principal amount not to exceed USD 100M USD.

"**Trademarks**" means all trademarks, service marks, domain names, trade names, business names, corporate names, trade dress, logos, designs, slogans, or other indicia of source or origin, whether registered, common law or otherwise, and any applications, recordings, renewals and other post-grant variations of any of the foregoing in any country or any political subdivision thereof, together, in each case, with the goodwill associated therewith or symbolized thereby.

"**USD**" means U.S. dollars.

"**USDC**" means the cryptocurrency USD Coin.

"**USDT**" means the cryptocurrency Tether.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC.

## SECTION 2.   THE LOANS

### 2.1   Advances, Interest and Payment.

(a)   Advances. Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth herein, Lender agrees to make Advances denominated in USD, USDC, USDT, BTC or ETH from time to time before the End Date in an aggregate principal amount not to exceed the Total Line of Credit Commitment.   Amounts borrowed under this Section 2.1(a) and repaid or prepaid as permitted hereunder may, subject to the terms and conditions of this Agreement, be reborrowed until but not after the End Date. c

4

FTX_3AC_000000078
FTX_3AC_000000075

(b)     Advance Request.  To obtain an Advance, Borrower shall send by email or text an Advance Request specifying: (i) the amount of collateral to be deposited and maintained in Borrower's Exchange account held under the email address operations@threearrowscap.com (the "**Account Assets**"), provided that the value of such specified Account Assets may never be less than 150% of the value of the related Advance requested; (ii) the amount of the Advance requested; (iii) whether such Advance will be denominated in USD, USDC, USDT, BTC or ETH; and (iv) the proposed Advance Date. In the event that the Lender accepts such Advance Request, Borrower shall deposit the requisite Account Assets into the Borrower's Exchange account (the "**Borrower Account**"). Upon receipt of the requisite Account Assets by Lender during regular business hours on any Business Day, Lender shall use commercially reasonable efforts to deposit the Advance set out in the Advance Request to the Borrower Account within two hours.

(c)     Hard Margin Call. Should the value of the Account Assets fall below the Hard Margin Call (as set forth in the applicable Advance Request, such Hard Margin Call to be, in any event no less than 125% of the value of digital assets loaned to the Borrower (as applicable, the "**Hard Call Requirement**") at any time, the Lender shall provide written notice to the Borrower of such Hard Margin Call and Borrower shall have two hours from the time of receipt of such notice to either (a) deposit additional collateral to the Borrower Account, or (b) close certain trading positions in the Borrower Account, in each case to restore the value of the Account Assets to greater than the Hard Call Requirement. If the value of the Account Assets is not restored to greater than the Hard Call Requirement within such two-hour period, or if the Lender determines that it would be detrimental for Lender to wait for such two-hour period to conclude (as determined in its sole and absolute discretion), Lender shall have the right to liquidate the Account Assets and all other assets held by the Borrower on the Exchange, including within the Borrower Account, and shall be fully entitled to all proceeds, property, or amounts received on such liquidation. In addition, the Lender may terminate this Agreement immediately without prior notice and close all accounts held by the Borrower on the Exchange.

(d)     Determining Value: The value of the Account Assets and the Hard Margin Call shall be determined by the Lender in its sole and absolute discretion.

(e)     Interest.  The principal balance of each Advance shall bear interest thereon at a rate equal to three percent 8%  per annum from and including the Advance Date through and including the date the Outstanding Balance is paid in full, and shall be calculated on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days each and the actual number of days elapsed.  If at any time and for any reason whatsoever, the interest rate payable on any Advance shall exceed the maximum rate of interest permitted to be charged by Lender to Borrower under applicable law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable law.  Any amount added to principal pursuant to this Agreement or any Loan Document shall bear interest at the rate specified herein and shall be payable with such interest upon demand by Lender and absent such demand, as otherwise provided herein

CONFIDENTIAL TREATMENT REQUESTED BY FTX

(f)    Payment. Accrued interest on each Advance shall be due and payable in full in arrears monthly on the last day of each month. The entire Outstanding Balance of all Advances shall be due and payable on the End Date. Borrower shall make all payments under this Agreement with respect to each Advance in the denomination of such Advance without setoff, recoupment or deduction and regardless of any counterclaim or defense.

2.2    Voluntary Prepayment; Mandatory Prepayments. The Outstanding Balance may be prepaid in whole or in part without penalty or premium at any time before the Maturity Date. Prepayments shall be applied first to outstanding fees and expenses (if any), second to accrued and unpaid interest, and then third to the outstanding principal of all Advances. Borrower shall prepay in full the Outstanding Balance prior to or concurrently with (i) the occurrence of a Change in Control or (ii) termination of this Agreement.

2.3    Late Payments. To the extent permitted under applicable law, Borrower agrees that if any payment pursuant to Section 2 is not made within three days of the due date, (a) Borrower will be charged a late charge of ten percent per annum of the amount of the past due payment, calculated from and including the date such payment was due through and including the date such payment is made and (b) Lender may liquidate a portion of the Collateral in an amount equal to any late payment and corresponding late charge.

2.4    Right to Terminate. Borrower may terminate this Agreement at any time upon five (5) Business Days advance notice to Lender and repayment in full of the Outstanding Balance. Except as provided in Section 2.1(c), Lender may terminate this Agreement at any time after the Maturity Date, upon six (6) months advance notice to Borrower.

## SECTION 3.  SUBORDINATION

3.1    Any indebtedness incurred by Borrower following the date of this Agreement shall be subordinated to the Secured Obligations, unless otherwise consented to by Lender in writing, such consent to not be unreasonably withheld. In the event that Lender consents to subordinate the Secured Obligations to future indebtedness, Lender agrees to execute a form of subordination agreement, as may be requested by any future lender to the Borrower from time time, to effect the foregoing subordination.

## SECTION 4.  SECURITY INTEREST

4.1    Grant. As security for the prompt and complete payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, Borrower hereby pledges, assigns, transfers and delivers to Lender, and grants to Lender a continuing and unconditional first priority security interest in all of Borrower's present and future rights, title and interest in the following (collectively referred to as the "**Collateral**"):

6

(a) all of Borrower's digital asset depository and exchange accounts at each Depository, including, without limitation, the Exchange and each other cryptocurrency exchange used by Borrower (such accounts and any other accounts to which Lender may transfer the Collateral, collectively, the "**Depository Accounts**");

(b) all cryptocurrency now or in the future held in, on deposit in or otherwise allocated to any of Borrower's digital asset depository accounts at any Depository, including, without limitation, the Depository Accounts (including, without limitation, any cryptocurrency transferred to any such digital asset depository account after the date hereof);

(c) any other cryptocurrency now or in the future issued with respect to any of the foregoing cryptocurrency as a result of a fork or other event that results in the holders of cryptocurrency receiving additional or replacement cryptocurrency (whether or not such other cryptocurrency is held in, on deposit in or otherwise allocated to the Depository Accounts or any other digital asset depository accounts at any Depository);

(d) all rights to receive delivery of or withdraw any of the foregoing cryptocurrency from each Depository and all rights against each Depository with respect to any digital asset depository accounts at such Depository, including, without limitation, the Depository Accounts, any of the foregoing cryptocurrency, and the proceeds thereof;

(e) all Receivables, Equipment, Fixtures, General Intangibles (including without limitation all Intellectual Property), Inventory, Investment Property, Deposit Accounts, Security Accounts, Cash, Cash Equivalents, Goods, and all other tangible and intangible personal property of Borrower whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located, and any of Borrower's property in the possession or under the control of Lender; and

(f) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

4.2 Borrower hereby:

(a) agrees that such security interest granted by Borrower to Lender constitutes a valid, first priority security interest in the Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any termination of this Agreement, Lender's security interest in the Collateral shall remain in effect for so long as any Secured Obligations (other than inchoate indemnity obligations) remains outstanding under this Agreement or any of the Loan Documents.

(b) agrees that Lender has the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

(c) authorizes Lender at any time and from time to time, at Borrower's expense, to file in any jurisdiction any financing statements and amendments that: (i) name the Collateral as collateral thereunder, regardless of whether any particular Collateral falls

7

within the scope of the UCC; (ii) contain any other information required by the UCC for sufficiency or filing office acceptance, including organization identification numbers; and (iii) contain such language as Lender determines helpful in protecting or preserving rights against third parties. Borrower ratifies any such filings made prior to the date hereof.

(d)    acknowledges and agrees that the obligations of Borrower under this Agreement shall be full recourse obligations of Borrower and that Borrower is and shall remain liable to Lender for the payment in full of all Secured Obligations (other than inchoate indemnity obligations) and performance of all obligations hereunder.

## SECTION 5.    CONDITIONS PRECEDENT TO LOAN

Lender's obligation to make Advances under this Agreement shall be subject to the satisfaction of all of the conditions set forth in this Agreement and the Loan Documents, including, without limitation, the following specific conditions precedent:

5.1    Conditions to the Initial Advance.  It shall be a condition to Lender's obligation to fund an initial Advance, that on or prior to the Closing Date:

(a)    Borrower shall have delivered to Lender the following, each in form and substance acceptable to Lender:

(i)    copies of the Loan Documents, executed by Borrower;

(ii)    certified copy of resolutions of Borrower's Board of Directors, Managers or other similar body, and if required, Borrower's shareholders or members evidencing approval of the transactions evidenced by the Loan Documents;

(iii)    certified copies of Borrower's organizational documents, as amended through the Closing Date;

(iv)    a certificate of good standing for Borrower from its jurisdiction of formation; and

(b)    upon the filing of security documents, including a UCC-1 financing statement and the obtaining of control agreements from the Exchange, the Security Documents will create upon the Closing a first priority security interest in all of the Collateral;

5.2    Conditions to All Advances.  It shall be a condition to Lender's obligation to fund each Advance that:

(a)    Lender shall have received an Advance Request executed by an officer of Borrower requesting an Advance prior to the End Date pursuant to Section 2.1(b).

(b)    (i) no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default and (ii) no event that has had

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_3AC_000000082
FTX_3AC_000000075

or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing;

(c)     As of each Advance Date, the representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or, if already qualified by "materiality," "Material Adverse Effect" or similar phrases, in all respects (after giving effect to such qualification)); provided, that in the case of any representation or warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be;

(d)     Lender shall have received such other documents as Lender may reasonably request, including a certificate executed by a duly authorized officer of Borrower certifying compliance with the provisions of Sections 5.2(b) through (c) as of such Advance Date.

## SECTION 6.   REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to enter into this Agreement and to make the Advances, Borrower represents and warrants to Lender that, as of the date hereof and as of each Advance Date:

6.1     <u>Corporate Status; Compliance with Law</u>.   Borrower: (a) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation; (b) is duly qualified to conduct business and is in good standing in all jurisdictions in which the nature of its business or its ownership or lease of properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect; and (c) has the requisite power and authority to conduct its business as now and proposed to be conducted and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties.

6.2     <u>Collateral</u>.   Except for the security interest in the Collateral granted by Borrower to Lender under this Agreement, Borrower is the sole, legal and equitable owner of the Collateral and no other security agreement, financing statement, or other security instrument covering the Collateral exists.   Borrower has rights in or the power to transfer the Collateral, and its title to the Collateral is free and clear of Liens, adverse claims, and restrictions on transfer or pledge, other than those created by this Agreement or the Loan Documents.

6.3     <u>Organizational Power, Authorization, Enforceable Obligations, Consents</u>.   The execution, delivery and performance of this Agreement and all other Loan Documents by Borrower: (a) are Borrower's legal power and do not contravene any provision of Borrower's organizational documents; (b) have been duly authorized by all necessary or proper action of Borrower; and (c) will not result in the creation or imposition of any Lien upon the Collateral, other than the Liens created by the Loan Documents.   The Loan Documents, when executed and delivered by Borrower, shall constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with their terms except as

9

FTX_3AC_000000083
FTX_3AC_000000075

limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

6.4     Actions Before Governmental Authorities.  There are no actions, investigations, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Borrower, threatened against or affecting Borrower or its property, before any Governmental Authority or before any arbitrator or panel of arbitrators.

6.5     Laws.  Borrower is not in violation of any Law, or in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority.  Borrower has conducted its business in compliance with applicable anti-corruption, anti-bribery, anti-money laundering, sanctions and/or anti-terrorism Laws.

6.6     Tax Matters.  Borrower has (a) filed all federal, state and material local Tax returns that are required to be filed, and (b) duly paid or fully reserved for all Taxes or installments thereof as and when due, which have or may become due pursuant to such returns other than those being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

6.7     Margin Stock; Use of Proceeds.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Advances will be used to extend credit to others for the purpose of purchasing or carrying any margin stock.  Borrower will use the proceeds of the Advances solely for lawful purposes.

**SECTION 7.  INDEMNITY**

7.1     Indemnity.  Borrower agrees to indemnify and hold Lender and its officers, directors, employees, agents, in-house attorneys, representatives and shareholders (each, an "**Indemnified Person**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal) (collectively, "**Liabilities**"), that may be instituted or asserted against or incurred by such Indemnified Person arising out of, in connection with, or as a result of (a) the execution and delivery of this Agreement and the Loan Documents, (b) credit having been extended, suspended or terminated under this Agreement and the other Loan Documents, (c) the administration of such credit, (d) the use of proceeds of the Advances, (e) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by Borrower or any of their

10

CONFIDENTIAL TREATMENT REQUESTED BY FTX

respective Affiliates), (f) the occurrence of any Event of Default and the disposition or utilization of the Collateral, (g) any factual information produced by Borrower and provided to Lender in connection with the transactions contemplated or financed under any Loan Document being or being alleged to be misleading and/or deceptive in any respect, (h) any inquiry, investigation, subpoena (or similar order) or litigation with respect to the transactions contemplated or financed under this Agreement; and (i) a failure by borrower to pay any amount due under a Loan Document on its due date, excluding, in the case of the foregoing clauses (a) through (e), Liabilities to the extent resulting solely from any Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment.  Borrower agree to pay, and to save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes (excluding taxes imposed on or measured by the net income of Lender) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.  In no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).

## SECTION 8.   COVENANTS OF BORROWER

As long as any Secured Obligations (other than inchoate indemnity obligations) are outstanding or Lender has any obligation to make Advances, Borrower agrees as follows:

8.1     Collateral; Liens Generally.  Borrower shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever, and shall give Lender prompt written notice of any legal process affecting the Collateral or any Liens.  Borrower will not sell, dispose or otherwise transfer the Collateral or any interest in the Collateral without the prior written consent from Lender.

8.2     Mergers or Acquisitions.  Borrower shall not merge or consolidate with or into any other business organization without the prior written consent of Lender.

8.3     Taxes.  Borrower shall pay when due all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against (a) Lender and related to, or in connection with, any of the transactions contemplated hereby or by other Loan Documents (other than taxes imposed on or measured by the net income of Lender), subject to reasonable notification thereof by Lender, and (b) Borrower or the Collateral or upon Borrower's ownership, possession, use, operation or disposition thereof or upon Borrower's rents, receipts or earnings arising therefrom.

8.4     Corporate Changes; Maintenance and Conduct of Business; Capital Structure.  Borrower shall not change its corporate name, legal form or jurisdiction of formation or principal place of business without at least 30 days' prior written notice to Lender.

11

CONFIDENTIAL TREATMENT REQUESTED BY FTX

8.5    Notification of Default or Event of Default.  Borrower shall notify Lender immediately in writing via email and by telephone pursuant to Section 11.3 after Borrower acquires knowledge of any breach or Default in the performance of any covenant or Secured Obligation under this Agreement, any Loan Document or any other agreement between Borrower and Lender, or the occurrence of any Event of Default.

8.6    Books and Records.  Borrower shall keep adequate books and records with respect to its material business activities.

8.7    Compliance with Laws and Organizational Documents; Maintenance of Licenses.  Without limiting any other provision of this Agreement, Borrower shall comply in all material respects with all Laws applicable to it and the terms of all organizational documents applicable to it.  Borrower shall obtain and maintain all material licenses, permits, certifications, consents and governmental authorizations and approvals necessary to own its property and to conduct its business as conducted on the Closing Date.

8.8    Financing Statements.  Upon Lender's request, Borrower will execute any financing statement or other document necessary to perfect or otherwise record Lender's security interest in the Collateral.

## SECTION 9.   EVENTS OF DEFAULT

Any one or more of the following events shall be an "**Event of Default**":

9.1    Payments.  Borrower fails to pay any amount due under this Agreement or any of the other Loan Documents when whether scheduled, upon acceleration or otherwise; or

9.2    Hard Margin Call. The amount held in the Borrower Account falls to below the Hard Margin Call Requirement; or

9.3    Covenants.  Borrower breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement, or any of the other Loan Documents or any other agreement between Borrower and Lender, and such default continues for more than three Business Days; or

9.4    Representations.  Any representation or warranty made by Borrower in any Loan Document or other statement (financial or otherwise) furnished by or on behalf of Borrower to Lender shall have been false, incorrect, incomplete or misleading in any material respect when made or furnished; or

9.5    Voluntary Bankruptcy or Insolvency Proceedings.  Borrower shall (a) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) admit in writing its inability to pay its debts generally as they mature, (c) make a general assignment for the benefit of its creditors, (d) be dissolved or liquidated, (e) commence a

12

CONFIDENTIAL TREATMENT REQUESTED BY FTX

voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any Bankruptcy Law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (f) take any action for the purpose of effecting any of the foregoing; or

9.6     Involuntary Bankruptcy or Insolvency Proceedings.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or the debts thereof under any Bankruptcy Law now or hereafter in effect shall be commenced; or

9.7     Attachments; Judgments.  Any portion of Borrower's assets are attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money against Borrower, or Borrower is enjoined or in any way prevented by court order from conducting any part of its business; or

9.8     Other Obligations.  The occurrence of any default or breach under any agreement or obligation of Borrower (a) involving any indebtedness in excess of $100,00, or (b) receipt of written notice of the occurrence of any default or breach under any other agreement or obligation of Borrower with annual payments or receipts in excess of $100,000 which, in the case of such default or breach, is not cured within any applicable grace or cure period; or

9.9     Foreclosure Proceedings.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Advances.

9.10     Change in Control.  The occurrence of any Change in Control without the prior written approval of Lender; or

9.11     Material Adverse Effect.  Any event occurs that has had or could reasonably be expected to have a Material Adverse Effect; or

9.12     Cessation of Business.  Borrower ceases to operate its business as a going concern or Borrower's board of directors, managers, stockholders or members elect to dissolve and wind up Borrower's affairs; or

9.13     Change in Law.  A change or material development in applicable law (including case law) or regulation makes the Advances unlawful, unless grandfathered.

13

CONFIDENTIAL TREATMENT REQUESTED BY FTX

## SECTION 10.          REMEDIES

10.1     <u>General</u>.  Upon and during the continuance of any one or more Events of Default, (a) Lender may, at its option, accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in <u>Section 9.4</u> or <u>Section 9.5</u>, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act), (b) Lender may, at its option, sign and file in Borrower's name any and all collateral assignments, notices, control agreements, security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and (c) each Depository is hereby authorized by Borrower to pay, and Borrower directs such Depository to pay, any amounts owed under this Agreement directly to Lender; and in furtherance thereof, Borrower hereby grants Lender an irrevocable power of attorney coupled with an interest. Lender may exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under applicable Law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral.  Without limiting the generality of the foregoing, Borrower expressly agrees that in any such default Lender may take immediate and exclusive possession of the Collateral and that Lender may liquidate the Collateral in whole or in part, at its sole discretion.  All of Lender's rights and remedies shall be cumulative and not exclusive. Borrower waives presentment, demand, protest or other notice of any kind.

10.2     <u>Collection; Foreclosure</u>.  Subject to the limitations set forth in <u>Section 3</u> (if any), upon the occurrence and during the continuance of any Event of Default, Lender may apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Lender may elect.  Any such sale may be made either at public or private sale at its place of business or elsewhere.  Borrower agree that any such public or private sale may occur upon ten calendar days' prior written notice to Borrower.  Lender may require Borrower to assemble the Collateral and make it available to Lender at a place designated by Lender that is reasonably convenient to Lender and Borrower.  The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by Lender in the following order of priorities:

(a)     First, to Lender for any reasonable costs, fees, or expenses incurred in connection with the sale or disposition of the Collateral, including any legal, accounting or other fees incurred;

(b)     Second, to Lender in an amount equal to the then unpaid amount of the Secured Obligations, in such order and priority as Lender may choose in its sole discretion; and

14

CONFIDENTIAL TREATMENT REQUESTED BY FTX

(c)     Finally, after the full, and final payment of all of the Secured Obligations, to any creditor holding a junior Lien on the Collateral, or to Borrower or its representatives or as a court of competent jurisdiction may direct.

Lender shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

10.3     Waiver.  Lender shall be under no obligation to marshal any of the Collateral for the benefit of Borrower or any other Person, and Borrower expressly waives all rights, if any, to Lender to marshal any Collateral.

10.4     Cumulative Remedies.  The rights, powers and remedies of Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of Lender.

## SECTION 11.        MISCELLANEOUS

11.1     Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.2     Usury Savings Clause. Lender and Borrower intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money or interest in excess of the maximum amount of interest (including all charges and fees) permitted to be charged by applicable law, from time to time.

11.3     Notice.     Any notice, demand, request, consent, approval, declaration, service of process or other communication that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received when sent to the email address set forth below such party's name on the execution page of this Agreement or to such other email address as each party may designate for itself by like notice.

11.4     Lender Appointed Attorney-In-Fact.  Borrower hereby appoints Lender Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time during the continuance of an Event of Default to take any action and to execute any instrument that Lender may deem necessary or advisable to accomplish the purposes of this Agreement (but Lender shall not be obligated to and shall have no liability to

15

Borrower or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. Borrower hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

11.5    Security Interest Absolute. To the extent permitted by law, Borrower hereby waives demand, notice, protest, notice of acceptance of this Agreement, Collateral received or delivered and all other demands and notices of any description. To the extent permitted by law, all rights of Lender and liens and security interests hereunder, and all Secured Obligations of Borrower hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligations or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any amendment or other modification of this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, willful or otherwise, in the payment of the Secured Obligations;

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Advances or any existence of or reliance on any representation by Lender that might vary the risk of Borrower or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any guarantor or surety.

11.6    Survival of Representations and Warranties. Borrower understands and agrees that in making the Advances, Lender is relying on all representations, warranties and covenants made by Borrower in this Agreement, the Loan Documents and in any certificate or other instrument delivered by Borrower to Lender under this Agreement. Such Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the execution of this Agreement and the funding of the advance, shall be continuing in nature, and shall remain in full force and effect until such time as all of Borrower's obligations under this Agreement shall be fully satisfied, or until

16

FTX_3AC_000000090
FTX_3AC_000000075

this Agreement shall be terminated in the manner provided herein, whichever is the last to occur.

11.7    Termination. This Agreement shall terminate upon the payment in full of all Secured Obligations and performance of all obligations hereunder. At such time, Lender's sole obligations shall be, (a) to the extent Lender has taken control of any Collateral, to direct each Depository to transfer such Collateral in the Depository Accounts to Borrower, at a wallet address provided by Borrower to Lender, and (b) to authorize Borrower to terminate any UCC financing statements filed by Lender against Borrower with respect to the Collateral.

11.8    Entire Agreement; Amendments.

(a)    This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

(b)    No amendment or waiver of, or supplement or other modification to, any Loan Document or any provision thereof, shall be effective unless the same shall be in writing and signed by Borrower and Lender, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

11.9    No Waiver. The powers conferred upon Lender by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers. No omission or delay by Lender at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by Borrower at any time designated, shall be a waiver of any such right or remedy to which Lender is entitled, nor shall it in any way affect the right of Lender to enforce such provisions thereafter.

11.10    Survival. All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of Lender and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

11.11    Successors and Assigns. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on Borrower and their permitted assigns (if any). Borrower shall not assign any obligations under this Agreement or any of the other Loan Documents without Lender's express prior written consent, and any such attempted assignment shall be void and of no effect. Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents without prior notice to or the consent of the Borrower, and all of such rights shall inure to the benefit of Lender's successors and permitted assigns.

17

11.12 <u>Governing Law</u>. This Agreement and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of Hong Kong, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

11.13 <u>Dispute Resolution</u>. Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

11.14 <u>JURY TRIAL WAIVER</u>. THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.15 <u>Professional Fees</u>. To the extent permitted by applicable law, Borrower promise to pay any and all reasonable attorneys' and other professionals' fees and expenses incurred by Lender after the Closing Date in connection with: (a) enforcement, collection or protection of Lender's rights in connection with this Agreement and the Loan Documents, including the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (b) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to Borrower or the Collateral, and any appeal or review thereof; or (c) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to Borrower, the Collateral, the Loan Documents, including representing Lender in any adversary proceeding or contested matter commenced or continued by or on behalf of Borrower's estate, and any appeal or review thereof.

11.16 <u>Assignment of Rights</u>. Borrower acknowledges and understands that Lender may sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "**Assignee**"). After such a permitted assignment, the term "Lender" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, Lender shall retain all rights, powers and remedies hereby given. No such assignment by Lender shall relieve Borrower of any of its obligations hereunder.

11.17 <u>Revival of Secured Obligations</u>. This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any

18

FTX_3AC_000000092
FTX_3AC_000000075

petition is filed by or against Borrower for liquidation or reorganization, if Borrower becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of Borrower's assets, or if any payment or transfer of Collateral is recovered from Lender. The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to Lender, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, Lender or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to Lender in cash.

11.18    Counting of Days. Except where otherwise specifically provided, any reference in this Agreement to a period of "days" means calendar days and not business days.

11.19    Caption Headings. Caption headings in this Agreement and the Loan Documents are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement or the Loan Documents.

11.20    Counterparts.   This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

11.21    No Third-Party Beneficiaries.    No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than Lender and Borrower unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between Lender and Borrower.

(SIGNATURES TO FOLLOW)

19

CONFIDENTIAL TREATMENT REQUESTED BY FTX

IN WITNESS WHEREOF, Borrower and Lender have duly executed and delivered this Loan and Security Agreement as of the day and year first above written.

**BORROWER**:

**Three Arrows Capital Ltd**

By: _____

Name: Kyle Davies
Title: Director

**LENDER:**

**FTX TRADING LIMITED**

By: _____

Name: Sam Bankman-Fried
Title: Director

Email Address for Notice
Attn: Kyle Davies
Email: operations@threearrowscap.com

with a copy (which shall not constitute notice) to:

Attn: NA
Phone:
Email:

Email Address for Notice
Attn: Sam Bankman-Fried
Email: legal@ftx.com / sam@ftx.com

with a copy (which shall not constitute notice) to:

Fenwick & West LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Attn: Andrew T. Albertson
Phone: 206-389-4552
Email: aalbertson@fenwick.com

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT]

**EXHIBIT A**
**Advance Request**

This Advance Request form incorporates all of the terms of the Loan and Security Agreement between FTX Trading Limited and **Three Arrows Capital Ltd** dated and effective as of 22/10/2021, and the following specific terms.

Amount of Advance:

Borrower Account email address:

| Collateral Type | | USD |
|---|---|---|
| Collateral | | |
| Hard Margin Call | | 125% |

**FTX Trading Limited**                    **Three Arrows Capital Ltd**

Per
:
*Sam Bankman-Fried*
DocuSigned by:
F0D59F19C7D34BA...

Per
:

Name:  Sam Bankman-Fried
Title:  CEO

Name:  Kyle Davies
Title:  Director

**EXHIBIT D**

LOC & Margin Document

US-DOCS\154233869.7

<u>**CONFIDENTIAL**</u>



# FTX Line of Credit

This Line of Credit Agreement is made as of this 30th day of March 2022 (the "**Line of Credit Agreement**"), by and among Three Arrows Capital Ltd of ABM Chambers 2283, Road Town, Tortola, BVI VG1110 ("**Borrower**") and FTX Trading Limited ("**Lender**"). A line of credit is hereby established in the amount of USD 120,000,000 for the benefit of the Borrower ("**Line of Credit**"), provided, however, that the Lender unilaterally may terminate the Borrower's privilege to request advances hereunder or lower said amount.

The Line of Credit will be subject to the following terms and conditions:

1. Lender reserves the right to request from Borrower, at any time, any information it deems necessary in order to assess the Borrower's continued eligibility to receive and maintain the Line of Credit, and Borrower agrees to provide such information promptly upon request. Such information may include, but is not limited to, information regarding the assets, liabilities and net worth of the Borrower.

2. At any time the Borrower desires for the Lender to advance sums pursuant to this Line of Credit Agreement, the Borrower may request such advance from the Lender, and the Lender, with or without reason, may deny such request.

3. The Lender reserves the right to remove the Line of Credit at any time and for any reason.

4. Funds advanced through the Line of Credit:

   (a) will bear interest at a rate of 5% per annum, payable daily at approximately 00:30 UTC and calculated in respect only of that portion of the Line of Credit then being utilised;

   (b) may not be withdrawn from the FTX exchange; and

   (c) may not be used for spot trading.

5. Throughout the lifetime of the Line of Credit, at least 200% of the Line of Credit ("**Collateral**") must be maintained in the Borrower's FTX account, as opened with the email address kyle@threearrowscap.com. Should the Collateral fall below 200% of the Line of Credit at any time, it must immediately, and by no later than twenty four hours of such fall, be reinstated to 200% of the Line of Credit. Borrower agrees that following any failure by it to return Collateral to 200% of the Line of Credit within one day of it falling below such amount, Lender may apply special interest in respect of outstanding amounts under the Line of Credit at that time at an indicative rate of 10% per day.

6. The occurrence of one or more of the following (herein a "**Default**" or an "**Event of Default**") shall constitute a default by the Borrower hereunder:

FTX_3AC_000000758
FTX_3AC_000000758

(a) any representation or warranty of the Borrower in connection with the Line of Credit is or becomes false;

(b) the failure by the Borrower to pay, when due, any portion of the Line of Credit;

(c) Borrower's insolvency, appointment of a receiver for all or a part of Borrower's property, the making of any assignment by Borrower for the benefit of creditors or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or upon the issuing of any writ of attachment by trustee process or otherwise or a restraining order or injunction affecting any of the Borrower's property; provide, however, if any such proceeding is commenced against the Borrower, the Borrower shall have thirty (30) days in which to cause such proceeding to be dismissed;

(d) the death, dissolution, termination of existence, declared insolvency or failure in business of the Borrower;

(e) the admission in writing of Borrower's insolvency or inability to pay debts generally as they become due, or upon any material deterioration of the financial condition of the Borrower;

7. If any Event of Default occurs, all obligations outstanding from the Borrower to the Lender shall immediately become due and payable without demand, protest or other notice of any kind, all of which are hereby expressly waived.  In the event of such Event of Default, the Lender may proceed to enforce the payment of all obligations of Borrower to Lender and to exercise any and all of the rights and remedies afforded to Lender by law of under the terms of this Line of Credit Agreement or otherwise.

8. This Line of Credit Agreement and the covenants and agreements herein contained shall continue in full force and effect until all obligations, liabilities and undertakings made hereunder have been paid or otherwise satisfied in full.  No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such rights or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

9. Borrower hereby certifies that any and all necessary resolutions that may be required to effectuate and validate the terms of this Line of Credit Agreement have been duly made and adopted by the Borrower.

10. This Line of Credit Agreement shall be governed by and construed in accordance with the laws of Antigua and Barbuda, shall be binding upon Borrower's successors and assigns and shall insure to the benefit of Lender's successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Line of Credit Agreement by their duly authorised officers or representatives.

**FTX INSTITUTIONAL CUSTOMER
MARGIN AND LINE OF CREDIT AGREEMENT**

This MARGIN AND LINE OF CREDIT AGREEMENT (this "Agreement") is effective as of the date the Customer is provided debt hereunder ("Effective Date") as a deed between the Customer acknowledging acceptance hereto, and FTX Trading Ltd. ("FTX"), a company organized and existing under the laws of Antigua and Barbuda (Customer and FTX are referred to, collectively, as the "Parties" and, individually, as a "Party").

WHEREAS, Customer is a customer of the FTX.com cryptocurrency exchange and FTX desires to afford Customer with access to margin trading and potentially discretionary line of credit facilities (together, the "Indebtedness") as set forth herein;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration,
the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Applicable Customer**. Customer represents, warrants and covenants to FTX that this Agreement is binding on both Customer and all of its Affiliated Companies that also have a

customer account on FTX (the "Affiliates"). For purposes of this Agreement, "Affiliated Companies" shall mean all companies that are controlled by that person. For this purpose, a person is deemed to control a company or entity if it (a) owns, directly or indirectly, at least 50 percent of the capital of the other company, or (b) substantially has the power to direct or cause the direction of the management and set the policies of such company or entity, or (c) has the same majority beneficial shareholder as the other company. Upon an Event of Default (as defined below), FTX may elect to pursue remedies against Customer and/or one or all of its Affiliates, in its discretion, without separate notice to any Affiliates.. Customer and the accounts of its Affiliates shall be aggregated for purposes of all collateral and limitations set forth herein. Customer and its Affiliates are together referred to herein as the "Customer".

2.  **Payment upon Demand**. Customer shall at all times be liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement. At any time, FTX may "call" the Indebtedness upon notice to Customer.

3.  **Lien**. All assets in all of the FTX accounts of the Customer (the "Secured Assets") are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX.

4.  **Maintenance of Collateral**.

    a.  Amount Required. Customer will at all times maintain such cash, cryptocurrency, or other property in the accounts of the Customer for collateral and/or margin purposes as FTX shall require from time to time via a margin call or other request. Collateral requirements may be established and changed by FTX in its sole discretion and judgement without notice to Customer.

    b.  Collateral Calls. In regard to collateral or margin calls, whether for maintenance or otherwise, in lieu of immediate liquidations, FTX, may permit Customer a period of time to satisfy a call. This time period shall not in any way waive or diminish FTX's right in its sole discretion, to shorten the time period in which Customer may satisfy the call, including one already outstanding, or to demand that a call be satisfied immediately. Nor does such practice waive or diminish the right of FTX to sell out positions to satisfy the call, which can be as high as the full indebtedness owed by Customer.

    c.  Liquidation. Customer acknowledges that the Secured Assets may be liquidated without notice to satisfy minimum maintenance, collateral requirements or margin calls. Customer acknowledges that it is not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements or margin calls. To satisfy minimum maintenance, collateral requirements or margin calls, and without further notice, Customer authorizes FTX to sell any assets, top up assets in its discretion, cancel any open order; close any outstanding order; and otherwise take any action deemed necessary to obtain liquidity to comply with collateral requirements with respect to the Indebtedness. Liquidation is conducted in the orderbooks on FTX or using voluntary liquidity providers. FTX does not itself generally take on the user's positions. Customer shall be liable to FTX for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by FTX or by the undersigned; and, the undersigned shall make payments of such obligations and indebtedness upon demand.

5.  **Interest Rate**. Customer shall pay interest on all Indebtedness extended under this Agreement. Interest will be charged on Customer's average daily net settled debit balance and will be calculated and assessed in accordance with the schedule and policies set forth by FTX. The interest rate may change without notice to Customer as changes occur in the general credit markets and industry conditions relating to the extension of margin credit. All payments received in your account, including dividends, interest, premiums and principal

payments may be applied to the balance due in your account. The interest rate will vary from time to time without prior notice from FTX. Upon any adjustment of the interest rate by FTX, Customer may elect to terminate this Agreement. Continuation of the Agreement after an interest rate adjustment constitutes consent by Customer to the changed interest rate.

6. **Margin Transactions**.

   a. Requirements for Participation. Margin requirements may be established and changed by FTX in its sole discretion and judgement without notice to the undersigned. All amounts owed under the margin program constitute Indebtedness under this Agreement. In making this determination, FTX may take into account various factors including but not limited to: (i) issues as to the applicable cryptocurrency such as, among others, the liquidity and volatility of such cryptocurrency, (ii) considerations as to the Customer's status, including but not limited to a decline in creditworthiness, and (iii) the general condition of the market.

   b. Permitted Balance. FTX computes the Customer's net account balances on FTX by adding up the total value of all cryptocurrency and other assets it is long, and subtracting the value of assets that the Customer is short. FTX may use a collateral weight of less than 1 to some assets that are less liquid or more volatile. FTX enforces margin limits and enforces that this ratio never drops below a certain value, generally ranging between 10% and 100% depending on the liquidity of the position.

   c. No Negative Balance. FTX generally enforces that the user's net account balances are never negative. If the user drops below initial margin requirements, they may no longer increase their position size. If the user drops far enough below initial margin, FTX may liquidate that user's positions in accordance with Section 4(c).

7. **Discretionary Line of Credit**. FTX may, at its discretion, issue lines of credit (LoCs). All amounts owed under LoCs constitute Indebtedness under this Agreement. An LoC is Indebtedness in the principal amount that is a USD balance granted to Customer's FTX account subject to the following: (i) LoCs may be used as collateral for futures trading; (ii) LoCs may be used as collateral for spot margin; (iii) LoCs may not be withdrawn; (iv) LoCs may not be used as collateral for spot margin borrows which are withdrawn from FTX; and (v) FTX monitors the health of each account with an LoC. Customer required to deposit funds daily such that its net account balance is at least their LoC size ("top up"). LoCs are repayable upon demand of FTX and FTX reserves the right to modify any aspect of the LoC program or requirements at any time.

8. **Lending by Customer**. FTX may permit the Customer to engage in lending programs whereby the Customer lends out assets on FTX platform and may be entitled to receive an interest payment for such lending, all dependent upon the parameters of the program established by FTX. In participating, Customer offers to let others borrow their coins in return for a specified interest payment. By default, all borrowing happens against the public user lending book, but in particular cases FTX may create a bespoke borrowing pool for liquidity providers so long as they abide by the margin limits and maintain sufficiently positive net account balances. The recipient of such lending may, at FTX's discretion, be required to pay interest in the borrowed assets. All such lending programs are in the discretion of FTX, and rules and requirements may be changed at FTX's discretion.

9. **Event of Default**. Any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "Event of Default" or "Events of Default" by any Party (such Party, the "Defaulting Party"):

   a. the failure of the Defaulting Party to satisfy any payment obligation under this Agreement or any other agreements, instruments, and documents executed in connection with this Agreement that are intended to create, perfect, secure or evidence liens or any other obligations in connection with the Secured Liabilities;

   b. (i) the Defaulting Party stops or suspends payment of any of its debts or is unable to, or admits its inability to, pay its debts as they fall due; (ii) the Defaulting Party commences negotiations, or enters into any composition, compromise, assignment or arrangement, with one or more of its creditors (excluding Customer, in its capacity as a lender) with a view to rescheduling any of its indebtedness (because of actual or

FTX_3AC_000000758

anticipated financial difficulties); or (iii) a moratorium is declared in respect of any indebtedness of the Defaulting Party;

c.  any action, proceedings, procedure or step is taken in relation to: (i) the suspension of payments, a moratorium of any indebtedness, winding up, dissolution, administration or reorganisation (using a voluntary arrangement, scheme of arrangement or otherwise) of the Defaulting Party; (ii) a composition, compromise, assignment or arrangement with any creditor of the Defaulting Party; or (iii) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Defaulting Party or any of its assets; or

d.  the value of the Defaulting Party's assets are less than its liabilities (taking into account contingent and prospective liabilities).

10. **Lender's Remedies**. Upon the occurrence and during the continuation of any Event of Default where Customer is the Defaulting Party, FTX may, at its option: (i) declare any amounts hereunder immediately due and payable with effect upon notice to Customer; (ii) terminate this Agreement upon notice to Customer; and (iii) exercise all other rights and remedies available to FTX hereunder, under applicable law, or in equity, against Customer and/or its Affiliates. On demand, Customer shall pay any balance owing with respect to the Indebtedness, including fees and any costs of collection. The reasonable cost and expense of collection of the debit balance, recovery, and any unpaid deficiency in the accounts of the undersigned with FTX, including, but not limited to attorney's fees, incurred and payable or paid by FTX shall be payable to FTX by Customer.

11. **Further Assurances**. Customer agrees that it shall promptly execute and deliver all instruments and documents, and take all actions, that may be reasonably necessary, or that FTX may reasonably request, in order to perfect and/or protect the assignment and security interest granted or intended to be granted hereby or to enable FTX to exercise and enforce its rights and remedies hereunder with respect to the Customer Assets, all associated financial interests, titles, and rights held therein or credited thereto and all proceeds thereof. Without limiting the generality of the foregoing, Customer hereby authorizes the filing of such financing or continuation statements, or amendments thereto, and shall execute or deliver such other instruments, endorsements or notices, as may be reasonably necessary or desirable or as FTX may reasonably request, in order to perfect and preserve the assignments and security interests granted or purported to be granted hereby.

12. **Governing Law; Jurisdiction**.

a.  This Agreement and all matters relating to this Agreement (whether in contract, statute, tort (including, without limitation, negligence) or otherwise), is governed by, and construed in accordance with the laws of Antigua and Barbuda and all laws applicable therein.

b.  Any dispute, controversy or claim arising out of, relating to, or having any connection with this Agreement, including any dispute as to its existence, validity, interpretation, performance, breach or termination shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("ICC"). The Emergency Arbitrator Provisions of the ICC Rules of Arbitration shall not apply. Such arbitration shall be administered in Antigua.

13. **Prior Agreements and Amendments**. This Agreement supersedes any prior agreements between the parties relating to the subject matter hereof. Any amendments to this Agreement must be in writing and executed by both parties.

14. **Entire Agreement**. This Agreement constitutes the entire Agreement among the Parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements relating to the subject matter of this Agreement.

15. **Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the Parties; provided, that the Customer may not assign this Agreement or any rights or duties hereunder without the prior written consent of the FTX.

16. **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any

specific provision. In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; provided that such severability shall be ineffective if it materially changes the economic benefit of this Agreement to any Party.

17. **Counterpart Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission (ie docusign) shall be equally as effective as delivery of an original executed counterpart of this Agreement.

18. **Relationship of Parties**. Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the Parties hereto other than the relationship of borrower and lender.

19. **No Waiver**. The failure of or delay by any Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by any Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by each Party hereto.

20. **Execution as a Deed**. The Parties hereto intend that this Agreement takes effect as a deed notwithstanding that any Party hereto may execute it by electronic signature or other online acceptance or acknowledgement.

21. **Miscellaneous**. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The word "include", "includes" or "including" will be interpreted on an inclusive basis and be deemed to be followed by the words "without limitation". A reference to any agreement, instrument or document is to be construed as a reference to that agreement, instrument or document as it may have been amended, supplemented, replaced or novated from time to time.

**FTX TRADING LTD:**                          **Three Arrows Capital Ltd**

Signature: _____     Signature: _____
                                                            *kyle Davies*

Name: _____     Name: _____
                                                            Kyle Davies

Title: _____     Title: _____
                                                            Director

          _____              _____

**EXHIBIT E**

July Discovery Response

36

US-DOCS\154233869.7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DEBTORS' RESPONSES AND OBJECTIONS TO THE FOREIGN REPRESENTATIVES OF THREE ARROWS CAPITAL, LTD.'S (I) FIRST SET OF INTERROGATORIES; (II) FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS; AND (III) NOTICE OF DEPOSITION

Pursuant to Rules 26, 30, 33 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these chapter 11 proceedings by Rules 7026, 7030, 7033, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and any other applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned attorneys, hereby submit these responses and objections (the "Responses") to (i) *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Interrogatories Directed to the Debtors* (the "Interrogatories"); (ii) *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Requests for the Production of Documents Directed to the Debtors* (the "Document Requests")[2]; and (iii) *Notice of Deposition of the Debtors Pursuant*

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Document Requests.

*to Fed. R. Bankr. P. 2004* (the "Deposition Notice," and together with the Interrogatories and the Documents Requests, the "Discovery"), each dated July 10, 2024 and served by Russell Crumpler and Christopher Farmer, in their joint capacities as the duly authorized foreign representatives (the "Foreign Representatives") of Three Arrows Capital, Ltd. ("3AC"), in connection with the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797] (the "Claim Objection").

## GENERAL OBJECTIONS

The general objections set forth below (the "General Objections") apply to the Discovery generally and to each definition in the Discovery (the "Definitions"), each instruction in the Discovery (the "Instructions"), Document Request, Interrogatory, and Topic, and unless otherwise stated, shall have the same force and effect as if fully set forth in response to each Definition, Instruction, Document Request, Interrogatory, and Topic.  Any objection to a Definition or Instruction shall also apply to any other Definition, Instruction, Document Request, Interrogatory, or Topic that incorporates that Definition or Instruction.  No response to any specific Document Request, Interrogatory, or Topic is, or shall be deemed to be, a waiver of the General Objections or the specific objections set forth below.  The fact that an objection is not listed herein does not, and shall not, constitute a waiver of that objection or otherwise preclude the Debtors from raising that objection at a later time.

1.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

2.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to impose on the Debtors any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

3.      The Debtors object to the Discovery to the extent it is duplicative of, or otherwise inconsistent with, the voluminous informal discovery provided by the Debtors to the Foreign Representatives of 3AC at significant burden and expense to the Debtors and their estates.

4.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules.  Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection. Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence that the Debtors do not object to a Document Request, Interrogatory or Topic on the basis of an applicable privilege, immunity, or protection.

5.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Foreign Representatives of 3AC, or otherwise more appropriately directed to another party or person.

6.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the Debtors' possession, custody, or control.

7.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek the production of trade secrets or other information that is confidential, proprietary, commercially sensitive, competitively significant, or personal in nature relating to the Debtors, their affiliates, and their current or former officers, directors, employees and/or advisors, clients, customers, or counterparties.  The Debtors' production of any documents in response to the Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

8.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to conduct anything beyond a reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

9.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments.  No response to any specific Document Request, Interrogatory, or Topic is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Document Request, Interrogatory, or Topic.

10.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Document Request, Interrogatory,

or Topic is, or shall be construed as, an admission that any factual predicate stated in the Document Request, Interrogatory, or Topic is accurate.

11.     No incidental or implied admissions are intended by the objections herein, nor shall the fact that the Debtors have objected or responded, or not objected or responded, to a particular Document Request, Interrogatory, or Topic be construed as an admission or indication that the Debtors possess documents responsive to such Document Request, Interrogatory, or Topic, or any other Document Request, Interrogatory or, Topic.  Similarly, a statement that the Debtors will produce documents in a response to a Document Request does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

12.     The Debtors reserve all objections that may be available to them at any hearing or trial or on any motion to the use or admissibility of any material produced.

13.     These Responses are based solely on facts reasonably known to the Debtors at the time of responding to the Discovery.  The Debtors reserve the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## **OBJECTIONS TO DEFINITIONS**

14.     The Debtors object to each of the Definitions, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates the Definition, to the extent that the Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

15.     The Debtors object to the Definitions of "Communication," "Document" or "Documents," "concerning" and "relating to," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates one of those Definitions, to the extent that they

-5-

purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

16.     The Debtors object to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf" or purports to seek information regarding non-Debtors.  The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

17.     The Debtors object to the Definition of "3AC" and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting on its behalf, including without limitation Three Arrows Capital Pte. Ltd., incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu."  The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected

from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

18.     The Debtors object to the Definition of "Person," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity." The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

## OBJECTIONS TO INSTRUCTIONS TO INTERROGATORIES

19.     The Debtors object to the following instructions to the Interrogatories (the "Interrogatory Instructions"). The failure to object to any of the Interrogatory Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

20.     The Debtors further object to the Interrogatory Instructions, and to each Interrogatory incorporating any such Interrogatory Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

21.      The Debtors object to Interrogatory Instruction Nos. 1, 3, 4, 6, and 10 and to each Interrogatory incorporating any such Interrogatory Instruction as overly broad and unduly burdensome.

22.      The Debtors further object to Interrogatory Instruction Nos. 1 and 7, and to each Interrogatory incorporating any such Interrogatory Instructions, as vague and ambiguous, in particular its inclusion of "assisted in" and "reasonable."

**<u>OBJECTIONS TO INSTRUCTIONS TO DOCUMENT REQUESTS</u>**

23.      The Debtors object to the following instructions to the Document Requests (the "<u>RFP Instructions</u>").  The failure to object to any of the RFP Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

24.      The Debtors object to the RFP Instructions to the extent they seek to impose requirements on the Debtors that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

25.      The Debtors object to RFP Instruction Nos. 4, 8, and 10 and to each specific Document Request incorporating any such RFP Instruction as overly broad and unduly burdensome.  The Debtors further object to these RFP Instructions, and to each specific Request incorporating any such RFP Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

26.      The Debtors further object to RFP Instruction No. 4 and 5 and to each specific Document Request incorporating any such RFP Instructions, as vague and ambiguous, in particular its inclusion of "constructive possession," "superior right or practical ability," and "deletion or redactions."

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Interrogatories as follows:

## INTERROGATORY NO. 1

Identify any and all agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038,[3] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents.

## RESPONSE TO INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning. The Debtors further object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. In addition, the Debtors object to this Interrogatory to the extent it is duplicative of Interrogatory No. 3.

The Debtors refer the Foreign Representatives to materials previously produced by the Debtors to 3AC as part of the informal information exchange between the parties, along with

---

[3]    Document references used in these interrogatories reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

the supplemental discussions and explanations provided by the Debtors and their financial advisors

in connection therewith (the "<u>Informal Discovery</u>") and in particular, (1) that certain loan and

security agreement dated October 22, 2021 between 3AC and FTX Trading, previously produced

bearing production numbers FTX_3AC_000000075 through FTX_3AC_000000095; and (2) that

certain line of credit agreement dated March 30, 2022 between 3AC, previously produced bearing

production numbers FTX_3AC_000000758 through FTX_3AC_000000763.  The Debtors further

refer the Foreign Representatives to the additional materials that will be produced to 3AC pursuant

to the Document Requests.

## INTERROGATORY NO. 2

Identify any and all FTX entities that at any point in time had any agreement (whether formal or informal, written or oral, or otherwise) with 3AC, including without limitation lending counterparties and FTX entities holding any Assets of 3AC (whether on a custodial basis or otherwise).

## RESPONSE TO INTERROGATORY NO. 2

The Debtors incorporate by reference the General Objections, Objections to

Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also

object to this Interrogatory to the extent it seeks information that is not relevant and/or because the

burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign

Representatives to the agreements between 3AC and FTX Trading identified in the Response to

Interrogatory No. 1.   The Debtors are not aware of any other commercial relationship or

agreements between the prepetition Debtors and 3AC.

## INTERROGATORY NO. 3

With respect to each FTX entity identified in response to Interrogatory No. 2, identify (i) the nature of the relationship between 3AC and such entity and (ii) any agreements or Documents relating to such relationship.

## RESPONSE TO INTERROGATORY NO. 3

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Interrogatory to the extent it is duplicative of Interrogatory No. 1.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.

## INTERROGATORY NO. 4

Confirm whether the proceeds of the BTC 15,250 and USDC 350,000,000 loans referenced in FTX_3AC_000013546 and FTX_3AC_000013547 were paid to 3AC.

## RESPONSE TO INTERROGATORY NO. 4

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors respond that the loans referenced in this Interrogatory were loans made by Voyager Digital, Ltd. and/or its affiliates ("Voyager") to 3AC, which bear no relation to any relationship or matters between the Debtors and 3AC.  Voyager provided documents to the Debtors relating to Voyager's own lending relationships in connection with a potential transaction between the Debtors and Voyager.  The Debtors produced FTX_3AC_000013546 and FTX_3AC_000013547 in the context of Informal Discovery in response to the Foreign Representatives' request for the Debtors' assistance in

providing them with any materials in the Debtors' possession relating to 3AC's commercial

relationships beyond the relationship between 3AC and FTX.  The Debtors will not search for or

produce additional materials related to these loans because they are not relevant to the Claim

Objection or any other matter between 3AC and FTX and are therefore outside the scope of

discovery.

## INTERROGATORY NO. 5

In a format similar to FTX_3AC_000000038, provide the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair" column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO INTERROGATORY NO. 5

The Debtors incorporate by reference the General Objections, Objections to

Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also

object to this Interrogatory to the extent it seeks information that is not relevant and/or because the

burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further

object to this Interrogatory to the extent it requires the Debtors to create new work-product.

Subject to and without waiver of their Objections, the Debtors respond that this

information is in the possession of or otherwise available to 3AC through (1) data previously

produced to 3AC contained in FTX_3AC_000000002; and (2) publicly available pricing

information.

## SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

Subject to and without waiving the foregoing General Objections, Objections to

Definitions, and Objections to Instructions to Document Requests, which are hereby expressly

incorporated into each of the following specific objections and responses as if fully set forth

therein, the Debtors respond to the Requests as follows:

**DOCUMENT REQUEST NO. 1**

All Documents and Communications relating to agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038,[4] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar Documents.

**RESPONSE TO DOCUMENT REQUEST NO. 1**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning. The Debtors further object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. In addition, the Debtors object to this Document Request to the extent it is duplicative of Document Request Nos. 2-4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

**DOCUMENT REQUEST NO. 2**

All Documents and Communications purporting to grant FTX a security interest in any of 3AC's Assets.

---

[4]   Document references used in these requests reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

## RESPONSE TO DOCUMENT REQUEST NO. 2

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1, 3 and 4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 3

All Documents and Communications purporting to perfect any such security interest described in Request No. 2.

## RESPONSE TO DOCUMENT REQUEST NO. 3

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1, 2 and 4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To

the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 4

All Documents and Communications relating to any agreement (whether formal or informal, written or oral, or otherwise) between FTX and 3AC, including without limitation Documents and Communications relating to (i) lending transactions between FTX and 3AC and (ii) arrangements pursuant to which any FTX entity holds any Assets of 3AC (whether on a custodial basis, as purported collateral, or otherwise).

## RESPONSE TO DOCUMENT REQUEST NO. 4

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1-3.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 5

All Documents and Communications relating to the transactions (including without limitation any sales, liquidations, or purported foreclosures by FTX) that resulted in the disposition of 1.015 billion U.S. Dollars in tokens from June 12, 2022 to June 15, 2022, as reflected in FTX_3AC_000000038.

## RESPONSE TO DOCUMENT REQUEST NO. 5

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 6

All transaction data relating to the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair" column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO DOCUMENT REQUEST NO. 6

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it requires the Debtors to create new work-product.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 5.

**DOCUMENT REQUEST NO. 7**

All transactional data evidencing, in any respect, any payments and any agreements (whether formal or informal, written or oral, or otherwise) relating to the BTC 15,250 and USDC 350,000,000 loans referenced in FTX_3AC_000013546 and FTX_3AC_000013547.

**RESPONSE TO DOCUMENT REQUEST NO. 7**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 4.

**RESPONSES AND OBJECTIONS TO SPECIFIC TOPICS**

Subject to and without waiving the foregoing General Objections and Objections to Definitions, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Topics as follows:

**TOPIC NO. 1**

The Debtors' relationships, contracts, and agreements with 3AC.

**RESPONSE TO TOPIC NO. 1**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above. The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad. The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to

-17-

3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 2

3AC's Accounts with Debtors.

## RESPONSE TO TOPIC NO. 2

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 3

3AC's Assets in its Accounts with Debtors.

## RESPONSE TO TOPIC NO. 3

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 4

Any of 3AC's Assets otherwise held by the Debtors.

## RESPONSE TO TOPIC NO. 4

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 5

3AC's negative USD balances reflected in FTX_3AC_000000038,[5] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents related thereto.

---

[5]    Document references used in these topics reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

**RESPONSE TO TOPIC NO. 5**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1, the Informal Discovery, and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 6**

Debtors' trading activities and lending relationship(s) with 3AC, including without limitation all transfers, payments, and loans between the Debtors and 3AC.

**RESPONSE TO TOPIC NO. 6**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the

Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 7**

Any basis purporting to grant FTX a security interest in any of 3AC's Assets or to perfect any such security interest.

**RESPONSE TO TOPIC NO. 7**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 8**

Any purported pledge, perfection, foreclosure, exercise of remedies, sale, transfer, liquidation, or other efforts by FTX to take possession, control, or ownership of any of 3AC's Assets or of the proceeds of such Assets.

**RESPONSE TO TOPIC NO. 8**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks

information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 9

Any transactions, including without limitation any sales, liquidations, or foreclosures by FTX, that resulted in the disposition of USD 1.015 billion in tokens from June 12, 2022 to June 15, 2022, as reflected in FTX_3AC_000000038.

## RESPONSE TO TOPIC NO. 9

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 10

Transaction data relating to the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair"

column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO TOPIC NO. 10

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above. The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad. The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 5, the Informal Discovery, and the additional materials that will be produced to 3AC pursuant to the Document Requests. The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

Dated:  July 26, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

  _/s/ Matthew B. McGuire_
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for Debtors and Debtors-in-Possession*

**EXHIBIT F**

September Discovery Response

37

US-DOCS\154233869.7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DEBTORS' (I) RESPONSES AND OBJECTIONS TO THE FOREIGN
REPRESENTATIVES OF THREE ARROWS CAPITAL, LTD.'S
(A) FIRST SET OF REQUESTS FOR ADMISSION; (B) SECOND SET OF
INTERROGATORIES AND (C) SECOND SET OF REQUESTS FOR PRODUCTION
AND (II) SUPPLEMENTAL RESPONSES AND OBJECTIONS TO THE FOREIGN
REPRESENTATIVES' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Federal

Rules"), made applicable to these proceedings (the "Chapter 11 Cases") by Rules 7026, 7034, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and any other

applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), FTX Trading

Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the

"Debtors"), by their undersigned attorneys, hereby submit these (I) responses and objections (the

"Responses") to (i) *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of*

*Requests for Admission Directed to the Debtors* (the "Requests for Admission"); (ii) *The Foreign*

*Representatives of Three Arrows Capital, Ltd.'s Second Set of Interrogatories Directed to the*

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and
4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the
Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list
of such information may be obtained on the website of the Debtors' claims and noticing agent at
https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is
Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Debtors (the "<u>Interrogatories</u>"); and (iii) *The Foreign Representatives of Three Arrows Capital, Ltd.'s Second Set of Requests for the Production of Documents Directed to the Debtors* (the "<u>Document Requests</u>," and together with the Requests for Admission and Interrogatories, the "<u>Discovery</u>"),[2] each dated August 7, 2024, served by Russell Crumpler and Christopher Farmer, in their joint capacities as the duly authorized foreign representatives (the "<u>Foreign Representatives</u>") of Three Arrows Capital, Ltd. ("<u>3AC</u>"), in connection with the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797] (the "<u>Claim Objection</u>"); and (II) supplemental responses and objections (the "<u>Supplemental Responses</u>") to *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Interrogatories Directed to the Debtors* (the "<u>First Set of Interrogatories</u>"), dated July 10, 2024, served by the Foreign Representatives in connection with the Claim Objection.

## **GENERAL OBJECTIONS**

The general objections set forth below (the "<u>General Objections</u>") apply to the Discovery generally and to each definition in the Discovery (the "<u>Definitions</u>"), each instruction in the Discovery (the "<u>Instructions</u>"), Request for Admission, Document Request, and Interrogatory, and unless otherwise stated, shall have the same force and effect as if fully set forth in response to each Definition, Instruction, Request for Admission, Document Request, and Interrogatory. Any objection to a Definition or Instruction shall also apply to any other Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition or Instruction. No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be deemed to be, a waiver of the General Objections or the specific

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Requests for Admission, Interrogatory, or Document Request, as applicable.

objections set forth below.  The fact that an objection is not listed herein does not, and shall not, constitute a waiver of that objection or otherwise preclude the Debtors from raising that objection at a later time.

1.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

2.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to impose on the Debtors any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

3.      The Debtors object to the Discovery to the extent it is duplicative of, or otherwise inconsistent with, the voluminous informal discovery provided by the Debtors to the Foreign Representatives of 3AC and the additional discovery provided in response to the *Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Requests for the Production of Documents* and the First Set of Interrogatories at significant burden and expense to the Debtors and their estates.

4.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product

doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules. Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection. Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence that the Debtors do not object to a Request for Admission, Document Request, or Interrogatory on the basis of an applicable privilege, immunity, or protection.

5.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Foreign Representatives of 3AC, or otherwise more appropriately directed to another party or person.

6.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the Debtors' possession, custody, or control.

7.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek the production of trade secrets or other information that is confidential, proprietary, commercially sensitive, competitively significant, or personal in nature relating to the Debtors, their affiliates, and their current or former officers, directors, employees and/or advisors, clients, customers, or counterparties. The Debtors' production of any documents in response to the Document Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

8.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to conduct anything beyond a

reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

9.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments.  No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Request for Admission, Document Request, or Interrogatory.

10.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be construed as, an admission that any factual predicate stated in the Request for Admission, Document Request, or Interrogatory is accurate.

11.     No incidental or implied admissions are intended by the objections herein, nor shall the fact that the Debtors have objected or responded, or not objected or responded, to a particular Request for Admission, Document Request, or Interrogatory be construed as an admission or indication that the Debtors possess documents responsive to such Request for Admission, Document Request, or Interrogatory, or any other Request for Admission, Document Request, or Interrogatory.  Similarly, a statement that the Debtors will produce documents in a response to a Document Request does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

12.     The Debtors reserve all objections that may be available to them at any hearing or trial or on any motion to the use or admissibility of any material produced.

13.     These Responses are based solely on facts reasonably known to the Debtors at the time of responding to the Discovery.  The Debtors reserve the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## OBJECTIONS TO DEFINITIONS

14.     The Debtors object to each of the Definitions, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates the Definition, to the extent that the Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

15.     The Debtors object to the Definitions of "Communication," "Document" or "Documents," and "relating to," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates one of those Definitions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

16.     The Debtors object to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, as overly broad and unduly burdensome to the extent it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf" or purports to seek information regarding non-Debtors. The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected

from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

17.     The Debtors object to the Definition of "3AC" and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, as overly broad and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting on its behalf, including without limitation Three Arrows Capital Pte. Ltd., incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu."  The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

18.     The Debtors object to the Definition of "Person," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, on the grounds that the Definition is overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity."  The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that

is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

## **OBJECTIONS TO INSTRUCTIONS TO REQUESTS FOR ADMISSION**

19.     The Debtors object to the following instructions to the Requests for Admission (the "RFA Instructions").  The failure to object to any of the RFA Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

20.     The Debtors further object to the RFA Instructions, and to each Request for Admission incorporating any such RFA Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

21.     The Debtors object to RFA Instruction Nos. 2, 3 and 5, and to each Request for Admission incorporating any such RFA Instruction as overly broad and unduly burdensome.

22.     The Debtors further object to RFA Instruction No. 6, and to each Request for Admission incorporating any such RFA Instructions, as vague and ambiguous, in particular its inclusion of "reasonable."

## **OBJECTIONS TO INSTRUCTIONS TO INTERROGATORIES**

23.     The Debtors object to the following instructions to the Interrogatories (the "Interrogatory Instructions").  The failure to object to any of the Interrogatory Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

24.     The Debtors further object to the Interrogatory Instructions, and to each Interrogatory incorporating any such Interrogatory Instructions, to the extent that they purport to

impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

25.     The Debtors object to Interrogatory Instruction Nos. 1, 3, 4, 6, and 10 and to each Interrogatory incorporating any such Interrogatory Instruction as overly broad and unduly burdensome.

26.     The Debtors further object to Interrogatory Instruction Nos. 1 and 7, and to each Interrogatory incorporating any such Interrogatory Instructions, as vague and ambiguous, in particular its inclusion of "assisted in" and "reasonable."

## OBJECTIONS TO INSTRUCTIONS TO DOCUMENT REQUESTS

27.     The Debtors object to the following instructions to the Document Requests (the "RFP Instructions").  The failure to object to any of the RFP Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

28.     The Debtors object to the RFP Instructions, and to each RFP incorporating any such RFP Instructions, to the extent they seek to impose requirements on the Debtors that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

29.     The Debtors object to RFP Instruction Nos. 4, 8, and 10 and to each specific Document Request incorporating any such RFP Instruction as overly broad and unduly burdensome.  The Debtors further object to these RFP Instructions, and to each specific Request incorporating any such RFP Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

30.     The Debtors further object to RFP Instruction No. 4 and 5 to each specific Document Request incorporating this RFP Instruction, as vague and ambiguous, in particular its

inclusion of "constructive possession," "superior right or practical ability," and "deletion or redactions."

### SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Requests for Admission, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Requests for Admission as follows:

### REQUEST FOR ADMISSION NO. 1

Admit that as of June 12, 2022, 3AC owned the following Assets that were held (on a custodial basis or otherwise) by FTX Trading Ltd:

|    | Asset | Amount | Cell in FTX_3AC_000000038 |
|----|-------|--------|---------------------------|
| a. | AVAX | 15.1000000000000000 | H 82460 |
| b. | BCH | 0.0000000061491708 | H 82462 |
| c. | BTC | 26779.5550000046000000 | H 82465 |
| d. | COIN | 0.0000000043469974 | H 82466 |
| e. | DOGE | 0.0000000031187781 | H 82469 |
| f. | DOT | 12319.6727758149000000 | H 82470 |
| g. | ETH | 137724.1741965020000000 | H 82471 |
| h. | ETHE | 2500915.6429776300000000 | H 82472 |
| i. | FIDA | 0.5672267700000000 | H 82473 |
| j. | FIDA_LOCKED | 5812134.4327732300000000 | H 82474 |
| k. | FTT | 1123117.3322516400000000 | H 82476 |
| l. | GBTC | 2847917.0030404600000000 | H 82477 |
| m. | GRT | 0.0000000093171430 | H 82478 |
| n. | LEO | 0.0000000075327645 | H 82483 |
| o. | LINK | 0.0000000100000000 | H 82484 |
| p. | LTC | 0.0000000072039376 | H 82487 |
| q. | LUNA2 | 607.6505084000000000 | H 82488 |
| r. | LUNA2_LOCKED | 1417.8511860000000000 | H 82489 |

| s. | LUNC | 31082.6818849600000000 | H 82490 |
|---|---|---|---|
| t. | PAXG | 0.0000000050000000 | H 82497 |
| u. | PYTH_LOCKED | 4166667.0000000000000000 | H 82499 |
| v. | ROOK | 16401.3766472050000000 | H 82502 |
| w. | SNX | 0.0000000100000000 | H 82505 |
| x. | SOL | 0.0000000068579291 | H 82506 |
| y. | SOS | 0.0000018500000000 | H 82507 |
| z. | SRM | 4123.0887553400000000 | H 82508 |
| aa. | SRM_LOCKED | 1184232.9101289600000000 | H 82509 |
| bb. | STETH | 0.0000000008290338 | H 82511 |
| cc. | SUSHI | 0.0000000034973833 | H 82512 |
| dd. | TRX | 0.0000000072275000 | H 82515 |
| ee. | UNI | 0.0000000088193574 | H 82517 |
| ff. | USDT | 0.0000000583035055 | H 82519 |
| gg. | USTC | 85995.6603976411000000 | H 82520 |
| hh. | WBTC | 0.0000000033487365 | H 82521 |
| ii. | XAUT | 0.0000000020000000 | H 82522 |
| jj. | ALPHA | 0.8934750000000000 | H 113345 |
| kk. | AURY | 0.7548800000000000 | H 113346 |
| ll. | AXS | 0.0788525000000000 | H 113348 |
| mm. | BTC | 0.0000462477463750 | H 113349 |
| nn. | COMP | 0.0000980300000000 | H 113350 |
| oo. | DOGE | 0.2259500000000000 | H 113351 |
| pp. | ETH | 0.0000000050000000 | H 113352 |
| qq. | FTT | 0.0693075000000000 | H 113353 |
| rr. | MCB | 0.0070274000000000 | H 113355 |
| ss. | MER | 164285.7100000000000000 | H 113356 |
| tt. | PERP | 0.0157650000000000 | H 113357 |
| uu. | SOL | 0.0073397500000000 | H 113359 |
| vv. | USD | 10.5821115206975000 | H 113360 |
| ww. | USDT | 0.0000000061500000 | H 113361 |
| xx. | USD | 0.0000000025000000 | H 120728 |
| yy. | FTT | 3.3911500000000000 | H 128508 |

| zz. | SRM | 85.3187374100000000 | H 128509 |
|---|---|---|---|
| aaa. | SRM_LOCKED | 527.4312625900000000 | H 128510 |
| bbb. | TRX | 0.0000310000000000 | H 128511 |
| ccc. | USD | 1278096.2959690800000000 | H 128512 |
| ddd. | USDT | 314190.3988726700000000 | H 128513 |
| eee. | SRM | 117.2866035500000000 | H 135404 |
| fff. | SRM_LOCKED | 730.3333964500000000 | H 135405 |
| ggg. | USD | 927716.6488290620000000 | H 135406 |
| hhh. | USDT | 308418.7859535600000000 | H 135407 |
| iii. | SRM | 89.4243048700000000 | H 142146 |
| jjj. | SRM_LOCKED | 556.6556951300000000 | H 142147 |
| kkk. | USD | 528273.8872676990000000 | H 142148 |
| lll. | USDT | 231451.9023334700000000 | H 142149 |
| mmm. | SRM | 123.0702100900000000 | H 148888 |
| nnn. | SRM_LOCKED | 760.7297899100000000 | H 148889 |
| ooo. | USD | 800411.7386709650000000 | H 148890 |
| ppp. | USDT | 272915.4528403000000000 | H 148891 |
| qqq. | BTC | 0.0000000093856447 | H 154434 |
| rrr. | USD | 0.0000000020970671 | H 154437 |
| sss. | BCH | 0.0000000052379276 | H 176557 |
| ttt. | BNB | 0.0000000086478739 | H 176558 |
| uuu. | BTC | 0.0000000003225168 | H 176559 |
| vvv. | LTC | 0.0000000014715642 | H 176562 |
| www. | MOB | 0.0000000078928964 | H 176564 |
| xxx. | TRX | 0.0000000048162230 | H 176570 |
| yyy. | USD | 0.0000000007125426 | H 176571 |
| zzz. | YFI | 0.0000000050000000 | H 176573 |
| aaaa. | ETH | 49.9060000000000000 | H 185744 |
| bbbb. | USD | 0.0000000080040000 | H 185745 |
| cccc. | FTT | 0.0000000035055250 | H 194417 |
| dddd. | USD | 29553625.0109609000000000 | H 194420 |
| eeee. | FTT | 0.0000000036855400 | H 209830 |
| ffff. | LOOKS | 0.0000000100000000 | H 209832 |

| gggg. | STETH | 0.0000000014959586 | H 209835 |
|---|---|---|---|
| hhhh. | USD | 4533633.5044397000000000 | H 209836 |
| iiii. | FTT | 98810.0578785700000000 | H 218844 |
| jjjj. | SRM | 5.3469398000000000 | H 218845 |
| kkkk. | SRM_LOCKED | 9642.9938584200000000 | H 218846 |
| llll. | USD | 9.1685101167595700 | H 218847 |
| mmmm | ETH | 0.0000000025000000 | H 224543 |
| nnnn. | USD | 0.0000000088080000 | H 224546 |
| oooo. | USD | 0.0000000018805000 | H 227546 |
| pppp. | USD | 0.0000000015963000 | H 230242 |
| qqqq. | USD | 0.0000000092400000 | H 232938 |
| rrrr. | SRM | 0.0174334500000000 | H 238024 |
| ssss. | SRM_LOCKED | 10.9540313100000000 | H 238025 |
| tttt. | USD | 0.0000000099137900 | H 238026 |
| uuuu. | USD | 0.0011249794600000 | H 241028 |
| vvvv. | USD | 0.0000000043640000 | H 243724 |
| Wwww | SRM | 0.0925681500000000 | H 248810 |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | H 248811 |
| yyyy. | USD | 0.0000000046773200 | H 248812 |
| zzzz. | BAL | 0.0000000100000000 | H 257788 |
| aaaaa. | BTC | 0.0000000040907300 | H 257789 |
| bbbbb. | ETH | 0.0000000050000000 | H 257790 |
| ccccc. | FTT | 1000.0000000100000000 | H 257791 |
| ddddd. | SRM | 118.6538830400000000 | H 257792 |
| eeeee. | SRM_LOCKED | 69226.0592868400000000 | H 257793 |
| fffff. | USD | 0.0000000015649857 | H 257794 |
| ggggg. | USD | 0.0013843232530000 | H 261252 |
| hhhhh. | USD | 0.0000000096320000 | H 263948 |
| iiiii. | USD | 0.0000000045400000 | H 266644 |
| jjjjj. | USD | 0.0000000023600000 | H 269340 |
| kkkkk. | USD | 0.0000000061850000 | H 272036 |

## RESPONSE TO REQUEST FOR ADMISSION NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Requests for Admission as set forth above.

Subject to and without waiver of their Objections, the Debtors deny that 3AC owned the Assets listed in Request for Admission No. 1 as of June 12, 2022.

### SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Interrogatories as follows:

## INTERROGATORY NO. 1

If Your response to Request for Admission No. 1 is anything other than an unequivocal admission, describe in full detail all facts and documents upon which You base Your denial, including without limitation, who You contend owns the Assets that were held (on a custodial basis or otherwise) by FTX Trading Ltd. for 3AC.

## RESPONSE TO INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Interrogatory on the basis that it seeks legal conclusions and/or legal arguments. The Debtors also object to this Interrogatory on the basis that it assumes the existence of facts that do not exist or the occurrence of events that did not take place.

Subject to and without waiver of their Objections, the Debtors state that 3AC did not own any of the Assets in the 3AC Customer Accounts or otherwise held on the FTX.com

exchange as of June 12, 2022.[3]  To the contrary, those Assets were held in wallets that the Debtors owned and controlled, and accordingly were owned by the Debtors.  Furthermore, no contract between the parties established any trustee-beneficiary or other similar relationship establishing 3AC's ownership over the Assets held in such wallets.  Specifically, the FTX Terms of Service (as defined below) did not establish any trustee-beneficiary relationship between any of the Debtors and 3AC, and in fact any such fiduciary or other similar relationship was expressly disclaimed in the FTX Terms of Service, which stated that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."  (FTX Terms of Service § 2.1.3 (FTX_3AC_000013696); *see also* 3AC Line of Credit Agreement (as defined below) § 18 ("[N]o provision contained herein shall be deemed to create any relationship between the Parties hereto other than the relationship of borrower and lender.") (FTX_3AC_000000763).)  Accordingly, consistent with the FTX Terms of Service, 3AC Loan and Security Agreement (as defined below), 3AC Line of Credit Agreement, and all other applicable documents governing the 3AC Customer Accounts (as defined below) (collectively, the "3AC Customer Account Documents"), the Debtors and 3AC had a debtor-creditor relationship with respect to the Assets in the 3AC Customer Accounts.[4]

---

[3]    To the extent 3AC withdrew any Assets from the FTX.com exchange on June 12, 2022, 3AC obtained title to them when they were transferred from wallets owned and controlled by the Debtors into wallets own and controlled by 3AC.

[4]    All applicable documents governing the 3AC Customer Accounts have previously been produced to the Foreign Representatives.  *See infra Supplemental Responses and Objections to the First Set of Interrogatories; see also Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (I) First Set of Interrogatories; (II) First Set of Requests for the Production of Documents; and (III) Notice of Deposition* (the "Responses to First Set of Discovery"), dated July 26, 2024.

The Debtors reserve all rights to fully address any claims to their property in litigation with 3AC or otherwise.

**INTERROGATORY NO. 2**

For each of the following 3AC Assets held (on a custodial basis or otherwise) by FTX Trading Ltd., describe in full detail the legal basis for the sale, liquidation, seizure, foreclosure or other transfer of that asset by FTX Trading Ltd. between June 12 and 14, 2022 and identify all facts and documents that support Your response:

|     | Asset | Amount | Cell in FTX_3AC_000000038 |
| --- | --- | --- | --- |
| a. | AVAX | 15.1000000000000000 | H 82460 |
| b. | BCH | 0.0000000061491708 | H 82462 |
| c. | BTC | 26779.5550000046000000 | H 82465 |
| d. | COIN | 0.0000000043469974 | H 82466 |
| e. | DOGE | 0.0000000031187781 | H 82469 |
| f. | DOT | 12319.6727758149000000 | H 82470 |
| g. | ETH | 137724.1741965020000000 | H 82471 |
| h. | ETHE | 2500915.6429776300000000 | H 82472 |
| i. | FIDA | 0.5672267700000000 | H 82473 |
| j. | FIDA_LOCKED | 5812134.4327732300000000 | H 82474 |
| k. | FTT | 1123117.3322516400000000 | H 82476 |
| l. | GBTC | 2847917.0030404600000000 | H 82477 |
| m. | GRT | 0.0000000093171430 | H 82478 |
| n. | LEO | 0.0000000075327645 | H 82483 |
| o. | LINK | 0.0000000100000000 | H 82484 |
| p. | LTC | 0.0000000072039376 | H 82487 |
| q. | LUNA2 | 607.6505084000000000 | H 82488 |
| r. | LUNA2_LOCKED | 1417.8511860000000000 | H 82489 |
| s. | LUNC | 31082.6818849600000000 | H 82490 |
| t. | PAXG | 0.0000000050000000 | H 82497 |
| u. | PYTH_LOCKED | 4166667.0000000000000000 | H 82499 |
| v. | ROOK | 16401.3766472050000000 | H 82502 |
| w. | SNX | 0.0000000100000000 | H 82505 |
| x. | SOL | 0.0000000068579291 | H 82506 |

| y. | SOS | 0.0000018500000000 | H 82507 |
|---|---|---|---|
| z. | SRM | 4123.0887553400000000 | H 82508 |
| aa. | SRM_LOCKED | 1184232.9101289600000000 | H 82509 |
| bb. | STETH | 0.0000000008290338 | H 82511 |
| cc. | SUSHI | 0.0000000034973833 | H 82512 |
| dd. | TRX | 0.0000000072275000 | H 82515 |
| ee. | UNI | 0.0000000088193574 | H 82517 |
| ff. | USDT | 0.0000000583035055 | H 82519 |
| gg. | USTC | 85995.6603976411000000 | H 82520 |
| hh. | WBTC | 0.0000000033487365 | H 82521 |
| ii. | XAUT | 0.0000000020000000 | H 82522 |
| jj. | ALPHA | 0.8934750000000000 | H 113345 |
| kk. | AURY | 0.7548800000000000 | H 113346 |
| ll. | AXS | 0.0788525000000000 | H 113348 |
| mm. | BTC | 0.0000462477463750 | H 113349 |
| nn. | COMP | 0.0000980300000000 | H 113350 |
| oo. | DOGE | 0.2259500000000000 | H 113351 |
| pp. | ETH | 0.0000000050000000 | H 113352 |
| qq. | FTT | 0.0693075000000000 | H 113353 |
| rr. | MCB | 0.0070274000000000 | H 113355 |
| ss. | MER | 164285.7100000000000000 | H 113356 |
| tt. | PERP | 0.0157650000000000 | H 113357 |
| uu. | SOL | 0.0073397500000000 | H 113359 |
| vv. | USD | 10.5821115206975000 | H 113360 |
| ww. | USDT | 0.0000000061500000 | H 113361 |
| xx. | USD | 0.0000000025000000 | H 120728 |
| yy. | FTT | 3.3911500000000000 | H 128508 |
| zz. | SRM | 85.3187374100000000 | H 128509 |
| aaa. | SRM_LOCKED | 527.4312625900000000 | H 128510 |
| bbb. | TRX | 0.0000310000000000 | H 128511 |
| ccc. | USD | 1278096.2959690800000000 | H 128512 |
| ddd. | USDT | 314190.3988726700000000 | H 128513 |
| eee. | SRM | 117.2866035500000000 | H 135404 |

| fff. | SRM_LOCKED | 730.3333964500000000 | H 135405 |
|------|------------|----------------------|----------|
| ggg. | USD | 927716.6488290620000000 | H 135406 |
| hhh. | USDT | 308418.7859535600000000 | H 135407 |
| iii. | SRM | 89.4243048700000000 | H 142146 |
| jjj. | SRM_LOCKED | 556.6556951300000000 | H 142147 |
| kkk. | USD | 528273.8872676990000000 | H 142148 |
| lll. | USDT | 231451.9023334700000000 | H 142149 |
| mmm. | SRM | 123.0702100900000000 | H 148888 |
| nnn. | SRM_LOCKED | 760.7297899100000000 | H 148889 |
| ooo. | USD | 800411.7386709650000000 | H 148890 |
| ppp. | USDT | 272915.4528403000000000 | H 148891 |
| qqq. | BTC | 0.0000000093856447 | H 154434 |
| rrr. | USD | 0.0000000020970671 | H 154437 |
| sss. | BCH | 0.0000000052379276 | H 176557 |
| ttt. | BNB | 0.0000000086478739 | H 176558 |
| uuu. | BTC | 0.0000000003225168 | H 176559 |
| vvv. | LTC | 0.0000000014715642 | H 176562 |
| www. | MOB | 0.0000000078928964 | H 176564 |
| xxx. | TRX | 0.0000000048162230 | H 176570 |
| yyy. | USD | 0.0000000007125426 | H 176571 |
| zzz. | YFI | 0.0000000050000000 | H 176573 |
| aaaa. | ETH | 49.9060000000000000 | H 185744 |
| bbbb. | USD | 0.0000000080040000 | H 185745 |
| cccc. | FTT | 0.0000000035055250 | H 194417 |
| dddd. | USD | 29553625.0109609000000000 | H 194420 |
| eeee. | FTT | 0.0000000036855400 | H 209830 |
| ffff. | LOOKS | 0.0000000100000000 | H 209832 |
| gggg. | STETH | 0.0000000014959586 | H 209835 |
| hhhh. | USD | 4533633.5044397000000000 | H 209836 |
| iiii. | FTT | 98810.0578785700000000 | H 218844 |
| jjjj. | SRM | 5.3469398000000000 | H 218845 |
| kkkk. | SRM_LOCKED | 9642.9938584200000000 | H 218846 |
| llll. | USD | 9.1685101167595700 | H 218847 |

| mmmm | ETH | 0.0000000025000000 | H 224543 |
|---|---|---|---|
| nnnn. | USD | 0.0000000088080000 | H 224546 |
| oooo. | USD | 0.0000000018805000 | H 227546 |
| pppp. | USD | 0.0000000015963000 | H 230242 |
| qqqq. | USD | 0.0000000092400000 | H 232938 |
| rrrr. | SRM | 0.0174334500000000 | H 238024 |
| ssss. | SRM_LOCKED | 10.9540313100000000 | H 238025 |
| tttt. | USD | 0.0000000099137900 | H 238026 |
| uuuu. | USD | 0.0011249794600000 | H 241028 |
| vvvv. | USD | 0.0000000043640000 | H 243724 |
| wwww | SRM | 0.0925681500000000 | H 248810 |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | H 248811 |
| yyyy. | USD | 0.0000000046773200 | H 248812 |
| zzzz. | BAL | 0.0000000100000000 | H 257788 |
| aaaaa. | BTC | 0.0000000040907300 | H 257789 |
| bbbbb. | ETH | 0.0000000050000000 | H 257790 |
| ccccc. | FTT | 1000.0000000100000000 | H 257791 |
| ddddd. | SRM | 118.6538830400000000 | H 257792 |
| eeeee. | SRM_LOCKED | 69226.0592868400000000 | H 257793 |
| fffff. | USD | 0.0000000015649857 | H 257794 |
| ggggg. | USD | 0.0013843232530000 | H 261252 |
| hhhhh. | USD | 0.0000000096320000 | H 263948 |
| iiiii. | USD | 0.0000000045400000 | H 266644 |
| jjjjj. | USD | 0.0000000023600000 | H 269340 |
| kkkkk. | USD | 0.0000000061850000 | H 272036 |

## RESPONSE TO INTERROGATORY NO. 2

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors also object to this Interrogatory on the basis that it seeks legal conclusions and/or legal arguments.  The

Debtors also object to this Interrogatory on the basis that it assumes the existence of facts that do not exist or the occurrence of events that did not take place.

Subject to and without waiver of their Objections, the Debtors state that certain of the Assets listed in Interrogatory No. 2 were not sold, liquidated, seized, foreclosed or otherwise transferred by the Debtors between June 12 and June 14, 2022.  The Debtors direct the Foreign Representatives to the chart set forth on Exhibit A attached hereto that identifies Assets listed in Interrogatory No. 2 that were sold, liquidated, seized, foreclosed or otherwise transferred by the Debtors between June 12 and June 14, 2022.

Further, the Debtors state that any liquidation by the Debtors of the Assets listed in Interrogatory No. 2 was executed pursuant to and in accordance with the 3AC Customer Account Documents (as defined below).  The 3AC Customer Account Documents imposed certain margin trading collateral requirements to the 3AC Customer Accounts (as defined below) and which, among other things, entitled FTX Trading to liquidate assets in the 3AC Customer Accounts in the ordinary course of business if the 3AC Customer Accounts failed to meet applicable collateral requirements and entitled FTX Trading to apply proceeds, property, or amounts received on such liquidation to reduce leverage in the account or otherwise resolve the collateral or account balance deficiencies.

**SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Document Requests, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Document Requests as follows:

## DOCUMENT REQUEST NO. 1

All Documents identified in Your responses to 3AC's First Set of Requests for Admission and Second Set of Interrogatories to You.

## RESPONSE TO DOCUMENT REQUEST NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors further object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors state that they have not identified any documents in their responses to 3AC's First Set of Requests for Admission and Second Set of Interrogatories beyond those previously identified and produced to 3AC.

## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO THE FIRST SET OF INTERROGATORIES

Subject to and without waiving the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Debtors' Responses to First Set of Discovery, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the First Set of Interrogatory Nos. 1 and 3 as follows:

## FIRST SET OF INTERROGATORY NO. 1

Identify any and all agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038, including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents.

## RESPONSE TO FIRST SET OF INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Responses to First

Set of Discovery.  The Debtors also object to this Interrogatory on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning.  The Debtors further object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  In addition, the Debtors object to this Interrogatory to the extent it is duplicative of First Set of Interrogatory No. 3.

Subject to and without waiver of their Objections, the Debtors respond that, to the Debtors' knowledge, prior to the commencement of the above-captioned cases, 3AC was the holder of multiple trading accounts on the FTX.com platform (collectively, the "3AC Customer Accounts").  Through the 3AC Customer Accounts, among other things, 3AC participated in FTX Trading's spot margin trading program.  In connection with the 3AC Customer Accounts and the spot margin trading program, 3AC and FTX Trading were parties to that certain Loan and Security Agreement, dated October 22, 2021, previously produced bearing production numbers FTX_3AC_000000075 through FTX_3AC_000000095 (the "3AC Loan and Security Agreement"), and that certain Line of Credit Agreement, dated March 30, 2022, previously produced bearing production numbers FTX_3AC_000000758 through FTX_3AC_000000763 (the "3AC Line of Credit Agreement").  In addition, additional documents related to the 3AC Customer Accounts include (1) that certain Terms of Service, dated May 13, 2022, previously produced bearing production numbers FTX_3AC_000013695 through FTX_3AC_000013756 (the "FTX Terms of Service"); (2) that certain draft Line of Credit Agreement between 3AC and FTX Trading, dated April 28, 2021, previously produced bearing production numbers FTX_3AC_000013664 through FTX_3AC_000013669; (3) an explanatory memorandum

describing the utilization of the Debtors' lines of credit, previously produced bearing production numbers FTX_3AC_000013689 through FTX_3AC_000013694; and (4) that certain undated terms of services, previously produced bearing production numbers FTX_3AC_000013670 through FTX_3AC_000013688.

## FIRST SET OF INTERROGATORY NO. 3

With respect to each FTX entity identified in response to Interrogatory No. 2, identify (i) the nature of the relationship between 3AC and such entity and (ii) any agreements or Documents relating to such relationship.

## RESPONSE TO FIRST SET OF INTERROGATORY NO. 3

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Responses to First Set of Discovery.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Interrogatory to the extent it is duplicative of First Set of Interrogatory No. 1.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to, and incorporate by reference, their Response to First Set of Interrogatory No. 1 above.

Dated:  September 3, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

 */s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for Debtors and Debtors-in-Possession*

**<u>EXHIBIT A</u>**

Exhibit A

| | Schedule Provided by 3AC | | Amount Liquidated Between June 12-14, 2022 |
|---|---|---|---|
| Ref | Asset | Amount | |
| a. | AVAX | 15.1000000000000000 | - |
| b. | BCH | 0.0000000061491708 | - |
| c. | BTC | 26,779.5550000046000000 | - |
| d. | COIN | 0.0000000043469974 | - |
| e. | DOGE | 0.0000000031187781 | - |
| f. | DOT | 12,319.6727758149000000 | 2.9727758100000000 |
| g. | ETH | 137,724.1741965020000000 | 10,697.8411965100000000 |
| h. | ETHE | 2,500,915.6429776300000000 | 2,500,915.6429776300000000 |
| i. | FIDA | 0.5672267700000000 | 0.5672267700000000 |
| j. | FIDA_LOCKED | 5,812,134.4327732300000000 | - |
| k. | FTT | 1,123,117.3322516400000000 | 580,833.6322516000000000 |
| l. | GBTC | 2,847,917.0030404600000000 | 2,847,917.0030404600000000 |
| m. | GRT | 0.0000000093171430 | - |
| n. | LEO | 0.0000000075327645 | - |
| o. | LINK | 0.0000000100000000 | - |
| p. | LTC | 0.0000000072039376 | - |
| q. | LUNA2 | 607.6505084000000000 | - |
| r. | LUNA2_LOCKED | 1,417.8511860000000000 | - |
| s. | LUNC | 31,082.6818849600000000 | 31,082.6818849600000000 |
| t. | PAXG | 0.0000000050000000 | - |
| u. | PYTH_LOCKED | 4,166,667.0000000000000000 | - |
| v. | ROOK | 16,401.3766472050000000 | - |
| w. | SNX | 0.0000000100000000 | - |
| x. | SOL | 0.0000000068579291 | - |
| y. | SOS | 0.0000018500000000 | - |
| z. | SRM | 4,123.0887553400000000 | 560.1311302500000000 |
| aa. | SRM_LOCKED | 1,184,232.9101289600000000 | - |
| bb. | STETH | 0.0000000008290338 | - |
| cc. | SUSHI | 0.0000000034973833 | - |
| dd. | TRX | 0.0000000072275000 | - |
| ee. | UNI | 0.0000000088193574 | - |
| ff. | USDT | 0.0000000583035055 | - |
| gg. | USTC | 85,995.6603976411000000 | 85,995.6603976400000000 |
| hh. | WBTC | 0.0000000033487365 | - |
| ii. | XAUT | 0.0000000020000000 | - |
| jj. | ALPHA | 0.8934750000000000 | - |
| kk. | AURY | 0.7548800000000000 | - |
| ll. | AXS | 0.0788525000000000 | - |
| mm. | BTC | 0.0000462477463750 | - |
| nn. | COMP | 0.0000980300000000 | - |
| oo. | DOGE | 0.2259500000000000 | - |

| | Schedule Provided by 3AC | | Amount Liquidated |
| :--- | :--- | :--- | :--- |
| Ref | Asset | Amount | Between June 12-14, 2022 |
| pp. | ETH | 0.0000000050000000 | - |
| qq. | FTT | 0.0693075000000000 | - |
| rr. | MCB | 0.0070274000000000 | - |
| ss. | MER | 164,285.7100000000000000 | - |
| tt. | PERP | 0.0157650000000000 | - |
| uu. | SOL | 0.0073397500000000 | - |
| vv. | USD | 10.5821115206975000 | - |
| ww. | USDT | 0.0000000061500000 | - |
| xx. | USD | 0.0000000025000000 | - |
| yy. | FTT | 3.3911500000000000 | - |
| zz. | SRM | 85.3187374100000000 | - |
| aaa. | SRM_LOCKED | 527.4312625900000000 | - |
| bbb. | TRX | 0.0000310000000000 | - |
| ccc. | USD | 1,278,096.2959690800000000 | - |
| ddd. | USDT | 314,190.3988726700000000 | 311,911.8513000000000000 |
| eee. | SRM | 117.2866035500000000 | - |
| fff. | SRM_LOCKED | 730.3333964500000000 | - |
| ggg. | USD | 927,716.6488290620000000 | - |
| hhh. | USDT | 308,418.7859535600000000 | 278,763.6226000000000000 |
| iii. | SRM | 89.4243048700000000 | - |
| jjj. | SRM_LOCKED | 556.6556951300000000 | - |
| kkk. | USD | 528,273.8872676990000000 | - |
| lll. | USDT | 231,451.9023334700000000 | 224,059.2492000000000000 |
| mmm. | SRM | 123.0702100900000000 | - |
| nnn. | SRM_LOCKED | 760.7297899100000000 | - |
| ooo. | USD | 800,411.7386709650000000 | - |
| ppp. | USDT | 272,915.4528403000000000 | 255,892.9899000000000000 |
| qqq. | BTC | 0.0000000093856447 | - |
| rrr. | USD | 0.0000000020970671 | - |
| sss. | BCH | 0.0000000052379276 | - |
| ttt. | BNB | 0.0000000086478739 | - |
| uuu. | BTC | 0.0000000003225168 | - |
| vvv. | LTC | 0.0000000014715642 | - |
| www. | MOB | 0.0000000078928964 | - |
| xxx. | TRX | 0.0000000048162230 | - |
| yyy. | USD | 0.0000000007125426 | - |
| zzz. | YFI | 0.0000000050000000 | - |
| aaaa. | ETH | 49.9060000000000000 | - |
| bbbb. | USD | 0.0000000080040000 | - |
| cccc. | FTT | 0.0000000035055250 | - |
| dddd. | USD | 29,553,625.0109609000000000 | - |

**Exhibit A**

| | Schedule Provided by 3AC | | Amount Liquidated Between June 12-14, 2022 |
|---|---|---|---|
| **Ref** | **Asset** | **Amount** | |
| eeee. | FTT | 0.0000000036855400 | - |
| ffff. | LOOKS | 0.0000000100000000 | - |
| gggg. | STETH | 0.0000000014959586 | - |
| hhhh. | USD | 4,533,633.5044397000000000 | - |
| iiii. | FTT | 98,810.0578785700000000 | - |
| jjjj. | SRM | 5.3469398000000000 | - |
| kkkk. | SRM_LOCKED | 9,642.9938584200000000 | - |
| llll. | USD | 9.1685101167595700 | - |
| mmmm | ETH | 0.0000000025000000 | - |
| nnnn. | USD | 0.0000000088080000 | - |
| oooo. | USD | 0.0000000018805000 | - |
| pppp. | USD | 0.0000000015963000 | - |
| qqqq. | USD | 0.0000000092400000 | - |
| rrrr. | SRM | 0.0174334500000000 | - |
| ssss. | SRM_LOCKED | 10.9540313100000000 | - |
| tttt. | USD | 0.0000000099137900 | - |
| uuuu. | USD | 0.0011249794600000 | - |
| vvvv. | USD | 0.0000000043640000 | - |
| wwww. | SRM | 0.0925681500000000 | - |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | - |
| yyyy. | USD | 0.0000000046773200 | - |
| zzzz. | BAL | 0.0000000100000000 | - |
| aaaaa. | BTC | 0.0000000040907300 | - |
| bbbbb. | ETH | 0.0000000050000000 | - |
| ccccc. | FTT | 1,000.0000000100000000 | - |
| ddddd. | SRM | 118.6538830400000000 | - |
| eeeee. | SRM_LOCKED | 69,226.0592868400000000 | - |
| fffff. | USD | 0.0000000015649857 | - |
| ggggg. | USD | 0.0013843232530000 | - |
| hhhhh. | USD | 0.0000000096320000 | - |
| iiiii. | USD | 0.0000000045400000 | - |
| jjjjj. | USD | 0.0000000023600000 | - |
| kkkkk. | USD | 0.0000000061850000 | - |