**<u>EXHIBIT 26</u>**

| | |
|---|---|
| **From:** | Taousse, Nacif (NY) |
| **Sent:** | Friday, October 4, 2024 6:39 PM |
| **To:** | Beller, Benjamin S.; Liu, Sienna; Glueckstein, Brian D.; Keeley, Julian M. |
| **Cc:** | Goldberg, Adam (NY); Harris, Christopher (NY); Mohebbi, Nima (LA); Ikeda, Tiffany (CC); Presley, Rebekah (NY); Wadier, Sebastien (LA); Zhao, Zijun (NY); Zhang, Helen (NY) |
| **Subject:** | FRE 408 COMMUNICATION / CONFIDENTIAL - FTX/3AC Amended Proof of Claim Draft |
| **Attachments:** | 3AC - FTX Amended POC Fully Compiled [LW Draft - 10.04.2024](154383875.1).pdf |

**SUBJECT TO FRE 408 AND EQUIVALENTS**

S&C team,

Pursuant to FRE 408 and in an attempt to resolve any dispute over 3AC's anticipated request to amend its proof of claim, we have attached hereto a draft of our amended claim.  Please let us know as promptly as possible whether you consent to 3AC's claim amendment.  In light of outstanding discovery (which our team followed up on several times at this point without response from you), we reserve our rights to revise this draft amended claim before filing it.

Regards,

**Nacif Taousse**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Direct Dial: +1.212.906.1835
Email: nacif.taousse@lw.com
https://www.lw.com

---

**From:** Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>
**Sent:** Monday, September 30, 2024 5:10 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Counsel,

We are still waiting for a substantive response to my September 20 email.  As one point of clarification, our request for communications with or concerning 3AC between June 1 and 30, 2022 includes messages from FTX employees' personal Telegram, Signal, and other messaging accounts.  At deposition, Mr. Gordon testified that the Debtors have not attempted to collect messages from any FTX employees' Telegram or other personal messaging accounts.  To the extent the Debtors take the position that these are not in their possession, custody, or control, please let us know.

Tiffany

**Tiffany M. Ikeda**

1

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Ikeda, Tiffany (CC)
**Sent:** Friday, September 27, 2024 9:40 AM
**To:** 'Beller, Benjamin S.' <bellerb@sullcrom.com>; 'Liu, Sienna' <lius@sullcrom.com>; 'Glueckstein, Brian D.' <gluecksteinb@sullcrom.com>; 'Keeley, Julian M.' <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Hi Benjamin,

We have yet to receive the information and documents requested below, or any response from your team.  As a result, and as stated in our last note, we will now require more time beyond October 4 to amend the proof of claim.  How much additional time is required will depend on when the requested information is received.

We're happy to discuss as needed.

Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Ikeda, Tiffany (CC)
**Sent:** Tuesday, September 24, 2024 4:29 PM
**To:** 'Beller, Benjamin S.' <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Hi Benjamin,

Please let us know what follow up requests you anticipate responding to and when we can expect to receive documents/information.  We need this for our amended proof of claim, which is currently due to be delivered to the S&C team on **October 4**.  To the extent we do not receive the requested documents/information, including any deposition, if necessary, sufficiently in advance (and no later than **Thursday, September 26**), we will require additional time to provide the proof of claim.  We can discuss further if it becomes necessary, but we note that our requests are far from burdensome and can be delivered easily: three publicly available documents we have asked you to identify, chats that can be found via a search on Relativity, and the already-prepared A&M work product relied upon to prepare for the deposition.

With respect to last week's deposition, we understand that the parties are at an impasse on whether the deposition is open, and we reserve all rights.

Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS** LLP
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

**From:** Beller, Benjamin S. <bellerb@sullcrom.com>
**Sent:** Sunday, September 22, 2024 7:32 PM
**To:** Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Tiffany – we confirm receipt of your follow up requests from the deposition and as stated we are taking them under advisement.  However, we do not agree to respond to the requests on your artificial and unnecessarily burdensome timeline. We will respond as appropriate in due course, including with respect to the appropriateness of your requests given the procedural status of the claim dispute.

In the interim, please note that, as we expect you are aware, many of the former employees that may have knowledge of the FTX Debtors' pre-petition relationship with 3AC either have been convicted of or are under indictment for federal crimes which has implications for their accessibility.

Finally, we disagree with your asserted basis for purporting to keep Mr. Gordon's deposition open, consider the deposition closed, will not present him or any other witness for further examination pursuant to Rule 30(b)(6) without a court order, and reserve all rights with respect thereto.


Benjamin S. Beller
+1 212 558 3334 (T) | +1 917 660 0174 (M)

---

**From:** Tiffany.Ikeda@lw.com <Tiffany.Ikeda@lw.com>
**Sent:** Friday, September 20, 2024 3:32 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** [EXTERNAL] RE: FTX/3AC

S&C team,

Thank you for your and Mr. Gordon's time during yesterday's deposition.  As previewed then, we have certain follow-up items.  They are set forth below:

- We request that the Debtors produce no later than **Monday, September 23** the documents that Robert Gordon reviewed to prepare for his deposition, including:

  - The three "publicly available" documents referenced in the deposition, which we understand related to: (1) collateral management; (2) liquidation process; and (3) spot-margin trading program.

- o   Any versions of internal A&M presentations or other work product referenced in the deposition that Mr. Gordon reviewed, which we understand to be at least two, with one prepared around September 10, 2024.

- We request that the Debtors conduct a new search for and produce, no later than **Friday, September 27**, all communications with or concerning 3AC between June 1 and 30, 2024, including but not limited to the messages sent by Zane Tackett referenced in the exhibits from yesterday's deposition, FTX_3AC_000000350 and 1394.

- Please confirm, no later than **Monday, September 23**, that Debtors' counsel represents the FTX developer named ████ and if so, provide his availability for a deposition.  Mr. Gordon relied on a conversation with ████ for the very limited testimony he was able to offer concerning the disposition of 3AC's assets.  If you do not represent ████ please provide his last known contact information.

- Please provide, no later than **Monday, September 23**, the last known contact information for Zane Tackett, Caroline Ellison, and the other FTX employees listed in FTX_3AC_000001594.  Mr. Gordon's testimony made clear that Debtors have made no efforts to contact former employees with relevant knowledge of their relationship with 3AC.  As a result, 3AC may need to depose these former employees itself.

As agreed, 3AC will deliver to the S&C team an amended proof of claim on October 4, 2024 (i.e., in 2 weeks).  Depending on the discovery items produced in connection with the above, what we learn from those items, and when they are produced, we may require more time to amend.

We further reiterate that the deponent was not adequately prepared for yesterday's deposition.  The deponent was unprepared to testify to, *inter alia*, 3AC's relationship with FTX (Topic No. 1), the composition of 3AC's "negative USD balances" (Topic No. 5), or the disposition of 3AC's assets (Topic No. 5) because, among other reasons, the Debtors made no attempt to contact anyone with personal knowledge of the deposition topics.  As we stated on the record, we are accordingly holding his deposition open and reserve all rights.

Regards,
Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Ikeda, Tiffany (CC)
**Sent:** Friday, September 13, 2024 2:59 PM
**To:** 'Beller, Benjamin S.' <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Hi Benjamin,

That works for us.  We will plan on starting at 9 am ET on Thursday.

Tiffany

**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Beller, Benjamin S. <bellerb@sullcrom.com>
**Sent:** Friday, September 13, 2024 2:00 PM
**To:** Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Understood, in that case we suggest starting at 9 ET

Benjamin S. Beller
+1 212 558 3334 (T) | +1 917 660 0174 (M)

---

**From:** Tiffany.Ikeda@lw.com <Tiffany.Ikeda@lw.com>
**Sent:** Friday, September 13, 2024 4:51 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** [EXTERNAL] RE: FTX/3AC

Hi Ben,

We agree to the scheduling proposal in your email for 3AC's amended proof of claim.

Thanks for providing the deponent's name and list of attendees for Thursday's deposition.  We are fine with starting at 10 am ET.  We are not sure how long the deposition will take, but please have the witness be prepared to stay all day if needed.  We will plan on providing lunch so we can be efficient with our breaks.

Best,
Tiffany

**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Beller, Benjamin S. <bellerb@sullcrom.com>
**Sent:** Friday, September 13, 2024 10:01 AM
**To:** Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY)

<Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

Tiffany – your scheduling proposal works for us except the pending claim objection should be adjourned to the December 12 omnibus hearing (not sine die), with your opposition due on November 20.  This will provide time for any dispute about an amended claim to be resolved but keeping the objection on calendar. And to be clear this schedule would apply to the original claim/claim objection with a new schedule to be evaluated in the event you validly file an amended claim.

Our 30b6 witness is Robert Gordon from A&M. For security, it will be me, Brian Glueckstein and Sienna Liu in attendance. Should we plan to start the deposition at 10 am ET? And do you have a sense of how much time you expect to need with the witness?

Thanks,

**Benjamin S. Beller**
+1 212 558 3334 (T) | +1 917 660 0174 (M)

---

**From:** Tiffany.Ikeda@lw.com <Tiffany.Ikeda@lw.com>
**Sent:** Monday, September 9, 2024 7:50 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** [EXTERNAL] RE: FTX/3AC

Counsel,

We write concerning the upcoming deposition and a proposal for 3AC's amended proof of claim.

## FTX 30(b)(6) Deposition

For the deposition at Latham's NY office on September 19, please let us know the name of the witness(es) who will be testifying on Topics 1-10 and 12-16.  Please also provide the names of any other attendees no later than September 18 so we can add them to the security list.

## 3AC's Amended Proof of Claim

You will recall that when we previously corresponded regarding scheduling of the 3AC claim objection matters, FTX provided an extension of 3AC's response deadline for the claim objection commensurate with the adjournment of hearing.

With our deposition now being scheduled, we propose the following process in an effort to move forward in an efficient manner.

- Adjourn 3AC's deadline to object to FTX's objection to 3AC's proof of claim to a date to be determined.
- September 19 – deposition of FTX representative
- October 4 – deadline for 3AC to deliver amended proof of claim to FTX (for avoidance of doubt, not file with the bankruptcy court)
- FTX will then respond on whether it will agree that 3AC may amend its proof of claim (subject to the right to object).

- If FTX accepts the filing of the amended proof of claim, the parties enter into a stipulation stating that the filing of the amended claim is acceptable.  FTX may then object to the amended proof of claim, with further proceedings to be determined at that stage.
- If FTX declines to agree to filing of the amended proof of claim, 3AC will file a motion to amend the claim with further proceedings within 10 calendar days of receipt of written notice (via email) of FTX's decision, and further proceedings on the claim objection would be determined at the time of the court's ruling on the motion to amend.

Please let us know if this proposal is acceptable at your earliest convenience.  We are available to discuss / meet & confer.

Best,
Tiffany

**Tiffany M. Ikeda**

**LATHAM & WATKINS** LLP
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Ikeda, Tiffany (CC)
**Sent:** Wednesday, September 4, 2024 6:23 PM
**To:** 'Beller, Benjamin S.' <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Subject:** RE: FTX/3AC

Hi Benjamin,

We will plan on taking the deposition of the Debtors' 30(b)(6) witness on September 19 at Latham's office in NY.

Best,
Tiffany

**Tiffany M. Ikeda**

**LATHAM & WATKINS** LLP
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

---

**From:** Beller, Benjamin S. <bellerb@sullcrom.com>
**Sent:** Tuesday, September 3, 2024 10:22 AM
**To:** Liu, Sienna <lius@sullcrom.com>; Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>; Keeley, Julian M. <keeleyj@sullcrom.com>
**Subject:** RE: FTX/3AC

And further to the below, we can make our 30b6 witness available for deposition at S&C's offices in NY on either September 18 or 19th. Please let us know.

**Benjamin S. Beller**
+1 212 558 3334 (T) | +1 917 660 0174 (M)

---

**From:** Liu, Sienna <lius@sullcrom.com>
**Sent:** Tuesday, September 3, 2024 10:07 AM
**To:** Tiffany.Ikeda@lw.com; Beller, Benjamin S. <bellerb@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com; Keeley, Julian M. <keeleyj@sullcrom.com>
**Subject:** RE: FTX/3AC

Counsel,

Please see attached (I) the Debtors' responses and objections to 3AC's second set of discovery requests directed to the Debtors on August 7, 2024; and (II) the Debtors' supplemental responses and objections to 3AC's first set of interrogatories directed to the Debtors on July 26, 2024.

Best,
Sienna


**Sienna Liu**
T: (212)558-4087

---

**From:** Liu, Sienna
**Sent:** Wednesday, August 28, 2024 8:38 PM
**To:** Tiffany.Ikeda@lw.com; Beller, Benjamin S. <bellerb@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** RE: FTX/3AC

Counsel,

We are working on responses to your second set of discovery requests, and will revert soon.

For the deposition, we are confirming dates for September, and will get back to you.  We will present a witness subject to all our objections, including both general and specific objections, as set out in our July 26, 2024 R&Os to your first set of discovery requests and the attached supplemental R&Os to the deposition notice, with the exception of Topic No. 11 (on loans made by Voyager to 3AC).

Best,
Sienna


**Sienna Liu**
T: (212)558-4087

**From:** Tiffany.Ikeda@lw.com <Tiffany.Ikeda@lw.com>
**Sent:** Tuesday, August 27, 2024 8:27 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** [EXTERNAL] RE: FTX/3AC

Counsel,

In your email dated August 15, you said you anticipated responding to our second set of discovery requests by the end of last week.  We have not received the Debtors' responses.  Can you please let us know when you anticipate serving them?

Also, please let us know when FTX's 30(b)(6) witness(es) will be available for deposition the week of September 9.  We expect FTX's witness(es) to be prepared on all topics listed in 3AC's July 10, 2024 deposition notice, including Topics 11-16 for which FTX did not serve any objections.

Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

**From:** Beller, Benjamin S. <bellerb@sullcrom.com>
**Sent:** Thursday, August 15, 2024 6:54 AM
**To:** Ikeda, Tiffany (CC) <Tiffany.Ikeda@lw.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY) <Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>; Rosen, Brian (NY) <Brian.Rosen@lw.com>
**Subject:** RE: FTX/3AC

We anticipate responding to your second set of discovery requests by the end of next week.  Given the calendar and schedules, we will get back to you on dates in the first two weeks of September for a deposition.  We agree to adjourn the hearing on our claim objection to the October omnibus hearing with a corresponding extension of 3AC's response deadline.

The FTX Debtors do not consent to 3AC filing an amended proof of claim and will oppose any relief sought from the Court for leave to do so.  It is especially difficult for us to even consider consenting when you have not articulated any claim that you believe is properly asserted against the FTX Debtors, or a basis for leave to amend.  We are willing to consider a request for consent to an amended claim if and when you did so.  Otherwise, we suggest you file any motion to amend the claim so the Court can address it.  We do not agree that needs to or should wait until your discovery efforts are completed, and that process should proceed in parallel.


**Benjamin S. Beller**
+1 212 558 3334 (T) | +1 917 660 0174 (M)

**From:** Tiffany.Ikeda@lw.com <Tiffany.Ikeda@lw.com>
**Sent:** Tuesday, August 13, 2024 6:25 PM
**To:** Beller, Benjamin S. <bellerb@sullcrom.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Cc:** Adam.Goldberg@lw.com; nima.mohebbi@lw.com; CHRISTOPHER.HARRIS@lw.com; Nacif.Taousse@lw.com; Zijun.Zhao@lw.com; Sebastien.Wadier@lw.com; Brian.Rosen@lw.com
**Subject:** [EXTERNAL] RE: FTX/3AC

Counsel,

I am writing to discuss depo scheduling, FTX's discovery responses, 3AC's forthcoming amended proof of claim, and 3AC's objection to the plan.

1. **Deposition Scheduling:**  On August 1 and 7, we asked you to check on whether FTX's 30(b)(6) witness would be available for deposition the week of August 19.  We have not heard back.  Please let us know if FTX's witness is available for deposition on August 21 or 22.

2. **FTX Discovery Responses:**  On August 7, we served 3AC's second set of discovery consisting of one RFA, one RFP, and two interrogatories, and set the response date for August 13 at 5 pm ET.  As that deadline has now passed, please let us know when you anticipate being able to provide a substantive response to the discovery.  As you may expect, we will need responses at least five days before we take FTX's 30(b)(6) depo.

3. **3AC's Forthcoming Amended Proof of Claim:**  As we discussed on August 1, our plan is to amend 3AC's proof of claim after we take FTX's deposition.  Will you consent to our filing of an amended proof of claim?  Alternatively, we will need to push back the claim objection deadline further to allow sufficient time to complete the deposition, file our amended proof of claim, and then have a hearing on a motion to amend our proof of claim before our response to the claim objection is due.

4. **3AC's Objection to the Plan:**  We are planning on filing a limited objection to the plan on the grounds that it does not provide for a reserve for disputed claims in an amount sufficient to meet the requirements of section 1123(a)(4) of the Bankruptcy Code to provide equal distributions for all creditors in the same class.  We are open to working with you on a resolution that provides notice of the amount of reserves and an opportunity for the parties to be heard (if necessary) or reaching an agreement on an extension of the objection deadline, in light of our ongoing work towards a claim resolution.

We suggest a meet and confer on Wednesday afternoon (ET) or anytime Thursday.  Please let us know what works for you.

Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100 | Los Angeles, CA 90067
D: +1.424.653.5416 | M: +1.213.507.4609

**From:** Ikeda, Tiffany (CC)
**Sent:** Wednesday, August 7, 2024 10:17 AM
**To:** 'Beller, Benjamin S.' <bellerb@sullcrom.com>; 'Glueckstein, Brian D.' <gluecksteinb@sullcrom.com>; 'Liu, Sienna' <lius@sullcrom.com>
**Cc:** Goldberg, Adam (NY) <Adam.Goldberg@lw.com>; Mohebbi, Nima (LA) <nima.mohebbi@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Zhao, Zijun (NY)

<Zijun.Zhao@lw.com>; Wadier, Sebastien (LA) <Sebastien.Wadier@lw.com>
**Subject:** FTX/3AC

Counsel,

Please see the attached discovery requests.  We have set these for a return date of August 13, but please let us know if you need more time and if so, when you anticipate being able to provide a substantive response.

During our call last Thursday, we discussed FTX's objections and responses to 3AC's discovery requests.  You said that although FTX's responses to the deposition topics only agreed to meet and confer, FTX was willing to put up a witness on all topics, with the caveat that you can only educate the witness based on what is known from the documents.  As such, we requested that you check on the witness's availability for deposition the week of August 19.  Can you please let us know if there are dates during that week that would work for a deposition?

Lastly, we appreciate your offer to work with us on providing the information in FTX_3AC_000000002 in a useable format.  Teneo is trying to address this issue, but we will circle back if we need further assistance.

Best,
Tiffany


**Tiffany M. Ikeda**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Direct Dial: +1.424.653.5416
Email: tiffany.ikeda@lw.com
https://www.lw.com [lw.com]

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com [lw.com].

**\*\*This is an external message from:** Tiffany.Ikeda@lw.com **\*\***

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

# Modified Form 410
## Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | **Three Arrows Capital Ltd (in liquidation)**<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____<br><br>Email(s) the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>c/o Teneo (BVI) Limited<br><br>Banco Popular Building, 3rd Floor, VG-1110<br><br>Road Town, Tortola<br><br>Contact phone _____<br>Contact email  russell.crumpler@teneo.com | **Where should payments to the creditor be sent?** (if different)<br><br><br><br><br>Contact phone _____<br>Contact email _____ |

| 4. Does this claim amend one already filed? | ☐ No<br>☒ Yes.  Claim number on court claims registry (if known) **5319**     Filed on  **06/30/2023**<br>                                                                                                MM  / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |

### Part 2:   Give Information About the Claim as of the Date the Case Was Filed

| 6. Do you have any number you use to identify the debtor? | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
|---|---|

If filing a claim for cryptocurrency, please fill in 7b.

7a. How much is the claim?     $ **SEE ATTACHED**

**Does this amount include interest or other charges?**
☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type _____; (ii) the amount in such currency _____; and (iii) a conversion rate to U.S. dollars _____.

7b.  List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|
| | **SEE ATTACHED** |

| 9. Is all or part of the claim secured? | ☒ No |
|---|---|
| | ☐ Yes. The claim is secured by a lien on property. |
| | **Nature of property:** |
| | ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.* |
| | ☐ Motor vehicle |
| | ☐ Other. Describe: _____ |
| | **Basis for perfection:** _____ |
| | Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) |
| | **Value of property:**   $_____ |
| | **Amount of the claim that is secured:**   $_____ |
| | **Amount of the claim that is unsecured:  $_____** (The sum of the secured and unsecured amounts should match the amount in line 7.) |
| | **Amount necessary to cure any default as of the date of the petition:**   $_____ |
| | **Annual Interest Rate** (when case was filed)_____% |
| | ☐ Fixed |
| | ☐ Variable |

| 10. Is this claim based on a lease? | ☒ No |
|---|---|
| | ☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____ |

| 11. Is this claim subject to a right of setoff? | ☒ No |
|---|---|
| | ☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☒ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required. | $_____ |

**Part 3:** **Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
　　　　　　　　　MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Russell Crumpler | | |
| | First name | Middle name | Last name |
| Title | Joint Liquidator of Three Arrows Capital Ltd | | |
| Company | Teneo (BVI) Limited | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | c/o Teneo (BVI) Limited, Banco Popular Building, 3rd Floor, VG-1110 | | |
| | Number　　　　Street | | |
| | Road Town, Tortola, British Virgin Island | | |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | russell.crumpler@teneo.com |

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                              12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- Fill in all of the information about the claim as of the date the case was filed.

- On the first page of the form, check the box to identify the Debtor against whom you assert a claim. Select only one Debtor per claim form.

- If the claim has been acquired from someone else, then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- Attach any supporting documents to this form. Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)
  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- Attach supporting documentation unless voluminous, in which case a summary must be attached. If documentation is unavailable, provide an explanation as to why documentation is not available.

- Do not attach original documents because attachments may be destroyed after scanning.

- If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.

- A Proof of Claim form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.

- For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian. For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

- Any proof of claim asserting a 503(b)(9) Claim must also: (i) include the value of the goods delivered to and received by the Debtors in the 20 days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the 503(b)(9) Claim is being asserted; (iii) state whether the amount asserted represents a combination of goods and services and, if applicable, the portion that relates solely to the value of the goods; and (iv) set forth whether any portion of the 503(b)(9) Claim was satisfied by payments made by the Debtors pursuant to any order of the Court authorizing the Debtors to pay prepetition claims.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.ra.kroll.com/FTX.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. § 503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

If by first class mail:

FTX Trading Ltd. Claims Processing Center
c/o Kroll Restructuring Administration LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

If by overnight courier or hand delivery:

FTX Trading Ltd. Claims Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

You may also file your claim electronically at
https://restructuring.ra.kroll.com/FTX/EPOC-Index

**Do not file these instructions with your form**

**Confidential & Subject to FRE 408**
**Attorney Work Product**
**LW Draft – 10.04.2024**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX Trading, Ltd, *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | Jointly Administered |

**ATTACHMENT TO AMENDED PROOF OF CLAIM FILED BY THE**
**JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD**

This attachment to the amended proof of claim (the "**Amended Proof of Claim**") is hereby filed by Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators and foreign representatives (the "**Joint Liquidators**") of Three Arrows Capital Ltd. (the "**3AC Debtor**"), against Debtor FTX Trading, Ltd. ("**FTX**"). This attachment is an integral part of the Amended Proof of Claim, which amends the claim previously filed under Claim No. 5319, and is incorporated by reference therein for all purposes.

**I.    Summary of the 3AC Debtor's Claims**

1.    On June 12, 2022, the 3AC Debtor had assets on the FTX platform worth approximately $1.59 billion. By the end of the day on June 14, 2022 – just two weeks before the 3AC Debtor commenced its liquidation – those assets were transferred to, or otherwise liquidated by or for the benefit of FTX, while the 3AC Debtor's purported "negative USD balance" on the FTX platform was reduced from approximately $1.33 billion to approximately $23 million.

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/ftx.

2.     At a minimum, these facts give rise to a preference claim for the value of the lost assets under the laws of the British Virgin Islands ("**BVI**") (which law governs the 3AC Debtor's BVI liquidation proceedings). In addition, depending on the ultimate facts revealed (including through evidence that the 3AC Debtor continues to request and FTX has to-date failed to produce), claims in the same amount exist as well for turnover, undervalue transaction, breach of contract, unjust enrichment, proprietary restitution, conversion, and breach of trust and fiduciary duty.

**II.**    **<u>Background on the 3AC Debtor</u>**

3.     The 3AC Debtor was incorporated in the BVI and operated a hedge fund with a focus on trading and investing in cryptocurrency and other digital assets.

4.     The 3AC Debtor's business collapsed in May and June 2022 in the wake of extreme fluctuations in the cryptocurrency markets. On June 27, 2022, it commenced a liquidation proceeding (the "**<u>BVI Proceeding</u>**") before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division), and that court issued an order appointing Russell Crumpler and Christopher Farmer as the Joint Liquidators of Three Arrows.

5.     On July 1, 2022, the Joint Liquidators, acting as the foreign representatives of the 3AC Debtor, commenced Chapter 15 proceedings before the United States Bankruptcy Court for the Southern District of New York (*In re Three Arrows Capital Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y.)). On July 28, 2022, that court granted recognition of the 3AC Debtor's foreign main proceeding pending in the BVI.

6.     Pursuant to BVI law, the Joint Liquidators are fiduciaries of the 3AC Debtor's estate created in the BVI Proceeding, with an obligation to conduct an orderly, fair liquidation of the 3AC Debtor and to maximize the value of its assets for the benefit of creditors. In furtherance of those duties, BVI law empowers the Joint Liquidators, *inter alia*, with the sole authority to take

2

possession and control of the 3AC Debtor's assets, carry on its business and manage its affairs,

and investigate the causes of its insolvency and any potential causes of action the estate may have.

**III.    Background on the Amended Proof of Claim**

7.    On June 30, 2023, consistent with the Joint Liquidators' duty to maximize value for

the estate, the 3AC Debtor timely filed proofs of claim (collectively, the "**Original Proofs of

Claim**") against FTX and each of its affiliated Debtors.  The Original Proofs of Claim asserted,

*inter alia*, claims in the nature of preference, conversion, and other avoidance actions under BVI,

New York, Delaware, and other applicable law, as well as all other claims, whether known or

unknown, based on acts, omissions, and transactions between the 3AC Debtor, FTX, and FTX's

affiliated Debtors.[2]

8.    At the time of the filing of the Original Proofs of Claim,  the Joint Liquidators had

access to extremely limited information concerning the relationship between the 3AC Debtor,

FTX, and FTX's affiliated Debtors.  Significant material information—including information

ostensibly in the possession of FTX—was missing.  The Joint Liquidators indeed faced extensive

challenges in obtaining documents and information necessary to conduct a comprehensive

evaluation of the 3AC Debtor's claims against FTX and other entities.  These challenges were due

to the destruction or other loss of the 3AC Debtor's books and records and the failure of the 3AC

Debtor's founders (who maintained day-to-day control over the 3AC Debtor prior to its collapse)

to cooperate with the Joint Liquidators.  When the Joint Liquidators gained access to the 3AC

Debtor's offices in Singapore, they even found that most physical documents, servers, and hard

---

[2]    *See* claim nos. 5120, 5121, 5125, 5145, 5147, 5148, 5151, 5152, 5154, 5155, 5156, 5158, 5159, 5160, 5167, 5168, 5169, 5170, 5171, 5172, 5173, 5175, 5176, 5177, 5178, 5179, 5180, 5181, 5182, 5183, 5184, 5185, 5186, 5187, 5188, 5189, 5190, 5191, 5192, 5194, 5195, 5196, 5197, 5198, 5199, 5200, 5201, 5203, 5204, 5238, 5239, 5253, 5262, 5269, 5306, 5308, 5319, 5323, 5324, 5327, 5331, 5333, 5336, 5339, 5345, 5348, 5351, 5355, 5360, 5362, 5368, 5373, 5419, 5444, 5445, 5446, 5448, 5449, 5450, 5451, 5452, 5454, 5455, 5456, 5457, 5459, 5460, 5461, 5462, 5464, 5466, 5470, 5473, 5474, 5476, 5477, 5478, 5580, 5581.

3

drives had been removed.  The Joint Liquidators essentially had no books or records, emails, or employees (former or current) to consult.  As a result, the Joint Liquidators could only tediously recreate the 3AC Debtor's books and records from whole cloth, including through the pursuit of discovery against numerous parties in multiple jurisdictions.

9.      While not as extreme as the challenges the Joint Liquidators faced, the professionals overseeing the FTX estate also apparently had limited access to their founders and had "shoddy books and records," resulting in FTX having to "build—from scratch—a reliable balance sheet."[3] John J. Ray III, who was engaged on Enron, stated that he had "never" seen "such a complete absence of trustworthy financial information" as in FTX's case.[4]

10.     The Joint Liquidators initiated their discovery efforts with respect to FTX through an information sharing agreement they reached with FTX in connection with the withdrawal of the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. for Coordination Among Courts*, which was filed on September 29, 2023 at ECF No. 2754.

11.     Pursuant to that agreement, the 3AC Debtor served informal information requests to FTX's advisors on October 27, 2023.  Over the subsequent months, FTX made four productions to the 3AC Debtor.  Instead of producing a comprehensive set of the communications shedding light on the relationship and transactions between the 3AC Debtor and FTX or the legal documents governing the parties' dealings, FTX chose to produce an enormous amount of raw data in a format requiring extensive further work by the 3AC Debtor's liquidation team.  FTX's productions contained vast volumes of raw and semi-raw data reflecting millions of line items that were too voluminous to be processed even in Microsoft Excel (which is capable of operating spreadsheets

---

[3]     *See Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-In-Possession*  [ECF No. 19143] (the "**Disclosure Statement**"), Section I.B.

[4]     *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 24], at ¶ 5.

US-DOCS\154233869.9

with up to 1,048,576 rows and 16,384 columns), in addition to 13,663 pages of more typical materials.

12.     Analyzing a document production of this size and nature on an efficient basis and within the resources available for the 3AC Debtor's liquidation required several months of extensive efforts, indeed, even just to be able to process and organize the raw data.  Nevertheless, this effort enabled the Joint Liquidators to identify several issues that clearly merited further investigation, including the identification of key information and documents that had existed but which FTX had not produced.

13.     Accordingly, on June 3, 2024, the 3AC Debtor sent additional informal information requests to FTX.  FTX did not respond.  On July 2, 2024, the 3AC Debtor sent FTX proposed formal discovery requests pursuant to Bankruptcy Rule 2004.

14.     Rather than respond to the requests, on July 8, 2024, FTX filed the *Debtors' Objection to Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* (the "**Objection**") [ECF No. 19797].  In the Objection, FTX argued that the claims set forth in the Original Proofs of Claim should be disallowed and expunged on the purely technical ground that the 3AC Debtor purportedly failed to allege facts and provide adequate support for its claims.  Of course, the Objection does not explain that FTX had failed to produce critical information and documents at the time of the Objection.

15.     Following this development, on July 10, the 3AC Debtor again provided its July 2, 2024 information requests to FTX pursuant to Federal Rules of Civil Procedure 33 and 34 and noticed the deposition of FTX pursuant to Federal Rule of Civil Procedure 36.  In response, FTX produced over the next two months various documents purporting to govern the relationships

5

between the 3AC Debtor and FTX.  FTX also responded to certain interrogatories and requests for admission that revealed new assertions by FTX.

16.    FTX finally produced a witness—Robert Gordon of Alvarez & Marsal (FTX's financial advisor)—to testify on FTX's behalf at a deposition on September 19, 2024.[5]  While this testimony clarified certain of FTX's positions reflected in their responses to interrogatories and requests for admission, it failed to answer basic questions—including, to mention a few of many glaring examples, what was the source of more than $700 million of the 3AC Debtor's alleged negative cash balance on the FTX platform, whether any particular "user" lent money to the 3AC Debtor,[6] where the 3AC Debtor's digital assets were on June 12, 2022, and whether FTX had sufficient digital assets to satisfy all claims against it on that date.

17.    Contrary to Rule 30(b)(6)'s mandate that "[t]he persons designated must testify about information known or reasonably available to the organization," FTX's witness was not properly prepared: he had no personal knowledge and made no effort to speak with anyone who had personal knowledge of the deposition topics, even though FTX had identified several former employees who had personal knowledge of the 3AC relationship and the June 2022 transactions. The FTX deposition thus highlighted several additional issues for further development of the factual record, as well as key information and documents that have not been searched for or produced.  Those documents included Alvarez & Marsal's analyses of the 3AC Debtor's assets and liabilities that the FTX witness used to prepare, FTX materials on margin lending that the

---

[5]    The transcript of FTX's deposition (the "**Deposition Transcript**") is voluminous and already in FTX's possession.  Accordingly, it is not attached to this Amended Proof of Claim.  The transcript remains available to any party in interest that seeks to access it upon written request to the Joint Liquidators' counsel.

[6]    Deposition Transcript, at 255–25; 256–1:17 ("**Q.** But you can't tell what constitute the rest of the US dollar balance of 1.3 billion besides the 631 million from table 8, right? **A.** Not specifically using doc. 8. **Q.** Okay. Do you have any – putting aside the document, can you tell me what – what else could constitute the other 700 million of liability? **A.** I -- I would need to perform additional analysis.  **Q.** Okay. But sitting here today, you can't tell me what the other $700 million of liability is? **A.** Not with pointing at other data sources that would then require analysis.")

6

witness used to prepare and referred to repeatedly in the deposition but have not been produced or identified in discovery responses, FTX chat messages about the June 2022 transactions that have not been produced but were referenced in other documents, and the last known contact information for the former FTX employees that FTX failed to contact.  The Joint Liquidators left the deposition open and requested on September 20, 2024 that FTX produce the missing information and documents.  To date, FTX has not produced the requested materials and has failed to even respond to multiple communications requesting an update on whether they will even agree to search for the requested materials.  FTX has also refused to produce a witness properly prepared on the deposition topics.  In other words, FTX is stonewalling.

18.    FTX's failure to produce these materials comes against the backdrop of an informal scheduling agreement between the parties.  Pursuant to that agreement, the 3AC Debtor agreed to deliver a draft of an amended Proof of Claim to FTX by October 4, 2024 in an effort to obtain FTX's consent to the amendment.  As a result of FTX's failure to produce the documents and information that the 3AC Debtor requested on September 20, 2024, the 3AC Debtor informed FTX (twice) that it will require additional time to deliver an amended Proof of Claim in order to incorporate any information revealed in any materials ultimately produced.  FTX ignored that correspondence.

19.    Nevertheless, in light of FTX's upcoming plan confirmation hearing on October 7, 2024 and FTX's pending objection to the Original Proofs of Claim, the Joint Liquidators have chosen to advance their case by filing this Amended Proof of Claim on the basis of information obtained to-date.  The Joint Liquidators reserve the right to further amend this Amended Proof of Claim on the basis of any additional information revealed through their ongoing discovery efforts, including when FTX fulfills its discovery obligations.

IV.     **The 3AC Debtor's Relationship with FTX**

      a.     The 3AC Debtor's Assets and Governing Documents

    20.    The limited information available to the Joint Liquidators at the time of the filing of

the Original Proofs of Claim indicated that FTX or its affiliates appeared to have seized or

foreclosed upon the 3AC Debtor's assets to satisfy a $120 million loan made by FTX to the 3AC

Debtor.

    21.    Information and documents obtained through discovery, however, have revealed

that the relationship between the 3AC Debtor and FTX was much broader than just the $120

million loan.  According to FTX, that relationship was purportedly governed by the following

documents (the "**Governing Documents**"):[7]

      a.     that certain Terms of Service, dated May 13, 2022, which FTX produced with bates numbers FTX-3AC-000013695 through FTX-3AC-000013756, attached hereto as **Exhibit A** (the "**May 2022 TOS**");

      b.     undated terms of service, which FTX produced with bates numbers FTX_3AC_000013670 through FTX_3AC_000013688, attached hereto as **Exhibit B** (the "**Undated TOS**");

      c.     that certain Loan and Security Agreement, dated October 22, 2021, which FTX produced with bates numbers FTX_3AC_000000075 through FTX_3AC_000000095, attached hereto as **Exhibit C** (the "**October 2021 LSA**"); and

      d.     that certain Line of Credit Agreement, which FTX produced with bates number FTX_3AC_000000758 through FTX_3AC_000000763 (the "**LOC & Margin Document**"), attached hereto as **Exhibit D**.  The LOC & Margin Document appears to include two separate agreements: a certain "FTX Line of Credit" dated March 30, 2022 (the "**March 2022 LOC**") and a certain undated FTX Institutional Customer Margin Line of Credit Agreement (the

---

[7] *See* (i) Response to Interrogatory No. 1, *Debtors' Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (I) First Set of Interrogatories; (II) First Set of Requests for the Production of Documents; and (III) Notice Of Deposition*, delivered to the 3AC Debtor on July 26, 2024 ("**July Discovery Response**", attached hereto as **Exhibit E**), and (ii) Response to First Set of Interrogatory No. 1, *Debtors' (I) Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (A) First Set of Requests for Admission; (B) Second Set of Interrogatories and (C) Second Set of Requests for Production and (II) Supplemental Responses And Objections To The Foreign Representatives' First Set Of Interrogatories* ("**September Discovery Response**", attached hereto as **Exhibit F**).

"**Margin Agreement**").  No provision in either agreement references the other, and each agreement appears to be a standalone contract having its own headings, different terms for FTX's counterparty ("Borrower" in the LOC Agreement and "Customer" for the Margin Agreement"), and different provisions governing choice of law, jurisdiction and defaults.  The 3AC Debtor therefore views the LOC Agreement and the Margin Agreement as two separate contracts.

22.    The May 2022 TOS purportedly governed FTX's relationship with the 3AC Debtor as a customer with digital assets deposited on the FTX exchange.

23.    The May 2022 TOS (which FTX asserts governs) make clear that the 3AC Debtor, not FTX, owned those assets.  Section 8.2.6 of the May 2022 TOS unambiguously states that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets", that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading", and that "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

24.    Publicly available testimony from Can Sun, FTX's former general counsel who personally took part in the drafting of the May 2022 TOS, further confirms the position that FTX's customers owned the assets they deposited on the FTX platform.  Mr. Sun testified during the *United States v. Samuel Bankman-Fried* case that FTX's position has always been, even before the introduction of the May 2022 TOS, that "that assets deposited on the exchange [by users] continued to be owned by them."[8]

25.    Despite such clear terms, FTX now denies that the 3AC Debtor owned those assets as of June 12, 2022.  Instead, FTX claims that *it* owned the assets because they "were held in

---

[8]    *See United States of America v. Samuel Bankman-Fried*, Case No. 22 CR 673 (LAK) (S.D.N.Y. Oct. 2023), October 19, 2023 Trial Transcript, at 1914–1:25; 1915–1:25; 1916–1.

wallets that the Debtors owned and controlled, and accordingly were owned by the Debtors" and that "no contract between the parties established any trustee-beneficiary or other similar relationship establishing the 3AC Debtor's ownership over the Assets held in such wallets."[9] But these arguments are legally irrelevant to ownership. FTX's mismanagement of its users' assets should not translate into FTX's deemed ownership of them in a manner that improves its litigation position as to prepetition customer rights and transactions. Regardless, FTX admitted in its deposition that these arguments are without factual support as regards the 3AC Debtor.[10] But if in violation of the agreement FTX's actions did destroy the 3AC Debtor's ownership interest, FTX is liable for the damages its breach of contract caused, as discussed further below.

26.     The Undated TOS were purportedly the predecessor to the May 2022 TOS.[11] The Undated TOS also contain provisions confirming that FTX's users owned the assets they deposited on the FTX platform. Section 22 of the Undated TOS provided, addressing FTX's prospective users, that "You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services *are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets*" (emphasis added). Likewise, Section 34 provides that FTX may report and deliver to the applicable jurisdiction "unclaimed property" that FTX holds in the accounts of customers it is unable to locate. Such a provision would serve no purpose if those assets in fact were contemplated to be FTX's property.

b.      The 3AC Debtor's Alleged Liabilities

---

[9]    September Discovery Response, Response to Interrogatory No. 1.

[10]   Deposition Transcript, at 80–16:19 ("**Q.** The commingling of assets you mentioned, as far as you know, did that involve Three Arrows? **A.** No.")

[11]   *See Declaration of Peter Greaves in Support of the Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief From Stay for Filing of the Application in the Supreme Court of the Commonwealth of the Bahamas Seeking Resolution of Non-U.S. Law and Other Issues* [Docket No. 1194], at ¶ 4.

10

27.     Based on a document FTX produced with bates number FTX-3AC-000000038, the 3AC Debtor had an alleged "negative USD balance" on the FTX exchange of approximately $1,332,681,172 by the end of the day on June 12, 2022 (the "**June 12 USD Balance**").  FTX has asserted that the "negative USD balance" is some form of a liability owed by the 3AC Debtor. Based on a document FTX produced with bates number FTX-3AC-000000008, the 3AC Debtor's spot margin borrowings amounted to $631,287,133 by the end of the day on June 12, 2022 (the "**Margin Liability**").  By the end of the day on June 14, 2022, that amount was reduced to approximately $363,808.  In its deposition, however, FTX could only identify the Margin Liability (which, according to FTX, amounts to approximately $631,287,133), and could not identify any other liabilities that would support the remaining $701,394,039 negative USD balance left in the June 12 USD Balance (the "**Unknown Alleged Liability**").[12]  To the extent FTX took actions, whether seizing Lost Assets or failing to provide proceeds from the sales of any Lost Assets, based on the Unknown Alleged Liability, FTX is liable for several torts, undervalue transaction claims, and other liability theories as explained below.

28.     Moreover, FTX asserted in its deposition that FTX's customers, and not FTX, were the 3AC Debtor's lending counterparties.  According to FTX, the June 12 USD Balance was not in fact owed to FTX, but rather to FTX's customers who participated in providing loans to the 3AC Debtor through the FTX exchange platform.[13]  This assertion is baldly contrary to the fact that the only agreements purportedly concerning the 3AC Debtor's margin borrowing and lines of credit are with FTX only, not with any of FTX's customers.  Further, FTX's assertion is also glaringly inconsistent with its own position that customer assets on the FTX exchange are property

---

[12]    Deposition Transcript, at 256–2:17.

[13]    Deposition Transcript, at 199–7:23.

US-DOCS\154233869.9

of the FTX estate (a position FTX took in its disclosure statement filed on June 27, 2024 at ECF No. 19143), *i.e.* that FTX (rather than other users) loaned property to the 3AC Debtor.[14]  Indeed, at its deposition FTX was unable to say whether there was a particular customer that loaned property to the 3AC Debtor, or if so who that customer was, and indeed indicated that its systems did not track who the supposed lender was at all.[15]

29.    In light of the foregoing, and because FTX has not produced any evidence to support its assertion that the 3AC Debtor's debt was owed to an unspecified group of FTX's customers, the 3AC Debtor disputes that assertion and maintains that any liability was owed to FTX only.

30.    According to FTX, FTX also extended a so-called "line of credit," first under an October 2021 LSA (which provided for a $100 million "line of credit"), and then under the March 2022 LOC Agreement (which provided for a "line of credit").[16]  But FTX admitted in its deposition that the so-called "line of credit" was not actually a debt that the 3AC Debtor had to repay; instead, it was simply a mechanism to reduce the 3AC Debtor's collateral requirements, in exchange for a fee paid by the 3AC Debtor.[17]  Based on a document FTX produced with Bates production number FTX-3AC-000000054, the "line of credit" equaled $100,868,666 by the end of the day on June 12, 2022 (the "**LOC Amount**").  By the end of the day on June 14, 2022, that amount was reduced to $0 after FTX chose to cancel the "line of credit".

---

[14]  Disclosure Statement, Section I.B. ("The FTX.com Exchange user agreement included conclusory language stating the customers own their digital assets and it did not include the other provisions necessary to create a conventional custody or trust relationship under applicable law. . . . Nor did such "ownership" language cover the billions in fiat currency owed to customers.")

[15]  Deposition Transcript, at 211–7:23 ("**Q.** Would 3AC have any way of knowing what user in FTX's view lent money to [the 3AC Debtor]? **A.** No, and it could be multiple users. **Q.** Does FTX have a document that shows which users lent money to 3AC as of June 12th, 2022? **A.** I'm not certain. **Q.** In the -- the way the lending program works, do the lending users lend money to a particular user? **A.** No. **Q.** So there -- if I understand, there is no particular user who lent money to 3AC? **A.** Not to my knowledge.")

[16]  Deposition Transcript, at 122–11:14.

[17]  Deposition Transcript, at 123–24:25; 124–1:7.

US-DOCS\154233869.9

c.    FTX's Unsecured Status

31.    Based on the documents FTX produced, the June 12 USD Balance is unsecured, and indeed FTX has never asserted any security interests exists.[18]  As explained above, the June 12 USD Balance consists of two components: (i) the Unknown Alleged Liability and (ii) the Margin Liability.

32.    **The Unknown Alleged Liability.**  FTX is unable to explain the basis for the Unknown Alleged Liability.  In other words, FTX claims that the Unknown Alleged Liability of $701,394,039 was owed by the 3AC Debtor, but cannot explain why.  According to FTX's discovery responses, the agreements that gave rise to the June 12 USD Balance are the Governing Documents.[19]  But among those the only document that purports to grant a security interest is the Margin Agreement, and that security interest, even if valid, only applies to the defined liabilities thereunder.  Because FTX cannot demonstrate what business activities (if any) supposedly generated the Unknown Alleged Liability, it cannot demonstrate that they fall within such defined liabilities and so could be secured.

33.    **The Margin Liability.**  FTX is also unsecured with respect to the Margin Liability. While FTX asserts that the Margin Agreement covers the loans to the 3AC Debtor, and the Margin Agreement purports to grant FTX a security interest in all assets of "the Customer" in FTX accounts as collateral for "Indebtedness" (defined as "margin trading and potentially discretionary

---

[18]    Deposition Transcript, at 187–23:25; 188–1:9 ("**Q.** You can't say whether the debtors think they had a security interest? **A.** I do not know. **Q.** So sitting here today, the debtors have not yet formed a view as to whether they have a security interest over these assets, right? **MR. GLUECKSTEIN:** Object to the form. **A.** Not to my knowledge.")

[19]    *See* September Discovery Response, Response to Interrogatory No. 1.  In addition to the Governing Documents, FTX points to a (i) *draft* Line of Credit Agreement between the 3AC Debtor and FTX, dated April 28, 2021, produced bearing production numbers FTX-3AC-000013664 through FTX-3AC-000013669, and (ii) an explanatory memorandum describing the utilization of the Debtors' lines of credit, previously produced bearing production numbers FTX_3AC_000013689 through FTX_3AC_000013694.  Because the former document is merely a draft Microsoft Word document and the latter does not purport to be an agreement between the parties, these documents are omitted from the list of Governing Documents provided herein.

13

line of credit facilities"), such purported security grant may not be enforced against the 3AC Debtor for numerous reasons.

34.    ***First***, the term "Customer" under the Margin Agreement, which purportedly refers to the grantor of the security interest, is not defined to include the 3AC Debtor.  In fact, it is not defined at all, and so the Margin Agreement entirely fails to specify who purportedly granted a security interest.

35.    ***Second***, there is no evidence that the Margin Agreement was properly executed.  The signature block included in the LOC & Margin Document (to which both the LOC Agreement and the Margin Agreement are affixed for no apparent reason) appears to relate to the LOC Agreement, not the Margin Agreement. Unlike the Margin Agreement, the LOC Agreement ends with the following sentence: "IN WITNESS WHEREOF, the parties hereto have executed this Line of Credit Agreement by their duly authorised officers or representatives."  The signature block in the LOC & Margin Document then lists as anticipated signatories the same entities listed as "parties" to the LOC Agreement: FTX and the 3AC Debtor.  By contrast, FTX's counterparty in the Margin Agreement is not even specified, nor does the Margin Agreement indicate it has been executed. In addition, FTX itself never executed the signature block

36.    ***Third***, Section 3 of the Margin Agreement only grants a security interest in "All assets in all of the FTX accounts of the Customer".  But according to FTX, there were no assets in the 3AC Debtor's account; instead, the 3AC Debtor's digital assets (including the Lost Assets) were held in commingled wallets.[20]  Accordingly, the Margin Agreement does not grant a security interest over the Lost Assets.

---

[20]    Deposition Transcript, at 95–13:25; 96–1:3 ("**Q.** Do the debtors know which common wallets held Three Arrows' digital assets? **A.** Not that I'm aware of. **Q.** Is there any way to tell, based on the debtors' current business records, which -- which wallets held 3AC's digital assets as of June 12th? **A.** Not that I'm aware of. **Q.** Is there any way to

14

37.    ***Fourth***, FTX assets that it (rather than the 3AC Debtor) owns the assets, in which case the 3AC Debtor could not legally have granted a security interest over them.

38.    ***Fifth***, if in fact other FTX users were the lenders to the 3AC Debtor, they were not granted any security interest in the Margin Agreement, as they are not parties to or beneficiaries of the Margin Agreement.

39.    ***Sixth***, the Margin Agreement was never registered with the appropriate authorities.

40.    At bottom, there is simply no indication in the Margin Agreement that its security grant applies to the 3AC Debtor, that the required formalities were followed, that it governs the Lost Assets at issue, or that it applies to the Unknown Alleged Liabilities.

## V.    <u>The Dissipation of the 3AC Debtor's Assets</u>

41.    As discussed, the documents obtained through discovery revealed that the 3AC Debtor's digital and other assets on the FTX platform amounted to $1,596,291,633.02 by the end of the day on June 12, 2022, and its negative USD balance was ostensibly $1,332,681,172.34. Through a series of liquidations, seizures, or other transfers on June 13, 2022 (the "**<u>June 13 Takings</u>**"), the 3AC Debtor's digital and other asset holdings were reduced to a value of $302,253,751.88, while its negative USD balance was reduced to $296,880,645.18. Following another series of liquidations, seizures, or other transfers on June 14, 2022 (the "**<u>June 14 Takings</u>**", and together with the June 13 Takings, the "**<u>June Takings</u>**"), the 3AC Debtor's digital and other asset holdings were further reduced to a value of $579,221.17 and the negative USD Balance was reduced to $23,505,083.92.[21]

---

tell, based on the debtors' business records, which customers have assets in a particular common wallet? **A.** There is not a tracking between a specific token and a specific customer. So they were a omnibus-type wallets.")

[21]    The values and transactions referenced in this paragraph are derived from documents that FTX produced to the 3AC Debtor bearing production numbers FTX-3AC-000000002 and FTX-3AC-000000038. Where documents produced by FTX do not include applicable asset pricing data, the Joint Liquidators have obtained this asset pricing data from public, online sources. The documents that FTX produced to the Joint Liquidators through

15

42.     In sum, approximately $1.59 billion in the 3AC Debtor's digital assets on the FTX platform was lost, and the negative USD balance was reduced by approximately $1.3 billion, all within the span of two days, and **approximately two weeks** before the 3AC Debtor initiated its liquidation proceedings in the BVI.

43.     The chart below reflects the end of day of the 3AC Debtor's assets and alleged negative USD balance on the FTX platform for each day during the relevant time period.  Notably FTX admitted that at the beginning of June 12 the 3AC Debtor's net balance was "in the high 200s" (in millions of dollars), and that somehow the June Takings destroyed that positive value by June 14.[22]

| Date | Total Value of Assets | Total Negative USD Balance | Net Balance |
|------|----------------------|---------------------------|-------------|
| 06/12/2022 | $1,596,291,633.02 | -$1,332,681,172.34 | $263,610,460.69 |
| 06/13/2022 | $302,253,751.88 | -$296,880,645.18 | $5,373,106.70 |
| 06/14/2022 | $579,221.17 | -$23,505,083.92 | -$22,925,862.75 |

---

discovery that are not otherwise attached hereto are voluminous and already in FTX's possession.  Accordingly, those documents are not attached to this Amended Proof of Claim, but they remain available to any party in interest that seeks access to them upon written request to the Joint Liquidators' counsel.

[22]     Deposition Transcript, at 31–17:25; 32–1:25; 33–1:25; 34–1:7 ("**Q.** Okay. And so what did you learn about the account balance, including perpetuals and futures, at the end of June 12th? **A.** Could you be specific on what you're looking to understand? **Q.** What was the number? **A.** I – I don't recall the exact number for end of June 12th. **Q.** Do you remember roughly?   **MR. GLUECKSTEIN:** Object to the form. **A.** It was – it was under – I believe it was under 200. **Q.** Approximately 200 million? **A.** It was – it was – I believe it started the day at approximately 2 – high 200s and then decreased from there, but I don't recall the exact number ended up. **Q.** Okay. And the date you're referring to is June 12th? **A.** Correct. **Q.** Okay. And do you recall approximately what the account balance was at the end of June 13th? **A.** I believe it was between 30 and 40 million. **Q.** Okay. What did you learn about why the account balance dropped from high 200s at the beginning of June 12th to approximately 30 million at the end of June 13th?"   **A.** So, over the course of June 12th, you saw a change in value driven by, the majority of were driven by change in pricing. So I would say a profit and loss impact. **Q.** Okay. And what else caused the decline in value? **A.** I believe on -- on June 12th, the majority was related to the P&L change. I don't recall if there was other smaller balance changes. **Q.** Okay. Do you recall on June 13th FTX liquidated a number of the assets in the Three Arrows account? **A.** The liquidation -- on – there was not a liquidation on June 13th. **Q.** Do you recall there were assets that were no longer in Three Arrows' account on the end of June 13th that were in its account at the end of June 12th? **A.** There were -- there were positions closed and assets sold. **Q.** Okay. All right. **A.** And withdrawals -- **Q.** I just want to make sure you -- **A.** And withdrawals that took place on June 13th. **Q.** Positions closed, assets sold, okay.")

16

44.     Of the $1,595,712,411.85 decline in value of assets on the days of the June Takings, the Joint Liquidators estimate (on the basis of a combination of Microsoft Excel spreadsheets that FTX produced and open-source price data) that $64,849,838 was on account of unrealized losses, withdrawals by the 3AC Debtor (including realized losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts[23].   The remaining $1,530,862,573.85 are considered lost assets (the digital assets and the other assets representing such amount are referred to herein as the "**Lost Assets**").

45.     FTX admits it liquidated on June 14 a subset of the Lost Assets worth, based on the Joint Liquidators' calculations, $82,107,599.82.[24] Otherwise, FTX denies that it liquidated the remainder.[25]   Instead, FTX asserts that an unnamed person or program associated with the 3AC Debtor initiated the liquidation of the Lost Assets and transfers to FTX[26] to reduce the 3AC Debtor's alleged liabilities to FTX.   Because FTX failed to speak with anyone with actual knowledge to determine who initiated the liquidation of the Lost Assets on FTX's platform, the Joint Liquidators are pursuing (and must pursue) further discovery from FTX related to this assertion.   FTX's failure to substantively engage with the 3AC Debtor—including its failure to provide last known contact information of certain former FTX employees likely to have relevant information—has hindered the Joint Liquidators' investigation.   As explained below, regardless

---

[23]   The amounts applicable to each of these items has been calculated by the Joint Liquidators based on data provided in documents produced by FTX, namely documents bearing bates numbers FTX-3AC-000000001 (funding payments), FTX-3AC-000000002 (trading fees and unrealized losses on futures contracts), FTX-3AC-000000003 and FTX-3AC-000000008 (interest charges), FTX-3AC-000000010 (withdrawals) and FTX-3AC-000000038 (unrealized losses and unrealized losses on withdrawals).   Where documents produced by FTX do not include applicable asset pricing data (namely end-of-day prices for futures contracts), the Joint Liquidators have obtained such pricing data from public, online sources.

[24]   The Joint Liquidators' calculation of this amount is based on  price data at the time of each transaction, as shown in the document FTX produced bearing bates number FTX-3AC-000000002.

[25]   September Discovery Response, Response to Interrogatory No. 2.

[26]   Deposition Transcript, at 35–14:25; 36–1:3.

US-DOCS\154233869.9

of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets, the 3AC Debtor has significant claims against FTX.

## VI.    **The 3AC Debtor's Claims**

46.    The 3AC Debtor's claims against FTX fall into two general categories: (i) preference claims under BVI law, and (ii) turnover, conversion, unjust enrichment, breach of trust/fiduciary duty, breach of contract, proprietary restitutionary, and undervalue transaction claims under BVI, U.S., Bahamian and English law, as applicable.

        a.       <u>BVI Preference Claims</u>

47.    Like in the U.S., BVI law recognizes unfair preference claims.  The 3AC Debtor asserts unfair preference claims under section 245 of the BVI Insolvency Act to avoid and recover $1,530,862,573.85 in preferential transfers made by the 3AC Debtor to FTX while the 3AC Debtor was insolvent (the "**BVI Preference Claim**").  These claims exist regardless of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets.

48.    Pursuant to section 245 of the BVI Insolvency Act 2003, a transaction is subject to avoidance as an "unfair preference" if the transaction: (i) "is an insolvency transaction;" (ii) is "entered into within the vulnerability period;" and (iii) "has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into."  BVI Insolvency Act 2003 (as amended), S.I. 47/2004 (the "**BVI Insolvency Act**"), § 245(1).  Each of these three elements is satisfied here.  If an unfair preference has occurred, recovery can be had against any entity that benefitted from the transaction.

        (1)    *The Transactions at Issue are "Insolvency Transaction"*

49.    Section 245 of the BVI Insolvency Act applies to "insolvency transactions."  Under section 244(2) of the BVI Insolvency Act, an "insolvency transaction" is a transaction "entered

into at a time when [a] company is insolvent" or that "causes a company to become insolvent." Insolvency Act 2003 (as amended), S.I. 47/2004, § 244(2).  A company is insolvent for these purposes if it is unable to pay its debts as they fall due, *i.e.* is cash-flow insolvent.  Insolvency Act 2002 (as amended), S.I. 47/2004, § 244(3), § 8(1)(c).

50.     Among other reasons for insolvency, the deterioration of market conditions leading up to June 2022 constituted a material adverse effect, among other events of default, under certain of the master loan agreements under which the 3AC Debtor was a borrower.  Depending on the specific terms of each master loan agreement, those events of default either automatically accelerated the loans at issue or rendered them immediately callable, such that the 3AC Debtor was cash-flow insolvent.  Based on the Joint Liquidators' ongoing investigations, the net amounts (after deducting any posted collateral) of loans under six of the largest uncollateralized and/or under-collateralized master loan agreements totaled $3,208,970,388.23 as of June 12, 2022, $3,426,115,251.70 as of June 13, 2022, and $3,454,496,096.87 as of June 14, 2022.  The 3AC Debtor had only $1,565,013,093.95, $1,938,690,892.10 and $1,681,622,009.76 worth of liquid assets on those dates respectively, and was therefore cash-flow insolvent on all dates, with deficits of $1,643,957,294.28, $3,120,144,168.32 and $3,370,569,218.11 respectively.

(2)     *The Transactions Occurred within the "Vulnerability Period"*

51.     Under Section 244 of the BVI Insolvency Act, the "vulnerability period" for a voidable transfer under Section 245 is generally "the period commencing six months prior to the onset of insolvency and ending in the appointment of the administrator or, if the company is in liquidation, the liquidator."  When a company is in liquidation and a BVI court appoints a liquidator, the "onset of insolvency" is generally "the date on which the application for the appointment of the liquidator was filed.  Here, the application for the appointment of the Joint

US-DOCS\154233869.9

Liquidators was filed on June 27, 2022.  The vulnerability period under BVI law with respect to the 3AC Debtor is therefore December 27, 2021 to June 27, 2022.

> (3)     *FTX Was Put In a Better Position Relative to an Insolvent Liquidation*

52.     As a result of the June Takings, FTX was repaid essentially all of its liabilities from the 3AC Debtor, resulting in an approximately 100% recovery to FTX.  (Indeed, as discussed above, FTX appears to have been paid vastly more than any established liabilities.)  This is far greater than any recovery rate that FTX could have achieved in the insolvent liquidation of the 3AC Debtor, particularly in light of FTX's unsecured status, as explained in paragraph IV.c. above.

53.     FTX cannot avoid preference liability by asserting that the liabilities were owed to other customers (as FTX now asserts) rather than to FTX.  Even if those other customers (rather than FTX) were 3AC's creditors, those creditors were made better off as noted above, meeting the third element of an unfair preference claim under BVI law.  And FTX would still be liable because it also benefited from the preferential transactions, for numerous reasons.  For one, FTX admitted in its deposition that it does not know which of its customers were the 3AC Debtor's lenders. Consequently, when those loans were not repaid in full in a liquidation of the 3AC Debtor, FTX would have absorbed that loss because FTX would have no idea which customer to allocate the loss to.  Accordingly, the preferential transaction put FTX in a better position than it would have been in an insolvent liquidation.

> (4)     *Quantum of BVI Preference Claim*

54.     Based on the foregoing, the Joint Liquidators assert the BVI Preference Claims to recover the Lost Assets, all of which were seized, liquidated, or otherwise disposed of after June 12, 2022 (*i.e.*, while the 3AC Debtor was insolvent and within the vulnerability period), and which

put FTX into a better position than it would have been in, in the 3AC Debtor's liquidation, if the June Takings had not occurred.

55.     The Joint Liquidators assert the BVI Preference Claim in the amount of the Lost Assets' value as of the time of the June Takings, which amounts to $1,530,862,573.85.

            b.      The Non-Preference Claims

56.     In addition, FTX may be liable for breach of contract and undervalue transactions.

                    (1)     *Breach of Contract Claim*

57.     Section 8.2.6(A) of the May 2022 TOS provides as follows:

> All Digital Assets are held in your Account on the following basis:
>
> (A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.
>
> (C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

58.     If FTX's actions deprived the 3AC Debtor of its ownership of the Lost Actions as FTX now alleges, then FTX violated sections 8.2.6(A) and 8.2.6(B) and is liable for breach of contract.  The damages are any amounts that the 3AC Debtor does not recover from FTX due, in whole or in part, to the 3AC Debtor's purported lack of ownership of the Lost Assets, up to the $1,530,862,573.85 value of those Lost Assets.

US-DOCS\154233869.9

(2)    *Undervalue Transaction Claim*

59.     Under section 246(1) of the BVI Insolvency Act, a company enters into an undervalue transaction with a person if "(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period."

60.     FTX appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability, despite failing to produce any evidence that the 3AC Debtor owed any particular obligations amounting to the Unknown Alleged Liability.   The 3AC Debtor did not receive any value in exchange for FTX's taking of the $701,394,039 in Lost Assets (or the proceeds thereof).

61.     As discussed above, under Section 244 of the BVI Insolvency Act, the "vulnerability period" for a voidable transfer under Section 245 is generally "the period commencing six months prior to the onset of insolvency and ending in the appoint of the administrator or, if the company is in liquidation, the liquidator."   The vulnerability period under BVI law with respect to the 3AC Debtor is therefore December 27, 2021 to June 27, 2022.   As also discussed above, the 3AC Debtor was insolvent for these purposes on June 13 and June 14, 2022.

62.     Based on the foregoing, the 3AC Debtor asserts an undervalue transaction claim in the amount of $701,394,039, representing the value of Lost Assets taken purportedly on account of the Unknown Alleged Liability.

22

c.    <u>Additional Non-Preference Claims Related to FTX's Taking of the Lost Assets.</u>

63.    If the 3AC Debtor's ongoing discovery efforts reveal that the Lost Assets were liquidated by FTX rather than unidentified persons associated with the 3AC Debtor, the Joint Liquidators also assert claims in the amount of $1,530,862,573.85 for turnover, unjust enrichment, breach of trust and fiduciary duty arising from the May 2022 TOS, breach of contract, conversion, and proprietary restitution to recover the value of assets that FTX seized or purported to foreclose upon in the absence of a valid and enforceable security interest.

(1)    *BVI Turnover Claim*

64.    Pursuant to section 274A of the BVI Insolvency Act, "[w]here any person has in his or her possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder." Insolvency Act 2003 (as amended), S.I. 47/2004, § 274A.

65.    As explained above, (i) the 3AC Debtor owned the Lost Assets on June 12, 2022, and (ii) FTX did not have a valid and enforceable security interest over those assets.  Accordingly, such assets rightfully belong to the 3AC Debtor, and FTX's purported foreclosure, seizure, or liquidation of them means that FTX took possession or control of the assets "to which the company appears to be entitled."  This is a textbook turnover claim.

66.    Consequently, the Joint Liquidators assert claims pursuant to section 274(A) of the BVI Insolvency Act to recover the Lost Assets for the benefit of the 3AC Debtor's estate (the "**<u>BVI Turnover Claims</u>**").

67.    The BVI Turnover Claims are valued at approximately $1,530,862,573.85, consisting of the value of the Lost Assets.

(2)   *U.S. Law Turnover Claim*

68.   As a debtor with a pending Chapter 15 case, the 3AC Debtor may also invoke the Bankruptcy Code's turnover provisions pursuant to Section 1521(a)(7) of the Bankruptcy Code. Specifically, section 542 of the Bankruptcy Code provides, in relevant part, that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property . . . ." 11 U.S.C. § 542(a).

69.   As explained above, the 3AC Debtor owned the Lost Assets as of June 12, 2022 and FTX did not have a valid and enforceable security interest in such assets at that time.  FTX's subsequent seizure of those assets without a valid and enforceable security interest did not alter the 3AC Debtor's legal right to own such assets.

70.   Accordingly, the Joint Liquidators assert claims pursuant to section 542 of the Bankruptcy Code to recover the Lost Assets for the benefit of the 3AC Debtor's estate (the "**U.S. Turnover Claims**").

71.   The U.S. Turnover Claims are valued at $1,530,862,573.85, consisting of the value of the Lost Assets.

(3)   *Unjust Enrichment Claim*

72.   The basic requirements for a claim in unjust enrichment are that the claimant must show (i) the defendant has been enriched, or has received a benefit; (ii) the enrichment of the defendant is "unjust"; and (iii) the enrichment of the defendant was at the expense of the claimant.

24

These requirements do not vary meaningfully regardless of whether Delaware law,[27] English law,[28] Bahamian law, or BVI law[29] is applied.

73.    FTX has been enriched through the June Takings, such enrichment was unjust because FTX did not have a security interest or any other basis to seize the Lost Assets, and such enrichment was at the 3AC Debtor's expense as the rightful owner of the Lost Assets (or, even in the absence of ownership, as the holder of a claim against FTX for the return of the Lost Assets).

74.    The 3AC Debtor's unjust enrichment claim is valued at approximately $1,530,862,573.85, consisting of the value of the Lost Assets.

(4)    *Breach of Trust and Fiduciary Duty Claim Arising under the May 2022 TOS*

75.    FTX claims that the May 2022 TOS did not establish any trustee-beneficiary relationship between FTX and the 3AC Debtor, and that any such fiduciary or other similar relationship was expressly disclaimed in Section 2.1.3 of the May 2022 TOS.[30] Section 2.1.3 of those terms of service stated that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."

76.    FTX ignores that Section 2.1.3 only disclaims FTX's fiduciary duties "*in connection with any trades or other decisions or activities effected by you using the Services*". Importantly,

---

[27]    Under Delaware law, unjust enrichment is "'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal citation omitted)

[28]    *See Samsoondar v. Capital Insurance Co Ltd* [2020] UKPC 33 at [18].

[29]    *(1) Nissan Motor Company Ltd (2) Nissan Middle East Fze v (1) Carlos Ghosn (2) Carole Nahas Ghosn (3) Beauty Yachts Pty Ltd* BVIHCM2019/0121 at [113]: "Unjust enrichment (C1 v D1): The general requirements for a claim in unjust enrichment under BVI law are as follows: (i) that D was enriched; (ii) that D was enriched at C's expense; and (iii) that the Defendant's enrichment was unjust. See Goff & Jones: The Law of Unjust Enrichment (9th ed. Sweet & Maxwell 2016), §1-09…."

[30]    September Discovery Response, Response to Interrogatory No. 1.

25

the May 2022 TOS do not disclaim fiduciary duties in connection with FTX's capacity as a custodian of assets.

77.    Furthermore, as FTX admitted, the May 2022 TOS are a "self-contradictory mess",[31] and courts are required to consider the intent of the exclusion clause with reference to the rest of the contractual arrangement, including the clear provisions in the May 2022 TOS asserting that FTX's customers retain ownership of their digital assets.

78.    Under English law, a trustee owes "a duty to preserve the assets of the trust except in so far as the terms of the trust permit the trustee to do otherwise."[32]    Assuming that FTX seized, liquidated, or otherwise disposed of the Lost Assets, FTX violated that duty.

79.    Accordingly, the 3AC Debtor asserts a claim for breach of trust and fiduciary duty against FTX in the amount of $1,530,862,573.85, representing the value of the Lost Assets.

(5)    *Breach of Contract Claims*

80.    Assuming the May 2022 TOS govern as FTX alleges, FTX also violated sections 8.2.6(A), 8.2.6(B), and 8.2.6(C) of that agreement because it appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability, despite failing to provide any basis whatsoever for the Unknown Alleged Liability.    FTX presented no evidence that the 3AC Debtor owed FTX any particular obligations resulting in the Unknown Alleged Liability.    Accordingly, the 3AC Debtor asserts a breach of contract claim in the amount of $701,394,039, representing the value of the Lost Assets that FTX prevented the 3AC Debtor from owning, controlling or withdrawing as provided under section 8.2.6 of the May 2022 TOS.

---

[31]    Disclosure Statement, Section I.B.

[32]    See *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58 at [51].

US-DOCS\154233869.9

81.   FTX also admitted that the 3AC Debtor was not in violation of any margin or collateral requirements before the end of the day on June 13, 2022.[33]  Accordingly, if outstanding evidence ultimately reveals that FTX (and not the 3AC Debtor) effected the June 13 Takings, FTX violated sections 8.2.6(A), 8.2.6(B), and 8.2.6(C) because it appropriated without justification the Lost Assets in the amount of $1,211,347,396.08, representing the value of the Lost Assets that were subject to the June 13 Takings.[34]

(6)   *Conversion Claim*

82.   The basic requirements for a conversion claim are that the claimant must show that (1) it has a superior possessory right, (2) it was deprived of the full benefit of that right, and the defendant assumed that right.  These elements are similar whether BVI law,[35] Bahamian law, or Delaware law[36] is applied.

83.   As explained above, the 3AC Debtor owned the assets with the ability to withdraw or transfer them at any time.  If outstanding discovery reveals that the Lost Assets were liquidated

---

[33]   Deposition Transcript, at 61–2:6 ("**Q.** Was the end of the day on June 13th the first time that the debtors were aware of Three Arrows being out of compliance? **A.** To my knowledge.").

[34]   The value of such Lost Assets is based on the Joint Liquidators' calculations using data provided in documents that FTX produced to the 3AC Debtor bearing bates numbers FTX-3AC-000000038 and other documents identified hereafter, and excludes (a) unrealized losses (calculated using document FTX-3AC-000000002), (b) the value (including realized losses) of any withdrawals by the 3AC Debtor (calculated using documents FTX-3AC-000000002 and FTX-3AC-000000010), (c) trading fees (calculated using document FTX-3AC-000000002), (d) interest charges (calculated using documents FTX-3AC-000000003 and FTX-3AC-000000008), and (e) funding payments on futures contracts (calculated using document FTX-3AC-000000001).  Where documents produced FTX do not include applicable asset pricing data (namely end-of-day prices for futures contracts), the Joint Liquidators have obtained such pricing data from public, online sources.

[35]   *Chiverton Construction Ltd v James Douglas Turnbull* BVIHCV 2015/0143 [2022] ECSC J0817-6 (defining conversion as occurring when "anyone who without authority receives or takes possession of another's goods with the intention of asserting some right or dominion over them, or deals with them in a manner inconsistent with the right of the true owner . . . , provided that there is an intention on the part of the person so dealing with them to negative the right of the true owner or to assert a right inconsistent therewith.")

[36]   *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, No. CV 2018-0783-PRW, 2021 WL 2588905, at *14 (Del. Ch. June 14, 2021) ("The necessary elements for a conversion under Delaware law are that a plaintiff: (1) had a property interest in the converted goods; (2) had a right to possession of the goods; and, (3) the property was converted.")

or seized by FTX, then FTX deprived the 3AC Debtor of those rights and assumed them for itself. Accordingly, the 3AC Debtor asserts a claim for the tort of conversion in the amount of $1,530,862,573.85, representing the value of the converted Lost Assets.

(7)     *Proprietary Restitutionary Claim*

84.     Under BVI law, where title remained with the claimant, the claimant had a proprietary restitutionary claim at common law (distinct from a claim for restitution on the grounds of unjust enrichment).[37]

85.     The 3AC Debtor owned and retained title to the Lost Assets under the explicit terms of the May 2022 TOS.  As explained above, FTX did not have the benefit of a valid security interest or other justification to seize or otherwise liquidate the Lost Assets. Accordingly, if outstanding evidence reveals that FTX (and not the 3AC Debtor) seized or otherwise liquidated the Lost Assets, the 3AC Debtor asserts a proprietary restitutionary claim under BVI law in the amount of $1,530,862,573.85, representing the value of the Lost Assets taken by FTX.

## VII.    <u>RESERVATION OF RIGHTS</u>

86.     Following ongoing discovery, the Joint Liquidators may uncover additional causes of action against FTX based on conduct, acts, omissions, and transactions between the 3AC Debtor and FTX.  These additional claims may include, but are not limited to, claims for fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, or aiding and abetting.

87.     This Amended Proof of Claim is without prejudice to claims, if any, that the 3AC Debtor or its estate has or may have for payment of any additional administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any

---

[37]    Armstrong DLW GmbH v Winnington Networks Ltd [2012] EWHC 10 (Ch), [2013] Ch 156

US-DOCS\154233869.9

transaction, whether or not such amounts are included in this Amended Proof of Claim, and the Joint Liquidators right to file such claims or any similar claims on behalf of the 3AC Debtor and its estate at an appropriate time is expressly reserved.

88.    The Joint Liquidators, on behalf of the 3AC Debtor's estate, further reserve all of their rights of setoff, recoupment, bankers' lien, and all similar such rights, as well as any equitable rights, and nothing herein shall be construed as a waiver thereof.

89.    The Joint Liquidators, on behalf of themselves and the 3AC Debtor's estate, reserve all of their respective procedural and substantive defenses and rights, including a right to a jury trial, with respect to any claim that may be asserted against them by FTX or any of its affiliates, any trustee for the estates of FTX and its affiliate debtors, any other party in interest in these chapter 11 cases, or any other person or entity whatsoever.

90.    The filing of this Amended Proof of Claim and the assertion of the claims herein are not and shall not be deemed or construed as a consent or admission with respect to the validity or accuracy of any valuation proposed by FTX, any of its affiliates, or any third party.  The Joint Liquidators and the 3AC Debtor do not waive or release any rights with respect thereto.

91.    The execution and filing of this Amended Proof of Claim is not (i) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights against any entity or person liable for all or part of the claims herein, (ii) a consent by the Joint Liquidators or the 3AC Debtor to the jurisdiction of this Court with respect to any proceeding commenced in these chapter 11 cases against or otherwise involving the Joint Liquidators, (iii) a waiver of the Joint Liquidators' or the 3AC Debtor's right to have any and all final orders in any and all non-core matters entered after de novo review by a United States District Court judge or their respective right to a trial by jury in any proceeding as to any and all matters so triable, whether designated legal or private

29

rights, or in any case or controversy or proceeding related thereto, notwithstanding the designation of such matters as "core proceedings" pursuant to section 157(b) of the Bankruptcy Code or otherwise, and whether such jury trial is pursuant to statute or the United States Constitution, (iv) a waiver of the right to withdraw the reference with respect to the subject matter of the claims herein, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Joint Liquidators or the 3AC Debtor, (v) an election of remedy or choice of law that waives or otherwise affects any other remedy or choice of law, (vi) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights and remedies under applicable law, including BVI law, (vii) a waiver of any right of action that the Joint Liquidators or the 3AC Debtor have or may have against FTX or any other person or entity, (viii) a waiver or release of any of the Joint Liquidators' or the 3AC Debtor's rights against any third party, and/or (ix) a waiver of any right to the subordination, in favor of the 3AC Debtor and its estate, of indebtedness or liens held by creditors of FTX or any of its debtor affiliates.

92.    To the extent that FTX, any of its debtor affiliates or any other party takes any action that would give rise to a counterclaim or other rights or claims that the 3AC Debtor or its estate may have against FTX or any of its debtor affiliates, the Joint Liquidators reserve all of their and 3AC's rights.

93.    The Joint Liquidators reserve the right to attach, produce and/or rely upon additional documentation that supports the 3AC Debtor's and its estate's claims against FTX, and any additional documents that may become available after further investigation or discovery, or upon FTX's request.  Nothing contained in this Amended Proof of Claim shall limit the rights of the Joint Liquidators to file papers or pleadings, or commence any proceedings, or take any actions concerning the 3AC Debtor's and its estate's claims against FTX or any of its debtor affiliates.

## VIII.    **Notices**

94.    All notices to the Joint Liquidators concerning this Amended Proof of Claim should

be sent to:

> **c/o Teneo (BVI) Limited**
> Banco Popular Building, 3rd Floor
> Road Town, Tortola, VG-1110
> British Virgin Islands
> Attn: Russell Crumpler
> Email: russell.crumpler@teneo.com and 3acliquidation@teneo.com

Copies of all notices to the Joint Liquidators concerning this Amended Proof of Claim should be
sent to:

> **LATHAM & WATKINS LLP**
> Attn: Christopher Harris, Adam J. Goldberg, and Nacif Taousse
> 1271 Avenue of the Americas
> New York, NY 10020
> Emails: chris.harris@lw.com, adam.goldberg@lw.com, and nacif.taousse@lw.com

95.    The request for copies of notices to be sent to Latham & Watkins LLP will not be

deemed authorization of Latham & Watkins LLP to accept service of process on behalf of the Joint

Liquidators.

US-DOCS\154233869.9

# EXHIBIT A

May 2022 TOS

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

(together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.     **STRUCTURE OF TERMS**

1.1     The Terms comprise:

1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2     the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3     the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2     To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3     **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

## 2. RISK DISCLOSURES

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1     **No advice and no reliance**

2.1.1     FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2     You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3     FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2     **Digital Asset transfers and volatility**

2.2.1     Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

## 2.3    Supply and value of Digital Assets

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

## 2.4    Margin trading

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below) (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

## 2.5    Complex products

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

2.6    **Blacklisted addresses and forfeited Assets**

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

2.7    **Software protocols and operational challenges**

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

2.7.5 Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8 Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9 Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10 No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11 Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12 Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3. APPLICABLE LAWS AND REGULATIONS

## 3.1 Compliance with Applicable Laws

3.1.1 You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2 Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

5

3.2 **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3 **Export controls**

3.3.1 The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A) you are in a prohibited jurisdiction as set forth at <u>Location Restrictions</u> (**"Restricted Territories"**);

(B) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C) you intend to transact with any Restricted Territories or Restricted Persons;

(D) you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E) the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2 We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4. **ELIGIBILITY**

4.1 In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1 If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2 If you are registering to use the Services on behalf of a legal entity, then:

(A) you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B) the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C) the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

5.    **REGISTRATION PROCESS; IDENTITY VERIFICATION**

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

6.    **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1    You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2    You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3    You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4    FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5    In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.    **ORDER BOOK AND CONVERT**

7.1    FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2    The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3     The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4     We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5     You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6     You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7     Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8     Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9     Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.      **ACCOUNT FUNDING**

8.1     **Funding - General**

    8.1.1   In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

    8.1.2   You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

    8.1.3   Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

8.2    **Digital Assets**

8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2    You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3    The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4    You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5    FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6    All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7    FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8    It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9 You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10 When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11 You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12 It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3 Fiat currency

8.3.1 Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2 Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3 E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4 E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5 You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

9.    **UNCLAIMED OR ABANDONED PROPERTY**

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10. **DEBIT ACCOUNT BALANCE**

10.1    If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2    If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2    you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3    you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11. **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12. **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1    FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1    refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2    decline to process any instruction or Order submitted by you; and/or

12.1.3    limit, suspend or terminate your use of one or more, or part of, the Services.

12.2    Such actions will not relieve you from your obligations pursuant to the Terms.

12.3    Such actions may be taken as a result of a number of factors, including without limitation:

12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10  Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.   **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

13.1.5    distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6    use a web crawler or similar technique to access our Services or to extract data;

13.1.7    reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8    perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9    take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10   transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11   otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12   transfer any rights granted to you under the Terms;

13.1.13   engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14   engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15   assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.    ELECTRONIC TRADING TERMS

14.1    FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2    A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3    In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4    We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5 FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6 Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7 The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

15. **STAKING**

15.1 When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2 The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

16. **MARGIN TRADING**

16.1 This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2 Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.    FORKS AND DISTRIBUTIONS

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5   In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.   ATTACKS ON BLOCKCHAIN NETWORKS

18.1   FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2   Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.   SITE; THIRD PARTY CONTENT

19.1   FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2   The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3   We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.   AVAILABILITY

20.1   We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

## 21.    RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

## 22.    UPDATES TO THE TERMS

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

## 23.    FEES

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

24.   **TAXES**

24.1   You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2   FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.   **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1   **License**

25.1.1   FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2   Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3   "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2   **API use**

25.2.1   Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2   FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3   FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3   **Third Party Applications**

25.3.1   We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2   If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3   You acknowledge and agree that you will not hold us responsible for, and will indemnify you from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4   In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

## 26.   PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 27.   CONFIDENTIALITY

27.1   You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2   You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3   The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1   in the public domain through no breach of the Terms;

27.3.2   known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3   required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4   If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5   Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6   Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7    The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8    The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9    The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28.    **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29.    **INDEMNIFICATION; RELEASE**

29.1    You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2    You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3    You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30.    **LIMITATION OF LIABILITY; NO WARRANTY**

30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

30.1.1   FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2   FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3   TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1   INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2   INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3   YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4   YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1   THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2   THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3   THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.    **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

36.    **FORCE MAJEURE AND RELIEF EVENTS**

36.1    FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1    any Force Majeure Event; or

36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37.    **ASSIGNMENT AND SUBCONTRACTING**

37.1    You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2    FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38.    **GENERAL**

38.1    **Entire agreement**

38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2    **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3    **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4    **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

assigns.

38.5    **Variation and waiver**

38.5.1    Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2    No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

38.6    **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

38.7    **Set off**

38.7.1    Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2    FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

38.8    **Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

38.9    **Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1    the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2    no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

38.10    **Electronic signature**

The Terms may be entered into by electronic means.

38.11 **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12 **Arbitration**

38.12.1 Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2 This arbitration agreement shall be governed by English law.

38.12.3 The seat of the arbitration shall be Singapore.

38.12.4 The language of the arbitration shall be English.

38.12.5 The number of arbitrators shall be one.

38.12.6 Each party agrees that:

(A) any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B) combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7 This agreement to arbitrate shall:

(A) be binding upon the parties, their successors and assigns;

(B) survive the termination of these Terms.

38.12.8 Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13 **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

27

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.  **DEFINITIONS**

1.1   As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)      acts of God, flood, drought, earthquake or other natural disaster;

(ii)     epidemic or pandemic;

(iii)    terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)     nuclear, chemical or biological contamination or sonic boom;

(v)      any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)     collapse of buildings, fire, explosion or accident; and

(vii)    any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.    **INTERPRETATION**

2.1   **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1   a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2   a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3   the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4   a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5   a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2   **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

2.3    **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1    a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2    a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3    a reference to an individual includes that individual's estate and personal representatives.

2.4    **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5    **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6    **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1    the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2    general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7    **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8    **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

**SCHEDULE 2**

**SERVICE SCHEDULE**

| Specified Service | Spot Market |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 3**

**SERVICE SCHEDULE**

| Specified Service | Spot Margin Trading |
| --- | --- |
| Specified Service description | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

| Risk disclosures | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
|---|---|
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

**SCHEDULE 4**

**SERVICE SCHEDULE**

| Specified Service | OTC / Off-exchange Portal (OEP Portal) |
|---|---|
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal. The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 5**

**SERVICE SCHEDULE**

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after.<br><br>Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24.<br><br>You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin.<br><br>Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins.<br><br>**IMPORTANT:** Section 16 of the General Terms applies to this service.<br><br>Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors.<br><br>In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
|---|---|
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date.<br><br>If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies.<br><br>You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin.<br><br>Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins.<br><br>**IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date.<br><br>The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money".<br><br>The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration.<br><br>Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value.<br><br>If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 7**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. <br><br> MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. <br><br> 1. Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. <br><br> 2. Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. <br><br> 3. Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. <br><br> You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. <br><br> **IMPORTANT**: Section 16 of the General Terms applies to this service. <br><br> MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

|  | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
|  | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 8**

**SERVICE SCHEDULE**

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specific Service.

| | |
|---|---|
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.<br><br>• **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.<br><br>• **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.<br><br>• **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

**SCHEDULE 9**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
|  | In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of: |
|  | • Tomorrow's MOVE Volatility contract<br>• Next weeks' MOVE contract, and the two weeks after that<br>• Next Quarter's MOVE contract, and the quarter after that and<br>• -1x BTC-PERP (Short) |
|  | IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long). |
|  | BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk. |
|  | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.

By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specified Service.

| | |
|---|---|
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

|  | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |

**SCHEDULE 10**

**SERVICE SCHEDULE**

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider. |
| | Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index. |
| | Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
| | You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins. |
| | You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform. |
| | You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins. |
| | Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable). |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 11**

**SERVICE SCHEDULE**

| Specified Service | NFT Market |
|---|---|
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion.<br><br>Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens.<br><br>NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all.<br><br>NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it.<br><br>While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion.<br><br>You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so.<br><br>There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value.<br><br>NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

|  | PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING. |

**SCHEDULE 12**

**SERVICE SCHEDULE**

| Specified Service | NFT Listing |
|---|---|
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

49

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

**SCHEDULE 13**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**

**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

### 1. FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)   your deposit of fiat currency to Digital Assets; and

b)   your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

### 2. FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or financial products.

---

3.      **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.      **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.      **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

**SCHEDULE 14**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

---

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

---

**SCHEDULE 15**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO JAPAN USERS ONLY**
**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are *non-recourse* with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

**別紙 15**

**サービスに関する別紙**

**日本のユーザーにのみ適用される規約**

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

---

FTX トレーディングは、P2P 貸借暗号資産の貸人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸人となることはありません。

当社のユーザーのみが、借受人又は貸人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

### 貸出し

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

### 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、***責任財産は***本借受人の口座において本借受人が保有する資産***に限定されます***。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出しを含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

**SCHEDULE 16**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO UK USERS ONLY**

**(Updated September 29, 2022)**

---

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

---

**EXHIBIT B**

Undated TOS

US-DOCS\154233869.7

**FTX EXCHANGE: TERMS OF SERVICE**

The following terms and conditions of service (the "**Terms**") constitute an agreement between you and FTX Trading LTD ("**FTX Trading**," "**we**," or "**us**"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("**FTX**" or the "**Exchange**") as a user ("**User**", "**you**" or "**your**") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("**API**"), or use any other services offered through the FTX website (ftx.com) (the "**Site**") (together, the "**Services**").  By registering for an FTX account ("**Account**") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange and "fiat currency" means any government issued national currency.  FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons.  Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

## 1. APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("**AML**") and counter-terrorist financing ("**CTF**") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.  For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

## 2. ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

If you are registering to use the Services on behalf of a legal entity, you represent and warrant that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

## 3.  REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name.  You are the only person authorized to use your Account and you may not share your Account credentials with any other person.  You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill.  You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries.  When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "**Enhanced Due Diligence**").  You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect.  If any such information changes, it is your obligation to update such information as soon as possible.  Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account.

We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

### 4.  AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF.  These standards are designed to prevent the use of the FTX platform for money laundering or terrorist financing activities.  We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

### 5.  INITIAL FUNDING; THIRD PARTY TRANSFERS

In order to fund your Account and begin trading, you must first procure Digital Assets.  FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar-pegged Digital Assets (each a "**Stablecoin**").  You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance.  The Exchange may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.  A partial list of fiat currencies supported by the Exchange can be found here.

FTX enables you to exchange ("**Convert**") one Digital Asset for another Digital Asset.  When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion.  The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you.  FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset.  If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever.  If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset).  FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets.  If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed.  Please also be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your funds may not be automatically credited, and may take time to recover.  Should you encounter any of these issues, you may contact us us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.

When you elect to transfer Digital Assets from your Account to a third party wallet or other location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

## 6.  FUTURES CONTRACTS

The futures listed by FTX include three contracts for each Digital Asset or index (each a "**Futures Contract**").  These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk.  In order to trade Futures Contracts on FTX, you must post collateral.  Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets.  This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time.  If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage.  If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position.  This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform.  In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses.  The use of leverage can lead to large losses as well as gains.

## 7.  LEVERAGED TOKENS

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("**Leveraged Tokens**").  FTX offers Leveraged Tokens for each underlying Digital Asset or index ("**Underlying**").  Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins.  The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption.  Users are charged or

credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("**BULL**"), -100% or -1x ("**HEDGE**"), or -300% or -3x ("**BEAR**") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period.  A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying.  Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns.


### 8.  FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("**Forks**") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset.  Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "**Dominant Digital Asset**") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "**Non-Dominant Digital Asset**").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork.  Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX.  When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support.   If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

FTX does not generally offer support for the distribution of assets based on a triggering fact or event, such as the possession of another asset (each an "**Airdrop**"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("**Staking Rewards**"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "**Digital Asset Distributions**").  FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("**Downtime**").  This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning.  During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork.  FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 9.  ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks.  In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trading, deposits, and withdrawals for such Digital Asset.  If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

## 10. API USE

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX.  You agree to not use the API or data provided through the API for any other commercial purpose.  You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity.  You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.  FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in

violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

## 11. ACCOUNT SUSPENSION AND CLOSURE

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services.  Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms.  We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms.  In order to do so, you should contact us for assistance in closing your Account.  You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account.  We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure.  You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.  Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

## 12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

### No advice

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services.  To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice.  Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.

You accept the risk of trading Digital Assets.  In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset.  You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

**Digital Asset transfers and volatility**

Trading in Digital Assets can be extremely risky and volatile.  Digital Assets may have unique features that make them more or less likely to fluctuate in value.  Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset.  Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons.  As a general matter, Users with limited trading experience and low risk tolerance should not engage in active trading on FTX. Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge.  Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks.  The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset.  We provide no warranty as to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely.  For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

**Futures and leveraged products**

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately.  If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin.  If your Account is under the minimum

margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin.  However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- *Market Price Variance Risk:* Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset.  The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- *Inverse Correlation Risk:* Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.

- *Portfolio Turnover Risk:* Leveraged Tokens may incur high portfolio turnover to manage the exposure to the underlying Digital Asset.  Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs.  Each of these factors could have a negative impact on the performance of a Leveraged Token.

- *Interest Rates:* Leveraged Tokens take positions in futures contracts to achieve their desired leverage.  These futures might trade at a premium or discount to spot markets in the applicable Digital Asset as a reflection of prevailing interest rates in cryptocurrency markets.  Thus, a Leveraged Token could outperform or underperform the Digital Asset's returns due to a divergence between the two markets.

**Supply and value of Digital Assets**

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

You acknowledge and agree that Digital Assets and/or FTX features available in one jurisdiction may not be available for trading or to access, as applicable, in another.

**Blacklisted addresses and forfeited funds**

Leveraged Tokens are Digital Assets built on the Ethereum blockchain.  FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Leveraged Tokens (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates these Terms ("**Blacklisted Addresses**").  In the event that you send Leveraged Tokens to a Blacklisted Address, or receive Leveraged Tokens from a

Blacklisted Address, FTX Trading may freeze such Leveraged Tokens and take steps to terminate your Account.

In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and you may forfeit any rights associated with your Leveraged Tokens, including the ability to redeem your Leveraged Tokens for U.S. Dollars. FTX Trading may also be forced to freeze Leveraged Tokens in the event that we receive a legal order from a valid government authority requiring us to do so.

**Software protocols and operational challenges**

The software protocols that underlie Digital Assets are typically open source projects, which means that (i) the development and control of such Digital Assets is outside of FTX's control and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

You are aware of and accept the risk of operational challenges.  FTX may experience sophisticated cyber attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services.  You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks.  You agree not to hold FTX Trading accountable for any related losses.

All Users understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your assets stored on our platform.  You claim full responsibility for monitoring such technological changes and understanding their consequences for your Digital Assets.  Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks involved associated with Digital Assets use generally or your use of our Services

**Compliance**

You are responsible for complying with applicable law.  You agree that FTX is not responsible for determining whether or which laws may apply to your transactions, including but not limited to tax law.  You are solely responsible for reporting and paying any taxes arising from your use of the Services.

**Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, exchange, and value of Digital Assets.

**No deposit protection**

Neither Digital Assets nor any fiat currency held in your Account is eligible for any public or private deposit insurance protection.

**Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions, including, but not limited to, Forks, Staking Rewards and Airdrops (as defined in Section 8 above).  FTX Trading is not obligated to support any such Digital Asset Distributions for Users.  If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX.  If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you.  Staking may subject your Digital Assets to additional risks and FTX is not responsible for losses you may incur related to staking.

## 13. RIGHT TO CHANGE OR REMOVE FEATURES AND SUSPEND OR DELAY TRANSACTIONS

We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability.  We may decline to process any order and may limit or suspend your use of one or more Services at any time, in our sole discretion.  Suspension of your use of any of the Services will not affect your rights and obligations pursuant to these Terms.

We may, in our sole discretion, decline to process orders if (i) we believe the transaction is suspicious; (ii) the transaction may involve fraud or misconduct; (iii) it violates applicable laws; or (vi) it violates these Terms.  Where permitted by law, we will notify you by the end of the business day if we have suspended processing your orders and, if possible, provide our reasons for doing so and anything you can do to correct any errors leading to the stoppage.

## 14. FEES

In consideration for the use of the Services, you agree to pay to FTX the appropriate fees, as set forth in our fee schedule displayed on the Site ("**Fee Schedule**"), which FTX Trading may revise or update in its sole discretion from time to time.  On request, FTX may make available an alternative fee schedule ("**Alternative Fee Schedule**") to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX in its sole discretion from time to time.  You authorize FTX to deduct any applicable fees from your Account at the time you make a given transaction.  Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

## 15. PROMOTIONS

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere.  You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to FTX.

## 16. SECURITY OF USER INFORMATION

You are responsible for maintaining the confidentiality and security of any and all account names, User IDs, passwords, and any other security feature that you use to access the Services.  You are responsible for (i) keeping your email address up to date in your Account profile and (ii) maintaining the confidentiality of your User information and the security of your Account, which includes the enabling of all relevant security features.  You agree to notify FTX immediately if you become aware of any unauthorized use of the Services or any other breach of security regarding the Services.  FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information.

We shall not bear any liability for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack.  If you question the authenticity of a communication purporting to be from FTX, you should login to your Account through the Site, not by clicking links contained in emails.

## 17. PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used.  You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 18. RESTRICTED ACTIVITIES

In connection with your use of the Services, you will not:

- violate or assist any party in violating any law, statute, ordinance, regulation or any rule of any self-regulatory or similar organization of which you are or are required to be a member through your use of the Services;
- provide false, inaccurate, incomplete or misleading information;
- infringe upon FTX's or any third party's copyright, patent, trademark, or intellectual property rights;
- engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;
- distribute unsolicited or unauthorized advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;
- use a web crawler or similar technique to access our Services or to extract data;
- reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;
- perform any unauthorized vulnerability, penetration or similar testing on the API;

- take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;
- transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;
- otherwise attempt to gain unauthorized access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;
- transfer any rights granted to you under these Terms;
- engage in any other activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct; or
- engage in any behavior which is unlawful, violates these Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion.

## 19. ELECTRONIC TRADING TERMS

FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset, Leveraged Token, or Futures Contract at any time, based on a number of factors, including changes in characteristics.

A transaction on FTX may fail for several reasons, including without limitation to change in prices, insufficient margin, or unanticipated technical difficulties.  FTX Trading makes no representation or warranty that any transaction will be executed properly.  We are under no circumstances liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner.  Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures on the Site.  You have full responsibility to determine and inquire into the failure of any transaction which you initiate.

In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to these Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software.  If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

We may refuse to execute a trade, or impose trade amount limits or restrictions at any time, in our sole discretion without notice.  Specifically, we reserve the right to refuse to process, or the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on FTX, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in these Terms.  FTX Trading reserves the right to halt deposit activity at our sole discretion.  A User may not change, withdraw, or cancel its authorization to make a transaction, except with respect to partially filled orders.

FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise.  The User's remedy in the event of an error will be limited to

seeking to cancel an order or obtaining a refund of any amounts charged to the User.  FTX Trading cannot guarantee such cancellations or refunds will always be possible.

FTX provides Users with a platform that allows their orders to be matched with the orders of other Users.  Orders may be partially filled or may be filled by a number of orders, depending on the trading activity at the time an order is placed.  FTX's relationship with you under these Terms is as a trading platform provider only and does not act as principal or counterparty with respect to trades entered into on the platform.  Notwithstanding the foregoing, (i) FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades, and (ii) affiliates of FTX may execute trades on the platform; provided, however, that such affiliates shall not be afforded any priority in trade execution.

The Digital Assets available for purchase through the Services may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods.  You acknowledge that while FTX Trading uses commercially reasonable methods to provide exchange rate information to you through our Services, the exchange rate information we provide may differ from prevailing exchange rates made available by third parties.  Similarly, the actual market rate at the time of your trade may be different from the indicated prevailing rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in actual versus indicated rates.

## 20. COMMUNICATIONS

These Terms are provided to you and concluded in English.  We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

## 21. FEEDBACK

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide on our platform or one of our social media accounts, regarding FTX or the Services (collectively, "**Feedback**") that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading.  FTX Trading will own exclusive rights, including all intellectual property rights, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

## 22. OWNERSHIP OF DIGITAL ASSETS

You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity.

### 23. TAXES

You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments.  It is your responsibility to determine what, if any, taxes apply to your activities on the Exchange, and to collect, report, and remit the correct tax to the appropriate tax authority. FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

### 24. INDEMNIFICATION; RELEASE

You agree to indemnify and hold FTX Trading, its affiliates, and service providers, and each of their officers, directors, agents, joint venturers, employees, and representatives harmless from any claim or demand (including attorneys' fees and any losses, fines, fees, or penalties imposed by any regulatory authority) arising out of your breach of these Terms, or your violation of any law or regulation.

For the purpose of this Section 24, the term "**losses**" means all net costs reasonably incurred by us or the other persons referred to in this Section which are the result of the matters set out in this Section 24 and which may relate to any claims, demands, causes of action, debt, cost, expense or other liability, including reasonable legal fees (without duplication).

If you have a dispute with one or more Users or third parties, you release FTX Trading (and its affiliates and service providers, and each of their officers, directors, agents, joint ventures, employees, and representatives) from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes.  If you have a dispute with anyone other than FTX Trading, you release us from liability associated with that dispute.

### 25. LIMITATION OF LIABILITY; NO WARRANTY

YOU EXPRESSLY UNDERSTAND AND AGREE THAT FTX TRADING AND OUR AFFILIATES AND SERVICE PROVIDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND REPRESENTATIVES WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, OR DAMAGES FOR LOSS OF PROFITS INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES (EVEN IF FTX TRADING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, RESULTING FROM: (I) THE USE OR THE INABILITY TO USE THE SERVICES; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.  ACCORDINGLY, SOME OF THE LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU.  IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR WITH THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES AND CLOSE YOUR ACCOUNT.  THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED.  FTX TRADING, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.  FTX TRADING MAKES NO WARRANTY THAT (I) THE SERVICES WILL MEET YOUR REQUIREMENTS, (II) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, OR (III) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

## 26. FORCE MAJEURE

FTX Trading shall have no liability for any failure or delay resulting from any abnormal or unforeseeable circumstances outside our reasonable control, the consequences of which would have been unavoidable despite all efforts to the contrary, including without limitation governmental action or acts of terrorism, earthquake, fire, flood, or other acts of God, labor conditions, delays or failures caused by problems with another system or network, mechanical breakdown or data-processing failures or where we are bound by other legal obligations.

## 27. GOVERNING LAW; VENUE AND ARBITRATION

The laws of Antigua and Barbuda shall govern these Terms.  Except as otherwise required by local law, any dispute between you and FTX Trading related in any way to, or arising in any way from, our Services or these Terms ("**Dispute**") shall be finally settled on an individual, non-representative basis in binding arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33), as modified by these Terms or in accordance with rules on which we may mutually agree.  Any arbitration shall take place in Antigua and Barbuda.  The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law.

## 28. AMENDMENTS

We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date.  The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date.  In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account.  You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms.

### 29. ASSIGNMENT

You may not transfer or assign these Terms or any rights or obligations you have under these Terms without our prior written consent or otherwise and any such attempted assignment shall be void.  We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent.  If you object to such transfer or assignment, you may stop using our Services and terminate this agreement by contacting us and requesting to close your account.

### 30. SURVIVAL

Upon termination of your Account or this agreement for any other reason, all rights and obligations of the parties that by their nature are continuing will survive such termination.

### 31. THIRD PARTY APPLICATIONS

If you grant express permission to a third party to connect to your Account, either through the third party's product or through FTX, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under this agreement.  Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

### 32. SITE; THIRD PARTY CONTENT

FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date.  FTX Trading will update the information on the Site as necessary to provide you with the most up to date information, but you should always independently verify such information.  The Site may also contain links to third party websites, applications, events or other materials ("**Third Party Content**").  Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services.  FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

### 33. LIMITED LICENSE; IP RIGHTS

FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to these Terms, to access and use the Services solely for approved purposes as determined by FTX Trading.  Any other use of the Services is expressly prohibited.  FTX Trading and its licensors reserve all rights in the Services and you agree that these Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part.  If you violate any portion of these Terms, your permission to access and use the Services may be terminated pursuant to these Terms.  "FTX.com," "FTX"

and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors.  You may not copy, imitate, or use them without FTX Trading's prior written consent.  All right, title, and interest in and to the Site, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

## 34. UNCLAIMED OR ABANDONED PROPERTY

If FTX Trading is holding funds in your Account, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time, applicable law may require us to report these funds as unclaimed property to the applicable jurisdiction.  If this occurs, FTX Trading will try to locate you at the address shown in our records, but if FTX Trading is unable to locate you, we may be required to deliver any such funds to the applicable jurisdiction as unclaimed property.  FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by applicable law.

## 35. LEGAL COMPLIANCE

The Services are subject to all applicable export control restrictions, and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if (i) you are in a prohibited jurisdiction as set forth at Location Restrictions ("**Restricted Territories**"); (ii) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government or by the European Union ("**Restricted Persons**"); (iii) you intend to transact with any Restricted Territories or Restricted Persons; (iv) you you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or (v) the publication or availability of the Services is prohibited or contrary to local law or regulation, or could subject FTX to any local registration or licensing requirements.

## 36. ENTIRE AGREEMENT; THIRD PARTY RIGHTS

The failure of FTX Trading to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision.  If any provision of these Terms shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and remain enforceable between the parties.

The headings and any explanatory text are for reference purposes only and in no way define, limit, construe, or describe the scope or extent of such section.  These Terms, including FTX's policies governing the Services referenced herein, the Privacy Policy, and the Security Policy, constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

These Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and other affiliates of FTX Trading, which each shall

be a third party beneficiary of these Terms, and no other person shall assert any rights as a third party beneficiary hereunder.  If some future court judgment deems any particular provision of these Terms unenforceable, the rest of the Agreement is still valid.

## 37. QUESTIONS AND CONTACT INFORMATION

We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise Users to check those channels before contacting support.

Telegram: https://t.me/FTX_Official
Twitter: https://twitter.com/FTX_Official
WeChat: ftexchange
Blog: https://blog.ftx.com/
Email: support@ftx.com

To contact us, please visit one of the links or channels above.  For support with your Account, you may email us at support@ftx.com.  Please provide all relevant information, including your FTX username and transaction IDs of any related deposits.  Although we make no representations or provide no warranties as to the speed of response, we will get back to you as soon as possible.

**EXHIBIT C**

October 2021 LSA

US-DOCS\154233869.7

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made and dated as of 22 October, 2021 and is entered into by and between Three Arrows Capital Ltd a limited company registered in BVI having its registered address at ABM Chambers 2283, Road Town, Tortola, BVI VG1110 ("**Borrower**"), and FTX Trading Limited ("**Lender**").

## RECITALS

WHEREAS, Borrower has requested that Lender make available to Borrower a line of credit (the "**Line of Credit**") pursuant to which Lender may make Advances denominated in USD, USDT, USDC, BTC or ETH to Borrower;

WHEREAS, Lender is willing to make the Advances on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained in this Agreement, Borrower and Lender agree as follows:

## SECTION 1.    DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Unless otherwise defined herein, the following capitalized terms have the following meanings:

"**Advance(s)**" means any loan advanced by Lender to Borrower pursuant to the Line of Credit under this Agreement.

"**Advance Date**" means the date on which an Advance is funded to Borrower hereunder.

"**Advance Request**" means a written request for an Advance submitted by Borrower to Lender as provided for in Section 2.1(b), using the form attached as Exhibit A, together with any additional documents or information requested by Lender.

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and under "common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Bankruptcy Laws**" means, collectively, all liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor-relief laws of applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**BTC**" means the cryptocurrency Bitcoin.

"**Business Day**" means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in Hong Kong.

"**Change in Control**" means (a) at any time, any "person" or "group", shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner", directly or indirectly, of forty-nine percent (49.0%) or more of the ordinary voting power for the election of directors of Borrower (determined on a fully diluted basis).

"**Closing Date**" means the date of this Agreement.

"**Collateral**" means the property described in <u>Section 4</u>.

"**Copyrights**" means all copyrights, whether registered or unregistered and published or unpublished, including copyrights in software, internet web sites, databases and the content thereof, held pursuant to the laws of any country.

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived hereunder, become an Event of Default.

"**Depository**" means the Exchange and any other exchange or otc desks used by the Borrower.

"**End Date**" means the earlier to occur of: (i) the Maturity Date; or (ii) any other date on which the Outstanding Balance becomes due and payable in full under the terms of this Agreement.

"**ETH**" means the cryptocurrency Ether.

"**Event of Default**" has the meaning set forth in <u>Section 9</u>.

"**Exchange**" means the FTX digital asset trading platform.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Insolvency Proceeding**" is any case by or against any Person under any proceeding under bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Indemnified Person**" means has the meaning set forth in <u>Section 7.1</u>.

"**Intellectual Property**" means all of Borrower's (i) rights anywhere in the world in and to Copyrights; Trademarks; Patents; trade secrets, confidential and proprietary information, including know-how, manufacturing and production processes and techniques, research and

development information, databases and data, customer and supplier lists and information; inventions; mask works; domain names; all other intellectual and industrial property rights of any type; and the rights to sue for past, present and future infringement, misappropriation or other violation of any of the foregoing and any harm to the goodwill associated therewith, and (ii) all tangible embodiments of the foregoing.

"**Laws**" means any federal, state, local and foreign statute, law, treaty, judicial decision, regulation, guidance, guideline, ordinance, rule, judgment, order, decree, code, injunction, permit, concession, grant, franchise, governmental (or quasi-governmental) agreement, governmental (or quasi-governmental) restriction or determination of an arbitrator, court or other Governmental Authority (whether or not having the force of law), whether now or hereafter in effect.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Loan Documents**" means this Agreement, the Security Documents, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"**Material Adverse Effect**" means a material adverse effect upon: (i) the business, operations, properties, assets, prospects or condition (financial or otherwise) of Borrower; or (ii) the ability of Borrower to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Lender's Liens on the Collateral or the priority of such Liens.

"**Maturity Date**" means two years from the date of this Agreement; provided however, that the Maturity Date shall automatically be extended for additional consecutive one-year periods thereafter unless Lender provides notice of termination at least sixty (60) days prior to the applicable Maturity Date.

"**Outstanding Balance**" means, at the applicable time, the sum of (i) the then unpaid principal amount of all Advances, plus (ii) all then accrued but unpaid interest on all Advances, plus (iii) all other amounts then payable under this Agreement.

"**Patents**" means all letters patent of, or rights corresponding thereto, in any country, all applications (including provisional, continuation (in-whole or in-part), and divisional applications) of the foregoing and any other pre-grant variations thereof, and all reissues, reexaminations, renewals, extensions and other post-grant variations thereof in any country.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"**Secured Obligations**" means all of Borrower's obligations and liabilities under each Loan Document, including any obligation to pay any amount whether arising by reason of an

extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Security Documents**" means each of this Agreement, all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, control agreements, financing statements and other documents as shall from time to time secure or relate to the Secured Obligations or any other obligation arising under any Loan Document or any part thereof, in each case, authenticated, or executed by Borrower.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Total Line of Credit Commitment**" means the obligation of Lender to make Advances to Borrower on or after the Closing Date in an aggregate principal amount not to exceed USD 100M USD.

"**Trademarks**" means all trademarks, service marks, domain names, trade names, business names, corporate names, trade dress, logos, designs, slogans, or other indicia of source or origin, whether registered, common law or otherwise, and any applications, recordings, renewals and other post-grant variations of any of the foregoing in any country or any political subdivision thereof, together, in each case, with the goodwill associated therewith or symbolized thereby.

"**USD**" means U.S. dollars.

"**USDC**" means the cryptocurrency USD Coin.

"**USDT**" means the cryptocurrency Tether.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC.

## SECTION 2.   THE LOANS

### 2.1    Advances, Interest and Payment.

(a)    Advances. Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth herein, Lender agrees to make Advances denominated in USD, USDC, USDT, BTC or ETH from time to time before the End Date in an aggregate principal amount not to exceed the Total Line of Credit Commitment.  Amounts borrowed under this Section 2.1(a) and repaid or prepaid as permitted hereunder may, subject to the terms and conditions of this Agreement, be reborrowed until but not after the End Date. c

(b)    Advance Request.  To obtain an Advance, Borrower shall send by email or text an Advance Request specifying: (i) the amount of collateral to be deposited and maintained in Borrower's Exchange account held under the email address operations@threearrowscap.com (the "**Account Assets**"), provided that the value of such specified Account Assets may never be less than 150% of the value of the related Advance requested; (ii) the amount of the Advance requested; (iii) whether such Advance will be denominated in USD, USDC, USDT, BTC or ETH; and (iv) the proposed Advance Date. In the event that the Lender accepts such Advance Request, Borrower shall deposit the requisite Account Assets into the Borrower's Exchange account (the "**Borrower Account**"). Upon receipt of the requisite Account Assets by Lender during regular business hours on any Business Day, Lender shall use commercially reasonable efforts to deposit the Advance set out in the Advance Request to the Borrower Account within two hours.

(c)    Hard Margin Call. Should the value of the Account Assets fall below the Hard Margin Call (as set forth in the applicable Advance Request, such Hard Margin Call to be, in any event no less than 125% of the value of digital assets loaned to the Borrower (as applicable, the "**Hard Call Requirement**") at any time, the Lender shall provide written notice to the Borrower of such Hard Margin Call and Borrower shall have two hours from the time of receipt of such notice to either (a) deposit additional collateral to the Borrower Account, or (b) close certain trading positions in the Borrower Account, in each case to restore the value of the Account Assets to greater than the Hard Call Requirement. If the value of the Account Assets is not restored to greater than the Hard Call Requirement within such two-hour period, or if the Lender determines that it would be detrimental for Lender to wait for such two-hour period to conclude (as determined in its sole and absolute discretion), Lender shall have the right to liquidate the Account Assets and all other assets held by the Borrower on the Exchange, including within the Borrower Account, and shall be fully entitled to all proceeds, property, or amounts received on such liquidation. In addition, the Lender may terminate this Agreement immediately without prior notice and close all accounts held by the Borrower on the Exchange.

(d)    Determining Value: The value of the Account Assets and the Hard Margin Call shall be determined by the Lender in its sole and absolute discretion.

(e)    Interest.  The principal balance of each Advance shall bear interest thereon at a rate equal to three percent 8%  per annum from and including the Advance Date through and including the date the Outstanding Balance is paid in full, and shall be calculated on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days each and the actual number of days elapsed.  If at any time and for any reason whatsoever, the interest rate payable on any Advance shall exceed the maximum rate of interest permitted to be charged by Lender to Borrower under applicable law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable law.  Any amount added to principal pursuant to this Agreement or any Loan Document shall bear interest at the rate specified herein and shall be payable with such interest upon demand by Lender and absent such demand, as otherwise provided herein

(f)　　Payment.  Accrued interest on each Advance shall be due and payable in full in arrears monthly on the last day of each month.  The entire Outstanding Balance of all Advances shall be due and payable on the End Date.  Borrower shall make all payments under this Agreement with respect to each Advance in the denomination of such Advance without setoff, recoupment or deduction and regardless of any counterclaim or defense.

2.2　　Voluntary Prepayment; Mandatory Prepayments. The Outstanding Balance may be prepaid in whole or in part without penalty or premium at any time before the Maturity Date.  Prepayments shall be applied first to outstanding fees and expenses (if any), second to accrued and unpaid interest, and then third to the outstanding principal of all Advances.  Borrower shall prepay in full the Outstanding Balance prior to or concurrently with (i) the occurrence of a Change in Control or (ii) termination of this Agreement.

2.3　　Late Payments.  To the extent permitted under applicable law, Borrower agrees that if any payment pursuant to Section 2 is not made within three days of the due date, (a) Borrower will be charged a late charge of ten percent per annum of the amount of the past due payment, calculated from and including the date such payment was due through and including the date such payment is made and (b) Lender may liquidate a portion of the Collateral in an amount equal to any late payment and corresponding late charge.

2.4　　Right to Terminate.  Borrower may terminate this Agreement at any time upon five (5) Business Days advance notice to Lender and repayment in full of the Outstanding Balance.   Except as provided in Section 2.1(c), Lender may terminate this Agreement at any time after the Maturity Date, upon six (6) months advance notice to Borrower.

## SECTION 3.  SUBORDINATION

3.1　　Any indebtedness incurred by Borrower following the date of this Agreement shall be subordinated to the Secured Obligations, unless otherwise consented to by Lender in writing, such consent to not be unreasonably withheld. In the event that Lender consents to subordinate the Secured Obligations to future indebtedness, Lender agrees to execute a form of subordination agreement, as may be requested by any future lender to the Borrower from time time, to effect the foregoing subordination.

## SECTION 4.  SECURITY INTEREST

4.1　　Grant.  As security for the prompt and complete payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, Borrower hereby pledges, assigns, transfers and delivers to Lender, and grants to Lender a continuing and unconditional first priority security interest in all of Borrower's present and future rights, title and interest in the following (collectively referred to as the "**Collateral**"):

6

(a)  all of Borrower's digital asset depository and exchange accounts at each Depository, including, without limitation, the Exchange and each other cryptocurrency exchange used by Borrower (such accounts and any other accounts to which Lender may transfer the Collateral, collectively, the "**Depository Accounts**");

(b)  all cryptocurrency now or in the future held in, on deposit in or otherwise allocated to any of Borrower's digital asset depository accounts at any Depository, including, without limitation, the Depository Accounts (including, without limitation, any cryptocurrency transferred to any such digital asset depository account after the date hereof);

(c)  any other cryptocurrency now or in the future issued with respect to any of the foregoing cryptocurrency as a result of a fork or other event that results in the holders of cryptocurrency receiving additional or replacement cryptocurrency (whether or not such other cryptocurrency is held in, on deposit in or otherwise allocated to the Depository Accounts or any other digital asset depository accounts at any Depository);

(d)  all rights to receive delivery of or withdraw any of the foregoing cryptocurrency from each Depository and all rights against each Depository with respect to any digital asset depository accounts at such Depository, including, without limitation, the Depository Accounts, any of the foregoing cryptocurrency, and the proceeds thereof;

(e)  all Receivables, Equipment, Fixtures, General Intangibles (including without limitation all Intellectual Property), Inventory, Investment Property, Deposit Accounts, Security Accounts, Cash, Cash Equivalents, Goods, and all other tangible and intangible personal property of Borrower whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located, and any of Borrower's property in the possession or under the control of Lender; and

(f)  to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

4.2    Borrower hereby:

(a)  agrees that such security interest granted by Borrower to Lender constitutes a valid, first priority security interest in the Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any termination of this Agreement, Lender's security interest in the Collateral shall remain in effect for so long as any Secured Obligations (other than inchoate indemnity obligations) remains outstanding under this Agreement or any of the Loan Documents.

(b)  agrees that Lender has the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

(c)  authorizes Lender at any time and from time to time, at Borrower's expense, to file in any jurisdiction any financing statements and amendments that: (i) name the Collateral as collateral thereunder, regardless of whether any particular Collateral falls

DocuSign Envelope ID: 9F9FC709-3663-4D29-BA1E-9B5A54238F3B

within the scope of the UCC; (ii) contain any other information required by the UCC for sufficiency or filing office acceptance, including organization identification numbers; and (iii) contain such language as Lender determines helpful in protecting or preserving rights against third parties. Borrower ratifies any such filings made prior to the date hereof.

(d)     acknowledges and agrees that the obligations of Borrower under this Agreement shall be full recourse obligations of Borrower and that Borrower is and shall remain liable to Lender for the payment in full of all Secured Obligations (other than inchoate indemnity obligations) and performance of all obligations hereunder.

## SECTION 5.   CONDITIONS PRECEDENT TO LOAN

Lender's obligation to make Advances under this Agreement shall be subject to the satisfaction of all of the conditions set forth in this Agreement and the Loan Documents, including, without limitation, the following specific conditions precedent:

5.1     <u>Conditions to the Initial Advance</u>.  It shall be a condition to Lender's obligation to fund an initial Advance, that on or prior to the Closing Date:

(a)     Borrower shall have delivered to Lender the following, each in form and substance acceptable to Lender:

(i)     copies of the Loan Documents, executed by Borrower;

(ii)     certified copy of resolutions of Borrower's Board of Directors, Managers or other similar body, and if required, Borrower's shareholders or members evidencing approval of the transactions evidenced by the Loan Documents;

(iii)     certified copies of Borrower's organizational documents, as amended through the Closing Date;

(iv)     a certificate of good standing for Borrower from its jurisdiction of formation; and

(b)     upon the filing of security documents, including a UCC-1 financing statement and the obtaining of control agreements from the Exchange, the Security Documents will create upon the Closing a first priority security interest in all of the Collateral;

5.2     <u>Conditions to All Advances</u>.  It shall be a condition to Lender's obligation to fund each Advance that:

(a)     Lender shall have received an Advance Request executed by an officer of Borrower requesting an Advance prior to the End Date pursuant to Section 2.1(b).

(b)     (i) no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default and (ii) no event that has had

or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing;

(c)    As of each Advance Date, the representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or, if already qualified by "materiality," "Material Adverse Effect" or similar phrases, in all respects (after giving effect to such qualification)); provided, that in the case of any representation or warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be;

(d)    Lender shall have received such other documents as Lender may reasonably request, including a certificate executed by a duly authorized officer of Borrower certifying compliance with the provisions of Sections 5.2(b) through (c) as of such Advance Date.

## SECTION 6.    REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to enter into this Agreement and to make the Advances, Borrower represents and warrants to Lender that, as of the date hereof and as of each Advance Date:

6.1    <u>Corporate Status; Compliance with Law</u>.    Borrower: (a) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation; (b) is duly qualified to conduct business and is in good standing in all jurisdictions in which the nature of its business or its ownership or lease of properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect; and (c) has the requisite power and authority to conduct its business as now and proposed to be conducted and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties.

6.2    <u>Collateral</u>.    Except for the security interest in the Collateral granted by Borrower to Lender under this Agreement, Borrower is the sole, legal and equitable owner of the Collateral and no other security agreement, financing statement, or other security instrument covering the Collateral exists.  Borrower has rights in or the power to transfer the Collateral, and its title to the Collateral is free and clear of Liens, adverse claims, and restrictions on transfer or pledge, other than those created by this Agreement or the Loan Documents.

6.3    <u>Organizational Power, Authorization, Enforceable Obligations, Consents</u>.  The execution, delivery and performance of this Agreement and all other Loan Documents by Borrower: (a) are Borrower's legal power and do not contravene any provision of Borrower's organizational documents; (b) have been duly authorized by all necessary or proper action of Borrower; and (c) will not result in the creation or imposition of any Lien upon the Collateral, other than the Liens created by the Loan Documents.  The Loan Documents, when executed and delivered by Borrower, shall constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with their terms except as

9

limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

6.4     <u>Actions Before Governmental Authorities</u>.  There are no actions, investigations, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Borrower, threatened against or affecting Borrower or its property, before any Governmental Authority or before any arbitrator or panel of arbitrators.

6.5     <u>Laws</u>.  Borrower is not in violation of any Law, or in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority.  Borrower has conducted its business in compliance with applicable anti-corruption, anti-bribery, anti-money laundering, sanctions and/or anti-terrorism Laws.

6.6     <u>Tax Matters</u>.  Borrower has (a) filed all federal, state and material local Tax returns that are required to be filed, and (b) duly paid or fully reserved for all Taxes or installments thereof as and when due, which have or may become due pursuant to such returns other than those being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

6.7     <u>Margin Stock; Use of Proceeds</u>.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Advances will be used to extend credit to others for the purpose of purchasing or carrying any margin stock.  Borrower will use the proceeds of the Advances solely for lawful purposes.

**SECTION 7.  INDEMNITY**

7.1     <u>Indemnity</u>.  Borrower agrees to indemnify and hold Lender and its officers, directors, employees, agents, in-house attorneys, representatives and shareholders (each, an "**Indemnified Person**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal) (collectively, "**Liabilities**"), that may be instituted or asserted against or incurred by such Indemnified Person arising out of, in connection with, or as a result of (a) the execution and delivery of this Agreement and the Loan Documents, (b) credit having been extended, suspended or terminated under this Agreement and the other Loan Documents, (c) the administration of such credit, (d) the use of proceeds of the Advances, (e) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by Borrower or any of their

respective Affiliates), (f) the occurrence of any Event of Default and the disposition or utilization of the Collateral, (g) any factual information produced by Borrower and provided to Lender in connection with the transactions contemplated or financed under any Loan Document being or being alleged to be misleading and/or deceptive in any respect, (h) any inquiry, investigation, subpoena (or similar order) or litigation with respect to the transactions contemplated or financed under this Agreement; and (i) a failure by borrower to pay any amount due under a Loan Document on its due date, excluding, in the case of the foregoing clauses (a) through (e), Liabilities to the extent resulting solely from any Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment.  Borrower agree to pay, and to save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes (excluding taxes imposed on or measured by the net income of Lender) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.  In no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).

## SECTION 8.   COVENANTS OF BORROWER

As long as any Secured Obligations (other than inchoate indemnity obligations) are outstanding or Lender has any obligation to make Advances, Borrower agrees as follows:

8.1     <u>Collateral; Liens Generally</u>.  Borrower shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever, and shall give Lender prompt written notice of any legal process affecting the Collateral or any Liens.  Borrower will not sell, dispose or otherwise transfer the Collateral or any interest in the Collateral without the prior written consent from Lender.

8.2     Mergers or Acquisitions<u>.  Borrower shall not </u>merge or consolidate with or into any other business organization without the prior written consent of Lender.

8.3     <u>Taxes</u>.  Borrower shall pay when due all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against (a) Lender and related to, or in connection with, any of the transactions contemplated hereby or by other Loan Documents (other than taxes imposed on or measured by the net income of Lender), subject to reasonable notification thereof by Lender, and (b) Borrower or the Collateral or upon Borrower's ownership, possession, use, operation or disposition thereof or upon Borrower's rents, receipts or earnings arising therefrom.

8.4     <u>Corporate Changes; Maintenance and Conduct of Business; Capital Structure</u>.  Borrower shall not change its corporate name, legal form or jurisdiction of formation or principal place of business without at least 30 days' prior written notice to Lender.

8.5     <u>Notification of Default or Event of Default</u>.  Borrower shall notify Lender immediately in writing via email and by telephone pursuant to <u>Section 11.3</u> after Borrower acquires knowledge of any breach or Default in the performance of any covenant or Secured Obligation under this Agreement, any Loan Document or any other agreement between Borrower and Lender, or the occurrence of any Event of Default.

8.6     <u>Books and Records</u>.  Borrower shall keep adequate books and records with respect to its material business activities.

8.7     <u>Compliance with Laws and Organizational Documents; Maintenance of Licenses</u>.  Without limiting any other provision of this Agreement, Borrower shall comply in all material respects with all Laws applicable to it and the terms of all organizational documents applicable to it.  Borrower shall obtain and maintain all material licenses, permits, certifications, consents and governmental authorizations and approvals necessary to own its property and to conduct its business as conducted on the Closing Date.

8.8     <u>Financing Statements</u>.  Upon Lender's request, Borrower will execute any financing statement or other document necessary to perfect or otherwise record Lender's security interest in the Collateral.

## SECTION 9.   EVENTS OF DEFAULT

Any one or more of the following events shall be an "**Event of Default**":

9.1     <u>Payments</u>.  Borrower fails to pay any amount due under this Agreement or any of the other Loan Documents when whether scheduled, upon acceleration or otherwise; or

9.2     <u>Hard Margin Call</u>. The amount held in the Borrower Account falls to below the Hard Margin Call Requirement; or

9.3     <u>Covenants</u>.  Borrower breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement, or any of the other Loan Documents or any other agreement between Borrower and Lender, and such default continues for more than three Business Days; or

9.4     <u>Representations</u>.  Any representation or warranty made by Borrower in any Loan Document or other statement (financial or otherwise) furnished by or on behalf of Borrower to Lender shall have been false, incorrect, incomplete or misleading in any material respect when made or furnished; or

9.5     <u>Voluntary Bankruptcy or Insolvency Proceedings</u>.  Borrower shall (a) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) admit in writing its inability to pay its debts generally as they mature, (c) make a general assignment for the benefit of its creditors, (d) be dissolved or liquidated, (e) commence a

DocuSign Envelope ID: 9F9FC709-3663-4D20-BA1E-9B5A54238F3B

voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any Bankruptcy Law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (f) take any action for the purpose of effecting any of the foregoing; or

9.6     <u>Involuntary Bankruptcy or Insolvency Proceedings</u>.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or the debts thereof under any Bankruptcy Law now or hereafter in effect shall be commenced; or

9.7     <u>Attachments; Judgments</u>.  Any portion of Borrower's assets are attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money against Borrower, or Borrower is enjoined or in any way prevented by court order from conducting any part of its business; or

9.8     <u>Other Obligations</u>.  The occurrence of any default or breach under any agreement or obligation of Borrower (a) involving any indebtedness in excess of $100,00, or (b) receipt of written notice of the occurrence of any default or breach under any other agreement or obligation of Borrower with annual payments or receipts in excess of $100,000 which, in the case of such default or breach, is not cured within any applicable grace or cure period; or

9.9     <u>Foreclosure Proceedings</u>.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Advances.

9.10     <u>Change in Control</u>.  The occurrence of any Change in Control without the prior written approval of Lender; or

9.11     <u>Material Adverse Effect</u>.  Any event occurs that has had or could reasonably be expected to have a Material Adverse Effect; or

9.12     <u>Cessation of Business</u>.  Borrower ceases to operate its business as a going concern or Borrower's board of directors, managers, stockholders or members elect to dissolve and wind up Borrower's affairs; or

9.13     <u>Change in Law</u>.  A change or material development in applicable law (including case law) or regulation makes the Advances unlawful, unless grandfathered.

## SECTION 10.          REMEDIES

10.1    <u>General</u>.  Upon and during the continuance of any one or more Events of Default, (a) Lender may, at its option, accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in <u>Section 9.4</u> or <u>Section 9.5</u>, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act), (b) Lender may, at its option, sign and file in Borrower's name any and all collateral assignments, notices, control agreements, security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and (c) each Depository is hereby authorized by Borrower to pay, and Borrower directs such Depository to pay, any amounts owed under this Agreement directly to Lender; and in furtherance thereof, Borrower hereby grants Lender an irrevocable power of attorney coupled with an interest. Lender may exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under applicable Law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral.  Without limiting the generality of the foregoing, Borrower expressly agrees that in any such default Lender may take immediate and exclusive possession of the Collateral and that Lender may liquidate the Collateral in whole or in part, at its sole discretion.  All of Lender's rights and remedies shall be cumulative and not exclusive. Borrower waives presentment, demand, protest or other notice of any kind.

10.2    <u>Collection; Foreclosure</u>.  Subject to the limitations set forth in <u>Section 3</u> (if any), upon the occurrence and during the continuance of any Event of Default, Lender may apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Lender may elect.  Any such sale may be made either at public or private sale at its place of business or elsewhere.  Borrower agree that any such public or private sale may occur upon ten calendar days' prior written notice to Borrower.  Lender may require Borrower to assemble the Collateral and make it available to Lender at a place designated by Lender that is reasonably convenient to Lender and Borrower.  The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by Lender in the following order of priorities:

(a)    First, to Lender for any reasonable costs, fees, or expenses incurred in connection with the sale or disposition of the Collateral, including any legal, accounting or other fees incurred;

(b)    Second, to Lender in an amount equal to the then unpaid amount of the Secured Obligations, in such order and priority as Lender may choose in its sole discretion; and

(c)     Finally, after the full, and final payment of all of the Secured Obligations, to any creditor holding a junior Lien on the Collateral, or to Borrower or its representatives or as a court of competent jurisdiction may direct.

Lender shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

10.3    <u>Waiver</u>.  Lender shall be under no obligation to marshal any of the Collateral for the benefit of Borrower or any other Person, and Borrower expressly waives all rights, if any, to Lender to marshal any Collateral.

10.4    <u>Cumulative Remedies</u>.  The rights, powers and remedies of Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of Lender.

## SECTION 11.        MISCELLANEOUS

11.1    <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.2    <u>Usury Savings Clause</u>.  Lender and Borrower intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money or interest in excess of the maximum amount of interest (including all charges and fees) permitted to be charged by applicable law, from time to time.

11.3    <u>Notice</u>.     Any notice, demand, request, consent, approval, declaration, service of process or other communication that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received when sent to the email address set forth below such party's name on the execution page of this Agreement or to such other email address as each party may designate for itself by like notice.

11.4    <u>Lender Appointed Attorney-In-Fact</u>.  Borrower hereby appoints Lender Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time during the continuance of an Event of Default to take any action and to execute any instrument that Lender may deem necessary or advisable to accomplish the purposes of this Agreement (but Lender shall not be obligated to and shall have no liability to

15

Borrower or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. Borrower hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

11.5    <u>Security Interest Absolute</u>. To the extent permitted by law, Borrower hereby waives demand, notice, protest, notice of acceptance of this Agreement, Collateral received or delivered and all other demands and notices of any description. To the extent permitted by law, all rights of Lender and liens and security interests hereunder, and all Secured Obligations of Borrower hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligations or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any amendment or other modification of this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, willful or otherwise, in the payment of the Secured Obligations;

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Advances or any existence of or reliance on any representation by Lender that might vary the risk of Borrower or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any guarantor or surety.

11.6    <u>Survival of Representations and Warranties</u>. Borrower understands and agrees that in making the Advances, Lender is relying on all representations, warranties and covenants made by Borrower in this Agreement, the Loan Documents and in any certificate or other instrument delivered by Borrower to Lender under this Agreement. Such Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the execution of this Agreement and the funding of the advance, shall be continuing in nature, and shall remain in full force and effect until such time as all of Borrower's obligations under this Agreement shall be fully satisfied, or until

this Agreement shall be terminated in the manner provided herein, whichever is the last to occur.

11.7    Termination. This Agreement shall terminate upon the payment in full of all Secured Obligations and performance of all obligations hereunder. At such time, Lender's sole obligations shall be, (a) to the extent Lender has taken control of any Collateral, to direct each Depository to transfer such Collateral in the Depository Accounts to Borrower, at a wallet address provided by Borrower to Lender, and (b) to authorize Borrower to terminate any UCC financing statements filed by Lender against Borrower with respect to the Collateral.

11.8    Entire Agreement; Amendments.

(a)    This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

(b)    No amendment or waiver of, or supplement or other modification to, any Loan Document or any provision thereof, shall be effective unless the same shall be in writing and signed by Borrower and Lender, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

11.9    No Waiver. The powers conferred upon Lender by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers. No omission or delay by Lender at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by Borrower at any time designated, shall be a waiver of any such right or remedy to which Lender is entitled, nor shall it in any way affect the right of Lender to enforce such provisions thereafter.

11.10    Survival. All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of Lender and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

11.11    Successors and Assigns. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on Borrower and their permitted assigns (if any). Borrower shall not assign any obligations under this Agreement or any of the other Loan Documents without Lender's express prior written consent, and any such attempted assignment shall be void and of no effect. Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents without prior notice to or the consent of the Borrower, and all of such rights shall inure to the benefit of Lender's successors and permitted assigns.

11.12    Governing Law.  This Agreement and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of Hong Kong, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

11.13    Dispute Resolution.    Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

11.14    JURY TRIAL WAIVER.  THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.15    Professional Fees.  To the extent permitted by applicable law, Borrower promise to pay any and all reasonable attorneys' and other professionals' fees and expenses incurred by Lender after the Closing Date in connection with: (a) enforcement, collection or protection of Lender's rights in connection with this Agreement and the Loan Documents, including the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (b) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to Borrower or the Collateral, and any appeal or review thereof; or (c) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to Borrower, the Collateral, the Loan Documents, including representing Lender in any adversary proceeding or contested matter commenced or continued by or on behalf of Borrower's estate, and any appeal or review thereof.

11.16    Assignment of Rights.  Borrower acknowledges and understands that Lender may sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "**Assignee**").  After such a permitted assignment, the term "Lender" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, Lender shall retain all rights, powers and remedies hereby given.  No such assignment by Lender shall relieve Borrower of any of its obligations hereunder.

11.17    Revival of Secured Obligations.  This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any

petition is filed by or against Borrower for liquidation or reorganization, if Borrower becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of Borrower's assets, or if any payment or transfer of Collateral is recovered from Lender.  The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to Lender, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, Lender or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to Lender in cash.

11.18    Counting of Days. Except where otherwise specifically provided, any reference in this Agreement to a period of "days" means calendar days and not business days.

11.19    Caption Headings. Caption headings in this Agreement and the Loan Documents are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement or the Loan Documents.

11.20    Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

11.21    No Third-Party Beneficiaries.  No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than Lender and Borrower unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between Lender and Borrower.

(SIGNATURES TO FOLLOW)

IN WITNESS WHEREOF, Borrower and Lender have duly executed and delivered this Loan and Security Agreement as of the day and year first above written.

**BORROWER**:

**Three Arrows Capital Ltd**

By: _____

Name: Kyle Davies

Title: Director

**LENDER:**

**FTX TRADING LIMITED**

By: _____

Name: Sam Bankman-Fried

Title: Director

Email Address for Notice
Attn: Kyle Davies
Email: operations@threearrowscap.com

Email Address for Notice
Attn: Sam Bankman-Fried
Email: legal@ftx.com / sam@ftx.com

with a copy (which shall not constitute notice) to:

Attn: NA
Phone:
Email:

with a copy (which shall not constitute notice) to:

Fenwick & West LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Attn:  Andrew T. Albertson
Phone:  206-389-4552
Email:  aalbertson@fenwick.com

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT]

## EXHIBIT A
### Advance Request

This Advance Request form incorporates all of the terms of the Loan and Security Agreement between FTX Trading Limited and **Three Arrows Capital Ltd** dated and effective as of 22/10/2021, and the following specific terms.

Amount of Advance:

Borrower Account email address:

| Collateral Type | | USD |
|---|---|---|
| Collateral | | |
| Hard Margin Call | | 125% |

**FTX Trading Limited**

**Three Arrows Capital Ltd**

Per: *Sam Bankman-Fried*
F0D59F19C7D34BA...

Name: Sam Bankman-Fried
Title: CEO

Per:

Name: Kyle Davies
Title: Director

**EXHIBIT D**

LOC & Margin Document

US-DOCS\154233869.7

**CONFIDENTIAL**



# FTX Line of Credit

This Line of Credit Agreement is made as of this 30th day of March 2022 (the "**Line of Credit Agreement**"), by and among Three Arrows Capital Ltd of ABM Chambers 2283, Road Town, Tortola, BVI VG1110 ("**Borrower**") and FTX Trading Limited ("**Lender**"). A line of credit is hereby established in the amount of USD 120,000,000 for the benefit of the Borrower ("**Line of Credit**"), provided, however, that the Lender unilaterally may terminate the Borrower's privilege to request advances hereunder or lower said amount.

The Line of Credit will be subject to the following terms and conditions:

1. Lender reserves the right to request from Borrower, at any time, any information it deems necessary in order to assess the Borrower's continued eligibility to receive and maintain the Line of Credit, and Borrower agrees to provide such information promptly upon request. Such information may include, but is not limited to, information regarding the assets, liabilities and net worth of the Borrower.

2. At any time the Borrower desires for the Lender to advance sums pursuant to this Line of Credit Agreement, the Borrower may request such advance from the Lender, and the Lender, with or without reason, may deny such request.

3. The Lender reserves the right to remove the Line of Credit at any time and for any reason.

4. Funds advanced through the Line of Credit:

    (a) will bear interest at a rate of 5% per annum, payable daily at approximately 00:30 UTC and calculated in respect only of that portion of the Line of Credit then being utilised;

    (b) may not be withdrawn from the FTX exchange; and

    (c) may not be used for spot trading.

5. Throughout the lifetime of the Line of Credit, at least 200% of the Line of Credit ("**Collateral**") must be maintained in the Borrower's FTX account, as opened with the email address kyle@threearrowscap.com. Should the Collateral fall below 200% of the Line of Credit at any time, it must immediately, and by no later than twenty four hours of such fall, be reinstated to 200% of the Line of Credit. Borrower agrees that following any failure by it to return Collateral to 200% of the Line of Credit within one day of it falling below such amount, Lender may apply special interest in respect of outstanding amounts under the Line of Credit at that time at an indicative rate of 10% per day.

6. The occurrence of one or more of the following (herein a "**Default**" or an "**Event of Default**") shall constitute a default by the Borrower hereunder:

(a) any representation or warranty of the Borrower in connection with the Line of Credit is or becomes false;

(b) the failure by the Borrower to pay, when due, any portion of the Line of Credit;

(c) Borrower's insolvency, appointment of a receiver for all or a part of Borrower's property, the making of any assignment by Borrower for the benefit of creditors or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or upon the issuing of any writ of attachment by trustee process or otherwise or a restraining order or injunction affecting any of the Borrower's property; provide, however, if any such proceeding is commenced against the Borrower, the Borrower shall have thirty (30) days in which to cause such proceeding to be dismissed;

(d) the death, dissolution, termination of existence, declared insolvency or failure in business of the Borrower;

(e) the admission in writing of Borrower's insolvency or inability to pay debts generally as they become due, or upon any material deterioration of the financial condition of the Borrower;

7. If any Event of Default occurs, all obligations outstanding from the Borrower to the Lender shall immediately become due and payable without demand, protest or other notice of any kind, all of which are hereby expressly waived. In the event of such Event of Default, the Lender may proceed to enforce the payment of all obligations of Borrower to Lender and to exercise any and all of the rights and remedies afforded to Lender by law of under the terms of this Line of Credit Agreement or otherwise.

8. This Line of Credit Agreement and the covenants and agreements herein contained shall continue in full force and effect until all obligations, liabilities and undertakings made hereunder have been paid or otherwise satisfied in full. No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such rights or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

9. Borrower hereby certifies that any and all necessary resolutions that may be required to effectuate and validate the terms of this Line of Credit Agreement have been duly made and adopted by the Borrower.

10. This Line of Credit Agreement shall be governed by and construed in accordance with the laws of Antigua and Barbuda, shall be binding upon Borrower's successors and assigns and shall insure to the benefit of Lender's successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Line of Credit Agreement by their duly authorised officers or representatives.

## FTX INSTITUTIONAL CUSTOMER
## MARGIN AND LINE OF CREDIT AGREEMENT

This MARGIN AND LINE OF CREDIT AGREEMENT (this "Agreement") is effective as of the date the Customer is provided debt hereunder ("Effective Date") as a deed between the Customer acknowledging acceptance hereto, and FTX Trading Ltd. ("FTX"), a company organized and existing under the laws of Antigua and Barbuda (Customer and FTX are referred to, collectively, as the "Parties" and, individually, as a "Party").

WHEREAS, Customer is a customer of the FTX.com cryptocurrency exchange and FTX desires to afford Customer with access to margin trading and potentially discretionary line of credit facilities (together, the "Indebtedness") as set forth herein;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration,

the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Applicable Customer**. Customer represents, warrants and covenants to FTX that this Agreement is binding on both Customer and all of its Affiliated Companies that also have a

customer account on FTX (the "Affiliates"). For purposes of this Agreement, "Affiliated Companies" shall mean all companies that are controlled by that person. For this purpose, a person is deemed to control a company or entity if it (a) owns, directly or indirectly, at least 50 percent of the capital of the other company, or (b) substantially has the power to direct or cause the direction of the management and set the policies of such company or entity, or (c) has the same majority beneficial shareholder as the other company. Upon an Event of Default (as defined below), FTX may elect to pursue remedies against Customer and/or one or all of its Affiliates, in its discretion, without separate notice to any Affiliates.. Customer and the accounts of its Affiliates shall be aggregated for purposes of all collateral and limitations set forth herein. Customer and its Affiliates are together referred to herein as the "Customer".

2. **Payment upon Demand.** Customer shall at all times be liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement. At any time, FTX may "call" the Indebtedness upon notice to Customer.

3. **Lien.** All assets in all of the FTX accounts of the Customer (the "Secured Assets") are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX.

4. **Maintenance of Collateral.**
   a. Amount Required. Customer will at all times maintain such cash, cryptocurrency, or other property in the accounts of the Customer for collateral and/or margin purposes as FTX shall require from time to time via a margin call or other request. Collateral requirements may be established and changed by FTX in its sole discretion and judgement without notice to Customer.
   b. Collateral Calls. In regard to collateral or margin calls, whether for maintenance or otherwise, in lieu of immediate liquidations, FTX, may permit Customer a period of time to satisfy a call. This time period shall not in any way waive or diminish FTX's right in its sole discretion, to shorten the time period in which Customer may satisfy the call, including one already outstanding, or to demand that a call be satisfied immediately. Nor does such practice waive or diminish the right of FTX to sell out positions to satisfy the call, which can be as high as the full indebtedness owed by Customer.
   c. Liquidation. Customer acknowledges that the Secured Assets may be liquidated without notice to satisfy minimum maintenance, collateral requirements or margin calls. Customer acknowledges that it is not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements or margin calls. To satisfy minimum maintenance, collateral requirements or margin calls, and without further notice, Customer authorizes FTX to sell any assets, top up assets in its discretion, cancel any open order; close any outstanding order; and otherwise take any action deemed necessary to obtain liquidity to comply with collateral requirements with respect to the Indebtedness. Liquidation is conducted in the orderbooks on FTX or using voluntary liquidity providers. FTX does not itself generally take on the user's positions. Customer shall be liable to FTX for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by FTX or by the undersigned; and, the undersigned shall make payments of such obligations and indebtedness upon demand.

5. **Interest Rate.** Customer shall pay interest on all Indebtedness extended under this Agreement. Interest will be charged on Customer's average daily net settled debit balance and will be calculated and assessed in accordance with the schedule and policies set forth by FTX. The interest rate may change without notice to Customer as changes occur in the general credit markets and industry conditions relating to the extension of margin credit. All payments received in your account, including dividends, interest, premiums and principal

payments may be applied to the balance due in your account. The interest rate will vary from time to time without prior notice from FTX. Upon any adjustment of the interest rate by FTX, Customer may elect to terminate this Agreement. Continuation of the Agreement after an interest rate adjustment constitutes consent by Customer to the changed interest rate.

6. **Margin Transactions.**
    a. Requirements for Participation. Margin requirements may be established and changed by FTX in its sole discretion and judgement without notice to the undersigned. All amounts owed under the margin program constitute Indebtedness under this Agreement. In making this determination, FTX may take into account various factors including but not limited to: (i) issues as to the applicable cryptocurrency such as, among others, the liquidity and volatility of such cryptocurrency, (ii) considerations as to the Customer's status, including but not limited to a decline in creditworthiness, and (iii) the general condition of the market.
    b. Permitted Balance. FTX computes the Customer's net account balances on FTX by adding up the total value of all cryptocurrency and other assets it is long, and subtracting the value of assets that the Customer is short. FTX may use a collateral weight of less than 1 to some assets that are less liquid or more volatile. FTX enforces margin limits and enforces that this ratio never drops below a certain value, generally ranging between 10% and 100% depending on the liquidity of the position.
    c. No Negative Balance. FTX generally enforces that the user's net account balances are never negative. If the user drops below initial margin requirements, they may no longer increase their position size. If the user drops far enough below initial margin, FTX may liquidate that user's positions in accordance with Section 4(c).

7. **Discretionary Line of Credit.** FTX may, at its discretion, issue lines of credit (LoCs). All amounts owed under LoCs constitute Indebtedness under this Agreement. An LoC is Indebtedness in the principal amount that is a USD balance granted to Customer's FTX account subject to the following: (i) LoCs may be used as collateral for futures trading; (ii) LoCs may be used as collateral for spot margin; (iii) LoCs may not be withdrawn; (iv) LoCs may not be used as collateral for spot margin borrows which are withdrawn from FTX; and (v) FTX monitors the health of each account with an LoC. Customer required to deposit funds daily such that its net account balance is at least their LoC size ("top up"). LoCs are repayable upon demand of FTX and FTX reserves the right to modify any aspect of the LoC program or requirements at any time.

8. **Lending by Customer.** FTX may permit the Customer to engage in lending programs whereby the Customer lends out assets on FTX platform and may be entitled to receive an interest payment for such lending, all dependent upon the parameters of the program established by FTX. In participating, Customer offers to let others borrow their coins in return for a specified interest payment. By default, all borrowing happens against the public user lending book, but in particular cases FTX may create a bespoke borrowing pool for liquidity providers so long as they abide by the margin limits and maintain sufficiently positive net account balances. The recipient of such lending may, at FTX's discretion, be required to pay interest in the borrowed assets. All such lending programs are in the discretion of FTX, and rules and requirements may be changed at FTX's discretion.

9. **Event of Default.** Any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "Event of Default" or "Events of Default" by any Party (such Party, the "Defaulting Party"):
    a. the failure of the Defaulting Party to satisfy any payment obligation under this Agreement or any other agreements, instruments, and documents executed in connection with this Agreement that are intended to create, perfect, secure or evidence liens or any other obligations in connection with the Secured Liabilities;
    b. (i) the Defaulting Party stops or suspends payment of any of its debts or is unable to, or admits its inability to, pay its debts as they fall due; (ii) the Defaulting Party commences negotiations, or enters into any composition, compromise, assignment or arrangement, with one or more of its creditors (excluding Customer, in its capacity as a lender) with a view to rescheduling any of its indebtedness (because of actual or

anticipated financial difficulties); or (iii) a moratorium is declared in respect of any indebtedness of the Defaulting Party;

c.  any action, proceedings, procedure or step is taken in relation to: (i) the suspension of payments, a moratorium of any indebtedness, winding up, dissolution, administration or reorganisation (using a voluntary arrangement, scheme of arrangement or otherwise) of the Defaulting Party; (ii) a composition, compromise, assignment or arrangement with any creditor of the Defaulting Party; or (iii) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Defaulting Party or any of its assets; or

d.  the value of the Defaulting Party's assets are less than its liabilities (taking into account contingent and prospective liabilities).

10. **Lender's Remedies.** Upon the occurrence and during the continuation of any Event of Default where Customer is the Defaulting Party, FTX may, at its option: (i) declare any amounts hereunder immediately due and payable with effect upon notice to Customer; (ii) terminate this Agreement upon notice to Customer; and (iii) exercise all other rights and remedies available to FTX hereunder, under applicable law, or in equity, against Customer and/or its Affiliates. On demand, Customer shall pay any balance owing with respect to the Indebtedness, including fees and any costs of collection. The reasonable cost and expense of collection of the debit balance, recovery, and any unpaid deficiency in the accounts of the undersigned with FTX, including, but not limited to attorney's fees, incurred and payable or paid by FTX shall be payable to FTX by Customer.

11. **Further Assurances.** Customer agrees that it shall promptly execute and deliver all instruments and documents, and take all actions, that may be reasonably necessary, or that FTX may reasonably request, in order to perfect and/or protect the assignment and security interest granted or intended to be granted hereby or to enable FTX to exercise and enforce its rights and remedies hereunder with respect to the Customer Assets, all associated financial interests, titles, and rights held therein or credited thereto and all proceeds thereof. Without limiting the generality of the foregoing, Customer hereby authorizes the filing of such financing or continuation statements, or amendments thereto, and shall execute or deliver such other instruments, endorsements or notices, as may be reasonably necessary or desirable or as FTX may reasonably request, in order to perfect and preserve the assignments and security interests granted or purported to be granted hereby.

12. **Governing Law; Jurisdiction.**

    a.  This Agreement and all matters relating to this Agreement (whether in contract, statute, tort (including, without limitation, negligence) or otherwise), is governed by, and construed in accordance with the laws of Antigua and Barbuda and all laws applicable therein.

    b.  Any dispute, controversy or claim arising out of, relating to, or having any connection with this Agreement, including any dispute as to its existence, validity, interpretation, performance, breach or termination shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("**ICC**"). The Emergency Arbitrator Provisions of the ICC Rules of Arbitration shall not apply. Such arbitration shall be administered in Antigua.

13. **Prior Agreements and Amendments.** This Agreement supersedes any prior agreements between the parties relating to the subject matter hereof. Any amendments to this Agreement must be in writing and executed by both parties.

14. **Entire Agreement.** This Agreement constitutes the entire Agreement among the Parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements relating to the subject matter of this Agreement.

15. **Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the Parties; provided, that the Customer may not assign this Agreement or any rights or duties hereunder without the prior written consent of the FTX.

16. **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any

specific provision. In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; provided that such severability shall be ineffective if it materially changes the economic benefit of this Agreement to any Party.

17. **Counterpart Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission (ie docusign) shall be equally as effective as delivery of an original executed counterpart of this Agreement.

18. **Relationship of Parties.** Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the Parties hereto other than the relationship of borrower and lender.

19. **No Waiver.** The failure of or delay by any Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by any Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by each Party hereto.

20. **Execution as a Deed.** The Parties hereto intend that this Agreement takes effect as a deed notwithstanding that any Party hereto may execute it by electronic signature or other online acceptance or acknowledgement.

21. **Miscellaneous.** Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The word "include", "includes" or "including" will be interpreted on an inclusive basis and be deemed to be followed by the words "without limitation". A reference to any agreement, instrument or document is to be construed as a reference to that agreement, instrument or document as it may have been amended, supplemented, replaced or novated from time to time.

| FTX TRADING LTD: | Three Arrows Capital Ltd |
|---|---|
| Signature: | Signature: _kyle Davies_ |
| Name: | Name: Kyle Davies |
| Title: | Title: Director |

**EXHIBIT E**

July Discovery Response

US-DOCS\154233869.7

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DEBTORS' RESPONSES AND OBJECTIONS TO THE FOREIGN
REPRESENTATIVES OF THREE ARROWS CAPITAL, LTD.'S
(I) FIRST SET OF INTERROGATORIES; (II) FIRST SET OF REQUESTS FOR THE
PRODUCTION OF DOCUMENTS; AND (III) NOTICE OF DEPOSITION**

Pursuant to Rules 26, 30, 33 and 34 of the Federal Rules of Civil Procedure (the

"Federal Rules"), made applicable to these chapter 11 proceedings by Rules 7026, 7030, 7033,

7034, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local

Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and

any other applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), FTX

Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively,

the "Debtors"), by their undersigned attorneys, hereby submit these responses and objections (the

"Responses") to (i) *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of*

*Interrogatories Directed to the Debtors* (the "Interrogatories"); (ii) *The Foreign Representatives*

*of Three Arrows Capital, Ltd.'s First Set of Requests for the Production of Documents Directed to*

*the Debtors* (the "Document Requests")[2]; and (iii) *Notice of Deposition of the Debtors Pursuant*

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and
4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the
Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list
of such information may be obtained on the website of the Debtors' claims and noticing agent at
https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is
Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Document
Requests.

*to Fed. R. Bankr. P. 2004* (the "Deposition Notice," and together with the Interrogatories and the Documents Requests, the "Discovery"), each dated July 10, 2024 and served by Russell Crumpler and Christopher Farmer, in their joint capacities as the duly authorized foreign representatives (the "Foreign Representatives") of Three Arrows Capital, Ltd. ("3AC"), in connection with the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797] (the "Claim Objection").

### **GENERAL OBJECTIONS**

The general objections set forth below (the "General Objections") apply to the Discovery generally and to each definition in the Discovery (the "Definitions"), each instruction in the Discovery (the "Instructions"), Document Request, Interrogatory, and Topic, and unless otherwise stated, shall have the same force and effect as if fully set forth in response to each Definition, Instruction, Document Request, Interrogatory, and Topic. Any objection to a Definition or Instruction shall also apply to any other Definition, Instruction, Document Request, Interrogatory, or Topic that incorporates that Definition or Instruction. No response to any specific Document Request, Interrogatory, or Topic is, or shall be deemed to be, a waiver of the General Objections or the specific objections set forth below. The fact that an objection is not listed herein does not, and shall not, constitute a waiver of that objection or otherwise preclude the Debtors from raising that objection at a later time.

1.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection. The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

2.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to impose on the Debtors any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

3.      The Debtors object to the Discovery to the extent it is duplicative of, or otherwise inconsistent with, the voluminous informal discovery provided by the Debtors to the Foreign Representatives of 3AC at significant burden and expense to the Debtors and their estates.

4.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules.  Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection. Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence that the Debtors do not object to a Document Request, Interrogatory or Topic on the basis of an applicable privilege, immunity, or protection.

5.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Foreign Representatives of 3AC, or otherwise more appropriately directed to another party or person.

6.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the Debtors' possession, custody, or control.

7.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek the production of trade secrets or other information that is confidential, proprietary, commercially sensitive, competitively significant, or personal in nature relating to the Debtors, their affiliates, and their current or former officers, directors, employees and/or advisors, clients, customers, or counterparties.  The Debtors' production of any documents in response to the Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

8.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to conduct anything beyond a reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

9.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments.  No response to any specific Document Request, Interrogatory, or Topic is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Document Request, Interrogatory, or Topic.

10.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Document Request, Interrogatory,

or Topic is, or shall be construed as, an admission that any factual predicate stated in the Document Request, Interrogatory, or Topic is accurate.

11.     No incidental or implied admissions are intended by the objections herein, nor shall the fact that the Debtors have objected or responded, or not objected or responded, to a particular Document Request, Interrogatory, or Topic be construed as an admission or indication that the Debtors possess documents responsive to such Document Request, Interrogatory, or Topic, or any other Document Request, Interrogatory or, Topic.  Similarly, a statement that the Debtors will produce documents in a response to a Document Request does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

12.     The Debtors reserve all objections that may be available to them at any hearing or trial or on any motion to the use or admissibility of any material produced.

13.     These Responses are based solely on facts reasonably known to the Debtors at the time of responding to the Discovery.  The Debtors reserve the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## <u>OBJECTIONS TO DEFINITIONS</u>

14.     The Debtors object to each of the Definitions, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates the Definition, to the extent that the Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

15.     The Debtors object to the Definitions of "Communication," "Document" or "Documents," "concerning" and "relating to," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates one of those Definitions, to the extent that they

purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

16.     The Debtors object to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf" or purports to seek information regarding non-Debtors.  The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

17.     The Debtors object to the Definition of "3AC" and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting on its behalf, including without limitation Three Arrows Capital Pte. Ltd., incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu."  The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected

from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

18.    The Debtors object to the Definition of "Person," and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity." The Debtors further object to this Definition, and to any Definition, Instruction, Document Request, Interrogatory or Topic that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

## **OBJECTIONS TO INSTRUCTIONS TO INTERROGATORIES**

19.    The Debtors object to the following instructions to the Interrogatories (the "Interrogatory Instructions"). The failure to object to any of the Interrogatory Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

20.    The Debtors further object to the Interrogatory Instructions, and to each Interrogatory incorporating any such Interrogatory Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

21.     The Debtors object to Interrogatory Instruction Nos. 1, 3, 4, 6, and 10 and to each Interrogatory incorporating any such Interrogatory Instruction as overly broad and unduly burdensome.

22.     The Debtors further object to Interrogatory Instruction Nos. 1 and 7, and to each Interrogatory incorporating any such Interrogatory Instructions, as vague and ambiguous, in particular its inclusion of "assisted in" and "reasonable."

## OBJECTIONS TO INSTRUCTIONS TO DOCUMENT REQUESTS

23.     The Debtors object to the following instructions to the Document Requests (the "RFP Instructions").  The failure to object to any of the RFP Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

24.     The Debtors object to the RFP Instructions to the extent they seek to impose requirements on the Debtors that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

25.     The Debtors object to RFP Instruction Nos. 4, 8, and 10 and to each specific Document Request incorporating any such RFP Instruction as overly broad and unduly burdensome.  The Debtors further object to these RFP Instructions, and to each specific Request incorporating any such RFP Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

26.     The Debtors further object to RFP Instruction No. 4 and 5 and to each specific Document Request incorporating any such RFP Instructions, as vague and ambiguous, in particular its inclusion of "constructive possession," "superior right or practical ability," and "deletion or redactions."

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Interrogatories as follows:

## INTERROGATORY NO. 1

Identify any and all agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038,[3] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents.

## RESPONSE TO INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning.  The Debtors further object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  In addition, the Debtors object to this Interrogatory to the extent it is duplicative of Interrogatory No. 3.

The Debtors refer the Foreign Representatives to materials previously produced by the Debtors to 3AC as part of the informal information exchange between the parties, along with

---

[3]    Document references used in these interrogatories reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

the supplemental discussions and explanations provided by the Debtors and their financial advisors

in connection therewith (the "Informal Discovery") and in particular, (1) that certain loan and

security agreement dated October 22, 2021 between 3AC and FTX Trading, previously produced

bearing production numbers FTX_3AC_000000075 through FTX_3AC_000000095; and (2) that

certain line of credit agreement dated March 30, 2022 between 3AC, previously produced bearing

production numbers FTX_3AC_000000758 through FTX_3AC_000000763.  The Debtors further

refer the Foreign Representatives to the additional materials that will be produced to 3AC pursuant

to the Document Requests.

## INTERROGATORY NO. 2

Identify any and all FTX entities that at any point in time had any agreement (whether formal or informal, written or oral, or otherwise) with 3AC, including without limitation lending counterparties and FTX entities holding any Assets of 3AC (whether on a custodial basis or otherwise).

## RESPONSE TO INTERROGATORY NO. 2

The Debtors incorporate by reference the General Objections, Objections to

Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also

object to this Interrogatory to the extent it seeks information that is not relevant and/or because the

burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign

Representatives to the agreements between 3AC and FTX Trading identified in the Response to

Interrogatory No. 1.  The Debtors are not aware of any other commercial relationship or

agreements between the prepetition Debtors and 3AC.

## INTERROGATORY NO. 3

With respect to each FTX entity identified in response to Interrogatory No. 2, identify (i) the nature of the relationship between 3AC and such entity and (ii) any agreements or Documents relating to such relationship.

## RESPONSE TO INTERROGATORY NO. 3

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Interrogatory to the extent it is duplicative of Interrogatory No. 1.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.

## INTERROGATORY NO. 4

Confirm whether the proceeds of the BTC 15,250 and USDC 350,000,000 loans referenced in FTX_3AC_000013546 and FTX_3AC_000013547 were paid to 3AC.

## RESPONSE TO INTERROGATORY NO. 4

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors respond that the loans referenced in this Interrogatory were loans made by Voyager Digital, Ltd. and/or its affiliates ("Voyager") to 3AC, which bear no relation to any relationship or matters between the Debtors and 3AC. Voyager provided documents to the Debtors relating to Voyager's own lending relationships in connection with a potential transaction between the Debtors and Voyager. The Debtors produced FTX_3AC_000013546 and FTX_3AC_000013547 in the context of Informal Discovery in response to the Foreign Representatives' request for the Debtors' assistance in

providing them with any materials in the Debtors' possession relating to 3AC's commercial

relationships beyond the relationship between 3AC and FTX.  The Debtors will not search for or

produce additional materials related to these loans because they are not relevant to the Claim

Objection or any other matter between 3AC and FTX and are therefore outside the scope of

discovery.

## INTERROGATORY NO. 5

In a format similar to FTX_3AC_000000038, provide the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair" column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO INTERROGATORY NO. 5

The Debtors incorporate by reference the General Objections, Objections to

Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also

object to this Interrogatory to the extent it seeks information that is not relevant and/or because the

burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further

object to this Interrogatory to the extent it requires the Debtors to create new work-product.

Subject to and without waiver of their Objections, the Debtors respond that this

information is in the possession of or otherwise available to 3AC through (1) data previously

produced to 3AC contained in FTX_3AC_000000002; and (2) publicly available pricing

information.

## SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

Subject to and without waiving the foregoing General Objections, Objections to

Definitions, and Objections to Instructions to Document Requests, which are hereby expressly

incorporated into each of the following specific objections and responses as if fully set forth

therein, the Debtors respond to the Requests as follows:

**DOCUMENT REQUEST NO. 1**

All Documents and Communications relating to agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038,[4] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar Documents.

**RESPONSE TO DOCUMENT REQUEST NO. 1**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning. The Debtors further object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. In addition, the Debtors object to this Document Request to the extent it is duplicative of Document Request Nos. 2-4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

**DOCUMENT REQUEST NO. 2**

All Documents and Communications purporting to grant FTX a security interest in any of 3AC's Assets.

---

[4]    Document references used in these requests reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

**RESPONSE TO DOCUMENT REQUEST NO. 2**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1, 3 and 4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

**DOCUMENT REQUEST NO. 3**

All Documents and Communications purporting to perfect any such security interest described in Request No. 2.

**RESPONSE TO DOCUMENT REQUEST NO. 3**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1, 2 and 4.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To

the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 4

All Documents and Communications relating to any agreement (whether formal or informal, written or oral, or otherwise) between FTX and 3AC, including without limitation Documents and Communications relating to (i) lending transactions between FTX and 3AC and (ii) arrangements pursuant to which any FTX entity holds any Assets of 3AC (whether on a custodial basis, as purported collateral, or otherwise).

## RESPONSE TO DOCUMENT REQUEST NO. 4

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it is duplicative of Document Request Nos. 1-3.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1 and the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 5

All Documents and Communications relating to the transactions (including without limitation any sales, liquidations, or purported foreclosures by FTX) that resulted in the disposition of 1.015 billion U.S. Dollars in tokens from June 12, 2022 to June 15, 2022, as reflected in FTX_3AC_000000038.

## RESPONSE TO DOCUMENT REQUEST NO. 5

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery. To the extent not previously produced, the Debtors will produce any additional non-privileged documents responsive to this Document Request that the Debtors are able to locate after a reasonable search.

## DOCUMENT REQUEST NO. 6

All transaction data relating to the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair" column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO DOCUMENT REQUEST NO. 6

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request to the extent it requires the Debtors to create new work-product.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 5.

**DOCUMENT REQUEST NO. 7**

        All transactional data evidencing, in any respect, any payments and any agreements (whether formal or informal, written or oral, or otherwise) relating to the BTC 15,250 and USDC 350,000,000 loans referenced in FTX_3AC_000013546 and FTX_3AC_000013547.

**RESPONSE TO DOCUMENT REQUEST NO. 7**

        The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

        Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 4.

<strong><u>RESPONSES AND OBJECTIONS TO SPECIFIC TOPICS</u></strong>

        Subject to and without waiving the foregoing General Objections and Objections to Definitions, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Topics as follows:

**TOPIC NO. 1**

        The Debtors' relationships, contracts, and agreements with 3AC.

**RESPONSE TO TOPIC NO. 1**

        The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above. The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad. The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

        Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to

3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 2

3AC's Accounts with Debtors.

## RESPONSE TO TOPIC NO. 2

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 3

3AC's Assets in its Accounts with Debtors.

## RESPONSE TO TOPIC NO. 3

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 4**

Any of 3AC's Assets otherwise held by the Debtors.

**RESPONSE TO TOPIC NO. 4**

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 5**

3AC's negative USD balances reflected in FTX_3AC_000000038,[5] including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents related thereto.

---

[5]    Document references used in these topics reflect the labels assigned to such documents in the dataset produced to the Foreign Representatives and their advisors by the FTX advisors in four separate rounds on December 14, 2023, January 8, 2024, January 12, 2024, and January 20, 2024.

**RESPONSE TO TOPIC NO. 5**

       The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is and/or because the burden or expense of the requested discovery outweighs its likely benefit.

       Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 1, the Informal Discovery, and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

**TOPIC NO. 6**

       Debtors' trading activities and lending relationship(s) with 3AC, including without limitation all transfers, payments, and loans between the Debtors and 3AC.

**RESPONSE TO TOPIC NO. 6**

       The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

       Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the

Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 7

Any basis purporting to grant FTX a security interest in any of 3AC's Assets or to perfect any such security interest.

## RESPONSE TO TOPIC NO. 7

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests.  The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 8

Any purported pledge, perfection, foreclosure, exercise of remedies, sale, transfer, liquidation, or other efforts by FTX to take possession, control, or ownership of any of 3AC's Assets or of the proceeds of such Assets.

## RESPONSE TO TOPIC NO. 8

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above.  The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad.  The Debtors further object to this Topic to the extent it seeks

information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests. The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 9

Any transactions, including without limitation any sales, liquidations, or foreclosures by FTX, that resulted in the disposition of USD 1.015 billion in tokens from June 12, 2022 to June 15, 2022, as reflected in FTX_3AC_000000038.

## RESPONSE TO TOPIC NO. 9

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above. The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad. The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Informal Discovery and the additional materials that will be produced to 3AC pursuant to the Document Requests. The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

## TOPIC NO. 10

Transaction data relating to the Daily Value, in U.S. Dollar, for the period between January 1, 2022 and July 31, 2022, of each derivative contract between 3AC and FTX, including without limitation any derivative contract listed in FTX_3AC_000000002 and for which the "pair"

column (as identified in Column J of FTX_3AC_000000002) ends in "-PERP" or with a particular date.

## RESPONSE TO TOPIC NO. 10

The Debtors incorporate by reference the General Objections and Objections to Definitions as set forth above. The Debtors also object to the Topic on the grounds that it is vague and ambiguous, and overly broad. The Debtors further object to this Topic to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to the Debtors' Response to Interrogatory No. 5, the Informal Discovery, and the additional materials that will be produced to 3AC pursuant to the Document Requests. The Debtors are willing to meet and confer with the Foreign Representatives with respect to the appropriateness of a deposition and the appropriate scope of any such deposition.

Dated:  July 26, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

 _/s/ Matthew B. McGuire_
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for Debtors and Debtors-in-Possession*

**EXHIBIT F**

September Discovery Response

37

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DEBTORS' (I) RESPONSES AND OBJECTIONS TO THE FOREIGN REPRESENTATIVES OF THREE ARROWS CAPITAL, LTD.'S (A) FIRST SET OF REQUESTS FOR ADMISSION; (B) SECOND SET OF INTERROGATORIES AND (C) SECOND SET OF REQUESTS FOR PRODUCTION AND (II) SUPPLEMENTAL RESPONSES AND OBJECTIONS TO THE FOREIGN REPRESENTATIVES' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these proceedings (the "Chapter 11 Cases") by Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and any other applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned attorneys, hereby submit these (I) responses and objections (the "Responses") to (i) *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Requests for Admission Directed to the Debtors* (the "Requests for Admission"); (ii) *The Foreign Representatives of Three Arrows Capital, Ltd.'s Second Set of Interrogatories Directed to the*

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

*Debtors* (the "Interrogatories"); and (iii) *The Foreign Representatives of Three Arrows Capital, Ltd.'s Second Set of Requests for the Production of Documents Directed to the Debtors* (the "Document Requests," and together with the Requests for Admission and Interrogatories, the "Discovery"),[2] each dated August 7, 2024, served by Russell Crumpler and Christopher Farmer, in their joint capacities as the duly authorized foreign representatives (the "Foreign Representatives") of Three Arrows Capital, Ltd. ("3AC"), in connection with the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797] (the "Claim Objection"); and (II) supplemental responses and objections (the "Supplemental Responses") to *The Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Interrogatories Directed to the Debtors* (the "First Set of Interrogatories"), dated July 10, 2024, served by the Foreign Representatives in connection with the Claim Objection.

## GENERAL OBJECTIONS

The general objections set forth below (the "General Objections") apply to the Discovery generally and to each definition in the Discovery (the "Definitions"), each instruction in the Discovery (the "Instructions"), Request for Admission, Document Request, and Interrogatory, and unless otherwise stated, shall have the same force and effect as if fully set forth in response to each Definition, Instruction, Request for Admission, Document Request, and Interrogatory. Any objection to a Definition or Instruction shall also apply to any other Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition or Instruction. No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be deemed to be, a waiver of the General Objections or the specific

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Requests for Admission, Interrogatory, or Document Request, as applicable.

objections set forth below.  The fact that an objection is not listed herein does not, and shall not, constitute a waiver of that objection or otherwise preclude the Debtors from raising that objection at a later time.

1.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

2.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to impose on the Debtors any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

3.     The Debtors object to the Discovery to the extent it is duplicative of, or otherwise inconsistent with, the voluminous informal discovery provided by the Debtors to the Foreign Representatives of 3AC and the additional discovery provided in response to the *Foreign Representatives of Three Arrows Capital, Ltd.'s First Set of Requests for the Production of Documents* and the First Set of Interrogatories at significant burden and expense to the Debtors and their estates.

4.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product

doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules.  Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection. Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence that the Debtors do not object to a Request for Admission, Document Request, or Interrogatory on the basis of an applicable privilege, immunity, or protection.

5.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Foreign Representatives of 3AC, or otherwise more appropriately directed to another party or person.

6.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the Debtors' possession, custody, or control.

7.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek the production of trade secrets or other information that is confidential, proprietary, commercially sensitive, competitively significant, or personal in nature relating to the Debtors, their affiliates, and their current or former officers, directors, employees and/or advisors, clients, customers, or counterparties.  The Debtors' production of any documents in response to the Document Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

8.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to conduct anything beyond a

reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

9.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments.  No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Request for Admission, Document Request, or Interrogatory.

10.      The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Request for Admission, Document Request, or Interrogatory is, or shall be construed as, an admission that any factual predicate stated in the Request for Admission, Document Request, or Interrogatory is accurate.

11.      No incidental or implied admissions are intended by the objections herein, nor shall the fact that the Debtors have objected or responded, or not objected or responded, to a particular Request for Admission, Document Request, or Interrogatory be construed as an admission or indication that the Debtors possess documents responsive to such Request for Admission, Document Request, or Interrogatory, or any other Request for Admission, Document Request, or Interrogatory.  Similarly, a statement that the Debtors will produce documents in a response to a Document Request does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

12.    The Debtors reserve all objections that may be available to them at any hearing or trial or on any motion to the use or admissibility of any material produced.

13.    These Responses are based solely on facts reasonably known to the Debtors at the time of responding to the Discovery.  The Debtors reserve the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## OBJECTIONS TO DEFINITIONS

14.    The Debtors object to each of the Definitions, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates the Definition, to the extent that the Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

15.    The Debtors object to the Definitions of "Communication," "Document" or "Documents," and "relating to," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates one of those Definitions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

16.    The Debtors object to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, as overly broad and unduly burdensome to the extent it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf" or purports to seek information regarding non-Debtors. The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected

-6-

from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

17.    The Debtors object to the Definition of "3AC" and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, as overly broad and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting on its behalf, including without limitation Three Arrows Capital Pte. Ltd., incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu."  The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

18.    The Debtors object to the Definition of "Person," and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, on the grounds that the Definition is overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity."  The Debtors further object to this Definition, and to any Definition, Instruction, Request for Admission, Document Request, or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that

is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

### OBJECTIONS TO INSTRUCTIONS TO REQUESTS FOR ADMISSION

19.    The Debtors object to the following instructions to the Requests for Admission (the "RFA Instructions").  The failure to object to any of the RFA Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

20.    The Debtors further object to the RFA Instructions, and to each Request for Admission incorporating any such RFA Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

21.    The Debtors object to RFA Instruction Nos. 2, 3 and 5, and to each Request for Admission incorporating any such RFA Instruction as overly broad and unduly burdensome.

22.    The Debtors further object to RFA Instruction No. 6, and to each Request for Admission incorporating any such RFA Instructions, as vague and ambiguous, in particular its inclusion of "reasonable."

### OBJECTIONS TO INSTRUCTIONS TO INTERROGATORIES

23.    The Debtors object to the following instructions to the Interrogatories (the "Interrogatory Instructions").  The failure to object to any of the Interrogatory Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

24.    The Debtors further object to the Interrogatory Instructions, and to each Interrogatory incorporating any such Interrogatory Instructions, to the extent that they purport to

impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

25.     The Debtors object to Interrogatory Instruction Nos. 1, 3, 4, 6, and 10 and to each Interrogatory incorporating any such Interrogatory Instruction as overly broad and unduly burdensome.

26.     The Debtors further object to Interrogatory Instruction Nos. 1 and 7, and to each Interrogatory incorporating any such Interrogatory Instructions, as vague and ambiguous, in particular its inclusion of "assisted in" and "reasonable."

**OBJECTIONS TO INSTRUCTIONS TO DOCUMENT REQUESTS**

27.     The Debtors object to the following instructions to the Document Requests (the "RFP Instructions").  The failure to object to any of the RFP Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

28.     The Debtors object to the RFP Instructions, and to each RFP incorporating any such RFP Instructions, to the extent they seek to impose requirements on the Debtors that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

29.     The Debtors object to RFP Instruction Nos. 4, 8, and 10 and to each specific Document Request incorporating any such RFP Instruction as overly broad and unduly burdensome.  The Debtors further object to these RFP Instructions, and to each specific Request incorporating any such RFP Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

30.     The Debtors further object to RFP Instruction No. 4 and 5 to each specific Document Request incorporating this RFP Instruction, as vague and ambiguous, in particular its

inclusion of "constructive possession," "superior right or practical ability," and "deletion or redactions."

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Requests for Admission, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Requests for Admission as follows:

## REQUEST FOR ADMISSION NO. 1

Admit that as of June 12, 2022, 3AC owned the following Assets that were held (on a custodial basis or otherwise) by FTX Trading Ltd:

|   | Asset | Amount | Cell in FTX_3AC_000000038 |
|---|---|---|---|
| a. | AVAX | 15.1000000000000000 | H 82460 |
| b. | BCH | 0.0000000061491708 | H 82462 |
| c. | BTC | 26779.5550000046000000 | H 82465 |
| d. | COIN | 0.0000000043469974 | H 82466 |
| e. | DOGE | 0.0000000031187781 | H 82469 |
| f. | DOT | 12319.6727758149000000 | H 82470 |
| g. | ETH | 137724.1741965020000000 | H 82471 |
| h. | ETHE | 2500915.6429776300000000 | H 82472 |
| i. | FIDA | 0.5672267700000000 | H 82473 |
| j. | FIDA_LOCKED | 5812134.4327732300000000 | H 82474 |
| k. | FTT | 1123117.3322516400000000 | H 82476 |
| l. | GBTC | 2847917.0030404600000000 | H 82477 |
| m. | GRT | 0.0000000093171430 | H 82478 |
| n. | LEO | 0.0000000075327645 | H 82483 |
| o. | LINK | 0.0000000100000000 | H 82484 |
| p. | LTC | 0.0000000072039376 | H 82487 |
| q. | LUNA2 | 607.6505084000000000 | H 82488 |
| r. | LUNA2_LOCKED | 1417.8511860000000000 | H 82489 |

| s. | LUNC | 31082.6818849600000000 | H 82490 |
|---|---|---|---|
| t. | PAXG | 0.0000000050000000 | H 82497 |
| u. | PYTH_LOCKED | 4166667.0000000000000000 | H 82499 |
| v. | ROOK | 16401.3766472050000000 | H 82502 |
| w. | SNX | 0.0000000100000000 | H 82505 |
| x. | SOL | 0.0000000068579291 | H 82506 |
| y. | SOS | 0.0000018500000000 | H 82507 |
| z. | SRM | 4123.0887553400000000 | H 82508 |
| aa. | SRM_LOCKED | 1184232.9101289600000000 | H 82509 |
| bb. | STETH | 0.0000000008290338 | H 82511 |
| cc. | SUSHI | 0.0000000034973833 | H 82512 |
| dd. | TRX | 0.0000000072275000 | H 82515 |
| ee. | UNI | 0.0000000088193574 | H 82517 |
| ff. | USDT | 0.0000000583035055 | H 82519 |
| gg. | USTC | 85995.6603976411000000 | H 82520 |
| hh. | WBTC | 0.0000000033487365 | H 82521 |
| ii. | XAUT | 0.0000000020000000 | H 82522 |
| jj. | ALPHA | 0.8934750000000000 | H 113345 |
| kk. | AURY | 0.7548800000000000 | H 113346 |
| ll. | AXS | 0.0788525000000000 | H 113348 |
| mm. | BTC | 0.0000462477463750 | H 113349 |
| nn. | COMP | 0.0000980300000000 | H 113350 |
| oo. | DOGE | 0.2259500000000000 | H 113351 |
| pp. | ETH | 0.0000000050000000 | H 113352 |
| qq. | FTT | 0.0693075000000000 | H 113353 |
| rr. | MCB | 0.0070274000000000 | H 113355 |
| ss. | MER | 164285.7100000000000000 | H 113356 |
| tt. | PERP | 0.0157650000000000 | H 113357 |
| uu. | SOL | 0.0073397500000000 | H 113359 |
| vv. | USD | 10.5821115206975000 | H 113360 |
| ww. | USDT | 0.0000000061500000 | H 113361 |
| xx. | USD | 0.0000000025000000 | H 120728 |
| yy. | FTT | 3.3911500000000000 | H 128508 |

| zz. | SRM | 85.3187374100000000 | H 128509 |
|---|---|---|---|
| aaa. | SRM_LOCKED | 527.4312625900000000 | H 128510 |
| bbb. | TRX | 0.0000310000000000 | H 128511 |
| ccc. | USD | 1278096.2959690800000000 | H 128512 |
| ddd. | USDT | 314190.3988726700000000 | H 128513 |
| eee. | SRM | 117.2866035500000000 | H 135404 |
| fff. | SRM_LOCKED | 730.3333964500000000 | H 135405 |
| ggg. | USD | 927716.6488290620000000 | H 135406 |
| hhh. | USDT | 308418.7859535600000000 | H 135407 |
| iii. | SRM | 89.4243048700000000 | H 142146 |
| jjj. | SRM_LOCKED | 556.6556951300000000 | H 142147 |
| kkk. | USD | 528273.8872676990000000 | H 142148 |
| lll. | USDT | 231451.9023334700000000 | H 142149 |
| mmm. | SRM | 123.0702100900000000 | H 148888 |
| nnn. | SRM_LOCKED | 760.7297899100000000 | H 148889 |
| ooo. | USD | 800411.7386709650000000 | H 148890 |
| ppp. | USDT | 272915.4528403000000000 | H 148891 |
| qqq. | BTC | 0.0000000093856447 | H 154434 |
| rrr. | USD | 0.0000000020970671 | H 154437 |
| sss. | BCH | 0.0000000052379276 | H 176557 |
| ttt. | BNB | 0.0000000086478739 | H 176558 |
| uuu. | BTC | 0.0000000003225168 | H 176559 |
| vvv. | LTC | 0.0000000014715642 | H 176562 |
| www. | MOB | 0.0000000078928964 | H 176564 |
| xxx. | TRX | 0.0000000048162230 | H 176570 |
| yyy. | USD | 0.0000000007125426 | H 176571 |
| zzz. | YFI | 0.0000000050000000 | H 176573 |
| aaaa. | ETH | 49.9060000000000000 | H 185744 |
| bbbb. | USD | 0.0000000080040000 | H 185745 |
| cccc. | FTT | 0.0000000035055250 | H 194417 |
| dddd. | USD | 29553625.0109609000000000 | H 194420 |
| eeee. | FTT | 0.0000000036855400 | H 209830 |
| ffff. | LOOKS | 0.0000000100000000 | H 209832 |

| | | | |
|---|---|---|---|
| gggg. | STETH | 0.0000000014959586 | H 209835 |
| hhhh. | USD | 4533633.5044397000000000 | H 209836 |
| iiii. | FTT | 98810.0578785700000000 | H 218844 |
| jjjj. | SRM | 5.3469398000000000 | H 218845 |
| kkkk. | SRM_LOCKED | 9642.9938584200000000 | H 218846 |
| llll. | USD | 9.1685101167595700 | H 218847 |
| mmmm | ETH | 0.0000000025000000 | H 224543 |
| nnnn. | USD | 0.0000000088080000 | H 224546 |
| oooo. | USD | 0.0000000018805000 | H 227546 |
| pppp. | USD | 0.0000000015963000 | H 230242 |
| qqqq. | USD | 0.0000000092400000 | H 232938 |
| rrrr. | SRM | 0.0174334500000000 | H 238024 |
| ssss. | SRM_LOCKED | 10.9540313100000000 | H 238025 |
| tttt. | USD | 0.0000000099137900 | H 238026 |
| uuuu. | USD | 0.0011249794600000 | H 241028 |
| vvvv. | USD | 0.0000000043640000 | H 243724 |
| Wwww | SRM | 0.0925681500000000 | H 248810 |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | H 248811 |
| yyyy. | USD | 0.0000000046773200 | H 248812 |
| zzzz. | BAL | 0.0000000100000000 | H 257788 |
| aaaaa. | BTC | 0.0000000040907300 | H 257789 |
| bbbbb. | ETH | 0.0000000050000000 | H 257790 |
| ccccc. | FTT | 1000.0000000100000000 | H 257791 |
| ddddd. | SRM | 118.6538830400000000 | H 257792 |
| eeeee. | SRM_LOCKED | 69226.0592868400000000 | H 257793 |
| fffff. | USD | 0.0000000015649857 | H 257794 |
| ggggg. | USD | 0.0013843232530000 | H 261252 |
| hhhhh. | USD | 0.0000000096320000 | H 263948 |
| iiiii. | USD | 0.0000000045400000 | H 266644 |
| jjjjj. | USD | 0.0000000023600000 | H 269340 |
| kkkkk. | USD | 0.0000000061850000 | H 272036 |

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

    The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Requests for Admission as set forth above.

    Subject to and without waiver of their Objections, the Debtors deny that 3AC owned the Assets listed in Request for Admission No. 1 as of June 12, 2022.

    **SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES**

    Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Interrogatories as follows:

**INTERROGATORY NO. 1**

    If Your response to Request for Admission No. 1 is anything other than an unequivocal admission, describe in full detail all facts and documents upon which You base Your denial, including without limitation, who You contend owns the Assets that were held (on a custodial basis or otherwise) by FTX Trading Ltd. for 3AC.

**RESPONSE TO INTERROGATORY NO. 1**

    The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Interrogatory on the basis that it seeks legal conclusions and/or legal arguments. The Debtors also object to this Interrogatory on the basis that it assumes the existence of facts that do not exist or the occurrence of events that did not take place.

    Subject to and without waiver of their Objections, the Debtors state that 3AC did not own any of the Assets in the 3AC Customer Accounts or otherwise held on the FTX.com

exchange as of June 12, 2022.[3]  To the contrary, those Assets were held in wallets that the Debtors owned and controlled, and accordingly were owned by the Debtors.  Furthermore, no contract between the parties established any trustee-beneficiary or other similar relationship establishing 3AC's ownership over the Assets held in such wallets.  Specifically, the FTX Terms of Service (as defined below) did not establish any trustee-beneficiary relationship between any of the Debtors and 3AC, and in fact any such fiduciary or other similar relationship was expressly disclaimed in the FTX Terms of Service, which stated that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."  (FTX Terms of Service § 2.1.3 (FTX_3AC_000013696); *see also* 3AC Line of Credit Agreement (as defined below) § 18 ("[N]o provision contained herein shall be deemed to create any relationship between the Parties hereto other than the relationship of borrower and lender.") (FTX_3AC_000000763).)  Accordingly, consistent with the FTX Terms of Service, 3AC Loan and Security Agreement (as defined below), 3AC Line of Credit Agreement, and all other applicable documents governing the 3AC Customer Accounts (as defined below) (collectively, the "3AC Customer Account Documents"), the Debtors and 3AC had a debtor-creditor relationship with respect to the Assets in the 3AC Customer Accounts.[4]

---

[3]    To the extent 3AC withdrew any Assets from the FTX.com exchange on June 12, 2022, 3AC obtained title to them when they were transferred from wallets owned and controlled by the Debtors into wallets own and controlled by 3AC.

[4]    All applicable documents governing the 3AC Customer Accounts have previously been produced to the Foreign Representatives.  *See infra Supplemental Responses and Objections to the First Set of Interrogatories; see also Responses and Objections to the Foreign Representatives of Three Arrows Capital, Ltd.'s (I) First Set of Interrogatories; (II) First Set of Requests for the Production of Documents; and (III) Notice of Deposition* (the "Responses to First Set of Discovery"), dated July 26, 2024.

The Debtors reserve all rights to fully address any claims to their property in litigation with 3AC or otherwise.

## INTERROGATORY NO. 2

For each of the following 3AC Assets held (on a custodial basis or otherwise) by FTX Trading Ltd., describe in full detail the legal basis for the sale, liquidation, seizure, foreclosure or other transfer of that asset by FTX Trading Ltd. between June 12 and 14, 2022 and identify all facts and documents that support Your response:

| | Asset | Amount | Cell in FTX_3AC_000000038 |
|---|---|---|---|
| a. | AVAX | 15.1000000000000000 | H 82460 |
| b. | BCH | 0.0000000061491708 | H 82462 |
| c. | BTC | 26779.5550000046000000 | H 82465 |
| d. | COIN | 0.0000000043469974 | H 82466 |
| e. | DOGE | 0.0000000031187781 | H 82469 |
| f. | DOT | 12319.6727758149000000 | H 82470 |
| g. | ETH | 137724.1741965020000000 | H 82471 |
| h. | ETHE | 2500915.6429776300000000 | H 82472 |
| i. | FIDA | 0.5672267700000000 | H 82473 |
| j. | FIDA_LOCKED | 5812134.4327732300000000 | H 82474 |
| k. | FTT | 1123117.3322516400000000 | H 82476 |
| l. | GBTC | 2847917.0030404600000000 | H 82477 |
| m. | GRT | 0.0000000093171430 | H 82478 |
| n. | LEO | 0.0000000075327645 | H 82483 |
| o. | LINK | 0.0000000100000000 | H 82484 |
| p. | LTC | 0.0000000072039376 | H 82487 |
| q. | LUNA2 | 607.6505084000000000 | H 82488 |
| r. | LUNA2_LOCKED | 1417.8511860000000000 | H 82489 |
| s. | LUNC | 31082.6818849600000000 | H 82490 |
| t. | PAXG | 0.0000000050000000 | H 82497 |
| u. | PYTH_LOCKED | 4166667.0000000000000000 | H 82499 |
| v. | ROOK | 16401.3766472050000000 | H 82502 |
| w. | SNX | 0.0000000100000000 | H 82505 |
| x. | SOL | 0.0000000068579291 | H 82506 |

| | | | |
|---|---|---|---|
| y. | SOS | 0.0000018500000000 | H 82507 |
| z. | SRM | 4123.0887553400000000 | H 82508 |
| aa. | SRM_LOCKED | 1184232.9101289600000000 | H 82509 |
| bb. | STETH | 0.0000000008290338 | H 82511 |
| cc. | SUSHI | 0.0000000034973833 | H 82512 |
| dd. | TRX | 0.0000000072275000 | H 82515 |
| ee. | UNI | 0.0000000088193574 | H 82517 |
| ff. | USDT | 0.0000000583035055 | H 82519 |
| gg. | USTC | 85995.6603976411000000 | H 82520 |
| hh. | WBTC | 0.0000000033487365 | H 82521 |
| ii. | XAUT | 0.0000000020000000 | H 82522 |
| jj. | ALPHA | 0.8934750000000000 | H 113345 |
| kk. | AURY | 0.7548800000000000 | H 113346 |
| ll. | AXS | 0.0788525000000000 | H 113348 |
| mm. | BTC | 0.0000462477463750 | H 113349 |
| nn. | COMP | 0.0000980300000000 | H 113350 |
| oo. | DOGE | 0.2259500000000000 | H 113351 |
| pp. | ETH | 0.0000000050000000 | H 113352 |
| qq. | FTT | 0.0693075000000000 | H 113353 |
| rr. | MCB | 0.0070274000000000 | H 113355 |
| ss. | MER | 164285.7100000000000000 | H 113356 |
| tt. | PERP | 0.0157650000000000 | H 113357 |
| uu. | SOL | 0.0073397500000000 | H 113359 |
| vv. | USD | 10.5821115206975000 | H 113360 |
| ww. | USDT | 0.0000000061500000 | H 113361 |
| xx. | USD | 0.0000000025000000 | H 120728 |
| yy. | FTT | 3.3911500000000000 | H 128508 |
| zz. | SRM | 85.3187374100000000 | H 128509 |
| aaa. | SRM_LOCKED | 527.4312625900000000 | H 128510 |
| bbb. | TRX | 0.0000310000000000 | H 128511 |
| ccc. | USD | 1278096.2959690800000000 | H 128512 |
| ddd. | USDT | 314190.3988726700000000 | H 128513 |
| eee. | SRM | 117.2866035500000000 | H 135404 |

| fff. | SRM_LOCKED | 730.3333964500000000 | H 135405 |
|---|---|---|---|
| ggg. | USD | 927716.6488290620000000 | H 135406 |
| hhh. | USDT | 308418.7859535600000000 | H 135407 |
| iii. | SRM | 89.4243048700000000 | H 142146 |
| jjj. | SRM_LOCKED | 556.6556951300000000 | H 142147 |
| kkk. | USD | 528273.8872676990000000 | H 142148 |
| lll. | USDT | 231451.9023334700000000 | H 142149 |
| mmm. | SRM | 123.0702100900000000 | H 148888 |
| nnn. | SRM_LOCKED | 760.7297899100000000 | H 148889 |
| ooo. | USD | 800411.7386709650000000 | H 148890 |
| ppp. | USDT | 272915.4528403000000000 | H 148891 |
| qqq. | BTC | 0.0000000093856447 | H 154434 |
| rrr. | USD | 0.0000000020970671 | H 154437 |
| sss. | BCH | 0.0000000052379276 | H 176557 |
| ttt. | BNB | 0.0000000086478739 | H 176558 |
| uuu. | BTC | 0.0000000003225168 | H 176559 |
| vvv. | LTC | 0.0000000014715642 | H 176562 |
| www. | MOB | 0.0000000078928964 | H 176564 |
| xxx. | TRX | 0.0000000048162230 | H 176570 |
| yyy. | USD | 0.0000000007125426 | H 176571 |
| zzz. | YFI | 0.0000000050000000 | H 176573 |
| aaaa. | ETH | 49.9060000000000000 | H 185744 |
| bbbb. | USD | 0.0000000080040000 | H 185745 |
| cccc. | FTT | 0.0000000035055250 | H 194417 |
| dddd. | USD | 29553625.0109609000000000 | H 194420 |
| eeee. | FTT | 0.0000000036855400 | H 209830 |
| ffff. | LOOKS | 0.0000000100000000 | H 209832 |
| gggg. | STETH | 0.0000000014959586 | H 209835 |
| hhhh. | USD | 4533633.5044397000000000 | H 209836 |
| iiii. | FTT | 98810.0578785700000000 | H 218844 |
| jjjj. | SRM | 5.3469398000000000 | H 218845 |
| kkkk. | SRM_LOCKED | 9642.9938584200000000 | H 218846 |
| llll. | USD | 9.1685101167595700 | H 218847 |

| mmmm | ETH | 0.0000000025000000 | H 224543 |
|---|---|---|---|
| nnnn. | USD | 0.0000000088080000 | H 224546 |
| oooo. | USD | 0.0000000018805000 | H 227546 |
| pppp. | USD | 0.0000000015963000 | H 230242 |
| qqqq. | USD | 0.0000000092400000 | H 232938 |
| rrrr. | SRM | 0.0174334500000000 | H 238024 |
| ssss. | SRM_LOCKED | 10.9540313100000000 | H 238025 |
| tttt. | USD | 0.0000000099137900 | H 238026 |
| uuuu. | USD | 0.0011249794600000 | H 241028 |
| vvvv. | USD | 0.0000000043640000 | H 243724 |
| wwww | SRM | 0.0925681500000000 | H 248810 |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | H 248811 |
| yyyy. | USD | 0.0000000046773200 | H 248812 |
| zzzz. | BAL | 0.0000000100000000 | H 257788 |
| aaaaa. | BTC | 0.0000000040907300 | H 257789 |
| bbbbb. | ETH | 0.0000000050000000 | H 257790 |
| ccccc. | FTT | 1000.0000000100000000 | H 257791 |
| ddddd. | SRM | 118.6538830400000000 | H 257792 |
| eeeee. | SRM_LOCKED | 69226.0592868400000000 | H 257793 |
| fffff. | USD | 0.0000000015649857 | H 257794 |
| ggggg. | USD | 0.0013843232530000 | H 261252 |
| hhhhh. | USD | 0.0000000096320000 | H 263948 |
| iiiii. | USD | 0.0000000045400000 | H 266644 |
| jjjjj. | USD | 0.0000000023600000 | H 269340 |
| kkkkk. | USD | 0.0000000061850000 | H 272036 |

## RESPONSE TO INTERROGATORY NO. 2

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors also object to this Interrogatory on the basis that it seeks legal conclusions and/or legal arguments.  The

Debtors also object to this Interrogatory on the basis that it assumes the existence of facts that do not exist or the occurrence of events that did not take place.

Subject to and without waiver of their Objections, the Debtors state that certain of the Assets listed in Interrogatory No. 2 were not sold, liquidated, seized, foreclosed or otherwise transferred by the Debtors between June 12 and June 14, 2022.  The Debtors direct the Foreign Representatives to the chart set forth on Exhibit A attached hereto that identifies Assets listed in Interrogatory No. 2 that were sold, liquidated, seized, foreclosed or otherwise transferred by the Debtors between June 12 and June 14, 2022.

Further, the Debtors state that any liquidation by the Debtors of the Assets listed in Interrogatory No. 2 was executed pursuant to and in accordance with the 3AC Customer Account Documents (as defined below).  The 3AC Customer Account Documents imposed certain margin trading collateral requirements to the 3AC Customer Accounts (as defined below) and which, among other things, entitled FTX Trading to liquidate assets in the 3AC Customer Accounts in the ordinary course of business if the 3AC Customer Accounts failed to meet applicable collateral requirements and entitled FTX Trading to apply proceeds, property, or amounts received on such liquidation to reduce leverage in the account or otherwise resolve the collateral or account balance deficiencies.

**SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Document Requests, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Document Requests as follows:

## DOCUMENT REQUEST NO. 1

All Documents identified in Your responses to 3AC's First Set of Requests for Admission and Second Set of Interrogatories to You.

## RESPONSE TO DOCUMENT REQUEST NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors further object to this Document Request to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.

Subject to and without waiver of their Objections, the Debtors state that they have not identified any documents in their responses to 3AC's First Set of Requests for Admission and Second Set of Interrogatories beyond those previously identified and produced to 3AC.

### SUPPLEMENTAL RESPONSES AND OBJECTIONS
### TO THE FIRST SET OF INTERROGATORIES

Subject to and without waiving the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Debtors' Responses to First Set of Discovery, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the First Set of Interrogatory Nos. 1 and 3 as follows:

## FIRST SET OF INTERROGATORY NO. 1

Identify any and all agreements (whether formal or informal, written or oral, or otherwise) between 3AC and FTX that gave rise to 3AC's negative U.S. Dollar balances reflected in FTX_3AC_000000038, including without limitation any loan agreements, security agreements, collateral pledges, loan assignment agreements, borrowing requests, margin call communications, trade confirmations, or other similar documents.

## RESPONSE TO FIRST SET OF INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Responses to First

Set of Discovery.  The Debtors also object to this Interrogatory on the basis that the term "gave rise to" is vague and ambitious, undefined and capable of multiple meanings and interpretations, and therefore this Interrogatory purports to impose an obligation on the Debtors to ascertain its intended scope and meaning.  The Debtors further object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  In addition, the Debtors object to this Interrogatory to the extent it is duplicative of First Set of Interrogatory No. 3.

Subject to and without waiver of their Objections, the Debtors respond that, to the Debtors' knowledge, prior to the commencement of the above-captioned cases, 3AC was the holder of multiple trading accounts on the FTX.com platform (collectively, the "3AC Customer Accounts").  Through the 3AC Customer Accounts, among other things, 3AC participated in FTX Trading's spot margin trading program.  In connection with the 3AC Customer Accounts and the spot margin trading program, 3AC and FTX Trading were parties to that certain Loan and Security Agreement, dated October 22, 2021, previously produced bearing production numbers FTX_3AC_000000075 through FTX_3AC_000000095 (the "3AC Loan and Security Agreement"), and that certain Line of Credit Agreement, dated March 30, 2022, previously produced bearing production numbers FTX_3AC_000000758 through FTX_3AC_000000763 (the "3AC Line of Credit Agreement").  In addition, additional documents related to the 3AC Customer Accounts include (1) that certain Terms of Service, dated May 13, 2022, previously produced bearing production numbers FTX_3AC_000013695 through FTX_3AC_000013756 (the "FTX Terms of Service"); (2) that certain draft Line of Credit Agreement between 3AC and FTX Trading, dated April 28, 2021, previously produced bearing production numbers FTX_3AC_000013664 through FTX_3AC_000013669; (3) an explanatory memorandum

describing the utilization of the Debtors' lines of credit, previously produced bearing production numbers FTX_3AC_000013689 through FTX_3AC_000013694; and (4) that certain undated terms of services, previously produced bearing production numbers FTX_3AC_000013670 through FTX_3AC_000013688.

## FIRST SET OF INTERROGATORY NO. 3

With respect to each FTX entity identified in response to Interrogatory No. 2, identify (i) the nature of the relationship between 3AC and such entity and (ii) any agreements or Documents relating to such relationship.

## RESPONSE TO FIRST SET OF INTERROGATORY NO. 3

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth in the Responses to First Set of Discovery.  The Debtors also object to this Interrogatory to the extent it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Interrogatory to the extent it is duplicative of First Set of Interrogatory No. 1.

Subject to and without waiver of their Objections, the Debtors refer the Foreign Representatives to, and incorporate by reference, their Response to First Set of Interrogatory No. 1 above.

Dated:  September 3, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

 /s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for Debtors and Debtors-in-Possession*

**EXHIBIT A**

**Exhibit A**

| | Schedule Provided by 3AC | | Amount Liquidated Between June 12-14, 2022 |
|---|---|---|---|
| **Ref** | **Asset** | **Amount** | |
| a. | AVAX | 15.1000000000000000 | - |
| b. | BCH | 0.0000000061491708 | - |
| c. | BTC | 26,779.5550000046000000 | - |
| d. | COIN | 0.0000000043469974 | - |
| e. | DOGE | 0.0000000031187781 | - |
| f. | DOT | 12,319.6727758149000000 | 2.9727758100000000 |
| g. | ETH | 137,724.1741965020000000 | 10,697.8411965100000000 |
| h. | ETHE | 2,500,915.6429776300000000 | 2,500,915.6429776300000000 |
| i. | FIDA | 0.5672267700000000 | 0.5672267700000000 |
| j. | FIDA_LOCKED | 5,812,134.4327732300000000 | - |
| k. | FTT | 1,123,117.3322516400000000 | 580,833.6322516000000000 |
| l. | GBTC | 2,847,917.0030404600000000 | 2,847,917.0030404600000000 |
| m. | GRT | 0.0000000093171430 | - |
| n. | LEO | 0.0000000075327645 | - |
| o. | LINK | 0.0000000100000000 | - |
| p. | LTC | 0.0000000072039376 | - |
| q. | LUNA2 | 607.6505084000000000 | - |
| r. | LUNA2_LOCKED | 1,417.8511860000000000 | - |
| s. | LUNC | 31,082.6818849600000000 | 31,082.6818849600000000 |
| t. | PAXG | 0.0000000050000000 | - |
| u. | PYTH_LOCKED | 4,166,667.0000000000000000 | - |
| v. | ROOK | 16,401.3766472050000000 | - |
| w. | SNX | 0.0000000100000000 | - |
| x. | SOL | 0.0000000068579291 | - |
| y. | SOS | 0.0000018500000000 | - |
| z. | SRM | 4,123.0887553400000000 | 560.1311302500000000 |
| aa. | SRM_LOCKED | 1,184,232.9101289600000000 | - |
| bb. | STETH | 0.0000000008290338 | - |
| cc. | SUSHI | 0.0000000034973833 | - |
| dd. | TRX | 0.0000000072275000 | - |
| ee. | UNI | 0.0000000088193574 | - |
| ff. | USDT | 0.0000000583035055 | - |
| gg. | USTC | 85,995.6603976411000000 | 85,995.6603976400000000 |
| hh. | WBTC | 0.0000000033487365 | - |
| ii. | XAUT | 0.0000000020000000 | - |
| jj. | ALPHA | 0.8934750000000000 | - |
| kk. | AURY | 0.7548800000000000 | - |
| ll. | AXS | 0.0788525000000000 | - |
| mm. | BTC | 0.0000462477463750 | - |
| nn. | COMP | 0.0000980300000000 | - |
| oo. | DOGE | 0.2259500000000000 | - |

**Exhibit A**

| | Schedule Provided by 3AC | | Amount Liquidated |
|---|---|---|---|
| **Ref** | **Asset** | **Amount** | **Between June 12-14, 2022** |
| pp. | ETH | 0.0000000050000000 | - |
| qq. | FTT | 0.0693075000000000 | - |
| rr. | MCB | 0.0070274000000000 | - |
| ss. | MER | 164,285.7100000000000000 | - |
| tt. | PERP | 0.0157650000000000 | - |
| uu. | SOL | 0.0073397500000000 | - |
| vv. | USD | 10.5821115206975000 | - |
| ww. | USDT | 0.0000000061500000 | - |
| xx. | USD | 0.0000000025000000 | - |
| yy. | FTT | 3.3911500000000000 | - |
| zz. | SRM | 85.3187374100000000 | - |
| aaa. | SRM_LOCKED | 527.4312625900000000 | - |
| bbb. | TRX | 0.0000310000000000 | - |
| ccc. | USD | 1,278,096.2959690800000000 | - |
| ddd. | USDT | 314,190.3988726700000000 | 311,911.8513000000000000 |
| eee. | SRM | 117.2866035500000000 | - |
| fff. | SRM_LOCKED | 730.3333964500000000 | - |
| ggg. | USD | 927,716.6488290620000000 | - |
| hhh. | USDT | 308,418.7859535600000000 | 278,763.6226000000000000 |
| iii. | SRM | 89.4243048700000000 | - |
| jjj. | SRM_LOCKED | 556.6556951300000000 | - |
| kkk. | USD | 528,273.8872676990000000 | - |
| lll. | USDT | 231,451.9023334700000000 | 224,059.2492000000000000 |
| mmm. | SRM | 123.0702100900000000 | - |
| nnn. | SRM_LOCKED | 760.7297899100000000 | - |
| ooo. | USD | 800,411.7386709650000000 | - |
| ppp. | USDT | 272,915.4528403000000000 | 255,892.9899000000000000 |
| qqq. | BTC | 0.0000000093856447 | - |
| rrr. | USD | 0.0000000020970671 | - |
| sss. | BCH | 0.0000000052379276 | - |
| ttt. | BNB | 0.0000000086478739 | - |
| uuu. | BTC | 0.0000000003225168 | - |
| vvv. | LTC | 0.0000000014715642 | - |
| www. | MOB | 0.0000000078928964 | - |
| xxx. | TRX | 0.0000000048162230 | - |
| yyy. | USD | 0.0000000007125426 | - |
| zzz. | YFI | 0.0000000050000000 | - |
| aaaa. | ETH | 49.9060000000000000 | - |
| bbbb. | USD | 0.0000000080040000 | - |
| cccc. | FTT | 0.0000000035055250 | - |
| dddd. | USD | 29,553,625.0109609000000000 | - |

**Exhibit A**

| | Schedule Provided by 3AC | | Amount Liquidated Between June 12-14, 2022 |
|---|---|---|---|
| **Ref** | **Asset** | **Amount** | |
| eeee. | FTT | 0.0000000036855400 | - |
| ffff. | LOOKS | 0.0000000100000000 | - |
| gggg. | STETH | 0.0000000014959586 | - |
| hhhh. | USD | 4,533,633.5044397000000000 | - |
| iiii. | FTT | 98,810.0578785700000000 | - |
| jjjj. | SRM | 5.3469398000000000 | - |
| kkkk. | SRM_LOCKED | 9,642.9938584200000000 | - |
| llll. | USD | 9.1685101167595700 | - |
| mmmm | ETH | 0.0000000025000000 | - |
| nnnn. | USD | 0.0000000088080000 | - |
| oooo. | USD | 0.0000000018805000 | - |
| pppp. | USD | 0.0000000015963000 | - |
| qqqq. | USD | 0.0000000092400000 | - |
| rrrr. | SRM | 0.0174334500000000 | - |
| ssss. | SRM_LOCKED | 10.9540313100000000 | - |
| tttt. | USD | 0.0000000099137900 | - |
| uuuu. | USD | 0.0011249794600000 | - |
| vvvv. | USD | 0.0000000043640000 | - |
| wwww. | SRM | 0.0925681500000000 | - |
| xxxx. | SRM_LOCKED | 58.1636581300000000 | - |
| yyyy. | USD | 0.0000000046773200 | - |
| zzzz. | BAL | 0.0000000100000000 | - |
| aaaaa. | BTC | 0.0000000040907300 | - |
| bbbbb. | ETH | 0.0000000050000000 | - |
| ccccc. | FTT | 1,000.0000000100000000 | - |
| ddddd. | SRM | 118.6538830400000000 | - |
| eeeee. | SRM_LOCKED | 69,226.0592868400000000 | - |
| fffff. | USD | 0.0000000015649857 | - |
| ggggg. | USD | 0.0013843232530000 | - |
| hhhhh. | USD | 0.0000000096320000 | - |
| iiiii. | USD | 0.0000000045400000 | - |
| jjjjj. | USD | 0.0000000023600000 | - |
| kkkkk. | USD | 0.0000000061850000 | - |