## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  December 12, 2024 at 1:00 p.m. (ET)** |
| | **Obj. Deadline:  December 5, 2024 at 4:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER ESTABLISHING
## THE AMOUNT OF THE DISPUTED CLAIMS RESERVE

FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105(a), 502(c) and 1142(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and rule 3021 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), setting the estimated amount of Disputed Claims for purposes of establishing a Disputed Claims Reserve under the Debtors' *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan").[2]  In support of the Motion, the Debtors submit the *Declaration of Steven P. Coverick in Support of the Motion of Debtors for Entry of an Order Establishing the Amount of the Disputed Claims Reserve* (the "Coverick Declaration") and respectfully state as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**Preliminary Statement**

1.      Although the Debtors have made enormous progress in reconciling the hundreds of thousands of scheduled and filed creditor claims in these Chapter 11 Cases, much work remains.  This work should not delay administration of these Chapter 11 Cases or distributions to creditors.  To permit distributions following the upcoming Effective Date of the Debtors' confirmed Plan, the Plan Administrator must establish a Disputed Claims Reserve as provided for by section 8.5 of the Plan.  This Motion seeks to do so in a manner that maximizes prudent initial distributions while being fair to all creditors holding Disputed Claims.  **This Motion does not seek to resolve or estimate any Disputed Claim for purposes of allowance or distribution.**

2.      The Debtors and their advisors have conducted a careful review of the Disputed Claims and developed the Disputed Claims Reserve from the ground up based on a variety of factors.  At the conclusion of this process, the Debtors determined that $6.533 billion of Disputed Claims is a conservative and reasonable initial Disputed Claims Reserve (the "Reserve Amount").  This Reserve Amount includes approximately *$3.4 billion of Disputed Claims over and above* the amounts the Debtors' project will ultimately become Allowed Claims.  Thus, while a smaller reserve is possible, the Reserve Amount will ensure any Disputed Claims that are ultimately Allowed can be satisfied in accordance with the terms of the Plan.  Future adjustments of the Reserve Amount will similarly be made in a transparent manner through subsequent order of this Court.  Establishing the Disputed Claims Reserve now will enable the Debtors to satisfy, subject to the terms of the Plan, the Claims of approximately 98% of the Debtors' creditors by number within 60 days of the Effective Date of the Plan.  Therefore, the Debtors request that the Court set the Disputed Claims Reserve at the Reserve Amount.

**Background**

3.    On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].

4.    On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

5.    On October 7, 2024, the Court confirmed the Plan, and on October 8, 2024, entered the *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] (the "Confirmation Order").

6.    Additional factual background relating to the Debtors' businesses and these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

**Facts Specific to the Relief Requested**

**I.    The Claims Reconciliation Process**

7.    On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and*

*(B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519], which established, among other things, a deadline of June 30, 2023 to file proofs of claim and proofs of interest on account of non-Customer Entitlement Claims (such date, the "Non-Customer Bar Date").  On June 28, 2023, the Court entered the *Order (I) (A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793], which established, among other things, a deadline of September 29, 2023 to file proofs of claim on account of Customer Entitlement Claims[3] against the Debtors (such date, the "Customer Bar Date", and together with the Non-Customer Bar Date, the "Bar Dates").

8.      Since the Bar Dates, the Debtors have worked to reconcile over 95,000 Customer Entitlement Claims and over 2,500 non-Customer Entitlement Claims that were filed in excess of $1.187 sextillion.  (Coverick Decl. ¶ 6.)  The reconciliation process involves, among other things, reviewing each claim against the Debtors' books and records to determine the validity of Claims, analyzing the supporting documentation submitted in support of such Claims, evaluating applicable law implicated by Claims, and, where appropriate, objecting to Claims.  (*Id.*)

9.      To date, the Debtors have filed 129 omnibus claims objections seeking to disallow and expunge, reclassify, or reduce over 28,100 asserted claims in excess of $27 quintillion.  (*Id.* ¶ 7.)  The Debtors' reconciliation process is significant and remains ongoing.  (*Id.*)

---

[3]   "Customer Entitlement Claim", as defined in the Plan, means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors that compensates the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange.  (*See* Plan § 2.1.47.)

## II.    Establishment of a Disputed Claims Reserve

10.    Pursuant to sections 7 and 8 of the Plan and section 3 of the Plan Administration Agreement, the Plan Administrator is tasked with the distribution of the Debtors' available funds to creditors.  The Plan Administrator is vested with the authority to object to, and reconcile, all claims.  (*See* Plan § 8.)  The Plan Administrator is also charged with administering, adjusting and maintaining the Disputed Claims Reserve.  (Plan § 8.5.)  Section 8.5 of the Plan provides for the establishment of a Disputed Claims Reserve:

> On or prior to the Initial Distribution Date, the Plan Administrator shall establish, if necessary, a reserve (the "Disputed Claims Reserve") (a) on account of Disputed Claims that may be subsequently Allowed after the Effective Date, and (b) to cover payments to FTX DM that may be required under the FTX DM Global Settlement Agreement. The Plan Administrator shall (i) reserve, as necessary, cash on hand in a manner consistent with Article 4 on account of the Disputed Claims Reserve in the amount that would otherwise be distributable to estimated Disputed Claims pursuant to the Plan, (ii) administer, adjust and maintain the Disputed Claims Reserve, and (iii) withhold in the Disputed Claims Reserve any amount to fund subsequent Distributions pursuant to the Plan or payments that may be under the FTX DM Global Settlement Agreement. The Plan Administrator may, but shall not be required to, seek estimation of any Disputed Claim by the Bankruptcy Court under section 502 of the Bankruptcy Code.

(Plan § 8.5.)  Furthermore, given the sheer number and size of Disputed Claims in these Chapter 11 Cases, the Confirmation Order provides that the Debtors would file this Motion and the Disputed Claims Reserve Amount shall be ordered by the Court.  (Confirmation Order ¶ 168.)

11.    Currently, the Debtors project having over $12 billion of cash available for distribution to creditors on the Initial Distribution Date.  (Coverick Decl. ¶ 10.)  The Debtors are eager to make substantial distributions to Holders of Allowed Claims, but the Plan Administrator is unable to do so until the Disputed Claims Reserve is sized and established.  (Confirmation Order ¶ 168.)

12.    Many of the remaining Disputed Claims are overstated in whole or in part. (Coverick Decl. ¶ 10.)  The Debtors employed a process to determine the appropriate amount of the Disputed Claims Reserve.  (*Id*.)  The Debtors did not start with any "target" number in mind. (*Id*.)  Rather, the Debtors and their advisors (including counsel) developed the Disputed Claims Reserve from the ground up based on (i) an analysis of the Debtors' books, records, and accounting systems; (ii) scheduled Claims; (iii) filed proofs of claim and their supporting documentation; (iv) communications and agreements, if any, with claimants; (v) legal considerations associated with the Claims; and (vi) other relevant factors.  (*Id*. ¶ 10.)

13.    Informed by this work, the Debtors in their business judgment calculated $6.533 billion of Disputed Claims as a reasonable, aggregate initial Disputed Claims Reserve (the "Reserve Amount").  (*Id*. ¶ 11.)  The Reserve Amount is based on intentionally conservative assumptions and, as detailed in Exhibit 1 to the Coverick Declaration, includes approximately $3.4 billion of Disputed Claims over and above the amounts that the Debtors project will ultimately become Allowed Claims.  (*Id*.)

**A.    Customer Entitlement Claims as a Component of the Reserve Amount**

14.    The Reserve Amount includes reserves for the full amount of all liquidated Disputed Customer Entitlement Claims, scheduled or timely filed prior to entry of the Confirmation Order that (i) are not subject to a pending objection or (ii) will not be subject to a pending objection as of December 12, 2024.  (Coverick Decl. ¶ 14.)  For these Claims, if a discrepancy exists between a customer's filed proof of claim and the Debtors' books and records, the Debtors are including in the Reserve Amount an amount consistent with the as filed or otherwise modified Customer Entitlement Claim.  (*Id.*)

15.    For both liquidated and unliquidated Disputed Customer Entitlement Claims that are subject to objections that the Debtors expect will remain pending before the Court

as of December 12, 2024, the Reserve Amount generally includes proposed modified amounts set forth by the Debtors in their objections, subject to increased amounts in certain circumstances.  (*Id.* ¶ 15.)  Claims subject to filed objections that the Debtors expect to be resolved by December 12, 2024 are excluded from the Reserve Amount, and any amounts determined to be Allowed by Final Order of the Bankruptcy Court on account of such Claims will be eligible to receive Distributions, pursuant to the terms and provisions of the Plan.  (*Id.*)

16.     The Debtors and their advisors reviewed unliquidated Customer Entitlement Claims that were filed and that are not currently subject to a pending objection.  Based on this review, the Debtors estimated an appropriately conservative amount for such claims in the aggregate.  (*Id.* ¶ 16.)

**B.     Non-Customer Entitlement Claims as a Component of the Reserve Amount**

17.     The Reserve Amount includes reserves for the full amount of the overwhelming majority of the nominal asserted value of liquidated Disputed non-Customer Entitlement Claims.   (Coverick Decl. ¶ 17.)   For most liquidated Disputed non-Customer Entitlement Claims, if a discrepancy exists between a filed proof of claim and the Debtors' books and records, the Debtors are including in the Reserve Amount an amount consistent with the as filed non-Customer Entitlement Claim.  (*Id*. ¶ 17.)

18.     As Mr. Coverick explains, the Debtors have concluded that it would be unreasonable to reserve the full amount stated in the proof of claim for a small number of liquidated Disputed non-Customer Entitlement Claims where the filed amounts are grossly inflated and not likely to be reflective of the merits of the claim.  (*Id*. ¶ 18.)  For this limited set of Claims, the Debtors either have agreement with the claimant not to reserve with respect to the Claim or are including in the Reserve Amount a lesser amount based on the Debtors' and their advisors' assessment of the Claim.  (*Id.*)

19.     The Debtors and their advisors also have reviewed all unliquidated non-Customer Entitlement Claims.  (*Id.* ¶ 19.)  Based on this review, the Debtors identified the unliquidated non-Customer Entitlement Claims which provided sufficient detail to estimate the value of the Claim.  For these Claims, the Debtors estimated and reserved an appropriately conservative amount. (*Id.*)

20.     Finally, notwithstanding the conservative assumptions made with respect to the Disputed Claims, the Debtors are nonetheless including an additional $500 million in the Reserve Amount to provide additional cushion to further protect those claims that are unliquidated or included at less than the full asserted Claim amount.  (*Id.* ¶ 20.)

## Jurisdiction

21.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

22.     By this Motion, the Debtors request entry of the Order, substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code and rule 3021 of the Bankruptcy Rules determining the estimated amount of Disputed Claims for purposes of establishing a Disputed Claims Reserve under the Plan.

**Basis for Relief**

**I.    Establishment of the Disputed Claims Reserve is Appropriate**

23.    Section 502(c) of the Bankruptcy Code mandates the estimation of all contingent or unliquidated claims which, unless fixed or liquidated, would unduly delay the administration of a debtor's estate, and provides, in pertinent part, as follows:

> "There shall be estimated for purpose of allowance under this section –
>
> 1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . ."

11 U.S.C. § 502(c).  Although section 502(c) refers to the estimation of claims for the purposes of allowance, courts in this district and others have estimated claims for other purposes, including to establish reserves for plan distributions.  *See, e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 26, 2018) (establishing estimated aggregate disputed claims reserves); *In re Newpage Corp.,* No. 11-12804 (KG) (Bankr. D. Del. Feb. 19, 2013) (establishing aggregate claims reserve of $150 million based on estimated disputed claims); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Aug. 9, 2013) (establishing a disputed claims reserve of up to $700 million); *see also In re Gen. Maritime Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 26, 2012) (estimating the maximum aggregate amount of unsecured claims for purposes of establishing an unsecured claims reserve); *In re Motors Liquidation Co.*, No. 09- 50026 (REG) (Bankr. S.D.N.Y. Mar. 23, 2011) (estimating the maximum amount of individual claims for purposes of establishing a claims reserve under a plan); *In re Chemtura Corp.*, No. 09-11233 (JLG) (Bankr. S.D.N.Y. Oct. 29, 2010) (same).

24.    Section 502(c) does not prescribe the method for estimating a claim, and it is well-established that courts therefore have discretion to accept any method that best suits the

circumstances of the case at hand.  *See, e.g.*, *Maxwell* v. *Seaman Furniture Co. (In re Seaman Furniture Co. of Union Square, Inc.)*, 160 B.R. 40, 42 (S.D.N.Y. 1993) (stating that "the bankruptcy court may use whatever method is best suited to the circumstances").  "Congress intended the [claim estimation] to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue." *Bittner* v. *Borne Chemical Co.*, 691 F.2d 134, 135 (3d Cir. 1982).  "Congress has not precisely defined the mode or method of claim estimation nor has it required a bankruptcy court to employ a particular mode or method of unliquidated claim estimation. Instead, it has left the particular mode or method of claim estimation to a bankruptcy court's sound discretion." *In re N. Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016).

25. "[W]hen estimating claims, bankruptcy courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (S.D.N.Y. 2007) (citation and internal quotations omitted). Indeed, the clearly stated purpose for allowing the estimation of claims is to "avoid undue delay in the administration of bankruptcy proceedings." *Frito-Lay, Inc.* v. *LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993); *see In re Innovasystems, Inc.*, 2014 WL 7235527, at *7 (Bankr. D.N.J. Dec. 18, 2014) ("There is no particular method to be employed in estimating a claim.  Estimation decisions therefore fall within the discretion of the trial judge.") (citations omitted); *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) ("In general, a bankruptcy court has discretion to determine the appropriate method of estimation in light of the particular circumstances of the bankruptcy case before it.").

26.      Further, the Court has broad authority under sections 1142(b) and 105(a) of the Bankruptcy Code over the property of the estates administered under the Plan and to issue any order necessary to implement the provisions of the Plan and the Bankruptcy Code.  *See* 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary to the consummation of the plan."); 11 U.S.C. § 105(a) ("The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.").

27.      Section 1142(b) provides the Court with the authority to issue orders necessary to implement the terms of a confirmed plan.  *See Binder* v. *Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F. 3d 154, 165 (3d Cir. 2004) (finding that, notwithstanding the entry of a confirmation order, bankruptcy courts may issue any order necessary to administer the estate); *United States Trustee* v. *Gryphon at the Stone Mansion*, 166 F.3d 552, 556 (3d Cir. 1999) ("Section 1142(b) provides that the bankruptcy court may take action to ensure the consummation of a confirmed plan."); *In re Intermet Corp.*, 2009 Bankr. LEXIS 2613, *13 (Bankr D. Del. 2009) ("[Section 1142(b)] provide[s] courts with broad authority to order parties to comply with reorganization plans… It is incumbent upon the Court to make certain that the Plan which the creditors overwhelmingly supported is given effect.")

28.      The fixing of the Reserve Amount as requested will prevent undue delay in the administration of these Chapter 11 Cases and permit the Debtors to make meaningful distributions on the Initial Distribution Date while providing appropriately conservative reserves for any Disputed Claims that later become Allowed Claims.  (Coverick Decl. ¶ 8.)  As detailed in the Coverick Declaration, the Debtors believe that the Reserve Amount strikes a careful balance

of making prompt distributions to the victims of the fraud committed by Mr. Bankman Fried and his accomplices who are currently holding Allowed Claims with ensuring there are sufficient assets to satisfy Disputed Claims that might become Allowed Claims.  (*Id*. ¶ 11.)

29.    The Debtors have made enormous progress in reconciling scheduled and filed Claims, but the number and magnitude of those Claims necessitates that process will continue well beyond the Effective Date of the Plan and the Initial Distribution Date.  (*Id.* ¶ 8.)  Moreover, individual estimation of each and every Disputed Claim is impractical in a case of this size (*id.* ¶ 9) and, importantly, not necessary.

30.    The Reserve Amount of $6.533 billion of Disputed Claims is a staggering number that is based on intentionally conservative assumptions and includes approximately $3.4 billion over and above the amounts that the Debtors project will become Allowed Claims. (Coverick Decl. ¶¶ 11, 13.)  Those financial projections were presented to the Court and used to obtain approval of the Disclosure Statement and confirmation of the Plan.  (*See* Disclosure Statement Appendix C [D.I. 19143].)

31.    In addition, *all* Disputed Claims will have recourse to the Disputed Claims Reserve and the entirety of the Reserve Amount, subject to the terms and provisions of the Plan. (Coverick Decl. ¶ 12.)  Thus, the Debtors are not seeking to impose individual caps on any Disputed Claims or class of Claims.  While Disputed Claims have recourse only to the Disputed Claims Reserve, to the extent the Debtors underestimated the amount that should be attributed to any Claim or type of Claims within a particular Class, the Debtors' overestimation with respect to other Disputed Claims or Classes will ensure there are sufficient assets available to address all Disputed Claims that become Allowed Claims.  Nothing limits the ability of any Holder of any Disputed Claim to prove the amount of its Claim or recover on a later Allowed Claim in accordance

with the Plan, subject to the aggregate limit of the Reserve Amount.  This structure, along with the conservative calculation of the Reserve Amount, provides for fair treatment of Disputed Claims under the Plan.  (*See id.* ¶ 13.)

32.     All Holders of Allowed Claims would be prejudiced if required to wait for estimation or resolution of all Disputed Claims on a final basis before receiving amounts available for distribution under the Plan.  Establishment of the Disputed Claims Reserve now will permit the Debtors, subject to the terms of the Plan, to satisfy the Claims of approximately 98% of creditors by number within 60 days of the Plan Effective Date.  As a result, the Debtors request that the Court establish the Disputed Claims Reserve at the Reserve Amount.

## II.     The Debtors' Proposed Process for Adjusting the Reserve Amount Should be Approved

33.     As described above and in the Coverick Declaration (¶¶ 6, 7), the Debtors' Claims reconciliation process has made tremendous progress but the work is ongoing.  The Debtors anticipate that over time, the pool of Disputed Claims will continue to shrink and the amount in excess of projected Allowed Claims reflected in the Reserve Amount will continue to increase. As a result, the Debtors expect that the time will come where adjustments to the Reserve Amount will be appropriate, consistent with applying the methodology used to establish the Disputed Claims Reserve.

34.     Notwithstanding the discretion provided to the Plan Administrator in section 8.5 of the Plan, the Debtors and the Plan Administrator have determined that the size, scope, and nature of these Chapter 11 Cases counsel that adjustments to the Reserve Amount should be made in a transparent manner and with the approval of this Court.

35.     As a result, the Debtors and the Plan Administrator intend to proceed as follows with respect to any adjustments to the Reserve Amount:

- The Plan Administrator will file on the docket a "Notice of Adjustment of Disputed Claims Reserve Amount" that will provide the proposed adjustment to the Reserve Amount (the "<u>Adjusted Reserve Amount</u>") with an explanation for the adjustment, including an updated version of the Disputed Claims Reserve schedule attached as Exhibit 1 to the Coverick Declaration.

- Any objection to the Adjusted Reserve Amount must be filed and served on the Plan Administrator within 14 days.

- If any timely objections are filed and served and resolved on a consensual basis, the Debtors shall submit a "Certification of Counsel" advising of the resolution(s) and requesting entry of an order authorizing the Adjusted Reserve Amount.

- If any timely objections are filed and served and unable to be resolved on a consensual basis, the Debtors shall notice the matter for hearing before the Court and will only proceed to make the requested adjustment upon entry of an order by the Court approving the Adjusted Reserve Amount.

36.     Adjustments made to the Disputed Claims Reserve consistent with the methodology used to establish the Reserve Amount will ensure that as the Disputed Claims pool continues to be reconciled, the Debtors can ensure future distributions reflect the realities at the time of the ongoing Claims reconciliation process and "promote a fair distribution to creditors through a realistic assessment of uncertain claims." *O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 981 F.2d 1450, 1461 (5th Cir, 1993); *see also In re Enron Corp.*, Case No. 01-16034, 2006 WL 544463, at *4 (Bankr. S.D.N.Y. Jan. 17, 2006) (noting "the estimation of claims promotes the purpose of setting the amount of claims that are to receive distributive shares").

37.     Courts regularly provide for processes to adjust disputed claims reserves when appropriate. *See, e.g., In re AMR Corporation*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Aug. 9, 2013) (approving procedures for reducing the amount of the disputed claims reserve based upon certain events, including upon the resolution of disputed claims); *In re Chemtura Corp.*, No. 09-11233 (JLG) (Bankr. S.D.N.Y. October 29, 2010) (approving procedures for transferring reserve

amounts from a disputed claims reserve to a non-disputed claims reserve upon disallowance of disputed claims).

## Notice

38.    Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; (g) counsel to the Ad Hoc Committee; (h) all holders of Disputed Claims; and (i) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as is just and proper.

Dated:  November 20, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*