## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: December 12, 2024** |
| | **Re: D.I. 27755** |

## DEBTORS' OBJECTION TO THE MOTION
## OF THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD.
## (IN LIQUIDATION) FOR LEAVE TO AMEND PROOF OF CLAIM

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" or "FTX") hereby submit this objection to the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* [D.I. 27755] (the "Motion").[2]  In support of this objection, the Debtors submit the *Declaration of Nicholas Shay* (the "Shay Declaration") and the *Declaration of Benjamin S. Beller in Support of Debtors' Objection to the Motion of the Joint Liquidators of Three Arrows Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* (the "Beller Declaration") filed contemporaneously herewith, and respectfully state as follows:

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd. is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.     Three Arrows Capital, Ltd. ("3AC"), a cryptocurrency and digital assets hedge fund that has been in court-supervised liquidation since July 2022, maintained certain customer accounts on the FTX.com exchange (collectively, the "3AC Accounts") before the Debtors filed for bankruptcy on November 11 and 14, 2022 (the "Petition Date").  On June 30, 2023, more than a year after 3AC's collapse and the commencement of liquidation proceedings in the British Virgin Islands, the Joint Liquidators of 3AC (the "Joint Liquidators") filed duplicative non-customer proofs of claims against each of the Debtors (Beller Decl. Ex. O, the "Original Proofs of Claim") exclusively with respect to "a purported foreclosure by the Debtors on collateral securing an approximately $120 million purported loan that Three Arrows owed the Debtors as of June 1, 2022" (the "Margin Liquidation").  (Original Proofs of Claim, Attachment ¶ 6.)

2.     Sixteen months after the deadline to file proofs of non-customer claims against the Debtors (the "Bar Date"), and three months after the Debtors filed an objection to the Original Proofs of Claim, the Joint Liquidators filed the Motion seeking leave to assert new claims against the Debtors in an amount exceeding *1.5 billion* arising from entirely new alleged facts never mentioned in the Original Proofs of Claim (the "New Claims").  The Joint Liquidators are seeking a do-over with the hope of creating a windfall of more than $1.5 billion that the Debtors would vigorously contest, thus wasting resources to the detriment of all legitimate creditors.

3.     The New Claims do not relate back to and are not encompassed by the Original Proofs of Claim.  The Margin Liquidation was triggered by the 3AC Accounts' non-compliance with applicable margin trading requirements after, among other things, 3AC had significantly increased its cryptocurrency exposure immediately following the collapse of the

markets for the TerraUSD and LUNA tokens (in which 3AC was a significant investor), and increased volatility in the cryptocurrency markets.

4.      In stark contrast, through the New Claims, the Joint Liquidators seek to assert arbitrary claims against the Debtors for the vast majority of the total value of all cryptocurrency assets held in the 3AC Accounts as of the end of June 12, 2022, including those not implicated by the Margin Liquidation, simply because the value of cryptocurrency assets in the 3AC Accounts two days later had fallen to less than $10 million.

5.      As an initial matter, the New Claims are baseless because—outside of the Margin Liquidation representing the sole alleged basis for the Original Proofs of Claim—they do not arise from *any action taken by FTX*.  As the Joint Liquidators are aware, between June 12, 2022 and June 14, 2022, other than the Margin Liquidation, the decrease in value of the cryptocurrency assets in the 3AC Accounts was the result of (i) market price declines, (ii) withdrawals from the 3AC Accounts by 3AC itself, and (iii) sales of cryptocurrency initiated by 3AC itself.[3]  (*See* Goldberg Decl. Ex. 18 at 12, 21-22; Ex. 19 at 18-22.)  But even setting aside that such claims are legally and factually deficient on the merits, the New Claims cannot be asserted because they plainly do not relate to the $120 million purported loan identified in the Original Proofs of Claim and seek damages stratospherically in excess of what is encompassed by the Original Proofs of Claim.

---

[3]   The Joint Liquidators assert that their purported claims of $1.53 billion have excluded approximately $65 million of "unrealized losses, withdrawals by the 3AC Debtor (including realized losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts."  (New Claims, Attachment ¶ 43.) Nonetheless, the New Claims still are entirely comprised of changes in value attributable to (i) market price declines, (ii) withdrawals from the 3AC Accounts by 3AC itself, and (iii) sales of cryptocurrency initiated by 3AC itself (other than the $82 million of Margin Liquidation).  (*See* Goldberg Decl. Ex. 18 at 12, 21-22; Ex. 19 at 18-22.)

6.      The Joint Liquidators' half-hearted argument to the contrary, contained in a single paragraph in the Motion (Mot. ¶ 27), misconstrues both the Original Proofs of Claim and New Claims and is entirely unpersuasive.   Moreover, the Motion does not include *any* substantive explanation of *how* the New Claims relate back to the Original Proofs of Claim, and instead focuses on ostensible equitable considerations premised on the Joint Liquidators' purported (but non-existent) information deficiencies at the time of the Bar Date.

7.      Putting all of that aside, the record is clear that the Joint Liquidators had more than enough information by the Bar Date to file proofs of claims sufficient to assert or at least properly preserve the New Claims.   As described more fully below, the Joint Liquidators actively investigated the 3AC Accounts and other relationships with FTX beginning just four days after their appointment on June 27, 2022.   (Crumpler Decl. ¶ 5; Beller Decl. Ex. B.)   By July 26, 2022, the Joint Liquidators had "full access" to the 3AC Accounts. (Crumpler Decl. ¶ 31.)   With such full access, the Joint Liquidators had the ability to view the entire history of specific deposits, withdrawals, and trades that occurred in the 3AC Accounts, including all associated subaccounts.   (Shay Decl. ¶ 4; Beller Decl. Exs. K-N; *see also* Beller Decl. Ex. P (the "Crumpler Deposition Transcript" or "Crumpler Depo. Tr.") at 82:9-83:11.)   The Joint Liquidators thus had the capacity to identify the assets previously held in the 3AC Accounts on June 12, 2022, and they also knew that most of those assets were no longer in the 3AC Accounts no later than July 19, 2022.  (Beller Decl. Ex. E.)

8.      Beyond access to the actual 3AC Accounts—which is all the Joint Liquidators, sophisticated insolvency professionals with a team supporting them, needed—the Joint Liquidators also requested and received substantial information from FTX employees via email on at least 11 occasions from July 2022 through October 2022.  (*See* Beller Decl. Exs. C-

H.)  Notably, the Joint Liquidators had sufficient information by no later than early 2023 for their professionals to prepare a financial statement of 3AC's assets, liabilities and positions as of May 31, 2022, including those assets held on the FTX.com exchange.  This financial statement—which the Joint Liquidators refer to as an "NAV" pack (Beller Decl. Ex. J, the "<u>May 2022 NAV Pack</u>")—unambiguously showed, among other things, that 3AC had at least $700 million worth of cryptocurrency assets on the FTX.com exchange at the end of May 2022.  (*Id.*; Crumpler Depo. Tr. at 106:12-107:2; 108:10-111:24.)

9.       With the benefit of all this information, the Joint Liquidators nonetheless filed proofs of claim limited to claims arising from the foreclosure on collateral securing a specific $120 million purported loan.  They did not assert *any* claims arising from the hundreds of millions of dollars that their own records showed had been in the 3AC Accounts at the end of May 2022 but that were no longer in the 3AC Accounts just weeks later.  Nor did they assert any claims for any of the specific cryptocurrencies that the May 2022 NAV Pack detailed, and no customer claims at all (for which they had an additional three months to file by the applicable bar date).

10.      Nevertheless, while the Joint Liquidators do not dispute that they had substantial information before the Bar Date (which on its own is a basis for the Court to deny the Motion), the Joint Liquidators argue that because they did not have in downloaded form *all* historical account information relating to the 3AC Accounts as of the Bar Date, they could not have asserted *any* claims beyond a claim arising from the Margin Liquidation.  That suggestion fails because a proof of claim need not contain all facts and allegations with respect to the purported claims in order to be asserted.  But more fundamentally, the Joint Liquidators had actual notice by no later than October 2022, long before the Bar Date, that substantial activity

had occurred in the 3AC Accounts beyond what was included in the Original Proofs of Claim. (*See* Crumpler Depo. Tr. 90:2-5 ("it became increasingly clear, as we get towards the end of October [2022], that we hadn't been provided with the full data."); *id.* 90:12-17 ("Q.  And you just made a comment that – as time progressed, and you referenced late October, is that October of 2022 where you started to question the information?  A.  Well, certainly the completeness of the information, yes.").)

11.     3AC's relationship with FTX was no secret—one of the founders of 3AC, Kyle Davies, tweeted on December 9, 2022 "I was the largest trader on FTX."  (Beller Decl. Ex. I.)  Yet the Joint Liquidators never took any action to remedy any perceived information deficiency, including seeking FTX's help to address any purported concerns about data completeness.  Most glaringly, after the Debtors filed for bankruptcy in early November 2022, the Joint Liquidators did not make *any* inquiries or requests to the Debtors for *any* documents or information until *two days before the Bar Date*, more than seven months later.  And even that was limited to a vague, high-level request for "any documentation concerning this purported lending relationship."  (Goldberg Decl. Ex. 1 at 2.)  The Joint Liquidators did not request any discovery from the Debtors until months after the Bar Date, and they did not seek formal discovery under Rule 2004 until more than a year after the Bar Date.  The Joint Liquidators simply have no excuse for their failure to file a proof of claims by the Bar Date that properly preserved the purported claims they now seek leave to assert.

12.     The Joint Liquidators' equitable arguments are particularly unavailing given the extreme prejudice to the Debtors of allowing the requested amendment to assert claims in an amount massively exceeding the amounts identified in the Original Proofs of Claim without any factual or legal basis.  Indeed, the Joint Liquidators fail to even articulate with any

particularity the legal basis for the New Claims, instead pointing only to the legally insufficient position that the Debtors have not proven that no valid claims exist.  (New Claims, Attachment ¶¶ 31, 44.)  The Joint Liquidators seek to assert claims against the Debtors for a cherry-picked and incomplete positive account balance based on only the value of cryptocurrency assets as of what appears to be an arbitrary moment in time selected by the Joint Liquidators, June 12, 2022, untethered to any legal or factual premise.  (*Id.*, Attachment ¶¶ 42-43).  Moreover, unlike the solitary fact alleged in the Original Proofs of Claim, the New Claims seek damages against the Debtors based on actions taken *by 3AC* and movements in market prices over an arbitrary period of time, which are facially meritless.  (Goldberg Decl. Ex. 18 at _013891.)

13.     The Joint Liquidators were required to assert their claims by the same deadline as every other creditor.  The Original Proofs of Claim, which were filed by experienced insolvency professionals after a year of investigation, cannot plausibly be read to include a claim for the value of the majority of assets held in the 3AC Accounts as of June 12, 2022, or at any other time.  The Joint Liquidators have no excuse for not asserting any of the New Claims by the Bar Date.

14.     The Joint Liquidators have fallen far short of carrying their burden either for obtaining leave to amend the Original Proofs of Claim or for excusable neglect to assert the New Claims, including under the heightened standard for a post-confirmation late-filed amendment.  Accordingly, the Debtors respectfully request that the Court deny the Motion.

## BACKGROUND

15.     The Debtors incorporate the factual background provided in the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797] (the "Claim Objection"), and set forth certain additional factual background below.

16.    3AC maintained a main customer account with 15 subaccounts and an additional secondary account on the FTX.com exchange as of the Petition Date.  Through the 3AC Accounts, 3AC could deposit, withdraw, buy and sell, and transfer digital assets, fiat currency and other assets like other FTX.com customers.  3AC actively used these accounts. Indeed, about a month after FTX filed for bankruptcy, one of the founders of 3AC, Kyle Davies, tweeted "I was the largest trader on FTX."  (Beller Decl. Ex. I.)  3AC participated in the margin trading platform provided on the FTX.com exchange, which allowed 3AC through the 3AC Accounts to, among other things, purchase cryptocurrency on the FTX.com exchange using U.S. Dollars even if it did not have a sufficient U.S. Dollar balance on the exchange, so long as the 3AC Accounts maintained compliance with the minimum asset and other contractual requirements.

17.    In connection with its margin trading, the 3AC Accounts also benefitted from what was referred to on the FTX.com exchange as a "Line of Credit", which functioned to increase the amount of margin available to the beneficiary (*i.e.*, 3AC) under the margin trading program by the amount of the Line of Credit.  On September 30, 2020, 3AC entered into an agreement with FTX pursuant to which it received a line of credit for $10 million.  (Beller Decl. Ex. A.)  On March 2, 2021, FTX and 3AC agreed to increase this line of credit by $10 million, to $20 million.  (*Id*.)  On October 26, 2021, FTX and 3AC again agreed to increase this line of credit, this time by $100 million to a total available amount of $120 million.  (*Id*.)  The amount of the Line of Credit utilized at any given time varied based on the balances of cryptocurrency and U.S. Dollar assets in the 3AC Accounts.

18.    On June 27, 2022, the Joint Liquidators were appointed as the joint liquidators of 3AC in connection with liquidation proceedings in the British Virgin Islands.

(Crumpler Decl. ¶ 5.)   On July 1, 2022, the Joint Liquidators commenced Chapter 15 proceedings on behalf of 3AC in the U.S. Bankruptcy Court for the Southern District of New York.  (*Id.* ¶ 6.)

19.     The Joint Liquidators first contacted FTX that same day, on July 1, 2022, a mere four days after being appointed.  (Crumpler Decl. ¶ 28.)   Members of the Joint Liquidators' team at Teneo (BVI) Limited ("Teneo") had a call with FTX employees on July 7, 2022.  (Crumpler Decl. ¶ 28.)  A Teneo team member that same day circulated notes from the call to the Joint Liquidators, which stated that 3AC held an account "valued at $3.4m" at that time, and that "there was trading in the account as of 6 July 2022."  (Beller Decl. Ex. C at 2.)

20.     The Joint Liquidators requested and received access to the 3AC Accounts mere weeks after being appointed.  On July 19, 2022, the Joint Liquidators gained access to view the 3AC Accounts.  (Crumpler Decl. ¶ 31.)  A week later, on July 26, 2022, they gained "full access" to the 3AC Accounts.  (*Id.*)  Access to the 3AC Accounts gave the Joint Liquidators the ability to review the deposit, withdrawal, and trade history, including for each subaccount, whether or not they chose to do so.

21.     Users with access to an FTX.com customer account could access pages showing deposits and withdrawals for the account and associated subaccounts, including information about the date and time, amount, and source or destination address.  (Shay Decl. ¶ 4.)  As Mr. Crumpler testified at his November 25, 2024 deposition, the Joint Liquidators and/or the Teneo team had "access to all withdrawal and deposit detail for June of 2022 once [they] accessed the account." (Crumpler Depo. Tr. at 51:23-52:1.)  A member of the Teneo team confirmed to the Joint Liquidators via email on July 19, 2022, "[t]here is a vast amount of transactional data on the account.  The majority of trf out on the out on the last date of trading,

being June 14, 2022, shows c.15,000 ETH being trf out to the Three Arrows tagged wallet."
(Beller Decl. Ex. E at 1.)

22.     In addition to withdrawal and deposit transactions, users with access to
FTX.com customer accounts could also review all specific individual trades in the "Fills" tab for
the account and associated subaccounts.  (Shay Decl. ¶ 4.)  This includes information about the
date and time, coin, size or amount, and type of transaction.  (*Id.*)  Indeed, FTX confirmed to the
Joint Liquidators in September 2022 that this information about historical trades was viewable in
the 3AC Accounts.   As an FTX employee informed the Joint Liquidators via email on
September 19, 2022, "[k]indly note that all trades can be found in the 'Fills' tab."  (Beller Decl.
Ex. F at 2.)  When asked about this email at his deposition, Mr. Crumpler testified that he
assumed it was correct that the FTX employee was referencing the "Fills" tab within the 3AC
Accounts, to which the Teneo team had access at the time.  (Crumpler Depo. Tr. at 82:13-83:11.)

23.     FTX also published information instructing customers on how they can
view their transaction history within their 3AC Accounts.  For example, a help guide titled "FTX
Features Overview" was publicly available until November 2022 (Beller Decl. Ex. K), and
included a screenshot of what users could see in their "Wallet" page (*id.* at 1).  It provided
instructions on accessing withdrawal and deposit information.  (*Id.*)  Although the screenshot
displayed the "Balances" view, it also showed the other visible tabs, including the "Fills" tab.
(*Id.*)  This help guide also confirmed that information for subaccounts was visible in the
FTX.com platform:  "If you want to switch between your subaccounts—perhaps to change which
product you're trading—the easiest thing to do is to use the subaccount bar on the trading page
…  This will appear on every trading page, and with one click you move to a different

subaccount!  You can also switch subaccounts in the top right menu by clicking on your account name."  (*Id.* at 9-10.)

24.     Similarly, FTX published an article titled "OTC Guide," which included questions and answers relating to OTC trading.  (Beller Decl. Ex. L.)  One question was "Where can I see my trades?"; the answer was "You can see your trade history at https://otc.ftx.com/fills. You can also see your current balances at https://otc.ftx.com/wallet."  (*Id.* at 3.)

25.     Information about historical activity, including trades, could also be derived from the 3AC Accounts via an Application Program Interface ("API").  The FTX.com API allowed customers to instantaneously access their "trades data" (including snapshots of their historical balances and positions, their order history, and their borrowing history) and their "private account data" (including all subaccounts associated with their account) using a series of programming commands published on the FTX website.  (Beller Decl. Ex. M.)  In fact, when a customer navigated to the help page for "Historical Data" on the FTX.com website, the page noted that they could "find historical trades" for their account via the FTX.com API.  (Beller Decl. Ex. N.)  That help article further instructed customers on how to get historical open-high-low-close, or "OHLC" data using the FTX.com API, including a link to "find historical trades here."  (*Id.*)  It further provided a link to "request your historical account snapshots here."  (*Id.*) It appears that the Joint Liquidators had access to information derived from the FTX.com API, which was included in the information relied on by Ascent Fund Services (Singapore) Pte. Ltd. ("Ascent") to create the NAV packs setting forth 3AC's assets, including those on the FTX.com exchange.  (Crumpler Decl. ¶ 36.)

26.     Although Mr. Crumpler misleadingly states in his declaration that the Joint Liquidators were "only able to download a high-level summary of withdrawal and deposit

details dating back to May 22, 2022 and May 11, 2022" (Crumpler Decl. ¶ 31), the Joint Liquidators in fact had access to the 3AC Accounts and all of the information contained in those online accounts until access to the exchanges was generally shut off when the Debtors commenced their Chapter 11 cases in November 2022 (Crumpler Decl. ¶ 34). At no time did the Joint Liquidators ask FTX employees or the Debtors for technical assistance with problems in accessing trade data within the 3AC Accounts.

27.      In addition to receiving access to the 3AC Accounts themselves, the Joint Liquidators also began requesting and receiving information and documents from FTX employees shortly after they were appointed. On July 12, 2022, the Teneo team asked that FTX "provide us with an asset statement at today's date and a full trading history for the account as well as any subaccounts for the past 90 days." (Beller Decl. Ex. D at 4.) Two days later, on July 14, 2022, an FTX employee emailed 44 spreadsheets to the Teneo team, and noted "[a]s requested, please find attached the deposit, withdrawal and transaction history of Three Arrows Capital. Kindly note that the client had a main account and various sub-accounts." (*Id.* at 1.)

28.      On September 13, 2022, a member of the Teneo team asked FTX to "advise how we can obtain deposit and withdrawal history prior to May 2022," and identified "internal transfers on 8 & 9 June 2022" to specific wallets with a request that FTX "advise what account these wallets are connected to." (Beller Decl. Ex. F at 3.) On September 16, 2022, an FTX employee responded with the "full Deposit and Withdrawal History for the account," and confirmed that one of the transfers went to a wallet that "appears to belong to an Administrator of Three Arrows Capital (kyle@threearrowscap.com)" and the other belonged to a client of FTX. (*Id.*) As Mr. Crumpler testified at his deposition, the Joint Liquidators did not request any trading history during this email exchange. (Crumpler Depo. Tr. at 74:8-13.)

29.     Three days later, on September 19, 2022, the Teneo team raised further questions to FTX employees about transfers and trading on June 15, 2022.  (Beller Decl. Ex. F at 2.)  An FTX employee responded that same day, and noted that "I do believe there were various 'Trades' placed after the deposit was made," and in this email informed the Joint Liquidators that "all trades can be found in the 'Fills' tab."  (*Id*.)[4]

30.     On September 26, 2022, the Teneo team confirmed that they had "reviewed the attached deposit/withdrawal schedules and note that [the] account []history begins at 00:20 on 1 January 2021," and requested "the account activity in 2020" as well as "all of the deposit and withdrawal history in the same format as" two specific spreadsheets in order to "allow us to see where the funds are originating and where the transfers are going."  (*Id*. at 1.)  The very next day, on September 27, 2022, an FTX employee provided "the requested Transaction History in the referenced format."  (*Id*.)

31.     The Joint Liquidators and their team continued to request additional information from FTX employees over the following weeks.  On October 13, 2022, a Teneo employee asked an FTX employee if FTX had "a record of the bank accounts to which the fiat withdrawals were sent," and an FTX employee responded three days later by identifying two bank accounts.  (Beller Decl. Ex. G at 8.)

32.     On October 16, 2022, the Teneo team reached out to FTX with a "high priority request with respect to trading activity on the 3AC account."  (*Id*. at 6.)  The Teneo employee wrote that he could "see that the Company had been both buying and selling AVAX for USD and PERP," and stated "I am only able to download 100 transactions at a time, but

---

[4] As described above, Mr. Crumpler testified at his deposition that he assumed the FTX employee was referencing the "fills tab" within the 3AC Accounts.  (Crumpler Depo. Tr. at 82:18-83:83.)

understand that there were thousands of trades conducted." (*Id.*)  The Teneo employee asked FTX "to pull this information for us" and that "[a]s a top priority we would like to have the balance of AVAX as at 14 May 2022 and then a breakdown of all AVAX transactions since that date." (*Id.*)  In a follow-up email, the Teneo employee asked for this information by the end of October 19, 2022.  (*Id.* at 5.)  An FTX employee sent a spreadsheet with the requested information about the AVAX token by that requested deadline.  (*Id.*)  The Teneo employee and FTX employee exchanged several emails about follow-up questions relating to AVAX and identification of certain wallets from October 19 through October 26, 2022.  (*Id.*; Beller Decl. Ex. H.)  The Joint Liquidators "had a particular interest in AVAX" (Crumpler Depo. Tr. at 85:16-17), and Mr. Crumpler testified that "we had a huge amount of transactional data specific to AVAX when it was disclosed to us," including "the transactional history for the life of AVAX" (*id.* at 92:17-19).  This was the only token for which the Joint Liquidators specifically requested transaction data from FTX employees by this point. (*Id.* at 94:6-9.)[5]

33.     Although FTX responded to each specific request from the Joint Liquidators (*Id.* at 84:7-8) and the Joint Liquidators did not raise any issues to FTX about the information that they had received, the Debtors understand that, by this point, the Joint

---

[5]  During his deposition, Mr. Crumpler identified a statement at Paragraph 34 of his declaration as one he "would make … a little clearer on the factual basis."  (Crumpler Depo. Tr. at 26:20-27:17; *see also id.* at 92:11-94:8.)  In his declaration, Mr. Crumpler stated that as of the Petition Date, "the only material information produced by FTX related to the deposit, withdrawal, and limited transactional data received on July 14, 2022, certain historical data in respect of withdrawals, deposits, and transfers which had been received on September 16, 2022, information in respect of a limited number of fiat bank withdrawals, and the "trade/fills" order data for AVAX tokens," and that "[w]e have now learned that this trade data represents only 0.00003% of the 3AC Debtor's spot trades on the FTX platform across June 13, 2022 and June 14, 2022."  (Crumpler Decl. ¶ 34.)

Mr. Crumpler testified that this 0.00003% figure was intended to reflect the value of trades in the AVAX token specifically as a "a percentage of the value … of the trades affected" in the 3AC Accounts during June 13 and 14, 2022.  (Crumpler Depo. Tr. at 92:11-94:5.)  In other words, the numerator was the purported value of AVAX trades, and the denominator was the purported value of all trading on June 13 and 14, 2022.  This is a meaningless and misleading statistic.

Liquidators nonetheless began to believe there were potential gaps in the information they were provided by FTX regarding the 3AC Accounts. Mr. Crumpler testified that "it became increasingly clear . . . towards the end of October [2022], that we hadn't been provided with the full data." (*Id*. at 90:2-5.) When asked about this statement, Mr. Crumpler stated that in October 2022 the Joint Liquidators "certainly" started to question "the completeness of the information" provided by FTX. (*Id.* at 90:12-17.)

34.     On November 11 and 14, 2022, the Debtors filed for bankruptcy. The Debtors did not receive any requests for information from the Joint Liquidators or their counsel for more than seven months after the Petition Date. (Beller Decl. ¶ 18.)

35.     The Debtors understand that, although the Joint Liquidators did not seek further information from the Debtors, the Joint Liquidators continued to receive information ahead of the Bar Date about the assets held in the 3AC Accounts from other sources. On April 24, 2023, the Joint Liquidators received a May 2022 NAV Pack prepared by Ascent. (Crumpler Decl. ¶ 36.) Ascent was 3AC's pre-liquidation fund administrator. (*Id.*) Prior to 3AC's insolvency, Ascent prepared NAV Packs for 3AC—which are packs that show the "net asset value" of 3AC—usually on a monthly basis. (Crumpler Depo. Tr. at 96:6-22.) To prepare these NAV Packs, Ascent obtained information about balances held by 3AC on the FTX.com exchange provided by ThreeAC Ltd (BVI) and/or 3AC, as well as access to FTX's API. (Crumpler Decl. ¶ 36.) Around the fall of 2022, the Joint Liquidators retained Ascent to prepare NAV Packs for February through May 2022. (Crumpler Decl. ¶ 36; Crumpler Depo Tr. at 97:10-15.)[6]

---

[6]     Although Mr. Crumpler stated in his declaration that "the Joint Liquidators had retained [Ascent] … to prepare NAV packs from February through June 2022," he testified at this deposition that, in fact, Ascent never prepared a NAV pack for June 2022. (Crumpler Depo. Tr. at 97:16-98:14.)

36.    The May 2022 NAV Pack—received by the Joint Liquidators more than two months before the Bar Date—shows that as of May 31, 2022, 3AC had at least $700 million worth of cryptocurrency assets held on the FTX.com exchange.  (Beller Decl. Ex. J at 6, 14, 18; *see also* Crumpler Depo Tr. at 107:18-108:5.)  It separately showed a purported $120 million loan owed by 3AC to the Debtors.  (Beller Decl. Ex. J. at 18; *see also* Crumpler Depo Tr. at 106:3-7.)  The Joint Liquidators did not reach out to the Debtors after receiving the May 2022 NAV Pack.  (Beller Decl. ¶¶ 18-19.)

37.    On May 3, 2023, the Debtors filed the *Motion of Debtors for Entry of an Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1416].  On May 19, 2023, the Court entered an order [D.I. 1519] setting a non-customer claims bar date of June 30, 2023 and establishing certain procedures.

38.    The Joint Liquidators' first request for information to the Debtors came roughly seven months after the Petition Date and eight months after the last outreach from the Joint Liquidators to FTX.  Two days before the Bar Date, on June 28, 2023, at around 4 p.m., counsel for the Joint Liquidators informed counsel for the Debtors about a potential claim for the first time:

> [W]e wanted to let you know that we're contemplating filing a claim against FTX ***on the basis of what appears may have been a purported foreclosure on collateral securing a ~$120 million made by FTX to 3AC***.  Before we do that, we wanted to ask if you had any documentation concerning this purported lending relationship.  We do not have access to any such documentation and are therefore simply going off transaction records.

(Goldberg Decl. Ex. 1 at 2 (emphasis added).)  Debtors' counsel responded that "[b]ased on an initial inquiry, we are not aware of any claims that 3AC has.  But if you think you have something, you should file a claim." (*Id.* at 1.)

39.     No formal discovery request under Rule 2004 was served by the Joint Liquidators before the Bar Date.  Nor were any other requests for information made between the Petition Date and June 28, 2022.  (Beller Decl. ¶¶ 18-19.)

40.     On June 30, 2023, the Joint Liquidators filed the Original Proofs of Claim on behalf of 3AC against each of the Debtors.  The Original Proofs of Claim included one sentence describing their purported claims:

> [C]laims under British Virgin Islands, New York, Delaware, and other applicable law, including without limitation claims in the nature of preference, conversion, and other avoidance actions, *arising from*, on information and belief, *a purported foreclosure by the Debtors on collateral securing an approximately $120 million purported loan* that [3AC] owed to the Debtors as of June 1, 2022.

(Original Proofs of Claim, Attachment ¶ 6.)  The sole alleged fact was "a purported foreclosure by the Debtors" with respect to a specific $120 million loan.  (*Id.*)  No other factual assertions were included—there were no allegations relating to the assets identified in the May 2022 NAV Pack, or relating to any of the data that the Joint Liquidators received from FTX or through their access to the 3AC Accounts.  There was no reference to any trades, transfers, withdrawals, or any other action, nor to any assets other than the collateral securing a discrete loan.  The Original Proofs of Claim lacked any information suggesting that additional claims might later be asserted for an amount more than twelve times the $120 million figure included.  The Original Proofs of Claim also disclosed the assertion that the Margin Liquidation gave rise to a secured claim.  (*Id.* at 3.)

41.     On September 29, 2023, Joint Liquidators filed the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. for Coordination Among Courts* [D.I. 2754] (the "Coordination Motion") in the FTX Chapter 11 cases seeking judicial coordination with other bankruptcy cases involving 3AC.  On October 10, 2023, the Debtors and the Joint Liquidators reached an agreement on informal information exchange (the "Informal Information Exchange Agreement"), and the Joint Liquidators agreed to withdraw the Coordination Motion.  (*See* Goldberg Decl. Ex. 2.)

42.     On October 27, 2023, the Joint Liquidators requested diligence information from the Debtors as part of the Informal Information Exchange Agreement.  (*See* Goldberg Decl. Ex. 3.)  Over the course of the following months, the Debtors conducted their review in response to these requests, and then produced a substantial volume of information. Specifically, on December 14, 2023, the Debtors produced to the Joint Liquidators additional transactional data associated with the 3AC Accounts, consisting of 72 spreadsheets (the "3AC Exchange Data").  (*See* Beller Decl. ¶ 20.)  This was followed by three additional productions on January 8, January 12, and January 20, 2024, which included (i) line of credit agreements entered into between the Debtors and 3AC, including drafts; and (ii) emails, communications, and other materials pertaining to transactions between the Debtors and 3AC.  (*Id.*)  The four productions in response to the informal October 27, 2023 diligence requests consisted of 4,166 documents and 13,663 pages of materials.  (*Id*.)

43.     On December 15, and December 20, 2023, the Joint Liquidators made two productions to the Debtors pursuant to the Informal Information Exchange Agreement.  Those productions included the NAV packs prepared by Ascent at the Joint Liquidators' request, including the May 2022 NAV Pack showing assets held by 3AC on the FTX.com exchange as of

May 31, 2022.  (*See* Beller Decl. ¶ 21, Ex. J.)  The Joint Liquidators were provided this May 2022 NAV Pack on or about April 24, 2023, more than two months prior to the Bar Date.  (*See* Crumpler Decl. ¶ 36.)

44.    On February 7, 2024, approximately two months after the production of the 3AC Exchange Data, the Joint Liquidators sent the Debtors a set of informal interrogatories related to the productions made by the Debtors, which was amended on March 8, 2024 (the "Informal Interrogatories").  (*See* Goldberg Decl. Exs. 4-5.)  At the request of the Joint Liquidators, the Debtors arranged a meeting via video-conference on March 19, 2024 with counsel to the Joint Liquidators, counsel to the Debtors, and the financial advisors to both parties.  (*See* Beller Decl. ¶ 23.)  During that meeting, the Debtors' financial advisor provided detailed responses and explanations to representatives of the Joint Liquidators with respect to the Informal Interrogatories.  (*Id*.)  The Debtors' counsel also indicated during that meeting that should there be any technical issues with viewing the large spreadsheets, the Debtors' financial advisor would be able to assist.  (*Id*.)  The Joint Liquidators never requested technical assistance from the Debtors, their counsel, or their financial advisor.  (*Id*. ¶ 24.)  In the following weeks, the Debtors, through their financial advisor, provided additional explanation and responses to the Joint Liquidators' counsel via email.  (*Id*. ¶ 25.)  The last set of responses to the Joint Liquidators' counsel were sent on April 5, 2024.  (*Id*.)

45.    After two months of silence, on June 3, 2024, the Joint Liquidators sent the Debtors another set of informal diligence requests via letter.  (*See* Goldberg Decl. Ex. 6.)  On July 2, 2024, the Joint Liquidators re-served those discovery requests pursuant to Bankruptcy Rule 2004.  These were their very first formal discovery requests seeking information regarding the relationship between 3AC and the Debtors (the "Rule 2004 Discovery Requests"), served

nearly a year after the Bar Date and two years after the Joint Liquidators were appointed in the 3AC liquidation proceedings. (*See* Goldberg Decl. Ex. 7.)

46.    On June 5, 2024, the Joint Liquidators filed the *Limited Objection and Reservation of Rights of the Foreign Representatives of Three Arrows Capital, Ltd.'s (In Liquidation) to the FTX Debtors' Motion for Entry of an Order Approving the Adequacy of the Disclosure Statement* [D.I. 16817].  In their objection, the Joint Liquidators stated, for the first time, that they had "identified facts that may be the basis for the 3AC Claims to be asserted in the *hundreds of millions of dollars*." (*Id.* at 3 (emphasis added).)  No mention was made of any claims for *$1.53 billion*, and the Joint Liquidators did not seek leave to amend at this time.

47.    On July 8, 2024, the Debtors filed a claim objection to the Original Proofs of Claim filed by the Joint Liquidators [D.I. 19797].

48.    On July 10, 2024, the Joint Liquidators re-served the Rule 2004 Discovery Requests pursuant to Federal Rules of Civil Procedure 33 and 34 seeking information about the relationship between 3AC and the Debtors, and issued a notice of deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) that listed 16 topics (the "<u>First Set of Discovery Requests</u>"). (*See* Goldberg Decl. Ex. 8.)  In the cover email, the Joint Liquidators' counsel asked for the Debtors' response "by July 12, 2024 if the FTX Debtors will voluntarily agree to produce the requested documents and information." (*Id.*)  The Joint Liquidators set July 15, 2024 as the deadline, asking the Debtors to respond and produce documents in just five days. (*Id.*)

49.    On July 26, 2024, roughly two weeks after receiving these extensive requests, the Debtors served their Responses and Objections to the First Set of Discovery Requests.  These were supplemented by the Supplemental Responses and Objections to the Joint

Liquidators' Notice of Deposition, which were served on August 28, 2024.  (*See* Goldberg Decl. Exs. 9, 11.)

50.     On August 1, 2024, the Debtors and Joint Liquidators met and conferred regarding the date and scope of the 30(b)(6) deposition.  The Debtors agreed to produce a witness to address all topics noticed by the Joint Liquidators except for Topic No. 11, which related to loans made by a third-party to 3AC and not relevant to any matter between 3AC and the Debtors.  On that same call, for the very first time, the Joint Liquidators informed the Debtors of their intention to seek amendment of their claims after the deposition.  At that time, they did not identify the scale, factual basis, or nature of those potential claims.  (*See* Beller Decl. ¶ 27.)

51.     On August 16, 2024, the Joint Liquidators filed the *Limited Objection and Reservation of Rights of the Foreign Representatives of Three Arrows Capital, Ltd.'s (In Liquidation) to the FTX Debtors' Motion for Entry of An Order Approving the Adequacy of the Plan* [D.I. 23146], which did not mention the Joint Liquidators' intention to seek leave to amend the Original Proof of Claims.

52.     The 30(b)(6) deposition of the Debtors took place on September 19, 2024. (Beller Decl. ¶ 28.)   During the deposition, the Debtors' 30(b)(6) designee (the "30(b)(6) Witness"), Robert Gordon of Alvarez & Marsal, testified on the Debtors' behalf for over five hours covering 15 topics noticed by the Joint Liquidators.  (*Id.*)  In particular, the 30(b)(6) Witness provided detailed testimony regarding how the spot margin trading program functioned and its compliance requirements, how to interpret and analyze the 3AC Exchange Data, details of the sales and withdrawals of assets that occurred between June 12 and June 14, 2022, the Line of Credit associated with the 3AC Accounts and applicable compliance requirements, and the relevant agreements governing the 3AC Accounts, among many other topics.  (*Id.*)

53.    From August 2024 to the present, the Joint Liquidators continued to serve expansive discovery requests.

54.    On October 4, 2024, the Joint Liquidators provided the Debtors with a draft of their amended proofs of claim.  (*See* Goldberg Decl. Ex. 26.)  The draft filed as Exhibit 1 to the Motion reflects changes to the draft received by the Debtors on October 4, 2024 [D.I. 27755-1].  The Joint Liquidators have continued to demand additional information from the Debtors even after October 4, 2024.

55.    On October 17, 2024, counsel for the Joint Liquidators and counsel for the Debtors met and conferred regarding, among other things, the Joint Liquidators' draft amended proof of claims.  The Debtors agreed to adjourn the Debtors' pending objection to the Original Proofs of Claim until a motion to amend was decided.  The Joint Liquidators, in turn, stated that they would file a motion to amend their proof of claims shortly after the October 17, 2024 meet and confer.

56.    The Joint Liquidators waited more than 20 days to file the Motion, which they filed after 10 p.m. ET on November 6, 2024.  The motion and exhibits thereto totaled ***852 pages***.  It included two separate declarations, including one by Mr. Crumpler.

57.    Following the filing of the Motion, the Joint Liquidators and Debtors agreed to adjourn the hearing on the Motion to the December 12, 2024 hearing, with the Debtors' objection deadline set for December 5, 2024.

58.    On November 25, 2024, in Miami, Florida, the Debtors took the deposition of Mr. Crumpler, both in his personal capacity and as a representative of the Joint Liquidators pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

# ARGUMENT

59.     The Motion should be denied because the Joint Liquidators do not articulate any valid basis for the Court to allow them to assert the New Claims either as an amendment of the Original Proofs of Claim or as late-filed new claims.  *First*, the New Claims do not relate back to the Original Proofs of Claim as is clear from the vast ocean of difference between the two in terms of the alleged factual bases, nature of the claims, and their scope and size.  As a result, the fundamental essence of the New Claims is unrecognizable from and in no way encompassed by what was filed in June 2023.  *Second*, even if the New Claims *did* relate back, leave should be denied because all of the equitable factors support denying the Motion, including (i) the unjustifiable failure of the Joint Liquidators to assert the New Claims by the Bar Date in light of the information they possessed at the time, and their failure to take appropriate steps to secure whatever additional information they claim to have needed notwithstanding their actual notice of significant activity in the 3AC Accounts, (ii) the substantial prejudice to the Debtors and its stakeholders that would result from the addition of over $1.4 billion to the disputed claims pool after the plan has been confirmed, and (iii) the Joint Liquidators' bad faith and dilatory motive in seeking amendment.  *Third*, the Joint Liquidators fail to satisfy the heightened standard requiring a "compelling reason" to justify amendment *after* plan confirmation.  *Fourth*, when the New Claims are assessed for what they are—late new claims, rather than an amendment—the Joint Liquidators have not and cannot show excusable neglect for their failure to timely assert the New Claims.  In sum, each and every element, factor and relevant consideration strongly favors denial of the Motion.

I.        **Leave to Amend Should Not Be Granted Because the New Claims Do Not Relate Back to the Original Proofs of Claim and Amendment Would Be Inequitable to the Debtors and Their Stakeholders.**

A.        The Joint Liquidators Mischaracterize the Rule 15 Standard in the Context of a Post-Bar Date Amendment.

60.        In the Motion, the Joint Liquidators rely heavily on non-bankruptcy cases applying the standard set out in Rule 15 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7015, to argue that the same "liberal" standard should apply to a post-bar date proof of claim amendment.  But it is black-letter law in bankruptcy that the relation back "analysis must be done in the context of the bankruptcy case." *In re Exide Technologies*, 601 B.R. 271, 293 (Bankr. D. Del. 2019).  For post-bar date amendments, "Rule 15 is intended to do precisely the same work as the standard … that has developed for granting leave to amend proofs of claim in bankruptcy," which "ask[s] whether the proposed amended proof of claim seeks to recover damages that are fairly encompassed within the original proof of claim." *In re Maxus Energy Corp.*, 2023 WL 5543612, at *7 (Bankr. D. Del. Aug. 28, 2023).

61.        In applying that standard, courts have uniformly emphasized that "[d]ates matter in bankruptcy" and "[f]or creditors, none is more important than the 'bar date.'" *Ellis* v. *Westinghouse Elec. Co.*, 11 F.4th 221, 221 (3d Cir. 2021).  "Creditors may not use the claims amendment process to circumvent the claims bar date." *In re Nortel Networks Inc.*, 573 B.R. 522, 529 (Bankr. D. Del. 2017).  "The bar date is important to the administration of the case as it brings certainty to a debtor's case by enabling the debtor and its creditors to know the amount of claims which exist." *In re Exide Technologies*, 601 B.R. at 293.  A bar date is "is a 'drop-dead date' that bars all prepetition claimants who received the required notice," *In re Trans World Airlines, Inc.*, 96 F.3d 687, 690 (3d Cir. 1996), and "can be thought of as akin to a statute of limitations, and must be followed." *Nortel Networks*, 573 B.R. at 527.  Bankruptcy courts in this

district have emphasized the policy reasons why the bar date should not be cast aside as the Joint

Liquidators ask this Court to do:

> The practical, commercial rationale underlying the need for a bar date [is] manifest. The creditors and bankruptcy court must be able to rely on a fixed financial position of the debtor in order to intelligently evaluate the proposed plan of reorganization for plan approval or amendment purpose. ***After initiating a carefully orchestrated plan of reorganization, the untimely interjection of an unanticipated claim, <u>particularly a relatively large one</u>, can destroy the fragile balance struck by all the interested parties in the plan***. Given the time sensitivity of such financial undertakings, the consequent delay in reevaluation necessitated by the late allowance of the claim may often spell disaster to recovery, even where ultimate approval is forthcoming. ***These considerations and realities militate in favor of restraint and caution in allowing untimely claims***.

*In re SemCrude*, 443 B.R. 472, 477 (Bankr. D. Del. 2011) (emphases added).

62.      Post-bar date amendments that would change the essence of the timely proof of claim are impermissible. Once "the bar date passes, a proof of claim typically cannot be amended to seek recovery of new or different amounts that were not fairly encompassed in the original (timely-filed) proof of claim." *Maxus Energy Corp.*, 2023 WL 5543612, at *1. To the contrary, "such amendments are limited to fleshing out the details of—but not fundamentally changing—the timely-filed proof of claim." *Id.* A post-bar date amendment "must be scrutinized to assure that it is not an attempt to file a new claim." *SemCrude, L.P.*, 443 B.R. at 477 (quoting *Hatzel & Buehler, Inc.* v. *Station Plaza Assocs., L.P.*, 150 B.R. 560, 562 (Bankr. D. Del. 1993)).

63.      Bankruptcy courts thus permit amendment after the bar date only if (1) there was a "timely assertion *of a similar claim* or demand evidencing an intention to hold the estate liable," *and* (2) "it would be equitable to allow the amendment." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *3 (D. Del. Aug. 18, 2022) (emphasis added); *see also In re Enron Corp.*,

419 F.3d 115, 133 (2d Cir. 2005).  Both showings are required for a creditor to obtain leave to amend.  *Mallinckrodt PLC*, 2022 WL 3545583, at *3.

64.     Moreover, post-confirmation amendments are subject to a "heightened" standard, requiring a showing of "compelling circumstances."  *See In re Winn-Dixie Stores, Inc.*, 639 F.3d 1053, 1056-57 (11th Cir. 2011).   Amendment of proofs of claims after plan confirmation "is not favored" and is justifiable under "only the most compelling circumstances." *Id.*; *see* Section II, *infra.*

B.     The New Claims Do Not Relate Back to the Original Proofs of Claim.

65.     The Joint Liquidators seek leave to assert claims that are fundamentally different from those raised in the Original Proofs of Claim in every material way.   A post-bar date amendment relates back only if it "'(1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claim.'"  *Enron Corp.*, 419 F.3d at 133; *see also Mallinckrodt Plc*, 2022 WL 3545583, at *3.   The proposed amendment does none of these things.   Rather, the proposed amendment would introduce new claims based on alleged facts wholly absent from the Original Proofs of Claim for damages more than twelve times greater than the amount included in the Original Proofs of Claim.   Adopting the Joint Liquidators' position would vitiate the requirement that a proposed amendment must actually relate back to the original filed claims and mean that *any* claim asserted by 3AC against the Debtors related to the FTX.com exchange could be asserted at any time.   That is not and cannot be the rule.

66.     *First*, a "proof of claim typically cannot be amended to seek *recovery of new or different amounts that were not fairly encompassed* in the original (timely-filed) proof of claim."  *Maxus Energy Corp.*, 2023 WL 5543612, at *1 (emphasis added).   "Ordinarily, to be within the scope of permissible amendment, the second claim should not only be of the same

nature as the first but also reasonably within the amount to which the first claim provided notice." *In re AM Intern., Inc.*, 67 B.R. 79, 82 (N.D. Ill. 1986). A "dramatic increase in the claim amount" that would "come as an unfair surprise to other creditors, and perhaps to the debtors" supports the exercise of discretion not to grant leave to amend. *Matter of Stavriotis*, 977 F.2d 1202, 1205 (7th Cir. 1992); s*ee Maxus Energy Corp.*, 2023 WL 5543612, at *5 (the "ultimate question on a motion for leave to amend a proof of claim" is "whether the damages sought in the proposed amendment are 'fairly encompassed within the original proof of claim' filed before the bar date").

67.    For example, new claims seeking "more than double the amount in [an] Original Proof of Claim" have been held to not be fairly encompassed by a timely proof of claim. *Exide Technologies*, 601 B.R. at 294. Indeed, bankruptcy courts have consistently denied leave where the recovery sought through the proposed amendment was orders of magnitude smaller than what the Joint Liquidators seek here. *See Enron Corp.*, 419 F.3d at 129 (affirming denial of leave where creditor sought to add claims seeking $12.5 million, and rejecting argument that amendment "would not have disrupted the proceedings because the claim is *de minimis* in the context of the vastness of the Enron bankruptcy"); *AM Intern., Inc.*, 67 B.R. at 82 (affirming denial of leave where creditor sought to increase claimed amount of $51,743.07 by an additional $131,413.47); *Stavriotis*, 977 F.2d at 1205 (denying leave where creditor sought to increase claimed amount from $11,132.93 to $2,435,078.39); *see also In re Kmart Corp.*, 381 F.3d 709, 713-14 (7th Cir. 2004) (denying motion to file late claims and crediting bankruptcy court's observation that $750,000 claim was "no small amount"); *In re Limited Gaming of America, Inc.*, 213 B.R. 369, 375 (Bankr. N.D. Okla. 1997) ("This Court does not find that the filing of a $5,000 claim put the debtor and creditors on notice that the claim may increase to over

$350,000."). Thus, "[c]hanging a proof of claim to add amounts that were outside the scope of the original proof of claim is treated as the filing of a new claim." *Maxus Energy Corp.*, 2023 WL 5543612, at *1.

68.     The Joint Liquidators cannot argue with a straight face that the Original Proofs of Claim "fairly encompassed" a proposed recovery of *$1.53 billion*.  The only monetary value referenced anywhere in the Original Proofs of Claim was "an approximately $120 million purported loan that Three Arrows owed the Debtors as of June 1, 2022."  (Original Proofs of Claim, Attachment ¶ 6.)  The sole alleged factual basis for their claims referenced "a purported foreclosure" of certain assets securing that $120 million loan and totaling much less.  (*Id.*)  Even viewed most charitably to the Joint Liquidators, there is no way to read this language to encompass claims for recovery of an amount beyond the value of the loan subject to foreclosure. But the scale of the New Claims dwarfs that amount—the Joint Liquidators seek to increase the amount of their claims *more than twelve times over*, by roughly $1.41 billion.  Indeed, the few bankruptcy court decisions cited by the Joint Liquidators addressed only modest increases in claim amount and are distinguishable.[7]  The Joint Liquidators cannot escape that the amount they now seek to recover is in no way suggested by any claim that could plausibly have been inferred from the Original Proofs of Claim.  The scale of the New Claims would transform the position the Joint Liquidators seek to occupy in these bankruptcy proceedings, and defies any notion of relation back.

---

[7]     *See In re Orion Refining Corp.*, 317 B.R. 660, 662 (Bankr. D. Del. 2004) (amendment did not change total claimed amount); *In re Edison Bros. Stroes, Inc.*, 2002 WL 999260, at *2 (Bankr. D. Del. May 15, 2002) (original proof of claim sought $7,841.30, amended proof of claim sought $152,015.54); *In re Ben Franklin Hotel Assoc.*, 186 F.3d 301, 303 (3d Cir. 1999) (original proof of claim sought "$2,000,000+," amended proof of claim sought "over $5,000,000"); *In re Stone & Webster, Inc.*, 547 B.R. 588, 595 (Bankr. D. Del. 2016) (original proof of claim sought $7,604,232, amended proof of claim sought $8,181,492).

69. *Second*, the proposed amendment "fundamentally chang[es]" the factual basis for the Original Proofs of Claim. *Maxus Energy Corp.*, 2023 WL 5543612, at *1. "If the initial proof did not 'give fair notice of the conduct, transaction or occurrence that forms the basis of the claim asserted in the amendment' then the amendment asserts new claims and will not be allowed." *In re Ben Franklin Hotel Assoc.*, 1998 WL 94808, at *3 (E.D. Pa. Mar. 4, 1998) (quoting *In re Westgate-California Corp.*, 621 F.2d 983, 984 (9th Cir. 1980)); *see In re Tribune Co.*, 2013 WL 5966885, at *8 n.11 (Bankr. D. Del. Nov. 8, 2013) (observing creditor "could not then amend the timely claim to add a claim that does not arise out of the same facts or circumstances as the timely filed claim"); *In re Anderson*, 2020 WL 6821796, at *8 (Bankr. D. Kan. Nov. 16, 2020) (denying leave to amend where creditor was "adding on a new component to its claim"). When the original, timely proof of claim "corresponds with a particular loan," claims based on "new and/or different loans" would be "new causes of action that do not 'relate back.'" *In re Residential Capital, LLC*, 2015 WL 4654906, at *12 (Bankr. S.D.N.Y. Aug. 5, 2015).

70. The New Claims depend on alleged facts wholly absent from the Original Proofs of Claim. The Original Proofs of Claim included just one substantive allegation: "a purported foreclosure by the Debtors on collateral securing an approximately $120 million purported loan that Three Arrows owed the Debtors as of June 1, 2022." (Original Proofs of Claim, Attachment ¶ 6.) This was the entire factual premise for the Original Proofs of Claim; no other facts were alleged about any action, agreement, asset or transaction. By contrast, the proposed amendment is a 94-paragraph brief masquerading as a proof of claim, and seeks recovery for nearly all of the value of the cryptocurrency assets in the 3AC Accounts as of the end of June 12, 2022 (*see, e.g.*, New Claims ¶¶ 43, 46)—even when FTX took no action with

respect to the vast majority of those assets. Indeed, the new and separate factual basis is confirmed by the language of the New Claims:

> The limited information available to the Joint Liquidators at the time of the filing of the Original Proofs of Claim indicated that FTX or its affiliates appeared to have seized or foreclosed upon the 3AC Debtor's assets *to satisfy a $120 million loan made by FTX to the 3AC Debtor*. Information and documents obtained through discovery, however, have revealed that the relationship between the 3AC Debtor and FTX was *much broader than just the $120 million loan*.

(New Claims ¶¶ 20-21 (emphasis added).) Numerous other factual allegations in the proposed amendment highlight that the New Claims involve an entirely distinct factual predicate than the Original Proofs of Claim.[8] Those allegations do not "flesh out" the one sentence factual basis asserted in the Original Proofs of Claim; they introduce a wide-ranging set of new alleged facts to support claims premised on wholly new facts and theories.

71.     The Joint Liquidators' attempt to elide the differences in claims underscores the absence of factual support they presently raise from the Original Proofs of Claim. It is simply not credible to state that "[t]he Original POC was based on transfers of the 3AC Debtor's assets in or around June 2022 to satisfy liabilities ostensibly owed to FTX." (Mot. ¶ 27.) The Original Proofs of Claim included just three paragraphs in the section titled

---

[8]     *See, e.g.*, New Claims, Attachment ¶ 25 ("FTX's mismanagement of its users' assets should not translate into FTX's deemed ownership of them in a manner that improves its litigation position as to prepetition customer rights and transactions"); ¶ 31 ("Because FTX cannot demonstrate what business activities (if any) supposedly generated the Unknown Alleged Liability, it cannot demonstrate that they fall within such defined liabilities and so could be secured"); ¶ 43 ("Of the $1,595,712,411.85 decline in value of assets on the days of the June Takings, the Joint Liquidators estimate (on the basis of a combination of Microsoft Excel spreadsheets that FTX produced and open-source price data) that $64,849,838 was on account of unrealized losses, withdrawals by the 3AC Debtor (including realized losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts. The remaining $1,530,862,573.85 are considered lost assets"); ¶ 53 ("the Joint Liquidators assert the BVI Preference Claims to recover the Lost Assets, all of which were seized, liquidated, or otherwise disposed of after June 12, 2022"); ¶ 59 ("FTX appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability, despite failing to produce any evidence that the 3AC Debtor owed any particular obligations amounting to the Unknown Alleged Liability"); ¶ 82 ("the 3AC Debtor owned the assets with the ability to withdraw or transfer them at any time").

"Summary of Claim." The first of those three paragraphs described the limitations in the Joint Liquidators' investigation, and did not allege any facts. (Original Proofs of Claim, Attachment ¶ 5.) The second paragraph defined "Known Claims" as claims "arising from, on information and belief, a purported foreclosure by the Debtors on collateral securing an approximately $120 million purported loan that Three Arrows owed the Debtors as of June 1, 2022." (*Id.*, Attachment ¶ 6.) The third paragraph generically asserted—without any reference to alleged facts—that there may be additional causes of action "based on conduct, acts, omissions, and transactions between and among Three Arrows, the Debtors, and the Debtors' affiliates." (*Id.*, Attachment ¶ 7.) No transfers were referenced—whether by date, account, transferor, transferee, or asset. And no potential disputed assets were referenced other than collateral relating to a specific foreclosure in connection with a specific loan. The factual basis for the New Claims—a cherry-picked and incomplete positive account balance limited to cryptocurrency assets as of an arbitrary date relative to a lower balance two days later—cannot be reconciled with claims narrowly based on the Margin Liquidation. The factual bases are therefore ***not*** "exactly the same" (Mot. ¶ 27) but in fact are wholly and markedly different.

72.      *Third*, amendment is not a proper means for introducing unsecured claims when the timely proof of claim asserted only secured claims. For reasons that are not clear to the Debtors, the Original Proofs of Claim were marked as "secured" by the Joint Liquidators. (Original Proofs of Claim at 3.)   "Secured claims are of an entirely different nature than unsecured claims, notwithstanding that both types of claims may arise from the same transaction … Therefore, the attempt to change the status of a claim from secured to unsecured is not considered an amendment, in the traditional sense, that is to be freely allowed." *In re Matthews*, 313 B.R. 489, 494 (Bankr. M.D. Fla. 2004). An original claim "asserting that [a creditor] was

fully secured [gives] no indication that the estate would ever be charged with an unsecured claim." *Id.*; *see also In re McBride*, 337 B.R. 451, 460 (Bankr. N.D.N.Y. 2006) ("this Court does not consider AmeriCredit's attempt to change the status of its claim from secured to unsecured to be a valid amendment"); *In re National Merchandise Co., Inc.*, 206 B.R. 993, 1000 (Bankr. M.D. Fla. 1997) (denying leave for an "amendment [that] seeks to change the status of the claim from unsecured to secured"); *In re Brown*, 159 B.R. 710, 714 (Bankr. D. N.J. 1993) ("Poss's proposed amendment of his claim will not pass muster under this test because a secured claim is materially different from an unsecured claim."). Nowhere in the Original Proofs of Claim was there a reference to any unsecured claim (or any potential unsecured claim); the term "unsecured" does not appear. By contrast, the proposed amendment answers the same question—"Is all or part of the claim secured"—in the exact opposite manner: "No." (New Claims at 3.) The reversal in asserted claim status compounds the wholesale transformation of the recovery amount and alleged factual basis.[9]

73. *Fourth*, amended claims do not relate back merely because a creditor reserves rights. "A reservation of rights to present a claim is not itself a claim." *In re Jackson*, 482 B.R. 659, 667 (S.D. Fla. 2012). Allowing creditors to sneak massive new claims in via amendment, after the bar date, because of non-substantive preservation language would render the bar date "meaningless." *In re Calpine Corp.*, 2007 WL 4326738, at *5 (S.D.N.Y. Nov. 21, 2007). "A blanket reservation that seeks to reserve all causes of action reserves nothing." *D&K Properties Crystal Lake* v. *Mutual Life Ins. Co. of New York*, 112 F.3d 257, 261 (7th Cir. 1997); *see also In re Northlake Hotels, Inc.*, 2014 WL 1477397, at *2 (N.D. Ga. Apr. 3, 2014) (denying

---

[9]    The Debtors further observe that the Joint Liquidators never sought to file a *customer* claim, notwithstanding that they now essentially assert just that—claims seeking the value of assets held in their accounts on the FTX.com exchange.

leave to amend notwithstanding creditor's "reservation in its original proof of claim [of] the right to file an unsecured deficiency claim and … its right to collect post-petition attorney's fees"); *In re Winn-Dixie Stores, Inc.*, 381 B.R. 804, 809-10 (M.D. Fl. 2008) (rejecting reservation of right to amend and supplement as "'stock language' that cannot reasonably be considered to operate as a post-confirmation reservation of rights"). Here, none of the reservations expressed by the Joint Liquidators are sufficient to save the New Claims as an amendment of the Original Proofs of Claim.

74.    Accordingly, the New Claims do not relate back to the Original Proofs of Claim for multiple and distinct reasons, and the Motion should thus be denied.

C.    None of the Equitable Factors Weighs in Favor of Granting Leave to Amend.

75.    Even if the New Claims *did* relate back to the Original Proofs of Claim— which they do not—the Court should nonetheless deny the Motion on equitable grounds. *See In re Mallinckrodt Plc*, 2022 WL 3545583, at *3 (To allow a post-bar-date amendment to proofs of claim, "the court must [] determine whether it would be equitable."); *see also Enron Corp.*, 419 F.3d at 133 (noting that "*if* an amendment does, in fact, 'relate back' to the timely filed claim, courts will 'examine each fact within the case and determine whether it would be equitable to allow the amendment'") (emphasis added; citation omitted).

76.    Irrespective of everything else, well prior to the Bar Date, the Joint Liquidators unquestionably had the May 2022 NAV Pack showing that 3AC had at least $700 million worth of cryptocurrency assets on the FTX.com exchange at the end of May 2022, the very same document that identified the $120 million purported loan that was the basis for the Original Proofs of Claim.  (Crumpler Depo. Tr. at 104:11-104:25; 106:3-107:2; 108:10-111:24.) If the Joint Liquidators had any legitimate concern about what happened to that $700 million

worth of cryptocurrency assets, they could have easily included a claim for those assets in the Original Proofs of Claim. They chose not to do so. Had they done so, the Debtors would have been on notice of a disputed claim about aspects of the 3AC Accounts beyond the Margin Liquidation. It would be inequitable to relieve the Joint Liquidators of the decision they made with respect to the scope of claims asserted, and the Motion should be denied on that basis alone.

77. Among the factors considered in deciding whether post-bar-date amendment would be equitable are "undue delay, bad faith, or a dilatory motive." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *3. Courts also consider "whether the debtor, or other creditors, would be unduly prejudiced by the amendment" and whether "the delay was justified." *In re B456 Sys., Inc.*, 2017 WL 6603817, at *15 (Bankr. D. Del. Dec. 22, 2017). But "the critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Id.*[10] Each of the relevant equitable factors strongly favors denying leave to amend.

> 1. *Amendment Would Impose Significant Prejudice on the Debtors and Their Stakeholders.*

78. Allowing the amendment would materially prejudice the Debtors and their stakeholders, including those creditors who timely asserted legitimate claims. Again, the Joint

---

[10] The Joint Liquidators argue that "leave to amend should **only** be denied upon a 'showing by the non-moving party of one of the following grounds for denial: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowance of the amendment; or (5) futility of the amendment.'" (Mot. ¶ 26 (quoting *In re Semcrude, L.P.*, 443 B.R. 472, 476 (Bankr. D. Del. 2011)).) But that portion of the *In re Semcrude* decision was *not* laying out the standard specific to post-bar date amendment, but to amendment of pleadings in general. In fact, as discussed above (*see* Section I.A, *supra*), courts in the Third Circuit have repeatedly emphasized the importance of the bar date and the specific, higher standards for post-bar-amendment of proofs of claim. Even if the *Semcrude* factors do apply, as discussed further below, the Debtors have sufficiently shown the applicable factors all warrant denying leave to amend: undue delay, bad faith and dilatory motive, undue prejudice to the Debtors, and futility of the amendment. Moreover, the inquiry can stop without even evaluating equitable considerations because the New Claims do not relate back to the Original Proofs of Claim.

Liquidators cite two non-bankruptcy cases[11] to argue that as long as the Debtors will "not be deprived of the chance to present facts or evidence to support its defenses," there is no prejudice. (Mot. ¶¶ 41-45.)  But that cannot be and is not the standard in the bankruptcy context because it would render the bar date meaningless.[12]

79.    To assess "prejudice to the debtor or other parties in interest" for post-bar-date amendment of claims, "courts consider: (1) the size of the claim in relation to the estate, (2) whether the plan has been filed with knowledge of the existence of the claim, and (3) the disruptive effect allowance of the claim would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated."  *In re Calpine Corp.*, 2007 WL 4326738, at *6 (S.D.N.Y. Nov. 21, 2007) (citations omitted).  Each of these factors weigh heavily against allowing amendment.

a.    The Outsized Scale of the New Claims Imparts Prejudice.

80.    The sheer size of the New Claims confirms the prejudice to the Debtors if leave to amend were granted.  The Joint Liquidators seek to assert claims exceeding *$1.53 billion*.  Late claims seeking the recovery of much, much smaller amounts have been found to be prejudicial in other large bankruptcies.  *See, e.g.*, *Enron Corp.*, 419 F.3d at 131 (affirming finding that the late assertion of a claim of $12.5 million was prejudicial in $900 billion bankruptcy); *Praedium II Broadstone, LLC* v. *Wall St. Strategies, Inc.*, 2004 WL 2624678, at *5 (S.D.N.Y. Nov. 18, 2004) (denying post-bar date amendment that would have increased the

---

[11]    *See* Mot. ¶ 41 (citing *Bechtel* v. *Robinson*, 886 F.2d 644 (3d Cir. 1989); *Mullin* v. *Balicki*, 875 F.3d 140 (3d Cir. 2017)).

[12]    The Joint Liquidators also argue that the amendment will not prejudice the Debtors because it was allegedly "based on information that was exclusively in [the Debtors'] possession."  (Mot. ¶ 41.)  The Joint Liquidators cite *no* bankruptcy authority to support this assertion.  It is also factually untrue.  As discussed herein, the Joint Liquidators had all the information they needed to try to assert the New Claims by the Bar Date, and to seek leave to amend far sooner than November 6, 2024.

claim from $91,000 to $1 million); *In re Kmart Corp.*, 381 F.3d 709, 713-14 (7th Cir. 2004) (upholding finding of prejudice where late-filed claim was $750,000 out of $6 billion total unsecured claims); *In re Sirgold, Inc.*, 2023 WL 3215881, at *2-3 (Bankr. S.D.N.Y. May 2, 2023) (finding $48,461.25 against total $2.2 million in allowed general unsecured debt supports a danger of prejudice).

        b.    <u>The Debtors Negotiated and Filed the Plan Without Knowledge of the New Claims.</u>

81.    Prejudice is further evident because the Debtors negotiated and filed their plan of reorganization without any knowledge of these substantial new claims.  *See Calpine Corp.*, 2007 WL 4326738, at *6 ("The timing of the filing of the New Claims, well into the negotiations between the Debtors and the creditors and more than six months after the Bar Date further supports a finding of prejudice.").

82.    There can be no dispute that the Debtors were unaware of the New Claims—and, importantly, their asserted magnitude—until October 4, 2024, when the Joint Liquidators provided a draft form of the proposed amended proof of claim to the Debtors.  This was after the Debtors had solicited and obtained votes on their Second Amended Joint Chapter 11 Plan of Reorganization (the "<u>Plan</u>"), and was a mere three days before the confirmation hearing held by this Court at which the Plan was approved.

83.    The Original Proofs of Claim, filed on June 30, 2023, asserted claims arising out of the purported foreclosure of an $120 million loan.  (Original Proofs of Claim, Attachment ¶ 6.)  The Joint Liquidators never gave any indication that they intended to belatedly assert claims for more than twelve times that value during the following 15 months, even though they had requested and received numerous productions from the Debtors and participated in calls with the Debtors and/or their advisors.

84.     On June 5, 2024, the Joint Liquidators filed a limited objection to the Debtors' Disclosure Statement.  *Limited Objection and Reservation of Rights of the Foreign Representatives of Three Arrows Capital, Ltd.'s (In Liquidation) to the FTX Debtors' Motion for Entry of an Order Approving the Adequacy of the Disclosure Statement* [D.I. 16817].  In this objection, the Joint Liquidators stated that they had "identified facts that may be the basis for the 3AC Claims to be asserted in the *hundreds of millions of dollars*."  (*Id.* at ¶ 3 (emphasis added).)  Even on June 5, 2024—nearly two years after their investigation began and nearly one year after the Bar Date—the Joint Liquidators' description of their potential claims *still* came nowhere close to the recovery they now seek.

85.     Although the Joint Liquidators indicated to the Debtors (for the first time) that they intended to amend their claims on August 1, 2024, the Joint Liquidators continued to obscure the scale of the New Claims for months.  They filed a limited objection to the Debtors' Plan on August 16, 2024, and again said nothing about potential claims exceeding $1 billion.  *Limited Objection and Reservation of Rights of the Foreign Representatives of Three Arrows Capital, Ltd.'s (In Liquidation) to the FTX Debtors' Motion for Entry of An Order Approving the Adequacy of the Plan* [D.I. 23146].

86.     It was only on the eve of the Plan confirmation hearing that the Joint Liquidators finally informed the Debtors that they intended to assert claims exceeding *$1.5 billion*.  With the Plan now confirmed, the Joint Liquidators seek to hijack significant distributable value for their own benefit.  *See In re B456 Sys., Inc.*, 2017 WL 6603817, at *15 (finding prejudice to the debtors when claimant failed "to provide fair and timely notice to the Debtors" of its assertion of new damages based on new legal theories).

-37-

87.     The Joint Liquidators cite an October 2023 A&M analysis to argue that the Debtors were aware of "the magnitude of transactions [between June 12 and June 15, 2022] giving rise to the 3AC Debtor's claims." (Mot. ¶ 54.)  The relevant inquiry here, however, is not whether the Debtors knew any *facts* relevant to potential claims, but whether the Debtors knew that the Joint Liquidators "would in fact assert" those claims.  *In re Milan Steel Fabricators, Inc.*, 113 B.R. 364, 369 (Bankr. N.D. Ohio 1990) (requiring not only that "the debtor know of the IRS's claims but, through unambiguous assertions by the IRS, know of its intent to assert those claims.").[13]  The Joint Liquidators did not (and cannot) argue that the Debtors were aware on the Bar Date that the Joint Liquidators would assert potential claims for $1.53 billion, nor that the Debtors were on such notice at any time before October 4, 2024.

88.     In any event, that the Debtors undertook an analysis of accounts associated with a $120 million claim is unsurprising, and does nothing to show that they were on notice of unstated (and meritless) claims more than twelve times larger.  Moreover, the Joint Liquidators conveniently ignore that that same analysis and an updated version thereof provided to them also showed that all but the $82 million Margin Liquidation of the $1.53 billion worth of assets that the New Claims target were sold or withdrawn by *3AC itself* or lost value from market price declines.  (*See* Goldberg Decl. Ex. 18 at 12, 21-22; Ex. 19 at 18-22.)  The Debtors could not reasonably foresee that the Joint Liquidators would pursue such meritless claims.

---

[13]   The Joint Liquidators cite *In re O'Brien* to suggest that as long as Debtors' counsel were "informed" of the "nature" and "intent to pursue" a claim prior to the effective date of a Plan, it weighs against prejudice.  But the parties in that case "entered into a permanent consent decree" providing for the same amount the creditor ended up pursing *18 months before confirmation*, and the debtors in that case even "listed [the creditor's] claim as an undisputed, unsecured claim in [the that same amount rounded to the dollar] in its schedules."  *In re O'Brien*, 188 F.3d 116, 118, 127 (3d Cir. 1999).  That is a far cry from the case here, where the Debtors had no notice of the nature and magnitude of the New Claims until three days prior to confirmation.

c.    Amendment Would Disrupt Plan Implementation.

89.    Undue prejudice to the Debtors also exists because the Joint Liquidators failed to "promptly act for over a critical year period … during which much irreversible progress was made towards resolving" the bankruptcy proceedings, when "protracted efforts of all of the parties involved in the estate culminated." *In re Drexel Burnham Lambert Grp., Inc.*, 148 B.R. 1002, 1007-08 (S.D.N.Y. 1993); *see also Nortel Networks Inc.*, 573 B.R. at 529 (Bankr. D. Del. 2017) (finding prejudice where the "filing of the plan and disclosure statement followed a successful mediation of the bankruptcy case after many months of exhausting negotiations"); *In re Smidth & Co.*, 413 B.R. 161, 167 (Bankr. D. Del. 2009) ("The Debtor has worked diligently towards the resolution of the case, resolving several issues.  Allowance of this claim provides more than an additional financial burden on the estate, it also would necessitate extensive litigation to determine the validity of the claim and liquidate it.").

90.    Progress in these proceedings has been hard fought, and accomplished in large part through a series of vigorously negotiated compromises among stakeholder groups. The Debtors' major creditor constituencies, including the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Non-US Customers, the Bahamas JOLs, the Commodity Futures Trading Commission, several state attorneys general, putative class action plaintiffs, Emergent Fidelity Technologies Ltd., BlockFi Inc. and its affiliated debtors, and the lead plaintiffs in the FTX multi-district litigation, as well as various offices within the United States Department of Justice, each had a role in negotiating and developing the complex set of transactions and settlements that come together in the Debtors' Plan.  That Plan formation process played out over months following the Bar Date based on financial and claims information without any notice of the potential $1.53 billion of new claims.  Introducing a brand new claim of this magnitude now would undercut the assumptions upon which creditors made

their decision to support the Plan. *See, e.g.*, *In re Alexander's Inc.*, 176 B.R. 715, 722 (Bankr. S.D.N.Y. 1995) ("[T]he Debtors and other creditors will be prejudiced because the Proof of Claim was filed after the Debtors' Plan was formulated, negotiated and confirmed. Debtors had proposed the Plan based upon a claims analysis that was undertaken during the seven-month period following the Bar Date which did not include [the claimant's] substantial claim of over a half a million dollars."); *In re Cable & Wireless USA, Inc.*, 338 B.R. 609, 614-15 (Bankr. D. Del. 2006) (late claim prejudices the debtors because it "may reduce funds available to unsecured creditors").[14]

> ### 2. The Joint Liquidators Have Unduly Delayed Pursuing the New Claims.

91.     In addition to the prejudice to the Debtors, the Joint Liquidators' extreme delay in seeking to assert the New Claims or putting the Debtors on notice of such claims is another basis for denying the Motion. First, the Joint Liquidators unjustifiably failed to file proofs of claim by the Bar Date to preserve their rights with respect to the New Claims, notwithstanding their access to significant information about the 3AC Accounts—including the May 2022 NAV Pack showing more than $700 million in cryptocurrency assets. Second, the Joint Liquidators also dragged their feet after the Bar Date by only seeking leave to amend after Plan confirmation, despite being in a position to do so far earlier. Their choices as to what claims to file and when should have consequences, and their unjustifiable delay should preclude any leave to amend.

---

[14]    The Joint Liquidators incorrectly assert that their amendment is necessary to size the disputed claims reserve. (Mot. ¶ 55.) This is wrong. The Debtors' motion to establish the Disputed Claims Reserve [D.I. 28102] required by section 8.5 of the Plan presents a Reserve Amount that is reasonable and appropriate irrespective of whether this Motion is granted or denied. The Disputed Claims Reserve motion is independent and separate from 3AC's Motion.

a.    <u>The Joint Liquidators Had Sufficient Information Before the Bar Date and Failed to Pursue the New Claims.</u>

92.    The Joint Liquidators were aware by April 2023—long before the Bar Date—that at least $700 million in cryptocurrency assets were held in the 3AC Accounts as of May 31, 2022.  They nonetheless failed to include any reference or assertion with respect to those assets (among others that they were aware of) in the Original Proofs of Claim.  Whatever the reason, it would be inequitable to give them leave to assert claims based on those assets now.  "Bankruptcy courts are not required to permit late amendments which are primarily used as a back-door route to secure bar-date extensions."  *In re Dubeck*, 74 A.F.T.R.2d (RIA) 5306, at *12 (Bankr. D.N.J. 1994).

93.    The Joint Liquidators also had "full access" to the 3AC Accounts by July 26, 2022, again long before the Bar Date.  (Crumpler Decl. ¶ 31.)  Access to customer accounts allowed users to view historical deposits, withdrawals, and trades for the account and associated subaccounts.  (Shay Decl. ¶ 4; *see also* Beller Decl. Ex. F at 2 (FTX employee emailing the Teneo team "[k]indly note that all trades can be found in the 'Fills' tab"); Crumpler Depo. Tr. at 82:13-83:11 (testifying that he "assume[d] that's correct" when asked whether the FTX employee "is referring you to the fills tab within the account"); *id.* at 83:4-11 (testifying that "I believe that to be correct" when asked whether the Teneo team "would have had access to the fills tab that [the FTX employee] was referring to"); Beller Decl. Ex. K at 1 (public "FTX Features Overview" guide providing instructions on how to access withdrawal and deposit information, which included a screenshot showing the "Fills" tab); *id.* at 9-10 (confirming users could switch between subaccounts); Beller Decl. Ex. L (public "OTC Guide" stating "You can see your trade history at https://otc.ftx.com/fills").)  The FTX.com API provided a further means for pulling and analyzing data from the 3AC Accounts (Beller Decl. Ex. M), and the Joint

Liquidators acknowledge that they had access to information derived from the FTX API before the Bar Date (Crumpler Decl. ¶ 36.)   The Joint Liquidators separately had access to FTX employees and a means for obtaining additional information for more than four months before the Petition Date.   They received information and/or data from FTX on at least 11 occasions between July 2022 and October 2022.   (Beller Decl. Exs. B-H.)   They also had the May 2022 NAV Pack showing hundreds of millions of dollars of assets had been held in the 3AC Accounts shortly before June 2022.   (Beller Decl. Ex. J.)   Yet they did not assert any claims relating to those assets or account activity by the Bar Date.

94.     And if this was not enough, the Joint Liquidators had actual notice that obligated them to at least try to learn more.   Although the Joint Liquidators now argue that they lacked sufficient information to assert the New Claims by the Bar Date, one of the Joint Liquidators—Mr. Crumpler—testified that it was "increasingly clear . . . towards the end of October" 2022 that the Joint Liquidators did not yet have "the full data" for the 3AC Accounts (Crumpler Depo. Tr. at 90:2-5.)[15]   Simply put, the Joint Liquidators had plenty of information, a longer opportunity to investigate than other creditors, and actual notice that more information might exist than they had reviewed as of October 2022.   They made no use of any of that information.

95.     The Joint Liquidators protest that their "resources were both limited and spread thin in the period leading up to and following the filing of the Original Proofs of Claims" (Crumpler Decl. ¶ 8), but that does not excuse their failures.   Had they been diligent, the Joint

---

[15]   In any event, the Joint Liquidators' assertion that "[t]he only relevant information that [they] possessed [as of the bar date] indicated that FTX or its affiliates appeared to have seized or foreclosed upon an unknown amount of the 3AC Debtor's assets to satisfy a $120 million line of credit made by FTX to 3AC" (Crumpler Decl. ¶ 36) is patently and wholly false.   The Joint Liquidators admit that they had access to the May 2022 NAV Pack before the Bar Date (Crumpler Decl. ¶ 36), and that NAV Pack listed significant cryptocurrency assets with "FTX" as the counterparty.   (*See* Beller Decl. ¶ 21, Ex. J.).

Liquidators could have served Rule 2004 discovery requests on the Debtors shortly after the Petition Date to confirm or augment the information they had received.  They did not.  Rather, the Joint Liquidators waited to reach out to the Debtors for additional information—formally or informally—for *more than seven months* after the Petition Date.  (Goldberg Decl. Ex. 1.)  And when they finally did, they did so via an informal email *two days* before the Bar Date, asking the Debtors' counsel if they had "any documentation" that they could use to support their Original Proofs of Claim.  (*Id.*)  The Joint Liquidators do not even attempt to explain what they did to investigate the facts surrounding these purported New Claims between the Petition Date and the Bar Date—the Crumpler Declaration jumps from November 11, 2022 (*see* Crumpler Decl. ¶ 32) to the Bar Date (*see id.* ¶ 35) without describing a single action taken during the intervening period.

96.     Unable to explain or dispute that they did not use the year before the Bar Date properly, the Joint Liquidators attempt to paint the misleading picture that they "diligently" sought information "only to be met with considerable delay by FTX at nearly every turn."  (Mot. ¶ 46.)  That is ridiculous.  Substantial information was provided by FTX (in response to the investigation when the Joint Liquidators were appointed) and later by the Debtors (when the Joint Liquidators undertook a second investigation beginning in the fall of 2023).

97.     For example, when the Joint Liquidators requested access to the 3AC Accounts in July 2022, they received it within weeks.  (Crumpler Decl. ¶ 31.)  When they requested information informally during September and October 2022, FTX provided responses in a matter of days.  (*See* Beller Decl. Exs. F-H.)  The Motion's over reliance on pretextual discovery disputes *after* the Bar Date (Mot. ¶¶ 30-40) confirms the obvious:  there is no excuse

for the most relevant period of inaction (that occurring prior to the Bar Date), which was caused by their failure to pursue any additional information.

98.    If the Joint Liquidators claim that they were unable to obtain necessary information to file a fulsome proof of claim according to the deadlines set by the Court, then it was incumbent on them to follow the appropriate processes for resolving discovery disputes. Indeed, as this Court has previously found, a failure to pursue discovery with sufficient rigor— including bringing disputes to the court if necessary—is consistent with undue delay.  *See* July 23, 2021 Hearing Tr. at 147:2-9, *In re Mallinckrodt Plc*, Case No. 20-12522 (JTD) (Bankr. D. Del. July 23, 2021) ("The reasons for delay also do not favor allowing the late-filed claims.  The movants never asked for 2004 discovery before the bar date, they never moved to compel discovery they claimed was not forthcoming.").

         b.    The Joint Liquidators Continued to Delay Advancing the New Claims for More Than a Year After the Bar Date.

99.    The already excessive delay was compounded by the Joint Liquidators' continued failure to meaningfully advance their potential claims even *after* the Bar Date. "[D]elay amounts to 'undue delay' where a party has waited an unreasonably long period of time to amend, or where the delay in filing the amendment is unwarranted.  *In re DePugh*, 409 B.R. 84, 100 (Bankr. S.D. Tex. 2009).  "[I]f the party requesting amendment unduly delays in seeking that amendment, a court may deem such delay preclusive."  *In re Quinn*, 423 B.R. 454, 464 (Bankr. D. Del. 2009), on reconsideration in part, 425 B.R. 136 (Bankr. D. Del. 2010).  Courts consider "the movant's reasons for not amending sooner."  *Cureton* v. *NCAA*, 252 F.3d 267, 273 (3d Cir. 2001).

100.    The pattern after the Bar Date was a simple one:  the Joint Liquidators would press for information after conveying a sense of urgency, and then take no action.  Yet the

Joint Liquidators argue in the Motion that they "did not gain access to any information from FTX until December 2023." (Mot. ¶ 5.)  As an initial matter, that ignores all of the information they received in 2022—including "full access" to the 3AC Accounts. (Crumpler Decl. ¶ 31.)  But it also suggests that the Debtors taking *less than eight weeks* to collect, review, and begin producing more than 13,663 pages of materials (across two holiday periods) *in late 2023* was somehow the cause of waiting until *November 6, 2024* to move for leave.  (Beller Decl. ¶ 20.)

101.    There is also no basis for the assertion that the Joint Liquidators "only recently received sufficient discovery from [the Debtors] that provided the factual basis for the Amended POC" (Mot. ¶ 30), or that "FTX had failed to produce critical information and documents at the time of the [Claim Objection on July 8, 2024]"[16] (*id*. ¶ 34), when the Joint Liquidators received the 3AC Exchange Data from the Debtors in December 2023 and had access to the data themselves through the 3AC Account in July 2022.

102.    The Debtors and their advisors made themselves available to answer the Joint Liquidators' questions, including a March 19, 2024 meeting in which the Debtors' financial adviser provided answers to a long list of technical questions regarding the 3AC Exchange Data sent by the Joint Liquidators, and offered assistance should the Joint Liquidators have any technical issue with the large spreadsheets.  (Beller Decl. ¶ 24.)  The Joint Liquidators never reached out for additional assistance.  Any additional "delay" after the Bar Date was therefore

---

[16]    The Joint Liquidators misrepresent the record by stating that the Debtors did not produce "a comprehensive set of the communications shedding light on the relationship and transactions between the 3AC Debtors and FTX or the legal documents governing the parties' dealings." (Mot. ¶ 32).  Shortly after producing the 3AC Exchange Data on December 14, 2023, the Debtors made three additional productions on January 8, January 12, and January 20, 2024, consisting of 4,094 documents and 13,591 pages of materials.  In particular, on January 8, 2024, the Debtors produced the October 22, 2021 Loan and Security Agreement and the March 30, 2022 Line of Credit Agreement, the key agreements governing the parties' commercial relationship.

due to the Joint Liquidators' own failure to promptly analyze the 3AC Exchange Data and their own strategic choices.

> 3.    *The Attempted Amendment Reflects Bad Faith and Dilatory Motive.*

103.    The Joint Liquidators' assertion of an amended claim now is not being done in good faith.  They filed unsubstantiated proofs of claim against each of the Debtors on the Bar Date based on one of the many pieces of information available to them—but not the others in the same May 2022 NAV pack.    After making that informed decision without seeking information from the Debtors, they embarked on a campaign of pursuing extensive, serial discovery requests long after the Bar Date with the hope of fishing for facts to bolster new, previously unasserted claims.

104.    The nature of the New Claims makes clear that asserting them in this form, on this record, at this stage of these proceedings amounts to bad faith or, at a minimum, dilatory tactics.  As one example, the Joint Liquidators claim that "$1,530,862,573.85 [of the assets in the 3AC Accounts] are considered lost assets."  (New Claims, Attachment ¶ 43.)  But those assets were *not* lost.  Instead, other than the $82 million that was liquidated by FTX as part of the Margin Liquidation, they either decreased in value due to pricing changes, or were sold or withdrawn *by 3AC*.  (*See* Goldberg Decl. Ex. 18 at 12, 21-22; Ex. 19 at 18-22.)  Allowing the Joint Liquidators to advance these specious and untimely claims would divert significant resources from the Debtors, who would now be required to litigate the merits of these late claims, at the precise moment when the Debtors are working towards timely distributions pursuant to the Plan.  *See In re Motors Liquidation Co.*, 598 B.R. 744, 759 (Bankr. S.D.N.Y. 2019) ("The mere prospect of litigating additional motions to file post-bar-date proofs of claim is enough to prejudice the debtor.").

105.    The Joint Liquidators also purposefully delayed informing the Debtors of the magnitude of these New Claims until October 4, 2024.  The Joint Liquidators knew "by August" that they intended to assert new claims against the Debtors (Crumpler Decl. ¶ 41), if not sooner.  But prior to October 4, 2024 and during the entire negotiation and discovery process, the Joint Liquidators *never* indicated that they were planning to pursue claims in the amount of $1.53 billion or that those claims would be fundamentally different than the claims relating to the $120 million loan that is the basis for the Original Proofs of Claim.

106.    Taken as a whole, each equitable factor weighs heavily against the Joint Liquidators.  This provides a separate, independent basis for denying the Motion.

## II.    The Proposed Amendment Does Not Satisfy the Higher Standard for Leave Following Plan Confirmation.

107.    Even if the Joint Liquidators could articulate a basis for amendment of their claims under ordinary circumstances, the Joint Liquidators must also satisfy the even higher showing of a "compelling reason" required for leave to amend a proof of claim *after* plan confirmation, which they do not.  On October 7, 2024, the Court held an evidentiary hearing on confirmation of the Debtors' Plan [D.I. 26412] and entered an order confirming the Plan the following day [D.I. 26404].  With the Plan confirmed, the Debtors are preparing for the Plan to become effective in early January 2025 and for distributions to creditors to begin later in Q1.[17] These efforts occur only in the context of hard-fought negotiations and resolutions with many constituencies, including customers, other creditors, and the government.  The Joint Liquidators' choice not to bring the scale of their outsized New Claims to the fore until after the Debtors

---

[17] *FTX Provides Update on Upcoming Timeline for Creditor and Customer Distributions* (Nov. 21, 2024), https://www.prnewswire.com/news-releases/ftx-provides-update-on-upcoming-timeline-for-creditor-and-customer-distributions-302313274.html.

made difficult choices based on the existing claims pool injects late uncertainty into complicated, multi-faced bankruptcy proceedings.

108.    For these exact reasons, post-confirmation claim amendments are held to a higher standard of review:  they must not only be equitable and relate back to the timely-filed claim, the creditor must offer a "compelling reason" to allow amendment.  *See In re Exide Techs.*, 601 B.R. at 294 (Bankr. D. Del. 2019), *aff'd,* 613 B.R. 79 (D. Del. 2020) (denying a post-confirmation motion to amend a claim because "the record before me does not establish any compelling reason [t]o allow such drastic amendment after the confirmation and effective date of the Plan"); *In re NextMedia Grp. Inc.*, 2011 WL 4711997, at *3 (D. Del. Oct. 6, 2011) (finding no "compelling reason"); *In re G-I Holdings, Inc.*, 514 B.R. 720, 760-61 (Bankr. D.N.J. Aug. 12, 2014) (same).   This elevated standard recognizes that "[c]onfirmation of the plan of reorganization is a second milestone, equivalent to final judgment in ordinary civil litigation. Once that milestone has been reached, further changes [to claims] should be allowed only for compelling reasons."  *Holstein* v. *Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993); *see also IRT Partners L.P.* v. *Winn-Dixie Stores, Inc.*, 639 F.3d 1053, 1056-57 (11th Cir. 2011) (holding post-confirmation amendment is "not favored, and only the most compelling circumstances justify it.").

109.    Bankruptcy courts regularly deny post-confirmation requests for leave to amend where a creditor fails to provide a "compelling reason" why the proposed amendment should be granted.  A "creditor's inattention to the case" does not suffice to show a compelling reason.  *Holstein*, 987 F.2d at 1271.  An increase in value of property securing a claim is not a compelling reason.  *In re Schroeder*, 607 B.R. 329, 338 (Bankr. E.D. Wi. 2019).  The debtor

entering into a non-prosecution agreement with the U.S. Department of Justice did not provide a compelling reason. *Exide Technologies,* 601 B.R. at 294.

110.    The Joint Liquidators have not even suggested that they have a "compelling reason" for why leave should be granted. Rightly so. But even if one strains to find a purported reason, it appears their argument would be that they lacked "comprehensive books and records" and "cooperation" from 3AC and its personnel (Mot. ¶ 2), that their resources "were occupied by the high level of complexity of the 3AC Liquidation" (*id*. ¶ 3), and that they sought discovery after the Bar Date but were "delayed" in their "ability to formulate the scope and factual bases for their claims by at least several months" (*id*. ¶ 5). None of this can plausibly rise to the level of a "compelling reason" sufficient to support amendment after Plan confirmation. The Joint Liquidators' recent discovery campaign—plainly intended to create a pretext for amendment—cannot do so following months and years of failing to act on information available to them.

### III.    The Joint Liquidators' Neglect in Asserting These Purported Claims Is Neither Excusable Nor a Basis for New, Late Claims.

111.    The Joint Liquidators' purported "alternative" basis for amendment—that their filing should be permitted under the "excusable neglect" standard—confirms the obvious: they are seeking to assert *new* claims. "The 'excusable neglect' standard of [Bankruptcy] Rule 9006(b)(1) governs *late* filings of proofs of claim in Chapter 11 cases." *Pioneer Inv. Servs. Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) (emphasis added); *see also Enron Corp.*, 419 F.3d at 133 (bankruptcy courts may "accept *new* proofs of claim that are filed belatedly as the result of 'excusable neglect'"). "[T]he creditor seeking to file a late proof of claim bears the burden of proving excusable neglect by a preponderance of the evidence." *Cable & Wireless USA, Inc.*, 338 B.R. at 613. The "excusable neglect" inquiry "takes into account all

of the relevant circumstances regarding the movant's omission, including (1) prejudice to the debtor, (2) the length of the delay and its potential effect on judicial proceedings, (3) the reason for the delay, including whether it was in the movant's control, and (4) the movant's good faith." *Mallinckrodt Plc*, 2022 WL 3545583, at *3 (citing *Pioneer Inv. Servs. Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  "[I]gnorance of one's own claim does not constitute excusable neglect, and [a creditor's] mistaken belief that it had no claim to assert bars its claim now." *Motors Liquidation Co.*, 598 B.R. at 758.  Even an earthquake is not excusable when the creditor hasn't demonstrated that "it was impossible for him to file a timely proof of claim.  *In re Edelman*, 237 B.R. 146, 153 (B.A.P. 9th Cir. 1999).  "[P]reoccupation or an excessive workload does not typically render a mistake excusable." *Enron Corp.*, 419 F.3d at 126.  "Courts take a 'hard line' when applying the *Pioneer* test, and have placed the emphasis in their analysis on the 'reason' for the delay." *In re Energy Future Holdings Corp.*, 619 B.R. 99, 110 (Bankr. D. Del. 2020).  "In analyzing the reason for the delay," courts take into account "the movant's sophistication," and a "sophisticated creditor . . . cannot characterize its failure to file a proof of claim as excusable neglect." *Motors Liquidation Co.*, 598 B.R. at 758.

112.    For the same reasons that amendment would be inequitable, the Joint Liquidators' attempt to assert new claims under the "excusable neglect" standard should likewise be rejected.  As many courts recognize, the "excusable neglect" analysis of *belated new claims* "closely resembles" the "equitable analysis of *belated amendments* to claims." *Enron Corp.*, 419 F.3d at 133; *see also In re Brown*, 159 B.R. 710, 715 n.4 (Bankr. D.N.J. 1993) ("[T]he equitable analysis applied in cases decided under Rule 7015 is essentially the same analysis that the Supreme Court used to determine what is 'excusable neglect' under Rule 9006(b)(1) for allowing the filing of an untimely claim.").

113.    As discussed at length above, all factors of the "excusable neglect" test weigh against allowing the amendment:  (i) allowing these $1.53 billion post-confirmation claims that are both untimely and specious would prejudice the Debtors and the other creditors who timely filed claims; (ii) the Debtors were only informed of the magnitude of the New Claims *more than 16 months* after the Bar Date; (iii) the delay was largely due to the Joint Liquidators' own lack of diligence and strategic choices in what to assert in the Original Proofs of Claim, and thus was entirely within their control; and (iv) the Joint Liquidators' strategy reeks of gamesmanship.  Here, the Joint Liquidators have not shown any "compelling" circumstances justifying their delay.  *In re NextMedia Grp. Inc.*, 2011 WL 4711997, at *3.  As such, they should not be permitted to file these New Claims as late claims under the "excusable neglect" standard.

## RESERVATION OF RIGHTS

114.    This Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors to object to any claim on any grounds whatsoever.  The Debtors expressly reserve all further substantive or procedural objections.   Nothing contained herein is intended or should be construed as:  (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Debtors' claim objection to the Original Proofs of Claims filed by the Joint Liquidators [D.I. 19797] or any order granting the relief requested by that objection; (e) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## **CONCLUSION**

115.    For the foregoing reasons, the Debtors respectfully request that that the Court sustain the Objection and deny the Motion with prejudice.

Dated:   December 5, 2024
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

   /s/ Matthew R. Pierce
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:   landis@lrclaw.com
          mcguire@lrclaw.com
          brown@lrclaw.com
          pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:   dietdericha@sullcrom.com
          bromleyj@sullcrom.com
          gluecksteinb@sullcrom.com
          bellerb@sullcrom.com