## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  February 27, 2025 at 10:00 a.m. ET**<br>**Obj. Deadline:  January 27, 2025 at 4:00 p.m. ET** |

### DEBTORS' AMENDED OBJECTION TO PROOFS OF CLAIM FILED BY SETH MELAMED AND MOTION FOR SUBORDINATION PURSUANT TO 11 U.S.C. §§ 510(B) AND 510(C)(1)

> **THIS OBJECTION OBJECTS TO CERTAIN CLAIMS.  THE CLAIMANT RECEIVING THIS OBJECTION SHOULD CAREFULLY REVIEW THIS OBJECTION AND, IF APPLICABLE, FILE A RESPONSE BY THE RESPONSE DEADLINE.**

FTX Trading Ltd. ("FTX"), FTX Japan Holdings K.K. ("FTX Japan Holdings"), Quoine Pte Ltd. ("Quoine"), and their affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") hereby submit this amended objection (the "Objection"), pursuant to sections 502 and 510(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to proofs of claim numbers 3244, 3353, 3385, and 4578 and an administrative claim [D.I. 27798] (collectively, the "Claims" and each a "Claim") filed by Seth Melamed.[2]  The Debtors seek to (1) subordinate the portion of Claim 3385 that arises from the

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]   Melamed also filed two proofs of claim against FTX Japan K.K. (Claim Nos. 3956 and 4470), but they were expunged following its sale to bitFlyer Holdings, Inc. ("bitFlyer") and the subsequent dismissal of the Chapter 11 Case of FTX Japan K.K. [D.I. 20560].

purchase or sale of FTX shares as an equity claim pursuant to section 510(b) of the Bankruptcy Code; (2) reduce the portion of Claim 3385 that arises from Melamed's alleged entitlement to certain amounts of cryptocurrency to the value of the cryptocurrency as determined by the Estimation Order; and (3) disallow and expunge Claims 3244, 3353, and 4578, and the Administrative Claim in their entirety, or in the alternative reduce the four claims to reflect the reasonable value of services provided by Melamed.   Additionally, the Court should (i) deny Melamed's request to compel arbitration, and (ii) equitably subordinate all of Melamed's Claims pursuant to section 510(c) of the Bankruptcy Code.   In support of the Objection, the Debtors submit the *Declaration of Henry Anthony Chambers* (the "Chambers Decl.") and the *Declaration of Taro Tanaka* (the "Tanaka Decl."), and respectfully state as follows:

## PRELIMINARY STATEMENT

1.     Melamed has filed five operative claims.   Claim 3385 seeks from FTX over $35 million in purported damages for breach of contract and fraudulent inducement related to FTX's purchase of Liquid Group, Inc., as well as an unspecified amount of indemnification.   The vast majority of Claim 3385—over $26 million—arises from the purchase or sale of FTX securities and must be subordinated pursuant to 11 U.S.C. § 510(b).   The remaining portion of Claim 3385 is a claim for cryptocurrency that FTX promised him, which must be reduced in accordance with this Court's Estimation Order.   Claims 3353 and 4578 are identical to each other and seek, from Quoine and FTX Japan Holdings, respectively, $52,500 in allegedly unpaid services fees.   But as a statutory insider (the COO of FTX Japan and a director of Quoine), Melamed is only entitled to claim compensation for the reasonable value of his services, and he has offered no evidence that he provided the Debtors any value.   Claims 3353 and 4578 should therefore be disallowed in their entirety.   Claim 3244 against FTX Japan Holdings seeks $200,000 for a bonus payment Melamed

claims he was due.  This claim fails because Melamed repudiated any bonus allegedly due to him and, in any event, whether to pay the bonus was in the "sole and absolute discretion" of FTX Japan Holdings.  Finally, in a recently filed administrative claim [D.I. 27798], Melamed seeks an unspecified amount of services fees and a "Transaction Award" pursuant to a Key Employee Incentive Program.  But Melamed is not entitled to any "Transaction Award" because he failed to agree to the terms of the Award.  Even if he were, the Debtors have no obligation to pay any "Transaction Award" because the obligation was transferred to a third party, bitFlyer, when bitFlyer purchased all assets of FTX Japan K.K.  Further, all of Melamed's Claims should be equitably subordinated pursuant to 11 U.S.C. § 510(c) because he engaged in inequitable conduct that caused harm to other creditors.

2.    Finally, this Court should retain jurisdiction over the SPA Claim rather than submitting it to arbitration because it would be significantly more efficient to litigate the Claims in this Court, and arbitrating them would cause the Debtors great prejudice.

**BACKGROUND**

3.    On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

4.     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

5.     On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519] (the "Non-Customer Bar Date Order").  The Non-Customer Bar Date Order established, among other things, the deadline of June 30, 2023 to file non-Customer Claims[3] against the Debtors.

6.     On June 30, 2023, Melamed filed non-customer Claim 3244 against FTX Japan Holdings, Claim 3353 against Quoine, Claim 3385 against FTX, and Claim 4578 against FTX Japan Holdings.

7.     On February 7, 2024, this Court entered the *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] (the "Estimation Order").  The Estimation Order "estimates for the purposes of solicitation, voting and distribution, the value of Claims based on Digital Assets and fiat currency . . . for any plan proposed or confirmed in these Chapter 11 Cases."  Estimation Order ¶ 2.

---

[3]   "Customer Claims" are claims (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, or federal or state law, rule or regulation, common law or otherwise) held by any person (as defined in section 101(41) of the Bankruptcy Code) or entity (as defined in section 101(15) of the Bankruptcy Code) against any of the Debtors, in each case, arising out of or related to (a) any cash, cryptocurrency, digital assets or other assets held by such person or entity in an account on any FTX exchange as of the Petition Date or (b) any other investment or trading activities on any FTX exchange.

8.      On July 10, 2024, the Debtors filed the *Debtors' Objection to Proofs of Claim Filed by Seth Melamed* [D.I. 20051] (the "Initial Claim Objection"), objecting to Claims 3244, 3353, 3385, and 4578.[4]

9.      On August 16, 2024, Melamed filed the *Opposition to Debtors' Objection to Proofs of Claim* [D.I. 23170] (the "Claim Objection Opposition"), which included the *Corrected Declaration of Seth Melamed in Support of Opposition to Debtors' Objection to Proofs of Claim* [D.I. 23173] (the "Melamed Declaration"), and the *Declaration of Takane Hori* [D.I. 23171] (the "Hori Declaration").

10.     Also on August 16, 2024, Melamed filed the *Joinder of Seth Melamed to the Objections to the Plan Raised By the Retail Customers and Reservation of Rights* [D.I. 23167] (the "Melamed Plan Objection").

11.     On October 7, 2024, the Court held a hearing at which it overruled the Melamed Plan Objection and all other objections, and approved the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan"). On October 8, 2024, this Court entered the *Order Confirming Second Amended Joint Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] (the "Plan Confirmation Order"). Among other things, the Plan states that "the value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion rates set forth in" the Estimation Order. Plan § 4.4. The Plan also defines "Claim" as "any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code." Section 101(5) in turn defines "claim" as a:

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

---

[4]     The Initial Claim Objection also objected to Claims 3956 and 4470, which were filed against former Debtor FTX Japan K.K. ("FTX Japan"), which have since been expunged and are no longer pending.

equitable, secured, or unsecured; or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

12.     On October 21, 2024, Melamed filed his *Notice of Appeal and Statement of Election* [D.I. 27000], appealing this Court's Plan Confirmation Order.

13.     On November 7, 2024, Melamed filed a Request for Payment of Administrative Expense [D.I. 27798] (the "Administrative Claim").

**FACTS SPECIFIC TO RELIEF REQUESTED**

14.     Melamed was the Chief Operating Officer ("COO") and a representative director of FTX Japan Holdings prior to commencement of the Chapter 11 Cases.  He also served as a director of Quoine, a wholly owned subsidiary of FTX Japan Holdings.

15.     Prior to becoming COO of FTX Japan Holdings, Melamed was COO and a shareholder of Liquid Group, Inc. ("Liquid"), a Japanese cryptocurrency holding company that had two relevant subsidiaries—Quoine Corporation n/k/a FTX Japan and Quoine Pte Ltd.—which together operated the Liquid cryptocurrency exchange.  On November 19, 2021, FTX, Melamed, and other Liquid shareholders executed the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) (the "SPA," attached as Chambers Decl. Ex. 3.).  Pursuant to the SPA, among other things, Melamed sold 12,203 shares of Liquid common stock and 510 Liquid stock options to FTX.  In exchange, FTX agreed to pay Melamed consideration in the form of cash, shares of FTX common stock, and delivery of certain cryptocurrency.  Specifically, pursuant to Schedule 2 of the SPA, Melamed was to receive:

a.     1,019,070 shares of FTX common stock (the "FTX Consideration Shares");

b.     $8,903,278.05 in cash (the "Cash Consideration"); and

c.      BTC 39.132, ETH 560.48, SOL 11,887.98, and FTT 47,532 (the "Crypto Consideration").

(Claim 3385 Annex ¶ 9; SPA Sch. 2, at 35–36.)  FTX and Melamed also signed a Side Letter Agreement (the "Side Letter," attached as Ex. 4 to the Chambers Decl.), dated November 19, 2021, which established specific dates on which Melamed and FTX were to exchange consideration for the acquisition.

16.     The transaction closed on April 4, 2022.  Upon closing, FTX paid Melamed the Cash Consideration and issued to Melamed the FTX Consideration Shares.  (Claim 3385 Annex ¶ 14.)  Pursuant to the terms of the Side Letter and the SPA, FTX retained the Crypto Consideration as security against any indemnification obligations that might arise under the SPA. (Side Letter § 2.1(d) (permitting FTX to "withh[o]ld" the "entirety" of the Crypto Consideration); SPA §§ 4.1, 4.2.)  Section 4.2 of the SPA provides that half of the Crypto Consideration shall be released by FTX to Melamed on April 4, 2023 and the remainder on April 4, 2024.  (Claim 3385 Annex ¶ 9; SPA § 4.2.)

17.     In Claim 3385 against FTX (the "SPA Claim"), Melamed seeks total damages of "not less than" $35,613,112.19 for alleged breach of the SPA and fraudulent inducement of the SPA.  (Claim 3385 Annex ¶ 4.)  This amount purportedly represents the cash value of the FTX Consideration Shares and the Crypto Consideration as of November 19, 2021. (*See* Claim 3385 Annex ¶ 4; SPA Sch. 2, at 35–36.)  Melamed also asserts that he is entitled to receive the Crypto Consideration in kind,[5] as well as unspecified indemnification.[6]  (Claim 3385

---

[5]  Melamed has been inconsistent as to whether he seeks the Crypto Consideration in kind.  The SPA Claim is not clear in this regard.  Melamed's Claim Objection Opposition seeks the payment of the cash value of the Crypto Consideration as listed in the SPA.  (*See* Claim Obj. ¶ 51.)

[6]  Melamed has not identified any amount of or basis for damages for his indemnification claim.  The Debtors therefore do not have an objection to such claim at this point in time (but for avoidance of doubt, request that such

Annex ¶ 4.)  Melamed purports to state his claims under theories of Japanese law and Delaware law, "to the extent applicable."  (Claim 3385 Annex ¶ 13.)  Melamed also "reserves the right to seek resolution of [the SPA Claim] in Singapore-based arbitral proceedings."  (*Id.* ¶ 32.)

18.    On October 19, 2022, Melamed and FTX Japan Holdings, on behalf of itself and its wholly owned subsidiary FTX Japan, entered into an Amended and Restated Management Agreement (the "<u>Management Agreement</u>," attached as Chambers Decl. Ex. 5).  (Claim 4578 Annex ¶ 1(a).)  Under the Management Agreement, Melamed agreed to serve as (i) a representative director and COO of FTX Japan Holdings and (ii) a director of Quoine.  (Management Agreement § 3.1(a)–(c).)  Quoine is a subsidiary of FTX Japan Holdings.  (*Id.* at 1.)  In return, FTX Japan Holdings agreed to pay Melamed a monthly "services fee" of $37,500, a monthly housing allowance of $3,500, and a monthly childcare allowance of $6,000.  (*Id.* § 4.1.)  Starting September 1, 2022, the Management Agreement contemplated that Melamed would split his time fulfilling his duties to FTX Japan and Quoine.  (*Id.* § 4.2.)  So long as Melamed performed services for FTX Japan, FTX Japan would pay Melamed 30% of the total services fee (or $11,250 per month) and 100% of the housing and childcare allowances; so long as Melamed performed services for Quoine, FTX Japan Holdings would "cause FTX Singapore to pay"[7] Melamed the remaining 70% of the services fee (or $26,250 per month).  (*Id.* § 4.2(a)–(b).)

19.    In Claim 4578 against FTX Japan Holdings and Claim 3353 against Quoine (the "<u>Salary Claims</u>"), Melamed contends that, pursuant to the Management Agreement, he was entitled to monthly compensation of $26,250 from Quoine.  Melamed contends that he provided

---

claim be subordinated under section 510(c) of the Bankruptcy Code along with Melamed's other claims).  The Debtors reserve all rights to object to any indemnification claim in the future, including on the basis that any such claim is untimely.

[7]    The Management Agreement defines Quoine as "FTX Singapore"; however, FTX Singapore never existed.

services in accordance with the Management Agreement but did not receive the agreed-upon payment of $26,250 per month from Quoine for the months of September and October 2022, totaling $52,500.  (Claim 4578 Annex ¶ 1(b); Claim 3353 Annex ¶ 1(b).)

20.　　In Claim 3244 against FTX Japan Holdings (the "Bonus Claim"), Melamed submits a $200,000 claim seeking a purported bonus payment (the "Bonus").  Melamed seeks payment of the Bonus, which he contends either FTX Japan Holdings or FTX Japan promised to pay prepetition.  (Claim 3244 Annex ¶ 1(c)–(d).)  In Claim 3244, Melamed provided no evidence that he was entitled to a bonus.  In his Claim Objection Opposition, Melamed referenced an email from Jen Chan, Chief of Staff at FTX, which he (incorrectly) claims shows he is entitled to the Bonus.  (Opp'n ¶ 63.)

21.　　On July 26, 2024, Melamed resigned as the representative director of FTX Japan Holdings.  On July 30, 2024, he was terminated from all positions he held with the Debtors.

22.　　On November 7, 2024, Melamed filed the Administrative Claim.  In the Administrative Claim, Melamed states that he is owed compensation under the Management Agreement, (Administrative Claim Addendum ¶ 5,) which the Debtors understand refers (at least in part) to the same subject matter as the Salary and Bonus Claims.  Melamed further contends in the Administrative Claim that he was a participant in the Key Employee Incentive Plan (the "KEIP"), and that he is therefore entitled to an award of an unspecified amount (the "Transaction Award") (authorized by this Court pursuant to the *Order Authorizing Implementation of a Key Employee Incentive Plan* [D.I. 1589] (the "KEIP Order")) due to the sale of FTX Japan to bitFlyer. (*Id.* ¶ 6.)  Melamed asserts that the Transaction Award was due to him within 60 days of the closing of the FTX Japan sale, and that it has not been paid.

23.     Melamed's Claims are summarized as follows:

| Description of Purported Damages | Claim Amount | Claim Nos. | Debtor |
|---|---|---|---|
| Damages for breach of contract and fraudulent inducement relating to the SPA | $35,613,112.19 | 3385 | FTX |
| Indemnification pursuant to the SPA | Unspecified | | |
| Services fees from September and October 2022 pursuant to the Management Agreement | $52,500 | 3353 4578 | Quoine FTX Japan Holdings |
| Bonus Payment pursuant to the Management Agreement | $200,000 | 3244 | FTX Japan Holdings |
| Services fees pursuant to the Management Agreement and Transaction Award pursuant to the KEIP | Unspecified | D.I. 27798 | N/A |

## JURISDICTION AND VENUE

24.     The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief sought are sections 502, 510(b), and 510(c) of the Bankruptcy Code and Bankruptcy Rules 3001 and 3007.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**AMENDED OBJECTION TO PROOFS OF CLAIM FILED BY SETH MELAMED**

25.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim.  11 U.S.C. § 502(b). Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b).

26.     While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) ("Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.").  The burden of persuasion with respect to the claim is always on the claimant, *see id*. at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity, *see, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004).

27.     Melamed's Claims seek a total of $35,865,612.19 against the Debtors in connection with claims arising under the SPA and the Management Agreement.  For the following reasons and others that will be demonstrated following discovery and a hearing, the Court should (1) subordinate Melamed's claim for the FTX Consideration Shares as an equity-related claim under section 510(b) of the Bankruptcy Code; (2) reduce Claim 3385 to reflect the value of the Crypto Consideration as determined by the Estimation Order; and (3) disallow and expunge Claims 3244, 3353, and 4578, and the Administrative Claim in their entirety, or in the alternative

reduce the four Claims to reflect the reasonable value of services provided by Melamed. Additionally, the Court should equitably subordinate all of Melamed's Claims pursuant to section 510(c) of the Bankruptcy Code.  Finally, for the avoidance of doubt, the Court should retain jurisdiction over the Claim 3385 dispute rather than sending it to arbitration.

I.      **Melamed's Equity-Based Claim Should Be Subordinated Pursuant to Section 510(b) of the Bankruptcy Code.**

28.     The vast majority of Melamed's SPA Claim—$26,709,834.14—"aris[es] from the purchase or sale of [Debtors'] securit[ies]" and thus must be subordinated.  11 U.S.C. § 510(b); Claim 3385 Annex ¶ 9.  Under section 510(b) of the Bankruptcy Code, any claim for "damages arising from the purchase or sale" of a security of the debtor "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b).

29.     In interpreting this statute, the Third Circuit has stated that the legislative intent behind section 510(b) is "to prevent disappointed shareholders from recovering their investment loss by using fraud . . . to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002); *see also In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 844 (Bankr. D. Del. 2001) (claim arises from the "purchase or sale" of a security if there is "an allegation of fraud in the purchase, sale or issuance of the . . . instrument").

30.     As the Third Circuit has noted, shareholders assume the risk of business failure and, as a result, are the appropriate party, rather than general unsecured creditors, to bear the risk of "unlawful conduct on the debtor's part that caused the stock's value to drop," including fraud. *Telegroup*, 281 F.3d at 141, 143.  Section 510(b) "was intended to prevent shareholders

from recovering their equity investment in parity with general unsecured creditors," *id.*, 281 F.3d at 142, which is exactly what Melamed seeks to do here.  The Court should reject his attempt to do so.  *See In re Kaiser Grp. Int'l, Inc.*, 260 B.R. 684, 687 (Bankr. D. Del. 2001) (subordinating claims by shareholders who alleged they were fraudulently induced to enter into merger agreement pursuant to which they received Debtor equity as consideration, holding that the claims fell "squarely within the purview of section 510(b)").

31.     Whether Melamed styles his claim as one for fraud or breach of contract, and whether he seeks to liquidate it before this Court or in arbitration, subordination is inescapable.  The Court must "look behind" a claim or award to determine whether it is based on equity, and therefore whether subordination is appropriate.  *In re U.S. Wireless Corp.*, 384 B.R. 713, 723 (Bankr. D. Del. 2008).  Melamed was promised—and received—FTX equity, which he now claims is not worth what he was promised.  His claim must be subordinated.

## II.     Melamed's Claim For the Crypto Consideration Must Comply With This Court's Estimation Order and the Debtors' Plan of Reorganization.

32.     Melamed asserts that he is entitled to $8,903,278.05 for his Crypto Consideration claim, which was the value of specific denominations of cryptocurrencies as listed in the SPA.  Melamed also contends that FTX breached the SPA by failing to deliver the Crypto Consideration on April 4, 2022, despite the fact that FTX was entitled under the SPA to retain the Crypto Consideration, and not deliver it until April 4, 2023 and April 4, 2024.[8]  (Opp'n ¶¶ 50-51.)

33.     But the SPA did not state that Melamed was entitled to $8,903,278.05 in cryptocurrency.  The SPA was clear that FTX was to pay Melamed BTC 39.132, ETH 560.48,

---

[8]    Melamed has contradicted himself on this point, so his position is not clear.  In the SPA Claim, Melamed alleged that FTX "breached its obligation to return one half of the [Crypto] Consideration on the one-year anniversary of the Completion Date, April 4, 2023."  (SPA Claim Annex ¶ 20.)  Yet in his Claim Objection Opposition, he suddenly changed course, arguing that FTX breached on April 4, 2022.  (Opp'n ¶¶ 50-51.)

SOL 11,884.98, and FTT 47,532.  (SPA Schedule 2 at 37.)  This is the only plausible reading of

the SPA, which stated that FTX was to withhold the Crypto Consideration and pay Melamed 50%

on April 4, 2023 and 50% on April 4, 2024.  And under Japanese law, which governs the SPA,

(*see* SPA § 19.1), contracts must be interpreted according to their plain meaning (Tanaka Decl.

¶ 9).  It would make little sense to list specific values of cryptocurrencies if FTX's obligation under

the SPA was to pay Melamed some unknown amount of cryptocurrencies worth half of

$8,903,278.05 on April 4, 2023, and a different, also unknown amount of cryptocurrency worth

half of $8,903,278.05 on April 4, 2024.  Melamed does not seriously dispute this.  (*See* Claim 3385

¶ 9 ("The Debtors agreed to pay for the Liquid Shares with . . . $8,903,278.05 worth of

cryptocurrency, as determined on November 19, 2021, made up of 39.132 bitcoin, 560.48 ETH,

11,884.98 Solana, and 47,532 FTT tokens.").)

   34. Melamed's claim is therefore unremarkable.  Like so many other creditors,

he has a "Claim in respect of [] Digital Asset[s]."  (*See* Plan § 4.4.)  The Plan specifically addresses

how such claims should be valued, stating:  "Unless otherwise expressly provided in the Digital

Assets Estimation Order, the value of a Claim in respect of a Digital Asset shall be calculated by

converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion

rates set forth in the Digital Assets Conversion Table."[9]  (*Id.* § 4.4.)

   35. As Section 4.4 of the Plan notes, this Court has already estimated, pursuant

to section 502(c) of the Bankruptcy Code, "the value of Claims based on Digital Assets" for the

---

[9] Section 502(c) of the Bankruptcy Code permits a bankruptcy court to "estimate[] for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c)(1).  The twin goals of section 502(c) are to "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions" and to "promote a fair distribution to creditors through a realistic assessment of uncertain claims."  *In re Continental Airlines, Inc.*, 981 F.2d 1450, 1461 (5th Cir. 1993).

purposes of "solicitation, voting and distribution." (Estimation Order ¶ 2.) This Court assigned specific monetary values to numerous digital assets. (*See Id.* Ex. 1.)

36.     Melamed did not object to the Estimation Order, and he does not challenge the validity of the Estimation Order in any of his Claims or in this Claim Objection Opposition. His ***only*** objection to Plan confirmation as it relates to the Plan's treatment of cryptocurrency was that the Plan does not permit "'in kind' distribution[s]." *Objection of Ahmed Abd El-Razek et al. to First Amended Joint Chapter 11 Plan of Reorganization* [D.I. 23162], joined by Melamed in the Melamed Plan Objection ¶ 16. This Court overruled the Melamed Plan Objection. (Plan Confirmation Order at 5.) "[A] confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation." *Donaldson* v. *Berstein*, 104 F.3d 547, 554 (3d Cir. 1997). Melamed's failure to object to the application of the Estimation Order, and consequent waiver of the issue on appeal, precludes him from now arguing he is somehow exempt from the Plan and the Estimation Order. *Id.*; *see also, e.g.*, *In re Varat Enters., Inc.*, 81 F.3d 1310, 1317 (3d Cir. 1996) ("Once a plan is confirmed, neither a debtor nor a creditor can assert rights that are inconsistent with its provisions.").

37.     Melamed offers one conclusory paragraph to explain why he should be exempt from the Plan and the Estimation Order, and it does not seriously grapple with the Estimation Order or even mention the Plan or its preclusive effect. He merely contends that, because of his claim—raised for the first time in his Claim Objection Opposition—that "FTX breached the SPA on April 4, 2022," "damages would be determined on that date – not the Petition Date," so the "Estimation Order is not applicable[.]" (Opp'n ¶ 51.) This argument is expressly contradicted by Melamed's own SPA Claim. (*See* Claim 3385 Annex ¶ 20.) And it is not correct as a matter of Japanese law (or common sense). (Tanaka Decl. ¶¶ 15-17.) As Mr. Tanaka explains,

and the plain language of the SPA and Side Letter make clear, "FTX was permitted to withhold the entirety of the Crypto Consideration from Mr. Melamed on the Completion Date," *i.e.*, April 4, 2022." (*Id.* ¶ 15.) FTX only had an obligation "to pay 50% of the Crypto Consideration on April 4, 2023 and 50% of the Crypto Consideration on April 4, 2024. (*Id.*)

38.    Even if Melamed were right as a matter of Japanese law (and he is not), Melamed does not explain how the date of FTX's breach changes the fact that his Crypto Consideration claim is a Claim in respect of Digital Assets. This is because it does not. The Plan defines "claim" by referencing section 101(5) of the Bankruptcy Code, (Plan § 2.1.30), which the Supreme Court has noted is a "broad definition," *Ohio* v. *Kovacs*, 469 U.S. 274, 279 (1985). "Claim" thus means any

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). Regardless of which theory Melamed chooses to pursue now—that he is entitled to the Crypto Consideration in kind or the purported cash value of the Crypto Consideration as of November 19, 2021—his claim clearly falls within the Plan's extremely broad definition of Claim.

39.    Melamed's fraud theory of recovery for the Crypto Consideration fares no better. Even if Melamed were defrauded out of the right to obtain specific digital assets, he would be no different from the many thousands of FTX creditors who entrusted FTX with holding cryptocurrency, only to lose it due to the fraud committed by Samuel Bankman-Fried and the other FTX insiders. His claim must therefore be valued in accordance with the Estimation Order.

40. Even setting the Estimation Order to the side, Melamed himself has never stated what he believes his measure of damages for fraud should be, other than to refer to the value ascribed to the Crypto Consideration in the SPA. As Mr. Tanaka explains, under Japanese law, the purpose of damages for tort claims such as fraud "is to restore the situation that would have existed had the wrongdoing not occurred." (Tanaka Decl. ¶ 20.) Because Melamed claims that he was induced to sign the SPA based on misrepresentations that FTX made to him, "had the allegedly fraudulent misrepresentations not been made, [Mr. Melamed] would not have signed the SPA." (*Id.*) His damages would thus be calculated "by determining the difference between the consideration Mr. Melamed received as part of the transaction and the true value of the Liquid shares and stock options that he sold to FTX pursuant to the SPA." (*Id.*)

41. "[A] proper damages calculation would require knowing at least the true value of Mr. Melamed's Liquid shares and stock options that he sold to FTX." (*Id.* ¶ 23.) While the value ascribed to those shares and options in the SPA may be probative for assessing their value, "it is not determinative." (*Id.* ¶ 24.) This is particularly true where, as here, it is well-established that the FTX insiders routinely (i) used commingled customer funds to finance venture investments and acquisitions, (ii) prioritized speed above all else, (iii) failed to retain financial advisors and perform financial analyses, and (iv) showed little to no price sensitivity. *See, e.g.*, Compl. for Avoidance & Recovery of Transfers & Obligations, *FTX et al.* v. *SkyBridge Capital II, LLC et al.* [D.I. 27829] ¶ 13 (alleging that FTX invested $45 million into hedge funds with "[n]o meaningful due diligence"); Compl. for Avoidance & Recovery of Transfers & Obligations, *Alameda Research Ltd. et al.* v. *Michael Giles et al.* [D.I. 1503] ¶ 52 (alleging Debtor West Realm Shires, Inc. bought Embed Financial Technologies Inc. for more than $200 million after nearly no diligence); Trial Tr. at 1500:18-1501:12 (former FTX executive Nishad Singh testifying that he

directed Debtor Alameda Research LLC to invest in Anthropic PBC without performing any due diligence on the company).  And with respect to the Liquid acquisition in particular, FTX and Liquid agreed to all material terms of the transaction less than two months after negotiations began, meaning FTX had no time to conduct fulsome due diligence on Liquid before agreeing to a deal price.

42.    Melamed is not entitled to special treatment for his Claim in respect of Digital Assets.  To allow him an outsized recovery would undermine the Bankruptcy Code's core aim of "achieving fundamental fairness and justice" for creditors.  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012).  The portion of the SPA Claim related to the Crypto Consideration should be reduced to comply with the terms of the SPA, this Court's Estimation Order, and the Plan.  Pursuant to the conversion rates set forth in the Digital Assets Conversion Table appended to the Estimation Order, Melamed's claim in respect of BTC 39.132, ETH 560.48, SOL 11,884.98, and FTT 47,532 is valued at $1,558,871.90.  This is all Melamed is entitled to receive.

## III.    Melamed Is Not Entitled To Prepetition "Services Fees."

43.    In the Salary Claims, Melamed submits two substantively identical Claims for $52,500 each, representing "services fees" he claims Quoine owed to him in September and October of 2022.  The Salary Claims arise from the Management Agreement between FTX Japan Holdings and Melamed.  These Claims must fail because (i) Melamed has not carried his burden of showing he is entitled to any "services fees," and (ii) as an insider, he is entitled only to the reasonable value of the services provided.

44.    Claim 3353 against Quoine should be disallowed and expunged in its entirety because Quoine is not a party to the Management Agreement, (*see* Management

Agreement at 1), and therefore Quoine is not the appropriate Debtor for any Claims arising from the Management Agreement.

45.    Claim 4578 against FTX Japan Holdings should likewise be disallowed and expunged in its entirety because Melamed has not provided any support for this Claim.  The asserted services fees are only payable to Melamed "for so long as [Melamed] performs services . . . to [Quoine] as director."  (Management Agreement § 4.2.)  Nowhere does Melamed identify a single service he provided for Quoine, so his claim is not entitled to *prima facie* validity. *In re Allegheny*, 954 F.2d at 173-74 (claimant must allege "facts sufficient to support the claim" to be entitled to *prima facie* validity).

46.    Implicitly conceding he provided no services to Quoine, Melamed argues that the fact that "customers of FTX Japan received 100% of their crypto back in kind, rather than a fraction of their coins dollarized as of the Petition Date," is evidence that he is entitled to the reasonable value of the services provided to FTX Japan.  (Opp'n ¶ 60.)  But as noted, Melamed's claims against FTX Japan were expunged because FTX Japan was purchased by bitFlyer. Moreover, as explained herein (*see infra* § VI.), Quoine—the only entity relevant for the Salary Claims—did not pay back its customers' cryptocurrency in kind.  This is in no small part to the fact that, as detailed below (*see infra* § VI.), Melamed recklessly transferred nearly $11 million of Quoine customer assets to FTX days before the Petition Date.  At any rate, the reason FTX Japan customers received all cryptocurrency back in kind was because the Japanese Financial Services Agency mandated that FTX Japan segregate customer assets, not because of any services provided by Melamed.

47.    Further, as Melamed is an insider, he is entitled only to the "reasonable value" of the services he provided to Quoine.  *See* 11 U.S.C. § 502(b)(4).  The Bankruptcy Code

defines an "insider" to include directors and officers of a debtor.   11 U.S.C. § 101(31)(B).

Melamed does not (and cannot) dispute that he fits this statutory definition; at all relevant times,

Melamed was the COO and a representative director of FTX Japan Holdings and a director of

Quoine.  He is therefore a quintessential insider, *see* 11 U.S.C. § 101(31)(B), and his Salary Claims

are limited to the "reasonable value" of services he provided.  To date, Melamed has offered no

evidence that his services provided any value.

**IV.     Melamed Is Not Entitled To Any Bonus Payment.**

48.     Melamed's Bonus Claim seeks payment of a cash bonus of $200,000

pursuant to the Management Agreement.  But Melamed is not entitled to any bonus, because

(i) Melamed himself declined any bonus on September 28, 2022, and (ii) the Management

Agreement committed the decision of whether to pay a bonus to the "sole and absolute discretion"

of FTX Japan Holdings and Quoine.

49.     In his Claim Objection Opposition, Melamed relies on a September 15,

2022 email of Jen Chan, FTX's Chief of Staff to payroll agents, purporting to award Melamed a

$200,000 Bonus.  (Chambers Decl. Ex. 6.)  But Melamed has selectively excerpted this email.  On

September 28, 2022, in the same e-mail thread that Melamed submitted to this Court, Melamed

himself ***instructed the payroll agents to not pay his bonus***.  (*Id.*)

50.     Regardless, the Management Agreement provides that the decision of

whether to pay Melamed a bonus rests in the "sole and absolute discretion" of the Boards of

Directors of FTX Japan Holdings and Quoine.  (Management Agreement § 4.3.)  Those Boards of

Directors did not exercise that "sole and absolute discretion" to award Melamed a Bonus, and he

has pointed to nothing indicating that they had any obligation to do so.  *See In re Lehman Bros.*

*Inc.*, 541 B.R. 45, 99 (Bankr. S.D.N.Y. 2015) (employee was not entitled to bonus where "clear

and unambiguous terms" of bonus policy stated bonus was "determined at the full discretion of senior [company] management").

51.     Furthermore, even if Melamed had some entitlement to a bonus (and he does not), the amount of the Bonus, if any, should be limited to the reasonable value of services Melamed provided as an insider.

**V.    Melamed Is Not Entitled To Payment On His Administrative Claim.**

52.     Melamed's Administrative Claim should be disallowed (i) to the extent that it duplicative of his Salary and Bonus Claims; (ii) because Melamed refused to sign an award agreement, which was a prerequisite to participating in the KEIP, thus precluding him from becoming entitled to any award under the KEIP; and (iii) because per the plain language of the Purchase and Sale Agreement between FTX Japan Holdings and bitFlyer (the "FTX Japan Sale Agreement" [D.I. 17923-2]), the Debtors are not liable for any payments or obligations arising out of the KEIP.

53.     First, the Administrative Claim vaguely asserts an entitlement to "compensation and other amounts" that Melamed is "owed under the FTX Japan Management Agreement." (Administrative Claim ¶ 5.)  It is not clear what this means.  To the extent Melamed seeks to assert his Salary and Bonus Claims as administrative claims, they should be disallowed for the reasons explained above.  And as these Claims accrued, if at all, before the Petition Date, Melamed cannot seek an Administrative Claim for them.  *See* 11 U.S.C. § 503(b)(1)(A).

54.     Second, to participate in the KEIP, Melamed was (and all other executives eligible to participate in the KEIP were) required to sign an award agreement, which included a customary release of claims against the Debtors.  Such award agreements are a customary condition to participation in incentive compensation programs to reflect the employee's agreement to the terms of the program.  Indeed, the KEIP Order stated that "[a]uthorization [under the Order]

to make payments to the KEIP Participants pursuant to the KEIP will not create any obligation on the part of the Debtors to make payments under the KEIP, unless the KEIP Participants meet the necessary conditions under the KEIP."  (KEIP Order ¶ 4.)  Melamed refused to sign the award agreement, so he did not agree to the terms of the KEIP and thus waived any right to participate.

55.     Third, even if Melamed was entitled to a Transaction Award, the Debtors would not have any obligation for the payment of the Transaction Award following the sale of FTX Japan.  As part of the sale of FTX Japan, bitFlyer assumed the obligation of paying any Transaction Awards.  Article 4.5 of the FTX Japan Sale Agreement states:  "Following the Closing, [bitFlyer] shall . . . pay any applicable Transaction Awards to any applicable KEIP Participants . . . .  *Neither [FTX Japan Holdings] nor any of its Affiliates shall have any obligations for any payments contemplated by the KEIP Order.*"  (FTX Japan Sale Agreement art. 4.5 (emphasis added).)  Melamed thus must seek any award payable under the KEIP from bitFlyer, not the Debtors.

## VI.   All of Melamed's Claims Should Be Subject to Equitable Subordination Under Section 510(c)(1) of the Bankruptcy Code.

56.     To the extent not disallowed and expunged, all of Melamed's Claims should be equitably subordinated under section 510(c)(1) of the Bankruptcy Code.  Section 510(c)(1) authorizes the Court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(1).  "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate."  *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002).  Subordination generally requires a showing that "(1) the claimant . . . engaged in some type of inequitable conduct; (2) the claimant's

-22-

misconduct . . . resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim [is] not . . . inconsistent with the Bankruptcy Code." *Id.* at 69 (emphasis omitted). "However, where the claimant is an insider, the standard for finding inequitable conduct is much lower." *Id.* at 70. Because "an insider's conduct is rigorously scrutinized," *In re Autobacs Strauss, Inc*., 473 B.R. 525, 582 (Bankr. D. Del. 2012), the Debtors "need not plead inequitable conduct with the level of particularity required for an outsider," *In re Advance Nanotech, Inc.*, 2014 WL 1320145, at *8 (Bank. D. Del. Apr. 2, 2014).

57.     As noted, as COO of FTX Japan and a director of Quoine, Melamed is a statutory insider. *See In re Furniture Factory Ultimate Holding, L.P.*, 2023 WL 5662747, at *31 (Bankr. D. Del. Aug. 31, 2023) ("For the purposes of a claim for equitable subordination, a party is an insider if it . . . meets the statutory definition of insider."). The Debtors' investigation to date has revealed substantial evidence that Melamed engaged in inequitable conduct, including "breach of fiduciary duties" and "undercapitalization" of Debtor Quoine. *See id.* (listing both as types of "inequitable conduct" warranting equitable subordination).

58.     First, under Melamed's leadership, the cryptocurrency exchange operated by Liquid's subsidiaries (the "Liquid Exchange") suffered multiple security breaches. Most notably, in August 2021, hackers took control of the Liquid Exchange's cryptocurrency warm wallet. The hackers were able to access the wallet because Liquid executives, including Melamed, failed to implement adequate controls to securely store the wallet's back-up key. (Chambers Decl. ¶ 9.) As a result of this direct failure, hackers compromised the Liquid Exchange's cryptocurrency warm wallet and stole nearly $95 million in customer funds. (*Id.*) The Liquid Exchange was only able to recover approximately $15 million of the stolen customer funds. (*Id.*)

59.     The hack made Quoine desperate for cash.  Less than two weeks after the hack, Sam Bankman-Fried agreed to bail Quoine out, loaning it $120 million.  (Chambers Decl. Ex. 1.)  Bankman-Fried, of course, did not stop there.  He acquired Liquid pursuant to the SPA, which, like many other FTX Group acquisitions, was done with little care or diligence, given that Bankman-Fried was spending commingled and misappropriated funds.  In the process, FTX substantially overpaid for Liquid.  Melamed himself therefore benefitted substantially from his own failures, receiving millions of dollars in the Liquid acquisition (along with the promise of additional consideration), but bringing Liquid and its affiliates within the FTX Group (and Bankman-Fried's control), to the great detriment of their creditors, including customers.

60.     Between October 22 and November 1, 2022—mere days before the petition date—Melamed directed the transfer of almost $11 million of Quoine cryptocurrency assets to FTX.com.  (Chambers Decl. Ex. 2.)  Given the timing, it appears that Bankman-Fried was attempting to use Quoine customer funds to stem the tide of withdrawals from the FTX exchange and thereby cover up the fraud he and other senior FTX insiders were perpetrating.  Although this transfer was purportedly intended to facilitate the migration of certain customers from Quoine to FTX.com, Melamed notably did not transfer custody of all of the Quoine customers' accounts to FTX.com, or inform Quoine's customers that he was transferring the assets that backed their accounts to FTX.  (*Id.*)  As a result, Quoine remained responsible to pay customer withdrawals despite no longer holding the assets transferred to FTX.com.  (*Id.* ¶ 13.)  This led to a significant mismatch between cryptocurrency assets held by Quoine and customer liabilities.  (*Id.* ¶¶ 13-14.)

61.     Melamed had no reason to transfer cryptocurrency assets in this way, which ran contrary to the agreed-upon timeline for migration and made no sense in that it separated cryptocurrency assets from the entity that held their accounts.  If Melamed had instead transferred

customers' assets only when each customer's account was migrated to the FTX.com exchange, Quoine would likely not have been left with a massive deficiency between cryptocurrency assets and customer liabilities.  (*Id.*)

62.    Nor were Quoine's Singaporean customers the sole victims of Melamed's breach.  Although FTX Japan's customers were ultimately made whole, the Japanese Financial Services Agency suspended FTX Japan's business.  The withdrawal freeze lasted until late February 2023, and on the first day it was lifted, FTX Japan users withdrew over $20 million in cryptocurrency assets from the exchange.[10]  Ultimately, the Debtors decided it was not a prudent use of estate resources to restart Liquid (n/k/a FTX Japan K.K.) operations, and sold it under a competitive process for a small fraction of what FTX paid Melamed and others for their interests in Liquid.  (*Id.* ¶ 17.)

63.    By reason of the foregoing facts (and additional facts likely to be adduced in discovery), and pursuant to section 510(c)(1) of the Bankruptcy Code, Melamed's Claims should be equitably subordinated to the claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of customer funds.  Such subordination would be consistent with the provisions and purposes of the Bankruptcy Code.

**VII.    Melamed's Claims Should Not Be Submitted to Arbitration.**

64.    Although the SPA contains an arbitration provision, the Court should decline to submit any of Melamed's claims to arbitration.

65.    Melamed has not sought relief from the automatic stay so that he can file an arbitration against the Debtors, nor has he filed such an arbitration.  Nonetheless, to the extent Melamed seeks relief from the automatic stay, as Judge Goldblatt noted in *In re Yellow Corp.*,

---

[10]    This value is calculated using the Estimation Order.

2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024), the Court should evaluate his request through the application of the factors set forth in *In re Rexene Prod. Co.*, 141 B.R. 574 (Bankr. D. Del. 1992):  "whether 'a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits.'"  *Yellow*, 2024 WL 1313308, at *12 (citing *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990) as "flesh[ing] out the balancing test set forth in *Rexene*," and considering factors such as "whether relief would result in a partial or complete resolution of the issues," "whether a specialized tribunal with the necessary expertise has been established to hear the cause of action," and "whether litigation in another forum would prejudice the interests of other creditors").

66.    Although bankruptcy courts will apply a presumption in favor of arbitration where a valid arbitration agreement exists, that presumption "can be overcome in appropriate circumstances where the imperatives of the bankruptcy case . . . so require." *Id.* at *13.  Any presumption of arbitrability is readily overcome here. *See id.* at *11.

67.    Sending Melamed's claim to arbitration would be extremely inefficient.  The Management Agreement does not contain an arbitration clause, so only the SPA Claim—one of Melamed's five Claims—could be resolved in arbitration.  Arbitrating the SPA Claim but adjudicating the remaining Claims in the Bankruptcy Court "would lead to a multiplicity of proceedings, undermine judicial economy, and decentralize disputes," which "militate[s] against" arbitration. *In re Salander O'Reilly Galleries*, 453 B.R. 106, 129 (Bankr. S.D.N.Y. 2011).

68.    Further, arbitration would only lead to undue delay and excessive costs.  Melamed has not initiated any arbitration proceedings.  The Parties have not discussed any preparations for

arbitration or the potential selection of arbitrators.  An arbitration would likely take a year or more.[11]  Melamed asserts that he has been "prejudiced by an extended delay of this matter," but this would only be exacerbated by further delay caused by arbitration.  *Response of Seth Melamed to Debtors' Emergency Motion for Entry of an Order (i) Adjourning Certain Matters Set for Hearing on September 12, 2024 and (ii) Extending the Deadline to File a Reply* [D.I. 24590] ¶ 11. As in *Yellow*, the significant likelihood of delay in resolving central issues of this bankruptcy case "counsels strongly" against arbitration.  *Yellow*, 2024 WL 1313308, at *14.

69.    Melamed, by contrast, will face no hardship if this Court maintains jurisdiction over the SPA Claim.  In fact, the opposite is true.  Arbitration would be pointless, because even if Melamed were to prevail, he would hold only an arbitral award, not any immediate entitlement to payment.  *See id.* at *11.  That is, as this Court explained at the September 12, 2024 omnibus hearing, "he's still got to come back [to the Bankruptcy Court] to collect on the claim."  (Sept. 12, 2024 Hearing Tr. at 78:12-13.)  Liquidation of the SPA Claim in arbitration does not immunize it from proper treatment under the Plan and the Bankruptcy Code, particularly because the Plan's definition of "claim" includes a "right to payment, whether or not such right is reduced to judgment [or] liquidated."  11 U.S.C. § 101(5); *see also In re Nat'l Energy & Gas Transmission, Inc.*, 492 F.3d 297, 302 (4th Cir. 2007); *U.S. Wireless Corp.*, 384 B.R. at 722.

70.    As explained herein, Melamed's equity-related claims under the SPA Claim— whether liquidated in arbitration or not—must be subordinated under section 510(b) of the Bankruptcy Code.  (*Supra* § I.)  Likewise, Melamed's claim pertaining to the Crypto Consideration is subject to treatment under the Plan regardless of where it is liquidated.  (*Supra* § II.)  And in all

---

[11]    The Singapore International Arbitration Centre reports that its arbitrations take a mean of 11.7 months and an average of 13.8 months.  [https://siac.org.sg/faqs/siac-general-faqs]

events, both portions of his SPA Claim should be equitably subordinated under section 510(c)(1) of the Bankruptcy Code. These issues must be resolved by this Court even if Melamed were to prevail in arbitration.

71. Both parties would in fact benefit by having this Court retain jurisdiction. A Singapore arbitration panel of general commercial jurisdiction is hardly a "specialized tribunal with the necessary expertise" to adjudicate Melamed's claims. *Cf. Yellow*, 2024 WL 1313308, at *6, 13 (statutorily created arbitration scheme for disputes relating to multiemployer pension plan showed "congressional judgment" to establish a specialized tribunal). On the contrary, as a general matter, "allowance or disallowance of claims against the estate" are statutorily enumerated "[c]ore proceedings" that this Court may "hear and determine" and "enter appropriate orders and judgments." 28 U.S.C. § 157(b)(2). The issues at the heart of Melamed's claims in particular— valuation of cryptocurrency-related claims and treatment of claims arising under executive compensation agreements or from the sale of FTX equity—are issues of core concern to most (if not all) creditors, and are precisely the type of issues that ***this Court*** is best positioned to adjudicate.

72. Because the Debtors would be greatly prejudiced by arbitrating the SPA Claim, and because Melamed would not only face no hardship but actually avoid hardships by litigating the SPA Claim in this Court, the Court should decline to submit the SPA Claim dispute to arbitration.

## RESERVATION OF RIGHTS

73. This Objection and Motion are limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the Debtors to object to any claim on any grounds whatsoever. The Debtors expressly reserve all further substantive or procedural objections. Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or

admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## NOTICE

74.     Notice of this Objection and Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; (g) counsel for the Ad Hoc Committee; (h) to the extent not listed herein, those parties requesting notice pursuant to rule 2002 of the Federal Rules of Bankruptcy Procedure; and (i) counsel to Melamed.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## CONCLUSION

75.     For the foregoing reasons, the Court should enter the Order, substantially in the form attached hereto as Exhibit A: subordinating Melamed's claim for the FTX Consideration Shares as an equity claim under section 510(b) of the Bankruptcy Code; reducing Claim 3385 to reflect the value of the Crypto Consideration as determined by the Estimation Order; and disallowing and expunging Claims 3244, 3353, and 4578, and the Administrative Claim in their entirety, or in the alternative reduce the four claims to reflect the reasonable value of services provided by Melamed.  Alternatively, the Court should equitably subordinate all of Melamed's claims.  Finally, the Court should retain jurisdiction over the Claim 3385 dispute rather than sending it to arbitration.

Dated: December 9, 2024
      Wilmington, Delaware

LANDIS RATH & COBB LLP

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

SULLIVAN & CROMWELL LLP
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*