**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF TARO TANAKA**

I, Taro Tanaka, of Miura & Partners, 3F East Tower Otemachi First Square 1-5-1, Otemachi, Chiyoda-ku, Tokyo 100-0004, Japan, hereby declare under penalty of perjury:

**Introduction and Scope of Opinion**

1. I make this declaration at the request of FTX Trading Ltd. and its affiliated debtors and debtors in possession (collectively, "FTX") in connection with the Chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases") relating to FTX. My opinion addresses (i) the construction, under Japanese law, of certain agreements entered into between (a) FTX and (b) Seth Melamed and other holders of the outstanding shares, stock options and warrants of Liquid Group Inc. ("Liquid"), a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan; and (ii) the potential damages to which Mr. Melamed would be entitled if he prevailed on a fraud claim relating to the Liquid transaction.

2. The authorities and other documents to which I make reference are appended to this Declaration.

**Qualifications**

3. I am a Japanese lawyer with over 12 years of experience. I received a J.D. from Keio University Law School in 2012 and an LLM from New York University School of Law in 2019.

4. I have practiced at several law firms in Japan. I am currently a partner at Miura & Partners, a full-service law firm headquartered in Tokyo, where I specialize in global dispute resolution, international law, and commercial litigation. I am fluent in Japanese and English.

5. I have no prior relationship with FTX, Mr. Melamed, or legal counsel representing either party in this proceeding.

**Background and Relevant Agreements**

6. I understand that effective April 4, 2022 (the "Completion Date"), FTX acquired Mr. Melamed's interests Liquid pursuant to two agreements, namely the: (1) Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders), dated November 19, 2021 (the "SPA"); and (2) Side Letter Agreement between Seth Melamed and FTX Trading Ltd, also dated November 19, 2021 (the "Side Letter").[1] Both agreements are governed by Japanese law in the relevant part. (SPA § 19.1; Side Letter § 8.1.) For purposes of this opinion, I assume that the SPA and the Side Letter are valid contracts under Japanese law. I have reviewed both the SPA and the Side Letter in preparing this Declaration. I have also reviewed Proofs of Claim Nos. 3244, 3353, 3385, 3956, 4470, and 4578 filed by Mr. Melamed, Mr. Melamed's *Opposition to Debtors' Objection to Proofs of Claim*, and the Declarations of Mr. Melamed and Takane Hori in support thereof.

---

[1] The SPA and the Side Letter are collectively referred to as the "Agreements." All exhibits referenced herein have the same meaning as the exhibits I understand are being filed with the *Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1)*.

7. I was asked to opine on the nature of the consideration that Mr. Melamed was to receive under the Agreements and when Mr. Melamed was entitled to receive that consideration under the Agreements.

8. As noted, in connection with FTX's purchase of Liquid, FTX and the major shareholders of Liquid, including Mr. Melamed, entered into the SPA on November 19, 2021, which outlined the consideration that FTX would pay Liquid's shareholders to acquire the company. On November 19, 2021, FTX and Mr. Melamed also entered into the Side Letter.

9. The relevant portions of the SPA and Side Letter are governed by Japanese law. According to the Supreme Court of Japan, when interpreting the meaning and content of specific provisions in a contract, the interpretation should be determined by comprehensively considering the wording and structure of the provision, its consistency with other provisions, and the circumstances leading to the conclusion of the contract.[2] In practice, when parties have validly entered into a contract, courts generally recognize the terms as written unless there are exceptional circumstances that warrant disregarding them.[3]

10. The SPA states that the "aggregate purchase price" to acquire Liquid shall be approximately USD 151 million, which "will be satisfied" by the payment of consideration in the form of cash (USD), shares of FTX common stock, and delivery of certain digital assets. Pursuant to Schedule 2 of the SPA, Mr. Melamed was to receive the following consideration for his ownership stake in Liquid: (1) $8,903,278.05 in cash consideration (the "Cash Consideration");

---

[2] *See*, for instance, Supreme Court of Japan (Second Petty Bench), June 11, 2007, Hanrei Times No. 1250, p. 80.

[3] Shihou Kenshujyo-hen [Translation: Legal Training and Research Institute of Japan (editor)], Minjisoshou ni okeru jijitsu nintei [Translation: Fact-finding in Civil Litigation], p.145 (2007).

(2) BTC 39.132, ETH 560.48, SOL 11,887.98, and FTT 47,532 (the "Crypto Consideration"); and (3) 1,019,070 shares of FTX common stock (the "FTX Share Consideration"). (SPA Schedule 2.) I understand it to be undisputed that, on the Completion Date, FTX delivered to Mr. Melamed the Cash Consideration and the FTX Share Consideration.

11. The SPA also provided that FTX could retain some of the consideration to satisfy obligations that the sellers, including Mr. Melamed, might have in connection with a claim by FTX for indemnification or breach of representations and warranties under the SPA, which could arise after the Completion Date. (SPA § 4.1.) Specifically, the SPA states that FTX "shall withhold . . . the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders." (SPA § 2.4.) Pursuant to the SPA, on each of "the first anniversary" and "the second anniversary" of the Completion Date (*i.e.*, April 4, 2023, and April 4, 2024, respectively), FTX was required to "pay . . . [Mr. Melamed] 50% of the [withheld] Crypto Consideration."[4] (SPA § 4.2.)

12. The Side Letter, which accompanied the SPA, elaborated on Clause 4.2 of the SPA. The Side Letter stated: "The total amount of consideration to be paid by [FTX] to Mr. Melamed . . . shall be paid ratably on the Completion Date, the Second Completion Date and the Last Completion Date, provided, that the total amount of Crypto Consideration of Mr. Melamed, *which shall be withheld in its entirety by the Purchaser as Retained Consideration in accordance with clause 4 of the Major Shareholders SPA*, shall be paid on the Completion Date." (Side Letter § 2.1(d) (emphasis added).)

---

[4] The SPA permitted FTX to subtract from those payments "any amounts paid pursuant to Clause 4.1," which permitted FTX to use the Crypto Consideration "to fund any payment obligations of [Liquid] to [FTX] in respect of an [FTX] Warranty Claim and/or reasonably necessary to serve as partial security for an Indemnification Obligation." (SPA §§ 4.1, 4.2.)

13. Consistent with the SPA and the Side Letter, FTX withheld the total amount of the Crypto Consideration on the Completion Date.

14. Mr. Melamed's Claim No. 3385 alleges fraud and breach of contract claims against FTX and claims that he was damaged in an amount "not less than $35,613,112.19." (Claim 3385 ¶ 4.) Mr. Melamed appears to have calculated these damages by adding (i) "the purchase price of [his] Liquid Shares, less actual cash received from [FTX] prior to the Petition Date," and (ii) the value allocated in the SPA to the "Retained [Cryptocurrency] Consideration."[5] (*Id.*)

**FTX Did Not Breach the SPA or the Side Letter by
Withholding the Crypto Consideration and Not Paying It on April 4, 2022**

15. Certain things are clear from the plain language of the SPA and the Side Letter. FTX was permitted to withhold the entirety of the Crypto Consideration from Mr. Melamed on the Completion Date. FTX had an obligation to pay 50% of the Crypto Consideration on April 4, 2023 and 50% of the Crypto Consideration on April 4, 2024.

16. It is also clear that FTX was obligated to deliver specified amounts of cryptocurrency tokens, not any particular amount of U.S. Dollars or other fiat currency. The SPA states that the purchase price "will be satisfied" by payment of, among other types of consideration, "the types and amounts of digital assets . . . as set out in Schedule 2." (SPA § 2.2(c).) This clearly

---

[5] Mr. Melamed's claim also seeks indemnification. None of Mr. Melamed's claims appears to quantify the amount that he seeks in indemnification. Further, the damages that Mr. Melamed seeks is exactly equal to the cash equivalent to the purported value of the Crypto Consideration and FTX Consideration Shares as of November 19, 2021, as stated in the SPA. (SPA Sch. 2.) I therefore assume that Mr. Melamed's purported damages total does not include any indemnification amount.

and unambiguously means that Mr. Melamed had a right solely to the specific forms consideration set forth in the SPA.

17. Consequently, FTX did not breach the Agreements by retaining the Crypto Consideration beyond the Completion Date. The SPA is clear that FTX was not required to pay Mr. Melamed any of the Crypto Consideration until April 2023. The Side Letter, which states that "the total amount of Crypto Consideration of Mr. Melamed . . . shall be withheld in its entirety by [FTX] as Retained Consideration in accordance with clause 4 of the [SPA]," reaffirmed this agreement. (Side Letter § 2.1(d).) This interpretation of the SPA and the Side Letter is confirmed by the fact that the Side Letter expressly references the specific provisions of the SPA that are altered by the Side Letter (*i.e.*, Side Letter § 2.1 specifically states that "Notwithstanding clauses 2.3, 6.1 and 6.3 of the Major Shareholders SPA, . . . Mr. Melamed and the Purchaser hereby agree that . . . "). But the Side Letter made no change to the provision in the SPA permitting FTX to withhold the Crypto Consideration. Therefore neither Mr. Melamed nor FTX altered FTX's right to withhold the Crypto Consideration, as outlined in Clauses 2.4 and 4 of the SPA, when they executed the Side Letter.[6]

18. It is therefore clear that under Japanese law, the SPA and the Side Letter gave Mr. Melamed a contractual right to delivery of specific amounts of the Crypto Consideration on April 4, 2023 and April 4, 2024, *i.e.*, 50% of BTC 39.132, ETH 560.48, SOL 11,887.98, and FTT 47,532 on each date. It was thus not possible for FTX to breach the Agreements until those dates. Further, under Japanese law, the SPA gave Mr. Melamed a right to delivery of specific cryptocurrency tokens, not to any specific amount of cash. Therefore, as of November 11 and

---

[6] Further, both the SPA and the Side Letter contain entire agreement clauses that state the Agreements "set[] out the complete legal relationship of the parties arising from or connected with" the subject matter of the Agreements. (*See* SPA § 16.1; Side Letter § 6.)

14, 2022 (the dates on which FTX filed for bankruptcy under U.S. law) Melamed possessed at most a contractual right to the delivery of the specified cryptocurrencies set forth in the SPA.

### Mr. Melamed's Damages for a Fraud Claim Are Limited to the Value of His Stake in Liquid, Which Is Unknown

19. As noted, Mr. Melamed also purports to seek at least $35,613,112.19 as damages for his fraud claim.

20. As a general rule, damages for tort claims such as fraud are determined pursuant to Article 709 as well as 416 of the Japanese Civil Code.[7] The purpose of such damages is to restore the situation that would have existed had the wrongdoing not occurred.[8] Mr. Melamed claims that he was induced to sign the SPA based on misrepresentations FTX made to him. (Claim No. 3385 ¶ 24.) Mr. Melamed claims that had the allegedly fraudulent misrepresentations not been made, he would not have signed the SPA. Under Japanese law, Mr. Melamed's damages for his fraud claim, if any, would be calculated by determining the difference between the consideration Mr. Melamed received as part of the transaction and the true value of the Liquid shares and stock options that he sold to FTX pursuant to the SPA.

21. For instance, in a case where a plaintiff paid 28,990,000 JPY to purchase companies, the plaintiff argued that it would not have entered into the business transfer agreement but for the false representations made by one of the defendants. The Japanese court found that the plaintiff acquired assets worth 7,364,168 JPY. The plaintiff sought damages equivalent to the full amount paid. But the court rejected the plaintiff's damages argument, finding that the plaintiff's

---

[7] Supreme Court of Japan (First Petty Bench), June 7, 1973, Supreme Court Civil Cases Reports Compilation, Vol. 27, No. 6, p. 682.

[8] Supreme Court of Japan (First Petty Bench), January 28, 1964, Supreme Court Civil Cases Reports Compilation, Vol. 18, No. 1, p. 138.

damages were the difference between the amount paid and the actual value of what was acquired, rather than the full amount of the agreed-upon consideration. Accordingly, the court awarded the damages of 21,625,832 JPY, representing the difference between the payment amount (*i.e.*, 28,990,000 JPY) and actual value of the acquired assets (*i.e.*, 7,364,168 JPY).[9]

22. Consistent with this precedent, the damages of Mr. Melamed should be calculated based on the actual value of the Liquid shares, rather than the agreed consideration amount under the Agreements.

23. Under Japanese law, damages calculations of tort claims are limited to those with legally sufficient cause, and are determined on a case-by-case basis.[10] For example, in Mr. Melamed's case, a proper damages calculation would require knowing the true value of Mr. Melamed's Liquid shares and stock options that he sold to FTX.

24. The SPA purports to value, as of November 19, 2021, the Liquid common shares and stock options that Mr. Melamed owned prior to the Completion Date. I have no opinion at this time on the accuracy of that valuation. Although it may be considered evidence of the true value of the Liquid shares and stock options, it is not determinative. It is not clear how the price was determined.[11] Samuel Bankman-Fried and the other prior principals of FTX have been

---

[9] Tokyo District Court, May 30, 2005, Westlaw Japan 2005WLJPCA05300004, p. 10.

[10] Sakae Wagatsuma *et al.*, Wagatsuma • Ariizumi Commentary Minpou - Sousoku • Bukken • Saiken [Translation: Wagatsuma • Ariizumi Commentary Civil Code - General Provisions • Real Rights• Claims] (8th ed. 2022), p. 1556.

[11] I understand that Mr. Melamed has represented that in 2021, Liquid engaged investment banks while considering potential "public listing and SPAC transactions," and that, as part of that process, Liquid received "indicative valuations from the investment banks Nomura and Deutsche Bank with valuations of Liquid ranging from $600,000,000 to $1,000,000,000." (Melamed Decl. ¶ 18.) I note that both of the valuations were preliminary, and Nomura's indicative valuation was "highly dependent on" several assumptions, including that "new business initiatives can bring in more retail customers, resulting in higher fee take rate." (*Id.*, Ex. 1.) Thus, while the indicative

convicted of crimes relating to the misappropriation of assets, which they spent copiously on illiquid and opaque investments, often, it is alleged, without performing meaningful due diligence.[12] Without further evidence of the value of Mr. Melamed's Liquid common shares or stock options, it is not possible to calculate Mr. Melamed's purported fraud damages under Article 709 of the Japanese Civil Code.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 9, 2024


Taro Tanaka

---

valuations may be additional evidence of the true value of Liquid, in my opinion, neither is determinative of the true value.

[12]    For example, the Debtors in the Chapter 11 Cases have alleged that FTX invested $45 million into the hedge funds SkyBridge II and SkyBridge GP, *see* Skybridge Compl. ¶ 13, and that Debtor West Realm Shires, Inc. nearly completely forewent due diligence before purchasing Embed Financial Technologies Inc. for more than $200 million, *see* Embed Compl. ¶ 52. At Mr. Bankman-Fried's criminal trial, Nishad Singh, another former FTX executive, testified that he directed Debtor Alameda Research LLC to invest in Anthropic PBC without performing any due diligence on the company. Trial Tr. at 1500:18-1501:12.

# T A R O   T A N A K A

Japanese qualified lawyer with experience in litigation and dispute resolution
**Email**: tt1872@nyu.edu **Website**: LinkedIn
**Languages**: Japanese (native), English (fluent), French (beginner)

## P R O F E S S I O N A L   E X P E R I E N C E

**Miura & Partners** Nov 2024 – Present
*Partner* – Dispute Resolution Team (Tokyo)
Representing domestic and international clients in dispute resolution.

**Legal Action Worldwide (LAW)** Aug 2023 – Sep 2024
*Legal Advisor* – Rohingya Crisis Programme (Cox's Bazar, Bangladesh)
Represent Rohingya clients in ongoing international justice processes related to their treatment in Myanmar:
- Conduct screening, interviews, and draft witness statements for more than 50 Rohingya survivors of genocide, detailing atrocities committed during the 'clearance operations' committed by the Myanmar military in 2016 and 2017. This evidence was gathered in support of The Gambia's case against Myanmar at the International Court of Justice (ICJ).
- Conducted research and authored a report on the long-term impacts of sexual violence against the Rohingya in Myanmar and its link with the crime of genocide.
- Effectively work and liaise with colleagues and clients from diverse cultural backgrounds, including Bangla-speaking peers, ensuring seamless project execution and collaboration.

**UN Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict** Jan 2022 – Jul 2023
*Judicial Affairs Officer* - Team of Experts on the Rule of Law and Sexual Violence in Conflict (New York)
Assisted national authorities in ensuring accountability for perpetrators of conflict-related sexual violence:
- Successfully negotiated with government officials and inter-state organisations, securing essential funding, political backing, and collaboration on key initiatives.
- Conducted detailed legal analyses and produced legal memos on issues regarding sexual violence in counter-terrorism, human trafficking, and ongoing ICJ cases, providing necessary guidance for the office's operations.
- Drafted various legal documents, public statements, and official correspondence, including the Framework of Cooperation between the United Nations and the Ukrainian Government on the Prevention and Response to Conflict-Related Sexual Violence.
- Engaged effectively with all levels of management and peers, including high-ranking officials and team members from diverse cultural backgrounds; organised and led international conferences with various stakeholders, facilitating successful communication, coordination, and collaboration.

**UN Office of the High Commissioner for Human Rights (OHCHR)** Jan 2020 – Jan 2022
*Associate Human Rights Officer* - Human Rights Council & Treaty Mechanism Division (Geneva)
Provided legal and ops support for the Committee on the Elimination of Discrimination against Women (CEDAW):
- Conducted comprehensive investigations on human rights situations of State parties by reviewing a wide range of sources and conducting in-depth factual and legal analysis under international human rights law, and drafted concluding observations and follow-up assessments of Austria, Indonesia, Fiji, and the UK.
- Provided operational assistance for the CEDAW sessions, facilitating meaningful participation of the CEDAW members and other stakeholders from across the world.
- Managed a critical project to address a backlog of over one hundred State party report submissions for the CEDAW, ensuring processing and compliance with reporting obligations.

*Associate Human Rights Officer* - Special Procedures Branch (Geneva)
Provided legal and logistical support for the mandate of the Independent Expert on sexual orientation and gender identity (IE SOGI):
- Conducted investigations of various human rights violations of LGBT people under international human rights law across the world, including research; interviewing victims and stakeholders and securely documenting their testimonies; and drafting more than 60 legal letters with factual and legal analysis, which were sent to Member States.
- Engaged effectively with state officials, other UN bodies, and various stakeholders to garner political support and collaboratively lead key initiatives on LGBT human rights issues.
- Led legal research and drafting of four thematic reports on issues related to LGBT people, such as (i) "conversion therapy" (which facilitated the nationwide ban of "conversion therapy" in France and Canada) and (ii) the development of the "gender" concept in international human rights.
- Led the drafting of communication materials and thematic statements, including COVID-19 and its impact on the LGBT population (co-signed by 96 United Nations and regional human rights experts) and the right to freedom of religion and the right to live free from violence and discrimination based on SOGI (jointly issued by more than 100 experts).

**Freshfields Bruckhaus Deringer** Sep 2015 – June 2018
*Associate* - Dispute Resolution Team (Tokyo)
Represented domestic and international clients in dispute resolution and global investigation matters:
- Represented clients in domestic civil litigation (e.g., protection of a dismissed employee, a claim for unpaid bonuses, an application for refugee status) and international arbitration cases (e.g., an Energy Charter Treaty arbitration under the ICSID Rules between a Japanese company and the Spanish Government).
- Worked with colleagues across the world in handling multi-jurisdiction litigations, such as a recall of defective vehicles in Asia-Pacific and the Middle East.
- Investigated an embezzlement case for a global corporate client, including developing an investigation protocol, reviewing thousands of documents, preparing factual narratives, summarising evidence, drafting talking points, conducting interviews with relevant stakeholders, and documenting testimonies.
- Conducted in-depth factual and evidence analysis and advised clients on various complex legal issues, such as (i) advising the Japanese Government on the post-war settlement issue between Japan and South Korea under the 1965 Treaty on Basic Relations between Japan and Korea and (ii) advising international clients on the impact of Japanese economic sanctions measures.
- Provided presentations and training to international clients and the Japanese Government on a range of issues, including international arbitration, global investigations, and sanctions.

**Mori Hamada & Matsumoto** Jan 2014 – Aug 2015
*Associate* - Dispute Resolution & Corporate Team (Tokyo)
Represented clients in dispute resolution and corporate matters:
- Represented domestic and international companies in domestic civil litigation cases, such as a share purchase demand.
- Conducted in-depth research and analysis on complex legal issues in corporate transactions, corporate governance (e.g. the impact of foreign countries' regulations regarding bribery), and disputes (e.g., a mandatory recall of defective products); drafted complex corporate agreements and preparing legal advice memoranda to foreign clients.
- Conducted global investigations and large-scale due diligence on global companies within short deadlines, including a multinational company's fraudulent accounting claim and an M&A transaction between an Indian and a Japanese company.
- Provided pro bono criminal defense, prepared legal briefings, and interviewed clients and witnesses.

# E D U C A T I O N

**New York University School of Law,** *Master of Laws in International Legal Studies (LL.M.)* **(New York, USA)**   2018-2019
Honours: Fulbright Scholarship; Dean's Graduate Award

**Keio University Law School,** *Juris Doctor* **(Tokyo, Japan)**   2010-2012
Honours: Graduated in the highest GPA group (within the top 5%); Yachiyo City Mita-kai Scholarship; Japan Students Services Organization Category 1 Graduate Students Loan Repayment Exemption for Outstanding Achievement

**Waseda University School of Law,** *Bachelor of Arts in Law* **(Tokyo, Japan)**   2006-2010

# P U B L I C A T I O N S

- *General Introduction of Investment Treaty Arbitration* (2018), co-author (only available in Japanese)
- *Investment Treaty Arbitration – the essential method to compensate damages of foreign investment*, December 2016 edition of The Lawyers (2016) (only available in Japanese)
- *General Introduction of Global Investigation* (2016), co-author (only available in Japanese)
- *Combating Bribery of Foreign Public Officials and Practical Responses - Global Compliance for Companies Expanding Overseas* (2014), co-author (only available in Japanese)