# EXHIBIT B

CONFIDENTIAL

# CRYPTOCURRENCY PURCHASE & SALE AGREEMENT

This CRYPTOCURRENCY PURCHASE & SALE AGREEMENT (this "Agreement"), is made and entered into on October __, 2024, by and among Maclaurin Investments Ltd., an International Business Company organized under the Laws of the Republic of Seychelles ( "Seller"), and [BUYER], an [_____] organized under the Laws of [_____] ("Buyer", and together with Seller, the "Parties", and each a "Party").

WHEREAS, on November 11, 2022 and November 14, 2022, Seller and certain of its affiliates (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "Bankruptcy Code") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

WHEREAS, on September 13, 2023, the Bankruptcy Court entered (a) the *Order Authorizing and Approving (i) Guidelines for the Sale or Transfer of Certain Digital Assets, (ii) the Sale or Transfer of Such Digital Assets in Accordance with Such Guidelines Free and Clear of Any Liens, Claims, Interests and Encumbrances, (iii) the Debtors' Entry Into, and Performance Under, Postpetition Hedging Arrangements, Including Granting Liens and Superpriority Administrative Expense Claims in Connection Therewith and (iv) the Debtors to Stake Certain Digital Assets* [D.I. 2505] (the "Digital Assets Sale Order"), which, among other things, established certain sales procedures in connection with the sale of the Debtors' digital assets (the "Sale Procedures") and (b) the *Order Authorizing FTX Trading Ltd. to Enter Into, and Perform Its Obligations Under, the Investment Services Agreement* [D.I. 2504], which authorized the Debtors to enter into, and perform its obligations under, an investment services agreement (as may be amended, amended and restated, modified or supplemented from time to time, the "IMA") in respect of certain assets;

WHEREAS, on February 8, 2024, the Bankruptcy Court entered the *Order Authorizing FTX Trading Ltd. to Enter Into, and Perform Its Obligations Under, the Letter Agreement to Second Amended and Restated Services Agreement* [D.I. 7136] and, in connection therewith and the IMA, the Debtors authorized the sale of the Cryptocurrency (as defined below) pursuant to the IMA;

WHEREAS, Seller holds [_____] WLD Tokens that are subject to the Transfer Restrictions (such WLD Tokens, the "Cryptocurrency") and desire to sell, transfer and deliver the Cryptocurrency to Buyer pursuant to the Digital Assets Sale Order, the IMA, the Sale Procedures and section 363 of the Bankruptcy Code, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transaction pursuant to the Digital Assets Sale Order and have approved this Agreement;

WHEREAS, Buyer desires to purchase from Seller the Cryptocurrency on the terms and subject to the conditions set forth herein, pursuant to the Digital Assets Sale Order, the IMA, the Sale Procedures and section 363 of the Bankruptcy Code; and

WHEREAS, the Parties acknowledge and agree that the Transaction is being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its affiliates and

Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisition by Buyer of the Cryptocurrency.

NOW THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE I.

## SALE AND PURCHASE OF THE PURCHASED CRYPTOCURRENCY

Section 1.1    Purchase and Sale of Cryptocurrency.  Pursuant to sections 105 and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, Seller agrees to sell, assign, convey, transfer and deliver to Buyer, and Buyer agrees to purchase and accept from Seller, the Cryptocurrency in exchange for the Purchase Price (such purchase of the Cryptocurrency, the "Transaction"), which Cryptocurrency shall be free and clear of any Liens other than Permitted Encumbrances.

Section 1.2    Settlement.

(a)    Within five (5) days following the later of (i) the date of this Agreement and (ii) notification to Buyer by each of BitGo, Inc. ("BitGo") and Galaxy Digital Capital Management LP ("Galaxy") of the completion of all applicable KYC Procedures (the "KYC Notification," and such time period, the "Settlement Window"), Buyer shall pay to Seller the Purchase Price by transfer of immediately available funds pursuant to instructions delivered by Seller (the date of receipt of such payment, the "Payment Date").

(b)    On or before the end of the Settlement Window, Buyer shall:

   (i)    First, if there does not remain in effect as of the date hereof one or more agreements between Buyer and BitGo substantially similar in substance to the form attached as Exhibit B hereto, execute the Custody Agreement with BitGo;

   (ii)   Second, establish with BitGo a digital wallet suitable for receipt of the Cryptocurrency ("Buyer's Wallet") to the extent Buyer's Wallet does not already exist; and

   (iii)  Third, identify in writing Buyer's Wallet (including the network address of such Buyer's Wallet) to Seller and to BitGo (in the case of BitGo, pursuant to the procedures on BitGo's standard user interface.

(c)    Seller shall, as soon as reasonably practicable following the Payment Date, deliver or cause to be delivered to Buyer the Cryptocurrency in a transaction or a series of transactions (the "Transfer"), it being understood that Seller shall have no obligation to take any action under this Section 1.2 to effectuate the Transfer before the end of the first business day following the latest to occur of (i) Buyer's establishment and identification to Seller and BitGo of Buyer's Wallet, (ii) the completion of all Standard Control Operating Procedures (as defined below), (iii) the Payment Date and (iv) the taking of all such action by TFH as may be reasonably necessary for Seller to effectuate the Transfer. Once the Transfer has been

effectuated, the Transaction shall be deemed to be finally and irrevocably settled (the date the Transfer has been effectuated, the "Settlement Date").

(d) Buyer agrees to comply with, and cooperate with Seller, BitGo and Galaxy in the completion of, any procedures that Seller, BitGo or Galaxy may reasonably request to facilitate (i) any "know-your-customer," anti-money laundering, sanctions compliance and similar procedures and reviews (collectively, the "KYC Procedures") and (ii) the settlement of the transfer of the Cryptocurrency to Buyer's Wallet, including callback verification procedures, address whitelisting and test transaction confirmations (the "Standard Control Operating Procedures").

(e) The Parties may agree in writing (including through electronic written communications) to alter or supplement any of the settlement procedures set forth in this Section 1.2.

Section 1.3    Termination Rights.

(a) In the event Seller fails to receive the Purchase Price within the Settlement Window, or if Buyer shall have breached any of its obligations under Section 1.2(b), Seller may in its sole discretion terminate this Agreement and the Transaction and shall be entitled to all remedies they may have under this Agreement and under Law, including with respect to cost of cover and similar damages (the "Specified Damages").

(b) In the event Seller fails to effectuate the Transfer prior to the ninetieth business day following the Payment Date (the "Long-Stop Date"), Buyer may in its sole discretion terminate this Agreement and the Transaction; provided, that such termination right shall not be available to Buyer if Buyer shall have breached (i) its obligation under Section 1.2(a), or (ii) any of its obligations under Section 1.2(b), Section 1.2(d) or Section 4.1 to the extent such breach shall have proximately contributed to Seller's failure to effectuate the Transfer prior to the Long-Stop Date.

(c) In the event Seller fails to effectuate the Transfer prior to the Long-Stop Date, Seller may in its sole discretion terminate this Agreement and the Transaction; provided, that such termination right shall not be available to Seller if Seller shall have breached any of its obligations under Section 1.2 or Section 4.1 to the extent such breach shall have proximately contributed to Seller's failure to effectuate the Transfer prior to the Long-Stop Date.

(d) In the event BitGo or Galaxy communicates to Seller that it is unable to timely or satisfactorily complete its applicable KYC Procedures with respect to Buyer, Seller may in its sole discretion terminate this Agreement and the Transaction and shall be entitled to all remedies it may have under this Agreement and under Law, including with respect to Specified Damages.

(e) In the event TFH does not complete necessary actions in order to effectuate the transfer of WLD Tokens, Seller may in its sole discretion, terminate this agreement and Transaction.

(f) Seller may at any time terminate this Agreement if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transaction or failing to terminate this Agreement would be inconsistent with their or any such Person's or body's fiduciary duties.

(g) In the event of any termination of this Agreement pursuant to Section 1.3(f) Seller shall promptly return to Buyer any portion of the Purchase Price that Buyer has paid to Seller hereunder, and neither Buyer nor Seller shall have any further rights or remedies hereunder.

Section 1.4    No Withholding.  Notwithstanding any other provision of this Agreement, any payment under this Agreement shall be payable without any withholding or deduction. If Buyer reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, the Parties shall use commercially reasonable efforts to mitigate or eliminate any such withholding or deduction.

Section 1.5    Transfer Taxes.  All Transfer Taxes arising from or relating to the consummation of the Transaction shall be borne by Buyer, regardless of the Party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.

Section 1.6    No Partnership Intended.  Nothing in this Agreement nor the Custody Agreement shall be deemed or construed to create a partnership, joint venture or other similar arrangement for any federal, state, municipal or other income tax purposes.

ARTICLE II.

DEFINITIONS

Section 2.1    Definitions.  In addition to the capitalized terms defined elsewhere in this Agreement, the following capitalized terms shall have the meanings specified in this Article II:

"Action" shall mean any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"CEA" shall mean the Commodity Exchange Act, as amended from time to time.

"CFTC" shall mean the U.S. Commodity Futures Trading Commission.

"Custody Agreement" shall mean, as applicable, (a) an agreement substantially in the form attached as Exhibit B hereto or, if there remains in effect as of the date hereof one or more agreements between Buyer and BitGo substantially similar in substance to the form attached as Exhibit B hereto, then (b) such agreements

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Foreign Bank" shall mean an organization that (a) is organized under the Laws of a non-U.S. country, (b) engages in the business of banking, (c) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (d) receives deposits to a substantial extent in the regular course of its business, and (e) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.

"Foreign Shell Bank" shall mean a Foreign Bank without a Physical Presence in any country, but does not include a regulated affiliate.

"Governmental Entity" shall mean any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement,

shall include the CFTC, SEC and any state securities authority or other regulatory authority or organization having jurisdiction over Seller, the Debtors, their respective wholly owned subsidiaries or Buyer.

"Issuance Agreements" means the contractual agreements that govern the issuance of the Cryptocurrency (as they may be amended) by TFH.

"Law" or "Laws" shall mean any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction, including without limitation the Bankruptcy Court.

"Liens" shall mean security interests, liens, mortgages, hypothecations, pledges, claims (pending or threatened), rights of first refusal, charges, escrows, encumbrances or similar rights.

"OFAC" shall mean the United States Office of Foreign Assets Control. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/.

"Order" shall mean any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Permitted Encumbrance" shall mean a restriction on transfer arising solely under applicable federal and state securities Laws and the Transfer Restrictions.

"Person" shall mean any individual, corporation, partnership, association, limited liability company, trust, estate or other entity, either individually or collectively.

"Physical Presence" shall mean a place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank (a) employs one or more individuals on a full-time basis, (b) maintains operating records related to its banking activities, and (c) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

"Purchase Price" shall mean an amount in cash equal to $[_____].

"SEC" shall mean the U.S. Securities and Exchange Commission.

"TFH" means Tools for Humanity Corp.

"Transfer Taxes" shall mean any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

"Transfer Restrictions" means the restrictions on the Cryptocurrency (i) set forth on Exhibit A hereto; and (ii) that may be imposed by TFH pursuant to the Issuance Agreements.

"USDC" shall mean USD Coin, the Circle Internet Financial, LLC digital stablecoin pegged to, and redeemable on a 1:1 basis for, the U.S. Dollar.

"WLD Tokens" means the cryptocurrency issued and created by TFH.

ARTICLE III.

REPRESENTATIONS AND WARRANTIES

Section 3.1  Seller Representations and Warranties. Seller represents and warrants to Buyer, as of the date hereof, the Payment Date and the Settlement Date:

(a)  Seller is an entity duly organized and validly existing in good standing (to the extent such concept is applicable) under the Laws of its jurisdiction of organization. Subject to compliance with the Sale Procedures and any other Order entered by the Bankruptcy Court applicable to the Transaction, Seller has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite company action on the part of Seller.

(b)  Subject to compliance with the Digital Assets Sale Order, the IMA, the Sale Procedures and any other Order entered by the Bankruptcy Court applicable to the Transaction, this Agreement has been duly executed and delivered by Seller and (assuming due authorization, execution and delivery by the other Parties), this Agreement constitutes a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other Laws of general application affecting enforcement of creditors' rights generally.

(c)  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, conflicts with, violates or constitutes a default under (i) any of Seller's organizational documents, (ii) any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any Governmental Entity to which Seller is subject or by which any of its assets or properties are bound, or (iii) any agreement, debt or other instrument to which Seller is a party or by which any of its assets or properties are bound, except, in each case, for such conflicts, violations, or defaults that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the value of the Cryptocurrency.

(d)  Neither Seller, nor any Person who controls Seller (i) bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time to time, or is a person or entity with whom dealings are prohibited or limited under any economic or trade sanctions regimes maintained or enforced by the United States, the European Union, the United Kingdom, the Cayman Islands, or the United Nations; (ii) is a Foreign Shell Bank; or (iii) resides in or has transferred cash or digital assets from or through an account in a country or jurisdiction that has been designated as subject to a "call for action" or countermeasures by the Financial Action Task Force on Money Laundering.

(e)  Subject to the Digital Assets Sale Order and compliance therewith, upon consummation of the Transaction, Buyer will be vested with good and valid title to the Cryptocurrency, free and clear of any and all Liens other than Permitted Encumbrances.

(f)  Seller is an "eligible contract participant" as such term is defined in section 1a(18) of the CEA.

(g) Seller has adequate information concerning the Cryptocurrency and the networks to which the Cryptocurrency is native, to make an informed decision regarding the sale of the Cryptocurrency. Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the issuers of the Cryptocurrency, and the networks to which the Cryptocurrency is native, that is not known to Seller and that may be material to a decision to purchase or sell the Cryptocurrency ("Seller Excluded Information"), (ii) Seller has determined to sell the Cryptocurrency notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller, and Seller waives and releases any claims that it might have against Buyer, whether under applicable securities laws (including non-United States securities laws) or otherwise, with respect to the nondisclosure of the Seller Excluded Information, in each case in connection with the sale of the Cryptocurrency and the transactions contemplated by this Agreement. Seller acknowledges and understands that the Cryptocurrency may substantially increase in value after the date hereof and that such Seller shall not be entitled to any such gains with respect to the Cryptocurrency. Seller understands that Buyer will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

(h) Other than the representations and warranties set forth in Section 3.2 and Section 5.5 Buyer has not made, and Buyer disclaims, any other representations or warranties, whether express or implied, and whether made by Buyer, any affiliate of Buyer or any of Buyer's or its affiliates' respective representatives

Section 3.2    Buyer Representations and Warranties.  Buyer hereby represents and warrants to Seller, as of the date hereof, the Payment Date and the Settlement Date:

(a) Buyer is an exempted limited company duly organized, validly existing and in good standing under the Laws of Cayman Islands. Buyer has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been, to the extent necessary, duly authorized by all requisite company action on the part of Buyer.

(b) This Agreement has been duly executed and delivered by Buyer and (assuming due authorization, execution and delivery by Seller), this Agreement constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other Laws of general application affecting enforcement of creditors' rights generally.

(c) Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, conflicts with, violates or constitutes a default under (i) any of Buyer's organizational documents, (ii) any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Buyer is subject or by which any of its assets or properties are bound, or (iii) any agreement, debt or other instrument to which Buyer is a party or by which any of its assets or properties are bound, except, in each case, to the extent that such conflicts, violations or defaults would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement. The execution and delivery by Buyer of this Agreement and the performance by Buyer of its obligations hereunder will not require any registration, filing, consent or approval under any Law, judgment, writ, decree, permit or license, or any consent or approval of any other party to Buyer's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon Buyer.

(d) Neither Buyer, nor any Person who controls Buyer (i) bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time to time, or is a

person or entity with whom dealings are prohibited or limited under any economic or trade sanctions regimes maintained or enforced by the United States, the European Union, the United Kingdom, the Cayman Islands, or the United Nations; (ii) is a Foreign Shell Bank; or (iii) resides in or has transferred cash or digital assets from or through an account in a country or jurisdiction that has been designated as subject to a "call for action" or countermeasures by the Financial Action Task Force on Money Laundering.

(e)     Buyer is the lawful owner of Buyer's Wallet and has good title thereto. Buyer's Wallet is owned and operated solely for the benefit of Buyer, and no Person, other than Buyer, has any right, title or interest in Buyer's Wallet.

(f)     Notwithstanding anything herein to the contrary, Buyer acknowledges that Seller may utilize wallets on an exchange to settle the Transaction and that such "hot wallets" are not owned and operated solely for the benefit of Seller.

(g)     Buyer intends to, and will, take physical delivery (within the meaning of the CEA and the rules and regulations of the CFTC promulgated thereunder) of the Cryptocurrency pursuant to the Transaction.

(h)     Buyer is an "eligible contract participant" as such term is defined in section 1a(18) of the CEA.

(i)     Buyer is an institutional accredited investor as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7), (a)(8), (a)(9), (a)(12) or (a)(13) under the Securities Act of 1933, as amended (the "Securities Act").

(j)     Buyer acknowledges and agrees that the enforceability of this Agreement against Seller is subject to compliance with the Digital Assets Sale Order, the IMA the Sale Procedures and any other Order entered into by the Bankruptcy Court applicable to the Transaction.

(k)     Buyer agrees, understands and acknowledges that Seller is not providing and will not provide any fiduciary, advisory, exchange or other similar services with respect to Buyer, any person related to or affiliated with Buyer, or the Transaction subject to this Agreement. Buyer is fully aware of: (i) the fact that the Cryptocurrency and the markets for the Cryptocurrency, are, by their nature, highly experimental, risky, and volatile; (ii) the possibility that the network to which the Cryptocurrency is native may never fully be developed, and to the extent developed, may not function as intended; (iii) the possibility that the network to which the Cryptocurrency is native may fail to attract sufficient interest from key stakeholders and the general public; (iv) the possibility that the network to which the Cryptocurrency is native (and/or the individuals or entities behind it) may be subject to investigation and enforcement actions from Governmental Entities that could, among other things, restrict or prohibit transactions in the Cryptocurrency or substantially increase the costs of such transactions, (v) the substantial uncertainty as to the application of securities, financial, and other laws to tokens and other digital assets, and that the interpretation of existing laws or new laws may affect the regulatory status of the Cryptocurrency, the offer or sale of the Cryptocurrency, and the use of the network to which such Cryptocurrency is native; (vi) the possibility that the Cryptocurrency may be deemed to be subject to transfer restrictions under U.S. or non-U.S. securities laws, and if so, may not be sold or otherwise transferred except if registered or pursuant to an exemption from such registration requirements and otherwise in compliance with such applicable laws; (vii) the cost and speed of transacting with the Cryptocurrency, which is variable and may increase dramatically at any time; (viii) the fact that cryptography is a progressing field with advances in code cracking and other technical advancements, such as the development of quantum computers, which may present risks to the Cryptocurrency, including theft and loss; (ix) the irreversibility of Cryptocurrency transactions, and the potential for loss due to human error; (x) the financial hazards involved; (xi) the qualifications and backgrounds of the management of Seller; and (xii) the tax consequences of acquiring the Cryptocurrency.

Buyer further acknowledges and agrees that (A) Buyer is solely responsible for any decision to enter into the transactions subject to this Agreement, including the evaluation of any and all risks related to any such transaction with the advice of such advisors as Buyer deems appropriate, and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits, risks and suitability of the transactions contemplated hereby and is financially capable of bearing a total loss of the Cryptocurrency; (B) in entering into any such transaction, Buyer has not relied on, and expressly disclaims any reliance on, any statement or other representation of Seller other than as expressly set forth herein; (C) other than the representations and warranties set forth in Section 3.1 and Section 5.5, Seller has not made, and Seller disclaims, any other representations or warranties, whether express or implied, and whether made by Seller, any affiliate of Seller or any of Seller's or its affiliates' respective representatives; and (D) the Cryptocurrency is being transferred "as is", "where is" and "with all faults" and without any indemnity to Buyer.

(l)     Buyer has adequate information concerning the Cryptocurrency, and the networks to which the Cryptocurrency is native, to make an informed decision regarding the purchase of the Cryptocurrency. Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the issuers of the Cryptocurrency, and the networks to which the Cryptocurrency is native, that is not known to Buyer and that may be material to a decision to purchase or sell the Cryptocurrency ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Cryptocurrency notwithstanding its lack of knowledge of Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws (including non-United States securities laws) or otherwise, with respect to the nondisclosure of the Buyer Excluded Information, in each case in connection with the purchase of the Cryptocurrency and the transactions contemplated by this Agreement. Buyer acknowledges and understands that the Cryptocurrency may decrease in value after the date hereof and that Buyer may suffer losses in value with respect to the Cryptocurrency. Buyer understands that Seller will rely on the accuracy and truth of the foregoing representations, and Buyer hereby consents to such reliance.

Section 3.3     Limitation on Liability. Buyer acknowledges and agrees that Seller shall not be liable for any loss, liability or damage resulting from or in connection with (i) any acts that Seller may take in accordance with or in reliance upon instructions from Buyer, BitGo, Galaxy or TFH in satisfying its obligations hereunder (except to the extent Seller's conduct in complying with such instructions constitutes gross negligence, fraud or willful misconduct, as finally determined in a judicial proceeding by a court of competent jurisdiction), (ii) any act or omission (including insolvency) or delay of any third party, including any blockchain provider, bank, digital wallet provider or digital currency exchange or any of their agents or subcontractors, including any failure by BitGo to comply with any instructions delivered by Seller pursuant to Section 1.2 or (iii) any interruption or delays of service, system failure or errors in the design or functioning of any electronic system and Seller shall be entitled to rely upon any notice, certificate, instrument, demand, request, direction, instruction, waiver, receipt, consent or other document or communication furnished hereunder or by BitGo, Galaxy or TFH in connection herewith, and upon advice and statements of legal counsel, independent accountants and other experts selected by Seller in good faith, and Seller shall have no responsibility to make any investigation into the facts or matters stated in any notice, certificate, instrument, demand, request, direction, instruction, waiver, receipt, consent or other document or communication furnished to them hereunder or by BitGo, Galaxy or TFH in connection herewith.

## ARTICLE IV.

## COVENANTS

Section 4.1　Bankruptcy Matters.

(a)　Buyer shall appear in the Bankruptcy Court if reasonably requested by Seller or required by the Bankruptcy Court in connection with the Transaction. Each Party shall keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing such other Party with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Transaction, solely to the extent such notices or other communications are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its outside legal counsel.

(b)　The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's approval of the Transaction. Seller shall promptly provide Buyer and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller have in their possession (or receive) related to the Transaction, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its outside legal counsel.

(c)　If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agree to use their commercially reasonable efforts to defend against such appeal, petition or motion, and Buyer agrees to cooperate reasonably in such efforts.

## ARTICLE V.

## MISCELLANEOUS

Section 5.1　Amendments; Waivers.　The provisions of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited by the provision had it not been waived. No consent with respect to any action or omission shall operate as a consent to, waiver of, or estoppel with respect to, any other or subsequent action or omission.

Section 5.2　Rights and Remedies.　No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy or power provided herein or by Law or at equity.

Section 5.3　Assignment; Successors and Assigns.　This Agreement will be binding on and inure to the benefit of the Parties and their respective successors, heirs, personal representatives, and permitted assigns. Buyer may not assign or delegate its rights or obligations hereunder without the prior written consent of Seller, which may be withheld in Seller's sole discretion, and any purported assignment in violation of this Section 5.3 will be void.

Section 5.4　Severability.　Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this

Agreement is held to be prohibited by or invalid under applicable Law, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such prohibited or invalid provision and (b) such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 5.5    Descriptive Headings and Construction.    The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. Unless otherwise indicated, references to Articles and Sections herein are references to Articles and Sections of this Agreement. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

Section 5.6    Interpretation.

(a)    As used in this Agreement, references to:

(i)    the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    this Agreement refers to this Agreement and the Exhibits to it; and

(iii)    all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)    Wherever this Agreement requires a Party to take an action, the requirement constitutes an undertaking by the Party to cause its subsidiaries, and to use its commercially reasonable efforts to cause its affiliates, to take appropriate action in connection therewith.

(c)    Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation". Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

Section 5.7    Governing Law.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)    Without limiting a Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Cryptocurrency, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the

jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 5.10; provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of (A) the United States District Court for the District of Delaware (the "District Court"), or in the event (but only in the event) that the District Court does not have subject matter jurisdiction over such Action, (B) the Delaware Court of Chancery, or in the event (but only in the event) that the District Court does not have subject matter jurisdiction over such Action and the Delaware Court of Chancery either lacks or declines to exercise subject matter jurisdiction over such Action, (C) the Delaware Superior Court – Complex Commercial Litigation Division, in each case for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each Party consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 5.10; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)    Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

Section 5.8    Entire Agreement.  This Agreement, including any Exhibits hereto, contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, written or oral, between the Parties with respect thereto. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, express or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

Section 5.9    Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be an original, but all such counterparts taken together shall constitute one and the same instrument. Transmission by telecopy, email or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

Section 5.10    Notices, Consents, etc.  Any notices, consents or other communications required or permitted to be sent or given hereunder by any of the Parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally to a Party, (b) sent to a Party by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered to a Party by a recognized overnight courier service, (d) sent to a Party via email or via other electronic means of communication identified as acceptable in this Agreement and agreed upon by the Parties, or (e) sent to a Party at the addresses as set forth below or at such other addresses as may be furnished in writing.

If to Seller:

Maclaurin Investments Ltd.

Attention: Raj Perubhatla
Email: rperubhatla@rlks.net

*With copies (which shall not constitute notice) to*:

Galaxy Digital Capital Management LP
Attention: FTXGalaxyOps
Email: FTXGalaxyOps@galaxy.com

Landis Rath & Cobb LLP
919 N. Market Street, Suite 1800
Wilmington, DE 19801
Attention: Matthew B. McGuire
Telephone: (302) 467-4400
Email:    mcguire@lrclaw.com

If to Buyer:

[INSERT]

Date of service of such notice shall be (i) the date such notice is personally delivered or sent by email, (ii) three (3) business days after the date of mailing if sent by certified or registered mail, or (iii) one (1) business day after date of delivery to the overnight courier if sent by overnight courier.

Section 5.11    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each Party and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

Section 5.12    Expenses.  Except as otherwise provided in this Agreement, each Seller and Buyer shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement or the Transaction. This Section 5.12 shall survive the termination or expiration of this Agreement.

Section 5.13    No Survival of Representations and Warranties or Covenants.  No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Settlement Date, except for covenants and agreements that by their terms are to be satisfied after the Settlement Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 5.14    Specific Performance.

(a)    Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause Buyer to consummate the Transaction and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 5.14 will be in addition to any other rights which a Party may have at Law or in equity pursuant to this Agreement.

(b) Each Party hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Buyer or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Buyer or Seller, as applicable, under this Agreement all in accordance with the terms of this Section 5.14.

Section 5.15    Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transaction, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of their estate.

Section 5.16    Damages. Without prejudice to Specified Damages, no Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

Section 5.17    Derivatives and Securities Law Matters. The Parties agree and acknowledge that: (i) the Transaction is not a "swap" transaction as defined in 7 U.S.C. §1a(47)(A) and the rules and regulations promulgated under the CEA by the CFTC; (ii) the Transaction is not a "security-based swap" as defined in 15 U.S.C. § 78c(a)(68) and the rules and regulations promulgated under the Exchange Act by the SEC and (iii) if the Transaction is deemed a securities transaction, the Parties agree that such transaction was effected in reliance on Rule 144 under the Securities Act.

[*Signature page follows*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

**Maclaurin Investments Ltd.**

By: _____
    Name: _____
    Title: _____

**[Buyer]**

By: _____

**EXHIBIT A**

**EXHIBIT B**

{1368.002-W0077723.2}
4894-5813-2417 v.4