## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD.,[1] | Case No. 22-11068 (JTD) |
| Debtor. | (Jointly Administered) |

**Hearing Date: February 27, 2025 at 10:00 a.m. (ET)**
**Objection Deadline: February 7, 2025 at 4:00 p.m. (ET)**

### MOTION OF HYUNG CHEOL LIM, AIMED, INC., BLOCORE PTE., LTD., JI WOONG CHOI, AND MOSAIC CO. LTD. FOR AN ORDER, PURSUANT TO RULES 3001 AND 3020(d) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND 11 U.S.C. §§ 105(a) AND 1142(b), FOR LEAVE TO AMEND PROOF OF CLAIM NO. 87144 TO CORRECT CLAIMANT'S NAME AND ADDRESS

Hyung Cheol Lim ("**Lim**"), his wholly owned entities, Aimed, Inc. ("**Aimed**") and Blocore Pte., Ltd. ("**Blocore**"), Ji Woong Choi ("**Choi**"), and Mosaic Co. Ltd. ("**Mosiac**" and together with Lim, Aimed, Blocore, and Choi, collectively, the "**Principals**"), by and through their attorneys, Venable LLP, respectfully submit this *Motion For an Order, Pursuant to Rules 3001 and 3020(d) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 105(a) and 1142(b), For Leave to Amend Proof of Claim No. 87144 to Correct Claimant's Name* (this "**Motion**") seeking an order, substantially in the form attached hereto as **Exhibit B**, granting the Principals leave to amend Proof of Claim No. 87144 (the "**Proof of Claim**") filed by their agent against the above-captioned debtors (the "**Debtors**") to correctly identify the Principals, rather than the agent, as the claimant so that the Principals may timely complete the Debtors' KYC process and ensure receipt of a distribution from the estate on account of their claim. In support of this Motion, the Principals submit (i) the *Declaration of Hyung Cheol Lim In Support of*

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https: //cases.ra. kroll. com/FTX.

*Motion For Leave to Amend Proof of Claim No. 87144* (the "**Lim Declaration**"), (ii) the

*Declaration of Ji Woong Choi In Support of Motion For Leave to Amend Proof of Claim No.*

*87144* (the "**Choi Declaration**"), (iii) the *Declaration of Andrew Glantz In Support of Motion*

*For Leave to Amend Proof of Claim No. 87144* (the "**Glantz Declaration**"), and (iv) the

Declaration of Professor Soogeun OH, Professor Emeritus at Ewha Womans University in Seoul,

Korea and an expert on Korean commercial law, company law, and bankruptcy law (the "**OH**

**Declaration**"), and respectfully state as follows:

## PRELIMINARY STATEMENT

1.     By this Motion, the Principals seek to correct a ministerial defect in the Proof of

Claim. [2]  It has come to the Principals' attention that their investment agent, Junho Bang

("**Bang**"), filed the Proof of Claim evidencing an approximately $59 million customer claim (the

"**Claim**") against the Debtors, approximately 95% of which represents the Principals' interests

and 5% of which *may* represent the interests of two other small investors. [3]  Rather than file the

Proof of Claim as the Principals' agent, identifying the Principals as the creditors, Bang

mistakenly filed the Proof of Claim in his own name and failed to check the box on the Proof of

Claim form marked "I am the creditor's authorized agent."  Consequently, it is currently Bang

that must successfully pass KYC approval in order for distributions to be made on the Claim.

Bang, however, is currently incarcerated in South Korea and is unlikely to be able to complete

any KYC procedures.  In order to rectify Bang's error and preserve the Principals' distributions,

---

[2] A copy of the Proof of Claim is attached hereto as **Exhibit A**.

[3] The Principals have served notice of this Motion on the two smaller investors who, prepetition, deposited digital assets with Bang but whose digital assets are likely to have been withdrawn by Bang from his FTX Account weeks or months before the Petition Date.  In addition, as the Certificate of Service to the Motion will attest, service has been made on all entities or persons of which the Principals are aware that may have an interest in the Claim.

the Principals seek leave of the Court to amend the Proof of Claim and substitute their name for

Bang's name as the initial holder of the Claim.

2.      Pursuant to the Investment Agreements (as defined below), and as more

particularly set forth in the OH Declaration, the Lim Declaration, and the Choi Declaration, Bang

served as the Principals' agent to invest some of their digital assets (the "**Entrusted Assets**") on

certain approved exchanges, including FTX.  As their agent, Bang was permitted to file the Proof

of Claim in the Debtors' chapter 11 cases to preserve their Entrusted Assets, but he should have

indicated on the Proof of Claim, as the Official Form requires, that the *Principals* were the

creditors and that he was signing and filing the Proof of Claim solely as their agent.

3.      The Debtors' Joint Chapter 11 Plan of Reorganization (the "**Plan**")[4] provides that,

for the Debtors to implement the Plan's distribution provisions, holders of Customer Entitlement

Claims must have their claims "verified" by the Original Holder of the claim (i.e., as of the

Petition Date), at which point the claim becomes an "Allowed Customer Entitlement Claim," and

then, again, "verified" by the current holder of the claim to receive the Plan distribution to which

they are entitled.  Verification includes satisfying the Debtors' KYC process.  The Claim is listed

on the Debtors' amended schedules as an undisputed, non-contingent, liquidated claim.[5]

Verification aside, the Claim is entitled to a distribution under the Plan, but such distribution

may be forfeited if the Original Holder and the current Holder (as those terms are defined in the

Plan) cannot timely complete the KYC process.  *See* Plan §§ 2.1.8, 2.1.47, and 7.14.

---

[4] The Plan was confirmed by order of the Court dated October 8, 2024 [Dkt. No. 26404] (the "**Confirmation Order**") and became effective January 3, 2025.

[5] On March 15, 2023, the Debtors scheduled the Claim as an undisputed, non-contingent, liquidated claim.  On June 17, 2023, the Debtors amended their schedules, and scheduled the Claim as a contingent claim.  On January 23, 2024, the Debtors again amended their schedules, and scheduled the Claim as a non-contingent claim.

4.      Bang is currently incarcerated in South Korea following his conviction for
fraudulent acts undertaken after the Petition Date (which he has appealed).  It is likely impossible
for Bang to timely and satisfactorily complete the Debtors' KYC process, or timely file
pleadings with this Court to amend the Proof of Claim.  Each of the Principals can, however,
timely and fully satisfy the pre-distribution requirements, and, as the true claimants under the
Proof of Claim, should be given an opportunity to do so.

5.      On November 22, 2024, the Debtors filed their *One Hundred Thirtieth (Non-
Substantive) Omnibus Objection to Unverified Customer Entitlement Claims* [Dkt. No. 28225]
(the "**KYC Objection**"), claiming that 451,735 customer claimants have not yet commenced the
KYC submission process and requesting that this Court set a timeline for customers to
commence and complete the KYC submission process or else forfeit their distributions and
disallow their claims.[6]  The Proof of Claim is listed in the KYC Objection as evidencing a claim
that is not yet verified.

6.      Time is of the essence, as the Debtors seek to have March 1, 2025 scheduled as
the deadline for unverified customer claimants to start the KYC process and June 1, 2025 as the
deadline for completing the process.  *KYC Objection* at ¶ 31.  The fact that the Principals are not
named in the Proof of Claim has already impaired their substantive rights, as they did not receive
notice of the KYC Objection until December, when the Principals' newly-retained U.S. counsel
became aware of the KYC Objection as it applied to the Claim.  The Principals respectfully
submit that, while amending the Proof of Claim before March 1, 2025 to correct the identity of
the creditor(s) and their addresses will have no effect on the Debtors or their estates, the failure

[6] Certain customer claimants have filed objections to the KYC Objection, which is currently scheduled to be heard
by this Court on January 23, 2025.

4

to timely amend the Proof of Claim will continue to impair the Principals' substantive rights and will most likely force the Principals to forfeit their distributions under the Plan. [7]

7.      Given the Debtors' timeline, if this Court cannot determine whether to grant leave to the Principals to amend the Proof of Claim so that they may commence the KYC submission process prior to March 1, 2025, or this Court determines that it cannot grant leave to amend the Proof of Claim without a further determination as to the ownership of the Claim, then the Principals respectfully request that this Court enter an order, pursuant to section 1142(b) of the Bankruptcy Code and Bankruptcy Rule 3020(d), directing the Debtors or the Plan Administrator (as that term is defined in the Plan) (i) to permit each of the Principals, and any other party that appears in this Court and asserts an ownership interest, as of the Petition Date, in the Claim, to commence the KYC submission process for the Claim before the March 1, 2025 deadline and (ii) reserve all distributions on account of the Claim until the Court can make a determination regarding amending the Proof of Claim and/or ownership of the Claim.

8.      The Principals' request arises from a set of deceptions perpetrated by Bang that have made the Principals' ability to preserve their distributions more challenging.  First, as more fully set forth in this Motion and in the Lim Declaration and the Choi Declaration, when rumors abounded that the Debtors were in financial distress, before the Petition Date, Bang sent messages to each of the Principals on Telegram telling them that he had (i) transferred the bulk of their digital assets to another exchange (which he never did) and (ii) that any losses the Principals would have otherwise incurred from Bang's inability to liquidate his positions and

---

[7] Indeed, by granting the relief requested, the Debtors and this Court will be responsive to the Debtors' concern that "the inadequate prepetition practices and recordkeeping increase the risk that the Debtors might allow claims of, and ultimately make distributions to, customers in violation of contractual protections and applicable law." KYC Objection ¶ 2.

return the Entrusted Assets would be replenished with Bang's own digital assets resulting in a deemed transfer of Bang's entire ownership interest in his FTX account to the Principals.

9.      Second, for many months after the Petition Date, Bang delivered false account statements to the Principals reflecting profits they were making on the Principals' Entrusted Assets that were allegedly transferred off of the FTX exchange in order to keep the Principals unaware of the real status of their assets.

10.     Third, on January 18, 2023, Bang purportedly assigned htis rights against FTX to Lemma Technologies, Inc. ("**Lemma**"), a Panamanian entity in which, upon information and belief, Bang is the sole shareholder.  Bang had no power or authority to execute such an assignment and did not inform the Principals about the assignment until July 2023. The Principals believe that the Proof of Claim may have initially been filed in Lemma's name.  If true, Lemma, too, should have filed the Proof of Claim in the Principals' name, checking the box labeled "I am acting as the creditor's authorized agent."[8]

11.     Finally, on June 16, 2023, Bang secretly, and without the Principals' consent or authorization, caused his lawyer to execute a trade confirmation on behalf of Lemma (the "**Svalbard Trade Confirmation**") with Svalbard Holdings, Limited ("**Svalbard**") to sell the Principals' Claim to Svalbard.[9]  Lemma never closed a transaction with Svalbard (nor could it, as neither Bang nor Lemma were authorized by the Principals to sell their Claim), and Svalbard has filed a complaint against Lemma in the State of New York for breach of contract under the

---

[8] Despite numerous efforts, the Principals have been unable to obtain a copy of the originally filed proof of claim (e.g., Kroll cannot provide a copy because of this Court's confidentiality order and Bang is incarcerated without access to his computer or cellphone.

[9] Bang or his lawyer also executed a second trade confirmation with Svalbard reflecting a second proof of claim that Bang (or Lemma) had filed against the Debtors (Proof of Claim No. 50458), but in which it is unclear whether the Principals have an ownership interest.  At this time, the Principals are not seeking to amend any proofs of claim relating to that second claim.  Rather, the Principals are hereby only reserving their rights with respect to the second claim.

terms of the Svalbard Trade Confirmation.  Upon information and belief, Svalbard has not

completed service of its complaint on Lemma.

12.      Despite the foregoing, Bang's various deceptions do not change the fact that the

Proof of Claim reflects the *Principals'* Claim against FTX for *their* lost Entrusted Assets which

Bang, as their agent, deposited on the FTX exchange, and, days before the Petition Date, became

unable to retrieve and return to the Principals as required under the Investment Agreements.

Accordingly, the Principals are the true owners of at least 95% of the Claim (and most likely

100% of the Claim) and, to preserve their right to implement the KYC-related distribution

provisions of the Plan and receive their distributions upon satisfaction of such provisions, the

Proof of Claim must, and should, be amended to reflect their ownership status.[10]

13.      In this District, as in many others, proofs of claim are ordinarily freely amendable,

even post-bar date, so long as the initial claim gave adequate notice of the existence, nature, and

amount of the claim.  This is particularly true where the purpose of the amendment is to cure a

defect in the originally filed claim, describe the original claim with more particularity, or plead a

new theory of recovery on the facts set forth in the original claim.  Indeed, at least one circuit

court has granted leave to amend where an agent filed a claim in its own name and failed to

indicate the identity of the true claimant, which is exactly the situation in this case.

14.      Upon information and belief, the Proof of Claim was originally filed in paper

form using the Debtors' customized version of the Official Proof of Claim Form. The Claim was

also listed on Schedule F-16 of the Debtors' schedules.[11]  After the Debtors amended their

schedules in June 2023, Bang accessed the FTX customer claims portal (the "Claims Portal") to

---

[10] The Principals have served notice of this Motion on each of the smaller investors.
[11] The Debtors scheduled the Claim as Schedule No. 6781810.  The Principals have the unique customer code assigned to the Claim by the Debtors and will disclose it to the Court, if the Court thinks it would be helpful, either in-camera or in any other way the Court may require.

accept the scheduled composition and amount of digital assets constituting the Claim.

Acceptance generated an online proof of claim form, again created by the Debtors, which Bang

electronically executed in his own name, mistakenly marking the box stating, "I am the creditor."

Regardless of the identity of the creditor, the Debtors clearly had timely and adequate notice of

the existence, nature and amount of the Claim.

15.     The Principals seek to amend the Proof of Claim only to correct the identity of the

creditor, the address to which notices should be sent, and the address to which payments should

be made, none of which will change the nature or amount of the Claim, assert a new or different

claim against the Debtors, or affect the Debtors or their estates in any way. By correcting the

identity of the creditor, the Principals, rather than their incarcerated agent, will be able to

complete the KYC process, have the Claim verified by the Debtors, and satisfy the Debtors' sole

objection to the Claim.

16.     If, however, the Principals are not timely granted leave to amend the Proof of

Claim, then, through no fault of their own, and solely as a result of Bang's misunderstanding of

how to complete the Proof of Claim form, the Principals will be unfairly and irreparably harmed

by having their distributions forfeited. The facts underlying this Motion present a compelling

reason for this Court, in the furtherance of justice and equity, to grant leave to amend the Proof

of Claim to correct the identity of the creditor and the addresses to which notices and payments

are to be made.

## JURISDICTION AND VENUE

17.     The United States Bankruptcy Court for the District of Delaware has jurisdiction

over these chapter 11 cases and this matter under 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference from the United States District Court for the District of Delaware,

dated February 29, 2012. Pursuant to Section CC of the Confirmation Order, this Court retained jurisdiction over matters related to the Plan after confirmation and consummation thereof.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

18.    Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Principals consent to entry of a final judgment or order with respect to this Motion.

19.    Venue of these chapter 11 cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

20.    The statutory predicates for the relief requested herein are sections 105(a) and 1142(b) of 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 3001 and 3020 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

### The Investment Agreements between the Principals and Bang

21.    Lim is a Korean national and is the sole shareholder of Aimed and Blocore; Aimed is a Republic of Korea entity and Blocore is a Singapore entity.  Choi is a Korean national and a managing director of Mosaic, a corporation organized under the laws of the Republic of Korea.

22.    From June 2022 to November 11, 2022, the Principals each separately executed certain discretionary investment agreements with Bang (or his authorized representative, Joon Song) (collectively, the "**Investment Agreements**"), pursuant to which Bang agreed to provide certain express, limited investment services to each of the Principals.  Translated copies of the applicable Investment Agreements are attached as exhibits to the Lim Declaration and the Choi

Declaration.[12]   At the time, Lim and Choi were unaware of each other or that they were both Bang's clients.

23.     The Investment Agreements (which are all substantially similar) are governed by Korean law and set forth the terms and conditions on which Bang agreed to act as the Principals' agent to invest and manage their Entrusted Assets.  Pursuant to the Investment Agreements, the Principals identified specific digital assets that they owned and entrusted to Bang to manage and invest according to a specified investment strategy, in exchange for which Bang had the right to earn an agency commission or "performance fee."   The Investment Agreements contained certain key provisions as follows:

> a.   The purpose of the Investment Agreements was to "define the necessary terms and conditions under which Party B [Bang] provides discretionary investment services for Party A's [Principals'] virtual currency investments . . .". Investment Agmt. Art. 1.
>
> b.   The scope of Bang's rights with respect to the Entrusted Assets was to make decisions about the "type, item, acquisition/disposition, method of acquisition/disposition, quantity, price, and timing" of investments. Investment Agmt. Art. 2.  Nothing in the Investment Agreements suggests that the Principals intended to transfer, or had transferred, ownership of the Entrusted Assets to Bang.

---

[12] All documents attached as exhibits to the Lim Declaration and the Choi Declaration, other than screenshots of the November 2022 Telegrams (as hereinafter defined), that have been translated from Korean to English were translated by a certified translator as required by Rule 604 of the Federal Rules of Evidence, made applicable to chapter 11 cases by Bankruptcy Rule 9017.  A copy of the translator's attestation is attached to the respective exhibit to which the attestation applies.

c. The Principals instructed Bang to invest the Entrusted Assets on five (5) specific exchanges; Bang could not add exchanges to the list of approved investments platforms without the Principals' express consent. Investment Agmt. Art. 7.

d. The Principals mandated that Bang use a particular investment strategy (i.e., an absolute return strategy) with respect to their Entrusted Assets, and Bang was obligated to consult with the Principals if he wished to use an alternative strategy. Investment Agmt. Art. 12.4.

e. *At any time during* the term of the Investment Agreements, the Principals could request a return of the principal and profits of their Entrusted Assets, and Bang was obligated to comply with the request.  Investment Agmt. Art. 4.

f. Bang was obligated to maintain a system to prevent "conflicts of interest" between the Principals and Bang and between the Principals and other of Bang's clients, presumably to identify Bang's investment of digital assets on a client-by-client basis and to calculate his carried interest fee. Investment Agmt. Art. 3.  Indeed, every six (6) months, Bang was to return to the Principals their Entrusted Assets, net of Bang's fee, and the Principals could then choose to deliver all or a portion of the Entrusted Assets back to Bang to reinvest. Investment Agmt. Art. 4.6.

g. Bang was responsible for any Entrusted Assets that he failed to return to the Principals. Art. 8.

11

        h.  Bang was charged with any other necessary matters related to the

            management of the Entrusted Assets (which presumably included filing a

            proof of claim if necessary), including twice-weekly reporting on the

            Principals' profits and losses. Investment Agmt. Art. 2.3 and Art. 12.1.

24.     Consistent with the Principals' understanding and intent in entering into the

Investment Agreement, and under Korean law, the Investment Agreements created a

"principal/agency" relationship between each of the Principals, on the one hand, and Bang, as

their agent, on the other hand.  OH Declaration at §§ 4.6 and 6.    In the opinion of Professor OH,

under Korean law, the Investment Agreements created an agency relationship between the

Principals and Bang such that the Principals' Entrusted Assets remained their personal property

even after Bang invested them on the FTX exchange.

25.     Similarly, under Delaware law, because the Principals retained sufficient direction

and control over the investment of their Entrusted Assets by Bang, and Bang agreed to provide

his investment services subject to the Principals' control and for the Principals' benefit, the

Investment Agreements would be deemed agency agreements, and Bang would be deemed to be

the Principals' agent with respect to the Claim.

26.     At all relevant times, the Principals intended and understood that Bang was their

agent under the Investment Agreements and that he neither had unlimited control over, nor any

ownership interest in, the Entrusted Assets (or in any claims flowing from such assets).  Lim

Declaration at ¶¶ 5-6; Choi Declaration at ¶¶ 5-6.  Moreover, as more fully set forth in paragraph

36 below and in the Glantz Declaration, the Principals, through their professionals, Xclaim and

CF Investigators Inc., have confirmed through analysis of transactions recorded on public

blockchain networks, account data provided to the Principals by Bang via the Claims Portal, and

the Investment Agreements that, within hours or minutes of Bang's receipt of the Entrusted

Assets, he caused the Entrusted Assets to be deposited to his FTX account relating to the Proof

of Claim. Glantz Declaration at ¶ 13.

**Bang's Fraudulent Activities Post-FTX Petition Date**

27.    FTX filed for chapter 11 relief on November 11, 2022 (the "**Petition Date**").  A

few days prior to the Petition Date, when rumors abounded that the Debtors were in financial

distress, Bang sent several messages through Telegram (collectively, the "**November 2022**

**Telegrams**") to each of the Principals, separately notifying them that he was concerned about the

FTX exchange and what he planned to do to protect their assets.  Translated copies of the

November 2022 Telegrams are attached to both the Lim Declaration and the Choi Declaration as

**Exhibits D, E, and F.** [13]

        a.    On November 7, 2022, Bang sent a message through Telegram (and spoke

           to Choi on the telephone) informing the Principals that he wanted to

           transfer the bulk of their Entrusted Assets from the FTX account to

           another exchange.  He stated further that, if "FTX's structural issues

           prevent withdrawals or cause a loss of funds, we will cover these losses

           with internal funds to ensure there is no loss to our investors." Lim

           Declaration, Exhibit D; Choi Declaration, Exhibit D.

        b.    On November 8, 2024, Bang sent a message through Telegram informing

           each of the Principals that he had successfully transferred 70% of their

           Entrusted Assets to Binance and that their assets were now safe.  Lim

           Declaration, Exhibit E; Choi Declaration, Exhibit E.  In fact, Bang had not

---

[13] The translations of the November Telegrams are automated translations provided by the Telegram system, and, as such, the Principals submit comply with the requirements of Rule 604 of the Federal Rules of Evidence.

transferred the Entrusted Assets because FTX had already frozen all

trading activity by November 8th, but, at the time, Bang did not admit that

to the Principals.

c.  On November 10, 2022, Bang sent another message through Telegram to

the Principals in which he stated, "we are currently considering it difficult

to recover the assets currently in FTX and are planning to process them as

losses.  And as we have mentioned online, we plan to deduct the amount

of loss tied up in FTX from the assets of the operator, Bang Jun-ho,

currently in operation."  Lim Declaration, Exhibit  F; Choi Declaration,

Exhibit F.

d.  Bang's decision to cede his digital assets (in the FTX account in which the

Principals' Entrusted Assets had been deposited) to the Principals' to

compensate them for any lost assets is consistent with his responsibilities

under the Investment Agreement to "compensate for the loss to ensure the

preservation of Party A's [the Principals'] investment funds and profits"

set forth in Article 8 of the Investment Agreements.

28.     For several months after the Petition Date, Bang delivered twice weekly

fraudulent investment statements to the Principals, claiming that their Entrusted Assets were

continuing to earn a profit.  The Principals never suspected that the statements were false or that

Bang was deceiving them. Lim Declaration at ¶ 12; Choi Declaration at ¶ 12.

29.     On January 18, 2023, Bang executed an Assignment Agreement with Lemma (the

"**Lemma Assignment Agreement**"), purportedly assigning all of Bang's rights in his two FTX

accounts to Lemma, including Bang's rights to file claims against any debtor in any bankruptcy

14

or restructuring proceeding involving such debtor with respect to his FTX accounts.  Nothing in the Investment Agreements gave Bang the power to assign to Lemma any rights in the Claim, none of the Principals ever consented to the Lemma Assignment Agreement, and none of the Principals were aware that Bang had assigned his rights to Lemma.  Lim Declaration at ¶ 24; Choi Declaration at ¶ 24

30.    Upon information and belief, but unbeknownst to the Principals at the time, in May or early June 2023, Bang began negotiating for the sale of his clients' claims against FTX, including claims based on the Principals' Entrusted Assets, with Svalbard, a company managed by Attestor Limited ("**Attestor**").  These negotiations apparently culminated in the execution of two Trade Confirmations, each dated as of June 16, 2023, each between Svalbard and Lemma, one for the Claim and one for a second, larger claim that Bang or Lemma has asserted against FTX.  Nothing in the Investment Agreements gave Bang the right to execute a trade confirmation with respect to the Claim, nor did the Principals ever consent to a trade confirmation being executed in connection with their Claim.  Lim Declaration at ¶ 22; Choi Declaration at ¶¶ 21-22.[14]

31.    In fact, it wasn't until a meeting held at Bang's offices on June 26, 2023 (the "**June 26, 2023 Meeting**") that Bang first informed the Principals that he was considering selling the Principals' Claim against FTX to Svalbard/Attestor.  Lim Declaration at¶ 19; Choi Declaration at ¶ 19.  They did not know that Bang had, without their consent, already executed

---

[14] Neither Bang nor Lemma closed the sale of the Proof of Claim to Svalbard, and Svalbard has commenced an action against Lemma in the Supreme Court of the State of New York (Index No. 650457/2024) for breach of the Svalbard Trade Confirmation. Svalbard seeks either specific performance of the Svalbard Trade Confirmation (which is unenforceable, as Lemma does not have the power or authority to sell the Proof of Claim) or money damages.

the Svalbard Trade Confirmation on behalf of Lemma. Lim Declaration at ¶ 19; Choi

Declaration at ¶ 19.

32.     It was at the June 26, 2023 Meeting that the Principals first met each other.  After

this meeting, Lim and Choi decided to work together to recover their Entrusted Assets, and they

have cooperated with each other on this matter ever since.  Lim Declaration at ¶ 21; Choi

Declaration at ¶ 20.

33.     On June 23, 2023, Bang executed a Statement of Fact (the "**June 23, 2023**

**Statement of Fact**")[15] in favor of Choi and Mosaic, in which Bang confirmed that (i) his

authority under the Investment Agreements was limited to investment decision-making for the

Principals' Entrusted Assets, (ii) at any time, the Principals under the Investment Agreement

could withdraw the invested principal and profits, (iii) the Entrusted Assets were currently held

in his FTX account, (iv) the Entrusted Assets had been "reported to" (i.e., a proof of claim had

been filed with) the Bankruptcy Court, (v) he was in the process of trying to sell the FTX claims,

and (vi) because the ownership of the Entrusted Assets remained with the Principals, any

distributions from the FTX bankruptcy case would be made to the Principals. A translated copy

of the June 23, 2023 Statement of Fact is attached as **Exhibit G** to both the Lim Declaration and

the Choi Declaration.

34.     Subsequently, on September 26, 2023, Bang supplemented the June 23, 2023

Statement of Fact with a Confirmation of Fact (the "**September 26, 2023 Confirmation of**

**Fact**"), a translated copy of which is attached as **Exhibit H** to both the Lim Declaration and the

Choi Declaration.  According to the September 26, 2023 Confirmation of Fact, Bang had two

accounts on the FTX exchange, one for approximately $59 million (corresponding to the Claim)

---

[15] In Korea, a Statement of Fact and Confirmation of Fact is a sworn statement similar to affidavits in the United States.

(the **FTX Account**),[16] and the other for approximately $106 million.[17]  Bang admitted that the Entrusted Assets were frozen on the FTX exchange and that, consistent with the November 2022 Telegrams and his responsibility under Article 8 of the Investment Agreements to compensate for lost assets, he had intended 100% of the FTX Account to be ceded to the Principals. September 26, 2023 Confirmation of Fact ¶ 4; November 2022 Telegrams; Investment Agreement at Article 8.

35.     In late October 2024, the Principals engaged Venable LLP to represent them in the Debtors' chapter 11 cases in connection with the Claim and the Proof of Claim and retained Xclaim to provide claim analytics, claim validation, and market valuation services.[18]

**The Records Indicate That the Principals Are the Owners of the Claim**

36.     Xclaim has independently reviewed public blockchain ledgers, associated wallet addresses, and private, secure FTX account data provided to FTX account holders by the Debtors to trace the flow of the Entrusted Assets from the Principals to Bang and from Bang to his FTX accounts.  After reviewing this information, and after reviewing additional analysis performed at Xclaim's direction by cryptocurrency investigations firm CF Investigators Inc. using TRM Labs and Chainalysis investigations software, Xclaim has confirmed that (a) Bang caused all of the Principals' Entrusted Assets to be deposited directly on the FTX exchange within minutes or hours of Bang's initial receipt of the Entrusted Assets and (b) consistent with Bang's obligations in the Investment Agreements, at no point between the time he received the Entrusted Assets and the time he caused such assets to be deposited with FTX did Bang trade, exchange, convert,

---

[16] The value of this claim is an estimate based on the prevailing asset prices of digital assets as of the Petition Date.
[17] The second account (which corresponds to claim number 50458) is not the subject of this Motion, and the Principals are simply reserving their rights with respect to that claim at this time.
[18] Contemporaneously with the filing of this Motion, Venable is filing a Bankruptcy Rule 2019 Statement disclosing its representation of the Principals in the Debtors' bankruptcy cases.

divide, or manipulate the Entrusted Assets or cause such assets to become comingled with his own assets or the assets of third parties. Glantz Declaration at ¶ 13.

37.     In addition, based on the FTX account data provided by Bang to the Principals, which the Principals provided to Venable and Xclaim on or about January 13, 2025, including account balances and derivative positions as of the Petition Date for Bang's main account and all subaccounts and historical transaction data such as deposits, withdrawals, and on-exchange transactions to, from, and within his main account and subaccounts, Xclaim was able to verify that Bang deposited all of the Principals' Entrusted Assets in the FTX Account that relates to the Proof of Claim.  Glantz Declaration at ¶ 15.

38.     Xclaim also verified that Bang deposited certain digital assets other than the Entrusted Assets to the FTX Account related to the Proof of Claim.  These deposits include (a) deposits of approximately $4.7 million of digital assets from a third party ("**Investor A**") (priced as of the Petition Date), (b) deposits of approximately $2.0 million of digital assets from another third party ("**Investor B**") (priced as of the Petition Date), and (c) deposits of approximately $18.4 million of digital assets (priced as of the Petition Date) which, upon information and belief based on Bang's books and records, represent Bang's own digital assets.  Glantz Declaration at ¶ 17.

39.     Given (i) the November 2022 Telegrams, in which Bang acknowledged his responsibility to cover all losses of Entrusted Assets that he could not withdraw from the FTX exchange and his intention to deem the Principals owners of enough of his assets on the FTX exchange to cover those losses, (ii) the September 26, 2023 Confirmation of Fact, in which Bang reiterated that the Principals would own the entire Claim to cover their losses, and (iii) Article 8 of the Investment Agreements, which compels Bang to compensate the Principals for any lost

18

assets to "ensure the preservation of [the Principals'] investment funds and profits," it is clear that, as of the Petition Date, the Principals were owners of at least 95% of Bang's FTX Account that relates to the Proof of Claim.  November 2022 Telegrams, September 26, 2023 Confirmation of Fact at ¶4; Investment Agreement Art. 8.

40.     It is likely, however, that the Principals actually own 100% of the Claim.  Records from FTX show that Bang withdrew approximately $35 million in digital assets (valued as of the Petition Date) in the months prior to the Petition Date.  Glantz Declaration at ¶ 18. Given Bang's statements in the June 23, 2023 Statement of Facts and the September 26, 2023 Confirmation of Facts, the Principals understand that none of *their* Entrusted Assets were transferred off the FTX exchange and that Bang considered the Principals to be entitled to at least 100% of the Claim to cover their losses (and perhaps a portion of the second, larger claim which is not the subject of this Motion).  It is, therefore, reasonable to assume that the digital assets he withdrew prepetition were predominantly his own assets, all the assets of Investor A (who, based on Bang's books and records, has been paid in full by Bang), and potentially all of Investor B's assets such that, as of the Petition Date, the Principals owned 100% of the Claim.

41.     As noted above, the Principals have served notice of this Motion on both Investor A and Investor B.  The Principals respectfully submit that, if neither Investor A nor Investor B appear before this Court and show that they had an ownership interest, as of the Petition Date, in the FTX Account and the Claim, then, consistent with the September 26 Confirmation of Fact, this Court should find that the Principals own 100% of the Claim and should be considered the sole creditors under the Proof of Claim.

**The Only Defect in the Proof of Claim is Ministerial in Nature**

42.       The Claim was listed on Schedule F-16 of the Debtors' schedules.  After the

Debtors amended their schedules in June 2023, Bang accessed the Claims Portal to accept the

amount and type of digital assets making up the Claim.  Acceptance generated an online proof of

claim form, again created by the Debtors, which Bang electronically executed in his own name,

mistakenly marking the box, "I am the creditor." Clearly, between their own schedules and the

Proof of Claim filed by Bang, the Debtors had timely and adequate notice of the existence,

nature and amount of the Claim.

43.       The Debtors have not objected to the Claim or to the Proof of Claim other than to

identify it as unverified in the KYC Objection.  The Claim is, therefore, a Customer Entitlement

Claim that would be Allowed and entitled to distribution upon verification.

44.       The only defect in the Proof of Claim are ministerial defects.  First, Bang

identified himself as the creditor rather than the Principals and checked the box, "I am the

creditor," rather than checking the box, "I am the creditors' authorized agent."  Second, the

address at which distributions should go should be the Principals' addresses, as they are the

creditors entitled to distributions on the Claim.  Finally, as a matter of practicality, given that

Bang is incarcerated, at a minimum, the Principals' counsel, Venable LLP, should be added to

the contact on the Proof of Claim to receive notices so that the Principals are aware of the filing

of pleadings that might affect the Claim.  While these are not substantive defects, the mistakes

will cause material detrimental consequences to the Principals if not timely corrected.

45.       In the Debtors' chapter 11 cases, to implement the distribution provisions of the

Plan, customer creditors who have a Customer Entitlement Claim must complete a ministerial

KYC process.  It is likely impossible for Bang to timely and satisfactorily complete this process

while he is incarcerated in Korea, nor can he seek leave to amend and correct the Proof of Claim.

Indeed, upon information and belief, Bang lacks sufficient privileges to submit the required KYC

materials through the FTX Claims Portal and generally has limited and unreliable access to

emails.

46.     Meanwhile, because Bang incorrectly failed to mark the "agent" box on the Proof

of Claim, the Principals cannot access the customer claim portal to commence the KYC process.

If the KYC process is not commenced by March 1, 2025, the Principals will forfeit their

distribution, even though they are each capable of timely and satisfactorily completing the KYC

process. There is, therefore, a compelling reason to amend the Proof of Claim to substitute the

Principals (the true creditors) for Bang as the original named creditor. Moreover, if the notice

and distribution addresses on the Proof of Claim are not also corrected, the Principals will not

receive notices related to the Claim (as has already happened at least once) and will not receive

their distributions, as Bang is in a Korean detention center.

## RELIEF REQUESTED AND REASONS THEREFOR

47.     By this Motion, the Principals seek permission to amend and correct the Proof of

Claim to substitute the Principals' names for Bang's name, the Principals' addresses for Bang's

addresses, and adding Venable as a notice contact, so that the Principals can timely complete the

Debtors' pre-distribution requirements and preserve their distributions under the Plan.  In the

alternative, if this Court cannot grant leave to amend the Proof of Claim prior to March 1, 2025,

then the Principals request this Court direct the Debtors or the Plan Administrator to reserve the

distributions that would otherwise be made on account of the Claim and provide the Principals

(and anyone else who timely appears before this Court asserting an ownership interest, as of the

Petition Date, in the Claim) with access to the Claims Portal or otherwise let them begin the KYC process.

**Proofs of Claim Are Freely Amendable**

48.   According to the Bankruptcy Rules, a proof of claim "should conform substantially to the appropriate Official Form." Bankruptcy Rule 3001(a).  Bankruptcy Rule 3001(b) provides that a proof of claim may be signed by the creditor or an authorized agent of the creditor.  Thus, the drafters of the Bankruptcy Rules contemplated that, if a creditor's authorized agent was signing the proof of claim, the agent must identify itself as such.  *See In re Unioil, Inc.*, 962 F.2d 988, 992-93 (10th Cir. 1992) (failure of agent to identify the actual creditor and disclose its role as an agent of the creditor was a defect in the proof of claim that should be remedied by an amendment).

49.   Official Form B-410 is the National Official Bankruptcy Form for proofs of claim.  Form B-410 requires, among other things, the name of the creditor, whether the creditor is signing the form or whether an authorized agent is signing the form on behalf of the creditor, the name and address to which notices should be sent, and the name and address to which distributions should be delivered.  *See* Form B-410 of the National Official Bankruptcy Forms.

50.   Bang neither identified the Principals as the owners of the digital assets in his FTX Account nor the true creditors for which he was acting as agent. Moreover, he failed to disclose that he was signing as an agent on behalf of the Principals. These defects, alone, can and should be remedied by an amendment to the Proof of Claim, substituting the Principals' names for Bang's name as the creditor.

51.   Furthermore, as a practical matter, the address on the Proof of Claim to which notices should be sent no longer serves any purpose, as Bang is in prison, not at the address set

forth in the Proof of Claim.  Similarly, the address for payments is both incorrect (as distributions should be sent to the creditor) and inadequate to serve any purpose (as Bang cannot access anything sent to the address listed on the Proof of Claim).  Therefore, the Proof of Claim should be amended to add Venable LLP for notice purposes and the Principals' designated address for receipt of payments and distributions.

52.    Proofs of claim are ordinarily freely amendable in this district so long as the initial claim gave adequate notice of the existence, nature, and amount of the claim. *See In re Onion Ref. Corp.*, 317 B.R. 660, 664 (Bankr. D. Del. 2004), citing *Interface Group-Nevada v. TWA (In re TWA)*, 145 F.3d 124, 140 (3d Cir. 1998) ("It is well-settled that amendments to timely proofs of claim are liberally allowed"); *Acthar Ins. v. Mallinckrodt plc (In re Mallinckrodt plc)*, 2022 U.S. Dist. LEXIS 147924, *6 ("Generally, 'amendments to proofs of claim should be freely allowed where the purpose is to cure defects in a claim as originally filed . . .'"); *Plains Mktg., L.P. v. Bank of Am., N.A. (In re Semcrude, L.P.)*, 443 B.R. 472, 477, (same). Where an amendment is sought post-bar date, courts in this District have scrutinized the amendment to ensure that the amendment is not a disguised "new claim," but even where an amendment might assert a new claim, where there is no prejudice to the estate, courts will allow the amendment. *Onion*, 150 B.R. at 665 (where debtor had previously scheduled the creditor's claim as a priority tax claim, but creditor had failed to check the priority box on its proof of claim, creditor would be permitted to amend the claim after debtor deleted the claim from its schedules even though the amendment was untimely).  Finally, at least one Circuit Court has granted leave to amend a proof of claim on facts very similar to the instant case.  In *Unioil, Inc.*, 962 F.2d 988, 992-93 (10th Cir. 1992), a trustee of a trust had filed a proof of claim but failed to indicate that he was merely the agent for the trust.  The court granted leave to the trustee to file an amendment to the

claim post-bar date to correct the mistake, holding that proofs of claim are freely amendable to correct defects, the amendment did not change the claim in any way other than to substitute one party for another, and the debtors would not be prejudiced in any way by the correction.

53.     In this case, the Proof of Claim was filed using the Debtors' customized electronic proof of claim form.  The Claim was also listed on the Debtors' schedules, and Bang accepted the scheduled claim on October 6, 2023.  Accordingly, the Debtors clearly had timely and adequate notice of the existence, nature and amount of the Principals' Claim.  Amending the Proof of Claim to correct the identity of the creditor will neither change the existence, nature or amount of the Claim, assert a new claim, nor affect the Debtors or their estates in any way.

54.     At least one court in this District has found that amending a claim post-effective date requires a showing of good cause.  *See CBS Outdoor Inc. v. NextMedia Group Inc. (In re NextMedia Group Inc.)*, 2011 U.S. Dist LEXIS 115541, *10 (D. Del. Oct. 6, 2011), citing *In re Winn-Dixie Stores, Inc.*, 639 F.3d 1053, 1056 (11th Cir. 2011) ("While it is not impossible to amend a claim after a plan of reorganization has been confirmed and rendered effective, a party must generally show good cause to do so.").

55.     In this case, there is a compelling reason to grant the Principals leave to amend the Proof of Claim. Distributions under the Debtors' Plan require timely and satisfactory completion of the KYC process or else such distributions may be forfeited.  The KYC Objection, if granted, has made it clear that, despite there being no objection to the Claim itself, the Claim may be expunged if it cannot be verified by March 1, 2025.  Given that Bang is currently incarcerated in South Korea, is either not receiving notices or unable to communicate to the Principals regarding such notices, and it will be impossible for him to timely or satisfactorily complete the KYC process, the Principals' distribution will likely be unnecessarily forfeited,

even though the Principals, themselves, could otherwise satisfy the Debtors' KYC requirements

and preserve their distributions.  There is, therefore, good cause to grant the Principals leave to

amend the Proof of Claim.

56.    Based on applicable law, the balance of justice clearly requires that the Court

grant the Principals leave to amend.  Neither the Debtors nor their estates will be affected in any

way by amending the Proof of Claim.  The Debtors acknowledged the nature and size of the

Claim when they listed the Claim on their schedules; the scheduled Claim was accepted by Bang,

and nothing in the relief requested in the Motion seeks to change the nature or amount of the

Claim.  Not granting leave to amend the Proof of Claim, however, will have devastating

consequences to the Principals. Accordingly, justice requires that the Principals be granted leave

to amend the Proof of Claim to correct the identity of the creditor, the address on which to serve

notice, and the address for making distributions, so that the Principals can preserve their

distributions under the Debtors' Plan.

**The Investment Agreements Created a Principal/Agency Relationship**

57.    The Investment Agreements are governed by Korean law. Oh Declaration at ¶ 15.

Under the Korean Civil Code and Commercial Code and analogous case law, the Investment

Agreements create a "principal/agency" relationship between the Principals and Bang. Oh

Declaration at §§ 4.6 and 6.

58.    Similarly, under Delaware law, the Investment Agreements would be deemed

principal and agency agreements. An agency relationship is created "when one party consents to

have another act on its behalf, with the principal controlling and directing the acts of the agent."

*Baccellieri v. HDM Furniture Indus., Inc.* 2013 Del. Super LEXIS 62, *8 (Del. Super. Feb. 28,

2013), *aff'd*, 74 A.3d 653 (Del. 2013).  An agency relationship exists if there is a "manifestation

by the principal that the agent act for him in accomplishing some undertaking, the agent accepts the undertaking, and there is an understanding between the parties that the principal is to be in control of the undertaking." *Id.* at n.12, quoting Restatement (Second) of Agency § 1 (1958). The party asserting the agency relationship has the burden of proving its existence, and where there is no genuine issue of material fact, a court may decide as a matter of law whether an agency relationship has been created. *Id* at *9.

59.     The Investment Agreements make clear that the Principals controlled how Bang was to invest their Entrusted Assets, which platforms he could use, and the investment strategy he could employ.  Any changes to these mandates required the Principals' consent.  Bang was to keep the Principals' Entrusted Assets separate from other clients' assets so as to avoid any "conflict of interest" with them or with Bang himself and was to provide twice-weekly reports to the Principals of their investment gains and losses.  Finally, the Principals could demand a return of their Entrusted Assets and the profits thereon at any time during the term of the Investment Agreements, and Bang was obligated to comply with such a request. By executing the Investment Agreement, Bang acknowledged and accepted the terms of the agency relationship and the control that the Principals would have on Bang's activities.  Based on all these facts, the Investment Agreements would be deemed to have created a principal/agent relationship under Delaware law.

60.     Accordingly, as a matter of applicable Korean and Delaware law, Bang is the Principals' agent with respect to the Entrusted Assets and to the Claim related to them, and he should have filed the Proof of Claim in the Principals' names as their authorized agent.  The fact that Bang mistakenly completed the Proof of Claim with his own name as creditor and failed to inform the Principals of the defect in the Proof of Claim earlier in the chapter 11 cases should not

jeopardize the Principals' distributions, as the ministerial defect can be easily remedied without affecting the Debtors or their estates in any way.

61.     Based on the foregoing, the Principals respectfully request leave to amend the Proof of Claim to substitute the Principals' names for Bang's name, adding Venable as a notice party, and substituting the Principals' address for Bang's address for distribution purposes.

**The Principals are the True Owners of the Claim**

62.     Given Xclaim's tracing analysis, the November 2022 Telegrams, and the statements made by Bang himself, the Principals own at least 95%, and most likely 100%, of the Claim.  First, Bang acknowledged and agreed that the Principals would own his digital assets on the FTX exchange to cover their losses.  Second, he confirmed that all proceeds of the Claim belonged to the Principals.  Third, given these acknowledgements, it is likely that Bang withdrew Investor A and Investor B's digital assets from his FTX Account prior to the Petition Date and that they had no ownership interest in the FTX Account or the Claim as of the Petition Date.  It is reasonable to conclude, therefore, that the Principals are the sole true owners of the Claim.

**This Court May Enter an Order, Pursuant to Bankruptcy Code Section 1142(b) and Bankruptcy Rule 3020(d), Providing the Principals Timely Access to the KYC Process to Implement the Distribution Provisions of the Plan.**

63.     In the alternative, if this Court cannot grant leave to the Principals at this time to amend the Proof of Claim, this court may, nonetheless, fashion relief that will protect the Principals' distribution pending further proceedings. This Court has the power and authority to enter an order, pursuant to Bankruptcy Code Section 1142(b) and Bankruptcy Rule 3020(d), to direct the Debtors or the Plan Administrator to (i) reserve the distribution to be made on account of the Claim until this Court can make a determination on whether to grant leave to amend the Proof of Claim or otherwise resolve ownership issues, if any, with respect to the Claim, and (ii) provide access to the Principals (or any other party appearing before this Court that timely

asserts a direct ownership interest in the Claim/Proof of Claim) to the Claims Portal or otherwise allow them to commence the KYC process in order to implement the distribution provisions of the Plan.

64.    Section 1142(b) of the Bankruptcy Code provides, in pertinent part, "[t]he court may direct the debtor and any other necessary party to . . . perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b). Bankruptcy Rule 3020(d) provides that, "Notwithstanding the entry of an order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. Pro. 3020(d). Similarly, Bankruptcy Rule 3020(d) gives the Court broad power to enter orders necessary to consummate confirmed plans. *In re TE Holdcorp, LLC*, 2021 Bankr. LEXIS 1302, *13-14 (Bankr. D. Del. May 14, 2021) (enforcement of a sale order post-consummation between non-debtor entities was within the court's power as necessary to enforce the plan and administer the estate.) As this Court explained in the *TE Holdcorp* case, "[t]he power the Court retains under Bankruptcy Rule 3020(d) is parallel to the Court's power under Bankruptcy Code Section 1142(b)."). *Id.*

65.    Courts have used the power granted to them under section 1142(b) and Bankruptcy Rule 3020(d) to enforce plan provisions, issue orders necessary to administer the estate in accordance with the plan and enforce plan provisions so that the plan may be fully consummated. *See, e.g*, *In re Intermet Corp.,* 2009 Bankr. LEXIS 2614, *10 (Bankr. D. Del. Sept. 2, 2009) (Because sections 105 and 1142(b) provide court with "broad authority to order parties to comply with reorganization plans," court directed parties to implement confirmed contingency plan provisions); *In re Lehman Brothers Holdings, Inc.*, 591 B.R. 153 (Bankr. S.D.N.Y. 2018) (court may order a plan administrator to perform any act that is necessary to consummate the plan so long as such action is contemplated within the confines of the plan); *In*

*re WorldCom, Inc,* 2009 Bankr. LEXIS 1136 (Bankr. S.D.N.Y, May 19, 2009) (overruling trustee's objection, court would determine whether defendant in adversary proceeding had an administrative expense claim against the debtor post-confirmation but pre-consummation, as plan provided for payment of all administrative expense claims in full); *In re Resorts Int'l*, 199 B.R. 113, 118 (Bankr. D.N.J. . 1996) (based on authority granted to it under section 1142(b) and rule 3020(d), court ordered accrued interest on escrow established by the plan to be returned to escrow depositor despite litigation trustee's claim that it belonged to the trust); *In re Jorgensen*, 66 B.R. 104, 108 (9th Cir. BAP 1986) ("The court under §§ 105(a) and 1142(b) can make necessary order to carry out the provisions of the plan.") The purpose of section 1142(b) is to "assure that the terms and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the final decree is entered closing the case." *WorldCom* at *23, quoting *In re Chateaugay Corp, v Back*, 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996) (internal citations omitted).

66.    Given the broad authority granted to this Court under Bankruptcy Code section 1142(b) and Bankruptcy Rule 3020(d) to enter orders aimed at implementing the provisions of the Plan, the Principals respectfully submit that, if the Court cannot grant leave to the Principals to amend the Proof of Claim before March 1, 2025 (whether from a timing perspective or otherwise), then it would be appropriate and in the interest of equity if this Court entered an order directing the Debtors or the Plan administrator to reserve any distributions to be made on account of the Claim until this Court can make a determination on whether to grant leave to the Principals to amend the Proof of Claim (or resolve ownership issues, if any, with respect to the Claim) and to allow the Principals (or any other party timely claiming a direct ownership interest in the Claim) to commence the KYC process with respect to the Claim.

67.    The purpose of the KYC process in connection with distributions under the Debtors' Plan is to certify that the holder of an allowed claim who is entitled to receive a distribution "is not a Person or Entity with whom it is illegal for U.S. persons to do business under Office of Foreign Assets Control sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons" and to verify the identity of the holder of such claim.  Plan § 7.14.  It is not to reduce or frustrate customer recoveries under the Plan but to ensure that distributions are not made in violation of U.S law and foreign policy.  By entering an order that would allow the Principals to access and comply with the Debtors' KYC process and set aside their distributions until this Court determines whether to grant the relief requested in this Motion, the Court will be entering an order necessary to implement the provisions of the Plan.

## CONCLUSION

WHEREFORE, based on the foregoing, the Principals respectfully request that this Court enter an order, substantially in the form attached hereto as Exhibit B, (i) finding that Hyung Cheol Lim (and his wholly-owned entities, Aimed, Inc. and Blocore Pte. Ltd.), Ji Woong Choi, and Mosaic Co., Ltd. are collectively the "creditors" under the Proof of Claim, (ii) authorizing the Principals to amend the Proof of Claim to substitute Hyung Cheol Lim, Aimed, Inc., Blocore Pte., Ltd, Ji Woong Choi, and Mosaic Co., Ltd., collectively, for Bang as the creditor on the Proof of Claim, (iii) authorizing the Principals to amend the Proof of Claim to substitute Venable LLP's contact information for Bang's in the Proof of Claim for notice purposes and an address designated by the Principals for payment purposes; (iv) directing Kroll Restructuring (the Debtors' claims agent) to promptly after entry of this Order reflect the amendments to the Proof of Claim as set forth herein; (v) directing the Plan Administrator (or whomever it has authorized

to coordinate the KYC process) to promptly after entry of this Order (but in no event later than February 27, 2025) grant access to the Principals to the Claims Portal with respect to the Claim for the purpose of commencing the KYC process; (vi) if this Court cannot determine whether to grant the Principals leave to amend the Proof of Claim before March 1, 2025, directing the Debtors and the Plan Administrator to give the Principals (and any other party appearing before this Court and timely asserted a direct ownership interest in the Claim) access to the Claims Portal or otherwise commence the KYC process with respect to the Claim not later than February 27, 2025; (vii) directing the Debtors and the Plan Administrator to reserve the distributions that would otherwise be made on account of the Claim until the Court can determine whether to grant the relief requested in this Motion (or otherwise resolve ownership issues, if any, with respect to the Claim); and (viii) granting such other and further relief as is just and proper.

Dated: January 21, 2025
        Wilmington, Delaware

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Tel: 302.298.3535
Fax: 302.298.3550
daobrien@venable.com

and

Jeffrey S. Sabin
Carol A. Weiner
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Tel: (212) 307-5500
Fax: (212) 307-5598
jssabin@venable.com
cweinerlevy@venable.com

*Counsel to Hyung Cheol Lim, Aimed, Inc., Blocore Pte., Ltd., Ji Woong Choi, and Mosaic Co., Ltd.*