## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD.,[1] | Case No. 22-11068 (JTD) |
| Debtor. | (Jointly Administered) |

## DECLARATION OF PROFESSOR SOOGEUN OH IN SUPPORT OF MOTION FOR LEAVE TO AMEND PROOF OF CLAIM NO. 87144

I, Soogeun Oh, hereby declare that:

1.      I am a citizen of the Republic of Korea, reside in Seoul, Korea, and am over the age of 18 years.  I am a Professor Emeritus at Ewha Womans University in Seoul, Korea.  Since 1986, I have taught commercial law, company law, and bankruptcy law, publishing numerous articles in these fields.  Since 1999, I have represented the Korean government in international organizations, including the IMF, World Bank, and UNCITRAL, where I also served as Chairperson.  Additionally, I was the principal drafter of Korea's current bankruptcy law, enacted in 2005, and led the efforts for its subsequent amendments.  A summary of my curriculum vitae is attached for further reference.

2.      I submit this Declaration in support of the *Motion of Hyung Cheol Lim, Aimed, Inc., Blocore Pte,, Ltd., Ji Woong Choi, and Mosaic Co., Inc, For an Order, Pursuant to Rules 3001 and 3020(d) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 105(a) and*

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

*1142(b), For Leave to Amend Proof of Claim No. 87144 to Correct Claimant's Name and Address* (this "**Motion**").[2]

3.      Attached is my legal opinion concerning the relationship between the parties to certain Discretionary Investment Agreements as further set forth in my opinion and in the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief, as is the attached opinion.

Dated: January 21, 2025
       Seoul, Korea                              */s/ Sooegun OH*_____
                                                 Sooegun OH

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to such terms in the Motion.

1.    **INTRODUCTION**

1.    My name is Soogeun OH, and I am a Professor Emeritus at Ewha Womans University in Seoul, Korea.   Since 1986, I have taught commercial law, company law, and bankruptcy law, publishing numerous articles in these fields.

2.    Since 1999, I have represented the Korean government in international organizations, including the IMF, World Bank, and UNCITRAL, where I also served as Chairperson. Additionally, I was the principal drafter of Korea's current bankruptcy law, enacted in 2005, and led the efforts for its subsequent amendments.

3.    For further details, a summary of my curriculum vitae is attached for your reference.

2.    **TASK AND DOCUMENTS REVIEWED**

4.    I have been requested by Venable LLP to provide my legal opinion on the legal relationship between the parties to the following substantially similar "Discretionary Investment Agreements", copies of accurate English translations of which are attached (hereinafter referred to as the "Investment Agreements").[1]

■    Discretionary Investment Agreement between Joon Song and Mosaic Co. Ltd., dated as of June 23, 2022;

■    Discretionary Investment Agreement between Joon Song and Mosaic Co. Ltd., dated as of June 27, 2022;

■    Discretionary Investment Agreement between Joon Song and Ji Woong Choi, dated as of June 27, 2022;

---

[1] Each agreement follows the same structure, and the contents of each article are almost identical, except for differences in the investment amount, type of entrusted virtual assets, and fee ratio.

1

- Discretionary Investment Agreement between Joon Ho Bang and Altcore Ltd., dated as June 27, 2022;

- Discretionary Investment Agreement between Joon Ho Bang and Hyung Cheol Lim, dated as of June 24, 2022; and

- Discretionary Investment Agreement between Joon Ho Bang and Gameberry, dated as of August 17, 2022.

5. In preparing this opinion, I have analyzed the Investment Agreements and reviewed relevant legal literature and court cases of Korea.

6. For references to Korean law, I have relied on translations provided by the Korea Legislation Research Institute,[2] a government-established and funded public entity. Regarding the Investment Agreements, I have primarily cited the translated version of the original Korean text, accompanied by a notarial certificate, while incorporating different translations or additional comments where necessary. Korean court decisions have been translated by me personally. Unless otherwise specified, the literature cited in this paper is written in Korean.

### 3. SYNOPSIS OF THE INVESTMENT AGREEMENTS

7. Under the Investment Agreements, which are substantially similar to each other, the parties exchanged services and fees as outlined in Article 1.

- JOON HO BANG (hereinafter referred to as "BANG") provides discretionary investment services (hereinafter referred to as the "Service") to HYUNG CHEOL LIM, Aimed, Inc. (as successor-in-interest to Gameberry), Blocore Pte. Ltd. (as successor-in-interest to Altcore), Ji Woong Choi and Mosaic Co., Ltd., as applicable (hereinafter

---

[2] https://elaw.klri.re.kr/kor_service/lawTotalSearch.do    Regarding the titles of statutes, the terms 'code,' 'law,' and 'act' are used interchangeably without a clear distinction. In this report, 'code' will refer to the Civil Code, Commercial Code, and Criminal Code, while 'act' will be used for other statutes enacted by the legislature.

2

referred to as "LIM et al.")

■    In return for the Service, LIM et al. compensates BANG with a discretionary investment fee

8.    LIM et al. entrusts BANG with discretion to make investment decisions regarding the management of virtual assets,[3] which they provided.   The scope of this discretion includes the following aspects, as outlined in Article 2:

■    Type and Item

■    Acquisition and disposition including method

■    Quantity, price, and timing of transactions

9.    BANG is obligated to perform the Service for LIM et al. in accordance with the following duties:

■    Good Faith Operation: Conducting the Service in good faith (Article 3).

■    Reporting: Providing updates on investment gains and losses to LIM et al. via email every Monday and Thursday at 2:00 PM (Article 12.1).

■    Conflict of Interest Management: Maintaining a system to prevent conflicts of interest that may arise between LIM et al. and BANG or between LIM et al. and BANG's other clients during the performance of discretionary investment duties (Article 3).

---

[3] The parties to the Investment Agreements use the terms "virtual currency," "investment assets," and "contract assets" to refer to the objects of investment.   In this report, I will adopt the term "virtual assets" to ensure consistency and avoid confusion.

The literature cited in this paper uses various terms, such as cryptocurrency, virtual currency, digital currency, and crypto assets, each covering different concepts.   GowoonNara BOO, Enforcement Measures for Virtual Assets – Focusing on Cryptocurrencies, *Korean Journal of Financial Law*, Vol. 20, No. 2, 2023, p. 356, fn. 2 ("When focusing on the technological aspect, the term *crypto* might be used.   When emphasizing the payment function, the term *currency* could be applied.   When highlighting the intangible nature, the term *virtual* may be preferred. When concentrating on the economic value as property, the term *asset* would be appropriate.")

The term "virtual assets" can encompass those terms insofar as they refer to USDC, which was entrusted to BANG by LIM et al. under the Investment Agreements.

3

■      Funds Transfer: Transferring the investment principal and profits to the virtual asset address designated by LIM et al. within three days of their request following the contract[4] period (Articles 4.2) or at their request, even during the contract period (Articles 4.4, 4.6, and 12.2).

■      Designated Exchanges: Utilizing only the exchanges specifically and expressly identified by LIM et al. for transactions (Article 7).

■      Absolute Return Strategy: Applying an absolute return strategy in managing the investments (Article 12.4).

■      Requiring the consent of LIM et al. to add an exchange to the list of designated exchanges or to change the absolute return strategy of investing.

10.     The Investment Agreements establish BANG's liability to compensate for any misplacement/inability to return[5] incurred during the transfer of virtual assets.    Such misplacement/inability to return includes, but are not limited to, refusal or failure by the exchange to acknowledge deposits, incorrect addresses, and other similar issues (Article 8).

11.     LIM et al. is obligated to pay BANG a certain percent of the profits as a fee (or carried interest)[6] every six months (Articles 4.1, and 4.5), in accordance with the High Water Mark provision (Article 4.7).

---

[4] The translation with the notarial certificate uses both "agreement" and "contract" interchangeably for the term "*GyeYac*" in Korean language, without a clear distinction in context.    As these two words are generally understood to have the same meaning, I have adhered to the usage found in the translation.

[5] The translation with the notarial certificate renders "*YuSil*" as "losses" in Article 8 and similarly translates "*Son*" as "losses" in Articles 4.6, 11, and 12.    However, "*YuSil*" and "*Son*" hold distinct meanings in Korean language and should be translated with different terms.    "*YuSil*" refers to being lost or misplacement/inability to return, while "*Son*" denotes losses.    In this paper, I have translated "*YuSil*" as "misplacement/inability to return" to reflect its specific meaning.

[6] The Investment Agreements employ the term "fee" in Article 1 and "carried interest" in Article 4, but both refer to the same concept as consideration for the Service.

12.     In addition to the authority to direct on which exchanges the virtual assets of LIM et al. may be invested and the investment strategy to be used by BANG, LIM et al. retains the following authorities:[7]

■     Payment Requests: To request payment of the principal and profits from BANG at any time (Articles 4.2).

■     Redemption Requests: To request redemption of the principal and profits, even during the contract period (Article 4.4).

■     Full Transfer Requests: To request a full transfer of the principal and profits, including carried interest, based on the notified investment performance at any time (Article 12.2).

13.     Additionally, LIM et al. is entitled to request an increase or decrease (partial withdrawal) of the investment amount (Article 5).

14.     Miscellaneous Provisions:

■     Parties' virtual asset address (Article 6)

■     Contract period (Article 9).

■     Valuation of contract assets (Article 10)

■     Evaluation of investment performance (Article 11)

■     Confidentiality (Article 13)

■     Jurisdictional court (Article 14)

## 4.     <u>APPLICABLE LAW</u>

### 4.1.   In General

---

[7] Although the Investment Agreements use different terms such as payment, redemption, return, and transfer, the essence of these terms is the same: they all refer to transferring the principal, profits, and losses to LIM et al.

5

15.      The applicable law to this case is the law of Korea, as the Investment Agreements were written in Korea and executed in Korea, both parties to the Investment Agreements were Korean nationals, and both had their residences in Korea.    Furthermore, jurisdiction is determined under the Civil Procedure Act of Korea, as specified in Article 14 of the Investment Agreements.

16.      The legal relationship between the parties is characterized under the Civil Code and the Commercial Code of Korea, given that the Investment Agreements are contracts between private legal entities.    For commercial cases, the Commercial Code takes precedence over the Civil Code as it is a special law for such cases.[8]

### 4.2.    The Commercial Code Article 101 and its Requirements

17.      The Commercial Code outlines typical patterns of commercial activities to which it applies.[9]    Among these, "commission agency" is applicable to the Investment Agreements in question.    Under Article 101 of the Commercial Code, a commission agent is defined as a person who, in the course of business, effects the sale and purchase of things[10]  or negotiable instruments under their own name but on the account of another party.

> The Commercial Code
>
>     Chapter VII. Commission Agency
>
>         Article 101. Definition

---

[8]  Article 1 of the Commercial Code (Applicable Rules to Commercial Matters) "Where this Act does not provide for a particular commercial matter, the commercial customary law shall apply; and if no such law exists, the Civil Code shall apply."

[9]  Those specific types of commercial activities encompasses sale, account current, undisclosed association, limited partnership, commercial agents, brokerage, commission agency, forwarding agent business, carriage business, hospitality business, warehouse business, financial lease business, franchise business, and bond purchasing business.

[10]  The KLRI translation tends to use the term "goods" more frequently in the context of the Commercial Code, while the term "things" is used in the Civil Code when translating the Korean term "*MoolGeon*.    For this report, I will adopt "things," as it more closely aligns with the German equivalent, "*Sachen.*"

> A person who makes it his or her business to effect sale and purchase of things or negotiable instruments under his or her own name on the account of another party is called a commission agent.

18.    The requirements for commission agency are (a) to conduct sale and purchase under his or her name on the account of another party, and (b) the business items consist of things and negotiable instruments.    I will address these requirements in the following sections respectively.

### 4.3.    To Conduct Sale and Purchase under his or her Name on the Account of the Another Party

19.    The distinctive feature of a commission agency, which differentiates it from an ordinary sale, lies in the separation of "name" and "account."    The Supreme Court interpreted the phrase "on the account of another party" in Article 101 of the Commercial Code as "all profits and losses resulting from the commission agent's transactions accrue to the principal."[11]

20.    BANG here, in the course of business, executed the sale and purchase of virtual assets under his own name but on the account of LIM et al., with all losses and profits belonging to LIM et al. (Article 4.6 of the Investment Agreements).    This establishes BANG as a typical commission agent.[12]

### 4.4. Negotiable Instruments or Things as Business Items

### 4.4.1. Negotiable Instruments

---

[11]  Supreme Court Judgement on May 29, 2008, Case Number 2005DA6297.

[12]  Na Lai LEE, A Study on the Legal Characteristics of the Virtual Currency and Rights of Virtual Currency Holders, *Business and Finance Law*, Vol. 89, May 2018, p. 28 ("The provisions on commission agency could apply to the legal relationship between virtual currency holders and a virtual currency exchange, provided that their intention to conduct sales and purchases through a commission agent is reflected in their contract or the terms and conditions of the virtual asset exchange.")

21.     Negotiable instruments[13] are generally understood as instruments representing property rights, where possession of the instrument is required in whole or in part for the establishment, assignment and exercise of those rights.[14]    Examples include transportation-related instruments such as bills of lading, warehouse receipts, and cargo receipts; instruments issued for corporate financing under company law, such as stock certificates, bonds, and subscription warrants; and instruments for payments , such as bills of exchange, promissory notes, and checks.

22.     Virtual assets differ significantly from negotiable instruments in several respects: (a) they cannot be transferred through negotiation, (b) they lack a statutory basis, and (c) possession is not always required for the establishment, assignment, or exercise of associated rights.    As such, virtual assets cannot be classified as negotiable instruments through interpretation alone unless explicitly characterized as such by a statute.

### 4.4.2.  Things

23.     Since the Commercial Code does not define "things," commentators often adopt the definition provided in the Civil Code, which defines "things" as corporeal objects, electricity, and other natural forces that can be controlled (Article 98).[15]    As virtual assets[16] do not

---

[13] The original Korean language of this term is "*YuGaJeungGwon*," which is equivalent to the German term, "Wertpapier."    The KLRI translation renders the term as "securities," which typically covers a narrower scope, including stock certificates and bonds.    To differentiate, I will use the term "negotiable instruments" to distinguish it from securities. which will be discussed in paragraphs 34-36.

[14] Ok Yeul SONG, *Lecture on Commercial Law*, 16th ed., 2025, p. 467.

[15] Commentators generally propose the following criteria for defining "things": (a) they must be corporeal objects, electricity, or other manageable natural forces; (b) they must be exclusively controllable; (c) they must possess independence; and (d) they must lack any association with personality.    *Commentary on Civil Code, General Provisions*, Vol. 2, 4th ed. 2010, pp. 257-270 (written by Sang Won LEE); Duk Soo SONG, *New Lectures on Civil Law*, 18th ed. 2025, p. 329f..

[16] The concept of "virtual assets" has been the subject of considerable discussion, but it seems to have been significantly clarified with the enactment of the Act on the Protection of Virtual Asset Users (effective from July 19, 2024).    It defines virtual asset as "electronic certificates (including all associated rights) that have economic value and that can be traded or transferred electronically."

conform to the traditional understanding of corporeal objects, electricity, or manageable natural forces, and there is no court decision on whether the virtual assets are classified as "things," it is necessary to carefully analyze the opinion of commentators.    There are both positive and negative opinions regarding whether virtual assets can be recognized as "things" under the Civil Code.    The positive view, which classifies virtual assets as things, would apply Article 101 directly to this case, while the negative view would apply it by analogy.

24.    The positive opinion argues that (1) the concept of "things" should be expanded to reflect advancements in science and technology, (2) virtual assets have intrinsic value, (3) they have the potential to be under exclusive control and management, and (4) they have been traded for legal currency.[17]

25.    The negative opinion criticizes the positive view on the following grounds: (a) virtual assets are conceptual entities and merely code existing in the digital realm, which cannot be classified as corporeal objects or manageable natural forces under traditional interpretations; (b) the essential elements of virtual assets exist in electronic form, and the objects of trade are economically valuable information, which cannot be regarded as corporeal objects or manageable natural forces; and (c) a private key alone cannot guarantee exclusive control over virtual assets.[18]

---

[17] Ki Yeon NAM, A Study on the Legal Value of Bitcoin, *DanKuk University Law Review*, Vol. 38, No. 3, 2014; Tae Woo YOOK, Change of Financial Systems by Virtual Currency or Cryptocurrency and its Legal Implications, *Kangwon Law Review*, Vol. 53, February 2018; Cha Ho JUNG & Seung Hyun LEE, A Study on Whether Electronic File can be Considered as Product Under the Korean Civil Act, *Sungkyunkwan Law Review*, Vol. 30, No. 1, March 2018; Seoung Jae JEON & Hun Yeong KWON, Compulsory Execution Measures for Crypto Currency, *Journal of Korea Information Law*, Vol. 22, No. 1, 2018; Jang Won CHOI, A Review of Legal Nature that Users of the Virtual Currency Exchange Obtain and the Compensation Responsibility for the Damages Caused by Internet Problems or Network Errors, *Journal of the Korea Academia- Industrial Cooperation Society*, Vol. 19, No. 1, November 2018; I Su KIM, Legal Nature of Bitcoin in Private Law, *Busan National University Law Review*, Vol 59, No. 4, November 2018; Woo Jung JON, Legal Characteristics of Cryptocurrency and Regulation Improvement Suggestion, *Korean Journal of Finance Law*, Vol 16, No. 1, April 2019; Jeong Hyun PARK, Legal Nature of Crypto Currency from the Perspective of General Civil Law Theory, *Law & Technology*, Vol 18, No. 1, 2022; Woo Sung KIM, Legal Nature of Virtual Asset, *Seoul Law Journal*, Vol. 64, No. 1, March 2023.

26.     The traditional categorization and interpretation of "things" under the Civil Code, which can be traced back to German civil law established in 1900, is inadequate for addressing virtual assets.   Proponents of the affirmative view advocate for resolving this issue through a flexible interpretation until new legislation provides clear guidance, while opponents adhere to the traditional interpretation until such legislation is enacted.   The courts have not yet issued a definitive ruling on the nature of virtual assets in the context of the Civil Code or the Commercial Code.

27.     Logical coherence could be enhanced by establishing a conceptual framework encompassing virtual assets and related concepts.   However, such a conceptual approach is not the only way to address various issues across many areas, and its practicability remains uncertain. Alternatively, a functional approach offers a viable option, focusing on identifying the most suitable solution for each individual case.   Although there is no consensus on whether virtual assets should be categorized as "things" and discussions on the legal nature of virtual assets are ongoing, legal issues has been addressed on a case-by-case basis.[19]

---

[18]  Na Lai LEE, A Study on the Legal Characteristics of the Virtual Currency and Rights of Virtual Currency Holders, *Business and Finance Law*, Vol. 89, May 2018; Bae Kyung YOON, Legal Characteristics of Virtual Currency and Civil and Criminal Enforcement, *Human Right and Justice*, Vol. 744, June 2018; Young Soo JUNG, A Study on Civil Compulsory Execution of Virtual Asset, *University of Seoul Law Review*, Vol, 29, No. 2, August 2021; Chang Min CHUN, Legal Issues of Virtual Asset Transactions from Perspective of Property Law – UNIDROIT Digital Assets and Private Law Project, *Seoul Law Journal*, Vol. 62, No. 1 March 2022; Hyun Jong LEE, Civil Compulsory Execution on Virtual Properties, *Journal of Civil Enforcement Law*, Vol, 18, No. 2, August 2022.

[19]  The first issue was taxation on virtual assets.   The Value Added Tax Act of 2008 stipulated that any person supplying goods or services must pay value-added tax (Article 1(1)(i)).   Goods were defined to include both corporeal and non-corporeal items (Article 1(2)).   The Supreme Court ruled that game money qualified as goods (Supreme Court Judgement on April 13, 2021, Case Number 2011DU30281).   The legislative amendment to impose income tax on virtual assets was made in 2021 and scheduled to be implemented in 2027.   As the National Tax Collection Act classifies virtual assets as "other property rights" under Article 55(3), rights over virtual assets are legally recognized as other property rights by legislation within the scope of taxation law.

The second issue was related to civil proceedings: whether virtual assets can be subject to seizure (or provisional seizure), how such seizure can be enforced, and what would be the court's verdict.   In current civil enforcement practice, virtual assets are regarded as things or equivalent to things but are not recognized as money or currency. Conclusion of court's decision in cases where claims related to virtual assets typically follows that used for the delivery of movables, such as "Deliver five Bitcoins."   It is rarely observed that the format of orders used for

10

28.    The negative view opposes treating rights over virtual assets as rights in rem and directly

applying all provisions of the Civil Code concerning rights in rem, arguing that virtual assets are

not "things."    This perspective appears logical.    However, the view that virtual assets are not

considered "things" and, therefore, rights over virtual assets are not subject to rights in rem does

not justify dismissing legal judgments on transactions involving virtual assets that have already

taken place.    Legal issues concerning virtual assets must be addressed through the

interpretation of existing statutes, rather than waiting for new legislation.[20]

### 4.5.    Application by Analogy

29.    The negative view does not block the possibility of handling rights over virtual assets in

a manner analogous to rights in rem or to applying certain provisions related to rights in rem to

---

monetary claims, such as "Pay a certain amount," is applied in cases involving virtual assets (Jeong Hyun PARK, Legal Nature of Crypto Currency from the Perspective of General Civil Law Theory, *Law & Technology*, Vol 18, No. 1, 2022, p. 15).

The third issue arose in criminal proceedings: whether virtual assets could be subject to confiscation or forfeiture and how such measures could be implemented in practice.    The Criminal Code specifies "things" as the object of confiscation (Article 48), however, as the term "things" is not defined in the Criminal Code, its definition in the Civil Code can be applied by analogy.    The trial court denied the confiscation, reasoning that Bitcoin did not qualify as "things" under Article 48(1) of the Criminal Code (Suwon District Court Judgement on September 7, 2017, Case Number 2017GODAN2884.).    In the appellate proceedings, the prosecutor shifted the legal basis for confiscation to the Act on the Regulation and Punishment of Criminal Proceeds Concealment, which defines the object of confiscation as "property."    Article 2, Subparagraph 2, Item 2 stipulates that "property" generated by committing serious crimes or acquired in return for such crimes is one of criminal proceeds, which are subject to confiscation and collection of equivalent value.    The appellate court ruled that Bitcoin qualifies as intangible property with monetary value under Article 2 of the Act and permitted confiscation (Suwon District Court Judgement on January 30, 2018, Case Number 2017NO7120).    The Supreme Court upheld the appellate court's decision (Supreme Court Decision on May 30, 2018, Case Number 2018DO3619).    Those decisions in criminal cases appear to adhere to the principle of legality, which requires the strict interpretation of criminal laws.

[20] *Commentary on Civil Code, General Provisions*, Vol. 2, 4th ed. 2010, p. 256, written by Sang Won LEE ("Digital information and digital content cannot be considered corporeal objects or natural forces, making it difficult to classify them as "things" under civil law.    Nevertheless, <u>excluding them from the scope of civil law regulation solely on the grounds that they do not qualify as "things" is undesirable given the realities of modern transactions.</u>"); Jeong Hyun PARK, Legal Nature of Crypto Currency from the Perspective of General Civil Law Theory, *Law & Technology*, Vol 18, No. 1, 2022, p. 19 ("In the realm of civil law, as opposed to the domain of criminal law governed by the principle of legality, it is essential to respond to the realities and necessities of transactions.    <u>It is not appropriate to isolate cryptocurrency as a property right that cannot integrate into the existing framework of property law solely based on traditional notions of corporeal objects or natural forces as defined in legal literature.</u>") (underline added)

11

virtual assets by analogy.    While it opposes recognizing virtual assets as things, it does not deny that virtual assets may possess attributes of things.[21]    The application of legal provisions by analogy is determined in accordance with the general principles of legal interpretation.

30.    The application of legal provisions by analogy supplements gaps in the law by applying legal norms governing similar cases to situations where no specific legal regulation exists. "When the literal or logical interpretation of the provisions of civil law fails to resolve practical legal disputes or leads to results that are significantly contrary to the notion of social justice, the court may apply the law by analogy.    This approach seeks to uphold the legislative spirit of the written law, enabling the reasonable resolution of legal disputes and producing outcomes consistent with the concept of justice."[22]

31.    In a situation where the Civil Code and Commercial Code, enacted in 1962, are unable to adequately regulate virtual assets developed after 2000, it is inevitable to resolve current legal issues by applying existing legal provisions by analogy.    This aligns with the situation described by the Supreme Court as "when the analogical application is deemed appropriate in light of the legal framework, legislative intent, and purpose of the relevant legal norms."[23]    If the provisions governing commission agency cannot be applied by analogy to cases involving virtual assets, given that virtual assets differ from the traditional concept of "things", thousands of similar cases will remain in a legal grey area.

### 4.6.    Conclusion

---

[21] GowoonNara BOO, Enforcement Measures for Virtual Assets – Focusing on Cryptocurrencies, *Korean Journal of Financial Law*, Vol. 20, No. 2, 2023, p. 377 ("From the perspective that virtual assets themselves represent economic value, they lack only a tangible form that can exist independently without electronic assistance.    Nevertheless, they clearly share characteristics akin to things, such as cash or artwork").

[22] Supreme Court Judgement on August 12, 1994, Case Number 93DA52808.

[23] Supreme Court Judgement on April 29, 2020, Case Number 2019DA226135; Supreme Court Judgement on July 22, 2021, Case Number 2019DA277812.

32.    Article 101 of the Commercial Code applies to this case either directly or by analogy.

33.    In this case, BANG conducts the sale and purchase of virtual assets as a business on the account of LIM et al.    Therefore, BANG qualifies as a commission agent, and LIM et al. as a principal.    The commission agency relationship fully aligns with the language of the Investment Agreements and objectively reflects the current practice of trading virtual assets through an agent.

### 5.    APPLICABILITY OF THE FINANCIAL MARKETS ACT AND OTHER ACTS PERTAINING TO VIRTUAL ASSETS

34.    There has been considerable debate about whether virtual assets should be treated as securities and regulated by securities regulatory agencies.    Additionally, some legislation includes provisions addressing virtual assets.    In this section, I will examine whether these statutes contain any provisions or legal rules that may impact the legal relationship between LIM et al. and BANG in this case.

35.    First, I will examine whether the Financial Investment Services and Capital Market Act (hereinafter referred to "Capital Markets Act'), a regulatory law on securities, includes virtual assets as its regulatory targets.    The Capital Market Act governs "financial investment instruments," which are established through agreements.[24]    However, in the case of virtual assets, such an agreement is not a prerequisite; for instance, virtual assets can be obtained through mining, which does not involve such an agreement.[25]

---

[24] Article 3(1) of the Financial Market Act defines financial investment instrument as (a) a right acquired by an agreement to pay money or any other thing with property value at a specific point in the present or in the future, with intent to earn a profit or avoid a loss, and (b) where there is a risk that the total amount of such money, paid or payable, to acquire that right may exceed the total amount of money, already recovered or recoverable from such right.

[25] The Financial Market Law divides financial investment instrument into securities and derivatives (Article 3 (2)). Article 4(2) enumerates six types of instruments: debt securities, equity securities, beneficiary certificates, investment contract securities, derivative-linked securities, and depositary receipts, none of which are equivalent to virtual assets.    Since there is no risk of incurring losses exceeding the original investment, virtual assets do not

36.     The current Capital Markets Act does not contain provisions that directly apply to Investment Agreements.   However, if the virtual assets in the Investment Agreements is deemed subject to the Capital Markets Act, it could be recognized as a type of negotiable instruments under Article 101 of the Commercial Act.   In such a case, the transaction of virtual assets is regulated by the Capital Market Act, while the legal relationship between LIM et al. and BANG would simultaneously be directly governed by Article 101 of the Commercial Code.

37.     Additionally, since the Capital Markets Act defines 'discretionary investment business,' using the same terminology as employed in the Investment Agreements in question, I will examine whether the relevant provisions can be applied to this case.

38.     Discretionary investment business, as defined under the Financial Markets Law,[26] pertains to the handling of financial investment instruments, which does not include the virtual asset involved in this case.   Accordingly, the activities conducted by BANG under the Investment Agreements cannot be classified as discretionary investment business under the Financial Markets Law.

39.     Even if BANG's business under Investment Agreements falls within the category of discretionary investment business as defined by the Capital Markets Act, the principal-agent relationship between LIM et al. and BANG remains unaffected.   This is because the Financial Markets Act governs the business activities of BANG, rather than the legal relationship between

---

qualify as a derivative under the Financial Markets Law.

[26] The term "discretionary investment business" is defined under Article 6 (8), which states "Discretionary investment business in this Act means the business of acquiring, disposing of, and managing financial investment instruments, etc., classifying them for investors taking into account the financial standing, purposes of investment, etc., of investors, with authorization from such investors for discretionary judgment, entirely or partially, over the financial investment instruments, etc." (underline added)

BANG and LIM et al.    Furthermore, no other provisions of the Financial Markets Act are applicable to the Investment Agreement

40.    I could find two statutes explicitly mentioning "virtual assets" in their titles or texts. One is the Act on the Protection of Virtual Asset Users (hereinafter referred to as the "APVAU").[27]  and the other is the Act on the Reporting and Use of Specific Financial Transaction Information (hereinafter referred to as the "Specific Financial Information Act").[28] These two statutes do not include provisions addressing the legal relationship between virtual assets service providers and users.

41.    I could not identify any other laws, beyond the Commercial Code and the Civil Code, that could govern the legal relationship between the parties to this Investment Agreements directly or by analogy.

## 6.    THE INVESTMENT AGREEMENTS SHOULD BE CHARACTERIZED AS COMMISSION AGENCY AGREEMENTS

42.    My analysis of the relationship of the parties to the Investment Agreements can be briefed as follows:

- ■  LIM et al. entrusted a certain amount of virtual assets to BANG and had him provide investment services in return of fees depending on the profits that he made.

---

[27]  Enacted on July 18, 2023. Act No. 19563, effective on July 19, 2024.   The APVAU was enacted to protect the rights and interests of virtual asset users and to promote transparent and sound trading practices in the virtual asset markets by prescribing regulations on the protection of users' assets, the prevention of unfair trade practices, and other related matters (Article 1).    It defines a "virtual asset service provider" as a person engaged in the buying, selling, exchange, transfer, safekeeping, and administration of virtual assets (Article 2(ii)).   The APVAU further regulates the operations of virtual asset service providers through provisions imposing obligations, prohibitions, and supervisory measures.

[28]  The Specific financial Information Act was enacted on September 27, 2001, to regulate money laundering activities and the financing of terrorism.    Virtual assets were included as a target of regulation through amendments in 2021, with further revisions made following the enactment of the APVAU in 2023.

15

■ BANG executed the sale and purchase of entrusted assets in his own name on the account of LIM et al.    This arrangement corresponds to the typical characteristics of a commission agency under the Commercial Code.

43.    This conclusion has implications in two respects, which will be addressed in the following sections.

### 6.5.  Ownership of Entrusted Virtual Assets

44.    The Investment Agreements stipulate that LIM et al. may request the return of the invested assets, and BANG is obligated to transfer them as requested (Para. 12).    While BANG, as a commission agent, directly acquires rights and assumes obligations with third parties in transactions conducted on behalf of LIM et al., the Investment Agreements do not explicitly address the ownership of the entrusted assets and any assets acquired through transaction (sale or purchase) made using those entrusted assets.

45.    In such cases, the provisions of the Commercial Code concerning commission agency supplement the intents of the parties.    Article 103 of the Commercial Code provides that things or negotiable instruments received by a commission agent from a principal, or things, negotiable instruments, or claims acquired by the commission agent through sale or purchase, are deemed to belong to the principal in the relationship between the principal and the commission agent or the commission agent's creditor.    Accordingly, LIM et al., as the principal, retains ownership of the invested assets and acquired assets in relation to both BANG and BANG's creditors.

46.    The ownership of entrusted assets also arises as an issue in criminal cases.    Article 355(1) of the Criminal Code states that a person who, having custody of another's property, embezzles or refuses to return it, shall be punished by imprisonment with labor for up to five years or by a fine not exceeding 15 million won. (underline added)

16

47.    In the context of commission agency contracts, the question arises whether entrusted property constitutes "another's property" under the Criminal Code.    The Seoul Appellate Court has ruled that embezzlement occurs when an agent misappropriates a principal's funds, even if those funds were deposited into the account of the agent.    This precedent affirms that entrusted funds under such contracts remain the property of the principal.[29]

### 6.6.    Right to Repossession

48.    The owner of property held by a bankruptcy trustee retains the right to request the return of such property, even after an adjudication of bankruptcy for a debtor.    This right, known as the "right to repossession," is recognized under Korean insolvency law.[30]    Its Article 407 states that a declaration of bankruptcy does not affect the right to repossess properties that do not belong to the debtor from the bankruptcy estate.

49.    Courts have upheld the principal's right to repossession in cases involving the bankruptcy of a commission agent.    The Supreme Court has ruled that a principal retains the right to repossession of things or negotiable instruments when a commission agent becomes bankrupt after receiving them.    This right extends to things or negotiable instruments obtained by the commission agent in exchange for those originally entrusted.[31]

### 7.    CONCLUSION

50.    I can draw the final conclusion regarding the legal relationship between LIM et al. and BANG under the Investment Agreements as follows.

---

[29] Seoul Appellate Court Judgement on August 29, 2018. Case Number 2018NO621.

[30] Its official title is the Debtor Rehabilitation and Bankruptcy Act.    It was enacted on April 1, 2005, and most recently amended on December 20, 2024.

[31] Supreme Court Judgement on May 29, 2008, Case Number 2005DA6297.    This judgement has been repeatedly cited as a leading case on the principal's right to repossession in the bankruptcy proceedings for a commission agent.

- The relationship between LIM et al. and BANG constitutes a commission agency under Article 101 of the Commercial Code, with LIM et al. as principals and BANG as the agent.
- Pursuant to Article 103 of the Commercial Code, the virtual assets entrusted by LIM et al. remain their property, even after being entrusted to and held by BANG, the agent.
- As the principals retain ownership of the entrusted virtual assets, they hold the right to repossess these assets in the bankruptcy proceedings of the agent, in accordance with Article 407 of the Korean bankruptcy law.

## 8.    DECLARATION

51.    I confirm my independence from all parties related to this case, their respective legal advisors, and the Court in this matter.    Additionally, I confirm that my fees are not, in any way, contingent upon the outcome of this case.

52.    I further confirm that all matters upon which I have expressed an opinion in this written report fall within my area of expertise.    I have exercised reasonable care and skill to ensure the accuracy and completeness of this report.

53.    The opinions expressed in this report are my own, impartial, and unbiased.    They have not been influenced by the dispute resolution process or any party involved in this matter.    I have not included any opinions suggested by others, including the requesting lawyers, without forming my own independent view.

54.    I also confirm that I have clearly distinguished between the facts and matters within my personal knowledge and those outside it.    For the facts within my knowledge, I confirm their truthfulness.

18

*[The Signature Page Will Follow.]*

Dated:  January 20, 2025
Seoul, Republic of Korea

Signed

Professor Soogeun OH

**CURRICULUM VITAE of Professor Soogeun OH**

**(Summary)**

**Education**

Seoul National University: Bachelor of Law 1979. Master of Law 1981, MBA 1984

University of Michigan Law School: M.C.L. 1985

Soongsil University: Doctor of Law 1994

**Academic Career**

Korea Military Academy: Instructor 1981–1984

Inha University: Professor of Law 1986–2000

Ewha Womans University: Professor of Law 2000–2021, Vice President for Planning and
    Coordination 2010–2012, Law School Dean 2014–2016, Professor Emeritus 2021–present

China University of Political Science and Law: Adjunct Professor for International Courses
    2019–present

**Other Activities**

Committee for the Enactment of Consolidated Insolvency Law, Ministry of Justice, Chairperson
    1098–2015

United Nations Conventions on the International Trade Law (UNCITRAL), Working Group III
    (Insolvency), Advisor for Korean government 2001–2010. Chairperson of Commission
    Session 2009–2010, Working III (Online Dispute Resolution) Chairperson 2010–2014

East Asian Association of Insolvency and Restructuring, Co-Chairperson 2009–2018

20

Committee for Rehabilitation and Bankruptcy, Supreme Court of Korea, Chairperson 2013–present

Korean Association of Law Schools, President 2015–2016

*KLRI Journal of Law and Legislation,* Editor-in-Chief 2018–present


**Publication**

"Accounting Standards and Accounting Clauses of the Commercial Code," *Essays in Honor of*
  *Professor Chung Hi Cho*l (Bakyoungsa, 1991)

"An Analysis of U.S. Cases on the KAL 007 Incident of 1983," *Essays in Honor of Professor Lee*
  *Tai Ro* (Josetongramsa, 1992)

"An Historical Analysis on the Carries' Liability Limitation," *The Korean Journal of Air Law*, vol.
  5 (Korea Association of Air Law, 1993)

"A Historical Study on Corporate Reorganization," *The Journal of Civil Cases*, vol. 16
  (Bakyoungsa, 1994)

"Receivership in a Corporation under the Reorganization Process," *The Journal of Civil Cases*,
  vol. 17 (Bakyoungsa, 1995)

"A New Trend in the Regulation of International Air Transportation," *The Korean Journal of Air*
  *and Space Law,* vol. 8 (Korean Association of Air and Space Law, 1996)

"Legal Issues on Airway Bill," *The Journal of Civil Cases,* vol. 19 (Bakyoungsa, 1997)

"Protection of Minority Shareholders' Rights and Enhancement of Management," *SangJangHyup*,
  vol. 37 (Korea Listed Companies Association, 1998)

"Analysis of Court Precedents on Defects of Resolutions in Shareholders' General Meeting,"
  *Private Law Journal*, vol. 4 (Chung Houn Legal Research Foundation, 1999. 1)

"Legal and Economical Foundation of Insolvency Law," *Commercial Cases Review*, vol. 11

21

(Korea Commercial Cases Association, 2000)

"Corporate Reorganization and Rule of Law," *Journal of Public Law*, vol. 29, no. 2 (Korean Association of Public Law, 2001.2)

"A Comparative Analysis of Insolvency Laws in East Asian Countries," *Commercial Law Review*, vol. 20, no. 2 (Korea Commercial Law Association, 2001. 8)

"A Critical Interpretation on the Article 401 of the Commercial Code," *Private Law Journal*, vol. 7 (Chung Houn Legal Research Foundation, 2002. 12)

"Commencement of Corporate Reorganization and Determination of Secured Amounts of Claims with *Geun*-Mortgage," *Cases and Practice Review*, vol. 6 (Bakyoungsa, 2003. 8)

"A Study on a Prepackaged Plan," *Commercial Law Review*, vol. 23, no. 1 (Korea Commercial Law Association, 2004. 5)

"An Empirical Study on the Implementation of Reorganization Plan," *Business Law Review*, vol. 19, no.4 (Korean Business Law Association, 2005. 12)

"A Study on Workout (Corporate Restructuring)," *Commercial Law Review*, vol. 24, no. 4 (Korea Commercial Law Association, 2006. 2)

"Principle on Assurance of Liquidation Value" *The Journal of Civil Cases*, vol. 26 (2007. 3)

"Priority in Insolvency Proceedings," *Journal of Korean Law*, vol. 7, no. 2(Seoul National University, 2008. 6) (Co-authored with Heejong Song) – *in English* –

"Corporate Rehabilitation Proceeding under DRBL: An Observation and a Few Suggestions" *JURIS*, vol. 4(Judicial Development Foundation, 2008. 6)

"Coordination of Cross-border Insolvency Proceedings" *International Trade Law*, vol. 88(Ministry of Justice, 2009. 8) (co-work with Heejong Song)

"Legitimacy of Ipso Facto Clause" *Cases and Practice Review*, vol. 9 (Bakyoungsa, 2010.1)

22

"Termination of Rehabilitation Proceedings and Avoidance" *Commercial Law Review,* vol. 30, no. 1 (Korea Commercial Law Association, 2011. 5)

"A Legal Analysis of Criterion on Consolidated Entities under the K-IFRS" *Commercial Law Review,* vol. 30, no. 3 (Korea Commercial Law Association, 2011. 11)

"Payment through the Third Party's Collateral and Determination of Liability of a Joint Surety-A Critique against Supreme Court Decision on 2010Da82130 Case" *Korean Journal of Insolvency Law,* vol. 4, no. 1 (Insolvency Law Institute of Korea, 2013. 5)

"Legal Issues on M&A in Rehabilitation Proceedings – Woongjin Holdings Case" *Commercial Law Review,* vol. 32, no. 2 (Korea Commercial Law Association, 2013. 8)

"The scope of application of Corporate Restructuring Promotion Act" *Korean Journal of Insolvency Law,* vol. 5, no. 1 (Insolvency Law Institute of Korea, 2014. 5)

"An empirical study on rehabilitation proceeding (2006-2012)," *Commercial Law Review,* vol. 34, no. 1 (Korea Commercial Law Association, 2015. 5)

"Borrowing pattern of over-indebted debtors and fraud," *Korean Journal of Insolvency Law,* vol. 6, no. 3 (Insolvency Law Institute of Korea, 2016. 10)

"An empirical study on the practice of the corporate Restructuring Promotion Act (2007-2013)" Korean Journal of Economic Law, vol. 16, no. 1 (2017. 4)

*Law and Practice on the Recognition of Cross-border Insolvency Proceeding* (Korea Legislation Research Institution, 2018)

"Corporate Insolvency of Listed Companies in Korea and Japan - Its Implication" *Chinese Financial and Legal Studies*, 2019(4), vol. 104 (co-authored, in Chinese)

"Personal Bankruptcy in Korea – the current situation and issues" *The Journal of Chinese University of Political Science and Law* (2020, 2). – in Chinese – (Translated by Chen

23

Jingshan)

"The Nature of Corporate Reorganization Promotion Act" *Korean Journal of Insolvency Law,*

vol. 11, no. 2 (Insolvency Law Institute of Korea, 2021. 12)

*Business and Law* (Hongmunsa, 2022)

"A Comparative Analysis on Cross-border Insolvency legislation of Japan, Korea, China and

UNCITRAL Model Law" *KLRI Journal of Law and Legislation*, Vol. 13, No. 2 (Korea

Legislation Research Institute, 2023. 11) (co-authored)

"An Emperical Study on Effects fo Debt Discharge", *Korean Journal of Insolvency Law,* vol. 14,

no. 1 (Insolvency Law Institute of Korea, 2024. 6)