**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | ) <br>) Chapter 11<br>)<br>) Case No. 22-11068 (JTD)<br>) (Jointly Administered)<br>)<br>) Related to Docket Nos. 1632, 1683, 1693, and 2235<br>)<br>) **Hearing Date: March 13, 2025 at 1:00 pm (ET)**<br>) **Objection Deadline: March 6, 2025, at 4:00 pm (ET)** |

**MOTION TO ENFORCE ORDER GRANTING MOTION OF PYTH DATA
ASSOCIATION FOR RELIEF FROM THE AUTOMATIC STAY (ECF 1693)**

Movant Do Kwon, by and through his undersigned counsel, seeks to enforce the Court's June 23, 2023 Order, *see* ECF 1693, which granted the Pyth Data Association ("PDA") relief from the automatic bankruptcy stay in these proceedings. In support of this motion, Mr. Kwon respectfully submits as follows.

**PRELIMINARY STATEMENT**

1.      PDA came to this Court in June 2023 and asked for relief from the automatic bankruptcy stay so that PDA could remint its cryptocurrency, PYTH. PDA promised the Court that doing so would benefit existing holders. Simply put, existing PYTH tokens were trapped in FTX wallets and unusable, so PDA would create replacement tokens that would be distributed to all original token holders. The value of the original PYTH tokens would be destroyed, but the market for the replacement tokens would flourish. To make this happen, PDA told the Court that it would apply "reasonable and customary customer identification procedures" to the holders of

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

original PYTH before providing them with the new PYTH tokens. Based on these and other assurances, the Court granted PDA's request for relief.

2. But PDA held back a critical detail: PDA planned to take for itself any replacement tokens where the original token holder did not or could not comply with PDA's customer identification procedures, which PDA set unilaterally. As a result, PDA would be enriched whenever PDA deemed there to be noncompliance, and it stood to make a fortune if large token holders were unable to comply.

3. And that is exactly what happened with Mr. Kwon, the former president of PDA's board and the holder of 500 million PYTH tokens, who was in a Montenegro detention facility and awaiting trial in a U.S. Securities and Exchange Commission ("SEC") enforcement matter at the time that the reminting plan was unfolding. PDA—acting through a Panamanian affiliate that PDA never mentioned to the Court—insisted that Mr. Kwon submit to a "live face verification" procedure that PDA knew Mr. Kwon could not satisfy; refused to accept a standard power of attorney that would have allowed Mr. Kwon's wife to complete the identification procedures on his behalf; and rejected the various efforts of Mr. Kwon's counsel to ensure that he—perhaps the individual PYTH holder most familiar to PDA—could confirm his identity.

4. When all was said and done, PDA declared the process at an end and pocketed Mr. Kwon's 500 million tokens. The total value of those tokens was $215 million.

5. Not long after, Mr. Kwon's SEC trial concluded and resulted in a final judgment that requires him to turn over his PYTH to the bankruptcy estate of his company, Terraform. PDA's sleight of hand in obtaining and implementing the Court's June 23, 2023 order obstructs Mr. Kwon's ability to comply, harming creditors and benefiting no one but PDA itself.

6. By insisting on unreasonable and non-customary customer identification

procedures and using the inevitable noncompliance as a justification for secret self-enrichment, PDA violated the Court's order approving the reminting plan. And by assuring the Court in the first place that its reminting plan would "deliver value" to "[a]ll Original PYTH holders," while failing to disclose that it would seize "unclaimed" PYTH tokens for itself, PDA abused the Court's process. For these and the additional reasons set forth below, the Court should direct PDA to provide Mr. Kwon with a reasonable process for verifying his identity so that he can obtain the PYTH that he is entitled to and comply with the judgment directing him to turn that PYTH over to the Terraform bankruptcy estate.

## BACKGROUND

7. PDA launched its titular cryptocurrency, PYTH, in 2021. ECF 1632 ("PDA Mot.") ¶ 21. Consumers either purchased or were granted PYTH, and PYTH tokens were stored in cryptocurrency wallets operated by Debtor FTX Trading Ltd. ("FTX"). *Id.* ¶ 20.

8. On November 11, 2022, FTX and more than 100 related entities filed for bankruptcy. *See* ECF 1. At the time, "approximately 99% of Original PYTH was held in accounts at FTX." PDA Mot. ¶ 4. Because of the automatic bankruptcy stay, holders of Original PYTH could not access or use their tokens, and thus there was "no use case or utility for Original PYTH." *Id.* ¶ 7.

9. To remedy this issue for the benefit of Original PYTH holders, PDA sought "relief from the automatic stay to adopt newly minted PYTH tokens … as the planned native token of the Pyth Protocol pursuant to a reminting plan." *Id.* ¶ 8. Under the reminting plan that PDA proposed on June 14, 2023, PDA would "adopt the New PYTH as the native token," essentially treating it identically to Original PYTH. *Id.* ¶ 9. PDA insisted that the reminting plan would make "the Pyth community … better off" and "holders w[ould] receive New Pyth that may one day have

3

substantial value." *Id.* ¶ 12; *see also id.* ¶ 10 (explaining that reminting plan will "deliver value to holders"); *id.* ¶ 11 (explaining that without the reminting plan "[a]ll Original PYTH holders … would thus lose the opportunity to benefit from owning a potentially valuable asset that can at this point be realized only if the Reminting Plan proceeds"). PDA did not disclose that it, too, was a holder of Original PYTH tokens and stood to directly benefit from the requested relief. *See* Ex. A at 3 (September 6, 2024 letter from PDA counsel).[2]

10. In seeking relief from the automatic stay, PDA represented to the Court that it had "work[ed] collaboratively" with the Debtors to "address certain issues and to obtain their consent to file this motion given the unique circumstances presented." PDA Mot. ¶¶ 8, 46. PDA told the Court that it would provide notice of the motion to the Debtors, the Official Committee of Unsecured Creditors, the U.S. Trustee, the SEC, the Internal Revenue Service ("IRS"), the U.S. Department of Justice ("DOJ"), the U.S. Attorney for the District of Delaware, and any other parties requesting notice. *Id.* ¶ 48.

11. On June 23, 2023, the Court granted PDA's motion, modifying the automatic bankruptcy stay to allow the reminting plan to occur, subject to numerous conditions on which PDA and the Official Committee of Unsecured Creditors had agreed. ECF 1693 ("Order"); ECF 1683. As relevant here, the Order provided that "[a]ny Reminting Plan" would "include reasonable and customary customer identification procedures that holders of Original Pyth will be required to satisfy in order to receive New Pyth." Order ¶ 3. The Court also required that, after the reminting plan was completed, a "representative of PDA" file a declaration with the Court "stating that PDA has endorsed New PYTH and Original PYTH has no functionality on the Pyth Protocol." *Id.* ¶ 4.

---

[2] All "Ex." citations refer to exhibits attached to the accompanying declaration of David Patton in support of Mr. Kwon's motion to enforce.

4

In finding just cause for the Order, the Court relied on the representation that the Debtors had "consent[ed] to the requested relief." *Id.* at 1–2.

12. The Court "retain[ed] jurisdiction with respect to all matters arising from or related to the implementation of" its Order permitting the reminting plan. *Id.* ¶ 6; *see also* PDA Mot. ¶¶ 14–17; *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders").

13. One month later, on August 23, 2023, a PDA representative submitted a sworn declaration informing the Court that the "Reminting Plan ha[d] been completed," that PDA had endorsed New PYTH, and that "Original PYTH ha[d] no functionality on the PYTH Protocol." ECF 2235 ¶¶ 4–5.

14. Despite PDA's declaration, PDA's efforts to distribute New PYTH—and ultimately take huge amounts of New PYTH for itself—were just beginning.

15. On August 16, 2023, just one week before PDA declared that the reminting plan had been "completed," *id.* ¶ 4, PDA's Board apparently "approved a Reminting Plan" that had been "submitted by the PYT Foundation," pursuant to which the Foundation would distribute New PYTH after holders of Original PYTH executed a "Token Delivery Agreement" and completed "any KYC requirements and anti-money laundering due diligence required by the PYT Foundation in its reasonable discretion," Ex. A at 3.

16. PDA had not disclosed to the Court the involvement of the Foundation in the reminting plan, let alone the nature of the relationship between the two entities. *See generally* PDA Mot. And PDA has since acknowledged that despite declaring the reminting plan "completed" on August 23, 2023, holders of Original PYTH were not even "informed … of the Reminting Plan" until "September 7, 2023," and the plan, as described by PDA itself, would take several months to

5

carry out. Ex. A at 3.

17. On September 7, 2023, the Foundation (through a nameless email, management@pyt.foundation) contacted holders of Original PYTH regarding the plan to distribute to each of them "an equivalent entitlement to Replacement PYTH Tokens." Ex. B at 3–4 (Sept. 7, 2023 email from PYT Foundation to PYTH token holders); *see also* Ex. A at 3 (stating that "[t]o the best of PDA's knowledge, the PYT Foundation attempted to inform all holders of Original PYTH about the requirements to obtain New PYTH" on September 7, 2023).

18. The Foundation's September 7 email identified "two steps" that token holders had to take to receive New PYTH: (i) completion of the "Synaps Process for KYC/KYB and Wallet Set Up" and (ii) execution of a "Token Delivery Agreement." Ex. B at 3–4. The email also unveiled a new term to the reminting plan—never disclosed to the Court—that token holders who did not complete those steps by an arbitrary December 7, 2023 deadline would "forfeit" their entitlement, and their New PYTH would "be reallocated and delivered to the Pyth Data Association." *Id.*

19. Mr. Kwon was among the Original PYTH holders who received the Foundation's email. At the time, Mr. Kwon held 500 million Original PYTH tokens, which he had obtained pursuant to a consultancy agreement with Tribal Invest Corp. (a wholly owned subsidiary of the Pyth Data Foundation). Ex. C (May 18, 2021 Pyth Consulting Agreement); Ex. D (May 18, 2021 Restricted Token Grant Agreement); Ex. E (May 23, 2022 Amendment to Restricted Token Grant Agreement). Mr. Kwon had previously served as president of PDA's board, but gave up his board seat in May 2022. Ex. F (May 17, 2022 letter of resignation). Mr. Kwon's PYTH holdings represented five percent of the total 10 billion New PYTH tokens that would be distributed in accordance with the reminting plan. Ex. B at 5.

20. Also at the time of the Foundation's email, Mr. Kwon was being held in a

Montenegro detention facility, and he and his company, Terraform Labs Pte Ltd., were defendants in an ongoing SEC enforcement action relating to the marketing of a cryptocurrency product that Terraform had developed. *See SEC v. Terraform Labs Pte Ltd.*, No. 23 Civ. 1346 (S.D.N.Y.).

21.    Within a week of the Foundation's email, counsel for Mr. Kwon responded and provided the information needed for the Token Delivery Agreement. Counsel also explained that Mr. Kwon had given his wife, Lee Daeun, power of attorney to act on his behalf, and attached that power of attorney. Ex. B at 2–3 (Sept. 13, 2023 email from A. Jetton to Foundation); Ex. G (power of attorney). Ms. Daeun herself dutifully completed all of the required "Synaps KYC/KYB" steps. Ex. B at 2 (Oct. 6, 2023 email from Foundation to A. Jetton) (noting "Lee Daeun" "Synaps verification process" "has already been submitted appropriately").

22.    Nearly a month later, the Foundation responded to Mr. Kwon's counsel, noting that Mr. Kwon himself "must also submit to the Synaps verification process." *Id.* Mr. Kwon's counsel responded immediately, explaining that because Mr. Kwon was "detained in Montenegro" he did not "have the ability to do the live face verification, which is required by the Synaps verification process" and asked the Foundation to "advise on an alternate approach." *Id.* (Oct. 6, 2023 email from A. Jetton to Foundation). Mr. Kwon's counsel followed up six days later, requesting an update, and she followed up again six days after that. *Id.* at 1–2 (Oct. 12 and 18, 2023 email from A. Jetton to Foundation).

23.    After two full weeks, the anonymous person writing from management@pyt.foundation finally responded, "We do require that all [ultimate beneficial owners] finish the KYC process and unfortunately there are no alternative solutions to the live verification requirement," concluding the email, "Sorry for the inconvenience." *Id.* at 1 (Oct. 20, 2023 email from Foundation to A. Jetton).

7

24. Counsel for Mr. Kwon tried another approach, emailing Synaps (the verification company). Ex. H at 2 (Nov. 21, 2023 email from A. Jetton to Synaps). She explained that because Mr. Kwon was "detained by Montenegrin authorities and is in jail ... [i]t is not possible for him to access a smart phone to go through the Synaps process." *Id.* She explained that Mr. Kwon's wife has his power of attorney, but that his wife's attempts to complete the Synaps process on Mr. Kwon's behalf were not working. *Id.* Mr. Kwon's counsel asked Synaps how to proceed.

25. Synaps support responded but did not answer Mr. Kwon's counsel's questions. *Id.* at 1 (Nov. 22, 2023 email from Synaps to A. Jetton). Mr. Kwon's counsel persisted, following up and explaining, once again, that Mr. Kwon's wife was acting pursuant to a power of attorney and that Mr. Kwon was in jail, did not have access to a smart phone, and could not comply with the live face verification requirement. Counsel offered, as an alternative, to do the verification herself as Mr. Kwon's attorney. *Id.* (Nov. 28, 2023 email from A. Jetton to Synaps).

26. On November 30, 2023, the Foundation sent a "final notice" stating there was "only 1 week left to complete" the Synaps vertification process. Ex. I at 2 (Nov. 30, 2023 email from Foundation to PYTH token holders). Within hours, Mr. Kwon's counsel responded, disputing that "the Synaps process is the only way to accomplish a reasonable KYC/KYB check," and again explaining that "there is no reasonable way that Do Kwon can complete a 'liveness check' as part of the Synaps process, because he does not have liberty to access a smart phone or laptop with a connection to the Internet." *Id.* at 1 (Nov. 30, 2023 email from A. Jetton to Foundation). Mr. Kwon's counsel emphasized that Mr. Kwon's wife had power of attorney and had successfully completed the Synaps process, and that the Foundation had failed to provide any alternate means of completing "this Pyth-imposed third-party process." *Id.* Mr. Kwon's counsel also reminded the Foundation that Mr. Kwon "previously completed a KYC/KYB process with respect to the

8

tokens." *Id.* Mr. Kwon's counsel concluded by objecting to the Foundation's "claim to be able to cause forfeiture of the tokens" and the "reallocat[ion]" to the PDA. *Id.*

27.     Thus, when the December 7, 2023 deadline hit, Mr. Kwon had, through his counsel, flagged for PDA, the Foundation, and Synaps that he was unable to complete live face verification. He had repeatedly offered other ways to verify his identity, including through his wife who had a power of attorney and who had already passed the Synaps' verification process herself, or through his counsel's completion of the verification process. And he expressed willingness to comply with any other reasonable alternative PDA might propose. PDA, of course, knew who its former board president was, and his detention in Montenegro was international news.[3] PDA seized his PYTH anyway.

28.     On December 14, 2023, "the PYT Foundation transferred to the PDA all tokens allocated to holders of Original PYTH who did not satisfy the requirements of the Reminting Plan." Ex. A at 3. That included the reminted PYTH owed to Mr. Kwon—which, on December 14, was worth $215 million.[4]

29.     In January 2024, Terraform declared Chapter 11 bankruptcy. *See In re: Terraform Labs Pte. Ltd.*, No. 24-10070 (Bankr. D. Del.), ECF No. 1. In April 2024, a civil jury hearing the securities claims against Terraform and Mr. Kwon found both defendants liable. Final J. Against Defs. Terraform Labs Pte Ltd. and Do Hyeong Kwon at 2, *SEC v. Terraform Labs Pte Ltd.*, No. 23 Civ. 1346 (S.D.N.Y. June 12, 2024), ECF 273. The final judgment entered in that case requires,

---

[3] *E.g.*, Predrag Milic, *A Cryptocurrency Mogul Arrested in Montenegro Faces Extradition to South Korea After a Court Ruling*, AP (Mar. 7, 2024), https://apnews.com/article/montenegro-cryptocurrency-kwon-extradition-terraform-south-korea-ea966ff4132b84759c0dd7d4e1d19d17; Reuters, *Montenegro Court Jails 'Cryptocurrency King' Do Kwon for Four Months* (June 19, 2023), https://www.reuters.com/world/europe/montenegro-court-jails-cryptocurrency-king-do-kwon-four-months-media-2023-06-19; Peter Hoskins, *Terrausd: South Korea 'Cryptocrash King' Do Kwon Jailed*, BBC (June 19, 2023), https://www.bbc.com/news/business-65957999.

[4] *Pyth Network*, CoinBase, https://www.coinbase.com/price/pyth-network (last visited February 27, 2025).

9

among other things, that Mr. Kwon "transfer" his "ownership interest in all PYTH tokens" to the Terraform bankruptcy estate. *Id.* at 8.

30. PDA's actions have prevented Mr. Kwon from complying with that judgment. Mr. Kwon, the Official Committee of Unsecured Creditors of Terraform Labs Pte. Ltd., and the Terraform Plan Administrator have sought to resolve this issue with PDA, the Foundation, and their respective counsel. Most recently, since December 2024, the undersigned counsel for Mr. Kwon and the Terraform Plan Administrator have engaged in discussions with counsel for PDA after advising PDA of Mr. Kwon's intention to seek judicial relief. All those efforts have failed, necessitating this motion.

**ARGUMENT**

31. It is "axiomatic" that the Court has inherent authority to enforce its own orders, *In re Continental Airlines, Inc.*, 236 B.R. 318, 325–26 (Bankr. D. Del. 1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80 (1994)), and the Bankruptcy Code likewise empowers the Court to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders … or to prevent an abuse of process," 11 U.S.C. § 105(a); *see also In re Achaogen, Inc.*, 649 B.R. 238, 248 (Bankr. D. Del. 2023) (recognizing power to hold parties in contempt where "(1) a valid order of the court existed; (2) the [litigant] had knowledge of the order; and (3) the [litigant] disobeyed the order" (quoting *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir. 1995)).

32. PDA's self-enrichment to the tune of hundreds of millions of dollars violated the Court's Order and represents a flagrant abuse of process. For all the reasons below, it should not be permitted to stand.

### A. PDA Violated the Court's Order by Using Unreasonable and Non-Customary Procedures

33. The Court's order allowed PDA to use "reasonable" and "customary" customer identification procedures in distributing New PYTH to original holders. PDA's actions were neither.

34. ***PDA's customer identification procedures were unreasonable.*** To start, because the purpose of a "customer identification procedure" is to ensure that people are who they say they are, a procedure is necessarily unreasonable where it cannot be satisfied by a customer whose identity was never in dispute. Here, of course, there was no confusion about who Mr. Kwon was. He had served as president of PDA's board, he had been hired by a related entity to advise the company about PYTH, and he was affirmatively advised about the reminting plan because PDA knew that he was a PYTH holder. Exs. B–F. Moreover, Mr. Kwon's detention in Montenegro was a widely publicized fact, and Mr. Kwon's counsel (from a major international law firm) and wife (in possession of his power of attorney) were ready and willing to navigate any formalities bearing on Mr. Kwon's receipt of New PYTH tokens. Ex. G. Any procedure that would make it impossible for Mr. Kwon to prove his identity in these circumstances cannot be considered reasonable.

35. The specific set of conditions that PDA imposed on recipients of New PYTH cannot be considered reasonable either.

36. PDA's insistence on live face verification from Mr. Kwon himself, and its refusal to entertain any alternative procedures, was not reasonable. Mr. Kwon, acting through sophisticated counsel, repeatedly offered to verify his identity in any way possible. And his counsel did more than express openness to alternatives; she provided the Foundation and Synaps with a signed power of attorney authorizing Mr. Kwon's wife to make financial and other decisions on his behalf, along with an explanation for why the power of attorney was needed, and Mr. Kwon's

wife herself completed the live face verification process. Exs. B, G. If, for whatever reason, the Foundation preferred to review other forms of identification from Mr. Kwon, that too would have sufficed. But PDA instead insisted on a rigid live face verification requirement that it knew Mr. Kwon could not satisfy.

37. Live face verification is hardly necessary to confirm a person's identity. The Bankruptcy Code, for example, specifies that debtors may prove their identity through a "driver's license, passport, or other document that contains a photograph of the debtor." 11 U.S.C. § 521(h)(1). The Bank Secrecy Act allows for similar flexibility. Under the Act's implementing regulations, banks must implement a written Customer Identification Program that includes "risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable." 31 C.F.R. § 1020.220(a)(1)–(2). For non-citizens, such procedures must require that an individual present "one or more of the following: A taxpayer identification number; passport number and country of issuance; alien identification card number; or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard." *Id.* § 1020.220(a)(2)(i)(A)(4)(i)–(ii); *see also Nia v. Bank of Am., N.A.*, --- F. Supp. 3d ---, 2024 WL 1298004, at *10 (S.D. Cal. Mar. 26, 2024). While different institutions use different procedures to ensure that they know the identities of their customers, the use of live face verification is by no means the only option—and certainly not one that must be used exclusively.[5]

38. Next, PDA's imposition of a short and arbitrary timeline—three months to comply with the customer identification procedures —smacks of unreasonableness. There was no exigency

---

[5] On top of all that, requiring face biometrics as part of any identification or verification system comes with a host of data and privacy security risks. For that reason, experts have advised against making it a routine part of a customer identification process. *See, e.g.*, Letter from CEO Arvind Krishna to Members of Congress, IBM (June 8, 2020), https://www.ibm.com/policy/facial-recognition-sunset-racial-justice-reforms/.

demanding or requiring that PDA act on "unclaimed" PYTH tokens within three months. Tokens could have been held in escrow for much longer than that, especially since the reminting plan itself envisioned that only 15% of New PYTH tokens would "be initially unlocked" and in free circulation. *See* Ex. B at 5.

39. Equally unreasonable is PDA's application of a penalty of total default for purported noncompliance with identification procedures. *Cf. In re Bell*, 617 B.R. 364, 375 (Bankr. D. Colo. 2020) (no basis to dismiss bankruptcy case because debtor failed to bring Social Security card to multiple Section 341 Meetings where debtor at most displayed commonplace inadvertence or negligence). The severity of the penalty is especially clear in the circumstances here, where PDA used the penalty to seize for itself five percent of the total PTYH available.

40. ***PDA's customer identification procedures were not customary.*** PDA's customer identification procedures were not customary either. Powers of attorney are a universally accepted method for a third party to make financial, medical, welfare, and other decisions when someone is incapacitated. The decision to entirely ignore a valid power of attorney is inconsistent with history and tradition, and could not be further from "customary."[6] Every single day, banks, Fortune 500 companies, the federal government, and every other sort of institution and entity recognize and respect powers of attorney.[7]

41. At bottom, PDA's approach to customer verification was neither reasonable nor customary, and served as nothing more than a pretext to allow PDA to take substantial amounts of

---

[6] Indeed, the first known references to powers of attorney date back to Mesopotamia. *See Ancient History Sourcebooks: A Collection of Contracts from Mesopotamia, c. 2300–428 BCE*, Fordham University, https://sourcebooks.web.fordham.edu/ancient/mesopotamia-contracts.asp.

[7] Major banks, for example, routinely have policies for, and guidance about, dealing with powers of attorney. *See, e.g.*, *Power of Attorney*, Bank of America, https://www.bankofamerica.com/signature-services/power-of-attorney/; *Caring for Family Members*, Wells Fargo, https://www.wellsfargo.com/financial-health/life-events/financial-caregiving/; *Customer Documentation*, Citibank, https://www.citibank.com/tts/sa/digital-account-guide/key-documentation/customer-documentation.html.

PYTH for itself. PDA acted in plain violation of the Court's Order.

### B. PDA Abused the Judicial Process by Failing to Disclose That the Reminting Plan Would Involve PDA's Appropriation of PYTH for Itself

42. The Court also has "broad authority … to take any action that is necessary or appropriate 'to prevent an abuse of process.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007) (quoting 11 U.S.C. § 105(a)); *see also*, *e.g.*, *In re Nixon*, 404 F. App'x 575, 579 (3d Cir. 2010) (affirming bankruptcy court's modification of interest award when "purposeful delay" constituted "abuse of process"). When a bankruptcy court is "faced with fraud," it may "engage in any appropriate action to root out the fraud and prevent an abuse of process in a manner consistent with the Bankruptcy Code and Rules." *In re Delloso*, 72 F.4th 532, 543 (3d Cir. 2023).

43. PDA represented to the Court that its request for relief from the bankruptcy stay and its plan to remint original PYTH was "for the benefit of Original PYTH holders." PDA Mot. ¶ 12. PDA also represented to the Court, as well as the Debtors and creditors, that "holders will receive New Pyth that may one day have substantial value." *Id.* But PDA purposefully omitted a critical component of its intended plan—that it would "reallocate" and have "delivered" to itself the PYTH tokens of holders that did not comply with the customer identification procedures that it controlled. Ex. B at 3–4.

44. PDA's omission was significant. To start, PDA's motion and follow-on filings highlighted the Debtors' and the Official Committee of Unsecured Creditors' consent to the PDA's proposal to remint PYTH. PDA Mot. ¶¶ 8, 39, 46; ECF 1683. And, of course, PDA was required to and did provide notice of its motion to not only the Debtors and the Official Committee of Unsecured Creditors, but also the U.S. Trustee, the SEC, the IRS, the DOJ, and the U.S. Attorney for the District of Delaware. PDA Mot. ¶ 48. Each was deprived of the opportunity make an informed choice about whether to object to the reminting plan. At the same time, the Court's ruling,

14

which relied at least in part on the lack of objection, *see* Order at 1–2, was based on the incomplete factual picture that PDA presented.

45. PDA also deprived the Court, the Debtors, creditors, and others the opportunity to consider the role that the Foundation would play in implementing customer identification procedures. Each had the right to ask further questions about, or object to, PDA's decision to involve an obscure Panamanian entity whose actions could have a direct effect on PDA's compliance with the Court's Order.

46. PDA's failure to disclose its plan to seize "unclaimed" PYTH for itself was significant for another reason: it frustrated the purpose of the automatic bankruptcy stay. It does not stretch the imagination that, given the opportunity, Debtors, creditors, and others would have argued that any truly unclaimed PYTH should escheat to them, not to PDA, a Swiss company that has no particular claim to the assets. It is exactly because assets that are in the possession of a bankruptcy estate are subject to a variety of conflicting claims that the automatic stay applies, to allow the Court the opportunity to adjudicate disputes and to allow all entities with a claim to fairly pursue it. *See* 11 U.S.C. § 362.

47. Further, PDA's repossession of large quantities of PYTH directly impacts all other owners of PYTH (including the Debtors and creditors who are owners). Thinking only about Mr. Kwon's PYTH, PDA appropriated 500 million tokens, which represents five percent of the total amount of PYTH available. That appropriation will give PDA substantially more control over the market for PYTH and, in turn, could impact its price and liquidity. The market will, of course, look different if Mr. Kwon's PYTH goes, as it should, through him to the Terraform bankruptcy estate.

48. All in all, PDA deceived the Court to secure relief from the automatic bankruptcy

15

stay and denied the Debtors, creditors, and others their opportunity to object to the actual reminting plan that PDA pursued, including PDA's seizure of substantial PYTH whenever an owner was deemed noncompliant with PDA-controlled identification procedures. And once it had the Court's Order in hand, PDA engaged in theft—in this case, a theft of $215 million. PDA's actions should not be given the Court's imprimatur.

### NOTICE AND NO PRIOR REQUEST

49. Notice of this Motion will be provided to: (i) the Debtors; (ii) the Official Committee of Unsecured Creditors; (iii) U.S. Trustee; (iv) the SEC; (v) the IRS; (vi) the DOJ; (vii) the U.S. Attorney for the District of Delaware; (viii) those parties requesting notice pursuant to Bankruptcy Rule 2002; and (ix) PDA. In light of the nature of the relief requested, Mr. Kwon submits that no further notice is required.

### POSITION OF THE SEC AND TERRAFORM BANKRUPTCY PLAN ADMINISTRATOR

50. ***Position of the SEC.*** The Commission filed a civil enforcement action for violations of the registration and antifraud provisions of the federal securities law violations against Mr. Kwon and Terraform ("Defendants") in the Southern District of New York on February 16, 2023. *See SEC v. Terraform Labs PTE, Ltd., et al.*, No. 23-cv-1346 (S.D.N.Y.). Thereafter, the court ruled at summary judgment that Defendants offered and sold securities in unregistered transactions, in violation of the federal securities laws, and a jury returned a verdict finding the Defendants liable for civil fraud charges. Mr. Kwon and Terraform then consented to entry of final judgment against them, under which Mr. Kwon committed to transferring to the Terraform bankruptcy estate "all PYTH tokens Kwon obtained pursuant to the May 2021 Token Grant Agreement." *SEC v. Terraform Labs Pte Ltd.*, 23 Civ. 1346 (S.D.N.Y. June 12, 2024), ECF 273 at 8-9. The consent final judgment further provides that all assets

transferred by Mr. Kwon to the bankruptcy estate "shall be distributed to harmed investors." *Id*. Mr. Kwon has consulted with the Commission staff and has been advised that in their view the motion to enforce the order granting relief from the automatic stay would aid in compensating harmed investors for their losses.

51.  ***Position of Terraform Plan Administrator.*** Mr. Kwon has also consulted with the plan administrator (the "Terraform Plan Administrator") of Terraform Labs Pte. Ltd.'s wind down trust regarding this motion. The Terraform Plan Administrator supports this motion because the relief requested herein will enable Mr. Kwon to comply with the SEC's final judgment and the transfer and ultimate distribution of the 500 million PYTH tokens to the wind down trust of Terraform Labs Pte. Ltd. for the benefit of Terraform Labs Pte. Ltd.'s crypto loss claimants, all as contemplated by the consent final judgment.

## CONCLUSION

For all the reasons above, Mr. Kwon respectfully requests that the Court order PDA to apply "reasonable and customary customer identification" procedures to him by entering the attached proposed order and that the Court grant any other relief that the Court deems necessary, just, and equitable.

| | |
|---|---|
| Dated: February 27, 2025 | Respectfully submitted,<br><br>GELLERT SEITZ BUSENKELL & BROWN, LLC<br><br>*/s/ Michael Busenkell*<br>Michael Busenkell (DE 3933)<br>1201 N. Orange Street, Suite 300<br>Wilmington, DE 19801<br>(302) 425-5812<br>mbusenkell@gsbblaw.com<br><br>Sean Hecker*<br>David Patton*<br>Michael Ferrara*<br>John C. Quinn*<br>Matthew J. Craig*<br>HECKER FINK LLP<br>350 Fifth Avenue, 63rd Floor<br>New York, New York, 10118<br>(212) 763-0883<br>shecker@heckerfink.com<br>dpatton@heckerfink.com<br>mferrara@heckerfink.com<br>jquinn@heckerfink.com<br>mcraig@heckerfink.com<br><br>Katherine Epstein*<br>HECKER FINK LLP<br>1050 K Street NW, Suite 1040<br>Washington, DC 20001<br>(212) 763-0883<br>kepstein@heckerfink.com<br><br>*Counsel for Movant Do Kwon*<br><br>* *pro hac vice* pending |