# EXHIBIT A



902 Broadway
18th Floor
New York, NY 10010-6035

212.430.2600
Fenwick.com

David W. Feder
dfeder@fenwick.com  |  212.430.2790

September 6, 2024

Joseph B. Evans
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, New York 10017-3852

Re:    <u>In re Terraform Labs Pte Ltd. et al., No. 24-100070 (BLS)</u>

Dear Mr. Evans:

Fenwick & West LLP represents the Pyth Data Association (the "PDA").  We write in response to your letter sent on behalf of the Official Committee of Unsecured Creditors ("Committee") of Terraform Labs Pte. Ltd. et al. ("Terraform"), dated August 13, 2024 (the "August 13 Letter"), and your letter dated August 30, 2024 (the "August 30 Letter") with accompanying discovery requests (the "Requests").  In this letter, the PDA addresses inaccuracies in the August 13 Letter, particularly about what rights Mr. Kwon was able to transfer in the SEC Settlement (as defined in the August 13 Letter).[1]  As described below, the PDA took possession of the tokens now demanded by the Committee through a public and transparent process approved by court order before Terraform filed for bankruptcy.  The PDA denies the wrongdoing alleged or implied by Committee in the August 13 Letter.

1.    **Original PYTH and the Reminting Plan**

The Pyth Network is a public blockchain-based software system that aggregates and provides in real time pricing data for various financial assets, such as digital assets and stocks. Market data providers and consumers use the Pyth Network to transmit and receive this financial market data.  The PDA is a Swiss association founded by Pyth Network participants to advance the development of the Pyth Network.  The PDA has three primary responsibilities: (1) develop technology to promote the Pyth Network's mission; (2) promote general education and awareness of the Pyth Network; and (3) encourage Pyth Network development through a grants program.[2]

---

[1] This letter does not address every allegation and claim in the August 13 Letter and the August 30 Letter, which both address conduct, contracts, and transactions unrelated to the PDA.  The PDA disputes the Committee's allegations and claims, except those expressly admitted in this letter.  The PDA reserves all rights, objections, and defenses.

[2] For more information, see https://pythdataassociation.com.

Joseph B. Evans
September 6, 2024
Page 2

The original PYTH token ("Original PYTH") was meant to be the native cryptographic token of the Pyth Network.  Original PYTH was to be used to, among other things, (i) reward those who contributed pricing data to the Network, (ii) acquire pricing data, and (iii) propose and vote on governance and Pyth Network developments.  Pyth Data Foundation minted the total supply of Original PYTH tokens on February 25, 2022.  Pursuant to a Contribution Agreement with Tribal Invest Corp., the PDA was entitled to 2,010,000,000 Original PYTH tokens.

The May 18, 2021 Token Grant Agreement between Do Kwon and Tribal Invest Corp. (the "Token Grant Agreement") establishes Mr. Kwon's right to Original PYTH.  The Committee alleges in its August 13 Letter that Tribal assigned the Token Grant Agreement to the PDA.  This is incorrect.  The PDA was not assigned the Token Grant Agreement and lacks contractual privity with Mr. Kwon or Terraform.  The PDA is in no position to accept or reject any proposed assignment of the Token Grant Agreement (or the Original PYTH that are the subject of that agreement) that the Committee seeks or may seek.

In fact, the Original PYTH at issue in the Token Grant Agreement remain untouched.  At token generation, 99.25% of Original PYTH tokens were held at cryptocurrency exchange FTX Trading, Ltd. ("FTX").[3]  FTX filed for relief under Chapter 11 of the Bankruptcy Code on November 11, 2022.  *See* Chapter 11 Voluntary Petition, *In re FTX Trading Ltd.*, No. 22-11068, ECF No. 1 (Bankr. Del. Nov. 11, 2022).  As of FTX's petition date, the same 99.25% of Original PYTH, including the Original PYTH that is the subject of the Token Grant Agreement, remained in an account at FTX subject to the FTX bankruptcy.  As a result of the automatic stay in that case, holders of Original PYTH were unable to access their tokens.

With Original PYTH locked up in the FTX bankruptcy, the Pyth Network could not perform the functions envisioned for Original PYTH, including rewarding participants and implementing tokenholder governance.  To address this, on June 14, 2023, the PDA moved the bankruptcy court, with the FTX debtors' consent, to lift the automatic stay and allow the PDA to adopt newly minted PYTH tokens ("New PYTH") to serve as the native token of the Pyth Network (the "Reminting Plan").  *See* Motion of the Pyth Data Association for Relief from the Automatic Stay, *In re FTX Trading Ltd.*, No. 22-11068, ECF No. 1632 (Bankr. Del. June 14, 2023) (the "Motion").  The Motion included the following representation: "The Reminting Plan will also include reasonable and customary customer identification procedures that holders of Original PYTH will be required to satisfy in order to receive new PYTH."  *Id.* ¶ 36.

On June 23, 2023, Bankruptcy Judge Dorsey lifted the automatic stay so that the Reminting Plan could proceed.  *See* Order Granting Motion of Pyth Data Association for Relief from the Automatic Stay, *In re FTX Trading Ltd.*, No. 22-11068, ECF No. 1693 (Bankr. Del. June 23,

---

[3] The remaining 0.75% of Original PYTH was held in self-custodied wallets by holders.

Joseph B. Evans
September 6, 2024
Page 3


2023) (the "Order").  The Order required the Reminting Plan to "include reasonable and customary customer identification procedures that holders of Original PYTH will be required to satisfy in order to receive New PYTH."  *Id.* ¶ 3.

On August 16, 2023, the PDA's Board approved a Reminting Plan submitted by the PYT Foundation.  The Reminting Plan stated that holders of Original PYTH would receive New PYTH from the PYT Foundation commensurate with their holdings of Original PYTH, subject to two requirements: (1) execution of a Token Delivery Agreement; and (2) completion of any KYC requirements and anti-money laundering due diligence required by the PYT Foundation in its reasonable discretion.

To the best of the PDA's knowledge, the PYT Foundation attempted to inform all holders of Original PYTH about the requirements to obtain New PYTH.  On September 7, 2023, the PYT Foundation informed holders of Original PYTH, including the PDA, of the Reminting Plan.  This communication stated that holders of Original PYTH were required to execute a Token Delivery Agreement and complete the KYC process administered by Synaps by December 7, 2023.  The PYT Foundation also stated that "any Existing Token Holder who fails to complete the two steps above to claim their Token Entitlement by the Deadline will forfeit their Token Entitlement and the Replacement PYTH Tokens will be reallocated and delivered to the Pyth Data Association." On October 13, 2023, the PYT Foundation sent a follow up email to holders of Original PYTH, including the PDA, reminding them "to please complete the Synaps process for KYC/KYB verification as soon as possible."  Finally, on November 30, 2023, the PYT Foundation sent an email to all Existing Token Holders, including the PDA, warning that "[t]here is **only 1 week left** to complete the claims process and receive your Token Entitlement," and explaining that "Any Existing Token Holder who fails to complete the process to claim their Token Entitlement by the Deadline will forfeit their Token Entitlement and the Replacement PYTH Tokens will be reallocated and delivered to the Pyth Data Association."[4]

On December 14, 2023, the PYT Foundation transferred to the PDA all tokens allocated to holders of Original PYTH who did not satisfy the requirements of the Reminting Plan.[5]  The

---

[4] Mr. Kwon and his counsel were aware of the customer identification procedure required by the Reminting Plan in advance of the deadline.  On September 13, 2023, Allison Jetton from Dentons, as counsel for Do Kwon, wrote to the PYT Foundation and the PDA to provide a "power of attorney for Do's wife to act on his behalf, such as being the signatory for this Token Delivery Agreement."  Ms. Jetton added, "We note the Synaps steps outlined below."  On November 30, 2023, seven days before the deadline, Ms. Jetton wrote to the PDA and other parties, which email acknowledged that Mr. Kwon was unable to complete the required customer identification procedure required to claim New PYTH.

[5] The transactions discussed in the August 13 Letter (including the so-called "Binance Deposit") have no connection to Mr. Kwon.  Those transactions relate to a different holder who received an allocation of Original PYTH similar in

Joseph B. Evans
September 6, 2024
Page 4

PDA believes that about five holders of Original PYTH did not meet the requirements to receive New PYTH.  Pursuant to the Reminting Plan, all New PYTH remaining after the claims process were sent to the PDA to be used to support the Pyth Network.

### 2.  Responses to Claims Asserted in the August 13 Letter

The August 13 Letter asserts that the PYT Foundation imposed an "after-the-fact 'KYC requirement'" contrary to the terms of the Token Grant Agreement.  But as described above, the FTX bankruptcy court order required a customer identification process.  The process was disclosed to Mr. Kwon and all other affected parties before the compliance deadline.  The transfer of forfeited New PYTH to the PDA could not have been designed to evade the SEC Settlement or affect the Terraform estate.  The transfer occurred more than a month before Terraform filed its Chapter 11 petition, two months before the Committee was formed, and six months before the SEC Settlement was first made public.  *See* Chapter 11 Voluntary Petition, *In re Terraform Pte Ltd.*, No. 24-10070, ECF No. 1 (Bankr. Del. Jan. 21, 2024); Notice of Appointment of Creditors' Committee Filed by U.S. Trustee, *In re Terraform Pte Ltd.*, No. 24-10070, ECF No. 101 (Bankr. Del. Feb. 29, 2024); Proposed Judgment, *SEC v. Terraform Labs Pte Ltd., et al.*, No. 23-cv-1346, ECF No. 271 (S.D.N.Y. June 12, 2024).

To the extent the Committee contends that Mr. Kwon transferred New PYTH to the Committee, this also cannot be true.  First, the Token Grant Agreement relates only to Original PYTH.  Second, Mr. Kwon forfeited whatever interest he had in New PYTH when he failed to complete the court-ordered customer identification process.  Mr. Kwon could not transfer an asset he did not own.  *E.g., Nyepon v. Human Res. Dev. Inst., Inc.*, 2012 WL 3686866 (D. Mass. Aug. 27, 2012) (contract to convey property seller did not hold title to was unenforceable); *E. I. DuPont de Nemours & Co. v. Laird*, 24 Del. Ch. 152, 160 (1939) ("That one having no title to goods, chattels, or other personal property can ordinarily pass none, by an alleged sale to another person, must be conceded.").

On the other hand, as of the date of the SEC settlement, Mr. Kwon retained the right to *Original PYTH* under the Token Grant Agreement.  That right is what Mr. Kwon transferred to the Committee pursuant to the SEC settlement agreement.  As far as the PDA is aware, the tokens remain custodied by FTX.  The PDA takes no position on the Committee's entitlement to Mr. Kwon's allocation of Original PYTH.

---

size to Mr. Kwon's, but who was able to complete the customer identification process required by the Reminting Plan.  There is nothing nefarious about these transactions.

Joseph B. Evans
September 6, 2024
Page 5

### 3.   Response to the August 30 Letter and Requests

Without waiving any right or objection, we are willing to meet and confer on a potential voluntary production by the PDA.  However, we note that many of the Requests depend on a misunderstanding of the above and other facts, relate to parties other than the PDA or contracts the PDA is not a signatory to, describe events that to the PDA's knowledge did not happen, are unreasonably overbroad, or request information completely unrelated to the Terraform estate. In advance of any meet-and-confer, to avoid wasting estate resources, we recommend the Committee review FTX bankruptcy filings and other public information about the context we have provided and formulate appropriate requests rather than proceed with the Requests sent on August 30.  Please advise of your availability.

\*\*\*

Please contact me at dfeder@fenwick.com with any questions or concerns.  The PDA reserves its rights and objections, including without limitation objections regarding lack of jurisdiction, defenses arising under equity or under contract, and any other defense, waiving none.

Sincerely,
FENWICK & WEST LLP

DAVID W. FEDER

DWF:jm

# EXHIBIT B

**From:** PYT Foundation <management@pyt.foundation>
**Sent:** Friday, October 20, 2023 4:38 PM
**To:** Jetton, Allison
**Subject:** Re: Important - Claim process for Replacement PYTH Tokens

[WARNING: EXTERNAL SENDER]

Hello Allison,

Excuse the late response. We do require that all UBOs finish the KYC process and unfortunately there are no alternative solutions to the live verification requirement.

Sorry for the inconvenience.

On Wed, Oct 18, 2023 at 1:56 PM Jetton, Allison <allison.jetton@dentons.com> wrote:

> Following up on this. Please advise.
>
> Thank you,
>
> Allison
>
> Allison Jetton
> Partner
>
> My pronouns are: She/Her/Hers
> +1 202 496 7362  |  +1 703 853 7999
> Washington, DC
>
> ---
>
> **From:** Jetton, Allison
> **Sent:** Thursday, October 12, 2023 9:32 PM
> **To:** PYT Foundation <management@pyt.foundation>
> **Subject:** RE: Important - Claim process for Replacement PYTH Tokens
>
> Hi,
>
> Could you please provide an update regarding this matter?
>
> Thank you!
>
> Best,
>
> Allison

Allison Jetton
Partner

My pronouns are: She/Her/Hers
+1 202 496 7362  |  +1 703 853 7999
Washington, DC

---

**From:** Jetton, Allison
**Sent:** Friday, October 06, 2023 4:55 PM
**To:** PYT Foundation <management@pyt.foundation>
**Subject:** RE: Important - Claim process for Replacement PYTH Tokens

Thanks for reaching out. This may be a bit difficult to accomplish because Mr. Kwon is detained in Montenegro. We do not have the ability to do the live face verification, which is required by the Synaps verification process. Please advise on an alternate approach. Thank you!

Best,

Allison

Allison Jetton

My pronouns are: She/Her/Hers
+1 202 496 7362  |  +1 703 853 7999
Assistant: Brenda Harold
Washington, DC

---

**From:** PYT Foundation <management@pyt.foundation>
**Sent:** Friday, October 06, 2023 4:45 PM
**To:** Jetton, Allison <allison.jetton@dentons.com>
**Subject:** Re: Important - Claim process for Replacement PYTH Tokens

**[WARNING: EXTERNAL SENDER]**

Dear Allison,

Please be advised that Kwon Do Hyeong must also submit to Synaps verification process in addition to Lee Daeun which has already been submitted appropriately/

Thank you for your understanding.

On Wed, Sep 13, 2023 at 9:28 PM Jetton, Allison <allison.jetton@dentons.com>
wrote:

Hello,

For the Token Delivery Agreement:

- Name: Lee Daeun for Kwon Do Hyeong
- Title: Attorney for Principal
- Physical address: 8 Ardmore Park #19-01 Singapore 25963
- Email address of the signatory: giselle703@gmail.com

Please see the power of attorney attached for Do's wife to act on his behalf, such
as being the signatory for this Token Delivery Agreement.

We note the Synaps step outlined below.

Thank you,

Allison

Allison Jetton

My pronouns are: She/Her/Hers
© +1 202 496 7362  |  © +1 703 853 7999

Assistant: Brenda Harold
Washington, DC

---

**From:** PYT Foundation <management@pyt.foundation>
**Sent:** Thursday, September 07, 2023 10:39 AM
**Cc:** ciaran@pyth.network; steve@pyth.network; abhimanyu@pyth.network
**Subject:** Important - Claim process for Replacement PYTH Tokens

**[WARNING: EXTERNAL SENDER]**

Hello - hope this email finds you well.

We are emailing you with important information pertaining to the tokens adopted
as the native token for the Pyth Network (the "**Replacement PYTH Tokens**").

Holders of the original PYTH Tokens ("**Existing Token Holders**") will receive an
equivalent entitlement to Replacement PYTH Tokens ("**Token Entitlement**"). The
original PYTH Tokens have become unavailable due to unforeseen

circumstances.  The Replacement PYTH Tokens are not materially different from the original PYTH Tokens.

Existing Token Holders have until 11:59 PM Eastern Standard (UTC -5) time on Thursday, December 7th, 2023 (the "**Deadline**") to exercise their Token Entitlement and claim the Replacement PYTH Tokens.

There are two steps Existing Token Holders must take to receive their Token Entitlements:

1. **Synaps Process for KYC/KYB and Wallet Set up**

   1. Complete the Synaps identification and authentication process here: *https://pyth.synaps.me/signup*. To avoid delays or issues, be sure to use the exact legal entity/person that is the Existing Token Holder.
   2. Provide a Solana wallet address which will receive the Replacement PYTH Tokens. To facilitate future governance, this wallet should allow for Web3 interaction via Wallet Connect. Note this wallet address will be collected by Synaps as part of the application form.
   3. Please reach out if you want more information on how to take delivery of the Replacement Pyth Tokens, including introductions to wallet service providers.  Existing Token Holders acknowledge and agree that PYT Foundation, its affiliates and service providers and the Pyth Data Association, its affiliates and services providers make no representations or warranties, express or implied, with respect to any providers of custody solutions ("**Custody Providers**") or their compatibility with Wallet Connect and disclaim any and all liability with respect to Custody Providers and Wallet Connect.

2. **Token Delivery Agreement (TDA)**

   1. Please see the attached TDA for your review and let us know if you have any questions. Please reply back to this email with the name, title, physical address, and email address of the signatory so that a TDA DocuSign (along with additional details) can be sent to such signatory for execution.

Note that any Existing Token Holder who fails to complete the two steps above to claim their Token Entitlement by the Deadline will forfeit their Token Entitlement and the Replacement PYTH Tokens will be reallocated and delivered to the Pyth Data Association.

There are 10,000,000,000 Replacement PYTH Tokens and this total supply will not increase. 85% of the Replacement PYTH Tokens will initially be contractually locked. The locked Replacement PYTH Tokens will gradually unlock 6, 18, 30, and 42 months after the Replacement Pyth Token launch. The remaining 15% of Replacement PYTH Tokens will initially be unlocked.

Thank you,

--
**PYT Foundation**

This email is for the confidential use of the named addressee(s) only and may contain proprietary, confidential, or privileged information and/or personal data. If you are not the intended recipient, you are hereby notified that any review, dissemination, or copying of this email is strictly prohibited, and requested to notify the sender immediately and destroy this email and any attachments. Email transmission cannot be guaranteed to be secure or error-free. The Foundation, therefore, does not make any guarantees as to the completeness or accuracy of this email or any attachments. This email is for informational purposes only and does not constitute a recommendation, offer, request, or solicitation of any kind to buy, sell, subscribe, redeem, or perform any type of transaction of a financial product. Personal data, as defined by applicable data protection and privacy laws, contained in this email may be processed by the Foundation, and any of its affiliated or related companies, for legal, compliance, and/or business-related purposes. You may have rights regarding your personal data; for information on exercising these rights or the Foundation's treatment of personal data, please email management@pyt.foundation.

--
**PYT Foundation**

This email is for the confidential use of the named addressee(s) only and may contain proprietary, confidential, or privileged information and/or personal data. If you are not the intended recipient, you are hereby notified that any review, dissemination, or copying of this email is strictly prohibited, and requested to notify the sender immediately and destroy this email and any attachments. Email transmission cannot be guaranteed to be secure or error-free. The Foundation, therefore, does not make any guarantees as to the completeness or accuracy of this email or any attachments. This email is for informational purposes only and does not constitute a recommendation, offer, request, or solicitation of any kind to buy, sell, subscribe, redeem, or perform any type of transaction of a financial product. Personal data, as defined by applicable data protection and privacy laws, contained in this email may be processed by the Foundation, and any of its affiliated or related companies, for legal, compliance, and/or business-related purposes. You may have rights regarding your personal data; for information on exercising these rights or the Foundation's treatment of personal data, please email management@pyt.foundation.

--
**PYT Foundation**

This email is for the confidential use of the named addressee(s) only and may contain proprietary, confidential, or privileged information and/or personal data. If you are not the intended recipient, you are hereby notified that any review, dissemination, or copying of this email is strictly prohibited, and requested to notify the sender immediately and destroy this email and any attachments. Email transmission cannot be guaranteed to be secure or error-free. The Foundation, therefore, does not make any guarantees as to the completeness or accuracy of this email or any attachments. This email

is for informational purposes only and does not constitute a recommendation, offer, request, or solicitation of any kind to buy, sell, subscribe, redeem, or perform any type of transaction of a financial product. Personal data, as defined by applicable data protection and privacy laws, contained in this email may be processed by the Foundation, and any of its affiliated or related companies, for legal, compliance, and/or business-related purposes. You may have rights regarding your personal data; for information on exercising these rights or the Foundation's treatment of personal data, please email management@pyt.foundation.

# EXHIBIT C

## CONSULTING AGREEMENT

This Consulting Agreement ("***Agreement***") is entered into as of May 18, 2021 (the "***Effective Date***"), between Tribal Invest Corp, a Panamanian corporation ("***Company***"), and Do Hyeong Kwon ("***Consultant***").

Company and Consultant desire to have Consultant perform services for Company, subject to and in accordance with the terms and conditions of this Agreement.

THEREFORE, the parties agree as follows:

**1.      SERVICES**

1.1      Statement of Work.  Company and Consultant have executed (or will execute) a statement of work, substantially in the form attached hereto as Exhibit A, that describes the specific services to be performed by Consultant (as executed, the "***Statement of Work***").  The Statement of Work will expressly refer to this Agreement, will form a part of this Agreement, and will be subject to the terms and conditions contained herein.  The Statement of Work may be amended only by written agreement of the parties.

1.2      Performance of Services.  Consultant will perform the services described in the Statement of Work (the "***Services***") in accordance with the terms and conditions set forth in the Statement of Work and this Agreement.

1.3      Consultant Personnel.  Consultant will perform all Services only through its regular, full-time employees and through subcontractors approved in advance in writing by Company (Consultant's employees and approved subcontractors, if any, are referred to collectively as the "***Consultant Personnel***"). Consultant acknowledges and agrees that all Consultant Personnel are subject to Company's continuing acceptance and that Company expressly reserves the right at any time to reject any Consultant Personnel for any reason.  To the extent that any Consultant Personnel are required to perform Services at a Company facility, Consultant will first ensure that such Consultant Personnel have been informed of Company's workplace, computer and security policies and procedures, and will comply with such policies and procedures at all times.

1.4      Delivery.  Consultant will deliver to Company the deliverables, designs, modules, software, products, documentation and other materials specified in the Statement of Work (individually or collectively, "***Deliverables***") in accordance with the delivery schedule and other terms and conditions set forth in the Statement of Work.

**2.      PAYMENT**

2.1      Fees.  As Consultant's sole compensation for the performance of Services, Company will pay Consultant the fees specified in the Statement of Work in accordance with the terms set forth therein. Without limiting the generality of the foregoing, Consultant acknowledges and agrees that, if specified in

the Statement of Work, Company's payment obligation will be expressly subject to Consultant's completion or achievement of certain milestones to Company's reasonable satisfaction.

2.2      Expenses.  Unless otherwise specified in the Statement of Work, Company will not reimburse Consultant for any expenses incurred by Consultant in connection with performing Services.

2.3      Payment Terms.  Unless otherwise provide in the Statement of Work, all fees and other amounts set forth in the Statement of Work, if any, are stated in and are payable in U.S. dollars.  Unless otherwise provided in the Statement of Work, Consultant will invoice Company on a monthly basis for all fees and expenses payable to Consultant.  Company will pay the full amount of each such invoice within thirty (30) days following receipt thereof, except for any amounts that Company disputes in good faith.  The parties will use their respective commercially reasonable efforts to promptly resolve any such payment disputes.

## 3.      RELATIONSHIP OF THE PARTIES

3.1      Independent Contractor.  Consultant is an independent contractor and nothing in this Agreement will be construed as establishing an employment or agency relationship between Company and Consultant or any Consultant Personnel.  Consultant has no authority to bind Company by contract or otherwise. Consultant will perform Services under the general direction of Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which Services are accomplished, subject to the requirement that Consultant will at all times comply with applicable law.

3.2      Taxes and Employee Benefits.  Consultant will report to all applicable government agencies as income all compensation received by Consultant pursuant to this Agreement.  Consultant will be solely responsible for the payment of all compensation to all Consultant Personnel, as well as for the payment of all withholding taxes, social security, workers' compensation, unemployment and disability insurance or similar items required by any government agency.  Consultant Personnel will not be entitled to any benefits paid or made available by Company to its employees, including, without limitation, any vacation or illness payments, or to participate in any plans, arrangements or distributions made by Company pertaining to any bonus, stock option, profit sharing, insurance or similar benefits.  Consultant will indemnify and hold Company harmless from and against all damages, liabilities, losses, penalties, fines, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or relating to any obligation imposed by law on Company to pay any withholding taxes, social security, unemployment or disability insurance or similar items in connection with compensation received by Consultant pursuant to this Agreement.

3.3      Liability Insurance.  Consultant acknowledges that Company will not carry any liability insurance on behalf of Consultant.  Consultant will maintain in force adequate liability insurance to protect Consultant from (i) claims under workers' compensation and state disability acts, and (ii) claims of personal injury (or death) or tangible or intangible property damage (including loss of use) that arise out of any act or omission of Consultant or any Consultant Personnel.

## 4.      OWNERSHIP

4.1      Disclosure of Work Product.  Consultant will, as an integral part of the performance of Services, disclose in writing to Company all inventions, products, designs, drawings, notes, documents, information,

documentation, improvements, works of authorship, processes, techniques, know-how, algorithms, specifications, biological or chemical specimens or samples, hardware, circuits, computer programs, databases, user interfaces, encoding techniques, and other materials of any kind that Consultant may make, conceive, develop or reduce to practice, alone or jointly with others, in connection with performing Services, or that result from or that are related to such Services, whether or not they are eligible for patent, copyright, mask work, trade secret, trademark or other legal protection (collectively, "**Consultant Work Product**"). Consultant Work Product includes without limitation any Deliverables that Consultant delivers to Company pursuant to Section 1.4.

4.2     Ownership of Consultant Work Product. Consultant and Company agree that, to the fullest extent permitted by applicable law, Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to each item of Consultant Work Product. Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to all right, title and interest in and to the Consultant Work Product, including all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how, and any and all other intellectual property or proprietary rights (collectively, "**Intellectual Property Rights**") therein.

4.3     Moral Rights. To the fullest extent permitted by applicable law, Consultant also hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, and waives and agrees never to assert, any and all Moral Rights (as defined below) that Consultant or any Consultant Personnel may have in or with respect to any Consultant Work Product, during and after the term of this Agreement. "**Moral Rights**" mean any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right."

4.4     Related Rights. To the extent that Consultant owns or controls (presently or in the future) any patent rights, copyright rights, mask work rights, trade secret rights, or any other intellectual property or proprietary rights that may block or interfere with, or may otherwise be required for, the exercise by Company of the rights assigned to Company under this Agreement (collectively, "**Related Rights**"), Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Related Rights, to the extent necessary to enable Company to exercise all of the rights assigned to Company under this Agreement.

## 5.     CONFIDENTIAL INFORMATION

For purposes of this Agreement, "**Confidential Information**" means and will include: (i) any information, materials or knowledge regarding Company and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development that is disclosed to Consultant or to which Consultant has access in connection with performing Services; (ii) the Consultant Work

Product; and (iii) the terms and conditions of this Agreement. Confidential Information will not include any information that: (a) is or becomes part of the public domain through no fault of Consultant; (b) was rightfully in Consultant's possession at the time of disclosure, without restriction as to use or disclosure; or (c) Consultant rightfully receives from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure. Consultant agrees to hold all Confidential Information in strict confidence, not to use it in any way, commercially or otherwise, except in performing Services, and not to disclose it to others. Consultant further agrees to take all actions reasonably necessary to protect the confidentiality of all Confidential Information, including, without limitation, implementing and enforcing procedures to minimize the possibility of unauthorized use or disclosure of Confidential Information.

**WARRANTIES**

5.1     No Pre-existing Obligations. Consultant represents and warrants that Consultant has no pre-existing obligations or commitments (and will not assume or otherwise undertake any obligations or commitments) that would be in conflict or inconsistent with or that would hinder Consultant's performance of its obligations under this Agreement.

5.2     Performance Standard. Consultant represents and warrants that Services will be performed in a thorough and professional manner, consistent with high professional and industry standards by individuals with the requisite training, background, experience, technical knowledge and skills to perform Services.

5.3     Non-infringement. Consultant represents and warrants that the Consultant Work Product will not infringe, misappropriate or violate the rights of any third party, including, without limitation, any Intellectual Property Rights or any rights of privacy or rights of publicity, except to the extent any portion of the Consultant Work Product is created, developed or supplied by Company or by a third party on behalf of Company.

5.4     Non-Solicitation of Personnel. During the term of this Agreement and for a period of one (1) year thereafter, Consultant will not directly or indirectly solicit the services of any Company employee or consultant for Consultant's own benefit or for the benefit of any other person or entity.

5.5     Agreements with Consultant Personnel. Consultant represents and warrants that all Consultant Personnel who perform Services are and will be bound by written agreements with Consultant under which: (i) Consultant owns or is assigned exclusive ownership of all Consultant Work Product, including all Intellectual Property Rights therein; and (ii) Consultant Personnel agree to limitations on the use and disclosure of Confidential Information no less restrictive than those provided in Section 5.

**6.     INDEMNITY**

Consultant will defend, indemnify and hold Company harmless from and against all claims, damages, liabilities, losses, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or resulting from:

(a)     any action by a third party against Company that is based on a claim that any Services performed under this Agreement, or the results of such Services (including any Consultant Work Product), or

Company's use thereof, infringe, misappropriate or violate such third party's Intellectual Property Rights; and

(b)        any action by a third party against Company that is based on any act or omission of Consultant or any Consultant Personnel and that results in: (i) personal injury (or death) or tangible or intangible property damage (including loss of use); or (ii) the violation of any statute, ordinance, or regulation.

## 7.        TERM AND TERMINATION

7.1        Term.  This Agreement will commence on the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, will remain in force and effect for as long as Consultant is performing Services pursuant to the Statement of Work.

7.2        Termination for Breach.  Either party may terminate this Agreement (including the Statement of Work) if the other party breaches any material term of this Agreement and fails to cure such breach within thirty (30) days following written notice thereof from the non-breaching party.

7.3        Termination for Convenience.  Company may terminate this Agreement (including the Statement of Work) at any time, for any reason or no reason, upon at least ten (10) days written notice to Consultant.

7.4        Effect of Termination.  Upon the expiration or termination of this Agreement for any reason: (i) Consultant will promptly deliver to Company all Consultant Work Product, including all work in progress on any Consultant Work Product not previously delivered to Company, if any; (ii) Consultant will promptly deliver to Company all Confidential Information in Consultant's possession or control; and (iii) Company will pay Consultant any accrued but unpaid fees due and payable to Consultant pursuant to Section 2.

7.5        Survival.  The rights and obligations of the parties under Sections 2, 3.2, 3.3, 4, 5.3, 5.5, 5.6, 6, 7.4, 7.5, and 8 will survive the expiration or termination of this Agreement.

## 8.        GENERAL

8.1        Assignment.  Consultant may not assign or transfer this Agreement, in whole or in part, without Company's express prior written consent.  Any attempt to assign this Agreement, without such consent, will be void.  Subject to the foregoing, this Agreement will bind and benefit the parties and their respective successors and assigns.

8.2        No Election of Remedies.  Except as expressly set forth in this Agreement, the exercise by Company of any of its remedies under this Agreement will not be deemed an election of remedies and will be without prejudice to its other remedies under this Agreement or available at law or in equity or otherwise.

8.3        Equitable Remedies.  Because the Services are personal and unique and because Consultant will have access to Confidential Information of Company, Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without

having to post a bond or other consideration, in addition to all other remedies that Company may have for a breach of this Agreement at law or otherwise.

8.4    Attorneys' Fees.  If any action is necessary to enforce the terms of this Agreement, the substantially prevailing party will be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled.

8.5    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding its body of law controlling conflict of laws.  Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California and the parties irrevocably consent to the personal jurisdiction and venue therein.

8.6    Severability.  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect, and the provision affected will be construed so as to be enforceable to the maximum extent permissible by law.

8.7    Waiver.  The failure by either party to enforce any provision of this Agreement will not constitute a waiver of future enforcement of that or any other provision.

8.8    Notices.  All notices required or permitted under this Agreement will be in writing, will reference this Agreement, and will be deemed given: (i) when delivered personally; (ii) one (1) business day after deposit with a nationally-recognized express courier, with written confirmation of receipt; or (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid.  All such notices will be sent to the addresses set forth above or to such other address as may be specified by either party to the other party in accordance with this Section.

8.9    Entire Agreement.  This Agreement, together with the Statement of Work, constitutes the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter.  In the event of a conflict, the terms and conditions of the Statement of Work will take precedence over the terms and conditions of this Agreement.  Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties hereto.

8.10    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**COMPANY:**                                      **CONSULTANT:**

**TRIBAL INVEST CORP**                            **DO HYEONG KWON**

By:                                               By:   *Do kwon*

Name:                                             Name: Do Kwon

Title:                                            Title:

Date:                                             Date: 5/20/2021

[*Signature Page to Consulting Agreement*]

**EXHIBIT A**

**STATEMENT OF WORK**

This Statement of Work is issued under and subject to all of the terms and conditions of the Consulting Agreement dated as of May 18, 2021, between Tribal Invest Corp ("***Company***") and Do Hyeong Kwon ("***Consultant***").

1.    **Description of Services**

Consultant shall provide product and business development services to the Company from time to time as reasonably requested by the Company or its representatives, including but not limited to promotion, marketing and strategic advice relating to the Pyth network. Consultant shall provide such other services as are reasonably requested by the Company, and are within the field of knowledge and expertise of Consultant, on an as-needed basis. (collectively, the "***Services***")

2.    **Payment Terms**

As sole and exclusive compensation for the Services, Consultant shall be entitled to receive 500,000,000 PYTH tokens, pursuant to the Company's standard form of Restricted Token Grant Agreement.

Consultant shall be responsible for reporting and paying any current and future taxes that it may incur resulting from the receipt of the Token Grant.

AGREED AS OF May 18, 2021

| **COMPANY:** | **CONSULTANT:** |
|---|---|
| **TRIBAL INVEST CORP** | **DO HYEONG KWON** |
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

# EXHIBIT D

THE OFFER AND SALE OF THE TOKEN INTERESTS (AS DEFINED HEREIN) HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THIS OFFERING IS BEING MADE ONLY OUTSIDE THE UNITED STATES TO NON-US PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE ACT) (AND ONLY IN JURISDICTIONS WHERE SUCH OFFER AND SALE IS PERMITTED UNDER APPLICABLE LAW) IN RELIANCE ON REGULATION S UNDER THE ACT. THE TOKEN INTERESTS MAY NOT BE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE AND FOREIGN SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## TRIBAL INVEST CORP

## RESTRICTED TOKEN GRANT AGREEMENT

This Restricted Token Grant Agreement (this "*Agreement*") is made and entered into as of May 18, 2021 (the "*Effective Date*") by and between Tribal Invest Corp, a Panamanian corporation (the "*Company*") and the undersigned (the "*Consultant*").

**WHEREAS**, Pyth Data Foundation, a Panamanian foundation (the "*Foundation*"), is building an oracle network (the "*Pyth Network*") to provide high fidelity financial market data to the blockchain industry powered by a blockchain protocol on the Solana network (the "*Pyth Protocol*");

**WHEREAS**, the Company is a wholly-owned subsidiary of the Foundation;

**WHEREAS**, Consultant is providing certain services for the Pyth Network pursuant to the Consulting Agreement attached hereto as Exhibit A, and in consideration of the Consultant's services rendered thereunder, the Consultant obtained the right to receive, automatically and without requiring any future payment, certain cryptographic tokens (such rights, the "*Rights to Tokens*" and, collectively with any securities received in substitution or fulfillment of such rights, or in replacement thereof, the "*Token Interests*") from the Company on the terms and conditions set forth in this Agreement.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Consultant agree as follows:

1.     **GRANT OF TOKENS.** Subject to the terms and conditions of this Agreement, and contingent upon the completion of the milestones set forth in Exhibit A of the Consulting Agreement, as determined by the Company in its reasonable discretion (the "*Services Milestone*"), the Company hereby grants to Consultant, the right to receive, automatically and without requiring any future payment, an aggregate of up to 500,000,000 Pyth Tokens (the "*Tokens*"). As used herein, "*Pyth Tokens*" means the native unit of value on the Pyth Protocol.

2.     **CLOSING**.

2.1     **Deliveries by Consultant.** Consultant hereby delivers a duly executed copy of this Agreement to the Company.

2.2     **Deliveries by the Company.** Following the Company's receipt of all documents to be executed and delivered by Consultant under Section 2.1, and contingent upon the completion of the Services Milestone, the Company will deliver the Tokens to the Consultant as soon as

practicable upon the expiration of the applicable Transfer Restrictions (as defined below). At least ten calendar days prior to the date of the public, broad launch of the Pyth Protocol, as determined by the Company in its sole discretion ("***Mainnet Launch***"), Consultant shall provide to the Company a network address in writing to which the Tokens shall be delivered.

      **3.**     **REPRESENTATIONS AND WARRANTIES OF CONSULTANT.**  Consultant hereby represents and warrants to the Company as follows.

      **3.1**     **Own Account.**  Consultant is receiving the Token Interests entirely for Consultant's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Consultant has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Consultant has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Consultant further represents that the Consultant does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

      **3.2**     **Access to Information.**  Consultant has had access to all information that Consultant reasonably considers important in making the decision to receive the Token Interests, and Consultant has had ample opportunity to ask questions concerning such matters.

      **3.3**     **Understanding of Risks.**  Consultant  is fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Consultant may not be able to sell or dispose of the Token Interests or use them as collateral for loans); (d) the qualifications and backgrounds of the management of the Company; and (e) the tax consequences of receiving the Token Interests. Further, the Consultant understands that the Tokens involve risks, all of which the Consultant fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Pyth Protocol and the Pyth Network will not function as intended; (ii) the Pyth Network will not be completed and the Pyth Tokens will not be distributed; (iii) the Pyth Network will fail to attract sufficient interest from key stakeholders; and (iv) the Company, the Pyth Network and/or any third parties ("***Third Parties***") involved in the development of the Pyth Network may be subject to investigation and punitive actions from governmental authorities. The Consultant understands and expressly accepts that the Tokens will be delivered to the Consultant at the sole risk of the Consultant on an "AS IS" and "UNDER DEVELOPMENT" basis. The Consultant understands and expressly accepts that the Consultant has not relied on any oral or written statements, representations or warranties made by the Company, any Third Parties or any of their officers, directors, employees, consultants, Consultants, equityholders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE CONSULTANT ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

      **3.4**     **Consultant's Qualifications.**  Consultant has a preexisting personal or business relationship with the Company of a nature and duration sufficient to make Consultant aware of the character, business acumen and general business and financial circumstances of the Company.  By reason of Consultant's business or financial experience, Consultant is capable of evaluating the merits and risks of

this transaction has the ability to protect Consultant's own interests in this transaction and is financially capable of bearing a total loss of the value of the grant.

      **3.5**     **No General Solicitation.** At no time was Consultant presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale and grant of the Token Interests.

      **3.6**     **Compliance with Securities Laws.** Consultant understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Consultant's ability to transfer the Token Interests.

      **3.7**     **No Public Market.** Consultant understands that no public market now exists for the Token Interests, and that the Company has made no assurances that a public market will ever exist for the Token Interests.

      **3.8**     **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although the Company does not concede this point in any jurisdiction. Accordingly Consultant understands and agrees as follows:

> **Consultant may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Consultant understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Consultant has also been advised that exemptions from registration and qualification may not be available or may not permit Consultant to transfer all or any of the Token Interests in the amounts or at the times proposed by Consultant. The Consultant further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Consultant's control, and which the Foundation is under no obligation and may not be able to satisfy.

      **3.9**     **Legends.** The Consultant understands that the Token Interests will be deemed to bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**3.10** **Rule 144.** In addition, Consultant has been advised that, to the extent applicable, SEC Rule 144 promulgated under the 1933 Act, which permits certain limited sales of unregistered securities, is not presently available with respect to the Token Interests and, in any event, to the extent applicable, requires that the Token Interests generally be held for a minimum of one year after they have been purchased and paid for (within the meaning of Rule 144), before they may be resold under Rule 144. Consultant understands that Rule 144 may indefinitely restrict transfer of the Token Interests so long as Consultant is an "affiliate" of the Company and certain information about the Company (as defined in Rule 144) is not publicly available.

**3.11** **Foreign Laws**. Consultant hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Token Interests or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the receipt of the Token Interests, (b) any foreign exchange restrictions applicable to such grant and receipt, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the receipt, holding, redemption, sale, or transfer of the Token Interests. Consultant's receipt and continued beneficial ownership of the Token Interests will not violate any applicable securities or other laws of the Consultant's jurisdiction.

**3.12** **Regulation S Representations and Restrictions**. Consultant makes the following additional representations, warranties and agreements:

**(a)** Consultant is <u>not</u> a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act. The grant of the Token Interests to the Consultant was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Consultant is not receiving the Token Interests for the account or benefit of any U.S. Person;

**(b)** Consultant will not, during the restricted period that is applicable to the Token Interests set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Token Interests, offer or sell any of the foregoing (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S; and

**(c)** Consultant will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Token Interests (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

Consultant acknowledges and agrees that the Token Interests will be deemed to bear the legend set forth below (in addition to any other legend required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company):

THE TOKEN INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND THE FOUNDATION DOES NOT INTEND TO REGISTER THEM. PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, THE TOKEN INTERESTS MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH TOKEN INTERESTS) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE TOKEN INTERESTS ARE REGISTERED UNDER

THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. RECIPIENTS OF TOKEN INTERESTS PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, MAY RESELL SUCH TOKEN INTERESTS ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE TOKEN INTERESTS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE TOKEN INTERESTS WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, RESELL THE TOKEN INTERESTS TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE TOKEN INTERESTS ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

**4.** **LOCKUP.** The Rights to Tokens and any Tokens deliverable in fulfillment thereof (as applicable at the time of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Transfer Restrictions***"):

**4.1** **Unlocked Tokens**. Until the Restricted Tokens are "Unlocked", as described below, Consultant agrees that it will not, without the prior written consent of the Company, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of (collectively, "***Transfer***") any Restricted Tokens, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens. The Restricted Tokens shall be considered to be "***Unlocked***" as follows: (a) up to and including the one-year anniversary of the First Closing Date (as defined below), no Tokens will be Unlocked; and (b) starting on the one-year anniversary of the First Closing Date and ending on the seventh (7) anniversary of the First Closing Date, the Tokens shall be Unlocked on a linear basis (monthly) beginning with 0% Unlocked on the one-year anniversary of the First Closing Date and ending with 100% Unlocked on the seven-year anniversary of the First Closing Date. As used herein, "***First Closing Date***" means the first date on which the Pyth Tokens are sold by the Company to a purchaser at a price of no less than \$0.03 per Token, as determined by the Company in its sole discretion.

**4.2** **Restrictions**. To ensure compliance with these Transfer Restrictions, the Company and/or its agents and representatives may impose technological lockups or restrictions on the Restricted Tokens.

**5.** **RIGHTS AS OWNER OF TOKENS.** The Consultant is not entitled, as a holder of the Rights to Tokens or Tokens, to vote or receive dividends or be deemed the holder of equity of the Company for any purpose, nor will anything contained herein be construed to confer on the Consultant, as such, any of the rights of an equityholder of the Company or any right to vote for the election of directors of the Company or upon any matter submitted to directors of the Company at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.** **DISCLAIMER AND LIMITATION OF LIABILITY.** Neither the Company nor any of its affiliates shall be liable or responsible to the Consultant, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching the Pyth Network or distributing the Pyth Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE COMPANY MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, CONSULTANT ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE COMPANY, OR ANY OTHER PERSON ON THE COMPANY'S BEHALF.

Consultant understands that Consultant has no right against the Company or any other individual or legal entity except in the event of the Company's material breach of this instrument or intentional fraud. THE COMPANY'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED $100,000. NEITHER THE COMPANY NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT OR THE USE OF ANY TOKENS.

**7.** **TAX CONSEQUENCES**. CONSULTANT UNDERSTANDS THAT CONSULTANT MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF CONSULTANT'S RECEIPT AND DISPOSITION OF THE RIGHTS TO TOKENS AND THE TOKENS.   CONSULTANT REPRESENTS (a) THAT CONSULTANT HAS CONSULTED WITH ANY TAX ADVISERS THAT CONSULTANT DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT AND DISPOSITION OF THE RIGHTS TO TOKENS AND THE TOKENS AND (b) THAT CONSULTANT IS NOT RELYING ON THE COMPANY, OR ANY AGENTS, REPRESENTATIVES, OR CONSULTANTS OF THE COMPANY, FOR ANY TAX ADVICE. CONSULTANT AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF RIGHTS TO TOKENS AND TOKENS HEREIN.

**8.** **COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests and the Tokens will be subject to and conditioned upon compliance by the Company and Consultant with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Pyth Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Pyth Tokens.

**9.** **GENERAL PROVISIONS**.

**9.1** **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during

normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in Panama City are open for business.

9.2     **Further Assurances.**  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.3     **Titles and Headings.**  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.4     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the Republic of Panama, without giving effect to that body of laws pertaining to conflict of laws.

9.5     **Dispute Resolution**.  Any controversy or dispute which arises out of or is related to this contract, and interpretation, application, performance and termination thereof, must be decided by arbitration administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules.

9.6     **Assignments; Successors and Assigns.**  The Company may assign any of its rights and obligations under this Agreement. Any assignment of rights and obligations by any other party to this Agreement requires the Company's prior written consent. This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.

9.7     **Entire Agreement.**  This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

9.8     **Amendment and Waivers.**  This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

9.9     **Severability.**  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or

provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.  Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

        **9.10**    **Counterparts; Facsimile Signatures.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[Signature page follows]

**IN WITNESS WHEREOF**, the Company and the Consultant has each caused this Restricted Token Grant Agreement to be executed by its duly authorized representative as of the Effective Date.

**COMPANY:**                                    **CONSULTANT:**

**TRIBAL INVEST CORP**                          **DO HYEONG KWON**

By: _____          By: _Do kwon_____

Name: _____          Name: _Do Kwon_____

Title: _____          Title: _____

Address: _____          Address: _101-2603 Galleria Foret Seoul South Korea_

_____          _____

## EXHIBIT 1

**CONSULTING AGREEMENT**