IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] , | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF EDGAR W. MOSLEY II
IN SUPPORT OF THE MOTION TO AUTHORIZE
PAYMENT OF INCENTIVE FEE AND COMPLETION FEE
TO DEBTORS' CHIEF EXECUTIVE OFFICER**

I, Edgar W. Mosley II, declare pursuant to 28 U.S.C. § 1746 as follows:

1.  I am a Managing Director with Alvarez & Marsal North America, LLC ("**A&M**"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operation restructuring.

2.  I have more than 20 years of restructuring and distressed investment experience across various industries, including oil & gas, manufacturing, transportation, automotive, retail, industrial construction, telecommunications, healthcare, and consumer products. I have a Bachelor's Degree from Harvard University, and have been recognized as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors, where I served on the board from 2019 until 2020.

3.  Since joining A&M, I have been involved in numerous Chapter 11 restructurings, including Seadrill Limited (2020 and 2017), Valaris plc, Diamond Offshore

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Drilling, Inc., Imerys Talc America, White Star Petroleum, Southcross Energy, Magnum Hunter Resources, Exide Technologies (where I served as the Chief Restructuring Officer), and Visteon Corporation.

4. I submit this declaration (the "**Declaration**") in support of the *Motion to Authorize Payment of Incentive Fee and Completion Fee to Debtors' Chief Executive Officer*.

5. I am not being compensated separately for this testimony other than through payments received by A&M as financial advisor retained by FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**" or "**FTX**"). A&M was retained by the Debtors from November 11, 2022 through January 3, 2025, and has been retained by the FTX Recovery Trust since January 3, 2025.

6. Except as otherwise indicated herein, all the facts set forth in this declaration are based upon by personal knowledge, my review of relevant documents, information provided to me by A&M professionals working under my supervision, or my opinion based upon my experience and knowledge related to the Debtors' operations, businesses, and financial condition. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

**I.    Mr. Ray's Contribution to a Very Complex Chapter 11 Proceeding**

7. Mr. Ray was appointed as CEO of the Debtors on November 11, 2022, following the collapse of the FTX Group. From the outset of his appointment, Mr. Ray oversaw the filing of the Chapter 11 Cases to halt withdrawals and then worked tirelessly to stabilize the FTX business and recover assets. In my experience, Mr. Ray's role in these Chapter 11 Cases was unique, given the sheer complexity and number of factors involved in his overall responsibilities. These responsibilities encompassed a broad range of tasks including, supporting the Debtors to establish corporate governance and implement comprehensive controls to manage and eliminate costs; secure, marshal, preserve and manage the Debtors'

2

assets and coordinate value-maximizing asset sales; investigate, commence, prosecute, and settle multiple disputes and otherwise manage litigation risk; negotiate the settlement of significant portions of claims with creditors; manage intense regulatory scrutiny, including testimony before Congress; and oversee the Chapter 11 Cases to ensure Plan confirmation and effectiveness, which ultimately enabled the FTX Recovery Trust to make its first distribution to customers.

8. Despite the size, complexity and highly-publicized nature of these Chapter 11 Cases, he operated without direct support staff or the infrastructure of an advisory firm, functioning instead as a "single-shingle" executive. Mr. Ray effectively assumed not only the risks and responsibilities of the FTX CEO, but the additional roles and responsibilities of a Chief Restructuring Officer ("**CRO**").

9. Between his appointment date and January 3, 2025, when the Plan went effective, Mr. Ray dedicated approximately 5,900 hours to these Chapter 11 Cases, averaging approximately 229 hours per month, to oversee virtually every aspect of the Debtors' business.

10. Mr. Ray was also responsible for running and closing the Debtors' cryptocurrency and token sales. Mr. Ray prepared the estimation motion, *Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No. 5202], and established the structure that implemented the coin monetization order [Docket No. 7090], ensuring that the Official Committee[2] and Ad Hoc Committee had a role in decision-making, including the selection of the Debtor's digital asset investment advisor, Galaxy Asset Management. Mr. Ray's leadership in running and closing the Debtors' cryptocurrency and token sales yielded approximately $8 billion to the Debtors' estates.

---

[2] Capitalized terms used but not defined in this Declaration shall have the meaning ascribed to them in the *Motion to Authorize Payment of Incentive Fee and Completion Fee to Debtors' Chief Executive Officer*, filed contemporaneously herewith.

11. At the outset of the Chapter 11 Cases, the trading price of claims hovered around 10-14%. By the end of the Chapter 11 Cases, expected recoveries to creditors had risen to 119%-143% per the approved Disclosure Statement, this is over a 1,000% increase versus the original expected creditor recovery estimates. Mr. Ray's successful marshalling and disposition of the Debtors' diverse asset base resulted in nearly $13 billion in cash generated, including $8.1 billion in digital asset sales and $3.2 billion from venture investments and brokerage assets, including the monetization of approximately $1.1 billion worth of Grayscale Trust assets and Bitwise Trust assets. All told, under Mr. Ray's leadership, between $14.7 billion and $16.5 billion of value is expected to be made available for customer and creditor distributions.

## II. The Incentive Fee Analysis

12. On January 9, 2023, the Court approved the Debtors' Owl Hill Application, which referenced a compensation structure that included a completion fee (the "**Completion Fee**") and an additional incentive fee for performance to be determined by the Independent Directors at the close of the Chapter 11 Cases (the "**Incentive Fee**"), though approval of such fees was deferred until the conclusion of the Chapter 11 Cases.

13. Following the confirmation of the Plan on October 8, 2024, the Independent Board asked A&M to conduct and refresh its analysis of the appropriate size of the Incentive Fee, as the Debtors, Official Committee and U.S. Trustee had previously agreed not to finalize the metrics to determine the Incentive Fee until after the conclusion of the Chapter 11 Cases.

14. In response, and under my direction, the A&M team reviewed compensation packages from precedent transactions with comparable fee arrangements to assess compensation and incentive structure for the dual CEO/CRO services that Mr. Ray provided to the Debtors' estates.

4

15.     ***First***, the A&M team considered the Incentive Fee structure contemplated at the beginning of the Chapter 11 Cases.  Prior to the approval of the Owl Hill Application, a potential incentive fee structure of 30 basis points of all distributions to creditors through a confirmed chapter 11 plan over $1 billion was discussed amongst a number of parties in interest and their advisors.  This initial threshold was set at $1 billion because, at the outset of the case, the original expectations of creditor recoveries were approximately $1 billion, based on the prevailing trading prices of claims at the time.  The structure was designed to incentivize recoveries exceeding these initial expectations, ultimately resulting in distributions surpassing this threshold.  This construct was supported by A&M's review of incentive fees awarded in similar chapter 11 proceedings at that time.  Based on the range of estimated asset recoveries as set forth in the Disclosure Statement ($14.7 to $16.5 billion), the 30-basis point incentive fee structure on recoveries over $1 billion in these Chapter 11 Cases would equate to an Incentive Fee to Mr. Ray of between $41.1 million and $46.4 million, significantly higher than the Incentive Fee of $38.1 million.

16.     ***Second***, the A&M team considered that Mr. Ray's role had significant similarities to that of a chapter 7 or chapter 11 trustee.  I understand that the Bankruptcy Code provides that the starting point for discussion on appropriate compensation for a chapter 7 trustee is the statutory commission of 3% of funds disbursed in the case.  In these Cases, if the same percentage commission were applied to calculate Mr. Ray's Incentive Fee, it would likely be nearly $500 million—more than twelve times greater than the Incentive Fee approved by the Independent Board and the Wind Down Board.

17.     ***Third***, under my supervision, the A&M team conducted a review of market comparisons and other relevant data points to present to the Independent Board and Wind Down Board.  The A&M team established a process to identify comparable compensation packages by reviewing: (i) incentive fees in comparable bankruptcy cases and (ii) annual

compensation arrangements for executives in (a) bankruptcy precedents and (b) certain public companies.

18. In order to identify an appropriate universe of bankruptcy case precedents, the A&M team first examined chapter 11 cases with interim managers in CEO and CRO roles, where success or incentive fees were tied to their engagement or retention. Given that these Chapter 11 Cases involved a staggering $23.1 billion in debt and $15.6 billion in recovery, the A&M team then focused on large cases with more than $3 billion in debt and over $1.5 billion in recovery. The team also focused on cases from the past five years that lasted between one and three years, as these Cases have lasted approximately 2.14 years.

19. Given the relatively small number of cases with this combination of factors, the A&M team expanded the scope of its analysis to include a handful of cases that fell outside the target period or had debt or recovery amounts that were larger or smaller than the targeted case precedent universe described above, but that nonetheless shared similarities with the FTX Chapter 11 Cases. Specifically, the team included four chapter 11 cases that had several similarities to FTX: *Lehman Brothers*, *General Motors*, *Enron*, and *Chrysler*. The team also included one chapter 7 case, *In re Refco, LLC*, Case No. 05-60134 (Bankr. S.D.N.Y.), in its analysis because in that case, the chapter 7 trustee operated similarly to a single-shingle executive to oversee a complex asset management and recovery process, similar in several respects to Mr. Ray's role in managing these Chapter 11 Cases.

20. The A&M team also decided to exclude certain bankruptcy precedents from its analysis. The team excluded compensation packages for investment bankers from its analysis, as investment banking advisors typically receive transaction fees, capital raising fees, and sale fees that are not comparable to the full scope of Mr. Ray's work in these Chapter 11 Cases. The team also decided to exclude *In re Bernard L. Madoff Inv. Sec. LLC*, Case No. 08-01789

(Bankr. S.D.N.Y.) from its analysis as an outlier, due to the sheer size of the compensation paid to the Chapter 7 Trustee there—$1.7 billion in trustee fees on $14.7 billion total recoveries.

21.     The A&M team then evaluated each case based on characteristics that were relevant and comparable to the Debtors' situation, including: (i) complex cases (meaning highly publicized cases with complex financial structures, operational challenges, and numerous stakeholders); (ii) cases involving the consolidation and monetization of substantial assets; (iii) cases involving multiple jurisdictions and government or regulatory oversight; (iv) cases where the debtor faced significant legal challenges posing material risks to the restructuring process, including creditor disputes, lawsuits, or regulatory enforcement actions; and (v) cases where substantial portions of debt were converted into equity, requiring complex negotiations with creditors to achieve a successful restructuring.

22.     Given the additional nuance of Mr. Ray as a single-shingle CEO retention, the universe of eleven comparable bankruptcy case precedents[3] was bifurcated into cases that were overseen by (i) advisory firms and (ii) single-shingle executives like Mr. Ray. The A&M team's analysis of these comparable bankruptcy precedents included an analysis of both completion fees, which are tied to the relevant effective date of the plan, and incentive fees, which are tied to recovery or other milestones. The team analyzed the compensation as a percentage of total debt (to provide an indication of the relative size of the fee to the complexity and size of the bankruptcy) and the compensation as a percentage of total recovery (to focus on successful restructurings with significant recoveries to multiple stakeholders).

---

[3]  The advisory firm cases the A&M team analyzed included: *In re McDermott International, Inc.*, Case No. 20-30336 (Bankr. S.D. Tex.); *In re SVB Financial Group*, Case No. 23-10367 (Bankr. S.D.N.Y.); *In re Westinghouse Elec. Co.*, Case No. 17-10751 (Bankr. S.D.N.Y.); *In re Revlon, Inc.*, Case No. 22-10760 (Bankr. S.D.N.Y.); *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555, (Bankr. S.D.N.Y.); *In re Motors Liquidation Co.*, Case No. 09-50026 (Bankr. S.D.N.Y.); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y.). The single-shingle cases the A&M team analyzed included: *In re Rite Aid Corp.*, Case No. 23-18993 (Bankr. D.N.J.); *In re Talen Energy Corp.*, Case No. 22-90339 (Bankr. S.D. Tex.); *In re Old Carco LLC (f/k/a Chrysler LLC)*, Case No. 09-50002 (Bankr. S.D.N.Y.); and *In re Refco, LLC*, Case No. 05-60134 (Bankr. S.D.N.Y.).

23. The A&M team found that for the bankruptcy case precedents using an advisory firm structure, the average incentive fee to CEO/CROs was 13 basis points of total recovery and 7 basis points of total debt. In contrast, the compensation in single-shingle bankruptcy case precedents was, on average, 47 basis points of total recovery and 35 basis points of total debt. Even if the Incentive Fee were limited to 30 basis points of creditor recoveries *over $1 billion* (which was the contemplated formulation at the outset of the case), that would support an Incentive Fee range between $41.1 and $46.4 million, which is significantly higher than the Incentive Fee the Independent Board approved. The A&M team then determined that, based on its CEO/CRO market analysis across all comparable bankruptcy case precedents, the average incentive fee was 23 basis points of total recovery and 17 basis points of total debt. Applying those averages to the $15.6 billion midpoint of expected recoveries in these Chapter 11 Cases and the $23.1 billion debt, the Incentive Fee would be calculated as $36 million and $39 million respectively. The $38.1 million Incentive Fee approved by the Independent Board and the Wind Down Board is within the range of the market CEO/CRO compensation.

24. The A&M team also reviewed the annual CEO compensations in the bankruptcy precedents it had identified, as well as compensation packages in comparable public companies. To identify comparable public companies, the A&M team leveraged the expertise of the A&M Compensation and Benefits team. Specifically, the A&M team reviewed compensation packages for CEOs in the financial services sector, the asset management sector, and the insurance sector with parallels to the Chapter 11 Cases in terms of regulatory scrutiny and financial complexity.[4] The team also analyzed the compensation package of the COO of Coinbase, a publicly traded company operating a cryptocurrency exchange platform, due to the sector similarities between Coinbase and FTX. The team further focused its analysis on

---

[4] The A&M team used the Coinbase chief operating officer's compensation package, rather than the CEO's, because the CEO received significant equity and stock options that resulted in an average total compensation of about $479 million over the last 3 years.

comparable public companies that had an enterprise value range between $10 and $20 billion, although it expanded that scope to $70 billion to include Coinbase for its crypto sector relevance. The relevant compensation period included FY2023 base compensation, short-term incentives (annual bonuses tied to performance metrics), and publicly disclosed target bonuses from proxy statements. The team also incorporated long dated stock awards that vest over multiple years and some equity and stock options that vest over 5- to 10-year periods.

25. The peer group companies outside of the bankruptcy context the A&M team included in its comparables analysis were *Principal Financial Group*, *Franklin Templeton Investments*, *SoFi Technologies, Inc.*, *Blue Owl Capital Inc.*, *Coinbase Global, Inc.*, and *Affirm Holdings, Inc.*

26. The A&M team found that the average CEO annual compensation was $16.7 million in and around the time of filing in the bankruptcy case precedents and $28.8 million for the comparable public sector companies, for a combined average of $22.7 million annual compensation. Mr. Ray's annualized compensation, inclusive of hourly fees and the requested Completion Fee and Incentive Fee, is $23.1 million, which falls within the range of this average between both sets of comparables.

### III. Presentation to the Board

27. I understand that a special board meeting was held on December 16, 2024 for the Independent Board to consider and approve the payment and amount of the Incentive Fee. I did not attend the meeting. I understand that the aforementioned presentation prepared at my direction and the recommendations of A&M were presented to the board by one of my partners at A&M. I understand the Independent Board approved the Incentive Fee in the amount of $38.1 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 2, 2025

*/s/ Edgar W. Mosley II*
Name: Edgar W. Mosley II
Title: Managing Director, Alvarez & Marsal North America, LLC
