**<u>Exhibit E</u>**

**Confirmation Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                         .  Chapter 11
                               .  Case No. 22-11068 (JTD)
FTX TRADING LTD., *et al.,*     .
                               .  (Jointly Administered)
                               .
                               .  Courtroom No. 5
                               .  824 North Market Street
         Debtors.             .  Wilmington, Delaware 19801
                               .
                               .  Monday, October 7, 2024
. . . . . . . . . . . . . . .  10:00 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtors:          Adam Landis, Esquire
                          LANDIS RATH & COBB LLP
                          919 Market Street
                          Suite 1800
                          Wilmington, Delaware 19801

                          Brian Glueckstein, Esquire
                          Andrew Dietderich, Esquire
                          Alexa Kranzley, Esquire
                          SULLIVAN & CROMWELL LLP
                          125 Broad Street
                          New York, New York 10004

(APPEARANCES CONTINUED)

Audio Operator:           Jermaine Cooper, ECRO

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  <u>gmatthews@reliable-co.com</u>

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Sunil Kavuri,
Ahmed Abd El-Razek,
Pat Rabbitte:                David Adler, Esquire
                             MCCARTER & ENGLISH LLP
                             Worldwide Plaza
                             825 Eighth Avenue
                             31st Floor
                             New York, New York 10019

For the Committee of
Unsecured Creditors:         Kenneth Pasquale, Esquire
                             PAUL HASTINGS LLP
                             200 Park Avenue
                             New York, New York 10166

For the SEC:                 William Uptegrove, Esquire
                             U.S SECURITIES AND EXCHANGE
                               COMMISSION
                             950 East Paces Ferry Road, NE
                             Suite 900
                             Atlanta, Georgia 30326

For the U.S. Trustee:        Benjamin Hackman, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, Delaware 19801

For LayerZero Group:         William Dalsen, Esquire
                             Jordan Sazant, Esquire
                             PROSKAUER ROSE LLP
                             1 International Plaza
                             Boston, Massachusetts 02110

For the Ad Hoc
Committee of Non-Us
Customers of FTX.com:        Erin Broderick, Esquire
                             EVERSHEDS SUTHERLAND
                             227 West Monroe Street
                             Suite 6000
                             Chicago, Illinois 60606

1  APPEARANCES (CONTINUED):

2  For the Celsius
   Litigation
3  Administrator:                Richard Levy, Esquire
                                 PRYOR CASHMAN LLP
4                                7 Times Square
                                 40th Floor
5                                New York, New York 10036

6  For the Bahamian
   Liquidators:                  Christopher Shore, Esquire
7                                WHITE & CASE LLP
                                 1221 Avenue of the Americas
8                                New York, New York 10020

9  For the Class
   Action Plaintiffs:            Andrew Entwistle, Esquire
10                               ENTWISTLE & CAPPUCCI LLP
                                 230 Park Avenue
11                               3rd Floor
                                 New York, New York 10169
12
   For Steadview Capital
13 Mauritius Limited:            Douglas Mintz, Esquire
                                 SCHULTE ROTH & ZABEL LLP
14                               555 13th Street, NW
                                 Suite 6W
15                               Washington, DC 20004

16
   Pro Se Litigants:             Kihyuk Nam
17                               Lidia Favario
                                 Arush Sehgal
18

19

20

21

22

23

24

25

INDEX

MOTIONS:                                                    PAGE

Agenda
Item 3: Second Amended Joint Chapter 11 Plan of             15
        Reorganization of FTX Trading Ltd. and
        its Debtor Affiliates [D.I. 26029;
        Filed on 9/30/24]

Agenda
Item 4: The Celsius Litigation administrator's
        Motion for Relief from the Automatic
        Stay [D.I. 16815; Filed on 6/5/24]


EXAMINATIONS:                                               PAGE

      JAMES DALOIA
      Cross-examination by Mr. Adler                        17

      STEVEN COVERICK
      Cross-examination by Mr. Adler                        23
      Cross-examination by Mr. Dalsen                       33

      EDGAR MOSLEY II
      Cross-examination by Mr. Adler                        41


DECLARATIONS:                                               PAGE

1)   James Daloia                                           16

2)   Steven Coverick                                        22

3)   Edgar Mosley, II                                       41

4)   Lord Neuberger                                         46

1          (Proceedings commence at 10:00 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5               Mr. Landis.

6               MR. LANDIS:  Good morning, Your Honor.  May I

7    please the Court, Adam Landis from Landis Rath & Cobb on

8    behalf of FTX Trading Ltd., and its related debtors and

9    debtors-in-possession.

10              Your Honor, this morning, shortly before 9, we

11   filed our second amended agenda, in connection with this

12   hearing, reflecting -- including a revised confirmation order

13   and reflecting the resolution of one additional objection of

14   the foreign representatives of Three Arrows Capital.  We

15   would propose to proceed in order of the agenda this morning.

16   Items Nos. 1 and 2 have been resolved.  That leaves us with

17   Item No. 3 to go forward, that is confirmation of the

18   debtors' second amended plan.  We would propose to have Mr.

19   Dietderich address the Court first and then Mr. Glueckstein

20   handle the confirmation matters.

21              THE COURT:  Okay.  Thank you.

22              MR. LANDIS:  Thank you, Your Honor.

23              MR. DIETDERICH:  Thank you, Mr. Landis.  For the

24   record Andy Dietderich, Sullivan & Cromwell, for the debtors.

25              As Mr. Landis said, Your Honor, Mr. Glueckstein

 1   will address our affirmative case for confirmation and the

 2   remaining objections.  I would like to say, if it pleases the

 3   Court, a few words on background.

 4             THE COURT:  I am not they can hear you in the

 5   back.  You might have to --

 6             MR. DIETDERICH:  Is this better, Your Honor?

 7             THE COURT:  Lift up the microphone so they're

 8   closer to you.

 9             MR. DIETDERICH:  How about this, testing one, two,

10   three.

11             THE COURT:  Can you hear in the back?  Okay,

12   you're good.

13             MR. DIETDERICH:  I will try my best to project.

14             THE COURT:  Okay.

15             MR. DIETDERICH:  Turning back the clock, Your

16   Honor, FTX filed on November 11th, 2022.  At the time it was

17   correctly seen as one of the most complex bankruptcy cases

18   ever attempted. It had the scope of a diversified financial

19   institution like Lehman, but with digital assets, no

20   effective regulatory system, the absence of accurate books

21   and records, competing foreign jurisdictions seeking to

22   displace this Court, and a team of founders that faced not

23   just investigation, but active criminal prosecution.

24             Less than 23 months later, we are here

25   contemplating what effectively is a fully consensual one day

1   confirmation hearing.  There are some remaining objections to

2   resolve, but what is striking is the lack of any plan

3   critical objection by any major stakeholder.  What marks the

4   resolution of this extraordinary case is not the level of

5   customer recovery merely, it is the level of consensus.

6           How did we get here? The answer is experienced

7   leadership.  At the start, Mr. Ray and the board made three

8   key decisions.  Everything else is a consequence of those

9   decisions.  The first was that former management would have

10  no role in these cases.  This meant not only excluding

11  compromised and potentially compromised employees, it meant

12  creating a new corporate organizational structure, a new

13  system of corporate governance, the migration of digital

14  assets to new custodians, new financial and tax reporting

15  systems, and new cash management and financial controls.

16          The result of this effort was credibility.  That

17  effort took time.  We were not able to say as much as we

18  wanted to say at the beginning of this case but after we had

19  done the work and were able to speak what we did say was

20  credible and there could be no restructuring without the

21  effort we spent early building the ability to produce

22  credible information.

23          The second decision we would cooperate with

24  government authorities.  At the first meeting of the company

25  the board determine that cooperating with the many government

1  investigations and compiling and providing information to

2  those investigations from a centralized repository was in the

3  economic best interest of FTX and its creditors.  We did not

4  do this just because it was the right thing to do.  We did it

5  because it was beneficial to creditors and there is no

6  decision we have made since that has created more

7  distributable value.

8          It is our posture of cooperation for the

9  government that has avoided criminal indictments of the

10  debtor.  That posture has allowed us to coordinate asset

11  recovery with governmental actors, it has positioned us to

12  conform the bankruptcy code definition of creditor with the

13  criminal law definition of victim and to stand here today

14  proposing a plan where unlike Madoff or other cases

15  substantially all value will be distributed to creditors in a

16  single centralized distribution process.

17          That posture has also avoided the assessment of

18  fines and penalties that would have reduced creditor

19  recoveries.  In fact, it has resulted in the voluntary

20  subordination of governmental claims, not just a bankruptcy

21  petition time value but to an unprecedented 9 percent post-

22  petition interest rate.  It even has resulted in the

23  subordination of federal income taxes for the prepetition and

24  the post-petition period. None of this would have been

25  possible without the initial decision to fully cooperate with

1  the government.

2        The third decision was that we would not make

3  business decisions alone.  We would do so with consensus with

4  the statutory committee and the other major stakeholders.

5  This was critical because of the difficulty of the business

6  judgments we faced.  Our assets were incredibly diverse and

7  often novel and hard to value.  Virtually all of them were

8  highly volatile.

9        What if we sold something and then it went up?

10  What if we held something and then it went down?  Mr. Ray and

11  the board's answer was not to make those decisions themselves

12  alone.  The most important example of this was the process

13  created for the liquidation of digital assets where the UCC

14  and later the ad hoc committee of customers made decisions

15  side by side with management.  Often this meant we could not

16  move as fast as we might wish.  Where we did not have

17  consensus, rather then run to Court and seek an order from

18  Your Honor we tried harder to reach agreement, but when

19  decisions were made they reflected everyone's views.

20        The number of important motions entered by this

21  Court without objection or hearing is testament to the power

22  of this approach.  Collaboration, Your Honor, is also the key

23  to understanding the plan.  Confirmation in this case is not

24  the creation of a building. It is the laying of a capstone.

25  The last piece that balancing everything and locks the other

1  pieces into place.

2          I should draw the Court's attention, before we get

3  to the plan in chief, to a few of those other pieces that

4  have been absolutely critical.  We have been thinking about

5  this day for almost two years.  The first piece was the

6  settlement with the Bahamas.  The Bahamas began this case as

7  a jurisdictional war.  Had that war been allowed to continue

8  the loss of value to creditors would have been excessive.

9  The Bahama settlement solved this problem with a novel

10  solution worked out with our friends at FTX Digital Markets.

11          That solution was the economic and procedural

12  consolidation of the Chapter 11 cases with the proceedings in

13  the Bahamas under a structure that did so by contract rather

14  than requiring extensive and expensive coordination

15  proceedings and lots of Court time.  That settlement has

16  already been approved by Your Honor and the Court in the

17  Bahamas, but its effectiveness is conditional on the

18  confirmation of the plan today.

19          A second critical stone was the global settlement

20  with customers.  That settlement resolved after many months

21  of discussion. The dispute between FTX and all of its

22  organized customer constituencies concerning whether digital

23  asset entitlements should be treated as claims or property

24  interests.  The settlement recognizes what became the

25  consensus view that customers do not have a legal interest in

1  property but that something happened here that as an

2  equitable matter suggests customers should have some priority

3  over general unsecured creditors.

4         The way the plan addresses this, consistent with

5  the general approach of substantive consolidation of the

6  debtors is to identify exchange shortfalls and create a

7  special priority intercompany claim that benefits all of the

8  customers of each exchange to the extent of that shortfall.

9  That settlement also, Your Honor, is to be finalized by

10  confirmation today.  Other important pieces were a settlement

11  with the IRS, with the CFTC, with state AG's, with the

12  liquidators in Australia, with Emergent, and with the MDL

13  Plaintiffs.  All of those settlements have an effectiveness

14  condition that is waiting for confirmation of the plan.

15         Now, Your Honor, I would like to address one

16  settlement that hasn't happened yet.  We still do not have an

17  understanding with the Department of Justice concerning the

18  over a billion dollars in forfeiture proceeds they are

19  holding in connection with the criminal prosecution of the

20  founders.  We are in discussions with the Department of

21  Justice.

22         What we have done in the meantime is to reach

23  consensus with the other parties besides FTX that have

24  competing claims against this money.  We resolved our

25  difficulties -- our differences, really, with Emergent, which

1  had a competing claim.  We resolved our differences with the

2  MDL Plaintiffs who had their own competing claim.  And we

3  have an understanding with the critical mass of the preferred

4  shareholders who also have a competing claim to this money as

5  well.

6          This raises the question I should address at the

7  outset because its one of the potentially confusing parts of

8  the plan and I want to get it right at the start of how we

9  see preferred shareholders in this case.  It makes sense to

10 clarify this.  The plan, Your Honor, is an absolute priority

11 plan.  It pays creditors and other stakeholders in accordance

12 with bankruptcy priorities.  And we do not anticipate there

13 will be any value available to preferred shareholders from

14 FTX in the plan.  We are forecasting that their distribution

15 is zero.  It may not be if we have extra money, but the

16 current forecast is the distribution is zero.

17          However, Your Honor, we are not the Department of

18 Justice.  The DOJ has the forfeiture proceeds and the DOJ, as

19 a matter of criminal law, is not bound by the absolute

20 priority rule or bankruptcy priority scheme.  Under criminal

21 law they see preferred shareholders as victims too.  So, as

22 we contemplate an arrangement with the DOJ for release of

23 forfeiture proceeds to us, we must either litigate or

24 negotiate in the criminal proceeding how much of that

25 recovery is received by the FTX estate and how much the DOJ

1  decides to allocate the preferred shareholders.

2           The plan does not incorporate this settlement.

3  There is no preferred shareholder settlement in the plan;

4  however, as part of our discussion so far with the DOJ there

5  is a possibility that the DOJ will ask FTX to, effectively,

6  be its distribution agent or its paying agent for money to be

7  distributed by the DOJ to the preferred shareholders.  Again,

8  we have a centralized distributional architecture and we

9  built that to be used by the government as well as by the

10 estate.

11          We included this possibility in the plan for

12 disclosure purposes but there is of yet no deal.  I should

13 underscore that our understanding with the preferred

14 shareholders to approach the DOJ jointly and advocate for

15 this is only that, an understanding.  With them it is not yet

16 an understanding with the DOJ.

17          Now the last thing I would like to address before

18 we go to the plan, Your Honor, is the process to building the

19 plan itself. In July 2023 the debtors filed publicly a first

20 draft of this plan expressly for the purpose of soliciting

21 comments from stakeholders.  Mr. Ray, the board and the team

22 recognized that this case was to big and to important,

23 effected too many people for us to only solicit feedback from

24 the creditor professionals who happen to be around the table

25 already.  This was a great decision.

1          We have received very meaningful feedback from

2    numerous creditors and governmental authorities that we could

3    incorporate into the plan and disclosure statement before we

4    launched.  Almost a year later, this Court approved the

5    disclosure statement.  We included in the disclosure

6    statement an unusual amount of background on the major

7    decisions reflected in the plan; in particular substantial

8    consolidation of the debtors and the comprehensive work done

9    by the debtors, the creditors committee, the ad hoc committee

10   of customers to explore strategic alternatives to the plan.

11          We launched customers and other creditors voted.

12   The voting, Your Honor, was overwhelming. The plan was

13   approved by 98 percent of voting creditors by amount and 96

14   percent of voting creditors by head count.  The turnout was

15   extremely robust.  This is not a case that had a silent

16   majority.  The majority has clearly spoken.  Over two-thirds

17   of all solicited claims around the world, Your Honor,

18   returned their ballots.

19          On behalf of Mr. Ray, the board and all of the

20   debtor professionals, this case represents some of the most

21   meaningful work of our careers. We thank the Court for its

22   guidance over this period and absent general questions I'd

23   like to hand the podium to Mr. Glueckstein and he will

24   present our case for confirmation.

25          THE COURT:  Thank you, Mr. Dietderich.  No

1  questions at this time.

2          MR. GLUECKSTEIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GLUECKSTEIN:  For the record Brian

5  Glueckstein, Sullivan & Cromwell, for the debtors.

6          As Mr. Dietderich has begun discussing, we are

7  here today seeking confirmation of the debtors plan of

8  reorganization.  We filed this morning, at Docket No. 26313,

9  the most up to date form of the confirmation order that

10 incorporates a number of changes to resolve a number of

11 objections.

12         The consensus in support for the plan reflected in

13 the voting results is further illustrated by the lack of

14 objections that were filed, many of which, we are pleased to

15 report, the debtors have since been able to resolve.  The

16 list of objections and status is contained in the chart

17 attached as Exhibit 1 to our reply brief.  Your Honor, since

18 the filing we have continued to work hard to resolve

19 objections to the greatest extent possible and have since

20 resolved the objection of ELD Capital, Three Arrows Capital,

21 RQ Capital, and we have resolved all but one remaining issue

22 in the objection of the Office of the United States Trustee.

23 We will address those objections as we proceed today.

24         If it pleases the Court, we intend to first

25 address the evidentiary record for today's hearing before

1   moving to argument and addressing the remaining objections

2   thereafter which are mostly legal in nature.

3          The debtors have submitted declarations from four

4   witnesses comprising -- consisting of those witnesses direct

5   testimony and the debtors affirmative case in support of

6   confirmation.  I will now address each.

7          Your Honor, the first witness of the debtors in

8   support of confirmation is James Daloia, senior director at

9   Kroll Restructuring.  Mr. Daloia submitted a declaration at

10  Docket No. 26045, which addresses solicitation and the voting

11  results.  At this time, Your Honor, the debtors respectfully

12  move to admit Mr. Daloia's declaration into evidence in

13  support of plan confirmation.  Mr. Daloia is in the courtroom

14  and available for cross-examination.

15         THE COURT:  Is there any objection?

16      (No verbal response)

17         THE COURT:  Its admitted without objection.

18      (Daloia declaration received into evidence)

19         THE COURT:  Does anyone wish to cross the witness?

20  We have one taker.

21         MR. GLUECKSTEIN:  Mr. Daloia, can you come

22  forward.

23         THE COURT:  Mr. Daloia, if you could take the

24  stand please.  Remain standing for the oath.

25              JAMES DALOIA, DEBTOR WITNESS, SWORN

1              MR. DALOIA:  James Daloia, D-A-L-O-I-A.

2              THE COURT:  Thank you.

3                          CROSS-EXAMINATION

4    BY MR. ADLER:

5    Q     Good morning, Mr. Daloia.

6    A     Good morning.

7    Q     My name is David Adler and I represent the Kavuri

8    Plaintiffs and separately Seth Melamed, all of whom are

9    creditors of the estate.

10         I wanted to ask you questions, since you put the

11   solicitation affidavit together, you mention in the affidavit

12   that there were a number of packages that were never

13   delivered or that you learned after the fact were not

14   delivered.  Can you elaborate on the that?

15   A     There is not much to elaborate on.  It just seems like

16   it is a post office error.

17   Q     How did you determine what happened?

18   A     Using our contacts we realized that, you know, making

19   calls, doing our research, finding out that these packages

20   were just not delivered.  And taking the word of the

21   creditors that they never received a package.

22   Q     So, you don't know whether everyone received a package,

23   do you? I mean there is no way to trace it, is there?

24   A     There would be no way to tell if everyone actually

25   received their package.  We trust the post office.

1  Q      Now under the disclosure statement and solicitation

2  order the ballots were supposed to be mailed -- emailed,

3  excuse me, to the email of record of the creditors, is that

4  correct?

5  A      Yes, if one was available.

6  Q      Did you, in fact, send it to all creditors by email?

7  A      If they had a valid email that was available, yes.

8  Q      What efforts did you undertake to make sure that

9  ballots were delivered if you got something back saying that

10 the email was undeliverable?

11 A      We would go through the records again to see if there

12 was another email address and if not, we would send it to any

13 physical address that we had on record.

14 Q      Okay.  Have you filed a list, under seal, with this

15 Court, identifying all the creditors who received the ballots

16 by email?

17 A      That I am not -- I don't believe so.

18 Q      Okay.  Is there -- do you know if you have a list?

19 A      We have records of those that would have had a bounce

20 back.

21 Q      To your knowledge there is no affidavit of service on

22 file?

23 A      No, not that I know of.

24 Q      Are you aware of the issue with my client, Melamed, and

25 what happened to him?

1  A     You would have to remind me specifically because there

2  were a number of issues that we --

3  Q     He did not receive a ballot by email.

4  A     Okay.

5  Q     And the ballot package was mailed to him on Wednesday,

6  August 14th and it was mailed to his prior counsel.  Got

7  there on August 16t and the ballot was returned.  Does that

8  refresh your recollection?

9  A     There was a number of instances.  So, if you are

10 telling me that is the case I will believe it.

11 Q     Okay.  I just want to go back to the point that you are

12 aware of 50 to 75 of these instances, I think you said in

13 your declaration.

14 A     Yes, roughly.

15 Q     Okay.  And are you aware that if a creditor was a

16 voting creditor and didn't return a ballot, he or she was

17 deemed to have released certain third parties?

18 A     If that is what the release provisions say, yes.

19 Q     Does that comport with your understanding?

20 A     I believe so, but I --

21 Q     I understand.  What would happen if a creditor came

22 forward and tried to bring a claim at this point who hadn't

23 voted?

24 A     A claim? I'm sorry.

25 Q     A claim -- let me be mor precise.  What would happen if

1   a creditor came forward and asserted a claim against a

2   release party under the plan who had not voted?

3          UNIDENTIFIED SPEAKER:  Objection, Your Honor.  It

4   calls for a legal conclusion.

5          THE COURT:  Sustained.

6   BY MR. ADLER:

7   Q    Let me ask you this question: In your experience -- how

8   long have you been in the restructuring field?

9   A    About 15 years.

10  Q    Have you submitted solicitation declarations before?

11  A    Yes.

12  Q    In your experience have you ever had a case where you

13  were seeking to -- or the debtors were seeking to obtain a

14  third-party release embodied in a plan where an affidavit of

15  service had not been filed identifying the creditors who had

16  received the ballots?

17  A    Can you restate that? I'm sorry, I --

18  Q    This plan calls for -- asks for a third-party release,

19  correct?

20  A    Correct.

21  Q    In your experience, in those types of cases, have you

22  ever had a situation where such a release was requested when

23  the parties who are granting the release are not identified

24  on an affidavit of service as having received the ballot?

25  A    Not that I am aware of.  They would normally all be on

1  the affidavit of service.

2  Q    Let me back up.  In your experience have you ever put

3  together a solicitation declaration without an affidavit of

4  service being on file indicating who the creditors were and

5  how they were served?

6  A    No.  The affidavit of service would always cover those

7  parties that were served, whether it be a ballot, a notice,

8  you know, any non-voting notice whether deemed to accept or

9  reject and the vote declaration would always reference that

10 affidavit of service.

11 Q    Right.  And in this case that affidavit of service is

12 not on file, is that correct?

13 A    The affidavit of service is on file.

14 Q    With all the names of the customers and how they were

15 served?

16 A    Depending on the redaction rules within the case it

17 might say name on file, but otherwise it would have all the

18 names of the parties that were served and what they were

19 served with.

20 Q    So, the unredacted version on file, the one under seal,

21 would have all the email addresses, is that correct?

22 A    If they were on there, yes.

23         MR. ADLER:  No further questions, Your Honor.

24         THE COURT:  Redirect -- well, I should ask: Does

25 anyone else wish to cross?

1          (No verbal response)

2                THE COURT:  Okay.  Mr. Glueckstein.

3                MR. GLUECKSTIEN:  No questions, Your Honor.

4                THE COURT:  Okay.  Thank you.

5                Thank you, Mr. Daloia.  You may step down.

6                THE WITNESS:  Thank you.

7          (Witness excused)

8                MR. GLUECKSTEIN:  Your Honor, the second witness

9    of the debtor in support of confirmation is Steven P.

10   Coverick, managing director at Alvarez & Marsal North

11   America, LLC.  Mr. Coverick submitted a declaration at Docket

12   No. 26041 which addresses facts relevant to the plan's

13   compliance with the bankruptcy code and approval of customer

14   priority and customer preference settlements, among other

15   things.  The debtors respectfully move to admit Mr.

16   Coverick's declaration into evidence in support of

17   confirmation. Mr. Coverick is in the courtroom and available

18   for cross-examination.

19                THE COURT:  Is there any objection?

20          (No verbal response)

21                THE COURT:  Its admitted without objection.

22          (Coverick declaration received into evidence)

23                THE COURT:  Anyone wish to cross Mr. Coverick?

24   Mr. Adler.

25                Please take the stand and remain standing for the

1  oath, sir.

2          THE COURT REPORTER:  Please raise your right hand.

3  Please state your first name and spell your last name for the

4  Court record, please.

5          MR. COVERICK:  Steven Coverick, C-O-V-E-R-I-C-K.

6           STEVEN COVERICK, DEBTOR WITNESS, SWORN

7          THE COURT:  Mr. Adler, whenever you are ready.

8                        CROSS-EXAMINATION

9  BY MR. ADLER:

10 Q    Good morning, Mr. Coverick.  My name is David Adler, I

11 represent the Kavuri Plaintiffs and Seth Melamed in this

12 proceeding.

13     I wanted to ask you a couple questions about your

14 declaration, particularly -- well, let's start off with the

15 solicitation process.  Were you involved in the solicitation

16 process at all?

17 A    I was involved in the solicitation process in a limited

18 capacity.

19 Q    But not on the day-to-day stuff that was just --

20 A    I was not involved in the individual solicitation to

21 creditors.

22 Q    My next question for you is in your declaration you say

23 the plan exculpation provisions are appropriate and should be

24 approved.  I wanted to ask you about the FTX recovery trust

25 exculpation agreement.  Do you believe that exculpation

1   should be approved?

2   A     I don't have the agreement in front of me, but I am

3   generally familiar with it.  Yes, I do believe it should be

4   approved.

5   Q     Are you aware that the exculpation covers the plan

6   administrator?

7   A     Yes.

8   Q     Does the plan administrator exist at the present

9   moment?

10  A     I believe the plan administrator is a role that would

11  be created upon effectiveness of the plan, but I also

12  understand, as defined in the plan supplement that it is the

13  same individual that is currently serving as CEO of the

14  debtors.

15  Q     Right.  But will be a new title with new powers.

16  A     That is my understanding.  Yes, sir.

17  Q     Were you involved at all in discussions over the scope

18  of that exculpation?

19  A     Not in detail, but I am generally familiar and was

20  involved in the general negotiations surrounding the releases

21  and exculpations in the plan.

22  Q     So, its Paragraph 8 of the, just so the record is

23  clear, plan administrator agreement.  Its in the second

24  amended plan supplement, Docket No. 26226-2 filed on October

25  3rd.  Paragraph 8 is the exculpation provision and the

1  exculpation has a change to it that was made from the last

2  amended -- last plan supplement where the carve outs to the

3  exculpation originally were fraud, gross negligence or

4  willful misconduct.  That has now been changed in the latest

5  version to simply willful misconduct.  Are you aware of that?

6  A    I generally recall the change, but I am not a lawyer,

7  so I am not familiar with the specific reasons why the change

8  may have been made.

9  Q    Okay.  You believe that this exculpation is appropriate

10 based on your experience?

11 A    Yes, sir.

12 Q    How about the wind down entities.  What are they under

13 Paragraph 8 of the exculpation?

14 A    I'm sorry, I don't have it in front of me.

15 Q    Generally speaking, do you know what the winddown

16 entities are under the plan?

17 A    Yes, sir, I do.

18 Q    Generally speaking, what are the winddown entities?

19 A    The winddown entities generally consist of the

20 remaining debtor entities that will provide assets into the

21 FTX recovery trust upon effectiveness of the plan.

22 Q    Right.  Are they being consolidated?

23 A    Substantially consolidated under the plan, that is

24 correct.

25 Q    Right.  Do the winddown entities presently exist as

1  that term is defined under the plan?

2  A    The entities that comprise the general definition of

3  winddown entities, those do currently exist.

4  Q    I also wanted to ask you some questions about crypto in

5  kind.   Were you involved in efforts by the debtors to make

6  distributions to creditors in kind?

7  A    I have been involved in the general discussions and

8  negotiations with the major stakeholders in this case

9  surrounding the mechanisms under which the debtors may be

10 able to make plan distributions.

11 Q    Can you tell us what efforts were made to attempt to

12 distribute in kind?

13 A    So, in general, the plan does not provide for in kind

14 distributions. That was a topic that was discussed at length

15 with major stakeholders in the case including the official

16 committee of unsecured creditors, the ad hoc committee, as

17 well as other stakeholders.  There were a number of factors

18 involved in the decision to make cash distributions pursuant

19 to the plan. I would be happy to elaborate on some of those

20 decisions if that is helpful.

21     One, the debtors do not have the cryptocurrency that

22 would be required to make in kind distributions and, in fact,

23 never had the cryptocurrency and the proportions in which

24 customers believed they had in their accounts.   The

25 cryptocurrency that the debtors did have has largely been

1  liquidated pursuant to the asset monetization order that was

2  entered, I believe, approximately a year ago in consultation

3  with the official committee of unsecured creditors and the ad

4  hoc committee.

5      So, the most important factor is the debtors simply

6  don't have the crypto to distribute in kind.  That would mean

7  the debtors would have to purchase that cryptocurrency on the

8  open market in order to make in kind distributions.  There is

9  a number of complicating factors that were considered with

10 regard to what that purchase would require, what the

11 logistics of such a complex distribution would be and in

12 consulting with the unsecured creditors committee and the ad

13 hoc committee, we determined, collaboratively, that it would

14 not be feasible and would, in fact, result in potentially

15 inequitable creditor recoveries for members of the same

16 class.

17     Further, we determined it would be exorbitantly

18 expensive to undertake such a large purchase. It would

19 require the purchase of billions of dollars of cryptocurrency

20 on the open market, there would be new professionals that

21 would have to be retained or additional administrative costs

22 that would be incurred to safeguard those assets while

23 waiting to make those distributions.

24     There would be, what we generally refer to as, slippage

25 where the debtors would effectively have to set a record date

1  and calculate the exact amount of cryptocurrencies that would

2  have to be purchased for a given distribution.  Once that

3  quantity was set at a record date the debtors would then have

4  to go purchase billions of dollars of cryptocurrencies in

5  those quantities which would, in consultation with our

6  investment fiduciary, Galaxy, we have been informed would

7  result in a runup in the market.

8       So, in other words, we would have to overpay for those

9  same quantities which would come at a detriment to other

10 creditors in the case.  So, those were the major factors in

11 addition to the fact that, in my understanding, there is

12 nothing in the bankruptcy code that requires a debtor to make

13 in kind distributions.

14 Q    Were you aware of the fact that customers who received

15 cash when they had crypto may have a taxable event?

16 A    I am not a tax professional, but I have --

17 Q    Neither am I.

18 A    -- discussed the topic with the debtors tax

19 professionals. I understand that to be a very complicated

20 topic and one that is predicated on the individual

21 circumstances of each customer, which jurisdiction they sit

22 in, the underlying nature of their entitlement. Its very

23 complicated and I am aware that there is not a conclusive

24 opinion amongst the tax professionals in this case that in

25 kind distributions would or would not eliminate tax exposure

1 | of a customer.

2 | Q     Fair enough for non-tax advice.

3 |       You mentioned that this consideration of distributing

4 | crypto in kind was done internally.  Were efforts made to

5 | reach out to third parties to act as an agent for the

6 | customer for crypto distributions?

7 | A     There have been many efforts and those efforts are

8 | still ongoing to identify distribution agents that would be

9 | required to make distributions under the plan.  There were

10 | discussions with those distribution agents as to what their

11 | capabilities may be with regard to cryptocurrencies.  As I

12 | understand, in the plan -- I actually forget if it's the plan

13 | or the disclosure statement, but the debtors mention that

14 | they're exploring the possibility of making some

15 | distributions in stablecoin.  So, that is a topic that has

16 | been discussed with some of those potential distribution

17 | agents.  So, yes, there were many discussions.

18 | Q     Were you involved in any of the other crypto

19 | bankruptcies that have been filed since 2022?

20 | A     No, sir.  Not personally.

21 | Q     Okay.  I will represent to you that in BlockFi it had

22 | simply cash and it managed to retain in Coinbase as its agent

23 | to convert the cash distribution to crypto for customers who

24 | wanted to receive in kind.  Was any attempt made to do that

25 | in this case?

1  A     I am aware of the general distribution scheme in

2  BlockFi. I did not serve as financial advisor to BlockFi, so

3  I can't speak to the factors that led to them making that

4  decision. I understand the cases to be very different cases,

5  the nature of the customer base to be very different, the

6  scope of the customer base, general size of the creditor

7  population.  So, again, I would just cite the factors that I

8  am aware of as to why the FTX debtors made the decision not

9  to do in kind distributions, but I can't speak to how BlockFi

10  came to that conclusion.

11  Q     Okay.  Were efforts made to -- or were discussions had

12  with Coinbase or PayPal?

13  A     As I mentioned, we had discussions with a number of

14  parties.  You know, due to the ongoing nature of those

15  discussions I think there's competitive concerns with

16  disclosing any individual names of distribution agents that

17  we have spoken to.

18  Q     Last topic is the fees to be paid to the various

19  entities created on the effective date.  So, we have the plan

20  administrator, we have the board for the FTX recovery trust,

21  we have the advisory committee, we have the Delaware

22  litigation trustee, and nowhere in the plan supplement is

23  compensation disclosed for those entities.  Can you tell me

24  why?

25  A     Well, I don't entirely agree with that.  In the plan

1 supplement we included a winddown budget.  That winddown

2 budget was prepared by the debtors, approved by the debtors

3 current board of directors and includes a level of detail as

4 to what is included in the winddown budget.  One of those

5 items lists governance which includes all of the plan

6 administrator, the recovery trust board, creditor advisory

7 committee, etc., and that estimate and total is included in

8 the winddown budget.

9 Q     Is it broken down on a line-by-line basis?

10 A     No, sir, it is not.

11 Q     Okay. How did you go about making those estimates

12 without knowing the compensation to be paid?

13 A     Well, I don't think we can know with certainty what

14 compensation would be paid to the plan administrator

15 specifically because that will be set by the winddown board

16 and that board does not exist today.  So, we could not

17 discuss it with that board; however, we did use an analysis

18 of run rates of the existing compensation.  We reviewed it

19 with both the individual that is slated to be serving as the

20 plan administrator and eventually the current board of the

21 debtors who all felt that the estimate that was included in

22 the winddown budget was reasonable.

23 Q     Can you give me a range of what that estimate was for

24 various entities?  Let's take the board of directors for the

25 FTX recovery trust.  Do you recall what the --

1  A     The total of all the governance costs in the winddown

2  budget is, I believe, I don't have it in front of me, but if

3  I recall its $34 million in total for the three-year

4  projected winddown period.  I don't have memorized the

5  individual line items behind that, but that is something that

6  my team did put together when preparing the winddown budget.

7  Q     So, the estimate from you was $34 million in total for

8  the winddown governance?

9  A     Yes, sir.

10 Q     Last question, what is the joint board?

11 A     The joint board, I would have to look at the

12 definition. I'm sorry, sometimes we speak in general terms.

13 Q     I ask because I thought I might have misread it the

14 first time, but its referenced in the compensation provision,

15 I believe, of the FTX recovery trust that the board -- the

16 FTX recovery trust board will receive the same compensation

17 as the joint board.

18 A     Okay.

19 Q     I have not seen the joint board defined anywhere in the

20 plan supplement documents.

21 A     Understood. I don't have it in front of me, but I can -

22 - I believe I understand what it means. I believe its

23 referring to the debtors existing board of directors, but I

24 can't be certain.  I would need to see the definitions in

25 front of me.

1  Q      What is the current compensation of the debtors board

2  of directors?

3  A      I believe each member of the board of directors has a

4  compensation of $50,000 a month.

5  Q      Are there any other fees that will be payable at any

6  point to the board other than the stipend?

7  A      No, sir, not that I'm aware of.

8  Q      So, there aren't incentive fees upon emergence from

9  bankruptcy or anything of that nature?

10 A      No, sir, not that I'm aware of.

11          MR. ADLER:  That's all I have, Your Honor.

12          THE COURT:  Thank you.

13          Does anyone else want to cross?

14          MR. DALSEN:  May I proceed, Your Honor?

15          THE COURT:  Yes.

16          MR. DALSEN:  Thank you, Your Honor.

17                     CROSS-EXAMINATION

18 BY MR. DALSEN:

19 Q      Good morning, Mr. Coverick.

20 A      Good morning.

21 Q      We met before.  My name is William Dalsen from

22 Proskauer Rose. I represent the LayerZero Group.

23          Now we met previously when you were deposed in this

24 proceeding, is that right?

25 A      Yes, sir.

1 Q    And at that deposition you testified on behalf of FTX

2 Trading Ltd. and its affiliated debtors and debtors-in-

3 possession, correct?

4 A    Yes, sir.

5 Q    And if I refer to FTX Trading Ltd. and its affiliated

6 debtors and debtors-in-possession as simple FTX is that okay

7 with you?

8 A    Yes, sir.

9 Q    Thank you.

10    At that deposition you were prepared to testify on

11 behalf of FTX as to the customer preference settlement,

12 correct?

13 A    That's correct.

14 Q    Out of curiosity, before you took the stand, somebody

15 handed you something in a manila envelope. Is that before

16 you?

17 A    It is.

18 Q    What is it?

19 A    It's my declaration.

20 Q    Got it.  Thank you.

21    Mr. Coverick, you are familiar with the second amended

22 joint Chapter 11 plan of reorganization of FTX Trading Ltd.

23 and its affiliated debtors that is the subject of this

24 hearing today, correct?

25 A    Correct.

1  Q      Do you have a copy of the plan with you?

2  A      I do no

3           MR. DALSEN:  Your Honor, may I approach the

4  witness?

5           THE COURT:  Yes.

6  BY MR. DALSEN:

7  Q      Mr. Coverick, I have handed you what was Exhibit 2 from

8  your deposition.  Can you tell us what this is?

9  A      It is the second amended joint Chapter 11 plan of

10 reorganization of FTX Trading Ltd. and its debtor affiliates.

11 Q      And if I just call that the plan, would that be okay

12 with you?

13 A      Yes, sir.

14 Q      Okay.  And now you are familiar with the plan because

15 you reviewed it and because you were involved in the

16 negotiations and formation of the plan, right?

17 A      That is correct.

18 Q      You are also familiar with the customer preference

19 settlements in the plan, correct?

20 A      That is correct.

21 Q      And you are familiar with the customer preference

22 settlement because you reviewed it and you were involved in

23 this negotiation, correct?

24 A      Correct.

25 Q      If you could turn to page 50 of this exhibit, I just

1  handed to you, the plan, and specifically I want to ask you

2  about Section 5.5.  Just let me know when you are there.

3  A     I'm there.

4  Q     Section 5.5 of the plan is a description of the

5  customer preference settlement, correct?

6  A     Correct.

7  Q     If you turn to page 51, please, which is also still

8  Section 5.5, let me know when you are there.

9  A     I'm there.

10  Q     Do you see the first full paragraph beginning the

11  debtors shall not designate?

12  A     I do.

13  Q     And this paragraph contains what you would call the

14  objective set of criteria under which all preference claims

15  should be reviewed, correct?

16  A     That is correct.

17  Q     The debtors did not use any criteria other then those

18  listed in this Paragraph of Section 5.5 to identify which

19  customer preference actions to exclude, correct?

20  A     That is correct.

21  Q     I want to ask you about the application of these

22  criteria now in Section 5.5.  Sir, debtors counsel reviewed

23  each customer preference claim to determine whether it met

24  one of those criteria in Section 5.5, is that right?

25  A     That's correct.

1  Q    Specifically, debtors counsel reviewed the base of

2  potential preference claims against the list of criteria and

3  for any claims that met one of the criteria they were

4  included in the plan supplement, is that right?

5  A    On the list of excluded customer preference actions,

6  yes.

7  Q    You had no direct involvement with the process of

8  reviewing claims against the set of criteria included in the

9  plan, correct?

10 A    No, that is a process that was conducted by debtors

11 counsel.

12 Q    You did not discuss with debtors counsel the specific

13 consideration of individual claims on the list of excluded

14 customer preference actions, correct?

15 A    That is correct.

16 Q    The FTX board of directors did not review each

17 individual claim that was set to be designated as an excluded

18 customer preference action, correct?

19 A    To the best of my knowledge that is correct.

20 Q    In fact, the FTX board did not review any particular

21 customer preference action that was designated as an excluded

22 customer preference action in the plan supplement, correct?

23 A    On an individual basis I believe that is correct.

24 Q    You were not involved with the attorneys at debtors

25 counsel who conducted the review of these claims, right?

1  A     No.  As I stated, that was a process conducted by

2  debtors counsel.

3  Q     And you personally did not decide whether any customer

4  preference action should be excluded under these criteria on

5  the second paragraph of Section 5.5, correct?

6  A     Correct.

7  Q     The debtors designated LayerZero Labs as an excluded

8  customer preference action because the debtors do have a

9  filed complaint against the LayerZero Group, correct?

10 A     Correct.

11 Q     And its your understanding that LayerZero Labs,

12 therefore, meets the criteria listed in Section 5.5(b) of the

13 plan to be an excluded customer preference action, correct?

14 A     Correct.

15 Q     Other than referring to the adversary complaint filed

16 against the LayerZero Group, there is nothing more you can

17 tell the Court about why LayerZero Labs was excluded under

18 Section 5.5 because you were not involved with the attorneys

19 at debtors counsel who conducted the review of claims,

20 correct?

21 A     Again, to be clear, I pointed to the adversary

22 complaint as containing the relevant information for why

23 LayerZero Labs and the LayerZero Group in general met the

24 criteria.  There is a lot of information in that complaint. I

25 am not a lawyer, so I can't speak to the legalities or merits

1  of the items included in the complaint, but I pointed to the

2  complaint as the supporting document, as well as the many

3  underlying documents behind that complaint as the reason for

4  why I believe LayerZero Labs and LayerZero Group met the

5  criteria for being on the list.

6  Q    You did not draft that complaint, correct?

7  A    I did not.

8  Q    You do not refer to that complaint in your declaration,

9  correct?

10 A    I do not.

11 Q    You did not review the documents underlying the

12 adversary complaint to draft that complaint, correct?

13 A    Not to draft the complaint, no.

14 Q    You did not know all of the documents that debtors

15 counsel used to draft the complaint, correct?

16 A    I don't have them memorized, but I am aware of their

17 general existence.

18 Q    Mr. Ari Litan is also on the excluded customer

19 preference list because the debtors have a cause of action

20 against him, correct?

21 A    Correct.

22 Q    Skip & Goose, another of my clients, is also on the

23 excluded customer preference list because the debtors have

24 filed a cause of action that includes Skip & Goose, correct?

25 A    Correct.

1  Q     And there are no other facts or information you can

2  share with us as to why the debtors determined that Skip &

3  Goose would be excluded from the customer preference

4  settlement, correct?

5  A     Again, I point to all of the facts and statements in

6  the adversary complaint that include Mr. Litan and Skip &

7  Goose's defendants.

8           MR. DALSEN:  I will pass the witness, Your Honor.

9           THE COURT:  Thank you.

10           Does anyone else want to cross?

11      (No verbal response)

12           THE COURT:  Mr. Glueckstein, go ahead.

13           MR. GLUECKSTEIN:  No questions, Your Honor.

14           THE COURT:  Thank you.  You may step down, sir.

15      (Witness excused)

16           THE COURT:  Mr. Dalsen, did you sign in on the

17  sign-in sheet? I don't see your name listed.

18           MR. DALSEN:  (Indiscernible).

19           MR. GLUECKSTEIN:  Thank you, Your Honor.

20  Continuing with the debtors case in support of confirmation,

21  our third witness, Your Honor, is Edgar W. Mosley II,

22  managing director at Alvarez & Marsal North America, LLC.

23  Mr. Mosley submitted a declaration at Docket No. 26044 which

24  addresses facts relevant to the debtors operations of the FTX

25  exchanges, the debtors positions as to the estate, and

1  substantive consolidation, among other things.

2        Your Honor, the debtors respectfully move to admit

3  Mr. Mosley's declaration and attached exhibits which are

4  Exhibits 2 through 6 on our exhibit list that we submitted in

5  advance of the hearing into evidence in support of

6  confirmation.  Mr. Mosley is in the courtroom and available

7  for cross-examination.

8        THE COURT:  Anyone object to the introduction of

9  the declaration and the exhibits?

10       (No verbal response)

11       THE COURT:  They are admitted without objection.

12     (Mosley declaration received into evidence)

13       THE COURT:  Anyone wish to cross?

14       Mr. Mosley, come forward.

15       THE COURT REPORTER:  Please raise your right hand.

16  Please state your full name and spell your last name for the

17  Court record, please.

18       MR. MOSLEY:  Edgar Mosley, II, M-O-S-L-E-Y.

19       EDGAR MOSLEY, II, DEBTOR WITNESS, SWORN

20       THE COURT:  Mr. Adler, whenever you are ready.

21              CROSS-EXAMINATION

22  BY MR. ADLER:

23  Q   Good morning, Mr. Mosley.  My name is David Adler, I

24  represent the Kavuri Plaintiffs and Mr. Seth Melamed.

25       I just had a few questions for you today which was were

1  you involved in the operational aspects of FTX post-petition?

2  A     I was.

3  Q     Were you involved at all in the discussions about

4  trying to make a crypto in kind distribution to creditors?

5  A     Yes, I was.

6  Q     Can you tell me or tell the Court what those

7  discussions consisted of?

8  A     Consistent with Mr. Coverick's testimony, I was

9  involved in many of the same meetings and discussions with

10  the unsecured creditors, the ad hoc committee as well as

11  management and the board.

12  Q     Are you aware, was there any attempt to reach out to an

13  exchange?

14  A     To reach out to an exchange?

15  Q     To convert the cash distribution to a creditor and to a

16  crypto distribution?

17  A     As Mr. Coverick stated, we are, as the debtors, still

18  considering all of our options and the plan does leave open

19  the potential of distributing via stablecoins.  So, yes, its

20  ongoing and we are talking to multiple parties about being a

21  distribution agent.

22  Q     Approximately how many?

23  A     I don't remember what the original list is.  I think we

24  are down to four or five parties at this point.

25  Q     Is it a competitive process?

1   A      Yes, it is.

2   Q      Are you seeking to retain that exchange as an agent for

3   the distribution?

4   A      We are seeking to retain distribution agents to make

5   distributions on behalf of the estate.  Does that answer your

6   question?

7   Q      Well, are they prepared to make distributions in

8   stablecoin?

9   A      We are looking at all options and some of those parties

10  will be able to make distributions in stablecoins.

11  Q      Is there a term sheet with any of those parties?

12  A      I am not certain as to whether or not there is a term

13  sheet right now.  I don't recall if there is a term sheet

14  right now.

15  Q      Is there a memorandum of understanding or something

16  more preliminary to a term sheet?

17  A      There are discussions at this point.

18  Q      But nothing in writing is what you are saying, correct?

19  A      I am saying that I don't recall whether or not we have

20  one.

21  Q      Were you involved in the discussions with respect to

22  the scope of the exculpation provision in the plan

23  administrator agreement?

24  A      Broadly.  I am clearly not as close to it as counsel,

25  management or Mr. Coverick, but broadly, yes.

1          MR. GLUECKSTEIN:  Your Honor, (indiscernible). We

2    would object at this point.  Mr. Mosley -- this is outside

3    the scope of Mr. Mosley's direct testimony which has been put

4    into evidence by his declaration.

5          THE COURT:  Mr. Adler, you outside the scope.

6          MR. ADLER:  My response is that he stated that he

7    was involved in the day-to-day operations of FTX and I am

8    trying to determine, you know, how that relates to the plan

9    process and specifically the plan supplement.

10          MR. GLUECKSTEIN:  Your Honor, Mr. Adler did not

11   notice Mr. Mosley as a hostile witness for this hearing. He

12   is appearing as a witness on cross-examination on his direct

13   which was submitted by his declaration.  Frankly, the prior

14   testimony was outside the scope as well, we let it go, but

15   now we are moving from more topics that are outside the scope

16   of his declaration.

17          THE COURT:  I will give you a little leeway, Mr.

18   Alder, but let's keep it tight.

19   BY MR. ADLER:

20   Q     Are you on the board of directors of the debtors right

21   now?

22   A     I am not.

23   Q     Okay.  Will you be on the board of directors of the FTX

24   Recovery Trust?

25   A     Not to my knowledge.

1          MR. ADLER:  No further questions.

2          THE COURT:  Thank you.

3          Redirect?

4          MR. GLUECKSTEIN:  No redirect.

5          THE COURT:  Okay.  Thank you.

6          You may step down, sir.  Thank you.

7     (Witness excused)

8          MR. GLUECKSTEIN:  Okay.  Your Honor Your Honor,

9  continuing with the Debtors' case, our fourth and final

10 witness this morning is the Right Honorable Lord Neuberger of

11 Abbotsbury, who is a former judge on the English Court of

12 Appeal and what became the U.K. Supreme Court.  He was later

13 appointed Master of the Rolls on that court as a senior Court

14 of Appeal judge in the United Kingdom.

15          Lord Neuberger is also a leading expert on U.K.

16 law issues.  We're lucky to have him here with us in the

17 courtroom today.

18          Lord Neuberger submitted a declaration at Docket

19 26042, pursuant -- in accordance with Rule 44.1 of the

20 Federal Rules of Civil Procedure to aid the Court with issues

21 as to the meaning and effect of the FTX.com in terms of

22 service, which are at the heart of the customer property

23 arguments being settled to the customer property settlement

24 contained in the plan.

25          Your Honor, at this time, the Debtors respectfully

1    move to admit Lord Neuberger's declaration into evidence in

2    support of confirmation.  Lord Neuberger is also available

3    for cross-examination.

4              THE COURT:  Okay.  Is there any objection?

5         (No verbal response)

6              THE COURT:  The declaration is admitted, without

7    objection.

8              (Neuberger Declaration received in evidence)

9              THE COURT:  Anyone wish to cross?

10        (No verbal response)

11             THE COURT:  No cross, thank you.

12             MR. GLUECKSTEIN:  Your Honor -- thank you, Your

13   Honor.  At this point, neither the Debtors, or as far as I'm

14   aware, the Court, have been provided notice of any witnesses

15   or evidence by any other party, so that seems it should close

16   the evidentiary record for the confirmation hearing.

17             THE COURT:  Did you have any other, because I know

18   you admitted Exhibits 1 through 6 and there were 17 exhibits

19   on your exhibit list.

20             MR. GLUECKSTEIN:  The remainder of the exhibits,

21   Your Honor, were filings in the case.  We would just ask the

22   Court to take judicial notice of those exhibits.

23             THE COURT:  Okay.  Thank you.  All right.

24             MR. GLUECKSTEIN:  Thank you, Your Honor.

25             Then proceeding, with respect to our confirmation

1    case, and Mr. Dietderich covered a number of points and I

2    won't repeat them, the plan satisfies, Your Honor, and the

3    Debtors submit, all of the requirements of the Bankruptcy

4    Code and is overwhelmingly supported by each class that was

5    entitled to vote.  As noticed, the plan provides for

6    recoveries on allowed claims that are projected to be paid in

7    full, plus interest, to all customers and non-governmental

8    creditors.

9            This result was inconceivable when the FTX Group

10   collapsed into bankruptcy less than two years ago.

11   Mr. Daloia's declaration details that every voting class

12   accepted the plan at 95 percent or more.

13           Mr. Coverick's declaration, now in evidence,

14   explains why the plan satisfies the requirements of the

15   Bankruptcy Code necessary for confirmation and also addresses

16   the Debtors' process and rationale for entering into the

17   customer priority settlement, that is an essential pillar of

18   the global settlement of claims in the plan.

19           The customer priority settlement provides a

20   negotiated resolution of arguments made that customers have

21   some form of property rights in the Debtors' assets that,

22   otherwise, would have required protracted litigation to

23   resolve on a final basis.  As detailed in our confirmation

24   memorandum of law, and supported by the declarations now in

25   evidence of Mr. Mosley and Lord Neuberger, the Debtors

1  maintain that well-settled case law establishes that all of

2  the Exchange assets are presumptively part of the Debtors'

3  estates because they were commingled together and that the

4  customers could never satisfy their burden to both, one,

5  prove that they have any property rights, pursuant to any

6  trust or availment of relationship and, two, trace any assets

7  that they claim to own, any of the assets that are currently

8  part of the Debtors' estates.

9          The unrefuted evidence in the record from Lord

10  Neuberger and Mr. Mosley conclusively establish the Debtors'

11  positions and should put an end to the narrative still being

12  peddle by a few individual customers that they could have

13  property interests in the Debtors' assets.  Those few still

14  advancing such arguments have claims arising from purchased

15  or traded digital assets on the FTX.com Exchange and,

16  therefore, as Mr. Mosley explains in his admitted

17  declaration, never had anything, other than a book entry

18  reflecting what was owed to them and, thus, no assets in any

19  deposit addresses at any time.

20          Nonetheless, as Mr. Mosley details in his

21  testimony, after the good faith, arm's-length negotiations,

22  the Debtors, the Official Committee, both the Ad Hoc

23  Committee and the Class Action Claimants who had asserted

24  customer property claims, all agreed to the customer priority

25  settlement in recognition of the arguments advanced by

1  customers and the fact that litigation of all such issues to

2  final judgment would be complex, burdensome, uncertain, and

3  could have delayed the conclusion of these cases and

4  distributions to creditors.  The plan and this result is now

5  also supported by the putative class representatives in the

6  multidistrict litigation pending in Florida.  The customer

7  priority settlement is reasonable and satisfies the standard

8  for approval, pursuant to Bankruptcy Rule 9019.

9          Your Honor, the settlements previously approved by

10 this Court, Mr. Dietderich walked there many of them,

11 including with the CFTC, the IRS, and other governmental

12 entities, facilitated the creation of the Supplemental

13 Remission Fund that's in the plan, which has the potential to

14 further increase customer and other eligible creditor

15 recoveries, and the formation of the Wind-down Trust through

16 the substantive consolidation of the Debtors, completes a

17 plan that the Debtors and virtually all of their stakeholders

18 have all agreed is the best possible option for resolving

19 these Chapter 11 cases and maximizing recoveries for

20 creditors and it should be confirmed.

21         There are, however, Your Honor, a few holdout

22 objections.  As I noted at the outset, the Debtors have

23 worked to resolve, through changes to the plan and the

24 confirmation order, as many objections as possible and was

25 largely successful.  We addressed, substantively, the

1 | remaining objections filed in the Debtors' reply filed at
2 | Docket 26039.  Those objections that remain raise mostly
3 | discrete, parochial issues by which the objector seeks to
4 | hold everyone else hostage for their own personal benefit and
5 | do not actually implicate the terms of the plan, and we
6 | submit none have merit.

7 | Unless the Court wishes to proceed differently, I
8 | will generally address the remaining objections one at a time
9 | by objector, but before I do, Your Honor, does the Court wish
10 | to hear from any of the plan supporters at this point before
11 | we get into the objections or later in the hearing?

12 | THE COURT:  If anyone wants to make a statement
13 | now, that would be fine.  And I think just to we move things
14 | along, as we're going through the objections, I know there
15 | are some overlapping objections, so I want to make sure
16 | parties who have an overlapping objection, with regard to
17 | whatever objection you are raising first or second or third,
18 | they have the opportunity to respond --

19 | MR. GLUECKSTEIN:  Yes, Your Honor.

20 | THE COURT:  -- to make their arguments.

21 | Do any other plan supporter wish to make an
22 | opening statement?

23 | MR. PASQUALE:  Good morning, Your Honor.

24 | Ken Pasquale from Paul Hastings for the Official
25 | Committee of Unsecured Creditors.

1          Your Honor, the Committee is very pleased to

2    support confirmation of the plan today and looks forward to

3    distributions being promptly made to customers and all

4    creditors of the Debtors upon confirmation.  We join in all

5    the substantive arguments set forth by the Debtors and join

6    in the request that the remaining objections be overruled.

7          When these cases began nearly two years ago, the

8    landscape for creditor recoveries was extremely uncertain.

9    The extent of the fraud by the Debtors' prepetition

10   management team was not yet known and cryptocurrency values

11   were extremely depressed.  The Committee, during those first

12   few months, was focused on leveraging market opportunities

13   and expediting these bankruptcy cases to a conclusion.

14         It was with those goals in mind that in the summer

15   of 2023, the Committee filed a motion asking this Court to

16   order plan mediation.  The Court never had to rule on that

17   motion because the Debtors, the Committee, the Ad Hoc Group,

18   and the other stakeholders soon thereafter began good faith

19   plan discussions, which were quite difficult at times, but

20   because of the professionalism of many in this courtroom,

21   those meetings resulted in a number of the agreements upon

22   which the plan today is founded, including, as you just

23   heard, the customer priority settlement.

24         There were plenty of bumps and disagreements

25   between the parties along the way, but we were able to

1   resolve those disputes, as Mr. Dietderich said, without

2   bringing them to the Court's attention and I think we're all

3   very proud to be able to say that today and to be able to

4   have done that.

5            It is a testament, again, to the parties in this

6   room that the plan not only held together, but resulted in

7   important components that maximized recoveries to creditors,

8   including providing post-petition interest to creditors at

9   the 9 percent consensus rate, the Supplemental Remission

10  Fund, those going to most creditors, and the establishment of

11  the Creditor Advisory Committee to assist in post-effective

12  date management of the estates.

13           Certainly, we benefited from a bull crypto market

14  over the last year, but it is because of the hard work of the

15  Debtors, the Committee, and the other stakeholders that we

16  were able to take advantage of those markets to maximize the

17  monetization of the Debtors' digital assets and to put these

18  cases in a position to not only conclude, but to conclude

19  while returning a par-plus recovery to unsecured creditors.

20           The Committee and all of its professionals extend

21  our sincere thanks to the Court, to the Court's staff for its

22  attention to these cases over these nearly two years and we

23  look forward to the day, soon to come, upon confirmation we

24  hope today, that creditors will begin to receive their plan

25  distributions.

1        Thank you, Your Honor.

2        THE COURT:  Thank you, Mr. Pasquale.

3        Anyone else?

4        MR. SHORE:  Good morning, Your Honor.

5        Chris Shore from White & Case, on behalf of the

6   Joint Official Liquidators of FTX DM as foreign

7   representatives of, in the FTX DM proceedings and FTX DM as a

8   creditor of the U.S. Debtors.

9        We also rise in support of this Chapter 11 plan,

10  which in our view, is a truly remarkable achievement by

11  Mr. Ray and his team of professionals, along with the various

12  directors on the joint board.

13       I'll also turn back in time.  We were one of the

14  few parties that appeared at that first day hearing when

15  Mr. Bromley laid out his state of the estate PowerPoint.  And

16  I'll be maybe more graphic than Mr. Dietderich, it was a

17  very, very dark presentation for creditors.

18       Despite Mr. Bromley's brave face, it was entirely

19  unclear what assets the Debtors had and whether they were

20  even safe with ongoing hacks occurring during that first day

21  hearing in real time.  The best the Debtors could come up

22  with on an org chart, which is typically one of the first

23  slides in any first day presentation was a vague spaghetti of

24  silos, grouping diverse businesses into one synthetic Debtor

25  with a joint board.

1              There was no, virtually no management; most had
2    been kicked out, had already lawyered-up, and ultimately
3    would be convicted of their crimes and everybody in the
4    courtroom was worried about the possibility that the Debtors,
5    themselves, would be indicted.  But have no fear, Mr. Bromley
6    deadpanned, it would all be sorted out once the corporate
7    records consisting of files of Slack messages, thumbs-up
8    emojis, furniture receipts, and Amazon QuickBooks printouts
9    were knitted together in the Debtors' schedule, and from our
10   perspective, there was a brewing first day dispute that
11   machinery referenced about what, if anything, was going to
12   proceed in this court versus the Bahamian Court.  And if I
13   remember Mr. Bromley's remarks correctly, out of all the
14   uncertainty and chaos in the first days, the one thing the
15   Debtors were sure of was that DM had no assets, had no
16   operations, and that the Bahamian proceedings were
17   illegitimate.
18              We've come a very, very long way.  We are here
19   today with a plan with overwhelming support that pays allowed
20   dollarized claims in full with interest.  And for the JOLs,
21   an approved settlement distribution scheme that recognizes
22   the jurisdictional importance of both insolvency regimes and
23   allows for rapid, coordinated distributions to the customers
24   of the FTX Enterprise, whether they elected to have their
25   claims liquidated in the Bahamas or, here, in this court.

1              And for that reason, the JOLs, two of whom were

2     able to make it here today, wholeheartedly support entry of

3     the confirmation order and whatever ruling Your Honor may

4     render today, we extend all of our thanks to the Court and

5     its staff for all of its attention and good care to our

6     respected legal views, and most importantly, for creating an

7     environment in which global consensus could take root.  So,

8     thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Shore.

10             Good morning.

11             MS. BRODERICK:  Good morning, Your Honor.

12             May I please the Court?  Erin Broderick of

13    Eversheds Sutherland on behalf of the Ad Hoc Committee of

14    Non-U.S. Customers of FTX.com.

15             The Ad Hoc Committee represents holders of

16    approximately $6 billion in claims, spanning 34 countries,

17    with claim amounts as small as a couple hundred dollars to

18    hundreds of millions of dollars.  The Ad Hoc Committee was

19    established in December of 2022 with an initial focus on

20    advancing customer property rights.

21             Those issues have been addressed at length by the

22    Debtors and other parties throughout these cases, but to

23    summarize briefly, the applicable legal standards, as well as

24    the factual realities of FTX prepetition operations,

25    including the misappropriation of customer assets, presents a

1  very difficult case and empiric victory at the end of the day

2  for customers on a "property of the estate" determination.

3          That said, however, the customers plain reading of

4  the terms of service and the reliance on assurances that

5  their assets will be safe and returned to them, has not been

6  dismissed or overlooked by anyone in this courtroom.  Indeed,

7  that was the foundation of the Ad Hoc Committee's negotiation

8  with the Debtors, the Official Committee, and other parties

9  in the case and ultimately resulted in the plan before the

10  Court that has several creative mechanisms to enhance

11  customer recoveries within the confines of the Bankruptcy

12  Code and in balance with the interest and rights of other

13  stakeholders.

14          We're very proud of the role that the Ad Hoc

15  Committee played in developing the plan.  We spearheaded the

16  customer preference settlement construct, which was critical

17  in providing certainty to allow customers to sell their

18  claims at the highest amount in the last year since the

19  settlement was announced.

20          We fiercely advocated for the 9 percent post-

21  petition interest rate implemented in the plan and the Ad Hoc

22  Committee's arguments and appeal to the equitable

23  prioritization of customer claims was central to the

24  subordination of governmental claims and creation of the CFT

25  Supplemental Remission Fund.  These plan components represent

1  not only sound legal reasoning, but consensus that was built

2  on collaboration in ensuring that customers receive the best

3  treatment possible within the constraints of these cases.

4          Our presence has not been front and center in

5  these cases, but that is not reflective of disengagement;

6  rather, it's a testament to the extremely constructive and

7  cooperative relationship that we've had with the Debtors, the

8  Official Committee, the JOLs, and other parties in the case.

9          In short, the Debtors' second amended plan

10  represents culmination of almost two years of extremely hard

11  work, skilled balancing of competing interests, and

12  unwavering dedication to provide the best treatment possible

13  for creditors.  The Ad Hoc Committee enthusiastically

14  supports confirmation of the plan and respectfully requests

15  that Your Honor enter the confirmation order.  Thank you.

16          THE COURT:  Thank you, Ms. Broderick.

17          MR. ENTWISTLE:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. ENTWISTLE:  May I please the Court?  Andrew

20  Entwistle, Entwistle & Cappucci, for the Class Action

21  Plaintiffs.

22          As Your Honor's aware, we filed the adversary

23  proceeding at the outset of this bankruptcy back in December

24  of 2022 on behalf of customers.  And, at that time, as you've

25  heard today, or been reminded today, although, I don't know

1   that anyone can forget, the customers stood in a position

2   that was, indeed, dark.  The likelihood of recovery by them

3   of anything on day one here was pretty bleak and we've worked

4   tirelessly with the Debtors throughout this proceeding to try

5   and resolve a number of issues that have led to the

6   recoveries that you've heard of here today and, obviously,

7   both sets of customers both, the FTX.com and the FTX U.S.

8   customers, have supported this plan, you know, in extremely

9   high numbers.  Over almost 90 percent of the U.S. customers,

10  by vote; 97 percent by dollars.  And 97 percent, I think, by

11  vote for the FTX dot -- or 95 percent for the FTX.com

12  customers and 97 percent, by dollars, have supported the

13  plan.

14          There's a good reason for that.  The customers are

15  recovering 100 cents on the dollar, plus the other amounts

16  that are in the plan.  But that doesn't come about in a

17  vacuum.  As you've heard from Ms. Broderick and others, the

18  Committee, we worked together in many ways; at odds, in other

19  ways.  There were -- we did extensive due diligence with the

20  Debtors on behalf of the customers.  There were four days of

21  hard-fought negotiations in 2022, as Your Honor is aware,

22  that led to the plan agreement that resolved the property

23  issues.

24          We fought hard on behalf, particularly on behalf

25  of the U.S. creditors, who had slightly different property

1  claims because of the law in California that affected those

2  claims, as opposed to that for the FTX.com claims.  Through

3  those negotiations, the result of which is the plan

4  supplemental agreement that takes the property settlement

5  into account.

6          None of that could have been accomplished without

7  the cooperation of the Committee, Mr. Ray, the Debtors, and

8  the Ad Hoc Committee as we worked through that process, which

9  was highly contentious at times, as you might imagine, in

10 order to get an equitable resolution for all customers, the

11 U.S. customers and the dot com customers.

12         And while I am aware that there are a couple of

13 customers out there that are still insisting on a property-

14 driven resolution by objection, that just wasn't possible

15 here.  As Your Honor's aware, the law, even the best of the

16 cases that one might argue from the U.S. point of view, is

17 far from settled and would there have been, in our view, a

18 very difficult argument to have advanced before the Court

19 successfully, although, credible.

20         The law, as we've heard, with regard to the dot

21 com customers is even less-settled and more difficult.  But

22 more importantly, as you've heard today, the Debtors didn't

23 have in-kind property to distribute to customers and we would

24 always have been fighting or always fighting for a solution

25 that would have helped through that process, recognizing that

1  bankruptcy law that applies to the claims here.  But an in-

2  kind property solution just wasn't feasible or practical as

3  we went through the in-depth due diligence and worked with

4  the Debtors' professionals to evaluate that situation.

5           That's what led, ultimately, to the final

6  resolution that's before the Court on the property issues

7  and, as a result, the customer adversary Plaintiffs

8  wholeheartedly support the plan and we'd ask that Your Honor

9  approve it and the property settlement that's baked into it,

10 in order to, as the Committee noted, advance the process here

11 so that we can start to get these distributions back out to

12 customers.

13          We thank Your Honor and your staff for all of your

14 time.  We've been before you on lots of different issues over

15 time, as you know, in trying to resolve some of the other

16 issues that are part of the adversary case; in particular,

17 the claims against some of the prior management of the

18 company.  At least one piece of that, we've successfully

19 resolved with the Debtors against Ms. Ellison; that'll come

20 before your Court, before Your Honor in due course.  Much of

21 the rest continues.  We're also working with them, as you

22 know, on the negotiations with the DOJ, which hopefully, will

23 come to a great fruition for the estate, as well.

24          But thank you, Your Honor, and your staff, again,

25 for all your time and hard work in this case and, again, we

1   wholeheartedly support the plan.  Thank you.

2            THE COURT:  Thank you.

3            MR. MINTZ:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. MINTZ:  Doug Mintz of Schulte Roth & Zabel, on

6   behalf of a group of preferred equity holders.  Our group

7   filed an updated 2019 last night at Docket 23154.

8            Our clients are among the preferred equity holders

9   and preferred equity holders, like many of the folks in this

10  courtroom, are victims of all that came before the

11  bankruptcy.  We are among several constituents that spent

12  time negotiating with the Debtors regarding treatment of the

13  preferred equity holders, particularly, as it pertains to the

14  Department of Justice's Remission Fund and Victims Fund.

15           The parties worked hard and fruitfully over the

16  last few months to reach the resolution that Mr. Dietderich

17  described earlier and filed a plan supplement agreement

18  documenting that on the docket at 25932.  Each of our

19  constituents have signed onto that plan support agreement and

20  we support that settlement, which treats preferred as they

21  should be treated, as victims here, and look forward to

22  working with the Debtors to reach a resolution with the

23  Department of Justice on the treatment of the Remission Fund

24  going forward.

25           We thank the Court for its time.  We thank Mr. Ray

1  and Mr. Dietderich for their hard work on this case and look

2  forward to further resolution.  Thank you.

3          THE COURT:  Okay.  Thank you, Mr. Mintz.

4          Anyone else in support?

5          Okay.  Mr. Dietderich?

6          MR. GLUECKSTEIN:  Thank you, again, Your Honor.

7          Brian Glueckstein for the Debtors.  So I --

8          THE COURT:  I'm sorry, I called you

9  Mr. Dietderich.  Sorry.

10          MR. GLUECKSTEIN:  No problem.

11          We will proceed -- I will proceed at this point to

12  address the remaining objections, Your Honor, and we'll just

13  kind of move through them.  I will group my remarks where

14  there is overlap to ensure that any objector who wants to

15  weigh in on the issue has an opportunity to.

16          Your Honor, the first, just starting in order, the

17  first objection to which, then there, are some joinders, all

18  on a *pro se* basis, filed by Mr. Nam and those supporting his

19  objection are really objecting to the valuation of the FTT

20  utility token.  That is styled as a classification objection,

21  Your Honor.

22          These objectors want to receive value for claims

23  on account of FTT tokens.  They wrongly argue that the

24  Court's final order entered in February 2024, after the

25  presentation of evidence and setting the value of claims

1   based on FTT at zero, should not be binding or somehow should

2   be revisited.

3            This is not permitted at this juncture, Your

4   Honor, and there is no basis, we submit, to do so.  The

5   evidence presented at that time on the estimation hearing by

6   the Debtors' experts, explain that FTT has no fundamental

7   value because it has no utility outside of an operating

8   FTX.com Exchange.  There is no and there will be no restarted

9   FTX.com Exchange.  We now know that conclusively.

10           Based on the evidence presented at that time, the

11  Court held that FTT was valued appropriately at zero.  No

12  evidence to the contrary was presented at that evidentiary

13  hearing and while it would not be permissible, none is

14  offered now.  The Court's estimation order is binding and

15  cannot be collaterally attacked.

16           The evidence presented at the estimation hearing,

17  including that FTT had unique equity-like features, such as

18  token burn, voting, and governance rights, and the fact that

19  FTT derived its value from FTX's future cash flows, supported

20  the classification of FTT as an equity class in the plan.  No

21  objector can point to any evidence, then or now, as to why

22  classification is wrong.  Of course, given the claims have

23  been conclusively value to be worth zero, the classification

24  on the facts as they now exist with no restarted Exchange

25  makes it somewhat of an academic exercise.

1          We submit, Your Honor, that the plan appropriately

2    treats and classifies FTT and these objections should be

3    overruled.

4          THE COURT:  Okay.  Thank you.

5          Mr. Nam, I see you raised your hand on Zoom.

6          MR. NAM:  Your Honor?

7          THE COURT:  Yes, go ahead.

8          MR. NAM:  This is Kihyuk Nam and my translator

9    (indiscernible).  I would like just to speak, Your Honor.

10          Thank you for giving me the opportunity to speak.

11   My name is Kihyuk Nam and I have filed an objection against

12   the Debtors that unfairly treats FTT holders.  I'm proceeding

13   with this objection on behalf of myself and my family.  And

14   my family members are not familiar with English and legal

15   procedures.  I have legally acquired their lot of claims and

16   represent them legally.

17          So, today, I stand here before you as a direct

18   victim affected by the Debtors' decisions.  I reviewed the

19   estimation valuation with my family members and I even sent a

20   letter to Your Honor requesting reconsideration of the FTT

21   valuation.

22          Well before the reorganization plan was released

23   when we received the estimation motion, the Debtor cannot

24   clearly stated, We at FTX will restart operations, so we

25   hoped that the value of FTT might recover in one way or

1   another.  Additionally, we noted that paragraph 7 of the

2   estimation order reserved rights regarding the classification

3   of FTT, so we waited until the situation became clear.

4           Subsequently, the plan to restart FTX was

5   abandoned and in the reorganization plan, FTT was valued at

6   zero dollars and classified in the lowest class, 17, making

7   the unfair treatment of FTT holders (indiscernible),

8   therefore, I proceeded to file objection to the current plan,

9   Your Honor.

10          In the Debtors' response to my objection, they

11  referred to paragraph 6 of the estimation order, stating that

12  classification of a claim is distinct from its value, stating

13  that and argued that I misread the reorganization order;

14  however, paragraph 7 of the estimation order begins with,

15  "Notwithstanding anything to the contrary in the motion or

16  this order," indicating that paragraph 7 takes precedence,

17  therefore, the scope of the reserved classification

18  (indiscernible) in paragraph 7, cannot be remedy by

19  paragraph 6.

20          Moreover, when interpreting the classification of

21  paragraph 7, FTT was valued at zero dollars because it was

22  classified as equity.  Since the classification of FTT had a

23  decisive impact on its value, classification and its value

24  cannot be conceded separately.

25          According to the Exhibit 5 of the estimation

1  motion in Document 5203, the price of FTT at the time of

2  bankruptcy was $2.69 and the asset liquidation discount rate

3  was only (indiscernible) point 13 percent.  Even after

4  applying this discount rate, the value exceeded $2.00, but a

5  100 percent FTT discount was applied, reducing its value to

6  zero dollars.

7          Moreover, according to 11 U.S.C. 502(j) of the

8  U.S. Bankruptcy Code, a claim that has been allowed or

9  disallowed may be reconsidered for just cause.  This provides

10  the legal basis for reexamining the classification and

11  valuation of FTT, considering the change of circumstances and

12  the importance of fair treatment.

13          Your Honor, the Debtor processed with FTT at zero

14  dollars.  I think that FTT lost its fundamental value due to

15  FTX's bankruptcy; however, cryptocurrencies, in general, they

16  have no intrinsic value and are priced based on market

17  sentiment.  The Dogecoin and other (indiscernible) coins

18  avoid being valued at zero because they have intrinsic value,

19  applying a different standard only to FTT is not fair, in

20  fact, FTT is still actively traded, as you know, on various

21  ETRADE markets today and is trading as similar or something,

22  sometimes higher prices than at the time of bankruptcy.

23          Your Honor, (indiscernible) the Debtors claims

24  that FTT is a (indiscernible), but FTT is a utility token,

25  not an (indiscernible).  The features which the Debtor

1  mentions are similar to securities, are general

2  characteristics of utility tokens and are unrelated to

3  ownership of (indiscernible).

4         Moreover, regardless of whether FTT is inactive,

5  it was trading as a discount asset on the FTX Exchange, so

6  general investors did not receive it as an equity.  Based on

7  this perception, it's unfair that we receive no compensation

8  simply because we chose FTT.  Even though we purchased Debtor

9  assets in the same manner as other investors just before the

10  bankruptcy.

11         Your Honor, last thing, circumstances have

12  significantly changed after the estimation order.  FTX's

13  assets have substantially recovered and most victims are

14  expected to receive over 140 percent compensation based on

15  the petition date.  I understand that the Debtor has even

16  decided to indemnify shareholders.

17         In this situation, is it truly fair to maintain

18  the general value only assigned to FTT?  Your Honor, I

19  respectfully request your wise judgment so victims like us

20  may receive fair treatment.

21         Your Honor, thank you for giving me the time to

22  speak.

23         THE COURT:  Thank you.

24         Mr. Dietderich -- Mr. Glueckstein -- I keep on

25  calling you Mr. Dietderich.

1          (Laughter)

2          MR. GLUECKSTEIN:  We're obviously next to each

3  other and so sometimes we do get confused.  It's no problem,

4  Your Honor.

5          Just a few things in response to Mr. Nam.  Just so

6  that the record is clear on how the estimation order that

7  Your Honor entered and in relation these provisions relate,

8  paragraph 6 of the estimation order that's now a final order,

9  long ago, provides that the only circumstance in which the

10 valuation of the FTT token would be reconsidered would be if

11 the plan that was submitted to Your Honor for consideration

12 was modified, such that there was an operating exchange

13 utilizing FTT as a utility token following confirmation.

14         So we had discussions with certain objectors at

15 the time and the question was, well, we were still in

16 discussions about what might happen, what hypothetically

17 could happen with respect to a restart exchange or a post-

18 effective date exchange.  In that circumstance, if we were to

19 modify our plan, because an exchange was going to be

20 restarted, then the question of value, based on the

21 characteristics of FTT might be different and there was a

22 reservation of rights to reopen that question.

23         In such circumstance, there's a separate provision

24 in paragraph 7 that talks about the classification and to

25 reserve rights of creditors to object to classification.  As

1  I said in my opening remarks, if the value of the token is

2  not greater than zero, it doesn't have practical, real-world

3  effect in any event, but we do believe that for the reasons

4  why the estimation order was entered, based on the

5  evidentiary record at the time, that there's a basis for the

6  classification, with a good basis for classification as it

7  sets forth in the plan.

8          There were references to Section 502(j).  To be to

9  be clear, there's no claims that have been disallowed here.

10  All that happened and through the estimation order is

11  valuation of the claims; that's what that estimation hearing

12  was about.

13          And I, respectfully, don't believe there's any

14  change in circumstances here, certainly, no motion has been

15  made to reopen that order, but there's certainly no change in

16  circumstances here in the perspective of the Debtors, as it

17  pertains to the FTT token.

18          And just finally, just so that there's no

19  confusion in the record, as Mr. Dietderich did address at the

20  outset of the hearing this morning, the Debtor has not made

21  any decision and the Debtor is not forecasting any

22  distributions to shareholders on account of their interests

23  in these bankruptcy cases.  The issue with respect to the DOJ

24  is separate and deals with assets that are outside the

25  estate.

1          So for all those reasons, Your Honor, we would

2  submit that the Court's order, with respect to the valuation

3  of FTT is long ago, final, and that the classification, as to

4  the nature of those claims in our plan is appropriate.

5          THE COURT:  Okay.  Thank you.

6          All right.  On this objection, I am going to

7  overrule the objection.  I did hold an estimation hearing in

8  which I determined the value of FTT tokens at zero, based on

9  the evidence that was submitted to me.

10          There was no contrary evidence submitted at that

11  time and I have no evidence today that the value of FTT

12  tokens would be anything other than zero.  So, and FTT tokens

13  were inextricably intertwined with the Debtors; it was a

14  token traded by the Debtors and since the Debtor is not re-

15  establishing an exchange, there simply is no basis upon which

16  the FTT tokens could increase in value or create some value

17  now or in the future.  So for those reasons, I will overrule

18  the objection.

19          MR. GLUECKSTEIN:  Thank you, Your Honor.

20          The next objection that I will address is the

21  objection that was filed by the Celsius plan administrator.

22  The Celsius --

23          THE COURT:  Before we do Celsius, we've been going

24  for an hour and a half, why don't we --

25          MR. GLUECKSTEIN:  Sure.

1          THE COURT:  -- take a 10-minute recess.

2          MR. GLUECKSTEIN:  Absolutely.

3          THE COURT:  And we'll come back, let's come back

4  at a quarter of.

5          MR. GLUECKSTEIN:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7      (Recess taken at 11:36 a.m.)

8      (Proceedings resumed at 11:45 a.m.)

9          THE CLERK:  All rise.  In.

10          THE COURT:  Thank you, everyone.

11          Mr. Glueckstein?

12          MR. GLUECKSTEIN:  Thank you, Your Honor.

13          It's still morning, so good morning.  Brian

14  Glueckstein for the Debtors.

15          Your Honor, moving to our next objection that

16  remains outstanding, that is the objection of the Celsius

17  plan administrator.  That objection, Your Honor, relates to

18  the Debtors' pending claim objection that is *sub judice* with

19  the Court, addressing Celsius', as we submit, time-barred

20  attempt to assert subsequent transferee claims under

21  Section 550 of the Bankruptcy Code, related to 497 different

22  Celsius customers, who are alleged to have transferred assets

23  to the accounts of the FTX Exchanges.

24          Of course, if the Debtors' claim objection is

25  ultimately sustained, all of these other issues become moot.

1   But with respect to the objection today, Your Honor, the

2   first objection that the plan administrator interposes is a

3   classification objection under Section 1122.  And on its

4   merits, the plan objection, we submit, fails.

5           Celsius argues that the Debtors must modify the

6   definition of customer entitlement claims to include its

7   subsequent transferee claims asserted under Section 550 of

8   the Bankruptcy Code, which Celsius, itself, acknowledges or

9   asserted against the Debtors.

10          Celsius is not a customer.  It has no rights of

11  its own to participate in the customer priority settlement

12  that we discussed at length this morning, or receive the

13  benefits that were negotiated and are provided to the

14  Debtors' customers holding claims to compensate holders for

15  value of assets held in account on the FTX Exchanges.

16          The subsequent transferee liability that Celsius

17  seeks to establish would result from a judgment against the

18  Debtors and for which the Debtors would be responsible,

19  ultimately, for satisfying.  While that would present some

20  issues for the Debtors in terms of allowance of any related

21  customer entitlement claims, that liability would simply be a

22  general unsecured claim, owing from the Debtors to Celsius,

23  and is properly classified as such; in fact, as we sit here

24  today, there remains significant uncertainty, whether any or

25  all of the subsequent transferee claims actually correspond

1  to customer liabilities of the Debtors, as of the petition

2  date in the same or lesser amounts or in any amount at all.

3          Celsius is not challenging how the plan generally

4  distinguishes between customer entitlement claims and general

5  unsecured claims, with customer entitlement claims separately

6  classified to provide the benefits of the customer priority

7  settlement detailed in the plan.

8          As we discussed in our papers, in our reply

9  papers, Celsius itself adopted a similar distinction in its

10  own bankruptcy plan, distinguishing between claims held by

11  customers in Celsius accounts from all other unsecured

12  claims, which would include subsequent transferee claims.

13          The Debtors' classification of claims satisfies

14  Section 1122(a) of the Bankruptcy Code on the facts of these

15  cases.  If Celsius is permitted to pursue its claims, it

16  would be pursuing those claims against the Debtor and those

17  are properly classified as general unsecured claims.

18          Celsius next argues that the Debtors must somehow

19  commit now, that it will not make any distributions to its

20  own creditors until both, Celsius' subsequent transferee

21  claims against the Debtors and the initial transferee claims

22  Celsius says it has asserted in New York are resolved.  There

23  is no basis whatsoever to require such a result; never mind,

24  legislated in our plan.

25          What Celsius is trying to do without saying it, is

1  obtain prejudgment garnishment as to the distributions that

2  would be owed to FTX Exchange customers with allowed claims

3  on the basis of Celsius purporting to have claims against

4  those customers.

5         Settled law provides that prejudgment garnishment

6  is generally not available against a Debtor because it unduly

7  burdens and complicates the administration of the estate.

8         And here, Your Honor, Celsius has not even made a

9  proper request for such relief for the Court to consider.

10  Their fallback position seems to be that the Debtors must

11  establish some specific reserve for their time-barred

12  subsequent transferee claims now at the plan confirmation

13  stage and we submit that is not correct.  No change to the

14  definition of disputed claims, as they suggest, is required.

15         To the extent the Court permits Celsius to assert

16  their subsequent transferee claims and/or their preference

17  claim against the coined Debtor, the Debtors will need to

18  consider those claims in considering and establishing their

19  disputed claims reserve, as contemplated by the plan.  But

20  there's no requirement for some special reserve for Celsius

21  and certainly no reserve is needed prior to the effectiveness

22  of the plan or the Court's ruling on the pending claims

23  objection.

24         On the disputed claims reserve issue, Your Honor,

25  which was also the focus of the Three Arrows Capital

1  objection, which we have now resolved, we believe the Debtors

2  have satisfied Section 1123(a)(4) by providing for a disputed

3  claims reserve in Section 8.5 of the plan and that nothing

4  more is required in the plan itself.

5           But as we explained in our papers, Your Honor, the

6  reality is, the establishment and size of the disputed claims

7  reserve contemplated by the plan in this case will be the

8  subject of a separate motion that the Debtors intend to file

9  with this Court and everyone's rights, including Celsius,

10 Three Arrows, and anyone else, are fully reserved with

11 respect to that motion and it's ultimately the size of the

12 disputed claims reserve that will be proposed.

13          We have added language, Your Honor, in new

14 paragraph 168 of the confirmation order in the version of the

15 order filed this morning, making this point clear and it was

16 that language that resolved the 3AC objection on this basis.

17 Certainly, that language, to the extent Celsius is continuing

18 to push the reserve issue at this time, should cover, more

19 than cover that issue as well.

20          But nonetheless, Your Honor, we, for all of those

21 reasons and those set forth in our papers, we submit that the

22 Celsius objection should be overruled.  Thank you.

23          MR. LEVY:  Good morning, Your Honor.  Richard Levy

24 of Pryor Cashman, on behalf of the Celsius litigation

25 administrator.

1           As when I was before you last time, Your Honor,

2    I'm going to refer to Celsius and the Celsius litigation

3    administrator as "Celsius"; I think it'll be easier for the

4    record.

5           Your Honor, I want to make clear at the outset

6    that we are not arguing that the plan should fail; we are

7    arguing that there is a defect in the plan that should be

8    addressed.  And to resolve that defect, we've suggested

9    several means in our responsive papers.  I'll get into that

10    in a little bit.

11           I'm going to suggest that there's yet another

12    basis that you'll see from the argument, Your Honor, that can

13    resolve this issue.  Not only are we misclassified and should

14    be otherwise classified, we could be separately classified.

15    Let's talk about this as we go through the argument.

16           I want to approach this from a dual perspective,

17    Your Honor.  The customer entitlement claims are in

18    Classes 5(a) and 5(b).  The general unsecured claims in which

19    the Debtors propose to classify us are in Class 6.  If our

20    claims are more in the nature of customer claims, directly or

21    indirectly, they should be in Class 5; perhaps, in their own

22    subclass of Class 5.  But given their nature, they surely

23    don't belong in Class 6.

24           Your Honor, we although that Section 1122 requires

25    that the plan provide for classification and equal treatment

1  of the members of each of those classes.  That requires that

2  substantially different claims can't be placed in the same

3  class and must be placed in a class with other claims of

4  similar nature or, perhaps, in a separate class.

5          The essential issue is not the person who holds

6  the claim, but it's the legal character of the claim as it

7  relates to the assets of the Debtor, and that's the Grace

8  case in Third Circuit 2012 -- '13 -- and in other cases.

9          The customer entitlement claims are based on

10 persons; persons who had an account with FTX.  That's the

11 only element that results in their classification in Class 5.

12 It says nothing, Class 5 said nothing -- says nothing about

13 any other means in which a claimant could have a connection

14 to or a claim against FTX based on a relationship to the

15 account, and that's what we are urging in our complaint,

16 proposed complaint, which underlies our proof of claim, that

17 we, in fact, have a relationship to that account.

18         It was Celsius property that was preferentially

19 transferred to holders of claims now in FTX to fund or to

20 increase the funding of their account at FTX.

21         THE COURT:  Well, let me ask you about that.

22         What's the basis for your argument that the funds

23 that were transferred from customers who withdrew their funds

24 from the Earn accounts prior to the petition date at Celsius,

25 what's the basis for Celsius to having any property interest

1    in those funds?

2            MR. LEVY:  In the Earn accounts, Your Honor, Judge

3    Glenn has concluded that that was property of the Celsius

4    estate.

5            THE COURT:  No, what he concluded was that funds

6    that were in the accounts as of the petition date were

7    property of the Debtors' estate.  He said nothing about funds

8    that had been withdrawn prepetition.

9            MR. LEVY:  Well, Your Honor, that's something we

10   may have to deal with going forward.

11           THE COURT:  You're definitely going to have to

12   deal with it going forward.

13           MR. LEVY:  It seems to me if it's in the account

14   at the petition date, it's the same principal, previously.

15           THE COURT:  Well, what's the basis for that?

16           MR. LEVY:  Because --

17           THE COURT:  Give me a basis.  Give me something to

18   hang my hat on that says that you can assert a property right

19   over funds that were withdrawn from the Celsius Earn accounts

20   by the customers.

21           MR. LEVY:  Your Honor, I would argue that those

22   were Celsius funds even before the petition date for the same

23   reasons that Judge Glenn concluded that they were Celsius

24   property.  The nature of the --

25           THE COURT:  But not once they're withdrawn.  Once

1  the customer withdraws the funds --

2          MR. LEVY:  Pardon me, Your Honor?

3          THE COURT:  Once the customer withdraws the funds

4  from the account, they revert back to the customer's

5  property.

6          How could, prepetition, how could Celsius have

7  said to a customer who withdrew their funds:  That money is

8  ours.  We still have a property interest in those funds.

9          Explain that to me.

10          MR. LEVY:  I'm going to say, Judge, that based on

11  Judge Glenn's reasoning, it's the same reasoning that would

12  apply to prior transfers out from Celsius.  The account funds

13  were never the property of the customer; they were property

14  of Celsius under the account documents and contract.

15          THE COURT:  They had bare legal title.

16          MR. LEVY:  Pardon me?

17          THE COURT:  They had bare legal title; the

18  customer still had an interest in those funds and they had

19  the right to withdraw them under their terms of service.

20          MR. LEVY:  It's still Celsius' property, as the

21  Earn ruling says.

22          THE COURT:  So if someone who withdrew their funds

23  from the Celsius account two years ago, two years before they

24  filed for bankruptcy, Celsius could go to that customer and

25  say, Hey, by the way, that's our property and we want it

1   back?

2           MR. LEVY:  I suppose that's a possibility.

3           THE COURT:  I don't think so.  I don't think so.

4           (Laughter)

5           THE COURT:  Go ahead.

6           MR. LEVY:  So, Your Honor, our theory, as we've

7   just discussed, is that there's a property interest in the

8   settlement, in the Celsius case -- in the Celsius estate that

9   tracks through to the customers at FTX.  They funded their

10  account using property in which Celsius had a property

11  interest.  They're going to receive a distribution.

12          Celsius has a claim that is based on the fact that

13  that account at FTX was funded with property in which Celsius

14  asserts a property interest and if upheld under Section 551,

15  that attribute remains at Celsius.  And we would have an

16  entitlement to be treated, in effect, as a customer.

17          We have a claim.  We have an indirect link.  I'll

18  agree, it's indirect at the moment, but indirect and direct

19  doesn't necessarily answer the question.

20          Also from the Grace case, Your Honor, in the 2013

21  decision by the Third Circuit, the question in that case was

22  whether indirect asbestos claimants who had claims for

23  indemnity and contribution were properly classified in the

24  same class as direct asbestos claims.

25          THE COURT:  What did you, when you filed your

1  proofs of claim, which proof-of-claim form did you use?

2          MR. LEVY:  Pardon me, Your Honor?

3          THE COURT:  Which proof-of-claim form did you use

4  when you filed your claims against the Debtors?

5          MR. LEVY:  We used the custom.  We used the class,

6  the general unsecured claim, because that's all I could.

7          We were not a person who held an account.  There's

8  no question about that.  But we're claiming that we have an

9  interest relating to that account.

10          And the point that's made in the Third Circuit

11  case in Grace is that indirect and direct claims relating to

12  asbestos liabilities were properly classified in the same

13  class and that there was no basis for carve the indirect out.

14  The key language in that case, Your Honor, I'll find it in a

15  moment.

16      (Pause)

17          THE COURT:  Well, while you're doing that --

18          MR. LEVY:  Pardon me?

19          THE COURT:  While you're doing that, I'd like to

20  know the answer to the question of, what evidence have you

21  introduced to me today?

22          MR. LEVY:  What happens?

23          THE COURT:  What evidence have you introduced in

24  this hearing today that would lead me to conclude that

25  Celsius has an interest as a customer in the FTX accounts?

1          MR. LEVY:  Your Honor, we have a filed proof of

2   claim, which includes the basis of our argument, and we've

3   explained that as a matter of what we rest our position on.

4   I don't think there's any dispute about that.

5          Your Honor, the Third Circuit says, "Both direct

6   and indirect claims under the asbestos plan exhibit a similar

7   effect on Grace's bankruptcy, they seek recovery for actions

8   related to Grace's asbestos liability."

9          By analogy, we seek recovery based on FTX's

10  liability relating to the existence of a customer account.

11         The Third Circuit goes on and says, although

12  Montana and the Crown (ph) must first -- those were the

13  indirect claimants -- must first be held liable for failure

14  to warn before they can bring such a claim, that makes no

15  difference to Grace, the debtor, as its liability for such a

16  claim depends solely on asbestos-related activities.

17         Same argument, by analogy, here.  FTX's liability

18  depends upon an account; not a person holding an account, an

19  account.  And our money, as we assert in our complaint, finds

20  its way into FTX to fund or increase the funding of an

21  account for which we will now be able to claim, should we win

22  in the avoidance proceeding, that that creates liability for

23  a subsequent transfer.

24         Your Honor, the point that is concluded in the

25  Grace case is that a reasonable classification of

1   indemnification and contribution, together with direct

2   asbestos personal injury claims, those were all properly

3   classified, and that's what we're asserting should happen

4   here, Your Honor.  Classification cannot be used to place

5   claims of substantially different character in the same

6   class.  I'm arguing, Your Honor, that our claims are not

7   substantially different because they arise from the account

8   relationship, the account existence, and not from the person

9   who holds the account.

10       (Pause)

11       MR. LEVY:  Forgive me, Your Honor, I'm trying to

12  skip down so I don't have to repeat myself.

13       Your Honor, to honor the purpose and meaning of

14  classification, it seems to me that the approaches that we've

15  suggested to the debtor are proper.  One, include us in Class

16  5, but, two, we shouldn't be in Class 6.  Our claims are

17  significantly different from any other creditor in Class 6,

18  to my knowledge.  Now, I have not looked at the thousands of

19  claims, but I doubt that anybody else is asserting a claim

20  based on liability through an account.  For that reason,

21  Judge, we don't belong in Class 6.  We belong perhaps in our

22  own class under Class 5.

23       So, Your Honor, I think I've explained the basic

24  theory here that the attributes of the claim are what should

25  govern classification and the attributes of the claim here

1  require that we be classified along with the customers so

2  that we are properly treated under the plan.

3           Let me turn to Mr. Glueckstein's comments and a

4  couple of other points that come up along the way.  As we

5  pointed out at the hearing on September 12th, Judge, one of

6  the big issues that arises from what we are talking about

7  here is the risk of potential dual exposure to the FTX

8  estate.  They may make distributions to customers and they

9  have a year to object to those customers under their Earn

10 plan.  So maybe they're going to do something that will delay

11 things and in fact that would be one procedural mechanism

12 that would work.  We've got a claim, the customers have a

13 claim, put it all in front of one proceeding instead of

14 having the risk of dual exposure to the estate, which I can't

15 imagine any judge or any debtor would want to face.

16          Mr. Glueckstein says that we're trying to seek

17 prejudgment garnishment.  I think Your Honor recognizes what

18 garnishment is as opposed to what we're asking, which is in

19 effect a holdback or a reserve.  We are not seeking the

20 imposition of a property interest against the debtors'

21 property or against the potential distributions to be made.

22 So we are not seeking garnishment at all or attachment.

23          You know, Your Honor, the cases that the debtor

24 relies on for this Chapter 7 case is they're not Chapter 13

25 cases.  They've said in their opposition to us, Your Honor,

1  in their response that we are a creditor of a creditor and we

2  don't have any standing to be heard.  I dispute that, Your

3  Honor.  We have a claim under Section 101.5 of the Bankruptcy

4  Code.  We have a right to payment, direct or indirect, that

5  makes us a creditor.  We're not dependent on the rights of

6  the -- we are not -- we have a claim, it will require certain

7  facts and circumstances to progress to further proceedings,

8  but we have a claim.  We are not a creditor of a creditor; we

9  are ultimately a creditor of FTX.

10          I think, Your Honor, that that's all I need to

11  say, unless Your Honor has further questions.

12          THE COURT:  No questions.  Thank you.

13          MR. LEVY:  Thank you, Your Honor.

14          MR. GLUECKSTEIN:  Thank you, Your Honor, just a

15  few points in response.  Maybe I'll take them in reverse

16  order.

17          On this last point, as Your Honor knows, the

18  debtors don't believe they have a claim against the debtors,

19  they believe -- we believe those claims are time-barred, and

20  we reiterated that point in our papers.  Obviously, if Your

21  Honor were to agree and sustain the claims objection that is

22  pending and rule that their claims cannot be brought against

23  the debtors in subsequent transferee claims, the only claim

24  they have vis-a-vis the debtor would be against the initial

25  transferee.

1         This issue of they're just trying to have us

2  reserve so that we don't pay out on the claim twice, we will

3  -- if their claims are allowed to proceed, we will have to

4  address that issue, Your Honor.  Obviously, the debtors have

5  no intention of making payments out at times when we have

6  issues that need to be resolved, but the suggestion that

7  Celsius can come in and say, well, you can't make any

8  distributions to creditors if the debtors determine those are

9  allowed claims, there's no basis for Celsius to say we can't

10 pay those claims.

11        And so, okay, the reserve issue, I understand the

12 reserve issue, we'll have to deal with a reserve if their

13 claims are allowed to proceed in one way or another, it

14 doesn't mean we believe we need to reserve on those claims

15 separately or in their entirety, but we'll deal with that

16 issue when we come to it.  But what they're asking is not

17 about a reserve, what they're asking, and we just heard it

18 again, is that somehow the debtor should be forced to hold

19 distributions until they reserve whatever litigation claims

20 they have in their court in New York.  There's no basis, none

21 has been cited to Your Honor to force the debtors to do that

22 at this stage.

23        Now, with respect to this argument that we've now

24 heard -- this is the most we've heard elaborated on it --

25 that somehow -- the argument now is that Celsius has an

1  actual property interest in the funds that were deposit --

2  allegedly deposited by their customers, who withdrew those

3  funds from the Celsius exchange from their account.  The

4  allegation is they deposited the money into an FTX account,

5  and now what they're arguing is that they had some property

6  interest in those funds at the time they were deposited.

7  And, as Your Honor correctly points out, there's no basis for

8  that whatsoever.  There's been no evidence put on about that,

9  there's been nothing cited to that would lead to that result.

10        And why are they doing this?  They're doing this

11  because they want to be classified as a customer claim.  In

12  the event that their claims are allowed to proceed against

13  the debtor under Section 550 of the Bankruptcy Code, they

14  want the benefits of the customer priority settlement.  They

15  are not a customer.  Whatever funds were deposited, to the

16  extent funds were deposited into the FTX exchange accounts by

17  the Celsius customers, those funds, like all other customer

18  deposits, were comingled with the debtors' assets and with

19  other customer assets and there are no property rights.  That

20  has now been conclusively determined by the evidence before

21  Your Honor today from Mr. Mosley and from Lord Neuberger.

22        So what they're trying to do is say, okay, but

23  wait a minute, we have this idea that we have a property

24  right that we're going to collect on through the customer who

25  deposited that money in the FTX exchange, there's no basis

1   for that whatsoever.  What it really sounded like they were

2   saying this morning is they have some kind of turnover action

3   or they want their funds back, and that's not what they've

4   done.

5            They have brought -- what they are seeking to

6   file, what they filed in their late proof of claim and what

7   they have sought to file in their draft complaint against the

8   debtors is a subsequent transferee liability claim against

9   the debtors pursuant to Section 550 of the Bankruptcy Code,

10  and there is no question, we deal with this in our papers,

11  that if that liability is established, that is a liability

12  that the debtors will have to deal with, that is a general

13  unsecured claim.  What they are not in any way, shape, or

14  form -- and we just heard it, Celsius admits they're not a

15  customer, they were not a customer of the exchange -- they

16  want to rely on this language that there was a relationship

17  to the account and that somehow their subsequent transferee

18  claim must be classified with the creditors -- with the

19  customers.

20           We submit, Your Honor, that the facts of this case

21  and the facts of this plan are clear:  The reason why the

22  customers are separately classified from the general

23  unsecured creditors is a result of the nature of the claims

24  that they have and the benefits that are being provided to

25  the customers as a result of the negotiated customer priority

1   settlement.  There is nothing about any of that that touches

2   on Celsius' subsequent transferee claims against the debtors.

3   And to the extent that they want to establish liability in

4   the Southern District of New York against the initial

5   transferees -- and we talked about this at the hearing last

6   month -- and they think they can come here and have some

7   theory to have the debtors -- somehow collect against the

8   debtors on that judgment, they can try to do that; we don't

9   think that will work, but they could try to do that.  But

10  what they cannot do is elevate their claim and elevate their

11  standing into the shoes of the customer.  They're not the

12  customer.

13          And so the classification for purposes of a plan

14  today, we submit, Your Honor, is correct.  Any issues with

15  respect to a disputed claims reserve have now been made clear

16  that we're going to be addressing those in terms of the

17  amount of that reserve in the aggregate with Your Honor

18  separately, and there is no basis whatsoever to force the

19  debtors to have Celsius, the Celsius administrator legislate

20  how the debtors are going to address their claims

21  reconciliation process.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          All right, I am going to overrule this objection

25  as well.

1          First of all, let me say I had hoped that I would

2    be in a position to have issued a ruling on the question of

3    whether or not Celsius' proof of claim was timely filed, but

4    I will do so as soon as possible in the future.  But as for

5    purposes of today, to reclassify them under 1122 because they

6    assert that they have a property interest in the accounts of

7    certain FTX customers, I simply have no evidence to support

8    that.  The proof of claim that was filed is not sufficient,

9    it only gives me the bare facts that customers of Celsius,

10   prior to the filing of the Celsius bankruptcy, withdrew funds

11   from their Earn accounts and deposited them into the FTX

12   accounts.  That's the only allegation that's in there, and

13   it's only an allegation, it's not any evidence.

14          So I have no basis to conclude that Celsius has

15   any interest whatsoever in any FTX customer account and, for

16   that reason, their classification under 1122 is correct.

17   They are a noncustomer general unsecured creditor of the

18   estate for purposes of the plan.

19          Debtors -- or the argument that the debtors must

20   not release funds to these FTX customers in connection with

21   distributions under the plan, the objection fails for the

22   same reason.  I have no basis to conclude at this point that

23   Celsius has any property interest whatsoever in those

24   customers' accounts.  The only thing Judge Glenn said in his

25   opinion in Celsius was that funds that were in the accounts

1   as of the petition date became property of the debtors'

2   estate.  He did not address the question of what happened

3   prior -- funds that were withdrawn prior to the petition date

4   of the Celsius case and, therefore, it has no impact on my

5   ability to say FTX customers should not get paid when the

6   distributions are made.

7            So, for those reasons, I will overrule the

8   objection, and we'll deal with the question about whether the

9   Celsius proof of claim is valid in the near future.

10            MR. GLUECKSTEIN:  Thank you very much, Your Honor.

11            So continuing forward with the remaining

12  objections, I plan to next address the remaining piece of the

13  objection filed by the Office of the United States Trustee.

14  The one issue that remains unresolved -- and I would like to

15  note, and we appreciate the engagement and we worked very

16  constructively with the Office of the United States Trustee

17  to resolve all but one issue in their objection based on the

18  revised -- the revisions to the plan and the revised

19  confirmation order.  The one issue that we have not resolved

20  that remains open is their challenge to the consensual third

21  party releases contained in Section 10.4 of the plan and the

22  corresponding injunction in Section 10.8.  This releases

23  issue was also raised in the Kavuri parties' objection as

24  well.

25            Your Honor, the argument being made is that the

1  opt-out release structure approved by this Court to obtain

2  consensual releases from the holders of claims is not

3  permissible.  Importantly, Your Honor, nobody is challenging

4  the scope of the releases being inappropriate, nobody is

5  challenging who is being released as inappropriate.  In fact,

6  the third party releases in this case are extraordinarily

7  narrow.

8          First, the releases do not release any causes of

9  action arising out of conduct that occurred prepetition, or

10  claims otherwise preserved for the wind-down trust, and are

11  limited to address plan formation and the business of these

12  Chapter 11 cases.  The releases also have carveouts for

13  fraud, gross negligence, and willful misconduct.

14           Second, the releases do not include a release for

15  any insider or employees of the debtors before Mr. Ray and

16  his team took over, an overlap with those covered by

17  exculpation in many respects.  There are, however, certain

18  parties benefitting from the releases who were integral to

19  the plan formation process, namely the ad hoc committee and

20  the joint liquidators of FTX Digital Markets.  Thus, the opt-

21  out releases in this case are narrowly tailored to the unique

22  facts and circumstances presented.

23          The debtors also provided, after discussions in

24  connection with the disclosure statement, with the United

25  States Trustee at that time in connection with approval of

1  the solicitation procedures, that releases are deemed --

2  releases for classes who are deemed to reject the plan

3  required opt-in releases, and so opt-in releases were

4  solicited for those classes as part of our process.

5          The voluntary release here is an important, albeit

6  limited, part of the plan.  The releases here, we submit, are

7  thus quite distinguishable from the general releases provided

8  in many plans.  Nonetheless, the objection asserts that the

9  releases are not consensual because they contain an opt-out

10 structure.  We submit this is wrong both before and after the

11 U.S. Supreme Court's decision in Purdue.

12         The U.S. Trustee's Office has for a long time

13 advocated against opt-out releases.  This is not an issue

14 arising from the Purdue decision.  But as the U.S. Trustee

15 acknowledges, prior to Purdue, Your Honor, along with many

16 other courts in this district have consistently held that

17 voluntary opt-out releases are consensual or can be

18 consensual on the right facts and are thus permissible.  This

19 Court is well aware of the reasoning on which those cases are

20 based that consent to the release can be inferred by failing

21 to opt out of the releases through a ballot election.

22         Notice is a very important component to those

23 decisions where creditors have an opportunity to opt out or

24 otherwise express their views on the proposed release.  On

25 the facts here, it is hard to imagine more notice having been

1  provided to creditors.  This case is one of highest profile

2  cases in history, it is regularly reported on in publications

3  around the world.  The debtors sent ballots with opt-out

4  materials to almost one million creditors in the voting

5  classes.  Those were accompanied by clear and thorough

6  materials explaining the releases and the opt-out process

7  that were approved by this Court.  In addition, the debtors

8  published notice of the releases and the need to opt out of

9  it if a creditor in the voting class did not want to grant

10  the releases in national and international publications,

11  including the New York Times and CoinDesk.com.

12        The debtors submit this robust notice is akin to

13  the type of noticing provided in class action cases pursuant

14  to Rule 23 of the Federal Rules of Civil Procedure, which

15  indisputably use and are permitted to use opt-out noticing.

16        The argument that somehow the Purdue decision up-

17  ended the ability for this Court to approve on appropriate

18  facts opt-out releases is baseless.  The Supreme Court's

19  decision in Purdue itself expressly cautioned that nothing in

20  the decision, "should be construed to call into question

21  consensual third party releases," and later stated, "or

22  express a view as to what qualifies as a consensual release."

23        Thus, if this Court were to believe that the

24  debtors' opt-out releases are consensual on the facts of this

25  case, then nothing in Purdue dictates a different result.

1  Courts in this circuit and elsewhere have recognized this

2  fact and have since the Purdue decision confirmed plans

3  containing opt-out structures for third party releases,

4  including in the Invitae case, BowFlex, and Robertshaw, all

5  of which are discussed in detail in our reply papers.  In the

6  Robertshaw case, Judge Lopez in the Southern District of

7  Texas noted that Purdue did not change the law on consensual

8  opt-out releases.

9          Your Honor, the U.S. Trustee and the Kavuri

10  parties each cite to the In re Chassix Holdings decision from

11  2015 for the proposition that opt-out releases are not

12  permitted, but that decision, which of course is not binding

13  on Your Honor, has been thoroughly considered by this Court

14  in the past when confirming plans containing opt-out

15  releases, and that case notes that the circumstances could

16  justify different outcomes on particular facts and

17  circumstances.  And we do submit that the facts of this case

18  support the very limited releases that are contained in this

19  plan.

20          Finally, Your Honor, we do discuss in our reply

21  brief and note we are of course aware that Judge Goldblatt

22  recently issued a decision in the In re Smallhold case

23  expressing a view that creditors need to take affirmative

24  steps to indicate consent following Purdue.  That decision,

25  which of course is not directly binding on the Court, we do

1 believe is inconsistent with <u>Purdue</u> and, critically,

2 distinguishable on its facts.

3          Here, as noted, notice was widely sent via both

4 direct and publication notice, featuring the releases in the

5 highest profile pending Chapter 11 case.  And the releases,

6 as discussed, are very limited.

7          I also note that Judge Goldblatt in his opinion

8 did not expressly rule on opt-outs for those who did receive

9 ballots but did not return them, and also noted that, if the

10 protections of Rule 23 class actions were provided, the

11 results might be different.

12          We submit, Your Honor, all things considered,

13 given the limited scope of the releases here, the facts and

14 circumstances of this case, the noticing that was provided to

15 creditors, that the releases in the debtors' plan here are

16 reasonable, consensual, and should be approved.

17          THE COURT:  Thank you.

18          MR. GLUECKSTEIN:  Thank you.

19          MR. HACKMAN:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. HACKMAN:  May it please the Court, Ben Hackman

22 for the U.S. Trustee.

23          Our office filed a confirmation objection at

24 Docket Item 23610 and our objection raised --

25          THE COURT:  You might need to speak up a little

1    for the folks in the back.

2              MR. HACKMAN:  I'm sorry, Your Honor.  Our office

3    filed a confirmation objection at Docket Item 23610 and our

4    objection raised ten issues with confirmation.  We have

5    resolved nine of those issues, and we thank debtors' counsel

6    for working with us.  Our only open issue is, does the plan

7    contain nonconsensual third party releases, and we

8    respectfully submit the answer is yes.

9              Our position is that third party releases that are

10   based on inaction such as a failure to opt-out are

11   nonconsensual, and third party releases that are

12   nonconsensual are foreclosed after the Supreme Court's ruling

13   in Purdue.

14             The second amended plan filed at Docket Item 26029

15   defines releasing parties to include creditors who are

16   unimpaired, creditors who are eligible to vote, but do not

17   return a ballot, and people who vote to accept or reject, but

18   do not opt out.  And that's in Article 2.1.172.  Our position

19   is that contract principles govern whether a release is

20   nonconsensual and that, under contract law, silence does not

21   equal consent except in limited circumstances not applicable

22   here.

23             As the Restatement Second of Contracts states in

24   Section 69, comment (c), the mere fact that an offeror states

25   that silence will constitute acceptance does not deprive the

1    offeree of his privilege to remain silent without accepting.

2    Here, people who are unimpaired, in unimpaired classes, are

3    not being asked to vote, their silence or inaction should not

4    equal consent to a third party release.

5              As the Bankruptcy Court for the Southern District

6    of New York wrote in the Chassix decision, it is difficult to

7    understand how a creditor can be unimpaired if it is

8    releasing its claims against third parties.  We submit that

9    the only way for creditors in unimpaired classes to consent

10   to the FTX plan's third party release is by opting into them.

11   The same thing goes for people who are eligible to vote, but

12   do not return a ballot.

13             The debtors' customer base in this case, as I

14   understand it, is spread out all over the world.  The

15   presentation the debtors made at the first day hearing, which

16   is filed at Docket Item 115, indicates that customers were

17   located in more than 24 countries, including 22 percent in

18   the Cayman Islands, 11 percent in the Virgin Islands, eight

19   percent in China, eight percent Great Britain, six percent

20   Singapore, five percent Bermuda, four percent Korea, four

21   percent the United Arab Emirates, and so on.  We're not sure

22   how many of the customer base, how many people in the

23   customer bases read and write English, or how many of them

24   are familiar with the U.S. legal system generally or the U.S.

25   bankruptcy system in particular.  I believe Mr. Daloia during

1  his testimony today indicated that he would not have a way to

2  tell if anyone, any particular person received a solicitation

3  package.  We submit that consent should not be inferred based

4  on a creditor or customer's inaction.

5      We recognize that this plan's third party releases

6  are limited, they do not extend to conduct that occurred

7  prepetition, as I read the document, they do not apply to

8  gross negligence, willful misconduct, fraud, or criminal

9  acts.  It seems to us that the third party releases largely

10 overlap with the plan's exculpation.  Having said that, we

11 agree with Judge Goldblatt's observation in the Smallhold

12 decision, which Mr. Glueckstein referenced, that

13 nonconsensual third party -- the nonconsensual third party

14 release is now per se unlawful.  And if a third party release

15 is nonconsensual, then no matter how narrow it is, it should

16 not be approved.

17     The debtors' reply in support of confirmation in

18 paragraphs 73 to 74 discusses the Smallhold decision.  We are

19 not suggesting that that decision is binding on Your Honor.

20 If Your Honor is inclined to consider the Smallhold analysis,

21 we agree -- we disagree with the debtors' argument that

22 Smallhold is inapplicable here.  The debtors argue that FTX

23 is distinguishable because creditors are being paid in full

24 and Smallhold did not address a situation where creditors

25 were being paid in full, but Smallhold did address releases

1  by unimpaired classes whose creditors are being paid in full.

2         The debtors argue that Smallhold is inapplicable

3  because they are people who were eligible to vote, but did

4  not return a ballot, were not releasing parties, but I think

5  it's clear what Judge Goldblatt was saying in that decision.

6  He wrote, "Whatever one might think about the propriety of

7  third party releases in the world before Purdue Pharma, this

8  Court concludes that in light of that decision there is no

9  longer a basis to argue with the conclusion in cases like

10  Washington Mutual, Emerge Energy, Sun Edison, or Chassix.

11  While the undersigned had previously been comfortable for the

12  reasons described in Arsenal, concluding that creditors that

13  failed to opt out may be deemed to consent to a plan's third

14  party release, the Court no longer believes it is appropriate

15  to do so."

16         That's page 26 of Judge Goldblatt's opinion.

17         I wanted to mention two other things about our

18  objection, Your Honor.  First, in paragraph 47, we had cited

19  to the Restatement Second of Contracts, paragraph 69.  The

20  quoted text in the citation is accurate, but the citation

21  itself is incomplete.  It should say Restatement Second of

22  Contracts, Section 69, comment (a).

23         The second point, Your Honor, is in paragraph 59

24  of our objection.  We cited to Judge Goldblatt's bench ruling

25  in TPC Group, Inc. to support the principle that voting to

1   accept does not necessarily manifest consent to a third party

2   release.  I flag that because, as I read the Smallhold

3   decision, I'm not sure if Judge Goldblatt would still adhere

4   to that view.  I don't want to speak for the Court, but I

5   flag it as potentially being a change in how the Court views

6   that issue.

7          To conclude, Your Honor, we respectfully submit

8   that contract principles govern whether a release is

9   nonconsensual; that, under contracts law, failing to respond

10  to an offer is generally not acceptance; and, similarly,

11  failing to respond to a plan solicitation is not consent.

12  People who took no action in response to the solicitation

13  materials should not be deemed to consent to the third party

14  releases.  We submit that consent by inference or silence

15  should not be permitted.  We acknowledge that the releases

16  are narrow in scope, they do not apply to conduct occurring

17  prepetition, they have various exceptions similar to

18  exculpation, but no matter how narrow they are in scope, if

19  they are nonconsensual, they are not permitted after Purdue.

20         So, we would respectfully submit that the Court

21  would be justified in requiring more than a failure to opt

22  out to establish consent in this case.

23         Unless Your Honor has any questions, that's all I

24  have.

25         THE COURT:  Well, let me ask you a question.  In

1   the context of a class action litigation, named plaintiffs in

2   that class action agree to a settlement with the defendants,

3   that settlement is a contract, isn't it?

4         MR. HACKMAN:  Your Honor, I'm not a class action

5   lawyer --

6         THE COURT:  Well, any settlement between two

7   parties is a contract, is it not?

8         MR. HACKMAN:  I would not dispute that, Your

9   Honor.

10         THE COURT:  Okay.  So, in the context of a class

11   action, class action plaintiffs, which may be only one or a

12   few people, enter into a settlement agreement with the

13   defendants on behalf of hundreds, thousands, tens of

14   thousands of people who also have claims for the same thing

15   against that defendant.  And a notice gets sent out to those

16   class action plaintiffs that says this is the settlement

17   we've entered into, you are one of the claim -- you have a

18   claim or a potential claim against the debtor -- or against

19   the defendant, if you want to opt out of this settlement and

20   pursue your own cause of action against that defendant, you

21   have the right to do so, but you've got to sign this form and

22   send it back to us; if you don't, you're deemed to have

23   consented and now you're part of the class, and you're going

24   to get whatever distribution there is under the terms of the

25   settlement.

1          How is that different from how it works in the

2     plan context where we have a committee with fiduciary duties

3     to all customers and other creditors in this case, with a

4     small number of customers and creditors who are participants

5     and sit on the creditors committee, who enter an agreement

6     with the debtors on a plan of reorganization that includes

7     something that says we're going to release claims against

8     third parties, send out notice to those parties and say, if

9     you don't want to participate in this, you have the right to

10    opt out, but you've got to sign this form and send it back;

11    if you don't, you're bound by the releases?  How is that any

12    different from what happens in a class action?

13         MR. HACKMAN:  Your Honor, I would submit that in

14    this case -- you know, Rule 23(b)(3) requires the Court to

15    find that there are -- that questions of law or fact common

16    to class members predominate over any questions affecting

17    only individual members, and that a class action is superior

18    to other available methods for fairly and efficiently

19    adjudicating the controversy, I don't think it would be

20    accurate to say that there are common questions of law or

21    fact to class members, assuming for the sake of argument that

22    the 23(b)(3) protections are a relevant factor.

23         So you have U.S. versus dot.com customer claims,

24    our office appointed an official committee to represent all

25    unsecured creditors, but there was a second ad hoc committee

1   of non-U.S. customers, presumably because different people

2   were in different situations.  As I read Mr. Cleary's Phase 2

3   report, the examiner did not find evidence that the FTX U.S.

4   customer assets were misappropriated in the same manner as

5   the FTX.com customer assets, that's --

6           THE COURT:  But they were still misappropriated --

7   not in the same manner, but they were still misappropriated.

8   Customer funds are gone.  There's no question that all the

9   customers are in the same boat.

10          MR. HACKMAN:  I believe his investigation had also

11  showed that there was little, if any, intentional comingling

12  of customer fiat currency with corporate fiat currency.

13          The shortfall at the dot.com exchange was very

14  different in size than the shortfall on the U.S. exchange.  I

15  believe it was $8 billion on the dot.com exchange versus $141

16  million on the U.S. exchange.  Beyond that, there's a

17  difference in treatment in this plan between larger customers

18  and convenience class customers.  Some customers deposited

19  cryptocurrency assets on the exchanges that are subject to

20  English trust arguments that the debtors are advancing today,

21  others deposited non-fungible tokens who are simply receiving

22  those NFTs back, and then still others such as FTT token

23  holders are getting nothing.

24          There's also the issue of different customers are

25  in different situations in terms of their preference

1   exposure.  And, as a simple bankruptcy matter, an official

2   committee is not appointed to advocate for a particular

3   creditor's interest, it's there to advocate for a class of

4   creditors, the unsecured creditors as an overall body.

5          There are -- I believe there were two million

6   customer accounts with net positive balances as of the

7   petition date in this case spread out over more than 20

8   countries, and I think it's unlikely that there would be

9   common questions of law or fact among all customers and

10  creditors.

11         THE COURT:  Okay.  Thank you, Mr. Hackman.

12         MR. HACKMAN:  Thank you, Your Honor.

13         THE COURT:  Anyone else wish to speak on the third

14  party releases?

15         Mr. Adler.

16         MR. ADLER:  Good afternoon, Your Honor, David

17  Adler on behalf of the Kavuri parties, and Mr. Malamed (ph).

18         I join completely -- we join completely in the

19  comments made by the U.S. Trustee.  I think that one of the

20  concerns here, which is reflected in the declaration of Mr.

21  Daloia, is in paragraph 8, which references that after the

22  voting deadline approximately 84 creditors contacted Kroll,

23  explaining that they received their solicitation package and

24  ballot near or after the voting deadline.  So I had a little

25  bit of a colloquy with Mr. Daloia on that.  The real concern

1  is what about all the people, the two million people who were

2  sent notice, what proportion of them did not receive anything

3  and did not bother to contact Kroll because they were unaware

4  of it because they never received it.

5       The debtors reference notice by publication.  I

6  think that is insufficient, and I also think that -- in

7  looking at the issue of whether mere silence can equal

8  acceptance, in some circumstances -- when Judge Bernstein

9  considered it in Sun Edison, he was just looking at New York

10  law, I believe, but we have customers all over the world, I

11  don't know what the laws of South Korea are on silence and

12  whether it's acceptance or not.  It's --

13       THE COURT:  Well, the plan is governed by U.S.

14  law, it's governed by U.S. Bankruptcy law.

15       MR. ADLER:  Well, I suppose that's an argument,

16  but if the customer never transacted in the United States,

17  there could be some more related issues than just looking at

18  Delaware law or U.S. law on whether silence is equivalent to

19  an acceptance.  Even within U.S. law, there's obviously a

20  multitude of different case law on that issue.

21       So the problem, I think, is the fact that the

22  customers are scattered across the world, some of them most

23  likely never received any solicitation materials whatsoever

24  and have not come forward, and they're being -- they're

25  releasing claims against third parties as part of this plan.

1  The debtor is not getting a discharge, but these other

2  parties are getting the equivalent of a discharge, a release.

3  So I think that's another issue that the Court should be

4  mindful of --

5          THE COURT:  Well, I've always taken the position

6  when considering third party releases that if a creditor or,

7  in this case, a customer of a creditor comes forward later

8  and says, hey, I never got notice, I didn't get the notice, I

9  didn't see the publications, I had no idea this was going on,

10  I'll listen to them and I'll consider that, and maybe give

11  them an opt-out on the release and say you can go ahead and

12  do whatever you want to do.

13          I can say, based on my experience and in

14  discussions with some of the other judges about their

15  experience, we've never seen someone come back later and say

16  I didn't get notice, I didn't get an opportunity to opt out,

17  I want that opportunity, but it's available.  If someone can

18  come forward and say I didn't get it, I'll listen to what

19  they have to say and make a decision on a case-by-case basis.

20          MR. ADLER:  I think that is appropriate, Your

21  Honor.

22          And I just wanted to address the class action

23  question that you posed to the U.S. Trustee.  From my limited

24  perspective, in those cases, generally, the creditor base is

25  not known.  So the only method you can do is notice by

1  publication --

2          THE COURT:  Sometimes they're known.

3          MR. ADLER:  Sometimes they're known, but a lot of

4  times --

5          THE COURT:  I just got one not too long ago where

6  someone sent me a notice and said, hey, you bought such-and-

7  such, saying you're a member of this class.

8          MR. ADLER:  I get them from Toyota all the time

9  and I don't even remember owning a Toyota.  But be that as it

10 may, Your Honor, you know, I think it's a mechanism that

11 exists in those cases where there's a lot of unknown

12 creditors, certainly not the entire universe is known, and I

13 think in those cases there's much more disclosure about the

14 noticing process.

15          Here, what concerns us is the fact that there's an

16 affidavit of solicitation that's on file, it doesn't list --

17 I mean, everything is sealed.  So, you know, it -- and I

18 think, Your Honor, in the perfect world, the releases would

19 be confined to those who turned in the ballots and checked

20 off the box, but I understand Your Honor may have different

21 views on it, but I think, given the multitude of creditors

22 and countries in this proceeding that it's difficult, you

23 know, to know who actually received the notice versus who

24 didn't.  All we know of are the people who received notice,

25 but received it late.

1          So do you have any questions for me?

2          THE COURT:  No, that's it.  Thank you.

3          MR. ADLER:  Thank you.

4          THE COURT:  Does anyone else wish to be heard?

5          MR. ENTWISTLE:  Your Honor, I'll be very brief,

6  Andrew Entwistle with Entwistle & Cappucci on behalf of the

7  adversary class plaintiffs.

8          Just to respond to your questions regarding what

9  happens in class actions, you have it exactly right.  There's

10 notice that goes out, it's very similar to the type of notice

11 here, and in most of those cases, as you have acknowledged

12 yourself has received, there are two kinds of notice.

13 There's notice by publication, which we had here, there's

14 also notice that goes out directly to identifiable class

15 members, and also to transfer agents or other folks that

16 manage funds for groups.

17          Now, in this case, obviously, we have notice that

18 went out in a number of different contexts, not only for the

19 plan, but also with regard to the customer notice, which was

20 the customer priority settlement, which we discussed at

21 length.  There were a large number of publications and

22 notices, releases, press releases by both the debtors; we

23 published some ourselves on behalf of class members.  The ad

24 hoc committee and the UCC all put notices out with regard to

25 the settlements just to advise customers about what was

1   happening.  They also got notices, at least from us, to the

2   extent we could publish information, with regard to the opt-

3   out process, to the extent they wanted to opt out.  But the

4   notice that happened here is very much like what would have

5   happened if we had had a 7023-type class before Your Honor

6   with regard to these settlements.  It's exactly what was

7   contemplated, I think, in terms of the notice to the plan.

8           And of course notice is never perfect, right?  And

9   to the extent there were some questions earlier with regard

10  to the notice process, there are always a couple of folks

11  that -- you know, you can't say that everybody got it, all

12  you can do is say who you sent it to, I think that's what

13  happened here.  I think the record is really well developed

14  in terms of the solicitation that went out, particularly to

15  the millions of customers that were on record, which were

16  easily identifiable here, and to, obviously, subsequent

17  holders of those funds and the like, as well as the other

18  creditors.

19          So I really just wanted to stand up and respond to

20  that part of Your Honor's question earlier today to the

21  extent that it was helpful.

22          THE COURT:  All right, thank you, appreciate it.

23          MR. ENTWISTLE:  Thank you, Your Honor.

24          THE COURT:  I thought somebody raised their hand

25  briefly online, was there someone who wanted to be heard?

1 Was there -- Mr. Arush Sehgal.  Go ahead, Mr. Sehgal.

2          MR. SEHGAL:  Hi, I'm Arush Sehgal, one of the

3 creditors.  I do also just agree with what was said by the

4 gentleman earlier that I didn't have a chance to -- well, my

5 voting packet arrived after the voting deadline had passed,

6 and I did intend to opt out of releases and I didn't -- I

7 didn't understand how to do it because I wasn't confident on

8 what to vote or how to vote.  I just wanted to add that.  If

9 given the opportunity to opt out, I would.

10          THE COURT:  Okay, anything else?  Thank you.

11          Mr. Glueckstein.

12          MR. GLUECKSTEIN:  Thank you, Your Honor, just a

13 few points in rebuttal.

14          Just as a starting point, Your Honor, Mr. Hackman,

15 you know, suggested this idea that there's some per se rule

16 that was created by Purdue whereby it is just now the law of

17 the land that opt-out releases cannot be approved, and we

18 disagreed with that premise.  As I noted earlier and as we

19 discussed at length in our papers, Purdue actually says the

20 complete opposite.

21          And so, once you get past that idea that there

22 isn't some per se unlawful rule, Your Honor has the ability

23 to form your own view -- it doesn't have to be one-size-fits-

24 all -- on the facts and circumstances of the case as to

25 whether the opt-out mechanisms that were proposed are

1    appropriate here under the circumstances.  And in doing so we

2    can't lose sight of the fact of what these third party

3    releases are.

4           There was a whole bunch of discussion about types

5    of claims and are customers similarly situated.  Your Honor,

6    we're not releasing any prepetition claims or any claims for

7    prepetition conduct.  So the question, honestly, of what

8    happened on the FTX exchange versus the dot.com exchange,

9    whether there was different misconduct by certain executives

10   or insiders versus others, none of those claims are being

11   released, they're outside the scope of the release.  The only

12   thing that is within the scope of the release in this case,

13   right, has to do with the business of the case and plan

14   formation.  It's a limited scope of parties.  All of those

15   parties are somewhere in this courtroom or on the Zoom.  Your

16   Honor has jurisdiction over those claims.

17          What we're talking about here are claims that

18   third parties would have to bring against parties who

19   participated in the plan formation process and the

20   proceedings before Your Honor.  If those claims were going to

21   be asserted, Your Honor would have jurisdiction over those

22   claims.  And so what these releases are doing is ensuring

23   that those claims, to the extent somebody did not opt out,

24   are being released and they're being -- there's estoppel

25   around the case.  It does start to sound a lot like the

1  grounds for exculpation, but the parties who are the

2  beneficiaries incrementally of these releases are not

3  eligible for exculpation.  The U.S. Trustee's Office made

4  that point clear and we worked through that with them, and

5  they are not in the exculpation provision that's in the plan

6  that we're asking Your Honor to approve.

7         So this is not a situation where it might be where

8  we had a general release of all prepetition officers and

9  directors, where some of the questions -- some of the

10 responses to Your Honor's question about class action might

11 become relevant.  I would submit, though, the real question

12 on class action is the noticing, and Your Honor has that a

13 hundred percent correct.  And as I said in my remarks

14 earlier, the issue here is there could not hardly be a

15 suggestion that more notice could be provided of these

16 releases to more people.  The estate has spent a fortune

17 noticing this plan, filing a publication notice, all within a

18 rubric that was approved by Your Honor in connection with our

19 solicitation procedures.

20         So what we have here are the same -- effectively

21 the same post-petition claims that all the creditors would

22 have that we're saying, if you didn't check the box and opt

23 out of the release that you had an opportunity to do, you're

24 going to be bound by those releases.  And I think certainly

25 the Rule 23 class action noticing, I would submit, is

1  available more broadly because there certainly is no per se

2  rule.

3         But for Your Honor to approve the releases in this

4  case, you can look at it in the context of what is actually

5  being released, who's being released, and for what.  And for

6  all of those claims, to the extent any creditor actually has

7  a direct claim against any of these parties for the business

8  of the case, Your Honor has jurisdiction over those claims,

9  and we submit that the release and the opportunity to opt out

10  is appropriate.

11         THE COURT:  Let me ask you a quick question, Mr.

12  Glueckstein.  Did anybody opt out that submitted those?

13         MR. GLUECKSTEIN:  Yes.

14         THE COURT:  How many did the debtor receive?  If

15  you have a general number, you don't have to give me an exact

16  number, if you know.

17         MR. GLUECKSTEIN:  Let me see if I can get one -- I

18  will get one.  There are certainly opt-outs.

19         And while we're getting that number, Your Honor, I

20  would just say on this point of the solicitation or errors in

21  the solicitation, to the extent that postal service delivery

22  caused the issues that are referenced in the declaration that

23  was admitted into evidence today, as noted in there, we've

24  corrected those issues, we've given people an opportunity.

25         Mr. Adler's clients submitted their ballots, they

1    I believe opted out of the releases.  So he doesn't even have

2    standing to be advocating on this point generally, but from

3    -- where irregularities were identified with respect to this

4    issue, we've addressed those issues, and that's in the record

5    and evidence before the Court.

6            THE COURT:  Were you aware of Sehgal's argument

7    that he did not receive notice and wanted to opt out, but

8    didn't have the opportunity?

9            MR. GLUECKSTEIN:  I personally am not aware of the

10   circumstances of his situation, so that's something we could

11   look into.

12           THE COURT:  Okay.

13           MR. GLUECKSTEIN:  So we think, ballpark, we have

14   somewhere in the neighborhood of between three and 4,000

15   creditors who opted out of the releases, who returned an opt-

16   out election.

17           THE COURT:  Okay.  Thank you.

18           All right.  The Supreme Court decision in Purdue

19   Pharma determined that nonconsensual third parties releases

20   are not permissible in the context of a bankruptcy plan of

21   reorganization.  The Court specifically left open the

22   question of what constitutes consent and declined to address

23   that issue.  So the lower courts now are going to try to have

24   to figure that out.

25           In my view, the Supreme Court was not saying that

1  third party consensual releases through an opt-out process

2  are per se improper.  I think opt-out releases remain a valid

3  way for a debtor to be able to obtain releases through the

4  plan process and do so on a consensual basis because the

5  parties are given the opportunity to opt out; if they don't

6  opt out or if they don't return a ballot at all, then they're

7  presumed to have opted out.  And I don't have any issues with

8  that process per se.  As Mr. Glueckstein pointed out, it is

9  done on a case-by-case basis.

10       And, in this case, I'm satisfied that the opt-out

11  process was appropriate.  The releases are very narrowly

12  tailored, they do not include opt-outs for conduct that

13  occurred prepetition, it's limited in the scope of the number

14  of people who are subject to the releases, and parties were

15  given individual notice through the notification process,

16  over a million, as Mr. Adler pointed out, received a ballot

17  and an opportunity to opt out, and there was also an

18  extensive publication notice.  And both of those ways of

19  giving notice to parties are acceptable in the context of

20  class action litigation, and I don't see why it would be any

21  different here under the facts and circumstances of this

22  case.  I think the creditors and the customers are in the

23  same position as every other customer and claimant.  They are

24  getting -- they're going to get paid; some are going to get

25  paid, according to the plan, they'll get paid in full, some

1 will not get paid in full, but they all were given the same

2 opportunity to opt out.

3          So I'm satisfied at this point that those opt-out

4 releases are appropriate and I will overrule the objection,

5 and, again, based on the facts and circumstances of this

6 case.

7          Now, Mr. Sehgal, I hope I'm pronouncing your name

8 correctly, you should --

9          MR. SEHGAL:  Thank you, yes.

10          THE COURT:  -- you should reach out to debtors'

11 counsel and see if you can work out something with them on

12 whether you got notice, if you didn't get notice in a timely

13 fashion in order for you to opt out, and whether they're

14 willing to agree to allow you to opt out at this point.  If

15 they are not, then you are going to be in a position where

16 you will have to file an action against whomever it is you

17 think you have a cause of action against -- and, again, this

18 is only -- this doesn't deal with prepetition conduct, so

19 it's only things that happened after the bankruptcy was filed

20 -- you would have to file a cause of action against them, an

21 adversary proceeding in the Bankruptcy Court, and raise -- or

22 defend against an argument by the party that you sue that you

23 opted out of those releases, and I'll deal with that at that

24 time.  But at this point I'm not going to say that you're

25 entitled to opt out at this time because I just don't know

1  the facts and circumstances of what you received and when you

2  received it and how you received it, and whether you had a

3  proper opportunity to opt out.  Okay?

4          MR. SEHGAL:  Yes, thank you.

5          THE COURT:  Do the debtors have contact

6  information for Mr. Sehgal?

7          MR. GLUECKSTEIN:  Yes, we do, Your Honor.

8          THE COURT:  Okay.  So they'll be reaching out to

9  you, Mr. Sehgal, to address the issue.  Okay?

10         How much -- how many more objections do we have?

11 Do we need to take a lunch break now and --

12         MR. GLUECKSTEIN:  Yeah, happy to, Your Honor.

13 Just so to preview, we have the remainder of Mr. Adler's

14 objection for his clients, I was going to address that next,

15 so we can either do that before or after the lunch break, and

16 then we have three objections after that.

17         THE COURT:  Okay.  So let's go ahead and take our

18 break now.  How much time do you want to have for lunch?

19         MR. GLUECKSTEIN:  I think we can be -- we can be

20 quite short, Your Honor, whatever you think.

21         THE COURT:  We can do -- come back at a quarter

22 'til 2:00?

23         MR. GLUECKSTEIN:  Sure, that's more than

24 sufficient.

25         THE COURT:  Okay.  We'll do a 45-minute recess for

1   lunch and we'll come back at quarter 'til 2:00.  Thank you.

2           MR. GLUECKSTEIN:  Thank you, Your Honor.

3       (Recess taken at 12:56 p.m.)

4       (Proceedings resume at 1:46 p.m.)

5           THE COURT:  Good afternoon, everyone.  Thank you.

6   Please be seated.  Mr. Glueckstein?

7           MR. GLUECKSTEIN:  Good afternoon.  Brian

8   Glueckstein for the Debtors.  I think that brings us where we

9   left off before the lunch break.  I'm going to address what I

10  think are the remaining pieces of the objection filed by Mr.

11  Adler's clients, the Kavuri group, and it was joined or filed

12  by one of his other clients, Mr. Melamed.

13          The first issue, Your Honor, is this argument that

14  the debtor's plan somehow must provide for in-kind

15  distributions of digital assets.  There is no legal basis in

16  the Bankruptcy Code or anywhere else to require the debtors

17  to provide in their plan for in-kind distributions on account

18  of claims based on digital assets.

19          As established by Mr. Mosley and throughout the

20  record of these Chapter 11 cases, the Debtors could never

21  have made in-kind distributions because there was a massive

22  shortfall of digital assets held on the petition date

23  compared to customer liabilities.

24          The Debtors have also spent the better part of the

25  last two years monetizing and maximizing the value of their

1   assets in accordance with orders issued by this Court,

2   including the coin monetization order.  The Debtors have

3   taken great steps to avoid the volatile market fluctuations

4   and other risks in speculating in digital assets during the

5   pendency of these Chapter 11 cases.

6          Mr. Coverick testified this morning, including on

7   cross examination, about the prohibitive factors to in-kind

8   distributions that the Debtors, or anybody else for that

9   matter, would face.

10          The Debtor's focus remains on getting

11   distributions made to creditors as soon as practicable, which

12   any creditor, of course, can then use to invest in digital

13   assets as they so choose.

14          There's some suggestion to some tax ramifications,

15   or somehow some tax ramifications of individual creditors as

16   a basis to impose this requirement.  Of course, there's no

17   evidence before the Court or tax opinion before the Court as

18   to any individual creditor's tax liabilities as a result of

19   receiving distributions from this estate.

20          And of course, those questions would vary, and the

21   answers to those questions would vary by jurisdiction, with

22   distributions being made to creditors around the world.

23          Your Honor, furthermore, there's no basis for the

24   Kavuri parties to suggest that somehow a Chapter 7 trustee

25   might do so in the context of this argument that we somehow

1   don't pass the best interest tests on this basis.  Chapter 7

2   trustee, of course, would face the same hurdles, and many

3   more because the conversion would negatively impact all

4   creditors who would lose the benefits of the plan and related

5   settlements.

6            The suggestion is also inconsistent with the

7   mandate of a Chapter 7 trustee whose role is to liquidate and

8   distribute assets, not take risky actions purchasing digital

9   assets for the benefit of a few.

10           The second issue that was raised that has not been

11  addressed has to do with the disclosures around the

12  liquidating trust.  Kavuri parties assert that the debtors do

13  not satisfy the best interest test of Section 1129(a)(7)

14  because of inadequate disclosure regarding the liquidating

15  trust.  The Kavuri parties, we submit, are wrong.

16           The debtors have disclosed a wind-down budget and

17  was testified across examination this morning by Mr.

18  Coverick, was addressed in his declaration, and submitted

19  their liquidation analysis with the disclosure statement that

20  was approved by this Court.

21           There's no credible argument that the compensation

22  of the plan administrator and the wind-down trust board,

23  which are projected and contained in the wind-down budget

24  that is disclosed and has been available since the filing of

25  a planned supplement, well in advance of voting deadline

1  would cost more than Chapter 7 liquidation at this point.

2          Beyond that, Your Honor, the debtor's disclosure

3  satisfies the requirements of Section 1129(a)(5) because they

4  include the identity and affiliations of the post-emergent

5  board and of the plan administrator.

6          There is, we submit, and we brief this in our

7  papers, there's no compensation disclosure requirement

8  because the requirement of Section 1129 applies to directors

9  and officers of the reorganized debtor, and here there are

10 none.  We are establishing a trust, but beyond that, to the

11 extent 1129(a)(5)(b) does apply, the debtors have made

12 sufficient disclosure of the identities and affiliations of

13 the wind-down trust directors and officers and the nature of

14 their compensation, which is what's required by statute.

15         The wind-down budget also estimates all costs of

16 the wind-down trust, including its cost of governance, as Mr.

17 Coverick explained this morning on cross examination.

18         Further details on the compensation of the plan

19 administrator are not yet available and not yet knowable

20 because the trust, of course, does not yet exist and the

21 board that will ultimately make that determination is not yet

22 seated.

23         I think with those points, we covered the releases

24 issue.  I'll reserve any comment if Mr. Adler raises other

25 points that I can address.

1          THE COURT:  Okay, thank you.

2          Mr. Adler.

3          MR. ADLER:  Good afternoon, Your Honor.  David

4    Adler from McCarter & English, on behalf of the Kavuri

5    plaintiffs and Seth Melamed.

6          I'll address the crypto in-kind argument first.

7    As I asked on cross examination today, every crypto case that

8    I've seen has a distribution in-kind.  And I understand, and

9    I'm not faulting the debtor on the fact that they monetize

10   their assets, the crypto, at the beginning of the case.

11   That's not the argument.

12          The argument is that when the money is going out,

13   why can't it pass through an exchange at that point and be

14   converted in-kind so that the customer receives back the same

15   type of crypto that they originally had put in.  And it does,

16   I believe, make a difference in some jurisdictions.

17          I'll say it, I'm not a tax lawyer, but from what I

18   understand, if you had five Bitcoin on the platform and you

19   get back two Bitcoin, that's a distribution in-kind that is

20   not a taxable event.  You get back stablecoin or cash, that's

21   a taxable event, as far as my limited knowledge goes.

22          So the point that I was trying to make today was

23   to see what efforts the debtors have done to move that

24   process along.  Now, it's been done in Celsius, it's been

25   done in BlockFi, and it seems to me that it could be an

1  optional process where the customer makes an election as to

2  whether they want to receive it through an exchange or not.

3  A customer can actually pay for it.

4          But, you know, we're talking about here today, and

5  it's a good thought, that the creditors are going to receive

6  140, 150 cents on the dollar.  What I think a lot of the

7  crypto customers look at is they had X Bitcoin on the

8  platform.

9          Let's say they had ten Bitcoin on the platform.

10  That ten Bitcoin today would be worth $650,000.  Given the

11  Bankruptcy Code and Your Honor's digital estimation ruling,

12  that is capped at $16,000.  So they have a claim for

13  $160,000, and if they get 140 percent on that, let's say

14  that's $200,000.  Now, they're getting that in cash.  If

15  their basis is low, they're going to have a taxable event

16  associated with that.

17          I just think it's the right thing to do to

18  minimize pain to the customers, especially given the fact

19  that when FTX filed, that was the low point in the crypto

20  market, and it essentially has gone up since November 10,

21  2022.

22          And really what I wanted to see was where the

23  process was.  And it looked -- from what I heard, there

24  wasn't much of a process.  And I think really it is something

25  that should be done in fairness to the people who had crypto;

1   that was their property.

2          They may not be able to get Your Honor to compel

3   the return of it or the proceeds from it, but it was their

4   property that was taken, and in exchange, they're getting

5   back not their property, and maybe having a taxable event

6   associated with it.  So that's my response on that point.

7          With respect to disclosure of compensation, I

8   heard the number of $34 million as a wind-down budget.  I

9   don't know.  I've been in cases where the compensation is set

10  under the plan supplement for the board, for the plan

11  administrator.

12          I don't know why it can't be set now, but if Your

13  Honor is inclined not to have them disclose it, what the

14  members are getting paid, what I would ask for is that in the

15  operating reports that get filed post confirmation, that

16  there just be breakdown of the individual line items for each

17  of the different committees.

18          And I do want to say that there are, as I count

19  them, four different entities that are getting paid post

20  confirmation.  There's the advisory committee, there's the

21  plan administrator, there's the FTX recovery trustee board of

22  directors.  There's the Delaware litigation trustee.  So

23  there are a lot of different entities that will be getting

24  paid, and each of them will have their own set of

25  professionals.

1           And I just think that, to me, the $34 million

2    number sounded a little low, but I would like to see that

3    those numbers be disclosed going forward, you know, after

4    confirmation, because that was the first time I heard that

5    number.

6           THE COURT:  Well, let's go back to the first

7    issue.  How, I mean, any case where you have a debtor holding

8    assets that are subject to fluctuation, you're going to --

9    people are going to say, well, I want my money back as a -- I

10   want it back in cash as the date of the petition date,

11   because the value of that property is now less than was

12   before.

13          And others are going to say, well, I want the

14   value of the property as it is today.  So I want the property

15   back.  But what in the code, can you answer Mr. Glueckstein's

16   question?  What in the code says I have to make the debtors

17   do that?

18          MR. ADLER:  I think that it is consistent with

19   good faith to try and give the customers back that which they

20   originally put in.

21          THE COURT:  But how?  I mean, I don't have any --

22   you didn't put on any evidence to show me how that would

23   work.  I mean, how would -- and I have testimony from Mr.

24   Mosley that it would not be able to work because of the vast

25   amount of -- over a million customers who submitted claims,

1  all different kinds of tokens.  Some have gone up, some have

2  gone down.

3          You mentioned today the value of Bitcoin.  Ten

4  Bitcoin would be $66,000 today.  A month and a half ago it

5  would have been $77,000.  It's gone down.  If the debtors

6  start buying up billions of dollars' worth of coin, the price

7  is going to go up and then they can't buy as much, and people

8  aren't going to get as much in distribution.  And I have no

9  answer to that.

10          MR. ADLER:  I'm not asking for the debtors to buy

11  it, okay?  I don't want the debtors to buy it.  I just want

12  the debtors to be able to distribute on a customer's behalf

13  to an exchange where that exchange can convert it into the

14  crypto to be placed into the customer's account.

15          All I want is an exchange after the debtor's

16  distributed.  Debtors are not going to buy crypto.  They

17  distribute it to Coinbase.  Let's use Binance, distributed to

18  Binance.  And what shows up in the customer's account is the

19  in-kind of what they originally put on.

20          THE COURT:  Explain to me how.  I don't understand

21  how that would work.  How would that possibly work?

22          MR. ADLER:  It worked in Celsius.  Coinbase was

23  retained.  They distributed Bitcoin, they distributed E.

24  Those people who got Stablecoins, they were allowed to

25  convert, I believe, at the time it got to Coinbase.  I mean,

1   there's -- and I believe the same process is going on right

2   now in BlockFi, where customers can sign up and basically let

3   Coinbase be an agent, and the distribution passes through

4   them such that what they receive is ultimately what they put

5   in.

6              THE COURT:  But every case is different, and I

7   don't know how much coin, what types of coin were in the

8   BlockFi and the other cases.  Every case is different.  I

9   know in this case, there were over 1,300 different types of

10  coin.

11             MR. ADLER:  You are correct, Your Honor.  I think

12  that it's -- I'm going to say this.  I think it is the

13  equitable thing to do to try and minimize tax events to those

14  people who have been injured.

15             THE COURT:  All right.  Okay.  Thank you.

16             Mr. Glueckstein?  Oh, nope.  Nobody else?

17             MR. GLUECKSTEIN:  Thank you, Your Honor.  Just a

18  couple of points.  The unrefuted testimony, there's been --

19  the only evidence that's been presented to the Court in

20  connection with this hearing on this issue was the testimony

21  from Mr. Coverick and then also some testimony from Mr.

22  Mosley on cross examination on what the debtors were doing

23  and why they didn't do it with respect to this issue of

24  allowing just all tokens to be the subject of in-kind

25  distributions.

1          Mr. Adler's arguments, respectfully, are wrong

2   with respect to what has happened in the other crypto cases,

3   which are not relevant, as Your Honor notes, and certainly

4   the suggestion that the reason why we should do this is to

5   somehow minimize tax liability.  What we just heard was now

6   Mr. Adler saying, we're not looking for the debtors to

7   actually acquire the crypto and make in-kind distributions.

8   We can just facilitate in-kind distributions through a

9   distribution agent.

10          I'm not a tax lawyer either, but there is no way

11  in any country in the world that that is going to satisfy

12  some sort of tax requirement that's going to give some tax

13  benefit to the customer.  The purchaser of the crypto at that

14  point is going to be the third-party distribution agent.

15          But regardless, there's no requirement for any of

16  this in the Bankruptcy Code.  And to the extent that what

17  these objectors are arguing is that somehow the basis for

18  their argument in which this was raised doctrinally, was a

19  best interest test objection.  And the idea that somehow

20  these debtors are not providing maximum value through this,

21  there's no evidence of that whatsoever.  None.  No evidence

22  in the record.

23          In fact, what we heard from Mr. Coverick, both in

24  his declaration and on cross-examination, is that trying to

25  do this, if the debtor were to embark on such a process,

1  would have a number of negative consequences for creditors.

2  A significant majority of the customers in this case, hold

3  fiat and stablecoin claims.

4         And so the idea that the estate, either through a

5  distribution agent or itself, is going to speculate at this

6  juncture in trying to deliver cryptocurrency, the business

7  judgment of the Debtor has been that we're not going to do

8  that.

9         And so we also heard from Mr. Mosley and Mr.

10  Coverick that the Debtors are in discussions, continuing

11  discussions, in a competitive process with the distribution

12  agents to provide distribution services to the Debtors the

13  terms of which are still to be determined.  And that one of

14  the things which is clear in the plan that the debtors are

15  exploring is the possibility of an election for stablecoin

16  distributions.

17         But none of these issues are plan issues.  And

18  just to be clear, the suggestion from Mr. Adler that he wants

19  to suggest what is best for the creditors of this estate with

20  no evidence from the podium, when he's representing a grand

21  total of four creditors, there's no basis to make these

22  proclamations.  There is absolutely no requirement that the

23  Debtors change the distribution architecture that he assigned

24  it to in the Bankruptcy Code or otherwise that would require

25  a change here.

1            So we submit on that issue.  There is absolutely

2    no reason, equitably, legally, or otherwise, to force the

3    Debtor to do something different than the process they're

4    currently on in exploring how they're going to make

5    distributions to creditors.

6            On the disclosure issue, we covered this.  The

7    wind-down budget more than satisfies our obligations under

8    the Bankruptcy Code.  What is required in the plan and the

9    plan supplement documents satisfy all of those requirements.

10   That is the standard that needs to be passed for confirmation

11   today.  There's no continuing obligation of disclosure on the

12   post-emergence Debtor.

13           Clearly, through the voting process and this

14   approval process, the other creditors have either

15   affirmatively supported this architecture, including the

16   board's and the plan administrator.  They'll be working post-

17   emergence or otherwise, if not objected to it.

18           So we would ask, Your Honor, that the remaining

19   portions of these creditor's objections be overruled.

20           THE COURT:  Thank you.  I am going to overrule

21   these objections.  There's nothing in the code that would

22   require the Debtors to provide in-kind distribution to

23   customers and creditors.  And the evidence, the only evidence

24   I have is that doing what Mr. Adler's clients are asking me

25   to do would actually be harmful to the creditors, not

1  beneficial.

2            If I had other evidence, I could consider it, but

3  I don't have any.  So the only thing I can say is the Debtors

4  have exercised their business judgment.  This looks like the

5  best way to handle distributions.  The evidence I have

6  supports that conclusion, and therefore, I will overrule the

7  objections.

8            MR. GLUECKSTEIN:  Thank you, Your Honor.  I think

9  we have three remaining.  The next objection that I will

10  address is the objection that was filed by the LayerZero

11  group.  There's two main components to this objection.

12            First, they dispute their exclusion from the

13  customer preference settlement as somehow being in violation

14  of Section 1123(a)(4) as unfair discrimination issue under

15  the plan.

16            And two, there's a challenge in their papers, at

17  least, to the ability to include language with respect to

18  502(d) in the plan.

19            With respect to the customer preference

20  settlement, Your Honor, I want to address what the customer

21  preference settlement is and what the evidence actually shows

22  with respect to the customer preference.

23            As in every case, the debtors at some point need

24  to make a decision as to how they are going to handle

25  preference claims, which are going to be preserved, which are

1  going to be pursued, which are going to be settled, and on

2  what terms.

3           As Mr. Coverick explained in his testimony, in his

4  declaration, the Debtors had extensive discussions with their

5  creditor constituencies, including the official committee and

6  the ad hoc committee, about how to handle customer preference

7  claims.  No customer, including those in the LayerZero group,

8  have some right to a settlement of preference claims.

9           The Debtors in their business judgment, on the

10  other hand, do have the right to retain any or all of the

11  preference claims and pursue them to maximize the value of

12  these estates.

13           As Mr. Coverick made clear, as a result of

14  discussions with creditors, given the projected recoveries

15  for allowed customer claims, along with other factors, the

16  debtors decided they would make settlement offers to most,

17  but not all, of those customers with preference exposure.

18           And to protect the estate, the Debtors negotiated

19  with the official committee, and the ad hoc committee, and

20  other stakeholders certain general categories of customer

21  preference defendants that the Debtors believe, again in

22  their business judgment, are appropriate to retain and not to

23  provide settlement offers at this time.

24           There's nothing unusual about that.  And there's

25  nothing about these determinations that permit the target of

1  those lawsuits, including the LayerZero group parties, to

2  come before this Court and argue, as they're doing today,

3  that the Debtors are required to provide them a settlement

4  offer.

5          On the face of that argument, it makes no sense.

6  So what did they do?  In order to manufacture standing, to do

7  so, the LayerZero parties wrongly argue that offering the

8  customer preference settlement to some but not all customers

9  violates Section 1123(a)(4) of the Bankruptcy Code.  We

10 submit that this argument is baseless.

11         As Mr. Coverick made clear in his declaration, the

12 customer preference settlement is not plan or claim treatment

13 provided on account of customer entitlement claims.  Your

14 Honor, that is the operative testimony from the Debtor's

15 perspective, and it's unrefuted, not the application of the

16 factors, which we'll get to in a minute, to LayerZero.

17         The question here for the Court is, is this plan

18 treatment or not?  And the facts and circumstances of what

19 this settlement is, where it came from, and why it appears in

20 the plan where it does are all in Mr. Coverick's testimony,

21 and those portions of his testimony are unrefuted with any

22 other evidence.

23         Your Honor, the customer preference settlement is

24 completely separate.  It was negotiated separately.  It was

25 discussed separately in the disclosure statement and in the

1   plan.  This settlement is no different than other settlements

2   in this case and others that are being implemented through

3   the plan process as permitted expressly by Section 1123(b)(3)

4   of the Bankruptcy Code, but are separate settlements from the

5   treatment of claims against the Debtors that are provided for

6   in the plan.

7         The customer preference settlement consists of the

8   Debtors making offers to certain creditors who then had the

9   opportunity to consider the offer's terms and whether or not

10  to accept them on an individual creditor basis.  To accept

11  the Debtor's offer, the customer needed to elect into the

12  settlement, agreed to the Debtor's proposed stipulated claim

13  amount, which was of critical importance to the Debtor, and

14  to vote in favor of the plan.

15        As Mr. Coverick details in his declaration, there

16  was significant administrative savings for the Debtors by

17  obtaining stipulated claims amounts and not needing to

18  reconcile those claims later.  The Debtors did utilize the

19  solicitation process to make these settlement offers.  That

20  was clear back at the time the solicitation procedures were

21  approved.

22        And we did that because we were already spending

23  significant time and money sending materials to close to one

24  million voting creditors, and it was the most efficient thing

25  to do.  Otherwise, we'd have to separately solicit offers and

1  acceptance of the preference elements to many of those same

2  creditors.

3         But of course, every potential preference claim is

4  different, has potentially different defenses to it and

5  constitutes a claim by the Debtors against the customer that

6  is completely unrelated to the customer's claims against the

7  Debtors, which are the claims that are being addressed

8  through the classes in the plan.

9         The preference settlement offer is not on account

10  of any claims against the Debtors and outside the scope of

11  the plan's treatment of claims.  And once that's established,

12  there can be no unfair discrimination and Section 1123(a)(4)

13  is inapplicable.

14         What LayerZero is really saying is they don't

15  believe the Debtors in their business judgment had a basis to

16  exclude them from receiving an offer to settle preference

17  claims.  But that argument holds no water outside of the

18  context of 1123(a)(4).  There is simply no legal basis

19  whatsoever for LayerZero to require the Debtors to make them

20  a settlement offer.

21         The criteria set forth for excluded customer

22  preference actions were established, again, as explained in

23  Mr. Coverick's testimony, after extensive discussions with

24  the creditor's committees to protect the Debtors and to

25  ensure that offers were not made to settle certain types of

1  customer preference actions too early in the process.

2          The customer preference defendants are not the

3  counterparties or the intended beneficiaries of those

4  criteria that we've heard so much about.  As Mr. Coverick

5  testified, the Debtors evaluated the potential preference

6  claims against the criteria set forth in Section 5.5 of the

7  plan and in exercising their business judgment, decided to

8  place certain actions on the list of excluded customer

9  preferences actions.

10         With respect to each of the LayerZero defendants,

11 the basis for their inclusion on the excluded customer

12 preference action list is self-evident by the public record

13 and confirmed by Mr. Coverick.

14         The Debtor's criteria simply provide that the

15 Debtors determined in their business judgment that there is a

16 reasonable basis to conclude that, among other things, any

17 debtor has a cause of action or defense against the recipient

18 of the preference or any of its affiliates other than a

19 preference claim.  That's the relevant portion of that

20 provision that we've been discussing and that is at issue

21 with LayerZero.

22         Each of the LayerZero parties are already named as

23 defendants in an adversary proceeding in which the Debtors

24 have alleged multiple causes of action based on allegations

25 that LayerZero benefited from transactions with Alameda

1  Ventures using misappropriated FTX group funds, and then took
2  advantage of the FTX group's desperate need for cash in the
3  hours leading up to their collapse.

4          Those claims, all of them, are in their early
5  stages of being litigated and discovery is ongoing in the
6  adversary proceeding that is pending before Your Honor.

7          For purposes of making offers to settle preference
8  claims, it is perfectly reasonable for the Debtors to retain
9  all of their rights against those litigation defendants and
10 resolve any and all claims there in that adversary
11 proceeding.

12         LayerZero's attempt to use the Debtor's offer of
13 customer preference settlements to other customers to force
14 the Debtors and now request this Court to force the Debtors
15 to release claims that are the subject of pending litigation
16 and where other claims might still be asserted post discovery
17 should be rejected.

18         What we're really doing here, Your Honor, just to
19 put a fine point on it, is what they are asking this Court to
20 do is to strike Counts 5 through 8 and 10 of the pending
21 adversary proceeding complaint.  They want them stricken.
22 They don't want to defend those causes of action, and their
23 basis for doing that is that we have made offers of
24 settlement of preferences to other customers in connection
25 with plan solicitation.

1        The other issue that they've raised involves

2    Section 502(d).  LayerZero seems to take issue with Section

3    8.3.2 of the plan, which contains familiar language stating

4    that claims shall be deemed temporarily disallowed pursuant

5    to Section 502(d) of the Bankruptcy Code until a cause of

6    action asserted by the Debtors is resolved.

7        The Debtors have pled claims pursuant to Section

8    502(d) of the adversary proceeding against the LayerZero

9    parties.  The plan provision does not permanently disallow or

10   do anything to prejudge the claims in that adversary

11   proceeding.

12       Rather, the plan provision recognizes the

13   indisputable case law holding that Section 502(d) can be

14   applied on an interim basis to allow the allowance of the

15   claim where the creditor is subject to an avoidance action.

16   That's exactly where LayerZero, all three of the LayerZero

17   parties sit.

18       The language in Section 502 (d) of the code is

19   mandatory.  Courts are clear that because the focus is on the

20   creditor and not the claim, any avoidable transfer may

21   require disallowance of all of that creditor's claims until

22   resolved.  Courts regularly recognize, we cite cases in our

23   papers and as was discussed by the Court in Enron and

24   elsewhere, that where there's a pending avoidance action,

25   defendant's claims continue to be disputed claims and

1    distributions are temporarily prevented.

2           This language that's in our plan has been approved

3    by this Court and others in this district and numerous other

4    cases, including in SIO 2 and Cred, amongst others.  It has

5    the exact effect of the pending adversary proceeding on the

6    allowance of the defendant's claim.

7           So we don't see any issue, either generally on

8    this point, and certainly with respect to LayerZero parties,

9    again, they are subject to litigation.  But what we're asking

10   to do, Your Honor, is overrule the subjection.  Let's allow

11   the adversary proceeding against the LayerZero parties to

12   resolve all of these matters, which is what should happen in

13   any event during due course through the litigation.

14           THE COURT:  Okay.  Thank you.

15           MR. GLUECKSTEIN:  Thank you.

16           MR. SAZANT:  Good afternoon, Your Honor.  Jordan

17   Sazant of Proskauer Rose on behalf of the LayerZero group,

18   which is comprised of LayerZero Labs Limited, Ari Litan, and

19   Skip & Goose, LLC.

20           When these cases began nearly two years ago, the

21   ashes of FTX were still smoldering, and the Debtor's advisors

22   and new officers had to roll up their sleeves and locate

23   billions of dollars of assets all over the world in

24   cyberspace.  And these cases presented a few critical and

25   difficult questions for the Debtors and for the Court and for

1 everyone else involved.

2          Who owned the assets held by FTX, the Debtors or

3 their customer depositors?  And regardless of that answer,

4 given the $9 billion shortfall on the FTX exchanges, how to

5 fairly allocate and distribute the value among the Debtor's

6 millions of customer depositors worldwide.

7          So the Debtors come before the Court with much

8 fanfare and touting the plan as this overwhelmingly

9 successful culmination of their efforts.

10          And the Debtors propose that the plan shall

11 constitute a good-faith compromise, settlement and resolution

12 of all claims, interests and causes of action against the

13 Debtors, including, among other things, issues relating to

14 the tracing of assets of individual debtors, the effects and

15 consequences of the .com TOS and U.S. TOS, and whether

16 exchange assets are property of the Debtor's estate.  That's

17 at the confirmation brief of Paragraph 52.

18          And so through this global settlement, the plan

19 provides for the substantive consolidation of the Debtor's

20 estates, the prioritization of returning assets to customers,

21 and liquidates and distributes the assets to customers in the

22 form of cash.

23          All customers, regardless of their claim currency

24 denomination are expected to recover approximately 130

25 percent of their petition date value of the property, and a

1   complete waiver of preference actions for customers who

2   withdrew their assets prior to the petition date.

3       My clients, however, are one of the few exceptions

4   to that rule, as they find themselves among the excluded

5   minority to whom the waiver of customer preference actions

6   does not apply.  As a result, the plan cannot be confirmed

7   for three independent reasons.

8       First, the plan violates Section 1123(a)(4) by

9   providing unequal treatment through a waiver of preference

10  claims only to those favored creditors who also agreed to

11  stipulate to their claim amounts and to vote to support the

12  plan and denying those recoveries to the excluded customer

13  preference actions.

14      The Debtors argue that the customer preference

15  waiver is not plan or claim treatment, but we will show why

16  that's incorrect.

17      Second, even if the customer preference waiver

18  doesn't constitute plan or claim treatment, the plan still

19  cannot be confirmed because it's offered in bad faith as

20  applied to at least two of the three members of the LayerZero

21  group.

22      While the Debtors purport to apply exclusive and

23  objective criteria to determine which customers should be

24  excluded from the customer preference settlement, as we've

25  already seen today, and as we'll discuss further, none of

1  those criteria are applicable to Mr. Litan or to Skip &

2  Goose.

3          And then third, the plan violates applicable

4  bankruptcy law by withholding distributions from liquidated

5  claims and invalidly treating them as disputed solely on

6  account of asserted preference actions that have not yet been

7  litigated to conclusion.

8          So for these reasons, which we'll take in order,

9  we believe the plan cannot be confirmed or, at the very

10 least, can only be with an amended excluded customer

11 preference actions exhibit that removes Mr. Litan and Skip &

12 Goose.

13          So we'll start with the unequal treatment under

14 1123(a)(4).  One of the fundamental underpinnings of the

15 Bankruptcy Code is that similarly situated creditors must be

16 treated equally.  Specifically, Section 1123(a)(4) of the

17 Bankruptcy Code requires that a plan provide the same

18 treatment for each claim or interest of a particular class

19 absent fee subject creditor's agreement otherwise.

20          As Your Honor noted at last week's hearing, one

21 can simply look to the terms of the plan and the plan

22 supplement and see clearly the discrepancies in treatment.

23 All creditors in Class 5 receive 130 percent of the petition

24 date value of their claim, and some receive the preference

25 waiver while others do not.

1          So the only question then is whether the portion

2   of recoveries associated with the waiver of preference

3   actions constitutes treatment on account of such creditor's

4   claims.  The Debtors respond that it does not because it's

5   described and contained in a separate section of the plan,

6   and they argue that the settlement offer is not on account

7   of creditor's claims against the Debtors, but rather a

8   settlement of a Debtor's claim against the subject creditor.

9          But that's only part of the story when it comes to

10  the customer preference settlement.  They also argue that the

11  only testimony before the Court is Mr. Coverick's declaration

12  that this is not planned treatment.  But that is not an

13  evidentiary question.  That is a legal question for the Court

14  and a conclusion for you to make.

15         So sure, the settlement offer proposes to resolve

16  the Debtor's potential preferences and preference actions

17  against creditors by waiving such claims, but the waiver of

18  claims isn't the settlement offer.  Otherwise, the Debtors

19  could simply have applied the objective criteria, waived

20  those claims, and moved on.

21         But instead, the settlement has two requirements.

22  You must agree to settle with the Debtors as to the

23  calculation of your claim, settling the claim against the

24  estate, and you must agree to vote that claim in favor of the

25  plan.  And worse yet, by tying the customer preference waiver

1  offer to a vote in favor of the plan, the Debtors ask this

2  Court to permit the -- to bind the excluded minority to

3  lesser treatment.

4        It's difficult to conceive of anything more

5  fundamentally tied to a creditor's claim than a settlement

6  that resolves its amount and its vote.  The Debtors focus

7  solely on the settlement's resolution of the Debtor's causes

8  of action while ignoring entirely the creditor's agreements

9  under the settlement.

10        And while courts have approved plenty of plans

11  which have provided the payment of fees or other

12  consideration to certain creditors in the class in exchange

13  for backstop commitments, to exit financing, or assisting in

14  structuring transactions or other similar tangential reasons,

15  that's not the case here at all.  None of these customers are

16  providing any separate value.

17        Instead, this case is similar to the Adelphia

18  bankruptcy cases where the Bankruptcy Court in the Southern

19  District of New York originally confirmed a plan providing

20  valuable releases and exculpations to creditors who voted in

21  favor of that plan and withheld such benefits from creditors

22  who opposed.

23        On appeal, the District Court for the Southern

24  District of New York stated that there is no doubt here that

25  in return for approving the plan, some claimants will receive

1 a more valuable settlement than others, i.e., additional

2 benefits on top of their pro rata distributions.

3        While such an outcome may be permissible where the

4 added benefit is given for truly collateral reasons, i.e.,

5 independent from their status as claimants, here, the benefit

6 is given in exchange for the claimants' affirmative vote for

7 the plan, an added benefit that is tied directly to the plan

8 itself and given to some claimants in a class but not all.

9        Such an inducement may well have led some

10 claimants to approve the plan when they otherwise may have

11 rejected it, and as a result, creditors opposing the plan may

12 have been prejudiced by a quid pro quo exchange of plan

13 approval for valuable releases and exculpation.

14        Section 1123(a)(4) guarantees that each class

15 member will be treated equally regardless of how it votes on

16 a plan where the receipt of valuable benefits in a plan is

17 conditioned on a vote to accept that plan, there is a very

18 real possibility of dissuading or silencing opposition to the

19 plan.

20        The Adelphia court granted a stay pending appeal

21 of that plan on grounds that there was substantial likelihood

22 that it would be overturned as a result.  However, that plan

23 was ultimately consummated because the appealing creditors

24 could not post the bond that was ordered.  And that's at 361

25 BR 337, and the quote is from Pages 363 to 64.

1          So here the benefit of the customer preference

2   waiver is granted not only on account of a creditor's vote in

3   favor of the plan, but also on account of stipulating to the

4   amount of the claim that's calculated by the Debtors and sent

5   out in the ballot.  Those are not the same tangential reasons

6   or added benefits.  This is part of the resolution of

7   customer claims and can't be offered prejudicially to the

8   majority of creditors at the exclusion of the disfavored

9   creditors.

10         Lastly, I just wanted one point from the Debtor's

11  reply.  The Debtor's reply on this point cites to the Energy

12  Future Holdings case for the proposition that the customer

13  preference waiver is outside the scope of the plan's

14  treatment of claims, and to argue that the provisions of

15  Section 1123(a)(4) do not apply to the Court's evaluation of

16  the customer preference waiver.

17         But the EFH case is clearly distinguishable.  The

18  Debtors quote EFH to state that under its plain language,

19  Section 1123(a)(4) applies only to a plan of reorganization

20  and therefore not to pre-confirmation settlements.  But this

21  is not a pre-planned settlement.  This offer's embedded

22  within the plan, was solicited through the plan ballots, and

23  requires a vote in favor of the plan.

24         It's not a 9019 settlement in the early stages of

25  the case, and notably the proposed confirmation order, which

1   I've checked the one file this morning, contains the same

2   language, it contains proposed findings by the Court that the

3   terms of the customer preference settlement are independently

4   fair, equitable, and reasonable and approves such terms

5   pursuant to Section 1123 of the Bankruptcy Code.

6           So if the Court agrees with our argument that the

7   customer preference waiver constitutes claim treatment under

8   the strictures of the Bankruptcy Code because of its

9   inextricable link to creditor's claim amounts and votes, then

10  the inquiry can end there, and the plan cannot be confirmed

11  due to the unequal treatment provided to creditors of the

12  same class.

13          But even if the Court disagrees and holds that the

14  customer preference waiver does not constitute claim

15  treatment despite the other terms of the settlement, then the

16  plan still cannot be confirmed until Ari Litan and Skip &

17  Goose are removed from the excluded customer preference

18  actions exhibit because, as applied to them, this plan is

19  internally inconsistent and offered in bad faith.

20          The Debtors represent that the customer preference

21  waiver is offered to all creditors who fall within the

22  objective set of criteria that it agreed upon with the UCC

23  and the ad hoc group.  And there are a specific set of five

24  criteria in Section 5.5 of the plan that apply to potentially

25  exclude a creditor from the benefits of the customer

1  preference settlement waiver.

2        And as we've just heard from the Debtor's witness,

3  they cannot point to any evidence that any of the criteria

4  have been met as to Mr. Litan and Skip & Goose.  The only

5  potential evidence cited by the Debtors and their declarant

6  is the adversary complaint, which, as you noted earlier, with

7  respect to the Celsius proof of claim, the adversary

8  complaint itself contains no evidence and is only mere

9  allegations.

10        And even if these allegations are credited,

11  they're insufficient to satisfy the objective criteria that

12  the Debtors state that they're appealing to.  These criteria

13  are, first, that the recipient was an insider of the Debtor.

14  Mr. Litan and Skip & Goose were not insiders of the Debtors

15  and there are no such allegations in the complaint.

16        The recipient was a current or former employee of

17  the Debtor.  Mr. Litan and Skip & Goose were not employees of

18  the Debtors and there are no such allegations in the

19  complaint.

20        The recipient may have had actual or constructive

21  knowledge of the commingling and misuse of customer deposits.

22  Mr. Litan and Skip & Goose had no knowledge of the Debtor's

23  fraud before it became public, and the Debtors make no such

24  allegations in the complaint.

25        The recipient either changed its KYC information

1   to receive preferential withdrawals or received assistance

2   from Debtor employees, which neither of which Mr. Litan or

3   Skip & Goose did, and no allegations are contained in the

4   complaint alleging such.

5         And finally, any debtor has a cause of action

6   other than a preference claim against the creditor or an

7   affiliate.

8         And so again, the Debtors point only to the

9   complaint that was filed against the LayerZero group in the

10   adversary proceeding as justification for excluding each of

11   the LayerZero group's members.  But the Debtors have also

12   confirmed that there's no other basis for including the

13   LayerZero group.  They are focused on the complaint.  And the

14   witness has said all allegations underlying the complaint are

15   what they are relying on.

16         And a review of the complaint shows only non-

17   preference causes of action asserted against LayerZero Labs

18   Limited.  And not that the complaint even contains any

19   allegations of such, but just to confirm, neither Mr. Litan

20   nor Skip & Goose are affiliates of LayerZero Labs, so they

21   would not qualify under the cause of action against an

22   affiliate category either.  Mr. Litan was merely an employee,

23   is now a contracted consultant, and holds no voting rights in

24   LayerZero Labs, and just to confirm, neither does Skip &

25   Goose.

1          Either the objective criteria described in Section

2  5.5 of the plan have meaning and must be applied as written

3  or they do not.  But the inclusion of Mr. Litan and Skip &

4  Goose on the excluded customer preference actions exhibit is

5  explicitly contrary to the terms of the plan and can only be

6  explained as a bad-faith attempt by the Debtors to extract

7  litigation leverage over LayerZero labs in the adversary

8  proceeding.

9          And so, for this reason, even if the selective

10 application of the customer preference waiver is permissible

11 under the Bankruptcy Code, the plan cannot be confirmed

12 without an amended plan supplement that removes Mr. Litan and

13 Skip & Goose from the excluded customer preference actions

14 list.

15         Notably, Paragraph 19 of the proposed confirmation

16 order contains a proposed finding that the plan supplement,

17 which includes the excluded customer preference actions list,

18 complies with the terms of the plan, and that finding simply

19 cannot be sustained by the Court under the current record

20 because the excluded customer preference actions list and

21 Section 5.5 and the objective criteria listed therein are

22 internally inconsistent with one another.

23         And then, finally, to address our last argument on

24 the disallowance of liquidated claims, the plan also provides

25 for the withholding of distributions to creditors on account

1   of all claims that are held by a creditor against whom the

2   debtors believe they have avoidance actions.

3         The disallowance and withholding of distributions

4   on account of otherwise allowable claims pursuant to Section

5   502(d) is not permissible in this district prior to an actual

6   judicial determination of liability on the defendant's part.

7   And we've cited to cases in this district holding the same,

8   including In Re Lids Corp at 260 BR 680.

9         The Debtor's reply argues that a delay in

10  distributions on otherwise allowable claims pending

11  adjudication of the adversary proceeding is permissible and

12  provided for in the Bankruptcy Code.  But it's telling that

13  the Debtor's reply brief cites only to non-Third Circuit

14  cases.

15        So while the Debtors may be correct on the law in

16  other districts, precedent in this district is clear that

17  preventing distribution on otherwise allowed claims as a

18  result of mere allegations of avoidable transactions is

19  improper and cannot be approved.

20        So for all these reasons, we believe that the plan

21  cannot be approved as it provides for unequal treatment to

22  Class 5 creditors as a result of the customer preference

23  waiver.  But even if you disagree with that, we believe that

24  the plan cannot be approved as currently constructed with the

25  plan supplement, including Mr. Litan and Skip & Goose as

1  excluded customer preference actions because that violates

2  the terms of the plan in Section 5.5 itself.

3             Unless Your Honor has any questions?

4             THE COURT:  No questions.  Thank you, Mr. Sazant.

5             MR. SAZANT:  Thank you.

6             MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

7  Glueckstein.  A few points in rebuttal.  Counsel suggests

8  that the inclusion of these parties on the excluded

9  preference list is, in their words, litigation leverage.  I

10 can hardly think of more of a litigation leverage play than

11 asking this Court to dismiss without adjudication Counts 5,

12 6, 7, 8, and 10 of a pending adversary proceeding complaint

13 that is pending before Your Honor.

14            The issue with respect to -- the suggestion here

15 is that we point to the complaint, the existence of the

16 complaint, as a reason to exclude.  That is true.  Point to

17 the allegations in the complaint.  That is also true.

18            There's a bunch of representations made from the

19 podium by counsel about Mr. Litan, his relationship to

20 LayerZero.  Lots of these facts are disputed.  None of them

21 have been adjudicated.  They are all going to be adjudicated

22 in the context of a complex adversary proceeding with a bunch

23 of transactions amongst three different parties who were

24 named as defendants by the Debtors in that action that

25 include LayerZero Labs, Mr. Litan, and Skip & Goose.

1          THE COURT:  Mr. Litan says there's no claims

2    against Mr. Litan and Skip & Goose other than preference

3    claims in the complaint.

4          MR. GLUECKSTEIN:  There's no claims that have been

5    asserted in that complaint, as of now, against those two

6    defendants, other than the preference claim.  That is true.

7    That case is in the very early stages of discovery.  And the

8    standard for the people that are on the excluded list is not

9    what we -- the criteria that we've negotiated and have

10   included in the plan, again, our position is for the benefit

11   of the estate, in consultation with our creditors, so that

12   we're not prematurely releasing claims, is that we have a

13   reasonable basis to believe we have claims.

14          It doesn't mean that we have asserted them all.

15   It doesn't mean that every complaint has been filed.  It

16   doesn't mean that every count of every complaint necessarily

17   has been filed.  This is an evolving process.

18          All we're saying, when we take a step back, is the

19   Debtors are not prepared at this time to make a settlement

20   offer to these parties because we have a complex piece of

21   litigation that is in discovery.  Our investigations against

22   them, against other parties on that excluded preference list,

23   remain ongoing.

24          And so the suggestion that we have to look at, and

25   we can compare this standard, which again, we would submit

1   they're not the party to evaluate whether we've complied with

2   the carve-out or the criteria set forth in this.  They are a

3   defendant in the litigation.

4           The question, which is why this all dials back to,

5   is if we accept the proposition for a moment that this is not

6   plan treatment, none of this is relevant because they're not

7   entitled as a litigation defendant to get a settlement offer

8   at any particular point in time from the Debtor.  We included

9   in the plan, as Section 1123(b) allows us to do, provision

10  that incorporates a settlement that's being implemented

11  through the plan.

12          Mr. Coverick not only stated in his declaration

13  that his understanding, not as a legal matter, that, of

14  course, is for Your Honor to decide, but his understanding as

15  the business representative of the Debtors, where he

16  described his presence at meetings where these issues were

17  discussed, is that this is not a treatment on account of

18  claims.  That is the testimony.  Sections 26, 27, Paragraphs

19  26, 27, 28, 29 of Mr. Coverick's declaration addressed these

20  issues.

21          Counsel argues, well, there's no separate value

22  being provided by the creditors for the settlement of the

23  preference claims, and so therefore it must be plan

24  treatment.  That's not true.  Paragraph 28 of Mr. Coverick's

25  declaration, he addresses very clearly that the Debtors

1  benefit from not needing to reconcile the amount of each

2  customer's claim for those accepting and opting into the

3  customer preference settlement.

4          We could not force people to accept their

5  stipulated claim.  If they want to litigate their claim

6  amount, they had the right to do that.  They didn't need to

7  take the settlement.  But to the extent that creditors opted

8  into the settlement and agreed to the Debtor's stipulated

9  claim amount, that ends the process of reconciling the

10 amounts of those claims for many creditors.

11         That's a significant benefit to the Debtors.

12 That's the testimony from Mr. Coverick in Paragraph 28 of his

13 declaration.  That testimony is unrefuted.

14         What the record before Your Honor shows is that a

15 settlement was offered to creditors that was solicited in

16 connection with the plan process, but that election was

17 separate from the plan process, that settlement is described

18 separately in the plan and in the disclosure statement at the

19 time the solicitation procedures were approved by this Court.

20         And as we set forth, we are asking, we are asking

21 for approval of that settlement separately, both in

22 connection -- pursuant to 1123(b) and Section 9019 of the

23 Bankruptcy Code.  And we briefed in our papers why we believe

24 the settlement on its terms, vis a vis the Debtor and the

25 customers, is an appropriate settlement of the customer

1 claims.

2          But the business judgment of the Debtor was to

3 exclude certain -- in consultation with the creditors, to

4 exclude certain creditors at this time from the settlement.

5 And out of everybody who's on that list, out of everybody

6 who's on that list of excluded customer preference actions,

7 these parties we have actually sued.  There is pending

8 litigation before Your Honor, and we intend to pursue that

9 litigation until it's resolved.

10          And again, what they are asking Your Honor to do

11 today is say, on one hand, this is somehow plan treatment and

12 they just get it.  But of course, I don't think they really

13 believe that because what they're saying is, well, even if

14 it's not, you know, we're going to try to apply and argue

15 that because, at this time, we have only asserted preference

16 claims against two of those defendants that somehow Your

17 Honor must summarily dismiss numerous causes of action

18 pending adversary proceeding.

19          And we submit, Your Honor, that there's no basis

20 to do that.  There's no requirement to do that because what

21 we have here is a settlement of preference actions.  The

22 benefit of those creditors who were offered that settlement,

23 who accepted it that's being implemented through the plan.

24 That's all it is.  We could have waited to do this.  We could

25 have made settlement offers with respect to preference

1  actions after confirmation.  We did it here.

2         And as explained in Mr. Coverick's declaration, we

3  did it here for efficiency, to ensure that we were maximizing

4  the opportunity while we were going out to creditors to get

5  the waiver -- to get the stipulated amounts agreed, and to

6  not have to do another mailing to close to a million people

7  once we had these terms agreed to.

8         Those who are excluded doesn't mean that the

9  Debtor is never going to settle their preference claims.  All

10  it meant is that the Debtors were not ready at this stage, at

11  the process when solicitation went out over this summer of

12  2024, to make that settlement offer at this time.

13         And so we would ask that this objection be

14  overruled, and that the plan, of course, be confirmed, and

15  that any issues with respect to the LayerZero parties be

16  addressed in the adversary proceeding in the context of that

17  litigation.

18         THE COURT:  Can you address Mr. Sazant's argument

19  about 502(d), that courts in this district have said you

20  can't?

21         MR. GLUECKSTEIN:  I can, Your Honor.  So the

22  language that we have in the plan has been, as I noted in my

23  early remarks, has been included in numerous plans.  And what

24  this idea, the context in which the cases that they're citing

25  to are different.

1          The questions there was in the context of

2  permanent disallowance, permanent disallowance for the

3  avoidance claims.  That's what Judge Wallace was talking

4  about in those cases, prior to the avoidance actions being

5  fully resolved.

6          What we submit is the state of the law with

7  respect to 502(d), including in this district, and why the

8  language that appears in our plan has appeared in other

9  plans, not only by Your Honor, approved by Your Honor, but

10 other judges in this district, is that the plan language

11 serves as a temporary disallowance until the cause of action

12 is resolved.

13         Of course, if the creditor -- if the avoidance

14 action is resolved favorably to the creditor, then we no

15 longer have a basis to withhold the distribution, at least on

16 that grounds.

17         But until that claim is resolved in the underlying

18 litigation with respect to the adversary proceeding, it is

19 perfectly appropriate.  It's consistent with the cases in

20 this district, and that's why, again, this language appears

21 in many plans for the Debtors not to pay out that

22 distribution until litigation is resolved.

23         Beyond that here, again, this is a situation

24 where, this is not a case where the creditor is standing here

25 saying that the plan provision is problematic and is

1  affecting their rights.  We've asserted a Section 502(d)

2  claim in the adversary proceeding.

3         That claim is pending.  It's there.  They haven't

4  moved to dismiss that claim.  They haven't moved to dismiss

5  that claim in the adversary proceedings, saying it can't be

6  maintained.  They didn't move to dismiss it all.  They

7  answered the complaint.

8         So, again, with respect to these parties, these

9  plan issues are manufactured.  These aren't issues that

10  impact their rights in any way.  There is a litigation that

11  is pending.  That litigation needs to be resolved on its

12  merits in due course.

13         THE COURT:  Okay.  Thank you.

14         MR. GLUECKSTEIN:  Thank you, Your Honor.

15         THE COURT:  All right.  I'm going to overrule the

16  objection.  I think the Debtors are correct that this is a

17  separate settlement.  It's not related to the plan itself.

18  The fact that they solicited through the plan to obtain

19  approval of the settlement from the creditors is not

20  something that would make this settlement a part of the plan

21  itself.

22         I think 1123(d)(3) allows for individual

23  settlements, and these are individual settlements on behalf

24  of the Debtors, who are the ones who are releasing their

25  claims against creditors, not the creditor releasing claims

1  against the Debtors.  So there's no disparate treatment here

2  amongst the members of this particular class.

3           Under the 502(d) issue, I agree, again, with Mr.

4  Gluckstein that the cases that are cited by the defendants

5  here or the movants here relate to a permanent disallowance

6  of claims.  This is a temporary disallowance until resolution

7  of the other claims against these particular creditors and

8  therefore does not violate 502(d), which explicitly allows

9  for temporary disallowance.  So for those reasons, I will

10  overrule the objection.

11           MR. GLUECKSTEIN:  Thank you very much, Your Honor.

12  I think that brings us to our last two objections, which I'm

13  just going to group together for efficiency, but fully

14  recognize they're separate objections.  There are two

15  objections --

16           THE COURT:  Mr. Shore -- so finish real quick.

17           MR. GLUECKSTEIN:  The -- both of these are --

18           THE COURT:  Hold on one second, Mr. Glueckstein.

19           Mr. Sazant, did you --

20           MR. SAZANT:  I'm sorry, I didn't mean to

21  interrupt.  But I just wanted to ask a question.  We had also

22  raised the objection that Mr. Litan and Skip & Goose did not

23  meet the requirements to be excluded from the -- and you

24  didn't rule explicitly on that.

25           THE COURT:  Right.

1        MR. SAZANT:  So I just wanted to know --

2        THE COURT:  Okay.  And I will do so.  I think as

3  Mr. Glueckstein explained, it wasn't the fact that the

4  complaint itself had been filed, the settlement is that the

5  Debtor can settle claims if they believe they don't have

6  anything other than a preference action against particular

7  defendants.

8        Mr. Glueckstein has indicated that they believe

9  they do have other claims against these two defendants and,

10  in fact, these are the only parties, as Mr. Glueckstein

11  points that have actually been sued.  Others are also on the

12  list who haven't been sued yet.

13        So that's just part of the settlement process.  So

14  I'll overrule that objection, as well.

15        MR. SAZANT:  Thank you, Your Honor.

16        THE COURT:  Mr. Adler?  You're going to have come

17  forward because I'm not sure we're getting this on the

18  record.

19        MR. ADLER:  I just want it to be clear that, Your

20  Honor, we haven't deal with the exculpation objection that I

21  made, so we have to come back to that at some point.

22        MR. GLUECKSTEIN:  I don't know how we're coming

23  back.  Your Honor, we addressed Mr. Adler's client's

24  objection.  You heard argument from him on whatever points he

25  had open.  You overruled his objection.  I don't know what --

1          THE COURT:  I think that was on the release --

2    third party releases.  But is there a separate objection on

3    the exculpation clauses?

4          MR. GLUECKSTEIN:  There is, Your Honor. Well, then

5    again, if Mr. Adler wants to address it, he should have

6    addressed it with his objection.  If Your Honor is inclined

7    to hear it, then we should hear it.

8          MR. ADLER:  I was getting up responding to Mr.

9    Glueckstein, who had raised the board fees and the crypto

10   (inaudible).

11         THE COURT:  I'll give you the opportunity, Mr.

12   Adler.  Do you want to -- Mr. Glueckstein, do you want to

13   deal with these last two first?  I'll go back to Mr. Adler.

14   Do you want to just --

15         MR. GLUECKSTEIN:  Sure, that's fine.  That's fine,

16   Your Honor.  The last two objections are objections that were

17   filed pro se by individual creditors, both very late,

18   including one that was filed just last week, days before the

19   hearing.

20         So defer to Your Honor whether the Court is

21   inclined to consider these very late objections in any event.

22   But I will address them.  Individuals Samuel Gunawan and

23   Linda Favario, who both filed objections arguing that they

24   have rights in the Debtor's property akin to the customer

25   property arguments, variations of them that we have been

1  addressing and we addressed this morning and that are the

2  subject of the customer priority settlement.

3         These objections, Your Honor, merely selectively

4  quote from the FTX.com terms of service to claim some

5  ownership interest in the Debtor's assets.

6         As discussed earlier and in the record this

7  morning, the unrefuted evidentiary record established by Mr.

8  Mosley is that the Debtors immediately commingled any digital

9  assets deposited on the FTX exchanges in the ordinary course,

10  and the tracing of those assets to any customer would be

11  impossible.

12         Neither of these objections present any evidence

13  that they could trace any claimed assets to those held by the

14  Debtors.  In addition, any customer who simply purchased,

15  traded, or sold or traded digital assets on exchanges never

16  had any tokens or coins in any account or in their possession

17  of control.

18         At all times, as Mr. Mosley makes clear, the

19  exchange assets were held in addresses and accounts owned and

20  controlled by the Debtors, and were commingled with the

21  Debtors and other assets.

22         Lord Neuberger, in his declaration, which was

23  admitted into evidence this morning, provides a very detailed

24  analysis of the relevant English law provisions and the law

25  that's relevant to the terms of Service, considered the terms

1  of service in that context, and ultimately concludes that the

2  FTX.com exchange customers are unsecured creditors.  That

3  testimony is unrefuted.

4          Of course, as we've been discussing over the

5  course of the day today, the Debtors have, nonetheless,

6  agreed to the customer priority settlement, which benefits

7  customers with priorities of payments of assets being

8  distributed as set forth in the plan.  So the settlement of

9  those claims and the benefits of that settlement are being

10  seen by all creditors, all customers, on account of their

11  claims as treated under the plan.

12          So to the extent that the Court is inclined to

13  consider either objection, we submit the Court should

14  overrule both of these objections on their merits.

15          THE COURT:  Thank you.  Are any of the -- yes, I

16  see Ms. Favario is on the line.

17          MS. FAVARIO:  Yes, Your Honor.

18          THE COURT:  Can you turn on your camera please,

19  Ms. Favario?

20          MS. FAVARIO:  I'm doing it.  Give me a second.

21  Sorry.  Okay, here I am.

22          THE COURT:  Thank you.

23          MS. FAVARIO:  Thank you so much, Your Honor, for

24  giving me the chance to speak.  My apologies, because English

25  is not my native language, so my English is a little bit

1   exotic.  I will read my notes, so I will try to avoid to

2   waste your time just trying to argue my points.  I will just

3   read my notes for being quick.

4          THE COURT:  Can you first address the issue of why

5   you filed your objection late?  It was past the deadline to

6   file objections.

7          MS. FAVARIO:  Because I didn't know at all that I

8   could file an objection by myself without a lawyer.  I don't

9   have money for paying a lawyer.  And when I discovered was

10  too late.  And I tried, simple as that.  I just tried.  And I

11  hoped that Your Honor could read it and the public could read

12  it.  I'm sorry, I'm very naive.  Bankruptcy is not my thing.

13  I'm learning.  Actually, I'm learning a lot.

14         THE COURT:  Unfortunately, yeah.

15         MS. FAVARIO:  Yes.  So in any case, I'm extremely

16  grateful for you give me the chance to speak.  So I'm FTX.com

17  customers, and the money that I had on that platform was the

18  money I received as a compensation for a car crash that left

19  me disfigured.

20         When I was 19 years old, I had a 20 operation on

21  my face.  Looks kind of okay now, but still full of scars.

22  So this money was the only the money that I had left after

23  the operation were the only thing, the only way to give me a

24  whole day age with dignity.  Because I work as a life model.

25  So I earn between 15 and 20 pounds per hour.  And this gives

1  me just a chance to survive with dignity, but not to pay

2  attention.  So these money were my future.

3          When I saw them disappear under my eyes on the 11,

4  after the 11 November, I was first confused and disappointed

5  and then quite suicidal.  I'm also neurodivergent.  So if

6  things don't make sense, I just panic.  And in that moment,

7  nobody was giving me any sort of answer.  No one was giving

8  me any explanation.

9          Then at some point after about one year during the

10  winter 2023, I found this community on X that gave me some

11  answer.  Mainly I found this community that breaks down quite

12  complex English -- U.S. bankruptcy documents and make it

13  understandable for people as me that they have a bad English.

14          So that I start to feel a little bit more relieved

15  about thinking, well, actually, maybe something positive can

16  happen.  Then there has been the SBF trial and in the U.S.

17  criminal court, the U.S. Criminal court actually cited the

18  same FTX term of service.  And the U.S. government

19  successfully argued that customer assets were not the

20  property of FTX, but instead the property of the customers.

21          But now the proposed plans seem to ignore the

22  original and ambiguous of service, framing the assets as a

23  part of the debt towards the estate.  And I think to argue

24  now, after 22 months, that these assets are Debtor assets, I

25  don't know, seems inconsistent with the criminal court

1   findings and SBF conviction.

2           So the FTX.com term of service clearly and

3   unequivocally establish ownership rights and they say title

4   to your digital assets shall at all time remain with you and

5   should not transfer to FTX Trading.  None of these digital

6   assets in your account are the property or of or should or

7   may be loaned to FTX Trading.  FTX Trading does not represent

8   or trade digital assets in user accounts as belonging to FTX

9   Trading.

10          So this language seems to me quite clear.  I

11  didn't need any explanation about these sort of things even

12  before when I start panicking.  So this language seems quite

13  clear to me that the digital assets on the FTX.com belong to

14  the customer, not to the Debtors, and the term of service

15  grant to customer legal title to their assets.

16          So after 22 months, the Debtors have avoided these

17  most critical issues in the case, and it has not been

18  something that Your Honor has had the ability to rule on.

19  And that is important for the rule of law, I believe.  It is

20  important for contract and property rights.

21          This court, I think for what is my understanding,

22  has not had the chance to rule on these, the most critical

23  issues in the case and as a result, hundreds of thousands of

24  customers have been left feeling helpless.

25          And let's remember that, as you can hear from my

1  beautiful, exotic English, a lot of customers, the majority

2  actually of them, they are not from U.S., and very often they

3  don't even speak English, so they don't have money left to

4  hire a lawyer to explain clearly what's going on in their

5  language, in a language that they can understand.

6  And finally, it seems kind of incredible that the

7  Debtors now claim that commingling of assets and poor record

8  keeping can override the explicit term of service that

9  establish ownership rights.  Debtors may assert that the

10 failure to segregate assets justify treating customer assets

11 as a part of the estate, but this is a failure on their part,

12 not ours.

13 Under this plan, my contractual rights and my

14 ownership rights have been trampled.  My property rights have

15 been disregarded.  If the plan will be approved without

16 sorting out before the matter of term of service, and this

17 term of service will be ignored, the FTX bankruptcy will set,

18 I think, a dangerous practical precedent for property and

19 contractual rights.

20 Property rights is a human right.  Right to

21 property is protected by the Fifth Amendment of the U.S.

22 Constitution that says no person should be deprived of life,

23 liberty, or property without due process of law, nor should

24 private property be taken for public use without just

25 compensation.

1              And last quote is from one of your founding

2   fathers, Thomas Jefferson, that in a letter wrote, the true

3   foundation of republican government is the equal right of

4   every citizen in his person and property and in their

5   management.  Thank you so much for listening to me.

6              THE COURT:  Thank you, Ms. Favario.  And your

7   English is very good.  Thank you.

8              MS. FAVARIO:  Thank you.

9              THE COURT:  Anyone else wish to be heard?  Who's

10  online?  Any other objectors?  Okay.

11             MR. KYUSONG:  Your Honor, if allowed, may I take

12  the floor?

13             THE COURT:  Who's speaking, please?

14             MR. KYUSONG:  My name is Eun Kyusong (phonetic)

15  from Advanced Legal PC who have assisted some Korean and

16  Korean-American unsecured creditors in this case.

17             THE COURT:  Have you filed an objection to the

18  plan of reorganization?

19             MR. KYUSONG:  No.  Actually, a 75-year-old Korean-

20  American lady reached out to me last Friday.  So I have some

21  concern to share with you.  Is that okay?

22             THE COURT:  Unfortunately, yes, it is.  Because

23  we're way too late for new objections.

24             MR. KYUSONG:  I will be brief.

25             THE COURT:  No, it's not just about being brief.

1   It's about whether you have missed the deadline and waived

2   your right to it object or waived the right of whoever this

3   individual is to object.  Number one.

4           Number two, I don't know that you are an attorney.

5   You say you're representing somebody, but you can't represent

6   someone unless you are an attorney and you have to have local

7   counsel.  So there's all kinds of issues with the fact that

8   this was done late.

9           So unfortunately, I'm going to have to tell you

10  that I cannot hear you with regard to any issues that you

11  might want to raise.  Okay?

12          MR. KYUSONG:  I'm attorney in the registered New

13  York.  In New York.  And I'm speaking about my client based

14  on -- this is claim litigation.  So your jurisdiction is

15  allowing attorney in other state to speak, right?

16          THE COURT:  Well, if it's a claim litigation, you

17  can do that later.  Right now we're dealing with plan

18  objections, and I don't have a plan objection from whomever

19  it is you are saying you represent.  So at this point, I

20  cannot hear you.  You'll have to wait until you get to the

21  claims administration process.

22          MR. KYUSONG:  Okay.  All right.

23          THE COURT:  Thank you.

24          MR. KYUSONG:  Thank you, Your Honor.

25          THE COURT:  Let's see someone else raise their

1   hand.  Mr. Uptegrove?  Mr. Uptegrove, can you hear me?  I

2   can't hear you.  You can hear me, but I can't hear you.

3          MR. UPTEGROVE:  Apologies, Your Honor.  William

4   Uptegrove, on behalf of the United States Securities and

5   Exchange Commission.  I just wanted to address our

6   reservation of rights that we filed.  I can do that later,

7   but I just -- you were asking for people on Zoom that had

8   filed something, so I wanted to make sure that I raised my

9   hand before --

10          THE COURT:  Only with regard to these objections,

11  but -- and I can tell you, reservations of rights are -- all

12  rights are always, always reserved.  I don't need -- I don't

13  need parties to stand up and say I reserve my rights.

14  Otherwise, I'm going to be here for the rest of the afternoon

15  having people say we reserve our rights.

16          MR. UPTEGROVE:  Yeah.  Your Honor, we just wanted

17  to make clear for the record that we were -- what we put in

18  our reservation of rights that the SEC is not opining as to

19  the legality under the federal security laws of any of the

20  transactions outlined in the plan.  That's all we wanted to

21  do.  So thank you, Your Honor.

22          THE COURT:  All right, thank you.  Anyone else?

23  Okay, Mr. Glueckstein

24          MR. GLUECKSTEIN:  Thank you, Your Honor.  Just

25  really briefly, in response to Ms. Favario, we understand the

1   concern she's expressing, and we just want to be clear that

2   the Debtors here are distributing all of the assets of this

3   estate.  We're distributing every asset that we are able to

4   find.

5           We are providing a waterfall plan that's going to

6   continue to allow assets to flow if we are able to bring in

7   more assets to augment this estate.  As was outlined over the

8   course of the day, starting with Mr. Dieterich's remarks this

9   morning, we have a planned structure here that is as

10  favorable as we think we can make it.

11          We've done a lot of hard work to get there in

12  terms of trying to really maximize the recoveries to

13  customers, including with the settlements we've negotiated

14  that have allowed for the supplemental remission fund value

15  to potentially flow to those creditors as well.

16          So we understand the concerns.  We do believe that

17  customers are being fairly compensated and then some, given

18  what we're able to accomplish under the Bankruptcy Code.

19          With respect to the specific objections to the

20  terms of service, customer property, those issues have been

21  conclusively addressed over the course of the hearing today.

22  The evidence in the record, including the conclusions on how

23  to interpret those from Lord Neuberger, are unrefuted.

24          The evidence before, Your Honor, we submit,

25  establishes not only that the 1919 settlement standard with

1   respect to the customer priority settlement is satisfied, but

2   that there is no evidence in the record to refute the Debtors

3   assertions with respect to the property propositions and the

4   terms of service interpretation as before the Court.

5           So with respect to the actual objection that was

6   filed, we do ask that that, as well as the objection from Mr.

7   Gunawan, who it seems is not appearing, be (inaudible).

8           THE COURT:  Okay, thank you.  All right, I am

9   going to overrule the objections.  Ms. Favario, the Debtors

10  have put on evidence to show and made legal arguments to show

11  that the funds, regardless of what is included in the terms

12  of service, became property of the Debtor's estate once those

13  funds became commingled with everybody else's funds.

14          And in order to show that you would have a

15  particular interest in any particular piece of property,

16  including any particular cryptocurrency that you might have

17  on the exchange, it would require evidence of tracing to show

18  that the funds that you included or the crypto that you

19  deposited are directly traceable back to some particular

20  point in the Debtor's assets.  And I don't have any evidence

21  of that.

22          So at this point, I think it is a foregone

23  conclusion at this point that the funds that were in the

24  accounts, despite what might be included in the terms of

25  service, are property of the Debtor's estate at this time.

1   All the crypto has been liquidated at this point.

2           If you have a claim and the Debtors are objecting

3   to your claim, you will receive a payment.  We've had

4   referred testimony today and others have argued about how the

5   payments are going to be up to 130 and 140 percent of the

6   value of your claim based on what it was at the time of the

7   filing of the bankruptcy.

8           So for those reasons, Ms. Favario, I'm going to

9   overrule your object.

10          MR. GLUECKSTEIN:  Thank you, Your Honor.  Just so

11  the record is clear, is the Court also overruling Mr.

12  Gunawan's objection?

13          THE COURT:  Yes, and Mr. Gunawan's objection as

14  well.

15          MR. GLUECKSTEIN:  Okay, thank you.  That's from

16  the Debtor's perspective, I thought we could address all the

17  objections.  I understand Mr. Adler thinks there's an

18  outstanding issue.  To the extent Your Honor is inclined to

19  hear that, or anybody else who thinks there are outstanding

20  objections, I think we're at that point of the day.

21          THE COURT:  Okay.  Let's go to Mr. Adler and hear

22  his objection on the exculpation provision.

23          MR. ADLER:  Good afternoon, Your Honor.  David

24  Adler from McCarter & English on behalf of the (inaudible)

25  parties (inaudible).  We objected on August 16th to the

1    exculpation provision under both the plan and the litigation

2    for the plan administration agreement, for the FTX recovery

3    trust.

4              I've taken a look at the changes that have been

5    made to Section 10.7 of the plan, and they have put in the

6    language that limits the exculpation to the petition date to

7    the effective date.  I think there might be a typo because at

8    the end in (c), it just references the effective date but not

9    occurring on or after the petition date.

10              I do think that it would be -- we said it in our

11    objection that exculpation should be limited to the committee

12    and the Debtor and no other parties.  To the extent the Court

13    wants to include other parties, we think it might be helpful

14    to have a list somewhere as a plan supplement of exculpated

15    parties so that everyone knows who's being exculpated.  That

16    was on the plan.

17              On the litigation on the plan administration

18    agreement, paragraph 8.  And this is from document 262262,

19    filed on October 3.  I'm on page 4 of 9.  Paragraph 8 is

20    exculpation.  And I had asked during the examinations one of

21    the witnesses about the plan administrator.

22              Paragraph 8 is giving the plan administrator, who

23    does not yet exist, an exculpation.  And when you read this

24    provision of the agreement, this amounts to essentially an

25    advance waiver, advance release.

1          So we're going to rely on Mallinckrodt, Your

2    Honor, that basically, Your Honor ruled that entities that

3    don't exist, you know, at the time the plan is confirmed, are

4    not entitled to the benefit of exculpation.  And we think

5    that paragraph 8, which is essentially advance release,

6    should be stricken from the -- from the FTX recovery -- from

7    the plan administration agreement.

8              THE COURT:  Okay, thank you.

9              MR. ADLER:  Thank you.

10             THE COURT:  Mr. Glueckstein?  Do you need a

11   minute?

12             MR. GLUECKSTEIN:  Your Honor, instructing

13   exculpation 10.7 of the plan, as Mr. Adler correctly notes,

14   we have revised that language in consultation with the U.S.

15   Trustee's Office with respect to the scope of that provision.

16   They were comfortable with it.  We don't believe that a list

17   of people needs to be included with that.  This language is

18   standard language that's included, the Court has included

19   frequently to pick up the title types of professionals and

20   advisors, representatives that are exculpated.  The

21   definition of exculpated parties is contained in the plan.

22             So from our perspective, the language as revised

23   in response to the U.S. Trustee complies with all legal

24   obligations and should be approved.

25             With respect to the form of the plan

1   administration agreement, that is, you know, that is

2   disclosed, and the plan supplement is ultimately an agreement

3   that is going to be entered into and executed by the Debtor's

4   recovery trust in Allen Hill (phonetic).  And the terms of

5   that are negotiating a contract from the perspective of not

6   only the plan administrator, but of the Debtor's perspective

7   of setting up the recovery trust, we think that the terms,

8   including an exculpation provision in this agreement, is in

9   the business judgment of the Debtor is appropriate, and so

10  they intended to move forward with it.

11          We are, of course, asking for approval of the form

12  of the agreement on behalf of the current Chapter 11 Debtor,

13  but it is contemplated to be a three-way agreement that will

14  govern only post-effectiveness activities.

15          THE COURT:  Can I see a copy of that section?  I

16  don't have it in front of me?

17          MR. GLUECKSTEIN:  Yes, Your Honor.  May I

18  approach, Your Honor?

19          THE COURT:  Yes, please.

20          MR. GLUECKSTEIN:  Section 8.

21          THE COURT:  Okay.  Thank you.  Anything else?

22          MR. GLUECKSTEIN:  No, Your Honor.  Well, the only

23  thing I would just to -- so the record is complete, we of

24  course, are asking for approval of the form of these

25  agreements on behalf of the Debtor so that they could be

1   moved forward and executed on.

2          They're not -- we're obviously not prejudging

3   anything that's going to happen or conduct of anybody or any

4   actions taken by the plan administrator post-effectiveness.

5   Of course, if somebody believes that there is something that

6   gives rise to a claim, they would have the ability to bring

7   that at the appropriate time.

8          THE COURT:  Okay.  All right.  I'm satisfied from

9   reading that language.  I think it's appropriate at this

10  point.  It's only a proposed agreement that has not yet been

11  executed and is subject to, I presume, negotiation once the

12  plan administrator is identified.  So I will overrule the

13  objection.

14         Also, under the exculpation under the plan, I

15  think is also appropriate based on the U.S. Trustee's

16  revisions that they requested, I think those are appropriate,

17  and therefore I will also overrule that objection.

18         Anything else, Mr. Glueckstein?

19         MR. GLUECKSTEIN:  No, I don't.  Unless there are -

20  - I guess we just confirm that there are no other outstanding

21  objections that the Court has not addressed.

22         THE COURT:  Okay.  Did we miss any of the

23  objections from anybody?  Going once, going twice.  Okay.  No

24  one has spoken, so I guess we are done with objections.

25         MR. GLUECKSTEIN:  Okay.  I had a couple comments

1  with respect to the order, Your Honor, but I think I really

2  want to address that now or after.

3          THE COURT:  Do we have -- I'm sorry, I couldn't

4  hear you.

5          MR. GLUECKSTEIN:  I'm sorry.  Sorry, Your Honor,

6  just two things with respect to the Debtor's proposed form of

7  order.  I have one and I think Mr. Dietderich has one that's

8  just been coming in as things are evolving here.

9          I just wanted to note for the record, we were

10 asked to note for the record by the U.S. Department of

11 Justice that there are provisions that we have included in

12 the plan that were negotiated.  Sorry.  In the confirmation

13 order that are negotiated provisions starting with Section

14 153, paragraph 153 of the order that were multi-agency

15 negotiations amongst the DOJ and other the various

16 governmental units that resolved any concerns any of those

17 government entities had.

18         So that's why they're not here today.  They asked

19 us to put that on the record, and I think Mr. Dietderich has

20 one late point on the board.

21         MR. DIETDERICH:  Thank you, Mr. Gluckstein.  Your

22 Honor, one last --

23         THE COURT:  Can I call you Mr. Glueckstein just to

24 make it even.

25         MR. DIETDERICH:  Thank you, Mr. Dieterich.  Yes,

1  Your Honor, one last comment also from our -- from the

2  federal government, back to my earlier remarks.  There's a

3  few creditors that have raised a question about language

4  recently added by the SEC.  It's Section 154, the proposed

5  form of order.

6          That language says that beneficial interest in the

7  consolidated wind-down trust will not be certificated and

8  cannot be transferred, sold, pledged, or otherwise disposed

9  of or offered for sale.  This language is intended, of

10  course, to address the application of the U.S. securities

11  laws and came from the Securities and Exchange Commission.

12          I just wanted to note for the record, in response

13  to some of these creditor inquiries, it is not intended to

14  prevent the ordinary operation of the claims trading market.

15  And of course the Debtor will honor claims trades and make

16  distributions to the applicable holders of claims on the

17  record dates as otherwise provided in the plan.

18          THE COURT:  Okay.

19          MR. DIETDERICH:  And that's it.

20          THE COURT:  Did the SEC want to have anything to

21  say about that one?  Anyone here for the SEC or online?  Mr.

22  Uptegrove?

23          MR. UPTEGROVE:  Yes, Your Honor.  William

24  Uptegrove for the United States Securities and Exchange

25  Commission.  Counsel is absolutely correct, though we concur

1   with what he restated on the record.

2           THE COURT:  Okay, thank you.

3           MR. DIETDERICH:  Thank you, Mr. Uptegrove.

4           THE COURT:  All right, anything else?

5           MR. DIETDERICH:  That concludes our presentation.

6           THE COURT:  All right, well, I guess we've

7   resolved all the objections, so I will approve the plan of

8   reorganization.

9           I do want to take a look at the proposed form of

10  order, revised form of order, because it came in early this -

11  - or, you know, late this morning, actually just a little

12  less than an hour before the hearing.  So I want to take a

13  look at it.  I will take a look at that.  Is that the final-

14  final version or are we going to have other potential

15  changes?

16          MR. DIETDERICH:  It's final-final.

17          MR. GLUECKSTEIN:  That's it, Your Honor.  And that

18  has limited changes that address primarily language we agreed

19  to add on the disputed claims reserve, which I addressed this

20  morning, formalizing the fact that we filed a motion on that.

21  (Inaudible), but we'll obviously let Your Honor take a look

22  at it.

23          THE COURT:  All right, I'll take a look and as

24  soon as I get through it, we'll get it entered for you.

25          MR. DIETDERICH:  Thank you very much, Your Honor.

1          THE COURT:  Thank you.  Well, I just want to say

2    congratulations, and I think this is a model case for how to

3    deal with a complex, very complex Chapter 11 bankruptcy

4    proceeding.  And I applaud everybody who was involved in the

5    negotiation process and resolving of objections and getting

6    this down to just a few plan objections at the time of the

7    hearing.

8          I think you did -- you all did a lot of hard work

9    and I greatly appreciate it.  So thank you all very much.

10          MR. DIETDERICH:  Thank you.

11          THE COURT:  Okay.  I guess that's it for the these

12    Debtors today, right?  Do we have anything else?

13          MR. LANDIS:  Thank you, Your Honor.  For the

14    record, Adam Landis from Landis, Rath & Cobb.  Seems a little

15    anticlimactic, but we do have a number four item on our

16    agenda, which is the Celsius litigation administrator's

17    motion for relief from the automatic stay.  We've listed all

18    the responses received, and also there's a similar motion in

19    the Chapter 15 case that has been filed.

20          THE COURT:  All right, that one I'm going to

21    continue to hold in abeyance until I rule on the issue of

22    whether or not Celsius has an appropriate claim or not.  I

23    think it would be premature at this point to have argument on

24    lifting the stay until I know whether there's something lift

25    the stay for.

1          MR. LANDIS:  We were at pains to list this on the

2    agenda, Your Honor, but the Debtors certainly appreciate you

3    are adjourning that until the underlying matter is resolved.

4          THE COURT:  Okay, thank you.

5          MR. LEVY:  Your Honor.  Richard Levy for the

6    Celsius litigation administrator.  I was in the back of the

7    room and unfortunately could not hear you clearly when you

8    spoke to Mr. Landis.

9          THE COURT:  I was saying that because I still

10   haven't ruled on the issue of whether or not the claim that

11   you filed is appropriate or not.  I'm going to hold this in

12   abeyance until I make that ruling, and then we'll have -- so

13   I know whether I even need to have a hearing on whether to

14   lift the stay.  And then we'll go from there so.

15         MR. LEVY:  So that, Your Honor, would relate only

16   to the U.S. cases.  We still have the Chapter 15 case.

17         THE COURT:  We'll deal with that.  Are we dealing

18   with that with your agenda, Mr. Shore?

19         MR. SHORE:  Yes, Your Honor.

20         THE COURT:  Okay, so we'll deal with that when we

21   get to Mr. Shore's agenda.

22         MR. LEVY:  I didn't hear Mr. Shore.

23         THE COURT:  He said yes.  That's on the agenda for

24   discussion in connection with that case as opposed to --

25         MR. LEVY:  So that's going to be carried to

1    another date as well?

2            THE COURT:  No, no, we're going to talk about it

3    today once we get to it.

4            MR. LEVY:  Okay.  Sorry, Your Honor.  Thank you.

5            THE COURT:  No problem.

6            MR. LANDIS:  Your Honor, again, for the record,

7    Adam Landis of Landis, Rath & Cobb, on behalf of the Debtors.

8    That does conclude the agenda for the FTX Trading case today.

9            THE COURT:  Okay, thank you, Mr. Landis.

10           All right, Mr. Shore.

11           MR. SHORE:  Well, Your Honor, we have only one

12   thing on -- again, Chris Shore from White & Case for the

13   Chapter 15 Debtor.

14           We have only one item on the agenda today, which

15   is the lift stay motion, and I would just turn over, unless

16   Your Honor wants to take a break, turn over the podium to the

17   Celsius administrator, and they can make their argument, and

18   I will respond.

19           THE COURT:  Okay.  Do we have any evidence on this

20   issue or is it all legal argument?

21           MR. SHORE:  We had put in the evidence at the last

22   hearing with respect to the other declarations.  The Celsius

23   administrator, I believe, wants to move in one objection or,

24   sorry, one sur sur reply declaration.  And I'd like to be

25   heard on that when we address it.

1          THE COURT:  Okay.  So no new evidence from the

2   joint administrators?

3          MR. SHORE:  Correct.

4          THE COURT:  Okay, thank you.  All right.  Mr.

5   Levy?

6          MR. LEVY:  Good afternoon, Your Honor.  Richard

7   Levy, Pryor Cashman for the Celsius litigation administrator.

8   As a preliminary matter, Your Honor --

9          THE COURT:  Now I'm having trouble hearing you,

10  Mr. Levy, can you pull him a little closer?  Try it there and

11  see if that works.

12         MR. LEVY:  Is that better?

13         THE COURT:  That's better, yes.  Thank you.

14         MR. LEVY:  Thank you, Judge.  Sorry, Your Honor.

15  You have trouble hearing me, I have trouble hearing you, and

16  I have a hearing problem, which makes it all -- I apologize,

17  Your Honor.

18         THE COURT:  We'll get through it.

19         MR. LEVY:  Your Honor, as a preliminary matter, to

20  complete the evidentiary record at the last hearing, Your

21  Honor granted us an opportunity to file a sur reply affidavit

22  declaration from -- excuse me -- from Bahamian counsel, which

23  we did at Docket No. 190.  The affidavit of the declaration

24  of Tara Cooper Burnside, a member of the firm of Higgs &

25  Johnson in the Bahamas.  And I can proffer that, Your Honor,

1  if you need anything more than a simply --

2          THE COURT:  No, I've seen it.  So let me just ask

3  you, Mr. Shore, are you objecting to (inaudible)?

4          MR. SHORE:  I do have an objection to a couple of

5  paragraphs.  I can either address that now or let counsel go

6  and just carry that objection.  I just ask you to strike, I

7  think, five paragraphs.

8          THE COURT:  All right, let's leave -- you finish

9  up, and then we'll go from there.

10         MR. LEVY:  Thank you, Your Honor.  Your Honor,

11  when we were here a couple of weeks ago, we began the

12  discussion of whether or not this application should be

13  granted relief from the stay by Your Honor with respect to a

14  proposed subsequent transferee litigation against the Celsius

15  -- excuse me -- against the FTX U.S. -- the FTX DM.  I

16  apologize, Your Honor.  I'm trying to find ones that are

17  (inaudible).  I apologize.

18         THE COURT:  Take your time.

19         MR. LEVY:  Picking up from where we were, Your

20  Honor, at that time.  Your Honor, I've left this out of my

21  notes back at my seat.  May I go back?

22         THE COURT:  Certainly.

23         MR. LEVY:  Thank you, Judge.  Your Honor, can I

24  ask for the Court's indulgence?  Could we have a five-minute

25  break while I get everything in order?

1          THE COURT:  Sure.  Let's make it ten, and we'll

2    come back at 3:30.

3          MR. LEVY:  Very good.

4          THE COURT:  Thank you.

5          (Off the record at 3:22 p.m.)

6          (On the record at 3:31 p.m.)

7          THE BAILIFF:  All rise.

8          THE COURT:  Thank you.  Please be seated.  I

9    forgot something.  All right.

10          MR. LEVY:  Is this good?  Judge, can you hear me

11    here?

12          THE COURT:  Yes.  Thank you.

13          MR. LEVY:  Judge, Richard Levy for Pryor Cashman

14    in behalf of the Celsius litigation administrator.  Thank you

15    for the break, Judge.  I appreciate that.

16          To finalize the admission of Ms. Cooper's -- Ms.

17    Burnside's declaration, Judge, I believe she is on the line.

18    Both parties, I understand, have waived or the other party

19    has waived cross examination.  But if the Court has any

20    questions, she will be available.

21          THE COURT:  Okay, so we resolved the issues that

22    Mr. Shore wanted to strike some of the declaration?

23          MR. SHORE:  No, but that does not require any

24    cross examination to establish.

25          THE COURT:  Okay, so I'll -- the declaration is

1  submitted without objection, then, subject to Mr. Shore's

2  wanting to strike certain provisions.

3           MR. LEVY:  Judge, when we were here last time, you

4  were asking the question why should you be deciding this

5  matter?  The submission by Ms. Burnside makes clear why you

6  should be deciding it.  And I will further amplify why you

7  should be deciding it and why you should be deciding it now.

8           To put a finer point on it, even with our having

9  filed lift stay motions in both the United States and

10 Bahamian courts, we are bound to do so because we're dealing

11 with dueling Debtors in both of those jurisdictions.  Because

12 there are Debtors on both sides of the aisle, lift stay

13 relief is required from both of those courts.  We need relief

14 from this court in order to sue in our United States claims

15 because we seek to pursue a judgment under the United States

16 Bankruptcy Law in a United States Bankruptcy Court.

17          Now, we filed a proof of claim in the Bahamas

18 because we had to in order to participate in the Bahamas case

19 if we wanted to receive a distribution in that case.

20          However, Your Honor, as was pointed out in the

21 proof of debt filed as Joint Official Liquidator's Exhibit 4,

22 we make very clear that instead of submitting to the

23 jurisdiction of the Court for purposes of determination of

24 our claim by the Joint Liquidators, we are asking for relief

25 from the stay in order to proceed with a proceeding, a court

1  adjudication of the issues that we have raised in our draft

2  complaint which arise under Sections 547 and 550 of the

3  United States Bankruptcy.

4         While we may have submitted to the jurisdiction of

5  the court in the Bahamas for various purposes, that does not

6  mean that the United States lift stay proceeding cannot or

7  should not go forward.  The fact that the -- excuse me -- it

8  cannot go forward.  And in fact, as a practical matter, it

9  should.  Let me explain why.

10         To the extent that we seek to proceed on our proof

11  of debt through a proceeding and not through Joint Official

12  Liquidators' adjudication, we need an indication from both

13  courts that we can do so.

14         Your Honor would be asked in the first instance to

15  grant relief from the automatic stay so that we can pursue

16  the litigation.  We know we have to go back to the Bahamian

17  court.  We have a lift stay proceeding already pending in

18  that court.  It's not teed up anywhere near we are in this,

19  but if Your Honor were to grant us relief, we think that that

20  would have exceedingly probative value for the Bahamian court

21  for this reason.

22         We are asking for relief under United States

23  Bankruptcy Law.  That's something that's relatively alien in

24  my understanding.  And I think Ms. Burnside could probably

25  amplify this.  U.S. preference law, bankruptcy law, is not

1  something that comes before the Bahamian courts with any

2  regularity.  They deal with local law.  But we're asking for

3  a proceeding to happen here in the United States where the

4  Bahamian state does not even apply.

5          But be that as it may, we need both courts to say,

6  yes, go ahead and proceed.  And we believe it would be more

7  efficient for Your Honor to make the initial ruling which

8  says, hopefully, yes, you can proceed with your United States

9  preference claim.

10         I want to know for sure that the Bahamian court

11  will go along with that.  And that may take a while because

12  the Bahamian system is somewhat slower than Your Honor's

13  courtroom.

14         It would be very similar, Your Honor, in a

15  situation I talked about last time I was here where a court

16  facing a lift stay proceeding says, yes, I want to let

17  another court handle the determination of the claim, the

18  adjudication allowance, the liquidation of the claim.  That's

19  effectively what we are asking the Bahamian court to do.

20         But I don't think the Bahamian court will be as

21  influenced on whether or not to grant that relief, unless

22  Your Honor tells us, which we ask, that, yes, you can proceed

23  on it here.  And frankly, Your Honor, the United States

24  courts are way more familiar with American bankruptcy.

25         It's hard to believe that a Bahamian court not

1  well versed in American bankruptcy law would take unto itself

2  that determination.

3         On the flip side, as I said, it makes sense for a

4  Bahamian law based controversy to be decided.  It makes sense

5  for a Bankruptcy Law-based controversy to be decided by the

6  United States court that's fully versed in the body of law.

7         Now, Your Honor, in her declaration, Ms. Roll

8  (phonetic), her sur reply declaration, Ms. Roll suggested

9  that it was doubtful, and I use that word doubtful that a

10 Bahamian court would recognize a claim based on Sections 547

11 and 550 because Bahamian preference law is different.

12         That's not the point.  The point is a claim

13 predicated on United States Bankruptcy Law which we request

14 to be adjudicated in the United States and then taken back to

15 the Bahamian court for consideration in connection with the

16 allowance of our proof of debt, that's what matters.  We're

17 asking for the Bahamian court, hopefully with Your Honor's

18 prior approval that we can proceed with an American

19 bankruptcy litigation.  The Bahamian court will say sure, go

20 ahead and do that.  Come back and see me in the Bahamas when

21 you've got your case completed.

22         Your Honor, in effect, doesn't have to do anything

23 more today other than say yes, you can proceed under the

24 automatic stay.  We know we have to deal with the Bahamian

25 court before we can go farther with where we are.

1        To be clear, we recognize that at the end of the

2   process, we have to bring any U.S. judgment back to the

3   Bahamian court in order to participate in the proceeding at

4   that time.  We are not trying to do an end run around the

5   Bahamian court, and we are certainly not trying to do

6   anything untoward in this court.  We are simply asking for

7   what is our right, I believe, under the circumstances, relief

8   from the automatic stay.

9        Now there are good and plenty reasons why Your

10  Honor should do that, in addition to the fact that a Bahamian

11  court is not a court of U.S. Bankruptcy Law.  What we have

12  asked for is permission to proceed in front of Judge Glenn in

13  New York for a couple of reasons.

14       He is well versed in the proceedings.  He has all

15  of the experience in the Celsius case.  He has all of the

16  Celsius proceedings centralized before him.  It would be

17  efficient for that court to continue to hear all matters

18  relating to that proceeding.  And once again, Judge, we still

19  have to go back to the Bahamas if and when we prevail in that

20  proceeding.

21       I think, Judge, that's about all I need to say at

22  the moment unless Your Honor has questions.

23       THE COURT:  I just want to be clear what relief

24  you're asking me for.  You want me to lift the stay?  Say

25  yes, I'm going to lift the stay to allow you to proceed with

1   your adversary proceeding in New York.

2          MR. LEVY:  Yes, Your Honor.

3          THE COURT:  So why -- I mean, this is a Bahamian

4   entity that's in a liquidation proceeding in the Bahamas with

5   assets located in the Bahamas.  Number one, why does U.S.

6   Bankruptcy Law even apply?  And number two, why should I --

7   why shouldn't I allow the Bahamian court to decide whether

8   they want to hear it or whether they want Judge Glenn to hear

9   it?

10         MR. LEVY:  This is not a usual ancillary

11  proceeding.  This is a case now that involves a Chapter 11

12  plan under which distributions are going to be made to the DM

13  customers with U.S. assets based on transactions that those

14  parties engaged in.  Celsius was a U.S.-based entity.  The

15  transfers came from U.S.-based entities.

16         As we pointed out, Your Honor, the judge in New

17  York has made various determinations and is administering the

18  stay and that's where we submit it should be determined.

19         I'm not asking Your Honor to do anything more

20  today than say, yes, you can proceed.  Just make sure you do

21  it right with the Bahamian court.  And I believe, Your Honor,

22  that a Bahamian court may have some question about whether or

23  nothing not to allow a proceeding under U.S. Bankruptcy Law

24  to proceed separately than the proceeding there.  But a

25  Bahamian judge doesn't deal with bankruptcy every day.

1          THE COURT:  Well, why can't I just say, okay, I'll

2     lift the automatic stay but it's up to the court in the

3     Bahamas to decide whether they're going to hear it or Judge

4     Glenn is going to hear it?

5          MR. LEVY:  Not exactly what I anticipated to hear

6     from Your Honor.  That certainly gets us over the first

7     hurdle, which is to get relief from the automatic stay

8     subject to our going to the Bahamian court to make a further

9     determination.

10          I believe, Your Honor, that recognizing what I

11     will call the primacy of U.S. Bankruptcy jurisdiction, it's

12     better for a U.S. Bankruptcy Court to be hearing it, even if

13     Your Honor grants us that relief.  I can't tell you that the

14     behavior court is going to say, no, I'm not going to let you

15     go back to New York.  At least let us have the relief that

16     we've asked subject to going to the Bahamas and doing what we

17     have to do next.

18          THE COURT:  And again, I don't know if you

19     answered my question.  Maybe you did.  I just didn't catch

20     it.

21          MR. LEVY:  I'm sorry Judge.  I didn't hear you.

22          THE COURT:  I have -- one of my questions that I

23     asked, I'm not sure.  You may have answered it and I just

24     didn't catch it.  But why does U.S. Bankruptcy Law apply to

25     Celsius's claims against a Bahamian entity in the Bahamas?

1           MR. LEVY:  The transfers came from Celsius, a

2   United States-based entity.

3           THE COURT:  Well, they came -- these, again, are

4   the same type of situation where customers withdrew funds,

5   pre-petition and then deposited them in the Bahamas?

6           MR. LEVY:  I can't say that for sure, Judge.  I

7   don't know all those details.  I do know that the money came

8   out of Celsius United States.  That took --

9           THE COURT:  Kind of an important issue.

10           MR. LEVY:  Pardon me?

11           THE COURT:  Kind of an important issue to know.

12           MR. LEVY:  It is, Judge.  And as far as I'm

13   concerned, Judge, the 500 or so cases, the transfers emanate

14   from the United States.  That's a basis for jurisdiction just

15   as it's a basis for bankruptcy venue.  Where are the assets

16   located.  Here, the transfers came from the United States.

17           THE COURT:  But the assets, from what I

18   understand, and maybe you can correct me if I'm wrong and Mr.

19   Shore will address it too, the assets, as far as I

20   understand, are in the Bahamas.  That there's this joint

21   agreement between the U.S. Debtors and the Bahamian Debtors

22   that a claimant can say I want my claim decided in the U.S.

23           MR. LEVY:  Well, that's an interesting question,

24   Your Honor, because I don't think any of us knows yet exactly

25   how many entities who were claimants accepted U.S.

1  jurisdiction versus Bahamian court jurisdiction.  That's

2  something that may have to get sorted out.

3          But let me posit this to Your Honor.  Your Honor

4  grants us leave from the automatic stay and says, go ahead,

5  go litigate in front of Judge Glenn.  Judge Glenn hears the

6  proceeding on the initial claims that have left -- that left

7  Celsius and are now in the hands of the former Celsius

8  customers who are FTX customers.

9          We get a judgment.  We get a judgment saying

10 you're right.  You now have initial transfers that have been

11 avoided.  They were avoided in the United States -- based on

12 United States law.  We have to go back to the Celsius court.

13 We have to ask for permission to enforce that judgment in the

14 Bahamian proceeding, and we will continue to pursue our

15 subsequent transfer remedies against anybody anywhere who is

16 subject to jurisdiction.

17          THE COURT:  All right.  Okay.  Let me hear from

18 you.

19          MR. LEVY:  Your Honor, I'll reserve in case you

20 have further questions.

21          THE COURT:  Thank you.

22          Mr. Shore?

23          MR. SHORE:  Thank you Your Honor.  Chris Shore

24 from White & Case on behalf of the JOLs.

25          As I said, I have one evidentiary issue, and then

1  I want to address each of Your Honor's questions that you

2  just asked.  Let me deal with the evidentiary issue first.

3          We ended last hearing with the Court authorizing a

4  sur reply, no question.  And I stood up and I said I want to

5  make clear this is a sur reply to address the issues that

6  were raised for the first time in the sur reply of Ms. Roll-

7  Capp.  Nobody said anything otherwise.

8          Then we got the Burnside declaration, and we

9  object to paragraphs 6 through 11 as improper sur sur reply

10  and ask the Court to strike them.  These paragraphs concern

11  the jurisdictional scope of the Bahamian stay and how it

12  applies to claimants in the Bahamian proceedings.

13          Let me set up the record on this first to explain

14  why I think this issue should have been raised long before

15  last week when they filed this sur reply.  Celsius filed its

16  motion on June 5th.  It's Docket 155 in the 15.  The JOLs

17  filed their opposition on July 8, which included two

18  declarations that the declaration of Ms. Roll-Capp, which is

19  in evidence, was at 166.

20          At paragraphs 7 through 12 of that declaration,

21  which was filed in July, Ms. Roll-Capp describes the effect

22  of the Bahamas stay on Celsius and she concludes at paragraph

23  11, if the Celsius litigation administrator has claims

24  against FTXDM, Bahamian law requires that he first seek to

25  lift the Bahamas stay or seek leave from the Bahamas court.

1  That was a -- evidence that was submitted to the Court on

2  July 8th.

3          On September 4tj, Celsius filed its reply at

4  Docket 173 in the 15, and that response is silent as to the

5  lift stay point.  They did not attempt to, at that time,

6  rebut anything that was said in Ms. Roll-Capp's declaration

7  with respect to the extent of the stay.  Five paragraphs.

8          Then on September 10th, we filed the supplemental

9  Roll-Capp declaration at 181.  In one paragraph, paragraph 5,

10  Ms. Roll-Capp declares, as I stated in my initial

11  declaration, and she summarizes what she said, which was to

12  emphasize the point of the following paragraphs, which is

13  that, having read our opposition, Celsius decided to actually

14  go seek lift stay not until September, as opposed to seeking

15  stay from this court in July.

16          So now on September 4th -- or no, sorry, not at

17  September 4th -- Ms. Burnside seeks to establish that the

18  stay only applies in the Bahamas.  That was testimony that

19  should have been provided in connection with the reply.  It

20  is not appropriate to have it come in as sur sur reply at

21  this point.

22          And I want to make clear why the record needs

23  protecting here from just people lobbing in new stuff at the

24  last second.  In the paragraphs at issue, Ms. Burnside quotes

25  extensively to Vocaline (phonetic).  In that block quote,

1    that court made clear, this is not the case where the person

2    sought to be restrained from proceedings abroad has made

3    himself a party to the proceedings, such as, for example,

4    filing a proof of claim.

5         But this case is that case.  We're not dealing

6    with what happens, what is the extent of a stay in a case in

7    which the party has not submitted to the jurisdiction.  We're

8    dealing with a case in which the party has submitted

9    jurisdiction.

10         So just as Mr. Levy came last time with --

11         MR. LEVY:  Levy.

12         MR. SHORE:  Levy.  Sorry.  Came with his own

13    cases, we could go back and forth all day.  I've got the

14    cases here that deal with the instance in which a party has

15    submitted to the jurisdiction of the Court, and they stand

16    for the obvious proposition.

17         If you go into a court and you seek to have your

18    claim adjudicated in that court, which is trying to provide

19    radical distribution to all, you're not free to just go

20    around the world and seek to have dozens, hundreds of other

21    courts adjudicate your claim without seeking relief from the

22    court to which you submitted your claim.

23         So the point, the whole point here is I think you

24    should just strike 6 to 11.  The record exists as it existed

25    when the opposition to the motion was submitted months ago.

1          THE COURT:  Okay, let me ask Mr. Levy if he wants

2    to respond to that.

3          MR. LEVY:  Sure, Your Honor.  I note, Your Honor,

4    that in as much as Mr. Shore wants to remove those

5    paragraphs, he's arguing from them even before we've gotten

6    to that point.  Your Honor, this was an affidavit by Ms.

7    Burnside to explain the full panoply of what she perceives to

8    be the issue here.  Whether Your Honor can rule, whether the

9    Bahamian court should rule.

10         I dispute the question of whether or not this is

11   something that needed to be -- needed to be handled

12   previously.  We got Ms. Burnside.  Ms. -- sorry, Ms. Roll's

13   supplemental affidavit two days before the hearing.  The key

14   issue was now in front of Your Honor at that hearing as I

15   started to present cases and Your Honor said, I need to hear

16   more.  I need to understand what's going on.  And we said we

17   would not go beyond the confines of Ms. Roll's supplemental

18   declaration.  We have not done that, Judge.

19         We have limited ourselves to Ms. Roll's

20   supplemental declaration, the points that were made, and

21   these are important points, Your Honor, in considering which

22   court has jurisdiction or should have jurisdiction to act

23   first.  We think the provision should remain before the

24   Court.

25         THE COURT:  Mr. Shore?

1      MR. SHORE:  I'm not disputing they're important

2  points.  All I'm saying is if they had an important point to

3  make, it should have been made in the normal sequence in

4  responding to the objection which was filed months ago, not a

5  week before the hearing.

6      THE COURT:  All right, I'm not going to strike

7  them, but I'll take them for what they're worth.  I did read

8  the declaration, so I'm familiar with what Ms. Burnside had

9  to say.  So we'll just leave it at that for now.

10      MR. SHORE:  Okay.  I have two points to make on

11 the objection to lift the stay in the Chapter 15 recognition

12 order.  One is the question of sequencing.  Which court

13 should decide the two pending lift stays, first?  And second,

14 the lack of cause at this point to lift the stay in the 15.

15      Point one, we believe this court should let the

16 Bahamas court decide first where the Celsius avoidance claim

17 gets liquidated and then have this court follow on at a later

18 date.  Either leave the stay in place or follow the direction

19 of the Bahamian court.

20      And I want to start with the actual state of play

21 because I think it's kind of getting lost, and it gets

22 sometimes lost because these motions were -- or the companion

23 lift stay against the U.S. Debtors was pending.

24      FTXDM has an ongoing liquidation in the Bahamas,

25 which is the recognized foreign main proceeding with the JOLs

1  as recognized foreign representatives.  The Celsius

2  administrator contends that he has claims against FTXDM, not

3  against the U.S. Debtors.  That's the subject of the late

4  claim, but against FTXDM based upon these alleged facts.

5           During the Celsius preference period customers of

6  Celsius directed that Celsius move their crypto and cash in

7  excess of $350 million to accounts at either the U.S. Debtors

8  or FTXDM in the name of those customers that were listed in

9  that sealed spreadsheet.

10          Wherefore, the Celsius administrator argues, FTXDM

11  is liable to him for those transfers as a subsequent

12  transferee.  Okay.  And now he's filed that claim in the

13  Bahamian liquidation.  That is, the liquidator has asserted a

14  proof of claim for monies that he alleges were transferred to

15  FTXDM accounts for customers removing their cash and crypto

16  from the Celsius platform during the preference period.

17          But he's insisting that rather than having the

18  Bahamian court liquidate that claim, he should be able to

19  liquidate that claim in the New York Bankruptcy Court.

20          We oppose and believe that the claim must be

21  liquidated in the Bahamas, and here's the current state of

22  play.  I think we all agree that two courts must act.  This

23  court must lift the Chapter 15 stay that's applicable to

24  Bahamian court to lift its stay.  Or, and I want to pause

25  here, address a supplemental anti-suit injunction.

1          So when we filed our opposition to the stay, the

2    Celsius administrator responded by filing a lift stay motion,

3    months after they filed the lift stay motion in this court,

4    essentially acknowledging that they needed to get relief of

5    the Bahamian court, as Ms. Roll-Capp had pointed out.

6          They then filed the sur reply, the sur reply

7    taking the position that regardless of what the JOLs were

8    saying, they believed that the stay of the Bahamian court

9    only applied within the territorial jurisdiction of the

10   Bahamas, taking the position they were free to go anywhere in

11   the world and seek to recover assets of FTXDM without relief

12   from the Bahamian court.

13         So we have now filed a belt and suspenders anti-

14   suit injunction action against them in the Bahamas to ensure

15   that pending further order of the Court, they're not free to

16   go around the world and seek to have their claims liquidated

17   anywhere else, which would be a stay violation.  So that's

18   the current state of play.

19         So now, we have a lift stay pending against the

20   JOLs here in New York.  We have a lift stay pending in the

21   Bahamas.  We have an anti-suit injunction application pending

22   in the Bahamas, and we think that the Bahamian court should

23   get the first shot at deciding, then have this court address,

24   to answer your sequencing point.

25         We don't believe it would be appropriate for Your

1   Honor to rule on the Chapter 15 lift stay and then send it
2   back to the Bahamian court to address the lifting of the
3   Bahamian stay.
4          And this is fundamentally a question of comity
5   between this court, not the New York Bankruptcy Court, but
6   this court as the Chapter 15 court and the Bahamian court as
7   to how to best protect their common debtor and their
8   creditors.
9          I don't want to spend too much time on comity,
10  other than to say it's -- I've always found it to be a do
11  unto other courts as you would have done to yourself.  This
12  is a question of a claim being asserted against the Bahamian
13  Debtor in a different proceeding.  And I believe Your Honor
14  would be rightfully upset if what happened here is the
15  Celsius administrator had gone to the Bahamian court and
16  asked the Bahamian court to rule on whether or not their
17  claims against the U.S. Debtors were timely or valid or
18  anything else.  This is fundamentally a core responsibility
19  of the Bahamian court to allow or disallow claims against the
20  Bahamian Debtor.
21          But I want to, you know, beyond that general
22  concept of comity in which a Chapter 15 court routinely
23  defers to an appropriate, sound decision of a court in the
24  foreign main proceeding, there's a very specific reason why
25  we're asking the Bahamian court to address this, and I'm

1  going to have to back up for just a second.

2         You heard earlier today in the confirmation

3  hearing the discussion of a customer claim and how that was

4  defined in the classification scheme of the Chapter 11

5  Debtor's plan.  We also have a customer/noncustomer

6  delineation in the global settlement agreement which Your

7  Honor approved and which the Bahamian court has approved and

8  which will go effective when the U.S. Debtor's Chapter 11

9  plan goes effective.

10         There is a definition of FTX customer entitlement

11 claim that's at page 8 of the GSA which is attached to JOL-1.

12 And it makes very clear that a customer claim are monies that

13 were deposited on the exchange in the name of the creditors.

14 Celsius is not alleging that the customers were -- or that

15 they were a customer of the Debtors.  Their argument is

16 customers of the Debtors moved our money.  So they do not fit

17 the entitlement of customer claims which will receive

18 depending on where you elect essentially the same treatment,

19 whether you're in the Bahamas or the U.S.

20         THE COURT:  How did they file it in the Bahamas?

21 Is it similar here?  We had customer claims and noncustomer

22 claims.  It had a different proof of claim form.

23         MR. SHORE:  They filed a noncustomer claim.

24 They're contending that they have a customer claim.  But I

25 don't -- when we're talking about cause and likelihood of

1  success, I, for the life of me, don't understand their

2  argument.

3        THE COURT:  Is it the same issue that they claim

4  they have an ownership interest in the customer's account?

5        MR. SHORE:  It's not in their lift stay motion.

6        THE COURT:  Okay.

7        MR. SHORE:  So I don't know.  The issue of a

8  noncustomer claim is as follows.  Under the approved GSA, the

9  Bahamian Debtors have $15 million to pay noncustomer claims,

10 and in those noncustomer claims include all the trade of all

11 the Bahamian operations of the Debtors that existed as of the

12 petition date.  That amount was set as part of the process

13 long before Celsius ever decided to come forward and say

14 they've got a 350-plus million dollar claim.  But that is now

15 final.

16        And so one of two things is going to happen.  If

17 that claim is allowed in the amount they want, the trade will

18 get wiped out in the Bahamas, just diluted down to nothing.

19 Or there will be potentially residual money which will flow

20 back to the United States estates through the mechanisms of

21 the GSA.

22        If that's going to be the effect of the allowance

23 of this claim, it would seem to me that the Bahamian court is

24 the best court in the first instance to address who's going

25 to be liquidating that claim and in what timeframe.

1        If what's going to happen here is the noncustomer

2   entitlement pool is going to be held up while this claim is

3   litigated in a New York Bankruptcy Court pursuant to the

4   Federal Rules of Civil Procedure and the Federal Rules of

5   Evidence, the Bahamian court should be the one deciding

6   whether or not we can all sit around and wait for that to

7   happen or whether this gets addressed in the Bahamian

8   proceedings.

9        So to answer your question, why shouldn't I just

10   lift the stay and send it back to the Bahamian court, it's

11   because from a comity perspective, it's more appropriate, we

12   believe, for Your Honor to say, you know what?  Why don't I

13   hear from the Bahamian court on issues that are central to

14   its estate, and then I'll decide whether or not it's an

15   appropriate order, which I will recognize in the Chapter 15,

16   or I'm going to go a different way and lift the stay, or I'm

17   going to go a different way and not lift the stay, however

18   you want to do it.

19        But it seems from a sequencing perspective in a

20   15, it's better to have the foreign main proceeding court

21   address that originally.

22        To the extent, though, that we're going to get in

23   to the merits of the lift stay motion in the 15, I've got

24   four reasons why you should not lift the stay.

25        First, the Bahamian court's always going to have

1  to act here.  Lifting the stay doesn't take away the need for

2  the Bahamian court to deal with the anti-suit injunction with

3  the lift stay motion or, as counsel just pointed out,

4  domesticating the judgment.

5           Lifting the stay though, point two, is going to

6  create another forum in which we're going to have to do

7  battle with them over a $15 million capped recovery.  We

8  should be looking for ways to streamline the process, not to

9  fall into the trap that all U.S. people want to do is

10  litigate.  We don't.

11          We're trying to resolve a limited pool situation

12  and exploding this into necessary proceedings in the Bahamas

13  and allowing a preference litigation to go forward in New

14  York doesn't seem an appropriate way to conserve resources

15  here.

16          But more importantly, if you look at the Rexing

17  (phonetic) factors, there are some key issues here that Your

18  Honor would have to rule on, which in fairness should be done

19  by the Court.  In order to lift the stay, you're going to

20  have to find that the DM estate is not prejudiced.

21          But the question of prejudice to the DM estate,

22  particularly laying out what I just did with respect to the

23  treatment of noncustomer claims, I don't know that you're in

24  a position to address that as well as the Bahamian court or

25  that you have the record from which you can make that

1  conclusion.

2          And think about likelihood of success on the

3  merits.  Counsel stood up and said this is easy, it's just a

4  preference action.  Preference action to go forward in New

5  York.  New York court can deal with this, but we all know

6  from our experience in this case that it's not that easy.

7          Think about one issue, the ownership of the

8  assets.  Under the DM terms of service.  Is the DM estate an

9  initial transferee?  That is, that the money was transferred

10  to them.  Is it a subsequent transferee?  What happens with

11  respect to commingling?

12          Your Honor is appropriately making those decisions

13  for the U.S. Debtors.  But opining on, without a record in

14  front of you that they have a likelihood of success that

15  they'll be able to show that the Bahamian Debtor was a

16  subsequent transferee, that is, the title to those assets

17  went to the customers and that somehow we took it later, I

18  don't know how you go about addressing those concepts.

19          Same with the issue of can they get an attachment?

20  They have a likelihood that they're going to be able to get

21  this customer money at a later date.  How does Your Honor

22  rule on this record with respect to the ability of the

23  Bahamian court to garnish creditor distributions?

24          And then finally, I don't think there's any rush

25  here.  Why does this have to be decided now?  Again, we have

1    the motions pending in the Bahamian court.  Counsel pointed

2    out in her supplemental sur sur reply declaration that the

3    Court's expected to act.

4           The only issue that counsel raised was, well,

5    we're further along in this proceeding.  But the reason

6    they're further along in this proceeding is because instead

7    of filing their lift stay application on June 5th in the

8    Bahamian court, just like they did here, we're just further

9    behind in sequence.

10           So they can't -- they can't create the problem and

11   say we should be proceeding here in New York because we

12   didn't file our lift stay motion until two months after we

13   were supposed to.

14           So I think at this point, again, primarily, I

15   think this is a question of comity that Your Honor should

16   just be deferring to the Court.  We can come back quickly to

17   Your Honor after the Bahamian court decides whether or not to

18   leave lift the stay to see where that claim is going to be

19   liquidated and we can handle it quickly with Your Honor.

20           I'm not going to necessarily have a problem while

21   reserving rights if the Bahamian court says I'm lifting the

22   stay and allow it to go forward in New York, and I'm going to

23   have a hard time arguing to Your Honor that you should stop

24   it.

25           But by the same token, if the Bahamian court says

1  I'm not lifting the stay, even if Your Honor were inclined

2  under U.S. law, if this was a Chapter 11 debtor to allow it

3  to proceed in the New York court, I think really you should

4  be deferring in that case to the Court, reserving your right

5  to find that in recognizing that order there was some defect

6  in due process or something like that that you wouldn't want

7  to recognize that order.

8          So I think sequencing, let's go first.  But if

9  you're inclined to take it up, let's go first in the Bahamas.

10 But if you're inclined to take it up, I'd ask that you deny

11 it.

12         THE COURT:  Okay.  Thank you.

13         Mr. Levy?

14         MR. LEVY:  One moment, Your Honor.

15         THE COURT:  Yep.

16         MR. LEVY:  Thank you, Your Honor.  Let me be

17 brief, Your Honor, but the first thing I do want to say is

18 that the anti-suit injunction is news.  We haven't been

19 served with it.  We know little, if anything, about it other

20 than what Mr. Shore has explained today.  Another 11th hour

21 tactic to try to delay this proceeding.

22         In any event, I have told Your Honor that we know

23 we have to go back to the Bahamas at some point for final

24 allowance of our claim, which we hope the merits of will be

25 litigated in the United States.  We know that the stay in

1  Bermuda -- in the Bahamas is not extraterritorial.  The fact

2  that they filed an anti-suit injunction this morning, I

3  gather it was this morning, just proves the fact that the

4  Bahamian stay doesn't extend beyond the shores of the

5  Bahamas.

6          Now, this is a non-routine case.  Mr. Shore would

7  have you believe that courts always defer in a Chapter 15

8  situation in comity rules.  This is not a routine case.  This

9  is a case in which distributions are being made under

10  different plans to customers of DM, the Bahamian Debtor, and

11  money is already going out the door.

12         We now have a -- it's almost ready to go out the

13  door.  We now have a confirmed plan through the gentleman

14  sitting to my right.  The efforts of the Debtors.  That's

15  going to start.

16         In the meantime, whatever rights we may have that

17  we can demonstrate to a court with jurisdiction to hear our

18  claim, we run the risk that the remedy is being frustrated

19  merely by the passage of time.

20         I will note, Your Honor, one of the last things

21  Mr. Shore said was who do we really have a right to recover

22  against?  It's clear in our papers, Your Honor, that the

23  progression is Celsius to initial transferees, the customers.

24  We win.  We have rights against them, but we also have rights

25  to go down the chain.  How FTXDM held its assets, we'll get

1    to that point if we need to.  We have a right to look to any

2    initial -- to all of the initial transferees and all of the

3    subsequent transferees that we can find, recognizing under

4    Section 550, we only get one single recovery per transferee,

5    per initial transfer.  So we'll get to that point, Judge.

6              But those points belong with the Court having

7    jurisdiction over the adjudication of a proceeding, which we

8    believe should be the United States court.  Under comity

9    rules, I don't think that that necessarily applies here,

10   Judge, because we are asking the Bahamian court to let us

11   come back here just as we are asking you to endorse our

12   application.

13             And this is a dual court situation because we have

14   two debtors.  We need, Your Honor's imprimatur.  We need the

15   Bahamian imprimatur.  There's no harm for Your Honor to rule

16   on this at this point and let us take that ruling back to the

17   Bahamian court to say, look, we have a U.S. judge recognizing

18   that the claims on which we plan to sue are U.S. claims under

19   the Bankruptcy Code which the Bahamian courts do not

20   administer.

21             Ms. Roll, when I was speaking earlier, said she

22   doubted that a Bahamian court would recognize a U.S.

23   preference claim.  She didn't have any citation to

24   (inaudible).  It was her doubt.  It was not an absolute

25   statement that it will never happen.

1          And I suggest, Your Honor, that because we don't

2     intend to use the Joint Liquidators' adjudication process, if

3     the Bahamian court will let us take on a proceeding, it's

4     going to be handled by a court here.  And that court's

5     judgment, hopefully in our favor, we will take back for the

6     adjudication process.

7          Your Honor, I think that's all I have.  Unless you

8     have questions.

9          THE COURT:  Okay.  No questions.  Thank you.

10         MR. LEVY:  Thank you, Judge.

11         THE COURT:  All right.  I'm not going to lift the

12    stay at this point.  I don't -- I just don't have enough

13    information, I think, and I think a lot of this is going to

14    be connected to what I do with the U.S. Debtors if I'm going

15    to lift the stay for them.  And I'm not going to make that

16    decision until I decide whether Celsius actually even has a

17    claim against the U.S. Debtors.

18         So there's a lot of steps here that need to be

19    happening before I get to a decision about whether I'm going

20    to lift the stay to allow something to go forward in New York

21    that might have an impact on this case and my decisions about

22    the U.S. Debtors as well as their Haitian Debtors.

23         So at this point I'm not going to rule.  I'm going

24    to hold this in abeyance until I rule on the question of,

25    one, whether Celsius has a claim against the U.S. Debtors

1   and, two, whether I would lift the stay against the U.S.

2   Debtors and allow the case to go forward in New York or

3   whether to allow it to go forward here.

4          And I think once I make those decisions, then we

5   can follow along with what happens with the Bahamian Debtors

6   at the end of the day.

7          MR. LEVY:  Your Honor, one housekeeping matter

8   that I should have addressed while I was at the podium, my

9   local counsel reminds me that as the movant in this matter

10  and subject to Your Honor's having taken, will take it under

11  advisement, carry it without a decision because obviously the

12  decision may affect us, given that we have a tolling

13  agreement.

14         I should move the admission of all declarations

15  and exhibits into the record so that it is complete before

16  Your Honor.

17         THE COURT:  Which declarations are we talking

18  about?

19         MR. LEVY:  The Roll declarations.  They're in the

20  exhibit list, Your Honor.  But the exhibit lists, Your Honor,

21  that were filed for this proceeding.

22         THE COURT:  Weren't they admitted in the first

23  hearing?

24         MR. LEVY:  It's at Docket No. 192 is the full list

25  of exhibits and declarations.

1      THE COURT:  I think all of them have been admitted

2   at this point, they were either admitted the first hearing --

3      MR. LEVY:  Your Honor, Ms. Burnside's declaration.

4   That was --

5      THE COURT:  That, I said, was submitted.

6      MR. LEVY:  Yes.

7      THE COURT:  So everything's in already.

8      MR. LEVY:  Thank you, Judge.

9      THE COURT:  Okay.  All right.  Anything else?

10  Okay, well, thank you all very much.  As I said, I will try

11  and get these rulings out as quickly as possible, because I

12  know we need to start moving things forward and get these

13  issues resolved.  So I thank you all for your patience, and

14  we are adjourned.

15      MR. GLUECKSTEIN:  Thank you, Your Honor.

16      (End of Proceedings.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    October 8, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    October 8, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25