**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

**In re: FTX TRADING, LTD., et al., Debtors.**

**Chapter 11 Case No. 22-11068 (JTD) (Jointly Administered)**

**OBJECTION TO EVERSHEDS SUTHERLAND'S FEE APPLICATION**

**TO THE HONORABLE JOHN T. DORSEY, UNITED STATES BANKRUPTCY JUDGE:**

Lidia Favario, an original creditor in the above-captioned case, respectfully submits this objection to the fee application of Eversheds Sutherland (US) LLP ("Eversheds"), counsel to the Ad Hoc Committee of Non-U.S. Customers ("Ad Hoc Committee"). For the reasons detailed below, Eversheds' requested fees should be denied in their entirety or, at a minimum, stayed pending a thorough investigation into the committee's conduct and Eversheds' representation.

---

**PREAMBLE**

**I. INTRODUCTORY STATEMENT**

As a creditor directly impacted by the financial collapse of FTX, I assert my right to be heard in these proceedings, with a vested interest in ensuring transparency and accountability in the administration of the bankruptcy estate.

The fee application at issue raises significant concerns regarding the purported "substantial contribution" of Eversheds to these proceedings. The record reflects that the Ad Hoc Committee, rather than advancing the interests of non-U.S. customers, engaged in actions that resulted in wasted resources, self-dealing, ineffective representation and undisclosed conflicts of interest.

Given the extraordinary financial impact of this bankruptcy on creditors, it is imperative that all professional fees be scrutinized to ensure compliance with the Bankruptcy Code and that only those contributions which demonstrably benefit the estate are compensated. As outlined herein, Eversheds fails to meet this standard.

**II. JURISDICTION AND STANDING**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated February 29, 2012.

Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

As a creditor and affected party in these proceedings, I have standing under 11 U.S.C. § 1109(b) to raise objections regarding the administration of the estate, the allocation of fees, and the conduct of parties seeking compensation from estate assets. Courts have recognized that creditors have a direct interest in ensuring that professional fees are reasonable and aligned with the objectives of the bankruptcy process. See In re Glob. Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011).

### III. LEGAL STANDARDS

Under 11 U.S.C. § 503(b)(3)(D), a party seeking compensation from the estate must establish that it made a "substantial contribution" to the case. This requires demonstrating that its actions conferred a tangible, measurable benefit on the estate or creditors. Courts have consistently held that efforts which are duplicative, self-serving, or otherwise fail to advance the resolution of the bankruptcy case do not meet this standard. See In re Buckhead Am. Corp., 161 B.R. 11, 15 (Bankr. D. Del. 1993).

Additionally, legal fees must be "actual, necessary, and reasonable" under 11 U.S.C. § 330(a)(1). The reasonableness of fees is evaluated based on factors such as the results achieved, the efficiency of services rendered, and whether the applicant's efforts were aligned with the interests of the estate. See In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 840 (3d Cir. 1994).

Moreover, professionals seeking compensation have a duty to avoid conflicts of interest and ensure transparency in their representations. Under Bankruptcy Rule 2014, all connections with parties in interest must be fully disclosed. Failure to disclose such connections may warrant the denial or disgorgement of fees. See In re eToys, Inc., 331 B.R. 176, 189 (Bankr. D. Del. 2005).

Furthermore, the equitable treatment principle under 11 U.S.C. § 1129(b) mandates that similarly situated creditors be treated fairly. The allocation of estate funds must not create unjustified disparities between creditors, particularly where original creditors who suffered direct financial losses are disadvantaged relative to claim buyers who purchased claims at a discount. The use of estate funds to support the fees of professionals representing claim buyers—who stand to profit from estate distributions—creates an inequitable result that violates the fundamental principles of fairness embedded in the Bankruptcy Code. See In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005) (requiring that distributions under a plan be fair and equitable to creditors).v

---

### ARGUMENT

### I. LACK OF SUBSTANTIAL CONTRIBUTION

Under 11 U.S.C. § 503(b)(3)(D), legal fees are compensable only if they result in a "substantial contribution" to the bankruptcy case, meaning tangible benefits to the estate or creditors. Eversheds fails this standard, as the Ad Hoc Committee's actions were ineffective, redundant, self-serving, not representative of "divergence of interest between the FTX.com customers and general unsecured creditors whose collective interests are represented by the [Unsecured Creditors Committee, the ("UCC")] UCC," and detrimental to creditor interests.

- **Stayed Litigation with No Benefit**:
  The Ad Hoc Committee on December 29, 2022, initiated litigation concerning customer property rights but stayed the proceeding shortly after filing in April 2023 and subsequently stayed the litigation indefinitely three months later, resulting in wasted resources. Despite accruing significant fees, the Ad Hoc Committee did not advance the case, leading to no meaningful resolution of the core issues affecting creditors.

  The Ad Hoc Committee filed a lawsuit on December 29, 2022, asserting that customer assets were held in trust and not part of the Debtors' estate. Shortly thereafter the Ad Hoc Committee filed a motion for partial summary judgement on March 24, 2023. However, a month later on April 21, 2023, the Ad Hoc Committee stayed the litigation for three months and then stayed this litigation indefinitely on August 2, 2023, negating any potential benefit while accruing millions of dollars in fees with very little focused on advancing legal theories and arguments relating to this issue. This inaction left creditors without the protection and advocacy the lawsuit promised.

- **Minimal Efforts on Critical Issues**:

  Analysis of the fee petitions during the Substantial Contribution Period shows that out of 2,162 hours billed, only 133.7 hours (6%) were dedicated to the most critical issue of whether customer assets belonged to the estate, representing approximately $160,000 of fees out of $2.2mm incurred (which represents approximately 1/1,000[th] of a percent of the $11.2B in FTX.com identified customer asset liabilities disclosed at the time by the Debtors). Notably, out of the hundreds of pages of fee statements and thousands of itemized fee entries showed a complete lack of focus on this core issue. Specifically, only 116 itemized entries were related to this critical issue:

- TOS/Terms of Service: 30 references

- English Law: 26 references

- Customer Property: 28 references

3

- Property of the Estate: 12 references
- Constructive Trust: 28 references

This reflects a disproportionate focus on non-critical matters while neglecting the very issue central to the Ad Hoc Committee's purported purpose, specifically to:

> "maximize recoveries on the claims of members against FTX Trading Ltd. and its affiliated Debtors (collectively, the "Customer Claims") on account of the assets members deposited, held, received, or acquired on the FTX.com platform (collectively, the "Customer Assets"), leveraging, where beneficial, the position that the Debtors have no equitable interest in the Customer Assets and/or that constructive trust theories require priority of distribution on the Customer Claims. Membership is open to all creditors with Customer Claims that are aligned with the Ad Hoc Committee's purpose."

This particular issue justifiably warranted *more fees* and legal analysis during the Substantial Contribution Period, not less, but the Ad Hoc Committee focused its attention on other matters, significantly deviating from its stated purpose.

- **Failure to Challenge the Galaxy Digital Investment Advisor Agreement:** On September 12, 2023, the Debtors entered into an Investment Advisor Agreement with Galaxy Digital. The Ad Hoc Committee did not object or reserve rights, despite its mandate to protect customer property. Instead, individual pro se creditors filed objections, highlighting asset sales not yet deemed estate property. The committee's silence forced unrepresented creditors to bear the burden of advocacy.

- **Inaction on Self-Dealing Transactions:** In March 2024, Galaxy Digital purchased $620 million in locked Solana ("SOL") tokens from the estate at $64 per SOL, despite a market value of $185 per SOL—resulting in well over a billion-dollar loss to the estate based on contemporaneous trading data from CoinMarketCap. This self-dealing transaction, where Galaxy acted as both advisor and buyer, violated basic fiduciary principles and the Investment Advisor Agreement approved by the court, as well as having no semblance of a so called "Chinese Wall" between Galaxy's investment banking and asset management operations, yet the Ad Hoc Committee raised no objection.

Had they challenged this sale, the estate could have retained significant value for creditors, likely well in excess of $1B.

4

- **Lack of Critical Mass of Creditor Representation During the Substantial Contribution Period**

The Ad Hoc Committee's purported membership during the Substantial Contribution Period included "approximately $2 billion in aggregate claims" however $1.5B of that figure was an unsubstantiated estimate with the below description:

> "This Member is serving in a representative capacity on behalf of a purported class of plaintiffs seeking certification in the litigation styled as Lam v. Bankman-Fried, et al., No. 22-07336 (N.D. Ca. Nov. 21, 2022) [D.I. 1], which the Member believes consists of approximately 6,000 FTX.com customers who held assets on the FTX.com platform with an approximate aggregate dollarized amount of $1.5 billion."

First, a class action claimant who filed a motion in a separate court would not have standing as was ruled by the Court related to the objections to the Disclosure Statement held on June 25, 2024 regarding the objections filed by the MDL class action claimants, nor would a single member, whether a lawyer or not, have authority to act in a "representative capacity" without each individual class action claimant being included in the 2019 filing in their individual capacity and claim value.

Second, a mere two months later this member voluntarily dismissed the case and never substantiated the value of the claims he purported to represent.

As such, the Ad Hoc Committee's membership during the Substantial Contribution Period did not exceed $500 million, or roughly 4% of the non-US customer liabilities reported of $11.2 billion. Furthermore, throughout the cases the membership of the Ad Hoc Committee did not surpass 100 members when the non-US customers totaled approximately 1 million, and of the $6B in reported claim value, 95.6% of that value was held by only 17 members comprised exclusively of purchased claims (inclusive of claims across FTX.US, non-customer claims, and preferred equity holder claims). As such, the Ad Hoc Committee at no point in the case represented a "diverse and large membership base" nor "efficiently and effectively keep a pulse on the day-to-day experiences of Dotcom Creditors." A representative sampling of such customers would easily disprove such a statement.

- **Overstated Role in Government Settlements and Other "Significant Role[s]"**

On one hand the Ad Hoc Committee represents that it was in a "consultation capacity" related to the CFTC and IRS settlements but on the other hand indicates that they "Play[ed] a significant role in working with the Debtors and [UCC] to shape the Plan to accommodate the concept of FTX.com customers receiving post-petition interest at the Consensus Rate of 9.0%, surplus value through distributions from the Supplemental Remission Fund funded by recoveries otherwise payable to holders of subordinated governmental claims." The contradictions aside, only a Debtor is privy to confidential settlement discussions with governmental entities, however this statement either indicates that the Ad Hoc Committee had a "significant role" in an inappropriate capacity in the case or, more probably, is grossly overstating its value contribution to the case by taking credit for a settlement that was wholly negotiated by the Debtors.

Notably, the only other "significant role" cited by the Ad Hoc Committee to support it's significant contribution to the case includes the statement that they "play[ed] a significant role in working with the Debtors and the Official Committee to negotiate and refine the Plan, and liquidating trust agreement, garner key support for the Plan, amend the solicitation procedures, coordinate with the Joint Official Liquidators, address confirmation objections and consult with the Debtors and the Official Committee on key plan settlements, including settlements with the FTX MDL Plaintiffs and the preferred equity shareholders, and ultimately secure confirmation of the Plan" as well as "a consultation capacity to the Debtors on monetization of tokens and other key venture assets, including the sale of the Debtors' Anthropic shares and the Debtors' interest in FTX Japan." Importantly, all the above citations are wholly duplicative of the direct role the UCC is tasked with undertaking in the case and thus should be completely dismissed as any evidence of any value contribution, let alone substantial contribution, to these cases.

- **Inappropriate Burden on Estate Assets Wholly Appropriate for Claim Buyers to Cover Attendant Fees**

Given the make up of the Ad Hoc Committee where in excess of $5.5B in petition date value claims have been acquired by claims buyers (at a significant discount), the associated costs of the ad hoc committee expenses should not be borne by the estate but rather borne by the individual members of the committee, who collectively have invested billions of dollars into purchasing claims from individual customer creditors. It is wholly inappropriate for estate assets to be allocated to such legal expenses in light of not only the facts outlined herein, but also by the

fact that these funds should bear the cost of legal expenses that were subservient to solely their interests in the case. The aggregate fees of the Ad Hoc Committee legal professionals in this case total approximately $8.8 million and inclusive of their investment banker advisor, Rothchild, total approximately $21.2 million. These costs should not be shifted to the Estate but rather be assumed by the members of the Ad Hoc Committee, whose interests the Ad Hoc Committee advanced to the expense and detriment of not just their other members, but of all creditors of these cases.

**Relevant Case Law:**

- *In re Celotex Corp.*, 227 F.3d 1336 (11th Cir. 2000): Fees are justified only when services demonstrably enhance the estate, not when efforts are abandoned or ineffective.

- *In re Buckhead America Corp.*, 161 B.R. 11 (Bankr. D. Del. 1993): Duplicative or negligible contributions do not warrant compensation from estate funds.

- *In re Lister*, 846 F.2d 55 (10th Cir. 1988): A substantial contribution requires measurable success, not merely initiating actions that are later abandoned.

---

## II. FAILURE TO PROTECT CUSTOMER INTERESTS UNDER THE PLAN SUPPORT AGREEMENT

The Ad Hoc Committee neglected its duty to enforce the Plan Support Agreement ("PSA") and adapt to changing circumstances, undermining creditor interests.

- **Unchallenged PSA Breaches:**
  The PSA, executed on October 16, 2023, required the Debtors to meet certain milestones as conditions to the commitments of the Ad Hoc Committee's support. Specifically, the milestones included:

- December 16, 2023 – File amended plan and disclosure statement (with information describing the KYC process and applicable deadlines)

- March 1, 2024 – Order approving the solicitation materials and disclosure statement

- June 1, 2024 – Confirmation order entered by the court

- July 1, 2024 – Plan effective date to have occurred no later than this date

  While a draft plan was filed on December 16, 2024, it did not include any details regarding the KYC process and applicable deadlines. Notably the KYC details would only be filed nearly a year later on November 22, 2024,

buried within the Debtors' One Hundred Thirtieth (Non-Substantive) Omnibus Objection. The remaining milestones were materially breached by months where the disclosure statement hearing occurring at the end of June 2024 (four-month delay), the confirmation order occurring in early October (five-month delay), and the plan effective date occurring in early January 2025 (six-month delay). Despite these material breaches the Ad Hoc Committee neither reserved rights nor filed a motion to enforce the PSA, or sought any concessions as a result of those material breaches, allowing the Debtors to repeatedly breach the PSA with impunity.

- **Omission of Venture Company Structure**:
  The PSA contemplated a Venture Company to manage venture assets (PSA § 4.2), a structure completely absent from the December 2023 plan draft. The committee's failure to object or propose alternatives abandoned a mechanism that could have maximized creditor recoveries by segregating high-value assets with dedicated operations and oversight needed to oversee the monetization of such complex assets separately from the Wind Down Trust.

- **Material Difference in Governance Structure**

  The terms of the PSA outlined that the plan administer of the Wind-Down Estate would report to an independent oversight board of five members "jointly selected and mutually agreed by the Ad Hoc Committee and the Official Committee." The composition of the final Wind Down Board consists of eight members, including all pre-effective date board members, two members of the Joint Official Liquidators, and only one Ad Hoc Committee/UCC appointed representative (who inexplicably could not be a holder of a claim in these cases and whose inclusion on the board will cease once customer and non-customer claims receive 100% of their allowed amounts plus interest), thus depriving creditors of having a voice and oversight in the Wind Down Trust.

- **Material Difference in Class Structure**

  The terms of the PSA outlined that the class hierarchy would include FTT claims ahead of preferred equity holders in the repayment structure. This hierarchy was reversed two months later in the draft plan filed in December 2023 without justification. Subsequently, multiple members of the Ad Hoc Committee purchased preferred equity holder claims, indicating an expected recovery to equity holders under the Plan, thus producing an inequitable outcome for non-US Customers who were also holders of FTT tokens. Thus, the Ad Hoc Committee specifically advanced the interest of a

select few of its members to the direct detriment to the creditors the Ad Hoc Committee purported to represent.

- **Outdated Strategy Despite Full Recoveries**:
  The PSA included a 15% clawback provision, premised on sub-par value recoveries. However, by November 2023, customer claims had a market value that exceeded 60%, where such funds expected at least a 15% IRR on their purchase value of such claims. Given the timing expectations of distributions from the Debtors, claim buyers part of the Ad Hoc Committee were already forecasting well above a 100% recovery. Advised by Rothschild, and with members having invested billions of dollars into purchases of claims, the Ad Hoc Committee should have foreseen this value recovery estimate and negotiated better terms to prioritize original creditors, or at a minimum renegotiate such element of the PSA upon the material breaches that occurred thereafter, yet it took no action.

**Alternative Actions**:

The Ad Hoc Committee could have enforced the PSA deadlines via motion, or sought concessions from the Debtors resulting from these material breaches, including, but not limited to, proposed reinstating the Venture Company, seeking to eliminate the clawback settlement percentage entirely, increasing the customer priority distribution under the waterfall, modifying the governance structure, or any other modification that would enhance non-US customer creditor distributions and recoveries.

**Relevant Case Law**:

- *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005): Parties must hold debtors accountable for PSA breaches to protect creditor rights.

- *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011): Inaction that harms creditor interests negates claims of substantial contribution.

- *In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006): Committees must adapt strategies to evolving case dynamics.

---

### III. UNDISCLOSED CONFLICT OF INTEREST AND DIVIDED LOYALTIES

Eversheds' undisclosed representation of an individual Ad Hoc Committee member in related matters compromises its independence and is evidence of divided loyalties, which justifies fee denial.

- **Nature of the Conflict:**
  Erin Broderick of Eversheds represented Wincent Investment Fund PCC Ltd.

prior to and during the formation of the UCC and sat in on multiple UCC meetings throughout the case.

- **Non-Disclosure**:
  Eversheds did not disclose this relationship in its retention application (Docket No. 2238), violating transparency obligations under Bankruptcy Rule 2014.

- **Impact on Decisions**:
  The Ad Hoc Committee's failure to challenge or reserve rights with respect to the Galaxy Digital Investment Advisor Agreement and PSA breaches aligns with the interests of claim buyers seeking quick, discounted payouts rather than maximizing estate value for all creditors. This suggests Eversheds prioritized its individual members over the broader creditor body, in addition to questionable legal ethical standards.

This lack of transparency suggests that its representation of the Ad Hoc Committee was compromised by divided loyalties and potential undisclosed conflicts of interest, as well as an inequitable outcome for the CFTC settlement that favored select members at the expense of the non-US customer creditors.

- **Unbalanced Representation**

  The Ad Hoc Committee primarily represented the interests of claim buyers rather than original creditors. The Eversheds Rule 2019 filings even indicate that 95.6% (Exhibit 1) of the committee's members by claim value among less than 17 members (at least 4 of which are affiliates of other individual members) are secondary claims market buyers, who acquired claims at substantial discounts.

**Relevant Case Law:**

- *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998): Undisclosed conflicts warrant fee denial to preserve proceeding integrity.

- *In re Pillowtex, Inc.*, 304 F.3d 246 (3d Cir. 2002): Divided loyalties undermine effective representation, disqualifying fee awards.

- *In re eToys, Inc.*, 331 B.R. 176 (Bankr. D. Del. 2005): Full disclosure of potential conflicts is mandatory for compensation eligibility.

**IV. INEQUITABLE OUTCOME UNDER THE PLAN**

The Ad Hoc Committee's failure to advocate for a fair distribution mechanism disadvantages original cryptocurrency holders, violating bankruptcy principles.

- **Disproportionate Benefits to Claim Buyers**:
  The Supplemental Remission Fund (Plan § 7.3) distributes recoveries equally among claim holders, ignoring that this outcome disproportionately benefits claim buyers who purchased primarily fiat and stablecoin claims at significant discounts to face value, while many original creditors who held volatile cryptocurrencies held their claims with the expectation that the Supplemental Remission Fund would specifically benefit the cryptocurrency appreciation only and not inequitably benefit claims holding fiat currencies or stablecoins. For example, SOL, valued at roughly $16 on the petition date has consistently traded in excess of $125 for the past year, BTC, valued at roughly $16,800 on the petition date, is now trading in excess of $80,000, and ETH, valued at roughly $1,270 on the petition date, is now trading in excess of $2,000. This allows claim buyers, with significant USD dollar denominated claims, to achieve a windfall under the Plan — e.g., a $1 million claim consisting of solely fiat or stablecoins may recover well in excess of $1.4 million (with only approximately $250,000 attributable to post-petition interest) while a corresponding $1 million claim made up entirely of SOL would receive an equivalent $1.4 million (where the current valuation of $1 million of SOL would be in excess of $13 million, $12 million dollars in excess of what 1 million $1 stablecoins would be valued at today). This resulting structure in aggregate stands to redistribute estate assets totaling billions of dollars to claim buyers to the direct detriment of original claimants who held crypto assets.

Furthermore, prior to voting on the plan, creditors had a reasonable expectation that the Supplemental Remission Fund would be available only on account of cryptocurrency claims (and not fiat or stablecoin claims or portions thereof). Not only was the CFTC Supplemental Remission Fund structure previewed in documents provided in advance of Sam Bankman-Fried's sentencing hearing in March 2024 (Exhibit 2) but they were also on record by Andrew Dietderich during the hearing held on June 25, 2024, when he stated:

> "The general unsecured creditor would not have access to the supplemental remission fund that we proposed to the CFTC. That would be available only to customers and lenders that effectively have cryptocurrency contracts."

At no time has the Ad Hoc Committee furthered any arguments or objections to any treatment under the plan that inequitably benefits approximately 10 of their

individual members, to the detriment of not only their remaining members, but the broader class of claimants they purport to represent. If the Ad Hoc Committee had a fiduciary duty to such creditors, which the Ad Hoc Committee has gone to great lengths to point out that they do not, they would be in violation of that fiduciary duty. Perversely, the Ad Hoc Committee's Cover Letter (Doc 29861) touts their contribution to the case from their "consultation capacity to the Debtors... including the CFTC and IRS settlements that paved the way for access to the supplemental remission fund for customers" when those very settlements disproportionately benefitted only a small portion of their own membership base.

- **Overcompensation of IRS Junior Claim:**
  The Junior IRS Claim, estimated at $0 in the June 2023 disclosure statement (Docket No. 19143), may now receive $685 million under the plan given that the claim buyers expect well in excess of the Debtor's high estimate of $16.5 billion in recoverable assets that is sufficient to purchase equity holder claims that only recover after the Junior IRS Claim is paid in full. Thus, the Ad Hoc Committee prioritized the recoveries to its members to the detriment of maximizing customer distributions. The Ad Hoc Committee's silence on this probable outcome is further evidence of their divided loyalties and prioritization of selected members over non-US customers.

- **Harm to Creditors:**
  Original creditors lose billions in potential recoveries due to the unchallenged SOL sale to Galaxy and UCC members and inequitable treatment under the plan.

**Alternative Actions:**

The Ad Hoc Committee could have proposed a distribution mechanism under the Supplemental Remission fund that only distributed to creditors based on the cryptocurrency portion of their claims versus a pro rata distribution that provides a windfall to their claim buyer members or objected to the IRS claim structure and required a redistribution of the Junior IRS Claim to the Supplemental Remission Fund.

**Relevant Case Law:**

- *In re Jevic Holding Corp.*, 787 F.3d 173 (3d Cir. 2015), *aff'd*, 580 U.S. 451 (2017): Distributions must align with equitable principles, not favor one class unjustly.

- *In re Armstrong World Industries, Inc.*, 432 F.3d 507 (3d Cir. 2005): Plans violating 11 U.S.C. § 1129(b)'s fair and equitable standard are impermissible.

- *In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003): Committees must ensure distributions reflect creditor priorities.

---

## V. CONCLUSION

Eversheds has not demonstrated a "substantial contribution" under 11 U.S.C. § 503(b)(3)(D). The Ad Hoc Committee's stayed litigation, failure to challenge detrimental transactions, and inaction on PSA breaches and plan inequities—compounded by Eversheds' undisclosed conflicts—harmed original creditors while benefiting claim buyers. Awarding fees would deplete estate funds without justification.

**WHEREFORE**, the undersigned respectfully requests that this Court:

(a) Deny the Ad Hoc Committee's fee application in its entirety;

(b) Alternatively, stay the fee application pending further investigation;

(c) Order disclosures of the Ad Hoc Committee's membership, financial interests, and decision-making records;

(d) Investigate Eversheds' conflicts arising from representing an individual UCC member; and

(e) Grant such other relief as the Court deems just and proper.

**Respectfully submitted,**
**Lidia Favario**

**Exhibit 1**

*Verified Ninth Supplemental Statement Of Eversheds Sutherland (US) LLP And Morris, Nichols, Arsht & Tunnell LLP Pursuant To Bankruptcy Rule 2019 [D.I. 26058] Summarized for Claim Buyer Entities (and Their Affiliates)*

| # | Member Name | Dollarized Amount (US$) | % | % of Total |
|---|---|---|---|---|
| 1 | Svalbard Holdings Limited; Svalbard II Holdings Limited; FTXCreditor LLC; Wireless Mouse LLC | 1,018,691,815.00 | 17.1% | 17.1% |
| 2 | Ceratosaurus Investors, LLC | 828,020,360.00 | 13.9% | 31.1% |
| 3 | Silver Point Capital, LP | 635,522,689.00 | 10.7% | 41.8% |
| 4 | Canyon Capital Advisors LLC, on behalf of its managed funds and accounts | 606,717,477.00 | 10.2% | 52.0% |
| 5 | FC Cayman A, L.L.C. | 593,194,190.96 | 10.0% | 61.9% |
| 6 | Fire Bouvardia, L.L.C. | 446,971,149.00 | 7.5% | 69.5% |
| 7 | Boway Holdings, LLC; Oaktree Opportunities Fund XI Holdings (Cayman) LP; Opps CY Holdings, LLC; Oaktree Value Opportunities Fund Holdings, L.P.; Oaktree Phoenix Investment Fund, L.P.; Oaktree London Liquid Value Opportunities Fund (VOF), L.P.; Oaktree-Copley Investments, LLC | 403,128,643.45 | 6.8% | 76.2% |
| 8 | Diameter Capital Partners LP | 397,109,562.00 | 6.7% | 82.9% |
| 9 | Hudson Bay Master Fund Ltd | 377,586,459.00 | 6.4% | 89.3% |
| 10 | Nexxus Holdings Operations LLC | 124,905,130.38 | 2.1% | 91.4% |
| 11 | Vicomte Holding LLC as manager of Arceau 507 II LLC, Arceau 507 LLC, Arceau X LLC, Oroboros FTX I LLC | 29,062,378.28 | 0.5% | 91.9% |
| 12 | Grand Teton Systems Inc. | 26,507,057.86 | 0.4% | 92.3% |

| | | | | |
|---|---|---|---|---|
| 13 | Olympus Peak Trade Claims Opportunities Fund I Non-ECI Master LP | 21,554,519.00 | 0.4% | 92.7% |
| 14 | Orange Phoenix LLC | 4,695,822.68 | 0.1% | 92.7% |
| 15 | Phoenix Digital | 4,186,421.00 | 0.1% | 92.8% |
| 16 | Phoenix TF, LLC | 653,996.22 | 0.0% | 92.8% |
| 17 | Lemma Technologies Inc.[1] | 165,000,000.00 | 2.8% | 95.6% |
| 49 | Other Non-Claim Buyers | 261,476,152.918 | 4.4% | 100.0% |
| | **TOTAL** | **5,944,983,823.75** | | |

Note: 1) Contested claim purportedly sold to Svalbard Holdings

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## VERIFIED NINTH SUPPLEMENTAL STATEMENT OF EVERSHEDS SUTHERLAND (US) LLP AND MORRIS, NICHOLS, ARSHT & TUNNELL LLP PURSUANT TO BANKRUPTCY RULE 2019

Eversheds Sutherland (US) LLP ("Eversheds") and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols," and together with Eversheds, "Counsel"), counsel to the Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee") comprising international customers (each a "Member" and collectively, the "Members") who hold accounts on the FTX.com platform, hereby submit this verified ninth supplemental statement (the "Ninth Supplemental Statement") pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 2019"), and respectfully state as follows:

1.      On or around December 2, 2022, the initial Members of the Ad Hoc Committee engaged Eversheds to represent the Ad Hoc Committee in connection with the Chapter 11 Cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (the "Debtors"). Morris Nichols was engaged by the Ad Hoc Committee effective December 4, 2022.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

2.      On March 24, 2023, Counsel filed the *Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 1156] (the "Initial Statement").

3.      On June 7, 2023, Counsel filed the *Verified First Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 1580] (the "First Supplemental Statement").

4.      On August 9, 2023, Counsel filed the *Verified Second Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 2144] (the "Second Supplemental Statement").

5.      On November 15, 2023, Counsel filed the *Verified Third Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 3797] (the "Third Supplemental Statement").

6.      On November 30, 2023, Counsel filed the *Verified Fourth Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 4400] (the "Fourth Supplemental Statement").

7.      On January 31, 2024, Counsel filed the *Verified Fifth Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 6799] (the "Fifth Supplemental Statement").

8.      On March 20, 2024, Counsel filed the *Verified Sixth Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 9793] (the "Sixth Supplemental Statement").

9.      On May 7, 2024, Counsel filed the *Verified Seventh Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 14224] (the "Seventh Supplemental Statement").

10.     On June 22, 2024, Counsel filed the *Verified Eighth Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 18534] (the "Eighth Supplemental Statement").

11.     Pursuant to Bankruptcy Rule 2019(d), this Ninth Supplemental Statement supplements the information provided in the Eighth Supplemental Statement. Since the date of the Eighth Supplemental Statement, certain changes have been made with respect to the composition of the Ad Hoc Committee and the disclosable economic interests that the Members represent.

12.     Attached hereto as **Exhibit A** is a revised list of the names, addresses, and disclosable economic interests of the Members, as reported to Counsel by each Member as of September 30, 2024, which is intended, as of the date hereof, to replace and supersede **Exhibit A** attached to the Eighth Supplemental Statement.[2]

13.     The information on **Exhibit A**, which is based on information provided by the Members to Counsel, is intended only to comply with Bankruptcy Rule 2019 and is not intended for any other purpose. Moreover, given the Members' limited access to the FTX.com platform, the information provided is based on the best available records and is subject to change. Counsel does not make any representation regarding the validity, amount, allowance, or priority of such claims and reserves all rights with respect thereto. Counsel does not own, nor has it ever owned,

---

[2] For the avoidance of doubt, all customers of FTX.com are welcome to join the Ad Hoc Committee, subject to requirements and protocols set forth in the Ad Hoc Committee Bylaws. We invite all who are interested to contact counsel to the Ad Hoc Committee via email at FTXinquiries@eversheds-sutherland.com.

any claims against or interests in the Debtors, except for the claims for services rendered by the Ad Hoc Committee.

14.     Nothing contained in this Ninth Supplemental Statement (or **Exhibit A** hereto) should be construed as a limitation upon, or waiver of, any rights of any Member of the Ad Hoc Committee, its respective affiliates, or any other entity, or an admission with respect to any fact or legal theory.  Nothing herein should be construed as a limitation upon, or waiver of, any rights of the Ad Hoc Committee or its Members to assert, file, and/or amend any claim or proof of claim filed in accordance with applicable law and any orders entered in these cases.

15.     Each Member of the Ad Hoc Committee has consented to Counsel's representation of the Ad Hoc Committee.  Counsel does not represent any Member of the Ad Hoc Committee in its individual capacity with respect to the objective of the Ad Hoc Committee in these Chapter 11 Cases.  While certain Members of the Ad Hoc Committee may hold non-customer claims in addition to customer claims, the Ad Hoc Committee represents such Members' interests solely in connection with their customer claims.

16.     As of the date of this Ninth Supplemental Statement, Eversheds and Morris Nichols represent parties in their individual capacities unrelated to the objective of the Ad Hoc Committee in the Chapter 11 Cases.  In addition, neither the Ad Hoc Committee nor any Member of the Ad Hoc Committee represents or purports to represent any other entities in connection with these cases.

17.     Counsel reserves the right to amend or supplement this Ninth Supplemental Statement in accordance with the requirements set forth in Bankruptcy Rule 2019.

18.     The undersigned verify that the foregoing is true and correct to the best of their knowledge.

4

Date: Wilmington, Delaware
September 30, 2024

/s/ Jonathan M. Weyand
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Matthew B. Harvey (No. 5186)
Jonathan M. Weyand (No. 6959)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
mharvey@morrisnichols.com
jweyand@morrisnichols.com

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
Michael A. Rogers
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com
michaelrogers@eversheds-sutherland.com

Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
sarahpaul@eversheds-sutherland.com

*Counsel to the Ad Hoc Committee of Non-US
Customers of FTX.com*

**Exhibit A**

| Member Name | Address | Dollarized Amount (US$) |
|---|---|---|
| Adam Rabie | ████████████████████ | 150,950.00 |
| Azamat Akylov | ████████████████████ | 11,373,198.56 |
| B2C Alternative Equity Ltd | C/O Corporation Service Company 251 Little Falls Drive, Wilmington, DE 19808 | 85,000,000.00 |
| Blooming Triumph International Limited | 13F 162 Queens Road Central, Hong Kong | 35,860,157.00 |
| Blue Basin Ventures LLC | 3172 N Rainbow Blvd #26642, Las Vegas, NV 89108 | 1,243,523.00 |
| Boway Holdings, LLC; Oaktree Opportunities Fund XI Holdings (Cayman) LP; Opps CY Holdings, LLC; Oaktree Value Opportunities Fund Holdings, L.P.; Oaktree Phoenix Investment Fund, L.P.; Oaktree London Liquid Value Opportunities Fund (VOF), L.P.; Oaktree-Copley Investments, LLC | 1301 6th Ave, 34th Floor, NY, NY 10019 | 403,128,643.45 |
| Canyon Capital Advisors LLC, on behalf of its managed funds and accounts | 2728 N. Harwood Street, 2nd Floor, Dallas, TX 75201 | 606,717,477.00 |
| Ceratosaurus Investors, LLC | One Maritime Plaza, Suite 2100, San Francisco, CA 94111 | 828,020,360.00 |
| Chien-Chih Chen | ████████████████████ | 200,000.00 |
| Crimson International Investment | c/o Al-Hamad Legal Group 4812 Addax Tower, Al Reem Island, Abu Dhabi UAE | 6,091,963.14 |
| Cyber Wealth Limited | 28/F, S22, 22 Heung Yip Road, Wong Chuk Hand, Hong Kong | 8,007,706.36 |

| Member Name | Address | Dollarized Amount (US$) |
|---|---|---|
| Daniel Gupta | ███████████████ | 420,000.00 |
| Diameter Capital Partners LP | 55 Hudson Yards, Suite 29B, New York, NY 10001 | 397,109,562.00 |
| Dietmar Poppe | ████████████████ | 281,807.90 |
| Dmitry Kozlov | ████████████████ | 252,185.00 |
| dParadigm Fund SPC | DE Cayman Ltd, Landmark Square, Westbay Road, PO Box 775, Grand Cayman KY1-9 | 575,599.93 |
| Falcon Hybrid SPC - RE7 Liquidity Fund SP | 3-212 Governors Square 23 Lime Tree Bay Ave PO Box 30746 SMB Grand Cayman KY1-1203 Cayman Islands | 1,269,016.63 |
| FC Cayman A, L.L.C. | c/o Maples Corporate Services Limited PO Box 309 Ugland House Grand Cayman, KY1-1104 Cayman Islands | 593,194,190.96 |
| Fire Bouvardia, L.L.C. | 190 Elgin Avenue, George Town Cayman DY1-9008 | 446,971,149.00[1] |
| Fingolfin GmbH | c/o 3T.LAW FAO Dr. Henning Frase Oberlaender Ufer 154a Koeln, Germany 50968 | 5,700,000.00 |
| Georgios Piliouras | ████████████████ | 116,635.23 |
| Grand Teton Systems Inc. | 1509 Bent Ave. Cheyenne, WY 82001 | 26,507,057.86 |
| Grzegorz Swiatek | ████████████████ | 540,260.00 |
| Hudson Bay Master Fund Ltd. | 28 Havemeyer Place, 2nd Floor, Greenwich, CT 06830 | 377,586,459.00 |
| Iris Partners | Iris Partners Corp. Suites 5 & 6 Horsfords Business Centre Long Point Road Charlestown St Kitts & Nevis | 804,000.00 |

---

[1] Includes claims held by separate funds and/or vehicles affiliated with Fire Bouvardia, L.L.C.

| Member Name | Address | Dollarized Amount (US$) |
|---|---|---|
| Ismael Lemhadri | ███████████ ████ | 150,000.00 |
| James Goodenough | ███████████ ████ | 5,670.00 |
| Jian Chen | ███████████ | 1,200,000.00 |
| John Ruskin | ███████████ █ | 350,000.00 |
| Jonathon Hughes | ███████████ | 22,063.00 |
| Kbit Global Limited | Craigmuir Chambers #71 Road Town Tortola VG1110 British Virgin Islands | 25,021,826.00 |
| Kirk Steele | ███████████ | 2,500,000.00 |
| Koalalgo Research | CO SERVICES CAYMAN LIMITED P. O. Box 10008 Willow House Cricket Square Grand Cayman KY1-1001 Cayman Islands | 3,700,000.00 |
| Koroush Ak Ltd. | 1-2 Craven Road, London, UK W5 2UA | 409,953.87 |
| Lemma Technologies Inc. | Via Espana, Delta Bank Building, 6th Floor, Suite 604D, Panama City PA-8 Panama | 165,000,000.00 |
| Marc-Antoine Julliard | ███████████ | 140,000.00 |
| Marc St. John Wolff Amey | ███████████ ████ | 637,000.00 |
| Michael Anderson | ███████████ ███ | 1,600,000.00 |
| Michael Currie | ███████████ | 40,000.00 |
| Mikita Kudzelka | ███████████ █ | 27,000.00 |
| Mohammad Alsabah | ███████████ | 275,000.00 |
| Nai Him Leslie Tam | ███████████ ████ | 8,214,895.72 |

| Member Name | Address | Dollarized Amount (US$) |
|---|---|---|
| Nexxus Holdings Operations LLC | 800 Miramonte Drive, Suite 380, Santa Barbara CA 93109 | 124,905,130.38 |
| NKB Finance Ltd. | Griva Digeni 13, 6030 Larnaca, Cyprus | 216.52 |
| Olympus Peak Trade Claims Opportunities Fund I Non-ECI Master LP | 177 West Putnam Ave Suite 2622-S1 Greenwich, CT 06831 | 21,554,519.00[2] |
| Orange Phoenix LLC | c/o The Corporation Trust Center 1209 Orange Street, Wilmington DE 19801 | 4,695,822.68 |
| Patrick Martin | ▮▮▮▮▮▮▮▮ | 500,000.00 |
| Patrick Wohlschlegel | ▮▮▮▮▮▮▮▮ | 57,973.85 |
| Paxtibi LLP | 221 W. 9th Street Wilmington, DE 19801 | 1,840,117.00 |
| Phoenix Digital | 42 W 33rd St, 27B New York, NY 10001 | 4,186,421.00 |
| Phoenix TF, LLC | 418 Broadway, Ste R, Albany, NY 12207 | 653,996.22 |
| Podtree Ltd. | 26,Kanachrine Place,Ullapool, Highland, Scotland | 19,581.26 |
| PRIMO Holding GmbH | Urbanstrasse 4, D-70839 Gerlingen, Germany | 853,674.48 |
| Raul Jain | ▮▮▮▮▮▮▮▮ | 42,000.00 |
| Robert Himmelbauer | ▮▮▮▮▮▮▮▮ | 107,013.57 |
| Rodney Clough | ▮▮▮▮▮▮▮▮ | 504,000.00 |
| Samuel Mandel | ▮▮▮▮▮▮▮▮ | 59,600.00 |
| Sheval Alijevski | ▮▮▮▮▮▮▮▮ | 146,000.00 |
| Sidar Sahin | ▮▮▮▮▮▮▮▮ | 50,974,281.00 |
| Silver Point Capital, LP | 2 Greenwich Plaza, Greenwich, CT 06830 | 635,522,689.00 |

---

[2] This amount does not include claim # 6299280 that is subject of Adversary Proceeding 23-50754. *See* [D.I. 3673].

| Member Name | Address | Dollarized Amount (US$) |
|---|---|---|
| Svalbard Holdings Limited; Svalbard II Holdings Limited; FTXCreditor LLC; Wireless Mouse LLC | c/o Attestor Limited, 7 Seymour Street, W1H 7JW London | 1,018,691,815.00 |
| Tellurian Exoalpha Digital Assets Systematic Fund | 89 Nexus Way, Camana Bay Grand Cayman, Cayman Islands KY1- | 1,062,047.90 |
| Vicomte Holding LLC as manager of Arceau 507 II LLC, Arceau 507 LLC, Arceau X LLC, Oroboros FTX I LLC | 4 Lakeside Drive, Chobham Lakes, GU24 8BD, Surrey, UK | 29,062,378.28 |
| Vincent Kwok | ███████████████ | 3,000,000.00 |
| William Johanna Petrus Christina Arts | ███████████████ | 64,802.00 |
| Yu Ting | ███████████████ | 64,434.00 |
| | **Total** | **$5,944,983,823.75** |

**Exhibit 2**

Exhibit B in the sentencing documents filed in the case of United States v.
Bankman-Fried (1:22-cr-00673), Doc. 414-2

# EXHIBIT B

Confidential Draft of 2/28/2024—Subject to Material Change

### FTX Distributions – Executive Summary for the USAO

1. Assuming that remission proceeds received from the USAO or other governmental authorities ("SDNY Remission Proceeds") are made available to the Debtors on or prior to the effective date of the chapter 11 plan (earliest August 1, 2024), the Debtors propose to apply 100% of the SDNY Remission Proceeds to make distributions to FTX.com customers and Alameda lenders, who rank senior to shareholders under applicable chapter 11 priorities.

   a. 100% of the SDNY Remission Proceeds would be paid to FTX.com customers and Alameda lenders. No SDNY Remission Proceeds would be used to pay trade or other general unsecured creditors, administrative expenses or taxes.

   b. Amounts paid to Alameda lenders from SDNY Remission Proceeds would include BlockFi. The Debtors have a settlement with BlockFi that contemplates mutual support for the release of the HOOD stock proceeds to the Debtors for distribution pursuant to the plan, the payment of $275 million to BlockFi immediately upon plan effectiveness, and the payment of the remaining portion of BlockFi's loan claim pro rata with claims by other Alameda lenders.[1]

   c. If the USAO is not comfortable with 100% of the SDNY Remission Proceeds being applied to pay FTX.com customers and Alameda lenders, a portion of the SDNY Remission Proceeds could be set aside in a separate fund and used by the Debtors solely to pay shareholders. However, the Debtors prefer that all funds are paid in accordance with chapter 11 priorities (see point 5 below).

2. After administrative expenses and any provision for priority or administrative taxes, the Debtors will apply all other property of their estates to pay allowed non-governmental creditor claims until all non-governmental creditors receive petition time value ("Petition Time Value") plus interest to the date of distribution at a rate to be determined (the "Consensus Rate"). The Consensus Rate will not be less than the Federal Judgment Rate (approx. 5.5%) nor more than the pre-judgment interest rate in Delaware at the petition time (9.0%).

   a. With respect to Petition Time Value, customers will continue to benefit from the intercompany priority over other creditors set forth in the current plan. Once Petition Time Value is paid in full to customers and all non-governmental creditors, customers and non-governmental creditors will be paid interest at the Consensus Rate on a pari passu basis.

3. After all non-governmental creditors receive Petition Time Value and interest at the Consensus Rate, the Debtors will apply remaining distributable value to pay governmental creditors as follows:[2]

---

[1]    The BlockFi settlement remains subject to Bankruptcy Court approval, and a hearing on the settlement is expected for mid-March.

[2]    Waterfall issues are under discussion with IRS and CFTC, but not agreed.

SDNY_NATIVE_00010089

Confidential Draft of 2/28/2024—Subject to Material Change

    a.  up to 25% (but not more than 25%) of remaining distributable value shall be available to pay allowed claims for U.S. Federal income taxes not previously paid ("<u>U.S. Tax Claims</u>");

    b.  all remaining distributable value not used to pay U.S. Tax Claims shall be used to pay allowed claims by the CFTC and other consenting governmental authorities ("<u>Governmental Claims</u>"), with payment of Governmental Claims to be made solely by deposit to a segregated fund maintained by the Debtors (the "<u>Civil Remission Fund</u>").

4.  The Debtors will apply 100% of the proceeds in the Civil Remission Fund to make payments on "<u>Supplemental Appreciation Claims</u>". These Supplemental Appreciation Claims will include only claims held by FTX.com customers, FTX.US customers and Alameda lenders who have a contractual right to receive digital assets that have appreciated in value from the petition time to a measurement date immediately prior to the approval of the Chapter 11 Disclosure Statement by the Bankruptcy Court. The amount of each eligible creditor's Supplemental Appreciation Claim will equal the USD equivalent of such appreciation, and the USD amount shall not change once fixed at the time of approval of the Disclosure Statement (i.e., no investor shall be entitled to make a claim for appreciation in value subsequent to approval of the Disclosure Statement). All Supplemental Appreciation Claims shall be in USD and fungible.

5.  The total amount of Governmental Claims is expected to be $3-5 billion, subject to negotiation with the applicable authorities. The total amount of U.S. Tax Claims is uncertain. Once all Governmental Claims and U.S. Tax Claims are paid in full, the Debtors will apply the remaining proceeds in their estates to make distributions to shareholder constituencies in accordance with chapter 11 priorities.

SDNY_NATIVE_00010090