## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

RECEIVED

2025 MAR 28 AM 8: 12

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| | (*Jointly Administered*) |
| Debtors. | |
| | Hearing Date: September 12, 2024 at 1:00 P.M. ET |
| | Objection Deadline: July 24, 2024 at 4:00 P.M. ET |

## ADDITIONAL MATERIALS REGARDING
## "CLAIMANT No. 53449's AND No. 53486's RESPONSE TO THE DEBTORS' FIFTIETH (NON-SUBSTANTIVE) OMNIBUS OBJECTION TO CERTAIN CLAIMS FILED AGAINST THE INCORRECT DEBTOR "
### Additional Materials (Part 2)

| | |
|---|---|
| DOCKET NUMBER、DATE FILED（文書番号、出願日） | Docket 17636、Filed 06/14/24 |
| THE NAME OF THE CLAIMANT（請求者の氏名） | NAGASAKA, TAKUYA（長坂　拓哉） |
| THE CLAIM NUMBER（請求番号） | (1)  53449          (2)  53486 |
| A DESCRIPTION OF THE BASIS FOR THE AMOUNT OF THE CLAIM（請求額の根拠の説明） | (1) 2.92772803 BTC   (2) 1.01748088 USD<br><br>This case is about FTX Trading's failure to transfer the account to FTX Japan, even though FTX Trading should have done so.<br><br>Moreover, the claimant (creditor) has no deficiencies whatsoever.<br><br>Since Japanese residents are required by Japanese law to maintain segregated accounts and to return assets in kind, not in US dollars, the BTC and US dollars must be transferred from FTX Trading to FTX Japan, and then the BTC and US dollars must be delivered to the claimant (creditor). |

# Table of Contents

## ADDITIONAL MATERIAL

—4—

1 ．TERMINOLOGY　　　　　　　　　　　　　　　　　　　　—4—

2 ．SUMMARY　　　　　　　　　　　　　　　　　　　　　　—5—

3 ．The conclusion of a contract for the transfer of receivables　　—6—
　(1)　Asset transfer agreement　　　　　　　　　　　　　　　—6—
　(2)　Sending transfer notices based on asset transfer agreements　—46—
　(3)　Customer consent to asset transfers as specified in the FTX Trading　—56—
　　　Terms of Service
　(4)　Filed a notification of business acquisition with the Kanto Local　—58—
　　　Finance Bureau
　(5)　FTX Japan Officially Launches Services　　　　　　　　—59—

4 ．Public announcements and representations by FTX Japan　　—61—
　(1)　Publication of FTX Japan's acceptance of the contents of the　—61—
　　　notice of transfer
　(2)　Acceptance of FTX Japan Mobile App by FTX Japan　　—67—
　(3)　Acceptance of FTX Trading Terms of Service by FTX Japan　—70—

5 ．The period during which FTX Trading explicitly rejected customers　—73—
　　located in Japan
　(1)　transfer notice　　　　　　　　　　　　　　　　　　—73—
　(2)　FTX Trading Terms of Service　　　　　　　　　　　—73—
　(3)　Official FTX.com website, " Location Restrictions"　　　—82—
　(4)　Official FTX.com website, " Jurisdiction, regulations, licensing,　—82—
　　　and practices"

6 ．Fraudulent acts committed by the debtor prior to the Chapter 11　—83—
　　proceedings
　(1)　FTX Trading's failure to segregate client assets　　　　—83—
　(2)　FTX Japan mobile app assets were managed by FTX Trading　—83—

7 ．Falsehoods alleged by the debtor after Chapter 11 proceedings　—84—
　(1)　Necessity of Identity Verification Procedures (KYC Process)　—84—

(2)  Need for merge account processing   —84—

(3)  Scope of asset transfer   —85—

(4)  Arrangements for assets managed by FTX Trading   —86—

8 .  Samuel Bankman Fried had been appointed President of FTX Japan   —87—

9 .  FTX Japan's prioritization of repayment of FTX intercompany debt   —90—
  over its customers

10.  Sale to bitFlyer Holdings, Inc.   —92—

11.  Organize the facts   —94—

  (1)  FTX Trading's Acquisition of a Japanese Crypto Asset Exchanger for   —94—
   the Purpose of Complying with Japanese Law

  (2)  Details of the asset transfer agreement   —95—

  (3)  Content of Notice of Assignment   —96—

  (4)  Existence of crypto assets that FTX Japan cannot handle   —97—

  (5)  Name change to FTX Japan mobile app   —98—

  (6)  Asset management on the FTX Japan mobile app   —98—

  (7)  FTX Trading FTX TERMS OF SERVICE   —98—

  (8)  Impact of Chapter 11   —99—

  (9)  Responses by FTX Japan to customers   —99—

12.  Conclusion of Additional Materials   —101—

# ADDITIONAL MATERIAL

## 1. TERMINOLOGY

(1)    FTX Trading

In this document, FTX Trading Ltd. will hereinafter be referred to as "**FTX Trading**".

(2)    Chapter 11

In this document, Chapter 11 proceedings are referred to as "**Chapter 11**".

(3)    Debtors

In this document, FTX-related companies, including FTX Trading and FTX Japan, which entered into Chapter 11 in November 2022, are hereinafter referred to as the "**Debtors**".

(4)    FTX Japan

The current trade name of FTX Japan KK is Custodiem KK (former trade name: FTX Japan KK / former trade name: QUOINE KK), but as the trade name at the time of filing this Chapter 11 petition was FTX Japan KK, for convenience in this document, hereinafter,  "FTX Japan" will hereafter be referred to as "**FTX Japan**".

FTX Japan KK was a wholly owned subsidiary of FTX Japan Holdings KK (former name: Liquid Group KK, changed to the current name on June 28, 2022), but bitFlyer Holdings KK acquired 100% shares of FTX Japan KK on July 26, 2024. Ltd. became a wholly owned subsidiary of bitFlyer Holdings, Inc. on July 26, 2024, following the acquisition of 100% of the shares of FTX Japan Co.

(5)    FTX Japan Mobile App

Blockfolio, Inc. launched the mobile app in 2019 under the name Blockfolio App. 2020, FTX Trading acquired the company and renamed the app FTX App in summer 2021. The name was later changed to FTX Japan Mobile App (or FTX JP Mobile App) in July 2022 for customers located in Japan.

The claimant also used the FTX Japan Mobile App.

(6)    Asset Transfer Agreement

The Asset Transfer Agreement executed by FTX Trading and FTX Japan (then known as QUOINE Corporation) on November 19, 2021 is hereinafter referred to in this document as the "**Asset Transfer Agreement**".

(7)    Transfer Notice

The emails titled "日本のお客様へ重要なお知らせ− Important Notice to JAPANESE Customer" sent by FTX Trading Ltd. in February and March 2022 are referred to in this document as, "**Transfer Notice**".

(8)    Transfer Deadline

The notice of transfer included an estimated date for the transfer of customer accounts from FTX Trading to FTX Japan, which, after being postponed once, was finally fixed at April 4, 2022.

This date is hereinafter referred to as the "**Transfer Deadline**".

## 2．SUMMARY

This is a fraud case in which the obligation to return all customer assets located in Japan managed by FTX Trading was transferred from FTX Trading to FTX Japan based on an asset transfer agreement executed prior to Chapter 11, but since the filing of Chapter 11, the debtor has failed to perform this obligation through false claims and has attempted to evade responsibility for it. However, since the filing of the Chapter 11 petition, the debtor has been attempting to evade this responsibility by failing to fulfill the obligation through false claims.

Under the arrangements of the Asset Transfer Agreement, some of the assets of FTX Japan's clients were held by FTX Trading in trust for FTX Japan. However, it appears that the fact that FTX Trading's assets came under the influence of Chapter 11 was unexpected by the Debtor. The debtor is attempting to resolve the unfavorable treatment that arose from the situation by pushing it onto some of its customers in Japan.

At this time, the debtor still does not accept responsibility for the management of its assets, and is attempting in every way possible to force its customers to pay dividends in U.S. dollars, claiming that the obligation to return assets rests with FTX Trading.

**FTX Japan is obligated to return the money to the claimant in kind, such as bitcoin, rather than in U.S. dollars.**

### 3. The conclusion of a contract for the transfer of receivables

(1)  Asset transfer agreement

The assets held by all customers located in Japan, including the claimant in this case, were subject to an asset transfer agreement dated November 19, 2021, under which the assets were transferred from FTX Trading to FTX Japan.

The Asset Transfer Agreement dated November 19, 2021 was filed in the Japanese court and the case record is available for anyone to review.The following asset transfer agreement is a document reproduced by the person who viewed it.

The original document is in English, but a Japanese translation is also attached.

(Asset Transfer Agreement) English Page 1

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

Execution Version

### DATED NOVEMBER 19, 2021

### FTX TRADING LTD.

and

### QUOINE CORPORATION

---

### ASSET TRANSFER AGREEMENT

---

1

4152-5337-2978.6

(Asset Transfer Agreement) English Page 2

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

## CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | INTERPRETATION | 1 |
| 2. | SALE AND PURCHASE | 4 |
| 3. | CONSIDERATION | 5 |
| 4. | CONDITIONS PRECEDENT | 5 |
| 5. | COMPLETION | 6 |
| 6. | WARRANTIES | 6 |
| 7. | ASSIGNMENT | 7 |
| 8. | EXCLUDED LIABILITIES AND ASSUMED LIABILITIES | 8 |
| 9. | PREPAYMENTS AND APPORTIONMENTS | 9 |
| 10. | PRE-COMPLETION OBLIGATIONS | 9 |
| 11. | ENTIRE AGREEMENT | 10 |
| 12. | VARIATION | 10 |
| 13. | SEVERANCE | 10 |
| 14. | NOTICES | 10 |
| 15. | GOVERNING LAW AND JURISDICTION | 11 |
| 16. | GOVERNING LANGUAGE | 12 |
| 17. | COUNTERPARTS | 12 |
| SCHEDULE 1 Completion Requirements | | 13 |

0

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 3

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**THIS AGREEMENT** is made on November 19, 2021

**BETWEEN:**

(1) **FTX TRADING LTD.**, a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda (the **"Seller"**); and

(2) **QUOINE CORPORATION,** a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the **"Purchaser"**).

(Each a **"Party"** and collectively, the **"Parties"**)

**WHEREAS:**

(A) The Parties, and the shareholders and/or stock option holders of Liquid Group Inc., the parent company of the Purchaser, have entered into the Major Shareholders SPA (as hereinafter defined) and certain other sale and purchase agreements pursuant to which the Seller shall acquire the shares, stock options and preference shares warrants of Liquid Group Inc. (the **"Liquid Share Transfers"**).

(B) In connection with the Liquid Share Transfers, the Seller has agreed to sell, and the Purchaser has agreed to purchase, the Assets (as hereinafter defined), subject to and on the terms and conditions of this Agreement.

**THE PARTIES AGREE** as follows:

**1. INTERPRETATION**

1.1 In this Agreement:

**"Account Receivables"** means the account receivables under any of the Customer Contracts due and owing to the Seller as at the Completion Date.

**"Affiliate"** means, with respect to any Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, **"control"** when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms **"controlling"** and **"controlled"** have the meanings correlative to the foregoing.

**"Assets"** means the assets to be sold and purchased under this Agreement as specified in Clause 2.1.

**"Assumed Liabilities"** means (i) all debts, liabilities and obligations of the Seller arising in respect of the Assets, and (ii) all the liabilities and obligations created by or arising under the Customer Contracts after Completion, except for the Excluded Liabilities.

1

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 4

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Completion**" means the completion of the sale and purchase of the Assets in accordance with Clause 5.

"**Completion Date**" means the date on which Completion occurs.

"**Condition**" has the meaning given to it in Clause 4.1.

"**Current Assets**" means the following Assets held by the Seller as at the Completion Date:

(a)     the Account Receivables; and

(b)     Digital Assets held by the Seller under the Customer Contracts.

"**Customer Contracts**" means the agreements entered into between the Seller and the Customers pursuant to which the Seller has agreed to provide services to the Customers to use the Exchange to buy, sell, exchange, hold, or otherwise transact in Digital Assets or their derivatives, or any other services offered by the Seller through its website, and "**Customer Contract**" means any one of them.

"**Customer Data**" means the Personal Data of any person with the right to access the services provided by the Seller under a Customer Contract.

"**Customer Prepayments**" means any payments, prepayments or deposits made by any Customer to the Seller prior to the Effective Time in respect of products or services to be provided after the Effective Time.

"**Customers**" means the existing customers of the Seller who are located in Japan and have entered into a Customer Contract with the Seller.

"**Digital Assets**" means bitcoin, ether or any other digital assets, crypto currency, virtual currency or token that are available to transact in using the Exchange.

"**Effective Time**" means 10:00 am, on the Completion Date.

"**Encumbrance**" includes any interest or equity of any person (including any right to acquire, option or right of pre-emption), and any mortgage, charge, pledge, lien, assignment, hypothecation, security interest (including any created by law), title retention or other security agreement or arrangement.

"**Exchange**" means the FTX cryptocurrency derivatives exchange operated by the Seller.

"**Excluded Liabilities**" means all debts, liabilities and obligations (both ascertained and contingent) of any nature due or owing at any time to or from the Seller to a third party which relate to or are attributable to or arise as a result of the Assets or Customer Contracts at any time before the Effective Time, including but not limited to:

2

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 5

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

 (a) all liabilities, claims, actions, proceedings, demands, costs and expenses which arise after the Effective Time in respect of any services provided by the Seller prior to the Effective Time; and

 (b) any liability for Taxation on profits or chargeable gains arising on transactions or in respect of periods up to the Effective Time.

**"Goodwill"** means the goodwill associated with the Assets.

**"Liquid Share Transfers"** has the meaning given to it in the recitals.

**"Longstop Date"** means March 31, 2022, or such other date as agreed by the Parties in writing in accordance with Clause 4.6.

**"Losses"** includes all liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses).

**"Major Shareholders SPA"** means that certain Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of November 19, 2021 by and between Kariya Kayamori, Seth Melamed, JAFCO SV4 Investment Limited Partnership, IDG China Venture Capital Fund V L.P., IDG Bitmain Fund L.P., IDG China V Investors L.P., the Seller, and Liquid Group Inc.

**"Notice"** has the meaning given to it in Clause 14.1.

**"Notice of Assignment"** means the notice of assignment to be issued by the Seller and the Purchaser to the Customers under the Customer Contracts.

**"Person"** means any natural person, company, corporation, general partnership, limited partnership, proprietorship, joint venture, firm, trust, fund, union, government, statutory or public authority, or any entity or incorporated or unincorporated organization or association.

**"Personal Data"** means any information relating to an identified or identifiable natural person; an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.

**"Records"** means all the books, files, records and other documents and written material of the Seller relating to any of the Assets in whatever medium held, including but not limited to all books of account, ledgers, income records, information relating to clients, customers and suppliers and other books, documents and computer records, but excluding any records the Seller is required by law to retain.

**"Retained Assets"** has the meaning given to it in Clause 7.5.

**"Rules"** has the meaning given in Clause 15.2.

3

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 6

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**"Seller's Solicitors"** means Anderson Mori & Tomotsune of Otemachi Park Building. 1-1-1 Otemachi, Chiyoda-ku, Tokyo, Japan, and any other affiliates thereof.

**"SIAC"** has the meaning given in Clause 15.2.

**"Taxation"** means all forms of taxation, charges, duties, imposts, contributions, levies, withholdings or liabilities whenever chargeable and whether of Japan or any other jurisdiction, and any penalty, fine, surcharge, interest, charges or costs relating thereto.

**"Third Party Claims"** means all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind in favor of the Seller and/or its Affiliates (whether known or unknown or whether currently pending, filed, or otherwise) against third parties to the extent exclusively resulting from or to the extent exclusively relating to the Assets, including all rights under express or implied warranties to the extent exclusively relating thereto, and **"Third Party Claim"** means any of them.

**"Third Party Consent"** means a consent, license, approval, authorisation or waiver required from a third party for the conveyance, transfer, assignment or novation in favour of the Purchaser of any of the Assets.

**"Type 1 Registration"** means the registration by the Purchaser as a Type I Financial Instruments Business (*dai-issyu kinyu shohin torihiki gyo*) as defined under the Financial Instruments and Exchange Act of Japan.

**"Tribunal"** has the meaning given in Clause 15.3.

1.2 References to Clauses are reference to clauses or sub-clauses of this Agreement.

1.3 References to a Schedule is to a schedule of this Agreement. Schedules form part of this Agreement.

1.4 Headings are for ease of reference only and do not form part of this Agreement.

1.5 A reference to a time of day is a reference to the time in Japan, unless a contrary indication appears.

2. **SALE AND PURCHASE**

2.1 Subject to the terms and conditions of this Agreement, with effect from the Effective Time, the Seller shall sell, transfer, assign, convey free from all Encumbrances, and the Purchaser shall purchase, the Assets set out below:

(a) the Current Assets;

(b) the Customer Contracts;

(c) the Customer Data;

(d) the Records;

4

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 7

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

    (e)  the Third Party Claims; and

    (f)  the Goodwill.

2.2    Subject to the terms and conditions of this Agreement, with effect from the Effective Time, the Purchaser shall assume and agree to pay, perform and discharge the Assumed Liabilities.

2.3    The Excluded Liabilities shall not form part of the sale and purchase of the Assets under this Agreement.

**3.    CONSIDERATION**

    The consideration for the Assets and the Assumed Liabilities shall be the aggregate amount of USD 1,000,000.

**4.    CONDITIONS PRECEDENT**

4.1    Completion is conditional upon the following conditions (the **"Conditions"**) being satisfied or waived in accordance with this Agreement:

    (a)  all corporate approvals of the Seller necessary for the completion of the transactions contemplated under this Agreement having been obtained;

    (b)  all corporate approvals of the Purchaser necessary for the completion of the transactions contemplated under this Agreement having been obtained;

    (c)  all other consents, approvals and authorizations required for the transfer of the Assets and the Assumed Liabilities from the Seller to the Purchaser under this Agreement having been obtained;

    (d)  the representations and warranties given by the Seller under this Agreement remaining true and accurate in all respects and not misleading in any respect up to and including the Completion Date;

    (e)  the representations and warranties given by the Purchaser under this Agreement remaining true and accurate in all respects and not misleading in any respect up to and including the Completion Date; and

    (f)  the completion of the Liquid Share Transfers under the Major Shareholders SPA shall have been consummated or shall be consummated simultaneously with Completion hereunder.

4.2    The Seller shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 4.1 (a), 4.1 (c), 4.1(d), and 4.1(f) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

4.3    The Purchaser shall use its reasonable endeavours to achieve satisfaction of the Condition set out in Clause 4.1(b), 4.1(c), 4.1(e) and 4.1(f) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5

4152-5337-2978.6

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

4.4    If, at any time, the Seller or the Purchaser becomes aware of a fact, matter or circumstance that might prevent a Condition from being satisfied, it shall immediately inform the other Party in writing.

4.5    If a Condition set out in Clause 4.1 has not been satisfied by the Seller or the Purchaser (as the case may be), has not been waived by agreement of the Seller and the Purchaser, and has not been waived by the Seller (solely with respect to Clause 4.1(e) or the Purchaser (solely with respect to Clause 4.1(d)) by 5:00 p.m. on the Longstop Date, this Agreement shall automatically terminate with immediate effect.

4.6    The Longstop Date may be extended by mutual agreement of the Seller and the Purchaser in writing, provided that the transaction shall be completed under the same terms and conditions hereunder.

4.7    Each Party's further rights and obligations cease immediately on termination, but termination does not affect a Party's accrued rights and obligations as at the date of termination.

## 5.    COMPLETION

5.1    Upon the terms and subject to the conditions of this Agreement, Completion shall take place at the offices of the Seller's Solicitors, or if the Parties agree otherwise, remotely via the electronic exchange of documents and signatures, upon the satisfaction or waiver of all of the Conditions, or such other place and time as the Parties may agree in writing.

5.2    At Completion, the Seller shall cause to be delivered to the Purchaser the documents set out in Paragraph 1 of Schedule 1 and all of the Assets capable of passing by delivery (if any) together with all relevant documents of title as may be in the custody of the Seller.

5.3    At Completion, the Purchaser shall:

(a)    subject to the Seller performing its obligations under Clause 5.2, pay the sum of USD 1,000,000 to the Seller in cash, wire transfer, or the transfer of digital assets of equivalent value, receipt of which sum in such amount shall constitute a good discharge by the Purchaser in respect of its obligation under this Clause 5.3(a); and

(b)    deliver to the Seller the documents set out in Paragraph 2 of Schedule 1.

## 6.    WARRANTIES

6.1    The Seller warrants to the Purchaser that:

(a)    the Seller has good and marketable title to each Asset (whether tangible or intangible), and each Asset is legally and beneficially solely owned by the Seller;

(b)    there are no Encumbrances over any of the Assets, and the Seller has not agreed to create any Encumbrances over the Assets or any part of them;

(c)    the Seller has the requisite power and authority to enter into and perform this Agreement and the documents referred to in it (to which it is a party), and they

6

(Asset Transfer Agreement)  English Page 9

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

constitute (or will constitute, when executed) valid, legal and binding obligations on the Seller in accordance with their respective terms;

(d)  the execution and performance by the Seller of this Agreement and the documents referred to in it (to which it is a party) will not breach or constitute a default under the Seller's articles of association, or any agreement, instrument, laws or regulations, order, judgement or other restriction which binds the Seller; and

(e)  all of the Customer Contracts are in force and effect and are enforceable by the Seller in accordance with their terms, and none of the parties to any Customer Contracts are in material breach thereof.

6.2  The Purchaser warrants to the Seller that:

(a)  the Purchaser has the requisite power and authority to enter into and perform this Agreement and the documents referred to in it (to which it is a party), and they constitute (or will constitute, when executed) valid, legal and binding obligations on the Purchaser in accordance with their respective terms; and

(a)  the execution and performance by the Purchaser of this Agreement and the documents referred to in it (to which it is a party) will not breach or constitute a default under the Purchaser's articles of association, or any agreement, instrument, laws or regulations, order, judgement or other restriction which binds the Purchaser.

## 7.  ASSIGNMENT

7.1  Subject to Clause 7.2, this Agreement shall constitute an assignment to the Purchaser of the rights, obligations and contractual status of all of Customer Contracts and Third Party Claims which are capable of assignment without the consent of any third party, in each case, with effect from the Effective Time.

7.2  To the extent that the assignment or attempted assignment of the rights, obligations and contractual status of a Customer Contract or Third Party Claim would cause a third party to repudiate such Customer Contract or Third Party Claim as it would constitute a breach of any such Customer Contract, this Agreement does not constitute an assignment or an attempted assignment of that Customer Contract or Third Party Claim.

7.3  In so far as any Assets are not delivered or formally transferred, novated or assigned to the Purchaser at Completion and until such time as they are formally transferred, novated or assigned to the Purchaser:

(a)  the Seller shall be deemed to hold all such Assets, and any monies, goods or other benefits received thereunder, on trust for the Purchaser; and

(b)  to the extent permissible under law or the terms of any relevant agreement:

(i)  the Seller shall use all reasonable endeavours, with the co-operation of the Purchaser, to procure at its cost that the Purchaser shall be entitled to the benefit, use and enjoyment of those Assets, to receive the income

7

4152-5337-2978.6

(Asset Transfer Agreement) English Page 10

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

therefrom, and to have the right of enforcement of the Third Party Claims, if any, relating to those Assets and (without limitation) shall provide access to all relevant books, documents and other information in relation to such Assets as the Purchaser may require from time to time; and

(ii)     the Purchaser shall perform all the obligations of the Seller in respect of such Assets which are Customer Contracts.

7.4    If any Third Party Consent is required to transfer an Asset and/or Assumed Liability to the Purchaser and such Third Party Consent has not been obtained prior to Completion, the Seller shall use all reasonable endeavours after Completion to obtain such consent as soon as possible following Completion and to effect any transfer, novation or assignment of that Asset and/or Assumed Liability at the request of the Purchaser after receipt of the Third Party Consent, and the Purchaser shall cooperate with the Seller so far as is reasonable for such purposes.

7.5    If in respect of any Asset and/or Assumed Liability a Third Party Consent is refused or not obtained within three (3) months of the Completion Date, the Parties shall each use all reasonable endeavours to achieve an alternative solution reasonably acceptable to the Seller and the Purchaser pursuant to which the Purchaser shall receive the full benefits of the relevant Asset and shall assume the full obligations of the relevant Assumed Liability. If an alternative solution which is reasonably acceptable to the Seller and the Purchaser is not found within six (6) months of the Completion Date, the Parties shall apply the following provisions in respect of such Asset (the **"Retained Asset"**):

(a)    if the Retained Asset is the benefit of a Customer Contract, the Purchaser may require the Seller to use its reasonable endeavours to terminate the Customer Contract without either Party incurring any further liability;

(b)    in respect of a Retained Asset which is not a Customer Contract, the Retained Asset shall be excluded from the sale of the Assets; and

(c)    neither Party shall have any further obligation to the other relating to the Retained Asset save to the extent resulting from any prior breach.

7.6    With respect to each Customer Contract transferred from the Seller to the Purchaser under this Agreement, the Seller shall cooperate with the Purchaser, to the extent practically reasonable and possible, to procure that the Customer under such Customer Contracts agrees to the terms and conditions of the user agreements of the Purchaser as of such transfer.

## 8.    EXCLUDED    LIABILITIES    AND    ASSUMED    LIABILITIES; INDEMNIFICATTION

8.1    Unless agreed otherwise in this Agreement:

(a)    the Seller shall be responsible for discharging the Excluded Liabilities and shall indemnify the Purchaser and keep the Purchaser fully indemnified in respect of such Excluded Liabilities and any Losses arising as a result of the breach by the Seller of this Clause 8.1(a); and

8

4152-5337-2978.6

(Asset Transfer Agreement) English Page 11

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

    (b)   subject to Clause 8.1(a), with effect from the Effective Time, the Purchaser shall be responsible for discharging the Assumed Liabilities and shall indemnify the Seller and keep it fully indemnified against all Losses incurred by the Seller as a result of the breach by the Purchaser of this Clause 8.1(b).

8.2    The Purchaser shall not be liable for any claim made by any person against the Seller for breach of contract which is outstanding against the Seller at Completion and which arises as a result of any act, omission or default of the Seller in relation to the Assets prior to Completion.

8.3    After the Effective Time, each Party shall indemnify and hold harmless the other Party from, against and in respect of any Losses incurred or suffered by such other Party resulting from, relating to or arising out of any breach of this Agreement by such Party.

## 9. PREPAYMENTS AND APPORTIONMENTS

9.1    All Customer Prepayments shall be apportioned by reference to the Effective Time such that:

    (a)   the Seller shall be entitled to such part of the Customer Prepayments that relate to the period ending on or before the Effective Time; and

    (b)   the Purchaser shall be entitled to such part of the Customer Prepayments that relate to the period after the Effective Time.

9.2    The net amount (if any) payable by or to the Seller under this Clause 9 shall be agreed between the Parties hereto by setting off the amount payable by the Seller to the Purchaser (if any) against the amount payable by the Purchaser to the Seller, both pursuant to this Clause 9, as soon as practicable after Completion. Within fourteen (14) days after such agreement the Purchaser shall pay the Seller or the Seller shall pay the Purchaser (as the case may be) such amount.

## 10. PRE-COMPLETION OBLIGATIONS

10.1    As soon as practicable after the signing of this Agreement, the Seller shall disclose the Customer Data to the Purchaser.

10.2    As soon as practicable after the signing of this Agreement, the Purchaser shall, and the Seller shall cooperate with the Purchaser for the Purchaser to:

    (a)   use commercially reasonable efforts to conduct the "Know Your Client" procedure and compliance checks on as many of the Customers as practicable prior to Completion in accordance with the applicable standards and guidelines; and

    (b)   develop the parsing of the application programming interface data of the Seller in order to receive all the Current Asset and Customer Data.

9

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 12

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

10.3    As soon as practicable after the signing of this Agreement but by no later than Completion, the Seller and the Purchaser shall jointly issue the Notice of Assignment, in a form mutually agreed by the Parties, to each Customer.

## 11.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties relating to its subject matter and supersedes any prior agreements (whether in writing or oral) relating to such subject matter.

## 12.    VARIATION

No amendment or variation of this Agreement shall be effective unless it is in writing and signed by or on behalf of each of the Parties.

## 13.    SEVERANCE

The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Agreement.

## 14.    NOTICES

14.1    A notice or other communication under or in connection with this Agreement (a **"Notice"**) shall be:

(a)    in writing;

(b)    in English; and

(c)    delivered personally or sent by courier by an internationally recognised courier company or by email, to the party due to receive the Notice at its address set out in Clause 14.3 or to such other address, person or email address as the party may specify by not less than seven (7) days' written notice to the other party received before the Notice was despatched provided that if the Notice is delivered by email it must also be delivered by one of the other methods specified in this Clause 14.1(c).

14.2    In the absence of evidence of earlier receipt, a Notice shall be deemed to have been duly given if:

(a)    delivered personally, when left at the address referred to in Clause 14.1(c);

(b)    sent by courier, two Business Days after posting it; and

(c)    sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 14.2 within one (1) Business Day of sending the email.

10

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 13

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

14.3    The address and email address referred to in Clause 14.1(c)are:

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| The Seller | FTX Trading Ltd c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint Jolm's Antigua and Barbuda | sam@ftx.com | CEO |
| | with a copy (which shall not constitute notice) to: Anderson Mori & Tomotsune Otemachi　Park Building 1-1-1, Otemachi Chiyoda-ku Tokyo 100-8136 Japan | ken.kawai@am t-law.com | Ken Kawai |
| The Purchaser | Quoine Corporation Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | mike.kayamori @liquid.com | CEO |
| | with a copy (which shall not constitute notice) to: Liquid Group Inc. Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | legal@liquid. com | Legal Department |

## 15.    GOVERNING LAW AND JURISDICTION

15.1    This Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

11

4152-5337-2978.6

(Asset Transfer Agreement) English Page 14

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

15.2    Any dispute, controversy or claim arising in any way out of or in connection with this Agreement (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the **"Rules"**), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential

15.3    The arbitration tribunal (**"Tribunal"**) shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

15.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Clause 15 shall be governed by the laws of Singapore.

15.5    The language of the arbitration proceedings shall be English.

15.6    Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

15.7    Nothing in this Clause 15 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

## 16.    GOVERNING LANGUAGE

16.1    This Agreement is drawn up in the English language. If this Agreement is translated into another language, the English language text prevails.

16.2.    Each notice, demand, request, statement, instrument, certificate or other communication given, delivered or made by a party to any other party under or in connection with this Agreement shall be:

(a)    in English; or

(b)    if not in English, accompanied by an English translation made by a translator, and certified by such translator to be accurate in all material aspects.

16.3    The receiving party shall be entitled to assume the accuracy of and rely upon any English translation of any document provided pursuant to Clause 16.2(b).

## 17.    COUNTERPARTS

This Agreement may be executed in any number of counterparts and by the Parties on separate counterparts, each of which when executed and delivered shall be an original and all of which when taken together shall constitute one and the same Agreement.

12

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 15

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

## SCHEDULE 1
## Completion Requirements

1.  At Completion, the Seller shall deliver, or procure delivery, to the Purchaser of, or make available to the Purchaser:

    (a)  physical possession of all the Assets capable of passing by delivery (if any), with the intent that title in such Assets shall pass by and upon such delivery;

    (b)  all such other assignments and/or novations together with the requisite notices, licenses, documents of title and relevant Third Party Consents as may be necessary to vest in the Purchaser title to all of those Assets which are not transferable by delivery and which will permit the Purchaser to enter into and take possession of the Assets;

    (c)  all the hard copies of the Customer Contracts (if any);

    (d)  the Records, duly written up to the Completion Date;

    (e)  a copy of the resolutions passed by the board of directors of the Seller authorising the execution by the Seller of this Agreement and all other documents ancillary to it or the transactions contemplated under this Agreement, and authorising the relevant signatory or signatories to execute this Agreement and any such other documents on behalf of the Seller;

    (f)  any other documents as the Purchaser shall reasonably request the Seller to execute and deliver to it in order to effect the transfer to the Purchaser of the Assets.

2.  At Completion, the Purchaser shall deliver to the Seller:

    (a)  duly executed counterparts of the agreements or deeds and other documents referred in Paragraph 1(b) of this Schedule 1; and

    (b)  a copy of the resolutions passed by the board of directors of the Purchaser authorising the execution by the Purchaser of this Agreement and all other documents ancillary to it or the transactions contemplated under this Agreement.

Signature Page for Seller

4152-5337-2978.6

(Asset Transfer Agreement) English Page 16

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**EXECUTED by the Parties:**

**Seller**

Signed by **SAM BANKMAN-FRIED** )       DocuSigned by:

as duly authorised representative of )

and for and on behalf of )       Sam Bankman-Fried

**FTX TRADING LTD.** )       672DA88132804B9...

14

4152-5337-2978.6

(Asset Transfer Agreement)  English Page 17

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**Purchaser**

Signed by KARIYA KAYAMORI as   )
the representative director of and for   )
and on behalf of   )          — DocuSigned by:
**QUOINE CORPORATION**   )          — AF51D8AA2A454C9...

Signature Page for Purchaser

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 1

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**締結版**

2021年11月19日付

FTX TRADING LTD.

と

QUOINE 株式会社

の間の

---

資産譲渡契約

---

1

(Asset Transfer Agreement) Japanese Translation Page 2

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

## 目　次

条項                                                                                          ページ

| | | |
|---|---|---|
| 1. | 解釈 | 1 |
| 2. | 売買 | 4 |
| 3. | 対価 | 5 |
| 4. | 前提条件 | 5 |
| 5. | 完了 | 6 |
| 6. | 保証 | 6 |
| 7. | 譲渡 | 7 |
| 8. | 除外債務および引受債務 | 8 |
| 9. | 前払金および配分 | 9 |
| 10. | 完了前の義務 | 9 |
| 11. | 完全合意条項 | 10 |
| 12. | 修正条項 | 10 |
| 13. | 分離条項 | 10 |
| 14. | 通知 | 10 |
| 15. | 準拠法および管轄裁判所 | 11 |
| 16. | 使用言語 | 12 |
| 17. | 副本 | 12 |
| スケジュール 1 完了要件 | | 13 |

0

4152-5337-2978. 6

(Asset Transfer Agreement) Japanese Translation Page 3

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

この契約は2021年11月19日に締結されました

間：

(1) アンティグア・バーブーダに設立され、登録事務所がアンティグア・バーブーダ、セントジョンズ、ローワーファクトリーロードにある**FTX TRADING LTD.**（「**売主**」）

(2) **QUOINE株式会社**（以下「**買主**」）は、〒101-0054東京都千代田区神田錦町3-17ヒロセビル1Fに主たる事業所を有する日本法人です。

（それぞれを「当事者」、総称して「両当事者」という。）

一方：

(A) 両当事者、および買主の親会社であるLiquid Group Inc.の株主および/またはストックオプション保有者は、主要株主SPA（以下に定義）およびその他の特定の売買契約を締結しており、これに基づいて売主はLiquid Group Inc.の株式、ストックオプション、優先株式ワラントを取得することになります（「**Liquid株式譲渡**」）。

(B) 流動株式譲渡に関連して、売主は本契約の条件に従い、資産（以下に定義）を売却することに同意し、**買主は資産を購入することに同意しました。**

両当事者は以下のように合意する。

1. 解釈

1.1 本契約において：

「**売掛金**」とは、契約完了日時点で売主に対して支払期限が到来している顧客契約に基づく売掛金を意味します。

「**関連会社**」とは、ある人物に関して、その人物を支配する、その人物によって支配される、またはその人物と共通の支配下にある他の人物を意味します。この定義の目的上、ある特定の人物に関して使用される「**支配**」とは、議決権付き証券またはその他の受益権の所有を通じて、契約またはその他の方法により、直接的または間接的に、その人物の経営および方針を指揮する権限を意味します。**「支配する」および「支配される」という用語は、前述と相関する意味を持ちます。**

「**資産**」とは、第2.1項に規定される本契約に基づいて売買される資産を意味します。

「**引受債務**」とは、**(i) 資産に関して生じる売主のすべての負債、債務および義務、および (ii) 完了後に顧客契約によって創出または生じるすべての債務および義務（除外債務を除く）** を意味します。

1

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 4

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

「営業日」とは、土曜日、日曜日、または日本国東京において法律により銀行の休業が義務付けられている、または認められているその他の日以外の日を意味します。

「完了」とは、第5条に従って資産の売買が完了したことを意味します。

「完了日」とは、完了が発生した日を意味します。

「条件」は第4.1項に定義された意味を持ちます。

「流動資産」とは、売主が完了時点で保有する以下の資産を意味します。
日付：

(a) 売掛金、および

(b) 顧客契約に基づいて売主が保有するデジタル資産。

「顧客契約」とは、売主と顧客との間で締結された契約であって、**売主が、顧客に対し、取引所を利用してデジタル資産又はその派生物の売買、交換、保有その他の取引を行うために売主の運営する取引所を利用することを可能にするサービスを提供することに合意したもの**、又は**売主が売主のウェブサイトを通じて提供するその他のサービス**を意味し、「顧客契約」とは、それらのうちのいずれかを意味します。

「顧客データ」とは、**顧客契約に基づいて売主が提供するサービスにアクセスする権利を持つ者の個人データ**を意味します。

「顧客前払い」とは、有効期間後に提供される製品またはサービスに関して、有効期間前に顧客が売主に対して行う支払い、前払いまたは預託金を意味します。

「顧客」とは、**日本国内に所在し、売主と顧客契約を締結している売主の既存の顧客**を意味します。

「デジタル資産」とは、取引所を使用して取引できるビットコイン、イーサ、またはその他のデジタル資産、暗号通貨、仮想通貨、トークンを意味します。

「有効時間」とは、完了日の午前 10 時を意味します。

「担保権」には、あらゆる人物のあらゆる権益または株式（あらゆる取得権、選択権または先買権を含む）、およびあらゆる抵当権、担保権、質権、先取特権、譲渡、抵当権設定、担保権（法律によって設定されたものを含む）、所有権留保またはその他の担保契約または取り決めが含まれます。

「取引所」とは、売主が運営するFTX暗号通貨デリバティブ取引所を意味します。

「除外債務」とは、発効期間前のいずれかの時点での資産または顧客契約に関連または起因する、またはその結果生じた、売主が第三者に対していつでも支払うべき、または負っているあらゆる種類の負債、債務、および義務（確定したものと偶発的なものの両方）を意味し、これには以下が含まれますが、これらに限定されません。

2

4152-5337-2978. 6

(Asset Transfer Agreement) Japanese Translation Page 5

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

    (a)  売主が発効期間中に提供したサービスに関して発効期間前後に発生するすべての債務、請求、訴訟、手続き、要求、費用および経費。

    (b)  取引から生じる利益または課税対象となる利益に対する、または発効時までの期間に関する課税義務

**「のれん」**とは、資産に関連するのれんを意味します。

**「流動株式譲渡」**とは、前文で定義された意味を持ちます。

**「ロングストップ日」**とは、2022年3月31日、または第14.6条に従って両当事者が書面で合意したその他の日を意味します。

**「損失」**には、すべての債務、費用、経費、損害および損失（直接的、間接的または結果的な損失、利益の損失、評判の損失、すべての利息、罰金および関連費用（完全補償ベースで計算）およびその他のすべての合理的な専門的費用および経費を含む）が含まれます。

**「主要株主SPA」**とは、2021年11月19日付けで栢森利弥、Seth Melamed、JAFCO SV4 Investment Limited Partnership、IDG China Venture Capital Fund V LP、IDG Bitmain Fund LP、IDG China V Investors LP、売主、およびLiquid Group Inc. の間で締結された、Liquid Group Inc.（主要株主）の株式、ストックオプションおよびワラントの売買に関する特定の契約を意味します。

**「通知」**とは、第14.1条に定義された意味を持ちます。

**「譲渡通知」**とは、顧客契約に基づき**売主および買主が顧客に対して発行する譲渡通知**を意味します。

**「人」**とは、自然人、会社、法人、合名会社、有限責任組合、個人事業、合弁会社、会社、信託、基金、組合、政府、法定機関または公的機関、または法人化または非法人化組織または協会。

**「個人データ」**とは、特定された、または特定可能な自然人に関するあらゆる情報を意味します。特定可能な自然人とは、特に名前、識別番号、位置データ、オンライン識別子などの識別子、またはその自然人の身体的、生理学的、遺伝的、精神的、経済的、文化的、または社会的アイデンティティに固有の1つ以上の要素を参照することにより、直接的または間接的に特定できる人物です。

**「記録」**とは、あらゆる媒体で保持されている資産に関連する売主のすべての帳簿、ファイル、記録、その他の文書および書面資料を意味し、これにはすべての会計帳簿、元帳、収入記録、クライアント、顧客、サプライヤーに関する情報、その他の帳簿、文書、コンピューター記録が含まれますが、これらに限定されません。ただし、売主が法律により保持することが義務付けられている記録は除きます。

**「留保資産」**とは、第7.5条に定義されている意味を持ちます。

**「規則」**とは、第15.2項に定義される意味を持ちます。

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 6

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**「売主の弁護士」**とは、東京都「代田区大手町1-1-1大手町パークビルのアンダーソン・毛利・友常法律事務所、およびその関連会社を指します。

**「SIAC」**は第15.2条に定義される意味を持ちます。

**「課税」**とは、日本またはその他の管轄区域の課税対象となるあらゆる形態の課税、料金、関税、賦課金、寄付、賦課金、源泉徴収または債務、およびこれらに関連する罰金、罰金、付加金、利息、料金または費用を意味します。

**「第三者に対する請求」**とは、資産にのみ起因する、または資産にのみ関連する範囲で、第三者に対して売主および/またはその関連会社に有利なあらゆる種類の請求、訴訟原因、訴訟提起、回収権および相殺権（既知か未知か、現在係争中か、申し立て済みか、その他かを問わず）を意味し、明示的または黙示的な保証に基づくすべての権利も資産にのみ関連する範囲で含み、**「第三者に対する請求」**とはそれらのいずれかを意味します。

**「第三者の同意」**とは、買主に有利な資産の譲渡、移転、譲渡または更改のために第三者から要求される同意、ライセンス、承認、許可または放棄を意味します。

**「第一種登録」**とは、買主が金融商品取引法で定義される第一種金融商品取引業（第一種金融商品取引業）として登録することを意味します。

**「裁判所」**とは、第15.3条に定める意味を有する。

1.2 条項への言及は、本契約の条項または下位条項への言及です。

1.3 スケジュールへの言及は、本契約のスケジュールを指します。スケジュールは本契約の一部を構成します。

1.4 見出しは参照を容易にするためのものであり、本契約の一部を構成するものではありません。

1.5 時刻に関する言及は、反対の表示がない限り、日本時間に関する言及です。

**2. 売買**

2.1 本契約の条件に従い、発効日から、売主はすべての負担から解放された状態で、以下の資産を売却、移転、譲受、譲渡し、買主はこれを購入するものとする。：

    (a) 流動資産

    **(b) 顧客契約**

    **(c) 顧客データ**

    (d) 記録

1

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 7

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

(e) 第三者に対する請求

(f) のれん。

**2.2 本契約の条件に従い、発効日から、買主は引受債務を引き受け、支払い、履行および免除することに同意するものとします。**

2.3 除外債務は、本契約に基づく資産の売買の一部を構成するものではありません。

## 3. 対価

資産および引受債務の対価は合計1,000,000米ドルとなります。

## 4. 前提条件

4.1 本契約に従って以下の条件（**「条件」**）が満たされるか放棄されることを条件とします。

(a) 本契約に基づいて想定される取引の完了に必要な売主の企業承認がすべて取得されていること。

(b) 本契約に基づいて予定されている取引を完了するために必要な買主の企業承認がすべて取得されていること。

(c) 本契約に基づく売主から買主への資産および引受債務の譲渡に必要なその他すべての同意、承認および許可が得られていること。

(d) 本契約に基づき売主が行った表明および保証は、完了日までの間、**あらゆる点で真実かつ正確であり、いかなる点においても誤解を招くものではないこと。**

(e) 本契約に基づき買主が行った表明および保証は、完了日までの間、**あらゆる点で真実かつ正確であり、いかなる点においても誤解を招くものではないこと。**

(f) 主要株主SPAに基づく流動株式移転の完了は、本契約に基づく完了と同時に完了しているか、または完了しているものとする。

4.2 売主は、本契約の締結後できる限り速やかに、かついかなる場合でも最終期限日の午後5時までに、第4.1条（a）、第4.1条（c）、**第4.1条（d）**、および第4.1条（f）に**定める各条件を満たすよう合理的な努力を払うものとします。**

4.3 買主は、本契約の締結後できる限り速やかに、かついかなる場合でも最終期限日の午後5時までに、第4.1条（b）、第4.1条（c）、**第4.1条（e）**、および第4.1条（f）に**定める条件を満たすよう合理的な努力を払うものとします。**

5

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 8

DocuSign Envelope ID: 17292B8F-FF60-4B09-8AB0-0F69678AD918

4.4 売主または買主は、いつでも、**条件が満たされることを妨げる可能性のある事実、事項または状況を認識した場合は、直ちに書面で相手方に通知する**ものとします。

4.5 第 4.1 条に定める条件が売主または買主（該当する場合）によって満たされず、売主と買主の合意によって放棄されず、かつロングストップ日の午後 5 時までに売主（第 4.1 条 (c) 項に関してのみ）または買主（第 4.1 条 (d) 項に関してのみ）によって放棄されなかった場合、本契約は自動的に即時終了します。

4.6 ロングストップ日は、売主と買主の書面による合意により延長することができますが、その場合、取引は本契約と同一の条件で完了するものとします。

4.7 各当事者のその他の権利および義務は契約終了と同時に直ちに消滅しますが、契約終了は契約終了日時点での当事者の発生した権利および義務に影響を及ぼしません。

## 5. 完了

5.1 本契約の条件に従い、完了は売主の弁護士事務所で行われるものとし、または両当事者が別途合意する場合は、すべての条件が満たされるか放棄された時点で、文書および署名の電子的な交換を介して遠隔で行われるものとし、または両当事者が書面で合意するその他の場所および期間に行われるものとする。

5.2 完了時に、売主は、売主が保管しているすべての関連権利文書とともに、付表 1 の第 1 項に規定する文書および**引渡しによって譲渡可能なすべての資産（ある場合）を買主に引き渡す**ものとします。

5.3 完了時に、買主は以下の義務を負う。

    (a) 売主が第5.2条に基づく義務を履行することを条件として、売主に対し現金、電信送金、または同等の価値のデジタル資産の譲渡により1,000,000米ドルを支払うものとし、当該金額の受領は、買主による本第5.3条(a)に基づく義務の履行の完全な履行を構成するものとする。

    (b) 売主に附則1第2項に定める書類を交付する。

## 6. 保証

6.1 売主は買主に対して以下を保証します。

    (a) 売主は各資産（有形か無形かを問わない）に対する有効かつ市場性のある所有権を有し、各資産は法的にかつ実質的に売主が単独で所有していること。

    (b) 資産のいずれにも負担がなく、売主は資産またはその一部に負担を設けることに同意していないこと。

    (c) 売主は、本契約および本契約で言及されている文書（売主が当事者である）を締結し、履行するために必要な権限を有し、

6

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 9

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

それぞれの条件に従って売主に対して有効、法的かつ拘束力のある義務を構成する（または実行されると構成する）：

(d) 売主による本契約書および本契約書で言及される文書（売主が当事者であるもの）の締結および履行は、売主の定款、または売主を拘束するあらゆる合意、法律、規則、命令、判決、またはその他の制限に違反せず、不履行を構成しないこと。
そして

(e) 顧客契約はすべて有効であり、その条件に従って売主によって執行可能であり、顧客契約のいずれの当事者も重大な違反を犯していない。

6.2 買主は売主に対して以下を保証します。

(a) 買主は、本契約および本契約で言及される文書（買主が当事者であるもの）を締結し、履行するために必要な権限を有し、それらの文書は、それぞれの条件に従って買主に対して有効で法的かつ拘束力のある義務を構成する（または実行されると構成される）こと、および

(a) 買主による本契約および本契約で参照される文書（買主が当事者であるもの）の締結および履行は、買主の定款、または買主を拘束するあらゆる契約、法律、規則、命令、判決、またはその他の制限に違反せず、不履行を構成しない。

## 7. 譲渡

7.1 第7.2条に従い、本契約は、第三者の同意なく譲渡可能なすべての顧客契約および第三者請求の権利、義務および契約上の地位を、それぞれ発効日から買主に譲渡するものとみなします。

7.2 顧客契約または第三者請求の権利、義務および契約上の地位の譲渡または譲渡の試みが、かかる顧客契約の違反を構成するため第三者に当該顧客契約または第三者請求を否認させる原因となる範囲において、本契約は当該顧客契約または第三者請求の譲渡または譲渡の試みを構成するものではありません。

7.3 完了時に資産が買主に引き渡されず正式に譲渡、移転、譲受されていない場合、または資産が買主に正式に譲渡、移転、譲受されるまで、次のとおりです。

(a) 売主は、当該資産およびそれに基づいて受け取った金銭、物品またはその他の利益のすべてを買主のために信託して保有するものとみなされる。

(b) 法律または関連する契約の条件に基づいて許容される範囲において、以下のことを行う：

(i) 売主は、買主の協力を得て、自らの費用で、買主が当該資産の利益、使用および享受を受け、収益を受け取ることができるよう、あらゆる合理的な努力を払うものとする。

7

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 10

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

また、買主が随時要求する、当該資産に関連するすべての帳簿、書類、その他の情報へのアクセスを提供するものとする。

(ii) 買主は、顧客契約である当該資産に関する売主のすべての義務を履行するものとする。

7.4 資産および/または引受債務を買主に譲渡するために第三者の同意が必要であり、完了前にかかる第三者の同意が得られていない場合、売主は完了後、可能な限り速やかにかかる同意を得るためにあらゆる合理的な努力を払い、第三者の同意を受領した後、買主の要求に応じて当該資産および/または引受債務の譲渡、移転、または譲受を行うものとし、買主はかかる目的のために合理的な範囲で売主に協力するものとします。

7.5 資産および/または引受債務に関して第三者の同意が拒否された場合、または完了日から3カ月以内に同意が得られなかった場合、両当事者はそれぞれ、売主および買主が合理的に受け入れられる代替案を達成するためにあらゆる合理的な努力を払うものとし、これに従って買主は関連する資産の利益を全額受け取り、関連する引受債務の義務を全額引き受けるものとします。完了日から6ヶ月以内に売主および買主が合理的に受け入れられる代替案が見つからない場合、両当事者は、かかる資産（以下「留保資産」といいます）に関して以下の規定を適用するものとします。

(a) 留保資産が顧客契約の利益である場合、買主は、いずれの当事者もそれ以上の責任を負うことなく、売主に対し、顧客契約を解除するために合理的な努力を払うよう要求することができる。

(b) 顧客契約ではない留保資産に関しては、当該留保資産は資産の売却から除外されるものとする。

(c) いずれの当事者も、事前の違反に起因する範囲を除き、留保資産に関して他方の当事者に対してそれ以上の義務を負わないものとする。

7.6 本契約に基づき売主から買主に譲渡された各顧客契約について、売主は、当該顧客契約に基づく顧客が、譲渡時点における買主のユーザー契約の条件に同意するよう、実務上合理的かつ可能な範囲で、買主に協力するものとする。

## 8. 除外債務および引受債務。

補償

8.1 本契約に別段の合意がない限り、

(a) 売主は、除外債務を履行する責任を負い、そのような除外された債務および売主による本条項8.1(a)の違反の結果として生じる損失に関して、買主を補償し、買主を完全に補償し続けるものとする。

8

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 11

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

  (b) 条項8.1 (a) に従い、発効時から、**買主は引受債務を履行する責任を負い**、買主による本条項8.1 (b) の違反の結果として売主が被ったすべての損失に対して売主を補償し、完全に補償し続けるものとします。

8.2 買主は、完了時に売主に対して未払いとなっている契約違反金について、また完了前の資産に関する売主の行為、不作為または債務不履行の結果として生じた請求について、いかなる者からも売主に対してなされた請求について責任を負わないものとします。

8.3 発効時間後、各当事者は、当該当事者による本契約の違反に起因して他方当事者が被った、またはこれに関連し、またはこれに起因して生じた損失について、他方当事者を補償し、免責するものとします。

## 9. 前払金および配分

9.1 すべての顧客の前払い金は、有効期間を基準として次のように配分されるものとします。

  (a) 売主は、有効期間以前に終了する期間に関連する顧客前払金の一部を受け取る権利を有するものとする。

  (b) 買主は、有効期間後の期間に関連する顧客前払金の一部を受け取る権利を有するものとします。

9.2 本第 9 条に基づき売主がまたは売主に支払うべき純額 (ある場合) は、本第 9 条に基づき売主が買主に支払うべき金額 (ある場合) と買主が売主に支払うべき金額 (両方ともある場合) を、完了後可能な限り速やかに相殺することにより、本契約の両当事者間で合意されるものとします。当該合意後 14 日以内に、買主は売主に、または売主は買主に (状況に応じて) 当該金額を支払うものとします。

## 10. 完了前の義務

### 10.1 **本契約の締結後、可能な限り速やかに、売主は買主に顧客データを開示するものとする。**

10.2 本契約の締結後、可能な限り速やかに、買主は以下のことを行うものとし、売主は買主に協力するものとする。

  (a) 適用される基準とガイドラインに従って、完了前に可能な限り多くの顧客に対して「顧客確認」手順とコンプライアンスチェックを実施するために、商業的に合理的な努力を払う。

  (b) **売主のアプリケーション・プログラミング・インターフェースのデータを解析し、現在の資産と顧客のデータをすべて受け取る。**

9

（Asset Transfer Agreement）Japanese Translation Page 12

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

10.3 本契約の締結後、可能な限り速やかに（ただし、本契約の完了までに）、**売主と買主は、両当事者が相互に合意した形式で、各顧客に対し、共同で譲渡通知を発行するものとする。**

## 11. 完全合意条項

本契約は、その主題に関する両当事者間の完全な合意を構成し、かかる主題に関する従前のあらゆる合意（書面または口頭による）に優先します。

## 12. 修正条項

本契約の修正または変更は、書面で行われ、両当事者またはその代理人によって署名されない限り、有効になりません。

## 13. 分離条項

いずれかの管轄区域の法律に基づく本契約のいずれかの規定の違法性、無効性または執行不能性は、他の管轄区域の法律に基づくその規定の合法性、有効性または執行可能性、または本契約のその他の規定の合法性、有効性または執行可能性に影響を与えないものとします。

## 14. 通知

14.1 本契約に基づく、または本契約に関連する通知またはその他の連絡（以下**「通知」**）は、次のとおりとします。

    (a) 書面で：

    (b) 英語で

    (c) 通知は、第 14.3 条に定める住所に通知を受け取る予定の当事者に直接手渡しするか、国際的に認められた宅配会社による宅配便で送付するか、または電子メールで送付されるものとし、通知が発送される前に相手方に 7 日以上前に書面で通知することにより当事者が指定するその他の住所、人物、または電子メール アドレスに送付されるものとします。ただし、通知が電子メールで送付される場合は、本第 14.1(c) 条に定めるその他の方法のいずれかでも送付されるものとします。

14.2 早期受領の証拠がない場合、以下の場合には通知は正当に行われたものとみなされる。

    (a) 第14.1条(c)に規定する住所に直接手渡された場合

    (b) 宅配便で発送される場合は、発送後2営業日以内に発送されます。

    (c) 電子メールで送信された場合、電子メールが送信された時点で、通知のコピーが電子メールの送信後1営業日以内に本条項14.2に規定する別の方法で送信されるものとします。

10

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 13

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

14.3 第14.1項(c)に規定する住所および電子メールアドレスは以下のとおりです。

| 当事者名 | 住所 | 電子メールアドレス | マーク<br>注目のために |
|---|---|---|---|
| 売主 | FTXトレーディング株式会社<br>コーポレート&トラスト<br>サービス（カリブ海）<br>限定下部工場<br>道路<br>セント・ジョルムズ<br>アンティグア・バーブーダ | サム@ftx.com | 最高経営責任者<br>(CEO) |
| | コピー（<br>構成されない<br>通知先：<br>アンダーソン・モリ&<br>友常<br>大手町パークビル<br>大手町1-1-1<br>千代田区<br>〒100-8136 東京都港区芝大<br>塚2-1-1<br>日本 | ken.kawai@am<br>t-law.com | 河合 健 |
| 買主 | Quoine 株式会社<br>広瀬ビル4F<br>神田錦町3-17<br>千代田区<br>東京都101-0054<br>日本 | マイク・カヤモ<br>リ @liquid.com | 最高経営責任者<br>(CEO) |
| | コピー（<br>構成されない<br>通知先：<br>リキッドグループ株式会社<br>広瀬ビル4F<br>神田錦町3-17<br>千代田区<br>東京都101-0054<br>日本 | 法的@liquid.<br>com | 法律上の<br>認可 |

**15. 準拠法および管轄裁判所**

**15.1 本契約（その存在、有効性または終了に関する紛争を含む）および本契約に起因または関連して生じる非契約上の義務またはその他の事項は、日本法に準拠します。**

11

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 14

DocuSign Envelope ID:17292B8F–FF60–4B09–8AB0–0F69678AD918

15.2 本契約に起因または関連して何らかの形で生じる紛争、論争、または請求（以下を含むがこれらに限定されない：(i) 契約上、契約前または非契約上の権利、義務、または債務に関する問題、および (ii) 本契約の存在、有効性、違反、または終了に関する問題）は、仲裁通知が当該規則（**「規則」**）に従って提出された時点で有効なシンガポール国際仲裁センター（**「SIAC」**）規則に従って管理される拘束力のある仲裁に付託され、**最終的に**解決されるものとします。当該規則は、本条項に参照により組み込まれ、本条項の残りの部分によって修正されるものとみなされます。仲裁手続き、それに関連して提出されたすべての文書およびすべての証言（書面または口頭）、および仲裁裁定は機密扱いとなります。

15.3 仲裁裁判所（**以下「裁判所」**）は、両当事者が別途 1 人の仲裁人に同意しない限り、規則に従って任命される 3 人の仲裁人によって構成されるものとします。

15.4 仲裁の場所および裁判地はシンガポールとします。本第 15 条の仲裁合意はシンガポールの法律に準拠するものとします。

15.5 仲裁手続きの言語は英語とする。

15.6 仲裁裁判所の裁定は書面で行われ、裁定が下された日から最終的なものとなり、両当事者を拘束するものとします。両当事者は、遅滞なく裁定を履行することを約束します。

15.7 本第 15 条のいかなる規定も、いずれかの当事者が管轄裁判所に対して保全救済または暫定的救済を求めることを妨げるものと解釈されることはありません。

## 16. 使用言語

16.1 本契約は英語で作成されます。本契約が他の言語に翻訳された場合、英語のテキストが優先されます。

16.2 本契約に基づき、または本契約に関連して当事者が他の当事者に与え、交付し、または行う各通知、要求、要請、陳述、証書、証明書またはその他の通信は、次のとおりとします。

(a) 英語で、または

(b) 英語以外の言語で作成された場合には、翻訳者による英語への翻訳を添付し、当該翻訳者によりすべての重要な点において正確であることが証明されていること。

16.3 受領当事者は、第16.2条(b)に従って提供される文書の英語翻訳の正確性を前提とし、それに依拠する権利を有するものとします。

## 17. 副本

本契約は、任意の数の副本で締結することができ、また両当事者が別々の副本で締結することができます。各副本は、締結され交付された時点で原本となり、すべてを合わせて 1 つの同一の契約を構成するものとします。

12

(Asset Transfer Agreement) Japanese Translation Page 15

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

## スケジュール1
## 完了要件

1. 完了時に、**売主は、以下のものを買主に引き渡すか、引き渡しを手配するか、または買主に利用可能にするものとします。**

   (a) **引渡しによって所有権が移転することを意図して、引渡しによって移転できるすべての資産（もしあれば）の物理的所有権；**

   (b) **その他すべての譲渡および/または移転と、必要な通知、ライセンス、権利証書、および関連する第三者の同意で、引渡しによって譲渡ができないすべての資産に対する所有権を買主に付与するために必要なもので、買主が資産を取得し占有することを可能にするもの；**

   (c) 顧客契約書のすべてのハードコピー（ある場合）；

   (d) 完了日までに正式に作成された記録；

   (e) 売主が本契約および本契約に付随するその他すべての文書、または本契約に基づき企図される取引を締結することを承認し、関連する署名者または署名者に売主を代表して本契約およびその他すべての文書を締結する権限を付与する、売主の取締役会で可決された決議のコピー；

   (f) 資産の買主への譲渡を実行するために、買主が売主に作成し、交付するよう合理的に要求するその他の文書。

2. 完了時に、買主は売主に以下を引き渡すものとする。

   (a) この附則第1項 (b) に規定する契約書または証書およびその他の文書の適正に作成された写し、および

   (b) 買主の取締役会が可決した、買主による本契約および本契約に付随するその他すべての文書、または本契約に基づいて企図される取引の締結を承認する決議のコピー。

売主の署名ページ

4152-5337-2978.6

(Asset Transfer Agreement) Japanese Translation Page 16

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**両当事者により執行される：**

**売主**

署名： **サム・バンクマン・フリード**　）　──── 文書署名者：
の正当に認可された代表者として、　　　）
　　　　　　　　　　　　　　　　　　　）　サム・バンクマン・フリード
**ＦＴＸトレーディング株式会社**　　　　）　──── 672DA88132804B9...

14

4152-5337-2978. 6

(Asset Transfer Agreement) Japanese Translation Page 17

DocuSign Envelope ID:17292B8F-FF60-4B09-8AB0-0F69678AD918

**買主**

代表取締役である栢森加里矢が署名　　　）
　　　　　　　　　　　　　　　　　　　）　　　┌─── 署名者：
　　　　　　　　　　　　　　　　　　　）　　　│
QUOINE株式会社　　　　　　　　　　）　　　└─── AF51D8AA2A454C9···

買主の署名ページ

The following is an excerpt and summary of the most significant portions of this asset transfer agreement.

---

(B)    In connection with the Liquid Share Transfers, FTX Trading has agreed to sell, and **FTX Japan has agreed to purchase, the Assets (as hereinafter defined), subject to and on the terms and conditions of this Agreement**.

---

1.1

"**Assets**" means the assets to be sold and purchased under this Agreement as specified in Clause 2.1.

The term "**Assumed Liabilities**" means **(i) all liabilities, debts and obligations of FTX Trading arising in respect of the Assets and (ii) all liabilities and obligations (other than Excluded Liabilities) created or arising by the Client Agreement after Completion**.

(b)    Digital Assets held by the FTX Trading under the Customer Contracts

"**Customer Contracts**" means the agreements entered into between the FTX Trading and the Customers pursuant to which **the FTX Trading has agreed to provide services to the Customers to use the Exchange to buy, sell, exchange, hold, or otherwise transact in Digital Assets or their derivatives**, or **any other services offered by the FTX Trading through its website**, and "**Customer Contract**" means any one of them.

"**Customers**" means **the existing customers of FTX Trading who are located in Japan and have entered into a Customer Contract with FTX Trading**.

"**Notice of Assignment**" means **the notice of assignment to be issued by FTX Trading and FTX Japan to the Customers under the Customer Contracts**.

---

2.1    Subject to the terms and conditions of this Agreement, with effect from the Effective Time, FTX Trading shall sell, transfer, assign, convey free from all Encumbrances, and FTX Japan shall purchase, the Assets set out below:

(a)    the Current Assets;
(b)    **the Customer Contracts**;
(c)    the Customer Data;
(d)    the Records;

2.2

Subject to the terms and conditions of this Agreement, with effect from the Effective Time, **FTX Japan shall assume and agree to pay, perform and discharge the Assumed Liabilities**.

4.

4.1    Completion is conditional upon the following conditions (the **"Conditions"**) being satisfied or waived in accordance with this Agreement:

(d)    the representations and warranties given by FTX Trading under this Agreement remaining true and **accurate in all respects and not misleading in any respect up to and including the Completion Date**;

(e)    the representations and warranties given by FTX Japan under this Agreement remaining true and **accurate in all respects and not misleading in any respect up to and including the Completion Date**; and

4.2

FTX Trading shall use its reasonable endeavours to achieve satisfaction of Condition set out in Clauses 4.1(d) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

4.3

FTX Japan shall use its reasonable endeavours to achieve satisfaction of Condition set out in Clause 4.1(e) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

4.4

If, at any time, FTX Trading or FTX Japan becomes aware of a fact, matter or circumstance that might prevent a Condition from being satisfied, it shall immediately inform the other Party in writing.

7.3

**In so far as any Assets are not delivered or formally transferred, novated or assigned to FTX Japan at Completion and until such time as they are formally transferred, novated or assigned to FTX Japan:**

(a) **FTX Trading shall be deemed to hold all such Assets, and any monies, goods or other benefits received thereunder, on trust for FTX Japan; and**

(b) to the extent permissible under law or the terms of any relevant agreement:

   (ii) **FTX Japan shall perform all the obligations of FTX Trading in respect of such Assets which are Customer Contracts.**

## 8. EXCLUDED LIABILITIES AND ASSUMED LIABILITIES; INDEMNIFICATTION

8.1 Unless agreed otherwise in this Agreement:

(a) FTX Trading shall be responsible for discharging the Excluded Liabilities and shall indemnify FTX Japan and keep FTX Japan fully indemnified in respect of such Excluded Liabilities and any Losses arising as a result of the breach by FTX Trading of this Clause 8.1(a); and

(b) subject to Clause 8.1(a), with effect from the Effective Time, **FTX Japan shall be responsible for discharging the Assumed Liabilities** and shall indemnify FTX Trading and keep it fully indemnified against all Losses incurred by FTX Trading as a result of the breach by FTX Japan of this Clause 8.1(b).

## 10. PRE-COMPLETION OBLIGATIONS

10.1

As soon as practicable after the signing of this Agreement, **FTX Trading shall disclose the Customer Data to FTX Japan.**

10.2

As soon as practicable after the signing of this Agreement, **FTX Japan shall, and FTX Trading shall cooperate with FTX Japan for FTX Japan to:**

(a)  use commercially reasonable efforts to conduct the "Know Your Client" procedure and compliance checks on as many of the Customers as practicable prior to Completion in accordance with the applicable standards and guidelines; and

(b) develop the parsing of the application programming interface data of FTX Trading in order to receive all the Current Asset and Customer Data.

10.3

As soon as practicable after the signing of this Agreement but by no later than Completion, FTX Trading and FTX Japan shall jointly issue the Notice of Assignment, in a form mutually agreed by the Parties, to each Customer.

11.

This Agreement constitutes the entire agreement between the Parties relating to its subject matter and supersedes any prior agreements (whether in writing or oral) relating to such subject matter.

To repeat, because it is very important, with the execution of the asset transfer agreement, all existing customer contracts and their assets located in Japan that had customer contracts with FTX Trading were to be purchased by FTX Japan, and FTX Japan was to fulfill all obligations that FTX Trading had assumed.

The representations and warranties made by FTX Trading and FTX Japan under the Asset Transfer Agreement were, up to the date of completion, true and accurate in all respects and were arrangements which must not be misleading in any respect.

The transfer notices sent under the Asset Transfer Agreement were sent by email between February and March 2022, which FTX Japan and FTX Trading jointly issued to FTX Trading customers located in Japan in a form mutually agreed upon by the parties.

Where assets had not been delivered to FTX Japan and were not formally assigned, transferred or transferred, or until the assets were formally assigned, transferred or transferred to FTX Japan, FTX Trading would hold all such assets and any money, goods or other benefits received therefrom in trust for FTX Japan. The arrangement was for the assets to be held on trust for the benefit of FTX Japan.

FTX Trading or FTX Japan was obliged to notify the other party in writing immediately if, at any time, it became aware of any facts, matters or circumstances that might prevent the conditions from being fulfilled.

(2)   Sending transfer notices based on asset transfer agreements

FTX Trading sent several transfer notices via email to FTX Trading subscribers located in Japan during February and March 2022. These were notices that the asset transfer agreement specified were to be prepared by mutual agreement between FTX Trading and FTX Japan.

   The transfer notice stated that all FTX Trading customers located in Japan were eligible. It also stated that the account would become an FTX Japan (formerly known as Quoine) account as of April 4, 2022, if the identity of the customer was not verified.

The final version of the transfer notice   received by the claimant in this case from FTX Trading is as follows. (Quoine K.K. is the former trade name of FTX Japan K.K.). This is the same as the one described in Docket 20744.

---

**FTX** <support@ftx.com>                                                    2022 年 3月31日



# 日本のお客様へ重要なお知らせ—
# Important Notice to Japanese Customer

FTX ユーザーの皆様

2022 年 2 月 2 日にすでにお知らせしましたとおり、当社は、Liquid と戦略的契約を締結し、2022 年 3 月 30 日をもって当社のすべての既存の日本ユーザーを Liquid の完全子会社であり日本の暗号資産交換業者兼第一種金融商品取引業者である Quoine 株式会社（以下「Quoine」といいます。）に移管する予定でしたが、2022 年 4 月 4 日に延期されました。

---

English Translation:

As previously announced on February 2, 2022, we have entered into a strategic agreement with Liquid to transfer **all of our existing Japanese users** to Liquid's wholly-owned subsidiary on March 30, 2022. The transfer was scheduled to be transferred to Quoine, Inc. (hereinafter referred to as "Quoine"), an asset exchange service provider and type I financial instruments business operator, but has been postponed to April 4, 2022.

当社は、お客様が日本居住者であることを確認しましたので、Quoine の
お客様として引き続きサービスをご利用いただくために、こちら
ftx.com/jp/kyc/でアカウント情報を更新していただく必要があります。
Quoine のお客様として継続を希望されない場合、2022 年 4 月 4 日（以
下「移管期日」といいます。）の午前 9 時まで、当社の利用規約に基づ
き、当社からお客様の資産を引き出し、お客様のアカウントを解約して
ください。



お客様は、記録上、KYC を完了しておりません。

また、移管期日までに KYC を完了しない場合、お客様は、（1）取引が
できず、（2）移管期日にレバレッジ倍率が 2 倍以下になるように強制的
に縮小され、（3）移管期日以降、資産の引き出し及び Quoine のアカウ
ントの解約以外できなくなります。Quoine のアカウントにアクセスし、
取引を継続する又は資産にアクセスするためには、上記リンクから KYC
を完了し、アカウント情報を更新していただく必要があります。

　　お客様のアカウントに関する以下の重要事項及び期限をご確認ください。

1. 2022 年 3 月 22 日以降、レバレッジが 2 倍を超えるいかなる新規ポジションも構築することができません。

2. 2022 年 3 月 26 日以降、(a)

　BTC、ETH、BCH、XRP、BAT、LTC、FTT、SOL 以外のトークンの現物取引、(b) 一切の先日付取引、及び(c)

　BTC、ETH、BCH、XRP、BAT、LTC、FTT、SOL のパーペチュアル以外のパーペチュアル取引、を行うことはできません。

3. 移管期日の午前 9 時に未約定の注文はすべて取り消され、それ以降いかなる新規注文も受け付けません。

4. お客様のアカウントは、移管期日の午前 9 時以降に Quoine に移管さ～ます。移管期日の午前 9 時に、お客様の資産及びポジションには以下の措置が行われます。

| 資産／ポジションの種類 | 移管期日午前 9 時（日本時間）時点の対応 | |
|---|---|---|
| | KYC を完了している場合 | KYC を完了していない場合 |
| 現物 | | |
| － BTC、ETH、BCH、XRP、BAT、LTC、XLM、FTT、SOL | Quoine に移管されます。 | 移管期日に Quoine に一旦移管され、その後の移行期間に KYC を完了していただきます。KYC が完了せずに移行期間が終了した場合、FTX、Quoine 及び第三者のカストディアンが別個に秘密鍵を管理するマルチシグネチャーウォレットに移管されます。お客様は、マルチシグネチャーウォレットからは、資産の引き出しのみ行うことができます。 |

- 48 -

| | | |
|---|---|---|
| - その他すべての現物残高 | FTX、Quoine 及び第三者のカストディアンが別個に秘密鍵を管理するマルチシグネチャーウォレットに移管されます。お客様は、移管期日以降、かかる資産の引き出しのみ行うことができます。また、かかる現物残高は、証拠金率の計算の対象外となります。 | |
| デリバティブ | | |
| -BTC、ETH、BCH、XRP、BAT、LTC、FTT、SOL のパーペチュアル | Quoine に移管されます。お客様が 2 倍超のレバレッジをかけている場合は、日本の規制に基づき、Quoine の利用規約に定める追証に関する規定に従い、追証が発動され、お客様のポジションの解消を避けるためには、2 営業日以内に追加証拠金を差し入れる必要があります。また、証拠金に代用暗号資産を利用している場合は、掛目が 50%に変更されますのでご注意ください。 | お客様のアカウントを Quoine に移管するまでに、レバレッジ倍率が 2 倍以下になるように強制的に縮小されます。また、証拠金に代用暗号資産を利用している場合は、掛目が 50%に変更されますのでご注意ください。 |
| - すべての先日付取引 | お客様のポジションは、利益又は損失の有無にかかわらず、移管期日に強制的にクローズし、解消されます。 | |
| -　　その他すべてのパーペチュアル | お客様のポジションは、利益又は損失の有無にかかわらず、移管期日に強制的にクローズし、解消されます。 | |
| レバレッジド・トークン、トークン化された株式及び予測市場トークン | お客様の資産及びポジションは、移管期日に強制的にクローズし、米ドルに清算したうえで、Quoine に移管されます。お客様は、移管期日以降、Quoine から米ドルを引き出すことができます。 | |

注）Quoine との取引を希望される場合、移管期日前までに①外部ウォレットに出庫する、②Quoine 取扱の暗号資産（BTC 等）に交換の上 Quoine に移管することも可能です。

また、当社の商品の日本でのローカライズの一環として、さらにいくつかの変更を行う予定です。引き続き、当社の最新の取引ルールと利用規約をご確認ください。

ご不明な点がございましたら、https://ftx.com/support のドロップダウンから「日本」を選択し、サポートチケットを送信してください。

FTX Team

---

Dear FTX user:

As previously announced on February 2, 2022, we have entered into an agreement to acquire Liquid Group, Inc. ("Liquid"). The acquisition is expected to close in late March, subject to customary closing conditions.

<u>In connection with the acquisition, and in order to provide services to existing Japanese users in compliance with Japanese laws, we have entered into a strategic transaction with Liquid, and were planning to transfer existing Japanese users of FTX to Quoine Corporation ("Quoine"), a wholly-owned subsidiary of Liquid, and a licensed Japanese crypto asset exchange service provider and Type I financial instruments business operator, on March 30, 2022.</u> This transfer has been postponed to April 4, 2022.

It was clearly stated that the purpose of this acquisition was to provide services to existing users in Japan in compliance with Japanese laws and regulations.

**We have identified you as a resident of Japan** and in order for you to continue as a Quoine customer, you will be required to provide additional KYC information. Upon logging into your account, you will be presented with a pop-up that directs you to provide updated KYC information. You may also go to ftx.com/jp/kyc/ to complete your updated KYC information directly. If you do not wish to continue as a Quoine customer, you have until 9:00 AM JST on April 4, 2022 (the "Transfer Deadline") to withdraw your assets from FTX and close your account in accordance with our Terms of Service.



However, our records indicate that you have completed KYC. **If you do not complete KYC by the Transfer Deadline, you will (1) not be able to trade, (2) be forcibly reduced down to a maximum of 2x leverage on the Transfer Deadline, and (3) will only be able to withdraw your assets and close your Quoine account after the Transfer Deadline.** In order to access your Quoine account to continue trading or to access your assets, you will need to update your account information by completing the new KYC request before April 4, 2022.

**PLEASE REVIEW THE FOLLOWING IMPORTANT INFORMATION AND DEADLINES REGARDING YOUR ACCOUNT:**

1. You will not be able to open any new positions greater than 2x

   leverage after March 22,2022.

2. You will not be able to trade (a) spot tokens other than BTC, ETH, BCH, XRP, BAT, LTC,

   XLM, FTT, and SOL, (b) any dated futures, and (c) any perpetuals other than BTC, ETH,

   BCH, XRP, BAT*, LTC*, XLM*, FTT*, SOL* perpetuals, in each case after March 26, 2022.

3. All open orders will be cancelled, and no new orders will be

   accepted after 9:00 AM JSTon the Transfer Deadline.

4. <u>You account will be transferred to Quoine starting at 9:00 AM JST</u>

   <u>on the Transfer Deadline. The following actions will be taken on</u>

   <u>your assets and positions at 9:00 AM on the Transfer Deadline:</u>

| Type of Asset or Position | Disposition at 9:00 AM JST on Transfer Deadline | |
|---|---|---|
| | **If you completed KYC** | **If you do not complete KYC** |
| **Spot** | | |
| BTC, ETH, BCH XRP, BAT, LTC, XLM, FTT, SOL | Transferred to Quoine | **Your account will be transferred to Quoine on the Transfer Deadline and you will be required to complete KYC during the subsequent transition period.** If KYC is not completed by the transition period, your assets will be transferred to a multisignature wallet held by FTX, Quoine and a third party custodian. **You will only be able to withdraw these assets after the Transfer Deadline.** |
| All other spot balances | Transferred to a multisignature wallet held by FTX, Quoine, and a third party custodian. You will only be able to withdraw these assets after the Transfer Deadline. In addition, these spot balances will no longer be taken into consideration in calculating your collateral ratio. | |