# EXHIBIT F

THE OFFER AND SALE OF THE TOKEN INTERESTS (AS DEFINED HEREIN) HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THIS OFFERING IS BEING MADE ONLY OUTSIDE THE UNITED STATES TO NON-US PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE ACT) (AND ONLY IN JURISDICTIONS WHERE SUCH OFFER AND SALE IS PERMITTED UNDER APPLICABLE LAW) IN RELIANCE ON REGULATION S UNDER THE ACT. THE TOKEN INTERESTS MAY NOT BE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE AND FOREIGN SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**TRIBAL INVEST CORP**

**RESTRICTED TOKEN GRANT AGREEMENT**

This Restricted Token Grant Agreement (this "***Agreement***") is made and entered into as of May 18, 2021 (the "***Effective Date***") by and between Tribal Invest Corp, a Panamanian corporation (the "***Company***") and the undersigned (the "***Consultant***").

**WHEREAS**, Pyth Data Foundation, a Panamanian foundation (the "***Foundation***"), is building an oracle network (the "***Pyth Network***") to provide high fidelity financial market data to the blockchain industry powered by a blockchain protocol on the Solana network (the "***Pyth Protocol***");

**WHEREAS**, the Company is a wholly-owned subsidiary of the Foundation;

**WHEREAS**, Consultant is providing certain services for the Pyth Network pursuant to the Consulting Agreement attached hereto as Exhibit A, and in consideration of the Consultant's services rendered thereunder, the Consultant obtained the right to receive, automatically and without requiring any future payment, certain cryptographic tokens (such rights, the "***Rights to Tokens***" and, collectively with any securities received in substitution or fulfillment of such rights, or in replacement thereof, the "***Token Interests***") from the Company on the terms and conditions set forth in this Agreement.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Consultant agree as follows:

1.      **GRANT OF TOKENS.** Subject to the terms and conditions of this Agreement, and contingent upon the completion of the milestones set forth on Exhibit A of the Consulting Agreement, as determined by the Company in its reasonable discretion (the "***Services Milestone***"), the Company hereby grants to Consultant, the right to receive, automatically and without requiring any future payment, an aggregate of up to 500,000,000 Pyth Tokens (the "***Tokens***"). As used herein, "***Pyth Tokens***" means the native unit of value on the Pyth Protocol.

2.      **CLOSING**.

2.1      **Deliveries by Consultant.** Consultant hereby delivers a duly executed copy of this Agreement to the Company.

2.2      **Deliveries by the Company.** Following the Company's receipt of all documents to be executed and delivered by Consultant under Section 2.1, and contingent upon the completion of the Services Milestone, the Company will deliver the Tokens to the Consultant as soon as

1

practicable upon the expiration of the applicable Transfer Restrictions (as defined below). At least ten calendar days prior to the date of the public, broad launch of the Pyth Protocol, as determined by the Company in its sole discretion ("***Mainnet Launch***"), Consultant shall provide to the Company a network address in writing to which the Tokens shall be delivered.

3.    **REPRESENTATIONS AND WARRANTIES OF CONSULTANT.** Consultant hereby represents and warrants to the Company as follows.

3.1    **Own Account.**    Consultant is receiving the Token Interests entirely for Consultant's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Consultant has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Consultant has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Consultant further represents that the Consultant does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

3.2    **Access to Information.**    Consultant has had access to all information that Consultant reasonably considers important in making the decision to receive the Token Interests, and Consultant has had ample opportunity to ask questions concerning such matters.

3.3    **Understanding of Risks.**    Consultant  is fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (<u>e.g.</u>, that Consultant may not be able to sell or dispose of the Token Interests or use them as collateral for loans); (d) the qualifications and backgrounds of the management of the Company; and (e) the tax consequences of receiving the Token Interests. Further, the Consultant understands that the Tokens involve risks, all of which the Consultant fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Pyth Protocol and the Pyth Network will not function as intended; (ii) the Pyth Network will not be completed and the Pyth Tokens will not be distributed; (iii) the Pyth Network will fail to attract sufficient interest from key stakeholders; and (iv) the Company, the Pyth Network and/or any third parties ("***Third Parties***") involved in the development of the Pyth Network may be subject to investigation and punitive actions from governmental authorities. The Consultant understands and expressly accepts that the Tokens will be delivered to the Consultant at the sole risk of the Consultant on an "AS IS" and "UNDER DEVELOPMENT" basis. The Consultant understands and expressly accepts that the Consultant has not relied on any oral or written statements, representations or warranties made by the Company, any Third Parties or any of their officers, directors, employees, consultants, Consultants, equityholders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE CONSULTANT ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

3.4    **Consultant's Qualifications.**    Consultant has a preexisting personal or business relationship with the Company of a nature and duration sufficient to make Consultant aware of the character, business acumen and general business and financial circumstances of the Company.  By reason of Consultant's business or financial experience, Consultant is capable of evaluating the merits and risks of

this transaction has the ability to protect Consultant's own interests in this transaction and is financially capable of bearing a total loss of the value of the grant.

**3.5** **No General Solicitation.** At no time was Consultant presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale and grant of the Token Interests.

**3.6** **Compliance with Securities Laws.** Consultant understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("**SEC**") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Consultant's ability to transfer the Token Interests.

**3.7** **No Public Market.** Consultant understands that no public market now exists for the Token Interests, and that the Company has made no assurances that a public market will ever exist for the Token Interests.

**3.8** **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although the Company does not concede this point in any jurisdiction. Accordingly Consultant understands and agrees as follows:

> **Consultant may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Consultant understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Consultant has also been advised that exemptions from registration and qualification may not be available or may not permit Consultant to transfer all or any of the Token Interests in the amounts or at the times proposed by Consultant. The Consultant further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Consultant's control, and which the Foundation is under no obligation and may not be able to satisfy.

**3.9** **Legends.** The Consultant understands that the Token Interests will be deemed to bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

     **3.10**     <u>**Rule 144.**</u>  In addition, Consultant has been advised that, to the extent applicable, SEC Rule 144 promulgated under the 1933 Act, which permits certain limited sales of unregistered securities, is not presently available with respect to the Token Interests and, in any event, to the extent applicable, requires that the Token Interests generally be held for a minimum of one year after they have been purchased and paid for (within the meaning of Rule 144), before they may be resold under Rule 144. Consultant understands that Rule 144 may indefinitely restrict transfer of the Token Interests so long as Consultant is an "affiliate" of the Company and certain information about the Company (as defined in Rule 144) is not publicly available.

     **3.11**     <u>**Foreign Laws**</u>.  Consultant hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Token Interests or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the receipt of the Token Interests, (b) any foreign exchange restrictions applicable to such grant and receipt, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the receipt, holding, redemption, sale, or transfer of the Token Interests.  Consultant's receipt and continued beneficial ownership of the Token Interests will not violate any applicable securities or other laws of the Consultant's jurisdiction.

     **3.12**     <u>**Regulation S Representations and Restrictions**</u>.  Consultant makes the following additional representations, warranties and agreements:

     **(a)**     Consultant is <u>not</u> a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act.  The grant of the Token Interests to the Consultant was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Consultant is not receiving the Token Interests for the account or benefit of any U.S. Person;

     **(b)**     Consultant will not, during the restricted period that is applicable to the Token Interests set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Token Interests, offer or sell any of the foregoing (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S; and

     **(c)**     Consultant will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Token Interests (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

     Consultant acknowledges and agrees that the Token Interests will be deemed to bear the legend set forth below (in addition to any other legend required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company):

     THE TOKEN INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND THE FOUNDATION DOES NOT INTEND TO REGISTER THEM.  PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, THE TOKEN INTERESTS MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH TOKEN INTERESTS) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE TOKEN INTERESTS ARE REGISTERED UNDER

THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. RECIPIENTS OF TOKEN INTERESTS PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, MAY RESELL SUCH TOKEN INTERESTS ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE TOKEN INTERESTS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE TOKEN INTERESTS WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO THE ONE YEAR ANNIVERSARY FROM THE DATE OF GRANT, RESELL THE TOKEN INTERESTS TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE TOKEN INTERESTS ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

**4.** **LOCKUP.** The Rights to Tokens and any Tokens deliverable in fulfillment thereof (as applicable at the time of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Transfer Restrictions***"):

**4.1** **Unlocked Tokens**. Until the Restricted Tokens are "Unlocked", as described below, Consultant agrees that it will not, without the prior written consent of the Company, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of (collectively, "***Transfer***") any Restricted Tokens, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens. The Restricted Tokens shall be considered to be "***Unlocked***" as follows: (a) up to and including the one-year anniversary of the First Closing Date (as defined below), no Tokens will be Unlocked; and (b) starting on the one-year anniversary of the First Closing Date and ending on the seventh (7) anniversary of the First Closing Date, the Tokens shall be Unlocked on a linear basis (monthly) beginning with 0% Unlocked on the one-year anniversary of the First Closing Date and ending with 100% Unlocked on the seven-year anniversary of the First Closing Date. As used herein, "***First Closing Date***" means the first date on which the Pyth Tokens are sold by the Company to a purchaser at a price of no less than $0.03 per Token, as determined by the Company in its sole discretion.

**4.2** **Restrictions**. To ensure compliance with these Transfer Restrictions, the Company and/or its agents and representatives may impose technological lockups or restrictions on the Restricted Tokens.

**5.** **RIGHTS AS OWNER OF TOKENS.** The Consultant is not entitled, as a holder of the Rights to Tokens or Tokens, to vote or receive dividends or be deemed the holder of equity of the Company for any purpose, nor will anything contained herein be construed to confer on the Consultant, as such, any of the rights of an equityholder of the Company or any right to vote for the election of directors of the Company or upon any matter submitted to directors of the Company at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.** **DISCLAIMER AND LIMITATION OF LIABILITY.** Neither the Company nor any of its affiliates shall be liable or responsible to the Consultant, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching the Pyth Network or distributing the Pyth Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE COMPANY MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, CONSULTANT ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE COMPANY, OR ANY OTHER PERSON ON THE COMPANY'S BEHALF.

Consultant understands that Consultant has no right against the Company or any other individual or legal entity except in the event of the Company's material breach of this instrument or intentional fraud. THE COMPANY'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED $100,000. NEITHER THE COMPANY NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT OR THE USE OF ANY TOKENS.

**7.** **TAX CONSEQUENCES**. CONSULTANT UNDERSTANDS THAT CONSULTANT MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF CONSULTANT'S RECEIPT AND DISPOSITION OF THE RIGHTS TO TOKENS AND THE TOKENS. CONSULTANT REPRESENTS (a) THAT CONSULTANT HAS CONSULTED WITH ANY TAX ADVISERS THAT CONSULTANT DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT AND DISPOSITION OF THE RIGHTS TO TOKENS AND THE TOKENS AND (b) THAT CONSULTANT IS NOT RELYING ON THE COMPANY, OR ANY AGENTS, REPRESENTATIVES, OR CONSULTANTS OF THE COMPANY, FOR ANY TAX ADVICE. CONSULTANT AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF RIGHTS TO TOKENS AND TOKENS HEREIN.

**8.** **COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests and the Tokens will be subject to and conditioned upon compliance by the Company and Consultant with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Pyth Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Pyth Tokens.

**9.** **GENERAL PROVISIONS**.

**9.1** **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during

normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by express courier.  All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto.  A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in Panama City are open for business.

       9.2    **Further Assurances.**  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

       9.3    **Titles and Headings.**  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

       9.4    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the Republic of Panama, without giving effect to that body of laws pertaining to conflict of laws.

       9.5    **Dispute Resolution**. Any controversy or dispute which arises out of or is related to this contract, and interpretation, application, performance and termination thereof, must be decided by arbitration administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules.

       9.6    **Assignments; Successors and Assigns.**  The Company may assign any of its rights and obligations under this Agreement.  Any assignment of rights and obligations by any other party to this Agreement requires the Company's prior written consent.  This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.

       9.7    **Entire Agreement.**  This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

       9.8    **Amendment and Waivers.**  This Agreement may be amended only by a written agreement executed by each of the parties hereto.  No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.  Any amendment effected in accordance with this Section will be binding upon all parties hereto and each of their respective successors and assigns.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.  No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

       9.9    **Severability.**  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.  If such clause or

provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

      **9.10**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[Signature page follows]

**IN WITNESS WHEREOF**, the Company and the Consultant has each caused this Restricted Token Grant Agreement to be executed by its duly authorized representative as of the Effective Date.

| COMPANY: | CONSULTANT: |
|---|---|
| **TRIBAL INVEST CORP** | **DO HYEONG KWON** |

| | | | | |
|---|---|---|---|---|
| By: | _(signature)_ | | By: | _Do Kwon_ |
| Name: | Diana Muñoz | | Name: | Do Kwon |
| Title: | Director | | Title: | |
| Address: | Dresdner Tower, 11th Floor, Panama City, Panama. | | Address: | 101-2603 Galleria Foret Seoul South Korea |

**EXHIBIT 1**

**CONSULTING AGREEMENT**

# CONSULTING AGREEMENT

This Consulting Agreement ("**Agreement**") is entered into as of May 18, 2021 (the "**Effective Date**"), between Tribal Invest Corp, a Panamanian corporation ("**Company**"), and Do Hyeong Kwon ("**Consultant**").

Company and Consultant desire to have Consultant perform services for Company, subject to and in accordance with the terms and conditions of this Agreement.

THEREFORE, the parties agree as follows:

## 1.    SERVICES

1.1      Statement of Work.  Company and Consultant have executed (or will execute) a statement of work, substantially in the form attached hereto as Exhibit A, that describes the specific services to be performed by Consultant (as executed, the "**Statement of Work**").  The Statement of Work will expressly refer to this Agreement, will form a part of this Agreement, and will be subject to the terms and conditions contained herein.  The Statement of Work may be amended only by written agreement of the parties.

1.2      Performance of Services.  Consultant will perform the services described in the Statement of Work (the "**Services**") in accordance with the terms and conditions set forth in the Statement of Work and this Agreement.

1.3      Consultant Personnel.  Consultant will perform all Services only through its regular, full-time employees and through subcontractors approved in advance in writing by Company (Consultant's employees and approved subcontractors, if any, are referred to collectively as the "**Consultant Personnel**"). Consultant acknowledges and agrees that all Consultant Personnel are subject to Company's continuing acceptance and that Company expressly reserves the right at any time to reject any Consultant Personnel for any reason.  To the extent that any Consultant Personnel are required to perform Services at a Company facility, Consultant will first ensure that such Consultant Personnel have been informed of Company's workplace, computer and security policies and procedures, and will comply with such policies and procedures at all times.

1.4      Delivery.  Consultant will deliver to Company the deliverables, designs, modules, software, products, documentation and other materials specified in the Statement of Work (individually or collectively, "**Deliverables**") in accordance with the delivery schedule and other terms and conditions set forth in the Statement of Work.

## 2.    PAYMENT

2.1      Fees.  As Consultant's sole compensation for the performance of Services, Company will pay Consultant the fees specified in the Statement of Work in accordance with the terms set forth therein. Without limiting the generality of the foregoing, Consultant acknowledges and agrees that, if specified in

the Statement of Work, Company's payment obligation will be expressly subject to Consultant's completion or achievement of certain milestones to Company's reasonable satisfaction.

2.2    Expenses.  Unless otherwise specified in the Statement of Work, Company will not reimburse Consultant for any expenses incurred by Consultant in connection with performing Services.

2.3    Payment Terms.  Unless otherwise provide in the Statement of Work, all fees and other amounts set forth in the Statement of Work, if any, are stated in and are payable in U.S. dollars.  Unless otherwise provided in the Statement of Work, Consultant will invoice Company on a monthly basis for all fees and expenses payable to Consultant.  Company will pay the full amount of each such invoice within thirty (30) days following receipt thereof, except for any amounts that Company disputes in good faith.  The parties will use their respective commercially reasonable efforts to promptly resolve any such payment disputes.

## 3.    RELATIONSHIP OF THE PARTIES

3.1    Independent Contractor.  Consultant is an independent contractor and nothing in this Agreement will be construed as establishing an employment or agency relationship between Company and Consultant or any Consultant Personnel.  Consultant has no authority to bind Company by contract or otherwise. Consultant will perform Services under the general direction of Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which Services are accomplished, subject to the requirement that Consultant will at all times comply with applicable law.

3.2    Taxes and Employee Benefits.  Consultant will report to all applicable government agencies as income all compensation received by Consultant pursuant to this Agreement.  Consultant will be solely responsible for the payment of all compensation to all Consultant Personnel, as well as for the payment of all withholding taxes, social security, workers' compensation, unemployment and disability insurance or similar items required by any government agency.  Consultant Personnel will not be entitled to any benefits paid or made available by Company to its employees, including, without limitation, any vacation or illness payments, or to participate in any plans, arrangements or distributions made by Company pertaining to any bonus, stock option, profit sharing, insurance or similar benefits.  Consultant will indemnify and hold Company harmless from and against all damages, liabilities, losses, penalties, fines, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or relating to any obligation imposed by law on Company to pay any withholding taxes, social security, unemployment or disability insurance or similar items in connection with compensation received by Consultant pursuant to this Agreement.

3.3    Liability Insurance.  Consultant acknowledges that Company will not carry any liability insurance on behalf of Consultant.  Consultant will maintain in force adequate liability insurance to protect Consultant from (i) claims under workers' compensation and state disability acts, and (ii) claims of personal injury (or death) or tangible or intangible property damage (including loss of use) that arise out of any act or omission of Consultant or any Consultant Personnel.

## 4.    OWNERSHIP

4.1    Disclosure of Work Product.  Consultant will, as an integral part of the performance of Services, disclose in writing to Company all inventions, products, designs, drawings, notes, documents, information,

documentation, improvements, works of authorship, processes, techniques, know-how, algorithms, specifications, biological or chemical specimens or samples, hardware, circuits, computer programs, databases, user interfaces, encoding techniques, and other materials of any kind that Consultant may make, conceive, develop or reduce to practice, alone or jointly with others, in connection with performing Services, or that result from or that are related to such Services, whether or not they are eligible for patent, copyright, mask work, trade secret, trademark or other legal protection (collectively, "***Consultant Work Product***").  Consultant Work Product includes without limitation any Deliverables that Consultant delivers to Company pursuant to <u>Section 1.4</u>.

4.2      <u>Ownership of Consultant Work Product</u>.  Consultant and Company agree that, to the fullest extent permitted by applicable law, Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to each item of Consultant Work Product.  Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to  all right, title and interest in and to the Consultant Work Product, including all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how, and any and all other intellectual property or proprietary rights (collectively, "***Intellectual Property Rights***") therein.

4.3      <u>Moral Rights</u>.  To the fullest extent permitted by applicable law, Consultant also hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, and waives and agrees never to assert, any and all Moral Rights (as defined below) that Consultant or any Consultant Personnel may have in or with respect to any Consultant Work Product, during and after the term of this Agreement.  "***Moral Rights***" mean any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right."

4.4      <u>Related Rights</u>.  To the extent that Consultant owns or controls (presently or in the future) any patent rights, copyright rights, mask work rights, trade secret rights, or any other intellectual property or proprietary rights that may block or interfere with, or may otherwise be required for, the exercise by Company of the rights assigned to Company under this Agreement (collectively, "***Related Rights***"), Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Related Rights, to the extent necessary to enable Company to exercise all of the rights assigned to Company under this Agreement.

**5.         CONFIDENTIAL INFORMATION**

For purposes of this Agreement, "***Confidential Information***" means and will include: (i) any information, materials or knowledge regarding Company and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development that is disclosed to Consultant or to which Consultant has access in connection with performing Services; (ii) the Consultant Work

Product; and (iii) the terms and conditions of this Agreement. Confidential Information will not include any information that: (a) is or becomes part of the public domain through no fault of Consultant; (b) was rightfully in Consultant's possession at the time of disclosure, without restriction as to use or disclosure; or (c) Consultant rightfully receives from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure. Consultant agrees to hold all Confidential Information in strict confidence, not to use it in any way, commercially or otherwise, except in performing Services, and not to disclose it to others. Consultant further agrees to take all actions reasonably necessary to protect the confidentiality of all Confidential Information, including, without limitation, implementing and enforcing procedures to minimize the possibility of unauthorized use or disclosure of Confidential Information.

**WARRANTIES**

5.1        No Pre-existing Obligations.  Consultant represents and warrants that Consultant has no pre-existing obligations or commitments (and will not assume or otherwise undertake any obligations or commitments) that would be in conflict or inconsistent with or that would hinder Consultant's performance of its obligations under this Agreement.

5.2        Performance Standard.  Consultant represents and warrants that Services will be performed in a thorough and professional manner, consistent with high professional and industry standards by individuals with the requisite training, background, experience, technical knowledge and skills to perform Services.

5.3        Non-infringement.  Consultant represents and warrants that the Consultant Work Product will not infringe, misappropriate or violate the rights of any third party, including, without limitation, any Intellectual Property Rights or any rights of privacy or rights of publicity, except to the extent any portion of the Consultant Work Product is created, developed or supplied by Company or by a third party on behalf of Company.

5.4        Non-Solicitation of Personnel.  During the term of this Agreement and for a period of one (1) year thereafter, Consultant will not directly or indirectly solicit the services of any Company employee or consultant for Consultant's own benefit or for the benefit of any other person or entity.

5.5        Agreements with Consultant Personnel.  Consultant represents and warrants that all Consultant Personnel who perform Services are and will be bound by written agreements with Consultant under which: (i) Consultant owns or is assigned exclusive ownership of all Consultant Work Product, including all Intellectual Property Rights therein; and (ii) Consultant Personnel agree to limitations on the use and disclosure of Confidential Information no less restrictive than those provided in Section 5.

**6.        INDEMNITY**

Consultant will defend, indemnify and hold Company harmless from and against all claims, damages, liabilities, losses, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or resulting from:

(a)        any action by a third party against Company that is based on a claim that any Services performed under this Agreement, or the results of such Services (including any Consultant Work Product), or

Company's use thereof, infringe, misappropriate or violate such third party's Intellectual Property Rights; and

(b)       any action by a third party against Company that is based on any act or omission of Consultant or any Consultant Personnel and that results in: (i) personal injury (or death) or tangible or intangible property damage (including loss of use); or (ii) the violation of any statute, ordinance, or regulation.

## 7.       TERM AND TERMINATION

7.1       <u>Term</u>.  This Agreement will commence on the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, will remain in force and effect for as long as Consultant is performing Services pursuant to the Statement of Work.

7.2       <u>Termination for Breach</u>.  Either party may terminate this Agreement (including the Statement of Work) if the other party breaches any material term of this Agreement and fails to cure such breach within thirty (30) days following written notice thereof from the non-breaching party.

7.3       <u>Termination for Convenience</u>.  Company may terminate this Agreement (including the Statement of Work) at any time, for any reason or no reason, upon at least ten (10) days written notice to Consultant.

7.4       <u>Effect of Termination</u>.  Upon the expiration or termination of this Agreement for any reason: (i) Consultant will promptly deliver to Company all Consultant Work Product, including all work in progress on any Consultant Work Product not previously delivered to Company, if any; (ii) Consultant will promptly deliver to Company all Confidential Information in Consultant's possession or control; and (iii) Company will pay Consultant any accrued but unpaid fees due and payable to Consultant pursuant to Section 2.

7.5       <u>Survival</u>.  The rights and obligations of the parties under Sections 2, 3.2, 3.3, 4, 5.3, 5.5, 5.6, 6, 7.4, 7.5, and 8 will survive the expiration or termination of this Agreement.

## 8.       GENERAL

8.1       <u>Assignment</u>.  Consultant may not assign or transfer this Agreement, in whole or in part, without Company's express prior written consent.  Any attempt to assign this Agreement, without such consent, will be void.  Subject to the foregoing, this Agreement will bind and benefit the parties and their respective successors and assigns.

8.2       <u>No Election of Remedies</u>.  Except as expressly set forth in this Agreement, the exercise by Company of any of its remedies under this Agreement will not be deemed an election of remedies and will be without prejudice to its other remedies under this Agreement or available at law or in equity or otherwise.

8.3       <u>Equitable Remedies</u>.  Because the Services are personal and unique and because Consultant will have access to Confidential Information of Company, Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without

having to post a bond or other consideration, in addition to all other remedies that Company may have for a breach of this Agreement at law or otherwise.

8.4     Attorneys' Fees.  If any action is necessary to enforce the terms of this Agreement, the substantially prevailing party will be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled.

8.5     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding its body of law controlling conflict of laws.  Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California and the parties irrevocably consent to the personal jurisdiction and venue therein.

8.6     Severability.  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect, and the provision affected will be construed so as to be enforceable to the maximum extent permissible by law.

8.7     Waiver.  The failure by either party to enforce any provision of this Agreement will not constitute a waiver of future enforcement of that or any other provision.

8.8     Notices.  All notices required or permitted under this Agreement will be in writing, will reference this Agreement, and will be deemed given: (i) when delivered personally; (ii) one (1) business day after deposit with a nationally-recognized express courier, with written confirmation of receipt; or (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid.  All such notices will be sent to the addresses set forth above or to such other address as may be specified by either party to the other party in accordance with this Section.

8.9     Entire Agreement.  This Agreement, together with the Statement of Work, constitutes the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter.  In the event of a conflict, the terms and conditions of the Statement of Work will take precedence over the terms and conditions of this Agreement.  Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties hereto.

8.10    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**COMPANY:**                                    **CONSULTANT:**

**TRIBAL INVEST CORP**                          **DO HYEONG KWON**

By:                                             By:

Name:  Diana Muñoz                              Name:  Do Kwon

Title:   Director                               Title:

Date:                                           Date: 5/20/2021

**EXHIBIT A**

**STATEMENT OF WORK**

This Statement of Work is issued under and subject to all of the terms and conditions of the Consulting Agreement dated as of May 18, 2021, between Tribal Invest Corp ("***Company***") and Do Hyeong Kwon ("***Consultant***").

1.      **Description of Services**

Consultant shall provide product and business development services to the Company from time to time as reasonably requested by the Company or its representatives, including but not limited to promotion, marketing and strategic advice relating to the Pyth network. Consultant shall provide such other services as are reasonably requested by the Company, and are within the field of knowledge and expertise of Consultant, on an as-needed basis. (collectively, the "***Services***")

2.      **Payment Terms**

As sole and exclusive compensation for the Services, Consultant shall be entitled to receive 500,000,000 PYTH tokens, pursuant to the Company's standard form of Restricted Token Grant Agreement.

Consultant shall be responsible for reporting and paying any current and future taxes that it may incur resulting from the receipt of the Token Grant.

AGREED AS OF May 18, 2021

**COMPANY:**                                    **CONSULTANT:**

**TRIBAL INVEST CORP**                 **DO HYEONG KWON**

By:                                                 By:

Name: Diana Muñoz                          Name:

Title: Director                                    Title:

Date:                                                Date:

## AMENDMENT TO RESTRICTED TOKEN GRANT AGREEMENT

This Amendment to Restricted Token Grant Agreement (this "***Amendment Agreement***") is made and entered into by and between Tribal Invest Corp, a Panamanian corporation (the "***Company***"), and the undersigned (the "***Consultant***") (collectively, the "***Parties***"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Token Agreement (as defined below).

## RECITALS

**WHEREAS,** the Parties previously entered into that certain Restricted Token Grant Agreement (the "***Token Agreement***") pursuant to which the Company granted Tokens (as defined therein) to the Consultant, subject to the terms and conditions set forth therein.

**WHEREAS,** the Parties desire to amend the Token Agreement as set forth herein.

**NOW THEREFORE,** in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.  **Amendment to Section 4.1.** Section 4.1 of the Token Agreement, including all references thereto in the Token Agreement, is hereby amended and restated in its entirety to read as follows:

"**4.1    Unlock Schedule.**    Until the Restricted Tokens are "***Unlocked***", as described below, Consultant agrees that it will not, without the prior written consent of the Company, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of (collectively, "***Transfer***") any Restricted Tokens, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens.  The Restricted Tokens shall be considered to be "***Unlocked***" as follows: (a) prior to the six (6) month anniversary of the First Closing Date (as defined below) (the "***First Unlock Date***"), no Tokens will be Unlocked; and (b) starting on the First Unlock Date and ending on the three (3) year anniversary of the First Unlock Date, the Tokens shall become Unlocked on a linear basis (annually) beginning with 25% of the Tokens Unlocked on the First Unlock Date and ending with 100% of the Tokens Unlocked on the three (3) year anniversary of the First Unlock Date.  As used herein, "***First Closing Date***" means the date the Tokens are first usable in the Pyth Protocol, as determined by the Sellers in their reasonable discretion.

Notwithstanding the foregoing, Consultant may Transfer Tokens, any options to purchase any Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Tokens; *provided* that (a) such transferred Tokens remain subject to the unlock schedule set forth in this Section 4.1 and the Transfer Restrictions set forth in Sections 3.8 and 9.6 herein to the same extent as if the transferee were the Consultant under this Agreement; and (b) after such Transfer, such transferee shall not Transfer any Tokens until the Tokens are Unlocked."

DocuSign Envelope ID: A0D44605-ABGO-4130-8EAC-E8D15E795125

2.    **Miscellaneous.**

2.1    **Integration.**  This Amendment Agreement and the documents referred to herein and therein constitute the entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersede all prior understandings and agreements, whether oral or written, between or among the Parties hereto with respect to the specific subject matter hereof.

2.2    **Successors and Assigns.**  Except as otherwise provided in this Amendment Agreement, this Amendment Agreement, and the rights and obligations of the Parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.

2.3    **Counterparts; Electronic Signatures.**  This Amendment Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  This Amendment Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: A0D44605-ABC0-4130-8EAC-E0D15E795125

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment Agreement as of _____June 29, 2022_____.


**TRIBAL INVEST CORP**

By: _____

Name: _____Diana Aidee Muñoz Maclao de Camargo_____

Title: _____Director_____

Date: _____June 29, 2022_____


**CONSULTANT NAME:**_____Do Hyeong Kwon_____

By: _____

Name: _____Do Hyeong Kwon_____

Title: _____

Date: _____23 May 2022_____


[SIGNATURE PAGE TO AMENDMENT TO RESTRICTED TOKEN GRANT AGREEMENT]