**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 29860, 29861, and 29994** |

**THE AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM'S REPLY IN SUPPORT OF ITS APPLICATION UNDER SECTIONS 503(b)(3)(D) AND 503(b)(4) OF THE BANKRUPTCY CODE FOR THE ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM FOR REASONABLE PROFESSIONAL FEES AND EXPENSES**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee"), submits this reply (this "Reply") in support of the *Application of the Ad Hoc Committee of Non-US Customers of FTX.com Under Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for Allowance and Payment of an Administrative Expense Claim for Reasonable Professional Fees and Expenses* [D.I. 29860] (the "Application"), and in response to the *Objection to Eversheds Sutherland's Fee Application* [D.I. 29994] (the "Objection") filed by Lidia Favario (the "Objector").[2] For the reasons stated herein and in the Application, the Objection should be overruled and the Application should be granted.

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of post-effective date debtor entities in these chapter 11 cases, a complete list of the post-effective date debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the FTX Recovery Trust's claims and noticing agent's website at https://cases.ra.kroll.com/FTX.

[2] Despite its caption, the Objection does not raise substantive objections to the *Final Fee Application of Eversheds Sutherland (US) LLP, as Lead Counsel for the Ad Hoc Committee of Non-US Customers of FTX.com, for Allowance of Compensation and Reimbursement of All Actual and Necessary Expenses for the Period from May 1, 2023, Through and Including October 8, 2024* [D.I. 29861] (the "Final Fee Application"), as similarly observed by the Fee Examiner. *See Fee Examiner's Summary Report on Final Fee Applications* at ¶¶ 31–32 [D.I. 30064]. However, Eversheds reserves all rights to address any issues raised with respect the Final Fee Application at the hearing on the Application, as needed.

**PRELIMINARY STATEMENT**[3]

1. The Objection is the only opposition filed to the Ad Hoc Committee's Application. No objection was filed by any party with a fiduciary duty to creditors or the estates—not the Debtors, not the Official Committee, not the post-effective date Advisory Committee, not the U.S. Trustee, and not the Fee Examiner. Rather, the sole Objector is an individual creditor dissatisfied with her treatment under the now-effective Plan, despite that Plan having been confirmed by more than 94% in number and more than 97% in amount of her own creditor class and providing that creditor class a recovery of up to 143%. A single creditor's dissatisfaction does not present a valid legal or factual basis to deny the Application.[4]

2. The Objection raises four principal arguments: (i) that the Ad Hoc Committee did not make a substantial contribution because it stayed its Adversary Proceeding concerning customer property rights; (ii) that the Ad Hoc Committee's composition, which included secondary claim holders, was not adequate to warrant reimbursement; (iii) that the Ad Hoc Committee failed to make certain disclosures only applicable to official committees under Bankruptcy Rule 2014; and (iv) that the Ad Hoc Committee's failure to achieve certain Plan outcomes desired by the Objector should result in denial of the Application. Each argument is either legally irrelevant, factually unsupported, or both.

3. ***First***, the contention that the Ad Hoc Committee did not make a substantial contribution because it agreed to stay its litigation fundamentally misapprehends the governing legal standard and the unrefuted factual record of these cases. The decision to stay the Adversary

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Application or the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26029] (the "Plan"), as applicable.

[4] Moreover, the Objector raised many of the same issues in objecting to Plan confirmation, all of which were overruled by the Court. She cannot now collaterally attack the Plan through the Objection.

Proceeding was both strategic and consensual, made in consultation with the Debtors, and was instrumental in achieving a negotiated resolution that became the backbone of the confirmed Plan. By pausing the litigation to pursue a value-maximizing settlement, the Ad Hoc Committee demonstrated sound judgment and a commitment to advancing the interests of non-U.S. customers of the FTX.com exchange ("Dotcom Creditors"). Ironically, the Objector faults the Ad Hoc Committee for not incurring *more* fees and not engaging in *more* litigation—an approach that would have delayed case resolution and distributions to Dotcom Creditors, with no guarantee of a better outcome. The Ad Hoc Committee's course of action, which accelerated unprecedented distributions to Dotcom Creditors, exemplifies exactly the type of contribution that courts have recognized as "substantial" for purposes of section 503(b)(3)(D) of the Bankruptcy Code.

4. ***Second,*** the Objector suggests that the Ad Hoc Committee's membership—in number and makeup—was somehow inadequate to warrant a substantial contribution claim. In doing so, she appears to conflate the requirements applicable to official committees under section 1102 of the Bankruptcy Code with the standard for reimbursement of creditor expenses under sections 503(b)(3)(D) and 503(b)(b)(4) of the Bankruptcy Code. Those sections are not concerned with formal appointment, critical mass, nor representational balance and rather turn solely on an actual and demonstrable contribution to the estate and its stakeholders, which has irrefutably been demonstrated here.

5. Nevertheless, the Ad Hoc Committee was the only organized body of Dotcom Creditors with sufficient scale, coordination, and creditor engagement to earn a formal seat at the negotiating table throughout the formative stages of these cases and development of the Plan, including during the Substantial Contribution Period. Moreover, the Ad Hoc Committee's composition from inception through dissolution consistently reflected the evolving makeup of the

broader Dotcom Creditor group that ultimately comprised Classes 5A and 7A under the confirmed Plan. And, despite the Objector's protestations to the contrary, original holders of Dotcom Customer Entitlement Claims always comprised the majority of the Ad Hoc Committee's membership by number.

6. ***Third***, the Objector incorrectly asserts that the Ad Hoc Committee's professionals were obligated to make disclosures under Bankruptcy Rule 2014. While the Ad Hoc Committee's professionals never had a conflict of interest, Bankruptcy Rule 2014 simply does not apply to the Ad Hoc Committee. The disclosures required under Bankruptcy Rule 2019, which were applicable to the Ad Hoc Committee, were properly and timely made throughout the pendency of these cases.

7. ***Fourth***, the Objector's broader dissatisfaction with the Plan—including criticisms of the preference settlement and class structure—are procedurally improper, legally irrelevant, and now moot. The Plan has been confirmed, is now effective, and was overwhelmingly supported by the Objector's own creditor class, along with all other creditor classes.[5] The preference settlement eliminated the need for individualized avoidance actions against potentially hundreds of thousands of Dotcom Creditors, protected smaller and more vulnerable customers, and contributed directly to the value-preserving and consensus-building objectives of these cases. It was just one of many integrated compromises that formed the basis of a Plan that received overwhelming support from Dotcom Creditors and delivers unprecedented projected recoveries of up to 143% for Dotcom Customer Entitlement Claims. These results speak for themselves.

8. In short, sections 503(b)(3)(D) and 503(b)(4) together authorize the allowance and payment of administrative expenses for professional fees of an ad hoc committee that makes a

[5] *See Declaration of James Daloia of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26045] (the "Voting Report").

substantial contribution to a chapter 11 case—defined as a contribution that confers an "actual and demonstrable benefit" to the estate. *See Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994). That standard is plainly met here. The record—including detailed billing records, a sworn declaration, and prior findings of this Court—confirms that the Ad Hoc Committee provided targeted, non-duplicative, and value-maximizing contributions during the Substantial Contribution Period. The Debtors' CEO, John J. Ray III, confirmed in a sworn declaration that the Ad Hoc Committee's involvement materially streamlined negotiations and helped produce a confirmable plan. This Court likewise found that the Ad Hoc Committee's participation was "beneficial to the estate as a whole." Hr'g Tr. at 58:20, *In re FTX Trading Ltd.*, (JTD) (Bankr. D. Del. Nov. 15, 2023). The Objection does not—and cannot—rebut those findings.

9. Accordingly, and for the reasons set forth herein, in the Application, and on the record in these cases, the Court should overrule the Objection and grant the Application.

## FACTUAL BACKGROUND

10. As detailed in the Application, the Ad Hoc Committee was formed on December 2, 2022—just three weeks after the Petition Date and thirteen days prior to the appointment of the Official Committee—to represent the interests of Dotcom Creditors. At such time, Dotcom Creditors faced considerable barriers to collective organization due to many factors, including redaction of creditor contact information on the docket, language and jurisdictional diversity, and creditors' limited familiarity with the U.S. chapter 11 process. *See* Application ¶ 13. Moreover, there were over two million Dotcom Creditors in these cases—making collective organization a daunting task.[6]

[6] *See* Section 3.R of the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* [D.I. 19143] (the "Disclosure Statement").

11. Soon after its formation, the Ad Hoc Committee initiated the Adversary Proceeding to seek a declaration that digital assets held on the FTX.com exchange were customer property, not estate property. The Ad Hoc Committee subsequently moved for partial summary judgment solely with respect to the existence of a trust on customer property. *See* Application ¶ 15.

12. After negotiations with the Debtors, the Ad Hoc Committee agreed to stay all litigation to pursue a value-maximizing, global resolution of the Adversary Proceeding through a Plan. Those efforts culminated in the execution of the Plan Support Agreement, which resolved the customer property dispute and became the foundation of the confirmed Plan. *See* Application ¶¶ 16-17.

13. As set forth in the Application, the Plan was confirmed on October 8, 2024, went effective on January 3, 2025, and is projected to provide a recovery for Class 5A Dotcom Creditors of 129% to 143%.[7] The Plan was supported by 94.48% in number and 97.16% in amount of voting Class 5A Dotcom Creditors.[8]

14. Throughout the Substantial Contribution Period, the Ad Hoc Committee operated transparently, consistently filed Rule 2019 statements disclosing its growing and diverse membership and aggregate holdings, and constructively engaged with the Debtors, the Official Committee, and other key stakeholders.

## ARGUMENT

### I. The Ad Hoc Committee Provided a Substantial, Non-Duplicative Benefit to the Estate and Creditors.

15. The Objector's primary argument is that the Ad Hoc Committee did not make a substantial contribution to these Chapter 11 Cases because it did not litigate its Adversary

[7] *See* Disclosure Statement § 1.G.

[8] *See* Voting Report.

Proceeding to judgment, allegedly duplicated efforts of the Official Committee, and acted in self-interest. These assertions reflect a misunderstanding of both the governing legal standard and the extensive evidentiary record before the Court.

**A. The Ad Hoc Committee's Resolution of the Adversary Proceeding Provided a Substantial Contribution to the Estates.**

16. One of the most significant contributions of the Ad Hoc Committee during the Substantial Contribution Period was its initiation and strategic resolution of the Adversary Proceeding concerning customer property rights on the FTX.com exchange.

17. The Adversary Proceeding raised complex questions under foreign law and sought clarity on whether Dotcom customer assets were held in trust—an ultimate determination that would hinge on the ability to trace individual customer, intercompany, and third-party transactions across a cash management system that, according to the First Day Declaration of John Ray III, lacked virtually all controls or proper recordkeeping. *See* Ray First Day Decl. [D.I. 24] ¶¶ 4-6.

18. Contrary to the Objector's selective and superficial parsing of time entries, a substantial portion of the Ad Hoc Committee's efforts during the Substantial Contribution Period was directed toward the initiation, development, and strategic resolution of the Adversary Proceeding. The Objector cites 116 time entries that reference certain terms purportedly relating to "customer property" to suggest limited engagement with this issue. Objection § I. But that approach ignores hundreds of additional entries reflecting work on the Adversary Proceeding—including pleadings and strategy related to "declaratory judgment" (50+ entries), "complaint" (250+ entries), and "summary judgment" (300+ entries). *See* Ex. B and Ex. C, Application.

19. After engaging in information sharing with the Debtors, the Ad Hoc Committee decided that rather than pursue a prolonged and expensive litigation track that would have consumed estate and judicial resources, it should stay litigation to open the door for productive

negotiations on resolution of customer property rights under a plan. The outcome of those negotiations—embedded in the Plan Support Agreement—ultimately formed the foundation of the Plan projected to deliver up to 143% recovery to Dotcom Creditors. *See Notice of Proposed Settlement of Customer Property Disputes* [D.I. 3291]

20. This strategic decision was entirely consistent with the Ad Hoc Committee's stated purpose in its governing bylaws: "The purpose of the Committee is to, in a cost-efficient and timely manner, represent the interests of non-U.S. customers of FTX.com in connection with any insolvency proceedings or other related process, with the goal of maximizing recoveries and preserving the rights of such customers." Bylaws § I.A. The Ad Hoc Committee's work—whether through litigation or negotiated resolution—was always focused on efficiency, speed, and value preservation for the benefit of Dotcom Creditors. That is precisely what the substantial contribution standard seeks to reward.

21. Moreover, the Objector's position is internally inconsistent. She faults the Ad Hoc Committee for acting efficiently—by resolving key litigation consensually—while at the same time asserting that it should have incurred *greater* expense by litigating customer property rights to judgment. That criticism ignores the statutory aim of section 503(b), which is to reward efforts that confer an actual benefit on the estate—not to encourage scorched-earth litigation. The Ad Hoc Committee's work—whether through targeted litigation or its efficient settlement—produced precisely the type of material benefit that section 503(b) is designed to incentivize.

22. The Objector's reliance on *In re Lister*, 846 F.2d 55 (10th Cir. 1988), is misplaced. In *Lister*, the applicant undertook certain actions that were not adopted by the debtor, did not further plan confirmation, and failed to produce any discernible benefit to the estate. In contrast, the Ad Hoc Committee's litigation and resolution of the Adversary Proceeding directly furthered

the reorganization process and led to a confirmed Plan with robust creditor support and above par recoveries for Dotcom Creditors. In *In re Celotex Corp.*, 227 F.3d 1336 (11th Cir. 2000), the court affirmed a substantial contribution award where disinterested parties confirmed the applicant's role in materially advancing the case—precisely the role played by the Ad Hoc Committee here.[9]

**B. The Ad Hoc Committee Did Not Act Solely Out of Self-Interest.**

23. The Ad Hoc Committee's formation and actions were driven by a commitment to securing an equitable and efficient resolution for all Dotcom Creditors. While creditor actions may inherently overlap with their own financial interest, that fact alone does not disqualify them from reimbursement where the broader creditor body also benefits. *See Lebron*, 27 F.3d at 944 ("Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement.").

24. Simply put, during the Substantial Contribution Period, the Ad Hoc Committee's actions benefited all Dotcom Creditors, regardless of their membership in the group. This Court recognized that benefit directly, stating at the reimbursement hearing:

> . . . I'm satisfied under the unique facts and circumstances of this case, not least of which is the millions of customers that are involved here, that it makes sense that there be at least one voice -- or in this case [], I guess, voices -- who can act through counsel to help steer this process to a plan of reorganization . . . I think having the ad hoc committee involved in that process is beneficial to the estate as a whole . . .

Reimbursement Hr'g Tr. at 58:4–23 (JTD).

[9] Other than the Plan-related objections addressed below, the Objector cites a single purported failure by the Ad Hoc Committee to represent Dotcom Creditor interests—its decision not to object to the retention of Galaxy as Investment Manager. Objection § I. *First*, that retention occurred outside the Substantial Contribution Period. *Second*, the Ad Hoc Committee actively negotiated key aspects of Galaxy's engagement, including terms relating to consultation rights and approval over certain actions. And *third*, the Court approved the terms finding it was in the best interests of the Debtors' estates. [D.I. 2504].

25. This recognition of the Ad Hoc Committee's independent role, constructive engagement, and estate-wide benefit underscores precisely why approval of the Application is appropriate under the standards of sections 503(b)(3)(D) and 503(b)(4).

**C. The Efforts of the Ad Hoc Committee Were Not Duplicative.**

26. The Ad Hoc Committee's contributions during the Substantial Contribution Period were distinct from those of the Debtors, Official Committee, and other stakeholders. The Official Committee was mandated to represent the interests of all unsecured creditors, including the Debtors' US and non-US customers, general unsecured creditors, and governmental creditors—each of which ended up being classified separately under the Plan.

27. By contrast, the Ad Hoc Committee was formed specifically to represent the interests of Dotcom Creditors and pursued issues unique to their claims, including the assertion that Dotcom Creditors owned the assets on the FTX.com exchange. As such, the interests represented by the Ad Hoc Committee diverged from those represented by the Official Committee and served as a critical counterpoint in the reorganization process.

28. Debtors' counsel has specifically recognized the value of that distinction, noting that the "Debtors have received substantial benefits from the Ad Hoc Committee's support and cooperation to date" and that the "Debtors view the Ad Hoc Committee as an important counterpoint to the UCC on a number of issues and we believe separate representation is appropriate." Reimbursement Hr'g Tr. at 16:7–17:1.

29. Courts grant substantial contribution claims where an applicant served a distinct and necessary function from an official committee. For example, in *In re M&G USA Corp.*, Judge Shannon emphasized the importance of coordination by a creditor group that streamlines communications and negotiations, reducing the burden on the estate. *In re M & G USA Corp.*, 599 B.R. 256, 265 (Bankr. D. Del. 2019). Here too, the Ad Hoc Committee unified a broad and diverse

set of international customers into a single, organized voice—an effort that streamlined engagement and materially advanced the administration of these cases.

30. The Objector offers no evidence to show that the Ad Hoc Committee's efforts were duplicative of work performed by estate professionals or the Official Committee, nor could she. The record is to the contrary. The Ad Hoc Committee acted as the sole organized representative of Dotcom Creditors during the Substantial Contribution Period and consistently advocated on their behalf. It served as the central point of engagement for a global customer base, which spared the estates the cost and delay of dealing with potentially thousands of individual Dotcom Creditors.

31. Thus, far from duplicating the functions of estate fiduciaries, the Ad Hoc Committee provided a necessary counterweight in negotiations and was uniquely positioned to represent Dotcom Creditors' unique interests in fundamental and threshold issues during the Substantial Contribution Period.

**II. The Objector's Criticism of the Ad Hoc Committee's Composition is Misplaced.**

32. The Objector asserts that the Ad Hoc Committee lacked a "critical mass" of support during the Substantial Contribution Period because certain class action claimants were ultimately removed from the Ad Hoc Committee. She further suggests that the Ad Hoc Committee's composition—including the participation of secondary purchasers—undermines the value of its efforts. Neither of these assertions is true or relevant to the Application.

33. The only relevant question under sections 503(b)(3)(D) and 503(b)(4) is whether the Ad Hoc Committee provided a substantial contribution to the estates. The characteristics of the Ad Hoc Committee's members are legally irrelevant. Under section 1123(a)(4) of the Bankruptcy Code, all holders of allowed claims in each class must receive the same treatment under a chapter 11 plan, regardless of whether they are original holders or secondary market participants. That principle was applied here: under the Plan, Dotcom Creditors were classified in either Class 5A or

Class 7A and received equal treatment as a class.[10] Accordingly, the Objector's focus on whether certain Ad Hoc Committee members were "original" account holders or assignees of customer claims is immaterial.

34. Moreover, not only is the Objector's assertion legally flawed, but it is also factually inaccurate. During the Substantial Contribution Period, original holders comprised the significant majority of the Ad Hoc Committee both in number and in aggregate claim amount. As disclosed in the Amended Reimbursement Motion and consistent with its governing Bylaws, the Ad Hoc Committee was open to any and all Dotcom Creditors who wished to join. *See* Bylaws § 2.1. As the cases progressed, the membership of the Ad Hoc Committee evolved in the same manner as the larger Dotcom Creditor base. Nonetheless, the Ad Hoc Committee continued to be anchored by a core of original holders and maintained a majority of original holders in number throughout not only the Substantial Contribution Period, but until its ultimate dissolution.

35. At the hearing on the *Amended Motion of Debtors to Enter Into, and Perform Their Obligations Under, the Reimbursement Agreements* [D.I. 3373], the Debtors' counsel recognized this dynamic and rejected any notion that the Ad Hoc Committee was not representative of the broader Dotcom Creditor class in stating:

> The Ad Hoc Committee was formed very early on in these cases and has continued to both grow and evolve to be representative of the vast and diverse group of FTX.com customers.

Reimbursement Hr'g Tr. at 13:23–14:1.

36. Ultimately, the Ad Hoc Committee's composition reflected the evolving makeup of the Dotcom Creditor body it was formed to represent—providing a centralized, organized, and credible voice for Dotcom Creditors that advanced the reorganization and benefited the estates.

[10] Pursuant to the Plan, Dotcom Creditors with an Allowed Dotcom Customer Entitlement Claim in an amount less than or equal to $50,000 were classified as Class 7A Dotcom Convenience Claims. Plan § 2.1.65.

**III. There Are No Conflicts That Should Preclude Approval of the Application.**

37. The Objector alleges that the Ad Hoc Committee's counsel had an undisclosed conflict of interest and failed to comply with Bankruptcy Rule 2014. This allegation is both legally unfounded and factually incorrect.

38. Bankruptcy Rule 2014 applies only to professionals "employed to represent or assist the trustee or debtor in possession under section 327" of the Bankruptcy Code. It requires estate professionals—such as those retained by the Debtors or a statutory committee—to disclose all known connections with the debtor, creditors, and other parties in interest to ensure disinterestedness. The Ad Hoc Committee was not a statutory committee under section 1102, and its professionals were not retained under section 327. Accordingly, neither the Ad Hoc Committee nor its professionals were required to file disclosures under Bankruptcy Rule 2014.

39. The Objection contends that Eversheds failed to disclose a supposed conflict arising from its representation of Wincent Investment Fund PCC Ltd. ("Wincent"). Wincent is a Dotcom Creditor in Class 5A. In its individual capacity, Wincent's interests were fully aligned with those of the Ad Hoc Committee and other similarly situated Dotcom Creditors. Eversheds' representation of Wincent, in its individual capacity, therefore presented no conflict—actual or potential—during the Substantial Contribution Period. Moreover, out of an abundance of transparency, Ms. Broderick proactively disclosed her representation of Wincent to the U.S. Trustee, the Debtors, and counsel to the Official Committee at the outset of these cases. The professionals for the Official Committee were aware of and appropriately managed all discussions and meetings to ensure that confidentiality and process integrity were preserved. The Objection also mistakenly claims that Eversheds failed to disclose the Wincent representation in a retention application. But again, Eversheds was never retained by the Debtors or the estates. As such, no retention application was filed, and no disclosures under Bankruptcy Rule 2014 were required.

40. Accordingly, the Objection's conflict allegations should be disregarded. They rest on a fundamental misunderstanding of Bankruptcy Rule 2014, the nature of Eversheds' role, and the alignment of interests between Wincent and the broader Dotcom Creditor group and Ad Hoc Committee membership.

**IV. The Objector's Plan-Related Assertions Are Procedurally Improper, Legally Irrelevant, and Moot.**

41. The Objector devotes most of her Objection to criticizing the confirmed and now-effective Plan and the Ad Hoc Committee's role in its development—asserting, among other things, that the Ad Hoc Committee failed to enforce certain provisions of the Plan Support Agreement or sufficiently advocate for alternative Plan treatment for certain Dotcom Creditors. These arguments are procedurally improper, legally irrelevant to the Application, and now moot.[11]

42. ***First***, the Objector's dissatisfaction with the Plan falls outside the scope of the Ad Hoc Committee's Application, which is limited to fees incurred during the Substantial Contribution Period. As detailed herein, during that period, the Ad Hoc Committee provided targeted, non-duplicative, and value-maximizing contributions.

43. ***Second***, the fact that the efforts of the Ad Hoc Committee led to the Plan is a testament to the value of such efforts. It is not, as the Objector suggests, a reason to deny the Application. The Plan received overwhelming support from Dotcom Creditors and delivers unprecedented projected recoveries of up to 143%. The Objector's contradictory position—

[11] To the extent this section of the Objection is intended to challenge the Eversheds' Final Fee Application, it should be summarily dismissed. The fees and expenses incurred by Eversheds in the Final Fee Application were approved, on an interim basis, under separate Court orders pursuant to that certain Amended & Restated Counsel Reimbursement Agreement by and between the Debtors and Counsel, dated October 24, 2023. *See* D.I. 9706, 17787, 24510, 28742, 29916. No party, including the U.S. Trustee and Fee Examiner, have objected to Eversheds' Final Fee Application. The Objector has not offered a valid basis for revisiting already-approved fees and expenses under the *Order Authorizing the Debtors to Enter Into, and Perform Their Obligations Under, the Reimbursement Agreements* [D.I. 3928].

claiming that the Ad Hoc Committee overstated its role in reaching settlements embodied in the Plan while simultaneously blaming the Ad Hoc Committee for the Plan's allegedly undesirable results—underscores the lack of merit in her arguments.

44. ***Third***, rather than advancing the interests of all creditors, the Objection reflects a narrow, self-interested view that has been repeatedly rejected. The Objector—whose claims are presumably denominated in certain appreciating tokens—continues to assert that she and a minority of similarly-situated creditors were entitled to more favorable treatment under the Plan. However, the legal and factual reasons why such claims were not entitled to special or different treatment have been fully explored and resolved in this case, including through the Court's approval of the *Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] and confirmation of the Plan [D.I. 26404]. The treatment of Dotcom Customer Entitlement Claims under the Plan was fair, consistent with the Bankruptcy Code, and overwhelmingly supported by the Dotcom Creditors the Objector purports to speak for.

45. Indeed, the Objector already filed objections to the *Motion to of Debtors to Estimate Claims Based on Digital Assets* [D.I. 5388] and the Plan [D.I. 26404]. She was heard by the Court and her objections were overruled. While she has the right to be heard on the Application, the continued repackaging of plan-related objections—now aimed at multiple professionals who helped deliver a Plan that was resoundingly approved by the estates' creditors—reflects a refusal to acknowledge compromises that benefitted the entire creditor body.[12] Worse, it ignores the significant estate resources consumed in responding to her numerous filings.

[12] The Objector also objected to the final fee applications of Quinn Emanuel Urquhart & Sullivan, LLP [D.I. 29387] and Sullivan Cromwell LLP [D.I. 29430].

46. In short, the Objector's plan-related assertions are procedurally improper, legally irrelevant, and moot. They fail to raise any basis to deny the Application, which should be evaluated solely under the applicable standard for substantial contribution—a standard that the Ad Hoc Committee has clearly satisfied.

## V. CONCLUSION

47. For the reasons set forth herein, this Court should overrule the Objection, and grant the relief requested in the Application.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, for the reasons stated herein and in the Application, the Ad Hoc Committee respectfully requests that the Court (i) overrule the Objection, (ii) allow the Substantial Contribution Claim in the full amount of $2,759,336.80, (iii) authorize and direct payment of the Substantial Contribution Claim to Eversheds and Morris Nichols, and (iv) grant such other relief as the Court deems just and proper.

Dated: April 14, 2025
Wilmington, Delaware

*/s/ Matthew B. Harvey*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Matthew B. Harvey (No. 5186)
Jonathan M. Weyand (No. 6959)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
mharvey@morrisnichols.com
jweyand@morrisnichols.com

-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
Andrew J. Polansky
Michael A. Rogers
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com
andrewpolansky@eversheds-sutherland.com
michaelrogers@eversheds-sutherland.com

Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
sarahpaul@eversheds-sutherland.com

*Counsel for the Ad Hoc Committee of Non-US Customers of FTX.com*