**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | ) <br> ) Chapter 11 <br> ) <br> ) Case No. 22-11068 (KBO) <br> ) (Jointly Administered) <br> ) <br> ) <br> ) Related to Docket Nos. 1632, 1683, 1693, 2235 and 29773 <br> ) <br> ) Hearing Date: April 17, 2025 at 2:00 PM (ET) <br> ) |

**REPLY IN SUPPORT OF MOTION TO ENFORCE ORDER
GRANTING MOTION OF PYTH DATA ASSOCIATION
FOR RELIEF FROM THE AUTOMATIC STAY (ECF 1693)**

Movant Do Kwon, by and through his undersigned counsel, respectfully submits this Reply in further support of his motion, ECF 29773, to enforce the Court's June 23, 2023 Order, *see* ECF 1693.

**PRELIMINARY STATEMENT**

1.  The Pyth Data Association ("PDA") sought this Court's permission to conduct a "Reminting Plan" offering a "like-for-like replacement" "at no additional cost" to owners of Original PYTH. PDA Mot. ¶¶ 34, 37. In making that request, PDA concealed from the Court that any token-holder who did not meet its notion of a "reasonable and customary customer identification procedure" would forfeit their tokens to PDA. This was blatant subterfuge: under the guise of making token-holders whole, PDA enriched itself enormously by, among other acts, taking 500 million PYTH tokens (5% of all existing PYTH) from Mr. Kwon for itself without ever

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases ra.kroll.com/FTX.

telling this Court that was its intention. Now PDA claims that appropriation was no more than the necessary result of applying "reasonable and customary customer identification procedures." But the post-hoc rationalizations offered in PDA's objection do nothing to show that taking Mr. Kwon's PYTH was permissible under this Court's order, let alone required by it.

2.     In direct defiance of this Court's order, PDA used unreasonable and non-customary procedures that conveniently resulted in a windfall to PDA. PDA offers no meaningful explanation for its decision to ignore Mr. Kwon's power of attorney or provide any alternative route to completing the consumer identification process other than a "liveness test" that required Mr. Kwon to access a smartphone from Montenegrin jail. Instead, PDA does no more than state the obvious; that Mr. Kwon did not complete the "liveness" check process. But insisting on a liveness check when PDA knew exactly who Mr. Kwon was, where he was, and why he could not comply, was not reasonable, and so violated this Court's order.

3.     PDA's motion tries to equate what this Court's order required—reasonable and customary *customer identification procedures*—with the more intensive "Know Your Customer" ("KYC") and "Anti-Money Laundering" ("AML") procedures that are traditionally required when opening a new account or onboarding a new customer. This argument, and the process PDA elected to follow, mischaracterizes this Court's order and what it was intended to do: To make sure that the redistributed PYTH was given to the right people: the original PYTH's original owners. That task was important because PDA's reminting meant that Original PYTH was valueless.

4.     As PDA's own sources emphasize, KYC and AML are terms of art, and PDA's decision to assert that Mr. Kwon would have failed whatever AML procedure they chose to apply is not only artificial but also falls outside of what this Court ordered. Indeed, at no point in the process of "customer identification procedures" did PDA tell Mr. Kwon that its basis for taking

his PYTH was some sort of AML concern. Nor does PDA even claim that it based its decision to appropriate Mr. Kwon's PYTH on an AML requirement. And in all events, Mr. Kwon now intends to give his ownership interest in PYTH to the Terraform Bankruptcy Estate, and so there can be no conceivable KYC or AML objection.

5. All agree that this Court can enforce its own orders. But PDA quibbles about whether or not its omissions to this Court really constituted an abuse of process, and whether some equitable principle bars Mr. Kwon from vindicating his rights. Those arguments fail. The Bankruptcy Code provides that Courts can act to prevent mischief of exactly the sort that happened here; a private party using omissions and half-truths to use the imprimatur of the court to facilitate its own self-enrichment. And while PDA may claim now that had Mr. Kwon acted more quickly or done something differently, this Motion would not have been needed, they cannot point to any legal principle that bars the relief requested herein.

6. At bottom, Mr. Kwon sought diligently to work with PDA to comply with their unilaterally imposed KYC/AML processes, and PDA (through the PYT Foundation (the "Foundation")) refused to make any reasonable accommodation.

7. Nothing about Mr. Kwon's motion or requested relief should negatively impact or restrict the actions of the FTX Recovery Trust in distributing the estate's assets to creditors. At issue here is not a difficult question about how to efficiently distribute limited assets among multiple creditors, but instead a straightforward case of a private party manipulating a Court order to enrich itself at another's expense.

**ARGUMENT**

A. **PDA Violated the Court's Order by Using Unreasonable and Non-Customary Procedures**

8. As outlined in Mr. Kwon's opening motion, this Court's order required PDA to

3

conduct "reasonable and customary consumer identification procedures" as part of its process in reminting Original PYTH and distributing it to the original holders. ECF 1693 ("Order") at 2. PDA makes essentially two arguments about those procedures; first, that it did apply reasonable and customary procedures, and second, that even if it did not, if Mr. Kwon had complied with the live face verification requirement, he would have failed other portions of PDA's process. But PDA (through the Foundation) was anything but reasonable, ignoring Mr. Kwon's repeated attempts to comply with the required processes, and insisting on the only form of verification that Mr. Kwon could not comply with. And PDA's post-hoc argument that, even if Mr. Kwon had been able to comply with the liveness check, he would have failed the KYC/AML process anyway inappropriately conflates "customer identification" with the broader requirements of KYC/AML and ignores that the funds here are going to the Terraform Bankruptcy Estate.

9.      *First*, PDA's insistence on live face verification from Mr. Kwon himself, and its refusal to entertain any alternative procedures, was not reasonable. PDA does not dispute that it knew who Mr. Kwon was, where he was, and that he had a valid power of attorney authorizing his wife to make financial and other decisions on his behalf. ECF 29773 ("Kwon Mot.") at 11-12; ECF 30053 ("PDA Obj.") ¶ 39 ("[J]ust because the PDA is familiar with who Kwon is, that familiarity does not substitute for a person appearing on camera …."). Its only response to Mr. Kwon's arguments, Kwon Mot. at 11, is that Mr. Kwon did not pass the liveness test and that the liveness test was reasonable. PDA Obj. ¶¶ 39-40. But that misses the point entirely.

10.     "Reasonableness" "does not turn on formalism." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 n.6 (2002). Courts considering whether something is "reasonable" across a variety of contexts explain that a determination of what is "reasonable" "cannot be determined in a vacuum." *Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987); *see also, e.g.*, *Brennan v.*

4

*Hendrigan*, 888 F.2d 189 (1st Cir. 1989); *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192 (9th Cir. 2021); *Angelex Ltd. v. United States*, 723 F.3d 500, 507 (4th Cir. 2013); *Nat'l Org. for Marriage, Inc. v. United States*, 807 F.3d 592, 599 (4th Cir. 2015).

11. Thus the question is whether, when Mr. Kwon, who PDA knew personally, directly sought accommodation to allow him to complete the customer identification process from Montenegro, it was reasonable for PDA to refuse to work with him and instead take possession of his PYTH. That decision cannot be considered reasonable, and PDA offers no real rebuttal to that point. In fact, ███████████████████████████████████████████████████████████████████████ PDA provides no explanation why, when combined with a valid power of attorney, that was not enough. Instead, it simply asserts that Ms. Lee's submission "did not meet the requirements of the liveness test for Kwon." PDA Obj. ¶ 24.

12. To support its inflexible use of a liveness test, PDA points out that many KYC processes use live face verification as one component of their customer identification process. No one contests that. Importantly, PDA provides no evidence that a liveness test is *indispensable* to a customer identification process. For that exact reason, it does not matter that the processes used in these Chapter 11 cases before distributions include a liveness test as one component. *See* PDA Obj. ¶ 37, n.30, 31. The question is whether PDA's inflexibility as to one of the biggest owners of PYTH, in a context where they were seeking extraordinary relief to remint their titular cryptocurrency, and when they stood to gain from that inflexibility, was reasonable. It was not.

13. The other sources that PDA points to in order to support the use of a liveness test face similar flaws. Based on the Synaps website ███████████████████████████████, a

---

[2] All references to "Obj. Ex." refer to the exhibits to PDA's Objection.

liveness check is an optional, not mandatory, part of the Synaps's offered processes.³ And while PDA claims, for example, that the "Financial Action Task Force" or "FATF" recommends the use of "high-resolution video transmission (allowing for remote identification and verification and proof of 'liveness')," PDA Obj. ¶ 38, that is misleading. In 2020, the FATF listed multiple relevant technologies for digital ID systems that "are, or could soon be, available at scale." It explained how digital ID systems could be used to "answer[] the question: **Who are you?**" and explained that the goal of an "identification/verification" requirement is to "collect[], validate[], and verify[] identity evidence and information about a person."⁴ It also considered whether "inherent factors" like "biometrics" could be used to "answer[] the question: **Are you the person who has been identified and verified?**" *Id.* ¶ 65. At no point does this FATF guidance, or any other Mr. Kwon could identify, insist that live face verification is the *only* way to conduct customer identification. To the contrary, a 2025 guidance cited to by PDA explains that the relevant goal of "customer due diligence" is "[i]dentifying the customer and verifying that customer's identity using reliable, independent source documents, data or information."⁵ The same document discusses how to deal with "persons acting on behalf of a customer," recognizing, of course, that sometimes individuals will conduct business and financial dealings through third parties, as Mr. Kwon attempted to do through his wife. *Id.* at 66.

14.     *Second*, PDA's post-hoc rationalization that Mr. Kwon would not have passed the

---

³ https://synaps.io/synaps-manager; [redacted]

⁴ https://www.fatf-gafi.org/content/dam/fatf-gafi/guidance/Guidance-on-Digital-Identity-report.pdf.
⁵ https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf, Recommendation 10 "Customer Due Diligence and Record Keeping."

other elements of their chosen Synaps KYC/AML process cannot hold water. PDA Obj. ¶ 40-41. Customer identification means just that—confirmation of an individual's identity. Applying customer identification protocols in the context of re-issuing cryptocurrency to the same set of people who already owned it makes a lot of sense. In other words, this Court's order required PDA to take reasonable efforts to ensure that it was distributing New PYTH to the same people who owned Original PYTH.

15.     PDA now argues that "reasonable and customary consumer identification procedures" actually means "Know Your Customer" and "Anti-Money Laundering" procedures that are typically used for new customers to combat financial crime and ensure compliance with related laws. But "KYC" and "AML" are terms of art that contemplate, as PDA suggests, an expansive process that can include an individual passing a "consumer identification procedure" that proves they are who they say they are but then failing some other component of the risk-based KYC/AML testing which is intended to limit distributions to certain individuals or entities that could pose a risk.[6] And PDA's proposed Reminting Plan was not about distributing assets to or making accounts for new customers; it was intended to be a reissuing of PYTH to the same people who already owned it (because PDA was rendering the original PYTH tokens worthless). ECF 2235 ("8/23/23 Cahill Dec.") ¶ 5.

16.     The FDIC, for example, has a "Customer Identification Program Rule," which is a smaller component of broader "Anti-Money Laundering/Countering the Financing of Terrorism" procedures. The customer identification component relates only to "procedures that enable the

---

[6] Indeed, a search across the docket for this case results in almost 200 hits for "Know Your Customer," and over 100 for "Anti-Money Laundering." The Court knew how to order KYC and AML procedures, and did not do so here. *Cf. Cassidy v. Secretary*, 119 F.4th 1336, 1342 (11th Cir. 2024) (holding that because the "state court knew how to designate an order *nunc pro tunc*" "[t]he absence of the phrase . . . is significant").

bank to form a reasonable belief that it knows the true identity of its customers."[7] Investopedia, as another example, explains that "[t]hree components of KYC include the customer identification program (CIP), customer due diligence (CDD), and enhanced due diligence (EDD)."[8] The relevant Order here, by contrast, does not use or in any way reference either "KYC" or "AML," instead using the language "customer identification procedures." Order at 2. That makes sense in the context of re-issuing what was supposed to be an essentially identical asset to the original owners of that asset. Order at 2; PDA Mot. ¶¶ 10, 34, 37; *see also* Kwon Mot. ¶ 17 (describing a variety of ways to confirm the identity of customers).

17.  PDA's references to the processes being applied in this proceeding and the FTX Digital Market Ltd. insolvency proceeding prove the point. PDA Obj. ¶ 37. In both instances, related Court orders use the term "KYC" and provide explicit detail about what sorts of information could be required. Dkt. 1793 at 4-5, 11-12; Dkt. 19068 at 26, 46, 81, 342. In turn, the actual procedures used and cited by PDA are referred to expressly as KYC and AML procedures. *See* PDA Obj. ¶ 37, n.30, 31.[9] The same is true of the JPMorgan Chase documentation PDA references, which discusses "Know Your Customer standards" as including a "Customer Identification Program" as separate from the applicable "Customer Due Diligence procedures." PDA Obj. ¶ 40, n.36. Further proving the point, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7] https://www.fdic.gov/news/financial-institution-letters/2024/fil24015a.pdf; 31 CFR 1020.220 ("The [Customer Identification Program] must be a part of the anti-money laundering compliance program.").

[8] https://www.investopedia.com/terms/k/knowyourclient.asp

[9] FTX, KYC Guidelines for Individual Customers, https://support.ftx.com/hc/en-us/articles/17964384447124-KYCGuidelines-for-Individual-Customers (describing "KYC Guidelines"); FTX Digital Markets Ltd., Claims User Guide, page 14, https://www.pwc.com/bs/en/services/business-restructuring-ftx-digital-markets/assets/ftx-digital-markets-claim-user-guide.pdf (describing "Know Your Customer ('KYC') and Anti-Money Laundering ('AML') checks").

18. PDA's generic references to why and how KYC and AML procedures can be valuable, PDA Obj. ¶ 40, all similarly miss the point. The argument once again conflates "customer identification," which is what this Court's order required, with broader controls on which individuals can receive certain assets.

19. PDA's rampant speculation that Mr. Kwon would not have and could never have passed a fair KYC/AML process is similarly baseless. PDA Obj. ¶ 41. It was not until these filings that PDA expressed any concerns about AML being a basis for denying the transfer of PYTH to Mr. Kwon. And now, PDA not only provides no evidence that Mr. Kwon would not have passed its chosen Synaps AML process, but also does not even assert that Synaps, the Foundation, or PDA applied any AML processes to Mr. Kwon as part of their customer identification process, or that they based their decision in any way on related concerns. Instead, Synaps time and time again told Mr. Kwon that "there are no alternative solutions to the live verification requirement." *See, e.g.*, Kwon Mot. Ex. B.[10] And even if, in some counterfactual world, PDA had reached a negative decision about Mr. Kwon's AML compliance, that still would not justify PDA enriching itself by over $200 million.

20. PDA's feigned AML concerns are also, at this point, irrelevant. Mr. Kwon will give his ownership interest in PYTH to the Terraform Bankruptcy Estate. Kwon Mot. ¶ 6, 29-30; Final J. Against Defs. Terraform Labs Pte Ltd. and Do Hyeong Kwon at 2, *SEC v. Terraform Labs Pte Ltd.*, No. 23 Civ. 1346 (S.D.N.Y. June 12, 2024), ECF 273. There can be no question that use is compliant with any KYC or AML concerns. For that exact reason, the SEC, as well as the Terraform Plan Administrator, supported Mr. Kwon's motion seeking to enforce this Court's

---

[10] All "Kwon Mot. Ex." citations refer to exhibits attached to the declaration of David Patton in support of Mr. Kwon's motion to enforce.

9

Order. Kwon Mot. ¶¶ 50-51. In many ways, Mr. Kwon's situation is aligned with that of the Debtors, who "participated in and completed the KYC process established by the PDA in connection with their receipt of New PYTH tokens." ECF 30052 ("FTX Trust Obj.") ¶ 4.[11] There are no KYC or AML concerns with providing assets to the Terraform Estate, for distribution in compliance with the plan there.

21.     *Third, and finally*, Mr. Kwon's motion does not intend to, and would not, impact in any way the distribution of assets from the FTX Recovery Trust. *See* FTX Trust Obj. ¶ 5. To put an even finer point on the matter, nothing in Mr. Kwon's motion or requested relief would impede the FTX Recovery Trust or this Court from imposing reasonable restrictions on creditors seeking compensation or from requiring (with Court approval) KYC or AML processes that need to be completed by a date certain. *See, e.g.*, ECF 29464; ECF 30042. PDA's unilateral decision to appropriate Mr. Kwon's PYTH (along with that of six other original holders) bears none of the markers of the sort of reasoned decision that bankruptcy courts make every day about how to efficiently distribute limited assets.

22.     For starters, PDA's application of stringent KYC and AML processes was done without Court notification or approval.[12] To the contrary, when the FTX Recovery Trust sought to apply a detailed KYC and AML process, it filed an objection and requested a process requiring additional "KYC" information and additional due diligence, which this Court then ordered. ECF 28225; ECF 29464. In the same vein, as discussed above, the application of KYC and AML processes in this proceeding and that of FTX Digital markets were subject to a valid Court order

---

[11] Though the briefing is silent on the matter, it is entirely possible (and would have been entirely appropriate) for counsel to have facilitated that process.

[12] The FTX Trust nonetheless makes the argument in their limited objection that they understood that KYC and AML procedures would take place. FTX Trust Obj. ¶ 2-4. That does not change the fact that the PDA's request and this Court's ultimate order are entirely lacking those terms of art, which are routinely used in this context when a party means to reference the well understood standards that cover regulated financial entities.

expressly discussing those sorts of procedures. Next, unlike claimants impacted by the April 2, 2025 "Notice of Expungement" who "did not commence" the mandated KYC submission process at all, Mr. Kwon had communicated extensively with PDA to seek resolution before the deadline, and in fact his wife, with a valid power of attorney, had successfully completed the process.

23. Further, the Court expressly ordered that unverified customer entitlement claims not made by a date certain would be waived. ECF 29464. But as to Mr. Kwon, PDA's decision was not a requirement of or contemplated by the Court order. Finally, it is important that the decision of PDA to forfeit Mr. Kwon's PYTH resulted in the self-enrichment of a private, Swiss entity, to the detriment of creditors in the Terraform action. It thus has no relationship at all to the decision making regarding how to allocate the FTX Recovery Trust's assets among multiple creditors (where the decision to limit claims temporally or in any other way results in more efficient distributions of larger amounts to other creditors). *Cf.* ECF 29464; ECF 30042. For those reasons, the FTX Recovery Trust's concerns, while understandable, are misplaced, and an order righting this wrong will in no way affect the ongoing FTX KYC and AML processes.

**B. PDA Abused the Judicial Process by Failing to Disclose That the Reminting Plan Would Enable PDA's Appropriation of PYTH for Itself**

24. The entirety of Mr. Kwon's motion is born of PDA's deceptive behavior, all done in the name of implementing this Court's order. *See, e.g.*, Kwon Mot. Ex. A at 5 ("[T]he FTX bankruptcy court order required a customer identification process."). PDA nevertheless attempts to argue that this sort of injury cannot be remedied by this court, and that equitable principles somehow counsel against granting relief. Both arguments fail.

25. Section 105(a) exists to remedy precisely injury caused by a private party using the judicial system for its own illicit aims. *See* Kwon Mot. ¶ 42 (citing cases). For that reason, courts can reject or remedy "maneuvers or schemes which would have the effect of undermining the

11

integrity of the bankruptcy system." *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996) (citation omitted); *In re Miszko*, 627 B.R. 809, 816 (Bankr. S.D.N.Y. 2021); *see also In re Boltz-Rubinstein*, 574 B.R. 542, 551 (Bankr. E.D. Pa. 2017) ("Undoubtedly, there are circumstances in which § 105 may be invoked to vindicate the integrity of the bankruptcy process and to respond to a fraud perpetuated or attempted to be perpetuated upon the court.").

26. PDA's halfhearted arguments about this Court's inherent powers can be easily dismissed. It cites to *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), for the idea that "Section 105(a) does not empower bankruptcy courts with a 'roving commission to do equity.'" PDA Obj. ¶ 48. But that case held that "[t]he general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code," 391 F.3d at 236, and there is no argument here that the Code prevents or restricts the Court's ability to enforce its own order relating to lifting the bankruptcy stay.

27. PDA's factual arguments that it did not abuse the judicial process are similarly unavailing. Essentially, PDA claims that because its procedures were "reasonable and customary," it did not violate this Court's order. *See* PDA Obj. ¶ 50. To support that claim, PDA asserts that it was "given discretion in how to implement the Reminting Plan." PDA Obj. ¶ 50. But what PDA told this Court was that it intended to "deliver value to holders" of Original PYTH and that its plan would make those holders whole. PDA Mot. ¶ 10; Kwon Mot. ¶ 9 (citing representations to the Court). The reality, which it concealed, is that it intended to unilaterally impose inflexible processes and that any holders who failed those processes would forfeit their property to PDA. In that context, it matters that PDA did not inform this Court of its plan for PYTH it deemed forfeited.

28. PDA also argues that because "everyone allocated Original Pyth" was notified that forfeited New PYTH would "default to PDA," there was no lack of transparency. PDA Obj. ¶ 51.

But PDA leaves out that it never *told the Court* that it intended to take any "forfeited" PYTH for itself. In fact, in August 2023, PDA informed this Court that the Reminting Plan was complete, even though at that time holders of Original PYTH had not yet been notified of the plan or received instructions about how to apply to receive New PYTH. *See* 8/23/23 M. Cahill Suppl. Decl. ¶ 4 ("The Reminting Plan has been completed."); Order ¶ 3; Kwon Mot. Ex. H at 33 (email informing original holders of "Claim process for Replacement PYTH Tokens"). In doing so, PDA doubled down on their original deceit, ensuring that there would be no dissent before this Court was led to believe that the reminting work was done.

29. To avoid that conclusion, PDA argues that it has no culpability because it is no more than a "not-for-profit association dedicated to the advancement of the Pyth Network."[13] But PDA's feigned nobility has no basis in reality. PDA, and the individuals that run it, are sophisticated market actors enmeshed in the cryptocurrency markets. A look at PDA's board proves the point. The PDA board members as of August 2023 worked at or were affiliated with Jump Trading, LMAX Group, Duoro Labs (a PYTH specific crypto-related entity),[14] and the Pyth Network. *See* PDA Obj. Ex. B. at 3.[15] In other words, the individuals in charge of making decisions

---

[13] *See* PDA Obj. ¶ 7 ("[T]he PDA is a not-for-profit association founded by Pyth Network participants to advance the development of the Pyth Protocol and Network, and the tokens it holds."); PDA Obj. ¶ 52 ("Kwon's argument that the PDA concealed the effect of failing to satisfy KYC/AML to enrich itself is flat wrong and absurd. The PDA's purpose is to advance the Pyth Network and Protocol and it will use all reallocated New PYTH for that purpose."); Cahill Decl. ¶¶ 2, 14-15.

[14] Muyao Shen, *Jump's Crypto Specialists Depart for Blockchain Focused Startup*, BLOOMBERG (Aug. 31, 2023) https://www.bloomberg.com/news/articles/2023-08-31/jump-crypto-s-specialists-depart-for-startup-that-will-work-with-pyth-network ("Former Jump employees Mike Cahill, Jayant Krishnamurthy and Ciaran Cronin have co-founded Douro Labs to work closely with the Pyth Network, a blockchain-based data service, according to a statement Tuesday. The group of 19 includes six others from Jump's crypto team who were already working on Pyth, a representative for Douro Labs said.").

[15] Ciaran Cronin, President of the PDA Board, is currently affiliated with Duoro Labs, with former roles at Jump Trading, and LMAX. *See* https://www.linkedin.com/in/ciar%C3%A1n-cronin-4684351a/?originalSubdomain=pt. Michael Cahill, Member of the PDA Board, is currently at Duoro Labs and formerly affiliated with Jump Trading, https://www.linkedin.com/in/michael-d-cahill/. Marc Tillement, Member of the PDA Board, appears to be primarily affiliated with the PYTH Network, https://www.linkedin.com/in/marc-tillement-442aa312a/?originalSubdomain=pt. His Twitter describes him as a "Pythian doing Pithy things." https://x.com/KemarTiti. Marc Degen, member of the

at PDA are all sophisticated financial actors with meaningful stakes in cryptocurrency (and, one assumes, meaningful stakes in PYTH).

30. For further example, Michael Cahill, PDA's declarant throughout this proceeding, ECF 30053-1; 1632-3; 2235, worked at Jump Crypto when PDA first sought relief from this Court. And based on LinkedIn, he now works at "Douro Labs," a "Financial Services" company building "oracle tooling, products, and Web3 infrastructure that will expand the Pyth Network's suite of decentralized data services." Last week, he met "with representatives on Capitol Hill to discuss blockchain innovation across various sectors."[16]

31. Not only is it clear that PDA's actions are not those of some uninterested third party, but PDA has deep ties to Jump Crypto, an entity that was directly involved with the promotion and sale of LUNA, Terraform's cryptocurrency token. Indeed, Jump recently settled with the SEC for activity directly related to the actions that PDA (with its many ties to Jump) now claims disqualify Mr. Kwon.[17] One of the SEC's main witnesses at the trial against Mr. Kwon and Terraform worked at Jump and now is a "maintainer of @PythNetwork on @solana."[18] PDA cannot claim that Mr. Kwon is ineligible to receive his PYTH tokens because of his actions at Terraform while PDA

---

PDA Board, appears to have connections to a variety of technology companies, https://www.linkedin.com/in/marcdegen/?originalSubdomain=ch. David Mercer, member of the PDA Board, is the CEO of LMAX Group. https://www.linkedin.com/in/mercerdavid/?originalSubdomain=uk.

[16] https://www.linkedin.com/posts/michael-d-cahill_had-the-privilege-today-of-meeting-with-representatives-activity-7313666863710769152-FMIS?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAsEoMQBtHmT4JEWXEnP9CxuKGvjQqrTmNU.

[17] Press Release, SEC, *Tai Mo Shan to Pay $123 Million for Negligently Misleading Investors About Stability of Terra USD* (Dec. 20, 2024), https://www.sec.gov/newsroom/press-releases/2024-212.

[18] https://x.com/_jhunsaker?lang=en; *see, e.g.*, *SEC v. Terraform Labs Pte Ltd.*, Case No. 1:23-cv-01346-JSR, ECF 248, Trial Tr. 61:16-21 (SEC Opening: "On the Jump side of the deal, former Jump employee, James Hunsaker will testify that on May 23rd, he heard Jump executive, Kanav Kariya, announce a deal with Terraform. Mr. Hunsaker will testify that after that announcement, Jump's cofounder, William DiSomma, began to issue instructions to Jump traders to buy up UST.")

14

itself is directly implicated in those same actions.[19] Put another way, if what PDA says about Mr. Kwon failing their KYC/AML process based on his role with Terraform is true, then PDA itself would have failed that same process.

32. Next, PDA pulls generic quotations from inapplicable cases to argue that Kwon somehow behaved inequitably and is thus not entitled to equitable relief. PDA Obj. ¶¶ 43-47. But these specious attacks are merely a smokescreen to distract the court from the fact that PDA has not shown (nor could they) that any equitable defenses apply to Mr. Kwon's motion.

33. PDA argues that Mr. Kwon's alleged delay in bringing this motion militates against relief—by claiming that Mr. Kwon's is a "self-inflicted injury"[20] and that Mr. Kwon did not "himself act[] equitably,"[21] these arguments are no more than a veiled attempt to invoke the doctrine of laches without naming it. A laches defense requires that the proponent establish both "prejudice" and "inexcusable" delay. *See EEOC v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 80-81 (3d Cir. 1984). PDA cannot show either element.

34. To start, PDA does not and cannot point to *any* meaningful delay. As both Mr.

---

[19] As Mr. Kwon outlined in his opening brief, in seeking permission to conduct a Reminting Plan, PDA never told the Court it intended to rely on the Foundation to conduct that plan. PDA goes to great effort in its motion to explain that the Foundation "is not an affiliate of the PDA, but a member of the Pyth Network that submitted the Reminting Proposal that was later adopted by the PDA Board." PDA Obj. ¶ 13, n.15; Cahill Decl. ¶ 6. But at the same time, it never explains why PDA delegated the task of implementing the Reminting Plan to the Foundation, an entity it claims is arm's length, but at the same time that it never mentioned to this Court.

[20] Neither case PDA cites for "self-inflicted injury" has any bearing on this one. Both were preliminary injunction cases, addressing the meaning of "irreparable harm" in that context; neither even address whether delay alone can constitute "self-inflicted injury" for purposes of a request in equity. *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024); *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021).

[21] PDA cites to *Manufacturers' Fin. Co. v. McKey*, 294 U.S. 442 (1935) for the proposition that "he who seeks equity must do equity" and *Ramirez v. Collier*, 595 U.S. 411, 434 (2022) for the proposition that when a party behaves inequitably, "the doors of the court will be shut against him." But these maxims are inapplicable and the cases they come from are similarly off-base: *McKey* found "no unconscionable or inequitable conduct" could be ascribed to the petitioner there, and in *Ramirez*, a capital case, the Court concluded that he did not sleep on his rights because he "sought to vindicate his rights for months" through an administrative grievance processes and because "respondents can hardly complain about the inequities of delay when their own actions were a significant contributing factor." *Id.* A capital case is not on all fours with the instant issue, but Mr. Kwon certainly took many steps to try to vindicate his rights. And, like in *Ramirez*, PDA contributed significantly to the alleged delay by setting an arbitrary three-month timeline and by refusing to extend it in light of Mr. Kwon's valid concerns.

Kwon's motion, and PDA's own documents, detail, when PDA was conducting the customer identification process, Mr. Kwon, through his counsel, reached out repeatedly. Kwon Mot ¶¶ 17-30; PDA Obj. Ex. J-M; Plan Admin. Join. ¶ 14. In August 2024, the Official Committee of Unsecured Creditors of Terraform Labs Pte. Ltd. et al. also reached out to PDA, which once again refused to negotiate or have a meaningful discussion regarding its decision to appropriate Mr. Kwon's tokens. *See* Kwon Mot. Ex. A. In December 2024, less than a year after the purported forfeiture, Mr. Kwon once again reached out to PDA to try to negotiate and, if not able to do so, file with the Court. That process involved multi-party discussions including PDA, the SEC, and the Terraform Plan Administrator, and at PDA's request, Mr. Kwon held off filing until April. Thus, at most, PDA can point to an intervening year where Mr. Kwon was less active on this issue.

35. It is therefore perhaps unsurprising that PDA does not even attempt to argue that Mr. Kwon's delay caused it prejudice, rendering its handwringing about Kwon's delay moot. *See United States v. Rebelo*, 358 F. Supp. 2d 400, 413 (D.N.J. 2005) (finding that a laches defense was not established because "[n]owhere in Rebelo's briefing papers does he make the argument that he suffered prejudice as a result of the Government's alleged lack of diligence"), *overruled on other grounds*, *Partyka v. Att'y Gen.*, 417 F.3d 408 (3d Cir. 2005). And how could it, when the three-month deadline that PDA imposed on original holders of PYTH was arbitrary and not based on any real-world deadline or need.

36. And even putting prejudice aside, a one-year delay, which Mr. Kwon spent incarcerated in two countries, is hardly "inexcusable." *See Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 82-84 (3d Cir. 1984) (holding that none of three separate delays of 29 months, 21 months, and 22 months sufficed to establish inexcusable delay); *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 209 (3d Cir. 1999) (Alito, J.) (reversing and vacating a district court finding of laches

16

for a delay of 27 months and where the district court "did not receive briefing from the parties . . . on the issue of prejudice"); *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1108 (3d Cir. 1996) (no inexcusable delay less than two years after the cause of action accrued, with "no evidence that this delay was dilatory"); *Bordes v. Comm'nr of Soc. Sec.*, 235 F. App'x 853, 860 (3d Cir. 2007) (three-and-a-half-year delay not laches because proponent failed to demonstrate inexcusable delay).

37. To the extent PDA seeks to invoke the "unclean hands" doctrine by suggesting that other civil and criminal actions against Kwon preclude equitable relief, the doctrine requires that any "inequitable conduct" "has immediate and necessary relation" to the equity sought. *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999). PDA does not attempt to link—nor could it—the actions against Mr. Kwon or his incarceration to the PYTH that he was promised. And, importantly, Mr. Kwon's motion would result in the delivery of his PYTH tokens directly to the Terraform Bankruptcy Estate, an outcome that would benefit creditors there.

38. PDA's motion contains a handful of other, specious attacks against Mr. Kwon, all focused on the idea that he did not do enough to comply with the inflexible demands of the artificial KYC/AML process, or on his commitment to provide his ownership interest in PYTH to the Terraform Bankruptcy Estate. PDA Obj. ¶ 44-45, 53. None of those points have either merit or relevance. As outlined in detail in Mr. Kwon's motion, Kwon Mot. ¶¶17-30, and as confirmed by PDA's own exhibits, PDA Obj. Exs. J-M, Mr. Kwon's counsel reached out repeatedly to the Foundation and PDA seeking a path forward and were consistently rebuffed.

39. PDA told this Court that it would provide holders of Original PYTH with an essentially identical asset. Instead, PDA used this Court's order to facilitate its own self-enrichment, which is now to the detriment of the Terraform Bankruptcy Estate.

## CONCLUSION

Mr. Kwon respectfully requests that the Court order PDA to apply "reasonable and customary customer identification" procedures and that the Court grant any other relief that the Court deems necessary, just, and equitable.

Dated: April 14, 2025

Respectfully submitted,

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
GELLERT SEITZ BUSENKELL & BROWN, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5812
mbusenkell@gsbblaw.com

Sean Hecker*
David Patton*
Michael Ferrara*
John C. Quinn*
Matthew J. Craig*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York, 10118
(212) 763-0883
shecker@heckerfink.com
dpatton@heckerfink.com
mferrara@heckerfink.com
jquinn@heckerfink.com
mcraig@heckerfink.com

Katherine Epstein*
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
kepstein@heckerfink.com

*Counsel for Movant Do Kwon*

* *admitted pro hac vice*