## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  May 14, 2025 at 9:30 A.M. ET** |

## FTX RECOVERY TRUST'S REPLY IN SUPPORT OF
## DEBTORS' AMENDED OBJECTION TO PROOFS OF CLAIM
## FILED BY SETH MELAMED AND MOTION FOR SUBORDINATION AND
## OPPOSITION TO CLAIMANT'S CROSS-MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..........................................................................................................................8

I.  MELAMED'S CLAIMS RELATING TO THE FTX CONSIDERATION
    SHARES AND FOR INDEMNIFICATION SHOULD BE SUBORDINATED
    PURSUANT TO 11 U.S.C. § 510(b) ..........................................................................8

    A.  Section 510(b) Was Enacted to Prevent the Very Sort of Gamesmanship
    That Melamed Attempts Here ..................................................................................8

    B.  Melamed's Claim for Indemnification Should Also Be Subordinated ...................9

    C.  This Court Should Rule on the Issue of Section 510(b) Subordination as a
    Threshold Matter .....................................................................................................10

II.  MELAMED SHOULD NOT BE ALLOWED TO RECOVER MORE THAN
     HE IS ENTITLED FOR THE CRYPTO CONSIDERATION ...................................12

    A.  Melamed's Claim for the Crypto Consideration Should Be Valued in
    Accordance with the Plan and Estimation Order ...................................................12

    B.  The Appropriate Treatment of the Crypto Consideration Is a Threshold
    Legal Issue That Would Obviate the Need for Any Further Litigation on
    Melamed's Alternative Theories of Recovery ........................................................15

III.  THE SALARY CLAIMS, BONUS CLAIM, AND ADMINISTRATIVE
      CLAIM SHOULD BE DISALLOWED AND EXPUNGED IN THEIR
      ENTIRETY ...............................................................................................................16

    A.  Melamed Has Not Demonstrated an Entitlement to the Salary Claims or
    Any Bonus Payment ...............................................................................................16

    B.  Melamed Is Not Entitled to Any Transaction Award, Which Would Not
    Be Payable by the Trust in Any Event ...................................................................16

    C.  Melamed's Claim For Post-Termination Compensation Is Without Merit ..........18

IV.  MELAMED'S CROSS-MOTION SHOULD BE DENIED ........................................20

    A.  Melamed Has Not Met His Burden of Demonstrating That His Salary
    Claims, Bonus Claim and Administrative Claim Fall Within the Scope of a
    Valid Arbitration Agreement ..................................................................................21

    B.  Arbitration Would Impede the Objectives of the Bankruptcy Code ....................25

**V.      TO THE EXTENT THAT THEY ARE NOT DISALLOWED AND
        EXPUNGED, MELAMED'S CLAIMS SHOULD BE EQUITABLY
        SUBORDINATED** ........................................................................................................**27**

**CONCLUSION**................................................................................................................................**29**

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases**

*In re Ameriflex Eng'g LLC*,
   587 B.R. 108 (Bankr. D. Or. 2018)......................................................................................10

*In re APF Co.*,
   264 B.R. 344 (Bankr. D. Del. 2001) ..............................................................................25, 26

*In re Bencharsky*,
   2010 WL 309145 (Bankr. N.D. Cal. Jan. 19, 2010) ...............................................................25

*Celsius Mining LLC* v. *Mawson*,
   2024 WL 1719633 (S.D.N.Y. Apr. 22, 2024).....................................................................21, 22

*In re Charge Enters., Inc.*,
   2024 WL 5131141 (Bankr. D. Del. Dec. 16, 2024)...........................................................9–10

*In re CIT Grp. Inc.*,
   2012 WL 831095 (Bankr. S.D.N.Y. Mar. 9, 2012) ................................................................11

*In re Ellswick*,
   2016 WL 3582586 (Bankr. N.D. Ala. June 24, 2016) ...........................................................25

*In re Essar Steel Minn. LLC*,
   2019 WL 2356979 (D. Del. June 4, 2019)............................................................................15

*Franlogic Scout Dev., LLC* v. *Scott Holdings, Inc.*,
   2017 WL 2982396 (E.D. Pa. July 12, 2017)..........................................................................21

*Helicos Biosciences Corp.* v. *Pac. Biosciences of Cal.*,
   2011 WL 6758481 (D. Del. Dec. 22, 2011)..........................................................................11

*In re Jacom Comput. Servs., Inc.*,
   280 B.R. 570 (Bankr. S.D.N.Y. 2002) ..................................................................................10

*In re Kaiser Grp. Int'l, Inc.*,
   260 B.R. 684 (Bankr. D. Del. 2001) .......................................................................................8

*Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*,
   560 F.3d 156 (3d Cir. 2009).................................................................................................21

*Kohn* v. *Leavitt-Berner Tanning Corp.*,
   157 B.R. 523 (N.D.N.Y. 1993) ............................................................................................15

*In re Lernout & Hauspie Speech Prods., N.V.*,
    264 B.R. 336 (Bankr. D. Del. 2001) ...................................................................10

*In re May*,
    591 B.R. 712 (Bankr. E.D. Ark. 2018) ...............................................................25

*In re Med Diversified, Inc.*,
    461 F.3d 251 (2d Cir. 2006)...............................................................................10

*In re Mid-Am. Waste Sys., Inc.*,
    228 B.R. 816 (Bankr. D. Del. 1999) ................................................................9, 10

*In re Mintze*,
    434 F.3d 222 (3d Cir. 2006)...............................................................................26

*In re Penson Worldwide*,
    587 B.R. 6 (Bankr. D. Del. 2018) .......................................................................25

*In re Peregrine Sys., Inc.*,
    2004 WL 716714 (Bankr. D. Del. Mar. 30, 2004)..................................................8

*In re Russell*,
    402 B.R. 188 (Bankr. N.D. Miss. 2009) .........................................................25–26

*Shearson/American Express, Inc.* v. *McMahon*,
    482 U.S. 220 (1987).........................................................................................25

*In re Telegroup, Inc.*,
    281 F.3d 133 (3d Cir. 2002).................................................................................9

*In re The Baptist Home of Phila.*,
    2011 WL 13500107 (Bankr. E.D. Pa. Oct. 11, 2011)......................................11–12

*In re Touch Am. Holdings, Inc.*,
    381 B.R. 95 (Bankr. D. Del. 2008) ....................................................................3, 9

*Travelers Indem. Co.* v. *Bailey*,
    557 U.S. 137 (2009).........................................................................................15

*In re Walnut Equip. Leasing Co., Inc.*,
    1999 WL 1271762 (Bankr. E.D. Pa. Dec. 28, 1999) ............................................10

*In re Wash. Mut., Inc.*,
    462 B.R. 137 (Bankr. D. Del. 2011) ...................................................................27

*In re Yarbrough*,
    2010 WL 3885046 (Bankr. M.D. Ala. Sept. 29, 2010).........................................25

*In re Yellow Corp.*,
    2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024)............................................................25, 26

**Statutes**

11 U.S.C. § 101(5) ............................................................................................................10, 12

11 U.S.C. § 502 ...........................................................................................................................25

11 U.S.C. § 510(b) ................................................................................................................ *passim*

11 U.S.C. § 510(c)(1)..................................................................................................................28

28 U.S.C. § 157(b)(2)(B) ...........................................................................................................25

The FTX Recovery Trust (the "Trust"), as defined in the confirmed and effective *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26404-1] (the "Plan") entered in the above-captioned proceeding, respectfully submits this reply in further support of *Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1)* [D.I. 28643] (the "Amended Objection"), and in response to the *Opposition to Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1) and Cross-Motion to Compel Arbitration* [D.I. 30077] (the "Amended Opposition"), including the declarations submitted therewith by (i) Seth Melamed [D.I. 30081]; (ii) Ryo Kawabata [D.I. 30078] (the "Kawabata Declaration"); (iii) Takane Hori [D.I. 30079] (the "Amended Hori Declaration"); and (iv) Takane Hori, specifically with respect to "Post Petition Director's Fees" [D.I. 30080] (the "Hori Post-petition Declaration"). In connection with the Amended Objection and this reply, the Trust submits the concurrently filed declarations of Taro Tanaka (the "Tanaka Reply Declaration"), Balakrishnan Ashok Kumar (the "Kumar Declaration"), and Henry Anthony Chambers (the "Chambers Reply Declaration").[1]

## PRELIMINARY STATEMENT

On December 9, 2024, the Trust filed its Amended Objection to five claims filed by Seth Melamed. As described in the Amended Objection, Melamed's purported claims arise from FTX Trading Ltd.'s ("FTX") April 2022 acquisition of Liquid Group, Inc. ("Liquid"), a company of which Melamed was a shareholder and officer, as well as Melamed's subsequent employment with, and termination from, positions he held at the post-acquisition entity, FTX Japan Holdings K.K. ("FTX Japan Holdings"), and certain of its subsidiaries, including FTX Japan

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings set forth in the Amended Objection.

K.K. and Quoine Pte Ltd. ("Quoine").  On April 7, 2025, Melamed filed his Amended Opposition.

The Amended Opposition does not meaningfully address any of the core infirmities of Melamed's

claims—whether those claims arise from the Liquid share purchase agreement or Melamed's

various employment-related theories.  Instead, Melamed seeks to delay adjudication in this Court

of the threshold legal issues that drive nearly all of his claims' value by forcing the Trust into a

wasteful and inappropriate arbitration.  For the reasons set forth in the Amended Objection and

below, and others that will be demonstrated following discovery and a hearing, the Court should

reject his attempt to do so.

       *SPA Claim*.  Pursuant to the November 19, 2021 share purchase agreement (the

"SPA," Ex. 3[2]), Melamed agreed to accept 1,019,070 shares of FTX common stock as partial

consideration for his shares of Liquid (the "FTX Consideration Shares").  (SPA Sch. 2.)  There is

no dispute that Melamed received the FTX Consideration Shares in accordance with the SPA.

Following FTX's collapse, the value of the FTX Consideration Shares decreased significantly,[3]

and Melamed—no longer happy to be an FTX shareholder—is attempting to re-trade his deal.  But

section 510(b) was enacted to prevent this very sort of gamesmanship.  Melamed does not seriously

dispute this.  Rather, he argues that a ruling on section 510(b) would be premature until the precise

value of his claim is liquidated—either before this Court or in arbitration.  This is wrong, and

transparently designed to create leverage by forcing the Trust to engage in costly and unnecessary

litigation.  Subordination pursuant to section 510(b) is a pure question of law.  Deciding it now is

within this Court's authority, and will greatly simplify the issues in dispute.

---

[2]    Unless otherwise specified, citations to "Ex." refer to the exhibits appended to the *Declaration of Henry Anthony Chambers in Support of Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination* [D.I. 28645] (the "Chambers Declaration").

[3]    Indeed, the FTX Debtors bought all 1,019,070 FTX Consideration Shares back from Melamed for $1 on December 28, 2022 at Melamed's request to assist him in his tax planning.  (Chambers Reply Decl. ¶¶ 14–16.)

Relatedly, Melamed also seeks indemnification of his legal fees pursuant to an indemnification provision in the SPA. (Claim No. 3385, the "SPA Claim" ¶ 4.) But this Court's precedent makes clear that any such indemnification claim would also be subordinated pursuant to section 510(b)'s plain language. *In re Touch Am. Holdings, Inc.*, 381 B.R. 95, 103 (Bankr. D. Del. 2008) ("The plain language of this section is broad enough to include indemnification claims.").

The other portion of Melamed's SPA claim—attributable to specified amounts of cryptocurrencies that he was to receive in partial consideration for his Liquid shares (the "Crypto Consideration")—likewise should be dealt with now. (SPA Sch. 2.) Pursuant to the SPA and a side letter agreement from the same day (the "Side Letter," Ex. 4), the Crypto Consideration was to be deemed "paid" upon closing, which took place on April 4, 2022 (the "Completion Date"), but retained by FTX and conveyed to Melamed on the first and second year anniversaries of the Completion Date. (SPA § 4.2; Side Letter § 2.1(d).) Despite this clear agreement and Melamed's acknowledgment of these terms (SPA Claim ¶¶ 19–20), Melamed nonetheless seeks to recover the Crypto Consideration's value on the date of the SPA rather than the Petition Date. But section 4.4 of the Plan clearly provides that "a Claim in respect of a Digital Asset" such as this one is "calculated by converting the value of such Digital Asset into Cash as of the Petition Date" in accordance with the conversion rates attached to the Court's *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] (the "Estimation Order"). By arguing for valuation at a date other than the Petition Date, Melamed is trying to put himself ahead of tens of thousands of similarly situated creditors with claims in respect of Digital Assets (*e.g.*, exchange customers). A ruling at the outset on valuation of the Crypto Consideration pursuant to the Plan's clear provisions on Digital Assets—a central subject of these Chapter 11 cases—would save the

parties significant additional litigation time and costs.

   ***Salary and Bonus Claims.*** Melamed also brings two duplicative claims for purportedly unpaid compensation from September and October 2022 (Claim Nos. 3353, 4578, the "Salary Claims") and for a bonus payment Melamed claims he was owed (Claim No. 3244, the "Bonus Claim") pursuant to a October 19, 2022 management agreement (the "Management Agreement," Ex. 5). The Amended Opposition does not respond to any of the Trust's arguments in the Amended Objection with respect to the Salary Claims or the Bonus Claim, each of which should be disallowed and expunged in its entirety for the reasons set forth in the Trust's Amended Objection. (*See* Am. Obj. ¶¶ 43–47; 48–51.)

   ***Administrative Claim.*** In a *Request for Payment of Administrative Expense* [D.I. 27798] (the "Administrative Claim"), Melamed seeks to recover a transaction award payment (the "Transaction Award") pursuant to a post-petition Key Employee Incentive Plan [D.I. 1589-1] (the "KEIP"). But although Melamed was eligible to participate in the KEIP, he failed to opt into the program, which required signing a standard award agreement. The Amended Opposition argues that it was impermissible for the Debtors to require Melamed to sign the award agreement after the Court had already issued an order authorizing the KEIP [D.I. 1589] (the "KEIP Order"). (Am. Opp. ¶ 84.) However, the Court's authorization gave the Debtors substantial discretion in how to implement the KEIP, which they appropriately exercised to deny Melamed payment. Regardless, Melamed seeks to recover the Transaction Award from the wrong entity, as bitFlyer Holdings, Inc. ("bitFlyer") assumed the obligation to pay any Transaction Awards under the KEIP in connection with its purchase of FTX Japan K.K., which the Court expressly authorized.

   Also as part of his Administrative Claim, Melamed seeks to recover damages arising out of his termination from FTX Japan Holdings (i) under Article 339 of the Japanese

Companies Act (the "JCA"), based on the assertion that he was terminated without "justifiable grounds" (Am. Opp. ¶ 79), and (ii) due to an alleged breach of the Management Agreement (Am. Opp. ¶ 79 n.19).  Regarding the former, the JCA's default provisions are inapplicable because the Management Agreement specifically provides the appropriate reasons, notice, and compensation required in the event of any "for Cause" or "without Cause" termination.  (Management Agreement § 11.)  But even if the JCA applied, the Debtors **did** have justifiable grounds to terminate Melamed for cause.  Melamed's Japanese law expert bases her analysis exclusively on the termination notice, which did not purport to contain an exhaustive recitation of the reasons for Melamed's termination. (*See* Hori Post-petition Decl. ¶ 29.)  Indeed, Melamed breached the Management Agreement and acted in a conflicted, self-interested manner that was inconsistent with his duties as Representative Director.  (Chambers Reply Decl. ¶¶ 6, 8, 10.)  The Tanaka Declaration confirms that these bases for Melamed's termination constitute "justifiable grounds" pursuant to the JCA.  (Tanaka Reply Decl. ¶¶ 21–24.)  Mr. Tanaka further opines that these grounds constitute sufficient bases for his termination under the terms of the Management Agreement, and thus, Melamed's argument that his "for Cause" termination constituted a breach of the Management Agreement fails for the same reasons as his JCA argument.  (Tanaka Reply Decl. ¶¶ 21–24.)  Moreover, even if Debtors did not have sufficient bases to terminate Melamed "for Cause" on August  20, 2024, Melamed at best would be entitled to $262,500, representing the compensation that he would have received pursuant to his July 30, 2024 "without Cause" termination, which Melamed does not challenge. (Tanaka Reply Decl. ¶¶ 32–33.)

   ***Arbitration.***  In a transparent attempt to delay this Court's ruling on legal issues that would resolve the majority of his claims, Melamed now moves to compel arbitration.  (Am. Opp. ¶¶ 41–51 (the "Cross-Motion").)  But Melamed has not met his burden of establishing that a

majority of his claims fall within the scope of a valid agreement to arbitrate.  Puzzlingly, Melamed

contends (for the first time) that *all* of his claims are subject to arbitration, including those arising

out of the Management Agreement (Am. Opp. ¶¶ 42–43), which does not contain an arbitration

clause.   As the Trust's Singaporean law expert explains, this interpretation is contrary to

Singaporean law (Kumar Decl. ¶ 11), which is the applicable law for purposes of interpreting the

arbitration provision (SPA § 19.4).[4]  Melamed does not provide a declaration of a Singaporean

law expert or otherwise analyze the SPA's arbitration provision under the laws of Singapore.

Although the SPA Claim (and only the SPA Claim) is arguably governed by an

arbitration clause, the core matters in dispute—*i.e.*, Section 510(b) subordination of Melamed's

claim in respect of the FTX Consideration Shares and indemnification of legal fees, and the

application of the Plan and Estimation Order to Melamed's claim for Crypto Consideration—

ultimately must be resolved by this Court regardless of whether Melamed's claim is liquidated in

arbitration.  Moreover, notwithstanding Melamed's arguments to the contrary, any arbitration of

Melamed's claims would lead to wasteful, duplicative proceedings and interfere with the

Bankruptcy Code's core objectives of centralized resolution of bankruptcy issues and efficient

resolution of claims.

***Equitable Subordination.***  The Amended Opposition makes two arguments against

equitable subordination, but both are unavailing.  *First*, it argues that equitable subordination may

only be sought through an adversary proceeding.  (Am. Opp. ¶¶ 58–62.)  But courts will consider

equitable subordination in the context of a claim objection where, as here, the chapter 11 plan

provides for equitable subordination (Plan § 4.3.25).  *Second*, Melamed disputes that he acted

---

[4]    Even if Japanese law applied to interpretations of the arbitration provision (which it unambiguously does not),
Melamed's argument similarly fails under Japanese law.  (Tanaka Reply Decl. ¶¶ 12–15.)  Melamed offers no
Japanese law opinion to the contrary.

inequitably and that creditors of the estate were harmed as a result.  But the Amended Objection, the Chambers Declaration, and the Chambers Reply Declaration all clearly demonstrate that Melamed breached his duties to FTX Japan Holdings and its subsidiaries on numerous occasions, including in connection with his misappropriation of $11 million in customer funds, his failure to implement controls that led to a detrimental hack, and his role in the ultimate bankruptcy.

*     *     *

In order to avoid further unnecessary litigation and dissipation of estate assets, the Trust respectfully requests that the Court sequence the proceedings with respect to the Amended Objection and the Cross-Motion, and address as a threshold matter, whether:  (1) Melamed's claims relating to the FTX Consideration Shares, and for indemnification under the SPA, must be subordinated pursuant to 11 U.S.C. § 510(b); and (2) Melamed's claim for the Crypto Consideration must be valued according to the Plan and Estimation Order.  Threshold rulings on these two issues would dramatically simplify the remaining matters in dispute with respect to the SPA Claim, and thus provide certainty with respect to ***nearly 99%*** of the total stated amount that Melamed seeks to recover across all of his claims, potentially allowing the parties to reach a resolution.  The Trust further requests that the Court disallow Melamed's Salary Claims, Bonus Claim, and Administrative Claim in their entirety, or in the alternative, reserve judgment on those claims pending discovery.  Finally, to the extent not already disallowed, the Trust respectfully requests that this Court equitably subordinate Melamed's claims pursuant to 11 U.S.C. § 510(c), or in the alternative, reserve judgment on that claim pending discovery and an evidentiary hearing.

# ARGUMENT

## I.    MELAMED'S CLAIMS RELATING TO THE FTX CONSIDERATION SHARES AND FOR INDEMNIFICATION SHOULD BE SUBORDINATED PURSUANT TO 11 U.S.C. § 510(b).

Melamed's Amended Opposition avoids addressing the merits of the Trust's statutory subordination argument, which is the key issue.  That is not surprising, because section 510(b) clearly applies to the portions of the SPA Claim seeking payment for the FTX Consideration Shares and indemnification, regardless of whether the SPA Claim sounds in fraud or breach of contract.  The Court should address this issue now, and reject Melamed's request to delay the inevitable in an attempt to drive up costs.

### A.    Section 510(b) Was Enacted to Prevent the Very Sort of Gamesmanship That Melamed Attempts Here.

Melamed does not seriously dispute that the portion of his claim attributable to the FTX Consideration Shares "aris[es] from the purchase or sale of [Debtors'] securit[ies]."  11 U.S.C. § 510(b); *see In re Kaiser Grp. Int'l, Inc.*, 260 B.R. 684, 685–86 (Bankr. D. Del. 2001) (claims for fraud and breach of contract brought by former shareholders of debtor's acquisition target fell "squarely within the purview of section 510(b)"); *In re Peregrine Sys., Inc.*, 2004 WL 716714, at *2 (Bankr. D. Del. Mar. 30, 2004) ("subordination cannot be defeated merely by attempting to classify a claim as a breach of contract rather than a breach incident to a stock purchase or sale agreement" and "[r]egardless of the fact that [claimant] now contends he was defrauded into making the exchange").[5]

---

[5]    Nor does it matter, as Melamed previously argued in his *Opposition to Debtors' Objection to Proofs of Claim* [D.I. 23170] (the "Initial Opposition"), that the SPA was an "agreement for **FTX** to purchase the **equity** of **Liquid**," rather than vice versa.  (Initial Opp. ¶ 46 (emphasis in original).)  It is well settled that section 510(b) applies where, as here, shares of the debtor were issued as consideration in connection with the debtor's merger with or acquisition of a target company.  *See, e.g.*, *In re Kaiser Grp. Int'l, Inc.*, 260 B.R. at 685–86; *In re Peregrine Sys., Inc.*, 2004 WL 716714, at *2.

Indeed, section 510(b) was enacted to prevent the very sort of maneuver that Melamed attempts here:  "bootstrap[ping]" his equity-related claim to one for damages in order to elevate the priority of his interest.  *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002).  In enacting section 510(b), "Congress also made the decision to subordinate based on risk allocation." *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, 825–26 (Bankr. D. Del. 1999).  As detailed in the Amended Objection (¶¶ 15–16), when Melamed entered into the SPA, he accepted the FTX Consideration Shares—and their associated risk—as partial consideration for his shares of Liquid. He therefore must also "assume[] the risk of business failure."  *In re Telegroup, Inc.*, 281 F.3d at 143.  Nor does it make a difference whether Melamed's purported loss was "caused by a pre-purchase fraud which induced his purchase" versus "a post-purchase fraud."  *In re Touch Am. Holdings, Inc.*, 381 B.R. at 105–06 (citation omitted).  "In either case," the loss "ultimately constitutes a claim for damages derived from his ownership of stock and therefore 'arising' from his purchase of the stock." *Id.*

B.    **Melamed's Claim for Indemnification Should Also Be Subordinated.**

Melamed's claim for indemnification of legal fees pursuant to the SPA must likewise be subordinated in accordance with section 510(b), which by its terms calls for subordination of claims for "reimbursement or contribution" on account of a claim arising from the purchase or sale of a security of the debtor.  It is black letter law that section 510(b) calls for subordination of otherwise indemnifiable fees incurred in connection with litigation (including bankruptcy claims) where the underlying claim is itself subordinated.  *See In re Touch Am. Holdings, Inc.*, 381 B.R. at 103 ("The plain language of this section is broad enough to include indemnification claims for both liabilities and expenses incurred on account of a claim for 'damages arising from the purchase or sale' of the debtor's or its affiliate's securities.") (citation omitted); *In re Charge Enters., Inc.*, 2024 WL 5131141, at *10 (Bankr. D. Del. Dec. 16, 2024)

(same); *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. at 829 (same).[6]  Indeed, one of the policy reasons

for including indemnification of attorneys' fees within the ambit of section 510(b) is to preserve a

claimant's "incentives to settle" and avoid the situation where, as here, a claimant pursues

frivolous claims at the estate's expense.  *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. at 828 (seeking

to avoid scenario where "indemnity claims against the debtor will be subordinated while litigation

costs incurred in continuing to defend the lawsuit will be subsidized by the unsecured creditors").

### C.    This Court Should Rule on the Issue of Section 510(b) Subordination as a Threshold Matter.

Melamed's Amended Opposition abandons any argument that section 510(b) does

not apply to his SPA Claim, arguing only that a ruling on section 510(b) would be premature

because "[t]he first step is to determine the amount of Melamed's claim under Japanese law

through arbitration."  (Am. Opp. ¶ 75.)  This argument is both legally incorrect and practically

counterproductive.

The Court's authority to rule on the applicability of section 510(b) before

determining the value or validity of Melamed's SPA Claim is well established.  *See, e.g.*, *In re

Lernout & Hauspie Speech Prods., N.V.*, 264 B.R. 336, 339–40 (Bankr. D. Del. 2001) ("[W]hether

a particular claim must be subordinated under § 510(b) for distribution purposes may proceed even

where the claim has not yet been allowed.").[7]  Indeed, section 510(b) by its terms applies to any

"claim" that (i) "aris[es] from rescission of a purchase or sale of a security of the debtor," (ii) is

for "damages arising from the purchase or sale of such a security," or (iii) is for "reimbursement

---

[6]    *See also In re Jacom Comput. Servs., Inc.*, 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002) (same); *In re Walnut Equip. Leasing Co., Inc.*, 1999 WL 1271762, at *6 (Bankr. E.D. Pa. Dec. 28, 1999) (same).

[7]    *See also In re Med Diversified, Inc.*, 461 F.3d 251, 257–58, 257 n.2 (2d Cir. 2006) (applying section 510(b) to claim for damages even though claimant "never explained how he calculated this amount"); *In re Ameriflex Eng'g LLC*, 587 B.R. 108, 111 (Bankr. D. Or. 2018) (section 510(b) subordination is a "threshold issue").

or contribution" on account of such a securities recission or damages claim. "[C]laim," in turn, is defined in the Bankruptcy Code as a "right to payment" or "equitable remedy" "whether or not such right is reduced to judgment," and is specifically defined to include "unliquidated" and "disputed" claims. 11 U.S.C. § 101(5).

A prompt ruling on section 510(b) is not only permissible, but also necessary for the efficient administration of the estate. The FTX Consideration Shares represent the vast majority (approximately 75%) of the total stated amount that Melamed seeks to recover across all of his claims. A decision on this pure question of law before engaging in discovery on Melamed's underlying common law claims would greatly simplify the issues being litigated and increase dramatically the likelihood of consensually resolving Melamed's claims. The unnecessary costs to the estate of litigating Melamed's various breach of contract and fraud claims are significant, and would grow further if any portion of Melamed's Cross-Motion were granted (though it should not be for the reasons discussed in Section IV, *infra*).[8]

The Court should reject Melamed's transparent attempt to delay a decision on this clear-cut legal issue and exercise its "broad discretion" to rule on the applicability of section 510(b) as a threshold matter. *Helicos Biosciences Corp.* v. *Pac. Biosciences of Cal.*, 2011 WL 6758481, at *1 (D. Del. Dec. 22, 2011) (court has "broad discretion" to "decide the order in which [it] hear[s] and decide[s] issues"); *see In re The Baptist Home of Phila.*, 2011 WL 13500107, at *1 (Bankr.

---

[8]    Although Melamed does not specifically argue that a determination on the applicability of section 510(b) should be made by an arbitrator, for the avoidance of doubt, this Court has exclusive jurisdiction over this bankruptcy-specific issue. *See In re CIT Grp. Inc.*, 2012 WL 831095, at *3 (Bankr. S.D.N.Y. Mar. 9, 2012) ("bankruptcy court must reserve jurisdiction" over applicability of section 510(b) "notwithstanding the parties' agreement to arbitrate"). The Plan also expressly retains the Court's "exclusive jurisdiction over all matters arising in or out of, or related to, these Chapter 11 Cases or the Plan," including, among other things, to "classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest." (Plan § 12.1.)

E.D. Pa. Oct. 11, 2011) (bankruptcy courts should reach "a prompt resolution" of any "threshold legal issue[s]" where it would be "in the best interests of the estate").

## II.    MELAMED SHOULD NOT BE ALLOWED TO RECOVER MORE THAN HE IS ENTITLED FOR THE CRYPTO CONSIDERATION.

As the Debtors explained in their Amended Objection, Melamed's claimed entitlement to the Crypto Consideration is a "Claim[] in respect of Digital Assets" and thus has a specified treatment under the Plan.  (Am. Obj. ¶¶ 32–42; Plan §§ 4.4, 5.2.)  Yet Melamed has put forward a number of shifting and inconsistent theories in an effort to recover more than he is entitled to for that claim.[9]  A ruling by this Court on the applicability of the Plan and Estimation Order to Melamed's claim for the Crypto Consideration would obviate the need for any further litigation—including any discovery—on those claims, saving the estate, Melamed, and the Court substantial resources.

### A.    Melamed's Claim for the Crypto Consideration Should Be Valued in Accordance with the Plan and Estimation Order.

Melamed seeks to recover the value of the Crypto Consideration, which requires only a straightforward application of the Plan and Estimation Order.  Pursuant to the Plan, "Claims in respect of Digital Assets" are "calculated by converting the value of such Digital Asset[s] into Cash as of the Petition Date" in accordance with the conversion rates attached to the Estimation Order.  (Plan §§ 4.4, 5.2.)  Melamed's claim for the Crypto Consideration is plainly a "Claim[] in respect of Digital Assets."  (Plan §§ 4.4, 5.2.)  It is a "Claim," as that term is broadly defined in the Plan and the Bankruptcy Code, because it asserts "a right to payment" or "equitable remedy"

---

[9]    Melamed's SPA Claim alleges that FTX "breached its obligation to return one half of the [Crypto] Consideration on the one-year anniversary of the Completion Date, April 4, 2023."  (SPA Claim ¶ 20.)  His Initial Opposition and Amended Opposition, by contrast, argue that FTX breached on the Completion Date.  (Initial Opp. ¶¶ 50–51; Am. Opp. ¶¶ 51–57.)  Melamed asserts that the value of his claim for the Crypto Consideration is $8,903,278.05, which reflects the value of the Crypto Consideration as of November 19, 2021, when the SPA and Side Letter were executed, but nowhere puts forward any theory of breach as of that date.

(and regardless of "whether or not such right is reduced to judgment," "unliquidated," or "disputed"). (Plan § 2.1.30 (incorporating 11 U.S.C. § 101(5)).) And it is "in respect of" or "based on" "Digital Assets" because it seeks to recover the value of various cryptocurrency assets purportedly owed to Melamed.[10] As such, Melamed's claim for the Crypto Consideration should be calculated based on the value of those assets as of the Petition Date.

Melamed's Initial Opposition addresses this argument in one conclusory paragraph, which states for the first time that "FTX breached the SPA on April 4, 2022" and thus "damages would be determined on that date -- not the Petition Date." (Initial Opp. ¶ 51.) But it is apparent from the record that even Melamed does not believe his own argument. In his SPA Claim, Melamed describes the Crypto Consideration claim as follows:

> Debtor promised Claimant the Retained Consideration[11] on the Completion Date. However, Debtor retained such consideration pursuant to Clause 4.1 of the Agreement for the purpose of using it as security against Claimant's indemnification obligations under the Agreement, should any arise. Pursuant to Clause 4.2 of the Agreement, *the Debtor agreed to release half of the Retained Consideration on the one-year anniversary of the Completion Date and the remaining half on the second-year anniversary of the Completion Date.*

(SPA Claim ¶ 19 (emphasis added).) The SPA Claim then asserts that FTX "breached its obligation to return one half of the Retained Consideration on the one-year anniversary of the Completion Date, April 4, 2023" (SPA Claim ¶ 20), thus further conceding that the first half of the Crypto Consideration was only to be released on that date. With respect to the remaining half of the Crypto Consideration, Melamed's SPA Claim continues that, "following the Petition Date and the resulting acceleration of Debtor's obligations, the Debtor **no longer** has the right to continue

---

[10]    The Estimation Order states that it applies to "Claims based on Digital Assets and fiat currency." (¶ 2.)

[11]    "Retained Consideration" is defined in the SPA to include "Retained Cash Consideration" and the Crypto Consideration. (SPA at 8.) However, Melamed was not entitled to receive any "Retained Cash Consideration" pursuant to the SPA. (SPA Sch. 2 at 37.) Thus, for Melamed, "Retained Consideration" and "Crypto Consideration" are one and the same.

to withhold Claimant's Retained Consideration" (SPA Claim ¶ 20 (emphasis added)), implicitly conceding the obvious—that FTX *did at one time* have the right to withhold the Crypto Consideration, and was only obligated to deliver it in 2023 and 2024.  If Melamed truly believed, as he now contends, that he was entitled to the Crypto Consideration at the time he signed the SPA, he would have said so *years ago*, instead of raising the argument for the first time in his opposition to the Trust's objections to his SPA Claim.  But at no time after signing the SPA did Melamed ever so much as ask that the Crypto Consideration be delivered (or even separately identified, held in a custody account, or otherwise set aside).  The reason for his silence is obvious:  he knew that he was not entitled to it.

Melamed's Japanese law expert "disagree[s]" "that it was 'clear'" that "FTX was not required to pay Mr. Melamed any of the Crypto Consideration until April 2023."  (Am. Hori Decl. ¶ 19.)  In support of this contention, Ms. Hori cites language in the Side Letter stating that the Crypto Consideration was to be deemed "paid" as of the Completion Date but would not actually be released to Melamed until April 2023 and April 2024, respectively.  (Am. Hori Decl. ¶¶ 13–14.)  But Melamed has not explained why this language (which the Trust presumes was included at Melamed's request for tax planning purposes) is of any significance.  It is undisputed that: (1) Melamed was not entitled actually to take delivery of the Crypto Consideration until 2023 and 2024; and (2) FTX took no steps to release the Crypto Consideration on the Completion Date, with no objection from Melamed.  In short, there is no plausible reading of the SPA or Side Letter that could support the conclusion that FTX breached those agreements as of the Completion Date.[12]

---

[12]    Nor does Melamed explain why, even if FTX had failed to deem the consideration "paid" as of April 4, 2022, that would entitle him to the entire amount of the Crypto Consideration, which indisputably was not to be released to Melamed in full for another two years.  And Melamed also does not explain why the Crypto Consideration should be valued at the time the SPA was signed (November 19, 2021).

**B.**     **The Appropriate Treatment of the Crypto Consideration Is a Threshold Legal Issue That Would Obviate the Need for Any Further Litigation on Melamed's Alternative Theories of Recovery.**

Whether Melamed's claim for the Crypto Consideration (which constitutes approximately 25% of the total amount of his claims) constitutes a "Claim[] in respect of Digital Assets" under the Plan is a pure question of law that, if answered as a threshold matter, would render all further litigation regarding the Crypto Consideration unnecessary, saving both sides needless expense and delay.

As an initial matter, this Court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders," including the Plan and the Estimation Order. *Travelers Indem. Co.* v. *Bailey*, 557 U.S. 137, 151 (2009); *see In re Essar Steel Minn. LLC*, 2019 WL 2356979, at *4 (D. Del. June 4, 2019) ("[B]ankruptcy courts have core jurisdiction to interpret and enforce their own confirmation orders.").   Indeed, the Estimation Order itself states that the Court "retain[s] jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion [for entry of the Estimation Order] or the implementation of th[e] [Estimation] Order." (Estimation Order ¶ 12.)  Similarly, the Plan provides that the Court retains "exclusive jurisdiction over all matters arising in or out of, or related to, these Chapter 11 Cases or the Plan," including to determine the "amount or allowance of Claims or Interests" and any "disputes" regarding "interpretation" of the Plan.  (Plan § 12.1.)

Even assuming that Melamed received an arbitral award for the full amount he seeks on his claim with respect to the Crypto Consideration, that claim would still be a "Claim[] in respect of Digital Assets" that is subject to valuation pursuant to the Plan and Estimation Order, and he would only be entitled to an allowed claim in the amount of $1,558,871.  *See Kohn* v. *Leavitt-Berner Tanning Corp.*, 157 B.R. 523, 527 (N.D.N.Y. 1993) (bankruptcy court correctly reduced state court judgment to portion allowed under 11 U.S.C. § 502(b)).  A determination on

the applicability of the Plan and Estimation Order to Melamed's claims for the Crypto

Consideration as a threshold matter would thus obviate the need to arbitrate his alternative legal

theories under Japanese common law (and the need for Japanese legal experts to opine on the

merits of these theories) only to return to this Court to reduce any arbitral award to the amount to

which Melamed is actually entitled.

### III.    THE SALARY CLAIMS, BONUS CLAIM, AND ADMINISTRATIVE CLAIM SHOULD BE DISALLOWED AND EXPUNGED IN THEIR ENTIRETY.

Although the parties have yet to engage in discovery with respect to Melamed's

Salary Claims, Bonus Claim, and Administrative Claim, each fails on its face and should be

disallowed in its entirety.  Should the Court preserve Melamed's claims pending an evidentiary

hearing, the Trust reserves the right to seek discovery into the purported factual bases for these

claims.

### A.    Melamed Has Not Demonstrated an Entitlement to the Salary Claims or Any Bonus Payment.

The Amended Opposition offers no response whatsoever to any of the arguments

in the Trust's Amended Objection regarding the Salary Claims or Bonus Payment.  Nor does it

further purport to substantiate Melamed's entitlement to them.  For the reasons set forth in the

Amended Objection, these claims should thus be disallowed and expunged in their entirety.  (*See*

Am. Obj. ¶¶ 45–51.)

### B.    Melamed Is Not Entitled to Any Transaction Award, Which Would Not Be Payable by the Trust in Any Event.

Melamed's claimed entitlement to the Transaction Award fails for at least two

reasons.  *First*, Melamed forfeited his right to participate in the KEIP because he refused to sign

the award agreement that all KEIP participants were required to sign.  The Amended Opposition

argues that the award agreement's customary waiver and release of claims against the Debtors was

a "new condition" that was not included in the KEIP Order and that "Debtors are not entitled to create new conditions for receiving the KEIP Award." (Am. Opp. ¶ 84.)  But the KEIP Order gives the Trust "authorization" to "take and perform all actions necessary to implement" and "effectuate" the KEIP in their "sole discretion." (KEIP Order.)  This makes sense: the purpose of the KEIP Order was to "ensure the maximization of value for the Debtors' estates and for the benefit of its creditors." (*Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan* [D.I. 1359] ¶ 32.)  It is both customary and reasonable for employee incentive agreements to require participants to sign award agreements as a condition to their payouts.  Melamed chose not to do so, and thus is not entitled to receive the Transaction Award pursuant to the KEIP.[13]

 *Second*, even if Melamed were entitled to a Transaction Award (and he is not), Melamed asserts his claim against the wrong entity.  When bitFlyer purchased FTX Japan K.K. from FTX Japan Holdings, the terms of the Purchase and Sale Agreement [D.I. 17923-3] (the "FTX Japan Sale Agreement") specifically provided that bitFlyer assumed the responsibility to "pay any applicable Transaction Awards" and that Debtors were released from any such responsibility.  (Am. Obj. ¶ 55; FTX Japan Sale Agreement § 4.5.)  The Amended Opposition responds by merely pointing to the language of the KEIP Order, which does not mention bitFlyer, and baldly arguing that the Court's order authorizing the FTX Japan Sale Agreement [D.I. 20560] (the "Sale Order") does not modify the KEIP Order.  (Am. Opp. ¶ 85.)  But even putting aside the

---

[13] Significantly, Melamed's actions also interfered with the Debtors' efforts to sell FTX Japan K.K. and thereby maximize the value for creditors.  (*See generally* Chambers Reply Decl.)  The Trust reserves the right to withhold or recoup any payments in respect of the Transaction Award to the extent that further evidence of Melamed's wrongdoing is uncovered over the course of this litigation.  (*See Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan* [D.I. 1359] ¶ 9 ("All awards granted under the KEIP will be subject to forfeiture and recoupment if there is a subsequent final determination that the recipient of the award engaged in wrongdoing.").)

KEIP Order's permissiveness, the Sale Order explicitly "authorized and approved" the FTX Japan Sale Agreement "in all respects," including "all of the terms and conditions thereof." (Sale Order ¶ 4.) In fact, the plain language of the Sale Order forecloses Melamed's argument by providing that its "failure to specifically include or make reference to any particular provision" of the FTX Japan Sale Agreement "shall not impair the effectiveness of such provision," because "it is the intent of this Court" that the FTX Japan Sale Agreement is "authorized and approved in [its] entirety." (Sale Order ¶ 4.) Put simply, the Sale Order authorizes and approves every provision in the FTX Japan Sale Agreement, including the ones assigning responsibility for the Transaction Awards to bitFlyer.

### C.    Melamed's Claim For Post-Termination Compensation Is Without Merit.

Melamed's Administrative Claim vaguely asserts that he is "owed compensation and other amounts" purportedly "under the [] Management Agreement." (Administrative Claim ¶ 5.) The Amended Opposition explains for the first time what Melamed actually is seeking:

1.    Payment for the remainder of his unfinished term (through Q1 2026) as Representative Director of FTX Japan Holdings, on the ground that he allegedly was terminated without "justifiable grounds" under Article 339 of the JCA (Am. Opp. ¶ 79); and

2.    Payment of director fees for a "minimum of seven months" because the Debtors allegedly breached the Management Agreement by terminating him "for Cause" on August 20, 2024. (Am. Opp. ¶ 79 n.19.)

This newly-explained claim suffers from several defects.

Regarding Melamed's argument that Debtors violated the JCA, as an initial matter, the JCA's default rules governing the dismissal of representative directors are inapplicable here because the Management Agreement contracted for different rules. (Tanaka Reply Decl. ¶¶ 16, 30–31.) The Management Agreement provides specific treatment for (i) termination "for Cause," which can be effectuated "immediately upon written notice" (§ 11.2), triggering certain payments

pursuant to section 11.5 (*e.g.*, unpaid services fees, reimbursements, etc.) and (ii) termination "without Cause," which can be done with "three (3) month's prior notice" (§ 11.1), triggering the same payments pursuant to section 11.5 plus outstanding unvested options to purchase FTX Common Shares (§ 11.6). The specificity in the Management Agreement leaves no room for doubt that the parties intended to, and did, contract around the JCA's default rules. (Tanaka Reply Decl. ¶¶ 31–34.) Indeed, section 11.4(a) of the Management Agreement specifically provides that, "[i]n the event of the termination of this Agreement," Melamed "acknowledges that he has no claims against" FTX or its affiliates "for loss of office." (Tanaka Reply Decl. ¶ 24.)

Regardless, the Debtors had "justifiable grounds" for Melamed's "for Cause" dismissal. After his July 30, 2024 termination, which was effectuated "without Cause," Melamed objected to the Debtors' Plan—an action which furthered Melamed's own interests but was directly contrary to the Debtors' best interests and constituted a breach of the Management Agreement and a violation of Melamed's duty of loyalty. (*E.g.*, Management Agreement § 3.1(e) (requiring Melamed to "act at all times for the proper purposes of [FTX Japan Holdings] and each member of the [FTX] Group").) As Mr. Tanaka explains, this breach constitutes "justifiable grounds" for termination under the JCA. (Tanaka Reply Decl. ¶ 24.)

Melamed's objection to the Plan also cannot be viewed in a vacuum. Melamed's argument that the Debtors lacked justifiable grounds for his termination is based exclusively on Ms. Hori's assessment of the grounds for his "for Cause" dismissal "articulated in" the August 20, 2024 notice of breach. (Am. Opp. ¶ 79; Hori Post-petition Decl. ¶ 29.) Ms. Hori's opinion does not take into consideration any factors leading to Melamed's July 30, 2024 termination, and Melamed does not argue that his July 30 "without Cause" termination was inconsistent with the JCA. (Am. Opp. ¶ 79.) But although the July 30 termination was effectuated as a "without Cause"

termination, Debtors had significant bases to terminate him "for Cause" at that time.  As the Chambers Reply Declaration explains, Melamed had engaged in significant self-interested behavior prompting his July 30 termination and continuing thereafter.  (Chambers Reply Decl. ¶¶ 6–11.)  For instance, Melamed submit a bid for FTX Japan K.K. to undercut existing bidders despite his intimate involvement with the sales process.  (Chambers Reply Decl. ¶ 8.)

Melamed's argument that his "for Cause" termination was in breach of the Management Agreement fails for the same reasons that his JCA argument fails.  As Mr. Tanaka explains, the considerations that constitute "justifiable grounds" for Melamed's termination pursuant to the JCA also constitute sufficient bases for his termination under the terms of the Management Agreement.  (Tanaka Reply Decl. ¶ 24.)

In any event, even if Debtors lacked sufficient justification for Melamed's "for Cause" termination, Melamed would not be entitled to remuneration through Q1 2026.  At best, he would be entitled to $262,500, representing the compensation that he would have received pursuant to his July 30, 2024 "without Cause" termination—the legality of which Melamed does not challenge.  (Tanaka Reply Decl. ¶ 33.)

The portion of Melamed's Administrative Claim seeking post-termination compensation should thus be disallowed.  Alternatively, the Court should reserve decision on this portion of the Administrative Claim pending discovery and an evidentiary hearing regarding the justifiable bases for Melamed's termination and the bases for his "for Cause" termination.

## IV.    MELAMED'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED.

Melamed moves to compel arbitration of all of his claims, but fails to identify any valid agreement to arbitrate the substantial majority of them, which do not arise out of or in connection with the SPA.  Even with respect to his SPA Claim, the Amended Opposition does not

address why the claim objection, which is at the heart of a bankruptcy court's core jurisdiction, should be arbitrated.  The Court should thus deny the Cross-Motion in its entirety.

A.      **Melamed Has Not Met His Burden of Demonstrating That His Salary Claims, Bonus Claim and Administrative Claim Fall Within the Scope of a Valid Arbitration Agreement.**

Before compelling arbitration, "a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).  "It is the movant's burden" to demonstrate both prerequisites.  *Franlogic Scout Dev., LLC* v. *Scott Holdings, Inc.*, 2017 WL 2982396, at *4 (E.D. Pa. July 12, 2017).  The "presumption in favor of arbitration 'does not apply'" to this inquiry.  *Kirleis*, 560 F.3d at 160 (citation omitted).

Melamed fails to demonstrate that his Salary Claims, Bonus Claim, and Administrative Claim fall within the scope of any agreement to arbitrate—valid or otherwise.  The Amended Opposition points to only one arbitration agreement between the parties, which was included in the SPA and governs disputes "arising in any way out of or in connection with" that agreement.  (Am. Opp. ¶ 41.)  But Melamed's claims for pre- and post-petition salary and bonus payments do not arise out of or in connection with the SPA; they instead are claims relating to his employment that are governed by the separate Management Agreement, which does not contain any arbitration provision.[14]  Melamed contends that the Court should overlook this fact because "the Management Agreement itself arises from the SPA."  (Am. Opp. ¶ 42.)  For that argument, Melamed cites one case from the Southern District of New York, *Celsius Mining LLC* v. *Mawson*, 2024 WL 1719633 (S.D.N.Y. Apr. 22, 2024).  But that case is irrelevant, because the applicability

---

[14]    Although the Amended Opposition asserts that "Melamed's Claims should *all* be adjudicated in an arbitration" (Am. Opp. ¶ 43 (emphasis added)), it does not provide any argument for arbitration of the Administrative Claim, and concedes that this Court has jurisdiction over at least a portion of that claim (Am. Opp. ¶ 85).

and scope of the SPA's arbitration provision is determined under the laws of Singapore (SPA § 19.4), as discussed further below.  It also is unhelpful to the substance of Melamed's arguments.

*Celsius Mining* involved a Co-Location Agreement with "an exceptionally broad arbitration clause" and a promissory note between the parties from the same day "to assist [defendant] with satisfying its obligations under [the Co-Location Agreement]."  2024 WL 1719633, at *2–3.  The district court concluded that the bankruptcy court erred in applying the arbitration provision in the Co-Location Agreement only to claims "arising under" that agreement because the phrase "arising under" did not appear in the arbitration provision.  *Id.* at *5.  The district court reasoned that the language in the Co-Location Agreement was broad enough to cover disputes arising out of the promissory note because it specifically stated, in bolded, capitalized letters, that the arbitration provision covered "**ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT**," and thus, "[t]here [wa]s no requirement that the dispute 'arise under' or even be 'in connection with' the Co-Location Agreement to be arbitrable."  *Id.* at *6.  Here, by contrast, the SPA's arbitration provision *does* require that disputes "aris[e] in any way out of or in connection with" the SPA.  (SPA § 19.2.)[15]

Melamed also submits the Kawabata Declaration—referenced in the Amended Opposition as the "Arbitration Declaration"—in support of his assertions that his claims "should be adjudicated in the manner that the parties agreed to in the SPA" and that "a Japanese court would honor the binding arbitration agreement contained in the SPA."  (Am. Opp. at 2, ¶ 50.)  But that declaration says nothing about the appropriate scope of the (separate) arbitration agreement,

---

[15]   In fact, the *Celsius Mining* court specifically reasoned that the portion of the arbitration provision at issue there providing that "any dispute between the parties in connection with this Agreement" was subject to arbitration "plainly refer[red] to the Co-Location Agreement and only the Co-Location Agreement," and that the arbitration provision arguably wouldn't have applied absent the bolded, capitalized language further broadening the provision's scope.  2024 WL 1719633, at *6.  Similar language is not present here.

let alone why it extends to Melamed's claims arising out of the Management Agreement.  More glaringly, Mr. Kawabata is not qualified to opine on the scope, validity, or interpretation of the arbitration provision because the provision is governed by the laws of *Singapore*, not Japan.  (SPA § 19.4; *see* Tanaka Reply Decl. ¶¶ 6–11.)  For the avoidance of doubt, however, Mr. Tanaka has opined that even under Japanese law, the arbitration provision in the SPA would not govern Melamed's claims arising out of the Management Agreement.  (Tanaka Reply Decl. ¶¶ 12–15.)

The Amended Opposition provides no support for the argument that the SPA's arbitration provision applies to Melamed's claims arising under the Management Agreement.  The Trust's expert on Singaporean law, Balakrishnan Ashok Kumar, makes clear that it does not.  (Kumar Decl. ¶ 11.)  As Mr. Kumar explains, the Singapore High Court addressed almost the same facts presented here in *Transocean Offshore International Ventures Ltd* v. *Burgundy Global Exploration Corp.*, [2010] 2 SLR 821.  (Kumar Decl. ¶ 14.)  There, the parties entered into an offshore drilling contract that contained an arbitration provision covering disputes "arising out of or in relation to or in connection with" the contract.  (Kumar Decl. ¶ 15.)  The Singapore High Court held that the arbitration clause in the drilling contract did not apply to plaintiff's claim for breach of a related escrow agreement, even though the drilling contract specifically required the execution of the escrow agreement.  (Kumar Decl. ¶¶ 15–16.)  The High Court noted that "distinct and specific words are required to incorporate an arbitration clause into a contract," and observed that "[i]n the present matter, not only was there no clause specifying that the arbitration clause was to be incorporated into the Escrow Agreement, but there was also an express clause conferring jurisdiction on the Singapore courts" which "evinced a clear intention by the parties" to resolve disputes arising under the escrow agreement pursuant to the terms of that agreement, not in arbitration.  (Kumar Decl. ¶¶ 17–18.)  Similarly, here, the Management Agreement does not

incorporate the SPA's arbitration provision, but rather confers the Tokyo District Court with exclusive jurisdiction.  (Management Agreement ¶ 16.)  It is therefore clear that the parties did not intend to arbitrate disputes arising under the Management Agreement.

The High Court in *Transocean* also specifically noted that although the arbitration clause extended to claims "'in connection with' the Drilling Contract," it was "principally concerned with claims and disputes arising out of or in relation to the Drilling Contract."  (Kumar Decl. ¶ 19.)  This was reinforced by two cases.  *First*, in *Coop International Pte Ltd.* v. *Ebel SA*, [1998] 1 SLR(R) 615, the High Court held that an arbitration clause in the parties' original distributorship agreement "did not extend to a dispute which arose out of the subsequent agreement," "which did not contain an arbitration clause."  (Kumar Decl. ¶ 19.)  The High Court reasoned that, "[i]f the dispute concerns a breach of the agreement itself or the proper interpretation of the terms of the distributorship agreement, then the arbitration clause would cover it."  (Kumar Decl. ¶ 19.)  However, where "the parties subsequently enter [] new agreements" that "do not have any arbitration clauses, and the dispute concerns these new agreements and not the original [] agreement" it was "difficult to see how the arbitration clause [] can be applicable."  (Kumar Decl. ¶ 19.)  *Second*, in *Kianta Osakeyhtio* v. *Britain & Overseas Trading Co. Ltd.*, [1954] 1 Lloyd's Rep 247, the High Court examined a case involving a 1937 contract that included an arbitration provision and a separate compensation agreement that did not include one.  (Kumar Decl. ¶ 20.)  The High Court held that although the compensation agreement "in one sense arose out of the 1937 contract," it was nonetheless a "new" and "self-contained agreement" with "an independent existence."  (Kumar Decl. ¶ 20.)  Therefore, a dispute arising out of the compensation agreement "did not arise out of the interpretation or the fulfilment of the contract of 1937."  (Kumar Decl. ¶ 20.)  The same is true here—the SPA applies by its own terms to disputes and controversies

arising out of or in connection with the SPA. (SPA § 19.2.) The Management Agreement has its own independent legal existence, and Melamed's claims arising out of the Management Agreement do not arise out of the interpretation or fulfillment of the SPA.

### B. Arbitration Would Impede the Objectives of the Bankruptcy Code.

Notwithstanding an otherwise applicable arbitration provision, bankruptcy courts may decline to compel arbitration where there is an "inherent conflict between arbitration and the [Bankruptcy Code's] underlying purposes." *Shearson/American Express, Inc.* v. *McMahon*, 482 U.S. 220, 227 (1987). Such a conflict exists here. Thus, in addition to Melamed's Salary Claims, Bonus Claim, and Administrative Claim, his Cross-Motion to compel arbitration should also be denied with respect to his SPA Claim.

The Amended Opposition crucially fails to recognize that claims disputes are statutorily enumerated "[c]ore proceedings" that are particularly unsuitable for arbitration. 28 U.S.C. § 157(b)(2)(B); *see* 11 U.S.C. § 502(b) (the Bankruptcy Court "shall determine" claims disputes). "The Supreme Court has made clear that the claims allowance process is at the heart of a bankruptcy court's jurisdiction over the property of the bankruptcy estate." *In re Yellow Corp.*, 2024 WL 1313308, at *10 (Bankr. D. Del. Mar. 27, 2024); *see In re Bencharsky*, 2010 WL 309145, at *1 (Bankr. N.D. Cal. Jan. 19, 2010) ("[T]he proof of claim changes everything."). Courts have thus repeatedly declined to compel arbitration of claim disputes. *See, e.g.*, *In re Yellow*, 2024 WL 1313308, at *7; *In re Penson Worldwide*, 587 B.R. 6, 12–13 (Bankr. D. Del. 2018); *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001).[16]

---

[16] *See also In re Ellswick*, 2016 WL 3582586, at *4–5 (Bankr. N.D. Ala. June 24, 2016) (declining to compel arbitration of claim dispute); *In re May*, 591 B.R. 712, 724 (Bankr. E.D. Ark. 2018) (same); *In re Yarbrough*, 2010 WL 3885046, at *5 (Bankr. M.D. Ala. Sept. 29, 2010) (same, noting "strong policy interest" in keeping "issues regarding creditor claims[] 'in one centralized and specialized forum'")); *In re Russell*, 402 B.R. 188,

As in those cases, arbitration of Melamed's claims conflict with the goals of the Bankruptcy Code.  Because claims disputes are within the Bankruptcy Court's core jurisdiction, arbitration would "inherently conflict[] with the fundamental tenet of centralized resolution of purely bankruptcy issues" and "[n]o competing federal policy favors the use of arbitration provisions to sidestep a bankruptcy court's conventional jurisdiction." *In re APF Co.*, 264 B.R. at 364.  Melamed's reliance on *In re Mintze*, 434 F.3d 222 (3d Cir. 2006), which did not involve a claims allowance dispute (or any cause of action under the Bankruptcy Code), is also misplaced. As this Court noted in *In re Yellow*, the "two critical differences between claims allowances disputes and the Third Circuit's characterization of *Mintze*" is that "claims allowance disputes arise out of the bankruptcy court's in rem jurisdiction over the bankruptcy estate rather than being ordinary civil lawsuits between two parties" and that "claims allowance disputes—even though they require consideration of non-bankruptcy law—are at bottom matters arising under § 502 of the Bankruptcy Code."  2024 WL 1313308, at *10.

Arbitration would also be inconsistent with "[t]he efficient resolution of claims and the conservation of the bankruptcy estate assets," which is another "integral purpose of bankruptcy." *In re APF Co.*, 264 B.R. at 364.  Indeed, "particularly in a case such as this, where the parties have not commenced or requested arbitration outside of bankruptcy, this court is the most efficient and effective forum in which to resolve these fundamental Bankruptcy Code issues." *Id.*  As discussed, resolution of Melamed's claims turns principally on the applicability of section 510(b) and treatment of the Crypto Consideration under the Plan and Estimation Order, key issues in these Chapter 11 cases that this Court is best positioned to resolve.  Even if the Court were to

---

193–95 (Bankr. N.D. Miss. 2009) (same, reasoning that "[c]entralized resolution of these bankruptcy issues and the Court's power to ensure obedience to its own orders weigh in favor of denying enforcement of the Arbitration Agreement").

order arbitration before ruling on those questions, that would only result in lengthy arbitration proceedings, after which the parties ultimately would return to this Court for adjudication of the key issues, which control nearly 100% of the claims' value.  Moreover, as discussed, Melamed's remaining claims arising out of his employment with and termination from the Debtors are not governed by an arbitration provision, and are thus appropriately before this Court.

In short, arbitration of any of Melamed's claims would result in further dissipation of estate assets, with no substantive change in their ultimate disposition.  The Court should therefore deny Melamed's Cross-Motion in its entirety.

## V.    TO THE EXTENT THAT THEY ARE NOT DISALLOWED AND EXPUNGED, MELAMED'S CLAIMS SHOULD BE EQUITABLY SUBORDINATED.

The Amended Opposition disputes the applicability of equitable subordination on procedural grounds, arguing incorrectly that "[e]quitable subordination may only be sought through an adversary proceeding" (Am. Opp. ¶¶ 58–62), and nominally on substantive grounds, arguing that Melamed's role in each instance of widespread corporate malfeasance identified in the Amended Objection somehow does not constitute inequitable conduct under the admittedly "less demanding" standard applicable to Melamed as an insider (Am. Opp. ¶¶ 63–74).  Both arguments fail.

Melamed's procedural argument is incorrect as a matter of law.  "An adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan." *In re Wash. Mut., Inc.*, 462 B.R. 137, 145 (Bankr. D. Del. 2011) (discussing Rule 7001).  Where, as here, "the Debtors' plan has provided for a class of subordinated claims" (*see* Plan § 4.3.25 ("Class 15 – Equitably Subordinated Claims")), "the Court will consider it in the context of" a claim objection, *In re Wash. Mut., Inc.*, 462 B.R. at 145.

Melamed's substantive arguments also fail.  *First*, the Amended Opposition argues

that "the Debtors have not alleged any inequitable conduct by Melamed in an individual capacity" (Am. Opp. ¶ 70), but that is simply not true, as the Chambers Declaration and the Chambers Reply Declaration both make clear.[17]

     *Second*, after arguing that the Amended Objection inappropriately "conflate[s] the action of the Liquid Entities with Melamed," the Amended Opposition argues that Melamed should be credited with the purported "success of FTX Japan [K.K.]" and that this somehow negates his misconduct. (Am. Opp. ¶¶ 70, 71.) The Amended Opposition does not explain the relevance of FTX Japan K.K. customers receiving their cryptocurrency back in full, which had nothing to do with Melamed or his inequitable conduct. As explained in the Amended Objection, FTX Japan K.K. customers *were* harmed by the withdrawal freeze imposed by the Japanese Financial Services Agency. (Am. Obj. ¶ 62.)

     *Third*, Melamed argues that "Quoine customers were not harmed" by Melamed's misappropriation (Am. Opp. ¶ 72), but that conclusory statement is also false. Absent those transfers, Quoine likely would not have been left with liabilities that exceeded its assets. (Chambers Decl. ¶ 14.) But regardless of any harm to Quoine customers, Melamed nonetheless breached his fiduciary duties, left Quoine undercapitalized, and furthered a massive fraud—each of which constitute inequitable conduct for purposes of section 510(c).

     *Finally*, Melamed argues that "there is no harm to creditors" because customers of FTX Japan K.K. recovered their deposits and the Debtors project a full recovery for customers of

---

[17] (*See, e.g.*, Chambers Decl. ¶ 9 ("whilst Melamed was Chief Operating Officer," "hackers were able to access" and "t[ake] control of the Liquid Exchange's cryptocurrency warm wallet" "because Liquid executives, including Melamed, had not implemented adequate controls"); Chambers Decl. ¶ 10 ("Melamed approached" Samuel Bankman-Fried regarding the "acquisition of Liquid" and "discuss[ed] the terms" with him); Chambers Decl. ¶¶ 12–13 ("Melamed directed the transfer of almost $11 million of cryptocurrency assets to FTX.com," "[h]owever, Melamed did not transfer custody of the majority of Quoine's customer accounts to FTX"); Chambers Reply Decl. ¶ 8 (while Melamed was "deeply involved in the sale process" of FTX Japan K.K. and "had regular interactions with multiple bidders," "Melamed submitted a bid that only slightly exceeded existing bids").)

Quoine.  (Am. Opp. ¶ 73.)  Even if true, the "harm to creditors" element of equitable subordination is not limited to customers, and customers are not the only legitimate creditors seeking to recover from the estate.  And, as discussed *supra*, Melamed's actions harmed creditors in a number of ways, including by driving Quoine into bankruptcy.[18]

Melamed's claims should thus be equitably subordinated to the extent that they are not disallowed.  The Trust is willing to defer discovery and an evidentiary hearing on its request for equitable subordination pending resolution on the other outstanding matters in dispute and determination if Melamed has any allowable claim to be subordinated.

## **CONCLUSION**

For the foregoing reasons, the Trust respectfully requests that the Court rule at the outset that: (1) Melamed's claims for the FTX Consideration Shares and indemnification are subordinated pursuant to 11 U.S.C. § 510(b); and (2) Melamed's claim for the Crypto Consideration is valued on the Petition Date, as determined by the Estimation Order.  The Trust further requests that the Court  disallow and expunge Melamed's Salary Claims, Bonus Claim, and Administrative Claim in their entirety and equitably subordinate Melamed's remaining claims pursuant to section 510(c) of the Bankruptcy Code, or alternatively, reserve judgment on those claims pending discovery and an evidentiary hearing.  Finally, the Trust respectfully requests that this Court deny Melamed's Cross-Motion to compel arbitration in its entirety.

---

[18]    Moreover, this element is also satisfied where the inequitable conduct results in "an unfair advantage on the claimant."  (Am. Opp. ¶ 64.)  Here, the Amended Objection also alleges that Melamed "benefitted substantially from his own failures."  (Am. Obj. ¶ 59.)

Dated:  May 7, 2025
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew R. Pierce
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*