IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF BALAKRISHNAN ASHOK KUMAR IN FURTHER SUPPORT OF DEBTORS' AMENDED OBJECTION TO PROOFS OF CLAIM FILED BY SETH MELAMED AND MOTION FOR SUBORDINATION PURSUANT TO 11 U.S.C. §§ 510(b) AND 510(c)(1) AND IN SUPPORT OF DEBTORS' OPPOSITION TO CLAIMANT'S CROSS-MOTION TO COMPEL ARBITRATION**

I, Balakrishnan Ashok Kumar, of BlackOak LLC, 168 Robinson Road, #10-01 Capital Tower, Singapore 068912, hereby declare under penalty of perjury under the laws of the United States of America:

**Introduction and Scope of Opinion**

1. I make this Declaration at the request of the FTX Recovery Trust (a/k/a the "Trust") in connection with the Chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases") relating to FTX Trading Ltd. ("FTX") and its affiliated debtors and debtors-in-possession (formerly, the "Debtors"). My opinion addresses the scope, under Singapore law, of the arbitration clause appearing in an agreement entered into between (a) FTX and (b) holders of the outstanding shares, stock options, and warrants of Liquid Group Inc., including Seth Melamed (the "SPA") [D.I. 28645-1 Ex. 3].

2. The authorities and other documents to which I make reference are appended to this Declaration.

**Qualifications**

3. I am a Singaporean lawyer with over thirty years of experience. I received my Bachelor of Laws from Queen Mary University of London in 1990. I was admitted as an

advocate and solicitor to the Supreme Court of the Republic of Singapore in June 1991. I am the director of BlackOak LLC, one of Singapore's premier law firms specializing in corporate restructuring and insolvency.

4. I am also an associate mediator at the Singapore Mediation Centre. I contribute regularly to law reform and practice development efforts in Singapore and Southeast Asia, and regularly publish scholarship on restructuring and insolvency practice.

5. I have no prior relationship with the Debtors, the Trust, Mr. Melamed, or legal counsel representing either party in this proceeding.

**Background and Relevant Agreements**

6. Based on the SPA, I understand that on November 19, 2021, FTX acquired Mr. Melamed's interests in Liquid Group Inc. At the same time, FTX and Mr. Melamed entered into a management agreement. I understand that the parties later amended the agreement at various times, including on October 19, 2022, which is the relevant version of the agreement here (the "Management Agreement") [D.I. 28645-1 Ex. 5].

7. I have reviewed both the SPA and Management Agreement in preparing this Declaration. I have also reviewed proofs of claim numbers 3244, 3353, 3385, and 4578 filed by Mr. Melamed in connection with the Chapter 11 Cases; the *Request for Payment of Administrative Expense* [D.I. 27798] filed by Mr. Melamed (the "Administrative Claim"); and the parties' briefs and submissions to date, including the *Opposition to Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1) and Cross-Motion to Compel Arbitration* [D.I. 30077] (the "Amended Opposition").

8. The SPA states that it is governed by Japanese law (SPA § 19.1), with the exception of the arbitration provision contained therein, which is governed by Singaporean law (SPA § 19.4). The Management Agreement states that it is governed by Japanese law in its entirety, and contains a forum selection clause designating the Tokyo District Court as the forum for resolution of disputes arising out of or in relation to the Management Agreement. (Management Agreement ¶ 16.)

9. Mr. Melamed argues that the arbitration clause in the SPA applies to *all* of his claims, including those claims that "arise from" the Management Agreement. (Am. Opp. ¶¶ 41–43.) By this, I understand Mr. Melamed to be referring to proofs of claim numbers 3353, 4578, 3244 (the "Management Agreement Claims").

10. I was asked to opine on the scope of the arbitration clause in the SPA (§ 19.2); specifically, whether the Management Agreement Claims and the Administrative Claim are subject to the SPA's arbitration clause.

**The SPA's Arbitration Clause Does Not Extend to
the Management Agreement Claims.**

11. As a matter of Singapore law, it is my opinion that the arbitration clause in the SPA would not reach the Management Agreement Claims.[1] The arbitration clause in the SPA reads: "Any dispute, controversy or claim arising in any way out of or in connection with this Agreement . . . shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre." (SPA § 19.2.)

---

[1] The arbitration clause states that it is governed by Singaporean law. (SPA § 19.4.) To determine the applicable law of an arbitration agreement, the Singapore courts adopt a three-stage test where the foremost inquiry is the parties' express choice of law of the arbitration agreement. (*See Anupam Mittal v Westbridge Ventures II Investment Holdings* [2023] 1 SLR 349 at [62].)

12. Through my review of Mr. Melamed's papers, I understand his argument to be that the SPA's arbitration provision should apply to his Management Agreement Claims because the SPA contains a provision that Mr. Melamed must enter into a management agreement with Liquid Group Inc. (later known as FTX Japan Holdings K.K) prior to closing, and thus, that the "Management Agreement itself arises from the SPA." (Am. Opp. ¶¶ 42–43.) Put differently, Mr. Melamed argues that because the Management Agreement was a closing condition to the SPA (Management Agreement § 5.1(o)), the arbitration clause in the SPA applies with equal force to the Management Agreement.

13. In the case of *Pertamina International Marketing & Distribution Pte Ltd* v *P-H-O-E-N-I-X Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc) and another matter* [2024] 6 SLR 105, it was generally accepted by the Singapore High Court that where there are multiple agreements between the same parties, and only one of those agreements contains an arbitration clause, it does not follow as a matter of course that the arbitration clause can be extended to cover disputes under the other agreements. Instead, the High Court emphasized that whether a particular arbitration agreement covers a dispute depends upon the proper construction of the arbitration agreement. Consistent with general principles of construction of any contract, it is necessary and appropriate to consider the relevant "factual matrix." (*Pertamina* at [41].)[2]

---

[2] The issue in *Pertamina* concerned whether an arbitration clause contained in a memorandum of understanding entered into by the parties also covered disputes arising out of sales contracts that came into existence pursuant to the parties' implementation of projects envisaged under the memorandum of understanding. In this regard, the High Court found that the arbitration clause covered disputes arising out of the sales contracts as, amongst other reasons, the sales contracts did not contain any separate dispute resolution provision. However, this can be distinguished from our present case as the Management Agreement has its own dispute resolution clause (i.e., the forum selection clause).

14. Further, the case of *Transocean Offshore International Ventures Ltd* v *Burgundy Global Exploration Corp* [2010] 2 SLR 821 shares similar facts with our present case, and is instructive.

15. In *Transocean*, the plaintiff and defendant entered into an offshore drilling contract (the "Drilling Contract"). [4] The Drilling Contract had a clause providing for mandatory arbitration of disputes "arising out of or in relation to or in connection with" that contract. [13] The Drilling Contract contained a condition precedent that prior to a specified date, the parties were required to enter into an agreement for the opening of an escrow account (the "Escrow Agreement"). [5] The Escrow Agreement had a forum selection clause designating courts in Singapore for the resolution of any disputes. [11] The defendant then failed to comply with the Escrow Agreement, and the plaintiff brought an action for, *inter alia*, breach of the Escrow Agreement. [8]

16. The defendant sought to stay the case pending arbitration. [9] The Singapore High Court found that the case was not arbitrable for a few reasons.

17. First, the High Court reasoned that the parties had intentionally chosen to include a forum selection clause in the Escrow Agreement, rather than an arbitration clause. [21] The High Court stated: "[T]he Drilling Contract demonstrated that the parties had agreed to carve out escrow matters from the Drilling Contract and to put them in a separate agreement. That evinced a clear intention by the parties to subject claims arising from the Escrow Agreement to the dispute resolution clause found within that particular agreement." [21] The High Court continued: "In the present matter, not only was there no clause specifiying [*sic*] that the arbitration clause was to be incorporated into the Escrow Agreement, there was an express clause conferring jurisdiction on the Singapore courts. Accordingly, incorporating an arbitration clause into the Escrow

Agreement would be plainly inconsistent with the clear wording of . . . the Escrow Agreement." [21]

18. Furthermore, "distinct and specific words are required to incorporate an arbitration clause into a contract." [21] Since the Escrow Agreement did not explicitly incorporate the arbitration clause into its terms, the dispute was not arbitrable. [21]

19. Second, the High Court found it significant that the arbitration clause in the Drilling Contract "made repeated references to the phrase 'this Contract.'" [22] The proper construction of the arbitration clause was that it was "principally concerned with claims and disputes arising out of or in relation to the Drilling Contract." [22] In reaching this conclusion, the High Court relied on *Coop International Pte Ltd* v *Ebel SA* [1998] 1 SLR(R) 615. There, the parties executed a distributorship agreement, then subsequently entered into another agreement, "which did not contain an arbitration clause." [23] The High Court held that an arbitration clause in the parties' original distributorship agreement "did not extend to a dispute which arose out of the subsequent agreement." [23] The High Court noted, "[i]f the dispute concerns a breach of the agreement itself or the proper interpretation of the terms of the distributorship agreement, then the arbitration clause would cover it." [23] "However, if the parties subsequently enter a new agreement or a series of new agreements which do not have any arbitration clauses, and the dispute concerns these new agreements and not the original distributorship agreement," then it was "difficult to see how the arbitration clause [] can be applicable." [23]

20. The *Transocean* Court also referred to *Kianta Osakeyhtio* v *Britain & Overseas Trading Co Ltd* [1954] 1 Lloyd's Rep 247, an English case,[3] which the *Coop International* case found guidance in. That case concerned a "1937 contract" and a separate

---

[3] It should be noted that English case law is persuasive in Singapore.

compensation agreement that "in one sense arose out of the 1937 contract." [24]  However, the English court found that the compensation agreement was a "new agreement and self-contained agreement" "which had an independent existence." [24]  As a result, the English court found that the dispute, "which arose out of that compensation agreement," did not "aris[e] either out of the interpretation or the fulfilment of the contract of 1937." [24]

21. Third, the High Court noted that it was "a trite canon of construction that the general should give way to the specific." [25] The forum selection clause in the Escrow Agreement mentioned the Escrow Agreement by name, and therefore its "specificity" "overrode" the arbitration provision in the Drilling Contract. [25] The Court held:

> [W]here different but related agreements contained overlapping and inconsistent dispute resolution clauses, the nature of the claim and the particular agreement out of which the claim arose ought to be considered. Where a claim arose out of or was more closely connected with one agreement than the other, the claim ought to be subject to the dispute resolution regime contained in the former agreement, even if the latter was, on a literal reading, wide enough to cover the claim. [26]

22. The dispute here contains very similar facts as *Transocean*, and the three reasons the High Court identified in its opinion also apply here. First, like the Escrow Agreement in *Transocean*, here the Management Agreement contains a forum selection clause (Management Agreement § 16), but does not contain an arbitration clause, which evinces a clear intention that the parties did not imagine resolving the Management Agreement Claims in arbitration. (*See Transocean* at [21].) The Management Agreement also does not incorporate the SPA's arbitration clause, which requires "distinct and specific words." [21]

23. Second, like in *Transocean*, the SPA's arbitration clause explicitly makes reference to disputes "arising in any way out of or in connection with this Agreement," referring to the SPA. (SPA § 19.2.) The arbitration clause in *Transocean* applied to disputes "arising out of or in relation to or in connection with this Contract," referring to the Drilling Contract. Hence, as

in *Transocean*, this wording limits the application of the arbitration clause to the agreement in which it exists.

24. Third, we have here two agreements, the Management Agreement, the execution of which was a condition precedent to the closing of the other, the SPA. Given that the agreements have "inconsistent dispute resolution clauses," the Singapore High Court advises that the arbitration clause in one agreement does not extend to cover disputes arising out of the other. [26]

25. Mr. Melamed states that all of his claims "arise either from the SPA or the Management Agreement" and thus, "should all be adjudicated in an arbitration in Singapore." (Am. Opp. ¶ 43.) For the above reasons, it is my opinion that the Management Agreement Claims are not subject to the arbitration clause in the SPA.

### The SPA's Arbitration Clause Does Not Extend to the Administrative Claim.

26. From my review of the Administrative Claim and Mr. Melamed's Amended Opposition, I do not understand Mr. Melamed to be arguing that the Administrative Claim should be arbitrated. (Am. Opp. ¶¶ 76–85.) I understand the Administrative Claim to be (i) a claim for a Transaction Award pursuant to a key employee incentive plan (Administrative Claim ¶ 6), and (ii) a claim for renumeration, primarily under the Japanese Companies Act (*see* Administrative Claim ¶ 5; Am. Opp. ¶¶ 76–79).

27. In any event, to the extent that Mr. Melamed is arguing that any portion of the Administrative Claim should be arbitrated pursuant to the SPA's arbitration provision because it arises out of the Management Agreement, I apply the same analysis above to conclude that the SPA's arbitration clause would not extend to cover any portion of the Administrative Claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2025

*/s/ Balakrishnan Ashok Kumar*
Balakrishnan Ashok Kumar