# EXHIBIT 1

# Anupam Mittal

v

# Westbridge Ventures II Investment Holdings

## [2023] SGCA 1

Court of Appeal — Civil Appeal No 64 of 2021
Sundaresh Menon CJ, Judith Prakash JCA and Steven Chong JCA
29 June, 5 September 2022; 6 January 2023

*Arbitration — Agreement — Governing law — When implication that proper law of main contract was intended to govern arbitration agreement was displaced*

*Arbitration — Arbitrability and public policy — What law should govern determination of arbitrability of subject matter of dispute*

*Arbitration — Conflict of laws — Governing law of arbitration agreement*

*Arbitration — Conflict of laws — Law governing objective arbitrability*

*Arbitration — Restraint of proceedings — Foreign judicial proceedings — Whether anti-suit injunction should be upheld where arbitration agreement breached*

*Arbitration — Stay of court proceedings — Grounds — Whether limited stay of Singapore court proceedings appropriate even though arbitration agreement breached*

Facts

In this appeal, the appellant sought to set aside an anti-suit injunction granted by the High Court judge ("Judge"). The central issue was whether by the commencement of proceedings before the National Company Law Tribunal ("NCLT") in Mumbai, India (the "NCLT Proceedings") the appellant acted in breach of an arbitration agreement with the respondent.

The appellant was an Indian resident and a founder of a company incorporated in India (the "Company"). The respondent was a Mauritian private equity fund that invested in the Company. The shareholders' agreement ("SHA") and supplementary agreement that the parties signed contained identically-worded governing law and arbitration clauses. The former clause stated that "[t]his Agreement and its performance shall be governed by and construed in all respects in accordance with the laws of the Republic of India". The latter clause referred any "dispute relating to the management of the Company or relating to any of the matters set out in this Agreement" to arbitration in Singapore. The parties' relationship soured in 2017 when the respondent expressed an interest in exiting the Company.

In 2021, the appellant commenced the NCLT Proceedings seeking remedies for corporate oppression. The appellant was the petitioner and the Company, the respondent's nominee director in the Company and the Company's co-founders were named as the respondents. Among other things, the appellant accused the respondent of colluding with others to wrest control of the management of the day-to-day operations of the Company from him.

In response to the commencement of the NCLT Proceedings, the respondent filed HC/OS 242/2021 ("OS 242") on 15 March 2021. On the same day, Andrew Ang SJ granted the respondent an urgent *ex parte* interim anti-suit injunction against the appellant. The appellant took action to neutralise the effect of the interim anti-suit injunction. He commenced a suit in the Bombay High Court on 18 March 2021, seeking, among other things, a declaration that the NCLT was the only competent forum to hear and decide the disputes raised in the NCLT petition. The Bombay suit had not been fixed for hearing.

The Judge granted a permanent anti-suit injunction against the appellant in OS 242 because he adjudged that the arbitration agreement had been breached by the commencement of the NCLT Proceedings and there were no good reasons to withhold the injunction. In reaching this conclusion, he held that: (a) the law that governed the issue of arbitrability at the pre-award stage was the law of the *seat*; (b) the disputes between the parties were arbitrable under Singapore law being the law of the *seat*; and (c) assuming Indian law governed the arbitration agreement, the disputes fell within the scope of the arbitration agreement.

On appeal, the appellant submitted that no breach of the arbitration agreement occurred because: (a) the disputes referred to the NCLT related to oppression and the mismanagement of a company and such disputes were non-arbitrable under the law of the arbitration agreement, which he averred was Indian law; and (b) in any case, the disputes did not fall within the scope of the parties' arbitration agreement because the parties could not have intended to refer disputes relating to oppression and mismanagement of a company to arbitration when these were non-arbitrable under the governing law of the arbitration agreement. He argued that doing so would render the arbitration agreement liable to be nullified. Even if the disputes fell within the scope of the arbitration agreement, the appellant asserted that the arbitration agreement was null and void for covering disputes which were non-arbitrable under its governing law.

**Held, dismissing the appeal:**

*Law(s) governing the determination of subject matter arbitrability*

(1)    The essential criterion of non-arbitrability was whether the subject matter of the dispute was of such a nature as to make it contrary to public policy for that dispute to be resolved by arbitration. Such public policy, referred to in s 11 of the International Arbitration Act 1994 (2020 Rev Ed) ("IAA"), was not limited to the public policy of Singapore but extended to foreign public policy where this arose in connection with essential elements of an arbitration agreement: at [47] and [48].

(2)    If it was contrary to local or relevant foreign public policy to determine a dispute arising under an arbitration agreement by arbitration, that dispute could not proceed to arbitration in Singapore: at [52].

(3)    An arbitration agreement derived its authority from the consensus of the parties and was the fount of the tribunal's jurisdiction. The law of the seat dealt with matters of procedure but the law of the arbitration agreement dealt with matters of the validity of the agreement and was, in that sense, anterior to the actual conduct of the arbitration: at [53].

(4)    The arbitrability of a dispute was, in the first instance, determined by the law that governed the arbitration agreement. If it was a foreign governing law and that law provided that the subject matter of the dispute could not be arbitrated, the Singapore court would not allow the arbitration to proceed because it would be contrary to public policy, albeit foreign public policy, to enforce such an arbitration agreement. Further, because of the operation of s 11 of the IAA, where a dispute might be arbitrable under the law of the arbitration agreement but Singapore law as the law of the seat considered that dispute to be non-arbitrable, the arbitration would not be able to proceed: at [55].

*Law governing the arbitration agreement*

(5)    Singapore law was the law of the arbitration agreement: at [75].

(6)    Reference in cl 20.1 of the SHA to Indian law being "in all respects" the governing law of the SHA and its performance was not to be construed as expressly choosing the law to govern the arbitration agreement as well even if that agreement was contained within the main contract: at [66].

(7)    As a general rule, a choice of law for the main contract would lead a court to hold that the same law also applied to govern the arbitration agreement. But the implication that Indian law was intended to govern the arbitration agreement was negated. The intention of the parties to settle their disputes by arbitration was not consistent with an implied choice of Indian law as the proper law of the arbitration agreement as such choice would negate the agreement since oppression claims (which were often intertwined with management disputes) were not arbitrable in India: at [67], [73] and [74].

(8)    Under the third stage of the governing law inquiry, Singapore law had the most real and substantial connection with the arbitration agreement in the SHA. Under cl 20.2 of the SHA, the arbitration was to take place in Singapore. As the law of the seat of the arbitration, Singapore law would govern the procedure of the arbitration including challenges to the tribunal or its jurisdiction and the award when the same was eventually issued: at [75].

*Nature of disputes in NCLT Proceedings*

(9)    In deciding whether any particular dispute fell within either category of disputes referred to arbitration, the relevant term in the arbitration agreement would be interpreted in accordance with Singapore law as the governing law of the arbitration agreement: at [76].

(10)    Practically all the complaints made by the appellant in the NCLT Proceedings either related to the management of the Company or to the SHA in some way and thus were encompassed by the arbitration agreement. The simple fact that all these allegations might eventually support a finding of oppression could not take them out of the categories of disputes that the SHA expressly provided should be submitted to arbitration. In any event, under Singapore law, disputes involving claims of corporate oppression could be arbitrated. Accordingly, the institution of the NCLT Proceedings was a breach of the arbitration agreement and there was no ground on which to discharge the anti-suit injunction granted by the Judge: at [61], [90] and [96].

*No limited stay of Singapore proceedings*

(11)   Despite the breach of the arbitration agreement, the court had case management powers under s 49(2) of the Supreme Court of Judicature Act 1969 (2020 Rev Ed) ("SCJA") read with s 18(2) and para 9 of the First Schedule to the SCJA to stay the concurrent proceedings until the concurrent proceedings in the Bombay High Court and the NCLT had concluded: at [98] and [99].

(12)   No limited stay of the Singapore proceedings was granted: at [107].

(13)   First, there did not appear to be a likelihood that the Bombay suit would be dealt with and resolved within the next year and a limited stay should not run for longer than 12 months. It was highly undesirable for allegations of breach of the SHA and mismanagement (including oppression) to be hanging over the respondent's head for a lengthy period of time: at [107].

(14)   Second, it was too speculative to conclude that it was fruitless to conduct an arbitration just because of the possibility that the award would not be enforceable in India. The process of the arbitration in itself could be beneficial to the parties in that it would compel them to collect and test their evidence and legal arguments and give them a strong indication of the strength of their respective cases. The determination of the tribunal could give rise to *res judicata* and estoppel points that would assist the parties if after the issue of the final award, court proceedings had to be taken in India or elsewhere to implement (if not directly enforce) the award or the findings of the tribunal: at [108].

[Observation: The solution to problems that might arise due to differences in subject matter arbitrability between the proper law of the arbitration agreement and the law of the seat lay in the hands of the parties themselves and their legal advisors. There was no reason why during the contract negotiation process, they should not be able to investigate possible differences in public policy between the two systems and craft an arbitration agreement which in its choices of proper law and seat would prevent such difficulties from frustrating the parties' desire to settle disputes by arbitration: at [60].]

**Case(s) referred to**

*BCY v BCZ* [2017] 3 SLR 357 (folld)

*BNA v BNB* [2020] 1 SLR 456 (distd)

*BNP Paribas Wealth Management v Jacob Agam* [2017] 3 SLR 27 (folld)

*Enka Insaat Ve Sanayi AS v OOO Insurance Company Chubb*
    [2020] 1 WLR 4117 (refd)

*Sulamérica Cia Nacional de Seguros SA v Enesa Engelharia SA* [2013] 1 WLR 102
    (folld)

*Tomolugen Holdings Ltd v Silica Investors Ltd* [2016] 1 SLR 373 (folld)

*Vijay Karia v Prysmian Cavi E Sistemi SRL* [2020] SCC Online SC 177 (refd)

**Legislation referred to**

International Arbitration Act 1994 (2020 Rev Ed) ss 11(1) (consd);
    ss 6, 10(3), 11, 31(4)(*a*), 31(4)(*b*)

Supreme Court of Judicature Act 1969 (2020 Rev Ed) ss 18(2), 49(2),
   First Schedule para 9 (consd)
Arbitration and Conciliation Act 1996 (Act No 26 of 1996) (India)  s 48(2)

*Nandakumar Ponniya Servai, Ashish Chugh, Pradeep Nair, Yiu Kai Tai and
Yap Yong Li (Wong & Leow LLC) for the appellant;
Thio Shen Yi SC, Tan May Lian Felicia, Uma Jitendra Sharma and Juliana Lake
(Lu Zhixuan) (TSMP Law Corporation) for the respondent;
Assoc Prof Darius Chan (Yong Pung How School of Law, Singapore Management
University) as amicus curiae.*

[Editorial note: This was an appeal from the decision of the High Court (General
Division) in [2021] SGHC 244.]

6 January 2023                                                    Judgment reserved.

**Judith Prakash JCA (delivering the judgment of the court):**

**Introduction**

1       In the High Court proceedings ("OS 242") from which this appeal
arises, the court granted a permanent anti-suit injunction against the
appellant. He was thereby restrained from: (a) pursuing Company Petition
No 92 of 2021 before the National Company Law Tribunal ("NCLT") in
Mumbai, India (the "NCLT Proceedings"); and (b) commencing other
proceedings in respect of disputes relating to the management of a
company incorporated in India named People Interactive (India) Pte Ltd
(the "Company"). The appellant and respondent are shareholders of the
Company.

2       The central issue before us is whether by the commencement of the
NCLT Proceedings, the appellant acted in breach of an arbitration
agreement with the respondent. The appellant submits that no breach
occurred because: (a) the disputes referred to the NCLT relate to
oppression and the mismanagement of a company and such disputes are
non-arbitrable under the law of the arbitration agreement which he avers is
Indian law; and (b) in any case, the disputes do not fall within the scope of
the parties' arbitration agreement. Even if they do, the appellant says the
arbitration agreement is null and void for covering disputes which are non-
arbitrable under the governing law of the arbitration agreement.

3       In the court below, the High Court judge (the "Judge") postulated that
the threshold question before him was: which system of law governs the
issue of subject matter arbitrability at the pre-award stage? The alternative
answers to this question were: (a) the law of the arbitration agreement; or
(b) the law of the seat, which in this case is Singapore. The Judge decided
that the answer was the law of the seat. Before us, the appellant challenges
that finding, contending that subject matter arbitrability is governed by the

law of the arbitration agreement, which he says is Indian law. As the Judge noted, prior to the hearing before him, the threshold question had not been decided in Singapore. This appeal therefore gives us the opportunity to consider the matter and, additionally, provide some guidance on what law governs an arbitration agreement which does not contain an express choice of law.

## Facts

### Parties and the SHA

4      The appellant is an Indian resident and a founder of the Company. Amongst other things, the Company owns and operates a well-known online and offline matrimonial service called "shaadi.com". It was co-founded by the appellant and his cousins, Anand Mittal ("AM") and Navin Mittal ("NM"), both of whom were among the initial shareholders of the Company. The appellant was the managing director of the Company from 30 November 2004 to 30 November 2019.

5      The respondent is a private equity fund incorporated under the laws of Mauritius. It invested in the Company in early 2006. Consequently, on 10 February 2006, the appellant and his cousins entered into two agreements with the respondent. One was a Share Subscription and Share Purchase Agreement under which shares in the Company were to be issued to the respondent. The second was a shareholders' agreement (the "SHA") regulating the parties' rights and responsibilities as shareholders. On 7 May 2008, the parties to the SHA signed the First Supplementary Subscription-Cum-Shareholders' Agreement (the "SSSA") with SVB India Capital Partners LP, SVB Financial Group and the respondent. Clause 20.2 of the SHA and cl 10.2 of the SSSA are identically-worded governing law and arbitration clauses.

6      Clause 20 of the SHA states:

20      GOVERNING LAW AND ARBITRATION

20.1  This Agreement and its performance shall be governed by and construed in all respects in accordance with the laws of the Republic of India. *In the event of a dispute relating to the management of the Company or relating to any of the matters set out in this Agreement*, parties to the dispute shall each appoint one nominee/representative who shall discuss in good faith to resolve the difference. In case the difference is not settled within 30 calendar days, it shall be referred to arbitration in accordance with Clause 20.2 below.

20.2  All such disputes that have not been satisfactorily resolved under Clause 20.1 above shall be referred to arbitration before a sole arbitrator to be jointly appointed by the Parties. In the event the Parties are unable to agree on a sole arbitrator, one of the arbitrators shall be appointed jointly by the Founders and the second arbitrator will be appointed by [the respondent]

and the third arbitrator will be appointed by the other two arbitrators jointly. *The arbitration proceedings shall be carried out in accordance with the rules laid down by International Chambers of Commerce and the place of arbitration shall be Singapore.* The arbitration proceedings shall be conducted in the English language. The parties shall equally share the costs of the arbitrator's fees, but shall bear the costs of their own legal counsel engaged for the purposes of the arbitration.

…

[emphasis in original omitted; emphasis added in italics and bold italics]

7      In 2014, NM sold his shares to the respondent and resigned as a director of the Company. According to the appellant, as of 30 March 2021, on a "fully diluted basis", the respondent held 44.38% of the shares in the Company, AM had 13.13% and he himself owned 30.26%.

8      Under the SHA, the respondent was entitled to appoint a nominee director to the board of the Company ("Board"). From 24 April 2019, one Shobitha Anne Mani ("Ms Mani") was the respondent's nominee director.

**Parties' relationship deteriorates in 2017**

9      The parties' relationship soured in 2017 when the respondent expressed an interest in exiting from the Company.

10     Clause 3.4 of the SHA envisaged that the Company was to complete an initial public offering ("IPO") within five years from closing (as defined in the SHA). If it did not do so, the respondent would be able to exit its investment through redemption of its shares and, if necessary, "drag along" rights as provided for in the SHA. The latter meant that the respondent could compel the Founders (*ie*, the appellant, AM and NM) to sell all or part of their shares, together with the respondent's shares, to a third-party buyer. As no IPO was achieved, the respondent wanted to disengage. Accordingly, discussions on the potential sale of the Company were held with an entity known as Info Edge (India) Ltd ("Info Edge"), which was a competitor of the Company. The appellant's position is that Info Edge is a "Significant Competitor" of the Company within the meaning of that term in the SHA.

11     The disengagement did not proceed smoothly as the parties disagreed on several matters including the potential sale of the Company to Info Edge, the respondent's refusal to consent to the re-appointment of the appellant as managing director in 2019 and the re-appointment of NM as a"Founder Director", another position defined in the SHA.

12     The appellant is unhappy over the potential sale to Info Edge because of its position as a Significant Competitor. According to the appellant, when the sale of the Company's shares was first being explored, the respondent refused to negotiate with any interested buyer apart from Info Edge. The appellant says that, at this time, he did not know that the

respondent also held investments in Info Edge. At the appellant's instigation, the Company and Info Edge entered into a non-disclosure agreement on 13 April 2017 for a term of two years to protect the Company's sensitive and confidential information. Sometime in 2018, when the respondent unexpectedly withdrew support for the sale of shares to Info Edge, the appellant placed on record his objections to the respondent's conduct, especially since the Company's sensitive and confidential information had been shared with Info Edge in discussions leading up to the deal. In 2019, the respondent initiated a revival of discussions with Info Edge. The appellant accuses the respondent of colluding with AM to secure terms from Info Edge that were favourable to it.

13    The appellant also asserts that, after he voiced his concerns about re-opening discussions with Info Edge in 2019, the respondent and AM "started taking steps in earnest" to oust him from the position of managing director of the Company.

14    In light of these disagreements, the appellant summarises his complaints against the respondent as follows:

(a)    The collusion complaint: "contrary to the joint venture or quasi-partnership nature of the Company since 2006, the NCLT Defendants colluded to oppress the Appellant (being the minority shareholder) with the intention being to wrest control of the management of the day-to-day operations of the Company in a manner contrary to the interests of the Company, and marginalise the Appellant as a shareholder and Board Member".

(b)    The breach of fiduciary duty complaint: "[AM] and [Ms Mani] in their capacity as directors of the Company, were in breach of their fiduciary duties and failed to act in the interests of the Company on a number of occasions".

### NCLT Proceedings commenced

15    On 3 March 2021, the appellant filed a petition in the NCLT seeking remedies for corporate oppression. On or about 24 March 2021, the NCLT petition was assigned its case number, *ie*, Company Petition No 92 of 2021. In the NCLT Proceedings, the appellant is the petitioner and the Company, the respondent, Ms Mani, AM and NM are named as the respondents. The Judge summarised the reliefs sought by the appellant in the NCLT Proceedings in these terms:

(a)    an injunction to restrain the respondent and the respondent's directors, employees, servants, agents and or any person claiming through or under them, from in any manner, disrupting the management and operation of the Company and/or conducting the

affairs of the Company in a manner prejudicial or oppressive to any member of the Company or to itself;

(b)   a declaration that the appellant's continuation as an executive director of the Company, pursuant to the resolution passed by the Board of directors at the meeting held on 28 November 2019, is valid and that all actions taken by the appellant as an executive director of the Company are not invalid;

(c)   an injunction to restrain the respondent, the Company and certain others, their directors, employees, servants, agents and/or any person claiming through or under them, from in any manner, whether directly or indirectly hindering and/or prohibiting the appellant from performing his functions as an executive director of the Company;

(d)   an order to direct the respondent, the Company and certain others to initiate a process for identifying and appointing a suitable, independent, non-partisan and impartial candidate to be managing director of the Company in a time-bound manner; and

(e)   certain other declarations and interim reliefs.

**OS 242 commenced**

16   The respondent reacted to the filing of the NCLT Proceedings by filing OS 242 on 15 March 2021. On the same day, Andrew Ang SJ granted the respondent:

(a)   an urgent *ex parte* interim anti-suit injunction against the appellant; and

(b)   leave to serve OS 242 on the appellant out of jurisdiction in India.

17   Thereafter, the appellant took action to neutralise the effect of the interim anti-suit injunction. He commenced an action in Bombay, which we elaborate on below. Separately, on 31 March 2021, the appellant filed an application to set aside the interim anti-suit injunction. However, when a permanent anti-suit injunction was issued against the appellant on 26 October 2021, that application was rendered moot.

**Bombay proceedings commenced**

18   The action in the Bombay High Court (the "Bombay suit") was started on 18 March 2021. By it, the appellant seeks the following orders:

(a)   a declaration that the NCLT is the only competent forum to hear and decide the disputes raised in the NCLT petition; and

(b)    a permanent injunction restraining the respondent or its agents, directors, employees, servants or any person claiming through or under it from, in any manner, whether directly or indirectly:

(i)    enforcing the anti-suit injunction; and

(ii)    pursuing or continuing with OS 242 and related proceedings in the Singapore High Court.

19    As far as we are aware, the Bombay suit has not been fixed for hearing yet. In March 2021, the appellant filed an interlocutory application in the Bombay suit by which he sought an interim injunction restraining the respondent from enforcing the interim anti-suit injunction granted by Ang SJ. This prayer has since been amended to refer to the permanent anti-suit injunction granted by the Judge. The application was originally fixed for hearing on 5 September 2022 but had to be adjourned to a date to be fixed.

**Submissions and decision below**

20    The respondent's primary basis for seeking the anti-suit injunction pursuant to OS 242 was that the arbitration agreement in the SHA had been breached by the commencement of the NCLT Proceedings.

21    The respondent argued that:

(a)    The subject matter of the disputes referred to the NCLT was arbitrable under Singapore law as the law of the seat of arbitration, since under Singapore law it is undisputed that even oppression and mismanagement claims are arbitrable. Even if the law governing arbitrability is the proper law of the arbitration agreement, Singapore law would nevertheless apply. Alternatively, even if Indian law applies as the proper law of the arbitration agreement, the pith and substance of the disputes is contractual as opposed to "dressed up" oppression and mismanagement claims, and therefore the disputes are arbitrable even under Indian law.

(b)    The disputes referred to the NCLT are essentially issues relating to the exercise of contractual rights under the SHA and fall within the scope of the arbitration agreement.

22    The appellant resisted the injunction on several grounds. He argued that:

(a)    Under Indian law, the pith and substance of the NCLT Proceedings lies in minority oppression and mismanagement of the Company (it should be noted that the respondent argued below and on appeal that the disputes are contractual).

(b)    The law governing the arbitration agreement determines whether the disputes referred to the NCLT are arbitrable. Indian law

governs the arbitration agreement. Under Indian law, disputes relating to oppression and mismanagement are not arbitrable because the NCLT has exclusive jurisdiction to adjudicate these disputes. This result would render the arbitration agreement null and void.

(c)    The disputes referred to the NCLT fall outside the scope of the arbitration agreement. Applying Indian law to interpret the scope of the arbitration agreement, parties could not have intended for such disputes to fall within the arbitration agreement since the arbitration agreement would be unworkable and liable to be declared void under Indian law.

23    The Judge granted the anti-suit injunction because he adjudged that the arbitration agreement was breached by the commencement of the NCLT Proceedings and there were no good reasons to withhold the injunction. His full grounds are set out in *Westbridge Ventures II Investment Holdings v Anupam Mittal* [2021] SGHC 244 (the "Judgment"). In concluding that the arbitration agreement had been breached, the Judge held: (a) the law that governed the issue of arbitrability at the pre-award stage was the law of the *seat*; (b) that the disputes between the parties were arbitrable under Singapore law being the law of the *seat*; and (c) assuming Indian law governed the arbitration agreement, the disputes fell within the scope of the arbitration agreement. We elaborate on each holding in turn.

24    First, the Judge held that the law of the seat of arbitration governs the question of whether the subject matter of a dispute is arbitrable for these reasons:

(a)    subject matter arbitrability, when raised at the pre-award stage before the seat court, is essentially an issue of the tribunal's jurisdiction. The law of the seat should apply to decide when the tribunal's jurisdiction should be limited by prescribing what types of disputes are arbitrable;

(b)    the same law should apply to arbitrability issues at both the pre-award and post-award stages;

(c)    applying the law of the seat at the pre-award stage is more consistent with the policy of promoting international commercial arbitration. A State's rules on arbitrability may reflect a policy of favouring international arbitration. It is undesirable for Singapore courts to give effect to foreign non-arbitrability rules which may undermine Singapore's policy of supporting international commercial arbitration; and

(d)    the weight of authority leans in favour of the law of the seat being applied.

It should be noted that as the Judge had held that the law of the seat governed the issue of arbitrability, he did not find it necessary to decide

what the proper law of the arbitration agreement was. At [62] of the Judgment, he stated that "even if" that proper law was Indian law, that would be of no relevance.

25    Secondly, the Judge held that the parties' disputes fell within the broad language of the arbitration agreement, *viz*, disputes "*relating to* the *management of the Company* or *relating to* any of the matters set out in this Agreement" [emphasis added]. He rejected the appellant's submission that parties could not have intended for disputes relating to oppression and mismanagement to fall within the scope of the arbitration agreement because it would then be declared void under Indian law. The Judge said that this purported intention contradicted the express wording of cl 20.1 of the SHA. Further, he found it speculative to assert that parties applied their minds to or contemplated excluding claims brought under Indian companies law legislation when they opted, in the SHA, to submit their disputes to an arbitration seated in Singapore.

26    Finally, the Judge regarded the breach of the SHA (due to commencement of the NCLT Proceedings) as *prima facie* entitling the respondents to an anti-suit injunction. He did not regard the following objections raised by the appellant as sufficient grounds to deny the injunction: (a) the resulting award would not be enforceable in India; (b) the NCLT Proceedings were vexatious and oppressive; (c) the arbitration agreement did not bind all parties to the dispute whereas the NCLT has jurisdiction over all relevant parties; and (d) the NCLT is the natural and competent forum to hear the dispute. He thus imposed a permanent anti-suit injunction on the appellant in these terms:

> An injunction is granted restraining the defendant, his agents or otherwise from:
>
> > (a)    pursuing, continuing and/or proceeding with the action commenced by the defendant by way of Company Petition No. 92 of 2021 in the National Company Law Tribunal ('NCLT') in Mumbai, India; and
> >
> > (b)    commencing or procuring the commencement of any legal proceedings in respect of any dispute, controversy, claim or disagreement of any kind in connection with or relating to the management of People Interactive (India) Private Limited ('People Interactive'), or in connection with or relating to any of the matters set out in the Shareholders' Agreement dated 10 February 2006, as amended from time to time (the 'SHA') in any other dispute resolution forum other than an arbitration tribunal constituted in accordance with the rules laid down by the International Chamber of Commerce ('ICC') and seated in Singapore, against the plaintiff, and/or Shobitha Annie Mani and/or Navin Mittal and/or Anand Mittal and/or People Interactive and/or any person in relation to any dispute relating to the management of People Interactive, or arising from, connected with or relating to any of the matters set out in the SHA.

**Parties' cases on appeal**

*Appellant's case*

27    The appellant puts forward two alternative grounds of appeal.

28    The first ground is that the parties' disputes do not fall within the scope of the arbitration agreement. The appellant argues that if, however, oppression and mismanagement disputes are covered by the arbitration agreement, it would be null and void since Indian law does not allow these disputes to be arbitrated. The argument proceeds as follows. First, that the governing law of the arbitration agreement is Indian law. Next, the parties' disputes relate to oppression and mismanagement of a company and are non-arbitrable under Indian law since the NCLT has exclusive jurisdiction over such disputes. Finally, the parties cannot have intended for the mention of disputes "relating to the management of the Company or relating to any of the matters set out in [the SHA]" (in cl 20.1) to cover disputes of oppression and mismanagement since the arbitration agreement would then be unworkable and liable to be nullified under Indian law.

29    The second ground of the appellant's case is that the parties' disputes referred to the NCLT are objectively non-arbitrable. Basically, he argues that subject matter arbitrability is determined solely by the law governing the arbitration agreement (*ie*, Indian law). Additionally, he argues that the International Arbitration Act 1994 (2020 Rev Ed) ("IAA") is silent on which forum's public policy should govern the question of subject matter arbitrability. Pertinently, he views arbitrability as a facet of the validity of the arbitration agreement. And as Art 34(2)(*a*)(i) of the UNCITRAL Model Law on International Commercial Arbitration ("Model Law") provides that the law of the arbitration agreement determines issues relating to the validity of the arbitration agreement, arbitrability should likewise be determined by the proper law of the arbitration agreement. In the *alternative*, the appellant proposes that regard must be given to *both* the non-arbitrability rules applicable in the law of the seat and to the law governing the arbitration agreement. He argues that non-arbitrability rules of the law of the arbitration agreement (if different from the seat law) are relevant if: (a) the law of the arbitration agreement has a materially closer connection to the dispute; or (b) the court adopts the approach of determining a composite list of matters that are non-arbitrable under both systems of law.

*Respondent's case*

30    The respondent's case largely mirrors its arguments below, save for points that it raises in rebuttal to the appellant's new arguments.

31    The respondent argues that the main issue is whether the subject matter of the disputes is arbitrable, and which law governs this question. It agrees with the Judge and his reasons for holding that the law of the seat is the only law which governs subject matter arbitrability at the pre-award stage. If the Judge is upheld, the disputes are arbitrable under the seat law (*ie*, Singapore law) regardless of how they are characterised. However, even if arbitrability is determined by the law of the arbitration agreement, the respondent submits that: (a) the law of the arbitration agreement is Singapore law because the presumption that the law governing the substantive contract (*ie*, Indian law) also governs the arbitration agreement is displaced by the fact that, on the appellant's case, the disputes would be non-arbitrable under Indian law; and (b) even if Indian law governed the arbitration agreement and the disputes relate to minority oppression, the disputes are arbitrable because the tribunal is only prevented from granting *relief* for oppression, but not from adjudicating the merits of the claim.

32    As to whether the disputes fall within the scope of the arbitration agreement, the respondent argues, applying Singapore as the proper law of the arbitration agreements, the disputes do fall within the language of cl 20.1 of the SHA. However, even if Indian law governs the arbitration agreement and subject matter arbitrability, the disputes are contractual or relate to the management of the Company and hence fall within the scope of the arbitration agreement. It also cites the Judge's reasoning that, even if the disputes relate to oppression and mismanagement, there is no evidence to suggest the parties intended to exclude such claims from the arbitration agreement.

33    The respondent also argues that the scope of the anti-suit injunction is not overly broad.

**Amicus curiae's submissions**

34    The *amicus curiae*, Associate Professor Darius Chan ("Prof Chan"), was invited to submit on "whether the law that governs the issue of subject matter arbitrability at the pre-award stage is the law of the seat or the proper law of the arbitration agreement". This issue arises in relation to the second ground of appeal. Prof Chan submits that the *lex fori* (*ie*, the law of the court that is hearing the matter) should determine the question of subject matter arbitrability. Hence in the pre-award stage, the seat court should apply the law of the seat to this issue. He argues that the *travaux préparatoires* of the Model Law shows that: (a) while alternative governing laws were actively considered for subject matter arbitrability at the *post*-award stage under Art 34(2)(*b*)(i), the drafters deliberately retained the *lex fori*; and (b) the drafters intended the same law to govern subject matter arbitrability at the *pre*-award stage.

Anupam Mittal v
Westbridge Ventures II Investment Holdings

### A further issue

35    After the oral hearing of the appeal had been completed, the court wrote to the parties asking them to submit on three questions which the Court posed. These were:

(a)    What is the status of the Bombay suit? If there has been an adjournment of the suit, what is the reason for the adjournment?

(b)    Has the NCLT been asked to determine whether it has exclusive jurisdiction over the dispute in the appellant's NCLT petition?

(c)    Whether (i) it is in the court's power to stay this appeal pending the Bombay High Court's disposal of the Bombay suit and/or the NCLT's determination of its own jurisdiction; and (ii) if so, whether that power should be exercised.

36    From the submissions subsequently tendered by the parties it appears that the answer to the first question is that the main suit in the Bombay High Court has not been fixed for hearing. Two interim applications were fixed for hearing on 5 September 2022 but were adjourned and are now awaiting new dates. In one of these applications, the Bombay High Court will rule on whether the NCLT has exclusive jurisdiction over the appellant's petition there.

37    The answer to the second question is no. According to the appellant, that is because he is currently restrained by the anti-suit injunction from taking any action in relation to the NCLT Proceedings.

38    As for the third question, while they agreed that this Court has case management powers to impose a limited stay of this appeal, the parties put forward opposing views on whether that power should be exercised. We will discuss their arguments further when we come to consider this issue.

### The issues in the appeal

39    Arising from the arguments, the following issues are to be determined in this appeal:

(a)    Are questions of arbitrability to be determined according to the law of the seat or the proper law of the arbitration agreement?

(b)    What is the proper law of the arbitration agreement in this case?

(c)    What is the proper characterisation of the disputes here?

(d)    Even if the disputes are arbitrable, should the court order a stay of the anti-suit injunction on case management grounds?

40    We have arranged the issues in this way because we think it more logical to deal with the question of law governing arbitrability before we decide what the law of the arbitration agreement is. Only thereafter,

assuming the agreement is found to be valid and binding, can we examine whether the appellant is contractually bound to arbitrate the disputes that he submitted to the NCLT.

### What law governs the issue of arbitrability?

41    The Judge and Prof Chan agree with the respondent that issues of arbitrability should be determined according to the law of the court hearing the matter irrespective of whether this issue arose at the pre-award stage or after the award had been issued. As Prof Chan noted in his Opinion, this issue of the law governing arbitrability has been much debated both by the drafters of the Model Law and by jurists in various jurisdictions. In so far as the issue arose in the post-award context, the conclusion reached and embedded in the Model Law (*vide* Arts 34(2)(*a*)(i) and 36(1)(*a*)(i)) is that the law which must be looked at to decide whether the matters contained in the award were arbitrable or not, is the law of the arbitration agreement. This is conveyed by the provision in those Articles that a challenge to an award may be made on the basis that "the [arbitration] agreement is not valid under the law to which the parties have subjected it". Prof Chan notes that "despite divergent views the Commission ultimately preferred retaining the *lex fori* in Art 34(2)(*b*)(i) [which deals with setting aside] for reasons of predictability and certainty".

42    When it came to pre-award questions of arbitrability however, nothing was embedded in the Model Law. According to Prof Chan, this was because as confirmed in the *UNCITRAL 2012 Digest of Case Law on the Model Law on International Commercial Arbitration* (United Nations, 2012), "at the pre-award stage, the drafting history of the Model Law indicates that the tribunal should apply the same law that the seat court would apply in ascertaining the subject matter arbitrability of a dispute in setting aside proceedings".

43    That there should be harmony on the applicable law between the pre- and post-award stages was also a view taken by the UK Supreme Court in the context of the validity of the arbitration agreement. In *Enka Insaat Ve Sanayi AS v OOO Insurance Company Chubb* [2020] 1 WLR 4117, that court (*per* Lord Hamblen and Lord Leggatt) opined (at [136]) that "it would be … illogical if the law governing the validity of the arbitration agreement were to differ depending on whether the question of validity is raised before or after an award has been made. To ensure consistency and coherence in the law, the same law should be applied to answer the question in either case". Further, according to Gary B Born, *International Commercial Arbitration* (Kluwer Law International, 3rd Ed, 2021) at p 644, most national courts including those of the US, France, Switzerland, Holland, Belgium, Italy, Austria and Sweden, have applied the *lex fori* at the pre-award stage.

44    While we are cognisant of the weight of the views of the drafters of the Model Law and those jurisdictions mentioned above that have adopted the law of the forum (which is usually the law of the seat) at the pre-award stage to determine subject matter arbitrability, we consider that there is one vital factor on which that approach has not placed enough weight. This factor is the importance of public policy in relation to issues of arbitrability.

45    In its essence, an arbitration agreement is an agreement by parties to remove disputes that may arise between them from adjudication by any national court system and subject them instead to resolution by privately appointed adjudicators. Nations, however, have an interest in what issues should only be determined in public forums because some issues have wider public impact beyond the individual interests of the disputants. This public interest may be expressed in legislation or it may be recognised by the judicial system as part of the public policy of the state. But different nations have different circumstances and contexts and therefore their legislation or public policies on what may be the subject of private dispute resolution may not accord with those of other states.

46    The relationship between arbitrability and public policy was extensively considered by this court in *Tomolugen Holdings Ltd and another v Silica Investors Ltd and other appeals* [2016] 1 SLR 373 ("*Tomolugen*") with emphasis on s 11 of the IAA. We can do no better than quote the following passages from *Tomolugen*:

> **The concept of arbitrability**
>
> 71.    We turn now to the question of arbitrability. The absence of arbitrability has come to be associated with that class of disputes which are thought to be incapable of settlement by arbitration. The concept of arbitrability has a reasonably solid core. It covers matters which 'so pervasively involve "public" rights and concerns, or interests of third parties, which are the subjects of uniquely governmental authority, that agreements to resolve … disputes [over such matters] by "private" arbitration should not be given effect': *Gary Born* ([33] *supra*) at p 945. However, the outer limits of its sphere of application are less clear. Lord Mustill and Stewart Boyd QC, for instance, suggest that '[i]t would be wrong … to draw … any general rule that criminal, admiralty, family or company matters cannot be referred to arbitration': Michael J Mustill & Stewart C Boyd, *The Law and Practice of Commercial Arbitration in England* (Butterworths, 2nd Ed, 1999) at pp 149–150.
>
> …
>
> 75.    The concept of arbitrability finds legislative expression in s 11 of the IAA, which reads as follows:

**Public policy and arbitrability**

11.—(1) Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration *unless it is contrary to public policy to do so*.

(2)    The fact that any written law confers jurisdiction in respect of any matter on any court of law but does not refer to the determination of that matter by arbitration shall not, of itself, indicate that a dispute about that matter is not capable of determination by arbitration.

…

It is evident from this that the essential criterion of non-arbitrability is whether the subject matter of the dispute is of such a nature as to make it contrary to public policy for that dispute to be resolved by arbitration. Beyond this, the scope and extent of the concept of arbitrability has been left undefined, as a consequence of which, it falls to the courts to trace its proper contours (see the *1993 Report on Review of Arbitration Laws* ([65] *supra*) at paras 26–28; *Larsen Oil v Petroprod* at [24]).

76.    In our judgment, the effect of s 11 of the IAA is that there will ordinarily be a presumption of arbitrability so long as a dispute falls within the scope of an arbitration clause. This presumption may be rebutted by showing that (*Larsen Oil v Petroprod* at [44]):

(a)    Parliament intended to preclude a particular type of dispute from being arbitrated (as evidenced by either the text or the legislative history of the statute in question); or

(b)    it would be contrary to the public policy considerations involved in that type of dispute to permit it to be resolved by arbitration.

[Court of Appeal's emphasis in *Tomolugen*]

47    We would like to reiterate the statement in [75] of *Tomolugen* that "the essential criterion of non-arbitrability is whether the subject matter of the dispute is of such a nature as to make it *contrary to public policy* for that dispute to be resolved by arbitration" [emphasis added]. This is putting forward the obverse of the proposition espoused by s 11 of the IAA which is that an arbitration agreement must be abided by unless it is contrary to public policy.

48    The question that immediately springs to mind is as to which public policy is referred to in s 11 of the IAA. It is our view that the public policy referred to in that section is not limited to the public policy of Singapore but extends to foreign public policy where this arises in connection with essential elements of an arbitration agreement. In s 11, the term "public policy" is not circumscribed or limited in any way and in its natural meaning may be read as referring to the public policy of any country; not only to that of Singapore. The lack of restriction in s 11 may be contrasted with s 31(4)(*b*) of the IAA which empowers the court to refuse to enforce a foreign award if it is contrary to the "public policy of Singapore". This is in line with Arts 34(2)(*b*)(ii) and 36(1)(*b*)(ii) of the Model Law which

authorise the Singapore courts to set aside an award made under the IAA or refuse to enforce it on the basis of "the public policy of *this* State" [emphasis added]. Obviously, "this State" in the context of the Model Law as the First Schedule to the IAA means Singapore. The drafters of the Model Law might have thought that public policy at the pre-award stage should be the same as that at the post-award stage, but they did not draft any article to that effect. Thus, the drafters of the IAA were not constrained in any way when they crafted s 11.

49    Bolstering our approach to the interpretation of "public policy" in s 11 is the whole purpose of the IAA. It was enacted to facilitate international commercial arbitration based on the principles embodied in the Model Law. Only "international" arbitrations, meaning arbitrations which have a substantial foreign element, are covered by the IAA. It was obviously well within the drafters' contemplation that many arbitrations that might subsequently be seated in Singapore would have no connection with this country apart from it having been chosen as the seat. In such situations, conceivably, the public policy of a foreign jurisdiction could impact the parties or the arbitration in some way. In choosing the language of s 11, the drafters could have ruled out that possibility, but they did not, and in our view, rightly so.

50    We do not consider that the interpretation we have given to public policy in s 11 is foreclosed by *Tomolugen* at [76]. While there the court was plainly referring to the Singapore Parliament and its policy, this was required by the issue the court was considering which was whether under Singapore law oppression claims were arbitrable. There was no need in that case to consider foreign public policy since the dispute involved a share sale agreement in respect of a Singapore limited company, the arbitration clause provided for arbitration in Singapore and there was no foreign law element involved. The court's discussion therefore proceeded entirely on the basis that only domestic law and domestic public policy were engaged.

51    This appeal presents an entirely different factual situation. The parties are mainly Indian (although the respondent is incorporated in Mauritius, its representative on the Board of the Company, Ms Mani, is Indian), the Company is an Indian company, their disputes arise under or in connection with a contract, the SHA, which contains an Indian choice of law clause, and there is an Indian law that provides that oppression disputes can only be decided by the NCLT. The only connection that Singapore has with the dispute and the parties is that any arbitration arising from the SHA is to be seated in Singapore. The appellant contends that the arbitration agreement is also governed by Indian law. The Judge did not decide the point; he thought it irrelevant to the issue of arbitrability. With respect, we do not agree.

52    Reading s 11(1) of the IAA as we do, what it means is that if it is contrary to local or relevant foreign public policy to determine a dispute

SINGAPORE LAW REPORTS          [2023] 1 SLR

arising under an arbitration agreement by arbitration, that dispute cannot proceed to arbitration in Singapore. In the case of a foreign arbitration agreement that would be the result even if Singapore law might hold the dispute in question to be capable of resolution by arbitration. In this connection, by "foreign arbitration agreement", we mean an arbitration agreement that is indisputably governed by foreign law even if one of the parties is Singaporean or the transaction has some other connection with Singapore. In almost all cases for an arbitration agreement to be indisputably governed by foreign law, that law would have been expressly chosen by the parties as its governing law albeit they would also have provided for Singapore to be the seat of the arbitration.

53     An arbitration agreement derives its authority from the consensus of the parties. Therefore, it is in our view unarguable that the arbitration agreement together with the law that governs it must determine exactly what the parties have agreed to arbitrate. The arbitration agreement is the fount of the tribunal's jurisdiction. The law of the seat deals with matters of procedure but the law of the arbitration agreement deals with matters of the validity of the agreement and is, in that sense, anterior to the actual conduct of the arbitration. If in an arbitration agreement the parties agree to arbitrate a range of questions that includes, for example, the question of custody of a minor, and they also agree that the arbitration agreement is governed by a law under which custody would not be arbitrable, surely the question of custody simply cannot be arbitrated regardless of what the seat law or any other law provides. This is because the agreement from which the jurisdiction of the arbitrators is derived is governed by a law that provides that those parties cannot arbitrate the question of custody. Consequently, the tribunal would not have jurisdiction to decide a custody dispute. And the Singapore court must recognise this want of jurisdiction and give effect to it.

54     To put it another way, if by the express choice of a governing law of the arbitration agreement, the parties have made part of or all their disputes non-arbitrable, there can be no question of an arbitration coming into effect to deal with the non-arbitrable part of the dispute. And it is only when an arbitration agreement does come into effect that the law of the seat kicks in. This does not mean that the law of the seat is irrelevant to the arbitrability issue. On the contrary, if the arbitration concerns an issue that happens to be non-arbitrable by the law of the seat, that would be an *additional* obstacle by reason of Art 34(2)(*b*)(i) of the Model Law. That article, as noted earlier, authorises the seat court to set aside an award in such circumstances. Likewise, in respect of the law of the place of enforcement, by virtue of s 31(4)(*a*) of the IAA, if the subject matter of the dispute is not arbitrable by Singapore law, then the foreign award may not be enforced here. Since enforcement may be sought in a court other than the seat court, it stands to reason that there is no basis at all for thinking

that the question of arbitrability is to be governed solely by the law of the
seat.

55    Accordingly, it is our view that the arbitrability of a dispute is, in the
first instance, determined by the law that governs the arbitration
agreement. If it is a foreign governing law and that law provides that the
subject matter of the dispute cannot be arbitrated, the Singapore court will
not allow the arbitration to proceed because it would be contrary to public
policy, albeit foreign public policy, to enforce such an arbitration
agreement. Further, because of the operation of s 11, where a dispute may
be arbitrable under the law of the arbitration agreement but Singapore law
as the law of the seat considers that dispute to be non-arbitrable, the
arbitration would not be able to proceed. In both cases, it would be contrary
to public policy to permit such an arbitration to take place. Prof Chan refers
to this as the "composite" approach.

56    The Judge considered at [48] of the Judgment ([24] *supra*), that
applying the law of the seat would avoid potential anomalies that would
otherwise arise from applying the proper law of the arbitration agreement
to the question of pre-award subject matter arbitrability. He gave two
examples. In both examples, he assumed that the arbitration agreement
provided for arbitration in Singapore but that it was governed by a foreign
law and that the dispute in question was not arbitrable under Singapore law
but could be arbitrated under the foreign law of the arbitration agreement.

57    In the first example, at [50] of the Judgment, party A commences
court proceedings in Singapore against party B and party B then applies
under s 6 of the IAA for a stay of the court proceedings in favour of
arbitration. The Singapore court finds, applying the foreign proper law of
the arbitration agreement, that the dispute is arbitrable and orders a stay of
the court proceedings. The arbitration then starts and proceeds to an award
against party A. After the award is rendered, party A, who had opposed the
stay application unsuccessfully, applies to the Singapore court to set aside
the award under Art 34(2)(*b*)(i) of the Model Law. Party A succeeds
because the court has then to apply Singapore law on arbitrability.

58    In the second example, given at [51] of the Judgment, party A
commences arbitration in Singapore and party B challenges the jurisdiction
of the tribunal on the basis that the subject matter of the tribunal is not
arbitrable. The tribunal, applying the proper law of the arbitration
agreement, decides it has jurisdiction. Party B then applies to the High
Court under s 10(3) of the IAA for the court to consider the matter and the
court agrees with the tribunal. The arbitration continues and an award is
rendered against party B who applies to set it aside under Art 34(2)(*b*)(i).
The same court would then have to apply Singapore law as the law of the
seat and set aside the award on the basis that the subject matter was not
arbitrable under Singapore law.

SINGAPORE LAW REPORTS [2023] 1 SLR

59    The Judge commented that it would be illogical for the same court to come to two different conclusions on subject matter arbitrability of the dispute in question merely because the argument or challenge is raised at different stages in the process, *ie*, pre-award *versus* post-award. We accept that such anomalous results would arise in a situation when one law is applied at one stage and another at the next. However, the conclusion that we have come to avoids these anomalous results because it means that at the pre-award stage, whenever the subject matter of the dispute is not arbitrable either under the proper law of the arbitration agreement or under Singapore law, the arbitration would not be able to proceed in Singapore (or anywhere else for that matter) and thus the outcome that the Judge finds objectionable would never arise.

60    In relation to the "composite approach", Prof Chan considers that this approach "combines the disadvantages of both approaches [*ie*, of the *lex fori* and the proper law], without offering any clear benefit" and was "unnecessarily restrictive and not in line with the general tendency to favour arbitration". We do not accept this criticism – whilst it is public policy in Singapore to encourage arbitration, such encouragement cannot override principles of comity or insist on the application of Singapore law to a substantive matter involving a foreign system of law expressly chosen by the parties. The solution to problems that may arise due to differences in subject matter arbitrability between the proper law and the law of the seat lies in the hands of the parties themselves and their legal advisors. There is no reason why during the contract negotiation process, they should not be able to investigate possible differences in public policy between the two systems and craft an arbitration agreement which in its choices of proper law and seat would prevent such difficulties from frustrating the parties' desire to settle disputes by arbitration.

61    It is common ground that under Singapore law disputes involving claims of corporate oppression can be arbitrated while under Indian law they can only be resolved by the NCLT. Accordingly, we now turn to the issue of whether Indian law is the proper law of the arbitration agreement and thus to be given primacy.

### What is the proper law of the arbitration agreement?

62    The three-stage test to determine the proper law of an arbitration agreement was laid down in *BCY v BCZ* [2017] 3 SLR 357 ("*BCY*") and involves considering at:

(a)    Stage 1: Whether parties expressly chose the proper law of the arbitration agreement.

(b)    Stage 2: In the absence of an express choice, whether parties made an implied choice of the proper law to govern the arbitration

agreement, with the starting point for determining the implied choice of law being the law of the contract.

(c)    Stage 3: If neither an express choice nor an implied choice can be discerned, which is the system of law with which the arbitration agreement has its closest and most real connection.

63    Applying the test here, the initial inquiry is whether the parties expressly chose the proper law of the arbitration agreement. This involves a consideration of cl 20 of the SHA. This is a fairly long clause but at this point the first two sub-clauses are most directly relevant. These are: cl 20.1 dealing with the governing law of the main contract and cl 20.2 containing the arbitration agreement. For convenience, we repeat the full wording of these clauses below:

> 20.    **GOVERNING LAW AND ARBITRATION**
>
> 20.1    *This Agreement and its performance shall be governed by and construed in all respects in accordance with the laws of the Republic of India.* In the event of a dispute relating to the management of the Company or relating to any of the matters set out in this Agreement, parties to the dispute shall each appoint one nominee/representative who shall discuss in good faith to resolve the difference. In case the difference is not settled within 30 calendar days, it shall be referred to arbitration in accordance with Clause 20.2 below.
>
> 20.2    *All such disputes that have not been satisfactorily resolved under Clause 20.1 above shall be referred to arbitration* before a sole arbitrator to be jointly appointed by the Parties. In the event the Parties are unable to agree on a sole arbitrator, one of the arbitrators shall be appointed jointly by the Founders and the second arbitrator will be appointed by [the plaintiff] and the third arbitrator will be appointed by the other two arbitrators jointly. The arbitration proceedings shall be carried out in accordance with the rules laid down by International Chambers of Commerce and *the place of arbitration shall be Singapore.* The arbitration proceedings shall be conducted in the English language. The parties shall equally share the costs of the arbitrator's fees, but shall bear the costs of their own legal counsel engaged for the purposes of the arbitration.
>
> [emphasis in original omitted; emphasis added in italics]

64    The appellant contends that the express wording of cl 20.1 not only makes it clear that the SHA is to be "governed by and construed in all respects in accordance with the laws of the Republic of India", but that these words ought to be construed to mean that the arbitration agreement in cl 20.2 is to be governed by Indian law as well. The fact that Indian law is the law of the arbitration agreement, he argues, is even more apparent because the governing law clause and arbitration agreement clause make express reference to each other and are intended to be read together.

65    The respondent contends that contrary to the appellant's case, there is no express choice of any law in the arbitration agreement. The fact that the SHA itself was to be governed by the laws of India is insufficient to make

Indian law the law of the arbitration agreement. This argument is based on the holding of this court in *BNA v BNB and another* [2020] 1 SLR 456 ("*BNA*") that specifying that the contract shall be governed by a particular law is "insufficient to constitute an express choice of the proper law of the arbitration agreement" (at [59]).

66    We agree with the respondent, applying *BNA*, that the language of cl 20.1 does not constitute an express choice of law for the arbitration agreement. The reference in cl 20.1 to Indian law being "in all respects" the governing law of "[the SHA] and its performance" is not to be construed as expressly choosing the law to govern the arbitration agreement as well even if that agreement is contained within the main contract. An express choice of law for an arbitration agreement would only be found where there is explicit language stating so in no uncertain terms.

67    We next consider whether the choice of Indian law to govern the SHA makes Indian law the implied choice of law to govern the arbitration agreement. As a general rule, a choice of law for the main contract will lead a court to hold that the same law also applies to govern the arbitration agreement. The leading authority in this regard is *Sulamérica Cia Nacional de Seguros SA and others v Enesa Engelharia SA and others* [2013] 1 WLR 102 ("*Sulamérica*"), where the English Court of Appeal considered the authorities and observed in relation to the determination of an implied choice of law to govern an arbitration agreement at [26] that:

> … [W]here the arbitration agreement forms part of a substantive contract an express choice of proper law to govern that contract is an important factor to be taken into account. … The concept of separability itself, however, simply reflects the parties' presumed intention that the agreed procedure for resolving disputes should remain effective in circumstances that would render the substantive contract ineffective. Its purpose is to give legal effect to that intention, not to insulate the arbitration agreement from the substantive contract for all purposes. *In the absence of any indication to the contrary, an express choice of law governing the substantive contract is a strong indication of the parties' intention in relation to the agreement to arbitrate.* A search for an implied choice of proper law to govern the arbitration agreement is therefore likely (as the dicta in the earlier cases indicate) to lead to the conclusion that the parties intended the arbitration agreement to be governed by the same system of law as a substantive contract, *unless there are other factors present which point to a different conclusion.* These may include the terms of the arbitration agreement itself or the *consequences for its effectiveness* of choosing the proper law of the substantive contract … [emphasis added]

68    The principle enunciated in *Sulamérica* thus was that although where an arbitration agreement is part of the main contract, the governing law of the main contract is a strong indicator of the governing law of the arbitration agreement when the court is seeking to imply the governing law, this indication may be displaced by the facts of the case, in particular the

terms of the arbitration agreement itself or how its effectiveness will be impacted by the choice of the same governing law for the arbitration agreement. In *Sulamérica* itself, the main contract was governed by Brazilian law but the arbitration clause provided for arbitration in London. Under Brazilian law, the arbitration agreement could be enforceable only with the consent of one of the parties and this meant that although parties had at the contractual stage agreed to arbitrate, subsequently one party could refuse to consent. This ability to opt out was likely to render the arbitration clause ineffective. On this basis, the court held that therefore the parties could not have made an implied choice of Brazilian law to govern the arbitration agreement. Instead, the law governing the arbitration agreement had to be determined by considering which system of law had the most close and real connection with the arbitration agreement. In that case, this was found to be English law, the law of the seat.

69     *Sulamérica* was considered by the High Court in *BCY* ([62] *supra*). Steven Chong J, as he then was, adopted the principle in *Sulamérica* that the governing law of the main contract is a strong indicator of the governing law of the arbitration agreement unless there are clear indications to the contrary. The choice of a seat different from the law of the governing contract would not in itself be sufficient to displace that starting point. The court observed that the governing law of the main contract "should only be displaced if the consequences of choosing it as the governing law of the arbitration agreement would *negate* the arbitration agreement even though the parties have themselves evinced a clear intention to be bound to arbitrate their disputes" (at [65] and [74]).

70     On that basis here, at the second stage, Indian law would be found to be the proper law of the arbitration agreement unless there is something in the circumstances that negates that implied choice. The respondent argues that the presumption that Indian law applies ought to be rebutted as applying it would frustrate the parties' intention to arbitrate their disputes relating to the management of the Company since, on the appellant's case, minority oppression disputes are non-arbitrable in India. The respondent points out that cl 20.1 specifically refers to disputes "relating to the management of the Company" and brings these within the ambit of the arbitration agreement as opposed to limiting its application to matters arising out of and/or in connection with the SHA. This, the respondent says, is significant as it manifests the parties' intention that management disputes are to be settled by arbitration, in addition to other matters set out in the SHA. This displaces the indicator that parties had made an implied choice for Indian law to be the law of the arbitration agreement.

71     Before we consider that argument, we need to say something about *BNA*. In that case, the main contract was governed by the law of the People's Republic of China ("PRC") and the seat of the arbitration was Singapore. Under PRC law, the arbitration agreement was invalid, but it

was valid according to Singapore law. The respondent in the case argued that PRC law could not be the governing law of the arbitration agreement because parties could not have chosen to invalidate the arbitration agreement at the same time as they expressed a manifest intention to arbitrate. The respondent urged the court to consider the PRC law position as part of the contextual interpretation of the arbitration clause. This argument was, however, rejected by the court on the basis that the respondent had not shown that the parties were, at the very least, aware that the choice of proper law of the arbitration agreement could have an impact upon the validity of the arbitration agreement. So, the differing effects of the two systems of law were not in themselves sufficient to displace the implied choice of PRC law as the proper law of the arbitration agreement in *BNA*.

72    In our view, the present case can be distinguished from *BNA* because the facts here demonstrate, much more strongly, the parties' desire for all disputes to be resolved by arbitration. First, the agreement was made in India among shareholders of an Indian company. In the general course, disputes among shareholders of a company are decided within the jurisdiction of the company's country of incorporation and, usually, in court. These shareholders specifically crafted a provision for all disputes concerning the agreement and its performance, including as to management of the Company, to be dealt with in arbitration. It is impossible to contend that as shareholders they were not aware that disputes arising under the SHA and also in connection with the management of the Company would give rise to questions of *Indian* company law that would generally fall to be determined by the *Indian courts* (at the time of the agreement). Yet, not only did they choose to arbitrate but they also chose to arbitrate under Singapore law in Singapore and according to the rules of the ICC, thereby choosing a seat and an arbitral body the common feature of which was that neither had any connection with India. In this regard, it should not be overlooked that the respondent although a shareholder of an Indian company, is itself a foreign entity, a private equity fund incorporated under the laws of Mauritius. It is certainly not fortuitous that cl 20.1 was deliberately drafted to encompass disputes "relating to the management of the Company". Singapore was likely chosen as an Asian arbitration-friendly jurisdiction where an ICC arbitration could be held. These were obviously choices made after some amount of thought. Secondly, it is material in this regard that the parties paid some amount of attention to the mechanics of the arbitration. This is shown by cll 20.3, 20.4, 20.5 and 20.6 of the SHA which provide as follows:

> 20.3    The award of the arbitral tribunal shall be final and conclusive and binding upon the Parties, and the Parties shall be entitled (but not subject) to enter judgement thereon in any Court of competent jurisdiction. The Parties agree that such enforcement shall be subject to the provisions of the Indian Arbitration and Conciliation Act, 1996 and neither Party shall seek to resist

the enforcement of any award in India or elsewhere on the basis that award is not subject to such provisions. The award rendered shall apportion the costs of the arbitration.

20.4   The Parties agree that the relevant courts of competent jurisdiction shall have the jurisdiction to entertain any proceedings for interim relief related to this Agreement whether during pendency, or after expiry or termination.

20.5   The Parties further agree that the arbitrators shall also have the power to decide on the costs and reasonable expenses (including reasonable fees of its counsel) incurred in the arbitration and award interest up to the date of the payment of the award.

20.6   When any dispute is referred to arbitration, except for the matters under dispute, the Parties shall continue to exercise their remaining respective rights and fulfil their remaining respective obligations under this Agreement.

73    Thus, the intention of the parties was that their disputes should be settled by arbitration with the courts (whether Indian or Singaporean) playing, basically, a supporting role by granting interim relief, and enforcing any award in terms issued by the tribunal. This intention is not consistent with an implied choice of Indian law as the proper law of the arbitration agreement as such choice would negate the agreement since oppression claims (which are often intertwined with management disputes) are not arbitrable in India.

74    We are satisfied that in this case there are sufficient indications to negate the implication that Indian law was intended to govern the arbitration agreement in the SHA as that implication would mean frustrating the parties' intention to arbitrate all their disputes. We would note in this connection Singapore's strong public policy in favour of arbitration as shown by the incorporation of the Model Law as part of Singapore law and its accession, ratification and adoption of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards *vide* the incorporation of the same as the Second Schedule of the Model Law. The courts must give effect to that public policy by upholding arbitration agreements and the obligation to arbitrate thereunder unless there is good reason not to do so.

75    Accordingly, we proceed to the third stage of the governing law inquiry. This is to determine which law has the most real and substantial connection with the arbitration agreement in the SHA. This is a straightforward exercise. Under cl 20.2, the arbitration is to take place in Singapore. As the law of the seat of the arbitration, Singapore law will govern the procedure of the arbitration including challenges to the tribunal or its jurisdiction and the award when the same is eventually issued. Accordingly, Singapore law is the law of the arbitration agreement.

*What is the nature of the disputes in the NCLT petition?*

76    Having concluded that the arbitration agreement is governed by
Singapore law, we now need to consider whether the commencement of the
NCLT Proceedings by the appellant was in breach of that agreement. This
question must be approached by considering whether the claims in the
NCLT Proceedings would fall within the ambit of the arbitration
agreement. In this regard, the disputes that must be submitted to
arbitration are, *per* cl 20.1, those "relating to the management of the
Company or relating to any of the matters set out in [the SHA]". There are
therefore, two categories of disputes that must be submitted to arbitration.
The first comprises disputes relating to the management of the Company
and the second comprises disputes relating to the provisions and
interpretation of the SHA. It should be noted that in deciding whether any
particular dispute falls within one category or the other or neither, this term
in the arbitration agreement would be interpreted in accordance with
Singapore law as the governing law of the arbitration agreement. There was
a suggestion that the appellant's complaints of mismanagement of the
Company would not relate to the "management" thereof as the term was
used in cl 20.1. We reject that submission. A complaint that alleges
mismanagement is, logically, a complaint that the management of the
Company is being mishandled and must therefore lead to a dispute about
how the Company is being managed.

77    The petition filed in the NCLT Proceedings contains six main
complaints/claims by the appellant and we will examine these in turn.

78    The first complaint relates to the appellant's assertion that his
continuation in the post of executive director of the Company is valid. He
complains that a malicious and illegal attempt is being made to oust him
from that executive role. The background to this complaint is that the
appellant managed the Company as its managing director for some
15 years. Then, on 28 November 2019, he was appointed executive director
by a Board resolution approved by Ms Mani, but the respondent alleged on
25 May 2020 that this appointment was invalid notwithstanding its
nominee's approval.

79    The appellant has two bases for his contention that he should remain
as executive director. The first is that the shareholders had an
understanding that he would manage and control the Company's
operations and that this understanding is reflected in the SHA. Further,
Ms Mani had consented to his appointment within the terms of the SHA
and the respondent had acquiesced in that appointment. Secondly, he
contends that he had a legitimate expectation of retaining an executive
position and that this expectation went "beyond the provisions of the
SHA". On the appellant's contentions alone, his first claim can be regarded
broadly as a management dispute (arising from the SHA) albeit he is using
arguments relating to oppression as additional justification for his claim

and that his contentions if proved could contribute to a finding of oppression.

80    The second claim relates to the respondent's attempts to appoint AM as the managing director of the Company and its alleged refusal to adopt a method which will ensure that a suitable independent non-partisan and impartial candidate can be appointed as the new managing director. The appellant alleges that AM is unfit to lead the Company and that his proposed appointment is part of the respondent's plan to prejudice the appellant. In relation to this complaint, the appellant is seeking an order directing the respondent, Ms Mani, AM and NM to initiate a process for identifying and appointing a suitable candidate as managing director and an interim injunction against the appointment of AM as managing director.

81    Looked at from one perspective, this complaint could be an issue of what is in the best interests of the Company, and it might turn on commercial considerations that lie beyond the scope of the SHA. Under cl 17.1.15 of the SHA, the respondent is given the right to consent to the appointment of members of the key management team. The appellant's point in the NCLT Proceedings is that the respondent is misusing this right and wants to appoint AM as managing director to facilitate its plan to sell the Company to a Significant Competitor.

82    It could be said that the substance of the appellant's complaint is that the majority shareholders are conducting the Company's affairs with a lack of probity and fair dealing and in order to install themselves in positions of power. This would be a typical case of oppression. The respondent submits in response, however, that this issue can equally be seen as a question of how the Company should be managed and the extent of the respondent's power under the terms of the SHA to control such management. We agree with the respondent. As explained earlier, the arbitration agreement is not limited to contractual disputes arising out of the terms of the SHA. It also encompasses "dispute[s] relating to … management" and this phrase is important in indicating a particular category of disputes that are to go to arbitration. In this connection, if a dispute relates to management, it will have to be arbitrated notwithstanding that it may not be of a contractual nature. We therefore agree with the respondent that the second complaint is subject to the arbitration agreement.

83    The third matter of which the appellant complains in the NCLT Proceedings is the attempts which AM and the respondent have allegedly made to bring NM back on to the Board of the Company as a "Founder Nominee Director" under the terms of the SHA.

84    The context for this complaint is that before 2014, NM was a "Founder" as defined in the SHA and the shares that he held were called "Founder Shares". The SHA confers certain benefits on a holder of Founder Shares including the right to appoint and remove four directors on the

Board (cl 16.2 SHA). In 2014, NM transferred all his shares to the respondent and resigned from the Company. In 2021, AM, who is also a Founder, transferred 1,000 of his shares to NM. In the NCLT Proceedings, the appellant's complaint is that according to the terms of the SHA, NM cannot claim the benefit of holding Founder Shares even though he has received them from AM. The appellant further alleges that the fact that Ms Mani, AM and NM are calling for NM to be reinstated as a "Founder Director" shows that they are colluding with the objective of driving the sale of the Company to a Significant Competitor. In the NCLT Proceedings, the appellant is seeking a declaration that NM is not entitled to the benefits/rights attached to the Founder Shares and an interim injunction preventing the other shareholders from appointing him a Founder Director.

85    The respondent contends that whether NM can hold the position of Founder Director by virtue of AM's transfer of 1,000 shares to him is a matter of contractual interpretation.

86    In our view, the dispute relating to NM's position as a shareholder, *ie*, whether he is now an ordinary shareholder or a Founder Director and the dispute over whether the 1,000 shares he received from AM retain their character as Founder Shares under cl 1.1(xx) of the SHA, is a dispute over matters set out in the SHA. The preamble of the SHA states that the "Founders" are the appellant, AM and NM. The adjudicator of this dispute, whether it be the arbitral tribunal or the NCLT, will have to decide in terms of the SHA what the effect of NM's original disposal of his Founder Shares was on his status and whether that status runs with the shares. There is also the question as to whether under cl 16.2 of the SHA the appellant is entitled to veto the re-appointment of NM as a Founder Nominee Director. Although the appellant alleges that this complaint is evidence of oppression because NM is being brought in to weaken his control of the Board and indeed that may also be so, such allegation cannot change the character of the dispute over NM's rights as a shareholder as falling within the category of disputes described as "any of the matters set out in this Agreement".

87    The fourth complaint made by the appellant in the NCLT Proceedings is regarding efforts by the respondent, AM and NM to alter the strength and composition of the Board of the Company. On 24 February 2021, these three shareholders requisitioned an extraordinary general meeting ("EGM") of the Company to appoint one Mr Vikas Nanda ("Mr Nanda") as the respondent's nominee on the Board, NM as a Founder Nominee Director, AM as managing director and one other person as a director. The appellant submits that these intended appointments show that the respondent wants to make him a "complete minority" on the Board and that "in a quasi-partnership" any such changes to the composition to the Board by appointing new/additional directors from one group only are acts of oppression.

88    The respondent argues that its appointment of Mr Nanda is merely an exercise of its contractual rights under cl 16.3 of the SHA to appoint two directors of the Board. It also points out that it has a right under the SHA to veto any change in the size or composition of the Board.

89    In our view, this complaint relates to the management of the Company. We agree with the appellant that it is not simply a matter of the exercise of contractual rights but could turn out to be an instance of oppression in that the respondent in pushing for a slew of appointments in the directorship of the Company is trying to isolate the appellant on the Board. It is relevant in this connection that the appellant has a further complaint in that he gave a notice putting forward his nominee, one Mr Khan, as a Founder Nominee Director and this notice was ignored by the other parties. He also alleges that he is being excluded from the chain of command and his legitimate expectations of management participation are being violated.

90    In our view, the fact that these complaints may result in a finding of oppression do not take them out of the arbitration agreement. They can be submitted to and determined by the tribunal as under Singapore law claims of oppression are arbitrable. What is important for present purposes is that all these claims can be classified as disputes "relating to management of the Company" and thus are encompassed by the arbitration agreement.

91    The fifth complaint asserts that the respondent's attempts to sell the Company to Info Edge are blatant violations of the SHA and constitute gross mismanagement of the Company. The appellant's position is that under the SHA, the sale of the Company to Info Edge cannot take place without his consent as Info Edge is a Significant Competitor within the meaning of that term as defined in cl 1.1(xxxiv) of the SHA. This is because under cl 8.1 the respondent is not allowed to sell its shares to any Significant Competitor "except with the written prior consent of the Founders". The appellant also accuses the respondent and Info Edge of acting in concert to further their "ulterior motives". The appellant is seeking an injunction prohibiting the respondent, AM and NM, from transferring their shares to Info Edge or any other Significant Competitor.

92    The respondent submits that whether the SHA precludes the sale of shares to Info Edge is a contractual dispute over the operation of cl 3.4 of the SHA and the extent of the respondent's exit rights. It claims that cl 3.4(ii) expressly permits the sale of shares to a Significant Competitor.

93    It is clear to us that this complaint arises under the SHA and is therefore covered by the arbitration agreement. It seems that the main issue regarding whether the sale to Info Edge should be enjoined is whether the appellant's right under cl 8.1 of the SHA to veto a sale of shares to a Significant Competitor *qualifies* the respondent's exit rights under cl 3.4(ii) of the SHA. Clause 3.4(ii) expressly allows the respondent to sell its shares

to "any independent third party" and this right is only available if the Company is unable to redeem the respondent's shares under cl 3.4(i) within the specified time frame. An additional contractual issue is whether the fact that the respondent has invested in Info Edge renders the latter a non-independent third party, such that a sale to Info Edge is not permitted under cl 3.4(ii) of the SHA. If either of these questions is resolved in the appellant's favour, there may be a strong case for enjoining the sale to Info Edge. These observations are based on the information available to us at this time and are not intended to be binding on any tribunal that may be subsequently appointed.

94    The appellant's final complaint in the NCLT Proceedings concerns, mainly but not only, alleged multiple breaches of fiduciary duties by Ms Mani and AM. In this connection the appellant alleges in the NCLT Proceedings that:

(a)    Ms Mani and AM continuously arranged for Info Edge to have access to sensitive and confidential information of the Company.

(b)    Ms Mani refused at the Board meeting on 10 June 2020 to consent to the annual operating plan of the Company on the basis that, under the SHA, the Company could not approve certain financial matters without having received the prior consent of the respondent.

(c)    The respondent has not initiated a process to select a suitable candidate for the post of managing director despite the appellant's insistence that this be done.

(d)    A recommendation made in June 2019 by AM and supported by Ms Mani was that the management team should seek the Board's consent for any expenditure beyond one crore rupees but in the appellant's view this would severely hamper the operations of the Company as its average monthly expenditure is 17 crore rupees.

(e)    Ms Mani has not confirmed certain Board minutes and in the appellant's submission this has put the Company in breach of regulatory requirements under Indian company law.

(f)    Ms Mani has been attempting to intimidate senior employees of the Company to extract information from which allegations against the appellant may be made.

(g)    Ms Mani has made baseless but serious allegations against the appellant, including allegations of financial impropriety.

(h)    AM and the respondent are colluding to influence the valuation of the respondent's shares by insisting that a non-binding "Expression of Interest" provided by Info Edge be taken into account by the valuation firms appointed by the Company.

(i)    The respondent is trying to delay the valuation and buy-back process including stalling the audit of the Company with the motive of rendering the Company unable to fulfil its buy-back obligation under cl 3.4(i) of the SHA within six months as specified in that clause.

95    It can be seen from the list above that many of the allegations of breach of duty have arisen in the context of the management of the Company. Others clearly relate to the SHA. Among these is the last complaint listed above which involves actions by the respondent which could be viewed as an attempt to manipulate the SHA for the respondent's benefit since if the Company fails to redeem the respondent's shares within the stipulated period, the respondent can exercise its drag along rights under cl 3.4(ii) of the SHA and force the appellant to sell his own shares in the Company. There are some complaints which do not involve management or the SHA, for example, Ms Mani's alleged attempts to intimidate senior employees of the Company and the allegation she has made about the appellant's alleged financial impropriety. In the main, however, the sixth complaint substantially rests on allegations of mismanagement and contractual misbehaviour. These are covered by the arbitration agreement.

96    From the analysis above, practically all the complaints made by the appellant in the NCLT Proceedings can be said to relate either to the management of the Company or to the SHA in some way. Proof of these complaints to the satisfaction of the adjudicator may justify a finding that the respondent and/or AM and/or Ms Mani have acted unfairly towards the appellant or managed the Company in such a manner as amounts to oppression. But the simple fact that all these allegations might eventually support a finding of oppression cannot take them out of the categories of disputes that the SHA expressly provides should be submitted to arbitration. Accordingly, we agree with the Judge that the institution of the NCLT Proceedings was a breach of the arbitration agreement. On that basis, there is no ground on which to discharge the anti-suit injunction granted by the Judge.

97    We should make it clear that nothing that we have said here in regard to the complaints made by the appellant in the NCLT Proceedings should be regarded as endorsing the respondent's submission that all the complaints are contractual in nature and do not come within the jurisdiction of the NCLT. Our analysis was directed at determining whether the disputes fall within the ambit of the arbitration agreement.

98    This brings us to the last issue which is whether despite the breach of the arbitration agreement these proceedings in Singapore should be stayed on case management grounds so that the appellant is not enjoined from continuing with the Bombay suit and obtaining an Indian court's

determination on whether the appellant's claims have been correctly submitted to the NCLT.

### Should these proceedings be stayed?

99    This court has case management powers under s 49(2) of the Supreme Court of Judicature Act 1969 (2020 Rev Ed) ("SCJA") read with s 18(2) and para 9 of the First Schedule to the SCJA to stay these proceedings until the concurrent proceedings in the Bombay High Court and the NCLT have been concluded. This would be a limited stay and the main reason for it would be to avoid conflicting decisions. In this regard, para 9 of the First Schedule of the SCJA confers on the court the power to stay proceedings "where by reason of multiplicity of proceedings in any court or courts … the proceedings ought not to be continued".

100    The grant of a limited stay pursuant to the SCJA is a discretionary exercise of the court's case management powers. In exercising these powers, the court is entitled to consider all the circumstances of the case. The underlying concern is the need to ensure the efficient and fair resolution of the dispute as a whole: see *BNP Paribas Wealth Management v Jacob Agam and another* [2017] 3 SLR 27 ("*BNP*").

101    *BNP* at [34] sets out a list of non-exhaustive factors to be considered in determining whether to grant the limited stay. These are:

(a)    which proceeding was commenced first;

(b)    whether the termination of one proceeding is likely to have a material effect on the other;

(c)    the public interest;

(d)    the undesirability of two courts competing to see which of them determines common facts first;

(e)    consideration of circumstances relating to witnesses;

(f)    whether work done on pleadings, particulars, discovery, interrogatories and preparation might be wasted;

(g)    the undesirability of substantial waste of time and effort if it becomes a common practice to bring actions in two courts involving substantially the same issues;

(h)    how far advanced the proceedings are in each court;

(i)    the law should strive against permitting multiplicity of proceedings in relation to similar issues; and

(j)    generally balancing the advantages and disadvantages to each party.

102    The court must also aim to strike a balance between three higher order concerns that may pull in different directions: first, a plaintiff's right to choose whom he wants to sue and where; second, the court's desire to prevent a plaintiff from circumventing the operation of an arbitration

clause; and third, the court's inherent power to manage its processes to prevent an abuse of process and ensure the efficient and fair resolution of disputes. The balance that is struck must ultimately serve the ends of justice: *Tomolugen* ([46] *supra*) at [188].

103    The appellant submits that factors (a), (d), (g), (i) and (j) (*per* [101] above) favour granting the limited stay (but no elaboration is offered). The respondent opposes a limited stay because: (a) the Bombay suit was commenced in direct contravention of a valid arbitration agreement between the parties and the appellant should not be permitted to circumvent the arbitration agreement; (b) the Bombay suit was not commenced *bona fide*; (c) Singapore is the only appropriate forum to hear the dispute as it has supervisory jurisdiction over the prospective arbitration and enforcement of the arbitration agreement; (d) the Bombay suit will likely be pending for ten to 12 years; and (e) if a limited stay were granted, parties seeking to circumvent arbitration agreements in the future could commence proceedings in other jurisdictions to hinder the enforcement of arbitration agreements.

104    We raised the issue of a limited stay with the parties in the first instance as we were concerned about the consequences of compelling the appellant to arbitrate his disputes with the respondent, AM and NM. The appellant has submitted that even if he succeeds in the arbitration, the award in his favour will not be enforceable in India. In this regard the Arbitration and Conciliation Act 1996 (No 26 of 1996) of India provides by s 48(2) as follows:

> **48.    Conditions for enforcement of foreign awards.**
>
> …
>
> (2)    Enforcement of an arbitral award **may** also be refused if the Court finds that —
>
> > (*a*)    the subject-matter of the difference is **not capable of settlement by arbitration** under the law of India; or
> >
> > (*b*)    the enforcement of the award would be contrary to the public policy of India.
>
> [emphasis added in bold italics]

105    The respondent is aware of the possibility that an award may not be enforceable in India, but that possibility has not affected its desire for the disputes to be arbitrated in Singapore as *per* the arbitration agreement. Additionally, it submits that the grounds for non-enforcement of foreign arbitral awards are discretionary. It relies on the word "may" in s 48(2). However, the respondent did not address the decision of the Indian Supreme Court in *Vijay Karia and others v Prysmian Cavi E Sistemi SRL and others* [2020] SCC Online SC 177 which held that if the subject matter of the dispute is non-arbitrable under Indian law, Indian courts have no

discretion to enforce the award. The respondent offered no authority to contradict or distinguish the case. It would seem that the appellant has substantial basis on which to be concerned that if he succeeds in the arbitration ultimately the whole process would be a waste of effort as the Indian courts will not assist him in enforcing the award.

106   We are therefore in a situation in which two of the higher order concerns that we noted in [102] above are pulling in opposite directions. On the one hand, we have found that the arbitration agreement binds the appellant and, taking account of that finding alone, he should be prevented from circumventing that obligation. On the other hand, the court is always concerned to ensure the fair and efficient resolution of disputes and making the parties undergo an arbitration which may result in an award that cannot be enforced may not conduce to such a resolution here.

107   Having balanced these factors, we have concluded that the appellant should be held to his obligations under the arbitration agreement and no limited stay of these proceedings should be granted. We have two reasons for this. The first is that there does not appear to be a likelihood that the Bombay suit will be dealt with and resolved within the next year and we do not think that any limited stay that we impose should run for longer than 12 months. To recap, the Bombay suit was commenced on 18 March 2021 and shortly thereafter, on 21 March 2021, the appellant filed "Interim Application 1010" applying for temporary restraining orders against the respondent to stop him enforcing the anti-suit injunction or interfering with the NCLT Proceedings. A second interim application was filed by the appellant in October 2021. This one may now be moot as it related to Info Edge's offer to buy the respondent's shares in the Company, and that offer has now lapsed. Both applications, albeit filed in 2021, were fixed for hearing on 5 September 2022 but that hearing could not go on due to the non-availability of a judge. The applications have now been re-listed for hearing but, to our knowledge so far, no new hearing date has been given. This is an unsatisfactory position as there is no telling how long the stay would have to be in place before even a preliminary adjudication is made. And then more time may be taken for possible appeals and the final hearing. In this balancing exercise, we have to consider the position of the respondent as well as that of the appellant and it is highly undesirable for allegations of breach of the SHA and mismanagement (including oppression) to be hanging over the respondent's head for a lengthy period of time.

108   The second reason is that it is too speculative to conclude that it is fruitless to conduct an arbitration just because of the possibility that the award would not be enforceable in India. The process of the arbitration in itself could be beneficial to the parties in that it will compel them to collect and test their evidence and legal arguments and give them a strong indication of the strength of their respective cases. The determination of the

tribunal could give rise to *res judicata* and estoppel points that would assist the appellant (and the respondent, of course) if after the issue of the final award, court proceedings have to be taken in India or elsewhere to implement (if not directly enforce) the award or the findings of the tribunal. On balance, we have concluded that whatever may be the position on arbitrability of the disputes taken by the Indian courts, an arbitration of these disputes cannot be unequivocally held to be a fruitless endeavour and a waste of resources.

**Conclusion**

109   For the reasons given above, we dismiss the appeal and maintain the anti-suit injunction in the terms ordered by the Judge.

110   Having considered the parties' submissions on costs, we award the respondent costs in the sum of $100,000 all in. There will be the usual consequential orders.

111   We conclude by expressing our gratitude to Prof Chan for his learned submissions and detailed research which we found to be most helpful.

Reported by Jonathan Tan Ming En.

EXHIBIT 2

# Pertamina International Marketing & Distribution Pte Ltd
v
# P-H-O-E-N-I-X Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc) and another matter

## [2024] SGHC(I) 19

Singapore International Commercial Court — Originating Application No 1
of 2024 and Originating Application No 23 of 2023 (Summons No 21 of 2024)
Sir Henry Bernard Eder IJ
25 June 2024; 28 June 2024

*Arbitration — Agreement — Scope — Umbrella agreement in form of memorandum
of understanding providing that "any dispute arising out of or in connection with this
agreement" was to be referred to arbitration — Parties entered into discrete sale
contracts after signing of memorandum of understanding which did not provide for
dispute resolution clause — Whether dispute over amounts due and owing under sale
contracts fell within scope of arbitration agreement in umbrella agreement*

*Civil Procedure — Rules of court — Singapore International Commercial Court
("SICC") — Defendant submitting SICC lacks jurisdiction to grant permanent anti-
suit injunction because SICC could hear only proceedings under International
Arbitration Act 1994 (2020 Rev Ed) — Established principle that power of Singapore
courts to grant permanent anti-suit injunction was not derived from International
Arbitration Act 1994 (2020 Rev Ed) — Whether SICC had jurisdiction to grant
permanent anti-suit injunction*

## Facts

These proceedings concerned an arbitration brought under the auspices of the
Singapore International Arbitration Centre ("SIAC") in SIAC Case No ARB No
084 of 2022 ("ARB 84") and a Final Award signed and dated 28 November 2023
("Final Award") whereby it was determined that the defendant, P-H-O-E-N-I-X
Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc)
(Phoenix), and another third-party guarantor, Udenna Corporation
("Udenna"), were jointly and severally liable to the claimant, Pertamina
International Marketing & Distribution Pte Ltd ("PIMD"). The claims advanced
in the arbitration related to certain contracts formed by an exchange of e-mails
between PIMD and Phoenix for the supply of petroleum products during the
months May and June 2021.

Phoenix alleged that there was never any binding arbitration agreement between
the parties and that therefore the arbitral tribunal in ARB 84 (the "Tribunal")
had no jurisdiction to hear the disputes. At a very early stage of the arbitral
proceedings, Phoenix informed the tribunal of its jurisdictional objection and
thereafter took no part in the arbitral proceedings. Despite Phoenix's
jurisdictional objections, the Tribunal proceeded to hear the dispute without its
participation and subsequently made the Final Award. On 30 November 2023,
SIAC registered and issued the Final Award in PIMD's favour.

On 2 December 2023, Phoenix commenced proceedings in the Republic of the Philippines (the "Philippines Court") by filing a Complaint against PIMD and Udenna (the "Philippines Action") seeking a declaration that ARB 84 and the Final Award were void and the issuance of a permanent injunction enjoining PIMD and Udenna from enforcing or undertaking to enforce the Final Award against Phoenix. Phoenix also sought, as a matter of "extreme urgency", the issuance of a Temporary Restraining Order and Writ of Preliminary Injunction pending the determination of the Philippines Action enjoining PIMD and Udenna from enforcing or undertaking any step to enforce the Final Award against Phoenix.

On 12 December 2023, PIMD filed an originating application without notice in SIC/OA 23/2023 ("OA 23") to register and enforce the Final Award in Singapore which was granted by way of SIC/ORC 69/2023 dated 18 December 2023 ("ORC 69").

On 12 January 2024, PIMD filed SIC/OA 1/2024 ("OA 1") in this court against Phoenix for, among other things, orders that: (a) Phoenix withdraw the Philippines Action; (b) Phoenix be restrained from pursuing or continuing to pursue the Philippines Action so long as the Final Award is not set aside; and (c) Phoenix be restrained from pursuing or continuing to pursue any further and/or other proceedings of any nature in the Philippines or anywhere else in the world against PIMD, in relation to the setting aside of or challenge to the Final Award.

On the same day, PIMD also filed SIC/SUM 2/2024 ("SUM 2") in this court against Phoenix for an interim anti-suit injunction ("ASI"). SUM 2 was heard on 18 January 2024 by Sir Henry Bernard Eder IJ on an *ex parte* basis who granted an interim ASI by way of SIC/ORC 5/2024 ("ORC 5") with the proviso that nothing in the order prevented Phoenix from taking the necessary steps to resist any recognition or enforcement of the Final Award. Phoenix took no steps to suspend the Philippines Action.

On 13 May 2024, Phoenix filed SUM 21, requesting that ORC 69 be set aside.

**Held, dismissing SUM 21 and allowing OA 1:**

*SUM 21*

(1)    In relation to SUM 21, it was common ground that no application had ever been made by Phoenix to set aside the Final Award in Singapore in accordance with Art 34 of the UNCITRAL Model Law on International Commercial Arbitration as set out in First Schedule to the International Arbitration Act 1994 (2020 Rev Ed) ("Model Law" and "IAA" respectively) and the three-month time limit for doing so had expired. Thus, it was not open to Phoenix to seek recourse against the Final Award under Art 34 of the Model Law: at [15].

(2)    Notwithstanding that Phoenix was precluded from seeking recourse against the Final Award under Art 34 of the Model Law, it was open to it to invite the court to refuse enforcement of the award as a matter of the court's discretion pursuant to s 19 of the IAA based on the grounds set out in Art 36(1) of the Model Law. Relevantly, Art 36(1)(*a*)(iii) of the Model Law provides that

recognition or enforcement could be refused if there was "proof" that an award "deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration": at [16] to [19].

(3)    The court rejected PIMD's contention that the court's earlier judgment in *Pertamina International Marketing & Distribution Pte Ltd v P-H-O-E-N-I-X Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc)* [2024] SGHC(I) 13 ("Judgment") precluded Phoenix from asserting that the Final Award was not valid and binding on the basis of *res judicata* and/or estoppel. Nothing in the Judgment dealt with the question of whether there was a relevant arbitration agreement nor whether the court should grant or refuse recognition or enforcement of the Final Award: at [21].

(4)    The court concluded that the disputes under the individual contracts for the supply of petroleum products executed during the months of May and June 2021 under which PIMD alleged that Phoenix owed the sum of USD 124,534,382.23 ("Sale Contracts"), as a matter of contractual interpretation, fell within the scope of the arbitration agreement as found under cl 10.2 of the Memorandum of Understanding dated 20 November 2019 between Phoenix and PIMD ("MOU"): at [22] and [57].

(5)    The starting point of any contractual interpretation exercise was the words used in the contract itself. The weight of authority was clear that arbitration agreements should apply equally to disputes under related agreements, particularly where the related agreements did not contain different dispute resolution provisions. This accorded with the normal *Fiona Trust* presumption of one-stop adjudication set out in *Fiona Trust & Holding Corp v Privalov* [2007] Bus LR 1719: at [42] and [44].

(6)    The Sale Contracts arose out of or were connected with the MOU because they came into existence pursuant to the parties' implementation of the projects as defined in the MOU. There was nothing in the MOU which displaced this conclusion. It was contrary to common business sense that large commercial parties based in different jurisdictions would have entered into significant international trade contracts without agreeing on a suitable forum for the resolution of disputes. Moreover, again so far as might be relevant, it was noteworthy that the parties did not enter into a separate arbitration agreement (or other dispute resolution mechanism) following the crystallisation of the dispute. To the extent that Phoenix's post-contractual conduct was relevant, Udenna's internal documents showed Udenna's Mr Fadullon telling Phoenix's Mr Nagunta that he was "setting things up for arbitration" in relation to the Sale Contracts, which could only be a reference to arbitration under the MOU's arbitration agreement since the Sale Contracts did not contain any arbitration agreement: at [46] and [47].

(7)    While the court accepted that each Sale Contract was discrete in the sense that each contract related to a separate and distinct shipment involving a unique quantity of petroleum products and a unique price, they were all entered into as part of and pursuant to the "umbrella agreement" contained in the MOU. That the Sale Contracts did not refer to the MOU was not necessarily surprising and, in any event, did not assist with answering the critical question as to whether the disputes arose "out of or in connection with" the MOU: at [48] to [51].

(8)     That PIMD had drafted long-form SPAs containing arbitration clauses with each of the Sale Contracts did not demonstrate that the parties considered that the arbitration agreement in the MOU did not apply to the Sale Contracts. The reason why these draft SPAs were prepared many months after the Sale Contracts had been executed and the shipments delivered was difficult, if not impossible, to understand. In any event, this argument was double-edged because these draft long-form SPAs were never executed. The fact of the matter was that the Sale Contracts as concluded did not contain any arbitration agreement or other provision for dispute resolution. The omission of such provisions was potentially explicable on the basis that it was, on reflection, thought that the arbitration agreement in the MOU would apply to any disputes: at [54].

(9)     The court rejected Phoenix's submission that the arbitration agreement under cl 10.2 of the MOU had expired and ceased to bind PIMD and Phoenix by the time PIMD commenced ARB 84. A dispute resolution clause generally survived the substantive contract so as to resolve whatever disputes that might subsequently come to light even after the expiry of the main contract: at [55].

*OA 1*

(10)   The court held that PIMD was entitled to a declaration that the Final Award was final, valid and binding on Phoenix given that Phoenix had not applied to set aside the Final Award within the three-month deadline: at [59].

(11)   As for PIMD's application for a permanent ASI, the court accepted that the SICC has jurisdiction to grant a permanent ASI in aid of arbitration proceedings. The court rejected Phoenix's submission that the SICC did not have jurisdiction to grant a permanent ASI as O 23 r 3(1) of the SICC Rules 2021 provided that the SICC could hear "only proceedings relating to international commercial arbitration that the General Division may hear under the IAA" and that an application for a permanent ASI was not one made "under the IAA". There was a difference between the basis for the court's jurisdiction to deal with a matter, and the court's powers to grant relief once the court's jurisdiction to deal with the matter was established. Once the SICC had the jurisdiction to deal with a case under s 18D(2)(*a*) of the Supreme Court of Judicature Act 1969 (2020 Rev Ed), which plainly applied here, the SICC was thereby clothed with all the powers of the General Division of the High Court to grant appropriate relief including a permanent ASI in aid of the arbitration proceedings, and the court could therefore go on to exercise the power under s 4(10) of the Civil Law Act 1909 (2020 Rev Ed): at [62] to [64].

(12)   The court exercised its discretion to grant the permanent ASI sought against Phoenix as the proceedings brought by Phoenix in the Philippines went much further than an attempt to resist enforcement in that they sought a declaration that both the Final Award and ARB 84 itself were void: at [67].

(13)   As for Phoenix's reliance on *Sun Travels & Tours Pvt Ltd v Hilton International Manage (Maldives) Pvt Ltd* [2019] 1 SLR 732 for the need for caution in anti-enforcement injunction cases particularly where the foreign court had already issued a judgment and the need to show "exceptional circumstances" to warrant the exercise of the court's jurisdiction, the case was distinguished. The circumstances there were different from that in the present

case for three reasons. First, recourse against the Final Award was to be had in the Singapore courts as Singapore was the seat of arbitration. The active steps taken by Phoenix by commencing and pursuing proceedings in the Philippines to persuade the Philippine Court that the arbitration and the Final Award were void was contrary to Art 34 of the Model Law and therefore impermissible as a matter of Singapore law. Second, although comity was obviously an important consideration, it lost some significance in cases involving exclusive jurisdiction clauses and arbitration agreements. Third, the continued pursuit of the proceedings in the Philippines by Phoenix was held to be a breach of the order of this court in ORC 5 and a contempt of court. As such, Phoenix could not pray in aid the fact that the proceedings in the Philippines had progressed since 18 January 2024 in support of its case that such progress was a relevant factor to be taken into account in its favour: at [68] to [71].

(14)   The court accordingly dismissed SUM 21 and granted the relief sought by PIMD in OA 1 subject to slight adjustments of the wording of the prayers therein: at [72].

**Case(s) referred to**

*Allianz Capital v Andress Goh* [2023] SGHC(A) 18 (refd)

*BXH v BXI* [2019] SGHC 141 (refd)

*Coop International Pte Ltd v Ebel SA* [1998] 1 SLR(R) 615; [1998] 3 SLR 670 (distd)

*Dallah Estate and Tourism Holding Co v Ministry of Religious Affairs, Government of Pakistan* [2011] 1 AC 763 (refd)

*Fiona Trust & Holding Corp v Privalov* [2007] Bus LR 1719 (refd)

*Gate Gourmet Korea Co, Ltd v Asiana Airlines, Inc* [2023] SGHC(I) 23 (refd)

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd* [2024] 1 SLR 307 (refd)

*Pertamina International Marketing & Distribution Pte Ltd v P-H-O-E-N-I-X Petroleum Philippines, Inc* [2024] SGHC(I) 13 (refd)

*PT First Media TBK v Astro Nusantra International BV* [2014] SLR 372 (refd)

*R1 International Pte Ltd v Lonstroff AG* [2014] 3 SLR 166 (refd)

*Sun Travels & Tours Pvt Ltd v Hilton International Manage (Maldives) Pvt Ltd* [2019] 1 SLR 732 (distd)

*Tjong Very Sumito v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732; [2009] 4 SLR 732 (refd)

**Legislation referred to**

Civil Law Act 1909 (2020 Rev Ed) s 4(10)

International Arbitration Act 1994 (2020 Rev Ed) ss 3(1), 12A, 19, 19B, First Schedule Art 6, First Schedule Art 34, First Schedule Art 36(1), First Schedule Art 36(1)(*a*)(iii)

Singapore International Commercial Court Rules 2021 O 23 r 3(1), O 25

Supreme Court of Judicature Act 1969 (2020 Rev Ed) s 18D(2)(*a*)

*Daniel Chia Hsiung Wen, Ker Yanguang (Ke Yanguang), Charlene Wee Swee Ting and Chan Kit Munn Claudia (Prolegis LLC) for the claimant;*

*Koh Swee Yen* SC *(instructed) (WongPartnership LLP), Liew Yik Wee, Wong Wan Chee and Ng Tse Jun Russell (Rev Law LLC) for the defendant.*

28 June 2024

**Sir Henry Bernard Eder IJ:**

**Introduction**

1    These proceedings concern an arbitration brought under the auspices of the Singapore International Arbitration Centre ("SIAC") in SIAC Case No ARB No 084 of 2022 ("ARB 84") and a Final Award signed and dated 28 November 2023 ("Final Award") whereby it was determined that the defendant, P-H-O-E-N-I-X Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc) ("Phoenix"), and another third party guarantor, Udenna Corporation ("Udenna"), were jointly and severally liable to the claimant, Pertamina International Marketing & Distribution Pte Ltd ("PIMD"), in the aggregate amounts of: (a) US$142,932,694.04 (including interest and legal and other costs); and (b) S$218,948.60, plus interest from 29 November 2023 (save for interest on the legal and other costs, which would commence beginning 12 December 2023). Both Phoenix and Udenna are incorporated and based in the Philippines.

2    The background is set out in my previous judgment in *Pertamina International Marketing & Distribution Pte Ltd v P-H-O-E-N-I-X Petroleum Philippines, Inc (also known as Phoenix Petroleum Philippines, Inc)* [2024] SGHC(I) 13 ("Judgment") which I do not propose to repeat.

3    I would only add that since the Judgment:

    (a)    On 13 May 2024, Phoenix filed SIC/SUM 21/2024 ("SUM 21") in SIC/OA 23/2023 ("OA 23") seeking the setting aside of SIC/ORC 69/2023 ("ORC 69").

    (b)    On 16 May 2024, PIMD filed a further Motion to Resolve to ask the Philippine Court of Appeal ("Phillipine CA") to urgently issue a temporary restraining order and/or writ of preliminary injunction pending the resolution of the Certiorari Petition.

    (c)    On 22 May 2024, the Philippine CA issued its Resolution in which it: (i) denied PIMD's application to enjoin the Philippine Regional Trial Court (the "Philippine RTC") from proceeding with the Philippines Action while it is considering PIMD's Certiorari Petition; (ii) directed Phoenix to file its comments on the Certiorari Petition within ten days from the date of notice of the Resolution; and (iii) permitted PIMD to file its reply to the comment within five days from its receipt of this.

    (d)    Service of OA 1 has now been effected on Phoenix in the Philippines under the Hague Convention.

4    There are now before the court two separate applications which overlap to a certain extent, *viz*:

(a)    OA 1 is PIMD's application for (i) a declaration that the Final Award is valid, final and binding; (ii) a permanent anti-suit injunction ("ASI"); and (iii) mandatory injunctions/orders essentially to require Phoenix to withdraw the Philippine proceedings and/or to prevent Phoenix from pursuing proceedings in the Philippines to seek declarations that the Final Award and ARB 84 are void.

(b)    SUM 21 is Phoenix's application filed in OA 23 to set aside ORC 69, which is this court's order allowing PIMD to enforce the Final Award against Phoenix and Udenna in Singapore.

5    I heard these applications on 25 June 2024. At the end of the hearing, I informed counsel of my decision *viz*, that I granted the relief sought by PIMD in OA 1 subject to: (a) slight amendment of the wording of the prayers set out in OA 1; and (b) the insertion of wording to the effect that nothing in my order has the effect of preventing Phoenix from resisting recognition or enforcement of the Final Award in the Philippines or elsewhere; and dismissed Phoenix's application under SUM 21. In addition, I ordered Phoenix to pay PIMD's costs of OA 1 and OA 23 including SUM 21, such costs to be assessed by me in due course unless otherwise agreed by the parties. These are my reasons for my decision.

6    In summary, the broad gist of Phoenix's submissions is as follows:

(a)    This court should refuse enforcement of the Final Award on the ground that there was no arbitration agreement between Phoenix and PIMD in relation to the dispute in the SIAC Arbitration. Consequently, ORC 69 should be set aside.

(b)    It follows from the lack of an arbitration agreement that there is no basis for the permanent ASI that PIMD seeks in OA 1 given that PIMD seeks the permanent ASI to restrain an alleged breach of an arbitration agreement. OA 1 should be dismissed on this basis.

(c)    Further and in any event, this court should dismiss OA 1 on jurisdictional grounds because the jurisdiction of the Singapore International Commercial Court ("SICC") as conferred under the Supreme Court of Judicature Act 1969 (2020 Rev Ed) ("SCJA") does not extend to hearing OA 1, in that the SICC has jurisdiction to hear only proceedings under the International Arbitration Act 1994 (2020 Rev Ed) ("IAA"), but OA 1 is not a proceeding under the IAA.

(d)    Further and in any event, this court should dismiss OA 1 on the merits because the Philippines Action is in substance not an attempt to challenge or set aside the Final Award and is simply a defensive proceeding under Philippine law intended only to have effect within the Philippines. In commencing and pursuing the Philippines Action,

Phoenix is merely exercising its undoubted right to resist enforcement of the Final Award in the Philippines, albeit in a pre-emptive manner given the fact that PIMD could obtain the fruits of the Final Award without ever seeking to enforce the Final Award in the Philippines.

(e)    Moreover, the issue of whether or not the Philippines Action is a proper course of action for Phoenix to take in the Philippines and as a matter of a Philippine law is, with respect, an issue for a Philippine court to resolve. In this regard, not only has the Philippine RTC denied PIMD's motion to dismiss the Philippines Action and ruled that it has personal jurisdiction over PIMD and subject matter jurisdiction over the Philippines Action, the Philippines' Court of Appeals has also denied PIMD's application to enjoin the Philippine RTC from proceeding with the Philippines Action while it is considering PIMD's appeal from the Philippine RTC's ruling.

7    Before dealing with the substance of the applications, I should mention two matters.

8    First, PIMD has referred me to [32] of the Judgment where I expressed the view that "the actions taken by Phoenix in the Philippines Action … clearly constitute a breach of ORC 5 and contempt of this court". For present purposes, it is sufficient to note that although no formal proceedings have been commenced for leave to issue committal proceedings under O 25 of the Singapore International Commercial Court Rules 2021 ("SICC Rules"), my view remains unchanged, and that Phoenix has taken no steps to purge such contempt. Notwithstanding, as at the last hearing, I propose, in the exercise of my discretion, to hear Phoenix and to consider its submissions on the two sets of applications.

9    Second, I proceed on the basis that this is a *de novo* hearing and that it follows that I am not bound by any of the conclusions expressed in the Final Award.

**SUM 21**

10    It is convenient to deal with this application first.

*Jurisdictional framework under the Model Law*

11    At the outset, it is important to understand the jurisdictional framework in which these applications come before the court.

12    Section 3(1) of the IAA provides that "with the exception of Chapter VIII" the UNCITRAL Model Law on International Commercial Arbitration as set out in First Schedule to the IAA ("Model Law") has the force of law in Singapore.

13    Section 19B of the IAA provides in material part as follows: "An award made by the arbitral tribunal pursuant to an arbitration agreement is

final and binding on the parties …" In essence, it is Phoenix's case that the Final Award is not final and binding because it was not made "pursuant to an arbitration agreement" within the meaning of s 19B of the IAA.

14    Article 34 of the Model Law provides that recourse against an award may be made only by an application for setting aside in accordance with paras (2) and (3) of that Article. Article 34(3) provides that any such application must be made within three months of the date on which the party making the application has received the award.

15    Here, it is common ground that no such application has ever been made by Phoenix and that the time limit for so doing has expired. The result is that, as a matter of Singapore law, it is not open to Phoenix to seek recourse against the Final Award under Art 34.

16    However, Phoenix submitted, and I accept, that there is a separate question as to whether the Final Award may be enforced. That depends not on Art 34 but on s 19 of the IAA, which is the provision through which the Singapore Parliament had conferred on the courts the discretion to refuse enforcement of arbitral awards:

> **Enforcement of awards**
>
> **19.** An award on an arbitration agreement may, by permission of the General Division of the High Court, be enforced in the same manner as a judgment or an order to the same effect and, where permission is so given, judgment may be entered in terms of the award.

17    In exercising the court's discretion under s 19 of the IAA, the Court of Appeal has stated that it is open to the court to consider the same grounds for resisting enforcement under Art 36(1) of the Model Law: *PT First Media TBK v Astro Nusantra International BV* [2014] SLR 372 ("*PT First Media TBK*") at [84]. This, according to the Court of Appeal, best gives effect to the purpose of the IAA which was to embrace the Model Law: *PT First Media TBK* at [50], [84] and [143(d)]. This was the conclusion the court reached despite the express provision in s 3(1) of the IAA that Chapter VIII of the Model Law does not have the force of law in Singapore: *PT First Media TBK* at [86]–[90].

18    In any event, it was common ground between the parties that I should proceed on the basis that in deciding whether or not I should grant or refuse enforcement of the Final Award, I should be guided by Art 36(1) of the Model Law which stipulates a number of grounds for refusing enforcement (and recognition). In relevant part, Art 36(1)(a)(iii) of the Model Law provides as follows:

> **Article 36. Grounds for refusing recognition or enforcement**
>
> (1)    Recognition or enforcement of an arbitral award, irrespective of the country in which it was made, may be refused only:

> (a)    at the request of the party against whom it is invoked, if that party furnishes to the competent court where recognition or enforcement is sought proof that:
>
> …
>
> (iii)    the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognised and enforced; or

19    Thus, it is open for an award to be refused enforcement if there is "proof" that an award "deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration …". It follows that it is open to a party to seek to resist enforcement even if that party has not itself sought recourse against the Final Award under Art 34. In my view, that is consistent with, for example, *Dallah Estate and Tourism Holding Co v Ministry of Religious Affairs, Government of Pakistan* [2011] 1 AC 763 in particular *per* Lord Mance JSC at [23] and the decision of the Court of Appeal in *PT First Media TBK*.

20    However, it is important to note that even in circumstances where a party can establish one of the grounds for resisting enforcement as specified in Art 36, the court is not necessarily bound to refuse enforcement. The language of s 19 of the IAA is permissive *ie*, "[a]n award on an arbitration agreement *may* … be enforced" [emphasis added]. Thus, it seems to me that it is at least open to a court not to refuse enforcement even if one or more of the grounds for refusing enforcement under Art 36(1) of the Model Law exists.

### The non-applicability of **res judicata** *or issue estoppel*

21    For the avoidance of doubt, I note that PIMD contends, in the context of its own application under OA 1, that Phoenix is precluded by virtue of my previous Judgment ([2] *supra*) from asserting that the Final Award is not valid and binding on the basis of *res judicata* and/or issue estoppel. So far as relevant, I deal with that below. In any event, I do not consider that anything that I decided in my previous Judgment precludes Phoenix from arguing that the court should refuse recognition or enforcement as a matter of discretion pursuant to s 19 of the IAA or Art 36 of the Model Law. In particular, I did not decide in my previous Judgment, the issue of whether there was a relevant arbitration agreement still less whether, as a matter of discretion, I should grant or refuse recognition or enforcement of the Final Award.

*Factual background*

22    On this basis, it is therefore necessary to consider Phoenix's substantive case that the Final Award should be refused recognition or enforcement on the ground that the Final Award deals with a dispute not contemplated by or not falling within the terms of a relevant arbitration agreement. Based on the affidavit evidence (which was helpfully set out in the parties' written submissions and is largely uncontroversial), I would summarise the relevant factual background as follows.

23    PIMD's and Phoenix's relationship began in early October 2019 and arose out of a natural alignment of strategic interests. The Pertamina Group was one of the biggest buyers of petroleum products in Southeast Asia and could provide Phoenix with a reliable supply of such products. Phoenix was active in the Philippines petroleum fuel and LPG markets and had a strong demand for petroleum products. Phoenix would therefore satisfy PIMD's strategy to pursue downstream petroleum markets in Asia, including the Philippines.

24    The parties had various discussions and meetings in the last quarter of 2019. Minutes of a meeting on 3 October 2019 circulated by Phoenix show that the parties intended to explore three main areas of potential collaboration, including the "downstream products trading in Singapore (e.g. Fuel Oils, LPG, Main Fuels diesel/mogas)". The parties also discussed materials required for the "trading process registration".

25    Discussions continued throughout October 2019 and by the end of October, Phoenix drew up a draft Memorandum of Understanding for PIMD to review. In Phoenix's cover e-mail, Mr Nagunta explained that: "Since the partnership intent is strategic and long term for the 2 companies, *this MoU will serve as umbrella agreement of identified workstreams that the two companies plan to do together in the Philippines, Singapore, and Indonesia*" [emphasis added].

*The execution of the Memorandum of Understanding dated 20 November 2019*

26    Thereafter, the Memorandum of Understanding dated 20 November 2019 ("MOU") was executed by Phoenix and PIMD. The MOU identified regional trading of downstream petroleum products and LPG between PIMD and Phoenix as "Workstream 1" and provided in material part as follows:

(a)    Recital C: "The Parties hereto intend to jointly explore, develop and implement regional strategic partnership workstreams in the Philippines, Singapore and Indonesia, which include *downstream oil and LPG trading*, downstream market entry for gas station in Philippines, and other downstream business either in Singapore and

Philippines as to be mutually agreed between the Party ('Projects')" [emphasis added].

(b)    Recital D: "This MOU sets out the key partnership parameters which the Parties intend to work together to evaluate, develop and form a regional strategic partnership in relation to the Projects".

(c)    Recital E: "This MOU is also intended *to serve as an umbrella agreement of multi workstreams* activities in each operating country" [emphasis added].

(d)    Clauses 2.1, 2.4, 3, 4.1 and 9.6:

> 2.    **PARTNERSHIP PRINCIPLE TERMS**
>
> 2.1    The Parties agree to work together for the identified workstreams in good faith during the term of this MOU to:
>
> > (a)    Acknowledge this MOU as an umbrella agreement (see the MOU framework Annex 1) that will serve as a main reference to the implementation of the Projects in the respective countries.
>
> …
>
> 2.4    Timeframe and target to sign partnership agreement of each workstream shall be determined and mutually agreed by the Parties after the Parties having mutually agreed on the feasibility study and commercial viability of the workstreams.
>
> …
>
> 3.    **EFFECTIVENES OF TERM**
>
> This MOU shall become effective upon the date of execution hereof and shall remain in full force and effect for a period of 2 (two) years since the date signing date (sic) unless and until terminated sooner and by notice in accordance with clause 7.
>
> 4.    **EFFECTIVITY OF EXCLUSIVITY**
>
> 4.1    It is acknowledged and agreed that the Parties are participating in this MOU are non-exclusive basis until each of identified workstreams is mutually agreed and executed by the Parties.
>
> …
>
> 9.    **NON-BINDING EFFECT AND LIMITATION OF LIABILITY**
>
> …
>
> 9.6    Neither party shall be liable for any direct nor indirect loss, any damage, any loss of profit or loss of potential business, or fee or other expenses arising out of or in connection of this MOU. In regards to Clause 9 .1, the liability of a Party to the other for breach of this MOU shall be limited to direct actual damages only.

(e)    Clause 10:

10.    **GOVERNING LAW AND DISPUTE SETTLEMENT**

10.1    This MOU shall be governed by and construed in accordance with the laws of Singapore.

10.2    Any dispute arising out of or in connection with this agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") one (1) arbitrators (sic) in accordance with the Arbitration Rules of the Singapore International Arbitration Centre for the time being in force which rules are deemed to be incorporated by reference in this Clause. The seat of any such arbitration shall be Singapore and the language of the arbitration shall be English.

*Sale Contracts*

27    After the MOU was signed, the parties began "Workstream 1" and commenced through trading petroleum products:

(a)    On 22 November 2019, in an internal Whatsapp message between two Phoenix personnel, Mr Nagunta provided a summary of the key points of the MOU to Mr Fadullon, which included a note that Phoenix has "started with fuel oil trading and probably LPG" in Singapore.

(b)    A shipment of fuel oil was delivered to Phoenix in December 2019. On 5 February 2020, Phoenix wrote to PIMD noting that "[Singapore Trading/Export Supply from Indonesia to Philippines" was a "Deal Done / on going".

28    From July 2020, through periodic tender processes, the parties would negotiate the commercial and operational terms applicable to upcoming cargoes. A letter of intent dated 21 July 2020 from Phoenix to PIMD in respect of the first of such tender processes described it being "to kick off the discussion *as per signed MoU*" [emphasis added].

29    In September 2020, Phoenix published a press release noting that "with the *strategic partnership*, PIMD … has begun *supplying petroleum products to Phoenix Petroleum* in Philippines and Singapore. It also allows the two companies to explore and co-develop other international downstream business opportunities in the region" [emphasis added]. PIMD submitted (and I accept) that this can only be a reference to the strategic partnership under the MOU. No other contractual document had been signed at that point.

30    In summary. the particular sale contracts which form the subject-matter of the Final Award were concluded in the following manner. Phoenix would hold periodic tender processes for supply of its petroleum

product requirements, in which it would invite various suppliers to bid to supply it with petroleum products. Between November 2019 and June 2021, sale contracts were awarded to PIMD pursuant to such tender processes in respect of 26 shipments of petroleum products, and deliveries were made for all 26 shipments.

31    In May and June 2021, as part of these tender processes, Phoenix sent invitations to various suppliers including PIMD inviting them to submit bids. After evaluating the bids submitted, Phoenix decided to award seven shipments to PIMD. Certain shipments were awarded to other suppliers that had submitted better commercial offers than PIMD had done for those shipments.

32    Confirmation of the terms of contracts awarded by Phoenix to PIMD took the form of deal recaps by way of e-mail. Thus:

(a)    In respect of Shipments 1 to 3, Phoenix invited PIMD to bid by way of an e-mail dated 17 May 2021, then awarded the shipments to PIMD and provided the terms of supply by way of an e-mail dated 21 May 2021. PIMD replied to confirm its agreement to the terms of supply by way of an e-mail also dated 21 May 2021.

(b)    In respect of Shipments 4 to 6, Phoenix invited PIMD to bid by way of an e-mail dated 15 June 2021, then awarded the shipments to PIMD and provided the terms of supply by way of an e-mail dated 21 June 2021. PIMD replied to confirm its agreement to the terms of supply by way of an e-mail also dated 21 June 2021.

(c)    In respect of Shipment 7, Phoenix awarded the shipment to PIMD and provided the terms of supply by way of an e-mail dated 22 June 2021.

In passing, I note that these e-mail exchanges were silent about any governing law and did not contain any arbitration clause nor any other provision relating to dispute resolution.

33    There is no dispute that these constituted binding contracts (which I refer to as the "Sale Contracts") and that the shipments made thereunder were in each case duly shipped and delivered by PIMD to Phoenix between 30 June and 31 August 2021.

34    As I understand, it is also common ground or at least not disputed by Phoenix that the amounts due and owing under these contracts total US$124,534,382.23 and that the whole of this amount was never paid and remains outstanding.

35    Thereafter, the parties began extensive discussions on various payment plans for Phoenix to satisfy the outstanding payments and even potentially restructure Phoenix's debt. In parallel, Phoenix procured a

Guarantee from its parent, Udenna (the second respondent in the arbitration). However, the restructuring was apparently unsuccessful.

36    In support of Phoenix's case, my attention was drawn by Ms Koh SC, counsel on behalf of Phoenix, to a further Memorandum of Understanding dated 1 December 2021 entered into between PIMD and Phoenix (hereinafter, the "Second MOU"). This was therefore some six months or so after the Sale Contracts had been executed and the shipments delivered. This second MOU was in substantially similar form to the original MOU save that it included a new cl 2.8 which provided as follows:

> 2.8    The implementation of each Projects discussion will be further detailed in and governed by a definitive agreement (Definitive Agreement). For the purpose of this MOU, Definitive Agreement means a separate legally binding agreement entered into between the Parties and/or their Affiliates which will set out the Parties and/or their Affiliates respective rights and obligations (as the case may be) in relation to the implementation of the cooperation and the business opportunity.

37    In addition, Ms Koh SC relied heavily on the fact that sometime in the course of December 2021, PIMD prepared and sent to Phoenix draft "long-form SPAs" for each of the Sale Contracts which contained arbitration clauses for SIAC arbitration in Singapore although in the case of disputes with a value of less than US$100,000, all but one of these drafts provided for arbitration in accordance with the London Maritime Arbitrators' Association Small Claims Procedure. There is no evidence as to why this was done; and given that the Sale Contracts had been concluded some six months earlier and the shipments thereunder delivered some four months earlier, the reason for so doing is difficult, if not impossible, to understand. It may have been an administrative error. In any event, it is common ground that these drafts were never signed by Phoenix – although, for the sake of completeness, I should mention that one long-form SPA was concluded and signed by the parties with respect to other cargoes.

*Conduct of the parties*

38    PIMD submitted that Phoenix's contemporaneous conduct and documents confirmed that it considered the disputes under the Sale Contracts as being subject to an arbitration – ostensibly arising out of or in connection with the MOU. Thus:

> (a)    On 28 January 2022, in an internal Phoenix WhatsApp correspondence between Mr Fadullon and Mr Nagunta discussing the payment issues relating to PIMD, Mr Fadullon noted that he was "setting things up for arbitration. If we don't put this in place basis for arbitration will be shorter" and "we have to take control of this as phoenix. Again I'm setting up for arbitration".

(b)    On 8 February 2022, Phoenix made an "appeal" to PIMD not to "bring [Phoenix] to arbitration", assuring PIMD that Phoenix remained "committed to pay [their] obligations the best way and quickest way [they] can" and "acknowledge the outstanding amount of USD 125,357,411.56 (Sales of Products = USD 124,534,382.23 and Demurrage and deviation/other cost = USD 823,029.33) and reasonable overdue payment penalty for discussion".

39    As payment was not forthcoming, PIMD filed the Notice of Arbitration on 6 April 2022.

### The proper construction of the scope of the arbitration clause under clause 10.2 of the MOU

40    For the avoidance of doubt, there is no dispute that the arbitration clause in the MOU is valid and binding. Phoenix does not contend otherwise. Rather, it is Phoenix's case that the disputes under the individual Sale Contracts did not fall within the scope of that arbitration agreement. In support of that case, Phoenix advanced a number of points which I deal with below.

41    First, Phoenix submitted that where there are multiple agreements between the same parties, and only one of those agreements contains an arbitration clause, it does not follow as a matter of course that the arbitration clause can be extended to cover disputes under the other agreements. In this context, Phoenix relied on *Coop International Pte Ltd v Ebel SA* [1998] 1 SLR(R) 615 ("*Coop International*"). As formulated, I readily accept that submission. However, as the court in that case emphasised at [30], the question as to whether a particular arbitration agreement in one contract covers certain disputes depends upon the proper construction of the arbitration agreement. I would only add that consistent with general principles of construction of any contract, it is necessary and appropriate to consider the relevant "factual matrix".

42    The starting point of any contractual interpretation exercise is the words used in the contract itself. Here, the relevant words in cl 10.2 of the MOU require that "[a]ny dispute arising out of or in connection with this Agreement … shall be referred to and finally resolved by arbitration". The words "arising out of or in connection with" are broad and expansive: see, for example, *Tjong Very Sumito and Others v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732 ("*Tjong Very Sumito*"), where the Court of Appeal considered that a clause referring to disputes "arising out of or in connection with" an agreement encompassed disputes arising under a fourth supplemental agreement which did not itself contain an arbitration clause. In coming to this conclusion, the Court of Appeal (at [66]) applied the proposition stated in Emmanuel Gaillard and John Savage, *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (Kluwer Law International, 1999) at para 520 with respect to a situation in which:

… where only the heads of agreement, or framework agreement, contains an arbitration clause to which the other related contracts refer. This case presents no difficulty. The parties' intention is clear: they sought to refer all disputes arising out of the whole set of contracts to arbitration, before a single arbitral tribunal constituted in accordance with the heads of agreement.

43    As submitted by PIMD, the Court's approach in *Tjong Very Sumito* is aligned with the weight of authority and the major textbooks to the general effect that arbitration agreements should apply equally to disputes under related agreements, particularly where the related agreements do not contain different dispute resolution provisions. By way of example, the authorities state as follows:

(a)    Gary B Born, *International Commercial Arbitration* (Wolters Kluwer, 3rd Ed, 2021) at §9.02:

> Where only one in a series of contracts, or in several related contracts, contains an arbitration agreement, that agreement should ordinarily be interpreted to encompass disputes over related contracts; absent contrary indications, this is consistent with the parties' reasonable expectations and facilitates efficient, neutral dispute resolution.

(b)    Bernard Hanotiau, *Complex Arbitrations: Multi-Party, Multi-Contract, Multi-Issue – A Comparative Study* (Wolters Kluwer, 2nd Ed, 2020) at para 641:

> In the cases that will be examined below, the courts have generally concluded that if two agreements between the same parties are closely connected and one finds its origin in the other, or is the complement or the implementation of the other, the absence of an arbitration clause in one of the contracts does not prevent disputes arising from the two agreements from being submitted to an arbitral tribunal and decided together.

(c)    *Dicey, Morris and Collins on the Conflict of Laws* (Lawrence Collins gen ed) (Sweet & Maxwell, 16th Ed, 2022) at para 12-082:

> It is generally to be assumed that just as parties to a single agreement do not intend as rational business people that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements do not generally intend a dispute to be litigated in two different tribunals.

44    As submitted by PIMD, such interpretation accords with the normal presumption of one-stop adjudication set out in *Fiona Trust & Holding Corp v Privalov* [2007] Bus LR 1719 ("*Fiona Trust*") and as adopted in Singapore in the context of multi-contract relationships in *Allianz Capital v Andress Goh* [2023] SGHC(A) 18 ("*Andress Goh*") (at [35] to [45]). The assumption was originally articulated by Lord Hoffman in *Fiona Trust* who stated (at [13]):

> … the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal.

45     As further submitted by PIMD, viewed through a commercial lens, it is readily understandable why parties who have included an arbitration clause in their framework or umbrella agreement may subsequently enter into ancillary contracts without expressly incorporating the arbitration clause. Often, there is simply no perceived need to "re-agree" a term which has already been expressly stated in the framework or umbrella agreement, and the parties will instead focus their efforts on negotiating the key commercial or operative elements of each transaction (for example, the type or volume of goods, sale price, and delivery date).

46     Here, the Sale Contracts arose out of or, at least, were connected with the MOU because they came into existence pursuant to the parties' implementation of the Projects as defined in the MOU. It is fair to say that the Sale Contracts contain no reference to the MOU and that there is no specific evidence of the parties referring to the MOU when the parties entered into the Sale Contracts but that seems to me the natural inference. As stated above, Recital C of the MOU refers to "*regional strategic partnership workstreams in the Philippines, Singapore, and Indonesia, which include downstream oil and LPG product trading …*" [emphasis added]. Both Recital E and cl 2.1(a) of the MOU state that the MOU acts as "umbrella agreement of multi workstream activities in each operating country". Phoenix also acknowledged the connectedness of the trading activities, which gave rise to the Sale Contracts, with the MOU, as seen from Phoenix's explanation to Udena's Mr Fadullon where he stated in his summary of the key points of the MOU that "[i]n [Singapore], we have started with fuel oil trading and probably LPG".

47     Again, as submitted by PIMD, there is also nothing in the MOU, Sale Contracts, or the parties' conduct which displaces the foregoing conclusion. The Sale Contracts do not contain their own arbitration agreement (or any dispute resolution provision for that matter). In so far as may be relevant, it seems to me contrary to common business sense that large commercial parties based in different jurisdictions might enter significant international trade contracts without agreeing a suitable forum for the resolution of disputes. Moreover, again so far as may be relevant, it is perhaps noteworthy that the parties did not enter into a separate arbitration agreement (or other dispute resolution mechanism) following the crystallisation of the dispute; and (if it is relevant) Phoenix's post-contractual conduct reinforces this conclusion: Udena's internal documents show Mr Fadullon telling Mr Nagunta that he was "setting things up for *arbitration*" [emphasis added] in relation to the Sale Contracts (see above at [38(a)]), which can only be a reference to arbitration under the

MOU's arbitration agreement since the Sale Contracts do not contain any arbitration agreement.

48    Second, Phoenix submitted that each of the Sale Contracts is an independent contract unrelated and unconnected to any other contract between Phoenix and PIMD, in the sense that each Sale Contract related to a separate and distinct shipment involving a unique quantity of petroleum products and a unique price. In one sense, I readily accept that each Sale Contract was discrete. However, that is not inconsistent with the Sale Contracts being entered into as part of and pursuant to the "umbrella agreement" contained in the MOU and that any dispute in respect of such Sale Contracts arises "out of" or at least "in connection with" the MOU.

49    Third, Phoenix submitted that the MOU was unrelated and unconnected to the Sale Contracts because the Sale Contracts were concluded following a competitive tender process in which other suppliers put in bids and Phoenix selected the most competitive bid; that the competitive nature of the tender process, in which PIMD was on a level playing field with the other suppliers, is inconsistent with and even antithetical to the "strategic partnership" relationship contemplated in the MOU in which PIMD would be in a position of special advantage; and that as was the case with the distributorship and settlement agreements in *Coop International* ([41] *supra*), in no sense could the Sale Contracts be said to be an extension or variation of the MOU. I readily accept that the Sale Contracts could not be said to be an "extension" or "variation" of the MOU. However, to repeat, that is not inconsistent with the Sale Contracts being entered into as part of and pursuant to the "umbrella agreement" contained in the MOU and that any dispute in respect of such Sale Contracts arises "out of" or at least "in connection with" the MOU.

50    Fourth, Phoenix submitted that the Sale Contracts did not refer at all to the MOU, just as the settlement agreement in *Coop International* did not refer to the distributorship agreement; and that this reinforces the point above that the competitive nature of the tender process that led to the Sale Contracts militates against any notion that the Sale Contracts were somehow connected to the MOU. According to Phoenix, had the parties envisaged that the Sale Contracts were an implementation of the partnership relationship contemplated in the MOU, PIMD would have invoked that partnership understanding to advance its own interests: the fact that it did not do so strongly suggests that the parties did not have in mind the MOU at all when they concluded the Sale Contracts.

51    As to these submissions, it is correct that the Sale Contracts did not refer to the MOU. However, I do not consider that that is necessarily surprising. Certainly, the absence of a reference to the MOU does not necessarily justify the "inference" that the parties did not have the MOU in mind when they concluded the Sale Contracts. In any event, it does not seem to me that this point necessarily assists with answering the critical

question as to whether the disputes arose "out of or in connection with" the MOU. There is no evidence before me to show that the absence of any reference to the MOU had been made deliberately to displace the *Fiona Trust* ([44] *supra*) presumption.

52      Fifth, Phoenix submitted that given that PIMD's position evidently is that Phoenix is liable to make good its alleged loss by paying the amounts stipulated in the Final Award, PIMD necessarily accepts that the dispute in the ARB 84 is not a claim for direct or indirect financial loss "arising out of or in connection with" the MOU. As contended by Phoenix, this is because if the dispute is characterised as such a claim, then Phoenix would not be liable to PIMD at all by reason of cl 9.6 which provided as follows:

> Neither Party shall be liable for any direct nor indirect loss, any damage, any loss of profit or loss of potential business, or fee or other expenses arising out of or in connection of [sic] this MOU. *In regards to Clause 9.1, the liability of a Party to the other for breach of this MOU shall be limited to direct actual damage only.* [emphasis added]

On this basis, Phoenix submitted that it follows that the dispute in ARB 84 is not one "arising out of or in connection of" the MOU within the meaning of the arbitration agreement in cl 10.2, and therefore falls outside the scope of the arbitration agreement.

53      I do not accept that submission. PIMD's case is not that the Sale Contracts are part of the MOU (and therefore would be governed by, *inter alia*, cl 9.6). PIMD's case is that the arbitration agreement in the MOU extends to cover disputes in respect of other future arrangements and other dealings which arise *out of or are connected* to the MOU. The arrangements and dealings under the Sale Contracts are therefore separate from the MOU but there has already been an agreement to arbitrate any disputes which arise out of or in connection with the MOU. Further, cl 9.6 is an exclusion of liability clause, and unlike an arbitration clause where the approach is to construe the words "arising out of or in connection with" as widely as possible pursuant to the *Fiona Trust* presumption, the interpretive approach for an exclusion of liability clause operates differently in that it is to be construed strictly. As such, even though both clauses utilise the same words, they do not necessarily carry the same meaning. In any event, I do not understand why cl 9.6 is even potentially relevant with regard to PIMD's claims which are the subject matter of the Final Award and which, as I understand, are simple debt claims. In any event, even if an expansive reading of cl 9.6 is taken, this is at most a potential defence Phoenix could have argued, *ie*, that the Sale Contracts are subject to a limitation of liability (potentially subject to the Unfair Contract Terms Act 1977 (2020 Rev Ed)). However, these arguments were not run as a defence by Phoenix. Instead, Phoenix (a) never denied liability in any forum; and (b) did not participate in the arbitration.

54    Sixth, Phoenix submitted that the fact that PIMD drafted long-form
SPAs containing arbitration clauses with each of the Sale Contracts
demonstrates that the parties never considered that the arbitration
agreement in the MOU applied to the Sale Contracts. According to
Phoenix, this is because the arbitration clauses in the draft long-form SPAs
were incompatible with the arbitration agreement in the MOU, in that the
latter provided for arbitration administered by the SIAC but all but one of
the former provided for arbitration administered in accordance with the
London Maritime Arbitrators' Association Small Claims Procedure. Thus,
Phoenix submits rhetorically: Had PIMD truly believed that the arbitration
agreement in the MOU applied to the Sale Contracts, it would not have
proposed different arbitration clauses, much less conflicting ones, to govern
the Sale Contracts. As I said at the hearing, the reason why these draft SPAs
were prepared many months after the Sale Contracts had been executed
and the shipments delivered is difficult, if not impossible, to understand. In
any event, this part of Phoenix's argument is double-edged because what is
common ground is that these draft long-form SPAs were never executed.
The fact of the matter is that the Sale Contracts as concluded did not
contain any arbitration agreement or other provision for dispute
resolutions. The omission of such provisions is potentially explicable on the
basis that it was, on reflection, thought that the arbitration agreement in the
MOU would apply to any disputes. I recognise that this is entirely
speculative and almost certainly legally irrelevant. But it serves to counter
the point relied upon by Phoenix. Similarly, I do not consider that the fact
that the parties entered into the second MOU in December 2021 with the
additional cl 2.8 assists with regard to the determination of the question as
to whether the disputes in respect of the Sale Contracts fell within the scope
of the original MOU.

55    Seventh, Phoenix submitted that even if the arbitration agreement in
the MOU could be said to encompass the kind of dispute that was before
the tribunal in ARB 84, the fact is that the MOU, and thus the arbitration
agreement in cl 10.2, had expired by the time PIMD commenced ARB 84
on 6 April 2022 and that therefore, the MOU and the arbitration agreement
in cl 10.2 ceased to be binding on Phoenix and PIMD after that date. I do
not accept that submission. It is not disputed that the Sale Contracts which
were the subject of ARB 84 were all entered into prior to 20 November
2021. A dispute resolution clause survives the substantive contract so as to
resolve whatever disputes that may subsequently come to light even after
the expiry of the main contract: *BXH v BXI* [2019] SGHC 141 at [84].

56    Finally, Ms Koh SC submitted that the wording in cl 10.2 of the MOU
should be interpreted to mean "[a]ny dispute arising out of or in
connection with a *breach* of this MOU …" [emphasis added]. I do not
accept that submission. That is not what the words in cl 10.2 say and to
interpret the words in such a way would, in my view, be to rewrite the

language chosen by the parties and substantially to narrow the scope of the arbitration clause.

57    For all these reasons, I reject Phoenix's submission that the disputes forming the subject-matter of ARB 84 did not fall within the scope of cl 10.2 of the MOU. It follows that Phoenix's application under SUM 21 must be rejected.

**OA 1**

58    Against the background above, I turn to consider PIMD's various applications under OA 1.

### *PIMD's application for a declaration that the Final Award is final, valid and binding on Phoenix*

59    I deal first with PIMD's application in prayer 4 of OA 1 for a declaration that the Final Award is final, valid and binding on Phoenix. Given that there has been no application to set aside the Final Award within the three-month deadline and in light of my conclusion above, it necessarily follows, in my view, that PIMD is entitled to the declaration sought.

### *PIMD's application for a permanent ASI*

60    I deal next with PIMD's application for a permanent ASI and other injunctive relief. As to such applications, there are two main issues, *viz*:

    (a)    does the SICC have jurisdiction to grant a permanent ASI? and

    (b)    if so, should such permanent ASI be granted as a matter of discretion, in the present case?

61    I deal with these two points in turn.

*Does the SICC have jurisdiction to grant a permanent ASI?*

62    As to the first point of whether the SICC has jurisdiction to grant a permanent ASI, I summarised the main thrust of the argument advanced by Phoenix at [36]–[37] of the Judgment ([2] *supra*). In summary, Phoenix submitted that this court, *ie*, the SICC, has no jurisdiction to grant a permanent ASI and that, for that reason alone, OA 1 should be dismissed in its entirety. It is fair to say that Ms Koh SC did not address this point in her oral submissions, However, in its written submissions, Phoenix submitted that the only plausible source of the SICC's jurisdiction to hear OA 1 is under s 18D(2)(*a*) of the SCJA. This confers on the SICC jurisdiction to hear any "proceedings relating to international commercial arbitration" that the General Division may hear and which satisfy the conditions prescribed in the SICC Rules. There can, in my view, be no doubt that the present proceedings relate to international commercial arbitration. However, Phoenix relied upon O 23 r 3(1) of the SICC Rules which

specifically provides that the SICC may hear "only proceedings relating to international commercial arbitration that the General Division may hear *under the IAA*" [emphasis added].

63    Further, Phoenix submitted that an application for a permanent ASI is not one made "under the IAA" and therefore necessarily falls outside the jurisdiction of the SICC. In support of that particular submission, Phoenix relied upon what it submitted is the well-established proposition that the power of the Singapore courts to grant a permanent ASI, even when it is granted to restrain a breach of an arbitration agreement, is *not* found in or derived from the IAA as was recognised in *R1 International Pte Ltd v Lonstroff AG* [2014] 3 SLR 166, where the High Court (at [40]) unequivocally rejected the notion that the "power to grant permanent ASIs to assist arbitration can be derived from s 12A of the IAA". To be clear, although Phoenix submitted that this court does not have jurisdiction to grant a permanent ASI, it accepted that this court does, at the very least, have jurisdiction to grant an interim ASI. It was for that latter reason that it was unnecessary to deal at the last hearing with the question as to the jurisdiction of this court to grant a permanent ASI.

64    However, that question needs to be addressed now. In my view, the answer is relatively straightforward. In short, there is a difference between the basis for the court's jurisdiction to deal with a matter, and the court's powers to grant relief once the court's jurisdiction to deal with the matter is established. Once the SICC has the jurisdiction to deal with a case under s 18D(2)(*a*) of the SCJA (as it plainly does here), the SICC is thereby clothed with all the powers of the General Division of the High Court to grant appropriate relief including a permanent ASI in aid of the arbitration proceedings, and the court can therefore go on to exercise the power under s 4(10) of the Civil Law Act 1909 (2020 Rev Ed). In reaching this conclusion, I draw comfort from the fact that a similar conclusion was reached by Thorley IJ in *Gate Gourmet Korea Co, Ltd and others v Asiana Airlines, Inc* [2023] SGHC(I) 23 albeit without much analysis.

*Should this court grant a permanent ASI in the exercise of its discretion?*

65    I addressed the question of whether this court should grant an interim ASI at [49]–[67] of the Judgment. In my view, it is unnecessary to repeat what I said there. I would only add a few words by way of further clarification and elaboration.

66    On this present application, Phoenix has strongly submitted that this court should decline to grant a permanent ASI since, according to Phoenix, the proceedings which it has initiated in the Philippines are unobjectionable because they are, according to Phoenix, by way of seeking to resist enforcement in a "proactive, pre-emptive manner"; that whether or not Phoenix is entitled to do that is a matter of Philippines law; and that the

Philippine courts are a far more appropriate forum than the Singapore courts to determine that question.

67     I do not accept that submission. The fact is that PIMD has (at least, as yet) not commenced any proceedings for enforcement of the Final Award in the Philippines. Moreover, as I said in the Judgment at [33], the proceedings brought by Phoenix in the Philippines go much further than an attempt to resist enforcement: they seek a declaration that both the Final Award and ARB 84 itself are void. As such, I do not consider that the Philippines proceedings can properly be characterised merely as an attempt to resist enforcement. Nor do I accept that the Philippine courts are a far more appropriate forum than the Singapore courts to determine those issues; nor whether Phoenix should be entitled to pursue proceedings of such type in the Philippines. Again, to repeat what I said in the Judgment, this court has supervisory jurisdiction of ARB 84 and the Final Award. As such, it falls to this court to supervise and, if appropriate, maintain the integrity of the Final Award. That is consistent with both the Model Law and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (10 June 1958), 330 UNTS 38 (entered into force 7 June 1959, accession by Singapore 21 August 1986) (the "New York Convention") which, as a matter of international comity, I would expect the Philippines courts to recognise and respect.

68     In support of this part of Phoenix's case, Ms Koh SC relied heavily on the decision of the Court of Appeal in *Sun Travels & Tours Pvt Ltd v Hilton International Manage (Maldives) Pvt Ltd* [2019] 1 SLR 732 ("*Sun Travels*"). In particular, she drew my attention to the passages in that judgment at [89] and [97]–[99] where the court set out the considerations which underpin the need for caution in anti-enforcement injunction cases particularly where the foreign court has already issued a judgment and, in such a situation, the need to show "exceptional circumstances" in order to warrant the exercise of the court's jurisdiction: see *Sun Travels* at [107]–[113]. The case is also instructive because although the court considered that the action being taken in the foreign court was plainly "impermissible", nevertheless the conclusion by the Singapore court was to refuse the relief sought. I bear well in mind all that was said in *Sun Travels* and Ms Koh SC's submissions in relation thereto. However, it is my conclusion that the circumstances in the present case are very different from *Sun Travels* and point strongly in favour of the exercise of the court's discretion in favour of PIMD for the following reasons.

69     First, the starting point is that, as I have now found, the disputes which were the subject matter of ARB 84 fell within the scope of the arbitration agreement contained in cl 10.2 of the MOU. As such, it was governed by Singapore law and Singapore was the seat of the arbitration. It follows that, as a matter of Singapore law, if Phoenix wished to have recourse against the Final Award, its only active remedy was to seek to set it

aside in the Singapore courts (*ie*, the designated court pursuant to Art 6 of the Model Law) pursuant to Art 34 of the Model Law. It necessarily follows that the active steps taken by Phoenix by commencing and pursuing proceedings in the Philippines to persuade the Philippine Courts that the arbitration and the Final Award were void was contrary to Art 34 and therefore impermissible as a matter of Singapore law. For the avoidance of doubt, I should repeat and emphasise that this is not to say that Phoenix could not seek to resist recognition or enforcement of the Final Award in the Philippines (or elsewhere) in the world. However, the important point is that PIMD has not sought, even now, to enforce the Final Award in the Philippines; and, as I have said repeatedly, the proceedings commenced and pursued by Phoenix in the Philippines cannot, in my view, properly be categorised as merely an attempt to resist enforcement.

70      Second, although comity is obviously an important consideration, it loses some significance in cases involving exclusive jurisdiction clauses and arbitration agreements: see *Sun Travels* at [75] – although as there stated, that is not to say that comity can never be engaged. Thus, where a party seeking relief is guilty of delay and the foreign court has already issued a judgment, the seat court may well refuse to grant relief – as the Court of Appeal did in *Sun Travels*. Even in cases where the foreign court has not issued a judgment, I would readily accept that, in cases where there has, for example, been substantial delay, a court may, in the exercise of its discretion, decide to refuse to grant injunctive relief. However, here it cannot, in my view, be said that PIMD is guilty of delay. Further, unlike *Sun Travels*, the Philippines Court has not issued a judgment on the merits. In particular, it has not determined the central issue which I have now determined *viz*, that the disputes the subject matter of ARB 84 fell within the scope of the arbitration agreement in cl 10.2 of the MOU and that the Final Award is final, valid and binding.

71      Third, it seems to me important to bear in mind that the continued pursuit of the proceedings in the Philippines by Phoenix is, as I have a held, a breach of the order I made on 18 January 2024 *ie*, SIC/ORC 5/2024 and a contempt of this court. As such, it does not seem to me that Phoenix can properly pray in aid the fact that the proceedings in the Philippines have progressed since 18 January 2024 in support of its case that such progress is a relevant factor to be taken into account in its favour. For that reason and contrary to Ms Koh SC's most forceful submissions, I do not consider that the decision of the Philippines Court of Appeal on 22 May 2024 is of assistance to Phoenix or tilts the balance in favour of Phoenix so far as the present application in this court is concerned. I should mention that after conclusion of the hearing and the announcement of my decision on 25 June 2024 in respect of the present applications, my attention has been drawn to a recent decision of the Court of Appeal in *Gonzalo Gil White v Oro Negro Drilling Pte Ltd and others* [2024] 1 SLR 307. This case was not referred to

in the course of my hearing on 25 June 2024 and I have therefore not had the benefit of the parties' submissions in relation thereto. I simply note it for the sake of completeness and observe that it appears to be consistent with the conclusions which I reached in the present case before becoming aware of its existence.

72    For all these reasons, it is my conclusion that SUM 21 should be dismissed and the relief sought by PIMD in OA 1 should be granted subject to adjustment of the wording as indicated above (at [5]).

73    Having said all that, I should repeat and make plain that nothing in this judgment is intended to preclude any proper attempt by Phoenix to resist recognition or enforcement of the Final Award under the New York Convention in the Philippines or elsewhere if and when PIMD may commence recognition and enforcement proceedings anywhere in the world. I emphasise the word "proper" because having now dealt with the substance of Phoenix's argument as to the scope of cl 10.2 of the MOU, it seems to me that it is at least arguable that that issue cannot be raised again elsewhere by Phoenix by way of resistance to recognition or enforcement of the Final Award on the basis of transnational estoppel However, I heard no argument on that point. If necessary, it may have to be considered at some other time.

Reported by Allen Chong Wei Xuan.

EXHIBIT 3

# Transocean Offshore International Ventures Ltd

v

# Burgundy Global Exploration Corp

## [2010] SGHC 31

High Court — Suit No 87 of 2009 (Registrar's Appeal No 311 of 2009)
Andrew Ang J
13 October 2009; 28 January 2010

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Claim arose out of or more closely connected with one agreement than the other — Whether claim subject to dispute resolution regime contained in agreement it was closely connected with, even if other regime wide enough to cover claim*

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Whether arbitration clause in one agreement incorporated into other agreement*

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Whether claim from which proceedings arose fell within scope of arbitration agreement — Section 6 International Arbitration Act (Cap 143A, 2002 Rev Ed)*

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Whether dispute arose out of or reasonably connected with agreement which contained arbitration clause*

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Whether exceptional circumstances amounting to strong cause established to justify departure from non-exclusive jurisdiction clause*

*Arbitration — Stay of court proceedings — Different but related agreements with overlapping and inconsistent dispute resolution clauses — Whether specific jurisdiction clause in one agreement prevailed over arbitration clause in another agreement*

## Facts

Transocean Offshore International Ventures Ltd ("the plaintiff") and Burgundy Global Exploration Corporation ("the defendant"), were parties to a novated offshore drilling contract ("the Drilling Contract") under which the former contracted to supply a drilling vessel ("the Vessel") and related drilling services to the latter. Under the Drilling Contract, it was a condition precedent that both parties were to enter into an escrow agreement ("the Escrow Agreement") for the opening of an escrow account ("the Escrow Account"), prior to the commencement of mobilisation by the plaintiff of the Vessel ("Commencement Date"). The Escrow Agreement additionally provided, *inter alia*, for the depositing by the defendant of an escrow amount ("the Escrow Amount") into the Escrow Account on or before 15 December 2008 or 30 days prior to the

Commencement Date, whichever was the earlier. Failure to deposit moneys into the Escrow Account entitled the plaintiff to terminate the Drilling Contract. Subsequently, the defendant failed to deposit the Escrow Amount and the plaintiff treated the defendant's failure to deposit as a repudiatory breach which it elected to accept. The plaintiff then commenced an action claiming, *inter alia*, damages for the defendant's breach and/or repudiation of the Escrow Agreement. Subsequent to the commencement of the action, the defendant appeared before the assistant registrar ("the AR") seeking a stay of the action brought by the plaintiff in favour of arbitration, as Art 25 of the Drilling Contract provided for arbitration in the event of disputes between the parties. The plaintiff resisted the stay action on the basis that cl 6.2 of the Escrow Agreement conferred non-exclusive jurisdiction in favour of the Singapore courts and waived jurisdictional objection in the same clause. The AR granted the stay application. She ordered that all further proceedings in the action brought by the plaintiff against the defendant be stayed in favour of arbitration in Singapore. The plaintiff hence appealed against the AR's decision.

**Held, allowing the appeal:**

(1)    The plaintiff's cause of action against the defendant was a straightforward claim arising from the defendant's failure to pay the Escrow Amount into the Escrow Account in accordance with the terms of the Escrow Agreement. As such, the claim fell squarely within the Escrow Agreement. The termination of the Drilling Contract was not premised on a breach of the Drilling Contract: at [15].

(2)    The burden was on the defendant to establish why the jurisdictional agreement in favour of the Singapore courts should not be honoured. Generally, a party wishing to depart from a non-exclusive jurisdiction clause had to show exceptional circumstances amounting to strong cause before it might be allowed to do so. In the present matter, it was pertinent for the defendant to establish that such strong cause for departure existed, given that cl 6.2 of the Escrow Agreement conferred non-exclusive jurisdiction in favour of the Singapore courts and the parties waived jurisdictional objection in the same clause. The situation involving a non-exclusive jurisdiction clause (cl 6.2(a) of the Escrow Agreement) coupled with a waiver of jurisdictional objection (cl 6.2(b) of the Escrow Agreement) was akin to that of an exclusive jurisdiction clause in a contract: at [16].

(3)    The defendant's reliance on *The Hung Vuong-2* [2000] 2 SLR(R) 11 as authority that the court might examine whether there were any real and genuine defences to the claim in determining whether there was any strong cause for the defendant not to be held to the jurisdictional agreement was based on an unwarranted extrapolation of the holding in *The Hung Vuong-2. The Hung Vuong-2* involved a situation where the tussle was between having the matter heard before the courts of one jurisdiction rather than those courts of another jurisdiction. The present dispute was however over the mode of dispute resolution rather than jurisdiction: at [17] to [19].

(4)    Distinct and specific words were required to incorporate an arbitration clause into a contract. In the present matter, not only was there no clause specifying that Art 25, the arbitration clause in the Drilling Contract, was to be

incorporated into the Escrow Agreement, there was an express clause conferring jurisdiction on the Singapore courts. Parties had intentionally carved the Escrow Agreement out from the Drilling Contract and expressly subjected the former to a non-exclusive jurisdiction clause rather than the arbitration clause: at [21].

(5)    Where an agreement which was subsequently terminated contained an arbitration clause but a subsequent agreement did not, the arbitration clause in the former agreement could apply nonetheless if the dispute had arisen out of or was reasonably connected with the earlier agreement. In the present matter, Art 25, as properly construed, could not extend to the claim in question: at [21] to [24].

(6)    It was a trite canon of construction that the general should give way to the specific. Given the specificity of cl 6.2 of the Escrow Agreement, it overrode Art 25 as the claim arose out of the Escrow Agreement: at [25].

(7)    Where different but related agreements contained overlapping and inconsistent dispute resolution clauses, the nature of the claim and the particular agreement out of which the claim arose ought to be considered. Where a claim arose out of or was more closely connected with one agreement than the other, the claim ought to be subject to the dispute resolution regime contained in the former agreement, even if the latter was, on a literal reading, wide enough to cover the claim. Hence, cl 6.2 of the Escrow Agreement prevailed over Art 25 of the Drilling Contract: at [26] and [27].

(8)    Section 6 of the International Arbitration Act (Cap 143A, 2002 Rev Ed) could only be invoked if the claim from which the proceedings arose fell within the scope of an arbitration agreement. On the facts, the Escrow Agreement did not contain an arbitration clause: at [28].

(9)    Where parties had agreed subsequent to the arbitration agreement that disputes might be resolved by litigation, the agreement to arbitrate would be treated as having been waived and the party applying for a stay would be estoppped from asserting his rights to insist on arbitration. In the present matter, even if proceedings instituted under the Escrow Agreement did fall within the scope of Art 25, that provision had been rendered inoperative by the parties entering into the subsequent Escrow Agreement which contained a jurisdiction clause: at [29].

**Case(s) referred to**

*Bambang Sutrisno v Bali International Finance Ltd* [1999] 2 SLR(R) 632; [1999] 3 SLR 140 (folld)

*Bayerische Landesbank Girozentrale v Kong Kok Keong* [2002] 1 SLR(R) 485; [2002] 4 SLR 283 (folld)

*Coop International Pte Ltd v Ebel SA* [1998] 1 SLR(R) 615; [1998] 3 SLR 670 (folld)

*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767 (folld)

*Hung Vuong-2, The* [2000] 2 SLR(R) 11; [2001] 3 SLR 146 (distd)

*Kianta Osakeyhtio v Britain & Overseas Trading Co Ltd* [1954] 1 Lloyd's Rep 247 (folld)

L & M Concrete Specialists Pte Ltd v United Eng Contractors Pte Ltd [2000]
   2 SLR(R) 852; [2000] 4 SLR 441 (folld)
S & W Berisford plc v New Hampshire Insurance Co [1990] 2 QB 631 (folld)
Tjong Very Sumito v Antig Investments Pte Ltd [2009] 4 SLR(R) 732; [2009]
   4 SLR 732 (folld)
UBS AG v HSH Nordbank AG [2009] 2 Lloyd's Rep 272 (folld)

**Legislation referred to**

International Arbitration Act (Cap 143A, 2002 Rev Ed) s 6

*Toh Kian Sing, Ian Teo and Aston Lai (Rajah & Tann LLP) for the plaintiff;*
*Rakesh Vasu and Winnifred Gomez (Gomez & Vasu) for the defendant.*

[Editorial note: The defendant's appeal to this decision in Civil Appeal No 137 of
2009 was dismissed by the Court of Appeal on 29 April 2010 with no written
grounds of decision rendered.]

28 January 2010

**Andrew Ang J:**

**Introduction**

1       This was an appeal against the decision of the assistant registrar
("the AR") in Summons No 3009 of 2009 who ordered that all further
proceedings in the action brought by the plaintiff against the defendant be
stayed in favour of arbitration in Singapore.

**Background**

*The parties*

2       The plaintiff, Transocean Offshore International Ventures Ltd, is a
company incorporated in the Cayman Islands. Its business includes that of
supplying mobile offshore drilling units and providing drilling services for
the development of oil and natural gas reserves.

3       The defendant, Burgundy Global Exploration Corporation, is a
company incorporated in the Republic of the Philippines. It was, at all
material times, in the business of exploration and development of oil and
gas resources in the Philippines.

*The facts*

4       The plaintiff and defendant were parties to a novated offshore drilling
contract dated 29 September 2008 read with Amendment No 1 dated
30 October 2008 (collectively "the Drilling Contract"). As novated, the
Drilling Contract provided for the plaintiff to supply a drilling unit or vessel

*C KIRK RHEIN JR* ("the Vessel") and related drilling services to the defendant.

5    The Vessel was to be made ready and thereafter mobilised from Singapore to the drilling site off the Philippines some time in January 2009. The commencement of such mobilisation by the plaintiff was defined by Art I(b) of the Drilling Contract as the "Commencement Date". Article 11 of the Drilling Contract then expressly stipulated that prior to the Commencement Date, it was a condition precedent that the plaintiff and defendant entered into an escrow agreement ("the Escrow Agreement") for the opening of an escrow account ("the Escrow Account"). The Escrow Agreement was backdated to 31 October 2008 to be consistent with the date of Amendment No 1.

6    The Escrow Agreement provided for the following:

   (a)    The establishment of the Escrow Account with the Singapore branch of Banco Bilbao in the joint names of the parties (cl 3.1(a)).

   (b)    The depositing by the defendant of the escrow amount ("the Escrow Amount") into the Escrow Account. The initial amount to be paid into this account was US$16.5m (cl 3.2(a)) payable on or before 15 December 2008 or 30 days prior to the Commencement Date, whichever was the earlier. Failure to deposit moneys into the Escrow Account in accordance with cl 3.2 entitled the plaintiff to terminate the Drilling Contract (cl 2).

   (c)    Further funding of the Escrow Account by the defendant on a monthly basis (cl 3.2(b)).

   (d)    Release of the funds in the Escrow Account to the plaintiff against joint instructions from the parties upon the defendant receiving an original invoice from the plaintiff (cll 4.1 and 4.2).

7    The defendant failed to deposit the Escrow Amount in accordance with cl 3.2(a). The plaintiff treated the defendant's failure to deposit as a repudiatory breach which it elected to accept. Accordingly, in accordance with the general law and cl 2 of the Escrow Agreement, which conferred on the plaintiff the right to terminate the Drilling Contract should the defendant fail to deposit the Escrow Amount into the Escrow Account in accordance with cl 3.2(a), the plaintiff issued a letter to the defendant on 22 December 2008 stating that it had:

   (a)    terminated the Drilling Contract pursuant to cl 2 of the Escrow Agreement; and

   (b)    accepted the defendant's repudiation of the Escrow Agreement due to its failure to deposit the Escrow Amount.

8    Thereafter, the parties entered into correspondence with the aim of finding a "suitably workable solution" but that did not bear fruit. The

plaintiff then commenced the current action claiming, *inter alia*, damages for the defendant's breach and/or repudiation of the Escrow Agreement. A writ was filed on 29 January 2009 with an amended writ and statement of claim filed subsequently on 19 March 2009.

9      Subsequent to the commencement of the suit, the defendant appeared before the AR in Summons No 3009 of 2009 seeking a stay of the action brought by the plaintiff in favour of arbitration. The AR granted the application on the basis that the Escrow Agreement could not be seen as being separate and distinct from the Drilling Contract. Hence, the arbitration clause under the Drilling Contract could be extended to cover disputes arising out of the Escrow Agreement. Further, she also found that the true dispute between the parties lay under the Drilling Contract and, accordingly, that the matter ought to be stayed in favour of arbitration pursuant to Art 25.1 of the Drilling Contract.

### The issues

10      What is significant for the purposes of this appeal is that the Drilling Contract and the Escrow Agreement have different dispute resolution clauses.

### The dispute resolution clause under the Escrow Agreement

11      Clause 6.2(a) of the Escrow Agreement confers non-exclusive jurisdiction in favour of the Singapore courts. It reads as follows:

> Each of the Parties *irrevocably submits to and accepts generally and unconditionally the non-exclusive jurisdiction of the courts and appellate courts of Singapore* with respect to *any legal action or proceedings* which may be brought at any time *relating in any way to this Agreement*. [emphasis added]

12      Clause 6.2(b) further provides:

> Each of the Parties *irrevocably waives any objection* it may now or in the future have to the venue of any action or proceedings, and any claim it may now or in the future have that the action or proceeding has been brought in an inconvenient forum. [emphasis added]

### The dispute resolution clause under the Drilling Contract

13      The Drilling Contract provides for arbitration in the event of disputes between the parties. In so far as it is material to this appeal, Art 25 (as amended) reads:

> 25.1   **Arbitration**
>
> The following Dispute Resolution provision **shall apply to this Contract**.
>
> (a)    Any dispute, controversy or claim arising out of or in relation to or in connection **with this Contract**, including without limitation any dispute as to the construction, validity,

interpretation, enforceability, performance, expiry, termination or breach of ***this Contract*** whether based on contract, tort or equity, shall be exclusively and finally settled by arbitration in accordance with this Article XXV. Any Party may submit such a dispute, controversy or claim to arbitration by notice to the other Party.

(b)  The arbitration shall be heard and determined by three (3) arbitrators. Each side shall appoint an arbitrator of its choice within fifteen (15) days of the submission of a notice of arbitration. The Party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within thirty (30) days following the appointment of both Party-appointed arbitrators. If the Party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal and/or one Party refuses to appoint its Party-appointed arbitrator within said thirty (30) day period, the appointing authority for the implementation of such procedure shall be the London Court of International Arbitration ("*LCIA*"), who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

(c)  Unless otherwise expressly agreed in writing by the Parties to the arbitration proceedings:

  (i)  The arbitration proceedings shall be held in Singapore;

  (ii)  The arbitration proceedings shall be conducted in the English language and the arbitrator(s) shall be fluent in the English language;

  (iii)  The arbitrator(s) shall be and remain at all times wholly independent and impartial;

  (iv)  The arbitration proceedings shall be conducted under the LCIA Rules, as amended from time to time ("*LCIA Rules*"), which Rules are deemed to be incorporated by reference into this Section 25.1;

  (v)  Any procedural issues not determined under the LCIA Rules shall be determined by the applicable laws of Singapore, other than those laws, which would refer the matter to another jurisdiction;

…

## 25.2  Continuing Obligation

The provisions of this Article XXV shall continue in force notwithstanding the expiration or prior termination of ***this Contract***.

[emphasis added in bold italics]

**The court's decision**

14    After hearing both parties, I allowed the plaintiff's appeal against the AR's decision. I set out the grounds of my decision below:

### The defendant's breaches of the Escrow Agreement

15    The plaintiff's cause of action against the defendant was a straightforward claim arising from the defendant's failure to pay the Escrow Amount into the Escrow Account in accordance with the terms of the Escrow Agreement. Indeed, the defendant did not dispute that it failed to deposit the requisite sum pursuant to cl 3.2(a) of the Escrow Agreement. As such, the claim fell squarely within cl 3.2(a) of the Escrow Agreement. The defendant argued that the termination of the Drilling Contract was premised on a breach of the Drilling Contract. Since Art 25.1 of the Drilling Contract provided that any dispute to the termination or breach would be governed by arbitration, Art 25.1 would also apply to the plaintiff's claim in this action. I rejected this argument as the reason for the termination was the defendant's breach of the Escrow Agreement.

### The inapplicability of Art 25 of the Drilling Contract

16    The burden then fell on the defendant to establish why the jurisdictional agreement in favour of the Singapore courts should not be honoured. Generally, a party wishing to depart from a non-exclusive jurisdiction clause must show exceptional circumstances amounting to strong cause before it may be allowed to do so: *S & W Berisford Plc v New Hampshire Insurance Co* [1990] 2 QB 631; *Bayerische Landesbank Girozentrale v Kong Kok Keong* [2002] 1 SLR(R) 485; *Bambang Sutrisno v Bali International Finance Ltd* [1999] 2 SLR(R) 632 ("*Bambang Sutrisno*") and *The Hung Vuong-2* [2000] 2 SLR(R) 11. In the present matter, it was pertinent for the defendant to establish that such strong cause for departure existed, given that cl 6.2 of the Escrow Agreement conferred non-exclusive jurisdiction in favour of the Singapore courts and waived jurisdictional objection in the same clause; and the Court of Appeal had made it clear in *Bambang Sutrisno* that the situation involving a non-exclusive jurisdiction clause (cl 6.2(a)) coupled with a waiver of jurisdictional objection (cl 6.2(b)) was akin to that of an exclusive jurisdiction clause in a contract.

17    The plaintiff relied on *The Hung Vuong-2* as authority that the court may examine whether there were any real and genuine defences to the claim in determining whether there was any strong cause for the defendant not to be held to the jurisdictional agreement. In the present matter, the defendant raised two defences. The first defence related to terms allegedly implied into the Drilling Contract and the Escrow Agreement. The defendant alleged that it was not obliged to deposit the Escrow Amount unless and until the following implied obligations or conditions precedent in the Drilling Contract and the Escrow Agreement were satisfied:

(a)    the plaintiff had provided various information and documents;

(b)    the plaintiff had facilitated the defendant in the conduct of certain feasibility studies;

(c)    the parties had reached an agreement on the Commencement Date or delivery date for the mobilisation of the Vessel; and

(d)    the defendant had inspected and approved the Vessel.

The second defence was based on Art 19.1 of the Drilling Contract, a clause purporting to absolve the defendant from liability for the plaintiff's consequential loss:

> Notwithstanding any provisions to the contrary elsewhere in the Contract, [the defendant] shall save, indemnify, release, defend and hold harmless [the plaintiff] Group from [the defendant] Group's own Consequential Loss and *[the plaintiff] shall save, indemnify, release, defend and hold harmless [the defendant] Group from [the plaintiff] Group's own Consequential Loss*. [emphasis added]

18    The plaintiff dealt at length with the two defences. With regard to the implied conditions precedent, the plaintiff argued cogently that there was no room for implying the same. One of the reasons it put forth was that none of these implied conditions precedent were ever alleged prior to the stay application (despite parties having exchanged extensive correspondence prior to the deadline for payment of the Escrow Amount) and that:

> On a general level (which applies to both 'terms implied in fact' as well as 'terms implied in law'), an implied term, as R E Megarry so aptly put it, is 'so often the last desperate resort of counsel in distress' (see R E Megarry, *Miscellany-at-Law* (Stevens & Sons Limited, 1955) at p 210 (*per* Andrew Phang Boon Leong JA in *Ng Giap Hon v Westcomb Securities Pte Ltd and others* [2009] 3 SLR(R) 518 at [45])

Moreover, since, by the defendant's own argument, the conditions precedent were to be implied into both the Escrow Agreement and the Drilling Contract, there was no reason to stay the action as it would be open to the defendant to rely upon the defence (for what it was worth) in the court proceedings. With regard to Art 19.1 of the Drilling Contract, the plaintiff argued that it was a red-herring. I agreed, though not for all the reasons proffered by the plaintiff.

19    Most importantly, the pre-occupation with the defences was, to my mind, based on an unwarranted extrapolation of the holding in *The Hung Vuong-2* ([16] *supra*). Upon a closer reading, I did not think that that case was entirely apropos. *The Hung Vuong-2* held that:

(a)    a party had to show "strong cause" where it sought to bring an action in a different jurisdiction from that provided for in the jurisdiction clause;

(b)    one of the factors which the court would take into account in determining "strong cause" was whether the party, which was seeking to take the action out of the contractual forum, genuinely desired trial in that foreign jurisdiction or was only seeking procedural advantages; and

(c)    it would be difficult for that party to contend that he genuinely desired trial if he was unable to show that there was a real dispute, *ie*, that he had a real defence to the claim and, accordingly, the court was entitled to look into the alleged defence to determine if there was any real substance to it.

*The Hung Vuong-2* involved a situation where parties could not agree on the jurisdiction under which the action ought to be brought. In other words, the tussle was between having the matter heard before the courts of one jurisdiction over the courts of *another jurisdiction*. The present matter, however, did not involve such a transnational element. Parties simply could not agree on whether the action ought to be brought before a court or an arbitration tribunal, *both of which are in Singapore*. The dispute was hence over the mode of dispute resolution, rather than jurisdiction.

20    In any event, I was firmly of the view that the defendant had not established a strong cause for departing from the agreement submitting to the jurisdiction of the Singapore courts. To my mind, Art 25 of the Drilling Contract did not apply for four reasons.

*Carving out of the Escrow Agreement from the Drilling Contract*

21    First, from a reading of the Escrow Agreement and the Drilling Contract, I was of the view that the parties had intentionally carved the former out from the latter and expressly subjected the former to a non-exclusive jurisdiction clause rather than an arbitration clause. Article 11 of the Drilling Contract demonstrated that the parties had agreed to carve out escrow matters from the Drilling Contract and to put them in a separate agreement. That evinced a clear intention by the parties to subject claims arising from the Escrow Agreement to the dispute resolution clause found within that particular agreement. Counsel for the plaintiff submitted that the motivation behind this move was to ensure quicker relief, in the event that the obligations contained in the Escrow Agreement were breached than if the matter were arbitrated, as there was no procedure under the London Court of International Arbitration Rules for a final interim award. I agreed with that submission as the obligations of the Escrow Agreement were relatively straightforward and non-technical in nature, as compared with those under the Drilling Contract. Counsel for the defendant, on the other hand, highlighted several references made in the Escrow Agreement to the Drilling Contract to support his position that the Escrow Agreement and the Drilling Contract were inextricably linked and that the former could not be seen on its own, separate and distinct from the Drilling

Contract. He relied, *inter alia*, on cl 4.1(b) of the Escrow Agreement, which required the plaintiff's invoice to be in accordance with Art 13 of the Drilling Contract, and cl 3.2(b) of the Escrow Agreement which made repeated reference to the word "Term" (which definition under cl 1.1 of the Escrow Agreement included the phrase "unless terminated in accordance with terms of the Drilling Contract"). I was not convinced by that argument, as a contract may refer to a separate contract without necessitating the conclusion that both were inextricably linked with each other. Further, it could equally be said that the limited reference to the Drilling Contract supported the view that the Drilling Contract was not intended to apply as a whole. There was no specific provision incorporating Art 25 of the Drilling Contract into the Escrow Agreement. Neither was there any general incorporation clause in the latter. The law provides that distinct and specific words are required to incorporate an arbitration clause into a contract. In *L & M Concrete Specialists Pte Ltd v United Eng Contractors Pte Ltd* [2000] 2 SLR(R) 852, Choo Han Teck JC stated at [18] that "arbitration clauses like exemption clauses, must be expressly brought to the attention of the other contracting party". In the present matter, not only was there no clause specifying that the arbitration clause was to be incorporated into the Escrow Agreement, there was an express clause conferring jurisdiction on the Singapore courts. Accordingly, incorporating an arbitration clause into the Escrow Agreement would be plainly inconsistent with the clear wording of cl 6.2 of the Escrow Agreement.

*Proper construction of Art 25 of the Drilling Contract*

22    Second, despite its apparent width, Art 25, as properly construed, did not extend to the claim in question. From the wording of the arbitration clause, it was clear that Art 25 was principally concerned with claims and disputes arising out of or in relation to the Drilling Contract, even though it also extended to those "in connection with" the Drilling Contract. After the general words "[a]ny dispute, controversy or claim arising out of or in relation to or in connection with this Contract", the examples of the types of dispute included were all those arising out of the Drilling Contract. Article 25.1 made repeated references to the phrase "this Contract". Further, Art 25.1(a) was preceded by an introductory sentence, which explicitly limited the parameters of the dispute resolution clause to cover claims arising out of the Drilling Contract only, as opposed to the Escrow Agreement: "The following Dispute Resolution provision shall apply to this Contract". This ought not to be dismissed as mere verbiage. Despite Art 25's apparent width, a dispute squarely under the Escrow Agreement and having at best a tenuous connection with the Drilling Contract ought not to be governed by Art 25 when cl 6.2 of the Escrow Agreement was clearly by far the more proximate dispute resolution clause.

23    I was reinforced in my view by *Coop International Pte Ltd v Ebel SA* [1998] 1 SLR(R) 615 ("*Coop International*"), a case concerning a subsequent agreement which did not contain an arbitration clause even though the original agreement that was subsequently terminated did. Parallels could be drawn between the arbitration clause in *Coop International* which covered "any dispute arising out of or in connection with the *present agreement* …" [emphasis added], and Art 25.1 of the Drilling Contract, in that both were drafted broadly. In construing the arbitration clause, Chan Seng Onn JC held that the arbitration clause in the original agreement did not extend to a dispute which arose out of the subsequent agreement. He rejected the respondents' argument which was based on the width of the arbitration clause and applied instead a test of "sufficient connection or relation" to the agreement containing the arbitration clause. The following remarks of Chan JC bear repetition:

> 24    Counsel for the respondents submitted that the dispute in question fell within the scope of the arbitration clause 12.2 as it was worded in very wide terms covering 'any disputes arising out of or in connection with' the distributorship agreement.
>
> 25    *Certainly the words of the clause are of wide import but its scope is not unlimited. The issues in dispute must still have arisen out of or be reasonably connected with the distributorship agreement.* If the dispute concerns a breach of the agreement itself or the proper interpretation of the terms of the distributorship agreement, then the arbitration clause would cover it.
>
> 26    However, if the parties subsequently enter a new agreement or a series of new agreements which do not have any arbitration clauses, and the dispute concerns these new agreements and not the original distributorship agreement, it becomes much less clear (a) whether the dispute in fact has any connection at all with the original agreement; and (b) whether the arbitration clause contained in the original agreement is applicable at all to the later agreements.
>
> 27    Hence, if a dispute concerns a transaction entirely unrelated to the distributorship agreement, I do not think that the arbitration clause 12.2 as drafted is capable of governing that dispute. Where the present dispute does not arise from the terms of the distributorship agreement or from the execution of that agreement itself, I find it difficult to see how the arbitration clause 12.2 can be applicable.

[emphasis added]

24    Chan JC found support for his observations in *Kianta Osakeyhtio v Britain & Overseas Trading Co Ltd* [1954] 1 Lloyd's Rep 247 where Morris LJ at 252:

> The compensation agreement itself in one sense arose out of the 1937 contract, but the compensation agreement, as it seems to me, was *a new agreement and self-contained agreement*. It was an agreement which had an *independent existence. The dispute which arose out of that compensation agreement concerning its meaning was not in my view a dispute arising either*

> *out of the interpretation or the fulfilment of the contract of 1937.*
> [emphasis added]

*Clause 6.2 of the Escrow Agreement prevailed over Art 25.1 of the Drilling
Contract*

25    Third, the defendant's approach to the Escrow Agreement and the
Drilling Contract was to look upon the former as an extension of the latter
and/or to construe the two together as though they were one document.
The implicit assumption of the defendant's case was that Art 25 was of
general application. Even if the Escrow Agreement was regarded as an
extension of the Drilling Contract or as one with the latter, the defendant's
position was still untenable. Clause 6.2 of the Escrow Agreement did not
purport to deal with any disputes arising out of the Drilling Contract.
Instead, it focussed only on claims arising out of the Escrow Agreement.
This was clear from the wording of cl 6.2(a), which explicitly provided for
the non-exclusive jurisdiction of the Singapore courts:

> … with respect to any legal action or proceedings which may be brought at
> any time relating in any way to this Agreement (ie, the Escrow Agreement).
> [emphasis added]

It is also a trite canon of construction that the general should give way to
the specific. Given the specificity of cl 6.2 of the Escrow Agreement, it
overrode Art 25 as the claim arose out of the Escrow Agreement.

26    In addition, I was of the view that where different but related
agreements contained overlapping and inconsistent dispute resolution
clauses, the nature of the claim and the particular agreement out of which
the claim arose ought to be considered. Where a claim arose out of or was
more closely connected with one agreement than the other, the claim ought
to be subject to the dispute resolution regime contained in the former
agreement, even if the latter was, on a literal reading, wide enough to cover
the claim. I found judicial support for this view in the English decisions of
*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999]
1 Lloyd's Rep 767 ("*Credit Suisse First Boston*") and *UBS AG v HSH
Nordbank AG* [2009] 2 Lloyd's Rep 272 ("*UBS AG*"). Both cases concerned
inconsistent jurisdiction clauses in separate agreements. In the former, a
case involving the purchase of a series of bonds by a hedge fund from a
bank, the purchase agreement contained an exclusive jurisdiction clause in
favour of the English courts but the re-purchase agreement contained a
non-exclusive jurisdiction clause in favour of the English courts and
entitled either party to bring a claim in a court of competent jurisdiction.
The bank made a margin call which the hedge fund was unable to pay, as a
result of which the hedge fund became liable to re-purchase the bonds. It
failed to pay the re-purchase price and that led the bank to commence
proceedings in England. The hedge fund then commenced proceedings in
New York against the bank for misrepresentation and fraud, which the

bank sought to restrain by way of an anti-suit injunction against the New York proceedings in the English courts. To enable it to obtain the anti-suit injunction to restrain the New York proceedings, the bank had to show that the governing jurisdiction clause was the exclusive English jurisdiction clause found in the purchase agreement. That contention was rejected by Rix J. At 777, the learned judge said:

> … where different agreements are entered into for different aspects of an overall relationship, and *those different agreements contain different terms as to jurisdiction*, it would seem to be applying *too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette.* [emphasis added]

Rix J further considered whether the complaint in the New York action arose out of the purchase agreement or the re-purchase agreement and decided in favour of the latter. He concluded at 777 that the English jurisdiction clause in the purchase agreement was either inapplicable or, if applicable, overridden by the non-exclusive jurisdiction clause in the re-purchase agreement:

> I am nevertheless reluctant to hold that those of [the hedge fund's] claims in its New York complaint which refer to [the re-purchase agreement] are claims which arise out of or in connection with the [purchase agreements] and do not arise out of or in connection with the [re-purchase agreement]. If they arise out of or in connection with both the [purchase agreement] and the [re-purchase agreement], then, where the jurisdiction clauses are in conflict, I do not see why the [re-purchase agreement] clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by [the bank], [the hedge fund] should be entitled to exercise the broader rights; or *on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved.* [emphasis added]

27    Rix J's approach was reaffirmed very recently by the English Court of Appeal in the second case of *UBS AG* ([26] *supra*) which also involved two jurisdiction clauses, one in favour of England and the other, New York. Lord Collin was of the view at 286 that:

> 94.    … [Rix J] must have meant as a matter of construction, … that the *parties must be taken to have intended that, where a dispute fell within both sets of agreements, it should be governed by jurisdiction clause in the contract which was closer to the claim.*
>
> 95.    In this case it is not necessary to go so far. *Whether a jurisdiction clause applies to a dispute is a question of construction. Where there are numerous jurisdiction agreements which may overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses.* The jurisdiction clause in the Dealer's Confirmation is a 'boiler plate' bond issue jurisdiction clause, and is primarily intended to deal with technical banking disputes. *Where the parties have entered into a complex transaction it is the jurisdiction*

> *clauses in the agreements which are at the commercial centre of the transaction*
> *which the parties must have intended to apply to such claims as are made in*
> *the New York complaint and reflected in the draft particulars of claim in*
> *England.*

[emphasis added]

*Inapplicability of section 6 of the International Arbitration Act*

28    Fourth, the defendant sought to rely on s 6 of the International
Arbitration Act (Cap 143A, 2002 Rev Ed) ("IAA") which provides:

> **Enforcement of international arbitration agreement**
>
> **6.**—(1) Notwithstanding Article 8 of the Model Law, where any party to an
> *arbitration agreement* to which this Act applies institutes any proceedings in
> any court against any other party to the agreement in respect of any matter
> which is the subject of the agreement, any party to the agreement may, at any
> time after appearance and before delivering any pleading or taking any other
> step in the proceedings, apply to that court to stay the proceedings so far as
> the proceedings relate to that matter. [emphasis added]

However, I was of the view that this section was not applicable as s 6 could
only be invoked if the claim from which the proceedings arose fell within
the scope of an arbitration agreement; the Escrow Agreement did not
contain an arbitration clause. In *Tjong Very Sumito v Antig Investments Pte
Ltd* [2009] 4 SLR(R) 732 ("*Tjong Sumito*"), the Court of Appeal made
it clear at [22] that s 6 of the IAA could only be invoked if the party
applying to stay the action could show that the instituted proceedings fell
within the scope of an arbitration agreement:

> Section 6 of the IAA acknowledges the primacy of the specific arbitration
> agreement in question. In order to obtain a stay of proceedings in favour of
> arbitration under s 6, the party applying for a stay ('the applicant') must first
> show that that he is party to an arbitration agreement, and that the
> proceedings instituted involve a 'matter which is the subject of the
> [arbitration] agreement'. In other words, the applicant has to show that the
> *proceedings instituted fall within the terms of the arbitration agreement*. If the
> applicant can show that there is an applicable arbitration agreement, then the
> court *must* grant a stay of proceedings unless the party resisting the stay can
> show that one of the statutory grounds for refusing a stay exists, *ie*, that the
> arbitration agreement is '*null and void, inoperative or incapable of being
> performed*'. [emphasis in original]

29    In any event, even if proceedings instituted under the Escrow
Agreement did fall within the scope of Art 25.1, that provision had been
rendered inoperative by the parties entering into the subsequent Escrow
Agreement. By introducing a jurisdiction clause in the subsequent Escrow
Agreement, the defendant waived the agreement to arbitrate and was,
accordingly, estopped from asserting its rights to insist on arbitration. This
was explained by the Court of Appeal in *Tjong Very Sumito* at [53]:

To these illustrations we would add cases where *the party applying for a stay has waived or may be estopped from asserting his rights to insist on arbitration, such as where the parties have agreed subsequently that disputes may be resolved by litigation*. The facts of such a case would fall to be decided in accordance with the usual contractual analysis of estoppel and or waiver on the basis that *the arbitration agreement is 'inoperative'*, see s 6(2) of the IAA. There are no impediments, under the IAA, preventing the parties to an arbitration agreement from agreeing to resolve the matter in any other manner that they may find more convenient. *In such a case, the agreement to arbitrate will be treated as having been waived as the parties are free to modify their agreement at any time*. [emphasis added]

**Conclusion**

30    All in all, the defendant's application for stay before the AR was really no more than a tactic to delay the progress of this suit. Allowing the stay to continue in operation would have meant allowing a defendant to subvert a plaintiff's contractual right to commence action in a particular venue by alleging defences that were purportedly based on another agreement. That could not be allowed, particularly when both parties clearly intended to subject any dispute arising out of a subsequent carved-out agreement to the Singapore courts. Accordingly, I allowed the plaintiff's appeal with costs fixed at $12,000 plus reasonable disbursements for the reasons above. I also set aside the costs ordered below.

Reported by Vanessa Yeo.