IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered) |

**DECLARATION OF TARO TANAKA IN FURTHER SUPPORT OF DEBTORS' AMENDED OBJECTION TO PROOFS OF CLAIM FILED BY SETH MELAMED AND MOTION FOR SUBORDINATION PURSUANT TO 11 U.S.C. §§ 510(b) AND 510(c)(1) AND IN SUPPORT OF DEBTORS' OPPOSITION TO CLAIMANT'S CROSS-MOTION TO COMPEL ARBITRATION**

I, Taro Tanaka, of Miura & Partners, 3F East Tower Otemachi First Square 1-5-1, Otemachi, Chiyoda-ku, Tokyo 100-0004, Japan, hereby declare under penalty of perjury:

**Introduction and Scope of Opinion**

1. I submit this declaration in further support of the *Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) And 510(c)(1)* [D.I. 28643] (the "Amended Objection"), and in response to two declarations filed by Seth Melamed: the *Declaration of Ryo Kawabata* [D.I. 30078] (the "Kawabata Declaration") and the *Declaration of Takane Hori in Support of Payment of Post Petition Director's Fees* [D.I. 30080] (the "Hori Postpetition Declaration").

2. I am a partner at the law firm Miura & Partners. In addition to the background information provided in the *Declaration of Taro Tanaka* [D.I. 28646], I was previously a part of Freshfields's international arbitration team, specializing in international arbitration and litigation, and have published several articles on the subject.

3. This declaration addresses (i) the interpretation of the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) (the "SPA") [D.I. 28645-1 Ex. 3], dated November 19, 2021; and (ii) Mr.

Melamed's claim for postpetition compensation in his *Request for Payment of Administrative Expense* [D.I. 27798] (the "Administrative Claim").

4. For the purposes of this declaration, I have reviewed the SPA, the Management Agreement (as defined below), Mr. Melamed's Administrative Claim, and both parties' briefs and submissions to date, including the *Opposition to Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1) and Cross-Motion to Compel Arbitration* [D.I. 30077] (the "Amended Opposition"). The authorities and other documents to which I make reference are appended to this Declaration.

## Background and Relevant Agreements

5. On November 19, 2021, FTX Trading Ltd. ("FTX"), Mr. Melamed, and others executed the SPA, pursuant to which FTX acquired Mr. Melamed's interests in Liquid Group, Inc. I understand that as a condition to the closing of the SPA, Mr. Melamed and the Debtors also entered into a management agreement, which was subsequently amended from time to time. (SPA § 3.1.) The relevant version of this agreement is the Amended and Restated Management Agreement between FTX Japan Holdings K.K. and Mr. Melamed (the "Management Agreement"), dated October 19, 2022. [D.I. 28645-1 Ex. 5.]

## The SPA is Governed by Japanese Law, Except for Its Arbitration Provision

6. There are two choice of law provisions set forth in the SPA. The arbitration clause states that it is governed by Singapore law (SPA § 19.4), and the remainder of the SPA is governed by Japanese law (SPA § 19.1).

7. In the Kawabata Declaration, Mr. Kawabata does not address the validity or enforceability of the SPA's arbitration clause, but nonetheless concludes that a Japanese court

-2-

would uphold the clause. (Kawabata Decl. ¶ 8–9.) However, he provides no supporting basis for this conclusion, which appears inconsistent with both the conflict of law rules of Japan and internationally adopted arbitration practice.

8. As a general rule of the conflict of laws, courts in Japan will honor the choice of law provisions of a private contract pursuant to Article 7 of the Act on General Rules for Application of Laws (Act No. 78 of June 21, 2006), which provides: "The formation and effect of a juridical act are governed by the law of the place chosen by the parties at the time of the act."

9. Parties may also specify that different laws govern different parts of a contract. The Supreme Court of Japan held in the Ringling Circus Judgement that "[A]rbitration is a dispute resolution procedure without the involvement of a national court. It is based on an agreement by the parties that a dispute is submitted to arbitrators who are third parties to the dispute, and that the parties are to be bound by an arbitral award. Considering the essential nature of arbitration, which is based on an agreement between parties, it is appropriate that with regard to formation and validity of an arbitration agreement in so-called international arbitration, the governing law shall be primarily determined by the parties' intentions pursuant to Article 7.1 of the Conflict of Law *[Note: equivalent to Article 7 of the current Act on General Rules for Application of Laws]*."[1] In that particular case, the relevant arbitration clause did not explicitly identify the law governing the arbitration agreement. The Court found that since the seat of arbitration was New York, there was an implied term to choose the law of New York as the law governing the arbitration agreement.

---

[1] Saiko Saibansho [Sup. Ct.] Sep. 4, 1997, 51-8, Saiko Saibansho Minji Hanreisyu, p. 3659. The Tokyo District Court has also held that in determining the formation and validity of so-called international arbitration agreements, Article 7 of the General Rules for the Application of Laws would apply and the governing law of arbitration agreements shall be primarily determined by the parties' intention (Tokyo District Court Judgement, June 19, 2020, L07530758, p. 6).

10. Also, Article 13.6 of the Arbitration Act of Japan (Act No. 138 of August 1, 2003) includes the principle of the separability of the arbitration clause. Therefore, an arbitration clause is generally treated as an agreement independent of the other terms of the contract.[2] This means an arbitration agreement can be governed by a law different from the law governing the main contract. In other words, even if the underlying contract is governed by Japanese law, the arbitration agreement contained within it may be governed by another law. This principle is well-established under Japanese law.[3]

11. In this present case, given that the relevant clause expressly states that the arbitration agreement is governed by the laws of Singapore (SPA §19.4), it is my professional opinion as both an arbitration practitioner and litigator in Japan, that a Japanese court would apply Singapore law, not Japanese law, to determine the enforceability, validity, and scope of the arbitration agreement. Mr. Kawabata overlooks the specific provision in SPA §19.4 that designates the governing law of the arbitration agreement. Therefore, Mr. Kawabata, who is not qualified as a Singapore lawyer, is not in a position to provide a legal opinion on the enforceability, validity or scope of the arbitration clause, which is governed by Singapore law.

12. Also, Mr. Melamed argues that all claims should be resolved through arbitration in Singapore, on the basis that they arise from *either* the SPA or the Management

---

[2] This approach is consistent with the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "<u>New York Convention</u>"), and UNCITRAL Model Law on International Commercial Arbitration (1985), with amendments as adopted in 2006 (the "<u>Model Law</u>"). The New York Convention and the Model Law primarily apply the laws chosen by the parties when the validity of an arbitration agreement is disputed in relation to the enforcement or setting-aside of an arbitral award. (New York Convention art. 5.1.a; Model Law art. 34(2)(a)(i), 36(1)(a)(i).)

[3] Professor Emeritus of Chuo University, Takeshi Kojima and Professor of Chuo University Takashi Inomata state in "Arbitration Act" (p. 611, Nihon Hyoronsha, 2014) that "the validity of an arbitration agreements shall be determined specifically based on the law governing the arbitration agreement itself, rather than on the validity of the underlying contract."

Agreement. (Am. Obj. ¶ 43.) However, in situations like the present case, where two separate agreements contain different dispute resolution provisions, Japanese courts will respect the parties' contractual choices. That is, if a claim based on the Management Agreement was filed with the Tokyo District Court, the court would not dismiss it merely because the defendant invoked the SPA's arbitration clause. The arbitration provision in the SPA cannot override the Management Agreement's own forum selection clause. (Management Agreement § 16.) In light of the dispute resolution clauses in the two agreements, Mr. Melamed's assertion that all of his claims must be resolved through arbitration is incorrect.[4]

13. Japanese courts determine the formation and validity of an arbitration agreement only after carefully examining the specific facts and circumstances of the case. For example, the Tokyo High Court stated that, as a general rule, the formation and validity of an arbitration agreement must be determined with great care, given that such an agreement includes a waiver of the right to bring a claim in court. It is therefore naturally required that the parties have a clear and mutual intention to submit disputes to arbitration.[5]

14. In the present case, any mutual intention to submit disputes to arbitration clearly exists only in relation to SPA. Therefore, although the SPA contemplates the execution of the Management Agreement, the Management Agreement is a completely separate contract, with different parties and its own forum selection clause, and there are no circumstances suggesting that the intention to arbitrate under the SPA should extend to the Management Agreement. Specifically, the SPA includes not only Mr. Melamed and Liquid Group Inc. (later FTX Japan Holdings K.K.),

---

[4] It is unclear whether Mr. Melamed requests arbitration of the entire Administrative Claim as well. For the avoidance of doubt, the same analysis applies to the Administrative Claim: namely, that the arbitration provision of the SPA would not expand to reach claims arising from other agreements.

[5] Tokyo High Court Judgement, Nov. 26, 1979, Tokyo High Court, Judgment Jiho Minji, Vol. 30, No. 11, p. 301.

but also multiple shareholders of then-Liquid Group Inc. In contrast, the parties to the Management Agreement are only Mr. Melamed and FTX Japan Holdings K.K.

15. Japanese courts have addressed a similar scenario and held that an arbitration clause in an earlier agreement does not automatically extend to a related subsequent contract. The Tokyo High Court held that the arbitration clause only extends to the subsequent contract when the subsequent contract is "supplemental" to and "integrated" in the earlier agreement. Conversely, when there are "special circumstances," such as "an express agreement to nullify the terms of the original contract," the arbitration clause does not reach to cover disputes arising from the subsequent contract.[6] Here, the Management Agreement's forum selection clause is an agreement between the parties to resolve disputes in the Tokyo District Court, not in arbitration. (Management Agreement § 16.) This reflects the parties' express intent to replace or override the SPA's arbitration clause. As such, there are "special circumstances" justifying the conclusion that the SPA's arbitration clause does not extend to the Management Agreement.

### Mr. Melamed Was Appropriately Terminated for Justifiable Grounds and Is Not Entitled to Any Compensation after Termination

16. Regarding Mr. Melamed's Administrative Claim for postpetition compensation, it is my professional opinion that the terms of the Management Agreement set the standard for the interpretation of Article 339.2 of the Companies Act of Japan (Act No. 86 of July 26, 2005) (the "Companies Act"). As discussed further below, the parties here contracted out of the default standard set out by the Companies Act, so any claim must be evaluated by using the terms of the Management Agreement to construe Article 339 of the Companies Act.

---

[6] Tokyo High Court Judgement, October 9, 1990, Kinyū Shōji Hanrei, No. 863, p. 45.

17. However, even if the Management Agreement is not taken into account in interpreting the Companies Act, the Companies Act only requires compensation for damages when there is no "justifiable ground" for termination. Mr. Melamed was terminated based on "justifiable grounds" under Article 339.2 of the Companies Act and as a result, Mr. Melamed is not entitled to any compensation after termination. Also, he was terminated with proper cause under the terms of the Management Agreement and using proper procedure in accordance with the terms of the Management Agreement.

18. The purpose of Article 339.2 of the Companies Act is to strike a balance between the shareholders' authority to dismiss directors at any time under Article 339.1 and the protection of those directors' expectations regarding the terms of their appointment. Under Article 339.2, directors who are dismissed on "justifiable grounds" are not entitled to seek damages arising from their termination. "Justifiable grounds" may include acts in violation of laws, or a significant unsuitability for the role (e.g., clear lack of managerial ability).[7]

19. In assessing whether "justifiable grounds" exist, the terms of the Management Agreement between the company and the director also should be considered. Judges from Civil Division 8 of the Tokyo District Court, which specializes in corporate law and arbitration cases, have stated that it is reasonable to take the terms of management agreements into account when interpreting Article 339.2 of the Companies Act.[8] Therefore, for example, if a director violates duties set out in a management agreement and is terminated for cause, such

---

[7] Wataru Nishiyama *et al.*, "Issues Surrounding Lawsuits for Damages Arising from Unjust Dismissal of Directors," Hanrei Times No. 1496, p.7.

[8] Wataru Nishiyama *et al.*, "Issues Surrounding Lawsuits for Damages Arising from Unjust Dismissal of Directors," Hanrei Times No. 1496, p. 9.

termination may also be considered a dismissal based on justifiable grounds. Therefore, although the term "Cause" is used below, it would also satisfy the standard of "justifiable grounds."

20. In this case, on August 20, 2024, the Debtors sent a letter (the "August 20 Termination Letter") [D.I. 30081 Ex. B] to Mr. Melamed, informing him of his termination for "Cause." The August 20 Termination Letter stated that Mr. Melamed was in breach of section 3.1(e) of the Management Agreement by virtue of his filing of the *Joinder of Seth Melamed to the Objections to the Plan Raised by the Retail Customers and Reservation of Rights* [D.I. 23167] (the "Plan Joinder"). The August 20 Termination Letter informed Mr. Melamed that he would have 30 days to cure the breach (which period expired on September 19, 2024), after which he would be deemed terminated for "Cause."

*Basis for Termination*

21. I disagree with Ms. Hori's assertion that Mr. Melamed did not breach the Management Agreement. (Hori Postpetition Decl. ¶¶ 34–36.) It is my opinion that Mr. Melamed's filing of the Plan Joinder constituted a breach of section 3.1(e) of the Management Agreement. That section obliges Mr. Melamed to, among other things, "act at all times for the proper purposes of [FTX Japan Holdings]" and "act in good faith and diligently serve the Company and each member of the Group, as applicable, and use his best endeavors to promote the business and interests thereof." (Management Agreement § 3.1(e)(iii)–(iv).) Mr. Melamed's breach of section 3.1(e) therefore appropriately forms the basis of his for-Cause termination, which was communicated to him in the August 20 Termination Letter.

22. Section 3.1(e) of the Management Agreement is consistent with Japanese law, under which directors owe a duty of loyalty and must perform their duties faithfully in accordance with applicable laws and regulations, the articles of incorporation, and shareholder

resolutions. (Companies Act art. 355.) Accordingly, directors are prohibited from pursuing their personal interests at the expense of the company's. Mr. Melamed appears to have submitted the Plan Joinder to advance his personal interests, because he reserved rights to object to the treatment of higher-priority creditors in the event that any of his claims are subordinated. (*See* Plan Joinder ¶ 15.)

23. Moreover, even prior to filing the Plan Joinder, Mr. Melamed exhibited a consistent pattern of self-interested conduct. As described in further detail in the concurrently filed reply declaration from Henry Anthony Chambers, Mr. Melamed was working on the sale process for FTX Japan K.K. and responsible for reviewing and approving the settlement of FTX Japan K.K.'s intercompany liabilities to attract new bidders and higher bids while simultaneously preparing and submitting his own bid for the company.

24. In light of these factors, it is my opinion that Mr. Melamed repeatedly placed his personal interests above those of the Debtors, culminating in the submission of the Plan Joinder. This conduct constitutes a clear violation of Section 3.1(e) of the Management Agreement, for which Mr. Melamed was appropriately terminated for Cause. This conduct further demonstrates that Mr. Melamed's termination also qualifies as a dismissal based on "justifiable grounds"—it was a breach of his duty of loyalty under the Companies Act (and therefore, a breach of laws), as well as a clear case of significant unsuitability for the role as outlined in paragraph 18 above. In other words, even if the Court finds that Mr. Melamed's termination for Cause on August 20 is invalid for any reason, Mr. Melamed still would not be entitled to damages under the Companies Act because he was dismissed with "justifiable grounds." In any event, Mr. Melamed has waived any claims for "loss of office," including his claim under the Companies Act. (Management Agreement § 11.4(a).)

*Procedure*

25.     Also, I do not agree with Ms. Hori's assertion that the procedure of the August 20 termination for Cause breached the Management Agreement. (Hori Postpetition Decl. ¶ 33.) Ms. Hori contends that the Debtors breached by not listing, in the August 20 Termination Letter, a specific sentence within section 3.1(e) of the Management Agreement that Melamed breached. But nothing in the Management Agreement states that the Debtors were required to identify a specific ***subsection*** within section 3.1(e) that Melamed breached. Likewise, Article 339 of the Companies Act does not impose any such procedural requirement. The Management Agreement provides that in the event of for-Cause termination, the Debtors must specify "(i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date." (Management Agreement § 11.7.)

26.     The August 20 Termination Letter (i) identified the termination provision relied upon, which was section 11.2 governing termination for Cause; (ii) described the facts and circumstances providing the basis for termination by identifying the Plan Joinder and stating the section of the Management Agreement Mr. Melamed breached, which was section 3.1(e); and (iii) identified the applicable termination date, which was 30 days from receipt of the August 20 Termination Letter, or September 19, 2024.

*Scope of Compensation*

27.     In the case of dismissal based on justifiable grounds, there is no obligation to pay damages for the period after the dismissal date. Therefore, the scope of any potential claim would be governed by the terms of the Management Agreement.

28. Because Mr. Melamed was terminated with "justifiable grounds" and for Cause, I am of the opinion that Mr. Melamed is entitled to compensation accrued as of September 19, 2024, the date his termination for Cause became effective. The Management Agreement defines "Cause" as, among other things, a breach of the Management Agreement, "which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach." (Management Agreement at 2.) The Debtors provided such notice on August 20, 2024. The August 20 Termination Letter informed Mr. Melamed of his opportunity to cure the breach within 30 days, and that if he did not cure the breach, his termination for Cause would become effective. The cure period expired on September 19, 2024. In the event of termination for Cause, the Management Agreement entitles Mr. Melamed to receive accrued but unpaid compensation. (Management Agreement § 11.5.) Mr. Melamed's monthly compensation under the Management Agreement was $37,500 per month. (Management Agreement § 4.1.) It is my understanding that Mr. Melamed was paid through the month of July 2024, so as of his termination effective date, he accrued unpaid compensation between August 1, 2024 and September 19, 2024. Prorated, this is equal to $61,250.

29. In any event, if for any reason the termination for Cause is held to be invalid, Mr. Melamed was separately terminated without Cause on July 30, 2024.[9] Ms. Hori does not appear to challenge any aspect of the July 30 termination without Cause. A Japanese court would enforce this termination without Cause in the event that any defect were found in the for-Cause termination.[10]

---

[9] *Corrected Declaration of Seth Melamed in Support of Opposition to Debtors' Objection to Proofs of Claim* [D.I. 23173] Ex. 26.

[10] Although the first termination letter without Cause was sent to Mr. Melamed on July 30, 2024, the Debtors were permitted to terminate him for Cause later based on a new incident that occurred after the first termination letter was issued—including, in part, on grounds previously considered in the initial decision. Nothing in the Management Agreement precludes this. As the second termination letter took effect on September 19, 2024, prior to the effective date of the first, it supersedes the earlier termination.

**Even if Mr. Melamed Was Terminated Without Justifiable Grounds,
His Damages Are Limited by the Terms of the Management Agreement**

30. Even assuming that Mr. Melamed's termination was without "justifiable grounds" or effectuated without Cause, the scope of any resulting damages is contractually limited. Therefore, Ms. Hori is incorrect when she states that Mr. Melamed is entitled to receive remuneration, including bonuses and other benefits, for the remainder of his term pursuant to Article 339.2 of the Companies Act. (Hori Postpetition Decl. ¶ 26–30.)

31. Parties may—as the parties did here—agree in advance on the financial terms that will apply in the event of dismissal. In determining damages under Article 339.2 of the Companies Act, it is appropriate to consider the mutual intentions between the director and the company. For example, where the parties have agreed that, upon termination, only certain payments would be made, such terms should be respected and reflected in the interpretation of Article 339.2.[11] This interpretation aligns with the underlying purpose of Article 339.2 of the Companies Act. If directors have entered into a separate agreement—such as the Management Agreement—that limits the scope of compensation in the event of termination, they cannot reasonably expect to be paid through the end of their intended term.[12]

*Compensation*

32. Here, this means that because the Management Agreement lays out the circumstances of, procedures for, and damages in the event of, termination, the Debtors and Mr. Melamed contracted out of the default terms provided by the Companies Act. A Japanese court

---

[11] Wataru Nishiyama *et al.*, "Issues Surrounding Lawsuits for Damages Arising from Unjust Dismissal of Directors," Hanrei Times No. 1496, p. 14.

[12] Wataru Nishiyama *et al.*, "Issues Surrounding Lawsuits for Damages Arising from Unjust Dismissal of Directors," Hanrei Times No. 1496, p. 9.

applying Japanese law would enforce the terms of the Management Agreement in this respect, even though they are more limited than the Companies Act.

33. In light of the Management Agreement, Mr. Melamed has not suffered any damages beyond the compensation expressly stipulated therein. Accordingly, the Debtors' liability, if any, is limited to that amount. He is not entitled to compensation through the end of his original intended term. I analyzed the appropriate level of damages in the case of for-Cause termination in paragraph 28. In the event that the Court finds that Mr. Melamed was terminated without Cause, or without "justifiable grounds," his damages pursuant to the Management Agreement would be, at most, seven months' compensation at $37,500 per month, or $262,500.[13]

*Bonuses and Other Benefits*

34. Ms. Hori's Declaration states that Mr. Melamed also claims entitlement to "any bonuses or other benefits." (Hori Postpetition Decl. ¶ 30.) However, in my view, such bonuses and benefits do not fall within the scope of compensable damages. Where bonuses are discretionary, based on annual performance, and not calculated pursuant to a fixed formula approved by the shareholders' meeting, they are generally not recognized as "damages" under Article 339.2.[14] Therefore, Mr. Melamed is only entitled to compensation expressly provided under the Management Agreement.

---

[13] I understand Mr. Melamed was paid through the month of July 2024. He received notice of termination without Cause on July 30, 2024. He was entitled to three-months' notice, during which he would be entitled to his normal salary. (Management Agreement § 11.5.) After those three months, he would be subject to an additional four-month non-compete period, during which he would also be entitled to his normal salary. (Management Agreement §§ 10.3–10.4.)

[14] Wataru Nishiyama *et al.*, "Issues Surrounding Lawsuits for Damages Arising from Unjust Dismissal of Directors," Hanrei Times No. 1496, p. 12.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2025

<u>*/s/ Taro Tanaka*        </u>
Taro Tanaka