**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**REPLY IN SUPPORT OF MELAMED'S**
**CROSS-MOTION TO COMPEL ARBITRATION**

      Seth Melamed ("**Melamed**") hereby submits this reply ("**Reply**") in support of his cross-motion to compel arbitration ("**Cross-Motion**") and in response to the opposition thereto as set forth in *FTX Recovery Trust's Reply In Support Of Debtors' Amended Objection To Proofs Of Claim Filed By Seth Melamed And Motion For Subordination And Opposition To Claimant's Cross-Motion To Compel Arbitration* (Doc. No. 30364; "**Opposition**").[2]  In support of this relief, Melamed states as follows:

**PRELIMINARY STATEMENT**

      1.      This dispute arises from FTX's[3] April 2022 acquisition of Liquid as memorialized in the SPA.  In that transaction, Melamed sold his interests in Liquid to FTX.  The SPA contained an exceptionally broad arbitration clause providing, among other things, that:

> Any dispute, controversy or claim arising in any way out of or in connection with this Agreement . . . shall be referred to and finally resolved by **binding arbitration**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (collectively, the "Debtors"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX

[2] The Reply is limited to the relief sought in the Cross-Motion and the arguments made by the Trust in point IV of the Opposition (pp. 20-27).

[3] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Cross-Motion.

administered by the Singapore International Arbitration Centre ("SIAC") in accordance
with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance
with such Rules (the "Rules"), **which Rules are deemed to be incorporated by
reference into this Clause and as may be amended by the rest of this Clause**.

SPA §19.2 (emphasis supplied).

2.      The Debtors do not dispute that the arbitration agreement is enforceable.  Thus,

Melamed's claims related to the sale of his interests in Liquid should be liquidated in the SIAC

arbitration.

3.      Specifically, Melamed contends that SPA §19.2 requires arbitration of "any

dispute" between himself and Debtors. In contrast, the FTX Recovery Trust (the "**Trust**") asks

this Court to retain and adjudicate all of Melamed's claims in the bankruptcy court on the basis

that: (i) Melamed has failed to "demonstrate that his Salary Claims, Bonus Claim and

Administrative Claim fall within the scope of any agreement to arbitrate" (Opposition at pp.

21-25); and (ii) arbitration of these disputes would purportedly *"impede the objectives of the*

*Bankruptcy Code"* (Opposition at pp.25-27).  Neither of these arguments has merit.

4.      <u>First</u>, the Trust argues that this Court must determine whether the "Salary Claims,

Bonus Claim and Administrative Claim" fall within the scope of the agreement to arbitrate.

However, per the enforceable arbitration agreement, determination of this gateway issue is solely

in the purview of the Arbitrator.

5.      In *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63 (2019), the

Supreme Court held that:

> When a dispute arises, the parties sometimes may disagree not only about the merits of
> the dispute but also about the threshold arbitrability question—that is, whether their
> arbitration agreement applies to the particular dispute. Who decides that threshold
> arbitrability question? . . .

"Even when a contract delegates the arbitrability question to an arbitrator, some federal courts nonetheless will short-circuit the process and decide the arbitrability question themselves if the argument that the arbitration agreement applies to the particular dispute is "wholly groundless." The question presented in this case is whether the "wholly groundless" exception is consistent with the Federal Arbitration Act. We conclude that it is not. The [FAA] does not contain a "wholly groundless" exception, and we are not at liberty to rewrite the statute passed by Congress and signed by the President. **When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.**

586 U.S. at 67; *see also Celsius Mining LLC v. Mawson Infrastructure Group Inc. (In re Celsius Network LLC)* ("[t]he question then becomes: who decides whether a dispute "relates in any way" to the [arbitration] [a]greement? The answer is: the arbitrator").

6.      "When the parties' contract delegates the arbitrability question to an arbitrator . . . a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc., supra,* 586 U.S. at 68.  The Arbitration Agreement must "clearly and unmistakably" indicate the parties' intention to delegate the gateway issue. *Id* at 694.

7.      The language of § 19.2 of the SPA incorporates the SIAC Rules by reference. Courts have determined that reference to the arbitration rules in an arbitration agreement "evidences a clear and unmistakable intent" to delegate the determination of the scope of the arbitration to the arbitrator.  *See James & Jackson, LLC. v. Willie Gary, LLC.*, 906 A.2d 76 (Del. 2006) ("[a]s a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator.  We do so in the belief that Delaware benefits from adopting a widely held interpretation of the applicable rule, as long as that interpretation is not unreasonable.").  Accordingly, the arbitration panel should decide the scope of the arbitration.

8.      <u>Second</u>, with respect to the Trust's arguments that the Court retains these claims, the burden of proof rests squarely on the party opposing arbitration under *In re Mintze,* 434 F.3d

3

222 (3d Cir. 2006) to demonstrate that, in enacting the specific statute under which the claims arise, Congress harbored an intention to preclude a waiver of judicial remedies for those particular statutory rights.

9.      The Trust has failed to meet its high burden of proof to preclude these claims from being liquidated in an SIAC arbitration proceeding.  The Trust's argument that arbitration would be *"wasteful"* or cause delay does not demonstrate an inherent conflict with the Bankruptcy Code. See *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985).   In its Opposition, the Trust points to section 502(b) and argues that "courts have thus repeatedly declined to compel arbitration of claim disputes" (Opposition at 25).   The Trust conflates the adjudication/liquidation of Melamed's claim with the allowance of the claim pursuant to Section 502(b) of the Bankruptcy Code.  Section 502(b) requires that this Court determine the claim *for allowance purposes*.  The liquidation of claims often takes place in other forums for many reasons (stay relief motions to liquidate claims in state court, mandatory/permissive abstention, personal injury actions).  In all of these situations where claims are adjudicated, the Bankruptcy Court retains the power to ultimately allow the claim for purposes of distribution.  If the Trust were correct that the centralization of claims creates an inherent conflict with the Federal Arbitration Act ("**FAA**")  such that a bankruptcy court has discretion to retain such claims, it would create an exception that would swallow the rule.  Moreover, the Trust's reliance on *In re Yellow Corporation*, 2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024) is misplaced because, among other things: (i) Melamed's claims in this case will have no impact on the Debtors' confirmed and effective plan of reorganization and (ii) the distributions to other creditors in this case are not only wholly unaffected and have already commenced.

4

10.     <u>Finally</u>, even if the Trust had demonstrated (which it has not) an inherent conflict giving the Court discretion to liquidate the claims, the Court should decline to exercise that discretion.  The contracts and the claims in this dispute are governed by Japanese law.  As such, they are better suited to liquidation in arbitration in Singapore before a specialized tribunal chosen by the parties themselves for that purpose.  Melamed is not seeking to have his claims "allowed" in this proceeding and recognizes that this Court will ultimately determine the allowance of his claims.  This two-step approach (arbitration **then** consideration of issues concerning allowance) is not only required by *Schein* and *Mintze*, but is also prudent and appropriate because liquidation of damages is a logical prerequisite to claim allowance.

11.     In sum, the Trust has not satisfied its heavy burden to demonstrate that the enforcement of the arbitration agreement would inherently conflict with the Bankruptcy Code. On the contrary, compelling arbitration here advances both the FAA's mandate and the efficient administration of justice.  Accordingly, Melamed requests this Court compel arbitration of Melamed's claims in accordance with the binding arbitration agreement, and stay further proceedings on his claims pending completion of the arbitration.

## <u>ARGUMENT</u>

## I.

### <u>THE FTX RECOVERY TRUST DOES NOT DISPUTE THAT THE SPA CONTAINS A VALID AND ENFORCEABLE ARBITRATION AGREEMENT</u>

12.     The FAA codifies a strong national policy favoring arbitration. See *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  It requires courts to "rigorously enforce arbitration agreements according to their terms", *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985), including terms that delegate "gateway" questions of

arbitrability to an arbitrator rather than a court.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010).

13.     Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  It is a "fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication."  *DDK Hotels v. Williams Sonoma, Inc*, 6 F.4th 308, 318 (2d Cir. 2020) (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019)).

14.     Here, the parties have entered into a valid and enforceable arbitration agreement. *See* Kawabata Declaration, ¶ 9 [Doc. No. 30078].  The Trust has not submitted any experts (nor could it) to dispute arbitrability.

## II.

### THE ARBITRATION AGREEMENT DELEGATES THE AUTHORITY TO DETERMINE THE SCOPE OF THE ARBITRATION TO THE ARBITRATOR

15.     According to the Trust, the Bankruptcy Court, after determining whether there is a valid agreement, must evaluate whether a particular dispute falls within the scope of the agreement.  Opposition at p. 20 ("[b]efore compelling arbitration, 'a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement.' *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 160 (3d Cir. 2009).").

16.     This test does not apply if the parties agreed to delegate arbitrability to an arbitrator.  *In Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63,, 67 (2019),  the

Supreme Court held that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.* at 67.

17.    There must be clear and unmistakable evidence that the parties agreed to delegate arbitrability.  The Third Circuit has held that the incorporation of AAA Rule 7(a) (which provides that the arbitrator can determine the scope of the arbitration) constitutes a clear and unmistakable delegation of arbitrability issues to the arbitrator. *See Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020); *see also James & Jackson, LLC. v. Willie Gary, LLC.*, 906 A.2d 76 (Del. 2006) ("[a]s a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator.  We do so in the belief that Delaware benefits from adopting a widely held interpretation of the applicable rule, as long as that interpretation is not unreasonable.").

18.    Rule 7(a) of the American Arbitration Association, Commercial Arbitration Rules, permits the arbitrator "rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counter-claim".

19.    The same logic applies with equal force to the incorporation of the SIAC Rules, as is the case here. . SIAC Rule 31.1 provides that:

> The Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity, applicability, **or scope of the arbitration agreement**. An arbitration agreement which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the Tribunal that the contract is non-existent or null and void shall not entail automatically the invalidity of the arbitration agreement.

(emphasis supplied). This provision is functionally identical to Rule 7(a) and therefore demonstrates clear and unmistakable evidence of delegation to the arbitrator.

20.    *Schein* creates a simple, threshold inquiry for a court: (1) Did the parties agree to arbitrate? (Yes, in the SPA). (2)  Did their agreement delegate the issue of arbitrability to the arbitrator?  If the answer to the second question is also yes, the Court's analysis is complete.  The matter must be referred to the arbitrator, who will then decide all gateway issues, including objections to the scope, validity, and applicability of the arbitration agreement.

21.    Because the SPA incorporates the SIAC rules into the arbitration agreement, the outcome here must be  the same as in *Schein*.  *Schein* leaves the Court with no discretion other than to let the arbitrator determine  the scope of the arbitration.[4]

22.    Finally, even if the Court examined the individual claims, they all fall under the scope of the arbitration agreement.  Melamed's Salary Claims, the Bonus Claim and the Administrative Claim all arise from the Management Agreement and "arise out of" or "in connection with" the SPA.[5]   The SPA contains a defined term, "Management Agreement" which is defined as "the management agreement to be entered into by each of the Management Shareholders[6] with the Company effective as of Completion . . . ."  SPA 1.1.  Clause 3 is entitled "Management Agreements" and provides that "[o]n or before Completion, each of the Management Shareholders shall enter into a Management Agreement with the Company on the terms and conditions reasonably satisfactory to [FTX] and the respective Management

---

[4] If the Court were to conclude that only the SPA claims should be arbitrated, Melamed would respectfully request that the claims under the Management Agreement be stayed pending the adjudication in the arbitration.  Doing so will avoid any multiplication of proceedings.  *See e.g. Coinbase v. Bielski*, 599 U.S. ___ (2023) (automatic stay of proceedings upon appeal of order denying motion to compel arbitration).

[5] Melamed's Administrative Claim consists of unpaid director's fees and unpaid sums from the Key Employee Incentive Program approved by the Bankruptcy Court on or about June 8, 2023 [Docket No. 1589] . Melamed acknowledges that the KEIP Claims do not directly relate to the Management Agreement.

[6] Melamed is explicitly included in the defined term "Management Shareholders.".

Shareholder, and which shall be effective from the date of Completion Agreement . . ."  SPA 3.1.

Moreover, a condition to the closing of the transaction was that " Management Agreements with

the Management Shareholders having been executed as of Completion" SPA 5.1(o).

**III.**

**HAVING THE CLAIMS LIQUIDATED THROUGH ARBITRATION**
**WOULD NOT IMPEDE THE OBJECTIVES OF THE BANKRUPTCY CODE**

23.    The Supreme Court has repeatedly instructed courts to "rigorously enforce

agreements to arbitrate" according to their terms and that "any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration" *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983).

24.    Under the three-part test established in *Shearson/Am. Express Inc. v. McMahon*,

482 U.S. 220 (1987), a party seeking to avoid arbitration must demonstrate a "contrary

congressional command" evident from (1) the statute's text, (2) its legislative history, or (3) an

"inherent conflict between arbitration and the statute's underlying purposes".  *Id.* at 227.

25.    In *McMahon*, the Supreme Court held that "[t]he burden is on the party opposing

arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the

statutory rights at issue." *Id.*   The Trust, as the party opposing arbitration, must *demonstrate* that

Congress intended to limit or prohibit the waiver of a judicial forum for a particular claim.  The

burden rests squarely on the party opposing arbitration—here, the Trust—to show that Congress

"intended to preclude a waiver of judicial remedies for the statutory rights at issue."  *Id.*

26.    The Third Circuit's approach to arbitrability is articulated in *In re Mintze,* 434 F.3d

222 (3d Cir. 2006) and *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d

1149, 1155-57 (3d Cir.1989).  *Mintze* involved a bankruptcy proceeding in which the debtor,

9

Ethel Mintze, asserted claims against American General Financial Services (AGFS) under
various federal and state consumer protection laws, including the Truth in Lending Act (TILA),
arising from a loan agreement.  The Third Circuit, in reversing the lower courts, held that the
bankruptcy court "lacked the authority and discretion to deny enforcement of the arbitration
provision" contained in the loan agreement unless the debtor could demonstrate that "Congress
intended to preclude waiver of judicial remedies for her claims".  *Id.* at 231.

28.     While the core versus non-core nature of a proceeding in bankruptcy might
influence the analysis of whether arbitration conflicts with the Bankruptcy Code's purposes, the
fundamental *McMahon* framework for discerning congressional intent remains the guiding
standard. The *Mintze* opinion itself clarifies this: "[w]here an otherwise applicable arbitration
clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement,
unless the party opposing arbitration can establish congressional intent, under the *McMahon*
standard, to preclude waiver of judicial remedies for the statutory right at issue".  *Id.* at 232.

28.     The *Mintze* test is explicitly and directly derived from the standard set forth by the
Supreme Court in *McMahon*.  This three-pronged inquiry provides the analytical structure for
courts to determine whether Congress has effectively carved out an exception to the FAA's
general applicability for a given federal statutory scheme.   The Trust has not cited specific
language in the statute or its legislative history that supports such a carve-out in this case.
Therefore, the Trust must demonstrate an "inherent conflict" between the FAA and the
Bankruptcy Code, which does not exist.

29.     The Trust relies on a supposed conflict between the FAA's policy of decentralized
dispute resolution and the Bankruptcy Code's policy of centralizing disputes in a single forum.
This argument is misplaced.

30.    The Trust's argument against arbitration fails for two independent reasons: (1) it improperly conflates the issue of *claim liquidation* with *claim allowance*, and (2) it prematurely attempts to order priorities among allowed claims before the distribution stage of a bankruptcy case.  The arbitral award will adjudicate the amount of the Debtors' liability.  The process of claim allowance under § 502 of the Bankruptcy Code is a two-step process: first, the claim must be liquidated (its validity and amount determined), and second, this court must determine its priority and allowance.  Through his Cross-Motion, Melamed is seeking only to liquidate his Claim through arbitration, recognizing that this Court will thereafter determine its allowance.

31.    Section 502(b) applies to the allowance of claims, not adjudication of claims. Here, Melamed is seeking only to have his claim adjudicated in the Singapore Arbitration and is not seeking to have the Singapore arbitration usurp the "core" function of the Bankruptcy Court in the allowance of the claims.

32.    The Trust's arguments that the bankruptcy code's centralization of claims creates an inherent conflict with the FAA are without merit.  On the contrary, the Bankruptcy Code itself recognizes that not all claims **will be liquidated** in the bankruptcy court.   28 U.S.C. §157(b)(2)(B) recognizes that unliquidated tort claims for personal injury or wrongful death claims are not statutory core proceedings.  28 U.S.C. § 1334(c)(2) requires a bankruptcy court to abstain from adjudicating a state law claim or cause of action that is related to a case under the Bankruptcy Code if there is a pending matter that can be timely adjudicated in a state forum of appropriate jurisdiction.  28 U.S.C. § 1334(c)(1) permits a bankruptcy court to abstain from hearing a particular proceeding in the interests of justice or comity.  The *Rooker-Feldman* doctrine restricts a bankruptcy court from reviewing a collateral attack by a party on a state court

11

judgment.[7]   These doctrines demonstrate that not all claims are to be adjudicated by bankruptcy

courts and that the FAA does not create an inherent conflict with the bankruptcy code.  Indeed, *In

re Yellow Corporation*, the bankruptcy court recognized that permitting claims adjudications in

forums other than bankruptcy court was routine: "[t]he fact that bankruptcy courts will at times

grant stay relief to permit prepetition claims to be liquidated outside of bankruptcy suggests that

some of the rhetoric in the caselaw and academic literature about the imperative to centralize all

claims allowance before a single judge is perhaps overblown."  *In re Yellow Corporation*, 2024

WL 1313308, fn 77 at 26 (f (Bankr. D. Del. Mar. 27, 2024).

33.     This dispute does not present such a conflict. Melamed's claims are pre-petition

contract, tort, statutory and employment claims that arise under the SPA and state law, governed

by Japanese law as chosen by the parties. They are not rights created by the Bankruptcy Code.

Rather, this is a classic two-party dispute to liquidate a pre-petition claim.   There is no inherent

conflict in liquidating these claims in a separate forum provided that this Court subsequently

determines their **allowance** pursuant to Section 502(b).

34.     In addition, there is no inherent conflict with the chapter 11 case.   The Debtors'

plan of reorganization has been confirmed and is effective, and distributions to creditors have

commenced. The outcome of this bilateral arbitration will not disrupt the plan, affect distributions

to other creditors, or unravel the bankruptcy case.  It will liquidate Mr. Melamed's claim, which

will then be paid (or not) according to the established terms of the confirmed plan. Allowing this

arbitration to proceed poses no threat, let alone a "serious jeopardy," to the objectives of the

Bankruptcy Code.

---

[7]  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S.
462 (1983).

35.     The Trust's reliance on *In re Yellow Corporation, et. al.*, 2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024) is misplaced.  In *Yellow*, Judge Goldblatt found "unusual circumstances" that were extraordinary.  Because certain alleged pension liabilities were the vast bulk of the estate, and so their determination directly affected the entire plan itself and thus all the creditors, the bankruptcy court denied the request to send the matter to arbitration.  That case is easily distinguished on multiple grounds.

36.     First, *Yellow Corp*. involved a direct and irreconcilable conflict between two federal statutes: the mandatory arbitration provision of the Multiemployer Pension Plan Amendments Act ("MPPAA") and the claims allowance provision of § 502 of the Bankruptcy Code. The court found that both statutes contained a mandatory "shall," creating a true statutory conflict. This case involves the FAA, which courts have consistently held does not inherently conflict with the Bankruptcy Code in the context of liquidating pre-petition claims.

37.     Second, the dispute in *Yellow Corp*. concerned massive pension withdrawal liability claims that the court described as "perhaps the most important issue to be decided in the bankruptcy case". The resolution of those claims directly impacted the viability of the entire reorganization and the recoveries of numerous other creditor classes. Here, Melamed's claims are part of a bilateral dispute that will not affect the Debtors' confirmed plan or other creditors' distributions.

38.     Third, the legal issue in *Yellow Corp*. was not a contractual or tort dispute but a challenge to the validity of regulations promulgated by a federal agency, the Pension Benefit Guaranty Corporation.  This raised complex questions of administrative law and statutory interpretation uniquely suited for a federal court.  Melamed's claims, in contrast, are predominantly claims under Japanese law for breach of contract, tort, and statutory damages.

39.     Finally, the *Yellow Corp.* court explicitly framed  its decision as an exercise of discretion in "unusual circumstances".  Judge Goldblatt treated the motion not as a motion to compel, but as a motion for relief from the automatic stay, and created a "rebuttable presumption" in favor of arbitration that was overcome only by the unique, case-dispositive facts before him.  No such "unusual circumstances" are present here. Thus *Yellow Corp.* provides no basis to deny arbitration in this straightforward two-party dispute based on the SPA.

40.     The other cases cited by the Trust are not on point.  *In re Penson Worldwide*, 587 B.R. 6 (Bankr. D. Del. 2018) does not involve an arbitration sought by a creditor.  *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001) predates *Mintze* and analyzes the request for arbitration under the core/non-core criteria that *Mintze* rejected.

## IV.

## EVEN IF THE COURT HAS DISCRETION UNDER *MINTZE*, THE COURT SHOULD REFRAIN FROM EXERCISING IT

41.     The proper and most efficient course is to allow the arbitrator to perform the task of liquidating the claims, as assigned by the SPA and FAA. The arbitral award will provide a definitive ruling on the amount of Melamed's claims.[8]   Once the claims are liquidated, the

---

[8] Melamed believes that consideration of the section 510(b) issues are premature for several reasons.  First, the claim should be liquidated in amount before section 510(b) is considered.  Without the liquidation of the claim, a ruling on the section 510(b) issue would appear to be advisory.  Second, because the SPA involved multiple forms of consideration, including, among other things, an indemnity provision, Melamed believes that a factual record needs to be developed concerning the different forms of consideration, the allocation of that consideration (*e.g.,* Debtors state no less than four times in their Opposition that section 510(b) **only** applies to the FTX Consideration Shares) and other damages related to the SPA.  Finally, it appears that the Debtors have filed similar section 510(b) motions with other claimants and have thereafter withdrawn those motions. *See* Doc. No. 30161. If the Debtors have changed their position on other claimants who have purchased securities of the Debtor, Melamed is entitled to know.

parties can then return to this Court, which can then determine the claims' allowance for distribution purposes under Section 502(b) of the Bankruptcy Code.[9]

42.    The Trust's vague assertions that arbitration will somehow harm the Estate are baseless. The plan is confirmed and effective.  The initial distribution occurred in May of 2025. The liquidation of Melamed's claim in a separate, contractually mandated forum will have no bearing on the ongoing administration of the estate or distributions to other creditors.  The arbitration is a self-contained, two-party proceeding.  It is the opposite of the "piecemeal litigation" that the Code's centralizing policy is designed to prevent.

43.    FTX freely and voluntarily agreed to resolve disputes in Singapore under SIAC Rules and Japanese law.  Japanese contract law is a sophisticated and well-developed legal system grounded in principles of good faith and freedom of contract.  Japanese civil law, as described in the declarations of Takane Hori, is a system of civil law that mirrors much of American federal and state common and statutory law.  It is hardly an alien or unfair system. There is no prejudice in compelling arbitration.

---

[9] The Trust admits no less than four times in its Opposition that section 510(b) does not apply to the entire claim. See Opposition at 6 (referring to "Section 510(b) subordination of Melamed's claim *in respect of the FTX Consideration Shares*") (emphasis added); *id*. at 7 (limiting its argument to "Melamed's claim *relating to the FTX Consideration Share*s") (emphasis added); *id*. at 8 ("the portion of [Melamed's] claim attributable to the FTX Consideration Shares");  *id*. at 29 ("Melamed's claims *for the FTX Consideration Share*s . . . are subordinated pursuant to 11 U.S.C. § 510(b)") (emphasis added).

**V.**

**THIS COURT SHOULD ADOPT A PROCEDURAL FRAMEWORK THAT
RESPECTS THE PARTIES' AGREEMENT AND THE COURT'S JURISDICTION**

44.    To provide clarity and ensure an efficient resolution, Mr. Melamed proposes a procedural framework that gives full effect to the parties' arbitration agreement while preserving this Court's ultimate authority over core bankruptcy matters:

**A.  A stay of These Proceedings Is Warranted to Allow for an Efficient Resolution in the Chosen Arbitral Forum**

Section 3 of the FAA mandates that once a court is "satisfied that the issue involved . . . is referable to arbitration," it "shall on application of one of the parties stay the trial of the action until such arbitration has been had".  A stay is required to prevent duplicative and wasteful parallel litigation, conserve the resources of both the Estate and the judiciary, and honor the parties' contractual choice of forum.

**B. A Proposed Sequencing of the Dispute Resolution Process**

Melamed respectfully proposes that the Court adopt the following sequence with respect to his claims.  First, the Court should enter an order granting the Cross-Motion, compelling the parties to proceed to arbitration before the SIAC.   Second, pursuant to the delegation of authority in the SPA, the arbitrator will first resolve any gateway questions of arbitrability raised by the Debtors.  The arbitrator will then adjudicate the merits of Mr. Melamed's claims under Japanese law and issue a final award that liquidates any liability of the Debtors.  Third, Once the award is issued, the resulting judgment will constitute a liquidated, allowed claim against the estate.  At that time, this Court pursuant to section 502(b) can determine the claim's proper treatment under the confirmed plan, including resolving any then arguments regarding the allowance of the claim.

16

This framework respects the parties' bargain and the mandate of the FAA, while properly preserving this Court's ultimate jurisdiction over the administration of the estate and the priority of distributions.

## <u>CONCLUSION</u>

For all the foregoing reasons, Seth Melamed respectfully requests that this Court enter an order (i) granting his Cross-Motion to Compel Arbitration; (ii) staying all proceedings in this Court related to Mr. Melamed's claims pending the conclusion of the SIAC arbitration; and (iii) granting such other and further relief as the Court deems just and proper.

McCARTER & ENGLISH, LLP

/s/ Kate R. Buck
Kate R. Buck (No. 5140)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE I 9801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
kbuck@mccarter.com
-   and  -
David J. Adler (admitted pro hac vice)
250 W. 55th Street, 13th Floor
New York, NY 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
dadler@mccarter.com
Counsel to Seth Melamed

Date: June 18, 2025