**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: August 12, 2025 at 9:30 a.m. (ET)**<br>**Objection Deadline: July 11, 2025 at 4:00 p.m. (ET)** |

**OBJECTION OF THE FTX RECOVERY TRUST TO THE AMENDED PROOF OF
CLAIM FILED BY THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD.**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of post-effective date debtor entities in these chapter 11 cases, a complete list of the post-effective date debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the FTX Recovery Trust's claims and noticing agent at https://cases.ra.kroll.com/FTX.

### Table of Contents

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 9

I.   The FTX.com Exchange ............................................................................9

     A.   Background on Operation of the Exchange .........................................9

     B.   Leveraged Trading ..............................................................................12

II.  The 3AC Accounts ...................................................................................22

     A.   Overview of 3AC Accounts and Governing Agreements.....................22

     B.   Activity in the 3AC Accounts Before June 12, 2022...........................29

     C.   Commingling of Assets Associated with the 3AC Accounts ...............31

     D.   Activity in the 3AC Accounts on June 13 and June 14, 2022 .............31

     E.   Margin Liquidation on June 14, 2022..................................................37

III. Procedural History ...................................................................................40

     A.   Debtors' Chapter 11 Cases and Ownership of Exchange Assets..........40

     B.   The Joint Liquidators' Original and Amended Proofs of Claim...........42

IV.  Claims Asserted in Proof of Claim ..........................................................45

ARGUMENT ...................................................................................................... 47

I.   The Proof of Claim Is Premised on Fundamental and Dispositive
     Misunderstandings of the 3AC Accounts and the Account Data. ...................48

     A.   The Value of Assets Credited to the 3AC Accounts Was $284 Million,
          Not $1.59 Billion. ...............................................................................49

     B.   The Account Balance Declined on June 13 and 14, 2022 Solely as the
          Result of Market Price Declines and Withdrawals by 3AC. ................52

     C.   The Joint Liquidators Overstate the Digital Asset Balance, Which Was
          $1.017 Billion (Not $1.59 Billion).......................................................53

II.  The Joint Liquidators' Purported Claims Share Several Other Fatal Flaws.....................55

A.      3AC's Claims Fail Because FTX Did Not Take Any Action with Respect to Any Assets Associated with the 3AC Accounts Other Than the $82 Million Liquidation. .......................................................................................55

B.      3AC's Claims Fail Because FTX Did Not Retain Any Benefit from the Reduction of the Account Balance of the 3AC Accounts on June 13 or 14, 2022 .................................................................................................................57

C.      3AC Did Not Have a Property Interest in Assets Held by the Exchange, Consistent with This Court's Conclusion at Plan Confirmation ...........................59

D.      FTX Was Contractually Entitled to Conduct the $82 Million Liquidation. ..........67

E.      The Joint Liquidators Fail to Allege Facts or Circumstances Supporting Most of the Claims They Assert, and Accordingly Such Claims Are Not Entitled to *Prima Facie* Validity .............................................................................69

III.    The Individual Claims Identified in the Proof of Claim Should Be Disallowed. ..............70

A.      BVI Preference Claim .............................................................................................70

B.      BVI Undervalue Transaction Claim .......................................................................75

C.      BVI Turnover Claim ...............................................................................................76

D.      Bankruptcy Code Turnover Claim..........................................................................78

E.      Customer Property Claim .......................................................................................79

F.      Negative Balance Contract Claim...........................................................................80

G.      Breach of Trust or Fiduciary Duty Claim ..............................................................82

H.      Unjust Enrichment Claim .......................................................................................83

I.      Conversion Claim ...................................................................................................86

J.      Proprietary Restitution Claim .................................................................................87

RESERVATION OF RIGHTS .................................................................................................. 88

CONCLUSION ......................................................................................................................... 88

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allegheny Int'l Inc.*,
   954 F.2d 167 (3d Cir. 1992)............................................................69, 70

*In re Am. Home Mortg. Holding*,
   458 B.R. 161 (Bankr. D. Del. 2011) ...........................................................78

*In re Bullion Rsrv. of N. Am.*,
   836 F.2d 1214 (9th Cir. 1988) ...................................................................65

*In re Cath. Diocese of Wilmington, Inc.*,
   432 B.R. 135 (Bankr. D. Del. 2010) ......................................................59, 65

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023) ...........................................................85

*In re DBSI, Inc.*,
   468 B.R. 663 (Bankr. D. Del. 2011) ...........................................................78

*In re Gilbreath*,
   395 B.R. 356 (Bankr. S.D. Tex. 2008) ........................................................70

*Goldberg* v. *N.J. Lawyers' Fund for Client Prot.*,
   932 F.2d 273 (3d Cir. 1991)......................................................................60

*Gordon* v. *Kohl's Dep't Stores, Inc.*,
   2017 WL 3390269 (E.D. Pa. Aug. 7, 2017) ...............................................84

*Gould* v. *Gould*,
   2012 WL 3291850 (Del. Ch. Aug. 14, 2012) ..............................................86

*In re Irish Bank Resol. Corp. Ltd. (in Special Liquidation)*,
   559 B.R. 627 (Bankr. D. Del. 2016) ...........................................................78

*Nemec* v. *Shrader*,
   991 A.2d 1120 (Del. 2010) .......................................................................83

*In re Strategic Techs., Inc.*,
   142 F. App'x 562 (3d Cir. 2005) ...............................................................59

*In re Tribune Co.*,
   2013 WL 1909617 (Bankr. D. Del., May 2, 2013).......................................70

**Statutes**

United States Code title 11, 11 U.S.C. §§ 101 *et seq.* ....................................................................40

Bankruptcy Code Section 363 ..............................................................................................78

Bankruptcy Code Section 365 ..............................................................................................88

Bankruptcy Code Section 542 ..............................................................................................45

**Other Authorities**

Bankruptcy Rule 2004 ..........................................................................................................43

Federal Rule of Civil Procedure 30(b)(6) ...........................................................................43

Federal Rule of Civil Procedure 33 .....................................................................................43

Federal Rule of Civil Procedure 34 .....................................................................................43

The Consolidated Wind Down Trust (the "FTX Recovery Trust"), as defined in the confirmed and effective *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan")[2] in the above-captioned proceedings, hereby submits this objection (the "Objection"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to proof of claim number 100078 (the "Proof of Claim") filed by the Joint Liquidators of Three Arrows Capital Ltd. (the "Joint Liquidators").   In support of the Objection, the FTX Recovery Trust submits contemporaneously herewith (i) Second Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury (the "Neuberger Decl."); (ii) Declaration of Steven P. Coverick (the "Coverick Decl."); (iii) Declaration of Stephen Nicholas Atherton K.C. (the "Atherton Decl."); and (iv) Declaration of Benjamin S. Beller (the "Beller Decl.").

## PRELIMINARY STATEMENT

1.      Prior to its collapse in June 2022 as the result of significant losses caused by high-risk trading in the cryptocurrency markets, Three Arrows Capital Ltd. ("3AC") was one of the largest traders on the FTX.com exchange (the "Exchange").   Like any other Exchange customer, 3AC transacted on the Exchange through its customer accounts (together, the "3AC Accounts").   Through its activity on the Exchange, 3AC bet big that cryptocurrency prices would increase using cash it did not have and, when prices instead plummeted, 3AC proceeded to liquidate the risky bets it had placed and withdraw assets from the Exchange.

2.      3AC's own risky strategy caused its collapse, and its own account activity— not any action by FTX Trading Ltd. ("FTX")—resulted in a significant decline in the "value"

---

[2] Capitalized terms not defined herein shall have the same meaning set forth in the Plan.

associated with the 3AC Accounts in June 2022.  Although the Joint Liquidators initially filed a proof of claim based solely upon a "foreclosure" upon assets in connection with a $120 million line of credit (the "Line of Credit"), they now assert claims for $1.53 billion (more than 12 times the amount originally sought).  Their apparent basis is a so-called "Lost Assets" theory:  they argue that because the 3AC Accounts purportedly showed a positive balance of $1.59 billion for certain assets at the end of the day on June 12, 2022, and that particular component of the overall account balance declined over the following days, they are entitled to recover essentially all of that from FTX.  (Proof of Claim ¶ 43.)  But this is a false premise that lacks any legal or factual merit, and, in fact, 3AC is owed nothing.

3.      The Joint Liquidators grossly inflate the actual $284 million value of assets associated with the 3AC Accounts on June 12, 2022 by more than $1.2 billion, and they ignore that the entire loss in account value resulted from market price declines and 3AC's own withdrawals, not any action taken by FTX.[3]  The Joint Liquidators ask this Court to force other Exchange customers and creditors to foot the bill for 3AC's failed strategy by asserting illogical and baseless claims for $1.53 billion.  Even before reaching the many legal and factual deficiencies of the Joint Liquidators' purported claims, it is clear that the "Lost Assets" theory is easily debunked, and these claims should be disallowed in their entirety.

4.      Notably, the Joint Liquidators do not actually allege what happened to the so-called Lost Assets.  They offer only generic speculation that "a series of liquidations, seizures, and other transfers" on June 13 and 14, 2022 caused a "decline in value of assets."  (*Id.* ¶¶ 40, 43.)

---

[3] The Joint Liquidators' effort to slice and dice the inseparable components of the Account Balance to manufacture a claim against FTX fails on its face, but, as discussed in greater detail below, *infra* ¶¶ 149-152, even if for argument's sake crediting their flawed premise, the Joint Liquidators overstate the Digital Asset Balance by $581 million; it was $1.017 billion at the end of June 12, 2022, not $1.59 billion.

The Joint Liquidators disclaim any responsibility to allege actual facts supported by evidence, instead taking the remarkable position (without support) that "regardless of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets, the 3AC Debtor has significant claims against FTX." (*Id.* ¶ 44.)  The Joint Liquidators cannot escape the simple fact that all of the trading and withdrawal activity occurring in the 3AC Accounts on June 13 and 14, 2022 was conducted by 3AC itself, until FTX properly initiated a series of transactions to liquidate $82 million in digital assets for cash late on June 14, 2022 (the "<u>Liquidation</u>"), which actually benefited 3AC (not FTX).

     5.     Contrary to the Joint Liquidators' false narrative, the value of any customer's account at any given point in time was reflected by the account's balance, a single, comprehensive figure covering *all* activity across *all* types of assets over the lifetime of the customer account (the "<u>Account Balance</u>").  Every transaction conducted through a given customer account in every type of tradeable asset (including Bitcoin ("<u>BTC</u>"), Ethereum ("<u>ETH</u>"), U.S. Dollars ("<u>USD</u>"), and many other cryptocurrency tokens, other digital assets, and fiat currencies) was reflected by the Account Balance.  The Joint Liquidators attempt to inflate their purported claims by carving up the Account Balance and isolating the sub-balance for all fiat currency assets (the "<u>USD Balance</u>") from the sub-balance for all cryptocurrency tokens, tokenized stocks, and other digital assets (collectively, the "<u>Digital Asset Balance</u>").  (Proof of Claim ¶ 1.)  The reason they do so is obvious:  the 3AC Accounts had a negative USD Balance and a positive Digital Asset Balance at the end of the day on June 12, 2022.[4]

---

[4] The Joint Liquidators have never articulated the logic or basis to select the end of June 12, 2022 as the relevant date for any claim.  Notably, the only action taken by FTX in connection with the 3AC Accounts—the liquidation of approximately $82 million of digital assets that resulted in approximately $82 million of USD credited to the 3AC Accounts—occurred late on June 14, 2022.

6.    But treating these integrated components of the Account Balance as separate and divisible is fundamentally irreconcilable with how the Exchange operated, the agreements between 3AC and FTX, and the history of activity in the 3AC Accounts.  The Account Balance was the headline figure and comprehensive measure of value presented to customers who logged into their account.  The component parts of the Account Balance moved in coordination every time a customer traded one asset for another.  The governing agreements for the 3AC Accounts—and other customer accounts—provided that all assets, regardless of asset type, determined compliance with maintenance requirements and related rights.  The ability of a customer to withdraw some assets was necessarily impacted by other assets associated with the account; customers could not leave behind negative balances and withdraw everything else. Indeed, for every customer claim in these bankruptcy proceedings, it was the comprehensive Account Balance—not an isolated component of it like the Digital Asset Balance or USD Balance—that was used to determine the size of the claim.  The Joint Liquidators ask this Court to treat 3AC Accounts unlike any other customer account in a manner that defies logic.

7.    Perhaps most tellingly, 3AC could *never* have built the positive Digital Asset Balance that the Joint Liquidators now claim without accumulating the negative USD Balance in parallel (*e.g.*, when 3AC sold a BTC for USD, the Digital Asset Balance declined, and the USD Balance necessarily rose by the same amount).  3AC was allowed to build its negative USD Balance through its voluntary participation in the margin trading program offered on the Exchange, which allowed 3AC to increase its exposure to movements in digital asset prices by using funds borrowed from other Exchange customers to acquire digital assets.  3AC's capacity to accumulate larger (and riskier) positions was bolstered by the $120 million Line of Credit.

8.     Beginning in mid-May 2022, 3AC opened increasingly large positions in BTC through spot purchases or margin and long perpetual futures positions (derivative contracts which increased 3AC's exposure to price movements for spot assets like BTC and ETH without the purchase or sale of the spot assets).   That was a strategic trading decision made by 3AC betting that the price would increase in the future.   At the same time, BTC and ETH prices were significantly declining amidst the Terra-Luna collapse.   As prices of BTC and ETH continued to plummet in early June 2022, 3AC's losses mounted, and its Account Balance fell.   3AC's positive Digital Asset Balance was reduced as the value of the digital assets fell, and its negative USD Balance increased (*i.e.*, became more negative) as its perpetual futures contracts continued to settle at significant losses.

9.     The Joint Liquidators' seemingly arbitrary chosen starting point for their false narrative is the end of the day on June 12, 2022 (UTC).   At that time, the 3AC Accounts had a total Account Balance of approximately $284 million.[5]   The Proof of Claim challenges the decrease in the value of assets associated with the 3AC Accounts over the next two days (June 13-14, 2022), using the nefarious label "Takings" to try to manufacture a claim against FTX.   (Proof of Claim ¶ 40.)   But there is no mystery or uncertainty about the decline in the value of these assets, and no one took anything from the 3AC Accounts other than 3AC itself.   The Account Balance declined by $282 million during those two days because of market price declines ($222 million) and withdrawals by 3AC ($60 million).   During these same two days, 3AC also sold nearly all of the spot cryptocurrency assets associated with the 3AC Accounts (*i.e.*, BTC, ETH, and FTT). These sales in fact did *not* cause any decline in the Account Balance because they involved the

---

[5] All values included herein are approximate and rounded to the nearest million, unless specified otherwise.

exchange of one asset (a digital asset) for another (USD) in fair-value transactions with other Exchange customers.

10.      No action by FTX resulted in any loss of value, and thus the assertion that 3AC has a claim against FTX is a fiction.  In fact, 3AC breached its agreements with FTX during this two-day period of declining prices and withdrawals.  3AC was contractually required to maintain an Account Balance of at least $240 million under its agreements with FTX, and the 3AC Accounts fell below that level at approximately 2:00 a.m. (UTC) on June 13, 2022.  FTX contacted 3AC multiple times to inform 3AC that it was out of compliance with its agreements and that FTX would have to liquidate assets in the 3AC Accounts unless 3AC corrected the issue.  3AC ignored FTX for more than six hours and, instead of depositing assets, it actually *withdrew* $18 million in ETH.  Finally, at 10:21 p.m. (UTC) on June 14, 2022, FTX initiated the Liquidation, a series of transactions in which digital assets were sold for $82 million.  This was the first and only action taken by FTX—all of the prior trades and withdrawals were done by 3AC via its own accounts. By the time of the Liquidation, the Account Balance for the 3AC Accounts was $7 million, having decreased by $277 million solely by virtue of market price declines and 3AC's withdrawals. Critically, the Liquidation did not reduce the value of assets; it actually preserved them.  Had the 3AC Accounts retained the same profile of assets as they did at 10:21 p.m. (UTC) on June 14, 2022, then the 3AC Accounts would have been worth negative *$18 million* at the Petition Date. The valid Liquidation that the Joint Liquidators assert is actionable did not benefit FTX; it benefited 3AC.

11.      The Joint Liquidators' $1.53 billion headline number is a fiction, and their "Lost Assets" theory cannot possibly provide a basis to even allege—let alone prove—any claim.

But there are additional independent bases to disallow the Proof of Claim because the Joint Liquidators' claims also suffer from numerous other common threshold legal deficiencies:

- Each of the purported claims requires some action or breach by FTX, or some transaction with FTX. But FTX did not take any action with respect to any assets associated with the 3AC Accounts, other than the Liquidation—which began at 10:21 p.m. (UTC) on June 14, 2022. The Liquidation involved only $82 million worth of assets, was contractually permitted, and in any event did not reduce the Account Balance but rather benefited 3AC.

- Each of the purported claims requires that FTX retained some benefit from or was enriched by the alleged action or transaction. But the Account Balance declined as the result of market price declines and withdrawals by 3AC, neither of which yielded any benefit to FTX. The offsetting declines of $842 million in the positive Digital Asset Balance and the negative USD Balance were overwhelmingly caused by 3AC's sales (90%), with the Liquidation explaining the remainder, but FTX did not retain a benefit from either type of sale—these merely resulted in the exchange of digital assets for USD with other Exchange customers and no change to the Account Balance.

- Nine of the ten purported claims require that 3AC have a property interest in the assets for which the Joint Liquidators seek recovery. But, consistent with this Court's holding in connection with Plan confirmation that "[t]he factual record establishes that all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property of the Debtors' Estates" (Confirmation Order ¶ 20), evidence confirms 3AC also did not have any property interest in the assets associated with the 3AC Accounts as of the end of June 12, 2022.

- At least five of the ten purported claims are not entitled to *prima facie* validity because they are not based on actual factual allegations, and the Joint Liquidators concede they do not exist unless "the 3AC Debtor's ongoing discovery efforts reveal that the Lost Assets were liquidated by FTX rather than unidentified persons associated with the 3AC Debtor." (Proof of Claim ¶ 62.)  In any event, the Joint Liquidators' condition—liquidation by FTX—is not present for any amount beyond $82 million.

- Each of the purported claims also fails as the result of specific factual defenses under the applicable law.  For example, the Joint Liquidators cannot establish a preference claim under the British Virgin Islands ("BVI") Insolvency Act because (i) there was no "insolvency transaction," (ii) because FTX was not left in a "better position" as a "creditor" of 3AC, and (iii) because all of the alleged activity at issue occurred in the ordinary course of commercial relations between 3AC and FTX.

12.    The facts, the law, and logic undercut any plausible argument that the Joint Liquidators have any claim against FTX, never mind any fraction of $1.53 billion.  At bottom, the Joint Liquidators seek to extract value from the Debtors' estates at the expense of legitimate creditors in order to salvage their own failed liquidation proceedings.  But FTX creditors should not and cannot serve as a backstop for 3AC's failed trading strategy.  Whereas 3AC took risky positions and fumbled its own strategy[6] that led to a decline in the value of the 3AC Accounts, those FTX customers who remain creditors in these proceedings did nothing wrong.  This Court should not reward the Joint Liquidators' smoke and mirrors attempt to leave the Debtors' creditors with 3AC's bill for a losing trading strategy.  The Proof of Claim is a jumble of baseless, speculative, and unsupported claims pled in the alternative and without sufficient facts or law masquerading as a proof of claim.  Not one of the purported claims has merit, and all should be disallowed in their entirety.

---

[6]    The June 22, 2022 written resolutions of the shareholders and directors of 3AC each note that "[t]he Company invests heavily in cryptocurrency and maintains leveraged positions, financed by lenders.  The recent crash in cryptocurrency prices has led to a default by the Company pursuant to the terms of the loans."  *See* First Affidavit of Russell Crumpler, *In the Matter of the Appointment of Liquidators in the High Court of the Territory of the British Virgin Islands over Three Arrows Capital Ltd (BVI Company No. 1710531) on 27 June 2022, by way of BVIHC(COM)2022/0119 and BVIHC(COM)2022/0117*, Case No. HC/OA 317/2022, General Division of the High Court of the Republic of Singapore (July 9, 2022), Ex. RC-3 at 847 & 850.

## FACTUAL BACKGROUND

### I.   The FTX.com Exchange

13.   Prior to the Petition Date, FTX and its affiliates operated two centralized digital asset exchanges.  (Coverick Decl., Ex. F, *Declaration of Edgar W. Mosley II in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26044] ("Mosley Confirmation Decl.") ¶ 15.)  The Exchange was available to customers in certain jurisdictions outside of the United States, while the FTX.US exchange was its much smaller counterpart in the United States.  (*Id.* ¶¶ 16-17.)  The Proof of Claim asserts various causes of actions solely against FTX that purportedly arise from 3AC's trading activities as a customer of the Exchange.

### A.   Background on Operation of the Exchange

14.   The Exchange offered a venue for both retail and institutional investors to trade digital assets and their derivatives.  (*Id.* ¶ 18.)  Generally, the Exchange did not take positions against or lend money to customers, but functioned as a platform for customers to trade with one another.

#### 1.   Management of Digital Assets

15.   The Exchange was a centralized exchange:  it received deposits of fiat currency and digital assets from its customers, commingled these assets into omnibus digital asset addresses and bank accounts (as described more fully below), facilitated trades between customers without any actual exchange of assets, and then drew from commingled pools to process withdrawals from the Exchange by customers.  (*Id.* ¶¶ 15, 32.)

16.   In order to access and trade on the Exchange, customers of the Exchange, including 3AC, were required to open an account uniquely associated with them (each a "Customer

Account"). (*Id.* ¶ 24.) Customer Accounts tracked the entitlements each customer had to assets held by the Exchange ("Exchange Assets"). (*Id.* ¶ 25.)

17.    Importantly, Customer Accounts were *not* wallets or bank accounts that held assets. (*Id.* ¶ 26.) They were not capable of storing, and did not store, any assets (digital or fiat currency). (*Id.*) Rather, Customer Account balances were aggregate entitlements tracked on the Exchange's master ledger. (*Id.* ¶ 27.) When two parties transacted on the Exchange, credits and debits associated with their Customer Accounts were entered on the Exchange's master ledger, but no digital assets or fiat currency actually moved. (*Id.* ¶¶ 27, 31.) This was publicly described as a feature of the Exchange that provided significant energy savings that limited the environmental impact of digital asset trading, and increased the speed at which customers could trade. (*Id.* ¶ 31.) An Exchange customer could only cause FTX to actually move digital assets or fiat currency when the Exchange customer deposited or withdrew assets onto or off of the Exchange. (*Id.*)

18.    When an Exchange customer deposited a digital asset onto the Exchange, that asset moved from an external address to an address owned and controlled by FTX ("Deposit Addresses"). (Mosley Confirmation Decl. ¶¶ 34-35.) Digital assets deposited by many different customers were swept from Deposit Addresses into addresses managed by FTX, where they were commingled together ("Sweep Addresses"). (*Id.* ¶ 37.) Whenever ETH or FTT was deposited onto the Exchange, FTX quickly swept it into Sweep Addresses containing the ETH or FTT deposited by other customers. (*Id.* ¶¶ 38-39.) Although the specific sweep mechanism differed for FTX's management of BTC, BTC was also ultimately swept into Sweep Addresses where it was aggregated and commingled in a similar manner. (*Id.* ¶¶ 40-44.) While deposited digital assets would be reflected as associated with the relevant Customer Account on the Exchange's

master ledger (and on the customer interface), the underlying digital assets themselves lost any connection to the customer who deposited them the moment they were swept because digital assets are fungible and therefore indistinguishable once commingled. (*Id.* ¶ 32.)  Similarly, fiat currency deposited by a customer lost any connection to that customer after its deposit, as FTX similarly held fiat currency deposited by customers in commingled bank accounts.[7]  (*Id.*)

## 2.    The Account Balance

19.    Every Customer Account had an Account Balance, which was the aggregate balance of all asset entitlements associated with that Customer Account.  (Coverick Decl. ¶ 7.) The Account Balance reflected every credit and debit associated with the Customer Account across all types of assets since the account was opened—including deposits, withdrawals, trades, and transfers. (*Id.*)  The Account Balance was the sole and comprehensive measure of value for a Customer Account expressed in a net consolidated USD equivalent value. (*Id.*)

20.    Every Customer Account also had sub-balances for each individual asset (*e.g.*, BTC, ETH, USD, etc.). (*Id.* ¶ 8.)  These sub-balances reflected all of the credits and debits for that particular asset associated with the Customer Account since the account was opened. (*Id.*) These individual asset sub-balances collectively comprised the Account Balance, and were connected because trades typically involved the exchange of one asset for another. (*Id.*)  For example, if a customer sold BTC for USD, their BTC sub-balance would decrease (reflecting that they no longer had an entitlement to the BTC that they sold), while their USD Balance would increase (reflecting that they were entitled to the USD proceeds from the sale).

---

[7] As used herein and for ease of understanding, references to buying or selling a digital asset or fiat currency on the Exchange, or assets associated with a Customer Account, refer to an entitlement to the relevant asset rather than proprietary interest in of said asset.  As described above, Account Balances—and the deposit, withdrawal, trade, and transfer activity that they cover—reflect ledger entries, namely a series of credits and debits.

21.     Although the overall Account Balance and sub-balances for individual assets were the only balances visible to a customer via the user interface for a Customer Account, sub-balances for different assets can be grouped into categories and aggregated for purposes of analysis, as the Joint Liquidators do in the Proof of Claim:  the USD Balance for fiat currency and the Digital Asset Balance for all digital assets and other assets .  (*Id.* ¶ 9.)  The USD Balance and the Digital Asset Balance changed inversely to one another in connection with any trading activity involving the exchange of USD for digital assets (or vice versa).  (*Id.* ¶ 10.)  The USD Balance and Digital Asset Balance were thus inextricably interconnected, and together (but only together) comprised the overall Account Balance (expressed in a USD equivalent amount value) and the value of the Customer Account.  (*Id.* ¶¶ 9-10.)

22.     A Customer Account was generally not permitted by the Exchange to have a negative Account Balance at any time, with certain limited exceptions for internal corporate-controlled accounts and FTX affiliate entity accounts.  (*Id.* ¶ 11.)  In other words, the overall Customer Account must have a positive value at all times.  (*Id.*)  By contrast, the balance for an individual asset type (*e.g.*, BTC) could be negative.  (*Id.*)  As discussed in detail below, a customer's USD Balance could be negative, provided that overall the Account Balance (*i.e.*, the combination of Digital Asset Balance and USD Balance) was positive and that the Customer Account otherwise was otherwise in compliance with applicable requirements under the governing agreements with FTX.  (*Id.*)

**B.     Leveraged Trading**

23.     FTX offered certain opportunities for customers to use leverage to make acquisitions of larger amounts of digital assets than could otherwise be acquired with the assets credited to the Customer Account.  (*Id.* ¶ 12.)  Leveraged trading allowed customers to increase their potential upside, but also increased their risk.  (*Id.*)  The amount of leverage that a customer

could take on in connection with spot margin or perpetual futures trading was limited based on, among other things, that customer's Account Balance.  (*Id.*)  Customers who used leverage to conduct spot margin or futures trading were subject to additional balance maintenance requirements, discussed in more detail below, compared to customers who did not engage in similar trading.  (*Id.*)

24.     3AC used leverage to conduct both spot margin trading and perpetual futures trading.  (*Id.* ¶ 57.)

### 1.     Spot Margin Trading

25.     Spot margin trading on the Exchange involved a customer purchasing one digital asset using another asset—either a digital asset or fiat currency—borrowed from other Exchange customers, not from the Exchange, through the spot margin lending program offered by the Exchange (the "Margin Program").  (*Id.* ¶ 13.)

26.     The Margin Program was a voluntary and competitive peer-to-peer market in which pools of customers borrowed assets from pools of other customers.  (*Id.* ¶ 14.)  Exchange customers opted into participation in the Margin Program by enabling this feature on their Customer Account.  (*Id.*)  Once the feature was enabled, a customer would automatically access the Margin Program when executing a trade that required payment of an asset in an amount exceeding the customer's applicable balance, and borrow the deficit through the Margin Program. (*Id.*)  As a simple illustrative example, without taking into consideration any applicable margin requirements, if a customer that had opted into the Margin Program had a positive $10,000 USD Balance and executed a trade that required payment of $25,000 (*e.g.*, buying 1 BTC for $25,000), then the customer would automatically borrow the other $15,000 via the Margin Program when the trade was executed.  (*Id.*)

-13-

27.     The Margin Program used an algorithm to connect the pools of borrowers and lenders. (*Id.* ¶ 15.) The pool of lenders and interest rate for a particular spot margin loan changed on an hourly basis. (*Id.*) At the beginning of an hour, customers who were willing to lend a particular asset would specify the quantity they were willing to lend, and the minimum interest rate they would require for the next hour. (*Id.*) All lenders with open loan offers on that particular asset for the next hour would be grouped together in a pool. (*Id.*) At the beginning of each hour, the Exchange would also group all the potential borrowers into a pool and calculate the total borrow demand for that particular asset. (*Id.*) The lending offers were then sorted by minimum interest rate, and the Exchange would automatically start fulfilling the borrow demand of all borrowers on a pro-rata basis until the total borrow demand was filled. (*Id.*) Due to the pooling of borrowers and lenders and the fact that borrow demand was filled on a pro-rata basis for all borrowers, every borrower in the borrower pool for that particular asset for that particular hour was borrowing from every lender in the lender pool for that particular asset for that particular hour, and vice versa. (*Id.*) Every borrower in the borrower pool for that particular asset paid the same rate determined through this process for that particular hour. (*Id.*) Similarly, every lender in the lender pool for that particular asset received the same interest rate. (*Id.*) After that hour had passed, the pool of lenders and interest rate offers would be recalculated, and the rate to be paid by the borrowers would change. (*Id.*)

28.     This peer-to-peer Margin Program was automatic and dynamic because loans were made simultaneously with trades, and the source of loans funds and payments thereon changed on an hourly basis. (*Id.* ¶ 16.) Borrowers borrowed from the particular pool of lenders for the given hour, not any individual lender who participated in that pool. (*Id.*) Said differently, there is no one-to-one borrower-lender relationship for any specific margin loan. (*Id.*)

-14-

29.     Buying digital assets using fiat currency borrowed through the Margin Program permitted customers to build larger positive Digital Asset Balances and larger negative USD Balances in their Customer Account, without affecting the (overall) Account Balance. (*Id.* ¶ 17.) Just like for any spot trade (without regard to margin), when USD was used to purchase a digital asset, the result was a credit to the Digital Asset Balance (in the amount of the value of the digital asset purchased) and a debit to the USD Balance (in the amount of the USD paid for the digital asset). (*Id.*) The difference between regular spot trading and margin trading utilizing USD was that the customer trading on margin used USD that was drawn from the Margin Program, not from their otherwise available USD Balance. (*Id.*) Generally, a customer would only borrow from the Margin Program if they had a negative USD Balance (or would have a negative USD Balance because of the trade). (*Id.*) The result of buying assets using funds borrowed from the Margin Program was a debit to the USD Balance, which would increase the negative USD Balance (*i.e.*, make it more negative). (*Id.*)

30.     For example, if a Customer Account had a USD Balance of $60,000, and the price of BTC was $50,000, the customer could acquire only 1 BTC if they did not participate in the Margin Program. (*Id.* ¶ 18.) After the trade, the customer would have a positive Digital Asset Balance of $50,000 (reflecting the value of 1 BTC) and a positive USD Balance of $10,000. The Account Balance remained $60,000 (assuming no further price changes or fees). (*Id.*)

31.     By contrast, if the customer participated in the Margin Program, and assuming there were no margin requirements, the customer could acquire 10 BTC by paying $500,000 in fiat currency—with the $60,000 USD Balance in the Customer Account, and $440,000 borrowed from other lenders through the Margin Program. (*Id.* ¶ 19.) After the trade, the customer would have a positive Digital Asset Balance of $500,000 (reflecting the value of 10 BTC) and a

negative USD Balance of $440,000.  (*Id.*)  The Account Balance would remain $60,000 (assuming no further price changes or fees).  (*Id.*)

32.    Spot margin trading increases the customer's exposure to changes in the price of digital assets:  the customer has the upside of price increases and downside of price declines for a larger amount of digital assets.  (*Id.* ¶ 20.)  The overall Account Balance is the same immediately following the trade in both scenarios above, but the latter has increased the customer's exposure to BTC prices by 9x.  (*Id.*)  Subsequent changes in the price of the relevant digital asset impacted the Account Balance significantly more for the customer who traded using the Margin Program.  (*Id.*)

33.    If the price of BTC increased to $55,000 (a 10% rise), the customer in the first example (who did not trade using the Margin Program) would still be entitled to the value of one BTC, which now has a market value worth $5,000 more than she paid for it.  (*Id.* ¶ 21.)  Her Customer Account would show a positive Digital Asset Balance of $55,000 (an increase by $5,000), and a positive USD Balance of $10,000 (unchanged).  (*Id.*)  The Account Balance increased from $60,000 to $65,000.  (*Id.*)

34.    By contrast, the customer in the second example (who borrowed funds through the Margin Program) would still be entitled to the value of ten BTC, which now have a market value worth $50,000 more than she paid for them.  (*Id.* ¶ 22.)  Her Customer Account would show a positive Digital Asset Balance of $550,000 (an increase by $50,000), and a negative USD Balance of $440,000 (unchanged).  (*Id.*)  The Account Balance would increase from $60,000 to $110,000.  (*Id.*)

35.    If the price of BTC instead decreased to $45,000 (a 10% decrease), the customer in the first example would still be entitled to the value of one BTC, with a market value

worth $5,000 less than she paid for it.  (*Id.* ¶ 23.)  Her Customer Account would show a positive Digital Asset Balance of $45,000 (a decrease by $5,000), and a positive USD Balance of $10,000 (unchanged).  (*Id.*)  The Account Balance would decrease from $60,000 to $55,000.  (*Id.*)

36.      The customer in the second example would face more significant losses. (*Id.* ¶ 24.)  She would still be entitled to the value of 10 BTC, with a market value worth $50,000 less than she paid for them.  (*Id.*)  Her Customer Account would show a positive Digital Asset Balance of $450,000 (a decrease by $50,000), and a negative USD Balance of $440,000 (unchanged).  (*Id.*)  The Account Balance would decrease from positive $60,000 to positive $10,000.  (*Id.*)  The impact of the market decline would be greater because the customer was more exposed to fluctuations in the price of BTC by virtue of taking a larger leveraged position in assets (using borrowed funds) that declined in value.  (*Id.*)

37.      As described more fully below, the Exchange imposed requirements for customers, among other things, to maintain certain minimum balances in their Customer Accounts in order to open positions via spot margin trading, and to continue to keep leverage open on the Customer Account.  (*Id.* ¶ 25.)  However, sufficiently large positions taken via spot margin trading, particularly across multiple digital assets, presented the risk of significant declines in overall Account Balance during periods of market declines.  (*Id.*)

38.      Whether an asset was bought or sold in connection with spot margin trading did not affect the manner in which the Exchange stored the relevant assets.  (*Id.* ¶ 26.)  Spot margin trades resulted in ledger entries (*i.e.*, credits and debits to Customer Accounts), not the movement of digital assets or fiat currency.  (*Id.*)

### 2.    Perpetual Futures Trading Overview

39.    In addition to spot trading individual assets, customers could also take "futures" positions, which were, in essence, contractual bets on the future price of a digital asset that did not require the customer to buy or sell the digital asset.  (*Id.* ¶ 27.)

40.    The Exchange offered different types of futures contracts, but customers predominantly used perpetual futures, which remain open indefinitely until the position is closed. (*Id.* ¶ 28.)  Nearly all of 3AC's open futures positions during June 2022 involved perpetual futures.[8]  (*Id.* ¶ 73.)

41.    Perpetual futures contracts were standardized to reference one unit of a given digital asset (*e.g.*, one BTC), included a reference price for that digital asset determined by the market, and did not have a specified end date.[9]  (*Id.* ¶ 29.)  One party to the contract took the "long" position (*i.e.*, betting the reference price will increase) and the other party took the "short" position (*i.e.*, betting the reference price will decrease).  (*Id.*)  Perpetual futures contracts on the Exchange settled at least every 30 seconds, and then automatically reset.  (*Id.*)  Every 30 seconds, the parties to the contract received a credit or a debit to their USD Balance in their Customer Accounts, depending on whether the reference price had gone up or down since the most recent settlement (*i.e.*, 30 seconds prior).  (*Id.*)  If the reference price increased in the 30-second settlement

---

[8] 3AC held an immaterial number of non-perpetual futures during the period in question.  The calculated gains on open non-perpetual futures contracts during the period in question was $7,000.  (Coverick Decl. ¶ 73.)

[9] The reference price was established by the market for perpetual futures contracts on the Exchange (*e.g.*, BTC-PERP), which was separate from the spot market for that asset (*e.g.*, BTC).  (Coverick Decl. ¶ 30.)  Parties opened new perpetual futures contracts in these markets by agreeing to a contract with a given reference price, and as a result, the reference price was set by a competitive market.  (*Id.*)  However, the reference price did *not* reflect any payment exchanged by the parties or any value for the perpetual futures contract itself—the perpetual futures market established the reference prices used in contracts, but it was costless to open or close a perpetual futures contract (other than small trading fees paid to the Exchange).  (*Id.*)

window, the short party would make a payment to the long party. (*Id.*) But if the reference price decreased, the long party would make a payment to the short party. (*Id.*)

42. The reference price was reset for the next 30-second window. (*Id.* ¶ 31.) Thus, every 30 seconds, the parties automatically made a new "bet" about where the price of the digital asset would go in the next 30 seconds, paid up, and bet again. (*Id.*) This cycle would continue until a party closed its position.[10] (*Id.*)

43. For example, if a customer opened 10 BTC-PERP contracts with a reference price of $50,000, and the reference price set by the BTC-PERP market increased by $5,000 (10%) in the next 30 seconds, then she would receive a $50,000 credit to her USD Balance (*i.e.*, the settlement would increase her USD Balance by $5,000 for each of her 10 contracts). (*Id.* ¶ 32.) But, if the reference price decreased by $5,000 in the next 30 seconds, her account would be debited $50,000, and her prior earnings would be automatically eliminated.[11] (*Id.*)

44. A perpetual futures contract itself was not an asset that had value—it could not be sold or otherwise transferred for consideration. (*Id.* ¶ 34.) The contract was a derivative instrument to create exposure to the price movement of the underlying asset—the opportunity to receive a USD credit or debit depending on whether prices went up or down every 30-second

---

[10] In this way, perpetual futures differed from conventional futures trading, which typically involves a contractually defined settlement date. (Coverick Decl. ¶ 31.)

[11] The parties' settlement payments made in USD every 30 seconds were the primary payment stream associated with perpetual futures contracts, but there were also small funding payments that were paid every hour to ensure that the reference price stayed close to the spot price for reference asset. (Coverick Decl. ¶ 33.) These payments covered the differences between (i) the price of an underlying digital asset (*e.g.*, BTC); and (ii) the prevailing reference price in the perpetual futures market (*e.g.*, BTC-PERP). (*Id.*) Especially in the case of less liquid digital assets, the market price used for the perpetual futures contract and the underlying asset could diverge, creating a space for arbitrage, and funding payments were intended to eliminate that discrepancy. (*Id.*) If, at the hourly mark, the reference price for the perpetual contract exceeds the price of the underlying digital asset, the long side would pay the short side the difference (*i.e.*, the funding payments), and vice versa. (*Id.*) In the case of heavily traded digital assets like BTC and ETH, the reference price for the perpetual futures contracts rarely diverged from the price of the underlying asset to a significant degree, and funding payments were typically much smaller. (*Id.*)

interval. (*Id.*) When a customer opened a perpetual futures position, the customer did not pay any amount for the contract itself, other than a small trading fee paid to the Exchange. (*Id.*) There was no change to the customer's Account Balance (other than the decrease in USD Balance as a result of the fee)—again, because the futures contract itself was not an asset. (*Id.*) Similarly, when the customer closed the position, the only impact to the customer's Account Balance was a small trading fee paid to the Exchange. (*Id.*)

45.    Because the perpetual futures contracts themselves were not assets, the notional amount of a customer's perpetual futures position (*i.e.*, the number of contracts multiplied by the reference price for those contracts) had no bearing on the customer's Account Balance. (*Id.* ¶ 35.) This is consistent with the fact that a perpetual futures contract was just that:  a contract.  It was neither a digital asset nor an entitlement to a digital asset that would otherwise be reflected in the Account Balance. (*Id.*)

46.    Customers enrolled in the Margin Program could access funds loaned through the Margin Program in order to make payments in connection with their perpetual futures trades, specifically to cover USD settlement payments following a loss during a 30-second window. (*Id.* ¶ 37.) Where the Customer Account required to make a settlement payment did not have a positive USD Balance in the amount of that payment, the necessary USD would be borrowed from the pool of customer lenders via the Margin Program. (*Id.*) This access to the Margin Program allowed a customer to keep perpetual futures positions open despite a negative USD Balance, provided that their account satisfied relevant margin requirements. (*Id.*)

### 3.    Account Balance Maintenance Requirements

47.    Exchange customers were subject to a variety of requirements to maintain a minimum level of assets in order to open and maintain leveraged positions on the Exchange, such as those accumulated through spot margin trading or perpetual futures trading. (*Id.* ¶ 38.)  If

the customer failed to comply with applicable requirements, FTX had the right to liquidate assets associated with the Customer Account, or to close the Customer Account. (*Id.*)

48.     FTX required a customer with an open position acquired via leverage to maintain a minimum value of assets for as long as the position was open (the "Maintenance Margin Requirement").[12] (*Id.* ¶ 40.) Two calculations were involved in determining compliance with the Maintenance Margin Requirement. (*Id.*)

49.     *First*, FTX calculated an adjusted value of the assets (that was distinct from the Account Balance) specifically for purposes of the Maintenance Margin Requirement (the "Margin Trading Account Value"). (*Id.* ¶ 41.) To determine the Margin Trading Account Value, FTX applied a weighted formula whereby the market value of each asset associated with the Customer Account (used for purposes of the Account Balance) was multiplied by a "weight" multiplier. (*Id.*) The weight multiplier was primarily based on liquidity and market capitalization of the applicable asset. (*Id.*) Because the weight multipliers were always less than or equal to one, the Margin Trading Account Value was always less than or equal to the Account Balance.[13] (*Id.*) A multiplier was used in order to reflect the greater risk associated with certain assets, such as more volatile cryptocurrency tokens. (*Id.*)

50.     *Second*, FTX calculated the threshold that the Margin Trading Account Value must exceed to permit the customer to maintain their leveraged position (the "Maintenance Margin Level"). (*Id.* ¶ 42.) To calculate the Maintenance Margin Level, FTX would multiply the

---

[12] FTX also required a customer seeking to *open* a new position on margin to have an initial minimum value of assets associated with their Customer Account, which was referred to as the initial margin requirement. (Coverick Decl. ¶ 39.) The customer was not required to maintain the initial margin requirement to keep the position open, but was required to comply with the initial margin requirement to make any subsequent leveraged trades. (*Id.*)

[13] If a Customer Account had a negative balance for a particular asset, then no weight multiplier was used, and the full negative balance was considered for purposes of the Margin Trading Account Value. (Coverick Decl. ¶ 41.)

market value of the leveraged position by the applicable "maintenance margin percentage;" this was 3% for USD, and determined for other assets and futures positions based on the size, liquidity, and market capitalization of the applicable asset or position. (*Id.*)

51.    Both the Margin Trading Account Value and the Maintenance Margin Level were determined by formulas that incorporated the market price of digital assets associated with the Customer Account. (*Id.* ¶ 43.) Those market prices fluctuated constantly, and at times sharply. (*Id.*) As a result, the Margin Trading Account Value and the Maintenance Margin requirement could increase or decrease quickly in line with market conditions. (*Id.*) The Margin Trading Account Value and the Maintenance Margin Requirement were accessible to the customer at all times via the user interface for their Customer Account. (*Id.*)

52.    A customer complied with the Maintenance Margin Requirement when the Margin Trading Account Value was at or above the Maintenance Margin Level. (*Id.* ¶ 44.) FTX required a customer to be in compliance with the Maintenance Margin Requirement for as long as the leveraged position remained open. (*Id.*) Although FTX under certain circumstances could send a margin call if customers did not meet the Maintenance Margin Requirement, in most instances, FTX would automatically begin liquidating their account until it was back in compliance. (*Id.*) Depending on the facts and circumstances, including the customer's trading history, FTX could choose to fully liquidate or close a Customer Account to mitigate risk to the Exchange and other Exchange customers. (*Id.*)

## II.    The 3AC Accounts

### A.    Overview of 3AC Accounts and Governing Agreements

53.    3AC opened a Customer Account on February 20, 2020. (*Id.* ¶ 45.) As of the Petition Date, the 3AC Accounts were structured as one main customer account with 15 subaccounts and a secondary account. (*Id.*) Compliance with the Maintenance Margin

Requirements and the Margin Trading Account Value was assessed at the subaccount level.  The vast majority of 3AC's leveraged trading occurred at a single subaccount.  (*Id.*)

54.     Through the 3AC Accounts, 3AC could deposit, withdraw, buy, sell, and transfer digital assets and fiat currency, like other Exchange customers.  (*Id.* ¶ 48.)  The manner in which FTX swept and stored digital assets or fiat currency deposited or acquired on the Exchange by 3AC did not differ from that of any other Exchange customer.  (*Id.* ¶ 98.)

### 1.     Terms of Service

55.     Like other customers, 3AC agreed to terms of service governing its use of the Exchange when it opened its Customer Account.  (*Id.* ¶ 46.)  An earlier version of the terms of service was operative in February 2020, when the 3AC Accounts were opened.  (*Id.* ¶ 47.)

56.     The Joint Liquidators' purported claims relate to alleged matters during June 2022.  Accordingly, the terms of service dated May 13, 2022 governed all of the activity during the June 13-14, 2022 time period that is relevant to the Proof of Claim.  (Coverick Decl., Ex. A (the "Terms of Service").)  These are the same Terms of Service that applied at the Petition Date and that were considered by Lord Neuberger (and this Court) in connection with Plan confirmation.

57.     The Terms of Service made clear that FTX was not a counterparty to 3AC for any of 3AC's trading activities.  They provided that "FTX Trading's relationship with [3AC] under the Terms is as a trading platform provider only," and that "FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform."  (Terms of Service at 1.)

58.     The Terms of Service also disclaimed any fiduciary relationship.  They provided that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities

-23-

effected by you using the Services." (Terms of Service § 2.1.3.) As Lord Neuberger stated in his declaration in support of Plan confirmation, this provision is one of several that are inconsistent with a potential trust relationship. (*Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury* [D.I. 26042] ("Neuberger Confirmation Decl.") ¶ 45,1; *see also id.* ¶¶ 45.2-45.6 (finding Sections 2.2.2, 2.10, 8.2.6, 9, and 38.6 all inconsistent with a potential trust relationship).)

59.    Additionally, the Terms of Service created rights and obligations with respect to margin trading. As a participant in the margin trading program, 3AC was required to provide an "initial posting of [assets] to meet initial margin requirements." (Terms of Service § 2.5.2.) Thereafter, 3AC was required to maintain a minimum amount of credits in its accounts in order to avoid liquidation, *i.e.*, the Maintenance Margin Requirement. (*See id.*)

60.    As a result, under the Terms of Service and related documents, if the 3AC Accounts were no longer in compliance with the Maintenance Margin Requirement (or an initial margin requirement), the 3AC would be "required to have or make additional [assets] available as margin to ensure that maintenance margin requirements are met." (*Id.*) By participating in the Margin Program, 3AC agreed to "maintain a sufficient amount of Assets at all times to meet [the] margin requirements, as such requirements may be modified from time to time." (*Id* § 16.2.)

61.    The Terms of Service expressly granted FTX the right to liquidate an account that was not compliant with those margin requirements:

> "If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account."

(*Id.*)

62.    The provisions of the Terms of Service taken together highlighted that all assets within a Customer Account (including those for which there was a negative balance) were viewed as an integrated set of assets defining the parties' rights and obligations.  Section 8.1.3 provided that "[a]ny available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates."  (*Id.* § 8.1.3.)  Section 10.3 addressed a "Debit Account Balance" at the account level—*i.e.*, across all assets.  (*Id.* § 10.)  Section 10.1 provided FTX with rights in the event "your Account has a debit balance" (*i.e.*, the *whole* account).  (*Id.* §10.1.)  Section 10.2 gave FTX the right to "debit your Account" and "withhold amounts from fiat currency and Digital Assets that you may transfer to your Account" (*id.* § 10.2), and Section 10.3.1 authorized FTX to "sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance" (*id.* § 10.3).  The aggregate pool of assets impacted the trading opportunities for a customer, and the aggregate pool of assets served as recourse for FTX—different types of assets were not isolated.

63.    The Terms of Service further specified that, in the case of margin trading, the Exchange did not bear the risk of a potential default by a borrower.  Rather, the users who voluntarily lent assets on the Margin Program bore such risk.  The Terms of Service stated that "[w]hen you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt."  (*Id.* §§ 2.4.1, 16.3.)

## 2.    Line of Credit

64.    In connection with its margin trading, 3AC was the beneficiary of a "Line of Credit" provided by FTX.  (Coverick Decl. ¶ 49.)  The Line of Credit functioned to increase the Margin Trading Account Value by the amount of the Line of Credit, thus allowing 3AC to take on

more leveraged positions than it would otherwise have been able to without the Line of Credit. (*Id.*)   The Line of Credit thus functioned in connection with 3AC's compliance with the Maintenance Margin Requirement.  (*Id.*)  It also allowed 3AC to trade using leverage without resorting to borrowing from the Margin Program up to the amount of the Line of Credit ($120 million). (*Id.*)

65.    3AC's Line of Credit was increased over time through new agreements, until it stood at $120 million in June 2022.  (*Id.* ¶ 50.)  3AC's Customer Account was initially permitted to use a $10 million Line of Credit in September 2020, which was increased to $20 million in March 2021.[14]  (*Id.* ¶ 51.)  Then, on October 22, 2021, 3AC and FTX entered into a Loan and Security Agreement, which, among other things, formalized the Line of Credit arrangement and increased 3AC's Line of Credit to $100 million.  (*See* Coverick Decl., Ex. D (the "October 2021 Line of Credit Agreement").)  While the October 2021 Line of Credit Agreement specified a Line of Credit limit of $100 million, the Exchange records reflected a limit of $120 million from October 26, 2021 onwards.  (Coverick Decl. ¶ 52.)

66.    Lastly, on March 30, 2022, 3AC and FTX entered into a new Line of Credit Agreement, which modified certain terms and conditions of 3AC's Line of Credit, and the Line of Credit limit was increased in writing to $120 million, in line with what was already reflected in the Exchange records.  (*Id.* ¶ 53; Coverick Decl., Ex. E (the "March 2022 Line of Credit Agreement").)  The March 2022 Line of Credit Agreement governed on June 13-14, 2022.[15] (Coverick Decl. ¶ 53.)

---

[14] To the FTX Recovery Trust's best knowledge, there was no written documentation associated with either the initial $10 million Line of Credit or the increase to $20 million.  (Coverick Decl. ¶ 51.)

[15] The Joint Liquidators half-heartedly argue that the October 2021 and March 2022 Line of Credit Agreements are not binding because they were not countersigned by FTX.  (Proof of Claim ¶ 34.)  That is entirely disingenuous. 3AC—specifically Kyle Davies, one of its two founders—signed the agreements, and it is clear that 3AC intended to

### a.    The LOC Requirement

67.    Under these agreements, 3AC was required to comply with an additional requirement to maintain a minimum Account Balance for the 3AC Accounts that was tied to the amount of the Line of Credit (the "LOC Requirement").  (October 2021 Line of Credit Agreement § 2.1(c); March 2022 Line of Credit Agreement at FTX_3AC_000000758.)

68.    The LOC Requirement was separate from and in addition to the Maintenance Margin Requirement under the Terms of Service.  Unlike the Maintenance Margin Requirement, which was dynamic because it incorporated ever-changing market prices, the LOC Requirement was a fixed threshold established by contract and did not change on a day-to-day basis.[16]

69.    In the October 2021 Line of Credit Agreement, 3AC agreed that it would maintain an Account Balance "no less than 125% of the value of digital assets loaned to [3AC]." (October 2021 Line of Credit Agreement § 2.1(c).)  Because the Line of Credit under this agreement was $120 million, 3AC was required to maintain an Account Balance of at least $150 million to comply with the LOC Requirement.  If 3AC failed to comply with the LOC Requirement, and failed to remedy its non-compliance following two hours' notice by FTX, then FTX had "the right to liquidate the Account [Balance] and all other assets held by [3AC] on the

---

be bound by them.  The conduct of both parties dispels any doubt as to the validity of the agreements:  3AC not only used the Line of Credit; it exhausted it.  (*See* Coverick Decl. ¶ 53.)  In light of the actual evidence that the contract was both intended and relied upon, the Joint Liquidators cannot seriously raise technical formalities in the context of an agreement negotiated by the founders of 3AC and FTX, two organizations the Joint Liquidators described as having significant recordkeeping deficiencies.  (*See* Proof of Claim ¶¶ 8-9.)

[16] Additionally, the Account Balance was used to determine compliance with the LOC Requirement; there was no weighted formula applied as was done to determine the Margin Trading Account Value in the context of the Maintenance Margin Requirement.

Exchange." (*Id.*)  FTX also had the right to liquidate assets without waiting two hours if it would be "detrimental" to do so in FTX's "so and absolute discretion." (*Id.*)

70.    The March 2022 Line of Credit Agreement increased the LOC Requirement to 200% of the Line of Credit:  $240 million.  (March 2022 Line of Credit Agreement at FTX_3AC_000000758.)  Under this agreement, if 3AC failed to maintain an Account Balance of $240 million at all times, then 3AC was required to "immediately, and by no later than twenty four hours," restore the Account Balance to $240 million. (*Id*.)  If 3AC failed to do so, then FTX had the right to liquidate any and all assets associated with the 3AC Accounts.  (*Id.* at FTX_3AC_000000760.)  Through that agreement, 3AC "acknowledge[d] that [the assets credited to the 3AC Accounts] may be liquidated without notice to satisfy minimum maintenance, [Account Balance] requirements or margin calls," and that it was "not entitled to choose which assets in its account(s) are liquidated or sold by FTX" to meet those requirements.  (*Id.*)  FTX also had the absolute "right to remove the Line of Credit at any time and for any reason."  (*Id.* at FTX_3AC_000000758.)

71.    The terms of the March 2022 Line of Credit Agreement confirmed that *all* assets associated with the 3AC Accounts (including those with negative balances) formed a singular, integrated pool of assets, the value of which defined rights and obligations.   That agreement provided that "FTX computes the Customer's net account balances on FTX by adding up the total value of all cryptocurrency and other assets it is long, and subtracting the value of assets that the Customer is short."  (*Id.* at FTX_3AC_000000761.)  And that "FTX generally enforces that the user's net account balances are never negative." (*Id.*)  In other words, FTX looked to the Account Balance, rather than particular sub-balances, when assessing whether 3AC complied with its obligations in connection with the Line of Credit.

-28-

### b.      How the Line of Credit Functioned

72.     The Line of Credit provided increased 3AC's Margin Trading Account Value by the amount of the Line of Credit: $120 million.  In other words, the Maintenance Margin Level was $200 million, then 3AC would only need to maintain a Margin Trading Account Value of $80 million to be in compliance with the Maintenance Margin Requirement.  That was the primary function of the Line of Credit.

73.     If 3AC engaged in a trade that would result in a negative USD Balance, the USD would be first drawn from the Line of Credit before being borrowed on the Margin Program. 3AC was able to continue to draw on that Line of Credit for such leveraged USD trades until the Line of Credit was fully utilized.  Once 3AC fully utilized the Line of Credit, any additional leverage would be borrowed from other customers via the peer-to-peer Margin Program.

### B.      Activity in the 3AC Accounts Before June 12, 2022

74.     3AC first began trading on the Exchange in 2020.  (Coverick Decl. ¶ 54.) 3AC did not deposit more than $100 million or have a total quarter-end Account Balance exceeding $13 million in any one of the first three quarters of 2020.  (*Id.* ¶ 55.)  3AC's activity increased significantly in Q4 2020, when 3AC deposited $551 million to and withdrew $492 million from the 3AC Accounts.  (*Id.*)  The scale of 3AC's activity continued to grow in 2021 and early 2022.  3AC deposited more than $1.8 billion in each quarter from Q1 2021 through Q1 2022, and withdrew more than $1.7 billion in each such quarter.  (*Id.*)

75.     3AC was also actively trading on the Exchange.  Indeed, one of the founders of 3AC, Kyle Davies, tweeted on December 9, 2022, "I was the largest trader on FTX."  (Beller Decl., Ex. A.)

76.     3AC's trading activity increased during Q2 2021, when 3AC gained $218 million via trading activity.  (Coverick Decl. ¶ 56.)  It remained active in trades throughout the

second half of 2021 and gained $230 million and $364 million, respectively, during Q3 and Q4 2021.  3AC continued trading on the Exchange during Q1 2022.  (*Id.*)

77.     3AC's trading changed in mid-May 2022, when it began to open large long spot margin positions in BTC.  (*Id.* ¶ 57.)  3AC built significant spot positions of BTC using funds borrowed through the Margin Program, and also opened significant long perpetual futures positions in BTC-PERP.  (*Id.*)  At the time, BTC was trading at an almost 60% discount of the November 2021 all-time highest price.  (*Id.*)  By entering into long positions at that time (both spot and futures positions), 3AC was buying into a deteriorating market and betting heavily that the market would rebound.

78.     Because 3AC spent funds borrowed from other customers via the Exchange's peer-to-peer Margin Program to acquire BTC (and thus build its positive Digital Asset Balance), there was a significant increase to 3AC's *negative* USD Balance.  (*Id.* ¶ 58.)  Notably, at this point 3AC had fully utilized its Line of Credit.  (*Id.*)

79.     Market prices did not increase as 3AC had bet.  In fact, the market continued to crash.  From May 31, 2022 to the end of June 12, 2022, the price of BTC dropped by more than 16%, and the price of ETH dropped by more than 26%.  (*Id.* ¶ 59.)  The overall Account Balance for the 3AC Accounts decreased by $270 million during this period, which was nearly half of its Account Balance at the end of May 31, 2022.  (*Id.*)

80.     Much of this reflected the movement of BTC.  The value of spot BTC associated with the 3AC Accounts decreased by $137 million from May 31, 2022 to June 12, 2022.  (*Id.* ¶ 60.)  During the same period, 3AC also recorded losses of $101 million to its USD Balance (*i.e.*, made it more negative) due to payments made under BTC-PERP contracts.  (*Id.*)  The 3AC Accounts further lost $70 million (in reduced positive Digital Asset Balance) from ETH holdings,

and another $17 million from other holdings.  (*Id.*)  While 3AC had net deposits of $121 million in USD during this period, it also had net withdrawals of $65 million worth of BTC, ETH, and other digital assets.  (*Id.*)

### C.    Commingling of Assets Associated with the 3AC Accounts

81.    As described above, Customer Accounts did not store any assets, and the Exchange swept and commingled assets that were deposited by customers.  At the end of the day on June 12, 2022, the Deposit Addresses associated with the 3AC Accounts did not contain any BTC, ETH or any other digital asset.  (Coverick Decl. ¶¶ 101-05.)  All BTC, ETH, and FTT associated with every deposit by 3AC had been transferred to Sweep Addresses managed by the Exchange and commingled with assets deposited by other Exchange customers.  (*Id.*)  3AC did not deposit any of the tokenized stocks credited to the 3AC Accounts (GBTC or ETHE)[17]—it acquired all tokenized stock through on-Exchange trades.  (*Id*. ¶¶ 106-11.)  Digital assets that a customer acquired on the Exchange via a trade or transfer were never held in its Deposit Address. As a result, as of June 12, 2022, 3AC's deposited digital assets had already been swept and commingled, all of the assets that 3AC acquired on the Exchange were commingled, and none of the assets associated with the 3AC accounts were traceable to any assets held by FTX.  (*Id.* ¶ 98.)

### D.    Activity in the 3AC Accounts on June 13 and June 14, 2022

82.    On June 12, 2022, at 11:59 p.m. (UTC), the 3AC Accounts had a total, positive Account Balance across all assets of ***$284 million***.  (*Id.* ¶ 61.)  This is the starting point for the activity challenged by the Joint Liquidators.  (*See* Proof of Claim ¶ 40.)  The Joint

---

[17] GBTC was a tokenized stock issued by FTX that mimicked Grayscale's Bitcoin Trust ETF. (Coverick Decl. ¶ 106.) ETHE was a tokenized stock issued by FTX that mimicked Grayscale's Ethereum Trust ETF.  (*Id.* ¶ 109.)

Liquidators do not dispute that the 3AC Accounts had an overall Account Balance of $284 million at the end of the day on June 12, 2022.

83.    The Account Balance of the 3AC Accounts at this time was comprised of the sub-balances below:

| | |
|---|---|
| *Digital Asset Balance* | $1,017 million |
| *USD Balance* | ($733 million) |
| **Total Account Balance** | **$284 million** |

(Coverick Decl. ¶ 61.)   For the reasons described below (*see infra* ¶¶ 149-151), the Joint Liquidators' figures for the Digital Asset Balance ($1.59 billion) and negative USD Balance ($1.3 billion) are inaccurate.

84.    There is no mystery about how the Account Balance decreased.   The Account Balance declined from $284 million at the end of the day on June 12 to $2 million at the end of the day on June 14 because of market price declines and withdrawals by 3AC.   (Coverick Decl. ¶ 62.)  There were no nefarious actions taken by FTX or anyone else outside of 3AC, and there are no unaccounted-for transactions.

85.    Price declines were the most significant cause of the decline in the Account Balance.  (*Id.* ¶ 63.)  On June 13, 2022, the price of BTC dropped by nearly 16%, and the price of ETH dropped by nearly 16%.  (*Id.*)  These market movements had two immediate consequences: (1) the positive Digital Asset Balance in the 3AC Accounts decreased as the result of the lower value of the digital assets; and (2) the negative USD Balance in the 3AC Accounts increased (*i.e.*, became more negative) because 3AC continued to make settlement payments in USD every 30 seconds under its long perpetual futures contracts.  (*Id.*)

86.     Table 1 below identifies net impact these price declines had on the Digital Asset Balance (and Account Balance) from 12:00 a.m. (UTC) on June 13, 2022 to 11:59 p.m. (UTC) on June 14, 2022.  (*Id.* ¶ 64.)

**Table 1:  Decline in Value of Assets Held in 3AC Accounts from Market Movements**

| Asset | Percentage Change | Impact on Digital Asset Balance |
|---|---|---|
| BTC | 17% decline | $95 million loss |
| ETH | 16% decline | $29 million loss |
| GBTC | 19% decline | $13 million loss |
| ETHE | 15% decline | $6 million loss |
| FTT | 14% decline | $6 million loss |
| Other tokens | N/A | $300 thousand gain |
| **Total** | N/A | $148 million loss |

87.     Price declines also caused 3AC to take substantial losses as the result of its perpetual futures contracts.  (*Id.* ¶ 65.)  3AC primarily held long side BTC-PERP contracts: meaning that, when the price of BTC declined, 3AC's account would make a settlement payment every 30 seconds (*i.e.*, a debit to its USD Balance) to reflect the change.  (*Id.*)  Because 3AC had a negative USD Balance, these debits further increased the 3AC Accounts' negative USD Balance (*i.e.*, made it more negative).  (*Id.*)  3AC's Account Balance was debited $74 million in USD via settlements under long BTC-PERP contracts on June 13 and 14, 2022.  (*Id.*)

**Table 2:  Decline in USD Balance of 3AC Accounts from Perpetual Futures Contracts**

| Contract | Percentage Change for Reference Asset | Impact on USD Balance |
|---|---|---|
| BTC-PERP | 17% decline | $74 million loss |

88.     Withdrawals by 3AC also drove down the Account Balance.  (*Id.* ¶ 66.)  On June 13, 2022, 3AC made six withdrawals from the Exchange:  (1) $2 million worth of FTT at 7:26 a.m.; (2) $35 million USD between 10:18 p.m. and 10:22 p.m.; and (3) $4 million worth of BTC at 10:34 p.m.  (*Id.*)  Then, *after* FTX informed 3AC that the 3AC Accounts were non-compliant with the March 2022 Line of Credit Agreement, 3AC made nine additional withdrawals

of ETH worth $18 million starting at 8:06 a.m. on June 14, 2022.  (*Id.*)  None of these withdrawals

went to an address controlled by FTX or any affiliate thereof.  (*Id.*)  These withdrawals reduced

the positive Digital Asset Balance when they involved a digital asset and increased the negative

USD Balance (*i.e.*, made it more negative) when they involved fiat currency.  (*Id.*)  Table 3 below

shows the withdrawals made by 3AC on June 13 and 14, 2022.  (*Id.*)

### Table 3:  3AC Withdrawals June 13, 2022 – June 14, 2022

| Date & Time (UTC) | Asset | Units Withdrawn | Spot Debit | USD Debit | Account Balance Impact |
|---|---|---|---|---|---|
| 7:26 a.m. (June 13) | FTT | 98,810 | $2 million | None | $2 million decrease |
| 10:18 p.m. (June 13) | USD | 35,000,000 | None | $35 million | $35 million decrease |
| 10:34 p.m. (June 13) | BTC | 195 | $4 million | None | $4 million decrease |
| 8:06 a.m. (June 14) | ETH | 14,900 | $18 million | None | $18 million decrease |
| **All** | **All** | **N/A** | **$25 million** | **$35 million** | **$60 million decrease** |

89.    Table 4 below shows the impact of market price declines and withdrawals

on the Account Balance for the 3AC Accounts on June 13 and 14, 2022.  (*Id.* ¶ 67.)

### Table 4:  Causes of Decline in Account Balance on June 13 and 14, 2022

| Cause | Amount | Percentage of Decline |
|---|---|---|
| **Total Decrease** | **$282 million** | **100%** |
| Price Declines | $222 million | 79% |
| *-Spot* | *$148 million* | *53%* |
| *-USD (Futures)* | *$74 million* | *26%* |
| 3AC Withdrawals | $60 million | 21% |

| Cause | Amount | Percentage of Decline |
|---|---|---|
| Price Declines | $222 million | 79% |
| *-Spot* | *$148 million* | *53%* |
| *-USD (Futures)* | *$74 million* | *26%* |
| 3AC Withdrawals | $60 million | 21% |
| **Total Decrease** | **$282 million** | **100%** |

-34-

90.     3AC also made more than 52,000 trades on June 13 and 14, 2022 in which they sold digital assets for USD.  (*Id.* ¶ 68.)  The consequence of such trades was *not* a decline to the Account Balance, but rather a debit to the Digital Asset Balance and an equivalent credit to the USD Balance.  (*Id.*)  These trades thus had no effect whatsoever on the Account Balance.  (*Id.*)  These trades did, however, reduce the positive Digital Asset Balance and reduce the negative USD Balance (*i.e.*, made it less negative).  Most significantly, 3AC sold 26,585 BTC to other Exchange participants between 7:29 a.m. (UTC) on June 13, 2022 and 7:01 a.m. (UTC) on June 14, 2022, which resulted in more than $611 million in debits to the Digital Asset Balance and credits to the USD Balance for the 3AC Accounts.  (*Id.* ¶ 69.)

91.     Nearly all of the trading in the 3AC Accounts was conducted by 3AC through its normal access to the 3AC Accounts.  As discussed further below, at 10:21 p.m. (UTC) on June 14, 2022, FTX initiated the Liquidation, which resulted in 24 trades that debited Digital Asset Balance by $82 million and credited the USD Balance by the same amount.  (*Id.* ¶ 70.)  Much like other trades, the Liquidation was neutral with respect to the Account Balance—it involved exchanging one type of asset (digital assets) for another (USD).  (*Id.*)

92.     Table 5 below identifies the trades for the 3AC Accounts on June 13 and 14, 2022, and their impact on the Digital Asset Balance, USD Balance, and overall Account Balance.  (*Id.* ¶ 71.)

**Table 5:  3AC Trades June 13, 2022 – June 14, 2022**

| Asset | No. Trades | Units Sold | Digital Asset Debit | USD Credit | Account Balance Impact |
|-------|-----------|-----------|---------------------|-----------|------------------------|
| BTC | 16,158 | 26,585 | $611 million | $611 million | None |
| ETH | 17,980 | 122,874 | $150 million | $150 million | None |
| GBTC | 1 | 2,847,917 | $38 million | $38 million | None |
| ETHE | 1 | 2,500,916 | $18 million | $18 million | None |
| FTT | 14,479 | 1,123,117 | $26 million | $26 million | None |

| Asset | No. Trades | Units Sold | Digital Asset Debit | USD Credit | Account Balance Impact |
|-------|-----------|-----------|---------------------|-----------|------------------------|
| Other tokens | 3,893 | n/a | ($1 million) | ($1 million) | None |
| **Total** | **52,512** | **n/a** | **$842 million** | **$842 million** | **None** |

93.     Table 6 shows the Account Balance for the 3AC Accounts at the end of each

hour on June 13 and 14, 2022.  (*Id.* ¶ 72.)

**Table 6:  3AC Account Balance by Hour, June 13-14, 2022**

| June 13 | | June 14 | |
|---------|---------|---------|---------|
| **Time (UTC)** | **Account Balance** | **Time (UTC)** | **Account Balance** |
| 12:00 a.m. | $284 million | 12:00 a.m. | $31 million |
| 1:00 a.m. | $264 million | 1:00 a.m. | $23 million |
| 2:00 a.m. | $232 million | 2:00 a.m. | $16 million |
| 3:00 a.m. | $207 million | 3:00 a.m. | $19 million |
| 4:00 a.m. | $216 million | 4:00 a.m. | $25 million |
| 5:00 a.m. | $210 million | 5:00 a.m. | $24 million |
| 6:00 a.m. | $203 million | 6:00 a.m. | $32 million |
| 7:00 a.m. | $210 million | 7:00 a.m. | $32 million |
| 8:00 a.m. | $168 million | 8:00 a.m. | $31 million |
| 9:00 a.m. | $133 million | 9:00 a.m. | $11 million |
| 10:00 a.m. | $123 million | 10:00 a.m. | $9 million |
| 11:00 a.m. | $119 million | 11:00 a.m. | $8 million |
| 12:00 p.m. | $103 million | 12:00 p.m. | $8 million |
| 1:00 p.m. | $101 million | 1:00 p.m. | $10 million |
| 2:00 p.m. | $103 million | 2:00 p.m. | $11 million |
| 3:00 p.m. | $63 million | 3:00 p.m. | $12 million |
| 4:00 p.m. | $88 million | 4:00 p.m. | $13 million |
| 5:00 p.m. | $103 million | 5:00 p.m. | $12 million |
| 6:00 p.m. | $97 million | 6:00 p.m. | $11 million |
| 7:00 p.m. | $91 million | 7:00 p.m. | $10 million |
| 8:00 p.m. | $86 million | 8:00 p.m. | $9 million |
| 9:00 p.m. | $89 million | 9:00 p.m. | $8 million |
| 10:00 p.m. | $84 million | 10:00 p.m. | $7 million |
| 11:00 p.m. | $33 million | 11:00 p.m. | $2 million |

94.     At the end of the day on June 14, 2022, the Account Balance for the 3AC

Accounts was $2 million.  It decreased by $282 million as the result of market movements and

withdrawals.  At the same time, and entirely unrelated to the Account Balance decline, the

composition of that Account Balance changed because 3AC made thousands of trades in which it

-36-

sold digital assets for USD.  Those trades yielded debits that reduced the positive Digital Asset Balance by $842 million, and credits in the same amount that brought the USD Balance into positive territory.  The Liquidation accounted for only $82 million (9.8%) of this impact.

### E.    Margin Liquidation on June 14, 2022

95.    As set forth above, 3AC was required to maintain an Account Balance of $240 million in the 3AC Accounts pursuant to the March 2022 Line of Credit Agreement.  It failed to do so by 2:00 a.m. (UTC) on June 13, 2022, and thereafter.  (*Id.* ¶ 74.)

96.    As set forth above, 3AC was required to comply with the Maintenance Margin Requirement.  The Margin Trading Account Value for the 3AC Accounts would have fallen below the Maintenance Margin Level absent the Line of Credit at approximately 9:00 a.m. (UTC) on June 13, 2022.  (*Id.*)

97.    The impact of market price declines and withdrawals on 3AC's Account Balance did not go unnoticed by FTX.  At around 11:10 p.m. (UTC) on June 13, 2022, 3AC asked an FTX employee, Zane Tackett, why it could not withdraw more funds.  (Beller Decl., Ex. B at Tackett_3AC_000000219.)  After several rounds of questions and answers via a group chat, at around 12:00 a.m. (UTC) on June 14, 2022, Tackett asked to discuss the situation with 3AC, and informed 3AC (including Kyle Davies) that 3AC was "underwater on the LOC" and had a "massively negative USD" Balance.  (*Id.* at Tackett_3AC_000000220.)  3AC ignored repeated requests for a response.  (*See id.* at Tackett_3AC_000000221 (Tackett writing, "I need a response here guys. You're now 20mm in the hole" and "I would really recommend responding here @Ningxin_TAC.  Lack of response gives us more cause for concern than anything").)  At 2:42 a.m. (UTC) on June 14, 2022, Zane Tackett messaged Sam Bankman-Fried to tell him that 3AC was "$20mm in the hole" and had "stopped responding."   (Beller Decl., Ex. C at FTX_3AC_000001594.)

98.     FTX continued to monitor the decline in value of the 3AC Accounts.  But 3AC did not seek to fill the hole in its accounts—it instead dug deeper.  Approximately five hours later (at 8:06 a.m. (UTC) on June 14, 2022), 3AC withdrew $18 million worth of ETH, further reducing the Account Balance and bringing it farther out of compliance with applicable requirements.  (Coverick Decl. ¶ 75.)

99.     FTX continued to try to discuss the situation with 3AC.  At 3:53 p.m. (UTC) on June 14, 2022, Tackett emailed Kyle Davies notifying him that the 3AC Accounts were out of compliance with the LOC Requirement and that FTX intended to exercise its right to remove the LOC.  (Beller Decl., Ex. D.)  Specifically, the email stated that "[the 3AC Accounts] are in an undesirable state," that FTX "tried to reach [3AC] several times," and the email was "like a final warning."  (*Id.*)  By the time of this email, 3AC had "about $13m in value" in its accounts, when 3AC was "obligated to maintain 200% of the line of credit ($240m) in [its accounts] at all times."  (*Id.*)  Therefore, 3AC was "$227m short on this obligation."  (*Id.*)  Tackett also reminded Davies that FTX "ha[d] the right to remove the [LOC] at any time," and that FTX intended to remove the LOC "whichever comes sooner:  [10 p.m. UTC], [or the 3AC Accounts] reaching $3 million of value."  (*Id.*)  The email further noted that "depending on the state of [the 3AC Accounts' leverage, the Accounts] may be liquidated" when the LOC was removed.  (*Id.*)  Following this email, neither Kyle Davies nor anyone else at 3AC ever responded to FTX or brought the 3AC Accounts back into compliance with the LOC Requirement.  By 4:08 p.m. (UTC) on June 14, 2022, FTX had turned off withdrawals from the 3AC Accounts.  (Beller Decl., Ex. C at FTX_3AC_000001594.)

100.    3AC still did not respond to FTX's requests to discuss the situation.  After more than six additional hours passed, FTX commenced the Liquidation at 10:21 p.m. (UTC).  (Coverick Decl. ¶ 76.)  Just prior to the first liquidating transaction, the 3AC Accounts had a total

positive balance of approximately $7 million, comprised of a positive Digital Asset Balance of $89 million and a negative USD Balance of $81 million.  (*Id.*)

101.    The $82 million Liquidation occurred in two steps.  (*Id.* ¶ 77.)  First, starting at 10:21 p.m. (UTC) on June 14, 2022, after the 3AC Accounts had been out of compliance with the account balance requirements under the March 2022 Line of Credit Agreement for at least 44 hours and 3AC had not responded to FTX for at least 19 hours, FTX performed a series of managed liquidation transactions involving four assets:  ETH, FTT, GBTC, and ETHE.  (*Id.*)  These assets were collectively sold by FTX to other Exchange customers for $81 million.  (*Id.*)  Second, eight minutes later, starting at 10:29 p.m. (UTC), FTX removed the Line of Credit from the 3AC Accounts.  (*Id.*)  An additional $1 million in assets were then auto-liquidated by FTX starting at 10:47 p.m. (UTC).  (*Id.*)

102.    The Liquidation on June 14, 2022 resulted in the exchange of $82 million worth of digital assets for $82 million in USD for the 3AC Accounts.  (*Id.* ¶ 78.)  The Liquidation did not decrease the Account Balance, because while the positive Digital Asset Balance decreased as digital assets were sold, the proceeds from the liquidation ($82 million) reduced the negative USD Balance (*i.e.*, made it less negative) in an equal amount.  (*Id.*)  In other words, the Liquidation had no impact on the Account Balance.

103.    Limited trading occurred in the 3AC Accounts after this point.  (*Id.* ¶ 79.)  The Account Balance was $2 million by the end of June 14, 2022.  (*Id.*)  That balance remained subject to market movements for the assets that remained, the Account Balance was $1 million on July 12, 2022 when the Joint Liquidators received access to the 3AC Accounts, and $1 million on the Petition Date.  (*Id.*)

104.    Notably, the $82 million Liquidation benefited 3AC by preserving the value of the 3AC Accounts. (*Id.* ¶ 80.) Through the Liquidation, 3AC exited deteriorating positions in digital assets in favor of stable positions in fiat currency. (*Id.*) And, with the benefit of hindsight, it is clear that the decision to liquidate in fact protected 3AC: had the Liquidation not occurred, the Account Balance would have been negative $1 million 12 hours after the Liquidation time, and the Account Balance would have fallen to negative $18 million by the Petition Date.[18] (*Id.*) The Liquidation stopped the bleeding on the 3AC Accounts, and the 3AC Accounts would have been wiped out by the actual market conditions that occurred had FTX not conducted the Liquidation.

## III.    Procedural History

### A.    Debtors' Chapter 11 Cases and Ownership of Exchange Assets

105.    On November 11 and November 14, 2022 (as applicable), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). Joint administration of the FTX Debtors' cases (the "Chapter 11 Cases") was authorized by the Bankruptcy Court by entry of an order on November 22, 2022.

106.    On September 30, 2024, the Debtors filed the Plan. Multiple creditors, including the LayerZero Group and Samuel Gunawan, objected to the Plan on the grounds that it did not respect the property rights of customers with respect to assets associated with Customer Accounts. This parroted arguments that had been made by different creditors at different points in time during the Chapter 11 Cases asserting that customers somehow had a property right in

---

[18] In fact, the 3AC Accounts were overdrawn by approximately $24 million as of the Petition Date. Nothing in this Objection is intended to waive any rights with respect to claims against the Joint Liquidators and any objection to the customer claim filed by the Joint Liquidators, and the FTX Recovery Trust reserves all rights.

assets held by the Debtors.  These creditors, like the Joint Liquidators (*See* Proof of Claim ¶ 23), relied on language from Section 8.2.6 of the Terms of Service.

107.    To resolve this issue, establish that the Debtors owned all of the assets it held, and to ensure the Bankruptcy Court could make findings with respect to estate property, the Debtors at the confirmation hearing on October 7, 2024 presented evidence establishing that digital assets and fiat currency deposited or acquired on the Exchange was commingled, and could not be traced to a specific customer.  The Debtors established that "[c]ryptocurrency, fiat currency, and stablecoin were commingled either when deposited or as it moved between addresses and accounts owned and controlled by FTX Group."  (Mosley Confirmation Decl., ¶ 32.)  The Debtors demonstrated that "[b]ecause units of cryptocurrency, fiat currency and stablecoin are fungible, it is impossible to identify a specific customer's assets within a commingled address or account." (*Id.*)  The Debtors further presented evidence that "the commingling and misuse of FTX Group's customer deposits occurred for several years" prior to the Petition Date.  (*Id.*)

108.    The Debtors also presented evidence of the interpretation of the Terms of Service under English law, which governs the Exchange accounts.  Based on a review of the Terms of Service and information about the operation of the Exchange, Lord Neuberger concluded that "[t]he use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen."  (Neuberger Confirmation Declaration ¶ 11.1(b).)  Lord Neuberger determined that the Terms of Service included provisions that "are inconsistent with an intention to create a trustee-beneficiary relationship." (*Id.* ¶ 45).  He concluded that the Terms of Service established a debtor-creditor relationship as to both digital assets (*id.* ¶ 11.1) and fiat currency (*id.* ¶¶ 82-86).

109.    The Court issued an order confirming the Plan on October 8, 2024.  In the confirmation order, the Court concluded as a matter of law that "[t]he factual record establishes that all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property of the Debtors' estates."  (*Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404], at ¶ 20 ("Confirmation Order").)

110.    On January 3, 2025, the FTX Debtors filed a notice that the Plan had gone effective.  (*Notice of Effective Date of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 29127].)  On the Plan effective date, the FTX Recovery Trust was established in accordance with the terms of the Plan, and all of the Debtors' assets vested in the FTX Recovery Trust.

## B.    The Joint Liquidators' Original and Amended Proofs of Claim

111.    On June 30, 2023, the Joint Liquidators filed identical proofs of claim (the "Original Proofs of Claim") on behalf of 3AC, asserting claims arising out of "a purported foreclosure by the Debtors on collateral securing an approximately $120 million purported loan."[19]

112.    On September 29, 2023, the Joint Liquidators filed the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. for Coordination Among Courts* [D.I. 2754] in the Chapter 11 Cases seeking judicial coordination with other bankruptcy cases involving 3AC.  On October 10, 2023, the Debtors and the Joint Liquidators reached an agreement on informal

---

[19]    See proofs of claim number 5120, 5121, 5125, 5145, 5147, 5148, 5151, 5152, 5154, 5155, 5156, 5158, 5159, 5160, 5167, 5168, 5169, 5170, 5171, 5172, 5173, 5175, 5176, 5177, 5178, 5179, 5180, 5181, 5182, 5183, 5184, 5185, 5186, 5187, 5188, 5189, 5190, 5191, 5192, 5194, 5195, 5196, 5197, 5198, 5199, 5200, 5201, 5203, 5204, 5238, 5239, 5253, 5262, 5269, 5306, 5308, 5319, 5323, 5324, 5327, 5331, 5333, 5336, 5339, 5345, 5348, 5351, 5355, 5360, 5362, 5368, 5373, 5419, 5444, 5445, 5446, 5448, 5449, 5450, 5451, 5452, 5454, 5455, 5456, 5457, 5459, 5460, 5461, 5462, 5464, 5466, 5470, 5473, 5474, 5476, 5477, 5478, 5580, 5581.

information exchange (the "Informal Information Exchange Agreement"), and the Joint Liquidators agreed to withdraw their motion.

113. On October 27, 2023, the Joint Liquidators requested diligence information from the Debtors as part of the Informal Information Exchange Agreement. Throughout the following months, the Debtors produced to 3AC a total of 4,166 documents and 13,663 pages of materials in response to the October 27, 2023 informal diligence requests.

114. On June 3, 2024, the Joint Liquidators sent the Debtors an additional set of informal diligence requests via letter seeking information about the relationship between 3AC and the Debtors. On July 2, 2024, the Joint Liquidators re-served those discovery requests pursuant to Bankruptcy Rule 2004.

115. On July 8, 2024, the Debtors filed the *Debtors' Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 19797], objecting to the Original Proofs of Claim on the grounds that they failed to articulate any cognizable claims entitled to *prima facie* validity.

116. On July 10, 2024, the Joint Liquidators re-served their Rule 2004 discovery requests pursuant to Federal Rules of Civil Procedure 33 and 34, and issued a notice of deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).

117. The 30(b)(6) deposition of the Debtors took place on September 19, 2024. The Debtors' 30(b)(6) designee was Robert Gordon of Alvarez & Marsal (the "30(b)(6) Witness"), the Debtors' financial advisor. There were no remaining personnel of the Debtors with contemporaneous knowledge of the 3AC Accounts or the facts in dispute. As a member of the A&M team engaged by the Debtors in connection with their Chapter 11 Cases, the 30(b)(6) Witness did not have (and could not have) the requisite contemporaneous knowledge to expand on

what is reflected in the documentary record.  Nonetheless, the 30(b)(6) Witness testified for over five hours concerning 15 topics noticed by the Joint Liquidators.

118.    On November 6, 2024, the Joint Liquidators filed the *Motion of the Joint Liquidators of Three Arrows Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* [D.I. 27755] (the "Motion to Amend"), seeking leave of the Court to amend proof of claim number 5319 against FTX Trading Ltd., and indicated therein that the Joint Liquidators intended to withdraw any claims filed against other Debtors.  The Joint Liquidators continued to serve expansive discovery requests through briefing on the Motion to Amend.

119.    On November 25, 2024, the Debtors took the deposition of Mr. Crumpler, both in his personal capacity and as a representative of the Joint Liquidators pursuant to Federal Rule of Civil Procedure Rule 30(b)(6) limited to those issues pertinent to the Motion to Amend.

120.    On December 5, 2024, the Debtors filed the *Debtors' Objection to the Motion of the Joint Liquidators of Three Arrows Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* [D.I. 28587].  On December 9, 2024, the Joint Liquidators filed the *Reply in Support of Motion of the Joint Liquidators of Three Arrows Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* [D.I. 28641].

121.    On December 10, 2024, the Joint Liquidators withdrew all of the Original Proofs of Claim except claim number 5319 by filing claim withdrawal forms on the Debtors' claims register.  The hearing on the Motion to Amend occurred on December 12, 2024.

122.    On March 13, 2025, the Court granted the Motion to Amend in the *Memorandum Opinion and Order Granting Motion for Leave to Amend Proof of Claim* [D.I. 29924] but made no findings with respect to the merits of 3AC's claims.

123.    On March 27, 2025, the Joint Liquidators filed the Proof of Claim, which amended and superseded the one remaining proof of claim, number 5319.

## IV.    Claims Asserted in Proof of Claim

124.    Despite having the benefit of tens of thousands of pages of documents produced in discovery, numerous information-sharing calls with the Debtors' advisors, and the briefing and litigation of the Motion to Amend, the Proof of Claim still takes a scattershot approach.  The Proof of Claim asserts some combination of claims for preference, turnover, conversion, unjust enrichment, breach of trust or fiduciary duty, breach of contract, proprietary restitution, and undervalue transaction under an amalgamation of "BVI, U.S., English, and Bahamian law," none of which in fact asserts a theory of liability.  (*See* Proof of Claim ¶ 45.)  The purported claims in the Proof of Claim are at best based on speculation, and at worst fail to even plead facts or circumstances that support any claim.

125.    *First*, the Joint Liquidators allege a claim for preference under Section 245 of the BVI Insolvency Act (the "<u>BVI Preference Claim</u>").  (*Id.* ¶¶ 46-54.)  The Joint Liquidators do not allege any preference claim under any other source of law.  This appears to be the Joint Liquidators' primary claim, as it is given its own section in the Proof of Claim (*id.*) and the remaining claims are categorized as "Non-Preference Claims" (*id.* ¶¶ 55-84).

126.    *Second*, the Joint Liquidators allege a claim for an undervalue transaction under Section 246(1) of the BVI Insolvency Act (the "<u>BVI Undervalue Transaction Claim</u>").  (*Id.* ¶¶ 58-61.)

127.    *Third*, the Joint Liquidators allege a claim for turnover both under Section 274A of the BVI Insolvency Act (the "<u>BVI Turnover Claim</u>")  (*Id.* ¶¶ 63-66.) and under Section 542 of the Bankruptcy Code (the "<u>Bankruptcy Code Turnover Claim</u>").  (*Id.* ¶¶ 67-70.)

128.    *Fourth*, the Joint Liquidators allege that FTX breached the Terms of Service relating to issues of ownership of the assets associated with the 3AC Accounts (the "Customer Property Claim").  Though it is unclear what the Joint Liquidators believe the breach was, they seem to take issue with this Court's final and non-appealable conclusion that assets held by the Exchange as of the Petition Date were property of the Debtors (and thus now of the FTX Recovery Trust).  Because the Joint Liquidators do not cite any other contract besides the Terms of Service, which are governed by English law, as having been breached, the purported Customer Property Claim is governed by English law.  (*Id.* ¶¶ 56-57.)

129.    Crucially, the Joint Liquidators concede that they cannot even purport to assert any claim other than the BVI Preference Claim, the BVI Undervalue Transaction Claim, and the Customer Property Claim unless "the 3AC Debtor's ongoing discovery efforts reveal that the Lost Assets were liquidated by FTX rather than unidentified persons associated with the 3AC Debtor."  (Proof of Claim ¶ 62.)  Not only is there no evidence that FTX liquidated any assets associated with the 3AC Accounts other than the acknowledged $82 million on June 14, 2022, but the Joint Liquidators' entire Lost Assets theory rests on various fundamentally flawed premises. The Joint Liquidators have therefore conceded that the rest of their purported claims are invalid on their face based on the record now before the Court.

130.    *Fifth*, the Joint Liquidators allege that FTX breached the Terms of Service because 3AC was prohibited from withdrawing assets as the result of its negative USD Balance (*id.* ¶¶ 79-80) (the "Negative Balance Contract Claim," and, together with the Customer Property Claim, the "English Law Contract Claims").

131.    *Sixth*, the Joint Liquidators allege a claim for unjust enrichment, and while they mention Delaware, English, BVI, or Bahamian law as possible bases, they do not specify

under which law they are asserting such a claim or articulate the basis for their claim (the "Unjust Enrichment Claim").  (*Id.* ¶¶ 71-73.)

132.    *Seventh*, the Joint Liquidators allege a claim for breach of trust or fiduciary duty (the "Breach of Trust or Fiduciary Duty Claim").  (*Id.* ¶¶ 74-78.)  The Joint Liquidators reference only the Terms of Service, which are governed by English law, in their sparse description of this purported claim.

133.    *Eighth*, the Joint Liquidators allege a claim for conversion (the "Conversion Claim"), and similarly mention Delaware, English, BVI, or Bahamian law but do not specify under which they are asserting such a claim or articulate the basis for their claim.  (*Id.* ¶¶ 81-82.)

134.    *Ninth*, the Joint Liquidators allege a "proprietary restitutionary claim" under BVI common law (the "Proprietary Restitution Claim").  (*Id.* ¶¶ 83-84.)

## ARGUMENT

135.    The Proof of Claim is at best a small dispute masquerading as the largest claim in the FTX bankruptcy proceedings.  The Joint Liquidators do not have any valid claims against the FTX Recovery Trust, let alone claims that could—even on their own flawed theories— possibly yield damages in the amount of $1.53 billion.  As a threshold matter, certain facts regarding the 3AC Accounts that cannot legitimately be disputed by 3AC make clear that 3AC's theories rest on gross misunderstandings of how the Exchange functioned, and that their asserted claims are entirely without merit.  Beyond these threshold issues requiring disallowance, the FTX Recovery Trust also has myriad substantive legal defenses to each of 3AC's purported claims, as discussed below.

**I.    The Proof of Claim Is Premised on Fundamental and Dispositive Misunderstandings of the 3AC Accounts and the Account Data.**

136.    The Joint Liquidators seek $1.53 billion on their "Lost Assets" theory, arguing that they are somehow entitled to recover from FTX a massively inflated value of certain assets associated with the 3AC Accounts at the end of the trading day on June 12, 2022, an arbitrary point of time.  Fundamentally, the Joint Liquidators misunderstand three basic, irrefutable facts that wholly undermine the Proof of Claim:

a.    The value of the 3AC Accounts was $284 million at the end of June 12, 2022, as reflected by the Account Balance, and not $1.59 billion as the Joint Liquidators assert.  The Joint Liquidators' attempt to misleadingly manufacture claims based on the Digital Asset Balance while ignoring the corresponding USD Balance is legally and factually without merit.

b.    The value of the 3AC Accounts was not "lost."  The decline in Account Balance from $284 million at the end of June 12, 2022 to $2 million at the end of June 14, 2022 was the result of market price declines ($222 million) and withdrawals by 3AC ($60 million).

c.    The Joint Liquidators' assertion of a $1.59 billion Digital Asset Balance is factually inaccurate.  The Digital Asset Balance was $1.017 billion (not $1.59 billion), and the negative USD Balance was $733 million (not $1.3 billion).  The Joint Liquidators' figures are inflated by $581 million for the Digital Asset Balance and $576 million for the negative USD Balance because they treat the notional amount of 3AC's futures contracts as if they were an asset and part of the Account Balance, when they are not.

137.    The headline-grabbing $1.53 billion value slapped onto the Proof of Claim cannot be reconciled with these facts.  It rests on an unreasonable and unsupportable starting

premise, inaccurate figures, and blindness to the actual events that occurred.  These purported claims should be disallowed in their entirety for these threshold reasons.

A.    **The Value of Assets Credited to the 3AC Accounts Was $284 Million, Not $1.59 Billion.**

138.    The Joint Liquidators seek to recover an amount purportedly attributable to the "decline in value of assets" associated with the 3AC Accounts (Proof of Claim ¶ 43), but they get the starting point for their theory hopelessly wrong.  The value of assets credited to the 3AC Accounts at the end of June 12, 2022 was $284 million.  The Joint Liquidators cannot claim a decline in value of $1.53 billion over a two-day period when the value at the start of that period was $284 million ($1.24 billion less than the amount they seek).

139.    Basic logic dictates that the Account Balance is the appropriate measure for the value of the 3AC Accounts, and therefore any decline in value related thereto.  The Account Balance represented the value of *all* assets associated with a Customer Account.  It was comprehensive, covering all transactions involving all assets over the lifetime of the account.

140.    The Account Balance had practical significance as the measure of value.  It was the figure customers saw when they logged into their Customer Account, along with sub-balances for each individual asset; customers did *not* see a Digital Asset Balance—that required math from the Joint Liquidators.  When FTX calculated the Maintenance Margin Requirement or the LOC Requirement, it considered *all* assets in the aggregate, not just selective pockets of them.

141.    The Account Balance also had legal significance because rights and obligations under governing agreements were defined by assets in the aggregate, not isolated groups of assets.  Under the Terms of Service, if a customer's Account Balance somehow became negative (*i.e.*, had an "outstanding debit balance"), then FTX was permitted to "recover" the negative amount by "sell[ing] *any*" assets associated with the Customer Account.  (Terms of

Service § 10.3.1 (emphasis added).)  When a customer traded on margin, the Terms of Service provided that "[a]ny available Assets held in your Account" may be "locked and used as collateral for margin trading." (*Id.* § 8.1.3.)  The March 2022 Line of Credit Agreement provided that FTX had the right to liquidate *any* assets credited to the 3AC Accounts if 3AC breached the LOC Requirement or Maintenance Margin Requirement (March 2022 Line of Credit Agreement at FTX_3AC_000000760), that 3AC was "not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements, or margin calls" (*id.*), and that "FTX generally enforces that the user's net account balances are never negative" (*id.* at FTX_3AC_000000761.)  Each of these obligations and rights relates to the 3AC Accounts in the aggregate, across all types of assets and their related balances—there was no division of positive balances as assets and negative balances as "liabilities."

142.    The Joint Liquidators attempt to carve up the Account Balance into the Digital Asset Balance and the USD Balance because, as of June 12, 2022, the former was positive and the latter was negative.[20]  They do not attempt to justify such a factually flawed approach, nor can they, because it is fundamentally at odds with how the Exchange worked.  These two components were inextricably linked, and are inseparable as parts of the value of assets associated with the 3AC Accounts.  When 3AC bought BTC and ETH with USD, it received a credit to its Digital Asset Balance and a debit to its USD Balance, just like any other customer.  And when 3AC bought BTC and ETH using borrowed funds via the Margin Program, it built up a positive Digital Asset Balance and a negative USD Balance at the same time.  The two moved in parallel, and 3AC could not have had one without the other.  Looking at the digital assets while ignoring

---

[20] As described below, the Joint Liquidators *also* use inaccurate figures for both the Digital Asset Balance and the USD Balance.  At the end of June 12, 2022, the Digital Asset Balance was $1.017 billion (not $1.59 billion), and the negative USD Balance was $733 million (not $1.3 billion).

the consequence of the cash spent to acquire them amounts to double-counting, and does not reflect the true position (or value) of the 3AC Accounts.

143.    The 3AC Accounts were not divided into assets and liabilities as the Joint Liquidators would have the Court believe.  All assets were considered in the aggregate, whether the individual balances were positive or negative.  3AC could not have withdrawn all of its digital assets and left the negative USD Balance behind—the Exchange prohibited Customer Accounts from going negative, and set requirements to maintain minimum levels of assets to keep leveraged positions open.  3AC could not have used only its Digital Asset Balance (and ignored its USD Balance) for purposes of meeting the Maintenance Margin Requirements or the LOC Requirement—all parts of the 3AC Accounts were necessarily considered by FTX in determining whether 3AC could increase its leveraged positions.  If one assumed that the 3AC Accounts looked exactly the same on the Petition Date as they did at the end of June 12, 2022, then 3AC could never have validly asserted a customer claim that ignored the negative USD Balance.  Indeed, the overall Account Balance determined every single customer claim in these Chapter 11 Cases—the Debtors did not pay out positive balances on some assets while ignoring negative balances on others.  To do so would be nonsensical.  There is no valid reason to ignore the realities of the Customer Accounts and give 3AC special treatment merely because it could not adequately manage its own risk.

144.    3AC bought digital assets with funds borrowed from other Exchange customers, and racked up losses through speculative positions.  By claiming right to the positive Digital Asset Balance and disclaiming any responsibility for the negative USD Balance, the Joint Liquidators want to escape with the value and leave the bill behind for other FTX creditors to pay.  This premise is flawed because all parts of the 3AC Accounts were inextricably linked.  The

"value" of the 3AC Accounts at the end of June 12, 2022 was $284 million, not $1.59 billion. There is no other starting figure for the reference point arbitrarily selected by the Joint Liquidators.

> **B.**   **The Account Balance Declined on June 13 and 14, 2022 Solely as the Result of Market Price Declines and Withdrawals by 3AC.**

145.   While the theoretical ceiling for the Joint Liquidators' claims is a mere fraction of what they claim, the evidence shows they have no claims at all.  The so-called "Lost Assets" were not lost—they decreased in value because of market price declines and withdrawals by 3AC.  This cannot support any claim against the FTX Recovery Trust.

146.   Contrary to the story told by the Joint Liquidators, who describe some unknown "Takings" to create confusion (Proof of Claim ¶ 40), there is no mystery about what happened in the 3AC Accounts on June 13 and 14, 2022:  the Account Balance was reduced by a combination of market price declines and 3AC's own withdrawals.  The Account Balance decreased by $282 million.  $222 million of that decrease (79%) resulted from market price declines.  This included a $148 million decline in the value of spot assets (part of the Digital Asset Balance), and $74 million in settlement payments made under perpetual futures contracts (part of the USD Balance).  3AC was long in BTC and ETH, and prices in those assets plummeted.  The other $60 million decrease resulted from withdrawals by 3AC.

147.   As described above, *none* of the trading activity in the 3AC Accounts on June 13 and 14, 2022 led to a loss of or decline in value of the Account Balance.  Almost all of that trading was conducted by 3AC itself, with just the $82 million Liquidation involving any action by FTX.  But the trading involved was neutral as to the value of assets associated with the 3AC Accounts because customers exchanged different assets of equal value.  Furthermore, the Liquidation actually *helped* 3AC by preventing the same assets from deteriorating to negative $18 million by the Petition Date.

148.    The 3AC Accounts retained a $2 million Account Balance at the end of the day on June 14, 2022.  None of the $282 million decrease in value can be called a "Taking" in good faith.  FTX did not take anything from 3AC as the result of market price movements, nor in connection with 3AC withdrawing assets from the Exchange.

### C.    The Joint Liquidators Overstate the Digital Asset Balance, Which Was $1.017 Billion (Not $1.59 Billion).

149.    There is no basis to isolate and consider only the decrease in the Digital Asset Balance for the reasons described above, but even this flawed theory is based on inaccurate facts because the Joint Liquidators overstate the Digital Asset Balance by $581 million.  The Digital Asset Balance at the end of June 12, 2022 was $1.017 billion, not $1.59 billion as the Joint Liquidators claim.  Because it is the Account Balance and not the Digital Asset Balance that represents the value of assets associated with the 3AC Accounts, and because the Joint Liquidators inflate the Digital Asset Balance and the negative USD Balance by almost identical amounts ($581 million for the Digital Asset Balance and $576 million for the negative USD Balance), the Joint Liquidators' error has nearly no actual impact.  But even the Joint Liquidators' flawed approach requires reducing the headline claim amount to $1.017 billion.

150.    The Joint Liquidators' mistake is simple:  they improperly include the notional amount of perpetual futures contracts within the Digital Asset Balance.  This is inconsistent with how the Exchange operated.  As explained above, the perpetual futures contracts did *not* have value nor were they assets like spot positions.  There was no cost to open or close a perpetual futures contract other than a minimal trading fee to the Exchange.  Neither 3AC nor any other customer could sell a perpetual futures contract for consideration.  Perpetual futures contracts generated USD credits and debits every 30 seconds, and once made, a settlement payment was simply part of the USD Balance.  Thus, the notional amount of perpetual futures contracts cannot

be considered part of the "value" of the 3AC Accounts because it does not represent any measure of value.  By including this notional amount, the Joint Liquidators overstate the positive Digital Asset Balance by $581 million.  The positive Digital Asset Balance was in fact $1.03 billion, not $1.59 billion.  (Coverick Decl. ¶ 84.)  The Joint Liquidators similarly overstate the negative USD Balance by $576 million to arrive at a negative USD Balance of $1.3 billion.  (*Id.*)

151.    The Joint Liquidators do not base these figures on any primary source data, but rather point to two summary documents produced by the Debtors.  (Proof of Claim ¶ 40 & n.20.)  Certain summary materials created by the Debtors' financial advisor included the notional amount of futures positions in figures for balances based on the application of a methodology developed in the context of scheduling customer claims, which included the notional amount of futures contracts as a separate account asset and added a negative offset for USD to maintain the correct overall Account Balance.[21]    (Coverick Decl. ¶¶ 86-93.)    But this context-specific methodology does not alter the fact that perpetual futures contracts were not part of any balance for the 3AC Accounts or any other Customer Account.[22]  (*Id.* ¶ 94.)  The Joint Liquidators cannot assert a claim for the notional amount of their futures contract when such amount was not part of the Account Balance and was not in fact an asset.

---

[21] In the context of creating their Schedules of customer claims, at the request of the Official Committee, the Debtors included on their Schedules the quantity of futures contracts on a separate line to allow estimation of one more USD payment reflecting the final 30-second period before the Petition Time.  (Coverick Decl. ¶ 90.)  To prevent double-counting, the Debtors also subtracted the notional amount of those open futures contracts from each customer's USD Balance.  (*Id.*)  This also fully resolves the Joint Liquidators' confusion with respect to the "Unknown Alleged Liabilities"—in fact, the entirety of the negative USD Balance (approximately $733 million) is entirely accounted for in the account records.

[22] The FTX Recovery Trust recognizes that this information goes beyond the explanation provided at the 30(b)(6) deposition testimony of Robert Gordon in September 2024.  At that time, the Joint Liquidators had not attempted to—without basis—carve up the Account Balance in this manner, and the FTX Recovery Trust has continued to investigate the allegations made by the Joint Liquidators since this deposition.

152.    The Joint Liquidators' "Lost Assets" theory is deficient at its core and easily dismissed.  The 3AC Accounts declined $282 million in value, but the record evidence confirms nothing was lost or taken from 3AC, and the Proof of Claim should be disallowed.

**II.    The Joint Liquidators' Purported Claims Share Several Other Fatal Flaws.**

153.    The Joint Liquidators seek to raise the specter of legitimate claims where there are none by asserting a patchwork of surface-level causes of action under a variety of foreign laws.  But any such claims are plainly without merit as a matter of law (independent of the fundamental factual deficiencies discussed above).

**A.    3AC's Claims Fail Because FTX Did Not Take Any Action with Respect to Any Assets Associated with the 3AC Accounts Other Than the $82 Million Liquidation.**

154.    The Joint Liquidators seek $1.53 billion under their Lost Assets theory.  But there is no evidence that FTX took any action other than the $82 million Liquidation.  Because FTX took no action with respect to any other assets or transactions, the Joint Liquidators have no basis to even assert, let alone evidence to prove, any other purported claims.

155.    The first action taken by FTX with respect to the claimed assets was the Liquidation at 10:21 p.m. (UTC) on June 14, 2022.  By the time of the Liquidation, which generated $82 million, the 3AC Accounts had an Account Balance of $7 million.  Before that point, all sales and withdrawals in the 3AC Accounts were unilaterally initiated by 3AC through its access to the 3AC Accounts.

156.    The Joint Liquidators concede that they could only assert seven of their named causes of action—the BVI Turnover Claim, the Bankruptcy Code Turnover Claim, the Negative Balance Contract Claim, the Unjust Enrichment Claim, the Breach of Trust or Fiduciary Duty Claim, the Conversion Claim, and the Proprietary Restitution Claim—"[i]f the 3AC Debtor's ongoing discovery efforts reveal that the Lost Assets were liquidated by FTX rather than

unidentified persons associated with the 3AC Debtor." (Proof of Claim ¶ 62.) The documentary evidence is unambiguous that FTX did not liquidate any assets associated with the 3AC Accounts other than the Liquidation. These seven claims therefore must be disallowed as a threshold matter.

157.    Furthermore, despite 3AC's legally dubious proposition to the contrary (*id.* ¶ 44), every single purported claim asserted by the Joint Liquidators requires some action by FTX. In the absence of any such action, each claim fails with respect to any amount in excess of the $82 million Liquidation amount:

- The BVI Preference Claim requires a "transaction" with FTX (*see infra* ¶ 193), but 3AC's own trades and withdrawals together with market price declines are what reduced the positive Digital Asset Balance—not any transaction with FTX. Moreover, as set forth below, any potentially relevant "transactions" were made in the ordinary course of 3AC's business as a cryptocurrency hedge fund.

- The BVI Undervalue Transaction Claim likewise requires a "transaction" with FTX (*see infra* ¶ 202), and fails for the same reason.

- The BVI Turnover Claim requires that FTX took possession or control of the assets claimed by 3AC (*see infra* ¶ 208). But none of the assets associated with the 3AC Accounts changed possession on June 13 or 14, 2022 other than those withdrawn by 3AC itself. It is also impossible to trace any assets to assets for which the FTX Recovery Trust has possession or control.

- Similarly, the Bankruptcy Code Turnover Claim requires that FTX have possession, custody, or control of the assets claimed by 3AC (*see infra* ¶ 214), and thus fails for the same reasons.

- The Customer Property Claim requires a breach of the Terms of Service. (*See infra* ¶ 220.) The Joint Liquidators do not challenge any specific action; instead, they challenge this Court's non-appealable conclusion that assets held by the Exchange were property of the Debtors (and now property of the FTX Recovery Trust).

- The Negative Balance Contract Claim also requires a non-existent breach of the Terms of Service. (*See* Section *infra* ¶ 226.) 3AC could not withdraw its negative USD Balance because that balance reflected a deficit of funds, not an entitlement to them.

- The Breach of Trust or Fiduciary Duty Claim requires a breach. (*See infra* ¶ 241.) There can be no breach without any alleged action.

- The Unjust Enrichment Claim requires an enrichment, an impoverishment, and a relationship between the two. (*See infra* ¶ 243.) Such a claim cannot be sustained

where 3AC's unilateral actions caused its Account Balance to decline and FTX did not take any action to enrich itself or impoverish 3AC.

- The Conversion Claim requires evidence that 3AC's property was converted. (*See infra* ¶ 251.) The actions that resulted in the diminution of the Account Balance were 3AC withdrawing digital assets and market price declines, not any action attributable to FTX.

- The Proprietary Restitution Claim requires that FTX seized the assets in dispute. (*See infra* ¶ 257.) FTX did no such thing—the Joint Liquidators claim digital assets that 3AC sold to other customers for cash or withdrew from the 3AC Accounts, as well as the loss of value from market price declines.

**B.     3AC's Claims Fail Because FTX Did Not Retain Any Benefit from the Reduction of the Account Balance of the 3AC Accounts on June 13 or 14, 2022.**

158.    Just as 3AC's claims fail because FTX was not involved in the transactions that reduced the Account Balance, 3AC's claims also fail for the independent reason that FTX did not benefit from any of the transactions identified by the Joint Liquidators on June 13 or June 14, 2022, including the Liquidation.

**1.     FTX Did Not Receive Any Benefit from 3AC's Own Trades, 3AC's Own Withdrawals, or Price Declines.**

159.    As described above, 3AC unilaterally sold significant amounts of digital assets on June 13 and 14, 2022. In total, 3AC (not FTX) sold approximately $842 million worth of digital assets. The effect was reducing the positive Digital Asset Balance and reducing the negative USD Balance (*i.e.*, making it less negative) at the same time, keeping the overall Account Balance neutral. These were fair value trades with Exchange customers; FTX did not benefit from 3AC shifting its exposure from one asset to another. FTX would have retained recourse to those same assets had they not been sold by 3AC.

160.    Furthermore, FTX certainly did not receive any benefit from 3AC's withdrawals of $60 million in value from the 3AC Accounts. Nor did FTX receive any benefit

from market price declines that decreased the positive Digital Asset Balance in the 3AC Accounts by $212 million.  It is unclear how the Joint Liquidators could assert otherwise.

161.    The Joint Liquidators concoct the argument that FTX was "repaid" liabilities when the negative USD Balance was reduced by 3AC's actions.  (Proof of Claim ¶ 51.) This is based on the same selective, illogical view that the Account Balance can be broken apart, with its component parts viewed in isolation.  The Account Balance must be viewed as a whole, and the Account Balance remained positive during the period challenged by the Joint Liquidators. FTX was not "repaid" any debt because there was no debt owed.[23]  In any event, 3AC borrowed USD from a pool of lending customers, not from FTX, such that this lending pool benefited from the reduction of 3AC's negative USD Balance, not FTX.[24]

### 2.  FTX Did Not Receive Any Legally Cognizable "Benefit" from the Liquidation That Could Support a Claim.

162.    FTX received no benefit from the $82 million Liquidation.  All proceeds from the Liquidation were used to offset the negative USD Balance in the 3AC Accounts and, as such, the Liquidation had no impact on 3AC's overall Account Balance.  FTX was not a recipient of either the proceeds of the Liquidation or the assets liquidated, which were sold to other customers on the Exchange.  Therefore, FTX was in no better position as a result of the

---

[23] As described above, the FTX Recovery Trust reserves rights with respect to the $24 million overdraw of the 3AC Accounts.

[24] The Joint Liquidators' argument that FTX benefited from the reduction in the negative USD Balance because it had "guaranteed" loans under the peer-to-peer Margin Program is fabricated.  (Proof of Claim ¶ 52.)  The pool of lenders made the loans, and the pool bore the risk of losses.  Moreover, the Joint Liquidators' reference to an "Explainer" document does not overcome the clear statement in the Terms of Service showing that the pool of lenders, not FTX, bore the risk that margin loans would not be repaid:  "When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt."  (Terms of Service §§ 2.4.1; 16.3.)  Finally, the facts here demonstrate that FTX does not bear risk of loss for margin loans because borrowers are required to maintain sufficient assets to sustain negative positions—when 3AC's Account Balance declined below required levels, FTX initiated the Liquidation.  The requirement that assets backstop leveraged positions is essential to trading on margin and the operation of any exchange.

Liquidation.  This is yet another reason to disallow all claims that require that FTX received a gift or benefit as a result of the Liquidation:  (i) the BVI Preference Claim; (ii) the BVI Turnover Claim; (iii) the Bankruptcy Code Turnover Claim; (iv) the Customer Property Claim; (v) the Negative Balance Contract Claim; (vi) the Unjust Enrichment Claim; (vii) the Conversion Claim; and (viii) the Proprietary Restitution Claim.

163.    All of the Joint Liquidators' purported claims require that FTX be left in a better position, have received a gift or benefit, have obtained possession or control over some property, or have been enriched as a result of the decrease in the Account Balance for the 3AC Accounts.  These claims cannot be maintained for any decrease in the Account Balance or based on the Liquidation because there is no basis to allege any benefit to FTX from those events.

## C.    3AC Did Not Have a Property Interest in Assets Held by the Exchange, Consistent with This Court's Conclusion at Plan Confirmation.

164.    Nine of the ten claims asserted by the Joint Liquidators require that the assets associated with the 3AC Accounts were the property of 3AC:  (i) BVI Preference Claim; (ii) BVI Undervalue Transaction Claim; (iii) BVI Turnover Claim; (iv) Bankruptcy Code Turnover Claim; (v) Customer Property Claim; (vi) Negative Balance Contract Claim; (vii) Unjust Enrichment Claim; (viii) Conversion Claim; and (ix) Proprietary Restitution Claim.  None of those claims can survive because 3AC did not have any such property interest.

165.    As a purported trust beneficiary seeking to assert claims to obtain purported trust funds, the Joint Liquidators bear the burden of (i) "demonstrating that the trust relationship and its legal source exist," and (ii) "identifying and tracing" the assets that they purportedly own because "they have been commingled" with other assets.  *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 147 (Bankr. D. Del. 2010) (citing *City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994)); *accord In re Strategic Techs., Inc.*, 142 F. App'x 562, 566 (3d Cir. 2005)

-59-

(explaining the burden on a purported trust beneficiary "[w]hen funds are commingled") (internal citation omitted). "Whereas the first showing is generally a question of state law, the second showing because it pertains to distribution of assets from an entity in federal bankruptcy proceeding, is exclusively a question of federal law." *Goldberg* v. *N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991) (cleaned up).

166.    This issue was already decided by this Court.  On October 8, 2024, this Court entered the Confirmation Order, which provided that "[t]he factual record establishes that all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property of the Debtors' Estates."  (Confirmation Order ¶ 20.)  The Joint Liquidators did not contest this issue in connection with Plan confirmation, nor did they appeal the Confirmation Order.

167.    The Joint Liquidators seek to avoid the Court's ruling and get a do-over, but do not provide any basis to do so.  Instead, they simply raise generalized arguments applicable to every FTX customer.  This Court has already evaluated the relevant contract terms on which they rely (from the Terms of Service), and the evidence confirms that the Joint Liquidators cannot trace the assets associated with the 3AC Accounts as of June 12, 2022.  As a result, the Court's findings of law in the Confirmation Order as to the ownership of assets held by the Exchange—which is the law of the case—applies with equal force to ownership of assets associated with the 3AC Accounts as of June 12, 2022.  This is fatal to nine of the ten claims asserted in the Proof of Claim.

1.     **The Terms of Service Confirm that 3AC Did Not Have a Property Interest in Any Assets Associated with the 3AC Accounts.**

168.     The Court's conclusion that Exchange Assets are property of the FTX Recovery Trust was based on evidence that, under English law,[25] the Terms of Service established a creditor-debtor relationship only, and did not establish a trust or any other property interest.  The very contract the Joint Liquidators invoke to claim a property interest confirms their lack of one.

169.     Under English law, an express trust requires "certainty as to" (i) "intention" to create a trust, (ii) the "subject-matter" of the trust; and (iii) the "objects" of the trust "(i.e., [its] beneficiaries)."  (Neuberger Confirmation Decl. ¶ 33; *see Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26035] (the "Confirmation Brief") ¶ 143.)  The Debtors demonstrated that the Terms of Service are contrary to any intention to create a trust in numerous respects.

170.     Under English law, a fiduciary relationship is "an essential part of a trustee-beneficiary relationship."  (Neuberger Confirmation Decl. ¶ 45.1; *see also* Confirmation Brief ¶ 143.)  The Terms of Service repeatedly disclaim evidence of any fiduciary relationship between FTX and customers like 3AC.  Section 38.6 provided that "***[n]othing in the Terms*** or in any matter or any arrangement contemplated by it ***is intended to constitute a*** partnership, association, joint venture, ***fiduciary relationship*** or other cooperative entity between the parties for any purpose whatsoever."  (Terms of Service § 38.6 (emphasis added).)  Section 2.1.3 provided that "FTX Trading is not your broker, intermediary, agent, or advisor and ***has no fiduciary relationship or obligation to you*** in connection with any trades or other decisions or activities effected by you

---

[25] *See* Terms of Service § 38.11 ("The Terms and any Dispute shall be governed by, and construed in accordance with, English law.").

using the Services." (*Id.* § 2.1.3 (emphasis added).)  Section 2.2.2 stated that "[w]e provide no warranty as to the suitability of the Digital Assets traded under the Terms and ***assume no fiduciary duty to you*** in connection with such use of the Services." (*Id.* § 2.2.2 (emphasis added).)  As the Debtors demonstrated to the Court, these explicit statements are direct evidence that the parties did not intend to form a trust.  (Neuberger Confirmation Decl. ¶¶ 45-46; *see also* Confirmation Brief ¶ 144; Neuberger Decl. ¶ 11(a).)

171.   Additionally, there is no trust relationship under English law absent an expressed intention for the purported trustee to hold legal title.  (Neuberger Confirmation Decl. ¶¶ 35.2, 45.4.)  The Terms of Service are wholly inconsistent with such an intention.  Section 8.2.6 provided that title to Digital Assets "shall not transfer to FTX" and that the customer is "the owner of [the] Digital Assets in [their] Account."  (Terms of Service § 8.2.6.)  This provision further confirms the absence of a trust relationship.

172.   The Joint Liquidators raise nothing new.  They point to this one solitary provision of the Terms of Service, Section 8.2.6.  (Proof of Claim ¶ 23.)  This section provides that title to digital assets "shall at all times remain with" the customer and "not transfer to FTX," that the customer "shall bear all risk of loss" as "the owner of the Digital Assets in your Account," that "[n]one of the Digital Assets in your Account are the property of . . . FTX Trading," and that "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."  (*Id.*; Terms of Service § 8.2.6.)  This provision was already considered by this Court in connection with its finding that Exchange Assets were property of the Debtors.  Lord Neuberger concluded that this "provision is inconsistent with the Dotcom Terms creating a trustee-beneficiary relationship because ***no trust can be created under English law without an intention that the purported trustee hold legal title***.  The language in this clause contrasts sharply with that usually

-62-

used to indicate that a trust was intended:  e.g., there is no suggestion that the Digital Assets will be held '*on behalf of*' or '*for*' the customer (or '*on trust*', which were the terms used in *Cryptopia*)." (Neuberger Confirmation Decl. ¶ 45.4 (emphasis added; italics in original).)  Lord Neuberger further concluded that, in light of the "use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers . . . any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen."  (*Id.* ¶ 11.1(b); *see also* Neuberger Decl. ¶ 11(b)-(c).)

173.    Indeed, the very same argument raised by the Joint Liquidators could be made by any FTX customer, and the Court considered exactly such an argument in reaching its conclusion that Exchange Assets were "property of the Debtors' Estates."  (Confirmation Order ¶ 20; Confirmation Brief ¶ 148 (discussing the impact of Section 8.2.6 of the Terms of Service).)

174.    In an attempt to circumvent this Court's analysis, the Joint Liquidators include one summary paragraph pointing to prior versions of the Terms of Service.  (Proof of Claim ¶ 26.)  The Terms of Service plainly apply to the June 2022 period because they were implemented in May 2022.  But that aside, the prior versions, and their reference to assets being "owned by" the customer or FTX's authority to provide unclaimed property to the government, do not change the conclusion that Exchange Assets are property of the FTX Recovery Trust.  This Court heard and accepted evidence from Lord Neuberger that "[t]here are no provisions in the Earlier Terms which positively suggest that a trust relationship is intended."  (Neuberger Confirmation Decl. ¶ 96.1; *see also* Neuberger Decl. ¶¶ 16-18.)  That Article 12, which provides that FTX "assume[s] no fiduciary duty to Users in connection with such use of the Services" (Coverick Decl., Exs. B at 10, C at 10), "is inconsistent with a trust relationship" for the same

reasons as similar statements in the May 2022 Terms of Service.  (Neuberger Confirmation Decl. ¶ 96.2And, "[b]y contrast with the [Terms of Service], the Earlier Terms effectively say nothing expressly as to how Digital Assets are to be held between the customer and FTX."  (*Id.* ¶ 95.)  The Joint Liquidators' citation to the earlier terms of service does nothing to change the analysis.

175.    Left without any argument under the actual terms of the contract, the Joint Liquidators point to subsequent statements by Can Sun, FTX's former general counsel, at Sam Bankman-Fried's trial in October 2023.  (Proof of Claim ¶ 24.)  As set forth in Lord Neuberger's declaration in support of this Objection, these statements made in the context of a criminal trial about fraud, rather than any proceeding related to property rights, do not change the meaning of the Terms of Service under English law, and have no effect here.  (Neuberger Decl. ¶ 11(d); *see also id.* ¶¶ 12-15 ("it is clear that the parties did not intend a trustee-beneficiary relationship in respect of Perpetual Futures Contracts"); ¶¶ 19-30 (the October 2021 Line of Credit Agreement and the March 2022 Line of Credit Agreement are not "not admissible background to [the Terms of Service] interpretation" and, even if they were, neither "justify concluding that 3AC's assets were held on trust by FTX Trading or that 3AC retained legal title to assets").)

## 2.    The Sweeping and Commingling of Assets Held by the Exchange Destroyed Any Property Interest.

176.    3AC cannot claim any property interest in any Exchange Assets for the additional reason that the Joint Liquidators could never trace the assets associated with the 3AC Accounts to any specific assets held by the FTX Recovery Trust.  The inability of customers to provide evidence tracing their claimed assets into funds held by the Debtors was an additional basis for this Court's conclusion that Exchange Assets are property of the Debtors.  Thus, the Joint Liquidators' argument for ownership of assets fails due to the nature of the FTX-customer legal relationship and because the Joint Liquidators cannot carry their evidentiary burden.

177.    Because the party seeking to assert property rights over commingled funds held by a debtor or recovery trust bears the "burden under federal law of identifying and tracing the . . . funds," *Cath. Diocese of Wilmington*, 432 B.R. at 149, the Joint Liquidators' failure to present evidence tracing any property is fatal to their claims based on ownership.  A customer who deposited assets on the Exchange must be able to identify the exact address or bank account where the digital asset or fiat currency currently resides, or the exact substitute assets that were acquired. *See, e.g.*, *In re Bullion Rsrv. of N. Am.*, 836 F.2d 1214, 1218 (9th Cir. 1988) (holding that a preference defendant asserting that gold bullion he had withdrawn from an account operated by the debtor was his property and not estate property had a "duty under federal bankruptcy law to trace his funds to the bullion he received" that he could not satisfy).

178.    This Court received and accepted substantial evidence regarding the general impossibility of tracing specific assets in reaching its prior conclusion.  As described above, each Customer Account had an Account Balance that reflected the credits and debits resulting from deposit, withdrawals, and exchange activity (*i.e.*, trades with other customers and transfers to or from other customers) over the lifetime of the account.  The Account Balance reflected ledger entries; the Customer Account did not actually hold any assets at all because it was not a wallet or bank account.  Any assets deposited by customers were quickly swept into commingled addresses (as to digital assets) and bank accounts (as to fiat currency).  Because both types of assets were fungible, it is impossible to identify which asset came from which customer.  Trades and transfers further reduced the connection between customer and specific asset because they were ledger-only transactions and did not result in the movement of digital assets or fiat currency—the Account Balance for a Customer Account would change when the customer bought or sold BTC, but the BTC involved in the trade remained in the Sweep Address as part of a commingled mass.  The

-65-

Debtors presented all of this evidence to the Court in connection with Plan confirmation, as supported by a declaration from Mr. Mosley.  (Confirmation Brief ¶¶ 35-44; 157-159.)  The Debtors also presented Lord Neuberger's conclusion that this "use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen."  (Neuberger Confirmation Decl. ¶ 11.1(b); *see also* Neuberger Decl. ¶ 11(a)-(c).)

179.    This evidence applies with equal force to the assets associated with the 3AC Accounts as of June 12, 2022.  The manner in which the Exchange swept digital assets deposited by customers was the same in June 2022 as it was in November 2022.  (Mosley Confirmation Decl. ¶¶ 32-37; Coverick Decl. ¶¶ 97-98, 101-11.)  FTX stored digital assets in Sweep Addresses in June 2022, and those Sweep Addresses held the assets deposited by many Exchange customers as a commingled mass.  (Coverick Decl. ¶ 97.)  Just as it was shown at the confirmation hearing that it was generally impossible to identify which digital assets within a Sweep Address as of the Petition Date came from a specific customer (Mosley Confirmation Decl. ¶¶ 32-33), it is generally impossible today to identify which digital assets within a Sweep Address as of June 2022 came from a specific customer.  (Coverick Decl. ¶¶ 97-98.)  The bases for the Court's conclusion as of the Petition Date support the same conclusion as of June 2022.

180.    The evidentiary record here further confirms that it is impossible to trace the assets associated with the 3AC Accounts as of June 12, 2022 into any asset currently held by the FTX Recovery Trust.  Like every other customer, any digital assets deposited by 3AC were sent initially to Deposit Addresses before they were swept into Sweep Addresses where they were commingled with assets from other customers.  (*Id.* ¶ 98.)

181.    The Deposit Addresses associated with the 3AC Accounts did not contain any digital assets at the end of the day on June 12, 2022 because any assets deposited by 3AC had already been swept and commingled.  (*Id.* ¶¶ 100-10.)  This includes BTC, ETH, and FTT. Because such assets are fungible, it is impossible to trace them once they have been commingled in this manner.  And none of the assets that 3AC purchased via trades on the Exchange could ever be traced because, as described above, trades on the Exchange did not involve the movement of actual assets.  (*Id.*)  This includes the rest of the BTC, ETH, and FTT that 3AC did not deposit (and instead acquired on the Exchange), as well as all of the GBTC and ETHE associated with the 3AC Accounts.  In sum, it is not possible to trace any asset associated with the 3AC Accounts (or deposited by 3AC) into a specific asset.

182.    It is the Joint Liquidators' burden to trace the assets they claim, and the evidence confirms they could never carry that burden.  They have no property interest in the assets associated with the 3AC Accounts as of June 12, 2022.  This is fatal to nine purported claims: (i) BVI Preference Claim; (ii) BVI Undervalue Transaction Claim; (iii) BVI Turnover Claim; (iv) Bankruptcy Code Turnover Claim; (v) Customer Property Claim; (vi) Negative Balance Contract Claim; (vii) Unjust Enrichment Claim; (viii) Conversion Claim; and (ix) Proprietary Restitution Claim.

**D.    FTX Was Contractually Entitled to Conduct the $82 Million Liquidation.**

183.    The Liquidation was the only action FTX took with regards to assets credited to the 3AC Accounts, which generated $82 million in USD proceeds that reduced the negative USD Balance in the 3AC Accounts.

184.    By the time of the Liquidation, the Account Balance of the 3AC Accounts was only $7 million due to 3AC's withdrawals and market price declines.  And, as one FTX employee described in an email six hours before the Liquidation, the 3AC Accounts were in an

"undesirable" state because, by the time of the email, 3AC was "$227m short" on its obligation under the March 2022 Line of Credit Agreement to maintain $240 million in Account Balance at all times.  By the time FTX initiated the Liquidation, 3AC had been out of compliance with this Account Balance requirement for at least 44 hours and 3AC had not responded to FTX for at least 19 hours.

185.    Under those circumstances, FTX was contractually entitled to conduct the Liquidation and remove the Line of Credit as it did.  The governing agreements gave FTX the right to close or liquidate assets credited to the 3AC Accounts should 3AC fail to comply with the applicable Margin Requirements.  *See supra* ¶¶ 61, 69-70.  If anything, FTX gave 3AC the courtesy of extensive prior notice before initiating the Liquidation when contractually, it was allowed to liquidate those assets "without notice."  (March 2022 Line of Credit Agreement at FTX_3AC_000000760.)  Moreover, pursuant to the March 2022 Line of Credit Agreement, FTX had the absolute "right to remove the Line of Credit at any time and for any reason."  (*Id.* at FTX_3AC_000000758.)

186.    Because the Liquidation was a valid exercise of FTX's contractual rights, any of the Joint Liquidators' claims that require a breach or a wrongdoing fail to the extent they were based on the Liquidation.  This would eliminate four out of ten claims as they relate to the asserted $82 million of damages arising from the Liquidation:

- The Customer Property Claim requires a breach of the Terms of Service.  (*See infra* ¶ 220.)  The Liquidation did not constitute a breach of the Terms of Service because FTX was contractually entitled to liquidate the 3AC Accounts when 3AC fell out of compliance with the Margin Requirements.

- The Negative Balance Contract Claim also requires a breach of the Terms of Service.  (*See infra* ¶ 226.)  As discussed above, there is no breach with regards to the Liquidation when the "breach" asserted was 3AC's inability to withdraw a deficit in its Account Balance.

- The Breach of Trust or Fiduciary Duty Claim also requires a breach. (*See infra* ¶ 241.) Even assuming there was a trust relationship or fiduciary duty—and there was not—there was no breach resulting from the Liquidation when FTX was only exercising its contractual rights.

- The Unjust Enrichment Claim requires an "enrichment" to FTX, and that the enrichment is "unjust." (*See infra* ¶ 243.) Such a claim cannot be sustained because—even putting aside that FTX was not enriched by the Liquidation—any such enrichment would not be unjust when FTX was merely exercising its contractual rights.

187.    The other six of the ten claims as they relate to the $82 million Liquidation also fail for additional reasons as laid out in more detail below.

### E.    The Joint Liquidators Fail to Allege Facts or Circumstances Supporting Most of the Claims They Assert, and Accordingly Such Claims Are Not Entitled to *Prima Facie* Validity.

188.    The Joint Liquidators fail to plead any facts or circumstances to support several of their claims, and instead raise only speculative "what if" arguments. Vague references to various potential claims fail to "allege[] facts sufficient to support a legal liability" such that the claims asserted are not entitled to *prima facie* validity. *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

189.    While "[t]he burden of proof for claims brought [under section 502(a)] rests on different parties at different times," the Joint Liquidators first bear the burden of alleging facts sufficient to support a legal liability against the FTX Recovery Trust. *Id*. Only if the allegations in a proof of claim meet this standard is it considered *prima facie* valid. *See id.*

190.    The Joint Liquidators assert several claims based on fanciful "outstanding evidence":  (i) the Negative Balance Contract Claim, (ii) the Conversion Claim, and (iii) the Proprietary Restitution Claim.  (Proof of Claim ¶¶ 57, 80, 82, 84.)  As one example, the Joint Liquidators assert a purported $1,530,862,573.85 conversion claim through a one-sentence description of the elements of such a claim that, according to the Joint Liquidators, are "similar whether BVI law, Bahamian law, or Delaware law is applied." (*Id.* ¶ 81.)  They also note that "[i]f

-69-

outstanding discovery reveals that the Lost Assets were liquidated or seized by FTX, then FTX deprived the 3AC Debtor of those rights and assumed them for itself." (*Id.* ¶ 82.) These claims based on hypothetical fact scenarios and asserted without evidence are clearly deficient, and "[a] debtor . . . 'has no evidentiary burden to overcome' in objecting to a claim that is not *prima facie* valid." *In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008) (citing *eCast Settlement Corp.* v. *Teresa Tran (In re Tran)*, 369 B.R. 312, 318 (Bankr. S.D. Tex. 2007)) (holding that debtors' objections alone are sufficient to shift the burden back to claimant when proof of claim had insufficient documentation).

191.    The Joint Liquidators' pattern of merely naming and listing the elements of several claims—without articulating any legal liability owed—cannot form a *prima facie* valid claim. *In re Tribune Co.*, 2013 WL 1909617, at *3 & n.10 (Bankr. D. Del., May 2, 2013) (disallowing and expunging claim when the claimant "has not articulated a discernable basis for a claim against the Debtors," and noting that "[e]ven were [the court] to decide that [claimant] had met her initial burden . . . the record reveals no basis upon which any relief can be granted"). This surface-level, scattershot assertion of claims against the FTX Recovery Trust falls far short of what is required, and, in any event, the "burden of persuasion is always on the claimant." *In re Allegheny Int'l Inc.*, 954 F.2d at 174 (internal citations omitted).

### III.    The Individual Claims Identified in the Proof of Claim Should Be Disallowed.

192.    In addition to the common threshold factual and legal reasons why each of the claims asserted by the Joint Liquidators fails, the FTX Recovery Trust has additional factual and legal defenses specific to each of the claims that separately support disallowance.

### A.    BVI Preference Claim

193.    A preference claim under Section 245 of the BVI Insolvency Act requires that the Joint Liquidators establish (i) an "insolvency transaction," (ii) that was entered into by the

company in liquidation (*i.e.*, 3AC), (iii) within the "vulnerability period," and (iv) which had the "effect of putting the creditor into a position" better than the creditor would have been in within the company's insolvent liquidation had the transaction not been entered into.  (Atherton Decl. ¶ 22.)

194.    *First*, the Proof of Claim lacks sufficient detail and specificity to support a preference claim under the BVI Insolvency Act.  (*Id.* ¶ 19.)

195.    *Second*, there was no "insolvency transaction" that could support a preference claim under BVI law because 3AC did not have any proprietary interest in the assets credited to the 3AC Accounts as of the end of June 12, 2022.  (Neuberger Confirmation Decl. ¶ 11; Atherton Decl. ¶ 29.)  Because 3AC did not have a proprietary interest in any of the assets associated with the 3AC Accounts at that time, none of the activity in those accounts on June 13 or June 14, 2022 resulted in the depletion of assets belonging to 3AC that might otherwise have been available to 3AC's other creditors.  (Atherton Decl. ¶¶ 27-29.)  Therefore, none of the account activity in question constitutes an "insolvency transaction."  (*Id.* ¶ 29.)

196.    *Third*, the Joint Liquidators must establish that 3AC was insolvent at the time of the transactions they allege were preferences, or that such transactions caused 3AC to become insolvent.  (*Id.* ¶ 34.)  The Joint Liquidators have not provided any evidence to support their argument that 3AC was insolvent on June 13 or 14, 2022.  (*Id.* ¶ 35.)

197.    *Fourth*, even if the Joint Liquidators could somehow establish the existence of an "insolvency transaction," the BVI Preference Claim fails because the Joint Liquidators cannot establish that FTX was a creditor of 3AC during any time relevant to the Proof of Claim.  (*Id.* ¶ 44.)  A preference claim under the BVI Insolvency Act can only be asserted against a "creditor."  (*Id.* ¶ 40.)  The Joint Liquidators do not argue that there was ever a negative Account

Balance on June 13 or 14, 2022.  A positive Account Balance renders FTX a debtor and not a creditor of 3AC for purposes of the BVI Preference Claim.  (*Id.* ¶ 43.)  There cannot be a preference claim against a debtor.  (*Id.*)

198.    *Fifth*, the BVI Preference Claim also fails because FTX was not put "into a better position" as a result of any action challenged by the Joint Liquidators, even if one assumed that FTX could be classified as a creditor.  (*Id.* ¶ 53.)  To constitute a preference, the relevant transaction must have put FTX in a better position than it otherwise would have been in the event that 3AC had entered insolvent liquidation.  (*Id.* ¶ 45.)  As detailed above, none of the challenged activity left FTX in a better position.  FTX did not receive any benefit or proceeds from 3AC's activities, from the decline in the Account Balance of the 3AC Accounts, or from the Liquidation. The Joint Liquidators do not even attempt to argue that FTX benefited from withdrawals to addresses controlled by 3AC or market price declines.

199.    As a result, there was no debt owed to FTX as of the date of any alleged transaction.[26]  The Joint Liquidators seek to confuse the issue by treating the negative USD Balance as "liabilities" separate from the positive Digital Asset Balance (Proof of Claim ¶ 52), when, as explained above, the positive Digital Asset Balance and the negative USD Balance were interconnected and inseparable components of the overall Account Balance.  Their tactic defies logic and does not manufacture creditor status under BVI law.  Under BVI law, in the event of an assumed liquidation of the 3AC Accounts, there would have been an automatic and self-executing insolvency set-off, the net result of which would have been the Account Balance, *i.e.*, a balance that takes into consideration both the positive Digital Asset Balance and the negative USD

---

[26] The FTX Recovery Trust reserves all rights with respect to whether FTX became a creditor of 3AC at a later date, including with respect to negative Account Balance and overdrawn amounts, and reserves all claims related thereto.

Balance.  (Atherton Decl. ¶ 48.)  3AC was entitled to the overall Account Balance, not just the parts of the balance that selectively benefit the Joint Liquidators' convoluted theories.  It is inappropriate under BVI law to look only at the negative USD Balance when determining whether there was a creditor left in a better position as the result of a transaction.  The 3AC Accounts maintained a positive Account Balance at all times,[27] and therefore FTX was never a creditor with respect to the assets associated with those accounts.

200.    *Sixth*, even if one pretended that the Joint Liquidators could overcome these fatal flaws, the FTX Recovery Trust *still* has a complete statutory defense to the BVI Preference Claim because any purported transaction occurred in the "ordinary course" of 3AC's business as a cryptocurrency henge fund.  A transaction cannot be an unfair preference if it occurs "in the ordinary course of [the company's] business."  (*Id.* ¶ 54 (citing BVI Insolvency Act § 245(2)).)  In assessing the defense, a BVI court would typically examine "the actual transaction in its factual setting," an examination that is "undertaken objectively by reference to the standard of what constituted the ordinary course of business," and would include consideration of the "past practices of the particular company and its dealing with the particular [other party]."  (Atherton Decl. ¶ 55.)  "[T]here may be circumstances where a transaction, exceptional to a particular trader, will nonetheless be in the ordinary course of business" and that "[t]he particular circumstances will require assessment in each case."  (*Id.*)  As a result, there is an ordinary course of business defense if the transactions at issue are part of the ordinary course of business between FTX and 3AC.

---

[27] Moreover, as explained above, apart from rare instance of technical errors, the Exchange did not allow its customers to have an overall negative Account Balance.  Therefore, there could never be a scenario where a liquidation of the 3AC Accounts would not fully set off the negative USD Balance, as the Joint Liquidators suggested.  (*See* Proof of Claim ¶ 52.)

201.    3AC was a cryptocurrency hedge fund.  There can be no dispute that 3AC's ordinary course of business involved depositing funds and trading on cryptocurrency exchanges. 3AC regularly made deposits throughout its time as an Exchange customer—it deposited more than $1.8 billion in each quarter from Q1 2021 through Q1 2022, and such deposits were a necessary step to enable trading on the Exchange.  3AC was also a high volume trader on the Exchange.  3AC opened the 3AC Accounts in February 2020 and gradually increased the scale of its activity, and by Q2 2021, it gained $218 million via trading activity.  (Coverick Decl. ¶¶ 45, 56.)  As Kyle Davies, one of the founders of 3AC, tweeted on December 9, 2022, "I was the largest trader on FTX."  (Beller Decl., Ex. A.)  3AC was also an active trader on many other cryptocurrency exchanges.[28]  It is therefore apparent that all of the relevant activity associated with the 3AC Accounts was part and parcel of 3AC's normal practices.  As the Joint Liquidators acknowledge, 3AC "operated a hedge fund with a focus on trading and investing in cryptocurrency and other digital assets."  (Proof of Claim ¶ 2.)  3AC commonly employed the strategy of using leverage to increase its exposure to digital asset prices.  Indeed, 3AC entered into the Line of Credit agreements with FTX in order to increase its ability to take positions on margin, which it frequently did.  Cryptocurrency trading is inherently risky, and using leverage to increase exposure to digital asset price changes amplifies that risk.  3AC was a sophisticated party well-versed in cryptocurrency trading, and the consequences of digital asset prices moving in an unfavorable direction were not just predictable, they were part of the deal.  3AC's decision to bet on BTC and ETH prices appreciating amidst market turmoil in May and June 2022 was the result of its ordinary strategy, and the decline in the value of the 3AC Accounts was the consequence of 3AC's ordinary

---

[28] *See* First Report to Creditors, *In the Matter of the Insolvency Act, 2003 and in the Matter of Three Arrows Capital Ltd. (In Liquidation)*, Case No. BVIHC (COM) 2022/0119 (Aug. 25, 2022), at 27 ("[3AC] utilized various exchanges to transact or hold digital assets.  The [Joint Liquidators] have contacted numerous parties in that regard.")

strategy failing.  Risk was not just a feature of the ordinary course of 3AC's business, seeking

profits in the face of risk *was* 3AC's business.

## B.    BVI Undervalue Transaction Claim

202.    The Joint Liquidators' BVI Undervalue Transaction claim also fails.  To

plead a claim for undervalue transaction under section 246(1) of the BVI Insolvency Act, the Joint

Liquidators must show that:

> "*(a)* the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or
>
> "*(b)* the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and
>
> "*(c)* in either case, the transaction concerned—
>
> > (i)    is an insolvency transaction; and
> > (ii)    is entered into with the vulnerability period."

(Atherton Decl. ¶ 62.)

203.    Section 246(2) of the BVI Insolvency Act provides an important statutory

defense to the definition above:  a transaction is *not* an undervalue transaction if "(a) the company

enters into the transaction in good faith and for the purposes of its business; and (b) at the time

when it enters into the transaction, there were reasonable grounds for believing that the transaction

would benefit the company."  (*Id.* ¶ 64.)

204.    *First*, the Proof of Claim lacks sufficient detail and specificity to support a

claim for undervalue transaction under the BVI Insolvency Act.  (*Id.* ¶ 19.)

205.    *Second*, as explained above, 3AC did not have any property interests in any

assets associated with the 3AC Accounts.  (Neuberger Decl. ¶ 11; Atherton Decl. ¶ 29.)  Because

none of those assets were the property of 3AC, FTX could not have "appropriated" or "tak[en]"

-75-

any of those assets from 3AC, and the Joint Liquidators cannot have an undervalue transaction claim arising out of the disposition of assets in which they did not have any proprietary interest. (Atherton Decl. ¶ 72.)

206.    *Third*, the Joint Liquidators must establish that 3AC was insolvent at the time of the transactions they allege were undervalue transactions.  (*Id.* ¶¶ 34, 74.)  The Joint Liquidators have not provided any evidence to support their argument that 3AC was insolvent on June 13 or 14, 2022.  (*Id.* ¶¶ 35, 74.)

207.    *Fourth*, even assuming that the Joint Liquidators were able to establish all the elements necessary for their BVI Undervalue Transaction Claim, the FTX Recovery Trust has a statutory defense to the claim under the BVI Insolvency Act.  (*Id.* ¶ 75.)  Whatever the Joint Liquidators argue is the "transaction" for purposes of this claim, there is no dispute that 3AC engaged in the relevant account activity in good faith for the purpose of carrying on its business with a reasonable belief that activity would benefit 3AC—the Proof of Claim does not allege otherwise.  Those elements establish a statutory defense under the BVI Insolvency Act.  (*Id.* ¶¶ 75-76.)  3AC inarguably traded, and opened and closed positions, as part of its business as cryptocurrency hedge fund.  3AC needed to deposit funds on cryptocurrency exchanges to facilitate its trading activity.  It frequently withdrew funds, including during the period at issue in the Proof of Claim.  3AC therefore conducted all relevant activity "in good faith for the purpose of the business" as a hedge fund seeking to amplify its profits through trading on cryptocurrency exchanges.  Thus, the FTX Recovery Trust has a statutory defense to the BVI Undervalue Transaction Claim.

## C.    BVI Turnover Claim

208.    The Joint Liquidators do not have a valid BVI turnover claim against the FTX Recovery Trust.  Section 274(A)(1) of the BVI Insolvency Act provides that "[w]here any

person has in his or her possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder." (*Id.* ¶ 79.)

209.    *First*, the Proof of Claim lacks sufficient detail and specificity to support a turnover claim under the BVI Insolvency Act. (*Id.* ¶¶ 19, 83.)

210.    *Second*, as explained above, 3AC did not have any property interests in any assets associated with the 3AC Accounts, which is a prerequisite for asserting a turnover claim under the BVI Insolvency Act. (*Id.* ¶ 80.) As such, the Joint Liquidators cannot succeed on their BVI turnover claim.

211.    *Third*, as explained above, the decrease in the Account Balance for the 3AC Accounts on June 13 and 14 was due to price declines and 3AC's own withdrawals—FTX did not take possession or control over any assets as a result of either of those events. Additionally, FTX did not receive the proceeds of any sales by 3AC, which amounted to $842 million between June 12 and 14, 2022. FTX therefore did not take possession or control over any assets traded in the 3AC Accounts.

212.    *Fourth*, with respect to the Liquidation, FTX did not receive any of the proceeds or the assets liquidated. As such, FTX did not take possession or control over any of the $82 million of liquidated assets.

213.    *Fifth*, the Joint Liquidators cannot establish that any digital assets that were once associated with the 3AC Accounts are in the possession or control of the FTX Recovery Trust, which is a prerequisite of establishing their turnover claim. (*Id.* ¶ 81.)

D.     **Bankruptcy Code Turnover Claim**

214.    The Joint Liquidators also do not have a turnover claim under the Bankruptcy Code against the FTX Recovery Trust.  The party seeking turnover bears the burden to establish that:  "(1) the property is in the possession, custody or control of another entity, (2) the property can be used in accordance with the provisions of section 363 and (3) the property has more than inconsequential value to the debtor's estate."  *In re DBSI, Inc.*, 468 B.R. 663, 669 (Bankr. D. Del. 2011) (cleaned up).  "Importantly, to support a cause of action for turnover, the trustee has the burden of proof, by a preponderance of the evidence, to establish that, *inter alia*, the property constitutes property of the estate."  *In re Irish Bank Resol. Corp. Ltd. (in Special Liquidation)*, 559 B.R. 627, 643-44 (Bankr. D. Del. 2016).  "Turnover is not appropriate where there is a legitimate dispute over ownership of the property."  *In re Am. Home Mortg. Holding*, 458 B.R. 161, 169 (Bankr. D. Del. 2011) (citing *In re Lexington Healthcare Grp., Inc.*, 363 B.R. 713, 716 (Bankr. D. Del. 2007) (same)).

215.    *First*, as explained above, the Bankruptcy Code Turnover Claim fails because 3AC did not have any property interests in any of the assets credited to the 3AC Accounts. Thus, none of those assets were the property of 3AC's estate and none can serve as a basis for any turnover claim under Section 363 of the Bankruptcy Code.

216.    *Second*, as explained above, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  3AC withdrew assets for its own benefit, and transacted with other customers on the Exchange.

217.    *Third*, as explained above, FTX did not retain any benefit or proceeds from the activity in the 3AC Accounts besides the Liquidation.  Therefore, none of the proceeds from 3AC's activities ended up in the possession, custody, or control of FTX.

218.     *Fourth*, FTX did not retain any benefit or proceeds from the Liquidation. Therefore, none of the proceeds from the Liquidation ended up in the possession, custody, or control of FTX.

219.     *Fifth*, the Joint Liquidators cannot establish that any digital assets that were once associated with the 3AC Accounts are in the possession or control of the FTX Recovery Trust.

### E.     Customer Property Claim

220.     The Customer Property Claim, which is purportedly based on an alleged breach of the Terms of Service, also fails.  The breach identified by the Joint Liquidators is an alleged breach of Sections 8.2.6(A) and 8.2.6(B) of the Terms of Service "[i]f FTX's actions deprived the 3AC Debtor of its ownership of the Lost Assets as FTX now alleges."  (Proof of Claim ¶¶ 56-57.)

"8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

(Terms of Service § 8.2.6.)

221.     *First*, the Terms of Service did not grant FTX customers property rights in assets held by the Exchange, as Lord Neuberger concluded in his declaration in support of Plan confirmation and as this Court concluded as a matter of law in the Confirmation Order.  (Neuberger Confirmation Decl. ¶ 11.1; Confirmation Order ¶ 20; *see also* Neuberger Decl. ¶ 11.)  This precludes the Joint Liquidators' circular argument that the lack of property interest confirmed by the Terms of Service in fact breached those same Terms of Service.

-79-

222.    *Second*, the Joint Liquidators do not identify any action that could conceivably constitute a breach.  It is unclear what action the Joint Liquidators challenge, but they appear to take issue with this Court's conclusion that assets held by the Exchange as of the Petition Date were property of Debtors and now the FTX Recovery Trust.  (*See* Confirmation Order ¶ 20). As explained above, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  There thus is no action that can amount to a potential breach of contract.

223.    *Third*, as explained above, FTX did not retain any benefit or proceeds from the activity in the 3AC Accounts besides the Liquidation.  Therefore, there are no potential damages for the breach alleged here.

224.    *Fourth*, with respect to the Liquidation, FTX did not retain any benefit or proceeds.  Therefore, there could be no potential damages.

225.    *Fifth*, the Joint Liquidators fail to articulate a sufficient basis for their claim to be entitled to *prima facie* validity.

F.    **Negative Balance Contract Claim**

226.    The Negative Balance Contract Claim likewise fails.  The breach identified by the Joint Liquidators is an alleged breach of Sections 8.2.6(A), 8.2.6(B), and 8.2.6(C) of the Terms of Service because FTX allegedly "appropriated $701,394,039 in Lost Assets (or the proceeds thereof), purportedly in satisfaction of the Unknown Alleged Liability."  (Proof of Claim ¶¶ 79-80.)

227.    The Terms of Service state the following:

"8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."

(Terms of Service § 8.2.6.)

228.    *First*, as explained above, there is no such thing as the "Unknown Alleged Liability."  The evidence confirms that the 3AC Accounts had an Account Balance of $284 million at the end of the day on June 12, 2022, which was comprised of a positive Digital Asset Balance of $1.017 billion and a negative USD Balance of $733 million.

229.    *Second*, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  3AC withdrew assets for its own benefit, and transacted with other customers on the Exchange.  FTX therefore did not appropriate anything from the 3AC Accounts.

230.    *Third*, the Joint Liquidators do not identify any action that could conceivably constitute a breach.  To the extent that they argue that 3AC should have been permitted to withdraw spot assets without regard to its negative USD Balance or the overall Account Balance, such a position is not supported by the Terms of Service.

231.    *Fourth*, the Terms of Service did not grant FTX customers property interest in assets held by the Exchange, as Lord Neuberger concluded in his declaration in support of Plan confirmation and as this Court concluded as a matter of law in the Confirmation Order.  (Neuberger Confirmation Decl. ¶ 11.1; Confirmation Order ¶ 20, *see also* Neuberger Decl. ¶ 11.)  As a result, there can be no alleged breach by virtue of "appropriating" assets that did not belong to 3AC.

232.    *Fifth*, as explained above, FTX did not retain any benefit or proceeds from the activity in the 3AC Accounts besides the Liquidation.  Therefore, there are no potential damages for the breach alleged here.

-81-

233.    *Sixth*, with respect to the Liquidation, FTX did not retain any benefit or proceeds.  Therefore, there could be no potential damages for the Liquidation either.

234.    *Seventh*, the Joint Liquidators fail to articulate a sufficient basis for their claim to be entitled to *prima facie* validity.

### G.    Breach of Trust or Fiduciary Duty Claim

235.    The Breach of Trust or Fiduciary Duty Claim is deficient on its face.

236.    *First*, FTX was neither a trustee for the assets credited to the 3AC Accounts, nor a fiduciary with respect to 3AC.  The Terms of Service expressly disclaim the existence of any fiduciary relationship between FTX and customers.  (*See* Terms of Service § 38.6 ("Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever."); *id.* § 2.1.3 ("FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."); § 2.2.2 ("We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.").)

237.    3AC's assertion that "the May 2022 TOS do not disclaim fiduciary duties in connection with FTX's capacity as a custodian of assets" (Proof of Claim ¶ 75) is incorrect—the Terms of Service do just that.  Section 38.6 of the Terms of Service states that "[n]othing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever."  (Terms of Service § 38.6.)

238.    Lord Neuberger determined that these provisions were also "inconsistent with an intention to create a trustee-beneficiary relationship," among others.  (Neuberger

Confirmation Decl. ¶ 45.)  In addition, a trust cannot be created under English law without an expressed intention that the purported trustee hold legal title, which is inconsistent with the very provisions identified by the Joint Liquidators.  (*See id.* ¶¶ 35.2, 45.4.)  Lord Neuberger concluded that the Terms of Service did not consider a trust in favor of FTX customers.  (*Id.* ¶¶ 11.1(a), 45; *see also* Neuberger Decl. ¶ 11.)

239.    As a result, the Breach of Trust or Fiduciary Duty Claim fails because the required relationship did not exist.

240.    *Second*, as explained above, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  3AC withdrew assets for its own benefit, and transacted with other customers on the Exchange.  There is no evidence of any action that could conceivably be alleged to have been a breach.

241.    *Third*, with respect to the Liquidation, FTX was merely exercising its contractual rights under the governing agreements.  As such there could not have been any breach of any trust or fiduciary duty.

242.    *Fourth*, the Joint Liquidators fail to articulate a sufficient basis for their claim to be entitled to *prima facie* validity.

**H.    Unjust Enrichment Claim**

243.    The Joint Liquidators assert a claim for unjust enrichment under either Delaware, English, Bahamian or BVI law.  The Joint Liquidators do not actually allege which law applies, but offer the view that the "requirements do not vary meaningfully." (Proof of Claim ¶ 71.)  Their vague claim fails in any event.  To state a claim for unjust enrichment under Delaware law, a party must allege "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec* v. *Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal citations omitted).

244.     *First*, the purported unjust enrichment claim is improper because the relationship between 3AC and FTX was governed by contract, specifically the Terms of Service, the October 2021 Line of Credit Agreement, and the March 2022 Line of Credit Agreement.  As such, 3AC has no claim for unjust enrichment.  *See, e.g.*, *Gordon* v. *Kohl's Dep't Stores, Inc.*, 2017 WL 3390269, at *11 (E.D. Pa. Aug. 7, 2017) (noting that "a claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim" (internal citations omitted)), *aff'd*, 816 F. App'x 649 (3d Cir. 2020). A similar barrier to the purported unjust enrichment claim exists under BVI law.  (*See* Atherton Decl. ¶ 96.)

245.     *Second*, there was no enrichment.  As explained above, FTX did not retain any benefit or proceeds from the activity in the 3AC Accounts besides the Liquidation.  3AC sold digital assets to other Exchange customers, and withdrew assets for its own benefit.  Where 3AC closed a position and reduced its negative USD Balance, that amount was returned to other users of the Exchange under the peer-to-peer Margin Program.  FTX did not reap any benefit from those activities, or from market price declines.

246.     *Third*, there was no impoverishment.  3AC initiated sales of digital assets and received USD proceeds for those sales.  Those reflected fair trades at market value, not an impoverishment.  Additionally, 3AC can hardly be impoverished by its withdrawals for its own benefit.  Finally, the FTX Recovery Trust does not understand the Joint Liquidators to allege that 3AC was impoverished by market price declines, but such a position would be ridiculous.  The decline in the 3AC Account Balance resulted from 3AC's own actions, and it was not impoverished by any of them.

-84-

247.    *Fourth*, there can be no impoverishment for the additional reason that 3AC did not have a property interest in assets held by the Exchange.  The Joint Liquidators try to avoid this outcome by arguing that "even in the absence of ownership," 3AC was deprived of "a claim against FTX."  (Proof of Claim ¶ 72.)  This is illogical.  The Joint Liquidators are *bringing* a claim for the assets they purport belonged to 3AC; they cannot argue that FTX was unjustly enriched by their lack of claim.

248.    *Fifth*, to the extent one assumed an enrichment and impoverishment—and there was none—it is apparent that FTX would have had a justification by virtue of its role as an Exchange supporting many customers.  "The absence of justification element 'usually entails some type of wrongdoing or mistake at the time of the transfer.'"  *In re Cred Inc.*, 650 B.R. 803, 832 (Bankr. D. Del. 2023) (quoting *Terr. of the U.S. V.I.* v. *Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007)).  Here, other than with respect to the liquidated $82 million, it was *3AC*—not FTX—who closed positions, made withdrawals, and ultimately reduced the Account Balance. When 3AC elected to sell digital assets or open positions, another customer was on the other side of the deal.  FTX, as an intermediary, acted as an Exchange with obligations to all its customers, and could not have given preferential treatment to 3AC.

249.    *Sixth*, the Joint Liquidators cannot show that the Liquidation was without justification.  (*See* Atherton Decl. ¶ 95.)  Rather, FTX warned 3AC repeatedly that they would liquidate the account consistent with the applicable agreement absent action from 3AC.  3AC never responded to these communications or took action to bring their account balance back in line with the Margin Requirements.  *See supra* ¶¶ 97-100.

250.     *Seventh*, the Joint Liquidators failed to articulate a sufficient basis for their claim to be entitled to *prima facie* validity.  They do not even identify the applicable law that purportedly authorizes their claim.

**I.      Conversion Claim**

251.     The Conversion Claim likewise fails.  As with the Unjust Enrichment Claim, the Joint Liquidators do not identify the applicable law, but observe that the "elements are similar whether BVI law, Bahamian law, or Delaware law is applied."  (Proof of Claim ¶ 81.) Under Delaware law, to prevail on a conversion claim, the claimant must show that (i) it had a property interest in the assets, (ii) it had a right to possession of the assets and (iii) the assets were converted.  *See Gould* v. *Gould*, 2012 WL 3291850, at *7 (Del. Ch. Aug. 14, 2012) (cleaned up).

252.     *First*, as explained above, 3AC did not have any property interest in any assets associated with the 3AC Accounts, which is a prerequisite for any claim for conversion. (*See* Atherton Decl. ¶ 100.)

253.     *Second*, as explained above, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  3AC withdrew assets for its own benefit, and transacted with other customers on the Exchange.  There is no basis to allege that FTX converted any assets when 3AC conducted the relevant transactions.

254.     *Third*, with respect to the Liquidation, FTX was not the recipient of any proceeds or any of the assets liquidated, and FTX therefore did "convert" any of the liquidated assets.

255.     *Fourth*, under BVI law specifically, the tort of conversion only applies to tangible assets, and not intangible assets, which include the crypto assets at issue.  (*Id.* ¶ 101.)  The Joint Liquidators thus have no valid claim for conversion under BVI law.

256.     *Fifth*, the Joint Liquidators failed to articulate a sufficient basis for their claim to be entitled to *prima facie* validity.  They do not even identify the applicable law that purportedly authorizes their claim.

**J.        Proprietary Restitution Claim**

257.     The Joint Liquidators assert that 3AC has a proprietary restitution claim under BVI common law against the FTX Recovery Trust for the value of the purported "Lost Assets" "if outstanding evidence reveals that FTX (and not the 3AC Debtor) seized or otherwise liquidated the Lost Assets." (Proof of Claim ¶¶ 83-84.)  This claim fails for numerous reasons.

258.     *First*, the Joint Liquidators concede that they do not have a Proprietary Restitution Claim unless there is evidence that FTX "seized or otherwise liquidated" the disputed assets.  (*Id.* ¶ 84.)  As described above, FTX did not take any action with respect to the 3AC Accounts besides the Liquidation.  The evidence confirms there is no claim here.

259.     *Second*, as explained above, 3AC lost any proprietary interest in the assets once they were deposited onto the Exchange.  None of the assets associated with the 3AC Accounts could therefore be the basis of a proprietary restitution claim.  (Atherton Decl. ¶ 88.)

260.     *Third,* the receipt of assets by FTX—through 3AC's deposits of new assets onto the Exchange—arose out of the arrangements freely entered into between 3AC and FTX, and as such, would not have been unconscionable.  (*Id.* ¶ 85.)

261.     *Fourth*, to the extent that the proprietary restitution claim is premised on the Liquidation, FTX was entitled to conduct the Liquidation.  (*Id.* ¶ 86.)

262.     *Fifth*, as explained above, FTX did not retain any benefit or proceeds from the activity in the 3AC Accounts besides the Liquidation.  None of the proceeds from 3AC's activities were "seized" by FTX.

263.    *Sixth*, with respect to the Liquidation, FTX was not the recipient of any proceeds or any of the assets liquidated, and FTX therefore did not "seize" any of the liquidated assets.

264.    *Seventh*, the Joint Liquidators cannot establish that any digital assets that were once associated with the 3AC Accounts are in the possession or control of the FTX Recovery Trust.  (*Id.* ¶ 90.)

## **RESERVATION OF RIGHTS**

265.    This Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the FTX Recovery Trust to object to any claim on any grounds whatsoever.  The FTX Recovery Trust expressly reserves all further substantive or procedural objections.  Nothing contained herein is intended or should be construed as:  (i) an admission as to the validity of any claim against the FTX Recovery Trust; (ii) a waiver of the FTX Recovery Trust's rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (v) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (vi) a waiver of the FTX Recovery Trust's rights under the Bankruptcy Code or any other applicable law.

## **CONCLUSION**

266.    For the foregoing reasons, the FTX Recovery Trust respectfully requests that the Court enter an order disallowing with prejudice the claims asserted in the Proof of Claim.

Dated: June 20, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       bellerb@sullcrom.com

*Counsel for the FTX Recovery Trust*