**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## SECOND DECLARATION OF THE RT. HON. LORD NEUBERGER OF ABBOTSBURY

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

I, The Rt. Hon. Lord Neuberger of Abbotsbury, hereby make this declaration (**Declaration**) under penalty of perjury pursuant to § 1746 and state as follows:

## I. INTRODUCTION

1. On September 30, 2024, I completed the *Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury* (**the Plan Declaration**) at the request of Sullivan & Cromwell LLP on behalf of FTX Trading Ltd. (**FTX Trading**) and its affiliated debtors and debtors in possession (collectively, **the Debtors**). The Plan Declaration is included as Annex 1 to this Declaration. In the Plan Declaration, I provided my opinion as to the meaning and effect of the "FTX Terms of Service" dated May 13, 2022 (**the Dotcom Terms**) and two earlier versions of FTX Trading's standard Terms of Service (together, **the Earlier Terms**). Specifically, I provided an opinion as to whether FTX Trading's customers might have any proprietary rights in digital assets deposited, held, received and/or acquired on the FTX.com platform (**the Platform**).

2. I have now been asked by Sullivan & Cromwell on behalf of the FTX Recovery Trust to give my opinion as to whether a specific customer of FTX Trading, Three Arrows Capital Ltd. (**3AC**), had any proprietary interest in the assets credited to its customer Account as of the end of the day on June 12, 2022.

3. Accordingly, this Declaration supplements the Plan Declaration, which remains my opinion for the reasons therein contained and is incorporated by reference as if set forth in full herein. References below preceded by "¶" are to paragraphs of the Plan Declaration unless otherwise stated. Capitalised expressions in this Declaration are references to defined terms in the Dotcom Terms unless otherwise stated.

4. I am being remunerated at the rate of £2,500 per hour, which is my current standard rate for providing opinions on English law. A junior barrister in my chambers working under my direction has assisted me in preparing this report. Although being paid by FTX Recovery Trust, I understand that my role is to give my honest opinion, and I have done so. Neither my compensation nor that of the junior barrister assisting me is contingent upon my findings, the testimony I may give, or the outcome of these proceedings.

5. I have set out my professional experience in Section II of the Plan Declaration. I set out in Annex 2, Annex 3, and Annex 4 to this Declaration respectively my curriculum vitae, a list of cases in which I have testified as an expert, and a list of the lectures (most of which have or will be published in some form) which I have given in the past ten years.

6. In reaching the conclusions set out in this Declaration, I have reviewed the Plan Declaration, judicial decisions, and textbooks referenced herein. I have also been provided with and have considered and taken into account certain documents provided by the Debtors. A list of the documents I have considered is set out in Annex 5 to this Declaration.

## II. 3AC'S RIGHTS IN DIGITAL ASSETS UNDER THE DOTCOM TERMS

7. I am instructed that 3AC contends that, as at the end of day on June 12, 2022, 3AC owned the Digital Assets credited to its customer Account, including certain quantities of Ethereum (**ETH**), Bitcoin (**BTC**), Grayscale Bitcoin Trust Tokenized Stock (**GBTC**), Grayscale Ethereum Tokenized Stock (**ETHE**), and FTT.

8. I am also instructed that by the end of day on June 12, 2022 there was no ETH, BTC, GBTC, ETHE, FTT, or other Digital Assets segregated for 3AC benefit in any deposit address associated with 3AC's customer Account.

9. More specifically, I have been instructed that any ETH, BTC and FTT that 3AC deposited prior to June 12, 2022 had been swept out of deposit addresses associated with 3AC's customer Account into various pool addresses under the sole control of FTX Trading, and that any quantities of these Digital Assets that 3AC acquired on the Platform remained in pool addresses under the sole control of FTX Trading, unless and until withdrawn from the Platform.

10. I have also been instructed that 3AC did not deposit any GBTC or ETHE onto the Platform. Rather, 3AC acquired its entitlements to GBTC and ETHE by purchasing quantities of GBTC and ETHE on the Platform and that those quantities of GBTC and ETHE remained in pool addresses under the sole control of FTX Trading, unless and until withdrawn from the Platform.

11. So far as Digital Assets are concerned, and based on the facts set forth above:

   a. I do not consider that the Dotcom Term created a trust of Digital Assets in favour of customers, including 3AC, for the reasons explained in the Plan Declaration, in particular Section VI(1) thereof.

   b. To the extent it could be argued that customers (including 3AC) and FTX Trading intended to establish a quasi-bailment relationship with respect to Digital Assets, they appear to have failed to achieve that result for the reasons I explained in Section VI(2) of the Plan Declaration. The use of pool addresses and the "sweeping" of Digital Assets from the addresses to which they were deposited by customers means that any legal interest in those Digital Assets on the part of 3AC was extinguished (typically upon such sweeping occurring) or to have never arisen.

   c. For the reasons explained in Sections VI(2)(d) and VII of the Plan Declaration, it follows that, if as of the end of the day on June 12, 2022 none of the Deposit Addresses associated with 3AC's customer account held any Digital Assets, then 3AC was not a quasi-bailor of any Digital Assets and accordingly could not have held any legal proprietary interest in them as a quasi-bailor.

   d. I have reviewed the *Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd* (**Proof of Claim**) and note that it relies upon certain statements made by Can Sun.[2] Under English law, such statements of the parties' subjective understanding of a contract are not relevant or admissible evidence of a contract's interpretation or effect, and therefore cannot be taken into account when interpreting a contract, as noted in ¶19.1 (and more broadly Section IV(2) of the Plan Declaration). The same is true in relation to the determination of whether a trust is intended, as noted in ¶35.5(b)[3] (and more broadly Section VI(1)(c) of the Plan Declaration). Thus, the statements made by Can Sun that are referenced in the

---

[2] Proof of Claim ¶24.

[3] For completeness I note that I have addressed the principles that apply to determining whether a separate declaration of trust has been made in ¶36.

Proof of Claim do not impact or change my conclusions as stated in the Plan Declaration or stated above in this Declaration.

## III. APPLICATION TO PERPETUAL FUTURES CONTRACTS

12. I am instructed that, as of the end of the day on June 12, 2022, 3AC also held Perpetual Futures Contracts. Perpetual Futures Contracts are defined in Schedule 5 of the Dotcom Terms as representing obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Schedule 5 further provides that Perpetual Futures Contracts do not have an expiry date but instead continuously roll over, i.e. every hour.

13. As a matter of principle, a trust may be declared in respect of the benefit of a contract.[4] However, as explained in Section VI(1)(a)(1) of the Plan Declaration, a trust will only be found to exist in a particular case if there is a sufficiently certain expressed intention to create a trust.

14. In my view, given the very powerful indications to that effect in the Dotcom Terms, it is clear that the parties did not intend a trustee-beneficiary relationship in respect of Perpetual Futures Contracts:

    a. As explained in ¶45.1, ¶45.6 and ¶46, sections 2.1.3 and 38.6 of the Dotcom Terms contain express statements that no fiduciary relationship was intended.

    b. As explained in ¶45.5 and ¶83.6, section 9.2 of the Dotcom Terms, which provides that FTX Trading or an Affiliate will hold Unclaimed or Abandoned Property on behalf of a customer in certain circumstances, would be regarded as a reasonably strong indication that a trustee-beneficiary relationship was not intended in other circumstances.

---

[4] *Lewin on Trusts* (20th edn) at [2-034] ("*A trust may be declared in respect of the benefit of a contract, both the benefit of being a contracting party and the fruits of the contract, even though the contract is not assignable at law, unless the terms of the contract contain a provision prohibiting a declaration of trust as well as assignment.*")

    c. The Plan Declaration addressed the relevance of section 9.2 of the Dotcom Terms in connection with Digital Assets, fiat currency and E-Money. In relation to Perpetual Futures Contracts, section 9.2 provides what is at least as powerful an indication that a trustee-beneficiary relationship was not intended in respect of the benefits of these contracts because section 9.2 does not apply to Perpetual Futures Contracts.[5] In other words, even though the parties may have intended for a trustee-beneficiary relationship in narrowly defined and exceptional circumstances with respect to Digital Assets, they did not extend that intention to Perpetual Futures Contracts.

15. In my view, as a matter of law, a bailment or quasi-bailment relationship is not possible in respect of the benefits of Perpetual Futures Contracts. As explained in ¶53, under English law the concept of "bailment" can only exist in relation to tangible goods that can be possessed. And though I consider that the concept of bailment can logically be extended to Digital Assets, which are a form of property,[6] I do not consider that it can extend to contractual rights, which is the correct characterisation of 3AC's interests under the Perpetual Futures Contracts.

## IV. EARLIER TERMS

16. My opinion as to the applicability, meaning and effect of the Earlier Terms is set out in Section IX of the Plan Declaration.

17. 3AC's Proof of Claim (at ¶26) relies in particular on articles 22 and 34 of the Earlier Terms. I have addressed article 22 in ¶¶97-98. Article 34 relates to unclaimed or abandoned funds and, apart from the fact that it applies only to funds rather than Digital Assets, is in similar terms to section 9.1 of the Dotcom Terms. However, article 34 does not contain a term similar to that in section 9.2 of the Dotcom Terms, which does create a trustee-beneficiary

---

[5] Section 9.2 applies to Unclaimed or Abandoned Property, a term defined in section 9.1 to be "*Assets in your Account*". "*Assets*", in turn, is defined as Digital Assets, fiat currency and E-Money.

[6] Plan Declaration, Section V.

relationship in specific circumstances. Article 34 of the Earlier Terms, therefore, is even more unhelpful than section 9.2 of the Dotcom Terms to an argument that there is a trust.

18. Article 34 of the Earlier Terms cannot create a relationship of quasi-bailment, because it relates to funds in a customer's Account, and thus cannot create a quasi-bailment relationship for the reasons explained in ¶81.

## V. THE OCTOBER 2021 LSA, MARCH 2022 LOC AND MARGIN AGREEMENT

19. I have been provided with copies of (a) a Loan and Security Agreement dated 22 October 2021 (the **October 2021 LSA**) and (b) a single document containing a Line of Credit Agreement dated 30 March 2022 (the **March 2022 LOC**) and a Margin and Line of Credit Agreement (the **Margin Agreement**).

20. The October 2021 LSA is governed by the laws of Hong Kong (section 11.12) and the March 2022 LOC and Margin Agreement are both governed by the laws of Antigua and Barbuda (respectively, clauses 10 and 12(a)). As explained in ¶7 I sit on a part-time basis as an appeal Judge in the top court of Hong Kong, and so far as the relevant contractual and commercial law is concerned, Hong Kong law is effectively identical to English law. The same is true for the laws of Antigua and Barbuda, as explained in ¶94.

21. As explained in ¶18.1, in interpreting a contract the court will identify the objective intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties to mean by the language used in the contract. As a matter of general principle that background knowledge could include the terms of previous contracts between the same parties.

22. In my view, however, the terms of the October 2021 LSA, the March 2022 LOC and the Margin Agreement are not admissible background to the interpretation of the Dotcom Terms. In circumstances where a contract (such as the Dotcom Terms) is effectively open to anyone to execute, the admissible background does not extend to information which only one party, or only some parties, who signed such a document would or could

reasonably have known.[7] Because the terms of the October 2021 LSA, the March 2022 LOC and the Margin Agreement could not have been expected to be reasonably known to all customers, they are not relevant to the construction of the Dotcom Terms.

23. As regards the Earlier Terms, the terms of the October 2021 LSA, the March 2022 LOC and the Margin Agreement are not admissible background to their interpretation because they had not been executed before the Earlier Terms came into force, which I am told was in 2019 and 2020.

24. But, even if the terms of these agreements were admissible background, they would not override or supplant the clear meaning of the Dotcom Terms or the Earlier Terms with respect to matters addressed therein. That follows from the fact that, as explained in ¶18.4, the meaning objectively intended by the parties is, save perhaps in a very unusual case, most obviously to be gleaned from the language they have used. That proposition applies with even greater force to the Dotcom Terms, which contain their own provisions regarding collateral (section 8.1.3) and the seizure and/or liquidation of Assets (section 16.2), and (above all), in section 38.1.1, provides that the Dotcom Terms "*constitute the entire agreement between you and FTX Trading with respect to the use of the Services*". Article 36 of the Earlier Terms similarly provides that the Earlier Terms (including various FTX Trading policies referenced in the Earlier Terms) "*constitute the entire agreement between you and FTX Trading with respect to the use of the Services*".

25. For the reasons explained in the Plan Declaration and above, in my view the meaning of the Dotcom Terms is clear and those terms constituted the entire agreement between 3AC and FTX Trading with respect to the use of the Services. The same is true of the Earlier Terms, to the extent that those applied once the Dotcom Terms were "*posted*": see ¶¶99-102. In those circumstances, the terms of the October 2021 LSA, the March 2022 LOC and the Margin Agreement would anyway not be relevant to the interpretation of the Dotcom Terms or the Earlier Terms.

---

[7] *Attorney General of Belize v Belize Telecom* [2009] UKPC 10, [2009] 1 WLR 1988 at [37] and *Re Sigma Finance* [2009] UKSC 2, [2010] 1 All ER 571 at [36]-[37].

26. In any event, even if the terms of the October 2021 LSA, the March 2022 LOC and the Margin Agreement were admissible background and potentially relevant to the interpretation of the Dotcom Terms or the Earlier Terms, none of those terms justify concluding that 3AC's assets were held on trust by FTX Trading or that 3AC retained legal title to assets.

27. As regards the October 2021 LSA, section 4.1 grants FTX Trading a continuing and unconditional first priority security interest in all of 3AC's present and future rights, title and interest in a long list of things, defined collectively as the "Collateral", set out in sections 4.1(a) to (f). These include all of 3AC's "*digital asset depository and exchange accounts at each Depository*[8]" (section 4.1(a)), along with any cryptocurrency "*now or in the future*" held or issued and "*all Receivables, Equipment, Fixtures, General Intangibles (including without limitation Intellectual Property […]) whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, [3AC] and wherever located, and any of [3AC's] property in the possession or under the control of [FTX Trading]*", among other things.

28. It is apparent that section 4.1 of the October 2021 LSA is drafted in very broad terms and is intended to capture anything of value that 3AC might now or in the future hold. It is therefore of little assistance in determining what assets 3AC in fact held as of the end of the day on June 12, 2022 pursuant to the Dotcom Terms (or any other agreement). Section 4.1(a) is therefore not in any way inconsistent with my opinion as to the effect of the Dotcom Terms.[9]

---

[8] Depository is defined as the Exchange and any other exchange or otc desks used by 3AC. Exchange is defined as the FTX digital asset trading platform.

[9] For completeness I note that under section 6.2 of the October 2021 LSA 3AC represented and warranted that it was the sole legal and equitable owner of the Collateral. This does not change my view. This language is relatively formulaic and even on its face cannot have been true because the Collateral was defined to extend to property not yet owned by 3AC, and in some cases even to property not yet in existence.

29. The terms of the March 2022 LOC and the Margin Agreement similarly could not cause me to change my view.

30. Clause 5 of the March 2022 LOC requires 3AC to maintain Collateral at an amount at least 200% of the Line of Credit in its customer Account. Clause 3 of the Margin Agreement provides that all assets in all of 3AC's FTX accounts, defined as the "Secured Assets", are collateral for the Indebtedness, a term defined in the recital and clause 7 to include discretionary line of credit facilities. Pursuant to that clause 3, 3AC pledges and grants a continuing lien on and security interest in the Secured Assets as continuing security for the Indebtedness. Accordingly, insofar as the assets associated with 3AC's customer Account are concerned, it appears to me that the combined effect of these clauses is broadly similar to section 4.1 of the October 2021 LSA. Thus, the March 2022 LOC has no impact on the view I expressed in the Plan Declaration or above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in London, UK on 19th June, 2025

*[signature]*

The Rt. Hon. Lord Neuberger of Abbotsbury