# Exhibit D

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made and dated as of 22 October, 2021 and is entered into by and between Three Arrows Capital Ltd a limited company registered in BVI having its registered address at ABM Chambers 2283, Road Town, Tortola, BVI VG1110 ("**Borrower**"), and FTX Trading Limited ("**Lender**").

## RECITALS

WHEREAS, Borrower has requested that Lender make available to Borrower a line of credit (the "**Line of Credit**") pursuant to which Lender may make Advances denominated in USD, USDT, USDC, BTC or ETH to Borrower;

WHEREAS, Lender is willing to make the Advances on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained in this Agreement, Borrower and Lender agree as follows:

### SECTION 1.    DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Unless otherwise defined herein, the following capitalized terms have the following meanings:

"**Advance(s)**" means any loan advanced by Lender to Borrower pursuant to the Line of Credit under this Agreement.

"**Advance Date**" means the date on which an Advance is funded to Borrower hereunder.

"**Advance Request**" means a written request for an Advance submitted by Borrower to Lender as provided for in Section 2.1(b), using the form attached as Exhibit A, together with any additional documents or information requested by Lender.

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and under "common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Bankruptcy Laws**" means, collectively, all liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor-relief laws of applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**BTC**" means the cryptocurrency Bitcoin.

"**Business Day**" means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in Hong Kong.

"**Change in Control**" means (a) at any time, any "person" or "group", shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner", directly or indirectly, of forty-nine percent (49.0%) or more of the ordinary voting power for the election of directors of Borrower (determined on a fully diluted basis).

"**Closing Date**" means the date of this Agreement.

"**Collateral**" means the property described in Section 4.

"**Copyrights**" means all copyrights, whether registered or unregistered and published or unpublished, including copyrights in software, internet web sites, databases and the content thereof, held pursuant to the laws of any country.

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived hereunder, become an Event of Default.

"**Depository**" means the Exchange and any other exchange or otc desks used by the Borrower.

"**End Date**" means the earlier to occur of: (i) the Maturity Date; or (ii) any other date on which the Outstanding Balance becomes due and payable in full under the terms of this Agreement.

"**ETH**" means the cryptocurrency Ether.

"**Event of Default**" has the meaning set forth in Section 9.

"**Exchange**" means the FTX digital asset trading platform.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Insolvency Proceeding**" is any case by or against any Person under any proceeding under bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Indemnified Person**" means has the meaning set forth in Section 7.1.

"**Intellectual Property**" means all of Borrower's (i) rights anywhere in the world in and to Copyrights; Trademarks; Patents; trade secrets, confidential and proprietary information, including know-how, manufacturing and production processes and techniques, research and

2

development information, databases and data, customer and supplier lists and information; inventions; mask works; domain names; all other intellectual and industrial property rights of any type; and the rights to sue for past, present and future infringement, misappropriation or other violation of any of the foregoing and any harm to the goodwill associated therewith, and (ii) all tangible embodiments of the foregoing.

"**Laws**" means any federal, state, local and foreign statute, law, treaty, judicial decision, regulation, guidance, guideline, ordinance, rule, judgment, order, decree, code, injunction, permit, concession, grant, franchise, governmental (or quasi-governmental) agreement, governmental (or quasi-governmental) restriction or determination of an arbitrator, court or other Governmental Authority (whether or not having the force of law), whether now or hereafter in effect.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Loan Documents**" means this Agreement, the Security Documents, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"**Material Adverse Effect**" means a material adverse effect upon: (i) the business, operations, properties, assets, prospects or condition (financial or otherwise) of Borrower; or (ii) the ability of Borrower to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Lender's Liens on the Collateral or the priority of such Liens.

"**Maturity Date**" means two years from the date of this Agreement; provided however, that the Maturity Date shall automatically be extended for additional consecutive one-year periods thereafter unless Lender provides notice of termination at least sixty (60) days prior to the applicable Maturity Date.

"**Outstanding Balance**" means, at the applicable time, the sum of (i) the then unpaid principal amount of all Advances, plus (ii) all then accrued but unpaid interest on all Advances, plus (iii) all other amounts then payable under this Agreement.

"**Patents**" means all letters patent of, or rights corresponding thereto, in any country, all applications (including provisional, continuation (in-whole or in-part), and divisional applications) of the foregoing and any other pre-grant variations thereof, and all reissues, reexaminations, renewals, extensions and other post-grant variations thereof in any country.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"**Secured Obligations**" means all of Borrower's obligations and liabilities under each Loan Document, including any obligation to pay any amount whether arising by reason of an

3

extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Security Documents**" means each of this Agreement, all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, control agreements, financing statements and other documents as shall from time to time secure or relate to the Secured Obligations or any other obligation arising under any Loan Document or any part thereof, in each case, authenticated, or executed by Borrower.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Total Line of Credit Commitment**" means the obligation of Lender to make Advances to Borrower on or after the Closing Date in an aggregate principal amount not to exceed USD 100M USD.

"**Trademarks**" means all trademarks, service marks, domain names, trade names, business names, corporate names, trade dress, logos, designs, slogans, or other indicia of source or origin, whether registered, common law or otherwise, and any applications, recordings, renewals and other post-grant variations of any of the foregoing in any country or any political subdivision thereof, together, in each case, with the goodwill associated therewith or symbolized thereby.

"**USD**" means U.S. dollars.

"**USDC**" means the cryptocurrency USD Coin.

"**USDT**" means the cryptocurrency Tether.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC.

## SECTION 2.    THE LOANS

### 2.1    Advances, Interest and Payment.

(a)    Advances. Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth herein, Lender agrees to make Advances denominated in USD, USDC, USDT, BTC or ETH from time to time before the End Date in an aggregate principal amount not to exceed the Total Line of Credit Commitment.  Amounts borrowed under this Section 2.1(a) and repaid or prepaid as permitted hereunder may, subject to the terms and conditions of this Agreement, be reborrowed until but not after the End Date. c

4

(b)    Advance Request.  To obtain an Advance, Borrower shall send by email or text an Advance Request specifying: (i) the amount of collateral to be deposited and maintained in Borrower's Exchange account held under the email address operations@threearrowscap.com (the "**Account Assets**"), provided that the value of such specified Account Assets may never be less than 150% of the value of the related Advance requested; (ii) the amount of the Advance requested; (iii) whether such Advance will be denominated in USD, USDC, USDT, BTC or ETH; and (iv) the proposed Advance Date. In the event that the Lender accepts such Advance Request, Borrower shall deposit the requisite Account Assets into the Borrower's Exchange account (the "**Borrower Account**"). Upon receipt of the requisite Account Assets by Lender during regular business hours on any Business Day, Lender shall use commercially reasonable efforts to deposit the Advance set out in the Advance Request to the Borrower Account within two hours.

(c)    Hard Margin Call. Should the value of the Account Assets fall below the Hard Margin Call (as set forth in the applicable Advance Request, such Hard Margin Call to be, in any event no less than 125% of the value of digital assets loaned to the Borrower (as applicable, the "**Hard Call Requirement**") at any time, the Lender shall provide written notice to the Borrower of such Hard Margin Call and Borrower shall have two hours from the time of receipt of such notice to either (a) deposit additional collateral to the Borrower Account, or (b) close certain trading positions in the Borrower Account, in each case to restore the value of the Account Assets to greater than the Hard Call Requirement. If the value of the Account Assets is not restored to greater than the Hard Call Requirement within such two-hour period, or if the Lender determines that it would be detrimental for Lender to wait for such two-hour period to conclude (as determined in its sole and absolute discretion), Lender shall have the right to liquidate the Account Assets and all other assets held by the Borrower on the Exchange, including within the Borrower Account, and shall be fully entitled to all proceeds, property, or amounts received on such liquidation. In addition, the Lender may terminate this Agreement immediately without prior notice and close all accounts held by the Borrower on the Exchange.

(d)    Determining Value: The value of the Account Assets and the Hard Margin Call shall be determined by the Lender in its sole and absolute discretion.

(e)    Interest.  The principal balance of each Advance shall bear interest thereon at a rate equal to three percent 8%  per annum from and including the Advance Date through and including the date the Outstanding Balance is paid in full, and shall be calculated on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days each and the actual number of days elapsed.  If at any time and for any reason whatsoever, the interest rate payable on any Advance shall exceed the maximum rate of interest permitted to be charged by Lender to Borrower under applicable law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable law.  Any amount added to principal pursuant to this Agreement or any Loan Document shall bear interest at the rate specified herein and shall be payable with such interest upon demand by Lender and absent such demand, as otherwise provided herein

5

    FTX_3AC_000000079

(f)    Payment.  Accrued interest on each Advance shall be due and payable in full in arrears monthly on the last day of each month.  The entire Outstanding Balance of all Advances shall be due and payable on the End Date.  Borrower shall make all payments under this Agreement with respect to each Advance in the denomination of such Advance without setoff, recoupment or deduction and regardless of any counterclaim or defense.

2.2    Voluntary Prepayment; Mandatory Prepayments.  The Outstanding Balance may be prepaid in whole or in part without penalty or premium at any time before the Maturity Date.  Prepayments shall be applied first to outstanding fees and expenses (if any), second to accrued and unpaid interest, and then third to the outstanding principal of all Advances.  Borrower shall prepay in full the Outstanding Balance prior to or concurrently with (i) the occurrence of a Change in Control or (ii) termination of this Agreement.

2.3    Late Payments.  To the extent permitted under applicable law, Borrower agrees that if any payment pursuant to Section 2 is not made within three days of the due date, (a) Borrower will be charged a late charge of ten percent per annum of the amount of the past due payment, calculated from and including the date such payment was due through and including the date such payment is made and (b) Lender may liquidate a portion of the Collateral in an amount equal to any late payment and corresponding late charge.

2.4    Right to Terminate.  Borrower may terminate this Agreement at any time upon five (5) Business Days advance notice to Lender and repayment in full of the Outstanding Balance.  Except as provided in Section 2.1(c), Lender may terminate this Agreement at any time after the Maturity Date, upon six (6) months advance notice to Borrower.

## SECTION 3.  SUBORDINATION

3.1    Any indebtedness incurred by Borrower following the date of this Agreement shall be subordinated to the Secured Obligations, unless otherwise consented to by Lender in writing, such consent to not be unreasonably withheld. In the event that Lender consents to subordinate the Secured Obligations to future indebtedness, Lender agrees to execute a form of subordination agreement, as may be requested by any future lender to the Borrower from time time, to effect the foregoing subordination.

## SECTION 4.  SECURITY INTEREST

4.1    Grant.  As security for the prompt and complete payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, Borrower hereby pledges, assigns, transfers and delivers to Lender, and grants to Lender a continuing and unconditional first priority security interest in all of Borrower's present and future rights, title and interest in the following (collectively referred to as the "**Collateral**"):

6

(a)    all of Borrower's digital asset depository and exchange accounts at each Depository, including, without limitation, the Exchange and each other cryptocurrency exchange used by Borrower (such accounts and any other accounts to which Lender may transfer the Collateral, collectively, the "**Depository Accounts**");

(b)    all cryptocurrency now or in the future held in, on deposit in or otherwise allocated to any of Borrower's digital asset depository accounts at any Depository, including, without limitation, the Depository Accounts (including, without limitation, any cryptocurrency transferred to any such digital asset depository account after the date hereof);

(c)    any other cryptocurrency now or in the future issued with respect to any of the foregoing cryptocurrency as a result of a fork or other event that results in the holders of cryptocurrency receiving additional or replacement cryptocurrency (whether or not such other cryptocurrency is held in, on deposit in or otherwise allocated to the Depository Accounts or any other digital asset depository accounts at any Depository);

(d)    all rights to receive delivery of or withdraw any of the foregoing cryptocurrency from each Depository and all rights against each Depository with respect to any digital asset depository accounts at such Depository, including, without limitation, the Depository Accounts, any of the foregoing cryptocurrency, and the proceeds thereof;

(e)    all Receivables, Equipment, Fixtures, General Intangibles (including without limitation all Intellectual Property), Inventory, Investment Property, Deposit Accounts, Security Accounts, Cash, Cash Equivalents, Goods, and all other tangible and intangible personal property of Borrower whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located, and any of Borrower's property in the possession or under the control of Lender; and

(f)    to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

4.2    Borrower hereby:

(a)    agrees that such security interest granted by Borrower to Lender constitutes a valid, first priority security interest in the Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any termination of this Agreement, Lender's security interest in the Collateral shall remain in effect for so long as any Secured Obligations (other than inchoate indemnity obligations) remains outstanding under this Agreement or any of the Loan Documents.

(b)    agrees that Lender has the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

(c)    authorizes Lender at any time and from time to time, at Borrower's expense, to file in any jurisdiction any financing statements and amendments that: (i) name the Collateral as collateral thereunder, regardless of whether any particular Collateral falls

7

within the scope of the UCC; (ii) contain any other information required by the UCC for sufficiency or filing office acceptance, including organization identification numbers; and (iii) contain such language as Lender determines helpful in protecting or preserving rights against third parties. Borrower ratifies any such filings made prior to the date hereof.

(d)    acknowledges and agrees that the obligations of Borrower under this Agreement shall be full recourse obligations of Borrower and that Borrower is and shall remain liable to Lender for the payment in full of all Secured Obligations (other than inchoate indemnity obligations) and performance of all obligations hereunder.

## SECTION 5.   CONDITIONS PRECEDENT TO LOAN

Lender's obligation to make Advances under this Agreement shall be subject to the satisfaction of all of the conditions set forth in this Agreement and the Loan Documents, including, without limitation, the following specific conditions precedent:

5.1    <u>Conditions to the Initial Advance</u>.  It shall be a condition to Lender's obligation to fund an initial Advance, that on or prior to the Closing Date:

(a)    Borrower shall have delivered to Lender the following, each in form and substance acceptable to Lender:

(i)    copies of the Loan Documents, executed by Borrower;

(ii)    certified copy of resolutions of Borrower's Board of Directors, Managers or other similar body, and if required, Borrower's shareholders or members evidencing approval of the transactions evidenced by the Loan Documents;

(iii)    certified copies of Borrower's organizational documents, as amended through the Closing Date;

(iv)    a certificate of good standing for Borrower from its jurisdiction of formation; and

(b)    upon the filing of security documents, including a UCC-1 financing statement and the obtaining of control agreements from the Exchange, the Security Documents will create upon the Closing a first priority security interest in all of the Collateral;

5.2    <u>Conditions to All Advances</u>.  It shall be a condition to Lender's obligation to fund each Advance that:

(a)    Lender shall have received an Advance Request executed by an officer of Borrower requesting an Advance prior to the End Date pursuant to Section 2.1(b).

(b)    (i) no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default and (ii) no event that has had

8

or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing;

(c)    As of each Advance Date, the representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or, if already qualified by "materiality," "Material Adverse Effect" or similar phrases, in all respects (after giving effect to such qualification)); provided, that in the case of any representation or warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be;

(d)    Lender shall have received such other documents as Lender may reasonably request, including a certificate executed by a duly authorized officer of Borrower certifying compliance with the provisions of Sections 5.2(b) through (c) as of such Advance Date.

## SECTION 6.    REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to enter into this Agreement and to make the Advances, Borrower represents and warrants to Lender that, as of the date hereof and as of each Advance Date:

6.1    <u>Corporate Status; Compliance with Law</u>.    Borrower: (a) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation; (b) is duly qualified to conduct business and is in good standing in all jurisdictions in which the nature of its business or its ownership or lease of properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect; and (c) has the requisite power and authority to conduct its business as now and proposed to be conducted and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties.

6.2    <u>Collateral</u>.    Except for the security interest in the Collateral granted by Borrower to Lender under this Agreement, Borrower is the sole, legal and equitable owner of the Collateral and no other security agreement, financing statement, or other security instrument covering the Collateral exists.  Borrower has rights in or the power to transfer the Collateral, and its title to the Collateral is free and clear of Liens, adverse claims, and restrictions on transfer or pledge, other than those created by this Agreement or the Loan Documents.

6.3    <u>Organizational Power, Authorization, Enforceable Obligations, Consents</u>.  The execution, delivery and performance of this Agreement and all other Loan Documents by Borrower: (a) are Borrower's legal power and do not contravene any provision of Borrower's organizational documents; (b) have been duly authorized by all necessary or proper action of Borrower; and (c) will not result in the creation or imposition of any Lien upon the Collateral, other than the Liens created by the Loan Documents.  The Loan Documents, when executed and delivered by Borrower, shall constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with their terms except as

9

limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

6.4    <u>Actions Before Governmental Authorities</u>.  There are no actions, investigations, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Borrower, threatened against or affecting Borrower or its property, before any Governmental Authority or before any arbitrator or panel of arbitrators.

6.5    <u>Laws</u>.  Borrower is not in violation of any Law, or in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority.  Borrower has conducted its business in compliance with applicable anti-corruption, anti-bribery, anti-money laundering, sanctions and/or anti-terrorism Laws.

6.6    <u>Tax Matters</u>.  Borrower has (a) filed all federal, state and material local Tax returns that are required to be filed, and (b) duly paid or fully reserved for all Taxes or installments thereof as and when due, which have or may become due pursuant to such returns other than those being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

6.7    <u>Margin Stock; Use of Proceeds</u>.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Advances will be used to extend credit to others for the purpose of purchasing or carrying any margin stock.  Borrower will use the proceeds of the Advances solely for lawful purposes.

## SECTION 7.  INDEMNITY

7.1    <u>Indemnity</u>.  Borrower agrees to indemnify and hold Lender and its officers, directors, employees, agents, in-house attorneys, representatives and shareholders (each, an "**Indemnified Person**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal) (collectively, "**Liabilities**"), that may be instituted or asserted against or incurred by such Indemnified Person arising out of, in connection with, or as a result of (a) the execution and delivery of this Agreement and the Loan Documents, (b) credit having been extended, suspended or terminated under this Agreement and the other Loan Documents, (c) the administration of such credit, (d) the use of proceeds of the Advances, (e) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by Borrower or any of their

CONFIDENTIAL TREATMENT REQUESTED BY FTX                                    FTX_3AC_000000084

respective Affiliates), (f) the occurrence of any Event of Default and the disposition or utilization of the Collateral, (g) any factual information produced by Borrower and provided to Lender in connection with the transactions contemplated or financed under any Loan Document being or being alleged to be misleading and/or deceptive in any respect, (h) any inquiry, investigation, subpoena (or similar order) or litigation with respect to the transactions contemplated or financed under this Agreement; and (i) a failure by borrower to pay any amount due under a Loan Document on its due date, excluding, in the case of the foregoing clauses (a) through (e), Liabilities to the extent resulting solely from any Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment. Borrower agree to pay, and to save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes (excluding taxes imposed on or measured by the net income of Lender) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement. In no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).

## SECTION 8.   COVENANTS OF BORROWER

As long as any Secured Obligations (other than inchoate indemnity obligations) are outstanding or Lender has any obligation to make Advances, Borrower agrees as follows:

8.1    Collateral; Liens Generally.   Borrower shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever, and shall give Lender prompt written notice of any legal process affecting the Collateral or any Liens. Borrower will not sell, dispose or otherwise transfer the Collateral or any interest in the Collateral without the prior written consent from Lender.

8.2    Mergers or Acquisitions.  Borrower shall not merge or consolidate with or into any other business organization without the prior written consent of Lender.

8.3    Taxes.  Borrower shall pay when due all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against (a) Lender and related to, or in connection with, any of the transactions contemplated hereby or by other Loan Documents (other than taxes imposed on or measured by the net income of Lender), subject to reasonable notification thereof by Lender, and (b) Borrower or the Collateral or upon Borrower's ownership, possession, use, operation or disposition thereof or upon Borrower's rents, receipts or earnings arising therefrom.

8.4    Corporate Changes; Maintenance and Conduct of Business; Capital Structure.  Borrower shall not change its corporate name, legal form or jurisdiction of formation or principal place of business without at least 30 days' prior written notice to Lender.

11

FTX_3AC_000000085

8.5     <u>Notification of Default or Event of Default</u>.  Borrower shall notify Lender immediately in writing via email and by telephone pursuant to <u>Section 11.3</u> after Borrower acquires knowledge of any breach or Default in the performance of any covenant or Secured Obligation under this Agreement, any Loan Document or any other agreement between Borrower and Lender, or the occurrence of any Event of Default.

8.6     <u>Books and Records</u>.  Borrower shall keep adequate books and records with respect to its material business activities.

8.7     <u>Compliance with Laws and Organizational Documents; Maintenance of Licenses</u>.  Without limiting any other provision of this Agreement, Borrower shall comply in all material respects with all Laws applicable to it and the terms of all organizational documents applicable to it.  Borrower shall obtain and maintain all material licenses, permits, certifications, consents and governmental authorizations and approvals necessary to own its property and to conduct its business as conducted on the Closing Date.

8.8     <u>Financing Statements</u>.  Upon Lender's request, Borrower will execute any financing statement or other document necessary to perfect or otherwise record Lender's security interest in the Collateral.

## SECTION 9.   EVENTS OF DEFAULT

Any one or more of the following events shall be an "**Event of Default**":

9.1     <u>Payments</u>.  Borrower fails to pay any amount due under this Agreement or any of the other Loan Documents when whether scheduled, upon acceleration or otherwise; or

9.2     <u>Hard Margin Call</u>. The amount held in the Borrower Account falls to below the Hard Margin Call Requirement; or

9.3     <u>Covenants</u>.  Borrower breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement, or any of the other Loan Documents or any other agreement between Borrower and Lender, and such default continues for more than three Business Days; or

9.4     <u>Representations</u>.  Any representation or warranty made by Borrower in any Loan Document or other statement (financial or otherwise) furnished by or on behalf of Borrower to Lender shall have been false, incorrect, incomplete or misleading in any material respect when made or furnished; or

9.5     <u>Voluntary Bankruptcy or Insolvency Proceedings</u>.  Borrower shall (a) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) admit in writing its inability to pay its debts generally as they mature, (c) make a general assignment for the benefit of its creditors, (d) be dissolved or liquidated, (e) commence a

12

CONFIDENTIAL TREATMENT REQUESTED BY FTX                                                     FTX_3AC_000000086

voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any Bankruptcy Law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (f) take any action for the purpose of effecting any of the foregoing; or

9.6     <u>Involuntary Bankruptcy or Insolvency Proceedings</u>.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or the debts thereof under any Bankruptcy Law now or hereafter in effect shall be commenced; or

9.7     <u>Attachments; Judgments</u>.   Any portion of Borrower's assets are attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money against Borrower, or Borrower is enjoined or in any way prevented by court order from conducting any part of its business; or

9.8     <u>Other Obligations</u>.  The occurrence of any default or breach under any agreement or obligation of Borrower (a) involving any indebtedness in excess of $100,00, or (b) receipt of written notice of the occurrence of any default or breach under any other agreement or obligation of Borrower with annual payments or receipts in excess of $100,000 which, in the case of such default or breach, is not cured within any applicable grace or cure period; or

9.9     <u>Foreclosure Proceedings</u>.   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Advances.

9.10    <u>Change in Control</u>.   The occurrence of any Change in Control without the prior written approval of Lender; or

9.11    <u>Material Adverse Effect</u>.  Any event occurs that has had or could reasonably be expected to have a Material Adverse Effect; or

9.12    <u>Cessation of Business</u>.  Borrower ceases to operate its business as a going concern or Borrower's board of directors, managers, stockholders or members elect to dissolve and wind up Borrower's affairs; or

9.13    <u>Change in Law</u>.  A change or material development in applicable law (including case law) or regulation makes the Advances unlawful, unless grandfathered.

13

## SECTION 10.        REMEDIES

10.1    <u>General</u>.  Upon and during the continuance of any one or more Events of Default, (a) Lender may, at its option, accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in <u>Section 9.4</u> or <u>Section 9.5</u>, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act), (b) Lender may, at its option, sign and file in Borrower's name any and all collateral assignments, notices, control agreements, security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and (c) each Depository is hereby authorized by Borrower to pay, and Borrower directs such Depository to pay, any amounts owed under this Agreement directly to Lender; and in furtherance thereof, Borrower hereby grants Lender an irrevocable power of attorney coupled with an interest. Lender may exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under applicable Law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral.  Without limiting the generality of the foregoing, Borrower expressly agrees that in any such default Lender may take immediate and exclusive possession of the Collateral and that Lender may liquidate the Collateral in whole or in part, at its sole discretion.  All of Lender's rights and remedies shall be cumulative and not exclusive. Borrower waives presentment, demand, protest or other notice of any kind.

10.2    <u>Collection; Foreclosure</u>.  Subject to the limitations set forth in <u>Section 3</u> (if any), upon the occurrence and during the continuance of any Event of Default, Lender may apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Lender may elect.  Any such sale may be made either at public or private sale at its place of business or elsewhere.  Borrower agree that any such public or private sale may occur upon ten calendar days' prior written notice to Borrower.  Lender may require Borrower to assemble the Collateral and make it available to Lender at a place designated by Lender that is reasonably convenient to Lender and Borrower.  The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by Lender in the following order of priorities:

(a)    First, to Lender for any reasonable costs, fees, or expenses incurred in connection with the sale or disposition of the Collateral, including any legal, accounting or other fees incurred;

(b)    Second, to Lender in an amount equal to the then unpaid amount of the Secured Obligations, in such order and priority as Lender may choose in its sole discretion; and

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_3AC_000000088

(c)     Finally, after the full, and final payment of all of the Secured Obligations, to any creditor holding a junior Lien on the Collateral, or to Borrower or its representatives or as a court of competent jurisdiction may direct.

Lender shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

10.3     <u>Waiver</u>.  Lender shall be under no obligation to marshal any of the Collateral for the benefit of Borrower or any other Person, and Borrower expressly waives all rights, if any, to Lender to marshal any Collateral.

10.4     <u>Cumulative Remedies</u>.  The rights, powers and remedies of Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of Lender.

## SECTION 11.          MISCELLANEOUS

11.1     <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.2     <u>Usury Savings Clause</u>. Lender and Borrower intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money or interest in excess of the maximum amount of interest (including all charges and fees) permitted to be charged by applicable law, from time to time.

11.3     <u>Notice</u>.     Any notice, demand, request, consent, approval, declaration, service of process or other communication that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received when sent to the email address set forth below such party's name on the execution page of this Agreement or to such other email address as each party may designate for itself by like notice.

11.4     <u>Lender Appointed Attorney-In-Fact</u>.  Borrower hereby appoints Lender Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time during the continuance of an Event of Default to take any action and to execute any instrument that Lender may deem necessary or advisable to accomplish the purposes of this Agreement (but Lender shall not be obligated to and shall have no liability to

15

DocuSign Envelope ID: 9F9F6709-3652-4D39-BA4E-0BF464238F3B

Borrower or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. Borrower hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

11.5    Security Interest Absolute. To the extent permitted by law, Borrower hereby waives demand, notice, protest, notice of acceptance of this Agreement, Collateral received or delivered and all other demands and notices of any description. To the extent permitted by law, all rights of Lender and liens and security interests hereunder, and all Secured Obligations of Borrower hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligations or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any amendment or other modification of this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, willful or otherwise, in the payment of the Secured Obligations;

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Advances or any existence of or reliance on any representation by Lender that might vary the risk of Borrower or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any guarantor or surety.

11.6    Survival of Representations and Warranties. Borrower understands and agrees that in making the Advances, Lender is relying on all representations, warranties and covenants made by Borrower in this Agreement, the Loan Documents and in any certificate or other instrument delivered by Borrower to Lender under this Agreement. Such Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the execution of this Agreement and the funding of the advance, shall be continuing in nature, and shall remain in full force and effect until such time as all of Borrower's obligations under this Agreement shall be fully satisfied, or until

16

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_3AC_000000090

this Agreement shall be terminated in the manner provided herein, whichever is the last to occur.

   11.7 <u>Termination</u>. This Agreement shall terminate upon the payment in full of all Secured Obligations and performance of all obligations hereunder. At such time, Lender's sole obligations shall be, (a) to the extent Lender has taken control of any Collateral, to direct each Depository to transfer such Collateral in the Depository Accounts to Borrower, at a wallet address provided by Borrower to Lender, and (b) to authorize Borrower to terminate any UCC financing statements filed by Lender against Borrower with respect to the Collateral.

   11.8 <u>Entire Agreement; Amendments</u>.

  (a) This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

  (b) No amendment or waiver of, or supplement or other modification to, any Loan Document or any provision thereof, shall be effective unless the same shall be in writing and signed by Borrower and Lender, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

   11.9 <u>No Waiver</u>. The powers conferred upon Lender by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers. No omission or delay by Lender at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by Borrower at any time designated, shall be a waiver of any such right or remedy to which Lender is entitled, nor shall it in any way affect the right of Lender to enforce such provisions thereafter.

   11.10 <u>Survival</u>. All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of Lender and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

   11.11 <u>Successors and Assigns</u>. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on Borrower and their permitted assigns (if any). Borrower shall not assign any obligations under this Agreement or any of the other Loan Documents without Lender's express prior written consent, and any such attempted assignment shall be void and of no effect. Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents without prior notice to or the consent of the Borrower, and all of such rights shall inure to the benefit of Lender's successors and permitted assigns.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

11.12    Governing Law.  This Agreement and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of Hong Kong, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

11.13    Dispute Resolution.   Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

11.14    JURY TRIAL WAIVER.  THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.15    Professional Fees.   To the extent permitted by applicable law, Borrower promise to pay any and all reasonable attorneys' and other professionals' fees and expenses incurred by Lender after the Closing Date in connection with: (a) enforcement, collection or protection of Lender's rights in connection with this Agreement and the Loan Documents, including the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (b) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to Borrower or the Collateral, and any appeal or review thereof; or (c) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to Borrower, the Collateral, the Loan Documents, including representing Lender in any adversary proceeding or contested matter commenced or continued by or on behalf of Borrower's estate, and any appeal or review thereof.

11.16    Assignment of Rights.   Borrower acknowledges and understands that Lender may sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "**Assignee**").  After such a permitted assignment, the term "Lender" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, Lender shall retain all rights, powers and remedies hereby given.  No such assignment by Lender shall relieve Borrower of any of its obligations hereunder.

11.17    Revival of Secured Obligations.   This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any

18

petition is filed by or against Borrower for liquidation or reorganization, if Borrower becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of Borrower's assets, or if any payment or transfer of Collateral is recovered from Lender.  The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to Lender, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, Lender or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to Lender in cash.

11.18   Counting of Days. Except where otherwise specifically provided, any reference in this Agreement to a period of "days" means calendar days and not business days.

11.19   Caption Headings. Caption headings in this Agreement and the Loan Documents are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement or the Loan Documents.

11.20   Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

11.21   No Third-Party Beneficiaries.  No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than Lender and Borrower unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between Lender and Borrower.

(SIGNATURES TO FOLLOW)

CONFIDENTIAL TREATMENT REQUESTED BY FTX                    FTX_3AC_000000093

IN WITNESS WHEREOF, Borrower and Lender have duly executed and delivered this Loan and Security Agreement as of the day and year first above written.

**BORROWER**:                                    **LENDER**:

**Three Arrows Capital Ltd**                     **FTX TRADING LIMITED**

By: _____                  By: _____

Name: Kyle Davies                                Name: Sam Bankman-Fried

Title: Director                                  Title: Director


Email Address for Notice                         Email Address for Notice
Attn: Kyle Davies                                 Attn: Sam Bankman-Fried
Email: operations@threearrowscap.com              Email: legal@ftx.com / sam@ftx.com


with a copy (which shall not constitute          with a copy (which shall not constitute
notice) to:                                      notice) to:

Attn: NA                                          Fenwick & West LLP
Phone:                                           1191 Second Avenue, 10th Floor
Email:                                           Seattle, WA 98101
                                                 Attn:  Andrew T. Albertson
                                                 Phone:  206-389-4552
                                                 Email:  aalbertson@fenwick.com


[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT]

CONFIDENTIAL TREATMENT REQUESTED BY FTX

## EXHIBIT A
### Advance Request

This Advance Request form incorporates all of the terms of the Loan and Security Agreement between FTX Trading Limited and **Three Arrows Capital Ltd** dated and effective as of 22/10/2021, and the following specific terms.

Amount of Advance:

Borrower Account email address:

| Collateral Type | | USD |
|---|---|---|
| Collateral | | |
| Hard Margin Call | | 125% |

**FTX Trading Limited**                    Three Arrows Capital Ltd

Per :  *Sam Bankman-Fried*               Per :  _____
        └─F0D59F19C7D34BA...

Name:  Sam Bankman-Fried                 Name:  Kyle Davies
Title:  CEO                              Title:  Director