**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF STEPHEN NICHOLAS ATHERTON K.C. IN SUPPORT OF THE FTX RECOVERY TRUST'S OBJECTION TO THE AMENDED PROOF OF CLAIM FILED BY THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 3

ACADEMIC AND PROFESSIONAL INFORMATION ......................................................... 3

SUMMARY OF CONCLUSIONS .......................................................................................... 5

SUMMARY OF THE SOURCES OF BVI LAW ................................................................. 11

THE BVI CLAIMS .................................................................................................................. 13

THE BVI PREFERENCE CLAIMS ...................................................................................... 13

(1) "INSOLVENCY TRANSACTION" .......................................................................... 14
(2) INSOLVENCY ............................................................................................................. 17
(3) THE "VULNERABILITY PERIOD" ........................................................................ 18
(4) THE ORDINARY COURSE OF BUSINESS DEFENCE ......................................... 23

THE BVI TRANSACTION AT AN UNDERVALUE CLAIM ......................................... 26

(1) "INSOLVENCY TRANSACTION", "TRANSACTION" AND THE "VULNERABILITY PERIOD" ................. 27
(2) THE STATUTORY DEFENCE - S.246(2) OF THE INSOLVENCY ACT .................... 31

THE BVI TURNOVER CLAIM .......................................................................................... 34

THE BVI PROPRIETARY RESTITUTION CLAIM ....................................................... 36

THE BVI UNJUST ENRICHMENT AND CONVERSION CLAIMS ............................. 38

(1) UNJUST ENRICHMENT ............................................................................................ 38
(2) CONVERSION ............................................................................................................. 40

I, Stephen Nicholas Atherton K.C., pursuant to 28 U.S.C. section 1746, hereby make this declaration ("***Declaration***") under penalty of perjury state as follows:

**INTRODUCTION**

1. I have been asked by Sullivan & Cromwell LLP, on behalf of the FTX Recovery Trust, to give my opinion as to certain relevant aspects of the laws of the Virgin Islands[1] and claims that have been asserted by reference to those laws (the "***BVI Claims***")[2] by the Joint Liquidators (the "***Joint Liquidators***") of Three Arrows Capital Ltd ("***3AC***") against FTX Trading Ltd ("***FTX***"). The BVI Claims are contained in a proof of claim (the "***POC***") that was filed against the FTX Recovery Trust by the Joint Liquidators on 27 March 2025.

2. I am being remunerated at the rate of £1,500 *per* hour, which is my standard rate for providing expert opinions on BVI law. Although I am being compensated by the FTX Recovery Trust, my compensation is in no way contingent upon my findings, the testimony I may give, or the outcome of these proceedings. I understand that my duty is to give my honest, objective and independent opinion to the Court, and I have done so.

3. In reaching the conclusions set out in this Declaration, I have reviewed the POC, as well as relevant judicial decisions and other relevant legal texts and publications. A list of the legal materials I have reviewed is attached as Exhibit A. I have also been provided with, and have considered, certain other relevant documents provided to me by the FTX Recovery Trust. A list of the documents that I have considered is attached as Exhibit B.

**ACADEMIC AND PROFESSIONAL INFORMATION**

4. I am a qualified barrister practising from barristers' chambers, Twenty Essex, in London and Singapore.

---

[1] This is the official name for the archipelago more commonly or more usually referred to as the British Virgin Islands (the ***BVI***): The Virgin Islands Constitution Order 2007 (SI 2007 No 1678). For the purposes of this Declaration and where necessary and appropriate I will use the abbreviation BVI.

[2] The BVI Claims are asserted pursuant to specific provisions of the (BVI) Insolvency Act 2003 (the "***Insolvency Act***") and by reference to causes of action, legal principles and remedies derived from the common law and the rules of equity as they apply in the BVI.

5.      I was awarded an Honours Degree in Law (Upper Second Class) by the University of Lancaster in June 1987.  I went on to study law at the University of Cambridge (Magdalene College), where I was awarded a Master of Law Degree with Honours (First Class) in June 1988.

6.      I was called to the Bar of England and Wales on 27 July 1989 and commenced practice as a barrister-at-law upon completion of my pupillage in October 1990, and I have continued to do so ever since.  I was appointed as Queen's Counsel ("***Q.C.***") on 16 October 2006.  On 8 September 2022, automatically upon the death of Her Majesty Queen Elizabeth II and the accession of His Majesty Charles III, I acquired the status and title of King's Counsel ("***K.C.***").

7.      My practice comprises international and domestic corporate insolvency and restructuring law, company law, civil aspects of international and domestic commercial fraud, personal insolvency, banking, general offshore and international commercial litigation, and international and domestic asset tracing.

8.      I was admitted to the Bar of the Eastern Caribbean (BVI) in 2008.  I am also called to the Bars of Bermuda, the Cayman Islands, the Federation of St Christopher and Nevis ("***St Kitts and Nevis***"), the Isle of Man and Samoa for specific cases.  I also have rights of audience in Brunei Darussalam for specific cases.

9.      I have been involved in many of the major domestic and international corporate insolvencies and restructurings that have occurred in the years since I entered into practice.  During my career, I have acquired relevant experience in commercial litigation, civil fraud and contentious company and insolvency proceedings in the United Kingdom, the Hong Kong Special Administrative Region of the People's Republic of China ("***Hong Kong***"), Brunei Darussalam, Malaysia, Singapore, Jamaica, the Cayman Islands, Bermuda, the BVI, St Kitts and Nevis, the Turks and Caicos Islands, Jersey, Guernsey, Samoa and the Isle of Man.  I have also been instructed, on a number of occasions, to provide advice (as counsel) in relation to the laws of the aforementioned jurisdictions.

10.     I have previously provided expert evidence as to English law (and the laws of other relevant common law jurisdictions) for the purposes of proceedings outside England and Wales (and for the purposes of proceedings outside other relevant common law jurisdictions) as follows:[3] in the United States District Court for the District of Columbia (relating to the laws of Bermuda); in the United States District Court for the Eastern District of Pennsylvania (in relation to the laws of the BVI); in the Federal Bankruptcy Court for the Southern District of Texas, Houston Division; in the High Court of Singapore; in the Court of First Instance of the High Court of Hong Kong; in the Amsterdam District Court; in the Amsterdam Court of Appeal; and in the High Court of South Africa (Western Cape Division, Cape Town).

11.     My *curriculum vitae* is attached as Exhibit C.

**SUMMARY OF CONCLUSIONS**

12.     In summary, my conclusions as to the validity of the BVI Claims in the light of the relevant principles of BVI law are as follows:

   a.  **The BVI Preference Claims**: The Joint Liquidators could not successfully assert unfair preference claims under the Insolvency Act based upon the averments contained in the POC on the bases that: (i) there does not appear to have been any relevant "*insolvency transaction*" during the period of 13-14 June 2022 or any other period relevant to the averments made in the POC; (ii) FTX does not appear to have been a "creditor" of 3AC at any time relevant to the averments made in the POC, since 3AC's Account Balance (as defined below) was always positive and, as such, represented an obligation owed by FTX to 3AC; (iii) FTX does not appear to have been put in a better position as a result of any alleged "*insolvency transaction*"; and (iv) even assuming that the Joint Liquidators might overcome the deficiencies noted in (i)-(iii) above, the deposit of Assets[4] with the FTX.com Exchange (the "***Exchange***") by 3AC, the use of the Exchange by 3AC, movements in the size of the Account Balance, and any other potentially relevant transaction involving 3AC

---

[3] As regards the law of England and Wales, unless otherwise stated.
[4] As defined in the FTX Terms of Service, dated 13 May 2022.

and FTX occurred in the ordinary course of 3AC's business and as a consequence the FTX Recovery Trust would have a statutory defence to the unfair preference claim;

b.  **The BVI Undervalue Transaction Claim**: The Joint Liquidators could not successfully assert that there have been any transactions at an undervalue pursuant to the Insolvency Act based upon the averments contained in the POC given that: (i) there does not appear to have been any relevant "*insolvency transaction*" during the period of 13-14 June 2022 or any other period relevant to the averments made in the POC; (ii) the Joint Liquidators have not properly explained in the POC, and it is not at all clear, what purported transactions are said by the Joint Liquidators to have been entered into by 3AC at an undervalue; and (iii) even assuming that the Joint Liquidators were able to establish that there had been any relevant transactions, the FTX Recovery Trust would have a statutory defence on the basis that any relevant transaction was entered into by 3AC, in good faith and for the purposes of it carrying on its business and (at the relevant time) there were reasonable grounds for 3AC to believe that the relevant transactions would be of benefit to it;

c.  **The BVI Turnover Claim**: The Joint Liquidators could not successfully assert a turnover claim, under s.274A(1) of the Insolvency Act, under the assertions in the POC on the basis that (by reference to, and in reliance upon the Declaration of Lord Neuberger):[5] (i) the Joint Liquidators will not be able to establish that 3AC had any proprietary interest in the Assets associated with the 3AC Account Balance as at the end of 12 June 2022 (or at any time thereafter); and (ii) consequently, the Joint Liquidators will not be able to establish a basis upon which they would be able to identify any relevant Asset and therefore will not be entitled to follow or trace any specific Asset in or formerly in the possession of the FTX Recovery Trust;

---

[5] The content of which I have been asked to assume is correct.  As I understand it, the Declaration of Lord Neuberger was admitted into evidence without objection in connection with the confirmation of the Debtors' Plan, and was considered by the Court, which concluded, among other things that, "[t]*he factual record establishes that all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date* [] *are property of the Debtors' estates*".

d.  **The BVI Proprietary Restitution Claim**: For the same reasons (i.e., an inability on the part of the Joint Liquidators to identify any relevant Asset and establish that 3AC had or has any relevant legal or beneficial proprietary interest in any Assets associated with the 3AC Account Balance as of the end of 12 June 2022 (or at any time thereafter)), the Joint Liquidators will not be able to assert successfully that 3AC is entitled to a proprietary restitutionary claim as against the FTX Recovery Trust or in respect of any Asset in the possession or formerly in the possession of the FTX Recovery Trust.  The circumstances in which 3AC deposited Assets with the Exchange was not such as to make it unconscionable for FTX to retain the benefit of the receipt of the Assets;

e.  **The BVI Unjust Enrichment Claim**: The Joint Liquidators will not be able to assert successfully a claim for unjust enrichment as against the FTX Recovery Trust based upon the averments contained in the POC given that: (i) it is far from clear that FTX was enriched (at the expense of 3AC) by reason of its dealings with 3AC or by reason of 3AC's use of the Exchange; (ii) even assuming that FTX was enriched at 3AC's expense in the course of FTX's dealings with 3AC, any such enrichment would have occurred pursuant to and in accordance with the terms upon which 3AC deposited Assets with the Exchange and the terms upon which 3AC was permitted access and traded on the Exchange, and therefore cannot be said to have been unjust or unconscionable; (iii) even assuming that the Joint Liquidators can show that FTX was unjustly enriched at the expense of 3AC, it may also be that the FTX Recovery Trust has a defence on the basis that it or FTX (in good faith) changed their position;

f.  **The BVI Conversion Claim**: The Joint Liquidators will not be able to assert successfully a claim for conversion to some or all of the Assets founded upon the averments contained in the POC on the basis that (again, by reference to and in reliance upon the Declaration of Lord Neuberger): (i) 3AC neither had nor has any relevant proprietary interest in the Assets that are or were in the possession of the FTX Recovery Trust, or any Assets which it might be said that FTX may have dealt with; and (ii) in any event, the Assets in question are intangible property and the

tort of conversion (at least at this point in the development of the common law) does not permit claims or remedies in relation to such assets.

13.     In reaching my conclusions as regards the relevant aspects of BVI law I have been asked to consider, I have also been asked to assume the following facts:

a.    3AC is a now defunct cryptocurrency hedge fund.  Before its eventual collapse in June 2022, 3AC was, "*well known in the cryptocurrency industry as a leading proprietary trading fund*" and was, "*one of the largest and best known cryptocurrency hedge funds*".[6]  It was engaged in "*short-term opportunity trading*" and was, "*heavily invested in cryptocurrency, funded through borrowings*" of both Digital Assets and fiat currency.[7]  As of April 2022, 3AC was reported to have more than $3 billion of assets under management;[8]

b.    As part of and in furtherance of its business as a proprietary trader in cryptocurrency and in order to obtain access to the Exchange, 3AC opened certain Accounts[9] with FTX and deposited Assets associated with those Accounts onto the Exchange;

c.    3AC opened its Accounts in February 2020.  During the period that it had access to the Exchange, and in the ordinary course of its business, 3AC regularly made deposits of Assets onto the Exchange and made withdrawals of Assets from the Exchange which transactions were recorded in its Account Balance.  However, 3AC did not make any new deposits of Assets with the Exchange during the period of 12-14 June 2022 (inclusive).  It made its last deposit of Assets onto the Exchange on 11 June 2022;

d.    In addition to the regular deposits onto and withdrawals from the Exchange, 3AC was also a high-volume trader in Assets on the Exchange.  Consistent with its

---

[6] *Declaration of Russell Crumpler in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief, In re Three Arrows Capital Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022), D.I. 3 ("**Mr Crumpler's Declaration**"), at paragraph 15.
[7] *Ibid.* at paragraphs 8 and 16.
[8] Mr Crumpler's Declaration at paragraph 8.
[9] As defined in the FTX Terms of Service.

business operations, it also traded digital assets on other exchanges.  In the course of its trading on the Exchange, 3AC made both gains and losses;

e.  A record was maintained of the aggregate value of all the Assets held with FTX and that were associated with 3AC's Accounts (the "***Account Balance***");

f.  Customers using the Exchange, such as 3AC, could effect trades and make deposits or withdrawals by reference to the different types of Asset (such as cryptocurrency tokens (e.g., Bitcoin and Ethereum) and fiat currency (e.g., US Dollars ("***USD***")) associated with the Account Balance.  In addition, there were specific sub-balances maintained for each type of Asset associated with the Account Balance.  I am given to understand that, for the purposes of analysis, these sub-balances may be divided into two categories: (i) a sub-balance in respect of all types of cryptocurrency tokens, stablecoin, and similar Digital Assets[10] in the aggregate (the "***Digital Asset Balance***"); and (ii) a sub-balance for all types of fiat currency in the aggregate (the "***USD Balance***");

g.  At all times, it was a requirement of the FTX Terms of Service pursuant to which 3AC had been granted access to the Exchange that 3AC maintain an overall positive Account Balance;[11]

h.  As part of its business activities, 3AC also participated in the Spot Margin Program offered by the Exchange as a Specified Service;[12]

i.  3AC was also the recipient of a Line of Credit in the sum of $120 million.[13]  Under the terms of the relevant Line of Credit Agreements, 3AC was (amongst other requirements) obliged to maintain an Account Balance of at least $240 million at all times;[14]

---

[10] As defined in the FTX Terms of Service.
[11] See sections 10 and 12 of the FTX Terms of Service.
[12] See Schedule 3 to the FTX Terms of Service.
[13] See the "***October 2021 Line of Credit Agreement***" and the "***March 2022 Line of Credit Agreement***".
[14] See clause 5 of the March 2022 Line of Credit Agreement.

j.  In the FTX Terms of Service, FTX expressly reserved the right to liquidate Assets to correct negative balances on Accounts associated with the Exchange;[15]

k.  As of the end of the day on 12 June 2022, the 3AC Account Balance was positive in the amount of approximately $284 million.  This reflected a positive Digital Asset Balance of approximately $1.017 billion and a negative USD Balance of approximately $733 million;

l.  The 3AC Account Balance declined on 13 and 14 June 2022, as the value of Digital Assets declined significantly and because 3AC made a number of withdrawals from its Account during that period;

m.  3AC also sold Digital Assets for USD, via trades on the Exchange, on 13 and 14 June 2022.  These trades did not reduce the 3AC Account Balance, but these trades did serve to reduce the positive Digital Asset Balance (upon the sale of Digital Assets) and serve to reduce the negative USD Balance (i.e., make the negative USD Balance less negative upon the receipt of proceeds from the sale of Digital Assets);

n.  From 13 June 2022, 3AC failed to comply with the terms of the relevant Line of Credit Agreements, in that it failed to maintain an Account Balance of $240 million at all times;

o.  Late in the day on 14 June 2022, and pursuant to the terms of the FTX Terms of Service and the relevant Line of Credit Agreements, FTX initiated a series of transactions by which Digital Assets associated with the 3AC Account Balance were sold for approximately $82 million (the "**Liquidation**");

p.  The transactions comprising the Liquidation (made via the 3AC Accounts) were effected by FTX with other users of the Exchange.  FTX did not receive the proceeds of realisations generated through the Liquidation other than a small trading fee;

---

[15] See for example sections 10 and 12 of the FTX Terms of Service.

q. As noted above and by reference to the Declaration of Lord Neuberger, I have been asked to assume that 3AC did not have any form of proprietary interest in the Assets associated within the Account Balance as of the end of 12 June 2022 (or as of any later time);

r. As a consequence (by reference to the Declaration of Lord Neuberger), it is impossible for 3AC to identify, follow or trace any specific Digital Asset or any other Asset associated with the Account Balance as of 12 June 2022 (or subsequently) to any Asset currently held by the FTX Recovery Trust or which might be said to represent any relevant Asset.

## SUMMARY OF THE SOURCES OF BVI LAW

14. The BVI is an Overseas Territory of the United Kingdom.

15. It is well established, by the jurisprudence of the BVI Courts that, in the absence of any local legislation or local case law to direct their approach, the BVI Courts will apply the common law of England.[16]  Furthermore: (i) as in many jurisdictions with a common law legal system (such as the BVI), the principle of *stare decisis* or the doctrine of precedent is a fundamental pillar;[17] and (ii) statutes enacted by the House of Assembly[18] are interpreted essentially in the same way as Acts of Parliament are interpreted by the Courts of England and Wales.[19]

---

[16] The Common Law (Declaration of Application) Act 1705, Cap. 13, Revised Laws of the Virgin Islands 1991; Broad Idea International Ltd v Convoy Collateral Ltd, VG 2020 HC 41 (Court of Appeal of the BVI)), *per* Periera CJ at paragraphs [35] and [45]; Vladimir Niyazov v Maples and Calder [2021] 1 LRC 561  (Court of Appeal (BVI)), *per* Ellis JA at paragraphs [30] and [31]; Re the Fees of an English Barrister [2021] ECSC J1206-2, *per* Jack J at paragraph [11]; and VTB Bank v Miccros Group Ltd, [2020] ECSC J0123-1, *per* Jack J at paragraph [105].
[17] Broad Idea International Ltd v Convoy Collateral Ltd, *supra*, at paragraph [35].
[18] However, the United Kingdom retains the power to enact legislation for the BVI and maintains the ability to extend the implementation of international treaties to the BVI.  Therefore, certain legislation and treaties adopted by the United Kingdom can form part of the laws of the BVI.
[19]  Re the Fees of an English Barrister, *supra*.  One specific difference is that BVI law expressly permits marginal notes, side notes, headings and references to other enactments in the margin or at the end of the text of a statute are available to assist in the interpretation of a statute: s.12 of the Interpretation Ordinance Cap 136, as replaced by s.4 of the Virgin Islands Interpretation (Amendment) Act 2014.

16.  The principles of *stare decisis* as applied in England are applied in the same way in the BVI (with all necessary changes for context).  As such:

a.  The Court of first instance in the BVI is the High Court.  Decisions of a Judge of the High Court do not technically bind the High Court itself, though a Judge of the High Court may only depart from a previous decision of another Judge of the High Court when he or she is convinced that the previous decision is plainly wrong;[20]

b.  Decisions of the High Court may be appealed to the BVI Court of Appeal.  The decisions of the Court of Appeal bind the High Court and are binding on the Court of Appeal itself; and

c.  Decisions of the BVI Court of Appeal may be appealed to the Privy Council.  Decisions of the Privy Council, sitting as the final court of appeal of the BVI, are binding on the Court of Appeal and the High Court.[21]

17.  Decisions of appellate and first instance courts in other Commonwealth, common law jurisdictions are also of persuasive effect, particularly decisions of the United Kingdom Supreme Court (and before that, the House of Lords), the Court of Appeal of England and Wales,[22] the High Court of England and Wales[23] and the Privy Council when sitting as the final Court of appeal of another jurisdiction (e.g., the Cayman Islands or Bermuda).  The decisions of these Courts are routinely followed in the BVI and are of considerable persuasive effect, unless the case before the BVI Courts is concerned with distinct features of local law (or where the decision from the other jurisdiction is principally concerned with the local law of the Court of that other jurisdiction).

---

[20] For example, see: Desmond Alphonso v Commissioner of Police [2006] 10 JBVIC 2001, *per* Joseph-Olivetti J at paragraph [31]; Re Spectrum Plus Ltd (in liquidation) [2005] 2 AC 680, at paragraphs [4]-[8]; Lornamead Acquisition Ltd v Kaupthing Bank HF [2013] 1 BCLC 73 and "Halsbury's Laws of England" (Civil Procedure, Volume 11 (2020)), at paragraph 32.

[21] The Privy Council does not have a strict rule that it is bound by its own previous decisions, nor those of the House of Lords or the United Kingdom Supreme Court; but the Privy Council will not depart from a previous decision of its own or that of the House of Lords or the United Kingdom Supreme Court without compelling reason to do so: "Privy Council Practice" (2017), at paragraphs 5.07-5.21; and see: Lewis v Attorney General of Jamaica [2001] 2 AC 50; and Gibson v Government of the United States of America [2007] 1 WLR 2367.

[22] And the equivalent in Scotland, the Inner House of the Court of Session.

[23] And the equivalent in Scotland, the Outer House of the Court of Session.

-12-

## THE BVI CLAIMS

18.    In the context of and by reference to the matters referred to above, I consider each of the BVI Claims in the following paragraphs.

19.    From the outset, it is important to record that the manner in which the claims have been articulated in the POC is not as fulsome as one might expect or as a BVI Court would require.  The lack of particularity in the recital of the BVI Claims (as contained in the POC), would (if before a BVI Court) subject the claims to a real risk of being summarily dismissed.  For example, in England, as regards a claim based on allegations that there had been a transaction at an undervalue pursuant to s.238 of the Insolvency Act 1986,[24] the High Court dismissed the liquidators' claim, on the basis that the liquidators had failed properly to plead or define the relevant transaction for the purposes s238 of the Insolvency Act 1986, and had failed adequately to address in their supporting evidence the undervalue at which the alleged transaction had allegedly been concluded.[25]

20.    In any event, I reserve the right to add to or otherwise amend this Declaration upon further information being made available and in the event that more clarity as to what precisely the basis of the Joint Liquidators BVI Claims are said to be.

## THE BVI PREFERENCE CLAIMS

21.    The quantum of the BVI Preference Claim, as articulated in the POC, is stated to be in the amount of $1,530,862,573.85.  The Joint Liquidators have asserted that "[t]*hese claims exist regardless of whether FTX or the 3AC Debtor initiated the liquidation of the Lost Assets*".[26]  As will be apparent from what is said below, I do not necessarily agree with that statement.

22.    A claim for an unfair preference under s.245 of the Insolvency Act requires the Joint Liquidators to establish the following elements that: (i) the any relevant transaction was an

---

[24] Hellard v Graiseley Investments Ltd [2018] EWHC 2664 (Ch).
[25] The dismissal of the case was upheld on appeal: Re Guardian Care Homes (West) Ltd (in liquidation) [2019] EWHC 2994 (Ch).
[26] See paragraph 46 of the POC.

"*insolvency transaction*"; (ii) the relevant transaction was entered into by the company now in liquidation; (iii) the relevant transaction was entered into within the "*vulnerability period*"; and (iv) the relevant transaction had the effect of putting the creditor into a position which, in the event of the relevant company going into insolvent liquidation, would have put that creditor in a better position than that creditor would have enjoyed had the relevant transaction not been entered into.

23. In the context of the present case and based upon the matters referred to above, I consider each of those necessary elements in turn below.  It is averred by the Joint Liquidators, in the POC, that each of the necessary elements referred to at (i), (iii) and (iv) are satisfied.[27]

24. It is my opinion that, based on the facts asserted and the assumptions on which I have been asked to rely as stated herein, the Joint Liquidators are unable to establish any preference claims under the Insolvency Act such as are advanced in the POC as against the FTX Recovery Trust.

*(1) "Insolvency Transaction"*

25. The Joint Liquidators: (i) contend that the relevant transactions (described as, "*a series of liquidations, seizures, or other transfers*"[28]) occurred on 13 and 14 June 2022; (ii) define the alleged relevant transaction or transactions said to have taken place on 13 June 2022 as the "*June 13 Takings*", and the transaction or transactions said to have taken placed on 14 June 2022 as the "*June 14 Takings*";[29] (iii) assert that as of 12 June 2022, 3AC's Account Balance stood at approximately $263.61 million, comprising a positive Digital Asset Balance of approximately $1.59 billion and a negative USD Balance of  approximately $1.33 billion;[30] and (iv) contend that these component parts of the overall Account Balance were reduced (i.e., that the positive Digital Asset Balance was reduced and the negative

---

[27] See paragraph 47.
[28] See paragraph 40 of the POC.
[29] Collectively defined as the "*June Takings*".
[30] At Paragraph 40 of the POC.  As will be apparent from the assumed facts rehearsed above, my instructions are that the 3AC Account Balance stood at approximately $284 million at the end of 12 June 2022.  This reflected a positive Digital Asset Balance of approximately $1.017 billion and a negative USD Balance of approximately $733 million.

USD Balance was reduced). The Joint Liquidators therefore alleged that the "*June Takings*" resulted in a loss to 3AC of approximately $1.53 billion.[31]

26. Notwithstanding the lack of clarity in the POC, the essence of the claims asserted appears to be that Digital Assets said to belong to 3AC were applied in order to reduce the liability of 3AC to FTX (as represented by the negative US Dollar Balance) and as such FTX has been preferred over the interests of other creditors of 3AC and to the detriment of those other creditors.

27. The first point to make is that it does not appear to me to be possible for there to have been any "*insolvency transaction*" on 13 or 14 June 2022 (including the "*June Takings*") insofar as the Assets said to have been the subject of the alleged "*insolvency transactions*" were not assets owned by 3AC, or in which 3AC had any proprietary interest, during the 13 or 14 June 2022 period. The mischief intended to be addressed by provisions such as s.245 of the Insolvency Act is to preserve the assets of an insolvent company for the benefit of its creditors as a whole. The ability of a liquidator to challenge certain types of transactions that have occurred pre-liquidation is to ensure that a creditor of an insolvent company does not obtain a benefit from a transaction that has served to deplete the assets of the insolvent company, such that there are fewer assets available for distribution to the other creditors of the company. In my opinion, even assuming that FTX has received a benefit from the "*June Takings*" there is no detriment to the other creditors of the 3AC because there has been no depletion in the assets of 3AC which might otherwise have been available to distribute to its creditors in the course of its liquidation.

28. As discussed further below, it may be argued by the Joint Liquidators that for the purposes of whether or not a transaction is an "*insolvency transaction*", it is not necessary that the transaction involves assets that belongs to the insolvent company in question. In my opinion, such an argument cannot succeed as a matter of the law of the BVI. The relevant analysis of the actual position in this regard is dealt with in more detail below in the course of the discussion relating to transactions at an undervalue un the Insolvency Act.[32]

---

[31] Defined by the Joint Liquidators as the "*Lost Assets*".
[32] See paragraphs 68-72 below.

29.    Ultimately, therefore, the burden of the allegedly relevant transactions was not borne by any assets of 3AC.  In other words, any transaction alleged to constitute a preference of FTX – will not have occurred at the expense of other creditors of 3AC.  In my opinion, therefore the alleged "*June Takings*" cannot constitute an unfair preference of FTX even if the position of FTX has allegedly been improved by the reduction of a debt owed to it by 3AC.[33]

30.    Moreover, s.244(2) of the Insolvency Act does not specify that the "*insolvency transaction*" must involve or be entered into by the relevant company itself.  All that is required, is for the transaction to occur at a time when the company is insolvent or for the transaction to cause the insolvency of the relevant company.

31.    However:

a.    In my opinion, on a proper interpretation of the Insolvency Act, and s.244(2) in particular, an "*insolvency transaction*" must be referring to a transaction entered into by the relevant company (i.e., in this case 3AC);

b.    That this is so, is made plain by the terms of s.245(1) of the Insolvency Act such that an, "*insolvency transaction*" may only be impeached on the basis of it being an unfair preference (other things being equal) where it is, "*a transaction* [is] *entered into by a company*".

32.    Whilst the POC is unclear as to whether the "*June Takings*" are alleged to have been initiated by FTX or 3AC,[34] to the extent the Joint Liquidators allege that the "*June Takings*" were not transactions entered into by or undertaken by 3AC or in which 3AC might otherwise have been involved, such transactions cannot (in my opinion) properly be characterised as being "*insolvency transactions*" entered into by the 3AC and therefore

---

[33] See the discussion in "Goode on Principles of Corporate Insolvency Law" (5th Ed, 2018), at paragraph 13-85; and see Mundy v Brown [2011] BPIR 1056. In that case the fact that monies were held on a *Quistclose* trust meant that claims against the recipients in respect of payments made to them using monies subject to the Quistclose arrangement failed on the basis that the payments in issue in that case did not constitute either transactions at an undervalue or unlawful preferences given that the payments were not made from company monies / assets.  See also the discussion in "McPherson & Keay's Law of Company Liquidation" (5th Ed, 2021) at paragraph 11-066.

[34] See paragraph 44 of the POC.  Although, it is at least implicit that the relevant transactions are alleged to have been effected by FTX.

would not be capable of impeachment as unfair preferences under s.245 of the Insolvency Act.

33.    As is acknowledged by the Joint Liquidators,[35] I understand that the FTX Recovery Trust denies that FTX was responsible for the substantial majority of dealings in relation to the Assets associated with the 3AC Accounts as of 12 June 2022, and that it was 3AC that initiated the relevant account activity, with the exception of the Liquidation initiated by FTX on 14 June 2022, which resulted in the sale of Assets for approximately $82 million.

*(2) Insolvency*

34.    A transaction is an "*insolvency transaction*", and therefore a potentially relevant transaction for the purposes of an unfair preference claim, if the relevant transaction was entered into at a time when the company alleged to have given the alleged unfair preference is insolvent, or where the relevant transaction causes that company to become insolvent.[36]

35.    For the purposes of an unfair preference claim in the BVI, a company is insolvent if it is unable to pay its liabilities as and when they fall due (on a cash-flow basis).[37]  In relation to the unfair preference claim, it is averred by the Joint Liquidators that 3AC was insolvent as of 12 June 2022.[38]  At the time of preparing this Declaration, I have seen no actual evidence of 3AC's insolvency (whether on a cash-flow basis or on a balance sheet basis). Similarly, I have seen no evidence on the basis of which the alleged June Takings might be said to have caused 3AC to become insolvent.  The only information I have seen, as to the alleged insolvency of 3AC, is that contained in paragraph 49 of the POC, which is expressed in the following terms:

> "*Among other reasons for insolvency, the deterioration of market conditions leading up to June 2022 constituted a material adverse effect, among other events of default, under certain of the master loan agreements under which the 3AC Debtor was a borrower. Depending on the specific terms of each master loan agreement,*

---

[35] At paragraph 44 of the POC.

[36] Section 244(2) of the Insolvency Act.

[37] See ss.2(1), 8(1)(c)(ii) and 244(3) of the Insolvency Act. An analysis of the "cash-flow" test for insolvency is contained in the United Kingdom Supreme Court decision in <u>BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3 BL plc</u> [2013] UKSC 28; and see <u>Donna Union Foundation v Koshigi Limited</u> BVIHC (Com) 231 of 2018

[38] See paragraphs 46, 47, 48, 49 and 53 of the POC.

*those events of default either automatically accelerated the loans at issue or rendered them immediately callable, such that the 3AC Debtor was cash-flow insolvent. Based on the Joint Liquidators' ongoing investigations, the net amounts (after deducting any posted collateral) of loans under six of the largest uncollateralized and/or under-collateralized master loan agreements totaled $3,208,970,388.23 as of June 12, 2022, $3,426,115,251.70 as of June 13, 2022, and $3,454,496,096.87 as of June 14, 2022. The 3AC Debtor had only $1,565,013,093.95, $1,938,690,892 and $1,681,622,009.76 worth of liquid assets on those dates respectively, and was therefore cash-flow insolvent on all dates, with deficits of $1,643,957,294.28, $3,120, 144,168.32 and $3,370,569,218.11 respectively".*

36. On the basis of the information made available to me, it is not possible for me to say whether or not 3AC was insolvent at the relevant time, or what was or might have been the cause of its alleged insolvency.  However, these are not matters for me but for the Court to determine.  Accordingly, for the purposes of this Declaration, I have assumed that 3AC was cash-flow insolvent on 13 and 14 June 2022.

37. However, as will be appreciated, this is a matter that the Joint Liquidators will be required to prove; insolvency being a necessary element of any claim that a transaction should be set aside as being an unfair preference under BVI law.

*(3) The "Vulnerability Period"*

38. For a transaction to constitute an unfair preference, the relevant transaction must have been entered into during the "*vulnerability period*".[39]  The relevant definition of "*vulnerability period*" is the period commencing six months prior to the "*onset of insolvency*" and ending with the appointment of the Joint Liquidators.[40]  In the present case, the onset of 3AC's insolvency began with the filing of the application for the appointment of the Joint Liquidators with the High Court of the BVI.  The application for the appointment of the Joint Liquidators was filed on 27 June 2022.  As such the "*vulnerability period*" commenced on 27 December 2021 (as averred in paragraph 50 of the POC).  The

---

[39] Section 244(1) of the Insolvency Act.
[40] There is no assertion that FTX was a "*connected person*" as regards 3AC and therefore the extended "*vulnerability period*" provided for in s.244(1) does not apply and is not relevant.

"*vulnerability period*" ended with the appointment of the Joint Liquidators which occurred on 29 June 2022[41] (not 27 June 2022 as averred in paragraph 50 of the POC).

39.    In the premises, allegedly relevant transactions that are said to have occurred on 13 and 14 June 2022 will have taken place within the "*vulnerability period*". The Joint Liquidators have not alleged that there were any other potentially relevant transactions that occurred outside the period of 13 and 14 June 2022. Nor do they allege that there were any other transactions that are said to have occurred within the "*vulnerability period*" and that are alleged to have constituted unfair preferences of FTX.[42]

*(4) FTX as a "Creditor" of 3AC*

40.    In order to be able to assert a claim against FTX Recovery Trust for an unfair preference, the relevant transactions must be such that, in its capacity as a "*creditor*", FTX was placed into a better position in the event of an insolvent liquidation of 3AC than it otherwise would have enjoyed had the relevant transactions not been entered into.

41.    Insofar as material to the present case, the word "*creditor*" and the terms "*secured creditor*" and "*unsecured creditor*" are defined in the Insolvency Act as follows:[43]

> *"(1) A person is a creditor of another person (the debtor) if he or she has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in—*
>> *(a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company;*
>> *[…]*
> *(2) A creditor is a secured creditor of a debtor if he or she has an enforceable security interest over an asset of the debtor in respect of his or her claim.*
> *(3) An unsecured creditor is a creditor who is not a secured creditor*".

42.    For these purposes and on the basis of the assumed facts, it is to be taken that at the end of the day on 12 June 2022, there was an overall positive Account Balance of approximately

---

[41] See paragraph 26 of Mr Crumpler's Declaration.

[42] Between 27 December 2021 to 27 June 2022, 3AC deposited Assets with FTX with a total value of $4.5 billion ($1.6 billion in Digital Assets, and $2.9 billion in USD). During the same period 3AC withdrew a total of $4.0 billion in Assets ($2.1 billion in Digital Assets, and $2.0 billion in USD).

[43] Section 9 of the Insolvency Act.

$284 million comprising a positive Digital Assets Balance of approximately $1.017 billion and a negative USD Balance of approximately $733 million.  Although the POC uses different figures for these component balances, which I understand to be incorrect but for which I have not independently reviewed the facts, the POC does not appear to allege that the 3AC Account Balance was negative at any relevant time on either 13 June or 14 June 2022.

43.     On that basis (i.e., by reference to the positive 3AC Account Balance), at the time of the transactions alleged to constitute unfair preferences (namely, 13 and 14 June 2022),[44] FTX was in fact a debtor, and not a creditor, of 3AC.  As a consequence, there cannot have been a preference of FTX, as only a creditor (and not a debtor) can be "preferred".[45]  The alleged relevant transactions served only to reduce the net (positive) Account Balance and therefore served to reduce the amount of the claim which 3AC had as a creditor of FTX by reference to the amount due from FTX to 3AC.

44.     Therefore, in my opinion, based upon the case theory advanced in the POC, the Joint Liquidators will not be able to establish the "creditor" status of FTX which is obviously an element that is essential to an unfair preference claim under the Insolvency Act.

*(5) Was FTX Put in a Better Position*

45.     Further, to constitute an unfair preference, the relevant transactions must have put FTX in a better position in the event of 3AC's insolvent liquidation.  As noted in one of the leading insolvency law text books commenting on s.239(4) of the English Insolvency Act 1986 which, for this purpose, is materially the same as the BVI provision:[46]

> "*Preference is tested by reference to a hypothetical, not an actual, liquidation. It is not necessary that the company shall in fact have gone into liquidation, for the preference provisions apply equally in administration. If the company enters administration, the question of preference still has to be tested by asking whether the effect of the payment, transfer or other act would be to put the creditor in a*

---

[44] Or at any other time relevant to the issues raised in the POC.

[45] "Goode on Principles of Corporate Insolvency Law", *op cit*, at paragraph 13-90(5).

[46] "Goode on Principles of Corporate Insolvency Law", *op cit*, at paragraph 13-87.  See also "McPherson & Keay's Law of Company Liquidation", *op cit*, at paragraph 11-066; and "Bailey & Groves: Corporate Insolvency - Law & Practice" (6th Ed, 2024), at paragraph 23.13.

> *better position if winding-up were to supervene than he would otherwise have had. It would seem that for this purpose liquidation should be assumed to have taken place immediately after the payment, transfer or other act in question… and with reference to creditors then existing, so that subsequent events (for example, the accrual of new preferential debts) should be ignored, a point which may assist a creditor who is collecting payment under a floating charge.*"

46.     That this is the correct approach is supported by a number of cases in England in relation to the meaning and effect of s.239(4) of the Insolvency Act 1986.[47]

47.     It appears from the POC that the Joint Liquidators take the position that the Account Balance is not a unitary asset, but comprises, separately: (i) the positive Digital Asset Balance, which represents a liability of FTX owed to 3AC; and (ii) the negative US Dollar balance, which represents a liability of 3AC owed to FTX.  I understand that any suggestion that the Account Balance is not a unitary asset is not accepted by the FTX Recovery Trust. Moreover, I am given to understand that the 3AC Account Balance was treated as and was understood at the time by both FTX and 3AC to constitute / was treated as being a unitary asset.

48.     That said, even assuming that the Account Balance is considered by the Court not to be a unitary asset so that any (positive) Digital Asset Balance represented an amount for which FTX was liable to pay 3AC and any (negative) USD Balance represented a debt owed by 3AC to FTX – as the Joint Liquidators appear to be asserting - this will not advance the claim of the Joint Liquidators.  The "*June Takings*" did not, in my opinion, put FTX in a better position as an alleged creditor of 3AC.  This is because, in my opinion, in the event of an assumed liquidation of 3AC taking place on 13 June 2022 (for example) there would have occurred an automatic and self-executing insolvency set-off (as required and as provided for under the Insolvency Act[48]), the net result of which would have been a net Account Balance of the same amount as the amount of the net Account Balance had the "*13 June Takings*" never occurred.  The same position would obtain, in my opinion, in relation to the "*14 June Takings*".  As a consequence, in my opinion it cannot be said that

---

[47] See: <u>Re Hawkes Hill Publishing Co Ltd (in liquidation)</u> [2007] EWHC 3073 (Ch), *per* Lewison J at paragraph [31]; <u>Re Oxford Pharmaceuticals Ltd</u> [2009] 2 BCLC 485; and to the same effect in relation to a situation of personal insolvency (i.e., bankruptcy), see <u>Re Ledingham-Smith</u> [1993] BCLC 635, *per* Morritt J at 641.
[48] See s.150 of the Insolvency Act.  And see: <u>Stein v Blake</u> [1996] AC 243 (House of Lords, England).

the transactions alleged to have constituted unfair preferences would have put FTX in a better position as an alleged creditor than it would otherwise have enjoyed in the event of 3AC's insolvent liquidation on 13 June 2022 or 14 June 2022.

49.     Additionally, to the extent that any part of the "*June Takings*" involved a trade which merely served to alter the value of the Digital Assets associated with the Account Balance and served to reduce the size of the negative USD Balance associated with the Account Balance, but did not reduce the overall net Account Balance, then the realisations of the Digital Assets, the proceeds of which then served to reduce the (negative) USD Balance as recorded in the Account Balance is no different to a situation in which the client of a bank makes payments to its bank from one account with the bank (which is in credit) to another overdrawn account held by it with the same bank.  In my opinion, transactions of that nature do not constitute unfair preferences, in circumstances where the bank has a right of combination as between the two accounts of the same client one of which is overdrawn and one of which is in credit.

50.     As noted above, FTX had a right under the FTX Terms of Service which was akin to a contractual right of set-off or a right of combination and pursuant to which I understand that FTX effected the Liquidation.  The existence of such rights, and there exercise by FTX, cannot therefore be said to give rise to an unfair preference of FTX as a consequence of the Liquidation.

51.     As referenced above (see paragraphs 27-29), it is also relevant, in my opinion, to consider the policy behind the promulgation of provisions such as s.245 of the Insolvency Act, which provide for the reversal of the economic consequence of certain types of transaction that are proximately antecedent to a company's insolvent liquidation.  It is, in my opinion, generally accepted that transactions which affect the disposition of the assets of a company before the commencement of winding up and which have the effect of reducing the assets that would otherwise be available to the creditors of a company should be susceptible to challenge, as they serve to adversely affect the statutory regime (as it exists in the BVI) for equal or proportional distribution of a company's assets to its creditors in the course of a liquidation.   Given that the Assets that are the subject of the alleged "*insolvency*

*transactions*" were not in fact Assets of 3AC at the relevant time, the policy that underlies the ability of a liquidator to set aside certain types of antecedent transactions is not engaged and, in my opinion, serves to further inform the reasoning that the relevant transactions do not involve unfair preference transactions effected for the benefit of FTX at the expense of the creditors of 3AC.  The effect of such transactions does no more than cause movements in the value of Assets associated with the Account Balance, reducing *pro tanto* the value of the Digital Assets associated with the Account Balance, and reducing *pro tanto* the (negative) US Dollar balance.[49]

52.     As to the much more limited set of trades which I understand to have comprised the Liquidation (as initiated by FTX), it appears to me that FTX was simply exercising its rights under the terms of the FTX Terms of Service that was or was equivalent to a contractual right of set-off (or right of combination); the exercise of which was not a transaction entered into by or involving 3AC and does not constitute or result in an unfair preference of FTX.

53.     In summary, and based on what is said above, a Court applying BVI law would not simply look at claim that there has been an unfair preference based solely upon the Digital Asset Balance, but would necessarily have to consider the negative USD Balance, at least to the extent that the Court took the view the Account Balance was not a unitary asset

*(4) The Ordinary Course of Business Defence*

54.     In my opinion, it would also appear that the FTX Recovery Trust has a complete statutory defence to any unfair preference claim under s.245 of the Insolvency Act.  Section 245(2) of the Insolvency Act provides that a transaction cannot be an unfair preference if it occurs "*in the ordinary course of* [the company's i.e., 3AC's] *business*".[50]

---

[49] Goode on Principles of Corporate Insolvency Law", *op cit*, at paragraphs 13-86 and 13-89.

[50] A defence in similar terms is provided for by the unfair preference provisions contained in s.243 of the Insolvency Act 1986, which applies to Scotland.  See for example: Balcraig Houses Trustee v Roosevelt Property Services Ltd 1994 SLT 1133; Nordic Travel Ltd v Scotprint Ltd 1980 SC 1; and Leslie, Liquidator of 3G Design Engineering Ltd v Alistair White [2013] CSIH 20.

55.     In assessing the relevant circumstances and whether they are such as give rise to this defence, in my opinion, a BVI court would typically examine, "*the actual transaction in its factual setting*", an examination that is, "*undertaken objectively by reference to the standard of what constituted the ordinary course of business*" and would include consideration of the "*past practices of the particular company and its dealing with the particular* [other party]".[51]   The Court will also have regard to the fact that, "*there may be circumstances where a transaction, exceptional to a particular trader, will nonetheless be in the ordinary course of business.*"[52]   In each case the particular circumstances will require to be assessed.

56.     A BVI Court would consider 3AC's business being that of a cryptocurrency hedge fund. Insofar as the purported transactions impugned by the Joint Liquidators can be seen as being in and of themselves part of a continuous course of trading by 3AC on the Exchange, or that other potentially relevant transactions (such as the making of deposits of Digital Assets or fiat currency by 3AC into its Account with FTX, and the making of withdrawals from its Account with FTX) were occurring with regularity from the date on which 3AC opened its Accounts until on or around 14 June 2022 such that it might be said that 3AC

---

[51] See the opinion of the Privy Council in Countrywide Banking Corp Limited v. Dean [1998] AC 338 (on appeal from the Court of Appeal of New Zealand).  The case concerned alleged preferential payments under s.266 of the Companies Act 1955 (this provision was reproduced in s.292 of the (New Zealand) Companies Act 1993, however, it did not survive the reform of the (New Zealand) Companies Act of 1992 which occurred in 2006).  The 1955 Act and 1993 Act (unamended) had a saving in respect of transactions that would otherwise be preferential in the event that they took place in the ordinary course of business.  See also the decision of the Court of Appeal of New Zealand in Waikato Freight and Storage (1988) Limited v. Meltzer [2001] 2 NZLR 541, commenting on the decision of the Privy Council in the Countrywide Banking case: "*The question is whether, at the time it was made, the relevant transaction was made in the ordinary course of business. That is a question of objective fact. General business practices are relevant to that question, as are any particular customs or practices within the field of commerce concerned. So too is the previous commercial relationship between the parties. The observer spoken of in the Privy Council is in reality the Court which must look at the circumstances, as objectively apparent at the time of the transaction. The ultimate question is whether on the evidence before the Court the transaction or payment can be said to have been made in the ordinary course of business. Was it in its objective commercial setting an ordinary or an out of the ordinary transaction for the parties to have entered into?*".  The amendments made in 2006 now contain provisions similar to those in the (Australian) Corporations Act 2001 where (in summary) a defence to an unfair preference claim may arise if the relevant transaction is: (i) one that is, for commercial purposes, an integral part of a continuing business relationship (for example, a running account) as between a company and a creditor of the company; and (ii) is effected in the course of the relationship, during which the level of the company's net indebtedness to the creditor is increased and reduced from time to time as the result of a series of transactions forming part of that relationship.
[52] Countrywide Banking Corporation Limited v Dean, *supra*.

was operating a "running account",[53] the BVI Court would, in my opinion, likely be compelled to conclude that there can have been no preference of FTX because any potentially challengeable transactions were entered into by 3AC as part of the ordinary course of dealing as between 3AC and FTX / the Exchange and therefore in the ordinary course of 3AC's business.

57.     An active trader in cryptocurrency such as 3AC would, in the ordinary course of its business, deposit assets and funds with cryptocurrency exchanges and proceed to trade on those exchanges using those assets / funds.  3AC would necessarily have had to deposit assets and fiat currency in order to transact on a cryptocurrency exchange - as was the case with the Exchange.  Trades by 3AC on the Exchange, and the deposit of Assets within the "*vulnerability period*" would, in my opinion, constitute transactions in the ordinary course of 3AC's business.[54]

58.     I do not view the fact that during the relevant period 3AC's trading on the Exchange led to losses as being, in and of itself,  any indication that such trading activity was outside the ambit if what would be considered to be the "*ordinary course*" of 3AC's business, particularly given the potential for losses when trading in any market (and all the more so in what might be considered to be a high risk and volatile market).  This view is supported by my understanding that 3AC was an experienced cryptocurrency hedge fund which would have been familiar with the risks associated with trading in digital assets.  Similarly, I do not consider the fact that 3AC traded digital assets for USD in order to close out positions held by it in digital assets,[55] to be outside the "*ordinary course*" of its business as a cryptocurrency hedge fund.

---

[53] I use this phrase not in the technical sense (see for example its reference in the (New Zealand) Companies Act 1993 (as emended) – as referred to above - and its interpretation by the New Zealand Courts in that context, and its reference in s.588FA(3) of the (Australian) Corporations Act 2001 and its interpretation by the Australian Courts in that context), but as a label to indicate that FTX and 3AC were engaged in regular and mutual dealings indicative of those dealings representing activity that reflected the entry into transactions by 3AC in the ordinary course of its business.

[54] See: Goode on Principles of Corporate Insolvency Law", *op cit*, at paragraph 13-84; "McPherson and Keay's Law of Company Liquidation", *op cit*, at paragraphs 11-068 and 11-069.  See also the discussion in, "*The Ballad of the Running Account - Voidable Preferences in the Ordinary Course of Business*" (1969) 7 MULR 178 (Baxt).

[55] Which, I am given to understand, is what occurred in this case.

**THE BVI TRANSACTION AT AN UNDERVALUE CLAIM**

59.    The POC also alleges a claim in the amount of $701,394,039 pursuant to s.246(1) of the Insolvency Act, on the basis that this amount represents the proceeds of a transaction at an undervalue that were received by FTX.[56]

60.    At paragraph 27 of the POC, the Joint Liquidators aver that at the end of 12 June 2022, the 3AC Accounts had a negative USD Balance of some $1,332,681,172.   The Joint Liquidators further aver that by the end of the day on 14 June 2022 this negative balance had been reduced by $631,287,133 resulting in a reduced negative US Dollar amount in the Account Balance with FTX of some $701,394,039.  What then appears to be alleged is that, "[t]*o the extent that FTX took actions*", they resulted in the negative US Dollar balance as of 14 June 2022 and that those actions were taken to discharge what is defined as the "*Unknown Alleged Liability*" and that, "[t]*o the extent that FTX took actions*" in relation to the "*Unknown Alleged Liability*", those actions are contestable on a variety of bases including on the basis that they constituted transactions at an undervalue pursuant to s.246(1) of the Insolvency Act.

61.    At paragraph 59 of the POC it is alleged that, "*FTX appropriated $701,394,039 in Lost Assets (or the proceeds thereof) purportedly in satisfaction of the Unknown Alleged Liability*".  The allegations contained in the POC as regards the purported transactions that are said to constitute transactions at an undervalue are no more explicit than the equivalent paragraphs dealing with allegations that there have been unfair preferences (see paragraphs 26-32 above).  The consequences for the lack of particularity as regards the claims based on allegations that there have been transactions at an undervalue – namely dismissal (in the event that they were being pursued before the BVI Courts – apply similarly in relation to the articulation of the alleged undervalue claims.

62.    Section 246(1) of the Insolvency Act is in the following terms (emphasis added):

>    "***Subject to subsection (2)**, a company enters into an undervalue transaction with a person if - (a) the company makes a gift to that person or otherwise enters into a transaction with that person on*

---
[56] Paragraphs 58-61 of the POC.

> *terms that provide for the company to receive no consideration; or*
> *(b) the company enters into a transaction with that person for a*
> *consideration the value of which, in money or money's worth, is*
> *significantly less than the value, in money or money's worth, of the*
> *consideration provided by the company; and (c) in either case, the*
> *transaction concerned—(i) is an insolvency transaction; and (ii) is*
> *entered into within the vulnerability period*".

63.   Section 246 of the Insolvency Act (as in the case of s.238 of the Insolvency Act 1986 in England), "*is concerned with the depletion of a company's assets by transactions at an undervalue*".[57]   As already observed, the obvious purpose of statutory provisions, such as s.246 of the Insolvency Act and s.238 of the Insolvency Act 1986 is to restore to a company's estate assets that have been wrongfully removed so that they may be realised and distributed for the benefit of that company's creditors as a whole.   On that basis, in my opinion, the property disposed of pursuant to a transaction that is said to constitute a transaction at an undervalue must belong to the company.[58]

64.   Importantly, s.246(2) of the Insolvency Act provides a defence to any claim that a relevant transaction constitutes a transaction at an undervalue as follows:

> "*A company does not enter into an undervalue transaction with a*
> *person if –*
> *(a) the company enters into the transaction in good faith and for the*
> *purposes of its business; and*
> *(b) at the time when it enters into the transaction, there were*
> *reasonable grounds for believing that the transaction would benefit*
> *the company*".

*(1) "Insolvency Transaction", "Transaction" and the "Vulnerability Period"*

65.   The rehearsal of the facts said to be relevant to and upon which the Joint Liquidators intend to rely are particularly exiguous.   As best as I can describe the basis of the claim, what is alleged is that: at some point on 13 and/or 14 June 2022, to the extent that FTX took action,

---

[57] Re MC Bacon Ltd [1990] BCLC 324, *per* Millett J at 340c.
[58] Mundy v Brown [2011] BPIR 1056. As referred to above. See also: Re Brookmann Home Ltd (In Liquidation) [2021] EWHC 2610 (Ch), in relation to transactions at an undervalue.

it appropriated assets to the value of $701,394,039[59] purportedly in satisfaction of the "*Unknown Alleged Liability*", but in respect of which 3AC did not receive anything in exchange.

66.    In relation to a claim under s.246 of the Insolvency Act, the Court is required in the first instance to identify, and to ascertain the nature of, the transaction which is sought to be avoided.  As part of this process the Court will have to look at the transaction in accordance with the parties' true intentions.[60]  The burden rests on the Joint Liquidators in proving some form of dealing between 3AC and FTX.[61]

67.    As in the case of the claim for an unfair preference, the Joint Liquidators apparently rely on actions said to have been taken by FTX unilaterally and which did not involve 3AC.  As such, on the Joint Liquidators' own case, it would seem that a necessary element to a claim under s.246 is absent, namely a transaction entered into by the relevant insolvent company (i.e., 3AC):[62] the unilateral appropriation (or misappropriation) by a person of the assets of a company do not constitute a dealing between that person and the company.[63]  As observed above, if there has not been any transaction to which the company was a party, s.246 of the Insolvency Act cannot, in my opinion, apply.

68.    Having said that, it is fair to say that the word "*transaction*"[64] in s.245 of the Insolvency Act, as a matter of ordinary language, may be said to embrace a potentially wide meaning and it may be argued that one should be wary of circumscribing the width of the statutory language with the possible result of undermining the purpose and effect of the provision.

---

[59] Although this may not be the correct amount by reference to the Joint Liquidators' own explanation of the claim as contained in the POC.

[60] Re Hampton Capital Ltd [2016] 1 BCLC 374, *per* Mr George Bompas QC (sitting as a Deputy High Court Judge in the Chancery Division), at paragraphs [36]–[38]; and Armour on '*Transactions at an Undervalue*' in, "Armour and Howard Bennett (eds), Vulnerable Transactions in Corporate Insolvency" (2002) at paragraph [2.64].

[61] Re Taylor Sinclair (Capital) Ltd [2001] 2 BCLC 176.

[62] See for example in England, under s.238 of the Insolvency Act 1986: Re Ovenden Colbert Printers Ltd [2013] EWCA Civ 1408; and Re Hampton Capital Ltd [2015] EWHC 1905 (Ch).

[63] Re Ovenden Colbert Printers Ltd, *supra*; and see Re Brabon [2001] 1 BCLC 11.

[64] Unlike in the BVI, in England the word "transaction" for the purposes of the Insolvency Act 1986 is defined in s.436 as including: "…*a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly*".

A transaction can include a series of transactions[65] and as such may encapsulate a period of dealing between the relevant parties and it may also apply to a composite transaction in which there is a contract between the relevant company and a counter-party, and a separate but linked contract between the relevant company and a different counter-party

69.    In this context, it has recently been determined by the United Kingdom Supreme Court[66] that the meaning of "*transaction*" (for the purposes of s.238 and s.423 of the Insolvency Act 1986 and as defined in s.436 of the Insolvency Act 1986) is not confined to a transaction by the relevant company with an asset owned by that company.

70.    However, this decision concerned the meaning of "*transaction*" in the context of a claim under s.423 of the Insolvency Act 1986 (a United Kingdom statute and not the Insolvency Act which is applicable in the BVI and under which the Joint Liquidators assert their claims), which permits claims to be made to set aside transactions at an undervalue that have been entered into by the debtor company with the intention to defraud its creditors (such intention has no relevance to the present case, as this is not a necessary element for a transaction at an undervalue claim).[67]    Such claims have to be entered into at an undervalue and the word "*transaction*" and the definition of what constitutes a transaction at an undervalue are used in both ss.238 and 423 of the Insolvency Act 1986.    As such, it was concluded in the Invest Bank case that the word "*transaction*" had to be given the same meaning throughout the Insolvency Act 1986 and therefore had to have the same meaning for the purposes of both ss.238 and 423.    The Court concluded that the language of s.423(1) of the Insolvency Act 1986 and the purpose of that section pointed to the conclusion that a "*transaction*" within section 423(1) was not confined to dealings with assets owned by the debtor company.[68]    It followed that the word "*transaction*" for the

---

[65] See the decision of the House of Lords in England of Phillips v Brewin Dolphin Bell Lawrie Ltd [2001] 1 WLR 143 in relation to s238 of the Insolvency Act 1986.  See also "McPherson and Keay's Law of Company Liquidation", *op cit*, at paragraphs 13-18 and 13-19.
[66] Invest Bank PSC v El-Husseiny [2025] 2 WLR 320.
[67] Such causes of action have been part of the law of England for some time, at least since the reign of King Edward III (50 Edward III, c 6).  And see also the Fraudulent Conveyances Act 1571 (13 Eliz, c 5), which was replaced by section 172 of the Law of Property Act 1925.
[68] Although this will usually be the case.

purposes of s.238 of the Insolvency Act 1986 was similarly not limited to transactions that only involved the transfer of assets owned by the company.[69]

71.     What is said above notwithstanding, in my opinion, the reasoning of the Courts in England in relation to the <u>Invest Bank</u> case (culminating in the judgment of the United Kingdom Supreme Court in that case), given that the <u>Invest Bank</u> case was concerned with the interpretation of the Insolvency Act 1986 in England and not the interpretation of a different statute i.e., the Insolvency Act in the BVI (which is not in the same terms) there is no reason to think that the reasoning in the <u>Invest Bank</u> case as regards the interpretation of the Insolvency Act 1986 in England would be applied by the Courts in the BVI.  The Insolvency Act does not include a provision the equivalent of s.423(1) of the Insolvency Act 1986 in England and nor does the Insolvency Act contain a definition of the word "*transaction*".  As a consequence, the issue of interpretation that arose for determination in the <u>Invest Bank</u> case does not and will not arise in the BVI under the Insolvency Act. Furthermore, the BVI has a separate statutory provision that deals with transactions entered into in fraud of creditors, which is not limited to situations of insolvency (and which is not contained in the Insolvency Act), and which is worded differently to s.246 of the Insolvency Act.[70]  Thus, the reasoning in the <u>Invest Bank</u> case has no application to a consideration of the meaning of the words "*insolvency transaction*" within the Insolvency Act in the BVI, whether as regards transactions at an undervalue or transactions said to constitute unfair preferences.[71]

72.     Accordingly, in my opinion, as a matter of BVI law, for a transaction to be impeached under ss.245 and 246 of the Insolvency Act, the relevant transaction must involve a dealing

---

[69] It should also be noted that claims made under s.423 of the Insolvency Act 1986 may be brought outside the confines of an insolvency situation and need not be brought by a liquidator.

[70] And for that matter is phrased in different terms to s.423 of the Insolvency Act 1986. The BVI equivalent to s.423 of the Insolvency Act 1986 is contained in s.81 of the Conveyancing and Law of Property Act 1961: "*Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced*".

[71] The reasoning in the <u>Invest Bank</u> case does not extend to the claims for unlawful preferences under s.238 of the Insolvency Act 1986 – since the defined term "transaction" does not form part of the defined elements of a claim under s.238.  This, in my opinion, arguably provides a further reason why the reasoning in the <u>Invest Bank</u> case ought not to be applied within the BVI, since if it was, the reasoning would extend to claims for unfair preferences under s.245 of the Insolvency Act, when in England the reasoning would not extent to claims for unlawful preferences under s.238 of the Insolvency Act 1986.

with the assets of the relevant insolvent company.  As described above, my understanding based on my instructions is that 3AC did not have any proprietary interests in the assets credited to the 3AC Accounts as of the end of 12 June 2022.

73.    Furthermore, and in any event, in my opinion, for any transaction to be actionable under s.246 of the Insolvency Act, 3AC must be party to or involved in the transaction in issue (which is not how the case appears to have been put by the Joint Liquidators), and the relevant transaction must be entered into within the "*vulnerability period*" and at a time when 3AC was insolvent (on a cash-flow basis).[72]  In addition, it is necessary to identify the terms of the alleged transaction and that they provided for 3AC not to receive any consideration.[73]

74.    As regards the meaning and effect of the terms "*insolvency transaction*" and "*vulnerability period*", see respectively paragraphs 25-37 and 38-39 above.

*(2) The Statutory Defence - s.246(2) of the Insolvency Act*

75.    Even assuming that the Joint Liquidators were able to establish all the elements necessary to prove that there has been a transaction at an undervalue under s.246(1) of the Insolvency Act, the FTX Recovery Trust would, in my opinion, have a statutory defence to the claim, pursuant to the terms of s.246(2) of the Insolvency Act.  The terms of s.246(2) are materially identical to the equivalent provision / statutory defence that exists in relation to transaction at an undervalue claims in England.[74]  The statutory defence was considered in detail for the purposes of s.238 of the Insolvency Act 1986 in England in TAQA Bratani Ltd v Fujairah Oil and Gas UK Llc,[75] in which case the statutory defence was successfully deployed.[76]

---

[72] Re Ovenden Colbert Printers Ltd, *supra*.
[73] Re Hampton Capital Ltd, *supra*.  If the transaction in issue does provide for consideration to be provided to the company, the transaction will constitute a transaction at an undervalue if the consideration received by the company is, in money or money's worth, significantly less than the value of the consideration provided by the company in money or money's worth: s.246(1)(b) of the Insolvency Act.  Both values have to be considered from the company's point of view: Re MC Bacon, *supra*.
[74] See s.238(5) of the Insolvency Act 1986.
[75] [2024] EWHC 3146 (Comm), *per* Dias J at paragraphs [259]-[271].
[76] See also: Levy McCallum Ltd v Mark Allen (liquidator of Fulford Hyman Ltd) [2007] NICh 3.

76.    The inquiry required to determine whether the statutory defence is made out is fact sensitive:[77]

   a.    As to the question of good faith, it is the good faith of the debtor company that is to be considered (i.e., 3AC).  The question of whether the relevant company entered into the transaction in good faith involves considering the subjective state of mind of those with control over the relevant company and who caused the relevant company to enter into the relevant transaction.  Good faith for the purposes of s.238(5) of the Insolvency Act 1986 may be taken to mean that there must be no intention to circumvent the objectives and purposes of the law of insolvency.  On the information available to me and based upon the allegations contained in the POC, there is nothing to suggest a lack of good faith on the part of 3AC in relation to any relevant transactions;[78]

   b.    In relation to the phrase, "*for the purpose of carrying on its business*", in my opinion, this connotes something broader than, "*in the ordinary course of business*".  What that means in any specific case will largely depend on the relevant facts.  Moreover, it is irrelevant that purpose may not have been the sole purpose.[79]  On the basis of the information available to me and based upon the allegations contained in the POC, the dealings between 3AC and FTX appear to have been for the purpose of carrying on 3AC's business (although the framing of the allegations in the POC in relation to the transaction at an undervalue claims is narrower than this and (importantly) does not assert that the transactions involved 3AC);

   c.    As regards the question of there being reasonable grounds for believing that the transaction would benefit the company, this does not require proof that the

---

[77] For example as stated by Bannister J[Ag] in <u>Tacon v Pitkin Group Ltd</u>, *supra*, at paragraph [68], "*the evidence clearly shows that this was not a transaction entered into in good faith and for the purposes of* [the insolvent company's] *business and there were no grounds at all for thinking that it would benefit* [the insolvent company]" and see more generally paragraphs [68]-[73].  See generally: "<u>McPherson and Keay's Law of Company Liquidation</u>", *op cit* at paragraphs 11-041-11-044; and "<u>Goode on Principles of Corporate Insolvency Law</u>", *op cit*, at paragraphs 13-37-13-40.

[78] <u>TAQA Bratani Ltd v Fujairah Oil and Gas UK Llc</u>, *supra*; and see "<u>McPherson & Keay's Law of Company Liquidation</u>", *op cit* at paragraph 11-042.

[79] <u>TAQA Bratani Ltd v Fujairah Oil and Gas UK Llc</u>, *supra*.

transaction did in fact benefit the company, only that the company had reasonable grounds for believing that it would benefit from the transaction. The grounds are to be assessed at the time of the transaction and whether or not those grounds are reasonable imports an objective test. On the information available to me and based upon the allegations contained in the POC, there is nothing to suggest that 3AC did anything other than deal with FTX in the belief (on reasonable grounds) that it would benefit from those dealings (although the manner in which the transactions at an undervalue claim is drafted is narrower than this and (importantly) does not assert that the transactions involved 3AC).

77.     As discussed above, there does not appear to have been any "*insolvency transaction*" during the 13-14 June 2022 period. To the extent the Joint Liquidators seek to argue that new deposits by 3AC of Digital Assets onto the Exchange, at some earlier undefined point in time, could potentially constitute transactions at an undervalue (which is not a claim that is made by in the POC), it is clear to me that as an active trader on various cryptocurrency exchanges, 3AC is likely to have regularly deposited funds on cryptocurrency exchanges (including the Exchange) as a necessary part of and to facilitate its trading activity. It would also appear obvious that such deposits were to further 3AC's business purposes as a hedge fund seeking to make profits through trading on cryptocurrency exchanges. Moreover, to the extent deposits at some earlier point in time are alleged to have been transactions at an undervalue, there does not appear to be any basis for saying that were not, "*reasonable grounds for believing that the transaction*[s] *would benefit* [3AC]".[80] Although I have not reviewed the specific facts, including for any period before 13 and 14 June 2022 or as to 3AC's activity on other exchanges, I would have expected it to be uncontroversial that 3AC deposited assets in order to earn profits from trading, and I understand that 3AC had been trading on the Exchange for two years before its eventual collapse.[81]

---

[80] See s.246(2)(b) of the Insolvency Act.
[81] And as noted in footnote 42 above, it also made - during the same period – a number of withdrawals from the Exchange. A further indication that what was occurring during the vulnerability period constituted ordinary trading transactions / activity.

**THE BVI TURNOVER CLAIM**

78.     The POC includes a "*turnover claim*", made under s.274A(1) of the Insolvency Act, in the amount of $1,530,862,573.85.[82]

79.     Section 274A(1) of the Insolvency Act provides that:

> "*Where any person has in his or her possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder*".

80.     The turnover claim being pursued by the Joint Liquidators is therefore predicated upon 3AC having a proprietary interest or having an entitlement to specific assets held by the FTX Recovery Trust.  By reference to the Declaration of Lord Neuberger (and as noted above), it is my understanding that 3AC did not have any proprietary interest in the assets associated with the 3AC Accounts or associated with the Account Balance as of the end of 12 June 2022 (or at any after that date).  As a result, the Joint Liquidators cannot succeed in their claim under s.274A of the Insolvency Act.

81.     Additionally, and on the same basis, I understand that it is impossible to identify any specific Digital Asset that was associated with the Account Balance as of 12 June 2022 (or at any time thereafter) as representing any asset now held by the FTX Recovery Trust.

82.     Section 247A(1) of the Insolvency Act is in materially identical terms to s.234(2) of the Insolvency Act 1986 in England.  In relation to s.234(2) of the Insolvency Act 1986 it has recently been observed by the Court of Appeal of England and Wales that (emphasis added):[83]

> "*As provided in s.234(2), the court is given power to direct the transfer to the office holder of any property, books or records to which the company "appears to be entitled".*

---

[82] Paragraph 62 of the POC.
[83] Ezair v Conn [2020] EWCA Civ 687, *per* Patten LJ at paragraph [26].  See also Re Sherwood Oak Homes Ltd (in Administration) [2024] EWHC 746 (Ch).

*"Property"* can include real property as the reference to *"convey"* and *"transfer"* makes clear. But the provisions of subss.(3) and (4) also confirm that an application under s.234 may not (and probably is not intended to) provide a definitive ruling about title nor is the possibility of such a ruling a pre-condition to the exercise of the power. Sections 234 and 236 are designed to assist an office holder in the carrying out of the relevant insolvency process by placing under his control the property and records to which the company appears to be entitled. ***Although, as Warner J recognised in Re London Iron & Steel Co Ltd [1990] B.C.C. 159 , a determination of whether the company appears to be entitled to the property does not preclude the resolution at the hearing of the grounds upon which the application is resisted, it may not provide an appropriate procedure for determining complex issues about title involving, in particular, claims by third parties. Section 234 creates a summary procedure whereby the office holder in his own name may seek the transfer of company property to him.*** *Although the entitlement to such an order will depend upon the company's apparent rights to the property in question and the judge will have to resolve any dispute about entitlement raised by the respondent in the proceedings,* ***the purpose of the power conferred on the court is and remains as Lord Hoffmann explained in Smith (Administrator of Cosslett (Contractors) Ltd) v Bridgend CBC [2001] UKHL 58; [2002] 1 A.C. 336; [2001] B.C.C. 740 at [26]–[28] that of enabling the office holder to carry out his statutory functions by placing the apparent property of the company under his control. This process does not therefore necessarily involve any determination of title and the final resolution of such a dispute may fall to be made in subsequent proceedings***".

83.    As a consequence, in my opinion, the invocation of s.274A of the Insolvency Act by the Joint Liquidators is not apt, given the complex facts, to determine (on a summary basis or at all) whether or not 3AC has any valid entitlement to the "*Lost Assets*", or the nature of that entitlement.  The need to determine those issues by reference to a complex factual matrix cannot, in my opinion, properly be described as a "*textbook turnover claim*".[84]  But the fundamental point remains that the Joint Liquidators cannot assert a valid turnover

---

[84] See paragraph 64 of the POC.

claim given that 3AC has no proprietary interest in the assets said to be the subject of the claim.

**THE BVI PROPRIETARY RESTITUTION CLAIM**

84.    The Joint Liquidators allege that 3AC has what is referred to as a "*proprietary restitution claim*" under the law of the BVI, in the amount of $1,530,862,573.85.[85]  In asserting this claim, the Joint Liquidators have cited and appear to rely upon[86] the English case of Armstrong DLW GmbH v Winnington Networks Ltd.[87]  In my opinion, the facts of the Armstrong case, the reasoning of the learned Judge as regards the relevant principles of law and their application to the facts of the Armstrong case, do not provide a valid basis for the Joint Liquidators' assertion that 3AC has a tenable "*proprietary restitution claim*".

85.    First, the receipt of the Assets by FTX - through 3AC's deposits of new Assets onto the Exchange - does not appear to have been unconscionable on the facts of the case as I understand them or as alleged in the POC – since the deposits arose out of the arrangements freely entered into between 3AC and FTX.

86.    Secondly, to the extent that the claim by 3AC is premised on the Liquidation by FTX, FTX was entitled, on the same basis, to conduct the Liquidation based on my review of the applicable contracts.

87.    Thirdly, I am instructed that and on the basis of the arrangements between FTX and 3AC as I understand them, legal title to the Assets was not retained by 3AC.

88.    Fourthly (and as Lord Neuberger has opined in his Declaration), there does not appear to be any subsisting proprietary interest in the Assets following their deposit on the Exchange. As a consequence, upon deposit of the Assets, 3AC lost any proprietary right or interest that it may have had and which may be said to be capable of vindication. As a consequence,

---

[85] See paragraph 84 of the POC.
[86] At footnote 36 of the POC.
[87] [2013] Ch 156.  This case does not appear to have been cited or approved by the BVI Courts, but for the reasons already stated, in my opinion, it may be considered to represent BVI law.

the type of claim and remedy that is said to exist by reference to the <u>Armstrong</u> case is not, in my opinion, available.

89.     Fifthly, I understand that the Assets have lost their identity and therefore cannot be "followed" or traced.

90.     Sixthly, I understand that 3AC has lost all title to the Assets and the Assets have ceased to be identifiable and are therefore not traceable or identifiable as now constituting different assets held by the FTX Recovery Trust to which the Joint Liquidators may lay claim.

91.     Seventhly, and depending upon the true nature of the remedy (whether personal or proprietary) the circumstances arguably give rise to a defence being available to the FTX Recovery Fund.  The FTX Recovery Fund may be able to argue that FTX changed its position in good faith following the receipt of the Assets.[88]  However, change of position is generally only available as a defence to a personal claim for unjust enrichment.[89]

92.     For the avoidance of doubt, and to repeat, my understanding is (by reference to the Declaration of Lord Neuberger): (i) the Joint Liquidators cannot establish that 3AC had any proprietary interest in the Assets credited to 3AC's Account Balance as of the end of 12 June 2022 (or anytime thereafter); and (ii) there is no ability to follow or trace any of the Assets that do form or did form part of the 3AC Account Balance as of 12 June 2022 (or anytime thereafter).

---

[88] The operation of the defence is founded on two principles, namely: (i) but for the receipt of the alleged benefit / enrichment, the recipient's position would not otherwise have changed, either because the recipient no longer has the benefit / enrichment alleged to have occurred, or because the recipient in reliance on the receipt of the benefit / enrichment has changed its position in some other way.  The defence is not available if the change of position would have occurred in any event regardless of the receipt of the benefit / enrichment.  There must be a causative link between the receipt of the benefit / the enrichment and the change of position.  Therefore, for example, the mere fact of having spent money following its receipt does not suffice to establish the defence; and (ii) the recipient's position must have changed in circumstances which make it inequitable for it to have to make restitution.  See "<u>Chitty on Contracts</u>" (35th Ed and Supplement), at paragraphs 33-199-33-210; and Chapter 27 "<u>Goff & Jones, the Law of Unjust Enrichment</u>" (10th Ed, 2022).  Both these principles underlie the defence because it is only where the defendant's position has changed by virtue of the receipt of the enrichment, and where it is just for the defendant to rely on the defence, that it is possible to conclude that the defendant's interest in the security of their receipt should prevail over the interest of the claimant in obtaining restitution.

[89] See generally: Chapter 27 of "<u>Goff & Jones, the Law of Unjust Enrichment</u>", *op cit*; and Chapter 44 of "<u>Lewin on Trusts</u>" (20th Ed, 2023).

**THE BVI UNJUST ENRICHMENT AND CONVERSION CLAIMS**

*(1) Unjust Enrichment*

93.　　The POC also alleges that 3AC has a (personal claim i.e., a non-proprietary claim) for unjust enrichment as against the FTX Recovery Trust.[90]  The Joint Liquidators assert that the requirements that must be established to found a claim for unjust enrichment, "*do not vary meaningfully regardless of whether Delaware law, English law, Bahamian law, or BVI law is applied*".[91]  I accept that there are no material differences between the law of England and the law of the BVI as to the necessary requirements for the valid pursuit of a claim for unjust enrichment (I make no comment as regards the commonality (if any) as regards the laws of Delaware of or the Bahamas).  However, the POC does not specify the governing law which the Joint Liquidators say applies to any claim in unjust enrichment as against the FTX Recovery Trust.  I consider this to be unsatisfactory and inadequate as an approach.

94.　　In paragraph 71 of the POC, the requirements for a claim in unjust enrichment are set out as follows, that the recipient must: (i) have been enriched or received a benefit; (ii) have been enriched or have benefited at the claimant's expense; (iii) have been enriched or have benefited unjustly; and (iv) must have no defences to the claim for unjust enrichment.  The following comments may be made:

　　　　a.　I largely agree with the rehearsal of the necessary requirements of a claim for unjust enrichment, with one qualification.  The enrichment or benefit may be at the direct or indirect expense of the claimant.  However, insofar as the enrichment or benefit is said to be at the indirect expense of the claimant, it will generally only be actionable in circumstances that encompass situations which, for the purposes of the rule, the law treats as equivalent to a direct enrichment or benefit, such that in reality there is no substantive or real difference;[92]

---

[90] See paragraphs 45 and 71-73 of the POC.
[91] See paragraph 71 of the POC (foot notes omitted).
[92] Investment Trust Companies (In Liquidation) v HMRC [2017] UKSC 29, per Lord Reed at paragraphs [43]-[60].

   b.   A claim made by reference to the law of unjust enrichment is designed to correct normatively defective transfers of value;[93] and

   c.   The enrichment or benefit received need not be restored to the claimant if the party in receipt of the enrichment or benefit was entitled to receive what is said to have led to the enrichment of the recipient, or has led to the benefit enjoyed by the recipient.[94]

95.   On my understanding of the facts and the terms upon which FTX and 3AC conducted their dealings, FTX was entitled to receive the Assets.   Indeed, it was necessary for 3AC to deposit Assets with FTX for it to be able to trade using the Exchange.   Furthermore, to the extent that the claim by 3AC is premised on the Liquidation of Assets by FTX, FTX was entitled, on the same basis, to conduct the Liquidation—which did not occur until 14 June 2022.

96.   A further barrier to a claim in unjust enrichment by the Joint Liquidators may arise by reason of the application of the general principle that where a benefit has been transferred pursuant to the terms of a contract which remains executory, or which has been discharged by performance, and has not otherwise been prematurely terminated, no claim in unjust enrichment will ordinarily be available.   The principle is founded upon the premise that the law should give effect to the parties' own allocations of risk and valuations and respect the bargain the parties have made as expressed in the contract; and the concept of unjust enrichment should not be permitted to encroach inappropriately into the law of contract and the principle of freedom of contract.   In any event, the availability of a claim in unjust enrichment depends upon the relevant contract first having been terminated.   As I

---

[93] AXA Sun Life plc v Commissioners of Inland Revenue [2025] STC 120 (Court of Appeal of England and Wales), *per* the judgment of the Court at paragraph [42].
[94] See for example: Barton v Morris [2023] AC 684 (United Kingdom Supreme Court), *per* Lady Rose JSC at paragraphs [75]-[107] (with Lords Briggs and Stephens JJSC agreeing); Dargamo Holdings v Avonwick Holdings, at paragraph 70; DD Growth Premium 2x Fund (in liquidation) v RMF Market Neutral Strategies (Master) Ltd [2017] UKPC (on appeal from the Cayman Islands); and Kleinwort Benson v Lincoln City Council [1999] 2 AC 349 (House of Lords, England).

understand the position, the contractual arrangements as between FTX and 3AC have not been repudiated or otherwise terminated.[95]

97. Finally, assuming that FTX was unjustly enriched, on the basis of the information presently available to me, the defence of change of position may be available to FTX Recovery insofar as it no longer retains any relevant assets.

*(2) Conversion*

98. The Joint Liquidators also assert that 3AC has a claim in conversion against FTX in relation to the Lost Assets.[96] The Joint Liquidators assert that there is no meaningful difference as to the elements necessary to establish a case in conversion whether pursuant to BVI law, Delaware law or Bahamian law. I accept that there are no material differences between the law of England and the law of the BVI as to the requirements for the valid pursuit of a claim for conversion. I make no comment as regards the commonality (if any) as to the laws of Delaware or the Bahamas. However, again, the POC does not specify the governing law which the Joint Liquidators say applies to any claim in conversion as against the FTX Recovery Trust. I consider this to be unsatisfactory and inadequate as an approach.

99. The tort of conversion is committed: (i) where a person without authority receives or takes possession of another's property; (ii) with the intention of asserting some right or dominion over that property inconsistent with the rights of the true owner; or (iii) deals with that property in a manner inconsistent with the rights of the true owner.[97]

100. On the basis of the matters referred to above, it would appear that: (i) the possession of the Assets by FTX was consequent upon the voluntary and consensual delivery of Assets to FTX by 3AC; (ii) via such delivery, FTX did not simply obtain possession of the Assets, but 3AC lost all proprietary interest in the Assets; and (iii) FTX appears to have been

---

[95] See generally the discussion in "Goff & Jones, the Law of Unjust Enrichment", *op cit*, at paragraphs 3-09 *et seq*.
[96] See paragraphs 45 and 81-82 of the POC.
[97] See paragraph 16-09 of "Clerk & Lindsell on Torts" (24th Ed, Consolidated). See generally "Clerk & Lindsell", *op cit*, Chapter 16. See also Chiverton Construction Ltd v Turnbull [2022] ECSC J0817-6, as cited at foot note 34 of the POC.

entitled to conduct the Liquidations on the basis of the terms of the relationship as between it and 3AC.  In any event,  given the absence of any proprietary interest in the Assets on the part of 3AC, after they had been transferred, there can, in my opinion, be no liability for conversion on the part of FTX / the FTX Recovery Trust.

101.   Moreover, although (certainly as a matter of the law of England) it appears now to be uncontroversial that crypto assets can and do constitute personal property,[98] such assets are intangible property.  The tort of conversion only applies to tangible assets.[99]  This provides a further reason as to why there can be no valid claim for conversion against the FTX Recovery Trust as alleged in the POC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Old Isleworth Middlesex on 20 June 2025

_____

Stephen Atherton KC

---

[98] See for example the following decisions of the Courts in England: AA v Persons Unknown [2019] EWHC 3556 (Comm); Fetch.ai v Persons Unknown [2021] EWHC 2254 (Comm); and Tulip Trading Ltd v Bitcoin Association [2023] EWCA.
[99] OBG Ltd v Allan [2008] 1 AC 1 (House of Lords, England).  See also: "The Law Commission, Digital Assets: Final Report" (Law Com No 412, 2023), 28 June 2023; and "Digital assets as personal property: Supplemental report and draft Bill" (Law Com No 416), 29 July 2024.