**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered) |
| FTX RECOVERY TRUST, and LP DIGITAL ASSET OPPORTUNITIES MASTER FUND SUCCESSOR LP,<br><br>    Plaintiffs,<br><br>- against -<br><br>WANDILLA HOLDINGS LIMITED,<br><br>    Defendant. | Adv. Pro. No. 25-_____(KBO) |

**COMPLAINT FOR TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 542, VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362, AND FOR BREACH OF CONTRACT**

1. Plaintiffs FTX Recovery Trust and LP Digital Asset Opportunities Master Fund Successor LP, f/k/a LedgerPrime Digital Asset Opportunities Master Fund LP[1], through their undersigned counsel, for their complaint against Defendant Wandilla Holdings Limited d/b/a Burnt ("Burnt" or "Defendant"), allege the following based upon personal knowledge and upon their investigations to date as to themselves and their own acts, and upon information and belief as to all other matters:

---

[1] In connection with the sale of the Debtors' (as defined below) LedgerX business pursuant to the *Order (I) Approving the LedgerX Business Purchase Agreement, (II) Approving the Sale of the LedgerX Business Free and Clear of All Liens, Claims, Interests and Encumbrances, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and (IV) Granting Related Relief* [D.I. 1433] (the "LedgerX Sale Order"), on September 15, 2023, LedgerPrime Digital Asset Opportunities Master Fund, LP was renamed LP Digital Asset Opportunities Master Fund Successor LP.

**NATURE OF THE CASE**

2. Plaintiffs bring this adversary proceeding ("Adversary Proceeding") pursuant to sections 105 and 542 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") to recover $XION tokens from Defendant. Plaintiffs also bring a claim against Defendant for a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code for Defendant's actions affecting property of the estates, and common law claims for breach of contract.

3. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). On October 8, 2024, the Court entered an order confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D. I. 26404-1] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127] (the "Plan Effective Date").

4. Debtor Maclaurin Investment Ltd. f/k/a Alameda Ventures Ltd. ("Maclaurin") is a wholly owned subsidiary of Debtor Alameda Research Ltd., which is a wholly owned subsidiary of Debtor Alameda Research LLC. Prior to the filing of the Chapter 11 Cases, Maclaurin engaged in venture investing in early-stage companies in the cryptocurrency, blockchain, and fintech industries.

5. On the Plan Effective Date, all assets of Maclaurin including all claims and causes of action, were transferred to and vested in Plaintiff FTX Recovery Trust, a Delaware statutory trust operated for the benefit all stakeholders. Accordingly, Plaintiff FTX Recovery Trust has

the authority to file this Complaint on behalf of Maclaurin to commence, and thereafter to prosecute, this Adversary Proceeding.

6.  Debtor LP Digital Asset Opportunities Master Fund Successor LP ("Successor Fund") f/k/a LedgerPrime Digital Asset Opportunities Master Fund LP ("Master Fund"), was an investment fund operated by Debtor LP Successor Entity LLC f/k/a LedgerPrime LLC ("LedgerPrime").[2]  Prior to the filing of the Chapter 11 Cases, LedgerPrime was a wholly owned subsidiary of Debtor Alameda Research LLC and operated as a digital asset management firm specializing in blockchain and cryptocurrency investments.  LedgerPrime carried out its venture investment activities through Master Fund.

7.  Pursuant to the Plan, Successor Fund was a "Separate Subsidiary" such that its assets and liabilities were not substantively consolidated with the Consolidated Debtors.  As a Separate Subsidiary, Successor Fund's assets were not transferred to or vested in Plaintiff FTX Recovery Trust.  However, (i) all Causes of Action of the Separate Subsidiaries, including Successor Fund, were preserved and vested in the wind down estate of the applicable Separate Subsidiary on the Plan Effective Date pursuant to section 5.17 of the Plan; and (ii) all assets of Debtor Alameda Research, including its equity interests in Successor Fund, were transferred to, and vested in, Plaintiff FTX Recovery Trust on the Plan Effective Date.

8.  Defendant Burnt is a token issuer that issues the $XION token f/k/a BURNT token ("$XION").

---

[2]  In connection with the sale of the Debtors' LedgerX business pursuant to the LedgerX Sale Order, on August 16, 2023, LedgerPrime LLC was renamed LP Successor Entity LLC.

9.  Before the launch of the $XION token, Maclaurin and Master Fund each purchased the right to receive $XION tokens through four separate Token Purchase Agreements, which are investment contracts offered by cryptocurrency developers to sell digital tokens.

10. Pursuant to the Token Purchase Agreement between Maclaurin and Defendant executed on executed on May 24, 2021 ("TPA 1"), Maclaurin agreed to make a total upfront payment of $300,000 USDC in exchange for the right to receive 4,000,000 $XION tokens on the date on which the $XION token became available for trading on a centralized cryptocurrency exchange, subject to an applicable unlocking schedule following delivery.

11. Pursuant to another Token Purchase Agreement between Maclaurin and Defendant executed on executed on May 24, 2021 ("TPA 2"), Maclaurin agreed to pay $400,000 USDC in exchange for the right to receive 5,333,333 $XION tokens on the date on which the $XION token became available for trading on a centralized cryptocurrency exchange, subject to an applicable unlocking schedule following delivery.

12. Pursuant to the Token Purchase Agreement between Maclaurin and Defendant executed on January 27, 2022 ("TPA 3"), Maclaurin agreed to make a total upfront payment of $500,000 USDC in exchange for the right to receive an aggregate of 1,250,000 $XION tokens one month following the date on which the $XION token became available for trading on a centralized cryptocurrency exchange, subject to an applicable unlocking schedule following delivery.

13. Pursuant to the Token Purchase Agreement between Master Fund and Defendant executed on December 23, 2021 ("TPA 4"), Master Fund agreed to make an upfront payment of $100,000 USDC in exchange for the right to receive 250,000 $XION tokens one month

following the date on which the $XION token became available for trading on a centralized cryptocurrency exchange, subject to an applicable unlocking schedule following delivery.

14. By January 28, 2022, Maclaurin had paid a total of $1,200,000 USDC in satisfaction of its obligations under TPA 1, TPA2 and TPA 3.

15. On information and belief, Master Fund paid a total $100,000 USDC in satisfaction of its obligation under TPA 4.

16. The $XION tokens became available for trading on a centralized cryptocurrency exchange on December 5, 2024.[3]  Pursuant to TPA 1 and TPA 2, Defendant was obligated to deliver $XION tokens in locked form to Maclaurin on December 5, 2024 (the "December 5 Trigger Date").  Under the terms of the unlocking schedules provided in TPA 1 and TPA 2, one-third of the $XION tokens owed to Plaintiffs are scheduled to unlock every six months after December 5, 2024.  All tokens owed to Plaintiffs will be fully unlocked by June 5, 2026.

17. Pursuant to TPA 3 and TPA 4, Defendant was obligated to deliver $XION tokens in locked form to Maclaurin and/or Master Fund on January 5, 2025, one month after the December 5, 2024 date on which the $XION tokens became available for trading on a centralized cryptocurrency exchange (the "January 5 Trigger Date").  Under the terms of the unlocking schedules provided in the TPAs, one-third of the $XION tokens owed to Plaintiffs are scheduled to unlock every six months after January 5, 2025.  All tokens owed to Plaintiffs will be fully unlocked by July 5, 2026.

18. To date, Defendant has not delivered any $XION tokens to Plaintiffs.

---

[3] *See*, *e.g.*, *Believe in XION: The Mainnet is Live*, XION BLOG, https://xion.burnt.com/blog/xion-mainnet-launch (last visited May 5, 2025).

19. On April 24, 2025, without providing any reason, Defendant informed Plaintiffs' advisors via email that, pursuant to section 5.2 of the TPAs, it was canceling Plaintiffs' token purchases and would refund Plaintiffs 90% of the purchase price that each Plaintiff had paid.

20. This Adversary Proceeding seeks the turnover of the locked $XION tokens owed to Plaintiffs and held by Defendant.

21. During the course of this Adversary Proceeding, Plaintiffs may learn (through discovery or otherwise) of additional property of the Plaintiffs subject to turnover under section 542 of the Bankruptcy Code, or of transfers made to Defendant that are avoidable under applicable law.  Plaintiffs intend to recover all such property.  Plaintiffs reserve the right to amend this Complaint.

## JURISDICTION AND VENUE

22. This Adversary Proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.  The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

23. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

24. Venue is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

25. The statutory predicates for the relief requested herein are sections 105, 362, and 542 of the Bankruptcy Code.

26. This Adversary Proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

27. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

28. Plaintiff FTX Recovery Trust is a Delaware statutory trust created and implemented pursuant to the Plan, and the sole owner by assignment of all rights and assets of Maclaurin under the Plan.

29. Plaintiff Successor Fund is a Cayman Islands entity and the successor to Master Fund. Prior to the filing of the Chapter 11 Cases, Master Fund was the investment vehicle of LedgerPrime.

30. Defendant is a company incorporated in the British Virgin Islands and headquartered in New York, New York. Defendant develops and operates the XION blockchain, a Layer 1 blockchain. In connection with the XION blockchain, Defendant develops, issues, and operates the $XION token. The $XION token is the native utility token of the XION blockchain.

31. At all relevant times, the $XION token has been issued and operated by Defendant.

## OTHER RELEVANT PERSONS

32. Maclaurin is a limited company incorporated in the Seychelles. It is a wholly owned subsidiary of Alameda Research Ltd., a British Virgin Islands company limited by shares.

33. Alameda Research Ltd. is a wholly owned subsidiary of Alameda Research LLC, a Delaware limited liability company.

34. LedgerPrime is a Delaware limited liability company. Prior to the Chapter 11 Cases, LedgerPrime and certain affiliated entities (including Master Fund) operated a hedge fund specializing in cryptocurrency ventures.

## FACTUAL ALLEGATIONS

35. Prior to the filing of the Chapter 11 Cases, Maclaurin engaged in venture capital investing in the cryptocurrency, blockchain, and fintech industries. It primarily targeted seed to early-stage investments in companies with a geographic focus on Asia and North America. Between 2020 and 2022, Maclaurin made a number of investments in decentralized finance business ventures.

36. Similarly, prior to the filing of the Chapter 11 Cases, Master Fund engaged in venture capital investing in the cryptocurrency industry. Master Fund was a Cayman investment vehicle used by LedgerPrime to make investments.

37. Upon information and belief, by early 2022, Defendant had solicited Maclaurin, Master Fund, and other entities to invest in the pre-launch $XION token.

38. The $XION token is the currency used on the XION blockchain.

**I.    The TPAs**

39. On May 24, 2021, Maclaurin entered into two TPAs with Defendant. Under TPA 1, Maclaurin agreed to pay $300,000 USDC in exchange for the right to receive 4,000,000 $XION tokens on the December 5 Trigger Date. Under the TPA 2, Maclaurin agreed to pay $400,000 USDC in exchange for the right to receive 5,333,333 $XION tokens on the December 5 Trigger Date.

40. All other terms in TPA 1 and TPA 2 are identical.

41. On January 27, 2022, Maclaurin entered into TPA 3 with Defendant. Under TPA 3, Maclaurin agreed to pay $500,000 USDC in exchange for the right to receive 1,250,000 $XION tokens on the January 5 Trigger Date.

42. On December 23, 2021, Master Fund entered into TPA 4 with Defendant. Under TPA 4, Master Fund agreed to pay $100,000 USDC in exchange for the right to receive 250,000 $XION tokens on the January 5 Trigger Date.

43. All other terms in TPA 3 and TPA 4 are identical.

44. Pursuant to TPA 1 and TPA 2, Maclaurin was entitled to receive an aggregate total of 9,333,333 $XION tokens on the December 5 Trigger Date, subject to an unlocking schedule. Under the unlocking schedule in TPA 1 and TPA 2, one third of Plaintiff FTX Recovery Trust's tokens owed under TPA 1 and TPA 2 should have unlocked or will unlock on each of June 5, 2025, December 5, 2025, and June 5, 2026.

45. Pursuant to TPA 3, Maclaurin was entitled to receive an additional 1,250,000 $XION tokens on the January 5 Trigger Date, subject to an unlocking schedule. Under the unlocking schedule in TPA 3, one third of Maclaurin's tokens owed under TPA 3 should have unlocked or will unlock on each of July 5, 2025, January 5, 2026, and July 5, 2026.

46. Pursuant to TPA 4, Master Fund was entitled to receive a total of 250,000 $XION tokens on the January 5 Trigger Date, subject to an unlocking schedule. Under the unlocking schedule in TPA 4, one third of Master Fund's tokens should have unlocked or will unlock on each of July 5, 2025, January 5, 2026, and July 5, 2026.

47. On March 30, 2021, Maclaurin paid a total of $700,000 USDC in satisfaction of its obligations under TPA 1 and TPA 2.

48. On January 28, 2022, Maclaurin paid $500,000 USDC in satisfaction of its obligations under TPA 3.

49. On information and belief, Master Fund paid $100,000 USDC in satisfaction of its obligations under TPA 4.

50. On the December 5 Trigger Date, Defendant was obligated under TPA 1 and TPA 2 to deliver to Plaintiff FTX Recovery Trust a total of 9,333,333 locked $XION tokens.

51. On June 5, 2025, Defendant was obligated under TPA 1 to unlock 1,333,333 of the $XION tokens due to Plaintiff FTX Recovery Trust.

52. On June 5, 2025, Defendant was obligated under TPA 2 to unlock 1,777,778 of the $XION tokens due to Plaintiff FTX Recovery Trust.

53. On the January 5 Trigger Date, Defendant was obligated under TPA 3 to deliver to Plaintiff FTX Recovery Trust 1,250,000 $XION tokens.

54. On the January 5 Trigger Date, Defendant was obligated under TPA 4 to deliver to Plaintiff Successor Fund 250,000 $XION tokens.

55. On July 5, 2025, Defendant was obligated under TPA 3 to unlock 416,667 of the locked $XION tokens due to Plaintiff FTX Recovery Trust.

56. On July 5, 2025, Defendant was obligated under TPA 4 to unlock 83,333 of the locked $XION tokens due to Plaintiff Successor Fund.

57. To date, Defendant has not transferred any of the 10,833,333 $XION tokens owed to Plaintiffs under the TPAs, nor has it unlocked any of the 3,611,111 $XION tokens in accordance with the unlocking schedules set forth in the TPAs.

**II.     Cancellation of the Token Purchases**

58.     After filing of the Chapter 11 Cases, and on multiple occasions following the December 5 Trigger Date and the January 5 Trigger Date, Plaintiffs' advisors contacted Defendant seeking the $XION tokens owed to Plaintiffs.

59.     On June 19, 2024, January 6, 2025, and March 28, 2025, Plaintiffs' advisors emailed Defendant seeking the $XION tokens. Defendant did not provide any substantive responses.

60.     On April 24, 2025, Defendant informed Plaintiffs' advisors via email that it intended to exercise its purported right to cancel Maclaurin's and Master Fund's token purchases pursuant to section 5.2 in the TPAs and would refund the $1,200,000 that Maclaurin paid and the $100,000 that Master Fund paid, less 10% fees and expenses.

**III.    The FTX Recovery Trust Attains Standing to Sue Defendant**

61.     On October 8, 2024, the Court entered an order confirming the Plan which became effective on the Plan Effective Date.

62.     Upon the Plan Effective Date, rights and assets of the Debtors including all claims and causes of action of Maclaurin and Debtor Alameda Research LLC's equity interests in Successor Fund (Successor Fund retained all of its assets and causes of action), were transferred to, and vested in, Plaintiff FTX Recovery Trust pursuant to sections 5.7 and 5.17 of the Plan, and paragraph 51 of the Plan confirmation order.

63.     Section 542(a) of the Bankruptcy Code mandates that "an entity, other than a custodian, in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

11

64. As of the Petition Date, the $XION tokens are property of the Debtors' estate pursuant to section 541(a)(1) of the Bankruptcy Code, which defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a).[4]

65. "Congress intended that property of the estate be broadly inclusive of all interests that the debtor has under state law." *In re Barksdale*, 281 B.R. 548, 551 (Bankr. D.N.J. 2002). "[T]he Bankruptcy Code is not concerned with the 'technicalities of title' when it comes to determining property of the estate." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *8 (Bankr. D.N.J. June 29, 2006). Instead, property belongs to the estate where the debtor controls the property or otherwise indicates its "legal or equitable interests" in the property. *E.g.*, *In re Schwartz*, 2014 WL 2621114, at *5 (Bankr. D.N.J. June 12, 2014) (holding that bank account not in debtor's name was nevertheless property of the estate where debtor funded account, showed "ownership, control, and interest" in account, and money "functionally belonged" to debtor).

## CAUSES OF ACTION

### COUNT ONE
### TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542

66. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 65 as if fully set forth here.

67. As alleged above, Defendant continues to withhold $XION tokens owed to Plaintiffs, which are Plaintiffs' assets that are not of inconsequential value. Plaintiffs seek an order from the Court directing Defendant to turn over all locked $XION tokens due to Plaintiffs

---

[4] In addition, insofar as Defendant qualifies as a custodian under section 543 of the Bankruptcy Code, it is obligated to "deliver to the [Debtors] any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case." 11 U.S.C. § 543(b).

under the TPAs pursuant to section 542(a) of the Bankruptcy Code, which are Plaintiffs' property pursuant to section 541(a)(1) of the Bankruptcy Code.

68. Plaintiff FTX Recovery Trust seeks turnover of the 10,583,333 $XION tokens owed to it, including 3,527,778 unlocked $XION tokens.

69. Plaintiff Successor Fund seeks turnover of the 250,000 $XION tokens owed to it, including 83,333 unlocked $XION tokens.

70. The relief requested also is authorized under the Court's equitable powers codified in section 105(a) of the Bankruptcy Code. Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

## COUNT TWO
## VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(a)(3), (k)

71. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 65 as if fully set forth here.

72. Section 362(a)(3) of the Bankruptcy Code provides, in relevant part, that a petition "filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

73. Plaintiffs' $XION tokens withheld by Defendant comprise property of the Debtors' estate under Section 541 of the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(1) (Estate property is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case").

74. Section 362(k) of the Bankruptcy Code permits an individual injured by a willful violation of the automatic stay to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, [to] recover punitive damages." *See* 11 U.S.C. § 362(k)(1).

75. Defendant's decision to withhold from Plaintiffs $XION tokens owed to Maclaurin and Master Fund under the TPAs warrants both actual and punitive damages to be determined by the Court based on the depletion of estate assets, including any losses in value of the $XION tokens withheld by Defendant resulting from Defendant's actions, as well as costs and attorneys' fees.

## COUNT THREE
## COMMON LAW BREACH OF CONTRACT UNDER SINGAPORE LAW

76. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 65 as if fully set forth here.

77. On May 24, 2021 and January 27, 2022, Maclaurin and Defendant entered into three valid and legally binding TPAs.

78. On December 23, 2021, Master Fund and Defendant entered into a valid and legally binding TPA.

79. Section 2.7(b) of TPA 1 and TPA 2 required Defendant to deliver 9,333,333 $XION tokens to Maclaurin on the December 5 Trigger Date, subject to an unlocking schedule through June 2026.

80. Pursuant to section 2.7(b) of TPAs 1 and 2, Defendant was obligated to transfer to Maclaurin 9,333,333 $XION tokens on December 5, 2024 and to unlock 3,111,111 $XION tokens to date.

81. Section 2.7(b) of TPA 3 and TPA 4 required Defendant to deliver 1,250,000 $XION tokens to Maclaurin and 250,000 $XION tokens to Master Fund on the January 5 Trigger Date, subject to an unlocking schedule through July 2026.

82. Pursuant section 2.7(b) to TPAs 3 and 4, Defendant was obligated to deliver 1,250,000 $XION tokens to Maclaurin and 250,000 $XION tokens to Master Fund on January 5, 2025 and to unlock 416,667 $XION tokens for Maclaurin and 83,333 $XION tokens for Master Fund to date.

83. Maclaurin fulfilled its obligations under TPA 1, TPA 2, and TPA 3 when it remitted $1,200,000 USDC to Defendant in satisfaction of the TPAs.

84. On information and belief, Master Fund fulfilled its obligation under TPA 4 when it remitted $100,000 USDC to Defendant in satisfaction of the TPA.

85. To date, Defendant has not delivered any of the 10,833,333 $XION tokens owed to Plaintiffs under the TPAs, nor has it unlocked any of the 3,611,111 $XION tokens in accordance with the unlocking schedules set forth in the TPAs. Such non-delivery by the Defendant constitutes a breach of section 2.7(b) of the TPAs. As a result of the Defendant's breach, the Plaintiffs suffered loss and damage.

## COUNT FOUR
## COMMON LAW BREACH OF CONTRACT UNDER SINGAPORE LAW

86. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 65 as if fully set forth here.

87. On May 24, 2021 and January 27, 2022, Maclaurin and Defendant entered into three valid and legally binding TPAs.

88. On December 23, 2021, Master Fund and Defendant entered into a valid and legally binding TPA.

89. Section 2.7(b) of TPA 1 and TPA 2 required Defendant to deliver 9,333,333 $XION tokens to Maclaurin on the December 5 Trigger Date, subject to an unlocking schedule through June 2026. On June 5, 2025, 3,111,111 $XION tokens were scheduled to unlock.

15

90. Section 2.7(b) of TPA 3 and TPA 4 required Defendant to deliver 1,250,000 $XION tokens to Maclaurin and 250,000 $XION tokens to Master Fund on the January 5 Trigger Date, subject to an unlocking schedule through July 2026. On July 5, 2025, 416,668 of Maclaurin's $XION tokens and 83,333 of Master Fund's $XION tokens were scheduled to unlock.

91. Maclaurin fulfilled its obligations under TPA 1, TPA 2, and TPA 3 when it remitted $1,200,000 USDC to Defendant in satisfaction of the TPAs.

92. On information and belief, Master Fund fulfilled its obligation under TPA 4 when it remitted $100,000 USDC to Defendant in satisfaction of the TPA.

93. To date, Defendant has not delivered any of the 10,833,333 $XION tokens owed to Plaintiffs under the TPAs, nor has it unlocked any of the 3,611,111 $XION tokens in accordance with the unlocking schedules.

94. Section 5.2 of the TPAs purportedly allows Defendant the right to cancel any token purchases in its "sole and absolute discretion."

95. In order to ensure that the TPAs have business efficacy, it is an implied term in fact of the TPA under Singapore law that (a) Defendant shall not exercise its discretion pursuant to section 5.2 of the TPAs arbitrarily, capriciously, or irrationally, or in the alternative, (b) Defendant shall exercise its discretion pursuant to section 5.2 of the TPAs reasonably. As a result, Defendant cannot exercise its discretion under section 5.2 in a manner that is arbitrary, capricious, irrational, or unreasonable so as to cancel a token purchase after Plaintiffs have remitted payment in full in satisfaction of their obligations under the TPAs and after the December 5 Trigger Date and January 5 Trigger Date have occurred.

96. On April 24, 2025, Defendant informed Plaintiffs' advisors via email that it intended to exercise its purported right to cancel Maclaurin's and Master Fund's token purchases pursuant to section 5.2 in the TPAs and would refund the $1,200,000 that Maclaurin paid and the $100,000 that Master Fund paid, less 10% fees and expenses. Defendant provided no reason for its decision to cancel Maclaurin's and Master Fund's token purchase agreements months after Defendant was obligated to have delivered the $XION tokens to them under the TPAs.

97. Defendant's cancellation of the token purchases months after Defendant was obligated to have delivered the $XION tokens to Plaintiffs under the TPAs and without providing any explanation for the cancellation constituted a breach of the implied term (a) not to exercise its discretion pursuant to section 5.2 of the TPAs in a manner that is arbitrary, capricious and irrational, or in the alternative, (b) to exercise its discretion reasonably. In turn, the Defendant would be in breach of the express term to deliver the $XION tokens pursuant to section 2.7(b) of the TPAs. As a result of the Defendant's breaches, the Plaintiffs suffered loss and damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

98. Enter an order under sections 105(a) and 542 of the Bankruptcy Code directing the turnover of all $XION tokens owed to Plaintiffs to date;

99. Enter an order under section 362(k) of the Bankruptcy Code awarding actual and punitive damages to Plaintiffs for Defendant's violation of the automatic stay;

100. Enter an order awarding damages to be assessed, to the Plaintiffs for the Defendants' breaches of the TPAs;

101. Enter an order requiring that Defendant specifically perform its obligations under the TPAs by transferring and unlocking all $XION tokens owed to Plaintiff to date;

102. Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

103. Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: July 10, 2025
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
cobb@lrclaw.com
mcguire@lrclaw.com
robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: wheelers@sullcrom.com
gluecksteinb@sullcrom.com
dunnec@sullcrom.com
crokej@sullcrom.com

*Counsel for Plaintiffs*