## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: August 12, 2025 at 9:30 a.m. (ET)**<br>**Objection Deadline: August 6, 2025 at 4:00 p.m. (ET)** |
| | **Ref. Nos. 3409, 3737, 29572, 30712 & 31312** |

### FTX RECOVERY TRUST'S MOTION FOR RECONSIDERATION OR
### TO MODIFY ORDER ALLOWING RHEINGANS-YOO'S FDU CLAIM

The FTX Recovery Trust ("Trust") hereby submits this motion (the "Motion") to reconsider or, in the alternative, to modify the Court's July 9, 2025 order ("Order") overruling the Trust's objection to and allowing Ross Rheingans-Yoo's claim relating to the $650,000 donation to an Effective Altruist cause of Rheingans-Yoo's choosing ("FDU Claim") [D.I. 31312]. In support of this Motion, the Trust respectfully states as follows:

### PRELIMINARY STATEMENT

1.     Based on newly discovered evidence and to prevent manifest injustice, the FTX Trust respectfully requests, pursuant to Federal Rule 59 and Bankruptcy Rules 3008 and 9023, that this Court reconsider its order allowing the FDU Claim. After the Court allowed Rheingans-Yoo's FDU Claim during the June 25, 2025 omnibus hearing, Rheingans-Yoo designated Manifold for Charity as the beneficiary of the $650,000 donation to be made pursuant to the FDU Claim. Manifold for Charity acts as the "charitable arm" of Manifold Markets, Inc. ("Manifold

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Markets")—an entity against which the Trust is currently litigating to recover more than $500,000 in fraudulent transfers which, upon information and belief, were used to establish Manifold for Charity. *See FTX Recovery Tr.* v. *Manifold Markets, Inc.*, Adv. Pro. No. 24-40214 (KBO), ECF No. 1 (the "Manifold Adversary Proceeding").

2.      Rheingans-Yoo and his counsel are undoubtedly aware of the Manifold Adversary Proceeding brought by the Trust. According to his personal blog, Rheingans-Yoo sits on the board of directors of Manifold for Charity, and the same counsel who represents Rheingans-Yoo in connection with his FDU Claim also represents Manifold Markets in the Manifold Adversary Proceeding. Manifold for Charity has still more connections to these Chapter 11 Cases: Nishad Singh, a former FTX Group[2] executive who pleaded guilty in connection with the FTX fraud, currently works as an engineer at Manifold for Charity; and Manifold for Charity recently hosted its annual conference at an Effective Altruist retreat that was a defendant in a separate adversary proceeding brought by the Trust. These extensive connections make clear that, rather than seeking to do good, Rheingans-Yoo instead is perpetuating a key component of the FTX fraud in which FTX insiders siphoned money from creditors to donate to "charities" in order to enhance their own personal reputations and line the pockets of their Effective Altruist acquaintances.

3.      Rheingans-Yoo's subsequent designation of a purported Effective Altruist charity which operates as the "charitable arm" of an entity from which the Trust is seeking to recover fraudulent transfers, and on whose board he sits, is newly discovered evidence that raises issues that implicate both the FDU Claim and the Manifold Adversary Proceeding. To address those issues, contemporaneously with the filing of this Motion, the Trust is also filing an amended

---

[2]      Terms not defined herein shall have the same meaning as used in the *Debtors' Objection to Proof of Claim Filed By Ross Rheingans-Yoo* [D.I. 3409] and the *Reply of FTX Recovery Trust in Further Support of Debtors' Objection to Ross Rheingans-Yoo's Claim* [D.I. 30712].

complaint in the Manifold Adversary Proceeding that names Manifold for Charity as a defendant and seeks, among other relief, to avoid the obligation to make any payment on the FDU Claim as a fraudulent conveyance.

4.     At the time the Court allowed Rheingans-Yoo's FDU Claim, the Trust and the Court were not, and could not have been, aware that Rheingans-Yoo would appoint Manifold for Charity as the Designated Beneficiary. *Max's Seafood Cafe ex rel. Lou-Ann, Inc.* v. *Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (purpose of reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence."). Indeed, even during the hearing on the FDU Claim, counsel for Rheingans-Yoo gave no indication of who the designated beneficiary of the FDU Claim would be. This new information—that Manifold for Charity is the Designated Beneficiary—provides a basis to grant the Trust's motion to reconsider the Order allowing Rheingans-Yoo's FDU Claim. Rheingans-Yoo's FDU Claim—and his designation of Manifold for Charity as the Designated Beneficiary—must be evaluated in the larger context of these Chapter 11 Cases, including the Manifold Adversary Proceeding, the fraud and other criminal conduct uncovered at the FTX Group (which included using commingled customer and corporate funds to make hundreds of millions of dollars in donations to Effective Altruist charities), the guilty pleas of insiders Caroline Ellison, Gary Wang, and Nishad Singh, and Bankman-Fried's conviction following a three-month trial. *In re Weinstock*, 1999 WL 342764, at *4 (Bankr. E.D. Pa. May 25, 1999) (claim objection "viewed in context of the bankruptcy as a whole"). The FDU Claim is 'compensation' that was obtained without any consideration by Rheingans-Yoo, and allowance of the FDU Claim would require the Trust to pay a "charity" in furtherance of the very fraudulent scheme Bankman-Fried sought to perpetrate.

5.      Allowance of the FDU Claim in this context and on these facts would be manifestly unjust. *See* Fed. R. Civ. P. 59(e); *Quinteros*, 176 F.3d at 677 (judgment may be altered to prevent manifest injustice).  While there exists no "judicial consensus" as to what constitutes manifest injustice for purposes of a Rule 59(e) motion, reconsideration is warranted where "the record presented [is] . . . so patently unfair and tainted that the error is manifestly clear to all who view it." *In re Roemmele*, 466 B.R. 706, 712 (Bankr. E.D. Pa. 2012) (citation omitted); *Pac. Gas & Elec. Co.* v. *United States*, 74 Fed. Cl. 779, 785 (2006) (manifest injustice must be "apparent to the point of being almost indisputable").  Allowance of the FDU Claim and payment to Manifold for Charity as the Designated Beneficiary and satisfaction of it with Trust assets would be manifestly unjust in light of the significant efforts the Trust has undertaken to recover fraudulent transfers to "charities" staffed with Bankman-Fried associates.

6.      If the Court is not inclined to grant the Trust's motion for reconsideration, the Trust respectfully requests that the Court modify the Order to defer distribution on the FDU Claim until the Manifold Adversary Proceeding is resolved.

## STATEMENT OF FACTS

### A.      Bankman-Fried's Ties to the Effective Altruist Movement

7.      In 2013, Bankman-Fried met William MacAskill, a founder of the "Effective Altruism" movement (and who would later become an advisor to the FTX Foundation).  McGuire Decl. Ex. 1 at 4.  Effective Altruism is a social movement whose adherents believe that they can maximize their impact for the benefit of others by taking high-paying jobs and giving away the money they earn to causes they believe are important.  *See* McGuire Decl. Exs. 2, 3.  Effective Altruists call this philosophy "earning to give."  McGuire Decl. Ex. 3.

8.      After graduating college, Bankman-Fried joined Jane Street Capital, a quantitative trading firm.  McGuire Decl. Ex. 4.  At Jane Street Capital, Bankman-Fried met other adherents

of Effective Altruism who would later follow him to the FTX Group, including Caroline Ellison and Rheingans-Yoo. *See* Trial Tr. 647:19-648:2, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 10, 2023), ECF No. 358; Sentencing Submission Ex. 24, *Unites States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 27, 2024), ECF No. 407-25.

9.      In September 2017, Bankman-Fried left Jane Street Capital to serve as the Director of Development for the Centre for Effective Altruism. McGuire Decl. Ex. 4. In November 2017, Bankman-Fried left the Centre for Effective Altruism and founded Debtor Alameda Research LLC (and together with Alameda Research Ltd. and its affiliates, "Alameda") with Tara MacAulay, who had been the CEO of the Centre for Effective Altruism. *See* McGuire Decl. Ex. 1 at 4. The initial funding for Alameda came from two influential Effective Altruist donors. *Id.* While early-stage Alameda was staffed with like-minded Effective Altruists, many Alameda employees quickly began to balk at Bankman-Fried's apparent disdain for "basic, standard corporate controls" and his "egregious shortcuts." *Id.* at 5. In April 2018, MacAulay and other Alameda employees confronted Bankman-Fried about his "unscrupulous business ethics" and "willful and knowing violations of agreements or obligations, particularly with regards to creditors," and offered to buy Bankman-Fried out in exchange for his resignation as CEO of Alameda. *Id.* When Bankman-Fried declined, the Alameda employees resigned in protest. MacAulay warned others in the Effective Altruist movement, including MacAskill, about Bankman-Fried. *Id.* In 2019, after the Center for Effective Altruism conducted an internal investigation into its connections with Alameda and Bankman-Fried, Bankman-Fried left the board of the Centre for Effective Altruism. *Id.* at 7.

10.     In 2021, Bankman-Fried formed the FTX Foundation, Inc. (the "FTX Foundation") to make donations and grants to Effective Altruist causes.[3]  As the CEO of the FTX Foundation, Bankman Fried hired Nick Beckstead, an Effective Altruist who sat on the Board of Directors of Effective Ventures, a federation of Effective Altruist organizations and projects (including the Centre for Effective Altruism).  The FTX Foundation also employed MacAskill as an advisor.

11.     Rheingans-Yoo—a self-proclaimed Effective Altruist—previously worked with Bankman-Fried at Jane Street Capital and they became close friends and roommates in Hong Kong.  In early 2022, Rheingans-Yoo moved into Bankman-Fried's $30 million penthouse in the Bahamas to begin working on Bankman-Fried's purported philanthropic initiatives—first, at the FTX Foundation, and later, at Latona Biosciences Group ("Latona").  As described in further detail in the complaint in the case captioned *Alameda Research Ltd. and FTX Trading Ltd.* v. *Platform Life Sciences, Inc. et al.*, Adv. Pro. No. 23-50444 (the "Latona Adversary Proceeding"), Latona was a sham Bahamian non-profit entity that Bankman-Fried and Rheingans-Yoo used to make investments, funded entirely by Alameda, in lifesciences companies that they "prefer[red] not []" be disclosed on Bahamian entity [Alameda's] balance sheet."

### B.     Bankman-Fried Defrauded Customers and Other Creditors of the FTX Group

12.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As described in detail in numerous filings in the FTX bankruptcy and in the FTX Insiders' guilty pleas and Bankman-Fried's criminal trial, the FTX Group faced a severe

---

[3]     The FTX Foundation was a non-profit, non-stock corporation incorporated in Delaware on February 1, 2022. On July 1, 2022, FTX Foundation filed with the  Secretary of State of the State of Delaware a Restated Certificate of Incorporation changing its name to FTX Philanthropy, Inc.  For simplicity, the Trust will refer to the FTX Foundation and its successor FTX Philanthropy collectively as the "FTX Foundation."

liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.[4]

13.     Bankman-Fried, Wang, Singh, and Ellison (the "FTX Insiders") among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.[5]

14.     All of the FTX Insiders, except for Bankman-Fried, pleaded guilty to crimes perpetrated through these practices that facilitated the massive fraud.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.  *See* Min. Entry, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).  On September 24, 2024, Ellison was sentenced to two years in prison. Min. Entry, *United States* v. *Ellison*, No. 22-cr-00673 (S.D.N.Y. Sept. 24, 2022). On February 28, 2023, Singh pleaded guilty to the same felonies, as well as an additional charge of conspiracy to violate campaign finance laws. *See* Min. Entry, *United States* v. *Bankman Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023).  On November 2, 2023, a jury found Bankman-Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit

---

[4]     *See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93]; the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and *the Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1] (the "Second John Ray Report").

[5]     One such investment included a $450 million investment in Modulo Capital, Inc., an entity founded by Rheingans-Yoo's brother and a former romantic partner of Bankman-Fried's.  *See Second John Ray Report at 27.*

securities fraud, and conspiracy to commit money laundering.  *See* Min. Entry, *United States* v. *Bankman Fried*, No. 22-cr-00673 (S.D.N.Y. Nov. 2, 2023)  On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.  Min. Entry, *United States* v. *Bankman Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2024).

15.      In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda and its affiliates "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.  Plea Tr. 24:6-14, *United States* v. *Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF No. 21.  Using these "special privileges," the FTX Insiders frequently caused FTX Group entities to misappropriate funds from the FTX exchanges for their own benefit, including to make political and charitable donations.

16.      Before his conviction, Bankman-Fried repeatedly, and publicly, claimed that Alameda operated as "a wholly separate entity" from FTX Trading Ltd. ("FTX.com").  McGuire Decl. Ex. 5 at 2.  Ellison was quoted as saying that "[w]e keep [FTX.com and Alameda] quite separate in terms of day to day operations."  *Id.*  In reality, Alameda routinely looted "several billion dollars" from FTX.com using its "special privileges," thereby defrauding FTX.com's creditors.  Plea Tr. 28:23-29:1, *United States* v. *Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF No. 102; Plea Tr. 24:6-14, *United States* v. *Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF No. 21.

17.      The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" and that Alameda was "borrowing" (*i.e.*, looting) billions of dollars from FTX.com in order to, among other things, finance sham "loans" from Alameda to the FTX Insiders. Ellison

admitted to being aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral, . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." Plea Tr. 27:5-15, *United States* v. *Ellison*, No. 22-cr-0673 (S.D.N.Y. Dec. 19, 2022), ECF No. 19.

18.    Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the fraudulent relationship between Alameda and FTX, as well as the scheme pursuant to which the FTX Insiders misappropriated customer funds.  For example, Singh testified he and Wang implemented the "allow negative feature" which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit."  Trial Tr. 1362:25-1363:10, *United States* v. *Bankman-Fried*, No. 22-cr-0673 (S.D.N.Y. Oct. 16, 2023), ECF No. 366.  When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main line plan remains, making FTX successful and growing it." *Id.* 1411:3-1412:10.  FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it.  The only thing we can do is grow the company and fill the hole."  Trial Tr. 1964:12-1965:5, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 19, 2023), ECF No. 372.

1.    Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could get from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments in . . . relatively early-stage companies."  Trial Tr. 693:4-17, *United States* v. *Bankman-Fried*, No. 22-cv-00673 (S.D.N.Y. Oct. 10, 2023), ECF No. 358.  Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which

"had been concealed from FTX's auditors." Trial Tr. 937:10-14, *United States* v. *Bankman-Fried*, No. 22-cv-00673 (S.D.N.Y. Oct. 11, 2023), ECF No. 360. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare some alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad." *Id.* 786:13-22. When third party lenders sought repayment of open term loans, Alameda would repay them—often using commingled and misappropriated funds obtained through its "unlimited line of credit"—so as to continue to project a façade of financial strength and solvency and prevent lenders from taking legal action that might cause the fraud to come to light.

19.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on [her] for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), ECF No. 115.

**C.     Prior to the Petition Date, the FTX Foundation Made "Charitable Donations" Using Commingled Funds**

20.     At all relevant times, the sole member of the FTX Foundation was Bankman-Fried, and its directors included Bankman-Fried, Singh, Wang, Ellison, and Beckstead, who were all adherents of Effective Altruism, McGuire Decl. Ex. 6 at 2; McGuire Decl. Ex. 7 at 2.

21.     Prior to the Petition Date, the FTX Foundation was an integrated part of the FTX Group and was funded by Alameda and other Debtor entities in the FTX Group. *See* Second John Ray Report at 25-26. When Bankman-Fried set up FTX Philanthropy in February 2021, he announced that the FTX Group would contribute at least "1% of FTX's revenue from fees" to FTX Philanthropy. *See id.* at 25 n.22. But Philanthropy's funds were largely sourced from FTX Group

bank accounts that contained commingled customer deposits, *see id.* at 25-26, contrary to public representations that it maintained strict separation of customer and corporate funds.

22.     The FTX Foundation claimed on its website that it "works to save lives, prevent suffering and build a flourishing future."  In reality, very few of the FTX Foundation's donations directly benefitted the needy.  Its largest donations went to associates of Bankman-Fried and others in the Effective Altruism movement, including from funds misappropriated from the FTX exchanges.  Donations of $2 million or more by the FTX Foundation had to be approved by Bankman-Fried.  The FTX Foundation's donations were intentionally designed to burnish Bankman-Fried's public image as a do-gooder even as he orchestrated one of the largest fraudulent schemes in U.S. history.  The FTX Foundation ceased operations when the FTX Group collapsed in November 2022.

23.     The donations to Effective Altruist and other charities were part of an integrated plan by the FTX Insiders to siphon money from FTX Group creditors and enhance their own personal and professional reputations at creditors' expense.  Bankman-Fried was aware at all relevant times of Alameda's special privileges that Wang had implemented, and he was also aware that Alameda was borrowing billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to Bankman-Fried himself, or to make putative "donations" to causes favored by him—including to entities he controlled or to individuals with whom he was connected.  As Bankman-Fried testified at his criminal trial, he believed that such donations "could have . . . positive public relations value."  Trial Tr. 2642:21-2643:4, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 30, 2023), ECF No. 378.  Bankman-Fried further testified that the source of his personal donations was loans from Alameda.  Trial Tr. 2422:7-9, 2423:7-12, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 27, 2023), ECF No. 376.  As

described in the Second John Ray Report, these "loans" were loans in name only, and the Trust has identified no evidence that any interest was ever paid on the supposed "loans," or that there was ever an intent to repay. *See* Second John Ray Report at 25.

    **D.**    **The Trust's Efforts to Claw Back Funds from Effective Altruist Charities**

    24.    On June 26, 2023, the FTX Debtors published the Second John Ray Report that revealed that donations from the FTX Foundation were made with commingled customer and corporate funds. [D.I. 1704]. On July 19, 2023, the FTX Debtors filed the complaint in the Latona Adversary Proceeding, which, among other things, sought to recover almost $70 million in investments in lifesciences companies made by Rheingans-Yoo using Alameda funds. [D.I. 1881]. Thereafter, the Trust devoted substantial resources to contacting each of the hundreds of charities that had received donations from the FTX Foundation, requesting that they voluntarily return the transfers to the estate.

    **a.**    **Many charities voluntarily returned the donations to the Trust**

    25.    The charities that received the largest donations were, unsurprisingly, Effective Altruist charities. For example, Effective Ventures USA and Effective Ventures UK, umbrella organizations for the Effective Altruist movement (including the Centre for Effective Altruism), had received "donations" from the FTX Foundation of $25 million and $6 million respectively. [D.I. 3745]. Rather than producing documents that the FTX Debtors had requested relating to the Centre for Effective Altruism's internal investigations concerning its connections to Alameda and the FTX Group's collapse, and, Bankman-Fried's departure from the Centre for Effective Altruism's board, Effective Ventures US and Effective Ventures UK voluntarily agreed to return approximately $26.8 million in donations they had received. *Id.* As part of the settlement, however, Effective Ventures USA and Effective Ventures UK required the FTX Debtors to

withdraw discovery requests and to refrain from seeking any discovery from them [D.I. 3745, 4442], which suggests that the documents they had would have been damning.

26.     The Trust also voluntarily recovered donations from numerous other Effective Altruist charities.  For example, the Trust was able to recover nearly 100% of the transfers made to Effective Altruism Sweden.  [D.I. 19885].  By way of other example, in 2022, the FTX Foundation made donations of $4.9 million to the European Summer Program on Rationality ("ESPR") to acquire a "renaissance chateau hidden away in the center of the Czech Republic" to be used as an Effective Altruist summer retreat.  McGuire Decl. Ex. 8.  Pursuant to a settlement, ESPR and a related entity agreed to sell the Czech chateau with the Trust receiving the sale proceeds.  [D.I. 19879].

27.     In total, the Trust's efforts to date to claw back donations to charities—and in particular Effective Altruist charities—has resulted in the recovery of over $94 million for creditors without the need to file adversary proceedings against those charities.

### b.     The Trust's Litigation against other "charities"

28.     When charities were unwilling to return the donations they had received from the FTX Foundation, the Trust initiated adversary proceedings, including against Effective Altruist charities, seeking the return of the fraudulently transferred funds.

29.     In one such adversary proceeding, the Trust sought to recover $4.9 million transferred to the Center for Applied Rationality ("CFAR") to acquire and make improvements to the Rose Garden Inn, a hotel in Berkeley, California.  *FTX Recovery Trust* v. *Center for Applied Rationality, et al.*, Adv. Pro. No. 24-ap-50066.  As described in the complaint, CFAR now operates the former Rose Garden Inn as an event space for Effective Altruist retreats, conferences, and workshops through its "Lighthaven project."  *See* CFAR Compl. ¶¶ 42-43; McGuire Decl. Ex. 9. As discussed below, Manifold Markets and Manifold for Charity host an annual conference at the

former Rose Garden Inn.  Pursuant to a settlement with CFAR, the Trust recovered substantial value from CFAR for the benefit of creditors.

### c.    The Manifold Adversary Proceeding

30.    On November 8, 2024, after it had refused to return $508,000 in pre-petition transfers it had received from the FTX Foundation, the FTX Debtors filed the complaint commencing the Manifold Adversary Proceeding.  By order dated February 14, 2025, the Trust was substituted as the Plaintiff in the Manifold Adversary Proceeding.  [Adv. D.I. 12].

31.    Manifold Markets, the original defendant in the Manifold Adversary Proceeding, was incorporated on February 25, 2022 as a Delaware corporation.  Manifold Markets holds itself out as "the world's largest social prediction market," McGuire Decl. Ex. 10, and allows users to use "play money" to bet on "any question [they] care about," creating "real-time odds on politics, tech, sports, and more."  Manifold Adversary Proceeding, Am. Compl. ¶ 37.  Manifold Markets' stated mission is to (i) "[p]rovide the most accurate, real-time predictions on any event[;]" (ii) "[c]ombat misleading news by incentivising traders to be fast and correct[;]" and (iii) "[h]elp people make more informed decisions by improving their model of the future."  McGuire Decl. Ex. 10.

32.    In 2022, Manifold Markets sought funding from the FTX Foundation to fund a matching pool for donations made by Manifold Markets users in an effort to launch Manifold Markets' first charity prediction market—Manifold for Charity.  McGuire Decl. Exs. 11, 12.  On or about July 12, 2022, the FTX Foundation approved a grant in the amount of $500,000 to Manifold Markets to be used solely for charitable purposes.  Manifold Adversary Proceeding, Am. Compl. ¶¶ 39-40.

33.    On or about August 8, 2022, the FTX Foundation transferred $500,000 to Manifold Markets (the "August 8 Transfer") for Manifold for Charity.  *Id.* ¶¶ 4, 40.  On or about October

26, 2022, the FTX Foundation transferred an additional $8,000 to Manifold Markets (the "October 26 Transfer" and together with the August 8 Transfer, the "Transfers") to fund prize payouts for a forecasting tournament.  *Id.* ¶ 4, 41.

34.     The Transfers from the FTX Foundation to Manifold Markets to establish Manifold for Charity were funded by commingled corporate and customer funds, including wallet deposits made by West Realm Shires, Inc. into the bank account of the FTX Foundation.  *Id.* ¶ 34.

35.     Following its investigation, the FTX Debtors identified the Transfers as avoidable transfers under the Bankruptcy Code and proactively reached out to Manifold Markets to request that the Transfers be returned for the benefit of creditors.  When Manifold Markets refused to return the Transfers, the FTX Debtors initiated the Manifold Adversary Proceeding, which remains pending.

**E.     Rheingans-Yoo Designates Manifold for Charity to Receive the $650,000 Donation Pursuant to the FDU Claim**

36.     Following the Court's allowance of Rheingans-Yoo's FDU Claim, the Trust received an email from Rheingans-Yoo's counsel stating that Rheingans-Yoo had designated Manifold for Charity to receive the $650,000 donation pursuant to the FDU Claim.  McGuire Decl. Ex. 13.  The Trust immediately recognized Manifold for Charity as the "charitable arm" of Manifold Markets.  McGuire Decl. Ex. 14.

37.     In June 2022, after being informed that the FTX Foundation would make a $500,000 donation, Austin Chen, the co-founder of Manifold Markets states that Manifold Markets would incorporate a "subsidiary" as a 501(c)(3) charity.  McGuire Decl. Ex. 12.  According to publicly available information, Manifold for Charity was registered as a 501(c)(3) charity in October 2022, and Manifold for Charity's 2022 Form 990 tax return shows that its 2022 revenues

consisted solely of $500,000, which appears consistent with the $500,000 transfer made by the FTX Foundation in August 2022.  McGuire Decl. Ex. 15.

38.    There is substantial overlap between Manifold Markets and Manifold for Charity. According to Manifold for Charity's 2023 Form 990 tax return, the co-founder of Manifold Markets, Austin Chen, is also the CEO of Manifold for Charity.  McGuire Decl. Ex. 16.  Manifold Markets appears to host Manifold for Charity's publicly available documents on its Notion site, McGuire Decl. Ex. 17, and both entities jointly host an annual conference at the Rose Garden Inn in Berkeley, California, which Rheingans-Yoo has attended in the past.  McGuire Decl. Exs. 18, 19.

39.    Manifold for Charity also has connections with former FTX Group personnel, including Rheingans-Yoo.   On his personal blog, Rheingans-Yoo writes that he "sit[s] on Manifund's board of directors."  McGuire Decl. Ex. 20.[6]  According to Manifold for Charity's publicly available bylaws, members of its board of directors may be eligible for compensation for their service.  McGuire Decl. Ex. 21.  Publicly available information also shows that Nishad Singh—one of the key FTX Insiders who perpetrated the massive fraud underlying these Chapter 11 Cases—now works at Manifold for Charity, McGuire Decl. Ex. 22, and that Manifold for Charity recently consulted with Gabe Bankman-Fried—Bankman-Fried's brother—regarding political spending, and has considered adding him to its board of directors.  McGuire Decl. Exs. 23, 24.

40.    Given his position as a director of Manifold for Charity, Rheingans-Yoo was undoubtedly aware of the Trust's litigation against Manifold Markets and Manifold for Charity's other connections to these Chapter 11 Cases when he designated Manifold for Charity as the

---

[6]    Manifold for Charity does business as Manifund.  *See* McGuire Decl. Ex. 14.

Designated Beneficiary of the FDU Claim.  Moreover, Scott Simon of Goetz Platzer, counsel for

Rheingans-Yoo in connection with the FDU Claim, also represents Manifold Markets in the

Manifold Adversary Proceeding.

41.     None of this was disclosed by Rheingans-Yoo or his counsel when they informed

the Trust that Rheingans-Yoo had designated Manifold for Charity as the beneficiary of the

$650,000 donation pursuant to the FDU Claim.

## ARGUMENT

**A.    Reconsideration of the Order Is Warranted Based on the New Information
that Manifold for Charity Is the Designated Beneficiary of the FDU Claim**

42.     A debtor, as a party in interest, may move for reconsideration of an order allowing

a claim, provided there is adequate cause for reconsideration.  11 U.S.C. § 502(j); Fed. R. Bankr.

P. 3008.  The bankruptcy court has wide discretion in determining whether there is adequate cause

for reconsideration of the allowance of a claim.  *In re Tri-State Ethanol Co., LLC*, 2009 WL

1079776, at *7 (Bankr. D.S.D. Apr. 21, 2009); *see also* Fed. R. Bankr. P. 3008 Adv. Comm. Note

("Reconsideration of a claim that has been previously allowed . . . after objection is discretionary

with the court.").

43.     If the court determines that there is sufficient cause for reconsideration, the court

may disallow a previously allowed claim if the "equities of the case" so dictate.  *In re Starlight

Grp., LLC*, 515 B.R. 290, 293 (Bankr. E.D. Va. 2014) (quoting *In re Durham*, 329 B.R. 899, 903

(Bankr. M.D. Ga. 2005)).

44.     "[T]o establish cause justifying reconsideration[,] the movant must demonstrate at

least one of the grounds set forth in Rule 59 or Rule 60(b) of the Federal Rules of Civil Procedure."

*In re Nortel Networks Inc.*, 2017 WL 3141906, at *1 (Bankr. D. Del. July 24, 2017) (internal

quotation marks omitted).  Rule 60(b) provides relief from an order when, *inter alia*, there is

(i) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); or (2) any other reason that justifies relief. Fed. R. Civ. P. 60(b) (made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9024). Rule 59 provides relief from an order when, *inter alia*, (1) new evidence becomes available, or (2) there is a need to correct a clear error of law or prevent manifest injustice. *Max's Seafood Café*, 176 F.3d at 677.

45.    The designation of Manifold for Charity as the beneficiary of the FDU Claim constitutes newly discovered evidence and demonstrates that allowing the FDU Claim under these circumstances would result in a manifest injustice that warrants reconsideration of the Order. As a threshold matter, it was impossible for the Trust or the Court to know which entity Rheingans-Yoo would designate as the beneficiary of his FDU Claim, even at the time of the hearing on the FDU Claim. *See In re Bailey*, 2021 WL 4314217, at *7 (Bankr. D.N.J. Sep. 22, 2021) (newly discovered evidence must have "not [been] discoverable before trial through the exercise of reasonable diligence"). In response to the Court's pointed question during the hearing on the FDU Claim, counsel for Rheingans-Yoo would not identify Rheingan-Yoo's intended Designated Beneficiary of the FDU Claim. *See* Hr'g Tr. 38:10-39:11 ("THE COURT: Let me ask you this: Why haven't you designated the charity . . . Why don't we know what this alleged charity would be? I have concerns about that. . . . [MR. SIMON:] It's just, procedurally, we were baffling over whether the [FDU Claim] was allowable."). The reason for Rheingans-Yoo's obfuscation is now clear.

46.    This is not a situation in which the Court should allow a "do over" by designating another charity given both the lack of candid disclosure and the basic fact that this Court would be countenancing the taking of funds to repay a customer for a purpose that is clearly detrimental to

creditors who have been harmed enough by contributions of their monies to charities, political organizations and other personal fraudulent purposes. The new fact—the designation of Manifold for Charity as the beneficiary of the FDU Claim—is material to the analysis of the FDU Claim in the context of these Chapter 11 Cases. *In re Bailey*, 2021 WL 4314217, at *7 ("Newly discovered evidence refers to evidence that . . . is material and not merely cumulative."). Rheingans-Yoo's shameless designation of Manifold for Charity as the beneficiary of the FDU Claim frustrates the Trust's significant efforts to recover fraudulent transfers from myriad "charities" that were little more than outposts for Bankman-Fried's Effective Altruist associates, and demonstrates why the FDU Claim never should have been allowed in the first place. *See* Second John Ray Report at 25-27. There was never anything altruistic about Bankman-Fried offering to siphon $650,000 to a "charity" as part of his criminal scheme. The payment of $650,000 in recovered creditor funds to Manifold for Charity now would be particularly perverse, because it could be used to pay a salary to Singh, a key FTX Insider who pled guilty for his role in perpetrating the massive fraud at the FTX Group, who now works at Manifold for Charity.

47.    Even more egregious, Rheingans-Yoo's designation of Manifold for Charity also raises concerns about his self-dealing. Rheingans-Yoo serves on the board of Manifold for Charity, and its bylaws allow directors to be paid for their service. Accordingly, Rheingans-Yoo's designation of Manifold for Charity could result in Rheingans-Yoo lining his own pockets and those of his friends at the expense of FTX creditors, just as Bankman-Fried and the FTX Insiders did, which precipitated these Chapter 11 Cases.[7]

---

[7]    Allowance of the FDU Claim would also be a slap in the face to charities that voluntarily returned their donations after the Trust informed them that the donations had been fraudulently transferred by Bankman-Fried.

48.     Because Rheingans-Yoo's designation of Manifold for Charity raises such serious concerns, the Trust does not believe that simply modifying the Designated Beneficiary will alleviate any concerns of impropriety or self-dealing.  Rheingans-Yoo's conduct makes clear that he cannot be trusted to designate a legitimate beneficiary of the FDU Claim and should not be given such an opportunity.  As these facts illustrate, Rheingans-Yoo's designation of Manifold for Charity creates a manifest injustice that warrants reconsideration of the Court's Order.  *In re Energy Future Holdings*, 575 B.R. 616, 628 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018) ("In order for a court to reconsider a decision due to 'manifest injustice,' the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it.").

49.     Accordingly, the Trust respectfully requests that the Court enter an order in the form attached hereto as <u>Exhibit A</u> granting its motion to reconsider the Order and disallowing the FDU Claim.  *See* 11 U.S.C. § 502(j); Fed. R. Civ. P. 59.

**B.      In the Alternative, the Court Should Modify the Order to Defer Distribution of the FDU Claim Pending Resolution of the Manifold Adversary Proceeding.**

50.     If the Court does not grant the Trust's motion to reconsider the Order, the Trust respectfully requests that the Court modify the Order to defer distribution on the FDU Claim pending resolution of the Manifold Adversary Proceeding.

51.     Contemporaneously with this Motion, the Trust is filing an amended complaint in the Manifold Adversary Proceeding (the "<u>Amended Manifold Complaint</u>"), which adds Manifold for Charity as a defendant and seeks, among other things, to avoid as a fraudulent conveyance the obligation incurred under the FDU Claim to pay Manifold for Charity, to disallow the FDU Claim

under 11 U.S.C. § 502(d), and to equitably subordinate the FDU Claim.[8]  Specifically, the Trust

has identified an additional $1,000,000 in Debtor transfers to Manifold Markets, and has identified

the substantial overlap between Manifold Markets and Manifold for Charity.  In short, the claims

in the Amended Manifold Complaint create additional, independent grounds to avoid, disallow, or

subordinate the FDU Claim distinct from those raised in the claim objection.

52.    Accordingly, should the Court deny the Trust's motion for reconsideration, the

Trust respectfully requests that the Court enter an order modifying the Order to defer distribution

on the FDU Claim pending resolution of the Manifold Adversary Proceeding.  *See* 11 U.S.C.

§§ 105(a), 502(d), 510(c); Fed. R. Civ. P. 59, 60.

## CONCLUSION

53.    For the foregoing reasons, the Trust respectfully requests that the Court enter an

order in the form attached hereto as <u>Exhibit A</u> granting the Trust's motion to reconsider the Order,

or, in the alternative, enter an order modifying the Order to defer distribution on the FDU Claim

pending resolution of the Manifold Adversary Proceeding.

---

[8]    Manifold Markets has not yet answered or responded to the complaint in the Manifold Adversary Proceeding, so the Trust can amend the Complaint as of right.  Fed. R. Civ. P. 15(a).

Dated: July 23, 2025
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
E-mail:  landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com
-and-

**SULLIVAN & CROMWELL LLP**

Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
E-mail:  wheelers@sullcrom.com
       gluecksteinb@sullcrom.com

*Counsel for the FTX Recovery Trust*