# Exhibit 1

SUBSCRIBE

POLITICS

# Exclusive: Effective Altruist Leaders Were Repeatedly Warned About Sam Bankman-Fried Years Before FTX Collapsed

16 MINUTE READ



Photo Illustration by Neil Jamieson from TIME

BY **CHARLOTTE ALTER** 

MARCH 15, 2023 7:00 AM EDT

L eaders of the Effective Altruism movement were repeatedly warned beginning in 2018 that Sam Bankman-Fried was unethical, duplicitous, and negligent in his role as CEO of Alameda Research, the crypto trading firm that went on to play a critical role in what federal prosecutors now say was among the biggest financial frauds in U.S. history. They apparently dismissed those warnings, sources say, before taking tens of millions of dollars from Bankman-Fried's charitable fund for effective altruist causes.

When Alameda and Bankman-Fried's cryptocurrency exchange FTX imploded in late 2022, these same effective altruist (EA) leaders professed outrage and ignorance. "I don't know which emotion is stronger: my utter rage at Sam (and

others?) for causing such harm to so many people, or my sadness and self-hatred for falling for this deception," tweeted Will MacAskill, the Oxford moral philosopher and intellectual figurehead of EA, who co-founded the Centre for Effective Altruism.

Yet MacAskill had long been aware of concerns around Bankman-Fried. He was personally cautioned about Bankman-Fried by at least three different people in a series of conversations in 2018 and 2019, according to interviews with four people familiar with those discussions and emails reviewed by TIME.

He wasn't alone. Multiple EA leaders knew about the red flags surrounding Bankman-Fried by 2019, according to a TIME investigation based on contemporaneous documents and interviews with seven people familiar with the matter. Among the EA brain trust personally notified about Bankman-Fried's questionable behavior and business ethics were Nick Beckstead, a moral philosopher who went on to lead Bankman-Fried's philanthropic arm, the FTX Future Fund, and Holden Karnofsky, co-CEO of OpenPhilanthropy, a nonprofit organization that makes grants supporting EA causes. Some of the warnings were serious: sources say that MacAskill and Beckstead were repeatedly told that Bankman-Fried was untrustworthy, had inappropriate sexual relationships with subordinates, refused to implement standard business practices, and had been caught lying during his first months running Alameda, a crypto firm that was seeded by EA investors, staffed by EAs, and dedicating to making money that could be donated to EA causes.

---

**More from TIME**



---

These repeated warnings to EA leaders, which have not been previously reported, represented a crossroads—for the budding crypto billionaire; for EA, a social movement dedicated to using reason to do the most good in the world; and for businesses and investors drawn into Bankman-Fried's crypto empire, which imploded in Nov. 2022, vaporizing more than $8 billion in customer funds. Many of the emerging issues at Alameda that were reported to EA leaders beginning in 2018—including pervasive dishonesty, sloppy accounting, and rejection of corporate controls—presaged the scandal that unfolded at FTX four years later, according to sources who were granted anonymity to avoid professional retribution or becoming entangled in Bankman-Fried's ongoing legal drama. "I was shocked at how much of what came out about FTX rhymed with the concerns we raised in the early days," says one person who spoke

directly with MacAskill and others about Bankman-Fried in 2018. "It was the same thing. All of the same problems."

It's not entirely clear how EA leaders reacted to the warnings. Sources familiar with the discussions told TIME that the concerns were downplayed, rationalized as typical startup squabbles, or dismissed as "he said-she said," as two people put it. EA leaders declined or did not respond to multiple requests from TIME to explain their reaction to these warnings and what they did in response. But by the end of 2018, Bankman-Fried's behavior was such an open secret that EA leaders were debating Bankman-Fried's presence on the board of the Centre for Effective Altruism. In emails among senior EA leaders, which TIME reviewed, one person wrote that they had raised worries about Bankman-Fried's trustworthiness directly with MacAskill, and that MacAskill had dismissed the concerns as "rumor." In 2019, Bankman-Fried left CEA's board.

MacAskill declined to answer a list of detailed questions from TIME for this story. "An independent investigation has been commissioned to look into these issues; I don't want to front-run or undermine that process by discussing my own recollections publicly," he wrote in an email. "I look forward to the results of the investigation and hope to be able to respond more fully after then." Citing the same investigation, Beckstead also declined to answer detailed questions. Karnofsky did not respond to a list of questions from TIME. Through a lawyer, Bankman-Fried also declined to respond to a list of detailed written questions. The Centre for Effective Altruism (CEA) did not reply to multiple requests to explain why Bankman-Fried left the board in 2019. A spokesperson for Effective Ventures, the parent organization of CEA, cited the independent investigation, launched in Dec. 2022, and declined to comment while it was ongoing.

No one has alleged criminal behavior on the part of top EA figures. None of the people who raised concerns about Bankman-Fried to EA leaders in 2018 and 2019 say they warned about specific criminal activity, nor did they foresee the size and scope of the alleged fraud at the heart of the FTX collapse. In charging documents, federal prosecutors identify the start of Bankman-Fried's alleged fraud as 2019.

Why did the braintrust of a social movement dedicated to virtuous impact apparently fail to heed repeated warnings about one of their own, while continuing to promote him publicly as a force for good? For a group of philosophers who had spent their lives contemplating moral tradeoffs and weighing existential risks, the warnings about Bankman-Fried may have presented a choice between embracing a big donor with questionable ethics or foregoing millions of dollars they believed could boost their nascent movement to help save the future of humanity. In a span of less than nine months in 2022, Bankman-Fried's FTX Future Fund—helmed by Beckstead—gave more than $160 million to effective altruist causes, including more than $33 million to organizations connected to MacAskill. "If [Bankman-Fried] wasn't super wealthy, nobody would have given him another chance," says one person who worked closely with MacAskill at an EA organization. "It's greed for access to a bunch of money, but with a philosopher twist."



Associate philosophy professor William MacAskill, at his office in Oxford on July 14, 2022. *Sophie Green for TIME*

**Sam Bankman-Fried and Will MacAskill** weren't just philosophical allies. They were old friends. The two met in 2013, when Bankman-Fried was still an undergrad at MIT. MacAskill convinced the young utilitarian math geek that he could maximize his impact by taking a high-paying finance job and giving his money away. Effective Altruists call this "earning to give."

Alameda was "earning to give" on crypto steroids. Launched in the fall of 2017 by Bankman-Fried, who had most recently worked at a quantitative trading firm called Jane Street Capital, and Tara Mac Aulay, who had been the CEO of the Centre for Effective Altruism, it was explicitly an EA project from the start, linked to the relatively new idea that more money could lead to more impact for effective altruist causes. "Almost everyone who came on in those early days was an EA. They were there for EA reasons," says Naia Bouscal, a former software engineer at Alameda. "That was the pitch we gave people: this is an EA thing."

Mac Aulay and Bankman-Fried originally planned to donate 50% of company profits to EA causes, and many of the executives also planned to donate most of their salaries. The initial funding for Alameda came from two influential EA donors: Luke Ding, a former currency trader who invested $6 million, and Jaan Tallinn, who loaned the firm $110 million worth of Ether, according to Semafor. Sources say that without the help of EA donors, it would have taken months to get anywhere near that amount of money, and never on such favorable terms.

But within months, the good karma of the venture dissipated in a series of internal clashes, many details of which have not been previously reported. Some of the issues were personal. Bankman-Fried could be "dictatorial," according to one former colleague. Three former Alameda employees told TIME

he had inappropriate romantic relationships with his subordinates. Early Alameda executives also believed he had reneged on an equity arrangement that would have left Bankman-Fried with 40% control of the firm, according to a document reviewed by TIME. Instead, according to two people with knowledge of the situation, he had registered himself as sole owner of Alameda.

**Read More:** *Effective Altruism Promises To Do Good Better. These Women Say It Has a Toxic Culture Of Sexual Harassment and Abuse.*

Bankman-Fried's approach to managing the business was an even bigger problem. "As we started to implement some of the really basic, standard corporate controls, we found more and more cases where I thought Sam had taken dangerous and egregious shortcuts," says one person who later raised concerns about Bankman-Fried to EA leaders. "And in many cases [he] had concealed the fact that he had done that."

"We didn't know how much money we actually had. We didn't have a clear accounting record of all the trades we'd done," Bouscal says. "Sam continued pushing us more and more in this direction of doing a huge number of trades, a huge number of transfers, and we couldn't account for that." At the same time, she adds, Bankman-Fried was spending enormous amounts of money because "he didn't have a distinction between firm capital and trading capital. It was all one pool."

Colleagues concluded Bankman-Fried had to go, and prepared an attempt to push him out. In early April 2018, four Alameda executives summoned Bankman-Fried to a conference room in the firm's new Berkeley, Calif., offices for what one participant describes as an "intervention-style confrontation." In a planning document prepared for that confrontation and reviewed exclusively by TIME, they accuse him of "gross negligence," "willful and wanton conduct that is reasonably considered to cause injury," and "willful and knowing violations of agreements or obligations, particularly with regards to creditors"—all language that echoes the U.S. criminal code.

The document, which has not been previously reported, accuses Bankman-Fried of dismissing calls for stronger accounting and inflating the expected value of adding new exchanges, and said a majority of employees thought he was "negligent" and "unethical." It also alleges he was "misreporting numbers" and "failing to update investors on poor performance." The team "didn't trust Sam to be in investor meetings alone," colleagues wrote. "Sam will lie, and distort the truth for his own gain," the document says.

The meeting was short. Mac Aulay and the management team offered Bankman-Fried a buyout in exchange for his resignation as CEO, and threatened to quit if he refused. Bankman-Fried sat there silently, according to two people present, then got up and left. The next day, he came back with his answer: he would not step down. Instead, the other four members of the management team resigned, along with roughly half of Alameda's 30 employees. Mac Aulay, an Australian citizen, was forced to leave the country shortly afterward, because her work visa was tied to Alameda.

In the weeks leading up to that April 2018 confrontation with Bankman-Fried and in the months that followed, Mac Aulay and others warned MacAskill, Beckstead and Karnofsky about her co-founder's alleged duplicity and unscrupulous business ethics, according to four people with knowledge of those discussions. Mac Aulay specifically flagged her concerns about Bankman-Fried's honesty and trustworthiness, his maneuvering to control 100% of the

company despite promising otherwise, his pattern of unethical behavior, and his inappropriate relationships with subordinates, sources say.

Bouscal recalled speaking to Mac Aulay immediately after one of Mac Aulay's conversations with MacAskill in late 2018. "Will basically took Sam's side," said Bouscal, who recalls waiting with Mac Aulay in the Stockholm airport while she was on the phone. (Bouscal and Mac Aulay had once dated; though no longer romantically involved, they remain close friends.) "Will basically threatened Tara," Bouscal recalls. "I remember my impression being that Will was taking a pretty hostile stance here and that he was just believing Sam's side of the story, which made no sense to me."

"He was treating it like a 'he said-she said,' even though every other long-time EA involved had left because of the same concerns," Bouscal adds.

Another early Alameda employee, who witnessed Bankman-Fried's behavior but didn't speak up, says that Bankman-Fried's clout within EA, bolstered by his close relationship to MacAskill, discouraged people from speaking out against him, particularly if they wanted to work in EA organizations in the future.

But one of the people who did warn others about Bankman-Fried says that he openly wielded this power when challenged. "It was like, 'I could destroy you,'" this person says. "Will and Holden would believe me over you. No one is going to believe you."



Former FTX Chief Executive Sam Bankman-Fried, who faces fraud charges over the collapse of the bankrupt cryptocurrency exchange, leaves following a hearing at Manhattan federal court on Jan. 3.   Andrew Kelly—Reuters/Alamy

**The blowup at Alameda** rippled through the EA movement. The mutiny—and its causes—would have been hard for the movement's leaders to miss, according to three people at EA organizations who heard about the implosion and the allegations that surrounded it. "It's very implausible that a bunch of the leaders didn't know quite a lot of details about what happened internally, because it was such a major thing in the EA community," says the person who worked with MacAskill at an EA organization.

Mac Aulay, who had perhaps raised the loudest concerns about Bankman-Fried, was distrusted by some EA leaders because of internal politics during her time at the Centre for Effective Altruism, according to a senior member of the EA community who heard about the warnings after the fact. Still, this person says, "both Will and Nick had significant amounts of evidence that Sam was not ethically good. That puts you in really murky territory: what are you supposed to do with that information?"

In the aftermath, Mac Aulay receded from the movement. Bankman-Fried moved to Hong Kong and rebuilt the firm with a small cohort of close allies, including Caroline Ellison, who later became Alameda's CEO. In the spring of 2019, while still running Alameda, Bankman-Fried started FTX. The crossroads had come and gone.

Sometime that year, the Centre for Effective Altruism did an internal investigation relating to CEA and Alameda, according to one person who was contacted during the investigation, and who said it was was conducted in part by MacAskill. Bankman-Fried left the board of the organization in 2019. The Centre for Effective Altruism did not respond to repeated requests from TIME to discuss the circumstances leading to his departure; MacAskill and others declined multiple opportunities to answer questions about those events.

Even after Bankman-Fried left the board of CEA, he retained MacAskill's support, both in public and private. In a 2022 interview on the 80,000 Hours podcast, MacAskill describes himself as "remarkably aligned with Sam," and said the FTX Future Fund could be a "an enormous inflection point for EA." FTX advertisements used the language of effective altruism. "I'm on crypto because I want to make the biggest global impact for good," read one FTX ad, which featured a photo of Bankman-Fried.

When Elon Musk was buying Twitter in 2022, MacAskill texted Musk to offer to introduce him to Bankman-Fried, according to text messages released during a lawsuit surrounding Musk's acquisition of Twitter. MacAskill referred to the FTX founder as "my collaborator," who had expressed interest in buying Twitter "and making it better for the world."

"You vouch for him?" Musk asked MacAskill.

"Very much so!" MacAskill replied. "Very dedicated to making the long-term future of humanity go well."

**Read More:** *Want To Do More Good? This Movement Might Have the Answer.*

By that time, EA's bet on Bankman-Fried seemed to be paying off handsomely. In 2022, Bankman-Fried started a charitable arm of FTX to fund EA causes, led by Beckstead, one of the philosopher leaders of EA who had been warned in 2018 by Bankman-Fried's colleagues. In its brief existence, the Fund gave more than $30 million to organizations connected to MacAskill, including $13.9 million to CEA and $17.9 million to Longview Philanthropy, where he sits on the advisory board.

In the meantime, Bankman-Fried was at the helm of what prosecutors have cast as one of the biggest financial scandals in American history. "Never in my career have I seen such an utter failure of corporate controls at every level of an organization," John Ray, who was brought in to manage FTX's bankruptcy after the company imploded, testified to Congress. The SEC complaint alleges that there "was no meaningful distinction between FTX customer funds and Alameda's own funds," and that Bankman-Fried used Alameda as his "personal piggy bank." Federal prosecutors allege that from 2019 onwards, Bankman-Fried spent billions of dollars of customer money to finance Alameda trading, Bankman-Fried's investments, and bankroll straw political donations. Among other things, prosecutors say, the money was used to "make charitable contributions." Bankman-Fried is facing 12 criminal charges; he has pleaded not guilty.



Rep. Van Taylor, R-Texas, reacts to the statement of John J. Ray III, CEO of FTX Group, that FTX used QuickBooks for accounting, during the House Financial Services Committee hearing titled "Investigating the Collapse of FTX, Part I," on Dec. 13, 2022. Ray took over after the resignation of Sam Bankman-Fried.   Tom Williams—CQ Roll Call/AP

None of the early Alameda employees who witnessed Bankman-Fried's behavior years earlier say they anticipated this level of alleged criminal fraud. There was no "smoking gun," as one put it, that revealed specific examples of lawbreaking. Even if they knew Bankman-Fried was dishonest and unethical, they say, none of them could have foreseen a fraud of this scope.

After FTX collapsed, MacAskill conveyed his dismay in a series of tweets expressing surprise. "I cannot in words convey how strongly I condemn what they did," MacAskill tweeted. "I had put my trust in Sam, and if he lied and misused customer funds he betrayed me, just as he betrayed his customers, his employees, his investors, & the communities he was a part of."

It was quite a turnaround for the visionary leader of the futurist movement. Just months earlier, in Aug. 2022, MacAskill published his second book, *What We Owe the Future*, about the moral duty to confront existential risks to humanity. "History is littered with people doing bad things while believing they were doing good," MacAskill writes in the book. "We should do our utmost to avoid being one of them." To celebrate its publication, the moral philosopher invited a group of luminaries to a dinner at Eleven Madison Park, the ultra-luxurious vegan restaurant where the tasting menu runs $438 per person with tip, before tax. The event, MacAskill wrote in an email invitation, "is hosted by my friend, Sam Bankman-Fried."

**Correction appended, Dec. 4, 2024:** *The original version of this story misstated whether Oxford's Global Priorities Institute received a grant of $1.2 million from FTX's philanthropic arm. FTX pledged the gift, but the Institute did not take the money.*

### MORE MUST-READS FROM TIME

- **Cybersecurity Experts** Are Sounding the Alarm on DOGE
- Meet the **2025 Women of the Year**
- The Harsh Truth About **Disability Inclusion**
- Why Do More **Young Adults Have Cancer?**
- **Colman Domingo** Leads With Radical Love
- How to Get Better at **Doing Things Alone**
- **Michelle Zauner** Stares Down the Darkness

**WRITE TO CHARLOTTE ALTER AT** CHARLOTTE.ALTER@TIME.COM



| | |
|---|---|
| Home | Entertainment |
| U.S. | Ideas |
| Politics | Science |
| World | History |
| Health | Sports |
| Business | Magazine |
| Tech | The TIME Vault |
| | TIME For Kids |
| | TIMECO2 |
| | Coupons |
| TIME Edge | Press Room |
| Video | TIME Studios |
| Masthead | U.S. & Canada Customer Care |
| Newsletters | Global Help Center |
| Subscribe | Contact the Editors |
| Digital Magazine | Reprints and Permissions |
| Give a Gift | Site Map |
| Shop the TIME Store | Media Kit |
| Careers | Supplied Partner Content |
| Modern Slavery Statement | About Us |

© 2024 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our **Terms of Service**, **Privacy Policy (Your Privacy Rights)** and **Do Not Sell or Share My Personal Information.**

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.

# Exhibit 2

**Essays in Philosophy**

Volume 18
Issue 1 *Effective Altruism*

Article 1

1-31-2017

# Effective Altruism: Introduction

William MacAskill
*Oxford University*, will@effectivealtruism.org

Follow this and additional works at: https://commons.pacificu.edu/eip

Recommended Citation

MacAskill, William (2017) "Effective Altruism: Introduction," *Essays in Philosophy*: Vol. 18: Iss. 1, Article 1. http://dx.doi.org/10.7710/1526-0569.1580

Essays in Philosophy is a biannual journal published by Pacific University Library | ISSN 1526-0569 | http://commons.pacificu.edu/eip/

# Essays in Philosophy

ISSN 1526-0569

**Volume 18, Issue 1 (2017)**

## Effective Altruism: Introduction

William MacAskill
*Oxford University*

Essays Philos (2017)18:1 | DOI: 10.7710/1526-0569.1580
Correspondence: will@effectivealtruism.org


© 2017 MacAskill. This open access article is distributed under a Creative Commons Attribution 4.0 License (https://creativecommons.org/licenses/by/4.0/)

Essays in Philosophy

Volume 18, Issue 1

Effective altruism is a very new philosophical approach, and the present issue of Essays in philosophy is the first academic volume entirely devoted to this idea.

As I and the Centre for Effective Altruism define it, effective altruism is the project of using evidence and reason to figure out how to benefit others as much as possible, and taking action on that basis.

On this definition, effective altruism is an intellectual and practical project rather than a normative claim, in the same way that science is an intellectual and practical project rather than a body of any particular normative and empirical claims. Its aims are welfarist, impartial, and maximising: effective altruists aim to maximise the wellbeing of all, where (on some interpretation) everyone counts for one, and no-one for more than one. But it is not a mere restatement of consequentialism: it does not claim that one is always obligated to maximise the good, impartially considered, with no room for one's personal projects; and it does not claim that one is permitted to violate side-constraints for the greater good.

Effective altruism is an idea with a community built around it. That community champions certain values that aren't part of the definition of effective altruism per se. These include serious commitment to benefiting others, with many members of the community pledging to donate at least 10% of their income to charity; scientific mindset, and willingness to change one's mind in light of new evidence or argument; openness to many different cause-areas, such as extreme poverty, farm animal welfare, and risks of human extinction; integrity, with a strong commitment to honesty and transparency; and a collaborative spirit, with an unusual level of cooperation between people with different moral projects.

I believe that effective altruism is an important idea for three reasons. First, it's an idea that should be supported by a very wide variety of moral views. Consequentialism, including utilitarianism, would of course support the idea of using one's resources to benefit others by as much as possible. But all plausible moral views care about making the world better, impartially speaking; and, given the radical inequality in the world today, they should support increased efforts from middle-class members of affluent countries to make the world better. As the late Derek Parfit noted in a talk about effective altruism, "I don't think the disagreement between utilitarianism, egalitarianism and prioritarianism makes much difference here, because the stakes are so high, and the difference that you can make is so obvious, that all those views are going to agree."[1]

---

[1]  Derek Parfit, 'Reasons, persons, and effective altruism', talk delivered at Harvard University on April 21, 2015, https://youtu.be/q6glXJ7dVU0

Second, it's an idea that is already doing a lot of good. Last year, GiveWell moved over $100 million for the most effective charities; Giving What We Can members have between them made over $1.4 billion in lifetime pledges to charity; GoodVentures is a $10 billion foundation that describes itself as part of the effective altruism community. In addition, thousands of people around the world have made significant changes to their career plans on the basis of effective altruist ideas, and a number of new non-profit and social enterprises have been founded on effective altruist principles.

Finally, it's an area where philosophical work is of huge real-world importance: if we want to claim that one course of action is, as far as we know, the most effective way of increasing the welfare of all, we simply cannot avoid making philosophical assumptions. How should we value improving quality of life compared to saving lives? How should we value alleviating non-human animal suffering compared to alleviating human suffering? How should we value mitigating risks of human extinction, with the loss of hundreds of trillions of future lives that that would involve? When it comes to small chances of doing huge amounts of good, should we simply maximise expected value, or is some other decision theory correct? How should we act in light of deep uncertainty about what the morally right thing to do is?

Because philosophical assumptions are so important to the effective altruist project, I'm very happy to see new academic work on this area. The essays in this journal cover a variety of topics.

Alida Liberman's 'Effective altruism and Christianity: possibilities for productive collaboration' considers potential areas of overlap—as well as possible sources of tension—between effective altruists and Christians. Liberman points out that one of the two tenets that she believes are at the core of effective altruism, namely that we should give away a significant portion of our income to assist the world's neediest people, is shared by the long-standing Christian tradition that recognizes a strong moral obligation to help the poor. (A similar point has been made by Toby Ord in his article 'Global poverty and the demands of morality'.[2]) The other tenet, that we should use the best available scientific tools to maximize the good done with the resources we give, seems more in tension with Christianity. Some of this tension is practical: as a matter of fact, Christian giving is not very effective, but this could change as a result of effective altruist outreach. But the tension is also partly doctrinal: unlike (most) effective altruists, Christians attach high value to giving aimed at supporting local churches

---

[2] In J Perry (ed.) *God, The Good, and Utilitarianism: Perspectives on Peter Singer*, Cambridge: Cambridge University Press, 2014, pp. 177-191.

and faith communities, at enabling communal worship of God, and at supporting evangelism.

Andrew Fisher's 'Theory-neutral arguments for "effective animal advocacy"' defends the extension of the effective altruist approach to the specific issue of animal advocacy. Fisher's proposal, specifically, is to rely on the best available evidence to identify the best ways of helping animals. According to Fisher, such an approach has been resisted by some in the animal advocacy movement because it is assumed that it involves a commitment to consequentialism, which many animal advocates reject. Fisher tries to defuse this source of resistance by noting, correctly, that effective altruism, and hence effective animal advocacy, does not presuppose a consequentialist moral theory.

Gianfranco Pellegrino's 'Effective altruism and the altruistic repugnant conclusion' argues that a component of effective altruism—which he calls altruistic maximization—has implications that are as repugnant as the well-known repugnant conclusion in population ethics. Such cases arise in situations where agents can bring about either a substantial benefit to few individuals or a tiny benefit to a much larger number of people. Pellegrino also claims that the this "altruistic repugnant conclusion" can only be avoided by abandoning the idea that our judgments in these cases are precise. This, according to Pellegrino, creates a dilemma: since imprecision undermines altruistic maximization, effective altruists face the choice between embracing a view that has deeply counterintuitive implications or rejecting a central tenet of effective altruism.

Joshua Kissel's 'Effective altruism and anti-capitalism: an attempt at reconciliation' attempts to find common ground between left-wing critiques of effective altruism and effective altruists' distrust of anti-capitalism strategy. Kissel argues that effective altruism and anti-capitalism are compatible both in theory and in practice, and that increased dialogue between these two approaches would result in outcomes that are preferable from each of these perspectives.

Kathryn Muyskens's 'The other half of effective altruism: selective asceticism' agrees with the ideas, central to effective altruism, that we have a duty to make the world a better place and that we should act on this principle by applying our powers of reason so as to make our efforts as effective as possible. Muyskens, however, seeks to emphasize an aspect of effective altruism that she believes has been unduly neglected: effective altruists should consider not only action, but also inaction, as an effective method of achieving social change.

Max Elder and Bob Fischer's 'Focus on fish: a call to effective altruists' argues that the three-factor framework that effective altruists often rely upon to assess rival causes justifies making fish a focus of animal-focused effective altruists to at least the same degree that hens and chickens currently are. The authors claim that the fish killed for food outnumber chickens by about one order of magnitude; that fish have been largely neglected by animal advocates in general and effective animal advocates in particular; and that the comparatively low tractability of fish suffering is more than offset by its much higher scale and neglectedness.

Peter Murphy's 'But does it hurt' explores the relationship between altruism and sacrifice. Murphy argues that, while it is not the case that the morally best acts necessarily involve personal sacrifice, such sacrifice is involved in acts deserving of the highest praise. He thus concludes that self-sacrifice bears on the moral evaluation of agents, but not on the moral evaluation of acts, with which effective altruists are primarily concerned.

Rhys Southan's 'Peter Singer, R.M. Hare, and the trouble with logical consistency' examines Richard Hare's metaethical theory and its influence on Peter Singer. Southan argues that Singer's strategy, inspired by Hare, of trying to persuade others by describing the principles underlying their prescriptions often fails because it attributes to them principles which they do not in fact endorse. Southan thus concludes that effective altruists, who like Singer often rely on consistency arguments, face a more daunting task than they generally believe.

# **Exhibit 3**

 

# Earning To Give

Explore if pursuing a high-income profession, for the purpose of donating a significant portion of earned income to the most effective charities in the world, is a promising path for you

Learn More

## Introduction To Earning To Give

# Why It Matters

Earning to Give (E2G) is a strategy where individuals pursue high-earning careers to maximize their philanthropic contributions. The core idea is to earn a substantial income and donate a significant portion to effective charities, potentially having a greater impact than by directly working in those fields. This approach allows individuals to leverage their income to generate substantial social good, and to support multiple causes simultaneously.

E2G offers career flexibility, allowing individuals to choose from a wide range of careers that match their skills and interests while still contributing significantly to global welfare. By targeting donations to underfunded and high-impact areas, individuals can fill funding gaps and accelerate progress in critical but overlooked fields.

Two crucial considerations when pursuing an E2G career are the opportunity to build valuable career capital in the role, and to avoid high-earning professions that might cause harm.

Learn More



*By donating up to half their income to effective charities, Jeff and Julia have found that giving generously not only saves lives but also brings them greater happiness and fulfillment. Photo: Image: Julia Wise/Jeff Kaufman*



*If you have the potential of being at the tail of the income distribution, you could have a*

*significant positive impact in the world by donating a large share of your income.*

*Source: Our World in Data*

# Career In Earning To Give

There are some professions where the average salary is much higher than most others, and by pursuing those, more money can be donated to impactful causes. Below is a non-exhaustive list of some of them.

## Tech Roles

## Finance Roles

**Management Consultancy**

**Startup Founders**

# From Vision To Transformation: Stories Of Impact



**Anton Osika Palfi**

AI Entrepreneur

Anton started his career as a software engineer with experience from CERN and Sana Labs, and is now an AI entrepreneur, committed to build products that help people, and donating a share of dividends and exit to highly effective charities.

#EarningToGive

#TAKE ACTION

# Where To Start?



## Create A Tailored Career Plan

Explore EA Sweden's free career guide, helping you to understand if Earning to Give is a promising path for you

Read Career Guide



## Take The 10% Pledge

The ◆ 10% Pledge is a public commitment to give at least 10% of your income to the organizations that can most effectively use it to improve the lives of others

Take The Pledge



## Apply For Individual Coaching

Get input on your career plan, or on a specific career decision, through individual coaching with EA Sweden. It's free of charge.

Apply For Coaching

# Additional Resources And Learning

### Found A Tech Startup

## Become A Tech Startup Founder

Consider applying to YCombinator, by many means the world's most successful tech startup accelerator

Apply

## Cause Area Profile

### Learn More

Explore 80,000 Hours' comprehensive analysis of "Why and how to earn to give"

Read More

## AIM Report

### Learn More About Founding A Startup

Dive deeper into the rationale for why founding a startup could be an impactful career path in Ambitious Impact's *"Founding to Give report"*

Explore The Report

## Find Roles At Startups

### Join A Startup

Explore lists of open startup roles within the area of your expertise

Explore Lists

## Forum Post

**Get Inspired**

Read AGB's post *"10 years of Earning to Give"* on the EA Forum to engage with a personal story

Read Post

Community

**Engage And Connect**

Connect with other people impact-motivated earning to give people through the *"Earning to Give"* Facebook group

Connect

# Get in touch with us

Full Name

e.g. John Doe

Email

e.g. john.doe@example.com

Message

Start typing here...

Send Message

**Feel free to reach out** Don't hesitate to get in touch if you want to know more about effectiv interested in collaborating with us.



Effective Altruism Sweden is a nonprofit building a community that uses evidence and analysis to identify and implement the most effective ways to assist others.

## Quick Links

Home

About Us

Career Support and Coaching

Engage Yourself

Contact

## Important Links

Privacy Policy

Code of Conduct

Anonymous Feedback

**Let's Connect!**  Stay connected to get the latest news and opportunities

Copyright © 2025 by Effektiv Altruism

Powered by Webtec

# Exhibit 4

 

Home   My Network   Jobs   Messaging   Notifications   For Business ▾   Try Premium for $0



## Sam Bankman-Fried · 3rd

CEO at FTX

 FTX: Cryptocurrency Derivatives Exchange

 Massachusetts Institute of Technology

Nassau, New Providence, The Bahamas · Contact info

500+ connections

**Message**   **+ Follow**   **More**

## Activity

27,052 followers

**Sam hasn't posted yet**

Recent posts Sam shares will be displayed here.

Show all activity →

## Experience

 **Chief Executive Officer**
FTX: Cryptocurrency Derivatives Exchange
Apr 2019 - Present · 6 yrs 4 mos
Hong Kong

 **CEO**
Alameda Research
Nov 2017 - Apr 2019 · 1 yr 6 mos

Alameda Research is a top cryptocurrency liquidity provider.

 **Director of Development**
The Centre for Effective Altruism
Oct 2017 - Nov 2017 · 2 mos

 **Trader**
Jane Street
Jun 2014 - Sep 2017 · 3 yrs 4 mos
New York

## Education

 **Massachusetts Institute of Technology**
Physics
2010 - 2014

## Interests

**Top Voices**   Companies   Groups   Schools

Case 22-11068-KBO    Doc 31847-1    Filed 07/23/25    Page 31 of 111



**David Solomon** · 3rd
Chairman & CEO at Goldman Sachs
1,317,840 followers

+ Follow

About

Professional Community Policies

Privacy & Terms ▾

Sales Solutions

Safety Center

Accessibility

Careers

Ad Choices

Mobile

Talent Solutions

Marketing Solutions

Advertising

Small Business



**Questions?**
Visit our Help Center.

**Manage your account and privacy**
Go to your Settings.

**Recommendation transparency**
Learn more about Recommended Content.

Select Language

English (English)

LinkedIn Corporation © 2025

# **Exhibit 5**

7/23/25, 3:15 PM                    Sam Bankman-Fried, Alameda CEO Caroline Ellison spoke about red flags at FTX 3 months before it collapsed | Fortune

Case 22-11068-KBO   Doc 31847-1   Filed 07/23/25   Page 33 of 111



Put your portfolio in
BEAST MODE
with our breaking news alerts!
READ NOW

24/7
MARKET NEWS
WWW.247MARKETNEWS.COM

☰ **FORTUNE**                                                              SUBSCRIBE

HOME          NEWS          FORTUNE 500          TECH          FINANCE          LEADERSHIP          LIFESTYLE          MULTIMEDIA

**THE LEDGER · FTX**

## Sam Bankman-Fried and Alameda CEO Caroline Ellison spoke about red flags at FTX 3 months before it collapsed. Here's what they said—and how they lied

November 18, 2022 at 5:58 AM EST



Sam Bankman-Fried, founder and chief executive officer of FTX Cryptocurrency Derivatives Exchange, during an interview on an episode of Bloomberg Wealth with David Rubenstein in New York, on Aug 17, 2022.

JEENAH MOON—BLOOMBERG VIA GETTY IMAGES

It was late August, and Sam Bankman-Fried appeared on a computer screen, sporting the black headphones, T-shirt and floppy bedhead that were his trademark as the ubiquitous face of crypto and the chief executive officer of FTX.

Questions were building about the exchange's relationship with Alameda Research, the trading firm he started that's behind the collapse of the cryptocurrency exchange. At the time, however, Bankman-Fried appeared eager to dispel concerns and agreed to an extensive interview. Bloomberg News also spoke with Alameda CEO Caroline Ellison, who usually avoided the spotlight.

Bankman-Fried lost his usual jittery bravado when pushed about Alameda's ties to the exchange. He often fumbled for his words and failed to provide direct answers to a simple question about where he lived. He maintained that the companies were adequately regulated and kept at a distance from each other.

We now know that much of what he said was untrue — or highly misleading at best. Documents filed in FTX's bankruptcy depict a free-wheeling enterprise rife with conflicts of interest, self-dealing and very little controls over what happened to customers' money. Funds were poorly tracked. Leadership was haphazard. Meaningful oversight appears virtually nil.

What actually happened behind the scenes at the crypto empire tumbled into ruin is still being pieced together in court. But the massive gulf between what Bankman-Fried said — and what was happening at the company he ran — has rattled investors' confidence and sent tremors across the industry by raising doubts about the solvency of other cryptocurrency firms.

Here's what Bankman-Fried and Ellison said and how it stacks up with what has since been disclosed. Some of the comments appeared in a Bloomberg News story published in September about the potential conflicts of interest at FTX and Alameda.

## On FTX's relationship with Alameda

**Bankman-Fried:** "As of today, there isn't that much of one there. You know, they obviously came from the same place originally. Or, you know, the same sort of original people … Most of the remaining nexuses have dropped off … Obviously, I know the people from Alameda decently well, but there isn't like a large amount of, you know, ways remain that we are actively working together, anything like that … Alameda is a wholly separate entity."

"They're different offices, like different principal offices. We don't have any shared personnel. We're also not the same company … We're not all under the same corporate umbrella or anything like that."

"I don't trade partially because I don't have time. It's a full-time job running FTX," he said. "But even if I did have time, I wouldn't because of wanting to have separations.**"**

**Ellison:** "They're both owned by Sam, obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously."

Alameda and FTX were, in fact, deeply intertwined. In a bankruptcy filing Thursday, court appointed CEO John J. Ray III said there was no independent governance of Alameda — which was 90% owned by Bankman-Fried — and FTX, and noted that the trading fund had an exemption from certain parts of FTX's protocols concerning the liquidation of customer funds. FTX imploded after revealing a roughly $8 billion shortfall on its balance sheet and reportedly used FTX customer money to fund risky bets made by Alameda.

## On internal controls

**Bankman-Fried:** "We have — I don't remember the exact numbers, but I want to say about 100 people, at FTX, involved in compliance."

It's unknown how many compliance staff — or even employees — FTX actually had. In the bankruptcy filing, Ray said the company has been unable to provide a complete list of who worked for it and in what capacity, adding that the lines of responsibility are unclear. But he paints a damning portrait of the firm's overall governance. "From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented," he wrote.

## On living arrangements for FTX, Alameda employees

**Bankman-Fried:** "I'm hesitating because I — I mostly sleep on the bag. I don't, it is legitimately not the case that I, that's where you say — exactly I live. Yeah. So I do hang out a lot in that, in that apartment after – after work – I do live in – technically I live in a – technically I live alone, but don't sleep there – I mostly sleep on couches and beanbags – but, but yeah."

In a separate interview with David Rubenstein, Bankman-Fried had said that he lived with colleagues in a "large apartment" near the office. Alameda and FTX shared a corporate campus in the Bahamas.

## On regulation of FTX

**Bankman-Fried:** "We are the most regulated crypto exchange by far. We are regulated by some definition by more regulators than any exchange of any type."

"I think it has historically been the case that crypto has been substantially more lightly regulated with much less oversight than traditional finance. But I don't think it's that's actually true of FTX."

Both FTX and Alameda lacked vigilant regulatory oversight, and the exchange's decision to incorporate in the Bahamas made it subject to regulations that are different than those of the US, where there are strict rules on the handling of customer accounts. So it was false to suggest it was exposed to more regulation than any other exchange. Though FTX US fell under the purview of regulators, crypto investors lack many of the protections they take for granted in savings accounts or even on stock exchanges. Now employees and customers with assets on its platform don't know if they'll ever get their money back.

## On company auditors

**Bankman-Fried:** "We are audited. We have financial audits, both for FTX US and FTX International. Each year. We have regulatory oversight, again, from a number of the largest jurisdictions in the world."

Only portions of Bankman-Fried's empire were audited, and the quality of those has been cast into doubt. While bankruptcy filings show FTX had been audited, Ray, the company's new court-appointed CEO, said he had "substantial concerns as to the information presented in the financial statements." One of the auditors, Prager Metis, describes itself as the "first-ever CPA firm to officially open its Metaverse headquarters" in the platform Decentraland. "I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances" of the companies, the filing concludes.

## On leadership

**Ellison:** "I think he's an amazing leader, obviously, and that's kind of the thing that first drew me to Alameda and I think that's why both Alameda and FTX have kind of succeeded thus far."

"I'm excited to see what he continues to do with FTX. And in the crypto space more broadly."

Bankman-Fried stepped down from his role as CEO and his company's collapse is drawing comparisons with the infamous downfalls of Enron and Lehman Brothers. American and Bahamian authorities have discussed the possibility of bringing him to the US for questioning.

Our new weekly Impact Report newsletter will examine how ESG news and trends are shaping the roles and responsibilities of today's executives—and how they can best navigate those challenges. Subscribe here.

## About the Authors

**ANNIE MASSA**

SEE FULL BIO >

**ANNA IRRERA**

SEE FULL BIO >

**HANNAH MILLER**

# Exhibit 6

**The New York Times** | https://www.nytimes.com/2022/12/21/technology/ftx-fraud-guilty-pleas.html

# Two Executives in Sam Bankman-Fried's Crypto Empire Plead Guilty to Fraud

Caroline Ellison, the former chief executive of Alameda Research, and Gary Wang, a founder of FTX, are cooperating in the federal criminal case against Mr. Bankman-Fried.

  

**By David Yaffe-Bellany, Matthew Goldstein and Benjamin Weiser**
Dec. 21, 2022

> **Sign up for the On Tech newsletter.** Get our best tech reporting from the week. Get it sent to your inbox.

Two former top executives of Sam Bankman-Fried's crypto trading empire have pleaded guilty to federal criminal fraud charges and are cooperating in the prosecution of the disgraced crypto entrepreneur, the U.S. attorney for the Southern District of New York said on Wednesday night.

The two are Caroline Ellison, 28, who was the chief executive of the cryptocurrency hedge fund Alameda Research, and Gary Wang, 29, a founder of FTX, the crypto exchange. They were key lieutenants in Mr. Bankman-Fried's vast business empire, an international web of investments and enterprises that began with the founding of Alameda and FTX.

Two federal regulatory agencies, the Securities and Exchange Commission and the Commodity Futures Trading Commission, also filed civil fraud charges against Ms. Ellison and Mr. Wang on Wednesday, building on fraud complaints they brought against Mr. Bankman-Fried last week.

The guilty pleas and cooperation agreements are a major advance in the federal prosecution of Mr. Bankman-Fried, who is in U.S. custody after agreeing to be extradited from the Bahamas to face trial in the Southern District of New York.

The combination of criminal and civil charges against the former top executives puts Mr. Bankman-Fried, 30, in an even more perilous legal position. The federal government has accused him of orchestrating a sweeping, yearslong fraud that culminated in the bankruptcy of FTX last month after the crypto equivalent of a bank run. Now two of his closest advisers are cooperating with the government as it pursues that case.

Mr. Wang and Ms. Ellison were not just close colleagues of Mr. Bankman-Fried. The three lived together in a luxurious penthouse in the Bahamas, where FTX was based, and Mr. Bankman-Fried and Ms. Ellison were at times romantically involved.

In the charges against Mr. Bankman-Fried, prosecutors and regulators have accused him of diverting billions in customer money for other uses, including buying real estate in the Bahamas, trading cryptocurrencies at Alameda, making campaign donations and investing in other crypto companies. Prosecutors contend he defrauded customers of, investors in and lenders to his crypto trading firm.

The charges revealed on Wednesday show that prosecutors and regulators believe Mr. Bankman-Fried was far from alone in running his scheme and worked with a close circle of colleagues, who followed his directions and played a key role in executing the fraud. The S.E.C. said that Ms. Ellison had misused FTX customer deposits to fund Alameda's trading activity and that Mr. Wang had created software that allowed that diversion of funds to take place.

"Ellison and Wang were active participants in the scheme to deceive FTX's investors and engaged in conduct that was critical to its success," the S.E.C. said in a statement.

The collapse of FTX and the prosecution of Mr. Bankman-Fried have been a major blow to the crypto industry, which has reeled for months as the prices of digital assets such as Bitcoin and Ether have plunged and a procession of major companies have filed for bankruptcy. The sudden implosion of FTX has unsettled customers of other crypto trading platforms, which are scrambling to assure investors that their money is safe.

The guilty pleas by Ms. Ellison and Mr. Wang could push other former high-ranking executives to cooperate with the authorities in the case against Mr. Bankman-Fried, who faces charges including fraud, money laundering and campaign finance offenses.

Case 22-11068-KBO    Doc 31847-1    Filed 07/23/25    Page 38 of 111

In a videotaped statement on Wednesday night, Damian Williams, the U.S. attorney, said Mr. Wang and Ms. Ellison were charged "in connection with their roles in the frauds that contributed to FTX's collapse."

Mr. Williams also reiterated a point he made last week when his office filed the criminal charges against Mr. Bankman-Fried. "If you participated in misconduct at FTX or Alameda, now is the time to get ahead of it," he said. "We are moving quickly, and our patience is not eternal."

Mr. Williams added that Mr. Bankman-Fried was in F.B.I. custody and being brought back to the United States from the Bahamas, and would be presented before a judge as soon as possible. The crypto entrepreneur is expected to appear in Federal District Court as early as Thursday.

Lawyers for Ms. Ellison declined to comment. Ilan Graff, a lawyer for Mr. Wang, said, "Gary has accepted responsibility for his actions and takes seriously his obligations as a cooperating witness."

During a two-week media blitz before his arrest on Dec. 12, Mr. Bankman-Fried claimed he had done nothing wrong and never intended to defraud anyone. He also claimed he wasn't fully aware of what was happening at Alameda.

A spokesman for Mr. Bankman-Fried declined to comment.

While the guilty pleas by Ms. Ellison and Mr. Wang still appear to be sealed under court orders, their plea agreements were released by prosecutors on Wednesday night. Ms. Ellison pleaded guilty to seven counts: two counts of wire fraud and five conspiracy counts involving wire, securities and commodities fraud and money laundering. Mr. Wang pleaded guilty to wire fraud and three conspiracy counts, which involved wire, securities and commodities fraud.

In the agreements, which were signed on Monday, Ms. Ellison and Mr. Wang pledged to "cooperate fully" with the U.S. attorney's office, the F.B.I. and other law enforcement agencies, and to "truthfully and completely disclose all information concerning all matters" they are asked about.

In its complaint, the S.E.C. said Ms. Ellison, under direction from Mr. Bankman-Fried, had manipulated the price of a digital currency that FTX created, called FTT, by buying large quantities to prop up its price. Alameda was one of the major firms that was trading FTT and had used the crypto token as collateral for loans it got from other big crypto firms to fund its trading.

Authorities have said that investors, lenders and customers were not aware of how closely connected FTX and Alameda were and that they operated essentially as one entity.

The Commodity Futures Trading Commission charged that Ms. Ellison had helped Mr. Bankman-Fried by making deceptive and misleading statements about the supposed separation between Alameda and FTX.

Mr. Wang helped further those close ties by creating systems that gave Alameda an unfair advantage over other customers in executing trades on the FTX platform, according to the commission.

Ms. Ellison met Mr. Bankman-Fried at the quantitative trading firm Jane Street, where she worked after graduating from Stanford University. Both were involved in effective altruism — a community focused on using data to maximize the long-term impact of charitable donations.

Mr. Bankman-Fried left Jane Street and eventually founded Alameda in 2017. Ms. Ellison joined him in 2018 and soon became a member of his inner circle. She followed him to Hong Kong, and took over as the chief executive of Alameda after Mr. Bankman-Fried founded FTX with Mr. Wang in 2019.

Mr. Wang was also part of the effective altruism community. Before he started working with Mr. Bankman-Fried, he was a software engineer at Google, where he developed price aggregation systems for Google Flights. Since FTX's founding, he has kept a low public profile, allowing Mr. Bankman-Fried to become the face of the exchange.

But behind the scenes, Mr. Wang played a key role in FTX, as one of the executives responsible for writing the platform's software code, according to the S.E.C.

As FTX collapsed, Ms. Ellison gathered a group of Alameda staff members who were working from the company's office in Hong Kong, and confessed that the firm had used customers' deposits to fill a shortfall in its accounts, The New York Times previously reported. She told them that she, Mr. Bankman-Fried, Mr. Wang and another executive, Nishad Singh, had all been aware of the scheme.

**David Yaffe-Bellany** covers cryptocurrencies and financial technology. He graduated from Yale University and previously reported in Texas, Ohio, Connecticut and Washington, D.C.

**Matthew Goldstein** covers Wall Street and white-collar crime and housing issues.

**Benjamin Weiser** is a reporter covering the Manhattan federal courts. He has long covered criminal justice, both as a beat and investigative reporter. Before joining The Times in 1997, he worked at The Washington Post.

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Executives Plead Guilty In FTX Case

# Exhibit 7

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/finance/currencies/how-ftxs-nishad-singh-once-an-honors-student-fell-into-crypto-crime-a37197a9

# How FTX's Nishad Singh, Once an Honors Student, Turned to Crypto Crime

He is the latest member of FTX's inner circle to plead guilty to fraud

*By* *Alexander Osipovich* Follow

*Updated* *March 1, 2023 12:04 pm ET*

Nishad Singh followed Sam Bankman-Fried into the high-stakes world of cryptocurrency trading. Now he could help put the former FTX chief executive in prison.

Mr. Singh, the 27-year-old former director of engineering at FTX, pleaded guilty this week to six criminal counts, including wire fraud. He agreed to cooperate with the government's investigation of FTX's collapse.

The deal means Mr. Singh could end up testifying against a colleague and friend whom he has known since childhood. Just a few months ago, he and Mr. Bankman-Fried were housemates in the Bahamas, living in a luxury penthouse with other executives at FTX and its sister trading firm, Alameda Research.

"I'm unbelievably sorry for my role in all of this and the harm that it has caused," Mr. Singh said in a court hearing in Manhattan on Tuesday.



Nishad Singh, FTX's former director of engineering, has pleaded guilty to six criminal counts. PHOTO: BOB VAN VORIS/BLOOMBERG

Mr. Singh attended the same elite Silicon Valley prep school as Mr. Bankman-Fried and was close friends with his younger brother, Gabriel Bankman-Fried. Like the Bankman-Fried brothers and several other top FTX executives, Mr. Singh was a proponent of effective altruism, a movement that urges adherents to make big bucks so they can give their fortune to charity.

Former colleagues said Mr. Singh was a well-liked figure at FTX, seen as kind and thoughtful and the most approachable member of the inner circle. The three other members of that circle were Mr. Bankman-Fried; Gary Wang, the reclusive genius who was FTX's chief technology officer; and Caroline Ellison, the chief executive officer of Alameda before its collapse. Both Mr. Wang and Ms. Ellison pleaded guilty to fraud charges in December.

Live Q&A

# The Bull and Bear Cases for Crypto

The Journal's lead writer for live markets, Gunjan Banerji, sat down with former White House communications director and crypto bull, Anthony Scaramucci, and former chief of the Securities and Exchange Commission's Office of Internet Enforcement and crypto bear, John Reed Stark, for a conversation about the bull and bear cases for crypto.

**Watch the conversation** →

Mr. Singh's former colleagues expressed disbelief that he got caught up in the alleged misuse of FTX customer funds, saying they found it hard to reconcile with his apparently sincere devotion to ethics and philanthropy.

Mr. Singh wrote software code that allowed Mr. Bankman-Fried to divert FTX customer funds to Alameda, and—along with Ms. Ellison and Mr. Wang—knew about the misappropriation of funds, according to a lawsuit filed Tuesday by the Securities and Exchange Commission.

At this week's hearing, Mr. Singh also admitted to falsifying FTX's revenue at the direction of Mr. Bankman-Fried.

In a statement, his lawyers said he would do everything he could to make things right for FTX's victims.

Mr. Singh owned a sizable chunk of FTX, which was valued at $32 billion before its collapse. Bankruptcy-court filings show Mr. Singh owned 7.8% of FTX's U.S. arm, 10% of its ventures arm and 44 million shares in its main international exchange, making him one of the unit's largest shareholders.



Before it collapsed, FTX was gearing up for growth from the Bahamas, where it had relocated for the crypto friendly regulatory regime. PHOTO: ROBYN DAMIANOS FOR THE WALL STREET JOURNAL

Raised in California by Indian immigrant parents, Mr. Singh became senior class president at Crystal Springs Uplands School in Hillsborough, Calif. Two former classmates recalled that he was an ambitious and diligent student. At age 16, he ran an ultramarathon to raise money for charity and set a world record for the fastest 100-mile run by a runner of his age, according to the San Jose Mercury News. He later did a TEDx Talk on the achievement, discussing how he overcame childhood asthma to become a long-distance runner.

In 2017, Mr. Singh graduated with highest honors from the University of California, Berkeley, majoring in electrical engineering and computer science. He took a job at Facebook but left a few months later after learning that his friend's big brother had started a crypto-trading firm, Alameda, and needed engineers.

Bitcoin was in the midst of a wild bull market and the firm seemed like an exciting opportunity, Mr. Singh said in a 2020 podcast interview. "I watched Sam execute a sequence of trades," he said, recalling an early visit to Alameda's office in Berkeley. "I knew nothing about trading at the time, but even then it was understandable that sequence of trades was superprofitable and easy to understand."

When he arrived at Alameda, Mr. Singh was "an unfailing nice person, good team player, good cultural influence and relatively weak programmer," Mr. Bankman-Fried

wrote in a 2018 performance review seen by The Wall Street Journal.

His technical proficiency improved over time, and he demonstrated a knack for easing internal tensions, eventually making him a valuable employee, Mr. Bankman-Fried wrote.

In an email to Mr. Bankman-Fried included in the performance review, Mr. Singh told his boss: "It's really, really fun learning about trading from you. I do feel slow when I try to learn, let alone when I need clarification ten times later. Ironically I think it'd help my fears here if you were honest with me about when I'm being a dumbass."

Mr. Singh moved to Hong Kong after Alameda set up shop there. When the firm launched FTX in 2019, Mr. Singh was one of the key technical architects of the new crypto exchange, along with Mr. Wang.

In 2021, when Mr. Bankman-Fried relocated FTX's headquarters to the Bahamas for its crypto-friendly regulatory regime, Mr. Singh settled in a five-bedroom penthouse in Albany, an elite gated community, with other top executives. Among them was his girlfriend, Claire Watanabe, who ran human resources and some FTX marketing efforts. The two of them owned a goldendoodle named Gopher. The dog became something of an FTX mascot, appearing occasionally in Mr. Bankman-Fried's Twitter feed.

Former colleagues say Mr. Singh generally fell in line with Mr. Bankman-Fried's decisions on how to run the company. He occasionally became his pointman for tricky personnel issues. For instance, after Mr. Bankman-Fried fell out with the head of FTX's U.S. arm, Brett Harrison, last year, Mr. Singh acted as a go-between for the feuding executives, people familiar with the matter said.

With other members of the inner circle, Mr. Singh was on the FTX Foundation board. The foundation backed causes popular in the effective-altruism community, such as research to prevent pandemics and limit the risks of artificial intelligence.

In an interview last summer, Mr. Singh said his earliest philanthropic efforts focused on animal welfare, but he had shifted to favor "long-termist" causes because of the greater potential impact on humanity. "You can care about saving lives today, or you can care about saving lives in the future," Mr. Singh told the Journal. "Over time I've become increasingly convinced that trying to affect the future is just higher-leverage."

Mr. Singh became a liberal megadonor, giving $11.7 million last year to candidates, political-action committees and branches of the Democratic Party, according to OpenSecrets.org, a website that tracks political contributions.

This week, Mr. Singh pleaded guilty to a scheme that involved making illegal political contributions using Alameda funds and masking the source of the money. In an indictment filed against Mr. Bankman-Fried last week, prosecutors said the former FTX chief executive used Mr. Singh as a straw donor to back left-leaning candidates. Referring to Mr. Singh as "CC-1," the indictment said Mr. Bankman-Fried pushed the younger executive to give at least $1 million to a super PAC that would in turn support a congressional candidate associated with LGBT issues.

That episode appears to refer to Mr. Singh's role in Vermont's contested Democratic primary for its sole House seat last year. On July 7, he gave $1.1 million to LGBTQ Victory Fund Federal PAC, a huge contribution for a group that had only about $150,000 of cash at the end of June, according to Federal Election Commission filings. Over the following weeks the PAC spent $990,000 in support of Becca Balint, the candidate who went on to win the Aug. 9 primary, FEC filings show. Ms. Balint won the general election, becoming the first openly gay person to represent Vermont in Congress.

Ms. Balint didn't solicit funds from Mr. Singh and only learned he was behind the donation from news reports, said Natalie Silver, her campaign manager. Ms. Balint's staff did meet with Gabriel Bankman-Fried and his Guarding Against Pandemics PAC, Ms. Silver added. A spokesperson for LGBTQ Victory Fund indicated it was ready to return the money, pending guidance from authorities.

In November, after FTX suspended customer withdrawals and it became clear that billions of dollars had gone missing, Mr. Singh fell into a psychological crisis, according to colleagues who saw him at the time and worried about his mental health. He sounded remote when colleagues tried to speak to him, and he was gaunt and unshaven the night before FTX's bankruptcy filing on Nov. 11, people familiar with the matter said.

He and Ms. Watanabe left the Bahamas for the U.S. soon after.

*—Corinne Ramey, James Fanelli, Angel Au-Yeung and Hannah Miao contributed to this article*

Write to Alexander Osipovich at alexo@wsj.com

*Appeared in the March 2, 2023, print edition as 'Bankman-Fried Confidant Is Possible Prosecution Witness'.*

## Videos

# Exhibit 8



## Effective Altruism-Linked Group Used Millions Donated By FTX To Buy A Czech Castle

Forbes.com

February 28, 2023 Tuesday

Copyright 2023 Forbes LLC All Rights Reserved

**Length:** 1713 words

**Byline:** Sarah Emerson, Forbes Staff
**Highlight:** Collapsed crypto exchange FTX's bankruptcy proceedings could endanger some of founder Sam Bankman-Fried s philanthropic gifts   like the one an effective altruism-aligned group used to buy a castle in Czechia.

# Body

<figure>

<figcaption>

Last July, an effective altruism-linked group received $4.5 million from FTX to fund the purchase of a Czech castle called Chateau Hostacov.

Federico Winer/Ultradistancia for Forbes

</figcaption></figure>

**Collapsed crypto exchange FTX's bankruptcy proceedings could endanger some of founder Sam Bankman-Fried s philanthropic gifts   like the one an effective altruism-aligned group used to buy a castle in Czechia.**

By, Forbes Staff

**Four months before FTX collapsed**into a multi-billion dollar catastrophe of doomed investments and shadowy subsidiaries, the crypto exchange donated millions of dollars to an obscure organization for a real estate investment: the purchase of a centuries-old castle in the scenic Czech highlands.

In July 2022, the $4.5 million gift was quietly bestowed by the FTX Foundation, the exchange s philanthropic arm, and is one of dozens of donations now sitting in the crosshairs of the sprawling FTX bankruptcy proceedings.

The FTX Foundation does not appear to have disclosed the donation before it was shuttered in December. But according to Irena Kotikova, a former Czech Association for Effective Altruism chairperson who applied for the grant, the funds were disbursed last July to the European Summer Program on Rationality (ESPR), a Czech educational non-profit with ties to  effective altruism,  a social movement promoted byFTX founder Sam Bankman-Fried. Roughly $3.5 million was reportedly used to acquire Chateau Hostacov,  a renaissance chateauhidden away in the center of the Czech Republic.

Effective Altruism-Linked Group Used Millions Donated By FTX To Buy A Czech Castle

In its simplest form, effective altruism advocates doing the most good for as many people as possible. The philosophy nominally took shape around 2011, and encourages the use of evidence and reason to determine how to best save the world. To some adherents, this has meant  earning to give  a sort of moral imperative for taking that Wall Street job, or running a multi-billion dollar crypto exchange (ideally not into the ground) in hopes of, say, safeguarding humanity against artificial intelligence or preventing a nuclear catastrophe. As Bankman-Friedonce said:  I wanted to get rich not because I like money, but because I wanted to give that money to charity.  (A few months laterhe toldthe**Wall Street Journal**that his charitable efforts were  as much PR as anything else. )

FTX Foundation waslaunchedin 2021 with a pledge to allocate 1% of FTX s revenue fees to charitable causes, on top of contributions from Bankman-Fried and lieutenantsCaroline Ellison, Gary Wang and Nishad Singh. One year later, its Future Fund initiativeemergedto focus specifically on effective altruism projects. The foundation s entire team wouldeventually resignin November, citing  fundamental questions about the legitimacy and integrity  of their benefactors. By that time, it claimed to have donated$190 millionto more than 100 projects.

What need would a charitable movement have for a palatial property with a lake and a frisbee golf course?

Before FTX imploded, however, a portion of those funds were used to acquire a company that owned Chateau Hostacov last October.  ESPR can't return the property or the money at the moment because there is currently no mechanism that we are aware of that would make it possible to legally send money  back to FTX  such that it would reliably make its way back to customers who lost their money,  Kotikova later wrote on the Effective Altruism Forum. Former FTX Foundation staff, as well as ESPR representatives, did not respond to requests for comment.

Chateau Hostacov s canary yellow walls punctuate a lush estate in Skryje, west of Prague. Since itwas builtin 1297, everyone from working class socialist families to Bohemian elite have occupied the castle. In 2007, it was purchased by the Ha a family who transformed Chateau Hostacov into a 17-room hotel, featuring a restaurant, pool, escape room, tennis courts and frisbee golf course. At the time of its closure late last year, the hotelhada 4.7 Google review. On Tripadvisor, where it has a4.5 rating, visitors celebrated the castle as a family-run gem, calling it a  step back in time to a magical world.

What need would a charitable movement have for a palatial property with a lake and a frisbee golf course?

Kotikova    who is not employed by ESPR, but runs the Hostacov project    told**Forbes**she spent three years searching the Czech Republic for an events venue before landing on the castle.  I wanted to be able to run events for up to 60-100 people,  she wrote, and had sought  an inspiring place which supports people s creativity and ability to think.

Kotikova claimed the grant agreement, which**Forbes**has not seen, stipulated the project must use the funds given to it. She claimed that  it has not yet been established what exactly was the source of our funding and whether it is subject to bankruptcy proceedings,  and that as a Czech entity,  we are governed by Czech laws which restrict our ability to make large payments overseas (at least until there is a basis for it).

She said an entity called FTX Philanthropy Inc. issued the contract. Delaware business records show that FTX Philanthropy was incorporated in Delaware last February and changed its name to FTX Foundation five months later. It is not one of the FTX entities listed as adebtor, and lawyers for exchange did not respond to questions about whether its grants will be targeted.

The funds went toward acquiring the Czech equivalent of an LLC that owned Chateau Hostacov. Czech business and property records show that in October, ESPR became the sole shareholder of this company, with Kotikova listed as an executive. The hotel s previous owner, Vojt ch Ha a, did not respond to a request for comment.

Lenka Du ková Munter, a sales specialist for historical properties at Czech real estate agency Luxent, told**Forbes** that the alleged sale price of 80 million koruna (or $3.5 million USD) seemed low based on public information about the estate s condition. Munter noted that there are strict European Union laws regulating financial stability and transparency around real estate transactions, so  it would be very unusual for a purchase to take place  behind the curtains  without scrutiny.

Effective Altruism-Linked Group Used Millions Donated By FTX To Buy A Czech Castle

Kotikova said she found the price of Chateau Hostacov to be quite good, and that it s common for such estates to be privately bought and repurposed. Shetold Czech public radio broadcasteri**ROZHLAS**in December that of the 107 million koruna received by ESPR from the FTX Foundation, roughly 80 million went toward purchasing the castle.

The project slated for Chateau Hostacov has not been publicly announced, though Kotikova told**Forbes**that it was not intended as an Effective Altruism project. Last September, Chateau Hostacovannouncedon its Facebook Page that it would no longer function as a hotel, but as an educational center for an unnamed non-profit, and the Prague-based Society for Effective Altruism lateridentified itselfas the area s new neighbors. (The society alsoadvertised a jobhelping to remodel a former hotel in the Czech highlands. Spokesperson Hana Kalivodová told**Forbes**they received no portion of the FTX Foundation funds.) When asked about Chateau Hostacov s relationship with the effective altruism group, Kotikova called the Facebook posts a miscommunication and unfortunately misleading about the nature of the project.

The ongoing federal investigation into Bankman-Fried, who faces 12 criminal charges for conspiracy and fraud, has cast a pall over FTX grantees that did not have visibility into the company s affairs or financials.

That could be a problem for charities here if FTX was always some kind of Ponzi scheme .

But for now, such donations remain in legal limbo. Meanwhile, FTX leadership has done little to assuage fears that grantees might be forced to return their funding through a legal process known as clawbacks, wherein FTX would seek to reclaim its assets. That would prove difficult for projects like the one at Chateau Hostacov, which appears to have already spent some of the funds. It s certainly a devastating practical problem, Matthew Gold, a bankruptcy partner at Kleinberg Kaplan, told**Forbes**. There are various legal standards that influence which recipients are captured by clawbacks and how far the reach back period extends for example, 90 days or two years before the date of the debtor s bankruptcy petition, depending on the determination. Virtually all of FTX s charitable giving occurred within the last two years.

FTX management is also undoubtedly interested in**when**the company became insolvent, as donations made during insolvency can make them liable for return. That could be a problem for charities here if FTX was always some kind of Ponzi scheme or never had proper assets, Gold added. It may always have been insolvent.

The company does not appear to have targeted FTX Foundation grantees yet. Molly Kovite, managing counsel for the effective altruism foundation Open Philanthropy,wrotethat clawback targets will eventually receive formal notice from the bankruptcy court, and will have the opportunity to litigate. In the meantime, Open Philanthropyhas allowedFTX grantees wishing to return their donations to apply for funding through its own program. Between2017and2019, Open Philanthropy also granted $850,000 to ESPR. It did not respond to a request for comment.

When Chateau Hostacov changed hands last year, news of its closurewas metwith disappointment on Facebook, where guests mourned the loss of public access. I d really like to know who s going to be funding the nonprofit, one person wrote. Even the website for its frisbee golf course is defunct. But the castle appears to be getting at least some use as a weekend getaway for effective altruists. In October 2022, just weeks before FTX imploded, aFacebook eventfor "people interested in effective altruism" shows a two-day gathering of enthusiasts at the Chateau Hostacov. The event's description says one of its goals is meeting people who want to improve the world.

**Correction: This story was updated to remove a comment that Chateau Hostacov could have been sold in a private transaction. An earlier version of this story also said the Society for Effective Altruism did not respond to a request for comment.**

**MORE FROM FORBES**

# Classification

**Language:** ENGLISH

Effective Altruism-Linked Group Used Millions Donated By FTX To Buy A Czech Castle

**Publication-Type:** Web Publication


**Subject:** GRANTS & GIFTS (93%); ASSOCIATIONS & ORGANIZATIONS (90%); CHARITIES (90%); FOUNDATIONS (90%); INSOLVENCY & BANKRUPTCY (90%); MAJOR GIFTS (90%); PHILANTHROPY (90%); NONPROFIT ORGANIZATIONS (78%); SOCIETY, SOCIAL ASSISTANCE & LIFESTYLE (70%); ARTIFICIAL INTELLIGENCE (50%); Innovation (%)


**Company:**  WALL STREET JOURNAL (51%)


**Industry:** REAL ESTATE (76%); REAL ESTATE INVESTING (75%); ARTIFICIAL INTELLIGENCE (50%)


**Person:** SAM BANKMAN-FRIED (93%)


**Geographic:** CZECH REPUBLIC (93%)


**Load-Date:** March 2, 2023

---

**End of Document**

# Exhibit 9

LIGHTHAVEN



# Lighthaven

*A campus in Berkeley, CA, run by Lightcone Infrastructure*

Chat with us    Submit an inquiry

 

### Retreats & Workshops

15 - 70 people

We offer cozy nooks, discussion rooms with endless whiteboards, and ~40 bedrooms (with up to ~80 beds).

### Conferences

50 - 500 people

Conference space for up to 140 people inside, 500 people outside. 20+ session spaces. 80 conference attendees can book accommodation on the campus.



### Event Space

10 - 500 people

We can host events ranging from 20 person talks to large 500 person mixers. We can provide sound setup, music, private kitchens, snacks, catering.

# WHAT IS LIGHTHAVEN?

Lighthaven is a space dedicated to hosting events and programs that help people think better and to improve humanity's long-term trajectory.

Past programs we hosted and were excited about have been the MATS program, which helps early-career researchers break into the field of AI Alignment, and workshops run by the Machine Intelligence Research Institute and the Topos institute on helping people better understand the long-term consequences of developing Artificial General Intelligence.

Lighthaven is a project by Lightcone Infrastructure, which is dedicated to facilitating intellectual progress on humanity's most important questions.

# PRICING

We determine pricing on a case-by-case basis, but a good approximation is:

**Retreats, Conferences and Lodging:**
$100 - $250 per person per day.

**Events:**
$50 - $125 per person.

We offer some groups large discounts (including free) if we think a project seems particularly great to us. Please feel quite free to ask us about this.

You can use your own caterer, but our default caterer offers meals from $20/meal to $50/meal that most visitors have found quite satisfying.

We do engage in some price discrimination. If we think your best alternative to our venue would be much more expensive, we may charge more than our listed price. We try to find a fair price that splits the difference between our own costs and the value you get out of the space.

We also provide more bespoke services (see below), though we generally charge more for this.

Overall we try to be reasonable about pricing, and don't expect to make much profit on the space.


## WHAT ARE PEOPLE SAYING?


Lighthaven felt rambly and wondrous and fun without being pretentious? Felt like an incredibly-well-executed, 11-of-10 house party venue (laudatory) crossed with Disneyland.

I am still learning about cool things and spaces in the venue that I missed (there was a robot sand table?)

– Manifest attendee in the Manifest feedback form


The venue itself is fucking gorgeous.

I heard something like that ~2/3 of the time as I was walking guests of honor in & giving them a tour. Something like "wow, how did you find this place?" or "damn, you guys got a good spot."

– Saul Munn, lead organizer of Manifest

We had an incredible time at the Lighthaven last week - many of the participants remarked how beautiful and cozy the campus is, and the atmosphere was extremely conducive for creative thinking and problem solving. All the little details from having lots of post-it pads and markers to mini fridges and fluffy slippers show how much thought was put into designing the space. [...]

we hope to be back at the Lighthaven again at our next event, if there are vacancies!

– Shao Wei, organizer of *Finding the Right Abstractions*
workshop run by the Topos Institute

Man, I really like the aesthetics. Other people seemed to also. 'Well appointed' is the phrase that keeps coming to mind for me. Lots of things I needed were nearby when I needed them. Having supplies in multiple areas is a good call and I think your supply list is pretty good.

The layout was also good for movement, good for thought. The math and science decorations were great. Vibe: it felt like you were happy to have us there and happy to help. That's a nice and unusual thing!

– Caitlin Elizondo, Head of People Operations
at the Centre for Effective Altruism

The venue was really great, things went really smoothly, and I'm excited to use the space again in the future for similar events.

– Alex Vermeer, MIRI COO

## CAMPUS SPACES

### Aumann Hall
Upstairs has a common space and 7 bedrooms.
Downstairs is great for parties and weekend conferences.

### Bayes House
Can sleep 30 people, and host sessions of up to 60 people.
Includes the surrounding gardens (200+ capacity).



### Cantor Cottage
A house with four bedrooms.

### Darwin Den
Front of building has 6 bedrooms and/or session spaces for small sessions.
Back of building has 4 of our nicest and most secluded bedrooms.

### Eigenspace
4 small session spaces, a gym, and a 60 person session space.

## SERVICES WE PROVIDE

For an additional charge we can provide (among many other things):

- Catering services, snacks & drinks
- General ops-support for your event
- Event branding and marketing

We have a lot of experience running all kinds of different events, from small 15-20 person dinners to 1000+ person conferences, to 2-month fellowships and research programs.

We can't guarantee we can provide everything you need, but if you are facing some kind of problem or obstacle in the course of preparing or running your event, we can probably help you.

## AUMANN HALL

















BAYES HOUSE




























DARWIN DEN















EIGENSPACE











## ABOUT LIGHTCONE

Lighthaven is a project by Lightcone Infrastructure.

We build tools and services we think will help humanity flourish into the long term future. We also run LessWrong.com and the Alignment Forum. To contact us, use the Intercom or event form, or send me an email at habryka@lighthaven.space.

# **Exhibit 10**

# About

Manifold is the world's largest social prediction market.

Get accurate real-time odds on politics, tech, sports, and more.

Or create your own play-money betting market on any question you care about.



## Intro video

Everything you need to know in 7 minutes presented by an animated corgi:



Predicting the future with the power of the Internet (and pissing off Rob ...

## Our mission

- Provide the most accurate, real-time predictions on any event.
- Combat misleading news by incentivising traders to be fast and correct.
- Help people make more informed decisions by improving their model of the future.








## Still have questions?

### FAQ
Answers to common questions

### Community guidelines
Rules, norms, and expectations

### Sitemap
I can't find something

If you need help with a specific market please tag @mods in a comment for help!

© Manifold Markets, Inc.  •  Terms  •  Privacy


Browse


Explore


About

# Exhibit 11

| | |
|---|---|
| **From:** | Stephen Grugett[stephen@manifold.markets] |
| **Sent:** | Mon 6/6/2022 5:57:48 PM (UTC) |
| **To:** | info@manifold.markets[info@manifold.markets] |
| **Bcc:** | leopold@ftx.com[leopold@ftx.com] |
| **Subject:** | Manifold Markets Investor Update |

To the investors of Manifold Markets:

It's been a few months since we completed our seed round, and we're happy to say that not only have we kept up our product development pace, we've seen it accelerate!

**Top asks**

- Looking for a **Head of Growth** with a proven track record of scaling an early- or mid-stage startup. We are also looking to hire a **Full Stack Developer** and a **UI/UX Designer**. Feel free to share our Job Board with interested candidates.
- Come visit our team & friends at our Mexico City offsite, anytime between Jun 17-30.
- Join our exclusive **#investors Discord channel~**

**Key developments**

- Expanded our team to 6 full-time and 2 part-time employees
- Raised a mini round of $420k from Leonis Capital & Vishal Maini at a $22M post-money valuation.
- Received a grant of $500k from FTX Future Fund for Manifold for Charity, and a grant for $343k from Survival and Flourishing Fund.
- New launches: Manifold for Charity, Manifold for Creators, lightning-fast homepage + search, notifications, open sourced our codebase, & much more!
- Currently at 140 DAU, 17% D/M AU, 53% WoW retention. See our analytics page for more.

From now on, we will plan to send out one investor update each month, in addition to the updates you'll find in our public newsletter.

Thanks for your support, and may all your bets be in your favor!

Cheers,

Stephen

Cofounder of Manifold Markets

# Exhibit 12

| | |
|---|---|
| **From:** | Austin Chen[akrolsmir@gmail.com] |
| **Sent:** | Wed 6/15/2022 1:49:29 AM (UTC) |
| **To:** | futurefund@ftx.com[futurefund@ftx.com] |
| **Cc:** | Leopold Aschenbrenner[leopold@ftx.com]; Joel Becker[joel@ftxfoundation.com] |
| **Subject:** | Re: Congrats! We'd like to fund your application |

A few updates:
- We're putting together a board of advisors for Manifold's 501c3 subsidary, and investigating incorporation options (if you have recommendations, let us know!)
- We've updated our Charities page to include a matching pool for all donations, with FTX Future Funds credited as the sponsor.
- We're planning to announce this in our next newsletter, going out today or tomorrow:



Manifold's first month of redeeming Mana to donate raised just over $5,000 for charities - thank you so much for your generosity! The biggest contributor, Joel Becker, donated over $4,000 at the last moment whilst also betting on the above market. This last-minute play bumped total donations just over $5000, allowing him to profit for M$28,892 and catapulting Joel to 2nd place on our leaderboards. We will be publishing an interview with him in the future, so keep an eye out for that!

We're also pleased to announce that **all donations made through July 15 are eligible for our very first matching pool!** We've set up a quadratic funding matching pool that grows by $1 every time someone donates $1. Quadratic funding is a neat mechanism because it puts more weight on smaller-sized donations, meaning that whales (like Joel) will have less influence over which charities receive the donation match~

Through July 15, up to $25k of donations will be matched via **quadratic funding**, courtesy of **the FTX Future Fund!**

| Raised by Manifold users | Number of donors | Matched via quadratic funding |
|---|---|---|
| **$5,026.83** | **49** | **$5,026.83** |

This matching pool is made available thanks to the FTX Future Fund, which has approved a $500k charitable grant to build out prediction markets for charity. It's truly an honor to be working with them to figure out how prediction markets can save the world!

We're not in a rush to receive the grant funding; but do keep us updated on what your lawyers say!
Let us know if there are any other logistical or PR considerations; otherwise, super excited to continue pushing forward on charity prediction markets!
Austin

On Tue, May 17, 2022 at 5:49 PM Austin Chen <akrolsmir@gmail.com> wrote:

    Hi Ketan (and the rest of the FF team)!
    Thanks so much for the funding; we really appreciate the vote of confidence, and hope to

direct the money wisely!

In terms of how this could work, there are a few options we had in mind:
1. We could set up a 501c3 subsidiary for Manifold for Good (and other charitable initiatives such as impact certs)
2. We could seek fiscal sponsorship to direct the funds (eg with Rethink Charities)
3. We could work out a process directly with FF where eg every month we send a list of charities and corresponding donation amounts.

I think 1 is ideal but might take a couple months; 2 is a decent short term option; 3 seems like it would have a fair bit of operational overhead for you and us, but maybe that's not the case? Also happy to entertain any other options!

And lmk if you'd want to hop on a call to discuss anytime! https://calendly.com/austinchen/manifold


Thanks again,
Austin

On Tue, May 17, 2022, 16:53 Future Fund <futurefund@ftx.com> wrote:

Dear Austin,

Congrats! We have decided to provide $500,000 of funding for Manifold Markets' application to launch a charity prediction market. We are discussing how best to structure the funding with our lawyers - there may be some complications involved since this particular project is a charitable one but the larger enterprise is a for-profit entity. We will be back to you soon about this, and with details for obtaining the funds; please feel free to reach out to us in a week if you haven't heard by then.

All the best,
Ketan Ramakrishnan, on behalf of the Future Fund

------------------------
Future Fund
ftxfuturefund.org
.

# **Exhibit 13**

| | |
|---|---|
| **From:** | Scott D. Simon <ssimon@goetzplatzer.com> |
| **Sent:** | Wednesday, July 2, 2025 5:16 PM |
| **To:** | Wheeler, Stephanie G. |
| **Cc:** | Scott D. Simon; Glueckstein, Brian D.; Mayberry, Keila M. |
| **Subject:** | [EXTERNAL] RE: proposed order allowing Ross's claim |

Hi Stephanie,

Your revisions are acceptable. I will submit the proposed order, as revised, to the Court.

The Designated Beneficiary, as defined in the proposed order, is Manifold for Charity, d/b/a Manifund, EIN 88-3668801. Banking details are at https://manifoldmarkets.notion.site/Manifund-Deposit-via-DAF-ACH-wire-or-crypto-02aee92e884a47e49efd4d93242e2080 [manifoldmarkets.notion.site]

Let me know if you need any additional information to identify the Designated Beneficiary, or if Kroll needs any documents to make the distribution. sds

--

Scott D. Simon | Partner
Goetz Platzer LLP | 914-500-8737

**From:** Wheeler, Stephanie G. <WheelerS@sullcrom.com>
**Sent:** Tuesday, July 1, 2025 9:21 AM
**To:** Scott D. Simon <ssimon@goetzplatzer.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Mayberry, Keila M. <mayberryk@sullcrom.com>; Wheeler, Stephanie G. <WheelerS@sullcrom.com>
**Subject:** RE: proposed order allowing Ross's claim

Dear Scott,

Attached are our revisions to the proposed order.

Best,

Stephanie

**From:** Scott D. Simon <ssimon@goetzplatzer.com>
**Sent:** Thursday, June 26, 2025 4:10 PM
**To:** Wheeler, Stephanie G. <WheelerS@sullcrom.com>
**Cc:** Scott D. Simon <ssimon@goetzplatzer.com>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Mayberry, Keila M. <mayberryk@sullcrom.com>
**Subject:** [EXTERNAL] proposed order allowing Ross's claim

Stephanie,

Attached is a proposed order allowing Ross's FDU claim. Please let me know if you have any comments.

Ross will identify a charity for payment of the claim. Once he does so, I will advise you of the charity's name, address, and contact information.



**Scott D. Simon**
Partner
Goetz Platzer LLP
One Penn Plaza | Suite 3100 | NY, NY 10119
T 914.500.8737 | F 212.629.4013
goetzplatzer.com [goetzfitz.com]

*The information in this transmission may be privileged and confidential. It is intended for the use of specific recipients.*
*In the event of an error, no waiver is intended, and we request that you notify the sender and destroy the original message.*

---

**This is an external message from:** ssimon@goetzplatzer.com **

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

# Exhibit 14



Grants & Fundraising Opportunities    Personal Blog    74

# Announcing Manifund Regrants

by **Austin Chen**     5th Jul 2023    Linkpost from manifund.org

Manifund is launching a new regranting program! We will allocate ~$2 million over the next six months based on the recommendations of our regrantors. Grantees can apply for funding through our site; we're also looking for additional regrantors and donors to join.

## What is regranting?

Regranting is a funding model where a donor delegates grantmaking budgets to different individuals known as "regrantors". Regrantors are then empowered to make grant decisions based on the objectives of the original donor.

This model was pioneered by the FTX Future Fund; in a 2022 retro they considered regranting to be very promising at finding new projects and people to fund. More recently, Will MacAskill cited regranting as one way to diversify EA funding.

## What is Manifund?

Manifund is the charitable arm of Manifold Markets. Some of our past work:

- Impact certificates, with Astral Codex Ten and the OpenPhil AI Worldviews Contest
- Forecasting tournaments, with Charity Entrepreneurship° and Clearer Thinking°
- Donating prediction market winnings to charity, funded by the Future Fund

## How does regranting on Manifund work?

Our website makes the process simple, transparent, and fast:

1. A donor contributes money to Manifold for Charity, our registered 501c3 nonprofit
2. The donor then allocates the money between regrantors of their choice. They can increase budgets for regrantors doing a good job, or pick out new regrantors who

share the donor's values.

3. Regrantors choose which opportunities (eg existing charities, new projects, or individuals) to spend their budgets on, writing up an explanation for each grant made.
   - We expect most regrants to start with a conversation between the recipient and the regrantor, and after that, for the process to take less than two weeks.
   - Alternatively, people looking for funding can post their project on the Manifund site. Donors and regrantors can then decide whether to fund it, similar to Kickstarter.

4. The Manifund team screens the grant to make sure it is legitimate, legal, and aligned with our mission. If so, we approve the grant, which sends money to the recipient's Manifund account.

5. The recipient withdraws money from their Manifund account to be used for their project.

## Differences from the Future Fund's regranting program

- **Anyone can donate to regrantors.** Part of what inspired us to start this program is how hard it is to figure out where to give as a longtermist donor—there's no GiveWell, no ACE, just a mass of opaque, hard-to-evaluate research orgs. Manifund's regranting infrastructure lets individual donors outsource their giving decisions to people they trust, who may be more specialized and more qualified at grantmaking.

- **All grant information is public.** This includes the identity of the regrantor and grant recipient, the project description, the grant size, and the regrantor's writeup. We strongly believe in transparency as it allows for meaningful public feedback, accountability of decisions, and establishment of regrantor track records.
  - Almost everything is done through our website. This lets us move faster, act transparently, set good defaults, and encourage discourse about the projects in comment sections.
  - We recognize that not all grants are suited for publishing; for now, we recommend sensitive grants apply to other donors (such as LTFF, SFF, OpenPhil).

- **We're starting with less money.** The Future Fund ended up distributing ~$100m over the 6 months of their program; we currently have about ~$2m to distribute and are fundraising for more.

# Round 1: Longtermist Regrants

We're launching with a cohort of 14 regrantors, each given a budget of $50k-$400k to direct to projects they believe will be the most impactful. We chose regrantors who are

aligned with our values and prioritize mitigating global catastrophic risks, though ultimately regrantors can choose to give to projects under any cause area.

This round is backed by an anonymous donor's contribution of $1.5 million, plus smaller grants from EA funders. Round 1 will end after this initial pool is spent, or after 6 months have passed.



**$400K** Leopold Aschenbrenner — Superalignment @ OpenAI

**$400K** Evan Hubinger — AGI safety Research Scientist at Anthropic. Previously Research Fellow at Machine Intelligence…

**$400K** Tristan Hume — Interpretability at Anthropic

**$400K** Adam Gleave — CEO & co-founder at FAR AI, a trustworthy AI non-profit; PhD AI UC Berkeley 2022; LTFF fund…

**$400K** Dan Hendrycks — Executive Director of the Center for AI Safety

**$50K** Qualy the lightbulb — Official Unofficial EA mascot

**$50K** Ted Suzman — ARC Evals

**$50K** Gavriel Kleinwaks — Project manager at 1Day Sooner, background in physics.

**$50K** Isaak Freeman — Studying math @ Berkeley. Past: self-taught biology & neurosci @ Oxford, director @ Future Forum.

**$50K** Marcus Abramovitch — Effective altruist, earning to give running a crypto fund. Very concerned with animal welfare an…

**$50K** Rachel Weinberg — Building this site! Ran EA @ Tufts, where I also studied math.

**$50K** Austin Chen — I work on Manifold & Manifund!

**$50K** Zvi Mowshowitz — Yeah, that one.

## Get involved with Manifund Regrants

For grantees: list your project on our site

If you are working on a longtermist project and looking for funding, you can post the details on our site here. Examples of projects we've funded:

- $13k to Rachel Freedman, for medical expenses/PhD salary supplement
- $25k to Joseph Bloom, for independent mech interp research
- $2.5k to Vipul Naik, for the Donations List Website (retroactive grant)

We're interested in proposals for AI safety, AI governance, forecasting, biorisk, and EA meta; we expect to best fund individuals and orgs looking for $1k-$200k.

For regrantors: apply for your own regrant budget

We're accepting applications from people who want to join as regrantors! In some cases, we'll offer to sponsor regrantors and provide budgets, and in others we'll just offer to list regrantors so they can receive donations from other users that they can go on to donate.

For large donors: designate your own regrantors

We're interested in anyone who would like to direct $100k+ this year through a regranting program. If that is you, reach out to austin@manifund.org or book a call!

Why might you choose to donate via a regranting program?

- **You care about longtermism, but don't know which projects need money.** Longtermist projects can be speculative, opaque, and nascent, making it harder for you to know where to direct their money. Regranting allows you to outsource these decisions to people who better understand the field.

- **You have specific regrantors whose judgement you trust.** Regranting surfaces opportunities that established EA grantmakers might otherwise miss, as regrantors can tap into their personal networks and fields of expertise. Regrantors can also initiate projects, by reaching out to grantees, launching prizes, and starting orgs.

- **You want to see your money move quickly.** Our regranting model requires less overhead than traditional grantmaking, as one person is responsible for the budget rather than a committee. This also allows for faster grant turnaround times, solving a key pain point for grantees. We think the world would be a better place if impactful projects could start a few weeks to months earlier.

- **You want to donate through a 501c3.** Manifund regrantors can give to other nonprofits, individuals, and for-profit orgs. If you operate a donor-advised fund or want the tax advantages of giving through a 501c3, we can facilitate that, so long as we vet that your regrantors make grants compatible with our charitable mission.

For everyone: talk to us!

We welcome feedback of all kinds. Whether you're a potential grantee, regrantor, or donor, we'd love to hear about your pain points with existing funding systems, and what kinds of projects you find exciting. Hop in our Discord and come chat with us, or comment on specific projects through our site!

8 comments, sorted by top scoring

[-] **habryka**  2y   ▼ 19 ▲   ✕ 9 ✓

This seems exciting! I am glad to see the EA funding landscape diversify more, and regranting programs seem like a decent way to do that.

⊙⁺

[-] **Austin Chen**  2y   ▼ 6 ▲   ✕ 1 ✓

Thanks! We're likewise excited by Lightspeed Grants, and by ways we can work together (or compete!) to make the funding landscape good.

⊙⁺

[-] **Quinn**  2y   ▼ 9 ▲   ✕ 5 ✓

It'd be great if yall could add a regrantor from the Cooperative AI Foundation / FOCAL / CLR / Encultured region of the research/threatmodel space. (epistemic status: conflict of interest since if you do this I could make a more obvious argument for a project)

⊙⁺

[-] **Austin Chen**  2y   ▼ 2 ▲   ✕ 1 ✓

I'm generally interested in having a diverse range of regrantors; if you'd like to suggest names/make intros (either here, or privately) please let me know!

⊙⁺

[-] **Elizabeth**  2y   ▼ 5 ▲   ✕ 2 ✓

How do you feel about people listing projects that are finished but were never funded? I think impact certificates/retroactive grants are better for epistemics°, at least for the kind of work I do, and it would be great to have a place for those.

⊙⁺

[-] **Austin Chen**  2y   ▼ 4 ▲   ✕ 1 ✓

I can't speak for other regrantors, but I'm personally very sympathetic to retroactive grants for impactful work that got less funding than was warranted; we have one example for Vipul Naik's Donations List Website and hope to publish more examples soon!

⚗ 1   ⊙⁺

[-] **Metacelsus**  2y   ▼ 1 ▲   ✕ 0 ✓

So, are the regrantors chosen by the donor, or by Manifund? Or both?

[-] **Austin Chen**  2y   ▽ 2 △   ✕ 0 ✓

The $400k regrantors were chosen by the donor; the $50k ones were chosen by the Manifund team.

Crossposted from the EA Forum. Click to view 51 comments.

Moderation Log

## More from Austin Chen

| 77 | AI for Epistemics Hackathon 🔗 | | Austin Chen | 4mo | 12 |
| 85 | 5 homegrown EA projects, seeking small donors 👤 | | Austin Chen | 9mo | 4 |
| 71 | If far-UV is so great, why isn't it everywhere? 🔗 | | Austin Chen | 9mo | 23 |

**View more**

## Curated and popular this week

| 192 | So You Think You've Awoken ChatGPT ★ | | JustisMills | 7h | 43 |
| 141 | An Opinionated Guide to Using Anki Correctly ★ | | Luise | 3d | 46 |
| 143 | Comparing risk from internally-deployed AI to insider and outsider threats… | | Buck | 6d | 20 |

# Exhibit 15

| efile Public Visual Render | ObjectId: 202331369349301848 - Submission: 2023-05-16 | TIN: 88-3668801 |
|---|---|---|

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2022**

Open to Public Inspection

**A** For the 2022 calendar year, or tax year beginning 01-01-2022 , and ending 12-31-2022

**B** Check if applicable:
- ☐ Address change
- ☐ Name change
- ☑ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

**C** Name of organization
Manifold for Charity

% Austin Chen

Doing business as

Number and street (or P.O. box if mail is not delivered to street address)
1621 E 6TH ST UNIT 1440    Room/suite

City or town, state or province, country, and ZIP or foreign postal code
Austin, TX  78702

**D** Employer identification number

88-3668801

**E** Telephone number

(408) 334-1853

**G** Gross receipts $ 500,000

**F** Name and address of principal officer:
Austin Chen
1950 15th Street
Unit A
San Francisco, CA  94114

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No

**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.

**H(c)** Group exemption number ▶

**I** Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ manifold.markets charity

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶

**L** Year of formation: 2022

**M** State of legal domicile: TX

## Part I Summary

**1** Briefly describe the organization's mission or most significant activities:
Manifold for Charity distributes donations to other charitable organizations.

**2** Check this box ▶ ☐

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . | **3** | 3 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . | **4** | 3 |
| **5** Total number of individuals employed in calendar year 2022 (Part V, line 2a) . . . . | **5** | 0 |
| **6** Total number of volunteers (estimate if necessary) . . . . . . . | **6** | 1 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, Part I, line 11 . . . . | **7b** | 0 |

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . | 0 | 500,000 |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . . | 0 | 0 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) . . . . | 0 | 0 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) . . . | 0 | 0 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 0 | 500,000 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3) . . . . | 0 | 35,664 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . . | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 0 | 1,575 |
| **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 0 | 37,239 |
| **19** Revenue less expenses. Subtract line 18 from line 12 . . . . . . . | 0 | 462,761 |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . | 0 | 462,761 |
| **21** Total liabilities (Part X, line 26) . . . . . . . | 0 | 0 |
| **22** Net assets or fund balances. Subtract line 21 from line 20 . . . . . | 0 | 462,761 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has

any knowledge.

| **Sign Here** | ▶ Signature of officer | | 2023-05-16 Date |
|---|---|---|---|
| | ▶ Austin Chen  Officer Type or print name and title | | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

May the IRS discuss this return with the preparer shown above? See Instructions. . . . . . . . . . . ☐ **Yes** ☑ **No**

**For Paperwork Reduction Act Notice, see the separate instructions.**     Cat. No. 11282Y     Form **990** (2022)

---

Form 990 (2022)     Page **2**

| Part III | **Statement of Program Service Accomplishments** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission:

Manifold for Charity distributes donations to other charitable organizations.

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: _____ ) (Expenses $ _____ 0 including grants of $ _____ 0 ) (Revenue $ _____ 0 )
0

**4b** (Code: _____ ) (Expenses $ _____ 0 including grants of $ _____ 0 ) (Revenue $ _____ 0 )
0

**4c** (Code: _____ ) (Expenses $ _____ 0 including grants of $ _____ 0 ) (Revenue $ _____ 0 )
0

**4d** Other program services (Describe in Schedule O.)
(Expenses $ _____ 0 including grants of $ _____ 0 ) (Revenue $ _____ 0 )

**4e** **Total program service expenses** ▶ _____ 0

Form **990** (2022)

---

Form 990 (2022)     Page **3**

| Part IV | **Checklist of Required Schedules** |
|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A . . . . . . . . . . . . . . . . . . . . . . . | **1** | Yes | |
| **2** | Is the organization required to complete Schedule B, Schedule of Contributors? See instructions. . . . | **2** | | No |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I . . . . . . . . . . . . . . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II . . . . . . . . | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Rev. Proc. 98-19? If "Yes," complete Schedule C, Part III . . | **5** | | No |

| | | | | Yes | No |
|---|---|---|---|---|---|
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* . | **6** | | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . | **7** | | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . | **8** | | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . | **9** | | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* . | **10** | | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, as applicable. | | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI.* | **11a** | | | No |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . | **11b** | | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . | **11c** | | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . | **11d** | | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* . | **11e** | | | No |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* . | **11f** | | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . | **12a** | | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? . | **14a** | | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . | **14b** | | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . | **15** | | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . | **16** | | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I.* See instructions. . | **17** | | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . | **18** | | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . | **19** | | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . | **20a** | | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . | **21** | | Yes | |

Form **990** (2022)

Form 990 (2022)             Page **4**

| Part IV | Checklist of Required Schedules *(continued)* | | | Yes | No |
|---|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . | **22** | | Yes | |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . | **23** | | | No |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . | **24a** | | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | | |

| | | | Yes | No |
|---|---|---|---|---|
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | 24d | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I . . . . . . . . | 25a | | No |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L,* Part I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25b | | No |
| **26** | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . | 26 | | No |
| **27** | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,* Part III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . | 28a | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . . | 28b | | No |
| c | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . . | 28c | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | 29 | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . . . . . | 30 | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . . . . | 33 | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 | | No |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | 35b | | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . . | 36 | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . . | 37 | | No |
| **38** | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. . . . . . . . . . . . . . | 38 | Yes | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable . . | 1a | 0 | | |
| b | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable . | 1b | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . . . . | | 1c | | |

Form **990** (2022)

Form 990 (2022)          Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* |
|---|---|

| | | | | Yes | No |
|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . . . . . . . . . | 2a | 0 | | |
| b | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | 2b | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | 3a | | No |
| b | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* . . . | | 3b | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | 4a | | No |
| b | If "Yes," enter the name of the foreign country: ▶ _____ | | | | |

See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR).

| | | | |
|---|---|---|---|
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | **5a** | | No |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | | No |
| **c** If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . | **5c** | | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . . | **6a** | | No |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . | **6b** | | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . | **7a** | | No |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . | **7b** | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . | **7c** | | No |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year . . . . . **7d** ___0 | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | | No |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | **7f** | | No |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . | **7g** | | No |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . | **7h** | | No |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . | **8** | | No |
| **9** **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** Did the sponsoring organization make any taxable distributions under section 4966? . . . . . | **9a** | | No |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | **9b** | | No |
| **10** **Section 501(c)(7) organizations.** Enter: | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | |
| **11** **Section 501(c)(12) organizations.** Enter: | | | |
| **a** Gross income from members or shareholders . . . . . . . . | **11a** | | |
| **b** Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . | **11b** | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | **12b** | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? . . . . . . **Note.** See the instructions for additional information the organization must report on Schedule O. | **13a** | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | |
| **c** Enter the amount of reserves on hand | **13c** | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | **14a** | | No |
| **b** If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . | **14b** | | |
| **15** Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . If "Yes," see the instructions and file Form 4720, Schedule N. | **15** | | No |
| **16** Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . . If "Yes," complete Form 4720, Schedule O. | **16** | | No |
| **17** **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? . . If "Yes," complete Form 6069. | **17** | | |

Form **990** (2022)

---

Page **6**

**Part VI** **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

**Section A. Governing Body and Management**

|  |  | Yes | No |
|---|---|---|---|
| **1a** Enter the number of voting members of the governing body at the end of the tax year | **1a** 3 | | |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent | **1b** 3 | | |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . | **2** | Yes | |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | No |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | No |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | No |
| **6** Did the organization have members or stockholders? . . . . . . . . . . . . . | **6** | | No |
| **7a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . | **7a** | | No |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . | **7b** | | No |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| **a** The governing body? . . . . . . . . . . . . . . . . . . . | **8a** | | No |
| **b** Each committee with authority to act on behalf of the governing body? . . . . . . . . | **8b** | | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If "Yes," provide the names and addresses in Schedule O . . . . . . | **9** | Yes | |

**Section B. Policies** (*This Section B requests information about policies not required by the Internal Revenue Code.*)

|  |  | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? . . . . . . . . | **10a** | | No |
| **b** If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** Describe on Schedule O the process, if any, used by the organization to review this Form 990. . . . . | | | |
| **12a** Did the organization have a written conflict of interest policy? If "No," go to line 13 . . . . . | **12a** | | No |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . | **12b** | | |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe on Schedule O how this was done . . . . . . . . . . . . . . . . | **12c** | | |
| **13** Did the organization have a written whistleblower policy? . . . . . . . . . . | **13** | | No |
| **14** Did the organization have a written document retention and destruction policy? . . . . . . | **14** | | No |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official . . . . . . . . | **15a** | | No |
| **b** Other officers or key employees of the organization . . . . . . . . . . . . | **15b** | | No |
| If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . . | **16b** | | |

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed▶
TX

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website   ☐ Another's website   ☑ Upon request   ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
▶Austin Chen  1950 15th Street Unit A San Francisco, CA 94114 (408) 334-1853

Form **990** (2022)

Form 990 (2022)                                                                                     Page **7**

Part VII   **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees,**

and Independent Contractors

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . ☐

## Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☑ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Austin Chen <br> ⋯⋯⋯⋯⋯⋯⋯⋯ <br> Officer | 1.00 <br> ⋯⋯⋯⋯ <br> 0.00 | X | | X | | | | 0 | 0 | 0 |
| (2) Vishal Maini <br> ⋯⋯⋯⋯⋯⋯⋯⋯ <br> Officer | 1.00 <br> ⋯⋯⋯⋯ <br> 0.00 | X | | X | | | | 0 | 0 | 0 |
| (3) Barak Gila <br> ⋯⋯⋯⋯⋯⋯⋯⋯ <br> Officer | 1.00 <br> ⋯⋯⋯⋯ <br> 0.00 | X | | X | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Form **990** (2022)

Form 990 (2022)

Page **8**

Part VII    **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) | (B) | (C) | (D) | (E) | (F) |

| Name and title | Average hours per week (list any hours for related organizations below dotted line) | Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | Estimated amount of other compensation from the organization and related organizations |
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . ▶ | | | | | | | | 0 | 0 | 0 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? If "Yes," complete Schedule J for such individual . . . . . . . . . . | **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . . . . . . . . | **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? If "Yes," complete Schedule J for such person . . . . . . . . . | **5** | | No |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶

Form **990** (2022)

Form 990 (2022)                                                                 Page **9**

| Part VIII | **Statement of Revenue** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . ☐

| | | **(A)** Total revenue | **(B)** Related or | **(C)** Unrelated | **(D)** Revenue |
|---|---|---|---|---|---|

| | | | exempt function revenue | business revenue | excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|

**Contributions, Gifts, Grants and Other Similar Amounts**

| | | |
|---|---|---|
| …derated campaigns . . | **1a** | 0 |
| …embership dues . . | **1b** | 0 |
| …undraising events . . | **1c** | 0 |
| …elated organizations | **1d** | 0 |
| …overnment grants (contributions) | **1e** | 0 |
| …ll other contributions, gifts, grants, and similar amounts not included above | **1f** | 500,000 |
| **g** Noncash contributions included in lines 1a - 1f:$ | **1g** | 0 |

**h Total.** Add lines 1a-1f . . . . . . . . ▶   500,000

**Program Service Revenue**

| | | Business Code | | | | |
|---|---|---|---|---|---|---|
| **2a** | | | 0 | 0 | 0 | 0 |
| b | | | 0 | 0 | 0 | 0 |
| c | | | 0 | 0 | 0 | 0 |
| d | | | 0 | 0 | 0 | 0 |
| e | | | 0 | 0 | 0 | 0 |
| **f** All other program service revenue. | | | 0 | 0 | 0 | 0 |
| **g** **Total.** Add lines 2a–2f. . . . . ▶ | | 0 | | | | |

**Other Revenue**

| | | | | | |
|---|---|---|---|---|---|
| **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | 0 | 0 | 0 | 0 |
| **4** Income from investment of tax-exempt bond proceeds ▶ | | 0 | 0 | 0 | 0 |
| **5** Royalties . . . . . . . . . ▶ | | 0 | 0 | 0 | 0 |

| | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|
| **6a** Gross rents | **6a** | 0 | 0 | | | | |
| **b** Less: rental expenses | **6b** | 0 | 0 | | | | |
| **c** Rental income or (loss) | **6c** | 0 | 0 | | | | |
| **d** Net rental income or (loss) . . . . . . ▶ | | | | 0 | 0 | 0 | 0 |

| | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|
| **7a** Gross amount from sales of assets other than inventory | **7a** | 0 | 0 | | | | |
| **b** Less: cost or other basis and sales expenses | **7b** | 0 | 0 | | | | |
| **c** Gain or (loss) | **7c** | 0 | 0 | | | | |
| **d** Net gain or (loss) . . . . . . . . ▶ | | | | 0 | 0 | 0 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **a** Gross income from fundraising events (not including $ ___ 0 of contributions reported on line 1c). See Part IV, line 18 . . . | **8a** | 0 | | | | |
| **b** Less: direct expenses . . . | **8b** | 0 | | | | |
| **c** Net income or (loss) from fundraising events . . ▶ | | 0 | | 0 | | 0 |

| | | | | | |
|---|---|---|---|---|---|
| **9a** Gross income from gaming activities. See Part IV, line 19 | **9a** | 0 | | | |
| **b** Less: direct expenses | **9b** | 0 | | | |
| **c** Net income or (loss) from gaming activities ▶ | | | 0 | 0 | 0 | 0 |
| **10a** Gross sales of inventory, less returns and allowances | **10a** | 0 | | | |
| **b** Less: cost of goods sold | **10b** | 0 | | | |
| **c** Net income or (loss) from sales of inventory ▶ | | | 0 | 0 | 0 | 0 |
| | | Business Code | | | |
| **11a** | | | 0 | 0 | 0 | 0 |
| **b** | | | 0 | 0 | 0 | 0 |
| OtherRevenueMiscAmt | | | 0 | 0 | 0 | 0 |
| **d** All other revenue | | | 0 | 0 | 0 | 0 |
| **e Total.** Add lines 11a–11d ▶ | | | 0 | | | |
| **12 Total revenue.** See instructions ▶ | | | 500,000 | 0 | 0 | 0 |

Form **990** (2022)

---

Form 990 (2022)                                                                                           Page **10**

| Part IX | **Statement of Functional Expenses** |
|---|---|

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)**<br>Total expenses | **(B)**<br>Program service expenses | **(C)**<br>Management and general expenses | **(D)**<br>Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . . . | 26,345 | 0 | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . . . . . | 9,319 | 0 | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . . . . . | 0 | 0 | | |
| **4** Benefits paid to or for members . . . . . . | 0 | 0 | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . . . . . | 0 | 0 | 0 | 0 |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . . . . | 0 | 0 | 0 | 0 |
| **7** Other salaries and wages . . . . . . . | 0 | 0 | 0 | 0 |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | 0 | 0 | 0 | 0 |
| **9** Other employee benefits . . . . . . . | 0 | 0 | 0 | 0 |
| **10** Payroll taxes . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . . | 0 | 0 | 0 | 0 |
| **b** Legal . . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **c** Accounting . . . . . . . . . | 0 | 0 | 0 | 0 |
| **d** Lobbying . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **e** Professional fundraising services. See Part IV, line 17 | 0 | | | 0 |
| **f** Investment management fees . . . . . . | 0 | 0 | 0 | 0 |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 0 | 0 | 0 | 0 |
| **12** Advertising and promotion . . . . . | 0 | 0 | 0 | 0 |
| **13** Office expenses . . . . . . . . | 0 | 0 | 0 | 0 |

| | (A) | (B) | (C) | (D) |
|---|---|---|---|---|
| 14 Information technology . . . . . . . | 1,575 | 0 | 0 | 0 |
| 15 Royalties . . . | | 0 | 0 | 0 |
| 16 Occupancy . . . . . . . . . | 0 | 0 | 0 | 0 |
| 17 Travel . . . . . . . . . . | 0 | 0 | 0 | 0 |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials . | 0 | 0 | 0 | 0 |
| 19 Conferences, conventions, and meetings . . . . | 0 | 0 | 0 | 0 |
| 20 Interest . . . . . . . . . | 0 | 0 | 0 | 0 |
| 21 Payments to affiliates . . . . . . | 0 | 0 | 0 | 0 |
| 22 Depreciation, depletion, and amortization . . | 0 | 0 | 0 | 0 |
| 23 Insurance . . . . . . . | 0 | 0 | 0 | 0 |
| 24 Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| a | 0 | 0 | 0 | 0 |
| b | 0 | 0 | 0 | 0 |
| c | 0 | 0 | 0 | 0 |
| d | 0 | 0 | 0 | 0 |
| e All other expenses | 0 | 0 | 0 | 0 |
| 25 Total functional expenses. Add lines 1 through 24e | 37,239 | 0 | 0 | 0 |
| 26 Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720). | 0 | 0 | 0 | |

Form **990** (2022)

---

Form 990 (2022)                                                                                    Page **11**

| Part X | **Balance Sheet** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| **Assets** | 1 Cash–non-interest-bearing . . . . . . . | 0 | 1 | 462,761 |
| | 2 Savings and temporary cash investments . . . . . . . . | 0 | 2 | 0 |
| | 3 Pledges and grants receivable, net . . . . . . . . | 0 | 3 | 0 |
| | 4 Accounts receivable, net . . . . . . | 0 | 4 | 0 |
| | 5 Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | 0 | 5 | 0 |
| | 6 Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . | 0 | 6 | 0 |
| | 7 Notes and loans receivable, net . . . . . . . | 0 | 7 | 0 |
| | 8 Inventories for sale or use . . . . . . . . | 0 | 8 | 0 |
| | 9 Prepaid expenses and deferred charges . . . . . . | 0 | 9 | 0 |
| | 10a Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D    **10a**   0 | | | |
| | b Less: accumulated depreciation    **10b**   0 | 0 | 10c | 0 |
| | 11 Investments—publicly traded securities . . . . . . | 0 | 11 | 0 |
| | 12 Investments—other securities. See Part IV, line 11 . . . . . | 0 | 12 | 0 |
| | 13 Investments—program-related. See Part IV, line 11 . . | 0 | 13 | 0 |
| | 14 Intangible assets . . . . . . . . . | 0 | 14 | 0 |
| | 15 Other assets. See Part IV, line 11 . . . . . . . | 0 | 15 | 0 |
| | 16 Total assets. Add lines 1 through 15 (must equal line 33) . . . | 0 | 16 | 462,761 |
| | 17 Accounts payable and accrued expenses . . . . . | 0 | 17 | 0 |
| | 18 Grants payable . . . . . . . . . | 0 | 18 | 0 |
| | 19 Deferred revenue . . . . . . . . | 0 | 19 | |

| | | | | | |
|---|---|---|---|---|---|
| **Liabilities** | 20 | Tax-exempt bond liabilities | 0 | **20** | 0 |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D | 0 | **21** | 0 |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | 0 | **22** | 0 |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | 0 | **23** | 0 |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . | 0 | **24** | 0 |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | 0 | **25** | 0 |
| | 26 | **Total liabilities.** Add lines 17 through 25 . . | 0 | **26** | 0 |
| **Net Assets or Fund Balances** | | **Organizations that follow FASB ASC 958, check here ▶ ☐ and complete lines 27, 28, 32, and 33.** | | | |
| | 27 | Net assets without donor restrictions . . . . | | **27** | |
| | 28 | Net assets with donor restrictions . . . . | | **28** | |
| | | **Organizations that do not follow FASB ASC 958, check here ▶ ☑ and complete lines 29 through 33.** | | | |
| | 29 | Capital stock or trust principal, or current funds . . | 0 | **29** | 462,761 |
| | 30 | Paid-in or capital surplus, or land, building or equipment fund . . . | 0 | **30** | 0 |
| | 31 | Retained earnings, endowment, accumulated income, or other funds | 0 | **31** | 0 |
| | 32 | Total net assets or fund balances . . . . | 0 | **32** | 462,761 |
| | 33 | Total liabilities and net assets/fund balances . . . . | 0 | **33** | 462,761 |

Form **990** (2022)

---
Page 12
---

| Part XI | **Reconcilliation of Net Assets** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . | **1** | 500,000 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . | **2** | 37,239 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . | **3** | 462,761 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . . | **4** | 0 |
| 5 | Net unrealized gains (losses) on investments . . . . | **5** | 0 |
| 6 | Donated services and use of facilities . . . . | **6** | 0 |
| 7 | Investment expenses . . . . | **7** | 0 |
| 8 | Prior period adjustments . . . . | **8** | 0 |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . | **9** | 0 |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 462,761 |

| Part XII | **Financial Statements and Reporting** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990:  ☑ Cash  ☐ Accrual  ☐ Other _____ If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Uniform Guidance, 2 C.F.R. Part 200, Subpart F? | **3a** | | No |

**b** If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits.

| | **3b** | | |
|---|---|---|---|

Form **990** (2022)

---

Form 990 (2022)

## Additional Data

Return to Form

**Software ID:** 22016104

**Software Version:** V1.0

**Form 990, Special Condition Description:**

Special Condition Description

**efile Public Visual Render** | **ObjectId: 202331369349301848 - Submission: 2023-05-16** | **TIN: 88-3668801**

# SCHEDULE A
**(Form 990)**

Department of the Treasury
Internal Revenue Service

## Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
▶ **Attach to Form 990 or Form 990-EZ.**
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2022**

Open to Public Inspection

**Name of the organization**
Manifold for Charity

**Employer identification number**
88-3668801

| Part I | Reason for Public Charity Status (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

**1** ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

**2** ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

**3** ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

**4** ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

**5** ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

**6** ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

**7** ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**8** ☑ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**9** ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

**10** ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

**11** ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

**12** ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

**a** ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

**b** ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

**c** ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

**d** ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

**e** ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

**f** Enter the number of supported organizations . . . . . . . . . . . . . . . . . _____

**g** Provide the following information about the supported organization(s).

| **(i)** Name of supported organization | **(ii)** EIN | **(iii)** Type of organization (described on lines 1- 10 above (see instructions)) | **(iv)** Is the organization listed in your governing document? | | **(v)** Amount of monetary support (see instructions) | **(vi)** Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**

Cat. No. 11285F

**Schedule A (Form 990) 2022**

— Page 2 —

| Part II | Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi) |
|---|---|

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

Calendar year

| Calendar year (or fiscal year beginning in) ▶ | (a) 2018 | (b) 2019 | (c) 2020 | (d) 2021 | (e) 2022 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | 0 | 0 | 0 | 0 | 500,000 | 500,000 |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf. . . . | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | |
| **4** **Total.** Add lines 1 through 3 | 0 | 0 | 0 | 0 | 500,000 | 500,000 |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) . . | | | | | | 0 |
| **6** **Public support.** Subtract line 5 from line 4. | | | | | | 500,000 |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2018 | (b) 2019 | (c) 2020 | (d) 2021 | (e) 2022 | (f) Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4. . | 0 | 0 | 0 | 0 | 500,000 | 500,000 |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . . | 0 | 0 | 0 | 0 | 0 | 0 |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on. . | 0 | 0 | 0 | 0 | 0 | 0 |
| **10** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | 0 | 0 | 0 | 0 | 0 | 0 |
| **11** **Total support.** Add lines 7 through 10 | | | | | | 500,000 |

**12** Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . . | **12** | |

**13** **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **14** Public support percentage for 2022 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . | **14** | 100 % |
| **15** Public support percentage for 2021 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . | **15** | 0 % |

**16a** **33 1/3% support test—2022.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . ▶ ☑

**b** **33 1/3% support test—2021.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . ▶ ☐

**17a** **10%-facts-and-circumstances test—2022.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . ▶ ☐

**b** **10%-facts-and-circumstances test—2021.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . ▶ ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Schedule A (Form 990) 2022**

--- Page 3 ---

Schedule A (Form 990) 2022 — Page **3**

| Part III | **Support Schedule for Organizations Described in Section 509(a)(2)** |
|---|---|
| | (Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.) |

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2018 | (b) 2019 | (c) 2020 | (d) 2021 | (e) 2022 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . . | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf.. | | | | | | |

| | | (a) | (b) | (c) | (d) | (e) | (f) |
|---|---|---|---|---|---|---|---|
| **5** | The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** | **Total.** Add lines 1 through 5 | | | | | | |
| **7a** | Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** | Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | |
| **c** | Add lines 7a and 7b.  . | | | | | | |
| **8** | **Public support.** (Subtract line 7c from line 6.) | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | | **(a)** 2018 | **(b)** 2019 | **(c)** 2020 | **(d)** 2021 | **(e)** 2022 | **(f)** Total |
|---|---|---|---|---|---|---|---|
| **9** | Amounts from line 6.  .  . | | | | | | |
| **10a** | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources.  . | | | | | | |
| **b** | Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | |
| **c** | Add lines 10a and 10b. | | | | | | |
| **11** | Net income from unrelated business activities not included on line 10b, whether or not the business is regularly carried on. | | | | | | |
| **12** | Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.)  .  . | | | | | | |
| **13** | **Total support.** (Add lines 9, 10c, 11, and 12.).  . | | | | | | |
| **14** | **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | | | | | |

## Section C. Computation of Public Support Percentage

| **15** | Public support percentage for 2022 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . | **15** | |
|---|---|---|---|
| **16** | Public support percentage from 2021 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . | **16** | |

## Section D. Computation of Investment Income Percentage

| **17** | Investment income percentage for **2022** (line 10c, column (f) divided by line 13, column (f)) . . . . . . | **17** | |
|---|---|---|---|
| **18** | Investment income percentage from **2021** Schedule A, Part III, line 17 . . . . . . . . . . . . . | **18** | |
| **19a** | **33 1/3% support tests-2022.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here**. The organization qualifies as a publicly supported organization . . . . . . ▶ ☐ | | |
| **b** | **33 1/3% support tests—2021.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here**. The organization qualifies as a publicly supported organization . . . . . ▶ ☐ | | |
| **20** | **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . ▶ ☐ | | |

**Schedule A (Form 990) 2022**

---

— Page 4 —

---

Schedule A (Form 990) 2022 <span style="float:right">Page **4**</span>

| Part IV | Supporting Organizations |
|---|---|

(Complete only if you checked a box on line 12 of Part I. If you checked box 12a, of Part I, complete Sections A and B. If you checked box 12b, of Part I, complete Sections A and C. If you checked box 12c, of Part I, complete Sections A, D, and E. If you checked box 12d, of Part I, complete Sections A and D, and complete Part V.)

## Section A. All Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* | | |
| | **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2).* | | |
| | **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer lines 3b and 3c below.* | | |
| | **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination.* | | |
| | **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.* | | |
| | **3c** | | |

| | | Yes | No |
|---|---|---|---|
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* | | |
| | | **4a** | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | | |
| | | **4b** | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | | |
| | | **4c** | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | | |
| | | **5a** | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | | |
| | | **5b** | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | **5c** | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI**.* | | |
| | | **6** | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990) .* | | |
| | | **7** | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* | | |
| | | **8** | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI**.* | | |
| | | **9a** | |
| **b** | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI**.* | | |
| | | **9b** | |
| **c** | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI**.* | | |
| | | **9c** | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* | | |
| | | **10a** | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* | | |
| | | **10b** | |

**Schedule A (Form 990) 2022**

---

Page 5

---

Schedule A (Form 990) 2022                                                                             Page **5**

### Part IV   Supporting Organizations (continued)

| | | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | | |
| | | **11a** | |
| **b** | A family member of a person described on 11a above? | **11b** | |
| **c** | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in **Part VI**.* | **11c** | |

### Section B. Type I Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in **Part VI** how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | | |
| | | **1** | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in **Part VI** how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | | |
| | | **2** | |

### Section C. Type II Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in **Part VI** how control or management of the* | | |

*supporting organization was vested in the same persons that controlled or managed the supported organization(s).*

| | | | |
|---|---|---|---|
| | | 1 | |

### Section D. All Type III Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s).* | **2** | | |
| **3** | By reason of the relationship described in line 2 above, did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard.* | **3** | | |

### Section E. Type III Functionally-Integrated Supporting Organizations

**1**   Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**:

**a**   ☐   The organization satisfied the Activities Test. Complete **line 2** below.

**b**   ☐   The organization is the parent of each of its supported organizations. Complete **line 3** below.

**c**   ☐   The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions)

**2**   Activities Test. **Answer lines 2a and 2b below.**

| | | | Yes | No |
|---|---|---|---|---|
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* | **2a** | | |
| **b** | Did the activities described on line 2a, above constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* | **2b** | | |

**3**   Parent of Supported Organizations. **Answer lines 3a and 3b below.**

| | | | | |
|---|---|---|---|---|
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *If "Yes" or "No", provide details in Part VI.* | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI. the role played by the organization in this regard.* | **3b** | | |

**Schedule A (Form 990) 2022**

---

Schedule A (Form 990) 2022

Page **6**

### Part V   Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

**1**   ☐   Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 *(explain in Part VI)*. **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| | **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Net short-term capital gain | **1** | | |
| **2** | Recoveries of prior-year distributions | **2** | | |
| **3** | Other gross income (see instructions) | **3** | | |
| **4** | Add lines 1 through 3 | **4** | | |
| **5** | Depreciation and depletion | **5** | | |
| **6** | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | **6** | | |
| **7** | Other expenses (see instructions) | **7** | | |
| **8** | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | **8** | | |

| | **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | **1** | | |
| **a** | Average monthly value of securities | **1a** | | |
| **b** | Average monthly cash balances | **1b** | | |
| **c** | Fair market value of other non-exempt-use assets | **1c** | | |
| **d** | **Total** (add lines 1a, 1b, and 1c) | **1d** | | |
| **e** | **Discount** claimed for blockage or other factors (*explain in detail in Part VI*): | | | |

| 2 | Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
|---|---|---|---|---|
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 0.015 of line 3 (for greater amount, see instructions). | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by 0.035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| | **Section C - Distributable Amount** | | | Current Year |
|---|---|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 | Enter 85% of line 1 | 2 | | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 | Enter greater of line 2 or line 3 | 4 | | |
| 5 | Income tax imposed in prior year | 5 | | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |
| 7 | ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions) | | | |

**Schedule A (Form 990) 2022**

─────────── Page 7 ───────────

Schedule A (Form 990) 2022        Page **7**

| Part V | **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations** (continued) |
|---|---|

| | **Section D - Distributions** | | Current Year |
|---|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | 1 | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | 2 | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | 3 | |
| 4 | Amounts paid to acquire exempt-use assets | 4 | |
| 5 | Qualified set-aside amounts (*prior IRS approval required - provide details in* ***Part VI***) | 5 | |
| 6 | Other distributions (*describe in* ***Part VI***). See instructions | 6 | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | 7 | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (*provide details in* ***Part VI***). See instructions | 8 | |
| 9 | Distributable amount for 2022 from Section C, line 6 | 9 | |
| 10 | Line 8 amount divided by Line 9 amount | 10 | |

| **Section E - Distribution Allocations** (see instructions) | **(i) Excess Distributions** | **(ii) Underdistributions Pre-2022** | **(iii) Distributable Amount for 2022** |
|---|---|---|---|
| 1 Distributable amount for 2022 from Section C, line 6 | | | |
| 2 Underdistributions, if any, for years prior to 2022 (reasonable cause required-- *explain in* ***Part VI***). See instructions. | | | |
| 3 Excess distributions carryover, if any, to 2022: | | | |
|   **a** From 2017 . . . . . . . . | | | |
|   **b** From 2018 . . . . . . . . | | | |
|   **c** From 2019 . . . . . . . . | | | |
|   **d** From 2020 . . . . . . . . | | | |
|   **e** From 2021 . . . . . . . . | | | |
|   **f Total** of lines 3a through e | | | |
|   **g** Applied to underdistributions of prior years | | | |
|   **h** Applied to 2022 distributable amount | | | |
|   **i** Carryover from 2017 not applied (see instructions) | | | |
|   **j** Remainder. Subtract lines 3g, 3h, and 3i from line 3f. | | | |
| 4 Distributions for 2022 from Section D, line 7:    $ | | | |
|   **a** Applied to underdistributions of prior years | | | |
|   **b** Applied to 2022 distributable amount | | | |

| | | | | |
|---|---|---|---|---|
| **c** Remainder. Subtract lines 4a and 4b from line 4. | | | | |
| **5** Remaining underdistributions for years prior to 2022, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | | |
| **6** Remaining underdistributions for 2022. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | | |
| **7 Excess distributions carryover to 2023.** Add lines 3j and 4c. | | | | |
| **8** Breakdown of line 7: | | | | |
| **a** Excess from 2018. . . . . . | | | | |
| **b** Excess from 2019. . . . . . | | | | |
| **c** Excess from 2020. . . . . . | | | | |
| **d** Excess from 2021. . . . . . | | | | |
| **e** Excess from 2022. . . . . . | | | | |

**Schedule A (Form 990)** (2022)

---

Page 8

Schedule A (Form 990) 2022                                                  Page **8**

**Part VI**    **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

| Facts And Circumstances Test |
|---|
| |

| Return Reference | Explanation |
|---|---|
| Part II - Line 10 | \| Year:, Amount:, Description:\| 2018, , \| 2019, \| 2020, \| 2021, \| 2022, \| |

**Schedule A (Form 990) 2022**

---

## Additional Data

[ Return to Form ]

**Software ID:**

**Software Version:**

efile Public Visual Render | ObjectId: 202331369349301848 - Submission: 2023-05-16 | TIN: 88-3668801

**Note: To capture the full content of this document, please select landscape mode (11" x 8.5") when printing.**

| Schedule I (Form 990) | Grants and Other Assistance to Organizations, Governments and Individuals in the United States | OMB No. 1545-0047 |
|---|---|---|
| | Complete if the organization answered "Yes," on Form 990, Part IV, line 21 or 22. | **2022** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990. ▶ Go to www.irs.gov/Form990 for the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

| Part I | General Information on Grants and Assistance |
|---|---|

1  Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes  ☑ No

2  Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

| Part II | Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed. |
|---|---|

| **(a)** Name and address of organization or government | **(b)** EIN | **(c)** IRC section (if applicable) | **(d)** Amount of cash grant | **(e)** Amount of non-cash assistance | **(f)** Method of valuation (book, appraisal, other) | **(g)** Description of noncash assistance | **(h)** Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| (1) The Clear Fund (DBA Givewell) 1714 Franklin Street 100335 Oakland, CA  94612 | 20-8625442 | | 8,880 | 0 | 0 | 0 | To support Givewell's mission of saving lives |

2  Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . . . . . . . . . . . . . . . . ▶  0

3  Enter total number of other organizations listed in the line 1 table . . . . . . . . . . . . . . . . . . . . . . ▶  1

For Paperwork Reduction Act Notice, see the Instructions for Form 990.          Cat. No. 50055P          Schedule I (Form 990) 2022

---

Schedule I (Form 990) 2022                                                                                                    Page **2**

| Part III | Grants and Other Assistance to Domestic Individuals. Complete if the organization answered "Yes" on Form 990, Part IV, line 22. Part III can be duplicated if additional space is needed. |
|---|---|

| **(a)** Type of grant or assistance | **(b)** Number of recipients | **(c)** Amount of cash grant | **(d)** Amount of noncash assistance | **(e)** Method of valuation (book, FMV, appraisal, other) | **(f)** Description of noncash assistance |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |

| Part IV | Supplemental Information. Provide the information required in Part I, line 2; Part III, column (b); and any other additional information. |
|---|---|

| Return Reference | Explanation |
|---|---|

Schedule I (Form 990) 2022

---

**Additional Data**                                                                                         [ Return to Form ]

Software ID:
Software Version:

| efile Public Visual Render | ObjectId: 202331369349301848 - Submission: 2023-05-16 | TIN: 88-3668801 |

**SCHEDULE O**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

## Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
► Attach to Form 990 or 990-EZ.
► Go to _www.irs.gov/Form990_ for the latest information.

OMB No. 1545-0047

**2022**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

| Return Reference | Explanation |
|---|---|
| Part VI, Line 2 | We have three board members who have equal voting rights: Austin Chen 1950 15th Street Unit A San Francisco CA 94114; Barak Gila 21675 Regnart Rd Cupertino CA 95014; and Vishal Maini 229 E 13th St #7B New York NY 10003. The three board members do have overlapping business interests. Austin Chen owns 26.67 percent of Manifold Markets a for-profit corporation. Barak Gila and Vishal Maini each own less than 0.1 percent of Manifold Markets. |
| Part VI, Line 8a | Not applicable. Only the board makes decisions. |
| Part VI, line 9 | \| Name of the person:, Address of the person:\| Vishal Maini, 229 E 13th St, #7B, New York, NY, 10003\| Barak Gila, 21675 Regnart Rd, Cupertino, , , 95014\| |
| Part VI, Line 2 | \| Explanation:\| We have three board members who have equal voting rights: Austin Chen 1950 15th Street Unit A San Francisco CA 94114; Barak Gila 21675 Regnart Rd Cupertino CA 95014; and Vishal Maini 229 E 13th St #7B New York NY 10003. The three board members do have overlapping business interests. Austin Chen owns 26.67 percent of Manifold Markets a for-profit corporation. Barak Gila and Vishal Maini each own less than 0.1 percent of Manifold Markets. |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat. No. 51056K    Schedule O (Form 990) 2022

## Additional Data

Return to Form

Software ID:
Software Version: