# Exhibit 16

**efile Public Visual Render**   **ObjectId: 202432909349300208 - Submission: 2024-10-16**   **TIN: 88-3668801**

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

Do not enter social security numbers on this form as it may be made public.

Go to **www.irs.gov/Form990** for instructions and the latest information.

OMB No. 1545-0047

**2023**

Open to Public
Inspection

**A   For the 2023 calendar year, or tax year beginning 01-01-2023   , and ending 12-31-2023**

| B Check if applicable: | C Name of organization | D Employer identification number |
|---|---|---|
| ☑ Address change | Manifold for Charity | |
| ☐ Name change | % Austin Chen | 88-3668801 |
| ☐ Initial return | Doing business as | |
| ☐ Final return/terminated | | |
| ☐ Amended return | Number and street (or P.O. box if mail is not delivered to street address)   Room/suite | E Telephone number |
| ☐ Application pending | 425 DIVISADERO ST SUITE 300 | |
| | City or town, state or province, country, and ZIP or foreign postal code | |
| | San Francisco, CA  94117 | G Gross receipts $ 3,035,055 |

| F  Name and address of principal officer: | H(a) | Is this a group return for | | |
|---|---|---|---|---|
| Austin Chen | | subordinates? | ☐ Yes | ☑ No |
| 1907 Golden Gate Avenue | H(b) | Are all subordinates | ☐ Yes | ☐ No |
| San Francisco, CA  94115 | | included? | | |
| | | If "No," attach a list. See instructions. | | |

**I** Tax-exempt status:   ☑ 501(c)(3)   ☐ 501(c) ( ) (insert no.)   ☐ 4947(a)(1) or   ☐ 527

H(c)  Group exemption number

**J   Website:**

**K** Form of organization:  ☑ Corporation  ☐ Trust  ☐ Association  ☐ Other     **L** Year of formation: 2022   **M** State of legal domicile: TX

## Part I   Summary

| | | |
|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: | |
| | Manifund supports impactful projects by developing innovative funding systems and software focusing on AI safety and effective altruism. Our mission is to advance critical cause areas by funding projects often overlooked by institutional donors. | |

Activities & Governance

| | | | |
|---|---|---|---|
| 2 | Check this box ☐ | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a)  .  .  .  .  . | **3** | 3 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) . | **4** | 2 |
| 5 | Total number of individuals employed in calendar year 2023 (Part V, line 2a) .  . | **5** | 1 |
| 6 | Total number of volunteers (estimate if necessary)  .  .  .  .  .  .  .  .  . | **6** | 10 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 .  .  .  . | **7a** | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 .  .  . | **7b** | 0 |

| | | **Prior Year** | **Current Year** |
|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) .  .  .  .  .  .  . | 500,000 | 2,923,150 |
| | **9** Program service revenue (Part VIII, line 2g) .  .  .  .  .  .  . | 0 | 0 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) .  .  .  . | 0 | 9,000 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 102,905 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 500,000 | 3,035,055 |

| | | | |
|---|---|---|---|
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3) .  .  . | 35,664 | 2,492,244 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) .  .  .  . | 0 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 83,000 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) .  .  .  . | 0 | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) .  .  .  . | 0 | 52,960 |
| | **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 35,664 | 2,628,204 |
| | **19** Revenue less expenses. Subtract line 18 from line 12 .  .  .  .  .  . | 464,336 | 406,851 |

| | | **Beginning of Current Year** | **End of Year** |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) .  .  .  .  .  .  .  .  .  . | 462,761 | 1,004,000 |
| | **21** Total liabilities (Part X, line 26) .  .  .  .  .  .  .  .  . | 0 | 134,388 |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 .  .  .  . | 462,761 | 869,612 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying statements and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has

| Sign Here | | | 2024-10-16 |
|---|---|---|---|
| | Signature of officer | | Date |
| | Austin Chen  CEO | | |
| | Type or print name and title | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name | | | | Firm's EIN |
| | Firm's address | | | Phone no. | |

May the IRS discuss this return with the preparer shown above? See Instructions.  .  .  .  .  .  .  .  .  .  .  .     ☐ Yes  ☑ No

**For Paperwork Reduction Act Notice, see the separate instructions.**                Cat. No. 11282Y                Form **990** (2023)

Form 990 (2023)                                                                 Page **2**

| Part III | Statement of Program Service Accomplishments |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III  .  .  .  .  .  .  .  .  .  .  .  .  .  ☑

**1** Briefly describe the organization's mission:

Manifund supports impactful projects by developing innovative funding systems and software focusing on AI safety and effective altruism. Our mission is to advance critical cause areas by funding projects often overlooked by institutional donors.

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ?  .  .  .  .  .  .  .  .  .  .  .  .     ☑ Yes  ☐ No

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services?  .  .  .  .  .  .  .  .  .  .  .  .  .  .     ☐ Yes  ☑ No

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: _____ ) (Expenses $ 1,677,414 including grants of $ 1,627,414 ) (Revenue $ 0 )

A charitable donor delegates a grantmaking budget to individuals known as regrantors. Regrantors independently make grant decisions based on the objectives of the original donor and their own expertise.

**4b** (Code: _____ ) (Expenses $ 37,497 including grants of $ 37,497 ) (Revenue $ 102,905 )

Venture funding for charitable endeavors.

**4c** (Code: _____ ) (Expenses $ 0 including grants of $ 0 ) (Revenue $ 0 )

Allow anyone to post a public grant proposal on the Manifund site for regrantors and the general public to fund

**4d** Other program services (Describe in Schedule O.)

(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e** **Total program service expenses** ▶ 1,714,911

Form **990** (2023)

Form 990 (2023)                                                                 Page **3**

| Part IV | Checklist of Required Schedules |
|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A*  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . | **1** | Yes | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors*? See instructions.  .  .  . | **2** | Yes | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I*  .  .  .  .  .  .  .  .  .  . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II*  .  .  .  .  .  .  . | **4** | Yes | |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Rev. Proc. 98-19? *If "Yes," complete Schedule C, Part III* . . | **5** | | No |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right | | | |

| | | | Yes | No |
|---|---|---|---|---|
| | Did the organization maintain any donor-advised funds of any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D,* Part I . . . . . . . . . . . . . . . . . . . . . . | 6 | Yes | |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . . . | 7 | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* | 8 | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . . . . . . . . . | 9 | Yes | |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* . . . . . | 10 | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D,* Part VI. . . . . . . . . . . . . . . . . . . . . . . . . | 11a | | No |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . . . . . | 11b | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . . . | 11c | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . . . . . . | 11d | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | 11e | | No |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | 11f | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . . . . . . . . | 12a | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | 12b | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | 13 | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | 14a | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . . . . . . . . . . | 14b | Yes | |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . . . . | 15 | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . . . . . . | 16 | Yes | |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I.* See instructions. . . . . | 17 | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . . . | 18 | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . . . . . | 19 | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . . | 20a | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | 20b | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . | 21 | Yes | |

Form **990** (2023)

Form 990 (2023)

| Part IV | **Checklist of Required Schedules** *(continued)* | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . . . | 22 | Yes | |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . . . | 23 | | No |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . . . . . . . . . . . . . . | 24a | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year | | | |

| | | | | Yes | No |
|---|---|---|---|---|---|
| **c** | ... to defease any tax-exempt bonds? | **24c** | | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I . . . | **25a** | | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L,* Part I . . . | **25b** | | | No |
| **26** | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* | **26** | | | No |
| **27** | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,*Part III . . . | **27** | Yes | | |
| **28** | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | | |
| **a** | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . | **28a** | | | No |
| **b** | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . | **28b** | | | No |
| **c** | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . | **28c** | | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . | **30** | | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . | **32** | | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . | **33** | | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . | **34** | | | No |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | | No |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . | **35b** | | | No |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . | **36** | | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . . | **37** | | | No |
| **38** | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | **38** | Yes | | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . ☐

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| **1a** | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable . . | **1a** | | 0 | | |
| **b** | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable . | **1b** | | 0 | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . | | | **1c** | | |

Form **990** (2023)

---

Form 990 (2023)

Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* |
|---|---|

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . | **2a** | | 1 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | | **2b** | Yes | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | | No |
| **b** | If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | | **4a** | | No |
| **b** | If "Yes," enter the name of the foreign country:_____ | | | | | |
| | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | | |

See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR).

| | | | | Yes | No |
|---|---|---|---|---|---|
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | 5a | | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | 5b | | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . | | 5c | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . . | | 6a | | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . | | 6b | | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . | | 7a | | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | 7b | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . | | 7c | | No |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . | 7d | | 0 | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | 7e | | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . | | 7f | | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . | | 7g | | No |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . | | 7h | | No |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . | | 8 | | No |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . | | 9a | | No |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | 9b | | No |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | 10a | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | 10b | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . | 11a | | | |
| **b** | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . | 11b | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | 12a | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | 12b | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . **Note.** See the instructions for additional information the organization must report on Schedule O. | | 13a | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . | 13b | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . | 13c | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | 14a | | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments?*If "No," provide an explanation in Schedule O* . . | | 14b | | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . . . . If "Yes," see the instructions and file Form 4720, Schedule N. | | 15 | | No |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . . If "Yes," complete Form 4720, Schedule O. | | 16 | | No |
| **17** | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? . . . If "Yes," complete Form 6069. | | 17 | | |

Form **990** (2023)

Form 990 (2023)                                                                                             Page **6**

**Part VI** **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines  8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . ☑

**Section A. Governing Body and Management**

| | | | Yes | No |
|---|---|---|---|---|

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | 1a | 3 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | 1b | 2 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . | **2** | | Yes | |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . | **7a** | | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . | **7b** | | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . . . . . | **8a** | | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . . | **8b** | | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If "Yes," provide the names and addresses on Schedule O . . . . . | **9** | | | No |

**Section B. Policies** (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | **11a** | Yes | |
| **b** | Describe on Schedule O the process, if any, used by the organization to review this Form 990. . . . . | | | |
| **12a** | Did the organization have a written conflict of interest policy? If "No," go to line 13 . . . . . | **12a** | | No |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . . . | **12b** | | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe on Schedule O how this was done . . . . . . . . . . . . . . . . | **12c** | | |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . . . . | **13** | | No |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . . . | **14** | | No |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . . | **15a** | | No |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . . . | **15b** | | No |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . | **16a** | Yes | |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . . . | **16b** | | No |

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed
CA , TX

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.
☐ Own website   ☑ Another's website   ☐ Upon request   ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
Austin Chen 425 Divisadero St Suite 300 San Francisco,CA 94117 (408) 334-1853

Form **990** (2023)

Form 990 (2023)

Part VII   **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

and independent Contractors

Check if Schedule O contains a response or note to any line in this Part VII  .  .  .  .  .  .  .  .  .  .  ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☑ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Vishal Maini .......................... Director | 1.00 ········ 0.00 | | | | X | | | 0 | 0 | 0 |
| (2) Barak Gila .......................... Director | 1.00 ········ 0.00 | | | | X | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Form **990** (2023)

Form 990 (2023)                                                                                           Page **8**

Part VII   **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) Name and title | (B) Average hours per | (C) Position (do not check more than one box, unless person | (D) Reportable compensation | (E) Reportable compensation | (F) Estimated amount of other |
|---|---|---|---|---|---|

| | week (list any hours for related organizations below dotted line) | is both an officer and a director/trustee) | | | | | | from the organization (W-2/1099-MISC/1099-NEC) | from related organizations (W-2/1099-MISC/1099-NEC) | compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . | | | | | | | | 0 | 0 | 0 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization  0

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . . . . . . **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? If "Yes," complete Schedule J for such person . . . . . . . . **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization

Form <b>990</b> (2023)

---

Form 990 (2023)  Page **9**

| Part VIII | **Statement of Revenue** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . ☐

| | (A) Total revenue | (B) Related or exempt function | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections |
|---|---|---|---|---|

| | | | revenue | | 512 - 514 |
|---|---|---|---|---|---|

**Contributions, Gifts, Grants and Other Similar Amounts**

| | | | | |
|---|---|---|---|---|
| 1a | Federated campaigns . . | **1a** | 0 | |
| b | Membership dues . . | **1b** | 0 | |
| c | Fundraising events . . | **1c** | 0 | |
| d | Related organizations | **1d** | 0 | |
| e | Government grants (contributions) | **1e** | 0 | |
| f | All other contributions, gifts, grants, and similar amounts not included above | **1f** | 2,923,150 | |
| g | Noncash contributions included in lines 1a - 1f:$ | **1g** | 0 | |
| h | **Total.** Add lines 1a-1f . . . . . . . | | | 2,923,150 |

**Program Service Revenue**

| | | Business Code | | | | |
|---|---|---|---|---|---|---|
| **2a** | | | | | | |
| b | | | | | | |
| c | | | | | | |
| d | | | | | | |
| e | | | | | | |
| f | All other program service revenue. | | | | | |
| **g** | **Total.** Add lines 2a–2f . . . . | | 0 | | | |

**Other Revenue**

| | | (i) Real | (ii) Personal | | | |
|---|---|---|---|---|---|---|
| 3 | Investment income (including dividends, interest, and other similar amounts) . . . . . . . | | | 9,000 | 9,000 | 0 | 0 |
| 4 | Income from investment of tax-exempt bond proceeds | | | 0 | 0 | 0 | 0 |
| 5 | Royalties . . . . . . . . | | | 0 | 0 | 0 | 0 |
| **6a** | Gross rents | **6a** | | | | | |
| b | Less: rental expenses | **6b** | | | | | |
| c | Rental income or (loss) | **6c** | | | | | |
| d | Net rental income or (loss) . . . . . . . | | | 0 | 0 | | 0 |

| | | (i) Securities | (ii) Other | | | |
|---|---|---|---|---|---|---|
| **7a** | Gross amount from sales of assets other than inventory | **7a** | | | | | |
| b | Less: cost or other basis and sales expenses | **7b** | | | | | |
| c | Gain or (loss) | **7c** | | | | | |
| d | Net gain or (loss) . . . . . . . . . | | | | | | |
| **8a** | Gross income from fundraising events (not including $ 0 of contributions reported on line 1c). See Part IV, line 18 . . . | **8a** | | 0 | | | |
| b | Less: direct expenses . . . | **8b** | | 0 | | | |
| c | Net income or (loss) from fundraising events . . | | | 0 | | 0 | 0 |
| **9a** | Gross income from gaming activities. See Part IV, line 19 . . . | **9a** | | 0 | | | |

| | | | | | |
|---|---|---|---|---|---|
| **b** Less: direct expenses . . . | **9b** | 0 | | | |
| **c** Net income or (loss) from gaming activities . . | | | 0 | 0 | 0 | 0 |
| **10a** Gross sales of inventory, less returns and allowances . . | **10a** | | | | |
| **b** Less: cost of goods sold . . | **10b** | | | | |
| **c** Net income or (loss) from sales of inventory . | | | | | |

| | Business Code | | | | |
|---|---|---|---|---|---|
| **11a** Securities commodity contracts and other financial investments and related activities | 523000 | 102,905 | 102,905 | 0 | 0 |
| **b** | | | | | |

OtherRevenueMiscAmt

| | | | | | |
|---|---|---|---|---|---|
| **d** All other revenue . . . . | | | | | |
| **e Total.** Add lines 11a–11d . . . . . | | 102,905 | | | |
| **12 Total revenue.** See instructions . . . . . | | 3,035,055 | 111,905 | 0 | 0 |

Form **990** (2023)

Form 990 (2023)                                                                                 Page **10**

**Part IX** **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . . . . . | 1,887,670 | 1,060,337 | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . . . . . . | 536,762 | 536,762 | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . . . . . . . | 67,812 | 67,812 | | |
| **4** Benefits paid to or for members . . . . . . . | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . . . . . . . | 83,000 | 50,000 | 33,000 | 0 |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . . . . | 0 | 0 | 0 | 0 |
| **7** Other salaries and wages . . . . . . . . | 0 | 0 | 0 | 0 |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | 0 | 0 | 0 | 0 |
| **9** Other employee benefits . . . . . . . | 0 | 0 | 0 | 0 |
| **10** Payroll taxes . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . | | | | |
| **b** Legal . . . . . . . . . | | | | |
| **c** Accounting . . . . . . . . | | | | |
| **d** Lobbying . . . . . . . . | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees . . . . . | | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | | | | |
| **12** Advertising and promotion . . . . . | 0 | 0 | 0 | 0 |
| **13** Office expenses . . . . . . . | 0 | 0 | 0 | 0 |
| **14** Information technology . . . . . . | 52,960 | 0 | 52,960 | 0 |
| **15** Royalties . . . | 0 | 0 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| 16 | Occupancy . . . . . . . . . | 0 | 0 | 0 | 0 |
| 17 | Travel . . . . . . . . . . | 0 | 0 | 0 | 0 |
| 18 | Payments of travel or entertainment expenses for any federal, state, or local public officials . | 0 | 0 | 0 | 0 |
| 19 | Conferences, conventions, and meetings . . . | 0 | 0 | 0 | 0 |
| 20 | Interest . . . . . . . . . . | 0 | 0 | 0 | 0 |
| 21 | Payments to affiliates . . . . . . | 0 | 0 | 0 | 0 |
| 22 | Depreciation, depletion, and amortization . . | 0 | 0 | 0 | 0 |
| 23 | Insurance . . . . | 0 | 0 | 0 | 0 |
| 24 | Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | All other expenses | | | | |
| 25 | **Total functional expenses.** Add lines 1 through 24e | 2,628,204 | 1,714,911 | 85,960 | 0 |
| 26 | **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation.Check here ☐ if following SOP 98-2 (ASC 958-720). | | | | |

Form **990** (2023)

---

Page 11

Form 990 (2023)     Page **11**

| Part X | **Balance Sheet** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☐

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash–non-interest-bearing . . . . . . . | 462,761 | 1 | 984,000 |
| | 2 | Savings and temporary cash investments . . . . . . . . . | 0 | 2 | 0 |
| | 3 | Pledges and grants receivable, net . . . . . . | 0 | 3 | 0 |
| | 4 | Accounts receivable, net . . . . . . | 0 | 4 | 0 |
| | 5 | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | 0 | 5 | 0 |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . | 0 | 6 | 0 |
| | 7 | Notes and loans receivable, net . . . . . . . . . | 0 | 7 | 0 |
| | 8 | Inventories for sale or use . . . . . . . . | 0 | 8 | 0 |
| | 9 | Prepaid expenses and deferred charges . . . . . . | 0 | 9 | 0 |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D   **10a**   0 | | | |
| | b | Less: accumulated depreciation   **10b**   0 | 0 | 10c | 0 |
| | 11 | Investments—publicly traded securities . | 0 | 11 | 0 |
| | 12 | Investments—other securities. See Part IV, line 11 . . . . . | 0 | 12 | 20,000 |
| | 13 | Investments—program-related. See Part IV, line 11 . . | 0 | 13 | 0 |
| | 14 | Intangible assets . . . . . . . . | 0 | 14 | 0 |
| | 15 | Other assets. See Part IV, line 11 . . . . | 0 | 15 | 0 |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 33) . . . | 462,761 | 16 | 1,004,000 |
| **Liabilities** | 17 | Accounts payable and accrued expenses . . . . . . | 0 | 17 | 0 |
| | 18 | Grants payable . . . . | 0 | 18 | 31,483 |
| | 19 | Deferred revenue . . . . . . . | 0 | 19 | 0 |
| | 20 | Tax-exempt bond liabilities . . . . . . | 0 | 20 | 0 |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D . | 0 | 21 | 102,905 |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . . . | 0 | 22 | 0 |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . . | 0 | 23 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 | Unsecured notes and loans payable to unrelated third parties | 0 | **24** | | 0 |
| 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | 0 | **25** | | 0 |
| 26 | **Total liabilities.** Add lines 17 through 25   .   . | 0 | **26** | | 134,388 |

| Net Assets or Fund Balances | | | | | | |
|---|---|---|---|---|---|---|
| | **Organizations that follow FASB ASC 958, check here** ☑ **and complete lines 27, 28, 32, and 33.** | | | | |
| | 27 | Net assets without donor restrictions   .   .   .   .   .   .   . | 0 | **27** | | 0 |
| | 28 | Net assets with donor restrictions   .   .   .   .   .   . | 462,761 | **28** | | 869,612 |
| | **Organizations that do not follow FASB ASC 958, check here** ▶ ☐ **and complete lines 29 through 33.** | | | | |
| | 29 | Capital stock or trust principal, or current funds   .   .   . | | **29** | | |
| | 30 | Paid-in or capital surplus, or land, building or equipment fund   .   . | | **30** | | |
| | 31 | Retained earnings, endowment, accumulated income, or other funds | | **31** | | |
| | 32 | Total net assets or fund balances   .   .   .   .   . | 462,761 | **32** | | 869,612 |
| | 33 | Total liabilities and net assets/fund balances   .   .   .   . | 462,761 | **33** | | 1,004,000 |

Form 990 (2023)

---

Page 12

---

Form 990 (2023)                                                                                                    Page **12**

| Part XI | **Reconcilliation of Net Assets** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XI   .   .   .   .   .   .   .   .   .   . ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12)   .   .   .   .   .   .   . | **1** | 3,035,055 |
| 2 | Total expenses (must equal Part IX, column (A), line 25)   .   .   .   .   .   .   . | **2** | 2,628,204 |
| 3 | Revenue less expenses. Subtract line 2 from line 1   .   .   .   .   .   . | **3** | 406,851 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A))   .   . | **4** | 462,761 |
| 5 | Net unrealized gains (losses) on investments   .   .   .   .   .   . | **5** | 0 |
| 6 | Donated services and use of facilities   .   .   .   .   .   . | **6** | 0 |
| 7 | Investment expenses   .   .   .   .   .   .   . | **7** | 0 |
| 8 | Prior period adjustments   .   .   .   .   .   .   . | **8** | 0 |
| 9 | Other changes in net assets or fund balances (explain in Schedule O)   .   .   .   .   . | **9** | 0 |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 869,612 |

| Part XII | **Financial Statements and Reporting** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII   .   .   .   .   .   .   .   .   .   . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990:  ☑ Cash  ☐ Accrual  ☐ Other _____  If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both:  ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both:  ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Uniform Guidance, 2 C.F.R. Part 200, Subpart F? | **3a** | | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | | |

Form **990** (2023)

## Additional Data

**Return to Form**

**Software ID:**  23017649
**Software Version:**  V2.0

**Form 990, Special Condition Description:**

| Special Condition Description |
| --- |

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

# SCHEDULE A
**(Form 990)**

Department of the Treasury
Internal Revenue Service

## Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
► **Attach to Form 990 or Form 990-EZ.**
► Go to _www.irs.gov/Form990_ for instructions and the latest information.

OMB No. 1545-0047

**2023**

Open to Public
Inspection

**Name of the organization**
Manifold for Charity

**Employer identification number**
88-3668801

| Part I | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

**1** ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

**2** ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

**3** ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

**4** ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

**5** ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

**6** ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

**7** ☑ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**8** ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**9** ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

**10** ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

**11** ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

**12** ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

**a** ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

**b** ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

**c** ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

**d** ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

**e** ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

**f** Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . _____

**g** Provide the following information about the supported organization(s).

| **(i)** Name of supported organization | **(ii)** EIN | **(iii)** Type of organization (described on lines 1- 10 above (see instructions)) | **(iv)** Is the organization listed in your governing document? | | **(v)** Amount of monetary support (see instructions) | **(vi)** Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat. No. 11285F    **Schedule A (Form 990) 2023**

— Page 2 —

| Part II | **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)** |
|---|---|

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

Calendar year

| Calendar year (or fiscal year beginning in) ▶ | | (a) 2019 | (b) 2020 | (c) 2021 | (d) 2022 | (e) 2023 | (f) Total |
|---|---|---|---|---|---|---|---|
| 1 | Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | 0 | 0 | 0 | 0 | 86,210 | 86,210 |
| 2 | Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . | | | | | | |
| 3 | The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | |
| 4 | **Total.** Add lines 1 through 3 | 0 | 0 | 0 | 0 | 86,210 | 86,210 |
| 5 | The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) . . | | | | | | 69,074 |
| 6 | **Public support.** Subtract line 5 from line 4. | | | | | | 17,136 |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | | (a) 2019 | (b) 2020 | (c) 2021 | (d) 2022 | (e) 2023 | (f) Total |
|---|---|---|---|---|---|---|---|
| 7 | Amounts from line 4. . | 0 | 0 | 0 | 0 | 86,210 | 86,210 |
| 8 | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . | 0 | 0 | 0 | 0 | 9,000 | 9,000 |
| 9 | Net income from unrelated business activities, whether or not the business is regularly carried on. . | | | | | | |
| 10 | Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | | | | | | |
| 11 | **Total support.** Add lines 7 through 10 | | | | | | 95,210 |
| 12 | Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . | | | | **12** | | 0 |

**13 First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☑

## Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 14 | Public support percentage for 2023 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . . | **14** | |
| 15 | Public support percentage for 2022 Schedule A, Part II, line 14 . . . . . . . . . . . . . | **15** | |

**16a 33 1/3% support test—2023.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . ▶ ☐

**b 33 1/3% support test—2022.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . ▶ ☐

**17a 10%-facts-and-circumstances test—2023.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . ▶ ☐

**b 10%-facts-and-circumstances test—2022.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . ▶ ☐

**18 Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Schedule A (Form 990) 2023**

--- Page 3 ---

| Part III | **Support Schedule for Organizations Described in Section 509(a)(2)** |
|---|---|
| | (Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.) |

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | | (a) 2019 | (b) 2020 | (c) 2021 | (d) 2022 | (e) 2023 | (f) Total |
|---|---|---|---|---|---|---|---|
| 1 | Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | | | | | | |
| 2 | Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 | Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . . | | | | | | |
| 4 | Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . | | | | | | |

| | | (a) 2019 | (b) 2020 | (c) 2021 | (d) 2022 | (e) 2023 | (f) Total |
|---|---|---|---|---|---|---|---|
| **5** | The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** | **Total.** Add lines 1 through 5 | | | | | | |
| **7a** | Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** | Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | |
| **c** | Add lines 7a and 7b. . | | | | | | |
| **8** | **Public support.** (Subtract line 7c from line 6.) | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | | (a) 2019 | (b) 2020 | (c) 2021 | (d) 2022 | (e) 2023 | (f) Total |
|---|---|---|---|---|---|---|---|
| **9** | Amounts from line 6. . . | | | | | | |
| **10a** | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . | | | | | | |
| **b** | Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | |
| **c** | Add lines 10a and 10b. | | | | | | |
| **11** | Net income from unrelated business activities not included on line 10b, whether or not the business is regularly carried on. | | | | | | |
| **12** | Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . | | | | | | |
| **13** | **Total support.** (Add lines 9, 10c, 11, and 12.). . | | | | | | |

**14**   **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

## Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| **15** | Public support percentage for 2023 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . | **15** | |
| **16** | Public support percentage from 2022 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . | **16** | |

## Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| **17** | Investment income percentage for **2023** (line 10c, column (f) divided by line 13, column (f)) . . . . . . | **17** | |
| **18** | Investment income percentage from **2022** Schedule A, Part III, line 17 . . . . . . . . . . . . . | **18** | |

**19a**   **33 1/3% support tests-2023.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . ▶ ☐

**b**   **33 1/3% support tests—2022.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . ▶ ☐

**20**   **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . ▶ ☐

**Schedule A (Form 990) 2023**

---

Schedule A (Form 990) 2023

Page **4**

| Part IV | Supporting Organizations |
|---|---|

(Complete only if you checked a box on line 12 of Part I. If you checked box 12a, of Part I, complete Sections A and B. If you checked box 12b, of Part I, complete Sections A and C. If you checked box 12c, of Part I, complete Sections A, D, and E. If you checked box 12d, of Part I, complete Sections A and D, and complete Part V.)

## Section A. All Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? If "No," describe in **Part VI** how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain. **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2). **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? If "Yes," answer lines 3b and 3c below. **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? If "Yes," describe in **Part VI** when and how the organization made the determination. **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use. **3c** | | |

| | | Yes | No |
|---|---|---|---|
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* **Part VI** *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* **Part VI** *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in* **Part VI,** *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* **Part VI.** **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990)* . **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* **Part VI.** **9a** | | |
| **b** | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* **Part VI.** **9b** | | |
| **c** | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* **Part VI.** **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* **10b** | | |

**Schedule A (Form 990) 2023**

Schedule A (Form 990) 2023                                                                                             Page **5**

| Part IV | **Supporting Organizations** (continued) |
|---|---|

| | | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? **11a** | | |
| **b** | A family member of a person described on 11a above? **11b** | | |
| **c** | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in* **Part VI.** **11c** | | |

**Section B. Type I Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* **2** | | |

**Section C. Type II Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in* **Part VI** *how control or management of the* | | |

*supporting organization was vested in the same persons that controlled or managed the supported organization(s).*

### Section D. All Type III Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | | |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s).* | **2** | | |
| 3 | By reason of the relationship described in line 2 above, did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard.* | **3** | | |

### Section E. Type III Functionally-Integrated Supporting Organizations

1 Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**:

a ☐ The organization satisfied the Activities Test. Complete **line 2** below.

b ☐ The organization is the parent of each of its supported organizations. Complete **line 3** below.

c ☐ The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions)

2 Activities Test. **Answer lines 2a and 2b below.**

| | | | Yes | No |
|---|---|---|---|---|
| a | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* | **2a** | | |
| b | Did the activities described on line 2a, above constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* | **2b** | | |
| 3 | Parent of Supported Organizations. **Answer lines 3a and 3b below.** | | | |
| a | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *If "Yes" or "No", provide details in Part VI.* | **3a** | | |
| b | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI. the role played by the organization in this regard.* | **3b** | | |

**Schedule A (Form 990) 2023**

---

Schedule A (Form 990) 2023           Page **6**

## Part V    Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 *(explain in Part VI)*. **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| | Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | 8 | | |

| | Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | 1 | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | **Discount** claimed for blockage or other factors (*explain in detail in Part VI*): | | | |

| 2 | Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 0.015 of line 3 (for greater amount, see instructions). | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by 0.035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |
| | **Section C - Distributable Amount** | | | Current Year |
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 | Enter 85% of line 1 | 2 | | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 | Enter greater of line 2 or line 3 | 4 | | |
| 5 | Income tax imposed in prior year | 5 | | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |
| 7 | ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions) | | | |

**Schedule A (Form 990) 2023**

---

Schedule A (Form 990) 2023          Page **7**

| **Part V** | **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations** (continued) |
|---|---|

| **Section D - Distributions** | | Current Year |
|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | 1 | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | 2 | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | 3 | |
| 4 | Amounts paid to acquire exempt-use assets | 4 | |
| 5 | Qualified set-aside amounts (*prior IRS approval required - provide details in Part VI*) | 5 | |
| 6 | Other distributions (*describe in Part VI*). See instructions | 6 | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | 7 | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (*provide details in Part VI*). See instructions | 8 | |
| 9 | Distributable amount for 2023 from Section C, line 6 | 9 | |
| 10 | Line 8 amount divided by Line 9 amount | 10 | |

| **Section E - Distribution Allocations** (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2023 | (iii) Distributable Amount for 2023 |
|---|---|---|---|
| 1 | Distributable amount for 2023 from Section C, line 6 | | | |
| 2 | Underdistributions, if any, for years prior to 2023 (reasonable cause required-- *explain in Part VI*). See instructions. | | | |
| 3 | Excess distributions carryover, if any, to 2023: | | | |
| a | From 2018 . . . . . . . | | | |
| b | From 2019 . . . . . . . | | | |
| c | From 2020 . . . . . . . | | | |
| d | From 2021 . . . . . . . | | | |
| e | From 2022 . . . . . . . | | | |
| f | **Total** of lines 3a through e | | | |
| g | Applied to underdistributions of prior years | | | |
| h | Applied to 2023 distributable amount | | | |
| i | Carryover from 2018 not applied (see instructions) | | | |
| j | Remainder. Subtract lines 3g, 3h, and 3i from line 3f. | | | |
| 4 | Distributions for 2023 from Section D, line 7: $ | | | |
| a | Applied to underdistributions of prior years | | | |
| b | Applied to 2023 distributable amount | | | |

| | | | |
|---|---|---|---|
| **c** Remainder. Subtract lines 4a and 4b from line 4. | | | |
| **5** Remaining underdistributions for years prior to 2023, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **6** Remaining underdistributions for 2023. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **7 Excess distributions carryover to 2024.** Add lines 3j and 4c. | | | |
| **8** Breakdown of line 7: | | | |
| **a** Excess from 2019. . . . . | | | |
| **b** Excess from 2020. . . . . | | | |
| **c** Excess from 2021. . . . . | | | |
| **d** Excess from 2022. . . . . | | | |
| **e** Excess from 2023. . . . . | | | |

**Schedule A (Form 990)** (2023)

---

Schedule A (Form 990) 2023                                                                 Page **8**

| Part VI | **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions). |
|---|---|

| Facts And Circumstances Test |
|---|
| |

| Return Reference | Explanation |
|---|---|
| Part II - Line 1, Unusual Grant Lists | \| Name of the Contributor:, Date of Grant:, Year:, Amount:, Description:\| Donor, 06 20 2023, "2023", $1575000, Grant to start the AI Safety Regranting program\| Donor, 06 15 2023, "2023", $1241000, General support of Manifold Markets\| |
| Part II, line 10 | \| S.No:, Amount:, Description:\| 1, 102905.00, Securities commodity contracts and other financial investments and related activities\| |

**Schedule A (Form 990) 2023**

---

# Additional Data                                                       Return to Form

Software ID:

Software Version:

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**Schedule B**

**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Schedule of Contributors

▶ **Attach to Form 990, 990-EZ, or 990-PF.**
▶ **Go to** *www.irs.gov/Form990* **for the latest information.**

OMB No. 1545-0047

**2023**

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

**Organization type** (check one):

**Filers of:**

**Section:**

Form 990 or 990-EZ

☐ 501(c)(  ) (enter number) organization

☐ 4947(a)(1) nonexempt charitable trust **not** treated as a private foundation

☐ 527 political organization

Form 990-PF

☐ 501(c)(3) exempt private foundation

☐ 4947(a)(1) nonexempt charitable trust treated as a private foundation

☐ 501(c)(3) taxable private foundation

Check if your organization is covered by the **General Rule** or a **Special Rule.**
**Note:** Only a section 501(c)(7), (8), or (10) organization can check boxes for both the General Rule and a Special Rule. See instructions.

**General Rule**

☐ For an organization filing Form 990, 990-EZ, or 990-PF that received, during the year, contributions totaling $5,000 or more (in money or other property) from any one contributor. Complete Parts I and II. See instructions for determining a contributor's total contributions.

**Special Rules**

☐ For an organization described in section 501(c)(3) filing Form 990 or 990-EZ that met the 33$^1/_3$% support test of the regulations under sections 509(a)(1) and 170(b)(1)(A)(vi), that checked Schedule A (Form 990 or 990-EZ), Part II, line 13, 16a, or 16b, and that received from any one contributor, during the year, total contributions of the greater of **(1)** $5,000 or **(2)** 2% of the amount on (i) Form 990, Part VIII, line 1h, or (ii) Form 990-EZ, line 1. Complete Parts I and II.

☐ For an organization described in section 501(c)(7), (8), or (10) filing Form 990 or 990-EZ that received from any one contributor, during the year, total contributions of more than $1,000 *exclusively* for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. Complete Parts I, II, and III.

☐ For an organization described in section 501(c)(7), (8), or (10) filing Form 990 or 990-EZ that received from any one contributor, during the year, contributions *exclusively* for religious, charitable, etc., purposes, but no such contributions totaled more than $1,000. If this box is checked, enter here the total contributions that were received during the year for an *exclusively* religious, charitable, etc., purpose. Don't complete any of the parts unless the **General Rule** applies to this organization because it received *nonexclusively* religious, charitable, etc., contributions totaling $5,000 or more during the year  .   .   .   .   .   .   .   .   .   ▶ $ _____

**Caution:** An organization that isn't covered by the General Rule and/or the Special Rules doesn't file Schedule B (Form 990, 990-EZ, or 990-PF), but it **must** answer "No" on Part IV, line 2, of its Form 990; or check the box on line H of its Form 990-EZ or on its Form 990PF, Part I, line 2, to certify that it doesn't meet the filing requirements of Schedule B (Form 990, 990-EZ, or 990-PF).

**For Paperwork Reduction Act Notice, see the Instructions for Form 990, 990-EZ, or 990-PF.**

Cat. No. 30613X

**Schedule B (Form 990) (2023)**

Schedule B (Form 990) (2023)

Name of organization
Manifold for Charity

Employer identification number
88-3668801

Manifold for Charity                                                                88-3668801

Part I

**Contributors** (see instructions). Use duplicate copies of Part I if additional space is needed.

**Contributors**

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| <u>RESTRICTED</u> | | $ RESTRICTED | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| . | | $ | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| . | | $ | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| . | | $ | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| . | | $ | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

| (a)<br>No. | (b)<br>Name, address, and ZIP + 4 | (c)<br>Total contributions | (d)<br>Type of contribution |
|---|---|---|---|
| . | | $ | ☐ **Person**<br>☐ **Payroll**<br>☐ **Noncash**<br><br>(Complete Part II for noncash contributions.) |

Schedule B (Form 990) (2023)

Schedule B (Form 990) (2023)                                                        **Page 3**

| Name of organization<br>Manifold for Charity | **Employer identification number**<br>88-3668801 |
|---|---|

**Part II**    **Noncash Property** (see instructions). Use duplicate copies of Part II if additional space is needed.

| (a)<br>No. from<br>Part I | (b)<br>Description of noncash property given | (c)<br>FMV (or estimate)<br>(See instructions) | (d)<br>Date received |
|---|---|---|---|

| (a) No. from Part I | (b) Description of noncash property given | (c) FMV (or estimate) (See instructions) | (d) Date received |
|---|---|---|---|
| . | | $ | |
| . | | $ | |
| . | | $ | |
| . | | $ | |
| . | | $ | |

Schedule B (Form 990) (2023)

---

Page 4

---

Schedule B (Form 990) (2023)                                                                 Page **4**

Name of organization
Manifold for Charity

Employer identification number
88-3668801

**Part III** | **Exclusively** religious, charitable, etc., contributions to organizations described in section 501(c)(7), (8), or (10) that total more than $1,000 for the year from any one contributor. Complete columns **(a)** through **(e) and** the following line entry. For organizations completing Part III, enter the total of *exclusively* religious, charitable, etc., contributions of **$1,000 or less** for the year. (Enter this information once. See instructions.) ▶  $ _____
Use duplicate copies of Part III if additional space is needed.

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

| (e) Transfer of gift | |
|---|---|
| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
| | |

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

| (e) Transfer of gift | |
|---|---|
| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
| | |

| (a) No. from | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

| (e) Transfer of gift | |
|---|---|
| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
| . | |

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

| (e) Transfer of gift | |
|---|---|
| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
| . | |

**Schedule B (Form 990) (2023)**

## Additional Data

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

## SCHEDULE C
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

▶Complete if the organization is described below. ▶Attach to Form 990 or Form 990-EZ.
▶Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

# 2022

Open to Public
Inspection

**If the organization answered "Yes" on Form 990, Part IV, Line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
● Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
● Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
● Section 527 organizations: Complete Part I-A only.
**If the organization answered "Yes" on Form 990, Part IV, Line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
● Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
● Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.
**If the organization answered "Yes" on Form 990, Part IV, Line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
● Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

| Part I-A | Complete if the organization is exempt under section 501(c) or is a section 527 organization. |
|---|---|

| 1 | Provide a description of the organization's direct and indirect political campaign activities in Part IV. See instructions for definition of "political campaign activities." | | |
|---|---|---|---|
| 2 | Political campaign activity expenditures. See instructions ................................................... ▶ | $ _____ |
| 3 | Volunteer hours for political campaign activities. See instructions .......................................... | _____ |

| Part I-B | Complete if the organization is exempt under section 501(c)(3). |
|---|---|

| 1 | Enter the amount of any excise tax incurred by the organization under section 4955 ............................. ▶ | $ _____ | |
|---|---|---|---|
| 2 | Enter the amount of any excise tax incurred by organization managers under section 4955 ...................... ▶ | $ _____ | |
| 3 | If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ......................................... | ☐ Yes ☐ No |
| 4a | Was a correction made? ......................................................................................... | ☐ Yes ☐ No |
| b | If "Yes," describe in Part IV. | |

| Part I-C | Complete if the organization is exempt under section 501(c), except section 501(c)(3). |
|---|---|

| 1 | Enter the amount directly expended by the filing organization for section 527 exempt function activities ..... ▶ | $ _____ |
|---|---|---|
| 2 | Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities ................................................................................................ ▶ | $ _____ |
| 3 | Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b.......... ▶ | $ _____ |
| 4 | Did the filing organization file **Form 1120-POL** for this year? ................................................... | ☐ Yes ☐ No |
| 5 | Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV. | |

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |

For Paperwork Reduction Act Notice, see the instructions for Form 990. | Cat. No. 50084S | **Schedule C (Form 990) 2022**

Schedule C (Form 990) 2022

| Part II-A | Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)) |
|---|---|

section 501(h)).

**A** Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

**B** Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| **Limits on Lobbying Expenditures**<br>**(The term "expenditures" means amounts paid or incurred.)** | **(a)** Filing organization's totals | **(b)** Affiliated group totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grass roots lobbying) ..................... | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) ...................... | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) ............................................. | | |
| **d** Other exempt purpose expenditures ............................................................. | 0 | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) ..................................... | 0 | |
| **f** Lobbying nontaxable amount. Enter the amount from the following table in both columns. | 0 | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | | |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) ................................ | 0 | |
| **h** Subtract line 1g from line 1a. If zero or less, enter -0-. ................................... | 0 | |
| **i** Subtract line 1f from line 1c. If zero or less, enter -0-. ................................... | 0 | |

**j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? ..........................................................................      ☐ Yes  ☐ No

### 4-Year Averaging Period Under Section 501(h)
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the separate instructions for lines 2a through 2f.)**

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | **(a)** 2019 | **(b)** 2020 | **(c)** 2021 | **(d)** 2022 | **(e)** Total |
|---|---|---|---|---|---|
| **2a** Lobbying nontaxable amount | 0 | 0 | 0 | 0 | 0 |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | 0 |
| **c** Total lobbying expenditures | 0 | 0 | 0 | 0 | 0 |
| **d** Grassroots nontaxable amount | 0 | 0 | 0 | 0 | 0 |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | 0 |
| **f** Grassroots lobbying expenditures | 0 | 0 | 0 | 0 | 0 |

Schedule C (Form 990) 2022

───── Page 3 ─────

Schedule C (Form 990) 2022                                                                 Page **3**

| Part II-B | **Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).** |
|---|---|

*For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.*

| | | (a) | | (b) |
|---|---|---|---|---|
| | | **Yes** | **No** | **Amount** |
| **1** | During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| **a** | Volunteers? ................................................................. | | | |
| **b** | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? ........ | | | |
| **c** | Media advertisements? .................................................... | | | |
| **d** | Mailings to members, legislators, or the public? ............................................. | | | |
| **e** | Publications, or published or broadcast statements? | | | |

| | | | | | |
|---|---|---|---|---|---|
| **f** | Grants to other organizations for lobbying purposes? .......................................................... | | | | |
| **g** | Direct contact with legislators, their staffs, government officials, or a legislative body? ...................... | | | | |
| **h** | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? .................. | | | | |
| **i** | Other activities? ................................................................................................ | | | | |
| **j** | Total. Add lines 1c through 1i ................................................................................. | | | | |
| **2a** | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? ..... | | | | |
| **b** | If "Yes," enter the amount of any tax incurred under section 4912 ........................................... | | | | |
| **c** | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 .................. | | | | |
| **d** | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? ...................... | | | | |

## Part III-A    Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? ................................................ | **1** | | |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? ............................................ | **2** | | |
| **3** | Did the organization agree to carry over lobbying and political expenditures from the prior year? ................................ | **3** | | |

## Part III-B    Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."

| | | | |
|---|---|---|---|
| **1** | Dues, assessments and similar amounts from members ...................................................... | **1** | |
| **2** | Section 162(e) nondeductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| **a** | Current year ................................................................................................ | **2a** | |
| **b** | Carryover from last year .................................................................................... | **2b** | |
| **c** | Total ...................................................................................................... | **2c** | |
| **3** | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues . | **3** | |
| **4** | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? ...................................................................................... | **4** | |
| **5** | Taxable amount of lobbying and political expenditures. See Instructions ......................................... | **5** | |

## Part IV    Supplemental Information

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions), and Part II-B, line 1. Also, complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| | |

**Schedule C (Form 990) 2022**

---

# Additional Data

[Return to Form]

**Software ID:**

**Software Version:**

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**SCHEDULE D**
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

► **Complete if the organization answered "Yes," on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.**
► **Attach to Form 990.**
► **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2022**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

## Part I    Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | 100 | |
| 2 | Aggregate value of contributions to (during year) | 249,170 | |
| 3 | Aggregate value of grants from (during year) | 83,903 | |
| 4 | Aggregate value at end of year . . . . . . . | 165,267 | |

5    Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the
organization's property, subject to the organization's exclusive legal control? . . . . . . . . . . . . .    ☑ **Yes** ☐ **No**

6    Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for
charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible
private benefit? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ☑ **Yes** ☐ **No**

## Part II    Conservation Easements.
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1    Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)    ☐ Preservation of an historically important land area

☐ Protection of natural habitat    ☐ Preservation of a certified historic structure

☐ Preservation of open space

2    Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation
easement on the last day of the tax year.

| | | Held at the End of the Year |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . . | 2a | |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . . | 2c | |
| d | Number of conservation easements included in (c) acquired after July 25, 2006, and not on a historic structure listed in the National Register . . . | 2d | |

3    Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the
tax year ► _____

4    Number of states where property subject to conservation easement is located ► _____

5    Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations,
and enforcement of the conservation easements it holds? . . . . . . . . . . . .    ☐ Yes ☐ No

6    Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► _____

7    Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► $ _____

8    Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . .    ☐ Yes ☐ No

9    In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and
balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes
the organization's accounting for conservation easements.

## Part III    Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a    If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art,
historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in
Part XIII, the text of the footnote to its financial statements that describes these items.

b    If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art,
historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the
following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . . ► $ _____

(ii) Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . . ► $ _____

2    If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the
following amounts required to be reported under FASB ASC 958 relating to these items:

a    Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . . ► $ _____

b    Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . ► $ _____

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**    Cat. No. 52283D    **Schedule D (Form 990) 2022**

Schedule D (Form 990) 2022　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page **2**

| Part III | Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)* |

**3** Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a** ☐ Public exhibition　　　　　　　　　**d** ☐ Loan or exchange programs

**b** ☐ Scholarly research　　　　　　　　　**e** ☐ Other ........................................................................

**c** ☐ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5** During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?． ． ．　☐ **Yes**　☐ **No**

| Part IV | Escrow and Custodial Arrangements. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ．　☐ **Yes**　☐ **No**

**b** If "Yes," explain the arrangement in Part XIII and complete the following table:

|  |  | Amount |
|---|---|---|
| **c** Beginning balance ． ． ． ． ． ． ． ． ． ． ． | **1c** |  |
| **d** Additions during the year ． ． ． ． ． ． ． ． | **1d** |  |
| **e** Distributions during the year ． ． ． ． ． ． ． | **1e** |  |
| **f** Ending balance ． ． ． ． ． ． ． ． ． ． ． | **1f** |  |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ． ． ．　☐ **Yes**　☐ **No**

**b** If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII ． ． ． ． ☐

| Part V | Endowment Funds. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

|  | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance ． ． ． ． |  |  |  |  |  |
| **b** Contributions ． ． ． ． ． ． |  |  |  |  |  |
| **c** Net investment earnings, gains, and losses |  |  |  |  |  |
| **d** Grants or scholarships ． ． ． |  |  |  |  |  |
| **e** Other expenditures for facilities and programs ． ． ． |  |  |  |  |  |
| **f** Administrative expenses ． ． ． |  |  |  |  |  |
| **g** End of year balance ． ． ． ． ． |  |  |  |  |  |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a** Board designated or quasi-endowment ▶ ........................................

**b** Permanent endowment ▶ ........................................

**c** Term endowment ▶ ........................................

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|  |  | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． | **3a(i)** |  |  |
| **(ii)** Related organizations ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． ． | **3a(ii)** |  |  |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? ． ． ． ． ． ． ． ． ． | **3b** |  |  |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

| Part VI | Land, Buildings, and Equipment. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land ． ． ． ． ． ． ． |  |  |  |  |
| **b** Buildings ． ． ． ． ． |  |  |  |  |
| **c** Leasehold improvements |  |  |  |  |
| **d** Equipment ． ． ． ． ． |  |  |  |  |
| **e** Other ． ． ． ． ． ． ． |  |  |  |  |

**Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* ． ． ▶ |  |

**Schedule D (Form 990) 2022**

Schedule D (Form 990) 2022 — Page **3**

| Part VII | Investments - Other Securities. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives . . . . . . . . . | | |
| (2) Closely-held equity interests . . . . . . . . . | | |
| (3) Other _____ | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 12.)  ▶ | | |

| Part VIII | Investments - Program Related. |
|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| **Total.** (Column (b) must equal Form 990, Part X, col.(B) line 13.)  ▶ | | |

| Part IX | Other Assets. |
|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| **Total.** (Column (b) must equal Form 990, Part X, col.(B) line 15.)   . . . . . . . . . . . ▶ | |

| Part X | Other Liabilities. |
|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| 1. | (a) Description of liability | (b) Book value |
|---|---|---|
| (1) Federal income taxes | | |

(5) Federal income taxes

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

**Schedule D (Form 990) 2022**

---

Schedule D (Form 990) 2022 | Page **4**

**Part XI   Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . | | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| **a** | Net unrealized gains (losses) on investments . . . . | **2a** | | | |
| **b** | Donated services and use of facilities . . . . . . . | **2b** | | | |
| **c** | Recoveries of prior year grants . . . . . . . . | **2c** | | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . | | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . | | | **3** | |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . . | **4b** | | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . | | | **4c** | |
| **5** | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) . . . . . . | | | **5** | |

**Part XII   Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| **1** | Total expenses and losses per audited financial statements . . . . . . . . . | | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| **a** | Donated services and use of facilities . . . . . . . | **2a** | | | |
| **b** | Prior year adjustments . . . . . . . . . . . | **2b** | | | |
| **c** | Other losses . . . . . . . . . . . . . | **2c** | | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . | | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . | | | **3** | |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1**: | | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . . | **4b** | | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . | | | **4c** | |
| **5** | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) . . . . . . | | | **5** | |

**Part XIII   Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|
| Part IV, line 2b | Holding on to cash balances for accredited investors to put into impact certificates |

**Schedule D (Form 990) 2022**

**Additional Data**

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**SCHEDULE F (Form 990)**

Department of the Treasury
Internal Revenue Service

# Statement of Activities Outside the United States

► Complete if the organization answered "Yes" to Form 990, Part IV, line 14b, 15, or 16.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2023**

Open to Public Inspection

Name of the organization
Manifold for Charity

Employer identification number
88-3668801

**Part I** | **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

**1** For grantmakers. Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☑ **Yes** ☐ **No**

**2** For grantmakers. Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

**3** Activites per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| Europe (Including Iceland and Greenland) | 0 | 0 | Grantmaking | | 67,812 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **3a** Sub-total . . . . . | 0 | 0 | | | 67,812 |
| **b** Total from continuation sheets to Part I . . . | 0 | 0 | | | 0 |
| **c Totals** (add lines 3a and 3b) | 0 | 0 | | | 67,812 |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.    Cat. No. 50082W    **Schedule F (Form 990) 2023**

Schedule F (Form 990) 2023 | Page **2**

**Part II** | **Grants and Other Assistance to Organizations or Entities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed.

| **1** (a) Name of organization | (b) IRS code section and EIN (if applicable) | (c) Region | (d) Purpose of grant | (e) Amount of cash grant | (f) Manner of cash disbursement | (g) Amount of noncash assistance | (h) Description of noncash assistance | (i) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**2** Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-

exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter . . . . . . . ▶ _____

3  Enter total number of other organizations or entities . . . . . . . . . . . . . . . . . . . . . ▶ _____

Schedule F (Form 990) 2023

---
Page 3
---

Schedule F (Form 990) 2023      Page **3**

**Part III**    **Grants and Other Assistance to Individuals Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 16. Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Region | (c) Number of recipients | (d) Amount of cash grant | (e) Manner of cash disbursement | (f) Amount of noncash assistance | (g) Description of noncash assistance | (h) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|
| Funding for research projects in the EU for AI safety existential risk and effective altruism | Europe (Including Iceland and Greenland) | 5 | 67,812 | International Wire | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Schedule F (Form 990) 2023

---
Page 4
---

Schedule F (Form 990) 2023      Page **4**

**Part IV**    **Foreign Forms**

1   Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* . . . . . . . . . . . . . . .    ☐ Yes   ☑ No

2   Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* . . . . . . . . . . .    ☐ Yes   ☑ No

3   Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations. (see Instructions for Form 5471)* . . . . . . . . . . .    ☐ Yes   ☑ No

4   Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund. (see Instructions for Form 8621)* .    ☐ Yes   ☑ No

5   Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons with Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* . . . . . . . . . . . . . .    ☐ Yes   ☑ No

6   Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990).* . . . . . . . . . . . . . .    ☐ Yes   ☑ No

Schedule F (Form 990) 2023

---
Page 5
---

Schedule F (Form 990) 2023      Page **5**

**Part V**    **Supplemental Information**
Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method; amounts of investments vs. expenditures per region); Part II, line 1 (accounting method); Part III (accounting method); and Part III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information. See instructions.

| Return Reference | Explanation |
|---|---|
| Part I Line 2 | Our website maintains a public listing of each grant's purpose the criteria for issuing a grant as well as the grantee's public reports of how each grant is spent. For an overview see https: manifund.org about regranting |

| Part I, line 3f | ExplanationTxt: | Cash | |
| Part III, line 1 | ExplanationTxt: | Cash | |
| Part III, Column(c) | ExplanationTxt: | Approximate number of EU grantees | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Schedule F (Form 990) 2023**

## Additional Data

**Software ID:**

**Software Version:**

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**Note: To capture the full content of this document, please select landscape mode (11" x 8.5") when printing.**

**Schedule I**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

**Grants and Other Assistance to Organizations,**
**Governments and Individuals in the United States**

Complete if the organization answered "Yes," on Form 990, Part IV, line 21 or 22.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2023**

Open to Public
Inspection

Name of the organization
Manifold for Charity

Employer identification number
88-3668801

| Part I | General Information on Grants and Assistance |
| --- | --- |

**1** Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . . . . .  ☑ Yes ☐ No

**2** Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

| Part II | Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed. |
| --- | --- |

| (a) Name and address of organization or government | (b) EIN | (c) IRC section (if applicable) | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of noncash assistance | (h) Purpose of grant or assistance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| (1) FAR AI 600 W Broadway Suite 660 San Diego, CA  92101 | 92-0692207 | 501(c)(3) | 400,100 | 0 | | | Ethan Perez Compute and other expenses for LLM alignment research |
| (2) Rethink Priorities 530 Divisadero St PMB 796 San Francisco, CA  94117 | 84-3896318 | 501(c)(3) | 325,409 | 0 | | | Apollo Research Scale up interpretability and behavioral model evals research |
| (3) Ashgro 2810 N Church St PMB 49028 Wilmington, DE  94117 | 88-4232889 | 501(c)(3) | 144,650 | 0 | | | Timaeus Scoping Developmental Interpretability |
| (4) Manifold Markets Inc 425 Divisadero Street Suite 300 San Francisco, CA  94114 | 88-0980715 | | 827,333 | 0 | | | Donation for general support of Manifold from Survival and Flourishing Fund via Founders Pledge |
| (5) MATS Research 2036 Bancroft Way Berkeley, CA  94704 | 99-0648563 | 501(c)(3) | 190,178 | | | | MATS Funding |

**2** Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . . . . . . . . . . . . . . . ▶ 4
**3** Enter total number of other organizations listed in the line 1 table . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ 1

For Paperwork Reduction Act Notice, see the Instructions for Form 990.                    Cat. No. 50055P                    Schedule I (Form 990) 2023

— Page 2 —

Schedule I (Form 990) 2023                                                                                      Page **2**

| Part III | Grants and Other Assistance to Domestic Individuals. Complete if the organization answered "Yes" on Form 990, Part IV, line 22. Part III can be duplicated if additional space is needed. |
| --- | --- |

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
| --- | --- | --- | --- | --- | --- |
| (1) ACX Forecasting Mini Grants to individuals working on research and other projects to promote forecasting and prediction markets | 15 | 35,998 | 0 | | |
| (2) Regranting towards projects in AI safety effective altruism and existential risk prevention | 20 | 499,265 | 0 | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |

| Part IV | Supplemental Information. Provide the information required in Part I, line 2; Part III, column (b); and any other additional information. |
| --- | --- |

| Return Reference | Explanation |
| --- | --- |
| Part I Line 2 | Grantees sign a grant agreement before we release funds to them stating that they will provide regular updates on the use of funds through our website at manifund.org every 6 months. Grantees who do not fill out timely updates receive automated emails prompting them to explain how the funds were spent. All updates are posted publicly on our website. |
| Part III Column (b) | | Type of grant or assistance:, Number of recipients:, How number of recipients was estimated?:| ACX Forecasting Mini Grants to individuals working on research and other projects to promote forecasting and prediction markets, 15, Approximate number of grantees involved in the ACX Minigrants round| Regranting towards projects in AI safety effective altruism and existential risk prevention, 20, Number of grantees receiving funding for their work| |

Schedule I (Form 990) 2023

**Additional Data**                                                                            Return to Form

Software ID:
Software Version:

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**SCHEDULE L**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Transactions with Interested Persons

**Complete if the organization answered "Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.**
**Attach to Form 990 or Form 990-EZ.**
**Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2023**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| Manifold for Charity | 88-3668801 |

## Part I — Excess Benefit Transactions (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

2 Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 . . . . . . . . . . . . . . $ _____

3 Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . $ _____

## Part II — Loans to and/or From Interested Persons.
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a, or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total** . . . . . . . . . . . . . . . | | | | | $ | | | | | | | |

## Part III — Grants or Assistance Benefiting Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| (1) Manifold Markets Inc | Austin Chen is CEO of Manifold for Charity and cofounder of Manifold Markets Inc. with ~13% owned | 827,333 | Fiscal sponsorship | Certifying that the donation from Survival and Flourishing Fund will be used correctly |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat. No. 50056A    **Schedule L (Form 990) 2023**

— Page 2 —

Schedule L (Form 990) 2023    Page **2**

## Part IV — Business Transactions Involving Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Part V — Supplemental Information
Provide additional information for responses to questions on Schedule L (see instructions).

| Return Reference | Explanation |
|---|---|

## Additional Data

Return to Form

Software ID:
Software Version:

---

efile Public Visual Render | ObjectId: 202432909349300208 - Submission: 2024-10-16 | TIN: 88-3668801

**SCHEDULE O**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

**Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
Attach to Form 990 or 990-EZ.
Go to www.irs.gov/Form990 for the latest information.**

OMB No. 1545-0047

**2023**

Open to Public
Inspection

Name of the organization
Manifold for Charity

Employer identification number
88-3668801

| Return Reference | Explanation |
|---|---|
| Part III, line 2 | Impact Certificates: Venture funding for charitable endeavors. Regranting: A charitable donor delegates a grantmaking budget to individuals known as regrantors. Regrantors independently make grant decisions based on the objectives of the original donor and their own expertise. Open Call: Allow anyone to post a public grant proposal on the Manifund site for regrantors and the general public to fund |
| Part VI, Line 2 | \| Employee:, Relationship:, Employee:\| Austin Chen, Family Relationship, Rachel Weinberg\| |
| Part VI, Section B, Line 11b | No review was or will be conducted |
| Part VI, Section C, Line 19 | Available through our website on Notion |
| Part VII, List Of Officers | \| Employee Name:, Description:\| Rachel Weinberg, Rachel earned $120k y salary in 2023\| Austin Chen, Austin takes no salary from Manifold for Charity\| |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.     Cat. No. 51056K     Schedule O (Form 990) 2023

## Additional Data

Return to Form

Software ID:
Software Version:

# Exhibit 17

 Meetings

📅 Calendar view    ☰ List

| | | |
|---|---|---|
| 📋 AI for Good Regranting w/ Jim | | May 29, 2025 4:04 PM |
| 💎 Mox Standup @May 29, 2025 | mox | May 29, 2025 3:06 AM |
| 📙 Manifund Standup @May 29, 2025 | | May 29, 2025 3:05 AM |
| 💎 Mox Standup @May 28, 2025 | mox | May 28, 2025 3:05 AM |
| 🙌 Manifund All-hands @May 27, 2025 | | May 27, 2025 5:41 PM |
| 💎 Mox Standup @May 27, 2025 | mox | May 27, 2025 3:04 AM |
| 📙 Manifund Standup @May 27, 2025 | | May 27, 2025 |
| 🏷️ Manifund team sync 🔲 | | May 26, 2025 5:25 PM |
| 💎 Mox Standup @May 26, 2025 (Monday format) | mox | May 26, 2025 3:05 AM |
| 🏛️ Austin <> Ajeya | | May 23, 2025 3:49 PM |
| 💎 Mox Standup @May 23, 2025 | mox | May 23, 2025 3:07 AM |
| 💎 Mox Standup @May 22, 2025 | mox | May 22, 2025 3:02 AM |
| 💎 Mox Standup @May 21, 2025 | mox | May 21, 2025 3:05 AM |
| 💎 Mox Standup @May 20, 2025 | mox | May 20, 2025 3:04 AM |
| 🏃 Notes on Fractal Tech Hub | | May 19, 2025 10:41 AM |
| 💎 Mox Standup @May 19, 2025 (Monday format) | mox | May 19, 2025 3:05 AM |
| 💎 Mox Standup @May 16, 2025 | mox | May 16, 2025 3:04 AM |
| 💎 Mox Standup @May 15, 2025 | mox | May 15, 2025 3:00 AM |
| 💎 Mox Standup @May 14, 2025 | mox | May 14, 2025 3:06 AM |
| 🎇 Nishad S | | May 13, 2025 5:14 PM |
| ✒️ Robin Goins | | May 13, 2025 4:01 PM |
| 🙌 Manifund All-hands @May 13, 2025 | | May 13, 2025 1:29 PM |
| 💎 Mox Standup @May 13, 2025 | mox | May 13, 2025 3:01 AM |
| 💎 Mox Standup @May 12, 2025 (Monday format) | mox | May 12, 2025 3:03 AM |
| 🔵 Joey Talk Notes: Going Meta | | May 10, 2025 10:24 PM |
| 💎 Mox Standup @May 9, 2025 | mox | May 9, 2025 3:05 AM |
| 🚲 Vishal pitch | | May 8, 2025 3:29 PM |
| 💎 Mox Standup @May 8, 2025 | mox | May 8, 2025 3:05 AM |
| 💎 Mox Standup @May 6, 2025 | mox | May 6, 2025 3:03 AM |
| 💎 Mox Standup @May 5, 2025 (Monday format) | mox | May 5, 2025 3:08 AM |
| 🏎️ Mox & Arbor | mox | May 1, 2025 7:30 PM |
| 🎧 Sara Hudson (Director of Mox candidate) | mox | May 1, 2025 5:40 PM |

🎮 Fynn Heide — May 1, 2025 5:05 PM

🗓️ Volunteer Meetup @May 1, 2025 — mox — May 1, 2025 3:13 PM

🎋 Jacintha <> Austin — May 1, 2025 2:33 PM

🏷️ Jacky (Celo community manager) — mox — April 25, 2025 4:56 PM

💎 Mox Standup @April 25, 2025 — mox — April 25, 2025 3:02 AM

🔨 Jim Pugh on "AI for Good" Regrantor Cohort? — April 24, 2025 8:24 PM

📄 volunteer notes — mox — April 24, 2025 3:14 PM

💎 Mox Standup @April 24, 2025 — mox — April 24, 2025 3:04 AM

💎 Mox Standup @April 23, 2025 — mox — April 23, 2025 3:07 AM

📒 Manifund Standup @April 23, 2025 — April 23, 2025 3:06 AM

🎤 Jessie (NYC — April 22, 2025 4:04 PM

📰 april 22 saul rachel mattie arbor mox — mox — April 22, 2025 3:48 PM

✏️ Emma Vidal (Manifund/Mox intern?) — mox — April 22, 2025 3:33 PM

📄 Claire short x Rachel — mox — April 22, 2025 3:18 PM

📒 Manifund Standup @April 22, 2025 — April 22, 2025 3:03 AM

💎 Mox Standup @April 22, 2025 — mox — April 22, 2025 3:03 AM

📒 Manifund Standup @April 21, 2025 — April 21, 2025 3:08 AM

💎 Mox Standup @April 21, 2025 (Monday format) — mox — April 21, 2025 3:04 AM

💎 Mox Standup @April 18, 2025 — mox — April 18, 2025 3:04 AM

📒 Manifund Standup @April 18, 2025 — April 18, 2025 3:04 AM

📍 Bec Wilson — April 17, 2025 7:31 PM

🏗️ PIBBSS <> Austin — mox — April 17, 2025 7:11 PM

📄 Jesse x Gabe @April 18, 2025 — April 17, 2025 7:03 PM

🌤️ Rob, David, Michael: trading fund lawyers — April 17, 2025 4:03 PM

💎 Mox Standup @April 17, 2025 — mox — April 17, 2025 3:05 AM

📒 Manifund Standup @April 17, 2025 — April 17, 2025 3:05 AM

📒 Manifund Standup @April 16, 2025 — April 16, 2025 3:06 AM

💎 Mox Standup @April 16, 2025 — mox — April 16, 2025 3:06 AM

🍀 Sophia <> Austin — April 15, 2025 4:31 PM

💎 Mox Standup @April 15, 2025 — mox — April 15, 2025 3:03 AM

📒 Manifund Standup @April 15, 2025 — April 15, 2025 3:00 AM

🙌 All Hands @April 15, 2025 — April 15, 2025

🙌 All Hands @May 2, 2025                                                      April 15, 2025

📙 Manifund Standup @April 14, 2025                                April 14, 2025 3:01 AM

💎 Mox Standup @April 14, 2025 (Monday format)        mox    April 14, 2025 3:00 AM

🏚 GGI <> Manifund on deal                                              April 11, 2025 5:05 PM

💎 Mox Standup @April 11, 2025                                mox    April 11, 2025 3:01 AM

🗒 2F Scheming                                                           mox    April 10, 2025 6:09 PM

💎 Mox Standup @April 10, 2025                                mox    April 10, 2025 5:47 AM

📙 Manifund Standup @April 10, 2025                              April 10, 2025 5:43 AM

🏹 Clara Collier (Asterisk) on Manifund's writing            April 9, 2025 11:46 AM

📙 Manifund Standup @April 9, 2025                                April 9, 2025 3:00 AM

💎 Mox Standup @April 9, 2025                                 mox    April 9, 2025 3:00 AM

📙 Manifund Standup @April 8, 2025                                April 8, 2025 3:01 AM

💎 Mox Standup @April 8, 2025                                 mox    April 8, 2025 3:01 AM

📙 Manifund Standup @April 7, 2025                                      April 7, 2025

💎 Mox Standup @April 7, 2025 (Monday format)          mox    April 7, 2025 3:00 AM

📄 mox/arbor fri april 4                                           mox    April 4, 2025 8:07 PM

💎 Mox Standup @April 4, 2025                                 mox    April 4, 2025 3:00 AM

🔢 Seldon <> Austin                                                       April 3, 2025 8:41 PM

⑧ Dusan on PIBBSS                                                mox    April 3, 2025 4:07 PM

💎 Mox Standup @April 3, 2025                                 mox    April 3, 2025 3:05 AM

🎪 Ben (FLF), Michael (Quilt), Esben (Apart) quick chat         April 2, 2025 2:32 PM

💎 Mox Standup @April 2, 2025                                 mox    April 2, 2025 3:00 AM

💎 Mox Standup @April 1, 2025                                 mox    April 1, 2025 12:18 PM

💎 Mox Standup @March 31, 2025 (Monday format)        mox    March 31, 2025 3:01 AM

💎 Mox Standup @March 28, 2025                               mox    March 28, 2025 3:04 AM

📄 making mox communal                                            mox    March 27, 2025 4:05 PM

💎 Mox Standup @March 27, 2025                               mox    March 27, 2025 3:00 AM

🎗 Aidan O' Gara                                                        March 26, 2025 5:40 PM

☂ Ella <> Austin                                                         March 26, 2025 5:07 PM

💎 Mox Standup @March 26, 2025                               mox    March 26, 2025 3:26 AM

📄 Jesse, Noah, Collin @March 26, 2025                           March 25, 2025 6:03 PM

♨ Chris <> Austin                                                        March 25, 2025 5:01 PM

| | | |
|---|---|---|
| 💎 Mox Standup @March 25, 2025 | mox | March 25, 2025 5:14 AM |
| 💎 Mox Standup @March 24, 2025 | mox | March 24, 2025 3:53 AM |
| 💎 Mox Standup @March 21, 2025 | mox | March 21, 2025 4:32 AM |
| 🎎 Rach F on Manifest, Mox | | March 20, 2025 7:06 PM |
| 💎 Mox Standup @March 20, 2025 | mox | March 20, 2025 4:20 AM |
| 💡 Manifund Standup @March 19, 2025 | | March 19, 2025 3:06 PM |
| 💎 Mox Standup @March 19, 2025 | mox | March 19, 2025 4:44 AM |
| 🎎 Tamay & Edu (Epoch) <> Austin | | March 18, 2025 9:14 PM |
| 🎇 Manifund Standup @March 18, 2025 | | March 18, 2025 3:34 PM |
| 💎 Mox Standup @March 18, 2025 | mox | March 18, 2025 4:27 AM |
| 👝 Collin / Noa / Jesse on LLMs on polymarket | | March 17, 2025 7:19 PM |
| ✉️ Manifund Standup @March 17, 2025 | | March 17, 2025 2:46 PM |
| 📄 Jesse Michael Wheatley 1:1 @March 17, 2025 | | March 17, 2025 12:03 PM |
| 💎 Mox Standup @March 17, 2025 | mox | March 17, 2025 5:24 AM |
| 🎌 VARA Meeting Agenda @March 18, 2025 | | March 14, 2025 9:00 PM |
| 🕐 Jesse + Kalshi Team @March 14, 2025 | | March 14, 2025 6:21 PM |
| 🍖 Manifund Standup @March 14, 2025 | | March 14, 2025 2:43 PM |
| 🔨 1:1 Jesse, Charles @March 14, 2025 | | March 14, 2025 12:33 PM |
| 💎 Mox Standup @March 14, 2025 | mox | March 14, 2025 5:21 AM |
| 🔔 Manifest sync w/ Stephen & David @March 13, 2025 | | March 13, 2025 9:02 PM |
| 🍏 Manifund Standup | | March 13, 2025 2:33 PM |
| 💎 Mox Standup @March 13, 2025 | mox | March 13, 2025 4:54 AM |
| 🏯 Manifund Standup @March 12, 2025 | | March 12, 2025 2:35 PM |
| 💎 Mox Standup @March 12, 2025 | mox | March 12, 2025 2:13 PM |
| 🥩 Claire Short <> Austin | | March 11, 2025 4:03 PM |
| 🏫 Manifund Standup @March 11, 2025 | | March 11, 2025 3:01 PM |
| 💎 Mox Standup @March 11, 2025 | mox | March 11, 2025 5:03 AM |
| 🧠 Thoughts: AI Soup ⇒ The Curve | | March 10, 2025 4:47 PM |
| ♦️ Tue 3/11 walkthrough with mary grace | mox | March 10, 2025 4:17 PM |
| 💎 Mox Standup @March 10, 2025 | mox | March 10, 2025 2:07 PM |
| 🎾 "Mox Visitors" program | | March 7, 2025 5:38 PM |
| 💎 Mox Standup @March 7, 2025 | mox | March 7, 2025 5:43 AM |

| | | |
|---|---|---|
| 💎 Mox Standup @March 7, 2025 (test) | mox | March 7, 2025 |
| 💎 Mox Standup @March 6, 2025 | mox | March 6, 2025 4:43 AM |
| 💎 Mox Standup March 6 - Sample New Template | mox | March 6, 2025 |
| 🚲 Board Meeting Q1 2025 | | March 6, 2025 |
| 🎬 Far-UV Showcase | mox | March 5, 2025 6:38 PM |
| 📄 Rachel Austin 1:1 Mar 5 | mox | March 5, 2025 5:31 PM |
| 🔍 Rachel & Jared from Forkable Catering | mox | March 5, 2025 4:45 PM |
| 💎 Mox Standup @March 5, 2025 | mox | March 5, 2025 3:43 AM |
| 🎌 AI for Epistemics: Hackathon Retro | mox | March 4, 2025 9:29 AM |
| 💎 Mox Standup @March 13, 2025 | mox | March 4, 2025 4:45 AM |
| 💎 Mox Standup @March 3, 2025 | mox | March 3, 2025 4:34 AM |
| 💎 Mox Standup @February 28, 2025 | mox | February 28, 2025 4:07 AM |
| 🍵 QTB & Ought & Austin | | February 27, 2025 6:23 PM |
| 💎 Mox Standup @February 27, 2025 | mox | February 27, 2025 4:26 AM |
| 💎 Mox Standup @February 26, 2025 | mox | February 26, 2025 4:39 AM |
| 🚦 Tony & Max (Davidson Insurance) | mox | February 25, 2025 7:07 PM |
| 💎 Mox Standup @February 25, 2025 | mox | February 25, 2025 3:14 AM |
| 🧫 Jesse <> Manifund | | February 24, 2025 8:02 PM |
| 📍 Ara & Mox | mox | February 24, 2025 6:06 PM |
| 🌀 Feedback from LISA guests | mox | February 24, 2025 4:56 PM |
| 💎 Mox Standup @February 24, 2025 | mox | February 24, 2025 4:16 AM |
| 💎 Mox Standup @February 21, 2025 | mox | February 21, 2025 4:33 AM |
| 🎾 Austin <> Scott | | February 20, 2025 3:43 PM |
| 💰 Ara notes from visiting | | February 20, 2025 1:40 PM |
| 🏆 AI for Epistemics chat with Owen | | February 20, 2025 12:48 PM |
| 💎 Mox Standup @February 19, 2025 | mox | February 19, 2025 3:40 AM |
| 📄 Austin Rachel S strategy discussion | mox | February 18, 2025 8:05 PM |
| 🎩 QTB Retro on Mox | mox | February 18, 2025 4:43 PM |
| ⛑️ Mox: Retro on QTB | mox | February 18, 2025 3:12 PM |
| 📄 PYOL party prep | mox | February 17, 2025 6:13 PM |
| 🍱 Meeting with Ara | mox | February 17, 2025 3:06 PM |
| 💎 Mox Standup @February 17, 2025 | mox | February 17, 2025 4:31 AM |

| 💎 Mox Standup @February 14, 2025 | mox | February 14, 2025 5:31 AM |
| ♨️ Lee | | February 13, 2025 3:32 PM |
| 💎 Mox Standup @February 13, 2025 | mox | February 13, 2025 3:18 AM |
| 📄 Rachel/Raj | mox | February 12, 2025 6:02 PM |
| 🌈 Caithrin | | February 12, 2025 4:39 PM |
| 💎 Mox Standup @February 12, 2025 | mox | February 12, 2025 2:00 PM |
| 🧩 Rachel/Austin 1:1 | mox | February 11, 2025 5:35 PM |
| 📄 Pike (Meter wifi) | mox | February 11, 2025 4:33 PM |
| ✏️ Mox Standup Feb 11 | mox | February 11, 2025 2:05 PM |
| 🧹 Cleaning Services call with Mary (Cappstone) | mox | February 10, 2025 5:29 PM |
| 💎 Mox Standup @Yesterday | mox | July 15, 2025 3:02 AM |
| 🚀 FLF Retreat | | July 14, 2025 4:27 PM |
| 💎 Mox Standup @July 14, 2025 (Monday format) | mox | July 14, 2025 3:00 AM |
| 💎 Mox Standup @Last Friday | mox | July 11, 2025 3:07 AM |
| 💎 Mox Standup @Last Thursday | mox | July 10, 2025 3:01 AM |
| 💎 Mox Standup @Last Tuesday | mox | July 8, 2025 2:59 AM |
| 💎 Mox Standup @Last Monday (Monday format) | mox | July 7, 2025 3:01 AM |
| 💎 Mox Standup @July 4, 2025 | mox | July 4, 2025 3:00 AM |
| 💎 Mox Standup @July 3, 2025 | mox | July 3, 2025 3:04 AM |
| ✋ Hazel / Austin | | July 2, 2025 2:37 PM |
| 💎 Mox Standup @July 1, 2025 | mox | July 1, 2025 3:06 AM |
| 💎 Mox Standup @June 30, 2025 (Monday format) | mox | June 30, 2025 3:01 AM |
| 💎 Mox Standup @June 27, 2025 | mox | June 27, 2025 3:03 AM |
| 💎 Mox Standup @June 26, 2025 | mox | June 26, 2025 3:06 AM |
| 📒 Manifund Standup @June 26, 2025 | | June 26, 2025 3:02 AM |
| 💎 Mox Standup @June 25, 2025 | mox | June 25, 2025 3:02 AM |
| 💎 Mox Standup @June 24, 2025 | mox | June 24, 2025 3:03 AM |
| 📒 Manifund Standup @June 24, 2025 | | June 24, 2025 3:02 AM |
| 📒 Manifund Standup @June 23, 2025 | | June 23, 2025 3:07 AM |
| 💎 Mox Standup @June 23, 2025 (Monday format) | mox | June 23, 2025 3:05 AM |
| 🧨 Lydia + Nishad <> Kay Kozaronek notes: | | June 20, 2025 12:30 PM |
| 💎 Mox Standup @June 20, 2025 | mox | June 20, 2025 3:00 AM |

| | | |
|---|---|---|
| 🏙️ Jim Pugh <> Austin | | June 19, 2025 6:45 PM |
| 💎 **Mox Standup** @June 19, 2025 | mox | June 19, 2025 3:01 AM |
| 🧡 **Manifund Standup** @June 19, 2025 | | June 19, 2025 3:00 AM |
| 💎 **Mox Standup** @June 18, 2025 | mox | June 18, 2025 3:07 AM |
| 🚃 PIBBSS <> Mox | mox | June 17, 2025 5:05 PM |
| 💎 **Mox Standup** @June 17, 2025 | mox | June 17, 2025 3:03 AM |
| 🧡 **Manifund Standup** @June 17, 2025 | | June 17, 2025 3:03 AM |
| 🧡 **Manifund Standup** @June 16, 2025 | | June 16, 2025 3:06 AM |
| 💎 **Mox Standup** @June 16, 2025 **(Monday format)** | mox | June 16, 2025 3:04 AM |
| 📕 Comparing benchmarks | | June 13, 2025 2:09 PM |
| 💎 **Mox Standup** @June 13, 2025 | mox | June 13, 2025 3:00 AM |
| 🔊 Manifund Board Meeting Q2 2025 | | June 12, 2025 5:45 PM |
| 💎 **Mox Standup** @June 12, 2025 | mox | June 12, 2025 3:04 AM |
| 🧡 **Manifund Standup** @June 12, 2025 | | June 12, 2025 3:03 AM |
| 💎 **Mox Standup** @June 11, 2025 | mox | June 11, 2025 3:01 AM |
| 💎 **Mox Standup** @June 10, 2025 | mox | June 10, 2025 3:07 AM |
| 🧡 **Manifund Standup** @June 10, 2025 | | June 10, 2025 3:07 AM |
| 💎 **Mox Standup** @June 9, 2025 **(Monday format)** | mox | June 9, 2025 3:07 AM |
| 🦊 **Manifund: Markets in AI Safety [talk]** | | June 7, 2025 11:50 AM |
| 💎 **Mox Standup** @June 6, 2025 | mox | June 6, 2025 3:00 AM |
| 🧡 **Manifund Standup** @June 5, 2025 | | June 5, 2025 3:02 AM |
| 💎 **Mox Standup** @June 5, 2025 | mox | June 5, 2025 3:00 AM |
| 💎 **Mox Standup** @June 4, 2025 | mox | June 4, 2025 3:07 AM |
| 🧡 **Manifund Standup** @June 3, 2025 | | June 3, 2025 3:06 AM |
| 💎 **Mox Standup** @June 3, 2025 | mox | June 3, 2025 3:03 AM |
| 🧡 **Manifund Standup** @June 2, 2025 | | June 2, 2025 3:07 AM |
| 💎 **Mox Standup** @June 2, 2025 **(Monday format)** | mox | June 2, 2025 3:05 AM |
| 💎 **Mox Standup** @May 30, 2025 | mox | May 30, 2025 3:02 AM |
| 🧎 Mox Standup Feb 10 | mox | February 10, 2025 12:43 PM |
| 🏺 **Mox: EAIF app & notes** | mox | February 7, 2025 5:59 PM |
| 📓 Max Duran (Meter) | mox | February 6, 2025 7:02 PM |
| ✒️ Questions for Jacob | mox | February 6, 2025 4:14 PM |

| | | |
|---|---|---|
| 🕰️ Austin / Rachel Shu: Mox setup | mox | February 6, 2025 1:09 PM |
| 🔴 The Curve <> AI Soup | | February 5, 2025 5:38 PM |
| 🚂 Harri (EAIF) <> Austin | | February 4, 2025 11:33 AM |
| 🎮 Cecilia <> Austin notes | | January 23, 2025 |
| ⛰️ Beacon <> Austin | mox | January 21, 2025 4:13 PM |
| 🎎 Ari <> Austin | | January 16, 2025 6:39 PM |
| 🍪 Esben <> Austin | | January 16, 2025 5:01 PM |
| 👨‍🦰 Jonny Spicer <> Austin | | January 14, 2025 4:04 PM |
| 🪑 Austin <> Brian / Alex | | January 14, 2025 3:34 PM |
| 🛳️ Nikola <> Austin | | January 9, 2025 3:59 PM |
| 🏞️ Stephen/Austin sketching out Manifest 2025 | | December 19, 2024 7:41 PM |
| ♦️ Pause AI offboarding | | December 19, 2024 5:01 PM |
| 📗 Check in w/ Jacob | mox | December 19, 2024 3:34 PM |
| 🏞️ A space of our own, in SF [minifest] | mox | December 18, 2024 2:21 AM |
| 🏞️ A space of our own, in SF [minifest] | mox | December 14, 2024 2:24 PM |
| 🌍 Yutori, Quilt | mox | December 12, 2024 6:26 PM |
| 🪪 Lauren Milliken | mox | December 12, 2024 5:06 PM |
| ♠️ Structuring, with Ross | mox | December 10, 2024 8:01 PM |
| ☯️ Elizabeth / Austin | mox | December 10, 2024 6:04 PM |
| 🎏 Manifund meets Michael & co | mox | December 10, 2024 5:13 PM |
| 🎷 Quick Jacob chat | mox | December 6, 2024 6:36 PM |
| 🎞️ Solaris AI overview, w/ Jacob | mox | December 6, 2024 3:09 PM |
| ⚙️ Board Meeting Q4 2024 | mox | December 5, 2024 3:03 PM |
| ⏱️ Impact Portfolio | | November 21, 2024 1:13 PM |
| 🏉 Timothy | | November 19, 2024 6:10 PM |
| ⛱️ Sam Faber Manning | | November 14, 2024 7:57 PM |
| 🕰️ Timothy <> Austin | | November 12, 2024 6:08 PM |
| 🎪 Minifest w/ Ronny | | October 29, 2024 6:00 PM |
| ⚙️ Phil Trammel on forecasting LLMS | | October 29, 2024 4:03 PM |
| 🛶 Jack from JLL on finding housing | mox | October 24, 2024 |
| 🎦 Kevin Scott to def/acc | | September 18, 2024 7:58 AM |
| 🎦 Kevin Scott to def/acc | | September 12, 2024 9:28 PM |

| | |
|---|---|
| 🪨 Harri <> Austin on EAIF | August 29, 2024 4:05 PM |
| 🀄 Jacob <> Austin | August 19, 2024 6:03 PM |
| ♣ Rai Sur <> Manifund | August 13, 2024 5:20 PM |
| ☣ Julie Snider of PsychCrisis on returning funds | August 13, 2024 12:05 PM |
| 🕸 Matt Clifford | August 12, 2024 1:01 PM |
| 🌕 Sam Black Bloomburrow | August 6, 2024 7:09 PM |
| 💰 Jesse Richardson <> Austin on polymarket fund | August 6, 2024 6:36 PM |
| 🔵 Matt Clifford <> Austin | August 6, 2024 12:27 PM |
| 🔍 Notes from paying out to a bunch of charities | July 26, 2024 9:32 PM |
| ⏲ Changlin <> Austin | July 18, 2024 6:02 PM |
| 📄 Hanseul (Spark Capital) <> Austin | July 17, 2024 1:41 PM |
| 🎞 Board of Directors Q3 2024 | July 16, 2024 |
| 🧗 Caleb <> Austin on Manifund processing EA Funds | June 28, 2024 7:03 PM |
| 🔢 Questions for Natasha (BHB CFO) | June 25, 2024 2:03 PM |
| 🖊 Jaron (Barrel Head broker) | June 24, 2024 |
| 🖌 Jay Schreiber <> Austin | May 30, 2024 4:19 PM |
| 🎛 Holly/PauseAI <> Austin | May 28, 2024 5:34 PM |

# Exhibit 18

# MANIFEST 2025

A festival for forecasts, markets, and novel ideas.
Hosted by Manifold and Manifund.

📍 June 6–8 · Lighthaven, Berkeley, California

**Buy Tickets**    Place Bets

## NOTABLE GUESTS

They told us they're coming – bet on whether they will!


**Nate Silver**
Statistician & writer of Silver Bulletin
100%


**Scott Alexander**
Psychiatrist & writer of Astral Codex Ten
100%


**Michael Lewis**
Bestselling author of The Big Short & Moneyball
%


**Chris Best**
Cofounder & CEO of Substack
100%


**Robin Hanson**
Economist & professor
100%


**Noah Smith**
Economist & writer of Noahpinion
100%


**Emmett Shear**
CEO of Softmax, Cofounder of Twitch
100%

**Luana Lopes Lara**
Cofounder of Kalshi
%


**Aella**
Sex researcher & writer of Knowingless
100%


**Patrick McKenzie**
Writer of Bits About Money
100%


**Joe Carlsmith**
Senior researcher at Open Philanthropy
100%


**Allison Duettmann**
President & CEO of the Foresight Institute
100%



**Stephen Grugett**

CEO & Cofounder of Manifold

100%



**Roon**

OpenAI, online etazzi

100%



**David Shor**

Political forecaster, Head of Data
Science at Blue Rose Research

100%



**Laura Deming**

CEO of Cradle

100%

Plus good odds on:

| | | |
|---|---|---|
| Ada When | Aidan McLaughlin | Alex Gajewski |
| Cremieux | Danielle Fong | Dave White |
| David Holt | Divya Siddarth | Dylan Matthews |
| Dylan Patel | Eoghan McCabe | Gwern Branwen |
| Isabel Juniewicz | Jay Baxter | Jeremiah Johnson |
| Kevin Roose | Kyle Schiller | Lars Doucet |
| Lincoln Quirk | Mike Yao | Nate Soares |
| Noam Brown | Nuño Sempere | Oliver Habryka |
| Ozzie Gooen | Panda Smith | Ric Best |
| Richard Hanania | Rob Miles | Samo Burja |
| Samuel Hammond | Scott Sumner | Sholto Douglas |
| Steve Hsu | Tracing Woodgrains | |



Headline



Platinum





Gold





Silver







Want to sponsor Manifest 2025?
Take a look at our sponsor prospectus!

## RAVE REVIEWS



"All of a sudden I become aware that the muscles in my cheeks have been hard at work putting a huge smile on my face for the last hour and are all exhausted and crampy."

Rachel
Manifesting Manifest
RACHELWEINBERG.SUBSTACK.COM

"The Manifest conference has been a successful experiment: put enough introverts with common interests into a confined space and they'll spontaneously turn into extroverts."
— Byrne Hobart

"For much of my life, I have poured my attention into tough-to-explain solitary pursuits, finding myself often sitting in quiet corners on the fringes of gatherings wondering if they're worth the effort. Not so last weekend."
— TracingWoodgrains

"It's hard to describe the vibe at Manifest unless you were there. But it was part Burning Man, part prediction market science fair, part middle school talent show. It was utterly delightful."
— Devansh Mehta

# GALLERY



# MANIFEST NIGHT MARKET

**Friday, June 6 · 7–10 PM @ Lighthaven** 🌙
Free and open to the community

The Night Market is back for the third year! An open-air evening celebration of all things markets. It's a chance to meet people, share ideas, see strange gadgets, and wander around in a transcendent twilight. A Very Bay Area World's Fair and a fun attempt to manifest the futures.

Previous markets included but not limited to:

- **Job market:** trade your skills for other skills, or find your next gig
- **Stuff market:** arts, crafts, foods
- **Experience market:** mini games, fortunes
- **Book market:** got a book? essay? poem?
- **Information market:** like a poster session, without the standards
- **Black market:** naming rights to a baby's middle name, 'probiotics', etc



Interested in hosting a booth? → Apply here

Interested in the career fair portion? → Apply here

Manifest 2025    Home    Speakers    Sponsors    Rave Reviews    Gallery    Night Market    Contact    Schedule    Buy Tickets    Sponsored by    Polymarket

FREQUENTLY ASKED QUESTIONS

+ What is the address?

+ What time on Friday does Manifest start?

+ What sort of things happen at Manifest?

+ Who is Manifest for?

+ What does my ticket include?

+ Can I come for just part of the event?

+ Will housing be available for purchase?

+ Can I bring my kids?

+ I have more questions

CONTACT THE TEAM



**David Chee**
Head Organiser

david@manifest.is

**Rachel**
Lead Organiser

rach@manifest.is

**Austin Chen**
Advisor

austin@manifest.is

Join the Discord!

# Exhibit 19



Icosian Reflections

...a tendency to systematize and a keen sense
that we live in a richly mathe...

# When each proud fighter brags

**11 Jan 2025** death, eulogy, effective altruism, game theory

**content warning:** As heavy as this blog gets.

(1)

I met Max Chiswick in June of 2024 because I wrote something wrong on the internet. He tracked me down at <u>Manifest</u> to tell me so—I <u>had written</u> about the shortcomings of poker as a teaching tool, but I had made several wrong assumptions about how one would play poker *differently* with the goal of learning instead of recreation.

First, you'd play with two players instead of eight. We nearly always play with eight-ish players because we want a *relaxing* game, where large gaps in the action are considered a *feature*. With two players, though, not only is it your turn four times as often, but more of your decisions are "live" because it's correct to play more (initial) hands and there are fewer that you should fold on sight.

Second, you'd play a game with fewer chips—meaning that you'd make bets in coarser increments and with a smaller ratio of largest-possible bet to smallest-possible bet. This makes the decision tree shallower and more amenable to explicit case-by-case reasoning, and it also has the nice effect of making the highest-stakes decisions less terrifying (while keeping the stakes of bread-and-butter decisions suitably meaningful).

But most importantly, if you're playing poker as an exercise for training your mind, you should focus less on becoming a theoretically-optimal

robot. You can read books and blogs about "game theory optimal" play (*e.g.*, Nash equilibrium) and drill yourself to get arbitrarily accurate at executing it, but that's *simply not the useful part*.

The part of poker that makes you smarter—Max explained to me—is observing the non-optimal patterns in your opponents' play, and playing the *non*-Nash strategies that exploit *them*. Instead of assuming that you are playing against a perfect player and aiming only to avoid imperfection yourself, you ask "What evidence can I see? What does that suggest is happening right now? How should I act in the world I find myself in? Can I get even more information about this? How?" You play the game, to win, as if it were an imperfect microcosm of an imperfect world. Because it is.

Put that way, I was (and am) convinced that <u>my original post</u> was arguing against a <u>strawman</u>. I had never actually played the kind of poker that would make a fair comparison! And, as the conversation went on, I—*we*—got excited about co-authoring a post exploring just where my first one had gone wrong.

We met the day after the conference; Max moved his flight to the evening so we could keep talking. And things turned from my original blog post, to our respective (mostly shared!) thoughts about the value of teaching through games in general, the richness of "find out what works" versus "learn what theory says", and what we were each up to next. And we hatched an idea.

We could—we realized in that living room meeting— we could and *wanted to* write an online course that presented a vision of 'games to learn through' the way *we* thought it should be presented.

There are moments in life where, if you're paying attention, your future forks and you get a choice. The project which wasn't even a suspicion twenty-four hours ago is now a *possibility*.

You can leave it as just that, an interesting possibility for an interesting afternoon.

Or you can decide that, whatever your plans were yesterday, you're now doing *this*.

Once upon a time, on a different continent and two years before, I had written games to teach trading skills. (I was working at the time at a New-York-based proprietary trading firm.) I loved that work. If ever we solve all of the world's problems and there's nothing that's *important* to do but each of us figure out how to well, then I'll be making games that teach. But now I was working on something different. I thought.

*Screw that*, I decided to write a course on games. *We* decided to write a course on games. Max had planned to expand his AI Poker Tutorial into an online textbook, but together we'd to go after the larger—and more satisfying—goal of entirely re-building it around interactives and challenges instead of readings. Then, after we'd taught the course to a few hundred students, we could pull it into a textbook.

It was June; could we be ready for when colleges start in September? Sure. Well, should we ship a Minimum Viable Product sooner than that and figure out what worked? That would be good. When would we have to…

Four weeks, we decided, was how long we had to write our first ten-class course. We'd teach through the lens of 'writing AIs for games', taking our students to the point where they could replicate the state of the art in 2019 —when reinforcement-learning models beat human players in multi-player No-Limit Texas Hold 'em. Not with lectures, but with a series of weekly hands-on challenges. We were ambitious and a bit crazy—but hey, we were in San Francisco.

It being San Francisco, we did indeed launch our in-person beta on July 15 —one week later than our initial goal, but just five weeks after Max and I met for the first time—at the SF Commons. (The amazing Ricki Heicklen also helped us prep and run that first class.) Just over forty students turned out for the first day! We had an interactive-first reading and challenge for them to work through in pairs.



"I'm exercising a part of my brain that hasn't been used since college!" said one of our students, "I feel like this is the kind of [stuff] that staves off dementia!"

And so, in a scrappy, startup fashion, we made it through our five weeks. Our students wrote AIs for toy-sized poker variants and imbalanced rock-paper-scissors games. They—*we*—discovered bugs in my reference implementation of counterfactual regret minimization and experimentally determined the conditions needed for it to converge that I had misunderstood. (Then we discovered and fixed the bugs second implementation attempt.)

Max and I built the airplane as we flew it—we met Sunday and Monday to prep for Monday's class, took Tuesday off to recover, Wednesday and Thursday to prep Thursday's, and…

In the end, we didn't get to AIs playing full games of poker—but we learned an incredible amount about what we needed to make to get our students there. We felt that we could do it with weekly classes over ten weeks instead of twice-weekly classes over five.

I had told Max—I had told *myself*—that this was only going to be a part-time thing for me. But he kept showing up to work on it. And I found that I kept showing up too.

In September, we tried something different with a single-day hackathon (at Fractal Tech Hub) that challenged students to write programs to play rock-paper-scissors against a series of flawed opponents (and each other). Our participants had a blast ("Felt like a mix between LeetCode and an escape room… I've never done anything like it!") but we weren't satisfied. We thought it could be so much better if we spent a few weeks improving it.



**Last scoring round**

You: -0.15 × weight 2.99 | Tournament #73 | Started: 9/8/2024, 1:06:01 PM | Ended: 9/8/2024, 1:17:47 PM

| Player | Total Score | Round Score | CrazyGuy | thien | hucares | Elijer | rosory | chiness | mk20111 | Paper | Scissors | Rock | Surge | Morty | Blaine | Sabrina | Koga | Blue | RPSWiki | Whitney | Misty | Bugsy | Falkner | Erika | Baseline |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CrazyGuy | +517.26 | +42.35 | - | +20.95 | +1.75 | +5.40 | -0.15 | +5.45 | +0.55 | +99.55 | +99.30 | +99.95 | +54.90 | +87.60 | +99.00 | +99.45 | +32.00 | +99.50 | +24.20 | +34.35 | +25.10 | +22.75 | +9.75 | +8.50 | +1.90 |
| thien | +371.40 | +32.62 | -20.95 | - | +1.70 | -2.00 | -0.90 | +2.55 | -0.15 | +99.80 | +99.85 | +99.70 | +68.00 | +58.15 | +96.85 | +32.10 | +30.30 | +32.00 | +24.75 | +33.45 | +23.75 | +21.05 | +15.95 | +5.55 | -3.90 |
| hucares | +304.41 | +21.27 | -1.75 | -1.70 | - | -5.20 | -0.70 | -4.85 | +0.10 | +97.05 | +98.50 | +98.35 | +68.95 | -2.55 | -0.05 | +21.95 | +39.65 | -5.05 | +30.45 | -1.05 | +28.95 | -1.15 | +0.40 | +9.55 | -1.90 |
| Elijer | +185.28 | +16.10 | -5.40 | +2.00 | +5.20 | - | +2.05 | -3.55 | -1.65 | +67.00 | +67.25 | +66.60 | +44.80 | +30.00 | +2.85 | +5.45 | +22.85 | -0.65 | +9.10 | +13.80 | +15.50 | +3.50 | +0.65 | +6.85 | 0.00 |
| rosory | -0.71 | -0.15 | +0.15 | +0.90 | +0.70 | -2.05 | - | +0.60 | +2.05 | -0.65 | -0.50 | -1.70 | -0.95 | +0.85 | +1.15 | -1.30 | -2.95 | +2.80 | +2.50 | -2.55 | -0.45 | -4.85 | +1.55 | -0.55 | +0.95 |
| chiness | -31.35 | +17.53 | -5.45 | -2.55 | +4.85 | +3.55 | -0.60 | - | -0.80 | +79.95 | +78.20 | +77.70 | +40.20 | +42.75 | -3.90 | -0.75 | +12.10 | -0.85 | +8.45 | +20.30 | +4.00 | +20.70 | +8.45 | -0.50 | -0.25 |
| mk20111 | -52.36 | +0.16 | -0.55 | +0.15 | -0.10 | +1.65 | -2.05 | +0.80 | - | -0.15 | -0.45 | +1.35 | -0.90 | -0.15 | -2.40 | -0.40 | +0.05 | -1.85 | +1.20 | -0.90 | -0.35 | -0.90 | +3.95 | +2.00 | -1.20 |

**All scoring rounds**

[Expand All] [Collapse All]

[Expand] You: -0.15 × weight 2.99 | Tournament #73 | Started: 9/8/2024, 1:06:01 PM | Ended: 9/8/2024, 1:17:47 PM

[Expand] You: -0.14 × weight 2.49 | Tournament #71 | Started: 9/8/2024, 12:39:50 PM | Ended: 9/8/2024, 12:51:49 PM

[Expand] You: -0.73 × weight 2.07 | Tournament #68 | Started: 9/8/2024, 12:00:02 PM | Ended: 9/8/2024, 12:07:11 PM

[Expand] You: 0.31 × weight 1.73 | Tournament #63 | Started: 9/8/2024, 11:30:27 AM | Ended: 9/8/2024, 11:34:47 AM

[Expand] You: 0.33 × weight 1.44 | Tournament #58 | Started: 9/8/2024, 11:03:18 AM | Ended: 9/8/2024, 11:06:52 AM

[Expand] You: -0.11 × weight 1.20 | Tournament #57 | Started: 9/8/2024, 10:30:50 AM | Ended: 9/8/2024, 10:34:25 AM

[Expand] You: 0.72 × weight 1.00 | Tournament #50 | Started: 9/8/2024, 10:02:23 AM | Ended: 9/8/2024, 10:05:08 AM

A few days later, Max asked whether we could do it again at Recurse Center in about a week. We could let that be an interesting possibility—or we could decide to do it. We did it.



Max found a seed-stage venture accelerator that was running a batch for games startups. Were we a VC-backable games startup? Well, what would it look like if we were? The deadline was in—oops *what*, less than a week? Are we really doing this? Well, we put together our best concept for what we'd do if we were building a metaphorical rocketship instead of an airplane.



We were rejected. ("…transparently, it's still a little early even for [us].")

Well, what if we did it anyway? Max, bouncing between San Francisco and New York month-to-month, kept working. Could we turn our hackathon infrastructure into a daily challenge like an ultra-niche Wordle? Sure, we could make an MVP. Or, after a throwaway comment that he seized before it could float away, could we make a site that let you play poker against LLMs? He made enough of it that we couldn't *not* finish it, and so we did.



I think that a hackathon at Minifest is the first thing that we *didn't* say yes to—frankly, I just couldn't keep up—but we sketched out how to launch Hold'LLM (free to watch a few "featured" tables, or you could pay to run and customize your own). Max wrote a list of the tasks we needed to launch; I helped him finish it. I got distracted; he kept plugging away.

On Monday I learned that Max was dead.

He had felt fatigued traveling in Senegal, with something that felt like the a terrible flu. It got suddenly and dramatically worse as he made his way to Israel. It was actually a malaria infection that had reached his brain.

He was hospitalized on New Year's Day. And then he was gone.

**1.** Beginnings and endings

**2.** Reflecting on death

**3.** What's next

**4.** Remembering Max

**5.** Gratitude

# (2)

When my grandfather died, I wanted to treat it as an encounter with Death, a meeting face-to-face with humanity's oldest and last enemy, one loss in the fight for a future where humans did not have to die when they weren't ready just because that was easier than staying alive. I wanted it to be part of a story that was *bigger* than one life ending forever because then at least it could make some *sense*.

Even then, though, I knew that that frame was for my benefit, because the actual Man-Hyong Yoo lived a story where death wasn't a thing we could end. To him, death was a thing that we postponed while we accomplished what we could with—and for—the people who mattered to us.

In that post, I quoted from Wilfred Owen's "The Next War":

Oh, Death was never enemy of ours!
We laughed at him, we leagued with him, old chum.
No soldier's paid to kick against His powers.
We laughed,—knowing that better men would come,
And greater wars: when each proud fighter brags
He wars on Death, for lives; not men, for flags.

Max Chiswick died of malaria.

Max wanted to end malaria. He worked on ending malaria.

No, he wasn't a doctor or a researcher, but he gave money to GiveWell because he believed that *people not dying of malaria* was a thing he wanted turn his resources toward—and wanted more than anything else he could buy with those dollars—and because as a player of games he thought that GiveWell's research was the best bet he could find to put his dollars on.

As I count these things, Max Chiswick warred on Death, for lives.

Max cared about doing it right. After he won the Manifest charity poker tournament and so could choose which charity would get $30,000, he asked me if there was anyone who I thought could turn the dollars into more lives than GiveWell.

Well, I love the work that GiveWell does, but I admitted that I have become even more excited about 1Day Sooner, and so we discussed my reasons. He went off to talk with their CEO to find out more, because if he could save more lives with those dollars, that was worth getting right.

On the same day that we met in my living room and decided we'd write a course on AI poker, we agreed to set the business up as a nonprofit, because he—*we*—were happy to take at most modest salaries and send any windfall profits on to the charities we thought could use it best.

Or rather, he had already made up his mind to do that with his share. He brought it up to see if I was on the same page and we could set up the company to work that way by design instead of as a for-profit.

(In the end, we never did try to make a profit in those first six months. There were a few points where we could have shipped something to sell, but each time we thought it would be better to work a bit more towards something much bigger.)

A friend, when they heard about Max's death, yelled in the kind of frustration that has nothing to point at but the whole world entire: "But I *already* wanted no one to die of malaria forever! I'm already *doing* the things it makes sense to do about it!"

Yeah, that's pretty much where I am, too.

The work that I put on hold every day that Max showed up with another Google Doc or feature idea or half a plan to put on an event *was* to make a world safe from infectious disease—as best I know how with the skills and funds and plans I have. And I don't have any better ideas for what to *do* about the problem except…what I was already doing before I met Max, that I put on hold for a day, a week, or a season at a time to work with him on our love of games. And so this can't exactly *add* to the amount that I want nobody to die of malaria, or what I'm going to do about it.

I don't know if this makes me feel better or worse.

# (3)

You're not supposed to make sudden decisions at times like these, but I know that I won't be finishing the work we had planned to do together.

"I couldn't have done it without—" is a thing you're supposed to say to be gracious, but I know that I *would not have* stuck to the project week after week if Max didn't keep showing up.

I wasn't the best collaborator—I wasn't even a *good* collaborator—at the end. He would reach out three times to set up a coworking session, or a strategy call, or ask if I could fix a thing on the server that had taken

everything down, before I would get back with a reply, because I wasn't managing my time well and because I was too stuck in a loop of guilt and shame and avoidance to open up a conversation about what to do about it.

Until two days after Christmas—five days before Max was taken to the hospital and didn't come out—when I screwed up the courage to write to him about it.

I had written it a few days earlier, but didn't want to send it on Christmas.

I don't know if he ever read it. Maybe I'll feel better if *someone* does:

> "Happy holidays! Sorry that I've been afk.
>
> I've taken a bit of time to reflect on the projects that I have going on and, well, I have too many to be able to do them all well. I've been having a huge amount of fun with the time that I've spent on Overbet / Poker Camp / RPS things, and I'm really glad to have had that chance, but I think I just can't keep it up heading into 2025.
>
> I do continue to think the work is very cool! If you decide it makes sense to keep working on things in the space, and want to keep me in the loop, I might be excited to make occasional contributions (especially on metagame-design / experience-design things). But in that world I think it makes sense to make a hard reset from an assumption of "two equal partners" to "Max, who leads the project, plus Ross, who might or might not sometimes contribute to things". *[…]*
>
> Obviously, this should also mean a complete reset on expectations of ownership (both economically and in terms of decision-making), starting from a default that all of it is yours and none of it is mine. I'm happy to do the work of making sure you have all of the stuff I've worked on, and catching you up so you can do with it what you want.
>
> I feel bad to have done a kind of rush-forward-then-pull-back move here, but now that we're here, I think it would be even worse in the long term to keep trying to do things while pretending that I can be an equal partner. What I don't regret is, taking a chance on standing up

the scrappy things we did—they've been energizing, fun, and I've learned a bunch from what we've tried (and shipped!).

I recognize this might leave you a bit in the lurch technically (to the extent that Claude isn't a sufficient partner for backend development!), and I also feel bad about that. Without implying an obligation to either side, I know that [a mutual friend] is working with part-time technical talent *[…]* and it could make sense for you to work with them in a partnership for your technical needs. I'd encourage you to have that conversation, if so!

Again, thanks for the experience of all we've done since June. It's been great, and I'm glad that when the opportunity came up we chose to jump on it instead of letting it pass us by. ''

There are times that you tell the world that you *won't* let this stop you, that you *will* pick up this banner and carry it forward in your friend's name—

—and there are times where you don't do that. Where it would be painful and lonely and hollow and just *wouldn't make sense* to go it alone. When all you can do is put it down, because it only ever made sense to do it together.

I am going to work on teaching through games again someday. But the projects that I was working on with Max made sense because we were working on them together, and I wouldn't do myself—or his memory—a service by carrying them on alone.

For now I've made sure that a few underline(things) underline(that) underline(we) underline(made) underline(together) are working, but I don't know that I'll keep them online forever.

# (4)

What should I say about Max?

He was earnest and optimistic—unpretentious and generous—passionate and kind. He believed that we could just build things if we wanted to, and that it didn't need to be more complicated than that. I find it easy to get wrapped up in anxieties and doubts and paralysis when starting a new project, but when Max went first to break the ice, he just…started doing things. Programming. Organizing. Planning. He wrote first drafts, plans, and prototypes like breathing.

As far as I could tell, he ate a bag of carrots every day. If we took a break from working and a walk around the block together, we'd wander into the Trader Joe's; I wouldn't buy anything and he'd buy two bags of carrots. I mean, he ate <u>plenty else</u>, most of it intentionally planned, but you'd notice the carrots first.

I met him long after he had stopped playing poker professionally, and by then he didn't play it for the love of the game. But he cared *about* games, and he wanted people to understand games, like…like an art historian who rages at the impoverished experience of everyone who think that there's no point to representational art now that we have perfect photography.

He thought that games didn't become boring once they were "solved", because the world isn't made of abstract perfect opponents. And, for any game worth playing, you have to live and play in *this* world, not in the world of theory. Fortunately, the practice of playing games against imperfect opponents is so much more interesting and *richer* than the theory of Nash equilibria.

I believe these things about games, too. And <u>it is said</u> that friendship "is born at the moment when one man says to another, 'What! You too? I thought that no one but myself…'", so our friendship didn't take long at all to get off the ground.

He wanted the world to be better, and so in his un-anxious, Max-y way, went about doing what he could do about it. He had more money than he needed to make himself happy, and he gave it to charities that he thought could improve the lives of others. And he cared about his impact and not just his gestures, so GiveWell suited him well.

And, rare enough among those who care enough to take on the work of improving the world, he believed in taking on those little, in-effective projects that make your own heart sing. Max understood that hearts starve as well as bodies, and that living well meant doing what you love sometimes as well as what was important.

Even faster than he started things, he collected inspirations and ideas. He wanted to write "*Bet Mitzvah*, a set of materials that introduce betting and related concepts and the value that they can impart, especially as you become an adult." He wanted to fix certain shortcomings in the Pluribus paper (the first AI to beat serious human players at multiplayer poker), and wanted to write up his arguments and re-analysis. He wanted to make a site to track the quality of hotels' breakfast eggs. He wanted to ride a bicycle from LA to NYC eating supermarket rotisserie chicken every day, and made a site for tracking what Chabad houses he wanted to visit in the future (or for the countries you've visited, for the goyim among us).

He collected great URLs for his someday-projects with very little self-control. Just a few of them:

- poker.camp
- expectedvalue.org
- betmitzvah.com
- overbet.ai
- rps.bot
- bandits.band
- blotto.lol
- 1card.poker
- nerd.casino

- pokervschess.com
- kards4kids.co
- hoteleggs.com
- carrotmuseum.org
- chis.biz

I cannot stress enough that there are dozens more of these.

Max traveled. A friend of Max's <u>writing</u> at the substack *Old Jewish Men*:

> In the month before he died, Max was in New York, San Francisco, Miami, Turkey, Senegal, Singapore and Israel. And, we can only assume, dozens of Whole Foods locations.
>
> This, however, was typical. He was, somehow, in every country in the world while also in transit, chatting with you from 36,000 feet in the air. At one moment he was teaching probability and risk assessment to kids in Senegal, the next cruising a comped buffet in Vegas while also magically seeing you tomorrow for Shabbos dinner in Crown Heights.
>
> The lifestyle left friends confused yet impressed by his ability to juggle time zones. Somehow Max always managed to be where you needed him. He lived everywhere and nowhere. But he wasn't a ghost. He was the opposite: a constant presence in the lives of those he loved and who loved him. He could sleep on anything, and even preferred couches and floors…
>
> He was always on the move, with a backpack full of organic produce, bike helmet in hand, a tennis racket on his back, zip-off cargo pants and laceless Salomon shoes; he was usually coming from or going to some obscure place for some bizarre reason that made perfect sense only to him.

Max never took a taxi or Uber if he could ride a bike there instead. He cycled from Cairo to Cape Town, walked the length of Israel, and hiked

across Annapurna in Nepal.

Then there's things *I've* learned about Max in the past week. Back to <u>OJM</u>:

> He knew nothing of art history, but loved art and collected it with a joyful passion. He became known in the New York art world, particularly through his connection to 56 Henry, a well-known Lower East Side gallery.
>
> Friends who went to gallery openings with Max claim it was "like walking in with the king of England — everyone knew him." But his tastes were his own; he didn't pander. He was what one friend, an artist whose work Max collected, called "a deep diver who loved finding weird unknown artists like Paa Joe, Gaetano Pesce, lots of outsider artists and an obscure Hasidic artist named Pinny."
>
> He traveled endlessly, amassing a collection of nearly a thousand unique pieces, including works from Daniel Arnold, Al Freeman, Liorah Tchiprout, Ruby Bradford and Ohad Meromi…

Not at all surprising to me, however: "…His taste in art aligned with his taste in clothing and furniture — it was fun, and often carrot-themed."

Since we've gotten this far, I suppose we can take the time for a bit of standard obituary (again, thanks <u>*OJM*</u>):

> Max Jordan Chiswick was born on December 1, 1985 to Peter and Ellen Chiswick in London, England. He grew up in Chicago and studied Electrical Engineering at Northwestern, graduating in 2008. He completed his masters [in algorithmic game theory] at the Technion in Haifa in 2017 before spending eighteen weeks at the

Recurse Center, an independent educational institution for computer programmers, in 2019. It was during Chiswick's days as an undergrad that he began his career as an online poker player. Not much is known about Max's exact winnings, but he didn't hold a regular job for at least a decade and a half following his retirement from online gambling in the mid 2000s. At the height of Max's poker career, he was playing 100 hands a minute, and completed a challenge to play three million hands in a year.

Chiswick saw the writing on the wall when Artificial Intelligence entered online poker, and decided to exchange professional playing for teaching. He thought poker offered real-world tools that far exceeded the simple joys of casual gambling…

"

…and, well, that's where we started.

This is the picture of Max you'll find online most often, but I will forever be partial to this one instead, for obvious personal reasons:



From left to right, that's me, Max, and Nate Silver playing at the final table of the Manifest charity poker event. Nate and I were the second-and-third players to get knocked out (simultaneously); Max would go on to win.

(つ)

There are moments in life where, if you're paying attention, your future forks and you get a choice. Max and I sat in my living room in June and asked: "Are we going to try this crazy thing together?"

We had our respective well-laid plans; mine had no connection to teaching or games. We'd only just met each other. But there was the opportunity: to work on an audacious project that needed each of us to complement the other, on this subject that had both of us saying, "What! You too? I thought that no one but myself…"

I am so extraordinarily glad that we decided to go for it. For six-and-some months, I had the pleasure and privilege of working on one of my life's passions with an instant friend who was every bit as passionate about it as I am. I felt at the time that it was the kind of opportunity that doesn't come back around if you let it pass you by, but…I didn't expect that to be true like this.

Six months isn't a lot of time, on the scale of a life, but I am so grateful that I had the chance to share these months with Max Chiswick instead of letting the opportunity pass us by.

He was—more than most people are—important in the lives of those around him in many different ways. But in mine, the memories of our long walks and talks, our late nights spent hacking and planning for the future, and his quiet, daily example that making things you love doesn't have to be complicated, those memories will continue to be a blessing.

◀ Donations 2022-2024





14 Dec 2024

*...a tendency to systematize and a keen sense that we live in a deep world...*





© 2013–2025 Icosian Reflections · Techni-legal

# Exhibit 20



Icosian Reflections

...a tendency to systematize and a keen sense
that we live in a broken world...

# Donations 2022-2024

**14 Dec 2024** donations, effective altruism

> **editorial note:** This post is incomplete, but I'm publishing it in its
> current form in the hopes that it'll be helpful to other people thinking
> about their end-of-year donation decisions.
>
> While I, as ever, recommend that every serious donor use a donor
> advised fund to allow them to set donation amounts in tax year 2024
> and decide recipient organizations in early 2025, I do recognize that a
> post published on December 31 is worse than one published this
> week. So we're going with this experiment with an unfinished draft.
>
> This notice will be removed when I consider this post final.

This post describes my thoughts, at the end of 2024, about using
money to make the universe a better place. I remain committed to
using at least 10% of what income I earn to do so, and am excited to do
more than that when I have the opportunity.

This year marks the tenth anniversary of my first $4,000 donation to
GiveWell's top charities! (That donation was 10% of my summer
internship salary, plus some other campus jobs.)

A lot has changed since my last post in 2021, only some of which I'm able
to recap here. (I have tried to publish these posts annually, but missed 2022
and 2023 for idiosyncratic reasons.) I'll break this post into **(1)** general
discussion and personal outlook, *[incomplete]*, and logistics, **(2)** donations

by cause area for <u>2024</u>, <u>2023, and 2022</u>, and <u>summary lists</u>, **(3)** *[incomplete: events of 2022 and 2023]*, and <u>personal-policy updates</u>, and **(4)** <u>other people's writeups that I have found interesting</u>.

## (1A)

Shortly after <u>my last donations post</u>, I left a career in quantitative trading where I had been straightforwardly earning to give. I took up what I believed to be an opportunity to have much greater impact by helping to direct a substantial amount of funding more thoughtfully at a new effective-altruist grantmaker. Having walked on that side of the fence for a while, I now believe that the limiting factor to impact is less *money* than "executive agency", or the will to say "yes, we're doing this" or whatever else you'd like to call it.

The other interesting thing about leaving a career of five years is that within *weeks* of doing so, my thoughts about what it would be possible for me to do had broadened significantly. I now have *so many ideas* for things that I think will have (expected) impact greater than my earning to give.

So, while I expect to continue donating 10% of what I earn, and more when it feels good, I consider it likely that the largest part of my above-and-beyond contributions will come from choices about what I work on, rather than a greater percentage of donations above some earnings level.

## (1B)

Incomplete: Discussion of my current views on cause areas and why my personal focus is *not* on AI safety.

## (1C)

I continue to recommend the use of a donor-advised fund (DAF) to anyone making more than two charitable (non-political) gifts a year, whether or not

to EA causes. I don't have new recommendations on basic DAF providers; my existing provider (Vanguard Charitable) has given me no particular reason to switch away.

While I usually haven't kept substantial balances in my DAF, a few factors led to me unintentionally having nearly two years of donations backed up for much of 2024. At some point, I moved these to a DAF at Manifund *(disclosure: I sit on Manifund's board of directors)*.

As a benefit of holding my DAF assets at Manifund, I was then able to advise Manifund to invest them in certain short-term private investment opportunities. These were successful and grew the balance by a meaningful fraction of one year's donation budget.

The private investments would not have been possible at Vanguard Charitable, so I was happy to work with Manifund on this and pay their general rates for transaction handling. (Their team is small and pre-scale and they aren't able to run the business as a loss-leader like Vanguard can.)

I understand that the Manifund team is very open to having conversations about other ways they can provide differentiated DAF services, as they search for unmet needs in the EA-financial-infrastructure space, so if you have weird needs I'd encourage you to reach out. I can introduce you if you have difficulty getting in touch on your own.

# (2A)

The categories I discuss in this section are: global health and welfare (previously "global poverty"), biological risks, animal welfare, politics, community, and other.

I use qualitative sizes to describe my donations that match the terms I have used in 2019–2021. While I am more open to sharing explicit amounts than I had been until 2021, I still haven't made a final determination about my long-term strategy for disclosing donations. Since the information ratchet only goes one way, I'm holding off from explicit numbers for now.

I mention inline when I made donations to the same organizations in 2022 or 2023. As always, I associate donations with the year I *committed* to making them, rather than the year that I sent money or advised a grant from my DAF. An unusually high number of cases in these years were delayed for reasons I expect not to recur (which I mention here for transparency, as well as for any recipient organizations whose records don't match the writeups here).

(GLOBAL HEALTH AND WELFARE)

**Medium** donation to 1Day Sooner, ending infectious diseases by empowering movements in science, policy, and ethics. (2023: **small**)

**Small** donation to GiveWell *(unrestricted funds)*, fighting global poverty and disease with evidence-backed interventions. (2023: **medium**; 2022: **large**)

I have donated to GiveWell every year since 2014, and I continue to believe that they do excellent work at finding the strongest evidence-backed interventions for improving global health and welfare. That said, I have come to believe that *non*-evidence-backed global health interventions— chances to move the needle on unprecedented opportunities—can have even greater expected impact.

There is no nonprofit organization that I am more excited to have working on these kinds of global health problems than 1Day Sooner, pound-for-pound and dollar-for-dollar. I've worked extensively with their indoor air quality research/policy team since 2022 and I particularly think that Gavriel Kleinwaks's work is great; I've followed more passively as their pharmaceutical-advocacy efforts have expanded from a focus on Human Challenge Trials to more opportunistic engagements across the global health landscape, and I am excited about those directions as well.

For a concrete example: their most recent direct work on global health and welfare was on policy work aiming to accelerate deployment of the R21 malaria vaccine. The vaccine has been estimated to have comparable QALY/$ to existing GiveWell interventions (1; 2; before the vaccine has had the chance to benefit from scale or learning effects)—but rather than

directly finding vaccine deployment, they focused on policy advocacy to convince other actors to move faster. In this context, as I understand it, "policy advocacy" might mean meeting with agency-level government officials, NGO staff, and similar stakeholders to understand where the true bottlenecks are, and seeing if they can be cleared by small, targeted pushes. This work, if done well, can multiply the impact of dollars spent on dollars moved.

For a longer-form (though less-cutrent) case for 1Day's work, see their CEO's 2021 post on the EA forum (and check the top comment, by Open Philanthropy global health and welfare program director Jacob Trefethen).

If I had to pick just one organization to support in global health, it would be 1Day. However, I'm tapering off my GiveWell donations over three years (2023-2025) as:

- I believe it's best practice to smooth changes to nonprofit funding where possible, and
- I continue to be reasonably happy with their work overall.

I think it's likely that my donations to GiveWell will actually stabilize at some nonzero level in the range I'm calling "small", but you'll have to tune in next year (and thereafter) to find out!

*Note: More than any other organization I've donated to, I consider the folks at 1Day to be friends and it's of course possible that that colors my judgment.*

## (BIOLOGICAL RISKS)

I believe that some of the most exciting marginal opportunities for preventing or mitigating biological risks (besides 1Day Sooner's incidental impacts in the cause area, which are nontrivial) are in accelerating commercially-viable anti-infective drugs (and drug platforms) to stock humanity's toolbox against future pandemics.

While there's a good deal of nonprofit work in the field of biosecurity that is clearly helpful, I honestly feel that accelerating the commercially-viable pharmaceuticals segment is particularly neglected and tractable. This is

where the majority of my "EA labor" has gone in the past two years (as well as in my professional work the year before that).

In 2024 I was/am involved in raising funds for two startups developing antivirals (and in 2023 I made a personal investment in a third). While I don't consider my personal investments in these drug companies to be donations, the 2024 fundraises rise to the level of the other donations on this list if I value the *time* I spent on fundraising at my work-for-profit compensation rates.

> Incomplete: still developing an opinion about whether these are cost-effective in dollars

If I were deploying dollars to nonprofits in the biorisk field, I would be considering:

- SecureBio, developing tech and policy to delay, detect, and defend against catastrophic pandemics.
- Blueprint Biosecurity, developing actionable roadmaps for new defenses against pandemics.
- The JHU Center for Health Security, exploring policy, science, and tech that can strengthen health security and save lives.

(ANIMAL WELFARE)

**Small** donation to the Good Food Institute *(split between GFI Europe and GFI Asia–Pacific)*, supporting the science, technology, and public policy to replace industrial animal agriculture and all its harms. (2023: **small**; 2022: **medium**)

Since my push to familiarize myself with GFI's work on animal welfare in 2019, I've tried to keep abreast of their work but frankly I have less of an informed view than I used to. My donations have largely tapered off as a reflection of my overall donation budget; if I were giving a larger total amount I would want to spend more time deciding between giving a larger amount or tapering this off.

GFI's international operations continue to be my favorite donation opportunities in the animal welfare field, for reasons I've discussed in prior years.

## (POLITICS)

**Medium** donations *(in total)* to nondisclosed political opportunities. (2023: **none**; 2022: **large**)

I continue to not release the details of these donations (other than their annual size) by default.

## (COMMUNITY)

Lightcone Infrastructure runs excellent events and a community space in Berkeley. I have attended something like half-a-dozen events of theirs in the past year and found them to be consistently excellent. The events and projects that they host and self-support tend to focus on supporting a Bay-Area community of people who care deeply about human flourishing now and in the future, and want to figure out the best way to have more of it.

I believe there is a strong case for considering a donation to Lightcone to be among the best opportunities in "close to home" effective-altruist community building. (I'll leave it to your judgment how that cause area segment compares to others.) In a world barely different from this one, I expect I would donate between $1,000 and $5,000 to their general fundraiser this year.

However, I've decided to make **no donation** instead, for the somewhat idiosyncratic reason that I'm organizing a personal event there next year and bringing them several times that in direct revenue. Given that, it seems odd to also be making a donation. Check back in for my thoughts in 2026.

## (OTHER)

EA Community Choice was a funding experiment by Manifund that airdropped a few hundred DAF dollars to each of several hundred people and then allocated additional funding to their donees according to a 'quadratic funding' mechanism.

I didn't spend a tremendous amount of time on research on allocating my $600 (given the relatively small dollars involved), and most established orgs that I was familiar with were not participating, but for the record, I allocated my funds to:

- Qally's Consulting, "Estimating annual burden of airborne disease": $200 [TK]
- Cambridge Infectious Diseases, "Preventing Worst-Case Pandemics" symposium: $100
- Elizabeth van Nostrand, retroactive funding forCovid-19 research: $100
- Lightcone Infrastructure: $100
- Sentinel: $100

## (2022/2023 ONLY)

*(This section includes only donations that I did* not *repeat in 2024. See the sections above for the 2022 and/or 2023 components of organizations I did donate to this year.)*

**Large** donations committed in each of 2023 and 2022 to *[recipient withheld]* contingent on *[details witheld]*, logistics pending.

**Small** donation in 2022 to the Quantified Uncertainty Research Institute.

> Incomplete: Details and any additional 2022/2023 donations.

## (2B)

In summary, for 2024:

- **Medium** donation to 1Day Sooner, ending infectious diseases by empowering movements in science, policy, and ethics.
- **Medium** donations *(in total)* to nondisclosed political opportunities.
- **Small** donation to GiveWell *(unrestricted funds)*, fighting global poverty and disease with evidence-backed interventions.
- **Small** donation to the Good Food Institute *(split between GFI Europe and GFI Asia–Pacific)*, supporting the science, technology, and public policy to replace industrial animal agriculture and all its harms.
- **No direct donations** *(but a good deal of professional work)* for biological risks; if I did then I would be considering SecureBio and the JHU Center for Health Security
- **No donation** to EA community-building (though if I did it would be to Lightcone Infrastructure)

For 2023, it was:

- **Large** donation to *[recipient witheld]* contingent on *[details witheld]*, logistics pending.
- **Medium** donation to GiveWell *(unrestricted funds)*, fighting global poverty and disease with evidence-backed interventions.
- **Small** donation to 1Day Sooner, ending infectious diseases by empowering movements in science, policy, and ethics.
- **Small** donation to the Good Food Institute *(split between GFI Europe and GFI Asia–Pacific)*, supporting the science, technology, and public policy to replace industrial animal agriculture and all its harms.
- **No donations** to political opportunities.

and for 2022:

- **Large** donation to GiveWell *(unrestricted funds)*, fighting global poverty and disease with evidence-backed interventions.
- **Large** donations *(in total)* to nondisclosed political opportunities.
- **Large** donation to *[recipient witheld]* contingent on *[details witheld]*, logistics pending.
- **Medium** donation to the Good Food Institute, (split between GFI Europe and GFI Asia–Pacific), supporting the science, technology, and public policy to replace industrial animal agriculture and all its harms.

- **Small** donation to the <u>Quantified Uncertainty Research Institute</u>.

## (3A)

> Incomplete: Discussion of events of 2022 and 2023 particularly as they interact with my donations posture and plans.

## (3B)

In 2023 and 2024 a great deal of my professional focus has been on private investments—finding them, evaluating them, and fundraising for them. This has required me to rethink a bit what exactly "what I earn" means in the context of my 10% pledge. What portion of a given investment's profits is "earned" versus a simple return on (post-pledge) capital?

Here are a few personal policies I am trying on in 2024 and 2025 to get more information about whether they seem to work well (with both the practicalities of the world and the 10% donation pledge I took in 2016). I'm not considering them *commitments* so much as *current practices*.

**(1: private investment returns)** I've written more extensively in *[incomplete: unpublished draft]*, but the short version is that I intend to make private investments and reinvestments using *pre-pledge dollars* and by default earmark 10% *of the shares* as pledged and 90% as post-pledge. This gives me the ability to liquidate portions of an investment for personal return/consumption at different times than I liquidate the portion for charity, while allocating a fair 10% of the available excess returns to charitable ends.

In my internal accounting, I credit myself for 10% of the value of the investment at the time of investment (pre-pledge dollars turning into donated assets plus post-pledge assets), and do not consider the returns on the corresponding 10% of the stake as a further donation (nor the profits on the 90% as additional income for the purposes of my 10% pledge).

**(2: investment returns 100% within a DAF)** When I make a private investment that is the result of effort and/or skill *within* a DAF or other post-donation vehicle (as I did within my Manifund DAF this year), I credit the realized profits as a donation of labor comparable to dollars for pledge purposes. (This puts it on equal footing with "make private investments with undonated funds, then donate all the proceeds", as 100% of the proceeds will have to stay in the DAF.) For fairness, I also intend to count any realized losses as a "negative donation" offsetting positive DAF contributions in my internal accounting of my 10% pledge obligations.

**(3: stock/options compensation)** When I receive stock or stock options as compensation for work, I earmark 10% of them as pledged and the remainder as post-pledge, regardless of when I choose to liquidate each portion. In my internal accounting, I credit myself for 10% of the taxable value at the time of vesting, (though this will often be zero for stock options with strike set to fair market value).

## (4)

Writeups from other sources that I found it interesting to read this season:

- GiveWell's 2024 Giving Recommendations
- GiveWell: Staff Members' Personal Donations for 2024
- Open Philanthropy: Suggestions for Individual Donors from Open Philanthropy Staff – 2024
- Where Open Phil staff are making personal donations in 2024
- Jacob Trefethen: Effective Nonprofits
- Survival and Flourishing Fund: Recommendations for Further Funding Opportunities Based on the SFF-2024 S-Process Round
- Zvi Mowshowitz: The Big Nonprofits Post
- Zvi Mowshowitz: Thoughts on the Survival and Flourishing Fund 2024 Round
- many individual comments on Lightcone Infrastructure by users of LessWrong

◀ Drug development costs can range over two orders of magnitude

When each proud fighter brags ▶

...a tendency to systematize and a keen sense
that we live in a strange world...

© 2013–2025 Icosian Reflections · Techni-legal



# Exhibit 21

BYLAWS
For MANIFOLD FOR CHARITY

## ARTICLE I PRINCIPAL OFFICE

The principal office of this corporation shall be located at 1621 E. 6th Street, Unit 1440, Austin, TX 78702.The Board of Directors (the Board) may change the location of the principal office from time to time.

## ARTICLE II MEMBERSHIP

This corporation shall have no voting members, but the Board of Directors may, by resolution, establish one or more classes of nonvoting members and provide for eligibility requirements for membership and rights and duties of members, including obligation to pay dues.

## ARTICLE III BOARD OF DIRECTORS

Section 1. Powers. This corporation shall have powers to the full extent allowed by law. All powers and activities of this corporation shall be exercised and managed by the Board of Directors of this corporation directly or, if delegated, under the ultimate direction of the Board.

Section 2. Number of Directors. The number directors shall not be less than three nor more than nine, with the exact number of authorized directors to be fixed from time to time by resolution of the Board of Directors.

Section 3. Limitations on Interested Persons. At all times, not more than 40% of the directors of this corporation may be interested persons. An interested person means either:

a. Any person currently being compensated by this corporation for services rendered to it within the previous six months, whether as a full-time or part-time employee, independent contractor, or otherwise, excluding an reasonable compensation paid to a director in his or her capacity as director; or

b. Any brother, sister, ancestor, descendant, spouse, brother in law, sister in law, son in law, daughter in law, mother in law, or father in law of any such person.

Section 4.

Until a successor has been elected, provided that the Chief Executive Officer shall automatically become a director by virtue of that office and provided also that the running of the term if the director shall be suspended for all officers during the time served as an officer. Directors other than the Chief Executive Officer may be re-elected to successive terms.

Election and Term of Directors. Each director shall be elected for a term of four years.

_____

A. Staggered Terms. One third of the total authorized number of directors shall be elected in each year. If the total authorized number of directors at any time shall not be evenly divisible by three so that a different number of directors must be elected in certain years, the Board of Directors shall make its best effort to equalize the numbers of director terms expiring in each year.

B. Term Endings. The term of office of each director shall end on December 31 of the applicable year.

Section 5. Vacancies. A vacancy shall be deemed to exist on the Board in the event that the actual number of directors is less than the authorized number for any reason. Vacancies may be filled by the remaining directors for the unexpired portion of the term.

Section 6. Resignation and Removal. Resignations shall be effective upon receipt in writing by the Chair, the Chief Executive Officer, the Secretary, or the Board of Directors of this corporation, unless a later effective date is specified in the resignation. Any director who does not attend at least a majority of regularly scheduled Board meetings during each year of his or her term in office may be asked, in the discretion of the Board, to resign as a director. A majority of the directors then in office may remove any director at any time, with cause.

Section 7. Annual Meetings. A meeting of the Board of Directors shall be held at least once a year. Annual meetings shall be called by the Chair, the Chief Executive Officer, or any two directors, and noticed in accordance with Section 9.

Section 8. Special Meetings. Special meetings of the Board of Directors may be called by the Chair, the Chief Executive Officer, or any two directors, and notices in accordance with Section 9.

Section 9. Notice. Notice of the annual meeting and any special meetings of the Board of Directors shall be given to each director at least one week before any such meeting if given personally or telephone, telegraph, or facsimile transmission, and shall state the date, place, and time of the meeting.

Section 10. Quorum. Two-thirds of directors in office shall constitute a quorum. The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, except as otherwise provided. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for such meeting. Directors may not vote by proxy.

Section 11. Action Without a Meeting. Any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board shall individually or collectively consent to such action. Such written consents shall be filed with the minutes of the proceedings of the Board. Such written consents shall have the same force and effect as the unanimous vote of such directors.

Section 12. Telephone, Email, and Video Meetings. Directors may participate in a meeting through use of conference telephone, electronic video screen communication, email, or other electronic transmission in compliance with Article VIII, Section 5 of these Bylaws so long as all of the following apply:

a. Each director participating in the meeting can communicate with all of the other directors at the meeting concurrently or serially, and

b. Each director is provided with the means of participating in all matters before the Board, including the capacity to propose, or to interpose an objection to, a specific action to be taken by the corporation.

Participation in a meeting pursuant to this Section constitutes presence in person at such meeting.

Section 14. Standard of Care.

A. General. A director shall perform the duties of a director, including duties as a member, in good faith, in a manner such director believes to be in the best interest of this corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like situation would use under similar circumstances.

In performing in duties of a director, a director shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, in each other case prepared or presented by:

i. one or more officers or employees of this corporation whom the director believes to be reliable and competent as to the matters presented;

ii. counsel, independent accountants, or other persons as to matters which the director believes to be within such person's professional or expert competence.

So long as in any such case, the director acts in good faith after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

A person who performs the duties of a director in accordance with this Section shall have no liability based upon and failure or alleged failure to discharge that person's obligations as a director, including, without limiting the generality of the foregoing, any actions or omissions which exceed or defeat a public or charitable purpose to which a corporation, or assets held by it, are dedicated.

B. Investments. Except with respect to assets held for use or used directly in carrying out this corporation's charitable activities, in investing, reinvesting, purchasing or acquiring, exchanging, selling, and managing this corporation's investments, the Board shall avoid speculation, looking instead to the permanent disposition of the funds, considering the probable income as well as the probable safety of this corporation's capital. No investment violates this Section where it conforms to provisions authorizing such investment contained in an instrument or agreement pursuant to which the assets were contributed to this contribution.

Section 15. Inspection. Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents, and to inspect the physical properties of this corporation.

Section 16. Compensation. The Board of Directors may authorize, by resolution, the payment to a director of a reasonable fee for services and/or expenses as a director and for attending meetings of the Board.

‗‗‗‗‗‗‗‗‗ ‗‗‗‗‗ ‗‗‗‗‗‗‗ ‗‗‗‗‗‗ ‗‗‗‗‗‗‗‗

Section 17. Executive Compensation Review. The Board of Directors shall review any compensation packages (including all benefits) of the Chief Executive Officer, the Treasurer, and the Secretary, and shall approve such compensation only after determining that the compensation is just and reasonable. This review and approval shall occur when such officer is hired, when the term of employment of such officer is renewed or extended, and when the compensation of such officer is modified, unless the modification applies to substantially all of the employees of this corporation.

ARTICLES IV COMMITTEES

Section 1. Board Committees. The Board of Directors may, by resolution adopted by a majority of the directors then in office, create any number of Board Committees, each consisting of two or more directors, to serve at the pleasure of the Board. Appointments to any Board Committee shall made by any method determined by a majority vote of the directors then in office. Board Committees may be given all the authority of the Board, except for the powers to:

- set the number of directors within a range specified in these Bylaws

- elect directors or remove directors without cause;

- fill vacancies on the Board of Directors or any Board Committee;

- fix compensation of directors for serving on the Board or any Board Committee;

- amend or repeal these Bylaws or adopt new Bylaws;

- adopt amendments to the articles of Incorporation of this corporation;

- amend or repeal any resolution of the Board of Directors which by its express terms is not so amendable or repealable;

- create any other Board Committees or appoint the members of any Board Committees; or

- approve and merger, reorganization, voluntary dissolution, or disposition of substantially all of the assets of this corporation.

Where it is not reasonably practicable to obtain approval of the Board before entering into a self-dealing transaction, a Board Committee may approve such transaction in a manner consistent with the requirements of Section 3 of Article VI of these Bylaws; provided that, at its next meeting, the full Board determines in good faith that the Board Committee's approval of the transaction was consistent with the requirements in Section 3 of Article VI and that it was not reasonably practical to obtain advance approval by the full Board, and ratifies the transaction by a majority of the directors then in office without the vote of any interested director.

Section 2. Advisory Committees. The Board of Directors may establish one or more Advisory Committees to the Board. The members of any Advisory Committee will consist of non-directors and may be appointed as the Board determines. Advisory committees may not exercise the authority of the Board to make decisions on behalf of this corporation, but shall be restricted to making recommendations to the Board or Board Committees, the implementing Board or Board Committee decisions and policies under the supervision and control of the Board.

The Board of Directors may adopt rules for the governance of any Board or Advisory Committee not inconsistent with the provisions of these Bylaws.

The Advisory Committee shall: (1) recommend to the Board of Directors the retention and, when appropriate, the termination of an independent certified public accountant to serve as auditor, (2) negotiate the compensation of the auditor on behalf of the Board, (3) confer with the auditor to satisfy the Board

Committee members that the financial affairs of this corporation are in order, and (4) approve performance of any non-audit services provided to this corporation by the auditor's firm.

ARTICLE V OFFICERS

Section 1. Officers. The officers of this corporation shall be a Chair of the Board, a Chief Executive Officer, a Secretary, and a Treasurer. The corporation may also have, at the discretion of the directors, such other officers as may be appointed by the Board of Directors. Any number of offices may be held by the same person, except that neither the Secretary nor the Treasurer may serve concurrently as the Chief Executive Officer, all officers shall be elected from among the directors of the corporation.

Section 2. Election. The officers of this corporation shall be elected annually by the Board of Directors, and each shall serve at the pleasure of the Board, subject to the rights, if any, of an officer under any contract of employment.

Section 3. Removal. Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, with cause, by the Board of Directors or by an officer on whom such power of removal may be conferred by the Board of Directors.

Section 4. Resignation. Any officer may resign at any time by giving written notice to the Chair, the Chief Executive Officer, or the Secretary of this corporation. Any resignation shall take effect on receipt of that notice by such officer or at any later time specified by that notice and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of this corporation under any contract to which the officer is a party.

Section 5. Vacancies. A vacancy in any office for any reason shall be filled in the same manner as these Bylaws provide for election to that office.

Section 6. Chair of the Board. The Chair shall preside at all meetings of the Board of Directors. The Chair shall have such other powers and duties as may be prescribed by the Board or these Bylaws.

Section 7. Chief Executive Officer. The Chief Executive Officer shall, subject to control of the Board, generally supervise, direct and control the business and other officers of this corporation. The Chief Executive Officer shall have the general powers and duties of management usually vested in the officer of Chief Executive Officer of the corporation and shall have such other powers and duties as may be prescribed by the Board or these Bylaws. The Chief Executive Officer shall also automatically serve as a member of the Board of Directors, with full rights and privileges.

Section 8. Secretary. The Secretary shall supervise the keeping of a full and complete record of the proceedings of the Board of Directors and its committees, shall supervise the giving of such notices as may be proper or necessary, shall supervise the keeping of the minute books of this corporation, and shall have such other powers and duties as may be prescribed by the Board or these Bylaws.

Section 9. Treasurer. The Treasurer shall be the chief financial officer of this corporation, shall supervise the charge and custody of all funds of this corporation, the deposit of such funds in the manner prescribed by the Board of Directors, and the keeping and maintaining of adequate and correct accounts of this corporation's properties and business transactions, shall render reports and accountings as required, and shall have such others powers and duties as may be prescribed by the Board or these Bylaws.

ARTICLE VI PROHIBITED TRANSACTIONS

Section 1. Approval. This corporation may engage in a self-dealing transaction if the Board determines, before the transaction, that (a) this corporation is entering into the transaction for its own benefit; (b) the transaction is fair and reasonable to this corporation at the time; and (c) after reasonable investigation, the Board determines that it could not have obtained a more advantageous arrangement with reasonable effort under the circumstances. Such determinations must be made by the Board in good faith, with knowledge of the material facts concerning the transaction and the director's interest in the transaction, and by a vote of a majority of the directors then in office, without counting the vote of the interested director or directors.

ARTICLE VII MISCELLANEOUS

Section 1. Fiscal Year. The fiscal year of this corporation shall end each year on December 31.

Section 2. Contracts, Notes, and Checks. All contracts entered into on behalf of this corporation must be authorized by the Board of Directors or the person or persons on whom such power may be conferred by the Board from time to time, and, except as otherwise provided by law, ever check, draft, promissory note, money order, or other evidence of indebtedness of this corporation shall be signed by the person or persons on whom such power may be conferred by the Board from time to time.

Section 3. Annual Reports to Directors. Within 90 days after the end of this corporation's fiscal year, the Chief Executive Officer shall furnish a written report to all directors of this corporation containing the following information:

(a). the assets and liabilities, including the trust funds of this corporation, as of the end of the fiscal year;

(b). the principal changes in assets and liabilities, including trust funds, during the fiscal year;

(c). the revenue or receipts of this corporation, both unrestricted and restricted for particular purposes, for the fiscal year;

(d). the expenses or disbursements of this corporation, for both general and restricted purposes, for the fiscal year; and

(e). any transaction during the previous fiscal year involving $50,000.00 or more between this corporation (or its parent or subsidiaries, if any) and any of its directors or officers (or the directors or officers of its parent or subsidiaries, if any) or any holder or more than ten percent of the voting power of this corporation or its parent or subsidiaries, if any, and the amount and circumstances of any indemnifications or advance aggregating more than $10,000.00 paid during the fiscal year to any director or officer of this corporation. For each transaction, the report must disclose the names of the interested persons involved in such transaction, stating such person's relationship to this corporation, the nature of such person's interest in the transaction and, where practicable, the value of such interest.

The foregoing report shall be accompanied by any report thereon of independent accountants or, if there is no such report, the certificate of an authorized officer of this corporation that such statement were prepared without an audit from the books and records of this corporation.

Section 4. Required Financial Audits. This corporation shall obtain a financial audit for any tax year in which it receives or accrues gross revenue of $1 million or more, excluding grant or contract income from any governmental entity for which the governmental entity requires an accounting. Whether or not they are required by law, any audited financial statements obtained by this corporation shall be made available for inspection, and shall remain available for three years (1) by making them available at this corporation's principal, regional, and district offices during regular business hours and (2) either by mailing a copy to any person who so requests in person or in writing or by posting them on this corporation's website.

Section 5. Electronic Transmissions. Unless otherwise provided in these Bylaws, and subject to any guidelines and procedures that the Board of Directors may adopt time to time, the terms "written" and "in writing" as used in these Bylaws include any form of recorded message in the English language capable of comprehension by ordinary visual means, and may include electronic transmissions, such as facsimile or email, provided (i) for electronic transmissions from the corporation, the corporation has obtained an unrevoked written consent from the recipient to the use of such means of communications; (ii) for electronic transmission to the corporation, the corporation has in effect reasonable measures to verify that the sender is the individual purporting to have sent such transmission; and (iii) the transmission creates a record that can be retained, retrieved, reviewed, and rendered into clearly legible tangible form.

Section 6. Amendments. Proposed amendments to these Bylaws shall be submitted in writing to the directors at least one week in advance of the Board meeting at which they will be considered for adoption. The vote of majority of the directors then in office or the unanimous written consent of the directors shall be required to adopt a Bylaw amendment.

Section 7. Governing Law. In all matters not specified in these Bylaws, or in the event these Bylaws shall not comply with federal applicable law, the State of Texas Nonprofit Legislative Law then in effect shall apply.

# **Exhibit 22**



# Manifund All-hands @May 13, 2025

View details

Last time: 🙌 **All Hands @May 2, 2025**

## Updates

- **Manifund**
  - Team: Austin, Lydia. Work trial offer to Nishad Singh.
    - Lydia:
      - couple years in AI
      - starting "givewell for AI safety"
    - Nishad:
      - engineering stuff for Manifund
  - Updates:
    - Recruiting w/ Lydia, Nishad
    - Speaking with 4-5 regrantors
    - ACX Grants perhaps in another month
  - Coming up:
    - Lydia: 🚜 **Proposal: "Givewell of AI Safety"**
      - have a spreadsheet
    - Nishad: 📨 **Proposal: Evaluating Manifund Projects** (?)
    - 🚀 **Proposal: Anthropic equity swap** (?)
  - **Biggest needs: large $ donors; chief-of-staff/ops role**

- **Manifest**
  - Team: David, Rach, Austin
  - Numbers (to update): 400 signups, ~$165k tickets, $295k sponsorships, ~20 P1/P2 speakers
  - Updates:



  - finalizing merch, sponsors
  - a few speakers want to come & join or talk — what should we talk about, what do attendees want?
    - Should make up something, or give them two options
  - Spike on sales when we tweeted — lever that helps, sent out the substack email yesterday
  - Coordinating with speakers
  - Main thing: end of week, have told Ben that we'll release the rooms not using or will be on the hook

- ○ Coming up:
  - ▪ Software needs for the event weekend
  - ▪ write haven app / matching app 🟦
    https://lightconeteam.slack.com/archives/C08RCG7NM5X
- ○ **Biggest needs:**
  - ▪ **Finalising panels for speakers**
    - • a lot are down to join a panel to speak but want us to tell them what it should be about
  - ▪ **Selling more tickets with word of mouth**
  - ▪ Projected to sell less than we could
    - • Hoping to sell 500-600; expecting to get 500
    - • Probably still 30-40 free tickets that have been given out but not claimed
- ○ Also:
  - ☐ Make Rach an admin
  - ☐ mox co working on manifest website
  - ☐ Lydia talk at Manifest
- **Mox**
  - ○ Team: Rachel, Mattie, Austin. Work trialing Robin Goins for Ops starting Mon.
  - ○ Updates:
    - ▪ Notable events: AI & D coworking day on Monday, Joey Savoie talk; 90/30 clubs
    - ▪ Hosting incubator for 4 companies (Seldon Accelerator). Plus private office for TamperSec
  - ○ Coming up:
    - ▪ Pre-Manifest coworking
    - ▪ PIBBSS starting
  - ○ **Biggest needs: great members, events; hiring for director role**
- **🏗 Mox Ramp (Incubator)**
  - ○ Team: Austin, (TODO find someone?)
  - ○ Still in early planning; spoke to some advisors
  - ○ Aiming to have announced in the next couple weeks, do something topical during Manifest, and then start the cohort shortly after (or: in July)
    - ▪ Could be Mentor <> Mentee matching event

# Collabs

- Manifest & Mox
  - ▶ From last time
- Manifest & Manifund
  - ○ List
  - ▶ From last time
- Mox & Manifund
  - ○ 🎓 Mox Ramp (Incubator)
  - ○ 🍱 Event idea: Mixture of Experts

- General openings:
  - ○ 0-2 headcount for Mox: Director of Mox, Events Lead, Operations
    - ■ Director
      - • Taking on events, admissions, hiring, fundraising, fiscal viability
  - ○ 0-2 headcount for Manifund: Engineer, Fundraising, Events, Op
  - ○ Generalists, people who can flex between multiple roles are great
  - ○ Also: only looking to bring on really great people

# Q & A

- How to get more ticket sales for Manifest
  - ○ Every new speaker — tweet & tag'
  - ○ Ask volunteers to tweet
- Night market — have the partiful, but there might be people on the fence. If we send out night market invite — or might make people not convert?

# Exhibit 23



# Manifund Standup @April 17, 2025

View details

## What got done?

Austin [a]

- List

Jesse [j]

- 📝 OpenPhil Effective Giving RFP Application
- Some changes to 💯 Reviewing AI safety regranting: our wins, and what didn't quite fit
- More writing on ✍️ AI safety: why give now?

## What's next?

Austin

- ☐ To-do

Jesse

- ☐ Work with Austin to get the OP Effective Giving Application finished and submitted
- ☐ Any further changes to 💯 Reviewing AI safety regranting: our wins, and what didn't quite fit?
- ☐ Keep writing ✍️ AI safety: why give now?
- ☐ Start writing term sheet for 🦉 Proposal: "Prediction Market Fund"
- ☐ Meeting with GBF, talk political giving and other stuff?

## Discussion topics

- Regrantor program
  - Regular launch post first?
  - Feedback on 💯 Reviewing AI safety regranting: our wins, and what didn't quite fit
  - Call with 👁 No access
  - So what to do:
    1. Publish as-is with a few changes
    2. Swap out something for LTFF
    3. Publish just the good ones
       - [j] leaning in that direction, good to publish something soon, relatively happy with what we've written, lower stakes
       - less spicy without this
    4. **Publish the announcement post first, then post review next week**
       - 🖼 **Post: Manifund 2025 Regrants**
         - Have the regrantors enough on board — b/c part of the post
         - Want to polish this a bit
         - [a] give Jesse login, put into substack
  - What changes do we want to make from here, if any, based on Dan and Adam's comments?
    - Have started a write-up for the LTFF grant if we think that's a better candidate and want to swap it in
    - 📄 1HYz90hDmccx4Tu3qqoJ37MI7umY3aAY9xPSasf_qMMM

- Grant application for effective giving
  - Deadline is midnight on Sunday the 20th
  - Jesse has written most of it, needs Austin's input on some remaining stuff
    - Highlight on the document places where Austin's input needed

- 🎇 **Rob, David, Michael: trading fund lawyers**, next steps?
  - Term sheet!

- Ella, Erin writeups

- Jesse x GBF meeting — anything I should mention in particular?
  - Political giving
    - Mention we've spoken with AIPN, ARI
    - Medium-term goal; do we want to bring Gabe on board and have a serious fundraising effort in the political space?
      - One question to explore with Gabe, what might we do differently / in addition to AIPN, ARI?
    - Does it have to be Gabe?
      - [a] no
  - Blue wave stuff? seems kind of interesting
  - Anthropic equity swap — less
  - Catch him up on Manifund activities generally

# FYI

- List

# Exhibit 24

# Jesse x Gabe @April 18, 2025

View details

- *Quant trader Jane Street*
- *Election forecasting and donor advising Civis Democratic donors which House races to give to in 2018*
- *Sean Casten starting in 2019*
- *Guarding against pandemics, biosecurity policy & politics*
  - Lobbying, endorsements, SuperPACs, etc.
  - Building large political movement for pandemic prevention
- *Wasn'ty paying attention to partisan politics in 2022, cultivate relationships mode*
- *Political giving probably 1 OOM more effective than charitable giving*
- *Main lessons from biosec: almost exclusivel SUperPAC, shifted focus to hard dollar by the end of 2022*
  - Hard dollars 10x more effective for building political will than SuperPAC $$$
  - And that was when we had a ton of money, so even more true now
    - TV ad rates, coordination (SuperPACs no coordination)
    - Main reason: not actually better at changing voter's minds, but perceived better by politicians
    - Fundraising goes from means to end, to end, so candidates think fundraising is good inherently. They feel pride over their own fundraising, not SuperPAC fundraising.
    - Hard dollars facilitate direct convos, harder with SUperPAC $$, due to campaign finance regs
    - You throw fundraisers
    - Average member of Congress raising ~$500/hour from cold calling fundraising
  - Soft power / psychological effects are crucial. Increasing trust. Not a stranger, a person in their "circle" sharing some braod value ~~ making AI go well.

- *Happy that AIPN, ARI exist. But both not perfect. Main thing they need is money. Diminishing returns only start hitting at six figures for donors.*
  - They really need a broad set of people.
  - 100 people at $100K/year would make you ~third biggest political hard dollar force in the US, behind Israel and ??
  - Way lower visibility than SuperPAC spending
    - Lower scrutiny, individuals giving a few grand is not in any way 'sus'
    - What's not public is whether you gave as part of fundraiser or anything
    - Potential for bad media coverage and backlash is a lot lower for ahrd dollars than SuperPACs
- *Best thing to do really is just raise money.*
- *Big time network effects for donors, to build up donations to justify fundraisers, etc.*
- *Felt like Austin didn't have an obvious group of political donors waiting to be tapped*
- *Corporate PACS donation caped $5K/year, so better if you have a more grassroots network*
- *Would be surprised if Manifund creating a 3rd one doing the ~same thing was better than us referring people to AIPN, ARI.*
  - If we could raise millions in hard-dollar donations, maybe worthwhile, but a little surprsied
  - If you had donors excited about giving millions/years, would be useful to have an AI alignment SuperPAC
    - SuperPAC would have an outreach arm that looks a lot like ARI, AIPN
  - Two superpacs, a D and an R
  - Only in primaries!!! ONE LESSON! ONLY IN PRIMARIES! (I already was on board with this). More impactful AND cheaper.
    - With a SuperPAC, only spend money on primaries — cheaper, higher leverage
  - If Manifund could help find that multi-million donor, that would be great!
  - SuperPAC would need to be connected to AIPN, maybe ARI
  - $10M+ for it to be worth it, to begin with.
    - How much money needed to begin?
  - ARI/AIPN do Zoom fundraisers for M to attend? to just vibe out how politics works.

- Gabe wants to start donor network for pro-democracy Republicans, similar to ARI and AIPN but more about therapy. Pro-democracy Republicans don't have a home
  - Atlantic article on Pete Meijer
  - Text chain for impeachers, run by Peter Meijer
  - Not just 2028, some of this is longer term
  - You need 1/5 of all House members to raise objection to electoral count
  - state-level, state-legislative races may be even better
  - Gotta find state leg primaries with pro-democracy R vs anti-democracy R
  - Cast wide net
  - Main thing this needs; money, a person to run it
  - Gabe thinks AI makes all this less important, not more
    - Most of what matters runs through AI, and this only partially runs through AI
- Next step: if you hear of donors that might be excited to give it to ARI or AIPN, please refer them, can send them to talk to GBF. **If you hear of donors that might be excited in pro-democracy stuff, please send them to talk to GBF. If they could plausibly give $50K/year, worth a conversation with GBF. Want to raise $1M.**
- Anything actionable from 2026 blue wave year thesis?
  - Gabe: I bet there's no big actionable thing, probably small changes
  - Might want to text Dan Colson if you think there are Republicans who are definitely gonna lose and so not worthwhile.
  - Also money-making opportunities?
  - Probably something to do in financial markets for blue wave, despite difficulties with trades in the past like Peso, SPX
- If you think there's valuable things for GBF to help, brainstorm, wiht election forecasting stuff, ot, appy to follow up convos
- Gabe will send contact info, can chat asychronously, maybe set up call again in week or two?