## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  August 12, 2025 at 9:30 a.m. ET** |
| | **Ref. Nos. 29733, 30911 & 30992** |

### FTX RECOVERY TRUST'S REPLY TO RESPONSE OF CLAIMANT ANGELO BREEN TO THE ONE HUNDRED SIXTIETH (SUBSTANTIVE) OMNIBUS OBJECTION TO CLAIMS

The FTX Recovery Trust[2] hereby submits this reply (the "Reply"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Response filed on June 18, 2025 [D.I. 30911] (the "Response"), by Claimant Angelo Breen ("Breen") to the *FTX Recovery Trust's One Hundred Sixtieth (Substantive) Omnibus Objection to Certain Overstated Proofs of Claim (Customer Claims)* [D.I. 29733] (the "Objection"), which included an objection to Customer Proof of Claim No. 96754 (the "Claim") filed by Breen against Debtor FTX Trading Ltd. ("FTX Trading").  In connection with the Reply, the FTX Recovery Trust submits the concurrently filed *Declaration of Michael S. Leto* (the "Leto Decl.") and the

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established on January 3, 2025, the effective date of the Debtors' confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan").

exhibits attached thereto.  In support of the Reply, the FTX Recovery Trust respectfully states as follows:[3]

### Preliminary Statement

1.      Breen's Claim alleging fraud and commingling of funds by FTX Trading and the FTX Insiders[4] fails on both the law and the facts, and should be disallowed in its entirety. *First*, irrespective of Breen's allegations, the Claim is clearly and unambiguously barred by the Global Settlement set forth in the Plan, which released all claims based on "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders" or "the purported commingling and misuse of customer deposits and corporate funds."  Plan § 5.2. *Second*, Breen argues that he should be permitted to recover on his Claim based on the FTX Recovery Trust's post-petition recovery of certain funds donated by FTX Foundation at the expense of legitimate creditors, but there is simply no legal basis for such result.  *Third*, the Claim is factually incorrect.  Breen's allegations notwithstanding, the funds he donated pre-petition to FTX Foundation were credited to a specific exchange account and donated for charitable purposes. *Fourth*, the FTX Recovery Trust's investigation to date strongly suggests that Breen has provided false information both with respect to opening his FTX account and in connection with the Claim. If so, any recovery is barred by the doctrine of "unclean hands."  And *finally*, the Claim is in any event time-barred:  even if it is generously considered a Customer Entitlement Claim, it was filed almost a full year too late.

---

[3]   The FTX Recovery Trust has served discovery requests on Breen, which remain outstanding.  While the FTX Recovery Trust believes the Claim can be disallowed on the current record, in the event the Court orders further proceedings, the FTX Recovery Trust reserves the right to supplement this Reply.

[4]   The Plan states that the term "'Insider' has the meaning set forth in section 101(31) of the Bankruptcy Code, and includes any non-statutory insiders of the Debtors and Affiliates of the Debtors, including, among others, Samuel Bankman-Fried, Zixiao 'Gary' Wang, Nishad Singh and Caroline Ellison."

**Background**

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading and its affiliated debtors (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

3.      On August 16, 2024, Breen filed the Claim against Debtor FTX Trading seeking $690,420, representing US dollars that he had withdrawn from his FTX Trading customer account and donated to FTX Foundation, Inc. ("FTX Foundation").

4.      On October 7, 2024, the Court confirmed the Plan, and on October 8, 2024, entered the *Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] (the "Confirmation Order").

5.      On January 3, 2025, the Effective Date (as defined in the Plan) occurred, which, among other things, established the FTX Recovery Trust and transferred, assigned, and vested all of the Debtors' assets in the FTX Recovery Trust.  *See Notice of Effective Date of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 29127].

**Background Specific to the Relief Requested**

A.      **FTX Foundation and Its Customer-Donation Program**

6.      In early 2021, Sam Bankman-Fried announced the formation of FTX Foundation and held it out publicly as a "philanthropic collective that . . . make[s] grants and investments to improve global health, prevent pandemics, reduce animal suffering, protect the climate and improve humanity's prospects of long-term survival and flourishing."  (Leto Decl. Exs. 1 & 2.) FTX Foundation collected donations from Debtor entities such as Alameda Research, and their employees, and represented that it would, in turn, donate those funds to charitable causes.

(*Id.*)  FTX Foundation did, indeed, donate money to many legitimate charities (although many of

its larger donations went to associates of the FTX Insiders in the "effective altruist" movement).

(*Second Interim Report of John J. Ray III* [D.I. 1704] (the "Second Interim Report".)  But many

of these donations were improperly funded by Debtor entities like Alameda Research and FTX

Trading that had misappropriated and commingled the funds of FTX customers, contrary to FTX's

public representations that it maintained a separation of customer and corporate funds.  *Id.*

Separate from funding by Debtor entities, however, FTX also solicited FTX customers to donate

to FTX Foundation.  (Leto Decl. Exs. 1 & 2.)

7.      On April 10, 2021, Breen opened a customer account on FTX.com (the

"Account").  (*Id.* Ex. 3.)  Between April 10, 2021 and April 13, 2021, Breen made donations to

FTX Foundation from the Account totaling USD $690,420.00 (the "Funds").  (*Id.* Ex. 4.)  On April

13, 2021, Breen announced on Twitter that he had "donated $690,420 worth of bear liquidations

to ftx.com/foundation."  (Claim Addendum at 20, 22.)  Breen's donation effected an on-exchange

transfer of $690,420 from the Account to donations@ftx.com, an FTX Trading account set up to

collect donations to FTX Foundation.  (Leto Decl. Ex. 4.)

8.      FTX    Foundation    made    several    large-dollar    donations    from

donations@ftx.com after Breen made his donation, including:

- $700,000 on May 6, 2021 to Oxygen for India, an organization that delivered medical oxygen in response to COVID-19 in India (*id.* Exs. 5 & 6);

- $175,000 on July 22, 2021, for "Dota Charity Donation to GiveDirectly." "Dota" is a video game, Defense of the Ancients, which was played in a global online charity tournament that raised funds for Give Directly, a non-profit organization that lets donors send money directly to the world's poorest households through unconditional cash transfers (*id.* Exs. 5 & 7);

- $960,000 on July 29, 2021, to purchase carbon credits from Pachama, whose mission is to "restore nature and solve climate change" (*id.* Exs. 5 & 10); and

- $680,191.56 on September 8, 2021, to Ronald McDonald House Charities, which provides temporary housing and other support for families whose children require pediatric medical care (*id.* Exs. 5 & 11).

Other organizations that received funds from donations@ftx.com after Breen's donation include Lighthouse Foundation, Hands on India, Henan Province Charity Foundation, Bryson DeChambeau Charity, Phil and Amy Mickelson Foundation, GivingGreen.earth, CarbonPlan, and the Honnold Foundation. (*Id.* Exs. 5-19.)

9.      In addition, on October 8, 2021, an $8 million donation to New Venture Fund, a non-profit that funds projects consistent with its "vision [for] an equitable world built on respect, access, opportunity, distributed power, and advancement for all people," was wired from a bank account belonging to FTX Trading. (*Id.* Exs. 24-29.) On October 18, 2021, FTX Trading was reimbursed for the New Venture Fund donation via an on-exchange internal transfer from donations@ftx.com to "expenses@ftx.com." (*Id.* Ex. 30.)

10.     With the reimbursement to FTX Trading, the remaining balance in donations@ftx.com was approximately $56,000. (*Id.* ¶ 6.) Between the time of Breen's donation and the transfer to New Venture Fund, charitable donations from donations@ftx.com totaled $12,679,852. (*Id.* Ex. 5.)

11.     After receipt of the $8 million transfer, New Venture Fund re-granted $4,160,000 of the funds to four charities and paid $310,000 for management fees to administer the grants. (*Id.* Exs. 31-38.) As of the Petition Date, New Venture Fund had retained $3,530,000 of the original donation. (*Id.* Exs. 39 & 40.)

12.     After the Petition Date, the Debtors entered into separate agreements with New Venture Fund and the re-grantees pursuant to which the Debtors recovered a total of $7,125,000 of the $8 million that was originally granted to New Venture Fund. (*Id.* Exs. 40-43.) The Debtors also recovered $200,000 from CarbonPlan. (*Id.* Ex. 44.) The Debtors have not

recovered the remaining funds donated from donations@ftx.com between the time of Breen's

donation and the donation to New Venture Fund in October 2021.  (*Id.* ¶ 7.)

      **B.**      **The Global Settlement Incorporated Into the Plan**

      13.      As set forth in Section 5.2 of the Plan, the Global Settlement provides for,

among other things, a "compromise, settlement, and resolution . . . of all Claims, Interests and

Causes of Action against . . . the Debtors" regarding:

> (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (k) all Causes of Action relating to any of the foregoing.

(Plan § 5.2.)  Further, the injunction in Section 10.8 of the Plan bars "any Person who has held,

holds, or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any

action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation,

debt, right, Interest or Cause of Action released, settled or exculpated under the Plan," or

"(b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award,

decree, or order on account of or in connection or with respect to any such Claim or Interest." (*Id.*

§ 10.8.)

14.     The Global Settlement was the result of protracted, good faith, arm's-length negotiations among the Debtors, the Official Committee of Unsecured Creditors, and other stakeholders.  *See Declaration of Steven P. Coverick in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* ¶ 23 [D.I. 26041] (the "<u>Plan Declaration</u>").  The Global Settlement incorporates, among other things, the customer priority settlement, which prioritized certain customer entitlement claims relative to certain other creditors in exchange for a broad release by all stakeholders of all potential claims relating to the Insiders' general mismanagement of the exchanges and their misappropriation of assets deposited by customers on the exchanges.  (Plan Declaration ¶ 22.)  The Global Settlement benefitted all parties-in-interest by preserving assets that otherwise would be expended in complex, burdensome and uncertain litigation that could have greatly delayed the conclusion of these Chapter 11 Cases.  (Plan Declaration ¶ 24.)

15.     The Confirmation Order entered by the Court incorporated the Global Settlement (Confirmation Order ¶¶ 38-40, 93) and expressly provides that "[t]he entry of this Confirmation Order constitutes the Court's approval of the Global Settlement . . . under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests and fall above the lowest power in the range of reasonableness."  (*Id.* ¶ 41.)  The Confirmation Order also gave full effect to the injunction set forth in Section 10.8 of the Plan.  (*Id.* ¶¶ 49, 143-44.)

### C.     The Claim, Objection and Response

16.     On August 16, 2024, Breen filed the Claim seeking to recover from the estate on account of his $690,420 donation on the basis that "these funds were likely commingled with other customer deposits and misappropriated, making it impossible to verify their use for the

-7-

intended charitable causes." (Claim Addendum at 3.)  Breen further asserted that "FTX's failure to protect and segregate these funds, as well as the company's broader misrepresentation of its practices, has led to the mismanagement of my donation." (Claim Addendum at 3.)

17.     The Objection, filed on February 25, 2025, objected to the Claim for two independent reasons.  First, the Claim did not match the Debtors' books and records for a Customer Entitlement Claim, which is defined in the Plan as a claim "for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange." (Plan § 2.1.47.)  The Debtors' books and records reflect only USD $0.565666940017389 in Breen's FTX customer account as of the Petition Date.  (Obj. ¶ 7; Obj. Sch. 1 at 22.)  Second, Breen's Claim of fraud and commingling of assets was resolved in the Global Settlement set forth at Section 5.2 of the Plan.

18.     In the Response filed on June 18, 2025, Breen reiterated the arguments in his Claim that his donated funds "were commingled with other FTX customer deposits and misappropriated by the Insiders, ultimately never leaving the Debtors' coffers for their intended philanthropic purposes." (Resp. ¶ 2.)  Breen also noted for the first time that "[s]ince the Petition Date, the Debtors have engaged in extensive claw back efforts to recoup customer funds" that were transferred as donations to non-profits and "even legitimate charities." (Resp. ¶ 8.)  Breen argued that "in the unlikely circumstances the Funds were properly donated to a charity as intended, the Debtors have or will in the future claw back a vast majority of those donations." (Resp.  ¶ 21.) Noting that "bankruptcy courts are courts of equity," Breen asserted without any support that "[t]he Debtors cannot be allowed to benefit from their vigorous avoidance efforts and then turn around and alleged Claimant's Funds were properly accounted for and donated to a legitimate charity simply to preclude Claimant from participating in distributions under the Plan." (Resp. ¶ 21.)

## Argument

### I.    The Plan's Global Settlement Bars Breen's Claim.

19.    Both Breen's Claim and his Response make clear that the Claim is grounded on alleged fraud and commingling of assets by FTX Trading and the FTX Insiders.  It is thus not a Customer Entitlement Claim but rather a General Unsecured Claim under the Plan.  The crux of Breen's Claim is that FTX Insiders marketed FTX Foundation as a philanthropic enterprise and then "misused," "misappropriated" or "mismanaged" funds donated by customers such as Breen, who was "fraudulently induced" to donate.  (*See* Claim Addendum at 10-15; Resp. ¶¶ 2, 4, 5, 15, 18.)  Breen also expressly alleges the "commingling and misuse of funds, including those intended for charitable purposes" and that FTX commingled donated funds "with customer deposits and corporate funds."  (*See* Claim Addendum 10-11; Resp. ¶¶ 2, 4, 5, 15, 18.)

20.    The terms of the Global Settlement in section 5.2 of the Plan unambiguously bar the Claim.  The Global Settlement resolves any claim regarding the "actual or purported fraud, unjust enrichment, misappropriation, conversation and misconduct of former Insiders . . . ."  (Plan § 5.2(b).)  The Global Settlement also resolves any claim based on "the purported commingling and misuse of customer deposits and corporate funds."  (*Id*. § 5.2(c).)  Thus, Breen's Claim—which is premised entirely on alleged fraud and commingling of assets—has been "settled" pursuant to section 5.2 of the Plan.  Breen is further enjoined from continuing his action to collect and enforce his settled claim pursuant to the Plan's injunction.  (*Id*. § 10.8.)  To read Sections 5.2 and 10.8 of the Plan as accomplishing anything less would render them "meaningless or illusory."  *Weinberg* v. *Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023); *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, [courts] apply contract principles.").

21.     Breen is bound by the Global Settlement.  The provisions of a confirmed plan "bind the debtor . . . and any creditor . . . whether or not the claim . . . of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan."  11 U.S.C. § 1141(a).    Section 5.2 specifically defines who the Global Settlement is applicable to: "stakeholders" of the Debtors who received "classification, treatment, Distributions, releases and other benefits provided by the Debtors," including Breen.  Indeed, in proceedings related to Plan confirmation, the Debtors described the Global Settlement as a compromise between the interests of FTX Trading customers and other unsecured creditors who were potential victims of the fraud perpetrated by Sam Bankman-Fried and the other Insiders.  *See, e.g.*, D.I. 26412 (Confirmation Tr. 10:19-11:8).  Further, customers' and other general unsecured creditors' fraud and other claims related to the conduct of Bankman-Fried and the Insiders were resolved under the Plan to promote an efficient resolution of these Chapter 11 Cases and maximize recoveries for claims arising from specific losses over claims based on general fraud theories.  (Disclosure Statement at 114.)

22.     Accordingly, section 5.2 of the Plan bars the Claim and Breen's Claim should be disallowed in its entirety.  To hold otherwise would override a key component of the Plan in favor a single claimant to the detriment of FTX customers who released certain rights in connection with the Plan to secure the benefits of the Plan.  There is no basis for the Court to do so, and the Claim should be disallowed.

## II.    The Plan Does Not Provide for Recovery of Clawed-Back Donations, and Cannot Be Modified Through the Court's Equitable Powers.

23.     Breen is not entitled to have his Claim allowed merely because the Debtors "clawed back" a portion of donated funds post-petition.  Nothing in the Plan or any applicable law permits allowance of a claim on that basis.  The Plan defines a Customer Entitlement Claim as a claim "for the value ***as of the Petition Date*** of Cash or Digital Assets held by such Person or Entity

in an account on any FTX Exchange." (Plan § 2.1.47 (emphasis added).) As of the Petition Date, Breen's account contained approximately $0.56; the funds he seeks to recover had been transferred out of his account more than a year and a half before the Petition Date. Per the terms of the Plan, no post-petition events—such as the Debtors' or the FTX Recovery Trust's later recovery of donated funds—affects the amount to which Breen is entitled as a Customer Entitlement Claim.

24.    If Breen felt he was entitled to some recovery on the basis of clawed-back funds, he should have objected to the proposed treatment of Customer Entitlement Claims under Plan. He did not. The Plan and Confirmation Order are *res judicata* as to "all issues decided or which could have been decided at the hearing on confirmation." *Donaldson* v. *Berstein*, 104 F.3d 547, 554 (3d Cir. 1997).

25.    Although Breen seeks to invoke the Court's equitable powers under section 105(a) of the Bankruptcy Code as a basis to recover some of the clawed-back funds, the Confirmation Order specifically found that the Global Settlement is "fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests." (Confirmation Order ¶ 41.) Therefore, any argument that the Global Settlement is not equitable has been conclusively decided.

26.    Moreover, courts may exercise their equitable powers only so long as doing so is "necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *In re Cade*, 552 B.R. 800, 804 (Bankr. S.D. Ohio 2014). Section 105 "does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Kalikow*, 602 F.3d 82, 96-97 (2d Cir. 2010). Section 105 does not afford the Court the power to allow otherwise invalid claims. The case cited in Breen's Response—*In re Kaiser Aluminum Corp.*, 456 F.3d 328 (3d Cir. 2006)—did not involve a claim

dispute or an attempt to obtain a recovery that was not provided for in a confirmed plan, but rather was about the fairness of a plan to terminate a debtors' pension plan. But, more relevant, courts specifically have declined to exercise their equitable powers in order to modify confirmed plans. In *In re Branded Operations Holdings, Inc.*, the court declined a *pro se* claimant's request to exercise its equitable powers to alter a confirmed plan, because the Bankruptcy Code provided specific circumstances under which a plan could be modified, none of which were applicable to the claimant's situation. 2025 WL 965911, at *8 (Bankr. S.D.N.Y. Mar. 30, 2025). Similarly, in *In re WorldCom, Inc.*, the court disallowed a claim for interest that was prohibited by the confirmed plan, noting, "this Court may not modify provisions of a confirmed plan by using its equitable powers." 352 B.R. 369, 379 (Bankr. S.D.N.Y. 2006).

27.     Breen's Claim cannot be allowed under the terms of the Plan, and those terms cannot be modified on an equitable basis. Accordingly, his Claim should be disallowed in its entirety.

## III.    Breen's Claim is Factually Incorrect.

28.     Breen's Claim is premised on the assertion that FTX Trading misused or misappropriated the Funds. The FTX Recovery Trust's review of account records establishes otherwise. FTX Trading created an exchange account—donations@ftx.com—specifically for customer-donated funds such as Breen's. After Breen donated the Funds in April 2021, FTX made donations to various charities and non-profits, including Oxygen for India, GiveDirectly, My Brothers' Keepers, Ronald McDonald House Charities and New Venture Fund. After accounting for all of these donations, the remaining balance in donations@ftx.com was approximately $56,000, meaning that substantially all customer-donated funds, including Breen's, had been used for charitable purposes.

29.    Breen relies on a September 20, 2021 email, attached as Exhibit A to the Response (the "September 2021 Email"), to support his assertion that FTX Trading had not donated any of the Funds.  (Resp. ¶¶ 11, 18.)  The email from FTX Trading stated that "[w]e are about to send your money to a US charity" and "will notify you of the details."  While FTX Trading never notified Breen of the charity donation details, nonetheless, the exchange account records show that FTX Trading already had made substantial donations from donations@ftx.com by September 2021.  The account records also show that, shortly after FTX Trading sent the September 2021 Email, substantially all of the funds in donations@ftx.com were donated to New Venture Fund.  Accordingly, Breen's Claim is factually incorrect and should be disallowed in its entirety.

30.    In addition, the other materials on which Breen relies do not specifically address customer-donated funds but rather address the separate issue of the misappropriation of funds deposited by customers on the exchanges.  Breen cites the Second Interim Report to argue that FTX Trading misused and commingled customer-donated funds.  But this report showed that FTX Insiders had made donations to FTX Foundation from various bank accounts controlled by Alameda Research and other Debtor entities, which contained corporate funds that were improperly commingled with FTX customer funds.  In particular, the Second Interim Report explains how the Insiders deposited FTX.com customer funds directly into the bank accounts of Alameda Research and other Debtor entities, such that "from the inception of FTX.com, Alameda's bank accounts received substantial funds from FTX.com customers."  (Second Interim Report at 10-11.)  The Second Interim Report goes on to discuss how the FTX Insiders used these commingled funds for various expenditures, including venture investments, the purchase of luxury real estate, and political and charitable donations.  (*Id*. at 23-30.)  Regarding FTX Foundation

-13-

specifically, the Second Interim Report states that the FTX Insiders funded FTX Foundation with transfers from a variety of Debtor bank accounts that contained improperly commingled customer and corporate funds, and that FTX Foundation used these commingled funds to make grants to individuals and non-profits.  (*Id*. at 25-26.)

31.    The Second Interim Report does not address how FTX Insiders disposed of funds that customers donated directly to FTX Foundation.  FTX Foundation was financed largely by Alameda Research and FTX Insiders, and also directed grant payments to be made via transfers from a variety of Debtor bank accounts (*id*.), which is what enabled the Debtors to recover some of those donations.  Nonetheless, the exchange records show that FTX Trading tracked customer donations to FTX Foundation in a segregated exchange account, and that substantially all of those funds were used for charitable purposes.  (Leto Decl. Exs. 5-19.)  Accordingly, Breen's Claim is factually incorrect and the Claim should be disallowed in its entirety.

## IV.    Breen Cannot Recover Because He Has "Unclean Hands."

32.    The FTX Recovery Trust's investigation of the Claim to date has uncovered evidence that calls into question not only the veracity of information Breen provided in connection with the Account and the Claim, but also as to his ownership of the Funds.[5]  Breen should be precluded from recovery if he has provided false or misleading information because "the unclean hands doctrine is a self-imposed ordinance that closes the doors of a court of equity to one tainted with the inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 401 (Bankr. D. Del. 2011); *see also In re Am. Home Mortg. Holding*, 458 B.R.

---

[5]    The FTX Recovery Trust's investigation is ongoing.  To the extent the Court does not disallow the Claim in its entirety now—it should—but instead orders further proceedings, the FTX Recovery Trust reserves its rights to supplement this Reply after it receives responses to its discovery requests.

161, 174 (Bankr. D. Del. 2011); *United States* v. *State St. Bank & Tr. Co.*, 520 B.R. 29, 69 (Bankr.

D. Del. 2014).

33.    Breen opened the Account under the name of ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████    Based on this information, Breen may have used a false

name to open the Account, and provided false information concerning his address and place of

residence both when he opened the Account and when he submitted the Claim.  And his post-

petition KYC information does not answer the question of where he actually resides.

34.    FTX Recovery Trust's investigation also casts doubt on whether Breen

actually owned the Funds at the time of his donation. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████    This information suggests that Breen may not

have owned the Funds or, at the very least, that Breen has not disclosed all of the relevant facts

with respect to the Claim.

**V.        The Court Should Disallow Breen's Claim Because It Is Untimely.**

35.        The Claim should be disallowed for the separate and independent reason that it was filed untimely and is thus barred.  Even classifying the Claim charitably as a Customer Entitlement Claim, Breen missed the Customer Claims bar date by almost a full year.  Breen did not file the Claim until August 16, 2024, yet the bar dates to file Non-Customer and Customer claims were June 30, 2023, and September 29, 2023, respectively. *See Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519] (the "Bar Date Order"); *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] (the "Customer Bar Date Order").  Therefore, absent demonstrating excusable neglect for the late-filed claim—which he cannot—pursuant to the respective bar date orders, Breen is barred and estopped from asserting the Claim against the estates or property and from receiving any distribution on account of the Claim.  (Bar Date Order at ¶ 13, Customer Bar Date Order at ¶ 14.)   *See also In re Trans World Airlines, Inc.*, 96 F.3d 687, 690 (3d Cir. 1996) ("The bar date . . . is a 'drop-dead date' that bars all prepetition claimants who received the required notice."); *In re PT-1 Communs., Inc.*, 386 B.R. 402, 409 (Bankr. E.D.N.Y. 2007) (bar dates serve the important purposes of "finality and debtor rehabilitation") (quotation and marks omitted); *In re Grand Union Co.*, 204 B.R. 864, 871 (Bankr. D. Del. 1997) ("[T]he claims bar date operates as a federally created statute of limitations, after which the claimant loses all of her right to bring an action against the 'debtor.'").

36.        Although Breen offers a variety of excuses for missing the bar date (*see* Claim at pp. 5-7), he utterly fails to carry his burden.  Breen "must show that [his] failure to file in a timely manner was due to 'excusable neglect'; otherwise, [his] claims arising pre-petition will

be barred." *Chemetron Corp.* v. *Jones*, 72 F.3d 341, 349 (3d Cir. 1995); *see also* Fed. R. Bankr. P. 9006(b)(1); *In re Enron Corp.*, 419 F.3d 115, 121 (2d Cir. 2005) (explaining that a late-filing claimant bears the burden of proving its excusable neglect).  The excuses Breen offers—health problems, delayed notice to an email Breen had stopped using, complexity of the claim, delayed recognition of the necessity to file—are the kind of excuses that could be offered by many other claimants, and they are not supported by anything other than Breen's bald assertions.  Moreover, Breen relies primarily on the Second Interim Report to argue that he was defrauded, but this report was filed on June 23, 2023.  [D.I. 1704].  That is more than three months before the September 29, 2023 Customer Claim bar date and more than a year before Breen filed the Claim.

37.    Therefore, Breen has not carried his burden to justify the late filed Claim and the Claim should be disallowed as untimely.[6]  *See Memorandum Opinion and Order* [D.I. 28891 at 13 (finding that claimant Celsius "has not met the standard for excusable neglect").

## Conclusion

38.    For the foregoing reasons, the FTX Recovery Trust respectfully requests that the Court sustain the Objection, overrule the Response and disallow the Claim in its entirety.

---

[6]    To the extent the Court declines to rule that the Claim is time-barred because timeliness was not a basis for objection in the Omnibus Objection, the FTX Recovery Trust reserves the right to object to the Claim as untimely pursuant to the *Order Granting (I) Leaving from Local Rule 3007-1(F) to Permit the Filing of Substantive Omnibus Objections and (II) Granting Related Relief* [D.I. 3429].  *See* at ¶ 2 ("[s]ubstantive objections are not required to raise all substantive objections to each claim in the initial substantive claim objection")

Dated:  August 6, 2025
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
         mcguire@lrclaw.com
         brown@lrclaw.com
         pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
         bromleyj@sullcrom.com
         gluecksteinb@sullcrom.com
         kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*