## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| - against - | |
| GENESIS DIGITAL ASSETS LIMITED, GDA US INC., DDH (NORTH AMERICA) INC., DDH-CHOLLA, LLC, DDH-OK-1, LLC, RASHIT MAKHAT, and MARCO KROHN, | Adv. Pro. No. 25-_____(KBO) |
| Defendants. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 544, 548, AND 550 AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305

Plaintiff FTX Recovery Trust (the "Trust" or "Plaintiff"), through its undersigned counsel, for its Complaint against Genesis Digital Assets Limited ("GDA"), certain of its U.S. subsidiaries, and two of its co-founders, Rashit Makhat and Marco Krohn (together the "Defendants"), alleges the following based upon personal knowledge and upon its investigation to date as to itself and its own acts, and upon information and belief as to all other matters:

### NATURE OF THE CASE

1.      This action seeks to recover $1.15 billion of commingled and misappropriated funds that Samuel Bankman-Fried transferred to Defendants for the purpose of perpetuating his fraud on customers and other creditors of the cryptocurrency exchange FTX Trading Ltd.

("FTX.com") and enriching himself through his controlling stake in his personal hedge fund Alameda Research LLC and its affiliates ("Alameda").

2.    Prior to the filing of the above-captioned bankruptcy cases (the "Chapter 11 Cases"), Alameda was a cryptocurrency trading firm owned 90% by Bankman-Fried and 10% by his subordinate Zixiao "Gary" Wang. Bankman-Fried was a co-founder of the FTX Group,[1] and at all relevant times controlled Alameda through his majority ownership stakes in Alameda's ultimate parent companies and through his various executive positions and directorship roles.

3.    Between August 2021 and April 2022, Bankman-Fried caused Alameda to purchase several tranches of shares in GDA, a Bitcoin mining firm, at outrageously inflated prices. While FTX Group funds were used to purchase the shares, only Alameda—and, in turn, Bankman-Fried, Alameda's 90% owner—was to receive any benefit, to the great detriment of customers and other creditors of FTX.com. By the time the purchases were made, as described further below, the FTX Insiders were regularly causing Alameda to "borrow" (i.e., loot) billions of dollars from the FTX.com exchange to fund their own profligate lifestyles and vanity investments—all while hiding the source of these funds from investors, creditors, and the general public.

4.    GDA stands as one of Bankman-Fried's most reckless investments with commingled and misappropriated funds. Discussions between Bankman-Fried and GDA began in July 2021. At the time, GDA was based in Kazakhstan and trying to raise money to expand globally and, specifically, into the United States. With looted funds burning a hole in Alameda's

---

[1]    The "FTX Group" comprises the Debtors, as well as non-Debtor affiliated entities. Specifically, the "FTX Group" refers to the four silos: (a) a group composed of Debtor West Realm Shires, Inc. and its Debtor and non-Debtor subsidiaries; (b) a group composed of Debtors Alameda Research LLC, Alameda Research Ltd. and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

pocket, Bankman-Fried committed to invest $100 million in GDA the following month. In doing so, he relied on flagrant misrepresentations and overlooked red flags. Kazakhstan had recently seen a rapid influx of cryptocurrency miners, which put severe strain on the country's fragile electricity grid. At the time of Alameda's investment, Kazakhstan had announced a new tax on cryptocurrency miners to take effect in the coming months. GDA did not provide Bankman-Fried audited financial statements, and the unaudited financials it did provide bore no relation to reality, failing to take into account the problems with the electrical grid in Kazakhstan and projecting an untested and unrealistic expansion into the United States.

5.      After transferring $100 million of the commingled and misappropriated money, Bankman-Fried decided to expand his investment dramatically at the worst possible time. By the fourth quarter of 2021, Kazakhstan's energy crisis had worsened and the government imposed increasingly crippling regulations on cryptocurrency miners, including caps on their energy use. In response, GDA desperately sought another round of financing, the proceeds of which were intended to accelerate the migration of the bulk of the business to the United States. Bankman-Fried was ready and dove right in when GDA's purported valuation—supported only by its own fraudulent, unaudited financials—inexplicably skyrocketed. While GDA estimated its enterprise value at $3.25 billion in July 2021, which was an already exaggerated figure, it claimed a valuation between *$8.3 and $12.2 billion* by November 2021. As a result of this "insane and off-market" valuation, as described by one of GDA's own board members, GDA did not have a single significant investor interested in this round of financing, other than Bankman-Fried.

6.      Undeterred, and accepting Defendants' misrepresentations, Bankman-Fried negotiated a rushed deal with GDA and its two co-founders and shareholders, Defendants Makhat and Krohn, to invest an additional $1 billion by the end of November 2021. If the spiking cost of

energy, crippling regulations, and lack of interest from other investors were not enough, the diligence process again raised a number of red flags, all of which Bankman-Fried did not take into account when he purchased GDA shares at an even more excessive overvaluation.  Worse still, over half of the funds invested went directly to Makhat and Krohn personally, allowing them to cash out of the failing company and conveying no benefit to GDA itself.

7.      In January 2022, Bankman-Fried transferred $550.9 million to Defendants Makhat and Krohn in exchange for 177 ordinary shares in GDA owned by them—representing a 50% increase in price per share from Alameda's initial investment just three months earlier.  In February and April 2022, Bankman-Fried caused Alameda to transfer an additional $501 million to GDA in exchange for 154 preferred shares.  In effectuating these transfers, Bankman-Fried concealed from FTX.com customers, creditors and investors that he was spending funds that had been misappropriated from FTX.com and commingled with other FTX Group funds.

8.      Today, with the Kazahkstan operations of GDA virtually worthless, substantially all of the consolidated assets of GDA and its subsidiaries, by value, are in the United States, although these assets are worth only a fraction of what Bankman-Fried paid GDA, Makhat and Krohn in the transactions that are the subject of this action.

9.      Bankman-Fried's purchases were archetypical fraudulent transfers.  In 2021, Bankman-Fried had everything to gain and nothing to lose from the GDA transactions.  Although Bankman-Fried paid for the GDA shares using commingled and misappropriated funds, including those deposited by FTX.com exchange customers, he personally stood to benefit from the acquisition because the GDA shares he acquired were held by Alameda, of which Bankman-Fried was a 90% owner.  Although Bankman-Fried disregarded Defendants' misrepresentations and knew that he was causing Alameda to overpay for the GDA shares, he was price-insensitive

because he was spending looted funds.  Worse still, by using liquid, misappropriated funds from FTX.com to pay for his investment in GDA, Bankman-Fried all but ensured that those funds could not be used to satisfy creditors, including customers seeking to withdraw assets from the exchange. In even a best-case scenario, the GDA shares would remain illiquid and impossible to monetize on any reasonable timetable in the event that FTX.com needed additional monies to pay its many creditors.

10.    Unsurprisingly, GDA ultimately missed each and every one of its revenue projections.  Ultimately, due to Bankman-Fried's looting and squandering of FTX Group funds— including on "investments" like the GDA shares—the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.

11.    Plaintiff brings this adversary proceeding pursuant to Sections 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)–(2) and 1305, to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made, all transfers of property of Debtors (as defined below).  Plaintiff has determined, based on its analysis and investigation to date, that all of the below transfers (the "Transfers") are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code:

| Date[s] | Amount of Transfer | Transferor | Transferee |
|---|---|---|---|
| October 5, 2021 | $100,000,000.32 | Alameda Research Ltd. | GDA |
| February 1, 2022 | $470,005,660.77 | Alameda Research LLC | Rashit Makhat |
| February 1, 2022 | $80,928,127.02 | Alameda Research LLC | Marco Krohn |
| February 28, 2022 | $250,000,000.00 | Alameda Research LLC | GDA |
| April 13, 2022 | $250,000,000.00 | Alameda Research LLC | GDA |

12.    On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On October 8, 2024, the Court entered an order confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127] (the "Plan Effective Date").

13.    Upon the Plan Effective Date, all assets of the Debtors, including all claims and causes of action, were transferred to and vested in Plaintiff, a Delaware statutory trust.  The Trust is the successor-in-interest to the litigation claims of Debtors Alameda Research LLC and Alameda Research Ltd.

14.    During the course of this adversary proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiff intends to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserves the right to further amend this Complaint to include, without limitation: (i) further information regarding any property or transfers, (ii) additional plaintiffs or defendants,

(iii) modifications of and/or revision to the Defendants' names, and (iv) additional causes of action, if applicable, that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

15.     Plaintiff FTX Recovery Trust is a Delaware statutory trust created and implemented pursuant to the Plan, and the sole owner by assignment of all rights and assets of Alameda under the Plan, as confirmed by the Court.

16.     Defendant GDA is a company registered in Cyprus with its United States headquarters in Houston, Texas.  GDA is in the business of Bitcoin mining, and claims to own and operate more than 20 Bitcoin mining centers, including nine in the United States.   Upon information and belief, Alameda's investments in GDA were intended to fund additional Bitcoin mining operations in the United States.  At the time of the Transfers, GDA maintained an office in New York, New York.  As of September 2025, GDA's website identifies it as having two offices: one located in Houston, Texas and another in Dubai.  The majority of GDA's assets and operations are now in the United States and are held by GDA's U.S. subsidiaries, which, on information and belief, are wholly controlled by GDA, share overlapping employees and directors, are entirely capitalized by transfers from GDA, and which otherwise fail to keep adequate corporate records or separate books.

17.     Defendant GDA US Inc., ("GDA US") is a Delaware company.  It is a wholly-owned subsidiary of GDA.

18.    Defendant DDH (North America) Inc. ("DDH NA") is a Delaware company.  It is a wholly owned subsidiary of GDA US.  GDA's U.S. operations were controlled through wholly-owned subsidiaries of DDH NA.[2]

19.    Defendant DDH-Cholla, LLC is a Delaware company.  It is a wholly-owned subsidiary of DDH NA.

20.    On information and belief, the GDA U.S. Subsidiaries operate as the alter egos of GDA.

21.    Defendant Makhat is one of GDA's co-founders.  On January 24, 2022, Alameda Research LLC, a Delaware limited liability company, agreed to purchase 77 ordinary GDA shares from Makhat for $470,005,660.77, which was transferred to Makhat on February 1, 2022.

22.    Defendant Krohn is one of GDA's co-founders and GDA's former Chief Strategy Officer.  On January 24, 2022, Alameda Research LLC, a Delaware limited liability company, agreed to purchase 26 ordinary GDA shares from Krohn for $80,928,127.02, which was transferred to Krohn on February 1, 2022.

## OTHER RELEVANT PERSONS AND ENTITIES

23.    Samuel Bankman-Fried is a co-founder of Alameda and was its sole director until September 6, 2022.

24.    Caroline Ellison was the co-CEO of Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

---

[2]    These subsidiaries include DDH-Lonestar-1, LLC, DDH-Lonestar-2, LLC, DDH-Lonestar-3, LLC, DDH-Lonestar-4, LLC, DDH-Lonestar-5, LLC, DDH-OK-1, LLC, Dog House TX-1, LLC, Dog House TX-2, LLC, DDH-Cholla, LLC, DDH-Owl, LLC, DDH Rowdy, LLC, DDH-Sunrise-1, LLC, DDH-Sunrise-2, LLC, DDH-Sunrise-3, LLC, DDH NC 1, LLC, Desert Bloom LLC, Mother Whale LLC, White Deer LLC, Southside Place LLC, DDH-Pacolet, LLC, DDH-Aiken, LLC, DDH-Ellison, LLC, DDH-Landfall 1, LLC, DDH-Landfall 2, LLC, and Pleyada Group, Inc. (together, with GDA US and DDH NA, the "GDA U.S. Subsidiaries").

25.     Gary Wang is a co-founder of Alameda.

26.     Nishad Singh is a co-founder of FTX Group entities West Realm Shires, Inc. and West Realm Shires Services, Inc.  Bankman-Fried, Singh, Wang, and Ellison are referred to collectively herein as the "FTX Insiders."

27.     Debtor Alameda Research LLC is a Delaware limited liability company that was 90% owned by Bankman-Fried and 10% owned by Wang.

28.     Debtor Alameda Research Ltd. is a British Virgin Islands company limited by shares, and is a wholly-owned subsidiary of Alameda Research LLC.

29.     Debtor Maclaurin Investments Ltd. f/k/a Alameda Ventures Ltd. is a limited company incorporated in the Seychelles.  It is a wholly-owned subsidiary of Alameda Research Ltd.

## JURISDICTION AND VENUE

30.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(a).

31.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

32.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

33.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

34.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

35.      The statutory predicates for the relief requested herein are Sections 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

36.      Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**I.      Bankman-Fried Defrauded Lenders, Investors, and Customers of the FTX Group.**

37.      Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1] (the "Second Interim Report").

38.    As detailed in the First Day Declarations, the FTX Group's pre-petition operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information. *See* Decl. John J. Ray III, D.I. 24, at 2. The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various reckless, illiquid investments. This spending spree was funded through a Ponzi-like arrangement whereby the FTX Insiders caused Alameda to borrow significant amounts of funds from third-party lenders and to repay those funds as needed by "borrowing"—*i.e.*, misappropriating—customer funds and "lending" money borrowed from third-party lenders and customers to the FTX Insiders.

39.    The FTX Insiders' fraudulent misappropriation and misuse of customer and investor assets, and Alameda's overextended positions both to FTX.com and third-party investors and lenders, resulted in a recurring need to expand the FTX Group to perpetuate a myth of success and growth, using after-obtained capital to satisfy earlier-incurred liabilities in Ponzi-like fashion. At Bankman-Fried's criminal trial, Ellison testified that the FTX Insiders planned to use customer deposits (among other assets) to repay third-party lenders, should the need arise. *See* Trial Tr. at 726:11-18, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023). She was concerned, however, that if the FTX Insiders "used FTX customer money to repay lenders, then [they] would have no source to repay the FTX customer money [they] had borrowed unless [they] were able to find new loans, or, you know, make a lot of money or something." *Id.*

40.    All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the Transfers. On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire

fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).    Singh pleaded guilty to the same felonies on February 28, 2023.  *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On November 2, 2023, a jury found Bankman-Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including wire fraud and conspiracies to commit wire fraud, commodities fraud, securities fraud, and money laundering.  *See* Jury Verdict, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).    On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.  *See* Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

41.    During Bankman-Fried's trial, Wang, Ellison and Singh testified about how they carried out the fraudulent scheme, and revealed how precarious the FTX Group's financial position was—including the period in which the FTX Group, at Bankman-Fried's direction, diverted funds that could have been used to pay creditors to finance the Transfers, in furtherance of the FTX Group's fraudulent scheme.

42.    As early as 2020, and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda, without disclosing to the banks that held those accounts or to FTX.com customers the true nature of the relationship between FTX.com and Alameda.  Trial Tr. at 655:1-17, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023).

43.    Beginning in September 2021, Ellison grew increasingly concerned with the escalating misappropriation of FTX customer assets and attempted to manually track Alameda's net asset value.  In February 2022, Ellison recorded that without "Sam coins"—speculative,

illiquid, and volatile cryptocurrencies peddled by Bankman-Fried—Alameda's net asset value was negative $7.8 billion. By this time, in addition to "borrowing" billions of dollars of customer funds, Alameda had also taken out billions of dollars in loans from third-party lenders. Many of the loans that Alameda had taken were high risk, open-term loans that could be called by the lenders at any time.

44.    Ellison estimated that, by the spring of 2022, Alameda had $10 billion in outstanding loans from third-party lenders, and she understood that a market downturn would leave Alameda unable to satisfy its obligations to its lenders, including lenders like Genesis Global Capital. Ellison also understood that the failure to repay debts would expose the FTX Insiders' fraudulent scheme. *See* Trial Tr. at 724:8-14, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023). In internal spreadsheets, Ellison calculated that, were Alameda to make an additional $3 billion of investments and the market soured, "[t]he probability that Genesis [Global Capital] recalls our loans goes up from 15 percent to 25 percent; and the probability that we're unable to make those loans payments goes up from 30 percent to 100 percent," and "there was no way we would be able to make the payments," even assuming Alameda "would be able to borrow FTX customer funds to make those payments." Trial Tr. at 725:7-20, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023).

45.    Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could [get] from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments . . . in . . . relatively early-stage companies." *Id.* at 693:4-17. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare some alternative ways of presenting the information" and "come up with ways to conceal things in [their]

balance sheet that [they] both thought looked bad." *Id.* at 786:13-22. When third-party lenders sought repayment of open term loans, Alameda would repay them—often using commingled and misappropriated funds obtained through its "unlimited line of credit"—so as to continue to project a façade of financial strength and solvency and prevent lenders from taking legal action that might cause the fraud to come to light.

46.     In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (i.e., government-issued) currencies and cryptocurrencies. Plea Tr. at 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022); *see* Plea Tr. at 27:5-18, ECF No. 19, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022). During Bankman-Fried's criminal trial, Wang further testified that he conspired with Bankman-Fried to commit wire fraud by giving these "special privileges to Alameda on FTX which allowed it to withdraw unlimited funds from [FTX.com]" and "l[ying] about this to the public." Trial Tr. at 304:12-16, ECF No. 356, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 5, 2023).

47.     Singh testified that he and Wang implemented the "allow negative feature," which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit." Trial Tr. at 1362:25-1363:10, ECF No. 366, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main line plan remains, making FTX successful and growing it." *Id.* at 1411:3-1412:10. FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is

and there is nothing we can do about it.  The only thing we can do is grow the company and fill

the hole." *Id.* 1964:12-1965:5.

48.     At their sentencings, Wang, Singh and Ellison acknowledged the effect that their

looting had on FTX Group creditors, including FTX.com exchange customers, stating:

- "I'm deeply sorry to all the people who I've hurt by my actions, to all the customers and investors in FTX who depended on FTX and trusted us with their money.  There was so many things I could have done differently that might have prevented them from losing all their money, but instead I took the easy path, the cowardly path, instead of doing the right thing."  Sentencing Tr. at 11:10-15, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. Nov. 20, 2024), ECF No. 544.

- "So many other good people have suffered as a result of what I took part in, employees who showed me love, trust and kindness, customers who relied on us to safeguard their financial futures and the people of the Bahamas who embraced us.  All of them have paid for my mistakes.  They lost their money and so much more.  I strayed so far from my values, and words cannot fully express how sorry I am to them."  Sentencing Tr. at 21:13-19, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. Oct. 30, 2024), ECF No. 536.

- "I want to start by saying how sorry I am.  I want to apologize most of all to the victims, to all the customers, lenders and investors who lost money as the result of my actions . . . I have participated in a criminal conspiracy that ultimately stole billions of dollars from people who put their trust in us."  Sentencing Tr. at 16:5-24, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. Sep. 24, 2024), ECF No. 524.

## II.     GDA Launches and Kazakhstan Implements Measures to Combat Its Energy Crisis.

49.     GDA rose to prominence in Bitcoin mining operations in Kazakhstan in May 2021.

At the time, GDA possessed significant political connections in Kazakhstan.  Specifically, two of

GDA's co-founders, Rashit Makhat and Abdumalik Mirakhmedov, had close ties to former

President Nursultan Nazarbayev, who remained head of the reigning political party under his

successor, President Kassym-Jomart Tokayev, after leaving office.

50.     Upon information and belief, because of its political connections, GDA initially

benefitted from low taxes and reliable, inexpensive sources of energy.  Throughout 2021, however,

Kazakhstan experienced a rapid influx of Bitcoin miners following China's severe restrictions on

the Bitcoin mining industry.  The surge in cryptocurrency mining operations put severe strain on the country's already fragile electricity grid, causing rolling blackouts, energy shortages, and inflated energy prices nationwide.  This posed a significant threat on the Kazakh cryptocurrency mining industry, as electricity is the largest variable expense for cryptocurrency mining operations.

51.     By summer of 2021, it was clear that an energy crisis was erupting in Kazakhstan. On June 24, 2021, Kazakhstan introduced a new tax on cryptocurrency miners to take effect in January 2022.  Kazakhstan also began the first of many rolling blackouts in July 2021, leading to social unrest.

## III.     Bankman-Fried Bets Big On GDA.

### A.     Alameda's Initial Investment of $100 Million to GDA.

52.     In July 2021, as the FTX Group was regularly "borrowing" customer funds to fill the hole in its balance sheets, and GDA was facing an energy crisis that threatened its continued operations, representatives of both entities began discussions about the FTX Group investing in GDA.  GDA had begun soliciting investors, including the FTX Group, to participate in a funding round to fund expansion into the United States.  In connection with the proposed investment, a member of GDA's board of directors represented that GDA's valuation was $3.25 billion based on a supposed $650 million "run-rate."  The GDA board member also claimed that GDA was "VERY attractively priced" at five times EBITDA.

53.     On July 14, 2021, GDA shared with the FTX Group unaudited financials and projections that did not account for the newly announced—but not yet implemented—Kazakh tax on Bitcoin miners.  Those financials projected annual revenue of $349 million in 2021, $952 million in 2022, $1.857 billion in 2023, and $2.446 billion in 2024.  GDA projected EBITDA of $275 million in 2021, $724 million in 2022, $1.376 billion in 2023, and $1.727 billion in 2024. Although GDA promised that audited financials were forthcoming, Bankman-Fried proceeded

with the transaction on the basis of the misrepresentations the FTX Group had received and without receiving any audited financials. Unsurprisingly, GDA ultimately missed all of its projections.

54.    In connection with Alameda's proposed participation in GDA's strategic raise, GDA also represented that it planned to expand its operations into the United States. In a July 2021 document shared with Alameda, GDA projected that it would have 20 Megawatts of Bitcoin mining capacity in South Carolina by October 2021 and 60 Megawatts by December 2021; 80 Megawatts of Bitcoin mining capacity in North Carolina by March 2022; and 20 Megawatts of Bitcoin mining capacity in Ohio by October 2021 and 220 Megawatts by April 2022.[3]

55.    Based on GDA's representations, Bankman-Fried negotiated an investment of $100 million. However, Bankman-Fried did not retain an investment bank or outside financial advisor to properly value GDA or review its financials and projections. GDA's figures were massively inflated, and failed to account for severe, known threats to the Kazakh mining industry. In fact, after receiving GDA's unaudited financials, the head of product at FTX.com, Ramnik Arora, remarked that GDA's claimed "cost advantage seems ridiculous" and expressed that Alameda's anticipated investment of $100 million would be "paying over the market rate."

56.    Others outside the FTX Group raised issues as well. On August 2, 2021, a U.S.-based hedge fund considering investing in GDA reached out to Bankman-Fried about the GDA investment, asking "how [h]e got comfortable with the ESG [Environmental, Social, and Governance] concerns." The social concerns including widespread blackouts and public backlash, made the industry politically toxic and raised the risk of even harsher regulations, which threatened the viability of GDA's business. Further, GDA's heavy reliance on political connections for

---

[3]    While GDA did ultimately expand its operations into the United States, GDA did not come close to meeting these projections.

preferential energy pricing was untenable in the current environment. The hedge fund ultimately decided not to invest. These risks continued to materialize in the weeks that followed as the Kazakh energy crisis unfolded.

57. On August 31, 2021, Bankman-Fried nonetheless executed a Series A Preferred Share Purchase Agreement to acquire 48 shares of GDA at $2,083,333.34 per share, committing Alameda Ventures Ltd. to a total of $100 million.

**B.      Bankman-Fried Transfers Commingled Customer Funds to GDA as Additional Red Flags Unravel.**

58. The Trust's investigation into the source of funds used for the Transfers to GDA reveals that, in addition to drawing on its "line of credit" at FTX.com, Bankman-Fried also used commingled, misappropriated funds from North Dimension Inc. ("North Dimension") bank accounts to purchase Alameda Venture Ltd.'s interests in GDA. North Dimension was one of the shell companies that was regularly used by the FTX Insiders to facilitate their frauds. As described in the Second Interim Report, Bankman-Fried falsely represented North Dimension to financial institutions as operating "a cryptocurrency trading business," when in fact it had no business operations or employees. Second Interim Report at 11, 18-19.

59. On September 8, 2021, $73 million in FTX Group customer deposits were deposited into North Dimension's account at Silvergate Bank. On the same day, those funds were transferred out of North Dimension's account, and then further transferred through multiple bank accounts belonging to the FTX Group, ultimately landing in an account belonging to Alameda Ventures Ltd. On September 9, 2021, Alameda Ventures Ltd. sent $100,000,000.32 to GDA for the purchase of the GDA shares from its U.S.-based Prime Trust bank account.

60. GDA's bank, however, would not accept the transfer without documentation that Prime Trust sent the money on behalf of Alameda Ventures Ltd., and that Alameda Ventures Ltd.

was the owner of the funds.  On October 5, 2025, GDA's bank returned the transfer, and that same day Alameda Research Ltd. sent $100,000,000.32 to GDA from its U.S.-based Silvergate Bank account to finance the investment.  Upon information and belief, that bank account also contained commingled and misappropriated FTX.com customer deposits.

61.     Upon information and belief, these funds were further transferred to the GDA U.S. Subsidiaries.  Following the investment, Bankman-Fried posted a GDA press release on Twitter, reporting that GDA "announced a new self-hosted industrial-scale bitcoin mining data center in West Texas."  On December 8, 2021, GDA "loaned" DDH-Cholla, LLC $12,000,000.  On December 27, 2021, GDA "loaned" GDA US Inc. $11,049,934.  That same day, GDA US "loaned" DDH NA $10,424,234.  On January 25, 2022, GDA "loaned" DDH-OK-1, LLC €1,000,000.

62.     Upon information and belief, these funds were also used to procure equipment for the GDA U.S. Subsidiaries.  Before February 13, 2022, $94,638,040.56 worth of Bitcoin mining computers were ordered to be sent from GDA's Chinese supplier to DDH NA for use in Texas.

### C. GDA's Failed Secondary Fundraising Round Results in Alameda "Rescue Financing."

63.     Immediately after GDA's summer 2021 funding round came to a close, Kazakhstan's national grid operator formally began to ration electricity.  While households, hospitals, and other essential industries were given priority, cryptocurrency mining firms—which were almost certainly to blame for the energy crisis—were pushed to the back of the line.  Not only were Bitcoin miners subjected to energy caps and rationing, but they also routinely had their power shut off when electricity demand exceeded supply.  Several mining companies were even forced to shut down sites after losing reliable power grid access.  Desperate to escape the crippling Kazakh regulations in favor of their already planned expansion into the United States, GDA soon began soliciting additional funding.

64.     GDA continued to provide misleading financials to investors—and even its own board members—that grossly inflated projections and failed to account for the taxes and restrictions on Kazakh cryptocurrency mining facilities.  On October 26, 2021 a presentation was circulated to GDA board members (which now included Bankman-Fried) to guide the board's "decision on the next round" of funding at the board meeting the following day.  The presentation estimated GDA's enterprise value at $6.5 billion.

65.     On November 23, 2021, Kazakhstan's former President Nazarbayev resigned from his role as the head of the country's ruling political party.  This ended GDA's political influence in the Kazakh government.

66.     Despite the obvious negative implications of this development on the viability of GDA's business model, the following day—and less than one month after the October 26, 2021 board deck valued GDA at $6.5 billion—GDA circulated an updated deck to its board in which GDA's claimed valuation ballooned to a range of $8.3 to $12.2 billion.

67.     But there was a problem:  GDA did not have a single investor interested in another round of financing—a failure that a GDA board member later attributed to GDA's "insane and off-market" valuation.  As a result, GDA changed its fundraising plan to be a "hybrid" secondary financing round to allow Krohn and Makhat to cash out before the value of their shares collapsed.

68.     Despite the lack of interest from any other investors and the subsequent negative political developments that only further darkened GDA's already grim outlook, Bankman-Fried agreed to make an additional hasty investment in GDA.  On November 30, 2021, only six days after the "insane and off-market" valuation, Ramnik Arora circulated term sheets to GDA for (i) a primary investment by Alameda Research LLC in GDA of $400-450 million and (ii) a secondary purchase of $500 million from existing shareholders, Krohn and Makhat.  It was later agreed that

Alameda's primary investment would be $250 million upfront for 77 shares from GDA, plus an option for GDA to sell an additional 77 shares for another $250 million; and Alameda's secondary investment would be $550.9 million for 177 ordinary shares from Makhat (151 shares) and Krohn (26 shares).

### D. Bankman-Fried Fails to Convince the Kazakhstani President to Loosen Mining Restrictions; Violent Protests Erupt in Kazakhstan Over Energy Crisis.

69.    While the parties negotiated the "secondary round," Bankman-Fried, along with other GDA executives and investors, traveled to Kazakhstan to meet with President Kassym-Jomart Tokayev on December 3, 2021.  According to public reporting, the purpose of this trip was to "try to allay the misgivings of the Kazakh government about cryptocurrency mining, which has caused considerable disruption to the country's electricity distribution network."  Bankman-Fried was unsuccessful.

70.    Tokayev remained skeptical about the excessive and unsustainable energy consumption associated with Bitcoin mining.  As one GDA board member later recalled, "taking investors to Kazakhstan to meet the government [didn't] matter," because "[c]orrupt, foreign governments can have special relationships with certain firms for certain periods of time, but it never lasts.  They blow with the wind and have no loyalty."  He noted that, as a result of this failed visit, GDA had "impaired (financially and reputationally) operations in that region which impact the overall firm."

71.    Less than a month after Bankman-Fried's unsuccessful trip to Kazakhstan, and while negotiations and diligence were still ongoing for Alameda's hybrid investment in GDA, violent protests erupted in Kazakhstan over spiking energy prices.  The so-called Bloody January unrest began on January 2, 2022 and continued until January 11, 2022, when it was put down by a coalition of military forces from Russia, Armenia, Belarus, Kyrgyzstan, Tajikistan, and

Kazakhstan.  The violence ultimately cost over two hundred lives, and also resulted in internet outages that shuttered GDA's cryptocurrency mining facilities.

72.    Against this backdrop, in January 2022, the increased tax on cryptocurrency miners went into effect, further crippling GDA.

### E.    Alameda's "Due Dilligence" Results in More Questions Than Answers.

73.    Negotiations for Alameda's hybrid investment continued through January 2022.

74.    Although Alameda made half-hearted attempts at due diligence, GDA failed to cooperate, complaining that Alameda was demanding "too much" due diligence throughout the process.  GDA rejected Alameda's initial due diligence questionnaire as "unjustifiable," and when Alameda sent an abbreviated questionnaire, GDA responded "N/A" to most questions.  GDA also refused to answer follow-up questions from Alameda's representatives.  For example, after Alameda discovered a convertible loan not reflected in the financials, GDA did not confirm whether it had other outstanding convertible notes.

75.    This diligence resulted in more questions than answers.  For example, GDA's financials circulated in connection with the transaction (i) were unsigned, (ii) showed under $85 million in assets—a fraction of what would be expected for a company claiming a valuation of over $5 billion, and (iii) failed to reflect key assets claimed by GDA, including an explanation for GDA's "other reserves" of over $56 million, and a convertible loan agreement and its subsequent conversion.

76.    It was also discovered that the shares Alameda was supposed to purchase from Makhat were issued "without board approval," and that a prior transfer of the shares that Alameda was to purchase from Makhat and Krohn had not been properly recorded.  This was not the only circumstance in which GDA had allowed for the transfer of shares without following the

appropriate protocols.  Diligence also revealed that GDA had mistakenly issued 300 shares to an investor who was only entitled to 204 shares—a $40 million discrepancy.

77.     Diligence further identified 11 discrepancies in GDA's corporate records, contradictions between GDA's Articles of Association and its Shareholders Agreement, inconsistencies in GDA's organizational chart of its subsidiaries, and reports tying Mirakhmedov to tax evasion and money laundering.

78.     On January 8, 2022, GDA's own banker at Citigroup questioned whether GDA's financial projections were "viable" and "reasonable," in communications with Bankman-Fried. The banker sent Bankman-Fried his own recalculations of GDA's financials the following day, resulting in lower forecasts for revenue and EBITDA.

79.     On January 14, 2022, GDA sent yet another set of inflated unaudited financials and projections that also failed to account for Kazakhstan's internet outages, rolling blackouts, energy caps, newly effective tax on miners, and political unrest.  Although GDA's financial position and operating conditions were more perilous than ever, as compared to its July 2021 projections, GDA's January 14, 2022 projections increased its revenue projection for 2022 by 13% to $1.073 billion, increased its revenue projection for 2023 by 66% to $3.096 billion, increased its EBITDA projections for 2022 by 15% to $837 million, and increased its EBITDA projections for 2023 by 78% to $2.458 billion.

80.     A comparison of GDA's January 14, 2022 projections with prior GDA projections also reveals that the January projections had been manipulated.  GDA's prior projections included different electricity rates for the different countries in which it operated, and GDA projected costs based on its anticipated energy use in each country.  In January 2022, when Kazakhstan's new tax on Bitcoin miners took effect, GDA's projections for the first time were calculated based on the

average price of electricity across the countries in which it operated. The result was a 30% understatement of GDA's energy costs. Unsurprisingly, GDA also missed these projections.

**F.     Alameda's $550 Million Transfer to Defendants Krohn and Makhat and $500 Million Transfer to GDA.**

81.     Despite the uncooperative due diligence process, GDA's gross overvaluation, the widespread political unrest, and the newly implemented taxes and crippling energy caps—which were especially severe during the winter months, as Kazakhstan prioritized heating households over supplying power to Bitcoin miners—Bankman-Fried nonetheless pushed forward with the deal.

82.     Bankman-Fried executed an Agreement for the Sale and Purchase of Shares on January 19, 2022, committing Alameda Research LLC to pay Krohn and Makhat a total of $550 million in exchange for 177 shares in GDA. The per share price of $3,112,620.27 represented a 50% increase from the $2,083,333 per share price Alameda paid GDA just three months earlier, when energy prices and regulatory conditions were far less severe, and despite the fact that Alameda would now acquire ordinary (as opposed to preferred) shares. On February 1, 2022, Alameda Research LLC transferred $470,005,660.77 and $80,928,127.02 to Makhat and Krohn, respectively, from its U.S.-based Silvergate Bank account.

83.     As GDA's operations continued to struggle, GDA was severely pressed for cash, and pushed to close another transaction with Alameda. On February 16, 2022, GDA sent a draft Series A Preferred Share Purchase Agreement to Alameda.

84.     On February 17, 2022, U.S.-based investment firm Paradigm—formerly a lead investor in GDA's earlier funding rounds—informed GDA that it would no longer be participating in the funding round that culminated in the February 28, 2022 Stock Purchase Agreement. This left Alameda as the sole investor in the entire $500 million fund raise.

85.    Between February 23 and 25, 2022, GDA sent representation and warranty-related documents, including financial statements, subsidiary loan information, energy contracts, and data purporting to show the results of its Bitcoin mining.  Bankman-Fried signed the Stock Purchase Agreement on behalf of Alameda Research LLC on February 24, 2022—before GDA even completed its delivery of documents.  Pursuant to the agreement, Alameda was to pay $250 million upfront for 77 shares in GDA, and GDA was also granted an option to put another 77 shares to Alameda for an additional $250 million.  GDA countersigned the agreement on February 28, 2022. That same day, Alameda Research LLC wired $250 million to GDA from its U.S.-based Silvergate Bank account.   Upon information and belief, that account contained commingled and misappropriated FTX.com customer deposits.

86.    The share price for this transaction was $3,246,753—56% higher than the price paid just four months earlier and over $134,000 more per share than the price paid to Krohn and Makhat just one month prior.  Again, GDA did not provide, any explanation for this dramatic increase in valuation as operating conditions were getting substantially worse.

87.    On April 7, 2022, GDA exercised its option to put another 77 shares to Alameda for an additional $250 million.   On April 13, 2022, Alameda Research LLC transferred $250,565,931.00 to GDA from its U.S.-based Silvergate Bank account.  Upon information and belief, that account contained commingled and misappropriated FTX.com customer deposits.[4]

88.    In summer 2022, an FTX Group entity hired GDA's co-founder's son as an analyst. In September 2022, the son replaced his father, GDA's co-founder, as GDA's executive chairman, and served as a director of the company along with Bankman-Fried.

---

[4]    While Alameda Research LLC paid for the transfer, the shares were ultimately transferred to Delaware-based Alameda Research Holdings Inc., which is a wholly-owned subsidiary of Alameda Research LLC.

89.     Despite repeated promises, GDA did not provide Alameda any audited financials until December 2023.  In total, Bankman-Fried caused Alameda to transfer $1.15 billion as investments in GDA, including $600 million to GDA and $550 million to Krohn and Makhat.

## IV.  Alameda Did Not Receive Reasonably Equivalent Value for the $1.15 Billion it Transferred to Defendants.

90.     In total, Bankman-Fried caused Alameda to transfer $601 million to GDA in exchange for 192 Series A Preferred Shares in GDA and $500.9 million to Makhat and Krohn in exchange for 177 ordinary shares in GDA.  Alameda vastly overpaid for these shares.

91.     The prices paid by Alameda were based on inflated valuations and projections. Because GDA repeatedly refused to submit to an audit, the valuations were not drawn from verified data but were instead based on GDA's own projections, which were untethered from reality.  The projections concealed the effects of the Kazakhstan energy crisis—including the tenfold increase in taxes on cryptocurrency miners and the energy restrictions that foreseeably resulted in serious electricity shortages for GDA and a material decline in its output (measured by "hash rates").

92.     The valuations not only fluctuated in short timeframes without credible explanation, but were based on "run rates"—an unreliable metric, particularly in markets with large fluctuations from external factors, such as cryptocurrency mining.  Even one of GDA's own board members described its valuation as "insane and off-market."  That GDA board member conceded that the revenue and production projections underpinning GDA's financial statements were "wildly off, consistently."

93.     The financial projections (and the purchase price paid by Alameda) also relied on GDA's projections that it would construct Bitcoin mining facilities in the United States in short order.  GDA had projected that it would have 20 Megawatts of Bitcoin mining capacity in South Carolina by October 2021 and 60 Megawatts by December 2021; 80 Megawatts of Bitcoin mining

capacity in North Carolina by March 2022; and 20 Megawatts of Bitcoin mining capacity in Ohio by October 2021 and 220 Megawatts by April 2022.  Although GDA incorporated GDA US Inc. in Delaware in November 2021, it unsurprisingly did not have sufficient funding to relocate to the United States at that time.  According to a September 2022 board presentation, GDA was on track to have only 75 Megawatts activated between two U.S.-based data centers by the end of that month—less than half the mining power in GDA's July 2021 projections.

94.     In its January 14, 2022 projections, GDA projected that it would have six data centers and 364 Megawatts of Bitcoin mining capacity in the United States by July 2022, but GDA only succeeded in opening two data centers with just 75 Megawatts of capacity by July 2022, over 90% less than GDA projected just months earlier.  In February 2022, GDA represented that it would open 17 data centers in the United States by December 2022 with 875 Megawatts of Bitcoin mining capacity.  Those data centers were supposed to be constructed for and operated by the GDA U.S. Subsidiaries.  However, in October 2022, when GDA's board of directors learned that the production was "a small fraction" of what was promised, a board member pushed for an independent forensic accounting investigation to trace where the investment funds had actually gone, what machines had been purchased, and exactly where they were located.

95.     GDA also had represented that an IPO was imminent.  However, no IPO has occurred.  Upon information and belief, no IPO was ever seriously planned.

96.     Unsurprisingly, GDA's poor historical performance confirms that its shares were significantly overvalued.  By spring 2022, GDA's unaudited financials revealed that "2022 [was] not going that great" with "major negative updates" on hash rates.  By summer 2022, financial updates showed GDA would need yet another funding round to cover its "capital gap."  By August 2023 the company was valued at a fraction of what it had been when Alameda invested.

97.     GDA ultimately missed each and every one of its revenue and EBIDTA projections shared with Alameda.

**V.     The Transfers Were Made When Alameda Was Insolvent.**

98.     At the time of the Transfers, Alameda:  (1) was insolvent;  (2) became insolvent as a result of the Transfers; (3) was engaged in a business or a transaction for which any property remaining with Alameda was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond Alameda's ability to repay as such debts matured.

99.     "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

100.    Bankman-Fried failed to implement the systems or controls necessary for companies entrusted with large amounts of customer money or other assets.  At Bankman-Fried's direction, the Debtors concealed their failing financial condition by misappropriating billions of dollars in cash, cryptocurrency, and other assets from customer accounts.  Bankman-Fried accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of mechanisms by which assets could be transferred within the Debtors' capital structure and, ultimately, out of the Debtors' custody.  As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Bankman-Fried and other FTX executives "to access and steal FTX customer deposits without detection."  *Id.* ¶ 4.

101.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited—with Bankman-Fried's knowledge or assistance—in Alameda or North Dimension bank accounts.  At the same time, although

FTX.com's software code base generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the software to permit Alameda to maintain a negative balance in its account on the exchange.

102.    Through these schemes, Bankman-Fried caused Alameda to avoid collateralizing its position on the exchange.  Bankman-Fried  also caused Alameda to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As a result of this tampering, the FTX.com exchange began running very large deficits, including during the time period in which Bankman-Fried caused approximately $1 billion to be transferred to the Defendants.

103.    In February 2022, Ellison estimated that without "Sam coins"—speculative, illiquid, and volatile cryptocurrencies peddled by Bankman-Fried—Alameda's net asset value was negative $7.8 billion.  By March 2022, Ellison privately estimated that FTX.com had a cash deficit alone of more than *$10 billion.*

104.    Bankman-Fried's misappropriation of funds rendered the FTX Group insolvent. Even without accounting for the distorting effects of the staggering fraud, the FTX Group's liabilities exceeded the fair value of their assets, and the Debtors lacked sufficient cash, cryptocurrency and other assets to cover customer accounts and their creditors' claims.  The FTX Group continued to operate only by continually concealing and lying to customers and other creditors about their financial condition and their pervasive misuse of customer funds.  Alameda's financial condition was particular dire, given that it had continuously operated using commingled and misappropriated funds, to which it had no right.

105.    Ellison admitted to this conduct in her plea allocution, stating that (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds.  Singh made similar admissions during his plea allocution.

106.    On November 2, 2023, Bankman-Fried was found guilty of various felonies arising out of, among other things, Bankman-Fried's causing Alameda to misappropriate FTX.com funds and Bankman-Fried's misrepresenting to lenders and investors the financial condition of Alameda and FTX.com.

## VI.    The Transfers Were Made for the Benefit of the GDA U.S. Subsidiaries.

107.    The Transfers were intended for, and were in fact used for GDA's expansion into the United States.  Although the scale of GDA's U.S. operations fell far short of GDA's projections, the Transfers nonetheless enabled GDA to develop its U.S. footprint.  Through the GDA U.S. Subsidiaries, GDA succeeded in opening at least four data centers in the United States, as well as importing necessary equipment for Bitcoin mining operations.  On information and belief, these U.S. entities had no sources of funds other than those raised by GDA, including the $600 million transferred to it by Alameda.

108.    On information and belief, the same individuals that controlled GDA also controlled the GDA U.S. Subsidiaries during the relevant period, and were at all times aware that Alameda received less than reasonably equivalent value for the Transfers.

**VII.    The GDA Transfers Were Part and Parcel of Bankman-Fried's Fraudulent Scheme to Enrich Himself.**

109.    Beginning in 2019 and continuing through 2022, Bankman-Fried conspired with Ellison and others to divert funds to Alameda that were intended to be deposited at FTX.com, so that Bankman-Fried could enrich himself.  *See* Superseding Indictment ¶ 18, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.  The Transfers were inextricably linked to this fraudulent scheme.

110.    By 2021, Bankman-Fried had already caused billions of dollars of customer funds to be diverted from the FTX.com exchange to Alameda.  Despite the ballooning debt Alameda owed FTX.com, Bankman-Fried caused Alameda to pay more than $1.15 billion for wildly overvalued GDA shares.  The Transfers were designed to benefit Bankman-Fried personally:  as the 90% owner of Alameda, he stood to capture nearly all of the upside from GDA's inflated valuation and potential success (both of GDA and Bitcoin generally) while at the same time externalizing the losses to the FTX Group's creditors and customers.

111.    Bankman-Fried pursued these investments with indifference to red flags and Defendants' flagrant misrepresentations precisely because he was gambling with commingled, misappropriated funds.  In round after round, Bankman-Fried agreed to pay ever higher valuations, even as GDA's business model collapsed under the weight of Kazakhstan's energy crisis and social unrest.

**VIII.    The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay, or Defraud Creditors.**

112.    As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the Transfers, including that:

i.    The Transfers were part of a scheme to enrich and otherwise benefit Bankman-Fried, including through his 90% ownership of Alameda;

ii.    The Transfers were funded by and in furtherance of Bankman-Fried's larger fraudulent scheme to risk customer funds on speculative investments and his aggrandizement;

iii.    Bankman-Fried misled creditors by, among other things, using a shell company to hide the source of the funds used for the Transfers;

iv.    The Transfers arose out of a close relationship between Bankman-Fried and the founders of GDA, including Krohn and Makhat;

v.    Bankman-Fried was largely indifferent to the per share price paid, and prioritized speed over diligence;

vi.    Bankman-Fried removed or concealed Alameda's assets;

vii.    The value of the consideration received by Alameda was not reasonably equivalent to the value of the assets transferred;

viii.    The Debtors were insolvent when, or became insolvent shortly after, the Transfers were made; and

ix.    The Transfers occurred shortly before or shortly after the Debtors incurred substantial debts.

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST DEFENDANTS GDA, MAKHAT and KROHN)**

113.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

114.    Debtors made the Transfers addressed herein on or around October 5, 2021, February 28, 2022, and April 13, 2022.  Each of the Transfers to GDA, Makhat and Krohn was a transfer of property of the Debtors.

115.    Each of these Transfers to GDA, Makhat and Krohn was made with the intent to hinder, delay, or defraud present or future creditors.

116.    Accordingly, each of these Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiff may recover from GDA, Makhat and Krohn the full amount of such Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS GDA, MAKHAT and KROHN)**

117.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

118.    Section 544(b) of the Bankruptcy Code authorizes Plaintiff to avoid any transfer of an interest in property of the Debtors that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

119.    Debtors made the Transfers addressed herein on or around October 5, 2021, February 28, 2022, and April 13, 2022.  Each of the Transfers to GDA, Makhat and Krohn was a transfer of property of the Debtors.

120.    Each of these Transfers to GDA, Makhat and Krohn was made with the intent to hinder, delay, or defraud present or future creditors.

121.    Accordingly, each of these Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff may recover from GDA, Makhat and Krohn the full amount of such Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST DEFENDANTS GDA, MAKHAT, and KROHN)**

122.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

123.    Debtors made the Transfers addressed herein on or around October 5, 2021, February 28, 2022, and April 13, 2022.  Each of the Transfers to GDA, Makhat and Krohn was a transfer of property of the Debtors.

124.    Debtors did not receive reasonably equivalent value in exchange for any of the Transfers.

125.    Each of the Debtors:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Debtor was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond its ability to repay as such debts matured.

126.     Accordingly, each of these Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from GDA, Makhat and Krohn the full amount of such Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305, AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS GDA, MAKHAT and KROHN)**

127.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

128.     Section 544(b) of the Bankruptcy Code authorizes Plaintiff to avoid any transfer of an interest in property of the Debtors that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

129.     Debtors made the Transfers addressed herein on or around October 5, 2021, February 28, 2022, and April 13, 2022.  Each of the Transfers to GDA, Makhat and Krohn was a transfer of property of the Debtors.

130.     Debtors did not receive reasonably equivalent value in exchange for any of the Transfers.

131.     Each of the Debtors:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Debtor was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond its ability to repay as such debts matured.

132.    Accordingly, each of these Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiff may recover from GDA, Makhat and Krohn the full amount of such Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT FIVE
### PROPERTY RECOVERY
### PURSUANT TO 11 U.S.C. § 550(a)(1)
### (AGAINST DEFENDANTS GDA, MAKHAT and KROHN)

133.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

134.    As alleged above, Plaintiff is entitled to avoid each of the Transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

135.    Because GDA, Makhat and Krohn are the initial transferees or the entities/individuals for whose benefit such transfers were made, Plaintiff may recover from GDA, Makhat and Krohn the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT SIX
### PROPERTY RECOVERY
### PURSUANT TO 11 U.S.C. § 550(a)(2)
### (AGAINST DEFENDANTS DDH NA, GDA US, DDH-OK-1, LLC, and DDH-CHOLLA, LLC)

136.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth here.

137.    As alleged above, Plaintiff is entitled to avoid each of the Transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

138.     Because GDA US, DDH NA, DDH-OK-1, LLC and DDH-Cholla, LLC are subsequent transferees who did not take for value or in good faith, Plaintiff may recover from GDA US, DDH NA, DDH-OK-1, LLC and DDH-Cholla, LLC the full value of the transfers set forth in paragraphs 61-62 pursuant to 11 U.S.C. 550(a)(2), plus interest from the transfer dates, and cost and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

139.     Enter an order that the Transfers addressed herein are avoidable fraudulent transfers and obligations under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

140.     Award Plaintiff under 11 U.S.C. § 550 no less than $1,150,933,788.11 (plus the value of any additional avoidable transfers that Plaintiff learns, through formal discovery or otherwise, were made to Defendants);

141.     Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

142.     Award Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:  September 22, 2025
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        ehrenbergs@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sascha N. Rand (admitted *pro hac vice*)
Isaac Nesser (admitted *pro hac vice*)
Heather Christenson (admitted *pro hac vice*)
Andrew Kutscher (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
E-mail: sascharand@quinnemanuel.com
        isaacnesser@quinnemanuel.com
        heatherchristenson@quinnemanuel.com
        andrewkutscher@quinnemanuel.com

*Counsel for Plaintiff FTX Recovery Trust*