```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 22-11068 (KBO)
 4   FTX TRADING LTD., et al.,     .
                                   .  (Jointly Administered)
 5                                 .
             Debtors.             .
 6                                 .
     . . . . . . . . . . . . . . .  .
 7                                 .
     FTX RECOVERY TRUST,           .  Adversary Proceeding
 8                                 .  No. 24-50184 (KBO)
             Plaintiff,           .
 9                                 .
        -against-                  .
10                                 .
     GATE TECHNOLOGY INCORPORATED, .
11   GATE GLOBAL, CORP., GATE      .
     INFORMATION PTE. LTD., and    .
12   SUN YUNZHI,                   .
                                   .
13           Defendants.           .
                                   .
14   . . . . . . . . . . . . . . .  .
                                   .
15   FTX RECOVERY TRUST,           .  Adversary Proceeding
                                   .  No. 24-50188 (KBO)
16           Plaintiff,           .
                                   .
17      -against-                  .
                                   .
18   FORIS DAX MT LTD., FORIS DAX  .
     ASIA PTE. LTD., FORIS DAX,    .  Courtroom No. 3
19   INC., and IRON BLOCK CAPITAL, .  824 Market Street
                                   .  Wilmington, Delaware 19801
20           Defendants.           .
                                   .  Wednesday, June 25, 2025
21   . . . . . . . . . . . . . . .  .  9:34 a.m.

22                      TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE KAREN B. OWENS
23               CHIEF UNITED STATES BANKRUPTCY JUDGE

24

25                          - Cont'd -
```

```
 1   FTX RECOVERY TRUST,              .   Adversary Proceeding
                                      .   No. 24-50189 (KBO)
 2            Plaintiff,              .
                                      .
 3       -against-                    .
                                      .
 4   AMERICAN ACTION                  .
     NETWORK, INC.,                   .
 5                                    .
              Defendant.              .
 6                                    .
     . . . . . . . . . . . . . . .    .
 7                                    .
     FTX RECOVERY TRUST,              .   Adversary Proceeding
 8                                    .   No. 24-50190 (KBO)
              Plaintiff,              .
 9                                    .
         -against-                    .
10                                    .
     AMERICAN PROSPERITY ALLAINCE,    .
11                                    .
              Defendant.              .
12                                    .
     . . . . . . . . . . . . . . .    .
13                                    .
     FTX RECOVERY TRUST,              .   Adversary Proceeding
14                                    .   No. 24-50191 (KBO)
              Plaintiff,              .
15                                    .
         -against-                    .
16                                    .
     AMERICAN VALUES                  .
17   COALITION, INC.,                 .
                                      .
18            Defendant.              .
                                      .
19   . . . . . . . . . . . . . . .    .

20

21

22

23

24

25                          - Cont'd -
```

```
 1  FTX RECOVERY TRUST,                 .  Adversary Proceeding
                                        .  No. 24-50192 (KBO)
 2          Plaintiff,                  .
                                        .
 3      -against-                       .
                                        .
 4  COMMON SENSE LEADERSHIP             .
    FUND, INC. a/k/a COMMONSENSE        .
 5  LEADERSHIP FUND,                    .
                                        .
 6          Defendant.                  .
                                        .
 7  . . . . . . . . . . . . . . . . .   .
                                        .
 8  FTX RECOVERY TRUST,                 .  Adversary Proceeding
                                        .  No. 24-50193 (KBO)
 9          Plaintiff,                  .
                                        .
10      -against-                       .
                                        .
11  CONGRESSIONAL LEADERSHIP            .
    FUND,                               .
12                                      .
            Defendant.                  .
13                                      .
    . . . . . . . . . . . . . . . . .   .
14                                      .
    FTX RECOVERY TRUST,                 .  Adversary Proceeding
15                                      .  No. 24-50197 (KBO)
            Plaintiff,                  .
16                                      .
        -against-                       .
17                                      .
    FARMINGTON STATE CORPORATION        .
18  (f/k/a FARMINGTON STATE BANK,       .
    d/b/a GENIOME BANK, d/b/a           .
19  MOONSTONE BANK), FBH                .
    CORPORATION, and JEAN               .
20  CHALOPIN,                           .
                                        .
21          Defendants.                 .
                                        .
22  . . . . . . . . . . . . . . . . .   .

23

24

25                              - Cont'd -
```

```
 1  FTX RECOVERY TRUST,              .  Adversary Proceeding
                                     .  No. 24-50199 (KBO)
 2          Plaintiff,               .
                                     .
 3     -against-                     .
                                     .
 4  NEW YORK SOLIDARITY NETWORK,     .
                                     .
 5          Defendant.               .
                                     .
 6  . . . . . . . . . . . . . . . .  .
                                     .
 7  FTX RECOVERY TRUST,              .  Adversary Proceeding
                                     .  No. 24-50200 (KBO)
 8          Plaintiff,               .
                                     .
 9     -against-                     .
                                     .
10  ONE NATION, INC.,                .
                                     .
11          Defendant.               .
                                     .
12  . . . . . . . . . . . . . . . .  .
                                     .
13  FTX RECOVERY TRUST,              .  Adversary Proceeding
                                     .  No. 24-50201 (KBO)
14          Plaintiff,               .
                                     .
15     -against-                     .
                                     .
16  PROSPERITY ALLIANCE, INC.,       .
                                     .
17          Defendant.               .
                                     .
18  . . . . . . . . . . . . . . . .  .
                                     .
19  FTX RECOVERY TRUST,              .  Adversary Proceeding
                                     .  No. 24-50202 (KBO)
20          Plaintiff,               .
                                     .
21     -against-                     .
                                     .
22  SENATE LEADERSHIP FUND,          .
                                     .
23          Defendant.               .
                                     .
24  . . . . . . . . . . . . . . . .  .

25                          - Cont'd -
```

```
 1   FTX RECOVERY TRUST,                 .   Adversary Proceeding
                                         .   No. 24-50203 (KBO)
 2            Plaintiff,                 .
                                         .
 3        -against-                      .
                                         .
 4   VOTO LATINO, INC.,                  .
                                         .
 5            Defendant.                 .
                                         .
 6   . . . . . . . . . . . . . . . .     .
                                         .
 7   FTX RECOVERY TRUST,                 .   Adversary Proceeding
                                         .   No. 24-50204 (KBO)
 8            Plaintiff,                 .
                                         .
 9        -against-                      .
                                         .
10   WORKING AMERICA,                    .
                                         .
11            Defendant.                 .
                                         .
12   . . . . . . . . . . . . . . . .     .
                                         .
13   FTX RECOVERY TRUST,                 .   Adversary Proceeding
                                         .   No. 24-50211 (KBO)
14            Plaintiff,                 .
                                         .
15        -against-                      .
                                         .
16   SECUREBIO, INC. dba                 .
     SECUREBIO,                          .
17            Defendant.                 .
                                         .
18   . . . . . . . . . . . . . . . .     .
19
20
21
22
23
24
25                                - Cont'd -
```

```
 1   FTX RECOVERY TRUST,              .   Adversary Proceeding
                                      .   No. 24-50212 (KBO)
 2                                    .
            Plaintiff,               .
 3                                    .
        -against-                    .
 4                                    .
     THE GOODLY INSTITUTE dba         .
 5   GOODLY LABS,                     .
                                      .
 6          Defendant.               .
                                      .
 7   . . . . . . . . . . . . . . .  .
     FTX RECOVERY TRUST,              .   Adversary Proceeding
 8                                    .   No. 24-50213 (KBO)
                                      .
 9          Plaintiff,               .
                                      .
10      -against-                    .
                                      .
11   SPARTZ PHILANTHROPIES, dba       .
     RETHINK CHARITY and              .
12   NONLINEAR,                       .
                                      .
13          Defendant.               .
                                      .
14   . . . . . . . . . . . . . . .  .
     FTX RECOVERY TRUST,              .   Adversary Proceeding
15                                    .   No. 24-50214 (KBO)
                                      .
16          Plaintiff,               .
                                      .
17      -against-                    .
                                      .
18   MANIFOLD MARKETS, INC.,          .
                                      .
19          Defendant.               .
                                      .
20   . . . . . . . . . . . . . . .  .

21

22

23

24

25                          - Cont'd -
```

```
 1   FTX RECOVERY TRUST,                .   Adversary Proceeding
                                        .   No. 24-50220 (KBO)
 2                                      .
              Plaintiff,                .
 3                                      .
         -against-                      .
 4                                      .
     DENG JUN, SHEN LING, TU JING,      .
 5   DENG DINGYUAN, DENG LAN, DENG      .
     JIAN, TU FAN, PAN YANG LIAN,       .
 6   HU JINGMING, HU SIFENG, YANG       .
     YUHUA, QIN YONG QIANG, HUANG       .
 7   YAO, DAI FUYANG, FU LING,          .
     CHEN CHAO, SHEN LIUGEN, LIN        .
 8   GUODONG, YANG YIBO, XU MIN,        .
     XU HONG, WAN JIAN, WU QIAO,        .
 9   WU TIANMING, LI PING, JIA          .
     SHUYUN, and JOHN DOES 1-20,        .
10                                      .
              Defendants.               .
11                                      .
     . . . . . . . . . . . . . . . .
12   FTX RECOVERY TRUST,                .   Adversary Proceeding
                                        .   No. 25-50635 (KBO)
13                                      .
              Plaintiff,                .
14                                      .
         -against-                      .
15                                      .
     KUROSEMI, INC.,                    .
16                                      .
              Defendant.                .
17                                      .
     . . . . . . . . . . . . . . . .
18   FTX RECOVERY TRUST,                .   Adversary Proceeding
                                        .   No. 25-50636 (KBO)
19                                      .
              Plaintiff,                .
20                                      .
         -against-                      .
21                                      .
     NFT STARS LIMITED,                 .
22                                      .
              Defendant.                .
23                                      .
     . . . . . . . . . . . . . . . .
24
25                                 - Cont'd -
```

1   APPEARANCES:

2   For the FTX
    Recovery Trust:              Matthew R. Pierce, Esquire
3                                LANDIS RATH & COBB, LLP
                                 919 Market Street
4                                Suite 1800
                                 Wilmington, Delaware 19801
5
                                 -and-
6
                                 Brian D. Glueckstein, Esquire
7                                Christopher J. Dunne, Esquire
                                 SULLIVAN & CROMWELL, LLP
8                                125 Broad Street
                                 New York, New York 10004
9

10  For Claimant
    No. 911658:                  R. Stephen McNeill, Esquire
11                               POTTER ANDERSON & CORROON, LLP
                                 1313 North Market Street
12                               6th Floor
                                 Wilmington, Delaware 19801
13

14  For Seth Melamed:            David Adler, Esquire
                                 MCCARTER & ENGLISH, LLP
15                               Worldwide Plaza
                                 825 Eighth Avenue
16                               31st Floor
                                 New York, New York 10019
17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:              Shaheed Austin, Jr., ECRO

21  Transcription Company:       Reliable
                                 The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1  <u>APPEARANCES (CONTINUED)</u>:

2  For Ross
   Rheingans-Yoo:              Michael J. Joyce, Esquire
3                              THE LAW OFFICES OF JOYCE, LLC
                               1225 King Street
4                              Suite 800
                               Wilmington, Delaware 19801
5
                               -and-
6
                               Scott D. Simon, Esquire
7                              GOETZ PLATZER, LLP
                               One Penn Plaza
8                              Suite 3100
                               New York, New York 10119
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                            INDEX

 2   MOTIONS:                                            PAGE

 3   Agenda
     Item 41:  Debtors' Objection to Proof of Claim filed by   20
 4             Ross Rheingans-Yoo
               [D.I. 3409, filed on October 30, 2023]
 5
               Court's Ruling:                          45
 6
     Agenda
 7   Item 42:  Motion to Extend Time to Complete KYC     --
               Requirements
 8             [D.I. 30432, filed on May 16, 2025]

 9             Court's Ruling:                           --

10   Agenda
     Item 43:  Motion to Appear Remotely Via Video Conference
11             [D.I. 30433, filed om May 16, 2025]

12             Court's Ruling:                           --

13   Agenda
     Item 44:  Debtors' Amended Objection to Proofs of Claim   48
14             Filed by Seth Melamed and Motion for
               Subordination Pursuant to 11 U.S.C. §§ 510(B)
15             and 510(C)(1)
               [D.I. 28643, filed on December 9, 2024]
16
               Court's Ruling:                          86
17
     Agenda
18   Item 45:  Opposition to Debtors Amended Objection to      48
               Proofs of Claim and Motion for Subordination
19             Pursuant to 11 U.S.C. §§ 510(B) and 510(C)(1)
               and Cross-Motion to Compel Arbitration
20             [D.I. 30077, April 7, 2025]

21             Court's Ruling:                          86

22

23

24

25
</pre>

1                                EXHIBITS

2   DECLARATIONS:                                        PAGE

3   1 - Declaration of Taro Tanaka, Docket 28646, 30367      50

4   2 - Declaration of Balakrishnan A. Kumar, Docket 30365   50

5   3 - Declaration of Ryo Kawabata, Docket 30078           67

6   4 - Declaration of Takane Hori, Docket 30079, 30080     67

7

8   Transcriptionists' Certificate                          87

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 9:34 a.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Good morning, everyone.  Nice to see

4    you.  Please be seated.

5                Good morning.

6                MR. PIERCE:  Good morning, Your Honor.

7                Matthew Pierce with Landis Rath & Cobb, on behalf

8    of the FTX Recovery Trust.

9                Your Honor, consistent with the Court's direction

10   at the May hearing, we've split the agenda into a morning

11   session, with respect to the omnibus matters and then an

12   afternoon session with respect to the Melamed claim objection

13   matters, which appear at Agenda Items 44 and 45.

14               Your Honor, the majority of the matters set for

15   the morning session are resolved.  We appreciate the Court

16   for entering the orders that were submitted under CNO and

17   COC.

18               THE COURT:  Happy to do so.

19               MR. PIERCE:  From the FTX Recovery Trust's

20   position, there's only one matter set -- remaining to go

21   forward this morning, which is Agenda Item 41, which is the

22   Ross Rheingans-Yoo claim objection.  Your Honor, we're aware

23   that there may be a scheduling matter that may need to be

24   addressed with respect to the claim objection response filed

25   by Mr. McNeill's client and we're happy to proceed with the

1  agenda however the Court would like.

2          THE COURT:  Why don't we take Mr. McNeill's issue

3  first and then we'll go into the more substantive matter.

4          MR. MCNEILL:  Good morning, Your Honor.

5          Steve McNeill from Potter Anderson & Corroon, here

6  on behalf of my client who has been identified with a unique

7  code of 911658.  I understand customer identifications are

8  sealed in this matter, Your Honor.

9          And thank you for the time in court this morning,

10  Your Honor.  I apologize for the early-morning email.

11          Essentially, Your Honor, my client was the subject

12  of the one-hundred-and-sixtieth-omnibus objection that was

13  filed back, I believe, in February.  We had originally

14  reached out regarding potential settlement resolution, got an

15  adjournment.  The adjournment was in perpetuity.  Things

16  weren't progressing fast enough for my client, so he wanted

17  us to move forward.

18          We reached out to counsel on May 23rd via email

19  and said, you know, we'd like to move this forward and, if

20  not, we want to go forward at today's hearing unless you give

21  us some documents.  They did give us some documents.  We

22  ultimately decided the documents weren't helpful; didn't

23  really support their position.  There's been no settlement

24  offers proposed either way, Your Honor.

25          So, we filed our objection last Wednesday.  We

1   noted on our objection that we, that -- with a hearing date

2   for today.  And then, when the agenda was filed, we noticed

3   that we were not listed on the agenda at all.  We reached out

4   to counsel and, you know, asked why; apparently, there was

5   some misunderstanding regarding the production of documents

6   and that, you know, whether that moved our request to go

7   forward today or not.

8           Nevertheless, Your Honor, we're here.  We want to

9   go forward.  My client is interested in resolving this and

10  moving on with his life and I believe that it is a contested

11  matter.  Since we filed the objection, we filed it a week

12  before, as is customary for objections in this district.  We

13  gave -- we filed it a week ago with today's hearing in mind,

14  Your Honor, and it's just not on the agenda.

15          But our request would be that we go forward today

16  on this matter.

17          THE COURT:  My understanding is that your claim

18  objection alleges fraudulent inducement, is that correct, or

19  your claim alleges fraudulent inducement?

20          MR. MCNEILL:  It's -- it was filed *pro se* by my

21  client Your Honor.

22          There is a fraudulent component; essentially, it

23  involves what was supposed to be a charitable donation.

24          THE COURT:  Uh-huh.

25          MR. MCNEILL:  My client made the charitable

1  donation to FTX philanthropy or whatever it's called now.

2  Made that do nation.  We do not believe that it ever left and

3  went out to any charity.

4         And so, Your Honor, in our view, that is -- you

5  know, all the funds at FTX are commingled and our view is it

6  never left the commingled accounts.  And even if it did, FTX

7  has been suing charities left and right to claw back money

8  that was paid to the charities.  But that is our position,

9  Your Honor, is that, basically, we were fraudulently induced

10 into making a gift that never left the FTX estate.

11        THE COURT:  Okay.  I ask because that type of

12 claim seems highly evidentiary in nature.

13        Are you prepared to go forward today with your

14 evidence?

15        MR. MCNEILL:  I don't believe so, Your Honor.

16 There's an abundance of evidence attached to the proof of

17 claim, but I appreciate that Your Honor probably hasn't seen

18 that either --

19        THE COURT:  Okay.

20        MR. MCNEILL:  -- because it probably wasn't in the

21 claims objection binder.

22        THE COURT:  Okay.

23        MR. MCNEILL:  But, Your Honor, that is, you know,

24 that would be our evidence, would be what was attached --

25 what was included and attached to the proof of claim, as well

1  as the couple of exhibits to our response.

2          THE COURT:  Okay.  That's helpful.  Thank you.

3          MR. MCNEILL:  Thank you.

4          MR. GLUECKSTEIN:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. GLUECKSTEIN:  Good to see you.

7          Brian Glueckstein, Sullivan & Cromwell, for the

8  FTX Recovery Trust.

9          So, we have a very different perspective on this,

10  Your Honor, and I think Your Honor is hitting on some of the

11  salient points.  We did agree -- this was one of numerous

12  claims, of course, that was in the hundred-and-sixtieth

13  omnibus objection.  We did engage with counsel when they

14  reached out; we gave them an extension.  We did, consistent

15  with counsel's remarks, they wanted documents, they wanted

16  information.  We provided that information, provided that

17  information on June 5th.  We offered to discuss it on the

18  phone.  We received no substantive engagement.

19          They did file a further, a response to the

20  objection last week.  They filed it under seal.  It raises

21  numerous factual issues, many of which we dispute.  If it is

22  the case, and apparently it is, because the first at least I

23  heard about this was last evening, that they intended to go

24  forward today or wanted to go forward today; if that is the

25  case and they're no longer interested in discussing this

1  claim with us, that's fine.  That's their right.

2        But, then, what we would like to do is address a

3  litigation schedule on this claim.  We believe that it might

4  be discovery that's necessary, based on the filing that they

5  filed last week.  We have some fundamental disagreements.

6  Counsel just referenced things like tracing and where money

7  went; that's, by nature, of course, evidentiary.  And we

8  think we should prepare for a hearing if that is, in fact,

9  necessary on this claim.

10        But, certainly, there's nothing before the Court

11 today.  The Court doesn't have the information it needs to

12 rule on this and the suggestion that this could just be

13 granted, based on a proof of claim that was filed is,

14 obviously, something we disagree with.

15        THE COURT:  Okay.  All right.

16        Well, listen, I agree that this matter is

17 premature.  I think I would at least need a reply from the

18 Trust --

19        MR. GLUECKSTEIN:  Right.

20        THE COURT:  -- but, also, beyond that, there

21 potentially is factual discovery that will be necessary.  I

22 agree that the parties need to meet and confer and discuss on

23 a schedule moving forward.

24        It sounds, Mr. McNeill, that you would like to

25 move forward sooner rather than later, your client would.

1  And so that's fine, I think we have omnibus -- we have dates

2  scheduled in this case that you could put the matter on and

3  then drive the parties to litigation on this.

4          So, why don't you meet and confer on a schedule

5  and a hearing date and we'll move forward with that.  You can

6  use an omni if we think that you can get it done --

7          MR. MCNEILL:  Okay.  Thank you -- yeah, thank you,

8  Your Honor.

9          THE COURT:  -- in the omnibus time.

10          MR. MCNEILL:  I think we're trying to schedule a

11  call, I think, tomorrow, but it was, you know, kind of -- it

12  was kind of too little too late at that point --

13          THE COURT:  Yeah.

14          MR. MCNEILL:  -- and so, I did want to raise it

15  for Your Honor because I think, you know, we had a

16  fundamental disagreement about even the tracing thing, given

17  the facts and circumstances of this case, Your Honor.  But I

18  understand your ruling and we will meet and confer and get

19  this back on the calendar.

20          THE COURT:  That would be great.

21          MR. MCNEILL:  Thank you, Your Honor.

22          THE COURT:  That would be helpful.

23          And the docket is becoming unmanageable, it seems,

24  so it's important that you all keep abreast of your matters

25  and do what you did to keep pushing forward to get them

1  scheduled, because things can just get lost.  So it's

2  incumbent upon everyone to be focused and advocate their

3  scheduling, I think, in a case of this nature, so thank you.

4          MR. MCNEILL:  Thank you, Your Honor.

5          I'm not sure there's much else going forward, but

6  I am not interested in it.

7          May I and my colleague be excused?

8          THE COURT:  That would be fine.

9          And just one more thing.  I'm fine with you all

10  want to agree on an informal schedule, but to the extent that

11  there'll be further deadlines that we could, perhaps, from

12  the Court's standpoint, keep track of, like, in a reply

13  deadline and when you want to schedule it for a hearing, if

14  you could just keep us abreast of it, I would appreciate it

15  because we'll monitor and be able to prepare for the hearing,

16  as opposed to, you know, receive a reply two days before the

17  hearing.  It just makes it difficult for us to be -- to

18  prepare.

19          MR. MCNEILL:  Absolutely, Your Honor.

20          THE COURT:  If you want to do a more formal order,

21  just submit it under certification of counsel and I'll enter

22  that order.  It's up to you.

23          MR. MCNEILL:  Okay.  Thank you, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          You may be excused.

1          MR. GLUECKSTEIN:  Thank you, Your Honor.

2          And point understood, and we are, as the Trust,

3   endeavoring to do that.  We understand there are a number of

4   matters, there are a number of claims objections that are

5   pending.  We are, certainly, only trying to bring forward the

6   ones that we believe are ripe and ready for the Court's

7   attention --

8          THE COURT:  Okay.

9          MR. GLUECKSTEIN:  -- that we're unable to resolve.

10  And we, of course, will give the Court sufficient notice on

11  that.

12          THE COURT:  Okay.  Thank you.

13          MR. GLUECKSTEIN:  With respect to the matter going

14  forward this morning, and we have successfully, as Mr. Pierce

15  referenced, been able to resolve many of the matters that

16  were originally scheduled for this morning's session,

17  consensually.  Well, there was a late adjournment on one that

18  we're talking to the movant.

19          So, as far as this morning goes, the only matter

20  going forward is Agenda Item 41, which is there's objection

21  to the remaining portion of the proof of claim filed by Ross

22  Rheingans-Yoo.  Your Honor, there was a lot of paper

23  associated with this claim, but there's very little of it

24  that's still relevant at this point.

25          THE COURT:  I'm motioning for the counsel to the

1  claimant to move forward and set yourself up at counsel's

2  table, if you see fit.

3          (Pause)

4          MR. GLUECKSTEIN:  And specifically, Your Honor,

5  with respect to the landscape of this claim, in April

6  of 2024, the Debtors were able to settle all aspects of this

7  claim except for what is referred to in the briefing as the

8  "FDU claim," which relates to a portion of a claimed bonus

9  where the claimant asserts FTX will make, upon election, a

10  $650,000 donation to an effective, alterous cause of the

11  movant's choosing if he wants, is the language that was used.

12          We resolved everything else.  We left that claim

13  expressly open because there was a disagreement with that

14  claim that could not be reached.  And so, where we -- what we

15  tried to do was streamline this issue for the Court.  And the

16  parties are in agreement that the question before the Court

17  today is really one that's legal in nature and application of

18  what are undisputed facts at this point; in fact, we have

19  filed a stipulation of undisputed facts, filed at

20  Docket 29218, so that there are no material facts in dispute

21  and we agreed no evidentiary hearing would be necessary.

22          I will briefly address why the claim, from the

23  Trust's perspective, can never be allowed.  We did address

24  these points comprehensively in our reply brief filed at

25  Docket 30712.  But just for a bit of context, Your Honor,

1   stepping back, what Mr. Rheingans-Yoo is asking this Court to

2   do is to compel the FTX Recovery Trust to make a $650,000

3   payment to a still-undisclosed, effective, alterous charity

4   of his choosing from funds that, of course, have been

5   recovered for the benefit of FTX creditors to be distributed

6   to victims of the fraud and the matters that have been before

7   this Court for, unbelievably, will soon be three years.

8            Mr. Rheingans-Yoo is seeking this money to be paid

9   out of the trust, despite the fact that the offer to make

10  such a donation that if it had been accepted prepetition --

11  and there's no dispute that there was never any designation

12  made by the claimant prepetition; there was never a request

13  made to FTX prepetition that's in the stipulated facts -- but

14  if a request had been made and a payment had gone out in the

15  period of time that we're talking about prepetition, the

16  Debtors would have sought to claw this money back as a

17  fraudulent transfer, alongside the approximately $95 million

18  and counting of improper, prepetition FTX donations that were

19  made to hundreds of entities that have already been brought

20  back into the estate.

21           The record of FTX making specious, fraudulent,

22  improper payments to purported charities and political groups

23  is well-documented in the record of these Chapter 11 cases

24  and elsewhere.  There's no basis, legally, equitably or

25  otherwise to permit Mr. Rheingans-Yoo to force the Recovery

1  Trust to make the $650,000 payment to an undisclosed

2  recipient now, when if FTX had done so prepetition, we submit

3  it would not have been permitted to stand.

4       The request for payment that the claimant has

5  dressed up as a claim, we submit, must be denied for three

6  independent reasons and just to touch on them briefly, first,

7  the movant has -- the claimant has no standing to recover on

8  the FDU claims because he's neither a creditor with an actual

9  entitlement to be paid, nor an authorized agent of such

10 creditor.  His proof of claim asserts that he is the

11 creditor.  He checked the box; he's the creditor who's

12 seeking to recover from the estate.

13       He has since recognized in the papers and in the

14 stipulated facts, that he doesn't have right to payment on

15 the claim under which the terms of the bonus memo, if

16 enforceable, merely provided that Mr. Rheingans-Yoo would be

17 able to direct a payment, if requested, to an effective,

18 alterous cause.

19       THE COURT:  Let me interrupt you.

20       If he had made the designation prepetition, as you

21 assert was necessary, then what would have been the -- what

22 would you have like to seen -- what would you have liked to

23 see with respect to a claim?

24       MR. GLUECKSTEIN:  I think the only -- at that

25 point, if a designation had been made -- if the hypothetical

1  is the designation was made but the payment was not made --

2          THE COURT:  Correct.

3          MR. GLUECKSTEIN:  -- if he had just identified the

4  creditor --

5          THE COURT:  Uh-huh.

6          MR. GLUECKSTEIN:  -- potentially, that

7  organization could have attempted to file a claim.  We would

8  object to it, because we don't believe that would be a valid

9  claim.

10          THE COURT:  Why is that, again, I'm sorry?  It's

11  not abundantly clear to me why you don't think it would be a

12  valid claim, because under -- isn't the theory that it is

13  part of his bonus compensation?

14          MR. GLUECKSTEIN:  His theory is that it's part of

15  his bonus compensation, right.

16          THE COURT:  Okay.

17          MR. GLUECKSTEIN:  The question is whether or not

18  the bonus compensation offer was, in fact, accepted.

19          So, if it was, in fact -- if the hypothetical is

20  it was, in fact, accepted and he designated somebody to

21  receive this payment, but we did not make the payment, we

22  would still have, at that point, that entity could,

23  theoretically, I guess, have come in and made a claim and we

24  would have had to evaluate the propriety of that claim and

25  the circumstances in which that grant was made to that

1  entity.

2          THE COURT:  Uh-huh.

3          MR. GLUECKSTEIN:  That's a different fact pattern

4  that we have now.

5          Those two gating issues, right, from our

6  perspective, never happened.  There was never an acceptance

7  of the offer to actually inform FTX that they want -- that

8  the claimant wanted such a payment to be made and no

9  designation was ever made of an entity.

10          So what we have now, post-petition, is

11  Mr. Rheingans-Yoo coming in and arguing that that offer was

12  somehow fixed and we should now make the payment to him, that

13  maybe could be directed.  We, of course, have no recourse as

14  to where that money would go at that point and, of course,

15  the plan isn't set up that way.  And that's why the case law

16  is clear that the actual claimant has to be the party who is

17  submitting the claim unless they are doing it on behalf of

18  another party and we know who that party is.

19          What we would have this in situation, if this

20  claim were to become allowed, we would make a $650,000

21  payment to the claimant who, even under the bonus

22  compensation structure, if accepted as true, prepetition, was

23  never entitled to possess that money or to keep that money,

24  certainly.  He was entitled to direct FTX to make a payment

25  to somebody else.  That never happened and would still never

1   happen, right.  As we sit here today, we have no idea where

2   that money would go if this claim was ultimately allowed.

3                THE COURT:  And why wouldn't I be able to just

4   direct the claims agent to make the distribution to the

5   charitable entity of his choosing?

6                MR. GLUECKSTEIN:  If the claim were to ultimately

7   become allowed and Your Honor put parameters around it, it

8   would be under -- you could order and put parameters around

9   what you needed to put it around --

10               THE COURT:  Uh-huh.

11               MR. GLUECKSTEIN:  -- but under our claims

12  structure under the plan --

13               THE COURT:  Uh-huh.

14               MR. GLUECKSTEIN:  -- right, from the Trust's

15  perspective, if we have an allowed claim, we pay the

16  claimant.

17               The holder of the claim at that point would be

18  Mr. Rheingans-Yoo, as the claimant, who has submitted the

19  claim.  We have nobody else on the scene.  We have nobody

20  else identified as to where that money would go.

21               THE COURT:  Okay.  I understand.  Thank you.

22               MR. GLUECKSTEIN:  The only other point I would

23  just address, and I'll let him speak -- his counsel speak and

24  reserve on rebuttal -- but the -- what we see in the further

25  response that the claimant filed here is a lot of reference

1   and discussion about the negotiation history leading up to

2   the bonus memo that documented what we're now here talking

3   about, this potential $650,000 payment.  And we submit while

4   that documentation is annexed to the stipulated facts because

5   those documents exist, right, our position is that none of

6   those documents are relevant and that parol evidence is not

7   admissible for the question at hand because what we have is

8   an employment agreement that postdates those documents.

9          That agreement includes an integration clause.

10  It's clear.  The language is clear.  The case law is clear

11  that on that type of language and, in fact, almost verbatim

12  language, the cases we cite in our reply papers, the Court is

13  not to look at parol evidence that predates that.  If

14  Mr. Rheingans-Yoo liked some of the formulations of how his

15  compensation bonus was going to be structured from the

16  earlier correspondence between himself and Mr. Bankman-Fried,

17  he needed to document that in the signed agreement.

18         The signed agreement is what controls here.  That

19  does not provide for any of this with respect to this

20  potential payment.  What, then, would govern it was his bonus

21  memo that postdates in connection with his employment

22  agreement and that has this language, whereby he needs to

23  have accepted and designated in order to trigger this.

24         And from our perspective, Your Honor, it is

25  important that the employment agreement itself talks about

1  the fact that a bonus could be offered and granted at the

2  sole discretion of the Debtor entity.  And terms can be put

3  on that.  Conditions can be put on that.  And the conditions

4  that were put on this particular piece of the grant, unlike

5  his other compensation which resolved for the settlement that

6  we reached last year, was that this had to be accepted.

7  There had to be direction provided to the Debtor, or to FTX

8  at the time --

9           THE COURT:  Uh-huh.

10           MR. GLUECKSTEIN:  -- and that never happened.  And

11  it's undisputed that it has never happened, even up until

12  today.

13           What's being asked for is the Court to grant this

14  claim, to make the $650,000 payment, and as we would have to

15  pay out under our plan, absent the Court imposing some sort

16  of conditions, we would pay it to the claimant and that would

17  be the end to the Trust's role in this.  And we don't believe

18  that under the circumstances, funds should be coming out of

19  the trust that are otherwise distributable to victims here

20  for this sort of a claim.

21           THE COURT:  When do you assert was the deadline by

22  which the claimant had to accept the alleged offer?

23           MR. GLUECKSTEIN:  The claimant -- well, the

24  reality of the situation is that shortly after the events in

25  question here, we filed for bankruptcy, right, so --

1              THE COURT:  Which would have been my next

2    question:  When was the petition date in relation to this?

3              MR. GLUECKSTEIN:  So while there wasn't a firm

4    expiration deadline that's set out in the documents, we

5    certainly believe FTX would view this as requiring acceptance

6    within a reasonable period of time.  But it's mooted by the

7    fact that, from our perspective, that the bankruptcy

8    intervened here.

9              And so there was no -- there was a period of time

10   pre-bankruptcy, but no designation was made.  But then the

11   bankruptcy happens, the proof of claim is filed.  There was

12   never any attempt to designate anybody pre or post-petition,

13   and so --

14             THE COURT:  When was the bar date established in

15   this case?

16             MR. GLUECKSTEIN:  I'm sorry, Your Honor?

17             THE COURT:  When was the bar date?

18             MR. GLUECKSTEIN:  The bar date on this type of a

19   claim was June -- the non-customer claim bar date was June

20   of 2023.

21             THE COURT:  Okay.  Thank you.

22             MR. GLUECKSTEIN:  So that's -- you know, the claim

23   was filed and preserved in connection with the bar date, but

24   the bar date was set eight months after the petition date.

25             THE COURT:  Understood.

1          Okay.  That's helpful.  Thank you.

2          MR. GLUECKSTEIN:  Absent any other questions, Your

3   Honor, I would just reserve time for rebuttal.

4          THE COURT:  I don't think I have any at this time.

5   Thank you.

6          MR. GLUECKSTEIN:  Thank you, Your Honor.

7          MR. JOYCE:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. JOYCE:  Nice to be here, Your Honor.

10         THE COURT:  Nice to see you.

11         MR. JOYCE:  Michael Joyce for claimant, Ross

12  Rheingans-Yoo.

13         Your Honor, Mr. Rheingans-Yoo is in court today,

14  along with my co-counsel Scott Simon of the Goetz Fitzpatrick

15  firm.  Mr. Simon is admitted *pro hac* and I would cede the

16  podium to Mr. Simon if it pleases the Court?

17         THE COURT:  That would be fine.  Thank you.

18         MR. JOYCE:  One matter, Your Honor, before I do.

19         I want to make sure you had a copy of the stip and

20  the related exhibits; if not, Your Honor, we can hand up a

21  binder.

22         THE COURT:  Oh, I don't have them in front of me

23  and I'm happy to refer to them during argument.

24         MR. JOYCE:  May I approach, Your Honor?

25         THE COURT:  Absolutely.

1          (Pause)

2                  THE COURT:  Thank you.

3                  Do you happen to have an extra copy for my law

4    clerk?

5                  MR. JOYCE:  I have possibly one to share.  You can

6    have this one.  We have our own copy.

7                  MR. SIMON:  We gave a copy to counsel, so...

8                  THE COURT:  Oh, okay.  If you happen to have an

9    extra one.  Thank you.

10                 MR. SIMON:  Thank you.  I appreciate it.

11                 Good morning, Your Honor --

12                 THE COURT:  Good morning.

13                 MR. SIMON:  -- Scott Simon, Goetz Platzer, LLP,

14   representing Ross Rheingans-Yoo, who is here in the

15   courthouse with us today.

16                 The Debtors are objecting to a strawman version of

17   Ross' claim.  They say Ross lacks standing, but they cite

18   products liability cases where the claimant had no

19   relationship with the Debtor.  They cite a case where the

20   claimant sold his claim to a third party before he filed it.

21   They cite cases where the claimant filed the proof of claim

22   representing an undisclosed class action, right.

23                 None of the cases the Debtor cites addressed the

24   issues that we have before the Court today, which is Ross was

25   employed by the Debtor.  The Debtor awarded him a bonus --

1  that's undisputed -- the Debtor did not pay the bonus.  Ross

2  has standing to assert a wage claim here and this isn't

3  argued; this is stipulated fact.

4          The Debtor issued a bonus memo to Ross two months

5  before the petition date, in August or September of 2022.

6  The Debtor did not dispute Ross' standing to assert the cash

7  portion of his claim; that was resolved.  So it doesn't make

8  sense for the Debtor to say that Ross lacks standing to

9  assert a claim based on the FDU portion, which was awarded in

10  the same bonus memo.

11          The Court understands that it's not our position

12  that Ross should be paid this FDU claim.  He is asserting the

13  claim because he has a right, a property right, a wage right

14  to direct payment to a charity that he designates.

15          Next, the Debtors say that Ross forfeited the FDU

16  bonus by not accepting it in the two months between the bonus

17  memo and the petition date.  Again, the Debtor argues against

18  the strawman.

19          They cite a case where the Debtor claims he should

20  have been awarded a bonus based upon the Debtor's past course

21  of performance of awarding bonuses to people in that position

22  and the Court disallowed the claim because the Debtor had the

23  discretion to award a bonus or not.

24          Here, of course, the parties stipulated that the

25  Debtor actually awarded the FDU bonus to Ross.  This

1  distinction is material, Your Honor.  The Debtor did not

2  engage with the numerous cases we cited for the principle

3  that a bonus is earned when it's awarded, not when it's paid,

4  even if the bonus is contingent upon future events.  Nor did

5  the Debtor engage with the cases we cited anticipating the

6  argument on reply that Ross waived the bonus by not accepting

7  it before the petition date.

8         It's black-letter law that waiver requires a

9  voluntary and intentional relinquishment of rights.  In the

10  stipulated facts, the parties agree that the bonus memo

11  contained no mechanism for Ross to accept the bonus, nor a

12  deadline for him to do so.

13         In one of the cases the Debtor cited on reply,

14  Barker v The Bancorp, the Court recited a longstanding policy

15  against the forfeiture of earned wages.  That's what we have

16  here.  Ross, indisputably, earned a bonus.  It was awarded to

17  him.  The Debtor is wrongfully arguing that Ross forfeited.

18         Now, the Debtors would have the Court exclude

19  Exhibit G in the binder we just provided; that's called

20  "final Ross terms."  The final Ross terms is the final

21  version of a negotiated document between Ross and the Debtors

22  that was executed before the employment agreement was signed.

23         The Debtor seeks to preclude Ross terms because

24  the Ross terms affirmatively states that Ross would receive

25  the bonus.  The Debtor's obligation to pay the bonus is not

1   contingent upon Ross accepting it.  There's no "if you want"

2   in the bonus memo.

3          The Debtor also seeks to preclude Ross terms

4   because it discusses Ross holding or rolling over the FDU

5   bonus, demonstrating that the parties never expected Ross to

6   immediately designate a charity.

7          Now, the Debtor holds up the employment

8   agreement's integration clause as a complete bar to the

9   admissibility of Ross terms as parol evidence, but that's not

10  the law.  Even the cases cited by the Debtor provide that an

11  integration clause prevents evidence from being admitted only

12  for the purpose of contradicting a writing when the subject

13  is specifically dealt with in the written agreement.

14         Here, Ross does not seek to shirk his part in or

15  avoid the consequences of the plain language of the

16  employment agreement.  The employment agreement provides the

17  Debtor explicitly with two pieces of discretion:  how much --

18  whether to award a bonus at all and if the bonus is awarded,

19  how much to award.  This is undisputed.

20         The Debtor ignores that the employment agreement

21  fails to discuss the structure of the bonus as the bonus

22  structure was discussed in Ross terms.  So Ross terms doesn't

23  contradict the employment agreement; it acknowledges that the

24  Debtor has discretion to award a bonus.  It's right there in

25  Ross terms.  But it says if a bonus is awarded, then it will

1  be awarded, half in cash and half in FDUs that Ross can

2  direct to donate to charity.

3          So --

4          THE COURT:  Doesn't the bonus memo memorialize

5  that anyway; I mean, doesn't the bonus memo that came after

6  the employment agreement --

7          MR. SIMON:  It does --

8          THE COURT:  -- provide the bonus and the FDU

9  award?

10          MR. SIMON:  Your Honor, you're absolutely right,

11  but what it --

12          THE COURT:  Okay.  So why do I need to look at the

13  Ross terms anyway?

14          MR. SIMON:  Because -- for two reasons:  one, the

15  bonus memo doesn't say -- it's inconsistent with the

16  employment agreement, right.  The bonus memo says, "if you

17  want."

18          THE COURT:  Okay.

19          MR. SIMON:  The employment agreement doesn't say,

20  "if you want."

21          So while we're on the topic of this integration

22  clause, the Debtor seeks to apply it to Ross, but not to,

23  themselves.  If the Debtor is correct that the employment

24  agreement is fully integrated, right, they claimed a minute

25  ago, terms can be put on the award of the bonus; that's

1  Counsel's own language.

2           Terms can't be put.  That's what an integration

3  clause means, right?  So if the employment agreement is fully

4  integrated, it says the Debtor has discretion whether to

5  award a bonus and how much to award a bonus.  It doesn't say

6  the Debtor can condition the bonus on Ross' specific

7  acceptance of it; it's awarded.  It's deemed accepted.

8           The employment agreement does not allow the Debtor

9  to condition a bonus.  It's also worth mentioning that the

10 employment agreement, while being unambiguous, was followed

11 by the bonus memo, which is ambiguous.  The Debtor admits

12 that the bonus memo doesn't tell Ross by when he needed to

13 designate a charity, nor the mechanism for him to do so.

14          So there's a fundamental principle that ambiguous

15 documents are construed against their drafting.  The Debtor

16 cited a case about the longstanding policy against forfeiting

17 wages.  So the Debtor can't be heard to argue that Ross

18 voluntarily and intentionally forfeited this FDU bonus by not

19 accepting it in the two months between when it was awarded

20 and when the Debtor filed a Chapter 11 petition.  This may

21 certainly be an issue of first impression for the Court.

22 It's certainly unusual for an executive to negotiate for half

23 of his bonus to be paid as a donation to the charity of his

24 choice, but Ross is a charitable person.  He was hired to

25 direct the charity and he wanted his compensation to be paid,

1   in part, to charity.  This is what the Debtor and Ross

2   agreed, as evidenced by Ross terms.

3              THE COURT:  Well, putting aside the Ross terms, if

4   this is a contract dispute, one could argue that the missing

5   deadline is a missing term.  So what's my authority to fill

6   in, under contract law, the missing term?

7              MR. SIMON:  The missing term can be filled in by

8   extrinsic evidence because if there's a missing term, then

9   the employment agreement is only partially integrated.  And I

10  cited many cases for that provision, that principle in my

11  papers.

12             If a partially integrated document is presented to

13  the Court, then the parties' prior negotiations are fair

14  game, especially here, where that parol evidence does not

15  contradict the agreement.  The Ross terms is the exact

16  evidence the Court is looking for that says:  Here's how the

17  bonus will be structured.  There is no timeline for Ross to

18  accept.  It could be held.  It could be rolled over.  And

19  there's no "if you want" provision.

20             But even if the Court declines to consider Ross

21  terms, there's no doubt that the FDU bonus was part of Ross'

22  compensation.  He earned that compensation when the Debtor

23  awarded it to him and the Debtor's attempt to blatantly add

24  an "if you want" term that's not in the employment agreement

25  should be rejected.

1          THE COURT:  Well, couldn't the proof of claim be

2   the answer to the "if you want"?

3          MR. SIMON:  It certainly could.

4          I mean, the Debtor is claiming that it wasn't

5   accepted within a reasonable time, but given a mere two

6   months and the fact that Ross was an employee, I don't think

7   that argument holds water.  So, yes, Your Honor, I believe

8   that the claimant here should not be found to have

9   intentionally and voluntarily forfeited wages that he earned.

10         THE COURT:  Let me ask you this:  Why haven't you

11  designated the charity?

12         MR. SIMON:  Because --

13         THE COURT:  Why don't we know who this alleged

14  charity would be?  I have concerns about that.

15         MR. SIMON:  Because as soon as we filed the

16  claim --

17         THE COURT:  Uh-huh.

18         MR. SIMON:  -- well, let's back up for a second.

19         The Debtor filed an adversary proceeding against

20  Ross and several other entities.  Ross was the director of an

21  FTX affiliate called "Latona BioScience."  Latona was one of

22  the charitable arms of FTX and Latona made grants, donations,

23  investments in health and science companies.

24         The Debtor clawed back, as part of this adversary

25  proceeding settlement, those donations because they were made

1  directly from the Debtor to those entities.  Ross as a

2  Defendant was alleged wrongfully to have, you know, conspired

3  with Sam Bankman-Fried about the underlying fraud.  These

4  claims were all resolved and settled, but because in that

5  adversary proceeding the Debtor immediately indicated that

6  Ross was not entitled to any portion of his claim, we didn't

7  feel that it was necessary or proper at the time to throw up

8  a flag and say, Oh, by the way, here's the charity, right.

9         It's just, procedurally, we were baffling over

10  whether the charitable donation, that FDU claim, was

11  allowable.  And now, once the Court determines that it's

12  allowable, we can certainly work with the Court and Counsel

13  to -- with, you know, the claims payment process and the

14  claims administrator to pay that out.  Ross does not seek to

15  be paid that money, but Ross has the property right to direct

16  the Debtor to pay that money.

17         Thank you, Your Honor.

18         THE COURT:  Okay.  Thank you.  I understand.

19         MR. GLUECKSTEIN:  Thank you, Your Honor.

20         Brian Glueckstein for the Recovery Trust.

21         The backdrop here is important, all right.  This

22  all arises out of what was a substantial piece of fraudulent

23  transfer litigation.  What the claimant was doing, we had

24  significant concerns, we had serious allegations about what

25  Latona, itself, what all these charitable donations that were

1  coming out of this entity were doing.  We did claw those

2  amounts back.  There were settlements.

3       So the merits of our allegations were never

4  adjudicated by the Court, because we managed to settle those

5  claims consensually, okay.  But at the end of the day, what

6  it's being asked to do now is to take a future -- an

7  additional portion of -- I'll come back to where I started.

8       If this money had been paid out in the period

9  we're talking about, if on September 2nd, the claimant had

10 designated the charity and FTX had made the payment,

11 this $650,000 would have been subject to the same clawback as

12 all the other payments that were subject to that litigation

13 and otherwise.

14       THE COURT:  Well, you would have asserted that.

15       MR. GLUECKSTEIN:  We would have asserted that.

16       THE COURT:  Right.  That's not fact or law.

17       MR. GLUECKSTEIN:  It's not fact.

18       THE COURT:  The fact is that you would have tried

19 to claw back.

20       MR. GLUECKSTEIN:  And I --

21       THE COURT:  But that's not the facts we have

22 before us.

23       MR. GLUECKSTEIN:  Well, I think it would raise an

24 interesting question if it was paid out now, whether we still

25 retain those claims because I think --

1          THE COURT:  Absolutely.

2          MR. GLUECKSTEIN:  -- we would seek to claw those

3  back if it were to be paid out now because it's all arising

4  out of the same circumstances.  But I guess --

5          THE COURT:  I guess all rights reserved, if I were

6  to allow the claim.

7          MR. GLUECKSTEIN:  So that's -- I mean, that,

8  potentially, is an issue for down the road if we were to get

9  there.

10          THE COURT:  Okay.

11          MR. GLUECKSTEIN:  But at the end of the day, the

12  issue here, with respect to this payment, the employment

13  agreement itself talks about, has a section about bonuses:

14  You may be eligible for a bonus.

15          The bonus memo, right, the bonus memo itself talks

16  about and has this language:  If you want us to make the

17  payment, we'll make the payment.  That is an offer.  That

18  piece of it is different; it's worded very differently than

19  the rest of his compensation, which awards him specific

20  compensation.

21          And so it is our argument that that piece of that

22  offer had to be accepted and it wasn't.  And I understand

23  Your Honor's hypothetical to counsel:  Could the proof of

24  claim by the acceptance?  That's a question for the Court.

25  We don't think so; we think this needed to happen earlier in

1  time.

2           THE COURT:  Well, I guess I'm beginning to ask you

3  the same question that I asked claimant's counsel, which is

4  under your argument, distilling it to a legal theory, okay,

5  which is what I'm required to do, there's a missing term,

6  because everyone agrees there's no deadline.  So I have to

7  fill in that term or maybe the missing term is so essential

8  it negates the entire contract, but that's not what I'm

9  hearing.

10          So, how do I fill the missing term in?  What do I

11  look to?  What's your position?

12          MR. GLUECKSTEIN:  Our position -- I certainly

13  don't -- we certainly don't agree.  Well, there's two points.

14  So, the Ross terms, as they're referred, we do not believe

15  those are not admissible.

16          THE COURT:  Okay.

17          MR. GLUECKSTEIN:  I don't believe, even if Your

18  Honor were to look at those terms, that that answers the

19  question Your Honor is positing now.

20          THE COURT:  Correct.

21          MR. GLUECKSTEIN:  Because it doesn't -- in those

22  terms, it's more direct language about awarding, but it

23  doesn't talk about acceptance, how this would be paid;

24  nonetheless, we think the answer here to this question is,

25  this never happened in the two months prior to the petition.

1  The petition happened.

2         Our position is regardless of whether there was a

3  deadline, whether there was a firm deadline that had to be

4  executed on by Mister -- by the claimant here, if, regardless

5  of whether that existed or what that term would be, there has

6  to be a prepetition claim as of the petition date.  Now, our

7  argument is that claim never vested, because he never

8  accepted it.

9         So, whether he could have accepted it a day later

10 or a month later or two months later --

11         THE COURT:  Uh-huh.

12         MR. GLUECKSTEIN:  -- had there been no bankruptcy,

13 he never accepted the offer as of the petition date.  There

14 was no claim.  There was an offer with no acceptance to this

15 piece of his bonus offer.  He doesn't have a prepetition

16 claim that vested as of the petition date.

17         THE COURT:  It wouldn't be contingent?

18         MR. GLUECKSTEIN:  Contingent on -- I don't think

19 so -- contingent on him accepting, later, the offer?

20         THE COURT:  Well, there's no deadline.  I guess

21 I'm sorry that I'm fixated on this deadline and, you know,

22 you have to get me off the deadline, because I'm fixated on

23 this deadline.  It's clear, under your theory, there's an

24 offer, but there's no indication of when the claimant may

25 have accepted or was required to accept, so to me, there's a

 1  missing term.

 2           Do we disagree?

 3           MR. GLUECKSTEIN:  If there's -- there is -- there

 4  is no deadline.  We -- I agree --

 5           THE COURT:  Okay.

 6           MR. GLUECKSTEIN:  -- there is no deadline, as in

 7  the documentation --

 8           THE COURT:  Right.

 9           MR. GLUECKSTEIN:  -- as to when he would have had

10  to accept.

11           THE COURT:  Okay.  So, does that make the claim

12  contingent?

13           MR. GLUECKSTEIN:  I think it -- I don't think it

14  makes the claim contingent.  I think what it does is that

15  he -- that there was no -- there was no claim as of the

16  petition date, because he did not accept it prior to that.

17           Whether he -- whether the deadline was

18  November 1st, December 1st, six months later, the intervening

19  event here was a bankruptcy.  There was no claim that he has

20  at that time.

21           THE COURT:  Okay.

22           MR. GLUECKSTEIN:  If the argument is he could have

23  accepted it at any point in the future and we have this

24  indefinite, contingent claim, you know, it's -- we disagree

25  with that.

1          THE COURT:  Okay.  No, that's helpful.

2          Okay.  I think I more -- I understand your

3    position.  Okay.

4          MR. GLUECKSTEIN:  Thank you, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          Okay.  Let me take a short break and I'm going to

7    come back and rule, all right.

8          We'll stand adjourned.

9          MR. SIMON:  Thank you, Judge.

10       (Recess taken at 10:16 a.m.)

11       (Proceedings resumed at 10:42 a.m.)

12          THE CLERK:  All rise.

13          THE COURT:  Thank you for your patience.  Please

14   be seated.

15          All right.  Thank you for the submissions in

16   anticipation of today's hearing on this issue, as well as the

17   arguments today.  And I do appreciate the parties meeting and

18   conferring to streamline the hearing today and reach the

19   stipulated facts that smoothed the way for today's argument.

20          Based on the submissions and the arguments of

21   counsel today, I am prepared to overrule the Debtor's

22   objection and allow the FDU claim as a general unsecured

23   claim.  I'll note at the outset this is a highly unusual set

24   of facts -- I've never seen it before -- it does put us in a

25   bit of a procedural, a unique procedural posture, with

1  respect to the claim distribution, and I'll talk about that

2  in a moment.  But to the actual issues at hand, I do find

3  that the claimant has standing to assert this claim, given

4  his personal interests in the FDU and the bonus.  And I do

5  believe that the claim was part of his bonus, as indicated by

6  the subsequent memorandum of Mr. Bankman-Fried, outlining the

7  terms of the discretionary bonus approved by the company.

8         As I think I hinted at very clearly in the

9  argument, the deadline to accept the FDU bonus was not

10 delineated in the memo, but I find that it was preserved

11 through the proof of claim that was submitted timely,

12 pursuant to Judge Dorsey's bar date order and that this is

13 reasonable, given that the bankruptcy intervened shortly

14 after the bonus memorandum was issued.

15        Mr. Yoo has indicated that he is not seeking to

16 receive payment of the claim; he would like it directed to

17 the charity.  I think the way to go about handling this issue

18 is for the parties to meet and confer on the designated

19 charity and that there is an order that allows the claim, but

20 directs the claims agent to make the payment to the charity

21 that is designated by the claimant.

22        If there's dispute, with respect to the

23 claimant -- the charity that is designated; that issue is not

24 before me today and I would entertain the dispute, if there

25 is one.  You'll have to let me know what that dispute is and

1 how we'll tee it up, okay.

2            Let me ask, when can you make the decision on the

3 charity, because I think it needs to be done ASAP.

4            MR. SIMON:  Within the week, Your Honor.

5            THE COURT:  Okay.  All right.

6            So meet and confer with Mr. Glueckstein and his

7 colleagues regarding a form of order that would memorialize

8 the ruling and address the distribution issues.  There could

9 be some unique issues from the Trust's perspective and the

10 claims agent, so we'll work through those issues and I'll be

11 here if you need me for subsequent disputes, okay.

12            Okay.  Thank you very much.

13            MR. SIMON:  Thank you.

14            THE COURT:  Is there anything else for this

15 session?

16        (No verbal response)

17            THE COURT:  No?

18            Okay.  I will see you, then, at 1:30.  Thank you

19 all very much.

20            COUNSEL:  Thank you, Your Honor.

21            THE COURT:  We'll stand adjourned.

22        (Recess taken at 10:45 a.m.)

23        (Proceedings resumed at 1:35 p.m.)

24            THE CLERK:  All rise.

25            THE COURT:  Good afternoon.  Nice to see everyone.

1          Please be seated.

2          MR. PIERCE:  Good afternoon, Your Honor --

3          THE COURT:  Mr. Pierce?

4          MR. PIERCE:  -- Matthew Pierce.

5     Good to see you again.

6          THE COURT:  Good to see you again.

7          MR. PIERCE:  Your Honor, I'm Matthew Pierce of

8    Landis Rath & Cobb on behalf of the FTX Recovery Trust, for

9    the record.

10         Your Honor, we're picking up on the agenda where

11   we left off where we broke this morning, which is Agenda

12   Item 44.  I will turn it over to Mr. Dunne, who will handle

13   the balance of the agenda.

14         THE COURT:  Great.  Thank you so much.

15         MR. DUNNE:  Good afternoon, Your Honor.

16         THE COURT:  Good afternoon.

17         MR. DUNNE:  Christopher Dunne from Sullivan &

18   Cromwell for the FTX Recovery Trust.

19         We are here to address certain threshold issues

20   relating to the Trust's amended objection to the claims filed

21   by Mr. Seth Melamed.  As a brief reminder, Mr. Melamed has

22   filed five operative claims seeking approximately $36

23   million.  These claims arise from FTX's acquisition of a

24   company called "Liquid Group," of which Mr. Melamed was a

25   shareholder and an officer, as well as some subsequent

1    employment operations.

2          Mr. Melamed's principal claim, which is

3    Number 3385, relates to the Liquid share-purchase agreement,

4    sounds and fraud and breach of contract, and we refer to this

5    in our papers and I'll refer to it today as the "SPA claim."

6    The vast majority of the value that Mr. Melamed seeks to

7    recover across all of his claims comes from two buckets of

8    consideration that were set forth in the Liquid SPA and those

9    buckets are one million shares of FTX common stock; we call

10   that the "FTX consideration shares," and specified amounts of

11   particular cryptocurrency tokens, which were to be delivered

12   to Mr. Melamed in April 2023 and 2024, but we're not

13   delivered, of course, because FTX went into bankruptcy.  We

14   call that the "crypto consideration."  And as this Court is

15   aware, of course, Mr. Melamed has moved to compel

16   arbitration.  The Liquid share-purchase agreement has a

17   Singapore law arbitration clause.  The Trust opposes

18   arbitration.

19         At the May 14th hearing, Your Honor, the Court

20   determined that we would address three threshold issues

21   today:  first, whether the portion of Mr. Melamed's claim

22   relating to the FTX consideration shares should be

23   subordinated, pursuant to Section 510(b) of the Bankruptcy

24   Code; second, whether the FTX plan of reorganization should

25   be applied to Mr. Melamed's claim relating to the crypto

1   consideration.  As this Court is aware, the plan provides

2   that claims in respect of digital assets are valued using

3   petition date prices, as set forth in the digital assets

4   estimation order.  And, third, the third threshold issue

5   being, whether any of Mr. Melamed's claims should be

6   liquidated in arbitration.

7           Before I begin, Your Honor, I would remind the

8   Court that both, the Trust and Mr. Melamed, have submitted

9   declarations of four law experts in connection with this

10  matter and at the May 14th hearing, the parties agreed that

11  these declarations should be admitted into evidence and to

12  forego cross-examination of the secured parties.  The Court

13  subsequently also indicated that it did not have questions

14  for the experts, so the Trust respectfully moves to admit

15  into evidence the declarations of Mr. Taro Tanaka and

16  Mr. Ashok Kumar; those are the trust experts on Japanese and

17  Singapore law, respectively.  Mr. Tanaka's and Mr. Kumar's

18  declarations were filed with the Court electronically at

19  Dockets 28646, 30365, and 30367.

20          THE COURT:  Okay.  Any objection?

21          MR. ADLER:  None, Your Honor.

22          THE COURT:  Okay.  They're admitted into evidence.

23  Thank you very much.

24      (Tanaka Declarations received in evidence)

25      (Kumar Declaration received in evidence)

1          MR. DUNNE:  Thank you, Your Honor.

2          With the Court's permission, I'll begin with

3   Section 510(b), subordination; the first threshold issue.

4          THE COURT:  Okay.

5          MR. DUNNE:  Your Honor, Section 510(b) provides

6   that claims for damages arising from the purchase or sale of

7   a security of the Debtor shall be subordinated.

8          Mr. Melamed's claim relating to the FTX

9   consideration shares plainly is such a claim.  It is a claim

10  for damages and it arises from the purchase of FTX

11  securities, because Mr. Melamed received FTX common stock in

12  exchange for his Liquid shares.  There's no dispute about

13  that.

14         If there were any doubt that Mr. Melamed's claim

15  must be subordinated, the policy underlying Section 510(b)

16  makes clear that it must be.  Many courts have recognized

17  that in enacting 510(b), Congress made the decision to

18  subordinate based on risk allocation.  And as the Third

19  Circuit has observed, Section 510(b) was enacted to stop

20  disappointed shareholders from, "bootstrapping their way to

21  parity with general creditors."

22         Mr. Melamed contracted for and received FTX

23  shares.  He is transparently trying to put his claim ahead of

24  other shareholders by framing it as a claim for breach of

25  contract and for fraud.  When Mr. Melamed sold his Liquid

1  Group shares to FTX, he could have negotiated for payment in

2  cash entirely.  By agreeing to be paid in FTX shares, he has,

3  as the Third Circuit put it, assumed the risk of business

4  failure.

5          Now, in all of the papers he has filed in

6  connection with this claim objection proceeding, Mr. Melamed

7  has raised only two arguments against Section 510(b)

8  subordination.  In the first, he has tried to really delay

9  adjudicating it, arguing that this Court should not consider

10 the matter until other issues, including arbitration, are

11 first resolved; the Court correctly rejected this at the

12 May 14th hearing.

13         Second, in response to his initial objection --

14 I'm sorry, in response to the initial claim objection that we

15 filed last year, he argued that the SPA was an agreement for

16 the sale of Liquid Group equity, not FTX equity, and that FTX

17 shares were, at best, incidental to the transaction.  We

18 would submit that this argument is baseless and, notably,

19 Mr. Melamed did not raise it in response to the trust's

20 amended objection.  The FTX consideration shares were hardly

21 incidental to the SPA; in fact, they comprised

22 approximately 60 percent of the compensation that Mr. Melamed

23 received in the transaction, and the substantial majority,

24 even more than 60 percent, of what he's currently seeking on

25 all of his claims now.

1           And, Your Honor, the fact that Mr. Melamed

2   acquired the FTX consideration shares as part of the Liquid

3   M&A transaction does not change the fact that they are

4   shares, the shares are equity of a debtor, and that his claim

5   must be subordinated.  As in many similar M&A transactions,

6   Mr. Melamed paid for the FTX consideration shares by

7   tendering his Liquid shares to FTX.  The same is true of many

8   claimants in many other cases whose claims were subordinated.

9   For instance, in both In re Kaiser Group International and

10  Peregrine Systems, these are cases cited at page 13 of the

11  trust's amended objection and page 8 of the trust's reply,

12  claimants received debtor equity as part of a share exchange

13  in a merger, and they subsequently sued for fraud and breach

14  of contract.  In both cases, this Court subordinated the

15  claims, stating that they were squarely within the purview

16  of 510(b).

17          When Mr. Melamed entered into the SPA, he accepted

18  the FTX consideration shares and their associated risk as

19  partial consideration for the shares of Liquid that he

20  provided to FTX, and he must, therefore, assume the risk of

21  FTX's business failure.

22          Relatedly, Your Honor, Mr. Melamed's SPA claim

23  seeks indemnification of his legal fees that he's incurred in

24  this action pursuant to an indemnification provision in the

25  Liquid Group SPA.  To the extent that Mr. Melamed is entitled

1  to any indemnification payments, and we of course contend

2  that he is not, those payments must also be subordinated

3  pursuant to 510(b).  And that's because, Your Honor, in

4  addition to claims for damages arising from the sale of the

5  security of the debtor, Section 510(b) on its face calls for

6  subordination of claims for reimbursement or contribution on

7  account of such a claim.

8         This Court has consistently interpreted this

9  language to include fees incurred in connection with

10  litigation where the underlying claim is itself subordinated.

11  So, put differently, if the Court concludes that

12  Mr. Melamed's SPA claim should be subordinated, the legal

13  fees incurred in litigating that claim must also be

14  subordinated.

15         And pages 9 and 10 of the trust's reply cites

16  several cases making this proposition clear.  This of course

17  also makes sense as a matter of policy for all the reasons

18  that go along with subordination of equity-related claims in

19  the first place and, as this Court has recognized, a contrary

20  rule would encourage frivolous litigation and disincentivize

21  settlement, all at the expense of FTX's other creditors.

22         I'll now address, Your Honor, the second threshold

23  issue, the crypto consideration.  As a reminder, Your Honor,

24  the Liquid SPA provided that Mr. Melamed was to receive

25  specified amounts of particular crypto currency tokens, which

1  were to be delivered to him in April of 2023 and April

2  of 2024, which were not delivered, again, because FTX went

3  bankrupt.

4          Unsurprisingly, and as Your Honor is well aware,

5  the Court and all stakeholders gave substantial attention to

6  the question of how to deal with digital assets when forming

7  the FTX plan of reorganization, and the plan provides that

8  the value of a claim in respect of digital assets is

9  calculated by converting the value of the digital assets in

10 question into cash as of the petition date in accordance with

11 conversion rates set forth in the separate estimation order.

12         Now, Your Honor, the estimation order, as my

13 partner Mr. Glueckstein knows all too well, was the linchpin

14 of the plan itself, it was the subject of multiple contested

15 hearings, competing expert testimony, and consideration of

16 over 150 objections from various stakeholders.  It was

17 intended to and, by its plain terms, does encompass all

18 claims of any type relating to digital assets, which, without

19 exaggeration, number in the millions.  This includes

20 everything from claims brought by FTX lenders for repayment

21 of digital asset loan claims to claims brought by FTX

22 customers for digital assets held in their customer accounts.

23         Mr. Melamed is not entitled, Your Honor, to

24 special treatment, his claim for the crypto consideration

25 clearly falls within the plan's definition of a claim in

1  respect of digital assets and it should be valued

2  accordingly.  To get very granular about it, it is a claim,

3  as that term is broadly defined in the plan and the

4  Bankruptcy Code, and the plan of course incorporates the

5  Bankruptcy Code's definition, because it's a right to payment

6  regardless of whether or when it was reduced to a judgment,

7  liquidated, unliquidated, and all the other myriad features

8  set forth in the Bankruptcy Code.  And it is of course in

9  respect of digital assets because Mr. Melamed was promised

10 specified crypto tokens and he's seeking to recover value

11 associated with those tokens.

12          Now, Mr. Melamed, notably, has not challenged the

13 trust's characterization of his claims for the crypto

14 consideration as a claim in respect of digital assets under

15 the plan, he just wants a different valuation framework and

16 valuation date.

17          Mr. Melamed argues that the crypto consideration

18 should be valued at the time the SPA was breached.  I want to

19 be very clear about one thing from the outset, whether FTX

20 breached the SPA and when that breach occurred, assuming it

21 did, does not matter, the plan provides for one treatment of

22 claims in respect of digital assets, regardless of how that

23 is characterized, and that treatment is valuation as of the

24 petition date using the estimation order.

25          When FTX filed for Chapter 11, as a practical

1  matter, Mr. Melamed had the right to receive specified

2  digital assets on April 4th, 2023 and April 4th, 2024.  It's

3  clear from the face of the SPA, which even defines the crypto

4  consideration as the retained consideration because it was

5  supposed to be retained at closing and released later.

6  Although Mr. Melamed highlights the fact that there was a

7  side letter to the SPA that states that the crypto

8  consideration was paid on the completion date, he

9  acknowledges in paragraph 19 of his SPA claim that FTX was

10 entitled to retain that consideration and to release it in

11 April of 2023 and 2024.

12         So, in short, Your Honor, what Mr. Melamed had on

13 the petition date was a contractual right to digital assets,

14 this makes him exactly like millions of other creditors, and

15 Judge Dorsey correctly rejected arguments for prepetition

16 valuations of crypto assets in formulating the estimation

17 order.  Mr. Melamed, again, is not entitled to special

18 treatment, the plan applies to his claim just as it does to

19 anyone else who has a claim in respect of digital assets.

20         And finally, Your Honor, the threshold issue of

21 arbitration.  First, the Court must address the question of

22 which of Mr. Melamed's claims are even covered by an

23 arbitration clause; this is Mr. Melamed's burden to prove.

24 Mr. Melamed has asserted five claims, he moves to compel

25 arbitration of all five of them based on an arbitration

1 clause contained in the SPA, but that arbitration clause

2 relates at most to the SPA claim.  Mr. Melamed concedes that

3 the portion of his administrative claim relating to the KEIP

4 is not arbitrable.  Mr. Melamed's claims for prepetition

5 compensation for bonus payments and, he contends, the non-

6 KEIP portion of his administrative claim are governed by a

7 separate management agreement, not the SPA.

8            Mr. Melamed argues that the management agreement

9 claims are arbitrable because the management agreement itself

10 arises from the SPA.  The management agreement of course does

11 not contain an arbitration clause, it contains a very

12 different clause, which I'll discuss in a moment.

13            So, Mr. Melamed is wrong for several reasons.

14 First, and importantly, Singapore law governs the SPA's

15 arbitration clause.  Mr. Melamed has not offered the

16 testimony of any Singapore law expert or any analysis under

17 Singapore law whatsoever.  The trust's Singapore law expert,

18 Mr. Kumar, has explained that an arbitration clause in one

19 contract does not extend to disputes arising out of a second

20 independent contract even where the second contract is

21 specifically contemplated by the first.  This is especially

22 the case here because the second contract, the management

23 agreement, not only makes no mention of arbitration it

24 specifically confers the Tokyo district court with exclusive

25 jurisdiction over disputes arising from that agreement.

1          Second, Your Honor, Mr. Melamed has cited one

2    Southern District of New York case in support of his

3    argument, that case is Celsius Mining, but that case does not

4    help him.  The arbitration provision in Celsius Mining,

5    stated in bolded, capitalized letters that the arbitration

6    clause covered any dispute of any nature between the parties

7    relating in any way to this agreement.  In light of that, the

8    Celsius Mining court concluded that there was no requirement

9    that the dispute arise under or even be in connection with

10   the agreement in order to be arbitrable, and it held that the

11   provision extended to disputes arising out of not just the

12   main agreement, but a related promissory note as well.  Here,

13   to fall within the arbitration clause, disputes must arise

14   out of or in connection with the SPA.  So the provision does

15   not extend as far as the one in Celsius Mining.

16          Mr. Melamed has not responded to these points

17   ever, not once.  Instead, what Mr. Melamed has chosen to do

18   is to argue for the first time in his reply brief that he

19   does not need to demonstrate that a valid arbitration

20   agreement governs his claims because the question of

21   arbitrability should be decided by the arbitrator and not by

22   this Court.  Your Honor should disregard this argument, it

23   was raised for the first time last week in what was

24   Mr. Melamed's fourth submission on the subject of

25   arbitrability.  This is, in our view, a transparent attempt

1  to take the question out of this Court's hands at the

2  eleventh hour because Mr. Melamed apparently has decided that

3  he does not want Your Honor to rule on it.

4          But to be clear, Your Honor, Mr. Melamed is wrong.

5  Even as a matter of U.S. law, the SPA's incorporation of the

6  rules of the Singapore International Arbitration Center does

7  not end the Court's inquiry here.  The U.S. Supreme Court has

8  made clear that the Court should decide the issue of

9  arbitrability unless there's clear and unmistakable evidence

10 that the parties intended to submit that question to the

11 arbitrator.  The Richardson case from the Third Circuit on

12 which Mr. Melamed relies itself states that even where an

13 agreement incorporates in that case it was the AAA rules, a

14 contract might still otherwise muddy the clarity of the

15 parties' intent to delegate.  And, notably, none of the cases

16 that Mr. Melamed cites involve multiple contracts with

17 inconsistent dispute resolution provisions, which is exactly

18 what's present here and which clearly affects the analysis.

19 In situations like that, many cases have held that the Court

20 should not reflexively delegate the question of arbitrability

21 to the arbitrable panel.

22          But to the extent that the Court is inclined to

23 hear more on this topic, notwithstanding the fact that

24 Mr. Melamed did not raise it until now, the trust would

25 request leave to file a surreply, if the Court is inclined to

1  read one.

2          Now, Your Honor, even with respect to

3  Mr. Melamed's motion to compel arbitration on the SPA claim,

4  that too should be denied because there Your Honor still has

5  discretion not to compel arbitration.  The Supreme Court has

6  held that Bankruptcy Courts may decline to compel arbitration

7  where there's an inherent conflict between arbitration and

8  the Bankruptcy Code's underlying purposes.  And this Court

9  held in In re Yellow that the Third Circuit case law does not

10 prohibit the Court -- I'm sorry, does not require the Court

11 to enforce a prepetition arbitration clause in the context of

12 a claim objection.  It's more nuanced than that.  The Yellow

13 court distinguishes the Mintz case, on which Mr. Melamed

14 relies, on the grounds that claims allowance disputes involve

15 the Bankruptcy Court's *in rem* jurisdiction and, unlike the

16 Truth in Lending Act claim that was at issue in Mintz, claims

17 allowance disputes arise out of Section 502 of the Bankruptcy

18 Code, which states that Bankruptcy Courts shall determine the

19 amount of contested claims and whether to allow them.

20         THE COURT:  Should I give any significance to the

21 fact that the Yellow court focused on perhaps the wrong --

22 well, let me ask this a different way.

23         In Mintz, the court focused on the cause of action

24 that was alleged by the parties, as have many, many, many

25 courts in conducting the analysis of whether we should defer

1  or not defer, or apply discretion or not apply discretion.

2  <u>Yellow</u> looked a little broader and said -- it didn't

3  necessarily look at the cause of action that was being

4  alleged, but looked at the proceeding and now it was brought

5  to the court.  So, the focus there was on the proceeding, the

6  claims objection process.

7          MR. DUNNE:  So, I'm sorry, what was your question,

8  Your Honor?

9          THE COURT:  Well, I'm trying to formulate --

10          MR. DUNNE:  Oh, okay.

11          THE COURT:  -- my question, which is, that seems

12  to be a break in the application of the law, quite frankly.

13          So, is the focus really on the nature of the

14  proceeding, or is the focus more rightly on the cause of

15  action that's being alleged?

16          MR. DUNNE:  I think, under this Court's

17  jurisprudence, we can't ignore the context in which the claim

18  alleges.

19          THE COURT:  Well, you would agree with me that

20  that was *dicta*?

21          MR. DUNNE:  That what was *dicta* precisely, Your

22  Honor?

23          THE COURT:  Well, so in <u>Yellow</u> the issue turned on

24  whether he should lift the stay, but the court then went on

25  to conduct this analysis when it was not needed.  The issue

1  before the court turned on whether he had the discretion to

2  lift the stay --

3          MR. DUNNE:  Right.

4          THE COURT:  -- and it could have ended then and

5  there, but it went on to talk about whether --

6          MR. DUNNE:  In part because --

7          THE COURT:  -- the FAA should yield or -- sorry,

8  whether the court should require mandatory arbitration if the

9  issue was not really the lift stay.

10          MR. DUNNE:  Yeah, the lift stay issue was a little

11 bit complicated there because the court did, I think,

12 acknowledge that a motion to lift the stay had not formally

13 been made, but nonetheless construed the claimant's request

14 as one to lift the stay, and then to move to compel

15 arbitration.  But I think the different is in -- or at least

16 in part in that the claimant had come to the Bankruptcy Court

17 seeking to assert a claim against the estate and this issue

18 had arisen in that context, whereas in <u>Mintz</u> the plaintiff --

19 or the estate, the debtor was going out and bringing solely

20 non-bankruptcy claims against, in that case, the defendant,

21 essentially a federal claim under the Truth in Lending Act.

22          So I do think that context is significant, I will

23 agree, of course, it's not dispositive.

24          THE COURT:  So, if this issue was arisen in an

25 adversary proceeding as opposed to the claims objection,

1  should that change my mind?

2          MR. DUNNE:  If the issue had --

3          THE COURT:  Is that a different analysis under

4  Mintz then?  Because Yellow even -- the court in Yellow even

5  acknowledged that the issue that was raised in the adversary

6  was really an objection to the secured claim of the lender,

7  but nonetheless it was alleged in an adversary proceeding and

8  that's a two-party dispute.  Is that the focus here?  Is that

9  the correct framework by which I should analyze whether I

10  have discretion to disregard an arbitration provision?

11          MR. DUNNE:  I think -- I do think it's important

12  that we not forget the context that we're in, that we not set

13  that aside completely, which I think the court in Yellow did

14  acknowledge the point that you are making and noted that the

15  posture could have arisen in a different way potentially, but

16  it had not and, in light of the fact that it had not and the

17  significance of the claims allowance process and the mandate

18  that appears in Section 502, which charges this Court to

19  value and determine whether to allow claims, that it had to

20  undertake the analysis that it did.

21          So, I think I understand your question.  I don't

22  think I -- your initial question, I don't think I would

23  regard it as dicta.  I think in light of that context,

24  the 502(b) context, the Court had to grapple with 502(b)'s

25  language, and it did so, and it still had flexibility to

1  reach either outcome under that framework.

2          THE COURT:  Okay.

3          MR. DUNNE:  And we would submit, Your Honor, that

4  the Court should reach the same resolution that the Yellow

5  court did here.  Sending Mr. Melamed's claim to arbitration

6  would frankly result in the waste of both estate assets and

7  Mr. Melamed's assets, as well as considerable delay.

8          As we have discussed, only one of Mr. Melamed's

9  claims is arbitrable and substantially all of the value of

10  that claim turns on the threshold issues of 510(b)

11  subordination and application of the plan, which all parties

12  agree must be decided by this Court.  And regardless of the

13  outcome here, to add another layer, the matter must still

14  come back before this Court on the issue of equitable

15  subordination, which we all agree.  So, in short, both

16  parties would benefit from this Court retaining jurisdiction.

17          Now, one last point, Your Honor, before I step

18  down, Mr. Melamed argues in his reply brief that the Court

19  should impose a procedural framework in which the Court

20  compels arbitration and stays all other proceedings until

21  this matter is finished.  That is clearly an attempt, in our

22  view, to re-litigate what Your Honor ruled at the May 14th

23  status conference, and what I think we're doing right now,

24  and should be disregarded.  The Court may rule on all of the

25  threshold issues now, it has the authority to do that, and a

1  decision on them will frankly, likely lead to a prompt

2  resolution of this entire claim.

3        THE COURT:  Are subordinated claims receiving any

4  distribution in this case?

5        MR. DUNNE:  I believe that they are not expected

6  to receive any distribution.

7        THE COURT:  Okay.

8        MR. DUNNE:  I'll turn -- I'm looking at

9  Mr. Glueckstein?

10        MR. GLUECKSTEIN:  Your Honor, at this point, like

11  in any plan, it's unknown, but it is not estimated that -- it

12  is not predicted at this point that subordinated claims will

13  receive a distribution.  There are billions of dollars of

14  subordinated Government claims that would have to be paid

15  before you could ever get to that level.

16        THE COURT:  Okay.

17        MR. GLUECKSTEIN:  But we of course, the trust

18  continues to -- you know, to look for assets, so we don't

19  know.

20        THE COURT:  Okay, I appreciate that.  There were

21  many, many, many classes of the plan and I don't have it

22  fully committed to memory, so thank you.

23        MR. DUNNE:  Me either, Your Honor.  Unless there

24  are further questions from the Court, that's all I have.

25        THE COURT:  I don't have anything further at this

1    time.  Thank you very much.

2              MR. DUNNE:  Thank you, Your Honor.

3              THE COURT:  Mr. Adler.

4              MR. ADLER:  Good afternoon, Your Honor, David

5    Adler --

6              THE COURT:  Good afternoon.

7              MR. ADLER:  -- from McCarter & English on behalf

8    of Seth Melamed.  With me today in court is Ms. Chelsea

9    Botsch from our Wilmington office.

10             I wanted to begin just as Mr. Dunne began.  We

11   would like to move into evidence the three declarations we

12   submitted in connection with our opposition to the amended

13   claims objection in April, and those are the declaration of

14   Ryo Kawabata, and that is Document Number 30078, there is a

15   declaration of Takane Hori, which is 30079, and then there's

16   a second declaration of Ms. Hori, which is 30080.

17             THE COURT:  Okay.  Well, based on the

18   representations, there's no objection, but I'll just ask for

19   the record for you to confirm.

20             MR. DUNNE:  Correct, no objection, Your Honor.

21             THE COURT:  Okay, great.  They're admitted into

22   evidence.  Thank you.

23         (Declaration of Ryo Kawabata received in evidence)

24         (Declarations of Takane Hori receive in evidence)

25             MR. ADLER:  Thank you, Your Honor.

1          So, I wanted to step back and go to the beginning

2    because we were thrown -- or the Court was sort of presented

3    with this in the middle of the dispute and I wanted to take

4    it back to 2021, which is when Mr. Melamed, who was a 22-

5    percent shareholder, agreed to sell his interests, and the

6    rest of Liquid's shareholders agreed to sell their interests,

7    to FTX.

8          Now, Liquid was a holding company that had two

9    exchanges underneath it, one that operated in Japan and one

10   that operated in Singapore.  The Japanese entity had a

11   license, a crypto license, which made it extremely valuable.

12   So that license required that a company that operates an

13   exchange would hold customer crypto in custody, and the

14   customers of FTX Japan received, unlike any other creditor in

15   this case, their distributions in kind 100 percent.

16         Now, Mr. Melamed and the rest of the shareholders

17   entered into this agreement in November of 2021, and the

18   completion date was -- the closing date took place on

19   April 4th, 2022.  And under the agreement, which was

20   referenced before, Mr. Melamed was entitled to several

21   different forms of consideration; he was entitled to $8.9

22   million, which was crypto-currency, which was set aside for

23   him, he was entitled to slightly more than a million shares

24   of FTX common stock.  He also received indemnities from the

25   debtor for any misrepresentation that was made on account of

1  the SPA.  And the SPA was very clear as a condition to

2  closing that a management agreement had to be entered between

3  Mr. Melamed and FTX and the FTX entities.

4        So that was a condition that was required as part

5  of the closing and it took place on April 4th.  Mr. Melamed

6  stayed on at FTX Japan, which is, you know, the old Liquid,

7  the filing took place.  He stayed on as the COO of the

8  company, getting -- interacting with the Japanese regulatory

9  authorities, getting their approval to reopen the withdrawal

10 window, and he stayed on actually until the FTX entity was

11 sold to, I think it was bitFlyer, in July of last year.  So

12 he started prepetition and continued all the way up to

13 approximately 11 months ago.

14        Now, for purposes of the claim, I want to direct

15 the Court's attention to the SPA and particular 7.2, which

16 are representations and warranties made by FTX Trading.  And

17 that representation -- those representations and warranties

18 refer to Part B of Schedule 6, which is, if you look at -- I

19 think it's the last item in Schedule 6, Number 8 says that

20 all information contained in this agreement and all other

21 information furnished by or on behalf of the purchaser to the

22 sellers before and during the negotiations leading up to the

23 agreement is true and correct in all material respects.

24        Well, I guess that did not turn out to be true, as

25 we all know, and there's a separate representation that's

1  made that all statements in the disclosure documents are true

2  and accurate.

3          Now, the disclosure documents are the documents

4  that were actually provided to the Japanese regulatory

5  authorities.  So, as I understand it, Liquid was sort of

6  acting as a conduit of information to the JFSA in order to

7  get their approval to let FTX buy the shares, but that's

8  another representation that obviously turned out not to be

9  accurate.

10         The section of the SPA that is very relevant to

11  this proceeding is Section 9.3, which is the indemnity, and

12  it essentially covers all losses, which is very, very broadly

13  defined to mean all costs, losses, liabilities, damages,

14  claims, demands, proceedings, expenses, penalties, and legal

15  and other professional fees, occurring on account of breach

16  of representations and warranties made by the purchaser.

17         So, in the proof of claim, which is Claim

18  Number 3385, it states, claimant asserts a general unsecured

19  non-subordinated claim against the debtor of not less

20  than $35,613,112.19, which represents the purchase price of

21  the Liquid shares less actual cash received, the retained

22  consideration the debtors' obligation to indemnify claimant

23  in connection with the purchase of LGI shares.  So that is

24  one of the items that is specifically identified in

25  Claim 3385.

1              With that as background, Your Honor, I think that,

2    from my perspective, the first threshold issue among the

3    threshold issues is our cross-motion to compel arbitration.

4    And for that I want to refer to Section 19.1 of the SPA,

5    which says Japanese law controls the agreement, and

6    Section 19.2, which states that any dispute, controversy, or

7    claim arising in any way out of or in connection with this

8    agreement shall be submitted to binding arbitration

9    administered by the Singapore International Arbitration

10   Center in accordance with the SIAC rules in force when the

11   notice of arbitration is submitted, which rules are deemed to

12   be incorporated by reference into this clause.

13              So, turning to the case law -- and I'm thinking

14   about Mintz and Hayes -- the first question is, is there a

15   valid and enforceable arbitration agreement.  Well, the

16   debtors haven't submitted any declarations that challenge the

17   arbitration agreement.  They acknowledge that it's an

18   enforceable agreement; they just say that it doesn't apply to

19   everything in this case, just to the SPA.  So, at least on

20   the threshold inquiry of whether there's a valid and

21   enforceable arbitration agreement, the answer is yes.

22              And the next question becomes, if there's an

23   arbitration agreement that's valid, does the scope of the

24   arbitration get delegated to the arbitrator.  And Mr. Dunne

25   made, you know, some statements that I raised it for the

1  first time in my reply, the Henry Schein Supreme Court case

2  that basically says, you know, if there's a delegation, it

3  needs to be enforced, that was in response to the trust's

4  statement that we had the burden of proof on it.  I don't

5  think that's the appropriate inquiry when there's a

6  delegation provision.  So that -- the reason why we cited

7  Henry Schein and the Celsius/Mohsin case was in response to

8  their statement that we have the burden of proof.

9       And what those cases stand for is essentially

10  that, when there's a delegation, the Court possesses no power

11  to decide the arbitrability issue and what one looks at is

12  the arbitration agreement itself.  And so if you're looking

13  at the arbitration agreement under Section 19.2 of the SPA, I

14  mean, I think it's pretty clear that the management agreement

15  arises out of the SPA, it was a condition to the closing that

16  that management agreement be executed.

17       So that, along with the incorporation of the SIAC

18  rules -- and I think we referred to in our reply the SIAC

19  rule, I think it's 28.1, that is the same as the AAA

20  Rule 7(a) that says that the arbitrators possess the

21  authority to determine the scope of their own arbitration.

22  So the provisions that the courts are looking at in Henry

23  Schein and in Mohsin are identical to the SIAC provision, and

24  when those rules are incorporated, I think it means that

25  essentially the Court has to defer in the first instance to

1  the arbitrator to decide what the scope of the arbitration

2  is.

3           Now, even I can't say that the court in Singapore

4  should be deciding what the Court -- what this Court

5  determined in connection with the KEIP, okay?  There's a

6  court order that says, you know, it's a key employee

7  incentive plan and, if certain conditions take place, the

8  claimant is entitled to an award.  Okay, I cannot see that

9  that would be subject to arbitration.  Okay?  That's just the

10  Court exercising its own authority to enforce its orders.

11          So I specifically referenced in the reply that

12  we're not taking the position that that claim needs to be

13  determined or whether the scope of the arbitration would

14  include that claim.  I acknowledge that that claim stays here

15  because it's already subject to a court order.

16          And on that line I just want to note that the

17  Third Circuit case of Richardson says that when there's a

18  clear and unmistakable delegation of arbitrability issues to

19  the arbitrator, which the Circuit found was -- you know,

20  happened when the parties included the rules in the

21  arbitration clause, that the court essentially has to defer

22  the scope of the arbitration to the arbitrator.

23          So, along that line, once we get past the scope, I

24  think the Court has to ask itself whether there are reasons

25  why the arbitration conflicts with Federal Bankruptcy law,

1  and we said in our reply that we don't think it does.  We are

2  not saying that the arbitrator is going to be determining the

3  Section 510(b) issue or the interpretation of the plan; it's

4  just going to be the adjudication of the claim.  And that

5  happens all the time, you know, despite the trust's position

6  that the goal of bankruptcy is the centralization of all

7  disputes and claims, I mean, courts frequently grant stay

8  relief for claims to be liquidated in state court, courts

9  permissibly and mandatorily abstain from adjudicating

10  disputes.  You have the Rooker-Feldman doctrine, which

11  basically -- you know, if there's a matter in state court, it

12  has to go through the appellate process, not come to the

13  Bankruptcy Court along the way.

14          So, there are many, many, many instances -- and,

15  obviously, personal injury claims and wrongful death claims

16  are not adjudicated in the Bankruptcy Court -- there are

17  many, many, many instances where the Bankruptcy Court does

18  not adjudicate the claim and it's left to the state court,

19  despite the trust's desire that the Bankruptcy Court

20  determine all claims.

21          So we don't think that there is a direct conflict

22  because claims are adjudicated in other forums all the time,

23  and we're not saying to the Court that the arbitrator is

24  going to decide the Section 510(b) issue or the

25  interpretation of the plan.  We're going to have to come back

1  here and the Court is going to have to determine those

2  issues, but we do think that it is appropriate for the claim

3  to be liquidated in the first instance in the arbitration

4  because there are a lot of factual issues here, Judge, that I

5  think need to get fleshed out before this Court can make a

6  ruling.

7        And what I'm referring to is there's a disputed

8  factual issue about whether there was a breach of contract

9  prepetition, okay?  They say it doesn't matter, whether

10  it's -- whether there's a breach of contract or not, the

11  result is the same.  I'm not so sure about that, Your Honor,

12  especially in light of the fact that Japanese law is

13  applicable here, I don't know whether that is the case and,

14  even if it were the case --

15        THE COURT:  What claim are you -- I'm sorry, just

16  to clarify, what claim are you talking about?

17        MR. ADLER:  So with -- in the declarations of the

18  foreign law experts we submit -- we submitted a declaration

19  that said the retained consideration was required to be paid

20  on April 4th, 2022, and the failure to pay it on

21  April 4th, 2022 was a breach of contract, which allowed

22  Mr. Melamed to go to arbitration and get a damages award as a

23  result of their breach of contract.  And I think you can see

24  that in Document Number 30079, paragraphs 16 and 17.  Our

25  expert says, in my opinion, if a Japanese court or arbitral

1  panel applying Japanese law were to examine clause 2.1(d) of

2  the side letter and the side letter schedule, it would

3  conclude that there was a modification to clause 2.4(d) of

4  the SPA.  Accordingly, it is my opinion that a Japanese court

5  or arbitral panel applying Japanese law would conclude that

6  by not paying the retained consideration to Melamed on the

7  completion date, FTX was in breach of the SPA and side

8  letter.

9          Then our expert goes on to say that, if FTX were

10 determined to have breached the SPA and side letter, it is my

11 opinion that a Japanese court or arbitral panel applying

12 Japanese law would award money damages in an amount equal to

13 the value of the retained consideration as of the date of the

14 breach, along with interest of three percent per annum on the

15 overdue sum, with interest accruing daily, and a statutory

16 late penalty of three percent per annum on the foregoing,

17 pursuant to Article 404-2 of the Japanese Civil Code.

18          So Mr. Tanaka, their expert, says that there was

19 not a breach.  And if you look at the Hori

20 declaration, 30079, she explains in detail why Mr. Takana is

21 incorrect in his assessment that there was not a breach of

22 contract.

23          All of this is to say, Your Honor, is that there

24 are disputed factual issues, and I'll come to another one as

25 we go forward, and that is the indemnity.

1          THE COURT:  On the retain consideration argument,

2   even if I sent it to arbitration and even if the arbitrator

3   determines, as your experts have determined, it still needs

4   to come back to me for allowability and classification,

5   correct?

6          MR. ADLER:  Correct.

7          THE COURT:  And I would have to apply the plan?

8          MR. ADLER:  Correct.

9          THE COURT:  Okay.

10          MR. ADLER:  We do not dispute that.

11          THE COURT:  So, there would be an argument at that

12   point that I would have to take that claim and apply the

13   estimation order to it, correct?

14          MR. ADLER:  Right.

15          THE COURT:  Okay.

16          MR. ADLER:  I mean, then argument and --

17          THE COURT:  So we would get there one way or the

18   other?

19          MR. ADLER:  Correct.

20          THE COURT:  Okay.  So it's really a timing issue?

21          MR. ADLER:  Correct.

22          THE COURT:  Okay.

23          MR. ADLER:  Now, I was just about to talk about

24   the indemnity claim.  Now, here, the record is pretty much

25   barren because it was identified in the proof of claim, but,

1  for example, let's suppose that there, in the negotiation

2  leading up to the SPA, there is a discussion over how the

3  retain consideration is to be handled.  Let's suppose that it

4  was going to be cash put aside and they convince Mr. Melamed,

5  based on the representations and warranties that crypto would

6  be held in custody, that -- to set it up that way.  That's

7  separate and apart from the breach of contract issue; in

8  other words, the formation, the modality of how the retain

9  consideration was to be held, okay.

10         If misrepresentations were made, it is my opinion

11  that those issues should be flushed out factually.  I would

12  take the position that that does not relate to a digital

13  asset, okay; that relates to the formation of a contract and

14  the agreement to structure it in a certain way, not in

15  respect of a digital asset, under Section 4.4 of the plan.

16         And I think that we would say, obviously, that

17  Your Honor would have the final say, but we think that the

18  record should be developed exactly what the scope of the

19  indemnity is and what the amount is and that there are

20  disputed factual issues as to, you know, along the way.  So

21  that's why we think this is premature to be decided today

22  because Your Honor just has a lot of legal argument in front

23  of her; not that much facts.  And we think that the

24  development of a factual record will assist the Court in

25  ultimately determining whether or not, you know, the 510(b)

1  argument applies and whether the plan Section 4.4 applies,

2  so --

3          THE COURT:  So there's a portion of your -- and

4  forgive me that I don't know the answer, despite reading the

5  pleadings -- but so that the indemnification claim, has that

6  fully been flushed out, what the indemnification looks like?

7          MR. ADLER:  Well, I think from --

8          THE COURT:  What is the claim amount and how --

9  what's it relating to?

10          MR. ADLER:  Well, I think that there's -- I mean,

11  if you take it, there's indemnity as a result of

12  misrepresentations, right.  So you have misrepresentations as

13  to the financial condition of FTX, right --

14          THE COURT:  Uh-huh.

15          MR. ADLER:  -- which, you know, relates to a lot

16  of different things.  It relates to the agreement of

17  Mr. Melamed to take part of the, or to set up the retain

18  consideration in the way that it was set up.  Obviously, it

19  relates to the stock itself, right.  Mr. Melamed was relying

20  on the reps and warranties and the audited financial

21  statements when he and the other shareholders made the

22  decision to sell to FTX.

23          There are also, obviously, claims for legal fees

24  and other professional fees.  Mr. Melamed has lawyers in

25  Japan, Singapore, here, you know, which would need to be

1  quantified.  And there would -- there are some other issues

2  related to the indemnity, as well, but it would generally

3  deal with the formation of the contract and, you know, the

4  events subsequent to the bankruptcy until the implosion of

5  FTX.

6          So, from our -- and I said it, but I think that

7  the consideration of the 510(b) issue is premature because

8  the liquidation should happen first, a factual record should

9  be built out, and then this Court can consider that, prior to

10 determining the allowability of the claim.

11          And it's the same thing with respect to the plan;

12 the plan says the value of the claim in respect of a digital

13 asset shall be calculated by converting the value of such

14 digital asset into cash as of the petition date.  Well, there

15 are a lot of different things floating around here and, you

16 know, one of the first issues is the breach of contract

17 issue, which the experts disagree on.  And, you know, if

18 there's a claim for, an indemnity claim for misrepresenting

19 the financial condition of FTX, does that relate or is that

20 in respect of the digital asset?

21          I don't think so.  I think that has to do with a

22 misrepresentation that was made at the time of the formation.

23 But I think that these are issues that the Court is going to

24 have to grapple with as, you know, once a record is built

25 out.

1          Now, I just wanted to respond a little bit to your

2    question about Yellow.  When I look at Yellow, what I see is

3    a hotly contested bankruptcy, where there's a claim by the

4    PBGC, which will swamp everything.  And so the whole case is

5    essentially on ice until that claim is quantified.

6          And, you know, we don't have that situation here.

7    FTX is out of bankruptcy.  The Trust is in charge of

8    liquidating the assets and quantifying the liabilities.  So

9    this case is very different than Yellow.

10          I'd also say that one of the points that Judge

11    Goldblatt looked at was the fact that even if the claim went

12    to arbitration, it still had to come back to an Article 3

13    Court.  So there was sort of a, you know, no harm, no foul,

14    you know, issue floating around because it had to come back

15    to an Article 3 Court in any event.  And that, coupled with

16    the fact that it was a multiparty dispute -- if I remember

17    correctly, it was one of the general unsecured creditors who

18    had filed the objection.  So you had the Debtor, some

19    creditors, the PBGC all fighting over this one issue.  And

20    the Court was concerned over the fact that, you know, if it

21    went to arbitration, the creditors, the general unsecured

22    creditors might be iced out of that proceeding.  So, from our

23    perspective of looking at it is sort of like an issue that

24    everything is dependent upon:  the quantification of that

25    liability.

1          And this is completely the opposite.  I mean, this

2    is a large claim to my client, but it's a very small claim in

3    the realm of FTX.

4          THE COURT:  So, regardless if I find whether I

5    have discretion or not --

6          MR. ADLER:  Right.

7          THE COURT:  -- if I fall into <u>Yellow</u>'s decision

8    that I have discretion --

9          MR. ADLER:  Right.

10         THE COURT:  -- that I should not exercise the

11   discretion?

12         MR. ADLER:  Right.

13         And we did make that point that the Singapore

14   Court is better equipped.  You know, speaking for myself,

15   dealing with the Japanese lawyers, I don't really understand

16   civil law and, you know, there are -- it's completely a Civil

17   Code country.  And we think that Singapore, the SIAC would be

18   the better -- has more experience in terms of dealing with

19   those matters and in terms of dealing with the liquidation of

20   these types of claims.  It's apparently a very common

21   procedure to resolve claims in this manner.

22         So, you know, for the reasons that we set forth in

23   the reply, we would ask that our cross-motion to compel

24   arbitration be granted and that the Court, essentially,

25   either direct the arbitrator to determine the scope of the

1   arbitration or put the claims related to the management

2   agreement on hold, pending that determination, so that when

3   we do have to deal with these issues, it can be done in a

4   coordinated fashion and not piecemeal.

5           And with that, Your Honor, do you have any

6   questions?

7           THE COURT:  I do not at this time.

8           MR. ADLER:  Thank you.

9           THE COURT:  Okay.

10          MR. DUNNE:  Very briefly, Your Honor.

11          Mr. Adler said a lot there, Your Honor, on the

12  background on the entities and what customers received and

13  why that may have been.  And I would just remind the Court

14  that none of that is before Your Honor today.  There were

15  three threshold issues before Your Honor today.

16          Significantly, Mr. Adler conceded just now that

17  the consideration that Mr. Melamed was to get in the SPA took

18  the form of FTX stock and specified cryptocurrency.  That

19  ends the inquiry on Section 510(b) subordination and plan

20  application.

21          And as Your Honor pointed out in colloquy with

22  Counsel, those are things that you can decide now.  Those are

23  things that will ultimately have to come back to you know

24  matter what is decided in an arbitration.

25          Mr. Adler also brought up a lot of things that his

1  experts say on the merits; obviously, both sides have

2  parties -- I'm sorry -- both sides have experts who have

3  views on the merits.  The reason that those experts aren't

4  here today and why both sides aren't cross-examining them is

5  that those things don't matter for purposes of this hearing.

6  We are dealing with purely legal issues that are clearly

7  before Your Honor and which all parties acknowledge must be

8  decided by this Court.

9         The other thing I would mention, Your Honor, is

10  Mr. Adler read a portion of the arbitration clause from the

11  SPA to you.  He omitted Section 19.4, I think, which says

12  that the arbitration agreement, in Clause 19, shall be

13  governed by the laws of Singapore, on which he has offered

14  neither evidence, nor argument.

15         And with respect to the various indemnification

16  arguments that Mr. Adler raised, I would simply point out

17  that the SPA indemnifies losses arising from breach of the

18  agreement.  For purposes of the issues the Court is looking

19  at today, it does not matter whether the agreement was

20  breached or not, because Section 510(b) subordination

21  applies, regardless of whether it is a fraud in the issuance

22  of securities or sale of securities or some breach of

23  contract or otherwise.

24         And, regardless, the crypto consideration piece

25  was a claim in respect of digital assets.  They're specified

1   digital assets -- he doesn't dispute that -- and he ascribes

2   value to them based on those digital assets.

3          THE COURT:  If there's an indemnification claim

4   arising from the cryptocurrency dispute, are you seeking to

5   subordinate that.

6          MR. DUNNE:  Yes, Your Honor.

7          We believe that we could seek to subordinate.  We

8   could properly seek to subordinate any claim associated with

9   the SPA on 510(b) grounds.  The case law on 510(b)

10  subordination is extremely broad; it extends to all claims

11  that even emanate from a contract or a claim relating to a

12  sale of securities of the Debtor.

13         We have taken the position, however, in this claim

14  proceeding that the best treatment of that claim is under the

15  plan as a claim in respect of digital assets and we have not

16  sought to subordinate the entire SPA claim, which would have

17  been our right to do.

18         THE COURT:  But just the indemnification portion?

19         MR. DUNNE:  The indemnification portion, it is

20  impossible to disentangle indemnification relating to the

21  crypto consideration piece from all of the other arguments;

22  it's one litigation that's essentially been brought.

23         THE COURT:  Uh-huh.

24         MR. DUNNE:  And, frankly, we believe that 510(b)

25  subordination could apply to every aspect on this, even the

1  crypto consideration piece.

2          THE COURT:  Okay.  Thank you.

3          MR. DUNNE:  Thank you, Your Honor.

4          THE COURT:  Okay.  Well, I'm going to take this

5  matter under advisement and I will attempt to rule promptly,

6  either orally or by written opinion.

7          Thank you for reserving the afternoon for this.

8  It turns out we didn't need to do that because you are all so

9  efficient and I very much appreciate that, but that meant you

10 all had to come down here in the afternoon and then stay,

11 so -- but it is what it is.  I'm glad that we had the

12 opportunity to tackle this today.

13          As I mentioned, I will take it under advisement

14 and I will see some, perhaps all of you, back here on Friday.

15 And with that, we'll stand adjourned.

16          Thank you all very much.

17          COUNSEL:  Thank you, Your Honor.

18          THE COURT:  Take care.

19      (Proceedings concluded at 2:31 p.m.)

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>CERTIFICATION</u> |
| 2 | We certify that the foregoing is a correct |
| 3 | transcript from the electronic sound recording of the |
| 4 | proceedings in the above-entitled matter to the best of our |
| 5 | knowledge and ability. |
| 6 | |
| 7 | <u>/s/ William J. Garling</u>                    <u>June 26, 2025</u> |
| 8 | William J. Garling, CET-543 |
| 9 | Certified Court Transcriptionist |
| 10 | For Reliable |
| 11 | |
| 12 | <u>/s/ Tracey J. Williams</u>                    <u>June 26, 2025</u> |
| 13 | Tracey J. Williams, CET-914 |
| 14 | Certified Court Transcriptionist |
| 15 | For Reliable |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |