EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re: 3409, 3737** |
| | **Hearing Date: February 27, 2025 at 10:00am (ET)** |

### STIPULATION OF UNDISPUTED FACTS
### RELATING TO ROSS RHEINGANS-YOO'S FDU CLAIM

Alameda Research (Bahamas) Ltd. ("__Alameda Bahamas__") and its affiliated debtors and debtors-in-possession (collectively, the "__Debtors__" and each a "__Debtor__") and Ross Rheingans-Yoo ("__Rheingans-Yoo__") hereby stipulate to the following undisputed facts in connection with the Court's determination of the Debtors' Objection to Ross Rheingans-Yoo's Foundation Direction Unit ("__FDU__") Claim 5166 [D.I. 3409]:

**Original Ross Terms**

1. Attached hereto as **Exhibit A** is a true and correct copy of a document produced by the Debtors (the "Original Ross Terms").

2. Attached hereto as **Exhibit B** is a true and correct copy of an export of the metadata associated with the Original Ross Terms.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in the above-captioned chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

3.      The Original Ross Terms is a Google document created at 6:55 AM UTC (1:55 AM ET) on December 30, 2021 by Samuel Bankman-Fried ("Bankman-Fried").  (Ex. B.) Bankman-Fried created the Original Ross Terms on the FTX Group's[2] Google Drive, which is accessible to the Debtors.  (Ex. B.)  Rheingans-Yoo does not have access to the private Google Drive of the Debtors.

4.      Bankman-Fried shared the Original Ross Terms with Rheingans-Yoo, who the metadata reflects was a viewer and collaborator of the document.  (Ex. B.)

5.      The Original Ross Terms concerns the proposed terms of Rheingans-Yoo's employment.

6.      The Original Ross Terms states as follows:

1)      Employed by Alameda Research

2)      Also supporting FTX Foundation

3)      Work could be any combination of trading infrastructure/ops/etc., and foundation work; we would decide dynamically, and it would mostly be Ross[ Rheingans-Yoo]'s decision. We anticipate that it would likely be > 50% foundation work, and possibly up to 100%.

    a)      You should chat with Nick [Beckstead ("Beckstead"), the CEO of the FTX Foundation,] about foundation stuff before this is finalized to confirm that you'd be excited to work together

4)      Economics:

    a)      Base salary: $200k/year

    b)      Bonus: discretionary; minimum of $1m/year, but with upside significantly beyond that.

        i)      To the extent that Ross's work is for the foundation, there would be an equally sized bonus in "foundation direction", i.e. choosing what the foundation does with its money (in addition to the cash bonus). This could be directed for any [Effective Altruism ("EA")] purposes at Ross's discretion;

---

[2]      The term "FTX Group" means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

the only oversight would be that it's plausibly EA, and e.g. it wouldn't need to be to a 501c3.

    c)    Signing bonus of $500k.

    d)    All cash bonuses could be converted to FTX equity at prevailing market rates if desired (or, obviously, tokens etc.)

5)    Start date: asap, but no later than january 10th.

6)    We would work on housing/immigration/etc.

7)    Anticipated to be in The Bahamas full time, although there is potentially some flexibility in that if desired.

8)    Manager: likely Caroline [Ellison ("Ellison")] + SBF [Bankman-Fried] + Nick [Beckstead] depending on the task

(Ex. A)

**Revised Ross Terms**

7.    Attached hereto as **Exhibit C** is a true and correct copy of a document produced by Rheingans-Yoo (the "Revised Ross Terms"), printed without comments.  Attached hereto as **Exhibit D** is a true and correct copy of the Revised Ross Terms that reflects Bankman-Fried's and Rheingans-Yoo's comments on Revised Ross Terms.

8.    Attached hereto as **Exhibit E** is a true and correct copy of a screenshot of the Google Docs "Activity" for the Revised Ross Terms from Rheingans-Yoo's personal computer.

9.    The Revised Ross Terms is a Google document Rheingans-Yoo created at 2:15 PM PT on December 30, 2021.  (Ex. E.)

10.    Rheingans-Yoo created the Revised Ross Terms on Rheingans-Yoo's private Google Drive.  The Debtors do not have access to the private Google Drive of Rheingans-Yoo, nor is there a copy of the Revised Ross Terms in the database of FTX Group documents.

11.   On January 1, 2022, Rheingans-Yoo shared the Revised Ross Terms through Google documents with Samuel Bankman-Fried ("Bankman-Fried"). (Ex. E.) Bankman-Fried was made an "Editor" of the Revised Ross Terms. (Ex. E.) Only Rheingans-Yoo edited the Revised Ross Terms, and only Rheingans-Yoo and Bankman-Fried commented on the Revised Ross Terms. (Ex. E.)

12.   The Revised Ross Terms concerns the proposed terms of Rheingans-Yoo's employment.

13.   The Revised Ross Terms states as follows:

1)   Employment, base terms:

   a)   35% employed by Alameda Research as trader, reporting to CE [Ellison].

      i)   $100k/yr base salary.

      ii)   Anticipate that this time may be seconded to FTXF [FTX Foundation], in discussion with CE [Ellison].

   b)   35% employed by FTX Foundation as Director of Special Projects, reporting to NB [Beckstead].

      i)   $100k/yr base salary.

   c)   30% independent, reporting to SBF [Bankman-Fried].

      i)   Anticipate that some of this will involve being Director of a 1-person standalone foundation that can move without directly involving the FTX brand.

      ii)   Also anticipate that it will often involve doubling down on 1a or 1b when needed.

2)   Economics, variable and one-off:

   a)   Bonus discretionary from AR [Alameda Research] & FTXF [FTX Foundation]; minimum $1mln/yr combined, but with upside significantly beyond that.

   b)   FTXF bonus computed in terms comparable to AR bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).

      i)   FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF.

    ii)     FDUs can be directed to plausibly-EA things at Ross's discretion with NB[ Beckstead]/SBF oversight for not damaging the FTXF/etc brand.

    iii)    Anticipate that FDUs could be granted to the 1c.i foundation if that helps with branding / control somehow.

    c)    All cash can be convertible to FTX / FTX US equity or tokens at employee terms.

    d)    $1mln cash incentive signing bonus, convertible at cash terms.

    e)    One-time startup grant: $2mln cash + $2mln FDU, vesting linearly over 7mo.

    f)    $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms, equity immediately vested.

3)    Logistics, other:

    a)    Start date: ASAP, but no later than Jan 10.

    b)    Startup logistics, short term including travel: fully expensed.

    c)    Startup logistics, medium term including housing, immigration: supported by AR, FTX, and/or FTXF.

    d)    Reporting to CE (for 1a), NB (for 1b), or SBF (for 1c), depending. i) SBF will set final bonus comp semesterly.

    e)    Payroll received from whatever entity operationally convenient.

    f)    Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

(Ex. C.)

14.    Attached hereto as **Exhibit F** is a true and correct copy of a January 1, 2022 Google Docs notification (the "SBF Comment") that Bankman-Fried received on one of his personal cell phones. Bankman-Fried abandoned this particular personal cell phone in the Bahamas, and the Bahamian Joint Official Liquidators recovered the device and shared with the Debtors an image of the device in or around January 2024.

15.    The SBF Comment reflects that Bankman-Fried commented on sections 2(a)-(c) of Revised Ross Terms (i.e., the sections discussing Rheingans-Yoo's bonus), *see supra* ¶ 13, and wrote "sgtm"—an acronym meaning "sounds good to me." (Ex. F.)

**Final Ross Terms**

16.     Attached hereto as **<u>Exhibit G</u>** is a true and correct copy of the document with the file name "2022-03-24 Ross terms" (the "<u>Final Ross Terms</u>"), printed without comments. Attached hereto as **<u>Exhibit H</u>** is a true and correct copy of the Final Ross Terms that reflects Bankman-Fried's and Rheingans-Yoo's comments on Final Ross Terms.

17.     Attached hereto as **<u>Exhibit I</u>** is a true and correct copy of a screenshot of the Google Docs "Activity" for the Final Ross Terms from Rheingans-Yoo's personal cell phone.

18.     The Final Ross Terms is a Google document that Rheingans-Yoo created on March 24, 2022.  (Ex. I.)  Rheingans-Yoo created Final Ross Terms on his private Google Drive.  The Debtors do not have access to the private Google Drive of Rheingans-Yoo, nor is there a copy of the Final Ross Terms in the database of FTX Group documents.

19.     On March 24, 2022, Rheingans-Yoo shared the Final Ross Terms with Bankman-Fried.  (Ex. I.)  Bankman-Fried was made an "Editor" of the Final Ross Terms.  (Ex. I.) Only Rheingans-Yoo and Bankman-Fried commented on and edited the Final Ross Terms.  (Ex. I.)

20.     The Final Ross Terms concerns the proposed terms of Rheingans-Yoo's employment.

21.     The Final Ross Terms state as follows:

1)     Employment, base terms:

    a)     35% employed by Alameda Research as trader / investment associate, reporting to CE [Ellison].

        i)     $100k/yr base salary.

        ii)     Anticipate that this time may be seconded to FTXF [the FTX Foundation], in discussion with CE.

    b)     35% employed by FTX Foundation as Program Officer, reporting to SBF.

        i)     $100k/yr base salary.

        ii)     Anticipate that this will involve leading Latona Bio + allied efforts, but also some things outside of biorisk when appropriate.

    c)    30% independent, reporting to SBF.

        i)     Anticipate independent projects that don't necessarily fit into the FTXF framework/brand.

        ii)     Also anticipate that this time can be used to double down on 1a or 1b when needed.

        iii)    Comp for truly independent projects set at SBF's discretion.

2)    Economics, variable and one-off:

    a)    Bonus discretionary from AR [Alameda Research] & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that.

    b)    FTXF bonus computed in terms comparable to AR employee bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).

        i)     FDUs held/rolled over are indexed to equity or cash, by agreement between Ross[ Rheingans-Yoo]/SBF [Bankman-Fried].

        ii)     FDUs can be directed to plausibly-EA things at Ross's discretion with NB[ Beckstead]/SBF oversight for not damaging the FTXF/etc brand.

        iii)    Anticipate that FDUs could be granted to a Ross-controlled personal foundation if that helps with branding / control somehow.

    c)    All cash can be convertible to FTX / FTX US equity or tokens at employee terms.

    d)    $0.5mln signing bonus, convertible at cash terms.

    e)    $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms (2022-01-04 valuation), equity immediately vested.

3)    Logistics, other:

    a)    Start date: 2022-01-04

    b)    Startup logistics, including housing, immigration: as per FTX employee policies.

    c)    Reporting to CE (for 1a) or SBF (for 1b+1c).

        i)     SBF will set final bonus comp semesterly.

    d)    Payroll received from whatever entity operationally convenient.

e)      Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

(Ex. G.)

**The Employment Agreement**

22.      Attached hereto as **<u>Exhibit J</u>** is a true and correct copy of the signed employment agreement between Rheingans-Yoo and Alameda Bahamas dated April 11, 2022 (the "<u>Employment Agreement</u>").

23.      The Employment Agreement was drafted by the FTX Group. Neither the Debtors nor Rheingans-Yoo have located any communications in which Rheingans-Yoo attempted to negotiate the terms of the Employment Agreement.

24.      On April 11, 2022, Darnell Davis of FTX Digital Markets emailed the Employment Agreement for signature by DocuSign to Caroline Ellison at her Alameda Research email address and Ross Rheingans-Yoo at his FTX Foundation email address.  Ellison signed the Employment Agreement by DocuSign on behalf of Alameda Bahamas, while Rheingans-Yoo printed it out and signed it by wet ink.

25.      The Employment Agreement provided that "[Alameda Bahamas] will employ [Rheingans-Yoo] as a Trader & Investment Associate."  Employment Agreement § 2(a).

26.      The Employment Agreement provided that "[Rheingans-Yoo] may be requested to, and by entering into this Agreement you agree to, work for an affiliate of [Alameda Bahamas], or for any other entity as [Alameda Bahamas] may request."  *Id.* § 2(c).

27.      The Employment Agreement provided that: "[Alameda Bahamas] may require [Rheingans-Yoo] to undertake additional duties of another position, either in addition to or instead of [Rheingans-Yoo's] normal duties, it being understood that [Rheingans-Yoo] will not be

required to perform duties which are not reasonably within [his] skill, experience or capabilities."

*Id.* § 2(d).

28.    The Employment Agreement provides:

> **Bonus**.  [Rheingans-Yoo] may be eligible to receive a discretionary bonus from time to time in an amount as may be determined by [Alameda Bahamas] in its sole and absolute discretion and subject to applicable withholdings.  Payment of a discretionary bonus in any given period does not entitle [Rheingans-Yoo] to any such bonus in any subsequent period.  Any discretionary bonus awarded to [Rheingans-Yoo] in writing by [Alameda Bahamas] will generally be paid to [Rheingans-Yoo] on the same date such bonuses are paid to all employees generally, so long as [Rheingans-Yoo] remain[s] an active employee in compliance with [his] agreements with [Alameda Bahamas] and have neither given nor received notice of termination prior to the bonus payment date.  Nothing herein shall be construed to obligate [Alameda Bahamas] to give [Rheingans-Yoo] or otherwise guarantee a bonus for any period.

*Id.* § 4(b).

29.    There is no mention of FDUs or directed grants in the Employment Agreement.

30.    The Employment Agreement contains an integration clause that provides:

> This Agreement, the Invention Assignment Agreement and the policies and procedures referred to in paragraph 1 contain the entire understanding of the parties in respect of the subject matter contained herein and therein.  In executing this Agreement, [Rheingans-Yoo] represent[s] that [he has] not relied on any representation or statement not set forth in this Agreement, the Invention Assignment Agreement and the said policies and procedures, and [he] expressly disavow[s] any reliance upon any such representation or statements.

*Id.* § 14(a).

31.    The Employment Agreement is enforceable according to its terms.

**The Incorporation of Latona**

32.    Non-Debtor Latona Biosciences Group ("Latona") is a Bahamian non-profit company.

33.    Latona's Certificate of Incorporation is dated May 20, 2022.

34.     Latona's Memorandum and Articles of Association are also dated May 20, 2022.

35.     According to Latona's Memorandum and Articles of Association, Rheingans-Yoo, Bankman-Fried, and Valdez Russell were the initial directors of Latona.

36.     Rheingans-Yoo held himself out as the "Director" or "Executive Director" of Latona and, in that role, reported directly to Bankman-Fried.  [D.I. 1881 ¶ 19]; Answer to Complaint Filed by Latona and Rheingans-Yoo ¶ 19, *Alameda Research Ltd.* v. *Platform Life Sciences Inc.,* Adv. Pro. No. 23-50444 (Bankr. D. Del.), ECF No. 63.

37.     Latona Bioscience Group was an entity under the umbrella of the FTX Foundation "brand."

**The Bonus Memo**

38.     Attached hereto as **Exhibit K** is a true and correct copy of a September 1, 2022 memorandum created by Bankman-Fried and shared with Rheingans-Yoo with the file name "Ross Rheingans-Yoo Review 2022S1 -- SBF -> RRY" ("Bonus Memo").

39.     Attached hereto as **Exhibit L** is a true and correct copy of the metadata associated with the Bonus Memo.

40.     Bankman-Fried was the author of the Bonus Memo, and Rheingans-Yoo was a viewer of the Bonus Memo.  (*See* Ex. L.)

41.     Under the heading "[b]onus information," Bankman-Fried wrote:

Your bonus for the first half of 2022 is any linear combination of:

    a) $650,000

Or

    b) Both:

>> i) 12,600 options on FTX Trading LTD, the parent company of FTX International
>>
>> ii) 268,000 options on West Real Shires, the parent company of FTX US
>
> (E.g. you could take half of (a) and half of (b).)
>
> On top of the above, you [Rheingans-Yoo] get another $650k of directed grants to any EA-driven cause if you want [(the "FDU Bonus")[3]].

(Ex. K.)

**Rheingans-Yoo's Employment**

42.     Rheingans-Yoo began working for the FTX Group on or about January 4, 2022.

43.     Prior to the execution of his Employment Agreement, with the knowledge and consent of Bankman-Fried and Beckstead, Rheingans-Yoo held himself out as a representative of the FTX Foundation and used a variety of different titles, including "program officer," "project officer," and "special projects lead" of the FTX Foundation.

44.     With the knowledge and consent of Bankman-Fried, who controlled the FTX Group, and Ellison, the CEO of Alameda Bahamas and Rheingans-Yoo's manager at Alameda Bahamas under the Employment Agreement, Rheingans-Yoo did not perform the duties typical of a Trader or Investment Associate for Alameda Bahamas.

45.     Rheingans-Yoo was not employed by the FTX Foundation.

46.     Rheingans-Yoo's salary and cash bonus were paid from bank accounts of non-Debtor FTX Digital Markets Ltd.

---

[3]      The term "FDU Bonus" refers to this portion of Rheingans-Yoo's Semester 1, 2022 bonus award.

-11-

47.    Attached hereto as **Exhibit M** is a true and correct copy of an Alameda Bahamas payslip for Rheingans-Yoo dated May 13, 2022 (according to the document's metadata), showing that FTX Digital Markets Ltd. paid Rheingans-Yoo "March & April 2022 salary" in addition to a "2-month bonus for remote work done in January & February 2022 prior to formal contract."

48.    Rheingans-Yoo did not inform anyone at the FTX Group prepetition that he had designated an EA-driven cause to receive the $650,000 directed grant.

49.    The Bonus Memo did not provide a specified mechanism for Rheingans-Yoo to inform the FTX Group of the EA-driven cause he had designated to receive the FDU Bonus.

50.    The Debtors have not identified any communications with Rheingans-Yoo in which the FTX Group provided a specified mechanism for Rheingans-Yoo to inform the FTX Group of the EA-driven cause he could designate to receive the FDU Bonus.

51.    The Bonus Memo did not provide any deadline by which Rheingans-Yoo had to inform the FTX Group as to the EA-driven cause he had designated to receive the FDU Bonus.

52.    The Debtors have not identified any communications with Rheingans-Yoo that provided Rheingans-Yoo with a deadline by which Rheingans-Yoo had to inform the FTX Group as to the EA-driven cause he had designated to receive the FDU Bonus.

**Rheingans-Yoo's Claim**

53.    Attached hereto as **Exhibit N** is a true and correct copy of the proof of claim form (the "Claim Form") associated with the non-customer claim numbered 5166 that Rheingans-Yoo asserted against Alameda Bahamas on June 29, 2023 ("Rheingans-Yoo's Claim").

On June 29, 2023, Rheingans-Yoo filed a second non-customer claim numbered 89710 against Alameda Bahamas that is duplicative of Rheingans-Yoo's Claim.

54.     In Part 3 of the Claim Form, Rheingans-Yoo checked the box that said, "I am the creditor."  (Ex. N.)

55.     In Part 3 of the Claim Form, Rheingans-Yoo did not check the box that said: "I am the creditor's attorney or authorized agent."  (Ex. N.)

56.     In filing the Claim Form, Rheingans-Yoo declared "under penalty of perjury that the foregoing is true and correct."  (Ex. N.)

57.     The Debtors are not aware of any documents or communications in their possession relating to the FDU Claim aside from those that the Debtors have already produced to Rheingans-Yoo.

58.     Rheingans-Yoo is not aware of any documents or communications in his possession relating to the FDU Claim aside from those that he has already produced to the Debtors.

**The Settlement Stipulation**

59.     Attached hereto as **Exhibit O** is a true and correct copy of the Stipulation of Settlement, dated April 11, 2024, that was entered into by Alameda Research Ltd., FTX Trading Ltd., Alameda Bahamas, Latona, and Rheingans-Yoo to resolve the claims against Rheingans-Yoo and Latona in the adversary proceeding captioned *Alameda Research Ltd.* v. *Platform Life Sciences Inc.,* Adv. Pro. No. 23-50444 (Bankr. D. Del.), and Rheingans-Yoo's Claim (inclusive of the duplicative claim), with the exception of the FDU Claim ("Settlement Stipulation").

60.     In the Settlement Stipulation, the parties agreed to "sever[]" the FDU Claim "for determination by the Bankruptcy Court at a later date."  Settlement Stipulation at 4.

61.    In the Settlement Stipulation, the "Parties agree[d]" that the FDU Claim "is primarily legal in nature."  Settlement Stipulation at ¶ 6 n.5.

62.    On May 22, 2024, the Bankruptcy Court entered an order approving the Settlement Stipulation.

Dated: January 15, 2025

**LANDIS RATH & COBB LLP**

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
landis@lrclaw.com
mcguire@lrclaw.com
brown@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted pro hac vice)
Brian D. Glueckstein (admitted pro hac vice)
Keila M. Mayberry
125 Broad Street
New York, NY  10004
Telephone: (212) 558-4000
wheelers@sullcrom.com
glueckstein@sullcrom.com
mayberryk@sullcrom.com

Counsel for the Debtors

**JOYCE, LLC**

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone: (302) 388-1944
mjoyce@mjlawoffices.com

-and-

**GOETZ FITZPATRICK LLP**
Scott D. Simon (admitted pro hac vice)
One Penn Plaza
Suite 3100
New York, NY 10119
Telephone: (212) 695-8100
ssimon@goetzfitz.com

Counsel to Ross Rheingans-Yoo

# EXHIBIT A

1) Employed by Alameda Research
2) Also supporting FTX Foundation
3) Work could be any combination of trading infrastructure/ops/etc., and foundation work; we would decide dynamically, and it would mostly be Ross's decision.  We anticipate that it would likely be > 50% foundation work, and possibly up to 100%.
   a) You should chat with Nick about foundation stuff before this is finalized to confirm that you'd be excited to work together
4) Economics:
   a) Base salary: $200k/year
   b) Bonus: discretionary; minimum of $1m/year, but with upside significantly beyond that.
      i) To the extent that Ross's work is for the foundation, there would be an equally sized bonus in "foundation direction", i.e. choosing what the foundation does with its money (in addition to the cash bonus).  This could be directed for any EA purposes at Ross's discretion; the only oversight would be that it's plausibly EA, and e.g. it wouldn't need to be to a 501c3.
   c) Signing bonus of $500k.
   d) All cash bonuses could be converted to FTX equity at prevailing market rates if desired (or, obviously, tokens etc.)
5) Start date: asap, but no later than january 10th.
6) We would work on housing/immigration/etc.
7) Anticipated to be in The Bahamas full time, although there is potentially some flexibility in that if desired.
8) Manager: likely Caroline + SBF + Nick depending on the task

# EXHIBIT B

| | |
|---|---|
| Document ID | F10705-E001042653 |
| BegAttach | F10705-E001042653 |
| M-Record Type | Edoc |
| FTI Collection Type Tracker | GD (Google Drive) |
| M-Master Date | 12/30/2021 7:05 |
| Unified Title | Ross Offer_1UtHaeW0XhzAoRQC48J2z92-eTO3wJyNq6HlInC8x2_8.docx |
| M-File Extension | docx |
| M-All Custodians | Bankman-Fried, Sam |
| Google Drive File | 1UtHaeW0XhzAoRQC48J2z92-eTO3wJyNq6HlInC8x2_8 |
| Google Drive File::File Name | Ross Offer |
| Google Drive File::Path | sam@alameda-research.com\My Drive\Ross Offer |
| Google Drive Folder | 0AJNSoJkbPuAqUk9PVA |
| Google Drive Folder::Google Folder Name | My Drive |
| M-All Paths | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_1.zip\Ross Offer_1UtHaeW0XhzAoRQC48J2z92-eTO3wJyNq6HlInC8x2_8.docx |
| M-File Name | Ross Offer |
| M-Author | sam@alameda-research.com |
| M-Date Accessed | 11/23/2022 7:28 |
| M-Date Created | 12/30/2021 6:55 |
| M-Date Last Modified | 12/30/2021 7:05 |
| M-Date Sent | |
| M-Date Received | |
| M-EDS-Active Participants | |
| M-EDS-Channel Name | |
| M-EDS-ChatSource | |
| M-EDS-Conversation Type | |
| M-EDS-Collaborators | ross@r-y.io |
| M-EDS-Inactive Participants | |
| M-EDS-Participants | |
| M-Email From | |
| M-Email To | |
| M-Email CC | |
| M-Email BCC | |
| M-File Path | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_1.zip\Ross Offer_1UtHaeW0XhzAoRQC48J2z92-eTO3wJyNq6HlInC8x2_8.docx |
| M-File Size | 7324 |
| M-Last Author | |
| M-Media Type | |
| M-Source Path | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_1.zip |
| M-Collection Entity | Alameda;FTX.com |
| M-Subject | |
| M-EDS-Attaching Participant | |
| M-EDS-Author | sam@alameda-research.com |
| M-EDS-Chat Start Time | |
| M-EDS-Chat End Time | |
| M-EDS-Reacted Users | |
| M-EDS-Viewers | ross@r-y.io |

# EXHIBIT C

1) Employment, base terms:
   a) 35% employed by Alameda Research as trader, reporting to CE.
      i) $100k/yr base salary.
      ii) Anticipate that this time may be seconded to FTXF, in discussion with CE.
   b) 35% employed by FTX Foundation as Director of Special Projects, reporting to NB.
      i) $100k/yr base salary.
   c) 30% independent, reporting to SBF.
      i) Anticipate that some of this will involve being Director of a 1-person standalone foundation that can move without directly involving the FTX brand.
      ii) Also anticipate that it will often involve doubling down on 1a or 1b when needed.
2) Economics, variable and one-off:
   a) Bonus discretionary from AR & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that.
   b) FTXF bonus computed in terms comparable to AR bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).
      i) FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF.
      ii) FDUs can be directed to plausibly-EA things at Ross's discretion with NB/SBF oversight for not damaging the FTXF/etc brand.
      iii) Anticipate that FDUs could be granted to the 1c.i foundation if that helps with branding / control somehow.
   c) All cash can be convertible to FTX / FTX US equity or tokens at employee terms.
   d) $1mln cash incentive signing bonus, convertible at cash terms.
   e) One-time startup grant: $2mln cash + $2mln FDU, vesting linearly over 7mo.
   f) $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms, equity immediately vested.
3) Logistics, other:
   a) Start date: ASAP, but no later than Jan 10.
   b) Startup logistics, short term including travel: fully expensed.
   c) Startup logistics, medium term including housing, immigration: supported by AR, FTX, and/or FTXF.
   d) Reporting to CE (for 1a), NB (for 1b), or SBF (for 1c), depending.
      i) SBF will set final bonus comp semesterly.
   e) Payroll received from whatever entity operationally convenient.
   f) Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

# EXHIBIT D

1) Employment, base terms:
   a) 35% employed by Alameda Research as trader, reporting to CE.
      i)   $100k/yr base salary.
      ii)  Anticipate that this time may be seconded to FTXF, in discussion with CE.
   b) 35% employed by FTX Foundation as Director of Special Projects, reporting to NB.
      i)   $100k/yr base salary.
   c) 30% independent, reporting to SBF.
      i)   Anticipate that some of this will involve being Director of a 1-person standalone foundation that can move without directly involving the FTX brand.
      ii)  Also anticipate that it will often involve doubling down on 1a or 1b when needed.
2) Economics, variable and one-off:
   a) Bonus discretionary from AR & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that.
   b) FTXF bonus computed in terms comparable to AR bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).
      i)   FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF.
      ii)  FDUs can be directed to plausibly-EA things at Ross's discretion with NB/SBF oversight for not damaging the FTXF/etc brand.
      iii) Anticipate that FDUs could be granted to the 1c1 foundation if that helps with funding / control somehow.
   c) All cash can be convertible to FTX / FTX US equity or tokens at employee terms.
   d) $2mln cash incentive signing bonus, convertible at cash terms.
   e) One-time startup grant: $2mln cash + $2mln FDU, vesting linearly over 7mo.
   f) $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms, equity immediately vested.
3) Logistics, other:
   a) Start date: ASAP, but no later than Jan 10.
   b) Startup logistics, short term including travel: fully expensed.
   c) Startup logistics, medium term including housing, immigration: supported by AR, FTX, and/or FTXF.
   d) Reporting to CE (for 1a), NB (for 1b), or SBF (for 1c), depending.
      i)   SBF will set final bonus comp semesterly.
   e) Payroll received from whatever entity operationally convenient.
   f) Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

## Summary of Comments on Revised Ross Terms.pdf

### Page: 1

Author: Sam Bankman-Fried    Date: 1/1/2022 8:41:00 PM
sgtm

Author: Sam Bankman-Fried    Date: 1/1/2022 8:41:00 PM

Author: Ross Rheingans-Yoo    Date: 1/2/2022 1:08:00 AM
Yeah, basically. Maybe it would be easier to just make 2e an indic expected $4mln first-semester bonus?

Author: Ross Rheingans-Yoo    Date: 1/1/2022 9:36:00 PM
"incentive" is an opportunity-cost offset.
"startup grant" is money-where-mouth-is on how we think the first ~semester might go, conditioned on working together until August.

Author: Sam Bankman-Fried    Date: 1/1/2022 9:49:00 PM
ahh got it, so roughly speaking "startup grant" replaces the first semester bonus and "incentive" is actual signing bonus

Author: Sam Bankman-Fried    Date: 1/1/2022 8:40:00 PM
what's the relationship/difference between these?

Author: Sam Bankman-Fried    Date: 1/1/2022 8:40:00 PM
sgtm

Author: Sam Bankman-Fried    Date: 1/1/2022 8:40:00 PM
sgtm

# **EXHIBIT E**



# EXHIBIT F

**55aaa75e-59bc-4b40-985b-1fcff308449d - Bonus discretionary from AR & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that. FTXF bonus computed in terms comparable to AR bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU). FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF. FDUs can be directed to plausibly-EA things at Ross's discretion with NB/SBF oversight for not damaging the FTXF/etc brand. Anticipate that FDUs could be granted to the 1c.i foundation if that helps with branding / control somehow. All cash can be convertible to FTX / FTX US equity or tokens at employee terms.**

| Participant | Entity | Login | Email |
|---|---|---|---|
| Sam Bankman-Fried | Sam Bankman-Fried | 1 | 0 |

Sam Bankman-Fried

2022-01-01 09:41:08.000 PM

sgtm

# EXHIBIT G

([previously 1](); previously 2)

1) Employment, base terms:
   a) 35% employed by Alameda Research as trader / investment associate, reporting to CE.
      i)    $100k/yr base salary.
      ii)   Anticipate that this time may be seconded to FTXF, in discussion with CE.
   b) 35% employed by FTX Foundation as Program Officer, reporting to SBF.
      i)    $100k/yr base salary.
      ii)   Anticipate that this will involve leading Latona Bio + allied efforts, but also some things outside of biorisk when appropriate.
   c) 30% independent, reporting to SBF.
      i)    Anticipate independent projects that don't necessarily fit into the FTXF framework/brand.
      ii)   Also anticipate that this time can be used to double down on 1a or 1b when needed.
      iii)  Comp for truly independent projects set at SBF's discretion.
2) Economics, variable and one-off:
   a) Bonus discretionary from AR & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that.
   b) FTXF bonus computed in terms comparable to AR employee bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).
      i)    FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF.
      ii)   FDUs can be directed to plausibly-EA things at Ross's discretion with NB/SBF oversight for not damaging the FTXF/etc brand.
      iii)  Anticipate that FDUs could be granted to a Ross-controlled personal foundation if that helps with branding / control somehow.
   c) All cash can be convertible to FTX / FTX US equity or tokens at employee terms.
   d) $0.5mln signing bonus, convertible at cash terms.
   e) $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms (2022-01-04 valuation), equity immediately vested.
3) Logistics, other:
   a) Start date: 2022-01-04
   b) Startup logistics, including housing, immigration: as per FTX employee policies.
   c) Reporting to CE (for 1a) or SBF (for 1b+1c).
      i)    SBF will set final bonus comp semesterly.
   d) Payroll received from whatever entity operationally convenient.
   e) Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

# EXHIBIT H

(previously 1; previously 2)

1) Employment, base terms:
   a) 35% employed by Alameda Research as trader / investment associate, reporting to CE.
      i) $100k/yr base salary.
      ii) Anticipate that this time may be seconded to FTXF, in discussion with CE.
   b) 35% employed by FTX Foundation as Program Officer, reporting to SBF.
      i) $100k/yr base salary.
      ii) Anticipate that this will involve leading Latona Bio + allied efforts, but also some things outside of biorisk when appropriate.
   c) 30% independent, reporting to SBF.
      i) Anticipate independent projects that don't necessarily fit into the FTXF framework/brand.
      ii) Also anticipate that this time can be used to double down on 1a or 1b when needed.
      iii) Comp for truly independent projects set at SBF's discretion.
2) Economics, variable and one-off:
   a) Bonus discretionary from AR & FTXF; minimum $1mln/yr combined, but with upside significantly beyond that.
   b) FTXF bonus computed in terms comparable to AR employee bonus, but distributed as a 50/50 split between cash and "foundation direction units" (FDU).
      i) FDUs held/rolled over are indexed to equity or cash, by agreement between Ross/SBF.
      ii) FDUs can be directed to plausibly-EA things at Ross's discretion with NB/SBF oversight for not damaging the FTXF/etc brand.
      iii) Anticipate that FDUs could be granted to a Ross-controlled personal foundation if that helps with branding / control somehow.
   c) All cash can be convertible to FTX / FTX US equity or tokens at employee terms.
   d) $0.5mln signing bonus, convertible at cash terms.
   e) $2.3mln loan against Edgar funds, 1.5%/ann rate, payable at min(2yr, Edgar payback + 90day). Convertible at cash terms (2022-01-04 valuation), equity immediately vested.
3) Logistics, other:
   a) Start date: 2022-01-04
   b) Startup logistics, including housing, immigration: as per FTX employee policies.
   c) Reporting to CE (for 1a) or SBF (for 1b+1c).
      i) SBF will set final bonus comp semesterly.
   d) Payroll received from whatever entity operationally convenient.
   e) Anticipate to be in The Bahamas 70%+ time, with possible flexibility.

---

## Summary of Comments on Final Ross Terms.pdf

### Page: 1

Author: Ross Rheingans-Yoo    Date: 3/24/2022 8:59:00 PM -04'00'
actually idk where Sam's counteroffer was; I think the main change was the signing bonus down to $0.5mln, which was incorporated here.

Author: Sam Bankman-Fried    Date: 3/25/2022 10:11:00 PM -04'00'
sgmt!

# EXHIBIT I



# EXHIBIT J

**Alameda Research (Bahamas) Ltd**
18 Veridian Corporate Center, Western Road, New Providence, the Bahamas

11th April 2022

Ross Rheingans-Yoo
Nassau, New Providence
The Bahamas

**Re: Offer of Employment**

Dear Ross,

1.    **Offer and Conditions.**

(a)    It is with great pleasure that we extend to you this offer ("**Offer**") to join Alameda Research (Bahamas) Ltd ("**Company**"). The material terms of the Offer are set forth in this letter agreement ("**Agreement**"). For greater certainty, effective upon commencement of your employment with the Company you will be employed solely by the Company and no longer employed by such prior employer entity.

(b)    The Offer and your employment with the Company shall be at all times subject to the following key terms and conditions. Notwithstanding the terms of paragraph 8 of this Agreement, if you have not or are unable to continue compliance with these key terms and conditions ("**Key Terms**"), your employment with the Company may be immediately terminated:

(i)    your being lawfully free to commence employment and having on commencement, and maintaining throughout your employment, a work permit, visa or other permission (if applicable) necessary to enable you to work for the Company. It is your duty to immediately notify the Company should your entitlement to reside and work in the Bahamas changes;

(ii)    your obtaining (or obtaining shortly after your Start Date (as defined below)) and continuing to maintain all applicable licenses and registrations with regulatory bodies as the Company shall determine are required or necessary for your position. It is your duty to immediately notify the Company if your license and registration status changes;

(iii)    your continued compliance with all applicable policies and procedures of the Company applicable to employees, and all applicable policies and procedures of the Company's affiliates notified to you (e.g., compliance policies of group

companies, to the extent applicable to your work), each as amended from time to time;

(iv)   your continued compliance with, and in all your actions not having caused the Company or any of its affiliates or any other employee or contractor to breach or contravene, all or any rules, regulations and requirements of any regulatory body, code of conduct or statutory provision to which you, the Company or any of its affiliates or any other employee or contractor is from time to time subject to;

(v)    your continued compliance with the Prevention of Bribery Act of The Bahamas and other relevant laws relating to the prevention of bribery or corrupt action that may be in force in any relevant jurisdiction, and any guidelines, regulations or rules related thereto and as amended from time to time; and

(vi)   satisfactory completion of the background or credit check investigation described in paragraph 11 hereof.

2.   **Title and Duties.**

(a)    The Company will employ you as Trader & Investment Associate. You will initially report to Caroline Ellison, while performing such duties and responsibilities as may be assigned to you from time to time. The Board of Directors (the "**Board**") may from time to time assign to you a first point of contact for communication with the Board.

(b)    Subject to compliance with all applicable laws, the Company reserves the right and has the sole discretion to amend, modify, terminate or interpret any of its current policies, practices and benefits at any time, and thereby modify the terms and conditions of your employment at any time, on reasonable notice where applicable.

(c)    You may be requested to, and by entering into this Agreement you agree to, work for an affiliate of the Company, or for any other client entity as the Company may request. You acknowledge that the Company's clients have affiliated entities with offices around the globe. Although the Company may require you to perform duties for any member of the Company's clients in these or other locations and may require you to travel to other locations from time to time, you will at all times remain an employee of the Company and your compensation shall be paid by the Company. Any services you may provide to any of the Company's clients are provided by you as an employee of the Company and your services for such Company's clients are provided on behalf of the Company.

(d)    You will perform all acts, duties and obligations and comply with such reasonable orders as may be assigned by the Company and which are consistent with your job title. The Company may require you to undertake additional duties of another position, either in addition to or instead of your normal duties, it being understood that you will

not be required to perform duties which are not reasonably within your skill, experience or capabilities.

(e)    You are required to devote your full time, attention and abilities to your job duties during working hours, and to act in the best interest of the Company at all times. You shall not, without the prior written consent of the Company, in any way directly or indirectly on your own account or for the benefit of a third party (i) be engaged or employed in, (ii) concerned with (in any capacity whatsoever), or (iii) provide services to: (x) any other business or organization that operates a cryptocurrency or futures trading business or exchange platform, or (y) any other business or organization where it is, or is likely to be, in conflict with the interest of the Company or where it may adversely affect the effective or efficient discharge of your duties.

(f)    During your probationary period of three (3) months, your employment may be terminated with no notice (and no payment in lieu). Upon completion of your probationary period, either party may terminate your employment in accordance with paragraph 8 of this Agreement.

3.    **Start Date.** Your start date of employment shall be on March 1st, 2022, or such other date agreed in writing between you and the Company ("**Start Date**"). If you fail to commence your employment on this Start Date for any reason, including a failure to satisfy the Key Terms set forth in paragraph 1 of this Agreement, this Offer shall lapse immediately; except that the Company may, on short notice to you, adjust your Start Date to an earlier or later date based on the time taken to process and/or issue your work visa.

4.    **Compensation.**

(a)    *Salary.* As compensation for your services, you will receive an annual gross salary at a rate of US$100,000.00 equivalent in B$, payable in accordance with the Company's regular local payroll processes, but not less frequently than monthly, in arrears ("**Base Salary**").

(b)    *Bonus.* You may be eligible to receive a discretionary bonus from time to time in an amount as may be determined by the Company in its sole and absolute discretion and subject to applicable withholdings. Payment of a discretionary bonus in any given period does not entitle you to any such bonus in any subsequent period. Any discretionary bonus awarded to you in writing by the Company will generally be paid to you on the same date such bonuses are paid to all employees generally, so long as you remain an active employee in compliance with your agreements with the Company and have neither given nor received notice of termination prior to the bonus payment date. Nothing herein shall be construed to obligate the Company to give you or otherwise guarantee a bonus for any period.

(c) ***Sign-on Bonus.*** You will receive a sign-on bonus, payable on or before your start date, to be paid as follows

    (i)    US$350,000 equivalent in B$;

    (ii)    an option to purchase 32,822 shares of Class A common stock of West Realm Shires Inc. (dba FTX US) ("***FTX US Option***") ; and

    (iii)    an option to purchase 1,618 shares of common stock of FTX Trading Ltd ("***FTX Option***" and together with the FTX US Option, collectively the "***Options***") .

The Options are subject to board approval of West Realm Shires Inc. and FTX Trading Ltd, respectively. The exercise price will be established by the board of directors of both companies after review of the applicable valuation. Both Options will be a non-incentive stock option subject to the terms and conditions of the applicable equity incentive plan and the stock option notice and agreement, and shall each vest over four years (monthly) with a one-year cliff, subject to continuous vesting on the applicable vesting dates.

5. **Taxes.**

(a) You are fully responsible for the payment of any salaries tax or income tax in the Bahamas or elsewhere arising from the payments received pursuant to this Agreement. All amounts payable to you by the Company shall be subject to applicable statutory deductions and withholdings required by the Company under local law.

(b) The Company shall deduct from your salary and any bonus (if deduction applicable) which you may be awarded any amounts which the Company is entitled, authorized and/or obligated under the laws of The Bahamas to deduct, such as contributions to the National Insurance Board ("**NIB**"). The Company further reserves the right to deduct any sums owed by you to the Company.

(c) You agree and acknowledge that if you are obligated to declare or file income or other taxes or governmental fees or other withholdings in any other jurisdiction (e.g. income tax, social security / national insurance in your country of citizenship or prior residence), it is your responsibility to report and pay such amounts and to make any required interim filings or payments. Without limiting the foregoing, you agree that the Company may (but is not required to) report, deduct and/or withhold any such amounts with respect to your compensation from time to time.

(d) Without limiting your obligations, if any time you are (with the written consent of the Company) concurrently employed by any other entity controlled by or under common control with the Company, you agree that the Company and/or any other such entity may, but is not required, to make aggregated withholdings.

6. **Representations.**

(a) You represent and warrant that on the Start Date and thereafter you are free to accept employment hereunder without any contractual or other restrictions, express or implied, with respect to any of your prior employers including but not limited to any post-termination obligations in respect to non-compete or non-solicitation restrictions or of any contract or agreement with or other obligation to any third-party binding on you.

(b) You warrant that you have made full and complete disclosure to the Company of all material facts, matters and documents relating to your employment (if any) with your existing or former employer.

(c) You represent that you have not entered into, and hereby agree not to enter into, any agreement, whether written or oral, in conflict with your employment with the Company.

(d) You represent that you have not taken or otherwise misappropriated and you do not have in your possession or control any confidential or proprietary information belonging to any individuals or entities you provided services to, including any prior employers, or connected with or derived from your services provided to such individuals or entities. You represent that you have returned to all individuals or entities you provided services to, including prior employers, any and all such confidential or proprietary information. You further acknowledge that the Company has informed you that you are not to use or cause the use of such confidential or proprietary information in any manner whatsoever in connection with your employment by the Company. You agree that you will not use or disclose any confidential or proprietary information of your former employer or employers or that you obtained from a source other than the Company, or any materials or documents you obtained under obligations of confidentiality imposed by reason of any of your relationships, if any, unless such materials or documents are generally available to the public or you have written authorization from such present or former employer or source for the possession and unrestricted use of such materials in connection with your employment by the Company.

(e) You represent that you are not currently a party to any pending or threatened litigation with any former employer or business associate.

(f) You shall indemnify, defend and hold harmless the Company and its affiliates and its or their respective directors, officers, principals and agents from any and all liabilities, claims, costs, damages or expenses arising from any breach of the representations and warranties and covenants in this clause 6.

7. **Benefits.**

(a) ***Benefit Plans.*** Upon completion of your probationary period, you may be eligible to, and may, at your election, participate in the Company's employee benefit plans and medical insurance plans (if any, from time to time), subject to applicable terms, conditions, exclusions and limitations as set forth in the relevant documentation and policies governing such plans from time to time in force (together, "**Benefit Plans**"). The Company's Benefit Plans are subject to amendment, change or modification, including elimination, from time to time, at the Company's sole discretion. For greater certainty, the Company does not currently have any employee benefit plans or medical insurance plans.

(b) ***Annual Leave.*** Your annual leave entitlement will be in accordance with the Company's vacation practices applicable to employees, as amended from time to time, subject to the minimum annual leave requirements of the Employment Act of The Bahamas, as may be amended from time to time (the "**Employment Laws**").

(c) ***Sick Leave.*** You must inform the Company as soon as possible if you will be or are absent from work by reason of sickness or injury. If you are absent for four or more consecutive working days, you must provide a medical certificate or other evidence acceptable to the Company. Sick pay will be paid in accordance with the Employment Laws.

8. **Termination.**

(a) ***Notice.*** Subject to paragraph 2(f) regarding the probationary period, either you or the Company may terminate your employment by giving not less than thirty (30) days' notice in writing to terminate your employment ("**Notice Period**"). The last day of the Notice Period is the effective date of termination ("**Termination Date**"). All licences, access and other rights held by you as an employee of the Company will be terminated upon the Termination Date, provided that the Company reserves the right to terminate your access earlier at its sole discretion for security reasons.

(b) ***Payment in Lieu.*** The Company may choose, in its discretion, to provide payment of your salary for not less than thirty (30) days in lieu of notice, calculated in accordance with the Employment Laws ("**Payment in Lieu**"). If Payment in Lieu is elected, you will be requested to return all Company property as set forth in paragraph 8(f) below and will immediately be prohibited from coming to the Company's premises or performing services on the Company's behalf. You will cease to be an employee on the day the Company serves notice that it elects Payment in Lieu and such date will become your Termination Date for the purposes of this Agreement.

(c) ***Garden Leave.*** The Company may elect to place you on garden leave for all or any portion of the Notice Period, during which period you may be prohibited from coming

6

to the Company's premises or performing services on the Company's behalf or communicating with any employees, clients or suppliers of the Company ("**Garden Leave**"). During Garden Leave, you will remain an employee of the Company and continue to be bound by the remaining terms of this Agreement until the Termination Date, receiving your Base Salary and applicable statutory benefits and participating in the Company's Benefit Plans, and the Company may by written notice to you require that you come to the Company's premises and/or transition your duties or otherwise perform services on the Company's behalf on an intermittent basis. You must remain contactable at all times during normal business hours. For the avoidance of doubt, Garden Leave may be elected for a portion of the Notice Period and Payment in Lieu for the remainder, with the effect that your Termination Date may be sooner.

(d) *Suspension.* Subject to compliance with all applicable laws, you may be suspended and required not to attend work while the circumstances of any complaint of suspected misconduct against you is being investigated by the Company and pending the outcome of any disciplinary hearing. During the suspension period, you will be paid your base salary.

(e) *Key Terms.* The Company reserves the right to terminate your employment without any Notice Period or Payment in Lieu if you are found guilty of gross misconduct, persistent unpunctuality, neglect of duty, and/or material breach of any of the terms of your employment including the Key Terms. The Company may terminate your employment without notice or pay in lieu based on grounds for summary dismissal as set out in the Employment Act of The Bahamas.

(f) *Company Property.* Upon termination of your employment, you must immediately return to the Company, in accordance with its instructions, all equipment including but not limited to, correspondence, records, specifications, software, disks, models, notes, reports and other documents and any copies or duplicates thereof and any other property belonging to the Company (including Company car, keys, credit cards, phone and other computer equipment, and office passes) which are in your possession or under your control. You must also irretrievably erase any information relating to the affairs of the Company or its employees, clients or suppliers from computer or other digital devices or storage, including remote storage, to the extent technically possible. You must, if so required by the Company, confirm in writing that you have complied with your obligations under this paragraph and provide reasonable evidence of compliance as may be requested.

(g) *Post Termination Date.* Prior to accepting employment with any person, firm, corporation or other entity during your employment by the Company or any of its affiliates or any period thereafter that you are subject to any of the Protective Covenants (as defined in paragraph 10 below), you shall notify the prospective employer in writing of your obligations under such provisions.

9.   **Confidentiality and Invention Assignment**

(a)   You agree that, during and after the term of your employment with the Company and regardless of when such information was disclosed to you, you will hold in a fiduciary capacity for the benefit of the Company, and shall not, at any time, disclose to any person or entity, or use, except as necessary in connection with the performance of your duties and responsibilities for the Company, any non-public information pertaining to the Company or its affiliates or any client or supplier of the Company or its affiliates, their business, their affiliates, any person or entity directly or indirectly controlling the Company or its affiliates or any or supplier client of the Company or its affiliates or their current or prospective customers, clients, suppliers and/or business partners ("**Confidential Information**"), including, but not limited to: (i) information relating to trade secrets, ideas, inventions (whether patentable or not, and whether or not patent protection has been applied for or granted), patents, patent applications, improvement, developments, discoveries, logos, know how, processes, utility models, mask work rights, copyrights, trademarks (whether registered or unregistered), service marks and other proprietary rights; (ii) existing and proposed products, software, computer programs (including source codes and object codes), services or arrangements, prices, sales and marketing information/plans, designs, financing information, business plans, projections and forecasts, policies and strategies, contracts, mailing lists, techniques, operations methods, current and potential customers, clients, suppliers and business partners, revenues, costs and expenses, financial information and/or financial data and any other matters relating to the business of the Company or its affiliates or any client or supplier of the Company or its affiliates and their current or prospective customers, clients and business partners; and (iii) any information the disclosure of which may adversely affect the good name, reputation, image or goodwill of the Company or its affiliates, any client or supplier of the Company or its affiliates or their business.  Without limitation as to the forms that Confidential Information may take, you acknowledge that Confidential Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of **unwritten knowledge or know-how**.

(b)   If pursuant to applicable law, regulation or legal process, you are requested or required to disclose any Confidential Information, unless prohibited by an Order of the Courts of The Bahamas, you will provide the Company with prompt notice of such request(s) or requirement(s) to enable the Company to seek an appropriate protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If an Order of the Courts of The Bahamas prohibit you from advising the Company of the existence and/or contents of the Order, you shall supply to the Court only the legally required Confidential Information.  When the Company becomes aware of the existence and/or content of an Order of the Courts, and a protective order or other remedy is not obtained by the Company or the Company waives compliance

8

with the provisions of this Agreement, you shall (i) furnish only that portion of the Confidential Information which is legally required to be furnished; and (ii) use your best efforts to obtain a protective order or other assurance, at the reasonable cost and expense of the Company, which shall be approved by the Company in advance, that confidential treatment will be accorded such Confidential Information.

(c)     You shall not make, use or permit to be made or used any notes, memoranda, papers, drawings, specifications, programs, digital data or other materials of any nature relating to any matter within the scope of the business of the Company or any client or supplier of the Company or concerning any of their dealings or affairs otherwise than for the benefit of the Company or its affiliates or the clients of the Company or its affiliates. You acknowledge and agree that all of the foregoing shall be and remain the sole and exclusive property of the Company or the clients of the Company. Immediately upon the termination or cessation of your services to the Company, or at any time upon the Company's request, you shall deliver all of the foregoing, and all copies thereof to the Company and shall not retain any copies thereof (in any form or on any medium whatsoever, including without limitation, on any computer hard drive).

(d)     As a condition of employment, you must also sign and abide by the Company's standard "Employee Invention Assignment Agreement" attached hereto as <u>Exhibit A</u> with no inventions excluded ("**Invention Assignment Agreement**").

10.    **Protective Covenants.**

(a)     Subject to any written regulations issued or revised by the Company from time to time which may be applicable, neither you nor any member of your family, nor any company or business entity in which you or they have an interest, is entitled to receive or obtain, directly or indirectly, any payment, discount, rebate, commission or other benefit from any third parties in respect of any business transacted (whether by you or not) by or on behalf of the Company or any client or supplier of the Company and if you, or any member of your family or any company or business entity in which you or they have an interest, directly or indirectly, obtain any such payment, discount, rebate, commission or other benefit you will forthwith account to the Company or clients or suppliers of the Company for the amount received or the value of the benefit so obtained.

(b)     You hereby further agree that you shall not, directly or indirectly, for your benefit or for the benefit of any other person (including, without limitation, an individual or entity), or knowingly assist any other person to:

        i. during your employment with the Company, in any manner, directly or indirectly,

(A) Solicit (as hereinafter defined) or attempt to Solicit the employment or services of any person who provided services to the Company, whether as an employee, an independent contractor or consultant, or as a supplier, or hire any such person; or

(B) Solicit or attempt to Solicit any person who is an employee of the Company to resign from such entity or to apply for or accept employment with any other person or entity; or

ii. during your employment with the Company, Solicit or attempt to Solicit or otherwise attempt to establish any business relationship (in connection with any business in competition with the Company) with any limited partner, investor, person, firm, corporation or other entity that is or was a customer, investor, business partner, client or employee of any such entity or Sponsored Fund, or prospective customer, investor, business partner or client, of the Company or Sponsored Fund, or interfere with or damage (or attempt to interfere with or damage) any relationship between the Company and their respective clients, suppliers, investors, business partners, customers or employees.

For purposes of this Agreement, the term **"Solicit"** means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action and **"Sponsored Fund"** means any investment fund, investment vehicle, managed account or other initiative (to be sponsored by the Company or any of its affiliates).

11. **Background Check.** You agree that  the Company may conduct a thorough background investigation including, if applicable, a credit check to the extent permitted by local law. You agree to execute all documents necessary or proper to enable the Company to conduct such investigation and provide all necessary and proper documentation to the Company to verify your identity, credit status, and employment eligibility under applicable law, including any required immigration status documentation necessary for you to be lawfully employed by the Company. Furthermore, you agree that your employment hereunder is contingent upon, and subject to satisfactory completion and the results of the background investigation and/or credit check described in the preceding sentence and the Company's verification of your identity and employment eligibility, in each case, in a manner acceptable to the Company in its sole and absolute discretion.

12. **Equal Opportunity.** The Company is an equal opportunity employer and does not permit discrimination or harassment on the grounds of sex, race, pregnancy, marital or family status, or disability. Personal information obtained by the Company for the purposes of employment will be subject to the provisions of the Data Protection (Privacy of Personal Information) Act. The Company will comply with its statutory obligations regarding the personal data

including sensitive personal data of its employees for the legitimate business purposes under this Agreement.

13. **Notices.** You may give written notices pursuant to this Agreement to your supervisor as identified in paragraph 2 of this Agreement. The Company may give written notices pursuant to this Agreement to you personally, by leaving such written notice on your desk or by email to your company-assigned email address or personal email address the Company may have on record. Notices may also be given by either party by letter addressed to the party at (in the case of the Company) its registered office for the time being and (in the case of the employee) his or her last known address and any notice given by letter shall be deemed to have been given at the time at which the letter would be delivered in the ordinary course of post or, if delivered by hand, upon delivery, and upon service by post it shall be sufficient to prove that the letter was properly addressed and posted. It is your duty to inform the Company and ensure your personal contact details are up-to-date at all times.

14. **Miscellaneous.**

   (a)   This Agreement, the Invention Assignment Agreement and the policies and procedures referred to in paragraph 1 contain the entire understanding of the parties in respect of the subject matter contained herein and therein. In executing this Agreement, you represent that you have not relied on any representation or statement not set forth in this Agreement, the Invention Assignment Agreement and the said policies and procedures, and you expressly disavow any reliance upon any such representations or statements.

   (b)   All rights, remedies and benefits expressly provided for in this Agreement are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this Agreement, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived).

   (c)   The failure of a party to this Agreement to insist upon strict adherence to any term hereof on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

   (d)   This Agreement, and all of your rights and duties hereunder, shall not be assignable or delegable by you. Any purported assignment or delegation by you in violation of the foregoing shall be null and void ab initio and of no further force and effect. This Agreement may be assigned by the Company to any affiliate thereof or to a person or entity which is an affiliate or successor in interest to all or substantially all of the business operations or assets of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall be become the rights and obligations of such affiliate person or entity.

11

(e)    You shall provide reasonable cooperation in connection with any regulatory or legal action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during your employment. Notwithstanding the generality of the foregoing, reasonable cooperation shall not require that you waive any applicable privilege or immunity. This provision shall survive any termination of this Agreement.

(f)    In the event that you breach any provision of the Protective Covenants section, the Company's obligation to make or provide payments or benefits under the Compensation or Benefits provisions will cease, except for Compensation or Benefits that the Company is required by law to pay to you. Furthermore, subject to applicable law, the Company will be entitled to an accounting and repayment of all profits, compensation, bonuses, commissions, remunerations or benefits which you directly or indirectly have realized and/or may realize as a result of, growing out of or in connection with any such violation.

(g)    The various provisions and paragraphs of this Agreement are severable and if any provision or paragraph or identifiable part thereof is held to be invalid or unenforceable by any court of competent jurisdiction, then such invalidity or unenforceability will not affect the validity or enforceability of the remaining provisions, paragraphs or identifiable parts thereof in this Agreement.

(h)    If any of the Protective Covenants provisions is held to be unenforceable by reason of it extending for too great a period of time or over too great a geographic area or by reason of it being too extensive in any other respect, the parties agree (i) such provision shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographic areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court making such determination and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in the Protective Covenants paragraph is separate, distinct and severable. The unenforceability of any provision of the Protective Covenant paragraph shall not affect the validity or enforceability of any other Protective Covenant or any other provision of this Agreement. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which you are in violation of any of such covenants, and all such restrictions shall automatically be extended by the period of your violation of any such restrictions.

(i)    The rights of the parties to terminate, rescind, or agree any amendment, waiver, variation or settlement under or relating to this Agreement, or any term of this Agreement, are not subject to the consent of any third party.

(j) This Agreement and any non-contractual obligations arising from or connected with it shall be governed by and construed in accordance with the Laws of Bahamas. This provision is concerned with any dispute, controversy, claim or difference of any kind whatsoever which arises out of or is related to this Agreement or any breach of this Agreement (a "**Dispute**") other than a breach of the Protective Covenants hereof. Each of the Company and you agree to attempt to resolve any Dispute by discussions and consultations in good faith for a period of fourteen (14) days after written notice has been sent by registered mail by one party to the other party ("**Consultation Period**"). If the Dispute remains unresolved upon expiration of the Consultation Period, then the parties will attempt to settle it by mediation in The Bahamas ("**Mediation**"). If the Dispute remains unresolved following Mediation, each of the parties irrevocably to arbitration under the laws of The Bahamas.

(k) Notwithstanding paragraph 14(j), if you commit a breach or are about to commit a breach of any of the Protective Covenants provisions hereof, the Company, its affiliates and any of their respective directors, officers, principals and agents shall have the right to employ the resolution procedure outlined in 14(j) above or to have this Agreement specifically enforced by any court or arbitral tribunal having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the legitimate business interests of the Company, its affiliates and injury to any of their respective directors, officers, principals and agents and that money damages will not provide an adequate remedy to any such party. In addition, the Company, its affiliates or any of their respective directors, officers, principals and agents may take all such other actions and remedies including injunctive relief available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach. The existence of any claim, demand, action or cause of action that you may have against the Company, its affiliates or any of their respective directors, officers, principals and agents, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company, its affiliates or any of their respective directors, officers, principals and agents of the Protective Covenant paragraph hereof.

*[the remainder of this page is intentionally blank]*

You may seek independent legal advice at your own cost regarding these terms if you so wish. If you agree with the terms of this Agreement and accept this Offer, please sign and date this Agreement in the space provided below to indicate your acceptance. We look forward to you joining the team. This Agreement may be signed in counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all the parties reflected hereon as the signatories.

Sincerely,

Alameda Research (Bahamas) Ltd

By: _Caroline Ellison_
Name: Caroline Ellison
Title: Co-CEO

AGREED AND ACCEPTED AS OF _2022 -04-11_ .

Ross Rheingans-Yoo
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Ross Rheingans-Yoo

## Exhibit A

### Employee Invention Assignment Agreement

## EMPLOYEE INVENTION ASSIGNMENT AGREEMENT

In consideration of, and as a condition of my employment with Alameda Research (Bahamas) Ltd (the "*Company*"), I, as the *"Employee"* signing this Employee Invention Assignment Agreement (this "*Agreement*"), hereby represent to the Company, and the Company and I hereby agree as follows:

1. **Purpose of Agreement.** I understand that the Company and its affiliates, including but not limited to Alameda Research Ltd (BVI), a limited company organised and existing under the laws of the British Virgin Islands ("*AR LTD*"), and its group companies, are engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company and its affiliates to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights anywhere in the world to the extent permitted by law. Accordingly, I am entering into this Agreement, whether or not I am expected to create inventions or other works of value for the Company. As used in this Agreement, "*Inventions*" means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets and includes anything wholly or partially created by me during the course of my employment whether or not during working hours or using the Company's premises or resources and whether or not recorded in material form.

2. **Relationship to AR LTD.** I understand that all Inventions and other work product that I develop are being developed by the Company for AR LTD. Accordingly, I consent to and will do anything necessary for the assignment of all such works by the Company to AR LTD, and I understand and acknowledge that AR LTD is the owner of all of the Inventions or other intellectual property created by me in my course of employment. I further understand that AR LTD is a third party beneficiary to this Agreement and has the full right to directly enforce any rights of the Company under this Agreement.

3. **Disclosure of Inventions.** I will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that I make, create, conceive or first reduce to practice, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets.

4. **Work for Hire; Assigned Inventions.** I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment will be "works made for hire" under the Copyright Act of The Bahamas and that the Company will be considered the author and owner of such copyrightable works. I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result

15

from work performed by me for the Company; ~~or (iii) relate to the Company's business or actual~~  ~~or demonstrably anticipated research or development~~ (the "*Assigned Inventions*"), will be the sole and exclusive property of the Company.

5. **Excluded Inventions and Other Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by me or acquired by me prior to the Effective Date (as defined below), and which are not to be assigned to the Company ("*Excluded Inventions*"). If no such list is attached, I represent and agree that it is because I have no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development. For purposes of this Agreement, "*Other Inventions*" means Inventions in which I have or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions. I acknowledge and agree that if, in the scope of my employment, I use any Excluded Inventions or any Other Inventions, or if I include any Excluded Inventions or Other Inventions in any product or service of the Company or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, I will immediately so notify the Company in writing. Unless the Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to the Company, in such circumstances (whether or not I give the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

6. **Exception to Assignment.** I understand that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention for which collectively no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on my own time, unless the invention (i) relates (A) directly to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development, or (ii) results from any work performed by me for the Company.

7. **Assignment of Rights.** I agree to assign, and do hereby irrevocably transfer and assign, to the Company: (i) all of my rights, title and interests in and with respect to any Assigned Inventions; (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (iii) to the extent assignable, any and all Moral Rights (as defined below) that I may have in or with respect to any Assigned Inventions. I also hereby forever waive and agree never to assert any Moral Rights I may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 5, even after termination of my employment with the Company. "*Moral Rights*" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

8.    **Assistance.** I will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide. I will not attempt to register nor patent any Assigned Inventions unless requested to do so by the Company. I will execute and deliver any documents that the Company may reasonably request from me in connection with providing such assistance. My obligations under this section will continue beyond the termination of my employment with the Company; provided that the Company agrees to compensate me at a reasonable rate after such termination for time and expenses actually spent by me at the Company's request in providing such assistance. I hereby appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose. I agree that this appointment is coupled with an interest and will not be revocable.

9.    **Physical Property.** All documents, supplies, equipment and other physical property furnished to me by the Company or produced by me or others in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such items when requested by the Company, excepting only my personal copies of records relating to my employment or compensation and any personal property I bring with me to the Company and designate as such. Even if the Company does not so request, I will upon termination of my employment return to the Company all Company property, and I will not take with me or retain any such items or copies or duplicates thereof.

10.    **No Breach of Prior Agreements.** I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, confidentiality, non-competition, or other agreement with any former employer or other party. I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of my own or of a former employer or third party that are not generally available for use by the public or have not been legally transferred to the Company.

11.    **Employment.** I understand that this Agreement is not a fixed term contract of employment. I understand that my employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, but in accordance with my Offer of Employment and applicable local law. I acknowledge that any statements or representations to the contrary are ineffective, unless put into a writing signed by the Company. I further acknowledge that my participation in any stock option or benefit program is not to be construed as any assurance of continuing employment for any particular period of time.

12.    **Company Opportunities; No Conflicting Activities.** During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects.

13.     **Use of Name & Likeness.** I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations to the extent permitted by local laws.

14.     **Notification.** I hereby authorize the Company, during and after the termination of my employment with the Company, to notify third parties, including, but not limited to, actual or potential customers or employers, of the terms of this Agreement and my responsibilities hereunder.

15.     **Injunctive Relief.** I understand that a breach or threatened breach of this Agreement by me may cause the Company to suffer irreparable harm and that the Company and any third party beneficiary will therefore be entitled to injunctive relief to enforce this Agreement in any court of competent jurisdiction, anywhere in the world.

16.     **Governing Law; Severability.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the duties of its employees and the protection of its trade secrets. This Agreement shall be construed in accordance with and governed by the laws of The Bahamas without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction. If any provision of this Agreement is invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible, given the fundamental intentions of the parties when entering into this Agreement. To the extent such provision cannot be so enforced, it will be stricken from this Agreement and the remainder of this Agreement will be enforced as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

17.     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement.

18.     **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between the parties hereto with respect to such subject matter.

19.     **Amendment and Waiver.** This Agreement may be amended only by a written agreement executed by each of the parties to this Agreement. No amendment or waiver of, or modification of any obligation under, this Agreement will be enforceable unless specifically set forth in a writing signed by the party against which enforcement is sought. A waiver by either party of any of the terms and conditions of this Agreement in any instance will not be deemed or construed to be a waiver of such term or condition with respect to any other instance, whether prior, concurrent or subsequent.

20.     **Successors and Assigns; Assignment.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will bind and

benefit the parties and their respective successors, assigns, heirs, executors, administrators, and legal representatives. The Company may assign any of its rights and obligations under this Agreement. I understand that I will not be entitled to assign or delegate this Agreement or any of my rights or obligations hereunder, whether voluntarily or by operation of law, except with the prior written consent of the Company.

21.    **Further Assurances.** The parties will execute such further documents and instruments and take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement. Upon termination of my employment with the Company, I will execute and deliver a document or documents in a form reasonably requested by the Company confirming my agreement to comply with the post-employment obligations contained in this Agreement.

22.    **Acknowledgement.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with this Agreement.

23.    **Effective Date of Agreement**. This Agreement is and will be effective on and after the first day of my employment by the Company, which is the "*Effective Date*".

**Alameda Research (Bahamas) Ltd**

By:  _Caroline Ellison_
     198B1A7CC5A74E7...

Name:  Caroline Ellison

Title:  Co-CEO

Date:  4/11/2022

**Employee:**

_____
Signature

Ross Rheingans-Yoo
_____
Name (Please Print)

DocuSign Envelope ID: 6F5E6808-B922-4BD9-9022-C5818F42FEDE
CONFIDENTIAL

## **Exhibit A**

### LIST OF EXCLUDED INVENTIONS UNDER SECTION 5

|  |  | Identifying Number |
| Title | Date | or Brief Description |

NONE.

   X    No inventions, improvements, or original works of authorship

_____ Additional sheets attached

Signature of Employee: _____

Print Name of Employee: Ross Rheingans-Yoo _____

Date: 2022-04-11 _____

# EXHIBIT K

For an overview of the semester, see [here](#).

Given the overall economic environment, bonuses are likely to be moderately lower than last semester on average.  Still, despite the crash, this is the second strongest semester we've had.

**Do not talk about your bonus with anyone else.**  People usually regret doing so: it almost always makes *at least* one of the people feel bad.

Happy to chat about this!

**Feedback for the semester:**

Your role is obviously a unique one, and a hard one to evaluate.

For instance, you did a great job of jumping into the Alvea situation and pushing to get shit done.  As it turns out, that didn't end up working out, for a confusing set of reasons.

This makes evaluating the semester hard.  I don't pretend to have done a great job of it, and mostly think that there will be a lot more information over time.  Treat compensation this semester as a placeholder as much as anything else, information-wise.

What went well:

1) Bias towards action
2) Getting stuff done
3) Building out relationships
4) Learning a ton about bio
5) The work with Together/Ed

Feedback/things to improve on:

1) Thinking about what the highest EV things to do are
2) Potentially focusing on one or two super valuable things and trying to drive them to conclusion

More generally, there's a question of what the right setup is for you going forward.  Right now you're in a bit of no man's land; I'm managing you, the Future Fund wasn't the right fit, and it's not clear what the right entity/etc. is.

I've been trying to figure out the right home/setup for you and Latona, and my guess is that it's likely to be Guarding Against Pandemics:

1) It's a bio safety org that we fund
2) A lot of what you do is super useful for them
3) You have knowledge which is useful for them, and vice versa
4) Right now GAP is a bit too far/divorced from the on-the-ground bio stuff
5) Thematically, GAP is a great fit:
   a) It should ideally be helpful for GAP to be affiliated with Latona
   b) It should ideally be helpful for Latona to be affiliated with GAP
   c) It makes sense

I've talked with Gabe and Michael, who are excited for this as well.

So, this would mean:

a) You are "affiliated with" GAP
   i) Still figuring out what the right formal entity here is
b) Publicly, you would be "working with" or "partnering with" GAP
   i) We'll nail down actual language
c) You wouldn't be "part of the FTX Foundation", in the same way that GAP isn't, although they money comes from the same place
d) You would still be affiliated with me/FTX to the extent helpful
e) I would still be your primary manager
f) Nothing would change in terms of compensation structure

What are your thoughts on this?

**Bonus Information:**

Your bonus for the first half of 2022 is any linear combination of:

a) $650,000

Or

b) Both:
   i) 12,600 options on FTX Trading LTD, the parent company of FTX International
   ii) 268,000 options on West Real Shires, the parent company of FTX US

(E.g. you could take half of (a) and half of (b).)

On top of the above, you get another $650k of directed grants to any EA-driven cause if you want.

For more context on equity, see here.

# EXHIBIT L

| | |
|---|---|
| Document ID | F10705-E001041910 |
| BegAttach | F10705-E001041910 |
| M-Record Type | Edoc |
| FTI Collection Type Tracker | GD (Google Drive) |
| M-Master Date | 9/1/2022 23:12 |
| Unified Title | Ross Rheingans-Yo_1a8I6SOh1dnZ86S4Vjc-YPRowyIK_dfGVApzXygRPaKs.docx |
| M-File Extension | docx |
| M-All Custodians | Bankman-Fried, Sam |
| Google Drive File | 1a8I6SOh1dnZ86S4Vjc-YPRowyIK_dfGVApzXygRPaKs |
| Google Drive File::File Name | Ross Rheingans-Yoo Review 2022S1 -- SBF -> RRY |
| Google Drive File::Path | sam@alameda-research.com\My Drive\doc_transfer\Money\2022S1\Reviews\Ross Rheingans-Yo Review 2022S1 -- SBF -> RRY |
| Google Drive Folder | 0AJNSoJkbPuAqUk9PVA;1LxBtzL4FmCVinbJv3VAksOtA-cvo7Sfe;1m9r-m7OwWXDLwjQAYC2d0weumEcuZ-yw;1NFTrm4Ln4mO6AzJFqtzj97v4qeG7wvIp;1Ua-9Sh546lliuPkmiKHwH7_8vyxI2PYN |
| Google Drive Folder::Google Folder Name | My Drive;2022S1;doc_transfer;Reviews;Money |
| M-All Paths | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_0.zip\Ross Rheingans-Yo_1a8I6SOh1dnZ86S4Vjc-YPRowyIK_dfGVApzXygRPaKs.docx |
| M-File Name | Ross Rheingans-Yoo Review 2022S1 -- SBF -> RRY |
| M-Author | sam@ftx.com |
| M-Date Accessed | 11/23/2022 6:46 |
| M-Date Created | 9/1/2022 23:08 |
| M-Date Last Modified | 9/1/2022 23:12 |
| M-Date Sent | |
| M-Date Received | |
| M-EDS-Active Participants | |
| M-EDS-Channel Name | |
| M-EDS-ChatSource | |
| M-EDS-Conversation Type | |
| M-EDS-Collaborators | sam@alameda-research.com |
| M-EDS-Inactive Participants | |
| M-EDS-Participants | |
| M-Email From | |
| M-Email To | |
| M-Email CC | |
| M-Email BCC | |
| M-File Path | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_0.zip\Ross Rheingans-Yo_1a8I6SOh1dnZ86S4Vjc-YPRowyIK_dfGVApzXygRPaKs.docx |
| M-File Size | 9047 |
| M-Last Author | |
| M-Media Type | |
| M-Source Path | \Bankman-Fried, Sam\F10705-1-BM3-E037\GD\DRIVE_-_Sam_Bankman-Fried_-_sam@alameda-research.com_0.zip |
| M-Collection Entity | Alameda;FTX.com |
| M-Subject | |
| M-EDS-Attaching Participant | |
| M-EDS-Author | sam@ftx.com |
| M-EDS-Chat Start Time | |
| M-EDS-Chat End Time | |
| M-EDS-Reacted Users | |
| M-EDS-Viewers | ross@ftx.org |

# EXHIBIT M



A L A M E D A   R E S E A R C H

## ALAMEDA (BAHAMAS)

| RECIPIENT | ROSS RHEINGANS-YOO | POSITION TITLE | TRADER & INVESTMENT ASSOCIATE |
|---|---|---|---|
| PAYMENT CYCLE | 04/20/22 | NIB NUMBER | n/a |
| EMPLOYEE START DATE | 03/01/22 | ADDITIONAL ALLOWANCES | $500.00 |
| PAY RATE | $100,000.00 | CHECK NO. | 1 |

| PAYMENTS | | DEDUCTIONS | | YEAR-TO-DATE | |
|---|---|---|---|---|---|
| REGULAR PAY | $8,333.33 | EE PENSION CONTRIBUTIONS | $0.00 | REGULAR PAY | $8,333.33 |
| MOBILE ALLOWANCE | $100.00 | OTHER | $0.00 | ADDITIONAL PAY (ALLOWANCES) | $500.00 |
| INTERNET ALLOWANCE | $100.00 | | | PENSION CONTRIBUTIONS | $0.00 |
| WELLNESS ALLOWANCE | $300.00 | | | NIB EMPLOYER CONTRIBUTIONS | $301.55 |
| FUEL ALLOWANCE | - | | | | |
| OTHER | $376,500.00 | | | | |

| TOTAL GROSS PAY | TOTAL DEDUCTIONS | TOTAL NET PAY |
|---|---|---|
| $385,333.33 | $0.00 | $385,333.33 |

| MESSAGES |
|---|

Pay includes $17,666.66 paid to Ross representing March & April 2022 salary. Additional $17,666.66 paid to Ross as a 2-month  bonus for remote work done in January & February 2022 prior to formal contract. Sign-on bonus of $350,000 paid in accordance with signed contract.

"JPMorgan Chase Bank, N.A.
270 Park Ave. New York, NY 10017, USA
US routing #: 021000021
SWIFT: CHASUS33
Account #: 113520057
Ross Rheingans-Yoo
5 Riverdale Drive, Orono, ME 04473, USA"

# **EXHIBIT N**

## United States Bankruptcy Court, District of Delaware

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☒ FTX Trading Ltd. (Case No. 22-11068) | ☐ Alameda Aus Pty Ltd (Case No. 22-11104) | ☐ Alameda Global Services Ltd. (Case No. 22-11134) | ☒ Alameda Research (Bahamas) Ltd (Case No. 22-11105) |
| ☒ Alameda Research Holdings Inc. (Case No. 22-11069) | ☒ Alameda Research KK (Case No. 22-11106) | ☐ Alameda Research LLC (Case No. 22-11066) | ☐ Alameda Research Ltd (Case No. 22-11067) |
| ☐ Alameda Research Pte Ltd (Case No. 22-11107) | ☒ Alameda Research Yankari Ltd (Case No. 22-11108) | ☐ Alameda TR Ltd (Case No. 22-11078) | ☒ Alameda TR Systems S. de R. L. (Case No. 22-11109) |
| ☐ Allston Way Ltd (Case No. 22-11079) | ☐ Analisya Pte Ltd (Case No. 22-11080) | ☐ Atlantis Technology Ltd. (Case No. 22-11081) | ☐ Bancroft Way Ltd (Case No. 22-11082) |
| ☐ Blockfolio, Inc. (Case No. 22-11110) | ☐ Blue Ridge Ltd (Case No. 22-11083) | ☐ Cardinal Ventures Ltd (Case No. 22-11084) | ☐ Cedar Bay Ltd (Case No. 22-11085) |
| ☐ Cedar Grove Technology Services, Ltd. (Case No. 22-11162) | ☐ Clifton Bay Investments LLC (Case No. 22-11070) | ☐ Clifton Bay Investments Ltd (Case No. 22-11111) | ☐ Cottonwood Grove Ltd (Case No. 22-11112) |
| ☐ Cottonwood Technologies Ltd (Case No. 22-11136) | ☐ Crypto Bahamas LLC (Case No. 22-11113) | ☐ DAAG Trading, DMCC (Case No. 22-11163) | ☐ Deck Technologies Holdings LLC (Case No. 22-11138) |
| ☐ Deck Technologies Inc. (Case No. 22-11139) | ☐ Deep Creek Ltd (Case No. 22-11144) | ☐ Digital Custody Inc. (Case No. 22-11115) | ☐ Euclid Way Ltd (Case No. 22-11141) |
| ☐ FTX (Gibraltar) Ltd (Case No. 22-11116) | ☐ FTX Canada Inc (Case No. 22-11117) | ☐ FTX Certificates GmbH (Case No. 22-11164) | ☐ FTX Crypto Services Ltd. (Case No. 22-11165) |
| ☐ FTX Digital Assets LLC (Case No. 22-11143) | ☐ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118) | ☐ FTX EMEA Ltd. (Case No. 22-11145) | ☐ FTX Equity Record Holdings Ltd (Case No. 22-11099) |
| ☐ FTX EU Ltd. (Case No. 22-11166) | ☐ FTX Europe AG (Case No. 22-11075) | ☐ FTX Exchange FZE (Case No. 22-11100) | ☐ FTX Hong Kong Ltd (Case No. 22-11101) |
| ☐ FTX Japan Holdings K.K. (Case No. 22-11074) | ☐ FTX Japan K.K. (Case No. 22-11102) | ☐ FTX Japan Services KK (Case No. 22-11103) | ☐ FTX Lend Inc. (Case No. 22-11167) |
| ☐ FTX Marketplace, Inc. (Case No. 22-11168) | ☐ FTX Products (Singapore) Pte Ltd (Case No. 22-11119) | ☐ FTX Property Holdings Ltd (Case No. 22-11076) | ☐ FTX Services Solutions Ltd. (Case No. 22-11120) |
| ☐ FTX Structured Products AG (Case No. 22-11122) | ☐ FTX Switzerland GmbH (Case No. 22-11169) | ☐ FTX Trading GmbH (Case No. 22-11123) | ☐ FTX US Services, Inc. (Case No. 22-11171) |
| ☐ FTX US Trading, Inc. (Case No. 22-11149) | ☐ FTX Ventures Ltd. (Case No. 22-11172) | ☐ FTX Zuma Ltd (Case No. 22-11124) | ☐ GG Trading Terminal Ltd (Case No. 22-11173) |
| ☐ Global Compass Dynamics Ltd. (Case No. 22-11125) | ☐ Good Luck Games, LLC (Case No. 22-11174) | ☐ Goodman Investments Ltd. (Case No. 22-11126) | ☐ Hannam Group Inc (Case No. 22-11175) |
| ☐ Hawaii Digital Assets Inc. (Case No. 22-11127) | ☐ Hilltop Technology Services LLC (Case No. 22-11176) | ☐ Hive Empire Trading Pty Ltd (Case No. 22-11150) | ☐ Innovatia Ltd (Case No. 22-11128) |
| ☐ Island Bay Ventures Inc (Case No. 22-11129) | ☐ Killarney Lake Investments Ltd (Case No. 22-11131) | ☐ Ledger Holdings Inc. (Case No. 22-11073) | ☐ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177) |
| ☐ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155) | ☐ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156) | ☐ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157) | ☐ LedgerPrime LLC (Case No. 22-11158) |
| ☐ LedgerPrime Ventures, LP (Case No. 22-11159) | ☐ Liquid Financial USA Inc. (Case No. 22-11151) | ☐ Liquid Securities Singapore Pte Ltd (Case No. 22-11086) | ☐ LiquidEX LLC (Case No. 22-11152) |
| ☐ LT Baskets Ltd. (Case No. 22-11077) | ☐ Maclaurin Investments Ltd. (Case No. 22-11087) | ☐ Mangrove Cay Ltd (Case No. 22-11088) | ☐ North Dimension Inc (Case No. 22-11153) |
| ☐ North Dimension Ltd (Case No. 22-11160) | ☐ North Wireless Dimension Inc. (Case No. 22-11154) | ☐ Paper Bird Inc (Case No. 22-11089) | ☐ Pioneer Street Inc. (Case No. 22-11090) |
| ☐ Quoine India Pte Ltd (Case No. 22-11091) | ☐ Quoine Pte Ltd (Case No. 22-11161) | ☐ Quoine Vietnam Co. Ltd (Case No. 22-11092) | ☐ Strategy Ark Collective Ltd. (Case No. 22-11094) |
| ☐ Technology Services Bahamas Limited (Case No. 22-11095) | ☐ Verdant Canyon Capital LLC (Case No. 22-11096) | ☐ West Innovative Barista Ltd. (Case No. 22-11097) | ☒ West Realm Shires Financial Services Inc. (Case No. 22-11072) |
| ☒ West Realm Shires Inc. (Case No. 22-11183) | ☒ West Realm Shires Services Inc. (Case No. 22-11071) | ☐ Western Concord Enterprises Ltd. (Case No. 22-11098) | ☐ Zubr Exchange Ltd (Case No. 22-11132) |

## Modified Form 410
# Proof of Claim

04/22

Read the Instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.

Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Ross Rheingans-Yoo

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   N/A

Email(s) the creditor used with the debtor   ross@ftx.org

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Goetz Fitzpatrick LLP
One Penn Plaza, Suite 3100
New York, New York 10119
Attn: Scott D. Simon, Esq.

Contact phone  (212) 695-8100
Contact email   ssimon@goetzfitz.com

Where should payments to the creditor be sent? (if different)

Ross Rheingans-Yoo
9450 SW Gemini Dr. #31347
Beaverton, OR 97008

Contact phone _____
Contact email  rosswrheingansyoo@gmail.com

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known)  N/A

Filed on   N/A
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**   $  N/A

Does this amount include interest or other charges?

☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type  N/A  ; and (ii) the amount in such currency  N/A  ; and (iii) a conversion rate to U.S. dollars  N/A  .

**7b.** List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)

| Coin List | Count | Coin List | Count |
| --- | --- | --- | --- |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|
| | **Employment Agreement (see attached)** |

| 9. Is all or part of the claim secured? | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>Nature of property:<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>Basis for perfection:<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.).<br><br>Value of property: $_____<br>Amount of the claim that is secured: $_____<br>Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $_____<br><br>Annual Interest Rate (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
|---|---|

| 10. Is this claim based on a lease? | ☒ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____ |
|---|---|

| 11. Is this claim subject to a right of setoff? | ☒ No<br>☐ Yes. Identify the property: _____ |
|---|---|

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☒ Yes. *Check one:*                    Amount entitled to priority<br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____<br><br>☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____<br><br>☒ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ 15,150<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____<br><br>☒ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies.   $ 993,611.08 |
|---|---|

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☐ No<br>☒ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.   (see attached)   $ 993,611.08 |
|---|---|

Modified Form 410                                           Proof of Claim                                   

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

- ☒ I am the creditor.
- ☐ I am the creditor's attorney or authorized agent.
- ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
- ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   06/29/2023
                   MM / DD / YYYY

/s/ Ross Rheingans-Yoo
_____
Signature

Print the name of the person who is completing and signing this claim:

Name        Ross                                    Rheingans-Yoo
            First name          Middle name         Last name

Title

Company  c/o Goetz Fitzpatrick LLP/Attn. Scott D.Simon, Esq.
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     One Penn Plaza, Suite 3100
            Number      Street

            New York                     NY      10119
            City                         State   ZIP Code

Contact phone   (212) 695-8100           Email   ssimon@goetzfitz.com

Attach Supporting Documentation (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
  (attach below)

☐ I do not have supporting documentation.

See addendum

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Kroll and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Kroll and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Kroll or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Kroll and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

## ADDENDUM TO PROOF OF CLAIM OF
## ROSS RHEINGANS-YOO

1.   Ross Rheingans-Yoo. Ross Rheingans-Yoo ("Ross") hereby files the accompanying proof of claim ("Proof of Claim") against Alameda Research (Bahamas) Ltd. ("Debtor"), the debtor in Chapter 11 Case No. 22-11105 (JTD), pending in the United States Bankruptcy Court for the District of Delaware. Ross holds a claim against the Debtor arising from an employment agreement dated April 11, 2022 ("Employment Agreement"), effective as of March 1, 2022, which has not been rejected by the Debtor subsequent to November 11, 2022 ("Petition Date"). The terms of the Employment Agreement and the unpaid compensation due to Ross are detailed more fully below.

2.   Summary of Claim. Prior to the Petition Date, the Debtor and Ross entered into the Employment Agreement pursuant to which Ross was employed as a Trader and Investment Associate. In consideration for the services provided by Ross to the Debtor pursuant to the Employment Agreement, Ross was to be paid (i) an annual salary of $100,000 USD payable in accordance with the Debtor's regular payroll process ("Base Salary"); (ii) a discretionary bonus ("Bonus"); and (iii) a sign-on bonus consisting of (a) $350,000 USD; (b) an option to purchase 32,822 shares of Class A common stock of West Realm Shires Inc. (d/b/a FTX US) ("FTX US Option"); and (c) an option to purchase 1,618 shares of common stock of FTX Trading LTD. ("FTX Option," and together with the FTX US Option, collectively the "Option"). Pursuant to the Employment Agreement and additional memoranda issued by Debtor, the Bonus was to be paid as follows: (i) 50% directly to Ross; and (ii) 50% in foundation direction units ("FDUs") directly to a charitable foundation to be selected by Ross.

{00106928 - 1}

3.    <u>Payments/Partial Payments.</u> Prior to the Petition Date, the Debtor exercised its discretion to declare the Bonus in the amount of $650,000 payable directly to Ross and $650,000 in FDUs. The Debtor failed to pay $5,763.33 of Base Salary accrued as of the Petition Date pursuant to the Employment Agreement directly to Ross. The Debtor failed to pay $275,000 of the declared Bonus directly to Ross. The Debtor failed to pay $62,847.75 of Base Salary accrued between the Petition Date and June 23, 2023 directly to Ross. The Debtor failed to pay $650,000 of the declared Bonus attributable to the FDUs to entities selected by Ross. The total compensation claim as of June 23, 2023 is $993,611.08.

4.    <u>Claims, Counterclaims, Setoffs and Defenses</u>. The Proof of Claim is not subject to any claims, counterclaims, setoffs, or defenses by the Debtor.

5.    <u>Priority Status</u>. The Proof of Claim is filed as an administrative claim against the Debtor pursuant to 11 U.S.C. §507(a)(2) and §503(b)(1).

6.    <u>Reservation of Rights</u>. The execution and filing of this Proof of Claim is not and shall not be deemed: (a) a waiver or release of Ross's rights against any other entity or person liable for all or any part of the claim asserted hereon; (b) consent by Ross to the jurisdiction of this Court in connection with any proceeding commenced in this case against or otherwise involving Ross; (c) a waiver of Ross's right to withdraw the reference to the subject matter of his claims, any objection or other proceedings commenced in connection therewith or any other proceedings commenced in this case against or otherwise involving Ross; (d) a waiver or release by Ross of his right to a trial by jury, in this Court or any other court; (e) a waiver of Ross's right to the subordination, in favor of Ross, of indebtedness or liens held by any creditors of the Debtor; or (f) an election of remedies by Ross that waives or otherwise affects any other remedy.

7.     _Amendments_. Ross expressly reserves his right to file any separate or additional proof of claim regarding the claims set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this Proof of Claim unless expressly so stated therein), to amend or supplement this Proof of Claim in any respect, including the filing of an additional or amended claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim for additional amounts or for any other reasons.  Ross expressly reserves his claim for additional unpaid compensation accruing from and after June 23, 2023.

8.     _Confidentiality_. The Employment Agreement and a subsequent memorandum evidencing the Debtor's discretionary grant of the Bonus are not being filed with this proof of claim because they are confidential. Ross will provide copies of these documents to the Court to review in camera, or to requesting counsel upon the execution of an appropriate confidentiality stipulation.

9.     _Notice_. All notices regarding this claim should be forwarded to:

> Goetz Fitzpatrick LLP
> One Penn Plaza, 31st Floor
> New York, New York 10119
> Attn: Scott D. Simon, Esq.
> Tel: (212) 695-8100
> ssimon@goetzfitz.com

10.     To the extent that there are any inconsistencies between the Modified Official Proof of Claim form filed herein and this addendum, the latter shall control.

# **EXHIBIT O**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD. and FTX TRADING LTD., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50444 (JTD) |
| PLATFORM LIFE SCIENCES INC., LUMEN BIOSCIENCE, INC., GREENLIGHT BIOSCIENCES HOLDINGS, PBC, RIBOSCIENCE LLC, GENETIC NETWORKS LLC, 4J THERAPEUTICS INC., LATONA BIOSCIENCES GROUP, FTX FOUNDATION, SAMUEL BANKMAN-FRIED, ROSS RHEINGANS-YOO, and NICHOLAS BECKSTEAD, | |
| Defendants. | |

## STIPULATION OF SETTLEMENT

This stipulation of settlement ("Stipulation") is being entered into by and among Alameda

Research Ltd. ("Alameda"), FTX Trading Ltd. ("FTX" and, together with Alameda, "Plaintiffs"),

Alameda Research (Bahamas) Ltd. ("Alameda Bahamas"), Latona Biosciences Group ("Latona")

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

and Ross Rheingans-Yoo ("Rheingans-Yoo").  Plaintiffs, Alameda Bahamas, Latona, and Rheingans-Yoo are each a "Party" and are referred to collectively as the "Parties."

**WHEREAS**, on November 11, 2022, Plaintiffs and Alameda Bahamas each filed petitions for voluntary relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered in the case captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del.);

**WHEREAS**, on June 29, 2023, Rheingans-Yoo filed a non-customer claim against Alameda Bahamas, claim no. 5166, and a duplicative claim, claim no. 89710, seeking at least $993,611.08 in unpaid employment compensation, comprised of four components:  (i) a claim for $275,000 in unpaid cash bonus ("Cash Bonus Claim"), (ii) a claim for $650,000 in unpaid bonus in the form of a donation to be made to a charity of Rheingans-Yoo's choosing ("FDU Claim"), (iii) a claim for $5,763.33 in unpaid prepetition salary ("Prepetition Salary Claim"), and (iv) a claim for $62,847.75 in unpaid postpetition salary[2] ("Postpetition Salary Claim" and, together, with the Cash Bonus Claim, FDU Claim, and Prepetition Salary Claim, the "Compensation Claims");

**WHEREAS**, on July 19, 2023, Plaintiffs commenced Adversary Proceeding No. 23-50444 (the "Adversary Proceeding") in the Bankruptcy Court against Latona, Rheingans-Yoo, and others by filing a complaint [Adv. D.I. 1], which Plaintiffs subsequently amended on December 22, 2023 [Adv. D.I. 73].  Plaintiffs assert in the Adversary Proceeding, among other things, claims against Latona related to fraudulent transfers by FTX and Alameda to Lumen Bioscience, Inc., Greenlight

---

[2]     In his Non-Customer Claim, Rheingans-Yoo "expressly reserve[d] his claim for additional unpaid compensation accruing from and after June 23, 2023."

Biosciences Holdings, PBC, Rioscience LLC, Genetic Networks LLC, and 4J Therapeutics Inc. (collectively, the "Small Lifesciences Defendants") and Platform Lifesciences Inc. ("PLS" ), and a claim against Rheingans-Yoo for aiding and abetting Samuel Bankman-Fried's breach of fiduciary duties to FTX and Alameda (the "Adversary Claims");

**WHEREAS**, on October 31, 2023, Rheingans-Yoo and Latona timely filed an answer to Plaintiffs' complaint in the Adversary Proceeding [Adv. D.I. 1],[3] in which Rheingans-Yoo and Latona denied the Adversary Claims;

**WHEREAS**, on November 1, 2023, Plaintiffs entered into a stipulation with the Small Lifesciences Defendants ("the "Stay Stip.") [Adv. D.I. 64], pursuant to which the Small Lifesciences Defendants agreed that, in connection with any resolution between Plaintiffs and Rheingans-Yoo and Latona, the Small Lifesciences Defendants would "work to facilitate[ ] the transfer to one or both of the Plaintiffs . . . all rights and interests that Latona currently has in the Small Lifesciences Defendants" (Stay Stip. ¶ 2);

**WHEREAS**, on January 18, 2024, Plaintiffs entered into a stipulation of settlement with PLS to resolve the Adversary Proceeding as to PLS, which settlement was approved on February 13, 2024 [Adv. D.I. 89];

**WHEREAS**, the Parties have been engaged in good-faith, arm's-length negotiations about resolving the Adversary Claims and the Compensation Claims;

**WHEREAS**, in order to avoid the expense, burden and inconvenience of litigation, the Parties desire and intend to effect a final settlement and resolution of the Adversary Claims and

---

[3]     Pursuant to the so-ordered Case Management Plan and Scheduling Order dated January 17, 2024 [Adv. D.I. 81], Rheingans-Yoo and Latona were not required to answer Plaintiff's amended complaint.

the Compensation Claims except the FDU Claim, which will be severed for determination by the Bankruptcy Court at a later date; and

**WHEREAS**, Plaintiffs and Alameda Bahamas, in the exercise of their business judgment, have concluded that final settlement and resolution of the Adversary Claims and the Compensation Claims (except the FDU Claim) in accordance with the terms of this Stipulation is in the best interest of Plaintiffs and Alameda Bahamas, their creditors and other stakeholders.

**NOW, THEREFORE, IT IS HEREBY STIPULATED** by and among the undersigned counsel for the Parties as follows:

1.      **Settlement of Adversary Claims**.  Rheingans-Yoo, in his capacity as a director of Latona, shall cause Latona (a) to execute and deliver to Plaintiff Alameda an Assumption and Assignment Agreement, substantially in the form attached hereto as Exhibit 1 (the "Assumption and Assignment Agreement"), Consent Agreements by and among Latona, Alameda, and each of 4J Therapeutics Inc. ("4J Therapeutics"), Lumen Bioscience, Inc. ("Lumen") and Rioscience LLC ("Rioscience"), substantially in the forms attached hereto as Exhibits 2–4 (the "Consent Agreements"), and any other such documents, instruments, conveyances and assurances necessary to assign Latona's interests in 4J Therapeutics, Lumen and Rioscience to Alameda, and (b) to take such further actions as Alameda may reasonably request to transfer and assign Latona's rights and interests in each of 4J Therapeutics, Lumen and Rioscience to Alameda.  Rheingans-Yoo shall cause Latona to execute and deliver the Assumption and Assignment Agreement within five (5) business days of the date on which the last of the three Consent Agreements is fully executed. Rheingans-Yoo and Latona represent and warrant that Latona and the Small Lifesciences Defendants have entered into no agreements providing Latona with rights and interests in the Small Lifesciences Defendants other than:  (i) the Charitable Research Funding Agreement, dated as of

August 5, 2022, by and between Lumen and Latona; (ii) the 2.88% Convertible Promissory Note of Genetic Networks LLC ("Genetic Networks"), due upon demand beginning in 2024 (the "2024 Note"); (iii) the 5% Convertible Promissory Note of 4J Therapeutics due 2028; (iv) the Note Purchase Agreement, dated as of October 7, 2022, by and among 4J Therapeutics, Latona and the other parties thereto; (v) the Amended and Restated Limited Liability Company Agreement of Riboscience, dated as of June 11, 2021; (vi) the Series A Unit Purchase Agreement with Riboscience, dated as of June 11, 2021, by and among Riboscience, Latona and the other parties thereto; (vii) the Investors' Rights Agreement, dated as of June 11, 2021, by and among Riboscience, Latona and the other parties thereto; (viii) the Voting Agreement, dated as of June 11, 2021, by and among Riboscience, Latona and the other parties thereto; (ix) the Right of First Refusal and Co-Sale Agreement, dated as of June 11, 2021, by and among Riboscience, Latona and the other parties thereto; and (x) the Subscription Agreement, dated August 11, 2022, by and between Latona and GreenLight Biosciences Holdings, PBC ("GreenLight"). Rheingans-Yoo and Latona make no representations or warranties as to the status or value of Latona's rights and interests in the Small Lifesciences Defendants. Rheingans-Yoo and Latona shall not incur any legal, administrative or other expenses necessary to affect such transfers or assignments, which costs shall be borne by Plaintiffs.

2. **Waiver of Rights**. Latona hereby waives any rights or preferences it may have (i) to receive consideration for those shares of common stock, par value $0.0001 per share, of GreenLight pursuant to the terms of that certain Agreement and Plan of Merger, dated as of May 29, 2023, by and among SW ParentCo, Inc., SW MergerCo, Inc. and GreenLight, and the transactions contemplated thereby, (ii) under that certain Subscription Agreement, dated as of

August 11, 2022, by and between Latona and GreenLight, and (iii) as a former stockholder of GreenLight.[4]

3.      **Termination of 2024 Note**.  Within five (5) days of Alameda providing written notice to Latona that Alameda has received a payment of $450,000 from Genetic Networks, Latona shall execute a Convertible Promissory Note Satisfaction and Release by and between Latona and Genetic Networks, substantially in the form attached hereto as Exhibit 5.

4.      **Partial Settlement of Compensation Claims**.  Excepting the FDU Claim, which is addressed in paragraph 5, the Debtors allow and shall pay, in accordance with their chapter 11 plan, Rheingans-Yoo's Compensation Claim as a General Unsecured Claim in the amount of $180,000, $15,150 of which will be treated as a priority claim under 11 U.S.C. § 507(a)(4) (the "Allowed Claim").  The Debtors, or their claims and noticing agent, shall update the Claims Register to reflect the allowance and classification of the Allowed Claim.

5.      **Further Submission on Objection to FDU Claim**.  The Debtors' Objection to the Compensation Claims (the "Objection") [D.I. 3409] and Rheingans-Yoo's Response to the Debtors' Objection (the "Response") [D.I. 3737] will not be withdrawn.  The Debtors will not object to Rheingans-Yoo filing a Supplemental Response to the Objection ten (10) days before the July 2024 omnibus hearing, or a later hearing as the parties so mutually agree, solely to address the FDU Claim (the "Supplemental FDU Response").  The Debtors will limit their reply to the Response and Supplemental FDU Response, if any, to addressing the FDU Claim, and will not address the balance of Rheingans-Yoo's Compensation Claims, except insofar as to inform the

---

[4]      Pursuant to an August 11, 2022 Subscription Agreement, by and between Latona and GreenLight, Latona acquired 1,403,061 shares in GreenLight.  On July 24, 2023, GreenLight was acquired in an all-cash, go-private transaction.  Pursuant to the terms of the merger agreement, Latona's shares in GreenLight converted into a right to receive $420,918.30.

Bankruptcy Court that the Debtors and Rheingans-Yoo have agreed to settle certain of Rheingans-Yoo's Compensation Claims and to sever the FDU Claim for determination by the Bankruptcy Court at a later date.

6.    **Discovery**.  Latona and Rheingans-Yoo shall provide certain discovery on the terms enumerated in (a) – (c) below.

(a)    Within sixty (60) days of the Effective Date, Latona and Rheingans-Yoo shall provide Plaintiffs any documents in their possession, custody, or control regarding Latona or its investments in or grants made to the Small Lifesciences Defendants and PLS;

(b)    To the extent that Plaintiffs deem it reasonably necessary, Rheingans-Yoo shall participate in an interview by Plaintiffs conducted by Zoom on a date mutually agreeable to the Parties after Defendant Samuel Bankman-Fried has filed his answer in the Adversary Proceeding (the "Interview").  Rheingans-Yoo shall be entitled to have counsel, at his own expense, during the Interview, which shall consist of a single session not to exceed seven hours, and which shall not be transcribed by a court reporter or otherwise recorded by video or audio; and

(c)    To the extent that Plaintiffs deem it reasonably necessary, Rheingans-Yoo, through his undersigned counsel, shall accept service of a subpoena under Federal Rule of Civil Procedure 45 (or equivalent) for his deposition and/or for the 30(b)(6) deposition of Latona in the Adversary Proceeding, provided that any such subpoena shall not be served prior to Defendant Samuel Bankman-Fried filing his answer in the Adversary Proceeding.  If Plaintiffs depose Rheingans-Yoo and/or Latona, the deposition shall be conducted by Zoom, and the deponents are entitled to have counsel, at their own expense, during any such deposition.

Nothing contained in this paragraph 6 shall be deemed or construed to be a waiver of Rheingans-Yoo or Latona's rights to assert privilege or other objections in connection with this discovery.[5]

7.     **Bankruptcy Court Approval**.  This Stipulation is subject in all respects to the approval of the Bankruptcy Court.  Plaintiffs and Alameda Bahamas shall file a motion, in a form reasonably acceptable to Latona and Rheingans-Yoo, seeking approval of the Stipulation (the "Approval Motion") within fourteen (14) days after the date on which the last of the settlement stipulations between Alameda and Latona and Alameda and each of the Small Lifesciences Defendants is fully executed.  In the event that the Bankruptcy Court declines to approve this Stipulation, or the order approving the Stipulation (the "Approval Order") does not become final and non-appealable, this Stipulation shall become null and void and of no further force and effect.

8.     **Effective Date**.  The terms of this Stipulation shall become effective upon the Approval Order becoming final and non-appealable (the "Effective Date").

9.     **Dismissal with Prejudice**.   Provided that Rheingans-Yoo and Latona have reasonably complied with their obligations under paragraphs 1 and 16 of this Stipulation, then within five (5) business days after the Assumption and Assignment Agreement is fully executed, Plaintiffs shall file with the Bankruptcy Court a notice of dismissal with prejudice of the Adversary Claims against Rheingans-Yoo and Latona (the "Notice of Dismissal").

10.     **Mutual Releases**.   Upon the filing of the Notice of Dismissal pursuant to paragraph 9, each Party unconditionally and irrevocably releases, acquits and forever discharges the other Parties and their officers, members, directors, employees, agents, attorneys and

---

[5]     Rheingans-Yoo has informed the Debtors that he reserves any rights he has under the Bankruptcy Code or Bankruptcy Rules to seek additional discovery on his FDU Claim.  The Debtors have informed Rheingans-Yoo that they will oppose any request for additional discovery on the FDU Claim, which the Parties agree is primarily legal in nature.

stockholders from any and all claims, counterclaims, demands, liabilities, suits, debts, costs, expenses, and causes of action, at law or in equity, including, but not limited to, claims for interest, compensatory, exemplary, statutory, punitive or restitutionary damages, and expert or attorneys' fees and costs, related to the Adversary Claims; provided, however, that the foregoing shall not release any obligations under or claim for breach of this Stipulation.

11.    **Partial Release of Compensation Claims**.  The Debtors allow Rheingans-Yoo's Compensation Claims, except the FDU Claim, as General Unsecured Claims in the amount of $180,000, $15,150 of which will be treated and paid as a priority claim under 11 U.S.C. § 507(a)(4).  Upon the filing of the Notice of Dismissal set forth in paragraph 9, Rheingans-Yoo (i) releases and disclaims any and all interests in his Compensation Claims (except the FDU Claim) to the extent they exceed the amount of $180,000 that the Debtors allow as a General Unsecured Claim, $15,150 of which will be treated and paid as a priority claim under 11 U.S.C. § 507(a)(4); and (ii) releases and forever discharges the Debtors from any liability in excess of $180,000, $15,150 of which will be treated and paid as a priority claim under 11 U.S.C. § 507(a)(4), in connection with his Compensation Claims (except the FDU Claim).  For the avoidance of doubt, Rheingans-Yoo does not release his FDU Claim, which shall be determined by the Bankruptcy Court at a later date.

12.    **Express Preservation of Claims by the Plaintiffs**.  For the avoidance of doubt, notwithstanding the foregoing, Plaintiffs' release of Claims in paragraph 10 above shall not include any claims asserted by Plaintiffs against any Defendants in the Adversary Proceeding other than Rheingans-Yoo and Latona.

13. **Reservation of Rights**. Except as otherwise set forth in this Stipulation, each Party reserves any and all rights, claims, and defenses against any other Party, including with respect to the FDU Claim.

14. **No Admission of Wrongdoing**. This Stipulation does not constitute an admission by any of the Parties of any wrongful action or violation of any federal, state, or commonwealth statutory or common law rights, or any other possible or claimed violation of law or rights. The Stipulation shall not be construed as an admission of liability.

15. **Good Faith and Understanding**. The Parties expressly represent and warrant that this Stipulation is entered into in good faith and acknowledge that execution of this Stipulation is not the product or result of any duress, economic or otherwise. The Parties represent and warrant that they have read and understand the terms of this Stipulation. The Parties further represent and warrant that each individual signing the Stipulation on behalf of such Party is fully authorized to sign on behalf of said Party.

16. **Cooperation**. Each Party shall cooperate with each other Party and take such actions as are reasonably necessary to obtain approval of this Stipulation by the Bankruptcy Court and entry of the Approval Order, and to effectuate its terms.

17. **Authorization**. Each Party, by and through their undersigned counsel, represents and warrants that the undersigned is fully authorized and empowered to execute and deliver this Stipulation on behalf of, and to bind, each of the Parties, as applicable, to the terms and conditions of this Stipulation.

18. **Costs**. Each Party shall bear its own costs and legal fees in connection with this Stipulation.

19.     **Counterparts**.  The Parties may execute this Stipulation in multiple counterparts, each of which constitutes an original as against the Party that signed it, and all of which together constitute one agreement.

20.     **Effectiveness**.  This Stipulation shall become effective upon the execution of the same by all Parties and delivery of counterparts of such signatures to the other Party.  The Parties irrevocably consent to the jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Stipulation and expressly waive any right to commence any such action in any other forum.


**AGREED BY**:

April __, 2024

—————————————————————
**SULLIVAN & CROMWELL LLP**

Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail:  wheelers@sullcrom.com
          gluecksteinb@sullcrom.com


*Counsel for Plaintiffs and Alameda Bahamas*

-11-

**GOETZ FITZPATRICK LLP**

Gary M. Kushner
Scott D. Simon
One Penn Plaza, Suite 3100
New York, NY 10119
Telephone: (914) 500-8737
E-mail:  gkushner@goetzfitz.com
            ssimon@goetzfitz.com


*Counsel for Ross Rheingans-Yoo and Latona*

**Exhibit 1**

## ASSUMPTION AND ASSIGNMENT AGREEMENT

This ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Agreement") is made effective as of [●], 2024, by and between Latona Bioscience Group, a nonprofit corporation organized under the laws of The Bahamas ("Assignor"), and Alameda Research Ltd., a company limited by shares organized under the laws of the British Virgin Islands ("Assignee"). Assignor and Assignee are referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, Assignee is a debtor in *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)), pending in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the Parties desire to effect a final settlement and resolution of the Adversary Claims; and

**WHEREAS**, pursuant to that Stipulation of Settlement, by and among Assignor, FTX Trading Ltd. and Assignee, which the Bankruptcy Court approved on [●], 2024 (the "Settlement"), Assignor has agreed to assign to Assignee, and Assignee has agreed to assume from Assignor, the Interests (as defined below) and all of Assignor's right, title and interest in and to the Operative Documents, and Assignor has agreed to assign to Assignee the Contractual Rights (as defined below).

**NOW, THEREFORE**, in consideration of the foregoing, and of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.     All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Settlement.

2.     For purposes of this Agreement:

(a)     "Interests" means (i) the 5% Convertible Promissory Note of 4J Therapeutics, Inc., due 2028 (the "2028 Note") and (ii) 224,467 Series A-2 Preferred Units in R123science LLC (the "Preferred Units");

(b)     "Designated Contracts" means (i) the Note Purchase Agreement, dated as of October 7, 2022, by and among 4J Therapeutics Inc., Assignor and the other parties thereto, (ii) the Charitable Research Funding Agreement, by and between Lumen Bioscience, Inc. and Assignor and (iii) the Series A Preferred Units Purchase Agreement, dated as of June 11, 2021, by and among Rbioscience LLC, Assignor and the other parties thereto;

(c)     "Operative Documents" means (i) the Amended and Restated Limited Liability Company Agreement of Rbioscience LLC, dated as of June 11, 2021, (ii) the Investors' Rights Agreement, dated as of June 11, 2021, by and among Rbioscience LLC, Assignor and the other parties thereto,

(iii) the Voting Agreement, by and among Riboscience LLC, Assignor and the other parties thereto and (iv) the Right of First Refusal and Co-Sale Agreement, by and among Riboscience LLC, Assignor and the other parties thereto; and

(d)     "Contractual Rights" means all of Assignor's rights and benefits, but not obligations, under the Designated Contracts.

3.     Assignor hereby represents and warrants to Assignee as of the date hereof that:

(a)     Assignor is an entity duly organized and validly existing in good standing under the laws of the Bahamas. Assignor has the requisite power and authority to enter into, execute and deliver this Agreement and to perform all of its obligations to be performed by it hereunder, and this Agreement constitutes a valid and binding obligation of Assignor, enforceable against it in accordance with its terms.

(b)     Assignor owns all right, title and interest in and to the Interests and the rights set forth for the benefit of Assignor under the Designated Contracts, free and clear of all liens (statutory or otherwise), charges, pledges, mortgages, leases, easements, hypothecations, usufructs, deeds of trust, security interests, options, rights of use, first offers or first refusals, servitudes, restrictive covenants or conditions, encroachments, claims, interests, restrictions or any other encumbrances of any kind (collectively, "Liens") other than any transfer restrictions arising solely under applicable federal and state securities laws or as set forth in the Operative Documents or the 2028 Note.

(c)     The execution and delivery by Assignor of this Agreement and the performance or consummation of the transactions contemplated hereby by Assignor do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests owned by Assignor or the Contractual Rights under the terms or provisions of (i) its organizational documents, (ii) any contract that is material to the value of the Interests or the Contractual Rights or (iii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, materially and adversely affect the Interests or the Contractual Rights.

(d)     Except pursuant to this Agreement, Assignor has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of the Interests held by Assignor or the Contractual Rights, (ii) converted, exchanged or redeemed all or any portion of the Interests or the Contractual Rights or (iii) agreed to do any of the foregoing.

(e)     No person or entity acting on behalf of Assignor or under the authority of

Assignor shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated hereby.

4.      Assignee hereby represents and warrants to Assignor as of the date hereof that:

(a)     Assignee is an entity duly organized and validly existing in good standing under the laws of the British Virgin Islands. Assignee has the requisite power and authority to enter into, execute and deliver this Agreement and to perform all of its obligations to be performed by it hereunder, and this Agreement constitutes a valid and binding obligation of Assignee, enforceable against it in accordance with its terms.

(b)     The execution and delivery by Assignee of this Agreement and the performance or consummation of the transactions contemplated hereby by Assignee do not conflict with or result in a breach or violation of (i) its organizational documents, (ii) any contract that is material to the value of the Interests or the Contractual Rights or (iii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement.

5.      Effective as of the date hereof, upon the terms and subject to the conditions set forth in the Settlement, (a) Assignor hereby assigns, conveys, transfers and delivers unto Assignee all right, title, benefit and interest of Assignor in, to and under the Interests and applicable Operative Documents and all of Assignor's burdens, obligations and liabilities in connection with the Interests and the applicable Operative Documents and (b) Assignee hereby accepts the aforesaid assignment and assumes and agrees to perform all of the obligations, terms, covenants and conditions required to be performed by Assignor in connection with the Interests and the applicable Operative Documents, in each case, other than any burdens, obligations, liabilities, terms, covenants and conditions arising under Section 7.6 of the 2028 Note.

6.      Effective as of the date hereof, upon the terms and subject to the conditions set forth in the Settlement, Assignor hereby assigns, conveys, transfers and delivers unto Assignee all Contractual Rights, and Assignee hereby accepts the aforesaid assignment.

7.      The Parties agree (a) the transactions contemplated by this Agreement shall not be subject to any deduction or withholding and (b) to use commercially reasonable efforts to obtain any certificate or other document from any governmental body as may be necessary to mitigate, reduce or eliminate any tax (including withholding or deduction in respect of taxes) that could be imposed with respect to the transactions contemplated by this Agreement.

8.      Each of Assignor and Assignee shall execute and deliver, at the reasonable request of any Party, such additional documents, instruments, conveyances and assurances and take such further actions as such Party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

9.       Neither Assignor nor Assignee may assign any of their respective rights or delegate any of their respective obligations under this Agreement, by operation of law or otherwise, without the prior written consent of the other Party.  Any purported assignment not permitted under this Section 9 shall be null and void.

10.       This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument specifically referring to this Agreement and signed, in the case of an amendment, supplement or change, by the Party against whom enforcement of such waiver is sought. Subject to Section 9, this Agreement shall extend to and shall bind and inure to the benefit not only of Assignor and Assignee, but also their respective heirs, legal representatives, successors and assigns.

11.       Nothing in this Agreement, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Settlement.  In the event of any conflict or inconsistency between the terms of the Settlement and the terms hereof, the terms of the Settlement shall govern and control.

12.       This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws.

13.       The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any person, entity or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other persons, entities or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

14.       This Agreement may be executed in one or more counterparts (including by facsimile or other electronic means), each of which shall be deemed an original, and all of which shall constitute one and the same Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have executed or caused this Agreement to be executed as of the date first written above.

**LATONA BIOSCIENCE GROUP**

By: _____

     Name:

     Title:

**ALAMEDA RESEARCH LTD.**

By: _____

     Name:

     Title:

**Exhibit 2**

# CONSENT AGREEMENT

This CONSENT AGREEMENT (this "<u>Consent Agreement</u>") is made effective as of [●], 2024, by and among Latona Bioscience Group, a nonprofit corporation organized under the laws of the Bahamas ("<u>Assignor</u>"), Alameda Research Ltd., a company limited by shares organized under the laws of the British Virgin Islands ("<u>Assignee</u>"), and 4J Therapeutics Inc., a Delaware corporation (the "<u>Subject Company</u>"). All of the signatories to this Consent Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

**WHEREAS**, Assignee is a debtor in *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)), pending in the U.S. Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, Assignee and the Subject Company desire to effect a final settlement and resolution of the Adversary Claim;

**WHEREAS**, Assignor wishes to transfer and assign to Assignee all of Assignor's right, title, benefit and interests and certain obligations (as set forth in the Assumption and Assignment Agreement) under the 5% Convertible Promissory Note of the Subject Company, due 2028 (the "<u>2028 Note</u>"); and

**WHEREAS**, pursuant to that certain Stipulation of Settlement, by and among Assignee, FTX Trading Ltd. and the Subject Company, as approved by the Bankruptcy Court on [●], 2024 (the "<u>Settlement</u>"), the Subject Company has agreed to consent to and approve the Assignment.

**NOW, THEREFORE**, in consideration of the foregoing, and of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      All capitalized terms used in this Consent Agreement but not otherwise defined herein are given the meanings set forth in the Settlement.

2.      Effective as of the date hereof, upon the terms and subject to the conditions set forth in the Settlement, the Subject Company hereby consents to and approves the Assignment. The Subject Company hereby waives (a) any restrictions on transfer applicable to the Assignment that the Subject Company may have the right to enforce and (b) any right to receive an opinion of counsel in connection with such Assignment.

3.      Assignee represents and warrants to the Subject Company as of the date hereof that it is a company limited by shares organized under the laws of the British Virgin Islands.

4.      Each of Assignor and the Subject Company represents and warrants to Assignee that it has made available to Assignor accurate and complete copies of the 2028 Note and the Note Purchase Agreement, dated as of October 7, 2022, by and among the Subject Company, Assignor and the other parties thereto (the "<u>Note Purchase Agreement</u>"), each as of the date hereof. Except for the 2028 Note and the Note Purchase Agreement, each of Assignor and the Subject Company represents and warrants to Assignee that it has not entered into any other

-1-

documents, agreements or side letters with any other entity or person with respect to any rights or obligations of Assignor related to the Subject Company.

5.  Each Party shall execute and deliver, at the reasonable request of any other Party, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Consent Agreement.

6.  No Party may assign any of their respective rights or delegate any of their respective obligations under this Consent Agreement, by operation of law or otherwise, without the prior written consent of the other Parties.  Any purported assignment not permitted under this <u>Section 6</u> shall be null and void.

7.  This Consent Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument specifically referring to this Consent Agreement and signed, in the case of an amendment, supplement or change, by the Parties against whom enforcement of such waiver is sought. Subject to <u>Section 6</u>, this Consent Agreement shall extend to and shall bind and inure to the benefit not only of the Parties, but also their respective heirs, legal representatives, successors and assigns.

8.  The Parties acknowledge and agree that neither the Chapter 11 Cases nor the Adversary Proceeding constitutes, in respect of the Subject Company, an involuntary proceeding under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally.

9.  In the event of any conflict or inconsistency between the terms of the Settlement and the terms hereof, the terms of the Settlement shall govern and control.

10.  This Consent Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws.

11.  The provisions of this Consent Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Consent Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Consent Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such

provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Consent Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12.     This Consent Agreement may be executed in one or more counterparts (including by facsimile or other electronic means), each of which shall be deemed an original, and all of which shall constitute one and the same Consent Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have executed or caused this Consent Agreement to be executed as of the date first written above.

**LATONA BIOSCIENCE GROUP**

By: _____
Name:
Title:

**ALAMEDA RESEARCH LTD.**

By: _____
Name:
Title:

**4J THERAPEUTICS INC.**

By: _____
Name:
Title:

**Exhibit 3**

# CONSENT AGREEMENT

This CONSENT AGREEMENT (this "Consent Agreement") is made effective as of [●], 2024, by and among Latona Bioscience Group, a nonprofit corporation organized under the laws of the Bahamas ("Assignor"), Alameda Research Ltd., a company limited by shares organized under the laws of the British Virgin Islands ("Assignee"), and Lumen Bioscience, Inc., a Delaware corporation (the "Subject Company"). All of the signatories to this Consent Agreement are collectively referred to as the "Parties" and individually as a "Party."

**WHEREAS**, Assignee is a debtor in *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)), pending in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, Assignee and the Subject Company desire to effect a final settlement and resolution of the Adversary Claim;

**WHEREAS**, Assignor wishes to transfer Assignor's rights and benefits, but not obligations, under the Charitable Research Funding Agreement, by and between the Subject Company and Assignor (the "Charitable Research Funding Agreement", and Assignor's rights and benefits, but not obligations, thereunder, the "Contractual Rights") to Assignee; and

**WHEREAS**, pursuant to that certain Stipulation of Settlement, by and between Assignee and the Subject Company, as approved by the Bankruptcy Court on [●], 2024 (the "Settlement"), the Subject Company has agreed to consent to and approve the transfer of the Contractual Rights to Assignee.

**NOW, THEREFORE**, in consideration of the foregoing, and of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      All capitalized terms used in this Consent Agreement but not otherwise defined herein are given the meanings set forth in the Settlement.

2.      Effective as of the date hereof, upon the terms and subject to the conditions set forth in the Settlement, the Subject Company hereby consents to and approves the transfer of the Contractual Rights to Assignee.

3.      Each of Assignor and the Subject Company represents and warrants to Assignee that it has made available to Assignor accurate and complete copies of the Charitable Research Funding Agreement as of the date hereof. Except for the Charitable Research Funding Agreement, each of Assignor and the Subject Company represents and warrants to Assignee that it has not entered into any other documents, agreements or side letters with any other entity or person with respect to any rights or obligations of Assignor related to the Subject Company.

4.      Each Party shall execute and deliver, at the reasonable request of any other Party, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give

effect to the transactions contemplated by this Consent Agreement.

5.      No Party may assign any of their respective rights or delegate any of their respective obligations under this Consent Agreement, by operation of law or otherwise, without the prior written consent of the other Parties.  Any purported assignment not permitted under this <u>Section 5</u> shall be null and void.

6.      This Consent Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument specifically referring to this Consent Agreement and signed, in the case of an amendment, supplement or change, by the Parties against whom enforcement of such waiver is sought.  Subject to <u>Section 5</u>, this Consent Agreement shall extend to and shall bind and inure to the benefit not only of the Parties, but also their respective heirs, legal representatives, successors and assigns.

7.      In the event of any conflict or inconsistency between the terms of the Settlement and the terms hereof, the terms of the Settlement shall govern and control.

8.      This Consent Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws.

9.      The provisions of this Consent Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Consent Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Consent Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Consent Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

10.     This Consent Agreement may be executed in one or more counterparts (including by facsimile or other electronic means), each of which shall be deemed an original, and all of which shall constitute one and the same Consent Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have executed or caused this Consent Agreement to be executed as of the date first written above.

**LATONA BIOSCIENCE GROUP**

By: _____
     Name:
     Title:

**ALAMEDA RESEARCH LTD.**

By: _____
     Name:
     Title:

**LUMEN BIOSCIENCE, INC.**

By: _____
     Name:
     Title:

4893-6290-1926 v.2

**Exhibit 4**

# CONSENT AGREEMENT

This CONSENT AGREEMENT (together with all schedules hereto, this "<u>Consent Agreement</u>") is made effective as of [●], 2024, by and among Latona Bioscience Group, a nonprofit corporation organized under the laws of the Bahamas ("<u>Assignor</u>"), Alameda Research Ltd., a company limited by shares organized under the laws of the British Virgin Islands ("<u>Assignee</u>"), and Riboscience LLC, a Delaware limited liability company (the "<u>Subject Company</u>"). All of the signatories to this Consent Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

**WHEREAS**, Assignee is a debtor in *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)), pending in the U.S. Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, Assignee and the Subject Company desire to effect a final settlement and resolution of the Adversary Claim;

**WHEREAS**, Assignor wishes to transfer and assign all of Assignor's right, title, benefit and interests in its 224,467 Series A-2 Preferred Units (the "<u>Preferred Units</u>") in the Subject Company to Assignee; and

**WHEREAS**, pursuant to that certain Stipulation of Settlement, by and among Assignee, FTX Trading Ltd. and the Subject Company, as approved by the Bankruptcy Court on [●], 2024 (the "<u>Settlement</u>"), the Subject Company has agreed to consent to and approve the Assignment.

**NOW, THEREFORE**, in consideration of the foregoing, and of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      All capitalized terms used in this Consent Agreement but not otherwise defined herein are given the meanings set forth in the Settlement.

2.      Effective as of the date hereof, upon the terms and subject to the conditions set forth in the Settlement, the Subject Company hereby consents to and approves the Assignment. The Subject Company hereby waives (a) any restrictions on transfer applicable to the Assignment that the Subject Company may have the right to enforce, (b) any right to receive an opinion of counsel in connection with the Assignment and (c) any rights of first refusal, and any notice rights in connection therewith, it may have in respect of the Assignment.

3.      Each of Assignor and the Subject Company represents and warrants to Assignee that it has made available to Assignor accurate and complete copies of the agreements set forth on <u>Schedule A</u> hereto (the "<u>Operative Documents</u>") as of the date hereof. Except for the Operative Documents, each of Assignor and the Subject Company represents and warrants to

Assignee that it has not entered into any other documents, agreements or side letters with any other entity or person with respect to any rights or obligations of Assignor related to the Subject Company.

4.      Each Party shall execute and deliver, at the reasonable request of any other Party, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Consent Agreement.

5.      No Party may assign any of their respective rights or delegate any of their respective obligations under this Consent Agreement, by operation of law or otherwise, without the prior written consent of the other Parties.  Any purported assignment not permitted under this Section 5 shall be null and void.

6.      This Consent Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument specifically referring to this Consent Agreement and signed, in the case of an amendment, supplement or change, by the Parties against whom enforcement of such waiver is sought.  Subject to Section 5, this Consent Agreement shall extend to and shall bind and inure to the benefit not only of the Parties, but also their respective heirs, legal representatives, successors and assigns.

7.      In the event of any conflict or inconsistency between the terms of the Settlement and the terms hereof, the terms of the Settlement shall govern and control.

8.      This Consent Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws.

9.      The provisions of this Consent Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Consent Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Consent Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Consent Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

10.     This Consent Agreement may be executed in one or more counterparts (including

by facsimile or other electronic means), each of which shall be deemed an original, and all of which shall constitute one and the same Consent Agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed or caused this Consent Agreement to be executed as of the date first written above.

**LATONA BIOSCIENCE GROUP**

By: _____

     Name:

     Title:

**ALAMEDA RESEARCH LTD.**

By: _____

     Name:

     Title:

**RIBOSCIENCE LLC**

By: _____

     Name:

     Title:

[*Signature Page to Consent Agreement*]

## Schedule A

1. Series A Preferred Units Purchase Agreement, dated as of June 11, 2021, by and among the Subject Company, Assignor and the other parties thereto.
2. Amended and Restated Limited Liability Company Agreement of the Subject Company, dated as of June 11, 2021.
3. Investors' Rights Agreement, dated as of June 11, 2021, by and among the Subject Company, Assignor and the other parties thereto.
4. Voting Agreement, dated as of June 11, 2021, by and among the Subject Company, Assignor and the other parties thereto.
5. Right of First Refusal and Co-Sale Agreement, dated as of June 11, 2021, by and among the Subject Company, Assignor and the other parties thereto.

**Exhibit 5**

**CONVERTIBLE PROMISSORY NOTE**

**SATISFACTION AND RELEASE**

1.      In consideration for an aggregate payoff amount of Four Hundred and Fifty Thousand Dollars ($ 450,000) (the "Payoff Amount") by Genetic Networks, LLC., a Delaware limited liability company ("Genetic") under that certain Convertible Promissory Note (the "Note") dated as of August 22, 2022, executed and delivered by Genetic as the borrower, in the original principal amount of Three Million Dollars ($3,000,000.00) in favor of Latona Bioscience Group, a nonprofit corporation organized under the laws of The Bahamas ("Latona") as payee, Latona, for itself and its successors and assigns, hereby confirms that, effective as of the Effective Date, (i) the aggregate outstanding principal balance, accrued interest, any other fees due to Latona and all other indebtedness, liabilities, and obligations of any kind owing to Latona under or in connection with the Note (the "Obligations") shall be paid and satisfied in full; (ii) all the security interests, mortgages, liens, pledges, charges and other encumbrances in favor of Latona to secure the Obligations, if any, shall be released and permanently terminated; (iii) all guarantees and security interests supporting the Obligations, if any, shall be released and permanently terminated; (iv) Latona forever waives, relinquishes and releases any and all claims against Genetic or Genetic's successors and assigns, for any and all liabilities and obligations, if any, of any kind whatsoever related to the Obligations; (v) all of the other respective obligations of Genetic or any of Genetic's subsidiaries or affiliates under the Notes shall be released and permanently terminated; (vi) the Note shall immediately terminate and be of no further force and effect; (vii) any conversion rights or other rights to acquire equity securities of Genetic under the Note will terminate and be null and void and Latona will thereafter not hold or have any right to acquire equity securities in Genetic with respect to the Note; and (viii) all other obligations of Genetic under the Note or any related agreements shall be terminated.

2.      From and after the Effective Date, Latona further agrees to procure and/or execute and to deliver to Genetic or Genetic's successors and assigns, from time to time, all releases, termination statements, certificates, instruments and documents, each in form and substance satisfactory to Genetic or Genetic's successors and assigns, and take any other actions, as may be reasonably requested by Genetic or Genetic's successors and assigns, or which are required to evidence the consummation of the payoff contemplated hereby, in each case at the expense of the requesting party (including attorneys' fees and expenses), and, effective as of the Effective Date, hereby authorizes Genetic and any other party designated by Genetic, to prepare, file, record and register any and all termination statements, releases and other instruments and documents evidencing the consummation of the payoff contemplated hereby, including, without limitation, UCC termination statements.

3.      "Effective Date" shall mean the date on which Genetic satisfies its obligations pursuant to that certain Stipulation of Settlement, by and among Alameda Research Ltd. ("Alameda"), FTX Trading Ltd. and Genetic, as approved by the Bankruptcy Court on [●], 2024, as the same may be amended, supplemented or otherwise modified from time to time, including but not limited to wiring to Alameda four hundred and fifty thousand dollars ($450,000).

4.      Alameda is a third-party beneficiary of this agreement and is entitled to enforce the provisions hereof.

*[Signature Pages to Follow]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal, this _____ day of _____, 2024.


**LATONA BIOSCIENCE GROUP**


By: _____
     Name:
     Title:

Acknowledged and agreed,

**GENETIC NETWORKS, LLC.**


By: _____
   Name:
   Title: