## Exhibit A

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ____** |

**ORDER GRANTING OTOY INTERNATIONAL, SEZC**
**LEAVE TO AMEND PROOF OF CLAIM**

Upon consideration of the motion (the "Motion")[2] of OTOY International, SEZC

("OTOY") seeking entry of an order (this "Order") granting OTOY leave to file the Amended POC

or, in the alternative, permitting OTOY to file a late claim based on a showing of excusable neglect,

all as more fully set forth in the Motion; and the United States District Court for the District of

Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to

this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the

United States District Court for the District of Delaware, dated February 29, 2012; and the Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having

found that it may enter a final order consistent with Article III of the United States Constitution;

and the Court having found that venue of this proceeding and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in

interest; and the Court having found that notice of the Motion and opportunity for a hearing on the

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Motion were appropriate and no other notice need be provided; and the Court having reviewed the Motion and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      OTOY is granted leave to amend the Original POC by filing the Amended POC substantially in the form attached hereto as **Exhibit 1**.

3.      The Amended POC shall relate back to the date of the filing of the Original POC and shall be deemed timely filed.

4.      Entry of this Order is without prejudice to the right of OTOY to seek leave to amend the Amended POC further.

5.      This Order shall be effective and enforceable immediately upon its entry.

6.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Amended Proof of Claim**

**United States Bankruptcy Court, District of Delaware**

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☐ FTX Trading Ltd. (Case No. 22-11068) | ☐ Alameda Aus Pty Ltd (Case No. 22-11104) | ☐ Alameda Global Services Ltd. (Case No. 22-11134) | ☐ Alameda Research (Bahamas) Ltd (Case No. 22-11105) |
| ☐ Alameda Research Holdings Inc. (Case No. 22-11069) | ☐ Alameda Research KK (Case No. 22-11106) | ☐ Alameda Research LLC (Case No. 22-11066) | ☒ Alameda Research Ltd (Case No. 22-11067) |
| ☐ Alameda Research Pte Ltd (Case No. 22-11107) | ☐ Alameda Research Yankari Ltd (Case No. 22-11108) | ☐ Alameda TR Ltd (Case No. 22-11078) | ☐ Alameda TR Systems S. de R. L. (Case No. 22-11109) |
| ☐ Allston Way Ltd (Case No. 22-11079) | ☐ Analisya Pte Ltd (Case No. 22-11080) | ☐ Atlantis Technology Ltd. (Case No. 22-11081) | ☐ Bancroft Way Ltd (Case No. 22-11082) |
| ☐ Blockfolio, Inc. (Case No. 22-11110) | ☐ Blue Ridge Ltd (Case No. 22-11083) | ☐ Cardinal Ventures Ltd (Case No. 22-11084) | ☐ Cedar Bay Ltd (Case No. 22-11085) |
| ☐ Cedar Grove Technology Services, Ltd. (Case No. 22-11162) | ☐ Clifton Bay Investments LLC (Case No. 22-11070) | ☐ Clifton Bay Investments Ltd (Case No. 22-11111) | ☐ Cottonwood Grove Ltd (Case No. 22-11112) |
| ☐ Cottonwood Technologies Ltd (Case No. 22-11136) | ☐ Crypto Bahamas LLC (Case No. 22-11113) | ☐ DAAG Trading, DMCC (Case No. 22-11163) | ☐ Deck Technologies Holdings LLC (Case No. 22-11138) |
| ☐ Deck Technologies Inc. (Case No. 22-11139) | ☐ Deep Creek Ltd (Case No. 22-11114) | ☐ Digital Custody Inc. (Case No. 22-11115) | ☐ Euclid Way Ltd (Case No. 22-11141) |
| ☐ FTX (Gibraltar) Ltd (Case No. 22-11116) | ☐ FTX Canada Inc (Case No. 22-11117) | ☐ FTX Certificates GmbH (Case No. 22-11164) | ☐ FTX Crypto Services Ltd. (Case No. 22-11165) |
| ☐ FTX Digital Assets LLC (Case No. 22-11143) | ☐ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118) | ☐ FTX EMEA Ltd. (Case No. 22-11145) | ☐ FTX Equity Record Holdings Ltd (Case No. 22-11099) |
| ☐ FTX EU Ltd. (Case No. 22-11166) | ☐ FTX Europe AG (Case No. 22-11075) | ☐ FTX Exchange FZE (Case No. 22-11100) | ☐ FTX Hong Kong Ltd (Case No. 22-11101) |
| ☐ FTX Japan Holdings K.K. (Case No. 22-11074) | ☐ FTX Japan K.K. (Case No. 22-11102) | ☐ FTX Japan Services KK (Case No. 22-11103) | ☐ FTX Lend Inc. (Case No. 22-11167) |
| ☐ FTX Marketplace, Inc. (Case No. 22-11168) | ☐ FTX Products (Singapore) Pte Ltd (Case No. 22-11119) | ☐ FTX Property Holdings Ltd (Case No. 22-11076) | ☐ FTX Services Solutions Ltd. (Case No. 22-11120) |
| ☐ FTX Structured Products AG (Case No. 22-11122) | ☐ FTX Switzerland GmbH (Case No. 22-11169) | ☐ FTX Trading GmbH (Case No. 22-11123) | ☐ FTX US Services, Inc. (Case No. 22-11171) |
| ☐ FTX US Trading, Inc. (Case No. 22-11149) | ☐ FTX Ventures Ltd. (Case No. 22-11172) | ☐ FTX Zuma Ltd (Case No. 22-11124) | ☐ GG Trading Terminal Ltd (Case No. 22-11173) |
| ☐ Global Compass Dynamics Ltd. (Case No. 22-11125) | ☐ Good Luck Games, LLC (Case No. 22-11174) | ☐ Goodman Investments Ltd. (Case No. 22-11126) | ☐ Hannam Group Inc (Case No. 22-11175) |
| ☐ Hawaii Digital Assets Inc. (Case No. 22-11127) | ☐ Hilltop Technology Services LLC (Case No. 22-11176) | ☐ Hive Empire Trading Pty Ltd (Case No. 22-11150) | ☐ Innovatia Ltd (Case No. 22-11128) |
| ☐ Island Bay Ventures Inc (Case No. 22-11129) | ☐ Killarney Lake Investments Ltd (Case No. 22-11131) | ☐ Ledger Holdings Inc. (Case No. 22-11073) | ☐ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177) |
| ☐ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155) | ☐ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156) | ☐ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157) | ☐ LedgerPrime LLC (Case No. 22-11158) |
| ☐ LedgerPrime Ventures, LP (Case No. 22-11159) | ☐ Liquid Financial USA Inc. (Case No. 22-11151) | ☐ Liquid Securities Singapore Pte Ltd (Case No. 22-11086) | ☐ LiquidEX LLC (Case No. 22-11152) |
| ☐ LT Baskets Ltd. (Case No. 22-11077) | ☐ Maclaurin Investments Ltd. (Case No. 22-11087) | ☐ Mangrove Cay Ltd (Case No. 22-11088) | ☐ North Dimension Inc (Case No. 22-11153) |
| ☐ North Dimension Ltd (Case No. 22-11160) | ☐ North Wireless Dimension Inc. (Case No. 22-11154) | ☐ Paper Bird Inc (Case No. 22-11089) | ☐ Pioneer Street Inc. (Case No. 22-11090) |
| ☐ Quoine India Pte Ltd (Case No. 22-11091) | ☐ Quoine Pte Ltd (Case No. 22-11161) | ☐ Quoine Vietnam Co. Ltd (Case No. 22-11092) | ☐ Strategy Ark Collective Ltd. (Case No. 22-11094) |
| ☐ Technology Services Bahamas Limited (Case No. 22-11095) | ☐ Verdant Canyon Capital LLC (Case No. 22-11096) | ☐ West Innovative Barista Ltd. (Case No. 22-11097) | ☐ West Realm Shires Financial Services Inc. (Case No. 22-11072) |
| ☐ West Realm Shires Inc. (Case No. 22-11183) | ☐ West Realm Shires Services Inc. (Case No. 22-11071) | ☐ Western Concord Enterprises Ltd. (Case No. 22-11098) | ☐ Zubr Exchange Ltd (Case No. 22-11132) |

**Modified Form 410**

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

## Part 1:  Identify the Claim

**1. Who is the current creditor?**

OTOY International SEZC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

Email(s) the creditor used with the debtor     richard@bfbst.com

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

OTOY International SEZC
c/o Brecheen Fedlman Breimer Silver
   & Thompson LLP
1875 Century Park East, Suite 1770
Los Angeles, CA  90069

Contact phone     13103863553
Contact email     richard@bfbst.com

Where should payments to the creditor be sent? (if different)

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

[ ] No
[X] Yes.  Claim number on court claims registry (if known) 4285

Filed on  06 / 29 / 2023
              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes. Who made the earlier filing? _____

## Part 2:  Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

[X] No
[ ] Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**   $ ____5,000,000 RNDR____

Does this amount include interest or other charges?

[X] No
[ ] Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type ____RNDR____ ; (ii) the amount in such currency ___5,000,000___ ; and (iii) a conversion rate to U.S. dollars ___$0.5381211___ .

**7b.  List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

| Coin List | Count | Coin List | Count |
|-----------|-------|-----------|-------|
|           |       |           |       |
|           |       |           |       |
|           |       |           |       |

| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|
| | loaned assets |

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

    ☐ Motor vehicle

    ☐ Other. Describe: _____

    **Basis for perfection:** _____

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:** $_____

    **Amount of the claim that is secured:** $_____

    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed)_____%

    ☐ Fixed

    ☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☒ Yes. Identify the property: 4,203,994 RNDR obligation of OTOY under Token Purchase Agreement dated as of June 23, 2021

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies. | $_____ |

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.** $_____

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
                MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Richard _____ Dickson _____ Thompson |
|---|---|
| | First name     Middle name     Last name |
| Title | _____ |
| Company | Brecheen Feldman Breimer Silver & Thompson, LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1875 Century Park East, Suite 1770 |
| | Number     Street |
| | Los Angeles                    CA     90069 |
| | City                           State  ZIP Code |
| Contact phone | 310-859-6839        Email  richard@bfbst.com |

Attach Supporting Documentation (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
　 (attach below)　　　　　☐ I do not have supporting documentation.

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Kroll and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Kroll and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Kroll or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Kroll and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

# MARKET MAKING AGREEMENT

**THIS AGREEMENT** (this "*Agreement*") is made effective as of 15th December 2021 (the "*Effective Date*") by and between Alameda Research Limited, a company limited by shares with a registered address at Tortola Pier Park, Building 1 Second Floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands  ("*Market Maker*") and OTOY International, SEZC, a Cayman with a registered address at c/o Floor 2, Willow House, Cricket Square P.O. Box 709 Grand Cayman KY1-1107 (the "*Customer*"). Market Maker and Customer may be referred to herein as a "*Party*", and together, the "*Parties*".

WHEREAS, Market Maker is a specialist (including its affiliates) in providing liquidity in markets for tokens across different exchanges;

WHEREAS, Customer has issued or intends to issue a token to operationalize its protocol and seeks to improve liquidity (the "*Tokens*"); and

WHEREAS, the Customer wishes to engage the services of Market Maker on the terms and for the consideration as set forth below (the "*Services*").

NOW, THEREFORE, in consideration of the promises and the mutual covenants, terms and conditions hereinafter set forth, and for other good and valuable consideration, receipt of which is specifically acknowledged, the parties hereto hereby agree as follows:

## Section 1. MARKET MAKER SERVICES

**(a) Market Operations & Trading.** Market Maker will quote the Tokens on each Applicable Exchange and stated market, to be amended from time to time upon mutual approval, with a bid/offer spread of no more than 50 basis points, at least 98% of the time. In terms of market depth, $125,000 should be within 2% of the best bid/offer.

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463A5801

Market Maker's quoting performance shall be measured each calendar week. If Market Maker fails to meet these quoting requirements for two consecutive calendar weeks, then Customer shall have the remedies set forth in Section 5(c) below, as well as any other available remedies at equity or at law. Such efforts will include the use of Market Maker's proprietary trading bot in accordance with a strategy crafted by Market Maker to add liquidity to any applicable markets. Market Maker will have sole discretion to craft such strategy and operate its trading bot in accordance with what Market Maker deems to be the most effective and efficient way to increase liquidity and to balance the order book. As such the liquidity provided by Market Maker may not be symmetric and there will be occasions in which Market Maker will place more bids than offers and vice versa. Market Maker will provide Customer with weekly reports of its daily trading activities on each Applicable Exchange, which will include:

- Total Trading Volume ("TTV") per cross per exchange (in USD equivalent)
- Market Maker's Traded Volume over Time (Daily, Weekly, Monthly, Quarterly)
- Market Maker's Traded Volume per cross per exchange (as a % of TTV)
- Average Bid/Offer Spreads (per cross)

**(b) Commencement.** Market Maker shall provide the services set forth in this Section 1 upon the date that is the later of: (i) the date that is five days from the Effective Date; (ii) the date following the day of receipt of the applicable Loan as set forth in Section 2 below; and (iii) the date on which the Tokens are listed for trading on an Applicable Exchange.

**Section 2. LOAN**

**(a) Loan.** Subject to the terms and conditions set forth herein, Customer shall provide one or more Loan(s) to Market Maker of the Tokens (the "***Loaned Assets***") pursuant to and with additional terms as set forth in a Term Sheet in substantially the same form as attached hereto as <u>Exhibit A</u> ("***Term Sheet***").

**(b) Interest.** The Loan(s) shall bear an interest rate as set forth in the applicable Term Sheet, accrued and payable on the date set forth in the applicable Term Sheet (the "***Maturity Date***").

**(c) Loan Procedure.** A Loan will commence upon the date funds are received by Market Maker, and in no case later than the date that is the later of: (i) the date that is 5 business days from the Effective Date; and (ii) the date on which the Tokens are listed for trading on any Applicable Exchange.

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463A5801

**(d) Loan Repayment Procedure.** Unless otherwise specified in Section 4 below, upon the Maturity Date Market Maker shall repay the entirety of the applicable Loan and all accrued and unpaid interest to Customer by 15th December 2023, directly to a wallet address, as applicable, designated by Customer.

**(e) Termination of Loan.**

The applicable Loan will terminate upon the earlier of:

      (i)      the Maturity Date;

      (ii)      the occurrence of an Event of Default as defined in Section 2(f) if Customer elects to terminate a Loan.

In the event of a termination of any Loan, any Loaned Assets shall be redelivered immediately and any accrued and unpaid interest as well as any fees owed shall be payable immediately to Customer.

**(f) Event of Default.** The following shall be events of default and cause a Loan and all accrued and unpaid interest to be immediately due and payable.

      (i)      the failure of Market Maker to return any and all Loaned Assets upon termination of any Loan; *provided*, *however*, that Market Maker shall have one (1) business day to cure such default;

      (ii)      a material default by Market Maker in the performance of any other provision of this Agreement, including without limitation a failure by Market Maker to abide by its obligations in Section 1 of this Agreement and Market Maker's failure to cure such material default within five (5) business days;

(iii)      any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings.

(iv)      Market Maker becomes subject to any investigation by any governmental or regulatory authority that questions the propriety or legality of Market Maker's activities.

(v) Market Maker is suspended from market making activities on any Applicable Exchange.

(vi) Market Maker becomes involved in any matter which potentially damaging to the high reputation of Customer.

(vi).      Customer considers, in its sole discretion, that the continued provision of the services would result in a breach of applicable law and regulation, including, but not limited to, any rules or regulations imposed by any operators of any of the Applicable Exchanges; or

(vii) A change in applicable law and regulation has occurred that requires or the Customer reasonably determines that it or Market Maker must obtain appropriate authorization with a regulatory or governmental authority in order to continue providing the services.

**Section 3. Monthly Fee**

The Market Maker shall receive a monthly fee of $100,000 during the duration of this agreement.

**Section 4. TERM, TERMINATION & REMEDIES**

**(a) Term & Voluntary Termination.** This Agreement will commence on the Effective Date and terminate 24 months thereafter (the "***Term***"). Either Party may terminate this Agreement upon thirty (30) days written notice to the other Party, however, unless there is an Event of Default or a termination of a Loan pursuant to Section [5(c)] below, such Loan shall continue until the Maturity Date or otherwise pursuant to the terms herein.

**(b) Termination.**

      (i)      Customer may terminate this Agreement for cause and without providing any prior notice upon the following:

      a.  Market Maker materially breaches any of the terms herein, following the receipt of notice and a two-week cure period.

      b.  Market Maker materially breaches Section 6 hereof.

      (ii)     Market Maker may terminate this Agreement for cause and without providing notice upon any of the following:

      a.  Customer fails to extend a loan in a timely manner for the tokens specified in the appropriate schedule.

      b.  Customer materially breaches Section 6 hereof.

**(c) Certain Remedies.** Upon the failure of Market Maker to meet its quote obligations as set forth herein for two consecutive calendar weeks, Customer may take any or all of the following actions) terminate the applicable Loan early by providing notice to Market Maker no later than seven (7) days after Market Maker's failure to perform. Upon receipt of such an early termination notification, Market Maker shall have until the end of the second business day after the notification to repay such Loan and any accrued and unpaid interest;

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463A5801

      (i)        terminate this Agreement upon written notice.

The remedies listed herein are not exclusive and do not preempt the use of any other remedy available at equity or at law, unless otherwise waived herein.

## Section 5. CONFIDENTIALITY

**a) Use of Confidential Information.** The Parties may, from time to time, disclose Confidential Information to one another. Accordingly, each Party agrees as the recipient (the "***Receiving Party***") to keep strictly confidential all Confidential Information provided by the other party (the "***Disclosing Party***"), whether or not such information was specifically labeled or stated to be confidential, secret or otherwise similarly designated. The Receiving Party further agrees to use the Confidential Information of the Disclosing Party solely for the purposes of fulfilling its obligations under this Agreement. The Receiving Party may not use for its own benefit or otherwise disclose any of the Confidential Information of the Disclosing Party or for any other purpose.

**(b) Definition of Confidential Information.** "***Confidential Information***" means, subject to Section 6(a), information in any form, oral, graphic, written, electronic, machine-readable or hard copy consisting of (i) any non-public information provided by the Disclosing Party, including but not limited to, all of its inventions, designs, data, source and object code, program interfaces, know-how, trade secrets, techniques, ideas, discoveries, marketing and business plans, pricing, profit margins, and/or similar information or (ii) any information which the Disclosing Party identifies as confidential information or the Receiving Party should understand from the context of the disclosure, to be confidential information. Confidential Information also includes this Agreement and the fact of its existence.

**(c) Scope.** The obligations of this Section 6, including the restrictions on disclosure and use, shall not apply with respect to any Confidential Information received by Customer to the extent Customer determines in good faith that it is necessary or advisable to disclose such Confidential

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463AF801

Information pursuant to a governmental or regulatory process or the requirements of any Applicable Exchange.

**(d) Time Limitations.** The provisions of this Section 6 will remain in force and effect for one year after the termination of this Agreement; *provided* that the protections of subsection (a) above shall apply to any Confidential Information that constitutes a trade secret of one of the Parties for so long as such Confidential Information remains a trade secret.

## Section 6. REPRESENTATIONS AND WARRANTIES

### a) Mutual Representations & Warranties

Each Party represents, warrants and covenants to the other Party that:

(i)     it has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder, including all required licenses and approvals as may be necessary;

(ii)     it has duly executed and delivered this Agreement; and

(iii)     this Agreement constitutes a valid and legally binding obligation of such Party, enforceable in accordance with its terms.

### (b) Market Maker Representations and Warranties

Market Maker represents, warrants and covenants to Customer that:

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463A5801

(i)     Market Maker will perform all its activities in a workmanlike manner and will use commercially reasonable efforts to provide the Services and Market Maker will comply with laws applicable to its business conduct; however, Market Maker provides no warranty as to the ultimate performance of the price of the Tokens and makes no representation that the Tokens will or will not achieve certain volume targets, nor does Market Maker make any promise or guarantee that it can get or keep the Tokens listed on any exchange or platform.

(ii)     Market Maker will not engage in any actions taken by a market participant or a person acting in concert with a market participant which are intended to (A) deceive or mislead other market participants; (B) artificially control or manipulate the price or trading volume of the Tokens or trading assets; (C) aid, abet, enable, finance, support, or endorse any of foregoing activity (such activity, "***Market Manipulation***"). Market Manipulation specifically includes, without limitation, front running, wash trading, spoofing, layering, churning and quote stuffing, but does not include customary market-making activities.

(iii)     Market Maker will comply, and Market Maker's affiliates and any persons acting on Market Maker's or Market Maker's affiliates' behalf will comply, at all times with all laws, statutes and regulations relating to anti-money laundering, countering the financing of terrorism, sanctions, anti-bribery and anti-corruption under all laws applicable to it or them (as the case may be).

**(c) Customer Representations and Warranties**. Customer represents and warrants that it has used its best efforts to conduct a legal analysis of the Tokens and that it has determined and that the Tokens do not constitute securities and in all respects the Tokens are being purchased for their utility on the applicable network protocol.

**Section 7. LIMITATION ON LIABILITY**

Customer agrees and acknowledges that Market Maker is not responsible for the ultimate performance of the Tokens on the market. The parties agree not to hold each other responsible for any price fluctuations or price depreciation of the Tokens during the Term of this Agreement, other than such fluctuations or depreciation caused by the gross negligence, willful misconduct or fraud of Market Maker. The parties also agree to not hold each other responsible in the event that the Tokens are delisted from any exchange or platform, other than due to the gross negligence, willful misconduct or fraud of Market Maker.

While Market Maker will use commercially reasonable efforts to vet any such online trading platform for adequate security, the parties agree to not hold each other responsible in the event such trading platform experiences a loss of funds that is outside of such party's control (including but not limited to a hacking incident or security breach) other than due to the gross negligence, willful misconduct or fraud of Market Maker for any damage in excess of the outstanding amount of the applicable Loan and any accrued and unpaid interest. In the event any sum of Customer's funds are lost due to an insolvency issue at any such online trading platform, which insolvency issue occurred through no fault of Market Maker, which shall be deemed to occur wherein such online trading platform will not return funds within thirty (30) days of a request made in writing by Market Maker, Market Maker will have the right to transfer to Customer any claim or portion of a claim it has against such trading platform as such claim relates to Customer's funds, but will not be relieved of its obligation to repay the Loan and Interest. Market Maker will execute any required paperwork to facilitate such transfer; after such transfer Market Maker will cooperate fully with Customer to sign any additional documents or provide any requested information to facilitate Customer's claim.

Both parties waive special, indirect, incidental, punitive and consequential damages and lost profits.

## Section 8. INDEMNIFICATION

Except to the extent that any liability, loss, penalty or damage is caused by gross negligence, willful misconduct or fraud or material breach of this Agreement on the part of Market Maker, Customer will defend, indemnify and hold harmless Market Maker and its affiliates (and each of their employees, shareholders, directors and representatives) for any penalty, claim or loss to the extent any such penalty, loss or claim that arises based on a final determination of a court of competent jurisdiction finding the Tokens to be a financial instrument that required registration, including but not limited to a security, in an applicable jurisdiction, or otherwise that the Tokens or the activities of Customer are unlawful under applicable law.

## Section 9. ARBITRATION

Any dispute, controversy or claim arising out of or relating to this contract, or the breach termination or invalidity thereof, shall be settled by arbitration administered by Judicial Arbitration and Mediation Services, Inc. under its commercial arbitration rules. the number of arbitrators shall be one. The place of arbitration shall be UK. Judgment on the award rendered by the arbitrator

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463AF801

may be entered in any court having jurisdiction thereof. This Section 10 is subject to Section 17 below.  However, either party may apply to any court of applicable jurisdiction for equitable or injunctive relief.


## Section 10. GOVERNING LAW


This Agreement will be governed by and construed and interpreted in accordance with the laws of BVI, without giving effect to choice of law provisions. Each party waives any right it may have to assert the doctrine of *forum non conveniens*, to assert that it is not subject to the jurisdiction of such arbitration or courts or to object to venue to the extent any proceeding is brought in accordance herewith.


## Section 11. ENTIRE AGREEMENT


This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the subject matter hereof, with the exception of any agreement signed contemporaneous hereto. This Agreement, including all schedules and attachments hereto, sets forth the entire agreement between the parties. It may not be changed, altered, modified or amended except in a writing signed by both parties.


## Section 12. NON-WAIVER


The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances will not be construed as a waiver or relinquishment of such provision or right.

## Section 13. ASSIGNMENT/NON-ASSIGNMENT


Neither Party will assign this Agreement, in whole or in part, without the prior written consent of the other Party. This Agreement will inure to the benefit of, and be binding upon the Parties hereto, together with their respective legal representatives, successors, and assigns, as permitted herein.

DocuSign Envelope ID: 14759C7A-3250-4687-A385-1BA1463A5801

## Section 14. SEVERABILITY

If any paragraph, term or provision of this Agreement will be held or determined to be unenforceable, the balance of this Agreement will nevertheless continue in full force and effect unaffected by such holding or determination to the fullest extent permitted by law as though such paragraph, term or provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

## Section 15. NOTICE

All notices hereunder will be in writing. Notices may be delivered by email to Market Maker at info@alameda-research.com, and to Customer at apryl.krakovsky@otoy.com Either party may designate a new address, for purposes of this Agreement, by notice to the other party in accordance with this paragraph.

## Section 16. CAPTIONS & HEADINGS

The section captions and headings are merely for ease of reference and will not to be read into the meaning of the covenants hereunder. This Agreement is the product of arm's length negotiation between the Parties and as such may not be resolved against the drafter.

## Section 17. ATTORNEY'S FEES

If any litigation or arbitration is necessary to enforce the terms of this Agreement, the prevailing party will be entitled to have their reasonable outside attorney fees paid by the other party.

## Section 18. SIGNATURES & COUNTERPARTS

PDF email and electronic signatures to this Agreement will be deemed as originals. This Agreement may be executed in counterparts, which when taken together will be deemed a single complete, fully executed document.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have set their signatures hereto as of the Effective Date.

**Alameda Research**

By: _____
DocuSigned by:
*Caroline Ellison*
198B1A7CC5A74E7...

Name: Caroline Ellison

Title: Co-CEO

**OTOY International, SEZC**

By: _____
DocuSigned by:
*Jules Urbach*
92A48A136427484...

Name: Jules Urbach

Title: CEO

**SCHEDULE A**

**Applicable Exchanges**

RNDR/USD RNDR USDT on Gemini, Coinbase, Binance, Huobi, FTX, and all other major exchanges where the Tokens may become listed or which the parties may mutually agree to add

Customer may remove any Applicable Exchange from the list at any time upon notice to Market Maker.

**SCHEDULE B**

**Token loan**

This schedule dated 15th December 2021 between Alameda Research ("Borrower") and OTOY International, SEZC ("Lender") incorporates all of the terms of the Market Making Agreement between Lender and Borrower. By signing this Term Sheet, you agree to the following specific terms:

Borrowed asset: RNDR

Amount of borrowed asset: 5,000,000 tokens

Borrow fee: 0% per annum

Maturity date: 15th December 2023

| OTOY International, SEZC | Alameda Research |
|---|---|
| DocuSigned by:<br>By: *Jules Urbach*<br>92A48A136427484... | DocuSigned by:<br>By: *Caroline Ellison*<br>198B1A7CC5A74E7... |
| Name: Jules Urbach | Name: Caroline Ellison |
| Title: CEO | Title: Co-CEO |

# OTOY INTERNATIONAL SEZC

# TOKEN PURCHASE AGREEMENT

This token purchase agreement (this "Agreement"), dated as of June 23, 2021 (the "Effective Date"), is entered into between Multicoin Concentrated Master Fund, LP ("**Multicoin Master Fund**") and Multicoin Venture Fund II, LP ("**Multicoin Venture Fund**" and together with Multicoin Master Fund, "**Multicoin**"), Alameda Research Ventures, LLC ("**Alameda**"), Lingham Family Trust ("**Lingham**"), The Solana Foundation ("**Solana**"), Metaverse One, LP ("**Metaverse**") and Bill Lee ("**Lee**") (collectively, the "**Purchasers**") and OTOY International SEZC, an exempted Cayman Islands company with limited liability (the "Company").

WHEREAS, Company wishes to sell to Purchasers, and Purchasers wish to purchase from Company, OTOY Render tokens ("RNDR") which are utility tokens used to pay for rendering projects on a peer-to-peer network managed by OTOY, Inc. (the "Render Network") subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Token Sale Terms.** Unless otherwise expressly provided by this Agreement, Purchasers agree to the Terms of Token Sale ("Terms") attached as Attachment A. By purchasing RNDR through this Agreement, Purchasers waive all challenges, of any nature, to the effectiveness of the Terms as applied to Purchasers. Capitalized terms used but not defined herein shall have the meaning given to them in the Terms.

2.    **Purchase and Sale of RNDR.** Subject to the terms and conditions set forth herein, Company shall sell and deliver RNDR to Purchasers, and Purchasers shall purchase RNDR from Company as follows:

(a) $30,950,000 in aggregate with Multicoin Master Fund, Multicoin Venture Fund, Alameda, Lingham, Solana, Metaverse and Lee each purchasing $16,750,000, $5,000,000, $7,250,000, $1,000,000, $250,000, $200,000 and $500,000, respectively (the "**Purchase Amount**")

(b) The portion of the Purchase Amount due from Multicoin Master Fund, Alameda, Lingham, Solana, Metaverse and Lee shall be due in five separate tranches based upon the achievement of certain milestones at the price per token set forth as follows:

(i)   35,681,250 RNDR for $0.24 per token upon full execution of this Agreement ("**Closing**")

1

(ii)  18,535,714 RNDR for $0.28 per token due on the date at which for the trailing three-month period the Render Network processes 10 times the ObH per month that is processed in May 2021

(iii)  17,300,000 RNDR for $0.30 per token due on the date at which the economics of RNDR have been approved by Multicoin (targeted for three months after the Effective Date and in no event later than six months after the Effective Date) ("**Tranche 3**")

(iv)  10,009,286 RNDR for $0.35 per token due on the date at which for the trailing three-month period the Render Network processes 25 times the ObH per month that is processed in May 2021

(v)  8,758,125 RNDR for $0.40 per token due on the date at which both (i) Tranche 3 has occurred and (ii) RNDR is listed on Binance or Coinbase

(c)  The portion of the Purchase Amount due from Multicoin Venture Fund shall be due in five separate tranches based upon the achievement of certain milestones at the price per token set forth as follows:

(i)  8,088,235 RNDR for $0.204 per token due at Closing

(ii)  4,201,681 RNDR for $0.238 per token due on the date at which for the trailing three-month period the Render Network processes 10 times the ObH per month that is processed in May 2021

(iii)  3,921,569 RNDR for $0.255 per token due on the date at which the economics of RNDR have been approved by Multicoin (targeted for three months after the Effective Date and in no event later than six months after the Effective Date) ("**Tranche 3**")

(iv)  2,268,908 RNDR for $0.298 per token due on the date at which for the trailing three-month period the Render Network processes 25 times the ObH per month that is processed in May 2021

(v)  1,985,294 Tokens for $0.34 per token due on the date at which both (i) Tranche 3 has occurred and (ii) RNDR is listed on Binance or Coinbase

(d)  Upon the fourth anniversary of the Closing, in the event that any of the foregoing milestones have not been achieved, the Purchasers will forfeit their rights to purchase tokens due upon the achievement of such milestones.

(e)  Purchasers may elect to exercise a tranche prior to the completion of such tranche at any time during the course of this Agreement at a purchase price equal to the respective price of such tranche as set forth in Sections 2(b) and 2(c).

(f)  If at the time of completion of any of these milestones, the Market Price is below the price associated with that milestone, the Company shall elect either (i) that the Purchasers' obligation to purchase the applicable tranche shall be suspended and postponed until such time, if ever, as the Market Price has equaled or exceeded the price associated with

the applicable milestone for a period of thirty consecutive days or (ii) the Purchasers shall instead purchase the full tranche from Company at the prevailing Market Price. For example, if Company elects (ii) and the Market Price is $0.20 when the milestone is met, the Purchasers would purchase the same number of tokens to be purchased in that tranche, but at $0.20 per token instead of the contractual price. This structure limits the maximum number of RNDR tokens that Company will have to sell.

(g) "**Market Price**" is equal to the ten-day rolling average of the market price per token as reported by CoinGecko at 0:00 UTC on the date that each foregoing milestone is acheived.

(h) "**ObH**" means OctaneBench Hours, the number of hours of a unit of work, OctaneBench, created by the Company to define compute power provided by any combination of graphics cards into a single score.

3.    **Token Structure.**

(a)    **Lock Up and Vesting**.

(i)    Tokens purchased or to be purchased pursuant to this agreement by Multicoin Master Fund, Alameda, Lingham, Solana, Metaverse and Lee shall begin vesting six months from the date of Closing, and the remaining tokens shall vest and cease to be subject to the Lock-up Provision in equal portions of 1/12 of the tokens each month thereafter, such that all tokens shall be fully vested 18 months from the date of Closing.

(ii)    Tokens purchased or to be purchased pursuant to this agreement by Multicoin Venture Fund shall begin vesting 12 months from the date of Closing, and the remaining tokens shall vest and cease to be subject to the Lock-up Provision in equal portions of 1/12 of the tokens each month thereafter such that all tokens shall be fully vested 24 months from the date of Closing.

(iii) "*Lock-up Provision*" means the general prohibition on the Purchaser's ability to sell, transfer, spend or exchange the tokens until such tokens are vested as provided herein. The Company may waive in writing the Lock-up Provision in its sole discretion.  Staking Income Tokens received and owned by Purchasers shall not be subject to the Lock-up Provision. For all tokens subject to the Lock-up Provision, Purchasers agree not to do or permit anything that would have the effect of circumventing the restriction, whether by way of any sale, option, agreement to sell, borrowing against the purchased RNDR, authorizing or permitting any lien or encumbrance on the purchased RNDR, use of any financial or derivative, instrument or technique of any kind to mitigate risk of holding the purchased RNDR or otherwise.

(b)    **Token Staking**. In the event that the Render Network offers staking rewards, both vested and unvested tokens for which the Purchasers have paid the applicable tranche Purchase Amount may be staked (the "**Staked Tokens**"), and the Staked Tokens shall receive additional tokens for the duration that the Staked Tokens are staked in an amount and at a frequency to be determined at the discretion of the Company (the "**Staking Income Tokens**"). Staking Income Tokens shall be immediately vested and not subject to the Lock-up Provision,

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5535A54B508

and any Token may be a Staked Token, including those subject to the Lock-up Provision or purchased pursuant to this agreement.

## 2.   **RNDR Purchase and Delivery Terms and Conditions.**

(a)     On signature hereof, Purchasers shall send the Purchase Price due at Closing by bank transfer to a Company bank account that Company provides directly to Purchasers.

(b)     After confirming receipt of the Purchase Price, Company shall deliver the purchased RNDR to a wallet designated by Purchasers.

(c)     The same process will apply to each further tranche when the tranche is to be purchased pursuant to the terms of this Agreement.

(d)     RNDR delivered pursuant to this Agreement will not be transferable for up to 21 calendar days after delivery.

(e)     RNDR delivered pursuant to this Agreement will be delivered by Company from the Cayman Islands. As such, Purchasers acknowledges that title to, and risk of loss of, RNDR passes from Company to Purchasers in the Cayman Islands.

*(Signature Page Follows)*

4

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

IN WITNESS WHEREOF, the undersigned have caused this agreement to be duly executed and delivered as of the Effective Date.

**THE COMPANY:**

**OTOY INTERNATIONAL SEZC**

*Julian Urbach*
Julian Urbach (Jun 23, 2021 17:28 PDT)

By: _____
    Julian Urbach
Title:
    CEO

**THE PURCHASERS:**

**MULTICOIN CONCENTRATED MASTER FUND, LP**

By: Multicoin Capital Fund GP I, LLC,
    its general partner

    By: Multicoin Capital GP, LLC,
        its managing member

DocuSigned by:

PYAHM SAMAN
A8026F34B9274E3...

By:     Pyahm Samani
Title:  Manager

**MULTICOIN VENTURE FUND II, LP**

By: Multicoin Venture Fund II GP, LLC,
    its general partner

    By: Multicoin Capital GP, LLC,
        its managing member

DocuSigned by:

PYAHM SAMAN
A8026F34B9274E3

By:     Pyahm Samani
Title:  Manager

**ALAMEDA RESEARCH VENTURES, LLC**

By:    Samuel Bankman-Fried
Title:  Chief Executive Officer

**BILL LEE**

By:    Bill Lee
Title:  Individual

**METAVERSE ONE, LP**

By:    Andrew Steinwold
Title:  Managing Partner

**THE SOLANA FOUNDATION**

By:    Patrick von Felten
Title:  Director

**LINGHAM FAMILY TRUST**

By:    Vinodan Lingham
Title:  Trustee

## ATTACHMENT A

### OTOY INTERNATIONAL SEZC

### TERMS OF TOKEN SALE

**OTOY INTERNATIONAL SEZC TERMS OF TOKEN SALE**

PLEASE READ THESE TERMS OF TOKEN SALE CAREFULLY. NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER, WHICH, IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THESE TERMS OF SALE, DO NOT PURCHASE TOKENS.

Your purchase of OTOY Render Tokens ("**RNDR**") from OTOY International SEZC ("**Company**," "**we**," or "**us**") is subject to these Terms of Sale ("**Terms**"). Each of you and Company is a "**Party**," and together the "**Parties**."

By purchasing RNDR from us, you will be bound by these Terms and all terms incorporated by reference. If you have any questions regarding these Terms, please contact us at info@rendertoken.com.

You and Company agree as follows:

**1. Purpose and Use of RNDR**

(a) Company has developed an open source, peer-to-peer ecosystem for GPU-based rendering and streaming services and related functionality (the "**RNDR Network**"), as described further in **Exhibit A**.

(b) RNDR are blockchain-based tokens designed and intended for users of the RNDR Network to obtain various rendering and streaming services, proof-of-render work, and related functionality from Company and other RNDR Network users (collectively, the "**Token Utility**"). Important additional details regarding Token Utility are provided in **Exhibit A**.

(c) Purchase, ownership, receipt or possession of RNDR carries no rights, express or implied, other than the right to use RNDR in connection with Token Utility. You understand and accept that RNDR do not represent or confer any ownership right or stake, share or security or equivalent rights, or any right to receive future revenue shares, intellectual property rights or any other form of participation in or relating to Company and its corporate affiliates, including the governance of Company and its corporate affiliates, subject to limitations and conditions in these Terms. RNDR are not intended to be a digital currency, security, commodity or any other kind of financial instrument, and accordingly, these Terms do not constitute any invitation (to the public in the Cayman Islands or otherwise) to subscribe for any securities.

## 2. Eligibility

In order to be eligible to participate in the Token Sale, you must:

(a) Be at least 18 years of age;

(b) Comply with all the terms and conditions set forth in these Terms;

(c) Complete the Registration process, as described in more detail in **Exhibit B**. The Registration process is mandatory and requires you to (i) provide all information we request during the Registration process ("**Registration Information**") and (ii) have an ERC20-compatible Ethereum wallet (a "**Purchasers Wallet**");

(d) Receive a confirmation email from us that, based on our review of your Registration Information, you have been approved to purchase RNDR in the Token Sale; and

(e) Pay the Purchase Price.

## 3. Scope of Terms

Unless otherwise stated herein, these Terms govern only your purchase of RNDR from us. Company will have no responsibility for the use of RNDR after RNDR are sold.

## 4. Cancellation; Refusal of Purchase Requests

Your purchase of RNDR from us is final, and there are no refunds or cancellations except as may be required by applicable law or regulation. We reserve the right to refuse or cancel RNDR purchase requests at any time in our sole discretion.

## 5. Procedures and Specifications

Important information about the procedures and material specifications applicable to your purchase is provided in **Exhibit B**. By purchasing RNDR, you acknowledge that you have read and understand **Exhibit B**.

## 6. Acknowledgment and Assumption of Risks

You acknowledge and agree that there are risks associated with purchasing RNDR, owning RNDR, and using RNDR in connection with Token Utility, as disclosed and explained in **Exhibit C**. If you have any questions regarding these risks, please contact us at info@rendertoken.com. BY PURCHASING RNDR, YOU EXPRESSLY ACKNOWLEDGE AND ASSUME THESE RISKS.

## 7. Security

You will implement and be responsible for implementing reasonable measures for securing your Purchasers Wallet and any other wallet or vault you use to hold RNDR you purchase from us, including any requisite private keys or other credentials necessary to access such Purchasers Wallet or other wallet or vault. Notwithstanding any other provision of these Terms, we will not be responsible or liable for any damages, losses, costs, penalties, fines or expenses arising out of

or relating to (i) your failure to implement reasonable measures to secure your Purchasers Wallet or any other wallet or vault you use to hold RNDR or the relevant access credentials, (ii) the loss of, tampering with, circumventing or unauthorized use of any of the access credentials to your Purchasers Wallet or any other wallet or vault you use to hold RNDR, (iii) any security breach affecting the security of your Purchasers Wallet or any other wallet or vault you use to hold RNDR or (iv) the loss of RNDR from your Purchasers Wallet or any other wallet or vault you use to hold RNDR.

## 8. Registration Information; Privacy Policy

Please refer to our Token Sale Privacy Policy at http://www.rendertoken.com/privacypolicy.html for information about how we collect, use and disclose your Registration Information and other information collected through www.rendertoken.com.

## 9. Taxes

Any amounts that you pay for RNDR are exclusive of all applicable taxes. You are responsible for determining what, if any, taxes apply to your purchase of RNDR, including, for example, sales, use, value added, and similar taxes. It is your responsibility to withhold, collect, report and remit the correct taxes to the appropriate tax authorities. We are not responsible for withholding, collecting, reporting, or remitting any sales, use, value added, or similar tax arising from your purchase of RNDR.

## 10. Representations and Warranties

You represent and warrant that:

(a) You have a sufficient technical understanding of cryptographic tokens (including RNDR and Ether), Ethereum-based protocols, distributed networks (including the RNDR Network) token storage mechanisms (including your Purchasers Wallet), and blockchain technology in general to understand these Terms and to appreciate the risks and implications of purchasing RNDR;

(b) You have read and understand the terms and conditions of these Terms (including all exhibits which are part of these Terms);

(c) You have obtained sufficient information about RNDR to make an informed decision to purchase RNDR;

(d) You understand, acknowledge and assume the restrictions and risks associated with the purchase, holding and use of RNDR as set forth herein, including, but not limited to, the risks explained and disclosed in Section 6 and **Exhibit C**;

(e) You understand that RNDR are intended to be used only in connection with Token Utility, and confer no rights of any form with respect to Company or its corporate affiliates, including, but not limited to, any ownership, voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other financial or legal rights;

(f) You are purchasing RNDR solely for use in connection with Token Utility and are not purchasing RNDR for any other purposes, including, but not limited to, any investment,

speculative or other financial purposes;

(g)  You understand and acknowledge that the Company is not registered with or licensed by any financial regulatory authority in the Cayman Islands or elsewhere. Accordingly, no Cayman Islands or other financial regulatory authority has passed upon the contents of these Terms or the merits of purchasing RNDR, nor have these Terms been filed with, or reviewed by, any Cayman Islands or other financial regulatory authority;

(h)  You understand and acknowledge that these Terms shall not be construed as an invitation (to the public in the Cayman Islands or otherwise) to subscribe for any securities, and you understand and acknowledge that no actions of, or documentation issued by the Company, shall be construed as such;

(i)  All Registration Information you have provided is complete and accurate;

(j)  You are at least 18 years of age;

(k)  Your purchase of RNDR complies with applicable laws and regulations in your jurisdiction, including, but not limited to, (i) legal capacity and any other applicable legal requirements in your jurisdiction for purchasing RNDR, using RNDR, and entering into contracts with us, (ii) any foreign exchange or regulatory or import/export restrictions applicable to such purchase, and (iii) any governmental or other consents that may need to be obtained;

(l)  You hereby certify that you are not (i) a citizen or resident of a geographic area in which purchase, holding or use of RNDR is prohibited by applicable law, decree, regulation, treaty, or administrative act, (ii) a citizen or resident of, or located in, a geographic area that is subject to U.S. or other applicable sanctions or embargoes, or (iii) an individual, or an individual employed by or associated with an entity, identified on the U.S. Department of Commerce's Denied Persons or Entity List, the U.S. Department of Treasury's Specially Designated Nationals List, the U.S. Department of State's Debarred Parties List or other applicable sanctions lists. You hereby represent and agree that if your country of residence or other circumstances change such that the above representations are no longer accurate, you will immediately notify Company and cease using RNDR. You agree that you will not knowingly sell or otherwise transfer RNDR to a party subject to U.S. or other applicable sanctions;

(m)  You are not resident or domiciled in the People's Republic of China, New York State or purchasing RNDR from a location in the People's Republic of China, or New York State;

(n)  If you are purchasing RNDR on behalf of any entity, (i) you are authorized to accept these Terms and to act on such entity's behalf, (ii) such entity will be responsible for breach of these Terms by you or any other employee or agent of such entity (references to "you" in the Terms refer to you and such entity, jointly), and (iii) such entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization;

(o)  You will not use RNDR or the RNDR Network in connection with any activity that violates applicable laws in any relevant jurisdiction, including, but not limited to, use of RNDR or the RNDR Network in connection with transactions that violate U.S. federal or state securities or commodity laws;

(p)  You will at all times maintain control of your Purchasers Wallet, and you will not

share or disclose the account credentials associated with your Purchasers Wallet with any other party. If you transfer RNDR from your Purchasers Wallet into another wallet or vault, youwill likewise at all times maintain control of such other wallet or vault, and you will not share or disclose the account credentials associated with such other wallet or vault with any other party;

(q)  You will comply with any applicable tax obligations in your jurisdiction arising from yourpurchase of RNDR; and

(r)  You understand and acknowledge that title to, and risk of loss of, RNDR you purchase from Company passes from Company to you in the Cayman Islands.

## 11. Indemnification

(a) To the fullest extent permitted by applicable law, you will indemnify, defend and hold harmless Company and our respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the "**Company Parties**") from and against all claims, demands, actions, damages, losses, costs and expenses (including attorneys' fees) that arise from orrelate to: (i) your purchase or use of RNDR, (ii) your responsibilities or obligations underthese Terms, (iii) any breach by you of these Terms, or (iv) any infringement or violationby you of any rights of, or laws or regulations applicable to, any other person or entity.

(b) Company reserves the right to exercise sole control over the defense, at your expense, of any claim subject to indemnification under Section 11(a). This indemnity is in addition to, and not in lieu of, any other indemnities set forth in a written agreement between youand Company.

## 12. Disclaimers

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE SPECIFIED IN A WRITING BY US, (A) RNDR ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, AND WE EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES AS TO RNDR, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT; (B) WE DO NOT REPRESENT OR WARRANT THAT RNDR ARE RELIABLE, CURRENT OR ERROR-FREE, MEET YOUR REQUIREMENTS, OR THAT DEFECTS IN RNDR WILL BE CORRECTED; AND (C) WE CANNOT AND DO NOT REPRESENT OR WARRANT THAT RNDR OR THE DELIVERY MECHANISM FOR RNDR ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

Some jurisdictions do not allow the exclusion of certain warranties or disclaimer of implied terms in contracts with consumers, so some or all of the exclusions of warranties and disclaimersin this Section 12 may not apply to you.

## 13. Limitation of Liability

(A)  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: (I) IN NO EVENT WILL COMPANY OR ANY OF THE COMPANY PARTIES BE LIABLE FOR LOSS OF PROFITS OR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

OR OTHER LOSS OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, WHERE RELATED TO LOSS OF REVENUE, INCOME OR PROFITS,LOSS OF USE OR DATA, OR LOSS FOR BUSINESS INTERRUPTION) ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE OR USE OF RNDR OR OTHERWISE RELATED TO THESE TERMS, REGARDLESS OF THE FORM OR CAUSE OF ACTION, WHETHER BASED IN CONTRACT, TORT, OR ANY OTHERLEGAL OR EQUITABLE THEORY (EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH LOSS WERE FORESEEABLE); AND (II) IN NO EVENT WILL THE AGGREGATE LIABILITY OF COMPANY AND THE COMPANY PARTIES (JOINTLY) FOR ANY LOSS ARISING OUT OF OR RELATING TO THESE TERMSOR THE USE OF OR INABILITY TO USE RNDR, EXCEED THE AMOUNT YOU PAY TO US FOR RNDR.

(B) THE LIMITATIONS SET FORTH IN SECTION 13(A) WILL NOT LIMIT OR EXCLUDE LIABILITY FOR FRAUD OR WILLFUL DEFAULT OF COMPANY.

## 14. Release

To the fullest extent permitted by applicable law, you release Company and the other Company Parties from responsibility, liability, claims, demands and damages (actual and consequential) of every kind and nature, known and unknown (including, but not limited to, claims of negligence), arising out of or related to disputes between users and the acts or omissions of third parties. **You expressly waive any rights you may have under California Civil Code § 1542 as well as any other statute or common law principles that would otherwise limit the coverage of this release (including similar laws in other applicable jurisdictions) to include only those claims which you may know or suspect to exist in your favor at the time of agreeing to this release.**

## 15. Dispute Resolution; Arbitration

PLEASE READ THE FOLLOWING SECTION CAREFULLY BECAUSE IT CONTAINS ADDITIONAL PROVISIONS APPLICABLE ONLY TO INDIVIDUALS RESIDENT OR DOMICILED IN THE UNITED STATES. IF YOU ARE RESIDENT OR DOMICILED IN THE UNITED STATES, THIS SECTION REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH COMPANY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US. IF YOU ARE RESIDENT OR DOMICILED OUTSIDETHE UNITED STATES, THIS SECTION DOES NOT APPLY TO YOU AT ALL AND FORMS NO PART OF OUR AGREEMENT WITH YOU.

(a) ***Binding Arbitration***. Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "**Disputes**") in which either Party seeks injunctiveor other equitable relief for the alleged unlawful use of intellectual property, including, without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents, you and Company (i) waive your and Company's respective rights to have any and all Disputes arising from or related to these Terms resolved in a court, and (ii) waive your and Company's respective rights to a jury trial. Instead, you and Company will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

(b) ***No Class Arbitrations, Class Actions or Representative Actions***. Any Dispute arising

out of or related to these Terms is personal to you and Company and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

(c)  **Federal Arbitration Act**. These Terms affect interstate commerce and the enforceability of this Section 15 will be both substantively and procedurally governed by and construed and enforced in accordance with the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "**FAA**"), to the maximum extent permitted by applicable law.

(d)  **Notice; Informal Dispute Resolution.** Each Party will notify the other Party in writing of any Dispute within 30 days of the date it arises, so that the Parties can attempt in good faith to resolve the Dispute informally. Notice to Company shall be sent by e-mail to Company at info@rendertoken.com. We may provide notice to you via email to the email address you provide in connection with Registration. Your notice must include (i) your name, postal address, email address and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that you are seeking. If you and Company cannot agree how to resolve the Dispute within 30 days after the date notice is received by the applicable Party, then either you or Company may, as appropriate and in accordance with this Section 15, commence an arbitration proceeding or, to the extent specifically provided for in Section 15(a), file a claim in court.

(e)  Any arbitration will occur in Los Angeles County, California. Arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Services ("**JAMS**"), which are hereby incorporated by reference. The state and federal courts located Los Angeles County, California will have exclusive jurisdiction over any appeals and the enforcement of an arbitration award. You may also litigate a Dispute in the small claims court located in the county where you reside if the Dispute meets the requirements to be heard in small claims court.

(f) **Authority of Arbitrator.** As limited by the FAA, these Terms and the applicable JAMS rules, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by these Terms. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

(g)  **Rules of JAMS.** The rules of JAMS and additional information about JAMS are available on the JAMS website. By agreeing to be bound by these Terms, you either (i) acknowledge and agree that you have read and understand the rules of JAMS, or (ii) waive your opportunity to read the rules of JAMS and any claim that the rules of JAMS are unfair or should not apply for any reason.

(h) **Severability of Dispute Resolution; Arbitration.** If any term, clause or provision of this

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

Section 15 is held invalid or unenforceable, it will be so held to the minimum extent required by law, and all other terms, clauses and provisions of this Section 15 will remain valid and enforceable. Further, the waivers set forth in Section 15(b) are severable from the other provisions of these Terms and will remain valid and enforceable, except as prohibited by applicable law.

## 16. Governing Law and Venue

These Terms will be governed by and construed and enforced in accordance with the laws of the Cayman Islands, without regard to conflict of law rules or principles (whether of the Cayman Islands or any other jurisdiction) that would cause the application of the laws of any other jurisdiction. Any Dispute between the Parties arising out or relating to these Terms or its subject matter or formation (including non-contractual Disputes of claims) will be resolved in the courts of the Cayman Islands, except where Section 15 applies to you because you are resident or domiciled in the United States in which case any such dispute must be resolved in accordance with Section 15.

## 17. Severability

If any term, clause or provision of these Terms is held unlawful, void or unenforceable, then that term, clause or provision will be severable from these Terms and will not affect the validity or enforceability of any remaining part of that term, clause or provision, or any other term, clause or provision of these Terms.

## 18. Disruption Event

In the event of a Disruption Event, we have the right to suspend or terminate this Agreement. A "**Disruption Event**" means (i) any event or occurrence that causes a disruption in the functionality of the Ethereum blockchain, and such disruption has an adverse effect on the processing time for Ethereum blockchain transactions, (ii) any event or occurrence that causes a disruption in the functionality of the smart contracts or other software used in connection with RNDR and such disruption has an adverse effect on the implementation of the this Agreement, (iii) a change in the price of Ether of 20% or more in any 24- hour period, or (iv) any compromise of security that has or in our sole good faith determination may have an adverse impact on this Agreement.

## 19. Modification of Terms

We have the right to modify these Terms if we reasonably believe that such modifications are necessary to comply with applicable laws or regulations or to address technical or factual inaccuracies. If we make changes, we notify you and update the "Last Updated" date above. We may also provide notice to you via email to the email address you provide during Registration. The amended Terms will be effective immediately, and your continued use or holding of RNDR, shall constitute your acceptance of the modified Terms.

## 20. Miscellaneous

These Terms constitute the entire agreement between you and us relating to your purchase of RNDR from us. Our failure to exercise or enforce any right or provision of these Terms will not operate as a waiver of such right or provision. We will not be liable for any delay or failure to perform any obligation under these Terms where the delay or failure results from any cause

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

beyond our reasonable control. We may assign our rights and obligations under these Terms. Purchasing RNDR from us does not create any form of partnership, joint venture or any other similar relationship between you and us. Except as otherwise provided in herein, these Terms are intended solely for the benefit of you and us and are not intended to confer third-party beneficiary rights upon any other person or entity. You agree and acknowledge that all agreements, notices, disclosures, and other communications that we provide to you, including these Terms, may be provided in electronic form.

\*\*\*\*\*

DocuSign Envelope ID: A86F0E3F-5180-4386-AB3F-B5635A54B508

**Exhibit A**
**Description of Company, the RNDR Network, and RNDR**

### 1. Overview of Company and Affiliates

Company is an exempted company with limited liability incorporated in the Cayman Islands and is not subject to supervision or regulation by the Cayman Islands Monetary Authority. Company will have primary responsibility for administering certain aspects of ongoing development related to RNDR, Token Utility and the RNDR Network. It is anticipated that Company's affiliate, OTOY, Inc., will provide certain administrative, technical and development services to Company in connection with ongoing development related to RNDR, Token Utility and the RNDR Network.

### 2. Transactions on the RNDR Network

Company's affiliate, OTOY, Inc., has already developed a fully-functional GPU-based rendering and streaming services platform. With the integration of RNDR and blockchain technology, that existing platform is being converted into a decentralized ecosystem with a broader scope of GPU-based rendering and streaming services, proof-of-render work, and related services (the "**RNDR Network**"). Transactions using the RNDR Network with RNDR are conducted by smart contracts where a user may exchange RNDR for such services, as follows:

An end user requiring rendering, streaming, proof-of-render work or related services ("**User**") can submit a task ("**Task**") to the RNDR Network through the RNDR Network portal or via the Internet through a supported toolchain ("**Portal**"). Based on the complexity and amount of GPUs necessary to complete the Task, the number of RNDR is calculated and the User is quoted a price for the Task in RNDR. The RNDR and Task details are attached to a smart contract, which is sent across the blockchain network where another User ("**Renderer**") will process the Task. Once the Task is complete, the RNDR are transferred from the User to the Renderer via the smart contract.

### 3. The Render User Development Fund

Company intends to establish The Render User Development Fund for several purposes in connection with the RNDR Network ("**Development Fund**").

First, the Development Fund will function as a RNDR reserve for Users requiring large Tasks by providing a liquid depository of RNDR ("**Development RNDR**"). To facilitate large Tasks, these Development RNDR will be sold through a smart contract at a price that is pegged to the then-current market value of RNDR.

Second, as the capacity and number of the Users requesting and performing Tasks increases, it is anticipated that more Development RNDR will be released into the ecosystem in the form of incentives for the Users performing Tasks. The sale and release of Development RNDR will also serve as an inflationary measure to bring more RNDR into the RNDR Network in order to bolster supply.

Third, as a means of encouraging use of RNDR and growth of the RNDR Network, Company anticipates delivering Development RNDR as bonuses to certain Purchasers of Sale RNDR (as defined in **Exhibit B**). Company's delivery of such bonuses, if any, is at its sole discretion.

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5935A54B508

Should Company decide to deliver bonus Development RNDR to certain Purchasers of Sale RNDR, Company intends to communicate the applicable conditions and procedures for such bonuses on its website or via email.

### 4. Additional Information Regarding RNDR Network and Ongoing Development

Further details regarding the RNDR Network, the use of RNDR for Token Utility, and Company's anticipated development roadmap are described in the "RNDR Network User Manual," (the "User Manual"), which is available at: : https://rendertoken.com/assets/files/RNDR_User_Manual.pdf. Although Company intends for the RNDR Network and RNDR to function in the manner generally described above, it reserves the right to modify features, functionalities or ongoing development plans in its sole and absolute discretion. Moreover, the information provided in the User Manual is provided for illustrative and descriptive purposes only, does not form part of these Terms unless expressly incorporated herein, and is subject to modification by Company in its sole and absolute discretion.

## Exhibit B
## Procedures and Specifications

### 1. Registration Procedures

To purchase RNDR, you must have (i) completed a registration process ("**Registration**") when made available by us at https://register.rendertoken.com/ or through direct communication with you and (ii) received a confirmation email from us that, based on ourreview of the Registration Information you provide during Registration, you have been approvedto purchase RNDR in the Token Sale. We reserve the right to request additional Registration Information, and to deny or revoke approvals to purchase RNDR in the Token Sale, at our sole and absolute discretion.

Before purchasing RNDR in the Token Sale, you will be required to review, agree to, and comply with these Terms.

### 2. Purchase and Delivery of RNDR

The RNDR smart contract address will only send RNDR to, verified ERC-20 compatible Purchasers Wallets belonging to persons who have completed Registration.

Although RNDR will be delivered to Purchasers Wallets at the time of purchase, the RNDR smart contract will restrict subsequent transfers of such RNDR for up to 21 calendar days after the end of the applicable Token Sale phase.

The RNDR smart contract will be deployed by Company from the Cayman Islands. As such, you acknowledge that title to, and risk of loss of, RNDR delivered by the smart contract passes from Company to you in the Cayman Islands.

### 3. Use of Proceeds from RNDR Token Sale

There are no restrictions on how the Company may use the proceeds of your purchase. As noted above, the Whitepaper is provided for illustrative and descriptive purposes only, does not form part of these Terms unless expressly incorporated herein, and is subject to modification by Company in its sole and absolute discretion.

**Exhibit C**

**Certain Risks Relating to Purchase, Sale and Use of RNDR**

*Important Note: As noted elsewhere in these Terms, RNDR are not being designed or sold as securities or any other form of investment product. Accordingly, none of the information presented in this **Exhibit C** is intended to form the basis for any investment decision, and no specific recommendations are intended. Company expressly disclaims any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from: (i) reliance on any information contained in this **Exhibit C**, (ii) any error, omission or inaccuracy in any such information or (iii) any action resulting from such information.*

**By purchasing, holding and using RNDR, you expressly acknowledge and assume the following risks:**

*1. Risk of Losing Access to RNDR Due to Loss of Private Key(s), Custodial Error or Purchasers Error*

A private key, or a combination of private keys, is necessary to control and dispose of RNDR stored in your Purchasers Wallet or other digital wallet or vault. Accordingly, loss of requisite private key(s) associated with your Purchasers Wallet or other digital wallet or vault storing RNDR will result in loss of such RNDR. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of your Purchasers Wallet or other digital wallet or vault service you use, may be able to misappropriate your RNDR. Any errors or malfunctions caused by or otherwise related to your Purchasers Wallet or other digital wallet or vault you choose to receive and store RNDR, including your own failure to properly maintain or use such Purchasers Wallet or other digital wallet or vault, may also result in the loss of your RNDR. Additionally, your failure to follow precisely the procedures set forth in **Exhibit B** for buying and receiving RNDR may result in the loss of your RNDR.

*2. Risks Associated with the Ethereum Blockchain*

Because RNDR and the RNDR Network are based on the Ethereum blockchain, any malfunction, breakdown or abandonment of the Ethereum blockchain may have a material adverse effect on the RNDR Network or RNDR. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to RNDR and the RNDR Network, including the use of RNDR for Token Utility, by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum blockchain.

*3. Risk of Mining Attacks*

As with other decentralized cryptographic tokens based on the Ethereum blockchain, RNDR are susceptible to attacks by miners in the course of validating RNDR transactions on the Ethereum blockchain, including, but not limited, to double-spend attacks, majority mining power attacks, and selfish-mining attacks. Any successful attacks present a risk to the RNDR Network and RNDR, including, but not limited to, accurate execution and recording of transactions involving

19

RNDR.

### 4. Risk of Hacking and Security Weaknesses

Hackers or other malicious groups or organizations may attempt to interfere with the RNDR Network or RNDR in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, because the RNDR Network is based on an open-source protocol, there is a risk that a third party or a member of the Company team may intentionally or unintentionally introduce weaknesses into the core infrastructure of the RNDR Network, which could negatively affect the RNDR Network and RNDR, including RNDR's use for Token Utility.

### 5. Risks Associated with Markets for RNDR

RNDR are intended to be used solely in connection with the RNDR Network, and Company does not support or otherwise facilitate any secondary trading or external valuation of RNDR. This restricts the contemplated avenues for using RNDR, and could therefore create illiquidity risk with respect to RNDR you hold. Even if secondary trading of RNDR is facilitated by third party exchanges, such exchanges may be relatively new and subject to little or no regulatory oversight, making them more susceptible to market-related risks. Furthermore, to the extent that third parties do ascribe an external exchange value to RNDR (e.g., as denominated in a digital or fiat currency), such value may be extremely volatile and diminish to zero.

### 6. Risk of Uninsured Losses

Unlike bank accounts or accounts at some other financial institutions, RNDR are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer, such as the Federal Deposit Insurance Corporation, or private insurance arranged by us, to offer recourse to you.

### 7. Risks Associated with Uncertain Regulations and Enforcement Actions

The regulatory status of RNDR and distributed ledger technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications. It is likewise difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications, including the RNDR Network and RNDR. Regulatory actions could negatively impact the RNDR Network and RNDR in various ways, including, for purposes of illustration only, through a determination that the purchase, sale, delivery or use of RNDR constitutes unlawful activity, or that registration or licensing is required for RNDR or for some or all of the parties involved in the purchase, sale, delivery or use of RNDR. Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approvals to operate in such jurisdiction.

### 8. Risks Arising from Taxation

The tax characterization of RNDR is uncertain. You must seek your own tax advice in connection with purchasing RNDR, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

### 9. Risk of Competing Protocols

It is possible that alternative platforms could be established that utilize the same open-source code and protocol underlying the RNDR Network. The RNDR Network may compete with thesealternative platforms, which could negatively impact the adoption of the RNDR Network and RNDR, including RNDR's use for Token Utility.

### 10. Risk of Insufficient Interest in the RNDR Network or Distributed Applications

It is possible that the RNDR Network will not be used by a large number of individuals, companies andother entities or that there will be limited public interest in the creation and development of distributed protocols and decentralized applications, more generally. Such a lack of use or interest could negatively impact the development of the RNDR Network and the potential utility ofRNDR, including its use for Token Utility.

### 11. Risks Associated with the Development of the RNDR Network

Although the RNDR Network will be deployed and operational at the time of the Token Sale, it is still subject to ongoing development and may undergo significant changes over time. How other participants, including Users and Renderers will use the RNDR Network is outside of Company's control. This could create the risk that RNDR or the RNDR Network, as further developed and used, may not meet your expectations at the time of purchasing RNDR. It is also possible that the RNDR Network will experience malfunctions or otherwise fail to be adequately developed over time, which may negatively impact the RNDR Network and the potential utility of RNDR, including its use for Token Utility.

### 12. Risk of an Unfavorable Fluctuation of Ether and Other Currency Value

The Company team intends to use the proceeds from selling RNDR to contribute to the ongoing development of the RNDR Network, as described further in **Exhibits A** and **B**. The proceeds of theToken Sale will be denominated in Ether, and may, at Company's discretion, be converted into other cryptographic and fiat currencies. If the value of Ether or other currencies fluctuates unfavorably during or after the Token Sale, the Company team may not be able to contribute to ongoing development of the RNDR Network in the manner that it intended.

### 13. Risk of Dissolution of the Company

It is possible that, due to any number of reasons, including, but not limited to, an unfavorable fluctuation in the value of Ether (or other cryptographic and fiat currencies), decrease in RNDR's utility (including its use for Token Utility), the failure of commercial relationships, or intellectual property ownership challenges, the Company may dissolve. The dissolution of Company may still adversely impact the RNDR Network and the utility of RNDR, given Company's role in developing the RNDR Network and its anticipated role in contributing to the ongoing development of the RNDR Network.

### 14. Risks Arising from Lack of Governance Rights in Company

Because RNDR confer no governance rights of any kind with respect to Company, all decisions

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

involving the Company will be made by Company at its sole discretion, including, but not limited to, decisions to discontinue contributions to the RNDR Network's ongoing development or to sell or liquidate the Company. As noted above, the consequences of those decisions could adversely impact the RNDR Network and the utility of RNDR that you hold, including RNDR's use for Token Utility.

### 15. Risks Associated with New and Evolving Laws Impacting Decentralized Application Technology

The distributed ledger and decentralized application ecosystem, and by extension the RNDR Network, may be subject to a variety of federal, state and international laws and regulations, including those with respect to consumer privacy, data protection, consumer protection, content regulation, network neutrality, cyber security, intellectual property (including copyright, patent, trademark and trade secret laws), and others. These laws and regulations, and the interpretation or application of these laws and regulations, could change. In addition, new laws or regulations affecting the RNDR Network could be enacted, which could adversely impact the Company, the RNDR Network and RNDR, including RNDR's use for Token Utility.

Additionally, the users and developers of the RNDR Network, including Users and Renderers, may be subject to industry specific laws and regulations or licensing requirements. If any of these parties fails to comply with any of these licensing requirements or other applicable laws or regulations, or if such laws and regulations or licensing requirements become more stringent or are otherwise expanded, it could adversely impact the RNDR Network and RNDR, including RNDR's use for Token Utility.

### 16.     Specific Risks Relating to Value and Function of RNDR

The value of RNDR will depend on the ability of the RNDR Network to match the demand for rendering and related services with the supply of GPU processing time available. Inadequate supply may result in rendering and other services taking more time, while inadequate demand may make it difficult to obtain services, both of which may discourage participation in the RNDR Network.

The value of RNDR should depend primarily on the prevailing value of the rendering work and related services the RNDR can obtain in the RNDR Network.

Although the RNDR Network is intended to be peer-to-peer, Company and its corporate affiliates anticipate being the sole or dominant provider of rendering and related services on the RNDR Network for a certain period of time following the sale of RNDR. The inability of Company and its corporate affiliates to provide such services during that period of time is likely to diminish materially, or eliminate entirely, the value of RNDR.

The price of RNDR should fluctuate in response to competitive and market conditions affecting the general supply of and demand for rendering and related services. These conditions are beyond the control of Company or of the token holders. The value of RNDR when it is

exchanged for rendering or related services in the RNDR Network may be lower than the price at which it was purchased.

The compensation for rendering or related services in the RNDR Network will depend on the

DocuSign Envelope ID: A86F0E3E-5180-4386-AB3E-B5685A54B508

resale price for the RNDR received for such services, which may be lower than the compensation that might have been received through other arrangements.

Sales of new RNDR by the Development Fund are, among other purposes, intended to help stabilize the price of RNDR around its intrinsic value for services in the RNDR Network, but there can be no assurance that such sales will succeed in doing so. The Development Fund will discontinue sales once it exhausts its reserve of RNDR. Company does not intend to take any actions to support or limit the price of RNDR, and may purchase and sell RNDR for its own account at any price.

RNDR does not limit in any respect Company's or its corporate affiliates' power to participate in other projects, operate other networks or issue other tokens that may compete with RNDR or the RNDR Network.

No promises of future performance or value are or will be made with respect to RNDR, including no promise of inherent value, no promise of continuing payments, and no guarantee that RNDR will hold any particular value.

### 17. *Unanticipated Risks*

Cryptographic tokens such as RNDR are a new and untested technology. In addition to the risks included in this **Exhibit C**, there are other risks associated with your purchase, holding and use of RNDR, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit C.**