# EXHIBIT 4



**Scott D. Simon**
Partner
ssimon@goetzplatzer.com

<u>By Email</u>

September 18, 2025

Sullivan & Cromwell LLP
Brian D. Glueckstein
125 Broad Street
New York, NY 10004

Re:     In re FTX Trading Ltd., et al., No. 22-11068 (KBO)
        <u>Ross Rheingans-Yoo – Motion to Reconsider and Adversary Proceeding</u>

Dear Brian:

I write in response to your September 11, 2025 letter, which itself responded to my August 21, 2025 notice and motion under Bankruptcy Rule 9011 and 28 U.S.C. § 1927 ("Motion"). You said you were "baffled" by the Motion. Since the purpose of notice under Rule 9011 is to allow the moving party to reconsider its filings, allow me to rectify your bafflement and correct your numerous misunderstandings in the hope that you will reconsider.

**The Motion for Reconsideration**

The Trust claims it has "significant concerns" that Ross sits on the board of Manifold for Charity and could therefore derive compensation from the FDU Bonus. This concern is frivolous because the Trust is trying to add a term to the Bonus Memo and FDU Order that does not exist. The Bonus Memo awarded Ross $650,000 paid "to any EA-driven cause." The FDU Order directs payment of the FDU Bonus "to the Effective Altruism-driven charity identified" by Ross. Neither document says, "any EA-driven cause *provided that Ross does not sit on the cause's board of directors*." Even if Manifold for Chairty paid its directors – as stated in the Motion, it does not – the Trust cannot object to allowance of the FDU Claim on this ground.

The Trust claims it has "well-founded" concerns that the FDU Bonus will be paid into an account in Ross's name at Manifold for Charity. This concern is also frivolous. As you write, conduct under Rule 11 is assessed by what was reasonable to believe when the offending pleading was filed. The Trust filed its Motion for Reconsideration and Amended Complaint on July 24, 2025. The Trust could not have been concerned on July 24, 2025 that Ross will receive the FDU Bonus into his own hands since my conversation with Trust counsel occurred on August 8, 2025.

Furthermore, despite the Trust supposedly having "immediately investigated" Manifold for Charity, your letter betrays a fundamental misunderstanding of how it and other donor-advised funds ("DAF") operate. Cash donated to a DAF becomes the legal property of the DAF; it ceases to be property of the donor. *See* 26 U.S.C. § 4966. The IRS recognizes this transfer of property

225 Broad Hollow Road | Suite 303
Melville, NY 11747
T: 212.695.8100 / 212.593.3000
F: 212.629.4013

One Penn Plaza | Suite 3100
New York, NY 10119
T: 212.695.8100 / 212.593.3000
F: 212.629.4013

105 Eisenhower Parkway | #401
Roseland, NJ 07068
T: 201.612.4444
F: 973.226.0031

goetzplatzer.com



Brian D. Glueckstein
September 18, 2025
Page 2

rights by allowing the donor to take a charitable deduction in the year that assets are contributed to a DAF.

As a 501(c)(3), Manifold for Charity is restricted in how it can invest or direct these funds. Laws prevent the funds from being used for the private benefit of the donor or those connected to him. After funds are donated to the DAF, the role of the donor-advisor is limited to the provision of nonbinding advice as to how the assets may be invested or used for charitable purposes. The DAF provider – here, Manifold for Charity – is not required to follow such advice.

The DAF provider, however, may find it in the interest of its own mission to generally follow such advice within the constraints placed upon it as a 501(c)(3). This is because the DAF provider's mission in some part is to benefit the world through the uniquely and diversely informed choices of its donor-advisors. It is also because the DAF provider will likely attract future donations to that mission only to the extent that prospective donor-advisors believe that their opportunities to direct regranting will not be curtailed, except by the limitations inherent in any 501(c)(3).

The highest responsibility of the officers and directors of a DAF provider is to ensure that the provider only makes regrants for charitable purposes. It is officers' duty to ensure, and that of directors to oversee, that following a donor-advisor's advice does not illegally inure to private benefit. In this responsibility, the organization, its officers, and its directors are responsible to state and federal authorities under statutes against misuse of philanthropic funds.

In sum, my representations to the Court on June 25, 2025 that Ross does not seek to be paid the FDU Bonus were true when made and remain true now. My July 2, 2025 email provided wire instructions for Manifold for Charity, not Ross. There is no manifest injustice. Despite conducting a self-evidently deficient "investigation" of Manifold for Charity, the Trust now has the full picture. If you wish to rely on willful ignorance as to how DAFs work, then the Trust and its counsel do so at their peril under Rule 9011 and 28 U.S.C. § 1927.

Moving on, I disagree that Ross's directive to change the recipient from Manifold for Charity to 1Day Sooner is a "red herring." It is in fact the Motion's keystone. If the Trust is legitimately concerned about Manifold for Charity receiving the FDU Bonus, and those concerns are not put to rest by the Motion and this letter, why *wouldn't* those concerns be resolved by donating the funds to an EA charity where Ross does not sit on the board and that is not being sued by the Trust? The Court will not look kindly on the Trust's attempt to have its cake and eat it too. Either the Trust has legitimate concerns about Manifold for Charity that are resolved by donating the FDU Bonus to 1Day Sooner, or the Trust is concern trolling to deny Ross his employment compensation because the Trust did not like the Court's decision overruling the Claim Objection.



Brian D. Glueckstein
September 18, 2025
Page 3

## The Amended Complaint

You are right that a trustee does not waive the right to initiate an avoidance action against a creditor whose claim was objected to and adjudicated on other grounds. But I stand by my belief that the subsequent avoidance action must relate to a separate prepetition transfer. Stated another way, a trustee is not required to assert avoidance as a counterclaim in a claims objection proceeding. But the trustee cannot then bring an action to avoid the court's post-petition allowance of the identical claim.

You cite a single case in support of your contention that an obligation remains avoidable even if the resulting payment would occur post-petition: *Alameda Research Ltd. v. Giles*, 2024 Bankr. LEXIS 2584, at *54-56 (Bankr. D. Del. Oct. 23, 2024). The case is easily distinguishable. There, an FTX affiliate acquired a broker-dealer called Embed. The founder of Embed, Michael Giles, was paid a $55 million retention bonus on the transaction's prepetition September 30, 2022 closing date. Other Embed employees were entitled to post-closing retention payments due after the intervening bankruptcy case was filed. The Trust sought to avoid the entire transaction.

Yes, the court denied the defendants' motion to dismiss the claims to avoid the post-closing retention payments. However, the motion sought dismissal on the ground that the obligation to make the payments rested with Embed, a non-debtor. The Court held that because the source of Embed's payment was ultimately the debtor, the debtor could await final determination of the avoidance action before making the payments. Importantly, the court found that the retention payments "were made as part of the deal to acquire Embed." That is, the fraudulent nature of the *prepetition* Embed transaction allowed the debtor to seek avoidance.

Here, to the contrary, the prepetition transaction giving rise to the FDU Claim was Ross's employment. The Trust stipulated that the Trust and Ross entered into the Employment Agreement, a valid and enforceable contract. The Trust stipulated that Ross earned the FDU Bonus. The Trust stipulated that the Bonus Memo allowed Ross to designate any EA-driven cause as the beneficiary. The Trust cannot now assert that any of those prepetition events were actually or constructively fraudulent.

Your equitable subordination argument is also frivolous. You claim that through Ross's position at Latona he was an "insider" and "knew" that Sam Bankman-Fried made fraudulent charitable contributions. The argument is frivolous because the Trust pled in the Latona adversary proceeding that Ross was *not* an insider and did not control the purse strings. And critically, the Trust released Ross from any claim relating to fraudulent transfers by Latona and aiding and abetting the insiders' breach of fiduciary duty to the Trust as a result of such transfers. The Trust's release of Ross for these claims does not require a fact-intensive inquiry. As a matter of law, the



Brian D. Glueckstein
September 18, 2025
Page 4

Trust cannot use claims released in the Latona adversary proceeding as grounds for subordinating Ross's FDU Claim.

We agreed that I will not file the Motion before September 26, 2025. Having read this letter, you may wish to consult with your Delaware co-counsel and your client, both of whom will, along with you, be subject to sanctions for refusing to withdraw the Motion to Reconsider and the Amended Complaint. I suggest that further extending until October 24, 2025 the date for Ross to respond to the Motion to Reconsider, for all defendants to respond to the Amended Complaint, and before which I will not file the Rule 9011 Motion, will give you time to properly consider whether to withdraw the pleadings.

Kindly advise by Monday, September 22, 2025, whether you will stipulate to further extend these periods until October 24, 2025.

Nothing herein can or shall be construed as a waiver of Ross's rights, all of which are expressly reserved.

Very truly yours,

GOETZ PLATZER LLP

By: _____
    Scott D. Simon


cc:    Michael J. Joyce, Esq.
       Stephanie H. Wheeler, Esq.
       Adam G. Landis, Esq.