Re: *In re* FTX Trading Ltd., et al., Case No. 22-11068 (KBO) — Limited Objection to the FTX Recovery Trust's Motion to Extend Claims Objection Deadlines (D.I. 33444)

Dear Clerk of Court:

I am a pro se creditor in the above-captioned case. I write to submit my Limited Objection to the FTX Recovery Trust's Motion to Extend Claims Objection Deadlines (D.I. 33444) (the "Extension Motion").

My Limited Objection is being filed in advance of the objection deadline of November 17, 2025 at 4:00 p.m. ET, in accordance with the applicable Local Rules, and in connection with the hearing currently scheduled for November 24, 2025 at 9:30 a.m. ET on the Extension Motion.

This is my first time filing through the Court's CM/ECF system. I respectfully request that the Clerk ensure that:

1. The PDF of my Limited Objection is properly attached to and viewable;
2. The docket text reflects that it is a "Limited Objection" to the Extension Motion; and
3. The docket entry is properly linked as "related to" D.I. 33444.

If any administrative revisions or re-submissions are required to ensure that the attachment and docket entry (including the subject line and related D.I. 33444 notation) appear properly on the docket, I will promptly comply with the form preferred by the Court.

Thank you very much for your assistance.

*Hejia Zhao*

Respectfully submitted,

Dated: November 17, 2025

Hejia Zhao (pro se)
[Apt redacted], Mood Lyndhurst, 38 Lyndhurst Terrace, Central, Hong Kong
Email: hz263@cornell.edu

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>FTX TRADING LTD., et al.,<br><br>　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 22-11068 (KBO)<br>(Jointly Administered)<br><br>**Hearing Date: November 24, 2025 at 9:30 a.m. (ET)** |

# LIMITED OBJECTION OF HEJIA ZHAO TO FTX RECOVERY TRUST'S MOTION TO EXTEND CLAIMS OBJECTION DEADLINES (D.I. 33444)

1. Creditor Hejia Zhao (the "Objector") respectfully objects to the FTX Recovery Trust's Motion to Extend Deadlines to Object to Claims and Administrative Claims (D.I. 33444) (the "Extension Motion"), or, alternatively, requests the Court limit any extension to a narrowly defined and time-limited period, with mandatory transparency and reporting safeguards described below.

## I. PRELIMINARY STATEMENT

2. Under Federal Rule of Bankruptcy Procedure 9006(b), the FTX Recovery Trust (the "Trust") bears the burden to show "cause" for enlarging the claims objection deadline. In a case where more than 96% of claims by number have already been resolved, a blanket, unconditional one-year extension is disproportionate and fails to satisfy that burden.

2

3. Objector does not oppose a reasonable extension, but the requested one-year, unconditional extension would endorse a claims process that is failing creditors. The Trust's current process, particularly for creditors indefinitely marked "Disputed," functions as an opaque "black box" that has already resulted in demonstrable, de facto discrimination in violation of the Bankruptcy Code.

4. For these "Disputed" creditors, the extension inflicts three forms of prejudice. First, it causes economic prejudice: every additional month of delay deprives them of the time-value and use of their recoveries while estate-level overhead continues to grow and erode the distributable pool. Second, it causes procedural prejudice: by pushing the objection deadline out another year, the Trust can continue to treat their claims as "Disputed" without filing any Rule 3007 objection, which in turn deprives them of a concrete path to allowance, discovery, and a hearing. Third, it causes informational prejudice: the Trust's opaque "black box" process leaves them with no explanation, no cure path, and no timeline.

5. None of the requested conditions alter the Plan's distribution waterfall, priorities, or relative timing among classes. They simply ensure that creditors who have completed all pre-distribution requirements are treated consistently within their Class and are given basic visibility into why their claims remain in "Disputed" status.

6. This arbitrary process highlights a deep structural misalignment of incentives: the Trust, paid from the estate, bears no cost for delay. Furthermore, the Trust's request for a full year is an extreme outlier, unsupported by its own cited precedents from this very Court, which establish a 120- to 180-day norm for such extensions.

7. Accordingly, Objector respectfully requests the Court grant only a limited 90-day extension, conditioned on the Trust implementing essential, "structurally corrective" safeguards.

These conditions, including periodic, class-based public reporting, are necessary to re-align the Trust's incentives with its beneficiaries, provide basic procedural due process, and ensure the Plan is consummated equitably.

## II. BACKGROUND

11. On November 3, 2025, the Trust filed the Motion seeking to extend the Claims Objection Deadline (Plan § 8.1) and the Administrative Claims Objection Deadline (Plan § 3.1) from January 3, 2026, to January 4, 2027—a period exceeding one year.

12. The Trust's own Motion acknowledges that a "significant portion" of claims have already been resolved. Of the initial 682,000 claims, only approximately 25,400 claims remain under active review. The Trust has thus resolved over 96% of the claims pool by number. Despite this progress, the Trust identifies only "dozens" of complex litigations and claim objections as the primary justification for delaying the resolution of all 25,400 remaining claims. This "one-size-fits-all" delay is inefficient and profoundly unfair to creditors with simple, non-litigious claims.

## III. ARGUMENT

**A. The Trust Has Not Shown "Cause" for a One-Year Extension Under Rule 9006(b)**

13. The Trust seeks its extension under Federal Rule of Bankruptcy Procedure 9006(b), which permits the Court to enlarge a deadline "for cause shown". The determination of "cause" is an equitable one, weighing all relevant circumstances. The Trust fails this test.

14. The Trust's request is disproportionate to the facts on the record. A proper factor analysis shows "cause" is lacking for a one-year extension:

(a) Case Maturity and Progress. Only about 4% of claims by number remain. This is a mature case, not one in its early-stage.

(b) Length of Extension. The Trust seeks to move the deadline from January 3, 2026, to January 4, 2027— a full year —even though the remaining claims are a small fraction of the original pool.

(c) Prejudice to Creditors. As detailed in Section B, *infra*, the prejudice to remaining creditors is certain, quantifiable, and operates through four distinct channels: (i) the marginal cost of administrative burn, (ii) the permanent loss of funds' time-value, (iii) the compounding economic risk from prolonged uncertainty, and (iv) the structural misalignment of incentives.

15. The Trust's reliance in its Motion (Para. 17) on *In re: Cred Inc.* (Case No. 20-12836 (KBO)) for "five one-year extensions" is misleading. A mature case with 96% of claims resolved is not comparable. More importantly, the Trust's own Motion (Para. 17-18) provides the best evidence against its request by citing cases from this very Court. In *In re: First Mode Holdings, Inc.* (Case No. 24-12794 (KBO)), this Court granted a first-time extension of only 120 days. In *In re: AeroCision Parent, LLC* (Case No. 23-11032 (KBO)) and *In re: Cano Health, Inc.* (Case No. 24-10164 (KBO)), this Court granted extensions of 180 days. Objector's request for a 90-day conditional extension is therefore perfectly reasonable and consistent with this Court's own prior orders.

**B. The Extension Imposes Economic Prejudice Driven by a Structural Misalignment of Incentives**

16. The Trust's request for a one-year extension must be evaluated under Rule 9006(b)'s "cause" standard. When a party seeks such an extension in a mature case, "cause" must be shown not just in qualitative terms ("work remains") but in quantitative terms: how much incremental value is expected from the extension, and at what cost to the creditor body.

17. The Extension Motion offers no such cost-benefit analysis. It simply assumes that more time is, by default, harmless. In light of the estate's demonstrated historical burn rate, that assumption is not credible.

18. The issue is no longer whether this case is expensive in the abstract—that cost has already been incurred. The question under Rule 9006(b) is whether the marginal benefit of one more year to object to the last 4% of claims justifies the marginal cost of keeping this machinery running. At confirmation, creditors relied on projections assuming an orderly and finite wind-down, not serial one-year extensions after approximately 96% of claims by number had already been reconciled.

19. This marginal cost creates economic prejudice that operates through at least four distinct channels:

20. (a) *Administrative Burn.* By early 2025, more than $952 million in professional fees had already been approved in the FTX chapter 11 cases, with about $948 million actually paid, increasing to roughly $969 million as of Q3 2025. What follows the confirmation is the Trust-level burn, summarized in Chart 1 – FTX Overhead Spent and Projected. Post-Effective-Date operating disbursements for Q1 and Q2 2025 total $90 million and $116 million (which expressly include professional fees), and Q3 reflects roughly another $100+ million of non-distribution disbursements.

6

21. On a conservative estimate, that puts post-confirmation overhead for 2025 in the neighborhood of $400 million (≈$300 million actually reported through Q3 plus ≈$100 million for Q4 at the same run-rate). Against an estate of about $16–$16.5 billion of assets and distributions under the confirmed Plan, that means roughly $1.4 billion in total professional and administrative overhead by the end of 2025 alone—about ≈9% of the entire estate.

22. The same figures imply an ongoing post-confirmation burn-rate of roughly $100 million per quarter, over $1 millon per day. If the Court grants a further one-year extension into 2026–27, the predictable, mechanical consequence is another ≈$400 million in overhead on top of what has already been spent—pushing total professional and administrative costs (inlcuding the Wind-Down Reserve) from roughly $1.8 billion toward $2.3 billion, and moving the overhead slice of the estate from ≈11% up toward ≈14%.

**Chart 1 – FTX Overhead Spent and Projected**

| # | Component | Timing / Status | Amount (USD M) | % of Estate (~$16.4B) |
|---|---|---|---|---|
| 1 | Pre-confirmation professional fees (Debtors + committees) | Actual, cumulative as of Q3 2025 – almost all incurred and approved before 2025 (only about $61M approved in 2025 clean-up). | 969 | ≈ 5.9% |
| 2 | Post-Effective Trust overhead 2025 Q1–Q3 (operating + professional costs) | Actual – Q1 + Q2 operating disbursements (90M + 116M), plus ≈108M from Q3. | 314 | ≈ 1.9% |
| 3 | Post-Effective Trust overhead 2025 Q4 | Estimated – using the average of Q2 and Q3 overhead run-rate (≈$112M). | 112 | ≈ 0.7% |
| 4 | Total overhead spent through full year 2025 = 1 + 2 + 3 | Mixed – pre-confirmation fees are cumulative; 2025 Trust overhead is actual Q1–Q3 plus estimated Q4. | ≈ 1,395 | ≈ 8.5% |
| 5 | Wind-Down Reserve (future operating, legal, litigation, admin) | Actual – $449m reserve. | 449 | ≈ 2.7% |
| 6 | Overhead spent or reserved under current | Pro-forma – what is already spent plus the budgeted wind-down pot. | ≈ 1,844 | ≈ 11.2% |

| | | | | |
|---|---|---|---|---|
| | Plan horizon = 4 + 5 | | | |
| 7 | Estimated additional overhead for one more year (2026–27) | Estimated – based on average post-Effective overhead in 2025 Q1–Q3 | ≈ 419 | ≈ 2.6% |
| 8 | Total overhead spent + reserved if 2026–27 extension is granted = 6 + 7 | Projected scenario. | ≈ 2,263 | ≈ 13.8% |

*All dollar amounts are in USD millions. Percentages are shown as a share of an estimated estate value of approximately $16.4 billion.*

23. This incremental administrative cost is applied ahead of unpaid creditors' claims and interest in the waterfall; for the remaining creditor body, every extra percentage point of aggregate administrative cost is functionally a percentage-point "haircut" on distributions that could otherwise be returned to them. The Trust nowhere quantifies this price tag or justifies it against the marginal benefit of another year of review.

24. These figures are derived from the Financial Reports for Q1 2025 (D.I. 30424) and Q2 2025 (D.I. 32371), and the Post-Confirmation Reports for the quarters ending March 31, 2025 (D.I. 30186), June 30, 2025 (D.I. 31627), and September 30, 2025 (D.I. 33205). These reports are among the very limited, and almost only, public disclosures from which a creditor can view the Trust's finances.

25. (b) *Loss of Time-Value.* This prejudice is magnified by the Plan's "as-if-paid" rule in Plan § 7.1. This provision creates a permanent time-value disparity between otherwise identical creditors. A Class 5A creditor paid in May 2025 received full value. A Class 5A creditor delayed until the new January 2027 deadline has their 9% Consensus Rate interest cut off as if they were paid in 2025, creating roughly a 20-month gap during which they have neither

their funds nor their interest. This results in a permanent economic loss of approximately 15% of that creditor's total claim value.

26. (c) *Compounding Risk of Uncertainty.* Beyond direct fee erosion and lost returns, prolonged uncertainty has its own economic cost. A customer who does not know whether they will receive a meaningful distribution within the next year cannot reliably commit to long-term obligations, may be forced to borrow at higher rates, or may have to liquidate other assets at disadvantageous times. These are real, if less visible, economic harms that compound with every day of the Trust's requested delay.

27. (d) *Structural Misalignment.* Objector's personal case is a perfect "case study" of this systemic failure. As a pro se creditor who followed every rule, completed every step (KYC, tax, and DSP onboarding), and was still arbitrarily denied her distribution while identically situated peers were paid, Objector personifies this misalignment.

28. Every additional month of delay increases estate-paid professional fees, while creditors like Objector receive nothing and suffer a permanent time-value disparity on their recoveries, as detailed above. The Trust bears no corresponding economic cost. This is the "structural misalignment of incentives" that this Court has the authority and the obligation under §§ 105(a) and 1142(b) to correct.

29. In short, the one-year extension is not a neutral scheduling adjustment. It has a predictable price tag—on the order of another $400 million of overhead—paid in advance of unpaid creditors' principal and interest, and a predictable opportunity cost for customers who have already waited years. Contrary to the Trust's contention that no one is prejudiced by delay, a creditor kept waiting an extra year could lose 15% of dollars of value compared to peers – a clear prejudice. The Plan itself also acknowledges the importance of time-value by providing

9

interest at the Consensus Rate for delayed payments. It would be disingenuous to suggest a years-long delay is neutral when the Plan's economics clearly indicate otherwise. The Trust has failed to show "cause" that this price is justified.

**C. The "Disputed" Status Is an Opaque "Black Box" That Violates Due Process**

30. This "black box" is exacerbated by the Trust's opaque rationales for delaying claims. As a fully compliant creditor, Objector has no way of knowing why her claim is "Disputed." In fact, Trust has never identified any factual or legal ground on which her claim is "Disputed."

31. Instead, the Trust relies on a purely circular position: the claim is "Disputed" solely because it has not been "Allowed," that the Trust has until at least January 3, 2026 to reconcile claims, and that "no claimant is entitled to jump the line," while still giving no claim-specific reason and promising only review "in due course."

32. All email inquiries regarding the Objector's claim status to the Trust went unanswered except for the one in Exhibit A (Emails to FTX support yield only templated responses). Now, without any further explanation, the Trust seeks to extend the objection deadline by another year.

33. This Extension Motion must be viewed against the backdrop of the Trust's "Restricted Jurisdiction" (RJ) motion (D.I. 31148), where the Trust explicitly sought authority to "consider Claims in Potentially Restricted Foreign Jurisdictions as Disputed Claims" (D.I. 31148-1, § (c)(i)). The Court never approved those controversial procedures.

34. Objector is thus left in an impossible position: unable to ascertain whether her claim is being delayed due to this unapproved de facto policy, a simple administrative error, or another reason entirely.

35. At the July 22, 2025 hearing on the RJ procedures, this Court recognized the need for a "transparent process designed to provide due process to the affected creditors with Court oversight." (See D.I. 33193, Para. 1, quoting July 22, 2025 Hr'g). The Trust's current "Disputed" designation regime—where fully compliant creditors receive no reasons, timelines, or cure instructions—falls far short of that standard. An unconditional one-year extension would entrench this failure of due process.

**D. The Trust Is Inverting the Bankruptcy Code's Default Allowance Mechanism**

36. The Trust is conflating two separate concepts: a bona fide legal objection and an administrative hold. The Claims Objection Deadline (Plan § 8.1) was intended to give the Trust a finite window to investigate and file legal objections.

37. Instead, the Trust is abusing the process. In practical terms, the Trust's approach inverts 11 U.S.C. § 502(a): instead of "deemed allowed unless objected to," remaining creditors are effectively "deemed disputed unless the Trust chooses to allow them." That is not what § 502(a) or Plan § 8.1 contemplated. The Claims Objection Deadline is a deadline for the Trust to file a bona fide legal objection, not a safe harbor for them to indefinitely treat compliant claims as "deemed disputed." This procedural inversion violates the Code.

38. In its own objection to Objector's emergency motion (D.I. 32785, Para. 2), the Trust stated that completing pre-distribution requirements "is not related to allowance of a Claim". This is a critical admission. If Objector's full compliance is not the issue, then the

continued "Disputed" status must rest on some other, undisclosed basis. The requested extension would allow that undisclosed basis to persist for another year.

**E. This Objection Seeks to "Enforce the Line" and Stop Demonstrable Unequal Treatment**

39. As demonstrated in Section B, *supra*, this constitutes a clear violation of 11 U.S.C. § 1123(a)(4). The Trust's "jump the line" mischaracterization is false. Objector was in the correct line (Class 5A, fully compliant). The Trust created de facto discrimination by arbitrarily paying some Class 5A creditors while delaying others. This "de facto" discrimination is not merely a procedural time gap; it is a quantifiable economic disparity. By creating a two-tier system where early-paid creditors receive full economic value and delayed creditors suffer a permanent economic penalty, the Trust is violating the Code's "same treatment" mandate.

40. The Trust's "floodgates" argument (D.I. 33193, Para. 30)—warning against "innumerable copycat motions"—is not a legal defense; it is a telling admission of its systemic failure. The "floodgates" only exist because the Trust has failed to implement a transparent, uniform process.

41. Worse, the Trust's own filings provide indisputable proof of this "motion-driven selectivity." In its Omnibus Response (D.I. 33193, Para. 7), the Trust admits it has "allowed, and made distributions on account of, the claims of a number of the objecting claimants" who had filed motions with the Court. This selective treatment is the very opposite of the "orderly" process the Trust claims to be protecting. It has created an "uneven playing field" that rewards some creditors who file motions while simultaneously punishing other creditors—like this Objector, who also filed motions (D.I. 32759, 32774)—by leaving them in the "black box"

without resolution. Granting an unconditional extension would sanction this arbitrary and unequal treatment.

**G. The Trust's Argument Underscores the Need for Triage, Not a Blanket Extension**

42. The Trust contends in the Extension Moiton (Para. 14) that absent a one-year extension "a massive number of premature objections would need to be filed that would unnecessarily burden the Court." That contention is inconsistent with the current posture of this case. By the Trust's own account, more than 96% of customer claims have already been reconciled; the headline "herculean" workload and "dozen" litigations it repeatedly invokes are now largely in later stages, with only a handful of active matters still being prosecuted. Those complex litigations are handled by dedicated litigation teams and do not prevent the Trust from resolving straightforward, fully-documented customer claims.

43. The "premature objections" argument also amounts to an admission that a substantial portion of the remaining 25,400 claims are not actually objectionable on the merits. If the Trust would be forced to file objections it does not yet believe in, that simply means many of these claims are ordinary administrative or mechanical issues—not genuine legal disputes. In that circumstance, the answer is not a one-year, undifferentiated extension, but a structured triage.

44. Objector's proposed 90-day, conditioned extension—paired with a triage and fast-track process for simple, fully compliant customer claims—directly addresses the Trust's stated concern. It avoids unnecessary, placeholder objections and prevents the Trust from using generalized references to a "herculean" task as a mask for the absence of any transparent progress by claim type. The Court need not choose between flooding the docket with premature objections and granting a year-long delay for every remaining customer; a targeted, triaged

process accomplishes the legitimate goal while avoiding disproportionate prejudice to simple customer claims.

## IV. RESERVATION OF RIGHTS

45. Objector expressly reserves the right to amend, supplement, or modify this Limited Objection to the Extension Motion at or prior to any hearing thereon. Furthermore, nothing contained herein is intended to be, nor should be construed as, a waiver of any of Objector's rights, claims, or remedies regarding the allowance of her Claim, the Plan, the Extension Motion, or any other matter in these Chapter 11 Cases. Objector specifically reserves the right to contest any determination by the Trust regarding the status or validity of her Claim in any appropriate forum.

## V. CONCLUSION

46. This Objection offers a workable solution to a systemic problem. The Trust's request for an unconditional, year-long extension is disproportionate to the mature state of this case. Granting it unconditionally would sanction a claims reconciliation process that is demonstrably opaque, unequal, and prejudicial, guaranteeing future motions from other creditors.

47. Each of the conditions proposed in the requested relief is narrowly tailored to address a specific prejudice caused by the requested extension: the interest equalization condition remedies the economic prejudice and time-value disparity; the triage and fast-track process and limited compel-action mechanism address the procedural prejudice by ensuring that simple claims move to resolution within the extension period; and the dispute-reason categories, cure

instructions, and monthly reporting alleviate the informational prejudice by replacing the "black box" with a transparent, Court-supervised framework.

48. None of these conditions alters the Plan's distribution waterfall or priorities; they simply ensure that any extension granted is not at the unfair expense of "Disputed" creditors.

## VI. REQUESTED RELIEF

**WHEREFORE**, for the reasons set forth herein, the Objector respectfully requests that the Court:

49. Grant the Extension Motion in part and deny it in part, consistent with the limited and conditioned relief set forth herein.

50. Extend the Claims Objection Deadline and the Administrative Claims Objection Deadline through and including April 3, 2026 (the "90-Day Extension"), without prejudice to the Trust's right to seek further extensions for cause shown.

51. Condition any such 90-Day Extension upon the Trust's implementation of the following procedures:

52. (a) *Condition to Ensure Economic Parity (Interest Equalization)*: Provide that, as a condition of any extension, for any Class 5A claim that is or remains "Disputed" without a filed Rule 3007 objection and is Allowed after the date of the first class-wide distribution, the Trust must calculate and pay post-petition interest at the Consensus Rate on the full unpaid amount of such Allowed Claim through the creditor's actual Distribution Date, in order to harmonize Plan § 7.1 with 11 U.S.C. § 1123(a)(4) and ensure that the Trust's administrative delay does not inflict a permanent economic disparity on later-paid creditors.

53. (b) *Mandatory Claims Triage & "Fast-Track"*: Require that, within 45 days of the Court's order granting any extension, the Trust:

(i) complete a "triage" of all remaining "Disputed" claims, categorizing them into "Simple Disputes" and "Complex Disputes." "Simple Disputes" shall mean claims where the Trust does not contend that the creditor's claim amount, entitlement, or priority is legally objectionable, and where the only outstanding issues relate to administrative, KYC/TIN, DSP, or similar compliance matters; and

(ii) establish and publicize a "fast-track" process for all "Simple Disputes" and use commercially reasonable efforts to resolve all such claims within the 90-Day Extension period.

54. (c) *Mandatory Transparency & Cure Instructions*: Require that, within 60 days of such order, the Trust:

(i) update the Kroll portal for every creditor with a "Disputed" claim to provide a specific, non-generic "Dispute Reason Category" (e.g., "KYC Mismatch," "Jurisdictional Review," "Pending Litigation"); and

(ii) provide clear "Cure Instructions" where a cure is possible by the creditor.

55. (d) *Mandatory Enhanced Communication Channel*: Direct the Trust to immediately overhaul its creditor support channels (including support@ftx.com and Kroll) to cease the use of generic, templated responses that disclaim knowledge, and to ensure that support staff are given access to the "Dispute Reason Category" and are empowered and required to

provide claim-specific, non-privileged status updates and direct creditors to the applicable "Cure Instructions" or "Projected Timeline" for their category.

56. (e) *Mandatory Monthly Status Reports*: Require that, beginning no later than January 15, 2026, the Trust file monthly status reports on the docket (which may be in chart or table form) detailing:

(i) the number of "Disputed" claims resolved in the prior month, by category;

(ii) the number of claims remaining in each category; and

(iii) any administrative obstacles requiring Court guidance.

57. Authorize a limited "Compel Action" mechanism under which any creditor whose claim remains in the "Simple Disputes" category after the 90-Day Extension, and for whom the Trust has not provided a cure, is granted leave to seek procedural relief only (such as requiring the Trust to provide a specific dispute category, status update, or projected timeline) on a summary, non-evidentiary basis, with such mechanism not to be construed as authorizing motions seeking claim allowance or estimation.

58. Provide that any order granting such relief shall be without prejudice to the rights of any party in interest to object to any further extension of the objection deadlines, and shall not prevent the Trust from seeking a further extension, provided that any such request is supported by a showing of good cause.

59. Provide that the Court shall retain jurisdiction to interpret, implement, and enforce any order granting such relief.

Dated: November 17, 2025

*Hejia Zhao* (signature)

Hejia Zhao (pro se)

[Apt redacted], Mood Lyndhurst, 38 Lyndhurst Terrace, Central, Hong Kong

Email: hz263@conrell.edu

Exhibit A – Objector's sole email response from the Trust regarding claim status

**Kranzley, Alexa J.** <kranzleya@sullcrom.com>  Fri, Sep 26, 3:40 AM
to FTX, zzext-landis, Andrew, James, Brian, zzExt-brown, zzext-pierce, zzext-mcguire, juliet.m.sarkessian@usdoj.gov, benjamin.a.hackman@

Dear Sherry,

The confirmed FTX Chapter 11 Plan of Reorganization provides that unless "Allowed" in accordance with the Plan, all claims against the FTX Debtors, including your claim, remain "Disputed." The Plan further provides that the FTX Recovery Trust has until at least January 3, 2026 (one year after the Effective Date) to resolve and reconcile all Disputed Claims and where necessary, to object and prosecute.  The Claims Objection Deadline may be extended upon approval of the Bankruptcy Court.  The FTX Recovery Trust is currently in the process of reviewing and reconciling hundreds of thousands of claims, and no claimant is entitled to jump the line and demand expedited review.  The FTX Recovery Trust will review all Disputed Claims in due course.

Additionally, please see the attached order entered by Judge Owens setting a status conference for October 23, 2025 at 9:30 am prevailing Eastern time.  The status conference will address the FTX Recovery Trust's motion to implement restricted jurisdiction procedures in potentially restricted foreign jurisdictions as well as your prior motion to compel filed at docket number 32384.

**Alexa J. Kranzley**
Sullivan & Cromwell LLP
125 Broad Street | New York, NY 10004-2498
kranzleya@sullcrom.com | www.sullcrom.com

## CERTIFICATE OF SERVICE

I, Hejia Zhao, certify that on November 17, 2025, I caused a true and correct copy of the foregoing Limited Objection to be served by electronic mail on the following:

**U.S. Trustee – District of Delaware**

• Juliet M. Sarkessian – juliet.m.sarkessian@usdoj.gov

• Benjamin A. Hackman – benjamin.a.hackman@usdoj.gov

• David Gerardi – david.gerardi@usdoj.gov

**Counsel to the FTX Recovery Trust – Sullivan & Cromwell LLP**

• Andrew G. Dietderich – dietdericha@sullcrom.com

• James L. Bromley – bromleyj@sullcrom.com

• Brian D. Glueckstein – gluecksteinb@sullcrom.com

• Alexa J. Kranzley – kranzleya@sullcrom.com

**Delaware Counsel to the Trust – Landis Rath & Cobb LLP**

• Adam G. Landis – landis@lrclaw.com

• Kimberly A. Brown – brown@lrclaw.com

• Matthew R. Pierce – pierce@lrclaw.com

• Matthew B. McGuire – mcguire@lrclaw.com

If any party does not consent to email service, I will promptly effect service by mail consistent with the Federal Rules of Bankruptcy Procedure and the Local Rules.

Dated: November 17, 2025

*Hejia Zhao*

Hejia Zhao (pro se)
[Apt redacted], Mood Lyndhurst, 38 Lyndhurst Terrace, Central, Hong Kong
Email: hz263@cornell.edu