## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:

FTX TRADING LTD., *et al.*,[1]

Debtors.

-------------------------------------------------------- x

: Chapter 11
:
: Case No. 22-11068 (KBO)
:
: (Jointly Administered)
:
: **Re: D.I. 30932**

## THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD.'S RESPONSE TO THE FTX RECOVERY TRUST'S OBJECTION TO THE AMENDED PROOF OF CLAIM

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the FTX Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the FTX Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ....................................................................1

II. FACTUAL BACKGROUND ........................................................................7

    A.  The 3AC Debtor Opens Accounts with and Trades on the FTX
        Exchange ........................................................................................7

    B.  FTX and the 3AC Debtor Enter into Terms of Service ................11

    C.  The 3AC Debtor Participates in Margin Trading on the FTX Exchange
        .......................................................................................................15

    D.  The 3AC Debtor and FTX Enter into a Line of Credit ................18

    E.  The 3AC Debtor Becomes Insolvent by June 12 .........................20

    F.  June 13 and 14, 2022: The 3AC Debtor's Digital Assets Are Sold or
        Liquidated .....................................................................................23

    G.  FTX Benefits from Repayment of the 3AC Debtor's Negative USD
        Balance .........................................................................................25

    H.  The 3AC Debtor Commences Insolvency Proceedings in the BVI ...............30

    I.  The Joint Liquidators Seek Discovery from FTX ........................31

    J.  The Joint Liquidators File a Proof of Claim Against FTX ...........32

    K.  The Court Approves the Motion to Amend the 3AC Debtor's Proof of
        Claim .............................................................................................32

    L.  The FTX Recovery Trust Objects to the Amended Proof of Claim ...............34

    M.  The Parties' Merits Discovery Is Ongoing ...................................36

III. LEGAL STANDARD .................................................................................38

IV. THE FTX RECOVERY TRUST'S OBJECTION RESTS ON A FAULTY
    FOUNDATION ..........................................................................................38

    A.  The 3AC Debtor Had a Beneficial Interest in the Digital Assets in Its
        FTX Accounts ...............................................................................39

        1.  The 3AC Debtor Beneficially Owned the Digital Assets in a
            Trust ..................................................................................40

            a.  Certainty of Intention Is Present ...................................42

            b.  Certainty of Subject Matter Is Present ..........................61

            c.  Certainty of Objects (*i.e.*, as to Beneficiaries) Is Present .............65

            d.  Conclusion: FTX and 3AC Had a Trust Relationship .................65

|   | 2. | The Joint Liquidators Are Not Required to Trace Their Digital Assets | 66 |
|   | 3. | The 3AC Debtor Also Owned Its Futures Contracts | 68 |
|   | 4. | Alternatively, the 3AC Debtor Retained Ownership Through a Quasi-Bailment | 68 |
|   | 5. | The Court Did Not Resolve the 3AC Debtor's Ownership Rights in the Confirmation Order | 71 |

**B.** The 3AC Debtor Had Distinct Assets and Liabilities on the FTX Exchange ... 76

|   | 1. | The May 2022 Terms of Service Invalidate the "Single Asset" Theory | 78 |
|   | 2. | The "Single Asset" Theory Contradicts How the Exchange Operated | 82 |

**V.    THE JOINT LIQUIDATORS' CLAIMS SHOULD BE ALLOWED ... 85**

**A.** Unfair Preference ... 85

|   | 1. | The Unfair Preference Claim Is Adequately Pleaded | 88 |
|   | 2. | The Joint Liquidators Have Established All Elements of Their Unfair Preference Claim | 89 |

|   |   | a. | 3AC Entered into the June 13-14 Transactions | 89 |
|   |   | b. | The June 13-14 Transactions Were "Insolvency" Transactions | 92 |
|   |   | c. | The June 13-14 Transactions Occurred Within the "Vulnerability Period" | 94 |
|   |   | d. | FTX Was a Creditor of the 3AC Debtor | 95 |
|   |   | e. | FTX Was Put in a Better Position by the June 13-14 Transactions | 101 |
|   |   | f. | Even If FTX Was Not a Creditor of the 3AC Debtor, FTX Is Still Liable for the Benefits It Received from the June 13-14 Transactions | 104 |
|   |   | g. | The Joint Liquidators Are Entitled to Recover from FTX the Value of the Assets Transferred Between June 13 and 14 | 110 |

|   | 3. | The FTX Recovery Trust's Defenses to the Unfair Preference Claim Fail | 111 |

|   |   | a. | Section 245 Does Not Require a Proprietary Interest in the Assets Transferred, but the 3AC Debtor Had Such an Interest in Any Event | 111 |

| | | b. | The FTX Recovery Trust's "Ordinary Course" Defense Is Conclusory and Refuted by the Record ........................................119 |
|---|---|---|---|
| | | c. | Neither Contractual nor Statutory Set-Off Assists the FTX Recovery Trust................................................................122 |
| | | d. | FTX Did Not Have a Valid and Perfected Security Interest........127 |
| | **B.** | | **Breach of Contract, Breach of Trust, and Breach of Fiduciary Duty ..........136** |
| | | **1.** | **The Breach Claims Are Adequately Pleaded .....................................137** |
| | | **2.** | **The Joint Liquidators Have Established All Elements of Their Breach Claims .......................................................................138** |
| | | a. | If FTX Deprived the 3AC Debtor of Ownership Rights, FTX Breached the Terms of Service and the 3AC Debtor's Trust ......138 |
| | | b. | If Ownership Is Necessary for the Preference Claim, FTX's Breaches Harmed the 3AC Debtor .............................................143 |
| | **C.** | | **Unjust Enrichment...............................................................................146** |
| **VI.** | **RESERVATION OF RIGHTS** ...............................................................................**148** | | |
| **VII.** | **CONCLUSION** ...............................................................................**148** | | |

Russell Crumpler and Christopher Farmer, in their joint capacities as the duly authorized foreign representatives and joint liquidators (the "Joint Liquidators") of Three Arrows Capital Ltd. (the "3AC Debtor" or "3AC") hereby submit this response (the "Response"), pursuant to 11 U.S.C. §§ 501-02 and the Order Approving the Amended Stipulation Governing Litigation of the FTX Recovery Trust's Objection to the Amended Proof of Claim [D.I. 32714] (the "Amended Stipulation"),[2] to the Objection of the FTX Recovery Trust to the Joint Liquidators' Amended Proof of Claim (the "Objection") [D.I. 30932]. In support of the Response, the Joint Liquidators submit contemporaneously herewith (1) the Declaration of the Right Honourable Dame Elizabeth Gloster DBE (the "Gloster Declaration"), (2) the Declaration of Robert Stuart Levy K.C. (the "Levy Declaration"), (3) the First Supplemental Declaration of Paul Anthony Webster K.C. (the "Webster Declaration"), (4) the First Supplemental Declaration of Matthew W. Lisle (the "Lisle Declaration"), (5) the Declaration of Fotis Konstantinidis and the First Supplemental Expert Report of Fotis Konstantinidis (the "Konstantinidis Report"), (6) the Declaration of Gregory E. Scheig and the Expert Report of Gregory E. Scheig (the "Scheig Report"), and (7) the Declaration of Tiffany Ikeda Austin (the "Austin Declaration").

## I.    PRELIMINARY STATEMENT

1.    What happened in this case is a classic preference. Just weeks before the 3AC Debtor's liquidation, its assets on the FTX Exchange were sold, repaying its debts to FTX in full while leaving only fractional recoveries for the 3AC Debtor's other creditors. Even if the preference claim were not allowed, if FTX's mishandling of those assets deprived the 3AC Debtor of its contractually promised ownership interest in them, then FTX's mishandling breached its

---

[2] In accordance with the Amended Stipulation, the parties agreed to extend the Joint Liquidators' Response deadline to November 25, 2025.

contract with the 3AC Debtor.  In an attempt to avoid these simple facts and escape liability, the FTX Recovery Trust resorts to fantastical, legalistic arguments divorced from the record, commercial reality, and common sense.  Among other fanciful claims, the FTX Recovery Trust contends that digital assets bought, sold, borrowed, and loaned by FTX customers did not actually exist; that the liabilities customers paid—and that FTX went to great lengths to minimize and manage—likewise were a mirage; and that the natural reading of a contractual promise that customers owned digital assets (and FTX did not) meant exactly the opposite.

2.      The truth is much simpler.  This case is, at its core, about the creditors of the 3AC Debtor, a cryptocurrency hedge fund that collapsed in June 2022, creating shockwaves throughout the industry.  Those creditors suffered when the former principals of the 3AC Debtor sold over $1 billion in digital assets on the FTX Exchange shortly before the insolvent 3AC Debtor entered liquidation, repaying its massive liabilities to FTX in full but leaving other creditors to file claims in the 3AC Debtor's liquidation and receive a fraction of what they were owed years later.  The Joint Liquidators—the representatives of the 3AC Debtor's estate and claimants in this litigation— have been empowered to pursue recoveries on behalf of those creditors.  Upon their appointment, the Joint Liquidators inherited virtually no records (no computers, no emails, no files) regarding the 3AC Debtor's assets and liabilities.  And they had no records of its historical transactions— records that had apparently been destroyed by the 3AC Debtor's founders.  So the Joint Liquidators went to work, seeking worldwide discovery to recreate the 3AC Debtor's financial records and assess what claims its estate may have—while facing an utter lack of cooperation, and in fact obstruction, from the 3AC Debtor's founders.

3.      Those investigative efforts led to FTX, which the Joint Liquidators eventually learned was one of the 3AC Debtor's largest lenders.  The 3AC Debtor had been a high-volume

trader on the FTX Exchange since 2020, taking large "long" positions in digital assets like Bitcoin ("BTC") and Ethereum ("ETH") and entering into millions of open-ended futures contracts that paid out if the value of the underlying digital assets rose (and vice versa if it fell)—contracts with enormous financial upside. Like other large cryptocurrency traders, the 3AC Debtor borrowed from the Exchange to acquire many of these assets. FTX not only allowed that practice, but encouraged it, as it earned more from increased trading on the Exchange. To that end, FTX established a "Margin Program" that permitted customers to buy cryptocurrency using borrowed funds, increasing both the potential risk and reward from movements in the market prices of the cryptocurrency. To the 3AC Debtor, FTX also extended a $120 million "Line of Credit" that allowed the 3AC Debtor to become even more leveraged on the Exchange.

4.      The digital assets that accumulated in the 3AC Debtor's (and other FTX customers') accounts on the Exchange were not merely fictitious bets on FTX's books, but actual assets that could be withdrawn, sold, or transferred from their accounts. FTX customers took those actions in the real world, withdrawing and transferring countless quantities of digital assets at the click of a button, just as the Exchange's terms of service promised they could. Those terms also promised FTX customers that the assets credited to their accounts belonged to them. Conversely, the funds that customers borrowed to acquire these assets—in the form of USD here—were not gifts to customers, but actual liabilities that needed to be repaid to FTX. That is how FTX treated them and how the parties here documented their transactions in binding agreements. In the real world, again, these liabilities could be, and generally were, repaid. But not always. When a customer defaulted on repayment, FTX would step in and cover those losses, shielding other Exchange customers from the losses.

5.      This is how the parties expected the FTX Exchange to function—and how the Exchange in fact functioned.  The 3AC Debtor continued to deposit cryptocurrency onto the Exchange, withdraw cryptocurrency from the Exchange, and acquire cryptocurrency and futures positions on the Exchange, while also incurring significant liabilities to FTX.  By mid-June 2022, the 3AC Debtor had amassed well over $1 billion worth of assets on the Exchange and nearly that much in USD debt that it had borrowed to trade on margin and had been extended under its Line of Credit.

6.      Then, between June 13 and 14, 2022, in the wake of both the collapse of the Terra/LUNA cryptocurrency token in which the 3AC Debtor was heavily invested and the resulting "crypto winter," something extraordinary happened: while hopelessly insolvent, the 3AC Debtor entered into a series of transactions that resulted in the sale or liquidation of substantially all of its assets on the Exchange, and used the proceeds of those sales to eliminate its liabilities to FTX.  These transactions were unprecedented.  They began with tens of thousands of individual digital asset sales initiated by the 3AC Debtor and the closure of millions of open futures contracts. They culminated in a manual liquidation by FTX of substantially all of the remaining digital assets in the 3AC Debtor's accounts, allowed by the 3AC Debtor, due to alleged noncompliance with collateral obligations.  The upshot of these transactions was that 3AC Debtor lost well over $1 billion in assets whose value could and should have been ratably distributed to its creditors, but was instead used to make FTX whole.  Just two weeks later, the 3AC Debtor entered liquidation in the British Virgin Islands ("BVI").

7.      Upon investigating, the Joint Liquidators determined that the 3AC Debtor's estate had meritorious claims against FTX.  In furtherance of their duties, the Joint Liquidators filed a proof of claim in this proceeding, which they amended once FTX (belatedly) produced pre-merits

discovery revealing additional claims of substantially greater scope.  One such claim is for unfair preference under BVI law.  The claim asserts that the 3AC Debtor owed FTX a substantial amount of money, the transactions on June 13 and 14, 2022 repaid that debt, and the transactions placed FTX in a better position than it would have been in the 3AC Debtor's liquidation.  Others are for breach of contract, trust, and fiduciary duty, and for unjust enrichment, on account of the FTX Recovery Trust's position that FTX—and not the 3AC Debtor—beneficially owned the digital assets in the 3AC Debtor's accounts, including those transferred away on June 13 and 14, 2022. The claims assert that FTX promised its customers in the Exchange's terms of service (and elsewhere) that they—and not FTX—owned the digital assets in their accounts, a promise that could only have been given effect to if the assets were held by FTX on trust for its customers, who retained beneficial title to their assets.  If FTX's handling of customer assets deprived the 3AC Debtor of these ownership rights—which the FTX Recovery Trust asserts it did—then FTX breached its promises to the 3AC Debtor.  In addition to not disputing this English law claim, the FTX Recovery Trust's English law expert affirmatively concedes the key elements of the claim: that FTX promised to provide the 3AC Debtor with ownership of the digital assets at all times (the contractual promise), that any sweeping was an action by FTX (the FTX action), and that FTX's sweeping destroyed the 3AC Debtor's property interest (the breach).

8.    What pre-merits discovery strongly indicated as to these claims, merits discovery confirmed.  The Joint Liquidators obtained extensive documentary and testimonial evidence not only from the FTX Recovery Trust, but from former FTX executives and employees with firsthand knowledge of how the Exchange operated in practice, what FTX represented to customers, and how FTX was supposed to handle customer assets.  Discovery from these on-the-ground witnesses substantiates the 3AC Debtor's claims.  For example, the Joint Liquidators deposed former FTX

CEO Sam Bankman-Fried, who testified that the 3AC Debtor's liabilities on the Exchange were owed to FTX (making FTX its "creditor," which supports the preference claim), and that FTX would absorb up to $1 billion of unpaid customer liabilities (confirming FTX's ability to cover the liabilities at issue here).  The Joint Liquidators deposed former FTX Head of Institutional Sales Zane Tackett, who testified that FTX would have "eat[en]" any losses from the 3AC Debtor's liabilities (establishing that FTX benefited from repayment of the liabilities regardless, which also supports the preference claim).  And the Joint Liquidators deposed former FTX Director of Engineering Nishad Singh, who testified that the Exchange's code did not in actuality permit FTX to saddle Exchange customers with these losses (which also supports the preference claim).

9.      In an effort to avoid the Joint Liquidators' claims, the FTX Recovery Trust concocts its own reality, relying on after-the-fact testimony from its postpetition financial advisor.  The problem for the FTX Recovery Trust is that the facts simply do not support its new reality.

10.      The FTX Recovery Trust asserts, for example, that a customer's only "asset" on the Exchange was a single net account balance that defined the customer's relationship with FTX, and that individual assets or liabilities that contributed to that balance were fictitious.  The reasons for this ploy are obvious: to sweep under the rug the massive amount of actual digital assets that were transferred away from the 3AC Debtor's accounts, all the while portraying the 3AC Debtor as owing FTX no liabilities at all (because it allegedly had a positive net account balance).  Unsurprisingly, the real-world facts do not bear out this made-for-litigation premise.  The premise contradicts FTX's terms of service and the testimony of witnesses with contemporaneous knowledge of how the Exchange actually worked—who stated that it could not function unless (as was the case) customers had individual assets and liabilities.  No wonder, then, that the FTX

Recovery Trust did not obtain any expert opinions to support this premise, or that one of its experts rejected it. Without this premise in tow, the rest of the tale unravels.

11.     The FTX Recovery Trust also asserts that, if assets and liabilities were separate, FTX, rather than 3AC, owned 3AC's digital assets before their sale (*i.e.*, that the 3AC Debtor somehow sold FTX's assets). In the real world, however, FTX promised the opposite, both in the Exchange's terms of service and in contemporaneous documents and testimony that repeatedly described customers as owning their digital assets on the Exchange. The FTX Recovery Trust, through its English law expert, offers only a strained, sophistic response that fails to contend with that evidence or offer a coherent explanation of what the relevant contractual terms *do* mean (if not exactly what they say).

12.     Notwithstanding the FTX Recovery Trust's efforts to muddy the waters, the commercial reality is clear and establishes these claims for the benefit of the 3AC Debtor's creditors.

## II.    FACTUAL BACKGROUND

### A.    The 3AC Debtor Opens Accounts with and Trades on the FTX Exchange

13.     The 3AC Debtor was a hedge fund incorporated in the BVI focused on trading and investing in cryptocurrency and other digital assets. *See* Declaration of Russell Crumpler in Support of Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief ("Crumpler Ch. 15 Decl."), *In re Three Arrows Capital, Ltd.*, [D.I. 3] ¶¶ 9, 15. Cryptocurrency hedge funds operate by trading in cryptocurrency markets and investing in cryptocurrency-related ventures, profiting from the volatility of cryptocurrency values. *See* Lisle Decl. ¶ 13. In February 2020, the 3AC Debtor opened accounts on the FTX exchange (the "FTX Exchange" or "Exchange"). *See* Declaration of Steven P. Coverick in Support of the FTX

Recovery Trust's Objection to the Amended Proof of Claim Filed by Joint Liquidators of Three Arrows Capital [D.I. 30934] ("Coverick Decl.") ¶ 45

14.    The FTX Exchange was an online digital-assets exchange platform accessible at FTX.com that offered services allowing customers, among other things, to deposit, withdraw, and trade digital assets.  *See* Austin Decl., Ex. 1, FTX Terms of Service (dated May 13, 2022) (the "May 2022 TOS") at 1.  The FTX Exchange was only available to persons who had their registered office or place of residence outside of the United States of America.  *Id.* at 1.  FTX customers' accounts on the FTX Exchange were linked to a ledger maintained by FTX that recorded the transactions and quantities of assets associated with each customer's account.  *See* Austin Decl., Ex. 2, Transcript of September 24, 2025 Deposition of Steven Coverick ("Coverick Dep. Tr. (Day 1)") at 84:17-85:3.

15.    FTX customers could deposit digital assets and fiat currency on the FTX Exchange. May 2022 TOS § 8.1.1.  When a customer deposited digital assets on the FTX Exchange, those assets were initially deposited into discrete and customer-specific deposit wallets maintained by FTX, and FTX held the private keys to those deposit wallets.  *See* Austin Decl., Ex. 3, Transcript of September 30, 2025 Deposition of Nils Molina ("Molina Dep. Tr.") at 94:18-95:7; *see also* Austin Decl., Ex. 4, Transcript of September 16, 2025 Deposition of Edgar Mosley ("Mosley Dep. Tr.") at 66:15-19, 67:23-68:3, 70:12-17.  FTX would then quickly sweep all assets from the customer-specific deposit wallet addresses into hot wallet addresses maintained by FTX—and for which FTX held the private keys—that pooled deposited digital assets with those of other customers.  *See* Coverick Dep. Tr. (Day 1) at 141:2-7; *see* Mosley Dep. Tr. at 67:23-68:3, 82:7-15.  Customers were aware that FTX held the keys to these wallet addresses, and were aware that the digital assets were swept into the pooled wallet addresses.  *See* Mosley Dep. Tr. at 85:12-24

(explaining the sweeping transactions are "self-evident" as the records are public); *see also* Testimony of Sam Bankman-Fried Before U.S. Senate Committee on Agriculture, Nutrition and Forestry (Feb. 9, 2022) ("Bankman-Fried Senate Testimony") at 34, https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf (explaining customer assets are "held in an omnibus wallet").

16.     Additionally, FTX customers could buy and sell assets on the FTX Exchange by trading with other customers. *See* May 2022 TOS at 1. Each such trade was recorded on FTX's ledger as linked to the applicable customer's account. *See* Coverick Dep. Tr. (Day 1) at 99:14-18. When a customer bought or sold digital assets on the FTX Exchange, the underlying assets did not move between wallet addresses; the trade was instead noted on FTX's ledger. *See id.* at 290:19-291:10.

17.     Like other FTX customers, the 3AC Debtor could deposit, withdraw, and trade digital assets through its accounts on the FTX Exchange. *See* May 2022 TOS at 1. The 3AC Debtor had multiple accounts on the FTX Exchange, structured as one main customer account with fifteen subaccounts and a secondary account (collectively, the "3AC Accounts"). *See* Coverick Decl. ¶ 45. At the end of the day on June 12, 2022,[3] the digital assets associated with the 3AC Accounts (the "Digital Assets"), not including the value of futures contracts, were worth over $1 billion. *See id.* ¶ 61.

18.     The 3AC Debtor also held perpetual futures contracts on the FTX Exchange. *See id.* ¶ 57. These perpetual futures contracts were open-ended contracts standardized to a single unit

---

[3] Unless otherwise specified, all dates in this Response refer to 2022 and all times are in Coordinated Universal Time ("UTC").

of a digital asset (*e.g.*, one BTC) and included a market-driven reference price for the digital asset.[4] *See id.* ¶ 29.  One party to the contract took a "long" position, betting that the reference price would increase, and another party would take a "short" position, betting that the reference price would decrease.  *See id.* ¶ 29.  The 3AC Debtor's perpetual futures contracts were primarily long positions in BTC, betting that the value of BTC would rise over time.  Coverick Dep. Tr. (Day 1) at 221:20-222:4.  When a customer took futures positions, the FTX Exchange required the customer to post collateral to cover any potential losses realized as a result of the futures position.  *See* Austin Decl., Ex. 6, Transcript of October 16, 2025 Deposition of Sam Bankman-Fried ("Bankman-Fried Dep. Tr.") at 98:6-99:11.

19.    FTX settled perpetual futures contracts on the FTX Exchange every 30 seconds, crediting or debiting a customer's account based on the increase or decrease in value of the underlying asset, which was, in most cases, BTC.  *See* Coverick Dep. Tr. (Day 1) at 176:24-177:10. Every hour, FTX mediated a payment between the longs and the shorts related to the differences between the futures price and the underlying reference price, crediting or debiting each customer for the unrealized gain or loss.  *See* Bankman-Fried Dep. Tr. at 140:10-15.  Perpetual futures positions on the FTX Exchange included an associated contingent asset or liability, depending on how the market moved every hour.  *Id.* at 99:12-17, 140:10-15.  The hourly mediated payments continued in perpetuity unless the trader closed the position; the trader was thus exposed to losses up to the value of the contract's underlying asset at the time the contract was entered into (*i.e.*, in the event the price of the underlying asset reaches zero) and potential unlimited upside—similar

---

[4] Futures, such as BTC-PERP, were highly popular on the FTX Exchange, often trading in volumes exceeding spot trading.  In fact, "future fill fees" constituted one of the largest (and often the largest) sources of FTX's revenue or income.  *See, e.g.*, Austin Decl., Ex. 5, FTX_3AC_000046173 (FTX Trading Consolidated Financial Statements) at -000046190.

to owning the underlying commodity. *See* Commodity Futures Trading Commission, *Understand Your Contractual Obligations*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/understandcontractobligations.html (last visited Nov. 23, 2025). Perpetual futures contracts could result in negative USD balances within a trader's account. *See, e.g.*, Austin Decl. Ex. 7, FTX_3AC_000013844 to -000013852 ("FTX Collateral Management Explainer"); Austin Decl., Ex. 8, Transcript of September 19, 2024 Deposition of Robert Gordon ("Gordon Dep. Tr.") at 197:2-21. When a customer owed a payment under a futures contract, the payment did not go to another customer but rather to FTX. Bankman-Fried Dep. Tr. at 140:21-141:1; 141:16-142:9.

20.    Perpetual futures contracts on the FTX Exchange had a "notional value." Coverick Dep. Tr. (Day 1) at 187:18-189:12. These values were crucial the FTX Exchange operations and were used to calculate trading fees, funding payments, and borrowing costs (for spot margin). *See, e.g.*, Austin Decl., Ex. 9, FTX_3AC_000045026 to -00045067 ("Complete Futures Specs") (April 11, 2022); FTX Collateral Management Explainer at -000013844-52. In addition, futures contracts also implicated FTX's risk engine, liquidation system, and margin requirements. The margin balance fluctuated with the price of open futures, affecting usable margin and liquidation risk. *See, e.g.*, Complete Futures Specs at -000045026-67; FTX Collateral Management Explainer at -000013844-52.

## B.    FTX and the 3AC Debtor Enter into Terms of Service

21.    The parties agree that FTX's Terms of Service that were implemented on May 13, *i.e.*, the May 2022 TOS defined above, govern the 3AC Debtor and FTX's relationship during the June 13-14 period relevant to this action. *See* Objection ¶¶ 55-56 (acknowledging that, while an earlier version of the terms of service existed when the 3AC Debtor opened its accounts in February 2020, the "terms of service dated May 13, 2022 governed all of the activity during the

June 13-14, 2022 time period that is relevant to the Proof of Claim"); *see also* May 2022 TOS at 1 (providing that "[b]y registering for a Platform account ('Account') or using the Services, you agree that you have read, understand and accept the Terms").  English law expressly governs both the May 2022 Terms of Service and "any dispute, claim, controversy or difference arising out of or in connection with" them.  May 2022 TOS ¶ 38.11, Schedule 1 ¶ 1.1; *see also* Declaration of The Right Honourable Lord Neuberger of Abbotsbury [D.I. 26042] ("Neuberger Initial Decl.") ¶ 14 ("That is a broadly stated choice of law clause.  It would in my opinion cover any dispute as to the meaning and effect of the [May 2022 Terms of Service] in any dispute between FTX Trading and its customers.").

22.    The May 2022 Terms of Service "constitute an agreement between" the 3AC Debtor and "FTX Trading Ltd, . . . or a Service Provider in respect of a Specified Service."  May 2022 TOS at 1.  The May 2022 Terms of Service "apply to [the 3AC Debtor's] use of", among other things, "the Exchange"—*i.e.*, "the trading platform operated by FTX Trading or its Affiliates"—"and any Specified Service that may be offered to [the 3AC Debtor] . . . as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in . . . or list Digital Assets."  *Id.* at 1, Schedule 1 ¶ 1.1.  "Digital Assets" as defined by the May 2022 Terms of Service include "any . . . digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin."  *Id.*

23.    FTX Digital Markets Ltd. was the Service Provider for several Specified Services, including essentially all of those at issue here:

- Spot Market, which was "a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets", May 2022 TOS at Schedule 2;

- Spot Margin Trading, which "enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on

your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users" and enables a customer to "then spot trade the borrowed Digital Assets through the Spot Market on the Platform", *id.* at Schedule 3;

- Futures Market, which was "a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, Futures Contracts) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage", *id.* at Schedule 5; and

- Leveraged Tokens Spot Market, which was "a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users", *id.* at Schedule 8.

24.     Section 8.2.6 of the May 2022 Terms of Service sets out the relationship between the 3AC Debtor and FTX as to the Digital Assets.  It describes the 3AC Debtor as (1) retaining title to those Digital Assets "at all times", (2) owning those Digital Assets, which it states, were not the property of or loaned to FTX, and (3) controlling the Digital Assets.  May 2022 TOS § 8.2.6.

25.     Section 8.2.6 is the only provision in the May 2022 Terms of Service concerning ownership.  Recognizing that customers own their digital assets but may sometimes abandon their property, section 9 of the May 2022 Terms of Service provides that if FTX "is holding Unclaimed or Abandoned Property" and cannot contact a customer, then the customer's "Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property", which "as Trustee, will hold the Unclaimed or Abandoned Property on [the customer's] behalf."  May 2022 TOS § 9.2.

26.     Prior to this chapter 11 proceeding, FTX repeatedly took the position that digital assets associated with customer accounts were owned by customers.  Consistent with that approach, FTX did not report an ownership interest in its customers' assets in its audited financial statements, as those assets were held in trust for customers and were not the property of FTX.  *See generally* FTX Trading Consolidated Financial Statements at -000046174; *see also id.*

13

at -000046183 (defining "Crypto assets held" without reference to customer assets), -000046190 (representing that FTX was "an agent in arranging transactions between customers and presents revenue for the fees earned on a net basis"), -000046200 (FTX "accounts for and continually verifies the amount of crypto assets within its control").  Indeed, the FTX Recovery Trust admitted that FTX's financial statements "have not recorded the customer fiat nor their crypto balances on [the] books as an asset or liability."  Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com ("FTX Commingling Report") at 23 [D.I. 1704].

27.     In addition, FTX Digital Markets Ltd., the particular FTX entity responsible for providing the relevant services to the 3AC Debtor, "often gave [VIP] clients in [the 3AC Debtor]'s shoes," *see* Austin Decl., Ex. 10, Transcript of October 31, 2025 Deposition of Zane Tackett ("Tackett Dep. Tr.") at 214:2-21; *see generally* Austin Decl., Ex. 11, FTX_3AC_000044442 to -000044450 ("Safeguarding of Assets & Digital Token Explainer"), an explainer document representing that FTX Digital Markets Ltd. was "ultimately responsible for the safeguarding of its customers' assets[,]" and that its "key roles and responsibilities" included "[a]ppropriately account[ing] for the difference between its own assets and its customers' assets."  Safeguarding of Assets & Digital Token Explainer  at -000044446; Tackett Dep. Tr. at 214:2-8.  It also explained to customers that "[a]ll third-party providers are aware that customer assets are held in trust."  *Id.* at -000044446.  Indeed, it was "FTX's policy that [customer assets] were not" assets of FTX Digital Markets Ltd.  Tackett Dep. Tr. at 218:3-22.  As FTX's then-Head of Institutional Sales put it, based on the "wallet architecture and the way that exchanges work," "FTX would be custodying

the assets that users deposited."  Tackett Dep. Tr. at 208:18-209:21.[5]  This policy was available

(and provided) to customers "upon request."  *Id.* at 214:18-21.

28.     Although FTX illegally traded in customers' digital assets, it did not do so publicly.

*See generally* FTX Commingling Report.

## C.     The 3AC Debtor Participates in Margin Trading on the FTX Exchange

29.     FTX operated a margin lending program (the "Margin Program") on the FTX

Exchange that purportedly enabled customers to provide and incur credit on the Exchange.  *See*

*generally* Austin Decl., Ex. 12, FTX_3AC_00013862 to -00013873 ("FTX Spot Margin Trading

Explainer").  Assets borrowed under the Margin Program could be used to purchase spot positions,

Spot Margin Trading Explainer at -000013862, or to settle liabilities incurred under futures

contracts, *see generally* FTX Collateral Management Explainer.

30.     According to the FTX Recovery Trust, the Margin Program involved the matching

of pools of customer borrowers with pools of customer lenders on the FTX Exchange through an

algorithm that filled customer borrowing demand with customer lending offers, setting interest

rates in the process.  Coverick Decl. ¶ 15.  In reality, however, the FTX Exchange's underlying

computer code did not require the existence of lending offers before permitting borrowing

transactions.  *See* Molina Dep. Tr. at 79:19-80:19.  Instead, the FTX Exchange code base

maintained entirely separate modules for (1) determining whether a borrowing could take place,

---

[5] The FTX Recovery Trust now asserts that customer assets were owned by FTX and were not held in trust for customers, citing other sections of the May 2022 Terms of Service that do not relate to ownership.  Specifically, in a section concerning trade advice, customers' reliance on it, and risk, FTX disclaimed a fiduciary relationship in connection with providing advice to customers about trading, May 2022 TOS § 2.1.3, and "provide[d] no warranty as to the suitability of the Digital Assets traded under the Terms and assume[d] no fiduciary duty to you in connection with such use of the Services[,]" May 2022 TOS § 2.2.2.  And in a boilerplate section alongside other standard terms, FTX explained that nothing in the Terms of Service was intended to constitute a partnership, association, joint venture, or fiduciary relationship.  *Id.* § 38.6.

(2) determining whether a lending transaction could take place, and (3) matching pools of borrowers and lenders. *See id.* at 91:3-12. The code responsible for allowing a transaction to trigger a "borrow" would execute almost immediately and independently, while the code that matched pools of lenders and borrowers operated on an hourly basis. *Id.* at 93:7-13.

31.    The purported customer "lenders" and "borrowers" did not transact directly and could not identify each other under the Margin Program. *See* Coverick Dep. Tr. (Day 1) at 376:18-23, 387:16-388:5. As FTX's former Director of Engineering (tasked with writing the FTX Exchange's code) testified, the code did not allocate a particular "borrow[ing]" customer with a particular "lend[ing]" customer. Austin Decl., Ex. 13, Transcript of October 28, 2025 Deposition of Nishad Singh ("Singh Dep. Tr.") at 16:10-25, 113:2-7. Instead, FTX managed the entire process, crediting the borrower's account with the loan amount and debiting the account for interest as it accrued, both solely at the level of the FTX Exchange's ledger. *See* Coverick Dep. Tr. (Day 1) at 384:7-13. Because FTX only effectuated these debits and credits at the ledger level, the purported customer "lenders" did not loan any specific assets to any specific customer "borrowers." *See id.* at 399:6-12. Likewise, there was no particular customer lender to any particular customer borrower. *See* Singh Dep. Tr. at 113:2-7.

32.    The FTX Recovery Trust characterizes the Margin Program as providing for loans between customers. *E.g.*, Objection ¶ 161. But repayment obligations under the program were owed to FTX, not other customers. Repayments were made to FTX, not credited to any particular lending customer, and did not decrease any specific lending customer's loan.[6] Repayment was

---

[6] *See* Bankman-Fried Dep. Tr. at 111:18-112:5, 114:6-13 ("[Q.] So if I borrowed $10 -- U.S. dollars on the margin lending program and I wanted to pay it back, I could transfer $10 onto my FTX account to repay the margin loan? A. In general, yes. Q. That $10 wouldn't then be transferred to the account of a particular customer lender; right? . . . .[A.] Not necessarily. Q. It would not necessarily be transferred to it? A. That's right. I'm not sure how you are defining that . . . . Q. If

accomplished via a ledger entry by FTX, and did not involve any borrower returning a borrowed asset to any particular lending customer.  *See* Coverick Dep. Tr. (Day 1) at 394:13-395:4.

33.    FTX professed that participation in the Margin Program was conditional on certain collateral requirements.  Spot Margin Trading Explainer at -000013862.  These collateral requirements, however, were not clear even to key FTX employees (including Nishad Singh), and the FTX Recovery Trust has not produced any documents in which these purported requirements were set forth for the FTX Exchange customers other than "explainers" akin to help articles on the FTX.com website.  *See* Singh Dep. Tr. at 16:10-25, 101:7-103:18.  Separate from these collateral requirements, FTX also purportedly did not permit accounts on the FTX Exchange to have a negative net balance.  Coverick Decl. ¶ 11.  In reality, accounts did at times have net negative balances.  *See* Singh Dep. Tr. at 86:14-87:12; Austin Decl., Ex. 14, FTX Recovery Trust's Resps. & Objs. to Interrogatory No. 3 (Seventh Set) (acknowledging approximately 11,000 customer accounts potentially had a negative account balance on June 14).

34.    The 3AC Debtor was a borrower under FTX's Margin Program, through which it borrowed U.S. dollars ("USD") to fund its trading activity and purchases of digital assets through the FTX Exchange.  As such, assets purchased using the 3AC Debtor's USD borrowings were reflected in its accounts' interface, and on the FTX Exchange ledger, as positive asset balances, while the accounts' USD balance indicated a liability for USD borrowed through the Margin Program.  *See* Coverick Decl. ¶ 19; Coverick Dep. Tr. (Day 1) at 384:10-13.  At the end of the day on June 12, the 3AC Debtor had incurred more than $700 million in USD liabilities on the FTX Exchange, which were "debts" that needed to be repaid.  *See, e.g.*, Tackett Dep. Tr. at 193:10-14

---

I borrowed $100,000 and then I repay it? -- A.  Yep.  Q. -- That doesn't -- that doesn't eliminate the loan that a particular user provided; right. . . . .  A.  It's not identified with a particular user.  It decreases the total amount of dollars being borrowed . . .").

(money in the 3AC Debtor's accounts that was not their own capital was a "debt"); May 2022 TOS §§ 2.4.1, 16.2 (characterizing amounts owed under the Margin Program as "debts").  While the assets that were loaned to the 3AC Debtor through the Margin Program were, according to the FTX Recovery Trust, from other Exchange customers, the FTX Recovery Trust admits that it is impossible to identify any particular customer lenders as those "lenders."  Austin Decl., Ex. 15, FTX Debtors' Resps. & Objs. to Interrogatory No. 2 (Fourth Set) ("The available data does not provide a means for identifying an individual lender as the source of specific funds borrowed by 3AC on any given date.").  The 3AC Debtor's payment obligations under the Margin Program, like those of other borrowers, were to FTX rather than any specific lending customer.  *See, e.g.*, Am. POC, Ex. B [Claim No. 100078], Margin Agreement § 2; Tackett Dep. Tr. at 256:12-257:3 (customer negative balances were owed to FTX).

### D.    The 3AC Debtor and FTX Enter into a Line of Credit

35.    The 3AC Debtor was a "VIP" client on the FTX Exchange due to its then-status as a large player in the cryptocurrency markets.  Tackett Dep. Tr. at 19:14-17.  VIP clients were "high volume traders" that were important to FTX and to whom FTX granted special privileges.  *See* Tackett Dep. Tr. at 15:5-22, 19:18-20:19.  One such privilege was the extension of lines of credit by FTX (separate and apart from any credit extended through the Margin Program).  *See* Austin Decl., Ex. 73, FTX_3AC_000013689 at -000013689; Coverick Decl. ¶ 49 ("[The line of credit] also allowed 3AC to trade using leverage without resorting to borrowing from the Margin Program up to the amount of the Line of Credit."); Austin Decl., Ex. 16, Transcript of September 25, 2025 Deposition of Steven Coverick ("Coverick Dep. Tr. (Day 2)") at 27:4-9 ("[T]he purpose of the line of credit is to increase an account's margin trading account value effectively providing it additional collateral so that it—the account has more—more cushion of head room over the requirement."), 28:8-11 ("[The line of credit] allows 3AC or any customer with a line of credit to first draw from

18

the line of credit before borrowing from the margin program.").  FTX had a standard form agreement for lines of credit, which it would modify to include economic terms specific to each applicable client, including the size of the line of credit, interest rate, and collateralization requirement.  Tackett Dep. Tr. at 85:4-20.

36.     As a VIP client, the 3AC Debtor received a line of credit issued by FTX.  *See* Tackett Dep. Tr. at 93:21-94:24.  On March 30, the 3AC Debtor and FTX entered into a line of credit agreement (the "Line of Credit Agreement") that was based on the standard form agreement FTX used with all other customers.  *Id.* at 91:3-9, 94:17-24.  The line of credit issued to the 3AC Debtor (the "Line of Credit") was in the amount of $120 million USD with a 5% per annum interest rate.  Am. POC, Ex. B [Claim No. 100078], Line of Credit Agreement at 1.  FTX (and only FTX) is defined as the "Lender" in respect of the Line of Credit.  Line of Credit Agreement at Preamble.

37.     At the same time, the 3AC Debtor also entered into a margin agreement with FTX ("Margin Agreement").  Line of Credit Agreement at 2-7.  The Margin Agreement was a separate agreement from the Line of Credit Agreement, but was part of the same document (collectively, the "March 2022 Agreements").  Section 21 of the Margin Agreement provides that the "[a]greement is solely for the benefit of the parties hereto" and that no other persons have rights or benefits thereunder.  Margin Agreement § 21.  The Margin Agreement purported to create certain rights and obligations between the 3AC Debtor and FTX, including making all "Indebtedness" payable by the 3AC Debtor to FTX upon FTX's demand.  *See id.* § 2; *see also* Levy Decl. ¶ 132; Austin Decl., Ex. 17, Transcript of November 19, 2025 Deposition of Stephen Houseman ("Houseman Dep.") Tr. at 316:3-8 ("Q. . . . [Y]ou believe that under the margin agreement it is abundantly clear that FTX is identified as the creditor; is that right?  A.  Yes, in clause 3.").  "Indebtedness", under the Margin Agreement, is defined to include debt incurred

through "margin trading and potentially discretionary line of credit facilities."  Margin Agreement at Recitals.  The Margin Agreement further specifies that "[a]ll amounts owed under LoCs [*i.e.*, lines of credit] constitute Indebtedness under [the Margin Agreement]" and that "[a]n LOC is Indebtedness in the principal amount that *is a USD balance* granted to Customer's FTX account." *Id.* § 7 (emphasis added).

38.     The Line of Credit Agreement required the 3AC Debtor to maintain "at least 200%" of the amount of the Line of Credit in the 3AC Debtor's account on the FTX Exchange as "Collateral."  Line of Credit Agreement § 5.  "Collateral" is not defined in the Line of Credit.  The FTX Recovery Trust asserts that this requirement meant that the 3AC Debtor was required to maintain an account balance (without counting amounts borrowed under the Line of Credit Agreement) equal to 200% of the Line of Credit amount.  *See* Coverick Dep. Tr. (Day 2) at 49:4-16.

39.     FTX removed the Line of Credit at 10:29 p.m. on June 14 because of the 3AC Debtor's alleged noncompliance with the "Collateral" requirement.  Coverick Dep. Tr. (Day 2) at 31:23-32:4; *see also* Tackett Dep. Tr. at 65:3-9.  Up until the Line of Credit's removal, the collateral made available under the Line of Credit remained available to the 3AC Debtor.  Tackett Dep. Tr. at 269:2-6.

**E.     The 3AC Debtor Becomes Insolvent by June 12**

40.     Throughout early 2022, the 3AC Debtor was heavily invested in the cryptocurrency token LUNA, associated with the stablecoin TerraUSD, via the Terra blockchain.  *See* Lisle Decl. ¶ 17.2.[7]  But the Terra ecosystem collapsed in mid-May, driving values to nearly zero.  *Id.*  Between

---

[7] TerraUSD was designed to be pegged to the USD and supported by a "guarantee fund" to support the value of the coin if prices declined.  *See* Lisle Decl. ¶ 17.2.

May 8 and 12, Terra lost its peg to the USD and the market lost faith in its value, resulting in overwhelming selling pressure.  *Id.*  By May 12, TerraUSD and LUNA's guarantee fund was exhausted.  *Id.*  TerraUSD and LUNA prices reached less than $0.01 and never recovered.  *Id.*  This collapse had a significant impact on the 3AC Debtor's financial condition, as the value of its LUNA holdings in this time period dropped from over $500 million on May 4 to approximately $7,445 by May 12.  *See id.*  At the time, the 3AC Debtor's exposure to Terra/LUNA was known in the industry.  *See* Tackett Dep. Tr. at 287:9-21, 293:17-25.

41.    The Terra/LUNA collapse had an outsized effect on the market.  *See* Tackett Dep. Tr. at 29:6-21.  The TerraUSD guarantee fund was made up of around $3 billion in BTC, and the rapid liquidation of the fund between May 8 and 12 depressed BTC prices.  *See* Lisle Decl. ¶ 17.2.  This added to widespread stress in crypto credit markets, resulting in margin calls on loans secured by digital assets and tightening liquidity across exchanges and lenders.  *Id* ¶ 17.4.  Contemporary reporting and industry analyses cited in the Lisle Declaration document these effects, including the speed of the decline and the resulting strain on leveraged participants and lenders exposed to crypto-collateralized borrowing.  *See id.* ¶ 17.3 n.16.  In this period, significant price declines in major tokens such as BTC and ETH coincided with increased margin requirements, forced deleveraging, and counterparties curtailing credit availability.  *Id.*

42.

43.     Against that backdrop, contemporaneous financial evidence, which was analyzed by the Joint Liquidators' expert Gregory E. Scheig, shows that the 3AC Debtor was insolvent by at least June 12.  *See* Scheig Report at 1.  Applying generally accepted insolvency tests and using the 3AC Debtor's available books and records, third-party data, and the transactional evidence produced in discovery, Mr. Scheig performed a balance-sheet analysis, a cash-flow (inability to pay debts as they fall due) analysis, and a reasonable-capital (adequate capitalization) analysis. *See id.* at 10-11.

44.



### F.    June 13 and 14, 2022: The 3AC Debtor's Digital Assets Are Sold or Liquidated

45.    At the center of this dispute is the sale and liquidation of the 3AC Debtor's Digital Assets that occurred between June 12 and 14.  As of end of day on June 12, the 3AC Debtor had incurred more than $700 million in USD liabilities on the FTX Exchange and had Digital Assets worth over $1 billion in its accounts on the FTX Exchange (excluding the value of its futures contracts).[9]  *See* Scheig Report at 30-31, Suppl. Ex. C.  By the end of day on June 14, however, the 3AC Debtor's USD liabilities on the FTX Exchange were almost entirely repaid through the sale and liquidation of substantially all of its Digital Assets.  *See id.* at 30.

46.    Based on the discovery that has taken place since the Amended Proof of Claim was filed, it appears that on June 13 and 14, the 3AC Debtor sold and FTX liquidated the vast majority of the 3AC Debtor's Digital Assets, reducing its positive Digital Asset balance and reducing its

---

[8]

[9] Data produced by the FTX Recovery Trust as FTX_3AC_000000038 ("Original Document 38") initially showed that as of end of day on June 12, the 3AC Debtor's Digital Assets were worth approximately $1.59 billion, and its negative USD balance was approximately $1.33 billion. While the figures above refer to the amended data produced by the FTX Recovery Trust ("Amended Document 38"), the Joint Liquidators reserve all rights with respect to the initial and amended data, including the right to challenge which data is more accurate and to rely on either data set.

USD liabilities, *i.e.*, by making less negative its negative USD balance (collectively the "June 13-14 Transactions").[10]  According to the FTX Recovery Trust, the 3AC Debtor first initiated a series of sales of the Digital Assets on June 13 and 14, closing out over 52,000 spot positions and over 8.5 million perpetual futures positions on the FTX Exchange.  Coverick Decl. ¶¶ 68, 86; *see* Coverick Dep. Tr. (Day 1) at 241:18-242:5.

47.    Then, on June 14 at 10:21 p.m., "FTX initiated a series of liquidating transactions in which [the 3AC Debtor's] digital assets were sold for $82 million" (the "June 14 Liquidation"). Coverick Decl. ¶ 70; *see also* Objection ¶ 94.  This $82 million liquidation was not automatic.  Nor was it triggered by any violation by the 3AC Debtor of its margin maintenance requirements to FTX.  Rather, it had become clear to Mr. Tackett and others at FTX that the 3AC Debtor was "scrambling" to repay loans, and FTX personnel discussed the likelihood of the 3AC Debtor's "bankruptcy."  *See* Tackett Dep. Tr. at 291:24-293:25.  FTX decided to manually liquidate the 3AC Debtor.  On June 14, FTX's code author and then Director of Engineering, Nishad Singh, wrote to other FTX employees, "the extreme thing would be to . . . forcibly remove the loc, leaving them pretty levered".  Austin Decl., Ex. 21, FTX_3AC_000044622 at -000044625.  Instead of removing the Line of Credit, Mr. Singh testified that he manually initiated the June 14 Liquidation to eliminate 3AC's negative USD balance (*i.e.*, its liability to FTX) on the FTX Exchange.  *See* Singh Dep. Tr. at 190:5-17, 212:3-9.  This manual liquidation resulted in the sale of $81 million of the 3AC Debtor's Digital Assets.

48.    Alameda Research LLC ("Alameda")—an FTX affiliate—was the counterparty to those trades.  Coverick Dep. Tr. (Day 2) at 252:12-253:11; FTX Recovery Trust's Resps. & Objs.

---

[10] Fact discovery is still ongoing, and the Joint Liquidators reserve the right to rely on additional facts, documents, or information that may become available after further investigation or discovery.

to Document Request No. 1 (8th Set) (stating Alameda "was the counterparty to 3AC"). The June 14 Liquidation was inconsistent with the 3AC Debtor's preferred execution style, which was to sell their Digital Assets instead of having them liquidated. *See* Austin Decl., Ex. 22, FTX_3AC_000044619 at -000044621 (Nishad Singh suggested to "sell '[the 3AC Debtor's] crypto with the execution style they prefer (instead of liquidation)").

49.     At the time of the June 14 Liquidation, the 3AC Debtor was not in violation of any margin maintenance requirements. Consistent with this, no automatic liquidation occurred, as would have happened if the 3AC Debtor was not meeting such requirements. The FTX Recovery Trust admitted it was unaware of any settings on the 3AC  Accounts that would prevent auto-liquidation, which would have been automatically triggered "to bring an account balance back in compliance with the maintenance margin requirement." *See* Coverick Dep. Tr. (Day 2) at 244:13-23, 245:4-8. On June 14 at 10:29 p.m., approximately eight minutes after Mr. Singh manually initiated the liquidation of $81 million of the 3AC Debtor's Digital Assets, FTX removed the Line of Credit from the 3AC Accounts. Coverick Decl. ¶¶ 76-77. Up until that point, the Line of Credit was in place and the 3AC Debtor was in compliance with FTX's margin maintenance requirement.[11] Once the Line of Credit was removed, "[a]n additional $1 million in assets were then auto-liquidated by FTX starting at 10:47 pm". *Id.* ¶ 77.

### G.      FTX Benefits from Repayment of the 3AC Debtor's Negative USD Balance

50.     FTX benefited from the elimination of the 3AC Debtor's negative USD balance on the FTX Exchange between end of day on June 12 and end of day on June 14. The negative USD

---

[11] *See, e.g.*, Tackett Dep. Tr. at 268:22-269:6 ("Q. When exactly was the line of credit sitting in their account until? A. Well, in the other chat, there you go, 6 p.m. Eastern time. Q. Up until that point in time, the collateral available under the line of credit was still available to Three Arrows; is that correct? A. I believe so, yes."

balance comprised of two elements: the $120 million Line of Credit, and the Margin Program. The $120 million Line of Credit was a debt owed to FTX, as discussed above.

51.    Likewise, the obligations under the Margin Program were payment obligation owed *to FTX*, not to any particular customer lender.  As such, any losses resulting from a borrower's failure to satisfy such a liability would have been (and were) absorbed by FTX, and not by any customer lender.  Lisle Decl. ¶ 33.  This is the case for several reasons.  First, because no specific lenders corresponded to any particular loan or borrower, losses resulting from borrower defaults could not be fairly allocated to customer lenders and instead had to be borne by FTX.  *Id.*  Second, because customer lenders could at any time opt to discontinue their participation in the Margin Program, freeing the previously loaned assets for the customer's withdrawal without the loaned assets being returned, they did not loan any assets to FTX.  *See* Molina Dep. Tr. at 61:23-62:14.  Accordingly, even if the borrower defaulted and did not return the loaned asset, the customer lender could cease participation in the Margin Program and withdraw their assets, necessitating that FTX absorbed the loss.  *See* Lisle Decl. ¶ 34.  Third, as explained below, the procedures established by FTX to address this default risk further demonstrate that FTX ultimately absorbed such losses.

52.    FTX established a multi-tiered liquidation and backstop liquidity program designed to mitigate the risk of customers incurring negative account balances.  This program's first line of defense against default risk was an automatic liquidation engine that it used to liquidate "any or all" of the assets in a customer's account if the customer's account value was below a certain maintenance margin requirement or FTX determined the customer was likely to default on a loan. *See* May 2022 TOS § 16.2; Austin Decl., Ex. 23, FTX_3AC_000013853 ("Liquidations

Explainer"). That liquidation would also involve the closing of any open futures contracts. *See* Coverick Dep. Tr. (Day 1) at 237:5-13.

53.     If, despite the automatic liquidation engine, the value of the account at issue dropped below a certain "auto-close margin fraction", FTX then used a backstop liquidity program (the "BLP") whereby certain backstop liquidity providers assumed customer positions, effectively absorbing their risk. Liquidations Explainer at -000013854 to -000013855. Certain affiliates of FTX, including Alameda, served as "backstop liquidity providers" within the BLP. *See* Coverick Dep. Tr. (Day 2) at 119:14-17. Under the BLP, if the backstop liquidity provider was able to close the customer position profitably, it kept the gains; if not, FTX's Insurance Fund (as defined and explained below) would cover residual losses if the backstop liquidity provider could not absorb the full negative balance (further demonstrating that FTX's affiliates, in their capacities as backstop liquidity providers, ultimately absorbed losses under the Margin Program). Lisle Decl. ¶ 35.

54.     As the next line of defense, if the BLP was insufficient to cover the full negative account balance of the customer, an insurance fund established by FTX (the "Insurance Fund") would step in to absorb the full loss for FTX. Lisle Decl. ¶ 35. Based on FTX's representations to its customers, the Insurance Fund absorbed losses up to the amount of funding in the Insurance Fund. *Id.* ¶¶ 36-37. The Insurance Fund was not a legally distinct pool of assets, but just a commitment by FTX to absorb losses in the amount of the fund. *Id.* ¶ 38 n.57.

55.     FTX instituted this elaborate multi-tiered risk-mitigation system precisely because it was not agnostic to the risks involved, but instead bore them. FTX effectively served as the "guaranteeing party" for repayment of margin borrowing on the Exchange, Bankman-Fried Dep. Tr. at 130:12-20, and covered losses under its Margin Program, *e.g.*, Tackett Dep. Tr. at

227:21-228:8 (FTX would typically "eat the loss" from negative account balances on the FTX Exchange); Bankman-Fried Dep. Tr. at 118:15-119:7 (. . . "[S]o long as FTX is able to cover any losses, we wouldn't be socializing losses to . . . the particular lenders who happen to lend to a particular customer . . . ."). Not only did FTX cover these losses, but it was able to do so at an enormous scale. Mr. Bankman-Fried, who had complete control over FTX, testified that he would have had FTX absorb up to $1 billion of losses rather than trigger a clawback. *See id.* at 154:14-25. In one particular instance, FTX directly absorbed a nine-figure customer loss associated with MobileCoin by allocating it to its affiliate Alameda. *See* Austin Decl., Ex. 24, Transcript of Direct Testimony of Nishad Singh, Criminal Trial of Sam Bankman-Fried at 1455:18-1456:21; Singh Dep. Tr. at 53:20-23.

56.    FTX's position as the party ultimately exposed to default risk and losses under the Margin Program is evident from the fact that it not only stood behind the multi-tiered risk mitigation system described above (whether as a backstop liquidity provider through Alameda or as the Insurance Fund's backer), but it was ultimately on the hook for any losses that system failed to absorb. Indeed, if the Insurance Fund described above was itself insufficient to cover the losses, FTX did so instead, despite what was said in FTX's customer-facing explainers, which provided that losses in such a scenario could be shared across FTX's customers pursuant to "clawbacks." Austin Decl., Ex. 25, FTX_3AC_000045167 at -000045169 ("Customers only face clawbacks if an account goes bankrupt *and* the backstop liquidity fund is empty." (emphasis in original)). The possibility of "clawbacks" was never more than theoretical: FTX never sought clawbacks from customers, and the FTX Exchange's code did not even allow them. *See* Singh Dep. Tr. at 55:22-56:1, 65:18-66:13.

57.     FTX actively sought to avoid clawbacks, because doing so would damage FTX's reputation and potentially cost FTX business.  *See* Lisle Decl. ¶ 40; *see also* Bankman-Fried Dep. Tr. at 154:3-5.  Such reputational and business damage would have spread beyond the confines of FTX's Margin Program and its participants, because any "clawbacks" would not only have allocated losses from borrower defaults to customer "lenders" under the Margin Program, but would have instead spread such losses across all FTX Exchange customers (whether or not they ever participated in the Margin Program) that had long positions in the asset classes comprising the portfolio at issue.  *See* Bankman-Fried Dep. Tr. at 149:25-150:5 ("Q. -- what would it mean to 'close down the positions'?  A.  Well, it would mean that if they were -- if, for instance, the liquidating users were short bitcoin users and the others were long, it would close down the longs as if they were BLPs").

58.     To avoid such reputational damage, FTX's policy was to avoid spreading losses across its customer base at all costs.  *See* Bankman-Fried Dep. Tr. at 154:3-5.  As the FTX Recovery Trust acknowledged, imposing margin trading losses on customers would have resulted in the FTX Exchange losing its status as "an attractive place for customers to trade."  *See* Coverick Dep. Tr. (Day 2) at 105:17-106:19; *see also* Tackett Dep. Tr. at 55:19-56:1 (allowing customers to incur negative account balances "would hurt the health of the exchange").

59.     In the same manner described above, FTX was likewise exposed to the losses that would have resulted from non-repayment of the 3AC Debtor's USD liabilities.  Because FTX stood to "eat" the 3AC Debtor's negative USD balances, it took several measures to bring the 3AC Accounts back into "good standing" in order to "protect[] [FTX] from basically having a massive hole."  Tackett Dep. Tr. at 146:5-24.  Due to the June 13-14 Transactions, FTX did not "eat" those "massive" liabilities.

60.     The June 13-14 Transactions also conferred on FTX a substantial reputational benefit because, as explained above, they eliminated any need FTX may have had to socialize the 3AC Debtor's losses across its customer base via "clawbacks" in a scenario where FTX was not able to absorb them itself.  A clawback from other FTX Exchange customers of the magnitude of the 3AC Debtor's USD liabilities as of June 12 would have been especially damaging to FTX, its business model, and its aspiration to remain an attractive trading platform.  Lisle Decl. ¶ 40.

**H.      The 3AC Debtor Commences Insolvency Proceedings in the BVI**

61.     On June 27, the 3AC Debtor commenced liquidation proceedings (the "3AC Debtor Liquidation") in the BVI Commercial Court, and on July 1, the Joint Liquidators were appointed by the BVI Court.  *See* Crumpler Ch. 15 Decl. ¶ 24.  The BVI court order provides that the Joint Liquidators have the power to "commence, continue, discontinue or defend any claim, action or legal proceeding in the United States of America ('US') as [they] see fit."  Crumpler Ch. 15 Decl. ¶ 27 (quoting Order of Jack, June 27, 2022).  "Much like a trustee in bankruptcy, the [Joint] Liquidators [were] charged with conducting an orderly and fair liquidation of the 3AC [D]ebtor and maximizing the value of its assets for the benefit of creditors."  Memorandum Opinion & Order Granting Motion for Leave to Amend Proof of Claim, [D.I. 29924] ("Order Granting Motion to Amend") at 2.

62.     To carry out their mandate, the Joint Liquidators have undertaken significant asset recovery efforts internationally against multiple counterparties, including chapter 11 debtors in the United States, and continued to pursue claims in the BVI Court against the 3AC Debtor's founders to recover assets.  *See* Declaration of Russell Crumpler in Support of the Motion of the Joint Liquidators of Three Arrows Capital, Ltd. for Leave to Amend Proof of Claim [D.I. 27755-3] ("Crumpler Motion to Amend Decl.") ¶ 8; Austin Decl., Ex. 26, Transcript of September 23, 2025 Deposition of Russell Crumpler ("Crumpler Dep. Tr.") at 42:3-17.  The 3AC Debtor's estate

includes illiquid cryptocurrency assets, the value of which is uncertain. In contrast to FTX's apparent recovery of the full face value of its claims (plus a potential surplus), projected creditor recoveries in the 3AC Debtor Liquidation are substantially less than par. *See* Crumpler Dep. Tr. at 47:4-49:2.

**I.     The Joint Liquidators Seek Discovery from FTX**

63.     As this Court recognized, at the time the Joint Liquidators were appointed, the 3AC Debtor had virtually no books or records, and the Joint Liquidators' attempts to obtain information from the 3AC Debtor's founders (who were also its former directors) were mostly futile. Order Granting Motion to Amend at 2-3. The Joint Liquidators were left with little more than a two-page list of assets as they began the tedious task of investigating and locating the 3AC Debtor's assets. Order Granting Motion to Amend at 2. The Joint Liquidators had no emails, no computers, no access to employees, or any other way to determine what assets the 3AC Debtor held, or more critically here, what transactions it had entered into in the past. *See* Crumpler Mot. To Amend Decl. ¶ 9.

64.     The Joint Liquidators' investigation included FTX. Immediately after their appointment, the Joint Liquidators worked diligently to obtain information concerning the 3AC Debtor's accounts from FTX. On July 1, the Joint Liquidators notified FTX of their appointment and requested that FTX provide information to assist with the 3AC Debtor Liquidation.

65.     On November 11, FTX filed for bankruptcy and the Joint Liquidators' access to the FTX Exchange was revoked. As of that date, very little material information had been produced by FTX.

**J.    The Joint Liquidators File a Proof of Claim Against FTX**

66.    On June 30, 2023, the 3AC Debtor timely filed proofs of claim (the "Original Proofs of Claim") against the FTX Debtors.[12]   As this Court recognized, at that time, "the information in the [Joint] Liquidators' possession was both incomplete and lacked the context needed for interpretation." Order Granting Motion to Amend at 13.  The only relevant information that the Joint Liquidators possessed indicated that FTX or its affiliates appeared to have seized or foreclosed upon an unknown amount of the 3AC Debtor's assets to satisfy a $120 million Line of Credit granted by FTX to the 3AC Debtor.

**K.    The Court Approves the Motion to Amend the 3AC Debtor's Proof of Claim**

67.    After filing the Original Proofs of Claim, the Joint Liquidators continued to seek discovery from the FTX Recovery Trust.  Instead of producing a comprehensive set of all intelligible data and communications about the relationship and transactions between the 3AC Debtor and FTX or all documents governing the parties' dealings, the FTX Recovery Trust's initially produced an enormous amount of raw data in a format requiring extensive further work by the 3AC Debtor's liquidation team.  *See* Crumpler Mot. To Amend Decl. ¶ 40.  By August 2024, this effort ultimately revealed that as of June 12, the 3AC Debtor had over one billion dollars' worth of digital assets, excluding the value of futures contracts, on the FTX Exchange. *See id.* ¶ 41.[13]  The Joint Liquidators' analysis further revealed that, between close of business on

---

[12] The Original Proofs of Claim asserted, *inter alia*, "claims under BVI, New York, Delaware, and other applicable law, including without limitation claims in the nature of preference, conversion, and other avoidance actions, arising from, on information and belief, a purported foreclosure by [FTX] on collateral securing an approximately $120 million purported loan that [the 3AC Debtor] owed [FTX] as of June 1, 2022", as well as "additional causes of action against [FTX] based on conduct, acts, omissions, and transactions between and among 3AC, [FTX], and [FTX's] affiliates."  Crumpler Mot. To Amend Decl. ¶ 35 (alterations in original).

[13] Over a year later, on August 25, 2025, FTX produced Amended Document 38, an amended version of Original Document 38, FTX_3AC_000000038, still showing that as of end of day on

June 12 and the close of business on June 14, nearly all of those assets were sold or liquidated. *See id.* ¶ 42.

68.     Documents obtained by the Joint Liquidators through discovery indicated that the 3AC Debtor's digital and other assets on the FTX Exchange amounted to over $1.5 billion by the end of the day on June 12, and its negative USD balance was over $1.3 billion.  Crumpler Mot. To Amend. Decl. ¶ 42.  Through a series of liquidations, seizures, or other transfers that occurred just two weeks before the 3AC Debtor initiated its liquidation proceedings in the BVI, the 3AC Debtor's digital and other asset holdings on the FTX Exchange were virtually eliminated, as was its negative USD balance.

69.     On November 6, 2024, the Joint Liquidators filed the Motion to Amend, seeking to amend the Original Proofs of Claim to incorporate these newly discovered facts.  *See* Motion to Amend [D.I. 27755].  Following an evidentiary hearing, on March 13, 2025, this Court granted the motion, observing that "[the FTX Debtors] gave the Liquidators only the raw data regarding the individual 3AC transactions on the FTX platform, and restricted access to the individuals who might be able to help put the puzzle together" and that "[the FTX Debtors'] assertion now that the Liquidators should be penalized for failing to assemble the puzzle faster is not well taken."  Order Granting Motion to Amend at 10.  The Court ultimately found that the Joint Liquidators had been "diligent in attempting to obtain the information" about the 3AC Debtor's claims and the FTX Debtors had "repeatedly delayed" providing such information.  *Id.* at 13.  The Court further recognized that "the claims in both the Original POC and the claims in the Amended POC all arise out of the same event: the liquidation of 3AC's account on the FTX [Exchange] between June 12

---

June 12, the 3AC Debtor had Digital Assets worth over $1 billion in its accounts on the FTX Exchange (excluding the value of its futures contracts.

and June 14, 2022, and the simultaneous satisfaction of a liability from 3AC to FTX in roughly the same amount that was liquidated." *Id.* at 9.

70.    On March 27, 2025, the Joint Liquidators filed their Amended Proof of Claim.

**L.    The FTX Recovery Trust Objects to the Amended Proof of Claim**

71.    The FTX Recovery Trust filed its objection on June 20, 2025, which consists of a whole new set of theories based on faulty foundational premises. Chief among them is the FTX Recovery Trust's so-called "single asset" theory—the notion that the 3AC Debtor (and other FTX customers) did not have separate assets and liabilities on the FTX Exchange but instead only an entitlement to the net value of those assets and liabilities. *See* Objection ¶¶ 5-7. In the FTX Recovery Trust's view, if a customer's overall account balance was positive, the customer was a creditor of FTX and had no financial obligations to FTX. This "single asset" theory is an artificial, post-bankruptcy construct; it is contradicted by the express language of the May 2022 Terms of Service; it is belied by contemporaneous documentary evidence and all contemporaneous witnesses, and it is entirely divorced from the reality of how FTX operated during the relevant time period. *See, e.g.*, Bankman-Fried Dep. Tr. 160:17-22 ("Q. Just the overall USD. Is that your understanding of how it worked, that the customer was only entitled to the overall asset balance . . . A. That was not my understanding . . ."); Singh Dep. Tr. at 175:18-176:6 ("[Q.]  If the way the FTX platform operated was the customers didn't actually have any assets or liabilities but just had a net account balance, that was the only thing they had, would you—would there still be a reason to have an automatic liquidation system? . . . A. It's hard for me to even imagine such a case. All you have are balances. What are you doing? Just giving people money? That's no trading. Q. That's not how you envision the system working? A. Correct."). Indeed, the FTX Recovery Trust's own English law expert, Lord Neuberger, opined that he has "always found [the 'single asset theory'] difficult to understand" and that it "does not apply when the client has a

positive net asset value" (*i.e.*, to the 3AC Debtor during the relevant period).  Austin Decl., Ex. 27, Transcript of November 11, 2025 Deposition of The Right Honourable Lord Neuberger Of Abbotsbury ("Neuberger Dep. Tr.") at 293:16-17, 294:20-24.

72.     Tellingly, the only support for the Objection is the post-bankruptcy analysis performed by the FTX Recovery Trust's financial advisor, Alvarez & Marsal ("A&M").  But A&M is not itself a contemporaneous witness nor did it speak with any current or former FTX employees other than Nils Molina regarding this dispute.  *See* Coverick Dep. Tr. (Day One) at 44:11-23.  Instead, the FTX Recovery Trust relied almost exclusively on the so-called "code base" to understand how the FTX Exchange operated.  *See, e.g.*, *id.* at 193:9-16, 229:9-11.  Had A&M bothered to speak to FTX's former officers and employees, it would have learned that the FTX Exchange operated drastically differently, if not in a manner entirely opposite, to the assertions made in the Objection.  *See, e.g.*, Bankman-Fried Dep. Tr. at 160:17-22; Singh Dep. Tr. at 175:18-176:6.

73.     Also troubling, on August 25, 2025—the very last day of party-document discovery—the FTX Recovery Trust produced an amended version of a key document that the Joint Liquidators had relied on in preparing their Amended Proof of Claim.[14]  The FTX Recovery Trust downplayed the amended data as "reflecting certain updates and clarifications consistent with information provided to you in March 2024."  *See* Austin Decl., Ex. 28, Aug. 25, 2025 Ltr. from Brian Glueckstein, counsel for the FTX Recovery Trust, to Latham & Watkins, counsel for the Joint Liquidators at 2.  The amended data—produced over seventeen months after the original data was produced—just so happened to fit the FTX Recovery Trust's new case theories, and the

---

[14] The newly produced document is Amended Document 38.  The original version of this document was produced in March 2024.

difference in the dollar values of the 3AC Debtor's assets in the original and amended document is approximately $600 million. *See* Coverick Dep. Tr. (Day 2) at 207:22-10 (testifying that the differences between the original and amended document included "the notional value of futures [which] was approximately $576 million" and "the negative or the deposit in question was $24 million").

74.     Finally, the Joint Liquidators note that in its Objection, the FTX Recovery Trust does not assert that it has a security interest over any assets at issue.  The FTX Recovery Trust disclaimed such an interest in sworn discovery responses and thus effectively abandoned any claim or defense based on having any purported security interest.  Austin Decl., Ex. 14, The FTX Recovery Trust's Resps. & Objs. to (1) Eighth Set of Requests for the Production of Documents, (2) Seventh Set of Interrogatories, and (3) Third Set of Requests for Admission at 30-31 ("[T]he FTX recovery Trust admits that FTX did not have a security interest in any Assets associated with the 3AC Accounts between June 12 and June 14, 2022 because FTX owned all Assets associated with the 3AC Accounts . . .").

## M.     The Parties' Merits Discovery Is Ongoing

75.     Since the filing of the Amended Proof of Claim, the parties have engaged in merits discovery on the 3AC Debtor's claims and the FTX Recovery Trust's defenses.  This discovery included extensive additional document productions and depositions of party witnesses and certain third-party witnesses, including former FTX management and FTX employees with personal knowledge of the FTX/3AC Debtor relationship and of the June 13-14 Transactions.  Expert discovery is ongoing, and the Joint Liquidators have not yet taken the deposition of fact witness Ryan Salame.

76.     Nonetheless, the merits discovery conducted to date substantiates the 3AC Debtor's principal claims.  In particular, witnesses have testified that:

- Contrary to the FTX Recovery Trust's assertions, the Line of Credit was a loan from FTX to the 3AC Debtor. *See, e.g.*, Tackett Dep. Tr. at 153:3-16 ("[W]e gave [the 3AC Debtor] 120 million dollars."); Bankman-Fried Dep. Tr. at 130:12-23 (a line of credit was a USD loan from FTX).

- FTX effectively served as the "guaranteeing party" for repayment of margin borrowing on the FTX Exchange, Bankman-Fried Dep. Tr. at 130:12-20, repudiating the FTX Recovery Trust's false claim in its Objection that this allegation in the Amended Proof of Claim was "fabricated," *see* Objection ¶ 161 n.24.

- FTX manually initiated the June 14 Liquidation, rather than an automatic liquidation triggered by noncompliance with margin requirements. *See, e.g.*, Singh Dep. Tr. at 190:5-17, 212:3-9, 212:22-213:10 (Mr. Singh manually initiated the June 14 Liquidation to eliminate 3AC's negative USD balance on the FTX Exchange); Coverick Dep. Tr. (Day 2) at 244:13-23, 245:4-8 (admitting that if the 3AC Debtor was out of compliance with the maintenance margin requirement, its accounts would have been automatically liquidated instead of manually liquidated).

77. As the Amended Proof of Claim forthrightly acknowledged, the viability of certain claims, many of which were pleaded in the alternative as permitted by the rules, "depend[ed] on [what] the ultimate facts revealed." Am. POC ¶ 2. And as the Joint Liquidators likewise acknowledged in the Amended Proof of Claim was possible, discovery conducted to date indicates that the 3AC Debtor was responsible for initiating each of the transactions at issue—other than the liquidation initiated by FTX on June 14 of $82 million worth of Digital Assets, which the 3AC Debtor was responsible for allowing to occur. Moreover, assuming for purposes of this Response the accuracy of the FTX Recovery Trust's belatedly produced Amended Document 38, the FTX Recovery Trust has now articulated a potential factual basis for the "Unknown Alleged Liability" (as defined in the Amended Proof of Claim). While reserving all rights to renew and/or amend such claims in light of further discovery, investigation, and analysis, for the purposes of this Response, the Joint Liquidators at this time, and without prejudice, withdraw the claims asserted in the Amended Proof of Claim for undervalue transaction, BVI turnover, U.S. law turnover,

conversion, and proprietary restitution.[15]  For the reasons below, the Joint Liquidators are entitled to complete relief based solely on their unfair preference claim, breach of contract, unjust enrichment, trust, and fiduciary duty claims.

## III.   LEGAL STANDARD

78.    In ruling on an objection to a proof of claim, courts in this Circuit apply the framework set forth in *In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992).  *Allegheny* articulates a multi-step sequence that allocates burdens between the claimant and the objector. First, the claimant meets its initial burden by filing a proof of claim that "alleges facts sufficient to support a legal liability."  *Id.* at 173.  At that point, the claim is *prima facie* valid.  *Id.*  The burden then shifts to the objector to produce evidence "equal in force" to the *prima facie* case that, if believed, would refute at least one allegation essential to the claim.  *Id.*  If the objector does so, the burden of persuasion remains with the claimant to prove the claim by a preponderance of the evidence.  *Id.* at 173-74.  If the objector does not, the claim stands allowed.  *See* 11 U.S.C. § 502(a).

## IV.   THE FTX RECOVERY TRUST'S OBJECTION RESTS ON A FAULTY FOUNDATION

79.    In a misguided effort to defeat the Joint Liquidators' claims, the FTX Recovery Trust rests its case on two threshold claims: (1) that the 3AC Debtor lacked a beneficial interest in the Digital Assets transferred away from the 3AC Debtor's accounts, and (2) that the 3AC Debtor had no individual assets or liabilities on the Exchange, but only a net account balance.  For the reasons that follow, neither assertion tracks reality.

---

[15] The Amended Proof of Claim raised three distinct factual predicates for the Joint Liquidators' breach claims: (1) that FTX deprived the 3AC Debtor of contractually provided ownership rights in the Digital Assets, *see* Am. POC ¶¶ 56-57; (2)  that FTX, without basis, appropriated Digital Assets to satisfy an "Unknown Alleged Liability," *see id* ¶¶ 59, 79; and (3) that FTX effected takings of the Digital Assets on June 13 without justification, *see id* ¶ 80.  At this time, and without prejudice, the Joint Liquidators do not prosecute the latter two predicates for the breach claim.

**A.    The 3AC Debtor Had a Beneficial Interest in the Digital Assets in Its FTX Accounts**

80.    To be clear, none of the Joint Liquidators' primary claims—for unfair preference; breach of contract, trust, and fiduciary duty; and unjust enrichment—requires that the 3AC Debtor have had any form of ownership interest in the Digital Assets. *See, e.g.*, Levy Decl. ¶ 34(a) ("[T]he FTX Recovery Trust is simply incorrect that an unfair preference claimant must have a proprietary interest in the assets subject to the preferential transaction, although 3AC has such an interest in any event."); Gloster Decl. ¶ 118 ("If, as a result of an act or omission by FTX, 3AC was deprived of its ownership rights in respect of the 3AC Digital Assets, . . . then FTX is in breach of clause 8.2.6 of the Terms, as FTX has not done what it contracted to do, and 3AC has a claim against FTX for breach of contract.").

81.    Still, the 3AC Debtor *did* have an ownership interest in those Digital Assets, and that ownership interest strengthens the Joint Liquidators' claims.[16]    The Joint Liquidators should prevail on their unfair preference claim notwithstanding the FTX Recovery Trust's (incorrect) theory that an unfair preference requires a transaction in which the debtor transfers an asset in which it has a formal "proprietary interest."    Further, the 3AC Debtor's ownership interest undermines the FTX Recovery Trust's attempted defense that an insolvency set-off would apply. And it further disproves the FTX Recovery Trust's overarching argument for the application of the so-called "single asset" theory—the notion that the 3AC Debtor (and other FTX customers) did not have separate assets and liabilities on the FTX Exchange but instead only an entitlement

---

[16] The sole exceptions are the Joint Liquidators' breach of contract, trust, and fiduciary duty claims, which are set out in the alternative if the Court finds that an ownership interest was necessary but absent.

to the net value of them.  Accordingly, the Joint Liquidators address at the outset why the 3AC Debtor had an ownership interest in the Digital Assets.

### 1.    The 3AC Debtor Beneficially Owned the Digital Assets in a Trust

82.     Under the May 2022 Terms of Service, the 3AC Debtor was the beneficial owner of the Digital Assets and had an equitable proprietary interest in commingled pools on the FTX Exchange when the Digital Assets were swept into them.  Legal title vested in FTX, which, as trustee, held the 3AC Debtor's interest on trust for the 3AC Debtor.  Gloster Decl. ¶ 17(a).  Parties can create an express trust through either conduct or words.  Austin Decl., Ex. 29, *Paul v Constance* [1977] 1 WLR 527; *see also* Austin Decl., Ex. 30, *Ruscoe v. Cryptopia* [2020] NZHC 728 ¶ 157(a); Neuberger Dep. Tr. at 141:6-12.  In either case, an express trust requires certainty as to: (1) intention, (2) subject-matter, and (3) objects (*i.e.*, as to beneficiaries).  Neuberger Initial Decl. ¶ 33; Gloster Decl. ¶ 48.

83.     Though the case law on digital assets is relatively nascent in England (as elsewhere), four authorities provide clear guidance as to how English courts would determine whether a cryptocurrency exchange formed a trust relationship with its customers.

84.     First, the Law Commission—a group established by statute in the United Kingdom to promote law reform—published a "Digital Assets: Final Report," providing guidance as to how courts could/should handle issues arising in the digital-asset space.  Austin Decl., Ex. 31, Law Commission Report at i.  "The Law Commission is a respected independent statutory body, consisting of experienced academic and practising lawyers, which keeps English law under review and recommends reform where needed," Neuberger Initial Decl. ¶ 22, and its reports serve as persuasive authority for English courts.  Neuberger Dep. Tr. at 33:2-3 ("As a judge I always took Law Commission reports seriously . . . ."), 94:8-10 (Law Commission reports are "certainly respected" in the English legal community).  The FTX Recovery Trust's English law expert, Lord

Neuberger, himself relied on the Law Commission Report in his own Declarations and could not identify anything wrong in its analysis of ownership of digital assets. *Id.* at 32:22-35:21; *see also* Neuberger Initial Decl. ¶¶ 27-28.

85.    Second, in the most factually analogous decision, *Ruscoe v. Cryptopia*, the New Zealand High Court analyzed the three certainties—certainty of intention, subject matter, and objects—to resolve an issue nearly identical to the one here: "[w]hether any or all of the Digital Assets [on an exchange] are held on trust for any or all Account Holders." *Ruscoe*, *supra*, ¶ 46(b). The High Court held that the exchange, Cryptopia, held the digital assets "on separate express trusts . . . for all accountholders." *Id.* ¶ 187.  Though *Ruscoe* is a New Zealand decision, English courts consider New Zealand cases persuasive authority, and the Law Commission Report relied on *Ruscoe* extensively.  *See* Neuberger Dep. Tr. at 35:23-36:23, 129:15-20; Law Commission Report ¶ 7.45 n.730; *see also* Law Commission Report ¶¶ 3.42-43 & n.175, 7.47 n.732.

86.    Third and fourth, two scholarly articles also address the issues raised here.  *See* Austin Decl., Ex. 32, Hin Liu, *Transferring Legal Title to a Digital Asset,* 5 J. Int'l Banking & Fin. L. 317 (2023); Austin Decl., Ex. 33, Hin Liu, Louise Gullifer, & Henry Chong, *Client-Intermediary Relations in the Crypto-Asset World*, Univ. of Cambridge Faculty of Law Research Paper No. 18/2021 (2020), reproduced in P. Davies & C. Tan (eds.), Intermediaries in Commercial Law (2022).  The former, as Lord Neuberger explains, provides a "detailed treatment" "of how legal ownership of digital assets works and how it can be transferred."  Neuberger Initial Decl. ¶ 27; Neuberger Dep. Tr. at 102:13-22.  The latter is, in his words, a "helpful article" that explains the "three possible types of relationships that are potentially relevant to understanding the [May 2022 Terms of Service]."  Neuberger Initial Decl. ¶¶ 30-31.

87. Thus, these four authorities guide the three certainty analyses, which "are in practice closely linked." *Id.* ¶ 33. In sum, the "best way" to characterize "the interests of beneficiaries of crypto-tokens or crypto-token entitlements held by a custodial holding intermediary"—like FTX—"on a consolidated unallocated basis for the benefit of multiple users is as rights of co-ownership in an equitable tenancy in common." Law Commission Report ¶ 7.53; Neuberger Dep. Tr. at 123:14 ("I think [that view] is probably right, yes."). As explained below, all three certainties—intention, subject matter, and objects—are readily satisfied.

a.    Certainty of Intention Is Present

88. A trustee-beneficiary relationship in this context requires that "legal title to digital assets vests with [an] intermediary, which holds that title on trust for the customer, while beneficial title remains with the customer." Neuberger Initial Decl. ¶ 30.1. Certainty of intention to create such a trust requires a "'clear substantive intention, based on an objective assessment, by the relevant party or parties." Gloster Decl. ¶ 59 (quoting Law Commission Report ¶ 7.43). Although "there must be clear evidence from what is said or done of an intention to create a trust," no formal or technical words or acts are required. *Paul v Constance* [1977] 1 WLR 527, 531. Both FTX's conduct and its agreement with the 3AC Debtor independently and together demonstrate the parties' intention to create a trust.

(1)    *FTX's Conduct Manifested an Intention to Create a Trust*

89. In finding certainty of intention, the *Ruscoe* court held that Cryptopia's intention alone could satisfy the element and that Cryptopia's conduct did so. *Ruscoe*, *supra*, ¶ 153; *see also* Austin Decl., Ex. 34, Jessica Hayton, Ben McFarlane, & Charles Mitchell, Equity and Trusts 273 ¶ 7-007 (15th ed. 2022) (explaining that certainty of intention "can arise as a result on one party's exercise of a power to create" a trust). The High Court highlighted four items:

42

- That Cryptopia had created the exchange while holding the public and private keys of accountholders, *Ruscoe*, *supra*, ¶ 153;

- That Cryptopia's internal database was structured to track client account balances, *id.*;

- That Cryptopia "did not intend to and did not trade in the digital assets in its own right," *id.* ¶ 154; and

- That Cryptopia's internal financial accounts and tax returns did not assert an ownership interest in the cryptocurrency, *id.* ¶ 165(d)(iii).

*See* Austin Decl., Ex. 35, Law Commission Consultation Paper ¶ 16.58 (describing these factors as the four the *Ruscoe* court considered); Law Commission Report ¶ 7.45 & n.730 (incorporating by reference its analysis from the "consultation paper paras 16.57-16.63"); *see also* Neuberger Dep. Tr. at 131:18-19 ("I would be surprised if the Law Commission had got [*Ruscoe*] wrong.").

90.     Just as Cryptopia's conduct demonstrated its intention to create a trust in *Ruscoe*, so too did FTX's conduct here.[17]  Like Cryptopia, FTX created its exchange while holding the private keys of users of the Exchange.  Mosley Dep. Tr. at 67:23-68:3, 82:5-15, 84:17-22.  And also like Cryptopia, FTX structured the exchange to track client account balances.  *See infra*

---

[17] Lord Neuberger attempts to distinguish *Ruscoe* on the purported basis that Cryptopia expressly told customers in its terms of service that it would hold digital assets "on trust" for each user, while the May 2022 Terms of Service did not.  Neuberger Initial Decl. ¶ 39.3 n.77.  But the language Lord Neuberger quotes came from an *amended* terms of service, *Ruscoe*, *supra*, ¶¶ 27, 179, which the *Ruscoe* court explicitly disclaimed relying on:

> As to the question when the intent to create the trusts was manifested, I am satisfied a trust came into existence for each of the cryptocurrencies as soon as Cryptopia came each time to hold a new currency for accountholders.  Trusts in respect of each currency that Cryptopia held arose on those particular dates and certainly before 7 August 2018.  I make that finding without needing to rely specifically on the amended terms created by the variation document.

*Id.* ¶ 155; *see also id.* ¶ 181 ("I have confirmed above that I am satisfied no variation of trust was involved in the amended terms.  Those terms merely confirmed what were the existing trusts in operation.").  At deposition, Lord Neuberger admitted that he may have been "wrong" in suggesting otherwise.  Neuberger Dep. Tr. at 146:23-147:4, 147:21-148:3.

section IV.A.1.b.    As FTX's then-Head of Institutional Sales put it, based on the "wallet architecture and the way that exchanges work," "FTX would be custodying the assets that users deposited."    Tackett Dep. Tr. at 208:18-209:21.    Although FTX illegally traded in customers' digital assets, it, like Cryptopia, did not do any such trading publicly.    *See generally* FTX Commingling Report.    Moreover, under the May 2022 Terms of Service, FTX expressly told customers that it did "not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading" and that none "may be loaned to[] FTX Trading."    May 2022 TOS § 8.2.6(B).

91.    Finally, like Cryptopia, FTX did not report an ownership interest in its customers' assets in its financial statements (as discussed below).    The authorities agree that this fact supports an intent to create a trust.    *See* Liu, Gullifer, & Chong, *supra*, at 4 ("If the crypto-assets are being held on trust for the client, they would not be held on the intermediary's balance sheet."); Neuberger Dep. Tr. at 109:5-20 (agreeing that an intermediary's financial statements can provide "some evidence of intent"); *cf.* Austin Decl., Ex. 36, *Re TXU Europe Group Plc* [2003] EWHC 3105 (Ch) ¶ 25 (explaining that references to an investment "as an asset" in a company's accounts "point[ed] against the creation of any trust" since the company "could not properly" have made such references "if, in truth, the investment was held on trust for others").    Accounting rules explain why.    Under U.S. Generally Accepted Accounting Principles ("GAAP"), "a digital asset custodian's (such as FTX's) omission of consumer digital assets from its own balance sheet would indicate the accountants' and auditors' conclusion that the custodial firm did not control such assets."    Scheig Report at 14-15.    "If the custodian (here, FTX) held the assets purely in a custodial capacity and had no such economic rights (if the customer bore all market risk and reward and the custodian had no right to sell, pledge, or use the crypto for its own benefit), recognition of the assets was not required on the custodian's balance sheet."    *Id.* at 15.    "An auditor's unqualified

opinion on those financial statements with no such customer assets included on FTX's balance sheet would support that they reached the conclusion that FTX did not control customer assets, which would thus be considered assets of the customer." *Id.* That evidence is unrebutted.

92.     Here, FTX's financial statements confirmed that they did not include the Digital Assets as FTX's assets.  In fact, the FTX Recovery Trust has admitted that FTX's financial statements "have not recorded the customer fiat nor their crypto balances on [the] books as an asset or liability."  FTX Commingling Report at 23.   Likewise, FTX's "Consolidated Financial Statements" for the years ended December 31, 2020 and 2021, prepared by an independent auditor, contained "Consolidated Balance Sheets," including a line for "Crypto assets held," without referencing customer assets.  FTX Trading Consolidated Financial Statements at -000046174; *see id.* at -000046183 (defining "Crypto assets held" without reference to customer assets).[18]

93.     FTX's statements within their financials further demonstrate their intention to create a trust relationship.  They explain that FTX:

- "is an agent in arranging transactions between customers and presents revenue for the fees earned on a net basis," *id.* at -000046190;

- "does not control the crypto assets, futures or option contracts before they are created and/or exchanged between the maker and taker, does not have inventory risk related to the crypto assets, and is not responsible for the contract fulfillment of the underlying crypto assets," and "acts as an agent in facilitating the ability for a customer to purchase from another customer," *id.* at -000046190; and

---

[18] In draft 2021 financial documents, FTX did not recognize or report customer assets.  Austin Decl., Ex. 37, THREE_ARROWS_00322550 (draft Q1 2021 FTX balance sheet); Austin Decl., Ex. 38, THREE_ARROWS_00322540 at -00322546 (discussing "GAAP" in relation to the draft Q1 202 balance sheet); *see also* Austin Decl., Ex. 39, THREE_ARROWS_00322563 (potentially draft Q2 2021 trial balance); Austin Decl., Ex. 40, THREE_ARROWS_00322564 (potentially draft Q2 2021 P & L statement), Austin Decl., Ex. 41, THREE_ARROWS_00322565 (potentially draft Q2 2021 balance sheet).  Likewise, FTX's Q3 "trial balances" for various FTX entities, including FTX Trading and FTX Digital Markets, do not mention customer assets.  Austin Decl., Ex. 72, FTX_3AC_000046202 (Q3 trial balances for FTX entities).

- "has committed to securely store all crypto assets it holds on behalf of users," *id.* at -000046200.

94.     In addition, FTX Digital Markets, the particular FTX entity responsible for providing many services to customers, represented that it was "ultimately responsible for the safeguarding of its customers' assets," and that "customer assets are held in trust." FTX_3AC_000044442 at -000044446; *see also* May 2022 TOS at 1, Schedules 2, 3, 5, 8.  Lord Neuberger himself conceded at deposition that these statements, of which he was not previously aware, support a trust relationship.  Neuberger Dep. Tr. at 91:1-92:1.

95.     Because FTX's conduct mirrored Cryptopia's in all relevant respects, FTX demonstrated its intention to create a trust relationship.

(2)     *FTX's Contract with the 3AC Debtor Manifested an Intention to Create a Trust*

96.     Even if the parties' conduct alone did not provide sufficient certainty that the parties intended a trust relationship, the May 2022 Terms of Service confirm that the parties intended to create a trust.

97.     In a contractual context, intention to create a trust turns on the proper interpretation of the applicable contractual language.  Gloster Decl. ¶ 59.  English courts apply conventional principles of contract construction, trying to "ascertain the objective meaning of the language which the parties have chosen to express their agreement."  *Id.* ¶¶ 43-43(a) (citation omitted).  To do so, an English court may use "both textualism and contextualism" and "will ask what a reasonable person, with all the background knowledge that would reasonably have been available to the parties when they entered into the contract, would have understood the language of the contract to mean."  *Id.* ¶ 43(b), (e).  Such background knowledge includes "clear and well-known legal principles" related to the contract.  *Id.* ¶ 47 (quoting Austin Decl., Ex. 42, *Challinor v. Juliet Bellis & Co* [2013] EWHC 347 (Ch) ¶ 277).  It also includes "consideration of the words used in

their documentary, factual and commercial context—the so-called 'factual matrix.'" *Id.* ¶ 43(b). Thus, the factual matrix encompasses what a customer "knew or should reasonably be expected to know" and what "the market generally understood." Neuberger Dep. Tr. at 74:15-18, 86:21-87:11.

98.     Because FTX swept all customer assets into pooled hot wallets shortly after they were acquired, all while promising FTX customers, like the 3AC Debtor, that they would own the assets associated with their accounts and that title would "at all times remain with" such customers, the parties intended to create a trust over the Digital Assets. Specifically, the parties intended that FTX, as an intermediary, hold legal title to the Digital Assets on trust for the 3AC Debtor, which retained beneficial title to those assets.

(a)     Customers Understood That Legal Title Went to FTX

99.     When customers initially deposited digital assets onto the FTX Exchange, they would do so into discrete and customer-specific deposit wallets maintained by FTX. *See* Mosley Dep. Tr. at 66:15-19, 70:12-17, 82:7-15. FTX, at all times, held the private keys to these deposit wallets. *See id.* at 67:23-68:3, 82:7-15.

100.    "[V]ery quickly" thereafter, FTX would sweep all assets from the customer-specific deposit wallets into sweep wallets maintained by FTX and for which FTX held private keys. *Id.* at 67:23-68:3, 82:5-15, 84:17-22. As the FTX Recovery's Trust English law expert, Lord Neuberger, concedes, FTX customers "[u]ndoubtedly" must have become aware of sweeping "pretty quickly." Neuberger Dep. Tr. at 59:21-60:10. Thus, at least by the time the May 2022 Terms of Service came into effect, preexisting FTX customers likely would have known of FTX's sweeping. *Id.* at 74:19-75:7.

101.    Relatedly, FTX customers understood the legal import of the sweeping to mean that FTX would hold the private keys for and thus legal title to those assets. As the FTX Recovery

Trust's experts explained, under English law, legal title to digital assets follows control of the private keys. *Id.* at 209:6-19; Houseman Dep. Tr. at 74:14-75:14 ("Q. . . . Could you explain at a high level your understanding of how the FTX exchange operated?  A. . . . [T]he feature of it that jumps out more than anything is that . . . you would hand the private keys to your crypto assets . . . to FTX, to the Exchange operator.  And anyone who knows anything about crypto  surely knows that once you hand over the private key, it's gone, it's gone to the other person.").  Lord Neuberger explicitly agreed with the reasoning of Liu's article that stated that "people assume or expect that a change in the state of the blockchain also corresponds with a change in the location of title," *i.e.*, that people assume a transfer of an asset to a different public address effects a change as to legal title.  Liu, *supra*, at 318; Neuberger Dep. Tr. at 103:23-105:15 (describing the proposition as having "a lot of force").  In other words, once assets were swept, customers understood that FTX had legal title to them.

102.    Meanwhile, FTX "portrayed itself [*i.e.*, to the market] as the vanguard of customer protection efforts in the crypto industry."  FTX Commingling Report; Bankman-Fried Senate Testimony at 34 ("[A]s a general principle FTX segregates customer assets from its own assets across our platforms"); *see also* Austin Decl., Ex. 71, Transcript of Direct Testimony of Can Sun, Criminal Trial of Sam Bankman-Fried ("Sun Tr.") at 1899:19-22 ("Q.  And what kinds of things do you recall observing the defendant say publicly about how FTX treated customer assets?  A.  That all customer assets of FTX were safeguarded, segregated, protected.").  FTX "often gave [VIP] clients in the onboarding process" an explainer document, stating that FTX Digital Markets Ltd. "is ultimately responsible for the safeguarding of its customers' assets," and that its "key roles and responsibilities" included "[a]ppropriately account[ing] for the difference between its own assets and its customers' assets."  FTX_3AC_000044442 at -000044446; Tackett Dep. Tr. at

214:2-8.  It also explained to customers that "[a]ll third-party providers are aware that customer assets are held in trust."  FTX_3AC_000044442 at -000044445.  At deposition, Lord Neuberger indicated that, though he had not been previously aware of these statements, they supported a trust relationship.  Neuberger Dep. Tr. 87:13-92:1.  Indeed, it was "FTX's policy that [customer assets] were not" assets of FTX Digital Markets Ltd.  Tackett Dep. Tr. at 218:3-22.

(b)    Customers Retained Beneficial Title Under Section 8.2.6

103.    Section 8.2.6 sets out the relationship between the 3AC Debtor and FTX as to the Digital Assets.  It describes the 3AC Debtor as (1) retaining title to the Digital Assets "at all times," (2) owning the Digital Assets, which, it states, are not the property of or loaned to FTX, and (3) controlling the Digital Assets.  May 2022 TOS § 8.2.6.  In full, the provision reads:

> All Digital Assets are held in your Account on the following basis:
>
> (A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets.  FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.
>
> (C)    You control the Digital Assets held in your Account.  At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

Section 8.2.6 thus evidences the intention that "owner[ship]" of and "[t]itle" to the Digital Assets remain with the 3AC Debtor "regardless of whether assets came to be associated with 3AC's

Accounts by virtue of a deposit made by 3AC, by means of a credit to 3AC's Accounts by a third party, or by means of trading activity on the Exchange."  Gloster Decl. ¶ 53.

104.    While section 8.2.6 does not explicitly state whether "owner[ship]" and "[t]itle" refer to legal or beneficial title to the Digital Assets, in light of the factual matrix, where customers understood that their assets would be commingled and that legal title would transfer to FTX, "owner[ship]" and "[t]itle" must refer to *beneficial* title.  *See id.* ¶ 55.  Although words in isolation may have multiple meanings (indeed, here, one could read "owner[ship]" and "[t]itle" as referring to *both* legal and beneficial title), "the terms of a contract are not construed in a vacuum, but must be interpreted in light of the factual matrix."  *Id.* ¶ 55; *see also id.* ¶ 44 ("Courts will never construe words in a vacuum." (quoting Austin Decl., Ex. 43, *Arbuthnott v. Fagan* [1995] 2 Lloyd's Rep 344 per Bingham MR)).  The factual matrix includes well-known legal principles related to the contract, what the market generally understood, and what customers knew or should reasonably have known.  *See supra* section IV.A.1.a(2)(a).  As discussed above, FTX customers knew—at least by the time of the May 2022 Terms of Service (if not always)—that FTX pooled its customer assets nearly immediately after customers deposited assets onto the Exchange.  They knew that FTX kept customer assets in pooled hot wallets, in respect of which FTX held the private keys. FTX customers also understood that, under English law, legal title followed the private keys, so, at least after assets were swept, FTX would have had legal title to them.  In that context, the only plausible meaning of section 8.2.6 is that the references to "owner[ship]" and "[t]itle" are to the *beneficial* ownership and *beneficial* title to the assets, with FTX holding those assets and/or the 3AC Debtor's equitable proprietary interest in the commingled pools on trust for their customers. *See* Gloster Decl. ¶ 55.

105.    In light of the factual matrix, where customers understood FTX to have legal title nearly immediately (at the very latest, after assets were swept), "owner[ship]" and "[t]itle" cannot mean *legal* "owner[ship]" and *legal* "[t]itle." *See id.* ¶ 56(c).  Indeed, it would be impossible. Gloster Decl. ¶ 56(c).  And English courts resist construing contracts, and particularly commercial ones, to mean that "the parties have contracted for the impossible." *Id.* ¶ 45 (quoting Austin Decl., Ex. 44, *The Epaphus* [1987] 2 Lloyd's Rep 213); Neuberger Dep. Tr. at 237:3-19 (agreeing that "the parties cannot have intended something that any market participant would know is an impossibility").  Thus, because market participants understood it was impossible that they would have legal title, the natural and ordinary meaning of "owner[ship]" and "[t]itle" must mean *beneficial* ownership and *beneficial* title.

106.    Further practical impossibilities arise if "owner[ship]" and "[t]itle" in section 8.2.6 refer to legal title.  It would make it impossible for FTX to treat the digital assets as fungible as it had to for the Exchange to function (such as in honoring withdrawal requests).  Gloster Decl. ¶ 56(c).  Moreover, if the 3AC Debtor did not maintain beneficial ownership and title, an "impossibility would arise in respect of digital assets credited to 3AC's 'Account' (that is, added to the balance associated with the 3AC Digital Assets on FTX's ledgers) by a third party or by virtue of dealings on the Exchange: unless and until 3AC took steps to withdraw such assets, there would never actually be an act of transfer to 3AC, and thus there would be no means by which legal title could transfer to 3AC." *Id.*; *see also* Neuberger Dep. Tr. at 237:8-10 ("[T]he parties cannot intend an impossibility").

107.    The FTX Recovery Trust has never propounded a credible, contrary interpretation of section 8.2.6.  Instead, the FTX Recovery Trust, through its English law expert, has taken shifting positions as to how section 8.2.6 should be interpreted.  None is availing.  In his first two

declarations, Lord Neuberger offered no interpretation of the clause but instead simply stated that the clause did not reflect an intent to create a trust. *See* Neuberger Initial Decl. ¶ 45.4; *see generally* Neuberger Initial Decl. (mentioning the clause three times (once in a footnote) in his 66-page report); Second Declaration of the Retired Honourable Lord Neuberger of Abbotsbury [D.I. 30933] (not mentioning the clause).

108.    Understanding that it would be incredible for such a critical provision to have no meaning at all, in his rebuttal declaration, Lord Neuberger *attempted* to provide section 8.2.6 with what he called a "natural[]" meaning," that "legal title to 3AC's Digital Assets rests with 3AC, at least at the point that they are deposited," with "the courts [left] to work out the consequences of the dealings with those assets thereafter."  Neuberger Rebuttal Decl. ¶ 21(a)(iii).  In other words, in an attempt to find some meaning, Lord Neuberger said the intent was only to transfer title for *deposited* assets (not purchased or traded ones), and only at the instant of deposit (not at all times). But this interpretation makes no sense.

109.    Nothing in section 8.2.6 is limited only to *deposited* assets, and nothing in it is limited only to the time of deposit.  To the contrary, section 8.2.6 provides that "Title to [the 3AC Debtor's] Digital Assets shall at all times remain with [the 3AC Debtor] and shall not transfer to FTX," that "[n]one of the Digital Assets in [the 3AC Debtor's] Account are the property of, or shall or may be loaned to, FTX," that FTX "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading," and the 3AC Debtor "control[s] the Digital Assets held in [its] Account."  May 2022 TOS § 8.2.6.  To conclude, in the face of such language (as Lord Neuberger did in his rebuttal declaration), that mere moments after the 3AC Debtor deposited digital assets onto the Exchange, they became the property of FTX, and that the 3AC Debtor never

acquired a proprietary interest in digital assets it purchased on the Exchange, is patently unreasonable.

110.    Unsurprisingly, then, when pressed at his deposition, Lord Neuberger changed his opinion.  He admitted that the interpretation in his rebuttal report was not natural and ordinary, and he abandoned it.  Instead, in a stunning admission, Lord Neuberger explained at deposition that the natural reading of section 8.2.6 is that the "customer [is] to be the owner in all aspects" (*i.e.*, both legal and beneficial) of "all digital assets" "[a]t all times."  Neuberger Dep. Tr. at 156:25-157:15, 161:18-24, 163:3-18; *see also id.* at 51:24-52:8, 151:8-11.  Lord Neuberger also admitted that his original view would have meant that the parties intended an impossibility.

111.    According to Lord Neuberger, no customer could trace its specific assets in the pooled wallets, and "if you cannot trace an asset then legal ownership goes to the intermediary" (*i.e.*, FTX).  *Id.* at 168:22-169:17.  The position of customers who purchased assets on the Exchange was even worse: even though section "8.2.6 covered assets that were purchased on the exchange," "it was not possible for Three Arrows to get legal title" to such assets, "because although there is an intention for them to get legal title (*see* § 8.2.6(a)) they never get control."  *Id.* at 250:20-251:2, 252:1-3.

112.    Lord Neuberger's rebuttal position would thus strip section 8.2.6 of its meaning. *See* Gloster Decl. ¶ 75(d) ("The logical terminus of Lord Neuberger's reasoning is to give clause 8.2.6 no meaning at all.  That cannot be right.").  He essentially says that the parties misunderstood the law and created an impossible and meaningless result, which he acknowledged the parties could not have intended.  *See, e.g.*, Neuberger Dep. Tr. at 237:8-10 ("Q.  And so you are saying . . . the parties cannot intend an impossibility?  A.  Yes.").  Under "established English principles of construction, where multiple interpretations are available, one of which gives content to a term

and others which do not, the Court will, if possible, adopt the interpretation that gives the term content, rather than rejecting the provision altogether." Gloster Decl. ¶ 56(a). "The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they make that intention abundantly clear." *Id.* ¶ 43(c) (quoting Austin Decl., Ex. 46, *The Fina Samco* [1995] 2 Lloyd's Rep 344). Under those circumstances, where customer assets were regularly swept into pooled hot wallets, where customers knew that legal title would follow the private keys to FTX, the only natural reading of section 8.2.6 is that the 3AC Debtor and FTX intended to create a trust, whereby the 3AC Debtor held a beneficial equitable proprietary interest in the digital assets associated with its accounts on the Exchange, with legal title vesting in FTX, which held the digital assets as trustee.

113.   Lord Neuberger recognized another "obvious problem" with his view. Neuberger Dep. Tr. at 214:17-215:5. Section 8.2.6, in addition to its other guarantees, provides that "[n]one of the Digital Assets in your Account are the property of, or *shall or may be loaned to*, FTX Trading." May 2022 TOS § 8.2.6(B) (emphasis added). Lord Neuberger agrees that customers retained the "contractual right" to "prevent[] FTX Trading from loaning those assets to itself." Neuberger Dep. Tr. at 214:8-19. But if Lord Neuberger were correct that digital assets attributable to customers' accounts were not those customers' property, Lord Neuberger could not say whether section "[8.2.6](B) would still apply." *Id.* at 214:8-23. That is so, as Lord Neuberger explains, because "it is a bit of nonsense if [the assets] are not theirs and they are FTX's to talk about them being 'loaned'." *Id.* at 214:23-25. Accordingly, in addition to ignoring the factual matrix (*i.e.*, the factual and commercial context) and creating the perverse result that FTX could own assets the parties intended FTX's *customers* to own, Lord Neuberger's view would also give a provision of the May 2022 Terms of Service no meaning.

54

114.    Fighting the natural interpretation of section 8.2.6, Lord Neuberger makes several additional, unpersuasive arguments.

115.    First, Lord Neuberger contends that "even if []his construction gives section 8.2.6 no independent effect, the argument against that interpretation really boils down, in substance, to an argument against surplusage," which, according to Lord Neuberger, "is generally regarded as little more than a makeweight point" under English law.  Austin Decl., Ex. 45, Rebuttal Declaration of the Right Honourable Lord Neuberger of Abbotsbury ("Neuberger Rebuttal Decl.") ¶¶ 9, 26. But giving meaning to section 8.2.6 (again, the only section of the May 2022 Terms of Service about *ownership* of digital assets associated with customers' accounts) does not entail "an argument against surplusage;" instead, it concerns the legal principle that "English Courts will endeavour to give effect to every clause in the parties' agreement."  Gloster Decl. ¶ 46.  At deposition, Lord Neuberger conceded that there was "a difference between" these two principles. Neuberger Dep. Tr. at 307:9-12.  "Surplusage is saying you have got two provisions in the contract which appear to mean the same thing.  So you say one of them must mean something different because you cannot have two provisions saying the same thing; whereas giving a provision meaning is saying, 'You have one provision and I cannot work out what it means, but if I can give it a meaning I will.'"  *Id.* at 307:12-19.  "[T]he rule against surplusage does not apply when there is only one provision in the contract addressing a particular topic."  *Id.* at 307:20-23.  Here, section 8.2.6 is the only provision in the May 2022 Terms of Service concerning ownership, so the Joint Liquidators' view of that provision could not have made—and does not make—"too much of the 'rule against surplusage.'"  Neuberger Rebuttal Decl. ¶ 9.  Dame Gloster does not cite the rule against surplusage, and it does not apply here.

116.    Second, Lord Neuberger cites a string of other provisions in the May 2022 Terms of Service—sections 2.1.3, 2.2, 9, and 38.6—which he says "are inconsistent with an intention to create a trustee-beneficiary relationship."  Neuberger Initial Decl. ¶ 45.  None is.  For starters, as Lord Neuberger recognized, "none of them actually mentions title," and "[n]one of them say you cannot split title."  Neuberger Dep. Tr. at 253:9-16.  More broadly, none concerns the ownership issues that section 8.2.6 addresses.  And Lord Neuberger concedes that a specific provision, which section 8.2.6 is, trumps a general provision.  *Id.* at 198:15-199:2 (explaining that "[i]f you have a general provision, it yields to a particular provision" and that "section 8.2.6 is more particular to the issue of ownership").  In fact, he uses that principle himself in his rebuttal report.  *See* Neuberger Rebuttal Decl. ¶ 22(o) ("[T]he fact that there is one specific and clear provision which is inconsistent with an equally clear and general provision is common in commercial contracts, and gives rise to the well-known rule that one gives effect to the particular, but otherwise one gives effect to the general . . . .").

117.    He first cites three provisions that indicate that FTX does not have certain duties, including certain fiduciary-type duties.  *See* Neuberger Initial Decl. ¶ 45.  Each provision is addressed below in detail, but, as a general matter, a lack of certain duties does not disprove a trust relationship, because "a relationship need not be fiduciary in every respect to give rise to fiduciary obligations in respect of certain transactions."  Gloster Decl. ¶ 63.  In fact, parties can disclaim even key fiduciary duties and still have a trust.  As Liu, Gullifer, and Chong explain in their article, "[i]n the commercial context, the courts have been flexible in allowing commercial parties to exclude duties or confer rights on the trustee that *prima facie* appear inconsistent with a trust, yet hold that a trust exists."  Liu, Gullifer, & Chong, *supra*, at 10 (citing Austin Decl., Ex. 47, *Citibank NA v. MBIA Assurance SA* [2007] EWCA Civ 11 for the proposition that a commercial

arrangement can be consistent with a trust even where it contains exclusions that "cut through the 'irreducible core' duties of trusteeship, such as the duty to act in good faith for the benefit of the beneficiaries" (footnote omitted)); *see also* Neuberger Dep. Tr. at 111:20-112:7 (agreeing with this point); Austin Decl., Ex. 69, John McGhee et al., Snell's Equity § 21-014 (35th ed., 2024) ("A trustee may sometimes hold property for a beneficiary without having any equitable powers of management over it and without owing any fiduciary duties to the beneficiary in respect of it."). In addition, none of the provisions Lord Neuberger cites rebuts a trust relationship. That is particularly true because each of these provisions addresses duties only in a narrow circumstance.

118.    The first provision, section 2.1.3, says that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services." May 2022 TOS § 2.1.3. The provision falls within a section about trade advice, customers' reliance on it, and risk;[19] the section is not concerned with the general relationship between the parties. Gloster Decl. ¶ 63. Nor does it deal with ownership of assets. In context, section 2.1.3 "disclaims a fiduciary relationship specifically '*in connection with* any trades or other decisions or activities effected by [the 3AC Debtor].'" *Id.* (quoting May 2022 TOS § 2.1.3) (emphasis added). The provision's concern, therefore, is protecting FTX against liability for trading and transactional decisions made by the 3AC Debtor using the Exchange. Gloster Decl. ¶ 63. Lord Neuberger conceded that section 2.1.3 was limited to decisions and activities "effected by you," *i.e.*, the customer, but that FTX, not the 3AC Debtor, made the decision to move digital assets from

---

[19] Although "the headings" in the Terms "are for convenience only and shall not affect the interpretation of the Terms," May 2022 TOS, Schedule 1 § 2.1.3, subsection 2.1—which is labeled "No advice and no reliance"—is nonetheless about how FTX is not providing trade advice to customers.

segregated to pooled wallets, *i.e.*, the actions that affected ownership. Neuberger Dep. Tr. at 176:21-177:5. Far from undermining a fiduciary relationship, section 2.1.3 shows that the parties knew how to disclaim a fiduciary relationship when they wanted to; that "there is no equivalent disclaimer of a fiduciary relationship anywhere in clause 8" only supports the Joint Liquidators' interpretation of section 8.2.6 as creating a fiduciary duty. Gloster Decl. ¶ 63.

119.    The second provision, section 2.2, likewise falls within section 2. It states that FTX "provide[s] no warranty as to the suitability of the Digital Assets traded under the Terms and assume[s] no fiduciary duty to you in connection with such use of the Services." May 2022 TOS § 2.2.2. The surrounding language of section 2.2.2 explains that "Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks" and that "[t]he listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset." May 2022 TOS § 2.2.2. "It is in that context that FTX purports to exclude liability, presumably as an advisor, of any fiduciary duty." Gloster Decl. ¶ 69(b). "Again, that is separate from the question of the relationship between FTX and the customer when it comes to *custody* or *ownership* of customer assets; that relationship is dealt with in clause 8." *Id.*[20]

---

[20] Lord Neuberger also argued that section 2.10, which provides that "[n]either Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection," May 2022 TOS § 2.10, was "inconsistent" with the creation of a trustee-beneficiary relationship, "because it suggests that the parties contemplated the risk of loss on insolvency, and there would be no risk of such loss and no need for deposit insurance if the Digital Assets or fiat currency are held on trust," Neuberger Initial Decl. ¶ 45.3. But, as Dame Gloster explains, in some jurisdictions, "public government deposit protection insurance schemes are available to protect customer bank deposits in case of bank failure," and section 2.10 "merely informs the user that the Exchange is not such an institution." Gloster Decl. ¶ 69(c). And, the "the

120.    And the third such provision, section 38.6, provides that "[n]othing in the Terms or in any matter or any arrangement contemplated by it [sic] is intended to constitute a partnership, association, joint venture, fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever" and that "[e]ach party confirms it is acting on its own behalf and not for the benefit of any other person."  May 2022 TOS § 38.6.  The provision is a generally worded "boilerplate" in the "back-end" of the Terms, alongside other standard terms, including a severability clause, a survival clause, and a choice-of-law provision.  Gloster Decl. ¶ 66.  The clause is focused on "disavowing any suggestion of a joint venture or the like." *Id.*  In any event, section 38.6 "cannot possibly be read as precluding a bare trust relationship in relation to the holding or ownership of Digital Assets across the board, not least because it would then be wholly inconsistent with clause 9.2," discussed next. *Id.*; Neuberger Dep. Tr. At 198:18-22 ("Q. So the rule you are referring to is that if you have a general provision it yields to the particular provision? A. Yes.  You cannot use 38.6 to negative 9.2.").

121.    The other provision Lord Neuberger cites, section 9 concerning "Unclaimed or Abandoned Property," actually strongly supports a trust relationship.  Section 9.1 addresses situations where FTX has to turn such property over to the state, and section 9.2 addresses what happens if the state does not require that FTX turn the property over.  May 2022 TOS §§ 9.1-2.  Section 9.2 provides, in relevant part, that if FTX "is holding Unclaimed or Abandoned Property" and cannot contact a customer, then the customer's "Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property," and that

---

unavailability of private insurance . . . does not mean that [an asset] cannot be held on trust." Gloster Decl. 69(c).  At deposition, Lord Neuberger admitted that his point on section 2.10 was "much less powerful" than those concerning the "previous two clauses."  Neuberger Dep. Tr. at 180:12-18; *see also id.* at 180:20-21 (describing the point as "straw in the wind"), 181:17-18 (describing it as "something of a thrown-in point").

FTX, "as Trustee, will hold the Unclaimed or Abandoned Property on [the customer's] behalf." May 2022 TOS § 9.2. Lord Neuberger admits that, under section 9.2, a trust exists over customer property if the property is abandoned or the customer does not respond. Neuberger Dep. Tr. at 187:12-17. But in Lord Neuberger's view, all FTX customers had already lost their property rights (if they ever had any) mere moments after depositing assets onto the Exchange and never acquired title to assets purchased on the Exchange that were never transferred to a customer's segregated deposit address. So, under Lord Neuberger's view, section 9 somehow grants property rights only to FTX customers who have abandoned their property or fail to respond to FTX. *Id.* at 188:19-24 ("That is how it works."). With respect, that view makes no sense whatsoever. Instead, the more logical reading is that section 9.2 (1) confirms that, despite abandoning the property, a trust still exists, including if the account is transferred to an affiliate, and (2) expands FTX's powers in that circumstance. *See* Gloster Decl. ¶ 65(b).

122.    Even if section 9.2 were not strongly supportive of the existence of a trust, it does nothing to undermine the existence of one. Although, in the abstract, "it might be inferred that, where the parties did not use the word 'Trust' in other parts of the Terms they did not intend to create one," no such inference would be appropriate here. *Id.* ¶ 65. First, section 9.2. is not redundant in light of section 8.2.6, because the former "confers powers that are not available under the custodial trusteeship to which . . . clause 8.2.6 gives rise," namely, "to charge fees and to pay unclaimed or abandoned property into a court." *Id.* ¶ 65(b); *see also* Neuberger Dep. Tr. at 193:7-11 ("Q.  You would agree that 9.2 grants certain powers that would not otherwise be available to a trustee; right?  A. . . . It does grant those rights; yes."). "Those powers and that flexibility are needed to deal with the very specific contingency that clause 9.2 is addressing; FTX would not be able to do those things under the bare custodial intermediary trusteeship to which . . .

clause 8.2.6 gives rise." Gloster Decl. ¶ 65(b). Second, "there are several drafting incoherencies in the" May 2022 Terms of Service, so "[t]he fact that clause 9.2 uses the term 'Trustee' and clause 8.2.6 does not," carries "very little weight;" indeed, "'Trustee' is used as if it were a defined term in clause 9.2, but that term is not, in fact, defined anywhere in the document, nor is it used anywhere outside of clause 9.2." *Id.* ¶ 65(c). Finally, the existence of this one factor is not "sufficiently compelling" for an English Court to "conclude that clause 8.2.6 bears a meaning that gives rise to an impossibility of performance and thus defies commercial common sense." *Id.* ¶ 65(a).

123.    In sum, none of these other provisions can bear the weight Lord Neuberger puts on them.

### b.    Certainty of Subject Matter Is Present

124.    Here, the trust resulted in the 3AC Debtor having an equitable tenancy in common over a percentage of the particular digital assets held in a particular wallet. Because the trust property at issue here is the pooled digital assets that FTX held in unsegregated omnibus accounts for the benefit of multiple users, and, because FTX kept meticulous records of the quantum of assets within those accounts, the subject matter of the trust is sufficiently certain.

125.    The test for certainty of subject matter is whether the trust property can be sufficiently identified. *Id.* ¶ 60. As the Law Commission Report explains, English common law has developed to find certainty irrespective of whether "assets are segregated or held in commingled, unallocated holdings such as in omnibus accounts." Law Commission Report ¶¶ 7.48-7.54. Lord Neuberger himself concedes that, under the common law, "[a] trust can be established in favour of one or more beneficiaries over a bulk of unascertained property in respective shares as equitable tenants in common (*e.g.*, of 2% of [one's] flock of 100 sheep)."

Neuberger Initial Decl. ¶ 38.2.  As he puts it, "[t]he subject of the trust (the flock) is certain, as is the beneficiary's share in it."  *Id.*

126.    Moving from the pastoral to the digital, the same principle applies to intangible assets.  For example, the leading English authority, Austin Decl., Ex. 48, *Hunter v. Moss*, [1994] 1 WLR 452, explains that "[s]hares in a company are simply a proportionate interest in the issued capital of the company," such that "all shares represent a co-ownership interest in a single indivisible unit."  Neuberger Initial Decl. ¶ 38.5(a); *see also* Gloster Decl. ¶ 60(b), Austin Decl., Ex. 49, *Pearson, Lomas v. Lehman Brothers Finance SA* [2010] EWHC 2914 [239] ("Although the picture created by that analysis is very much more complicated than the simple facts of *Hunter v. Moss*, I consider that it gives rises to no fatal uncertainty of subject matter.").  In the instance case, certainty of subject matter "can be satisfied in connection with a group of fungible and intangible assets held in an unsegregated omnibus account for the benefit of multiple users." Gloster Decl. ¶ 60(a); *see also* Law Commission Report ¶¶ 7.50-7.55 (discussing *Hunter v. Moss*); Neuberger Dep. Tr. at 125:9-126:10 (acknowledging the Law Commission Report on this point). As the Law Commission Report explains, "the best way to understand the interests of beneficiaries under such trusts are as rights of co-ownership in an equitable tenancy in common."  Law Commission Report ¶ 7.55; *see also* Neuberger Initial Decl. ¶ 39.3 ("[I]f the agreement made it clear that a trust relationship was intended and also that there would be sweeping and pooling of digital assets, a court might hold that there was a trust over all the pool addresses, in respect of which all customers were beneficiaries as tenants in common."); Liu, Gullifer, & Chong, *supra*, at 4 n.12 ("Certainty of subject-matter and object are relatively uncontroversial in the current context.").  Certainty of subject matter does not require that the parties explicitly state that the subject matter is a pool of assets.  Neuberger Dep. Tr. at 124:6-20.

127.    In *Ruscoe*, the High Court of New Zealand held that accountholders could demonstrate certainty of subject matter, even though the exchange, Cryptopia, held the private keys to the assets acquired on the exchange such that accountholders did not know the private key associated with any particular coin. *Ruscoe*, *supra*, ¶ 147.  The court reasoned that, for each cryptocurrency, relevant accountholders shared "[b]eneficial co-ownership of the relevant currency . . . in proportion to the numbers of relevant cryptocoins that they had each contributed (either initially when new coins were acquired or as a result of trades between accountholders)." *Id.* ¶ 145.  Thus, they could demonstrate "which cryptocurrencies are subject to what trust," and the subject matter was certain, because "Cryptopia maintained its own database of the accountholders and digital assets that it controlled," which recorded the subject matters of the trust. *Id.* ¶¶ 142-43, 147.

128.    So too here.  FTX, like Cryptopia, held the private keys associated with the Digital Assets, and FTX, like Cryptopia, kept a ledger that tracked each customer's "deposits, withdrawals, and other trades, as well as transfers that the customer account may have received or sent." Coverick Dep. Tr. (Day 1) at 90:8-15.  The ledger tracked all transactions conducted on the Exchange, including those for digital assets and futures.  *See* Coverick Dep. Tr. (Day 2) at 99:14-100:15.  FTX could determine both the amount of a particular digital asset it held in a wallet, and the percentage that each customer held.  *See* Molina Dep. Tr. at 29:9-18 ("I wrote some code . . . as well as rewrote some code that enabled customers to get information about their historical balance," *i.e.*, the "tokens associated with an account at a previous point in time."); *see, e.g.*, Schedules of Assets and Liabilities and Statements of Financial Affairs, Schedules E-F [D.I. 967] (FTX's schedule of unsecured customer claims).  Thus, by using the internal ledger, FTX could compute what percentage of the amount of a particular ticker in its corresponding omnibus

wallet belonged to each customer at any given time.  Indeed, FTX conducted analysis and assessed

the amount of digital assets it held in the Exchange wallet by tickers, including BTC and ETH.

*See* Coverick Dep. Tr. (Day 2) at 287:25-288:6, 288:22-289:10.  In any event, as Lord Neuberger

admits, evidentiary uncertainty does not defeat a trust.  Neuberger Dep. Tr. at 139:7-13.  Thus,

certainty of subject matter is satisfied.

129.    The FTX Recovery Trust sets out only the flimsiest counterargument.   In his

rebuttal declaration, relying solely on an unreported case called *Piroozzadeh v. Persons Unknown*

[2023] EWHC 1024 (Ch), *see* Austin Decl., Ex. 50, Lord Neuberger attempted to argue that

certainty of subject matter "becomes problematic," because identifying the 3AC Debtor's

proportionate share would, in his view, be "close to impossible" given the volume of deposits,

withdrawals, and trades on the FTX Exchange.  Neuberger Rebuttal Decl. ¶ 25 (citation omitted).

But when pressed at deposition, Lord Neuberger admitted that *Piroozzadeh* was not about this

issue.  Besides being an interlocutory decision, *Piroozzadeh* concerned an asset that had been

stolen from a claimant, who was not a user of the exchange and therefore did not concern "whether

a user of the exchange was in a trust relationship with the exchange," but instead whether digital

assets could be traced in the particular circumstances of that case.  Neuberger Dep. Tr. at 270:23-

273:10.

130.    In addition, Lord Neuberger admitted that he did not have the factual bases to

support his argument.  He confessed that he could not identify a source in the record for his concern

that it would be "close to impossible" to track the 3AC Debtor's proportionate share of assets;

indeed, he admitted that if "FTX was always able to determine how many digital assets of a

particular kind it had, what percentage of those were owned by customers and what percentage of

those were owned by itself, . . . then it does dilute" his view.  *Id.* at 85:8-10.  Accordingly, *Piroozzadeh* is no obstacle to certainty of subject matter.

> c.    Certainty of Objects (*i.e.*, as to Beneficiaries) Is Present

131.    As to the final certainty, both parties' experts agree that the 3AC Debtor can satisfy the criterion of certainty of objects.  Gloster Decl. ¶ 58; Neuberger Initial Decl. ¶ 42 ("No issues appear to present themselves in the present context [as to objects] . . . .").  The test is "relatively easily satisfied," asking simply whether the beneficiaries of a trust can be identified.  Law Commission Report ¶ 7.47; *see also* Gloster Decl. ¶ 58.  In *Ruscoe*, the High Court of New Zealand held the element was satisfied where accountholders could show positive coin balances for their individual accounts.  *Ruscoe*, *supra*, ¶¶ 148, 150.  Here, FTX's records show the 3AC Debtor's quantum of each asset.  *See* Coverick Dep. Tr. (Day 1) at 90:8-15.  Accordingly, this criterion is met.  Gloster Decl. ¶ 58.

> d.    Conclusion: FTX and 3AC Had a Trust Relationship

132.    Because each of the elements of a trust—certainty of intention, subject matter, and objects—is satisfied, the 3AC Debtor had (1) a beneficial title to the Digital Assets, with legal title vesting in FTX, which held the Digital Assets as trustee on trust for the 3AC Debtor, and (2) an equitable proprietary interest in the shared pools of digital assets, as tenant in common.  *Id.* ¶ 17(a).

133.    Lord Neuberger does not cite, because none exists, any case holding that a customer does not have a trust relationship with an exchange in these circumstances.  In fact, he admitted he could not identify a factually similar case.  Neuberger Dep. Tr. at 38:3-14.  Put simply, the Law Commission Report, *Ruscoe*, the May 2022 Terms of Service and the factual matrix support Dame Gloster's opinion that a trust exists here.

## 2.      The Joint Liquidators Are Not Required to Trace Their Digital Assets

134.    The FTX Recovery Trust argues that the Joint Liquidators' claims fail because, according to the FTX Recovery Trust, the Joint Liquidators cannot trace the Digital Assets held on trust.  Objection ¶¶ 164-67, 176.  But under English law, the inability to trace property interests does not negate or invalidate a trust—indeed, as noted above, the trust here is not over particular traceable assets, but rather over a percentage of an undivided whole.  *See* Law Commission Report ¶¶ 7.85 & n.783 (describing "approaches to tracing . . . as an alternative to a *pro rata* allocation principle" applicable to trusts of the kind discussed above), 7.88 ("Consultees broadly agreed that a *pro rata* allocation of shortfall losses might be practical, fair, and pragmatic, and would potentially avoid both the question of what tracing rules apply to crypto-tokens in any given circumstance, as well as the practical issue of applying the applicable tracing rules." (footnote and quotation marks omitted)).

135.    Tracing is thus irrelevant.  The Joint Liquidators do not seek to withdraw the Digital Assets from the property of FTX's estate or to establish a priority over those assets in the bankruptcy, so the Joint Liquidators need not trace the Digital Assets.

136.    Instead, the FTX Recovery Trust cites only irrelevant U.S. law about whether a creditor can assert a proprietary interest in certain assets in a bankruptcy estate, which the 3AC Debtor is not attempting to do.  And even that law would support the 3AC Debtor's position that in June, FTX held the Digital Assets and/or the 3AC Debtor's equitable proprietary interest on trust.  "In general, 'to establish rights as a trust recipient'"—*i.e.*, to remove trust assets from the property of a debtor's estate or obtain priority over such assets—"'a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled.'"  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (citation omitted).  The two inquiries are separate: the first concerns the *existence*

of a trust, while the second concerns the right to *enforce* such a trust to benefit a claimant over other claimants. *See In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1063 (3d Cir. 1993) (explaining that, even where certain assets were held in trust, the "beneficiaries of trust funds bear the burden of identifying and tracing their trust property"); *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 162 (Bankr. D. Del. 2010) (similar).

137.    Different law governs each inquiry. For the first (concerning the creation of a trust), courts "look to state law to determine whether the claimant has shown a trust relationship." *City of Farrell*, 41 F.3d at 95. Here, as just discussed, the parties created a trust under English law.[21] "Once a bankruptcy court makes a determination concerning whether a debtor has any legal or equitable interest in property based upon applicable state law," the second inquiry (concerning enforcement) "is a federal question." *Id.* at 95-96 (citation omitted). That is, federal law controls questions of "whether [trust] property will come into the estate," *id.*, or whether to "grant[] one party distribution priority over the other," *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 281 (3d Cir. 1991).

138.    The second question determines whether the trust holder can obtain the asset or only a *pro rata* share of the trust funds. But the 3AC Debtor is not seeking either—its assets are gone—and, instead, it is pursuing a claim for its loss.

---

[21] Where the parties have contractually agreed that the law of a specific jurisdiction applies, courts look to that jurisdiction's law. *See In re Net Pay Sols., Inc.*, 822 F.3d 144, 158 n.13 (3d Cir. 2016) (looking to Pennsylvania law when determining the existence of a trust since "[the Debtor]'s agreements with its customers designate Pennsylvania law as the governing law"); *In re Green Field Energy Servs., Inc.*, 585 B.R. 89, 103-14 & n.23 (Bankr. D. Del. 2018) (same as to Texas law). Here, that law is English law, because the 3AC Debtor and FTX agreed, per the May 2022 Terms of Service, that "the Terms" and "any dispute, claim, controversy or difference arising out of or in connection with the Terms" "shall be governed by, and construed in accordance with, English law." May 2022 TOS § 38.11, Schedule 1 ¶ 1.1; Neuberger Initial Decl. ¶ 14 ("That is a broadly stated choice of law clause. It would in my opinion cover any dispute as to the meaning and effect of the Dotcom Terms in any dispute between FTX Trading and its customers.").

### 3.    The 3AC Debtor Also Owned Its Futures Contracts

139.    Even if futures contracts were not "Digital Assets" as that term is used in the May 2022 Terms of Service, the 3AC Debtor still had a proprietary interest in its rights under those contracts.  Under the May 2022 Terms of Service, according to Dame Gloster, "Futures Contracts were derivative contracts that could be owned and traded in the way of typical futures contracts." Gloster Decl. ¶ 150.  As a party to the futures contracts, the 3AC Debtor's rights were "its choses in action and its personal property." *Id.* (citing Austin Decl., Ex. 51, *Torkington v Magee*, [1902] 2 KB 427, at 430).  This evidence is unrebutted.  *See* Neuberger Dep. Tr. at 305:20-206:2 ("Q. . . . [Y]ou do not disagree that Three Arrows in fact owned the contractual rights associated with the futures contracts that it entered into; right?  A.  Yes.").  Accordingly, the 3AC Debtor had a proprietary interest in the chose(s) in action arising from the futures contracts into which it entered. Gloster Decl. ¶ 150.

### 4.    Alternatively, the 3AC Debtor Retained Ownership Through a Quasi-Bailment

140.    Even if the Court were to conclude that section 8.2.6 did not create a trust over the Digital Assets or the 3AC Debtor's equitable proprietary interest, the 3AC Debtor still had a proprietary interest in the Digital Assets via a quasi-bailment.

141.    Quasi-bailment is a control-based analogue of bailment applying to intangible assets.  *See id.* ¶ 40 (citing Law Commission Report ¶ 7.115).  Under English law, a bailment describes the relationship in which a person with superior title (the bailor) allows another (the bailee) to hold an asset, with duties to keep it safe and redeliver it or deal with it as directed.  Law Commission Report at vii.  The classic example of a bailment is a waiter taking a diner's coat for safekeeping at a restaurant.  Law Commission Consultation Paper ¶ 17.84.  Though English law would have to develop to apply the concept of bailment to intangible assets (such that the concept

would become *quasi*-bailment) since they cannot be possessed, both parties' experts expect English law to do so.  *See* Neuberger Initial Decl. ¶¶ 53-56 (describing the "incremental development in the common law" required for quasi-bailment as "not . . . a problem, as an extension or development to English law is required in relation to almost all legal issues regarding digital assets, and indeed it seems to be a logical extension of the conclusion that digital assets are property"); Gloster Decl. ¶¶ 40, 78 (agreeing with Lord Neuberger on this point).  The Law Commission also recommends such a development.  *See* Law Commission Report ¶ 7.102 (calling the development "conceptually coherent" and lauding it as "offer[ing] market participants a useful additional framework for structuring custodial intermediated holding arrangements as an alternative to trusts").

142.    Looking to control rather than possession (given the intangible nature of the assets), quasi-bailment describes a relationship in which a user (a quasi-bailor) retains legal proprietary rights in assets held by a custodial intermediary (a quasi-bailee).  *Id.* ¶ 7.103.  There, the user retains a superior legal proprietary interest, while the intermediary acquires a limited control-based proprietary interest, subject to the user's superior title.  *Id.*

143.    The parties' agreement here satisfies both elements of quasi-bailment.  As the parties' experts agree, quasi-bailment would require that (1) the parties intended to create a legal relationship whereby the quasi-bailee (FTX) would obtain control of assets but the quasi-bailor (the 3AC Debtor) would have a superior interest, and (2) the quasi-bailor, in fact, had a superior interest.  Neuberger Decl. ¶ 57; Gloster Decl. ¶ 80.  If the Court accepts Lord Neuberger's interpretation of section 8.2.6—that it intended that the 3AC Debtor have legal, not just equitable title—rather than Dame Gloster's interpretation, then those requirements are met here.

144.    As to intent, as explained above, section 8.2.6 outlines the parties' intentions to preserve the customer's title, disclaims any FTX property interest, and gives the customer the right to call for delivery or direct a transfer.  Gloster Decl. ¶ 81(a); Neuberger Initial Decl. ¶ 61 ("Based on the provisions suggesting that legal title would be held by customers, one could argue that the proper characterisation of any such intended arrangement was that of quasi-bailment.").  As to the quasi-bailor having a superior interest, the 3AC Debtor has superior title to FTX, since it was the notional purchaser of assets for value, and section 8.2.6 expresses that—as between the 3AC Debtor and FTX—the 3AC Debtor would have title (or at a minimum, superior title).  Gloster Decl. ¶ 81(b).

145.    Lord Neuberger disagrees with Dame Gloster on primarily two grounds.  On the first element, Lord Neuberger says that the parties intended a quasi-bailment only over specific and segregated digital assets associated with a customer's account and did not intend to create a legal tenancy in common over all of FTX's network addresses.  Neuberger Initial Decl. ¶ 64.  But, as the Law Commission Report explains, just as a bailment can arise over mixed tangible assets, a quasi-bailment could arise over mixed intangible assets.  Law Commission Report ¶ 7.113; Gloster Decl. ¶ 83; *see also* Austin Decl., Ex. 75, Michael Bridge, Louise Gullifer, Kelvin Low, & Gerard McNeel, The Law of Personal Property 323 ¶ 12-022 (3rd ed. 2021) (explaining that "in the case of consensual mixing of fungible goods," such as farmers' grain consensually mixed with other farmers' grain, bailment has "no need for specific re-delivery" of the original goods).  That is, the Law Commission did not consider that a "limited control-based legal proprietary interest would necessarily be precluded where crypto-tokens are co-mingled or mixed so that specific entitlements can no longer be identified."  Law Commission Report ¶ 7.113.

146.    Second, Lord Neuberger predicts that the standard for a quasi-bailment would require that the quasi-bailor (the 3AC Debtor) previously have held legal title.  Neuberger Dep. Tr. at 226:22-227:18.  But as Lord Neuberger admitted at deposition, "nothing in the Law Commission's analysis . . . requires that the customer previously [have] had legal title."  *Id.* at 236:5-8.  And he admitted that the Law Commission envisaged that quasi-bailment would be created despite the custodial intermediary (*i.e.*, FTX) having factual control (*e.g.*, control of the private keys) with the customer having some sort of legal control by contract—*i.e.*, exactly Dame Gloster's position.  *Id.* at 234:16-236:4.  Lord Neuberger does not cite any authority (the Law Commission Report or anything else) supporting the idea that a quasi-bailment would require that the quasi-bailor previously have held legal title.  In this scenario, the 3AC Debtor had legal control, and an interest superior to FTX's, because section 8.2.6 effectively said so, and because section 8.2.6 allowed the 3AC Debtor to request that FTX act in a certain way as to the Digital Assets, in particular, to transfer them to the 3AC Debtor (or others).  Thus, just like restaurant patron could request his or her coat from the waiter, the 3AC Debtor could request the Digital Assets from FTX.

147.    In sum, even if the Court were to find no express trust under section 8.2.6, the 3AC Debtor held a superior proprietary interest in the Digital Assets through a quasi-bailment.

### 5.    The Court Did Not Resolve the 3AC Debtor's Ownership Rights in the Confirmation Order

148.    Lastly, the FTX Recovery Trust argues that, in the Confirmation Order, the Court resolved whether, in mid-June 2022, the 3AC Debtor had a proprietary interest in the Digital Assets.  Objection ¶¶ 166-67, 221.  But the Court made no such determination.

149.    While the FTX Recovery Trust repeatedly quotes the Confirmation Order as stating that "[t]he factual record establishes that all Digital Assets and Cash held by the FTX Exchanges

on or after the Petition Date . . . are property of the Debtors' Estates," *id.* ¶¶ 11 (quoting Confirmation Order ¶ 20), 109 (same), 166 (same), each time it glosses over that the Court expressly limited its holding to assets held by the FTX Exchange "*on or after* the Petition Date." Confirmation Order ¶ 20 (emphasis added); *id.*, Ex. A (Plan) § 2.1.143 (defining "Petition Date" as November 11 and November 14, 2022). The FTX Recovery Trust's Objection also literally omits the context the Court supplied immediately after the quoted language: that "all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property of the Debtors' Estates *within the meaning of section 541 of the Bankruptcy Code*," *id.* ¶ 20 (emphasis added).

150.    The two qualifications in paragraph 20 of the Confirmation Order ("on or after the Petition Date" and "within the meaning of section 541 of the Bankruptcy Code") that the FTX Recovery Trust now either glosses over or omits both point to the same inescapable conclusion: paragraph 20 of the Confirmation Order is a specific factual finding that does not concern the facts at issue here or otherwise determine the issue of ownership of assets during the prepetition period. The "on or after the Petition Date" qualification is self-explanatory and plainly limits the Court's finding to the post-petition period. The reference to section 541 of the Bankruptcy Code reinforces that point. Paragraph 20 of the Confirmation Order explains that it makes a finding as to property of the FTX "Debtors' *Estates*," *id.* ¶ 20 (emphasis added), and section 541 of the Bankruptcy Code provides that such "Estates" come into existence *after* the commencement of a bankruptcy case, 11 U.S.C. § 541(a) ("The commencement of a case . . . creates an estate.").[22] The "Estates" did

---

[22] Moreover, the Court acknowledged that its holding as to whether something was "property of the Debtors' Estates within the meaning of section 541" was tentative by offering alternative ways it could make claimants prejudiced by its ruling whole: "Further, *to the extent that any Exchange Assets are not property of the Debtors' Estates*, this Court has jurisdiction to direct their equitable distribution pursuant to the Plan and in accordance with the terms of the Customer Priority Settlement (as defined in the Disclosure Statement) incorporated therein." Confirmation Order ¶ 20 (emphasis added). In other words, in the same breath that the Court held that digital assets

not exist before the commencement of FTX's bankruptcy cases, which occurred several months *after* the mid-June period at issue here.  The Court did not have a reason in the context of plan confirmation to find—and did not find—that an entity that did not exist between June 12 and June 14 (*i.e.*, the estate) had ownership interests as of that time.

151.    The FTX Recovery Trust should know these limitations of the Confirmation Order better than anyone (besides the Court), because FTX itself proposed the qualified language in paragraph 20 to the Court.  *See* Notice of Filing of Proposed Confirmation Order, Ex. A ¶ 20 [D.I. 26034-1].  The limited finding in the Confirmation Order was all that was necessary to confirm the Plan and the global settlement embodied therein.  Based on the limitations expressly set forth in paragraph 20 of the Confirmation Order, the Joint Liquidators had no notice of findings (as the FTX Recovery Trust maintains) adverse to their claims and no reason to challenge a finding that, by its express terms, did not apply to a time period before the Petition Date or assets that were no longer on the Exchange as of the Petition Date, such as the assets at issue in this dispute.

152.    The context of the Confirmation Order's findings reinforces that the Confirmation Order does not support the FTX Recovery Trust's position.  Paragraph 20 is an integral part of the "Global Settlement" embodied in FTX's plan, which the Joint Liquidators were not a party to but which expressly addressed issues relating to ownership of digital assets, including "purported comingling and misuse of customer deposits and corporate funds;" "tracing of assets of individual Debtors to particular sources of funding;" "transactions among the Debtors prior to and on the Effective Date," and, critically, "*the effects and consequences of the Debtors' Terms of Service*

---

were property of the FTX Recovery Trust's Estates after a certain point in time and for purposes of § 541, it held that, in fact, they might *not* be property of the FTX Debtors' estates (*i.e.*, that some claimants likely could both establish a trust over and trace assets).  The Court then explained how it could remedy any harm (*i.e.*, by giving some claimants priority over others) if it had wrongly determined, in the Confirmation Order, that some claimants' property was property of the estate.

*and **whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property** of the Debtors' Estates.*"  Confirmation Order ¶ 39 (emphasis added).

153.    That Global Settlement, according to the FTX Recovery Trust's counsel, "resolved after many months of discussion," issues of "property rights in the Debtors' assets that, otherwise, would have required protracted litigation to resolve on a final basis" and recognized that "litigation of all such issues to final judgment would be complex, burdensome, uncertain, and could have delayed the conclusion of these cases and distributions to creditors."  Oct. 7, 2024 Hr'g Tr. [D.I. 26412], at 47:19-23; 48:20-25; 49:1-4; *see also Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* [D.I. 19143] § 4.B.5 ("Purported customer property interests and entitlements in the Debtors' digital assets fiat currency is a central and highly controversial issue in these Chapter 11 Cases. . . .  Litigation over these issues with the Ad Hoc Committee or the Class Action Claimants would be time consuming and costly.  To consensually resolve these issues and avoid the unnecessary time and costs, the Debtors established priority claims and shortfall amounts for the benefit of customers against the General Pool. . . .  The Debtors, the Official Committee, the Ad Hoc Committee and the Class Action Claimants believe that the Plan provides holders of claims with recoveries that reflect the relative risks and benefits of their claims, and takes into account the costs and likelihood of prosecution to final judgment.").  Accordingly, paragraph 20 of the Confirmation Order does not reflect this Court's final pronouncement on the outcome of any litigation regarding ownership issues.

154.    Instead, it reflects the agreement of various stakeholders on an integrated settlement for distributions on claims pursuant to the plan.  As a result of the Global Settlement, FTX's plan yielded recoveries in excess of 100% to the FTX Debtors' customer creditors and garnered their

overwhelming support.   As part of the settlement, creditors asserting "Customer Entitlement Claims" (defined as claims that compensate their holder "for the value *as of the Petition Date* of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange," Confirmation Order, Ex. A (Plan) § 2.1.47) received a waiver of potential preference claims against them by the FTX Estates, removing part of their risk of loss on litigation over the nature of their claims and asset ownership under the Global Settlement.   *See* Confirmation Order ¶ 42. While the FTX Recovery Trust should be commended for this consensually settled outcome and the Plan that achieved it, the FTX Recovery Trust may not wield the settlement as a weapon against individual claimants beyond the express terms of the Confirmation Order.   The Court, therefore, should not divorce the Confirmation Order from its context in approving the Global Settlement embodied in the Plan and apply findings beyond their expressly limited terms to issues that were not before the Court and were not on notice to the 3AC Debtor in connection with Plan confirmation.

155.   For all these reasons, paragraph 20 of the Confirmation Order is not "law of the case" on the issues here, as the FTX Recovery Trust asserts.   Objection ¶ 167.   That doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."   *Pepper v. United States*, 562 U.S. 476, 506 (2011) (citation omitted).   Because that paragraph did not resolve the issue of ownership of the assets that were subject to the June 13-14 Transactions (or any other prepetition assets), the law-of-the case doctrine simply does not apply.[23]

---

[23] Should the Court decide the issue of ownership of the Digital Assets during the June 13-14 period in the Joint Liquidators' favor, the decision will not impact the Global Settlement or the allocation and distribution scheme that the plan and Confirmation Order embody.   For at least three reasons, other creditors could not use the decision to assert, at this stage, an ownership interest in assets held by the FTX Recovery Trust.   *First*, a decision on this issue would be made only as to

B.     **The 3AC Debtor Had Distinct Assets and Liabilities on the FTX Exchange**

156.     According to the FTX Recovery Trust, the 3AC Debtor—and apparently all other FTX customers—did not have assets and liabilities on the FTX Exchange, but instead only an entitlement to the net value of its individual positions.  *See* Objection ¶¶ 5-7.  Under the FTX Recovery Trust's so-called "single asset" theory, because the Exchange interface somewhere showed customers an overall account balance—what it characterizes as the "headline," "comprehensive figure covering all activity across all types of assets over the lifetime of the customer account"—any and all sub-balances including, any positive Digital Asset Balance and any negative USD Balance, became "interconnected and inseparable components of the overall Account Balance."  *Id.* ¶¶ 5-7, 21, 199.  That is, according to the FTX Recovery Trust, the entire financial relationship between FTX and any given customer was defined simply by that customer's overall account balance; if that balance was positive, the customer was a creditor of FTX and had no financial obligations to FTX.

157.     If, for example, a customer borrowed $100,000 to buy ten BTC, each worth $10,000, then under the "single asset" theory, that customer had an entitlement to exactly 0 BTC and $0, rather than having a $100,000 negative USD liability and, separately, $100,000 worth of Bitcoin.  If the customer then sold two BTC, each still worth $10,000, and applied the proceeds to its USD liability, the net entitlement stayed at $0 (rather than the customer having an $80,000

---

the assets associated with the 3AC Accounts during the June 13-14 period, and not any in existence on the Exchange as of the commencement of FTX's chapter 11 proceedings (the relevant date for the allowance and determination of claim amounts pursuant to 11 U.S.C. § 502(b)).  *Second*, the decision would concern adjudicating a preference claim, which only a debtor with pending insolvency proceedings could bring, but the Joint Liquidators are not aware of any other similarly situated creditors who continue to pursue preference claims.  *Third*, the claims-bar date (for customer and non-customer creditors) has long passed in these chapter 11 cases, so no new creditor claims (preference or otherwise) will arise.

negative USD liability and $80,000 worth of Bitcoin).  According to the FTX Recovery Trust, this type of transaction did not change FTX's or the customer's assets, liabilities, or other rights.

158.    The "single asset" theory is false.  It finds no credible footing in fact or logic, and appears to be a post hoc invention by the FTX Recovery Trust, tailormade to suit its positions in this litigation.  It is contradicted by the May 2022 Terms of Service, which make clear that FTX customers like 3AC Debtor owned the assets they deposited or purchased on the Exchange and, where applicable, owed debts to FTX, including funds borrowed under FTX's Margin Program. It is contradicted by FTX's own English law expert, Lord Neuberger, who opined that even though (in his view) FTX owned the assets on the Exchange, customers had distinct claims against and debts owed to FTX.  And it is contradicted by the contemporaneous documentary evidence and witness testimony regarding how the Exchange operated in reality.

159.    Applying this fiction to the 3AC Debtor, the FTX Recovery Trust argues that, despite the June 13-14 Transactions paying down hundreds of millions of dollars owed to FTX, FTX received no unfair preference from the transactions.  First, the FTX Recovery Trust tells this Court, FTX was not a "creditor" of the 3AC Debtor, as required for an unfair preference claim, because, even though the 3AC Debtor had a *negative* USD balance on the Exchange, the 3AC Debtor's overall account balance was positive.  *Id.* ¶ 197.  Second, the FTX Recovery Trust urges, FTX was not put "into a better position" as a result of the June 13-14 Transactions, as also required for a preference claim, because the transactions did not change the 3AC Debtor's overall account balance.  *Id.* ¶ 198.  Instead, according to the FTX Recovery Trust, when the assets were sold, effectively nothing changed; rather than a liability being paid off, the 3AC Debtor's net (and only) entitlement stayed the same (just as the customer who sold the two BTC in the previous example

had the same net entitlement before and after the sale)—because the 3AC Debtor's only "asset" in the first place was any surplus in its overall account balance.

160.    While one might understand why the FTX Recovery Trust would devise such a theory for this litigation, the theory is, in the words of its own expert, "quite difficult to understand."  Neuberger Dep. Tr. at 293:16-17; *see also id.* at 293:18-20 ("I am somebody who tends to work out what the parties' rights are by reference to what they have agreed rather than to some theory.").  Lord Neuberger's difficulty in understanding FTX's theory is justified, because FTX's own employees, including its former CEO and former Director of Engineering, did not see the Exchange as operating that way.  *See, e.g.*, Bankman-Fried Dep. Tr. at 160:17-22 ("Q. . . . Is that your understanding of how it worked, that the customer was only entitled to the overall asset balance.  A.  That was not my understanding . . . ."); Singh Dep. Tr. at 175:18-176:6 ("If the way the FTX platform operated was the customers didn't actually have any assets or liabilities but just had a net account balance, . . . [i]t's hard for me to even imagine such a case.  All you have are balances.  What are you doing?  Just giving people money?  That's no trading.").  Instead, the FTX Exchange's terms of service and actual operation betray the theory for what it is: a post hoc concoction divorced from real-world evidence.

### 1.    The May 2022 Terms of Service Invalidate the "Single Asset" Theory

161.    The May 2022 Terms of Service governed the customers of the FTX Exchange to "buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in" digital assets including via "spot trad[ing]," "spot margin trading," and "trad[ing] . . . futures contracts."  May 2022 TOS at 1, Schedules 2, 3, 5 (capitalization altered).  English law—which governs the May 2022 Terms of Service—thus determines this issue, and it is undisputed that, under English law, this theory is false.  English law "treats assets and liabilities as existing separately and not as one single net position or sum," unless the parties agree otherwise.  Gloster Decl. ¶ 16(c).  Despite the

FTX Recovery Trust retaining three experts admitted to practice English law, none of them endorses the "single asset" theory; they either disclaim it or were instructed to assume it. *See* Neuberger Dep. Tr. at 293:10-294:10; Austin Decl., Ex. 52, Transcript of November 12, 2025 Deposition of Stephen Nicholas Atherton K.C. ("Atherton Dep. Tr.") at 198:4-18, 215:21-216:12; Austin Decl., Ex. 53, Declaration of Stephen Houseman KC, ("Houseman Decl.") ¶¶ 22, 26. Instead, the sole expert asked to formally consider the matter—Dame Gloster—opined that it is incorrect. *See* Gloster Decl. ¶¶ 16(c), 101; Neuberger Dep. Tr. at 293:10-295:19 ("Q. And you are not giving an opinion whether or not the customer had assets and liabilities; right?  A. You are quite right.  Q.  Okay. So you are not giving an opinion whether the single asset theory is correct or not; right?   A.   I find the single asset theory, I have always found it quite difficult to understand.").

162.    The May 2022 Terms of Service confirm this undisputed testimony that assets and liabilities are separate.  *See* Gloster Decl. ¶ 16(c); *see id.* ¶¶ 99-109.  First, under the May 2022 Terms of Service, the 3AC Debtor owned the Digital Assets.  *See supra* section IV.A. Accordingly, because the premise of the "single asset" theory is that FTX customers did *not* own the assets attributable to their accounts but instead owned only an entitlement to their net account balance, the theory directly contradicts the May 2022 Terms of Service.  But, for the all the reasons below, the theory fails even if the customers do not own the assets.

163.    Second, even if the 3AC Debtor did not own the Digital Assets (though it did), the existence of section 38.7.2 supports that there were separate assets and liabilities.  It confers on FTX a unilateral right of set-off, but the right would be entirely meaningless if the 3AC Debtor's assets and liabilities were always consolidated into a net number—there would be nothing for FTX to set off in that case.  Gloster Decl. ¶ 106; Neuberger Dep. Tr. at 293:6-9 ("Q. . . . Now if a

customer does not have any digital assets or liabilities there would be no need to set them off; right?  A.  I agree."); *cf. In re Net Pay Sols., Inc.*, 822 F.3d 144, 158 n.13 (3d Cir. 2016) ("Were it otherwise, Net Pay would not have bothered to contract for a set-off right . . . since, as it claims, all the money it received from its customers would have been its property anyway.").

164.    Third, section 2.4.1 contemplates that a customer could take a variety of actions as to its digital assets (*e.g.*, trading, withdrawing, lending) on the Exchange.  *See, e.g.*, May 2022 TOS §§ 2.4.1 ("When you lend Assets to other Users, . . . ."), 7.4 ("[W]e do not guarantee that you will be able to buy and/or sell your Assets . . . at any particular price or time."), 8.2.6(C) ("[Y]ou may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."), 8.2.9 ("You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address . . . ."), 8.2.10 ("When you elect to transfer Digital Assets from your Account to a third party wallet address . . . ."), 16.3 ("When you lend Assets to other Users, . . . .").  But those rights are antithetical to the "single asset" theory, because, as the FTX Recovery Trust's own expert put it, "if there are no assets they cannot sell them."  Neuberger Dep. Tr. at 286:7-14.  Nor could customers "trade" an overall net account balance or "lend" it or "withdraw" it, because while the overall net account balance is a USD figure, customers' accounts may or may not hold the full net balance in USD.  *See* Gloster Decl. ¶ 102 (analyzing sections 7.4, 8.2.6(C), 8.2.9, and 8.2.10 of the May 2022 Terms of Service); *see also* Levy Decl. ¶¶ 112-13 ("[The 'single asset' theory] is inconsistent with the existence of the Margin Program, because if FTX customers' only 'asset' was a net account balance, they would have had no digital assets or fiat currency to 'lend' under the Margin Program, and thus could not have been 'lenders'.").

165.    Fourth, section 10 provides that, if a customer has a "debit balance," FTX may under certain circumstances "sell any Digital Assets or redeem any fiat currency or E-Money in

[the] Account to recover the outstanding debit balance." May 2022 TOS § 10.3.1. And section 16.2, which concerns margin trading, enables FTX to "seize and/or liquidate any or all of [a customer's] positions and Assets" when "the value of the Assets in [the customer's] Account falls below the margin maintenance requirement" or when the "Account appears to be in danger of defaulting. *Id.* § 16.2. If "debit balance" and "value of the Assets in [the] Account" referred to an overall debit balance and an overall account balance, respectively (*i.e.*, in accordance with the "single asset" theory), these liquidation clauses would have little meaning, as they could not effect any reduction of the debit balance or a change in the "value of the Assets." *See* Gloster Decl. ¶¶ 104-05; Levy Decl. ¶ 120. After all, the net balance would stay the same. Accordingly, the provisions only work if, contrary to the "single asset" theory, FTX considered customer assets and liabilities as separate.

166.    The FTX Recovery Trust's attempt to cast sections 10.3.1 and 16.2 as concerning an overall account balance do not support the "single asset" theory. *See* Neuberger Rebuttal Decl. ¶¶ 43-45. Lord Neuberger acknowledged that those clauses contemplate "effectively a right of set-off," which (as with section 38.7) is, in his words, "inconsistent with the single asset theory." Neuberger Dep. Tr. at 293:20-294:1. In addition, section 16.2 explicitly recognizes the existence of both consumer assets and consumer debts, as Lord Neuberger noted. *Id.* at 289:1-3 ("Q. . . . So 16.2 suggests that customers both have assets and can also have debts; right? A. Yes.").

167.    Finally, even if the May 2022 Terms of Service provided some modicum of support for the "single asset" theory, according to the FTX Recovery Trust's own English law expert, the theory would come into existence only when a customer had a *negative* overall account balance; until then, the customer had all the distinct rights available to them under the May 2022 Terms of Service. *See id.* at 286:19-287:11, 294:16-24 ("Q. . . . So if I understand right, you think [the

'single asset' theory] probably does not apply when the client has a positive net asset value; is that right? . . . A.  I think that is right, yes.").  But the FTX Recovery Trust concedes that the 3AC Debtor had a *positive* net account balance as of the end of June 12.  *See* Objection ¶ 82 ("On June 12, 2022, at 11:59 p.m. (UTC), the 3AC Accounts had a total, positive Account Balance across all assets of $284 million."); *see also* Atherton Dep. Tr. at 202:18-203:4 (explaining that he understood that 3AC's account balance was positive at the time of June 14 Liquidation).

### 2.    The "Single Asset" Theory Contradicts How the Exchange Operated

168.    Equally fatal to the "single asset" theory is that it conflicts with how the FTX Exchange worked in practice.  Externally, instead of just a net account value, the Exchange tracked digital assets within accounts and described them separately, whether positive or negative, to customers.  *See* Coverick Dep. Tr. (Day 1) at 97:18-98:13, 99:14-100:15, 107:12-108:12. Customers, like the 3AC Debtor, could view balances for each unique ticker symbol, not just an overall net account balance.  *See id.* at 126:19-127:14, 238:22-241:4; *see also* ███████████ ████████████████████████████████.  The design was intentional, because the specific details, such as how much of each token was associated with a customer's account, could inform a customer's trading decisions.  *See* Molina Dep. Tr. at 118:23-119:8, 122:16-20.

169.    And, internally, FTX likewise treated different assets in a customer's account differently, maintaining separate portfolios that did not simply aggregate into an "overall" balance. *See* Tackett Dep. Tr. at 197:21-24 ("Q.  So those particular assets don't net off against each other for purposes of some kind of overall?  A.  No.").  When converting non-USD collateral to USD to cover a negative balance, FTX prioritized digital assets in a specific order.  *See* Austin Decl., Ex. 55, Non-USD Collateral Explainer (FTX_3AC_000044909) at -000044912 ("FTX will first turn (non-USD fiat), then (BTC and USDT), then (ETH, BNB, PAXG, XAUT, KNC), and (BCH, LTC, TRYB, LINK, TRX), and then FTT (if you have it enabled) into USD.").  FTX also assigned

varying percentages of collateral values to different digital asset types based on their different liquidity profiles.  *See* Singh Dep. Tr. at 26:15-19.  For instance, due to fungibility differences, FTX would treat GBTC differently than BTC on the Exchange.  *See* Tackett Dep. Tr. at 197:2-198:2.  A customer could not always just look to the overall account balance to determine its ability to engage in transaction on the Exchange, because "[f]or some accounts and transactions, the specific tokens the account has affect[ed] whether the transaction can be done."  Molina Dep. Tr. at 122:11-123:3.  If, as the FTX Recovery Trust argues, customers simply had net asset positions, there would be no need to account for the liquidity of the underlying assets since they did not exist.

170.    FTX also separately tracked a customer's negative USD balance, which it described as distinct from an overall account balance.  *See* FTX Collateral Management Explainer (FTX_3AC_000013844) at -000013850 to -000013851.  Publicly available help pages and explainer documents confirmed that assets and liabilities on the Exchange were functionally different.  For instance, FTX.com help pages described the distinct types of digital assets that customers could hold in their accounts to outline what actions a customer could take as to them: some could be borrowed while others could not.  *See, e.g.*, FTX Spot Margin Trading Explainer (FTX_3AC_000013862) at -000013863 ("What assets are available for borrowing/lending?  You can find the current list on the borrow and lending pages, as well as via API.  Most but not all spot assets available for deposit and withdrawal on FTX can be borrowed.").  FTX even had lengthy discussions of negative USD balances and how they were created, which would be curious if they did not exist.  *See, e.g.*, Non-USD Collateral Explainer (FTX_3AC_000044909) at -000044913; FTX Collateral Management Explainer (FTX_3AC_000013844) at -000013850; Austin Decl., Ex. 56, FTX Margin/Collateral Explainer (FTX_3AC_000044679) at -000044680.

171.    FTX's Margin Program is likewise incompatible with the "single asset" theory.  If FTX customers were only entitled to a net account balance, they would not have any digital assets or USD available to lend.  But under the Margin Program, customers like the 3AC Debtor were purportedly "lending" specific assets (or asset entitlements), not just a portion of a net account balance.  *See* Lisle Decl. ¶ 59.5; FTX Spot Margin Trading Explainer (FTX_3AC_000013862) at -000013870 to -000013871 ("To lend an asset out, you specify the quantity you want to lend, and the minimum interest rate you'd require. . . . Assets that you are lending are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc.  However, they can be used as maintenance margin to prevent liquidations.").  Indeed, FTX paid interest to customer lenders on the basis that they were lending assets.    FTX Spot Margin Trading Explainer (FTX_3AC_000013862) at -000013870 ("Every hour, lenders are paid and borrowers are charged.").

172.    The "single asset" theory is also inconsistent with the existence and function of FTX's automatic liquidation engine.  As described above, under the May 2022 Terms of Service, FTX could liquidate a customer's "positions and Assets"—using a "liquidation mechanism," including an automatic liquidation engine—when the value of the assets in a customer's account fell "below the margin maintenance requirement" or when the "[a]ccount appear[ed] to be in danger of defaulting."  May 2022 TOS § 16.2.  But the automatic liquidation engine would be pointless if a customer's sole entitlement was their net account value.  *See* Singh Dep. Tr. at 175:18-176:3 ("Q. . . . If the way the FTX platform operated was the customers didn't actually have any assets or liabilities but just had a net account balance, that was the only thing they had, . . . would there still be a reason to have an automatic liquidation system? . . . A.  It's hard for me to even imagine such a case.").  If the "single asset" theory were true, FTX need not have designed a

complicated liquidation engine intended to manage customers' account risks caused by different types of assets and customers' participation in different programs. *See* Liquidations Explainer (FTX_3AC_000045167). Instead, FTX could simply have turned off the account before it went negative.

173. In sum, the evidence—FTX's agreement with the 3AC Debtor, FTX's operation of the Exchange, the understanding of its own CEO and employees, and the FTX Recovery Trust's own expert—repudiates the "single asset" theory.

## V.   THE JOINT LIQUIDATORS' CLAIMS SHOULD BE ALLOWED

### A.   Unfair Preference

174. The Joint Liquidators bring an unfair preference claim under BVI law with respect to the digital and other assets that were sold and liquidated between June 13 and 14 in repayment of the 3AC Debtor's liabilities on the FTX Exchange. Under section 245 of the BVI Insolvency Act 2003 (as amended, the "BVI Insolvency Act"[24]), a transaction entered into by a debtor company constitutes an unfair preference given to a creditor if the transaction (1) is an "insolvency transaction", (2) occurs within the "vulnerability period", and (3) "has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into." BVI Insolvency Act § 245(1).

175. In the Amended Proof of Claim, the Joint Liquidators state a quintessential preference claim under BVI law: the 3AC Debtor owed substantial monetary liabilities to FTX on an unsecured basis, that debt was repaid through a series of asset sales just before the 3AC Debtor's

---

[24]   The BVI Insolvency Act is available at https://www.bvifsc.vg/sites/default/files/insolvency_act.pdf.

liquidation, and those transactions resulted in FTX obtaining a greater recovery from the 3AC Debtor on account of that debt than if the sales had not occurred.  While the FTX Recovery Trust asserts a handful of defenses to the preference claim, including that the June 13-14 Transactions were in the "ordinary course" of the 3AC Debtor's business, none succeeds.  The Joint Liquidators' preference claim would prevail under BVI law and should be allowed in full by this Court.

176.    Nothing in BVI law limits preferential transactions only to those involving assets in which the debtor company had a proprietary interest.  Animating section 245 of the Act and its associated remedial provisions is instead the *pari passu* principle—the prescription that creditors of equal rank should stand on the same footing in an insolvent liquidation of the debtor.  This principle is circumvented where, as occurred here, pre-liquidation transactions accord a creditor a greater recovery than it would have received in the debtor's liquidation, to the prejudice of the debtor's other unsecured creditors.  *See* Levy Decl. ¶¶ 52, 67.  The principle can be—and cases confirm often is—undermined even if the assets that form the subject matter of the preferential transactions are not owned by the debtor.  *Id.* ¶ 67.

177.    Nor does anything in BVI law require that a preferential transaction decrease the net value of the debtor company's estate.  The FTX Recovery Trust takes pains in its Objection to argue that the June 13-14 Transactions did not decrease the 3AC Debtor's overall account balance—its contrived yardstick for the value of the relevant assets.  *See, e.g.*, Objection ¶¶ 8-10, 145-48, 157.  Even accepting that factual premise, FTX's emphasis on loss in value is a *non sequitur*.  An unfair preference claim is concerned with whether antecedent debt was repaid to a creditor, not whether the value of the debtor's estate declined as a result of that payment.  *See* Levy Decl. ¶ 52.  An unfair preference claim generally does not decrease the estate's net value, because the claim assumes that assets that would have been available to a debtor were used to repay an

antecedent debt.  The FTX Recovery Trust thus seems to confuse an unfair preference with an undervalue transaction (or, in U.S. parlance, a preference with a fraudulent conveyance).

178.    Left with no viable legal bases on which to oppose the unfair preference claim, the FTX Recovery Trust resorts to the specious argument that allowing the preference claim would give the 3AC Debtor "special treatment" relative to FTX's other creditors.  *See* Objection ¶¶ 6, 143.  This, of course, ignores that the 3AC Debtor is *not* similarly situated to FTX's other creditors: it is a debtor in liquidation whose Joint Liquidators are empowered under BVI law to pursue avoidance and other causes of action against FTX's estate, for the benefit of the 3AC Debtor's own unsecured creditors.  The Joint Liquidators' unfair preference claim, which arises from the repayment of the 3AC Debtor's financial obligations on the Exchange, is one of those causes of action.  If other creditors of FTX are debtors with pending insolvency proceedings, they can also pursue preference claims.

179.    This should come as no surprise to the FTX Recovery Trust, as FTX has sought to avail itself of the special rights afforded to it under the Bankruptcy Code's avoidance provisions. FTX Debtor Alameda Research Ltd. brought an adversary complaint against Voyager Digital, LLC ("Voyager")—at the time a debtor in its own Chapter 11 proceedings—seeking to recover from Voyager certain transfers that Alameda Research Ltd. allegedly made to Voyager on account of antecedent debt Alameda owed to Voyager.  *See generally* Complaint to Avoid and Recover Preferential Transfers [D.I. 596].  Alameda Research Ltd. ultimately settled these (and other) claims with Voyager.  *See generally* Order (1) Authorizing the Debtors to Enter into the Global Settlement Agreement with Voyager, (2) Approving the Global Settlement Agreement, and (3) Granting Related Relief [D.I. 13123].  The FTX Recovery Trust's criticism of the Joint Liquidators for availing themselves of similar statutory rights rings hollow at best.

### 1.    The Unfair Preference Claim Is Adequately Pleaded

180.    The FTX Recovery Trust offers a fleeting argument that the Joint Liquidators' unfair preference claim is insufficiently pleaded under U.S. and/or BVI law. *See* Objection ¶¶ 188, 194. It is wrong. Because the claim is brought in this Court, applicable U.S. pleading standards, rather than BVI pleading standards, govern. *See In re Nortel Networks, Inc.*, 469 B.R. 478, 496-99 & n.12 (Bankr. D. Del. 2012) (applying *Allegheny* and U.S. pleading standards to proof of claim asserting causes of action arising under foreign law). Under *Allegheny*, as discussed above, the Joint Liquidators need only "allege[] facts sufficient to support a legal liability" to establish the *prima facie* validity of the preference claim. 954 F.2d at 173. This is a "'relatively low threshold' that is less burdensome than the federal civil pleading standard." *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 544 (Bankr. D. Del. 2016) (citation omitted).

181.    The Joint Liquidators' preference claim easily passes that threshold. The Amended Proof of Claim alleges, among other things, which transactions give rise to the preference claim, the dates of those transactions, the amounts transferred in those transactions, the parties involved in those transactions, and the nature of the debt that those transactions repaid. *E.g.*, Am. POC ¶¶ 1, 41-44, 46-54. Even if Rule 8(a)'s formal notice pleading standard applies in this context,[25] these allegations also satisfy that standard. *See In re IT Grp. Inc.*, 2005 WL 3050611, at *14-15 (D. Del. Nov. 15, 2005) (applying Rule 8(a)'s flexible requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief" to preference claim asserted under Bankruptcy

---

[25] Bankruptcy Rule 9014 does not by default apply Bankruptcy Rule 7008 in contested matters such as this. Fed. R. Bankr. P. 9014(c).

Code).[26]  Tellingly, the FTX Recovery Trust never says what more it believes was needed to put

it on notice of the claim, and its lengthy Objection belies any claim of insufficient notice.

### 2. The Joint Liquidators Have Established All Elements of Their Unfair Preference Claim

#### a. 3AC Entered into the June 13-14 Transactions

182.    A company "enter[s] into" a transaction within the meaning of section 245 of the

BVI Insolvency Act when it "tak[es] . . . some step," engages in some "act of participation," or is

"in some other way . . . party to or involved in the transaction." *See* Levy Decl. ¶¶ 77-78 (quoting

Austin Decl., Ex. 57, *Hunt (Liquidator of Ovenden Colbert Printers Ltd) v. Hosking* [2013] EWCA

Civ 1408, [2015] BCC 615).  This standard encompasses a broad range of conduct by the company

and does not require that it initiated the relevant transactions to have "entered into" them.  *See id.*

Under this standard, the 3AC Debtor "entered into" each of the June 13-14 Transactions.  On the

current record, there is no dispute that the 3AC Debtor "entered into" each of the June 13-14

Transactions prior to FTX's June 14 Liquidation.  The FTX Recovery Trust and its BVI law expert

have affirmatively taken this position.  Objection ¶¶ 90-91; Atherton Dep. Tr. at 71:17-73:6.

According to the FTX Recovery Trust, these transactions resulted in the sale of approximately

$842 million worth of Digital Assets, and a corresponding repayment of the 3AC Debtor's USD

liabilities on the Exchange.  Coverick Decl. ¶ 71.  There is likewise no dispute that the 3AC Debtor

was responsible for closing out the futures positions it held in the June 13-14 period, the notional

---

[26] The allegations in the Amended Proof of Claim would satisfy even the more stringent gloss on Rule 8(a) some courts have applied to Chapter 5 preference claims asserted via formal adversary complaints.  *See In re IT Grp. Inc.*, 2005 WL 3050611, at *14-15.

value of which was over $500 million.  Coverick Dep. Tr. (Day 1) at 241:18-243:5; Coverick Dep. Tr. (Day 2) at 207:22-208:10.[27]

183.    The 3AC Debtor also "entered into" the June 14 Liquidation.  Even if the 3AC Debtor did not itself initiate those asset sales, it was at a minimum "in some other way . . . party to or involved in the transaction[s]."  *See Hunt*, *supra*.  That is because a preferential "transaction" within the meaning of section 245 of the Act may consist of a series of transactions that encompass a period of dealing between the parties.  Levy Decl. ¶ 86; *see also* Declaration of Stephen Nicholas Atherton K.C. In Support Of The FTX Recovery Trust's Objection To The Amended Proof of Claim Filed By The Joint Liquidators of Three Arrows Capital [D.I. 30935] ("Atherton Initial Decl.") ¶ 68.  Insofar as the 3AC Debtor authorized FTX to carry out the June 14 Liquidation pursuant to the May 2022 Terms of Service or the March 2022 Agreements, as the FTX Recovery Trust contends, the grant of that authorization by the 3AC Debtor and the ensuing exercise of that authority by FTX would constitute a composite transaction "entered into" by the 3AC Debtor.  *See* Levy Decl. ¶ 87.  There is no dispute that the 3AC Debtor's entries into these agreements constitute "transactions," or that these transactions (and the sales that followed) all occurred within the applicable "vulnerability period" (defined below).  *See* Atherton Dep. Tr. at 74:6-11, 95:10-96:10. If the June 14 Liquidation was authorized by the May 2022 Terms of Service or March 2022 Agreements, then, the 3AC Debtor would be deemed to have "entered into" those transactions under BVI law.

184.    Stephen Nicholas Atherton K.C., the FTX Recovery Trust's BVI law expert, opposes this conclusion on the grounds that the 3AC Debtor's entry into the relevant agreements

---

[27] Transactional support for this can be derived from a document produced by the FTX Recovery Trust as FTX_3AC_0000000002.

constituted "renewal[s]" of those agreements, for which the 3AC Debtor received "commensurate consideration." Austin Decl., Ex. 58, Declaration of Stephen Nicholas Atherton K.C. in Rebuttal ("Atherton Rebuttal Decl.") ¶ 53. But Mr. Atherton was unfamiliar with the material differences between the May 2022 Terms of Service and the March 2022 Agreements, on the one hand, and prior agreements to which FTX and the 3AC Debtor were parties, on the other. Atherton Dep. Tr. at 78:2-21, 85:20-87:3. For example, the May 2022 Terms of Service contain materially more robust customer digital asset ownership and control rights than appear in a prior incarnation of the Exchange's terms. *Compare* May 2022 TOS § 8.2.6, *with* Coverick Decl. at Ex. C § 22. And there is no evidence that the parties had ever before entered into a Margin Agreement of the type that appears in the March 2022 Agreements. Mr. Atherton also conceded that whether the 3AC Debtor received "commensurate consideration" is not relevant to an unfair preference claim. Atherton Dep. Tr. at 82:1-22.

185. Bolstering this involvement is the fact that FTX extensively engaged with the 3AC Debtor and its principals on June 13 and 14 and provided them with advance notice of the intended liquidation and an opportunity to prevent it. *E.g.*, Tackett Dep. Tr. at 139:17-140:19; Coverick Dep. Tr. (Day 2) at 264:21-265:12. Those pre-liquidation communications were extensive, involving discussions between the parties regarding potential Line of Credit adjustments, purported account collateral requirements, and options to avoid liquidation. Tackett_3AC_000000158 at -000000219 to -000000222. Notwithstanding those discussions, the 3AC Debtor elected not to deposit additional funds into its account, or take other steps, to avoid the liquidation. Nothing prevented the 3AC Debtor from doing so; as the FTX Recovery Trust acknowledged, "[3AC] had the ability to decide to deposit more assets onto the exchange." Coverick Dep. Tr. (Day 2) at 265:13-266:17; *see also* Scheig Report at Suppl. Ex. G.5. This

election by the 3AC Debtor, as Mr. Levy explains, also establishes a relevant degree of involvement by it in the June 14 Liquidation, further supporting the conclusion that the 3AC Debtor "entered into" those transactions. Levy Decl. ¶ 88.[28]

b.    The June 13-14 Transactions Were "Insolvency" Transactions

186.    A transaction constitutes an "insolvency transaction" under the BVI Insolvency Act if it "is entered into at a time when the company is insolvent" or "causes the company to become insolvent." BVI Insolvency Act § 244(2). A company is "insolvent" within the meaning of this section when it is "unable to pay its debts as they fall due." *Id.* §§ 8(1)(c)(ii), 244(3). That is, a company is "insolvent" in this context when it fails the "cash-flow" test. Levy Decl. ¶ 91.

187.    In analyzing the cash-flow test, BVI courts undertake a commercial assessment of a company's cash-flow insolvency that is not limited to debts due on a specific day, but extends to debts falling due in the near future. *Id.* ¶¶ 92-93; *see also* Austin Decl., Ex. 59, *Re Cheyne Finance plc (No. 2)* [2007] EWHC 2402 (Ch), [2008] Bus. L.R. 1562 ¶ 51 ("[C]ash-flow or commercial insolvency is not to be ascertained by a slavish focus only on debts due as at the relevant date."). While the company's balance sheet position is not itself determinative of insolvency under section 244 of the Act, it is relevant insofar as it bears on the company's practical ability to meet maturing obligations, such as where short-term indebtedness or callable loans will imminently fall due and there is no realistic prospect of repayment. Levy Decl. ¶ 94. In that scenario, the company will likely be deemed cash-flow insolvent, even if it could pay debts presently due. *Id.*

---

[28] The FTX Recovery Trust argues in passing that the unfair preference claim requires a transaction "with FTX." Objection ¶ 157 (first bullet). Section 245 of the BVI Insolvency Act requires no such thing—notably, the FTX Recovery Trust's BVI law expert does not endorse that reading—but in any event the expert evidence supports the conclusion that the relevant transactions were in fact with FTX. *See* Levy Decl. ¶¶ 162, 181.

188.    Here, there does not appear to be any dispute as to the 3AC Debtor's insolvency. The 3AC Debtor produced expert evidence of insolvency, and the FTX Recovery Trust offered no response.  As discussed in more detail above, the contemporaneous financial evidence and the expert testimony establish that the 3AC Debtor was cash-flow insolvent as of June 12 and, in any event, that the June 13-14 Transactions occurred amid, and were driven by, a liquidity failure that rendered the 3AC Debtor unable to pay its debts as they fell due in the reasonably near term.  *See supra* section II.E.  The only reasonable conclusion from this evidence is that the 3AC Debtor could not meet its financial obligations as they fell due, was cash-flow insolvent, and lacked adequate capital.  *See* Scheig Report at 22-25, Exs. A.1-A.2, Suppl. Ex. C, Suppl. Ex. D.

189.    Even if the 3AC Debtor was not yet insolvent on June 12—and the unrebutted expert evidence confirms that it was—the June 13-14 Transactions were still "insolvency transactions" because the 3AC Debtor would have become unable to pay its debts within the reasonably near term thereafter.  Contemporaneous events outside the FTX Exchange show that the 3AC Debtor's financial position rapidly declined after June 12 and that the 3AC Debtor would not have been able to pay its debts within the reasonably near term thereafter.  On June 13, the 3AC Debtor defaulted on a margin call from ███████████████████████, and BTC prices continued to decline during the week following June 12, driving down the value of the 3AC Debtor's cryptocurrency assets.  *See id.* at 30-31.[29]  Given the magnitude of the 3AC Debtor's borrowings, ██████████████ rapidly declining collateral values, and lenders' own market stresses, the 3AC Debtor's lenders would have either immediately called open-term or callable

---

[29] On the FTX Exchange, at the same time, the 3AC Debtor appears to have rapidly closed out nearly all of its positions between June 13-14, with the digital assets associated with the 3AC Debtor's accounts on the Exchange falling from over $1 billion as of end of day on June 12 to approximately $1.72 million by end of day on June 14. *See* Lisle Decl. ¶¶ 11-13, 23; Scheig Report at 30-31.

loans or exercised termination rights under material adverse effect provisions, if they had known of 3AC's true financial condition at the time of the June 13-14 Transactions. *See* Lisle Decl. ¶¶ 63-71. That would result in the 3AC Debtor having an immediate and insurmountable cash deficit without reasonably available liquidity to address it. *See* Scheig Report at 24-25, Ex. A.2. Thus, because the 3AC Debtor would not have been able to pay its debts within the reasonably near term after the June 13-14 Transactions, the transactions were "insolvency transactions" under section 244(2)(b) of the BVI Insolvency Act. *See* Levy Decl. ¶¶ 89-96 (explaining that cash-flow insolvency is a commercial assessment encompassing debts falling due in the reasonably near future). The fact and expert evidence in the record confirms that, given the 3AC Debtor's liabilities and lack of liquidity at the time, the June 13-14 Transactions were "insolvency transactions" within the meaning of section 244(2) of the Act. *See id.* ¶ 96.

190.    The FTX Recovery Trust has adduced no evidence to the contrary, and its BVI law expert has not disputed—and indeed has assumed—the 3AC Debtor's cash-flow insolvency at the time of the transactions. Atherton Initial Decl. ¶ 36; Atherton Rebuttal Decl. ¶ 18 n.17; Atherton Dep. Tr. 96:11-97:6.

    c. <u>The June 13-14 Transactions Occurred Within the "Vulnerability Period"</u>

191.    Under the BVI Insolvency Act, a preferential transaction not involving a connected person is entered into within the "vulnerability period" if it occurs in the period beginning six months prior to the "onset of insolvency" (*i.e.*, the date an application to appoint a liquidator is filed) and ending on the appointment of the company's liquidator. BVI Insolvency Act § 244(1).

192.    There does not appear to be any dispute about this element either. The application to appoint the Joint Liquidators was filed on June 27, which means that the vulnerability period began on December 27, 2021 (*i.e.*, six months prior to the "onset of insolvency"). The

vulnerability period ended on June 27, when the Joint Liquidators were appointed by the BVI Commercial Court.  Because the June 13-14 Transactions occurred between these dates, they occurred within the applicable "vulnerability period."  *See* Levy Decl. ¶ 98.  The FTX Recovery Trust does not contend otherwise, and its BVI law expert conceded as much.  Atherton Initial Decl. ¶ 39.

### d.   FTX Was a Creditor of the 3AC Debtor

193.   The FTX Recovery Trust argues that FTX was not a "creditor" of the 3AC Debtor. This position rests on the FTX Recovery Trust's contrived "single asset" theory—the theory that the parties' relationship was represented merely by an overall account balance (always positive), and involved no actual digital assets or margin liabilities, despite the fact that the 3AC Debtor had a substantial negative USD balance.  *See* Objection ¶ 197; Atherton Initial Decl. ¶¶ 42-44; Atherton Rebuttal Decl. ¶¶ 54-56.  For all the reasons set out above, *see supra* section IV.B, that theory is nonsense; the 3AC Debtor has both assets and liabilities.

194.   Once that is accepted, the FTX Recovery Trust cannot seriously dispute that FTX was a creditor.  While the FTX Recovery Trust ignores it, the proper starting point in the "creditor" analysis is the BVI Insolvency Act.  The Act defines a person as a "creditor" of a company when the person has a claim against the company that would be an "admissible claim" in the company's liquidation.  BVI Insolvency Act § 9(1).  "Admissible claims" encompass all "liabilities" of the company as of or arising after its liquidation based on preexisting obligations, subject to certain irrelevant exceptions.  *Id.* § 11(1)-(2).  The Act defines a "liability," in turn, as "a liability to pay money or money's worth including a liability under an enactment, a liability in contract, tort or bailment, a liability for a breach of trust and a liability arising out of an obligation to make restitution," and makes clear that a "liability" includes a "debt."  *Id.* § 10(1).  A "liability" under the Act "may be present or future, certain or contingent, fixed or liquidated, sounding only in

damages or capable of being ascertained by fixed rules or as a matter of opinion." *Id.* § 10(2).  In

short, a "creditor" under the Act is simply a person to whom the company owes a money payment,

even if the payment obligation is contingent.  *See* Levy Decl. ¶ 108.

195.    Under this definition, FTX was plainly a creditor of the 3AC Debtor.  There is no

genuine dispute that the 3AC Debtor had incurred more than $700 million in USD liabilities on

the Exchange by the end of the day on June 12, or that these were "debts" that needed to be repaid.

*See, e.g.*, Tackett Dep. Tr. at 193:10-14 (money in the 3AC Debtor's accounts that was not their

own capital was a "debt").  While the FTX Recovery Trust has at times suggested that the 3AC

Debtor acquired the bulk of its negative USD balance via borrowings from other Exchange

customers, *see, e.g.*, Objection ¶ 161, the relevant inquiry for "creditor" status under the Act is not

who "loaned" the 3AC Debtor these amounts, but who had a claim for repayment—that is, to

whom negative balances were owed.  *See* Levy Decl. ¶ 123.

196.    That entity was FTX.  The relevant agreements confirm as much.  *First*, The May

2022 Terms of Service establish FTX's creditor status vis-à-vis Exchange customers like the 3AC

Debtor.  That document was a bilateral agreement between FTX and each Exchange customer, and

expressly disclaims the creation of any rights or remedies in favor of third parties, such as other

customers.  May 2022 TOS § 38.9.  Any obligations imposed on customers via the May 2022

Terms of Service were therefore obligations to *FTX*.  Levy Decl. ¶¶ 124-25.  One of those

obligations was to pay "us" (*i.e.*, FTX), upon demand, any outstanding "debit balance" in a

customer's account.  May 2022 TOS § 10.3.  As Dame Gloster and Mr. Levy explain, that

provision would be incoherent unless "debit balance" referred to a customer's negative USD

balance.  Gloster Decl. ¶¶ 103-04; Levy Decl. ¶¶ 119-20.  That is, a customer owed its negative USD balance to FTX.[30]

197.    The FTX Recovery Trust has identified no agreements that rendered a customer's negative balances, or any portion of them, payable to other Exchange customers (or any other third parties).  That is because the Exchange did not operate that way.  As discussed above, FTX's Margin Program was administered by FTX and effected by FTX debiting and crediting customer accounts, not by transactions between specific customers.  *See supra* section II.C; *see also* Coverick Dep. Tr. (Day 1) at 376:11-23 ("[I]t's not as if a borrower . . . had a bitcoin from a specific customer.").  According to the FTX Recovery Trust, no assets were exchanged between customers at all under the Margin Program.  *Id.* at 365:23-366:14.  Consistent with the Exchange's infrastructure, customers repaid "borrowed" margin loans, including USD, by paying FTX, not other customers.  *See* Bankman-Fried Dep. Tr. at 111:8-112:12.

198.    *Second*, the March 2022 Agreements underscore that the 3AC Debtor *in particular* owed all relevant payment obligations on the Exchange to FTX.  The March 2022 Agreements are bilateral agreements between only FTX and the 3AC Debtor.  FTX (and only FTX) is defined as the "Lender" with respect to the Line of Credit.  Line of Credit Agreement at Preamble.  The agreements contain no provisions that imposed on the 3AC Debtor any financial obligations to third parties.  Nor could they, consistent with section 21 of the Margin Agreement, which provides that the "[a]greement is solely for the benefit of the parties hereto" and that no other persons have rights or benefits thereunder.  Margin Agreement § 21.

---

[30] The FTX Recovery Trust's position would also render incoherent section 38.7 of the May 2022 Terms of Service, which is premised on there being "amounts payable by [the customer] to FTX" (and the converse).  May 2022 TOS § 38.7.2.  If FTX could not be both a debtor and creditor in respect of customer balances, there would never be anything to set off under section 38.7.

199.    By contrast, these agreements created substantial contingent financial obligations to pay FTX.  The Margin Agreement provides that the 3AC Debtor was at all times "liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement"—a liability that *FTX* could call.  *Id.* § 2.  In the event of an account liquidation, the 3AC Debtor was similarly liable *to FTX* for any remaining deficiency.  *Id.* § 4(c).  These contingent liabilities to FTX encompass any USD or digital asset borrowings by the 3AC Debtor under the Margin Program, which is the very subject matter of the Margin Agreement.  Levy Decl. ¶ 132; *see also* Margin Agreement at Preamble.  They also encompass the principal amount of the 3AC Debtor's $120 million Line of Credit, which "constitute[s] Indebtedness under this Agreement" and is "repayable upon demand of FTX."   Margin Agreement § 7; *see also* Tackett Dep. Tr. at 257:7-20 (the 3AC Debtor owed "[t]he LOC princip[al] plus any further negative amounts").   In short, because the 3AC Debtor had financial obligations under these agreements, and those obligations were owed to FTX, FTX was a "creditor" of the 3AC Debtor within the meaning of the Act.  Levy Decl. ¶ 135.

200.    Those with firsthand knowledge of the Exchange confirmed that FTX was the 3AC Debtor's creditor.  *E.g.*, Tackett Dep. Tr. at 256:12-257:3 (customer negative balances were owed to FTX); Bankman-Fried Dep. Tr. at 64:16-23 (positive and negative balances represented "a liability from FTX to the customer . . . and from the customer to FTX").   Unrebutted expert evidence confirms as much.  *E.g.*, Lisle Decl. ¶¶ 31-32 (Exchange infrastructure was inconsistent with customer-to-customer liabilities).  The FTX Recovery Trust itself described a "negative account balance" as a "debt [owed] to the exchange," not to third parties.  *See* Coverick Dep. Tr. (Day 2) at 106:22-107:7.  The converse is also true on the FTX Recovery Trust's case: as its BVI law expert posited, a customer's positive account balance represented an amount due "from FTX."

Atherton Initial Decl. ¶ 43; *see also* Atherton Dep. Tr. at 206:21-207:22 (customers expected payment of positive account balances "from FTX").  Having conceded that any excess portion of a customer's positive digital asset balance or negative USD balance is a payment obligation between FTX and that customer (as opposed to other parties), the FTX Recovery Trust cannot credibly claim that the remaining portions of those balances are not.  Because losses from the 3AC Debtor's futures contracts were realized in its USD balance, those too were payable to FTX (and vice versa for gains).  *See* Bankman-Fried Dep. Tr. at 141:16-142:9.  The 3AC Debtor's funding payment obligations for futures contracts were likewise owed to FTX.  *Id.* at 140:21-141:1.

201.    The evidence is especially stark as to the $120 million of the 3AC Debtor's USD borrowings that were attributable to its Line of Credit.  *See* Austin Decl., Ex. 14, FTX Recovery Trust's Resps. & Objs. to Interrogatory No. 1 (Seventh Set) ("[T]he [3AC Debtor's] Negative U.S. Dollar Balance as of the end of the day on June 12, 2022 (UTC) included the aggregate of the U.S. Dollar Balance, both negative and positive, for all of the 3AC Accounts (including subaccounts) and the $120 million Line of Credit"); Coverick Dep. Tr. (Day 2) at 70:20-71:12 ("[The Line of Credit] is a borrow on the account.").  The $120 million provided by the Line of Credit, the FTX Recovery Trust admits, was not "borrow[ed]" from the Margin Program at all.  *See* Coverick Decl. ¶ 49; Coverick Dep. Tr. (Day 2) at 98:12-99:5.  The FTX Recovery Trust does not say in its Objection from whom it was borrowed, or to whom it was owed, but the answer on both counts is clear: FTX.  *See* Tackett Dep. Tr. at 153:3-16 ("[W]e gave [the 3AC Debtor] 120 million dollars."); Bankman-Fried Dep. Tr. at 130:12-23 (a line of credit was a USD loan from FTX); Coverick Dep. Tr. (Day 2) at 172:4-13 (3AC Debtor paid interest on the Line of Credit to FTX).  On what basis

the FTX Recovery Trust views FTX as anything other than a creditor as to the Line of Credit is unclear.[31]

202.    None of the FTX Recovery Trust's experts show otherwise.  Its English law expert does not engage with the point.  Its Antigua law expert affirmatively *concedes it*.  At deposition, Mr. Houseman accepted that "Indebtedness" within the meaning of the Margin Agreement extends to all liabilities the 3AC Debtor incurred via the Margin Program, as well as all amounts the 3AC Debtor owed under the Line of Credit.  Houseman Dep. Tr. at 145:25-146:8.  He further testified it is "abundantly clear" that FTX was the 3AC Debtor's "creditor" as to that Indebtedness.  *Id.* at 313:21-316:8.  The Margin Agreement, Mr. Houseman opined, "contemplate[s] that all the liability is owed to FTX."  *Id.* at 318:19-319:11.

203.    Its BVI law expert offers only cursory remarks about certain of the provisions in the agreements, before maintaining that FTX was a debtor to the 3AC Debtor.  Atherton Rebuttal Decl. ¶ 57.  These views are not only irreconcilable with Mr. Houseman's opinions, but woefully deficient.  Mr. Atherton acknowledged at deposition he was "not seeking to interpret" the May 2022 Terms of Service or March 2022 Agreements, that he could not identify terms of the

---

[31] While the FTX Recovery Trust asserts that the 3AC Debtor's overall account balance was at all times positive, record evidence undermines that assertion.  Former FTX Head of Institutional Sales Zane Tackett, who was responsible for liaising with the 3AC Debtor regarding its account balances and financial obligations, testified that the 3AC Debtor's account balance was "negative" as of June 14.  Tackett Dep. Tr. at 118:25-120:24.  That is because, as Mr. Tackett explained, when the 3AC Debtor's account balance (exclusive of its Line of Credit) was less than the $120 million Line of Credit amount, it was treated by FTX as "essentially negative" because the $120 million was owed to FTX, and not a positive balance in fact available to the 3AC Debtor.  *Id.* at 123:24-124:20, 257:21-258:7; *see also id.* at 153:3-25 ("I also don't believe for a minute that someone logging in on the 3AC team would see 120 million and they would think, oh, great, we have $120 million.").  But for the Line of Credit amount, Mr. Tackett testified, the 3AC Debtor's account balance would have been negative $83 million prior to the June 14 Liquidation.  *Id.* at 126:4-127:8.  The Joint Liquidators reserve all rights to seek further discovery on this topic and to assert that the 3AC Debtor's overall account balance was in fact negative, rendering FTX a creditor on the FTX Recovery Trust's case.

agreements that supported certain of his remarks, and that his positions relied on assumptions provided by counsel rather than an independent review of the facts. *See* Atherton Dep. Tr. at 214:13-215:4, 215:13-216:12, 217:21-218:13. He also conceded that he "[didn't] know" whether FTX was a creditor as to certain liabilities under the May 2022 Terms of Service, as that "depend[ed] upon an absolute understanding of how the Exchange operated" that he did not have. *Id.* at 201:24-202:16. This unsupported testimony falls far short of satisfying the FTX Recovery Trust's evidentiary burden, particularly given that is it contradicted by another expert of the FTX Recovery Trust.

204.    Moreover, the construct that FTX was solely a debtor vis-à-vis the 3AC Debtor is inconsistent with the 3AC Debtor having margin and collateral obligations to FTX, and thus with the claim that FTX was authorized to liquidate the 3AC Debtor to redress a supposed breach of those obligations. *See, e.g.*, Objection ¶¶ 183-85. When confronted at deposition with this inconsistency, the FTX Recovery Trust's BVI law expert conceded that if FTX were only a debtor to the 3AC Debtor, "then it wouldn't have any right to enforce . . . as against 3AC." Atherton Dep. Tr. at 201:1-22; *see also id.* at 218:20-219:10 (conveying understanding that FTX "could not seek repayment of a monetary obligation pursuant to the line of credit" if it were a debtor). The FTX Recovery Trust's positions in the case gut its argument that FTX was not the 3AC Debtor's creditor.[32]

e.        FTX Was Put in a Better Position by the June 13-14 Transactions

205.    A creditor is placed in a "better" position due to a preferential transaction under the BVI Insolvency Act when it receives a greater recovery from the debtor company than it would

---

[32] If it were determined that FTX was not a creditor of the 3AC Debtor, the Joint Liquidators reserve all rights to seek relief from FTX pursuant to breach of contract and all other applicable causes of action for unauthorized conduct under the parties' agreements.

have received in a liquidation of the company had the transactions not occurred.  Levy Decl. ¶ 99 (citing BVI Insolvency Act § 245(1)).  The assessment of whether the creditor was preferred is measured not by reference to the company's actual liquidation, but from a hypothetical liquidation assumed to occur immediately after the challenged transactions.  *Id.* ¶ 100; *see also* Atherton Initial Decl. ¶ 45.

206.    By this measure, the June 13-14 Transactions placed FTX in a better position than its position in a hypothetical liquidation of the 3AC Debtor had those transactions not occurred. The transactions eliminated more than $700 million in USD liabilities that the 3AC Debtor had incurred on the Exchange as of June 12.  If those liabilities were owed to FTX—for the reasons set out above, they were—there can be no serious dispute that this element of the unfair preference claim is satisfied.  In the real world, FTX obtained what the FTX Recovery Trust has characterized as a dollar-for-dollar reduction in the 3AC Debtor's USD liabilities as a result of the asset sales (*i.e.*, repayment of almost 100% of the 3AC Debtor's liabilities on the Exchange).  *See* Objection ¶ 94.[33]  By contrast, in a hypothetical liquidation of the 3AC Debtor at the same time, but assuming these transactions did not occur, FTX would have received a far smaller percentage of the value of the digital assets that were sold to repay these liabilities, which instead would have been distributed to the 3AC Debtor's general creditor body on a *pari passu* basis.  *See* Crumpler Dep. Tr. at 47:4-48:22 (estimating that creditors of the 3AC Debtor currently stand to receive only approximately 38 cents on the dollar).

207.    Each of the FTX Recovery Trust responses misses the mark.  First, it disputes the factual premise that FTX was a creditor of the 3AC Debtor, again in reliance on its "single asset"

---

[33] The closure of the 3AC Debtor's futures positions between June 13 and 14 likewise eliminated the 3AC Debtor's contingent liabilities to FTX under those contracts to the full extent of those liabilities.

theory.  Objection ¶¶ 198-99; Atherton Initial Decl. ¶ 47.  For all the reasons set out above, those litigation positions are inconsistent with reality and aspects of the FTX Recovery Trust's own case, and should be rejected.  *See supra* sections IV.B, V.A.2.d.

208.    Second, the FTX Recovery Trust claims that FTX did not receive the "proceeds" from the June 14 Liquidation (or other asset sales).  Objection ¶ 162.  That is legally irrelevant and factually unsupported.  If FTX was the creditor of the 3AC Debtor's liabilities on the Exchange— it was—then the satisfaction of those liabilities benefited FTX vis-à-vis the 3AC Debtor.  What FTX may have done with the assets following the sales, and any "proceeds" thereof, is a separate matter.  Notably, the FTX Recovery Trust testified that digital asset sales on the Exchange did not result in the movement of digital assets between customers; the assets stayed with FTX.  *See* Coverick Dep. Tr. (Day 1) at 290:24-291:10, 370:11-22.  To the extent that FTX's June 14 Liquidation generated "proceeds," the FTX Debtors received them, contrary to what the FTX Recovery Trust tells the Court in its Objection.  Indeed, discovery revealed that *Alameda* was the counterparty to each of FTX's June 14 Liquidation transactions and received "entitlements to the digital assets which were the subject of the Liquidation."  Coverick Dep. Tr. (Day 2) at 253:7-11; Austin Decl., Ex. 14, FTX Recovery Trust's Resps. & Objs. to Document Request No. 11 (Eighth Set).[34]  Alameda economically benefited from acquiring the positions of liquidated accounts as a backstop liquidity provider.  *See* Singh Dep. Tr. at 58:8-15 (backstop liquidity providers acquired assets at better than market prices); Bankman-Fried Dep. Tr. at 171:23-172:4 (backstop liquidator providers acquired two-thirds of remaining value of liquidated account).

---

[34] The FTX Recovery Trust also admitted at deposition that Alameda was likely a counterparty to asset sales by the 3AC Debtor on June 13.  Coverick Dep. Tr. (Day 2) at 217:17-220:3.

209.    Third, and in the alternative, the FTX Recovery Trust argues that a statutory or contractual set-off—it is not clear which it believes applies—would serve to place FTX in the same position as conjured by its "single asset" theory, and thus that FTX was not preferred.  Objection ¶ 199; Atherton Initial Decl. ¶¶ 48-50; Atherton Rebuttal Decl. ¶¶ 61-63.  For the reasons set forth below, the FTX Recovery Trust's invocation of these defenses fails as a matter of fact and law. *See infra* section V.3.c.

f.    <u>Even If FTX Was Not a Creditor of the 3AC Debtor, FTX Is Still Liable for the Benefits It Received from the June 13-14 Transactions</u>

210.    Under BVI law, as discussed above, a person need not be a creditor of an insolvent company for the company to recover from it as a result of a preferential transaction.  That is because the overarching objective of the Act is simply the "restor[ation]" of the position that the company would have been in but for the preferential transactions.  *See* BVI Insolvency Act § 249(1)(b).  The Act does not prescribe set ways to achieve that result; section 249 is instead of significant "generality."  *Id.* § 249(2).  In giving effect to this restorative objective, the BVI court thus has wide discretion to fashion appropriate remedies.  Levy Decl. ¶ 102.  In particular, section 249(2)(d) of the Act permits a court to "require any person to pay, in respect of benefits received by him or her from the company, such sums to the [company] as the [c]ourt may direct"—even if that person was not a creditor of the company.  BVI Insolvency Act § 249(2)(d).  Indeed, subject to certain limitations, section 249 of the BVI Insolvency Act permits courts to impose orders that "affect the assets of, or impose obligations on, anyone."  Levy Decl. ¶ 44; *see also* BVI Insolvency Act § 249(3).  Thus, whether or not FTX was the 3AC Debtor's "creditor" with respect to its Exchange liabilities—it was—is not dispositive of the question whether FTX is liable to the 3AC Debtor with respect to an unfair preference.  The FTX Recovery Trust's BVI law expert acknowledged none of this in his initial report.

211.    If FTX was not the 3AC Debtor's creditor, then other Exchange customers must have been.  On the FTX Recovery Trust's case, the 3AC Debtor's negative USD balance was "borrowed" from other Exchange customers.  *See* Objection ¶ 161.  These funds were not a gift to the 3AC Debtor, but a "debit" incurred by the 3AC Debtor that needed to be "credit[ed]" back to the "lending" customers.  Coverick Dep. Tr. (Day 1) at 369:14-370:10; *see also* May 2022 TOS § 16.2 (indicating that borrowing customers incurred "debts" to other customers that needed to be "settle[d]").  The FTX Recovery Trust does not dispute that the "lending" customers in fact received these credits.  Coverick Dep. Tr. (Day 1) at 394:13-395:4 *see also* Tackett Dep. Tr. at 227:7-20 (testifying he was "not aware" of any instances in which lending customers were not repaid).  Accepting the FTX Recovery Trust's characterization of how "lending" and "borrowing" worked under the Margin Program, by reducing the 3AC Debtor's debits associated with its margin borrowing, the June 13-14 Transactions would have reduced the 3AC Debtor's liabilities to the applicable pool of "lending" customers.  *See* Gordon Dep. Tr. at 210:2-211:2 (testifying that the June 13-14 Transactions "closed out and repaid loans made by other FTX customers").  Because those customers' "loans" would have been repaid in full, they would have been placed in a better position by virtue of the sales in a hypothetical liquidation of the 3AC Debtor than if the sales had not occurred.  That is, the June 13-14 Transactions satisfy the elements of an unfair preference claim under section 245.  Levy Decl. ¶ 157.  The FTX Recovery Trust's experts do not appear to contest this conclusion.[35]

212.    But the facts show that FTX benefited nonetheless.  Indeed, the record is replete with evidence that FTX would in fact have absorbed losses that other Exchange customers would

---

[35] For the avoidance of doubt, the Joint Liquidators' position is that the 3AC Debtor's margin-related liabilities were obligations owed to FTX, not other Exchange customers.  *See supra* section V.A.2.d.

otherwise have experienced as result of the non-repayment of the 3AC Debtor's USD liabilities—and thus benefitted enormously from repayment of these "loans."  The extent of its benefit would be measured by the extent of the losses it avoided absorbing.  *Id.* ¶ 158.[36]

213.    As detailed above, FTX took pains to avoid losses under its Margin Program, and to ensure that margin-related liabilities were satisfied.  *See supra* section II.G.  These measures included the establishment of a multi-tiered liquidation and backstop liquidity program designed to mitigate the risk of customers incurring negative account balances.  *Id.*  FTX was not agnostic to those risks, but bore them.  Indeed, FTX effectively served as the "guaranteeing party" for repayment of margin borrowing on the Exchange.  Bankman-Fried Dep. Tr. at 130:12-20.  Provided that FTX were able to cover losses arising from borrower defaults, it did so.  Tackett Dep. Tr. at 227:21-228:9 (FTX would typically "eat the loss" from negative account balances on the Exchange); Bankman-Fried Dep. Tr. at 118:15-119:7 ("[S]o long as FTX is able to cover any losses, we wouldn't be socializing losses to . . . the particular lenders who happen to lend to a particular customer . . . .").  Mr. Bankman-Fried confirmed that FTX in fact would have covered over $1 billion of customer losses.  Bankman-Fried Dep. Tr. at 154:3-155:6.  And while FTX admitted the possibility of recouping losses from Exchange customers via so-called "clawbacks," that possibility was no more than theoretical: FTX never in fact sought clawbacks from customers, nor did the Exchange's code ever allow them.  Singh Dep. Tr. at 55:22-56:1, 65:18-66:13.

214.    And FTX's actions here confirm that it was highly motivated to avoid these losses.  As Mr. Tackett testified, FTX took aggressive steps to bring the 3AC Debtor's accounts back into

---

[36] More specifically, as Mr. Levy explains, a BVI court would compare FTX's financial exposure in the event the 3AC Debtor had filed for liquidation immediately before the preferential transactions to its exposure (if any) following the transactions.  Levy Decl. ¶ 158.  In the event of the 3AC Debtor's liquidation, any recourse to its assets would be stayed under BVI law.  *Id.* ¶ 158.

"good standing" because otherwise FTX would need to "eat" the 3AC Debtor's negative USD balances. Tackett Dep. Tr. at 146:5-24. Those steps were necessary for FTX to "protect[] [itself] from basically having a massive hole." *Id.* at 146:17-24. By virtue of the June 13-14 Transactions, and the June 14 Liquidation by FTX, FTX avoided the need to "eat" those "massive" liabilities.

215. The June 13-14 Transactions also benefited FTX reputationally. FTX's policy was to avoid imposing losses on customers at all costs. Bankman-Fried Dep. Tr. at 154:3-5. If FTX permitted customers to incur losses on account of margin trading, as the FTX Recovery Trust acknowledged, then the Exchange would no longer "be an attractive place for customer to trade." Coverick Dep. Tr. (Day 2) at 105:17-106:19; *see also* Tackett Dep. Tr. at 55:19-56:1 (allowing customers to incur negative account balances "would hurt the health of the exchange"). A clawback from other Exchange customers of the magnitude of the 3AC Debtor's USD liabilities as of June 12 would be especially damaging to FTX and its business model. Lisle Decl. ¶ 40. The avoidance of reputational damage is a cognizable benefit under section 249. *See* Levy Decl. ¶ 160.

216. None of what the FTX Recovery Trust's BVI law expert musters in response moves the needle. He contests the factual premise of this analysis (on the basis of assumptions provided to him), Atherton Rebuttal Decl. ¶ 68(a), but admits he did not review the relevant factual materials, Atherton Dep. Tr. at 31:2-32:7, 270:5-272:19. He asserts that FTX was not "legally obligated" to absorb certain types of losses on the Exchange (again on the basis of assumptions provided), Atherton Rebuttal Decl. ¶¶ 7(e), 68(b), but was aware of no authority for the proposition that only losses a party is "legally obligated" to absorb are recoverable under section 249, Atherton Dep. Tr. at 263:21-268:7. He asserts that the "principal beneficiary" of the asset sales was the 3AC Debtor, Atherton Rebuttal Decl. ¶ 68(d), but does not dispute that multiple parties can benefit from the same transaction, Atherton Dep. Tr. at 272:24-273:22. He suggests that the reputational

107

benefit would not have come "from" the 3AC Debtor, Atherton Rebuttal Decl. ¶ 68(d) n.102, but fails to explain how the 3AC Debtor's agency in effecting the preferential transactions did not create that benefit, Atherton Dep. Tr. at 277:14-278:16.  And he observes that a court has discretion to deny relief despite receipt of a benefit, Atherton Rebuttal Decl. ¶ 68(f), but by the same token acknowledges that the court has "wide discretion" to grant that relief and that the inquiry is "very fact specific and very contextual," Atherton Dep. Tr. at 171:9-15, 182:18-183:10.

217.    Finally, Mr. Atherton claims that the rebuttable presumption of good faith in section 250(3) of the BVI Insolvency Act precludes application of section 249.  Atherton Rebuttal Decl. ¶ 69.  Problems abound with this argument.  *First*, the presumption of good faith does not create a presumption that the beneficiary received "value" from the transaction; value is a separate requirement the beneficiary must satisfy under section 250(2)(b).    Atherton Dep. Tr. at 285:6-286:1.  Here, Mr. Atherton offers no coherent explanation of how FTX received "value" from the preferential transactions—especially if, as the FTX Recovery Trust asserts, FTX was not a creditor of the 3AC Debtor.  *Cf.* Levy Decl. ¶ 164.

218.    *Second*, the presumption of good faith does not apply if FTX had notice that the challenged transactions were unfair preferences.  BVI Insolvency Act § 250(4)(a)(i).  Those are the facts here.  FTX was well aware of the effect of the asset sales on the 3AC Debtor's margin-related liabilities; FTX had been monitoring the 3AC Debtor's account balances during the June 13-14 period.  *See* Tackett Dep. Tr. at 149:14-25.  FTX was also aware of the 3AC Debtor's financial distress during—and prior to—that period.  *See infra* section V.A.3.c.(2).  A beneficiary does not establish good faith when it had knowledge that the company repaid its liabilities at a time when the company was in some financial difficulty or was insolvent—or at least when the beneficiary "shut [its] eyes to that possibility."  *See* Austin Decl., Ex. 60, *Re Sonatacus Ltd* [2007]

BCC 186 ¶¶ 28-29, 32, 33; *see also* Levy Decl. ¶ 163 & n.75.  Mr. Atherton posits that "there is nothing to suggest that FTX had notice that 3AC had entered into transactions that constituted unfair preferences," but concedes he had not reviewed relevant factual materials.  *See* Atherton Dep. Tr. at 287:17-21.

219.    *Third*, a beneficiary of a preferential transaction is not exempted from the reach of section 249 if it was a "party to the transaction."  BVI Insolvency Act § 250(2)(b); *see also* Levy Decl. ¶¶ 161-62.  The preferential transactions could not have occurred without FTX's involvement, given that it operated the Exchange.  *See supra* section II.C.  Mr. Atherton does not meaningfully grapple with these facts.  Atherton Dep. Tr. at 289:8-21.  Nor does he attempt to reconcile how FTX could validly invoke "set-off" rights if it was not a party to the transactions.  And while Mr. Atherton offered the novel position that the "party to the transaction" requirement does not apply to unfair preference claims—despite the plain meaning of section 250(2)(b)—he acknowledged he was unaware of any authority that adopts that view.  *Id.* at 289:23-291:19.

220.    At the same time that the FTX Recovery Trust seeks to evade liability for the enormous benefits its received from the June 13-14 Transactions, it admits—and the record confirms—that to the extent other customers "loaned" USD to the 3AC Debtor, they are not reasonably identifiable.  Austin Decl., Ex. 15, FTX Debtors' Resps. & Objs. to Interrogatory No. 2 (Fourth Set) ("The available data does not provide a means for identifying an individual lender as the source of specific funds borrowed by 3AC on any given date."); Singh Dep. Tr. at 113:2-7 (Exchange code did not allocate a particular "borrowing" customer with a particular "lending" customer).  That is, if other Exchange customers were the 3AC Debtor's technical "creditors," the 3AC Debtor has no practical recourse to them for the preferential transactions.  The FTX Recovery Trust's positions would thus leave the 3AC Debtor's estate with a harm but without a remedy

under section 245.  The restorative objectives of the Act and broad remedial scope of section 249 are designed to avoid that result.  In these circumstances, FTX is properly held liable for the full amount of the unfair preference claim, on account of the benefits it received from the preferential transactions, even if did not receive those benefits in the capacity of the 3AC Debtor's "creditor."

g.    The Joint Liquidators Are Entitled to Recover from FTX the Value of the Assets Transferred Between June 13 and 14

221.    In the context of an unfair preference claim, as discussed above, the BVI Insolvency Act accords the court significant latitude to "make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction."  BVI Insolvency Act § 249(1)(b).  Insofar as FTX was preferred as a creditor or otherwise benefited from the June 13-14 digital asset sales and closure of futures positions, the Joint Liquidators are entitled to recover from FTX the full value of assets transferred to satisfy the 3AC Debtor's then-liabilities—actual or contingent—on the Exchange.

222.    The parties dispute the value of those assets.  As to the Digital Assets, the FTX Recovery Trust has acknowledged that the challenged transactions resulted in the transfer away from the 3AC Debtor of assets that then had a value of at least $842 million.  Objection ¶ 94.  The FTX Recovery Trust's own transactional data have been inconsistent, initially ascribing over $575 million in value to the 3AC Debtor's futures positions as of June 12, before the FTX Recovery Trust reversed course.  *See* Coverick Decl. ¶¶ 92-93.  The Joint Liquidators will prove at trial the full value of the assets transferred to repay the 3AC Debtor's liabilities on the FTX Exchange.  The only way to fully "restor[e]" the position the 3AC Debtor would have been in but for the transactions, however, would be to provide to the 3AC Debtor the current value of the assets transferred away from the 3AC Debtor's accounts on June 13-14 or the current value of its interests

in the relevant pools of assets. *See* BVI Insolvency Act § 249(1)(b). That value will also be established at trial.

### 3. The FTX Recovery Trust's Defenses to the Unfair Preference Claim Fail

#### a. Section 245 Does Not Require a Proprietary Interest in the Assets Transferred, but the 3AC Debtor Had Such an Interest in Any Event

223.    The FTX Recovery Trust's principal defense to the unfair preference claim appears to be that the 3AC Debtor must have had a "proprietary interest" in the Digital Assets sold or liquidated on June 13-14 to succeed in a preference claim under section 245. Objection ¶ 195; Atherton Initial Decl. ¶ 27. Otherwise, its BVI law expert opines, none of the transactions would constitute a "transaction" within the meaning of section 245. Atherton Rebuttal Decl. ¶ 26. Mr. Atherton never says precisely what he means by "proprietary interest." *See id.* (opining that a "transaction" within the meaning of section 245 requires only "some form of proprietary interest"). He merely proceeds from the assumption that the 3AC Debtor did not have "any form" of proprietary interest in the Digital Assets, whatever form of proprietary interest might be required. *See id.* ¶ 7(f)(i).[37] The FTX Recovery Trust's position is wrong as a matter of law, wrong as applied to the 3AC Debtor, and wrong as a matter of policy.

#### (1) Mr. Atherton's "Proprietary Interest" Opinion Is Irrelevant Because the 3AC Debtor Had a Proprietary Interest

224.    As established above, the 3AC Debtor had a beneficial ownership interest in the Digital Assets at the time of the June 13-14 Transactions, or alternatively was a quasi-bailor of the

---

[37] At deposition, Mr. Atherton testified that his view "at the moment" was that section 245 was "principally" concerned with assets in which the company has a "beneficial proprietary interest." Atherton Dep. Tr. at 48:12-49:19. Mr. Atherton conceded that if a company were a bailor of the assets transferred, it would also have the requisite proprietary interest. *Id.* at 102:5-21.

Digital Assets.  *See supra* section IV.A.  The FTX Recovery Trust's "proprietary interest" defense therefore fails on these facts.

(2)    *Mr. Atherton's "Proprietary Interest" Opinion Is Irrelevant Because the 3AC Debtor at a Minimum Owned Its Contractual Entitlements*

225.    Even if the 3AC Debtor did not have a cognizable "proprietary interest" in the Digital Assets themselves, the FTX Recovery Trust's defense still fails because the 3AC Debtor legally and beneficially owned its contractual "entitlements" to those Digital Assets—which the parties agree are "assets" of the 3AC Debtor.  The FTX Recovery Trust could not argue otherwise, because the BVI Insolvency Act expansively defines an "asset" to "include[] money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property."  BVI Insolvency Act § 2(1).  Thus, even if the 3AC Debtor has only contractual entitlements to the Digital Assets, those entitlements fall within this definition.  Levy Decl. ¶ 72.

226.    Like a contractual right for the delivery of a commodity, contractual entitlements to the Digital Assets constitute a "chose in action" that the law recognizes as property.  *See* Atherton Dep. Tr. 103:22-104:15 ("The chose in action would be an asset of 3AC, correct.").[38]

---

[38] Seemingly backing off of his strict "proprietary interest" theory, Mr. Atherton conceded at deposition that a preferential transaction may involve assets in which the company has something less than a formal proprietary interest:

> Q.  Mr. Atherton, does an insolvency transaction require a proprietary interest in the assets involved in that transaction?  A.  The transaction requires the transaction to involve the assets of the company.  Those assets may be reflective of the company having a proprietary interest in them or, as we discussed earlier, it may be that a $50 credit balance in a bank that is not the property stricto sensu of the company is, nevertheless, an asset of the company in the terms of its chose in action.

*Id.* at 140:8-24.

Here, the May 2022 Terms of Service granted the 3AC Debtor, among other contractual rights, entitlements to withdraw, transfer, or sell the Digital Assets.  May 2022 TOS §§ 8.2.3, 8.2.4, 8.2.6(C); *see also* Coverick Dep. Tr. (Day 1) at 91:18-94:21 (customer asset entitlements included the ability to withdraw assets credited to their accounts).  A contractual entitlement to delivery of the Digital Assets, Mr. Atherton concedes, "may well constitute an asset of 3AC."  Atherton Rebuttal Decl. ¶ 51.  These entitlements are also capable of transfer and thus of depleting a company's assets.  *See* Atherton Dep. Tr. at 110:5-19, 128:7-18.[39]

227.    That is what happened in the course of the June 13-14 Transactions.  When the 3AC Debtor executed trades to transfer Digital Assets to FTX and/or other Exchange customers, it transferred its entitlements and accompanying rights.  *See* Levy Decl. ¶ 74.  Once transferred, the entitlements could no longer be exercised by the 3AC Debtor.  The transactions thus depleted the 3AC Debtor's assets.  *Id.*

228.    Mr. Atherton's only substantive response appears to be that the 3AC Debtor's contractual entitlements are irrelevant to the preference claim and instead "would seem to be encapsulated in [a] breach of contract claim" arising from FTX's failure to deliver the Digital Assets upon the 3AC Debtor's request.  Atherton Rebuttal Decl. ¶ 51.  This argument is curious, because there was no refusal by FTX to deliver the Digital Assets, nor is the Joint Liquidators' breach of contract claim based on such a refusal.

---

[39] The same analysis applies to the 3AC Debtor's futures contracts, which were "its choses in action and its personal property."  Gloster Decl. ¶ 150.  The FTX Recovery Trust's experts do not contend otherwise.

(3)    *Mr. Atherton Is Incorrect That an Unfair Preference Claim Requires a "Proprietary Interest"*

229.    The defense fails in all events.  That is because, contrary to Mr. Atherton's conclusion, BVI law does not require a proprietary interest in assets transferred for that transfer to constitute a preferential "transaction" under section 245 of the Act.  Section 245 provides merely that "a *transaction* entered into by a company is an unfair preference given by the company to a creditor," provided that it satisfies the criteria set out above.  *See* BVI Insolvency Act § 245(1) (emphasis added).  The BVI Insolvency Act does not define what constitutes a "transaction," a term that is used throughout the "voidable transactions" sections of the Act—not only in the unfair preference provision.  *See generally id.* pt. VIII.  Given the Act's broad remedial objectives to redress prejudice to a debtor's creditors arising from voidable transactions, the "transaction[s]" subject to section 245 are broad in scope.  That much is undisputed.  Levy Decl. ¶ 52 ("[T]he BVI court would give a broad interpretation to the word 'transaction' in section 245 of the BVI [Insolvency Act] so as to include any arrangement which has the effect of conferring an advantage on a creditor in relation to past indebtedness of the company in preference to its other creditors . . . ."); Atherton Initial Decl. ¶ 68 ("[I]t is fair to say that the word 'transaction' in s.245 of the Insolvency Act, as a matter of ordinary language, may be said to embrace a potentially wide meaning and it may be argued that one should be wary of circumscribing the width of the statutory language with the possible result of undermining the purpose and effect of the provision." (footnote omitted)).

230.    The FTX Recovery Trust and Mr. Atherton nevertheless urge this Court to read into section 245 a requirement that a "transaction" must involve assets in which the debtor has a "proprietary interest"—words that do not appear in the Act.  While there is not controlling BVI law authority on this question, persuasive English law authority has addressed it and held that

corresponding provisions in the corresponding UK Insolvency Act 1986 (as amended, the "UK Insolvency Act"[40]) require no such thing.

231.    In the recent decision of *Invest Bank PSC v. El-Husseiny*, [2025] UKSC 4, [2025] 2 WLR 320, *see* Austin Decl., Ex. 61, the UK Supreme Court (the United Kingdom's highest court) addressed whether a "transaction" within the meaning of certain similar sections of the UK Insolvency Act require that the company "own" the assets transferred.   Adopting a "straightforward" reading of "transaction" under the UK Insolvency Act,[41] and observing the broad purpose of section 423 of the Act to avoid prejudicing creditors, the UK Supreme Court held, in no uncertain terms, that a "transaction" is not so limited.  *Id.* ¶¶ 30, 33, 64, 70-71.  The court emphasized that the appellants' narrower construction of "transaction" would "read[] exclusionary words into" the Act and undermine the remedial purpose of section 423.  *Id.* ¶¶ 56, 60.

232.    The FTX Recovery Trust portrays *Invest Bank* as having "limited" application beyond section 423 of the UK Insolvency Act, *e.g.*, Atherton Rebuttal Decl. ¶ 38, but the UK Supreme Court's analysis confirms otherwise.[42]  The court was confronted with the argument that a "transaction" within the meaning of section 423, which allows the court to reverse an undervalue transaction putting assets beyond the reach of creditors, should be construed to exclude a

---

[40] The UK Insolvency Act is available at https://www.legislation.gov.uk/ukpga/1986/45/contents.

[41] The UK Insolvency Act expressly defines a "transaction" to "include[] a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly."  UK Insolvency Act § 436(1).  The definition is "broad" and applies to the term "transaction" wherever used in the UK Insolvency Act.  Levy Decl. ¶¶ 52 n.20, 54; Atherton Dep. Tr. at 145:18-146:2.

[42] *Invest Bank* also involved section 238 of the UK Insolvency Act, which relates to "transaction[s]" at an undervalue entered into by an insolvent company and is the analog to section 246 of the BVI Insolvency Act ("[u]ndervalue transactions").  Noting the "common purpose" of sections 238 and 423 of the UK Insolvency Act—to avoid prejudicing creditors—the court saw no reason to construe a "transaction" subject to these provisions any differently.  *Invest Bank*, *supra*, ¶¶ 61-64.

transaction involving assets that did not belong to the debtor.  The court was also confronted with the argument that the sections of the UK Insolvency Act allowing the court to grant relief with respect to undervalue transactions generally (sections 238, 339, and 423) necessarily excluded preferences.  The court rejected those arguments.  *Invest Bank*, *supra*, ¶¶ 70-74.  While it noted that undervalue and preference claims have different criteria, it held that the same "transaction" may constitute both an undervalue transaction and a preference.  *Id.* ¶ 74.  The UK Supreme Court's reasoning applies with equal force to the corresponding provisions of the BVI Insolvency Act.  *See* Levy Decl. ¶ 66.

233.    Decisions of the UK Supreme Court are treated as highly persuasive authority in the BVI and are routinely followed.  *Id.* ¶¶ 39, 66; Atherton Initial Decl. ¶ 17; Atherton Dep. Tr. at 141:18-142:4.  For this reason, Mr. Levy opines, a BVI court would endorse the reasoning of *Invest Bank* and conclude that none of the analogous provisions of the BVI Insolvency Act— including its preference and undervalue sections—require that a "transaction" involve assets owned by the insolvent company.  Levy Decl. ¶¶ 61-62.  Like their English law counterparts, sections 245 and 246 of the BVI Insolvency Act are aimed at avoiding prejudice to the debtor company's creditors as a result of various types of transactions entered into by the debtor company.  *See id.* ¶ 67 (section 245 is designed to prevent circumvention of the *pari passu* principle); Atherton Dep. Tr. at 160:19-23 ("Q.  The core purpose of both the English law preference provisions and undervalue transaction provisions is to avoid prejudice to creditors; is it not?  A. In broad terms, yes.").  To conclude otherwise would frustrate the purposes of sections 245 and 246 of the BVI Insolvency Act and require reading words into the Act—the very tack the UK Supreme Court rejected in *Invest Bank*.  Levy Decl. ¶ 63.

234.    Mr. Atherton concedes that if the reasoning of *Invest Bank* were to apply in the BVI, then it "would extend to claims for unfair preferences under [section 245]."  Atherton Initial Decl. ¶ 71 n.71.  His attempt to distinguish *Invest Bank* does not withstand scrutiny.  First, Mr. Atherton notes that the UK Insolvency Act is a different statute from the BVI Insolvency Act and from a different jurisdiction.  *Id.* ¶ 71; Atherton Rebuttal Decl. ¶ 38.  But the BVI Insolvency Act is based on and closely related to the UK Insolvency Act.  Levy Decl. ¶ 40.  Second, Mr. Atherton suggests that *Invest Bank* would not apply to "situations of insolvency," apparently because section 423 of the UK Insolvency Act does not itself require insolvency.  *See* Atherton Initial Decl. ¶ 71.  But the UK Supreme Court also analyzed provisions that do require insolvency and held that the meaning of "transaction" was no different in those.  *Invest Bank*, *supra*, ¶ 64 (construing sections 238 and 339 of the UK Insolvency Act).[43]  Third, Mr. Atherton attempts to distinguish *Invest Bank* on its facts because the transaction at issue there involved the transfer of assets belonging to a subsidiary owned by the company (though not by the company itself).  Atherton Rebuttal Decl. ¶¶ 40-42.  But neither the UK Supreme Court's statutory interpretation nor holding turned on that fact.  *See Invest Bank*, *supra*, ¶ 60.  The argument is a red herring.

235.    Mr. Atherton also offers no basis—principled or otherwise—to construe "transaction . . . at an undervalue" under section 238 of the UK Insolvency Act (addressed in *Invest Bank*) any differently than "undervalue transaction" under section 246 of the BVI Insolvency Act,

---

[43] Mr. Atherton at times suggests that the relevant inquiry is whether an "insolvency transaction" under section 245 requires a proprietary interest in the assets transferred.  *See, e.g.*, Atherton Initial Decl. ¶ 71; Atherton Dep. Tr. at 156:17-157:5, 291:20-292:13; *see also* Objection ¶ 195.  But an "insolvency transaction" *is* defined in the Act, and simply refers to a "transaction" that meets certain additional criteria related to the company's financial condition.  BVI Insolvency Act § 244(2).  Any attempt by the FTX Recovery Trust to predicate its "proprietary interest" argument on the definition of "insolvency transaction" therefore begs the question of what a "transaction" means.

its analog.  "Transaction" plainly has the same meaning across these provisions; Mr. Atherton even acknowledges that the former may have "relevance" to the latter.    Atherton Dep. Tr. at 153:22-154:4.  He also acknowledges that "insolvency transaction" as used in section 246 of the BVI Insolvency Act (undervalue transactions) does *not* mean something different when used in section 245 (unfair preferences).  *Id.* at 157:6-16.  Because section 245 (unfair preferences) and section 246 (undervalue transactions) of the BVI Insolvency Act both apply to an "insolvency transaction," "transaction" must therefore have the same meaning in both sections.  Mr. Atherton nevertheless persists that section 245 embodies a unique "proprietary interest" requirement that is absent from related provisions with related terms that further related purposes.  Mr. Atherton's position does not hold water.[44]

236.    Mr. Atherton's positions are also inconsistent with authority from Commonwealth jurisdictions that hold that preferential transactions under related statutes need not involve assets owned by the transferring company.  *See, e.g.*, Levy Decl. ¶ 67 & n.30 (citing Austin Decl., Ex. 62, *G & M Aldridge Pty Ltd v. Walsh* [2002] BPIR 482; Austin Decl., Ex. 63, *Re Emanuel (No.14) Pty Ltd (in Liquidation)* (1997) 15 ACLC 1099).  In *G & M Aldridge* and *Re Emanuel*, as Mr. Levy explains, certain creditors were preferred even where the payments came from funds belonging to third parties, not the debtor.  *Id.*  While Mr. Atherton asserts that those cases are factually different to this one, he does not (because he cannot) argue that they endorsed a requirement that the company must have owned the assets it transferred for a preference claim to succeed.  *See* Atherton

---

[44] Mr. Atherton also advances a grab bag of other arguments in support of his "proprietary interest" requirement, but none succeeds.  For example, he reasons that because an "insolvency transaction" under section 245 extends to transactions that "may be said to have caused the company to become insolvent," section 245 is confined to transactions that deplete the "actual assets of an insolvent company."    Atherton Rebuttal Decl. ¶ 33(b).  But an "insolvency transaction" also includes transactions entered into when the company is already insolvent.  BVI Insolvency Act § 244(2).

Rebuttal Decl. ¶¶ 45, 47.  If the law imposed such a requirement, creditors could evade liability by routing transactions through financing arrangements during the vulnerability period, subverting the *pari passu* principle.  *See* Austin Decl., Ex. 64, McPherson & Keay's Law of Company Liquidation § 11-065 (Andrew R. Keay ed., 5th ed. 2021) ("To allow such a scheme as this to prevail whereby the bankrupt parts with his whole estate for the benefit of one creditor alone would open the door to a multitude of frauds.").[45]  The Court should reject the FTX Recovery Trust's attempt to rewrite section 245 of the BVI Insolvency Act.

> b.    The FTX Recovery Trust's "Ordinary Course" Defense Is Conclusory and Refuted by the Record

237.    The FTX Recovery Trust next urges that the unfair preference claim fails because the June 13-14 Transactions occurred in the "ordinary course" of the 3AC Debtor's business.  The argument grasps at straws and is foreclosed by unrebutted expert evidence to the contrary.

238.    Under BVI law, to be sure, a transaction that would otherwise constitute an unfair preference does not give rise to a claim under section 245 if it "took place in the ordinary course of business."  BVI Insolvency Act § 245(2).  In assessing whether a transaction occurs in the "ordinary course" of business, BVI courts apply an objective standard and consider the "actual setting" in which the transactions took place.  Levy Decl. ¶ 171(a).  While the test is fact-dependent, and encompasses all relevant criteria, the "focus" of the inquiry is on "the ordinary operational activities of businesses as going concerns, *not responses to abnormal financial difficulties*."  Austin Decl., Ex. 65, *Countrywide Banking Corp Limited v. Dean* [1998] AC 338 at

---

[45] Mr. Atherton argues that in circumstances where a third party repays the creditor's debt on behalf of the company, avoiding the transaction would be a "windfall" to the company's estate and "punitive" for the preferred creditor.  Atherton Rebuttal Decl. ¶ 33(d)(ii).  But as he acknowledges, recovering the assets transferred to the creditor would not preclude the creditor from then claiming against the estate, and the BVI Insolvency Act contemplates that very potential outcome.  *See* BVI Insolvency Act § 249(2)(g).

349E (emphasis added); *see also* Levy Decl. ¶ 170(d).  A transaction is not in the ordinary course of a company's business merely because it was contractually required or permitted.  Levy Decl. ¶ 171(e).  Nor is a transaction in the ordinary course of business merely because it might have occurred as a matter of general business practices in some other setting in the relevant industry. *Id.* ¶ 171(b).  In short, courts assessing this defense must examine the factual context of the particular transactions, apply an objective lens, and distinguish routine operations from crisis-driven conduct.  *See Id.* ¶¶ 170-71.  The proponent of the defense—here, the FTX Recovery Trust—bears the burden of proving that the challenged transactions were in the ordinary course of business.  *Id.* ¶ 172; Atherton Dep. Tr. at 297:5-8.

239.    The FTX Recovery Trust has not come close to meeting its burden—or made any meaningful attempt to do so.  Its primary "evidence" consists of conclusory assertions from its BVI law expert to the effect that transactions effected by the 3AC Debtor within the "vulnerability period" were inherently in the ordinary course of business because the 3AC Debtor was a cryptocurrency hedge fund that regularly traded cryptocurrency.  *See* Atherton Initial Decl. ¶¶ 56-57.  From little more than this observation, the FTX Recovery Trust tells this Court "[i]t is . . . apparent that all of the relevant activity associated with the 3AC Accounts was part and parcel of 3AC's normal practices."  Objection ¶ 201.[46]

240.    The problem for the FTX Recovery Trust is that its ordinary course theory does not engage with the "actual setting" in which the relevant transactions took place.  Its BVI law expert admitted as much, acknowledging that he had "not reviewed or assessed what are said to be the

---

[46] Neither the FTX Recovery Trust nor its BVI law expert offers any explanation of how the liquidation transactions conducted by FTX on June 14 could have been in the ordinary course of business.  They were not.  Levy Decl. ¶ 178; *see also* Tackett Dep. Tr. at 148:11-19 (confirming that FTX had never manually liquidated the 3AC Debtor's accounts prior to June 14).

relevant facts."  Atherton Rebuttal Decl. ¶ 73.  That is insufficient to carry the FTX Recovery Trust's burden.  *See Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (expert opinion must be grounded in "facts or data" and not based on "unsupported speculation").

241.    While this defense is properly rejected without more, the Joint Liquidators' expert reports, which engage with the facts and data in the record, confirm that the June 13-14 Transactions did *not* occur in the ordinary course of business.  *First*, the 3AC Debtor's trading activities on June 13-14 were materially different from its prior trading practices on the FTX Exchange.  Over those two days, the 3AC Debtor conducted tens of thousands of trades, the vast majority of which were closing out the 3AC Debtor's positions on the FTX Exchange.  *See* Konstantinidis Report ¶ 19; *see also* Lisle Decl. ¶¶ 11, 21-22, 24.  Relative to the 3AC Debtor's trading patterns on the FTX Exchange over the prior six months, these two days featured record trading of over $1 billion in a single day (many times higher than the 95th percentile of historical total daily trading value), compressed trade frequency (with 99% of the orders executed immediately rather than waiting for a buyer), and the closing of large positions.  *See* Konstantinidis Report ¶¶ 10, 18-19, 46-49, 52, 55-59.  Not only were the 3AC Debtor's trading activities in this window drastically different from its prior trading on the FTX Exchange, they were drastically different from its contemporaneous trading on other exchanges, which remained within normal ranges.  *See id.* §§ V-VI.  Viewed objectively, as the expert testimony confirms, these transactions thus deviated from the 3AC Debtor's trading in the ordinary course of business and reflected an extraordinary sell-off that was "unprecedented in 3AC's trading history."  *See id.* ¶¶ 17-19; *see also* Lisle Decl. ¶¶ 12, 24.[47]

---

[47] Over this two-day period, the 3AC Debtor's remaining digital assets on the FTX Exchange fell from over $1 billion at the end of day June 12 to just under $2 million by the end of the day June 14.  *See* Lisle Decl. ¶¶ 11-13, 23.

242.     *Second*, the June 13-14 Transactions were responses to abnormal financial difficulties, not ordinary operations.  The Terra/LUNA collapse in May 2022 precipitated sharp market-wide drawdowns, heightened volatility, widespread margin calls, and tightening credit conditions across exchanges and lenders.  *See* Lisle Decl. ¶¶ 17-20.  Moreover, by June 12, the 3AC Debtor was heavily leveraged and insolvent on balance-sheet and cash-flow bases, and thus the ensuing asset sales occurred when the 3AC Debtor was no longer a going concern, rather than as part of its routine portfolio management.  *See* Scheig Report at 30; Lisle Decl. ¶ 20.  Nor did the June 13-14 Transactions benefit the 3AC Debtor's creditor body.  *See* Levy Decl. ¶ 173 (when the company's insolvency becomes inevitable, a BVI court would consider whether the preferential transactions benefited the company's creditors as a whole).  The transactions eliminated the 3AC Debtor's liabilities only on the FTX Exchange, and its trading activity substantially ceased soon thereafter.  *See* Konstantinidis Report ¶¶ 13, 79-87; Lisle Decl. ¶¶ 21-22.

243.     Analyzing and applying this evidence, Mr. Levy concludes that a BVI court would reject the FTX Recovery Trust's ordinary course of business defense.  Levy Decl. ¶¶ 175-76.  That conclusion is unrebutted.  At deposition, Mr. Atherton acknowledged that this evidence would be considered by a BVI court and that the FTX Recovery Trust has produced no evidence to the contrary.  Atherton Dep. Tr. at 301:8-302:14.  That should end the matter.

c.     <u>Neither Contractual nor Statutory Set-Off Assists the FTX Recovery Trust</u>

244.     In a further gambit to defeat the Joint Liquidators' unfair preference claim, the FTX Recovery Trust argues that the exercise of contractual set-off rights and/or statutory set-off nullify any benefit FTX received from the preferential transactions.  Objection ¶ 199; Atherton Initial Decl. ¶¶ 48-50; Atherton Rebuttal Decl. ¶¶ 61-63.  Because these supposed set-off rights would have collapsed the 3AC Debtor's liabilities and entitlements on the FTX Exchange into an overall

account balance, the argument goes, FTX was no better off as a result of the preferential transactions than if they had not occurred in the event of a hypothetical liquidation. *See* Objection ¶ 199. Of course, the premise that the 3AC Debtor had distinct assets and liabilities on the Exchange to set off is incompatible with the FTX Recovery Trust's "single asset" theory. Atherton Dep. Tr. at 243:18-21. The FTX Recovery Trust's set-off argument is likewise inconsistent with its position that FTX was not a creditor of the 3AC Debtor, as only creditors can avail themselves of set-off rights. *See* Levy Decl. ¶ 154. Even if these positions were not fatally inconsistent, the argument also fails on its own terms for the reasons set out below.

(1)     *Contractual Set-Off Is Inapplicable*

245.   FTX did not in fact exercise contractual set-off rights, which is fatal to this argument. Where a purported contractual set-off right is not exercised prior to a company's hypothetical liquidation, it has no bearing on the analysis of whether a creditor was put into a better position than the company's other creditors from the preferential transactions. *Id.* ¶¶ 145, 153. FTX's BVI law expert concedes this. Atherton Dep. Tr. at 236:2-11.

246.   Factually, the FTX Recovery Trust has at no point asserted that FTX exercised any such rights. While its BVI law expert vaguely alluded in his declarations to rights akin to "a contractual right of set-off or a right of combination," he did not identify those purported rights. *See* Atherton Initial Decl. ¶ 50; Atherton Rebuttal Decl. ¶ 62(a). When pressed at deposition regarding what those supposed rights were, Mr. Atherton speculated only that section 38.7 of the May 2022 Terms of Service "could" have provided FTX with a contractual set-off right or right of combination. Atherton Dep. Tr. at 227:10-228:24. He did not opine that it *did*.

247.   Section 38.7 of the May 2022 Terms of Service is of no help to the FTX Recovery Trust. Section 38.7.2 provides that "FTX Trading *may* set off any amounts which from time to

time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms." May 2022 TOS § 38.7.2 (emphasis added). There is no evidence in the record—including from contemporaneous documents or fact witness testimony—that FTX in fact invoked this provision. The evidence refutes any claim that the June 13-14 Transactions were in fact conducted by FTX as an exercise of any contractual set-off rights. The bulk of these transactions—consisting of more than 52,000 individual trades—were apparently conducted by the 3AC Debtor, not by FTX. Coverick Decl. ¶ 68. Nor is it clear how, mechanically, FTX could have exercised set-off rights with respect to each of these trades given the number involved. *See* Atherton Dep. Tr. at 231:24-232:19. And the parties' contemporaneous communications evidence that FTX liquidated the remainder of the Digital Assets due to perceived noncompliance with collateral and/or margin requirements, not due to supposed set-off rights, much less section 38.7 specifically. *See, e.g.*, Tackett_3AC_000000158 at -000000219 to -000000222.

(2)    *Statutory Set-Off Is Inapplicable*

248.    The FTX Recovery Trust's reliance on section 150 of the BVI Insolvency Act fares no better. That section provides that where "there have been mutual credits, mutual debts or other mutual dealings between a debtor and a creditor claiming or intending to claim in the insolvency proceeding . . . the sum due from one party shall be set-off against the sums due from the other party." BVI Insolvency Act § 150(1). When this section applies, it does so automatically and displaces all other potential set-off rights. Levy Decl. ¶ 145.

249.    A threshold flaw in this argument is its timing. According to the FTX Recovery Trust's BVI law expert, claims subject to statutory set-off are measured as at the *actual* date of the debtor company's liquidation (or potentially upon the *actual* appointment of the company's

liquidators)—as opposed to as at a *hypothetical* liquidation occurring immediately after the relevant transactions.  *See* Atherton Rebuttal Decl. ¶ 62(b); Atherton Dep. Tr. at 236:21-238:5, 242:16-243:6.  Here, the FTX Recovery Trust has not adduced evidence that there were liabilities of the 3AC Debtor to set off on June 27, and in fact has asserted that the 3AC Debtor's USD liabilities had been eliminated by the end of the day on June 14.  *See* Objection ¶ 94.  Under this framework, the statutory set-off is irrelevant.

250.    Even if timing were not a problem, mutuality is.  For section 150 to apply, the credits and debts between the parties need to be "mutual."  In this context, "mutuality" (or "commensurability") is satisfied only if each party's claim against the other is a monetary claim. Levy Decl. ¶ 146; *see also* Austin Decl., Ex. 67, Rory Derham, Derham on the Law of Set Off § 9.01 (5th ed. 2024) ("For the insolvency set-off section to apply the demands must be commensurable, in other words the claim on each side of the account must be a money demand."). A proprietary claim, such as a claim for the delivery of assets, is not properly set off against a personal claim.  Levy Decl. ¶ 148; *see also* Atherton Dep. Tr. at 239:19-240:1 (acknowledging that "[a]s a matter of law, a proprietary claim cannot be setoff . . . as against a monetary claim in the insolvency section under Section 150.").  That the value of a proprietary claim may be measurable in monetary terms, even with precision, does not convert the claim into a monetary one.  Derham, *supra*, § 9.01.  For example, a claim for the return of property is not a monetary claim, even though it is compensable by reference to the value of the property.  *See id.*

251.    Mutuality is not present in this case.  The 3AC Debtor's obligations to FTX were plainly monetary in nature, as they relate to the 3AC's USD borrowings on the Exchange.  FTX's obligations to 3AC were not.  Because the 3AC Debtor had a proprietary interest in the Digital Assets, *see supra* section IV.A, its claim relating to those assets would be to the assets

themselves—regardless of whether the claim was compensable in monetary terms. *See* Levy Decl. ¶¶ 148-49. And even if the 3AC Debtor's interests in the Digital Assets were only contractual in nature, mutuality or commensurability would still be lacking. That is because the 3AC Debtor's contractual entitlements were to withdraw, transfer, or sell the relevant digital asset. *See id.* ¶ 150 (citing May 2022 TOS §§ 8.2.3, 8.2.4, 8.2.6(C)); *see also* Coverick Dep. Tr. (Day 1) at 91:18-94:21 (acknowledging that customer asset entitlements included the ability to withdraw assets credited to their accounts). Unlike the 3AC Debtor's obligations to FTX, FTX's obligation with respect to these entitlements is *not* to pay the 3AC Debtor a "sum" of money. Section 150 of the Act therefore does not come into play.

252.    Mr. Atherton responds that because the 3AC Debtor lacked a proprietary interest in the Digital Assets (based on his instructions), the 3AC Debtor's digital asset balance represented a monetary claim or claim reducible to money, purportedly creating mutuality. Atherton Rebuttal Decl. ¶ 65. His response fails to address that while 3AC Debtor was contractually entitled to the Digital Assets or their delivery under the May 2022 Terms of Service, FTX had not refused to deliver them. These entitlements therefore had *not* "been reduced to money" (even assuming they were capable of that). *Cf. id.* Mr. Atherton recognized as much at deposition, taking the position that money damages would accrue only "insofar" as the 3AC Debtor exercised its right to delivery of the Digital Assets *and* that request was refused. Atherton Dep. Tr. at 187:11-16; *see also id.* at 106:22-107:16 ("If that asset existed and wasn't delivered, then the punitive claim for breach of contract would be for damages for the value of that asset."). He did not opine that occurred; to the contrary, he disclaimed offering any opinion on "how or if it was possible for 3AC to seek to enforce . . . clause 8.2.6 or in what circumstances it may be able to obtain a remedy or assert there has been a breach of that clause." *Id.* at 294:15-295:3. Rather than being reduced to money

damages (and giving rise to a monetary claim), the entitlements remained a chose in action, reflecting the 3AC Debtor's contractual "ability" to request delivery of the Digital Assets. *Id.* at 118:19-119:6. That chose in action was, by Mr. Atherton's admission, the 3AC Debtor's "property." *Id.* at 108:19-109:19. Mr. Atherton fails to reconcile that admission with his simultaneous concession that a property claim cannot be set off against a monetary claim, *id.* at 239:19-240:1, let alone the foregoing authority confirming that result.

253. A creditor also cannot benefit from section 150 if it had actual notice that the debtor company was insolvent, at a time when the creditor "gave credit to the debtor or received credit from the debtor." BVI Insolvency Act § 150(2). Here, the evidence indicates that FTX was on notice of the 3AC's Debtor's financial distress prior to and during the preferential transactions. Zane Tackett, FTX's former Head of Institutional Sales, testified that rumors had been swirling in the market that the 3AC Debtor was in financial trouble and that he believed the 3AC Debtor's financial state had "deteriorated" by early June. Tackett Dep. Tr. at 106:15-107:7, 289:21-290:1. By June 14, it was clear to Mr. Tackett and others at FTX that the 3AC Debtor was "scrambling" to repay loans, and during the June 14 Liquidation, FTX personnel discussed the likelihood of the 3AC Debtor's "bankruptcy." *Id.* at 291:24-293:25; *see also* Tackett_3AC_000000158 at -000000222 ("We know that you are likely overwhelmed with short-term responsibilities. . . . [I]f you wanted to discuss financial relief options for your firm as a whole, we would be open to a conversation there."). FTX's apparent awareness of 3AC's insolvency further undercuts the FTX Recovery Trust's invocation of insolvency set-off.

### d.   FTX Did Not Have a Valid and Perfected Security Interest

254. The FTX Recovery Trust cannot invoke a security interest over the Digital Assets in response to the unfair preference claim (or any other claims), *i.e.*, to argue that FTX was put in no better position as a result of the June 13-14 Transactions because FTX would have exercised a

security interest in a hypothetical liquidation.  Nor does the FTX Recovery Trust try to.  At deposition, the FTX Recovery Trust's Rule 30(b)(6) witness testified that he did "not know" whether the FTX Recovery Trust believed it had a security interest over the Digital Assets.  Gordon Dep. Tr. at 187:23-188:9; *see also* Coverick Dep. Tr. (Day 2) at 296:9-297:19 (FTX Recovery Trust, via its designee, was "not qualified" to take a position on whether it had a security interest).  And after the Joint Liquidators devoted a whole section of the Amended Proof of Claim to "FTX's Unsecured Status," Am. POC ¶ 39, the FTX Recovery Trust said nothing on this subject in its Objection, *see* Objection ¶¶ 193-201 (declining to raise affirmative defense of security).  Nor has it offered expert evidence that any purported security interest would actually impact the Joint Liquidators' claims.  Given the weakness of such a defense, the FTX Recovery Trust's election to refrain from asserting it is understandable.

255.    More recently, the FTX Recovery Trust even *disclaimed* a security over the Digital Assets, admitting in its discovery responses that it "did not have" such a security because, in its view, it "owned all" the assets.  Austin Decl., Ex. 14, FTX Recovery Trust's Resps. & Objs. Request for Admission No. 6 (Third Set); *see also* Webster Decl. ¶¶ 50-51 ("It is a legal impossibility to own an asset and use that asset as security for an obligation owed to oneself . . . .").

256.    As explained above, *supra* section IV.A, the 3AC Debtor—not FTX—beneficially owned the Digital Assets and/or had an equitable proprietary interest in the commingled pools.  Still, the FTX Recovery Trust has no enforceable security interest in the Digital Assets.  An enforceable security interest requires (1) attachment, *i.e.*, the creation of a security interest, and (2) perfection of that security interest, *i.e.*, a further step, such as possession or registration, which constitutes notice of the security interest to third parties.  Houseman Decl. ¶ 70.  The parties' experts agree that, under Antiguan law, section 3 of the Margin Agreement contains the only

potential grant of a security interest, Webster Decl. ¶¶ 47-49; Houseman Decl. ¶ 21, but the FTX

Recovery Trust cannot prove either that any security attached or that it was perfected.

(1)    <em>No Security Attached</em>

257.    First, under the Margin Agreement, no security attached to the Digital Assets,

because the Margin Agreement allows for a security interest only over "assets in all of the FTX

accounts of the Customer," Margin Agreement § 3, and, at the relevant time, there were no assets

in the 3AC Debtor's accounts.  As Mr. Webster testified, under Antiguan law, the phrase "the FTX

accounts of the Customer" means the segregated wallet for that Customer.  Webster Decl. ¶ 53.

But, by June 12, there were no such assets, as FTX had swept the Digital Assets out of the 3AC

Debtor's segregated accounts into pooled hot wallet addresses.  As the FTX Recovery Trust admits

in the Objection, "Customer Accounts did not store any assets, and the Exchange swept and

commingled assets that were deposited by customers," so, by end of day on June 12, the 3AC

Debtor's customer-specific deposit addresses "did not contain any BTC, ETH[,] or any other

digital asset."  Objection ¶ 81 (citing Coverick Decl. ¶¶ 101-05).  Thus, under the terms of the

Margin Agreement, no security could have attached to the Digital Assets.  Webster Decl. ¶¶ 52-53.

258.    To try to counter this point, the FTX Recovery Trust retained Stephen Houseman

K.C., an English barrister whose only experience in the Antiguan courts is equivalent to one <em>pro

hac vice</em> admission, as a rebuttal expert.  Houseman Dep. Tr. at 20:16-19 ("Q.  As far as you know,

your own admission to Antiguan court is through an ad hoc practicing certificate?  A.  That's my

best guess.").  Mr. Houseman, however, did not opine on the relevant issue.  He merely offered an

opinion on what the word "in" means: "the word 'in' is the same thing as 'credited to or associated

with.'"  Houseman Dep. Tr. at 130:10-12.  But he offered no opinion on the question here, what

the term "the FTX accounts of the Customer" means.  On that point, Mr. Houseman offered no

reasoned opinion.  Houseman Dep. Tr. at 133:14-21 ("Q. . . . You're not giving an opinion on that;

129

right, sir?  A.  No, I just assumed that.").  Mr. Webster's uncontested testimony is that, as a matter of Antiguan law, "FTX accounts of the Customer," as used in the Margin Agreement means "that Customer's individual wallet addresses," Webster Decl. ¶ 53, and the uncontested facts are that there were no Digital Assets in them, *see* Objection ¶ 81.  Accordingly, no security attached to the Digital Assets.

(2)    *Even If Security Attached, FTX Did Not Perfect It*

259.    Second, even if security did somehow attach to the Digital Assets, FTX nevertheless failed to perfect it.  Because different types of security have different perfection requirements, the first step for assessing perfection is to determine the type of security taken, using standard principles of contractual interpretation.  Webster Decl. ¶ 62; Houseman Decl. ¶ 55.  The next step is to determine whether the creditor's relationship to the property satisfies the requirements of the security purportedly taken.  Webster Decl. ¶ 71.  Because the only types of security potentially applicable here (a pledge or lien), if extended to intangible assets at all, would require FTX to have exclusive control over the Digital Assets, and because FTX lacked such exclusive control, FTX could not and did not perfect any security  interest.

(a)    The Margin Agreement Grants, at Most, Only a Lien<br>or Pledge, Not a Charge

260.    As to the first step, determining the type of security purportedly taken, the Margin Agreement purports to create a lien or pledge only.  Antiguan law recognizes four types of consensual security: (1) "the mortgage, which is a security transfer of ownership;" (2) "the pledge, which creates a limited legal interest by the delivery of possession;" (3) "the contractual lien, which differs from the pledge only in that the creditor's possession was acquired otherwise than for the purpose of security;" and (4) "the charge."  Houseman Decl. ¶ 53; Webster Decl. ¶ 63.

261.    In full, the relevant provision reads:

130

Lien.  All assets in all of the FTX accounts of the [3AC Debtor] (the "Secured Assets") are collateral for the Indebtedness.  The [3AC Debtor] *hereby pledges and grants a continuing lien on and security interest in,* the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of [3AC Debtor] to FTX under this Agreement.  *FTX shall have all the remedies of a chargee under the laws of Antigua* and [3AC Debtor] shall *not grant any other person a lien* against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX.

Margin Agreement § 3 (emphases added).  The provision thus refers specifically to security in the form of a "pledge[]" and "lien."

262.    As to a mortgage, the parties' experts agree that the clause does not provide for one. Webster Decl. ¶ 68; *see* Houseman Decl. ¶ 101 ("I agree with Mr. Webster that clause 3 of the . . . Margin Agreement did not create a mortgage over the Secured Assets (Webster Declaration §68).").

263.    As to a charge, on its face, the Margin Agreement likewise does not provide for one.  Webster Decl. ¶ 67.  Mr. Houseman, however, contends that the clause "and security interest in" must mean "charge," even though when the parties wanted to refer to facets of a charge in the Margin Agreement, they did so explicitly.    Houseman Decl. ¶ 102; Houseman Dep. Tr. at 259:11-260:16; *see* Margin Agreement § 3 (discussing "remedies of a chargee").  Mr. Houseman's contention is wrong for at least two reasons.

264.    First, Mr. Houseman's position relies exclusively on the rule against surplusage to argue that "if the words 'and security interest in' are to have any meaning additional to security by way of pledge or lien," they effectively must mean "charge."    Houseman Decl. ¶ 102(ii); Houseman Dep. Tr. at 260:17-261:3.    But, as the FTX Recovery Trust's other expert, Lord Neuberger, explained (relying on the same English law principles applicable under Antiguan law), the rule against surplusage is "generally regarded as little more than a makeweight point, especially

131

in the case of a standard form." Neuberger Rebuttal Decl. ¶ 9; *see also* Neuberger Rebuttal Decl. ¶ 9(a)-(e) (describing the rule as "of little value in the interpretation of commercial contracts," "rarely of much force," and "unlikely to be useful in interpreting a standard form of contract"); Bankman-Fried Dep. Tr. at 136:11-19 ("Q.  Is that an FTX template?  A.  It looks very much like one . . . ."); Gordon Dep. Tr. at 131:16-132:11 ("Q. . . . You're saying pieces of the part of this exhibit that start on the second page and says 'FTX Institutional Customer Margin and Line of Credit Agreement,' pieces of that onwards come from other standard FTX documents? A.  Correct.").  That is especially so when the same clause—in fact, the same sentence—contains other instances of surplusage.  Margin Agreement § 3 (describing the "full and punctual payment, performance and discharge of the Indebtedness").  In any event, the rule against surplusage is, of course, of no weight (because there is no surplusage) when there is an alternative interpretation that gives the phrase meaning.  And here there is.  Instead of implicitly creating a whole new and separate security interest, the clause simply clarifies the extent of the prior phrase; that is, the words "and security interest in" show that "pledge[s]" and "lien" do in fact refer to a security interest.

265.    Second, Mr. Houseman also relies on a sentence subsequent to the one describing the type of security granted (lien or pledge), which explains that the parties contractually agreed to the "remedies of a chargee."  Margin Agreement § 3.  But the specificity of the reference to the "remedies of a chargee" undercuts Mr. Houseman's view that, just a few lines earlier, the parties intended the words "and security interest in" to mean "charge."  That is so, because when they wanted to refer to a "charge[]," they did so explicitly.  *See also* Webster Decl. ¶ 67; Houseman Dep. Tr. at 276:25-277:7 ("Q.  So sitting here today can you tell me any reason why if parties have intended to create a charge they would not have just stated charge?  A.  Because they are not very good at drafting.").  Mr. Houseman admitted that "if the parties intended for '[and] security interest

in' to 'grant a charge,' it would have been clearer to state 'and *other* security interest in.'" Houseman Dep. Tr. at 263:7-13 (emphasis added). And he struggled to explain what "remedies of a chargee" would add if the words "and other security interest in" already created a "charge," leading to the very sort of surplusage Mr. Houseman was trying to avoid. Houseman Dep. Tr. at 283:3-286:13.

266. Instead, as the Joint Liquidators' Antigua law expert, Paul Webster K.C., explains, and as the Law Commission Report confirms, there is often "good reason for a party to seek the 'remedies of a chargee' without seeking to *become* a chargee." Webster Decl. ¶ 67; *see* Law Commission Report ¶ 8.29 (explaining that "various practical and commercial considerations limit the appeal and operation of non-possessory security-based arrangements [such as a charge] for crypto-token collateral arrangements"). The law of the chargor (*i.e.*, the customer) usually determines whether the charge must be registered and the consequences if it is not (*e.g.*, invalidation); compliance with such registration requirements would be logistically difficult for a company with tens of thousands of customers worldwide. Webster Decl. ¶ 67; Law Commission Report ¶ 8.30 ("A common concern relates to the application of statutory formality requirements, for example perfection requirements applicable to non-possessory security interests, such as registration.").

267. Thus, the Margin Agreement provides, at most, only for a pledge or lien, with the remedies of a chargee.

(b)   FTX Did Not Perfect Any Pledge or Lien

268. As to the second step, determining whether the creditor has satisfied the requirements of the type of security purportedly taken, FTX has not done so. If Antiguan law developed to allow pledges and liens over digital assets, perfection would likely require that FTX have had exclusive control over the Digital Assets, which it did not.

133

269.    As Antiguan law stands today, it is not possible to have a pledge or lien over digital assets, because pledges and liens are possessory forms of security, and one cannot "possess" intangible property under Antiguan law.  *See also* Webster Decl. ¶¶ 14, 63(i)-(ii), 72 ("[T]o perfect a lien or a pledge, the creditor must have possession of the assets to perfect a security over them."), 73 ("[V]irtual assets are not capable of physical possession and, therefore, applying a traditional approach, cannot form the subject matter of a lien or, by extension, a pledge." (citation omitted)); Houseman Decl. ¶¶ 10(ii), 53, 72, 74 ("[A]pplying a traditional approach, such assets cannot form the subject matter of a lien or a pledge.").  If Antiguan courts were to extend the law to apply to a lien or pledge over digital assets,[48] however, the parties' experts agree that they would likely "look to control as a proxy for possession when determining whether a creditor had perfected a security" and that such control would need to be "exclusive."  Webster Decl. ¶¶ 75, 82; *see also* Houseman Decl. ¶ 76.

270.    Here, FTX lacked such exclusive control.  The May 2022 Terms of Service, for example, explicitly state that the 3AC Debtor "control[s] the Digital Assets held in [its] Account" and that it "may withdraw [its] Digital Assets."  May 2022 TOS § 8.2.6.  It further states that the 3AC Debtor "may sell" Digital Assets and "transfer Digital Assets from [its] Account."  *Id.* §§ 8.2.4, 8.2.9.  As Mr. Houseman admitted, a grantor's ability to transfer title to its assets, to invest and trade its assets, or to lend its assets are each "inconsistent with the grantee's exclusive control."  Houseman Dep. Tr. at 231:11-232:12.

271.    The 3AC Debtor not only had the right to take such action but actually took it. According to the FTX Recovery Trust, 3AC withdrew approximately $60 million in value from

---

[48] The same development of the law would allow for a quasi-bailment, since bailments are a form of pledge.  *See, e.g.*, Webster Decl. ¶ 63(i) (describing a "pledge" as a "bailment of personal chattels to a creditor").

the Digital Assets in mid-June. *See* Objection ¶¶ 9, 10, 80, 88, 90, 136(b), 146, 160.  Indeed, on June 14, FTX emailed the 3AC Debtor, complaining that FTX had warned the 3AC Debtor that it was allegedly in breach of the Line of Credit Agreement and that the 3AC Debtor "did not respond to [FTX's] inquiries and withdrew even more from [its] account, thereby becoming even more delinquent on [its] obligation and acting against the spirit of [their] agreement."  Austin Decl., Ex. 68, FTX Spot Margin Trading Explainer (FTX_3AC_000013568) at -000013569.  Such rights and actions belie FTX having exclusive control.

(3)    <em>Mr. Houseman's Opinions Are Not Relevant Here</em>

272.    Finally, and critically, even if Mr. Houseman were right, he offered no opinion in the scenario the Court is most likely to address—where it has found that the 3AC Debtor has a property interest in an undivided share of the property in a wallet address.  In fact, despite testifying that his analysis depended on "a very important premise"—namely, an "assum[ption]" that the 3AC Debtor "retained any proprietary interest[] [in] digital assets [it] put onto the Exchange"— Mr. Houseman acknowledged that he did not know what a "[p]ercentage stake in an undivided pool . . . looks like as a premise." Houseman Dep. Tr. at 49:1-25, 199:13-15.  He further admitted that if the relevant property were a "form of interest in a pool, then for perfection purposes [one] should be looking at control over that pool," *id.* at 200:11-17, but when asked how he would determine control in that context, he admitted that he did not know, *id.* at 303:21-304:5 ("[Q].  [I]f the proprietary interest is a percentage of the digital assets in the wallet, how would you measure control over that proprietary interest?  A.  I don't know how you would . . . .").

273.    Not surprisingly, Mr. Houseman therefore admitted that he was not giving opinions as to the relevant scenario.  In particular, he conceded that, in this scenario, he was not giving any opinions about a charge, just about a pledge or a lien. *Id.* at 308:10-24 ("Q.  Are . . . there opinions you are giving on that hypothetical premise?  A.  Yes, the pledge [and] the lien analysis remains

135

intact."). And he then further conceded that, even as to a pledge or a lien, he was not giving any opinion as to whether either was perfected. *Id.* at 308:25-309:11 ("Q. How about the issue of exclusive control, are you giving an opinion on that issue in the hypothetical world where the relevant asset is just a percentage of the wallet? A. I am just trying to think through in terms of perfection of a pledgor, perfection of a lien. No, . . . I don't think I am, because I find . . . the premise that you are positing is just too esoteric."). So, Mr. Houseman simply offers no opinion that FTX would have a valid security interest if the Court determines that the 3AC Debtor had a beneficial interest in an undivided share of the assets in the commingled wallet.

(4)   <em>Conclusion: FTX Had No Valid or Perfected Security</em>

274.   To the extent that the FTX Recovery Trust intended to advance an affirmative defense that FTX had a perfected security interest in the Digital Assets, the FTX Recovery Trust has not seriously done so. Even if it had, it could not meet its burden. Because the Margin Agreement only provided that assets "in all of the FTX accounts of the Customer" could serve as security, and because there were no such assets "in" the 3AC Debtor's customer accounts, no security attached. Even if security had attached, to perfect the security (which on its face was a pledge or lien), FTX needed to have exclusive control over the Digital Assets but did not. And even if FTX could show attachment and perfection, Mr. Houseman critically offered no opinion on security over the type of property interest at issue here: a property interest in an undivided share of the property in a wallet address.

## B.   Breach of Contract, Breach of Trust, and Breach of Fiduciary Duty

275.   If the Court determines that FTX's conduct deprived the 3AC Debtor of its ownership rights over the Digital Assets provided by the May 2022 Terms of Service, FTX breached the May 2022 Terms of Service, the 3AC Debtor's trust, and FTX's fiduciary duties to the 3AC Debtor. In fact, these claims are undisputed under English law.

### 1.    The Breach Claims Are Adequately Pleaded

276.    As it did with the Joint Liquidators' preference claim, the FTX Recovery Trust, in throwaway fashion, maintains that the Joint Liquidators have insufficiently pleaded their claims for breach of contract, trust, and fiduciary duty.  *See* Objection ¶¶ 188, 225, 242.  But, to establish the *prima facie* validity of breach claims, a proof of claim need only "allege[] facts sufficient to support a legal liability to the claimant."  *In re Allegheny Int'l, Inc.*, 954 F.2d at 173.  The Amended Proof of Claim easily clears this "relatively low threshold."  *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. at 544 (citation omitted).

277.    The Amended Proof of Claim adequately pleads the contract claims by identifying (1) the operative agreements, including the key contractual provision which explicitly granted the 3AC Debtor ownership of the Digital Assets and title to those assets at all times, (2) the challenged conduct (a potential "depriv[ation] . . . of [the 3AC Debtor's] ownership of the [Digital Assets] as FTX now alleges"), and (3) its potential damages ("any amounts that the 3AC Debtor does not recover from FTX due, in whole or in part, to the 3AC Debtor's purported lack of ownership of the [Digital] Assets, up to the $1,530,862,573.85 value of th[em]").  Am. POC ¶¶ 21-25, 55-57, Exs. A-D.  Likewise, the Amended Proof of Claim alleges the facts underlying the trust and fiduciary duty claims, including that FTX had a duty to preserve the assets of the trust, which arose from the same contractual provision underlying the breach of contract claim.  *Id.* ¶¶ 22-25, 62, 74-78, Exs. A-D.  Nothing more was needed.[49]

---

[49] For the same reasons, if Rule 8(a) were to govern the pleading requirements, the Amended Proof of Claim would satisfy its requirements.  Rule 8(a) is a notice standard, and FTX's substantive response to this claim in its Objection shows it was sufficiently on notice.  It recognized that the clause it allegedly breached was section 8.2.6, *see* Objection ¶ 220, and that the breach itself was FTX's actions that had the effect of depriving 3AC of ownership of the Digital Assets, *id.* ¶ 222.

2.    **The Joint Liquidators Have Established All Elements of Their Breach Claims**

278.    FTX had contractual obligations and bore trust and fiduciary duties to the 3AC Debtor under the May 2022 Terms of Service.  English law governs both the Terms themselves and "any dispute, claim, controversy or difference arising out of or in connection with" them.  May 2022 TOS § 38.11, Schedule 1 ¶ 1.1; Neuberger Initial Decl. ¶ 14 ("That is a broadly stated choice of law clause.  It would in my opinion cover any dispute as to the meaning and effect of the Dotcom Terms in any dispute between FTX Trading and its customers.").

279.    The elements are established here.[50]  The Gloster and Neuberger Declarations establish that the breach is undisputed under English law.  And it is also undisputed under English law that the 3AC Debtor may recover as damages the full value of any claims lost as a result of a breach, including any preference claims.  Consequently, if FTX's action or inaction deprived the 3AC Debtor of ownership rights necessary to make out a claim, the Joint Liquidators can recover the resulting loss.

a.    <u>If FTX Deprived the 3AC Debtor of Ownership Rights, FTX Breached the Terms of Service and the 3AC Debtor's Trust</u>

280.    As to breach of contract, the English law experts agree that FTX contractually promised to provide the 3AC Debtor with ownership rights over the Digital Assets at all times. *See supra* section IV.A.1.  Section 8 of the May 2022 Terms sets out FTX's rights and obligations as custodian of the Digital Assets.  Gloster Decl. ¶ 143.  Under section 8.2.6, the 3AC Debtor and

---

[50] The FTX Recovery Trust does not dispute the validity of the contract or argue that the 3AC Debtor was in breach. *See, e.g.*, Coverick Decl. ¶ 46 (stating that "3AC agreed to terms of service when it opened the 3AC Accounts, like other customers did when opening their Customer Accounts" and that the May 2022 Terms of Service served as "the user agreement that specified the terms of service for the Exchange on and after May 13, 2022"); Objection ¶¶ 220-25, 235-42 (declining to object to any of the breach claims on the grounds that the 3AC Debtor had failed to perform under the May 2022 Terms of Service).

FTX agreed that "[t]itle to [the 3AC Debtor's] Digital Assets shall at all times remain with [the 3AC Debtor] and shall not transfer to FTX," that "[n]one of the Digital Assets in [the 3AC Debtor's] Account are the property of, or shall or may be loaned to, FTX," that FTX "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading," and that the 3AC Debtor "control[s] the Digital Assets held in [its] Account." May 2022 TOS § 8.2.6. In short, FTX promised the 3AC Debtor permanent ownership rights over the Digital Assets that would never transfer to FTX. Gloster Decl. ¶ 137. If FTX failed to provide those rights or, once given, deprived the 3AC Debtor of them, FTX breached section 8.2.6 of the May 2022 Terms of Service. *Id.* ¶ 118.

281.    The breach is undisputed under English law. Despite the FTX Recovery Trust's retaining an English law expert, that expert, Lord Neuberger, chose almost entirely not to give an opinion as to what FTX's contractual obligations were or whether FTX had breached them. Neuberger Dep. Tr. at 299:19-300:12 ("I am not giving an opinion one way or the other because I have not thought about it."). But to the extent he gave any opinions, Lord Neuberger admitted that the "natural" meaning of Section 8.2.6 is that the customer was promised it would own the assets at all times. *Id.* at 155:1-158:3 ("Q. So the natural meaning of this clause [8.2.6] is that at all points in time, no matter where and in what wallet the assets are held that the customer owns the digital assets; right, Sir? A. Yes."), 163:7-15 (explaining that the intent of section 8.2.6 was "for the customer to be the owner in all aspects"), 255:23-256:3 ("The natural meaning [of section 8.2.6] is that the digital assets are intended to be the property of the customer and that FTX is intended to have no interest in those assets."). So the English experts agree that FTX promised that customers would own the digital assets associated with their accounts on the Exchange.

282.    Consistent with the undisputed English law testimony about the contractual promises in the May 2022 Terms of Service, FTX regularly represented to customers that it would handle their digital assets in a way that maintained their ownership interests. *See* Lisle Decl. ¶ 56. As FTX's current plan administrator explained, FTX "portrayed itself as the vanguard of customer protection efforts in the crypto industry," and, in representations to the public, regulators, and Congress, FTX "represented that it maintained a strict separation of customer and corporate funds, including by maintaining customer funds in omnibus bank accounts 'for the benefit of' . . . FTX exchange customers." FTX Commingling Report.    In one such statement to Congress, Sam Bankman-Fried, FTX's former CEO, emphasized that a "key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting." FTX further represented that customer assets were "safeguarded." Sun Tr. at 1899:19-22. In explainer materials that FTX distributed to VIP customers, FTX represented that FTX Digital Markets Ltd. was "ultimately responsible for the safeguarding of its customers' assets," and that its "key roles and responsibilities" included "[a]ppropriately accounting for the difference between its own assets and its customers' assets." FDM Safeguarding of Assets Policy (FTX_3AC_000044442) at -000044446; Tackett Dep. Tr. at 214:2-8. It also explained to customers that "customer assets are held in trust." FDM Safeguarding of Assets Policy (FTX_3AC_000044442) at -000044446.    Indeed, it was "FTX's policy that [customer assets] were not" assets of FTX Digital Markets Ltd.  Tackett Dep. Tr. at 218:3-22.  If, in contrast to its contractual and trust obligations and in contrast to its representations to customers, FTX instead comingled assets in a way that destroyed the 3AC Debtor's proprietary interest, "it breached both its obligations under its contract and its duties as trustee." Gloster Decl. ¶ 126; *see also* Neuberger Rebuttal Decl. ¶ 25 (explaining that, under the instructions he was given, "not only

were a customer's assets commingled with other customers' assets, they were commingled with the assets of the FTX Exchange").

283.     The FTX Recovery Trust complains that the Joint Liquidators "do not identify any action that could conceivably constitute a breach."  Objection ¶ 222.  But the FTX Recovery Trust knows that the answer is FTX's commingling, because, according to its own Objection (quoting Lord Neuberger), the "use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen."  *Id.* ¶ 108.  Lord Neuberger confirmed this point, testifying that "the decision to move a digital asset from a segregated wallet to a commingled wallet was a ***decision*** made by FTX," not the customer, and that "the movement itself was an ***activity*** by FTX, not the customer."  Neuberger Dep. Tr. at 177:1-8 (emphases added).  Lord Neuberger also testified that it was ***FTX's sweeping action (rather than the contract)*** that prevented 3AC from having ownership.  *Id.* at 306:5-24; *see also id.* at 168:22-169:9.[51]  The admissions are critical and damning, as they establish that it was FTX's commingling that would have breached its contractual promise.

284.     Other FTX actions may have further deprived the 3AC Debtor of its promised ownership right.  According to Lord Neuberger, if FTX deprived other FTX customers of ownership of and/or control over their assets, those customers could not have transferred ownership or control to the 3AC Debtor when it acquired assets from them.  *Id.* at 174:24-175:4

---

[51] Lord Neuberger's declarations concede this point as well.  Neuberger Initial Decl. ¶ 11.1(b) ("The use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen.").

("[O]nce there is an asset which is in the client's account which the client never controlled, the client can never have acquired . . . title to it.").  If so, FTX never provided the 3AC Debtor with the ownership interest in and title to the Digital Assets promised when the 3AC Debtor purchased or traded for assets on the Exchange.  In addition, Lord Neuberger at one point claimed that the volume of deposits, trades, and withdrawals on the FTX Exchange may have made it "essentially futile and close to impossible" for the 3AC Debtor to identify its proportionate share of each coin on the Exchange.  Neuberger Rebuttal Decl. ¶ 25 (citation omitted); Neuberger Dep. Tr. at 269:11-270:17.  The result, according to Lord Neuberger, was that the 3AC Debtor may not have been able to demonstrate the certainty of subject matter necessary to form a trust relationship with FTX.  Neuberger Rebuttal Decl. ¶ 25.  If true, then FTX's failure to maintain a proper ledger further deprived the 3AC Debtor of its ownership interest in the Digital Assets.

285.    Consistent with Lord Neuberger's English law testimony, Dame Gloster testified that because (1) "the Terms permitted commingling in an omnibus trust account," (2) "FTX promised that 3AC would have a proprietary interest in the Digital Assets," and (3) "FTX had control over the operation of the Exchange and how any commingling occurred," FTX was "therefore required to conduct any commingling in a way that satisfied its promise to maintain 3AC's proprietary interest."  Gloster Decl. ¶ 126.  It is undisputed as a matter of English law that if FTX's acts or omissions—by commingling, by failing to provide ownership and/or control, and/or by failing to maintain an adequate ledger—deprived the 3AC Debtor of the ownership it was promised in section 8.2.6, FTX breached the contract under English law.

286.    As to a trust, the analysis is similar.  The trust relationship reinforced FTX's contractual duties to the 3AC Debtor, because the "basic duty of a trustee, in relation to the custody of trust property, is to keep it safe, not to imperil it and to prioritise the interests of the beneficiary

above its own." Gloster Decl. ¶ 143.[52]  Thus, the conduct that would constitute a breach of the

May 2022 Terms of Service also constitutes a breach of the 3AC Debtor's trust.  *Id.* ¶ 118.

> b.    <u>If Ownership Is Necessary for the Preference Claim, FTX's Breaches Harmed the 3AC Debtor</u>

287.    If any of FTX's breaches deprived the 3AC Debtor of a proprietary interest in the

Digital Assets, and if the Court determines that the 3AC Debtor would have succeeded on its

preference claim if it owned the Digital Assets, then the 3AC Debtor is entitled to recover the value

of that lost claim from the FTX as damages for breach of contract.  In fact, this issue too is

undisputed as a matter of English law.

288.    Under English law, a claimant's remedy for a breach of contract is typically "all

which it has lost as a result of the breach." *Id.* ¶ 121.  Likewise, the remedy for a breach of trust

is "to equitable compensation or an account of profits," the aim of which is to put the claimant "in

as good as a position as if no wrong had occurred." *Id.* ¶ 125.  Lord Neuberger does not dispute

the availability of these remedies.  *See* Neuberger Rebuttal Decl. ¶¶ 48-59.

289.    If the result of this breach was to prevent the 3AC Debtor from prevailing on its

preference claim, the value of that lost claim is the quantum of damages.  As Dame Gloster opined,

the loss to the 3AC Debtor's caused by FTX's breach "is equivalent to whatever would have been

the benefit to the estate of the Joint Liquidators' claim for a preference."  Gloster Decl. ¶ 136.

Likewise, for a breach of trust, the 3AC Debtor could recover the same amount as equitable

compensation, because "the loss to the estate flows directly from the equitable wrong committed

---

[52] "A breach of trust will occur where there has been a defalcation by the trustee (that is, the unauthorised payment of money from a trust fund into the trustee's hands or for its benefit)." Gloster Decl. ¶ 125.  "A breach of fiduciary duty is a type of breach of trust, which would occur if a trustee appropriated to itself, in a manner unauthorised, assets of a beneficiary." *Id.*  For ease of reference, unless specified otherwise, the Joint Liquidators use the term "breach of trust" to also refer to "breach of fiduciary duty."

by FTX as trustee of the [Digital] Assets," *i.e.*, from FTX's misappropriation of the Digital Assets, either by failing to hold those assets and/or by treating them in a way that destroyed the 3AC Debtor's proprietary interest. *Id.* Accordingly, the Joint Liquidators can recover the value of a preference claim lost as the result of the FTX Recovery Trust's conduct.

290.    The only defense the FTX Recovery tries to raise is whether a damages limitation clause (section 30) in the May 2022 Terms of Service could limit the damages available here. It could not. Section 30.1 provides that, "nothing in the terms shall limit or exclude a party's liability . . . for fraud or fraudulent misrepresentation; or . . . to the extent such liability cannot be excluded by applicable law." May 2022 TOS § 30.1-2 (capitalization altered). Section 30.2.2 then provides that, "subject to section 30.1, neither FTX Trading nor any of the other indemnified parties shall be liable to you in contract, tort (including negligence), equity, statute or any other cause arising out of or in connection with the terms . . . ***for . . . indirect or consequential loss or damage***." *Id.* § 30.2.2 (capitalization altered and emphasis added). This section does not prevent the damages here for several reasons.

291.    *First*, section 30.2.2 only applies to limit "indirect or consequential loss or damage." *Id.* But here, under undisputed English law, the loss of the preference claim would be "direct[]" damage, because it flows directly from the breach of section 8.2.6. Gloster Decl. ¶ 136 ("[T]he loss to the estate flows directly from the equitable wrong"). Notably, Lord Neuberger does not give any opinion as to what damages would be excluded under this clause. Neuberger Dep. Tr. at 304:6-12.

292.    *Second*, section 30 does not apply at all to the obligations arising under section 8. As Dame Gloster testified, under English law, section 8—the clause creating the promised ownership interest and trust—does not purport to exclude the scope of FTX's liability as trustee.

Gloster Decl. ¶ 144.  Thus, in Dame Gloster's view, the "better reading" of section 8 is that it "contains all of the provisions relevant to the trustee relationship," whereas other provisions deal with FTX's role in other capacities, such as being the service provider of the Exchange.  *Id.* Accordingly, the damages limitation clause has no role to play as to section 8.

293.    *Third*, even if the damages limitation clause could bear on the duties created by section 8, English law does not permit it to exclude any claim for breach of the type described above, "namely one of (effectively) misappropriating the trust assets."  *Id.* ¶ 145.  Under English law, a trustee can only exclude its duty or liability by clear and unambiguous words, and courts construe such clauses "restrictively," such that "[a]nything not clearly within it is treated as falling outside it."  *Id.* ¶ 145(a) (quoting McGhee *et al.*, *supra*, § 30-025).  Even if clearly worded, English courts may not apply the clause "if it exceeds the permitted range of exclusion," namely if it violates the "irreducible core of duties" of a trustee.  *Id.* ¶ 145(b) (quoting McGhee *et al.*, *supra*, § 30-026).  Thus, a trustee cannot exclude liability for loss or damage resulting from "conduct falling below the objective standard of an ordinary honest trustee."  *Id.* (footnotes omitted) (citing Austin Decl., Ex. 70, *Armitage v Nurse* [1998] Ch. 241 and McGhee *et al.*, *supra*, § 30-026).  As explained above, FTX promised, by contract, that the 3AC Debtor would retain ownership interests in the Digital Assets; likewise, "the irreducible core of FTX's liability as trustee under the [May 2022 Terms of Service] was to respect and preserve 3AC's equitable ownership in the 3AC Assets and not to misappropriate them."  *Id.*  In a scenario in which FTX breached such duties, it fell below the "objective standard of an ordinary honest trustee."  That is, FTX either deliberately defied its duties by purposely depriving customers of their ownership rights, or it did so recklessly by failing to take precautions to protect its customers' ownership rights, contrary to its

representations to customers.  *See supra* section II.B.  Thus, FTX, acting as trustee, could not disclaim its damages for its breach of trust.  Gloster Decl. ¶ 145(b).

294.    In sum, nothing in section 30 prevents the Joint Liquidators from recovering the value of a preference claim lost as a result of the FTX Recovery Trust's conduct.

### C.    Unjust Enrichment

295.    Even if the Court declines to find a breach claim as set out in Section V.B, *supra*, the same facts establish the Joint Liquidators' unjust enrichment claim under English law.[53]  All the elements—(1) FTX's enrichment, (2) at the 3AC Debtor's expense, (3) in unjust circumstances—are met.  *See* Gloster Decl. ¶ 124; *Fenton Whelan Ltd. v. Cleveland Clinic Found.*, 2025 WL 3003924, at *8 (N.D. Ohio Oct. 27, 2025) (citing English law authorities for the elements).

296.    If FTX's acts or omissions deprived the 3AC Debtor of a proprietary interest in the Digital Assets, and if the Court determines that the 3AC Debtor would have succeeded on its preference claim if it owned the Digital Assets, then FTX enriched itself, at the 3AC Debtor's expense, through those acts and/or omissions.  Those acts and/or omissions would be unjust for the reasons set out in Section V.B, *supra*, namely that FTX promised the 3AC Debtor that the 3AC Debtor would have a proprietary interest in the Digital Assets at all times, that FTX would not have a proprietary interest in such assets, and that FTX was acting to ensure that the 3AC Debtor retained that interest.  *See* Gloster Decl. ¶¶ 111-18, 131-34; *see also* May 2022 TOS § 8.2.6.

---

[53] English law governs the unjust enrichment claim.  Although the Amended Proof of Claim noted that multiple jurisdictions' law, including English law, share similar elements, Am. POC ¶¶ 71-73, English law applies here, because the claim arises out of or in connection with the May 2022 Terms of Service, which designate English law as governing, *see* May 2022 TOS § 38.11, Schedule 1 ¶ 1.1; Gloster Decl. ¶ 2.

297.    For an unjust enrichment claim, under English law, restitution is equal to the value of the benefit obtained, *i.e.*, "payment of a sum of money which will have the effect of reversing the defendant's unjust enrichment."  *See* Gloster Decl. ¶¶ 124, 128, 139.  Here, the measure of recovery mirrors the value of the benefit FTX received for the purposes of the 3AC Debtor's unfair preference claim.  Where FTX's conduct deprived the 3AC Debtor of the proprietary interest that likely would have been recovered through the 3AC Debtor's unfair preference claim, restitution is measured by the value of that claim—FTX's gain at the 3AC Debtor's expense.  *Id.* ¶¶ 128, 136, 139.  This fits what occurred: FTX's position improved because the 3AC Debtor's assets reduced its indebtedness and augmented the FTX estate, and it avoided having to return that benefit, thus warranting a personal money award.  *See id.* ¶¶ 128-29, 131-39.

298.    Finally, there is no viable defense to restitution on these facts.  *First*, because the unjust enrichment claim is pled in the alternative to the contract claims, the FTX Recovery Trust cannot argue that the claim fails because a contract (the May 2022 Terms of Service) governs the parties' relationship.   Objection ¶ 244.   Second, the FTX Recovery Trust cannot resort to section 30.2 to avoid the restitutionary remedy.  As explained in Section V.B, section 30.2 limits compensatory "loss or damage" from "use or inability to use the Services" and excludes only consequential loss; it does not bar direct loss or restitutionary remedies.  *See* May 2022 TOS § 30.2; Gloster Decl. ¶¶ 141-47.  The loss of the proprietary interest or its USD equivalent that would have been restored to the 3AC Debtor through the preference claim is a direct consequence of FTX's misapplication of assets.  Moreover, even if the damages were not direct, the Joint Liquidators could still recover, because section 30.2 limits damages to the customer, not, as here, restitution for FTX's unjust gains.  *See* May 2022 TOS § 30.2.

299.    In sum, even if the Joint Liquidators' contract claims are narrowed, the Joint Liquidators are entitled to restitution for FTX's unjust enrichment.    FTX obtained a concrete economic benefit at the 3AC Debtor's expense in unjust circumstances, *i.e.* where FTX's acts and/or omissions caused the loss of the 3AC Debtor's proprietary right, and FTX's express and repeated promise was to ensure that that right was preserved.    English law entitles the 3AC Debtor to a personal restitutionary award equal to the preference-equivalent value of that enrichment. Gloster Decl. ¶¶ 128, 136, 139.

## VI.    RESERVATION OF RIGHTS

300.    The Joint Liquidators file this Response with full reservation of rights, including, without limitation, the right to amend, clarify, or supplement this Response at any time, in any manner, for any reason, including by pursuing or asserting any claims that were raised in the Amended Proof of Claim and by relying on additional facts, documents, or information that may become available after further investigation or discovery.    In particular, due to a variety of reasons including the availability of witnesses and the parties, fact and expert discovery in this matter are ongoing.    In citing documentary or testimonial evidence produced by the FTX Recovery Trust in this matter, the Joint Liquidators do not concede such evidence is accurate, relevant, or admissible in evidence.    The Joint Liquidators reserve the right to object to the relevance, admissibility, and use of any discovery produced in this matter, including at any trial of this matter.    The Joint Liquidators further reserve the right to seek to preclude or limit the scope of any of the FTX Recovery Trust's expert opinions or testimony at any appropriate time.

## VII.    CONCLUSION

301.    For the foregoing reasons, the Joint Liquidators respectfully request that this Court overrule the Objection, enter an order allowing the Joint Liquidators' unfair preference claim,

breach of contract, trust, and fiduciary duty claims, and unjust enrichment claim, and grant the

Joint Liquidators such other and further relief as the Court deems just and proper.

Dated:  November 25, 2025          */s/ John W. Weiss*
        Wilmington, Delaware

                                   John W. Weiss (No. 4160)
                                   Joseph C. Barsalona II (No. 6102)
                                   Alexis R. Gambale (No. 7150)
                                   **PASHMAN STEIN WALDER HAYDEN, P.C.**
                                   824 North Market Street, Suite 800
                                   Wilmington, DE 19801
                                   Telephone: (302) 592-6496
                                   Email:  jweiss@pashmanstein.com
                                           jbarsalona@pashmanstein.com
                                           agambale@pashmanstein.com

                                   – and –

                                   Christopher Harris (admitted *pro hac vice*)
                                   Adam J. Goldberg (admitted *pro hac vice*)
                                   Zachary F. Proulx (admitted *pro hac vice*)
                                   Nacif Taousse (admitted *pro hac vice*)
                                   **LATHAM & WATKINS LLP**
                                   1271 Avenue of the Americas
                                   New York, NY 10020
                                   Telephone: (212) 906-1200
                                   Email:  christopher.harris@lw.com
                                           adam.goldberg@lw.com
                                           zachary.proulx@lw.com
                                           nacif.taousse@lw.com

                                   – and –

                                   Tiffany Ikeda Austin (admitted *pro hac vice*)
                                   **LATHAM & WATKINS LLP**
                                   10250 Constellation Blvd., Suite 1100
                                   Los Angeles, CA 90067
                                   Telephone: (424) 653-5416
                                   Email:  tiffany.ikeda@lw.com

                                   *Counsel to the Joint Liquidators*
                                   *of Three Arrows Capital Ltd.*