**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX Trading Ltd., et al., | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF**

**THE RIGHT HONOURABLE DAME ELIZABETH GLOSTER DBE**

**IN SUPPORT OF THE**

**AMENDED PROOF OF CLAIM FILED BY THE JOINT LIQUIDATORS OF**

**THREE ARROWS CAPITAL LTD (IN LIQUIDATION)**

I, **THE RIGHT HONOURABLE DAME ELIZABETH GLOSTER DBE** make this declaration pursuant to 28 U.S.C. § 1746 and, under penalty of perjury of the laws of the United States of America, state as follows:

1.    **INTRODUCTION**

1    In November 2022, FTX Trading, Ltd. (**FTX**) and 101 affiliated debtors (the **Debtors**), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (**Chapter 11 Proceedings**).

2    FTX operated a trading platform through which certain services were offered to customers, which relevantly included the ability to transact digital assets (the **Exchange**).   The relevant terms governing the relationship between FTX and its customers who used the Exchange are contained in terms of service, dated 13 May 2022 (the **Terms**).   The Terms are governed by English law.

3    Latham & Watkins LLP (**Latham & Watkins**) represents Russell Crumpler and Christopher Farmer, in their capacity as the joint liquidators (the **Joint Liquidators**) of a British Virgin Islands (**BVI**) company, Three Arrows Capital, Ltd. (in Liquidation) (**3AC**), appointed by the BVI Court and foreign representatives of 3AC, pursuant to Chapter 15 of the US Bankruptcy Code in the case captioned In re Three Arrows Capital, Ltd., Case No. 22-10920 (Bankr. S.D.N.Y.).

4    The Debtors (advised by their counsel Sullivan & Cromwell LLP and Landis Rath & Cobb LLP and represented by the FTX Recovery Trust), on the one hand, and 3AC and the Joint Liquidators, on the other hand, are in dispute in those proceedings with the FTX Liquidators in relation to 3AC's entitlement to certain assets, or to damages or compensation in respect of their value.   That dispute is set out in the Amended Proof of Claim filed by 3AC and the Joint Liquidators in the Chapter 11 Proceedings (the **APOC**) and the Objection to the APOC filed by the FTX Recovery Trust in those proceedings (the **Objection**).

5    I have been asked by Latham & Watkins on behalf of the Joint Liquidators to give my opinion in this Declaration on certain questions of English law, which are contained in section 2 of this Declaration.   I describe the facts which I have been asked to assume and the documents which I have taken into account, in section 4 of this Declaration. All the facts relating to the Chapter 11 Proceedings to which I refer in this document

are based on instructions that I have received from Latham & Watkins. I have no personal knowledge of any such facts. Section 3 of this Declaration contains a summary of my conclusions, and my reasoned analysis is contained in sections 7–9. I have set out certain applicable principles of English law in sections 5 and 6.

6    I am being remunerated at the rate of £2000 per hour which is my standard rate for providing expert opinions on English law. Although I am to be paid, I believe, by the Joint Liquidators, I understand that my role is to give my honest and independent opinion to the US Bankruptcy Court, on the questions I have been asked, and I have done so. I have been assisted in preparing this Declaration by Karen Petch, a barrister practising from Twenty Essex chambers. However, the reasoning and conclusions expressed in this Declaration are my own and in respect of which I take full responsibility. My remuneration is not contingent on the success of the Joint Liquidators in the Chapter 11 Proceedings and I am instructed by Latham & Watkins that neither is that of Ms Petch.

7    A summary of my professional experience is set out in Annex 1 of this Declaration. My full curriculum vitae is contained in Annex 2.

8    In addition, I have undertaken my own research (with the assistance of Ms Petch) on the questions of English law that I have been asked. Annex 3 contains a list of the materials which I have had available to me, and where necessary consulted, in the course of preparing this Declaration.

## 2.    QUESTIONS FOR CONSIDERATION

9    **Question 1:** By reference to the Terms, what title and rights (legal, beneficial, equitable and/or proprietary) did 3AC have to the 3AC Assets (as defined in ¶ 16 below) as at 12 June 2022, and what was the legal relationship between 3AC and FTX on 12 June 2022 in respect of those assets? Is the position the same, or different in relation to fiat currency, as opposed to digital assets, held in 3AC's Accounts as at 12 June 2022?

10    **Question 2:** What right(s) to possession or control (if any) did each of 3AC and FTX have over the 3AC Assets?

11    **Question 3:** Do the provisions of the Terms support a contention that the extent of 3AC's rights (if any) over the 3AC Assets is limited to a single net figure arrived at by

deducting from the value of the 3AC Assets the amount of any liabilities owed by 3AC to FTX?

12   **Question 4:** If FTX had carried out or permitted action(s) that resulted in the sale, transfer, or liquidation of some or all of the 3AC Assets between 12 June and 14 June 2022, would the Terms have authorised such action(s)?  If not, what claim(s) under English law would 3AC have against FTX (if any) in relation to the wrongful loss of its interest in those assets as a result?

13   **Question 5:** To the extent that FTX's conduct deprived 3AC of, or removed, 3AC's ownership rights (if any) to, the 3AC Assets (both in respect of digital assets and fiat currency), would such conduct by FTX give rise, as against FTX, to a breach of contract claim, a claim in restitution, a claim in conversion, a breach of trust claim, and/or a breach of fiduciary duty claim?

14   **Question 6(a):**  Assuming your answer to Question 5 is "yes," under English law and the Terms, what remedies would be available to 3AC for such a breach?

**Question 6(b):**  Additionally, assume that the 3AC Joint Liquidators have no claim against FTX for receiving an unfair preference under the (BVI) Insolvency Act 2003 and the only reason that they do not have that claim is because FTX's breach of the Terms caused 3AC not to have an equitable proprietary interest in the 3AC Assets.  Can the loss of an unfair preference claim form part of the damages recoverable by 3AC from FTX for its breach of the Terms?

15   **Question 7**: What is the nature of 3AC's interest in the Futures Contracts?

## 3.   SUMMARY OF CONCLUSIONS

16   The precise nature of 3AC's interest in digital assets notionally associated with 3AC's "Account" or Accounts (as defined in the Terms) on the Exchange is central to the questions that I have been asked to address and is explored in detail below.[1] Aware of that controversy, and save in those parts of this Declaration where I am dealing directly with the issue of what the precise nature of 3AC's entitlements actually is, I use the

---

[1] The Terms use the concept of an "Account" to signify the notional "holdings" of a customer on the Exchange. However, an Account on the Exchange is not a depository (i.e. it is not the equivalent of gold bars in a safe); nor, as I understand it, is it a crypto wallet. Rather, an "Account" is essentially a ledger maintained by FTX that associates assets with particular customers.

term the "**3AC Assets**" as a convenient shorthand definition to refer to the assets, including both "Digital Assets" (as defined in the Terms) and fiat currency (as likewise defined), which were associated with 3AC's Account; similarly, I use the term the "**3AC Digital Assets**" to refer to "Digital Assets" as defined in the Terms associated with 3AC's Account). My use of those terms is a convenience only and is not in itself intended to imply any particular type of legal or other interest.

17    The conclusions I have reached on the questions posed are as follows:

a)    **Question 1**: Clause 8.2.6 of the Terms describes 3AC as the "owner" of all Digital Assets associated with its Account on the Exchange and says that 3AC has "[t]itle" to them. Although the Terms do not state expressly whether such ownership and title are legal or equitable, for reasons I explain below, I consider it likely that an English court would interpret the Terms as providing: (i) that the nature of 3AC's interest in the 3AC Digital Assets is a beneficial[2] equitable proprietary interest in those assets; (ii) that legal title in those assets vests in FTX, which holds them as trustee on trust for 3AC, and (iii) that the legal characterisation of 3AC's holding is that it is a tenant in common of the equitable interest in the shared pools of digital assets held by FTX on behalf of account-holders into which 3AC's Digital Assets were transferred. In other words, 3AC has an equitable proprietary interest in, or put another way, an equitable title to, such assets and the relationship between 3AC and FTX in respect of them is one of trustee and beneficiary.

Clause 8.2.6 does not apply to fiat currency. Therefore, I consider it likely that an English court would interpret the Terms as providing only an *in personam* right to 3AC to recover from FTX the fiat currency held in 3AC's Accounts on the Exchange.

b)    **Question 2**: As to control, clause 8.2.6 of the Terms states explicitly that 3AC was the party in control of its Digital Assets. It follows from my response to Question 1 in relation to the 3AC Digital Assets that I consider the nature of that control to have been as follows: 3AC had the right to require FTX to transfer to

---

[2] I use the word "beneficial" in the sense that the interest was one which was owned by 3AC for its own use, as opposed to being an interest which was held by way of security. It is not necessary for present purposes to repeat the word when describing the equitable proprietary interest in subsequent paragraphs of this Declaration.

(or to 3AC's order) all of its equitably owned assets. In other words, 3AC was entitled to call for a share of the pooled Digital Assets in respect of which it had an equitable interest as tenant in common, up to the amount of such assets recorded as being associated with its Account on the Exchange and thus corresponding to the amount of its equitable interest.

As to possession, neither 3AC nor FTX had rights to possess the Digital Assets on the Exchange. That is because digital assets are, as intangible property, incapable of possession as currently understood in English law. To be something that can be possessed, English law tends to require that it can be controlled physically.[3]

However, it is likely that, in the future, an English Court considering issues concerning proprietary rights in digital assets will look to the concept of "control" rather than the concept of "possession," as the former is capable of including intangible assets, such as digital assets. That in turn may lead the English court also to develop the concept of bailment, by analogy, to include quasi-bailment of digital assets.

If an English Court found there was no trust in respect of the 3AC Digital Assets, but was prepared to extend the concept of bailment to include quasi-bailment of digital assets, then it might find, recognising that legal and factual control were separated by the structure of the Exchange, that 3AC held a control-based proprietary interest in the Digital Assets in its account, equivalent to a proportionate share in a common pool, as quasi-bailor. If that were the case it would have a proprietary interest in the 3AC Digital Assets; or at least a superior interest in the 3AC Digital Assets to FTX, with the result that 3AC's Digital Assets would fall outside the general assets of FTX in its Chapter 11 case.

c)  **Question 3**: Unless the parties agree to a different position, English law treats assets and liabilities as existing separately and not as one single net position or sum. Nothing in the Terms suggests that the parties agreed to deviate from that position so as to treat the 3AC Assets as combined into a single net position.

---

[3]  *Your Response Ltd v Datateam Business Media Ltd* [2014] EWCA Civ 281, [2015] 3 WLR 887 at 892 by Moore-Bick LJ.

d)    **Question 4:** The Terms provide no general authorisation to FTX to appropriate assets.  There are only narrow derogations from that general position: clause 10 granted FTX a power to sell the 3AC Digital Assets to the extent needed to recover any outstanding debts owed in relation to debit balances; clause 16 of the Terms granted FTX a power to seize and liquidate assets where 3AC breached margin requirements or was indebted to other account holders and appeared to be in danger of default.  Unless those narrow derogations were engaged in respect of the appropriations, the Terms did not permit FTX to appropriate the 3AC Digital Assets.

My view is reinforced, but not dependent on, my view as to ownership under clause 8.2.6, and the provisions that the 3AC Digital Assets "shall not transfer to FTX" (clause 8.2.6(A)), that none of the 3AC Digital Assets "are the property of … FTX" (clause 8.2.6(B)), and that the 3AC Digital Assets were under 3AC's control (clause 8.2.6(C)).

Unless FTX can establish that one of the derogations in clause 10 or clause 16 applied, FTX's acts in appropriating and transferring those assets amounted to a breach of the Terms and also a breach of trust.  FTX was only entitled to set-off any fiat currency in FTX's account against any "amounts" owing to it by 3AC.  If FTX purported to appropriate a larger amount of fiat currency associated with 3AC's Account than was justified to set-off liabilities owing to it, then that was a breach of the Terms actionable as a claim in contract.

e)    **Question 5:** As set out in my response to Question 1, I consider it likely that the Terms provided for commingling of assets but that such commingling did not remove 3AC's equitable proprietary ownership of, and equitable title to, the 3AC Digital Assets.  It follows that I do not consider that commingling was in itself a breach of the Terms.  I also do not view any other action by FTX as removing or diminishing 3AC's ownership rights.  If, contrary to my primary view, FTX deprived 3AC of these rights of ownership or diminished them, then for the reason I explain below, 3AC has several viable claims against 3AC including breach of contract, restitution, breach of trust and possibly, an action by analogy to, if not in, conversion.

f)   **Question 6(a)**: If FTX, by its actions, deprived 3AC of its equitable proprietary interest in the 3AC Digital Assets, then those actions were undertaken in breach of trust. 3AC would be entitled to bring a claim for breach of trust against FTX seeking orders to restore it, by means of equitable compensation, to the position it would have been in but for the breach. 3AC may have a claim in restitution if the breaches had the effect of enriching FTX at 3AC's expense.

For the reasons I have described in my response to Question 5, the FTX Liquidations (as defined in ¶ 27 below) were a breach of the Terms. 3AC would be entitled to bring a claim for breach of trust against FTX seeking orders to restore it, through equitable compensation, to the position it would have been in but for the breach.

**Question 6(b):** If the lack of an equitable proprietary ownership in the 3AC Digital Assets were to be the reason that no preference claim is available, then in my view, the Joint Liquidators would be entitled to recover the value of the lost preference claim as part of a claim for equitable compensation for breach of trust, or damages for breach of contract, or be capable of being recompensed as restitution for unjust enrichment.

g)   **Question 7**: By reference to the Terms only, it appears that Futures Contracts were derivative contracts that could be owned and traded in the way of typical futures contract. 3AC's rights under the Futures Contracts were its choses in action and its personal property. 3AC has a proprietary interest in the chose(s) in action arising from the Futures Contracts.

## 4.   FACTUAL BACKGROUND AND KEY DOCUMENTS

18   I have been provided by Latham & Watkins with the following documents for the purposes of this Declaration (the **Briefed Documents**):

a)   The APOC, filed on 21 March 2025, including its exhibits, namely:

i)   the Terms, marked with Bates numbers FTX_3AC_000013695 through FTX_3AC_000013756, attached as Exhibit A thereto;

ii)   undated terms of service, which FTX produced with Bates numbers FTX_3AC_000013670 through FTX_3AC_000013688, attached as Exhibit B thereto (the **Undated Terms of Service**);

iii)   a Loan and Security Agreement, dated 22 October, 2021, which FTX produced with Bates numbers FTX_3AC_000000075 through FTX_3AC_000000095, attached as Exhibit C thereto (the **October 2021 LSA**); and

iv)   a document, which FTX produced with Bates numbers FTX_3AC_000000758 through FTX_3AC_000000763, attached as Exhibit D thereto.  The document appears to include two agreements: an "FTX Line of Credit" dated 30 March, 2022 (the **March 2022 LOC**), and an undated FTX Institutional Customer Margin Line of Credit Agreement (the **Margin Agreement**).

b)   The Objection, filed on 20 June 2025, including the documents contemporaneously submitted in support, namely:

i)   the Second Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury dated 19 June 2025 (the **Second Neuberger Declaration**), with annexes thereto, including the First Declaration of Lord Neuberger, dated 30 September 2024 (the **First Neuberger Declaration**);

ii)   the Declaration of Steven P. Coverick dated 20 June 2025 (the **Coverick Declaration**), with exhibits thereto, including the Declaration of Edgar W. Mosley II in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates dated 30 September 2024 (the **Mosley Declaration**);

iii)   the Declaration of Stephen Nicholas Atherton K.C. dated 20 June 2025 (the **Atherton Declaration**), with exhibits thereto; and

iv)   the Declaration of Benjamin S. Beller dated 20 June 2025 (the **Beller Declaration**), with exhibits thereto;

v)   an email thread, which FTX produced with Bates number FTX_3AC_000013568 through FTX_3AC_000013569, that encompasses

Exhibit D to the Beller Declaration, with the text of the email thread digitally extracted in a font and colour to make the text more legible; and

vi)    the Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates by the Court in the Chapter 11 Proceedings dated 8 October 2024 (the **Confirmation Order**) [D.I. 26404].

c)    A document entitled "FTX Digital Markets Limited: Safeguarding of Assets & Digital Token Management Policy" with Bates number FTX_3AC_000044442 - FTX_3AC_000044450.

d)    A document entitled "Complete Futures Specs" dated 11 April 2022 with Bates number FTX_3AC_000045026 - FTX_3AC_000045067.

e)    A document titled "Testimony of Sam Bankman-Fried Co-Founder and CEO of FTX" relating to a hearing before the US Senate Committee on Agriculture, Nutrition and Forestry, dated 9 February 2022.

f)    A document titled "Backstop Liquidity Provider Program" dated 4 January 2022 with Bates numbers FTX_3AC_000044809 - FTX_3AC_000044809.

g)    A document titled "FTX Digital Markets Limited – Safeguarding of Assets & Digital Token Management Policy" with Bates numbers FTX_3AC_000044442 - FTX_3AC_000044450.

h)    An email from FTX OTC Portal to Kyle Davies dated 2 February 2021 with Bates number 3AC-FTX-00539323.

i)    An email from FTX OTC Portal to Kyle Davies dated 6 February 2021 with Bates number 3AC-FTX-00536147.

19    In respect of the Briefed Documents, I have been instructed to assume that: (i) each of the Briefed Documents is a true and accurate copy of what it purports to be; (ii) as far as Latham & Watkins is aware, there is no other document, with which I have not been provided, that supersedes, varies or otherwise affects the enforceability of any of the Briefed Documents according to the governing law of those documents; and (iii) the March 2022 LOC and the Margin Agreement superseded the October 2021 LSA in all

material respects and is the document that was in operation between the parties to it as at 12 June 2022.

20   The facts set out in this section have been supplied to me by Latham & Watkins for the purposes of preparing this Declaration and I have assumed, without making any enquiry of my own, that they are correct. I reserve the right to amend or supplement this Declaration based on further information being made available to me, including as a result of further discovery obtained in this matter.

21   3AC was incorporated in the British Virgin Islands and operated a substantial hedge fund, whose principal business was trading and investing in cryptocurrency and other digital assets.

22   FTX provided services for customers, amongst other things, to hold and trade digital assets via an online exchange platform, i.e. the Exchange.

23   3AC used or could have used the Exchange in the following ways:

a)   3AC had multiple accounts on the Exchange (at FTX.com). Like other customers on the Exchange, 3AC could deposit, withdraw, buy, sell, and/or transfer digital assets and fiat currency through its accounts.

b)   3AC had the ability to conduct leveraged trading on the Exchange via its participation in the spot margin lending programme offered by the Exchange, which allowed 3AC to purchase digital assets using borrowed assets, including borrowed fiat currency. 3AC could also borrow fiat currency to make payments on perpetual and other futures positions on digital assets which it could take via the Exchange. In the Chapter 11 Proceedings (defined below), FTX has taken the position that other users of the Exchange, and participants in its margin lending programme, loaned 3AC such borrowed assets. FTX maintains that it did not guarantee such loans.

24   As at end of day on 12 June 2022:

a)   the assets in or allocated to 3AC's accounts on the Exchange (i.e. the 3AC Assets as defined in ¶ 16 above) included a substantial quantity of digital assets (then valued at over $1 billion); and

b)   3AC separately had a substantial negative U.S. Dollar balance (in fiat currency) on the Exchange (i.e. it owed that amount), which was lower in absolute value terms than the value of such digital assets.  3AC's negative U.S. Dollar balance reflected, among other things, over $600 million in fiat currency that 3AC had borrowed for the purposes of participating in FTX's spot margin lending programme.

25   Between 13 June 2022 and 14 June 2022, the 3AC Digital Assets were substantially all sold, liquidated, or otherwise transferred out of 3AC's accounts. I am also instructed to assume that between 13 and 14 June 2022, the value of the assets associated with 3AC's accounts on the Exchange at all times exceeded the value of the liabilities associated with 3AC's accounts on the Exchange.

26   The Joint Liquidators have estimated that, over the course of those two days, unrealised losses, withdrawals by 3AC (including realised losses on those withdrawals), trading fees, interest charges, and funding payments on futures contracts account for a reduction of approximately $65 million in the value of the 3AC Assets.

27   On 14 June 2022, FTX was directly responsible for the sale, liquidation or transfer of some $82 million worth of the 3AC Digital Assets and it applied the proceeds in reduction of 3AC's negative U.S. Dollar balance by approximately $82 million (the **FTX Liquidations**).  3AC and FTX disagree about who was responsible for directing the sale, liquidation, or transfer of what remained of the 3AC Digital Assets between 13 June 2022 and 14 June 2022, prior to the FTX Liquidations.  I am, however, instructed to assume for the purpose of my analysis that 3AC carried out, or was responsible for, the transactions other than the FTX Liquidations.

28   I am also instructed that, at the time of the FTX Liquidations, FTX had made no demand for repayment of any amount owing by 3AC on the Exchange but had merely asked for additional collateral to be posted.

29   The FTX Liquidations (which I am instructed were made by FTX) and other sales, liquidations and transfers of the 3AC Digital Assets between 13 June 2022 and 14 June 2022 (which I am instructed were made by 3AC itself) substantially eliminated the amount of 3AC's outstanding U.S. Dollar borrowings on the Exchange.

30    After 14 June 2022, trading activity in 3AC's accounts on the Exchange substantially ceased.

31    On 27 June 2022, 3AC commenced liquidation proceedings before the Eastern Caribbean Supreme Court in the High Court of Justice in the BVI (Commercial Division) and the Joint Liquidators were appointed by the Court on the same day.

32    On 1 July 2022, the Joint Liquidators, as foreign representatives of 3AC, commenced Chapter 15 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.  On 28 July 2022, that Court granted recognition of 3AC's foreign main proceeding pending in the BVI, which conferred upon the Joint Liquidators various powers in the United States.

33    On 11 and 14 November 2022, FTX, and 101 affiliated debtors, filed voluntary petitions for relief in the Chapter 11 Proceedings.

34    3AC filed the APOC in the Chapter 11 Proceedings, which made claims for: (i) BVI unfair preference; (ii) breach of contract; (iii) undervalue transaction; (iv) BVI turnover; (v) U.S. law turnover; (vi) unjust enrichment; (vii) breach of trust / breach of fiduciary duty;  (viii) conversion;  and  (ix) proprietary restitutionary claims.   The breach of contract and breach of trust / breach of fiduciary duty claims are asserted under English law.

35    As to the breach of contract claim, 3AC has alleged at least three different breaches in the APOC:

a)    the first is based on any actions that FTX may have taken (e.g. FTX's commingling of the 3AC Assets) that deprived 3AC of contractually provided ownership rights in the 3AC Assets; see APOC [56]–[57];

b)    the second: (i) assumes that FTX carried out or allowed action(s) that resulted in the sale, transfer, or liquidation of some or all of the 3AC Assets specifically on 13 June 2022; and (ii) is based on 3AC's allegation that it was not in violation of certain requirements before close of business on 13 June 2022 that otherwise could have potentially permitted FTX, as a matter of contract, to have carried out or allowed such action(s); see APOC [80]; and

c)   the third: (i) assumes that the sale, transfer, or liquidation of some or all of the 3AC Assets on 13 June 2022 was used, at least in part, to satisfy supposed liabilities that 3AC had incurred on the Exchange and that supposedly contributed to 3AC's overall negative U.S. Dollar balance as of that date; and (ii) is based on 3AC's allegation that FTX has not substantiated those supposed liabilities; see APOC [79].

36   I am instructed to assume the following facts about how the Exchange was likely to have operated:

a)   The Exchange was an online trading platform, on which FTX's customers were able to transact in digital assets, including BTC, ETH, USDC and USDA.

b)   The common gateway to transacting on the Exchange was for a customer to accept the Terms.  Then, the customer could either (or both):

i)   transfer Digital Assets to a wallet provided by FTX and, once those assets were visible to the customer, via the user interface for a Customer Account, trade those assets on the Exchange;

ii)  deposit fiat currency into a bank account controlled by FTX, and, once that fiat currency was visible to the customer, via the user interface for a Customer Account, use that currency to purchase assets on the Exchange.

c)   When a customer generated an "address within [their] Account" to which they sent their Digital Assets, as referred to in clause 8.2.1 of the Terms, that "address" was not a personal wallet, but rather a wallet owned and maintained by FTX that was segregated from other wallets containing FTX's own assets and the assets of other FTX customers.

d)   A customer's "Account" was not a wallet.  Rather, an "Account", so called, was in reality just a ledger entry maintained by FTX in which FTX recorded the quantity of the Digital Assets, fiat currency, and e-money notionally associated with the customer in wallets provided by FTX.  The Account recorded the Digital Assets deposited but did not record any unique identifying number of any specific assets deposited by the customer.

[ 14 ]

e)   When a customer deposited fungible Digital Assets in their "Account" on the Exchange, those assets were not permanently stored in the segregated wallets referred to at sub-paragraph (c) above.  Even where assets were initially deposited into wallets associated with that customer, those assets were then transferred to pooled "hot wallets" owned and controlled by FTX.  Those hot wallets (for which FTX retained the private key) held, on an unsegregated, collective basis, the crypto-token entitlements of multiple customers.

f)   When trading resulted in a customer accruing Digital Assets, while the amount of the asset gain was registered on FTX's ledgers as being associated with the customer's Account but, there was no actual transfer of the digital asset to the customer.  Those assets were also stored unsegregated, in FTX's hot wallets.

g)   When a customer traded Digital Assets on the Exchange, no actual underlying Digital Assets moved between wallets.  Instead, the trade order would be sent to and executed by FTX on the Exchange's ledger so that the trade was recorded in the ledger without any asset actually moving between wallets.  The exchanged assets remained in the commingled wallets.

h)   A customer who deposited and then withdrew Digital Assets from the Exchange could not be assured of receiving precisely the same assets back due to the fungibility of most Digital Assets; what the customer received Digital Assets of the same kind and of the same value.

37   I am further instructed to assume that both FTX and 3AC knew the facts above prior to 3AC entering into the Terms.

## 5.    APPLICABLE PRINCIPLES — DIGITAL ASSETS AND PROPERTY RIGHTS

38    Recent decisions of the English Courts[4] and commentary[5] have consistently recognised that property rights are capable of subsisting in digital assets.

39    Property rights are capable of subsisting in blockchain-based digital assets, including fungible ones such as those envisaged to be traded by 3AC on the Exchange.[6]

40    Digital assets are intangible property, which historically has meant that they were not capable of possession, and thus that, as a matter of English law, there could be no bailment of them.[7] While there is currently no control-based legal proprietary interest so as to permit a quasi-bailment, I agree with Lord Neuberger (First Neuberger Declaration ¶¶ 53-56) that it is likely that the common law will develop in due course to recognise such an interest[8]. Indeed, other superior courts in the common law world have already proceeded in this direction with the Tasmanian Full Court recently concluding that digital assets are capable of "possession", while describing a conclusion that there could be no claim in conversion for wrongful interference with a chose in action because it could not be possessed as being "foreign to contemporary common sense and the reality of the digital world", and supporting the view that the categorisation of personal things as either choses in possession or in action "no longer reflects today's commerce and intercourse".[9]

41    There is no legal difficulty in separating legal and equitable ownership of digital assets, with the equitable title being held on trust.[10] Indeed, crypto-token intermediated holding

---

[4]    *Tulip Trading Ltd v Bitcoin Association for BSV* [2023] 4 WLR 16; *AA v Persons Unknown* [2019] EWHC 3556 (QB); [2020] 4 WLR 35 at [56] - [59]; *D'Aloia v Persons Unknown & Ors* [2024] EWHC 2342 (Ch) *Osbourne v Persons Unknown Category A* [2023] EWHC 39 (KB); *Jones v Persons Unknown* [2022] EWHC 2543 at [23]; *DPP v Briedis* [2021] EWHC 3155; *Tulip Trading v Van Der Laan* [2023] EWCA Civ 83, [2023] 4 WLR 16 at [24].

[5]    UKJT Legal Statement on Crypto-assets and Smart Contracts (2019) at [44]; Law Commission Final Report on Digital Assets (Law Com No 412) (**Law Commission Final Report**), ¶ 3.42; UKJT Legal Statement on Digital Assets and English Insolvency Law [19].

[6]    *Tulip Trading Ltd v Bitcoin Association for BSV* [2023] 4 WLR 16; *AA v Persons Unknown* [2019] EWHC 3556 (QB); [2020] 4 WLR 35 at [56] - [59]; *D'Aloia v Persons Unknown & Ors* [2024] EWHC 2342 (Ch) [2025] 1 WLR 821; *Osbourne v Persons Unknown Category A* [2023] EWHC 39 (KB); *Jones v Persons Unknown* [2022] EWHC 2543 at [23]; *DPP v Briedis* [2021] EWHC 3155; *Tulip Trading v Van Der Laan* [2023] EWCA Civ 83, [2023] 4 WLR 16 at [24].

[7]    Law Commission ¶ 7.98.

[8]    As proposed by the Law Commission of England and Wales at ¶ 7.115.

[9]    *Poulton v Conrad* [2025] TASFC 7 at [90], [93].

[10]    See e.g. *Ruscoe v Cryptopia Ltd* (in liquidation) [2020] NZHC 728.

arrangements can be structured as trusts, including where the underlying entitlements are: (a) held on a consolidated unallocated basis for the benefit of multiple users; or (b) potentially even commingled with unallocated entitlements held for the benefit of the holding intermediary itself under the law.[11]

42     The model whereby digital assets deposited on an exchange are held in unsegregated pools is very common in the cryptocurrency industry, and the financial services industry more generally in respect of different types of financial assets.   Indeed, as the Law Commission of England and Wales (**Law Commission**) observed at ¶ 7.3 of the Law Commission Final Report:

> "Where the entitlements comprise of, or relate to, crypto-tokens which are fungible, they are typically retained or recorded as pooled, consolidated balances. In these circumstances, there are not normally any specific, segregated allocations in those accounts or network addresses that can be linked to the claims of individual users. In other words (and in high-level terms), much of the holding intermediary market holds user 'entitlements' to crypto-tokens (or pools thereof), rather than specific crypto-tokens themselves".

## 6.     APPLICABLE PRINCIPLES — INTERPRETATION OF CONTRACTS

43     I agree also with the summary of the principles of construction stated by Lord Neuberger at ¶¶ 16-20 of the First Neuberger Declaration.   An English Court, when construing a contract such as the Terms, will apply conventional principles relating to the construction of contracts.[12] They include (relevantly):

---

[11]     Courts in other common law jurisdictions have accepted that it is possible for a valid trust to be created over digital assets (including over commingled, unallocated holdings of digital assets): *Ruscoe v Cryptopia Limited (in liquidation)* [2020] NZHC 728, [2020] 22 ITELR 925 (New Zealand); *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 02 (Singapore); *Re GateCoin Ltd (In Liquidation)* [2023] HKCFI 914 (Hong Kong).  The same conclusion will be accepted under English law: see *Legal Statement on Digital Assets and English Insolvency Law*, [48].

[12]     *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101; *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900; *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619; and *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] 2 WLR 1095.

a)     Where a contract has been made in writing, "[t]he court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement"[13] and the parties' subjective intentions are immaterial.

b)     To ascertain the objective meaning of the words, the Court will ask what a reasonable person, with all the background knowledge that would reasonably have been available to the parties when they entered into the contract, would have understood the language of the contract to mean.  This involves a consideration of the words used in their documentary, factual and commercial context — the so-called "factual matrix".[14]

c)     The Court will not take a literal reading of the words, divorcing them from their context.  Rather, the English Courts will consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching a view as to that objective meaning.[15]  Part of that exercise is the application of commercial common sense.  While the Court must be alive to the possibility that the parties may have agreed something commercially unwise — and it is not the Court's role to re-write an unwise bargain — "[t]he fact that a particular construction leads to a very unreasonable result must be a relevant consideration.  The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they make that intention abundantly clear"[16].

d)     While the "labels" used may not be decisive, the language is a compelling guide.  In *LBIE v RAB Market Cycles (Master) Fund Limited & anor* [2009] EWHC 2545, the words "belong to the Counterparty" and "do not belong to the Prime Broker" were said to amount to "the clearest language to display their intention that securities held by the Prime Broker for the time being continue to belong beneficially to the Counterparty".

---

13    *Wood v Capita* at [10], Lord Hodge (with whom Lords Neuberger, Mance, Clarke and Sumption agreed).
14    *Burnett or Grant v International Insurance Co of Hanover Ltd* [2021] UKSC 12, [2021] 1 WLR 2465 at [29], Lord Hamblen.
15    *Wood v Capita* at [10], Lord Hodge (with whom Lords Neuberger, Mance, Clarke and Sumption agreed).
16    *The Fina Samco* [1995] 2 Lloyd's Rep 344.

e)   The Court may use both textualism and contextualism as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements.

44   As to the so-called factual matrix:

a)   "Courts will never construe words in a vacuum. To a greater or lesser extent, depending on the subject matter, they will wish to be informed of what may variously be described as the context, the background, the factual matrix or the mischief. To seek to construe any instrument in ignorance or disregard of the circumstances which gave rise to it or the situation in which it is expected to take effect is in my view pedantic, sterile and productive of error".[17]

b)   That being so, "[b]efore a Court begins to construe a written contract, it must know all the relevant circumstances which exist and are within the knowledge of the contracting parties at the time when they make their contract".[18]

45   A further principle of particular relevance to the present situation is that "any court will hesitate for a long time before holding that, as a matter of construction, the parties have contracted for the impossible, particularly in a commercial contract. Parties to commercial contracts can be expected to contemplate performance, not breach"[19]. This can be seen as an example of the more general principle identified above, namely that clear words are needed before a Court will conclude that the parties intended an interpretation that produces an unreasonable result.

46   The English Courts will endeavour to give effect to every clause in the parties' agreement and not to reject a clause unless it is manifestly inconsistent with, or repugnant to, the rest of the agreement.[20]

---

17   *Arbuthnott v Fagan* [1995] 2 Lloyd's Rep 344 at per Bingham MR.
18   *Hvalfangerselkapet Polaris A/S v Unilever Ltd* (1933) 46 Lloyd's Rep 29.
19   *The Epaphus* [1987] 2 Lloyd's Rep 213.
20   *Barton v Fitzgerald* (1812) 15 East 529, 541; *Bush v Watkins* (1851) 14 Beav. 425, 432*; Pagnan SpA v Tradax Ocean Transportation SA* [1987] 2 Lloyd's Rep. 342, 349*; RWE Npower Renewables Ltd v JN Bentley Ltd* [2014] EWCA Civ 150, [17].

47    Finally, a contract must be interpreted on the basis that the parties "must be taken to know the general law"[21].  That is so because "a reasonable person cannot be assumed to be in ignorance of clear and well-known legal principles affecting or incidental to the contractual engagement in question".[22]

48    As to the principles concerning the creation of a trust, I agree with the propositions of law set out in ¶¶ 33–38 and 40–42 of the Second Neuberger Declaration.  In relation to ¶ 39 of the Second Neuberger Declaration, I agree that:

a)    it is possible under English law for the operators of an exchange to declare a trust over its network addresses that hold digital assets in favour of customers who, as beneficiaries, share as tenants in common in a pool of digital assets held in that network address;

b)    it is possible also for a trust to subsist over assets where those assets have been automatically swept into that network address from another network address, if the terms of the trust deed provide that it is so; and

c)    whether a trust is taken to have arisen (and the terms of that trust) are ultimately a question of characterisation and will turn on the terms of the document that purports to create the trust.

49    As will be seen below, while I agree with what Lord Neuberger says about the applicable principles, I disagree about the result which is arrived at upon their correct application to the facts in this case.

## 7.    CLAUSE 8.2.6 OF THE TERMS

50    The Recitals to the Terms indicate that, despite the technical reality that FTX pooled digital assets into hot wallets whose private keys it controlled itself, FTX's relationship with 3AC, as a customer with digital assets on the Exchange, was intended to be as "a trading platform provider only" as FTX was not engaged "as principal or counterparty with respect to trades entered into on the Platform" (albeit that there are some limited exceptions that are not presently relevant).

---

[21]    *Triple Point Technology Inc v PTT Public Co Ltd* [2021] UKSC 29.
[22]    *Challinor v Juliet Bellis & Co* [2013] EWHC 347 (Ch) at [277].

51   The main provisions of the Terms concerned with purchase, sale and custody of digital assets on the Exchange are to be found in clause 8.  For present purposes, the key provision is clause 8.2.6, which sets out the basis on which digital assets are held by FTX.[23]

52   Clause 8.2.6 applies to "Digital Assets".  "Digital Assets" is defined in the Terms and includes "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform."  Fiat currency is not a Digital Asset.  Indeed, fiat currency is defined separately in the Terms, consistently with its meaning in ordinary usage, as "any government issued national currency".

53   Clause 8.2.6 makes plain the intention that "owner[ship]" of and "[t]itle" to all Digital Assets in 3AC's Account is to lie with 3AC.  That is so regardless of whether assets came to be associated with 3AC's Account by virtue of a deposit made by 3AC, by means of a credit to 3AC's Account by a third party, or by means of trading activity on the Exchange.

54   This intention is reflected throughout all three parts of the clause: in clause 8.2.6(A) by references to "your" Digital Assets, title to which "remain[s] with you", in clause 8.2.6(B) through the statement that FTX does not "treat Digital Assets in User's Account as belonging to FTX" and in clause 8.3.6(C) by the provision that "You [i.e. the customer] control the Digital Assets held in your Account".

55   What clause 8.2.6 does not state in clear terms (or indeed at all) is whether the "ownership" and "title" which 3AC is said to have is intended to subsist as a legal or equitable title in the Digital Assets.  Read in a vacuum, the words could mean either — indeed, they would probably most naturally be read as a reference to legal *and* equitable title.  However, as explained above, the terms of a contract are not construed in a vacuum, but must be interpreted in light of the factual matrix.  Read in that context, I consider that the most likely meaning of the clause is that the reference to "ownership"

---

[23]   The clause refers to assets as being "held in an [a]ccount".  However, this is figurative.  As already noted, nothing is in fact held "in" an Account.  Rather, an Account is a ledger entry associating balances with a customer.

and "title" are to the equitable interest in the assets and that, on a proper construction, clause 8.2.6 conveys an intention that FTX will hold the assets on trust.

56    My reasons for reaching this conclusion are as follows:

a)    The English Courts, where possible, will strive to give content to the provisions contained in the parties' agreement by interpreting the words against the context, the background, the factual matrix or the mischief the provision is trying to resolve.  As I explained at ¶ 43c) above by reference to established English principles of construction, where multiple interpretations are available, one of which gives content to a term and others which do not, the Court will, if possible, adopt the interpretation that gives the term content, rather than rejecting the provision altogether.

b)    The context in which clause 8.2.6 falls to be interpreted is one where (as per the factual matrix): (i) 3AC's act of depositing digital assets with FTX for use on the Exchange involved a transfer of control from 3AC to FTX, such that, once the assets were deposited, FTX's private keys, rather than 3AC's private keys, were needed to deal with the assets; and (ii) 3AC's digital assets would ultimately be pooled with the digital assets of other customers and held in unsegregated hot wallets such that a withdrawal of digital assets by 3AC would not necessarily (or even likely) lead to the same digital assets being returned.

c)    In that context, it would make no sense for the parties to agree that 3AC held the legal title to the digital assets associated with 3AC's customer Account; indeed, that would be impossible.  In respect of digital assets deposited by 3AC, legal title would necessarily pass when the assets were deposited and transferred to wallets that FTX controlled.  This would have to be so in order for FTX to treat the digital assets as fungible so as (for example) to transfer a different digital asset to 3AC in response to a withdrawal request.  A further impossibility would arise in respect of digital assets credited to 3AC's "Account" (that is, added to the balance associated with the 3AC Digital Assets on FTX's ledgers) by a third party or by virtue of dealings on the Exchange: unless and until 3AC took steps to withdraw such assets, there would never actually be an act of transfer to 3AC, and thus there would be no means by which legal title could transfer to 3AC.

[ 22 ]

d)      In those circumstances, the most lucid construction of clause 8.2.6 is to interpret the references to ownership and title as being to equitable ownership and title. Clause 8.2.6 envisages that legal title to assets associated with 3AC's Account would belong to FTX, with equitable ownership and title belonging to 3AC. The words of the clause are capable of carrying that meaning, it is a meaning that is consistent with the factual matrix as I have identified it and it is a meaning that makes commercial sense, not least because that splitting of legal and equitable interests is achievable as a matter of law.

e)      As a matter of legal analysis, if clause 8.2.6 provides for the legal interest in digital assets to lie with FTX and the equitable interest to lie with 3AC, what it is providing for is an intermediated holding arrangement in the form of a bare custodial trust, "title" and "ownership" being construed to refer to the beneficial interest under that trust.[24]   That, therefore, is what the clause must intend: not because its words expressly call for a trust but because, properly construed in light of the factual matrix, the clause calls for a splitting of legal and equitable interest in a manner that necessarily entails trusteeship.

## 8.      A TRUST UNDER CLAUSE 8.2.6

57      I consider it important to satisfy myself that a trust under clause 8.2.6 would work as a matter of law — i.e. that the three requirements of a trust (being certainty of objects, subject matter and intention[25]) could be met.  I am so satisfied.

58      The test for certainty of objects is that the beneficiaries of a trust can be identified.[26] That plainly poses no difficulty here: the records kept by FTX as to the identity of its Account holders and the amount and type of digital assets associated with each Account meets the requirement.

59      The requirement for certainty of intention has been pithily described in a digital asset context as a "clear substantive intention, based on an objective assessment, by the relevant party or parties for the holding intermediary to hold its title to specified crypto-

---

[24]      R Goode and L Gullifer *Goode and Gullifer on Legal Problems of Credit and Security* (7th ed. 2022) [6-14].

[25]      *Knight v Knight* (1840) 49 ER 58 at 63, Lord Langdale MR.

[26]      *Knight v Knight* (1840) 49 ER 58 at 68; *Re Gulbenkian's Settlement Trusts (No.1)* [1970] AC 508, HL.

token entitlements on trust for one or more beneficiaries".[27]  What amounts to a clear intention is context specific.[28]  In a contractual context, the question of whether there is an intention to create a trust turns on the proper interpretation of the clause.  Here, my view is that the proper interpretation of clause 8.2.6 does create a trust for the reasons explained above.

60    The test for certainty of subject matter is whether the trust property can be sufficiently identified.[29]  A complication that arises here is that FTX's pooling of digital assets into unsegregated hot wallets results in each customer's digital assets being mixed with those of other customers (and, as noted above, FTX treated such assets as interchangeable).  However:

a)    While the position in England is not beyond doubt, the currently prevailing and in my opinion, better, view is that the test for certainty of assets can be satisfied in connection with a group of fungible and intangible assets held in an unsegregated omnibus account for the benefit of multiple users.[30]

b)    ***Hunter v Moss*** [1994] 1 WLR 452 is the leading[31] English authority on this point.  That decision has been interpreted in two different ways.  The first approach is the "intangible assets exception" approach, in which *Hunter v Moss* is said to stand for the proposition that property rights can arise in an unidentifiable part of a specified quantity of a bulk of assets that are intangible where those assets are indistinguishable from each other.  The other interpretation, commonly referred to as the "equitable co-ownership approach" characterises the interests of beneficiaries under such trusts as rights of co-ownership in an equitable tenancy in common over the entire pool.

---

[27]    Law Commission Final Report ¶ 7.43.
[28]    See Lewin on Trusts (20th Ed.) [3-003]-[3,006].
[29]    *Knight v Knight* (1840) 49 ER 58 at 63; Lewin on Trusts (20th Ed.) [5-003].
[30]    See, for example: *Goode and Gullifer*, Chapter 6 Section 4; R Goode, "Ownership and Obligation in Commercial Transactions" (1987) 103 Law Quarterly Review 433, 436.  See also M Yates, G Montague, The Law of Global Custody (4th ed. 2013) [3.27]; V Dixon, "The Legal Nature of Intermediated Securities: An Insurmountable Obstacle to Legal Certainty?" in L Gullifer, J Payne, *Intermediation and Beyond* (2019) p 64.  See also Law Commission Final Report ¶¶ 7.48-7.55.
[31]    The authors of *Goode and Gullifer,* conclude in Chapter 6 section 4 that the result in *Hunter v Moss* is correct and therefore should be no danger that an English court would hold that a trust of part of a shareholding failed for lack of identification.

c)   When considering the principle in *Hunter v Moss* and its application to cryptocurrency in England, the Law Commission said that their preferred view was the equitable co-ownership approach:

> "… the best way to characterise the interests of beneficiaries of crypto-tokens or crypto-token entitlements held by a custodial holding intermediary on a consolidated unallocated basis for the benefit of multiple users is as rights of co-ownership in an equitable tenancy in common."[32]

d)   I agree with that analysis, which seems to me to be supported by the analysis of Briggs J in *Pearson, Lomas v Lehman Brothers Finance SA* [2010] EWHC 2914 at [232].  In that case, Briggs J explained (at [227]) that:

> "A trust of part of a fungible mass without the appropriation of any specific part of it for the beneficiary does not fail for uncertainty of subject-matter, provided that the mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain."

and that the nature of the beneficiary's interest in the fund is that of a "beneficial co-ownership share" rather than interest in any particular part of the fund.

e)   Professors Goode and Gullifer have analysed the principle in *Hunter v Moss* as being correct and observe that it, and its subsequent line of authorities, reflect the principle that, if there is a clear intention to declare a trust, then the Court has no reason to deny its existence merely because of commingling, particularly given that, despite the financial assets having been commingled, whenever identification of a trust interest becomes relevant, it is possible to identify the relevant interest.[33]

61   In short, therefore, I see no difficulty in principle with the proposition that clause 8.2.6 creates a trust and that the subject matter and objects of the trust are readily capable of

---

[32]   Law Commission Final Report ¶ 7.53.
[33]   *Goode and Gullifer* p 254.

being ascertained by reference to the ledger kept by FTX in respect of assets transferred in and out of the FTX wallets in accordance with the instructions of its customers.

62    Although the focus of my analysis has been clause 8.2.6, because that is the clause that squarely governs ownership of and title to digital assets associated with an Account, I have also reviewed the Terms as a whole to see whether there are other provisions that cast doubt on the proposition that clause 8.2.6 is to be interpreted such that FTX holds digital assets associated with 3AC's Account on trust.  In my opinion there are no such provisions.  Three clauses which I have considered with particular care — because they struck me as having the greatest potential to point against the conclusion I have reached with respect to the construction of clause 8.2.6 — were clauses 2.1.3, 9.2 and 38.6 of the Terms.

63    Clause 2.1.3 states that "FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services".  At first blush, the disclaimer of a fiduciary relationship might be thought contrary to the existence of a trust.  However, the context is important.  Clause 2 as a whole is not concerned with the general relationship between the parties but is concerned with trading and risk.  Clause 2.1 is about ensuring that FTX cannot be held responsible for 3AC's trading decisions.  Clause 2.1.3 itself is similarly focused: it disclaims a fiduciary relationship specifically "in connection with any trades or other decisions or activities effected by [3AC]".  It is protecting FTX against liability for trading and transactional decisions made by 3AC using the Exchange.  It says nothing at all about the relationship between the parties in relation to the holding or ownership of digital assets on the Exchange that are associated with 3AC's Account.  Indeed, a relationship need not be fiduciary in every respect to give rise to fiduciary obligations in respect of certain transactions.[34]  Therefore even if clause 2.1.3 disclaims a fiduciary relationship in its context, it does not affect the relationship existing in the context of clause 8.2.6.  If anything, it seems to me that the existence of clause 2.1.3 supports what I consider to be the proper interpretation of clause 8.2.6, inasmuch as there is no equivalent disclaimer of a fiduciary relationship anywhere in clause 8.

---

[34]    *Agip (Africa) Ltd v Jackson* [1990] Ch 265, 290C; *Chase Manhattan Bank N.A. v Israel British Bank (London) Ltd* [1981] Ch 105 at 118-119 (Goulding J).

64      Clause 9.2 gives FTX a power that arises, in essence, in relation to inactive Accounts where it cannot contact the account holder.

65      It is legitimate to consider whether, in circumstances where this clause expressly deals with the creation of trusts, it might be inferred that, where the parties did not use the word "Trust" in other parts of the Terms they did not intend to create one.  However, on balance, I do not consider that the existence of this clause undermines my conclusion that an English Court would be likely to find that clause 8.2.6 also creates a trust.  I have reached this view for the following reasons:

   a)   First and foremost, the existence of this clause is at most one factor that a Court might take into account when construing clause 8.2.6; it does not seem to me a sufficiently compelling factor to cause the Court to conclude that clause 8.2.6 bears a meaning that gives rise to an impossibility of performance and thus defies commercial common sense.

   b)   Secondly, clause 9.2 confers powers that are not available under the custodial trusteeship to which I consider clause 8.2.6 gives rise.  Clause 9.2 permits either FTX itself, or an Affiliate of FTX, to act as trustee.  It also confers powers to charge fees and to pay unclaimed or abandoned property into a court.  Those powers and that flexibility are needed to deal with the very specific contingency that clause 9.2 is addressing; FTX would not be able to do those things under the bare custodial intermediary trusteeship to which I consider clause 8.2.6 gives rise.  Therefore, there is no question of clause 9.2 being redundant if clause 8.2.6 gives rise to a trust.

   c)   Thirdly, there are several drafting incoherencies in the document.  The fact that clause 9.2 uses the term "Trustee" and clause 8.2.6 does not, may reflect nothing more than that different individuals drafted those two sections.  Therefore, in my view, very little weight can be placed on the fact that different terms and structures are used in different sections of the document.  I am fortified in that conclusion by the fact that "Trustee" is used as if it were a defined term in clause 9.2, but that term is not, in fact, defined anywhere in the document, nor is it used anywhere outside of clause 9.2.

66    Finally, clause 38.6 provides that nothing in the Terms or related documents is "intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever" and that "Each party confirms it is acting on its own behalf and not for the benefit of any other person". This is essentially a boilerplate provision that appears (under the heading "No partnership or agency") in the back-end of the Terms. The clause is concerned with disavowing any suggestion of a joint venture or the like — and the disclaimer of fiduciary relationship here must be read in that context, a conclusion that is strengthened by looking at the types of associations listed in that clause. Clause 38.6 cannot possibly be read as precluding a bare trust relationship in relation to the holding or ownership of Digital Assets across the board, not least because it would then be wholly inconsistent with clause 9.2.

67    In short, therefore, nothing in clauses 2.1.3, 9.2, 38.6 or indeed anywhere else in the Terms cause me to change my conclusion as to how clause 8.2.6 should be interpreted.

68    Lord Neuberger's view is that the Terms do not create a trust of Digital Assets in favour of customers including 3AC for the reasons explained in the First Neuberger Declaration: Second Neuberger Declaration ¶ 11(a). Lord Neuberger places emphasis on clauses 2.1.3, 2.2.2, 2.10, 9 and 38.6 as supporting his conclusion that those provisions of the Terms are inconsistent with an intention to create a trustee / beneficiary relationship: First Neuberger Declaration ¶ 45.

69    I disagree:

a)    As I have said at ¶ 63 above, while clause 2.1.3 purports to exclude a fiduciary relationship, it is important to construe that statement in the context of the Terms as a whole. Clause 2 relates to disclosing risks to customers who might trade on the platform. In the context of informing clients about the risks of trading on the exchange it makes perfect sense that FTX would exclude for itself any fiduciary or advisory obligations[35]. Clause 2.1 is about ensuring that FTX cannot be held responsible for 3AC's trading decisions. Clause 2.1.3 is making clear that FTX

---

[35] See, for example, my decision in *JP Morgan Chase Bank & Ors v Springwell Navigation Corporation* [2008] EWHC 1186 (Comm) (27 May 2008) where I rejected the argument that the bank owed fiduciary or advisory obligations to its customer in relation to the sale of derivative products.

is not acting as a broker to the customer in the context of that customer placing trades on the Platform: "FTX Trading is not your broker, intermediary, agent or advisor…".  Clause 2.1.3 itself disclaims a fiduciary relationship specifically "**in connection with any trades or other decisions or activities effected by [3AC]**" (emphasis added).  It is protecting FTX against liability for trading and transactional decisions made by 3AC using the Exchange and to ensure that FTX is free to compete with its customers in any proprietary trading (which a fiduciary would not be free to do).  It says nothing at all about the relationship between the parties in relation to how a customer's digital assets on the Exchange are treated by FTX or as to the ownership, title or holding of Digital Assets.  Indeed, that is because that is what clause 8 addresses.  And it is relevant to note that clause 8 itself contains no such exclusion of a fiduciary or trustee relationship.

b)  Like clause 2.1, clause 2.2 contains further risk disclaimers.  It purports to put the customer on notice of the risks inherent in trading Digital Assets.  Clause 2.2.2, warns the customer that "[u]nderstanding Digital Assets requires advanced technical knowledge" and that the mere fact that the Digital Asset is listed on the Exchange does not indicate FTX's approval or disapproval of it; and that the customer should rely on "[their] own understanding of the risks specific to each Digital Asset" rather than assuming that because it is listed on the Exchange it is endorsed by FTX.  It is in that context that FTX purports to exclude liability, presumably as an advisor, of any fiduciary duty.  Again, that is separate from the question of the relationship between FTX and the customer when it comes to *custody* or *ownership* of customer assets; that relationship is dealt with in clause 8.

c)  Clause 2.10 warns the user that fiat currency and e-money deposited on the Exchange is not eligible for "public or private deposit insurance protection".  In some jurisdictions, public government deposit protection insurance schemes are available to protect customer bank deposits in case of bank failure.  For example, in the United Kingdom, the Financial Services Compensation Scheme provides deposit insurance protection of deposits up to the value of £85,000.  That protection is only available where funds are deposited with eligible institutions.  Clause 2.10 merely informs the user that the Exchange is not such an institution.

As to the unavailability of private insurance in respect of the deposit amounts, there is nothing inconsistent with assets being held on trust not being eligible for insurance protection. The fact that an asset cannot be insured does not mean that it cannot be held on trust or that, if the trustee damages it, loses it, misappropriates it to itself or otherwise misappropriates it that the beneficiary would have no remedies against the trustee for breach of trust, conversion, account of profits or damages. There is nothing inconsistent between clause 2.10 and the existence of a trustee-beneficiary relationship between FTX and 3AC in respect of the 3AC Digital Assets held on the Exchange.

d)    Clause 9 deals with unclaimed and abandoned property. I have described at ¶¶ 64 and 65 above why I do not think clause 9.2 excludes the existence of a trustee-beneficiary relationship in respect of Digital Assets held by FTX on behalf of customers.

e)    Clause 38.6 excludes partnership, joint venture or other relationship of that species having fiduciary characteristics. As I have explained above at ¶ 66, this clause is concerned with disavowing any suggestion of a joint venture or the like — and the disclaimer of fiduciary relationship here must be read in that context. It does not exclude the existence of a trustee-beneficiary relationship.

70    It appears from ¶ 45.4 of the First Neuberger Declaration that at least one reason Lord Neuberger says that clause 8.2.6 cannot create a trust relationship is that "no trust can be created under English law without an intention that the purported trustee hold legal title". Lord Neuberger points to words in other contexts that he considers would better indicate the intention to confer a trust relationship "on behalf of", "for" and "on trust". I do not agree.

71    First, Lord Neuberger's conclusion appears to be premised on the view that FTX did not hold the legal interest in the assets on the Exchange. Legal interest is analogous in English law to the concept of "title". I am instructed that when a customer generated an "address within [their] Account" to which it sent its Digital Assets, as referred to in clause 8.2.1 of the Terms, that "address" was not a personal wallet, but rather a wallet owned and maintained by FTX which was segregated from other wallets containing FTX's own assets and the assets of its other customers. So, when a customer transferred

an asset on to the FTX platform, the title to that asset changed from belonging to the customer both legally and beneficially, with the result that there was a separation of the legal and beneficial title, where FTX appeared on the blockchain as the owner of the Digital Asset and the equitable interest in the asset was preserved by the agreement in clause 8.2.6.  The separation of legal and equitable title in that way is not new to digital assets; and is common in custodian security structures.  Therefore, as a matter of fact, Lord Neuberger's first concern does not arise because FTX was the legal holder of the Digital Assets held on the exchange.

72      It may be that Lord Neuberger, in arriving at that view, was working on the assumption that the words "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX" in the first sentence of clause 8.2.6 would need to be applied to both legal and equitable title and, if it were, no trust could arise because there would be no transfer of title.  As to this, as I have already said, the meaning of clause 8.2.6 must be determined by considering what would have been known by the parties when they entered into the contract.  3AC and FTX both knew at the time they entered into the Terms that, practically, 3AC could not retain *legal* title to the asset if it was to transact on the Exchange because, as I said above at ¶ 56, that is not how a digital asset exchange operates, or, indeed, how FTX's Exchange operated.  Therefore, to read clause 8.2.6 as relating to both legal and equitable title, as though it were providing for *legal title* in digital assets associated with the customer's account to stay with it, both legally and beneficially, leads to the absurdity whereby the parties have apparently contracted for something that they would know could not be achieved.  As I said above at ¶ 45 an English Court would be unlikely to construe the provision in a way that would lead to an impossibility and, as I said at ¶ 56, where multiple interpretations are available, one of which gives content to a term and others which do not, the Court will, if possible, adopt the interpretation that gives the term content, rather than rejecting the provision altogether.

73      As to Lord Neuberger's second point, viz. that the relevant words of trust are not present, again, I disagree.  In this context, the relevant requirement for establishing intention is to show "clear substantive intention, based on an objective assessment, by the relevant party or parties for the holding intermediary to hold its title to specified

crypto-token entitlements on trust for one or more beneficiaries"[36]. What amounts to a clear intention is context specific.[37] In a contractual context, the question whether there is an intention to create a trust turns on the proper interpretation of the clause. Lord Neuberger appears to agree, in substance, that is the law: see First Neuberger Declaration at ¶ 35.1. As I have said, I consider the wording in clause 8.2.6 clearly demonstrates an intention for the beneficial/equitable/proprietary interest in any Digital Asset contained in the customer's account to stay with the customer, by use of these phrases "Title to your Digital Assets shall at all times remain with you" and "shall not transfer to FTX Trading" and "[a]s the owner of the Digital Assets in your Account" and "None of the Digital Assets in your Account are the property of… FTX Trading".

74     If the parties had intended that, once the Digital Assets of a customer had been transferred into the customer's account, all the customers would lose all of their *proprietary* interest in those assets and would be entitled only to an *in personam* claim against FTX in respect of the cash value of those assets, then that intention would have to have been reflected in clear words. The draftsman would not have included words stressing that the assets would remain the property of the customer (as he chose to do in clause 8.2.6) and would have instead included words to the opposite effect. Indeed, in circumstances where FTX had gone to lengths at other parts of the Terms to disclaim a fiduciary relationship, one would expect to see words here such as "once you transfer Digital Assets onto the Exchange, you are no longer entitled to any particular asset" or "FTX assumes no duty to you in connection with the Digital Assets in your account". It follows that I disagree with the conclusion also stated in ¶ 45 of the First Neuberger Declaration that the only circumstance in which a trustee-beneficiary arrangement was contemplated was in the circumstances concerning abandoned property in clause 9.

75     At ¶ 47 of the First Neuberger Declaration, Lord Neuberger says that, even if a trust were intended, he does not consider it possible to construe the Terms as creating the type of trust found to exist in *Hunter v Moss*. This is precisely the opposite conclusion to my own. I have considered carefully Lord Neuberger's reasons as to why such a trust cannot exist, but I do not agree with them. In relation to his reasons I comment as follows:

---

[36]     Law Commission Final Report ¶ 7.43.
[37]     See *Lewin on Trusts* (20th Ed.) [3-003]-[3-006].

a)   The point made by Lord Neuberger at ¶ 47.1, viz. that such a trust cannot exist because the terms are inconsistent with an intention to create a trust, is circular. In any event, I have already addressed above why I consider that clause 8.2.6 does indeed display such an intention.

b)   The existence of an omnibus client account is not defeated by commingling of the assets in circumstances where the assets are fungible and the relative entitlement of each client in the pool is recorded in the records of the custodian.

c)   The point made by Lord Neuberger at ¶ 47.2, viz. that post-fact commingling is irrelevant for the purposes of the Terms, assumes that it was not part of the shared knowledge of the parties at the time of contracting that legal title to the assets would be transferred to FTX which would hold the assets in an omnibus account(s). That, in my view is an incorrect assumption, particularly in the case of 3AC, which was a sophisticated, institutional trader of Digital Assets and would have known at the time it entered into the Terms how assets were to be held. Assessed against that assumption, it is entirely supportable that 3AC knew at the time of contracting that a pooled address(es) would be used and Digital Assets would be commingled. It follows that an English Court would likely find that the Terms could (and did) give rise to an omnibus client asset trust account of the type which I have described.

d)   The logical terminus of Lord Neuberger's reasoning is to give clause 8.2.6 no meaning at all. That cannot be right. Lord Neuberger concludes that 3AC had no trust over the assets attributable to its accounts and potentially had, as discussed below, quasi-bailment over just a fraction of those assets. He then further concludes that "to the extent that no trust was established and a quasi-bailment was not achieved, the effect is that FTX Trading is the legal and beneficial owner of the Digital Assets and customers are merely creditors of FTX Trading (i.e., there will be a debtor-creditor relationship)": First Neuberger Declaration ¶ 66. In other words, in Lord Neuberger's view, FTX held both legal and equitable title to the assets. That gives clause 8.2.6 no work to do, and Lord Neuberger does not explain how his view can accommodate the plain words "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading," that "None of the Digital Assets in your Account are the property

of, or shall be loaned to, FTX Trading," that "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading," and that "You control the Digital Assets held in your Account".

76    If, contrary to my conclusions, clause 8.2.6 did not create a trust, then an alternative construction is available, namely that clause 8.2.6 purported to govern the parties' relationship with 3AC as quasi-bailor and FTX as quasi-bailee of the 3AC Digital Assets.  I explain this further below.

## 9.    QUASI-BAILMENT UNDER THE TERMS

77    As I have said above, in my opinion the correct characterisation of clause 8.2.6 of the Terms is that it creates a trust.  If clause 8.2.6 did not create a trust, and, on the assumption that quasi-bailment is, or were to be, a concept recognised by English law, then I believe an English Court would recognize a quasi-bailment of the 3AC Digital Assets pursuant to the Terms.

78    At ¶ 52 of the First Neuberger Declaration, Lord Neuberger posits (but dismisses) the possibility of the Terms creating a "quasi-bailment".  As Lord Neuberger accepts at ¶¶ 53 and 54, English law does not presently recognise a legal concept of a quasi-bailment.[38]  I agree.  However, as the Law Commission recognised in its review of the English law relating to digital assets, and as Lord Neuberger seems to accept, it is conceptually possible that the English law will develop to extend the principle of bailment to recognise a control-based legal proprietary interest so as to permit a quasi-bailment: see Law Commission Final Report at ¶ 7.115; First Neuberger Declaration ¶¶ 53–56.

79    Lord Neuberger described quasi-bailment as conceptually coherent and considered whether (assuming it was recognised as an English law concept) whether the Terms could give rise to a quasi-bailment of the Digital Assets transferred on to the Exchange by a customer: First Neuberger Declaration ¶¶ 56–65.

80    Lord Neuberger describes the two necessary elements of a quasi-bailment as: *first* that the parties intended to create a legal relationship whereby the bailee would obtain

---

[38]    See also Law Commission Final Report ¶ 7.98.

control of the digital assets but the bailor would have superior title; and *second* that the bailor had superior title.  I agree.

81    When those elements are analysed against clause 8.2.6, and the assumed facts in respect of 3AC's use of the Exchange, it would be possible for a court to conclude that FTX held the 3AC Assets on a quasi-bailment.  That is because:

a)    It is plain from the words of clause 8.2.6 that what was intended was that 3AC would retain title to its Digital Assets.  No clearer words could be used than those which appear in clause 8.2.6: "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading" and "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading".

b)    3AC had superior title to FTX to any asset in its account on the Exchange because it was a notional purchaser of those assets for value.  On the face of it, the terms provide that title does not pass from 3AC to FTX such that, as between 3AC and FTX, 3AC would retain superior title.  The same rationale would apply whether the assets were purchased on the Exchange or transferred on to the Exchange. What clause 8.2.6 reveals is that, however assets were obtained by 3AC, as between 3AC and FTX, 3AC had a superior interest in the assets and was capable of controlling them.

82    At ¶ 60.3 Lord Neuberger says that, for customers to retain title as a legal tenant in common in a pool when depositing their asset into a pool, one would need "to find an intention that the proprietary interest retained by the customer was only a proportionate interest in the bulk to which he has contributed".  First, I disagree that there is any difficulty in discerning that intention in clause 8.2.6.  Second, as I have said in the context of my previous discussion in relation to trusts, there is nothing conceptually problematic about identifying a share of a person's entitlement in a fungible mass, provided that the share itself is not uncertain.  The share was not uncertain because FTX maintained records of precisely the quantity of each unit of Digital Asset and fiat currency that was attributed to each customer on the Exchange.

83    If an English Court found that bailment included quasi-bailment of intangible assets, recognition of the title of a user of the Exchange to a Digital Asset would not be precluded where the Digital Assets were co-mingled or mixed.  Bailments can arise over mixed quantities of tangible assets where the goods are mixed by consent, so as to give rise to a right of co-ownership in the mixed fungible mass[39]; and the question is whether the parties so intended a bailment over the proportionate share.  Much like the Law Commission, I see no reason why the English Courts should not develop similar or equivalent reasoning for application to digital assets if the Court were developing the concept of quasi-bailment for the purpose of giving effect to the commercial arrangements and intentions of crypto-currency users.

84    At ¶ 60.4 Lord Neuberger says that if a customer were to acquire an asset from the exchange they would never obtain "the necessary degree of control" and therefore they would never "obtain legal title (superior or at all) to the digital asset" and so consequentially would be an unsecured creditor.  I disagree.  When studying the question of who has superior title, one must look at 3AC as compared to FTX.  As I have said above, clause 8.2.6 of the Terms soundly demonstrates that it was the intention of the parties that any asset acquired on the Exchange by a customer and "held in [the customer's] Account" would be treated, as between FTX and 3AC, as 3AC's asset.  I do not disagree that it is important to consider who, as between FTX and 3AC was taken to control the asset, but that too is answered by clause 8.2.6 in 3AC's favour.

85    While FTX had control of the asset in a literal sense (in that it was the only party that was in practice capable of transferring a Digital Asset on the exchange because they were stored in a wallet owned and controlled by FTX and in respect of which it maintained the private key), the "control" provided for under clause 8.2.6 should be construed as a right to request FTX to act in respect of the assets and, specifically, to require FTX to transfer the 3AC Digital Assets to 3AC (or to its order).  In practical terms, that control (if it did not give 3AC beneficial entitlement to the asset, which I have concluded it did), gave it a superior interest in the asset.  In my view, if English law were to develop the concept of a quasi-bailment and the purpose of that

---

[39]    *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101 at 113–114; *Mercer v Craven Storage* [1994] CLC 328, HL; *Glencore International v Metro Trading International* [2001] 1 Lloyd's Rep 284 at [154]-[155].  See also M Bridge, L Gullifer, K Low, G McNeel *The Law of Personal Property* (3rd. ed. 2021) [12-021].

development were to accommodate digital asset exchange structures, then an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange and that FTX held the 3AC Digital Assets as quasi-bailee.

## 10.    QUESTIONS

86    In light of the analysis set out above, I now answer the questions posed in my instructions.

87    **Question 1:** *By reference to the Terms, what title and rights (legal, beneficial, equitable and/or proprietary) did 3AC have to the 3AC Assets (as defined in ¶ 16 above) as at 12 June 2022, and what was the legal relationship between 3AC and FTX on 12 June 2022 in respect of those assets?  Is the position the same, or different, in relation to fiat currency, as opposed to digital assets, held in 3AC's Accounts as at 12 June 2022?*

88    I will deal first with my conclusions on Digital Assets.  Clause 8.2.6 is clear that 3AC is the owner of all Digital Assets associated with its Account, i.e. the 3AC Digital Assets, on the Exchange and has title to them.  For the reasons I have explained above, the reference in that clause to ownership and title are to ownership of the equitable proprietary interest in the Digital Assets and not legal title.  In summary, that is because the retention of legal title by 3AC was not possible.  Accordingly, for the clause to have meaning, it must mean ownership of the equitable proprietary interest in the assets.  Thus, what the parties agreed by clause 8.2.6 was a separation of the legal and equitable interests such that FTX held legal title in respect of the 3AC Digital Assets on trust and 3AC retained the equitable title.

89    The likely effect of clause 8.2.6 was to give rise to a trust whereby 3AC became tenant in common of the equitable interest in each shared pool of digital assets into which FTX transferred the 3AC Digital Assets, the extent of 3AC's interest being quantified by reference to its contribution to each pool.  By way of hypothetical example, if 3AC had 100 Bitcoin associated with its Account on the Exchange, which FTX held in an unsegregated pool of 1,000 Bitcoin, then 3AC would own 10% of the equitable interest in that unsegregated pool.  FTX would hold the entire pool on trust for 3AC and the other customers whose Bitcoin were stored in it.

90      In short, therefore, the effect of clause 8.2.6 in relation to the 3AC Digital Assets is that (i) the legal interest in the assets vested in FTX who held them on trust for 3AC; (ii) 3AC had a beneficial interest in the deposited assets; and (iii) the precise legal characterisation of 3AC's holding is that it is a tenant in common of the equitable interest in the shared pools of digital assets held by FTX on behalf of customers.

91      Clause 8.2.6 does not apply to fiat currency, because fiat currency is not a Digital Asset. Therefore, any fiat currency that was held on the Exchange as at 12 June 2022 was not held subject to the trust to which I have just referred.  3AC's right to recover its fiat currency deposited on the Exchange is a contractual *in personam* one.  Therefore, if at the time of FTX's bankruptcy, there were still fiat amounts standing to the credit of 3AC's Accounts on the Exchange then 3AC would have had an unsecured claim against the FTX estate in respect of those funds.

92      **Question 2:** *What right(s) to possession or control (if any) did each of 3AC and FTX have over the 3AC Assets?*

93      Dealing first with the 3AC Digital Assets, as to rights of control, clause 8.2.6 states explicitly that 3AC was the party in control of its Digital Assets.  However, FTX was the only party which was in practice capable of exercising control (being the party with the private key).  The "control" provided for under clause 8.2.6 therefore must have been a right to request FTX to act in respect of the assets and, specifically, to require FTX to transfer the 3AC Digital Assets to 3AC (or to its order).  In practical terms, in light of the trust arrangement that I have concluded came into effect by virtue of clause 8.2.6, 3AC's right was to call for FTX to take action in respect the pooled assets in respect of which 3AC had an equitable interest as tenant in common, up to the quantity of such assets that are recorded as being associated with 3AC's Account on the Exchange.

94      While, as the English common law currently stands, the concept of "possession" applies only to property that is "tangible, moveable and visible," as I have said above, I expect that the English common law will in the near future develop to allow for a concept analogous to, or a proxy for, possession of intangible property.  That development would allow further the development of a concept analogous to bailment in which holding intermediaries would acquire a control-based legal proprietary interest in assets

held, while the bailor retained superior legal title and such that, at the conclusion of the bailment, the bailor would have the power to require the bailed asset to be returned or dealt with as the bailor directed.[40]

95    It follows that the answer to Question 2 is that, on one view, no person was in "possession" (as conventionally understood) of the 3AC Digital Assets as at 12 June 2022, because those assets are intangible property and therefore possession in the conventional sense was not possible.  However, on another view, an English Court presented with this fact pattern might find that FTX was given custody of the 3AC Digital Assets in a capacity analogous to a bailee, such that FTX held a control-based legal proprietary interest in the Digital Assets, subject always to the superior title held by 3AC in a capacity analogous to that of a bailor.

96    That conclusion is, I think, sound, because the relationship between FTX and 3AC, both under the Terms and practically, reveals that 3AC held a superior interest in the 3AC Digital Assets.  At all times prior to 12 June 2022, 3AC held the right to control the 3AC Digital Assets in its Account insofar as it could request of FTX, pursuant to clause 8.2.6, that FTX act in respect of the assets in the way 3AC directed and, specifically, to require FTX to transfer those assets to 3AC (or to 3AC's order).  At a minimum, it had a better right to control of those assets than FTX because subject to my response to Question 4 below, FTX had no right to control the 3AC Assets (whether digital or fiat) save in accordance with 3AC's instructions.

97    As to fiat currency, the rights of 3AC to have returned to it the amounts standing to its credit on the Exchange were contractual; that is they were personal as opposed to proprietary rights.  It had neither rights of possession nor control in respect of fiat currency because it had no proprietary interest in fiat currency.

98    **Question 3:** *Do the provisions of the Terms support a contention that the extent of 3AC's rights (if any) over the 3AC Assets is limited to a single net figure arrived at by deducting from the value of the 3AC Assets the amount of any liabilities owed by 3AC to FTX?*

---

[40]    Law Commission Final Report ¶¶ 3.30, 7.97.

99    The starting point is that English law treats assets and liabilities as existing separately. The parties may expressly or impliedly agree a different position (for example, set-off rights). Therefore, whether FTX was entitled to combine or reduce the respective asset and liability positions on 3AC's Accounts into a single net sum, such that a single figure comprised 3AC's rights against it, depends on whether there was any provision in the Terms (or that arises by implication from them) that would entitle it to do so.

100    In my opinion there is no such provision.

101    That is, not only is there no term on the face of the document to this effect; but a construction of the Terms as a whole supports the construction that the parties did not intend that a single figure sum comprised the whole of 3AC's rights against FTX (the so called "single asset theory").

102    *First,* the Terms clearly contemplate that the customer can deal with its assets. For example, clause 8.2.6(C) permits a user to withdraw its Digital Assets from its account at any time. An embedded assumption in clause 7.4 is that the customer can buy and sell its Assets. Clauses 8.2.9 and 8.2.10 contemplate the customer's ability to "send[]" and to "elect to transfer" its Digital Assets from its Account to a third-party wallet address. It was of course also possible for the customer to lend its assets (Digital Assets, fiat currency and e-money) to other users. It is difficult to reconcile those provisions with the single asset theory because they all rely on the assumption that the customer was entitled to deal with its assets without regard to the net balance on its account.

103    *Second*, is clause 10, which contains the terms relating to what FTX is entitled to do if the customer has a "debit balance" on its account. Clause 10 is aimed at allowing FTX to manage its exposure (either directly or via other users) to the customer where the customer's trading account has fallen into debit. Where there is a negative balance, fees and charges become payable (clause 10.1), FTX can suspend the services (clause 10.2) and it can, if it follows the procedures in clause 10.3, liquidate the customer's assets and apply those liquidation amounts against the negative balance (clause 10.3.1).

104    The only coherent interpretation of the words "debit balance" in that clause are to a negative USD (i.e. trading) balance. That is because if debit balance meant overall debit balance (i.e. the single asset theory), there would be no use in liquidating the Assets as described in clause 10.3.1 because that could not effect any reduction of the

debit balance; it would just change one asset type into another.  Clause 10.3.1 can only work if the Assets on a customer's account are held separately from its liabilities.

105   *Third*, clause 16.2, which deals with margin trading, likewise contemplates the separate existence of Assets.  That provision enables FTX to "seize and/or liquidate any or all of your positions and Assets" when the account falls below the "margin maintenance requirement" or is in "danger of defaulting".  As with clause 10.3.1, and for the same reasons, that provision only works if the customers' Assets were treated as being held separately from their liabilities.

106   *Fourth*, the Terms contain a unilateral right of set-off in favour of FTX (clause 38.7.2). I have been instructed that FTX did not purport to exercise its right under clause 38.7.2. Before any set-off right is exercised, such right is not effective, and so did not reduce these two obligations into one. In fact, the existence of this contractual set-off right confirms that before it is exercised, there are in fact two obligations.  It would be entirely meaningless if there were not separate obligations because there would be nothing to set-off.  The fact that the right of set-off was unilateral suggests that this is an outcome that FTX would have wished to avoid because it wished to reserve to itself the ability to choose which amounts were subject to the set off (that is, only amounts payable by FTX to the customer and not amounts payable by the customer to FTX).

107   *Fifth,* banker's set-off, also described as the right of combination, is not available to FTX in support of the "single asset theory".  First, the right of banker's set-off only extends to obligations owing to a bank in its capacity as banker; as opposed to debts to it as the result of carrying on some other type of business.  There is nothing about FTX's role under the Terms that put it in the position of banker vis a vis the customers.  Second, the banker's right of set-off does not exist where the accounts are not held in the same capacity or where there is an expressed or implied agreement to keep them separate.[41] Even if one were to reject my conclusion that clause 8.2.6 creates a trust, it unequivocally demonstrates an intention of the parties that 3AC's trading and asset accounts on the Exchange be kept separate from one another.  That is sufficient to exclude the operation of banker's set-off where it might otherwise arise.  Third,

---

41      Paget's Law of Banking 14th ed. [14.28].

cryptocurrency is not money, but property.  It is not capable of being set-off against other accounts in the way that would occur through the combination of accounts.

108    Therefore, my answer to Question 3 is that 3AC's rights over its assets are not limited to the net position of the assets after accounting for 3AC's liabilities incurred via the FTX Exchange.  3AC is entitled to recover its assets from the Exchange and, separately, FTX would have a personal claim against 3AC in respect of liabilities owed by 3AC to FTX under the Terms.  Presumably, for that reason, FTX would be entitled to file a claim in 3AC's liquidation in respect of such liabilities.  If 3AC owed money liabilities to other users on the Exchange, as distinct from FTX, then I assume that those users would be entitled to file a claim in 3AC's liquidation.

109    My answer to this question does not depend on 3AC having a proprietary interest in the 3AC Assets.  Therefore, even if, contrary to my primary conclusions, 3AC did not have a proprietary interest in the assets held by FTX as a trustee, my answer to Question 3 would be the same.

110    **Question 4:** *If FTX had carried out or allowed an action(s) that resulted in the sale, transfer, or liquidation of some or all of the 3AC Assets between 12 June and 14 June 2022, would the Terms have authorised such an action(s)?  If not, what claim(s) under English law would 3AC have against FTX (if any) in relation to the wrongful loss of its interest in those assets as a result?*

111    The Terms provide no general authorisation to FTX to appropriate assets other than in narrow circumstances under which FTX could do so, namely those set out in clauses 10 and 16.2.

112    Clause 10 is concerned with a situation where 3AC's Account has a debit balance; it provides that, in those circumstances, a customer agrees to pay applicable fees, the amount of the debit balance, and "such other amounts specified in the Terms".  In order to exercise rights under that clause in relation to 3AC, the following prerequisites would all need to be met: (i) 3AC's Account would have to have a "debit balance" (which, as I said in ¶ 104 above, as a matter of ordinary language, means that the total value of the U.S. Dollar balance associated with the Account would need to be less than zero) (clause 10.1); (ii) 3AC would have to have failed to pay to FTX the applicable fees, total debit balance and "other amounts specified in the Terms" (clause 10.2); and

(iii) FTX would have to have made a demand to 3AC to make good the shortfall and, despite that demand, 3AC would have to have failed to make payment "of the outstanding debit balance by the time stated in the demand". If, and only if, all of those pre-conditions were met, would FTX have the right to "sell any Digital Assets… in your Account to recover the outstanding debit balance" (clause 10.3.1) and 3AC would be liable under an indemnity to make whole the losses suffered by FTX, including legal and compliance costs: clauses 10.3.2 and 10.3.3.

113   In addition to establishing these prerequisites, in order to rely on clause 10 in relation to the transactions referred to in the question, FTX would have to establish that the assets at issue were all appropriated for the purposes of increasing the value of the Account to zero and covering any applicable fees or other amounts that FTX was lawfully entitled to charge under the Terms. If FTX appropriated any of the 3AC Digital Assets for any other purpose, or if the pre-requisites were not met, then the clause has no application or relevance.

114   Clause 16 is concerned with margin trading. It gave FTX the right to seize or liquidate assets if it determined that an Account "appear[ed] to be in danger of defaulting on a loan", or if the assets associated with the customer's Account fell below the margin maintenance requirement. However, there is an important limit to what was otherwise a wide power: it could be exercised only for the purposes of "reduc[ing] your leverage or settl[ing] debts to other Users". Thus clause 16 did not give FTX a right to liquidate assets for the purposes of settling debts that it considered 3AC may have owed to FTX.

115   In summary, therefore, whilst there were narrow circumstances in which the Terms authorised FTX to appropriate assets, there was no general authorisation to do so. On the contrary, the clear position as set out in clause 8.2.6 is that the 3AC Digital Assets "shall not transfer to FTX" (clause 8.2.6(A)), that none of the assets "are the property of … FTX" (clause 8.2.6(B)), and that the assets were under 3AC's control (clause 8.2.6(C)). That is true irrespective of whether clause 8.2.6 created a trust over the 3AC Digital Assets. In other words, regardless of whether my interpretation of clause 8.2.6 is correct, the Terms do not authorize FTX to appropriate assets outside the narrow circumstances of clauses 10 and 16.2.

116    Regardless of whether I am correct as to how clause 8.2.6 should be interpreted as to ownership and proprietary equitable interests, if FTX had appropriated the digital assets associated with 3AC's Account without authorisation, that would have amounted to a breach of clause 8.2.6, because FTX would have been acting contrary to the express agreement as to how such digital assets should be treated. If I am correct as to how clause 8.2.6 should be interpreted, then FTX's act in appropriating the assets would also have been a breach of trust because FTX would not have been dealing with the assets for the beneficiaries, but rather for itself and would not have been dealing with them in accordance with the powers granted to it as trustee by the Terms.

117    **Question 5:** *To the extent that FTX's conduct deprived 3AC of, or removed, 3AC's ownership rights (if any) to, the 3AC Assets (both in respect of digital assets and fiat currency), would such conduct by FTX give rise to, against FTX, a breach of contract claim, a claim in restitution, a claim in conversion, a breach of trust claim, and/or a breach of fiduciary duty claim?*

118    If, as a result of an act or omission by FTX, 3AC was deprived of its ownership rights in respect of the 3AC Digital Assets, (i.e. contrary to my view that its equitable proprietary interest in respect of those assets was preserved), then FTX is in breach of clause 8.2.6 of the Terms, as FTX has not done what it contracted to do, and 3AC has a claim against FTX for breach of contract. If I am right that FTX received the 3AC Digital Assets as trustee (because depositing and purchasing assets on the Exchange necessarily entailed a separation of legal and beneficial title) and an act or omission of FTX has resulted in 3AC losing its beneficial title, e.g. as a result of sweeping the 3AC Digital Assets from the deposit address into a pool or multiple pools, FTX also acted in breach of trust. If the consequence of the breach is that 3AC is taken to have only an *in personam* right against FTX for recovery of the assets, then I consider that 3AC would have claims based upon one or more of breach of contract or breach of trust. 3AC may also have a claim in restitution.

119    **Question 6(a):** *Assuming your answer to Question 5 is "yes," under English law and the Terms, what remedies would be available to 3AC for such a breach?*

120    First, I set out some of the applicable legal concepts.

(i) the claimant cannot recover losses that they could have avoided by taking reasonable steps; (ii) the claimant can recover losses that at the time of contracting (and on the assumption that the parties actually foresaw the breach in question) were within their reasonable contemplation as a not unlikely result of that breach[42] and were not losses for which the defendant could not reasonably have been regarded as assuming responsibility.[43]

122    The right of contracting parties to claim damages for breach of contract can be excluded by the parties in their contract.  Exclusion clauses are construed following the principles applicable in contracts generally.[44]    The words used, commercial sense, and the documentary and factual context, are, and should be, normally enough to determine the meaning of a contractual provision.[45]    Practically, that means that if a clause is expressed clearly and unambiguously, there is no justification for placing upon the language of the clause a strained or artificial meaning so as to avoid the exclusion. However, the clause must also be construed in the context of the contract as a whole, in a way that is consistent with business common sense and which would not defeat the commercial object of the contract.  Additionally:

a)    a party affected by an exclusion clause is bound by the clause if the party tendering the document has done what may be reasonably considered to give notice of the clause to the persons of the class to which they belong.[46]

b)    the more extreme the consequences are, in terms of excluding or modifying the liability that would otherwise arise, then the more stringent the court's approach should be in requiring that the exclusion or limit should be clearly and unambiguously expressed.[47]

---

[42]    *Hadley v Baxendale* (1854) 9 Ex 341; *Victoria Laundry (Windsor) Ltd v Newman Industries Ltd* [1949] 2 K.B. 528; and *Koufos v C Czarnikow Ltd (The Heron II)* [1969] 1 AC 350.

[43]    *Transfield Shipping Inv v Mercartor Shipping Inv (The Achilleas)* [2008] UKHL 48, [2009] 1 A.C. 61.

[44]    *Scottish Power UK Plc v BP Exploration Operating Co Ltd* [2016] EWCA Civ 1043 at [28] - [29].

[45]    *K/S Victoria Street v House of Fraser (Stores Management) Ltd & ors* [2011] EWCA Civ 904 at [68].

[46]    Chitty on Contract, 35th ed. [18-002].

[47]    *BHP Petroleum Limited v British Steel PLC* [2000] 2 Lloyd's Rep 277 cited in *Soteria Insurance Limited v IBM United Kingdom Limited* [2022] EWCA Civ 440 at [37].

c) a "strict" approach to interpretation should also be taken to the construction of terms "… where they seek to prevent a liability from arising by removing, through a subsidiary provision, part of the benefit which it appears to have been the purpose of the contract to provide.  The vice of a clause of that kind is that it can have a propensity to mislead, unless its language is sufficiently plain.  All that said, words of exception may be simply a way of delineating the scope of the primary obligation."[48]

123    A party who has suffered from its counterparty's breach of contract may pursue a restitutionary remedy instead of a contractual remedy for a breach of contract where (i) the breach is cynical and deliberately calculated to make gains; and (ii) normal compensatory damages are inadequate, in the sense that difficulties of assessment or bars to the recovery of certain types of damages mean that compensatory damages will not put the claimant into as good a position as if the contract had been performed.[49]

124    A claimant can bring a claim in **unjust enrichment** as an alternative to the contract claim where the defendant has been enriched at the expense of the claimant in circumstances that are unjust.[50]  Restitution can be available either in the form of a personal restitutionary claim (an order for the payment of a sum of money which will have the effect of reversing the defendant's unjust enrichment) or a proprietary restitutionary claim (a declaration that the defendant holds certain property on trust for the claim, or that that the property is impressed with a lien to secure the defendant's restitutionary obligation).[51]  The latter requires that the claimant can specify the property in respect of which their interest lies, by tracing or otherwise.

125    A **breach of trust** will occur where there has been a defalcation by the trustee (that is, the unauthorised payment of money from a trust fund into the trustee's hands or for its benefit).  A **breach of fiduciary duty** is a type of breach of trust, which would occur if a trustee appropriated to itself, in a manner unauthorised, assets of a beneficiary.  The

---

[48]    *Impact Funding Solutions Ltd v Barrington Support Services Ltd (formerly Lawyers at Work Ltd)* [2016] UKSC 57, [2017] A.C. 73 at [35].

[49]    *Attorney General v Blake* [2001] 1 AC 268, *Esso Petroleum Co Ltd v Niad* [2001] All ER (D) 324 (Nov). See discussion in A. Burrows (2019) *Remedies for torts, breach of contract and equitable wrongs*, 4th ed. (**Burrows' Remedies**), p 359.

[50]    *Samsoondar v Capital Insurance Co Ltd* [2020] UKPC 33 at [18]; **Goff & Jones** on Unjust Enrichment (10th ed.) [1-08] and [1-14].

[51]    See for example *Portman Building Society v Hamlyn Taylor Neck (A Firm)* [1998] 4 All E.R. 202 at 205; *Navier v Leicester* [2002] EWHC 2596 (Ch) at [21] and the discussion in Goff & Jones at [1-44].

remedy of the beneficiary for a breach of trust is to equitable compensation or an account of profits. The aim of equitable compensation is to compensate for loss sustained by reason of an equitable wrong and it is concerned with putting the claimant in as good as a position as if no wrong had occurred. The extent to which a beneficiary may recover against a trustee for breach of trust can be limited by the trust document, however a trustee or fiduciary cannot exempt themselves from liability for fraud, bad faith or wilful default. Wilful default in this context means a deliberate breach of trust.[52]

*FTX failed to preserve 3AC's proprietary interest*

126   I have described above why I consider both that the Terms permitted commingling in an omnibus trust account (see ¶¶ 61 and 75 above) and that FTX promised that 3AC would have a proprietary interest in the Digital Assets (see ¶ 88 above). FTX had control over the operation of the Exchange and how any commingling occurred. FTX was therefore required to conduct any commingling in a way that satisfied its promise to maintain 3AC's proprietary interest. If instead, FTX conducted commingling in a way that destroyed that proprietary interest, it breached both its obligations under its contract and its duties as trustee. I assume in this section that, by consequence of such a breach, 3AC lost its equitable proprietary interest in the 3AC Assets and that the 3AC Assets came to form part of FTX's assets beneficially held and therefore part of the Chapter 11 Bankruptcy estate of FTX.

127   On those assumptions, the breach is both a breach of contract and a breach of trust. 3AC could bring an action against FTX for breach of trust and it is entitled to recover from FTX as equitable compensation the amount that would put it in the position it would have been in, but for the breach. A similar result can be arrived at through a breach of contract analysis, provided the claim would not be barred by the exclusion provision contained in clause 30.2 of the Terms (as I conclude below).

128   3AC could also bring a claim in unjust enrichment because the effect of the destruction of 3AC's proprietary rights was that the assets came to form part of FTX's general asset pool. The claim would be a personal restitutionary claim (an order for the payment of a sum of money which would have the effect of reversing the defendant's unjust

---

[52]   *Armitage v Nurse* [1998] Ch. 241 252 A-G.

enrichment) because, assuming the former 3AC Assets have been sold or lost, it is not possible to obtain a declaration that FTX holds the 3AC Assets on trust.

129    If an English Court (contrary to my conclusions above) were not to accept that clause 8.2.6 gave rise to a trust, but instead found that digital assets were capable of possession and that FTX held them on a quasi-bailment, then, implied in that conclusion, is that 3AC and the other customers agreed to their Digital Assets being held in a mixed fund. Moreover, even in circumstances where the mixing of the goods (or here the digital assets) subject to a bailment is non-consensual, nonetheless the quasi-bailees would be held to be tenants in common.[53]   In that scenario, commingling would not be a breach; but, by appropriating the assets to itself, FTX committed conversion or an analogous tort.   The remedy would therefore be either a declaration that 3AC had a proprietary interest in a proportionate part and for 3AC to be restored to the position it would have been in had the wrongful misappropriation not occurred[54]; or an order for damages in the amount of the actual sale price of the assets, or the market value of the goods at the time of the sale (if they were sold at an undervalue[55]), as well as any special loss flowing naturally and directly from the wrong.[56]

130    As with my analysis in respect of the commingled trust, it is not fatal to the preservation of a proprietary interest in bailed goods that the goods are commingled.   If a bailor deposits goods with a bailee who commingles the goods with the goods of its other clients in a mixed bulk such that the original identity of a customer's assets is lost, but the bailment was intended to entitle customers to the redelivery of an asset, or its fungible equivalent, then the customers would be taken to own the mixed bulk, with each depositor becoming an owner in proportion to the amount of his contribution.[57] As goods were added or removed from the bulk then the interests of the contributors would vary to reflect the quantity of goods held to their order.[58]   In those circumstances no title passes to the bailee.   So if the bailee were, in those circumstances, to appropriate

---

[53]    *Indian Oil Corp Ltd v Greenstone Shipping Co SA (The Ypatianna)* [1988] QB 345 at 370–71 per Staughton J.
[54]    *Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25.
[55]    See Burrows' Remedies at p 340.
[56]    *Kuwait Airways Corp v Iraqi Airways Co and another* [2002] UKHL 19.
[57]    *Glencore International AG v Metro Trading International Inc & ors* [2001] CLC 1,732 at 1,777; see also *Mercer v Craven Grain Storage Ltd* [1994] CLC 328.
[58]    *Glencore* at 1,777B.

any of portion of the mixed bulk to itself, the bailor would have a claim in conversion against the bailee.

*The FTX Liquidations violated clause 8.2.6*

131   I am instructed that FTX was responsible for the FTX Liquidations.  I consider those liquidations now as possible bases for a claim for breach of trust and/or contract.

132   According to Mr Coverick, the FTX Liquidations had the effect of, from the perspective of 3AC, exchanging $82 million worth of Digital Assets for $82 million in fiat currency. Assuming, as I have concluded, that the 3AC Assets were held by FTX on trust, the legal effect of the FTX Liquidations was to remove $82 million worth of the 3AC Digital Assets from the trust and appropriate them to itself, and to create an *in personam* claim for 3AC against FTX in relation to $82 million of fiat currency.  Based on those assumptions, the FTX Liquidations were a breach of trust because:

a)   FTX held the 3AC Assets on trust for 3AC.  It was a bare trust and 3AC retained rights of control to the sale or withdrawal of those assets: clause 8.2.6(C). Therefore, absent 3AC's consent (which I am instructed was not given), or the engagement of one of the narrow derogations from the terms that permitted FTX to deal with the assets (that I described in my answer to Question 4), FTX was not entitled to liquidate the assets.

b)   FTX made no prior demand for repayment, and therefore the liquidation rights in clause 10.3 of the Terms were not engaged.

c)   The FTX Liquidations had the effect of moving the 3AC Digital Assets outside of the trust and destroying 3AC's proprietary interest in the assets, appropriating the assets to FTX and replacing 3AC's interest with an *in personam* claim only to the value of $82 million fiat currency.

133   The FTX Liquidations were also a breach of contract because the liquidations were not, in the circumstances, permitted by the Terms.

134   3AC is therefore entitled to be put back into the position it was in prior to the breach of trust through equitable compensation or an account of profits or by the payment of

damages for breach of contract.  The former two remedies would be proprietary claims which would take priority over the unsecured creditors in the Chapter 11 Proceedings.

**Question 6(b):** *Additionally, assume that the 3AC Joint Liquidators have no claim against FTX for receiving an unfair preference under the (BVI) Insolvency Act 2003 and the only reason that they do not have that claim is because FTX's breach of the Terms caused 3AC not to have an equitable proprietary interest in the 3AC Assets.  Can the loss of an unfair preference claim form part of the damages recoverable by 3AC from FTX for its breach of the Terms?*

135     The starting point is that, if FTX had not breached the Terms, 3AC would have had an equitable proprietary interest in the Digital Assets.  I am asked to assume that this deprivation of a proprietary interest would be found to prevent the 3AC Joint Liquidators from prevailing in an unfair preference claim against FTX.

136     The loss to the estate by reason of FTX's breach, therefore, is equivalent to whatever would have been the benefit to the estate of the Joint Liquidators' claim for a preference.  In my view, that amount would be recoverable as equitable compensation for breach of trust by 3AC, because the loss to the estate flows directly from the equitable wrong committed by FTX as trustee of the 3AC Assets.  If an English Court found that FTX held the 3AC Digital Assets on trust or, alternatively, as quasi-bailee for 3AC, the equitable wrong was FTX's misappropriation of the 3AC Digital Assets to itself, either by failing to hold those assets and/or by treating them in a way that destroyed 3AC's proprietary interest.

137     If (contrary to my primary analysis that FTX acted as trustee and to my secondary analysis that FTX held the 3AC Digital Assets as quasi-bailee for 3AC as quasi-bailor), an English Court found that no trust or quasi-bailment arose, the loss would still be recoverable as damages for breach of contract.  That is because what was promised by FTX to 3AC was Digital Assets that would belong to 3AC, whose ownership would never transfer to FTX.  In breach of that covenant, FTX never gave 3AC its promised proprietary interest in those assets and instead appropriated the assets to itself.  I have been told to assume that the fact it was never given a proprietary interest in the Digital Assets destroyed the 3AC estate's ability, in an insolvency, to recover as a preference the proceeds that were "paid" by 3AC to FTX.

138    While the preference claim is one that, strictly speaking, belongs to the Joint Liquidators, because it arises under the (BVI) Insolvency Act 2003, that does not affect my conclusion as a matter of English law.  That is because the claim is for the benefit of the body of creditors of the company, in this case 3AC, for the purposes of restoring the estate to the position it would have been in but for the preferential action.  It would be a perverse outcome if a trustee and creditor could, by breaching its terms of trust and its contract, deplete the estate of its assets and then use that breach as the excuse for why it could avoid the effect of the statutory preference regime.  That outcome would leave the estate without a remedy for a wrong and in my view, the loss would be recoverable by an award of damages, equitable compensation or restitution.

139    Additionally, 3AC has a claim in unjust enrichment, on the basis that FTX's conduct has resulted in FTX obtaining a better result from a hypothetical liquidation of 3AC than it would have done but for its breach of the contract.  That enrichment has come at the expense of 3AC, first, because FTX removed from 3AC its proprietary equitable interest in the assets and, second, because it put FTX in a better position as a creditor of 3AC than it would have been in but for the breach.

*No exclusion of breach of trust by the Terms*

140    In my opinion none of the breach of trust claims discussed above are excluded by the exclusion clause in the Terms.

141    Clause 30 deals with the limitation of FTX's liability and that of its associated entity. Clauses 30.2–30.5 are each subject to clause 30.1, which makes clear the drafter's intention that nothing in the terms is intended to attempt to exclude liability that cannot at law be excluded.  Clause 30.2 is expressly subject to clause 30.1 and contains the operative exclusion provision (to which I will return); clause 30.3 deals with exclusion of liability for the actions of third-party intermediaries; clause 30.4 contains provisions relating to the exclusion of implied warranties concerning the merchantability of the services provided; clause 30.5 is also expressly subject to clause 30.1 and relates to loss arising from the use of the Services.

142    Clause 30.2 purports to exclude FTX and "any other indemnified party" from liability "in contract, tort (including negligence), equity, statute or any other cause arising out of or in connection with the Terms".  It describes the breadth of the exclusion of

damages and purports to exclude (inter alia) losses of profit, indirect and consequential loss or damage.

143    Clause 8 of the Terms (and in particular clause 8.2.6) sets out the rights and obligations of 3AC and FTX when it comes to FTX's custodial functions as holder of the Digital Assets.  The basic duty of a trustee, in relation to the custody of trust property, is to keep it safe, not to imperil it and to prioritise the interests of the beneficiary above its own.  The purpose of clause 8.2.6 is to make clear FTX's intention to take on those obligations as trustee.  If, as here, FTX misappropriated the assets (either by mixing them with the assets of others or by selling them without consent), that violates the very basis of the trustee-beneficiary relationship.

144    Clause 8 (the clause creating the trust) does not purport to exclude the scope of FTX's liability as trustee.  The better reading of clause 8 is that it contains all of the provisions relevant to the trustee relationship in circumstances where other provisions of the document deal with FTX's role in other capacities, such as being the service provider of the Exchange, which is an entirely different capacity from the capacity in which it acts under clause 8.  Therefore, in my opinion, the better interpretation is that the exclusion provisions in clause 30 do not apply at all to any claim against FTX as trustee.

145    If, contrary to that conclusion, clause 30 does have a role to play in determining the ambit of claims which can be brought against FTX as trustee, the clause does not exclude any claim for a breach such as described above namely one of (effectively) misappropriating the trust assets.  That is because clause 30.2 cannot be construed as purporting to exclude a claim for fraud, bad faith or misappropriation against FTX as trustee, because:

a)    "The duty or liability of a trustee under the general law can only be excluded by clear and ambiguous words. The court construes the exemption clause restrictively. Anything not clearly within it is treated as falling outside it."; see Snell's Equity, 35th edition (2025) at paragraph 30 – 025 and cases there cited at fn. 115.

In my opinion, clause 30.2 does not suggest on its construction, or merely by use of the word "EQUITY", that FTX's obligations as trustee in relation to the preservation of 3AC's equitable ownership of the 3AC Assets are being excluded.

b)  In any event, even "a clearly worded clause may not be applied according to its terms if it exceeds the permitted range of exclusion. A trustee owes an irreducible core of duties that cannot be excluded if the transaction between himself [and the settlor] is to be recognised as a trust."[59]

So, for example, liability cannot be excluded as a matter of law for loss or damage resulting from a trustee's actual fraud[60], which is understood in this context to mean dishonesty in the sense of conduct falling below the objective standard of an ordinary honest trustee[61].  In the present context the irreducible core of FTX's liability as trustee under the Terms was to respect and preserve 3AC's equitable ownership in the 3AC Assets and not to misappropriate them. It follows that, in my opinion, any attempt to exclude liability for breach of that obligation would be contrary to law, and therefore ineffective.

c)  In this context I am instructed to assume that the commingling of the 3AC Assets was not negligent, but rather a deliberate act on the part of FTX and one it did, knowing its obligation to keep safe 3AC's equitable proprietary interest in its assets. On that basis, in my opinion, 3AC's claim for breach of that obligation would not be capable as a matter of law of being excluded under clause 30.2.

d)  Likewise, I am instructed to assume that the FTX Liquidations were a wilful act that took place at a time when it appeared to FTX that it would have been in FTX's best interests to minimise its exposure to 3AC; and that the FTX Liquidations cannot be construed as anything other than actions taken by FTX in protection of its own interests and in wilful disregard of its obligations to keep safe the 3AC Assets. Again, on that basis, in my opinion, 3AC's claim for breach of that obligation would not be capable as a matter of law of being excluded under clause 30.2.

**Question 7**: *What is the nature of 3AC's interest in the Futures Contracts?*

146  "Futures Contracts" are defined in Schedule 5 of the Terms as including "Quarterly Futures Contracts" and "Perpetual Futures Contracts".  Quarterly Futures Contracts

---

[59] See Snell's Equity, at 30 – 026.
[60] *Armitage v Nurse* [1998] Ch. 241.
[61] See Snell's Equity, at 30 – 026.

"represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date…" and Perpetual Futures Contracts "represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open…". Quarterly Futures Contracts had an expiry date, whereas Perpetual Futures Contracts did not.

147     Futures Contracts were capable of being traded on the "Futures Market" hosted by FTX Digital Markets Limited (**FTX DM**).  To trade in Futures Contracts, the user posted "collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin" and the contracts were settled in stablecoin, rather than by delivery of the underlying Digital Asset.  FTX DM retained the right to liquidate the user's open positions on their Futures Contracts (that is; by drawing from their collateral pool to the extent their positions were out of the money) if markets moved materially against them.

148     Schedule 5 to the Terms contained a right for FTX DM to take "any measures in their sole discretion" in relation to open positions, provided those steps were "for the purposes of mitigating potential losses to you, other users, and the service provider and its affiliates".  Examples of the steps it could take included "forced position reduction and liquidation under market volatility".

149     I have not been provided with any particular Futures Contracts or their standardised terms and I have been instructed to assume, generally, that: (i) 3AC was the counterparty to a number of Futures Contracts at the time of its insolvency; and (ii) each Futures Contract was not a "tokenised futures contract" as referred to in the definition of "Digital Assets" in the Terms.

150     By reference to the Terms only it appears that Futures Contracts were derivative contracts that could be owned and traded in the way of typical futures contracts.  3AC's rights under the Futures Contracts were its choses in action and its personal property.[62] 3AC had a proprietary interest in the chose(s) in action arising from the Futures Contracts.

---

[62]     *Torkington v Magee* [1902] 2 KB 427, at 430.

## 11.    DECLARATION

151    Pursuant to 28 U.S.C. s 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Executed in London, United Kingdom, on 21 October 2025,

Right Honourable Dame Elizabeth Gloster DBE

## ANNEX 1

### Summary of Professional Experience

### The Rt. Hon. Dame Elizabeth Gloster DBE

1       Dame Elizabeth Gloster DBE practised as a commercial and Chancery QC at One Essex Court, Temple, London, EC4Y 9AR, from 1991 until 2004, before accepting an appointment as a High Court judge, becoming the first woman to be appointed a judge of the Commercial Court in 2004. From 1973 to 1991 she practised as a junior barrister and subsequently a QC, at both Chancery and commercial Chambers. She was Judge in Charge of the Commercial Court from 2010-2012. She was appointed to the Court of Appeal in 2013 and became Vice-President of the Civil Division of that Court in 2016. Dame Elizabeth retired from the Court of Appeal in 2018 and since then has practised full time as an arbitrator, expert in English law and strategic adviser from One Essex Court.

2       Dame Elizabeth is a Judge of the Abu Dhabi Global Market Courts and a Justice of the Court of Appeal of Bermuda (both part-time appointments). She is one of 25 persons listed as willing and able to serve as a member of an arbitration panel under the Agreement between the European Union and the United Kingdom relating to the UK's Withdrawal from the European Union and the European Atomic Energy Community. In November 2020, having been appointed on the instructions of HM Treasury, she produced her independent investigation's report into the Financial Conduct Authority's regulation of London Capital & Finance plc. In July 2021 she was appointed to the ICC International Court of Arbitration as an alternate member for the UK. With effect from 1 September 2023, Dame Elizabeth was appointed by the Master of the Rolls, on the advice of an independent selection panel, to serve as a Deputy Chair of the Takeover Appeal Board.

3       As a High Court Judge, Dame Elizabeth presided over numerous important commercial and financial markets cases, including *JP Morgan Chase Bank v Springwell Navigation Corporation*, *Masri v Consolidated Contractors International* and the

notable *Berezovsky v Abramovich* trial. Many of her cases involved consideration of complex contractual issues and equitable principles.

4    As a Lady Justice in the Court of Appeal, Dame Elizabeth sat on numerous important commercial and financial cases, ranging from capital markets, arbitration, shipping, gas and oil, insurance, tax, and insolvency to LIBOR fixing. These included *LBG Capital No. 1 Plc v BNY Mellon Corporate Services Limited*, *Burlington Loan Management Ltd & Ors v Lomas & Ors* (a Lehman case), *Ukraine v The Law Debenture Trust Corporation Plc*, *British Airways Plc v Emerald Supplies Limited & Ors*, and *Gard Marine v China National Chartering Co. Ltd*. As in the Commercial Court, many of her cases involved consideration of complex contractual issues and equitable principles.

5    Dame Elizabeth has been appointed both as chair and co-arbitrator in a large number and wide range of international arbitrations including insurance/reinsurance, shipping, banking, gas and oil, electricity pricing, construction, joint venture and investment disputes. She was awarded Senior Arbitrator of the Year at the Legal 500 Bar Awards 2023 and again in 2025. She has also acted as an expert in English law in a number of cases, as well as a strategic adviser in connection with various Court cases and arbitrations.

**ANNEX 2**

**Curriculum Vitae**



# CURRICULUM VITAE

# THE RT HON DAME ELIZABETH GLOSTER DBE, PC

**Date of birth**         5 June 1949

**Education**

**1967-1970**         Girton College, Cambridge BA Hons (Law)

**1963-1967**         Roedean School, Brighton

**Other academic qualifications**

**2011**         Girton College, Cambridge, Honorary Fellow

**2007**         Harris Manchester College, Oxford, Honorary Fellow

**Arbitral career**         Since retiring from the Court of Appeal in June 2018, Liz has practised as an international arbitrator from the Chambers of Lord Grabiner QC, One Essex Court, Temple, London EC4 9AR; the link to her Chambers website is attached http://www.oeclaw.co.uk/barristers/profile/the-rt-hon-dame-elizabeth-gloster-dbe-pc

Liz has been appointed both as chair and co-arbitrator in a wide range of international commercial and state investment disputes, including numerous ICC, LCIA, DIFC, PCA, UNCITRAL, ad hoc and other arbitrations; Liz has extensive experience in complex commercial and

corporate disputes, including (but not limited to), financial markets, derivatives, banking, joint venture and investment disputes, insurance/reinsurance, gas and oil, electricity and construction and insolvency.

**Career as expert and adviser**

Liz also acts as an expert in English law and as a strategic adviser. As an expert, she has given expert evidence on a number of issues in relation to foreign proceedings. She has been appointed as a strategic adviser to clients in relation to proceedings in the Commercial Court, Court of Appeal and the Supreme Court as well as in relation to arbitration proceedings. She is, and has been, a member of litigation committees in relation to class actions in the Commercial Court, the Competiton Appeal Tribunal and the Dutch Courts.

**Other**

Liz is one of 25 persons listed by the UK Goveernment as willing and able to serve as a member of an arbitration panel under the Agreement between the European Union and the United Kingdom relating to the UK's Withdrawal from the European Union and the European Atomic Energy Community.

In November 2020, following her appointment by the Financial Conduct Authority, on the direction of HM Treasury, she produced her independent investigation's report into the Financial Conduct Authority's regulation of London Capital & Finance plc Report of the Independent Investigation

In July 2021 she was appointed to the ICC International Court of Arbitration as an alternate member for the UK.

With effect from 1 September 2023, Liz was appointed by the Master of the Rolls to serve as a Deputy Chair of the Takeover Appeal Board which is an independent body which hears appeals against rulings of the Hearings Committee of the Takeover Panel.

In 2024 Liz was appointed a member of the University of Oxford Appeal Court.

She was awarded Senior Arbitrator of the Year at the Legal 500 Bar Awards 2023 and again in 2025.

**Current Judicial appointments**

| | |
|---|---|
| **2018-** | Judge of the Abu Dhabi Global Market Courts (part time appointment) |
| **March 2019 -** | Justice of the Court of Appeal in Bermuda (part time appointment) |

**Previous Judicial appointments/responsibilities**

| | |
|---|---|
| **2016-2018** | Vice-President of the Court of Appeal of England and Wales, Civil Division |
| **2016-2018** | England and Wales member of the international Judicial Insolvency Network (JIN); attended the judicial cross-border insolvency conference in Singapore in 2016, which established the network and judicial co-operation guidelines |
| **2013-2018** | Lady Justice of Appeal, Court of Appeal of England and Wales, appointed Privy Counsellor |
| **2010-2012** | Judge in charge of the Commercial Court |
| **2010-2012** | Judge in charge of the Mercantile Courts |
| **2004-2013** | High Court judge, Queen's Bench Division; assigned on appointment to the Commercial Court; the first woman to be appointed as a Commercial Court judge; also sat (periodically) in the Chancery Division; heard high profile case of *Berezovsky v Abramovitch and others* [2012] EWHC B15 (Ch) and [2012] EWHC 2463 (Comm) in her capacity as a judge of both divisions; |
| **1995-2004** | sat as a deputy High Court judge in both the Chancery Division and in the Commercial Court |
| **1995-2004** | appointed and held office as a Recorder |
| **1993-2004** | as a QC sat as a Justice of Appeal in the Courts of Appeal of Jersey and Guernsey (part time appointments) |

**Career at the Bar**

| | |
|---|---|
| **1991-2004** | practised as a Chancery/commercial/insolvency QC at One Essex Court, now the chambers of Lord Grabiner QC |

| 1989-2004 | as a QC, appeared and/or advised in a wide spectrum of high profile Chancery/commercial/insolvency cases; these included: |

• acting for the Secretary of State in the disqualifications of the Barings directors, the Blue Arrow directors, and Terry Venables, as director of Tottenham Hotspur

• acting for the Inland Revenue in a number of complex anti-tax avoidance cases

• acting for office holders / creditors in cases arising out of major international insolvencies:  Barlow Clowes, Maxwell, Canary Wharf (Olympia & York), Heron, Enron, Telewest, Parmalat, Marconi, TXU, Barings etc.

• advising in relation to disputes arising out of the ISDA Market Agreement and derivative contracts generally

• acting for substantial institutional corporate investors who sued the Government as result of the latter's alleged conduct in relation to the administration of Railtrack

• appearing in corporate and insurance insolvency cases in the Supreme Court of Bermuda – *Stena v Sea Containers (*takeover battle*), EMLICO*, and *Bermuda Fire and Marine (*both insurance insolvencies)

• advising the Hong Kong Government in relation to the disqualification of directors following the collapse of a substantial financial institution

• appearing as leading counsel for a major bank in the important swaps case of *Hazell v Hammersmith & Fulham London Borough Council* [1992] 2 A.C. 1

| **1989** | appointed a QC |
| **1988-2000** | junior, and subsequently leading, counsel for the Crown in the criminal cases of *R -v- Saunders, Ronson, Lyons and Parnes* and *R v Seelig, Spens and Ma*yhew (the *Guinness* case) which went to the European Court of Human Rights |
| **1982-1989** | member of the panel of junior counsel who appeared for the Department of Trade and Industry in company and Chancery matters; acted for, and |

|            | advised, the DTI in relation to insolvency, corporate and insurance regulatory matters and public interest litigation |
| **1977-1991** | practised as a member of multi-discplinary Chancery /commercial/tax chambers at Queen Elizabeth Building |
| **1975**   | called as an *ad eundem* member by Lincoln's Inn |
| **1973-1977** | practised as a member of Chancery chambers at 9 Old Square, Lincoln's Inn |
| **1971**   | called to the Bar by Inner Temple; awarded Profumo scholarship. |

## Associations and other offices held

| | |
| --- | --- |
| **2018 -** | Chair of LegalUK |
| **2018** | Treasurer of the Honourable Society of the Inner Temple |
| **2017** | Reader of the Honourable Society of the Inner Temple |
| **2014-2018** | President of the British Insurance Law Association |
| **2014-** | Patron of the Justice Appeal |
| **2012-** | Patron of the London Branch of the Chartered Institute of Arbitrators |
| **2011-** | trustee and one of the founders of the Rolls Building Art & Educational Trust; a charitable trust which aims to introduce young people from deprived or disadvantaged backgrounds to the civil justice system and to the possibility of a career in law; the Trust provides an educational programme in the building, enabling students to take part in a mock trial in one of the Rolls Building courts and to meet a High Court judge to ask career-related questions |
| **ongoing** | member of INSOL (International Association of Restructuring, Insolvency and Bankruptcy professionals) |
| **1992-1993** | non-executive director of the Civil Aviation Authority |

## Speeches and lectures

Liz has delivered numerous speeches and lectures on a variety of legal topics to law societies, students' associations, solicitors' associations, Chancery Bar Association, COMBAR, Circuit Bar associations, GC100, the European Commercial Judges Forum, and at law conferences both in the UK and internationally. She has also chaired/participated in many conferences,

# ANNEX 3

## Materials and Authorities

### A. Background Documents

1. Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd, including the Attachment and all Exhibits that was filed in In re FTX Trading Ltd., et al., Case No. 22-11068 on March 27, 2025 and ascribed Claim No. 100078.

2. Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd., In re FTX Trading Ltd., et al., Case No. 22-11068 [D.I. 30932] filed on 20 June 2025.

3. A document entitled "FTX Digital Markets Limited: Safeguarding of Assets & Digital Token Management Policy" with bates number FTX_3AC_000044442 - FTX_3AC_000044450.

4. A document entitled "Complete Futures Specs" dated 11 April 2022 with Bates number FTX_3AC_000045026 - FTX_3AC_000045067.

5. A document titled "Testimony of Sam Bankman-Fried Co-Founder and CEO of FTX" relating to a hearing before the US Senate Committee on Agriculture, Nutrition and Forestry, dated 9 February 2022.

6. A document titled "Backstop Liquidity Provider Program" dated 4 January 2022 with Bates numbers FTX_3AC_000044809 - FTX_3AC_000044809.

7. A document titled "FTX Digital Markets Limited – Safeguarding of Assets & Digital Token Management Policy" with Bates numbers FTX_3AC_000044442 - FTX_3AC_000044450.

8. An email from FTX OTC Portal to Kyle Davies dated 2 February 2021 with Bates number 3AC-FTX-00539323.

9. An email from FTX OTC Portal to Kyle Davies dated 6 February 2021 with Bates number 3AC-FTX-00536147.

### B. Cases

10. *AA v Persons Unknown* [2019] EWHC 3556 (Comm); [2020] 4 ALR 35

11. *Agip (Africa) Ltd v Jackson* [1991] Ch 547 (CA)

12.    *Arbuthnott v Fagan* [1995] 2 Lloyd's Rep 344

13.    *Armitage v Nurse* [1998] Ch 241

14.    *Arnold v Britton* [2015] UKSC 36; [2015] AC 1619

15.    *Attorney General v Blake* [2001] 1 AC 268

16.    *Barton v Fitzgerald* (1812) 15 East 529

17.    *BHP Petroleum Ltd v British Steel plc* [2000] 2 Lloyd's Rep 277

18.    *Burnett or Grant v International Insurance Co of Hanover Ltd* [2021] UKSC 12; [2021] 1 WLR 2465

19.    *Bush v Watkins* (1851) 14 Beav. 425, 432

20.    *Boscawen v Bawja* [1996] 1 WLR 328

21.    *Challinor v Juliet Bellis & Co* [2013] EWHC 347 (Ch)

22.    *ByBit Fintech Ltd v Xin* [2023] SGHC 199

23.    *Charity Commissioners for England and Wales v Framjee* [2015] 1 WLR 16

24.    *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] 1 AC 1101

25.    *Chase Manhattan Bank N.A. v Israel British Bank (London) Ltd* [1981] Ch 105

26.    *Cherry v Boultbee* (1839) 4 My & C 442

27.    *Clayton's Case* (1817) 1 Mer 572

28.    *D'Aloia v Persons Unknown* [2024] EWHC 2342 (Ch)

29.    *Danisz v Persons Unknown* [2022] EWHC 280 (QB)

30.    *Davis v Hueber* (1923) 31 CLR 583 (HCA)

31.    *Dhingra v Dhingra* [1999] EWCA Civ 1899

32.    *DPP v Briedis* [2021] EWHC 3155 (Admin)

33.    *Esso Petroleum Co Ltd v Niad* [2001] All ER (D) 324

34.    *El Ajou v Dollar Land Holdings* [1993] BCLC 735

35.    *FHR European Ventures LLP v Cedar Capital Partners LLC* [2015] AC 250 (SC)

36.    *Foskett v* McKeown [2001] 1 AC 10

37.    *Glencore International AG v Metro Trading International Inc & ors* [2001] CLC

38.    *Hadley v Baxendale* (1854) 9 Ex 341

39.    *Hunter v Moss* [1994] 1 WLR 452

40.    *Hvalfangerselkapet Polaris A/S v Unilever Ltd* (1933) 46 Lloyd's Rep 29

41.    *Impact Funding Solutions Ltd v Barrington Support Services Ltd (formerly Lawyers at Work Ltd)* [2016] UKSC 57; [2017] AC 73

42.    *Indian Oil Corp Ltd v Greenstone Shipping Co SA (The Ypatianna)* [1988] QB 345

43.  *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896

44.  *James Rose (Bolton) Ltd v Winder* [1915] 1 Ch 62

45.  *Jones v Persons Unknown* [2022] EWHC 2543

46.  *JP Morgan Chase Bank & Ors v Springwell Navigation Corporation* [2008] EWHC 1186 (Comm)

47.  *K/S Victoria Street v House of Fraser (Stores Management) Ltd & ors* [2011] EWCA Civ 904

48.  *Koufos v C Czarnikow Ltd (The Heron II)* [1969] 1 AC 350

49.  *Knight v Knight (1840) 49 ER 58Kuwait Airways Corp v Iraqi Airways* Co [2002] UKHL 19

50.  *Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25

51.  *LBIE v RAB Market Cycles (Master) Fund Limited & anor* [2009] EWHC 2545

52.  *Lipkin Gorman v Karpnale Ltd* [2021] EWHC 1998 (Ch)

53.  *Litecoin Foundation Ltd v Inshallah Ltd* [2021] EWHC 1998 (Ch)

54.  *Lloyd's Rep 284Foskett v McKeown* [2001] 1 AC 102

55.  *LMN v Bitflyer Holdings Inc* [2022] EWHC 2954 (Comm)

56.  *Mercer v Craven Storage* [1994] CLC 328 (HL)

57.  *Navier v Leicester* [2002] EWHC 2596 (Ch)

58.  *Miller v Race* (1758) 1 Burr 452

59.  *Milroy v Lord* (1862) 4 De GF & J 264

60.  *National Stadium Project (Grenada) Corporation v NH International (Caribbean) Ltd* [2020] UKPC 25

61.  *Osbourne v Persons Unknown Category A* [2023] EWHC 39 (KC)

62.  *Pagnan SpA v Tradax Ocean Transportation SA* [1987] 2 Lloyd's Rep 342

63.  *Paul v Constanc* [1977] 1 WLR 527

64.  *Pearson v Lehman Brothers* [2010] EWHC 2914

65.  *Pearson v Lehman Brothers* [2011] EWCA Civ 1544

66.  *Portman Building Society v Hamlyn Taylor Neck (A Firm)* [1998] 4 All ER 202

67.  *Poulton v Conrad* [2025] TASFC 7

68.  *Piroozzadeh v Person Unknown* [2023] EWHC 1024 (Ch)

69.  *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 02

70.  *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50

71.  *Re CA Pacific Finance Ltd* [2000] 1 BCLC 494

72.    *Re Gatecoin Ltd (in liquidation)* [2023] HKCFT 914

73.    *Re Goldcorp Exchange Ltd* [1995] 1 AC 74

74.    *Re Gulbenkian's Settlement Trusts (No. 1)* [1970] AC 508 (HL)

75.    *Re Harvard Securities Ltd* [1998] BCC 567

76.    *Re Kayford Ltd* [1975] 1 WLR 279

77.    *Re London Wine Co Ltd* [1986] PCC 121

78.    *Re Rose*  [1952] Ch 499

79.    *Re Stapylton Fletcher Ltd* [1994] 1 WLR 1181 (Ch)

80.    *Richards v Delbridge* (1874) LR 18 Eq 11

81.    *Ruscoe v Cryptopia Ltd (in liquidation)* [2020] NZHC 728

82.    *Ruscoe v Cryptopia* [2020] NZLR 809

83.    *Russell-Cooke Trust Co v Prentis* [2003] 2 All ER 478

84.    *Serious Fraud Office v Hotel Portfolio TT Ltd* [2021] EWHC 1273 (Comm)

85.    *Shalson v Russo* [2005] Ch 281

86.    *Smith v Torque Group Holdings Ltd* Unreported, 2 July 2021

87.    *RWE Npower Renewables Ltd v JN Bentley Ltd* [2014] EWCA Civ 150

88.    *Scottish Power UK Plc v BP Exploration Operating Co Ltd* [2016] EWCA Civ 1043

89.    *Samsoondar v Capital Insurance Co Ltd* [2020] UKPC 33

90.    *Soteria Insurance Limited v IBM United Kingdom Limited* [2022] EWCA Civ 440

91.    *The Epaphus* [1987] 2 Lloyd's Rep 213

92.    *The Fina Samco* [1995] 2 Lloyd's Rep 344

93.    *The Playa Larga* [1983] 1 AC 244

94.    *The South Australian Insurance Company v William Beavis Randell and Samuell Randell* (1869) LR 3 PC 101

95.    *Torkington v Magee* [1902] 2 KB 427

96.    *Transfield Shipping Inc v Mercator Shipping Inc (The Achilleas)* [2008] UKHL 48; [2009] 1 AC 61

97.    *The Federal Republic of Brazil v Durant International Corporation* [2016] AC 297

98.    *Tippawan Boonyaem v Persons Unknown* [2023] EWHC 3180 (Comm)

99.    *Trustee of the Property of FC Jones v Jones* [1997] Ch 159

100.    *Tulip Trading Ltd v Bitcoin Association for BSV* [2023] 4 WLR 16

101.    *Tulip Trading v van der Laan*  [2023] EWCA Civ 83; [2023] 4 WLR 16

102.    *Victoria Laundry (Windsor) Ltd v Newman Industries Ltd* [1949] 2 KB

103.    *Wang v Darby* [2021] EWHC 3054 (Comm)

104.   *Westdeutsche Landesbank v Islington LBC* [1996] AC 669

105.   *White v Shortall* [2006] NSWSC 1379

106.   *Wilkinson v North* [2018] 4 WLR 41

107.   *Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] 2 WLR 1095

108.   *Your Response Ltd v Datateam Business Media Ltd* [2014] EWCA Civ 281; [2015] 3
         WLR 887 at 892

### C.  Legal Commentary and Articles

109.   Duncan Sheehan, *Digital assets, blockchains and relativity of title* [2024] JBL 78

110.   Hin Liu, *Transferring legal title to a digital asset* [2023] 5 JIBFL

111.   Louise Gullifer, Henry Chong & Hin Liu, *Client-Intermediary Relations in the
         Crypto-Asset World*, University of Cambridge Faculty of Law Research Paper No.
         18/2021

112.   Legal   Studies Research Paper Series, Paper 18/2021, March 2021 Robert Stevens,
         *Crypto is not property* (2023) 139 LQR 615

113.   Roy Goode, *Are Intangible Assets Fungible?*  [2003] LMCLQ 379

114.   UK Jurisdiction Taskforce, *Legal Statement on Crypto assets and Smart Contracts,
         the Law Tech Delivery Panel* (November 2019)

115.   Law Commission Digital Assets – Consultation Paper

116.   Law Commission Digital Assets – Final Report

117.   LawTech UK Legal Statement on Digital Assets and English Insolvency Law

### D.  Practitioner Texts

118.   Bridge, Gullifer, McMeel, and Low, *Law of Personal Property,* Chapter 17 (3rd
         Edition, December 2021)

119.   Burrows, *Remedies for Torts, Breach of Contract and Equitable Wrongs* (4th Edition,
         2019)

120.   *Chitty on Contracts,* (35th Edition, December 2024)

121.   Hanbury and Martin: *Modern Equity, Chapter 3* (22nd Edition, October 2021)

122.   *Goff & Jones on Unjust Enrichment* (10th Edition, December 2022)

123.   Goode and Gullifer, *Legal Problems of Credit and Security* (7th Edition, 2022)

124.   G. Virgo, *The Principles of Equity and Trusts, Chapter 19* (5th Edition, May 2023)

125.    *Lewin on Trusts, Chapter 5* (20th Edition, March 2020)

126.    *Lewin on Trusts, Chapter 7* (20th Edition, March 2020)

127.    *Paget's Law of Banking,* (14th Edition, September 2014)

128.    Sir Kim Lewison, *The Interpretation of Contracts,* Chapter 3 8th Edition, December 2023

129.    *Snell's Equity, Chapter 22 – 24* (34th Edition, December 2019)

130.    *Snell's Equity, Chapter 22 – 24* (35th Edition, December 2024)

131.    Yates & Montague, *The Law of Global Custody* (4th Edition, 2013)

**E.  Reports**

132.    Declaration of Paul Anthony Webster, KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)

133.    Declaration of Robert Stuart Levy KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)