**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX Trading Ltd., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ROBERT STUART LEVY KC IN SUPPORT OF THE
AMENDED PROOF OF CLAIM FILED BY THE JOINT LIQUIDATORS OF
THREE ARROWS CAPITAL LTD (IN LIQUIDATION)**

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................ 1

II.     QUALIFICATIONS AND PROFESSIONAL EXPERIENCE ......................... 2

III.    INSTRUCTIONS AND ASSUMPTIONS ....................................................... 4

IV.     SUMMARY OF CONCLUSIONS .................................................................. 9

V.      THE LEGAL SYSTEM OF THE BVI ........................................................... 11

VI.     THE BVI CLAIMS ........................................................................................ 13

        A.      The Unfair Preference Claim ............................................................. 13

                1.      Summary of BVI Unfair Preference Law ................................ 13

                2.      The Parties' Positions on the Joint Liquidators' Unfair
                        Preference Claim ..................................................................... 14

                3.      A Section 245 "Transaction" Does Not Require a Proprietary
                        Interest in the Assets Transferred, and FTX Concedes That 3AC
                        Had Such an Interest Regardless.............................................. 16

                4.      3AC "Entered Into" the Relevant Transactions ...................... 25

                5.      3AC's Insolvency..................................................................... 28

                6.      The Relevant Transactions Occurred within the Vulnerability
                        Period ...................................................................................... 31

                7.      FTX Was Put in a Better Position as a Creditor of 3AC and
                        Otherwise Benefitted from the Transactions .......................... 31

                8.      FTX's Ordinary Course of Business Defence ......................... 51

        B.      The Transaction at an Undervalue Claim ........................................... 56

                1.      Relevant Insolvency Transactions ........................................... 57

                2.      3AC's Insolvency and the Vulnerability Period ..................... 57

                3.      Transactions at an Undervalue ................................................ 58

                4.      FTX's Section 246(2) Defence ............................................... 58

        C.      The BVI Turnover Claim .................................................................... 60

        D.      The BVI Proprietary Restitutionary Claim ......................................... 63

        E.      The BVI Unjust Enrichment Claim ..................................................... 67

        F.      The BVI Conversion Claim ................................................................. 69

I, Robert Stuart Levy KC, LLB, LLM (Cantab.) make this declaration pursuant to 28 U.S.C. s 1746 and, under penalty of perjury, state as follows:

## I.    INTRODUCTION

1.    I have been asked by Latham & Watkins LLP, on behalf of the Joint Liquidators (the "**Joint Liquidators**") of Three Arrows Capital Ltd ("**3AC**"), to give my opinion on certain claims (the "**BVI Claims**") under the laws of the Territory of the Virgin Islands (commonly known as the British Virgin Islands) (the "**BVI**") made in the Amended Proof of Claim (the "**APOC**") filed by the Joint Liquidators against FTX Trading Ltd. ("**FTX**"), which I understand is now represented by the FTX Recovery Trust, and on the objection to the APOC filed by the FTX Recovery Trust (the "**Objection**") and certain materials submitted in support thereof.

2.    I am being remunerated at the rate of £925 per hour, which is my standard rate for providing expert opinions on BVI law. A junior barrister in my chambers working under my direction and supervision has assisted me in preparing this Declaration. Although I am being paid by the Joint Liquidators, I understand that my role is to give my honest and independent opinion to the US Bankruptcy Court, and I have done so. Neither my remuneration nor the remuneration of the junior barrister who is assisting me is in any way contingent upon my findings, any testimony I may give, or the outcome of this matter.

3.    In reaching the conclusions set out in this Declaration, I have reviewed the APOC and the exhibits thereto. Those exhibits include:

a.    At Exhibit A to the APOC, a certain Terms of Service, dated May 13, 2022 ("**May 2022 TOS**");

b.    At Exhibit C to the APOC, a Loan and Security Agreement, dated October 22, 2021("**October 2021 LSA**"); and

c.    At Exhibit D to the APOC, a document containing an "FTX Line of Credit" dated March 30, 2022 ("**LOCA**"), and an undated FTX Institutional Customer Margin Line of Credit Agreement ("**MLCA**").

4.      I have also reviewed the Objection; the Declaration of Benjamin S. Beller in Support of the Objection and the exhibits thereto (the "**Beller Declaration**"); the Declaration of Steven P. Coverick in Support of the Objection and the exhibits thereto; the Declaration of Stephen Nicholas Atherton KC in Support of the Objection (the "**Atherton Declaration**"); and the Second Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury (and Annex 1 thereto) (the "**Neuberger Declaration**") which are cited in the Atherton Declaration. I have also considered relevant judicial decisions, legal texts and publications (a list of which is attached as Annex 1). Finally, I have also been provided with certain other documents by Latham & Watkins LLP, a list of which is attached as Annex 2, and have considered those documents as relevant.

5.      I reserve the right to amend or supplement this Declaration based on further information being made available to me, including as a result of subsequent discovery taken in this matter.

## II.      QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

6.      I am a barrister practising from 3 Stone Buildings, Lincoln's Inn, London, WC2A 3XL.

7.      I was called to the Bar of England and Wales in 1988 and was appointed Queen's Counsel (now King's Counsel) in 2010. I was called to the Bar of the British Virgin Islands in September 2003. I have also been admitted to the Bars of Anguilla and St. Vincent and the Grenadines. I am regularly admitted on an *ad hoc* basis to appear in court proceedings in the Cayman Islands (both at first instance in the Grand Court and on appeals to the Cayman Islands Court of Appeal)[1]. I have also been admitted, *ad hoc*, to appear in proceedings in Bermuda.

8.      I have been in continuous practice at the Bar since 1990, since when I have regularly appeared before the courts of England and Wales (at all levels). I have more than 20 years' experience as a practitioner before the courts of the BVI (at all levels, including countless first instance hearings/trials, numerous appeals to

---

[1] For the purposes of this Declaration I have not checked the number of my *ad hoc* limited admissions but would estimate that it is in excess of 35. If called upon to do so, I could confirm the exact number.

the Eastern Caribbean Supreme Court ("**ECSC**")[2] Court of Appeal, and a number of hearings before the Judicial Committee of the Privy Council ("**Privy Council**")[3]).

9.    In 2023 I was appointed by the Attorney General of the BVI to be a member (for two years from 1 November 2023) of the BVI Legal Services Panel, to provide legal and consultancy services to the Government of the BVI in cooperation and collaboration with counsel in the Office of the Attorney General.

10.   Since May 2023, I have been appointed three times by the Judicial and Legal Services Commission of the ECSC[4] to sit as an acting Justice of Appeal of the ECSC Court of Appeal[5], and have sat in that court hearing appeals (principally appeals from the Commercial Division of the BVI). I have written a number of judgments (in which the other Justices of Appeal concurred). I have been invited to sit on other occasions, but other commitments have prevented me from doing so. When sitting as a Judge of the ECSC Court of Appeal I have the full power and authority of a Judge of that Court.

11.   I attach as Annex 3 my *curriculum vitae*. I have given evidence of the law of the BVI in foreign proceedings. In ***Emerald Bay Worldwide Limited v Barclays Wealth Corporate Officers (Guernsey) Limited*** (Transcript 11 June 2013), Deputy Bailiff McMahon sitting in the Royal Court of Guernsey (Ordinary Division) preferred my evidence regarding BVI law concerning directors'

---

[2] The ECSC is a superior court of record for the Organisation of Eastern Caribbean States. It was established in 1967 by the West Indies Associated States Supreme Court Order. The ECSC has two divisions, the High Court and the Court of Appeal. The ECSC's territorial jurisdiction covers six independent states (Antigua and Barbuda, Domenica, Grenada, Saint Kitts and Nevis, Saint Lucia, St. Vincent and the Grenadines) and three British Overseas Territories (Anguilla, BVI and Montserrat).

[3] The Privy Council, or more accurately the Judicial Committee of the Privy Council, is the ultimate appellate tribunal for the UK overseas territories and Crown dependencies, as well as a number of member states of the Commonwealth of Nations that have retained the appeal to the Privy Council. The Privy Council almost invariably sits in London, generally with a bench of five justices. Its panel is usually comprised of sitting justices of the UK Supreme Court, although on occasion the panel may include other distinguished jurists from other English courts or other jurisdictions. The former Chief Justices of the ECSC, Dame Janice Pereira DBE, and the Cayman Islands, Sir Anthony Smellie KCMG KC, have both been invited to sit with the Privy Council.

[4] The Judicial and Legal Services Commission appoints judges of the ECSC on behalf of HM The King (apart from the Chief Justice who is appointed directly by HM The King by Letters Patent).

[5] The ECSC Court of Appeal is, in theory (and certainly before COVIDovid-19 travel restrictions was, in practice) a peripatetic Court of Appeal, travelling to each of the nine territories within its jurisdiction at various times each year to hear appeals from the courts of those jurisdictions. Save for "special sittings", the ECSC Court of Appeal sits three times each year in the BVI.

indemnities to that of the opposing expert "without hesitation". That decision was upheld by the Court of Appeal of Guernsey in its judgment of 12 December 2013. I have also provided reports dealing with the law of the BVI in other proceedings (including in New Jersey). So far as I am aware, such other proceedings have settled, or at least, to date, I have not been required to attend for cross-examination.

## III. INSTRUCTIONS AND ASSUMPTIONS

12. I have been instructed to assume for purposes of this Declaration that (a) each of the documents I have been provided is a true and accurate copy of what it purports to be, (b) the May 2022 TOS was the operative FTX terms of service during the relevant period and (c) the LOCA and MLCA superseded the October 2021 LSA in all material respects.

13. The facts set out in this section have been supplied to me by Latham & Watkins LLP for the purposes of preparing this Declaration, and I have assumed that they are correct.

14. 3AC was an investment firm, incorporated in the BVI, whose principal business was trading and investing in cryptocurrency and other digital assets.

15. FTX provided services for customers, amongst other things, to deposit, withdraw and trade digital assets via an online cryptocurrency platform available to users/customers thereof at FTX.com ("**FTX Exchange**" or "**Exchange**").

16. I am instructed to assume that 3AC used or could have used the FTX Exchange in the following ways:

   a.  3AC had multiple accounts on the FTX Exchange. Like other customers on the FTX Exchange, 3AC could deposit, withdraw and/or trade digital assets and fiat currency through its accounts on the Exchange.

   b.  3AC had the ability to conduct leveraged trading on the FTX Exchange via its participation in the FTX Exchange's "Margin Program". The Margin Program allowed 3AC to acquire digital assets, or entitlements

thereto, using borrowed assets, including borrowed fiat currency such as U.S. Dollars ("**USD**"). Upon acquiring such digital assets via the Margin Program, 3AC's accounts on the Exchange would reflect an entitlement to the relevant assets, and its USD balance a liability corresponding to any USD borrowed to acquire such digital assets. 3AC's digital asset entitlements and separate USD liabilities were tracked via an electronic ledger maintained by FTX.

c.    Under the Margin Program 3AC could also borrow fiat currency to make periodic payments on perpetual futures and other futures contracts it also entered into via the Exchange, which gained or lost value depending on fluctuations in the price of underlying digital assets.

d.    There is no one-to-one borrower-lending relationship for any assets borrowed pursuant to the Margin Program, and there is no practicable way to identify an individual customer as the source of any specific digital assets or fiat currency borrowed by 3AC under the Margin Program.

17.    I am further instructed to assume the following how the Exchange was likely to have operated in June 2022:

a.    FTX customers' "accounts" on the Exchange did not store specific digital assets but rather corresponded to an electronic ledger maintained by FTX in which FTX recorded the quantity of the digital assets, fiat currency, and other assets to which the customer was entitled.

b.    FTX customers could deposit digital assets and fiat currency using the Exchange, which was reflected in their Exchange accounts. When a customer deposited fungible digital assets in this manner, those assets were initially segregated in customer-specific wallet addresses. However, those assets were then transferred to pooled "hot wallets" controlled by FTX. Those hot wallets (for which FTX retained the private keys) held, on an unsegregated, commingled basis, the digital asset entitlements of multiple customers.

c.    FTX customers could also acquire digital assets on the Exchange, such as via trading with other customers. When they did so, the amount and value of the assets acquired were registered on FTX's ledger as being associated with the applicable customer's account, but there was no actual transfer of the acquired digital assets to a wallet or address of that customer. Those assets too were stored on an unsegregated, commingled basis in "hot wallets" controlled by FTX.

d.    FTX customers could also withdraw digital assets and fiat currency from the Exchange. A customer who withdrew digital assets or fiat currency in this manner did not necessarily receive the same assets that they deposited into the Exchange, due to the fungibility of most digital assets and fiat currency; the customer would instead receive assets of the same kind.

18.    Pursuant to the LOCA, 3AC received a "line of credit" from FTX ("**LOC**"), subject to the terms thereof. During the relevant time period, the total face amount of the LOC was $120 million. Amongst other things, the LOC permitted 3AC to borrow up to $120 million to obtain digital asset entitlements on the Exchange without participating in FTX's Margin Program.

19.    I am instructed to assume that as at the end of day on 12 June 2022[6]:

a.    3AC's accounts on the FTX Exchange included a substantial quantity of digital assets, such as Bitcoin, which were then collectively valued at over $1 billion.

b.    3AC's accounts on the FTX Exchange separately had a substantial negative USD balance. 3AC's negative USD balance reflected, amongst other things, over $600 million that FTX debited from 3AC's accounts as a result of 3AC's leveraged trading via FTX's Margin Program, which was a liability of 3AC on the Exchange.

---

[6] I have been instructed to assume that all relevant dates and time refer to Coordinated Universal Time (UTC), unless otherwise specified.

c.      3AC's negative USD balance also reflected 3AC's utilisation of its $120 million LOC with FTX, all or substantially all of which was utilised during the relevant period.

20.    Between the beginning of the day on 13 June 2022 and the end of the day on 14 June 2022, substantially all of the digital assets associated with 3AC's accounts on the FTX Exchange were sold, liquidated or otherwise transferred out of 3AC's accounts.

21.    The Joint Liquidators have estimated that, during these dates, unrealised losses on unsold assets, withdrawals by 3AC (including realised losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts accounted for a reduction of approximately $65 million in the value of 3AC's assets on the Exchange.

22.    FTX was responsible for the liquidation of digital assets associated with 3AC's accounts on the Exchange worth approximately $82 million, which occurred late on 14 June 2022 (the **"Liquidation"**).

23.    For the purposes of this Declaration, I am instructed to assume that 3AC was responsible for initiating the remainder of the (more than 52,000) transactions on 13 June 2022 to 14 June 2022 which resulted in the sale and/or liquidation of digital assets associated with 3AC's accounts on the Exchange.

24.    I am also instructed to assume that between 13 and 14 June 2022, the value of the assets associated with 3AC's accounts on the Exchange at all times exceeded the value of the liabilities associated with 3AC's accounts on the Exchange.

25.    Between 13 and 14 June 2022 the sales or liquidations of assets associated with 3AC's accounts on the Exchange resulted in the elimination of 3AC's negative USD balance on the Exchange.

26.    After 14 June 2022, trading activity associated with 3AC's accounts on the Exchange substantially ceased.

27.    I am instructed that 3AC had a beneficial equitable proprietary interest in (i.e. equitable title to) the digital assets associated with its accounts on the Exchange

during the relevant period, and that 3AC was a tenant in common of the equitable interest in each shared pool of digital assets into which FTX transferred such assets. I am further instructed that legal title in respect of those digital assets vested in FTX for the purposes of FTX holding them as trustee on trust for 3AC. I am further instructed that, in the alternative to the foregoing trust relationship, 3AC held a control-based proprietary interest in the digital assets associated with its accounts on the Exchange, equivalent to a proprietary interest in a proportionate share in a common pool, as quasi-bailor and that, as quasi-bailor, 3AC would have a proprietary interest in the digital assets associated with its accounts on the Exchange, superior to any interest FTX would have had over them.

28.    FTX has not asserted that it is a secured creditor of 3AC in respect of the digital assets or fiat currency associated with 3AC's accounts on the FTX Exchange, or of any other assets.

29.    On 27 June 2022, 3AC commenced liquidation proceedings before the Commercial Division of the ECSC High Court.

30.    3AC's general body of creditors will not recover the full value of their creditor claims via the BVI liquidation proceedings.

31.    On 1 July 2022, the Joint Liquidators, as foreign representatives of 3AC, commenced Chapter 15 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York. On 28 July 2022, that Court granted recognition of 3AC's foreign main proceeding pending in the BVI, which conferred upon the Joint Liquidators various powers in the United States.

32.    On 11 and 14 November 2022, FTX and 101 affiliated debtors, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

33.    On 27 March 2025, the Joint Liquidators filed the APOC in FTX's bankruptcy proceeding.

## IV.    SUMMARY OF CONCLUSIONS

34.    Based on the foregoing instructions and assumptions, and my review of the legal authorities discussed in this Declaration and the factual materials provided to me, and as qualified by the more detailed analysis that follows, my conclusions with respect to each claim I have been asked to evaluate under BVI law are as follows:

a.    **The Joint Liquidators' Unfair Preference Claim under Section 245 of the BVI IA**: The Joint Liquidators' unfair preference claim satisfies each element of a preferential transaction under BVI law. As an initial matter, the FTX Recovery Trust is simply incorrect that an unfair preference claimant must have a proprietary interest in the assets subject to the preferential transaction, although 3AC has such an interest in any event. Moreover, the sales and or liquidations of the digital assets associated with 3AC's FTX Exchange accounts between 13 and 14 June 2022 were transactions entered into by 3AC, while 3AC was insolvent and within the requisite vulnerability period, and resulted in placing FTX—the clear creditor of 3AC in respect of 3AC's liabilities on the Exchange—into a better position in 3AC's liquidation than FTX would have been in had the preferential transactions not occurred. Even if the FTX Recovery Trust could demonstrate that FTX was not 3AC's creditor, the Joint Liquidators are still likely to obtain recovery from FTX on account of the preferential transactions because FTX benefitted from the transactions, to the extent of repayment of 3AC's Exchange liabilities. Whilst the FTX Recovery Trust has asserted an "ordinary course of business" defence to the unfair preference claim, it is the FTX Recovery Trust's burden to substantiate this defence, but it is has not done so, as the facts indicate that, amongst other things, the relevant transactions were effected in response to abnormal financial difficulties rather than 3AC's ordinary operational activities.

b.    **The Joint Liquidators' Undervalue Transaction Claim under Section 246 of the BVI IA**: The Joint Liquidators' undervalue transaction claim, like their unfair preference claim, does not require

ownership of the assets transferred in the relevant transactions, and is likely to succeed if the transactions resulted in the repayment of a debt that did not exist or were conducted at less than market value and FTX obtained the assets sold or entitlements to them. It is the FTX Recovery Trust's burden to establish a "good faith" defence to this claim, but it has not offered evidence in support of such a defence; to the contrary, the evidence available to me indicates that the requirements of this defence could not be satisfied.

c. **The Joint Liquidators' Turnover Claim under Section 274A of the BVI IA**: The Joint Liquidators are entitled to the relief available under section 274A of the BVI IA on account of 3AC's apparent beneficial ownership of the digital assets associated with its FTX Exchange accounts, which does not depend on the identification of specific digital assets subject to that ownership interest. That section 274A itself does not contemplate a complex determination of property rights does not preclude its application insofar as property right disputes are resolved in the context of substantive claims at issue in this litigation.

d. **The Joint Liquidators' Proprietary Restitutionary Claim under BVI Common Law**: 3AC's digital asset entitlements on the FTX Exchange constituted, at a minimum, a contractual legal entitlement to the value of those assets, which is a sufficient legal interest for a proprietary restitutionary claim. The Joint Liquidators' proprietary restitutionary claim in respect of such interest is likely to succeed if the relevant transactions resulted in the repayment of a debt that did not exist or were conducted at less than market value and FTX obtained the assets sold or entitlements to them.

e. **The Joint Liquidators' Unjust Enrichment Claim under BVI Common Law**: The Joint Liquidators' unjust enrichment claim is likely to succeed if the relevant transactions resulted in the repayment of a debt that did not exist or were conducted at less than market value and FTX obtained the assets sold or entitlements to them; in either case, FTX would have been enriched, unjustly, at 3AC's expense. A change of

position defence would not be viable under these circumstances, as it would rely on FTX's own errors in enriching itself.

f. **The Joint Liquidators' Conversion Claim under BVI Common Law**: Whilst the law pertaining to the conversion of digital assets is developing, and might be extended to cover wrongful interference with digital assets by the BVI courts, this not the current state of the law. If the law were to be so extended, the Joint Liquidators' conversion claim could succeed if FTX deprived 3AC of beneficial ownership of the digital assets associated with its FTX Exchange accounts or liquidated such assets without authority.

## V.    THE LEGAL SYSTEM OF THE BVI

35.    The BVI is an Overseas Territory of the United Kingdom. Its laws are comprised of the common law of England[7], certain legislation of the UK Parliament which also applies in the BVI[8], and legislation passed by the local legislature (now known as the House of Assembly).

36.    Original jurisdiction in the BVI is exercised by the High Court which is part of the ECSC[9]. The High Court has a specialist Commercial Division which deals, inter alia, with corporate insolvency proceedings.

37.    Appeals from the High Court lie to the ECSC Court of Appeal, and appeals from the ECSC Court of Appeal lie to the Privy Council.

38.    Similar to England and Wales, the BVI has a doctrine of binding precedent (*stare decisis*):

a.    Decisions of a Judge of the High Court do not bind the High Court itself, although a Judge of the High Court should only depart from a previous

---

[7] The Common Law (Declaration) Act 1705 expressly declared the common law of England to be in force in the Leeward Islands, of which the BVI formed part: see *Broad Idea International Ltd v Convoy Collateral Ltd* BVIHCMAP 2019/0026 (29 May 2020) at [45] per Pereira CJ and *VTB Bank v Miccros Group Ltd* BVIHC (Com) 2018/0067 (23 January 2020) at [105] per Jack J.

[8] Legislation of the UK Parliament can apply in the BVI in three ways: (a) a statute of the UK Parliament can expressly (or by necessary implication) declare that it applies to the BVI, (b) it can be applied by an Order in Council made by the Privy Council or by legislation of the House of Assembly, or (c) it formed part of the law of England on the settlement of the islands: see *VTB Bank v Miccros Group*, *supra*, at [44] per Jack J.

[9] See sections 6 and 7 of the Eastern Caribbean Supreme Court (Virgin Islands) Act 1968 (as amended).

decision of another Judge of the High Court if he or she considers that the decision is plainly wrong;

b.　　Decisions of the ECSC Court of Appeal are binding on the High Court and on the ECSC Court of Appeal itself;

c.　　Decisions of the Privy Council on an appeal from the ECSC Court of Appeal in a case from the BVI are binding on the High Court in the BVI and the ECSC Court of Appeal hearing an appeal from the BVI.

d.　　The Privy Council itself is not, strictly speaking, bound by its own previous decisions, nor those of the Judicial Committee of the UK House of Lords (**"House of Lords"**) or its successor, the Supreme Court of the United Kingdom ("**UK Supreme Court**")[10], but it will not depart from such decisions without compelling reason to do so[11].

39.　　Decisions of the higher English courts, i.e. the English High Court, Court of Appeal and the UK Supreme Court, although not binding in the BVI, are regarded as highly persuasive and generally followed[12]. Decisions from the courts of other Commonwealth jurisdictions (such as Australia, Canada and New Zealand) are also regarded as persuasive and are frequently cited in the BVI.

40.　　Corporate insolvency in the BVI is governed by the Insolvency Act 2003 as amended ("**BVI IA**"), and the Insolvency Rules 2005 as amended (the "**BVI IR**"). These laws are closely based on the UK Insolvency Act 1986 ("**UK IA**") and the English Insolvency Rules 1986, though there are material differences[13].

---

[10] The House of Lords was renamed or replaced by the UK Supreme Court.
[11] *Convoy Collateral Ltd v Broad Idea International Ltd* [2023] AC 389 at [67] per Lord Leggatt JSC.
[12] See *Convoy Collateral Ltd v Cho Kwai Chee* JCPC 2020/0043 and see also the recent decision of Doyle J who considered the doctrine of *stare decisis* in the Cayman Islands in *In the matter of HQP Corporation (in Official Liquidation)* 2023 (2) CILR 203 (note, the decision of the Cayman Islands Court of Appeal is currently awaited).
[13] For example, there is no equivalent in the BVI of section 239(5) of the UK IA, the preference provision in the UK, which provides that the court will not make an order unless the company which gave the preference "*was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b)*" (i.e. an intention to prefer or to put the counterparty in a better position than it would have been in had the thing not been done).

## VI.   THE BVI CLAIMS

41.   As relevant to this Declaration, in the APOC the Joint Liquidators bring statutory claims against FTX under the BVI IA for (a) unfair preference, (b) undervalue transactions and (c) turnover, as well as, I have been instructed, BVI common law claims against FTX for (d) proprietary restitution, (e) unjust enrichment and (f) conversion. Each of these claims arises from transactions that occurred between 12 June 2022 and 14 June 2022 in relation to 3AC's accounts on the FTX Exchange, and digital assets or fiat currency associated with such accounts.

### A.   The Unfair Preference Claim

#### 1.   Summary of BVI Unfair Preference Law

42.   Section 245(1) of the BVI IA provides that a transaction entered into by a company is an unfair preference given by the company to a creditor if it (a) is an *"insolvency transaction"*, (b) is *"entered into"* within the *"vulnerability period"*, and (c) has the effect of putting the *"creditor"* into a position which, in the event of the company going into insolvent liquidation, will be better than the position the creditor would have been in if the transaction had not been entered into. I discuss the meanings of these terms and the contours of each of these requirements below, and apply them to the Joint Liquidators' unfair preference claim.

43.   Under section 249(1)(a)-(b) of the BVI IA, if the BVI court finds that a transaction is an unfair preference as to any creditor, it has a very broad discretion to fashion an appropriate remedy. It may make an order setting aside the transaction in whole or in part, or make *"such order as it considers fit"* for restoring the position to what it would have been if the company had not entered into the transaction.

44.   Amongst other remedial orders that may be made under section 249 in respect of an unfair preference, the BVI court may *"require any person to pay, in respect of benefits received by him or her from the company, such sums to the office holder as the Court may direct"*[14]. Such orders can affect the assets of, or

---

[14] Section 249(2)(d) of the BVI IA.

13

impose obligations on, anyone, even if such person was not the creditor of the company or the person who transacted with the company (i.e. third parties)[15], provided that no order shall prejudice any interest in assets acquired in good faith for value from a person other than the company (or prejudice any interest deriving from such an interest), and no order for payment can be made against a person who received a benefit from the transaction in good faith and for value, except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he or she was a creditor of the company[16].

45.    These provisions empower the court to devise a suitable remedy to achieve the remedial purposes of the BVI IA rather than merely annulling the transaction and leaving the consequences of that annulment to the operation of the general law[17].

46.    Section 245(1) is subject to section 245(2) which provides that a transaction is not an unfair preference if it took place *"in the ordinary course of business"*. I address the scope of this exception below, and its potential application to the Joint Liquidators' unfair preference claim.

### 2.    The Parties' Positions on the Joint Liquidators' Unfair Preference Claim

47.    The Joint Liquidators' unfair preference claim relates to a series of transactions that occurred between 13 and 14 June 2022. The Joint Liquidators allege that, digital assets (or entitlements to digital assets) associated with 3AC's accounts on the Exchange, with a value of over $1 billion, were sold or liquidated to substantially reduce (in absolute value terms) 3AC's negative USD liabilities reflected on the Exchange.

48.    These transactions are alleged to have amounted to an unfair preference within the meaning of section 245(1) of the BVI IA because they depleted the assets (or the value thereof) that would have been available to 3AC's general body of

---

[15] Section 249(3) of the BVI IA.
[16] Section 250(2) of the BVI IA.
[17] ***UBS AG New York and others (Appellants) v Fairfield Sentry Ltd (In Liquidation) and others (Respondents) (British Virgin Islands)*** [2019] UKPC 20 at [11].

creditors, and did so to the advantage of FTX because the transactions resulted in repayment in full of liabilities that 3AC owed to FTX. Thus, it is alleged, FTX was put into a better position relative to 3AC's other creditors in a hypothetical liquidation at the time of such transactions[18].

49.     The FTX Recovery Trust argues that the preference claim fails under BVI law because, as set out in the Atherton Declaration:

    a.     There was no *"transaction"* that could support such an unfair preference claim because 3AC did not have any proprietary interests in the digital assets associated with 3AC's accounts on the Exchange as at the end of 12 June 2022. Accordingly, none of the activity associated with the accounts on 13 and 14 June 2022 could be said to have resulted in a depletion of assets which might otherwise have been available to the general body of creditors of 3AC;

    b.     FTX's Liquidation on 14 June 2022 did not constitute transactions *"entered into"* by 3AC, so the Joint Liquidators cannot state an unfair preference as to such transactions;

    c.     The Joint Liquidators have not provided evidence to show that 3AC was insolvent on 13 or 14 June 2022;

    d.     The unfair preference claim fails because the Joint Liquidators cannot establish that FTX was a creditor of 3AC during the relevant time. This is said to follow from the premise that there was never a negative overall "Account Balance" on 3AC's accounts 13 or 14 June 2022;

    e.     FTX was not put in a better position as a result of the transactions that occurred on 13 or 14 June 2022, including purportedly because there would have been a statutory insolvency set-off whereby 3AC's asset entitlements from the FTX Exchange would have automatically been offset by its liabilities to FTX; and

---

[18] See APOC at [40] – [44], [46] – [52].

    f.    The transactions that occurred on 13 and 14 June 2022 took place in the ordinary course of business, so they cannot constitute an unfair preference by virtue of section 245(2) of the BVI IA.

50.    I disagree with each of these contentions by the FTX Recovery Trust and address each in turn below.

    **3.    A Section 245 "Transaction" Does Not Require a Proprietary Interest in the Assets Transferred, and the FTX Recovery Trust Concedes That 3AC Had Such an Interest Regardless**

51.    In the Atherton Declaration, Mr Atherton KC narrowly construes the terms *"transaction"* and *"insolvency transaction"* as used in section 245(1) of the BVI IA to exclude transactions involving assets in which the insolvent company does not have a proprietary interest[19].

52.    I disagree with Mr Atherton's interpretation, which I believe is unduly restrictive and inconsistent with highly persuasive authority that would be applied in the BVI. The BVI IA does not contain a definition of the word *"transaction"*[20]. In my opinion, the BVI court would give a broad interpretation to the word *"transaction"* in section 245 of the BVI IA so as to include any arrangement which has the effect of conferring an advantage on a creditor in relation to past indebtedness of the company in preference to its other creditors, regardless of the company's ownership of the subject matter of the transaction. To conclude otherwise would risk undermining the statutory purpose behind section 245, which is to prevent circumvention of the *pari passu* principle[21].

53.    Strong support for a broad interpretation of section 245, and the conclusion that section 245 does *not* limit its application to *"transactions"* involving assets owned by the company, is drawn from the recent decision of the UK Supreme Court in ***Invest Bank PSC v El-Husseiny*** [2025] 2 WLR 320. In that case the UK Supreme Court had to consider the meaning of the word *"transaction"* (as defined in section 436 of the UK IA) in the context of section 423 of the UK

---

[19] See e.g. [27] – [29] of the Atherton Declaration.
[20] This is in contrast to the UK IA which expressly (and broadly) defines "transaction" in section 436 as follows: *""transaction" includes a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly"*.
[21] See ***McPherson and Keay's Law of Company Liquidation*** at [11-017]; ***Goode & McKendrick on Commercial Law*** (6th edition) at [31.38].

IA, which confers a wide-ranging power on the court to unwind transactions at an undervalue that have been entered into by a debtor with an intention to defraud creditors. Although this power is contained in the UK IA, its exercise is not dependent on the debtor having been insolvent at the time of the transaction or becoming insolvent as a result of it[22].

54.     The specific question the UK Supreme Court had to consider in the **Invest Bank** case was whether section 423 could apply to a transaction whereby a debtor caused a company which he owned to transfer a valuable asset for no consideration or at an undervalue, thereby reducing or eliminating the value of his shares in the company to the prejudice of his creditors. The UK Supreme Court held that it could. It concluded that, on a straightforward reading of section 423, and in light of the broad definition of *"transaction"* in section 436, there was no requirement that the transaction under challenge should involve a disposal of assets owned by the debtor (there, the owner of the company).

55.     The UK Supreme Court further held (at [61] – [72]) that the word *"transaction"* in section 423 carries the same meaning as it does in section 238 of the UK IA (i.e. the analogue of section 246 of the BVI IA), which deals with remediation of transactions at an undervalue.

56.     I note that Mr Atherton KC expresses the view[23] that *"there is no reason to think that the reasoning in the Invest Bank case as regards the interpretation of the Insolvency Act 1986 in England would be applied by the Courts in the BVI"*. He notes, correctly, that the BVI IA does not contain a provision equivalent to section 423 of the UK IA, nor does it contain a definition of the word *"transaction"*. From that, Mr Atherton KC reasons that *"the issue of interpretation that arose ... in the Invest Bank case does not and will not arise*

---

[22] The closest BVI equivalent is section 81 of the BVI Conveyancing and Law of Property Act 1961, which provides that *"every conveyance of property made ... with intent to defraud creditors shall be voidable at the instance of any person thereby prejudiced"*. By section 2 of that Act, *"conveyance"* is broadly defined to include *"a mortgage, charge, lease, assent, vesting declaration, vesting instrument, disclaimer, release and every other assurance of property or of an interest therein by any instrument, except a will"*, and *"convey"* has a corresponding meaning. *"Property"* is similarly broadly defined in the Act as including *"anything in action, and any interest in real or personal property"*. Both this provision and section 423 of the UK IA derive ultimately from the Fraudulent Conveyances Act 1571, which remains in force in the BVI: see **VTB Bank v Miccros**, *supra*, at [42] – [48] per Jack J and **Nissan Motor Company & Ors v Goshn & Ors** BVIHCM2019/0121 (9 August 2024) at [73] per Wallbank J.
[23] In [70] – [71] of the Atherton Declaration.

*in the BVI under the Insolvency Act"*, and concludes by saying that the *"case has no application to a consideration of the meaning of the words "insolvency transaction" within the* [BVI IA]*"*[24].

57.    I disagree with Mr Atherton KC's analysis and conclusion. Whilst I obviously accept that the UK Supreme Court was considering a different provision (the BVI equivalent of which is not found in the BVI IA), it was nonetheless engaged in a process of statutory construction (the rules of which would be materially the same in the BVI). Importantly, under the heading *"A straightforward reading of section 423"*, the UK Supreme Court held in the **Invest Bank** case, at [33], that a straightforward reading of that section, together with the definition of *"transaction"* in UK IA section 436, would suggest that the transaction under consideration in that case fell within section 423(1), and that there was no requirement for the debtor himself to dispose of property belonging to him (i.e. property in which he had a proprietary interest). At [37], Lady Rose and Lord Richards (with whom the other Justices agreed) said, *"where* [section 423] *contains no express requirement for a disposal of any property belonging to the debtor (as the appellants accept), the application of well-established principles of statutory construction would seem to lead to the same analysis as* [the judge at first instance and the English Court of Appeal] *on this issue*"[25].

58.    Furthermore, the UK Supreme Court noted (at [60]) that the suggestion that a transaction must relate to property that is owned by the debtor would be to impose a restriction which was not justified by the language of the relevant section and would undermine its very purpose. That reasoning applies to the BVI IA as well.

59.    In [61] onwards, the UK Supreme Court considered the inter-relationship between UK IA section 423 and sections 238 and 339 (which deal respectively

---

[24] In [71] of the Atherton Declaration.
[25] See also [53] – [56] of the UK Supreme Court decision. At first instance, Andrew Baker J held, with reference to the statutory language, that *"it is impossible to say that it is a pre-requisite of a transaction entered into by a debtor, for it to fall under section 423, that it concerns an asset beneficially owned by the debtor"* (see [12] of the UK Supreme Court decision). As regards the English Court of Appeal's judgment, this is summarized at [19] of the UK Supreme Court decision in broad terms. Amongst other things, the English Court of Appeal held that section 423 used very broad language and did not appear to require the transfer of any assets, *"let alone assets of which the debtor is the beneficial owner"*, and that there was no policy reason why the provision should be read in such a restrictive manner (see the judgment of the English Court of Appeal at [2024] KB 49 at [60] – [67]).

with undervalue transactions in corporate and personal insolvency), and said at [64] that those sections shared a common purpose, i.e. to set aside or provide other redress in cases where there have been transactions at an undervalue which have prejudiced creditors. It concluded that it could see no reason as a matter of policy or purpose why a transfer by a company owned by an insolvent company or bankrupt individual should not fall within those sections. In other words, there was no basis for reading into those sections a requirement that the transaction under challenge should involve an asset in which the insolvent company or bankrupt individual had a proprietary interest. There likewise is no reason to read such an unwritten requirement into the relevant provisions of the BVI IA, in contravention of their remedial purpose.

60.     Nothing in the UK Supreme Court's decision suggests to me that the particular definition of *"transaction"* in section 436 of the UK IA was critical to its conclusion that *"transaction"* in section 423 (and sections 238 and 339) did not import a requirement of a proprietary interest in the transferred asset. Put another way, based on the UK Supreme Court's reasoning, I believe that its conclusion would have been the same if the UK IA (like the BVI IA) had not contained a definition of *"transaction"*. In essence, the UK Supreme Court concluded, applying well-established principles of statutory construction, that the transaction under consideration was caught by section 423 because it was well within the mischief at which section 423 is aimed, and there was no express wording in section 423 limiting its application to a transaction involving an asset belonging in any capacity to the debtor (see [37]).

61.     In my view the BVI court would undoubtedly have regard to the reasoning of the UK Supreme Court in **Invest Bank** in considering the meaning of *"transaction"* in section 245 (and section 246) of the BVI IA and find it highly persuasive. Like section 423 of the UK IA, the wording of section 245 of the BVI IA does not expressly limit its application to a transaction involving an asset belonging to the insolvent company. Nor does any such limitation appear in the definition of *"insolvency transaction"* in section 244(2). Further, it is not difficult to imagine a transaction which would be well within the mischief at which section 245 is aimed, but which does not involve an asset belonging to

the insolvent company. For example, the company might agree with a creditor that it will cause one of its subsidiaries to transfer an asset belonging to the subsidiary to the creditor in satisfaction of a pre-liquidation debt owed by the company. That transaction would undoubtedly have put the creditor in a better position than the company's general body of creditors, thereby circumventing the *pari passu* principle, but it would not have been a transaction involving an asset in which the company had a proprietary interest.

62.    Accordingly, in the same way and for the same reasons that the UK Supreme Court concluded that there was no reason to limit the application of section 423 of the UK IA to a transaction involving an asset belonging beneficially to a debtor, I consider that the BVI court would likely conclude that there is no reason to limit section 245 (or section 246) of the BVI IA to such a transaction.

63.    Mr Atherton KC's narrower interpretation of the word *"transaction"* in sections 244 to 246 of the BVI IA requires reading words into those provisions (an approach which was rejected by the English courts at all levels in ***Invest Bank***), and also fails to address the very mischief to which the relevant provisions are directed. It seems to me that, if Mr Atherton were right, section 246 of the BVI IA would be toothless in the face of a transaction such as that which was under consideration in ***Invest Bank*** (i.e. a transfer at an undervalue of an asset belonging to a company wholly owned by the debtor). I think that the BVI court would be very unlikely to reach that conclusion.

64.    The fact that such a transaction might also be caught by section 81 of the Conveyancing and Law of Property Act 1961 (or indeed the Fraudulent Conveyances Act 1571), as Mr Atherton KC suggests, would not, in my view, prevent it from also being caught by section 246 of the BVI IA. As the UK Supreme Court explained at [74] of ***Invest Bank***, the same transaction can fall within more than one of the relevant provisions (transactions at an undervalue, preference or transaction defrauding creditors). Conversely, if section 81 were limited to property belonging to the debtor, that would not in my view be a reason to construe section 246 (or section 245) of the BVI IA as being so limited (indeed quite the reverse).

65.    In short, there is nothing in the language of the relevant provisions in the BVI IA to limit their scope to transactions involving assets in which the insolvent company had a proprietary interest, and I note that Mr Atherton KC does not point to anything in the BVI IA in support of his conclusion.

66.    In a recent decision in the Cayman Islands, *In the matter of HQP Corporation Limited (in Official Liquidation)* 2023 (2) CILR 203, Doyle J considered the doctrine of *stare decisis* in seven jurisdictions having the Privy Council as its ultimate appellate tribunal[26]. The analysis did not include the BVI; however in my view its courts would adopt the same approach as those of the Cayman Islands in respect of this doctrine. Doyle J concluded, at [70], that the essential reasoning, or *ratio decidendi*, of a judgment of the Privy Council on an appeal from the Cayman Islands is binding on all judges in those islands, and that decisions of the House of Lords (now the UK Supreme Court) are not binding but are persuasive, or highly persuasive, such that a Cayman Islands judge may decline to follow them only in certain circumstances[27]. I consider that a BVI court would find the reasoning in *Invest Bank* highly persuasive; although it would not be "exactly on point" when it came to construing the relevant BVI legislation, it is nonetheless of great significance.

67.    In support of his narrow interpretation of the word *"transaction"* in section 245(1), Mr Atherton KC invokes the *"mischief"* at which the section is aimed, which he says is *"to preserve the assets of an insolvent company for the benefit of its creditors as a whole"*[28]. I would take issue with that formulation of the mischief at which section 245(1) is aimed. In my view, it would be more accurate to say that the mischief at which the section is aimed is the circumvention of the *pari passu* principle. This occurs when, as a result of a transaction, a creditor is put in a better position than other creditors of equal rank, regardless of whether the transaction involves an asset belonging to the company. Thus, for example, the High Court of Australia (i.e. Australia's highest Court) held in *G&M Aldridge Pty Ltd v Walsh* [2002] BPIR 482 that

---

[26] An appeal against this judgment was heard by the Cayman Islands Court of Appeal in November 2024 and at the time of writing its judgment is awaited. I will update the Court in the event that the Cayman Islands Court of Appeal's decision materially affects the conclusions expressed herein based on Doyle J's decision.
[27] See [70] of the judgment.
[28] See [27] of the Atherton Declaration.

payments made to certain unsecured creditors out of a fund that was subject to a floating charge in favour of a bank[29] which had crystallised shortly before the payments were made amounted to a preference. The creditors had received an advantage over other creditors simply because they had received a payment in respect of an unsecured pre-liquidation debt, whereas other unsecured creditors had not. The High Court of Australia rejected the argument that the payments did not amount to preferences because they were made from funds which were unavailable for distribution to the general body of creditors[30].

68.     I note that Mr Atherton KC relies on a first instance decision from England, *Mundy v Brown* [2011] BPIR 1056, in support of his view that a transaction cannot amount to a preference within the meaning of section 245(1) unless it involves an asset owned by the company which would otherwise have been available for distribution among the general body of creditors[31]. In the *Mundy v Brown* case the English High Court held that the fact that certain payments were made out of funds which were the subject of a so-called *Quistclose* trust[32] (and therefore did not beneficially belong to the company in liquidation) provided a complete defence to a claim that the payments had been preferences within the meaning of section 239 of the UK IA. The Judge (HHJ Raynor QC) held (at [29]) that both preference and undervalue claims were based upon the premise that funds belonging to the company had been wrongfully applied either in a preference or in a transaction at an undervalue.

69.     The Judge in *Mundy v Brown* cites no authority at all for the proposition that a preference claim is premised on funds beneficially belonging to the company having been wrongfully applied to prefer a creditor. For one thing, such an

---

[29] A floating charge differs from a fixed charge in that the asset (or class of assets) subject to the charge is not finally appropriated as security for the payment of the debt until the occurrence of some future event. In the meantime, the chargor is free to use the charged asset (or class of assets) and remove it from the security: see *In re Spectrum Plus Ltd (in Liquidation)* [2005] 2 AC 680 (House of Lords).

[30] See also *Re Emanuel (No.14) Pty Ltd (in Liquidation)* (1997) 15 ACLC 1099 in which the company was owed a debt by a third party, who agreed to pay one of the company's creditors in settlement of what was owed to the company. The Full Federal Court of Australia held that the payment to the company's creditor by the third party was a preference.

[31] See [29] and footnote 33 of the Atherton Declaration.

[32] A *Quistclose* trust (named after the decision of the House of Lords in *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567) arises where money is advanced for a specific purpose and the borrower is not free to apply the money for any other purpose. It prevents the borrower from obtaining any beneficial interest in the money, at least while the designated purpose is still capable of being carried out.

approach would preclude an unfair preference claim in the archetypal case where funds in a company bank account, in respect of which the company has only a contractual entitlement, are used to pay a creditor. Further, the decision of the High Court of Australia in *G&M Aldridge Pty Ltd v Walsh* does not appear to have been considered by the Judge in *Mundy v Brown*. Further, *Mundy v Brown* of course pre-dates the decision of the UK Supreme Court in the *Invest Bank* case by some years (which is binding on English courts)[33].

70.     For the reasons set out above, I consider that a BVI court in 2025 would, rather than follow *Mundy v Brown*, adopt the reasoning of the UK Supreme Court in *Invest Bank* and hold that it is not a requirement of section 245(1) that the transaction said to constitute an unfair preference should necessarily involve an asset which belongs beneficially to the company.

71.     Accordingly, while I understand the Joint Liquidators contend that 3AC had a beneficial ownership interest in the assets subject to the transactions that underlie the unfair preference claim (discussed in greater detail below)[34], the Joint Liquidators are not required to make such a showing, or demonstrate any other form of ownership, to succeed on their unfair preference claim.

72.     Moreover, even if Lord Neuberger were correct that a preference requires a transaction involving the debtor's assets, it appears undisputed that the relevant transactions in the present case did involve the debtor's assets. Indeed, it appears to be accepted by the FTX Recovery Trust that 3AC had "entitlements" to the digital assets (and/or their value) associated with its accounts on the Exchange at the relevant times[35]. In my view that entitlement clearly constituted an "asset"

---

[33] The conclusion reached by the Deputy Judge in *Mundy v Brown* that a preference claim is premised on funds beneficially belonging to the company being wrongfully applied to prefer a creditor is also difficult to reconcile with certain *obiter dicta* in a subsequent decision of the English High Court. In *Re Hood* [2021] 2 WLR 313 the English High Court considered a third party's payment to the petitioning creditor purportedly discharging the debtor's petition debt to the creditor, where the debtor had agreed to repay or reimburse that third party. Section 284 of the UK IA renders void any disposition of property by a bankrupt individual between (a) the making of a bankruptcy application or presentation of a bankruptcy petition and (b) the making of a bankruptcy order. The question was whether the payment of the petition debt was a disposition of the debtor's property for the purposes of section 284. Green J held that it was not, as the debtor never beneficially owned the funds, but commented *obiter* that counsel for the respondent had accepted that there would probably be a good case for a preference claim against the petitioning creditor (who had been paid in full by the third party) under section 340 of the UK IA (which deals with preferences in the context of personal insolvency).
[34] APOC at [23] – [24]
[35] See e.g. [16] – [17] of the Objection. See also S. Coverick Dep. Tr. (Day 1) at 86:6–92:4.

of 3AC, as defined in section 2(1) of the BVI IA. This very broad provision explains that *"asset" "includes money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property"*. It is clear that an entitlement to digital assets and/or their value is an interest that falls within the broad definition of *"asset"* under the BVI IA.

73.    I note in this regard that the Commercial Division of the ECSC High Court has held in ***Smith v Torque Group Holdings Ltd*** BVIHC (Com) 0031 of 2021 (2 July 2021, Wallbank J) that crypto assets themselves are "assets" and "property" for the purposes of the BVI IA[36]. If that is right, it seems to me that a contractual right to sell, withdraw and transact with crypto assets from a commingled pool of such assets must be an "asset" and "property" for the purposes of the BVI IA as well.

74.    On this basis, I consider that the trades posited to be executed by 3AC on 13 and 14 June 2022 and by FTX on 14 June 2022 were clearly transactions that involved assets of 3AC within the meaning of the BVI IA (i.e. at the very least, contractual entitlements 3AC had to digital assets held by FTX) being sold to other users of the Exchange and the proceeds being applied to reduce 3AC's negative USD balance. As a result, those assets (and their value) were no longer available to the Joint Liquidators for distribution to the creditors of 3AC as a whole after 3AC went into liquidation on 27 June 2022. I therefore do not agree with Mr Atherton's view in [27] of the Atherton Declaration that the transactions on 13 and 14 June 2022 caused no detriment to the other creditors of 3AC because they supposedly did not involve assets that might otherwise have been available to distribute to 3AC's creditors in the course of its liquidation.

---

[36] In reaching this conclusion Wallbank J drew on the UK Jurisdiction Taskforce's *Legal statement on cryptoassets and smart contracts* (November 2019). In England the courts up to Court of Appeal level have confirmed that crypto assets are a form of property for the purposes of obtaining proprietary remedies in equity: see ***Tulip Trading Ltd v Bitcoin Assoc*** [2023] 4 WLR 16 at [24] per Birss LJ.

### 4.    3AC "Entered Into" the Relevant Transactions

75.    As noted above, an unfair preference claimant must also demonstrate that the relevant transactions were *"entered into"* by the company under section 245(1) of the BVI IA.

76.    I agree with Mr Atherton KC when he explains, at [30] of the Atherton Declaration, that the definition of *"insolvency transaction"* in section 244(2) does not expressly require that an *"insolvency transaction"* must be entered into by the company itself, and that all that is required for the purposes of that definition is for the transaction to occur at a time that the company is insolvent, or for the transaction to cause its insolvency. I also agree with his conclusion in [31] that to qualify as a transaction subject to section 245 the relevant transaction has to be "entered into by [the] company". That is clear from the wording of section 245(1).

77.    Guidance on what it means to for a company to have *"entered into"* a transaction may be found in the decision of the English Court of Appeal in ***Hunt (Liquidator of Ovenden Colbert Printers Ltd) v Hosking*** [2015] BCC 615. In that case Kitchin LJ explained (at [32]), when considering section 238 of the UK IA (transactions at an undervalue), that a *"transaction"* which is *"entered into"* by the company *"connotes the taking of some step or act of participation by the company ... or* [that the company] *in some other way be party to or involved in the transaction in issue so that it can properly be said to have entered into it"*.

78.    I consider that a BVI court, when construing section 245(1) of the BVI IA, would consider the English decision in ***Hunt*** and look to see whether (per ***Hunt***) there had been *"the taking of some step or act of participation by"* 3AC, or whether 3AC was, *"in some other way ... party to or involved in the transaction so that it can properly be said to have entered into it"*.

79.    Based on the instructions and documents I have been provided, I understand that there are two series of transactions said to constitute an unfair preference: (a) a substantial number of sales and trades of digital assets associated with 3AC's accounts on the Exchange between 13 and 14 June 2022, which the FTX

Recovery Trust asserts were initiated by 3AC, and (b) the liquidations of digital assets associated with 3AC's accounts on 14 June 2022, which FTX concedes it conducted. I address whether each series of transactions was *"entered into"* by the company, here 3AC, below.

80.     I accept that, to the extent the decline in the value of 3AC's digital asset balance was attributable to a decline in the market price of the underlying digital assets that 3AC kept rather than sold, then that decline in value could not form part of any unfair preference claim.

81.     Similarly, I accept that any withdrawals from the FTX Exchange by 3AC of cash or digital assets for its own benefit that it kept could not form part of any preference claim against FTX.

### a.      13 and 14 June 2022 Trades Ostensibly by 3AC

82.     The FTX Recovery Trust asserts that 3AC itself carried out more than 52,000 trades on 13 and 14 June 2022 in which it sold digital assets associated with its accounts on the FTX Exchange (allegedly valued at some $842 million), and that the proceeds of those transactions (or associated ledger credits) were used to reduce 3AC's negative USD balance on the Exchange[37].

83.     Insofar as the FTX Recovery Trust is correct that 3AC carried out each of these trades on 13 and 14 June 2022, then it seems to me that each such trade was plainly *"a transaction entered into by a company"* for the purposes of section 245(1) of the BVI IA, and therefore potentially an unfair preference within the meaning of that section if the requirements of sub-sections (a) to (c) are met and it did not take place in the ordinary course of business (all of which I address further below).

### b.      14 June 2022 Admitted Liquidation by FTX

84.     I now turn to the question whether the Liquidation on 14 June 2022, whereby FTX (purportedly in the exercise of its contractual rights) sold $82 million worth of digital assets associated with 3AC's accounts to other users on the

---

[37] See [90] – [94] of the Objection.

Exchange and used the proceeds to reduce 3AC's negative USD balance[38], could be said to have amounted to a *"transaction entered into"* by 3AC for the purposes of section 245(1) of the BVI IA. In considering this issue, I express no view on whether FTX was contractually entitled to carry out the Liquidation (as it claims to have been).

85.  As I understand it, the FTX Recovery Trust contends that FTX was authorised to carry out the Liquidation by the terms and conditions which governed its relationship with 3AC. It is not clear from the Objection or the materials I have reviewed precisely which provision(s) the FTX Recovery Trust is relying on for this purported contractual right, but I assume it has in mind clause 10.3 of the May 2022 TOS, whereby 3AC authorised FTX to sell digital assets in its accounts to recover an outstanding debit balance, and/or clause 4(c) of the MLCA, whereby 3AC authorised FTX to a sell any assets held in its accounts in order to obtain liquidity to comply with collateral requirements in respect of "Indebtedness" within the meaning of the MLCA. Insofar as the FTX Recovery Trust were to rely on other provisions in the May 2022 TOS, it seems to me that (assuming the validity of the May 2022 TOS) by entering into an agreement with FTX on the terms set out in the May 2022 TOS 3AC would have agreed to FTX enforcing such provisions.

86.  As Mr Atherton KC correctly observes at [68] of the Atherton Declaration, a transaction for the purposes of section 245(1) can include a series of transactions and as such may encapsulate a period of dealing between the relevant parties and may also apply to a composite transaction[39].

87.  Applying that principle here, and with reference to the ***Hunt*** case, if the US Bankruptcy Court determines that FTX carried out the Liquidation pursuant to the authorisation granted by FTX in clause 10.3 of the May 2022 TOS (or other provisions of the May 2022 TOS) and/or clause 4(c) of the LOCA, I consider that the grant of that authorisation and the Liquidation could properly be said to have formed part of a composite transaction for the purposes of section 245(1).

---

[38] As described in [95] – [104] of the Objection.
[39] See e.g. ***Phillips v Brewin Dolphin Bell Lawrie Ltd*** [2001] 1 WLR 143 in which the House of Lords held that two linked, but distinct, contracts made up a single "transaction" for the purposes of section 238 of the UK IA (transactions at an undervalue).

That composite transaction began with the grant of the authorisation (on 13 May 2022 when the May 2022 TOS came into force and/or on 30 March 2022 when FTX and 3AC entered into the MLCA) and concluded with the Liquidation on 14 June 2022, and therefore occurred entirely within the *"vulnerability period"* (defined below)[40]. In that scenario, I consider that the composite transaction culminating in the Liquidation constitutes a *"transaction entered into"* by 3AC within the meaning of section 245(1) of the BVI IA.

88.    Although not dispositive to my analysis, I also understand that the facts are that 3AC was given extensive advance notice of FTX's intended Liquidation and engaged with FTX regarding the prospect of the Liquidation[41]. If it could have objected to the Liquidation (on the basis that FTX was not contractually entitled to carry it out) or prevented it from occurring by, amongst other things, depositing additional assets into its accounts on the Exchange (as I understand the facts show[42]), but 3AC elected not to do so and thereby permitted the Liquidation to go ahead, these actions would show a degree of involvement by 3AC in the Liquidation that a BVI court may also deem relevant in assessing whether the Liquidation constitutes a *"transaction entered into"* by 3AC under section 245(1).

### 5.    3AC's Insolvency

89.    Section 244(2) of the BVI IA provides that a transaction is an *"insolvency transaction"* if (a) it is entered into at a time when the company is insolvent, or (b) it causes the company to become insolvent.

90.    Section 244(3) of the BVI IA provides that, for the purposes of section 244(2), *"insolvent"* has the meaning specified in section 8(1) with the deletion of paragraph (c)(i). Section 8(1) reads as follows:

   *"A company or a foreign company is insolvent if—*

---

[40] See ***Re Jackson & Bassford Ltd*** [1906] 2 Ch. 467 in which an agreement to give security for a debt on demand by the creditor, and the subsequent giving of such security pursuant to a demand, within the vulnerability period was held to be a preference (cited in ***Goode on Principles of Corporate Insolvency Law*** (5th edition) at 13-74 where the authors also express the view that an agreement for set-off, beyond what would be allowed to the creditor under the rules governing insolvency set-off, is capable of amounting to a preference).
[41] See Exhibits B and D to the Beller Declaration.
[42] See S. Coverick Dep. Tr. (Day 2) at 264:4–266:17.

> (a)  *it fails to comply with the requirements of a statutory demand that has not been set aside under section 157;*
>
> (b)  *execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the company is returned wholly or partly unsatisfied; or*
>
> (c)  *either—*
>
>> (i)  *the value of the company's liabilities exceeds its assets; or*
>>
>> (ii)  *the company is unable to pay its debts as they fall due".*

91.  Sub-sections (a) and (b) are deeming provisions. Non-compliance with a statutory demand which has not been set aside or non-satisfaction of execution of a judgment debt results in the company being deemed to be insolvent (regardless of its actual financial position). If neither of those deeming provisions applies, insolvency for the purposes of the voidable transactions provisions in Part VIII of the BVI IA (which includes section 245 thereof) is determined by reference to the "cash-flow" test, i.e. whether the company is unable to pay its liabilities as they fall due.

92.  I am not aware of a BVI court having considered the "cash-flow" test in detail but am of the view that, in determining this question, the BVI court would not be confined to considering the company's cash-flow position at the relevant date, but would undertake a commercial assessment of insolvency and would have regard to the company's likely position in the near future. As Briggs J (now Lord Briggs JSC) put it in ***Re Cheyne Finance plc (No.2)*** [2008] Bus. L.R. 1562 at [51]:

> *"... cash-flow or commercial insolvency is not to be ascertained by a slavish focus only on debts due as at the relevant date. Such a blinkered review will, in some cases, fail to see that a momentary inability to pay is only the result of a temporary lack of liquidity soon to be remedied, and in other cases fail to see that due to an endemic shortage of working capital a company is on any commercial view insolvent, even though it*

*may continue to pay its debts for the next few days, weeks or even months before an inevitable failure".*

93.  **Re Cheyne Finance** was cited with approval by the UK Supreme Court in **BNY Corporate Trustee Services Ltd v Eurosail-UK-2007-3BL plc** [2013] 1 WLR 1408. In that case Lord Walker of Gestingthorpe said this at [37]:

> *"… the "cash-flow" test is concerned, not simply with the petitioner's own presently-due debt, nor only with other presently-due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business".*

94.  Thus, the company's balance sheet position will still be relevant in applying the cash-flow test. If the company is carrying indebtedness on its balance sheet which will fall due in the reasonably near future and which the company has no realistic prospect of repaying when it does fall due, the company may be said to be insolvent on the cash-flow basis, even if it could still pay its debts presently due.

95.  The APOC asserts that 3AC was cash-flow insolvent on 12 to 14 June 2022 as deteriorating market conditions up to June 2022 constituted a material adverse effect (amongst other events of default) under certain master loan agreements under which 3AC was a borrower[43]. The APOC alleges that these events of default either accelerated the loans or rendered them immediately payable, such that 3AC was cash-flow insolvent on each of these dates. It is said that between 12 and 14 June 2022 3AC had large deficits against the sums due under the various loans.

96.  If these (or substantially similar) allegations were substantiated, I am confident that a BVI court would find that evidence sufficient to determine that the 13 to 14 June 2022 transactions at issue in this case were entered into at a time when 3AC was insolvent within the meaning of section 244 of the BVI IA.

---

[43] APOC at [49].

**6.    The Relevant Transactions Occurred within the Vulnerability Period**

97.    For the purposes of the unfair preference provisions in section 245, the *"vulnerability period"* is the period of 2 years (in the case of a preference given to a connected person) or 6 months (in the case of a preference given to any other person) prior to the *"onset of insolvency"* and ending on the appointment of the liquidator by the court. The *"onset of insolvency"* in a case where the liquidator has been appointed by the court (such as the present), is the date on which the application for the appointment of the liquidator was filed[44].

98.    The transactions which are said by the Joint Liquidators to have constituted unfair preferences within the meaning of section 245(1) occurred on 13 and 14 June 2022. That is within the period commencing six months prior to the *"onset of insolvency"* (i.e. within the period commencing six months prior to 27 June 2022, being the date on which the application for the appointment of the Joint Liquidators was filed)[45], and therefore within the *"vulnerability period"* as defined in section 244(1) of the BVI IA[46].

**7.    FTX Was Put in a Better Position as a Creditor of 3AC and Otherwise Benefitted from the Transactions**

99.    As for section 245(1)(c), the essence of a preference is that a creditor has received more from a company before it goes into liquidation than would otherwise have been received in a liquidation. A potential preferential transaction must involve a person in their capacity as an existing creditor and relate to a past indebtedness[47].

100.   The "better position" of the preferred creditor is measured at the time of each transaction by reference to a "hypothetical" liquidation of the company at that same time. The question a BVI court will ask itself is whether, if the transaction were permitted to stand, it would have the effect of disturbing the statutory order of priorities as regards payment in winding up:

---

[44] Section 244(1) of the BVI IA.
[45] See Exhibit 5 to the Declaration of Russell Crumpler dated 1 July 2022.
[46] I understand that Mr Atherton KC does not dispute that the relevant transactions occurred within the *"vulnerability period"*.
[47] See ***Goode***, *supra*, at [13-79].

> *"Preference is tested by reference to a hypothetical, not an actual, liquidation. It is not necessary that the company shall in fact have gone into liquidation, for the preference provisions apply equally in administration. If the company enters administration, the question of preference still has to be tested by asking whether **the effect of the payment, transfer or other act would be to put the creditor in a better position if winding-up were to supervene than he would otherwise have had.** It would seem that **for this purpose liquidation should be assumed to have taken place immediately after the payment**, transfer or other act in question, and with reference to creditors then existing, so that subsequent events (for example, the accrual of new preferential debts) should be ignored, a point which may assist a creditor who is collecting payment under a floating charge"*[48] *(emphasis added).*

101.    In order to satisfy section 245(1)(c) of the BVI IA in respect of FTX, the Joint Liquidators would therefore need to establish that the transactions on 13 and 14 June 2022 had the effect of putting FTX, as a creditor of 3AC, in a better position in a hypothetical liquidation at the time of those transactions than it would have been in had the transactions not been entered into.

102.    Alternatively, even if FTX itself was not a creditor of 3AC, but some other creditor was preferred and FTX nevertheless benefited from those transactions (otherwise than in good faith and for value), the BVI court could make an order requiring FTX to make a payment to the Joint Liquidators in a sum equivalent to the value of the benefits it has received from the transactions. As noted above, section 249(1) of the BVI IA gives the court a very wide discretion, in respect of a transaction held to be an unfair preference, to make *"such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction"*. Section 249(2)(d) makes it clear that this discretion may be exercised to, amongst others, *"require any person to pay, in respect of benefits received by him or her from the company, such sums to the office holder as the Court may direct"*. Further, section 249(3) expressly

---

[48] ***Goode**, supra, at [13-87]. See also **Re Ledingham-Smith** [1993] B.C.L.C. 635 and **Re Hawkes Hill Publishing Co Ltd** [2007] B.C.C. 937 (which was applied by the ECSC Court of Appeal in **Mackellar v Khoo Kin Yong & Ors** – Unreported – BVIHCMAP2013/008 – Transcript 14 April 2016).

provides that *"in respect of an unfair preference or an undervalue transaction, an order under* [section 249(1)] *may affect the assets of, or impose any obligation on, any person whether or not he or she is the person with whom the company in question entered into the transaction"*.

103.    This is subject to the proviso in section 250(2)(b) that an order under section 249(1) in respect of an unfair preference may not *"require a person who received a benefit from the transaction in good faith and for value to pay a sum to the office holder, except where that person was a party to the transaction or ... the preference was given to that person when he or she was a creditor of the company"*[49].

104.    I address each of these scenarios below.

> **a.    FTX Was a Creditor of 3AC, Regardless of Whether It Was the Lender of 3AC's Margin Borrowing or Whose Assets Were Lent**

105.    Section 9(1)(a) of the BVI IA provides that *"A person is a creditor of another person (the debtor) if he or she has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in—(a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company ..."*.

106.    *"Admissible claims"* are defined in section 11(2) of the BVI IA as *"liabilities"* of the company at the commencement of the liquidation, arising after the commencement of the liquidation by virtue of an obligation incurred before the commencement of the liquidation and any interest that may be claimed in accordance with the BVI IA or the BVI IR.

---

[49] See the decision of the English Court of Appeal in ***Re Sonatacus Ltd*** [2007] BCC 186 for an example of an order made under the equivalent provisions in the UK IA against a third party who was not a creditor of the company in liquidation but had nevertheless received a benefit from the transaction that constituted a preference otherwise than in good faith and for value, where that benefit was measured as the value of the preferential transfer. See also the decision of the ECSC Court of Appeal in ***Byers v Chen*** BVIHCVAP 2015/2011 (12 June 2018). In ***Byers v Chen***, although the ECSC Court of Appeal declined to make an order under section 249(3) against a third party on the grounds that she had not received any real benefit from the payment that was held to be an unfair preference, Baptiste JA explained (at [110]) that *"the absence of a benefit does not necessarily preclude an order pursuant to section 249(3)"* but instead was merely *"a factor which the court can take into account in the exercise of its discretion, whether or not to make an order against a third party"*.

107.    A *"liability"* is defined in section 10(1) of the BVI IA as *"a liability to pay money or money's worth including a liability under an enactment, a liability in contract, tort or bailment, a liability for a breach of trust and a liability arising out of an obligation to make restitution, and "liability" includes a debt".* As made clear in section 10(2), *"liabilities" "may be present or future, certain or contingent, fixed or liquidated, sounding only in damages or capable of being ascertained by fixed rules or as a matter of opinion".*

108.    In other words, a creditor is a person to whom the debtor owes a payment of money, even if that payment obligation is future, contingent or unliquidated.

109.    I understand that it is common ground between the Joint Liquidators and the FTX Recovery Trust that 3AC had a substantial negative USD balance in its accounts with FTX as at end of day 12 June 2022, although I understand that the parties dispute the amount of that negative balance at the relevant time.

110.    According to the Objection[50], 3AC's negative USD balance represents sums of USD borrowed by 3AC through (a) the Margin Program and (b) the $120 million LOC extended by FTX to 3AC pursuant to the LOCA.

111.    If 3AC's negative USD balance on 13 and 14 June 2022 (or any part of it) could be said to represent a liability that was owed by 3AC to FTX, then it seems to me that FTX was clearly a creditor of 3AC within the meaning of section 9(1)(a) of the BVI IA at the relevant time in respect of that balance.

112.    I note, however, that the FTX Recovery Trust disputes that the negative USD balance represented a liability owed by 3AC to FTX. It contends that the only relevant interest of 3AC, and potential source of liability, is an overall account balance, which it claims remained positive for 3AC throughout the period from 12 to 14 June 2022. On this basis, Mr Atherton KC expresses the view that FTX was in fact a debtor, and not a creditor, of 3AC at the relevant time. As a consequence, he says that there cannot be an unfair preference claim under section 245(1) against FTX[51].

---

[50] See [23] – [46] and [64] – [73] of the Objection.
[51] See [42] – [44] of the Atherton Declaration.

113.    As a preliminary matter, I believe that Mr Atherton's argument is inconsistent with the existence of the Margin Program, because if FTX customers' only "asset" was a net account balance, they would have had no digital assets or fiat currency to "lend" under the Margin Program, and thus could not have been "lenders". Nor do I see how the FTX Recovery Trust's acknowledgment that 3AC's debt obligations would "be a debt to the exchange"[52] can be reconciled with its suggestion that 3AC's margin borrowings were instead owed to other Exchange customers.

114.    Putting aside these inconsistencies, the relevant documents make clear that the FTX Recovery Trust is incorrect. The issue of whether the negative USD balance on 3AC's accounts with FTX at the relevant times represented a liability owed by 3AC to FTX seems to me to be a question of construction of the May 2022 TOS and the LOCA/MLCA[53]. Neither of those agreements is governed by BVI law. The May 2022 TOS are governed by English law and the LOCA and MLCA are governed by the laws of Antigua and Barbuda[54].

115.    In my experience, a BVI court would construe the May 2022 TOS without hearing expert evidence of English law (though has the discretion to require such evidence)[55]. That is because English law is not treated as foreign law in the BVI. Likewise, a BVI court is likely to be willing to determine the contents of the law of another Member State of the Eastern Caribbean Supreme Court (such as Antigua and Barbuda) without the benefit of expert evidence, at least where it is not suggested that there are any relevant differences between that law and English law (though again has the discretion to require such evidence)[56].

---

[52] See S. Coverick Dep. Tr. (Day 2) at 106:22–107:7.
[53] For purposes of this Declaration, I assume the validity of the May 2022 TOS, LOCA and MLCA and the terms therein, but offer no opinion on these subjects.
[54] Antigua and Barbuda is a former British colony. As in the case of the BVI, the common law of England was extended to Antigua and Barbuda by the Common Law (Declaration of Application) Act 1705. Like the BVI, Antigua and Barbuda is a member of the Eastern Caribbean Supreme Court.
[55] The BVI courts routinely consider questions of English law without hearing expert evidence from English law experts. So far as I am aware, only in one case, the ***Cukurova*** litigation, did the BVI court allow expert evidence of English law.
[56] See ***VTB Bank v Miccros***, *supra*, at [105] per Jack J.

116.    The approach adopted by the English courts to the interpretation of written
agreements was summarised by Lord Hamblen JSC in the following terms in
**Sara & Hossein Asset Holdings Ltd v Blacks Outdoor Retail Ltd** [2023] 1
WLR 575 (at [29]) (citing the earlier, more detailed discussion by Lord Hodge
JSC in **Wood v Capita Insurance Services Ltd** [2017] AC 1173 at [8] – [15]):

> "(1) The contract must be interpreted objectively by asking what a
> reasonable person, with all the background knowledge which would
> reasonably have been available to the parties when they entered into the
> contract, would have understood the language of the contract to mean.
>
> (2) The court must consider the contract as a whole and, depending on
> the nature, formality and quality of its drafting, give more or less weight
> to elements of the wider context in reaching its view as to its objective
> meaning.
>
> (3) Interpretation is a unitary exercise which involves an iterative
> process by which each suggested interpretation is checked against the
> provisions of the contract and its implications and consequences are
> investigated".

117.    It would appear (perhaps unsurprisingly) that the courts of Antigua and Barbuda
adopt the same approach: see **The Barbuda Council v PLH (Barbuda) Ltd**
ANUHCV2023/0043 (26 September 2024) per Byer J at [23], also citing the
decision of the UK Supreme Court in **Wood v Capita Insurance Services Ltd**.

118.    There are numerous aspects of the May 2022 TOS that indicate that FTX was
3AC's creditor in respect of its negative USD balance. First, I note that clause
8.2.6(C) provides that *"You control the Digital Assets held in your Account. At
any time, subject to outages, downtime, and other applicable policies (including
the Terms), you may withdraw your Digital Assets by sending them to a different
blockchain address controlled by you or a third party"*. It is in my view
significant that clause 8.2.6(C) permits a user to withdraw its Digital Assets
from its Account at any time. That is difficult to reconcile with the argument
advanced by the FTX Recovery Trust that FTX users' only asset on the
Exchange (and thus only potential liability) was their net overall account

balance. Had that been the intention of the parties, one would have expected clause 8.2.6(C) to provide that a user's right to withdraw Digital Assets was limited to the positive amount of the net account balance, but it does not.

119. Second, clause 10.1 of the May 2022 TOS provides that *"If at any time your Account has a debit balance, you agree to pay us* [i.e. FTX]*: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms."* Further, clause 10.3 provides, inter alia, that:

> *"If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:*
>
> *10.3.1  you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance …".*

120. I interpret "debit balance" to mean a negative USD balance, not an overall net account balance. The contrary interpretation, that the provisions of clause 10 are only engaged if the overall net account balance is in debit (i.e. if there is a negative balance on a user's fiat currency account which exceeds (in absolute value terms) the positive balance of its Digital Assets[57]), cannot be the correct construction of clause 10 based on an objective reading of the May 2022 TOS. That is because it would render FTX's right under clause 10.3.1 to sell Digital Assets *"to recover the outstanding debit balance"* entirely meaningless. By definition, on the FTX Recovery Trust's case, the right under clause 10.3.1 only arises in a situation in which the assets in the Account are insufficient to cover the negative balances of the Account. But on the FTX Recovery Trust's case, it would be impossible to recover the outstanding "debit balance" from the assets in the Account. In my view, the only commercially coherent construction of clause 10 is that it was intended to apply whenever there was a negative balance within a user's Account. In such a situation, the user was always liable to pay FTX the negative balance (plus the other sums mentioned in clause 10.1), just as a borrower is always liable on a demand note. If, upon demand, the user then

---

[57] See [62] of the Objection.

failed to pay the negative balance to FTX, FTX was entitled to sell assets in the Account to recover the outstanding balance.

121.   If that is the correct construction of clause 10, then it follows that FTX was a creditor of 3AC during the relevant period of 12 to 14 June 2022. It is common ground that 3AC had a substantial negative USD balance during that period (although the precise amount has yet to be determined). Under clause 10.1 it was liable to pay that negative balance *to FTX* and FTX was apparently entitled, if 3AC failed to pay the balance on demand, to sell Digital Assets within 3AC's accounts to recover that negative balance.

122.   Third, FTX is the only entity to which 3AC could owe payments. In particular, clause 16 of the May 2022 TOS deals with margin trading. Clause 16.2 provides, inter alia, as follows:

> *"If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debts to other Users … If, after your positions and Assets are liquidated, your Account still contains insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed …".*

123.   In arguing that 3AC did not have liabilities to FTX, the Objection asserts that *"3AC borrowed USD from a pool of lending customers, not from FTX"*[58]. But the issue under BVI law is not who lent 3AC USD, but who 3AC's creditor was, i.e. to whom 3AC owed a monetary payment. The Objection concedes that because of the way in which the FTX Exchange operated, there was no direct borrower-lender relationship among customers participating in the Margin Program., i.e. there was no customer lender to whom 3AC owed a monetary payment[59]. Confirming this, the May 2022 TOS constituted a contract only between FTX and an individual user such as 3AC; I have seen no evidence of

---

[58] See [161] of the Objection. See also [26] of the Objection, which asserts that *"the Margin Program was a … peer-to-peer market in which pools of customers borrowed assets from pools of other customers"*.
[59] See [28] of the Objection.

any contractual relationship between 3AC and any other users of the FTX Exchange in respect of the Margin Program.

124.   FTX could not have created an obligation for 3AC to pay other FTX customers acting as an agent for 3AC or other customers, because clause 2.1.3 of the May 2022 TOS expressly provides, inter alia, that FTX is not a customer's agent.

125.   Moreover, I note that clause 38.9 of the May 2022 TOS provides that, save as expressly provided, the May 2022 TOS *"are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the* [May 2022 TOS]*"*. Other customers of the Exchange do not fall within the definition of *"Affiliate"* contained in Schedule 1 to the May 2022 TOS, nor are there (as far as I can see) any provisions in the May 2022 TOS that create rights or remedies in any parties other than FTX in respect of the Margin Program. Clause 16.2 certainly does not appear to do so.

126.   Fourth, I note that clause 38.7 of the May 2022 TOS provides as follows:

>   *"**Set off***
>
>   *38.7.1   Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the* [May 2022 TOS] *or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the* [May 2022 TOS]*.*
>
>   *38.7.2   FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the [May 2022 TOS] or otherwise against any amounts payable by you to FTX Trading under the [May 2022 TOS]"*.

127.   This set off clause is clearly premised on FTX being a creditor of a customer such as 3AC under the May 2022 TOS. Further, it seems to me that the clause would be entirely meaningless if, as the FTX Recovery Trust contends, a

customer's account did not comprise separate assets and liabilities, but only a single asset represented by the customer's net account balance, as it is uncertain what there would be to set off under clause 38.7 on the FTX Recovery Trust's theory.

128.  In short, on an objective reading of the May 2022 TOS, FTX (or an affiliate thereof) appears to be the only entity to which any sums of money, margin borrowing repayment obligations or other Exchange-related liabilities were or could have been owed under the May 2022 TOS[60].

129.  The LOCA also supports the conclusion that FTX was a creditor of 3AC. The LOCA is an agreement between FTX and 3AC pursuant to which FTX provided 3AC with a $120 million LOC. The LOCA expressly defines FTX as the "Lender" of the LOC and 3AC as the "Borrower."  There are no other parties to the LOCA, and any financial obligations and liabilities of 3AC under the LOCA appear to have been owed only to FTX. I understand that the FTX Recovery Trust has taken the position that 3AC's LOC balance under the LOC as at end of the day on  12 June 2022 was in fact a constituent component of 3AC's negative USD balance on the FTX Exchange. Moreover, the FTX Recovery Trust asserts in its Objection that the LOC, which was *"fully utilized"* during the relevant time, *"allowed 3AC to trade using leverage without resorting to borrowing from the Margin Program up to the amount of the Line of Credit"*[61]. I also understand that the FTX Recovery Trust has represented that 3AC's interest payment obligations in respect of the utilised amount of the LOC were in fact paid to FTX (or affiliates)[62]. Accepting these assertions, it is impossible to see how any person or entity other than FTX was a creditor in respect of the portions of 3AC's negative USD balance on the Exchange attributable to the LOC during the relevant time. In addition, the fact that 3AC clearly owed FTX a money payment equal to the utilised amount of the LOC supports that the remainder of 3AC's negative USD balance was also a liability. When 3AC borrowed an additional USD beyond the maximum amount of the LOC, that

---

[60] Consistent with that objective reading, I understand that FTX's CEO during the relevant period testified that customer liabilities on the Exchange, including in respect of negative asset balances, were liabilities that customers owed to FTX. S. Bankman-Fried Dep. Tr. at 64:16–23.
[61] See [64] and [73] of the Objection.
[62] See Coverick Dep Tr. (Day 2) at 58:4–11, 172:4–13.

additional dollar also needed to be repaid, and the only entity to which that payment could go was FTX.

130.    The MLCA, which states in its introductory clause that 3AC was provided a *"debt"* thereunder, likewise supports the conclusion that FTX was a creditor of 3AC. Like the LOCA, there are no parties to the MLCA other than 3AC and FTX. Clause 21 of the MLCA makes this clear, emphasising that *"no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement"*. As with the LOCA, I see no provisions in the MLCA that create any financial obligations or liabilities to persons or entities other than FTX.

131.    In particular, clause 2 of the MLCA provides that *"Customer shall at all times be liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement. At any time, FTX may "call" the Indebtedness upon notice to Customer"*.

132.    The *"principal"* or *"other obligations owing under this Agreement"* include fiat currency or digital assets borrowed via margin trading, including 3AC's USD borrowings under the Margin Program, as such borrowings are the subject matter of the MLCA. 3AC would thus have been liable to repay that amount *to FTX* pursuant to clause 2 of the MLCA (regardless of the identity of the lender or lenders of such assets). Accordingly, FTX was in my view clearly a creditor of 3AC within the meaning of section 9(1) of the BVI IA in respect of any amount owing under the MLCA during the relevant period.

133.    Moreover, I see nothing in the MLCA that limits 3AC's repayment obligations to FTX only to the amount that 3AC's overall account balance was negative, as Mr Atherton's "unitary asset" argument would imply. Even assuming for the sake of argument that "debit balance" within the meaning of clause 2 of the MLCA refers to an overall net negative account balance, it is clear that 3AC's potential debt obligations to FTX under the MLCA are not so limited (or else the MLCA would have limited 3AC's indebtedness thereunder to any "debit balance").

134.    In light of these provisions, I consider that a BVI court would conclude that the May 2022 TOS and the LOCA/MLCA confirm FTX's creditor status vis-à-vis 3AC and disprove the FTX Recovery Trust's argument that 3AC's net overall account balance is to be regarded as its only asset on the FTX Exchange. Instead, a BVI court would likely conclude that the digital assets associated with 3AC's account were distinct assets to which 3AC was entitled and that, on the true construction of those documents, 3AC's borrowing liabilities in its accounts at the relevant time represented a debt owed by 3AC to FTX. There is in my view nothing in the wording of the May 2022 TOS and/or the LOCA/MLCA that states or implies that these distinct assets and liabilities do not exist (and instead that 3AC's net account balance defines the only relationship between 3AC and FTX); indeed, provisions like clauses 10.3 and 38.7 of the May 2022 TOS and clause 2 of the MLCA would be unnecessary and meaningless if that were the case.

135.    Accordingly, it seems to me that the only person to whom 3AC owed a monetary payment arising from its margin and LOC borrowing would be FTX, and so FTX would be a creditor of 3AC within the meaning of section 9(1) of the BVI IA in respect of any such liability. That is true even if such liability were contingent at the relevant time (e.g. if any right FTX had to liquidate 3AC's digital asset entitlements to reduce 3AC's negative USD balance had not yet crystallised).

**b.    FTX Was Put in a Better Position by the Relevant Transactions**

136.    As noted above, according to the Objection 3AC's negative USD balance was reduced by some $842 million as a result of 3AC ostensibly selling digital assets on 13 and 14 June 2022 and the proceeds of those sales being credited to its USD balance.

137.    If the negative USD balance represented a debt owed by 3AC to FTX (as I conclude above), then it would seem to me that (subject to the issue of insolvency set-off which I address below) the transactions entered into by 3AC on 13 and 14 June 2022 clearly had the effect of putting FTX in a better position vis-à-vis the other unsecured creditors of 3AC, in a hypothetical liquidation

immediately after the relevant transactions, than it would have been in had they not been entered into.

138.    Had the trades effected by 3AC on 13 and 14 June 2022 not occurred, and had 3AC gone into insolvent liquidation immediately thereafter each trade occurred, FTX would have received a smaller share of the value of the digital assets than were used to reduce the debt owed to it by 3AC because that sum would have been distributed among the general body of 3AC's creditors on a *pari passu* basis (after payment of the Joint Liquidator's expenses and any preferential claims).

139.    This is equally true of the Liquidation on 14 June 2022, which reduced 3AC's liabilities to FTX yet further by some $82 million.

140.    If the utilised amount of 3AC's $120 million LOC with FTX was not reflected in 3AC's negative USD balance, but was repaid to FTX by virtue of the transactions that occurred on 13 and 14 June 2022, then FTX was also put into a better position relative to 3AC's other unsecured creditors through repayment of the LOC balance owed to it.

141.    If, as discussed below, 3AC's negative USD balance were instead owed to other customers of the Exchange, then those customers were placed in a better position for corresponding reasons, thus satisfying this element of an unfair preference claim.

### c.    The BVI Statutory Insolvency Set-Off Is Inapplicable

142.    In [48] of the Atherton Declaration it is argued that the transactions that occurred on 13 and 14 June 2022 did not put FTX in a better position, even if 3AC's net account balance on the FTX Exchange was not considered a "unitary asset", because in the event of a hypothetical liquidation of 3AC taking place immediately after the relevant transactions, there would have occurred an automatic and self-executing insolvency set-off under section 150 of the BVI IA, which would have seen 3AC's positive digital asset balance being set-off automatically against its negative USD balance, thereby producing the same result as the FTX Recovery Trust's "unitary asset" theory.

143.    I disagree with Mr Atherton KC's analysis and conclusion. To the contrary, I believe that a BVI court would conclude that section 150 of the BVI IA has no application in the present case.

144.    Section 150 of the BVI IA provides as follows:

"(1) Subject to section 435, where, before the relevant time, there have been mutual credits, mutual debts or other mutual dealings between a debtor and a creditor claiming or intending to claim in the insolvency proceeding—

    (a)    an account shall be taken of what is due from each party to the other in respect of those mutual credits, mutual debts or other mutual dealings, as at the relevant time;

    (b)    the sum due from one party shall be set-off against the sums due from the other party; and

    (c)    only the balance of the account, if any, may be claimed in the insolvency proceeding or is payable to the debtor, as the case may be.

(2) A creditor is not entitled to claim the benefit of a set-off under this section if he or she had actual notice that the debtor was insolvent—

    (a)    at the time he or she gave credit to the debtor or received credit from the debtor; or

    (b)    at the time he or she acquired any claim against the debtor or any part of or interest in such a claim.

(3) For the purposes of subsection (2), "insolvent" has the meaning specified in section 8 with the deletion of subsection (1)(c)(i) of that section.

(4) Where, before the relevant time, a creditor waives or agrees that he or she will not claim the benefit of a set-off under this section, that waiver or agreement takes effect notwithstanding subsection (1), except to the extent that a creditor who was not a party to the agreement, or has not agreed otherwise, is prejudiced".

145.    As Mr Atherton KC points out, the set-off provided for in section 150, when it applies, is automatic and self-executing. Where it applies, it also displaces all other forms of set-off not exercised prior to the hypothetical liquidation[63]. That is, contracted-for set-off rights that were not exercised are irrelevant.

146.    Insolvency set-off under section 150 of the BVI IA applies only where there have been *"mutual credits, mutual debts or other mutual dealings"* between the parties. The requirement of mutuality means that both the claim and the counterclaim have to be commensurable, i.e. they must both be monetary claims or claims which a party is entitled to have reduced to money, and the claim and the counterclaim must be between the same parties in the same right[64].

147.    In my view the requirement of mutuality is not satisfied in the present case. FTX's claim against 3AC in respect of the negative USD balance, whether under the May 2022 TOS or the MLCA, is clearly a monetary claim; it is a liability in the nature of a monetary debt allegedly payable to FTX.

148.    It is difficult to see, however, how 3AC could be said to have a monetary claim against FTX in respect of its digital asset entitlements. Insofar as 3AC's digital asset entitlements, on a proper analysis, represent a proprietary entitlement (whether under a trust or a quasi-bailment relationship) to digital assets held by FTX, then 3AC's claim against FTX in respect of those assets would not be a claim sounding in money, but a claim for the assets themselves. As a matter of general principle, a proprietary (*in rem*) claim cannot be set off against a personal (*in personam*) claim[65]. Further, a person holding property as a trustee or bailee for another cannot set off against the obligations he owes in that capacity a money claim he has against the beneficiary or bailor, even in respect of that property[66]. In such a case the claim and the counterclaim are not

---

[63] *MS Fashions Ltd v Bank of Credit and Commerce International SA (No.2)* [1993] Ch 425, affirmed by the CA; *Stein v Blake* [1996] AC 243.

[64] See *Goode*, *supra*, at 9-24; *Stein v Blake*, *supra*, at 590; *Hiley v People's Prudential Assurance Co* (1938) 60 C.L.R. 468 at 496–497.

[65] *Rose v Hart* (1818) 8 Taunt 499 at 505; *Eberle's Hotels and Restaurant Co v Jonas* (1887) 18 QBD 459 at 467; *Ellis & Co's Trustee v Dixon-Johnson* [1925] AC 489 at 492; *Rolls Razor Ltd v Cox* [1967] 1 QB 552 at 571F, 578A–B (in respect of goods that were not certain to be sold); *Lehman Brothers International (Europe) (No 2)* [2010] 2 BCLC 301 at [331] – [337].

[66] See *Re Lehman Brothers International (Europe) Ltd* [2010] 2 BCLC 301 at [331] per Briggs J; *Lloyds Bank NZA Ltd v National Safety Council of Australia Victorian Division* (1993) 10 ACSR 572 at 581 per Phillips J (Court of Appeal of Victoria, Australia).

commensurable. This is so even if the property held on trust is itself a money fund. If the beneficiary in such a case goes into liquidation, the trustee must hand over the fund to the liquidator and is left to prove in the liquidation for his counterclaim[67].

149.    Accordingly, if it is determined by the US Bankruptcy Court that 3AC was the beneficial owner of digital assets associated with its accounts on the FTX Exchange (or a bailor of such assets), the FTX Recovery Trust would not be able to rely on insolvency set-off under section 150 of the BVI IA (or any other form of set-off) to reduce the amount of its liability in respect of any unfair preference claim under section 245(1).

150.    However, even if the digital assets entitlements could not be said to represent a proprietary entitlement to any digital assets held by FTX, but were purely contractual in nature, I would still be of the view that there would be a lack of mutuality, so that insolvency set-off would not apply. Under the May 2022 TOS, FTX's obligation to 3AC in respect of its digital asset balance is not an obligation to pay a sum of money. Rather, under clause 8.2 of the May 2022 TOS, FTX is required to deal with the digital assets associated with a user's accounts in accordance with that user's instructions. That could be to exchange one digital asset for another pursuant to clause 8.2.3, to sell a digital asset to another user for fiat currency under clause 8.2.4, or to withdraw a digital asset from the Exchange by sending it to a different blockchain address controlled by the user or a third party under clause 8.2.6(C). Those are not obligations to pay a sum of money, unlike 3AC's obligations to FTX in respect of the negative USD balance[68].

---

[67] *National Westminster Bank Plc v Halesowen Presswork and Assemblies Ltd* [1972] AC 785; *Re Mid-Kent Fruit Factory* [1896] 1 Ch 567.

[68] That the Joint Liquidators are seeking a monetary recovery from FTX in respect of the unfair preference claim does not create the requisite mutuality. That is because FTX's liability to repay the unfair preference does not arise until after the commencement of 3AC's liquidation and exists for the benefit of 3AC's unsecured creditors, not merely for the company's own benefit, whereas the debt owed by 3AC to FTX is a pre-liquidation trading liability; the two are temporally and substantively dissimilar: see *Lister v Hooson* [1908] 1 KB 174, *Re A Debtor* [1927] 1 Ch 410, and the decision of the Full Court of the Federal Court of Australia in *Morton as Liquidator of MJ Woodman Electrical Contractors Pty Ltd v Metal Manufacturers Pty Ltd* [2021] FCAFC 228.

151.    For these reasons, I disagree with Mr Atherton KC's conclusion that the transactions that occurred on 13 and 14 June 2022 did not put FTX in a better position due to an insolvency set-off under section 150 of the BVI IA.

152.    Separately from the insolvency set-off point, Mr Atherton KC argues in [49] – [53] of the Atherton Declaration that, insofar as any transactions that occurred on 13 and 14 June 2022 did not reduce 3AC's overall net account balance, they are not capable of constituting an unfair preference in circumstances where FTX had a right "*akin to a contractual right of set-off or a right of combination*" (pursuant to which it allegedly effected the Liquidation) because the existence of this right means that there was no change in the value of the assets available for the creditors as a whole. Accordingly, Mr Atherton asserts that the policy behind section 245 of the BVI IA is not engaged. Mr Atherton does not clearly specify the source of the contractual "set-off" right or "right of combination" under the May 2022 TOS pursuant to which FTX allegedly effected the Liquidation, nor am I aware of any factual materials reflecting FTX's invocation of any such right.

153.    I do not think that this argument would find favour with a BVI court, because contractual set-off rights that were not in fact exercised are irrelevant in the hypothetical liquidation, as noted above. This is because, if the transactions had not occurred and 3AC had gone into liquidation on 14 June 2022, FTX would have been prevented from exercising any contractual right of set-off by virtue of section 175(1)(c)(ii) of the BVI IA. Section 175(1)(c)(ii) provides that, with effect from the commencement of the liquidation of a company, no person may exercise or enforce, or continue to exercise or enforce any right or remedy over or against assets of the company[69]. Accordingly, in the hypothetical liquidation posited by section 245(1)(c) the digital assets which were sold by 3AC or FTX on 13 and 14 June 2022 would have been available for distribution among its creditors as a whole if the transactions under challenge had not occurred. Those transactions therefore squarely engage the policy behind section 245 of the BVI IA.

---

[69] This does not affect the right of a secured creditor to take possession of and realise or otherwise deal with the assets of the company over which that creditor has a security interest: see section 175(2).

154.    I note that, insofar as FTX were not a "creditor" of 3AC within the meaning of the BVI IA, as the FTX Recovery Trust and Mr Atherton KC elsewhere contend, then FTX could not avail itself of the insolvency set-off under section 150 in any event.

155.    I also note that the FTX Recovery Trust has not asserted that it is a secured creditor of 3AC and so do not address what implications that status would have.

### d.    FTX Otherwise Benefitted from the Relevant Transactions

#### (1)    FTX Benefited from the Avoidance of Losses It Would Have Absorbed

156.    Alternatively, as I indicated above, even if FTX was not a creditor of 3AC within the meaning of the BVI IA, a BVI court could, and I believe would, make an order against FTX under section 249(2)(d) of the BVI IA as a non-creditor which benefited from the relevant transactions.

157.    If, contrary to the conclusion I reached above, some or all of 3AC's negative USD balance represented a debt 3AC owed to other users of the Exchange (through the Margin Program), then the transactions said to have occurred on 13 and 14 June 2022, insofar as they involved the repayment of that debt through the sale of digital assets associated with 3AC's accounts, would have put those other users in a better position, relative to 3AC's other unsecured creditors, than they would otherwise have been in in a hypothetical liquidation of 3AC occurring immediately after the transactions. These transactions would thus remain unfair preferences under section 245.

158.    If FTX (or affiliated entities) would have absorbed the losses that would otherwise have been borne by other Exchange customers as a result of the non-repayment of 3AC's negative USD balance, as I understand FTX's CEO testified[70], then FTX benefited from the transactions, to the extent of the losses it avoided incurring. To determine the extent of the benefit under section 249(2)(d), I believe a BVI court would compare (a) the financial situation FTX would have been in had 3AC filed for liquidation immediately before the preferential transactions with (b) the financial situation FTX was in as a result

---

[70] See e.g. S. Bankman-Fried Dep. Tr. at 118:15–119:7, 130:12–20, 154:3–155:6.

of the transactions. Here, if 3AC had filed for liquidation immediately before the preferential transactions, then any attempt to seize or liquidate the assets in 3AC's accounts on the Exchange would have been stayed under BVI law in 3AC's liquidation proceedings and neither FTX nor any "creditor" customers would have had access to them. In this scenario, FTX would have to absorb 3AC's negative USD balance as a loss, because 3AC would not have repaid those liabilities (other than any amount FTX were to obtain if it submitted an allowed claim in 3AC's liquidation proceedings). Thus, by eliminating 3AC's negative USD balance on the Exchange, the transactions benefitted FTX by avoiding losses that FTX (or its affiliates) would otherwise have absorbed.

159.    In this scenario, I believe that a BVI court would deem it appropriate to require FTX to pay the Joint Liquidators, pursuant to section 249 of the BVI IA, the value of the benefits it received by virtue of preferential transactions in favor of other Exchange customers, which the BVI court would measure as the amount of losses FTX avoided incurring.

160.    If FTX would not have absorbed these losses, the preferential transactions still benefited FTX by enabling it to operate the Exchange in an orderly fashion. If 3AC had failed to repay other users of the Exchange any USD borrowings it owed them before going into liquidation, it may reasonably be supposed that FTX would have suffered significant reputational damage[71], and might even have incurred substantial liabilities to other users if it could be said that it had failed to take adequate precautions to prevent 3AC from defaulting on loans made to it by other users. Indeed, I understand that FTX likely strived to avoid situations where borrowing customers incurred negative account balances due to leveraged trading the incurrence of such losses would make the Exchange less attractive to its customer base[72]. Moreover, insofar as FTX did not return assets to the customers who loaned them to 3AC, following their sale by 3AC

---

[71] In ***Byers v Chen***, *supra*, the appellant argued that the payment that was found to have been an unfair preference had been made to protect the personal reputation of the respondent. There is no suggestion in the judgment of Baptiste JA (with which Michel and Thom JJA agreed) that reputational benefit is not capable of amounting to a benefit for the purposes of section 249(2)(d), although it was held on the facts that any such benefit was minimal, given the modest size of the payment, and that no weight could therefore be attached to it (see [112]).

[72] See S. Coverick Dep. Tr. (Day 2) at 105:17–106:19.

or FTX on 13 to 14 June 2022, FTX benefited directly from the sale of the assets.

(2)    FTX Did Not Receive These Benefits in Good Faith and for Value

161.    In order to make an order against FTX as a non-creditor which received a benefit from an unfair preference, the Court would also need to be satisfied that FTX did not receive the benefit in good faith and/or did not provide value for the benefit, unless it were determined that FTX was a party to the relevant transactions: see section 250(2)(b) of the BVI IA.

162.    It strikes me that, even if FTX were not deemed 3AC's creditor in respect of the transactions on 13 and 14 June 2022, it was at least a party to such transactions. As discussed above, I am unaware of any bilateral contractual or lending arrangements between 3AC and other customers of the Exchange pursuant to the Margin Program and understand that the FTX Recovery Trust has acknowledged there was no direct lending relationships between customers[73]. The FTX Exchange itself was a necessary participant in effecting borrowing and lending transactions, which were given effect via ledger entries recorded by and on the Exchange[74]. Moreover, as I noted above, FTX was the only party to the asserted contractual arrangements with 3AC pursuant to which FTX conducted the Liquidation and applied the proceeds of the asset sales on 13 and 14 June 2022 to 3AC's accounts on the Exchange.

163.    Even if FTX were not a party to the transactions, so that its good faith potentially becomes relevant, the presumption of good faith under section 250(3) of the BVI IA does not apply if FTX, at the time of the transactions, had notice that the transactions were unfair preferences: see section 250(4) of the BVI IA. If FTX was (or ought to have been) aware that 3AC was insolvent at the time that it entered into the relevant transactions (i.e. on 13 and 14 June 2022), or became insolvent as a result of them, and that there was a real possibility that 3AC would go into liquidation in the next six months, then a BVI court would likely

---

[73] See e.g. S. Coverick Dep. Tr. (Day 1) at 369:14–370:10, 387:12–388:5.
[74] See S. Coverick Dep. Tr. (Day 1) at 369:14–370:10.

conclude that FTX had notice that the transactions were unfair preferences and therefore did not receive the benefit in good faith[75].

164.     Even if FTX received these benefits in good faith, it is in my view difficult to see how FTX could be said to have done so for value if (as the FTX Recovery Trust claims) it was not a creditor of 3AC in respect of the negative USD balance. As far as I can see, FTX gave no value to 3AC for the benefits of avoiding any financial liabilities and/or reputational damage that would have resulted from a default by 3AC of repayment of its negative USD balance, or of being able to operate the Exchange in an orderly manner

165.     Accordingly, if the BVI court were otherwise satisfied that there was a proper basis for making an order against FTX under section 249(1) as a non-creditor which received a benefit from an unfair preference, the limitations imposed by section 250 would not appear to prevent it from doing so.

### 8.     FTX's Ordinary Course of Business Defence

166.     The FTX Recovery Trust contends that it has a complete defence to the Joint Liquidators' unfair preference claim under section 245 of the BVI IA because the transactions that occurred on 13 and 14 June 2022 supposedly occurred in the ordinary course of 3AC's business as a cryptocurrency hedge fund[76]. For the reasons set out below, I do not agree with this contention.

167.     As noted above, section 245(2) of the BVI IA provides that *"A transaction is not an unfair preference if the transaction took place in the ordinary course of business"*.

168.     In **Byers v Chen**, *supra*, binding authority in the BVI, the ECSC Court of Appeal held that a payment was not made in the ordinary course of business within the meaning of section 245(2) just because it was a payment which the company

---

[75] See **Re Sonatacus Ltd**, *supra*, at [29], in which the English Court of Appeal held that the beneficiary of the preferential transaction failed to establish good faith under an analogous provision of the UK IA where the beneficiary had knowledge that the company's liabilities were repaid when it was in financial difficulty and shut its eyes to that possibility of the company's insolvency.

[76] See Objection at [200] – [201] and the Atherton Declaration at [54] – [58].

was contractually obliged to make. Baptiste JA (with whom Michel and Thom JJA agreed) said this at [103]:

> "... the ordinary course of business defence is intended to enable a company to continue to make payments to ordinary trade creditors so that they continue to supply goods and services to the company thereby enabling the company to continue to trade as a going concern. However, once an insolvency process is inevitable, payments to ordinary creditors can no longer be justified on the basis of continuity of trade. There [sic] justification would only lie if their result is an overall positive benefit to creditors as a whole".

169. Further, helpful guidance as to the test to be applied in considering whether a transaction can be said to have taken place *"in the ordinary course of business"* was provided by the Privy Council in the case of **Countrywide Banking Corp Limited v Dean** [1998] AC 338. This was an appeal from the Court of Appeal of New Zealand concerned with the preference provisions in section 266 of New Zealand's Companies Act 1955 (as amended). Transactions that took place in the ordinary course of business were expressly excluded from the ambit of those provisions, as they are under section 245 of the BVI IA. In my view, a BVI court is likely to regard the guidance given by the Privy Council in the **Countrywide** case as highly persuasive.

170. The judgment of the Board[77] in the **Countrywide** case (delivered by Gault J[78]) makes it clear that the test is essentially one of fact. The Board declined to adopt any particular formulation of the test, or make any comprehensive statement of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business, but emphasised the following points[79]:

---

[77] In appeals heard by the Privy Council, the panel of judges hearing the case is known as the "Board".
[78] Then a Judge of the Court of Appeal of New Zealand and later a Justice of the Supreme Court of New Zealand (following its creation in 2004 when New Zealand abolished the right of appeal to the Privy Council in London). The Board also comprised four serving members of the Judicial Committee of the House of Lords (then the UK's highest appellate tribunal), i.e. Lord Browne-Wilkinson, Lord Slynn of Hadley, Lord Hoffmann and Lord Hutton.
[79] At 349B–350A.

a.    The test is not satisfied simply because, in a general sense, the transaction is one which might reasonably take place in some business setting;

b.    The transaction must be examined in the actual setting in which it took place;

c.    The test is objective. The transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business; and

d.    The *"focus must be on the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties"*.

171.    Based on the authorities cited above, I consider that a BVI court would apply the following principles in determining whether the transactions that occurred on 13 and 14 June 2022 took place in the ordinary course of 3AC's business:

a.    The transactions should be examined in the actual setting in which they took place, and the determination is to be made objectively;

b.    General business practices may be relevant, as will practices specific to the crypto industry, but the test is not satisfied simply because the transactions were ones which might reasonably have taken place in some business setting and/or in the crypto industry;

c.    The focus should be on the ordinary operational activities of 3AC as a going concern, not on 3AC's responses to abnormal financial difficulties;

d.    Accordingly, the transactions will only have taken place in the ordinary course of business if they enabled 3AC to continue to trade as a going concern or if they could be said to have been for the benefit of 3AC's creditors as a whole; and

e.    The transactions will not have taken place in the ordinary course of business merely because they were made pursuant to a contract.

172.    If the FTX Recovery Trust wishes to argue that the transactions took place in the ordinary course of 3AC's business, I consider that the burden of establishing this would lie with the FTX Recovery Trust. This is on the basis of the ordinary rule that he who avers must prove: see **Re Barton Manufacturing Co Ltd** [1998] BCC 827 at 830C per Harman J, and **TAQA Bratani Ltd v Fujairah Oil and Gas UK Plc** [2024] EWHC 3146 (Comm) in which it was common ground that the burden of establishing the statutory defence to a transaction at an undervalue claim in section 238(5) of the UK IA rested with the person against whom the order was sought (at [252]). I do not believe that a BVI court would find that the FTX Recovery Trust has satisfied this burden.

173.    In deciding whether or not, for example, the 52,000+ sales that 3AC apparently carried out on 13 and 14 June 2022, and the use of the sale proceeds to reduce 3AC's negative USD balance, were in the ordinary course of business within the meaning of section 245(2) of the BVI IA, a BVI court would need to assess whether those trades were part and parcel of the *"ordinary operational activities"* of 3AC's business as a going concern, whether they were in fact *"responses to abnormal financial difficulties"* and, if insolvency was inevitable, whether those trades benefited 3AC's creditors as a whole. That would involve comparing 3AC's trading patterns on the relevant dates to its historic trading patterns, and taking into account other potentially relevant matters (such as market conditions and whether 3AC's insolvency had become inevitable at the time the relevant trades took place).

174.    While I agree with Mr Atherton KC that a BVI court would consider 3AC's business as being that of a cryptocurrency hedge fund, and that this business involved the depositing and withdrawing of, and trading in, digital assets on the Exchange, I do not agree that it follows from this that all trades, deposits and withdrawals by 3AC on the Exchange within the vulnerability period constituted transactions in the ordinary course of 3AC's business (as Mr Atherton KC appears to summarily conclude in [57] of the Atherton Declaration). In my view, that is too simplistic and inconsistent with the approach taken by the ECSC Court of Appeal in **Byers v Chen** and the approach described by the Privy Council in the **Countrywide** case.

175.    According to the Joint Liquidators, 3AC was cash-flow insolvent on 13 and 14 June 2022[80]. If that is right, and/or it could be said that the relevant transactions were a response to abnormal financial difficulties, then payments made to creditors on those dates cannot be said to have been made in the ordinary course of business. As the ECSC Court of Appeal observed in the passage from **Byers v Chen** quoted above, once an insolvency process becomes inevitable, payments to ordinary (i.e. unsecured) creditors can no longer be justified on the basis that they enable a company to continue to trade as a going concern. In such circumstances, it is incumbent on the directors of the insolvent company to act in the interests of the general body of creditors as a whole.

176.    The evidence in the reports prepared by Fotis Konstantinidis and Matthew Lisle further demonstrate that 3AC's trading activity on the FTX Exchange on 13 and 14 June 2022 was out of the ordinary. As described in Fotis Konstantinidis's report, relative to 3AC's prior trades on the Exchange, its trades on 13 and 14 June 2022 involved a much larger volume, involved larger trade sizes, and occurred more quickly. By comparison, according to that report, 3AC's trading activity on other cryptocurrency exchanges at the same time remained within normal ranges. Similarly, according to Matthew Lisle's report, the nature of 3AC's trading activity on the FTX Exchange on 13 and 14 June 2022 was out of line with industry expectations, because a hedge fund conducting ordinary-course trading in digital assets, even when faced with a deteriorating market, would not dispose of substantially all digital assets in its accounts on an exchange within a short amount of time. While I offer no opinions on the data underlying these reports or the analyses therein, assuming the accuracy of these reports, it is in my view more likely than not that a BVI court would conclude that 3AC's trading activity on 13 and 14 June 2022 was a response to 3AC's financial distress and abnormal financial difficulties and therefore not in the ordinary course of business, even if it could not be said that by 13 June 2022 3AC was already insolvent or that its insolvency was inevitable. Therefore, I believe that a BVI court would conclude that the ordinary course of business

---

[80] See APOC at [49].

defence under section 245(2) of the BVI IA is not available to the FTX Recovery Trust.

177.   Even if 3AC has been operating a "running account" in the sense suggested by Mr Atherton KC at [56] of the Atherton Declaration, if the transactions on the relevant dates were of a degree of magnitude greater than and substantially different to its normal operations, because they were a response to abnormal financial difficulties, then I do not consider that the mere fact that 3AC habitually traded cryptocurrency or borrowed funds on the Exchange would render such transactions in the "ordinary course of business" under section 245(2).

178.   Finally, regarding the Liquidation carried out by FTX on 14 June 2022, a BVI court would in my view be bound to conclude that it did not comprise transactions in the ordinary course of business if, as the FTX Recovery Trust claims, it was a response by FTX to a failure by 3AC to engage with FTX's requests to bring its account back into compliance with asserted collateral and/or margin requirements, especially in the absence of evidence that a forced liquidation by FTX of assets associated with 3AC's accounts ever occurred previously or that 3AC's USD borrowings were ever previously eliminated by FTX.

**B.   The Transaction at an Undervalue Claim**

179.   The Joint Liquidators also have asserted an undervalue transaction claim against FTX under section 246 of the BVI IA, on the basis that FTX appropriated certain digital assets, or the proceeds of the sales thereof, for insufficient consideration[81].

180.   Section 246(1) of the BVI IA provides as follows:

*"Subject to subsection (2), a company enters into an undervalue transaction with a person if—*

---

[81] See APOC at [58] – [61].

> (a)    the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or
>
> (b)    the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and
>
> (c)    in either case, the transaction concerned—
>
>> (i)    is an insolvency transaction; and
>>
>> (ii)    is entered into within the vulnerability period."

### 1.    Relevant Insolvency Transactions

181.    As set forth above, the relevant transactions for the Joint Liquidators' undervalue transaction claim consist of more than 52,000 alleged trades on 13 and 14 June 2022, in which digital assets associated with 3AC's accounts on the FTX Exchange were sold and the proceeds of such sales applied to reduce in absolute value terms 3AC's negative USD balance. Assuming that 3AC carried out these trades, and that FTX, via its Exchange, credited the proceeds of these trades to 3AC's USD balance, then 3AC would have entered into "transaction[s]" with FTX within the meaning of section 246(1) of the BVI IA.

182.    Moreover, for the reasons set forth above, I disagree with Mr Atherton's reliance on the **Invest Bank** case to conclude that a "transaction" within the meaning of section 246(1) of the BVI IA is confined to transactions involving assets in which the company had a proprietary interest[82]. In my view, a BVI court would very likely conclude with reference to **Invest Bank** that no such proprietary interest is required to succeed in a section 246(1) claim.

### 2.    3AC's Insolvency and the Vulnerability Period

183.    As for the requirements that the transaction(s) under challenge should be an "insolvency transaction" that was entered into during the "vulnerability period"

---

[82] See [69] – [72] of the Atherton Declaration.

as defined in sections 244(1) and (2) of the BVI IA, see the discussion in sections VI.A.5 to VI.A.6 above, which applies equally here.

### 3.  Transactions at an Undervalue

184.    The Joint Liquidators' claim under section 246 could only succeed if the transactions that occurred on 13 and 14 June 2022 (or some of them) could be said to have been on terms that provided for 3AC to receive no consideration, or consideration which is significantly less in value than the consideration provided by 3AC.

185.    The proceeds of the relevant trades (or associated ledger credits) were ostensibly used to reduce 3AC's negative USD balance. I note, however, that the Joint Liquidators have alleged that the negative USD balance on 3AC's accounts with FTX at the relevant time may have been substantially over-stated[83]. If it is the case that (a) the true extent of 3AC's indebtedness (as reflected in 3AC's negative USD balance on the FTX Exchange) was less than the value of the payments and/or credits that were effected by the Exchange from the sale of digital assets associated with 3AC's accounts on 13 and 14 June 2022, or (b) if such assets were sold or liquidated at below market value and FTX obtained the assets or entitlements to them, then I consider that those payments/credits would constitute transactions at an undervalue within the meaning of section 246(1). That is because either FTX would have provided no consideration to 3AC to the extent that the proceeds or ledger credits the Exchange applied to reduce 3AC's negative USD balance exceeded 3AC's indebtedness or else insufficient consideration to the extent that the assets were not realised at market value.

### 4.  FTX's Section 246(2) Defence

186.    Mr Atherton KC asserts that in [75] – [77] of the Atherton Declaration that the FTX Recovery Trust would be able to avail itself of the statutory defence contained in section 246(2) of the BVI IA, which provides that a company does not enter into a transaction at an undervalue with a person if (a) the company enters into the transaction in good faith and for the purposes of its business, and (b) at the time when it enters into the transaction, there were reasonable grounds

---

[83] APOC at [27].

for believing that the transaction would benefit the company. I disagree with Mr Atherton's analysis.

187.    As a preliminary matter, it would be the FTX Recovery Trust's burden to establish that defence[84]. It is difficult to see how the FTX Recovery Trust would be able to discharge this burden in the absence of evidence from the individuals who were in control of 3AC at the relevant time explaining their intentions behind the transactions under consideration, or contemporaneous documentary evidence that sheds light on those intentions. This is because, as Mr Atherton KC rightly observes[85], the question of whether 3AC entered into the transactions in good faith and for the purposes of its business involves consideration of the subjective intentions of those who controlled 3AC at the relevant time[86]. I have not seen any contemporaneous evidence that sheds light on those intentions.

188.    As a matter of BVI law, it would not be good enough, in my view, for the FTX Recovery Trust simply to say that there is nothing to suggest a lack of good faith on the part of 3AC in relation to the relevant transactions (as Mr Atherton KC does in [76] of the Atherton Declaration). That effectively reverses the burden of proof, shifting it onto the Joint Liquidators. It would mean that defendants would be able to rely successfully on the statutory defence in every claim under section 246, unless there were positive evidence demonstrating a lack of good faith, which would be at odds with the objectives of the BVI IA. Cases in which the defence has been successfully invoked are, however, rare.

189.    In any event, I do not agree that there is nothing to suggest a lack of good faith on the part of 3AC. Good faith for these purposes essentially means that there must be no intention to circumvent the objectives of the law of insolvency, i.e. to ensure that the assets of the insolvent company are distributed among its creditors in accordance with the statutory order of priorities[87]. If it is right that the transactions that occurred on 13 and 14 June 2022 involved the making of payments to FTX and/or its Exchange, the value of which significantly

---

[84] See *Re Barton Manufacturing Co Ltd* [1998] BCC 827 and *TAQA Bratani Ltd v Fujairah Oil and Gas UK Plc* [2024] EWHC 3146 (Comm) at [252].
[85] See [76] of the Atherton Declaration.
[86] See *TAQA Bratani Ltd v Fujairah Oil and Gas UK Plc*, *supra*, at [254].
[87] See *TAQA Bratani Ltd v Fujairah Oil and Gas UK Plc*, *supra*, at [138], [255].

exceeded 3AC's true indebtedness on the Exchange, or if the assets were sold at significantly less than their market value in such transactions, they would have had the effect of circumventing the objectives of the law of insolvency[88]. They would also, in my view, have involved potential breaches by 3AC's directors of their fiduciary duty to act in the best interests of the company, which include the interests of the company's creditors as a whole in circumstances where the company is insolvent (as 3AC is said to have been), where it is bordering on insolvency or where it is probable that the company would enter an insolvent liquidation or administration[89], and/or breaches by 3AC's directors of their duty to exercise reasonable care and skill. If that is right, it must in my view raise serious doubts about whether 3AC can be said to have entered into the relevant transactions in good faith, or indeed for legitimate business purposes. There is nothing in the evidence that I have seen so far to dispel those doubts.

190.    As to the second limb of section 246(2), which must also be proved by the defendant to prevail on a section 246(2) defence, I struggle to see how it could be said that there were any grounds (let alone reasonable grounds) for believing, as at 13 to 14 June 2022, that 3AC would benefit from paying FTX significantly more than it was owed (if that is what happened). Unsurprisingly, there is (as far as I can see) no evidence to show that this is what those in control of 3AC at the relevant time in fact believed. Again, it is not sufficient in my view for the FTX Recovery Trust to say without evidence (as Mr Atherton KC does in [76] of the Atherton Declaration) that there is nothing to suggest that 3AC did anything other than deal with FTX in such a belief.

## C.    The BVI Turnover Claim

191.    At [63] – [66] of the APOC the Joint Liquidators seek relief from FTX pursuant to section 274A of the BVI IA, which confers a power on the BVI court to require a person who has in his or her possession any assets or documents to

---

[88] Indeed, they would have had that effect even if the value of the payments did not exceed 3AC's true indebtedness to FTX because FTX would still have been preferred over the other creditors of 3AC.
[89] See the decision of the UK Supreme Court in ***BTI 2014 LLC v Sequana SA & Ors*** [2024] AC 211, as applied by the ECSC Court of Appeal in ***Byers v Chen*** BVIHCMAP 2024/0009 (20 June 2025).

which the company *"appears to be entitled"* to *"pay, deliver, convey, surrender or transfer the assets or documents to the office holder"*.

192.  As noted above, the definition of "asset[s]" in section 2(1) of the BVI IA is very broad and includes *"money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property"*.

193.  The BVI IA does not expressly define what constitutes an entitlement to assets for the purposes of section 274A. English case law interpreting section 234(2) of the UK IA (the wording of which is almost identical to that of section 274A(1) of the BVI IA) has however ascribed a broad meaning to this statutory language, such that assets to which the company "appears to be entitled" would include assets in which the company appears to have a beneficial ownership interest[90]. Given the analogous nature of these statutory provisions, I believe that a BVI court would similarly construe the words "appears to be entitled" to assets to encompass an apparent beneficial ownership interest in such assets.

194.  It is important to note that section 274A(1) does not create any substantive rights or claims in relation to assets or documents. Rather, the section is designed to assist office holders such as the Joint Liquidators in the carrying out of the relevant insolvency process by placing under their control the property and records to which the company appears to be entitled[91].

195.  Accordingly, in order to succeed on an application under section 274A(1) the Joint Liquidators would need to establish that FTX is holding assets (or the proceeds of assets) to which 3AC has an apparent entitlement, which encompasses assets in which 3AC had an apparent beneficial ownership interest.

---

[90] See e.g. ***Kendall v Ball*** [2024] BCC 734 in which the English court determined, in the context of an application under section 234 of the UK IA, that the directors of a company in administration held land acquired by them in breach of their duties on constructive trust for the company.
[91] See ***Ezair v Conn*** [2020] BCC 865 at [26] per Patten LJ.

196.    As Mr Atherton KC rightly observes[92], the English Court of Appeal has made it clear that an application under section 234(2) of the UK IA is not an appropriate vehicle for determining complex issues about title to property; indeed, such an application does not necessarily involve the court making any final determination of title at all in the context of the section 274A(1) application[93]. An order under section 274A(1) may be made for the purpose of preserving assets while any dispute about their ownership is resolved in separate proceedings or via other substantive claims.

197.    This does not mean, however, that it can never be appropriate for the court finally to resolve issues as to title in the context of an application under section 274A(1). Whether it will do so depends on whether it would be fair to determine the issue summarily, without statements of case, discovery and witness statements[94]. For example, if the issue involves a pure point of law (as in *Ezair v Conn* itself), the court may grasp the nettle and determine it. Nor does this mean that it is inappropriate for the court finally to resolve issues as to title in the context of substantive claims brought in parallel with a section 274A(1) application before that court, and to give effect to resolution of those issues via a section 274A(1) application.

198.    With reference to Lord Neuberger's declaration, Mr Atherton also asserts that the Joint Liquidators cannot succeed in their BVI turnover claim because they did not hold an (unspecified) proprietary interest in the digital assets at issue in this case[95]. However, that is disputed by the Joint Liquidators, who contend that 3AC had a proprietary interest in such digital assets[96]. If this dispute were to be resolved in the Joint Liquidators' favour in these or other proceedings, I do not see any reason why a court could not make an order under section 274A(1) requiring the FTX Recovery Trust to transfer to the Joint Liquidators any assets in its possession, or the proceeds thereof, in respect of which 3AC has been held to have a beneficial interest.

---

[92] In [82] of the Atherton Declaration.
[93] See *Ezair v Conn*, *supra*, at [26] per Patten LJ.
[94] See *Kendall v Ball*, *supra*, at [33] per ICC Judge Greenwood.
[95] In [80] and [83] of the Atherton Declaration.
[96] APOC at [23].

199.    Mr Atherton also appears to challenge the Joint Liquidators' BVI turnover claim on the basis that it is allegedly "impossible to identify any specific Digital Asset that was associated with the Account Balance as of 12 June 2022 (or at any time thereafter) as representing any asset now held by the FTX Recovery Trust"[97]. I disagree with that assessment. Insofar as the Joint Liquidators establish that 3AC had an apparent beneficial ownership interest not in "specific" digital assets, but to a proportionate share of pooled digital assets that FTX held on trust for 3AC (and other customer beneficiaries), there is nothing in my view that would require the Joint Liquidators to identify "specific" digital assets associated with 3AC's accounts to succeed in their BVI turnover claim, much less "specific" digital assets that are not in the possession of FTX's successor entity. In this regard, I note that the definition of "asset" within the meaning of the BVI IA is not limited to specific identifiable assets, but extends to "every description of interest" in property. In my view, the broad scope of such interests would naturally extend to equitable interests in shared pools of assets, as the Joint Liquidators contend 3AC had in this case.

### D.    The BVI Proprietary Restitutionary Claim

200.    At [83] – [84] of the APOC the Joint Liquidators assert that 3AC has a "proprietary restitutionary claim" under BVI Law in respect of any digital assets held in 3AC's account on the Exchange which FTX unlawfully seized and/or liquidated.

201.    The English courts have recognised the existence at common law of a "proprietary restitutionary claim", which is distinct from a restitution claim based on unjust enrichment. Such a claim involves the vindication of the claimant's persisting legal title to an asset where that asset has been transferred away from the claimant and has found its way (directly or through a substitute asset) into the hands of the defendant: see *Trustee of the Property of F. C. Jones & Sons (a firm) v Jones* [1997] Ch 159 (a decision of the English Court of Appeal) and *Foskett v McKeown* [2001] 1 AC 102 (a decision of the House of Lords), which were considered in *Armstrong DLW GmbH v Winnington*

---

[97] In [81] of the Atherton Declaration.

*Networks Ltd* [2013] Ch 156 (a decision of the English High Court cited in [83] of the APOC, footnote 36).

202.   The description of the claim as "proprietary" is potentially misleading. Although based on the claimant's persisting legal title to the asset transferred, it is in fact a personal claim in restitution against the recipient of the asset for its value: see *Armstrong* at [63]. This type of claim does not arise where the relevant asset is a chattel or land or a documentary intangible (because there are distinct causes of action in tort covering these types of property), but it is available in respect of money (possibly under the old common law action for money had and received) and in respect of choses in action and other types of intangible property: see *Armstrong* at [85] – [94][98].

203.   A bona fide purchaser for value without notice of the claimant's right has a defence to such a claim, but it is not settled whether a change of position defence applies to such a claim. The Deputy Judge in *Armstrong* expressed doubts about this on the basis that the proprietary restitutionary claim is not a claim based on unjust enrichment: see *Armstrong* at [99] – [103]. Based on the Deputy Judge's analysis, I believe it unlikely that a BVI court would recognise a change of position defence in the context of a proprietary restitutionary claim not based on unjust enrichment[99].

204.   I am not aware of any decision of the BVI courts which considers such a proprietary restitutionary claim, but I consider it likely that they would follow the English cases cited above and hold that such a claim exists at common law (as distinct from a restitutionary claim based on unjust enrichment)[100].

205.   In support of the proprietary restitutionary claim the Joint Liquidators rely on clause 8.2.6(A) of the May 2022 TOS which expressly provides that all digital

---

[98] In *Armstrong* the Deputy High Court Judge held that the claim was, in principle, available in respect of an allowance issued pursuant to the European Union's Emission Trading Scheme, but it failed on the facts because the legal title to the allowances had ceased to vest in the claimant when they had been transferred to a fraudster.
[99] I note that Mr Atherton KC also observes in [91] of the Atherton Declaration that a change of position defence is generally only available as a defence to a personal claim for unjust enrichment.
[100] Notwithstanding the contrary views expressed in some textbooks and academic writing: see e.g. *Goff & Jones on the Law of Unjust Enrichment* (10th edition) at [8-12] – [8-26], [8-68], and Burrows, *The Law of Restitution* (3rd edition) at pp. 168 – 172. The contrary view is that "proprietary restitutionary claims" are better analysed as claims for restitution on the grounds of unjust enrichment (the unjust factor being the claimant's lack of consent to the transfer).

assets in a user's account on the Exchange are held on the basis that *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading"*. I am instructed, however, that the Joint Liquidators' position is that legal title to the digital assets associated with 3AC's accounts vested in FTX such that FTX held such assets on trust for 3AC as the trust beneficiary. Assuming the US Bankruptcy Court agrees with that position, it is difficult to see how a proprietary restitutionary claim based on 3AC's persisting legal title to digital assets held on the Exchange for its benefit could be sustained. This because the essence of such a claim is that the claimant is seeking to enforce his subsisting legal property rights: see *Armstrong* at [85].

206.    If the US Bankruptcy Court were to determine that the May 2022 Terms of Service instead created a "quasi-bailment" of the digital assets associated with 3AC's accounts, whereby 3AC, as the bailor, retained legal title to such assets and FTX, as the bailee, merely obtained control over them, then I believe that 3AC would have a viable proprietary restitutionary claim under BVI law to the extent that FTX transferred any such assets to itself without justification. If, for example, it is found that FTX was not entitled to carry out some or all of the Liquidation under the applicable terms and conditions, then in my view the Joint Liquidators would have a proprietary restitutionary claim against FTX in this scenario. Insofar as the bailment arose over commingled pools of assets, whereby 3AC retained a proprietary interest in a proportionate share of those assets[101], then it would not be necessary for any specific assets to be followed or traced to the FTX Recovery Trust to sustain the proprietary restitutionary claim.

207.    Independent of the establishment of a trust or quasi-bailment, the digital asset balance associated with 3AC's accounts must (at the very least), as I noted above, have represented a contractual and legal entitlement to the value of the

---

[101] That a bailment can arise in such circumstances is confirmed by the decision of the House of Lords in *Mercer v Craven Grain Storage Ltd* [1994] CLC 328 in which it was held that, where a farmer deposited grain with a storage company to be stored in common with the grain of other farmers in a fluctuating bulk, the farmers owned the resulting bulk in common and the storage company was their bailee. See also *Glencore International AG v Metro Trading International Inc* [2001] 1 Lloyd's Rep. 284 in which Moore-Bick J cited *Mercer* and also a long line of U.S. cases in which people whose goods were stored in common were held to be tenants in common and bailors (at 321). The position appears to be the same where the mixing of the goods is wrongful: see *Indian Oil Corp Ltd v Greenstone Shipping Co SA (The Ypatianna)* [1988] QB 345 at 370-71 per Staughton J.

balance, i.e. a chose in action. The same must be true of any fiat currency credited to the account. That appears to be acknowledged by the FTX Recovery Trust[102]. As *Amstrong* confirms, such a chose in action can, in principle, be the subject of a proprietary restitutionary claim.

208.    As noted above, according to the Objection, the transactions that occurred on 13 and 14 June 2022 included more than 52,000 trades made by 3AC itself and the trades carried out by FTX as part of the Liquidation. These transactions involved the selling of digital assets (or, on the FTX Recovery Trust's apparent view, contractual entitlements to digital assets held in a commingled pool) associated with 3AC's accounts to other users of the Exchange, and the application of the proceeds of those sales to reduce the negative USD balance on 3AC's accounts (which, for the reasons explained above, I consider to have been a debt owed by 3AC to FTX).

209.    On the information currently available to me, I consider that 3AC would have a proprietary restitutionary claim against FTX in respect of the above-mentioned transactions if the negative USD balance on 3AC's accounts at the relevant time was over-stated (as the Joint Liquidators have alleged[103]). In that scenario, FTX would, in effect, have taken some of the proceeds from the transactions, which belonged legally and beneficially to 3AC[104], and applied them to pay off an indebtedness to FTX and/or its Exchange which did not in fact exist. In those circumstances, 3AC would have a claim against FTX for the value of the proceeds used to pay off non-existent indebtedness based on its persisting legal title to those proceeds. I also consider that 3AC would have a proprietary restitutionary claim against FTX in respect of the transactions effected by FTX pursuant in the Liquidation insofar as the assets subject to the Liquidation were sold at less than market value, depriving 3AC of the full value of those proceeds. Under BVI law, it would not be necessary to show that the FTX Recovery Trust

---

[102] See e.g. [17] and [18] and footnote 7 of the Objection.
[103] APOC at [27].
[104] It seems to me that such proceeds are analogous to money deposited in a bank account. The depositor's right to claim payment of his deposit from the bank is a chose in action which the law recognises as property that legally belongs to the depositor: see *In Re Bank of Credit and Commerce (No.8)* [1998] AC 214 at 226G per Lord Hoffmann.

still retains those proceeds or their substitute, provided that the Joint Liquidators can demonstrate that they came into FTX's hands previously[105].

210. Plainly, the FTX Recovery Trust would not be able to defend such a claim on the basis that FTX was a bona fide purchaser for value without notice (as it gave no value to the extent that the proceeds were used to discharge non-existent indebtedness). Nor do I think that it would be able to raise a change of position defence (insofar as that defence is available at all in relation to a proprietary restitutionary claim), as that would involve FTX having to rely on its own errors in mis-stating the negative USD balance or selling assets at less than market value to argue that it would be inequitable to order it to make restitution.

### E. The BVI Unjust Enrichment Claim

211. In broad terms, to succeed on a claim against FTX in unjust enrichment under BVI law the Joint Liquidators would need to show that (a) FTX has been enriched, (b) the enrichment was at 3AC's expense, and (c) FTX's enrichment at 3AC's expense was unjust: see e.g. the decision of the ECSC Court of Appeal in *Featherwood Trading Ltd v Fraunteld Management Ltd* (10 June 2013) BVIHCVAP2012/0020 at [7] per Mitchell JA, citing the decision of the House of Lords in *Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221.

212. If it were shown that, on 13 and 14 June 2022, FTX and/or its Exchange received proceeds from the sale of digital assets associated with 3AC's accounts on the Exchange (or associated ledger credits) for its own benefit in an amount which exceeded 3AC's true indebtedness to FTX and/or its Exchange (because the negative USD balance on 3AC's accounts was over-stated), then I consider that a claim against FTX based on unjust enrichment likely would succeed. In such a scenario, FTX would clearly have been enriched at 3AC's expense.

---

[105] See *Armstrong* at [63]. I understand that the FTX Recovery Trust has testified that Alameda Research, one of the FTX debtors, was likely the counterparty to certain digital asset sale transactions that 3AC entered into prior to 14 June 2022. See S. Coverick Dep. Tr. (Day 2) at 219:17–220:3. And in respect of the Liquidation on 14 June 2022, I understand that the factual evidence shows that Alameda Research was the counterparty to the liquidation transactions. *Id.* at 253:7–9, 257:10–258:10.

213.    Alternatively, if it were shown that the assets associated with 3AC's accounts on the FTX Exchange were sold or liquidated at below market value on 13 or 14 June 2022 and that FTX and/or its Exchange received those assets or entitlements to them in such transactions, then I consider that FTX likewise would have been enriched at 3AC's expense to the extent of the difference between the price at which the assets were sold and the market value of the assets at the time of the sale.

214.    FTX's enrichment would be unjust because FTX would have provided no consideration to the extent that the amount it received exceeded 3AC's true indebtedness or insufficient consideration to the extent that it received the assets or entitlements to them at below market value[106].

215.    Mr Atherton KC suggests[107] that the Joint Liquidators may be prevented from pursuing a claim in unjust enrichment by the general principle that where a benefit has been transferred pursuant to the terms of a contract which remains executory, or which has been discharged by performance, and has not otherwise been prematurely terminated, no claim for unjust enrichment will ordinarily be available.

216.    The principle invoked by Mr Atherton KC is based on the premise that the law generally should give effect to the parties' own allocations of risk and valuations, as expressed in the contract, and should not permit the law of unjust enrichment to be used to overturn those allocations and valuations. The consequence of that premise is, however, that claims in unjust enrichment should be permitted, even where a contract is still subsisting, if those claims do not undermine the contractual allocation of risk and value[108].

217.    I do not consider that this principle would preclude a claim in unjust enrichment in the scenario I consider above, i.e. where the amount paid by 3AC to FTX

---

[106] See **Re Hampton Capital Ltd** [2016] 1 BCLC 374 in which the defendant received sums from the claimant company's bank account pursuant to improper instructions given by a director of the company. The English High Court held that the defendant owed the company a strict restitutionary liability in unjust enrichment to repay the money in full because there was no contract between the defendant and the company that justified the payments, which had been a misappropriation of the company's money.
[107] See [96] of the Atherton Declaration.
[108] See **Goff & Jones**, *supra*, at 3-21.

exceeded 3AC's true indebtedness to FTX. In that scenario the over-payment which FTX has received is not a benefit which has been received pursuant to the terms of a contract. It was a misappropriation of 3AC's assets which was not governed by any of contractual terms between 3AC and FTX of which I am aware. Accordingly, to allow a claim in unjust enrichment in respect of it would not cut across the contractual allocation of risk.

218.     Again, I do not believe that the FTX Recovery Trust could have a viable change of position defence to such a claim, as Mr Atherton suggests (without factual support) in [97] of the Atherton Declaration, as that would involve FTX having to rely on its own error in mis-stating the negative USD balance or selling assets at less than market value to argue that it would be inequitable to order it to make restitution.

## F.     The BVI Conversion Claim

219.     Conversion is an act of deliberate dealing with a chattel in a manner inconsistent with another's right whereby the other is deprived of the use and possession of that chattel: see ***Clerk & Lindsell on Torts*** (24th edition) at [16-07][109].

220.     It is now widely accepted (including by the BVI courts at first instance and the English Court of Appeal) that digital assets are a form of personal property[110]. However, they are not chattels (i.e. things in possession). They are a form of intangible property. On the current state of the English authorities, a claim for conversion does not lie in respect of dealings with intangible property. This was the conclusion reached by a majority of the House of Lords in ***OBG Ltd v Allan*** [2008] 1 AC 1 in which the defendants were held not to be liable in the tort of conversion for appropriating to themselves the benefits of certain contractual rights vested in the claimants.

221.     It is important to note, however, that the law relating to crypto assets, and conversion thereof, is still developing. In 2023 the Law Commission of England

---

[109] See also ***Chiverton Construction Ltd v James Douglas Turnbull*** BVIHCV 2015/0143 (17 August 2022) at [34] per Ellis J (citing a similar definition from an earlier edition of ***Clerk & Lindsell***).
[110] See ***Smith v Torque Group Holdings Ltd***, *supra*; ***Tulip Trading Ltd v Bitcoin Assoc*** [2023] 4 WLR 16; More recently, in ***D'Aloia v Persons Unknown*** [2025] 1 WLR 821 Mr Richard Farnhill (sitting as a Deputy Judge of the English High Court) held that crypto assets were neither things in possession nor things in action, but a distinct form of personal property.

and Wales[111] published a lengthy report which considered how the principles of private law apply (or should apply) to digital assets[112]. One of the issues considered by the Law Commission in this report was the application of the tort of conversion to digital assets. It concluded that, on the current state of the law, there are certain scenarios in which there is potentially no remedy for wrongful interference with digital assets (such as the "burning" of digital assets, i.e. their permanent removal from circulation by sending them to an inaccessible IP address). In order to fill this lacuna, the Law Commission recommended that the courts should develop a specific and discrete form of tortious liability, analogous to the tort of conversion, to deal with wrongful interference with digital assets[113].

222.    I am not aware of any decision of the BVI courts which considers the application of the tort of conversion to digital assets (or to intangible property more generally). The decision of the House of Lords in **OBG Ltd v Allan** would of course be highly persuasive to a BVI court. Although not strictly speaking bound by it, a BVI court may well feel constrained to follow it. However, given the growing importance of the crypto industry to the BVI as an offshore jurisdiction, I consider that there is a real (i.e. non-fanciful) possibility that a BVI court might take up the Law Commission's recommendation and develop the common law by creating a new form of tortious liability, analogous to the tort of conversion, which covers wrongful interference with digital assets.

223.    If the tort of conversion (or a form of tortious liability analogous to it) could be said to extend to digital assets under BVI law, the Joint Liquidators would have to establish a factual basis for such a claim. In other words, they would need to demonstrate that FTX had dealt with digital assets (or contractual entitlements to such assets) belonging to 3AC in a manner inconsistent with 3AC's rights, so as to deprive 3AC of the use of them. Depending on the factual findings made

---

[111] A body established by the Law Commissions Act 1965 to keep the law of England and Wales under review and recommend reforms. Its current chair is Lord Justice Fraser, a serving Judge of the English Court of Appeal, and the Law Commissioners are distinguished legal academics.
[112] Law Com No. 412, **Digital Assets: Final Report** published on 28 June 2023.
[113] See pp. 253 to 261.

by the US Bankruptcy Court, there appear to me to be two factual avenues for a tort-based claim analogous to conversion:

a.    As noted above, pursuant to clause 8.2.6 of the May 2022 TOS all digital assets held on behalf of 3AC were held on the basis that (A) title to those assets remained with 3AC and did not transfer to FTX, (B) none of the digital assets were the property of FTX, and (C) 3AC controlled the digital assets and was entitled to withdraw them at any time. If, in fact, FTX deprived 3AC of beneficial ownership of the digital assets deposited or acquired by 3AC on the Exchange (as the FTX Recovery Trust contends[114]), such as due to "sweeping" and pooling processes, it seems to me that this would have constituted a conversion of 3AC's digital assets, i.e. a deliberate dealing with those assets in a manner which was inconsistent with 3AC's rights under clause 8.2.6 of the May 2022 TOS, and permanently deprived 3AC of the use of them in accordance with those rights;

b.    Further, or alternatively, if it is found that FTX was not entitled to carry out some or all of the Liquidation under the applicable terms and conditions, the Liquidation could in my view be said to amount to a conversion of 3AC's digital assets (or contractual entitlements to such assets).

224.    As redelivery of such assets themselves no longer appears to be possible, 3AC's remedy for any wrongful interference with its digital assets would lie in damages. Like any other tort, the object of an award of damages in respect of a conversion is to compensate the claimant for loss suffered. In practice, however, the measure of damages in conversion is typically the market value of the goods converted at the time of conversion. In addition, a claimant is entitled to recover any special loss that flows naturally and directly from the wrong: see *Clerk & Lindsell on Torts*, *supra* at [16-95].

225.    In the present case, it seems to me that the assessment of loss would be complicated insofar as the market value of the digital assets that were converted

---

[114] See e.g. [18] of the Objection.

was purportedly credited to 3AC's accounts on the FTX Exchange and used by 3AC for the purposes of its trading activities. In such a scenario, it would be difficult to see that 3AC has suffered a loss as a result of any wrongful interference with its digital assets (or entitlements to such assets) in respect of which damages could be awarded. If however it were determined that the negative USD balance on 3AC's accounts was over-stated at the time of the digital asset sales/liquidations or that the full market value of the digital assets that were converted was not credited to 3AC's accounts by FTX or its Exchange, then I believe that a claim analogous to conversion would be viable, subject to the discussion above[115].

---

[115] Damages in conversion may be reduced by the redelivery of the property converted. Where the claimant receives the benefit of the property, though the property itself never actually came back into his hands, this may be treated as equivalent to a redelivery: see *Hiort v London & North Western Ry Co* (1879) 4 Ex. D. 188 and *Plevin v Henshall* (1833) 10 Bing. 24, cited in *Clerk & Lindsell on Torts*, *supra* at [16-128].

Pursuant to 28 U.S.C. s 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in London on 21 October 2025

Robert Stuart Levy KC

**Annex 1**

**List of authorities, legal texts and other publications**

<u>Authorities</u>

1. ***Armstrong DLW GmbH v Winnington Networks Ltd*** [2013] Ch 156

2. ***Banque Financière de la Cité v Parc (Battersea) Ltd*** [1999] 1 AC 221

3. ***BNY Corporate Trustee Services Ltd v Eurosail-UK-2007-3BL plc*** [2013] 1 WLR 1408

4. ***Broad Idea International Ltd v Convoy Collateral Ltd*** BVIHCMAP 2019/0026 (29 May 2020)

5. ***Broad Idea International Ltd v Convoy Collateral Ltd*** [2023] AC 389

6. ***BTI 2014 LLC v Sequana SA & Ors*** [2024] AC 211

7. ***Byers v Chen*** BVIHCVAP 2015/2011 (12 June 2018)

8. ***Byers v Chen*** BVIHCMAP 2024/0009 (20 June 2025)

9. ***Chiverton Construction Ltd v James Douglas Turnbull*** BVIHCV 2015/0143 (17 August 2022)

10. ***Countrywide Banking Corp Limited v Dean*** [1998] AC 338

11. ***D'Aloia v Persons Unknown*** [2025] 1 WLR 821

12. ***Eberle's Hotels and Restaurant Co v Jonas*** (1887) 18 QBD 459

13. ***Ellis & Co's Trustee v Dixon-Johnson*** [1925] AC 489

14. ***Emerald Bay Worldwide Limited v Barclays Wealth Corporate Officers (Guernsey) Limited*** (Guernsey Judgment 16/2013, 11 June 2013)

15. ***Ezair v Conn*** [2020] BCC 865

16. ***Featherwood Trading Ltd v Fraunteld Management Ltd*** BVIHCVAP2012/0020 (10 June 2013)

17. ***Foskett v McKeown*** [2001] 1 AC 102

18. ***G&M Aldridge Pty Ltd v Walsh*** [2002] BPIR 482

19. ***Glencore International AG v Metro Trading International Inc*** [2001] 1 Lloyd's Rep. 284

20. ***Hiley v People's Prudential Assurance Co*** *(1938) 60 C.L.R. 468*

21. ***Hiort v London & North Western Ry Co*** (1879) 4 Ex. D. 188

22. ***Hunt (Liquidator of Ovenden Colbert Printers Ltd) v Hosking*** [2015] BCC 615

23. ***Indian Oil Corp Ltd v Greenstone Shipping Co SA (The Ypatianna)*** [1988] QB 345

24. ***In Re Bank of Credit and Commerce (No.8)*** [1998] AC 214

25. ***In the matter of HQP Corporation (in Official Liquidation)*** 2023 (2) CILR 203

26. *In re Spectrum Plus Ltd (in Liquidation)* [2005] 2 AC 680

27. *Invest Bank PSC v El-Husseiny* [2025] 2 WLR 320

28. *Kendall v Ball* [2024] BCC 734

29. *Lister v Hooson* [1908] 1 KB 174

30. *Lloyds Bank NZA Ltd v National Safety Council of Australia Victorian Division* (1993) 10 ACSR 572

31. *Mackellar v Khoo Kin Yong & Ors* BVIHCMAP2013/008 (14 April 2016)

32. *Mercer v Craven Grain Storage Ltd* [1994] CLC 328

33. *MS Fashions Ltd v Bank of Credit and Commerce International SA (No.2)* [1993] Ch 425

34. *Morton as Liquidator of MJ Woodman Electrical Contractors Pty Ltd v Metal Manufacturers Pty Ltd* [2021] FCAFC 228

35. *Mundy v Brown* [2011] BPIR 1056

36. *National Westminster Bank Plc v Halesowen Presswork and Assemblies Ltd* [1972] AC 785

37. *Nissan Motor Company & Ors v Goshn & Ors* BVIHCM2019/0121 (9 August 2024)

38. *OBG Ltd v Allan* [2008] 1 AC 1

39. *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143

40. *Plevin v Henshall* (1833) 10 Bing. 24

41. *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567

42. *Re A Debtor* [1927] 1 Ch 410

43. *Re Barton Manufacturing Co Ltd* [1998] BCC 827

44. *Re Cheyne Finance plc (No.2)* [2008] Bus. L.R. 1562

45. *Re Emanuel (No.14) Pty Ltd (in Liquidation)* (1997) 15 ACLC 1099

46. *Re Hampton Capital Ltd* [2016] 1 BCLC 374

47. *Re Hawkes Hill Publishing Co Ltd* [2007] B.C.C. 937

48. *Re Hood* [2021] 2 WLR 313

49. *Re Jackson & Bassford Ltd* [1906] 2 Ch. 467

50. *Re Ledingham-Smith* [1993] B.C.L.C. 635

51. *Re Lehman Brothers International (Europe) (No 2)* [2010] 2 BCLC 301

52. *Re Mid-Kent Fruit Factory* [1896] 1 Ch 567

53. *Re Sonatacus Ltd* [2007] BCC 186

54. *Rolls Razor Ltd v Cox* [1967] 1 QB 552

55. *Rose v Hart* (1818) 8 Taunt 499

56. ***Sara & Hossein Asset Holdings Ltd v Blacks Outdoor Retail Ltd*** [2023] 1 WLR 575

57. ***Smith v Torque Group Holdings Ltd*** BVIHC (Com) 0031 of 2021 (2 July 2021)

58. ***Stein v Blake*** [1996] AC 243

59. ***TAQA Bratani Ltd v Fujairah Oil and Gas UK Plc*** [2024] EWHC 3146 (Comm)

60. ***The Barbuda Council v PLH (Barbuda) Ltd*** ANUHCV2023/0043 (26 September 2024)

61. ***Trustee of the Property of F. C. Jones & Sons (a firm) v Jones*** [1997] Ch 159

62. ***Tulip Trading Ltd v Bitcoin Assoc*** [2023] 4 WLR 16

63. ***UBS AG New York and others v Fairfield Sentry Ltd (in Liquidation) and others*** [2019] UKPC 20

64. ***VTB Bank v Miccros Group Ltd*** BVIHC (Com) 2018/0067 (23 January 2020)

65. ***Wood v Capita Insurance Services Ltd*** [2017] AC 1173

Legal texts

66. ***Clerk & Lindsell on Torts*** (24th edition, 2025)

67. A. Burrows, ***The Law of Restitution*** (3rd edition, 2010)

68. ***Goff & Jones on the Law of Unjust Enrichment*** (10th edition, 2022)

69. ***Goode on Principles of Corporate Insolvency Law*** (5th edition, 2018)

70. ***Goode & McKendrick on Commercial Law*** (6th edition, 2020)

71. ***McPherson and Keay's Law of Company Liquidation*** (5th edition, 2021)

Other publications

72. Law Commission of England and Wales, ***Digital Assets: Final Report*** (Law Com No. 412) (published 28 June 2023)

**Annex 2**

**Additional Documents provided by Latham & Watkins LLP**

Declaration of Russell Crumpler in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief, dated 1 July 2022, and the exhibits thereto

Transcript of the 12 December 2023 Examination of Su Zhu (3AC-FTX-00533281)

Transcript of the 13 December 2023 Examination of Su Zhu (3AC-FTX-00533487)

Transcript of the 16 September 2025 Deposition of Edgar W. Mosley II

Transcript of the 24 September 2025 Deposition of Steven P. Coverick

Transcript of the 25 September 2025 Deposition of Steven P. Coverick

Transcript of the 30 September 2025 Deposition of Nils Molina

Transcript of the 16 October 2025 Deposition of Sam Bankman-Fried

Declaration of the Right Honourable Dame Elizabeth Gloster DBE in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)

Declaration of Paul Anthony Webster, KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)

Expert Report of Fotis Konstantinidis CFF in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)

Declaration of Matthew W. Lisle in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation)

**Annex 3**

**Curriculum Vitae of Robert Levy KC**

<u>**Bar admissions**</u>

England and Wales – 1998
British Virgin Islands – 2003
Also admitted in Anguilla, St. Vincent and the Grenadines
Regularly called *ad hoc* in the Cayman Islands and Bermuda

Appointed Queen's Counsel (now King's Counsel) in 2010

<u>**Memberships**</u>

Chancery Bar Association
Commercial Bar Association

<u>**Overview**</u>

Robert specialises in commercial and chancery matters, ranging from complex international litigation (often involving conflicts of law and multi-jurisdictional claims) to general commercial disputes such as those arising from commercial contracts, joint ventures and share sale agreements. Many of his claims involve complex fraud and dishonesty allegations.

He has particular expertise in claims involving directors' duties and an acknowledged expert on BVI law. In addition to his company law expertise, he also specialises in insolvency and shareholder appraisal valuation cases.

Robert's practice has a large international element both onshore and offshore. He is recommended in both Chambers & Partners and Legal 500 for commercial dispute resolution, chancery commercial, civil fraud and offshore.

Robert was called to the Bar of the Eastern Caribbean Supreme Court, British Virgin Islands in 2003 and has appeared there regularly at first instance, as well as on numerous appeals to the Court of Appeal of the Eastern Carribean Supreme Court, and appeals to the Privy Council. He is regularly admitted *ad hoc* in the Cayman Islands and also in Bermuda.

He has acted as an additional justice of the Court of Appeal of the Eastern Carribean Supreme Court on three occasions and was appointed by the Attorney General of the BVI to sit for two years on the BVI Legal Services Panel.

<u>**Areas of expertise**</u>

Commercial dispute resolution
Company and partnership
International
Insolvency
Trusts
Property
Civil Fraud

Arbitration

## **Representative cases**

**Re** *HQP Corporation* – persuaded the Cayman Islands Court not to follow the House of Lords decision in *Houldsworth*. Appeared for the respondents in the Cayman Islands Court of Appeal – judgment awaited.

*Premier Assurance* – first application under the 31(1) of the Cayman Islands Insurance Act 2010 relating to transfers of insurance business by an insurance company in winding-up.

*KrisEnergy* – Cayman Islands Court of Appeal regarding injunction to restrain presentation of winding-up petition.

*Proceedings in private* – Robert continues to act in proceedings in the Cayman Islands concerning the liquidation of a NY listed fund and in England in relation to the winding-up of an international commodities trading companies. The names of these proceedings are not public.

*Jinpeng* – Just and equitable winding-up – Robert acted in the BVI proceedings and the Hong Kong arbitration. He also acted in *Re Central Shipping*, *Re Ocean Sino*, *Re Minto Global* in the BVI.

*Virgina Solutions* – Cayman Islands just and equitable winding-up of US company.

*Re Grantway* – BVI receivership proceedings.

Robert has acted in numerous (approximately one half) of the proceedings in the Cayman Islands under s238 of the Companies Act (dissenting shareholder appraisal proceedings) – *Re Shanda Games*, *Re Bona Films*, *Re Qihoo*, *Re Trina Solar*, *Re Sina*, *Re Nord Anglia*, *Re Qunar*, *Re Mindray*, *Re Perfect World*, *Re HomeInss*, and taken two cases to trial. He has also acted in similar proceedings in Bermuda – *Re Jardine Matheson* and *Re Triton International*, and in the BVI – *Re Nettar Group*.

*Re Adenium Energy* – Cayman Islands enforcement of security against company in winding-up.

*Holm v Wen* – lengthy litigation in the BVI (with appeals to the ECSC Court of Appeal concerning a 22% stake in a BVI bank.

*Pleshakov v Skystream* (Privy Council appeal).

*Ablyazov –* Robert acted for many years for the Kazakh bank recovery fund in its proceedings against Mukhtar Ablyazov.

*Cukurova* – lengthy litigation in the BVI (with appeals to the ECSC Court of Appeal and the Privy Council) concerning Turkish telecom assets.

*IPOC* – lengthy litigation in the BVI (with appeals) concerning Russian telecom assets.

Robert regularly advises a leading corporate security trustee on the security issues arising out of new issues of listed securities on various European stock exchanges.

**Recent Recommendations**

**Chambers UK Bar Guide 2026:**

"Robert is brilliant and incredibly effective. He's wonderful to work with."
"Robert is very calm and very impressive in terms of his advocacy skills. He is someone who is a go-to for large, complex disputes."
"He is very calm and impressive in his advocacy skills."
"He has great instincts."
Robert Levy KC of Three Stone is an experienced commercial silk who has fought and won major civil fraud cases for clients located across the world, including in the Caribbean, South America and Russia. He acts for both claimants and defendants.
"Robert is a pleasure to work with; he is calm, concise and strategically excellent."
"Robert Levy is impressive."

**Chambers Global 2025:**

"He is one of our go-to silks. He is very experienced, very smart, incredibly down to earth and easy to work with. He's the go-to guy for complex offshore work and has the ability to charm judges."
"Robert is a very good advocate. He's very approachable, knows the clients very well and has the trust and confidence of the client."
"Robert is a heavyweight barrister, a real details man. He's absolutely fearsome in cross-examination too – he's brilliant at that."
"Robert is a senior silk and a polished advocate. He is brilliant on the detail and formidable in his cross-examination."
"Robert is a go-to silk for heavyweight offshore litigation and asset tracing."
"A very experienced, very smart guy who is easy to work with. He is tenacious and quick-witted."
"Robert is a really supportive silk and a team player."

**Chambers UK Bar 2025:**
"A very experienced, very smart guy who is easy to work with. He is tenacious and quick-witted."
"Robert is a senior silk and a polished advocate. He is brilliant on the detail and formidable in his cross-examination."
"Robert is a go-to silk for heavyweight offshore litigation and asset tracing."
"Robert is a really supportive silk and a team player."
"Robert brings the gravitas and experience you expect from a senior silk. He has the ear of the judge and provides excellent strategic advice."
"Robert provides first-class levels of service, is very responsive and provides easily digestible, commercially focused advice."
"Robert is a very good advocate. He's very approachable, knows the clients very well and has the trust and confidence of the client."
"He is one of our go-to silks. He is very experienced, very smart, incredibly down to earth and easy to work with. He's the go-to guy for complex offshore work and has the ability to charm judges."

"Robert is a heavyweight barrister, a real details man. He's absolutely fearsome in cross-examination too – he's brilliant at that."