**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al*., | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. No. 825** |

**FIRST SUPPLEMENTAL DECLARATION OF PAUL ANTHONY WEBSTER, KC IN SUPPORT OF THE
AMENDED PROOF OF CLAIM FILED BY THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD
(IN LIQUIDATION)**

I, **PAUL ANTHONY WEBSTER, K.C.**, residing in the Territory of the Virgin Islands ("**BVI**") over the age
of 18 years, hereby declare as follows:

1.      I am instructed by Latham & Watkins LLP, attorneys at law for the joint liquidators of Three
Arrows Capital Ltd. in Case No. 22-11068 (KBO) in the United States Bankruptcy Court, District
of Delaware, against FTX Trading Ltd., *et al*. (the "**FTX Bankruptcy Proceedings**"), to provide
the District Court with a report of issues arising in the FTX Bankruptcy Proceedings that are
governed by the laws of Antigua and Barbuda.

**I.      PROFESSIONAL AND EDUCATIONAL BACKGROUND**

2.      I hold a Bachelor of Laws Degree from the University of the West Indies (1978), and I
graduated from the Norman Manley Law School, Jamaica, in 1980.

3.      In October 1980, I was admitted to practise as a barrister of the Eastern Caribbean Supreme
Court, Virgin Islands Circuit. I am also admitted to practise in Antigua and Barbuda, Anguilla
and the Turks and Caicos Islands. I practised in the BVI from October 1980 to August 2015.
During this period, I made numerous appearances in the courts of the Eastern Caribbean at
all levels up to the Privy Council. The Privy Council is the final appellate court for UK overseas
territories, Crown dependencies and a number of member states of the Commonwealth of
Nations. It usually comprises sitting justices of the UK Supreme Court, and sometimes includes
distinguished judges from other English courts or other jurisdictions. I also held several
temporary appointments as a judge of the Eastern Caribbean High Court and Court of Appeal
between 2001 and 2014. In March 2003, I was appointed one of Her Majesty's Counsel (now
King's Counsel).

4.      In July 2008, I was admitted to practise in Antigua and Barbuda. I also appeared as counsel in
the High Court and Court of Appeal in Antigua. I have also presided over the hearing and

determination of numerous appeals in Antigua when I was a judge of the Eastern Caribbean Court of Appeal. As a judge of the Court of Appeal I have written numerous judgments and delivered *ex tempore* decisions of the Court on matters of Antiguan law.

5.   In September 2015, I was appointed as an acting judge of the Court of Appeal of the Eastern Caribbean Supreme Court. I held that position until my retirement in July 2023. I also acted as a temporary judge in the Commercial Court of the BVI from January to August 2024.

6.   In February 2025, I returned to private practice as a consultant in the firm of O'Neal Webster, the firm that I founded with my then partner, Colin O'Neal, in 1990.

7.   I have produced expert reports on various aspects of BVI law for several overseas courts including the United States District Court for the Southern District of New York (three cases), the High Court of Hong Kong SAR (twice), the United States District Court for Florida, the Ontario Supreme Court and The Arbitration Institute of the International Chamber of Commerce, Sweden and London. Most of the reports I have produced are in the areas of commercial law, company law and corporate insolvency. I also attended the High Court of Hong Kong twice to give oral expert evidence regarding BVI company law issues.

8.   Throughout my professional career I have served on the boards of various public and private bodies in the BVI. I am a two-term past president of the BVI Bar Association. I was the chairman of the BVI Social Security Board before my elevation to the bench in 2015. In 2023, I was appointed co-chair of the Rules Review Committee of the Eastern Caribbean Supreme Court. The Committee reviewed and revised the Rules of Court of the Eastern Caribbean Supreme Court resulting in the passage of the Civil Procedure Rules (Revised Edition) 2023 in July 2023. A copy of my CV is attached.

9.   I understand my duty to the Court and I have complied with and will continue to comply with that duty. I am not connected in any way with the substance of this dispute and have no interest in its outcome. My compensation is $1,200 per hour for my time and $750 and $450 per hour for work performed by my associates. Compensation is not contingent on the outcome of the case, the substance of my opinions, or the content of my testimony.

10.   I have reviewed copies of the following documents:

(a)   Three Arrows Capital Ltd.'s Amended Proof of Claim filed in the FTX Bankruptcy Proceedings (the "**Claim**");

(b)   The four documents referred to as the "Governing Documents" at paragraph 21 of the Claim;

(c)   Two "Spot Margin Trading Explainer" documents produced by FTX with the beginning Bates numbers, FTX_3AC_000013862 (the "**April 4, 2022 Spot Margin Trading Explainer**") and FTX_3AC_000045694 (the "**October 6, 2022 Spot Margin Trading Explainer**");

(d)   The FTX Responses and Objections to Three Arrows Capital Ltd.'s discovery requests in the FTX Bankruptcy Proceedings, dated 9 September 2025 (the "**FTX Responses**");

(e)      The FTX Objection to the Amended Proof of Claim (the "**FTX Objection**"); and

(f)      The Declaration of Robert Stuart Levy KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd (in Liquidation).

## II.    SUMMARY OF CONCLUSIONS

11.    Below I set out a summary of my conclusions under the terms of the Loan Documents and Antiguan law (which governs the Loan Documents). Capitalized terms have the meanings of the defined terms in bold elsewhere in my Declaration.

12.    *First*, the LOC does not purport to, and did not, provide a security.

13.    *Second*, though the Margin Agreement, in theory, could have created a security, it did not do so for at least two, independent reasons:

      a.    <u>Ownership of the Assets</u>: If FTX owned the Assets (as it claims), FTX could not use them as security. The creditor in a security transaction cannot own the asset given as security. Indeed, I understand FTX, per the FTX Responses, to have disclaimed a security over the Assets for this very reason. Moreover, 3AC would have had no right to put up assets belonging to FTX as collateral for the security.

      b.    <u>Lack of Assets</u>: Even if FTX could theoretically have had a security interest over the Assets, I understand there were no such Assets. The Margin Agreement provides a purported security grant over "All assets in all FTX accounts of the Customer", which, as a matter of contract interpretation, I take to mean the individual account or wallet of a customer. As I understand the circumstances, however, there were no assets "in" a 3AC wallet address on the FTX Exchange. Instead, FTX had transferred the Assets into pooled wallet addresses managed by FTX.

14.    *Third*, even if the Margin Agreement did create a security, perfection would be necessary to enforce it, and FTX did not and cannot perfect the security. As I explain below, the Margin Agreement purported to allow for a security in the form of a lien or pledge (as opposed to a charge or mortgage). In addition to the reasons summarized above which relate to both the grant of security and perfection, under Antiguan law, perfection of a lien or pledge requires that the creditor have possession or, when dealing with intangible assets, exclusive control of the secured assets from the moment that the security is created through the duration of the security. However, FTX had neither the requisite possession nor the requisite exclusive control. Digital assets, as intangible assets, are incapable of possession, so FTX did not possess any secured assets. To have the requisite control, FTX's control over the secured assets needed to be exclusive; the power of 3AC to withdraw assets over which security was purportedly granted is inconsistent with perfection. Here, the FTX Terms of Service granted 3AC a right of withdrawal, and FTX has admitted that 3AC actually withdrew Assets. Accordingly, FTX could not enforce any security, to the extent one was granted, under the Margin Agreement.

15.    *Fourth*, assuming FTX could have had a valid, perfected security under the Loan Documents, I also examined the extent of such a security, which is defined by the parties' agreement, and noted that:

(a)    to the extent FTX made loans to 3AC through the Margin Lending Program, it did not have a valid, perfected security in respect of such lending, because the Loan Documents did not sufficiently identify FTX as the lender for the Margin Lending Program. To have a valid, perfected security, there must be certainty of identity as to the lender and borrower, but, if anything, the Loan Documents conveyed that Third-Party Lenders—and not FTX—were the lenders under the Margin Lending Program; and

(b)    to the extent Third-Party Lenders made loans to 3AC through the Margin Lending Program, they lacked the privity of contract needed to establish a valid, perfected security, as they were not parties to the Loan Documents (or any other documents with 3AC relating to their loans). Moreover, there was insufficient certainty of identify as to the lender and borrower in this scenario, because there was—and is still—apparently no way to identify the Third-Party Lenders who purportedly made loans to 3AC for 3AC's use in margin trading.

## III.    BACKGROUND

### A.    Factual Background

16.    I do not have personal knowledge of the facts in this case beyond the documents I have reviewed. I have been instructed to assume the following facts:

17.    Three Arrows Capital Ltd. ("**3AC**") is a BVI incorporated company. It operated a hedge fund which focused on trading and investing in cryptocurrency and other digital assets. FTX Trading Ltd. ("**FTX**" or the "**FTX Exchange**") is an International Business Company incorporated under the laws of Antigua and Barbuda. It operated a digital exchange which at its peak in 2022 was one of the largest digital exchanges in the world.

18.    In February 2020, 3AC opened accounts on the FTX Exchange (at FTX.com) and invested large amounts of money through the Exchange.

19.    3AC used or could have used the FTX Exchange in the following ways:

(a)    Like other customers on the FTX Exchange, 3AC could deposit, withdraw, buy, sell or transfer digital assets and fiat currency through its accounts.

(b)    FTX provided 3AC with a loan or loans in the form of a "line of credit"—as laid out in the LOC—which, among other things, reduced 3AC's margin-related collateral requirements in exchange for certain fees paid by 3AC. 3AC used funds drawn from

4

the line of credit as leverage to invest in cryptocurrencies in amounts exceeding the value of its own assets.

(c)    3AC could also participate in the spot margin lending program offered by FTX (the "**Margin Lending Program**"), which allowed 3AC to purchase digital assets using borrowed assets, including borrowed fiat currency. 3AC could also use the Margin Lending Program in connection with its perpetual futures positions on digital assets that it could take via the FTX Exchange.

(d)    In the FTX Bankruptcy Proceeding, FTX has taken the position that other users of the FTX Exchange—and not FTX—participated in its Margin Lending Program and extended borrowing facilities or assets to 3AC through that program. I refer to these other purported lending users as "**Third-Party Lenders**".

(e)    I have been instructed to consider two scenarios: (1) that FTX's position is correct that Third-Party Lenders, and not FTX, extended borrowing facilities or assets through the Margin Lending Program to customers participating in that program; and (2) that FTX's position is incorrect and that, through the Margin Lending Program, FTX extended borrowing facilities or loaned assets to customers participating in that program. I offer no opinion on the correctness of either scenario.

(f)    I have also been instructed to assume that, to the extent any Third-Party Lenders made loans to 3AC under the Margin Lending Program, they had no contract with 3AC to do so, and that it was and is impossible to identify which Third-Party Lenders made any such loans.

20.    FTX provided 3AC with a line of credit that was used to leverage 3AC's investments. The last such agreement was on March 20, 2022 when FTX and 3AC entered into a new agreement by which FTX increased the line of credit to US$120 Million (the "**LOC**"). The copy of the LOC that I have reviewed is Exhibit D to the Claim. The LOC is not signed by the parties. It is the first part of what appears to be a two-page document within Exhibit D. It is followed on the second page, without a page break, by an "FTX Institutional Customers Margin and Line of Credit Agreement" which appears to be a contract issued by FTX (the "**Margin Agreement**"). The signature of Mr. Kyle Davies, identified in the Margin Agreement as a director of 3AC, is on the last page of the Margin Agreement. The Margin Agreement is not signed by FTX. In construing the LOC and Margin Agreement, I have treated both as separate but related agreements. I refer to the LOC and Margin Agreement together as the "**Loan Documents**".

21.    The parties also appear to have adopted another FTX document headed "**FTX Terms of Service**" which sets out in detail the terms on which FTX provided services to its customers. It is dated May 13, 2022, but is not signed. It is exhibited to the Claim as Exhibit A and is referred to in paragraphs 55 and 56 of the FTX Objection as follows (internal citations omitted):

> "55. Like other customers, 3AC agreed to terms of service governing its use of the Exchange when it opened its customer account. An earlier version of the terms of service was operative in February 2020, when the 3AC accounts were opened.
>
> 56. The Joint Liquidators' purported claims relate to alleged matters during June 2022. Accordingly, the terms of service dated May 13, 2022 governed all of the

activity during the June 13-14, 2022 time period that is relevant to the Proof of Claim."

An earlier but undated version of the Terms of Service is Exhibit B to the Claim.

22.    3AC traded heavily in digital assets on the FTX Exchange, at times using the facilities made available to it under the LOC and the Margin Lending Program (paragraphs 25-31 of the FTX Objection describe how the process allegedly worked) to make leveraged investments. If the market for crypto continued to raise, as I am sure 3AC expected, it would have made huge profits. However, in or about May 2022, the market for cryptocurrency began to fall and the value of 3AC's investments with it. On June 14, 2022, FTX began requesting that 3AC increase certain assets in its accounts, which 3AC did not do. FTX then liquidated Assets to pay amounts allegedly due to it.

23.    3AC's case is that on June 12, 2022, its accounts at FTX included a substantial quantity of digital assets (valued over US$1 billion). 3AC separately had a substantial negative USD balance on the FTX Exchange, which was lower in absolute value terms than the value of the digital assets.

24.    By the end of the day on June 14, 2022, substantially all of the digital assets associated with 3AC's accounts on the FTX Exchange has been sold, liquidated or otherwise transferred. 3AC also asserts that the negative USD balances in its FTX accounts were almost entirely reduced.

25.    FTX admits that it liquidated approximately US$82 million worth of 3AC's assets but denies that it liquidated any other amount. FTX alleges that any other losses suffered by 3AC were caused by its high-risk investment strategy which resulted in massive losses when the market for cryptocurrency plummeted in June 2022, and 3AC's own withdrawal of US$60 million during the relevant period in June 2022. *See* FTX Objection [9].

26.    On June 27, 2022, the High Court (Commercial Division) of the BVI appointed Russell Crumpler and Christopher Farmer as Joint Liquidators of 3AC. The liquidation of 3AC is governed by the laws of the BVI. The Liquidators were granted recognition under Chapter 15 of the US Bankruptcy Code as foreign representatives of 3AC by the Bankruptcy Court for the Southern District of New York on July 28, 2022.

27.    On November 11, 2022, FTX filed its Chapter 11 Bankruptcy Proceedings in the Bankruptcy Court for the District of Delaware.

28.    On March 13, 2025, the court in the FTX Bankruptcy Proceedings allowed the Joint Liquidators of 3AC to file an Amended Proof of Claim (which I have described as the Claim) on behalf of 3AC, asserting claims for up to US$1,530,802,573.85 under the Insolvency Act of the BVI and common law, and claiming the return of the US$1,530,802,573.85, including by setting aside preferential transfers. On June 20, 2025, FTX filed the FTX Objection denying the claims.

29.    I have been asked by Latham & Watkins LLP on behalf of the Joint Liquidators to review the Loan Documents and comment on whether, under the laws of Antigua and Barbuda, the Loan

Documents created a security interest in 3AC's assets on the FTX Exchange, which could have been enforced in the event of a hypothetical liquidation at the time of the transactions on June 13 and 14, 2022. The Loan Documents have provisions that say they are governed by and should be read and construed in accordance with the laws of Antigua and Barbuda.

30. I was also asked to review the portions of the Declaration of Robert Stuart Levy KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd. (in Liquidation) relating specifically to the Loan Documents governed by Antiguan law. After reviewing those portions, I conclude that they accurately reflect my views of Antiguan law and my interpretation of the Loan Documents under Antiguan law.

31. I have made no investigation of and express no opinion in relation to the laws of any country other than Antigua and Barbuda. This declaration is limited to and is given based on the current law and practice in Antigua and Barbuda.

32. Before commenting on the Loan Documents, it is helpful to say something about the sources of law in Antigua and Barbuda and rules for interpreting contracts.

## B. Sources of Law in Antigua and Barbuda

33. Antigua and Barbuda is one of nine countries comprising the region known as the Eastern Caribbean. The superior court system of the Eastern Caribbean comprises the High Courts where trials are conducted. Appeals from the High Court are to the Eastern Caribbean Supreme Court ("**ECSC**") Court of Appeal, and finally to the Judicial Committee of the Privy Council in London. The Court of Appeal is an itinerant court which hears appeals from decisions of the High Court and statutory tribunals of member States and Territories of the Eastern Caribbean, including Antigua and Barbuda.

34. Antigua and Barbuda is an independent country. It has its own Parliament which is authorised to make laws for the peace, order and good government of Antigua and Barbuda. The country is a common law jurisdiction and its courts apply rules of common law and equity where statutory law does not apply pursuant to the **Common Law (Declaration of Application) Act**, 1705, Chapter 92 of the Laws of Antigua and Barbuda. Under this Act, the common law of England applies to Antigua and Barbuda, save where such law has been altered by any written law made in or applicable to Antigua and Barbuda.

## C. Rules of Interpretation

35. There are no statutory provisions in Antigua and Barbuda relating to the interpretation of contracts. The common law rules therefore apply. Over the last 50 years or so the Courts of England and the Eastern Caribbean have been working on and refining the rules relating to the interpretation of contractual provisions. The Courts have identified the core part of the exercise as identifying the intention of the parties gathered from the words used in the contract and all the relevant surrounding circumstances. This core principle has been described and explained by judges in various cases in England and the Eastern Caribbean. In

**Rainy Sky SA v Kookmin Bank** [2011] UKSC 50, a decision of the UK Supreme Court, Lord Hoffmann described the process as follows:

> "*I would accept the submission made on behalf of the appellants that the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.*"

36.    The guidance from the Supreme Court in England in Rainy Sky and other cases in the superior courts in England has been adopted and applied in many decisions of the Eastern Caribbean Court of Appeal including **Kenneth Krys and others v New World Value Fund Limited and others** BVIHCMAP2013/0017; **Dickon Mitchell v Rita Joseph-Olivetti** GDAHCVAP 2014/0026; **GTAWA v St. Georges University Limited** GDAHCVAP 2014/008. In **Yang Hsueh Chi Serena et al. v Equity Trustee Limited** BVIHCMAP 2013/0012 Farara JA stated:

> "*It must be emphasised that, in adopting this approach to construction, the court is not seeking simpliciter to find the dictionary or grammatical meaning of the words used in the relevant provision. The court is seeking to determine, as a matter of common sense, the intention of the parties from the meaning of the relevant words, as understood by the reasonable man having knowledge of the relevant background. This approach fundamentally involves a consideration of the words to be construed against the background of the entire document (or series of documents) relating to the particular transaction.*"

In short, I am required to interpret the Loan Documents in accordance with the language used by the parties in the context of the background reasonably available to them at the time and all the relevant circumstances.

### D.    The Loan Documents

#### 1.    The LOC

37.    The LOC is a line of credit agreement. It provides that FTX would provide 3AC with a line of credit of US$120 million (replacing an earlier line of credit of US$100 million). Amounts drawn down by 3AC would bear interest at 5% per annum payable daily. 3AC had to maintain assets of at least 200% of the line of credit (or US$240 million). If the value of the assets fell below this level, FTX could demand that 3AC provide the requisite collateral within one day of call. Failure to comply with the demand would entitle FTX to charge interest on all outstanding amounts at an indicative rate of 10% per day (clause 5).

38.  It is not disputed that 3AC drew on the LOC and used the borrowed funds as leverage to invest heavily in cryptocurrencies. Eventually, FTX made collateral demands that were not met by 3AC, and it thereafter liquidated assets associated with 3AC's accounts.

39.  In summary, the LOC established the mechanism by which 3AC obtained financing from FTX to use as leverage for investing in cryptocurrencies. The LOC contains certain provisions that are usual for a line of credit agreement, including an events of default clause, and it is governed by the laws of Antigua and Barbuda. The document does not, by itself, create a security interest in the assets of 3AC.

## 2.  The Margin Agreement

40.  The Margin Agreement is a separate document which accompanies the LOC. It recites that FTX desires to afford the "Customer" with access to "margin trading and potentially discretionary line of credit facilities (together, the 'Indebtedness') as set forth herein". The Customer is not named in the Margin Agreement. The Margin Agreement makes clear in its introductory clause that the Customer is being provided "debt" thereunder. The signature block at the end of the document was apparently completed by inserting the name "Three Arrows Capital Ltd" and the name, title and signature "Kyle Davies", "Director" on the signature line. FTX did not sign the Margin Agreement.

### a.  The Recital (Indebtedness)

The Customer's "Indebtedness" is defined in the recital of the Margin Agreement as the amount of margin trading and line of credit facilities granted to 3AC, and "[A]ll amounts owed under the [M]argin [Lending] [P]rogram." Margin Agreement [6a].

### b.  Clause 3

Clause 3 reads:

> "**Lien**. All assets in all of the FTX accounts of the Customer (the "Secured Assets") are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX."

41.  I refer to assets associated with 3AC accounts on the FTX Exchange as the "**Assets**".

### c.    Clause 4

42.    Clause 4 is complementary to Clause 3. It sets out the Customer's obligation to maintain the level of assets under the heading "Maintenance of Collateral", and in sub-paragraph c. sets out FTX's contractual right to liquidate the Secured Assets. Clause 4 does not of itself purport to create a security interest in the Secured Assets. It establishes the contractual mechanism for liquidating the Secured Assets.

(i)    Sub-paragraph (a) requires the Customer to maintain the levels of assets in the Customer account as directed by FTX.

(ii)    Sub-paragraph (b) sets out FTX's right to make collateral or margin calls.

(iii)    Sub-paragraph (c) deals with the issue of FTX's right to liquidate or sell the Secured Assets to satisfy outstanding obligations of the Customer under the Margin Agreement. Sub-paragraph (c) is lengthy but I set it out hereunder:

"*c. Liquidation. Customer acknowledges that the Secured Assets may be liquidated without notice to satisfy minimum maintenance, collateral requirements or margin calls. Customer acknowledges that it is not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements or margin calls. To satisfy minimum maintenance, collateral requirements or margin calls, and without further notice, Customer authorizes FTX to sell any assets, top up assets in its discretion, cancel any open order; close any outstanding order; and otherwise take any action deemed necessary to obtain liquidity to comply with collateral requirements with respect to the Indebtedness. Liquidation is conducted in the orderbooks on FTX or using voluntary liquidity providers. FTX does not itself generally take on the user's positions. Customer shall be liable to FTX for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by FTX or by the undersigned; and, the undersigned shall make payments of such obligations and indebtedness upon demand*."

### d.    Clause 6

43.    Clause 6 deals with margin transactions. Sub-paragraph (b) of Clause 6 reiterates that if the Customer account balance "drops far enough below initial margin, FTX may liquidate [the Customer's] positions in accordance with Section 4(c)".

### e.    Clause 7

44.    Clause 7 sets out FTX's power to offer lines of credit and confirms that amounts owed under the lines of credit are Indebtedness under the Margin Agreement.

### f.    Clauses 9 and 10

45.    Clause 9 lists the Events of Default and Clause 10 lists FTX's remedies in the event of default.

IV.    **ANALYSIS**

46.    Based on my review of the Loan Documents (and other materials described above) and Antiguan law (which governs the Loan Documents), I conclude that (A) the Loan Documents did not grant FTX a security; (B) even if they did, FTX did not perfect the security, such that it could not enforce the security; and (C) even if FTX had a security under the Loan Documents and had perfected that security, such security would not cover amounts or assets FTX or Third-Party Lenders loaned under the Margin Lending Program.

A.    **The Loan Documents Did Not Grant FTX a Security**

47.    In my view, the Loan Documents did not create a security.

48.    The LOC does not purport to be a security document, that is, a document capable of creating a security interest, and it did not create a security interest.

49.    Although the Margin Agreement does purport to be a security document, and Clause 3 purports to create a security interest, other features of the Margin Agreement, as well as certain aspects of the manner in which FTX treated the Secured Assets (defined in clause 3 of the Margin Agreement) indicate that the Margin Agreement did not create a valid security interest in the Assets:

(i)     FTX asserted in the FTX Objection that it owned the Assets; and

(ii)    Clause 3 of the Margin Agreement grants security over only "assets in all of the FTX accounts of the Customer".

Each of these reasons independently precludes the Margin Agreement from creating a security interest.

1.    **FTX Asserts in the FTX Objection that It Owned the Assets.**

50.    FTX cannot have a security interest in assets it owns. It is a legal impossibility to own an asset and use that asset as security for an obligation owed to oneself – the asset must be owned by the person putting it up as security (3AC). Accordingly, if FTX is correct that it owns the Assets, it cannot have a security over them.

51.    I am fortified in this conclusion by FTX's response No. 6 of the FTX Responses that:

> "[T]he FTX Recovery admits that FTX did not have a security interest in any Assets associated with the 3AC Accounts between June 12 and June 14, 2022 because FTX owned all Assets associated with the 3AC Accounts prior to the Effective Date, at which point all assets were transferred to the FTX Recovery Trust."

I offer no opinion on FTX's assertion that it owned the Assets.

2.    **Clause 3 of the Margin Agreement Purports to Grant Security over "All Assets in All of the FTX Accounts of the Customer," of Which It Appears There Were None**

52.    The language of Clause 3 and the way that FTX operated the FTX Exchange pose further obstacles to the proposition that the Margin Agreement created a valid security interest.

53.    The language of Clause 3 purports to grant a lien over "All assets in all of the FTX accounts of the Customer," and, as a matter of contract interpretation, "the FTX accounts of the Customer" refers to that Customer's individual wallet addresses. As I understand it, however, there were no assets *in* 3AC's accounts with FTX. This point is made explicitly by FTX in paragraph 81 of the FTX Objection (footnote and internal citations omitted):

> "*Customer Accounts did not store any assets, and the Exchange swept and commingled assets that were deposited by customers. At the end of the day on June 12, 2022, the Deposit Addresses associated with the 3AC Accounts did not contain any BTC, ETH or any other digital asset. All BTC, ETH, and FTT associated with every deposit by 3AC had been transferred to Sweep Addresses managed by the Exchange and commingled with assets deposited by other Exchange customers. 3AC did not deposit any of the tokenized stocks credited to the 3AC Accounts (GBTC or ETHE)—it acquired all tokenized stock through on-Exchange trades. Digital assets that a customer acquired on the Exchange via a trade or transfer were never held in its Deposit Address. As a result, as of June 12, 2022, 3AC's deposited digital assets had already been swept and commingled, all of the assets that 3AC acquired on the Exchange were commingled, and none of the assets associated with the 3AC accounts were traceable to any assets held by FTX.*"

Taking this statement at face value, the Margin Agreement was limited, in so far as it purported to create a security interest over the Assets, to only those assets *in* 3AC's accounts (that is, its individual wallet addresses) – of which I understand there were none.

3.    **Summary**

54.    In summary, the way that the assets were handled by FTX was inconsistent with the creation and continuation of a security interest as provided for in the Loan Documents.

55.    If the foregoing analysis is correct, FTX did not have a security interest over any Assets.

B.    **FTX Did Not Perfect Any Security It May Have Had**

56.    If the foregoing analysis is not correct and FTX had a security interest in the Secured Assets (which is disputed by 3AC), the next issue would be whether the security is enforceable. This inquiry is important because a contractual right to enforce a security is only valid between the parties to the security document. To be enforceable against office holders such as liquidators,

the security must be perfected. As I explain below, it is my opinion that FTX did not perfect any security it may have had.

57.     Perfecting security means taking the legal steps necessary to make the security interest enforceable against third parties—especially in the event of the insolvency of the debtor. *See* **Bristol Airport plc v Powdrill and others** *infra*. If it is perfected it will give the creditor (FTX) priority over unsecured creditors, including the right to liquidate the security before the rights of other creditors, or a liquidator, are considered. The parties, and particularly the creditor, must ensure that the security is properly <u>created and perfected</u>. As Professor Goode and Professor Gullifer, the learned editors of **Goode and Gullifer on Legal Problems of Credit and Security** (7th Edition 2022) state at paragraph 2-02 –

> "*Attachment denotes the creation of the security interest as between the debtor and creditor. The effect of attachment is that the security interest fastens on the asset so as to give the creditor rights in rem against the debtor itself, though not necessarily against third parties. Attachment of a security interest is thus to be distinguished from perfection of a security interest, the latter usually involving a further step (possession, registration, notice or attornment) which constitutes notice of the security interest to third parties and must be taken if they are to be bound. This is using the concept of perfection in a broad sense, to mean any steps to give public notice of the interest which have the effect of making the interest enforceable against one or more (but not necessarily all) third parties…*"

58.     In **Bristol Airport plc v Powdrill and others** [1990] 1 Ch 744 Sir Nicholas Browne-Wilkinson VC accepted counsel's description of a security at page 760 as follows –

> "*Security is created where a person (the creditor) to whom an obligation is owed by another (the debtor), by statute or contract, in addition to the personal promise of the debtor to discharge the obligation, obtains rights exercisable against some property in which the debtor has an interest in order to enforce the discharge of the debtor's obligation to the creditor.*"

59.     In this case, FTX as creditor accepted the promise of 3AC as debtor to repay the Indebtedness, and 3AC gave FTX the right to enforce any security (which I conclude above was not created in the first instance) including by exercising a discrete contractual right to liquidate the Secured Assets to meet maintenance and collateral requirements and margin calls. Had the security been validly created and perfected, FTX could have enforced it against third parties, including the Liquidators. Otherwise, FTX could not have.

60.     For the reasons set out below, I conclude that FTX did not perfect any security it might have had. Given the form of security that the Margin Agreement allows, FTX would have needed possession or, in the absence of possession, exclusive control over the Assets to perfect a security over them, and FTX did not have such possession or control.

1.    **Requirements for Perfecting Security over Digital Assets**

61. Antiguan law has not yet precisely defined how to perfect a security over digital assets. Accordingly, I looked to other instructive sources to ascertain how an Antiguan court would most likely determine how to perfect such a security. Ultimately, I conclude that a creditor would need exclusive control over a digital asset to perfect a security over it.

62. To determine how to perfect security over an asset, the first step is to determine the nature of the security taken.

63. Only four types of consensual security are recognized under Antiguan law, which in this respect mirrors English law: (i) pledge (ii) contractual lien (iii) equitable charge and (iv) mortgage. *See* **In re Cosslett (Contractors) Ltd** [1998] Ch 495 at 508F-G per Millett LJ (with whom Evans Sir Ralph Gibson LJJ agreed). These securities may be defined as follows:

   (i)     **Pledge**: A pledge is a bailment of personal chattels to a creditor (the "pledgee") by way of security. It entails a transfer of possession but not title. **Snell's Equity** (35th Edition 2024) at paragraph 36-004.

   (ii)    **Contractual lien**: A contractual or common law lien is a right to retain assets until a debt is paid. It can be created by agreement (unlike an equitable lien which arises from certain relationships between the parties, e.g. solicitor (attorney) and client). A contractual or common law lien can only arise where the creditor has possession of the assets. **Snell's Equity** (35th Edition 2024) at paragraphs 36-006 to 30-007.

   (iii)   **Equitable charge**: An equitable charge is created when property is appropriated to the discharge of a debt, without any conveyance of title to the lender. **Snell's Equity** (35th Edition 2024) at paragraph 36-003.

   (iv)    **Mortgage**: a mortgage is a conveyance of land or other property to the lender as security for the payment of a debt or the discharge of a debt or some other obligation for which it is given. On satisfying the obligation in respect of which the mortgage was given, the borrower or "mortgagor" has a right to redeem the mortgage (an "equity of redemption") and recover the property unencumbered by the mortgage. **Snell's Equity** (35th Edition 2024) at paragraph 36-002.

64. The Margin Agreement purports to allow for the creation of a lien or pledge; it does not purport to allow for the creation of a charge or mortgage.

65. Clause 3 of the Margin Agreement describes the security as a lien over the Customer's assets in all of its FTX accounts, and the assets are defined as "Secured Assets". A lien is usually, but not always, created involuntarily by a person who provided goods or services to his customers and holds on to the customer's property until he is paid for the goods or services provided. A lien can also be created voluntarily by agreement between the parties. The Margin Agreement here is an example of an attempt to create a voluntary lien by agreement.

66. Clause 3 of the Margin Agreement also states that the Customer "pledges and grants" a continuing lien and security interest in the Secured Assets. A pledge is created voluntarily by

agreement between the parties and generally includes transferring possession of the security to the pledgee. In the event of default, the pledgee can sell the secured property to recover the outstanding amount. I am not sure if Clause 3 was an attempt to treat the transaction as a pledge, but it does not matter whether the parties intended to create a lien or a pledge. The result would be the same under my analysis. Both a lien and a pledge, and any other form of security, must be over some form of property, including intangible property such as virtual or digital assets.

67.     The Margin Agreement does not purport to create a charge. As I just discussed, Clause 3 provides that 3AC grants FTX a pledge, lien and security interest in respect of the Secured Assets until the Indebtedness has been paid. It goes on to state that "FTX shall have all the remedies of a chargee under the laws of Antigua". This additional stipulation would not be necessary if the remainder of clause 3 were intended to create a charge and, in my opinion, an Antiguan Court would be likely to find that clause 3 does not create a charge. Indeed, there is often good reason for a party to seek the "remedies of a chargee" without seeking to *become* a chargee. While a pledge or lien is perfected by possession without the need for registration, charges granted by companies are invalid in many jurisdictions (e.g. Antigua and Barbuda section 250 of the Companies Act, England and Wales) if they are not registered. Moreover, the law of incorporation of the chargor, i.e. the customer and not FTX, usually determines whether registration is required and the consequence of failing to register, which would be logistically very difficult for a company with tens of thousands of customers worldwide.

68.     The Margin Agreement also does not purport to create a mortgage. As mentioned above, a mortgage involves a conveyance of property to the lender until a debt is repaid. In my view, 3AC's right to withdraw its assets under clause 8.2.6(C) of the Margin Agreement, exercised on the dates at issue (June 13 and/or 14, 2022), is fundamentally inconsistent with a mortgage of those assets in FTX's favor. I discuss 3AC's right to withdraw its assets and clause 8.2.6(C) further below (*see ¶¶ 86-87 infra*).

69.     The second step for determining how to perfect security over an asset, therefore, is to look at the items purportedly serving as the security to ensure they constitute property. We are dealing in this matter with a virtual or digital asset.

70.     The High Court in England has ruled that USDT, a digital asset, is capable of being property: **D'Aloia v Persons Unknown and others** [2025] 1WLR 821. This case is helpful in showing that digital assets are property under Antiguan law.

71.     The third step for determining how to perfect security over an asset is to ensure that, given the type of security and type of property of the asset, the creditor's relationship to the property satisfies the requirements of the security purportedly taken.

72.     Where there are no statutory provisions for perfecting security (as in Antigua), the common law applies. For personal property, perfection of a lien or pledge is completed by the creditor

taking possession or control of the security. In other words, to perfect a lien or a pledge, the creditor must have possession of the assets to perfect a security over them.

73. Possession is simple enough for physical assets. The lender can take actual or constructive delivery of the asset. For intangible assets such as shares in a company, the lender can take possession of the share certificates. The Secured Assets here consisted of virtual assets (cryptocurrency), and virtual assets are not capable of physical possession and, therefore, applying a traditional approach, cannot form the subject matter of a lien (*see* **Your Response Ltd. v Datateam Business Media Ltd.** [2014] EWCA Civ 281, discussed further below) or, by extension, a pledge. As such, possession cannot be transferred to or taken by the creditor to perfect the security.

74. This begs the question—how is a lien or pledge to be taken over virtual assets and how is it to be perfected if possession of those assets is necessary for perfection but legally impossible? Regrettably, neither the Parliament nor the Courts of Antigua have yet grappled with this issue, but, as I explain below, in my view, the Courts of Antigua would most likely determine that a creditor must exclusively control virtual assets to perfect a security over them.

### 2.   Control of Digital Assets

75. As I just mentioned, the courts in Antigua and the Eastern Caribbean have not yet resolved how security over digital assets can be perfected. Based on the persuasive authorities I consulted and my experience as a judge, I conclude that an Antigua court would look to control as a proxy for possession when determining whether a creditor had perfected a security.

76. There is a dearth of cases on the issue of perfecting securities over digital assets. The closest authority that I have found in the Eastern Caribbean, and this is only by way of analogy, is that the Commercial Court in the BVI has noted in two cases that the location of cryptocurrency is determined by the location of the person who controls the relevant crypto wallet by having the private key. *See* **Smith and Kardachi v Torque Group Hotels Limited and others** BVIHCCOM 2021/0003 (Wallbank J); **AQF v XIO and others** BVIHCCOM 2023/0239 (Mangatal J). Neither case deals with the more difficult issue of determining who has control of crypto assets put up as security for a loan. By way of analogy, I would say that FTX would have to establish control of the Secured Assets to prove that it had perfected its security over them.

77. For further guidance on how to determine the issue, I considered extra-judicial writings. The most important source was the **Law Commission Report on Digital Assets** that was presented to Parliament in the UK in June 2023 (the "**LC Report**"). The Law Commission was instructed to "review the law on crypto-tokens and other digital assets and to consider whether the law of England and Wales required reform to ensure that it can accommodate such assets." The Commission concluded that the principles relating to things in possession and things in action did not apply neatly to digital assets and that new principles need to be applied to what they described as a third category of things – digital assets. The Commission proposed the following approach to digital assets at paragraph 3.28 of the LC Report –

> "*We conclude that the law should not attempt directly to apply legal principles applicable to things in possession or things in action to third category things. For this reason and for the reasons we discuss in Chapter 5 (Control), we conclude that, instead of directly applying the concept of possession, the law of England and Wales can develop jurisprudence around a concept of control which is better suited to the functions of third category things and the technology they use. We think that control will form an important constituent part of the legal rules and principles that apply to complex interactions with third category things . . . This is consistent with international developments which also focus on control and not possession*."

78.     The conclusion of the Law Commission that control should be the guiding principle when dealing with the legal characteristics of digital assets is consistent with the views of the judges of the Commercial Court of the BVI (*see* paragraph 76 *supra*) regarding the location of cryptocurrency. I have had regard to the unique characteristics of digital assets, and I am satisfied that the control of digital assets should play a significant role in determining whether security over those assets has been perfected. If the security holder has sufficient control of the assets, that control should be a powerful indication that the security has been perfected.

### 3.     Test for control

79.     How then is control to be determined? The Law Commission suggested the following test for determining control of digital assets at paragraph 5.10:

> "*[B]roadly speaking, the person in control of a [digital] object at a particular moment in time is the person who is able sufficiently to:*
> *(1) exclude others from the [digital] object;*
> *(2) put the [digital] object to the uses of which it is capable; and*
> *(3) identify themselves as the person with the abilities specified in (1) to (2) above.*"

80.     The International Institute for the Unification of Private law **(UNIDROIT)**, in its **Principles of Digital Assets and Private Law** posits a similar test for control:

> "*6.1     The concept of 'control' is of great importance in these Principles. Principle 6 contains a detailed definition of control of a digital asset. Although control is a factual concept that is separate from and need not accompany, proprietary rights, the existence of 'control' pursuant to the definition in Principle 6 is a requirement for certain legal consequences in these Principles (for example, as a condition precedent to qualification as an innocent acquirer, and for third-party effectiveness and priority of security rights).*
>
> *6.2     The exclusive ability requirements in Principle 6(1)(a) contemplate that 'control' assumes a role that is a functional equivalent to that of 'possession' of*

> *movables. However, 'possession' in this context is a purely factual matter and not a legal concept. Moreover, because a digital asset is intangible, this functional equivalence to possession involves only the dominion and power over a digital asset but does not involve the physical situs dimension applicable to possession of movables. Whether 'control', as defined in Principle 6, exists is a matter of fact and does not depend on a legal conclusion. However … the presence of control gives rise to legal consequences.*"

81.    A case that provides some guidance on the issue of control is the English Court of Appeal decision in **Your Response Ltd. v Datateam Business Media Ltd.** [2014] EWCA Civ 281. The claimant was hired to manage the defendant's database. Differences arose between the parties and the claimant refused to release the database, claiming a lien on it. The trial judge found that he was entitled to the lien. The Court of Appeal allowed the defendant's appeal and set aside the lien. It did so mainly because the claimant did not have exclusive control of the database having given the defendant free access and the password to the database. Moore-Bick LJ confirmed the requirement of "exclusive control" for a security, stating at paragraph 31 of his judgment that –

> "*Although the contract in the present case contained no express provision for the publisher [defendant] to have access to the data, neither did it contain any provision, express or implied, excluding him from it and the fact that the data manager [claimant] did in fact make access to it freely available by the provision of a password is in my view inconsistent with the conclusion that he was in fact exercising the kind of exclusive control that would equate to the continuing possession required for the exercise of a lien. In view of the other conclusions to which I have come it is not necessary to reach a final decision on this point, but if necessary I would hold that in this case the data manager did not exercise the degree of control necessary to entitle it to exercise a lien.*"

82.    I have considered the extracts from the publications, the decision of the Court of Appeal in **Your Response Ltd.**, and the obvious principle that the degree of control that is necessary to establish perfection is a question of fact and degree in each case. What emerges is that the security holder must have exclusive control of the subject matter of the security to the extent of receiving substantially all of the benefits from the asset and preventing others from receiving such benefits. The security holder must also have the exclusive ability to transfer the benefits received from the asset and be able to prevent others from having access to or receiving benefits from the asset.

83.    I would add that control must exist when the security is being created and continue for the duration of the security. If control is lost, the security will also be lost. However, the crucial time for determining control is when the security is being enforced. Hypothetically, if control is lost during the currency of the loan transaction, the security will be effective if control is regained by the time it is being enforced.

### 4.    Application of the Control Test

84.    Applied to this matter, FTX would fail the "exclusive control" test to perfect a security interest.

85.    The starting point for determining the issue of control in this case is the Loan Documents themselves. Unsurprisingly they are silent on the issue of control. However, there are indications in the Margin Agreement that FTX had some degree of control of the Secured Assets. For example, the right to sell or take any other action that it deems appropriate to liquidate the assets is set out in Clause 4. That right must involve having some control of the assets. Beyond the terms of the Loan Documents, I assume FTX held the private keys to the wallets containing the Assets, which also suggests some degree of control.

86.    Despite this, FTX did not have exclusive control of the Assets. Clause 8.2.6(C) of the Terms of Service states (emphases added) –

> "*All Digital Assets are held in your Account on the following basis …*
> *(C) <u>You control the Digital Assets held in your Account</u>. At any time, subject to outages, downtime, and other applicable policies (including the Terms), <u>you may withdraw your Digital Assets</u> by sending them to a different blockchain address controlled by you or a third party.*"

87.    The treatment of the Secured Assets by FTX was in accordance with this clause and it is clearly inconsistent with any notion that FTX had exclusive control of the Assets. This is borne out by FTX's own argument that in June 2022, 3AC withdrew approximately US$60 million in value from the Assets. *See* FTX Objection [9, 10, 80, 88, 90, 136(b), 146, 160]. If FTX had exclusive control of the Assets this could not have happened. This circumstance thus debunks any theory, which, in fairness, has not been relied on by FTX, that FTX exclusively controlled the Assets. There is no evidence to support such a view, and even if there were, it would be inconsistent with FTX's case that 3AC withdrew substantial amounts from its accounts on June 13 and 14, 2022.

### C.    Neither FTX Nor Any Third-Party Lenders Would Have Security Over Any Amount They Loaned to 3AC Under the Margin Lending Program

88.    I have set out above the reasons why no security was created or perfected. However, and in any event, any such security was contractually limited to the "Indebtedness" as that term is defined in the Margin Agreement.

89.    The Customer's "Indebtedness" is defined in the recital of the Margin Agreement as the amount of margin trading and line of credit facilities granted to 3AC, and, in Clause 6a, as "[a]ll amounts owed under the [M]argin [Lending] [P]rogram." The latter could include loans advanced by Third-Party Lenders.

1.      **FTX Had No Security Over Amounts It or Others Loaned to 3AC Through the Margin Lending Program**

90.     Regardless of the correctness of FTX's position regarding whether it was a lender under the Margin Lending Program, FTX could not claim as security any amount or asset that either it or any Third-Party Lenders lent to 3AC under the Margin Lending Program.

91.     Under Antiguan law relating to privity of contracts (as discussed below), only a party to a security document may acquire a security and, even then, only for the amount it has loaned as security, because only a lender may acquire a security over its loans.

92.     FTX therefore would not have a security over amounts or assets that Third-Party Lenders loaned to 3AC.

93.     To the extent that FTX did provide margin lending to 3AC (an issue on which I express no opinion), it could not have security over the amounts it loaned through the Margin Lending Program. There must be certainty of identity as to the lender and borrower. The identity of the lender is an essential part of the contract, and he, she or it must be clearly identifiable for a security to be valid and perfected. FTX was not so identifiable as a lender.

94.     The Loan Documents refer to users of the Exchange, including 3AC, as lenders or potential lenders under the Margin Lending Program and do not refer to FTX as lender under the Margin Lending Program (*see* Margin Agreement [8]). The FTX Terms of Service likewise refer to other users as the lenders, rather than FTX. *See* FTX Terms of Service [2.4, 16]. FTX's Spot Margin Trading Explainer documents also indicate that Third-Party Lenders—and not FTX—would serve as lenders under the Margin Lending Program. For instance, the October 6, 2022 Spot Margin Trading Explainer states that "With spot margin trading, users can trade with leverage and go short on spot markets by borrowing from other users (lenders) on FTX, who are looking to earn yield on their assets". The April 4, 2022 Spot Margin Trading Explainer in a section entitled "How does borrowing/lending work?" also references lending to and borrowing from "another user". In its recent filing, FTX has disclaimed that it was the lender under the Margin Lending Program. *See* FTX Objection [25, 161 & n.24].

95.     To the extent FTX was in fact the lender under the Margin Lending Program, because FTX stated that it was not a lender to 3AC, there was not sufficient certainty of identity of the lender (FTX) to grant or perfect a security in respect of such loans through the Margin Lending Program.

2.      **Third-Party Lenders Would Have No Security Over Amounts They Lent to 3AC Through the Margin Lending Program**

96.     Third-Party Lenders could not enforce the liability under the terms of the Margin Agreement, because they are not parties to the Margin Agreement. Neither could they, for the same reason, claim a security interest in the Assets based on the Margin Agreement.

97.    The common law relating to non-parties attempting to benefit from a contract was settled by the House of Lords (now the UK Supreme Court) in 1962 in the celebrated case of **Scruttons Ltd. v Midland Silicones Ltd.** [1962] AC 446. The case confirmed the fundamental principle of privity of contract – that only persons who are parties to a contract can sue on it, and a non-party cannot take advantage of provisions of the contract even where it is clear that they were intended to benefit the third party. Applied to this case, there was no privity of contract between FTX/3AC and other users of the Exchange, and they cannot enforce the terms of the Loan Documents against FTX or 3AC. Neither can it be said that the Margin Agreement created a lien or other security interest in favour of any such third-party lenders.

98.    This privity of contract principle has been applied in the courts of the Eastern Caribbean. In **Henry Owens III v Anguilla Partnership Enterprises Limited** (AXAHCVAP 2017/0008) the ECSC Court of Appeal, following **Scruttons Ltd. v Midland Silicones Ltd.**, set aside an award of damages for breach of a construction contract because the award in the lower court, as part of a default judgment, was made to a party who was involved in the construction project but was not a party to the construction contract.

99.    Even if the Third-Party Lenders were the actual lenders under the Margin Lending Program (again, an issue on which I express no opinion), they are not parties to the Margin Agreement and cannot enforce its provisions. Any assertion that they can enforce the Margin Agreement is inconsistent with Antiguan law regarding privity of contract as outlined in the preceding paragraphs. The law regarding privity means, among other things, that the Third-Party Lenders cannot rely on any security created by the Margin Agreement.

100.    A separate reason also precludes the Third-Party Lenders from creating a valid, perfected security in respect of the Indebtedness attributable to them. As discussed above, I am instructed that there was—and is still—apparently no way to identify the Third-Party Lenders who purportedly made loans to 3AC for use in 3AC's margin trading. Under Antiguan law, a security interest cannot be granted to an amorphous undefined class, but rather only to specific parties.

## V.    CONCLUSION

101.    In summary, it is my opinion that the Margin Agreement did not create a valid security over the Assets. Even if the security was valid, it was not perfected. In this case, the actions of the parties do not reach the threshold of establishing that FTX had valid security over the Assets, and even if FTX did, it did not have sufficient control of the Assets to constitute a valid and perfected security enforceable against the world.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated October 31, 2025
British Virgin Islands

**PAUL ANTHONY WEBSTER, K.C.**

**CURRICULUM VITAE**

**PAUL ANTHONY WEBSTER, KC**

I received a Bachelor of Laws degree from the University of the West Indies, Barbados, West Indies, in 1978 and a Legal Education Certificate from the Norman Manley Law School, Kingston, Jamaica, in 1980.

I was admitted to practise in the British Virgin Islands in 1980 and worked in the Chambers of the late McWelling Todman, KC until 1990 when I established the firm of O'Neal Webster. Initially, I worked mainly in civil litigation and as the firm's practice developed the bulk of my work was in the area of commercial litigation with a concentration on company law including shareholder disputes, corporate insolvency and cross-border commercial disputes.

I have made numerous appearances in the courts of the Eastern Caribbean at all levels up to the Privy Council.    In March 2003 I was appointed one of His Majesty's Counsel.

Between 2001- 2015 I held several temporary appointments as a judge of the High Court and the Court of Appeal of the Eastern Caribbean Supreme Court.

In August 2015 I was appointed to act as a judge of the Court of Appeal of the Eastern Caribbean Supreme Court. I sat as a judge of the Court of Appeal until my retirement in August 2023.  I also sat as a judge of the Commercial Court of the British Virgin Islands from January to August 2024 to fill a temporary vacancy in the Court.

In September 2019 I was appointed as co-chair of the Rules Revision Committee. The Committee's mandate was to review and revise the rules of practice and procedure of the civil courts in the Eastern Caribbean. The Committee completed its work in 2023 which resulted in the passage of the Eastern Caribbean Civil Procedure Rules (Revised Edition) 2023 on 31 July 2023.

I have produced expert reports on various aspects of BVI law for several overseas courts including the High Court of Hong Kong SAR, the United States District Court for New York, the United States District Court for Florida, the Ontario Supreme Court, the High Court of Singapore and The

Arbitration Institute of the International Chamber of Commerce, Sweden and London. The majority of the reports I have produced are in the areas of commercial law, shareholder disputes, derivative actions and corporate insolvencies. In 2000 I attended the High Court of Hong Kong and gave oral evidence on BVI law relating to the appointment and removal of directors of a BVI company. In 2010 I provided expert evidence to the High Court of Hong Kong in the case of East Asia v New Cotai and others (HCA 2189/2009) regarding the availability of multiple derivative actions in the BVI. I travelled to Hong Kong in 2013 to give expert evidence in the same case.

I have written more than 120 judgments as a judge of the Court of Appeal and the Commercial Court. Most of these judgments are published on the Eastern Caribbean Court website at www.eccourts.org.

I am a two-term past president of the BVI Bar Association; past chairman of the BVI Social Security Board; past chairman and current member of the BVI Insolvency Committee; current member of INSOL and past member of the International Insolvency Institute (USA).

In February 2025 I rejoined O'Neal Webster as a litigation consultant. My work in the firm is now focused on producing expert evidence reports of BVI law for use in overseas courts, and advising on litigation matters. My most recent assignment was to advise on and oversee the liquidation of the Bank of Asia (BVI) Limited, a local bank that provided services mainly to overseas customers.  The bank is currently in provisional liquidation.