# Exhibit 30

**IN THE HIGH COURT OF NEW ZEALAND**
**CHRISTCHURCH REGISTRY**

**I TE KŌTI MATUA O AOTEAROA**
**ŌTAUTAHI ROHE**

**CIV-2019-409-000544**
**[2020] NZHC 728**

|  | BETWEEN | DAVID IAN RUSCOE AND MALCOLM RUSSELL MOORE<br>Applicants |
|---|---|---|
|  | AND | CRYPTOPIA LIMITED (IN LIQUIDATION)<br>Defendant |

| | |
|---|---|
| Hearing: | 11 – 14 February 2020 |
| Memoranda Filed: | 02 March 2020 – J S Cooper QC for the Creditors<br>04 March 2020 – P G Watts QC for the Accountholders<br>10 March 2020 – S A Barker for the Applicant Liquidators |
| Appearances: | S A Barker, M A Harris and A E Cao for the Applicant Liquidators<br>J S Cooper QC and J A R Barrow for the Creditors<br>P G Watts QC and S C I Jeffs for the Accountholders |
| Judgment: | 8 April 2020 |

---

### JUDGMENT OF GENDALL J

---

This judgment was delivered by me on 8 April 2020 at 3:30 p.m. pursuant to
Rule 11.5 of the High Court Rules

Registrar/Deputy Registrar

Date:

## Table of Contents

**Introduction** [1]
**Background facts** [5]
    *(a)  General* [5]
    *(b)  What is cryptocurrency?* [21]
    *(c)  How Cryptopia operated* [22]
    *(d)  Cryptopia's terms and conditions* [23]
    *(e)  Cryptopia's financial accounts* [32]
    *(f)  SQL database and how Cryptopia generated income* [34]
    *(g)  The hack* [38]
    *(h)  Advertising and promotion* [41]
**The law – s 284 Companies Act 1993** [43]
**The liquidator's application** [46]
**Issue 1 – the property issue** [50]
    - *An aside – what are the implications?* [50]
    - *What is "property" and why does it matter here?* [63]
    - *The authorities* [70]
        • *B2C2 Ltd v Quoine Pte Ltd* [77]
        • *Other authorities* [85]
    - *The four requirements for a "property" interest* [102]
        *(a)  Identifiable subject matter* [104]
        *(b)  Identifiable by third parties* [109]
        *(c)  Capable of assumption by third parties* [114]
        *(d)  Some degree of permanence or stability* [117]
    - *Conclusion on the four criteria* [120]
    - *Possible arguments against cryptocurrency being property* [122]
    - *Public policy arguments* [129]
    - *Conclusion* [133]
**Issue 2 – The trusts issue** [134]
    *A.  The primary issue – are the digital assets held on trust for accountholders?* [135]
    *Application to the facts of present case* [140]
        • *Certainty of subject matter* [141]
        • *Certainty of objects* [148]
        • *Certainty of intention* [151]
    *Additional matters* [167]
    *B.  The remaining issues before the Court* [188]
    - *Question (c) What happens if there is no trust or cryptocoins are not property?* [189]
    - *Question (d) What are the terms of the trust(s) and when did the trust(s) come into existence?* [192]
    - *Question (e) Inability to identify individual shareholders?* [199]
    - *Question (f) Recovery of stolen digital assets* [203]
    - *Potential relevance of any fault of Cryptopia relating to the lost digital assets* [206]
**Result** [209]
**Costs** [210]

## Introduction

[1]    Cryptopia Ltd (in liquidation) (Cryptopia) was formed in 2014 as a cryptocurrency trading exchange.  It had a short but tumultuous history.  It was placed into liquidation in May 2019 after suffering a serious hack and the loss of some $30 million of cryptocurrency from its exchange.

[2]    Issues in the liquidation have arisen over just who owns the remaining cryptocurrency under the control of Cryptopia and what should happen now.

[3]    The applicants (the liquidators) apply to the Court for directions under s 284(1)(a) of the Companies Act 1993 relating to the categorisation and distribution of assets in the liquidation.

[4]    Two tasks before the liquidators are the subject of the assistance they seek from this Court.  The first is in confirming just what are the assets in the liquidation.  Once that matter which is the subject of the present application is determined, the liquidators say they intend to advance a further application to propose methods of distribution of the company's assets.  The present application, counsel say, is therefore part one of a two-part process before distribution of Cryptopia's remaining assets can be achieved.

## Background facts

*(a) General*

[5]    Cryptopia is a cryptocurrency exchange.  Essentially, it is an online platform or exchange designed principally, among other things, to allow users to trade pairs of a vast range of cryptocurrencies between themselves, with Cryptopia charging fees for trades, deposits and withdrawals.

[6]    Cryptopia, was started by Rob Dawson and Adam Clark, essentially as a hobby.  It described itself internally as: "Providing an auction house and marketplace, several stable nodes on the network, and a support framework for each coin accepted on the site."

[7]    Up to early 2017, Cryptopia's operations were reasonably modest, having attracted some 30,000 users.  The number of users, however, expanded exponentially from November 2017 as the price of bitcoin a unit of account for a popular cryptocurrency known formally as Bitcoin,[1] more than trebled.  Counsel have indicated that at that point the number of users would have been well in excess of 900,000, the majority being from outside New Zealand.

[8]    Specifically, between November 2017 and January 2018, the value of one bitcoin had increased from approximately USD 4,350 to almost USD 20,000.  The number of registered accountholders at Cryptopia grew by over 940 per cent over the same period and company revenue and staff numbers grew significantly.  As at 18 October 2019, after the company was liquidated, Cryptopia had 960,143 accountholders with a positive coin balance.  Of that number, 104,186 are believed to be accountholders with a "deemed nil value", presumably because of the hack.  The balance comprises a substantial number of accounts of only modest value.

[9]    Cryptopia's reach was global.  New Zealand had the 26th largest number of accountholders (9,475) with 230 other countries and territories identified as accountholders by reference to internet protocol (IP) addresses.  Certain problems with this IP address method of identification have been identified but, notwithstanding any anomalies, it is clear Cryptopia was operating as a global business.

[10]    Cryptopia enabled accountholders to trade approximately 900 cryptocoins, more than any other exchange in the world.  It is clear, however, that some 400 of these cryptocoins had been delisted by Cryptopia and could not be traded at the time it was placed into liquidation.

[11]    The liquidators, as I understand it, have estimated Cryptopia currently holds cryptocurrency currently worth about NZD 170 million.

---

[1]    Lacking guidance on the correct manner to refer to cryptocurrencies from Coppard and others *New Zealand Law Style Guide* (3rd ed, Thomson Reuters, Wellington, 2018), I have decided to refer to them in this way:  the cryptocurrency *system* is to be capitalised (for example "… when Bitcoin was first developed…"); but the *unit of account* for a cryptocurrency is not to be capitalised (for example "… at the rate of one ethereum for 0.04 of a bitcoin."). This is consistent with the approach taken in the *Associated Press Stylebook Online*.

[12]    In January 2019 Cryptopia's servers were hacked.  Somewhere between nine and 14 per cent of its cryptocurrency was stolen, this being valued at around NZD 30 million.  Cryptopia temporarily suspended its operations before resuming them in March 2019.  Soon after, in May 2019, Cryptopia's shareholders resolved by special resolution to place the company into liquidation.

[13]    As to the hack, this theft of what was about $30 million of several cryptocurrencies was effected by way of an unauthorised transfer of those cryptocurrencies to an undisclosed external exchange.  It seems this transfer is irreversible.

[14]    The liquidators, as I have noted, have now applied to this Court under s 284(1)(a) Companies Act  for guidance and directions.  Counsel advise that to the best of their knowledge this is the first occasion on which issues of this type concerning cryptocurrency have been before the courts in New Zealand.

[15]    Essentially, the present application is run by the liquidators for directions on the legal status of a number of cryptocurrencies held by Cryptopia ("the digital assets") and in particular whether those digital assets are held on trust by the company.

[16]    Counsel for the liquidators make clear that the liquidators have no interest in whatever outcome is reached by the Court on the issues in the present application but simply wish to ensure the Court receives full argument on those issues.

[17]    Effectively, the tussle which is before the Court is one between the creditors of Cryptopia on the one hand and the accountholders who have invested in the various digital assets ("the accountholders") on the other.

[18]    Experienced senior counsel have been appointed by the Court to represent those classes of affected interests in the application – Ms Cooper QC for the creditors and Mr Watts QC for the accountholders (who have also been described here as "the potential trust beneficiaries").

[19]    In essence, therefore, the present application concerns the legal nature and status of the digital assets and of potential equitable interests in them.  These digital assets, as I have noted, have an approximate value of about NZD 170 million.

[20]    The present contest over the digital assets is effectively one between the more than 800,000 accountholders holding a positive coin balance with Cryptopia, the company's estimated 37 trade and other creditors and its 90 shareholders.

*(b) What is cryptocurrency?*

[21]    At the outset it is useful to provide a definition of cryptocurrency generally. Counsel seem to accept that a most helpful description is found in a British report of the  "UK Jurisdiction Taskforce" entitled *Legal Statement on Cryptoassets and Smart Contracts*.[2]  The report was authored by four barristers, experts in this field and considers broadly the legal status of cryptoassets and, in particular, whether the law treats them as property.  In the report, the authors provide what is a useful and non-technical summary of cryptoassets or cryptocurrency.  This definition follows the heading in the report "What is a Cryptoasset?"  It explains:

> 24.    In October 2008, the pseudonymous Satoshi Nakamoto published his now-famous paper *Bitcoin: A Peer-to-Peer Electronic Cash System.* Observing that commerce on the Internet relied almost exclusively on financial institutions serving as trusted third parties, Nakamoto proposed a new electronic payment system "based on cryptographic proof instead of trust", with digital tokens – *bitcoins* – taking the place of  traditional currency.   The first bitcoin came into existence in January 2009, not coincidentally at the height of the global banking crisis.

> 25.    Many other systems have been developed since then to implement commercial applications using cryptographic techniques.  The market continues to expand as new applications and new techniques are explored.

> 26.    Most applications involve dealings in assets of some kind, which therefore have to be represented digitally within the system.  We use the term *cryptoasset* to refer generally to such a representation. However, that should not be understood as a term of art.  Because of the great variety of systems in use and kinds of assets represented (ranging from purely notional payment tokens such as bitcoins to real-

2      UK Jurisdiction Taskforce *Legal Statement on Cryptoassets and Smart Contracts* (The LawTech Delivery Panel, November 2019) [*Legal Statement on Cryptoassets and Smart Contracts*] < https://technation.io/news/uk-takes-significant-step-in-legal-certainty-for-smart-contracts-and-cryptocurrencies/>.

world tangible objects) it is difficult to formulate a precise definition of a cryptoasset and, given the rapid development of the technology, that would not be a useful exercise. Indeed, there is no consistency even in the nomenclature, with *virtual* and *digital* also widely used to describe the kinds of things with which we are concerned.

27. Instead, we have set out to identify and describe, in general terms, the features of cryptoassets that may be regarded as genuinely novel or distinctive, as compared with conventional assets, so that we can then consider whether and how those features might be relevant to issues of legal and proprietary status.

28. A cryptoasset is ultimately defined by reference to the rules of the system in which it exists. Functionally, it is typically represented by a pair of data parameters, one public (in that it is disclosed to all participants in the system or to the world at large) and one private. The public parameter contains or references encoded information about the asset, such as its ownership, value and transaction history. The private parameter – the *private key* – permits transfers or other dealings in the cryptoasset to be cryptographically authenticated by digital signature. Knowledge of the private key confers practical control over the asset; it should therefore be kept secret by the holder. More complex cryptoassets may operate with multiple private keys (*multisig*), with control of the asset shared or divided between the holders.

29. Dealings in a cryptoasset are broadcast to a network of participants and, once confirmed as valid, added to a digital ledger. The main function of the ledger is to keep a reliable history of transactions and so prevent *double-spending*, i.e. inconsistent transfers of the same cryptoasset to different recipients. The ledger may be *distributed* and *decentralised*, that is, shared over the network with no one person having a responsibility for maintaining it, or any right to do so. A common type of distributed ledger uses a *blockchain*, which comprises blocks of transactions linked together sequentially, but other models are also in use.

30. An important feature of some systems is that the rules governing dealings are established by the informal consensus of participants, rather than by contract or in some other legally binding way. Consensus rules (employing methods such as *proof-of-work* or *proof-of-stake*) may also determine which version of the distributed ledger is definitive. The rules are self-enforcing in practice, even if not enforceable in law, because only transactions made in compliance with them and duly entered in the ledger will be accepted by participants as valid.

31. Although not all systems possess all of them, we can therefore identify the principal novel and characteristic features of cryptoassets as being:

    (a)    **intangibility**;

    (b)    **cryptographic authentication**;

    (c)    use of a **distributed transaction ledger**;

(d)    **decentralisation**; and

(e)    ruled by **consensus**.

32.    It is those features that have given rise to much of the debate about legal and proprietary status and on which we therefore focus our analysis.

33.    Some cryptoassets are intended to represent or are linked to conventional assets external to the system, for example money or debt obligations, tangible goods or land, a share or unit in a company or fund, or a contractual right of some kind; those assets are sometimes referred to as *tethered*, *exogenous* or *off-chain*.  Such an external asset is certainly property but what, if any, rights in it conferred on the holder of the corresponding cryptoasset will depend on the contractual structure or legal rules of the system.  For the present, we are concerned only whether the cryptoasset itself (the *native* or *on-chain* asset) is property, as distinct from any other asset it might represent, although we return to the relationship between on-chain and off-chain assets below when we discuss whether cryptoassets can operate as assets of title.

34.    Many dealings in cryptoassets involve intermediaries such as brokers or custodians; that is the case even in systems, such as Bitcoin, that are designed to avoid the need for intermediation.  What personal and proprietary rights the principal may have against an intermediary will depend on established rules of contract, tort and agency.  That is outside the scope of the present discussion.

(emphasis original, footnotes omitted)

*(c) How Cryptopia operated*

[22]    In two affidavits one of the liquidators, David Ruscoe described how Cryptopia itself operated.  In his affidavit Timothy Brocket, Cryptopia's Director of Finance and Administration from 1 July 2018 up to the date of the company's liquidation, also offered some insight into the company's operations.  In summary, the position seemed to be:

(a)    Cryptopia provided an online platform or exchange that allowed accountholders to trade pairs of cryptocurrencies.  In order to do so, a user was first required to register with Cryptopia to open an account and to make a deposit or purchase in one of the five "base currencies".

(b)    The customer's deposit would be made into a "hot wallet" (a wallet connected to the internet) for the cryptocurrency in question.  Once

deposited the currency could be left in the hot wallet to meet withdrawal requests from other users or be transferred to a "cold wallet" (a wallet not connected to the internet). Once an initial deposit was made to the exchange, the accountholder's wallet listed a coin balance equivalent to the deposit. The accountholder would then be able to use the services offered by the exchange, including selling and buying cryptocurrency.

(c)    All cryptocurrency on the exchange was stored in digital (hot or cold) wallets. The distinction between the hot and cold wallets turns upon the way in which the data in the wallets was stored:

    (i)    Cold wallets were held offline preventing them from being hacked (at least by outsiders). It appears that 75 per cent of the cryptocurrency held by Cryptopia (by volume) was stored in cold wallets.

    (ii)    Hot wallets were online, hosted on servers physically located in Phoenix, Arizona (and potentially at some point prior also in the Netherlands). The balance of the cryptocurrency held by Cryptopia (or 25 per cent by volume) was located in hot wallets.

(d)    When a trade occurred between two users on the exchange, the users' respective coin balances on the company's internal ledger would change to reflect the trade, but the balances in the company's digital wallets did not change.

(e)    The trades and transfers that took place on the exchange did not affect the blockchain ledgers, (the general ledgers of ownership that exist for each cryptocurrency outside of the exchange). This is because at all times the coins remained held in Cryptopia's digital wallets.

(f)    Whether a wallet was cold or hot (whether it was stored online or not) was not immutable. A wallet could be made hot by bringing it online or cold by taking it offline. Coins could also be transferred between

wallets. For instance, a new user will have deposited a particular coin to a hot wallet but Cryptopia may have then transferred it to a cold wallet for safekeeping.

(g)     Although Cryptopia had one hot wallet per cryptocurrency, it may have had multiple cold wallets for the same cryptocurrency. Mr Ruscoe's evidence is that there were "separate cold wallets for supposed company holdings and customer holdings of the same currency." Cold wallets also appeared to serve a residual purpose of topping up hot wallets depending upon the volume or withdrawal requests for a particular coin.

(h)     From the account holder's perspective, it made no difference if cryptocurrency was held in hot or cold wallets. In fact, they may have been unaware of this distinction. Each accountholder was able to transfer cryptocurrency (as reflected in their coin balance) to a privately held digital wallet, another Cryptopia account or an account hosted on another exchange.

(i)     Similarly, from the account holder's perspective, it made no difference if trades were made inside or outside Cryptopia's exchange. There was, however, a mechanical difference to those trades resulting from how Cryptopia stored and managed the cryptocurrency traded on its platform:

(i)     Trades within the exchange: a transfer of cryptocurrency between accountholders (two users of Cryptopia) was effected by corresponding adjustments to the accountholders' coin balances. As Cryptopia held the underlying cryptocurrency it did not need to make any changes to the wallets to effect the transactions. The transactions were recorded in Cryptopia's internal structured query language (SQL) database (or internal ledger of transactions).

(ii)     Trades outside the exchange:  as with an internal trade, a transaction to a wallet held outside the exchange involved an adjustment to the accountholder's coin balance.  However, Cryptopia would have to transfer cryptocurrency from a hot wallet to the recipient who in turn would transfer cryptocurrency to another Cryptopia hot wallet.  That transaction would be recorded on the relevant cryptocurrency's public ledger.

(j)     Unlike transactions on the exchange which did not move coins between wallets, all cryptocurrency transactions that moved coins from one wallet (or address) to another required a private and public key.  The public key is essentially the digital wallet address, and the private key is similar to a password, that is known only to the user.  A new private key is generated each time cryptocurrency is transferred on the blockchain.

(k)     Cryptopia exclusively held the private keys to its digital wallets that contained the cryptocurrencies traded on the exchange.  As I understand it, accountholders did not have access to the private keys.

(l)     Cryptopia charged a fee for each trade and a withdrawal fee.  Cryptopia had its own accounts on the exchange so that when a trade took place the trade fee would be paid into Cryptopia's account for collecting trade fees.

(m)     The cryptocurrency associated with Cryptopia's own account holdings on the exchange was held in Cryptopia's digital wallets and pooled along with user holdings.

(n)     Cryptopia also charged various fees for services such as recovering cryptocurrency that had been accidentally transferred to another user on the exchange.

(o)     Significantly, as I see it, Cryptopia's Customer Service Analyst Manual, an internal document, outlined the company's own perspective on what accountholders received from Cryptopia.   The manual explained that:

> Exchange services like Cryptopia manage and maintain wallets, and provide you with the functionality to send and receive transactions as well as securely hold[ing] the balances assigned to your account.

### (d) Cryptopia's terms and conditions

[23]     The earliest record of any terms and conditions for Cryptopia appears to be a version dated January 2015.Although it is unclear whether Cryptopia may have had a version available prior to January 2015, it appears not.

[24]     What does seem clear is that the relationship between Cryptopia and the accountholders, especially at the outset, was not a well-documented one.

[25]     Turning to the language used by Cryptopia in those earliest Terms and Conditions introduced in January 2015, these relevantly state:

> **Terms – Cryptopia**
>
> **Terms and Conditions**
>
> **Website Terms of Use**
>
> This website (site) is operated by Cryptopia Limited…your use of this site is governed by these terms of use.  By access and browsing this site you agree to be bound by these terms of use.  We make this site available to you in order to provide information about our products and services and enable you to purchase these products and services from us online.
>
> …
>
> **Marketplace Liability**
>
> …
>
> Cryptopia is a service to allow anyone to offer, sell and buy items at any time. *We are not involved in the actual transaction between Buyers and Sellers.  We have no control over* and do not guarantee the quality, safety or legality of items advertised, the truth or accuracy of listings, the ability of Sellers to sell items, the ability of Buyers to pay for items, the timeliness of deliveries, or that a Buyer or Seller will actually complete a transaction.  *We do not transfer legal ownership of items* from the Seller to the Buyer.  Unless the Buyer and

the Seller agree otherwise, *the Buyer will become the item's lawful owner* upon physical receipt of the item from the Seller.

…

**Right to use site and content**

You may use the site only for the purposes for which it is provided.  You must not use this site for fraudulent or other unlawful activity or otherwise to do anything to damage or disrupt this site.  Multiple accounts for the purpose of defrauding, circumventing bans, soliciting or abusing Cryptopia Ltd services will result in immediate termination of all related accounts, *including seizure of all on-site digital property*.  Threats towards Cryptopia Ltd, Cryptopia Ltd Staff will result in immediate termination of all related accounts, *including seizure of all on-site digital property*.

…

**Amendments**

We may amend these terms of use from time to time, so you should check and read these terms of use regularly.  By continuing to use this site after any such amendment, you are deemed to have agreed to the amended terms of use.

(emphasis added, all bold original)

[26]    These original terms and conditions seemed to apply unchanged until 7 August 2018 when a new "Terms and Conditions" document was introduced by Cryptopia.  It seems this was crafted with legal assistance and may have resulted because of a view taken by Cryptopia executives at the time that more detailed terms and conditions were required.

[27]    These new 7 August 2018 Terms and Conditions, the parties have accepted, varied the earlier terms and conditions.  Amongst other things, these varied Terms and Conditions relevantly stated:

**Introduction**

A.  These terms and conditions of use (terms) apply to the Cryptopia website and associated applications (the platform) and the services (services) operated and provided by Cryptopia Limited.

B.  These terms, the platform and the services allow you to:

(i)  Buy, sell and exchange supported coins through the platform.

(ii)  Use fiat pegged tokens, when available; and

(ii)  Store supported coins in our hosted wallets.

C.   In these terms Cryptopia, we, us or our, means Cryptopia and you or your means the person accessing or interacting with the platform and/or the services.

…

## 2.        Understanding your risks

Trading in coins is speculative and high risk.  You may lose some or all of any money or coins that *you* hold or transact using the platform.  *You* should not trade coins unless you can afford to lose *your* investment without hardship. **Please read the Cryptopia Risk Statement carefully for a summary of some of the risks that you must understand before you use the platform or services.**

…

**Your account**

### 4.1    Opening an account

(a)        To use the platform and our services, you must open an account by completing our process through the platform.  We can decline to open an account or provide a service, without notice and for any reason.

(b)        We will require proof (satisfactory to us) of your identity when you open an account, to enable us to meet our obligations under the Applicable Law (in particular any anti money laundering or countering financing of terrorism requirements).  In addition, we may ask for such other information as we consider is necessary or desirable…

### 4.2    Using your Account

(a)        Your account comprises *your* coin balances…including where applicable any fiat pegged tokens that you hold…and includes a record of all *your* transactions.

(b)        You agree to accept responsibility for all activities that occur under your account or password.

(c)        You must maintain the confidentiality and security of any information that can be used to access your account.

…

(a)        You understand that anyone accessing your account will be able to enter into transactions using *your* coin balances and where applicable any fiat pegged tokens and we have no obligation to verify or take any

steps to verify any instruction received from you or appearing to be sent by you.

### 4.3   We can suspend your account

(a)   We may suspend, limit or restrict access to your account, the platform any service, at any time without notice if:

    (i)   You fail to pay any amounts owing under these terms to us or any other person when they are due.

    (ii)   We become aware of a dispute over either the *ownership of any assets* in your account or the operation of the account.

…

(d)   Subject to any applicable law, if we close your account:

    …

    (iii)   We may at our discretion provide you with access to the platform solely to the extent necessary to access to your account for a period of 90 days to allow you to transfer your Coins to a different digital wallet or to redeem any fiat pegged tokens.

…

### 5   Your Coin balances

(a)   *Your Coin balances* form part of your account, and allow *you* to send, receive and store supported Coins…in accordance with instructions received by you through the platform;

…

(d)   *Your Coin balances* are operated by us, and represent entries *in your name on the general ledger of ownership* of Coins maintained and held by us.  This means the Coins in your deposit wallets may be pooled in our internal accounts with other users' Coins at any time.

(e)   *Each user's entry in the general ledger of ownership of Coins is held by us on trust for that user.*

### 6.   Fiat pegged tokens

(a)   Where we are able to do so…we may offer fiat pegged tokens to enable you to upload fiat dollars to your account in exchange for the equivalent pegged tokens which are tradeable on our platform.

…

(e)   Fiat pegged tokens are not financial products in themselves and do not give you any rights or carry any obligation.  They are a digital representation of fiat dollars *held on trust for you* in the custodial account.  Under these terms *you hold the beneficial interest in these*

*fiat dollars* and can instruct us as trustee to deliver them to you at any time, subject to these terms…

**7.      Trading on the platform**

…

**7.2      Reversals, cancellations**

(a)      You cannot cancel, reverse, or change any transaction once it is submitted.

…

**7.3      Agent**

You appoint Cryptopia, and *Cryptopia accepts the appointment, as your agent* for any transaction in Coins that you have entered into through your account on the platform in accordance with these terms.

**7.4      Location of transactions**

All transactions through the platform are deemed to take place in New Zealand.  On completion of the transaction, you are *deemed to take possession of your account and the assets in your account in New Zealand.*

**8.      Platform change and business disruptions**

(a)      We will use reasonable care in operating our platform, so as to limit disruptions to the platform, user accounts and their services. However, you accept that our platform will not necessarily be available uninterrupted or error-free and it may also be inaccessible from time to time while undergoing maintenance or upgrade work...

…

**13.      Fees and expenses**

**13.1      You agree to pay our fees.**

You agree to pay all fees and expenses associated with or incurred by you in relation to your use of our services or platform which are published on our platform.

…

**14.      Taxes**

By using our platform, you accept that it is up to you to understand whether and to what extent, any taxes apply to any *transactions you conduct* through our services or platform.  We accept no responsibility for, nor make any representation in respect of, your tax liability.

…

19.    **Glossary**

In these terms:

…

**Coin balance(s)** means any record of Cryptopia holding funds on the Cryptopia platform *on your behalf*.

…

**Custodial account** means the bank account held by Cryptopia *on behalf of users* for the purpose of receiving and transmitting fiat dollar funds matched to fiat pegged tokens.

**Services** means any services provided by us to you or any other user whether through the platform or outside of it, including *the purchase, sale and exchange of coins* and the provision of the platform, your account (including any fiat pegged tokens) in any Coin wallet.

(emphasis added, all bold original)

[28]    As Cryptopia's last Director of Finance and Administration, Mr Brocket deposed before me that he had responsibility for the accounting, financial reporting, budgeting, tax compliance, investments, insurance, people and culture, and audit functions of Cryptopia.

[29]    He confirmed in that affidavit that, based on his knowledge, there were only ever these two sets of Cryptopia's terms and conditions that applied to customers. This evidence was unchallenged before me. In particular, he stated:

> From an operational perspective, there were no material changes to the way the business operated that resulted from the change to the terms and conditions in August 2018. An email was sent to all customers of which there were approximately 2.3 million users when the changes were effected.

[30]    Mr Brocket further deposed:

> 6.    Cryptopia provided a trading platform…for accountholders to trade pairs of cryptocurrencies.
>
> …
>
> 11.    …Accountholders could make deposits and withdrawals of enabled coins. Any accountholder could withdraw *its cryptocurrency* from the exchange into a privately held digital wallet, controlled by the accountholder or alternatively transfer cryptocurrency to another exchange, if the currency in question was traded on that other exchange or the exchange agreed to host it.

> 12.    Trades...were carried out on the Cryptopia exchange through the use of order books that listed the available buy/sell orders.  When the orders matched a trade would occur…

(emphasis added)

[31]    As to how Cryptopia would be paid for cryptocurrency transactions, Mr Brocket stated:

> 15.    …Cryptopia charged a trading fee charge of 0.2 per cent of the value of the trade…the trading fee was charged to the buyer and the seller.
>
> 16.    If a seller wanted to trade one bitcoin, then she would have 1.002 BTC deducted from her account, of which 0.002 BTC would go to Cryptopia as the transaction fee on the sell side.  The "purchaser" would receive 0.998 BTC, with the difference of 0.002 BTC being paid to Cryptopia as the fee on the buy side…

*(e) Cryptopia's financial accounts*

[32]    Lastly, before the Court are a range of Cryptopia's profit and loss statements and balance sheets for the period 1 January 2018 to 8 August 2018 and for the period around 2018/2019.  What is clear from these financial accounts prepared by Cryptopia's in-house accountant is that details of its assets do not include any cryptocurrency, other than the amounts in its platform that Cryptopia clearly held on its own account.  Digital currency held on the platform for accountholders was not shown as an asset of or belonging to Cryptopia.  Nor was any appropriate entry in the liabilities section of Cryptopia's balance sheets to show advances to the company from accountholders which financed the acquisition of these digital assets.

[33]    From GST returns which are before the Court, there is also no suggestion that digital trading of the large number of digital assets held for accountholders was undertaken in any way by Cryptopia on its own account.

*(f) SQL database and how Cryptopia generated income*

[34]    The SQL database was Cryptopia's internal database that recorded transactions carried out on the exchange and the coin balances of each account.

[35]    Cryptopia charged accountholders a fee for deposits, trades, withdrawals and listing coins.  The company had several accounts on the exchange into which the fees were paid.  These accounts had a corresponding SQL entry.

[36]    When a trade took place the trade fee would be credited to Cryptopia's fees account which would generate a corresponding entry on the SQL database.  A weekly report was prepared by Cryptopia that summarised the trading fees generated in the previous week and converted these into New Zealand dollars.

[37]    The underlying holdings of Cryptopia itself were also reconciled into the company's accounting system, Xero, and recorded in the accounts as company assets.  Appropriate journal entries would be created.  This was set up like a bank account in Xero.

*(g) The hack*

[38]    As I have noted, Cryptopia was hacked, this occurring in January 2019.  The parties estimate that the hackers stole approximately NZD 30 million worth of cryptocurrency from the exchange.  That cryptocurrency was withdrawn from the exchange using the private keys for the currencies in question, so Cryptopia was not able to reverse the transactions.  The hack is the subject of an ongoing police investigation but this is not as yet resolved.

[39]    Currently the liquidators are in the process of ascertaining the amount of cryptocurrency that was stolen and the amount that is left in Cryptopia's wallets.  This process involves individually "standing up" the digital wallet for each cryptocurrency (of which there are approximately 500) and recreating each entry to protect the system from any malware that might be left over from the hack.

[40]    Once that process is completed, the liquidators will be able to carry out a reconciliation exercise between the actual cryptocurrency holdings that the company controls or owns and the accountholders' account balances recorded in the SQL database.  The results of this process will assist the liquidators in determining not only what is available for distribution, but also the proportion of account balances or claims that can be distributed or paid once the present application is determined.

*(h) Advertising and promotion*

[41]    It seems from the available evidence before the Court that Cryptopia did not actively promote its business, at least until it adopted a new marketing strategy in July 2018 by which point its user numbers had already spiked.

[42]    Mr Ruscoe has confirmed that Cryptopia marketed itself through channels like Google and Trade Me advertisements and it promoted itself through banner advertisements and through some event sponsorship.  The majority of this marketing seems to have been through online social media channels.  On these aspects, Mr Watts for the accountholders submits that there are aspects of this advertising and promotion which support the existence of trusts being established for the holding of accountholders' cryptocurrency.  I will address this aspect further below.

**The law – s 284 of the Companies Act 1993**

[43]    The application before me, as I have noted, is made under s 284(1)(a) of the Companies Act 1993.  In terms of this provision, this Court on an application from, amongst others, a liquidator (as has happened here) has a supervisory jurisdiction to: "…give directions in relation to any matter arising in connection with the liquidation."

[44]    The authors of *Heath and Whale on Insolvency*, in commenting on the application of s 284 state:[3]

> …if there is a difficulty at any stage of the administration, it is the liquidator's clear duty to inform the court and seek directions [under s 284 of the Act].

[45]    In addressing the liquidator's principal duties engaged in the liquidation of a company, s 253 of the Companies Act describes this duty as being:

> …
>
> (a)    to take possession of, protect, realise, and distribute the assets, or the proceeds of the realisation of the assets, of the company to its creditors in accordance with this Act; and

---

[3]    Paul Heath and Michael Whale (eds) *Heath and Whale on Insolvency* (online ed, LexisNexis) at [22.8(e)] (footnote omitted).

(b)    if there are surplus assets remaining, to distribute them, or the proceeds of the realisation of the surplus assets, in accordance with section 313(4)–

in a reasonable and efficient manner.

## The liquidators' application

[46]    In the liquidators' application to this Court orders are sought which they say relate to the following questions:

### As to the legal status of the Digital Assets

(a)    Whether any or all of the various cryptocurrencies (digital assets) held by the liquidators of Cryptopia constitute "property" as defined in s 2 of the Companies Act 1993;

(b)    Whether any or all of the Digital Assets are held on trust for any or all Account Holders (whether by way of express, implied, resulting, constructive, Quistclose Trust or otherwise);

(c)    If the answer to question (a) or (b) is no, then to the extent that such digital assets are not "property" whether the applicant liquidators should satisfy claims of:

    (i)    Any Account Holder of the company (Account Holder) for the return of his/her/its digital assets; and

    (ii)    Unsecured creditors;

        by conversion of such Digital Assets into fiat currency and paying such in accordance with Part 16 of the Companies Act 1993;

(d)    If the answer to question (b) is yes in any respect, then:

    (i)    When did the Trust/s come into existence? When the company updated its terms and conditions on 7 August 2018 (Amended Terms), or at some alternative date?

    (ii)    What are the terms of the Trust/s?

    (iii)    Are the Digital Assets held on trust:

        1.    In an individual trust for each Account Holder, with the result that each Account Holder is the sole beneficiary of the Trust?

        2.    In one trust for the benefit (of) all Account Holders with the result that all Account Holders are co-beneficiaries of the same trust, or

3.   In multiple trusts for the benefit of specific groups of Account Holders, with the result that Account Holders within a specific group are co-beneficiaries of same trust, or

4.   On some other basis.

(e)   What is the consequence of the applicant liquidators being unable to ascertain the identity of any Account Holder, and what consequences flow in relation to any Digital Assets associated with that account, specifically:

(i)   Can the applicant liquidators close any such Accounts and retain any Digital Assets as assets of the company; or

(ii)   Do any such Digital Assets fall to be dealt with pursuant to the Trustee Act 1956, or otherwise.

(f)   If and to the extent that the applicant liquidators recover stolen Digital Assets, then are such to be dealt with by the applicant liquidators:

(i)   In accordance with the determination sought above;

(ii)   Pro rata according to the amounts recovered assessed against amounts stolen; or

(iii)   As assets of the company.

(g)   Directing that the reasonable fees and disbursements of Peter Watts QC, Jenny Cooper QC, Buddle Findlay and the liquidators shall be met, in the first instance, from the pool of realised Bitcoin holdings pursuant to paragraph 3(b) of the order of this Court dated 29 May 2019, on the basis that the fees are a necessary and reasonable expense of the liquidation, of and incidental to the protection, preservation, recovery, management and administration of the assets of Cryptopia, with the Court's decision as to the ultimate incidence of counsel's costs to be reserved until the originating application has been determined, or as otherwise ordered by the Court.

(h)   Leave is reserved for the applicants to apply for such further ancillary orders as are necessary.

[47]   From the liquidators' application there appear to be two main issues for determination by the Court with a number of subsidiary issues flowing from this.  As to the two main issues, they seem to be:

(a)   Are cryptocurrencies a type of "property" in terms of the Companies Act and, linked to this, can cryptocurrencies form the subject matter of a trust?

(b)     Was Cryptopia, in providing a cryptocurrency storage and exchange service for its customers, a trustee of the currency brought onto the exchange by accountholders and held by it?

[48]     In all the present circumstances, in essence the dispute before the Court, which is one between the accountholders and the creditors, simply concerns the proprietary effects of the digital assets in relation to Cryptopia, a New Zealand company in liquidation.  The dispute is not one between participants in a particular cryptocurrency system.  In reality, the dispute is simply between the accountholders and the creditors (and possibly also the shareholders) of a limited liability company that operates a cryptocurrency exchange.

[49]     In that respect, counsel for all parties before me agreed that the law applicable to each of the issues in this case is New Zealand law.  Mr Watts, counsel for the accountholders, went further and addressed the issue of applicable law relating to this case which I acknowledge and adopt.  I am satisfied for present purposes, as counsel have agreed, that New Zealand law is to apply to the present issues before me.

## Issue 1 - The "property" issue

*An aside – what are the implications?*

[50]     Before me Mr Watts for the accountholders submitted that cryptocurrencies must be seen as a form of intangible personal property both at common law and within the definition contained in s 2 of the Companies Act.  The liquidators and the creditors disagree with this.  The creditors also contend that cryptocurrencies are not property capable of forming the subject matter of a trust at common law.

[51]     The accountholder's position, however, is that even if cryptocurrencies are not seen as personal property in the full sense, they are still assets capable of forming the subject matter of a trust.

[52]     On these aspects, Mr Watts contended that any finding by this Court that cryptocurrencies are not property would have profound and unsatisfactory implications for the law in New Zealand including in particular insolvency law,

succession law, the law of restitution and commercial law more generally.  Mr Watts maintained that Ms Cooper for the creditors is wrong to argue that these problems are sufficiently important that they should be left to Parliament for an appropriate remedy.

[53]    Turning to this first question as to whether the digital assets have the indicia of "property" and can form the subject matter of a trust, it is important to say something first about the general background to this issue.

[54]    Given that the application before the Court seeks directions as to how the liquidators should distribute the digital assets, the creditors' position is that the digital assets, along with Cryptopia's other remaining assets should be distributed on a pari passu basis, treating all accountholders and other unsecured creditors equally.

[55]    The position taken by the accountholders here is different, however.  They say that the digital assets belong to them and, if need be, are held by Cryptopia in trust for the accountholders.  As such those digital assets should be divided by currency and distributed to accountholders in proportion to their holding of each particular cryptocurrency as recorded in Cryptopia's SQL database.

[56]    Leaving aside those digital assets in issue here and the money held on trust to back the New Zealand dollar tokens (NZDTs), Cryptopia's assets on liquidation consist of:

(a)    a little over NZD 686,000 held in a bank account;

(b)    fixed assets with a book value of NZD 2 million but a likely realisable value as low as NZD 100,000; and

(c)    344 bitcoin (having a present value of approximately NZD 4.6 million) recorded as being held by Cryptopia for its own account.

[57]    It is clear, therefore, that the pool available to creditors, which I understand number about 37 different parties, if the remaining digital assets are found to be held by Cryptopia on trust, would be around NZD 5.4 million.  This would mean that any creditors who were not also accountholders would recover less than 50 per cent of the

amount of their claims, given that it seems the total value of all creditors' claims is an estimated NZD 12.7 million (including about NZD 5 million owed to the Inland Revenue Department).

[58]    There may also be an issue here, according to Ms Cooper, for those accountholders who lost all their various holdings in the hack.  In this regard, as I understand it, holders of ethereum cryptocurrency lost 100 per cent of their holdings in the hack.  Thus, if the digital assets were divided by currency and in proportion to an accountholder's holding of each currency, those holders would receive nothing.

[59]    Ms Cooper has said that, in contrast, if the digital assets were to be available for distribution to all accountholders and creditors on a pari passu basis, the total pool of assets she estimates would be approximately NZD 217 million and the percentage recovery by each creditor would then be likely to be over 85 per cent of its total claim.

[60]    I set out these matters purely by way of background information.  Mr Watts has properly identified that, even if they are accurate, these possible results are not strictly relevant and have no bearing on the true legal position to be reached by this Court in making its assessment of the questions before it.

[61]    I return now to consider what is the proper assessment of the Digital Assets here.  Before me, all parties appeared to agree that the Digital Assets are "assets" in terms of the general definition of this word in certain sections of the Companies Act where this word appears.[4]

[62]    On the issue as to whether cryptocurrencies are a type of "property", however, the parties differ markedly.  And, in any event, a first question must be asked why does this matter?

---

[4]    Companies Act 1993, s 253, addresses the principal duty of a liquidator to take possession of, protect, realise and distribute "assets" of the company to its creditors.  Section 313 too deals with distribution of a company's surplus "assets".

*What is "property" and why does it matter here?*

[63]    Sarah Green, in a chapter called "Cryptocurrencies in the Common Law of Property" in her and David Fox's text *Cryptocurrencies in Public and Private Law* addresses this question:[5]

> Property law matters both internally and externally to a cryptocurrency system.  Internally – among the users of the system – property law is a justifiable ground for the recovery of coins or their value when they are stolen or transferred by fraud.  The irreversibility of cryptocurrency transactions, in a purely technological sense, need not bar the reversal of their legal effect or the recognition that they are legally defective.  Property law has its own systemic norms.
>
> Essentially – to third parties dealing with users of the system – the recognition of cryptocurrencies as objects of property is no less important.  It is only a matter of time before cryptocurrencies are used in transactions external to the block chain.  Property is a gateway to many standard forms of transactions.  A crypto-coin can never become the subject matter of a trust or a proprietary right of security, nor will it be an asset in a deceased's person's estate, unless it is first recognised as an object of property.  The same is true of a secured creditor or trust beneficiary enforcing their claim in property to the unsecured creditors of an insolvent coin-holder.   The development of a viable cryptocurrencies derivative market may sometimes require that the primary assets from which secondary claims are constructed are capable of legal recognition as property.

[64]    And, in the UK Jurisdiction Taskforce's *Legal Statement on Cryptoassets and Smart Contracts*, there is a specific section entitled "What is property, and why does it matter?"[6]   In this section the following paragraphs are useful to note:

> 35.    Strictly, the term property does not describe a thing itself but a legal relationship with a thing:  it is a way of describing a power recognised in law as permissibly exercised over the thing.  The fundamental proprietary relationship is *ownership*:  the owner of the thing is, broadly, entitled to control and enjoy it to the exclusion of anyone else.  However, ownership is just one kind of property right:  property is a comprehensive term and can be used to describe many different kinds of relationship between a person and a thing.
>
> 36.    Why does it matter if a cryptocurrency asset is capable of being property.  It matters because in principle proprietary rights are recognised against the whole world, whereas other – personal – rights are recognised only against someone who has assumed a relevant legal duty.  *Proprietary rights are of particular importance in an insolvency, where they generally have priority over claims by*

---

[5]    Sarah Green "Cryptocurrencies in the Common Law of Property" in David Fox and Sarah Green (eds) *Cryptocurrencies in Public and Private Law* (Oxford University Press, Oxford, 2019) at 141.

[6]    *Legal Statement on Cryptoassets and Smart Contracts*, above n 2.

> *creditors, and when someone seeks to recover something that has been lost, stolen, or unlawfully taken.*  They are also relevant to the questions of whether there can be a security interest in a crypto asset and whether a crypto asset can be held on trust.

> 37.    The term *property* is also part of the lexicon of the law:  it is widely used in statutes and cases.  It is important to understand whether the many statutory and common law rules applicable to property apply also to crypto assets and, if so, how.  *Of particular significance are the rules concerning succession on death, the vesting of property on personal bankruptcy, the rights of liquidators in corporate insolvency, and tracing in cases of fraud, theft or breach of trust.  It would, to say the least, be highly unsatisfactory if rules of that kind had no application to crypto assets.*

(emphasis added)

[65]   And:

> 41.    Some take the view that the design of crypto assets means that there is no need for traditional legal rules or processes.  Law is irrelevant, it is sometimes said, because dealings are effected by non-legally-binding consensus between users, because cryptographic authentication and validation using strong encryption methods makes dealings irreversible, and because decentralisation and disintermediation means that there is no responsible party who can be compelled to act at the direction of a court.  We do not agree.  *The design of crypto assets may create some practical obstacles to legal intervention but that does not mean that crypto assets are outside the law.*

(emphasis added)

[66]   As I have noted above, Mr Watts suggested too that a finding that cryptocurrencies are not property would have profound and unsatisfactory implications for New Zealand's law, including insolvency law, succession law, law of restitution and commercial law more generally.

[67]   Before me, although it seems the creditors may have recently changed their position here to some extent, essentially, they <u>now</u> contend that cryptocurrencies are not property nor are they capable of forming the subject matter of a trust at common law.  The accountholders strongly dispute this position.  Mr Watts contends that it should be a reasonably straightforward exercise for this Court to find that cryptocurrencies are in general a species of intangible personal property and are capable of being the subject matter of a trust.

[68]    And, before me, Mr Watts provided detailed and extensive submissions on this issue as to the status of cryptocurrencies as property for two reasons:

(a)    This was given, first, the new opposition now from counsel to the creditors broadly accepted by counsel for the liquidator over this point; and

(b)    Secondly, the fact that the status of cryptocurrencies as property has attracted significant attention around the common law world in recent years without, it seems, as yet receiving a definitive judicial analysis.

[69]    For present purposes it will become apparent that I reach the conclusion that the cryptocurrencies here situated in Cryptopia's exchange are a species of intangible personal property and clearly an identifiable thing of value.  Without question they are capable of being the subject matter of a trust.  I will now set out my reasons for this conclusion.

*The authorities*

[70]    This first issue outlined at para [46](a) of this judgment asked the specific question whether any or all of the digital assets held by the liquidators are "property" within the definition outlined in s 2 of the Companies Act.

[71]    That section defines "property" as:

> …property of every kind whether tangible or intangible, real or personal, corporeal or incorporeal, and includes rights, interests, and claims of every kind in relation to property however they arise.

[72]    Although there is a certain circularity with this definition, it is nevertheless inclusive and wide in that it extends "property" for the purposes of the Act to include "rights, interests, and claims of every kind in relation to property however they arise."

[73]    Courts in New Zealand have accepted that the definition of "property" in the Companies Act is a "wide" one and includes "money" despite money not being expressly included in the terms of the s 2 definition.  This is clear from the

Supreme Court decision in *McIntosh v Fisk*.[7]   There, the Court accepted it was arguable that "the payment of money by RAM would fall within s 292(3)(a) as a transfer of property by RAM due to the wide definition of "property" in s 2 of the Companies Act."[8]

[74]   Further, in *Chapman v Effective Fencing Ltd,* Associate Judge Faire held:[9]

> The definition of "property" in s 2 in referring to "every kind" of property, is wide enough to cover money.  Clearly money is "tangible" and "personal" property in terms of the definition.

[75]   Lord Wilberforce's opinion in the House of Lords in *National Provincial Bank Ltd v Ainsworth* is often cited as the classic statement of the characteristics of "property".[10]   There, his Lordship said:

> Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability.

I will return to this definition shortly.

[76]   But first, I turn to several recent cases where the question of cryptocurrencies as "property" has been addressed to some extent.  The first is a Singaporean case, *B2C2 Ltd v Quoine Pte Ltd*, which Ms Cooper in particular considered to be an important decision, given its factual setting was not dissimilar to the present case.[11]

*B2C2 Ltd v Quoine Pte Ltd*

[77]   Initially this involved a 2019 first instance decision of the Singapore International Commercial Court, a new division of the High Court of Singapore created in 2015. That decision was then appealed to the Court of Appeal of Singapore and was the subject of a lengthy appeal judgment delivered this year.[12]   In the lower

---

[7]     *McIntosh v Fisk* [2017] NZSC 78, [2017] 1 NZLR 863.
[8]     At [55].
[9]     *Chapman v Effective Fencing Ltd* HC Auckland CIV-2004-404-5905, 21 April 2005 at [34].
[10]    *National Provincial Bank Ltd v Ainsworth* [1965] AC 1175 (HL) at 1247–1248.
[11]    *B2C2 Ltd v Quoine Pte Ltd* [2019] SGHC(I) 3, [2019] 4 SLR 17 [*B2C2* (SGHC)].
[12]    *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 2 [*B2C2* (SGCA)]

court, all parties accepted that cryptocurrencies were a species of "property", a concession which the judge, Thorley IJ[13] accepted was rightly made.

[78]   The case concerned a Singaporean cryptocurrency exchange operated by Quoine, in many ways like Cryptopia, on which B2C2 was a trader. Some trading was set up to occur automatically through computers connected to the exchange and was pre-programmed. The transactions which led to the litigation were conducted by way of algorithms created by Quoine and by B2C2. The trades in question resulted from pre-programmed requests to exchange cryptocoins of ethereum for bitcoin. Errors occurred in the programming and an unusual set of circumstances resulted in B2C2's computer offering ethereum for bitcoin at the rate of one ethereum for 10 bitcoin. The computer of another trader on that platform accepted that bid, seven such trades taking place ("the disputed trades"). The going rate of ethereum for bitcoin in the market at the time was one ethereum for 0.04 of a bitcoin. The effect of the automatic trading was that B2C2 sold ethereum at about 250 times its appropriate price. Quoine became aware of the mistake. It then reversed the trades which led to the litigation.

[79]   B2C2 sued Quoine in the High Court for breach of the contract between it as a trader and Quoine as the operator of the exchange and for breach of trust as a result of Quoine's having returned the bitcoin to the counterparty. A defence of mistake was raised in that Court but Thorley IJ held there was no basis for setting aside the trading and Quoine was accordingly liable to B2C2 for having wrongly reversed the trades. He upheld both B2C2's contract claim and its claim for breach of trust.

[80]   That breach of trust claim could have succeeded only if the bitcoins in question were an asset that could form the subject matter of a trust. At the lower court level, Quoine had conceded that Bitcoin was a species of "property" but it did not concede that there was any trust. Thorley IJ considered that the concession on the "property" point was rightly made and in his judgment his Honour stated:[14]

> Cryptocurrencies are not legal tender in the sense of being a regulated currency issued by government but do have the fundamental characteristic of intangible property as being an identifiable thing of value. Quoine drew my

---

[13]   The "IJ" judicial office abbreviation refers to International Judge, an office of the Supreme Court of Singapore. Thus, references to Thorley IJ are to be read as "International Judge Thorley".
[14]   At [142].

attention to the classic definition of a property right in the House of Lords decision of *National Provincial Bank v Ainsworth* [1965] 1 AC 1175 (HL) at 1248:

> …it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability.

> Cryptocurrencies meet all these requirements. Whilst there may be some academic debate as to the precise nature of the property right, in the light of the fact that Quoine does not seek to dispute that they may be treated as property in a generic sense, I need not consider the question further.

[81]    In the proceeding, as I have mentioned, B2C2 had alleged that Quoine's reversal of the disputed trades was in breach of contract and breach of trust. On the trust point there were no express words in Quoine's terms and conditions indicating an intention to create a trust. However, B2C2 argued Quoine had shown an intention to create a trust by holding traders' cryptocurrency in separate digital wallets from Quoine's own assets. Against that, Quoine submitted that a Risk Disclosure Statement it had provided notified customers that assets were not deposited in a trust account so customers may lose their assets in the case that Quoine was to be bankrupted or go into liquidation.

[82]    The High Court, in considering the first instance claims brought by B2C2, allowed them both on the basis of breach of contract and breach of trust. In finding there was a trust, the Court there held that the "decisive factor" was that the assets were held separately as members' assets rather than as part of Quoine's trading assets. The decision was appealed to the Court of Appeal as I have noted. On appeal the majority upheld the High Court's decision on the breach of contract aspect but overturned the decision on the breach of trust cause of action. On that breach of trust claim, a majority of the Court of Appeal rejected the International Judge's view that it was a "decisive factor" that the assets were held separately rather than as part of Quoine's trading assets. The Court of Appeal found the mere fact Quoine's assets were segregated from its customers cannot in and of itself lead to the conclusion that there was a trust. Further discussion of this trust aspect will follow later in my judgment.

[83]    On the "property" question, in its decision, the Court of Appeal also declined to decide whether Bitcoin as the cryptocurrency in question was "property" capable

of forming the subject matter of a trust.  In their decision the Court of Appeal in the majority judgment, delivered by Menon CJ, commented:[15]

> There may be much to commend the view that cryptocurrencies should be capable of assimilation into the general concepts of property.  There are, however, different questions as to the type of property that is involved.  It is not necessary for us to come to a final position on this question in the present case.

[84]   This comment from the Court of Appeal, although not definitive, along with similar suggestions from other authorities, in my view, are of some help when considering this question as to whether the digital assets here could be regarded as "property".

*Other authorities*

[85]   A second case perhaps supporting this interpretation is a 2018 decision in *Vorotyntseva v Money-4 Ltd*.[16]  There, Birss J sitting in the Chancery Division of the English High Court granted ex parte a proprietary freezing order over some bitcoin and ethereum currency, stating that the defendant in that case had not suggested that "cryptocurrency cannot be a form of 'property'".[17]  No further discussion took place on the point.

[86]   In a not dissimilar Canadian decision, *Shair.Com Global Digital Services Ltd v Arnold*, the Supreme Court of British Colombia granted an ex parte preservation order to the plaintiff company against its former chief operating officer with respect to digital currencies that might still be in the defendant's possession.[18]  Without providing any reasoning the Court accepted that cryptocurrencies could be property within the rules for preservation orders, noting that in the correspondence between the parties that had been filed for the proceeding the defendant had not denied that the plaintiff had an interest to pursue.

---

[15]   *B2C2* (SGCA), above n 12 at [144].
[16]   *Vorotyntseva v Money-4 Ltd* [2018] EWHC 2596 (Ch).
[17]   At [13].
[18]   *Shair.Com Global Digital Services Ltd v Arnold* 2018 BCSC 1512.

[87]    Recently, a decision of the English High Court in *AA v Persons Unknown* also held that cryptocurrencies are "property". [19]    There, Bryan J granted an interim proprietary injunction against a cryptocurrency exchange over bitcoin which represented proceeds of ransom monies paid out to a hacker by the applicant insurance company.  The hackers had installed malware into the insurance company's computer system, and demanded the company pay a ransom in bitcoin, to regain access to its system.  The ransom was paid in bitcoin and transferred into the exchange.  The insurance company applied to the Court for an interim proprietary injunction against the exchange over the bitcoin, amongst other things.

[88]    Only counsel for the applicant insurance company appeared at the hearing in that case and filed submissions.  And, it seems the High Court there primarily relied on the *Legal Statement on Cryptoassets and Smart Contracts*, and that no other argument was addressed to the Court on the issue.[20]

[89]    It is also useful, as I see it, to turn to consider a diverse range of types of assets that have already been recognised elsewhere as "property" at equity.  These examples of "property" also illustrate that they are capable of being the subject of a trust.  They include:

> (a)    Any simple chose in action– even an oral contract can be the subject of an orally created trust with the result that a liquidator of a corporate trustee could not pursue the chose in order to obtain a money judgment for the benefit of unsecured creditors.[21]

> (b)    Non-enforceable debt claims – for example a barrister's claim that fees be paid by the relevant instructing solicitor was recently held in *Gwinnutt v George* to be part of the property belonging to a bankrupt barrister, even though the barrister had no legally enforceable right to the fees.  In the circumstances of that case, in fact there was also no contract all between the barrister and the solicitors. [22]

---

[19]    *AA v Persons Unknown* [2019] EWHC 3556, [2020] 4 WLR 35 at [57]–[59].
[20]    *Legal Statement on Cryptoassets and Smart Contracts*, above n 2.
[21]    See *Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch) at 258.
[22]    *Gwinnutt v George* [2019] EWCA Civ 656, [2019] Ch 471.

(c)     Payments through the banking system – money transactions have recently ceased to involve tangible coins or banknotes and usually take the form of electronic bank payments.  Equity will apply its proprietary tracing rules to payments effected by these means, even though on transfer of money from one bank account to another this does not involve the transfer of anything in the literal sense from the payer to the payee and the recipient does not hold the same asset.[23]

(d)     Copyright – although copyright has statutory recognition, it nevertheless provides a strong example of intangible property.  The subject matter of copyright turns merely on combinations of sounds or shapes in two or three dimensions (including words or drawings) that are sufficiently distinctive to justify the law preventing others from reproducing them.[24]  These sounds and shapes can exist in digital form.  Although the resulting intellectual property needs to be identifiable, in many cases whether there has been a copyright infringement will involve an element of judgment in the tribunal called upon to adjudicate on the associated legal rights.  These rights can be made the subject matter of a trust.

(e)     Shares – shares in a company are another type of intangible property which typically has a more complicated existence than merely conferring a right to sue.  Voting rights in relation to the appointment and removal of directors and in relation to other important company matters can be exercised.  Shares are properly regarded as an item of property in equity even where they are non-transferrable or transferrable only to particular persons.[25]

(f)     Licences/exemptions/quotas – modern statutory regulation frequently operated on the basis of blanket prohibitions coupled with defined

---

[23]    See D Fox, "Property Rights in Money" Oxford University Press, Oxford, 2008, at [1.108]

[24]    Section 14 Copyright Act 1994 sets out the statutory categories of recognised copyright, which are to include literary, dramatic, musical or artistic works, sound recordings, films, communication works and typographical arrangements of publicised editions.

[25]    *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150 (Ch).

exemptions granted to individuals that allow each individual then to trade. Such exemptions function and are recognised as intangible items as property. Their value is not derived from a right to sue but rather the opposite, namely an immunity from prosecution.[26] Examples of this include export quotas, milk supply quotas, fishing quotas, petroleum exploration licences, waste disposal licences, and carbon credits. These tradeable rights can form the subject matter of a trust and where that happens the asset falls outside the estate of an insolvent trustee. There is a large body of case law that confirms such rights are a type of property and subject to normal property protections.[27]

(g)     A trustee's rights of indemnity – a trustee's rights to be indemnified in respect of trust expenses has been held to confer a proprietary interest in the trust assets even though these assets are realised by self-help remedies rather than recourse to the courts: *Carter Holt Harvey Woodproducts Australia Pty Ltd v Commonwealth*.[28] Although these rights are not choses in action, they are a species of intangible property. The breadth of the sort of interests that may be the subject of a trust is also confirmed here at [84] as follows:[29]

> To describe [the right of indemnity] as constituting a beneficial interest in the trust assets, and so as property, thus acknowledges the characteristic blending of personal rights and obligations with proprietary interests which is the "genius" of the trust institution. Such a beneficial interest falls naturally and ordinarily within the definition of "property" in s 9 of the Corporations Act.

Although a number of the examples outlined above do involve statutory licences and quotas and are within broad statutory definitions of the word "property" in the respective jurisdictions, the types of interest capable of forming the subject matter of a trust at equity, as I see it, are no less broad. A similar point was made by Mr Stephen

---

26   *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch), [2013] Ch 156.

27   See by way of example *Attorney General of Hong Kong v Nai-Keung* [1987] 1 WLR 1339 at 1342 (export quotas); *Swift v Dairywise Farms Ltd* [2000] 1 WLR 1177 at 1185 (milk quota) and *Commonwealth of Australia v WMC Resources Ltd* (1998) 194 CLR 1 (petroleum exploration licences, not being an interest in land).

28   *Carter Holt Harvey Woodproducts Australia Pty Ltd v Commonwealth* [2019] HCA 20, (2019) 368 ALR 390.

29   *Carter Holt Harvey*, above n 28, at [84] (footnotes omitted).

Morris QC sitting as a deputy High Court judge in *Armstrong DLW GmbH v Winnington Networks Ltd*:[30]

> Whilst the cited case law concerned the meaning of "property" as specifically defined in various statutes, in my judgment, the reasoning of Morritt LJ (in *Celtic Extraction*) applies equally to the characteristics of property at common law. Indeed, Morritt LJ himself relied upon *National Provincial Bank v Ainsworth*.[31] Moreover the terms used in statutory definitions are themselves derived from common law concepts.

[90]    At this point it is useful also to interpolate three recent New Zealand cases which might be seen to be at the boundaries of the legal concept of "property". The first is *Dixon v R*.[32] In this case, which adopted a broad approach to the concept, the Supreme Court held that a digital copy of CCTV footage was "property" within the broad definition found in s 2 of the Crimes Act 1961. The defendant had downloaded a copy of certain footage without the consent of the owner of the computer on which the footage had been recorded. The Court held that computer data can be "property" and that making a copy of it involves a taking, even when the data is not protected by a password. The Supreme Court appeared to endorse the view that computer data would meet general definitions of property including that within s 4 of the Property Law Act 2007. Arnold J, writing the judgment of the Court, stated :[33]

> We consider that interpreting the word "property" as we have is not only required by the statutory purpose and context but is also consistent with the common conception of "property".

[91]    The second case, a decision of Thomas J in the High Court is *Henderson v Walker*.[34] In that case Thomas J was prepared to apply the principles of *Dixon* in a private law setting and to extend the tort of conversion to purely personal digital information, including the content of private emails. However, her Honour also concluded merely making a copy of emails and other personal data would not amount to conversion. Refusing access to them or destroying them would be, nevertheless.

---

[30]    *Armstrong DLW GmbH v Winnington Networks Ltd*, above n 26 at [59] (citation omitted, footnote added).
[31]    *Ainsworth*, above n 10.
[32]    *Dixon v R* [2015] NZSC 147, [2016] 1 NZLR 678.
[33]    At [51] (footnotes omitted).
[34]    *Henderson v Walker* [2019] NZHC 2184.

[92]    In that case, Mr Walker in his capacity as liquidator of subsidiary companies of Property Ventures Limited (PVL) came into possession of a laptop belonging to PVL and of a tape drive that was a backup of PVL's server.  There were a lot of personal, non-company emails sent by and to Mr Henderson, a principal of PVL, and some personal photographs on those devices.  Mr Walker distributed at least some of these or allowed them to be distributed to third parties who should not have received this material.  Mr Henderson sued Mr Walker, pleading some seven causes of action including breach of confidence, invasion of privacy and conversion.  Thomas J held that in principle the common law action in conversion was available with respect to some of the actions which had occurred involving the computer data.

[93]    In my view, it is reasonable to conclude that the reasoning of Thomas J that this data was effectively "property" capable of being converted, could be properly extended to wrongful interferences with cryptocurrency or digital assets.  Any person who gained unauthorised access to the private key attached to cryptocoins and used it would permanently deprive the proper possessor of the cryptocoins of that property and its value.

[94]    Another recent High Court decision in New Zealand, *Commissioner of Police v Rowland*, is also usefully noted here.[35]  In that case this Court approved a settlement under the Criminal Proceeds (Recovery) Act 2009 that included quantities of two cryptocurrencies – bitcoin and ethereum.  The question whether the cryptocurrencies were "property" that was amenable to forfeiture under that legislation, however, was not raised in the proceeding.  An assumption was made that they did fall within the definition in terms of that legislation.  The definition of "property" in the Criminal Proceeds (Recovery) Act at s 5 provides:

> property—
>
> (a)    means real or personal property of any kind—
>
> > (i)    whether situated in New Zealand or a foreign country; and
> >
> > (ii)    whether tangible or intangible; and
> >
> > (iii)    whether movable or immovable; and

---

[35]    *Commissioner of Police v Rowland* [2019] NZHC 3314.

(b)     includes an interest in real or personal property

[95]    Turning back to the decisions noted above in *Dixon* and *Henderson*, in those cases the New Zealand courts involved have accepted that the orthodox position that information is not "property" does not attach to cases involving digital assets. There, digital files were seen as "property" by distinguishing them from "pure information".

[96]    So far as the Supreme Court was concerned in *Dixon v R*, in the context of the Crimes Act 1961, this was because the files (the digital footage) there:

(a)    could be identified;

(b)    had a value;

(c)    were capable of being transferred; and

(d)    had a physical presence, albeit one that could not be detected by means of unaided sensors.

[97]    In Thomas J's decision in this Court in *Henderson*, in the context of the tort of conversion, this was because it was possible to control and therefore possess the digital files (a large number of documents, emails and images). Possession required cognitive control and manual control. While traditionally the tort of conversion requires physical control and therefore tangibility, physical control is only one example of manual control. The two fundamental elements of manual control are excludability and exhaustibility – whether others can be excluded from the thing's control and when the thing's value can be deprived from others. In her decision Thomas J considered both were satisfied on the facts because:

(a)    As to excludability: digital files have a material presence. They physically alter the medium on which they are held. The physical presence allows others to be excluded from the digital asset, either by physical control of the medium or by password protection.

(b)     As to exhaustibility: digital files can be deleted or modified so as to render them useless or inaccessible.

[98]    These principles, in my view, apply equally in the present case to the cryptocurrencies at issue.

[99]    I turn now to the Companies Act.  In that Act reference is made to both "property" and "assets".  Assets are not defined in the Act other than the section specific definition at s 129 which applies to "major transactions".  Section 129(2) provides:

> …**assets** includes property of any kind, whether tangible or intangible

That definition is expressly limited to s 129 and the use of inclusive language supports the finding that the term "asset" might possibly be seen as wider in scope than "property".

[100]   The powers of liquidators in the Act are generally expressed to be over a company's "assets":

(a)     Section 248(1)(a) provides that:

The liquidator has custody and control over the company's assets.

(b)     Section 253 characterises the principal duty of a liquidator as:

(a)     to take possession of, protect, realise and distribute the assets, or the proceeds of the realisation of the assets, of the company to its creditors in accordance with the act; and

(b)     if there are surplus assets remaining, to distribute them, or the proceeds of the realisation of the surplus assets, in accordance with s 313(4) in a reasonable and efficient manner.

[101]   The term "asset" is used elsewhere in the Companies Act:

(a)     The solvency test: the relevant limb of the test here is that: "the value of the company's assets is greater than the value of its liabilities…".[36]

---

[36]    Companies Act, s 4(1)(b).

(b)    Section 237 provides that the Court may make additional orders relating to (among other things):

> …
>
> (a)    the transfer or vesting of real or personal property, assets, rights, powers, interests, liabilities, contracts, and engagements:
>
> …

(c)    Clause 1(1) of sch 7 requires the liquidator to pay:

> …
>
> (e)    to any creditor who protects, preserves the value of, or recovers assets of the company for the benefit of the company's creditors by the payment of money or the giving of an indemnity,—
>
> > (i)    the amount received by the liquidator by the realisation of those assets, up to the value of that creditor's unsecured debt; and
> >
> > (ii)   the amount of the costs incurred by that creditor in protecting, preserving the value of, or recovering those assets.

### *The four requirements for a "property" interest*

[102]  I return now to the classic statement of the characteristics of "property" outlined by Lord Wilberforce in *Ainsworth* essentially to recognise what constitutes a "property" interest, and then to apply this to each cryptocurrency at issue here.[37]  In doing so, I need to say at the outset that I am satisfied the criteria for Lord Wilberforce's definition of "property" are clearly met in this case.  I say this bearing in mind the indications I have outlined from the range of authorities noted above that support this conclusion.  This is also in line with the approach adopted in the *Legal Statement on Cryptoassets and Smart Contracts* noted above.[38]

[103]  Lord Wilberforce's long-applied statement is outlined at [75] above.  It outlines four requirements that I now address in turn.

---

[37]    *Ainsworth*, above n 10.

[38]    *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at [21].

*(a)    Identifiable subject matter*

[104]   The first requirement is that the asset in question needs to be definable.  It needs to be capable of being isolated from other assets whether of the same type or of other types and thereby identified.  It is possible, however, for there to be co-ownership (either at law or in equity) of a definable share of an identified bulk of like assets.  The present situation, as I see it, is one of this sort.

[105]   Computer-readable strings of characters recorded on networks of computers established for the purpose of recording those strings, as I see it, are sufficiently distinct to be capable of then being allocated uniquely to an accountholder on that particular network.  For the cryptocurrencies involved here, the allocation is made by what is called a public key – the data allocated to one public key will not be confused with another.  This is the case even though the identical data is held on every computer attached to the network.  Indeed, the working of the system is such that the distribution of the data across a large network of computers, when combined with cryptography that prevents individual networks from altering historic data over the network, assists in giving that data stability.  It is these features that provide the basic underpinning for the existing cryptocurrencies.

[106]   This is in large measure similar to what occurs in the banking system where large and trusted international banks record balances in various numbered bank accounts held with them.  The identifiability provided by cryptocurrency data recorded in the network of computers (called the "distributed ledger") is no less than the identifiability which results from the bank's inclusion of balances in their customers' numbered bank accounts.  Equity regards such recorded bank balances as a type of property owned by the party in whose favour the balance is recorded.

[107]   The developer of the most widely known cryptocurrency (Bitcoin), Satoshi Nakamoto, who I have referred to above, argued in 2008: [39]

> …an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party…

---

[39]    Satoshi Nakamoto "Bitcoin: A Peer-to-Peer Electronic Cash System" (31 October 2008) Bitcoin <https://bitcoin.org/bitcoin.pdf> at 1.

will provide superior stability and reliability compared to the traditional banking system.

[108]   It is also the case, as I see it, that the public key so allocated to a cryptocurrency account might also be argued to be more readily identifiable than some asserted rights for example to copyright (which is acknowledged as "property") where issues of originality may be at play.

*(b)   Identifiable by third parties*

[109]   The second component of property outlined by Lord Wilberforce is that the thing needs to be identifiable by third parties.  This element alludes to the thing identified having to have an owner capable of being recognised as such by third parties.  The degree of control over the type of asset that a person has to have before the law recognises it as capable of being owned must involve an element of judgement but again I am satisfied here that cryptoassets clearly meet this criterion.

[110]   On this aspect, it has long been recognised by property lawyers that the power of an owner to exclude others from an asset provides a more important indicator of ownership than the power actively to use or benefit from that asset.

[111]   The unique strings of data recording the creation of and dealings with cryptocurrency are always allocated via the public key to a particular accountholder connected to the system.  But that allocation by itself is unlikely to be recognised as creating an item of property if there is no element of excludability.  So, if that accountholder's personal connection to the data via the public key could be lost through any person connected with the network being able to reallocate the cryptocurrency to any other colleague on the network without the consent of the accountholder, there might be some doubt whether the law would conclude that the accountholder owned the key.

[112]   The degree of control necessary for ownership (namely the power to exclude others) is achieved for cryptocurrencies by the computer software allocating to each public key a second set of data made available only to the holder of the account (the private key), and requiring the combination of the two sets of data in order to record a

transfer of the cryptocurrency attached to the public key from one account to another. A varied public key and a new private key for the cryptocurrency are generated after each transfer of cryptocurrency. The private key, in effect, is like a PIN. Anyone who learns of the private key attached to a public key can transfer the public key but the private key, having been used once in respect of the public key, cannot be used again.

[113]   These features of cryptocurrencies inhibit two potential practices. First, the existence of the private key inhibits the possibility of involuntary transfers – it gives the power to exclude third parties from access. And secondly, the creation of a new private key after each transfer or disposition inhibits a holder from purporting to transfer the cryptocurrency data twice.

*(c)      Capable of assumption by third parties*

[114]   The third of Lord Wilberforce's criteria, namely that the right or interest in question must be capable of assumption by third parties, generally involves two aspects:

   (a)      Third parties must respect the rights of the owner in that property and will be subject to actions expressly devised by the law to give effect to proprietary rights if they assert their own claim to ownership without justification. Property has been said by its nature to be concerned with legal rights that affect strangers to bilateral transactions.[40] These third parties will also include insolvency officials of an insolvent trustee; and

   (b)      Normally, but not always, an asset recognised by the law as an item of property will be something which is potentially desirable to third parties such that they would want themselves to obtain ownership of it. It might not matter that an asset has no current market value if there has been a market for the asset in the past. For example, in the case where polluted land has excessive clean-up costs, it may be worthless, but it will still be regarded as property.

---

[40]      See Fox "Cryptocurrencies in the Common Law of Property", above n 5, at [6.10].

[115]   Both aspects of this component of Lord Wilberforce's test are reflected in comments by Lord Bridge for the Privy Council in *Attorney-General of Hong Kong v Nai-Keung*, a case concerned with a charge of theft of an export quota brought under the theft ordinance of Hong Kong:[41]

> It would be strange indeed if something which is freely brought and sold and which may clearly be the subject of dishonest dealing which deprives the owner of the benefit it confers were not capable of being stolen.  Their Lordships have no hesitation in concluding that export quotas in Hong Kong, although not "things in action" are a form of "other intangible property.

[116]   I am satisfied here that cryptocurrencies meet both aspects of the assumption by third parties criterion outlined by Lord Wilberforce.  There can be no doubt that cryptocurrencies can be, and many are, the subject of active trading markets.

*(d)      Some degree of permanence or stability*

[117]   The last of Lord Wilberforce's criteria for determining whether something is capable of attracting proprietary status, in my view is also met here.  This criterion requires that the thing needs to have some degree of permanence or stability, but as I see the position, it does not add much to the other three criteria noted above.  It is true too that some assets will have little permanence yet undoubtedly be property, such as the example of the ticket to a football match which can have a very short life yet unquestionably it is regarded as property.  Also unproblematic, as I see it, will be situations where the short life of an asset is the result of the deliberate process of transferring the value inherent in the asset so that one asset becomes replaced by another.  As I have noted above, cryptocurrencies work in this manner but it is also true that bank payments use a similar process which is simply native to the type of property in question.  This is not inimical to the asset's status as property.

[118]   The blockchain methodology which cryptocurrency systems deploy also greatly assist in giving stability to cryptocoins.  The entire life history of a cryptocoin is available in the public recordkeeping of the blockchain.  A particular cryptocoin stays fully recognised, in existence and stable unless and until it is "spent" through the

---

[41]     *Attorney-General of Hong Kong v Nai-Keung* [1987] 1 WLR 1339 (PC) at 1342.

use of the private key, which may never happen.  Standard cryptocurrency systems do not provide for the arbitrary cancellation of coins.

[119]   While it is possible for cryptocurrencies to be wrongfully interfered with, by someone gaining unauthorised access to the private key or by hacking the address to which an owner intends to send a coin, these risks are not markedly greater than those borne by an owner of tangible property or a person relying on the integrity of a bank account record with or without the use of a PIN.

*Conclusion on the four criteria*

[120]   I am satisfied that cryptocurrencies meet the standard criteria outlined by Lord Wilberforce to be considered a species of "property".  They are a type of intangible property as a result of the combination of three interdependent features. They obtain their definition as a result of the public key recording the unit of currency. The control and stability necessary to ownership and for creating a market in the coins are provided by the other two features – the private key attached to the corresponding public key and the generation of a fresh private key upon a transfer of the relevant coin.

[121]   This identical point is made in the *Legal Statement on Cryptoassets and Smart Contracts* which says that a cryptoasset is "a conglomeration of public data, private key and system rules."[42]

*Possible arguments against cryptocurrency being property*

[122]   Two arguments that are most commonly raised to suggest that cryptocurrencies do not have the status of "property" are:

(a)     The common law recognises only two classes of personal property: tangibles and choses in action. Cryptocurrencies are said to be neither.

(b)     Information is not generally recognised as a form of "property" and cryptocurrencies might be said to be a form of information.

---

[42]     *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at [65].

[123]   Although before me counsel for the creditors did not rely particularly on the first objection noted above, nevertheless I address it briefly.  On this, I am satisfied the argument here is in fact a red-herring.  This is because cases which might be perceived to be problematic in this area are not about the limits of what can be recognised as "property" but simply about the number of categories of "property" one needs.  This accords with the well-known dictum of Fry LJ sitting in the English Court of Appeal in *Colonial Bank v Whinney* that all personal property must either be a chose in possession or a chose in action.[43]The argument follows that cryptocurrencies are neither a chose in possession nor a chose in action.

[124]   Essentially here, Fry LJ in his judgment did not seem to be taking a narrow view of what can be classified as property, but rather he was simply wanting to push all examples of property into one of two categories.  There is nothing, as I see it, in Fry LJ's dictum that would lead a court to conclude that cryptocurrencies are not property.  The most that could be said is that cryptocoins might have to be classified as choses in action.  Indeed, it would be ironic that something that might be said to have more proprietary features than a simple debt is deemed not to be property at all when a simple debt qualifies.

[125]   For these reasons, this first argument advanced by some to support the claim that cryptocurrency is not property in my view is readily dismissed.

[126]   I turn now to the second argument suggesting that cryptocurrency does not have the status of property as noted at [122](b) above.  This is to the effect that cryptocoins are just a type of information and that information is not property.  The argument is based on the view that neither the common law nor equity recognises property in "information" and cryptocurrencies are said to be merely digitally recorded information.  This argument, it is said, is supported by the 2014 decision of the English Court of Appeal in *Your Response Ltd v Datateam Business Media Ltd*.[44]  In *Your Response*, the Court held that there could be no property in a database in the situation prevailing there, which involved a party contracted by a client to maintain and update a database of the client's customers.  It was held that this party had no common law

---

43    *Colonial Bank v Whinney* (1885) 30 Ch D 261 (CA) at 285.
44    *Your Response Ltd v Data Team Business Media Ltd* [2014] EWCA Civ 281, [2015] QB 41.

lien over the database for the fees owed to it.  As I see it, however, the decision in *Your Response* does not go much further than to make a determination upon the particular facts of that case.  I am satisfied it is an inconclusive precedent in a case such as the present.

[127]   And, in my view, it is wrong in any event to regard cryptocurrencies as mere information because:

(a)   The whole purpose behind cryptocurrencies is to create an item of tradeable value not simply to record or to impart in confidence knowledge or information.  Although cryptocoins are not backed by the promise of a bank, the combination of data that records their existence and affords them exclusivity is otherwise comparable to the electronic records of a bank. The use of the private key also provides a method of transferring that value.  This might be seen as similar in operation to, for example, a PIN on an electronic bank account.

(b)   And, generally, as I see it, cryptocoins are no more mere information than the words of a contract are.  What allows a contract to be capable of being an item of property is not the words nor even the binding promise which is only a personal obligation, but the fact that equity recognises there is a unique relationship between the parties created by the words and then supplies a system for transferring the contractual rights.  Similarly, a unique relationship and system of transfer exists with respect to the relevant data on the blockchain that makes up a cryptocoin.

(c)   In *Boardman v Phipps* Lord Upjohn stated:

> In general, information is not property at all.  It is normally open to all who have eyes to read and ears to hear."[45]

This statement appears to confirm as a principle for not regarding information as property the fact that it can be infinitely duplicated.

---

[45]   *Boardman v Phipps* [1967] 2 AC 46 (HL) at 127.

Again, this is not true of cryptocoins where every public key recording the data constituting the coin is unique on the system where it is recorded.  It is also protected by the associated private key from being transferred without consent.

(d)     Cryptocurrency systems provide a more secure method of transfer than a mere assignment of a chose in action.  It is possible in equity for the holder of a chose in action to assign it multiple times.  Only one assignment will be effective to bind the debtor but the winner may not be the first assignee in time but rather the first assignee to notify the debtor.  By way of contrast, a cryptocoin can not only be assigned in that way but it can also be sold only once.

[128]   I am satisfied that cryptocurrencies are far more than merely digitally recorded information.  The argument that cryptocurrency is mere information and therefore it is not property is a simplistic one and, in my view, it is wrong in the present context. I dismiss it.

*Public policy arguments*

[129]   Lastly, I turn to certain public policy arguments here.  It is widely known that at least some types of cryptocurrency are used by criminals for the transmission of funds across borders in order to pursue criminal activity and as a means of laundering the proceeds of past criminal activity.    This is not exclusive, however. Cryptocurrencies have also become popular with honest people as a method of effecting payments and of investing.  The traditional banking sector is itself widely reported to be already using block chain technology and to be planning to create trading platforms for cryptocurrencies.[46]  Any failure by the general law to recognise cryptocurrencies as property, as I see it, would have little effect in reducing potential criminal activity.  The banking system is subject to exploitation by the criminal fraternity just as other traditional assets are.

---

[46]     For instance, the Royal Bank of Canada: Erik Hertzberg "Bank of Canada lays groundwork for digital currency" *Bloomberg News* (online ed, New York, 26 February 2020) <https://www.bloomberg.com/news/articles/2020-02-25/bank-of-canada-lays-groundwork-for-digital-currency>.

[130]   In my view, honest commercial developments may very well be hindered by a failure of the general law to recognise cryptoassets as property.   This is notwithstanding any possible need for more formal regulation of cryptocurrencies.

[131]   The *Legal Statement on Cryptoassets and Smart Contracts* has also advocated dealing with the status of cryptocurrencies unencumbered by other legal issues including the need for regulation.[47]   Similarly, in those cases where the status of cryptocurrencies as property has been assumed or conceded, including those I have noted above, no court has felt obliged to take a public policy objection.  Further, before me Ms Cooper for the creditors raised no particular public policy arguments.

[132]   Overall, I am of the view that public policy questions here do nothing to harm the accountholders' contention that cryptocurrencies do have the status of property.

*Conclusion*

[133]   The answer to the question posed at [46](a) above is yes.  I find that, for the reasons outlined above, all of the various cryptocurrencies are "property" within the definition outlined in s 2 of the Companies Act and also probably more generally.   In addition, these digital assets, I find, being property, are capable of forming the subject matter of a trust.

**Issue 2 - The trusts issue**

[134]   The second question relates to the issue whether any or all of the digital assets are held on trust for accountholders (whether by way of express, implied, resulting, constructive, Quistclose trust or otherwise).  If the answer to this question is yes in any respect, then a range of further questions arise which are:

(a)     When did the trust(s) come into existence?  When the company updated its terms and conditions on 7 August 2018 ("the amended terms"), or some alternative date?

(b)     What are the terms of the trust(s)?

---

[47]     *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at 10 – 11.

(c)    Are the digital assets held on trust:

   (i)    in an individual trust for each accountholder, with the result that each accountholder is the sole beneficiary of the trust?

   (ii)    in one trust for the benefit of all accountholders with the result that all accountholders are co-beneficiaries of the same trust?

   (iii)    in multiple trusts for the benefit of specific groups of accountholders with the result that accountholders within a specific group are co-beneficiaries of the same trust? or

   (iv)    on some other basis?

## A. The primary issue – are the digital assets held on trust for accountholders?

[135]   On the primary question, the position advanced by the accountholders that the digital assets here are held on trust for the accountholders is strongly disputed by the creditors.  That overall position for the accountholders is that Cryptopia is a trustee for the accountholders of the cryptocurrency it held for those parties as set out in the SQL database.  The accountholders say first, the relevant trusts involve one separate trust for each type of cryptocurrency and secondly, the trusts all existed before any amended terms on 7 August 2018 may have come into effect.  If this is not the case then they say, in any event, the amended terms simply confirmed Cryptopia's trustee status.

[136]   In response, the creditors' position is that any trust here is denied and accordingly it must follow first, that the accountholders are simply unsecured creditors of Cryptopia and secondly, that the subsidiary questions outlined at [134] above do not arise.

[137]   There are four main areas of difference between the accountholders and the creditors regarding this trusts issue:

(a)    The extent to which the Court can infer a trust in the present situation with what are said to be limited or no express verbal declarations to that effect.

(b)    As a matter of construction, was Cryptopia's principal duty in its exchange only to deliver a fixed quantity of currency when called for or was it to hold the relevant pools of cryptocurrency (including cryptocurrency that accountholders had themselves brought onto the platform) on behalf of those accountholders and to deal with each accountholder's share in the pool as directed by that party? (This would also obviously include Cryptopia itself as a beneficiary with respect to its own specific holdings of cryptocurrency which it held personally on the exchange).

(c)    The relevance to the trusts issue of the powers and amenities given to cryptocurrency in Cryptopia's terms and conditions provided to accountholders.

(d)    Did the amended terms and conditions:

(i)    Affect a variation of the trusts?

(ii)   Apply automatically to all accountholders from 7 August 2018?

[138] Turning to the primary contention advanced by Mr Watts for the accountholders that an express trust has been created here, comments in *Equity and Trusts in New Zealand* are usefully repeated:[48]

### 4.2.1   Introduction

To create a valid express trust, not only must any necessary formalities and the rule against perpetuities…be complied with, but three "certainties" must be satisfied.

The three certainties are:

---

[48]   Andrew Butler (ed) *Equity and Trusts in New Zealand* (2nd ed, Thomson Reuters, Wellington, 2009) at [4.2.1] (footnotes and cross-references omitted).

(a)      intention;

(b)      subject matter; and

(c)      objects.

Certainty of intention is necessary to ensure the onerous burdens of trusteeship are not lightly imposed, while certainty of subject matter and objects is necessary to ensure the possibility of judicial supervision over the actions of the trustees and, ultimately, to ensure the court can administer the trust if the trustees cannot be found or fail to act properly.  Where there is no certainty of intention, no trust exists, and the person holding legal title is the full owner.  However, where it is clear that a trust was intended, but there is no certainty of subject matter and/or objects, the property falls into residue or is applied to a gift over as the case may be.

[139]   As to the issue of certainty of intention to create a trust, some useful comments are expressed in *Jacobs' Law of Trusts in Australia* which states: [49]

### Certainty of intention to create a trust

5.02     A court cannot hold that an express trust exists unless it is satisfied that there was the intention to create such a trust.  The question will be whether there is language or conduct which shows a sufficiently clear intention to create such a trust.  No formal or technical words are required; any apt expression of intention will do.  The conclusion that the intention existed may be drawn as an inference from the available evidence.  In order to infer intention, the Court may look to the nature of the transaction and the whole of the circumstances attending the relationship between the parties and known to them, including commercial necessity.  If the inference to be drawn is that the parties intended to create or protect an interest in a third party and the trust relationship is the appropriate means of creating or protecting that interest or of giving effect to the intention, then an intention to create a trust may be inferred.  Such a trust is an express, not a constructive trust and the earlier reluctance to infer such a trust no longer obtains, at least in Australia.

The overall question is whether in the circumstances of the case, and on the true construction of what was said and written, a sufficient intention to create a trust has been manifested.  It is not necessary that the creator of the trust should know that the particular relationship intended to be created is in law a trust.  A trust will be created, whether or not the creator is aware of it, provided that in substance the creator's actions have the legal effect of creating the relationship which is known in law as a trust…In commercial documents, there will often be no suggestion that the parties in their written instrument did not mean what they said, or said what they meant.  In such cases where there is no sham or illegality, the use of language expressing a trust in terms will be effective to supply the requisite intention.

---

[49]      JD Heydon, MJ Leeming and KS Jacobs *Jacobs' Law of Trusts in Australia* (8th ed, LexisNexis, Sydney, 2016) at [5.02].

**Application to the facts of the present case**

[140]   I turn first to determine the question whether the cryptocurrencies in issue here were held on an express trust by considering the three certainties needed outlined at [138] above.

*Certainty of subject matter*

[141]   It is useful to begin with a consideration of certainty of subject matter.  On this, as I have found above, at law cryptocurrencies are "property" and are able to form the subject of a trust.

[142]   Here, the principal evidence relied upon is found in the affidavits of Mr Ruscoe and Mr Brocket.  The issue arises here whether it can be established in fact which cryptocurrencies are subject to what trusts.

[143]   As a cryptocurrency exchange, Cryptopia maintained its own database of the accountholders and digital assets that it controlled, as I have noted, called the SQL database. The liquidators as I understand it are still in the process of reconciling this database.

[144]   What is clear here from the evidence before me is that in the current circumstances it appears all cryptocurrency holdings were held on trust by Cryptopia, although Cryptopia was itself one of the beneficiaries of some trusts relating to cryptocurrency which the company had itself introduced.

[145]   The accountholders' position is that there was a single trust created for each relevant cryptocurrency.[50]  Beneficial co-ownership of the relevant currency was shared by relevant accountholders in proportion to the numbers of relevant cryptocoins that they had each contributed (either initially when new coins were acquired or as a result of trades between accountholders).

---

[50]    It appears there were some 900 types of cryptocoin traded on Cryptopia's exchange of which some 400 have now been de-listed.

[146]   As I have noted, Cryptopia was itself a beneficiary of some of those trusts for cryptocurrency it held itself.  This applied whether it related to cryptocurrency held in hot wallets or cold wallets for the respective cryptocurrency.

[147]   Cryptopia itself kept and stored the private keys associated with acquisitions of each cryptocurrency in this case so that accountholders did not know the private key associated with any particular coin.  There is no evidence before the Court to indicate the Cryptopia was a bailee of any currency.  The subject matter of the various trusts being the cryptocurrencies was clearly recorded in Cryptopia's SQL database records and I am satisfied this provided sufficient certainty of subject matter here.

*Certainty of objects*

[148]   Here, I find that clearly from the point of view of principle, there can be no uncertainty in this case as to who the beneficiaries of the relevant trusts were.  They can be taken to be those with positive coin balances for the respective currencies in Cryptopia's SQL database subject to such adjustments as may be needed when all remaining evidence in this case comes in.  This is in line with Simon Thorley IJ's decision in *B2C2* where his Honour concluded on the facts of that case that the beneficiaries of the single trust of cryptocurrency at issue were sufficiently certain, as they "…are identifiable from the individual accounts of each of the members." [51]

[149]   Although it is true here that, as the liquidators have indicated, they may have some difficulties finding out the true identities of some of the accountholders and making contact with them, meaning some evidential uncertainty may arise, the result may mean simply that particular beneficial interest claims in the cryptocurrency may not be established.  However, as I see it, this would not invalidate the trust for those whose precise identities can be shown.  Evidential uncertainty does not defeat a trust.[52]

[150]   In my view, there is no question that the requirement for certainty of objects is established here.

---

[51]   *B2C2* (SGHC), above n 11 at [143].
[52]   *Re Baden's Deed Trusts (No 2)* [1973] 1 Ch 9 (CA) at 19–20.

*Certainty of intention*

[151]  The last of the requirements for a valid express trust is an intention in the settlor(s) to create a trust, objectively assessed.

[152]  Here the accountholders suggest that it is only necessary to show that Cryptopia intended to hold the digital assets on trust even though such an intention was probably held also by the accountholders themselves when transferring coins to Cryptopia.

[153]  On this, I am satisfied that Cryptopia manifested its intent through its conduct in creating the exchange without allocating to accountholders public and private keys for the digital assets it commenced to hold for them.  The SQL database that Cryptopia created showed that the company was a custodian and trustee of the digital assets and effect needs to be given to this.

[154]  In addition, Cryptopia did not intend to and did not trade in the digital assets in its own right according to the evidence before me except to the extent that it too was a beneficiary of the trusts established.

[155]  As to the question when the intent to create the trusts was manifested, I am satisfied a trust came into existence for each of the cryptocurrencies as soon as Cryptopia came each time to hold a new currency for accountholders.  Trusts in respect of each currency that Cryptopia held arose on those particular dates and certainly before 7 August 2018.  I make that finding without needing to rely specifically on the amended terms created by the variation document.  And, in any event, as I note above, Cyrptopia's last director of finance and administration, Mr Brocket, in his uncontested evidence, confirmed that effectively there was no material change to the way the business operated that resulted from the August 2018 variation to the terms and conditions.

[156]  Finally, it is not unusual in a case of an express trust for there to be a lack of some documentation as is apparent with Cryptopia's exchange platform in the present case.

[157]   For completeness, I note also a number of factors here which support the conclusions I have reached which are:

(a)     At common law express trusts of personal property can come into existence and be evidenced orally or as a result of conduct including simply by force of the circumstances as between relevant parties.[53]

(b)     It is not really necessary, even in a commercial context, that the settlor or other party involved in the relationship understand what a trust is, if the conduct including the arrangements between the parties objectively suggests that a trust was the appropriate legal consequence.[54]

(c)     It is not a significant indicator against a trust that the fungible property of one party is mixed with the fungible property of another in a single pool, nor that the content of that pool and the identity of the beneficiaries is constantly changing.

[158]   On this last aspect, before me Ms Cooper for the creditors placed particular reliance on a decision of the Privy Council *Re Goldcorp Exchange Limited (In Receivership).*[55]  In this case the New Zealand company Goldcorp in receivership was a gold dealer.  Essentially as part of its business it sold gold bullion to customers.  The sales were to members of the public who had purchased "non-allocated" gold and received a "certificate of ownership" stating that the company would store and insure the gold for the customer.  Brochures and oral statements from the company indicated that the customers' gold would be stored in a large bulk and audited "to ensure there are sufficient stocks to meet all commitments".  The company went into receivership.

[159]   The *Goldcorp* case was essentially a Sale of Goods Act case.  After noting that no legal or equitable title could have passed to the customers merely on the basis of the contract of sale (given it was a sale of unascertained, generic goods) the Board

---

[53]     *Levin v Ikiua* [2010] NZCA 509, [2011] 1 NZLR 678; *Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch); *B2C2* (SGHC); and *Re Harvard Securities Ltd (in liq)* [1997] 2 BCLC 369 (Ch) at 371.
[54]     *Pearson*, above n 53.
[55]     *Re Goldcorp Exchange Limited (In Receivership)* [1994] 3 NZLR 385 (PC).

went on to consider whether the collateral promises found in the brochures and representations were effective to create a trust in favour of the customers. With respect to the non-allocated customers, the Board held that no trust existed.

[160]   There is no doubt that in *Goldcorp* customers were told duplicitous things when they purchased gold from the company. The misrepresentations made and the deceptions were huge and resulted in the company's managing director being charged criminally, convicted and imprisoned. The Privy Council had looked at whether there was a restitutionary trust but this argument for a trust was only collateral to a sale of goods argument for the sale of unascertained goods. It failed on its own facts in the *Goldcorp* situation for lack of certainty of subject matter and intention. The present case before me is quite different. It does not involve tangible goods and here Cryptopia is generally not a seller (apart from its limited sales of NZDT). It was just a custodian and provider of the trading and storage platform essentially.

[161]   *Goldcorp* primarily is simply a Sale of Goods Act case and one that in any event turns on its own facts. The *Goldcorp* case does not stand for no trust being a possibility here. It is readily distinguishable from the situation with Cryptopia before me.

[162]   Next, Ms Cooper for the creditors referred again to the *Quoine* decision in the Singapore Court of Appeal I mention above and she contended it was influential here and provided a number of close parallels with the present case. In *Quoine* the majority in the Court of Appeal upheld the High Court's decision allowing a breach of contract claim but overturned that Court's finding that there had been a breach of trust. Essentially, the majority determined that there was no trust due to a lack of certainty of intention to create a trust. Its reasoning on the trust issue was relatively brief but its main thrust was:

(a)     An intention to create a trust is not to be inferred "simply because a court thinks it is an appropriate means of protecting or creating an interest". [144];

(b)     The mere fact that assets are segregated by a trustee from other assets held by the trustee does not lead to the conclusion that there was a trust. [145];

(c)     There was in fact no segregation since the evidence was that the amount of currency recorded in the database did not necessarily match what the company held in its wallets.  [146] – [147]; and

(d)     A term in the company's Risk Disclosure Statement providing as it did that if the company went bankrupt it would not be able to return customer assets and customers may suffer losses, was not consistent with the normal position of a trustee who becomes insolvent. [148].

[163]   Properly, Ms Cooper did acknowledge before me that the High Court and Court of Appeal decisions in *Quoine* were based on the particular facts of that case and its terms and conditions which did not refer to a "trust" in any way.  This was quite unlike Cryptopia's terms and conditions.  But, she maintained that factors such as first, Quoine operating a system where it had a database showing coins allocated to individual customer accounts but holding those digital assets in unsegregated wallets and, secondly, the need for Quoine to procure coin if a customer wanted to purchase a cryptocurrency were similar to Cryptopia's operations and provided close parallels. Accordingly, Ms Cooper, while acknowledging that *Quoine* is not binding on this Court, suggested that it provides some authority for a finding that no trust existed here over the cryptocurrency held in Cryptopia's wallets and that these digital assets should form part of the company's assets available for distribution to creditors.

[164]   It is clear that the construction of contractual and trust arrangements between parties must always remain a matter for the decision-making court in question.  I do take into account the decision in *Quoine* in this light, and note also that I will leave on one side suggestions from Mr Watts that the Court of Appeal's judgment is open to criticism here in a number of respects.

[165]   Looking to the facts prevailing in *Quoine*:

(a)     It appears that *Quoine* operated its platform in a different and much more active way than is in evidence here in relation to Cryptopia. *Quoine* was a major "market-maker".  It was actively placing buy and sell orders on the system.  It was the principal market-maker estimated to be responsible for around 98 per cent of the market-making trades on its platform.    In addition, *Quoine* lent funds, including cryptocurrency, to other market-makers and did not attempt to ensure there was actual cryptocurrency in its wallets to match the loans.  As a result, buyers contracted to deliver to *B2C2* more than 3000 bitcoins on various automated arrangements when they had only 13.52 bitcoins in their account with *Quoine*.

(b)     In addition, *Quoine* was also engaged in futures trading which necessarily was trading not matched by actual currency.

(c)     Customers of *Quoine* were also involved in transactions like the one in question as market-makers and not investors.  In marked contrast there was no provision in the present case in Cryptopia's terms of trade that attempted to make customers subject to the risk of Cryptopia becoming insolvent and going into liquidation – quite the contrary.

(d)     As I amplify below, in contrast to *Quoine* there were a number of other factors here pointing to Cryptopia being a trustee for its customers' cryptocurrency:

(i)     The express trust provisions in the amended terms and conditions;

(ii)    Other indicators of a trust both before and after August 2018 from the evidence;

(iii)   Cryptopia's internal financial accounts and GST returns demonstrated that it did not assert any ownership in the

cryptocurrency beyond its beneficial interest in its own personal cryptocurrency as an accountholder.

(iv)     The agency clause noted in cl 7.3 of the variation terms together with material in the customer service manuals and a legal opinion on these issues which is before the Court.

[166]   Overall, I am satisfied here that *Quoine* is readily distinguishable from the facts in the case before me.  The factual arrangements in *Quoine* are different, as I see it, from the position that prevailed in Cryptopia's business undertakings here.

*Additional matters*

[167]   Cryptopia, it seems, operated for nearly five years.  There is little evidence before the Court directed at how during this time Cryptopia managed to attract the many accountholders it did to its platform.

[168]   Nevertheless, I confirm again that I am satisfied there is sufficient evidence before me to conclude that in the course of Cryptopia's operations a series of express trusts in favour of accountholders arose in respect of their respective digital assets. Key details of those trusts and of their changing subject matter and membership were held in the SQL database maintained throughout by Cryptopia.

[169]   Cryptopia confirmed throughout and operated on the basis that its whole purpose in establishing the cryptocurrency exchange was to provide a platform to enable accountholders to store their currency from which they could trade in cryptocurrency amongst themselves should they so wish.  Generally, Cryptopia was not in the business of selling cryptocurrency but was rather just an exchange that charged fees for a service.  This applied other than for a short period in relation to the cryptocurrency NZDT which it seems Cryptopia engaged in from about May 2017 until about 9 February 2018.  With the exception of NZDT through this period, it is clear accountholders as customers of Cryptopia brought their own cryptocurrency onto Cryptopia's exchange, as I note at [22] above from the evidence of Mr Brocket.

[170]  In establishing what is frequently described throughout as an "exchange", Cryptopia and all other parties with whom it was connected no doubt had in mind that Cryptopia would be operating as an "exchange broker" in a legal sense.    It is interesting to note that in *Black's Law Dictionary*, "exchange broker" is defined as "someone who negotiates money or merchandise transactions *for others*" (emphasis added). [56]

[171]  Issues of agency, as I see it, also arise here.    Indeed in some of the documentation before me, Cryptopia is described as an "agent" for accountholders with regard to transactions entered into on their behalf.

[172]  I am satisfied too from material which is before the Court, that Cryptopia's web-based instruction pages and live customer interfaces clearly implied that accountholders would be depositing, buying, selling and owning their *own* cryptocurrency.    Frequently, as I note at [27] above there is reference in the documentation to "*your* coin balances" (emphasis added).  At [176] - [178] below there are also references to "*you*" and "*your*" relevant to matters of the ownership of the cryptoassets and their being traded (emphasis added).  Although it is not altogether clear when these web-based instructions first went live, the evidence before me indicates they were certainly operating by April 2016.  Those instructions might possibly have misled accountholders into thinking that they directly held the cryptocurrency in question rather than perhaps being only beneficial owners.  But what is clear to me is that those instruction pages certainly do not suggest that accountholders were to have nothing more than a mere contract under which they would be unsecured creditors of Cryptopia with Cryptopia having the power to dispose of the cryptocurrency without an accountholder's consent.  If Cryptopia was indeed holding these digital assets, then it was cryptocurrency that it had acquired only by virtue of the trust which accountholders had placed in it as custodian for them.

[173]  "Custodian" language has also featured with some prominence in this case.  On this, *Black's Law Dictionary* describes a "custodian of property" as:

---

[56]    Bryan A Garner *Black's Law Dictionary* (10th ed, Thomson Reuters, Eagan, 2014).

> A custodian responsible for managing real or personal property. The custodian's duties generally include securing, safeguarding and maintaining the property in the condition received and accounting for any changes in it.

[174]  The Cryptopia Risk Statement also speaks of customers "owning" their own cryptocurrency. In addition, it warns customers of the many risks of their owning cryptocurrency and of using Cryptopia's platform. But it did not in any way suggest that one of the risks to be run by account holders was that Cryptopia would itself *own* the cryptocurrency legally and beneficially, let alone that this would be the position if Cryptopia were, as has happened, to go into liquidation.

[175]  Additionally, by the Risk Statement:

    (a)    Clause 28 informed accountholders that Cryptopia may hold its own digital currencies on the platform, which indeed happened. There was no suggestion made that in fact Cryptopia beneficially owned *all* the digital currency on the platform.

    (b)    Clause 29 addressed fees payable for using the platform. This did not suggest that any capital gains in the cryptocoins would enure to Cryptopia, which would have been the normal position had Cryptopia been the legal and beneficial owner of them.

[176]  I turn now to Cryptopia's "marketing strategy" of July 2018, details of which are before me. This was a strategy promoted by Cryptopia, which stated that Cryptopia was providing:  "A trading platform for global cryptocurrency investors who want to trade safely", and that the company was "dedicated to ensuring *you* can deposit, trade and withdraw your cryptocurrency coins securely whilst offering world class service" (emphasis added).

[177]  Significantly here, customers were also referred to as "users" and not as "buyers". The strategy referred also to Cryptopia's "high level security" stating: "Rest easy: knowing *your* cryptoasset investments are securely protected" (emphasis added).

[178]  The accompanying fact sheet also contained the following statement: "Our mission is to enable the widespread adoption of digital currencies to give people control back of *their* money through faster, cheaper, and more efficient financial services" (emphasis added).

[179]  I turn now to say something more about the amended terms and conditions updated from 7 August 2018.  Those terms, and in particular cls 5(d) and 5(e), and cls6(e)– (g) and (k) in respect of "fiat pegged tokens", contain express recognition that the cryptocurrencies held by Cryptopia for accountholders are held on trust for those accountholders.  It is those accountholders it seems who retain the beneficial ownership throughout.  Ms Cooper for the creditors has endeavoured to make something of the specific wording of cl 5(e) which, to repeat, states:

> (e)    Each user's entry in the general ledger of ownership of coins is held by us, on trust, for that user.

Ms Cooper contends that on its face this provision states that it is the "entry" in the ledger of ownership which is held "on trust" rather than the cryptocurrency itself.  As I see it, this interpretation is wrong.  It would lead to a nonsensical situation.  Although that wording in cl 5(e) is not ideal, I am satisfied there can be no doubt that what was intended by the provision was that it is the cryptocurrency or coins themselves which are held by Cryptopia "on trust for" the particular accountholder.

[180]  Before me, Mr Barker for the liquidators pointed out that the evidence before the Court shows that approximately 536,662 accountholders did not engage with Cryptopia's exchange after the updated terms and conditions of 7 August 2018 were advised.  Mr Barker went on to suggest that these amended terms, if anything, simply resulted in a variation of trust for the accountholders or, alternatively, created a new trust that operated only in favour of those accountholders who engaged with the exchange after the amended terms came into effect.  On this, Mr Barker noted that any finding that some users or accountholders are beneficiaries of trusts and some are not could also pose potential prejudice to non-trust accountholders for the future.  He was quick to point out that these issues were raised simply so that the consequences of any particular outcome could be clearly understood by the Court.

[181]   On these aspects, I disagree with Mr Barker's interpretation here.  I have confirmed above that I am satisfied no variation of trust was involved in the amended terms.  Those terms merely confirmed what were the existing trusts in operation.  As I have noted, Mr Brocket, the only employee of Cryptopia to give evidence before me, this evidence also being uncontested, said the amended terms did not change the way the company had always operated.  It was clear too, which Mr Barker for the liquidator accepted, that even if the amended terms improved the position of existing accountholders then the amendment must be seen as unobjectionable from their perspective.

[182]   As I see it, the amended terms on their face took immediate effect for all existing accountholders and it was therefore not necessary for an accountholder actively to use the Cryptopia platform post-August 2018 in order to get the benefit of those terms.

[183]   It must follow, therefore, that at no point in time were there separate sets of trust assets on the one hand, for accountholders under the historic terms and, on the other, for accountholders who had accepted the amended terms.  Again, Mr Brocket in his evidence I have noted above confirmed as much.  Nor, in my view, was it necessary to reach a position where individual trusts were seen as arising for each individual accountholder.  I am satisfied that all accountholders by currency held their interests on exactly the same terms as other accountholders of that particular currency.  That said, on all the evidence before me I conclude that Cryptopia acted as a bare trustee under a separate trust for each individual cryptocurrency held on its platform.  All the accountholders for that one particular currency were simply beneficiaries under that one trust.

[184]   Ms Cooper for the creditors has endeavoured (unsuccessfully) to question this conclusion.  I find that Cryptopia's principal duty under each of these respective trusts was to hold the relevant pool of currency, in many cases which the accountholders had brought onto the platform, on behalf of those accountholders (which might include Cryptopia itself as a beneficiary accountholder if it had personally acquired certain of those pool assets).  As part of this Cryptopia as trustee was required to deal with each accountholder member's share in the pool as directed by the member.

[185]   In this respect, the powers and immunities given to Cryptopia in the terms and conditions which I have outlined at para [27] above, as I see it, are all proper provisions in trusts of this type.

[186]   And I confirm my conclusion finally that the amended terms and conditions of 7 August 2018 did not effect any particular variation of the trusts.  Those amended terms applied automatically to all accountholders in the respective cryptocurrencies from 7 August 2018.  And, indeed the standard trust arrangements for each cryptocurrency had related back to the original inception of Cryptopia.

[187]   In answer to the question raised at [46](b) I conclude that the various cryptocurrencies were at equity held on separate express trusts by Cryptopia for all of the accountholders.

B. The remaining issues before the Court

[188]   I now need to turn to the remaining questions posed at para [46]:

*Question (c) – What happens if there is no trust or cryptocoins are not "property"?*

[189]   Question (c) of this paragraph, as it reads in the application, states:

> If the answer to Question (a) is No, then to the extent that such digital assets are not "property" whether the applicant liquidators should satisfy claims of:
>
> (i)    Any accountholder of the company (accountholder) for the return of his/her/its digital assets; and
>
> (ii)   Unsecured creditors,
>
> By conversion of such digital assets into fiat currency and paying such in accordance with Part 16 of the Companies Act 1993.

[190]   Given the answers I have given to questions (a) and (b) to the effect that the various digital assets held by the liquidators *do* constitute "property" as defined in s 2 of the Companies Act, and those digital assets here *are* held on trust for the accountholders, this question (c) does not arise.

[191]   But in any event, I note that even if I had found the digital assets were not "property" within s 2 of the Companies Act and were not held on trust for the accountholders, then those digital assets would be an "asset" of the company as that word is used in ss 253 and 313 of the Companies Act.   In those circumstances the assets should be realised by the liquidators and the proceeds distributed in the ordinary way under pt16 of the Companies Act.   In that event, accountholders' claims would rank with ordinary unsecured creditors of Cryptopia.   Given my findings noted above, however, that is not the case here.

*Question (d) – What are the terms of the trust/s and when did the trust/s come into existence?*

[192]   For the reasons I have outlined above, I am satisfied that an express trust came into existence for every different type of currency here which Cryptopia acquired as a result of a dealing with an accountholder.   The precise dates on which this may have occurred were not in evidence before me.

[193]   Nevertheless, once such a trust came into existence it applied to any currency of the relevant type subsequently acquired by Cryptopia as part of the running of its cryptocurrency platform whether or not the currency was in hot wallets or cold wallets.

[194]   In most cases the trusts in question will have pre-dated the varied terms in August 2018.   But in any event as I see it, trusts arose in respect of each parcel of digital assets when they were acquired and the amended terms made no difference.   Any new kinds of cryptocurrency acquired after the amended terms came into existence in August 2018, as I see it, from the time of acquisition will have become subject to trusts on the same basis.

[195]   As to what were the terms of the trust or trusts, in my view, it is not necessary or practicable at this point comprehensively to list all the terms that might govern the trusts in question.   As Briggs J's judgment in *Pearson v Lehman Brothers Finance SA* stated:[57]

> …the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property beneficially in

---

[57]     *Pearson*, above n 53, at [245].

circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence. In all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles.

[196] As I see it here, Cryptopia essentially fulfilled the role of a bare trustee in relation to the accountholders. Cryptopia's trust duties therefore were somewhat confined. Its principal role was to hold each group of digital assets as trustee for the accountholders, to follow their instructions, and to let individual accountholders then increase or reduce their beneficial interest in the relevant trusts in accordance with the system Cryptopia had created for that purpose.

*Question (d)(iii) – Separate trust for each accountholder – or one trust for all accountholders – or multiple trusts for specific groups?*

[197] As I have outlined above, I have found that Cryptopia here is a trustee of separate trusts, one for each cryptocurrency with the beneficiaries being all accountholders holding currency of the relevant type.

[198] It follows that I reject alternatives 1 and 2 in Question (d)(iii) and uphold alternative 3 noted above at [46].

*Question (e) – Inability to identify individual accountholders?*

[199] Question (e) outlined at para [46] above states:

What is the consequence of the applicant liquidators being unable to ascertain the identity of any accountholder, and what consequences flow in relation to any digital assets associated with that account, specifically:

(i) Can the applicant liquidators close any such accounts and retain any digital assets as assets of the company; or

(ii) Do any such digital assets fall to be dealt with pursuant to the Trustee Act 1956 or otherwise?

[200] In my view, the appropriate course of action here where the liquidators find themselves unable to identify particular accountholders is the second alternative, namely for the digital assets that would otherwise fall to be allocated to that accountholder to be dealt with in accordance with s 76 of the Trustee Act 1956.

[201]   Section 76 of the Trustee Act provides:

**76      Distribution of shares of missing beneficiaries**

(1)      Where any property is held by a trustee and the property or any part thereof cannot be distributed because the trustee does not know whether any person who is or may be entitled thereto is or at any material date was in existence, or whether all or any of the persons who are members of any class who are or may be entitled thereto are or at any material date were in existence, or because the trustee does not know whether any such person is alive or dead or where he is, the trustee may publish such advertisements (whether in New Zealand or elsewhere) as are appropriate in the circumstances calling upon every such person and every person claiming through any such person to send in his claim within a time to be specified in the advertisements, not being less than 2 months in any case from the date on which the advertisement is published. Where the trustee is in doubt as to what advertisements should be published under this subsection, he may apply to the court for directions in that regard.

(2)      Where the trustee has received (whether as a result of the advertisements or not) any claim to be a person to whom any such advertisement relates, or any notice that any person may claim to be such a person, but the trustee is not satisfied that the claim is or would be valid, the trustee may serve upon the claimant or the person of whom the trustee has notice as aforesaid, a notice calling upon him, within a period of 3 months from the date of service of the notice, to take legal proceedings to enforce the claim, if he wishes to pursue it, and to prosecute the proceedings with all due diligence; and advising him that, if he fails to do so, his claim may be disregarded and application may be made to the court without further notice for an order authorising the distribution of the property. Nothing in this subsection shall make it necessary for the trustee to serve such a notice on any such person; and the court may make an order under this section, whether or not such a notice has been served on any such person, if it is satisfied that the information supplied to the trustee by that person or otherwise in the possession of the trustee indicates either that the person is not one of the persons specified in the advertisements or that he is not likely to be one of those persons.

(3)      Upon proof by affidavit of the circumstances, and of the inquiries that have been made, and of the results of inquiries and advertisements, and of the claims of which the trustee has received notice, and of the notices that the trustee has given to claimants under subsection (2), and of the action (if any) which the claimants have taken to enforce their claims, the court may order that the trustee may distribute the property or part thereof, subject to such conditions as the court may impose,—

(a)      as if every person and every member of any class of persons specified in the order (being all or any of the persons specified in the advertisements) is not in existence or never existed or has died before a date or event specified in the order; and

(b)    where as a consequence of the order it is not possible or practicable to determine whether or not any condition or requirement affecting a beneficial interest in the property or any part thereof has been complied with or fulfilled, as if that condition or requirement had or had not been complied with or fulfilled (as the court may determine).

(4)    In making any order under subsection (3), the court may—

    (a)    disregard (without express reference thereto in the order) the claims of any persons who do not appear to the court to be, or to be likely to be, any of the persons specified in the advertisements:

    (b)    disregard (without express reference thereto in the order) the claim of any person to whom the trustee has given notice under subsection (2) and who has failed to take legal proceedings to enforce the claim or to prosecute any such proceedings with all due diligence:

    (c)    exclude from the operation of the order any person to whom the trustee has not given notice under subsection (2) and who in the opinion of the court may be one of the persons specified in the advertisements, or any person whom the court considers should for any reason be excluded from the operation of the order:

    (d)    provide that the order shall not be acted on for such period or except on such conditions as may be specified in the order or that the effect of the order shall during a period so specified be advertised in such manner and form as may be specified in the order, or that the order be served upon such person or persons as are specified therein; and in the event of the court exercising the jurisdiction conferred by this paragraph it may in the order direct that the same shall be of no effect in respect of any person specified therein in the event of that person instituting proceedings in New Zealand to enforce his claim and serving the proceedings upon the trustee within such period as is specified in the order.

(5)    Any such order may be made notwithstanding that there has not been strict compliance with any directions as to advertisements previously given by the court, or that an error has been made in any advertisement (whether or not any directions have previously been given by the court) if the court considers that the error would not be likely to have prejudiced or misled the persons to whom the advertisement relates.

(6)    Where the court makes an order under this section that the trustee may distribute any property or part thereof as if every person and every member of any class of persons specified in the order (not being a person expressly excluded from the operation of the order) is not in existence or never existed or has died before a date or event specified in the order, and the trustee distributes in accordance with the order, the trustee shall be exonerated from any further liability to any such person or to any member of any such class:

provided that nothing in this subsection shall prejudice any remedy which any person may have against any person other than the trustee, including any right which he may have to follow the property and any money or property into which it is converted.

(7)     The court may make 1 or more orders under this section in respect of the same property.

(8)     Any order made under this section may direct how the costs of the order and of advertising under or for the purposes of the order shall be borne.

(9)     It shall not be necessary to serve notice of an application for an order under this section upon any person, unless the court otherwise orders.

(10)    Nothing in this section shall prejudice the right of the trustee (if he so desires) to distribute under any other law or statutory provision or prejudice the protection thereby afforded when he makes distribution pursuant to any such law or provision.

[202]   This s 76 process needs to be undertaken here where appropriate.  It must follow, therefore, that alternative 1 (suggesting that the digital assets be retained as assets of Cryptopia) is not appropriate here.

*Question (f) – Recovery of stolen digital assets*

[203]   Question (f) outlined at [46] states:

If and to the extent that the applicant liquidators recover stolen digital assets, then are such to be dealt with by the applicant liquidators:

(i)      in accordance with the determination sought above;

(ii)     pro rata according to the amounts recovered assessed against amounts stolen; or

(iii)    as assets of the company.

[204]   Here, I have accepted submissions advanced to me for the accountholders that there are separate trusts for each type of cryptocurrency held by Cryptopia.  There is one such trust for each type of cryptocurrency held.  As such, it necessarily follows that only those accountholders who hold types of cryptocurrency that were stolen would have suffered a loss as a result of that misappropriation.  Those losses, as I see it, should be borne pari passu by those accountholders alone.[58]   It must follow

---

[58]     *Pearson*, above n 53 at [244].

therefore, in my view, that any recoveries of misappropriated cryptocurrency should enure to the benefit of those same accountholders.

[205]   To determine the position as between the accountholders who are beneficiaries of the relevant trusts relating to the particular misappropriated cryptocurrency is somewhat more difficult, however.  The appropriate process as I see it is:

> (a)   as at the date of the theft, the liquidators should determine the accountholders affected and their relative shares in any trust of the digital assets which are the subject of the theft.  The liquidators should then apply the loss from the theft pro rata to those existing holdings.  It should not therefore be necessary for the liquidators otherwise to discriminate amongst those accountholders, although the default position might be seen as pari passu distribution of the loss;

> (b)   to the extent that subsequent to the theft any accountholder acquired digital assets of the type that suffered the theft and those assets were added to the relevant trust assets, no reduction for the theft should be applied to that accountholder's share in the trust assets; and

> (c)   any recoveries of cryptocurrency lost as a result of the theft should be applied pro rata to make up the loss suffered by such accountholders as were affected by it under the principles I have outlined above.

*Potential relevance of any fault of Cryptopia relating to the lost digital assets*

[206]   I have not been asked in the current application to address the relevance of any questions which might arise relating to the potential that Cryptopia may be legally culpable for lost digital assets here.  This issue potentially arises if the digital assets were held on trust as I have found and Cryptopia is now holding fewer digital assets than were transferred to it by accountholders and not withdrawn by them.  The losses may have occurred from the hack and theft, but there may be other causes of this shortfall.

[207]   It may be useful, however, to provide some brief comments on this aspect.  In principle, where a trustee is one of the beneficiaries of the trust (as Cryptopia says is the case here) and there is a shortfall in the trust assets, the trustee cannot share in any distribution of assets among beneficiaries where the trustee is found to be legally culpable in respect of that shortfall to the extent of the shortfall.[59]

[208]   These comments are, however, by way of an aside as the issue of trustee-fault is not strictly before the Court here.  This may be a matter for further consideration later.

**Result**

[209]   As to the questions posed by the liquidators in their application as outlined at [46] above, the answers to those questions are:

(a)   On the question whether any or all of the digital assets held by the liquidators constitute "property" as defined in s 2 of the Companies Act, the answer is **yes**, *all* of the digital assets constitute "property".

(b)   On the question whether any or all of these digital assets are held on trust for accountholders, the answer is **yes**, they are *all* held by way of express trusts.

(c)   Question (c) raised issues only if the answer to question (a) or question (b) was, **no**.  That is not the case here, given that those questions were both answered **yes**.  Nothing further is required, therefore, with respect to this question (c).

(d)   Given that the answer to question (b) above is **yes**, then the following questions arise under Question (d), and their answers are:

(i)   Question (i):  When did the trusts come into existence?  The answer is that, in each case when the first tranche of a specific

---

[59]   *Finnigan v Yuan Fu Markets Ltd (in liq)* [2013] NZHC 2899 at [46]; and *Russell-Cooke Trust v Prentis* [2003] EWHC 1206 (Ch) at [6].

cryptocurrency was accepted onto Cryptopia's platform, one trust was established for that particular cryptocurrency and came into existence (and this was the case either before or after 7 August 2018 when the company updated its terms and conditions).

(ii)   Question (ii):  What are the terms of the trusts?  The answer is that these are those terms which are implied into a particular trust by law.

(iii)   Question (iii):  On what basis are the digital assets held on trust?  The answer is as set out at as offered at subpara (iii) of this question.  This means that the digital assets are held in multiple trusts for the benefit in each case of specific groups of accountholders who hold that particular group or type of digital asset with the result that accountholders within a specific group are co-beneficiaries of the same trust.

(e)   On this question (e) which relates to the consequence of the liquidators being unable to ascertain the identity of any particular accountholder and what consequences should follow in relation to digital assets associated with that account,  The answer is that these digital assets fall to be dealt with pursuant to s 76 of the Trustee Act.  The requirements set out in that provision are to apply here.

(f)   Question (f) asks if, and to the extent that the applicant liquidators recover stolen digital assets, how are these to be dealt with by the liquidators?  The answer is as outlined at para (f)(ii) to the effect that they are to be dealt with pro rata within each specific trust for the digital asset concerned according to the amounts recovered assessed against the amounts stolen.

**Costs**

[210]   Outlined at para (g) of the liquidators' application specified at para [46] above, is a request, effectively from all parties, for a direction that their reasonable fees and disbursements on this application should be met in the first instance from the pool of realised bitcoin holdings pursuant to [3(b)] of the order of this Court dated 29 May 2019.

[211]   This is on the basis that these fees and disbursements are a necessary and reasonable expense of the liquidation of, and incidental to the protection, preservation, recovery, management and administration of, the assets of Cryptopia.

[212]   On this costs question, I am satisfied that the costs of counsel for the liquidators, counsel for the accountholders and counsel for the creditors should be met from the bitcoin holdings pool as sought on the basis outlined.  All counsel at this point provided detailed and helpful submissions for the resolution of these issues and their costs are properly met from this pool.

[213]   A direction is now made that the reasonable fees calculated on an indemnity basis and disbursements of counsel for the liquidators, counsel for the accountholders and counsel for the creditors are to be met from the pool of realised bitcoin holdings pursuant to para [3(b)] of this Court's order dated 29 May 2019.

[214]   Insofar as it may be necessary here I certify for second counsel in each case.


.....................................................
**Gendall J**

Solicitors:
Buddle Findlay, Wellington for Applicant Liquidators

Copies to:
Jenny Cooper QC, Barrister, Auckland, for Creditors
Jane Barrow, Barrister, Auckland, for Creditors
Peter Watts QC, Barrister, Auckland, for Accountholders
Samuel Jeffs, Barrister, Auckland, for Accountholders

# Exhibit 31

# Transferring legal title to a digital asset

(2023) 5 JIBFL 317

1 May 2023

Journal of International Banking & Financial Law  >  2023 Volume 38  >  Issue 5  >  Articles



Journal of International Banking and Financial Law

## Features

Hin Liu

Is lecturer of law at the University of Oxford. Email: hin.liu@law.ox.ac.uk He would like to thank Luke Rostill, Ben McFarlane, Louise Gullifer and Matthew Kimber for their comments/input on this article
© Reed Elsevier (UK) Ltd 2023

*In this article, Hin Liu considers what should be required to transfer legal title to a digital asset. He argues that the requirement should be a "change of control" coupled with an intention to transfer title, and that it would be inappropriate to require an "on-chain transfer".*

\* \* \* \* \* \*

## KEY POINTS

- The author argues that a "change of control" should be a necessary condition for the transfer of title to a digital asset.

- The risks of fraudulent conduct (in the form of fraudulent assertion, fraudulent denial, and double sales), and the relative ease of transferring control of a digital asset, mean that an "agreement" rule analogous to the sale of goods cannot be applied in the digital asset context.

- Contrary to the Law Commission, the requirement of an on-chain transfer is not necessary.

- In order to protect the autonomy of the transferor, a change of control cannot be a sufficient condition for the transfer of title, and there needs to be an intention requirement.

\* \* \* \* \* \*

## 1. INTRODUCTION

Cases across the common law world have held that certain types of digital assets (such as cryptocurrencies and NFTs) can be the subject of property rights,[1] but there are no cases on the follow-up question of how title to a digital asset can be transferred.[2]

Clearly, the question of how (legal) title[3] to a digital asset is transferred is extremely significant, as it carries consequences in many contexts such as liability for interference,[4] sale, bona fide purchase, rescission and

insolvency. This is crucial given the significant use and adoption of digital assets, the recent spate of crypto-related insolvencies, the hacks perpetrated on blockchains, and general crypto market volatility.

The issue of transferring legal title to a digital asset has been discussed by the Law Commission, academics and industry participants. Importantly, the Law Commission has suggested that a "transfer operation that effects a state change"[5] (also called an "on-chain transfer")[6] should be required for a transfer of title to a digital asset. Whether an on-chain transfer (or any other formality requirement) should be required to transfer legal title to a digital asset is crucial, as it involves balancing competing considerations such as:

- giving effect to the policies of the blockchain;

- protecting the general expectations of blockchain users;

- giving effect to the autonomy of digital asset owners; and

- the prevention of fraud.

This article argues that imposing a formality requirement (or necessary condition) of an "on-chain transfer" is unnecessary. Instead, the necessary condition should be "change of control". However, concerns relating to the autonomy of the transferor mean that a change of control should not be seen as sufficient: there also needs to be an intention to transfer title.[7]

In reaching the conclusion that a change of control is necessary but insufficient to transfer legal title to a digital asset *inter vivos*,[8] it would be apposite to first outline the nature of digital assets and policies specific to the digital asset context, as well as explore the notion of a "transfer" in the blockchain context. I will then examine the methods of transferring rights to existing forms of property, and their rationales, and consider whether these rationales are applicable to digital assets. I come to the conclusion that some do not, and that it is necessary to have a "change of control" to transfer legal title to a digital asset. I will then examine why an "on-chain transfer" formality requirement should not be imposed. Finally, I will discuss why a change of control on its own should not be a sufficient condition for the transfer of title (namely to protect the autonomy of the party in control by giving effect to his intentions).

## 2. DIGITAL ASSETS AND BLOCKCHAIN

A digital asset is an exclusively controllable asset on an electronic record that is rivalrous, fully divestible, and independent of the legal system and other persons.[9] Essentially, it consists of a "transactional power" to alter particular data entries on an electronic record,[10] and classic examples include Bitcoin and Ether, where one can use a private key[11] to sign transactions that alter the public address[12] to which the asset is associated.

The focus of this article will be on blockchain assets[13] (also referred to as crypto-assets or crypto-tokens).[14]

There are various policies specific to the blockchain context that have a direct bearing on the rule that should be adopted in respect of transfers of title. Most notably, the core purpose of the blockchain is to allow value to be stored and moved in a safe and efficient way without the co-operation of a central counterparty, through the creation of "locked virtual spaces" over which people can have exclusive control, and through having a searchable record of "movements" of assets across these "virtual spaces".

This means that there must be a strong link between control and title. If the link between "control" and the location of title is too weak (ie there are too many "decouplings" between who has control and who has legal title), this creates a series of undesirable consequences, two of which will be outlined.

First, this increases the potential for fraud. If transactions involving the passing of legal title can happen without transferring control of the digital asset, this increases the amount of fraudulent claims that can be asserted against the person in control of a digital asset (eg a fraudster claiming that the person in control has sold a digital asset to him off-chain by agreement), as well as frauds that can be perpetrated by the person in control (eg by way of a "double sale").[15]

Second, people generally expect or assume that if someone has control over a digital asset, he has title to it.[16] Allowing too many "decouplings" will create unfair surprises[17] for purchasers of digital assets[18] and creditors who lend against digital assets.

As such, it is desirable to have the strongest link possible between control and

-------------------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 318*

legal title (which would take the form of a one-to-one link), subject to any overriding public policy considerations.

There are indeed countervailing considerations that mean there cannot be a one-to-one correspondence between control and legal title. Primarily, the existence of various types of unauthorised transfers (such as thefts) mean that there cannot be a one-to-one correspondence between control and title, because (for example) it would be undesirable for the legal system to give title[19] to a thief who executes an on-chain transfer to his own address.

## 2.1 Ambiguity in the use of "transfer"

Although this article's focus is on the transfer of *title* to a digital asset, the notion of a "transfer" is used very ambiguously in the blockchain context, and it is crucial to clarify what could be meant by a "transfer". There are three ways in which it is used, the first two of which denote a factual event, and the third referring to a legal event. The first way "transfer" is used is to denote an on-chain transfer in respect of a digital asset such that it is now located at a different public address. The second notion of "transfer" denotes a "change of control" or a "transfer of control", ie the transferee being in the same position as the transferor (in having the exclusive power to execute an on-chain transfer that results in the digital asset being located at a different public address), or in other words "stepping into the shoes" of the transferor.[20] This can happen without an on-chain transfer, for example where a USB stick is handed to the transferee where the private key is stored inside the USB and the transferor has no knowledge of the key (a "USB change of control").[21] The final notion of transfer refers to the transfer of legal title.

The second meaning can be confused with the first meaning, since in both cases the holder of the private key is in the same factual position in respect of the digital asset, namely that he is the only person who has the power to execute an on-chain transfer of the digital asset.[22] It can also be lumped with the third meaning, since people make the general assumption that an action that changes the identity of the person who has exclusive control of a digital asset results in a transfer of title to the digital asset.[23]

The first and third meanings are often lumped together, because people assume or expect that a change in the state of the blockchain also corresponds with a change in the location of title.[24] Thus, it is crucial to separate the meanings and examine how the three meanings interrelate.

This article explores the conditions required for the transfer of title (the third meaning of "transfer"). In particular, it discusses whether "change of control" (the second meaning) and "on-chain transfer" (the first meaning) are necessary or sufficient conditions for the transfer of title.

## 3. WAYS OF TRANSFERRING TITLE TO EXISTING ASSETS

As digital assets are property, it would be useful to look at existing types of property and ascertain whether the current methods of transferring rights to these types of property are feasible starting points for the analysis in relation to digital assets.

In relation to choses in action, the right can be transferred through assignment or novation. Assignment and novation are applicable to rights against people,[25] and not to objects of property that are independent of the legal system and other persons.[26] As such, they are inappropriate in the context of digital assets.[27]

Transferring legal title to a digital asset

In relation to chattels, legal title can be transferred through:

- a deed;

- delivery of the chattel (coupled with the relevant intention); or

- a sale.

The analogy between chattels and digital assets is much closer since both chattels and digital assets are distinct objects independent of the legal system with an identifiable location that can be transferred[28] and completely divested: it is the closest analogy out of all the existing forms of property. Thus, the three methods of transferring title to a chattel will be considered in ascertaining whether they (or their digital equivalent) should be applied to digital assets.

The three methods of transferring title to a chattel (deed, delivery and sale) are part of the wider debate as to whether formalities should be imposed for the transfer of legal title. Equally, consideration of these methods in the digital asset context is part of this same debate, and so the rationale of formality requirements will be explored.

## 3.1 Formality requirements

As McFarlane notes in *The Structure of Property Law*,[29] there are four reasons for imposing a formality requirement: evidence, reduction of fraudulent claims, publicity, and caution. First, a formality requirement provides evidence to the parties as to the existence of the relevant transaction. Second, it reduces the chance of third parties fraudulently asserting that a person with legal title to an asset has transferred a right or granted an interest to them,[30] as the third party in question would need to prove that the formality requirement was satisfied (eg that there was delivery, writing or a deed).[31] With these formality requirements, the third party would not be able to fabricate a claim that (for example) the owner orally agreed to sell the asset to him. Third, formalities such as registration provide publicity to third parties, by providing notice that the transferee has the relevant right or interest, as they can simply search the relevant source (such as the register) to find this out.[32] Fourth, formalities have a cautionary effect on transferors as they are forced to think seriously about the transfer, and this ensures that "oral transfers" conducted on a whim will not have legal effect.

Against these four reasons, there are several reasons against the imposition of a formality requirement. The first is the inconvenience and expense involved in complying with a particular formality requirement: the need to have a deed (or writing), or the need to register, takes time and/or money. Second, imposing a formality requirement may frustrate reasonable expectations or cause unfair surprise. If in a particular context it is (for example) customary or normal market practice to conduct transactions orally, imposing a formality requirement of writing would cause unfair surprise to people in that context

------------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 319*

as they find out that their transactions are void or unenforceable for a lack of writing. Third, there may be vagueness in: (i) the scope of the rule; and/or (ii) what satisfies the formality requirement, making the rule difficult to apply. This also creates the further consequence that judges may (for pragmatic reasons) resort to unnatural interpretations of the requirement to reach reasonable outcomes, which may in turn render the law uncertain, technical and/or complex.[33]

Ultimately, when deciding whether to impose a formality requirement in a particular context, we need to assess the relative weight of the reasons for and the reasons against imposing such a requirement.

## 4. DEED

Title to a chattel can be transferred by way of deed.[34] Although there is no explicit discussion in the case law about

Transferring legal title to a digital asset

the rationale of the deed requirement in the context of transferring title to chattels, there are various benefits to imposing a deed requirement. First, it provides evidence of a transaction between the parties and aids in preventing fraud. For example, if one party wishes to deny that the transaction took place, the other party can use the deed as evidence that the transaction took place and thereby disprove the allegations of the other party. Second, imposing a deed requirement produces a cautionary effect for the transferor, as the act of producing and signing a formal document in front of witness(es)[35] will go towards ensuring that the transferor's intention to enter into the transaction is not a mere product of haste, but instead seriously contemplated with the relevant consequences in mind.

However, there are two obvious disadvantages of the deed method. First, having a document drawn up and signed in the presence of witness(es) just to transfer title to a chattel is an extreme hassle. Second, a deed provides no publicity to third parties, such that they would not be able to reliably infer who has title merely based on who possesses the chattel, since someone may possess a chattel but not have title to it because they used a deed to transfer title.

In the digital asset context, allowing a deed to be sufficient to transfer title would be disastrous. Transferring title by way of deed would mean that title can be transferred off-chain without a change of control. This in turn gives rise to the "double sale" problem, where (in this context) A sells a digital asset to B by way of deed without transferring control of the asset,[36] and then (fraudulently) sells the asset to C through transferring control of the asset to C. In this case, B's title would be extinguished by C's bona fide purchase (provided there is a bona fide purchaser rule that applies in C's situation).[37]

Also, insofar as the deed method in the physical asset context was underpinned by the need to eliminate the need to physically deliver a heavy or bulky object, this concern is not applicable to digital assets because digital assets are "moved around the digital space" by way of an on-chain transfer instead of physical acts that can be laborious.

*Requiring* a deed for title to be transferred is even more disastrous. Apart from the above disadvantages, this causes a massive inconvenience: one cannot transfer title to a digital asset by executing an on-chain transfer. This defeats a core purpose of the blockchain, namely, to act as a facilitative mechanism that provides a way to quickly move assets between exclusively controllable spaces (through an on-chain transfer).

In addition, just as in the physical asset context, a deed provides no publicity. This stands in contrast with an on-chain transfer (which provides positive publicity),[38] or an off-chain change of control, which provides some negative publicity in that a third party will know that the relevant person does not have control of the asset, given that he cannot sign a signature from the address in which the asset is contained.[39]

## 5. DELIVERY V SALE

Having established that using a deed as a method of (or requirement for) transferring title is inappropriate in the digital asset context, it would be apposite to explore the rationales behind the delivery and sale methods of transferring title (in respect of physical assets) and examine whether they apply across to digital assets.

Stripped to its essence, delivery involves the transferee taking possession of a physical asset with the consent of the transferor.[40] The case law on the delivery requirement for physical assets does not discuss the rationale of this requirement in much detail.[41] There have been several rationales for the delivery rule that are incorrect or circular, such as "delivery is part of the definition of a gift"[42] or "it is normal to deliver the good where there is a gift".[43] The first is circular because it does not show why "giving and taking" should be imposed as a requirement for transferring legal title. Similarly, the second also does not explain why delivery should be a *requirement* for transferring title to a physical asset.[44]

Nonetheless, the delivery requirement for physical assets can be rationalised as a manifestation of the basic principle that "possession is evidence of title". Generally, we make the assumption that a person who has possession of a physical asset has title to it, and the delivery rule helps us track this assumption by aligning

possession with title insofar as it ensures that without a transfer of possession, there is no transfer of title. As such, the "publicity" and "evidence" functions can be fulfilled.

The disadvantage of a delivery requirement (as with a deed requirement) is the inconvenience and expense involved (in delivering a good to the transferee or drawing up and signing a deed in front of witnesses).

Nonetheless, with the introduction of the *indebitatus assumpsit* and the rise of consensual contracts,[45] the law developed such that title could be transferred (under a sale) by way of agreement.[46] This was later codified in the form of s 17 of the Sale of Goods Act 1979. It provides that property can pass when the parties intend it to pass (ie when they agree), and so there is no need for any act of delivery.

Indeed, this transition was fuelled by the commercial convenience of not having to wait for the goods to be shipped halfway across the world, or having to use a deed, for title to be transferred. Party autonomy and commercial convenience[47] therefore underpin the rule that agreement is sufficient to transfer title to goods under a sale. The balance struck by the rule indicates a preference for convenience over the corresponding increase in the risk of fraud, or the decrease in publicity/reduced

*(2023) 5 JIBFL 317 at 320*

signalling effects. The latter concerns are partially mitigated through the introduction of *nemo dat* exceptions that offer protection to a bona fide purchaser in specified circumstances.[48]

## 6. THE BLOCKCHAIN: DELIVERY EQUIVALENT OR SALE EQUIVALENT?

It would now be appropriate to examine whether the equivalent of "delivery" (ie a change of control) should be imposed as a formality requirement for the transfer of title to a digital asset, or whether this formality requirement should be dispensed with such that the equivalent of "sale" as a method of transferring title (ie allowing title to pass by agreement of the parties) should be introduced into the blockchain context.

## 6.1 Delivery equivalent: "change of control" approach

A "change of control" denotes a change in the person who has the exclusive ability to exercise (positive and negative) control over the digital asset.[49] This is analogous to delivery of a physical asset. Delivery requires a taking of possession by the transferee, with the transferor's consent:[50] in other words, this involves a change in the person who has exclusive factual control over the physical asset. This is the same factual requirement as a "change of control" in respect of a digital asset.

In the blockchain context, people generally expect or assume that someone who has control of an asset in a public address also has title to it. As such, to give effect to such an expectation, this would justify a formality rule that helps to keep control and title in the same location. This mirrors the basic rule in the chattels context that "possession is evidence of title".[51] Such a rule is premised on the expectation (or general experience) that if someone has possession of a chattel, he would have title to it.

Imposing a formality requirement of a "change of control" also substantially reduces the risk of fraudulent conduct. First, it significantly reduces the risk of a third party fraudulently asserting that the current owner has sold the asset to them, because the third party would need to prove that he has control of the digital asset, *and* that the current owner does not have control of it.[52] Second, it prevents the person in control from fraudulently *denying* a transfer of title. If the formality requirement did not exist, the person in control could sell the asset to X without executing an on-chain transfer or giving up control of the private key, and then deny that the sale took place. In this case, X cannot point to anything on the blockchain (and cannot establish that the person in control no longer has control of his private key) to prove that the transaction took place.

Transferring legal title to a digital asset

More generally, in terms of publicity, this formality requirement helps to prevent third parties who want to buy or lend against a digital asset from being misled. Requiring a change of control for the transfer of title to a digital asset means that (all else being equal) there will be fewer situations in which control and title are decoupled. Thus, if a purchaser agrees to buy an asset in a particular address and the seller changes control of the asset to the purchaser,[53] there will be a much higher chance that the purchaser will obtain good title to the digital asset.[54] Similarly, if a secured creditor wants to lend against a digital asset in a particular address, there will be a much higher chance that the person who controls that address has title to the asset.

## 6.2 "Sale" equivalent: agreement approach

Against these reasons, it may nonetheless be argued that party autonomy is important, meaning that parties should be free to transfer title to a digital asset without the need for a change of control. This argument can be supported using the context of sale of a physical good, where no formalities are required for the transfer of title. If I can transfer title to gold (or any other commodity) just by agreeing with my counterparty to do so under a sale, why should this not be allowed in the context of (eg) a Bitcoin? Imposing a formality requirement may frustrate the expectations of the transferor.

However, there is a key difference between physical goods and digital assets, such that the equivalent of a "sale" rule (where title can pass as long as the parties agree) should not be introduced in the digital asset context. Specifically, the gain in commercial convenience by allowing title to pass by agreement is extremely significant for physical goods, whereas it is not for digital assets, such that this small advantage does not justify a departure from the formality rule. In the physical goods context, goods need to be shipped from across the world (which could take months), and it would be inconvenient to require delivery of the good for title to pass. The buyer may want to use the good to raise finance in the interim period between agreeing to buy the good and actual delivery, and so preventing title from passing (despite an agreement to buy the good) will prevent the buyer from doing so (leading to an inefficient use of capital). It would also be inconvenient to require a deed for every sale of goods, and doing so would frustrate the reasonable expectations of the parties.

This is a much stronger reason to justify decoupling of title and control than in the blockchain context. In the blockchain context, the equivalent of "delivery" is a change of control, and this involves much less friction and inconvenience than shipping goods across the world. An on-chain change of control just requires one to interact with an existing application that connects to the blockchain[55] which would allow the transfer to happen. In turn, an off-chain change of control can be done by way of a USB change of control,[56] which (if the parties are physically proximate enough) would be extremely convenient, and this is often preferable to an on-chain change of control because gas fees[57] do not need to be paid.[58]

Thus, the disadvantage of "inconvenience/ expense" is relatively minor in the blockchain context, compared to (eg) the delivery of goods halfway across the world, or land registration (where one needs to fill in forms and send documents to the land registry, and there are often significant time delays). As such, not much would be lost in requiring a change of control. Conversely, a lot would be lost if a "change of control" requirement was not necessary, for it would lead to a dramatic increase in the instances of title and control being decoupled, which would undermine the core purpose of the blockchain,[59] as well the evidential, publicity and prevention of fraud functions of the formality requirement.

-------------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 321*

This "change of control" requirement addresses (or substantially reduces) the risk of fraudulent conduct. First, there is no factual ability to "double sell". This is because the "seller" no longer has control of the digital asset after the first sale. Without such control, he cannot "sell the asset twice" by transferring control of the asset to the "second buyer". Second, fraudulent assertion of a sale becomes much more difficult. If someone wants to claim that a particular digital asset has been sold to him, he needs to establish that he holds the private key to the digital asset

and the "original controller" does not.[60] In contrast, if the "agreement" approach were adopted, owners would be at risk of fraudulent claims that they sold the digital asset to the fraudster (and the evidence for such a claim can be constructed without needing to allege or prove any change of control).[61] Owners would not have the assurance that such claims would fail in the absence of a change of control.

Third, this substantially reduces the incentive for someone to fraudulently *deny* that he has sold an asset to someone else. When a person retains control (after transferring title by way of agreement), it is much easier to fraudulently represent (to the court or third parties) that he still has title to the asset, because of the general assumption that if one has control of a digital asset, he has title to it. Where there is a change of control requirement however, this situation cannot arise because he simply has not transferred title to the asset: there is no *sale* to fraudulently deny.[62]

## 6.2.1 The role of bona fide purchase

Nonetheless, it may be argued that dispensing with the formality requirement[63] is acceptable if title can be "cleared"[64] by way of a bona fide purchaser (BFP) rule. This is because if a subsequent purchaser (C) can obtain clean title as long as he acts in good faith, then he would be in the same position as if the blockchain had been an accurate record of title, even if the "seller" (B) did not have clean title.

However, it is suggested that a BFP rule will not take care of the problem. First, it would not remove the "fraudulent assertion" problem. If transfers of legal title can happen off-chain by way of agreement, owners would still be exposed to fraudulent assertions from strangers (eg that the owner orally agreed to sell the asset to the fraudster for a low price), which the owner would need to defend specifically, instead of being able to relying on the fact that there has been no change of control.

Second, the lack of a "change of control" formality rule means that the "double sale" problem would remain. As mentioned, the "double sale" problem arises in the digital asset context where B sells a digital asset to A without changing control of the asset to A,[65] and then (fraudulently) sells the asset to C through executing an on-chain transfer or a change of control to C.

The root of the "double sale" problem arises from the "agreement" rule, and using a "general" BFP defence would only solve the symptom of the problem (with C obtaining title) but not the root (there being a necessary loser, who in this scenario would be A). It is the decoupling of title from control that is allowed by the agreement rule which creates the problem of having to choose between A and C (ie there being a "necessary loser"). If there is a "change of control" rule, this sets the relevant expectation such that if someone wants to buy a digital asset, he would ask for a change of control or an on-chain transfer, instead of the converse expectation that one can obtain title to a digital asset just by agreement, without a change of control. In such a scenario, someone in B's position would have no control of the digital asset (since it is not in the same address, or he no longer has the private key) and would not be able to conduct a "double sale" fraud[66] (the possibility of such fraud being premised on the assumption that B still has control of the digital asset).

## 7. ON-CHAIN TRANSFER AS FORMALITY REQUIREMENT

Nonetheless, one may object to a "change of control" formality requirement on the basis that it is not stringent enough, and the Law Commission has suggested that an on-chain transfer should be a necessary condition for the transfer of title to a digital asset.[67] This raises the question of whether such a formality requirement is preferable to a "change of control" requirement.

It is suggested that a formality requirement of an on-chain transfer is not necessary, because the relevant risks are adequately addressed by a "change of control" requirement. Imposing a more stringent formality requirement would unnecessarily stifle party autonomy. Party autonomy would be stifled because methods of transferring the private key off-chain, such as a USB change of control, would not be sufficient to transfer title to the relevant digital asset.

Transferring legal title to a digital asset

An on-chain transfer is often expensive (as substantial gas fees may need to be paid), and market participants often rely on off-chain methods of transferring the private key with the expectation that this is sufficient to transfer legal title. The question is whether the restriction on party autonomy as a result of imposing an "on-chain transfer" requirement is necessary.

## 7.1 The "register" justification

The core justification for the "on-chain transfer" requirement is based on the idea that the blockchain is analogous to a register (given that it is a ledger or database), and so there needs to be a high enough degree of "coupling" between the "register entries" and the location of title. Otherwise, the blockchain would no longer be a reliable source for finding out who has title, and would not provide enough publicity, since not all transactions that involve the transfer of legal title would be publicised. Imposing an on-chain transfer requirement would therefore be necessary to protect third parties such as secured creditors.[68]

In other words, there must be a sufficiently high degree of coupling between "the information shown on the register" and title, as opposed to coupling between control and title. However, it is suggested that the notion that the blockchain is a register rests on a false assumption. Ordinarily, a register contains the name of the person with the right, the property to which the right relates, and the right itself. For example, the Land Register contains:

- the name of the person with the right to or interest in the property;

- the property that is the subject of the right or interest; and

--------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 322*

- the nature of the right or interest (eg the fee simple) that the person has over the property.

The blockchain does not contain these elements. It is pseudonymous and does not contain the name of the person who owns or controls the property. The information conveyed by the blockchain is which assets are in which (locked) spaces.[69]

This "register" fallacy is attributable in part to the inferences that people make based on the premise that "the blockchain is a public database" or "the blockchain is a public record of transactions". These starting premises lead people to make the inference that "the blockchain is therefore a register". However, this inference is fallacious as it is missing the necessary premise of "the record shows the name of the interest holder, the asset, and the interest".

"Correspondence" or "coupling" between the information shown and legal title[70] is required to the extent that it is necessary to protect third party reliance on the information shown on the register. When a person relies on some information or data from the external world, that data is causing him to form a belief as to a state of affairs, which he subsequently acts on. In the case of the Land Register, people use the register entries to form beliefs about who has legal title, and reasonably expect the entries to be accurate, given that it is a government-run national register. They act on such beliefs by purchasing property or taking an interest in it, and so there is a need to protect such reliance by coupling the records with legal title.[71] Indeed, the Land Register is expressly designed to encourage reliance on the register entries to find out who has legal title.[72]

Indeed, if the location of title were to be decoupled from the register entries, then purchasers and creditors would suffer. A purchaser may not gain good title when he relies on the register entry showing that the vendor is "owner" of the property (especially in the absence of a wide BFP rule), and a creditor would have less collateral[73] to enforce against if the debtor does not own the property (contrary to what is shown on the register). Thus, with the Land Register, there is a need to protect third party reliance through imposing a formality rule that ensures the coupling of title with the register entries.

It is important to note that "reliance" in relation to particular information/data[74] consists of two stages: the "external

Transferring legal title to a digital asset

input" stage and the "verification" stage. First, there is an "external input" (data one observes from the world, such as a register entry) which causes a person to infer or assume that a particular conclusion is true. Second, this reduces (or eliminates) the effort he expends in verifying whether the conclusion is true. Where there is a high degree of (reasonable) reliance in relation to the two stages, this militates in favour of a high degree of "correspondence" between the information shown and legal title.

On the other hand, if the relevant information provided (or quality of the "information signal") is insufficient, a reasonable person might not assume (even provisionally) that a conclusion (in this case that the person shown on the records has legal title) is true, and as such, he would independently verify whether the conclusion is true. In this case, there is no reliance that the law ought to protect through providing a high degree of "correspondence" between the "information signal" and the relevant conclusion, which in this context would be that the person has legal title. This is because the downside of maintaining a high (or complete) degree of correspondence between the records and title through imposing the requisite formality rule is that it stifles party autonomy. Party autonomy should be respected unless there is an overriding reason (primarily in relation to the protection of third parties) that justifies such a formality requirement.

In relation to physical goods, there is a lower degree of "reliance" on a person's possession of an asset in inferring that he has title, as compared to the reliance that people place on the Land Register records in indicating the location of legal title. This is because although we make the general assumption that if one possesses a physical asset he has title to it, we also know that there are many arrangements in respect of goods that involve the person possessing the good not being the owner (such as hire or hire purchase arrangements),[75] ie where title is decoupled from control. Thus, even if the external input (X having control of a physical asset) leads a person to make the general assumption that a conclusion (X having title to the asset) is true, that does not replace his independent verification and judgement as much as in the case of the Land Register. Often, he would make his own inquiries to confirm whether the initial assumption is true,[76] resulting in a lower degree of "reliance".

In the blockchain context, there is an even lower degree of reliance on the "information" shown on the blockchain in inferring the location of title, since third parties would not know who owns or controls which assets: they are just given the virtual location of each asset.[77] Thus, the initial "external input" given by the blockchain does not lead the reasonable person to assume that a particular identified person has title (in contrast with the physical asset context).[78] It merely leads the reasonable person to assume that the person who has control of the assets in the address has title. As such, if he wants to find out who has title to certain digital assets, he would need to independently establish that a person[79] has control of the assets in the relevant address, to engage the general assumption that such person has title to them. To prove control (ie to mirror the "physical possession" threshold for chattels), the person purporting to have control of the digital assets can sign a message/signature using his private key, which proves that he has such control.[80] As such, it would be reasonable to require third parties to first ensure that the person they are transacting with has control.[81] Even at this point however, what is engaged is merely the *general* assumption that the person has title by virtue of his control, and further independent inquiries need to be made to verify whether this assumption is true.[82] These inquiries cannot be satisfied by looking at the blockchain.

Thus, in the blockchain context, there is no "reasonable reliance" that ought to be protected by imposing the degree of coupling demanded by an on-chain transfer requirement. The on-chain transfer requirement rests on the "register" analogy, and such an analogy

---------------------------------------------------------------------------------------------------    *(2023) 5 JIBFL 317 at 323*

rests on the idea of protecting parties who reasonably rely on information provided by the "register".[83] In this regard, the blockchain cannot serve the purpose that the Land Register is designed to serve (encouraging reliance on the information provided to ascertain who has legal title), because it simply does not provide the necessary information.[84]

## 7.2 Definitional ambiguities and the "equitable BFP" issue

There are also definitional ambiguities relating to the idea of an "on-chain transfer" or a "transfer operation that effects a state change". Most crucially, there is an ambiguity as to whether the state change needs to be on the blockchain in which the asset is constituted, or whether state changes on other blockchains/protocols can also suffice. For example, if an asset is constituted on a Layer 1 (L1) chain,[85] it is ambiguous as to whether state changes on a Layer 2 (L2) protocol[86] would satisfy the formality requirement.

On one hand, "state change" may refer only to a state change on L1, because the L1 chain is where the digital asset is constituted. On the other hand, one may interpret the requirement as covering transfers on L2, because even though there is no state change on the blockchain in which the asset is constituted, there is nonetheless still a "transfer operation", and this results in a "state change" on the other blockchain/protocol.[87]

This definitional ambiguity affects (for example) Lightning transfers in relation to Bitcoin: does a transfer at the L2 level transfer legal title to the Bitcoin, or is a L1 transfer required? Also, there are different types of L2 mechanisms (eg state channels, rollups, plasma chains, and subdivisions within them). From a technical perspective, these function very differently from each other, and offer differing degrees of publicity.[88] Thus, if "state change" encompasses L2 state changes, there is a further difficulty in relation to whether we treat the different L2 mechanisms in the same way for the purpose of the formality requirement.

On the other hand, if the "on-chain transfer" requirement can only be satisfied by a L1 transfer, this may cause problems in relation to the protection of purchasers at the L2 level. State changes at the L2 level would not result in the transfer of legal title to the L1 asset and would only[89] result in either the creation of an equitable interest in the L1 asset (in the case of the first L2 transaction), or the transfer of such equitable interest in the L1 asset (in the case of subsequent L2 transactions),[90] which may result in purchasers at the L2 level being insufficiently protected.

For example, a bona fide purchaser of an asset at the L2 level would only obtain an equitable interest, and so would not take free of existing equitable interests (as the BFP defence only applies where the purchaser obtains a *legal* interest). Suppose that A (a L2 interest holder of a digital asset) holds his L2 interest on trust for B, and then sells it to C, a bona fide purchaser. C does not take free of A's interest, since he obtains an *equitable* interest (the L2 interest) instead of legal title.

This position may significantly reduce the attractiveness of holding L2 interests, since bona fide purchasers may find themselves bound by a (sub-)trust[91] of which they had no knowledge. This position is anomalous because a bona fide purchaser of a *legal* interest for value without notice takes free of prior equitable interests.

Indeed, McFarlane criticises the scope of the BFP rule. Specifically, the applicability of the rule should not depend on the "historical origin"[92] of the right obtained by the purchaser (common law or equity). Instead, a bona fide purchaser should take free of any equitable interests against the right purchased, regardless of whether the right purchased is legal or equitable. Indeed, it is difficult to justify why a purchaser of legal title to a good should be able to take free of a prior trust, but a purchaser of a trust interest should not be able to take free of a prior sub trust: in both cases the purchaser is acquiring the very right that the seller had, instead of a right that depends on the seller's right.[93] If L2 transfers happen at the "equitable interest" level, there would need to be an amendment to the scope of the BFP rule in order to maintain market confidence in the use of digital assets at the L2 level.

It must also be noted that the blockchain L2 context is different from the intermediated securities context, which also involves people dealing with equitable interests. However, the "equitable BFP" issue, which also exists in theory in the intermediated securities context, does not give rise to problems in practice. This is because there is netting, meaning that it is hard to trace the movement of specific assets, and it is difficult to know who one purchased their securities from.[94] In the digital asset context however, there are many situations where the purchaser can identify the seller of the digital asset purchased, which means the "equitable BFP" point may give rise to problems in practice, compared to in the intermediated securities context where the equitable BFP issue is mainly academic.

Using a "change of control" formality requirement also allows us to avoid these problems (the register disanalogy, the definitional ambiguity, and the equitable BFP issue) in relation to the "on-chain transfer" formality requirement.

## 7.3 Protection of secured creditors?

Nonetheless, there is a concern that if title can be transferred off-chain, this would provide insufficient protection for secured creditors as they would not be able to tell when the debtor has transferred title to the asset[95] (thus making the creditor have fewer assets to enforce against) given that there is no positive publicity.[96] This argument would therefore suggest that an "on-chain transfer" requirement is necessary to provide enough publicity. However, it is suggested that in such situations, secured creditors should be protecting themselves. Creditors can bargain for more protection, for example in the form of a transfer of the collateral into a multisig address over which the creditor has negative control, or into an address over which the creditor has exclusive (positive and negative) control.[97] They may also simply adjust the terms of their arrangement to account for the risk of the debtor transferring title to the asset off-chain.[98]

## 8. "SUFFICIENT" CONDITION

Having established that a change of control should be a necessary condition for the transfer of title, the next question to examine is whether this should be a sufficient condition



*(2023) 5 JIBFL 317 at 324*

for the transfer of title. It is argued that a change of control should not be sufficient to transfer title, because it is imperative to protect the autonomy of the transferor by ensuring that his title is only transferred to someone else when he intends such title to be transferred. As such, there must be an extra (mental) requirement that the transferor intended to transfer title to the digital asset, in line with the requirement in respect of physical assets (that the transferor must have intended to transfer title to the asset).[99]

Indeed, there are many situations involving a change of control without the associated mental element where it would be undesirable to have title pass.[100] "Core" cases of these situations include theft, hacks, and forgeries[101] where a defendant executes an on-chain transfer of a digital asset into a public address that he controls, without the owner's knowledge or consent.[102] In such cases, title ought to remain with the owner, and an analogy may be drawn with relative title in the physical asset context, where a new (inferior relative) title arises in favour of the defendant.[103] In other words, the owner keeps his (superior) title and the defendant (thief, etc) obtains a new (inferior, relative) title.[104]

These cases are justified exceptions to the general position that there should be a one-to-one correspondence between control and title, and for obvious reasons. Protection of autonomy is key in a liberal society: it is undesirable to deprive someone of their property right when he or she does not intend to part with it.

Nonetheless, if a transfer of title is *prima facie* intended, are there potentially other factors that may invalidate the transfer? In the general personal property context, legal title is still transferred despite the existence of, eg a general mistaken assumption, duress or undue influence, but it is not transferred in the context of a mistake as to *identity*.[105] One may wonder whether the same approach should be adopted in the digital asset context.

It is suggested that there is no reason to depart from this general position in the digital asset context, since there is nothing different about digital assets insofar as this specific point about autonomy is concerned. The law's decision that certain factors impair the autonomy of a party to an extent that title does not transfer (and other factors do not have such an effect) does not depend on the type of asset, since what is involved is *autonomy*. For example, in a normal mistaken gift case, the "transferor" still makes the transfer volitionally: it is just that he is operating with "incorrect data". If operating on "incorrect data" in the context of a mistaken gift is insufficient to vitiate the transfer of

legal title in the physical asset context (in the absence of a mistake as to identity),[106] it is difficult to see why this should be sufficient to vitiate the transfer of legal title in the digital asset context.

## 9. CONCLUSION

This article has argued that a "change of control" should be a necessary condition for the transfer of title to a digital asset. The risks of fraudulent conduct (in the form of fraudulent assertion, fraudulent denial, and double sales), and the relative ease of transferring control of a digital asset, mean that an "agreement" rule analogous to the sale of goods cannot be applied in the digital asset context. Such risks can be addressed using a "change of control" requirement, and contrary to the Law Commission, the requirement of an on-chain transfer is not necessary. Finally, in order to protect the autonomy of the transferor, a change of control cannot be a sufficient condition for the transfer of title, and there needs to be an intention requirement.

* * * * * *

## Further Reading:

- Digital assets: the mystery of the "link" (2022) 3 JIBFL 161.
- Transfers of equitable interests in the digital asset world (2022) 5 JIBFL 325.
- Lexis+® UK: Private Client: Overviews: Digital assets and cryptoassets — overview.

* * * * * *

**End of Document**

# <u>Exhibit 32</u>

# Transferring legal title to a digital asset

(2023) 5 JIBFL 317

1 May 2023

**Journal of International Banking & Financial Law** > **2023 Volume 38** > **Issue 5** > **Articles**



Journal of International Banking and Financial Law

## Features

Hin Liu

Is lecturer of law at the University of Oxford. Email: hin.liu@law.ox.ac.uk He would like to thank Luke Rostill, Ben McFarlane, Louise Gullifer and Matthew Kimber for their comments/input on this article

© Reed Elsevier (UK) Ltd 2023

*In this article, Hin Liu considers what should be required to transfer legal title to a digital asset. He argues that the requirement should be a "change of control" coupled with an intention to transfer title, and that it would be inappropriate to require an "on-chain transfer".*

\* \* \* \* \* \*

## KEY POINTS

- The author argues that a "change of control" should be a necessary condition for the transfer of title to a digital asset.

- The risks of fraudulent conduct (in the form of fraudulent assertion, fraudulent denial, and double sales), and the relative ease of transferring control of a digital asset, mean that an "agreement" rule analogous to the sale of goods cannot be applied in the digital asset context.

- Contrary to the Law Commission, the requirement of an on-chain transfer is not necessary.

- In order to protect the autonomy of the transferor, a change of control cannot be a sufficient condition for the transfer of title, and there needs to be an intention requirement.

\* \* \* \* \* \*

## 1. INTRODUCTION

Cases across the common law world have held that certain types of digital assets (such as cryptocurrencies and NFTs) can be the subject of property rights,[1] but there are no cases on the follow-up question of how title to a digital asset can be transferred.[2]

Clearly, the question of how (legal) title[3] to a digital asset is transferred is extremely significant, as it carries consequences in many contexts such as liability for interference,[4] sale, bona fide purchase, rescission and

Transferring legal title to a digital asset

insolvency. This is crucial given the significant use and adoption of digital assets, the recent spate of crypto-related insolvencies, the hacks perpetrated on blockchains, and general crypto market volatility.

The issue of transferring legal title to a digital asset has been discussed by the Law Commission, academics and industry participants. Importantly, the Law Commission has suggested that a "transfer operation that effects a state change"[5] (also called an "on-chain transfer")[6] should be required for a transfer of title to a digital asset. Whether an on-chain transfer (or any other formality requirement) should be required to transfer legal title to a digital asset is crucial, as it involves balancing competing considerations such as:

- giving effect to the policies of the blockchain;

- protecting the general expectations of blockchain users;

- giving effect to the autonomy of digital asset owners; and

- the prevention of fraud.

This article argues that imposing a formality requirement (or necessary condition) of an "on-chain transfer" is unnecessary. Instead, the necessary condition should be "change of control". However, concerns relating to the autonomy of the transferor mean that a change of control should not be seen as sufficient: there also needs to be an intention to transfer title.[7]

In reaching the conclusion that a change of control is necessary but insufficient to transfer legal title to a digital asset *inter vivos*,[8] it would be apposite to first outline the nature of digital assets and policies specific to the digital asset context, as well as explore the notion of a "transfer" in the blockchain context. I will then examine the methods of transferring rights to existing forms of property, and their rationales, and consider whether these rationales are applicable to digital assets. I come to the conclusion that some do not, and that it is necessary to have a "change of control" to transfer legal title to a digital asset. I will then examine why an "on-chain transfer" formality requirement should not be imposed. Finally, I will discuss why a change of control on its own should not be a sufficient condition for the transfer of title (namely to protect the autonomy of the party in control by giving effect to his intentions).

## 2. DIGITAL ASSETS AND BLOCKCHAIN

A digital asset is an exclusively controllable asset on an electronic record that is rivalrous, fully divestible, and independent of the legal system and other persons.[9] Essentially, it consists of a "transactional power" to alter particular data entries on an electronic record,[10] and classic examples include Bitcoin and Ether, where one can use a private key[11] to sign transactions that alter the public address[12] to which the asset is associated.

The focus of this article will be on blockchain assets[13] (also referred to as crypto-assets or crypto-tokens).[14]

There are various policies specific to the blockchain context that have a direct bearing on the rule that should be adopted in respect of transfers of title. Most notably, the core purpose of the blockchain is to allow value to be stored and moved in a safe and efficient way without the co-operation of a central counterparty, through the creation of "locked virtual spaces" over which people can have exclusive control, and through having a searchable record of "movements" of assets across these "virtual spaces".

This means that there must be a strong link between control and title. If the link between "control" and the location of title is too weak (ie there are too many "decouplings" between who has control and who has legal title), this creates a series of undesirable consequences, two of which will be outlined.

First, this increases the potential for fraud. If transactions involving the passing of legal title can happen without transferring control of the digital asset, this increases the amount of fraudulent claims that can be asserted against the person in control of a digital asset (eg a fraudster claiming that the person in control has sold a digital asset to him off-chain by agreement), as well as frauds that can be perpetrated by the person in control (eg by way of a "double sale").[15]

Second, people generally expect or assume that if someone has control over a digital asset, he has title to it.[16] Allowing too many "decouplings" will create unfair surprises[17] for purchasers of digital assets[18] and creditors who lend against digital assets.

As such, it is desirable to have the strongest link possible between control and

----------------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 318*

legal title (which would take the form of a one-to-one link), subject to any overriding public policy considerations.

There are indeed countervailing considerations that mean there cannot be a one-to-one correspondence between control and legal title. Primarily, the existence of various types of unauthorised transfers (such as thefts) mean that there cannot be a one-to-one correspondence between control and title, because (for example) it would be undesirable for the legal system to give title[19] to a thief who executes an on-chain transfer to his own address.

## 2.1 Ambiguity in the use of "transfer"

Although this article's focus is on the transfer of *title* to a digital asset, the notion of a "transfer" is used very ambiguously in the blockchain context, and it is crucial to clarify what could be meant by a "transfer". There are three ways in which it is used, the first two of which denote a factual event, and the third referring to a legal event. The first way "transfer" is used is to denote an on-chain transfer in respect of a digital asset such that it is now located at a different public address. The second notion of "transfer" denotes a "change of control" or a "transfer of control", ie the transferee being in the same position as the transferor (in having the exclusive power to execute an on-chain transfer that results in the digital asset being located at a different public address), or in other words "stepping into the shoes" of the transferor.[20] This can happen without an on-chain transfer, for example where a USB stick is handed to the transferee where the private key is stored inside the USB and the transferor has no knowledge of the key (a "USB change of control").[21] The final notion of transfer refers to the transfer of legal title.

The second meaning can be confused with the first meaning, since in both cases the holder of the private key is in the same factual position in respect of the digital asset, namely that he is the only person who has the power to execute an on-chain transfer of the digital asset.[22] It can also be lumped with the third meaning, since people make the general assumption that an action that changes the identity of the person who has exclusive control of a digital asset results in a transfer of title to the digital asset.[23]

The first and third meanings are often lumped together, because people assume or expect that a change in the state of the blockchain also corresponds with a change in the location of title.[24] Thus, it is crucial to separate the meanings and examine how the three meanings interrelate.

This article explores the conditions required for the transfer of title (the third meaning of "transfer"). In particular, it discusses whether "change of control" (the second meaning) and "on-chain transfer" (the first meaning) are necessary or sufficient conditions for the transfer of title.

## 3. WAYS OF TRANSFERRING TITLE TO EXISTING ASSETS

As digital assets are property, it would be useful to look at existing types of property and ascertain whether the current methods of transferring rights to these types of property are feasible starting points for the analysis in relation to digital assets.

In relation to choses in action, the right can be transferred through assignment or novation. Assignment and novation are applicable to rights against people,[25] and not to objects of property that are independent of the legal system and other persons.[26] As such, they are inappropriate in the context of digital assets.[27]

In relation to chattels, legal title can be transferred through:

- a deed;

- delivery of the chattel (coupled with the relevant intention); or

- a sale.

The analogy between chattels and digital assets is much closer since both chattels and digital assets are distinct objects independent of the legal system with an identifiable location that can be transferred[28] and completely divested: it is the closest analogy out of all the existing forms of property. Thus, the three methods of transferring title to a chattel will be considered in ascertaining whether they (or their digital equivalent) should be applied to digital assets.

The three methods of transferring title to a chattel (deed, delivery and sale) are part of the wider debate as to whether formalities should be imposed for the transfer of legal title. Equally, consideration of these methods in the digital asset context is part of this same debate, and so the rationale of formality requirements will be explored.

## 3.1 Formality requirements

As McFarlane notes in *The Structure of Property Law*,[29] there are four reasons for imposing a formality requirement: evidence, reduction of fraudulent claims, publicity, and caution. First, a formality requirement provides evidence to the parties as to the existence of the relevant transaction. Second, it reduces the chance of third parties fraudulently asserting that a person with legal title to an asset has transferred a right or granted an interest to them,[30] as the third party in question would need to prove that the formality requirement was satisfied (eg that there was delivery, writing or a deed).[31] With these formality requirements, the third party would not be able to fabricate a claim that (for example) the owner orally agreed to sell the asset to him. Third, formalities such as registration provide publicity to third parties, by providing notice that the transferee has the relevant right or interest, as they can simply search the relevant source (such as the register) to find this out.[32] Fourth, formalities have a cautionary effect on transferors as they are forced to think seriously about the transfer, and this ensures that "oral transfers" conducted on a whim will not have legal effect.

Against these four reasons, there are several reasons against the imposition of a formality requirement. The first is the inconvenience and expense involved in complying with a particular formality requirement: the need to have a deed (or writing), or the need to register, takes time and/or money. Second, imposing a formality requirement may frustrate reasonable expectations or cause unfair surprise. If in a particular context it is (for example) customary or normal market practice to conduct transactions orally, imposing a formality requirement of writing would cause unfair surprise to people in that context

-------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 319*

as they find out that their transactions are void or unenforceable for a lack of writing. Third, there may be vagueness in: (i) the scope of the rule; and/or (ii) what satisfies the formality requirement, making the rule difficult to apply. This also creates the further consequence that judges may (for pragmatic reasons) resort to unnatural interpretations of the requirement to reach reasonable outcomes, which may in turn render the law uncertain, technical and/or complex.[33]

Ultimately, when deciding whether to impose a formality requirement in a particular context, we need to assess the relative weight of the reasons for and the reasons against imposing such a requirement.

## 4. DEED

Title to a chattel can be transferred by way of deed.[34] Although there is no explicit discussion in the case law about

Transferring legal title to a digital asset

the rationale of the deed requirement in the context of transferring title to chattels, there are various benefits to imposing a deed requirement. First, it provides evidence of a transaction between the parties and aids in preventing fraud. For example, if one party wishes to deny that the transaction took place, the other party can use the deed as evidence that the transaction took place and thereby disprove the allegations of the other party. Second, imposing a deed requirement produces a cautionary effect for the transferor, as the act of producing and signing a formal document in front of witness(es)[35] will go towards ensuring that the transferor's intention to enter into the transaction is not a mere product of haste, but instead seriously contemplated with the relevant consequences in mind.

However, there are two obvious disadvantages of the deed method. First, having a document drawn up and signed in the presence of witness(es) just to transfer title to a chattel is an extreme hassle. Second, a deed provides no publicity to third parties, such that they would not be able to reliably infer who has title merely based on who possesses the chattel, since someone may possess a chattel but not have title to it because they used a deed to transfer title.

In the digital asset context, allowing a deed to be sufficient to transfer title would be disastrous. Transferring title by way of deed would mean that title can be transferred off-chain without a change of control. This in turn gives rise to the "double sale" problem, where (in this context) A sells a digital asset to B by way of deed without transferring control of the asset,[36] and then (fraudulently) sells the asset to C through transferring control of the asset to C. In this case, B's title would be extinguished by C's bona fide purchase (provided there is a bona fide purchaser rule that applies in C's situation).[37]

Also, insofar as the deed method in the physical asset context was underpinned by the need to eliminate the need to physically deliver a heavy or bulky object, this concern is not applicable to digital assets because digital assets are "moved around the digital space" by way of an on-chain transfer instead of physical acts that can be laborious.

*Requiring* a deed for title to be transferred is even more disastrous. Apart from the above disadvantages, this causes a massive inconvenience: one cannot transfer title to a digital asset by executing an on-chain transfer. This defeats a core purpose of the blockchain, namely, to act as a facilitative mechanism that provides a way to quickly move assets between exclusively controllable spaces (through an on-chain transfer).

In addition, just as in the physical asset context, a deed provides no publicity. This stands in contrast with an on-chain transfer (which provides positive publicity),[38] or an off-chain change of control, which provides some negative publicity in that a third party will know that the relevant person does not have control of the asset, given that he cannot sign a signature from the address in which the asset is contained.[39]

## 5. DELIVERY V SALE

Having established that using a deed as a method of (or requirement for) transferring title is inappropriate in the digital asset context, it would be apposite to explore the rationales behind the delivery and sale methods of transferring title (in respect of physical assets) and examine whether they apply across to digital assets.

Stripped to its essence, delivery involves the transferee taking possession of a physical asset with the consent of the transferor.[40] The case law on the delivery requirement for physical assets does not discuss the rationale of this requirement in much detail.[41] There have been several rationales for the delivery rule that are incorrect or circular, such as "delivery is part of the definition of a gift"[42] or "it is normal to deliver the good where there is a gift".[43] The first is circular because it does not show why "giving and taking" should be imposed as a requirement for transferring legal title. Similarly, the second also does not explain why delivery should be a *requirement* for transferring title to a physical asset.[44]

Nonetheless, the delivery requirement for physical assets can be rationalised as a manifestation of the basic principle that "possession is evidence of title". Generally, we make the assumption that a person who has possession of a physical asset has title to it, and the delivery rule helps us track this assumption by aligning

Transferring legal title to a digital asset

possession with title insofar as it ensures that without a transfer of possession, there is no transfer of title. As such, the "publicity" and "evidence" functions can be fulfilled.

The disadvantage of a delivery requirement (as with a deed requirement) is the inconvenience and expense involved (in delivering a good to the transferee or drawing up and signing a deed in front of witnesses).

Nonetheless, with the introduction of the *indebitatus assumpsit* and the rise of consensual contracts,[45] the law developed such that title could be transferred (under a sale) by way of agreement.[46] This was later codified in the form of s 17 of the Sale of Goods Act 1979. It provides that property can pass when the parties intend it to pass (ie when they agree), and so there is no need for any act of delivery.

Indeed, this transition was fuelled by the commercial convenience of not having to wait for the goods to be shipped halfway across the world, or having to use a deed, for title to be transferred. Party autonomy and commercial convenience[47] therefore underpin the rule that agreement is sufficient to transfer title to goods under a sale. The balance struck by the rule indicates a preference for convenience over the corresponding increase in the risk of fraud, or the decrease in publicity/reduced

---

*(2023) 5 JIBFL 317 at 320*

signalling effects. The latter concerns are partially mitigated through the introduction of *nemo dat* exceptions that offer protection to a bona fide purchaser in specified circumstances.[48]

## 6. THE BLOCKCHAIN: DELIVERY EQUIVALENT OR SALE EQUIVALENT?

It would now be appropriate to examine whether the equivalent of "delivery" (ie a change of control) should be imposed as a formality requirement for the transfer of title to a digital asset, or whether this formality requirement should be dispensed with such that the equivalent of "sale" as a method of transferring title (ie allowing title to pass by agreement of the parties) should be introduced into the blockchain context.

## 6.1 Delivery equivalent: "change of control" approach

A "change of control" denotes a change in the person who has the exclusive ability to exercise (positive and negative) control over the digital asset.[49] This is analogous to delivery of a physical asset. Delivery requires a taking of possession by the transferee, with the transferor's consent:[50] in other words, this involves a change in the person who has exclusive factual control over the physical asset. This is the same factual requirement as a "change of control" in respect of a digital asset.

In the blockchain context, people generally expect or assume that someone who has control of an asset in a public address also has title to it. As such, to give effect to such an expectation, this would justify a formality rule that helps to keep control and title in the same location. This mirrors the basic rule in the chattels context that "possession is evidence of title".[51] Such a rule is premised on the expectation (or general experience) that if someone has possession of a chattel, he would have title to it.

Imposing a formality requirement of a "change of control" also substantially reduces the risk of fraudulent conduct. First, it significantly reduces the risk of a third party fraudulently asserting that the current owner has sold the asset to them, because the third party would need to prove that he has control of the digital asset, *and* that the current owner does not have control of it.[52] Second, it prevents the person in control from fraudulently *denying* a transfer of title. If the formality requirement did not exist, the person in control could sell the asset to X without executing an on-chain transfer or giving up control of the private key, and then deny that the sale took place. In this case, X cannot point to anything on the blockchain (and cannot establish that the person in control no longer has control of his private key) to prove that the transaction took place.

Transferring legal title to a digital asset

More generally, in terms of publicity, this formality requirement helps to prevent third parties who want to buy or lend against a digital asset from being misled. Requiring a change of control for the transfer of title to a digital asset means that (all else being equal) there will be fewer situations in which control and title are decoupled. Thus, if a purchaser agrees to buy an asset in a particular address and the seller changes control of the asset to the purchaser,[53] there will be a much higher chance that the purchaser will obtain good title to the digital asset.[54] Similarly, if a secured creditor wants to lend against a digital asset in a particular address, there will be a much higher chance that the person who controls that address has title to the asset.

## 6.2 "Sale" equivalent: agreement approach

Against these reasons, it may nonetheless be argued that party autonomy is important, meaning that parties should be free to transfer title to a digital asset without the need for a change of control. This argument can be supported using the context of sale of a physical good, where no formalities are required for the transfer of title. If I can transfer title to gold (or any other commodity) just by agreeing with my counterparty to do so under a sale, why should this not be allowed in the context of (eg) a Bitcoin? Imposing a formality requirement may frustrate the expectations of the transferor.

However, there is a key difference between physical goods and digital assets, such that the equivalent of a "sale" rule (where title can pass as long as the parties agree) should not be introduced in the digital asset context. Specifically, the gain in commercial convenience by allowing title to pass by agreement is extremely significant for physical goods, whereas it is not for digital assets, such that this small advantage does not justify a departure from the formality rule. In the physical goods context, goods need to be shipped from across the world (which could take months), and it would be inconvenient to require delivery of the good for title to pass. The buyer may want to use the good to raise finance in the interim period between agreeing to buy the good and actual delivery, and so preventing title from passing (despite an agreement to buy the good) will prevent the buyer from doing so (leading to an inefficient use of capital). It would also be inconvenient to require a deed for every sale of goods, and doing so would frustrate the reasonable expectations of the parties.

This is a much stronger reason to justify decoupling of title and control than in the blockchain context. In the blockchain context, the equivalent of "delivery" is a change of control, and this involves much less friction and inconvenience than shipping goods across the world. An on-chain change of control just requires one to interact with an existing application that connects to the blockchain[55] which would allow the transfer to happen. In turn, an off-chain change of control can be done by way of a USB change of control,[56] which (if the parties are physically proximate enough) would be extremely convenient, and this is often preferable to an on-chain change of control because gas fees[57] do not need to be paid.[58]

Thus, the disadvantage of "inconvenience/ expense" is relatively minor in the blockchain context, compared to (eg) the delivery of goods halfway across the world, or land registration (where one needs to fill in forms and send documents to the land registry, and there are often significant time delays). As such, not much would be lost in requiring a change of control. Conversely, a lot would be lost if a "change of control" requirement was not necessary, for it would lead to a dramatic increase in the instances of title and control being decoupled, which would undermine the core purpose of the blockchain,[59] as well the evidential, publicity and prevention of fraud functions of the formality requirement.

------------------------------------------------------------------------------------- *(2023) 5 JIBFL 317 at 321*

This "change of control" requirement addresses (or substantially reduces) the risk of fraudulent conduct. First, there is no factual ability to "double sell". This is because the "seller" no longer has control of the digital asset after the first sale. Without such control, he cannot "sell the asset twice" by transferring control of the asset to the "second buyer". Second, fraudulent assertion of a sale becomes much more difficult. If someone wants to claim that a particular digital asset has been sold to him, he needs to establish that he holds the private key to the digital asset

and the "original controller" does not.[60] In contrast, if the "agreement" approach were adopted, owners would be at risk of fraudulent claims that they sold the digital asset to the fraudster (and the evidence for such a claim can be constructed without needing to allege or prove any change of control).[61] Owners would not have the assurance that such claims would fail in the absence of a change of control.

Third, this substantially reduces the incentive for someone to fraudulently *deny* that he has sold an asset to someone else. When a person retains control (after transferring title by way of agreement), it is much easier to fraudulently represent (to the court or third parties) that he still has title to the asset, because of the general assumption that if one has control of a digital asset, he has title to it. Where there is a change of control requirement however, this situation cannot arise because he simply has not transferred title to the asset: there is no *sale* to fraudulently deny.[62]

## 6.2.1 The role of bona fide purchase

Nonetheless, it may be argued that dispensing with the formality requirement[63] is acceptable if title can be "cleared"[64] by way of a bona fide purchaser (BFP) rule. This is because if a subsequent purchaser (C) can obtain clean title as long as he acts in good faith, then he would be in the same position as if the blockchain had been an accurate record of title, even if the "seller" (B) did not have clean title.

However, it is suggested that a BFP rule will not take care of the problem. First, it would not remove the "fraudulent assertion" problem. If transfers of legal title can happen off-chain by way of agreement, owners would still be exposed to fraudulent assertions from strangers (eg that the owner orally agreed to sell the asset to the fraudster for a low price), which the owner would need to defend specifically, instead of being able to relying on the fact that there has been no change of control.

Second, the lack of a "change of control" formality rule means that the "double sale" problem would remain. As mentioned, the "double sale" problem arises in the digital asset context where B sells a digital asset to A without changing control of the asset to A,[65] and then (fraudulently) sells the asset to C through executing an on-chain transfer or a change of control to C.

The root of the "double sale" problem arises from the "agreement" rule, and using a "general" BFP defence would only solve the symptom of the problem (with C obtaining title) but not the root (there being a necessary loser, who in this scenario would be A). It is the decoupling of title from control that is allowed by the agreement rule which creates the problem of having to choose between A and C (ie there being a "necessary loser"). If there is a "change of control" rule, this sets the relevant expectation such that if someone wants to buy a digital asset, he would ask for a change of control or an on-chain transfer, instead of the converse expectation that one can obtain title to a digital asset just by agreement, without a change of control. In such a scenario, someone in B's position would have no control of the digital asset (since it is not in the same address, or he no longer has the private key) and would not be able to conduct a "double sale" fraud[66] (the possibility of such fraud being premised on the assumption that B still has control of the digital asset).

## 7. ON-CHAIN TRANSFER AS FORMALITY REQUIREMENT

Nonetheless, one may object to a "change of control" formality requirement on the basis that it is not stringent enough, and the Law Commission has suggested that an on-chain transfer should be a necessary condition for the transfer of title to a digital asset.[67] This raises the question of whether such a formality requirement is preferable to a "change of control" requirement.

It is suggested that a formality requirement of an on-chain transfer is not necessary, because the relevant risks are adequately addressed by a "change of control" requirement. Imposing a more stringent formality requirement would unnecessarily stifle party autonomy. Party autonomy would be stifled because methods of transferring the private key off-chain, such as a USB change of control, would not be sufficient to transfer title to the relevant digital asset.

Transferring legal title to a digital asset

An on-chain transfer is often expensive (as substantial gas fees may need to be paid), and market participants often rely on off-chain methods of transferring the private key with the expectation that this is sufficient to transfer legal title. The question is whether the restriction on party autonomy as a result of imposing an "on-chain transfer" requirement is necessary.

## 7.1 The "register" justification

The core justification for the "on-chain transfer" requirement is based on the idea that the blockchain is analogous to a register (given that it is a ledger or database), and so there needs to be a high enough degree of "coupling" between the "register entries" and the location of title. Otherwise, the blockchain would no longer be a reliable source for finding out who has title, and would not provide enough publicity, since not all transactions that involve the transfer of legal title would be publicised. Imposing an on-chain transfer requirement would therefore be necessary to protect third parties such as secured creditors.[68]

In other words, there must be a sufficiently high degree of coupling between "the information shown on the register" and title, as opposed to coupling between control and title. However, it is suggested that the notion that the blockchain is a register rests on a false assumption. Ordinarily, a register contains the name of the person with the right, the property to which the right relates, and the right itself. For example, the Land Register contains:

- the name of the person with the right to or interest in the property;

- the property that is the subject of the right or interest; and

- the nature of the right or interest (eg the fee simple) that the person has over the property.

The blockchain does not contain these elements. It is pseudonymous and does not contain the name of the person who owns or controls the property. The information conveyed by the blockchain is which assets are in which (locked) spaces.[69]

This "register" fallacy is attributable in part to the inferences that people make based on the premise that "the blockchain is a public database" or "the blockchain is a public record of transactions". These starting premises lead people to make the inference that "the blockchain is therefore a register". However, this inference is fallacious as it is missing the necessary premise of "the record shows the name of the interest holder, the asset, and the interest".

"Correspondence" or "coupling" between the information shown and legal title[70] is required to the extent that it is necessary to protect third party reliance on the information shown on the register. When a person relies on some information or data from the external world, that data is causing him to form a belief as to a state of affairs, which he subsequently acts on. In the case of the Land Register, people use the register entries to form beliefs about who has legal title, and reasonably expect the entries to be accurate, given that it is a government-run national register. They act on such beliefs by purchasing property or taking an interest in it, and so there is a need to protect such reliance by coupling the records with legal title.[71] Indeed, the Land Register is expressly designed to encourage reliance on the register entries to find out who has legal title.[72]

Indeed, if the location of title were to be decoupled from the register entries, then purchasers and creditors would suffer. A purchaser may not gain good title when he relies on the register entry showing that the vendor is "owner" of the property (especially in the absence of a wide BFP rule), and a creditor would have less collateral[73] to enforce against if the debtor does not own the property (contrary to what is shown on the register). Thus, with the Land Register, there is a need to protect third party reliance through imposing a formality rule that ensures the coupling of title with the register entries.

It is important to note that "reliance" in relation to particular information/data[74] consists of two stages: the "external

Transferring legal title to a digital asset

input" stage and the "verification" stage. First, there is an "external input" (data one observes from the world, such as a register entry) which causes a person to infer or assume that a particular conclusion is true. Second, this reduces (or eliminates) the effort he expends in verifying whether the conclusion is true. Where there is a high degree of (reasonable) reliance in relation to the two stages, this militates in favour of a high degree of "correspondence" between the information shown and legal title.

On the other hand, if the relevant information provided (or quality of the "information signal") is insufficient, a reasonable person might not assume (even provisionally) that a conclusion (in this case that the person shown on the records has legal title) is true, and as such, he would independently verify whether the conclusion is true. In this case, there is no reliance that the law ought to protect through providing a high degree of "correspondence" between the "information signal" and the relevant conclusion, which in this context would be that the person has legal title. This is because the downside of maintaining a high (or complete) degree of correspondence between the records and title through imposing the requisite formality rule is that it stifles party autonomy. Party autonomy should be respected unless there is an overriding reason (primarily in relation to the protection of third parties) that justifies such a formality requirement.

In relation to physical goods, there is a lower degree of "reliance" on a person's possession of an asset in inferring that he has title, as compared to the reliance that people place on the Land Register records in indicating the location of legal title. This is because although we make the general assumption that if one possesses a physical asset he has title to it, we also know that there are many arrangements in respect of goods that involve the person possessing the good not being the owner (such as hire or hire purchase arrangements),[75] ie where title is decoupled from control. Thus, even if the external input (X having control of a physical asset) leads a person to make the general assumption that a conclusion (X having title to the asset) is true, that does not replace his independent verification and judgement as much as in the case of the Land Register. Often, he would make his own inquiries to confirm whether the initial assumption is true,[76] resulting in a lower degree of "reliance".

In the blockchain context, there is an even lower degree of reliance on the "information" shown on the blockchain in inferring the location of title, since third parties would not know who owns or controls which assets: they are just given the virtual location of each asset.[77] Thus, the initial "external input" given by the blockchain does not lead the reasonable person to assume that a particular identified person has title (in contrast with the physical asset context).[78] It merely leads the reasonable person to assume that the person who has control of the assets in the address has title. As such, if he wants to find out who has title to certain digital assets, he would need to independently establish that a person[79] has control of the assets in the relevant address, to engage the general assumption that such person has title to them. To prove control (ie to mirror the "physical possession" threshold for chattels), the person purporting to have control of the digital assets can sign a message/signature using his private key, which proves that he has such control.[80] As such, it would be reasonable to require third parties to first ensure that the person they are transacting with has control.[81] Even at this point however, what is engaged is merely the *general* assumption that the person has title by virtue of his control, and further independent inquiries need to be made to verify whether this assumption is true.[82] These inquiries cannot be satisfied by looking at the blockchain.

Thus, in the blockchain context, there is no "reasonable reliance" that ought to be protected by imposing the degree of coupling demanded by an on-chain transfer requirement. The on-chain transfer requirement rests on the "register" analogy, and such an analogy

--------------------------------------------------------------------------------------------------    *(2023) 5 JIBFL 317 at 323*

rests on the idea of protecting parties who reasonably rely on information provided by the "register".[83] In this regard, the blockchain cannot serve the purpose that the Land Register is designed to serve (encouraging reliance on the information provided to ascertain who has legal title), because it simply does not provide the necessary information.[84]

Transferring legal title to a digital asset

## 7.2 Definitional ambiguities and the "equitable BFP" issue

There are also definitional ambiguities relating to the idea of an "on-chain transfer" or a "transfer operation that effects a state change". Most crucially, there is an ambiguity as to whether the state change needs to be on the blockchain in which the asset is constituted, or whether state changes on other blockchains/protocols can also suffice. For example, if an asset is constituted on a Layer 1 (L1) chain,[85] it is ambiguous as to whether state changes on a Layer 2 (L2) protocol[86] would satisfy the formality requirement.

On one hand, "state change" may refer only to a state change on L1, because the L1 chain is where the digital asset is constituted. On the other hand, one may interpret the requirement as covering transfers on L2, because even though there is no state change on the blockchain in which the asset is constituted, there is nonetheless still a "transfer operation", and this results in a "state change" on the other blockchain/protocol.[87]

This definitional ambiguity affects (for example) Lightning transfers in relation to Bitcoin: does a transfer at the L2 level transfer legal title to the Bitcoin, or is a L1 transfer required? Also, there are different types of L2 mechanisms (eg state channels, rollups, plasma chains, and subdivisions within them). From a technical perspective, these function very differently from each other, and offer differing degrees of publicity.[88] Thus, if "state change" encompasses L2 state changes, there is a further difficulty in relation to whether we treat the different L2 mechanisms in the same way for the purpose of the formality requirement.

On the other hand, if the "on-chain transfer" requirement can only be satisfied by a L1 transfer, this may cause problems in relation to the protection of purchasers at the L2 level. State changes at the L2 level would not result in the transfer of legal title to the L1 asset and would only[89] result in either the creation of an equitable interest in the L1 asset (in the case of the first L2 transaction), or the transfer of such equitable interest in the L1 asset (in the case of subsequent L2 transactions),[90] which may result in purchasers at the L2 level being insufficiently protected.

For example, a bona fide purchaser of an asset at the L2 level would only obtain an equitable interest, and so would not take free of existing equitable interests (as the BFP defence only applies where the purchaser obtains a *legal* interest). Suppose that A (a L2 interest holder of a digital asset) holds his L2 interest on trust for B, and then sells it to C, a bona fide purchaser. C does not take free of A's interest, since he obtains an *equitable* interest (the L2 interest) instead of legal title.

This position may significantly reduce the attractiveness of holding L2 interests, since bona fide purchasers may find themselves bound by a (sub-)trust[91] of which they had no knowledge. This position is anomalous because a bona fide purchaser of a *legal* interest for value without notice takes free of prior equitable interests.

Indeed, McFarlane criticises the scope of the BFP rule. Specifically, the applicability of the rule should not depend on the "historical origin"[92] of the right obtained by the purchaser (common law or equity). Instead, a bona fide purchaser should take free of any equitable interests against the right purchased, regardless of whether the right purchased is legal or equitable. Indeed, it is difficult to justify why a purchaser of legal title to a good should be able to take free of a prior trust, but a purchaser of a trust interest should not be able to take free of a prior sub trust: in both cases the purchaser is acquiring the very right that the seller had, instead of a right that depends on the seller's right.[93] If L2 transfers happen at the "equitable interest" level, there would need to be an amendment to the scope of the BFP rule in order to maintain market confidence in the use of digital assets at the L2 level.

It must also be noted that the blockchain L2 context is different from the intermediated securities context, which also involves people dealing with equitable interests. However, the "equitable BFP" issue, which also exists in theory in the intermediated securities context, does not give rise to problems in practice. This is because there is netting, meaning that it is hard to trace the movement of specific assets, and it is difficult to know who one purchased their securities from.[94] In the digital asset context however, there are many situations where the purchaser can identify the seller of the digital asset purchased, which means the "equitable BFP" point may give rise to problems in practice, compared to in the intermediated securities context where the equitable BFP issue is mainly academic.

Transferring legal title to a digital asset

Using a "change of control" formality requirement also allows us to avoid these problems (the register disanalogy, the definitional ambiguity, and the equitable BFP issue) in relation to the "on-chain transfer" formality requirement.

## 7.3 Protection of secured creditors?

Nonetheless, there is a concern that if title can be transferred off-chain, this would provide insufficient protection for secured creditors as they would not be able to tell when the debtor has transferred title to the asset[95] (thus making the creditor have fewer assets to enforce against) given that there is no positive publicity.[96] This argument would therefore suggest that an "on-chain transfer" requirement is necessary to provide enough publicity. However, it is suggested that in such situations, secured creditors should be protecting themselves. Creditors can bargain for more protection, for example in the form of a transfer of the collateral into a multisig address over which the creditor has negative control, or into an address over which the creditor has exclusive (positive and negative) control.[97] They may also simply adjust the terms of their arrangement to account for the risk of the debtor transferring title to the asset off-chain.[98]

## 8. "SUFFICIENT" CONDITION

Having established that a change of control should be a necessary condition for the transfer of title, the next question to examine is whether this should be a sufficient condition



*(2023) 5 JIBFL 317 at 324*

for the transfer of title. It is argued that a change of control should not be sufficient to transfer title, because it is imperative to protect the autonomy of the transferor by ensuring that his title is only transferred to someone else when he intends such title to be transferred. As such, there must be an extra (mental) requirement that the transferor intended to transfer title to the digital asset, in line with the requirement in respect of physical assets (that the transferor must have intended to transfer title to the asset).[99]

Indeed, there are many situations involving a change of control without the associated mental element where it would be undesirable to have title pass.[100] "Core" cases of these situations include theft, hacks, and forgeries[101] where a defendant executes an on-chain transfer of a digital asset into a public address that he controls, without the owner's knowledge or consent.[102] In such cases, title ought to remain with the owner, and an analogy may be drawn with relative title in the physical asset context, where a new (inferior relative) title arises in favour of the defendant.[103] In other words, the owner keeps his (superior) title and the defendant (thief, etc) obtains a new (inferior, relative) title.[104]

These cases are justified exceptions to the general position that there should be a one-to-one correspondence between control and title, and for obvious reasons. Protection of autonomy is key in a liberal society: it is undesirable to deprive someone of their property right when he or she does not intend to part with it.

Nonetheless, if a transfer of title is *prima facie* intended, are there potentially other factors that may invalidate the transfer? In the general personal property context, legal title is still transferred despite the existence of, eg a general mistaken assumption, duress or undue influence, but it is not transferred in the context of a mistake as to *identity*.[105] One may wonder whether the same approach should be adopted in the digital asset context.

It is suggested that there is no reason to depart from this general position in the digital asset context, since there is nothing different about digital assets insofar as this specific point about autonomy is concerned. The law's decision that certain factors impair the autonomy of a party to an extent that title does not transfer (and other factors do not have such an effect) does not depend on the type of asset, since what is involved is *autonomy*. For example, in a normal mistaken gift case, the "transferor" still makes the transfer volitionally: it is just that he is operating with "incorrect data". If operating on "incorrect data" in the context of a mistaken gift is insufficient to vitiate the transfer of

legal title in the physical asset context (in the absence of a mistake as to identity),[106] it is difficult to see why this should be sufficient to vitiate the transfer of legal title in the digital asset context.

## 9. CONCLUSION

This article has argued that a "change of control" should be a necessary condition for the transfer of title to a digital asset. The risks of fraudulent conduct (in the form of fraudulent assertion, fraudulent denial, and double sales), and the relative ease of transferring control of a digital asset, mean that an "agreement" rule analogous to the sale of goods cannot be applied in the digital asset context. Such risks can be addressed using a "change of control" requirement, and contrary to the Law Commission, the requirement of an on-chain transfer is not necessary. Finally, in order to protect the autonomy of the transferor, a change of control cannot be a sufficient condition for the transfer of title, and there needs to be an intention requirement.

* * * * * *

## Further Reading:

- Digital assets: the mystery of the "link" (2022) 3 JIBFL 161.

- Transfers of equitable interests in the digital asset world (2022) 5 JIBFL 325.

- Lexis+® UK: Private Client: Overviews: Digital assets and cryptoassets — overview.

* * * * * *

---

**End of Document**

# Exhibit 33

# Legal Studies Research Paper Series



UNIVERSITY OF
CAMBRIDGE
Faculty of Law



*PAPER NO. 18/2021*

*MARCH 2021*

# Client-Intermediary Relations in the Crypto-Asset World

*Louise Gullifer, Henry Chong & Hin Liu*

Further information about the University of Cambridge Faculty of Law Legal Studies
Research Paper Series can be found at http://www.law.cam.ac.uk/ssrn/

Electronic copy available at: https://ssrn.com/abstract=3697946

# Client-intermediary relations in the crypto-asset world

Hin Liu, Louise Gullifer, Henry Chong[*]

# 1.Introduction

In a world where financially valuable assets are increasingly being stored in digital form, questions arise as to the legal categorisation of such assets. The question of whether crypto-assets can constitute property has been the subject of some recent litigation[1] and thus legal analysis. If the answer to such question is in the affirmative, as the recent *Cryptopia* case suggests, this raises a plethora of further questions that need to be resolved by the courts before investors, regulators and accountants alike can approach digital assets with a sufficient degree of legal certainty. One such question, on which this paper focuses, concerns the relationship between a crypto-asset intermediary (such as a crypto-asset stock exchange or custodian),[2] and its clients that store crypto-currencies or crypto-securities ('**clients**').[3]

This question is of practical importance because the vast majority of crypto-assets are kept by intermediaries, yet we simply do not know with any reasonable certainty the basis on which these assets are being held. Most agreements between clients and intermediaries are extremely vague, and are silent as to the legal relationship between the parties. Yet, since common law courts will have to determine the legal category into which the agreement falls, they should be guided by a consistent set of principles that allow them to characterise agreements with a degree of certainty and practical justice that is acceptable to commercial parties. This is essential for the determination of clients' entitlements on the intermediary's insolvency, a question of high public policy importance which has arisen frequently in recent litigation.[4] In addition, as crypto-assets are (at least at present) not subject to extensive regulation, intermediaries of such assets will not be constrained by many regulatory requirements in relation to investor protection. The determination of the precise legal relationship between the parties, therefore, becomes of even greater public policy importance. This paper addresses the situation where the applicable law to the question of the proprietary characterisation of the client-intermediary relationship is the common law.[5]

[*] Hin Liu: Lecturer of Private Law and DPhil Law Candidate, University of Oxford; Legal and Business Associate, Fusang Corp.
Louise Gullifer QC (Hon), FBA: Rouse Ball Professor of English Law, University of Cambridge.
Henry Chong: CEO, Fusang Corp.

[1] *B2C2 Ltd v Quoine Pte Ltd* [2019] SGHC(l) 3; *Quoine Pte Ltd v. B2C2 Ltd.* [2020] SGCA(I) 02; *Ruscoe v Cryptopia Ltd* [2020] NZHC 728; *AA v Persons Unknown* [2019] EWHC 3556 (Comm).

[2] This paper will assume that crypto-assets can constitute property, in line with the cases mentioned in n 1.

[3] Crypto-currencies and crypto-securities are examples of crypto-assets. The characteristic features of crypto-assets involve "(a) intangibility, (b) cryptographic authentication, (c) use of a distributed transaction ledger, (d) decentralisation, and (e) rule by consensus": see UK Jurisdiction Taskforce, 'Legal Statement on cryptoassets and smart contracts' (November 2019), [31]. See [24]-[34] for a more detailed discussion of crypto-assets generally.

[4] Such as cases arising from the Mt Gox insolvency: e.g. Reference number 25541521 Case claiming the bitcoin transfer, etc., Tokyo District Court, Heisei 26 (Year of 2014), (Wa)33320, Judgement of Civil Division 28 of 5 August 2015 (Year of Heisei 27); Decision of the Moscow Arbitrazh Court (Case No. A40-124668/17-71-160F, 5 March 2018).

[5] Excluding Canada and the US, which rely heavily on statute. See Part VI of the Ontario Securities Transfer Act 2006 (S.O. 2006, c.8). Also see Article 8 of the Uniform Commercial Code (US), which governs the position in relation to securities: many crypto-assets held at intermediaries will fall within that Article.

1

Electronic copy available at: https://ssrn.com/abstract=3697946

This paper argues that the most likely (default) relationship between a crypto-asset intermediary and a client is one of trustee and beneficiary, although there are also other possible legal characterisations, namely outright title transfer, 'quasi-bailment', and mere obligations sounding in contract. Ultimately, in a particular case, the legal characterisation of the relationship, as well as the precise obligations undertaken by the intermediary, will depend on the client-intermediary agreement itself. The crucial question is one of boundaries: what are the outer limits of each legal category? *When* does it remain possible to say that an agreement creates legal effect X (e.g. trust), even if the precise terms agreed appear to deviate dramatically from the paradigm case of X (e.g. where a trustee has a very extensive right of use over the crypto-assets in question)?

There are, essentially, four questions that need to be asked:

Q1: Does the intermediary have *legal* title to the asset?
Yes: Q2
No: Q3

Q2: Do the Three Certainties exist?
Yes: [Trust]
No: [Outright Title Transfer]

Q3: Is there a transfer of quasi-possession[6] of the token with the consent of the transferee?
Yes: [Quasi-Bailment]
No: [Contractual Obligation Only]

Q4: What are the terms of the contract?
[Look at the terms of the contract; whether it gives rise to a fiduciary relationship; what duties are excluded/modified (e.g. duty of care)]

# 2. Crypto-asset custody: the possible legal relationships

A custodian is a (natural or legal) person who holds property for or on behalf of a client. *Black's Law Dictionary* defines 'custodian of property', as a person "responsible for managing real or personal property".[7] Thus, on the basis that crypto-assets can constitute

---

[6] 'Quasi-possession' in the context of crypto-assets (or intangibles in general) denote a degree of control which would amount to possession of a physical asset. The degree of control required to constitute possession of a physical asset is exclusive physical control (see, e.g. *Powell v McFarlane* (1977) 38 P&CR 452 (Ch) 471; Luke David Rostill, 'Fundamentals of Property Law: Possession, Title and Relativity' (DPhil Thesis, University of Oxford 2016) 28). This would require the presence of both positive and negative control in respect of the asset. Positive control denotes the ability to use, dispose of and transfer the asset, whereas negative control involves the ability to prevent others from using the asset. As such, quasi-possession denotes the presence of both positive and negative control in respect of a crypto-asset. See also section 2C, especially the discussion on Green and Snagg.

[7] *Cryptopia* (n 1), [173], citing Bryan A Garner, *Black's Law Dictionary* (10th ed, Thomson Reuters 2014).

2

Electronic copy available at: https://ssrn.com/abstract=3697946

property, a custodian of crypto-assets is a person holding such assets for or on behalf of clients.

Generally, the duties of a custodian of property include "securing, safeguarding and maintaining the property in the condition received and accounting for any changes in it".[8] Ultimately, the precise duties owed in each individual client-custodian arrangement will depend on the terms of the contract. Such duties are determined in large part, and at least initially, by the legal categorisation of the arrangement (title transfer, trust, etc). It is to this issue we now turn.

### A. Outright Title Transfer

The first possible legal relationship between client and intermediary is that of outright title transfer, i.e. where legal title is vested absolutely in the intermediary. This is to be discerned from the intention of the parties to the client-intermediary agreement. If, upon construing the terms of the agreement, it is intended that full legal and beneficial title be transferred to the intermediary, then title to the asset will vest in the intermediary as long as the relevant formalities for transfer (if any) are complied with.[9] This arrangement is found in a banker-customer relationship: it was held in *Foley v Hill*[10] that a customer who deposits money in a bank account transfers outright title to his money. The bank is only under a personal (contractual) obligation to pay an equivalent sum, and otherwise has unencumbered title to the money. Crypto-assets held in accounts by exchanges could also be held to give rise to an outright title transfer.[11]

The effect of an outright title transfer is that the intermediary can freely dispose of the assets held in its custody: it is the absolute owner, and is not under a duty to use the asset for the benefit of the client. This has consequences in terms of insolvency and tax treatment. If the intermediary becomes insolvent, the client would not have any entitlement to the asset. In relation to tax, it is the intermediary who will be subject to the applicable tax regime, meaning that (for example) capital gains tax would not be levied upon the client, but rather the intermediary. In addition, it would be expected that the asset will show up on the intermediary's balance sheet: the fact that the asset shows up on the intermediary's balance sheet is a strong indicia of intent to transfer title. Nonetheless, there will be contractual obligations owed by the intermediary as a result of the client-intermediary agreement.

### B. Trust

Rather than holding the asset absolutely, the intermediary could hold the asset on trust for the client. For this to be the case, the 'three certainties' for creating a trust need to be satisfied (certainty of intention, subject-matter and object). In this context, the crucial task is to determine whether the requisite intention to create a trust can be ascertained from the

---

[8] *Ibid*.
[9] For example, in the case where a debt is assigned, notice to the debtor (issuer) is required for the (statutory) assignment to be perfected (Law of Property Act 1925, s.136(1)).
[10] (1847) 2 HLC 28.
[11] Janis Sarra and Louise Gullifer, 'Crypto-claimants and bitcoin bankruptcy: Challenges for recognition and realization' (2019) 28(2) IIR 233, 259.

3

Electronic copy available at: https://ssrn.com/abstract=3697946

agreement.[12] What must be intended is that the intermediary will not have free use of the asset.[13]

The trust also has to be constituted, i.e. the trustee must have legal title: this would be satisfied automatically if the asset is obtained by the intermediary (trustee) itself. If not, there must be a transfer of title from a relevant third party, or from the client.

If the crypto-assets are being held on trust for the client, they would not be held on the intermediary's balance sheet. In *Cryptopia*, the fact that the intermediary "did not assert any ownership in the cryptocurrency" in its "internal financial accounts" was a factor in favour of a trust being created.[14] In the case of the intermediary's insolvency, its creditors would not be able to access the assets being held on trust, and the client would be able to obtain the assets. This provides a very strong form of protection to the client, in contrast with the position under outright title transfer, where the trustee's creditors have full recourse to the assets being transferred and the client has no entitlement to the asset.

A trust relationship imposes a default set of obligations on the trustee. The trustee is obliged to use the asset for the best interests of the beneficiary, which means that it cannot put itself into a position of conflict of interest, or use the asset to make a personal profit.[15] If the trust is a 'bare' trust, as was the case in *Cryptopia*,[16] the trustee is obliged to act upon the beneficiary's instructions.[17] The trustee is also subject to a duty of care, whereby it needs to take the "precautions which an ordinary man of business would take in managing similar affairs of his own".[18]

## C.  (Quasi-)Bailment

A bailment relationship arises where there is a voluntary transfer of possession, with the consent of the transferee. In this context, possession of the crypto-asset is required to be transferred to the intermediary, and the intermediary needs to consent to (a) the presence of goods in its possession, and (b) its legal status as a bailor. This means that one cannot create a bailment relationship merely by sending bitcoins to a particular wallet held at an intermediary, if the intermediary does not consent.

If a bailment relationship is created, the bailor is under a duty to take reasonable care of the goods. The negligence standard of care applies, and may be varied according to whether the

---

[12] Certainty of subject-matter and object are relatively uncontroversial in the current context. The certainty of subject-matter requirement is satisfied irrespective of whether the assets are held in a segregated or omnibus account: (see *Cryptopia* (n 1); *Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch); *Hunter v Moss* [1993] EWCA Civ 11; *Re Harvard Securities* [1997] EWHC 371; *White v Shortall* [2006] NSWSC 1379). Most relevantly, it been decided that crypto-assets in a mixed/omnibus account can be held on trust for multiple beneficiaries (*Cryptopia* (n 1)), [141]-[147]), and that a trust can exist even if "the content of [the asset] pool…is constantly changing" ([157]). In turn, the certainty of object requirement is clearly satisfied as the assets are held on trust for the clients/accountholders; neither evidential uncertainty in identifying the individuals who hold each account, nor the fact that the "identity of the beneficiaries is constantly changing", defeats the trust (*Cryptopia* (n 1), [148]-[150] and [157]).

[13] See, e.g. *Lambe v Eames* (1871) 6 Ch App 597.

[14] *Cryptopia* (n 1), [165].

[15] *Bristol and West Building Society v Mothew* [1998] Ch 1.

[16] *Cryptopia* (n 1), [183] and [196].

[17] *Ibid*, [196].

[18] *Speight v Gaunt* (1883) 9 App Cas 1, 19. This general law duty may, however, be displaced by the statutory duty of care: see Trustee Act 2000, s.1.

4

Electronic copy available at: https://ssrn.com/abstract=3697946

bailee is acting gratuitously or for reward.[19] Where the bailment arises by contract, the terms of the contract govern the bailment relationship, and so there is an obligation not to deviate from the *terms* of the bailment.

However, there is a fundamental difficulty with creating a bailment relationship between a client and an intermediary of crypto-assets: under the current law, it is impossible to create a bailment of an intangible asset (including crypto-assets). The rationale is that since (according to the conventional view) it is impossible to have possession of intangible assets in common law jurisdictions, and since possession is required for a bailment, it is impossible to have a bailment of intangible assets.

Nonetheless, if (as argued by Green and Snagg) a crypto-asset can be 'possessed' on the footing that it is a 'concrete' object,[20] the consequence is that a bailment can arise over crypto-assets held by an intermediary on behalf of a client. More specifically, Green and Snagg argue that anything that does not "depend on the existence of, or relationship between, individuals for its existence"[21] can meaningfully be possessed, if the characteristics of excludability and exhaustibility are satisfied.[22] Therefore, as a crypto-asset is not destroyed upon the death of particular individuals,[23] it can be the subject of possession. This analysis, nonetheless, remains controversial,[24] and many jurisdictions adhere to the view that bailments are impossible in relation to intangible assets.[25] Thus in this context, the term 'quasi-bailment' will be used, to reflect the fact that the principles relating to possession are applied *by analogy* with physical, tangible assets. Similarly, the term 'quasi-possession' will be used to denote a degree of control over a crypto-asset which would amount to possession of a physical asset, since intangibles such as crypto-assets cannot be possessed in the strict sense under the current law. This will probably require the presence of both positive and negative control in respect of the asset. Positive control denotes the ability to use, dispose of and transfer the asset, whereas negative control involves the ability to prevent others from using the asset. Nonetheless, this paper does not take a view on Green and Snagg's analysis: the use of 'quasi-possession' terminology merely reflects the current law position that 'possession' does not apply to intangibles.

Another potential obstacle to the creation of a (quasi-)bailment over crypto-assets arises from the argument that crypto-assets cannot be transferred, insofar as the movement of value through the blockchain happens through the creation and destruction of informational entities,[26] instead of the movement of the same asset from place to place or from person to

---

[19] Michael Bridge, Louise Gullifer, Kelvin Low and Gerard McMeel (eds), *The Law of Personal Property* (2nd ed, Sweet & Maxwell 2017)), 11-024 to 11-035.

[20] Sarah Green and Ferdisha Snagg, 'Intermediated Securities and Distributed Ledger Technology' in Louise Gullifer and Jennifer Payne (eds), Intermediation and Beyond  (Hart Publishing 2019).

[21] *Ibid*, 346.

[22] Also see *Cryptopia* (n 1), [91]-]98] and [109]-[113].

[23] Crypto-assets are also transferable (from address to address) and excludable (through the use of a private key).

[24] For example, Kelvin Low argues that the concept of possession should be confined to tangible objects: see Kelvin FK Low, 'The perils of misusing property concepts in contractual analysis' (2014) 130 LQR 547, 549-551.

[25] E.g. Hong Kong, Singapore, Australia, Canada.

[26] Jason Grant Allen, 'Negotiability in digital environments' (2019) 7 JIBFL 459, 460-461, citing David Fox, 'Cryptocurrencies in the Common Law of Property' in David Fox and Sarah Green (eds), Cryptocurrencies in Public and Private Law  (Oxford University Press 2019), paras 6.19 and 6.53.

Electronic copy available at: https://ssrn.com/abstract=3697946

person. In this sense, it may be that crypto assets are 'transmitted' instead of 'transferred'.[27] One of the constitutive elements of a bailment is that the bailor has title to the asset in the bailee's possession.[28] If there is transmission instead of transfer, the asset in the possession of the 'bailee' is not an asset to which the 'bailor' has title, because when the asset leaves the 'bailor' it is destroyed and a *new* asset is created in the hands of the 'bailee'. The 'bailor' has no title to the newly created asset; on this logic there would be no bailment relationship and (for example) no duty of care.[29]

Nonetheless, the arguments as to 'transmission versus transfer' appear to be finely balanced. Against the 'transmission' view explained above, it could be argued that such a view erroneously equates the informational entities (that are destroyed and created) with the assets themselves. Instead, one can conceptualise the informational entities as part of a *process* by which the underlying crypto-asset (such as a bitcoin) is being transferred from address to address. Irrespective of how each blockchain organises its informational entities throughout the process of 'transfer', the end result is that an asset is transferred from person to person.[30] Alternatively, it can be argued that since the focus of bailment (whether 'real' or quasi-bailment) is the imposition of a particular set of duties on the bailee (most notably the duty of care), this can happen irrespective of whether the thing held is exactly the same thing as that 'transferred'. Thus, even if the 'transmission' objection fails to be rebutted, this would not pose an obstacle to the creation of a quasi-bailment. [31]

If the assets held in the relevant account with the intermediary are mixed with the assets of other clients, does this stop a quasi-bailment from arising? There is no direct authority on this, but an analogy can be drawn with cases involving physical assets. All depends on intention, and in the physical assets context, the co-ownership analysis is applicable if so intended. If the terms of the agreement (or statute/court) provide that the clients and the custodian agree that the former should be tenants in common of the total assets deposited, there would be a bailment (*Mercer v Craven Storage*).[32] In this context, there is no reason to

---

[27] UK Jurisdiction Taskforce (n 3), [62].

[28] Jamie Glister and James Lee (eds), *Hanbury and Martin, Modern Equity* (21st ed, Sweet & Maxwell 2018), 2-002: bailment is "where a chattel owned by X is, with X's permission, in the possession of Y".

[29] The 'transmission' issue doesn't pose a problem in outright title transfer or trust (and by extension, mere contractual obligation). With a trust, instead of a transfer of the same property to the intermediary to hold on trust, there can be a destruction of property in the client and the creation of new property in the intermediary that is declared on trust. Also, where the trust is created by declaration, this does not require the transfer of property (trust can be declared). With an outright title transfer, the client parts with the asset, and the intermediary obtains a new asset. As a starting point, the intermediary can do anything with the new asset: there is no difference in duties, as the intermediary has full legal and beneficial title to the asset (albeit a different one). Finally, with a mere contractual obligation, there is simply no need to deal with transmission because no property will have been transmitted in the first place.

[30] See, e.g. Joanna Perkins and Jennifer Enwezor, 'The legal aspect of virtual currencies' (2016) 10 JIBFL 569, 570, where bitcoins were described as 'virtual choses in possession'. This would seem to be the case irrespective of whether the 'UTXO model' or the 'account model' is used, since in both cases we can identify where the asset is by reference to the blockchain record (even if we may need to trace the process of 'creation and destruction of informational entities' to locate where the asset is).

[31] There is good reason for imposing a duty of care where (1) as a result of A's actions, an asset owned by A is destroyed, and a new asset is in B's quasi-possession, and (2) B agrees to hold the asset on behalf of A. There is no need to insist on the same requirement of 'transfer' of the same asset from A to B, since 'transmission' is the crypto-equivalent of 'transfer', and so a 'transmission' from A to B (combined with consent by B to hold on behalf of A) may be considered sufficient for a quasi-bailment to arise.

[32] [1994] CLC 328.

Electronic copy available at: https://ssrn.com/abstract=3697946

distinguish physical and crypto-assets, and so the same co-ownership analysis should also apply in the quasi-bailment context.

However, if the client's asset is mingled with other clients' assets, and the custodian merely promises to redeliver an equivalent quantity to the client, there is probably no bailment, because such arrangement is usually considered a relinquishment of property/ownership once transferred to the custodian.[33] Again, this analysis should also prevent a quasi-bailment from arising. Where this is the case, there is an outright title transfer to the intermediary, against whom the client only has personal rights. This would yield disastrous consequences for the client if the intermediary becomes insolvent.

### D.  Mere Contractual Obligation

Where there is no outright title transfer, trust, or quasi-bailment, the legal relationship between the client and intermediary will only sound in contract. The obligations between client and intermediary will then be contractual (assuming that the requirements for contract formation are satisfied).

There would also be terms implied by default into the client-intermediary agreement. This is the case where the intermediary is performing a service (i.e. in the vast majority of cases), in which case there is an implied term to carry out the service with reasonable care and skill.[34] Alternatively, if the intermediary is supplying 'digital content', there will be an implied term of reasonable care and skill not to damage the client's digital content as long as the latter is a consumer.[35]

# 3. Contractual Exclusion/Modification of the Default Position

The above analysis provides a default starting point as to the obligations incumbent on the intermediary in relation to the crypto-asset(s). The corollary question arises as to whether, and to what extent, the default obligations described in the previous section can be varied by the parties' agreement (initially or subsequently).

### A.  Mere contractual obligation

Where the relationship between the client and intermediary is one where there is a 'mere contractual obligation', the obligations between the parties are by definition governed by their contractual agreement. Thus, they can be varied, modified or excluded by the parties subject to the relevant statutory controls: for example, the parties are free to include exemption and limitation clauses subject to the limits of the Unfair Contract Terms Act 1977 and the Consumer Rights Act 2015.[36]

---

[33] Andrew Burrows (ed), *English Private Law* (3rd ed, OUP 2013), 16.18.
[34] Supply of Goods and Services Act 1982, s.13.
[35] Consumer Rights Act 2015, s.46(1).
[36] These are UK statutes, but there are similar statutes in other common law jurisdictions. See, e.g. Unfair Contract Terms Act (Cap 396, Laws of Singapore); Control of Exemption Clauses Ordinance (Cap 71, Laws of Hong Kong).

7

Electronic copy available at: https://ssrn.com/abstract=3697946

Nonetheless, if a 'mere contractual obligation' is intended, the parties need to be careful not to unintentionally create a quasi-bailment, as would happen, for example, if the intermediary gains quasi-possession of the asset and agrees to hold it for the client.

When, then, does a mere contractual obligation become a quasi-bailment? Bailment seems to require a transfer of *exclusive* possession (*Yearworth*),[37] and this could pose a problem in the crypto-asset context. A quasi-bailment would be created where the intermediary is the only entity with access to the client's private key.[38] For example, a technology platform such as Ledger or BitGo could have exclusive access to the private keys of clients holding crypto-assets, in which case there would be a quasi-bailment. However, what if multiple people know the private key from the outset? For example, what if both the intermediary and the client have access to the private key? In this case, it is unlikely that a quasi-bailment exists, because there is no quasi-possession: control of the crypto-assets is shared between the intermediary and the client (instead of exclusively residing with the intermediary).

It may be argued that the current authorities on bailment are so far removed from the digital context that the conclusion may well be different in the case of crypto-assets. Nonetheless, there is no reason to suspect why the conclusion should be any different in this particular regard merely because the asset is digital. There can be physical assets stored in safety deposit boxes which have multiple keys held by different people[39] in which case there is shared possession and no bailment:[40] this conclusion should not differ where the crypto-asset equivalent is involved.

### a) *The 'mere provider of technology' argument*

Some intermediaries may claim that they are mere 'providers of technology' (instead of custodians) and are thus under no legal duties in relation to the asset.[41] However, where a 'technology provider' offers its services to the client, there is a contract (e.g. a licensing agreement, or a sale relationship, depending on how the software is provided). Therefore, there will be obligations under the contract. The crucial point to note is that such a contract does not relate to the property rights of the client, because the technology provider, at least as a starting point, does not obtain any property rights to the underlying assets. There would be a 'mere contractual obligation' on the part of the technology provider (as opposed to a bailment) if it does not have quasi-possession of the assets.

---

[37] *Yearworth v North Bristol NHS Trust* [2010] QB 1, [48(d)]. Also see *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 QB 171, 189; *Midland Silicones Ltd. v Scruttons Ltd* [1961] 1 Q.B. 106, 119.

[38] *Ashby v Tolhurst* [1937] 2 KB 242.

[39] 'Different people' in the sense that apart from the bailee (as a single legal person), other people may also have the key. If the bailee is a company, several individuals employed by the company can have access to the keys, but there is still exclusive possession since the employees' possession is the company's possession. If there are people outside the company who have access to the keys, then there would not be exclusive possession as the keys are held by 'different people'.

[40] There would still be a bailment, however, where the putative 'bailee' has exclusive possession at the time when it agrees to hold the asset for the transferor (thus creating the bailment), and other people *subsequently* know the key (but do not agree to hold the asset for the transferor).

[41] There are 'two-party' and 'three-party' cases. The 'two-party' case is where there are only two parties involved (the client and the technology provider). The 'three-party' case involves the technology provider, the intermediary/custodian, and the client. The difference is that with the 'three-party case', the technology provider is *different* from the intermediary/custodian. The 'three-party' case arises where the technology provider only provides the software or technological framework (e.g. Amazon Web Services) and a separate intermediary uses the software.

8

Electronic copy available at: https://ssrn.com/abstract=3697946

Scenarios where the technology provider does not have quasi-possession are common, such as in cases where a software provider (such as AWS)[42] has the private keys stored on its database but cannot access the private keys, and thus cannot access the assets themselves. In such a case, there is no positive control and thus no quasi-possession. Nonetheless, there may be negative control, as it is possible for the software provider to deny access to the private keys, whether accidentally or deliberately. An accidental denial of access would occur in cases involving a 'desktop wallet' where the private key sits with a laptop computer. If there is a bug in the software, this could lead to the private keys being lost (most notably if the bug destroys all stored data) without this being deliberately intended. A deliberate denial of access would occur in a case where the software developer deletes the relevant application. Where a mobile application allows one to type in and store private keys on a database, the developer of the application could still decide to delete it entirely. If this happens, all data contained on it (including the private keys) would be erased.

In such scenarios, the technology provider is likely to deny the existence of any legal relationship with the client, and if no legal relationship exists (i.e. no legal duties are imposed on the technology provider), there may not be any available redress to the clients. This is because the destruction of the private keys in practice means that the clients would not be able to access their crypto-assets at all: in the absence of a legal remedy, this would remain the case. Here, where the technology provider has neither quasi-possession nor title to the crypto-asset (as would be the case in the absence of a trust or title transfer arrangement), any duties would have to arise in tort or contract.

As mentioned, the default position is governed by the relevant license agreement, which is likely to have a term (express or implied) not to deliberately and/or negligently destroy the asset.[43]

This default position can be excluded or modified by agreement, as long as the statutory controls under the UCTA and CRA are not violated. It is therefore possible for negligence liability to be exempted.[44] This would mean that where there is an 'accidental denial of access' caused by a system bug, leading to a loss of the client's private key (temporarily or permanently), there would be no contractual or tortious claim. In such circumstances, it may be thought unfair for the client to be left with no remedy, especially in relation to this new area of technology where there is likely to be a significant informational disparity between the parties, and where the client lacks the ability to monitor the intermediary's conduct. Thus, it may be that crypto-asset services should be subject to a bespoke regulatory regime in order for clients to have adequate avenues of legal redress and be sufficiently protected.

## B. Outright title transfer

For an outright title transfer, the default position is that there is nothing to 'exclude': the asset is at the free disposal of the intermediary, because it has absolute title. As such, anything agreed to in the contract will only serve to *increase* the obligations incumbent on the intermediary. The parties are free to choose what obligations are to be imposed, but this is again subject to the relevant statutory controls, for example, when it comes to determining

---

[42] Amazon Web Services
[43] See nn 34-35.
[44] *Ibid*.

9

Electronic copy available at: https://ssrn.com/abstract=3697946

what liabilities can be excluded or modified. The parties also need to be careful not to unintentionally create a trust, as would happen if the parties intend the intermediary not to have free use of the asset.

## C. Trust

The default obligations of the trustee are the duties of no-conflict and no-profit, the duty of care, and the specific obligations in the trust instrument.[45] The extent to which these duties can and should be excluded by a trustee is a subject of heated debate,[46] and in the crypto-asset context these debates are no less relevant. Crucially, if too many duties are being excluded (and/or too many rights are given to the trustee), the arrangement may not end up being a trust at all: instead, there would be a title transfer or (quasi-)bailment.

In the commercial context, the courts have been flexible in allowing commercial parties to exclude duties or confer rights on the trustee that *prima facie* appear inconsistent with a trust, yet hold that a trust exists.

In relation to duties, an instructive example is *Citibank v MBIA*.[47] Here, a trust was upheld despite considerable exclusions of duties: e.g. the trustee was bound by the instructions of a third party (MBIA), and when so instructed the trustee "need not have regard to the interests of the [beneficiary n]oteholders"[48] when acting. Despite the fact that such exclusions cut through the "irreducible core" duties of trusteeship,[49] such as the duty to act in good faith for the benefit of the beneficiaries,[50] the court held that the commercial arrangement was consistent with a trust. Similarly, in the commercial securities context (including where crypto-assets are involved), one may expect the court to adopt this expansive approach favouring party autonomy, and hold that substantial exclusions of duties in relation to the custodian do not negate the existence of a trust.

In relation to rights, the most pertinent issue concerns the trustee's right of use. This issue arises when determining whether an arrangement transferring legal title to the intermediary gives rise to a trust or an outright title transfer. It would appear that conferring a right on the trustee to use the 'trust' asset for its own benefit would negate the existence of a trust, since the essence of a trust is that the trustee manages property for the benefit of the beneficiary. In general, the certainty of intention requirement for creating an express trust looks to filter out arrangements where the trustee is intended to have *free use* of the asset, and so if the trustee effectively has free use of the asset (through conferring a right of use), there would seem to be no trust.[51]

Indeed, *Cryptopia* seems to distinguish between situations where the custodian engages in trading and cases where it just holds on to the asset.[52] Where the custodian is allowed to use

---

[45] *Bristol and West Building Society v Mothew* [1998] EWCA Civ 533; *Youyang Pty Ltd v Minter Ellison Morris Fletcher* (2003) 212 CLR 484.

[46] See e.g. Joshua Getzler, 'Ascribing and Limiting Fiduciary Obligations: Understanding the Operation of Consent' in Andrew S Gold and Paul B Miller, (eds), *Philosophical Foundations of Fiduciary Law* (OUP 2014).

[47] *Citibank NA v MBIA Assurance SA* [2007] EWCA Civ 11.

[48] Alexander Trukhtanov, 'The Irreducible Core of Trust Obligations' (2007) 123 LQR 342, 342; *Citibank* (n 47), [54].

[49] Trukhtanov (n 48), 343.

[50] *Ibid*, 345.

[51] This is subject to the discussion of *Pearson v Lehman* (n 12) which follows shortly.

[52] See e.g. [165]-[166].

10

Electronic copy available at: https://ssrn.com/abstract=3697946

the assets for its *own* commercial purposes (e.g. as a liquidity provider or lender),[53] this militates in favour of the arrangement being a title transfer (and vice versa where the custodian merely 'holds on' to the asset for the client).

Nonetheless, in *Pearson v Lehman*,[54] Briggs J held that a right of use *per se* does not negate the existence of a trust. More broadly, there are "no hard and fast rules whereby the consensual disapplication of some basic trustee duty precludes the recognition of a trustee-beneficiary relationship between the parties".[55]  Briggs J refers to his own judgment in *LBIE v RAB Market Cycles*,[56] where a right of use in a prime brokerage agreement was held to be "not…inevitably fatal" to the recognition of a trustee-beneficiary relationship, since "other aspects of the relationship pointed more powerfully in favour of a trust".[57] The question arises as to when exactly the conferral of a right of use becomes inconsistent with the existence of a trust, resulting instead in an outright title transfer being created.

In the *RAB* case, Briggs J held that a 'right to swap' was consistent with a trust. Briggs J uses the term 'right to swap' as denoting a right on the part of the trustee to sell or dispose of the relevant property, as long as an 'equivalent' substitute asset or right comes back in exchange.[58] This arrangement is consistent with a trust in that the asset or right[59] obtained in return for the original asset is held on trust for the beneficiary.[60] In essence, this means a trust can exist over a shifting class of assets. Typically, in the securities lending context, the substitute asset is the intermediary's right against its disposition counterparty (for money and/or for securities), and this will be held on trust for the client.

However, in *Pearson v Lehman*, it was held that one of the arrangements between the Lehman entities (specifically that in relation to the 'pre-RASCALS' period) could not give rise to a trust.[61] This is because the 'trustee' (LBIE) had a right to dispose of the assets without a correlative obligation to hold any substitute assets on trust. For example, LBIE was permitted to use the assets to "make good short positions both for other affiliates and for LBIE itself".[62] As there is no substitute asset coming back in exchange that can form the subject-matter of a trust, the intermediary's obligations (such as the obligation to get assets in at a future time) would only be personal: they do not relate to any specific asset. More generally, Briggs J found that "LBIE's consensual use of securities held in its house depot account appears to have been subject to no significant restrictions of any kind".[63] It was held that LBIE's permitted conduct "much more closely resemble[d] that of a banker in relation to its customer's deposits"[64] as opposed to a trustee holding property for the benefit of its

---

[53] *Ibid*, [165].

[54] *Pearson* (n 12).

[55] *Ibid*, [260].

[56] [2009] EWHC 2545 (Ch).

[57] *Pearson* (n 12) [258]; see also *RAB* (n 56), [60]-[64].

[58] *RAB* (n 56)*, [61]-[62]; *Pearson* (n 12) [293].

[59] The right may be a personal right against the counterparty to have equivalent securities transferred back at a later date, and/or assets obtained in exchange as collateral.

[60] As distinguished from the situation where there is *nothing* coming back into the trust after the initial asset is disposed of (in which case there is no trust: see subsequent paragraphs). For the avoidance of doubt, the terminology of 'swap' used here does not denote 'swap derivative'.

[61] *Pearson* (n 12), [265]-[294].

[62] *Ibid*, [275]. If a trader makes good a short position, this 'closes out' the transaction, meaning that there is no further obligation on the counterparty.

[63] *Ibid*, [293].

[64] *Ibid*, [275].

11

beneficiary. Indeed, *Foley v Hill*[65] stands for the proposition that title to money deposited at a bank is transferred from the customer to the bank outright, meaning that the bank can (e.g.) sell or lend the money without incurring any obligation in relation to the property sold or lent, or its substitutes. The bank merely has an obligation in debt: there is no trust.

Thus, the line between outright title transfer and trust would seem to be determined based on whether the 'trustee's' right of use comes with a correlative obligation to hold substitute property on trust.[66] If it does, the right becomes a 'right to swap'. If it does not, the right would make the position of the 'trustee' so similar to that of a banker in relation to his customer, meaning that the law would characterise the transaction as an outright title transfer.

This boundary makes logical and conceptual sense. A trust involves specific rights being held for the benefit of another.[67] Where there is a 'right to swap', there is a substitute asset (right) that is being held on trust for the beneficiary, despite the sale or disposition of the original property. A trust can exist because a right is being held for the benefit of another at all times. However, where there is no 'right to swap', all that exists is a personal obligation where the 'trustee' promises to pay the economic equivalent of the client's underlying entitlement.[68] A personal *obligation*, which is not a *right*, cannot be held on trust: thus, the absence of a right to swap is fatal to the existence of a trust, and this is explicable in conceptual terms.

## D. Quasi-bailment

Finally, in relation to quasi-bailment, we have said that if there is a quasi-bailment between the intermediary and the client, this imports a duty of care in tort (as well as duties in contract under the client-intermediary agreement). Subject to the relevant statutory controls,[69] the duty to take reasonable care can be excluded or modified by contract, by the inclusion of either a duty-defining clause (which excludes the duty in the first place),[70] or an exemption clause (which relieves the quasi-bailee from the consequences of breaching the duty).[71] Other duties can be added or excluded by the parties if so agreed, but such duties are again subject to the applicable statutory controls.[72]

The touchstone that distinguishes quasi-bailment on the one hand, and trust and outright title transfer on the other hand, is the location of legal title. In a trust or outright title transfer, the

---

[65] *Foley* (n 10).
[66] Thus, even a right conferred on the intermediary to keep profits from the use of the asset is consistent with a trust, as long as there is an asset (right) that the intermediary holds for the client. See, for example, *RAB* (n 56).
[67] See, e.g. Ben McFarlane, 'Equity, Obligations and Third Parties' (2008) 2 Sing JLS 308, 318: "[T]he key feature of an equitable property right is that: (i) A is under a duty to B; and (ii) A's duty relates to a specific *right* held by A."
[68] This is similar to a banker-customer relationship, which only imposes a personal obligation on the banker.
[69] Most notably the Unfair Contract Terms Act 1977 ('UCTA') and the Consumer Rights Act 2015 ('CRA').
[70] On the distinction between duty-defining and exemption clauses, see Edwin Peel, *Treitel on the Law of Contract* (15th ed, Sweet & Maxwell 2020), 7-014.
[71] See *Morris v CW Martin & Sons Ltd* [1966] 1 QB 716, (especially 728-730) for a discussion of how a bailee's duty of care can be modified through the inclusion of an exemption clause.
[72] See *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61, [8]: "Bailment…is commonly contractual and the terms of the contract will commonly modify its incidents". See also *Morris v Martin* (n 71), 731-732: "most cases of bailment today are accompanied by a contractual relationship between bailee and bailor which may modify or extend the common law duties of the parties that would arise from the mere fact of bailment.". The fact that the parties can modify the incidents of bailment (most notably the duty of care) by contract suggests that the *limit* to which they can do so is also governed by the rules of contract (i.e. statutory and public policy controls).

12

Electronic copy available at: https://ssrn.com/abstract=3697946

intermediary by definition has legal title to the asset, whilst in a quasi-bailment, the bailee only has quasi-possession, not title: title remains with the client. As such, in ascertaining whether the client-intermediary agreement gives rise to a quasi-bailment or a trust or an outright title transfer, the relevant feature to observe is where the legal title is intended to be vested.

In practice however, it may not be easy to tell whether an agreement gives rise to a quasi-bailment, or an outright title transfer. Where there is a transfer of quasi-possession of the crypto-asset with the consent of the intermediary, we know that a (quasi-)bailment arises. If the agreement on its face does not transfer title or manifest any intention on the part of the client to do so, there is *prima facie* no outright title transfer.[73]

However, what if an extensive right of use (and/or rehypothecation) is conferred on the intermediary? Does this mean that the 'bailee' behaves so much like an owner such that the law considers the arrangement to be an outright title transfer? This, as is also the case when determining when trust shades into outright title transfer, calls for an analysis as to the outer boundaries of the bailment concept. The question of re-hypothecation in the bailment context has not been considered by the courts because cases on rights of re-hypothecation have only arisen in the context of intangible assets (shares and debts), which under the current law cannot be the subject of a bailment.

In the personal property context, a right conferred on a 'retention of title' buyer[74] to sub-sell, intermix or alter the goods is consistent with a bailment.[75] This would be so even if the seller has no right to trace the proceeds of sub-sales.[76] Also, the analysis of the Supreme Court in *The Res Cogitans* accepts that a right given to a bailee to consume the bailed property does not negate the existence of a bailment. Thus, if one accepts that a bailee is at liberty to divest itself of title to the subject-matter of the bailment and still accept that there is a bailment, then it does not seem to matter whether this divestment is to be effected through destruction, sale or otherwise. As such, it would seem that a right of rehypothecation in respect of crypto-assets would not negate the existence of a quasi-bailment.

Yet, this line of logic seems to go against the *Pearson* decision,[77] where a right to use securities without a correlative obligation to hold substitute assets on trust was deemed fatal to the creation of a trust (the arrangement being one of outright title transfer instead), whereas a right to 'swap' was held to be consistent with a trust. If the logic of *Pearson* is to be applied in the bailment context, then it would be inconsistent with the retention of title cases as well as *The Res Cogitans*, where the absence of an obligation to hold substitute assets was not held fatal to the existence of a bailment. In light of this uncertainty, it is simply impossible to tell when (if at all) a right of re-hypothecation conferred on a 'bailee' is consistent with a bailment, and *a fortiori* a quasi-bailment.

---

[73] This discussion assumes that the three certainties for a trust are not satisfied, so that it cannot be a trust; barring resulting trusts which may arise when a trust is intended but fails for another reason, such as a lack of certainty of objects (e.g. in *Re Vandervell Trustees Ltd (No. 2)* [1974] EWCA Civ 7).

[74] Such buyers are bailees.

[75] Norman Palmer (ed), *Palmer on Bailment* (3rd ed, Sweet and Maxwell 2009), 3-048; *Clough Mill Ltd v Martin* [1985] 1 WLR 111.

[76] *Ibid.*

[77] In relation to the pre-RASCALS period: see [265]-[294], and text to nn 61-64.

13

Electronic copy available at: https://ssrn.com/abstract=3697946

# 4. Drawing the boundaries between each legal characterisation: further general points

Having set out the four different legal categories or 'buckets' into which the relevant client-intermediary arrangement may fall, it may seem that each category would be clearly delineated and that it is easy to decide which category a particular agreement falls within. However, the reality is that there will be very difficult borderline cases, and the task of the court is to faithfully and accurately categorise the arrangement.

In this regard, there are three crucial points to note.

First, labelling something as a particular legal arrangement (e.g. 'trust' or 'lease') cannot *per se* turn such arrangement into a trust or lease, unless the substantive requirements of a trust or lease (or other legal category) are satisfied. As Lord Templeman noted in *Street v Mountford*,[78] "The manufacture of a five-pronged implement for manual digging results in a fork even if the manufacturer…insists that he intended to make and has made a spade".[79] In relation to the categorisation question, Lord Millett in *Agnew v IRC*[80] provides a useful starting point, by setting out a two-stage approach.[81] The court must first ascertain what has been agreed between the parties, and *then* categorise such agreement in legal terms.[82]

Secondly, and despite the above, the label used by the parties could matter in a borderline case where the agreement seems to fall in between two legal categorisations (e.g. trust and outright title transfer). Take the example where there is a transfer of legal title to the intermediary, with the agreement providing that the intermediary has a right of use over the asset. Here, the agreement may give rise to an outright title transfer, but could also give rise to a trust (as *Pearson v Lehman* makes clear that a right of use by the trustee is consistent with the existence of a trust). Both categorisations are possible, and the task is to ascertain what the parties intended. In this context, the label chosen by the parties ('trust' or 'title transfer') would matter because it provides the court with information as to what the parties intended, which would ultimately be decisive as to how the arrangement is categorised. The label could also affect the interpretation of other terms in the agreement (i.e. influence how those terms are being read in context), which would again affect or alter the legal outcome.

Thirdly, if the parties attempt to create one kind of arrangement but ultimately fail in doing so, the general approach is that the court will not recharacterise the arrangement into another 'bucket' unless the requirements of the alternative arrangement are satisfied.[83] Thus, cases have said that a court will not treat a failed gift (one type of title transfer) as a trust, unless the

---

[78] *Street v Mountford* [1985] AC 809.
[79] *Ibid*, 819. if the requirements for creating a spade have not been satisfied, one has not created a spade.
[80] [2001] UKPC 28.
[81] The categorisation question in *Agnew* concerned the line between fixed and floating charges, but the general approach to categorisation set out in *Agnew* is applicable generally in English law.
[82] *Ibid*, [32].
[83] E.g. *Milroy v Lord* [1862] EWHC J78.

14

Electronic copy available at: https://ssrn.com/abstract=3697946

requirements for a trust are satisfied.[84] There have, however, been exceptions to this approach where the courts have (at least ostensibly) appeared to 'rescue' an arrangement by recharacterising it, despite the requirements of the alternative characterisation arguably being relaxed to accommodate the case in question.[85] Thus, it is worth keeping in mind this question: how easily will the court recharacterise the arrangement into another 'bucket' despite the arrangement deviating significantly from the paradigm case of that new 'bucket'?

# 5. The redundancy of bailment in the crypto-asset context

As we have seen, the incidents of an English law trust can be heavily modified by the parties' agreement. Extensive exclusions of duties, even those that appear to strike at the heart of the 'irreducible core' duties of trusteeship, remain compatible with the existence of a trust. Rights of use and disposal of the trust assets can also be conferred on the trustee without negating the existence of a trust. Furthermore, outside of the trust context, parties can agree on any set of legal rights and obligations by contractual agreement, subject only to the statutory and public policy limits on contractual freedom.

Thus, one may wonder whether the concept of bailment (and thus quasi-bailment) is useful at all in the crypto-asset context, if all (or almost all) the incidents of bailment can be replicated through a combination of trust and contract (including contractual agreements to transfer outright title to the intermediary). The two most significant incidents of a bailment relationship are (1) the bailee's duty of care, and (2) the bailee's right to sue third parties for deliberately or negligently interfering with the relevant property. First, as to the duty of care, this is a default incident of an express trust,[86] and in the context of the client-intermediary agreement, there would be an implied term to carry out the relevant (custodial) service with reasonable care and skill. Insofar as the bailee's duty of care can be excluded or modified by contract, this can also be done in the context of a trust or the implied term of care and skill.[87] Secondly, as to the bailee's right to sue third parties for interference, the same right exists where there is a trust or an outright title transfer: the custodian has the legal title and can thus sue third parties for interference. The *bailor* may also have a right to sue third parties for interference, most notably when it has a right to immediate possession (in relation to the property), allowing it to sue third parties in conversion.[88] A rough analogue for this right exists in the trust context, namely the *Vandepitte* procedure[89] which allows a beneficiary to join the trustee and sue third party wrongdoers, such as individuals who have converted the trustee's property.

---

[84] *Ibid*; *Richards v Delbridge* (1874) LR 18 Eq 11.
[85] E.g. *T Choithram International SA v Pagarani* [2000] UKPC 46; *Les Affreteurs Societe Anonyme v. Leopold Walford (London) Ltd* [1919] AC 801.
[86] *Speight v Gaunt* (n 18); Trustee Act 2000, s.1.
[87] *Armitage v Nurse* [1998] Ch 241 at 253-254;  Trustee Act 2000, Sch 1 para 7; Supply of Goods and Services Act s.16.
[88] Michael A Jones, Anthony M Dugdale, Mark Simpson, *Clerk & Lindsell on Torts* (22nd ed, Sweet & Maxwell 2017), 17-59 to 17-63.
[89] *Vandepitte v Preferred Accident Insurance Co* [1933] AC 70.

15

Electronic copy available at: https://ssrn.com/abstract=3697946

Other (actual or potential) features of a bailment relationship can be replicated by a trust as well. The duty of the bailee not to intentionally damage or destroy the property has an equivalent in the trust context: the duty to act in good faith in the beneficiaries' interests, which straightforwardly includes a duty not to intentionally damage or destroy the property. Finally, although the law is unclear as to whether a bailee can have a right of use or rehypothecation in relation to the property, this feature (if it exists) can be replicated through trust, as it is settled that a trustee can have a right of use and rehypothecation in relation to the trust property.

Thus, if the incidents of bailment can for all intents and purposes be replicated through a mixture of trust and contract, any bailment analysis would be redundant in this context. Given that the trust has evolved throughout the centuries into such a dynamic and flexible doctrinal tool that can cater to many forms of property holding arrangements, one may argue that trusts can and should be the concept that does the heavy normative lifting. Contract is even more flexible: there are relatively few limits on contractual freedom. In contrast, the idea that bailments can only apply to tangible objects is firmly entrenched in English law.[90] To extend the concept of bailment to cover crypto-assets requires the development of a 'quasi-bailment', which requires a new conceptual structure to be created. For example, the issue of whether 'transmission' is sufficient to create a quasi-bailment would need to be tackled. So will the issue of whether the interest of the 'quasi-bailee' is sufficient to constitute an action in conversion and/or trespass. Difficult issues would arise in determining *whether* the torts of conversion and trespass apply to intangible assets, which are by definition "incapable of being touched or felt". Even if so, *what* would constitute a trespass or conversion in the crypto-asset context, which may have no close equivalent in the physical asset context? Furthermore, to claim that 'crypto-assets are like tangibles and thus there must be bailment' would be inconsistent with the trend in the common law world to treat crypto-assets as another type of intangible property other than choses in action.[91]

As such, developing this new legal tool of 'quasi-bailment' would only be worth it if strictly necessary, and for the reasons mentioned above, this legal tool of quasi-bailment is unnecessary. Indeed, 'quasi-bailment' would be a legal construct applied by the courts if it were the only or the best way to explain the holding of digital assets by an intermediary: in such cases, it would function as a 'gap filler' concept. However, given the existence of the trust, there is no such 'gap', and so bailment analysis would be redundant.

# 6. The most likely outcome

The above analysis has addressed the possible legal analyses of the relationship between a client and an intermediary, as well as how the court is to approach the question of distinguishing between different types of legal relationships. But this does not shed light on which legal relationship is in practice going to feature most frequently – the question we now address.

---

[90] Bailment requires a transfer of possession, and intangible assets cannot be possessed: see, e.g. *OBG v Allan* [2007] UKHL 21; *Your Response Ltd v Datateam Business Media Ltd* [2014] EWCA Civ 281. There are good reasons for restricting the concept of bailment to tangible assets: see, e.g. Kelvin FK Low (n 24), 549-551.
[91] See, e.g. *Cryptopia* (n 1); UK Jurisdiction Taskforce (n 3), [35]-[85].

16

Electronic copy available at: https://ssrn.com/abstract=3697946

Which legal relationship is in practice going to feature most frequently depends on (1) what agreements are likely to be drafted, and (2) the court's approach to the interpretation of contracts. We would expect to see that most client-intermediary agreements would give rise to a trust relationship.

Client-intermediary agreements in the crypto-asset context tend to be drafted in the form of 'give us the asset, and we will hold it on your behalf', but the vast majority of such agreements are silent as to the exact nature of the legal relationship between the parties. Nonetheless, this form makes outright title transfer an unlikely possibility, as the asset is expressed to be held on behalf of the client.[92] 'Mere contractual obligation' is also a very unlikely possibility, since the legal title and/or quasi-possession will most likely be with the intermediary. Thus, the most likely possibilities are quasi-bailment and trust.

Which possibility (quasi-bailment or trust) is more likely would in turn depend on what is intended by the parties, as objectively ascertained from the contract.

First, the parties are likely to have intended an arrangement that would provide more commercial certainty, and the trust provides this certainty to a much greater extent. The English law trust has developed through centuries of case law, resulting in a concept which contains relatively well defined boundaries yet is extremely flexible. This stands in stark contrast with bailment even if, *ex hypothesi*, (quasi-)bailment applies to intangible assets and can apply in a case of 'transmission': the outer edges of the concept are far from settled, for instance in the context of a right of rehypothecation. Indeed, the trust has done a lot of heavy normative lifting over the centuries and this creates a positive feedback loop through 'conceptual inertia'. The more case law there is on trusts, the more certainty there is as to how the trust operates, and so the more this causes parties to want to adopt the trust structure.

Secondly, to the extent that parties are likely to have intended a legal arrangement that would comply with regulatory requirements in the relevant jurisdiction, this provides a strong indication that a trust was (objectively) intended. This is because many regulators may require virtual asset providers (or at least providers of virtual securities) to hold assets on trust for their clients, and this is the case in Hong Kong.[93] This provides a further factor in favour of there being a trust.

Even if the intention of the parties in a particular case is to *avoid* being regulated in the first place (meaning that the second argument does not apply), the most likely arrangement would still be a trust, since the parties are likely to have intended to create an arrangement that offers commercial certainty (i.e. the first argument does apply).

Thus, the most likely characterisation of the client-intermediary relationship is that of trustee and beneficiary. The two factors explored above create a strong presumption in favour of there being a trust. This means that realistically, for the relationship to be characterised as one of (quasi-)bailment, we would expect there to be at least an express reference to (quasi-)bailment in the client-intermediary agreement.

---

[92] See, e.g. *Cryptopia* (n 1) at [172]-[178]. But there would be an outright title transfer in specific circumstances, for example where the custodian has a right of rehypothecation over the assets, and is not obliged to hold any substitute assets for the investor.

[93] Hong Kong Securities and Futures Commission, 'Position Paper – Regulation of virtual asset trading platforms' (6th November 2019), [46]-[47].

17

Electronic copy available at: https://ssrn.com/abstract=3697946

# 7. Practical Considerations

The conclusion that the most likely characterisation of the client/intermediary relationship is that of trustee and beneficiary is not, however, consistent with current market practice and expectations. As mentioned, most intermediary/client contracts are totally silent on the nature of the custodial relationship (or if such a relationship exists at all), or if intermediaries do claim such a relationship, they attempt to argue that they have a mere contractual relationship (in which they will often disclaim any and all liability and duties to their client).

Intermediaries do not want to say that they are acting as trustees, as doing so would naturally imply certain duties (even if those duties are reduced to a minimum), and, more importantly, almost certainly trigger licensing requirements in many common law jurisdictions. With the important exception of the UK, which does not require licensing for (only) acting as a professional trustee, many other jurisdictions, including Hong Kong, Singapore, Malaysia, the Cayman Islands, the British Virgin Islands, etc (representing the vast majority of jurisdictions in which digital asset intermediaries are based outside of the US) all require intermediaries to be licensed to act as professional trustees (defined as the provision of trust services as an ongoing business, for a profit).

So far most digital asset intermediaries, and indeed most associated regulators, have not fully addressed the issue of how those digital asset intermediaries should be regulated or licensed, assuming that the underlying asset in which they deal is unregulated. For example,  the Hong Kong Securities and Futures Commission (SFC) has decided that most digital asset intermediaries are outside their purview, as long as they deal in neither securities nor futures. The SFC has, however, introduced an  "opt-in" regulation for virtual asset exchanges, in which they can voluntarily come under their jurisdiction, if those intermediaries *also* deal in at least one security or future.[94] Additionally, in those cases, the SFC has decided that those intermediaries must hold digital assets in trust, through a licensed trust provider. This, along with recent judgements in the *Quoine* and *Cryptopia* cases,[95] clearly show a trend towards regulators and courts deciding that the proper and natural relationship between digital asset intermediaries and their clients is one of a trust. Regulators and courts have, so far, stopped short of deciding that *all* digital asset intermediaries should hold those assets on trust.

Given our analysis, and unless a digital asset intermediary can successfully argue that they should fall into a different category, this does mean that most digital asset intermediaries will immediately attract a requirement to be licensed as 'professional trustees'.  This is separate from any other licensing requirements that they may trigger. This aligns with general public policy that looks to protect end investors, as licensing as 'professional trustees' would immediately bring into place KYC[96] and AML[97] rules, reporting requirements, and regulatory oversight. Such licensing is "no big deal" for the typical financial intermediary that deals in fiat money or securities, or indeed most other assets of value, and should likewise not be an issue for digital asset intermediaries, if they are genuinely operating in the best interests of their end investors.

---

[94] *Ibid*, [8].
[95] See n 1.
[96] Know your customer
[97] Anti-money laundering

Electronic copy available at: https://ssrn.com/abstract=3697946

# 8.Conclusion

This paper has analysed the possible legal relationships between a client and an intermediary of crypto-assets, and has established that there are four types of legal relationships: namely outright title transfer, trust, (quasi-)bailment, and mere contractual obligation. In many cases it is difficult to determine whether a particular client-intermediary agreement gives rise to one type of legal relationship or another, but all turns on the interpretation of the agreement in accordance with settled principles of construction and characterisation. Furthermore, it is uncertain whether the law will develop in a way such that bailment analysis will be accepted in the context of crypto-assets, for the objections relating to possession, transmission and (possibly) exclusivity would need to be surmounted before the concept can be applied. In the final analysis, it is concluded that the most likely type of legal relationship that would appear in practice is the trust, because this accords with the objective intention of the parties who wish to have commercial certainty, and (possibly) wish to comply with the relevant regulatory requirements within the particular jurisdiction in question.

Electronic copy available at: https://ssrn.com/abstract=3697946

# Exhibit 34

# 7

# THE THREE CERTAINTIES

## 1. INTRODUCTION

An express trust can exist only if the trust property[1] is held by the trustee (i.e. the trust must be completely constituted),[2] any requisite formalities have been complied with,[3] and the "three certainties" are present: certainty of intention to create a trust; certainty of subject matter of the trust; and certainty of objects. As David Richards LJ stated in *North v Wilkinson*:[4]

> The creation of a trust has significant, and generally irreversible, consequences. The settlor, by creating the trust, ceases to be entitled to the benefit of the property subject to the trust. If, as in the present case, he continues to hold the legal title to the property, he holds it, to the extent of the interest created by the trust, for the benefit of the beneficiaries of the trust and becomes subject to exacting fiduciary duties owed to the beneficiaries in relation to the trust property. The law therefore requires certainty on three crucial elements: the intended beneficiaries, the property to be subject to the trust and the intention of the settlor to create the trust. These elements must be established objectively by reference to the documents, words or conduct relied on as creating the trust. Statements as to the settlor's intention made subsequently are irrelevant. There is a parallel with the approach adopted to determine whether a contract has been made.

**7–001**

The three certainties are required to ensure that trustees hold specific property in respect of which they owe duties to beneficiaries which are capable of being enforced in practice by the courts. The existence of such duties is crucial to the existence of trusts. As Millett LJ stated in *Armitage v Nurse*:[5]

**7–002**

> there is an irreducible core of obligations owed by the trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no trusts.

Certainty of subject matter and of objects are requirements of *all* trusts. If, for example, B claims that she has a beneficial interest under a constructive or resulting trust, then she needs to show that the defendant holds specific property subject to a duty to B. Certainty of intention, however, is a requirement only where a settlor exercises her power to set up a trust. Hence it does not apply to trusts imposed by law. In cases of the latter sort, the defendant still holds specific property subject to

**7–003**

---

[1] As discussed at paras 4–029 to 4–033, the "property" held on trust consists of the specific rights (in the sense of legal entitlements) held on trust.
[2] See Chapter 5.
[3] See Chapter 6.
[4] [2018] EWCA Civ 161; [2018] 4 W.L.R. 41 at [2].
[5] [1998] Ch. 241 at 253.

272    The Three Certainties

a duty to B, but that duty arises for some other reason, not because of the settlor's successful creation of an express trust.

**7–004**    There is a further difference between certainty of intention on the one hand and certainty of subject matter and of objects on the other. In the former case, we are concerned with the simple question of whether or not the settlor intended to create a trust. In relation to certainty of subject matter and of objects, however, we are not simply seeking a "Yes" or "No" answer when considering the acts of the settlor: we must ask, rather, what property was meant to be subject to the trust, and which people were meant to benefit (or not meant to benefit) from its performance? Whilst certainty of intention can be seen as relating to the preliminary question of whether the supposed trustee is under a duty *at all*, certainty of subject matter requires us to find specific property to which that duty relates, and certainty of objects requires us to be able to identify the content of that duty.

## 2. Certainty of Intention

**7–005**    An express trust can arise only if it can be shown that the settlor (S) intended to create a trust, either by transferring property to trustees to hold on trust,[6] or by declaring themselves to be the trustee of property that she owns.[7] Certainty of intention is required because the key event that gives rise to the trust is the settlor's exercise of a power to set up the trust. S can successfully self-declare a trust for B without B having any knowledge that S has exercised S's power to do so.[8]

**7–006**    As we saw in Chapter 4,[9] where a trust has been constituted by S having transferred property to T to hold on trust for B, T must consent to her role as trustee. If T, having received the property from S, refuses to act as trustee, or if S sets up a testamentary trust whereby T is to hold on trust for B, and T refuses to accept the property from S's personal representatives, then, if necessary,[10] a new trustee will be found,[11] and the property will be vested in that new trustee: "equity never allows a trust to fail for want of a trustee."[12] After receiving property from S, and before transferring it to the new trustee, S's chosen but reluctant T will not be free to use the property for their own benefit, and rather holds it on terms requiring them to transfer title to the new trustee: to that extent B can be said to have a beneficial interest without T necessarily having consented to act as trustee.[13] In the vast majority of cases, however, the trustees receive the property having previously agreed with the settlor that they will be trustees, and the beneficiaries know that they will be beneficiaries.

---

[6]    See paras 5–003 to 5–004.

[7]    See para.5–005.

[8]    See, e.g. *Fletcher v Fletcher* (1844) 4 Hare 67; *Re Lewis* [1904] 2 Ch. 656; *Rose v Rose* (1986) 7 N.S.W.L.R. 679 at 686; *Re Kayford* [1975] 1 W.L.R. 279. Indeed, there may be no beneficiaries for a period while income is being accumulated and the ultimate contingent beneficiary may not be born or otherwise ascertained for some time, especially for jurisdictions other than England where the accumulation period can be as long as the perpetuity period. Note however that it is possible for B to disclaim B's interest under the trust: see paras 4–027 to 4–028.

[9]    See paras 4–023 to 4–026.

[10]    Where B is the sole beneficiary and absolutely entitled under the trust, and is also adult and of sound mind, they will be able to exercise the *Saunders v Vautier* (1841) 4 Beav. 115 power to terminate the trust: see para.12–064ff) and so an order for the transfer of the property itself to B may well be appropriate.

[11]    Note that under Trustee Act 1925 s.36, S's personal representative will hold the property on trust for B, but with a power to appoint new trustees.

[12]    *Bisrat v Kebede* [2015] EWHC 840 (Ch) at [30]. See too, e.g. *Re Robinson* [1892] 1 Ch. 95 at 100: "If the gift is good in other respects the Court will take care that it shall not fail for want of a trustee." See too, e.g. *Mallott v Wilson* [1903] 2 Ch. 494; *Harris v Sharp* [2003] W.T.L.R. 1541; *Kynnersley v Wolverhampton City Council* [2008] W.T.L.R. 65.

[13]    *Fletcher v Fletcher* (1844) 4 Hare 67; *Childers v Childers* (1857) 1 De G. & J. 482.

## A. The Test

S's intention to create a trust cannot, by itself, have that effect. Rather, an express trust arises where S has exercised her power to create a trust, and that requires not only intention, but also some external communication of that intention. It is important to note that, as in other parts of the law where rights can arise as a result on one party's exercise of a power to create such rights, S's intention must be judged objectively.

**7–007**

---

### Byrnes v Kendle

### High Court of Australia (2011) 243 C.L.R. 253

Kendle held legal title to a property but had signed an acknowledgment of trust in 1997 declaring that he held a half share of the interest in the property on trust for Byrnes, his estranged wife. It was now claimed that Kendle had committed breaches of his duties as trustee, by letting the house out to his son for five years for only a nominal rent. That claim was allowed by the High Court of Australia. One of the arguments made by Kendle in attempting to resist the claim was that he was not in fact a trustee as, although he had signed the acknowledgment of trust, he did not in fact have the required intention to create a trust of the property. That argument was rejected by all of the judges in the High Court decision. This extract reproduces the reasons for doing so given by Heydon and Crennan JJ., in a joint judgment.

**7–008**

HEYDON AND CRENNAN JJ.: In this court [Kendle] submitted that it was necesssary for [Byrnes] to establish a subjective intention by [Kendle] to create a trust. . . This submission is incorrect. The trial judge's estimate of [Kendle's] evidence about subjective intention, and the evidence itself, was irrelevant. The submission rests on a fundamental but very common misconception. . .

**7–009**

The authorities establish that in relation to trusts, as in relation to contracts, the search for "intention" is only a search for the intention as revealed in the words the parties, used, amplified by facts known to both parties. Thus in 1881 Sir George Jessel M.R. said:[14]

**7–010**

> "The settlement is one which I cannot help thinking was never intended by the framer of it to have the effect I am going to attribute to it; but, of course, as I very often say, one must consider the meaning of the words used, not what one may guess was the intention of the parties."

In 1934 Lord Wright said, speaking of a failed attempt to settle property on trust:[15]

**7–011**

> "the court, while it seeks to give effect to the intention of the parties, must give effect to that intention as expressed, that is, it must ascertain the meaning of the words actually used. There is often an ambiguity in the use of the word 'intention' in cases of this character. The word is constantly used as meaning motive, purpose, desire, as a state of mind, and not as meaning intention as expressed. The words actually used must no doubt be construed with reference to the facts known to the parties and in contemplation of which the parties must be deemed to have used them . . . But allowing for these and other rules of the same kind, the principle of the common law has been to adopt an objective standard of construction and to exclude general evidence of actual intention of the parties; the reason for this has been that otherwise all certainty would be taken from the words in which the parties have recorded their agreement or their dispositions of property."

Neither in England nor in Australia has the application of the principles for establishing and defining a trust been analysed with the sophistication devoted in England to their application in contract. However, in both English and Australia law the surrounding circumstances are material to the questions whether the words used created a trust and what its terms are. Accordingly, Conaglen was correct to say:

**7–012**

> "The court's focus when construing the terms of [a] bilateral arrangement [creating a trust] is on the objective meaning that those terms would convey to a reasonable person, just as it is when construing contractual arrangements."

---

[14]    *Smith v Lucas* (1881) 18 Ch. D. 531 at 542.
[15]    *Commissioners of Inland Revenue v Raphael* [1935] A.C. 96 at 142–143.

**7–013**

The question is what the settlor or settlors did, not what they intended to do.

That truth tends to be obscured by constant repetition of the need to search for an "intention to create a trust". That assertion can be seen as concerning the first of the three "certainties" . . . But the "intention" referred to is an intention to be extracted from the words used, not a subjective intention which may have existed but which cannot be extracted from those words. This is as true of unilateral declarations of alleged trust as it is of bilateral covenants to create an alleged trust. It is as true of alleged trusts which are not wholly in writing as it is of alleged trusts which are wholly in writing. In relation to alleged trusts which are not wholly in writing, the need to draw inferences from circumstances in construing the terms of conversations may in practice widen the extent of the inquiry, but it does not alter its nature.

**7–014**

As with contracts, subjective intention is only relevant in relation to trusts when the transaction is open to some challenge or some application for modification[16] . . . But subjective intention is irrelevant both to the question of whether a trust exists and to the question of what its terms are.

## B. Applying the Test in Practice

### i. A General Donative Intention is Insufficient

**7–015**

No technical expressions or particular formulae are needed to create a trust: the circumstances must show however that the person holding the relevant property is intended to be subject to a legally binding *duty* to hold that property for others (or for herself and others). As Jessel MR said in *Richards v Delbridge*, when considering the rules applying to a self-declaration of trust:[17]

It is true that [the settlor] need not use the words "I declare myself trustee", but he must do something which is equivalent to it, and use expressions which have that meaning; for, however anxious the Court may be to carry out a man's intention, it is not at liberty to construe words otherwise than according to their proper meaning . . . The cases in which the question has arisen are nearly all cases in which a man, by documents insufficient to pass a legal interest, has said "I give or grant certain property to B." . . . The true distinction appears to me to be plain, and beyond dispute: for a man to make himself a trustee there must be an expression of intention to become a trustee, whereas words of present gift show an intention to give property over to another, and not retain it in the donor's own hands for any purpose, fiduciary or otherwise.

**7–016**

As Jessel MR went on to note,[18] this approach accords with the principle in *Milroy v Lord*,[19] which was discussed in Chapter 5:[20] if S attempts to set up a trust for B by means of a transfer to trustees to hold for B, but that attempt fails, as the property remains with S, a court cannot then use S's undoubted general intention to benefit B as the basis on which to find a declaration of trust by S, as clearly S did *not* intend to hold the property herself on trust for B. If a declaration is to be found in such a case, there must be some additional evidence, such as some statement by S that justifies a court in finding that S exercised the power to bind the property in her own hands;[21] although where S clearly intended some form of gift to B, it has been suggested that it may be possible for a court, in some cases at least, to

---

[16]    [Three of the examples given of such a challenge or application were "an equitable challenge for mistake" (see para.7–071); an "allegation of 'sham'" (see paras 7–059ff); and a "claim for rectification" (see para.7–072).]

[17]    (1874) L.R. 18 Eq. 11 at 14, reaffirmed in *Clarence House Ltd v National Westminster Bank Plc* [2009] EWCA Civ 1311; [2010] 1 W.L.R. 1216 at [43] per Ward LJ. Note too the close analogy, discussed at paras 3–211 to 3–218 with the requirement of intention as applied to an equitable assignment of a legal chose in action.

[18]    (1874) L.R. 18 Eq. 11 at 15.

[19]    (1862) 4 De G.F. & J. 264.

[20]    See paras 5–006 to 5–011.

[21]    As was found to be the case in, e.g. *Re Ralli's W.T.* [1964] Ch. 288 and *T Choithram International SA v Pagarani* [2001] 1 W.L.R. 1: see paras 5–020 and 5–012 to 5–022.

look at the words used by S and, "by a benevolent construction . . . tease out" an implied declaration of trust.[22]

Besides the cases referred to by Jessel MR, where S has said "I give or grant certain property to B", there may also be cases, particularly in a domestic context, where legal title to property is vested in one party only (S), but there is some evidence that the property was treated, in practice, as held for the benefit of that party and another (B). Where the property involved is land, s.53(1)(b) of the Law of Property Act 1925 means that B can prove any such declaration of trust only by means of signed writing, and in the absence of such writing, B may then have to resort to a constructive or resulting trust in order to claim a beneficial interest.[23] In relation to property other than land, no such formality requirement applies. The question in such cases is simply whether any statement of S can be found which, when interpreted against the relevant facts (which include the nature of the parties' relationship), shows an objective intention that S should hold the property subject to a legal duty not to use it wholly for S's own benefit, but to use it for B's benefit too. The next extract provides an example of how that question may be resolved in practice.   **7–017**

*Paul v Constance*

Court of Appeal [1977] 1 W.L.R. 527

SCARMAN L.J. (with whom BRIDGE and CAIRNS L.J. agreed): Mr Dennis Albert Constance was a wage earner living in Cheltenham until he died on March 9, 1974. He was married to Bridget Frances Constance, the defendant in this action. But they parted in June 1965. In 1967 Mr Constance met Mrs Doreen Grace Paul, who is the plaintiff in this action. The two of them set up house together in December of that year, and they lived to all appearances as man and wife up to the date of Mr Constance's death. The house in which they lived was the property of the plaintiff.   **7–018**

In August 1969 Mr Constance was injured at his work. He claimed damages against his employers . . . his claim was disposed of by the payment to him of a sum of £950. This money he received by cheque early in 1973. He discussed with the plaintiff what to do with the money, and the evidence is clear that they decided it was to go into a bank account. The two of them went to see the manager of the St George's Square branch of Lloyds Bank in Cheltenham, and there they had a discussion about opening a bank account. According to the notes of evidence which the trial judge made, the two of them had a discussion with the bank manager. He explained to them the different sorts of accounts which they could open, and the decision was taken to open a deposit account. At that stage Mr Constance revealed that they were not married. It is perhaps of some significance in understanding this interview if one recalls the evidence that was given by a Mr Thomas, a fellow employee of Mr Constance's, who said that he knew that they were not married but most people did not. After Mr Constance had told the manager that they were not married the manager said: "Well, it will be in your name only then?" Mr Constance said: "Yes." Then Mr Constance asked the manager what was to happen if the plaintiff wanted to draw on the account, or if he wanted the plaintiff to draw on it, and the manager said that that could be done if she used a note with Mr Constance's signature on it authorising her to draw on the account.   **7–019**

The account that was opened that day in February 1973 is at the very heart of this case. The account was maintained in Mr Constance's name from that date until the date of his death. Over the period between 1973 and his death, some 13 months later in 1974, further sums were paid into the account including, in particular, some sums which represented "bingo" winnings. It is clear from the evidence that Mr Constance and the plaintiff did play "bingo", and they played it really as a joint venture. They did have winnings from time to time, and at any rate three of such winnings—none of them very great—were   **7–020**

---

[22]   *Curtis v Pulbrook* [2011] EWHC 167 (Ch); [2011] 1 B.C.L.C. 638 at [43], per Briggs J, applying *Pennington v Waine* [2002] EWCA Civ 227; [2002] 1 W.L.R. 2075. It is worth noting, however, that in *T Choithram International SA v Pagarani* [2001] 1 W.L.R. 1 at 11, per Lord Browne-Wilkinson, citing *Milroy v Lord* (1862) 4 De G.F. & J. 264, specifically said that "the court will not give a benevolent construction so as to treat ineffective words of outright gift as taking effect as if the donor had declared himself a trustee for the donee: see para.5–015.

[23]   See paras 6–027 to 6–050.

paid into the account. It is clear from the plaintiff's evidence that they thought of those winnings as "their winnings": neither hers nor his alone, but theirs. Nevertheless, when the account was closed on the death of Mr Constance the ultimate balance, after the addition of interest, consisted largely of the initial sum of £950 representing Mr Constance's damages as a result of his injury at work. There was one withdrawal during this period, a sum of £150, and the evidence was that that money was divided between the two of them after part of it had been used for buying Christmas presents and some food.

**7–021**    The plaintiff began her action after the death of Mr Constance against his lawful wife, the defendant, who took out letters of administration for his estate since he died intestate. The plaintiff claims that the bank account in his name, to which I have referred, was held by him on trust for the benefit of himself and the plaintiff jointly. She claims that it was an express trust declared orally by him on numerous occasions. The defendant maintains that the whole fund contained in the account was the beneficial property of the deceased at the time of his death, and, as such, became part of his estate after death.

**7–022**    The matter came on for trial and on August 12 the Judge found in favour of the plaintiff. He found the existence of an express trust, a trust for the benefit of the plaintiff and the deceased jointly, and he ordered that the sum of £499.21 be paid to the plaintiff as representing one half share of the fund to which she was beneficially entitled.

**7–023**    The only point taken by the defendant on her appeal to this court goes to the question whether or not there was, in the circumstances of this case, an express declaration of trust.

**7–024**    Counsel for the defendant drew the attention of the court to the so-called three certainties that have to be established before the court can infer the creation of a trust. We are concerned only with one of the three certainties, and it is this:[24]

> "The words [that is the words of the declaration relied on] must be so used that on the whole they ought to be construed as imperative. [A little later on the learned author says:] No particular form of expression is necessary for the creation of a trust, if on the whole it can be gathered that a trust was intended. A trust may well be created, although there may be an absence of any expression in terms imposing confidence. A trust may thus be created without using the word 'trust' for what the court regards is the substance and effect of the words used."

**7–025**    Counsel for the defendant has taken the court through the detailed evidence and submits that one cannot find anywhere in the history of events a clear declaration of trust in the sense of finding the deceased man, Mr Constance, saying: "I am now disposing of my interest in this fund so that you, Mrs Paul, now have a beneficial interest in it." Of course, the words which I have just used are stilted lawyers' language, and counsel for the plaintiff was right to remind the court that we are dealing with simple people, unaware of the subtleties of equity, but understanding very well indeed their own domestic situation. It is right that one should consider the various things that were said and done by the plaintiff and Mr Constance during their time together against their own background and in their own circumstances.

**7–026**    Counsel for the defendant drew our attention to two cases [*Jones v Lock*[25] and *Richards v Delbridge*[26]], and he relies on them as showing that, though a man may say in clear and unmistakable terms that he intends to make a gift to some other person, for instance his child or some other member of his family, yet that does not necessarily disclose a declaration of trust; and, indeed, in the two cases to which we have been referred the court held that, though there was a plain intention to make a gift, it was not right to infer any intention to create a trust. . .

**7–027**    There is no suggestion of a gift by transfer in this case. The facts of those cases do not, therefore, very much help the submission of counsel for the defendant, but he was able to extract from them this principle: that there must be a clear declaration of trust, and that means there must be clear evidence from what is said or done of an intention to create a trust, or as counsel for the defendant put it, "an intention to dispose of a property or a fund so that somebody else to the exclusion of the disponent acquires the beneficial interest in it." He submitted that there was no such evidence.

**7–028**    When one looks to the detailed evidence to see whether it goes as far as that—and I think that the evidence does have to go as far as that—one finds that from the time that Mr Constance received his damages

---

24   *Snell's Equity,* 27th edn, p.111.
25   (1865) 1 Ch. App. 25.
26   (1874) L.R. 18 Eq. 11.

right up to his death he was saying, on occasions, that the money was as much the plaintiff's as his. When they discussed the damages, how to invest them or what to do with them, when they discussed the bank account, he would say to her: "The money is as much yours as mine." The judge, rightly treating the basic problem in the case as a question of fact, reached this conclusion. He said:

"I have read through my notes, and I am quite satisfied that it was the intention of [the plaintiff] and Mr Constance to create a trust in which both of them were interested."

In this court the issue becomes: was there sufficient evidence to justify the judge reaching that conclusion of fact? In submitting that there was, counsel for the plaintiff draws attention first and foremost to the words used. When one bears in mind the unsophisticated character of Mr Constance and his relationship with the plaintiff during the last few years of his life, counsel for the plaintiff submits that the words that he did use on more than one occasion namely: "This money is as much yours as mine", convey clearly a present declaration that the existing fund was as much the plaintiff's as his own. The judge accepted that conclusion. I think he was well justified in doing so and, indeed, I think he was right to do so. There are, as counsel for the plaintiff reminded us, other features in the history of the relationship between the plaintiff and Mr Constance which support the interpretation of those words as an express declaration of trust. I have already described the interview with the bank manager when the account was opened. I have mentioned also the putting of the "bingo" winnings into the account, and the one withdrawal for the benefit of both of them.    **7–029**

The question, therefore, is whether in all the circumstances the use of those words on numerous occasions as between Mr. Constance and the plaintiff constituted an express declaration of trust. The judge found that they did. For myself, I think he was right so to find. I therefore would dismiss the appeal.    **7–030**

A question that went unaddressed by the court in *Paul v Constance* was as to the precise terms of the trust declared by Constance (S).[27] If the initial trust was such that S was holding on trust for himself and Paul (B) as joint tenants, and this beneficial joint tenancy was not severed before S's death then, on S's death, B would become solely entitled to the beneficial interest, and so could have claimed the full sum credited to the bank account. It seems to have instead been assumed that the initial trust involved S holding on trust for himself and B as beneficial tenants in common, each with an individual (but undivided) half share of the beneficial interest, so that on S's death, and in the absence of a will by S, his 50% share passed under the intestacy rules.    **7–031**

The answer to this question as to the terms of the initial trust must also depend on S's objective intention, but of course, particularly where the parties are not alive to the technicalities, there is unlikely to be any clear intention on this point.    **7–032**

To the extent that a default answer is necessary, it is probably right to say that, consistently with the result in *Paul v Constance*,[28] a tenancy in common should be preferred as it ensures that each party has an individual interest that can be passed on her death,[29] and so avoids the "gamble of the tontine".[30]    **7–033**

---

[27]    Note that this question has also been overlooked, even by the House of Lords and Supreme Court, in relation to the common intention constructive trust of land: see, e.g. A. Briggs (2012) 128 L.Q.R. 183, commenting on *Jones v Kernott* [2011] UKSC 53; [2012] 1 A.C. 776 and *Stack v Dowden* [2007] UKHL 17; [2007] 2 A.C. 432.

[28]    Consistently too with the approach applied to common intention constructive trusts where, as discussed at paras 17–187 to 17–192, a tenancy in common seems to be assumed as the default position if one party is not intended to have a greater share than the other.

[29]    A joint tenancy carries with it the doctrine of survivorship which has been described as "odious in equity" (*R. v Williams* (1735) Bunb. 342 at 343) owing to its effect that the surviving joint tenant is wholly entitled.

[30]    That is, the point that a joint tenancy, if not severed, means that the survivor takes all, whereas those who die earlier take nothing.

### ii. An Intention to Impose a Legally Binding Duty is Necessary

**7–034**   A trust arises only when the trustee holds property subject to a legally binding duty and so an express trust can arise only where S's objective, expressed intention was that such a duty should arise.[31] This point is important if S transfers property to T expressing confidence, a wish, or a hope that T will use the property for the benefit of B. Such transfers are most likely to occur in a testamentary context. Originally, the courts were only too ready to treat such words as creating a trust,[32] but the following extract is from a case which signalled a change in approach.

---

*Lambe v Eames*

Court of Appeal in Chancery (1870–71) L.R. 6 Ch. App. 597

**7–035**   John Lambe left his entire estate, including a freehold, to his widow "to be at her disposal in any way she may think best for the benefit of herself and family." When the widow died, she left the freehold on trust for one of her daughters, Elizabeth Eames, but subject to an annual payment for Henry Lambe, an illegitimate son of one of Lambe's sons. Elizabeth refused to make the annual payment to Henry, arguing that, by the terms of John's will, the widow had received the freehold subject to a trust for the benefit of herself and family, and that Henry, as an illegitimate child, did not qualify as "family". Henry argued instead that John's will had made an absolute gift of the freehold to his widow.

**7–036**   JAMES L.J.: If this will had to be construed irrespective of any authority, the construction would, in my opinion, not be open to any reasonable doubt . . . [The] question is whether [the words "to be at her disposal in any way she may think best for the benefit of herself and family"] create any trust affecting the property; and in hearing case after case cited, I could not help feeling that the officious kindness of the Court of Chancery in interposing trusts where in many cases the father of the family never meant to create trusts, must have been a very cruel kindness indeed. I am satsifed that the testator in this case would have been shocked to think that any person caling himself a next friend could file a bill in this Court, and, under pretence of benefitting the children, have taken the administration of the estate from his wife. I am satisfied that no such trust was intended, and that it would be a violation of the clearest and plainest wishes of the testator if we decided otherwise. . .

**7–037**   It is possible that in this case there may be some obligation on the widow to do something for the benefit of the children; but assuming that there is such an obligation, it cannot be extended to mean a trust for the widow for her life, and after her death for the children, in such shares as she may think fit to direct . . . [And] if there be any such obligation, I think it has been fairly discharged by the way in which she has made her will—giving part for the benefit of one member of the family, and part to a natural son, whom she might reasonably think it her duty to benefit.

---

**7–038**   The "very cruel kindness" consisted of the courts' former willingness, in interpreting a provision such as that in John Lambe's will, to find that the widow held the property subject to a trust for the benefit of herself and her children: this would secure a benefit to the children, but would equally hamper the widow's ability to deal with the property. The point made by James LJ is that a testator, particularly one such as John Lambe who made his will "in the prime of life, with a wife and young children", might well prefer his widow to have complete freedom to deal with the property, and so to be able to react to unforeseen events, trusting that she would discharge any moral duties to provide for other family members but not imposing any legal limits on her dealings.

---

[31]   See e.g. *Hilton v Cosnier* [2018] EWHC 2728 (Ch) at [27]: a statement of S's current intention that his grandchildren should receive a particular property in the future was not sufficient to create an immediate trust with those grandchildren as beneficiaries with a future interest, as there was no intention of S's imposing an immediate duty on himself to the grandchildren. Similarly, in *Yusuf v Yusuf* [2019] EWHC 90 (Ch), it was stated at [111] that there was no declaration of trust where the relevant document "does not demonstrate an intention to create a trust at the time it was signed, but only an intention to sign some future document or documents".

[32]   *Eade v Eade* (1820) 5 Madd. 118 at 121; *Palmer v Simmonds* (1854) 2 Drew. 221; *Gutty v Cregoe* (1857) 24 Beav. 185.

Since the 1870s, the courts have therefore drawn an important distinction between words which express a hope or desire that T *will* act in a certain way[33] and words which impose a duty that T *must* act in a certain way. The former, by themselves, do not give rise to a trust;[34] although of course the question is always whether, viewed in context, the true expressed, objective intention of S was to impose a duty on T.[35] For example, in *Re Adams and Kensington Vestry*,[36] a testamentary transfer from a husband to his widow "in full confidence that she will do what is right as to the disposal thereof between [S's] children" did not manifest an intention to impose a legally binding duty on T and so did not give rise to not trust.[37]

**7–039**

In the specific context of a testamentary transfer to a spouse, the Administration of Justice Act 1982 s.22, states that:

**7–040**

> Except where a contrary intent is shown, it shall be presumed that if a testator devises or bequeaths property to his spouse in terms which in themselves would give an absolute interest to the spouse but by the same instrument purports to give his issue an interest in the same property, the gift to the spouse is absolute notwithstanding the purported gift to the issue.

So, for example, if a testator leaves "all my property to my wife and after her death to our children", the wife will take the property absolutely and is under no obligation to hold it on trust for the children.[38]

**7–041**

An intention that the party holding property (T) should be under *some* duty to B does not necessarily give rise to a trust; for a trust to arise, the duty must relate specifically to the trust property, and must be such that T has a duty not to use the property for her own benefit, unless and to the extent that T too is a beneficiary of the trust. In *North v Wilkinson*,[39] for example, the Court of Appeal noted that the first instance judge had erred in failing to consider if the agreement between the parties could be given effect to by "a conclusion other than a trust, in particular a personal obligation".[40] In that case, the practical difficulties involved in having a trust in favour of B of a percentage of A's business, where A was a sole trader,[41] were not insurmountable in theory, but, as "no thought at all had been given"[42]

**7–042**

---

[33]  Such words are sometimes referred to as "precatory", with "precatory words" then being words that do not, by themselves, create a trust: see, e.g. *Re Brace* [1954] 1 W.L.R. 955 at 958; *Re Freud (Deceased)* [2014] EWHC 2577 (Ch); [2014] W.T.L.R. 1453 at [43], [46]. However, the term "precatory" is not very helpful, as some cases also refer to "precatory trusts": e.g. *Re Steele's WT* [1948] Ch. 603 at 607–608.

[34]  See, e.g. *Mussoorie Bank Ltd v Raynor* (1882) 7 App. Cas. 321 (no trust where S in S's will gives property to T "feeling confident that she will act justly to our children in dividing the same when no longer required by her").

[35]  By the Administration of Justice Act 1982 s.21, extrinsic evidence, including evidence of the testator's intention, may be admitted to assist in its interpretation: (a) in so far as any part of the will is meaningless; (b) in so far as the language used in any part of it is ambiguous on the face of it; and (c) in so far as evidence, other than evidence of the testator's intention, shows that the language used in any part of it is ambiguous in the light of the surrounding circumstances.

[36]  (1884) 27 Ch.D. 394.

[37]  See too, e.g. *Re Diggles* (1888) 39 Ch.D. 253 (no trust where the will states: "it is my desire that she allows A.G. an annuity of £25 during her life) "; *Re Johnson* [1939] 2 All E.R. 458 (no trust where the will states that "I request that C on her death leave her property to my four sisters").

[38]  The statutory presumption contained in s.22 can be displaced. See, e.g. *Harrison v Gibson* [2005] EWHC 2957 (Ch); [2006] 1 W.L.R. 1212: the testator had expressed a sufficiently clear intention that his widow had a life interest in the relevant property which was held on trust for the children in equal shares.

[39]  [2018] EWCA Civ 161.

[40]  [2018] EWCA Civ 161 at [38]. The primary focus of the parties' agreement had been on B's receiving a shareholding in a future company, and it was noted at [41]–[42] that the rights of a shareholder (contractual and some statutory right against the company) are quite different from those of a beneficiary of a trust.

[41]  For those difficulties, see [2018] EWCA Civ 161 at [44]–[46]: e.g. what is the position in relation to liabilities arising from the business: should the existence of such liabilities reduce B's share of the assets of the business?

[42]  [2018] EWCA Civ 161 at [44] and [46].

to such difficulties by the parties, it was regarded as unlikely that the parties had in fact intended to create a trust, rather than imposing a merely personal duty on A to B.[43] Note too that, even if it is intended to give B an equitable interest in A's property, this does not necessarily mean a trust arises: if, for example, A is to be free of any duty in relation to the property if A meets a debt owed to B, then the arrangement gives B a security interest (an equitable charge) rather than an interest under a trust.[44]

### iii. The Relevance of Segregation of the Alleged Trust Property

**7–043**   In ascertaining whether S's expressed objective intention was to set up a trust of particular property, one relevant factor may be how that property was to be treated by the supposed trustee, T. If there is nothing to indicate that T (or, in the event of a claimed self-declaration, S) was to treat the property as separate from her own, that will be, at least, a strong indication that no trust was intended. After all, a key feature of a trust is that the trustee is not free to use the property entirely for her own benefit. As Channell J put it in *Henry v Hammond*:[45]

> It is clear that if the terms upon which the person receives the money are that he is bound to keep it separate, either in a bank or elsewhere, and to hand that money so kept as a separate fund to the person entitled to it, then he is a trustee of that money and must hand it over to the person who is his [beneficiary]. If on the other hand he is not bound to keep the money separate, but is entitled to mix it with his own money and deal with it as he pleases, and when called upon to hand over an equivalent sum of money, then, in my opinion, he is not a trustee of the money, but merely a debtor.

**7–044**   This point may be important in determining the nature of an agency relationship. For example, consider a case where an agent (A) collects money from customers on behalf of her principal (P). If the arrangement between A and P is that A is free to pay that money into her own bank account, but must settle up with P on a monthly basis by paying an equivalent sum over to P, then A simply owes a debt to P (i.e. A must pay P a particular sum of money) and does not hold the money received from customers on trust for P. The situation is thus similar to that of a bank receiving payment from a third party on behalf of a customer: the bank must credit the sum to the customer's account, thus increasing the debt it owes to the customer, but the bank does not hold the specific payment received on trust for the customer.[46] In contrast, if the arrangement between A and P is, for example, that A must pay the money into a separate bank account, then it may be possible to find an intention that A was to hold that money on trust for P. In that case, A's duty is not simply a personal obligation to pay a sum of money to P; rather A holds *specific* rights (the chose in action constituted by the bank account) on trust for P. The difference between those two cases will of course be crucial if, for example, A goes into insolvency:[47] if P can identify money held by A on trust for P, P can simply claim that money; whereas if

---

43   See too e.g. *Re Lester* [1942] Ch. 324 (a bequest of shares to A "subject to the payment" of certain annuities did not create a trust but rather imposed a personal duty on A).
44   See, e.g. *Re Oliver* (1890) 62 L.T. 533.
45   *Henry v Hammond* [1913] 2 K.B. 515 at 521, per Channell J. See too, e.g. *R. v Clowes (No.2)* [1994] 2 All E.R. 316 at 325; *Commissioners of Customs & Excise v Richmond Theatre Management Ltd* [1995] S.T.C. 257.
46   See, e.g. *First City Monument Bank Plc v Zumax Nigeria Ltd* [2019] EWCA Civ 294 at [81]–[84], Lewison LJ.
47   See, e.g. *Bailey v Angove's Pty Ltd* [2016] UKSC 47; [2016] 1 W.L.R. 3179 (see too para.17–220) and *Azam v Iqbal* [2007] EWHC 2025 (Admin); [2008] Bus. L.R. 168.

A is a collecting agent, P is simply an unsecured creditor who will have to settle for receiving a proportion of the total sum due from A.

The distinction between an agent who owes a debt to P and an agent who instead holds funds received on trust is also crucial when considering if a statutory limitation period applies to an action by P to recover sums due from A. P's claim against a collecting agent is purely contractual, and so is barred six years from the date of A's breach of contract.[48] In contrast, if a trust exists, P's claim is "to recover from the trustee trust property" and no statutory limitation period applies.[49] That difference was in issue in *Nelson v Rye*,[50] a decision discussed by Millett LJ in the following extract from *Paragon Finance plc v DB Thakerar & Co*:[51]

**7–045**

> In *Nelson v Rye* the plaintiff was a solo musician who appointed the defendant his manager on terms that he would collect the fees and royalties which were due to him and pay his expenses and account to him annually for his net income after deducting his own commission. When the relationship came to an end the plaintiff claimed an account, and the question was whether the account should be limited to the six years before the issue of the writ or whether it should extend over the whole period of the relationship. . .
>
> . . . [The] defendant's liability to account for more than six years before the issue of the writ in *Nelson v Rye* depended on whether he was, not merely a fiduciary (for every agent owes fiduciary duties to his principal), but a trustee, that is to say, on whether he owed fiduciary duties in relation to the money.
>
> Whether he was in fact a trustee of the money may be open to doubt. Unless I have misunderstood the facts or they were very unusual it would appear that the defendant was entitled to pay receipts into his own account, mix them with his own money, use them for his own cash flow, deduct his own commission, and account for the balance to the plaintiff only at the end of the year. It is fundamental to the existence of a trust that the trustee is bound to keep the trust property separate from his own and apply it exclusively for the benefit of the beneficiary. Any right on the part of the defendant to mix the money which he received with his own and use it for his own cash flow would be inconsistent with the existence of a trust. So would a liability to account annually, for a trustee is obliged to account to his beneficiary and pay over the trust property on demand. . .
>
> Unless the defendant was a trustee of the money which he received, however, the claim for an account was barred after six years. . . Accordingly, in so far as it decided that the defendant was liable to account without limit of time even if the money was not trust money, *Nelson v Rye* was wrongly decided.

**7–046**

**7–047**

**7–048**

**7–049**

The basic point is that a trust requires T to be under a duty in relation to specific property: a duty just to pay B a sum of money, where that money can come from any source, does not count as a trust. There is, therefore, an overlap with the requirement of certainty of subject matter, and we will see below that the courts, particularly in modern commercial contexts, have been willing to find a trust even where T has a broad power to use and mix the trust funds.[52] It should therefore be emphasised that the overarching question is one as to S's expressed and objectively understood intention. The mere fact that T is permitted to mix funds does not, by itself, prevent the finding of a trust.

**7–050**

For example, the mingling of funds received from S1 and S2 will not be fatal to the finding of a trust where T receives such funds to make investments for the parties which are to be held separately from T's own assets: an investment, such as a block of securities, can be held by T on trust for S1 and S2 in

**7–051**

---

[48] Limitation Act 1980 s.5. The contractual limitation applies even if the claim is an action for an account, as s.23 stipulates that: "An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account."

[49] Limitation Act 1980 s.21(1)(b).

[50] [1996] 1 W.L.R. 1378.

[51] [1999] 1 All E.R. 400 at 415–416.

[52] See paras 7–082 to 7–086.

their proportionate shares.[53] Similarly, where T adds funds of S1 and S2 to funds of T's own, and then makes investments to be held separately from T's own assets, those investments can be held on trust for S1, S2 and T in proportionate shares.[54] If T were then to sell such investments and, without authority from S1 and S2, to pay the proceeds into T's own bank account, S1 and S2 would each then have a right to trace into T's bank account and claim a proportionate share of that right:[55] once a trust has been established, unauthorised mingling by T does not, by itself, terminate the trust.[56]

### iv. The Distinction between a Duty and a Power

**7–052**   In answering the key question of whether S had an expressed, objective intention to impose on T the required duty in relation to the trust property, it is useful to bear in mind the distinction between a duty and a power.[57] The distinction can be somewhat tricky to apply in practice. There may be cases in which T clearly is a trustee, holding property subject to specific duties, and B is clearly a beneficiary of that trust, but T also has authority to use the trust property so as to benefit C. The question then is whether T has merely been given a *power* to act so as to benefit C, or whether instead the terms of the settlement impose a *duty* on T to act in that way: only in the latter case does C, as well as B, acquire a beneficial interest under the trust; only in the latter case will the court be required to execute the trust if T fails to act for C's benefit. As we will see below,[58] the distinction between a power and a duty is also crucial in determining which particular test is to be applied in determining if the parties benefitting from the exercise of the power or duty have been defined with sufficient certainty.

**7–053**   The conceptual distinction between a power and a duty is clear, although it is complicated slightly by the fact that S may have intended T to hold a power in a fiduciary capacity, so that T, whilst not bound to exercise the power in a particular way, does have particular duties *in relation to* the power, such as a duty to consider seriously and fairly whether to exercise it. The existence of such duties distinguishes a fiduciary power from a bare power: a bare power exists where T has no duty to consider seriously and fairly whether to exercise the power.

**7–054**   In practice, however, in the context of a specific settlement, there may be only a very fine line between interpreting a term that potentially benefits C as giving T a fiduciary power or as instead imposing a trust under which C, as well as B, has a beneficial interest. For example, consider the following two cases: (i) T holds funds on trust for B, but with a power to make distributions of interest to C, X, Y or Z; and (ii) T holds funds on a discretionary trust for B and C, but with a power to distribute a certain proportion of those funds to X, Y or Z. It may not always be simple in practice to determine which of those two interpretations best accords with S's expressed, objective intentions: as Lord Wilberforce put it in *Re Baden's Deed Trusts (No.1)*: "A layman and, I suspect, also a logician, would find it hard to understand what difference there is."[59]

**7–055**   There are of course further possibilities. For example, if S makes a testamentary disposition to trustees on trust to B for life, S may combine that with a bare power for B to appoint the capital among such of S and B's children as B may see fit. If, then, B dies and that power has not been exercised, the capital will be held on a resulting trust for S's estate, as S has not directed any other parties for

---

[53]   *R. v Clowes (No.2)* [1994] 2 All E.R. 316; *Re Goldcorp Exchange* Ltd [1995] 1 A.C. 74.
[54]   *Re Lewis's of Leicester Ltd* [1995] 1 B.C.L.C. 428.
[55]   See, e.g. *Foskett v McKeown* [2001] 1 A.C. 102.
[56]   For discussion of the rules of tracing, and of the limits of the ability of a beneficiary to assert a claim in relation to assets acquired through an unauthorised use of trust assets, see paras 15–023ff.
[57]   See e.g. paras 4–009 to 4–010.
[58]   See paras 7–124ff.
[59]   [1971] A.C. 424 at 448 (also known as *McPhail v Doulton*; extracted at paras 7–126 to 7–142).

whose benefit the trustees should hold the property if the power is not exercised.[60] A different result obtains, of course, if S instead intended that, in default of B exercising the power to appoint among the children, the property should then be held for the children in equal shares: in that case there is a fixed trust for all of the children, but the beneficial interest of each child is subject to B's exercising the power to appoint the property wholly to the other children.[61]

There may be a very fine line between cases in which the court is, and is not, willing to infer that S intended such a fixed trust in the event of B's not fully exercising the power to appoint.[62] One relevant factor will be the width of the class: whilst a trust for equal division between the objects of an unexercised power of appointment may be a practical solution if the objects are all members of a narrow class (e.g. S's children), such a trust would be very unlikely to reflect S's intention if the class were very broad (e.g. all S's employees, ex-employees and their relatives and dependants). As Lord Wilberforce noted in *Re Baden (No.1)* in considering that very class:[63]   **7–056**

> Equal division is surely the last thing the settlor ever intended: equal division among all may, probably would, produce a result beneficial to none. Why suppose that the court would lend itself to a whimsical execution?. . . Equal division may be sensible and has been decreed, in cases of family trusts, for a limited class, here there is life in the maxim "equality is equity", but the cases provide numerous examples where this has not been so. . .

In relation to a broad class of objects, it is of course possible for S to set up a discretionary trust, so that T does have to distribute the trust property, but there is no duty to divide it equally amongst members of the class. The difference between a discretionary trust and a power of appointment is that, in the former, T has a *duty* to distribute. There is therefore an extremely fine line between the cases where: (i) T holds on a discretionary trust for X, Y and Z, but subject to the possible exercise of a power of appointment by T in favour of C; and (ii) T has a power to appoint to X, Y and Z, and T is to hold on trust for C if the power of appointment is not exercised.   **7–057**

Further, in our example where S makes a testamentary disposition to trustees on trust to B for life, with a bare power for B to appoint the capital among such of S and B's children as B may see fit, it would also be possible for S to provide expressly that, if B does not exercise that power of   **7–058**

---

60   See, e.g. *Re Weekes's Settlement* [1897] 1 Ch. 289: a bequest to B, S's husband, was made with a "power to dispose of all such property by will amongst our children in accordance with the power granted to him as regards the other property which I have under my marriage settlements" no express gift over in default of B's exercise of that power. Romer J refused to infer that S intended that, should B fail to exercise the power, the property should be divided equally between the children, stating at 292: "The authorities do not show, in my opinion, that there is a hard and fast rule that a gift to A for life with a power to A to appoint among a class and nothing more must, if there is no gift over in the will, be held a gift by implication to the class in default of the power being exercised." See too *Re Combe* [1925] 1 Ch. 210; *Re Poulton's WT* [1987] 1 All E.R. 1068.

61   See, e.g. *Wilson v Duguid* (1883) 24 Ch.D. 244, where, in contrast to *Re Weekes's Settlement* [1897] 1 Ch. 289, it was found on the facts that an inference could be made that S had intended a gift to the children equally if B did not exercise the power of appointment. Similarly, each child has an immediate beneficial interest, but one which is liable to be divested by B's exercise of the power, if there is a bequest "to W for life, remainder to our children equally, but so that W may instead appoint the capital between our children in such shares as she may see fit": see, e.g. *Re Llewellyn's Settlement* [1921] 2 Ch. 281; *Re Arnold* [1947] Ch. 131.

62   It is of course also possible for S, for example, to stipulate that, in default of the exercise of the power of appointment, the trustees will hold on a discretionary trust, with the children as objects of that trust: see para.7–058.

63   [1971] A.C. 424 at 451 (also known as *McPhail v Doulton*). See further paras 7–144 to 7–145. Lord Wilberforce's comments were made when considering how a court would execute a discretionary trust for such a class, but his point is clearly relevant to the question of establishing the likely intentions of S in relation to such a class.

appointment, the trustees will then hold on discretionary trust for the children. It is however very difficult for a court to *infer* such an intention to create a discretionary trust in default. Consequently the basic choice, if no express provision is made for the case where B does not exercise the power of appointment, is between a resulting trust for S's estate[64] and a trust for equal division amongst S the children.[65] The court will have to decide which of those possibilities best reflects S's expressed, objective intention.

## C. Shams

### i. The Doctrine

**7–059**    As emphasised by Heydon and Crennan JJ in the passage from *Byrnes v Kendle* set out above,[66] the court's focus when determining if S has exercised her power to set up a trust is on S's expressed, objective intention. As Lord Wright had noted in *Commissioners of Inland Revenue v Raphael*,[67] one of the cases relied on in *Byrnes*:[68] "It must be remembered at the outset that the court, while it seeks to give effect to the intention of the parties, must give effect to that as expressed, that is, it must ascertain the meaning of the words actually used." In *Byrnes*, however, an "allegation of sham" was recognised as one of the situations in which subjective intention may be relevant, as "the transaction is open to some challenge".[69]

**7–060**    In *Midland Bank Plc v Wyatt*,[70] for example, Mr and Mrs Wyatt, beneficial owners of their family home, signed a trust deed which stated that Mr Wyatt now held his beneficial share on trust for Mrs Wyatt and his two daughters. Mr Wyatt relied on this deed when the bank attempted to enforce a charging order against his interest in the home: he argued that his debts could not be enforced against that property, as he held it on trust for his wife and daughter. In the usual case, the signed deed would of course be conclusive evidence that S had indeed exercised his power to set up a trust.[71] It was held by the judge, however, that "the trust deed was executed by [Mr Wyatt], not to be acted upon but to be put in the safe for a rainy day" and the judge stated that: "I do not believe Mr Wyatt had any intention when he executed the trust deed of endowing his children with the interest, which at that time was his only real asset."[72] The finding then was that Mr Wyatt had intended only to rely on the trust deed if it was necessary to protect his interest in the home from execution by a creditor; despite signing the deed, he had not in fact exercised his power to set up a trust. The deed was intended by

---

64    As was found in, e.g. *Re Weekes's Settlement* [1897] 1 Ch. 289.
65    As was found in, e.g. *Wilson v Duguid* (1883) 24 Ch.D. 244.
66    (2011) 243 C.L.R. 253 at [42], [50]–[62] (extracted at paras 7–008 to 7–014).
67    [1935] A.C. 96 at 142.
68    (2011) 243 C.L.R. 253 at [106] (extracted at para.7–011).
69    (2011) 243 C.L.R. 253 at [63]. Note that s.423 of the Insolvency Act 1986 (which deals with transactions defrauding creditors, whether those transactions take the form of a trust or not) can apply where S acts with a substantial purpose of putting assets beyond the reach of actual or future creditors, allowing a court to make an order restoring the property to S for the benefit of S's creditors. That provision may of course apply even if there was no sham, and a trust was set up by S. Similarly, s.37 of the Matrimonial Causes Act 1973 gives the court a jurisdiction to set aside dispositions made with the intention of defeating a spouse's claim to ancillary relief.
70    [1995] 1 F.L.R. 697.
71    See, e.g. *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [59] per Neuberger J: "there is a very strong presumption that parties intend to be bound by the provisions of agreements into which they enter, and, even more, intend the agreements they enter into to take effect."
72    [1995] 1 F.L.R. 696 at 707.

Mr Wyatt to mislead and Mrs Wyatt had been "recklessly indifferent"[73] to the possibility of its being used to mislead third parties such as Mr Wyatt's actual or future creditors. As a result, his interest in the home was subject to no trust, and so the bank could proceed to enforce their charging order over that interest. Whilst the term "sham trust" is sometimes used in reference to a case such as *Midland Bank Plc v Wyatt*, as Birss J pointed out in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*:[74] "Despite the frequent references to a 'sham trust', there is not really any such thing. What may or may not be a sham are the acts or documents which purport to set up the trust."

The sham doctrine may also apply to a document signed by S apparently setting up a trust by way of a transfer to T. In *Rahman v Chase Bank (CI) Trust Co Ltd*,[75] for example, Rahman purported to set up a trust, governed by Jersey law, where any capital remaining in the trust fund on an appointed day was to be divided between certain of his relatives. Until that point, both the trustees and Rahman had various powers in relation to the trust property, including a power to make appointments to Rahman. The court, looking at what had happened in practice after the date of the document, found that, to the extent that it suggested that Rahman had set up a trust for the benefit of others, the document was a sham: in fact, the trustees held the property as nominees for Rahman, who therefore had the beneficial interest in the trust property. The judge held that "the trustee was never made the master of the assets. [Rahman] intended to and in fact retained control of the capital and income of the trust fund throughout this lifetime".[76] The terms of the document could therefore be disregarded:[77] the trustee in fact held the property on a bare trust for Rahman.

7–061

It is important to note that, even if S has retained some significant practical control over the exercise of powers by T, this may be perfectly consistent with the finding that S intended to create a trust for the benefit of others, rather than a trust solely for S's own benefit:[78] after all, one of the main attractions of a trust (as opposed to an outright gift) is that it may be used by settlors as a means of benefitting other people whilst also keeping some control over the use of the trust property. However, in a case where S has transferred the property to T,[79] there comes a point where the extent of the duties owed by T to S mean that S has to be regarded as a beneficiary of the trust.[80] Such cases do not necessarily involve shams as such; it may be that S genuinely but mistakenly believed, perhaps as a result of poor

7–062

---

[73]   It was stated in *Midland Bank v Wyatt* [1997] 1 B.C.L.C. 242 at 245 that "a sham transaction will remain a sham transaction even if one of the parties to it merely went along with the 'shammer' not either knowing or caring about what he or she was signing." This was interpreted in *A v A* [2007] EWHC 99 (Fam) at [52] as demonstrating that "reckless indifference" by one party can suffice to show a common intention: see *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch) at [150].

[74]   [2017] EWHC 2426 (Ch) at [145].

[75]   [1991] J.L.R. 103.

[76]   [1991] J.L.R. 103 at 112.

[77]   Note that there are cases, and *Rahman* may well have been one, where, even if the document is treated at face value, and the sham doctrine is not applied, it can still be said that the rights and powers given to S by the document are so extensive that S in fact has a beneficial interest in the trust property. Certain offshore jurisdictions, however, not wanting to deter potential settlors, have legislated to ensure that the reservation of certain types of rights and powers will not lead to a finding that S has a beneficial interest in the property, e.g. the Bermuda Trusts (Special Provisions) Act 1989 s.2 (as amended by the Trusts (Special Provisions) Amendment Act 2014).

[78]   Similarly, the mere fact that T in practice acquiesced in S's wishes without considering the terms of the trust does not render the document setting up the trust a sham, as it may be that T is simply acting in breach of the trust genuinely set up in that document: see *A v A* [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 at [42].

[79]   Similarly, in a case where S attempts a self-declaration of trust: if the powers held by S are such that it cannot be said that S is under a duty not to use the trust property for S's own benefit then either there is no trust, or S is a beneficiary of the trust.

[80]   Some off-shore jurisdictions have sought to minimise the risk to settlors of a court making such a finding by legislative provisions stating that the reservation by S of certain powers "shall not affect the validity of the trust nor delay the trust taking effect": see e.g. Trusts (Jersey) Law 1984 s.9A and fn.77.

legal advice, that the legal structure created was one in which S was not a beneficiary of a trust.[81] As a result, the term "illusory trust" has been used to refer to such cases.[82] There is no necessity to use such a label, however, as no distinct doctrine is being applied: the court is simply undertaking its usual task of establishing S's objective intentions as to what rights and duties have been created,[83] and then seeing if those rights and duties give rise to a trust and, if so, on what terms. We therefore agree with some recent judicial observations that the term "illusory trust" is unhelpful.[84]

**7–063**    Whether as a result of the finding of a sham or otherwise, the finding that an apparent trust on which S is holding property does not exist, or that an apparent trust for third parties is in fact a trust for S, can have very significant consequences for S. As can be seen from *Midland Bank v Wyatt*, it means that property which, according to the terms of the document, is held by S for others is in fact at S's free disposition and so is available to meet the claims of S's creditors. Similarly, in a case such as *Rahman*, the finding of a sham means that T holds the property on a bare trust for S: such an interest is again available to S's creditors and must be taken into account when assessing S's tax liability. As well as insulating assets from general creditors or trying to limit a tax bill, S may have wished to put assets beyond the reach of any claims by a spouse, or by a relative who would be entitled on S's death under a particular jurisdiction's "forced heirship" rules.

**7–064**    The onus of proving that a document which appears to create a proper trust is actually a sham is on the person making the allegation.[85] Whilst it is rarely invoked, the sham doctrine is generally relied upon *against* S, by a party such as one of S's creditors.[86] Certainly, it is not open to a purported settlor to deny the objective effect of her own acts by relying on her secret dishonest intention to produce a different outcome.[87] In *Official Assignee v Wilson*[88] the New Zealand Court of Appeal concluded from this that S's trustee in bankruptcy was also precluded from alleging the existence of a sham, as he could be in no better position than the "settlor" herself. However, it seems strongly arguable that, as the trustee in bankruptcy acts on behalf of S's creditors, his ability to have a transaction declared a sham should not be compromised by any deception practised by S; although, of course, the interests of any innocent third parties who have relied on the apparent trust must be taken into account.[89]

---

[81]  See *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch) at [168], per Birss J: such a conclusion "is not the same thing as a finding of sham. The analysis is all concerned with what the effect of the deed truly is. It is not concerned with the subjective intentions of the parties to create a pretence to mislead."

[82]  Similarly, the mere fact that T in practice acquiesced in S's wishes without considering the terms of the trust does not render the document setting up the trust a sham: see fn.78.

[83]  The Privy Council's decision in *Webb v Webb* [2020] UKPC 22, for example, can be understood on this basis: see S. Agnew [2021] C.L.J. 18.

[84]  See e.g. *Clayton v Clayton (No.1)* [2016] NZSC 29; [2016] 1 N.Z.L.R. 551 at [123]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch) at [169]. Contrast *Law Society v Dua* [2020] EWHC 3528 (Ch) at [143].

[85]  *A v A* [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 at [69]; *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [68]. It is a serious allegation involving dishonesty, and "the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability": *Re H (Minors)* [1996] A.C. 563 at 586.

[86]  See too, e.g. *Hitch v Stone* [2001] S.T.C. 214. Note too that, even if there is no sham and S did set up such a trust, such creditors may then attempt to rely on the "claw-back" provisions of the Insolvency Act 1986, as discussed at fn 69.

[87]  See, e.g. *Shalson v Russo* [2005] Ch. 281 at [190]. In *Commissioner of Stamp Duties v Jolliffe* (1920) 28 C.L.R. 178, the High Court of Australia allowed S to rely on his own sham as against a taxing authority, but the dissent of Isaacs J has since been preferred: see, e.g. *Byrnes v Kendle* (2011) 243 C.L.R. 253.

[88]  [2008] 3 N.Z.L.R. 45.

[89]  See, e.g. *Re Yates (A Bankrupt)* [2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476 at [219]–[220]; *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [60].

### ii. Defining a Sham

The notion of a sham is not, of course, specific to the law of trusts. In *Snook v London and West Riding Investments Ltd*, Diplock LJ, albeit reluctantly,[90] suggested the following definition of the concept:[91]    **7–065**

> it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intended to create. . .for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived.

It is therefore clear that a degree of dishonesty is involved in a sham.[92] Whose intention is relevant when considering if a document apparently setting up a trust is a sham? In *Re Esteem Settlement*, the Royal Court of Jersey held that, where the apparent trust was set up by S's transfer of property to T to hold on trust,[93]    **7–066**

> in order to find a sham, the court must find that both the settlor and the trustee had the intention that the true position should be otherwise than as set out in the trust deed which they both executed.

That reasoning was also adopted by Rimer J in *Shalson v Russo*:[94]    **7–067**

> When a settlor creates a settlement he purports to divest himself of assets in favour of the trustee, and the trustee accepts them on the basis of the trusts of the settlement. The settlor may have an unspoken intention that the assets are in fact to be treated as his own and that the trustee will accede to his every request on demand. But unless that intention is from the outset shared by the trustee (or later becomes so shared), I fail to see how the settlement can be regarded as a sham. Once the assets are vested in the trustee, they will be held on the declared trusts, and he is entitled to regard them as so held and to ignore any demands from the settlor as to how to deal with them. I cannot understand on what basis a third party could claim, merely by reference to the unilateral intentions of the settlor, that the settlement was a sham and that the assets in fact remained the settlor's property. One might as well say that an apparently outright gift made by a donor can subsequently be held to be a sham on the basis of some unspoken intention of the donor not to part with the property in it. But if the donee accepted the gift on the footing that it was a genuine gift, the donor's undeclared intentions cannot turn an ostensibly valid disposition of his property into no disposition at all. To set that sort of case up the donee must also be shown to be a party to the alleged sham. In my judgment, in the case of a settlement executed by a settlor and a trustee, it is insufficient in considering whether or not it is a sham to look merely at the intentions of the settlor. It is essential also to look at those of the trustee.

---

[90]   The statement set out here was prefaced by Diplock LJ's comment that: "it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word": [1967] 2 Q.B. 786 at 802.

[91]   [1967] 2 Q.B. 786 at 802. The reference to documents cannot mean that either all of a document is sham, or none of it: see *Hitch v Stone* [2001] EWCA Civ 63; [2001] S.T.C. 214. Rather, each apparent creation of rights within a document must be seen as a relevant "act", and will only be valid if accompanied by the necessary intention that those rights should genuinely be created.

[92]   See, e.g. *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [46], [59], endorsed in *A v A* [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 at [53].

[93]   [2003] J.L.R. 188 at [54].

[94]   [2003] EWHC 1637 (Ch); [2005] Ch. 281 at [190].

**7–068**   In *A v A*, Munby J similarly stated that:[95]

> [there should be no finding of sham where] the trust property has been vested in someone who accepts that he holds the property as trustee on the trusts of a document which he believes to be a genuine instrument. He has no intention that the arrangement should be a sham . . . What is required is a common *intention* [of S and T], but reckless indifference will be taken to constitute the necessary intention.[96]

**7–069**   There may seem to be a discrepancy between this requirement of common intention and the point made above,[97] that a settlor setting up an express trust is exercising her own power to do so, and can therefore act unilaterally.[98] There are two plausible ways of resolving this tension. First, the sham doctrine can be seen as essentially evidential:[99] the court is asking when, in considering the intention of the settlor, it is possible to look beyond a signed document seemingly setting out that intention and to take account of factors such as the subsequent conduct of the relevant parties. Where that document has been executed by two parties, it seems that it can be disregarded only when both of those parties are, to some degree at least, involved in the deception. However, if a case were to involve a deed executed unilaterally and purporting to declare a trust of S's property, it is difficult to see how the intention of anyone other than S could be relevant.[100] Once the document is disregarded, the court can establish S's true intention. At that point, having made a decision as to the relevant evidence, and having undertaken an assessment of that evidence, the court can apply the standard test for the existence of an express trust.[101]

**7–070**   The second means of resolving the tension is to argue that there is no special sham doctrine as such, and that the cases can in fact be best seen as involving the application of the standard objective approach to evaluating S's intention. Douglas and McFarlane[102] have argued, for example, that the common intention requirement for a sham reflects the fact that S's intention is to be judged objectively, so that, once that common shamming intention is present, it is clear that, judged from the perspective of the reasonable person to whom S is communicating S's intention, the required intention to set up a trust is absent, as that party knows that the written document is not intended to be decisive.[103] On that view:[104]

---

[95]   [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 at [46], [52].

[96]   Munby J. considered *Midland Bank v Wyatt* to be a case in which that test was satisfied, as Mrs Wyatt could be seen as having gone along with the sham "neither knowing or caring what [she was] signing": [2007] EWHC 99 (Fam); [2007] 2 F.L.R. 467 at [52], approving the analysis in *Re Esteem Settlement* [2003] J.L.R. 188 at [58].

[97]   See para.7–005.

[98]   This point is explored by J. Palmer [2008] N.Z.L.J. 319, although note the reply to Palmer's analysis by M. Conaglen, "Trusts and Intention" in E. Simpson and M. Stewart (eds), *Sham Transactions* (Oxford University Press, 2013), 7.36–7.66 and see too paras 4–023 to 4–026.

[99]   This seems to be the effect of the analysis in M. Conaglen, "Sham Trusts" [2008] CL.J. 176 and M. Conaglen, "Trusts and Intention" in *Sham Transactions* (2013).

[100]   See, e.g. *Painter v Hutchison* [2007] EWHC 758 (Ch); [2008] B.P.I.R. 170 at [111]–[112]. At [115], Lewison J offered one way of explaining this point: "where there is a simple unilateral declaration of trust, the settlor and the trustee are one and the same person. So even if it is necessary to consider the intention of both the settlor and the trustee, in practice that amounts to the same thing as considering the intention of the settlor alone."

[101]   This the argument of B. McFarlane and E. Simpson, "Tackling Avoidance" in J. Getzler (ed.), *Rationalizing Property, Equity and Trusts: Essays in Honour of Edward Burn* (Oxford University Press, 2003).

[102]   S. Douglas and B. McFarlane, "Sham Trusts" in H. Conway and R. Hickey (eds) *Modern Studies in Property Law,* Vol.9 (Hart Publishing, 2017), p.237.

[103]   So, in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch), it was found at [424] that: "at all material times [S] regarded all the assets in these trusts as belonging to him and intended to retain ultimate control" and at [434] that this would have been obvious to someone in the position of the director of T, the trustee company. So, if, properly interpreted, the trust documents did not fulfil that objective intention, they would have been, in that sense, sham documents: see [437].

[104]   S. Douglas and B. McFarlane, "Sham Trusts" in *Modern Studies in Property Law,* Vol.9 (2017), pp.237, 249.

just because a court is looking behind the written declaration of trust does not mean that it is adopting a subjective approach . . . the objective approach employed in trusts law requires the court to ask what the settlor's words meant *to a reasonable person in the position of the addressee*. Such a person in sham cases (usually the trustee, but sometimes a beneficiary) is privy not just to the "declaration of trust", but also to other communications which inform the trustee of the settlor's desire to keep hold of his assets. To ask what a reasonable person in the position of the trustee would have understood the settlor to mean, therefore, naturally forces the court to "look behind" the declaration of trust as the trustee was privy to other communications.

## D. Mistakes

We have seen that S's intention to set up a trust has to be judged objectively, but that, on one view at least, S's subjective intention to deceive will be relevant when considering if a document apparently setting up a trust can be disregarded as a sham. S's inward thought processes may also be relevant where S did express a genuine intention to set up a trust, but her decision to exercise her power to set up a trust was vitiated by a mistake. In these circumstances the court may allow them to rescind the settlement, provided that her decision to create the trust was caused by her mistake, and she made a mistake sufficiently serious to render the trust voidable.[105] When deciding whether to allow rescission, the court will also take into account matters such as the interests of third parties. This is all examined in more detail in Chapter 20.    **7–071**

It is also possible for there to be a mistake in the documents setting up the trusts, if those documents do not accurately record S's intention. In such a case, a court may order rectification of the documents, with retrospective effect, so that they accord with the relevant intention. We will consider rectification in Chapter 21. Where S signs a trust document, the usual position of course is that, consistent with S's intention, the trust document will be regarded as the exclusive source of the terms of the trust. If, however, S is mistaken as to the content of the document when signing it, this subjective flaw can justify a court in ignoring S's intention that the document be the sole source of the terms of the trust,[106] so that the court can instead look beyond the document to establish the trust terms of the trust. This still allows room for those true terms to be established by the standard objective test,[107] rather than through S's subjective intention alone.[108]    **7–072**

## 3. Certainty of Subject-Matter

### A. The Nature of the Test

A trust can exist only if a trustee (T) is under a duty in relation to specific property held by T: "the creation of a valid trust requires the existence at that time of some assets to which the trust would apply".[109] To establish a valid express trust the settlor (S) must therefore make it certain what property    **7–073**

---

[105] *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108.
[106] See e.g. S. Douglas, "Misuse of Rectification in the Law of Trusts" (2018) 134 L.Q.R. 138.
[107] The contrary suggestions in *Day v Day* [2013] EWCA Civ 280; [2014] Ch. 114 (see e.g. Etherton C at 122) that S's subjective intention can also control the content of the trust terms on rectification are difficult to support: see S. Douglas, "Misuse of Rectification in the Law of Trusts" (2018) 134 L.Q.R. 138.
[108] See e.g. B. McFarlane and S. Douglas, "Sham Trusts" in *Modern Studies in Property Law*, Vol.9 (2017), p.237 and S. Douglas, "Misuse of Rectification in the Law of Trusts" (2018) 134 L.Q.R. 138, applying to trusts the approach taken in relation to rectification of contracts by R. Stevens, "Objectivity, Mistake and the Parol Evidence Rule" in E. Peel and A. Burrows (eds) *Contract Terms* (Oxford University Press, 2007).
[109] *North v Wilkinson* [2018] EWCA Civ 161 at [14] (David Richards LJ).

is to be held on trust.[110] For example, in *Boyce v Boyce*,[111] S bequeathed two houses to T on trust to convey whichever house Maria should choose to Maria and to convey the other to Charlotte. Maria died before S and so could not make a selection. It was held that the trust in favour of Charlotte was void for uncertainty of subject matter.

**7–074**    The need to identify the specific property to which B's right relates is certainly not unique to trusts: it is present in any case where B claims a legal or equitable property right. For example, no matter what the intention of the parties may have been, no property can pass in a sale of goods unless the specific goods have been identified, either by the terms of the parties' contract or by later ascertainment and appropriation.[112] As noted by Lord Mustill in *Re Goldcorp Exchange Ltd*,[113] this need for identification (as well as intention) is not some "arid legal technicality" but rather depends on "the very nature of things".[114] In that case, for example, the vendor had promised to sell a particular quantity of gold bullion to each customer, but the promise did not relate to any *specific* bullion, and so, even if a customer paid in advance, she could acquire no legal title. Seeking protection from the consequences of the vendor's insolvency, such customers instead claimed that a trust had arisen. This claim, as far as it related to any particular bullion,[115] failed for exactly the same reason: the subject-matter of the supposed equitable property right could not be identified.

## *B. Applying the Test*

**7–075**    The test does not require the subject matter of a gift or trust to be identified before the time when the gift or trust takes effect. In a will, therefore, S can validly make a disposition of "the residue of my estate" as the property comprised in that residue will be clear by the time when the gift or trust takes effect, as the executors will have met any debts and taxes due from the estate and have distributed any specific legacies. Similarly, of course, a gift or trust in relation to "half of the residue of my estate" would be valid; a disposition of "the bulk of my residuary estate" would however be too uncertain,[116] unless clear guidance could be found as to a particular meaning of the term "bulk" intended by S. Similarly, if S directs, in her will, that property is to go to her spouse, and "such part of it as may not be required by [the spouse]" shall, on the spouse's death, be held on trust for their children, the attempt to set up an immediate trust for the children fails, as there is no certainty as to its subject matter, and so the spouse takes absolutely.[117] In *re Last*, however, S directed that all her property should go to her brother and "at his death anything, that is left, that came from me to go to my late husband's grandchildren". As the brother died without a will or anyone entitled on his intestacy, such remaining property would otherwise have gone to the Crown as bona vacantia, so Karminski J strained

---

[110]    *Palmer v Simmonds* (1854) 2 Drew. 221 at 227 ("the bulk of my residuary estate" cannot satisfy the certainty requirement though "my residuary estate" can); *Re London Wine Co (Shippers) Ltd* [1986] P.C.C. 121 (settlor cannot declare itself trustee of unascertained 20 out of 80 bottles of Château Lafite 1970 in its cellar though it could declare it held its holding of 80 bottles on trust as for three-quarters for itself and one-quarter for X).

[111]    (1849) 16 Sim. 476.

[112]    Sale of Goods Act 1979 s.16.

[113]    [1995] 1 A.C. 74 at 90.

[114]    This is in turn a reference to C. Blackburn, *The Effect of the Contract of Sale* (William Benning and Co, 1845), p.123.

[115]    The customers also attempted to claim that the pre-payment of the price was held on a trust imposed by law. No such trust could arise, however, as the contract had not imposed any limit on the use the vendors could make of the money: the claimed trust of the money therefore failed for the same reason as the trust claimed in *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669: see para.16–026.

[116]    *Palmer v Simmonds* (1854) 2 Drew 221.

[117]    See e.g. *Mussoorie Bank v Raynor* (1882) 7 App. Cas. 321 at 331; *re Dunstan* [1918] 2 Ch. 304. See too Administration of Justice Act 1982 s.22 (extracted at para.7–040).

to interpret the will in such a way as to allow the gift to the grandchildren to succeed. He achieved this result by finding that, on a construction of the will as a whole, the brother had only a life interest in the property, with the grandchildren entitled in equal shares on his death.[118]

Where S makes a lifetime transfer of property to T to hold on trust for B, the identity of the trust property will necessarily be certain by virtue of the transfer. However, identifiability problems can arise in cases where S purports to declare herself trustee of some of her property without clearly identifying that property. For example, if S purports to declare herself trustee for B of 20 of her 80 gold bars, then (just as would be the case if a contract for sale was made on those terms) B acquires no interest until 20 bars have been ascertained and appropriated to the transaction with B.[119]    **7–076**

The position is different, however, if S declares a trust under which B has a 25% share of S's interest in the 80 gold bars. In such a case, the subject-matter of B's equitable property right *is* identified: it is all of the 80 gold bars. B's interest allows her a share in the benefit of S's single right to the identified 80 bars. For the same reason, property can pass immediately in a contract for the sale of a 25% share in S's right to the 80 bars.    **7–077**

In *Hunter v Moss*,[120] the question was whether a trust could arise as a result of a declaration that S held 50 of his 950 shares in a particular private company on trust for B. The Court of Appeal affirmed the view of the first instance judge that there was sufficient certainty of subject-matter and so a trust arose. Dillon LJ stated that:[121]    **7–078**

> Just as a person can give, by will, a specified number of his shares of a certain class in a certain company, so equally, in my judgment, he can declare himself a trustee of 50 of his ordinary shares in [a company] and that is effective to give a beneficial proprietary interest to the beneficiary under the trust.

This particular reasoning can be criticised. If S has made a will, then on her death, S's rights in all her assets are transferred to her executor, who is then obliged to implement S's wishes subject to the payment of debts, expenses and taxes. At no point does the executor have the free enjoyment of the property for herself. In contrast, where S purports to declare an inter vivos trust of property of which she is currently the full beneficial owner, it could be said that her attempt to constitute a trust of some of this property should be complete only when she has taken the further step of identifying the specific property to be held on trust. It could be argued that, until then, S has simply made an imperfect gift.    **7–079**

It may nonetheless be possible to support the approach in *Hunter v Moss* on different grounds. The principle in the case was usefully summarised by Briggs J in *Re Lehman Brothers International (Europe)*,[122] who then went on to discuss the nature of the trust recognised in that case:    **7–080**

> A trust of part of a fungible mass without the appropriation of any specific part of it for the beneficiary does not fail for uncertainty of subject matter, provided that the mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain . . . *Hunter v Moss* has not been without its academic and judicial critics, but its conclusion that there is no objection on the grounds of

---

[118]    [1958] P. 137. Note "bona vacantia" roughly translates as "ownerless goods": see para.16–068ff.

[119]    *Re London Wine Co Shippers Ltd* [1986] P.C.C. 121; *Re Stapylton Fletcher Ltd* [1995] 1 All E.R. 192; *Re Goldcorp Exchange* [1995] 1 A.C. 74. Some of the practical problems in the sale of goods context have now been remedied by Sale of Goods (Amendment) Act 1995.

[120]    [1994] 1 W.L.R. 452; criticised by D.J. Hayton (1994) 110 L.Q.R. 335; followed in an undefended case as applicable to intangibles but not tangibles: *Re Harvard Securities Ltd* [1997] 2 B.C.L.C. 369.

[121]    [1994] 1 W.L.R. 452 at 459.

[122]    [2010] EWHC 2914 (Ch) at [225]. The decision of Briggs J was affirmed by the Court of Appeal: [2011] EWCA Civ 1544; [2012] 2 B.C.L.C. 151.

> uncertainty to a trust of part of a shareholding of a trustee has been generally followed, in this country,[123] in Hong Kong,[124] and in Australia.[125] . . . The difficulty with applying the Court of Appeal's judgment in *Hunter v Moss* to any case not on almost identical facts lies in the absence of any clearly expressed rationale as to how such a trust works in practice. There has not been unanimity among those courts which have followed *Hunter v Moss*, nor among the many academics who have commented on it, as to the correct approach. The analysis which I have found the most persuasive is that such a trust works by creating a beneficial co-ownership share in the identified fund, rather than in the conceptually much more difficult notion of seeking to identify a particular part of that fund which the beneficiary owns outright.[126]

**7–081**    On this view, the key point in *Hunter v Moss* is that S was dealing with shares and not, for example, with gold. A share, by definition, is simply a proportionate part of a total set of entitlements, held by the complete body of shareholders, in relation to a company.[127] So if S has 950 shares of the same type, S does not have 950 separate rights; rather, S has one right (essentially a contractual right against the company) and the content of that right is determined by the number of shares. An analogy can be drawn with a bank account: the customer has just one right, but the extent of the credit determines the content of that right. This means that a declaration of trust of 50 of S's 950 shares can therefore be interpreted as a declaration of trust under which B becomes beneficially entitled to a 1/19th share of S's chose in action against the company constituted by all of the 950 shares: it is thus the same as a declaration of trust of a 25% share of 80 gold bars.[128] In contrast, if S instead declares a trust of 20 of her 80 gold bars, that *cannot*, by itself, be interpreted as a declaration of trust of a 25% share of S's right to the whole 80 bars, as each gold bar is a specific thing, and has a specific existence independent of any broader right.

**7–082**    There is certainly some evidence that, following *Hunter v Moss*, the courts have been readier to find that the requirement for certainty of subject-matter has been met. In *Re Lehman Brothers International (Europe)*,[129] for example, it was reasonably clear that the parties had intended to create a system where T, acting as a hub for buying and selling shares and other securities for all Lehman affiliate companies in Europe, would acquire rights from third parties on behalf of the affiliates, and would then hold those rights on trust for the affiliates. On the collapse of Lehman Brothers, different companies within the group had different creditors, and some of those creditors disputed whether the parties' arrangements had indeed created a trust, instead arguing that T in fact held unencumbered title to the securities.

**7–083**    This argument was based on the fact that the parties had agreed that, although T held the securities for and on account of the affiliates, T was also free to deal with those securities for its own benefit (for example by lending them, or by transferring them to third parties in order to satisfy its own contracts with such third parties) provided that, when the affiliate accounts were settled at the end of each day, T was able to provide the correct number and type of securities to each affiliate. It

---

[123] *Re Harvard Securities Ltd (in liq.)* [1997] 2 B.C.L.C. 369.

[124] *Re CA Pacific Finance Ltd* [2000] 1 B.C.L.C. 494.

[125] [2006] NSWSC 1379 [after a very thorough analysis of the authorities and of academic views].

[126] [Reference was made here to R. Goode, "Are Intangible Assets Fungibles?" [2003] L.M.C.L.Q. 309 and the judgment of Campbell J in *White v Shortall* [2006] NSWSC 1379 at [212].]

[127] See R. Goode "Are Intangible Assets Fungibles?" [2003] L.M.C.L.Q. 309, although note the contrary argument (in relation to private companies such as that in *Hunter v Moss*) made by G. Morton in S. Worthington (ed.), *Commercial Law and Commercial Practice* (Hart Publishing, 2003), pp.296–302.

[128] Note that where S is dealing with shares in a public company, it is almost certain (see paras 1–081 and 6–108) that S has only an equitable interest, as the shares are held through intermediaries, and S's equitable interest is very likely to be a proportionate one in a bigger pool of such shares held by an intermediary higher up the chain: in such a case, any declaration of trust of S's shares is necessarily a dealing in relation to co-ownership of a bigger pool of such shares.

[129] [2010] EWHC 2914 (Ch) at [225]. The decision of Briggs J was affirmed by the Court of Appeal: [2012] 2 B.C.L.C. 151.

was therefore argued that the apparent trust lacked certainty of subject-matter, as T's ultimate duty related purely to the number and type of securities and so did not relate to any specific property held by T, as that duty could be satisfied by using securities acquired from elsewhere, not the securities initially acquired on behalf of a particular affiliate.

Briggs J, whilst noting that the facts of the case were much more complicated than those in *Hunter v Moss*,[130] held that the certainty of subject matter requirement had nonetheless been satisfied. The point was that if, for example, T at one point acquired 100 ordinary ICI shares on behalf of an individual affiliate company (B), the subject matter of the trust would then be T's total holding of such shares, as well as any rights of T arising as a result of its future dealings with such shares (such as rights against third parties to whom T might lend the shares or sell the shares). It was argued that problems could arise if there was, at any point, a shortfall, so that the current rights held by T did not suffice to meet its duties to the affiliates; but Briggs J found that, as all the parties had consented to the arrangement, and thus to the possibility of a shortfall, it could be implied that they had consented to "bear the consequences of the shortfall equally".[131]    **7–084**

Moreover, whilst there might be points in time when T had disposed of shares without gaining any rights against third parties as a result, and so (consistently with the terms of the agreement) would have to reconstitute the fund by acquiring such shares, "a trust does not fail for want of certainty merely because its subject matter is to consist of after-acquired property":[132] even though at a particular point its subject matter might be uncertain, the trust can be valid if "the terms of the trust are sufficient to identify its subject matter in the future."[133] On this point, it is worth noting that the arrangement between the parties was not gratuitous: T had a binding contractual duty to reconstitute the fund by acquiring the necessary shares. It may therefore be possible to draw on the principle applied in cases such as *Pullan v Koe*,[134] and to find that a trust therefore arose immediately on T's acquisition of such shares.[135] Nonetheless, a difficulty remains: if, as in *Lehman Brothers*, T is permitted to deal with the relevant property for T's own benefit, subject only to a duty to reconstitute the fund from *any* source, then can it be said that T has more than a merely personal duty, given that there is a point in time when T's duty does not relate to any *specific* rights held by T?[136]    **7–085**

The broader issue in *Lehman Brothers*, which has arisen in a number of contexts, is the extent to which commercial parties can secure the advantages that come from establishing a trust, whilst at the same time giving the supposed trustee a wide power to deal with the trust property, or giving parties other than the supposed beneficiaries significant powers in relation to the decisions made by the trustees.[137] Briggs J's approach to this broader question is evident from his statement that:[138]    **7–086**

> The law does not lightly allow contracting parties' purposes and intentions to be defeated by supposed uncertainty, and there is in my judgment no reason why the law should do so any more readily than normal merely because the issue is as to the validity of an intended trust. On the contrary, the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property

---

130    [2010] EWHC 2914 (Ch) at [239].
131    [2010] EWHC 2914 (Ch) at [244].
132    [2010] EWHC 2914 (Ch) at [235].
133    [2010] EWHC 2914 (Ch) at [225].
134    [1913] 1 Ch. 9. See paras 5–076ff and 17–073ff.
135    But note, strictly speaking, this trust is a constructive one.
136    For discussion of this problem, see R. Stevens, "Floating Trusts" in P. Davies and J. Penner (eds) *Equity, Trusts and Commerce* (Hart Publishing, 2017).
137    See too *Citibank NA v MBIA Assurance SA* [2007] EWCA Civ 11; [2007] 1 All E.R. (Comm) 475.
138    [2010] EWHC 2914 (Ch) at [245].

> beneficially, in circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence. In all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles.

**7–087**   It is useful to compare the decisions in *Lehman Brothers* and in *North v Wilkinson*.[139] In the latter case, the Court of Appeal considered a claim that A, a sole trader, had created a trust in B's favour of 5% of A's business assets. Drawing on *Hunter v Moss* and *Lehman Brothers*, David Richards LJ found that "such a trust would not lack certainty of subject matter" as it would attach to "5% of such fluctuating credit balance as from time to time existed during the currency of the trust". However, the trust claimed in *North v Wilkinson*, as noted earlier in this chapter,[140] would raise serious practical issues, to which the parties had not addressed their minds. As a result, it was held that, whilst such a trust was possible in theory, it could not be said in practice that the parties had intended to create it, given that they had not dealt with the obvious practical difficulties that would arise from a trust. In *Lehman Brothers*, in contrast, where the very well-advised parties clearly had intended a trust, the court was willing to give effect to that intention.

**7–088**   Indeed, as shown by Briggs J's drawing of an analogy with common intention constructive trusts of the family home,[141] this judicial desire to give effect, where possible, to an intention to establish a trust can be seen beyond the commercial sphere. *Hunter v Moss* itself provides an example of the court's willingness to take a practical, rather than an overly-technical, approach when applying the test for certainty of subject-matter. Rimer QC, deciding the case at first instance, stated that:[142]

> the question of whether in any particular case there is such certainty depends, or ought to depend, not on the application of any immutable principle based on the requirements of a need for segregation or appropriation, but rather on whether, immediately after the purported declaration of trust, the court could, if asked, make an order for the execution of the purported trust. In any particular case it could and will only do so if, inter alia, the subject matter of the trust is identified with sufficient certainty.

**7–089**   In *Re Golay's Will Trusts*,[143] for example, a gift in a will directing that B should receive "a reasonable income" was upheld as valid, as the testator was regarded as having "given a sufficient indication of his intention to provide an effective determinant of what he intends so that the court in applying that determinant can give effect to the testator's intention". This was because the term was interpreted as requiring an objective assessment of reasonableness, such as courts are accustomed to making, which did not depend on the testator's subjective or personal view. As we will now see, this emphasis on whether the terms of the supposed gift or trust are clear enough to enable the court to ensure that those terms have been complied with is also evident when considering the third of the three certainties.

---

[139]   [2018] EWCA Civ 161.
[140]   See para.7–042.
[141]   See para. 7–086. Briggs J went on to note ([2010] EWHC 2914 (Ch) at [245]) that, in the "protracted and difficult debate" as to the common intention constructive trust of the family home (as to which, see paras 17–121ff), it has never been suggested that the parties' failure to specify the extent of B's beneficial interest causes the trust to fail for uncertainty.
[142]   *Hunter v Moss* [1993] 1 W.L.R. 934 at 945 (affirmed on appeal: [1994] 1 W.L.R. 452).
[143]   [1965] 1 W.L.R. 969 at 971.

## 4. Certainty of Objects

### A. The Nature of the Tests

The third of the three certainties, which can be referred to as requiring "certainty of objects", is, **7–090** again, based on an underlying principle that is not unique to the law of trusts. A trust necessarily involves T holding property subject to a duty; a contract, for example, also involves a contracting party (call her D) being under a duty to another. Such a duty can exist only where it is possible for a court to enforce it. This means two things. First, a court must be able to *police* the duty: it must be able to tell if particular action by T (or D) is or is not a breach of the duty. Second, a court must be able to *enforce* the duty: in the event of T (or D)'s failure to perform the duty, the court must be able to make an order that gives effect to the content of the duty. A valid trust, like a valid contract, must therefore provide a court with sufficient information to police and enforce the supposed duty imposed on T or on D.

There may also be relationships which a court must police, but need not enforce. This is the case **7–091** where T has a *power* to act in a certain way, but no duty to act. For example, S may transfer property to T to hold on trust for B, but with a power for T to appoint up to one half of the property to "any of [S's] old friends". T has no duty to make any such appointment, and so a court will never be called upon to enforce the power. The court does need to ensure, however, that any purported exercise of the power by T is authorised. This means that if T chooses, for example, to exercise the power in favour of X, and B challenges the exercise of that power, the court needs to be able to tell if X is, or is not, an "old friend" of S. If the term "old friend" is so uncertain that a court will simply be unable to make such an assessment, then the power cannot be policed, and so it will be invalid.

It is therefore clear that when a court deals with questions of certainty of objects, we first need to **7–092** ask what limits S intended to impose on T, in order to see what information is required for a court to police and (if necessary) enforce such limits. We must first, therefore, consider the different possibilities. We will start with arrangements with the least demanding certainty of objects requirements, and move up to those with the most demanding.

### B. Identifying the Test to be Applied

#### i. Gifts Subject to a Condition Precedent

In *Re Barlow's Will Trusts*,[144] a testatrix (S) instructed her executor "to allow any member of my family **7–093** and any friends of mine who may wish to do so to purchase" particular paintings in her estate at a low valuation. The term "friend" seems like a clear example of an uncertain term: how could a court tell in practice if X is or is not within that class? However, Browne-Wilkinson J held the disposition to be valid. His reasoning turned on the fact that the testatrix had effectively made a series of individual gifts to persons answering the description of her blood relations or friends, since the effect of the disposition was to confer on such persons a series of options to purchase at a low price. This was important as, if the disposition was invalidated, this would result in the loss of property to any person who clearly was, on any view, a member of S's family or friend of S. This suggested that as long as S had just one

---

[144]   [1979] 1 W.L.R. 278.

friend (on anyone's definition of that word), invaliding the instruction to S's executor as regards friends would, in effect, deprive that person of a clear entitlement.

**7–094**    Certainly, there was no need to have a complete list of all family members and friends, as all that was required was for the executors to be able to say of any individual coming forward whether or not she had proved that she was a relation or friend. The risk of the executors allowing someone not truly entitled to buy a painting (e.g. X, who was not in fact a friend of S) could therefore be dealt with by other means, e.g. by presuming that, if X cannot show that she is clearly within the class of "member of my family" or "friends", then X is not within that class and no gift need be made to them.[145] Such an approach may create some practical difficulties for the executors, who may have awkward decisions to make, but that disadvantage, it seems, is the price of ensuring that the vested entitlements of any clear friends are upheld.

**7–095**    In *Re Barlow's Will Trusts*, Browne-Wilkinson J relied on *Re Allen*,[146] where the Court of Appeal had upheld a bequest "to the eldest of the sons of [S] who shall be a member of the Church of England and an adherent to the doctrine of that Church". By upholding this gift, the court gave the eldest son the chance to establish that he met the condition imposed on the gift. It was not necessary for the executors to be able to tell of a hypothetical X whether or not X met the condition: they simply had to consider, in turn according to age, each of the sons of S. As Lord Evershed MR observed in *Re Allen*,[147] a gift to "B if he is a tall man" should not be invalidated, as B, if he is 6ft 6ins, should not be deprived of the gift.

**7–096**    Certainly, if there are a small number of ascertainable possible recipients of the gift, it seems reasonable that each should be given the chance to show that she comes within the "core" meaning of the qualifying condition, even if that term is conceptually uncertain, in the sense that a clear meaning, enabling marginal cases to be decided, cannot be found.[148]

## ii. Non-Fiduciary Powers

**7–097**    It is possible for a settlor S to give a party who is not a trustee a power in relation to trust property. For example, S could give property to trustees to hold on trust for B, whilst also giving P, S's sister, a power to order the trustees to advance up to half of the trust fund to any of S's friends. In such a case, there is a question as to whether S intended P to be under any duties in relation to the exercise of that power—such as, for example, a duty to consider periodically whether or not to exercise that power. Such duties are generally assumed to arise where S gives a power to a trustee, T, because T, as a trustee, has fiduciary duties.[149] If, instead, S gives a power to someone such as P who is not expected to have similar responsibilities, then there is no such presumption.[150]

**7–098**    Where P has no such duties, P may be called a holder of a "non-fiduciary power" or "bare power". In such a case, the court's only concern in policing the exercise of the power is to ensure that P does not

---

[145]    That was the approach taken to relatives by Megaw and Sachs LJJ in *Re Baden's Deed Trusts (No.2)* [1973] Ch. 9: see paras 7–155 to 7–171.

[146]    [1953] Ch. 810.

[147]    [1953] Ch. 810 at 817.

[148]    See, e.g. L. McKay, "Re Barlow and the Certainty of Objects Rule" [1980] Conv. 263 at 277; C.T. Emery, "The Most Hallowed Principle: Certainty of Beneficiaries of Trusts and Powers of Appointment" (1982) 98 L.Q.R. 551 at 564.

[149]    See paras 2–066 to 2–216 for a discussion of fiduciary duties.

[150]    Indeed, if the power given to P is one which P can also exercise for her own benefit, then it will be difficult to see it as a fiduciary power, as the ability to act in one's own self-interest is inconsistent with the basic nature of fiduciary duties: see paras 2–094 to 2–137.

exercise the power in favour of someone who is outside the class specified by S. This means that the court needs to be able to tell of any given person whether or not that person is inside the class: should P exercise the power in favour of X, and B then challenges that disposition, the court will then be able to tell if the exercise of the power was authorised. This test is often called the "given postulant" test or the "is or is not" test. It is of great importance in practice, as it also applies in the much more common case where a power is given to a trustee.

It seems that a power to make dispositions in favour of any "friend" of S will not pass this "is or is not" test, as the term is not sufficiently certain to enable a court to decide, in a marginal case, if X is nor is not in the class. This may be unfortunate for C, a party who was, on any view of the concept of friendship, a friend of S. It is important to note, however, that the invalidity of the power does not deprive C of any vested entitlement, but only of the possibility that P would have exercised the power in C's favour. This explains why the more relaxed test applied to conditional gifts[151] does not apply to powers. In *Re Gulbenkian's Settlement Trusts*,[152] the House of Lords therefore rejected the view of Lord Denning MR in the Court of Appeal that, in the case of a power,[153] it was only necessary to show that any one person is clearly within the class. Lord Upjohn stated that:[154]   **7–099**

> with respect to mere powers, while the court cannot compel the trustees to exercise their powers, yet those entitled to the fund in default must clearly be entitled to restrain the trustees from exercising it save among those within the power. So the trustees, or the court, must be able to say with certainty who is within and who is without the power.

### iii. Fiduciary Powers

Consider a case in which a settlor S gives property to a trustee T to hold on trust for a beneficiary B, whilst also giving T a power to advance up to half of the trust fund to any of S's friends. As in the case of a non-fiduciary power, the court will have to police the power by ensuring that it is not exercised in favour of anyone outside that class, and so the "is or is not" test will be applied. In this case, however, T's power is a fiduciary one because she holds it in her capacity as trustee. This means that T will be under further duties: the question is whether the existence of such duties means that a higher standard of certainty is required than in the case of a non-fiduciary power. Those questions were considered by Megarry VC in the following extract, which draws an explicit link between the nature of the duties that S seeks to impose and the certainty required of S's settlement.   **7–100**

At various points in the extract Megarry VC refers to a "mere power" vested in trustees, by which he means a fiduciary power that the trustees need not exercise. Megarry VC uses this term to differentiate the power from a power that the trustees owe a duty to exercise in some way. Confusingly, the latter type of power is sometimes called a "trust power",[155] but, as it gives rise to a discretionary trust, we will examine it separately below.[156]   **7–101**

---

[151]  See paras 7–093 to 7–096.
[152]  [1970] A.C. 508.
[153]  The case itself concerned fiduciary powers, but the reasoning also applies to non-fiduciary powers.
[154]  [1970] A.C. 508 at 525.
[155]  As in, e.g. *Re Baden (No.1)* [1971] A.C. 424 (extracted at paras 7–126 to 7–142).
[156]  See paras 7–124ff.

### Re Hay's Settlement Trusts

### Chancery Division [1982] 1 W.L.R. 202

**7–102**   By clause 4 of Lady Hay's settlement made in 1958, trustees held the trust fund

"on trust for such persons or purposes for such interests and with such gifts over and (if for persons) with such provisions for their respective maintenance or advancement at the discretion of the Trustees or of any other persons as the Trustees shall by any deed or deeds revocable or irrevocable (but if revocable not after the expiration of 21 years from the date hereof) executed within 21 years from the date hereof appoint . . . and in default of such appointment in trust for the nieces and nephews of the Settlor now living in equal shares."

**7–103**   A proviso precluded any appointment being made to the settlor, any husband of her, and any trustee or past trustee. For the first five years income was to be accumulated and then the income was to be held on discretionary trusts for the nieces and nephews or charities until the clause 4 power of appointment was exercised or ceased to be exercisable (by expiry of the 21 years). In 1969 a deed of appointment was executed, clause 1 conferring a power of appointment on the trustees (exercisable till expiry of the 21-year period in the 1958 settlement) to hold "the trust fund and the income thereof on trust for such persons and such persons as shall be appointed." Clause 2 directed that the undisposed-of income (until full exercise of the clause 1 power) be held on discretionary trusts for the benefit of any persons whatsoever (the settlor, any husband of her, any existing or former trustee excepted) or for any charity. The questions arose: (i) whether or not the very wide power of appointment in the 1958 settlement was valid; and (ii) if it was valid then whether its purported exercise by the trustees in 1969 was void in creating a very wide discretionary trust that was either an impermissible delegation by the trustees of their power under the 1958 settlement, or was in itself void as th planned discretionary trust was administratively unworkable? The first question is our focus here, and it was decided in favour of validity; on the second question, however, it was decided that the very wide discretionary trust involved an impermissible delegation by the trustees of their powers under the 1958 settlement.

**7–104**      MEGARRY V.-C.: . . . The starting point must be to consider whether the power created by the first limb of clause 4 of the settlement is valid. . . . The essential point is whether a power for trustees to appoint to anyone in the world except a handful of specified persons is valid. Such a power will be perfectly valid if given to a person who is not in a fiduciary position: the difficulty arises when it is given to trustees, for they are under certain fiduciary duties in relation to the power, and to a limited degree they are subject to the control of the courts. . . .

**7–105**      In *Re Manisty's Settlement*[157] a settlement gave trustees a discretionary power to apply the trust fund for the benefit of a small class of the settlor's near relations, save that any member of a smaller "excepted class" was to be excluded from the class of beneficiaries. The trustees were also given power at their absolute discretion to declare that any person, corporation or charity (except a member of the excepted class or a trustee) should be included in the class of beneficiaries. Templeman J. held that this power to extend the class of beneficiaries was valid. . .

**7–106**      I propose to approach the matter by stages. First, it is plain that if a power of appointment is given to a person who is not in a fiduciary position, there is nothing in the width of the power which invalidates it per se. The power may be a special power with a large class of persons as objects; the power may be what is called a "hybrid" power, or an "intermediate" power, authorising appointment to anyone save a specified number or class of persons; or the power may be a general power. Whichever it is, there is nothing in the number of persons to whom an appointment may be made which will invalidate it. The difficulty comes when the power is given to trustees as such, in that the number of objects may interact with the fiduciary duties of the trustees and their control by the court. The argument of counsel for the defendants carried him to the extent of asserting that no valid intermediate or general power could be vested in trustees.

**7–107**      That brings me to the second point, namely, the extent of the fiduciary obligations of trustees who have a mere power vested in them, and how far the court exercises control over them in relation to that power. In the case of a trust, of course, the trustee is bound to execute it, and if he does not, the court will see to its execution. A mere power is very different. Normally the trustee is not bound to exercise it, and the court will not compel him to do so. That, however, does not mean that he can simply fold his hands and ignore

---

[157]   [1974] Ch. 17.

it, for normally he must from time to time consider whether or not to exercise the power, and the court may direct him to do this.

When he does exercise the power, he must, of course (as in the case of all trusts and powers) confine himself to what is authorised, and not go beyond it. But that is not the only restriction. Whereas a person who is not in a fiduciary position is free to exercise the power in any way that he wishes, unhampered by any fiduciary duties, a trustee to whom, as such, a power is given is bound by the duties of his office in exercising that power to do so in a responsible manner according to its purpose. It is not enough for him to refrain from acting capriciously; he must do more. He must "make such a survey of the range of objects or possible beneficiaries" as will enable him to carry out his fiduciary duty. He must find out "the permissible area of selection and then consider responsibly, in individual cases, whether a contemplated beneficiary was within the power and whether, in relation to the possible claimants, a particular grant was appropriate"[158] . . .

**7–108**

That brings me to the third point. How is the duty of making a responsible survey and selection to be carried out in the absence of any complete list of objects? This question was considered by the Court of Appeal in *Re Baden (No.2)*. That case was concerned with what, after some divergences of judicial opinion, was held to be a discretionary trust and not a mere power; but plainly the requirements for a mere power cannot be more stringent than those for a discretionary trust. The duty, I think, may be expressed along the following lines. The trustee must not simply proceed to exercise the power in favour of such of the objects as happen to be at hand or claim his attention. He must first consider what persons or classes of persons are objects of the power within the definition in the settlement or will. In doing this, there is no need to compile a complete list of the objects, or even to make an accurate assessment of the number of them: what is needed is an appreciation of the width of the field, and thus whether a selection is to be made merely from a dozen or, instead, from thousands or millions. . . . Only when the trustee has applied his mind to "the size of the problem" should he then consider in individual cases whether, in relation to other possible claimants, a particular grant is appropriate. In doing this, no doubt he should not prefer the undeserving to the deserving; but he is not required to make an exact calculation whether, as between deserving claimants, A is more deserving than B.[159]

**7–109**

If I am right in these views, the duties of a trustee which are specific to a mere power seem to be three-fold. Apart from the obvious duty of obeying the trust instrument, and in particular of making no appointment that is not authorised by it, the trustee must, first, consider periodically whether or not he should exercise the power; second, consider the range of objects of the power; and third, consider the appropriateness of individual appointments. I do not assert that this list is exhaustive; but as the authorities stand it seems to me to include the essentials, so far as relevant to the case before me.

**7–110**

On this footing, the question is thus whether there is something in the nature of an intermediate power which conflicts with these duties in such a way as to invalidate the power if it is vested in a trustee. . .I do not see how mere numbers can inhibit the trustees from considering whether or not to exercise the power, as distinct from deciding in whose favour to exercise it.

**7–111**

The second ground of [claimed invalidity] seems to be that the power is so wide that it would be impossible for the trustees to consider in any sensible manner how to exercise it, and also impossible for the court to say whether or not they were properly exercising it. With respect, I do not see how that follows. If I have correctly stated the extent of the duties of trustees in whom a mere power is vested, I do not see what there is to prevent the trustees from performing these duties. [In *Re Baden (No.2)*,[160] the Court of Appeal explained] how the trustees should make a survey and consider individual appointments in cases where no complete list of objects could be compiled. I also have in mind that the settlor in the present case is still alive, though I do not rest my decision on that.

**7–112**

From what I have said it will be seen that I cannot see any ground on which the power in question can be said to be void. Certainly it is not void for linguistic or semantic uncertainty; there is no room for doubt in the definition of those who are or are not objects of the power. Nor can I see that the power is administratively unworkable. The words of Lord Wilberforce in *Re Baden (No.1)*[161] are directed to discretionary

**7–113**

---

158   *Re Baden (No.1)* [1971] A.C. 424 at 449 and 457, per Lord Wilberforce.
159   See *Re Gestetner, deceased* [1953] Ch. 672 at 688, approved in *Re Baden (No.1)* [1971] A.C. 424 at 453.
160   [1973] Ch. 9.
161   [1971] A.C. 424 at 457.

trusts, not powers. Nor do I think that the power is void as being capricious. In *Re Manisty's Settlement*[162] Templeman J. appears to be suggesting that a power to benefit "residents in Greater London" is void as being capricious "because the terms of the power negative any sensible intention on the part of the settlor". In saying that, I do not think that the judge had in mind a case in which the settlor was, for instance, a former chairman of the Greater London Council, as subsequent words of his on that page indicate. In any case, as he pointed out earlier, this consideration does not apply to intermediate powers, where no class which could be regarded as capricious has been laid down. Nor do I see how the power in the present case could be invalidated as being too vague, a possible ground of invalidity considered in *Re Manisty's Settlement*.[163] Of course, if there is some real vice in a power, and there are real problems of administration or execution, the court may have to hold the power invalid: but I think that the court should be slow to do this. Dispositions ought if possible to be upheld, and the court ought not to be astute to find grounds on which a power can be invalidated. Naturally, if it is shown that a power offends against some rule of law or equity, then it will be held to be void: but a power should not be held void on a peradventure. In my judgment, the power conferred by clause 4 of the settlement is valid.

**7–114**    [Megarry VC then accepted the argument that "clause 2 of the deed of appointment is void as being an excessive execution of the power" as it involved an impermissible delegation of that power by the trustees of the 1958 settlement to the trustees of the 1969 discretionary trust]. . .

**7–115**    That, I think, suffices to dispose of the case. I have not dealt with the submission which counsel for the defendants put in the forefront of his argument. This was that even if the power had been wide enough to authorise the creation of the discretionary trust, that trust was nevertheless as bad as being a trust in favour of "so hopelessly wide" a definition of beneficiaries "as not to form anything like a class so that the trust is administratively unworkable".[164] I do not propose to go into the authorities on this point. I consider that the duties of trustees under a discretionary trust are more stringent than those of trustees under a power of appointment,[165] and as at present advised I think that I would, if necessary, hold that an intermediate trust such as that in the present case is void as being administratively unworkable. In my view there is a difference between a power and a trust in this respect. The essence of that difference, I think, is that beneficiaries under a trust have rights of enforcement which mere objects of a power lack.

**7–116**    [He then held that the nieces and nephews living at the date of the settlement had become entitled to the trust fund on the expiration of 21 years from the date of the settlement by virtue of the gift over in default of any valid appointment within the 21 years.]

**7–117**    The analysis of Megarry VC is very helpful as it makes clear the link between the certainty of objects test and the nature of the duties owed by the holder of a power. Like the holder of a non-fiduciary power, the holder of a fiduciary power should not exercise the power in favour of someone outside the permitted class, and so the "is or is not" certainty test must be met.[166] In addition, however, the holder of a fiduciary power also has, at least,[167] the three duties identified by Megarry VC:[168] (i) to consider periodically whether or not he should exercise the power; (ii) to consider the range of objects of the power; and (iii) to consider the appropriateness of individual appointments.

**7–118**    As held by Megarry VC,[169] the width of the class does not in itself prevent T from fulfilling those duties. It is important that T can carry them out without having a complete list of all potential objects. In *Re Baden (No.2)*,[170] for example, Megaw LJ stated that (even in relation to a discretionary trust),

---

[162]    [1974] Ch. 17 at 27.
[163]    [1974] Ch. 17 at 24.
[164]    *Re Baden (No.1)* [1971] A.C. 424 at 457, per Lord Wilberforce.
[165]    See *Re Baden (No.1)* [1971] A.C. 424 at 457.
[166]    This may be the point that Templeman J had in mind in *Re Manisty's Settlement Trusts* [1974] Ch. 17 at 24 when stating that a power may be invalid if "too vague".
[167]    Note Megarry VC's statement that "I do not assert that this list is exhaustive": [1982] 1 W.L.R. 202 at 210 (extracted at para.7–110). See paras 2–091 to 2–093 for a discussion of the content of fiduciary duties.
[168]    [1982] 1 W.L.R. 202 at 210 (extracted at para.7–110).
[169]    Preferring the analysis of Templeman J in *Re Manisty's Settlement Trusts* [1974] Ch. 17 to the obiter views of Buckley LJ in *Blausten v IRC* [1972] Ch. 256.
[170]    [1973] Ch. 9 at 24.

there is no need for T to ascertain all of the possible objects: as long as a substantial number of objects can clearly be identified, T can proceed to consider how to exercise the power to select particular objects as recipients of part of the fund.

It could instead be argued, in the words of Lord Upjohn in *Re Gulbenkian's Settlement Trusts*,[171] that: **7–119**

> The trustees have a duty to select the donees of the donor's bounty from among the class designated by the donor; he has not entrusted them with any power to select the donees merely from known claimants who are within the class, for that is constituting a narrower class and the donor has given them no power to do this.

The practical difficulty, however, is that if a complete list of all potential objects were required, the flexibility available to S by conferring a power on trustees would be severely reduced. The most significant way of departing from S's intentions, of course, is to find that a power is invalid with the effect that those entitled in default of the exercise of the power take absolutely, without any chance for the power to be exercised. It is therefore reasonable for a court to presume that, in order for the power to be valid, S would be content with T, when considering the exercise of the power, to have an "appreciation of the width of the field",[172] rather than a duty to survey the whole field. This coincides with the point that we noted above in relation to certainty of subject matter:[173] the courts are prepared to take a practical view of certainty requirements in order to uphold, if possible, the intended arrangement. As Megarry VC phrased it:[174] **7–120**

> Dispositions ought if possible to be upheld, and the court ought not to be astute to find grounds on which a power can be invalidated.

Megarry VC did however consider whether the terms of the power were such as to make it "void as being capricious". In *Re Manisty's Settlement Trusts*,[175] Templeman J's view was that this ground of invalidity would arise if "the terms of the power negative any sensible intention on the part of the settlor." The point seems to be that, in discharging the three duties identified by Megarry VC, T needs to bear in mind the (expressed, objective) intention of the settlor: it will clearly be a key factor, for example, in considering the appropriateness of a particular possible distribution. If, however, the terms of the trust provide T with no evidence as to that intention, and there is no other evidence that T could draw on in considering what might be a sensible approach to the exercise of the power, then the power will be invalid. It would seem that this need for a "sensible intention on the part of the settlor" is not a requirement for a non-fiduciary power, as the holder of such a power is free in any case simply to refuse to consider whether to exercise it. **7–121**

It therefore seems that the need for the power to be non-capricious (i.e. for there to be evidence of a sensible intention on the part of the settlor, either from the terms of the power or from other circumstances) is a further requirement for the validity of a fiduciary power which does not apply to a non-fiduciary power. It should be emphasised, however, that this additional hurdle is extremely unlikely to cause any practical problems for S. After all, in practice, people do not tend to use settlements (especially ones drawn up with professional advice) as a means to act irrationally or mysteriously. Indeed, it is worth noting that the power in question in *Re Manisty's Settlement* was itself **7–122**

---

[171]   [1970] A.C. 508 at 524.
[172]   *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 210 (extracted at para.7–109).
[173]   See para.7–089.
[174]   *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 212 (extracted at para.7–113).
[175]   [1974] Ch. 17 at 27.

upheld, and the example given by Templeman J of a capricious power (a power to benefit "residents in Greater London") was queried by Megarry VC in *Re Hay's Settlement Trusts*,[176] on the basis that a sensible intention of the settlor might be evident if "the settlor was, for instance, a former chairman of the Greater London Council". Megarry VC also limited the potential reach of the non-capricious requirement by stating that it cannot apply where the power is an intermediate one (i.e. exercisable in favour of anyone in the world, bar those specifically excepted) as in such a case, "no class which could be regarded as capricious has been laid down".

**7–123**   Megarry VC also considered, and rejected, the argument that a fiduciary power will be invalid if it is "administratively unworkable", stating that this requirement applied only to discretionary trusts.[177] We will now consider the rules applying in the latter type of case.

### iv. Discretionary Trusts

**7–124**   The distinction between a fiduciary power and a discretionary trust consists in the fact that the latter involves a duty on a trustee (T) to exercise the power in some way, and hence make some distribution of the trust property.[178] When holding property on a discretionary trust, T can be prevented from exercising her power in favour of a party outside the permitted class of objects and, as a fiduciary, she also has the duties outlined above.[179] The "is or is not" test and the non-capricious requirement must therefore apply to discretionary trusts as they do to a fiduciary power. The question is whether the addition of the duty to make some distribution should lead to further certainty requirements that apply to a discretionary trust but not to a fiduciary power.

**7–125**   This critical question was considered by the House of Lords in *Re Baden's Deed Trusts (No.1)*, which is also known as *McPhail v Doulton*.[180] It had been previously held by the Court of Appeal that a discretionary trust can be valid only if a complete list can be drawn up of all the objects of the trust, i.e. of all possible recipients of the trust property.[181] The majority of the House of Lords rejected that view and instead found that discretionary trusts should, with some small differences,[182] be subject to the same certainty test as applied by the House of Lords to fiduciary powers in *Re Gulbenkian's Settlement Trusts*:[183] the "is or is not" test. It should be noted that Lord Wilberforce in the following extract refers to a discretionary trust as a "trust power"[184] to distinguish it from what in *Re Hay's Settlement Trusts* Megarry VC called a "mere power" held in a fiduciary capacity.[185]

| *Re Baden's Deed Trusts (No.1), McPhail v Doulton* |
| :---: |
| House of Lords [1971] A.C. 424 |

**7–126**   The facts and the issues appear clearly in the following speech of LORD WILBERFORCE with which LORD REID and VISCOUNT DILHORNE concurred, although dissenting speeches were delivered by LORD HODSON and LORD GUEST.

---

[176]   [1982] 1 W.L.R. 202 at 212 (extracted at para.7–113).
[177]   [1982] 1 W.L.R. 202 at 213 (extracted at para.7–115).
[178]   A discretionary trust need not be exhaustive however: the duty need not be to distribute all of the trust fund. For discussion see, e.g. Y. Grbich, "*Baden*: Awakening the Conceptually Moribund Trust" (1974) 37 M.L.R. 643, 643.
[179]   See para.7–117.
[180]   [1971] A.C. 424.
[181]   *IRC v Broadway Cottage Trusts* [1955] Ch. 20.
[182]   See further paras 7–146 to 7–149.
[183]   [1970] A.C. 508.
[184]   See too, e.g. *Re Baden (No.1)* [1971] A.C. 424 (extracted at paras 7–126 to 7–142).
[185]   See para.7–101.

LORD WILBERFORCE: My Lords, this appeal is concerned with the validity of a trust deed dated July 17, 1941, by which Mr. Bertram Baden established a fund for the benefit, broadly, of the staff of the respondent company Matthew Hall & Co Ltd.

The critical clauses are as follows:

"9.  (a)  The Trustees shall apply the net income of the Fund in making at their absolute discretion grants to or for benefit of any of the officers and employees or ex-officers or ex-employees of the Company or any relatives or dependants of any such persons in such amounts at such times and on such conditions (if any) as they think fit and any such grant may at their discretion be made by payment to the beneficiary or to any institution or person to be applied for his or her benefit and in the latter case the Trustees shall be under no obligation to see to the application of the money.

"(b)  The Trustees shall not be bound to exhaust the income of any year or other period in making such grants as aforesaid and any income not so applied shall be dealt with as provided by clause 6(a) hereof enabling moneys to be placed with any Bank or to be invested.

"(c)  The Trustees may realise any investments representing accumulations of income and apply the proceeds as though the same were income of the Fund and may also (but only with the consent of all the Trustees) at any time prior to the liquidation of the Fund realise any other part of the capital of the Fund which in the opinion of the Trustees it is desirable to realise in order to provide benefits for which the current income of the Fund is insufficient.

"10.  All benefits being at the absolute discretion of the Trustees, no person shall have any right title or interest in the Fund otherwise than pursuant to the exercise of such discretion, and nothing herein contained shall prejudice the right of the Company to determine the employment of any officer or employee."

Clause 11 defines a perpetuity period within which the trusts are, in any event, to come to an end and clause 12 provides for the termination of the fund. On this event the trustees are directed to apply the fund in their discretion in one or more of certain specified ways of which one is in making grants as if they were grants under clause 9(a) . . .

In this House, the appellants contended that the provisions of clause 9(a) constitute a trust and not a power. If that is held to be the correct result both sides agree that the case must return to the Chancery Division for consideration, on this footing, whether this trust is valid. But here comes a complication. In the present state of authority, the decision as to validity would turn on the question whether a complete list (or on another view a list complete for practical purposes) can be drawn up of all possible beneficiaries. This follows from the Court of Appeal's decision in *Inland Revenue Comrs v Broadway Cottages Trust*[186] as applied in later cases by which, unless this House decides otherwise, the Court of Chancery would be bound. The respondents invite your Lordships to review this decision and challenge its correctness. So the second issue which arises, if clause 9(a) amounts to a trust, is whether the existing test for its validity is right in law and if not, what the test ought to be.

Before dealing with these two questions some general observations, or reflections, may be permissible. It is striking how narrow and in a sense artificial is the distinction, in cases such as the present, between trusts or as the particular type of trust is called, trust powers, and powers. It is only necessary to read the learned judgments in the Court of Appeal[187] to see that what to one mind may appear as a power of distribution coupled with a trust to dispose of the undistributed surplus, by accumulation or otherwise, may to another appear as a trust for distribution coupled with a power to withhold a portion and accumulate or otherwise dispose of it. A layman and, I suspect, also a logician, would find it hard to understand what difference there is.

It does not seem satisfactory that the entire validity of a disposition should depend on such delicate shading. And if one considers how in practice reasonable and competent trustees would act, and ought to act, in the two cases, surely a matter very relevant to the question of validity, the distinction appears even less significant. To say that there is no obligation to exercise a mere power and that no court will intervene to compel it, whereas a trust is mandatory and its execution must be compelled, may be legally correct enough, but the proposition does not contain an exhaustive comparison of the duties of persons who are

7–127

7–128

7–129

7–130

7–131

7–132

---

[186]  [1955] Ch. 20.
[187]  [1969] 2 Ch. 388.

trustees in the two cases. A trustee of an employees' benefit fund, whether given a power or a trust power, is still a trustee and he would surely consider in either case that he has a fiduciary duty; he is most likely to have been selected as a suitable person to administer it from his knowledge and experience, and would consider he has a responsibility to do so according to its purpose. It would be a complete misdescription of his position to say that, if what he has is a power unaccompanied by an imperative trust to distribute, he cannot be controlled by the court if he exercised it capriciously, or outside the field permitted by the trust.[188] Any trustee would surely make it his duty to know what is the permissible area of selection and then consider responsibly, in individual cases, whether a contemplated beneficiary was within the power and whether, in relation to other possible claimants, a particular grant was appropriate.

7–133   Correspondingly a trustee with a duty to distribute, particularly among a potentially very large class, would surely never require the preparation of a complete list of names, which anyhow would tell him little that he needs to know. He would examine the field, by class and category; might indeed make diligent and careful enquiries, depending on how much money he had to give away and the means at his disposal, as to the composition and needs of particular categories and of individuals within them; decide on certain priorities or proportions, and then select individuals according to their needs or qualifications. If he acts in this manner, can it really be said that he is not carrying out the trust?

7–134   Differences there certainly are between trusts (trust powers) and powers, but as regards validity should they be so great as that in one case complete, or practically complete ascertainment is needed, but not in the other? Such distinction as there is would seem to lie in the extent of the survey which the trustee is required to carry out; if he has to distribute the whole of a fund's income, he must necessarily make a wider and more systematic survey than if his duty is expressed in terms of a power to make grants. But just as, in the case of a power, it is possible to underestimate the fiduciary obligation of the trustee to whom it is given, so, in the case of a trust (trust power), the danger lies in overstating what the trustee requires to know or to enquire into before he can properly execute his trust. The difference may be one of degree rather than of principle; in the well-known words of Sir George Farwell[189] trusts and powers are often blended, and the mixture may vary in its ingredients.

7–135   I now consider whether the provisions of clause 9(a) constitute a trust or a power. Naturally read, the intention of the deed seems to me clear: clause 9(a), whose language is mandatory ("shall"), creates, together with a power of selection, a trust for distribution of the income, the strictness of which is qualified by clause 9(b) which allows the income of any one year to be held up and (under clause 6(a)) either placed, for the time, with a bank, or, if thought fit, invested. Whether there is, in any technical sense, an accumulation seems to me in the present context a jejune enquiry; what is relevant is that clause 9(c) marks the difference between "accumulations" of income and the capital of the fund: the former can be distributed by a majority of the trustees, the latter cannot. As to clause 10, I do not find in it any decisive indication. If anything it seems to point in favour of a trust, but both this and other points of detail are insignificant in the face of the clearly expressed scheme of clause 9. I therefore declare that the provisions of clause 9(a) constitute a trust and remit the case to the Chancery Division for determination whether on this basis clause 9 is (subject to the effects of section 164 of the Law of Property Act 1925) valid or void for uncertainty.

7–136   This makes it necessary to consider whether, in so doing, the court should proceed on the basis that the relevant test is that laid down in the *Broadway Cottages* case[190] or some other test. That decision gave the authority of the Court of Appeal to the distinction between cases where trustees are given a power of selection and those where they are bound by a trust for selection. In the former case the position, as decided by this House, is that the power is valid if it can be said with certainty whether any given individual is or is not a member of the class and does not fail simply because it is impossible to ascertain every member of the class. (The *Gulbenkian* case.[191]) But in the latter case it is said to be necessary, for the trust to be valid, that the whole range of objects (I use the language of the Court of Appeal) should be ascertained or capable of ascertainment.

7–137   The respondents invited your Lordships to assimilate the validity test for trusts to that which applies to powers. Alternatively, they contended that in any event the test laid down in the *Broadway Cottages* case was too rigid, and that a trust should be upheld if there is sufficient practical certainty in its definition for

---

[188]  cf. G. Farwell, *Farwell on Powers*, 3rd edn (Stevens & Son, 1916), p.524.
[189]  G. Farwell, *Farwell on Powers*, 3rd edn (1916), p.10.
[190]  [1955] Ch. 20.
[191]  [1970] A.C. 508.

it to be carried out, if necessary with the administrative assistance of the court, according to the expressed intention of the settlor. I would agree with this, but this does not dispense from examination of the wider argument. The basis for the *Broadway Cottages* case principle is stated to be that a trust cannot be valid unless, if need be, it can be executed by the court, and that the court can only execute it by ordering an equal distribution in which every beneficiary shares. So it is necessary to examine the authority and reason for this supposed rule as to the execution of trusts by the court.

Assuming, as I am prepared to do for present purposes, that the test of validity is whether the trust can be executed by the court, it does not follow that execution is impossible unless there can be equal division. As a matter of reason, to hold that a principle of equal division applies to trusts such as the present is certainly paradoxical. Equal division is surely the last thing the settlor ever intended; equal division among all may, probably would, produce a result beneficial to none. Why suppose that the court would lend itself to a whimsical execution? And as regards authority, I do not find that the nature of the trust, and of the court's powers over trusts, calls for any such rigid rule. Equal division may be sensible and has been decreed, in cases of family trusts for a limited class, here there is life in the maxim "equality is equity," but the cases provide numerous examples where this has not been so, and a different type of execution has been ordered, appropriate to the circumstances. . . .

**7–138**

So I come to *Inland Revenue Comrs v Broadway Cottage Trusts*.[192] This was certainly a case of trust, and it proceeded on the basis of an admission, in the words of the judgment, "that the class of 'beneficiaries' is incapable of ascertainment." In addition to the discretionary trust of income, there was a trust of capital for all the beneficiaries living or existing at the terminal date. This necessarily involved equal division and it seems to have been accepted that it was void for uncertainty since there cannot be equal division among a class unless all the members of the class are known. . .

**7–139**

. . . I think we are free to review the *Broadway Cottages* case. The conclusion which I would reach, implicit in the previous discussion, is that the wide distinction between the validity test for powers and that for trust powers, is unfortunate and wrong, that the rule recently fastened on the courts by the *Broadway Cottages* case ought to be discarded, and that the test for the validity of trust powers ought to be similar to that accepted by this House in *Re Gulbenkian's Settlement Trusts* for powers, namely that the trust is valid if it can be said with certainty that any given individual is or is not a member of the class.

**7–140**

Assimilation of the validity test does not involve the complete assimilation of trust powers with powers. As to powers, I agree with my noble and learned friend Lord Upjohn in *Re Gulbenkian's Settlement* that although the trustees may, and normally will, be under a fiduciary duty to consider whether or in what way they should exercise their power, the court will not normally compel its exercise. It will intervene if the trustees exceed their powers, and possibly if they are proved to have exercised it capriciously. But in the case of a trust power, if the trustees do not exercise it, the court will; I respectfully adopt as to this the statement in Lord Upjohn's opinion.[193] I would venture to amplify this by saying that the court, if called on to execute the trust power, will do so in the manner best calculated to give effect to the settlor's or testator's intentions. It may do so by appointing new trustees, or authorising or directing representative persons of the classes of beneficiaries to prepare a scheme of distribution, or even, should the proper basis for distribution appear, by itself directing the trustees so to distribute. The books give many instances where this has been done and I see no reason in principle why they should not do so in the modern field of discretionary trusts.[194] Then, as to the trustees' duty of enquiry or ascertainment, in each case the trustees ought to make such a survey of the range of objects or possible beneficiaries as will enable them to carry out their fiduciary duty.[195] A wider and more comprehensive range of enquiry is called for in the case of trust powers than in the case of powers.

**7–141**

Two final points: first, as to the question of certainty, I desire to emphasise the distinction clearly made and explained by Lord Upjohn,[196] between linguistic or semantic uncertainty which, if unresolved by the court, renders the gift void, and the difficulty of ascertaining the existence or whereabouts of members of the class, a matter with which the court can appropriately deal on an application for directions. There may be a third case where the meaning of the words used is clear but the definition of beneficiaries is so

**7–142**

---

192 [1955] Ch. 20.
193 [1970] A.C. 508 at 525.
194 See *Brunsden v Woolredge* (1765) Amb. 507; *Supple v Lowson* (1773) Amb. 729; *Liley v Hey* (1842) 1 Hare 580; and *Lewin on Trusts* (16th edn, 1964), p.630.
195 cf. *Liley v Hey* (1842) 1 Hare 580.
196 [1970] A.C. 508 at 524.

**7–143**
hopelessly wide as not to form "anything like a class" so that the trust is administratively unworkable or in Lord Eldon L.C.'s words one that cannot be executed.[197] I hesitate to give examples for they may prejudice future cases, but perhaps "all the residents of Greater London" will serve. I do not think that a discretionary trust for "relatives" even of a living person falls within this category . . .

[The appeal was therefore allowed. It was declared that the provisions of clause 9(a) constituted a trust. The case was remitted for determination whether, on the basis of the test set out by the majority of the House of Lords, clause 9 was valid or void for uncertainty. On this remittal, Brightman J. held that the trust was valid, and this was confirmed by the Court of Appeal in *Re Baden's Deed Trusts (No.2)*.[198]]

**7–144**    We noted above[199] that the certainty of objects test is based on the need for the court to police limits and enforce duties. The important point about a discretionary trust, as opposed to a fiduciary power, is that the trustee has a duty to make at least some distribution, and the court may need to enforce that duty. It is therefore vital to know what form such enforcement might take. If the only option for the court is to order the trustee to divide the relevant property equally between all those within the class then, as Lord Wilberforce noted, it is necessary to have a complete list of all such objects.[200] That seems to have been the assumption behind the Court of Appeal's view, in *IRC v Broadway Cottage Trusts*,[201] that a discretionary trust is valid only if a complete list of objects can be drawn up.

**7–145**    Lord Wilberforce's rejection of that view depends on the (surely correct) point that a court is not so limited when it comes to enforcing a discretionary trust. Indeed, in a case such as *Re Baden (No.1)*, where the settlor has nominated a very wide class of objects, such equal division, which would perhaps see each party acquiring only a very small sum of money, is "surely the last thing the settlor ever intended; equal division among all may, probably would, produce a result beneficial to none".[202] As other means of enforcement are available,[203] the potential need to enforce the trustee's duty to make some distribution does not require a complete list of objects to be drawn up.

**7–146**    As Lord Wilberforce also noted, given the difficulties in some cases of distinguishing between a fiduciary power and a discretionary trust, it is also sensible to align the certainty tests applying in each case.[204] Indeed, it has since been held, by the Privy Council in *Schmidt v Rosewood Trust Ltd*,[205] that even if a party is only an object of a fiduciary power, rather than of a discretionary trust, that party "may also be entitled to protection from a court of equity, although the circumstances in which he may seek protection, and the nature of the protection he may expect to obtain, will depend on the court's discretion".[206] It therefore seems that, in exceptional cases at least, it may be possible for a court to step in and execute a fiduciary power.[207]

**7–147**    This does not mean, however, that the certainty tests to be applied to a fiduciary power and to a discretionary trust are necessarily identical. First, as to policing T's duties, Lord Wilberforce suggested, in relation to T's duty to survey the range of objects of the power, that: "A wider and more comprehensive range of enquiry is called for in the case of trust powers [ie a discretionary trust] than in the

---

[197]    *Morice v Bishop of Durham* (1805) 10 Ves. 521 at 527 (see paras 8–002 to 8–007).
[198]    [1973] Ch. 9 (extracted at para.7–155ff).
[199]    See para.7–090.
[200]    [1971] A.C. 424 at 450 (extracted at paras 7–137 to 7–138).
[201]    [1955] Ch. 20.
[202]    [1971] A.C. 424 at 451 (extracted at para.7–138).
[203]    [1971] A.C. 424 at 451 (extracted at para.7–138).
[204]    [1971] A.C. 424 at 448–449 (extracted at paras 7–134 to 7–142).
[205]    [2003] 2 A.C. 709.
[206]    [2003] 2 A.C. 709 at [51], per Lord Walker.
[207]    See *Mettoy Pension Trustees Ltd v Evans* [1991] 2 All E.R. 513 at 549, approved in *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26; [2003] 2 A.C. 709 at [42], [51].

case of powers."[208] Secondly, as to enforcing T's duties, Lord Wilberforce suggested that there may be cases in which:

> the meaning of the words used is clear but the definition of beneficiaries is so hopelessly wide as not to form 'anything like a class' so that the trust is administratively unworkable or in Lord Eldon L.C.'s words one that cannot be executed.[209]

The first of Lord Wilberforce's points is hard to understand and seems to have had no practical effect: in later cases, such as *Re Hay's*, no distinction has been made between fiduciary powers and discretionary trusts in considering the nature of a fiduciary's duty to survey the range of objects. Even if the need for the discretionary trustee to make some exercise of the power justifies a somewhat higher duty in this respect, it is very difficult to translate it into a tangibly different certainty test. **7–148**

The second of Lord Wilberforce's points, in contrast, has had an impact, and there are cases in which discretionary trusts have failed on the grounds of administrative unworkability. The example hesitantly given by Lord Wilberforce was of a class of "all the residents of Greater London".[210] In *R. v District Auditor, Ex p. West Yorkshire MCC*,[211] an attempt to set up a discretionary trust "for the benefit of any or all or some of the inhabitants of the County of West Yorkshire" failed on the basis of administrative unworkability.[212] It has been assumed that the requirement of administrative workability applies only to discretionary trusts, and not to powers, even if fiduciary.[213] **7–149**

The requirement of administratively workability does therefore seem to be a distinction between discretionary trusts and fiduciary powers. It is not of great practical importance, even in the rare case where a trust or power in relation to such a class is set up. This is because fiduciary powers are subject to the non-capricious requirement,[214] and this may well also apply where the apparent arrangement would be administratively unworkable. The distinction does appear to be defensible as a matter of principle, if it is related to the fact that the discretionary trustee, unlike a fiduciary power-holder, has a duty to make some distribution, and the court may need to enforce that duty. It may then be possible to say that there are some decisions as to distribution that a fiduciary power-holder may validly make but which a court would not wish to undertake, as the role of the courts as even-handed purveyors of justice means that they should not also be involved in broad polycentric disputes as to, for example, how a large sum of money should be spent amongst the 2.5 million inhabitants of West Yorkshire.[215] **7–150**

### v. Fixed Trusts

If a settlor (S) transfers property to a trustee (T) to hold on trust for various beneficiaries, each of whom is to receive a fixed share of the benefit of the property, then of course the identity of each beneficiary must be certain. This requirement causes no practical problems as S will naturally have identified the **7–151**

---

[208] [1971] A.C. 424 at 457 (extracted at para.7–140).
[209] [1971] A.C. 424 at 457 (extracted at para.7–141).
[210] [1971] A.C. 424 at 457 (extracted at para.7–141).
[211] (1986) R.V.R. 24.
[212] See too *Re Harding (Deceased)* [2007] EWHC 3 (Ch); [2008] Ch. 235 at [15]: it is "common ground that a private trust for such a large class as the black community in four London Boroughs would be so large as to make a private trust unworkable, and hence void".
[213] See, e.g. *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 212 (extracted at para.7–115).
[214] See para.7–121.
[215] For example, whilst it might be permissible for T, as a private individual, to choose to spend the money on sports facilities for local residents, a court might not want to have to take a view as to whether the money should be spent on that purpose or instead on schools, or hospitals, or public transport, etc.

beneficiaries: if one or more of the beneficiaries cannot be found, this will not invalidate the trust and jeopardise the rights of the ascertainable beneficiaries, as the trustees can simply pay the shares of the missing beneficiaries into court, or otherwise ask the court for directions.[216]

**7–152**    A difficulty may arise, however, if the trust calls for equal division amongst members of a certain class, and the number within that class cannot be established, as that uncertainty means that the extent of any individual's beneficial interest cannot be established. In such a case, then, the "complete list" test, which no longer applies to discretionary trusts, must apply.

### vi. Gifts Subject to a Condition Subsequent

**7–153**    We started this discussion by considering gifts subject to a condition precedent, such as where S transfers property to T to hold on trust for B *if* B meets a certain condition. A condition subsequent is imposed where, instead, B acquires her right but that right is forfeited if the condition occurs. We saw that the certainty test applied in the case of a condition precedent is very easy to satisfy, as, if there is a situation in which one person might clearly qualify for the gift, then that person should not lose their entitlement by means of the gift's being seen as invalid. The same concern, of protecting B's entitlement, leads to a very strict certainty test's being applied in the case of a gift subject to a condition subsequent. The condition must be described in such a way that the court can see from the outset precisely and distinctly upon the happening of what event the interest is to be forfeited.[217] The circumstances involving forfeiture must be clearly known in advance so that B knows precisely where she stands. The condition will also be invalid if it is repugnant to the essential alienability of the interest given[218] or if it is void on the grounds of public policy.[219]

## C. Applying the Relevant Test

### i. Applying the "Is or Is Not" Test

**7–154**    We have seen that the "is or is not" test, which states that a power or discretionary trust will be invalid if it is not possible to tell of any given person whether that person is or is not in the permitted class, is crucial in determining the validity of powers (both non-fiduciary and fiduciary) and discretionary trusts. Having determined by a majority that the test should apply to the discretionary trust that S attempted to set up in *Re Baden's Deed Trusts (No.1)*, the House of Lords remitted the case to the High Court so the test could be applied.

---

[216]    See too Trustee Act 1925 s.27, which gives trustees and personal representatives who have advertised properly and waited for beneficiaries to come forward immunity from liability if funds are then distributed only amongst ascertainable beneficiaries. Note too that, by means of a *Benjamin* order (named for *Re Benjamin* [1902] 1 Ch. 723), a court may allow a trustee or executor to distribute even if not all of the beneficiaries have been ascertained. See, e.g. *Re Green's W.T.* [1985] 3 All E.R. 455. The purpose in each case is to protect the trustees or executor from liability for the distribution; the beneficial interests of any unascertained beneficiaries do continue unless and until, for example, the relevant property is acquired by a bona fide purchaser for value without notice.

[217]    *Clavering v Ellison* (1859) 7 H.L. Cas. 707; *Blathwayt v Lord Cawley* [1976] A.C. 397 at 429. This is consistent with equity's general sensitivity to the effects of forfeiture, as discussed in paras 2–217 to 2–260.

[218]    *Re Scientific Investment Pension Plan Trusts* [1999] Ch. 53 at 59.

[219]    See, e.g. *Church Property Trustees of Newcastle Diocese v Ebbeck* (1960) 104 C.L.R. 394: a condition that B must "profess Protestant faith" was void for public policy as it was designed by the testator to encourage his three sons to divorce their Catholic wives. A condition designed to restrain marriage altogether will also be void as contrary to public policy: see, e.g. *Lloyd v Lloyd* (1852) 2 Sim. N.S. 255. See too J.-S. Beaudry and A. Nair, "Property, Equality and the Freedom to Discriminate: The Case of the Discriminatory Gift' in S. Farran. et al (eds) *Modern Studies in Property Law: vol 11* (Hart Publishing, 2021).

The critical clause in the trust deed (cl.9(a)) provided for grants "to or for the benefit of any of the officers and employees or ex-officers or ex-employees of [the defined company] or to any relatives or dependants of any such persons".[220] Brightman J decided at first instance that this class did pass the "is or is not" test, although in reaching that conclusion he held that the trustees and a court could assume that anyone who could not show that she was in the class was in fact outside the class. The Court of Appeal confirmed that result but each of the three judges provided different reasons for his decision.

**7–155**

*Re Baden's Deed Trusts (No.2)*

Court of Appeal [1973] Ch. 9

SACHS L.J.: It is first to be noted that the deed must be looked at through the eyes of a businessman seeking to advance the welfare of the employees of his firm and those so connected with the employees that a benevolent employer would wish to help them. He would not necessarily be looking at the words he uses with the same eyes as those of a man making a will. Accordingly, whether a court is considering the concept implicit in relevant words, or whether it is exercising the function of a court of construction, it should adopt that same practical and common-sense approach which was enjoined by Upjohn J. in *Re Sayer*[221] and by Lord Wilberforce in *Re Baden (No.1)*,[222] and which would be used by an employer setting up such a fund.

**7–156**

The next point as regards approach that requires consideration is the contention, strongly pressed by Mr Vinelott [counsel for S's executors, arguing that the trust was invalid], that the court must always be able to say whether any given postulant is not within the relevant class as well as being able to say whether he is within it. In construing the words already cited from the speech of Lord Wilberforce in *Re Baden (No.1)*,[223] (as well as those of Lord Reid and Lord Upjohn in *Re Gulbenkian's Settlement Trusts*)[224], it is essential to bear in mind the difference between conceptual uncertainty and evidential difficulties. That distinction is explicitly referred to by Lord Wilberforce in *Re Baden (No.1)*,[225] when he said:

**7–157**

". . . as to the question of certainty. I desire to emphasise the distinction clearly made and explained by Lord Upjohn[226] between linguistic or semantic uncertainty which, if unresolved by the court, renders the gift void, and the difficulty of ascertaining the existence or whereabouts of members of the class, a matter with which the court can appropriately deal on an application for directions."

As Mr. Vinelott himself rightly observed, "the court is never defeated by evidential uncertainty," and it is in my judgment clear that it is conceptual certainty to which reference was made when the "is or is not a member of the class" test was enunciated. (Conceptual uncertainty was in the course of argument conveniently exemplified, rightly or wrongly matters not, by the phrase "someone under a moral obligation" and contrasted with the certainty of the words "first cousins.") Once the class of persons to be benefited is conceptually certain it then becomes a question of fact to be determined on evidence whether any postulant has on inquiry been proved to be within it: if he is not so proved, then he is not in it. That position remains the same whether the class to be benefited happens to be small (such as "first cousins") or large (such as "members of the X Trade Union" or "those who have served in the Royal Navy"). The suggestion that such trusts could be invalid because it might be impossible to prove of a given individual that he was *not* in the relevant class is wholly fallacious—and only Mr. Vinelott's persuasiveness has prevented me from saying that the contention is almost unarguable.

**7–158**

It was suggested that some difficulty arises from the passage in the speech of Lord Wilberforce in *Re Baden (No. 1)*,[227] where he referred to the need of trustees "to make such a survey of the range of objects or

**7–159**

---

220  See [1973] Ch 9 at 12.
221  [1957] Ch. 423 at 436.
222  [1971] A.C. 424 at 452.
223  [1971] A.C. 424 at 450: "can it be said with certainty that any given individual is or is not a member of the class?".
224  [1970] A.C. 508 at 518, 521 and 525.
225  [1971] A.C. 424 at 457.
226  *Re Gulbenkian's Settlement Trusts* [1970] A.C. 508 at 524.
227  [1971] A.C. 424 at 457.

possible beneficiaries as will enable them to carry out their fiduciary duty." The word "range," however, in that context has an inbuilt and obvious element of considerable elasticity, and thus provides for an almost infinitely variable range of vision suitable to the particular trust to be considered. In modern trusts of the category now under consideration it may be sufficient to know whether the range of potential postulants runs into respectively dozens, hundreds, thousands, tens of thousands or even hundreds of thousands. I cannot imagine that the above-quoted passage was intended to cast doubt, for instance, on the validity of wide-ranging discretionary trusts such as those of the Army Benevolent Fund. When looked at in the context of the rest of the speech this particular passage does not seem to me to cause any difficulty. In my judgment it refers to something quite different, to a need to provide a list of individuals or to provide a closely accurate enumeration of the numbers in the class: it relates to that width of the field from which beneficiaries may be drawn and which the trustees should have in mind so that they can adapt to it their methods of discretionary selection. Assessing in a business-like way "the size of the problem" is what the trustees are called on to do. . .

**7–160**      In agreement with the practical approach of Brightman J.,[228] I consider that the trustees, or if necessary the court, are quite capable of coming to a conclusion in any given case as to whether or not a particular candidate could properly be described as a dependant—a word that, as the judge said, "conjures up a sufficiently distinct picture." I agree, too, that any one wholly or partly dependent on the means of another is a "dependant." There is thus no conceptual uncertainty inherent in that word and the executors' contentions as to the effect of its use fail.

**7–161**      As regards "relatives" Brightman J., after stating, "It is not in dispute that a person is a relative of an . . . employee . . ., if both trace legal descent from a common ancestor:" a little later said: "In practice, the use of the expression 'relatives' cannot cause the slightest difficulty."[229] With that view I agree for the reasons he gave when he correctly set out the evidential position.

**7–162**      MEGAW L.J.: If this trust were to be held void for uncertainty because of the inclusion of the "dependants" in clause 9 (a), I think that few trusts would stand. I do not find any greater uncertainty in it than is inherent in, or can by ingenuity be conjured up in relation to, any ordinary, well understood word. . .

**7–163**      Then it is said that the deed is invalid because of the inclusion of the word "relatives." Brightman J.,[230] approached that question on the basis that: "It is not in dispute that a person is a relative of an officer or employee or ex-officer or ex-employee, if both trace legal descent from a common ancestor." He held that the executors' argument on this issue also failed. I agree, for the reasons given by the judge.

**7–164**      [The test set out by Lord Wilberforce in *Re Baden (No.1)*[231]] is this:

> ". . . the power is valid if it can be said with certainty whether any given individual is or is not a member of the class and does not fail simply because it is impossible to ascertain every member of the class."

**7–165**   The executors' argument concentrates on the words "or is not" in the first of the two limbs of the sentence quoted above: "if it can be said with certainty whether any given individual is *or is not* a member of the class." It is said that those words have been used deliberately, and have only one possible meaning; and that, however startling or drastic or unsatisfactory the result may be—and Mr. Vinelott does not shrink from saying that the consequence is drastic—this court is bound to give effect to the words used in the House of Lords' definition of the test. It would be quite impracticable for the trustees to ascertain in many cases whether a particular person was *not* a relative of an employee. The most that could be said is: "There is no proof that he is a relative." But there would still be no "certainty" that such a person was not a relative. Hence, so it is said, the test laid down by the House of Lords is not satisfied, and the trust is void. For it cannot be said with certainty, in relation to any individual, that he is not a relative.

**7–166**      I do not think it was contemplated that the words "or is not" would produce that result. It would, as I see it, involve an inconsistency with the latter part of the same sentence: "does not fail simply because it is impossible to ascertain every member of the class." The executors' contention, in substance and reality, is that it does fail "simply because it is impossible to ascertain every member of the class.". . .

**7–167**      In my judgment, much too great emphasis is placed in the executors' argument on the words "or is not." To my mind, the test is satisfied if, as regards at least a substantial number of objects, it can be said with

---

228    [1972] Ch. 607 at 625.
229    [1972] Ch. 607 at 625.
230    [1972] Ch. 607 at 625.
231    [1971] A.C. 424 at 450 and 454.

certainty that they fall within the trust; even though, as regards a substantial number of other persons, if they ever for some fanciful reason fell to be considered, the answer would have to be, not "they are outside the trust," but "it is not proven whether they are in or out." What is a "substantial number" may well be a question of common sense and of degree in relation to the particular trust: particularly where, as here, it would be fantasy, to use a mild word, to suggest that any practical difficulty would arise in the fair, proper and sensible administration of this trust in respect of relatives and dependants.

STAMP L.J.: There are, however, in my judgment serious difficulties in the way of a rejection of Mr. Vinelott's submission. . . **7–168**

The first difficulty, as I see it, is that the rejection of Mr. Vinelott's submission involves holding that the trust is good if there are individuals—or even one—of whom you can say with certainty that he is a member of the class. That was the test adopted by and the decision of the Court of Appeal in *Re Gulbenkian's Settlement Trusts*[232] where what was under consideration was a power of distribution among a class conferred upon trustees as distinct from a trust for distribution: but when the case came before the House of Lords that test was decisively rejected and the more stringent test upon which Mr. Vinelott insists was adopted. Clearly Lord Wilberforce in expressing the view that the test of validity of a discretionary trust ought to be similar to that accepted by the House of Lords in the *re Gulbenkian's Settlement Trusts*[233] did not take the view that it was sufficient that you could find individuals who were clearly members of the class; for he himself remarked, towards the end of his speech as to the trustees' duty of inquiring or ascertaining, that in each case the trustees ought to make such a survey of the range of objects or possible beneficiaries as will enable them to carry out their fiduciary duty. It is not enough that trustees should do nothing but distribute the fund among those objects of the trust who happen to be at hand or present themselves. . . **7–169**

If the matter rested there, it would in my judgment follow that, treating the word "relatives" as meaning descendants from a common ancestor, a trust for distribution such as is here in question would not be valid. Any "survey of the range of the objects or possible beneficiaries" would certainly be incomplete, and I am able to discern no principle upon which such a survey could be conducted or where it should start or finish. The most you could do, so far as regards relatives, would be to find individuals who are clearly members of the class—the test which was accepted in the Court of Appeal, but rejected in the House of Lords, in *Re Gulbenkian's Settlement Trusts.*[234] **7–170**

The matter does not, however, rest there. . .[Stamp L.J. then referred to *Harding v Glyn*,[235] in which a court executed a discretionary trust for relations by distributing to the testator's next of kin in equal shares]. . . Does it then make any difference that here the discretionary trust for relations was a reference not to the relations of a deceased person but of one who was living? I think not. The next of kin of a living person are as readily ascertainable at any given time as the next of kin of one who is dead. A trust for the next of kin of a person, without more, was not a trust for the next of kin according to the statutes which would regulate the distribution of the personal property of a deceased person had he died intestate, but a trust for his nearest blood relations.[236] To execute a discretionary trust for the relations or relatives of a living person by distribution among his nearest blood relations appears to me a satisfactory method of so doing; and, if it were necessary to give a construction to the word "relatives" in relating to a living person in an inter vivos settlement, to construe it as a reference to his nearest blood relations would be far more likely to give effect to the intention than a construction which embraced all who were descended from one of his ancestors. . .nothing could be more improbable than that [S] should have intended the trustees to be at liberty to make grants to a relative of an employee of whose very existence that employee might be ignorant. "Nearest blood relations or dependants" makes more sense. . . **7–171**

The only other challenge to the validity of the trust is directed against the use of the word "dependants" which it is said introduces a linguistic or semantic uncertainty. That in the context the word connotes financial dependence I do not doubt, and although in a given case there may be a doubt whether there be a sufficient degree of dependence to satisfy the qualification of being a "dependant," that is a question which can be determined by the court and does not introduce linguistic uncertainty. **7–172**

[232] [1968] Ch. 126.
[233] [1970] A.C. 508.
[234] [1970] A.C. 508.
[235] (1739) 1 Atk. 469.
[236] *Re Gray's Settlement* [1896] 2 Ch. 802.

**7–173**    Stamp LJ's approach can be seen as more faithful to the specific language used by Lord Wilberforce in *Re Baden (No.1)*: it must be possible to tell of any given person whether she is *or is not* in the class. In other words, in considering if a given postulant, X, is a relative or dependant, it must be possible to put X in either in the "Yes" box or the "No" box. A discretionary trust would therefore be void if X had to go into a "Don't know" box. On that approach, the trust was valid (in a world before DNA testing) only because Stamp LJ was prepared to treat relatives as meaning "next-of-kin" or "nearest blood relations" in which case any postulant would fall within the "Yes" box or the "No" box.

**7–174**    The approach of Sachs and Megaw LJJ (as well as that of Brightman J at first instance)[237] could be seen as more faithful to the underlying policy of Lord Wilberforce's speech in *Re Baden (No.1)*, which was to develop the law so as to give S the flexibility to set up a discretionary trust with a potentially very wide class of objects. It is also consistent with the pragmatic, rather than overly-technical, approach to certainty tests that we have seen at a number of points in this chapter.[238] A key part of their approach is the assumption that if it cannot be shown that X is in the class, X must be treated as being out of the class. This may introduce an element of artificiality, but it enables a court to police the trustees, who know that they are at risk if exercising a power in favour of a party who has not demonstrated that she is within the permitted class.

**7–175**    Once such an assumption is adopted, however, the question arises of whether anything in fact remains of the certainty test: might any class, even "friends" be valid on the basis that anyone not clearly in the class must be treated as outside it? The practical problem in such a case might be that so few people would clearly qualify that T would not be able to exercise a genuine choice when deciding how to exercise the power. Megaw LJ sought to deal with this by imposing a requirement that there must be a "substantial" core of objects who are clearly within the class. This raises again the point raised by Lord Upjohn in *Re Gulbenkian's Settlement Trusts*:[239] the consequence is that the class is narrowed from that which S stated; but at least the trust is validated.

**7–176**    Sachs LJ, in contrast, sought to give some content to the certainty test by adopting the distinction between conceptual and evidential uncertainty.[240] This provides another means of invalidating a discretionary trust for "friends": the term in itself is inherently uncertain, as no stable definition can be provided. In practical terms, though, it is difficult to see why this matters: if it could be shown that sufficient people were clearly within the class (as the uncertain term nonetheless has a core meaning) then, given the assumption that anyone who cannot show she is in the class is outside it, the duties of the trustees could, it seems, be discharged in practice.

**7–177**    It might be thought that, given the differing approaches adopted in *Re Baden (No.2)*, the law is in an unsatisfactory state. It is certainly not the case, however, that the courts have subsequently had to deal with problems arising from the application of the "is or is not" test to powers and discretionary trusts, nor that the use of such wide powers and trusts has diminished. It seems rather that, with the confirmation in *Re Baden (No.2)* that key terms such as "relative" and "dependant" are sufficiently certain, well-advised settlors have felt no need to investigate the boundaries of the certainty test through the sort of idiosyncratic terms that are beloved of examiners but extremely rare in practice.

---

237   [1972] Ch. 607 at 626.
238   See paras 7–089 and 7–120.
239   [1970] A.C. 508 at 524 (extracted at para.7–119).
240   For further discussion of this distinction, see C. Emery, "The Most Hallowed Principle—Certainty of Beneficiaries of Trusts and of Powers of Appointment" (1982) 98 L.Q.R. 551.

## ii. Resolving Apparent Uncertainty

It is possible for a settlor (S) to attempt to avoid certainty problems by identifying a party who can resolve a dispute as to whether X is or is not in the permitted class, or has or has not met a particular condition. It is clear that such a party's decisions may assist in relation to evidential uncertainty although, following *Re Baden (No.2)*,[241] such uncertainty is in any case unlikely to invalidate the planned arrangement. The more important question is as to the impact of such a party's decision on potential conceptual uncertainty caused by the inherent vagueness of the terms used to define a class.

**7–178**

In *Re Tuck's Settlement Trusts*,[242] for example, S's settlement provided for payment of an income to B "if and when and so long as he shall be of the Jewish faith and be married to an approved wife". An approved wife was defined as "a wife of Jewish blood by one or both of her parents and who has been brought up in and has never departed from and at the date of the marriage continues to worship according to the Jewish faith". It was also provided that as to such facts, in the case of dispute or doubt, the decision of the Chief Rabbi in London of either the Sephardim or Ashkenazim communities "shall be conclusive". It was held by the Court of Appeal that these terms were conditions precedent and, given the lenient test applied in such cases,[243] they were certain enough even without the reference to the Chief Rabbi.

**7–179**

In an obiter discussion, Lord Denning MR rejected the argument of counsel that the appointment of a party to resolve doubt could not save a settlement from conceptual (as opposed to evidential) uncertainty, stating instead that:[244]

**7–180**

> I see no reason why a testator or settlor should not provide that any dispute or doubt should be resolved by his executors or trustees, or even by a third person . . . [If] the appointed person is ready and willing to resolve the doubt or difficulty, I see no reason why he should not do so. So long as he does not misconduct himself or come to a decision which is wholly unreasonable, I think his decision should stand. After all, that was plainly the intention of the testator or settlor.

Lord Denning's analysis can be contrasted with that of Jenkins J in *Re Coxen*:[245]

**7–181**

> If the testator had insufficiently defined the state of affairs on which the trustees were to form their opinion he would not have saved the condition from invalidity on the ground of uncertainty merely by making their opinion the criterion, although the declaration by the trustees of this or that opinion would be an event about which in itself there could be no uncertainty.

This view was followed in *Re Jones*[246] and in *Re Wright's Will Trusts*[247] where a gift of property to trustees "to use the same at their absolute discretion for such people and institutions as they think have helped me or my late husband" failed for uncertainty. The point is that S had not intended the trustees to be able to appoint to anyone at all: a condition is attached and the trustees need some means of making sense of that condition.

**7–182**

It may be that Lord Denning's approach can be reconciled to this by finding that, if a party is appointed by S to resolve doubts, this does not mean that the arrangement will necessarily be certain.

**7–183**

---

[241]   [1973] Ch. 9: see paras 7–155 to 7–171.
[242]   [1978] Ch. 49.
[243]   See paras 7–093 to 7–096.
[244]   [1978] Ch. 49 at 61–62.
[245]   [1948] Ch. 747 at 761–762.
[246]   [1953] Ch. 125: "if at any time B shall in the uncontrolled opinion of the trustee have social or other relationship with C."
[247]   [1981] L.S. Gaz. 841. Also see *Tatham v Huxtable* (1950) 81 C.L.R. 639 at 653.

After all, the court[248] must have some means of reviewing any decision by the appointed party: in *Dundee General Hospital Board v Walker*,[249] a case heavily relied on by Lord Denning in *Re Tuck*,[250] Lord Reid pointed out (in a case where such a power had been given to trustees), that their decision could be challenged:

> if it can be shown that the trustees considered the wrong question, or that, although they purported to consider the right question, they did not really apply their minds to it or perversely shut their eyes to the facts, or that they did not act honestly or in good faith.

**7–184**   It must similarly be the case that the decision by the party appointed to resolve doubts can be challenged if it is so unreasonable that no reasonable person could have made it. In order to consider such challenges, it seems, the court will need *some* information as to the criteria to be used by the appointed party when making the decision, and so, whilst a decision by that party may assist in resolving some doubts, it would be a mistake to think that the underlying definition of the class can be wholly uncertain.

### Questions

1. A testator who died a month ago by her will made the following bequests:
   (a) £10,000 to Ahmed and at his death the remaining part of what is left that he does not want for his own use to be divided equally between Xerxes and Yorick;
   (b) £50,000 to my trustees Tom and Tim to distribute among such of the inhabitants of Cambridge as they shall in their unfettered discretion think fit;
   (c) £100,000 to my said trustees to distribute among Brian, Charlene, David, Ellen, Oswald, Peter, Quentin and Raheem and such of my other business associates and old friends as they shall see fit;
   (d) residue to my son Simon trusting that he will see to it that my old friends shall have the contents of my wine cellar; and in case of any doubts he shall have power to designate who are my business associates and old friends.

   **Consider the validity of these bequests, the testator having lived in Cambridge all her life.**

2. *Are the certainty tests applicable to fiduciary powers identical to those applying to discretionary trusts? Should they be?*

3. Simon Settlor, who was 4ft 11ins tall, has just died. In his home-made will, he directed his executors:
   (a) to pay £2,000 to each of my small relatives;
   (b) to distribute £8,000 as they see fit among such persons as they consider to be friends of mine; and
   (c) to hold my residuary estate on trust to pay the income therefrom to my four daughters equally in their respective lifetimes but if a daughter marries a supporter of Fulham

---

248  The jurisdiction of the court cannot be ousted: *Re Raven* [1915] 1 Ch. 673: *Re Wynn's WT* [1952] Ch. 271.
249  [1952] 1 All E.R. 896.
250  [1978] Ch. 49 at 61.

Football Club the share of such daughter shall accrue to the other daughters, as shall also be the case on the death of a daughter, but on the death of my last surviving daughter they shall distribute the capital within one year among such persons connected with me who have been benefited by me in my lifetime as they shall see fit.

**Advise on the validity of the above bequests.**