# <u>Exhibit 36</u>

<div align="right">Case No: 7611 of 2002</div>

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
Neutral Citation Number [2003] EWHC 3105 (Ch)

<div align="right">
Royal Courts of Justice
Strand, London, WC2A 2LL
</div>

<div align="right">Date: 18th December 2003</div>

**Before** :

**THE HONOURABLE MR JUSTICE BLACKBURNE**

- - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF TXU EUROPE GROUP PLC (IN ADMINISTRATION)**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Richard Snowden QC and Paul Newman** (instructed by **Herbert Smith**) for the Applicant
**Terry Mowschenson QC and James Ayliffe** (instructed by **Denton Wilde Sapte**) for the
respondents

Hearing dates : 17th and 18th November 2003
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

<div align="center">
.............................
The Hon Mr Justice Blackburne
</div>

**Mr Justice Blackburne:**

Introduction

1.     The purpose of this application which is brought by the joint administrators of TXU
       Europe Group plc ("the Company") is to determine whether a portfolio of units in
       various investments ("the portfolio") managed by Baring Asset Management Limited
       ("Barings") is held by the Company on trust to provide top-up benefits to certain
       senior employees of the Company and certain associated companies.   If there is no
       such trust, the joint administrators seek the court's determination of whether the
       portfolio is subject to an equitable charge to secure the payment of those top-up
       benefits and, if it is, whether that charge is a floating charge which is void as against
       the joint administrators (as regards any security thereby conferred) for want of
       registration under section 395 of the Companies Act 1985.   The benefits in question
       are broadly what the employees would have received by way of pension benefits under
       the Electricity Supply Pension Scheme ("the ESPS") if the earnings cap introduced by
       the Finance Act 1989 had not been introduced but after taking into account, to the
       extent possible within Inland Revenue limits, the benefits to which the employees are
       entitled under the terms of that scheme.    At stake is whether some or all of the
       portfolio investment goes in priority to the former senior executives of the Eastern
       Group (they number a dozen or so) or whether it forms a part of the funds available to
       the Company's unsecured creditors.

2.     The portfolio was established by a payment of £10 million to Barings on 14 May
       1998.   As at 31 July 2003 it was valued at £8,195,825.47.

3.     Mr Richard Snowden QC and Mr Paul Newman appear for the joint administrators.
       Mr Terence Mowschenson QC and Mr James Ayliffe appear for some, but not all, of
       the employees in question.

Background facts

4.     The Company is a part of the TXU group of companies in Europe.   The group has a
       somewhat complicated history.   So far as material that history is as follows.   Upon
       privatisation of the Eastern Electricity Board in 1989 a group of companies ("the
       Eastern Group") was formed headed by a company called Eastern Electricity plc.   The
       Eastern Group was acquired by Hanson plc in 1996 and the Company, then known as
       Eastern Energy Holdings plc, was added as a holding company at the head of the
       group and, shortly thereafter, renamed Eastern Group plc.   Following that acquisition
       and in order to facilitate various demergers, The Energy Group plc ("TEG") was
       created to hold the energy interests of Hanson, including the Eastern Group. It became
       the Company's parent company.   Following demerger from Hanson plc and flotation
       in 1997, the Eastern Group (headed by TEG) was acquired by TXU Corporation, a
       large US utility company.    That occurred in May 1998.    In November 1999 the
       Company, by now an intermediate holding company within the overall TXU group of
       companies, changed its name to its present name.    The Company, along with other
       companies in the Eastern Group, was placed in administration on 19 November 2002
       and the applicants were appointed its joint administrators.

5.     The ESPS is the main pension scheme for the electricity industry in this country.
       According to the undisputed evidence of Paul Marsh (currently chief operating officer

and a director of the Company and formerly its finance director), the scheme is and was at all material times divided into financially separate sections or groups, each with a principal employer exercising powers on behalf of all of the employers in that group. Payment of pensions is organised by each group separately.   In the Eastern Group the principal employer until August 2001 was Eastern Electricity plc.   After that date it was the Company.

6.      Benefits under the ESPS are on a final salary basis dependent inter alia upon the number of years' service of that employee with his employer.   The scheme is approved by the Inland Revenue pursuant to what is now Part XIV of the Income and Corporation Taxes Act 1988.

7.      Before 1989 there was no limit to the amount of salary which could be used to calculate members' benefits under an approved occupational pension scheme such as the ESPS.   Following the passing of the Finance Act 1989, a cap, commonly known as the earnings cap, was introduced to limit the total amount of earnings that could be so used in respect of members joining such schemes after 1 June 1989. All of the respondents except Mr Watson joined the ESPS after 1 June 1989.

8.      In common with many other companies the Eastern Group resolved to continue to provide new senior executives - those joining the Eastern Group after 1 June 1989 - with pensions based upon their full salary, notwithstanding that the earnings cap would otherwise apply to limit the salary which could be so used.   To do so, it was necessary to establish arrangements to provide the benefits in question (assessed by reference to salary in excess of the earnings cap) which would operate outside the regime of Inland Revenue approval.   These arrangements are commonly known as "top-up" arrangements.

9.      One way of providing such arrangements (according to a report to the Company dated 15 February 2002 by Bacon & Woodrow, a firm of actuaries) is by means of what is known as a "funded unapproved retirement benefits scheme" ("FURBS").   Another is by means of an "unfunded unapproved retirement benefits scheme" ("UURBS").   A FURBS is an employer-sponsored occupational pension scheme, established under a trust in the same way as the ESPS except that it does not have Inland Revenue approval.   As a result, there is no limit on the level of benefits, employer contributions are treated as a benefit so that the member pays tax on them, the employer pays National Insurance on any employer contributions, investments are subject to income and capital gains taxes and benefits can normally be taken tax-free (if they are paid as lump sums).   It can be established on either a defined benefit or a defined contribution basis.   An UURBS is in essence no more than a promise by the employer to top up the member's benefits from the approved scheme.   This means that the benefits can be increased to the level which would have been paid if the earnings cap did not apply.   No separate fund of money is built up and so, in practice, only defined benefits can be provided.   An advantage of such an arrangement is that it is simple to establish and run. Its main disadvantages are that members may be unhappy with the level of protection and the employer may be unhappy with the unfunded liabilities which thereby accrue and which need to be shown as such on the balance sheet.

10.     It is common ground that until May 1998, ie until the time of or very shortly before the acquisition of the Eastern Group by the TXU Corporation, the top-up element of

senior employees' pension entitlements (ie that part which was in excess of the benefits available under the ESPS) was entirely unfunded and unsecured. Employees entitled under the top-up arrangement had to rely on the employer's covenant to make the top-up payment when the pension benefits became payable. This was made clear in the service contracts and other documentation under which they were appointed. Thus, in a letter dated 7 August 1992 from Eastern Electricity plc to a Mr Stephen Connock, it was stated that the shortfall in his pension benefits arising from the earnings cap would be made up so that the combined level of his benefits from the ESPS and from Eastern Electricity would be what they would have been if the earnings cap had not applied, that the benefits would be provided from the ESPS "to the extent that it is possible within the Inland Revenue limits", with the company (Eastern Electricity) only providing that part (if any) of the total benefits which could not be provided by the ESPS, that the top-up arrangement was conditional on his becoming a member of the ESPS and contributing to it 6% of salary (not limited to the earnings cap) but subject to maximum contributions of 15% of the earnings cap in any tax year and, importantly for present purposes, that the top-up arrangement had no assets and benefits would be paid directly from company revenue. To similar effect is clause 7 (dealing with pension benefits) of the service agreement dated 21 January 1997 between TEG and Mr Eric Anstee (who is one of the respondents to this application): clause 7.2, provides for TEG to provide benefits "under an unapproved and unfunded scheme" additional to those provided by the ESPS and clause 7.2(D) provides that "this top-up arrangement will have no assets. Benefits will be paid directly from the revenue of [TEG]".

11. By mid-1997 senior employees began to voice concern over the unfunded nature of the top-up arrangement. This concern was prompted by several factors including (1) the retirement on ill-health grounds of Mr Connock who began to draw an early retirement pension, a substantial portion of which was unfunded, (2) increases in pension benefits (and therefore of the unfunded element) resulting from the inclusion (with effect from 20 January 1997) of bonuses in the definition of pensionable pay and (3) uncertainty over how a new corporate owner of the Eastern Group, which by then had become a likely target for a take-over, would view the accumulated and increasing build-up of the unfunded top-up liability. As a result, Mr Paul Marsh, the finance director of the Eastern Group, together with Mr Philip Ellis, the company secretary of the Company, and, when he later joined the Eastern Group as human resources director, Dr David Huber were asked to investigate the position and prepare a proposal for the consideration of the Company's board concerning the arrangements, if any, which should be put in place. Bacon & Woodrow were asked to advise.

12. Initially, consideration was given to creating a funded arrangement (ie a FURBS) but, because of the adverse tax consequences for the directors, this option was abandoned. Instead, attention moved to some kind of unfunded arrangement. Bacon & Woodrow, in an undated letter probably written in late 1997, floated the idea of establishing an "internal" fund. They wrote:

> "If the top-up is unfunded cash flow would be zero up to retirement and would be the pension payments made after retirement (payable for the life of the employee and at a rate of 2/3rds thereafter to any surviving spouses). This is the current situation…   These payments would be increased in line with inflation and, again, would be deductible for corporation tax

> purposes when made. The top-up pension could be fully or
> partially commuted for cash at retirement, which would bring
> forward the cash flow. In practice, it may be decided to
> establish internal funds to meet the benefit costs. Payments
> could be made in to these funds to mirror the gross contribution
> that would have been paid into the FURBS; allocations to such
> reserves would not be deductible for corporation tax purposes -
> the deduction would be due when benefit payments are made."

13.   This eventually led, in April 1998, to a meeting between Mr Marsh, Mr Ellis, Dr
Huber, Mr John Devaney (another of the respondents) and Mr Anstee.   There is
disagreement over precisely what was discussed and agreed at that meeting.   (It was
not suggested that any minutes were made of this (or any earlier) meeting and neither
side desired to cross-examine any of the relevant witnesses on the contents of their
affidavits setting out how they understood matters.)   Whatever it was that was agreed,
it led to Mr Marsh sending the following internal memorandum dated 21 April 1998
to the directors of Eastern Electricity Plc (all or most of whom were entitled under the
top-up arrangement):

> "Unfunded pensions
>
> Following recent changes to the directors' and senior managers'
> pensions benefits, I have been considering an appropriate way
> of funding these increased liabilities. Within the next week or
> so I intend to move £10m into funds managed by ING Barings
> to cover the company's promise on these arrangements. This
> will be a simple investment (ie not under a pensions trust), so
> the tax position on unfunded pensions is unaffected.
>
> Philip [Ellis] will put in place any necessary approval
> processes.
>
> **Note for Mike Torrance** [who held office, either then or
> subsequently, as "vice-president taxation"] You will need to be
> happy that this is structured in such a way so as to have no
> adverse tax consequences. Could you talk to Philip [Ellis]."

14.   Mr Marsh's thinking behind this proposal is contained in paragraph 23 of his first
witness statement:

> "...Mr Devaney and Mr Anstee, together with Mr Huber, Mr
> Ellis and myself considered that any purchaser of the Eastern
> Group would be significantly more likely to accept the
> continuance of the unapproved pension promises if the Eastern
> Group could show that there were assets available within the
> Eastern Group to meet its commitments to those directors and
> senior managers who had accrued an Unapproved Entitlement.
> Given the uncertainties over the future ownership of the Eastern
> Group we also considered it reasonable to do all we could to
> make provision for these pension benefits short of triggering
> personal tax charges. I therefore proposed that money from

> Eastern Group should be invested in a separate investment fund, in order to secure the pensions benefits as best we could given the desire not to incur personal tax liabilities. By investing in a range of assets typical to a pension fund we hoped that this fund could then grow as the Unfunded Entitlements grew (through length of service and new joiners), and be reviewed from time to time to see if it would still broadly be expected to cover the Unapproved Entitlements. Our intent was to separate these funds as far as practicable from the company funds given the constraints imposed by personal tax considerations. It would therefore give comfort to the directors in respect of any future purchaser of Eastern Group recognising the separate funding of these liabilities. It was intended that any purchaser would be able to see that money had been put aside in relation to the contractual obligation to pay the Unapproved Entitlements, and might therefore be reluctant to use this fund for other purposes as the beneficiaries of these entitlements could point to specific assets set aside for their funding. However, we did not obtain legal advice as to the level of security this arrangement provided for beneficiaries by this separation of funds."

15.   Mr Anstee described the background in paragraphs 16 to 18 of his affidavit.   He referred to the concern that he and others felt about their unfunded pension promises because of a possible takeover and whether the unfunded pension promises could be met out of company revenue.   He also referred to Eastern Electricity's concern about the extent of its liability in respect of such promises and the need to ensure that it was able to meet its obligations.   Then, having mentioned that Mr Marsh and he jointly discussed with Bacon & Woodrow during 1997 the quantum of the unfunded liabilities and how they might be secured, he said this:

> "... It was agreed by John Devaney, Paul Marsh, Philip Ellis, myself and David Huber, who was also involved in this process from late 1997 when he joined the company, that establishing a formal trust was not a suitable option given the tax consequences. John Devaney and I instructed Paul Marsh, Philip Ellis and David Huber to find another way of securing the unfunded pension promises as the concerns [referred to earlier] still needed to be addressed.

> During late 1997 and into early 1998 Paul Marsh, Philip Ellis and David Huber continued to investigate ways of addressing Eastern Electricity's concerns regarding the unfunded pension promises. ..This investigation was an ongoing process and involved a number of informal meetings and conversations between John Devaney, Paul Marsh, Philip Ellis, David Huber and myself and advice from Bacon & Woodrow."

16.   His understanding of what was proposed was as follows (paragraphs 19 to 21 of his affidavit):

> "In a meeting between Paul Marsh, Philip Ellis, David Huber, John Devaney and myself in April 1998 at John Devaney's office Paul Marsh suggested that the best option for ensuring security for the unfunded pension promises, without incurring tax, would be by establishing a separate designated fund out of which the unfunded pension liabilities should be met in the event that either a purchaser or the company did not, or could not, meet the unfunded pension liabilities for whatever reason. Paul Marsh, presumably on advice from Bacon & Woodrow who had been advising Paul Marsh on these issues throughout 1997 and continued to do so, said that by putting the money into a separate appropriation account which specified that it was for the benefit of the directors entitled to the unfunded pensions, the company and any future purchaser would be unable to use the money for any purpose other than paying the unfunded pension promises.
>
> At the April meeting Paul Marsh and Philip Ellis suggested that the fund be invested as a pension fund, the intention being that the fund would continue to grow and match the unfunded pension liabilities. It was agreed that the fund manager would be instructed in the mandate that the fund was to be used to meet the unfunded pension promises only and as such the fund was to be invested as a pension fund. The fund manager was to ensure, through the investment strategy that the assets of the fund at least matched the unfunded pension liabilities.
>
> The purpose of establishing and managing a fund in this way was to get as close to a FURBS trust as possible without triggering a tax liability. We all agreed at the April meeting that this was the best method of ensuring that the directors' unfunded pension promises were secure and the company could adequately provide for these liabilities by a separate appropriation. It was agreed that £10 million, being the total unfunded pension liabilities at that time, be put into the fund."

17.    Mr Anstee then went on (in paragraph 23) to describe how he understood matters after the portfolio investment had been established:

> "In light of the impending takeover, the fact that the Barings fund had been separately appropriated by the company so that any subsequent owner could not use the funds for any purpose other than payment of the unfunded pension promises was of great comfort to me particularly as, if any subsequent owner failed to meet the unfunded pension promises out of company revenue, they would be obliged to meet the promises out of the Barings fund. Furthermore, in addition to obliging any new owner to meet the contractual promise I was aware that the existence of a separate fund, managed as a pension portfolio, would also assist Eastern Electricity to manage the unfunded pension liabilities. Had I suspected that the Barings Fund was

> not absolute security for ensuring that the unfunded pension
> promises would be met, I would have taken the FURBS option,
> and suffered the tax consequences."

18.    Mr Devaney's recollection, according to paragraph 9 of his affidavit, was of a number
of meetings with Mr Anstee, Dr Huber, Mr Marsh and, he believed, Mr Ellis and that
"at all times the discussions were conducted with the intention of securing the
pensions in an acceptable manner which fell short of creating a trust which we were
informed, by our advisers Bacon & Woodrow, would have given rise to a substantial
and immediate tax liability".   He went on to add (in paragraph 11 of his witness
statement):

> "It has always been my understanding based upon the meetings
> referred to in paragraph 9 that the Barings Fund was established
> to provide security for the unapproved pensions. The original
> discussions between Eric Anstee and I in 1997 and 1998
> focused upon our concern that the pensions, being purely
> contractual in nature, were not secured and any purchasers of
> the Group might seek to limit or renege upon them. Our further
> discussions involving Paul Marsh and David Huber were
> always conducted on the basis that it would be necessary to
> provide security for those promises in a way that any purchaser
> of the Group would not be able to avoid the promises. Anything
> short of that goal would have been unacceptable and a waste of
> time and effort. It was therefore my understanding that the
> decisions taken at the meetings between myself, Eric Anstee,
> Paul Marsh and David Huber, which led directly to the
> proposals put to the board of Eastern Electricity plc in May
> 1998 to create ...the Barings Fund, met that concern. In short I
> considered that the Barings Fund was created to provide a
> guarantee for the unapproved pensions and a source of payment
> if the need arose."

19.    According to Dr Huber, whose recollections relevant to establishment of the portfolio
are set out in paragraphs 8 and 9 of his affidavit:

> "It was eventually suggested, I would assume with advice from
> Bacon & Woodrow, at a meeting in early 1998 between Paul
> Marsh, Philip Ellis, Eric Anstee, John Devaney and myself that
> a separate fund should be established to secure the unfunded
> pension liabilities. Paul Marsh believed that this was the most
> secure way of ensuring that the unfunded pension promise
> liabilities were met in the absence of a FURBS trust
> arrangement. This was the optimum solution without incurring
> the negative tax consequences. The separate fund would ensure
> that there were sufficient funds out of which the unfunded
> pension liabilities could be met in the event that the Eastern
> Group or any future owner failed to honour the unfunded
> pension promises. The fund was also a good way for the
> Eastern Group to manage these unknown future liabilities. To
> further help the company manage the liabilities and help ensure

> that the fund contained sufficient funds to meet the liabilities, it
> was agreed that the fund, to all intents and purposes, should be
> managed like a pension fund.
>
> It was thereafter agreed that the fund would be set up for the
> benefit of the directors who had unfunded pension promises.
> The Eastern Group could not use the fund for any other
> purpose.
>
> This was one of the main reasons for the fund as it provided the
> directors with comfort as they knew that the unfunded pension
> promises were secured by the fund so in the event that the
> Eastern Group did not honour its unfunded pension obligations,
> the unfunded pension promises would be paid out of the fund.
> The £10 million to be put into the fund was the level of the
> unfunded pension liabilities at that time and it was hoped that
> by following the investment strategy set out in paragraph 8 the
> fund would continue to grow and be able to cover fully the
> unfunded pension liabilities."

20.     Mr Ellis, at the time company secretary to the Company, had no specific recollection
        of the meetings to which Mr Anstee and Dr Huber had referred in their evidence.   In
        paragraph 16 of his affidavit he set out his understanding of the arrangement
        concerning the portfolio:

> "I agree with Dr Huber ...that the two major concerns for the
> Eastern Group were the growing obligations of the Eastern
> Group in respect of the Unapproved Entitlements and the
> prospective acquisition of The Energy Group plc.   The decision
> in the 21 May 1998 Board meetings was made in the light of
> these two concerns. The Directors were informed by way of Mr
> Marsh's 21 April 1998 memo and the 21 May 1998 Board
> Paper, for example, that the funds were not part of a pensions
> trust, although they would be available to meet the Unapproved
> Entitlements, if necessary. It was anticipated that the funds
> would be available to meet the contractual obligations to pay
> the Unapproved Entitlements. However, based on Bacon &
> Woodrow's advice in relation to the setting up of a FURBS and
> in the absence of a FURBS, I believe it remained open to the
> Eastern Group or the prospective purchaser to take the funds
> out of the Baring Account and use them in other ways, should
> they wish to do so. The commercial realities involved in
> keeping good relations with the Directors and Senior Managers
> led me to believe it was unlikely they would do so. In any
> event, any proposal to alter the arrangements in respect of the
> Unapproved Entitlements would not have taken place without
> the involvement of the Directors and Senior Managers with
> Unapproved Entitlements."

21.     Mr Derek Bonham, executive chairman of TEG until shortly after its acquisition by
        TXU Corporation in May 1998 and a non-executive director of that company until

February 2002, was not a party to the decision taken by Eastern Electricity (or the Company) in April/May 1998 but said that he was "aware of the developments" from discussions with Mr Devaney, Mr Anstee and Mr Marsh.  In paragraphs 3 to 6 of his affidavit, he described his understanding of matters thus:

> "...In May 1998 I also became aware that Eastern Electricity Plc was investigating a proposal to provide added protection for the relevant executives who had been given the unapproved pension promises.   Later I was informed that Eastern Electricity Plc had decided to create a discrete fund for the benefit of the executives and to transfer £10 million to Baring Asset Management Limited, commonly referred to as the Barings Fund.  Although I was not a party to the decisions taken by Eastern Electricity Plc (I was not and never have been a director of that company) nevertheless, in my role as a executive chairman of TEG, the holding company of the Eastern Group, I was aware of the developments from discussions with John Devaney, Eric Anstee and Paul Marsh…
>
> I was aware from the discussions which I held with John Devaney and Eric Anstee that they had been concerned about the possibility of a takeover of TEG and a weakening of the unapproved pension promises. I also understood from these discussions that a trust could not be established without incurring a tax liability but that it was the intention of the board of Eastern Electricity Plc to obtain as much security as possible for the unapproved pension promises without incurring tax. It was against this backdrop that the decision was taken by Eastern Electricity Plc to create the Barings Fund.
>
> It was and continues to be my understanding from the discussions with John Devaney and Eric Anstee and Paul Marsh that the Barings Fund was created with the intention of providing security for, and if necessary a source for payment of, the unapproved pensions payable by Eastern Group to its executives. I fully appreciated the position of the directors and Eastern Electricity Plc and their rationale, as explained earlier, in setting up the Barings Fund and considered the actions taken to be an appropriate means of providing security for the unapproved pensions...
>
> I can confirm that, as the executive chairman of TEG, it was my clear understanding at the time the Barings Fund was established that the Fund was set up for the sole purpose of ensuring that Eastern Electricity Plc's unapproved and unfunded pension obligations were met. Whilst I was aware that the unapproved pensions were promised from the revenue of the company I believed that ultimately the Barings Fund was intended to be available to meet those liabilities."

22.    On 14 May 1998 the transfer of £10 million by the Company to Barings took place
and with it the establishment of the portfolio.   The matter was the subject of a joint
paper dated 21 May 1998 by Mr Marsh and Dr Huber to the boards of directors of the
Company and Eastern Electricity.    The paper was headed "Pension Issues".
According to its introductory paragraphs, its purpose was to update "the Executive [ie
senior management] on a number of pension related issues" and seek approval to
amendments to the rules of the ESPS and another pension scheme.   Paragraph 8 of
the joint paper was as follows:

> "Consideration has been given to an appropriate way of funding
> the increased liabilities relating to the unfunded element of the
> pensions for Directors and certain Senior Managers, as advised
> in the Group Finance Director's memorandum dated 21 April
> 1998. It has been decided to invest £10 million initially in an
> Exempt Trust managed by Barings Asset Management Limited.
> The Exempt Trust will be converted into an 'Open-ended'
> Investment Company with a range of 12 institutional sub-funds
> on 1 June 1998. The investment is not part of a pension trust
> and is stand-alone."

23.    The paper invited the Executive to "note" the £10 million investment "relating to
liabilities associated with the unapproved element of pensions for Directors and
certain Senior Managers" and to authorise Mr Marsh and Mr Ellis "to manage the
investment on behalf of the Company and take such action as they may consider
appropriate".

24.    At its meetings that same day the boards of directors of both the Company and Eastern
Electricity ratified the £10 million portfolio investment "relating to liabilities
associated with the unapproved element of pensions for Directors and certain Senior
Managers" and gave Mr Marsh and Mr Ellis the authority which the joint paper had
recommended "to manage the investment on behalf of the Company and take such
action as they may consider appropriate".

A trust

25.    At all material times the portfolio has been held by the Company, albeit managed by
Barings.   The question is whether the Company, when it applied its £10 million in
acquiring the portfolio, evinced (or has subsequently evinced) any intention of
declaring itself a trustee of that investment and if so for whom and in what shares.
Not only is there an absence of any positive indication in the available documentation
contemporaneous with the establishment of the portfolio of an intention to hold it in
trust but such indicators as there are, relevant to the nature of the investment, point
against the creation of any trust.    Thus the Company's accounts refer to the
investment as an asset.   The accounts could not properly have done so if, in truth, the
investment was held on trust for others.

26.    It is clear, moreover, that the Company's directors at the time that the portfolio
investment was made - and for whose benefit the trust fund would be held assuming
one was established - had no wish to establish a trust since the consequence of so
doing would have been the incurring by each, as a beneficiary of the trust, of an
immediate charge to tax (to the extent of each person's beneficial share of the fund).

This is clear from, for example, paragraph 22 of Mr Marsh's first affidavit (quoted above) and paragraph 9 of Mr Devaney's affidavit (also quoted above).   At the time Mr Devaney was chairman and managing director of the Company.   Mr Anstee, according to paragraph 16 of his affidavit, regarded the establishment of "a formal trust" as "not a suitable option given the tax consequences".   It is not to be supposed that Mr Anstee could have intended some form of *informal* trust since the tax consequences would have been the same.

27.    When unfunded benefits came into payment (as they did for Mr Anstee and Mr Devaney) there was no recourse to the portfolio.   If the portfolio had been intended to provide for those benefits - in that each executive entitled to top-up arrangements had a beneficial share of the portfolio equal to the value of his entitlement - it is to be expected that payments, when their entitlements came into payment, would have come from that source.

28.    Nor is it altogether clear precisely who the intended objects were of the trust, if such it was.   The evidence of Mr Anstee and Dr Huber suggests that the £10 million figure was intended to equate to the amount of the unfunded pension liabilities at the time the investment was created and therefore that it did not extend to future employees.   If so this would exclude Mr Roger Partington, who is another of the respondents and who became employed by Eastern Electricity in December 1999 and left the TXU Group in October 2002, and Mr John Beckitt, who between August 2000 and February 2001 was an executive vice-president of the Company.   Those two persons only joined the TXU Group after the portfolio had been established.   On the other hand the trust would have included someone such as Mr William Watson, another of the respondents who had left the Group's employment in March 1998.     In his submissions, however, Mr Mowschenson submitted, admittedly in the context of his arguments in support of the existence of an equitable charge, that the fund was intended to benefit <u>any</u> employee who was offered top-up arrangements as part of his contract of employment with the group and, by implication, that the intention was to include persons, such as Mr Partington and Mr Beckitt, appointed to the Group, after the portfolio had been established.

29.    There is no reason, of course, why there should not be a trust for a class of persons which may increase in number.   The evidence, however, must make this clear.   It fails to do so.   In any event, assuming that this was what was intended, it is wholly unclear how the fund was intended to be shared among such persons.   Section 73 of the Pensions Act 1995 lays down distinct priorities, in the event of any deficiency in assets to satisfy entitlements in full, as between different categories of member dependent, inter alia, upon whether that member's benefits are already in payment.   It is unclear whether there was any intention to mirror that scheme of provision or whether, instead, the intention was that in such an event the fund should be distributed, without distinction between those in payment and those not yet in payment, on a pro rata basis.   The evidence simply does not condescend upon these matters.

30.    For these reasons I do not consider that an out-and-out trust of the portfolio was either intended or established.

<u>Equitable charge</u>

31.    In <u>Swiss Bank corporation v Lloyds Bank Ltd</u> [1982] AC 584 at 594 to 596 Buckley
       LJ said this in relation to equitable charges:

> "An equitable charge may, it is said, take the form either of an
> equitable mortgage or of an equitable charge not by way of
> mortgage.   An equitable mortgage is created when the legal
> owner of the property constituting the security enters into some
> instrument or does some act which, though insufficient to
> confer a legal estate or title in the subject matter upon the
> mortgagee, nevertheless demonstrates a binding intention to
> create a security in favour of the mortgagee, or in other words
> evidences a contract to do so: see Fisher and Lightwood's Law
> of Mortgage, 9th ed. (1977), p.13.   An equitable charge which
> is not an equitable mortgage is said to be created when property
> is expressly or constructively made liable, or specially
> appropriated, to the discharge of a debt or some other
> obligation, and confers on the chargee a right of realisation by
> judicial process, that is to say, by the appointment of a receiver
> or an order for sale: see Fisher and Lightwood, p.14.
>
> …
>
> The essence of any transaction by way of mortgage is that a
> debtor confers upon his creditor a proprietary interest in
> property of the debtor, or undertakes in a binding manner to do
> so, by the realisation or appropriation of which the creditor can
> procure the discharge of the debtor's liability to him, and that
> the proprietary interest is redeemable, or the obligation to create
> it is defeasible, in the event of the debtor discharging his
> liability.   If there has been no legal transfer of a proprietary
> interest but merely a binding undertaking to confer such an
> interest, that obligation, if specifically enforceable, will confer a
> proprietary interest in the subject matter in equity.      The
> obligation will be specifically enforceable if it is an obligation
> for the breach of which damages would be an inadequate
> remedy.    A contract to mortgage property, real or personal,
> will, normally at least, be specifically enforceable, for a mere
> claim to damages or repayment is obviously less valuable than a
> security in the event of the debtor's insolvency.    If it is
> specifically enforceable, the obligation to confer the proprietary
> interest will give rise to an equitable charge upon the subject
> matter by way of mortgage.
>
> It follows that whether a particular transaction gives rise to an
> equitable charge of this nature must depend upon the intention
> of the parties ascertained from what they have done in the then
> existing circumstances.   The intention may be expressed or it
> may be inferred.    If the debtor undertakes to segregate a
> particular fund or asset and to pay the debt out of that fund or
> asset, the inference may be drawn, in the absence of any contra
> indication, that the parties' intention is that the creditor should

have such a proprietary interest in the segregated fund or asset as will enable him to realise out of it the amount owed to him by the debtor: compare In re Nanwa gold Mines Ltd [1955] 1 WLR 1080 and contrast Moseley v Cressey's Co (1865) LR 1 Eq 405 where there was no obligation to segregate the deposits. But notwithstanding that the matter depends upon the intention of the parties, if upon the true construction of the relevant documents in the light of any admissible evidence as to surrounding circumstances the parties have entered into a transaction the legal effect of which is to give rise to an equitable charge in favour of one of them over property of the other, the fact that they may not have realised this consequence will not mean that there is no charge.   They must be presumed to intend the consequences of their acts.

In the present case the loan agreement contained no express requirement that IFT should charge FIBI securities or the fruits of the borrowing by way of mortgage to secure repayment of the loan.    Such intention must be found, if at all, by implication.

A binding obligation that a particular fund shall be applied in a particular manner may found no more than an injunction to restrain its application in another way, but if the obligation be to pay out of the fund a debt due by one party to the transaction to the other, the fund belonging to or being due to the debtor, this amounts to an equitable assignment pro tanto of the fund: see Rodick v Gandell (1852) 1 De GM&G 763, 777 and Palmer v Carey [1926] AC 703, 706-707:

> 'This is but an instance of a familiar doctrine of equity that a contract for valuable consideration to transfer or charge a subject matter passes a beneficial interest by way of property in that subject matter if the contract is one of which a court of equity will decree specific performance.'"

That last passage was a quotation from the judgment, delivered by Lord Wrenbury, of the Privy Council in Palmer v Carey.    Immediately preceding that passage from the judgment in that case was the following (echoed in what Buckley LJ said earlier in that paragraph of his judgment):

> "An agreement for valuable consideration that a fund shall be applied in a particular way may found an injunction to restrain its application in another way.    But if there is nothing more, such a stipulation will not amount to an equitable assignment. *It is necessary to find further that an obligation has been imposed in favour of the creditor to pay the debt out of the fund."* (emphasis added)

32.    In the <u>Swiss Bank</u> case the argument that there had been an equitable charge failed because there was no specifically enforceable contractual obligation to discharge the loan in question out of the particular fund that was said to be charged for the purpose. The House of Lords agreed with that conclusion and, as it seems to me, with the statement of principle contained in Buckley LJ's judgment.

33.    That statement of principle was repeated by Millett LJ in <u>Re Coslett (Contractors) Ltd</u> [1998] Ch 495 in the following passage (at 500):

> "It is of the essence of a charge that a particular asset or class of assets is appropriated to the satisfaction of a debt or other obligation of the chargor or a third party, so that the chargee is entitled to look to the asset and its proceeds for the discharge of the liability.   This right creates a transmissible interest in the asset.   A mere right to retain possession of an asset and not to make use of it for a particular purpose does not create such an interest and does not constitute a charge,"

34.    In <u>Flightline Ltd v Edwards</u> [2003] 1WLR 1200 the issue was whether a consent order, whereby a freezing injunction obtained against a company should cease to have effect on payment, on the company's behalf, of £4.2 million into a bank account in the joint names of the parties' solicitors subject to an undertaking scheduled to a further consent order that the company would not withdraw or in any way dispose of or deal with or encumber its interests in the monies up to a limit of £3.325 million in the joint account until further order of the court, gave rise to a valid equitable charge in favour of the applicant.   Giving the judgment of the Court of Appeal, Jonathan Parker LJ, after referring to <u>Palmer v Carey</u> [1926] AC 703 and the <u>Swiss Bank</u> case said this (at paragraphs 47 and 48):

> "Although <u>Palmer v Carey</u> concerned contractual arrangements made between the parties out of court, in our judgment Lord Wrenbury's statement of principle applied directly to consent orders … which embodied terms agreed between the parties; and also indirectly, by analogy, to other court orders …
>
> The question in the instant case, then, is whether one can spell out of the terms of the March order a provision (albeit not expressed in terms) to the effect that the company must satisfy any judgment obtained by Flightline (up to the specified maximum of £3.325 m) out of the monies in the joint account; or, to put it the other way round, a provision to the effect that if Flightline is successful in obtaining a judgment in the action it is entitled to payment out of such monies (or of so much thereof as is required to satisfy the judgment) as a matter of right."

He went on to say that the court was unable to spell out of the March order any such provision.

35.    What therefore must be shown is (1) that a particular asset (or class of asset) has been appropriated to the satisfaction of a debt or other obligation of the chargor or a third party and (2) that the chargee has a specifically enforceable right to look to the asset

(or class of asset) or its proceeds for the discharge of the liability.   Whether a particular transaction gives rise to an equitable charge depends upon the intentions of the parties, ascertained from what they have done.   Their intention may be express or inferred.   An expression of intention will not be determinative of the legal effect of the transaction if, upon a proper understanding of the admissible evidence (including any material documents), the transaction in question has a different legal effect. Equally, it is irrelevant that the parties may not have realised that the legal effect of the transaction into which they have entered gives rise to an equitable charge if, upon a proper understanding of the admissible evidence, that is its legal effect.

36.     The claim here is to an equitable charge upon a portfolio investment which is and has at all times been and remains in the legal ownership of the Company.   What therefore must be shown is that the portfolio has been appropriated by the Company to satisfy the claims of senior executives entitled to top-up payments and that each executive in question has a specifically enforceable right to look to the portfolio for the discharge of his claim.

37.     There seems little doubt that, on the evidence, the portfolio was established to provide a source out of which, if need be, the top-up benefits could be made.   The investment appears to have been treated separately from the Company's other assets.     It was separately identified in the Company's accounts.   It does not appear to have been available as part of the company's ordinary circulating capital.   There seems equally little doubt that, on the evidence, the intention was that the portfolio should be available to meet the claims of <u>any</u> executive entitled to top-up benefits whether he was in the Group's employment as such executive at the time of establishment of the portfolio or only became so entitled (for example, Mr Partington and Mr Beckitt) at a later date.   In short, the first element of the twofold test is demonstrated.

38.     The difficulty, to my mind, is whether the evidence justifies a conclusion that the executives entitled to the top-up benefits acquired an *enforceable right* to resort to the portfolio to meet their respective claims, in short, whether the second element of the twofold test is fulfilled.

39.     However much senior executives may have thought that the portfolio provided security for the payment of their top-up benefits (and the passages from the evidence which I have quoted emphasise their concern to have "security" for their top-up benefits), it is difficult to discern in what way they acquired an enforceable right to look to that investment as a source of payment.   Mr Mowschenson submitted that those principally involved in setting up the portfolio must be taken as having contracted on behalf of themselves and all of the other senior executives entitled to top-up benefits, both present and future, and that each executive gave consideration for the Company's undertaking to secure those benefits by continuing in the Group's employment after the portfolio was set up in reliance on the fact that the portfolio was there to protect those benefits.   I find it exceedingly difficult to spell out any such contractual intention from what occurred.   It is certainly not evident from any of the documentation that has been produced.   In any event this interpretation of events is not one which is open to an executive in the position of, for example, Mr William Watson (one of the respondents) who ceased to be in the Group's employment before the portfolio was established.   It is difficult to see how it applies to persons such as Mr Partington and Mr Beckitt who were not even in the Group's employment at the time the portfolio was established.

40.    Mr Mowschenson's preferred basis for submitting that executives had a contractual right to a charge on the portfolio was the right in the Company or Eastern Electricity as the case might be "to amend … in whole or in part in its absolute discretion" the top-up arrangements.    See, for example, paragraph 7 of the letter sent by Eastern Electricity to Mr Anstee dated 25 February 1994.   Such a right, he submitted, was a part of the overall contractual arrangement between the executives and their respective employees.   It entitled the Company (or Eastern Electricity, as the case might be) to set up a fund with a view to that fund acting as security for the unfunded benefits thereby, without more, giving rise, he said, to an enforceable right in employees to look to the fund for payment of their benefits.

41.    The difficulty about this analysis is threefold: (1) the service agreements subsequently entered into (for example that between TEG and Mr Anstee dated 27 January 1997) contain no such term (2) it is questionable whether, in any event, the clause was intended to extend to such a matter and (3) even after the portfolio was established, service agreements and associated documentation setting out employees' unfunded pension benefits contained no mention of any security.   Thus, it is to say the least surprising that, in the very detailed documentation setting out the terms upon which Mr Beckitt was employed (in August 2000), there is not one word about any security affecting the unfunded top-up arrangements.

42.    Those difficulties aside, it is the fact that at the time and subsequently, at any rate until the Group went into administration, no one appears to have thought that executives did have any security rights over the portfolio.   Thus, in June 1998, a month after it was established Mr Marsh and Mr Ellis signed a formal agreement appointing Barings to manage the portfolio.    Among other information about the Company, its investment objectives and other matters concerned with the management of the portfolio set out in that agreement is a representation by Mr Marsh and Mr Ellis (on behalf of the Company) that the portfolio was "free from all liens and charges" and that "no liens or charges will arise from the acts or omissions" of the Company.

43.    As I have already mentioned the portfolio featured in the Company's subsequent accounts, appearing on its balance sheet as an investment.   The Company's unfunded pensions' liability also appeared.   There was no note (as there should have been if some or all of that liability was secured) indicating the nature of any security given for that liability (see paragraph 48(4)(b) of Schedule 4 to the Companies Act 1985) much less that the portfolio was that security.

44.    On 25 July 2001 the Company's board considered a paper by Mr Marsh entitled "TXU Europe - pensions".   Among the topics dealt with by the paper was that of unfunded pension commitments.   The following is the section dealing with that topic:

            "17. Inland Revenue regulations provide that for staff joining a pension scheme after June 1989, an approved pension fund cannot pay a pension in excess of two-thirds of a set amount, known as the Earnings Cap, which is adjusted annually to take account of inflation; the Earnings Cap is currently £95,400. It is therefore common practice for UK companies to meet the pensions obligations for capped senior executives in excess of the Earnings Cap, known as unapproved retirement benefits. This is generally achieved through a Funded Unapproved

Retirement Benefit Scheme ("FURBS"), an Unfunded Unapproved Retirement Benefit Scheme ("UURBS") or a cash compensation arrangement.

18. The Company decided in 1998, primarily to minimise administration and costs, to provide unapproved final salary pension benefits for its capped senior executives on an unfunded basis. There are 21 current and former senior employees in this category. It also sets aside approximately £10 million in a fund managed by Barings Asset Management to assist in meeting these liabilities. In addition, the Company put in place insurance cover to manage to [sic] risk arising from death in service and ill-health pension benefits. The premium in respect of life cover is treated as a benefit-in-kind which gives rise to a tax charge on the individuals.

19.    A FURBS provides the most security for an unapproved final salary pension promise with assets held under trust, separate from the Company. However, a FURBS does not have the tax privileges afforded to an approved pension scheme. A UURBS, whilst providing a lower level of security, is simpler to operate and generally has lower running costs than a FURBS.

20. In view of the impending valuation of the approved Scheme and continuing corporate activity, notably the Transfer Scheme [a reference to the separation of the supply side from the distribution side of TXU Europe's business], it is considered appropriate to review the existing arrangements to meet the Company's pension obligations in excess of the Earnings Cap for capped senior executives and to establish whether they continue to be the most cost effective and secure method of providing unapproved benefits. It would also be timely to assess the extent to which the sum set aside in the fund held with Barings Asset Management adequately covers the past and future accrual of unapproved pension liabilities, together with the future investment strategy of these assets and the extent to which any matching of assets to liabilities should take place as a means of enhancing perceived security and easing cash flow demands on the Company, should the unapproved scheme remain unfunded."

The paper then recommended board members to authorise Mr Marsh and one other "to consider the results of a review of the existing arrangements for unapproved pension arrangements and, if appropriate, to implement such changes as they may consider necessary or expedient".    The recommendation was adopted by the board and a resolution passed accordingly.

45.    That led to the report by Bacon & Woodrow dated 15 February 2002 to which I have already referred.   In it, after setting out the effect of the earnings cap and reviewing the current TXU approach to pension benefits over and above the maximum permitted by the Inland Revenue (under approved schemes) and after setting out the options for

dealing with the earnings cap (namely, do nothing, pay compensation, augment the ESPS benefits as far as possible, pay contributions to a personal or stakeholder pension, or establish a FURBS or an UURBS) and reviewing the pros and cons of some of the alternatives and referring to various surveys and costings, the report noted that if members remained in service and enjoyed salary increases in accordance with the assumptions adopted in the most recent actuarial valuation of the ESPS, there would, for certain pensions, be a large element of enhanced benefit which could not be provided within the ESPS.   The report went on to cost that element for the persons concerned in respect of service accrued to 1 April 2002.    After referring to the valuation assumptions on which the figures were based and setting out what those figures yielded for each employer affected, Bacon & Woodrow stated:

> "As TXU is responsible for providing benefits based on uncapped salary, then any element, which cannot be provided from the ESPS, would either need to be funded from a FURBS or continue to be treated as an UURBS. The calculations referred to above show that the current value of these liabilities is around £2.3m."

The report then went on to consider individual contribution rates and concluded that, in the case of directors, there was "a sizeable unapproved element to each individual's accrued pension promise together with a significant funding rate required for next year's unapproved pension cost".   It recommended continuation of the practice of charging 6% contributions on full salary subject to the maximum of 15% of the earnings cap, at any rate for current employees, and the establishment of a defined contribution FURBS to replace the unfunded unapproved final salary benefits for future service for the existing capped directors.   From start to finish there is not a suggestion in the report that any part of the Company's accrued liability for the cost of providing unapproved unfunded benefits was secured against the portfolio (or any other of its assets) much less was already funded under a trust established by the Company.

46.     Shortly before the Company (and other companies in the group) were placed in administration in late November 2002, Denton Wilde Sapte, ("DWS") acting on behalf of five former executives of the group (respondents to these proceedings) wrote to Mr Marsh to raise the issue of the "unfunded pension promises" made to their clients prior to TXU's takeover and "to investigate the possibility of securing their pension promises for the future by the establishment of a funded arrangement or by such other means as may be appropriate".   The letter recognised that any such arrangement would require the Company's cooperation. It invited the Company "to enter into discussions with a view to identifying a way ahead".   Clearly the clients for whom DWS were acting did not at that time consider that their unfunded entitlements were already funded or otherwise secured.

47.     Indeed, only three days earlier, Mr Devaney had written to the chairman and chief executive of TXU Corporation (the ultimate US parent company) to suggest the setting up of a separate trust to manage current and future unfunded pension obligations.   Aware of the portfolio, Mr Devaney referred to that investment as a "ring-fenced reserve fund" and as having originally had "an actuarially calculated value of £10 million". He added:

> "We estimate that this amount will cover current and future liabilities for the six executives already receiving a pension as well for those with a clause in their TXU contracts for a future unfunded pension. We understand that there are around fifteen such staff -we would like to clarify this number with you. Subject to your agreement, we are looking to transfer the ring-fenced and dedicated amount of £10 million to a Trust Fund in the UK which will be administered by Trustees on behalf of the twenty or so beneficiaries."

48. It was only in a letter written later that month that DWS referred to the portfolio held by Barings and suggested that it was impressed with a trust in favour of his clients.   It was only in a further letter, written very shortly after the Company and others in the group had been placed in administration, that DWS suggested that the circumstances in which the portfolio was established gave rise to "proprietary rights in equity over the investment, by way of trust or equitable charge".   (The Company's response to these suggestions was to deny that the portfolio investment was intended to be, or had been, impressed with any form of trust (adding that, if it had, the executives benefiting under it would have incurred an immediate charge to tax of £4 million) or had become subject to an equitable charge.)

49. I have come to the conclusion that the evidence falls short of establishing the existence of any enforceable right in senior executives, under their top-up arrangements, to have recourse to the portfolio to make good any shortfall in provision.   At most, the portfolio represented a fund set aside as a source out of which to provide the executives with those benefits.   It follows that I decline to find that the portfolio is subject to any form of equitable charge.

50. I confess that this is a conclusion which I am not unhappy to reach because the notion that senior executives, all or most of whom were directors, should be free to provide for themselves, at the Company's expense, a £10 million cushion against the Group's failure to honour its unfunded commitments to them is scarcely attractive.   Not least is this so when there is nothing in either the accounts or in the minutes of any relevant board meetings to suggest to the reader that any trust or security had been established. It is true, as Mr Mowschenson pointed out, that those involved in establishing the portfolio were acting without legal advice.   On the other hand, it is clear that they were alive to the tax consequences of what they were doing.   There is an illuminating passage in this regard contained in paragraph 24 of Mr Anstee's affidavit.   It is as follows:

> "The memo [Mr Marsh's memorandum of 21 April 1998] very specifically said that this was not a pension trust to avoid any misinterpretation resulting in a tax charge. I should explain that Paul Marsh, Philip Ellis, David Huber, John Devaney and myself were all very concerned that the separate designated fund was so close to a pension trust, in that it was solely for the benefit of the directors' unfunded pensions and was invested as a pension fund, that we thought the Inland Revenue would regard it as a pension trust and tax it accordingly. The wording of this document and all subsequent documents relating to the unfunded pension was to be, and indeed was, very carefully

> drafted to ensure that the fund was not seen as a formal pension
> trust. Indeed, the note at the bottom of the 21 April 1998 memo
> is for Mike Torrance, the group's tax manager for Eastern
> Group, asking him to confirm that he was happy with the
> structure of the separate fund."

51.    In wording such documentation as there is with the care to which Mr Anstee refers,
those involved in the matter succeeded not only in avoiding any suggestion that a trust
had been created but also in avoiding any suggestion that the portfolio was intended to
provide them with any kind of security.   In my view, the matter is to be judged by the
terms in which the Company's decision to establish the fund was recorded.   There is
nothing in the minutes of the meetings on 21 May 1998 ratifying the decision to
establish the fund as "an appropriate way of funding the increased liabilities relating to
the unfunded element of the pension for Directors and certain Senior Managers" to
suggest that the £10 million was subject to any enforceable security.

The section 395 point

52.    Given my conclusion in relation to the creation of an equitable charge, the further
question whether any security created by such a charge was void against the
Company's joint administrators for want of registration under section 395 does not
arise.   Since the matter was argued, however, I shall briefly state my view on the
point.

53.    Mr Snowden's submission was that any equitable charge was floating in nature and, as
such, registrable under section 395 as being "a floating charge on the company's
undertaking or property" within section 396(1)(f).

54.    In Re Cosslett (Contractors) Ltd [1998] Ch 495 Millett LJ said this (at 510) about a
floating charge:

> "The chargor's unfettered freedom to deal with the assets in the
> ordinary course of his business free from the charge is
> obviously inconsistent with the nature of a fixed charge; but it
> does not follow that his unfettered freedom to deal with the
> charged assets is essential to the existence of a floating charge
> …
>
> The essence of a floating charge is that it is a charge, not on any
> particular asset, but on a fluctuating body of assets which
> remain under the management and control of the chargor, and
> which the chargor has the right to withdraw from the security
> despite the existence of the charge.   The essence of a fixed
> charge is that the charge is on a particular asset or class of
> assets which the chargor cannot deal with free from the charge
> without the consent of the chargee.   The question is not whether
> the chargor has complete freedom to carry on his business as he
> chooses, but whether the chargee is in control of the charged
> assets."

55.     Lord Millett referred to that passage when delivering the judgment of the Privy
        Council in <u>Agnew v Commissioner of Inland Revenue</u> [2001] 2AC 710 at 724.   See
        also paragraphs 12 and 13 of the judgment in that case.

56.     Mr Snowden's reasons for submitting that, if a charge was created over the portfolio,
        the charge was floating in nature were that the portfolio was to be held by Barings for
        the benefit of the Company, the Company had control of the portfolio through the
        agency of Mr Marsh and Mr Ellis, with investment decisions delegated to Barings, and
        that none of the chargees (if that is what they were) were to have any say in, still less
        any control over, dealings with the portfolio.   In short, ring-fenced though it might
        have been, the portfolio constituted a fluctuating body of investments managed by
        Barings with all investment decisions in relation to the units which make up the
        portfolio being made by Barings who answered only to the Company.

57.     I do not accept that these considerations would have resulted in the creation of a
        floating charge.   If the Company has no right to apply the individual investments
        which together constitute the portfolio for any of its ordinary purposes but is obliged
        to hold them at all times subject to the charge in favour of the chargees, the charge is a
        fixed charge.   It is nonetheless a fixed charge because, under the charge, there is a
        right in the chargor to convert the investment into cash or exchange it for other
        investments.   If therefore the question had arisen, I would have held that the equitable
        charge was fixed rather than floating in nature.

<u>A footnote</u>

58.     There is a suggestion in the evidence of Mr Beckitt that during discussions leading up
        to agreement on the basis of his employment by the Group, including discussions on
        his pension and other rights, Dr Huber gave him to understand that the unapproved
        element of his pension was secured by a fund that would pay his pension if the
        Company was unable to pay.   He says that these matters were repeated some months
        later, by which time he was well into his period of service with the company, when, he
        says, the terms of his original letter of appointment were being converted into a proper
        service agreement along with a separate pensions agreement.   There may therefore be
        a basis for saying, on the particular facts of his case, that he became contractually
        entitled to a charge on the portfolio to secure his unfunded pension rights.

59.     This application has not been concerned with particular circumstances, such as those
        relating to Mr Beckitt, which may give rise to particular rights and about which I am
        in no position to come to any conclusion.   Rather, the matter has been argued very
        largely, if not wholly, on the basis of what occurred at the time the portfolio was
        established and what consequences flow from those events.   Nothing I have decided
        is intended to preclude the possibility of particular claims of that kind.

# Exhibit 37

**Document Produced in Native Format**

CONFIDENTIAL

THREE_ARROWS_00322550

# Exhibit 38

# private-ftx-accounting: 05/05/2021

**Caroline (Eades) Papadopoulos**

05/05/2021 01:00:05

[replied to a thread: 05/04/2021 01:15:14]

Hi Please see these updated Q1 2021 drafts. Happy to discuss them at 10pm HK if you would like.

📎 Q1 2021 FTX Trading Ltd. Draft Unaudited, Not Consolidated 5.4.21.pdf | PDF

📎 Q1 2021 FTX Trading LTD Financial Drafts 5.4.21.xlsx | Excel Spreadsheet

**Sam Bankman-Fried**

05/05/2021 01:35:55

[replied to a thread: 05/04/2021 01:15:14]

awesome, thanks!

has the bottom line been reconciled with balances to see if CDR + gas cane in line?

**Caroline (Eades) Papadopoulos**

05/05/2021 01:38:07

[replied to a thread: 05/04/2021 01:15:14]

<@Sam Bankman-Fried> I'm sorry I don't understand what you're asking. Could you rephrase it?

**Sam Bankman-Fried**

05/05/2021 01:42:57

[replied to a thread: 05/04/2021 01:15:14]

how are we calculating the gas payments? are we backing it out from balances minus CDRs, or something else?

**Sam Bankman-Fried**

05/05/2021 01:45:58

[replied to a thread: 05/04/2021 01:15:14]

(Edited)

i.e. are we backing it out from (balances - other expenses), or are we directly estimating it from (transfers*gas cost) or something like that?

**Caroline (Eades) Papadopoulos**

05/05/2021 01:57:18

[replied to a thread: 05/04/2021 01:15:14]

Understood- Calculated in two steps, does not touch the CDRs:

1. Gas for BTC was backed out of your digital assets (balance sheet) and USD value was calculated using average BTC price for the BTC used just in the quarter. That was $1.5M. Attached is the schedule for the calculation.
2. And the gas fees from the expense files (picture attached on the totals per month). These would be

also taken out of your assets to record the expense.

📎 1. AUDIT Q1 BTC Gas Fees.xlsx | Excel Spreadsheet



---

**Sam Bankman-Fried**

05/05/2021 02:34:36

[replied to a thread: 05/04/2021 01:15:14]

hm -- so for the 34.568 BTC, where did that come from? was that coming from the net balance of expenses@ on 3/31 that got closed out or something? A bit confused aslo because that was a positive number

---

**Sam Bankman-Fried**

05/05/2021 02:39:35

[replied to a thread: 05/04/2021 01:15:14]

I guess I'm confused about what the negative 'Wallet sweep' airdrops represent

---

**Sam Bankman-Fried**

05/05/2021 02:40:30

[replied to a thread: 05/04/2021 01:15:14]

er is that truing up exchange balances with wallet balances and so realizing 59 BTC of cost (presumably gas)?

---

**Sam Bankman-Fried**

05/05/2021 02:40:59

[replied to a thread: 05/04/2021 01:15:14]

<@Gary Wang> would love your thoughts on this too, I think I'm confusing myself

---

**Caroline (Eades) Papadopoulos**

05/05/2021 02:53:25

[replied to a thread: 05/04/2021 01:15:14]

<@Sam Bankman-Fried> the BTC comes from the airdrop file. From what I understand, the -59BTC represents total from inception BTC gas paid. To see the Q1 gas amount we take the -59 less the amount at 12/31/20 of 24.54 = 34.56 just for Q1.

---

**Gary Wang**

05/05/2021 16:08:34

[replied to a thread: 05/04/2021 01:15:14]

negative balance sweeps are gas fees

---

THREE_ARROWS_00322541

**Gary Wang**

05/05/2021 16:09:12

[replied to a thread: 05/04/2021 01:15:14]

or more precisely, gas fees minus CDR recoveries, but for BTC there shouldn't be any CDRs so it's just gas fees

**Gary Wang**

05/05/2021 16:11:33

[replied to a thread: 05/04/2021 01:15:14]

34.6 looks right

**Jayesh Peswani**

05/05/2021 16:14:33

[replied to a thread: 05/04/2021 01:15:14]

Thanks Gary. For BTC gas - the team's multiplied 34.6 by the average BTC price for the quarter

**Jayesh Peswani**

05/05/2021 16:15:04

[replied to a thread: 05/04/2021 01:15:14]

For ETH gas, the number of transactions and overall size looked similar to Q4 as well.

**Gary Wang**

05/05/2021 16:25:50

[replied to a thread: 05/04/2021 01:15:14]

how are we calculating the Q1 ETH gas?

**Gary Wang**

05/05/2021 16:32:00

[replied to a thread: 05/04/2021 01:15:14]

282187 withdrawals + 302060 deposit sweeps times around $10 to $20 per transaction should be around $5M to $10M

**Jayesh Peswani**

05/05/2021 16:35:10

[replied to a thread: 05/04/2021 01:15:14]

Currently it was the number of withdrawals in Q1 in the withdrawals file (same process as what we followed in 2020)... but it did look a little low given how big Q1 was

**Gary Wang**

05/05/2021 16:36:38

[replied to a thread: 05/04/2021 01:15:14]

actually the BTC number should be 59, not 34.6

THREE_ARROWS_00322542

**Gary Wang**

05/05/2021 16:37:49

[replied to a thread: 05/04/2021 01:15:14]

34.6 is the difference between how much we paid in Q1 2021 and how much we paid in 2020

---

**Gary Wang**

05/05/2021 16:51:31

[replied to a thread: 05/04/2021 01:15:14]

something that complicates things is that some of the CDRs recovered in 2021 was for CDRs from 2020                                                                          (Edited)

---

**Jayesh Peswani**

05/05/2021 17:19:54

[replied to a thread: 05/04/2021 01:15:14]

This is the working for the ETH Gas fees in Q1

📎 transfers1+Withd, Dep, airdrops - Q1 2021 (2).xlsx | Excel Spreadsheet

---

**Jayesh Peswani**

05/05/2021 17:41:04

[replied to a thread: 05/04/2021 01:15:14]

Does this approach make sense to you?

---

**Gary Wang**

05/05/2021 19:06:21

[replied to a thread: 05/04/2021 01:15:14]

for 2021, ETH gas fees needs to be backed out from CDR recoveries and wallet sweeps, in addition to what shows up in withdrawals

---

**Caroline (Eades) Papadopoulos**

05/05/2021 19:21:17

[replied to a thread: 05/04/2021 01:15:14]

<@Gary Wang> - Thank you! <@Ramnik Arora> <@Jayesh Peswani> can you guys help me understand what I need to do here to back out the ETH from cdr & wallet sweeps? I'm not sure how I go about this.

---

**Sam Bankman-Fried**

05/05/2021 19:26:58

[replied to a thread: 05/04/2021 01:15:14]

see https://wireless-mouse.slack.com/archives/G01J2R796AX/p1620242736262600

My guess is:

1. CDRs: probalby close to 100% recovery
2. gas: you can use this as the fudge factor between our calculation and sum_balances

THREE_ARROWS_00322543

[May 5th, 2021 12:25 PM] 11235813sam: <!here> What I think we need to do: *2020:* I think, but am not sure, that all of our balances sheets etc. are using stale numbers. The updated numbers are in the google drive. *Can we re-run 2020 from scratch with the current files in the drive?* I think that the only things we'll need to do are:

1. use the things in the google drive
2. add in the BNB holdings which were off-exchange at the end of 2020
3. I think the spl-bridge stuff is *correct* now in the drive and we hopefully won't have to correct for it, but confirm this
4. compare to sum_balances; if there are divergences, add in gas to line up with sum_balances for the bottom line Sum_balances at the end of 2020 should then line up with everything else.

BTW I think that CDR recovery rate is probably more like 100% than 87%, but if it's just that vs gas it's not a *huge* deal. *2021 Q1:* There are newly uploaded files. Please update based on those. I suspect we are using old files in the most recent docs. After that:

1. the *only* adjustment we should need to make is for contractor expenses from Q1 reimbursed after Q1; those should be added on *both* to the income statement *and* to the effective sum_balances
2. *everything* else is on sum_balances and it should be *nothing but USD* at the end of the quarter
3. this should *mostly* line up with sum_balances, except for CDRs + gas. Set CDR recovery rate + gas fees to line up with sum_balances for the bottom line, after adding in the missing expenses from (1) to *both* of the PnL calculation, and sum_balances

<@Gary Wang> / <@Ramnik Arora> -- does this line up with what you think? *To be clear: I think both 2021 and 2021 PnL & balance sheets are probably not quite right, and need to be updated per above. Please pull files from scratch from the drive, making sure to use Gary's raw files and not the processed files we've made because those might be on older versions!!!*

### Samuel Bankman-Fried

<!here> What I think we need to do: *2020:* I think, but am not sure, that all of our balances sheets etc. are using stale numbers. The updated numbers are in the google drive. *Can we re-run 2020 from scratch with the current files in the drive?* I think that the only things we'll need to do are:

1. use the things in the google drive
2. add in the BNB holdings which were off-exchange at the end of 2020
3. I think the spl-bridge stuff is *correct* now in the drive and we hopefully won't have to correct for it, but confirm this
4. compare to sum_balances; if there are divergences, add in gas to line up with sum_balances for the bottom line Sum_balances at the end of 2020 should then line up with everything else.

BTW I think that CDR recovery rate is probably more like 100% than 87%, but if it's just that vs gas it's not a *huge* deal. *2021 Q1:* There are newly uploaded files. Please update based on those. I suspect we are using old files in the most recent docs. After that:

1. the *only* adjustment we should need to make is for contractor expenses from Q1 reimbursed after Q1; those should be added on *both* to the income statement *and* to the effective sum_balances
2. *everything* else is on sum_balances and it should be *nothing but USD* at the end of the quarter
3. this should *mostly* line up with sum_balances, except for CDRs + gas. Set CDR recovery rate + gas fees to line up with sum_balances for the bottom line, after adding in the missing expenses from (1) to *both* of the PnL calculation, and sum_balances

<@Gary Wang> / <@Ramnik Arora> -- does this line up with what you think? *To be clear: I think both 2021 and 2021 PnL & balance sheets are probably not quite right, and need to be updated per above. Please pull files from scratch from the drive, making sure to use Gary's raw files and not the processed files we've made because those might be on older versions!!!*

---

Posted in #private-ftx-accounting

### Caroline (Eades) Papadopoulos

05/05/2021 18:31:31

[replied to a thread: 04/09/2021 01:37:21]

<@Jayesh Peswani> Since FTX paid this but Alameda should have, should we go ahead and record a receivable from Alameda?

**Sam Bankman-Fried**

05/05/2021 19:01:56

[replied to a thread: 04/09/2021 01:37:21]

so this is an interesting one

the funds went:

alameda bank --> ftx bank --> payment

so in fact ftx's balances are correct, and we should effectively ignore the line item

up to you guys how we book that, but we *don't* need to do an offsetting xfer, just make sure the books reflect that it didn't come from FTX

**Caroline (Eades) Papadopoulos**

05/05/2021 19:22:31

[replied to a thread: 04/09/2021 01:37:21]

<@Sam Bankman-Fried> ahhh, ok, so we'll look for the Alameda deposit and the outflow from FTX's bank. We'll make sure they offset eachother and do not become recorded as an expense or receivable. Thanks for the clarification!

**Sam Bankman-Fried**

05/05/2021 19:26:13

[replied to a thread: 04/09/2021 01:37:21]

sweet!

---

**Sam Bankman-Fried**

05/05/2021 19:25:36

💬 5 replies

(Edited)

<!here>

What I think we need to do:

*2020:*

I think, but am not sure, that all of our balances sheets etc. are using stale numbers.

The updated numbers are in the google drive.

*Can we re-run 2020 from scratch with the current files in the drive?*

I think that the only things we'll need to do are:

1. use the things in the google drive
2. add in the BNB holdings which were off-exchange at the end of 2020
3. I think the spl-bridge stuff is *correct* now in the drive and we hopefully won't have to correct for it, but confirm this
4. compare to sum_balances; if there are divergences, add in gas to line up with sum_balances for the bottom line Sum_balances at the end of 2020 should then line up with everything else.

BTW I think that CDR recovery rate is probably more like 100% than 87%, but if it's just that vs gas it's not a

THREE_ARROWS_00322545

*huge* deal.

*2021 Q1:*

There are newly uploaded files. Please update based on those. I suspect we are using old files in the most recent docs.

After that:

1. the *only* adjustment we should need to make is for contractor expenses from Q1 reimbursed after Q1; those should be added on *both* to the income statement *and* to the effective sum_balances
2. *everything* else is on sum_balances and it should be *nothing but USD* at the end of the quarter
3. there are "airdrops" which should be *exactly* enough to get our PnL calc to equal the change in sum_balances (as long as we include (1) in both)
4. Set CDR recovery rate + gas fees to line up with sum_balances for the bottom line (so adding up to the value of the airdrop), after adding in the missing expenses from (1) to *both* of the PnL calculation, and sum_balances
5. In other words: the files we upload should exactly reconcile, e.g. the sum of all of the line items should exactly equal the change in sum_balances

<@Gary Wang> / <@Ramnik Arora> -- does this line up with what you think?

*To be clear: I think both 2021 and 2021 PnL & balance sheets are probably not quite right, and need to be updated per above. Please pull files from scratch from the drive, making sure to use Gary's raw files and not the processed files we've made because those might be on older versions!!!*

*Oh also -- if there are changes or classifications we've made, we should make sure to communicate those to <@Gary Wang> so he can update FTX and re-generate files for the google drive*

---

**Caroline (Eades) Papadopoulos**

05/05/2021 20:57:35

[replied to a thread: 05/05/2021 19:25:36]

(Edited)

<@Sam Bankman-Fried> Understood. We will start now on #1 below.

1. We will download all of the 2019-2021 files this afternoon. For the transactions paid in non-USD we will use the coin prices for the day, and then upload into a new QBO file. To confirm, for Expense& Revenue files, we will use those uploaded by Gary dated April 18. Unless someone has a new version we should use, we can use the coin prices/day files Ramnik previously compiled for us.
2. We will share the reports with you all at this point (as soon as we can, possibly not until Friday). This will be from 2019 - Q1 2021.
3. We will record the BNB holdings.
4. For the negative BTC in the airdrops file for 12/31/19 (none), 2020 (-24.5457BTC on 12/4), and 2021 (-59BTC) - how should we record these amounts? After the back and forth discussions, I want to ensure we are using the correct information for the correct periods as well as marking the BTC to the proper prices for the years/quarters.
5. We will then compare the sum balances (Gary version April 21) & then discuss the CDR recovery rate you would like to use and the gas expense and make adjustments based on a discussion we have at that time.
6. The items you're missing from the above are related to GAAP adjustments (on the balance sheet which will flow into the P&L but mostly don't affect digital assets other than #7-9 below), such as recording liabilities at period end that were not yet paid until the following period (such as AWS invoices dated January but relate to December services) or prepaid expenses. Other items that immediately come to mind are recording your Prime Trust bank activity. We won't post these entries until after we have discussed the raw information from #2-5 above and you are satisfied.
7. Another item for GAAP FS: Reclassifications such as moving the OTC related USDC revenue that is on our balance sheet out of our digital assets balance and into the receivables from Alameda @ 12/31/20 (since we have been told Alameda has not paid FTX the OTC revenue as of 12/31/20). OTC Revenue from 12/31/20 -was it paid during Q1 2021 or is it still receivable as of March 31?
8. OTC Revenue from 12/31/20 -was it paid during Q1 2021 or is it still receivable as of March 31?
9. OTC Revenue from Q1 2021 - -was it paid during Q1 2021 or is it still receivable as of March 31?
10. Negative Customer Account Balances - The file in Google from Gary is dated February. Should we still use this? We had recorded this as a reduction to FTX's USDC and an increase to Backstop fund Expense. Is this still correct to do?
11. Re-circulate the Financials for discussion/approval.
12. After the above adjustments have been made, we will provide to Gary the revisions that should be made on FTX's side. There will be some he does not include in FTX (like recording prepaid, accrued expenses, receivable OTC...)

THREE_ARROWS_00322546

CONFIDENTIAL

THREE_ARROWS_00322547

# Exhibit 39

**Document Produced in Native Format**

CONFIDENTIAL

THREE_ARROWS_00322563