# Exhibit 70

Ch.

A

[COURT OF APPEAL]

ARMITAGE v. NURSE AND OTHERS

1997    Feb. 18, 19, 20;                Hirst, Millett and Hutchison L.JJ.
        March 19

B

*Trusts—Trustee—Breach of trust—Exclusion of liability—Clause exempting trustee from liability for loss from any cause apart from own actual fraud—Whether excluding liability in absence of dishonesty—Whether repugnant to trust—Whether void on grounds of public policy—Whether trustees entitled to costs in absence of inquiry into their conduct*

C

    By a settlement made on 11 October 1984 the plaintiff, who was then aged 17, became entitled in remainder to settled agricultural land of which her mother was tenant for life. Her portion was to be held on certain trusts until she reached the age of 40. Clause 15 of the settlement provided that no trustee should be liable for any loss or damage to the plaintiff's fund or the income thereof at any time or from any cause unless it was caused by his own actual fraud. On the trial of preliminary issues in an

D

action for breach of trust brought by the plaintiff against the trustees, the judge held that clause 15 of the settlement could operate to absolve the trustees from liability for breaches which were not the result of dishonesty on their part and that the plaintiff's claims in respect of breaches of trust allegedly committed before 15 June 1987 were not barred by section 21 of the Limitation Act 1980.[1] He awarded the trustees 80 per cent. of their costs, but directed that, since the trustees were defending

E

themselves and had taken points which cost money and in respect of which they were unsuccessful, they should not be at liberty to reimburse themselves from the trust fund for the remaining 20 per cent.
    On appeal by the plaintiff from the judge's decision that the trustees were absolved from liability by clause 15 and cross-appeal by the trustees from his order for costs:—

F

    *Held*, dismissing the appeal, (1) that, since it was open to contracting parties to exclude liability for ordinary or even gross negligence, such an exclusion was also open to the parties to a settlement; that, by referring to "actual" fraud, clause 15 of the settlement excluded constructive fraud or equitable fraud and was apt to exclude liability for breach of trust in the absence of a dishonest intention; that, although trustees might deliberately commit a breach of trust by consciously acting beyond their

G

powers, their conduct was not fraudulent if they did so in good faith and in the honest belief that they were acting in the interest of the beneficiaries; that a clause excluding the liability of a trustee for equitable fraud or unconscionable behaviour was not so repugnant to the trust or contrary to public policy as to be liable to be set aside at the suit of a beneficiary; and that, accordingly, since without amendment the pleadings could not support a plea

H

of fraud, clause 15 of the settlement operated to absolve the trustees from liability for the alleged breaches so long as they had not acted dishonestly; but that the plaintiff would be allowed to

---

[1] Limitation Act 1980, s. 21: see post, p. 260D–E.

examine the trust documents and investigate the trustees'   A
management in order to re-amend her statement of claim (see
post, pp. 250G, 251B–C, D–F, 253D–F, 254A–E, 259G, 263G–264B).

*Wilkins v. Hogg* (1861) 31 L.J.Ch. 41 applied.

(2) That section 21(1)(*a*) of the Limitation Act 1980 was
limited to cases of fraud or fraudulent breach of trust properly so
called and therefore to cases involving dishonesty; that liability for
a dishonest breach of trust endured without limitation of time,
but that in the absence of deliberate concealment liability for an   B
honest breach of trust was statute-barred after six years; that,
since the plaintiff had no present right to capital or income but
only the right to require the trustees to consider from time to
time whether to accumulate the income or to exercise their power
to pay or apply it for her benefit, she had merely a future interest
and not an interest in possession; and that, accordingly, her claim
was not barred by section 21(3) (post, pp. 260F–261A, H, 264A–B).

(3) Allowing the trustees' cross-appeal, that trustees were   C
entitled to a lien on the trust fund for the costs of successfully
defending themselves against an action for breach of trust, but
there was no such entitlement where their defence failed; that,
since the action against the trustees would be dismissed without
any inquiry into their conduct unless the pleadings were amended,
they were entitled to recoup themselves out of the trust fund if
and when the action against them was dismissed; and that,   D
accordingly, there had been no basis for the judge's order depriving
them of their right of recoupment (post, pp. 262D–E, 263A–C, F–G,
264A–B).

*In re Spurling's Will Trusts; Philpot v. Philpot* [1966] 1 W.L.R.
920 applied.

*Turner v. Hancock* (1882) 20 Ch.D. 303, C.A. distinguished.

*Per curiam.* The view is widely held that trustee exemption
clauses have gone too far, and that trustees who charge for their   E
services and who, as professional men, would not dream of
excluding liability for ordinary professional negligence should not
be able to rely on an exemption clause excluding liability for gross
negligence. If such clauses are to be denied effect, however, it
should be done by Parliament (post, pp. 256B–D, 264B).

Decision of Jacob J. affirmed.

The following cases are referred in the judgment of Millett L.J.:   F

*Attorney-General v. Heywood* (1887) 19 Q.B.D. 326, D.C.
*Aylesford (Earl of) v. Morris* (1873) L.R. 8 Ch.App. 484
*Beaman v. A.R.T.S. Ltd.* [1949] 1 K.B. 550; [1949] 1 All E.R. 465, C.A.
*Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250;
   [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Carruthers v. Carruthers* [1896] A.C. 659, H.L.(Sc.)
*Chapman, In re; Cocks v. Chapman* [1896] 2 Ch. 763, C.A.   G
*City Equitable Fire Insurance Co. Ltd., In re* [1925] Ch. 407, C.A.
*Clarke v. Clarke's Trustees,* 1925 S.C. 693
*Davy v. Garrett* (1878) 7 Ch.D. 473, C.A.
*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)
*Gartside v. Inland Revenue Commissioners* [1968] A.C. 553; [1968] 2 W.L.R.
   277; [1968] 1 All E.R., H.L.(E.)
*Goodman v. Harvey* (1836) 4 A. & E. 870   H
*Grill v. General Iron Screw Collier Co.* (1866) L.R. 1 C.P. 600
*Hinton v. Dibbin* (1842) 2 Q.B. 646
*Knox v. Mackinnon* (1888) 13 App.Cas. 753, H.L.(Sc.)
*Leedale v. Lewis* [1982] 1 W.L.R. 1319; [1982] 3 All E.R. 808, H.L.(E.)

A
    *Lewis v. Great Western Railway Co.* (1877) 3 Q.B.D. 195, C.A.
    *Londonderry's Settlement, In re; Peat v. Walsh* [1964] Ch. 594; [1964] 3 W.L.R.
      246; [1964] 2 All E.R. 732
    *Midland Bank Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.* [1996]
      P.L.R. 179
    *Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
    *Pass v. Dundas* (1880) 43 L.T. 665

B
    *Perrins v. Bellamy* [1899] 1 Ch. 797, C.A.
    *Rae v. Meek* (1889) 14 App.Cas. 558, H.L.(Sc.)
    *Seton v. Dawson* (1841) 4 D. 310
    *Spurling's Will Trusts, In re; Philpot v. Philpot* [1966] 1 W.L.R. 920; [1966]
      1 All E.R. 745
    *Trusts of Leeds City Brewery Ltd.'s Debenture Stock Trust Deed, In re; Leeds
      City Brewery Ltd. v. Platts (Note)* [1925] Ch. 532, C.A.

C
    *Turner v. Hancock* (1882) 20 Ch.D. 303, C.A.
    *Vickery, In re; Vickery v. Stephens* [1931] 1 Ch. 572
    *Walters v. Woodbridge* (1878) 7 Ch.D. 504, C.A.
    *Wilkins v. Hogg* (1861) 31 L.J.Ch. 41
    *Wyman v. Paterson* [1900] A.C. 271, H.L.(Sc.)

    The following additional cases were cited in argument:

D
    *Applegate v. Moss* [1971] 1 Q.B. 406; [1971] 2 W.L.R. 541; [1971] 1 All E.R.
      747, C.A.
    *Attorney-General v. Power* [1906] 2 I.R. 272
    *Baden v. Société Générale pour Favoriser le Développement du Commerce et de
      l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509; [1992] 4 All E.R.
      161
    *Banister, In re; Broad v. Munton* (1879) 12 Ch.D. 131, C.A.

E
    *Bartlett v. Barclays Bank Trust Co. Ltd. (Nos. 1 and 2)* [1980] Ch. 515; [1980]
      2 W.L.R. 430; [1980] 2 All E.R. 92
    *Beckett's Settlement, In re* [1940] Ch. 279
    *Beddoe, In re; Downes v. Cottam* [1893] 1 Ch. 547, C.A.
    *Buckton, In re; Buckton v. Buckton* [1907] 2 Ch. 406
    *Chaine-Nickson v. Bank of Ireland* [1976] I.R. 393
    *Clark v. Woor* [1965] 1 W.L.R. 650; [1965] 2 All E.R. 353
    *Figg v. Clarke* [1997] 1 W.L.R. 603

F
    *Gladstone v. Padwick* (1871) L.R. 6 Ex. 203
    *Green v. Russell, McCarthy (Third Party)* [1959] 2 Q.B. 226; [1959] 3 W.L.R.
      17; [1959] 2 All E.R. 525, C.A.
    *Grosvenor Hotel, London (No. 2), In re* [1965] Ch. 1210; [1964] 3 W.L.R. 992;
      [1964] 3 All E.R. 354, C.A.
    *Hallows v. Lloyd* (1888) 39 Ch.D. 686
    *Harrison v. Randall* (1851) 9 Hare 397

G
    *Holding and Management Ltd. v. Property Holding and Investment Trust Plc.*
      [1989] 1 W.L.R. 1313; [1990] 1 All E.R. 938, C.A.
    *Kitchen v. Royal Air Force Association* [1958] 1 W.L.R. 563; [1958] 2 All E.R.
      241, C.A.
    *Lloyd v. McMahon* [1987] A.C. 625; [1987] 2 W.L.R. 821; [1987] 1 All E.R.
      1118, C.A. and H.L.(E.)
    *McDonald v. Horn* [1995] I.C.R. 685; [1995] 1 All E.R. 961, C.A.

H
    *National Oilwell (U.K.) Ltd. v. Davy Offshore Ltd.* [1993] 2 Lloyd's Rep. 582
    *Nestle v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
      E.R. 118, C.A.
    *Palamisto General Enterprises S.A. v. Ocean Marine Insurance Co. Ltd.* [1972]
      2 Q.B. 625; [1972] 2 W.L.R. 1425; [1972] 2 All E.R. 1112, C.A.

Armitage v. Nurse (C.A.)                                    [1998]

*Pauling's Settlement Trusts, In re* [1962] 1 W.L.R. 86; [1961] 3 All E.R. 713    A

*Pearson v. Inland Revenue Commissioners* [1980] Ch. 1; [1979] 3 W.L.R. 112; [1979] 3 All E.R. 7, C.A.; [1981] A.C. 753; [1980] 2 W.L.R. 872; [1980] 2 All E.R. 479, H.L.(E.)

*Pearson (S.) & Son Ltd. v. Dublin Corporation* [1907] A.C. 351, H.L.(I.)

*Raineri v. Miles* [1981] A.C. 1050; [1980] 2 W.L.R. 847; [1980] 2 All E.R. 145, H.L.(E.)

*Royal Brunei Airlines Sdn. Bhd. v. Tan* [1995] 2 A.C. 378; [1995] 3 W.L.R. 64;    B
[1995] 3 All E.R. 97, P.C.

*Smith, In re; Smith v. Thompson* [1896] 1 Ch. 71

*Speight v. Gaunt* (1883) 9 App.Cas. 1, H.L.(E.)

*Suisse Atlantique Société d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361; [1966] 2 W.L.R. 944; [1966] 2 All E.R. 61, H.L.(E.)

*Thomas Witter Ltd. v. T.B.P. Industries Ltd.* [1996] 2 All E.R. 573

*Tito v. Waddell (No. 2)* [1977] Ch. 106; [1977] 2 W.L.R. 496; [1977] 3 All E.R.    C
129

*Torrance v. Bolton* (1872) L.R. 8 Ch.App. 118

*Waterman's Will Trusts, In re; Lloyds Bank Ltd. v. Sutton* [1952] 2 All E.R. 1054

*Whiteley, In re; Whiteley v. Learoyd* (1886) 33 Ch.D. 347, C.A.

*Young and Harston's Contract, In re* (1885) 31 Ch.D. 168, C.A.
                                                                              D

APPEAL and CROSS-APPEAL from Jacob J.

By an amended statement of claim dated 20 December 1993 Paula Rachel Armitage, as beneficiary of a trust contained in a settlement of 11 October 1984, claimed against the trustees, (1) Richard Nurse, (2) Dudley Thomas Bowman Stammers and Brian Arthur Stammers, as personal representatives of Arthur George Stammers, deceased, (3) Keith    E
Flatman and (4) Jeffrey Reginald Wright, for various alleged breaches of trust.

On 28 June 1995 Jacob J. determined agreed preliminary points in the action and declared that (a) all the defendants were absolved by clause 15 of the settlement from liability for certain of the breaches of trust alleged in the statement of claim, (b) none of the defendants were absolved by clause 9 of the settlement from liability for breaches of trust alleged in the    F
statement of claim and (c) none of the claims of breach of trust was barred by the Limitation Act 1980. The judge deprived the trustees of 20 per cent. of their costs and on 28 July 1995 barred the trustees from recovering that part of their costs from the trust fund.

By a notice of appeal dated 23 August 1995 the plaintiff appealed to set aside the judge's declaration that clause 15 absolved the defendants    G
from liability for breaches of trust on the grounds, inter alia, that the judge had wrongly construed the clause to relieve the defendants of all liability which was not the result of dishonesty on their part; that the judge was wrong in law in construing actual fraud as equating to actual dishonesty; that actual fraud should have been construed as embracing conduct short of dishonesty amounting to wilful or deliberate or reckless breaches of trust; that the judge ought to have held that if clause 15 was to be    H
construed as excluding liability on the part of the trustees for all breaches of trust other than those committed dishonestly, then the clause was so inimical to the concept of trust as to be repugnant, and that as a matter

A  of law or policy the trustees could not rely on it either at all or to exclude liability for loss resulting from reckless or deliberate breaches of duty committed by them; and that the judge ought in all the circumstances to have declared that none of the trustees were absolved by clause 15 from liability for the alleged breaches of trust.

    By notices of cross-appeal dated 8 September and 4 October 1995 the defendants appealed against the judge's declarations on issues (b) and (c)

B  and on the issue of costs. The grounds of appeal on the issue of costs were, inter alia, that the judge was wrong in law in holding that for the purposes of R.S.C., Ord. 62, r. 6(2) a trustee who defended himself against allegations of breach of trust had in substance acted for his own benefit rather than for the benefit of the fund and that he ought to have held that a trustee so defending himself was acting in his capacity of trustee and

C  was entitled to a lien on the fund for all his costs except only any incurred through acts amounting to misconduct.

    The facts are stated in the judgment of Millett L.J.

    *Bernard Weatherill Q.C.* for the plaintiff. The irreducible core duties of a trustee include (1) a duty to inquire as to the extent and nature the

D  property and the trusts (see *Hallows v. Lloyd* (1888) 39 Ch.D. 686, 691; *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260, 1265E, 1266H, 1275E–G and *Wyman v. Paterson* [1900] A.C. 271); (2) a duty to obey directions in the settlement unless the deviation is sanctioned by the court (see *Harrison v. Randall* (1851) 9 Hare 397, 407 and *Royal Brunei Airlines Sdn. Bhd. v. Tan* [1995] 2 A.C. 378, 390A–B); (3) a duty to account for his stewardship of the assets under his control; (4) a duty to carry on

E  the business of the trust with the degree of prudence to be expected of a hypothetically reasonably prudent man of business (see *Speight v. Gaunt* (1883) 9 App.Cas. 1, 19 and *In re Whiteley; Whiteley v. Learoyd* (1886) 33 Ch.D. 347, 355).

    The court will insist that the trustee discharges his duties with honesty and in good faith: see *In re Smith; Smith v. Thompson* [1896] 1 Ch. 71, 76.

F  Any act or neglect on his part which is not authorised or excused by the terms of the trust instrument is a breach of trust: see *Green v. Russell, McCarthy (Third Party)* [1959] 2 Q.B. 226, 241 and *Tito v. Waddell (No. 2)* [1977] Ch. 106, 247B–248E.

    The technical meaning of wilful default includes want of ordinary prudence in the trustee: see *In re Chapman; Cocks v. Chapman* [1896] 2 Ch. 763, 776 and *Bartlett v. Barclays Bank Trust Co. Ltd.*

G  *(No. 2)* [1980] Ch. 515, 546A–F. For a more common sense meaning in a contractual context, see *In re Young and Harston's Contract* (1885) 31 Ch.D. 168, 174–175, 176. Wilful default is to be distinguished from mere negligence and involves conscious breach of duty or recklessness: see *In re Trusts of Leeds City Brewery Ltd.'s Debenture Stock Trust Deed* [1925] Ch. 532, 533–534, 537–538, 544; *In re City Equitable Fire Insurance Co. Ltd.* [1925] 1 Ch. 407, 434–438, 522–524; *Lloyd v. McMahon* [1987] A.C.

H  625, 646H–647A, 647E, 702, 717; *Raineri v. Miles* [1981] A.C. 1050, 1068G–H, 1094H–1095A; *Palamisto General Enterprises S.A. v. Ocean Marine Insurance Co. Ltd.* [1972] 2 Q.B. 625, 646C–E; *National Oilwell (U.K.) Ltd. v. Davy Offshore Ltd.* [1993] 2 Lloyd's Rep. 582, 621 and *In re Vickery;*

*Vickery v. Stephens* [1931] 1 Ch. 572. The latter case has often been     A
criticised, but is supportable when understood to be an authority on the
scope of the exemption in section 30(1) of the Trustee Act 1925; it was not
a case on the liability of trustees to account as the basis of wilful default.

There is a distinction between common law fraud and equitable fraud.
Dishonesty, usually at the heart of common law fraud, is not the only
badge of fraud: see *Derry v. Peek* (1889) 14 App.Cas. 337, 350, 358–359,
374. The essence of common law fraud is an absence of bona fides. As to     B
equitable fraud, the court has a discretion not to enforce or set aside
contract, instruments or transactions where there has been unconscionable
conduct: see *Torrance v. Bolton* (1873) L.R. 8 Ch. App.Cas. 118, 124–125.
In relation to section 26(*b*) of the Limitation Act 1939, fraud has been
construed to include equitable fraud: see *Applegate v. Moss* [1971]
1 Q.B. 406, 413B–C, 414F–H, 417A–C; *Beaman v. A.R.T.S. Ltd.* [1949] 1 K.B.     C
550; *Kitchen v. Royal Air Force Association* [1958] 1 W.L.R. 563 and *Clark
v. Woor* [1965] 1 W.L.R. 650.

A breach of trust which is committed recklessly or wilfully is fraudulent
in equity see *Royal Brunei Airlines Sdn. Bhd. v. Tan* [1995] 2 A.C. 378,
387C–391D. It is not necessary to plead positive dishonesty by the trustees:
see *Davy v. Garrett* (1878) 7 Ch.D. 473, 489. Any breach of trust apt to
cause loss which is committed wilfuly or recklessly satisfies the test: see     D
*Baden v. Société Générale pour Favoriser le Développement du Commerce et
de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509, 574G–H.
[Reference was also made to *Thomas Witter Ltd. v. T.P.B. Industries Ltd.*
[1996] 2 All E.R. 573.]

Clause 15 of the trust deed must be interpreted as if the expression
"actual fraud" embraces wilful default and recklessness: see *Midland Bank*     E
*Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.* [1996] P.L.R. 179.
The word "actual" adds nothing to fraud: see *Gladstone v. Padwick* (1871)
L.R. 6 Ex. 203. In contract parties cannot exclude liability for their own
fraud: see *S. Pearson & Son Ltd. v. Dublin Corporation* [1907] A.C. 351,
353–354, 362 and *In re Banister* (1879) 12 Ch.D. 131, 136, 142–143, 149.
Similarly, trustees cannot be exempted from liability for breach of trust
arising from gross negligence or bad faith: see *Wilkins v. Hogg* (1861)     F
31 L.J.Ch. 41, 43; *Pass v. Dundas* (1880) 43 L.T. 665, 666, 667; *Knox v.
Mackinnon* (1888) 13 App.Cas. 753, 762–763, 765–766, 768; *Rae v. Meek*
(1889) 14 App.Cas. 558, 572–573; *Wyman v. Paterson* [1900] A.C. 271,
278–279, 281, 287, 291 and *Clarke v. Clarke's Trustees* [1925] S.C. 693,
707, 712. Exemption clauses must be construed in their context so as not
to defeat the main purpose of the parties: see *Suisse Atlantique Société*     G
*d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale* [1967]
1 A.C. 361, 398F–G. [Reference was also made to *In re Waterman's Will
Trusts; Lloyds Bank Ltd. v. Sutton* [1952] 2 All E.R. 1054, 1055C–D and
*Bartlett v. Barclays Bank Trust Co. Ltd. (No. 1)* [1980] Ch. 515, 534B–F.]

The judge was right to hold that the plaintiff did not enjoy an interest
in possession and that time had not begun to run under section 21(3) of
the Limitation Act: see *Gartside v. Inland Revenue Commissioners* [1968]     H
A.C. 553, 566D–568D, 602B–603B, 607C–G, 614E, 615A–G, 621E–622C;
*Pearson v. Inland Revenue Commissioners* [1980] Ch. 1, 8H–9D, 18F–19C;
[1981] A.C. 753; *In re Pauling's Settlement Trusts* [1962] 1 W.L.R. 86, 115;

A   [1994] 1 Ch. 303, 353; *Attorney-General v. Power* [1906] 2 I.R. 272, 280 and
*Figg v. Clarke* [1997] 1 W.L.R. 603.

    As to costs, the defendants in bringing forward the preliminary points
were acting in their own interest, not for the protection of the trust fund:
contrast *In re Spurling's Will Trusts; Philpot v. Philpot* [1966] 1 W.L.R.
920. In the normal course of events trustees who lose in adversarial
litigation have no right to be indemnified from, and have no lien for their
B  costs, on, the trust fund: see *McDonald v. Horn* [1995] I.C.R. 685,
694c–696d; *In re Buckton; Buckton v. Buckton* [1907] 2 Ch. 406, 413–415.
[Reference was also made to *Holding and Management Ltd. v. Property
Holding and Investment Trust Plc.* [1989] 1 W.L.R. 1313, 1324c–h.]

    *Gregory Hill* for the trustees. Trustee exemption clauses are strictly
construed but liability for anything short of fraud may be excluded by
C  sufficiently clear words: see *Midland Bank Trustee (Jersey) Ltd. v. Federated
Pension Services Ltd.* [1996] P.L.R. 179, 192–197. An allegation of
deliberate breach of trust is not, without more, an allegation of fraud
within clause 15. Fraudulent conduct must be distinctly alleged: see
*Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch.
250, 268h and *Davy v. Garrett*, 7 Ch.D. 473, 489.

D    At common law, recklessness is a way of being dishonest, not an
alternative "badge of fraud:" see *Thomas Witter Ltd. v. T.B.P. Industries
Ltd.* [1996] 2 All E.R. 573, 586j–587h, 588d–e. "Equitable fraud" cannot
be exhaustively defined. But the established uses of the term do not apply
to the instant case. Not every conscious breach of trust is ipso facto
fraudulent. Actual fraud does not include constructive fraud: *Gladstone v.
Padwick*, L.R. 6 Ex. 203, 211.

E    *Royal Brunei Airlines Sdn. Bhd. v. Tan* [1995] 2 A.C. 378 and *Baden v.
Société Générale pour Favoriser le Développement du Commerce et de
l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509 must be understood
as cases on accessory liability in constructive trusteeship. [Reference was
also made to *S. Pearson & Son Ltd. v. Dublin Corporation* [1907] A.C. 351;
*In re Banister*, 12 Ch.D. 131; *Wilkins v. Hogg*, 31 L.J.Ch. 41, 43; *Pass
v. Dundas*, 43 L.T. 665, 666; *Knox v. Mackinnon*, 13 App.Cas. 753; *Rae v.
F  Meek*, 14 App.Cas. 558; *Wyman v. Paterson* [1900] A.C. 271 and *Clarke v.
Clarke's Trustees*, 1925 S.C. 693.]

    The limitation period began to run against the plaintiff when she
turned 18. The right to require the trustees to consider exercising
discretions in her favour is sufficient to give her an interest in possession
for this purpose: see *Leedale v. Lewis* [1982] 1 W.L.R. 1319. The decisions
G  on "interest in possession" for tax purposes are not conclusive for
limitation. [Reference was also made to *Gartside v. Inland Revenue
Commissioners* [1968] A.C. 553, 617–620; *Attorney-General v. Heywood*
(1887) 19 Q.B.D. 326 and *In re Beckett's Settlement* [1940] Ch. 279, 285.]
The proviso to section 21(3) of the Limitation Act 1980 is satisfied as soon
as the beneficiary has an immediate right to receive or an immediate right
to be considered for the immediate distribution of the fund and to receive
H  trust accounts: see *Chaine-Nickson v. Bank of Ireland* [1976] I.R. 393.

    The trustees' lien over the trust fund extends to the costs of defending
charges of breach of trust and can only be lost through misconduct: see *In
re Spurling's Will Trusts; Philpot v. Philpot* [1966] 1 W.L.R. 920, 922c,

930G, 931D–932A, 933B–C, 935B–G, 936C–G and *Turner v. Hancock* (1882)    A
20 Ch.D. 303. R.S.C., Ord. 62, r. 6(2) is concerned with the regulation of
costs inter partes which are in the discretion of the court: see section 51(1)
of the Supreme Court Act 1981. If Ord. 62, r. 6(2) purports to alter
the substantive law as to the trustees' lien, it is ultra vires: cf. *In re
Grosvenor Hotel, London (No. 2)* [1965] Ch. 1210, 1243B–C, 1249F, 1262D.

                                                      *Cur. adv. vult.*      B

19 March.  The following judgments were handed down.

MILLETT L.J.  The main questions which arise in this appeal are
concerned with the true construction of a trustee exemption clause in a
settlement and the legitimate scope of such clauses in English law.         C
   The appellant, Paula Rachel Armitage, has brought an action for
breach of trust against the respondents, who are the trustees and the
personal representatives of deceased trustees of a settlement of which she
is the principal beneficiary. The settlement contains a trustee exemption
clause (clause 15) in very wide and general terms as well as a special and
more limited exemption clause (clause 9). Jacob J. was asked to decide
three preliminary questions in the action. They may be summarised as      D
follows: (1) whether clause 15 of the settlement operates to absolve the
respondents from liability for all or any of the breaches alleged in the
amended statement of claim; (2) whether clause 9(a) of the settlement
operates to similar effect; and (3) whether any of Paula's claims in respect
of breaches of trust alleged to have been committed before 15 June 1987
are statute-barred.                                                          E
   The judge decided question (1) in the affirmative and questions (2) and
(3) in the negative. He awarded the respondents 80 per cent. of their costs
but deprived them of the right to reimburse themselves out of the trust
fund to the extent of the remaining 20 per cent.
   Both parties appeal to this court. Paula appeals against the judge's
answer to question (1). The respondents appeal against his answers to
questions (2) and (3) and against his order depriving them of their right to   F
reimburse themselves for their costs out of the trust fund. We have given
leave to Paula to raise a further question which was not considered by the
judge. This is whether if, as the judge ruled, clause 15 on its true
construction exempts each of the respondents from all liability for breach
of trust other than liability for his own dishonesty, the clause is void for
repugnancy or on grounds of public policy.                                   G

*The facts*

   The settlement was made on 11 October 1984. It was the result of an
application to the court by the trustees of a marriage settlement made by
Paula's grandfather for the variation of the trusts of the settlement under
the Variation of Trusts Act 1958. Paula's mother was life tenant under the
marriage settlement and Paula, who was then aged 17, was entitled in      H
remainder. The settled property consisted largely of land which was farmed
by a family company called G. W. Nurse & Co. Ltd. The company had
farmed the land for many years and, until March 1984, it had held a

A   tenancy of the land. Paula's mother and grandmother were the sole
directors and shareholders of the company.

Under the terms of the variation the property subject to the trusts of
the marriage settlement was partitioned between Paula and her mother.
Part of the land together with a sum of £230,000 was transferred to Paula's
mother absolutely free and discharged from the trusts of the marriage
settlement. The remainder of the land ("Paula's land") together with a sum
B   of £30,000 was allocated to Paula. Since she was under age, her share was
directed to be held on the trusts of a settlement prepared for her benefit.
So the settlement came into being.

Under the trusts of the settlement the trustees held the income upon
trust to accumulate it until Paula attained 25 with power to pay it to her
or to apply it for her benefit. Thereafter, and until Paula attained 40, they
C   held the income upon trust to pay it to her. The capital was held in trust
for Paula at 40 with trusts over in the event of her death under that age,
and with provision for transferring the capital to Paula in instalments after
she had attained 25 but not 40.

The settlement, which must be taken to have been made by Paula as
well as by her mother, appears to have been drawn by counsel for the
marriage settlement trustees (Mr. P. W. E. Taylor Q.C. and Mr. Geoffrey
D   Jaques) and approved on Paula's behalf by junior counsel who appeared
for her guardian ad litem. It was approved on her behalf by the High
Court (Judge Fitz-Hugh Q.C. sitting as a judge of the Chancery Division).


*The pleadings*

The amended statement of claim pleads a number of breaches of trust
E   in detail. The judge summarised them under four heads. First, Paula
complains that in breach of trust the trustees appointed the company to
farm Paula's land as well as the land which had been transferred to her
mother. It is alleged that this was not merely grossly imprudent but was
expressly forbidden by clause 12 of the settlement, inserted for fiscal
reasons, which provides that no capital or income subject to the trusts of
the settlement shall in any circumstances whatsoever be paid or applied
F   beneficially (save for full consideration) or be applied for the benefit
whether directly or indirectly of Paula's mother or grandmother. (The
respondents, of course, plead that the company's obligation to manage the
farm constituted full consideration for the £500 a quarter which it was
paid for doing so. It is not alleged that the company's appointment had
any adverse fiscal consequences.) Secondly, it is alleged that in breach of
G   trust the trustees failed thereafter properly to supervise the company's
management of Paula's land. Thirdly, it is alleged that the trustees failed
to make proper inquiry into the reasons why the value of Paula's land
apparently fell dramatically between the date on which it was valued for
the purposes of the partition in 1984 and the date when it was sold in
1987. Finally, it is alleged that the trustees failed to obtain proper payment
of interest in respect of a loan made to Paula's mother.
H   Before us counsel for Paula has summarised the pleadings more
generally. They allege, he says, not merely a failure to distinguish between
Paula's interests and those of her family but a deliberate course of conduct
on the part of the trustees to disregard the interests of Paula and

subordinate them to the interests of her mother or other members of the    A
family who were not objects of the trust, or at the very least a conscious
indifference to Paula's interests.

Before analysing the pleadings in more detail, it is convenient to
consider the scope of clause 15 of the settlement.

*Clause 15 of the settlement.*
                                                                          B
    Clause 15 of the settlement is in the following terms:

       "No trustee shall be liable for any loss or damage which may
happen to Paula's fund or any part thereof or the income thereof at
any time or from any cause whatsoever *unless such loss or damage
shall be caused by his own actual fraud. . . .*" (My emphasis.)

The clause was taken from *Hallett's Conveyancing Precedents* (1965). A    C
more prolix clause to the same effect may be found in *Key and Elphinstone's
Precedents in Conveyancing*, 15th ed. (1953). In my judgment, the meaning
of the clause is plain and unambiguous. No trustee can be made liable for
loss or damage to the capital or income of the trust property caused
otherwise than by his own actual fraud. "Actual fraud" means what it
says. It does not mean "constructive fraud" or "equitable fraud." The
word "actual" is deliberately chosen to exclude them.                     D

Counsel for Paula submits that in a settlement the context requires the
word "fraud" to be given the extended meaning which the courts of equity
came to give it. The distinction between fraud properly so-called and other
cases to which the Court of Chancery, in his own words, "undoubtedly did
apply the term 'fraud,' although I think unfortunately" is expounded in
the speech of Viscount Haldane L.C. in *Nocton v. Lord Ashburton* [1914]    E
A.C. 932, 953. As he explained: "In Chancery the term 'fraud' thus came
to be used to describe what fell short of deceit, but imported breach of a
duty to which equity had attached its sanction." It is worthy of note that
he himself used the expression "actual fraud" throughout his speech to
distinguish cases of common law fraud or deceit from these other cases.
Lord Dunedin did the same when he said, at p. 963: "if based on fraud,
then, in accordance with the decision in *Derry v. Peek* (1889) 14 App.Cas.    F
337, the fraud proved must be actual fraud, a mens rea, an intention to
deceive." *Derry v. Peek* established that nothing short of a fraudulent
intention in the strict sense will suffice for a case of deceit or fraud
properly so-called. It requires proof of dishonesty. Nothing less will do.
Gross and culpable negligence is not enough. This was confirmed in
*Nocton v. Lord Ashburton*, which also established that dishonesty is not a    G
necessary factor in cases of so-called equitable fraud.

In my judgment, therefore, clause 15 is apt to exclude liability for
breach of trust in the absence of a dishonest intention on the part of the
trustee whose conduct is impugned. I would have added nothing further
but for the confusion which appears to have been engendered in the
attempt to apply the concept of actual fraud to an allegation of breach of
trust.                                                                    H

The common law knows no generalised tort of fraud. *Derry v. Peek*,
14 App.Cas. 337 was an action for damages for deceit, that is to say, for
fraudulent misrepresentation. In such a case fraud must be proved by

A    showing that the false representation was made knowingly, that is to say, without an honest belief in its truth, or recklessly, that is to say, not caring whether it was true or false. Care needs to be taken when these concepts are applied *not to a representation but to a breach of trust*. Breaches of trust are of many different kinds. A breach of trust may be deliberate or inadvertent; it may consist of an actual misappropriation or misapplication of the trust property or merely of an investment or other dealing which is

B    outside the trustees' powers; it may consist of a failure to carry out a positive obligation of the trustees or merely of a want of skill and care on their part in the management of the trust property; it may be injurious to the interests of the beneficiaries or be actually to their benefit. By consciously acting beyond their powers (as, for example, by making an investment which they know to be unauthorised) the trustees may

C    deliberately commit a breach of trust; but if they do so in good faith and in the honest belief that they are acting in the interest of the beneficiaries their conduct is not fraudulent. So a deliberate breach of trust is not necessarily fraudulent. Hence the remark famously attributed to Selwyn L.J. by Sir Nathaniel Lindley M.R. in the course of argument in *Perrins v. Bellamy* [1899] 1 Ch. 797, 798: "My old master, the late Selwyn L.J., used to say, 'The main duty of a trustee is to commit *judicious* breaches of

D    trust.'" The expression "actual fraud" in clause 15 is not used to describe the common law tort of deceit. As the judge appreciated it simply means dishonesty. I accept the formulation put forward by Mr. Hill on behalf of the respondents which (as I have slightly modified it) is that it

"connotes at the minimum an intention on the part of the trustee to pursue a particular course of action, either knowing that it is contrary

E    to the interests of the beneficiaries or being recklessly indifferent whether it is contrary to their interests or not."

It is the duty of a trustee to manage the trust property and deal with it in the interests of the beneficiaries. If he acts in a way which he does not honestly believe is in their interests then he is acting dishonestly. It does *not matter whether he stands or thinks he stands to gain personally from*

F    *his actions*. A trustee who acts with the intention of benefiting persons who are not the objects of the trust is not the less dishonest because he does not intend to benefit himself.

In my judgment clause 15 exempts the trustee from liability for loss or damage to the trust property no matter how indolent, imprudent, lacking in diligence, negligent or wilful he may have been, so long as he has not

G    acted dishonestly.

*The permitted scope of trustee exemption clauses*

It is submitted on behalf of Paula that a trustee exemption clause which purports to exclude all liability except for actual fraud is void, either for repugnancy or as contrary to public policy. There is some academic support for the submission (notably an article by Professor Matthews,

H    "The Efficacy of Trustee Exemption Clauses in English Law" [1989] Conv. 42 and *Hanbury & Martin's Modern Equity,* 14th ed. (1993), pp. 473–474) that liability for gross negligence cannot be excluded, but this is not the view taken in *Underhill and Hayton's Law of Trusts and Trustees,* 15th ed.

(1995), pp. 560–561 (where it appears to be taken only because the editor    A
confusingly uses the term "gross negligence" to mean reckless indifference
to the interests of the beneficiaries). In its consultation paper Fiduciary
Duties and Regulatory Rules, A Summary (1992) (Law Com. No. 124),
para. 3.3.41 the Law Commission states:

> "Beyond this, trustees and fiduciaries cannot exempt themselves
> from liability for fraud, bad faith and wilful default. It is not, however,    B
> clear whether the prohibition on exclusion of liability for 'fraud' in
> this context only prohibits the exclusion of common law fraud or
> extends to the much broader doctrine of equitable fraud. It is also not
> altogether clear whether the prohibition on the exclusion of liability
> for 'wilful default' also prohibits exclusion of liability for gross
> negligence although we incline to the view that it does."

C

This passage calls for two comments. First, the expression "wilful
default" is used in the cases in two senses. A trustee is said to be
accountable on the footing of wilful default when he is accountable not
only for money which he has in fact received but also for money which he
could with reasonable diligence have received. It is sufficient that the
trustee has been guilty of a want of ordinary prudence: see e.g. In re
Chapman; Cocks v. Chapman [1896] 2 Ch. 763. In the context of a trustee    D
exclusion clause, however, such as section 30 of the Trustee Act 1925, it
means a deliberate breach of trust: In re Vickery; Vickery v. Stephens [1931]
1 Ch. 572. The decision has been criticised, but it is in line with earlier
authority: see Lewis v. Great Western Railway Co. (1877) 3 Q.B.D. 195; In
re Trusts of Leeds City Brewery Ltd.'s Debenture Stock Trust Deed; Leeds
City Brewery Ltd. v. Platts (Note) [1925] Ch. 532 and In re City Equitable    E
Fire Insurance Co. Ltd. [1925] Ch. 407. Nothing less than conscious and
wilful misconduct is sufficient. The trustee must be

> "conscious that, in doing the act which is complained of or in
> omitting to do the act which it said he ought to have done, he is
> committing a breach of his duty, or is recklessly careless whether it is
> a breach of his duty or not:" see In re Vickery [1931] 1 Ch. 572, 583,    F
> per Maugham J.

A trustee who is guilty of such conduct either consciously takes a risk that
loss will result, or is recklessly indifferent whether it will or not. If the risk
eventuates he is personally liable. But if he consciously takes the risk in
good faith and with the best intentions, honestly believing that the risk is
one which ought to be taken in the interests of the beneficiaries, there is    G
no reason why he should not be protected by an exemption clause which
excludes liability for wilful default.

Secondly, the Law Commission was considering the position of
fiduciaries as well as trustees, and in such a context it is sensible to
consider the exclusion of liability for so-called equitable fraud. But it
makes no sense in the present context. The nature of equitable fraud may
be collected from the speech of Viscount Haldane L.C. in Nocton v. Lord    H
Ashburton [1914] A.C. 932, 953 and Snell's Equity, 29th ed. (1990),
pp. 550–551. It covers breach of fiduciary duty, undue influence, abuse of
confidence, unconscionable bargains and frauds on powers. With the sole

A exception of the last, which is a technical doctrine in which the word "fraud" merely connotes excess of vires, it involves some dealing by the fiduciary with his principal and the risk that the fiduciary may have exploited his position to his own advantage. In *Earl of Aylesford v. Morris* (1873) L.R. 8 Ch.App. 484, 490–491 Lord Selborne L.C. said: "Fraud does not here mean deceit or circumvention; it means an unconscientious use of the power arising out of these circumstances and conditions; ..." A

B trustee exemption clause such as clause 15 of the settlement does not purport to exclude the liability of the fiduciary in such cases. Suppose, for example, that one of the respondents had purchased Paula's land at a proper price from his fellow trustees. The sale would be liable to be set aside. Clause 15 would not prevent this. This is not because the purchasing trustee would have been guilty of equitable fraud, but because by claiming

C to recover the trust property (or even equitable compensation) Paula would not be suing in respect of any "loss or damage" to the trust. Her right to recover the land would not depend on proof of loss or damage. Her claim would succeed even if the sale was at an overvalue; the purchasing trustee could never obtain more than a defeasible title from such a transaction. But clause 15 would be effective to exempt his fellow trustees from liability for making good any loss which the sale had occasioned to the trust estate

D so long as they had acted in good faith and in what they honestly believed was Paula's interests.

 Accordingly, much of the argument before us which disputes the ability of a trustee exemption clause to exclude liability for equitable fraud or unconscionable behaviour is misplaced. But it is unnecessary to explore this further, for no such conduct is pleaded. What is pleaded is, at the very

E lowest, culpable and probably gross negligence. So. the question reduces itself to this: can a trustee exemption clause validly exclude liability for gross negligence?

 It is a bold submission that a clause taken from one standard precedent book and to the same effect as a clause found in another, included in a settlement drawn by Chancery counsel and approved by counsel acting for an infant settlor and by the court on her behalf, should be so repugnant

F to the trusts or contrary to public policy that it is liable to be set aside at her suit. But the submission has been made and we must consider it. In my judgment it is without foundation.

 There can be no question of the clause being repugnant to the trust. In *Wilkins v. Hogg* (1861) 31 L.J.Ch. 41, 42 Lord Westbury L.C. challenged counsel to cite a case where an indemnity clause protecting the trustee

G from his ordinary duty had been held so repugnant as to be rejected. Counsel was unable to do so. No such case has occurred in England or Scotland since.

 I accept the submission made on behalf of Paula that there is an irreducible core of obligations owed by the trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no

H trusts. But I do not accept the further submission that these core obligations include the duties of skill and care, prudence and diligence. The duty of the trustees to perform the trusts honestly and in good faith for the benefit of the beneficiaries is the minimum necessary to give

A

substance to the trusts, but in my opinion it is sufficient. As Mr. Hill
pertinently pointed out in his able argument, a trustee who relied on the
presence of a trustee exemption clause to justify what he proposed to do
would thereby lose its protection: he would be acting recklessly in the
proper sense of the term.

B

It is, of course, far too late to suggest that the exclusion in a contract
of liability for ordinary negligence or want of care is contrary to public
policy. What is true of a contract must be equally true of a settlement. It
would be very surprising if our law drew the line between liability for
ordinary negligence and liability for gross negligence. In this respect
English law differs from civil law systems, for it has always drawn a sharp
distinction between negligence, however gross, on the one hand and fraud,
bad faith and wilful misconduct on the other. The doctrine of the common
law is that: "Gross negligence may be evidence of mala fides, but is not
the same thing:" see *Goodman v. Harvey* (1836) 4 A. & E. 870, 876, *per*
Lord Denman C.J. But while we regard the difference between fraud on
the one hand and mere negligence, however gross, on the other as a
difference in kind, we regard the difference between negligence and gross
negligence as merely one of degree. English lawyers have always had a
healthy disrespect for the latter distinction. In *Hinton v. Dibbin* (1842)
2 Q.B. 646 Lord Denman C.J. doubted whether any intelligible distinction
exists; while in *Grill v. General Iron Screw Collier Co.* (1866) L.R. 1 C.P.
600, 612 Willes J. famously observed that gross negligence is ordinary
negligence with a vituperative epithet. But civilian systems draw the line in
a different place. The doctrine is culpa lata dolo aequiparatur; and
although the maxim itself is not Roman the principle is classical. There is
no room for the maxim in the common law; it is not mentioned in *Broom's
Legal Maxims*, 10th ed. (1939).

C

D

E

The submission that it is contrary to public policy to exclude the
liability of a trustee for gross negligence is not supported by any English
or Scottish authority. The cases relied on are the English cases of *Wilkins
v. Hogg*, 31 L.J.Ch. 41 and *Pass v. Dundas* (1880) 43 L.T. 665; and the
Scottish cases of *Knox v. Mackinnon* (1888) 13 App.Cas. 753, *Rae v. Meek*
(1889) 14 App.Cas. 558, *Wyman v. Paterson* [1900] A.C. 271 and *Clarke v.
Clarke's Trustees*, 1925 S.C. 693. These cases, together with two other
Scottish cases, *Seton v. Dawson* (1841) 4 D. 310 and *Carruthers v.
Carruthers* [1896] A.C. 659, and cases from the Commonwealth and
America, were reviewed by the Jersey Court of Appeal in *Midland Bank
Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.* [1996] P.L.R. 179
in a masterly judgment delivered by Sir Godfray Le Quesne Q.C.

F

G

In *Wilkins v. Hogg*, 31 L.J.Ch. 41 Lord Westbury L.C. accepted that
no exemption clause could absolve a trustee from liability for knowingly
participating in a fraudulent breach of trust by his co-trustee. But, subject
thereto, he was clearly of opinion that a settlor could, by appropriate
words, limit the scope of the trustee's liability in any way he chose. The
decision was followed in *Pass v. Dundas*, 43 L.T. 665, where the relevant
clause was held to absolve the trustee from liability. In the course of his
judgment Sir James Bacon V.-C. stated the law in the terms in which
counsel for the unsuccessful beneficiaries had stated it, viz. that the clause

H

A    protected the trustee from liability unless gross negligence was established;
but this was plainly obiter.

Each of the Scottish cases contains dicta, especially in the speeches of
the Scottish members of the House of Lords, which have been taken by
academic writers to indicate that no trustee exemption clause in a Scottish
settlement could exonerate a trustee from his own culpa lata. But in fact
all the cases were merely decisions on the true construction of the
B    particular clauses under consideration, which were in common form at the
time. In *Knox v. Mackinnon*, 13 App.Cas. 753, for example, it was
unnecessary to consider the exemption clause since the transaction in
question was outside its scope. Lord Watson, nevertheless, speaking of
"a clause conceived *in these or similar terms*," said, at pp. 765–766, that it
was the settled law of Scotland that "such a clause is ineffectual to protect
C    a trustee against the consequences of culpa lata, or gross negligence on his
part," and added, quoting Lords Ivory, Gillies and Murray in *Seton v.
Dawson*, 4 D. 310, 318, that "*clauses of this kind* do not protect against
positive breach of duty" (my emphasis). In *Seton v. Dawson* the judges
who were in the majority spoke to the same effect both of "the protecting
clause which occurs in this particular deed" and of "the usual clauses
framed for the same object." In *Rae v. Meek*, 14 App.Cas. 558, 572–573
D    Lord Herschell pointed out that the clause in question was a common one
found in many trust deeds and did not come before the court for
construction for the first time. He said that its effect had been considered
in *Seton v. Dawson* and adopted the passage in Lord Watson's speech in
*Knox v. Mackinnon* to which I have already referred. In *Carruthers v.
Carruthers* [1896] A.C. 659 the House was concerned with a standard
E    trustee exemption clause which was to be treated as inserted into the trust
deed. Their Lordships held that the terms of such a clause would not
exempt trustees from liability for culpa lata. *Wyman v. Paterson* [1900]
A.C. 271 was not a case of negligence at all, but of a plain failure to
perform a positive obligation. It turned on the true construction of the
particular clause under consideration. In *Clarke v. Clarke's Trustees*, 1925
S.C. 693 the Lord President, Lord Clyde, held that the clause in question
F    did not protect the trustees from the consequence of their negligence. He
added, at p. 707:

> "It is difficult to imagine that any clause of indemnity in a trust
> settlement could be capable of being construed to mean that the
> trustees might with impunity neglect to execute their duty as trustees,
> in other words, that they were licensed to perform their duty carelessly.
G    > There is at any rate no such clause in this settlement."

It is not easy to know what to make of this (save that it was obiter).
In *Midland Bank Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.*
[1996] P.L.R. 179, Sir Godfray Le Quesne Q.C. read the passage as directed
to the construction of the indemnity clauses common in Scottish
settlements at the time. I do not so read it. I tend to think that the Lord
H    President was saying that it was difficult to conceive of a settlor permitting
the inclusion of a clause which would have the effect stated. But I agree
with Sir Godfray that the Lord President was emphasising the need to
exclude liability for negligence by clear and unambiguous words, and was

A

not purporting to exclude the possibility of such a clause on the grounds of public policy.

I agree with the conclusion of the Jersey Court of Appeal that all these cases are concerned with the true construction of the particular clauses under consideration or of similar clauses in standard form in the 19th century. None of them deal with the much wider form of clause which has become common in the present century, and none of them are authority for the proposition that it is contrary to public policy to exclude liability for gross negligence by an appropriate clause clearly worded to have that effect.

B

At the same time, it must be acknowledged that the view is widely held that these clauses have gone too far, and that trustees who charge for their services and who, as professional men, would not dream of excluding liability for ordinary professional negligence should not be able to rely on a trustee exemption clause excluding liability for gross negligence. Jersey introduced a law in 1989 which denies effect to a trustee exemption clause which purports to absolve a trustee from liability for his own "fraud, wilful misconduct or gross negligence." The subject is presently under consideration in this country by the Trust Law Committee under the chairmanship of Sir John Vinelott. If clauses such as clause 15 of the settlement are to be denied effect, then in my opinion this should be done by Parliament, which will have the advantage of wide consultation with interested bodies and the advice of the Trust Law Committee.

C

D

*Do the pleadings allege fraud?*

The position which I have reached so far, therefore, is that the respondents are absolved by clause 15 of the settlement from liability for all loss or damage to the trust estate except loss or damage caused by their own dishonesty or the dishonesty of their deceased. The question which then arises is: does the amended statement of claim allege dishonesty?

E

In opening the appeal counsel for Paula expressly disclaimed any intention to allege dishonesty. He did the same before the judge. I would not, myself, hold him to this concession, from which he later resiled, because I think that he may have understood the word "dishonesty" more narrowly than is justified. I take his concession to mean only that it is not intended to allege that any of the trustees acted for their own personal benefit.

F

The general principle is well known. Fraud must be distinctly alleged and as distinctly proved: *Davy v. Garrett* (1878) 7 Ch.D. 473, 489, *per* Thesiger L.J. It is not necessary to use the word "fraud" or "dishonesty" if the facts which make the conduct complained of fraudulent are pleaded; but, if the facts pleaded are consistent with innocence, then it is not open to the court to find fraud. As Buckley L.J. said in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, 268:

G

"An allegation of dishonesty must be pleaded clearly and with particularity. That is laid down by the rules and it is a well-recognised rule of practice. This does not import that the word 'fraud' or the word 'dishonesty' must be necessarily used ... The facts alleged may sufficiently demonstrate that dishonesty is allegedly involved, but where the facts are complicated this may not be so clear, and in such

H

A    a case it is incumbent upon the pleader to make it clear when dishonesty is alleged. If he uses language which is equivocal, rendering it doubtful whether he is in fact relying on the alleged dishonesty of the transaction, this will be fatal; the allegation of its dishonest nature will not have been pleaded with sufficient clarity."

B    That case is authority for the proposition that an allegation that the defendant "knew or ought to have known" is not a clear and unequivocal allegation of actual knowledge and will not support a finding of fraud. It is not treated as making two alternative allegations, i.e. an allegation (i) that the defendant actually knew with an alternative allegation (ii) that he ought to have known; but rather a single allegation that he ought to have known (and may even have known—though it is not necessary to allege this).

C    Before turning to the pleadings I would add one thing more. In order to allege fraud it is not sufficient to sprinkle a pleading with words like "wilfully" and "recklessly" (but not "fraudulently" or "dishonestly"). This may still leave it in doubt whether the words are being used in a technical sense or merely to give colour by way of pejorative emphasis to the complaint.

D    I shall now consider the detailed allegations in the amended statement of claim.

(1) The appointment of the company. This is dealt with in paragraphs 7 and 8. The substance of the complaint is that the appointment was ill-advised and that the trustees ought to have known this. It is not alleged that they had any improper object in making the appointment. Despite the repeated use of the words "in reckless and wilful breach of trust" the complaints to which they relate are complaints of omission. They are consistent with honest incompetence. If proved, they support a finding of negligence, even of gross negligence; but not of fraud.

(2) The failure to supervise the company. This is dealt with in paragraph 9 of the amended statement of claim. The substance of the allegations in paragraph 9.1(1) to (5) and (8) to (11) is neglect of duty. The complaints are complaints of omission. They are consistent with honest incompetence. At best the charge is one of indolence, at worst of negligence.

Paragraph 9.1(6) stands on a different footing. It alleges that the trustees "consciously determined" to limit the income of Paula's fund to £15,000 "and/or to allow [the company] to buy equipment or to build up its capital." This is supported by particulars which refer to a note by one of the trustees (unfortunately now dead) which appears to show that the trustees considered that it was undesirable that Paula's fund should have too much income. I am satisfied that, considered by itself, the sub-paragraph does not sufficiently allege fraud. It is equivocal. It is unclear whether it is alleged that the trustees had an improper purpose or what that purpose was. In particular, it does not distinctly allege (though it may hint) that the trustees deliberately decided to limit the income of Paula's fund in order to benefit the company or its shareholders (who were not objects of the trust); nor do I understand how the one was capable of achieving the other, given the nature of the contractual arrangements with

the company. The note referred to in the particulars plainly calls for an    A
explanation, but it is not inconsistent with honesty. I can think of several
possible explanations, all innocent and plausible.

In any case, paragraph 9.1(6) cannot support an independent allegation
of breach of trust, since the note was apparently never acted on. It was
written in connection with a contemplated transaction which in the event
did not proceed, and in respect of which it is not alleged that failure to
carry the transaction into effect was the fault of the trustees let alone    B
amounted to a breach of trust on their part. At the most, therefore, the
sub-paragraph could provide particulars of the matters relied on in support
of an allegation of improper purpose made elsewhere.

Paragraph 9.1(7) complains that the trustees wrongly delegated certain
of their powers to the company. If such delegation was not authorised it
constituted a breach of trust. But, in the absence of an averment that the    C
trustees delegated their powers in the knowledge that this would result in
a misapplication of trust money and that it did so, this is not a charge of
fraud.

The several complaints in paragraph 9.1 (including paragraph 9.1(6))
are summarised in paragraph 9.11(A) in terms which confirm that they are
allegations of neglect of duty only, not allegations of fraud. Paragraphs 9.2
contains the allegation that the trustees were guilty of "reckless and wilful    D
breach of trust" but in its context this is a meaningless incantation. The
purpose of paragraphs 9.2 and 9.2A is to allege that the trustees' failure
to supervise the company or to manage Paula's land properly caused loss
to the trust fund.

(3) *The value of Paula's land.* This is dealt with by paragraph 11.
Paula's land was sold in 1987 for £299,000, i.e. £175,000 less than the    E
value assigned to it at the time of the partition. It was sold on the basis
of professional advice and to a purchaser at arm's length, and it is not
alleged that the sale was at an undervalue. The complaint is only that the
trustees failed to inquire into the reasons for the apparent decline in
the value of Paula's land, said to be all the more surprising given that the
land appropriated to Paula's mother (which was sold at the same time)
had appreciated in value; and failed to investigate the possibility that they    F
might have a cause of action against the valuers who had valued Paula's
land at the time of the partition, or against the company for the negligent
management of Paula's land. These are charges of negligence, not fraud;
and this is confirmed by the terms in which the complaints are summarised
in paragraph 11.6.

(4) *Payment of interest.* This is dealt with in paragraphs 12 and 13. In    G
order to assist Paula's mother, the trustees agreed to purchase from her
the house where Paula lived with her. The agreement was, it appears,
subject to contract, and in the event Paula's mother did not proceed. In
the meantime, however, the trustees raised £200,000 from the capital of the
settlement and used it to pay off a legal charge which the bank had over
the house, taking a deposit of the title deeds by way of security. In due
course the house was sold, and the trustees were paid the sum of £200,000    H
with simple interest at 8 per cent. during the 16-month period of the loan.
It is alleged that the transaction constituted a breach of trust, but the only
relief claimed in respect of it is in respect of an alleged deficiency of

A   interest. It is not alleged that 8 per cent. was below the commercial rate of
    interest properly chargeable in respect of the loan.
        In the absence of clause 15 the trustees would, I apprehend, be liable
    to account on the footing of wilful default (which in this context, it will
    be remembered, means lack of due diligence) for the difference between
    simple interest at 8 per cent. and compound interest at a commercial rate
    (if higher). Clause 15 exonerates the trustees from any liability to account
B   on the footing of wilful default unless they have been dishonest. It is not
    alleged that the trustees deliberately undercharged or acted dishonestly in
    not obtaining a higher rate or compound interest. The pleading is
    consistent with innocence. It does not amount to a charge of fraud.
        (5) The subordination of Paula's interests to those of her mother. This
    appears only in paragraph 9.3. So far as material it reads:

C           "It is averred that *in the premises* [the trustees] pursued a policy
        ... which failed and neglected to give paramount consideration to the
        best interests of Paula and instead ... pursued a policy designed to
        benefit [Paula's mother and grandmother] who were not objects of the
        trust." (My emphasis.)

    In my judgment, this pleading is embarrassing. It is difficult to know
D   whether it alleges fraud or not. If the word "designed" means "intended"
    then it does. But the word may mean merely "calculated" (in the sense of
    "likely"). If it were merely a matter of construing the paragraph, I would
    be inclined to think that the word should be taken in its latter signification,
    so as not to involve a charge of fraud. I would say this for two reasons.
    First, the words "in the premises" show that paragraph 9.3 does not
    contain a new allegation but rather a summary of the effect of the
    allegations previously made in paragraph 9; and nothing in the earlier
E   parts of the paragraph (not even paragraph 9.6) amounts to a charge of
    fraud. Second, the first part of paragraph 9.3 alleges only that the trustees
    pursued a policy which was objectionable because it failed in fact to give
    paramount consideration to Paula's interests, not that it was their chosen
    policy not to do so. That is not a charge of fraud. Given the ambiguity in
    the word "designed," I would give it the meaning which makes the second
F   part of the paragraph mirror the first. Accordingly, I read the paragraph
    as alleging nothing more than a failure on the part of the trustees to
    distinguish properly between Paula's interests and those of her mother and
    grandmother. That is not a charge of fraud.
        But it is not just a question of construction. The pleading is clearly
    equivocal. Without amendment, it cannot support a finding of fraud.
G
    *Question (1)*
        I am of opinion that, as at present drawn, the amended statement of
    claim does not allege dishonesty or any breach of trust for which the
    trustees are not absolved from liability by clause 15. Accordingly, I would
    answer question (1) in the affirmative as the judge answered it.

H   *Clause 9(a) of the settlement*
        Clause 9(a) of the settlement reads:
            "the trustees ... shall have power to carry on or join or assist in
        carrying on or directing any business of farming ... with power for

that purpose ... to employ or engage ... any managers or agents ...    A
and to delegate all or any of the powers vested in them in relation to
the business ... *And the trustees shall be free from all responsibility and*
*be fully indemnified out of Paula's fund in respect of any loss arising in*
*relation to the business.*" (My emphasis.)

In the absence of the clause, the trustees would have no power to carry
on a farming business, whether themselves or through an agent. If they    B
did so, however prudently, they would commit a breach of trust. The
clause confers the necessary powers. The judge rightly held that the
concluding words of the clause confer upon the trustees a consequential
exemption from liability for trading losses incurred in the carrying on of
the farming business. It does not exonerate them from liability for
imprudently investing in a farming business yielding poor returns or from    C
failing to ensure that the business is properly managed.

*Question (2)*

Accordingly, I would answer question (2) in the negative as the judge
answered it.

D

*Limitation*

Section 21 of the Limitation Act 1980 provides:

"(1) No period of limitation prescribed by this Act shall apply to
an action by a beneficiary under a trust, being an action—(a) in
respect of any fraud or fraudulent breach of trust to which the trustee
was a party or privy; ... (3) Subject to the preceding provisions of    E
this section, an action by a beneficiary ... in respect of any breach of
trust ... shall not be brought after the expiration of six years from
the date on which the right of action accrued. For the purposes of
this subsection, the right of action shall not be treated as having
accrued to any beneficiary entitled to a future interest in the trust
property until the interest fell into possession."    F

Two questions have been argued. The first is whether section 21(1)(a)
is limited to cases of fraud or fraudulent breach of trust properly so called,
that is to say to cases involving dishonesty. The judge held that it is. In my
judgment, he was plainly right for the reasons which he gave.
I have explained the meaning of the word "fraud" in a trustee exemption
clause, and there is no reason to ascribe a different meaning to the word    G
where it appears in section 21(1)(a) of the Limitation Act 1980. Moreover,
the meaning of the subsection is not free from authority. Its predecessor,
section 26 of the Limitation Act 1939, was held to "mean what it says"
and to be limited to cases where fraud was an ingredient of the wrong: see
*Beaman v. A.R.T.S. Ltd.* [1949] 1 K.B. 550, 558, *per* Lord Greene M.R.
The meaning of the words "fraud" and "fraudulent" in section 21(1)(a) is
not distorted by the meaning of the expression "concealed fraud" formerly    H
used in section 26 of the Act of 1939 and which was given a very special
meaning but has been replaced in the Act of 1980 by the more accurate
expression "deliberate concealment." The result is that in the absence of

A    deliberate concealment liability for an honest breach of trust is statute-
barred after six years, but liability for a dishonest breach of trust endures
without limitation of time.

The second question is whether Paula had a present interest while she
was under the age of 25 or whether she had only a future interest which
fell into possession when she attained that age. The judge held that she
had merely a future interest. In my judgment, he was right. Until Paula
B    attained 25 the trustees held the trust fund upon trust to accumulate the
income with power instead to pay it to Paula or to apply it for her benefit.
She had no present right to capital or income but only the right to require
the trustees to consider from time to time whether to accumulate the
income or to exercise their power to pay or apply it for her benefit. That,
in my judgment, is not an interest in possession. Paula was, of course, a
beneficiary and as such was entitled to see the trust documents. The
C    respondents submit that this was sufficient to give her an interest in
possession within the meaning of the section, and cite *Leedale v. Lewis*
[1982] 1 W.L.R. 1319 in support. In my judgment, that case does not assist
the respondents. As Lord Wilberforce pointed out, at p. 1329: "The word
'interest' is one of uncertain meaning and it remains to be decided on the
terms of the applicable statute which, or possibly what other, meaning the
D    word may bear."

The statutory language and context in that case compelled the
conclusion that an object of a discretionary trust of capital and income
had an interest in settled property. *Attorney-General v. Heywood* (1887)
19 Q.B.D. 326 was to similar effect. That decision was approved in *Gartside
v. Inland Revenue Commissioners* [1968] A.C. 553, where, however, a
different conclusion was reached because of the different context in which
E    the word "interest" was used.

The meaning of the word must, therefore, be ascertained from the
context in which it appears. As the tax cases show, the evident policy of a
taxing Act may sometimes make it necessary that an object of a
discretionary trust or power should be treated as having an interest and
sometimes it may show the contrary. The question thus depends upon
identifying the legislative purpose which section 21(3) of the Act of 1980
F    is intended to achieve.

The respondents submit that the policy to which section 21(3) of the
Act of 1980 gives effect is that it would be unfair to bar a plaintiff from
bringing a claim unless and until he is of full age and entitled to see the
trust documents and so has the means of discovering the injury to his
beneficial interest. The difficulty with this argument, in my judgment, is
that it proves too much. Every beneficiary is entitled to see the trust
G    accounts, whether his interest is in possession or not. The rationale of
section 21(3) appears to me to be different. It is not that a beneficiary
with a future interest has not the means of discovery, but that he should
not be compelled to litigate (at considerable personal expense) in respect
of an injury to an interest which he may never live to enjoy. Similar
reasoning would apply to exclude a person who is merely the object of a
H    discretionary trust or power which may never be exercised in his favour.

*Question (3)*

Accordingly, I would answer question (3) also in the negative, as did
the judge.

*Costs*

A

The judge awarded the respondents 80 per cent. of their costs, depriving them of the remaining 20 per cent. because they were unsuccessful on two of the points which had been argued. After hearing further argument, he directed that the respondents should not be at liberty to reimburse themselves out of the trust fund to the extent of that 20 per cent. He considered that the respondents were defending themselves and, having taken points which cost money and in respect of which they were unsuccessful, ought to bear those costs themselves.

B

The judge recognised that there was long-standing authority to the contrary, but held that it was displaced by the terms of R.S.C., Ord. 62, r. 6(2). That rule entitles a trustee to recoup his costs out of the trust fund and authorises the court to order otherwise "only on the ground that he has acted unreasonably or, in the case of a trustee or personal representative, has in substance acted for his own benefit rather than for the benefit of the fund."

C

The respondents cross-appeal from the judge's ruling, which, they claim, deprives them of their legal rights. They submit that trustees are entitled to a lien over the trust fund for their costs, and that this lien extends to the costs of litigation, including the costs of defending themselves against a charge of breach of trust: see *Turner v. Hancock* (1882) 20 Ch.D. 303 and *In re Spurling's Will Trusts; Philpot v. Philpot* [1966] 1 W.L.R. 920. The lien is only lost by misconduct.

D

But the principle is in my opinion overstated. Trustees are entitled to a lien on the trust fund for the costs of successfully defending themselves against an action for breach of trust. That was the position in *In re Spurling's Will Trusts* as it was in *Walters v. Woodbridge* (1878) 7 Ch.D. 504, which it followed. But on what principle can one justify their right to recoup themselves out of the trust fund for the costs of unsuccessfully defending themselves against such an action? It offends all sense of justice. The respondents rely on *Turner v. Hancock*, 20 Ch.D. 303 and submit that that was just such a case; but I do not think that it was. The action was an action for an account. On taking the accounts it was found that a sum was due from the trustee and not to him as he contended. It was therefore a case in which the trustee was unsuccessful; but it was not a case in which he was found to be guilty of misconduct or breach of trust. In the course of his judgment Sir George Jessel M.R. said, at p. 305:

E

F

"These rights ... can only be lost or curtailed by such inequitable conduct on the part of a mortgagee or trustee as may amount to a violation or culpable neglect of his duty under the contract.... It is not the course of the court in modern times to discourage persons from becoming trustees by inflicting costs upon them if they have done their duty, or even if they have committed an innocent breach of trust."

G

As Ungoed-Thomas J. pointed out in *In re Spurling's Will Trusts* [1966] 1 W.L.R. 920, 935–936, it is not enough to deprive trustees of their right to recoup their costs out of the trust fund that the claim is a claim to recover money from them for the benefit of the trust. If the trustees succeed, then the claim was not well founded, and they cannot be denied

H

A    their right of recoupment. I would add that, even if the claim succeeds, yet
they may not have so conducted themselves as to lose their right of
recoupment.

In the present case, the judge deprived the respondents of 20 per cent.
of their costs because they had put forward arguments on which they had
been unsuccessful. That was a proper exercise of his discretion. But he also
deprived them of their right to recoup themselves out of the trust fund to
B    the extent of that 20 per cent. on the ground that the claim was a hostile
claim against them personally for breach of trust. In my opinion, that was
not a sufficient ground for denying them their contractual rights. As things
stood at the conclusion of the judge's judgment, he had held that the
respondents were absolved by clause 15 from liability in respect of all
the claims for breach of trust pleaded against them, with the result that the
C    greater part of the action was bound to fail (there is a claim to an account
in respect of a separate matter which is not particularly contentious and
which would survive). Accordingly, unless the pleadings were amended, the
action would be dismissed without any inquiry into the trustees' conduct.
This would not provide any basis for depriving the respondents of their
rights.

Accordingly, I would set aside this part of the judge's order.
D

*Amendment of the pleadings*

At the conclusion of *Belmont Finance Corporation Ltd. v. Williams
Furniture Ltd.* [1979] Ch. 250 this court granted the unsuccessful respondent
leave to amend the pleadings. No such application is before us. Nevertheless
I think that Paula should be given the opportunity to re-amend the
E    amended statement of claim if so advised. I express no view on whether
there is material which would justify counsel in advising such a course;
and I would not wish to encourage it. They will no doubt bear in mind
that at the material time the trustees of the settlement consisted of one
professional man and two distant relatives, and that a charge of fraud
against independent professional trustees is, in the absence of some
F    financial or other incentive, inherently implausible.

The possibility of amendment affects the order for costs which ought
to be substituted for the order which the judge made. In my judgment, the
respondents should have the right to recoup themselves out of the trust
fund but only if and when the action against them is discontinued or
dismissed. If the action is repleaded and succeeds against any of them,
then the unsuccessful respondents should not recoup themselves out of the
G    trust fund without the leave of the court given after trial of the action.

*Conclusion*

It is our view that Paula should be given the maximum opportunity to
see the trust documents and to investigate the manner in which the trustees
managed the affairs of the trust. We would wish to hear counsel as to the
H    terms of any order which we should make in this respect, in particular as
to the appropriate tribunal to entertain such an application (whether the
master or the judge in chambers), the imposition of any time limits, and
whether, prior to such application, Paula should have the right to have the

Millett L.J.                    Armitage v. Nurse (C.A.)                    [1998]

trust documents produced to her: see *In re Londonderry's Settlement; Peat*                    A
*v. Walsh* [1964] Ch. 594.

   Subject thereto, the appeal and cross-appeal will be dismissed. The
order of the judge refusing the respondents liberty to recoup their costs
out of the trust fund will be set aside, and an order in the terms indicated
above substituted.

   HUTCHISON L.J.   I agree.                                                            B

   HIRST L.J.   I also agree.

                              *Appeal and cross-appeal dismissed.*
                              *Order for costs set aside. Respondents*
                                 *not to recoup costs out of trust funds*        C
                                 *without leave of court given after*
                                 *trial of action.*

   18 December.   The Appeal Committee of the House of Lords (Lord
Goff of Chieveley, Lord Nolan and Lord Hutton) dismissed a petition by
the plaintiff for leave to appeal.
                                                                                        D
   *Solicitors: Royds Treadwell; Hood Vores & Allwood, Dereham; Greenland*
*Houchen, Attleborough; Mills & Reeve, Norwich.*

                    [Reported by JOHN SPENCER ESQ., Barrister]

                                                                                        E

                              ——————

                                                                                        F

                                                                                        G

                                                                                        H

# Exhibit 71

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                            22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                    Trial
     ------------------------------x
 7
                                             New York, N.Y.
 8                                           October 19, 2023
                                             9:32 a.m.
 9

10   Before:

11
                          HON. LEWIS A. KAPLAN,
12
                                             District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
     Anthony Imperato, USAO Paralegal Specialist
```

1  did you approve related to lending FTX customer money to

2  Alameda?

3          MR. COHEN:  Same objection.

4          THE COURT:  Overruled.

5  A.  Never approved anything like that, and I would never have

6  done it either.

7  Q.  And if you could just speak up a little bit, Mr. Sun.  I

8  want to make sure the jury can hear you.

9  A.  No, absolutely not.

10 Q.  While you worked at FTX, did you have conversations with

11 the defendant about how FTX treated its customer assets?

12 A.  Yes.

13 Q.  And what, if anything, did the defendant tell you about how

14 FTX received customer fiat or dollar deposits?

15 A.  That they were received, safeguarded, and segregated from

16 FTX's customer funds—sorry—from FTX's proprietary funds.

17 Q.  And you mentioned that the defendant told you that customer

18 funds were segregated from FTX proprietary funds.  What did you

19 mean by FTX proprietary funds?

20 A.  So FTX's own funds as a company, funds that it uses to pay

21 for bills, to pay for, you know, website services, pay vendors,

22 those were FTX's own funds.  FTX customers' funds were always

23 separated from those.

24 Q.  And you referred to the defendant telling you that FTX

25 customer funds were segregated from proprietary funds.  What

1    does "segregated" mean?

2    A.   It means it is held separately, in a separate account from

3    FTX's own proprietary funds.

4    Q.   What did you understand was the purpose of segregating

5    customer funds from FTX proprietary funds?

6    A.   To clearly identify them as customer funds so that they

7    would not be misappropriated.

8    Q.   And when you say "misappropriated," what do you mean by

9    that?

10   A.   Stolen, used for anything else other than what the customer

11   instructs us to do.

12   Q.   Did you at any time observe public statements by the

13   defendant about how FTX treated customer assets?

14   A.   Yes.

15   Q.   In what forums?

16   A.   On Sam's tweets; his public congressional testimonies; his,

17   you know, statements to investors; to regulators; other

18   conversations.

19   Q.   And what kinds of things do you recall observing the

20   defendant say publicly about how FTX treated customer assets?

21   A.   That all customer assets of FTX were safeguarded,

22   segregated, protected.

23   Q.   You talked about customer dollar or fiat deposits.  What,

24   if anything, did the defendant tell you about how

25   cryptocurrency deposits were received at FTX?

1   A.  They were received and kept in an omnibus wallet for all

2   customer funds that was separated from FTX's own proprietary

3   funds as well.

4   Q.  And just to be clear, is that what the defendant told you?

5   A.  Yes.

6   Q.  And you mentioned——

7        THE COURT:  I didn't hear that.  I'm sorry.  I didn't

8   hear an answer.

9        THE WITNESS:  Yes.

10        THE COURT:   Thank you.

11   Q.  You mentioned that the defendant described an omnibus

12   wallet for customers.  What do you mean by an omnibus wallet?

13   A.  Right.  So say if two customers each had one Bitcoin and

14   they deposit it into the platform.  We would not have one

15   Bitcoin wallet for each customer; instead, we would keep both

16   of those customers' assets into one combined wallet, so that

17   one wallet would have two Bitcoins, but that is all customer

18   assets and it is separated from all of the remaining FTX

19   proprietary assets.

20   Q.  As general counsel of FTX, were you familiar with something

21   called the key principles of FTX?

22   A.  Yes.

23   Q.  And what were those?

24   A.  I used to be able to recite this, but——

25   Q.  So before you recite them, can you explain what we're

# Exhibit 72

**Document Produced in Native Format**

Confidential

# Exhibit 73

## Lines of Credit on FTX

FTX offers select VIP/MM clients Lines of Credit (LoC), which can be used as collateral for spot margin and future positions and preventing liquidations. For any outstanding LoC, we will only charge interest on the amount utilized to prevent liquidations (more details and examples in the next section).

## Interest Calculation

Your interest is calculated based on the following factors:

| LoC Interest Rate Calculator | | | | |
|---|---|---|---|---|
| **Collateral Ratio** | **Level** | **Collateral Ratio** | **Interest** | |
| | Under collateralized | 50% | 3% | |
| | Fully collateralized | 100% | 2% | |
| | Overcollateralized | 125% | 1% | |
| | Highly Overcollateralized | 200% | 0% | |
| **Daily Volume Multiplier** | **Level** | **Vol Multiplier** | **Interest** | |
| | Sub min | <10x | 5% | |
| | Minimum | 10 - 15x | 3% | |
| | Medium | 15 - 20x | 2% | |
| | High | >20x | 1% | |

*If you'd like to discuss a higher collateralization ratio in return for lower interest, let us know.*

To get your final LoC cost, add up the interest rates based on the above factors. Examples:

| User | // | Collateral Ratio | Daily Volume Ratio | Total Interest |
|---|---|---|---|---|
| User 1 | Setting | 50% collateral | 16x | 5% |
| | Interest | 3% | 2% | |
| User 2 | Setting | 125% collateral | 10x | 4% |
| | Interest | 1% | 3% | |
| User 3 | Setting | 200% collateral | 21x | 1% |
| | Interest | 0% | 1% | |

FTX_3AC_000013689

## How interest is charged on Lines of Credit

Interest payments for LoCs account-wide (inclusive of LoCs held in main account and all subaccounts) will be debited from the **main account** every day at approximately 00:30 UTC. You are responsible for maintaining sufficient funds in the main account to facilitate these interest payments and FTX is not responsible for any liquidations arising from insufficient collateral in the main account following the interest being debited. If the interest payment causes the main account to go negative, withdrawals on your account will be disabled until the negative balance is rectified.

How interest is charged:

| # | Interest is charged on the smallest amount of the LoC needed to: | How it's calculated |
|---|---|---|
| 1 | Prevent liquidation | *(Total Position Notional \* MMR) - (Total Collateral in USD - LoC)*<br><br>*Summed across all subaccounts* |
| 2 | Maintain positive non-USD balances in accounts that do not have spot margin enabled (although we expect this to rarely--if ever--occur). | *For each non-USD coin:*<br><br>*negative balances in non-spot-margin-enabled subs - positive balances in all subs* |

The amount charged will be the max between 1 and 2 (from the table above) - i.e., if the amount of the LoC utilized to prevent liquidation is higher than the amount utilized to maintain positive non-USD balances in accounts that don't have spot margin enabled, the amount utilized for liquidation prevention is what we will charge interest on. Alternatively, if the amount of the LoC utilized to maintain positive USD and non-USD balances is higher, then that is the amount we will charge interest on.

## Preventing Liquidation

How we calculate the smallest amount of the LoC needed to prevent liquidation: (minimum amount of funds needed to avoid liquidation) - (total collateral - LoC).

Minimum amount of funds needed to avoid liquidation = Total Position Notional Across all subaccounts \* maintenance margin requirement (e.g. 3%)

CONFIDENTIAL

<u>Example 1 - LoC is not being utilized to prevent liquidation, so **no interest is charged**</u>.

| User's Collateral | LoC | Total Collateral |
|---|---|---|
| $250,000 | $250,000 | $500,000 |

| Total Position Notional | MMR % | Minimum collateral to avoid liquidation |
|---|---|---|
| $1,000,000 | 3% | $30,000 |

| LoC used to prevent liquidation | -$220,000 | This means we are not using our LoC |
|---|---|---|

(minimum collateral to avoid liquidation) - (total collateral - LoC)

<u>Example 2 - LoC is being utilized to prevent liquidation. Therefore, **interest is charged**</u>.

| User's Collateral | LoC | Total Collateral |
|---|---|---|
| $250,000 | $250,000 | $500,000 |

| Total Position Notional | MMR % | Minimum collateral to avoid liquidation |
|---|---|---|
| $10,000,000 | 3% | $300,000 |

| LoC used to prevent liquidation | $50,000 | This means we are using $50k from our LoC |
|---|---|---|

Of note, the exposure is **calculated across all subaccounts**, not a per subaccount basis. So even if the LoC is being utilized to prevent a liquidation in one subaccount, but is not being utilized when looking at the account's maintenance margin requirements as a whole, LoC utilization for option 1 (preventing liquidation) would be 0.

Here's an example of how we calculate your LoC utilization across all subaccounts:

Imagine you have 3 subs with $1,000,000 LoC and $2,000,000 worth of BTC as collateral total. They're broken down in the following way:

FTX_3AC_000013691

| // | Subaccount A | Subaccount B | Subaccount C | Account Total |
|---|---|---|---|---|
| Positions | $3,000,000 | $10,000,000 | $12,000,000 | $25,000,000 |
| BTC collateral (in USD) | $50,000 | $1,500,000 | $450,000 | $2,000,000 |
| USD LoC | $100,000 | $100,000 | $800,000 | $1,000,000 |
| Total Collateral | $150,000 | $1,600,000 | $1,250,000 | $3,000,000 |
| Margin Fraction (MF) | 5.00% | 16.00% | 10.42% | 12.00% |
| MF without LoC | 1.67% | 15.00% | 3.75% | 8.00% |
| MMF (assuming 3%) | $90,000 | $300,000 | $360,000 | $750,000 |
| LoC used to prevent liq | $40,000 | -$1,200,000 | -$90,000 | -$1,250,000 |

*Note: Negative values in the last row means we are not using the credit line*

In the example above, even though the LoC is preventing Subaccount A from getting liquidated, the margin fraction across all subaccounts without the LoC is 8%, which is higher than the 3% Maintenance Margin Requirement. Therefore, **this account is not being charged any interest on their LoC.**

Alternatively, let's assume everything above is the same, but that the total notional amount across all positions is actually $75,000,000 (in other words, the Maintenance Margin Requirement is now $2,250,000). In this case, your BTC collateral of $2,000,000 is not enough to cover this position, which then means that you are using $250,000 from the USD LoC to prevent liquidation. As a result, interest will be charged on that $250,000.

## Using LoCs on spot markets

Until recently, users with LoCs were not able to trade into negative USD even with spot margin enabled (i.e. by longing a spot asset through spot margin using all of their USD as collateral). In other words, we did not let you spend USD on spot markets if it'd result in your USD balance being below your LoC.

Now, we will allow this if you have spot margin turned on, and any amount your USD balance is lower than that of your LOC will be treated as a USD borrow in the spot margin system. And so you will be able to trade spot, expanding your LoC balances, and will pay prevailing spot margin market rates for the borrow. Related to this change, we require any subaccount that has an LOC to enable spot margin.

As an example, assume you have a $500,000 LoC and $625,000 in BTC as collateral, for a total of $1,125,000.

FTX_3AC_000013692

Now, let's say you want to buy $600,000 worth of ETH spot using margin. This would mean that the shortfall amount between your USD balance and LoC will be $600,000, which will be considered as a spot margin borrow and be charged the current USD spot margin rate.

| Collateral Overview | |
|---|---|
| Asset | Balance |
| USD (LoC) | -$100,000 |
| BTC | $625,000 |
| ETH | $600,000 |
| Total | $1,125,000 |

| Position & LoC Overview | |
|---|---|
| Borrow size | $100,000 |
| Margin Fraction | 1125% |
| MF without LoC | 625% |
| MMF | 3% |
| Min Collateral Required | $3,000 |
| LoC used to prevent liq | -$622,000 |

Shortfall amount = USD balance - LoC
= $100,000 - $500,000 = **-$600,000**

Since your USD balance is now negative, you will be paying the spot margin interest rate on the $600,000 like any other spot margin trade. Additionally, your margin fraction without the LoC is nowhere near the liquidation threshold (3%), which means that you are not using the LoC and therefore will not be charged any interest for it.

## API Endpoints for Lines of Credit

GET wallet/loc_changes
See LoC transfers between subaccounts.

GET wallet/loc_interest_charges
Shows individual LoC charges. This only includes interest charges whenever your LoC is used to prevent liquidation. Spot margin borrows whenever there is a shortfall between your LoC and USD balance will not be reflected in this endpoint (available here instead).

POST subaccounts/transfer_line_of_credit
This allows you to move your LoC from one subaccount to another instantly at no charge.

FTX_3AC_000013693

Request fields:
- source: subaccount nickname or null for main acount
- destination: subaccount nickname or null for main account
- size: number

## LOC Utilization Per Subaccount

By default, FTX will evaluate your collateral across all subaccounts in order to determine your LoC utilization.

However, if you'd rather have the LoC utilization per subaccount, we can enable this for you. We would charge each of your subaccounts interest separately based on their individual LOC usage. If you're interested in this, let us know.

CONFIDENTIAL

# Exhibit 74

# *328 Mercer & Ors v Craven Grain Storage Ltd

No Substantial Judicial Treatment

**Court**
House of Lords

**Judgment Date**
17 March 1994

**Report Citation**
[1994] C.L.C. 328

House of Lords

Lord Templeman , Lord Goff of Chieveley , Lord
Browne-Wilkinson , Lord Mustill and Lord Lloyd

Judgment delivered 17 March 1994

*Summary judgment—Bailment—Conversion—Grain stored by farmers' co-operative—Grower sought return of wheat—Insufficient wheat in store to satisfy demand—Damages sought for failure to deliver balance of grain—Whether summary judgment available to grower—Whether storage co-operative entitled to leave to defend action— Rules of the Supreme Court, O. 14 .*

This was an appeal by a farmers' co-operative ('the storage society') against a decision of the Court of Appeal that growers were entitled to summary judgment under RSC, 0.14 in respect of their claim for damages for the failure of the storage society to redeliver the balance of wheat the growers had deposited with the society.

By a storage agreement of July 1987 the storage society, a farmers' co-operative, agreed to store the growers' grain for ten years. Each member of the society signed a similar agreement. On receipt by the society, the grain of one member was intermixed with grain of the same grade contributed by other members, and some from depositors who were not members. The commingled mass was continually drawn upon and replenished. Each member was given a receipt showing the weight and grade deposited from time to time by that member. Under the agreement the growers delivered wheat to the society between July and September 1990. In July 1991 the growers' demand for the return of their wheat was only partially met by the society. The growers claimed damages for failure to redeliver the balance in the sum of £300,835, the value of their wheat in July 1991. They sought summary judgment under RSC, 0.14 .

The storage society sought leave to defend the action on the ground that the growers had lost title to their wheat. Alternatively, the growers had entered into marketing agreements with another company, 'the marketing society', and the wheat had been withdrawn on the instructions of the marketing society with which the storage society was entitled to comply. The High Court had ordered summary judgment, upheld by the Court of Appeal. The storage society appealed.

*Held* , allowing the storage society's appeal (by a majority):

1.  The storage society had no arguable defence to the growers' claim on the basis of proprietary rights.

2.  (Per Lord Templeman, Lord Browne-Wilkinson and Lord Mustill) The contractual issues raised by the storage society made the claim unsuitable for summary judgment. The issues between the parties required to be decided at trial in the light of all the facts and relevant authorities.

3.  (Per Lord Goff of Chieveley and Lord Lloyd dissenting) The courts below were fully justified, on the issues before them, in refusing the storage society leave to defend the action.

**Representation**

Edward Bannister QC and Mark Sutton (instructed by Blake Lapthorne ) for the appellants.
M Moore-Bick QC and Richard King (instructed by T A Matthews ) for the respondents.

**SPEECHES**

Lord Templeman:

In these O. 14 proceedings, the courts below relied mainly on the proprietary rights of the parties; in considering whether summary judgment is appropriate, the contractual rights of the parties must also be considered.

*329*

The plaintiffs are growers of grain. By a storage agreement dated 27 July 1987 the plaintiffs agreed with the defendant Craven Grain Storage Ltd ('the storage society'), a farmers' co-operative, the terms upon which the storage society would for the next ten years store grain for the plaintiffs and each other member of the society who signed a similar agreement. Briefly, the costs to the storage society of storage and other expenses for each harvest were estimated before the beginning of the harvest and finalised at the end and were paid by the members of the society in proportion to the amount of grain stored for each member. Clause 8(a) of the storage agreement provided that:

> 'Whilst in the possession of the society the grain shall remain the property of the grower but … the risk of loss of or damage to the grain shall be on the society.'

Upon receipt by the storage society, the grain of one member was intermixed by the storage society with grain of the same grade contributed by other members becoming immediately indistinguishable among the resultant mass. Further, as all members were Well aware, the commingled mass was continually drawn upon and replenished, so that the mass was not only inherently intermixed but was also fluctuating. Grain contributed by members was also intermixed with grain of the same grade contributed by depositors who were not members of the storage society. Each member was given a receipt showing the weight and grade of grain deposited from time to time by that member.

Pursuant to the storage agreement, the plaintiffs between 26 July and 4 September 1990 delivered to the storage society 1,509.04 tonnes of milling wheat grades HP1 and HP2 and 710.21 tonnes of milling wheat grade FAQ3.

In July 1991 the plaintiffs demanded the return of their wheat but the demand was only met to the extent of 107.14 tonnes. The plaintiffs now claim, as damages for failure to redeliver the balance, the sum of £300,835, the value of their wheat in July 1991.

© 2025 Thomson Reuters.

The storage society sought to defend the action on the grounds that despite cl. 8 of the storage agreement the plaintiffs lost title to their wheat. The plaintiffs' wheat was lawfully mixed with and became indistinguishable from wheat contributed by other persons. Wheat which included or may have included the whole or an unascertainable part of the plaintiffs' wheat was withdrawn from the mix from time to time. Therefore, it is said, by July 1991 the plaintiffs could not prove title to any wheat. Lord Mustill pointed out in the course of the argument that the storage society were bailees and could not question the title of their bailor. In any event, title to the wheat lawfully mixed could not be acquired by the storage society which by no stretch of the imagination had any right thereto. The title must have remained in the growers from time to time interested in the mix in proportion to their respective tonnages. The storage society was guilty of conversion if it allowed the mix to be so depleted by withdrawals that the balance remaining was not sufficient to satisfy the demands of the plaintiffs.

In the alternative, the storage society claim that all the wheat deposited in their store by the plaintiffs and other members who had entered into a marketing agreement with Craven Grain Ltd ('the marketing society') had been withdrawn from store on the instructions of the marketing society and that the storage society were entitled to comply with those instructions.

The plaintiffs had entered into a marketing agreement with the marketing society dated 19 July 1983 and thereafter, to the knowledge of the plaintiffs, the storage society acted oil the instructions of the marketing society as agents for the plaintiffs.

In the marketing agreement the plaintiffs are defined as 'the grower', the marketing society is defined as 'the society', 'grain' includes wheat and 'member' includes the grower and means a shareholder in the society who has a contract with the society on the same terms.

*330*

By cl. 2(a):

> 'In each year in which this contract is in operation the grower shall sell through the agency of the society, which shall sell on behalf of and as agent for the grower, not less than the required proportion of the tonnage of grain produced by the grower that year.'

© 2025 Thomson Reuters.

The required proportion for the 1990 harvest was 100 per cent.

By cl. 2(c):

> 'The grain sold by the grower … shall include all the grain which the grower
> stores in the store of Craven Grain Storage Ltd …'

By cl. 6 the grower may notify the marketing society if he wishes the whole or part of his grain
to be included in a price pool. The society will endeavour to arrange delivery of the grain in
accordance with the notified wishes of the grower and by cl. 7(a):

> 'shall arrange to transport all the grain sold hereunder from the grower's
> farm to the places of delivery to the buyers but the costs of transport shall
> be borne by the grower except in the case of consignments of grain sold as
> part of a price pool in respect whereof the costs of transport shall be pooled
> amongst all the members participating in that pool.'

By cl. 8 the society 'shall ensure that the property and risk in every consignment of grain sold
hereunder passes to the buyer at the latest on delivery to him'. By cl. 9 the society is authorised
'to receive on behalf of and as agent for the grower all payments from buyers in respect of the
prices of grain sold hereunder'. By cl. 7 of the schedule to the agreement, on a sale of grain not
included in any price pool on behalf of the member the society shall pay to that member within
28 days after receipt of the purchase price from the buyer a sum equivalent to that price after
deduction of the appropriate charge for the services of the marketing society in accordance with
the provisions of the agreement.

In April 1991 the plaintiffs informed Mr Muxlow in his capacity as manager of the marketing society that the plaintiffs would not sell their 1990 harvest for less than £160 per tonne. If Mr Muxlow sold for less than £160 he broke his instructions. If he sold for £160 or more, the marketing society did not account to the plaintiffs for the sale price.

The storage society wish to contend that upon the true construction of the storage agreement and the marketing agreement and in the events which happened it was expressly or impliedly provided, agreed or understood that the storage society would act on the instructions of the marketing society with regard to the sale of grain from storage and that it was not incumbent on the storage society to ascertain the names of the vendors or the instructions of the vendors or the terms of the contracts entered into on behalf of the vendors by the marketing society in relation to any withdrawal from storage. It will be argued that in law and in practice the vendors trusted the storage society to store and trusted the marketing society to sell and that the vendors were not entitled to a guarantee by the storage society of the obligations of the marketing society. The plaintiffs contend that the marketing agreement is irrelevant to the contractual relationship between the plaintiffs and the storage society. In any event, it is argued, even if the marketing society produced the marketing agreement to the storage society as authority for a withdrawal, the storage society was not thereby authorised expressly or by implication or by any course of dealing to allow the quantity of each grade of grain held by the storage society to be so depleted that in July 1991 the storage society could not satisfy the demand of the plaintiffs for the return of every tonne of grain for which receipts had been issued by the storage society to the plaintiffs. The storage society should not have released any grain deposited by members of the society without first ascertaining that the release had been sanctioned by identified members to whom the grain belonged. At this juncture and in the absence of evidence and full argument I have only reached the *331 conclusion that the application of the plaintiffs for summary judgment should be dismissed. The plaintiffs wish to contend and the storage society wish to dispute that the storage society are in any event liable to the plaintiffs because Mr Muxlow was the chief executive of both societies. This issue also had better be decided at trial.

The Court of Appeal purported to decide this issue without knowledge of the facts. I consider that their decision requires reconsideration in the light of the facts and all the relevant authorities. In view of the fact that battle over O. 14 was primarily fought and lost in the courts below on the proprietary argument, I would not disturb the order for costs made by the Court of Appeal and would order that the costs of the hearing of the appeal to this House be costs in the cause.

Lord Goff of Chieveley:

At the close of the argument before the appellate committee I was satisfied, as I believe were all of your Lordships, that the courts below were fully justified, on the issues before them, in refusing the appellants leave to defend the action. I also came to the conclusion that, in all the circumstances, it would not be appropriate for your Lordships' House to depart from the decision of the courts below. I would therefore, like Lord Lloyd, have dismissed the appeal. However, since I understand that the remainder of your Lordships have come to a different conclusion, it follows that the action will now proceed to trial; and in these circumstances I do not think that it would be right for me to say anything further about the matter.

Lord Browne-Wilkinson:

For the reasons given by Lord Templeman I too would allow this appeal.

Lord Mustill:

For the reasons given by Lord Templeman I too would allow this appeal.

Lord Lloyd:

The appellants' printed case consists of 37 paragraphs. Paragraphs 1–22 are concerned with the so-called proprietary issues, that is to say, the defendants' argument that the plaintiffs cannot claim in conversion, because they lost title to their grain when it became mixed with other grain in the defendants' silos. All your Lordships are agreed that the proprietary issues do not provide the defendants with an arguable defence, and that the courts below were right so to hold.

Paragraphs 23–33 of the appellants' case are concerned with the so-called contractual issue. The contractual issue relates to an *alternative* claim by the plaintiffs, pleaded in para. 7 of the statement of claim, that the defendants are liable for breach of cl. 8(a) of the storage agreement. In support of that claim the plaintiffs rely on the uncontradicted evidence of Mr Mercer that he gave instructions to Mr Muxlow not to sell below £160 per tonne.

In the four remaining paragraphs of the case, the defendants say that the alternative claim raises an issue of fact which is unsuitable for the summary procedure under RSC, O. 14 .

Before your Lordships the appellants advanced a new argument in answer to the plaintiffs' primary claim in conversion. This was that they are entitled to rely on an express or implied term of the storage agreement or a course of dealing, whereby they were authorised to deliver the plaintiffs' grain to Craven Grain Ltd. But this argument is nowhere reflected in the appellants' case nor was it raised below. It follows that the courts below were, in my view, entitled to reach the conclusion which they did on the material before them, and to give judgment in favour of the plaintiffs. In agreement with Lord Goff of Chieveley, I would have dismissed the appeal.

But as a majority of your Lordships think otherwise, the case will now proceed to trial. In those circumstances I say nothing as to the merits of the new argument.

*(Appeal allowed)*  ***\*332***

# Exhibit 75

Chapter 12

## BAILMENT

Table of Contents

Bailment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-001
  When does a bailment arise? . . . . . . . . . . . . . . . . . . . . . . . 12-007
  Bailment and the law of obligations . . . . . . . . . . . . . . . . . 12-023
    Law of contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-023
    Law of tort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-027
  Bailment and the law of property . . . . . . . . . . . . . . . . . . . . 12-040

Bailment

**Introduction**    In this chapter we consider bailment, the largest sub-category of the **12-001** interest of possession.[1] Accordingly the various species of bailment represent the principal device at law for carving out dependent interests from the primary interest of ownership of goods. Later chapters examine particular commercially significant instances of bailment.[2] Necessarily the focus is on the proprietary consequences of bailment, although the obligations which can arise from bailment are described in outline. There is a long tradition of writing on bailment, which is a venerable topic in the common law, pre-dating modern thinking on contract, tort and property. Sir William Blackstone described it as part of "our legal dialect",[3] and the jargon of bailor and bailee is well-entrenched in common law thinking, although its practical implications are often unclear. In the medieval and early modern period judges and writers drew upon classical Roman law for its content. It was the subject of what is probably the first modern treatise in English private law, Sir William Jones's *An Essay on the Law of Bailments* in 1781.[4] For most of the twentieth

---

[1]    There is a voluminous literature starting with Jones, W., *An Essay on the Law of Bailments* (1781). See also: Winfield, P., *The Province of the Law of Tort (Tagore Law Lectures delivered in 1930)* (1931), 92–103; Bell, A.,"*The Place of Bailment in the Modern Law of Obligations*" in Palmer, N. and McKendrick, E., Interests in Goods, 2nd edn. (1998), 461; McMeel, G., "The redundancy of bailment" [2003] L.M.C.L.Q. 169; Dempster, H., "Clearing the Confusion Surrounding Bailment: Bailment as an Exercise of a Legal Power by the Bailor" (2004) 33 *Common Law World Review* 295; McBain, G.,"Modernising and Codifying the Law of Bailment" [2008] J.B.L. 1; Sheehan, D., *The Principles of Personal Property Law*, 2nd edn (2017), Ch.10; and Palmer, N., *Palmer on Bailment*, 3rd edn (2009).

[2]    See Chs 13 (storage and carriage), 14 (leases and hire) and 16 (pledge), paras 16-011 to 16-026.

[3]    Bl Comm II 452.

[4]    His role as author of the first modern essay on English private and commercial law may be one of Jones's lesser intellectual achievements. Whilst a British judge in India his studies in Sanskrit led him to postulate the existence of the common ancestor language, Proto-Indo-European, thereby

century judges and writers accommodated and assimilated older bailment reasoning to the more modern categories of contract and tort, which subjects had emerged as dominant concepts following the abolition of the forms of action by the Common Law Procedure Act 1852.[5] However over the last 25 years there has been a reversal of this trend, with a greater emphasis laid on the supposed autonomy of bailment reasoning.[6] In contrast, the principal twentieth century textbook on personal property law wryly cautioned: "It seems the confusion produced in the law of bailment may be due to postulating a law of bailment."[7] That warning is accepted here.

**12-002**  **Historical background**    Bailment has a long history,[8] with Bracton in the thirteenth century responsible for transplanting, and on occasion copying out, Roman law discussions and concepts into English law. Holt CJ then entrenched those borrowings at the beginning of the eighteenth century in *Coggs v Bernard*.[9] That case has been described as "one of the most celebrated ever decided in Westminster Hall, and justly so, since the elaborate judgment of Lord Holt contains the first well-

---

inventing the study of historical linguistics. For an introduction to Jones as a lawyer see Ibbetson, D., "Sir William Jones as Comparative Lawyer" in Murray, A., (ed), *Sir William Jones 1746–94 [–] A Commemoration* (1994), 17, esp at pp.38–42; and for a (too scathing) more recent assessment by the same legal historian of the *Essay*, and its "violent syncretism" and ahistoricism see Ibbetson, D., "Sir William Jones and the Nature of Law" in Andrew Burrows and Lord Rodger of Earlsferry, (eds), *Mapping the Law: Essays in Memory of Peter Birks* (2006), p.619.

[5]   Sections 2, 3, 49 and 91 of the Common Law Procedure Act 1852. Section 49, in particular, included amongst its list of statements which need not be proved (fictitious pleadings that were not traversable), and therefore should be omitted from modern pleadings, "the Statement of losing and finding, and Bailment, in Actions for Goods or their Value", that is the fictitious findings and bailments which had been essential but fictitious averments for claims for *detinue sur trover*: See Baker, J.H., *An Introduction to English Legal History*, 4th edn (2002), p.393; *The Oxford History of the Laws of England, Volume XII 1820–1914 Private Law* (2010), p.1116. The forms of pleadings of causes of action sanctioned in s.91 and Sch.B of the 1852 Act include forms for the hire of goods (para.12), wrongful conversion or deprivation of goods (para.28) and wrongful detention of goods (para.29), but no form for bailment.

[6]   The reversal in the assimilation trend is largely down to the influence of Professor Palmer's writings, in particular: Palmer, N. *Palmer on Bailment*, 1st edn (1979), 2nd edn (1991), 3rd edn (2010) and Palmer, N., (ed), "Bailment and Pledge" in *Halsbury's Laws of England*, 5th edn (2011), Vol.4.

[7]   Also: "It is not reasonable to expect ordered development in the history of a concept which today has no defined position in our legal system." Tyler, E. and Palmer, N., *Crossley Vaines on Personal Property*, 5th edn (1973), at p.71. The author responsible for Ch.6 on bailment for the 5th edn, and for these remarks, was Professor Palmer.

[8]   *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731, Diplock LJ observed that the principles were derived from Roman law. For the historical background see: Holdsworth, HEL III 336–349; Pollock and Maitland HEL II 169–71; Baker, J.H., *An Introduction to English Legal History*, 4th edn (2002), pp.389–400; Zimmermann, R., *The Law of Obligations: Roman Foundations of the Civilian Tradition* (1996), pp.188–229; Ibbetson, D., *A Historical Introduction to the Law of Obligations* (1999), pp.33–35, 164–168; Ibbetson, D., "The Law of Business Rome: Foundations of the Anglo-American Law of Negligence" [1999] C.L.P. 74, 80–84; and McMeel, G., "The redundancy of bailment" [2003] L.M.C.L.Q. 169, at pp.172–175.

[9]   *Coggs v Bernard* (1703) 2 Ld Raym 909; 92 E.R. 107; see generally Ibbetson, D., "Coggs v Barnard (1703)" in Charles Mitchell and Paul Mitchell, (eds), *Landmark Cases in the Law of Contract* (2008), 1. Legal historians spell the defendant's surname "Barnard" which is how it appears on the court record. See also the pleadings at *Coggs v Barnard* (1702) 3 Ld Raym 163; 92 E.R. 622. We have used Lord Raymond's orthography in Vol.2 of his reports as that is how it appears in subsequent law reports and most discussions.

ordered exposition of the English law of bailments."[10] More recently the UK Supreme Court described it as a "landmark case".[11]

**Coggs v Bernard**    In *Coggs v Bernard* the defendant agreed to move several hogsheads of brandy from one cellar to another, in the course of which, one of the casks was staved, and several gallons of brandy lost. The plaintiff brought an action upon the case, and the matter being thought one of "great consequence" it was argued before the full Court of King's Bench, and the defendant was found liable for his breach of his undertaking. It was neither alleged nor pleaded that the defendant was to have any money for his pains, so the case was treated as one of a gratuitous service. Holt CJ's judgment is most famous for his classification of six different types of bailment:

**12-003**

> "[1] The first sort of bailment is, a bare naked bailment of goods, delivered by one man to another to keep for the use of the bailor; and this I call a depositum, and it is that sort of bailment which is mentioned in *Southcote's case*. [2] The second sort is, when goods or chattels that are useful, are lent to a friend gratis, to be used by him; and this is called commodatum, because the thing is to be restored in specie. [3] The third sort is, when goods are left with the bailee to be used by him for hire; this is called locatio et conductio, and the lender is called locator, and the borrower conductor. [4] The fourth sort is, when goods or chattels are delivered to another as a pawn, to be a security to him for money borrowed of him by the bailor; and this is called in Latin vadium, and in English a pawn or a pledge. [5] The fifth sort is when goods or chattels are delivered to be carried, or something is to be done about them for a reward to be paid by the person who delivers them to the bailee, who is to do the thing about them. [6] The sixth sort is when there is a delivery of goods or chattels to somebody, who is to carry them, or do something about them gratis, without any reward for such his work or carriage, which is this present case."[12]

The third, fourth and fifth types of bailment in this taxonomy are all *contractual bailments*, and each remains a commercially significant species of contract in the twenty-first century, embracing the hire of goods (chattel leases, with modern offshoots such as hire-purchase and the finance lease), the pledge of goods (and by extension, the pledge of documents of title to goods afloat, which is important in trade finance) and contracts for services in respect of goods, encompassing all carriage by land, sea or air, and all warehousing services, that is, the modern logistics industry. Each is considered further in Chs 12, 13 and 15 of this work. The first,[13] second and sixth categories[14] are examples of gratuitous bailments in modern terminology, and the rights, obligations and incidents of the relationships are a matter of common law.

**The legacy of Coggs v Bernard**    First, Holt CJ's classification of bailments has been the starting-point for most subsequent discussions of the concept of bailment.[15] It serves as a reminder that appropriate differentiation is needed to deal with this

**12-004**

---

[10]  Chitty, T.W., Denning, A.T., and Harvey, C.P., (eds), *Smith's Leading Cases*, 13th edn (1929), Vol.I, p.190.

[11]  *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8] (Lord Sumption).

[12]  *Coggs v Bernard* (1703) 2 Ld Raym 909 at 912–913 (numbering added).

[13]  Such as a waiter taking a diner's coat at a restaurant: *Ultzen v Nicols* [1894] 1 Q.B. 92.

[14]  The gratuitous rendering of services to goods which was at issue in *Coggs* itself.

[15]  For example see the decision of the House of Lords in 2009 in *TRM Copy Centres (UK) Ltd v Lanwall Services Ltd* [2009] UKHL 35; [2009] 1 W.L.R. 1375, para.[10] (Lord Hope).

over-broad category. It cannot be too readily assumed, and it was not assumed by
Holt CJ, that the legal rules for one type of bailment necessarily carried across to
another type. Accordingly, whilst this chapter deals with general concepts of bail-
ment the detailed rules for the proprietary aspects of the hire of goods, storage and
carriage and pledge are considered in subsequent chapters.[16] Secondly, in determin-
ing that the defendant was liable upon his undertaking for the negligent rendering
of a gratuitous service, the Court of King's Bench provided a seminal authority in
the modern law of tort.[17] It is not unrealistic to see the case as a precursor to the as-
sumption of responsibility test which eventually emerged in *Hedley Byrne & Co Ltd
v Heller & Partners Ltd*.[18] Thirdly, the occasion for the detailed taxonomy of bail-
ments was to determine the appropriate standard of care for a gratuitous bailee,[19]
and the reasoning posited a spectrum of possibilities, from the strict liability of the
common carrier, to liability for gross negligence, in the case of a bailment
exclusively for the benefit of the bailor. This discussion has not stood the test of
time: "Lord Holt's attempt to calibrate in refined degrees the obligation to take care
has largely fallen foul of the twentieth century trend to standardize the duty of care
in the tort of negligence as one of reasonable care."[20] The Supreme Court has held
that the time-honoured concept of the common carrier is "no longer a useful
paradigm for the common law liability of a shipowner. Common carriers have for
many years been an almost extinct category.[21] Despite some comparatively recent
statements differentiating the standard of care of the bailee for reward from the
gratuitous bailee, it is submitted that the modern standard of care applicable to all
bailees is that demanded by the circumstances of the case.[22] Most recently the
Supreme Court has confirmed, in the context of a shipowner as a bailee for reward:
"a bailee of goods is not an insurer. His duty is limited to taking reasonable care
of the goods."[23] Lastly, from the personal property law perspective, *Coggs* yields
little guidance, only discussing the proprietary aspects of pledge, and recording that

[16] Chs 13, 14 and 16.
[17] In Chitty, T.W., Denning, A.T., and Harvey, C.P., (eds), *Smith's Leading Cases*, 13th edn (1929),
Vol.I, pp.190–196 it is treated as the foundation for the tortious liability of both gratuitous agents
and gratuitous bailees, and the rendering of gratuitous services more generally: "The confidence
induced by undertaking any service for another is a sufficient legal consideration to create a duty in
the performance of it." See also: Ibbetson, D., *A Historical Introduction to the Law of Obligations*
(1999), pp.33–35, 164–168; Ibbetson, D., "The Law of Business Rome: Foundations of the Anglo-
American Law of Negligence" [1999] C.L.P. 74, 80–84.
[18] *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] A.C. 464, HL; and see the refinement of
the test in *Spring v Guardian Assurance Plc* [1995] 2 A.C. 296 and *Henderson v Merrett Syndicates
Ltd* [1995] 2 A.C. 145, HL.
[19] Prior to this case the authority of *Southcote v Bennet—Southcote's Case* (1601) 4 Co Rep 83b; 76
E.R. 1061 had appeared to favour the absolute liability of the bailee for the loss or destruction of
the goods. See Bl Comm II 453: "But now the law seems to be settled upon a much more rational
footing; that such a general bailment will not charge the bailee with any loss, unless it happens by
gross neglect …".
[20] Bridge, M., *Personal Property Law*, 4th edn (2015), p.64.
[21] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8]
(Lord Sumption).
[22] *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694, CA; *Sutcliffe v Chief Constable of
West Yorkshire* [1996] R.T.R. 86, CA. See further paras 11-027 to 11-032.
[23] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8];
although curiously Lord Sumption cited *Coggs v Bernard* as authority for this proposition.

BAILMENT

the pledgee had a "special property" in the goods.[24] This has also been evident in later discussions of bailment, with the preponderance of discussion concerning the obligations dimension, rather than the proprietary dimension of bailment.

**Theoretical basis**    As was observed above with regard to the larger category of possession,[25] so too with bailment, English law displays a tendency to "lump concept" thinking. So it has been said: **12-005**

> "In medieval English law—which had 'but a meagre stock of words that can be used to describe dealings with moveable goods'—a host of legal relationships were lumped together under the title of bailment ... To this day bailment is a somewhat labyrinthine concept."[26]

Given both its longevity and intricacy there has been considerable speculation about the theoretical basis of bailment. Three themes emerge.

*(1) Foundation is possession*    First, bailment is said to be founded on possession.[27] Indeed bailment necessarily forms a substantial sub-category of the concept of possession.According to Lord Sumption:

> "Bailment is a transfer of possession giving rise to a legal relationship between the bailor and the bailee which is independent of contract ..."[28]

It is a matter of debate which (if any) instances of possession do not involve a bailment. Nobody describes a thief as a bailee, although he has possession.[29] Traditionally finders were not conceived of as bailees, although some more recent authorities have described finders as bailees.[30] It is also controversial whether persons to whom goods are misdelivered and other involuntary recipients should be described as bailees.[31] Bailment as a related concept to possession forms a central topic within the law of personal property (at least so far as goods or things in pos-

---

[24]  *Coggs v Bernard* (1703) 2 Ld Raym 909, at p.916. This reflected the discussion in Bracton, which in turn borrowed from Roman law, and represented the last stage of development of Roman law.

[25]  See para.11-002.

[26]  Zimmermann, R., *The Law of Obligations: Roman Foundations of the Civilian Tradition* (1996), p.204; in turn quoting Pollock and Maitland *HEL*, II 169. Contrast the late Tony Weir, who spoke of "all those relationships usefully called "bailments" in the common law." *Casebook on Tort*, 6th edn (1996), p.492.

[27]  Winfield, P., *The Province of the Law of Tort (Tagore Law Lectures delivered in 1930)* (1931), 93; and at 100: "bailment is more fittingly regarded as a distinct branch of the Law of Property, under the title Possession than as appropriate to either the law of contract or the law of tort." Cited in *Chesworth v Farrar* [1967] 1 Q.B. 407, at p.415 (Edmund-Davies J).

[28]  *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8] (Lord Sumption).

[29]  *Webb v Chief Constable of Merseyside Police* [2000] Q.B. 427, CA; *Costello v Chief Constable of Derbyshire* [2001] EWCA Civ 381; [2001] 1 W.L.R. 1437. See also *Field v Sullivan* [1923] V.L.R. 70; *Jaroo v Attorney-General of Trinidad and Tobago* [2002] UKPC 5; [2002] 1 A.C. 871, PC; *R v Rose* [2008] EWCA Crim 239; [2008] 1 W.L.R. 2113, paras [8]–[12] (Richards LJ); and *Scopelight Ltd v Chief Constable of Northumbria Police Force* [2009] EWCA Civ 1156; [2010] Q.B. 438, para.[18] (Leveson LJ).

[30]  For example, *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731 (CA, Diplock LJ: "bailment by finding"). See also *Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd* [1970] 1 W.L.R. 1262, PC. For a recent statement that finders are not properly to be regarded as bailees see: Hickey, R., *Property and the Law of Finders* (2010), at pp.4–5, 81–84.

[31]  See para.12-013.

session are concerned). As stated above, it is uncontroversial that a bailment by way of pledge entails that the pledgor has the general property in the goods, whereas the pledgee is said to have the special property. It is submitted that the language of general and special property is equally apt for all consensual bailments.[32]

*(2)  Role of consent*    Secondly, the creation of a relationship of bailment is in (nearly) all accounts said to arise from *consent*. However the issue of whose consent is relevant has proved very controversial. The first and dominant theory for most of the history of bailment was that it was a relationship founded upon agreement or the mutual consent of bailor (the person entrusting possession of the goods to another) and bailee (the party accepting responsibility for the goods so entrusted). Indeed in the eighteenth century, three of its most distinguished expositors—Sir John Holt CJ,[33] Sir William Blackstone[34] and Sir William Jones[35] —regarded bailment as a species of contract.[36] In more recent times theories based on the unilateral consent of either bailor[37] or bailee[38] have become prominent, with the latter theory currently attracting most judicial support.[39] Many examples of the bailee's liability at common law may be explained by the bailee's "undertaking" with respect to the goods, and once the doctrine of consideration hardened into an essential prerequisite of contractual liability, it became the best explanation.[40] For example, Diplock LJ stated that the relationship of bailment arose from the "voluntary taking into custody of goods which are the property of another."[41] The various consent models will be considered further below, and it will be submitted that the unilateral consent of the bailee model, whilst adequate to explain the tortious liability of the bailee, is inadequate to explain the proprietary aspects of bailment. In summary, how can the unilateral consent of the transferee (as opposed to the transferor) of an asset explain the creation of a new proprietary interest?

---

[32]  See paras 12-036 to 12-039.

[33]  *Coggs v Bernard* (1703) 2 Ld Raym 909 at 919; 92 E.R. 107, rejecting an argument that the undertaking was nudum pactum: "But to this I answer, that the owner's trusting him with the goods is a sufficient consideration to oblige him to careful management."

[34]  Bl Comm II 452: "BAILMENT, from the French *bailler*, to deliver, is a delivery of goods in trust, upon a contract expressed or implied, that the trust shall be faithfully executed on the part of the bailee."

[35]  Jones, W., *An Essay on the Law of Bailments* (1781), pp.1 and 117: "BAILMENT is a delivery of goods in trust, on a contract express or implied, that the trust shall be duly executed, and the goods redelivered, as soon as the time or use, for which they were bailed, shall have elapsed or be performed."

[36]  Winfield, P., *The Province of the Law of Tort (Tagore Law Lectures delivered in 1930)* (1931), p.96: "During the seventeenth and succeeding centuries the contractual element became more prominent." Earlier at p.28, Blackstone is chided by Winfield: "Bailment he regarded as merely a species of contract of common occurrence."

[37]  Dempster, H., "Clearing the Confusion Surrounding Bailment: Bailment as an Exercise of a Legal Power by the Bailor" (2004) 33 *Common Law World Review* 295.

[38]  The promulgation of this theory is associated with the writings of Professor Palmer: most recently Palmer, N., *Palmer on Bailment*, 3rd edn (2009). See also Tay, A.E.S., "The Essence of Bailment: Contract, Agreement or Possession" (1966) 5 Syd. L.R. 239.

[39]  *The Pioneer Container* [1994] 2 A.C. 324; *East West Corp v DKBS AF 1912 A/S* [2003] EWCA Civ 83; [2003] Q.B. 1509 at [24] (Mance LJ).

[40]  Winfield, *The Province of the Law of Tort (Tagore Law Lectures delivered in 1930)* (1931), pp.93–96. See also Stevens, R., *Torts and Rights* (2008), at pp.9–11.

[41]  *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731, CA; *Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd* [1970] 1 W.L.R. 1262 at 1268, PC; *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1 at [48(d)].

[312]

*(3) Obligations and property*    Thirdly, many accounts of bailment unhelpfully state that the topic "stands at the point at which contract, property and tort converge"[42] or that it straddles the law of obligations and the law of property. Such statements might equally well be made of the law of sale of goods or the assignment of things in action. These assertions should not stand as obstacles to the rational exposition of the relevant rules and principles. In this account a sharp divide is drawn between bailment within the law of obligations and bailment within the law of personal property.

**Modest contribution of bailment reasoning**    Lastly, it follows from the previous point—bailment's intersection with the law of contract, tort, unjust enrichment and personal property—that the size and shape of the topic of bailment has in itself proved controversial. Sir William Blackstone was able to dispatch bailment in three paragraphs in his influential *Commentaries*.[43] Most accounts treat bailment as a comparatively small topic in the law in comparison with, say, contract or tort. In contrast, the prominent modern textbook account by Palmer treats bailment as an apparently massive topic.[44] At the opposite end of the spectrum of opinion from Professor Palmer's viewpoint, it has been suggested that the topic shrinks away to nothing once its component principles have been distributed amongst the conceptual categories of consent, wrongs, unjust enrichment and property law.[45] Perhaps the safest view is that of Andrew Bell that the distinctive contribution of bailment reasoning to English law is comparatively modest.[46]    **12-006**

## When does a bailment arise?

**Law and equity**    Bailment is an exclusively common law notion. There can be no bailment of an equitable, as opposed to legal, interest in goods.[47] In *MCC Proceeds Inc v Lehman Bros International (Europe)* Hobhouse LJ made clear: "A relationship of beneficiary and trustee is not that of bailor and bailee. It is in law the antithesis of that: the bailor has the legal property as does the trustee, not the beneficiary. It is also a confusion to refer to the language of bailment which talks of the bailor entrusting the goods to the bailee and to equate that with a declaration of trust. The one is, despite the language, a legal relationship…; the other is purely equitable."[48] Furthermore, whilst a bailee may in addition owe fiduciary duties to his bailor,[49] these do not derive from the bailment, and are not an ordinary incident of the bailment relationship. Indeed the too ready assumption that a bailee    **12-007**

---

[42]  Palmer, N., *Palmer on Bailment*, 3rd edn (2009), 1 and Beale, H., (ed), *Chitty on Contracts*, 32nd edn (2015), para.33–001.

[43]  Bl Comm II 452–54. Sir William Jones criticised the otherwise "excellent" Blackstone for the brevity of his account: Jones, W., *An Essay on the Law of Bailments* (1781), at p.3, and took 130 pages for his own Essay.

[44]  The 3rd edn (2009) has 2,220 pages.

[45]  McMeel, G., "The redundancy of bailment" [2003] L.M.C.L.Q. 169.

[46]  Bell, A., "The Place of Bailment in the Modern Law of Obligations" in Palmer, N. and McKendrick, E., *Interests in Goods*, 2nd edn (1998), p.461; Sheehan, D., *The Principles of Personal Property Law*, 2nd edn (2017), Ch.10.

[47]  In *Re Bond Worth* [1980] 1 Ch. 228 at 263 (Ch D: Slade J).

[48]  *MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 4 All E.R. 675 at 702. See also the rejection of an argument of a "trust derived from a bailment", or indeed a "floating bailment" in *In re Goldcorp Exchange Ltd* [1995] 1 A.C. 74 at 95–99, PC.

[49]  *In re Hallett's Estate* (1880) 13 Ch. D 696, CA (solicitor holding bonds on behalf of client).

was automatically a fiduciary casts doubt upon the reasoning in the earliest case on modern retention of title clauses.[50]

**12-008**    **The subject-matter of bailment**    The subject-matter of bailment are things in possession.[51] In the context of the carriage of passengers and their goods, it is clear that bailment reasoning only applies to the latter: "bailment is confined to chattels and does not extend to human beings."[52] Nevertheless the Court of Appeal in *Yearworth v North Bristol NHS Trust*[53] extended the concept of property, and consequently the scope of bailment, to sperm donated by the claimants, to be stored for future reproductive use should the chemotherapy which they were undergoing compromise their fertility. Accordingly human tissue and human bodily products may the subject-matter of a bailment.[54]

**12-009**    **Consent**    The traditional common law rule was that bailment was a relationship founded upon agreement or the mutual consent of bailor (the person entrusting possession of the goods to another) and bailee (the party accepting responsibility for the goods so entrusted). In practice the vast majority of bailments of goods will be mutually consensual, and the majority of them will be contractual. Accordingly the terms of the contract will be the principal source of the rights and duties of the parties inter se.The Supreme Court has confirmed that:

> "Bailment is a transfer of possession giving rise to a legal relationship between the bailor and the bailee which is independent of contract, although in practice it is commonly contractual and the terms of the contract will commonly modify its incidents."[55]

However since at least *Coggs v Bernard*,[56] it has been recognised that a gratuitous bailment may also arise, and that duties may be imposed on the bailee arising from his undertaking.

**12-010**    **Unilateral consent theory**    Under the influence of Professor Palmer[57] the theory that all bailments should rather be based on the unilateral consent of the bailee has achieved prominence, and is supported in obiter dicta in recent leading cases.[58] The obvious disadvantage of the unilateral consent model is that in seeking to identify the irreducible core of bailment, and to include more marginal cases such as sub-

---

[50] *Aluminium Industrie Vaassen BV v Romalpa Aluminium Ltd* [1976] 1 W.L.R. 676, CA. See McMeel, G., "Retention of Title: the Interface of Contract, Unjust Enrichment and Insolvency" in Francis Rose, (ed), *Restitution and Insolvency* (2000) 134, esp. at pp.151–152; Bradgate, R., "Twenty-five years of Romalpa" in Davies, I., *Security Interests in Mobile Equipment* (2002), 29, at p.90; Mc-Cormack, G., *Reservation of Title*, 2nd edn (1995), pp.45–47. See para.20-035.
[51] Compare *Your Response Ltd v Datateam Business Media Ltd* [2014] EWCA Civ 281; [2015] Q.B. 41.
[52] *Clarke v West Ham Corp* [1909] 2 K.B. 858 at 877 (CA: Farwell LJ).
[53] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1.
[54] See para.1-070.
[55] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8] (Lord Sumption).
[56] *Coggs v Bernard* (1703) 2 Ld Raym 909; 92 E.R. 107; *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1 at [48](a) and (b).
[57] Palmer, N., *Palmer on Bailment*, 3rd edn (2009).
[58] *The Pioneer Container* [1994] 2 A.C. 324; *East West Corp v DKBS AF 1912 A/S* [2003] EWCA Civ 83; [2003] Q.B. 1509 at [24] (Mance LJ).

bailments and finders,[59] it may over-simplify the position, and entail that clusters of rules appropriate for one type of commercial activity (e.g. warehouse keeping and carriage) are appropriate or applicable to wholly different fields of human activity (e.g. the hobby of metal detecting). A number of important constraints on bailment reasoning must be noted.

**Critique of unilateral consent theory**    First, as stressed above, the majority of **12-011** bailments are mutually consensual, and indeed contractual. Therefore the contractual terms are all-important. In many commercially significant contexts—hire of goods, hire-purchase, warehousing and transport—there are either statutorily implied terms (or international transport conventions) or detailed standard terms (often on trade association terms). The former are likely to enhance the duties of the bailee, and the latter are likely to attempt to limit or circumscribe those obligations. However, at bottom the parties' agreement is the basis of the relationship. Secondly, the unilateral consent model is most apt to explain the tortious or delictual obligation of the gratuitous bailee or the sub-bailee to take reasonable care of goods. The suggested test of where "a person voluntarily takes another's goods into his custody"[60] is either identical to, or directly analogous to, one of the principal modern tests for recognising a duty of care in negligence, assumption of responsibility.[61] Thirdly, the unilateral consent model is least effective when considering the personal property dimension of bailment. As explained above possession is both a legally recognised interest in goods, and delivery of possession is a mode by which one person transfers, and another acquires that interest. It runs counter to orthodox property law reasoning when seeking to ascertain whether an interest has been transferred or acquired to focus on the state of mind of the transferee, as opposed to the transferor of goods.[62] It is submitted that the better view is that as a general rule it is either the agreement of the parties, to effect delivery or the unilateral consent of bailor, which is relevant to the transfer of the possession in the goods. It is only in cases where the intentions of the bailor cannot be ascertained that the court considers the state of mind of the transferee alone. It is noteworthy that in the cases which lend their imprimatur to the unilateral consent theory the judges were concerned only the *obligations* dimension of bailment, and not with any proprietary question.[63] Accordingly from the obligations dimension bailment arises from either the agreement of the parties, or from (in cases of gratuitous bailment) the voluntary taking of another's goods into custody. In contrast, from the property dimension the consent of the bailor is generally essential to the transfer of the possessory interest in his goods to the bailee.

---

[59] It is controversial whether finders can properly be called bailees: Hickey, R., *Property and the Law of Finders* (2010), pp.4–5, 81–84.

[60] *The Pioneer Container* [1994] 2 A.C. 324 at 342 (PC: Lord Goff).

[61] *Hedley Byrne Ltd v Heller & Partners Ltd* [1964] A.C. 464, HL; *Spring v Guardian Assurance Plc* [1995] 2 A.C. 296 (HL: Lord Goff); and *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145 (HL: Lord Goff and Lord Browne Wilkinson).

[62] The interests of both finders and thieves are explained as a matter of public policy, arising from stability of possession, and represent limited exceptions to the requirement that the transferor must consent.

[63] *The Pioneer Container* [1994] 2 A.C. 324; *East West Corp v DKBS AF 1912 A/S* [2003] EWCA Civ 83; [2003] Q.B. 1509; *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1 at [48](c)].

**12-012    Knowledge**    The consent of the bailee may presuppose that the bailee has knowledge of the bailor. The requirement for knowledge was emphasised in the context of a sub-bailment in *The Pioneer Container* by Lord Goff:

> "a sub-bailee can only be said for these purposes to have voluntarily taken into his possession the goods of another if he has sufficient notice that a person other than the bailee is interested in the goods so that it can properly be said that (in addition to his duties to the bailee) he has, by taking the goods into his custody, assumed towards that other person the responsibility for the goods which is characteristic of a bailee."[64]

Similarly older authorities emphasise this requirement. In *Lethbridge v Phillips*[65] the plaintiff was an eminent portrait painter who lent a miniature to one Mr Bernard, who in turn sent it to the home of the defendant, where it was badly damaged by being left on a mantelpiece by a large stove. There had been no request by the defendant that the miniature be sent across, or any previous communication. In those circumstances Lord Abbott CJ nonsuited the plaintiff:

> "The defendant could not, without his knowledge and consent, be considered a bailee of the property. In some instances it had happened that property of a much greater value than that in the present case had been left at gentlemen's houses by mistake, in such cases the parties could not be considered as bailees of the property without their consent."[66]

**12-013    "Unconscious" or "involuntary" bailment**    More recent authority suggested that some duty may be owed to the owner even where possession is acquired without knowledge. In *AVX Ltd v EGM Solders Ltd*[67] the plaintiffs, in the course of returning to the defendants part of a consignment of defective solder spheres, comprising a single large box, mistakenly addressed a further 21 boxes of capacitors to the same address. The defendants' employees did not notice the error and set about scrapping all the components. Staughton J noted the capacitors were "finished goods which could not, by any stretch of imagination, be said to look remotely like solder spheres." His Lordship described the situation as one of "unconscious bailment", and held that on the facts there was a culpable failure on the part of the defendants to check the contents of the 22 boxes.[68] However the traditional view that a relationship of bailment presupposes that the alleged bailee knows of the alleged bailor was re-asserted by the Court of Appeal in *Marcq v Christie Manson & Woods Ltd (trading as Christie's)*.[69] There the well-known auction-house were entrusted by a Mr Schuenemann with Jan Steen's *The Backgammon Players* to sell. However it remained unsold at the end of the Old masters sale, and was returned to Mr Schuenemann. Unbeknownst to Christie's the painting had been stolen from the

---

[64]  *The Pioneer Container* [1994] 2 A.C. 324 at 342 (PC: Lord Goff). In *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731, Diplock LJ stressed that the sub-bailee knew that they were taking into custody a fur which they knew to be the property of their immediate bailor.

[65]  *Lethbridge v Phillips* (1819) 2 Stark 544; 171 E.R. 731. See also *Howard v Harris* (1884) Cab. & Ellis. 253; *Neuwith v Over Darwen Industrial Co-operative Society* (1894) 63 L.J.Q.B. 290.

[66]  *Lethbridge v Phillips* (1819) 2 Stark 544 at 171 E.R. 731.

[67]  *AVX Ltd v EGM Solders Ltd* 1 July 1982; *The Times,* 7 July 1982.

[68]  Staughton J added: "Had the defendants discovered that the boxes were not their property they would have ceased to be unconscious bailees and become involuntary bailees. It was the duty of such a bailee at least not to destroy the goods forthwith without any inquiry of the true owner, unless they were of a noxious nature."

[69]  *Marcq v Christie Manson & Woods Ltd (trading as Christie's)* [2003] EWCA Civ 731; [2004] Q.B. 286.

BAILMENT

claimant 18 years earlier. The claimant's claim for damages for conversion failed,[70] as did a second claim that Christie's were involuntary or unconscious bailees. The Court of Appeal held that whilst the relationship of bailment undoubtedly existed between Mr Schuenemann and Christie's, they denied it could exist between the auctioneers and the claimant of whose interest they were wholly unaware.[71] Tuckey LJ cast doubt on the bailment reasoning in *AVX v EGM Solders*, and observed that on the facts there would have been no difficulty in establishing a claim in negligence, without invoking a relationship of bailment.[72] Accordingly the better view is that it is not possible to be an unconscious bailee, or to be in a relationship of bailment with knowledge of the alleged bailor.[73]

**Possession**    It is fundamental that there is a delivery or transfer of possession as interest from one party to another for bailment to arise. In the leading case of *Ashby v Tolhurst* Romer LJ stated: "in order that there shall be a bailment there must a delivery by the bailor, that is to say, he must part with his possession of the chattel in question."[74] Therefore leaving a car on a private car park, without leaving the keys with the attendant, did not give rise to a relationship of bailment, but one of licensor and licensee of the land. In contrast, valet parking would result in a transfer of possession, and a perfected relationship of bailment.[75] More recently, in *Yearworth v North Bristol NHS Trust*,[76] Lord Judge CJ stated: "A bailment arises when, albeit on a limited or temporary basis, the bailee acquires exclusive possession of the chattel or a right thereto."[77]   **12-014**

Delivery includes both actual or physical handing over of goods, and constructive or symbolical delivery. According to Sir Mackenzie Chalmers:   **12-015**

"Delivery may be actual or constructive. Delivery is constructive when it is effected without any change in the actual possession of the thing delivered, as in the case of delivery by attornment or symbolic delivery."[78]

An example of symbolic delivery is the handing over of a sample of bulky goods

---

[70] See also para.32-028.

[71] *Marcq v Christie Manson & Woods Ltd (trading as Christie's)* [2004] Q.B. 286 at [46] (Tuckey LJ); also citing at [49] *The Pioneer Container* [1994] 2 A.C. 324 at 342 (PC: Lord Goff).

[72] [2004] Q.B. 286, at para.[52]: "A person, who destroys goods which are self-evidently not his in the mistaken belief that they are, must be liable." See also *Robot Arenas Ltd v Waterfield* [2010] EWHC 115 (QB), paras [15–26].

[73] Compare Palmer, N., *Palmer on Bailment*, 3rd edn (2009), paras 6–004 to 6–022.

[74] *AVX v EGM Solders* [1937] 2 K.B. 242, 255.

[75] Compare *Mendelssohn v Normand Ltd* [1970] 1 Q.B. 177, CA; *Searle v Laverick* (1874) LR 9 Q.B. 122: livery stable keeper entrusted with carriage and horses within second sub-category of the fifth sort of bailment identified by Holt CJ in *Coggs v Bernard* (1703) 2 Ld Raym 909 at 917–918; 92 E.R. 107, so duty to take ordinary care and skill. See also *Chua Chye Leon Alan v De-Luxe Nite Club Pte Ltd* [1993] 2 SLR (R) 420.

[76] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1.

[77] *Yearworth v North Bristol NHS Trust* [2010] Q.B. 1 at [48(d)]; citing *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 Q.B. 171 at 189, (Diplock J); [1961] 1 Q.B. 106 at 119, (Hodson LJ). See also *TRM Copy Centres (UK) Ltd v Lanwall Services Ltd* [2009] UKHL 35; [2009] 1 W.L.R. 1375, HL.

[78] *Chalmers' Sale of Goods Act 1893*, 5th edn (1902); adopted (in the context of s.24 of the Sale of Goods Act 1979) in *Gamer's Motor Centre (Newcastle) Pty Ltd v Natwest Wholesale Australia Pty Ltd* (1987) 163 C.L.R. 236, HCA; *Forsythe International (UK) Ltd v Silver Shipping Ltd, The Saetta* [1994] 1 W.L.R. 1334 (Clarke J); and *Michael Gerson (Leasing) Ltd v Wilkinson* [2001] Q.B. 514, CA. *East West Corp v DKBS 1912 A/S* [2003] EWCA Civ 83; [2003] Q.B. 1509.

to the intended transferee.[79] Delivery for the purpose of constituting a valid pledge can be either actual or "constructive, or symbolical."[80]

**12-016    Attornment**    Attornment by a bailee is an example of constructive delivery.[81] Where a warehouse-keeper or other storage facility holds the goods of A as bailee, and A wishes to transfer his interest in them to B, A can of course take delivery of the goods.[82] Alternatively, B may be content for the bailee to continue to hold the goods for his account. Pollock and Wright stated the requirement for a valid attornment by a bailee:

> "There must be a complete assent of all three parties to the appropriation of specific goods to the buyer under the contract, and it is to be noted … that the transfer of indicia of title, such as delivery warrants, is not of itself sufficient."[83]

Attornment therefore generally requires both a communication from A to the bailee to hold the goods for B, and an acknowledgment from the bailee to B that he now does so. It is insufficient for a warehousekeeper to amend his records without communicating that fact to the buyer.[84] Furthermore, the goods must be sufficiently identified as the goods to be transferred.[85]

**12-017    Section 29(4) of the Sale of Goods Act 1979**    Delivery by way of attornment by a bailee is codified in s.29(4) of the Sale of Goods Act 1979 (using the more neutral word "acknowledgment" because the Act extends to Scotland):

> "Where the goods at the time of sale are in the possession of a third person, there is no delivery by seller to buyer unless and until the third person acknowledges to the buyer that he holds the goods on his behalf…"

**12-018    Stevedores**    The question whether stevedores are bailees has proved controversial. A straightforward application of the leading case of *Coggs v Bernard*[86]—the porterage of a cask of brandy from one premises to another—would suggest they are always bailees. However the authorities are more nuanced. Two questions must be distinguished. First, do the stevedores owe a duty of care to owner or person with a possessory title? Secondly, can the stevedores rely on defences based on exemption clauses in a contract to which the owner of the goods is not privy? In *Midland*

---

[79] *Kemp v Falk* (1882) 7 App Cas 573 at 586 (HL: Lord Blackburn).
[80] *Dublin City Distillery (Great Brunswick Street, Dublin) Ltd v Doherty* [1914] A.C. 823 at 843 (HL: Lord Atkinson). Lord Atkinson comprehensively reviewed the authorities on constructive delivery (at 848–849). See also Official *Assignee of Madras v Mercantile Bank of India Ltd* [1935] A.C. 53, PC.
[81] For the origins of the language of attornment in feudal land law see Baker, J.H., *An Introduction to English Legal History*, 5th edn (2019), p.281, in the context of the emergence of the fee simple.
[82] See also para.29-004.
[83] Pollock, F. and Wright, R.S., *An Essay on Possession in the Common Law* (1888), p.72; citing *Farina v Home* (1846) 16 M. & W. 119; 153 E.R. 1124, Exch.
[84] *Laurie and Morewood v Dudin and Sons* [1926] 1 K.B. 223, CA. Contrast Sheehan, D., *The Principles of Personal Property Law* (2011), p.285 which suggests (erroneously it is submitted) that limited actions, such as entering details in the warehouseman's books, may suffice.
[85] *Mitsui & Co v Novorossiysk Shipping Co (The Gudermes)* [1993] 1 Lloyd's Rep. 311, CA.
[86] *Coggs v Bernard* (1703) 2 Ld Raym 909; 92 E.R. 107.

Bailment

*Silicones Ltd v Scruttons Ltd*[87] a drum containing chemicals was unloaded by the defendant stevedores. The bill of lading on its terms governed the period before loading and after discharge, and defined "carrier" to include any person acting as carrier or "bailee". The stevedoring contract between the carrier and the stevedores purported to confer the same protection as the carrier had under the bill of lading as against the cargo interests, to the stevedores. The drum of chemicals was moved by the stevedores to a shed leased by the carrier from the Port of London Authority, where it was stored for three weeks. The drum was dropped and damaged when it was being moved from the shed to a lorry sent by the claimant buyers of the cargo. The defendant stevedores defended a claim in negligence on the basis that they were sub-bailees from the carriers,[88] and entitled to avail themselves of the limitation clause in the bill. The claimants rejected this, submitting that all they had done was "handle the cargo in and out of the shed",[89] and that they never had exclusive possession which remained at all times with the carrier. Diplock J appeared to accept the latter submission: "I doubt whether, on the facts, the defendants were ever bailees, whether sub, bald or simple."[90] However his Lordship appeared to consider the question immaterial as any possession they had was given to them by the carriers. The Court of Appeal was more emphatic there was no bailment.[91] In the House of Lords Viscount Simonds, of the majority, was clear in agreement with Diplock J that here was no bailment of any kind.[92] Lord Denning famously dissented, on the basis that the stevedores were entitled as sub-bailees to the benefit of the exemption clause in the bill of lading, on the basis that the cargo-owners impliedly authorised the sub-contracting to the stevedores on terms.[93] By way of contrast to the majority view in *Scruttons*, in *Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd*[94] a ship docked at wharf belonging to the harbour board, and the stevedores unloaded the cargo of clocks and stacked it in a shed belonging to the board, which was used and controlled by the stevedores during working hours. One case of clocks was stolen. Here the question was whether the defendant stevedores as bailees owed a duty of care to the cargo-owners? The Privy Council held that, even though there was no direct contractual relation between claimants and stevedores, and no attornment between them, and assuming the bailment between shipowner and claimants continued, the stevedores were nevertheless sub-bailees and owed a direct duty of care.[95] It may be that the degree of control and duration of the relationship need to be closely examined in each case. Where the handling is transient the stevedores may be treated as analogous to employees

---

87  *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 Q.B. 171 (Diplock J); [1961] 1 Q.B. 106, CA; [1962] A.C. 446, HL.

88  *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 Q.B. 171 at 175 (submission of E Roskill QC).

89  *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 Q.B. 171 at 178 (submission of A Mocatta QC).

90  *Midland Silicones Ltd v Scruttons Ltd* [1959] 2 Q.B. 171 at 189.

91  *Midland Silicones Ltd v Scruttons Ltd* [1961] 1 Q.B. 106 at 119 (Hodson LJ), and 131–132 (Pearce LJ).

92  *Midland Silicones Ltd v Scruttons Ltd* [1962] A.C. 446 at 470. Lord Keith agreed.

93  *Midland Silicones Ltd v Scruttons Ltd* [1962] A.C. 446 at 489–491. Lord Denning had greater success with the principle of sub-bailment on terms in *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716, CA.

94  *Scruttons, in Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd* [1970] 1 W.L.R. 1262, PC.

95  *Scruttons, in Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd* [1970] 1 W.L.R. 1262 at 167; citing *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716, CA. See also *Lotus Cars Ltd v Southampton Cargo Handling Plc (The Rigoletto)* [2000] 2 Lloyd's Rep. 532.

[319]

having mere custody, as described in the next paragraph. However it is submitted that stevedores will be properly characterised as bailees in the majority of cases, at least for the purpose of imposing a duty of care on them to the true owner, and correspondingly for the potential application of the principles of sub-bailment to limit or exclude such prima facie liability.[96]

**12-019** **Employers and employees** For reasons derived from the now defunct law of larceny,[97] servants, or in modern terminology, employees, are generally held not to be bailees, but to have "mere custody" of their employer's goods.[98] Conversely in *Meux v Great Eastern Railway Co*[99] the plaintiff's servant took a train journey and a porter dropped his portmanteau containing the plaintiff's servant's livery on the railway line and it was destroyed. The plaintiff as owner of the livery was held to be able to recover in negligence. Smith LJ expressly left open the question what claim the servant might have and what the damages would be.[100] Some commentators treat this as another example of the rule that employees only have custody, not possession.[101] That may be correct, but the court decided the case firmly on the plaintiff's right to sue as owner of the goods in negligence.[102] The categorisation appears to be of little or no practical significance in modern times, and questions as to whether employees owe or are owed a duty of care, and the question whether they can use their employee's exemption clauses as a shield, are unlikely to be resolved by reference to bailment reasoning, as opposed to ordinary principles of contract and tort.

**12-020** **Re-transfer** Traditionally it was a requirement of bailment that there should be either specific re-delivery of the very same asset transferred, or a right in the bailor to call for re-delivery in certain events.[103] "An incident of property, that is in bailment, is that the Bailor may require its restoration."[104] That is still the general rule. However it is not without exception, and the more modern formulation is that the bailor must at least retain some reversionary interest in the goods. For example, the owners and suppliers of goods under an agreement to sell on a retention of title basis, or pursuant to a hire-purchase contract, or the consignor of goods for carriage to a buyer, are all bailors under a species of contractual bailment where if the obligations of each party are properly performed there will be no re-delivery.[105] So

---

[96] See para.12-037.

[97] Now superseded by the Theft Act 1968 s.1.

[98] *Alexander v Southey* (1821) 5 B. & A. 247 at 249; 106 E.R. 1183 (Holroyd J); Pollock, F. and Wright, R.S., *An Essay on Possession in the Common Law* (1888), at p.28; Bell, A.P., *Modern Law of Personal Property in England and Ireland* (1989), pp.60–62; Bridge, M., *Personal Property Law*, 4th edn (2015), pp.39–41.

[99] *Meux v Great Eastern Railway Co* [1895] 2 K.B. 387, CA; followed in *Lee Cooper Ltd v CH Jeakins & Sons Ltd* [1967] 2 Q.B. 1, QBD.

[100] *Meux v Great Eastern Railway Co* [1895] 2 K.B. 387 at 394.

[101] Hudson, A., "Trespass to Goods" in Palmer, N. and McKendrick, E., (eds), *Interests in Goods*, 2nd edn (1998), 809 at pp.811–812; Sheehan, D., *The Principles of Personal Property Law*, 2nd edn (2017), p.9.

[102] See para 3-001.

[103] Jones, W., *An Essay on the Law of Bailments* (1781), at pp.64–65, and at p.102, distinguishing loans for use from loans for consumption. In loans for consumption the "absolute property of them is transferred to the borrower" (at p.64).

[104] *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101 at 110 (PC: Sir Joseph Napier).

[105] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1 at [48(e)]. Similarly

too where a time charterer had paid for all the bunkers on board the ship the court held that they were held to be vested in the shipowners as bailees for the charterers. The bunkers were available to be used by the master in carrying out the charterer's orders.[106] Accordingly in *TRM Copy Centres (UK) Ltd v Lanwall Services Ltd*[107] Lord Hope suggested the following definition:

"It embraces all situations in which possession of goods is given by one person to another upon the condition that they shall be restored to the person by whom possession has been given, or dealt with as he directs, upon expiry of the agreed period of possession."[108]

The position has been pushed to new limits in *The Res Cogitans*.[109] Bunkers were supplied to the eponymous vessel on an "all moneys" retention of title basis[110] but with the shipowners having the right to consume the bunkers in the operation of the vessel. The contract of supply expressly provided that the shipowners were: "in possession of the bunkers as solely as bailee for the seller, and shall not be entitled to use the bunkers other than for propulsion of the vessel…". The shipowners accepted they were bailees on such terms.[111] The head supplier's terms similarly reserved title and defined the recipient as being in possession as a bailee. All the bunkers were consumed, probably after the expiry of the credit period, without payment being made. Upholding the arbitrators the Supreme Court held this was a sui generis contract of bailment, being in substance one which afforded the shipowners the liberty to consume the goods prior to any payment and without any property passing, and insofar as unconsumed that property would pass upon full payment.[112] It did not fall within the Sale of Goods Act 1979. The shipowners were obliged to pay the contract price in accordance with its express terms.

**Loans for consumption**    It follows that *The Res Cogitans*[113] casts some doubt **12-021** upon the traditional view that loans for consumption should be distinguished from loans for use, and that only the latter is a bailment. Therefore the neighbour who lends a cup of rice expects the specific return of the cup, and ideally the return of some rice, but not the same rice.[114] It would now appear that some loans for

---

goods supplied on a sale or return basis are said to be the subject of contractual bailments: *Atari Corporation (UK) Ltd v Electronics Boutique Stores (UK) Ltd* [1998] Q.B. 539, CA.

[106] *Stellar Chartering & Brokerage Inc v Efibanca-Ente Finanziario Interbancario SpA, (The Span Terza (No.2))* [1984] 1 W.L.R. 27 at 31 (HL: Lord Diplock). Bridge, M., *Personal Property Law*, 4th edn (2015), pp.73–74 describes this as a "wasting bailment."

[107] *TRM Copy Centres (UK) Ltd v Lanwall Services Ltd* [2009] UKHL 35; [2009] 1 W.L.R. 1375.

[108] *TRM Copy Centres (UK) Ltd v Lanwall Services Ltd* [2009] 1 W.L.R. 1375 at [10].

[109] *PST Energy 7 Shipping LLC v O W Bunker Malta Ltd* [2016] UKSC 23; [2016] A.C. 1034. For critical discussion see Bridge, M, "The UK Supreme Court decision in The Res Cogitans and the cardinal role of property in sales law" (2017) *Singapore Journal of Legal Studies* 345; and Gullifer, L., "'Sales' on Retention of Title terms: is the English law analysis broken?" (2017) 133 L.Q.R. 244.

[110] See para.21-008 to 21-010.

[111] *PST Energy 7 Shipping LLC v O W Bunker Malta Ltd* [2016] UKSC 23; [2016] A.C. 1034 at [7].

[112] The argument before the arbitrators that on one analysis property passed for or in a nanosecond when the bunkers went up in smoke was not formally before the Court of Appeal or Supreme Court, but Lord Mance rejected it parenthetically in his analysis of the substance of the contract at [2016] UKSC 23; [2016] A.C. 1034 at [28].The Supreme Court also rejected the Court of Appeal's view that the contract might be seen as a sale of goods pro tanto: [2015] EWCA Civ 1058 [2016] 2 W.L.R. 1072 at [33] (Moore-Bick LJ); [2016] UKSC 23; [2016] A.C. 1034 at [31] (Lord Mance).

[113] *PST Energy 7 Shipping LLC v O W Bunker Malta Ltd* [2016] UKSC 23; [2016] A.C. 1034.

[114] Lawson, F. and Rudden, B., *The Law of Property*, 3rd edn (2002), at pp.61–62. Roman law and the Latin language clearly distinguished the loan for consumption (mutuum) from the loan for use

BAILMENT

consumption, especially where there are restrictions on what the bailee may do with the loaned items, may be analytically a bailment. However it is submitted that there are still instances, where the relationship is properly characterised as a loan for consumption, with property in the asset passing to the recipient. The central case example of a loan for consumption, namely a loan of money, is manifestly not a bailment. Accordingly the relationship of banker and customer is not one of bailment. Money paid into a bank account by a customer becomes the property of the banker.[115] The same approach, not involving bailment, has been applied to goods where farmers agree to mix fungible goods in silos or warehouses with those of other farmers. In *The South Australian Insurance Co v Randell*[116] a farmer deposited wheat with a miller, whose customary course of business was to mix it with the wheat of others so that it lost its identity and became part of the common stock of the miller. The wheat was either sold as such, or ground into flour and sold. It was never intended that the identical wheat delivered by the farmers should be returned to them. The farmers were entitled to an equal quantity of wheat of like quality,[117] or a sum representing the market price on the day when wheat was so demanded, at the miller's option. Sir Joseph Napier, delivering the Advice of the Privy Council, stated:

> "Wherever there is a delivery of property on a contract for an equivalent in money or some other valuable commodity, and not for the return of his identical subject matter in its original or an altered form, this is a transfer of property for value—it is a sale and not a bailment."[118]

The case was directly analogous to that of banker and customer. On the true construction of this relationship as between the farmers and the miller to the risk of loss of the wheat was on the miller. Whilst it might be possible to have an agreement where goods are mixed by consent so as to give rise to co-ownership, this was not such a case because the miller was entitled to sell or grind the wheat as part of his current stock.[119] That last consideration would no longer be decisive in the wake of *The Res Cogitans*.

---

(commodatum): Zimmermann, R., *The Law of Obligations: Roman Foundations of the Civilian Tradition* (1996), pp.188–189. Contrast the English language: Pollock and Maitland *HEL*, II 170.

[115] *Foley v Hill* (1848) 2 H.L.C. 28 at 36; 9 E.R. 1002 (Lord Cottenham LC.); *London Joint Stock Bank Ltd v Macmillan* [1918] A.C. 777 at 814 (HL: Viscount Haldane LC.); *Joachimsom v Swiss Bank Corp* [1921] 3 K.B. 110, CA; *Libyan Arab Foreign Bank v Bankers Trust Co* [1989] 728 at 748 (QBD, Staughton J: "It is elementary, or hornbook law to use an American expression, that the customer does not own any money in a bank. He has a personal and not a real right. Students are taught at an early stage of their studies in the law that it is incorrect to speak of 'all my money in the bank.'").

[116] *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101. See also *Chapman Bros v Verco Bros* (1933) 49 C.L.R. 306.

[117] There was no direct evidence that this was the case but the Privy Council proceeded on the basis most favourable to the miller who was claiming these were "goods in trust" under his fire insurance. (1869) LR 3 PC 101 at 108.

[118] *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101 at 108; citing Jones, W., *An Essay on the Law of Bailments*, 3rd edn, pp.64 and 102.

[119] *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101 at 113–114. See also para.16-022.

BAILMENT

**Mercer v Craven Grain Storage**   In *Mercer v Craven Grain Storage Ltd*[120] a   **12-022**
farmers' co-operative society agreed to accept deposits of grain on written terms.
The grain was mixed with other deposits of the same grade. The bulk was regularly
drawn upon and replenished. Receipts were issued showing the weight and grade
of grain deposited. The society sought to resist a claim in conversion by arguing that
the farmers had transferred property in the grain, but the majority of the House of
Lords held the farmers entitled to an interest in the bulk in proportion to their
contributions. The case was treated as one of bailment, with the mixing by consent
giving rise to a tenancy in common between all contributors to the bulk. First, the
case needs treating with some caution because it was an application for summary
judgment, decided by a bare majority with no reference made to the relevant
authorities. Secondly, on one view the court was simply applying Sir Joseph
Napier's observation at the end of *Randell*'s case on mixing by consent.[121] However
in the wake of *The Res Cogitans* the case can be analysed on the basis that there is
no need for specific re-delivery in the case of consensual mixing of fungible
goods.[122]

## Bailment and the law of obligations

### *Law of contract*

**Introduction**   The common law category of bailment is of some antiquity, and is   **12-023**
"older in our common law than the legal concept of parol contract."[123] Whilst as we
have seen it is not necessary for a relationship of bailment to share all the require-
ments of a binding contract—agreement (offer and acceptance), consideration,
intention to create legal relations, formalities (where applicable)—in practice the
vast majority of bailments are contractual. Indeed it has been authoritatively stated
that: "most cases of bailment today are accompanied by a contractual relationship
between bailee and bailor which may modify or extend the common law duties of
the parties that would arise from the mere fact of bailment."[124] This is the principle
of the primacy of contract which curtails the impact which bailment reasoning may
have so far as obligations and rights are concerned.[125] The primacy of contract is
subject to restrictions on excluding liability in the Unfair Contract Terms Act 1977

---

[120] *Mercer v Craven Grain Storage Ltd* [1994] CLC 328, HL; noted Smith, L.D., "Bailment with
Authority to Mix – and Substitute" (1995) 111 L.Q.R. 10. See also *Crawford v Kingston* [1952] OR
714 (Ont); *Harding v CIR* [1977] 1 N.Z.L.R. 337.
[121] *The South Australian Insurance Co v Randell* (1869) LR 3 PC 101 at 113–114. See further para.16-
022.
[122] Compare Sheehan, D., *The Principles of Personal Property Law* (2011), p.266–267.
[123] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731 (CA: Diplock LJ).
[124] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 731–32 (CA: Diplock LJ). See also Salmon
LJ at p.738.
[125] Ordinary principles of contractual construction applying business common sense should apply.
Contrast Australian authority requiring clear words to over-ride common law rights: *Hill v Reglon
Property Ltd* [2007] NSWCA 295, paras [46]: "Where the bailment is created by contract, the extent
to which the common law principles continue to apply depends upon a construction of the contract.
Common law rights are only excluded or overridden by the terms of the contract if the clearest of
terms to that effect are used." (Beazley JA). See generally McMeel, G., "The redundancy of bail-
ment" [2003] L.M.C.L.Q. 169 at 177–179.

BAILMENT

s.3(1) of the Misrepresentation Act 1967[126] and Pt 2 of the Consumer Rights Act 2015.

**12-024**  **Three sources of rights and duties**    Accordingly the three principal sources of the obligations and rights of the parties to the bailment are as follows. First, the express terms of the bailment, where there is a contract. Secondly, and in respect of the most significant bailments—hire, hire-purchase, contracts for the provision of services in respect of the goods of another—the implied terms of the contract, and predominantly the statutorily implied terms, in contracts between a trader and a consumer the terms which are treated as having been included.[127] Thirdly, in the sphere of international carriage, the international transport conventions given statutory force in UK law.[128] Furthermore, the standard terms of prominent trading associations in the fields of internal carriage and storage of goods are prominent sources of the obligations and rights of the parties. Significant examples include the standard terms of the Road Haulage Association,[129] the United Kingdom Warehousing Association[130] and the Construction and Plant-hire Association.[131] In this context, the legal techniques are the familiar ones of incorporation and construction, both of express contractual terms[132] and statutory construction of international transport conventions.[133]

**12-025**  **Termination of bailment**    At common law the rule appeared to be that any act which is repugnant to the bailment or inconsistent with the terms of bailment, such as a (purported) sale or pledge terminates the bailment, causing the right to possession to revert to the bailor.[134] Accordingly the bailor could bring a claim for wrongful interference against a third party, or the bailee. This has been extended to a bailment on terms.[135] However the courts have been reluctant to give full effect to this

---

[126]  As to which see *First Tower Trustees Ltd v CDS (Superstores International) Ltd* [2018] EWCA Civ 1396; [2019] 1 W.L.R. 637.

[127]  Sections 6 to 11 of the Supply of Goods and Services Act 1982 (hire); ss.8 to 12 of the Supply of Goods (Implied Terms) Act 1973 (hire-purchase); ss.1 to 5A of the Supply of Goods and Services Act 1982 (contracts for transfer of property in goods); and ss.1 to 16 of the Supply of Goods and Services Act 1982 (contracts for services); ss.9 to 17 of the Consumer Rights Act 2015 (goods contracts between trader and consumer); see also ss.2, 3, 6 and 7 of the Unfair Contract Terms Act 1977 and ss.31 and 65 of the Consumer Rights Act 2015.

[128]  Carriage by rail: International Transport Conventions Act 1983 (Uniform Rules concerning the Contract for the International Carriage of Goods by Rail ("CIM"); carriage by road: Carriage by Road Act 1965 (Convention on the International Carriage Of Goods by Road ("CMR")); carriage by sea: Carriage of Goods by Sea Act 1971 (Hague-Visby Rules); and carriage by air: Carriage by Air Act 1961 (Warsaw and Montreal Conventions). See Clarke, M., "The transport of goods in Europe: patterns and problems of uniform law" [1999] L.M.C.L.Q. 36.

[129]  Road Haulage Association Conditions of Carriage 2009.

[130]  United Kingdom Warehousing Association Conditions of Contract 2006.

[131]  CPA Model Conditions 2011.

[132]  See Lewison, K., *The Interpretation of Contracts*, 7th edn (2020) and McMeel, G., *McMeel on the Construction of Contracts—Interpretation, Implication and Rectification*, 3rd edn (2017).

[133]  Having regard to the more teleological approach to construction of international conventions endorsed in *James Buchanan & Co Ltd v Babco Forwarding & Shipping (UK) Ltd* [1978] A.C. 141 at 152 (HL: Lord Wilberforce) and *Fothergill v Monarch Airlines Ltd* [1981] 1 A.C. 251, HL.

[134]  *Fenn v Bittleston* (1851) 7 Ex 152; 155 E.R. 895 (Parke B); *Mulliner v Florence* (1873) 3 Q.B.D. 484.

[135]  *MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 4 All E.R. 675 at 686 (CA: common ground). See also *Penfold's Wines Proprietary Ltd v Elliott* [1946] HCA 46; (1946) 74 C.L.R. 204; *Hill v Reglon Property Ltd* [2007] NSWCA 295 at [41], [43], and [56].

principle which emphasises the distinctiveness of bailment reasoning. In *William Whiteley Ltd v Hilt*,[136] in respect of a piano let on hire-purchase, it was held that whilst a bailment can be determined by doing any act inconsistent with the bailment, it did not necessarily extinguish any other proprietary interest which the bailee had in the goods. In that case the Court of Appeal treated the option to purchase under the hire-purchase agreement as a separate interest of a proprietary character.[137] It is submitted that as a matter of principle it would be preferable for the courts to assimilate the approach to termination of possessory interests with modern rules on the discharge of contracts, and to reject the notion of automatic termination of interests.[138]

**Deviation**   A similar approach would be desirable to the so-called concept of "quasi-deviation", which by analogy with elderly carriage of goods by sea authority, treats the storage by a bailee of the goods in an unauthorised place as a fundamental breach of contract, automatically discharging the relationship.[139] It would be preferable for the reasoning to be made consistent with modern learning on the termination of contracts.[140]   **12-026**

### *Law of tort*

**Introduction**   In the absence of contractual or statutory obligations on the bailee, the default position is that the bailee owes a duty of care to the bailor which either arises in the tort of negligence, or is akin to the principles of the tort of negligence. The duty of care of a bailee long pre-dates attempts to enunciate general principles for the recognition of a duty of care at common law, such as by Brett MR in *Heaven v Pender*,[141] or in Lord Atkin's articulation the "neighbour principle" in *Donoghue v Stevenson*,[142] or in more modern appellate authority. However the duty of the bailee is clearly one of the individual instances which fed into the modern general principle. This was authoritatively stated by Lord Browne-Wilkinson in *Henderson v Merrett Syndicates Ltd*[143]:   **12-027**

---

[136] *William Whiteley Ltd v Hilt* [1918] 2 K.B. 808, CA. See also *North General Wagon & Finance Co Ltd v Graham* [1950] 2 K.B. 7; *Union Transport Finance Ltd v British Car Auctions Ltd* [1978] 2 All E.R. 385.

[137] *William Whiteley Ltd v Hilt* [1918] 2 K.B. 808 at 819 (Swinfen Eady MR); see also 822 (Warrington LJ).

[138] Compare *Photo Production Ltd v Securicor* [1980] A.C. 827, HL.

[139] *Gibaud v Great Eastern Railway Co* [1921] 2 K.B. 426; *Edwards v Newland Ltd* [1950] 2 K.B. 534 (CA: personal nature of duty of car, nature of goods or place of storage all relevant to liability). See also *Mendelssohn v Normand* [1970] 1 Q.B. 177 at 184 (CA, Lord Denning MR: deviation cases still good authority after *Suisse Atlantique Societe d'Armement Maritime SA v Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, HL) and *Mitchell v Ealing London Borough Council* [1979] 1 Q.B. 1, QBD (squatter's furniture).

[140] *Suisse Atlantique Societe d'Armement Maritime SA v Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, HL; *Photo Production Ltd v Securicor* [1980] A.C. 827, HL. Contrast Palmer, N., *Palmer on Bailment*, 3rd edn (2009), paras 1–064 to 1–071.

[141] *Heaven v Pender* (1883) 11 Q.B.D. 503 at 509 (CA: Cotton and Bowen LJJ did not concur with the Master of the Rolls's broad statement of principle).

[142] *Donoghue v Stevenson* [1932] A.C. 562 at 580 (HL: Lord Atkin). For scepticism about the existence of a general tort of negligence see Stevens, R., *Torts and Rights* (2007).

[143] *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145, HL.

"Although the historical development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the careless performance of what they have undertaken to do, not the description of the trade or position which they hold."[144]

Prior to the abolition of the forms of action by the Common Law Procedure Act 1852 a claim against a bailee for breach of this duty of care, long recognised by common law, would have proceeded by an action on the case, like any other claim for negligence. Given this, it is a solecism to speak of an action in bailment, but it is an error into which the Courts have fallen on occasion.[145]

**12-028  Law Reform Committee**  Judges who were more familiar with the learning on the old forms of action would not have understood the claim against a negligent bailee as being in "bailment" as opposed to being in "negligence." This can be illustrated by reference to the Law Reform Committee's Report on *Conversion and Detinue* in 1971 which lay behind the reforms in the Torts (Interference with Goods) Act 1977 Act (albeit their proposals were not implemented in full). The very distinguished committee[146] lamented the dominance of outdated distinctions based on the old forms of action and gave this illustration:

"if E, a bailee of F's goods, sells them it is conversion. If he damages them negligently, it is negligence. If they are stolen or lost by his negligence, he is liable in detinue. If he delivers them to the wrong person, it is conversion. If he delivers them to his bailor without title, it is no tort at all."[147]

This analysis is reflected in s.1 of the 1977 Act with its taxonomy of "wrongful interference" claims (conversion, trespass and negligence), with no explicit recognition of a cause of action in bailment.[148] In the wake of the 1977 Act, with its abolition of detinue,[149] it was envisaged that bailees would only be liable in either conversion or negligence to their bailors.

---

[144] *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145 at 205.

[145] For example in the obiter dicta of Lord Denning MR in *Building and Civil Engineering Holidays Scheme Management Ltd v The Post Office* [1966] 1 Q.B. 247 at 260–261, CA, describing the claim in bailment as sui generis. See also *Sutcliffe v Chief Constable of West Yorkshire* [1996] R.T.R. 86 at 90 (CA: Otton LJ).

[146] Including Lord Pearson and Lord Diplock, Sir Robert Megarry, Buckley and Orr LJJ, and distinguished academics, Professor A.G. Guest and Lord Lloyd of Hampstead.

[147] See Law Reform Committee, *Eighteenth Report (Conversion and Detinue)* (Cmnd 4774, September 1971), para.6(c).

[148] Advocates of bailment as a cause of action must be driven back to s.1(d) of the Torts (Interference with Goods) Act 1977 ("any other tort so far as it results in damage to goods or an interest in goods"), unless it is contended that an action in bailment is not a tort at all. The obvious purpose of section 1(d) is to preserve the bailor's action for damage to his reversionary interest where the bailment is for a term, and he has no right to immediate possession, as in *HSBC Rail (UK) Ltd v Network Rail Infrastructure Ltd (formerly Railtrack Plc)* [2005] EWCA Civ 1437; [2006] 1 W.L.R. 643. In those circumstances it cannot be contended that the Committee was unaware of bailment reasoning. See Law Reform Committee, *Eighteenth Report (Conversion and Detinue)* (Cmnd 4774, September 1971), para.34.

[149] Section 2(1) of the Torts (Interference with Goods) Act 1977; consequently s.2(2) renders a bailee liable in conversion for loss or destruction of goods in breach of his duty to his bailor, which would previously have been actionable only in detinue (detinue sur bailment) but not conversion at com-

**Yearworth v North Bristol NHS Trust**   The view that bailment is a separate **12-029** cause of action appears most prominently in *Yearworth v North Bristol NHS Trust*,[150] although the statements did not appear to be necessary for the decision in that case, and are difficult to reconcile with Lord Browne-Wilkinson's speech in *Henderson v Merrett Syndicates Ltd*,[151] and with a number of binding decisions of the Court of Appeal. In *Yearworth* a number of men, facing chemotherapy for cancer, accepted a service offered by their NHS Trust of safeguarding samples of their semen for their benefit in the event that the treatment they were undergoing compromised their fertility. However the hospital's mechanism for ensuring that the samples were preserved at the requisite temperature failed. The men alleged that they had suffered mental distress, and in some cases depressive illness, on learn-ing that what might have been their only chance of having children in the future had been compromised. At first instance the case was pleaded in negligence, but in the Court of Appeal the men were held entitled to damages both in negligence and pursuant to "a distinct cause of action…under the law of bailment."[152] The Court of Appeal was "unpersuaded" that the liability of a gratuitous bailee must be tor-tious, and was "strongly attracted" to the view that it was a liability sui generis.[153]

Given the late amendment to plead bailment there was no extensive citation of authority on this question. A number of authorities are difficult to reconcile with the assertion that the common law liability of a bailee for negligence is not tortious. In *Turner v Stallibrass*[154] the plaintiff recovered damages from an agister for injuries to his horse arising from the animal being placed in a field with a concealed barbed wire fence. The Court of Appeal unanimously held that the common law liability of a bailee to his bailor not to be negligent was a cause of action founded upon a tort.[155] In *Chesworth v Farrar*[156] a tenant left valuable antiques at the shop she leased from her landlord after he re-took possession of the premises. Her claim against the administrators of his estate for breach of bailment was held by Edmund-Davies J, looking at the "substance" rather than the "form",[157] to be essentially founded on the deceased's possession of her goods, and therefore an action in respect of a cause of action in tort, and statute-barred.[158] Obviously as a general principle a claimant

---

mon law. See Law Reform Committee, *Eighteenth Report (Conversion and Detinue)* (Cmnd 4774, September 1971), para.8.

[150] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37, [2010] Q.B. 1; noted Lee, J., "The Fertile Imagination of the Common Law: Yearworth v North Bristol NHS Trust" (2009) 17 *Torts Law Journal* 130; McMeel, G., "Bailment: Fertility and the Forms of Action" [2010] L.M.C.L.Q. 22.

[151] *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145 at 205, HL. See para.11-024.

[152] *Yearworth v North Bristol NHS Trust* [2010] Q.B. 1, para.[46].

[153] Prefaced by: "Absent authority to the contrary of which we are unaware" [2010] Q.B. 1 at [48(h)], citing Palmer, N., *Palmer on Bailment*, 2nd edn (1991), at pp. 44 and following.

[154] *Turner v Stallibrass* [1898] 1 Q.B. 56, CA.

[155] It was necessary to classify the nature of the cause of action for the purposes of the applicable rule as to costs under section 116 of the County Courts Act 1888.

[156] *Chesworth v Farrar* [1967] 1 Q.B. 407.

[157] *Chesworth v Farrar* [1967] 1 Q.B. 407 at 414.

[158] *Chesworth v Farrar* [1967] 1 Q.B. 407 at 416. Pursuant to s.1(3) of the Law Reform (Miscellane-ous Provisions) Act 1934, which modified the common law rule of actio personalis moritur cum persona, but imposed short limitation periods. In contrast, an alternative claim for money had and received, waiving the tort of conversion (which would now be seen as a restitutionary claim), was within the ordinary six-year period under the Limitation Act 1939. In *Re Diplock* [1948] Ch. 465 at 514 (CA: Lord Greene MR) was binding authority that such a claim was one founded on a simple contract.

should be able to "advance his claim, as he wishes, either in contract or in tort; and no doubt he will … advance the claim on the basis which is most advantageous to him."[159] However it seems claims are being re-classified as neither contractual nor tortious in order to circumvent or evade some rule which impedes or inconveniences the claimant, or to acquire some juridical advantage not available in the usual categories. The perception in *Yearworth* was that bailment damages were more analogous to supposedly generous contractual damages, given this was future loss of fertility. It is questionable whether this is the best way to develop the common law.[160] Given the need to classify causes of action for the purposes of important statutory rules on contributory negligence,[161] limitation[162] and the conflict of laws,[163] it is a backward step to insist that the delictual liability of the bailee for negligence is sui generis, and neither contractual nor tortious. It is also difficult to reconcile with previous authorities which have accommodated bailment to the usual statutory division between obligations arising from contract, and obligations arising from tort.

**12-030**    **Standard of care**    It is submitted that the modern law is that bailees, whether acting under contract, or acting gratuitously, owe a duty of care to take reasonable care of the goods such as is required by the circumstances of the particular case.[164] Whilst this simple proposition represents modern English law, the traditional approach to this question has been more elaborate, and there is recent appellate dicta suggesting a more differentiated approach to the standard of care, at least between contractual and gratuitous bailees. Accordingly it is necessary to consider these in a little further detail.

**12-031**    **Traditional differentiations of standard of care**    In the great case of *Coggs v Bernard*[165] the motivation for Holt CJ's taxonomy of bailments was to elaborate the standard of care required within each sub-category. A fourfold hierarchy of standards of liability was laid down. First, and most stringently, a regime of strict liability, subject only to the common law exceptions of Act of God and actions of the King's enemies, for common carriers and masters of vessels.[166] Secondly, li-

---

[159] *Coupland v Arabian Gulf Oil Ltd* [1983] 1 W.L.R. 1136 at 1153 (CA: Robert Goff LJ).

[160] It appears to be the premise upon which Professor Palmer advocates bailment as a sui generis category: Palmer, N., *Palmer on Bailment*, 2nd edn (1991), p.1: "[bailment's] independent character has provided a refuge for judges who wish to avoid the particular legal consequences dictated by some other cause of action with which bailment overlaps." Palmer, N., *Palmer on Bailment*, 2nd edn (1991), p.1 was to like effect, save that it referred to "form of action" rather than cause of action. See also Lee, J., "The Fertile Imagination of the Common Law: Yearworth v North Bristol NHS Trust" (2009) 17 *Torts Law Journal* 130, 142–43.

[161] Law Reform (Contributory Negligence) Act 1945; statutory proportionate defence available for claims in negligence and where there is concurrent liability in negligence and for breach of an implied contractual term to use reasonable care and skill.

[162] Limitation Act 1980 s.2 (tort), s.5 (simple contract) and s.14A (extended period for claims in "negligence").

[163] Compare Sir Richard Aikens, "Which way to Rome for cargo claims in bailment when goods are carried by sea?" [2011] L.M.C.L.Q. 482.

[164] *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694, CA; *Sutcliffe v Chief Constable of West Yorkshire* [1996] R.T.R. 86 at 90 (CA: Otton LJ) and at 94 (Nourse LJ). See further para.11-030.

[165] *Coggs v Bernard* (1703) 2 Ld Raym 909; 92 E.R. 107.

[166] Common carrier is one of the ancient "common callings" of the common law, along with common innkeepers. The ancient common law rule is that a ferryman, common innkeeper or common car-

ability for slight negligence. Thirdly, liability for ordinary negligence. Fourthly, liability for gross negligence. The theory behind this sliding scale was subsequently elaborated by Sir William Jones, who believed there were "infinite shades of *default* or *neglect*."[167] His principal thesis in *An Essay on the Law of Bailments* was that a bailee should only be obliged to exercise a "degree of care *proportioned to the nature of the bailment*."[168] Accordingly where the bailment is mutually beneficial for bailor or bailee a standard of ordinary negligence should apply, such as in cases of pledge or in Holt CJ's fifth category (for those bailees who were not common carriers). Where the bailment principally benefits the bailor—such as Holt CJ's first category of *depositum*—the bailee should only be liable for gross negligence. Conversely, where the bailee alone benefits—such as Holt CJ's second and third categories—he should be "*more than ordinarily* careful" and therefore slight negligence was the appropriate standard.[169] The ratio of *Coggs* was that in the sixth category, the gratuitous rendering of services, the standard of ordinary negligence was the apt one.

**The modern approach**    What we have characterised as the modern approach has roots going back to at least *Wilson v Brett*.[170] The plaintiff lent a valuable horse to the defendant to show to a third person with a view to a sale. The defendant took the animal on to slippery ground where it slipped and fell repeatedly, eventually breaking a knee. At trial Rolfe B simply directed the jury to consider whether the defendant, who had some knowledge of, and skill with, horses, had been negligent in going on to that ground, or had ridden the horse carelessly. The jury found for the plaintiff and awarded damages. On a motion for a new trial on the ground of misdirection, Serjeant Byles submitted that there were three classes of bailments (clearly drawing upon Sir William Jones's classification), and this was not solely for the benefit of the bailee, and that only gross negligence would suffice. The Court of Exchequer, comprising Lord Abinger CB, Parke, Alderson and Rolfe BB, held the direction to the jury was appropriate. Rolfe B memorably recounted his view at trial: "I said I could see no difference between negligence and gross negligence— that it was the same thing, with the addition of a vituperative epithet."[171]    **12-032**

**Houghland v Low Luxury Coaches**    The assimilation of bailment reasoning to modern tortious principles is no better exemplified than in *Houghland v RR Low (Luxury Coaches) Ltd*.[172] A group of pensioners returning from a trip to Jersey had the misfortune to have their coach break down, and the plaintiff suffered the additional loss of her luggage The claim was brought in detinue and negligence. The    **12-033**

---

rier "ought to keep the goods in their custody safely, and shall not be discharged if they are stolen by thieves": *Southcote v Bennet—Southcote's Case* (1601) 4 Co Rep 83b at 84a; 76 E.R. 1061. For a comparatively recent application to tramways: *Clarke v West Ham Corp* [1909] 2 K.B. 858 (CA: Farwell and Kennedy LJJ). Carriers have long sought to escape the stringency of this regime, with the standard terms of principal trade associations—such as the RHA and UKWA—usually commencing with the pronouncement that the service provider is a private carrier, and not a common carrier.

[167] Jones, W., *An Essay on the Law of Bailments* (1781), p.7.
[168] Jones, W., *An Essay on the Law of Bailments* (1781), p.5.
[169] Jones, W., *An Essay on the Law of Bailments* (1781), p.10.
[170] *Wilson v Brett* (1843) 11 M. & W. 113; 152 E.R. 737.
[171] *Wilson v Brett* (1843) 11 M. & W. 113 at 115–116.
[172] *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694, CA.

judge held the defendant coach company was a gratuitous bailee[173] and awarded damages on the basis that the bags which went missing either during a three-hour period whilst the coach was unattended in the darkness, or the subsequent transfer of bags to a relief coach. On appeal it was contended the appropriate standard was gross negligence. Ormerod LJ echoed Rolfe B: "I am bound to say that I am not sure what is meant by the term 'gross negligence'".[174] The standard was rather that demanded by the particular circumstances of the case.

**12-034**   **Authority suggesting lower standard of care of gratuitous bailee**   Two appellate cases contain dicta continuing to differentiate the standard of care of a gratuitous bailee. First, *Port Swettenham Authority v TW Wu & Co (M) Sdn Bhd*[175] Lord Salmon in the Privy Council referred to a statutory test of the care a man of ordinary prudence would, under similar circumstances, take of his own goods, and stated: "This standard, although high, may be a less exacting standard than that which the common law requires of a bailee for reward. But the line between the two standards is a very fine line, difficult to discern and impossible to define."[176] It must be pointed out that the Privy Council was considering the rule in the Malaysian Contracts Ordinance.[177] Furthermore, the statement is tentative and Lord Salmon's scepticism about the ability to differentiate these standards is reminiscent of both Rolfe B and Ormerod LJ Secondly, and more emphatically in *The Winson*,[178] where salvors off-loaded cargo of wheat from a stricken vessel, Lord Diplock observed that once the salvage operation ceased the contractual bailment between salvors and cargo-owners became a gratuitous bailment. Therefore:

> "so long as that relationship of bailor and bailee continued to subsist the salvors, under the ordinary principles of the law of bailment too well known and too well-established to call for any citation of authority, owed a duty of care to the cargo owner to take such measures to preserve the salved wheat from deterioration by exposure to the elements as a man of ordinary prudence would take for the preservation of his own property."[179]

This was obiter dicta as the decision in the case related to the salvors' right to be reimbursed for the services rendered.[180] Subsequently *Houghland* has been followed twice in the Court of Appeal. First, in *British Road Services Ltd v Arthur V Crutchley & Co Ltd*.[181] Secondly, in *Sutcliffe v Chief Constable of West Yorkshire*,[182] where Otton LJ followed *British Road Services* and stated: "no distinction is to be

---

[173]   Omerod LJ indicated that he considered that finding open to challenge, but no cross-notice was served by the respondent: *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694 at 697.

[174]   *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694 at 697; citing *Gibbon v McMullen* (1869) LR 2 PC 317 at 336 (Lord Chelmsford, in turn citing Rolfe B in *Wilson v Brett* (1843) 11 M. & W. 113; 152 E.R. 737).

[175]   *Port Swettenham Authority v TW Wu & Co (M) Sdn Bhd* [1979] A.C. 580, PC.

[176]   *Port Swettenham Authority v TW Wu & Co (M) Sdn Bhd* [1979] A.C. 580 at 589.

[177]   Sections 104 and 105 of the Contracts (Malay States) Ordinance of 1950 drawing no distinction between gratuitous bailments and bailments for reward.

[178]   *China Pacific SA v Food Corporation of India, The Winson* [1982] A.C. 939, HL.

[179]   *China Pacific SA v Food Corporation of India, The Winson* [1982] A.C. 939 at 860.

[180]   See Mitchell, C. et al, Goff & Jones: *The Law of Unjust Enrichment*, 9th edn (2016), paras [18–51] to [18–60].

[181]   *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1968] 1 All E.R. 811 at 817 (CA: Lord Pearson).

[182]   *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1996] R.T.R. 86, CA.

BAILMENT

drawn between a gratuitous bailment and one for reward."[183] Most recently, the reasoning of Lord Diplock in *The Winson* was quoted and followed by the Supreme Court in *The Kos*,[184] albeit not directly on the issue of the standard of care. Accordingly there must be some uncertainty as to whether the broader test preferred by the Court of Appeal in *Houghland*, *British Road Services* and *Sutcliffe*, or an approach which continues to differentiate between contractual bailments and gratuitous bailments as favoured in the UK's highest courts in *The Winson* and *The Kos* will prevail. As a matter of precedent the Court of Appeal is bound to follow its own statements which appear to form the rationes of its three cases. It is submitted as a matter of principle the broader test is to be preferred. The fact that services were rendered gratuitously can be a factor weighed by a court in deciding what care was reasonable in the particular circumstances of the case. The value of the goods is also a relevant factor. Most recently, Lord Sumption on behalf of a unanimous Supreme Court has stated, in the context of a bailee for reward: "a bailee of goods is not an insurer. His duty is limited to taking reasonable care of the goods.[185]"

**Bailee possessing special skill**   A bailee with a special skill or who holds himself out as having some special skill is bound to use the reasonable care to be expected of someone with that skill.[186] This rule was recently re-affirmed in the context of gratuitous bailments in *Yearworth v North Bristol NHS Trust*,[187] where Lord Judge CJ stated: "If a gratuitous bailee holds himself out to the bailor as able to deploy some special skill in relation to the chattel, his duty is to take such care of it as is reasonably to be expected of a person with such skill."[188]    **12-035**

**Reversal of the burden of proof**   A forensically significant feature of the characterisation of a relationship as one of bailment is that the burden of proof on the issue of breach of duty rests upon the bailee, and not upon the bailor asserting breach of duty.[189] In *Coldman v Hill*[190] a farmer took in cattle under a contract of agistment and a number of them were stolen without his fault, and he was held to have discharged the onus of proof with regard to the initial theft. However the farmer failed to inform either the owner or the police of the theft for three weeks after the theft. The Court of Appeal held that the farmer was subject to a second shift in the onus of proof to prove that he had taken reasonable steps to recover the cat-    **12-036**

---

[183] *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1996] R.T.R. 86 at 90. See also at 94 (Nourse LJ citing *Houghland* as the basis of the test).

[184] *ENE Kos 1 Ltd v Petroleo Brasileiro SA (No.2), The Kos* [2012] UKHL 17; [2012] 2 A.C. 164 at [25]–[28] (Lord Sumption).

[185] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8].

[186] *Wilson v Brett* (1843) 11 M. & W. 113 at 115; 152 E.R. 737 (Parke B).

[187] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37; [2010] Q.B. 1.

[188] *Yearworth v North Bristol NHS Trust* [2010] Q.B. 1 at [48(g)], citing *Wilson v Brett* (1843) 11 M. & W. 113; 152 E.R. 737.

[189] *Joseph Travers & Sons v Cooper* [1915] 1 K.B. 73 at 87–88 (CA: Buckley LJ, quoting *Morison, Pollexfen & Blair v Walton* (Unreported, HL 10 May 1909); *Coldman v Hill* [1919] 1 K.B. 443, CA; *Houghland v RR Low (Luxury Coaches) Ltd* [1962] 1 Q.B. 694 at 699 (Ormerod LJ) and at 700 (Willmer LJ); *Building and Civil Engineering Holidays Scheme Management Ltd v The Post Office* [1966] 1 Q.B. 247 at 261, (CA: Lord Denning MR); *Port Swettenham Authority v TW Wu & Co (M) Sdn Bhd* [1979] A.C. 580, PC.

[190] *Coldman v Hill* [1919] 1 K.B. 443, CA; followed in *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1968] 1 All E.R. 811 at 813 (CA: Lord Pearson).

tle, which he had not discharged. In *British Road Services Ltd v Arthur V Crutchley & Co Ltd*[191] Sachs LJ explained the reason for the reversal of the burden of proof:

> "The common law has always been vigilant in the interests of bailors whose goods are not returned to them by the bailee for a number of reasons: in so far as that vigilance relates to the onus of proof, one of the reasons stems from the fact that normally it is only the bailee who knows what care has been taken of the goods, and another from the number of temptations to which a bailee may succumb."[192]

In *Morris v CW Martin & Sons Ltd*[193] Lord Denning MR, discussing bailment for reward, stated:

> "If the goods are lost or damaged, whilst they are in his possession, he is liable unless he can show—and the burden is on him to show—that the loss or damage occurred without any neglect or default or misconduct or himself or of any of the servants to whom he delegated his duty. If he shows that he took all due care to employ trustworthy servants, and that he and his servants exercised all diligence, and yet the goods were stolen, he will be excused: but not otherwise."[194]

Therefore theft by a third party to the bailment despite the exercise of all reasonable diligence will not be a breach of duty by the bailee. Similarly, if the bailee hires a competent builder to construct the warehouse or other building where the goods are to be stored, and there is no reason to suspect the building is unsound, he is not responsible for loss caused by defective building works.[195] The bailee is not an insurer of the goods.[196] In contrast, where employees are negligent in not taking reasonable precautions, or if they collude with the thieves, the bailee will be in breach of duty.[197]

**12-037**    In *Volcafe Ltd v Cia Sud Americana de Vapores SA*[198] Lord Sumption restated the evidential burden and the pragmatic justification which emerged from it:

> "although the obligation of the bailee is thus a qualified obligation to take reasonable care, at common law he bears the legal burden of proving the absence of negligence. He need not show exactly how the injury occurred, but he must show either that he took reasonable care of the goods or that any want of reasonable care did not cause the loss or damage sustained … First, it is clear that the burden of proof with which these decisions were concerned was a legal burden. It is quite different from the evidential burden which may arise where the facts give rise to a rebuttable inference of negligence or under the principle res ipsa loquitur. Secondly, while the rule about the burden of proof in English law developed long before any pragmatic justification was advanced for it, its continued importance in the law of bailment has consistently been supported on the ground that

---

[191] *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1968] 1 All E.R. 811, CA.
[192] *British Road Services Ltd v Arthur V Crutchley & Co Ltd* [1968] 1 All E.R. 811 at 822. See also *Metaalhandel JA Magnus BV v Ardfields Transport Ltd* [1988] 1 Lloyd's Rep. 197; *James Buchanan & Co Ltd v Hay's Transport Services Ltd* [1972] 2 Lloyd's Rep. 535.
[193] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716.
[194] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716.
[195] *Searle v Laverick* (1874) LR 9 Q.B. 122 (Exch Ch).
[196] *Coggs v Bernard* (1703) 2 Ld Raym 909 at 913; 92 E.R. 107; *Searle v Laverick* (1874) LR 9 Q.B. 122 at 126 (Blackburn J: livery stable keeper not an insurer; *aliter* common carriers and innkeepers); *Coldman v Hill* [1919] 1 K.B. 443 at 448 (Bankes LJ).
[197] *Southcote v Bennet—Southcote's Case* (1601) 4 Co Rep 83b, 76 E.R. 1061; *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 726 (CA: Lord Denning MR); *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [8] (Lord Sumption).
[198] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358.

BAILMENT

because the bailee is in possession of the goods it may be difficult or impossible for anyone else to account for the loss or damage sustained by them."[199]

**Sub-bailment: duty of care of sub-bailee**    Originally a sub-bailee owed no direct duty to the head bailor at common law. The bailor's right lay against the bailee, who could in turn claim against the sub-bailee.[200] In the modern law it is clear that a sub-bailee owes a direct duty of care to the head bailor.[201] The seminal statement would appear to be in Pollock and Wright: "If the bailee of a thing sub-bails it by authority … and there is no direct privity of contract between the third person and the owner … it would seem that both the owner and the first bailee have concurrently the rights of a bailor against the third person according to the nature of the sub-bailment."[202]    **12-038**

**Sub-bailment on terms**    Lord Denning's unsuccessful effort to utilise "bailment on terms" reasoning in *Midland Silicones Ltd v Scruttons Ltd*[203] did not deter him from utilising "sub-bailment on terms" as an explanation of why, prima facie, a clause in a sub-bailee's contract with an intermediate bailee may bind the head bailor where he expressly or impliedly consents to the sub-contracting, in the subsequent case of *Morris v CW Martin & Sons Ltd*.[204] Critically this reasoning was adopted by the Privy Council in *The Pioneer Container*.[205] There is nothing peculiar to the context of personal property, possession or bailment about this reasoning, which forms an exception to the doctrine of privity of contract. So in *Sandeman Coprimar SA v Transitos Transportes Integrales SL* Lord Phillips MR considered that the same outcome could be achieved through contractual reasoning.[206]    **12-039**

## Bailment and the law of property

**Interest by way of possession**    It follows ineluctably from bailment's roots in the broader concept of possession that each bailee has a proprietary interest, even if only a transient or fragile one, in the goods bailed by way of possession. In *Coggs*    **12-040**

---

[199] *Volcafe Ltd v Compania Sud Americana de Vapores SA* [2018] UKSC 61; [2019] A.C. 358 at [9]–[10].

[200] Holmes, O.W., *The Common Law* (1881), pp.164–180; *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 728 (CA: Lord Denning MR).

[201] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 729 (Lord Denning MR), 731–732 (Diplock LJ) and p.738 (Salmon LJ); *Gilchrist Watt & Sanderson Pty Ltd v York Products Pty Ltd* [1970] 1 W.L.R. 1262 at 1267, 1270, (PC: Lord Pearson); *The Pioneer Container* [1994] 2 A.C. 324 (PC: Lord Goff). See also *East West Corp v DKBS AF 1912 A/S* [2003] EWCA Civ 83; [2003] Q.B. 1509 at [30]; *Sandeman Coprimar SA v Transitos Transportes Integrales SL* [2003] EWCA Civ 113; [2003] Q.B. 1270; *Matrix Europe Ltd (in liquidation) v Uniserve Holdings Ltd* [2009] EWHC 919 (Comm).

[202] Pollock, F. and Wright, R.S., *An Essay on Possession in the Common Law* (1888), at p.169; quoted in *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716 at 728 (CA: Lord Denning MR).

[203] *Midland Silicones Ltd v Scruttons Ltd* [1962] A.C. 446, HL.

[204] *Morris v CW Martin & Sons Ltd* [1966] 1 Q.B. 716.

[205] *The Pioneer Container* [1994] 2 A.C. 324, PC; noted Bell, A., "Sub-bailment on Terms: a New Landmark" [1995] L.M.C.L.Q. 177. The Privy Council rejected the view that a bailor's consent was not required to a sub-bailment. See also *The Makhutai* [1996] A.C. 650, PC; *East West Corp v DKBS AF* 1912 A/S [2003] EWCA Civ 83; [2003] Q.B. 1509 at [25] and following; *PST Energy 7 Shipping LLC v O W Bunker Malta Ltd* [2016] UKSC 23; [2016] A.C. 1034 (CA: Moore-Bick LJ).

[206] *Sandeman Coprimar SA v Transitos Transportes Integrales SL* [2003] EWCA Civ 113; [2003] Q.B. 1270 at [63] (Lord Phillips MR). See Bridge, M., *Personal Property Law*, 4th edn (2015), pp.65–68.

BAILMENT

*v Bernard*[207] Sir John Holt CJ's focus was on the obligations dimension of bailment, and he only adverted to the proprietary character of a pledgee's interest, which he described as a "special property". In his seminal discussion Sir William Jones considered the special property of the pledgee to be only part of a wider proposition that "every bailee has a temporary *qualified* property."[208] In respect of locatio or hire, Jones was emphatic that the "hirer gains a transient qualified property in the *thing* hired."[209] This was confirmed by Earl Jowitt in *United States of America v Dollfus Mieg et Cie SA* where it was stated: "Under English law, where there is a simple contract of bailment at will the possession of the goods bailed passes to the bailee."[210] Whilst some doubt has been expressed about the proprietary character of a lease or hire of goods, the better view is that all bailees with a right to possession have a right of a proprietary character, which carries with it the right to sue third parties who wrongfully interfere with the goods. This is discussed further in Ch.13.[211]

**12-041    The interest of a pledgor**    The pledgor has the general property in the goods. A pledgor of goods retains ownership of the items pledged and has the right to sell the goods to a third party who takes them subject to the special property of the pledgee.[212] This was laid down in 1844 in *Franklin v Neate*[213] in a judgment delivered by Rolfe B:

> "With so little, then, of direct authority, we must act on the general principle, that a pawnor, like every other bailor, retains his property in the goods pawned, subject only to the qualified property transferred to the pawnee; that as an incident to such property, he has a right of sale, and that after the sale the purchaser has the same interest in the chattel which the pawnor had."[214]

The pledgor had pawned a chronometer to the defendant, authorising the latter to sell it if it was not redeemed with a year. Subsequently the pledgor sold his interest in the goods to the plaintiff subject to the defendant's rights as pledgee. Subsequently the plaintiff buyer tendered the sum due to the defendant after 12 months had expired, but the defendant refused to deliver up the item. It was held that plaintiff buyer was entitled to succeed in an action of trover against the defendant pledgee.

**12-042    The interest of a pledgee**    A pledgee has a qualified or special property in the goods pawned.[215] In *Rich v Aldred*,[216] where a claim for detinue was brought in respect of a portrait of Oliver Cromwell, Lord Holt CJ opined at trial:

---

[207] *Coggs v Bernard* (1703) 2 Ld Raym 909; 92 E.R. 107, K.B.
[208] Jones, W., *An Essay on the Law of Bailments* (1781), p.80; also he stated that a "general bailee has unquestionably a limited property in the goods intrusted to this care."
[209] Jones, W., *An Essay on the Law of Bailments* (1781), at p.85.
[210] *United States of America v Dollfus Mieg et Cie SA* [1952] A.C. 582 at 605 (HL: Earl Jowitt).
[211] See para.14-011.
[212] See para 16-017.
[213] *Franklin v Neate* (1844) 13 M. & W. 480; 153 E.R. 200.
[214] *Franklin v Neate* (1844) 13 M. & W. 480 at 486.
[215] *Franklin v Neate* (1844) 13 M. & W. 480; 153 E.R. 200.
[216] *Rich v Aldred* (1705) 6 Mod 216; 87 E.R. 968.

BAILMENT

"if A. bail goods to C. and after give his whole right in them to B. B. cannot maintain *detinue* for them against C. because the *special property* that C. acquires by *the bailment*, is not thereby transferred to B."[217]

This led Rolfe B to contend: "That in ordinary cases of bailment, not by way of pawn, the bailor may sell, is a proposition not admitting of doubt."[218]

**The interest of a hirer of goods**    Whilst the proposition has not been universally accepted,[219] the better view if that the interest of a hirer of goods is proprietary in character.[220] The proprietary character of the possessory entitlement of a lessee under a finance lease was confirmed by the courts in *On-Demand Information Plc v Michael Gerson (Finance) Plc*.[221] The interest of a lessor as a bailor for a term is accordingly a reversionary interest.[222] This matter is further discussed in Ch.14.[223]    **12-043**

---

[217] Emphasis in the original.

[218] *Franklin v Neate* (1844) 13 M. & W. 480 at 486; 153 E.R. 200.

[219] Contrast Swadling, W., "The Proprietary Effect of a Hire of Goods" in Palmer, N. and McKendrick, E., (eds), *Interests in Goods*, 2nd edn (1998), 491; Harris, J.W., *Property and Justice* (1996), at p.59.

[220] Bl Comm II 454 ("qualified property"); Jones, W., *An Essay on the Law of Bailments* (1781), at p.85 ("transient qualified property"); Lawson, F. and Rudden, B., *The Law of Property*, 3rd edn (2002), pp.81, 115–117; J Hill, "The Proprietary Character of Possession" in Cooke, E., (ed), *Modern Studies in Property Law—Volume 1* (2001), 23, pp.35–40; Furey, F., "Goods Leasing and Insolvency" in Palmer, N. and McKendrick, E., (eds), *Interests in Goods*, 2nd edn (1998), 787, p.788; Bridge, M., *Personal Property Law*, 4th edn (2015), pp.41–43.

[221] *On-Demand Information Plc v Michael Gerson (Finance) Plc* [2001] 1 W.L.R. 155, CA; [2002] UKHL 13; [2003] 1 A.C. 368, HL. See also *Barton Thompson and Co Ltd v Stapling Machines Co* [1966] Ch. 499.

[222] Tettenborn, A., "Reversionary Damage to Chattels" [1994] C.L.J. 326; and Green, S., "Understanding the Wrongful Interference Actions" [2010] Conv 15, at pp.21–25. See paras 13-012 and 32-061.

[223] See para.14-012.