**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**REPLY IN FURTHER SUPPORT OF THE OBJECTION OF THE FTX RECOVERY
TRUST TO THE AMENDED PROOF OF CLAIM FILED BY THE JOINT
<u>LIQUIDATORS OF THREE ARROWS CAPITAL LTD.</u>**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of post-effective date debtor entities in these chapter 11 cases, a complete list of the post-effective date debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the FTX Recovery Trust's claims and noticing agent at https://cases.ra.kroll.com/FTX.

## Table of Contents

PRELIMINARY STATEMENT ..................................................................................... 1

LEGAL STANDARD.................................................................................................... 8

SUMMARY OF THE CLAIMS AT ISSUE ................................................................. 9

KEY FACTUAL AND PROCEDURAL BACKGROUND ....................................... 13

     A.     Discovery ..........................................................................................14

     B.     Uncontroverted Factual Evidence.....................................................19

ARGUMENT ............................................................................................................... 24

I.     The Joint Liquidators Have Not Proven the Preference Claim............................24

     A.     Relevant Legal Framework for the Preference Claim under BVI Law. ................26

           1.     Elements That the Joint Liquidators Must Prove....................... 26

           2.     Defenses and Discretion Regarding Relief ................................ 32

     B.     FTX Was Not a Creditor of 3AC...........................................................33

     C.     Even if FTX Were a Creditor, It Was Not Put Into a Better Position as the Result of the Challenged Trades. ........................................................39

           1.     The Challenged Trades Did Not Diminish the Account Balance, Which Was the Most That 3AC Could Have Distributed to Its Creditors in a Hypothetical Liquidation. .................................... 40

           2.     3AC Had No Proprietary Interest in Digital Assets, Which Forecloses Any Argument That 3AC Could Have Distributed the Digital Assets at Issue. .............................................................. 48

                     a.     This Court Already Determined That Customers Do Not Have a Proprietary Interest in Digital Assets............. 48

                     b.     3AC Was Not the Beneficiary of a Trust Over Digital Assets. ................................................................. 54

                          i.     The Terms of Service Do Not Demonstrate the Required Intention to Create a Trust............... 55

                          ii.     FTX's Conduct Is Irrelevant to the Intent Inquiry, and Does Not Show an Intent to Create a Trust. ...................................................... 61

|  |  | iii. | The Joint Liquidators Cannot Prove Certainty of Subject. | 65 |

|  | c. | There Was No Bailment Over Digital Assets. | 68 |

|  | d. | The Joint Liquidators' New Chose in Action Theory Is Circular and Does Not Demonstrate that 3AC Could Have Distributed Digital Assets. | 71 |

3. The Joint Liquidators' Theory that FTX Received a Benefit Lacks Evidentiary Support. ........................ 73

4. FTX's Right of Set-Off Precludes a Preference Claim Even Under the Joint Liquidators' Own Theory. ........................ 78

5. Even If the Challenged Trades Putatively Constitute a Preference, FTX Did Not Receive More than It Would Have in a Hypothetical Liquidation Because It Held a Valid and Perfected Security Interest Over the Digital Assets and Therefore Was Not Unfairly Preferred. ........................ 84

     a. The Opinion Offered by Mr. Webster Is Not Credible and Should Be Given No Weight. ........................ 86

         i. Mr. Webster Lacks Expertise Relevant to Secured Transactions and Security Interests Under Antiguan Law. ........................ 87

         ii. Mr. Webster's Deposition Testimony Demonstrates a Lack of Understanding of Core Principles of Antiguan Law Related to Secured Transactions and Security Interests. ........................ 87

     b. The Line of Credit Agreement Grants FTX a Security Interest Over All Assets Associated with the 3AC Accounts. ........................ 89

     c. FTX's Pledge and Lien Over the Digital Assets Were Perfected Through Exclusive Control. ........................ 91

     d. The Line of Credit Agreement Also Granted FTX a Charge Over the Digital Assets. ........................ 93

     e. FTX's Security Interest Would Extend to Digital Assets Under the Joint Liquidators' "Percentage of an Undivided Share" Theory. ........................ 96

f.      The Line of Credit Agreement Created a Valid
Security over Assets Credited to the 3AC Accounts. ....... 97

D.      The FTX Recovery Trust Has a Complete Defense to the Preference
Claim Because the Challenged Trades Occurred in the Ordinary Course
under BVI Law. .......................................................................................98

E.      The Joint Liquidators' Preference Claim Would Create an Inequitable
Result and Should Be Disallowed Under U.S. Equitable Principles. .................104

II.    The Alternative Breach Claims Lack Any Coherent Basis. ............................................109

A.      The Breach Claims Have Been Released and Enjoined Under the Global
Settlement. .......................................................................................110

B.      The Joint Liquidators Fail to Identify Any Breach of Duty or Contract. ...........114

C.      Principles of English Law Do Not Support the Damages Theory
Articulated by the Joint Liquidators. ...................................................116

D.      The Exclusion Clause in the Terms of Service Precludes the Breach
Claims. ...........................................................................................119

III.   The Joint Liquidators' Alternative Unjust Enrichment Theory Is Not Supported by
Any Evidence, Law, or Established Theory of Recovery................................................121

A.      The Unjust Enrichment Claim Has Been Released and Enjoined Under the
Global Settlement...............................................................................122

B.      The Terms of Service Govern the FTX-3AC Relationship and Preclude the
Unjust Enrichment Claim. ..................................................................122

C.      The Joint Liquidators Have Not Proven the Elements of the Unjust
Enrichment Claim. ............................................................................123

D.      Remedies, If Any, Must Be Determined by Reference to the Value of the
Enrichment. ....................................................................................125

RESERVATION OF RIGHTS ..................................................................... 126

CONCLUSION....................................................................................... 126

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allegheny Int'l, Inc.*,
   954 F.2d 167 (3d Cir. 1992)................................................................8

*In re Application of Adan* v. *Avans*,
   2007 WL 1850910 (D.N.J. June 25, 2007).............................................86

*Abdille* v. *Ashcroft*,
   242 F.3d 477(3d Cir 2001)..................................................................8

*Armitage* v. *Nurse*,
   [1998] Ch 241 ...............................................................................120

*Arnold* v. *Britton*,
   [2015] UKSC 36.............................................................................59

*Re Avanti Communications Ltd. (in administration)*,
   [2023] EWHC 940 (Ch)....................................................................93

*Beiger* v. *IRS*,
   496 U.S. 53 (1990)..........................................................................30

*Benedetti* v. *Sawiris*,
   [2013] UKSC 50......................................................................124, 125

*Bitumenes Orinoco, S.A.* v. *New Brunswick Power Holding Corp.*,
   2007 WL 485617 (S.D.N.Y. Feb. 13, 2007)......................................86, 87

*Bostrom* v. *Seguros Tepeyac, S. A.*,
   225 F. Supp. 222 (N.D. Tex. 1963) ......................................................89

*British Westinghouse Electric and Manufacturing Co Ltd* v. *Underground*
   *Electric Railways Co of London Ltd*,
   [1912] AC 673 (HL) ......................................................................118

*Byers* v. *Chen.*,
   [2021] UKPC 4 ..............................................................................78

*Callaway Golf Co.* v. *Dunlop Slazenger Grp. Americas, Inc.*,
   2004 WL 1534786 (D. Del. May 21, 2004).........................................100

*Cant* v. *Mad Brothers Earthmoving Pty Ltd (in liq)*,
   [2020] VSCA 198 ...........................................................................31

*Charpentier* v. *Godsil*,
    937 F.2d 859 (3d Cir. 1991)....................................................................................85

*Countrywide Banking Corp Limited* v. *Dean*,
    [1998] AC 338 .....................................................................................................104

*Charpentier* v. *Godsil*,
    937 F.2d 859 (3d Cir. 1991)....................................................................................85

*Credit Suisse Virtuoso SICAV-SIF* v. *SoftBank Group Corp*,
    [2025] EWHC 2631 (Ch).........................................................................................32

*Dargamo Holdings* v. *Avonwick Holdings*,
    [2021] EWCA Civ 1149.........................................................................................125

*Darty Holdings SAS* v. *Carton-Kelly*,
    [2023] EWCA Civ 1135 ....................................................................................30, 32

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
    706 F.3d 217 (3d Cir. 2013)..................................................................................111

*Donaldson* v. *Bernstein*,
    104 F.3d 547 (3d Cir.1997)..............................................................................51, 52

*Re Emanuel (No. 14) Pty Ltd (in Liquidation)*,
    (1997) 15 ACLC 1099 ............................................................................................31

*The Epaphus*,
    [1987] 2 Lloyd's Rep 213 .......................................................................................61

*Matter of Ford*,
    967 F.2d 1047 (5th Cir. 1992) .............................................................................105

*Re Gatecoin Ltd (in liq)*,
    [2023] HKCFI 914............................................................................................63, 64

*Gilstrap* v. *Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006)......................................................................9

*G & M Aldridge Pty Ltd* v. *Walsh*,
    [2002] BPIR 482 .....................................................................................................31

*Hadley* v. *Baxendale*,
    (1854) 9 Ex 341 ...........................................................................................118, 120

*In re Integrated Health Servs.*, *Inc.*,
    344 B.R. 262 (Bankr. D. Del. 2006) .....................................................................113

*Invest Bank PSC* v. *El-Husseiny*,
[2025] 2 WLR 320 ...........................................................................29, 31,

*Johnson* v. *Agnew*,
[1980] AC 367 ...........................................................................................117

*In re Jorczak*,
314 B.R. 474 (Bankr. D. Conn. 2004) ........................................................8

*Re Lehman Brothers International (Europe) (In Administration)*,
[2012] EWHC 2997 ..............................................................................93, 94

*LMN* v. *Bitflyer Holdings Inc*,
[2022] EWHC 2954 (Comm)..................................................................63, 64

*Lowick Rose LLP (In Liquidation)* v. *Swynson Ltd*,
[2017] UKSC 32 ........................................................................................125

*Lutz* v. *Boas*,
40 Del. Ch. 130 (Del. Chan. 1961) .............................................................9

*In re Mariner Post-Acute Network, Inc.*,
2005 WL 1662226 (D. Del. July 8, 2005) ..................................................8

*MacDonald* v. *Costello*,
[2011] EWCA Civ 930 ..............................................................................122

*Marks* v. *Alfa Grp.*,
615 F. Supp. 2d 375 (E.D. Pa. 2009) .......................................................86

*In re Murgillo*,
176 B.R. 524 (9th Cir. BAP 1994)..............................................................9

*Nabulsi* v. *Nahyan*,
2009 WL 1658017 (S.D. Tex. June 12, 2009) ..........................................86

*National Provincial & Union Bank v. Charnley*,
[1924] 1 KB 431 .........................................................................................93

*In re Nortel Networks, Inc.*,
469 B.R. 478 (Bankr. D. Del. 2012) .....................................................9, 66

*In re NorthEast Gas Generation, LLC*,
639 B.R. 914 (Bankr. D. Del. 2022) ........................................................111

*Pan Ocean Shipping Co Ltd* v. *Creditcorp Ltd ("The Trident Beauty")*,
[1994] 1 WLR 161 ....................................................................................122

*Paul* v. *Constance*,
[1977] 1 WLR 527 ...................................................................................62

*Paul* v. *Deloitte & Touche, LLP*,
974 A.2d 140 (Del. 2009) ...........................................................111, 112

*Pearson, Lomas* v. *Lehman Brothers Finance SA*,
[2010] EWHC 2914 (Ch)............................................................................54

*Pepper* v. *Litton*,
308 U.S. 295 (1939)...........................................................................9, 105

*Quoine Pte Ltd* v. *B2C2 Ltd*,
[2020] SGCA(I) 02 ........................................................................55, 62, 63

*Rubin* v. *Eurofinance SA*,
[2012] UKSC 46 ................................................................................30, 32

*Ruscoe v. Cryptopia*,
[2020] NZHC 728 .......................................................................62, 63, 64

*Samsoondar* v. *Capital Insurance Co Ltd* ,
[2020] UKPC 33 ....................................................................................125

*Sec. Inv. Prot. Corp* v. *Bernard L. Madoff Inv. Sec. LLC*,
650 B.R. 5 (Bankr. S.D.N.Y. 2023)..........................................................8, 9

*Re Sigma Finance*,
[2009] UKSC 2 ...........................................................................56, 59, 65

*In re Shelter Enters., Inc.*,
98 B.R. 224 (Bankr. W.D. PA 1989) .......................................................105

*In re Shenango Grp. Inc.*,
501 F.3d 338 (3d Cir. 2007)....................................................................111

*Re Spectrum Plus Ltd (in Liquidation)*,
[2005] UKHL 41 .......................................................................................88

*Transfield Shipping Inc* v. *Mercator Shipping Inc (The Achilleas)*,
[2008] UKHL 48........................................................................................118

*In re Treco*,
240 F.3d 148 (2d Cir. 2001).............................................................106, 108

*Triple Point Technology Inc* v. *PTT Public Co Ltd*,
[2021] UKSC 29 ........................................................................................61

*Vertiv, Inc.* v. *Wayne Burt PTE, Ltd.*,
    92 F.4th 169 (3d Cir. 2024) ...................................................................105, 108

*Weinberg* v. *Waystar, Inc.*,
    294 A.3d 1039 (Del. 2023) ...................................................................112, 114

*Wilkinson* v. *North*,
    [2018] 4 WLR 41 ................................................................................54, 56, 62

*Wood* v. *Capita Insurance Services Limited*,
    [2017] UKSC 24 ......................................................................................56, 59

*In the Matter of Yield App Limited (In Liquidation)*,
    [2025] CC 18/2025 ........................................................................................66

**Statutes**

11 U.S.C. § 365................................................................................................126

11 U.S.C. § 550(a) .............................................................................................30

11 U.S.C. § 550(d) .............................................................................................30

11 U.S.C. § 541...................................................................................................53

11 U.S.C. § 1522(a) .........................................................................................105

BVI Business Companies Act §§ 161, 163, 166................................................96

BVI Insolvency Act § 185(1).............................................................................28

BVI Insolvency Act § 207 .................................................................................28

BVI Insolvency Act § 234(3)(a) ........................................................................28

BVI Insolvency Act § 244 ..........................................................................26, 124

BVI Insolvency Act § 245 ...........................................................................32, 98

BVI Insolvency Act § 249 .................................................................................32

BVI Insolvency Act § 251 .................................................................................28

U.K. Insolvency Act 1986 ...........................................................................31, 32

**Rules**

Fed. R. Civ. P. 30(b)(6).....................................................................................15

Fed. R. Civ. P. 44.1 ..................................................................................................86

**Other Authorities**

Charles Mitchell et al., *Underhill and Hayton: Law Relating to Trusts and Trustees* (20th ed. 2022) ...........................................................................................55

Law Commission of England and Wales, "Digital Assets: Final Report" ....................................62

Louise Gullifer, Henry Chong & Hin Liu, *Client-Intermediary Relations in the Crypto-Asset World* ..............................................................................................70

Michael Bridge et al., *The Law of Personal Property* (3d ed. 2021)...........................................69

Restatement (Second) of Conflict of Laws § 131 .........................................................9

Roy Goode, *Goode on Principles of Corporate Insolvency Law* (5th ed. 2018) .........................31

Roy Goode & Louise Gullifer, *Goode and Gullifer on Legal Problems of Credit and Security* (7th ed. 2022).....................................................................................88

UNIDROIT Principles on Digital Assets and Private Law .........................................................92

The FTX Recovery Trust hereby submits this reply (the "Reply") in further support of the *Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 30932] (the "Objection"), and in response to *The Joint Liquidators of Three Arrows Capital Ltd.'s Response to the FTX Recovery Trust's Objection to the Amended Proof of Claim* [D.I. 33900] (the "Response").[2]  In support of the Reply, the FTX Recovery Trust submits contemporaneously herewith (i) the Rebuttal Declaration of Stephen Nicholas Atherton K.C. (the "Atherton Rebuttal Declaration"), (ii) the Rebuttal Declaration of the Rt. Hon. Lord Neuberger of Abbotsbury (the "Neuberger Rebuttal Declaration"), (iii) the Rebuttal Declaration of Stephen Houseman K.C. (the "Houseman Declaration"); and (iv) the Reply Declaration of Benjamin S. Beller (the "Beller Reply Declaration").

## PRELIMINARY STATEMENT

1.      As explained in the FTX Recovery Trust's Objection, the Joint Liquidators do not have *any* valid claims against FTX.[3]  The Response leaves no doubt that the Joint Liquidators seek a massive windfall from the FTX Recovery Trust to the detriment of the FTX Recovery Trust's true creditors.  The Joint Liquidators are unabashed in pursuing a recovery from the FTX Recovery Trust for assets that 3AC never had and was never entitled to receive from the Exchange (or any other party).  The Joint Liquidators fail to articulate any valid claim against the FTX Recovery Trust, let alone prove one through admissible evidence.

2.      Having abandoned most of their theories posited in the Proof of Claim, the Joint Liquidators now advance only three claims:  a preference claim under Section 245 of the BVI

---

[2]    The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established on January 3, 2025, the effective date of the Debtors' confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26404-1] (the "Plan").

[3]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Objection.

Insolvency Act (the "Preference Claim"), and back-up claims for breach of contract or trust (the "Breach Claims") and unjust enrichment (the "Unjust Enrichment Claim") under English law. Each of these purported claims depends entirely on counterfactual assumptions untethered to the evidentiary record or the facts relied upon by the Court in overseeing these Chapter 11 cases for more than three years.  They also require this Court to throw out the bedrock principle of equal treatment of similarly situated creditors that is central to the Bankruptcy Code and the confirmed Plan.  Each of the Joint Liquidators' claims fails for many independent reasons.  But, most fundamentally, to sustain the Joint Liquidators' claims would require the Court to apply foreign law in incorrect and unprecedented ways while disregarding how the Exchange functioned for every customer—including 3AC—while it operated, and also require relitigating this Court's conclusion that the Terms of Service applicable to all customers (including 3AC) did not create any proprietary interest in the digital assets held by the Exchange and controlled by FTX, which is now the law of the case.

3.       The Joint Liquidators insist that they are special because 3AC is in liquidation in the BVI.  But they are not, and the Joint Liquidators' role as liquidators of 3AC does not change the fact that 3AC was a prepetition customer of the Exchange entitled to no more and no less than other customers under the terms of the Plan confirmed by this Court.

4.       The Joint Liquidators seek to recover the value of "over $1 billion in assets" allegedly arising from 3AC's own market sales of digital assets on the Exchange and the automatic crediting of USD proceeds to the 3AC Accounts through standard Exchange mechanics. (Response ¶ 6.)  But their theories of recovery depend entirely on the premise that 3AC had the right to withdraw or claim from FTX the entirety of the Digital Asset Balance credited to the 3AC Accounts and simply leave behind the interconnected negative USD Balance that 3AC built in

parallel.  3AC did not have that right, under any circumstances, and the Joint Liquidators have not identified any fact or legal authority that says otherwise.   The uncontroverted evidence demonstrates that 3AC—like every other customer—was never entitled or able to withdraw more than its Account Balance, which was **approximately $284 million** as of the Joint Liquidators' arbitrarily selected date of June 12, 2022 (and which fell over the ensuing two days to approximately $2 million due to withdrawals by 3AC and market price declines).   When the Exchange was operational, 3AC could not have under any circumstances withdrawn the full Digital Asset Balance (whether in the amount of $1.017 billion or otherwise) on which the Joint Liquidators fixate while simultaneously disregarding its negative USD Balance.  Consequently, they have no path to claiming that amount (or anything close to it) from FTX under any theory.

5.      To try to skirt that reality, the Joint Liquidators try to reopen longstanding trust arguments that this Court already rejected when it concluded, at Plan confirmation, that customers had no proprietary interest in the digital assets held by the Exchange in order to determine that all digital assets and cash held by the Exchange on or after the Petition Date are property of the Debtors' Estates.  As a result, the Joint Liquidators are unable to identify any transaction benefitting FTX as a creditor that diminished 3AC's estate, which they are obligated to do to establish the Preference Claim.

6.      This revisionist history following 3AC's failed high-risk trading strategy is all the more glaring when the Joint Liquidators have once again changed their story in the Response from that spun in the Proof of Claim, consistent with the lack of evidentiary support for their theories and claims.  In the Response, the Joint Liquidators no longer contend that anyone other than 3AC initiated the vast majority of the trades they challenge, that FTX appropriated digital assets, that there existed some "Unknown Alleged Liability," or that the trades yielded less than

fair value for 3AC.  (Response ¶ 77.)  The Joint Liquidators have abandoned claims they previously

described as "textbook."  (Proof of Claim ¶ 64; *see* Response ¶ 77.)  Instead, they now rely on

counterfactuals, speculation and unsupported factual narrative—contrary to the Terms of Service,

the Exchange's mechanics, and all evidence—that 3AC had the right to withdraw the full Digital

Asset Balance while leaving behind only the negative USD Balance.  In the Joint Liquidators'

world, 3AC, unlike every other customer trading on margin on the Exchange, and contrary to the

codebase functionality of the Exchange, was free to ignore its negative margin positions it

necessarily incurred in amassing the positive asset sub-balances.  Any such suggestion is patently

absurd.  That conclusion has no basis in fact or law, and if it somehow did, this Court should not

recognize any such application of BVI preference law.

7.       The reason for the Joint Liquidators' retreat is straightforward:  the facts are

clear and uncontroverted.  At the end of the day on June 12, 2022,[4] the 3AC Accounts had an

Account Balance of approximately $284 million, comprised of a positive Digital Asset Balance of

approximately $1.017 billion and a negative USD Balance of approximately $733 million.  Over

the next two days, 3AC itself entered into more than 52,000 ordinary-course trades—almost all

using its own Application Program Interface ("API")—selling digital asset entitlements for USD

entitlements (the "Challenged Trades").  In substance, the Joint Liquidators do not challenge the

trades themselves, which were bilateral transactions between 3AC and other Exchange customers

for value at market prices.  They instead complain about the Exchange's automatic application of

the USD proceeds from those sales to the 3AC Accounts' USD Balance.  Those trades reduced the

Digital Asset Balance and made the USD Balance less negative in equal amounts, but they did not

---

4       Unless otherwise noted, all times are denoted in UTC.

reduce the Account Balance (again, the maximum amount 3AC would have been entitled to withdraw or claim from the Exchange).

8.      In any event, by exiting deteriorating positions, the Challenged Trades preserved value for 3AC and its eventual creditors as the cryptocurrency market was declining. By the time 3AC entered liquidation in the BVI, its Account Balance was approximately $1.3 million—higher than it would have been had the Challenged Trades not occurred.  The FTX Recovery Trust has shown all of this through primary-source Exchange data, summary data, governing agreements, and extensive testimony from its corporate representative, Steven Coverick.

9.      By contrast, despite bearing the burden of proof, the Joint Liquidators put forward no affirmative contemporaneous factual evidence of their own.  They do not challenge the accuracy or completeness of the Exchange data.  Instead, they rely on mischaracterizations of the FTX Recovery Trust's evidence and speculative deposition testimony from former FTX employees, several of whom have been convicted of federal crimes and have zero credibility, in an attempt to prove an impossible counterfactual.

10.      Against this evidentiary backdrop, the Joint Liquidators come nowhere close to carrying their burden of proving each element of their purported claims.  The Preference Claim suffers from myriad issues.  The Joint Liquidators need to win on *every single one* of these issues to succeed on the Preference Claim, but they lose on all:

- The Joint Liquidators cannot prove that FTX was a "creditor" of 3AC because the 3AC Accounts had a positive Account Balance at all relevant times—*i.e.*, it was 3AC that could look to FTX for payment up to and including the Petition Date, not the other way around. *See* Section I.B, *infra.*

- The Joint Liquidators cannot prove that the alleged preference transaction(s) reduced the value of assets that would otherwise have been available for distribution to 3AC's creditors,

and therefore cannot prove that such transactions put FTX in a "better position" as a creditor than it would have been in a hypothetical liquidation of 3AC because:

- 3AC had no right to withdraw or claim the Digital Asset Balance because 3AC's entitlement was limited to, at most, its Account Balance, and the Challenged Trades did not reduce the Account Balance. *See* Section I.C.1, *infra*;

- This Court has already concluded that FTX customers like 3AC had no proprietary interest in digital assets held by the Exchange, and therefore 3AC had no proprietary interest in any relevant digital assets. In any event, the Terms of Service did not create any trust, bailment, or chose in action in or in respect of the digital assets for 3AC. *See* Section I.C.2, *infra*;

- FTX did not "benefit" from the Challenged Trades or the application of USD sale proceeds to the 3AC Accounts because FTX was not a creditor with respect to the negative USD Balance and would not have absorbed (and had no obligation to step in to pay) 3AC's borrowings under the Margin Program. *See* Section I.C.3, *infra*;

- If, in the alternative, FTX were a creditor with respect to the negative USD Balance, then, prior to the liquidation of 3AC, FTX exercised a valid contractual right of set-off pursuant to the Terms of Service and according to the standard operation of the Exchange, regardless of whether 3AC once had a proprietary interest in digital assets (which it did not). *See* Section I.C.4, *infra*; and

- If 3AC had any proprietary interest in digital assets (which it did not), then FTX had a valid security interest over the relevant digital assets pursuant to the Line of Credit Agreement (as defined below), which precludes any showing that FTX was placed in a better position. *See* Section I.C.5, *infra*.

- Even if the Joint Liquidators could establish each element of the Preference Claim (they cannot), the FTX Recovery Trust would have a complete ordinary course defense that precludes recovery. *See* Section I.D, *infra*.

- The Joint Liquidators' appeal to the Court's discretion fares no better. In fact, all equitable considerations—consistency in equal treatment of customers, assigning responsibility for 3AC's demise where it belongs, and preserving value for distribution to FTX's other creditors—further point to the obvious outcome: disallowance. *See* Section I.E, *infra*.

11.     Although they describe the Preference Claim as "classic" (Response ¶ 1) or "quintessential" (*id.* ¶ 175), the Joint Liquidators ask this Court to be the *first court anywhere* to award *any* relief for a preference claim under the BVI Insolvency Act. The Joint Liquidators do not cite to a single successful preference claim under the BVI Insolvency Act, and their BVI law

expert admitted that he is not aware of one.[5]  Nonetheless, they ask this Court to apply BVI law in a way that a BVI court would not.  Similarly, the Joint Liquidators ask not only to relitigate property-law issues that were resolved by this Court and treat the 3AC Accounts differently than every other Customer Account on the Exchange, they also ask the Court to make new English law regarding an equitable tenancy in common over digital assets, a bailment relationship as to intangible property, and a brand new form of relief for a breach of contract premised on the loss of a preference claim.  The Court need not and should not accept the Joint Liquidators' invitation to develop new BVI law and English law far beyond the present state.

12.    Disallowance of the remaining Breach Claims and Unjust Enrichment Claim is also warranted because they are meritless and have been released and enjoined pursuant to the Global Settlement under the Plan.  It is imperative that the Joint Liquidators be held to the same standard and terms as all other creditors, particularly given that the Joint Liquidators interposed an objection to the Plan on certain other issues but chose not to object to the Global Settlement or any provision of the Plan or Confirmation Order relevant here.

13.    The Joint Liquidators seek special treatment, but are entitled to none.  Their purported claims are meritless, and they cannot be elevated above other customers of the Exchange.  The Joint Liquidators seek to relitigate property and contract interpretation issues already resolved through Plan confirmation.  They assert claims that were released by the Global Settlement that binds them and every other party.  They claim value based on an isolated, cherrypicked part of 3AC's Customer Account despite every other Customer Account being

---

[5]    Beller Reply Decl., Ex. 1, Transcript of December 11, 2025 Deposition of Robert Stuart Levy, K.C. ("<u>Levy Dep. Tr.</u>") 185:8-11 ("Q.  So are you aware of a single instance in which a BVI court has awarded relief pursuant to a preference claim under the BVI Insolvency Act?  A.  I am not aware.  That's not to say that they don't exist. Q.  Are you aware of a single instance in which any court anywhere has awarded relief pursuant to a preference claim under the BVI Insolvency Act?  A.  No, that's not to say they don't exist though.").

valued by the Account Balance.  The Joint Liquidators' status as liquidators does not relieve them of their burden of rebutting uncontroverted evidence or entitle them to a windfall at the expense of FTX's other customers.

14.     The Joint Liquidators have had every opportunity for almost two years to investigate, articulate and prove a valid claim, and the Response confirms that they have none. The Joint Liquidators can no longer hide behind the position that they are still gathering facts or have unanswered questions.  The time for questions, speculation, shifting goalposts, and unsupported assertions—all of which have wasted millions of dollars of the FTX Recovery Trust and 3AC's own assets—is over.  The Joint Liquidators bear the burden of proving a claim through admissible evidence, and bring none to the table.  The Proof of Claim should be disallowed in its entirety with prejudice.

## **LEGAL STANDARD**

15.     Where, as here, the objector has produced evidence to rebut the claimant's *prima facie* case, the claimant bears the burden of proving each element of its purported claim (including damages) through admissible evidence by a preponderance of evidence.  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  A claim must be disallowed (or, where applicable, reduced) when the claimant fails to present admissible evidence proving the elements of the claim. *See In re Mariner Post-Acute Network, Inc.*, 2005 WL 1662226, at *1-2 (D. Del. July 8, 2005) (affirming reduction in the amount of the claim due in part to the inadmissibility of the claimant's evidence); *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (failure to prove via admissible evidence the facts needed to establish the claims renders the claims invalid).

16.     "[F]oreign law is treated as a fact that must be proven by the parties." *Abdille* v. *Ashcroft*, 242 F.3d 477, 489 n.10 (3d Cir 2001).  The party asserting a foreign-law claim bears "the burden of proving foreign law to enable . . . the court to apply it in a particular case."

*Sec. Inv. Prot. Corp* v. *Bernard L. Madoff Inv. Sec. LLC*, 650 B.R. 5, 16 (Bankr. S.D.N.Y. 2023)

(cleaned up).  The Court's role "is to determine foreign law as ***currently applied***" by the applicable

foreign court.  *In re Nortel Networks*, *Inc.*, 469 B.R. 478, 499 (Bankr. D. Del. 2012) (emphasis

added).  Federal courts "should be more hesitant" to apply foreign law "when doing so would

necessarily involve expanding, extending, or departing from well-settled and long established

principles of foreign law."  *Id.* (quoting *Gilstrap* v. *Radianz Ltd.*, 443 F. Supp. 2d 474, 491

(S.D.N.Y. 2006), *aff'd* 233 F. App'x 83 (2d Cir. 2007)).

17.    The law of the forum governs the question of remedies.  *See, e.g.*, *Lutz* v.

*Boas*, 176 A.2d 853, 857 (1961) ("It is well established that the law of the forum governs questions

of remedial or procedural law."); Restatement (Second) of Conflict of Laws § 131 (A.L.I. 1971)

("The local law of the forum determines the manner of enforcing a judgment.").  Regardless of

whether a claim is asserted under foreign or domestic law, the bankruptcy court retains the

authority to determine "the allowance and disallowance of claims; the collection and distribution

of the estates of bankrupts and the determination of controversies in relation thereto . . . and the

entering of such judgments 'as may be necessary for the enforcement of the provisions'" of

statutory bankruptcy law.  *Pepper* v. *Litton*, 308 U.S. 295, 304 (1939); *see also In re Murgillo*, 176

B.R. 524, 531 (9th Cir. BAP 1994) ("Even though a claim may be valid and enforceable under

state law, the bankruptcy court has sole jurisdiction and discretion to allow or disallow the claim

under federal law.").  In fashioning a remedy, bankruptcy courts are authorized to "sift the

circumstances surrounding any claim to see that injustice or unfairness is not done in

administration of the bankrupt estate."  *Pepper*, 308 U.S. at 307-08.

## SUMMARY OF THE CLAIMS AT ISSUE

18.    Through the Response, the Joint Liquidators have withdrawn most of the

claims they asserted in the Proof of Claim.  (*See* Response ¶ 77 ("[T]he Joint Liquidators at this

time, and without prejudice, withdraw the claims asserted in the Amended Proof of Claim for undervalue transaction, BVI turnover, U.S. law turnover, conversion, and proprietary restitution."); *id.* ¶ 77 n.15 (noting that the Joint Liquidators "do not prosecute" purported "breach claim[s]" premised on an "Unknown Alleged Liability" or FTX "effect[ing] takings of the Digital Assets on June 13 without justification").)

19.    The Joint Liquidators now pursue only three causes of action; none is valid.[6]

*First*, the BVI Preference Claim, through which the Joint Liquidators allege that 3AC's own market sales of digital assets on the Exchange and the corresponding crediting of the USD proceeds of those sales to the 3AC Accounts via the standard, automatic function of the Exchange amounts to an unfair preference claim under the BVI Insolvency Act.  In contrast to their prior theories,[7] the Joint Liquidators' current preference theory is that 3AC's trades and the Liquidation yielded to FTX "a greater recovery than it would have received in [3AC's] liquidation, to the prejudice of [3AC's] other unsecured creditors." (Response ¶ 176.)  In other words, the Joint Liquidators allege that but-for the Challenged Trades, 3AC could have actually withdrawn digital assets in an amount far exceeding the Account Balance (and up to the Digital Asset Balance, an amount nearly four times larger), and distributed those digital assets to 3AC's creditors.  In order to establish such a claim, the Joint Liquidators must provide evidence proving that (among other things) 3AC was entitled to obtain from the Exchange all of the digital assets sold in the Challenged Trades or the value thereof.

---

[6]    Notably, the Joint Liquidators still fail to articulate any basis for selecting what appears to be an arbitrary moment in time—June 12, 2022—as the date of reference for the causes of action.  (*See* Objection ¶ 71.)

[7]    The Joint Liquidators are no longer pursuing a theory that FTX took any action with respect to the Digital Assets (other than the $82 million Liquidation which FTX has acknowledged from the beginning of this dispute).  *Compare* Response ¶ 77 ("discovery conducted to date indicates that the 3AC Debtor was responsible for initiating each of the transactions at issue") *with* Proof of Claim ¶¶ 40-44 (alleging that certain "Takings" by FTX occurred on June 13 and 14, 2022).

20.     *Second*, the Joint Liquidators allege, in the alternative to the Preference Claim, conditional claims for Breach of Contract, Breach of Trust, and Breach of Fiduciary Duty under English law to the extent that "the Court determines that FTX's conduct deprived the 3AC Debtor of its ownership rights over the Digital Assets" (*i.e.*, the Breach Claims).  (Response ¶ 275.)  The Joint Liquidators appear to treat breach of contract and breach of trust as separate claims but assert the same underlying theory for both.   The Response makes clear that the Breach Claims are contingent on two predicates:  (i) first, "[i]f any of FTX's [alleged] breaches deprived the 3AC Debtor of a proprietary interest in the Digital Assets," *and* (ii) second, "if the Court determines that the 3AC Debtor would have succeeded on its preference claim if it owned the Digital Assets."  (*Id.* ¶ 287.)  In other words, the Breach Claims are the Joint Liquidators' attempt to repackage the Preference Claim in the event that the Preference Claim is disallowed.

21.     *Third*, the Joint Liquidators also allege, again in the alternative to the Preference Claim, a claim for unjust enrichment under English law.  (Response ¶ 295.)  Like the Breach Claims, the Unjust Enrichment Claim is asserted only on the condition "that the 3AC Debtor would have succeeded on its preference claim if it owned the Digital Assets."  (*Id.* ¶ 296.) The Unjust Enrichment Claim thus appears to be the second of two back-up claims, and indeed is covered by only five paragraphs within the 301-paragraph Response.  (*See id.* ¶¶ 295-99.)

22.     Notably, despite almost two years of discovery, the Response does not include any amount for claimed damages constituting the claim.  Although the Proof of Claim purported to seek $1.53 billion on the Preference Claim (Proof of Claim ¶ 54), the Joint Liquidators no longer advance such a demand anywhere in the Response.  The Response makes passing

references to the Digital Asset Balance,[8] the negative USD Balance,[9] and the value of digital assets sold in the Challenged Trades,[10] but avoids actually identifying the relevant metric for damages or the actual figure claimed.  The Response instead claims that "[t]he Joint Liquidators will prove at trial the full value of the assets transferred to repay the 3AC Debtor's liabilities on the FTX Exchange."  (Response ¶ 222.)  The Joint Liquidators do not simply defer providing evidence as to actual damages figures; they make no attempt to even articulate their theory of damages.  This is a contested claim objection, and the Joint Liquidators have still to this day failed to articulate the actual amount of their claim or how that amount is to be calculated.

23.     Nonetheless, it is apparent that the Joint Liquidators' purported theories (even if entirely accepted) cannot yield a claim in excess of the value of the entitlements to digital assets comprising the Challenged Trades.  Despite the Joint Liquidators' imprecise references to larger figures,[11] their preference theory rests on the Challenged Trades.[12]  The uncontroverted evidence establishes that under the Joint Liquidators' theory, which the FTX Recovery Trust disputes, this amount is $842 million.  (Coverick Decl. ¶ 71, tbl. 5.)  The Joint Liquidators do not seek the return of any specific digital assets or the current value thereof (Response ¶¶ 135, 138),[13]

---

[8]   *See* Response ¶ 5 ("the 3AC Debtor had amassed well over $1 billion worth of assets on the Exchange").

[9]   *See* Response ¶ 159 ("paying down hundreds of millions of dollars owed to FTX").

[10]   *See* Response ¶ 222 ("[T]he challenged transactions resulted in the transfer away from the 3AC Debtor of assets that then had a value of at least $842 million.").

[11]   In contrast to the Proof of Claim, the Response does not seek recovery of the notional amount of perpetual futures contracts, which was approximately $576 million on June 12, 2022.  As described below, the uncontroverted evidence demonstrates that the notional amount of perpetual futures contracts was not part of the Account Balance or an asset that could be obtained by 3AC.

[12]   Paragraph 221 of the Response states that "the Joint Liquidators are entitled to recover from FTX the *full value of assets transferred to satisfy the 3AC Debtor's then-liabilities*—actual or contingent—on the Exchange." (emphasis added).

[13]   To the extent that the Joint Liquidators intend to argue that they may claim the *current* value of digital assets at issue in the Challenged Trades, that is misplaced and incorrect.  The Joint Liquidators could not seek the return

and concede that they may not recover declines in either the Account Balance or the Digital Asset Balance caused by withdrawals by 3AC or market price declines (Proof of Claim ¶ 43, Levy Dep. Tr. 318:20-323:8).[14]  Like every claim on account of digital assets in these Chapter 11 cases that could be an "Allowed Claim" under the Plan, the claim must exist as of the Petition Date and be valued pursuant to the Court's Estimation Order.

## **KEY FACTUAL AND PROCEDURAL BACKGROUND**

24.    The evidentiary record is uncontroverted with respect to the key operative facts.  Most importantly, both parties rely on the same contracts and cite to the same Exchange data.  The FTX Recovery Trust presented extensive evidence on these topics in support of the Objection.  Although the Joint Liquidators previously raised questions about these fundamental documents, the Response confirms that there is little (if any) dispute about what documents governed the relationship between FTX and 3AC or what actually happened with the 3AC Accounts on June 13 and 14, 2022.  The Response raises legal arguments and competing inferences from these established documents, not competing factual evidence.

25.    Nevertheless, the Joint Liquidators attempt to muddy the waters with misleading quotations from a series of fact depositions conducted with former FTX insiders and

---

of specific assets because they lack a proprietary interest in any specific assets as explained in the Objection and below.  The Breach Claims and Unjust Enrichment Claim are not only foreclosed by the Global Settlement; they are also subject to the *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] (the "Estimation Order") applying Petition Date pricing to any claim.

[14]    Setting aside the Challenged Trades, the Account Balance was reduced on June 13 and 14, 2022 by the (i) withdrawal by 3AC of approximately $60 million in assets (digital and fiat) from the Exchange, and (ii) another approximately $222 million reflecting losses on spot and futures positions caused by declines in market prices for digital assets.  (Coverick Decl. ¶¶ 62-67, tbl. 4.)  Part of that decline in the Account Balance, the Digital Asset Balance of $1.017 billion referred to by the Joint Liquidators was reduced by (i) withdrawals by 3AC of digital assets (approximately $25 million), and (ii) approximately $148 million reflecting declines in spot positions (with losses caused by futures contracts decreasing only the USD Balance).  (*Id.*, tbls. 3 and 4.)  The Joint Liquidators themselves acknowledged in the Proof of Claim that they have not claimed to recover amounts attributable to "unrealized losses, withdrawals by the 3AC Debtor (including realized losses on those withdrawals), trading fees, interest charges and funding payments on futures contracts" (Proof of Claim ¶ 43), and their BVI law expert agrees (Levy Dep. Tr. 318:20-323:8).

with improper factual testimony from the Joint Liquidators' purported foreign-law and other experts.[15] Certain of the assertions made in the Response, however, overtly misstate the testimony offered by fact witnesses or omit critical context, as addressed below.

## A.   Discovery

26.     The parties conducted significant additional discovery following the filing of the June 20, 2025 Objection.  Discovery is complete, and has been for some time.[16]

27.     Both before and after filing their Proof of Claim, the Joint Liquidators obtained extensive discovery from the Debtors and the FTX Recovery Trust.  In total, they have propounded 79 document requests, 24 interrogatories, and 10 requests for admission.  The FTX Recovery Trust and the Debtors produced over 46,000 pages of documents to the Joint Liquidators, in addition to the primary source Exchange data for the 3AC Accounts.  The FTX Recovery Trust identified the relevant values for the 3AC Accounts derived from that primary source data via the Coverick Declaration filed in support of the Objection, and detailed how the FTX Recovery Trust conducted the calculations to reach those values via the *Supplemental Declaration of Steven P. Coverick in Support of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed*

---

[15]   In support of their Response, the Joint Liquidators submitted (1) the Declaration of the Right Honourable Dame Elizabeth Gloster DBE [D.I. 33901] (the "Gloster Declaration"), (2) the Declaration of Robert Stuart Levy K.C. [D.I. 33902] (the "Levy Declaration"), (3) the First Supplemental Declaration of Paul Anthony Webster K.C. [D.I. 33903] (the "Webster Declaration"), (4) the First Supplemental Declaration of Matthew W. Lisle [D.I. 33904](the "Lisle Declaration"), (5) the Declaration of Fotis Konstantinidis and the First Supplemental Expert Report of Fotis Konstantinidis [D.I. 33905] (the "Konstantinidis Declaration"), (6) the Declaration of Gregory E. Scheig and the Expert Report of Gregory E. Scheig [D.I. 33906] (the "Scheig Declaration"), and (7) the Declaration of Tiffany Ikeda Austin [D.I. 33901] (the "Austin Declaration").

[16]   Fact discovery was complete when the Response was filed, contrary to Joint Liquidators' suggestion. (Response ¶¶ 47 nn.10, 75, 300.)  The FTX Recovery Trust responded to the Joint Liquidators' final, delayed request for a small set of documents on November 18, 2025 (a week before the Response), and more than 96% of all documents were produced to the Joint Liquidators by August 25, 2025 (three months before the Response).  The last fact witness deposition took place two months ago (on October 31, 2025).

*by Joint Liquidators of Three Arrows Capital* [D.I. 32748] (the "Coverick Supplemental Declaration"), filed on September 19, 2025.

28.      Since the Objection was filed, the Joint Liquidators have noticed eleven fact depositions, ultimately taking six and abandoning the remainder.[17]   All but one deposition conducted by the Joint Liquidators lasted more than six hours on the record.   Most notably, the Joint Liquidators demanded another Rule 30(b)(6) corporate deposition as well as a deposition of Mr. Coverick in his personal capacity.   The Joint Liquidators served a sweeping Rule 30(b)(6) notice containing 49 topics.   To address the notice, the FTX Recovery Trust designated Mr. Coverick as the corporate representative for nearly every topic.   When the Joint Liquidators complained that Mr. Coverick provided *further explanation* of the FTX Recovery Trust's calculation of figures from primary source data (that the Joint Liquidators had already received) via the Coverick Supplemental Declaration, they received additional time to depose Mr. Coverick. In total, Mr. Coverick testified on the record ***for nearly 15 hours***.[18]

29.      In turn, the Joint Liquidators offered Russell Crumpler, one of the Joint Liquidators, as their Rule 30(b)(6) designee in response to the FTX Recovery Trust's 20 deposition topics.   Throughout the deposition, Mr. Crumpler refused to answer basic questions about 3AC and the Joint Liquidators' purported claims.   On at least 67 occasions, Mr. Crumpler offered some version of the canned response that the Joint Liquidators' analysis of essential issues was

---

[17]   On multiple occasions, the Joint Liquidators abandoned their deposition notices within days of the deposition being set to begin, always without explanation.   Such tactics imposed substantial costs on the creditors of the FTX Recovery Trust.

[18]   The Joint Liquidators took the remarkable position that all of Mr. Coverick's time on the record reflected statements made in his capacity as a 30(b)(6) representative of the FTX Recovery Trust, despite the rule providing a seven-hour limitation.

"ongoing" and "subject to further legal determination and conclusions."[19]    A chart excerpting

certain questions and answers from this deposition is submitted herewith as Exhibit 3 to the Beller

Reply Declaration.

30.    The Joint Liquidators also had unparalleled access to other fact witnesses.

The Joint Liquidators deposed Sam Bankman-Fried, who is incarcerated in federal prison in

California.    The Response relies heavily on Mr. Bankman-Fried's deposition testimony as

evidence, citing to his deposition transcript no less than 27 times.    But Mr. Bankman-Fried is not

a credible fact witness.    Nor is much of the cited testimony admissible or more than naked

speculation.    On November 2, 2023, Mr. Bankman-Fried was convicted of seven felony charges,

including multiple counts of wire fraud (including as to FTX customers), multiple counts of

conspiracy to commit wire fraud (including as to FTX customers), conspiracy to commit securities

fraud, conspiracy to commit commodities fraud, and conspiracy to commit money laundering.

(*See* Beller Reply Decl., Ex. 4, Verdict Form, *United States* v. *Bankman-Fried*, No. 22-cr-00673,

at 1-2 (S.D.N.Y. Nov. 2, 2023).)    He was sentenced to 300 months (25 years) in prison.    (Beller

Reply Decl., Ex. 5, Transcript of Bankman-Fried Sentencing Hearing ("<u>Bankman-Fried</u>

<u>Sentencing Hr'g Tr.</u>"), *United States* v. *Bankman-Fried*, No. 22-cr-00673, Dkt. No. 426, at 58:24-

25 (S.D.N.Y. Apr. 9, 2024).)    The court in Mr. Bankman-Fried's criminal proceeding also found

that ***Mr. Bankman-Fried repeatedly lied under oath***:

> "I find, subject to anything counsel says after I complete this, that
> ***Mr. Bankman-Fried gave perjured testimony at trial as to material***
> ***matters*** in at least the following respects:  First, he falsely testified
> that until the fall of 2022, he had no knowledge that Alameda had

---

[19]    *See, e.g.*, Beller Reply Decl., Ex. 2, Transcript of September 23, 2025 Deposition of Russell Crumpler ("<u>Crumpler</u>
<u>Dep. Tr.</u>") 105:16-106:3 ("Q.  So sitting here today, do you have -- does 3AC have any understanding of what
FTX perpetual futures contracts were in June of 2022? . . .  A.  I don't.  My -- 3AC's understanding is based on
legal advice and legal conclusion"); *id.* 203:18-25 ("Q.  Do you have your own calculations with respect to market
decline amounts during this period that are different from Mr. Coverick's?  A.  Our calculations and analysis with
respect to both the data provided to us by FTX and publicly available data are ongoing.").

spent FTX customer deposits. . . . Second, I find that he testified falsely, that he first learned that Alameda had a roughly $8 billion liability to FTX in October 2022. . . . Finally, he falsely testified that he did not know that repayment of called third-party loans to Alameda, in or about mid June 2022, would require Alameda to borrow more customer funds from FTX."

(Bankman-Fried Sentencing Hr'g Tr. 10:4-20 (emphasis added).)

Although the court made three specific perjury findings, it also made clear that Mr. Bankman-Fried's propensity to lie under oath was far more wide reaching than just these highlighted instances:

"I did not think it a fruitful use of time to spell out every time I thought Mr. Bankman-Fried testified willfully and knowingly falsely at trial.  There are more than the ones I've articulated, but that suffices.  ***And when he wasn't outright lying, he was often evasive, hairsplitting, dodging questions and trying to get the prosecutor to reword questions*** in ways that he could answer in ways he thought less harmful than a truthful answer to the question that was posed would have been.  ***I've been doing this job for close to 30 years.  I've never seen a performance quite like that***."

(*Id.* 57:16-58:2 (emphasis added).)

31.    Mr. Bankman-Fried expressed open hostility towards the FTX Recovery Trust, John Ray, and Sullivan & Cromwell LLP during his deposition in this matter.  (Beller Reply Decl., Ex. 6, Transcript of October 16, 2025 Deposition of Samuel Bankman-Fried ("Bankman-Fried Dep. Tr.") 234:23-237:9; 239:2-240:10; 241:25-243:12; 244:16-245:2.)  For example, when asked whether there was "anything" that he "answered differently because of [his] views about Sullivan & Cromwell or Mr. Ray," Mr. Bankman Fried responded that he "can't rule out the possibility" that he answered differently based on his animosity and that it would "certainly cause [him], on the margin, to be much less excited for . . . funds to end up under the control of the . . . FTX debtors rather than Three Arrows' debtors."  (Bankman-Fried Dep. Tr. 245:8-246:10.)

32. The Joint Liquidators' campaign to depose former FTX insiders who are convicted felons included Nishad Singh, FTX's former Director of Engineering.[20] Separately, they also demanded and received testimony from an FTX engineer, Nils Molina, for over six hours. The Joint Liquidators sought for months to obtain the testimony of FTX's former Head of Institutional Sales, Zane Tackett, even seeking an order from the District of Colorado authorizing substituted service of subpoena. The FTX Recovery Trust obtained Mr. Tackett's agreement to voluntarily provide deposition testimony. The Joint Liquidators also deposed another corporate representative of the FTX Recovery Trust, Edgar Mosley of A&M.

33. None of this testimony, however, limits or alters the paramount evidence in this dispute: the primary source Exchange data that confirms precisely what happened with respect to the 3AC Accounts on June 13 and 14, 2022 and how the Exchange functioned in the ordinary course when it was operational. That data has long been available to the Joint Liquidators.[21] The Joint Liquidators do not articulate any specific challenge to the accuracy of that data, the summary data provided by the FTX Recovery Trust, or the explanation of how to calculate the figures included in the Objection that was provided in the Coverick Supplemental Declaration.

34. Instead, the Joint Liquidators try to create an inference of inaccuracy by suggesting that a summary compilation of certain Exchange data produced in August 2025 "just so happened to fit the FTX Recovery Trust's new case theories." (Response ¶ 73.) First, there were no "new theories": the Objection was the first (and only) response to the Proof of Claim

---

[20] The Joint Liquidators voluntarily abandoned their attempts to depose Caroline Ellison and Ryan Salame mere days before those depositions were scheduled to take place, having moved this Court for (and received) leave to depose them. This resulted in waste of the FTX Recovery Trust's resources.

[21] The Joint Liquidators' criticism of the FTX Recovery Trust for the production of "an enormous amount of raw data" in December 2023 and January 2024 rings hollow (*see* Response ¶ 67)—that data is the primary source record of what occurred on the Exchange.

(itself an amendment to the Original Proofs of Claim), which was the first time the Joint Liquidators included the novel theory that they are somehow entitled to the value of the Digital Asset Balance instead of (at most) the Account Balance. Second, the data provided to the Joint Liquidators supports the FTX Recovery Trust's positions because those positions are based on the factual evidence, not mere speculation and contemplation. The Exchange data and summary thereof in the Objection remain uncontroverted.

35.     The Joint Liquidators carry the burden of proof, and can no longer shield their meritless claims on the basis of unanswered questions and speculation.

**B.      Uncontroverted Factual Evidence**

36.     The evidentiary record is clear and uncontroverted as to central factual issues presented by the Joint Liquidators in the Proof of Claim. The Joint Liquidators neither put forward new factual evidence of their own, nor directly challenge the factual evidence provided by the FTX Recovery Trust.

37.     ***Applicable Contracts.*** 3AC was subject to and traded pursuant to the May 2022 terms of service (Coverick Decl., Ex. A, (the "Terms of Service")), as well as the Line of Credit Agreement dated March 30, 2022 (Coverick Decl., Ex. E, (the "Line of Credit Agreement")). As the Response correctly notes, "[t]he parties agree that FTX's Terms of Service that were implemented on May 13 . . . govern the 3AC Debtor and FTX's relationship during the June 13-14 period relevant to this action." (Response ¶ 21.) Deposition testimony confirmed that the Line of Credit Agreement was a single agreement consistent with FTX's other line of credit agreements. (Beller Reply Decl., Ex. 7, Transcript of October 31, 2025 Deposition of Zane Tackett ("Tackett Dep. Tr.") 86:8-9 ("[T]his is by and large the line of credit agreement that was used across the board").) Whereas the Proof of Claim argued in passing that "there is no evidence that the Margin Agreement was properly executed" and that "there is simply no indication in the

Margin Agreement that . . . the required formalities were followed [or] that it governs the Lost Assets at issue" (Proof of Claim ¶¶ 34, 39), the Joint Liquidators assert no such argument in the Response.[22]

38.    ***Account Balance.***    The 3AC Accounts had an Account Balance of approximately ***$284 million*** at the end of the day on June 12, 2022. (Coverick Decl. ¶ 61.) This was comprised of a positive Digital Asset Balance of $1.017 billion and a negative USD Balance of $733 million. (*Id.*) The FTX Recovery Trust produced to the Joint Liquidators the primary source Exchange data necessary to calculate those balances (Coverick Decl. ¶ 82 (noting the "10 spreadsheets derived directly from Exchange records")), and produced a summary compilation of certain Exchange data that included the calculations (Beller Reply Decl., Ex. 8, FTX_3AC_000000038_Amended). The FTX Recovery Trust presented factual testimony confirming these balances via the Coverick Declaration, and additional testimony explaining how to calculate those balances based on the Exchange data via the Coverick Supplemental Declaration. (Coverick Supplemental Decl. Ex. A.) The Joint Liquidators do not identify any evidence contesting these figures, nor do they raise any arguments challenging these figures.[23] Thus, the evidence proving the Account Balance and components thereof as of June 12, the unexplained date chosen by the Joint Liquidators as the reference point for their claims, is uncontroverted.

---

[22]    The Joint Liquidators appear to maintain the position that the Line of Credit Agreement is two separate agreements, which is inconsistent with the factual record. (*See* Tackett Dep. Tr. 91:3-9 (describing the format of the Line of Credit Agreement as "the exact same" as the format that FTX used for other customers).) The Line of Credit has a single DocuSign ID across all pages. (Coverick Decl., Ex. E.) Although inaccurate, the distinction they draw does not matter. They do not contest that this agreement—including both portions they identify as separate—governed.

[23]    The Response questions the timing of a production of an amended summary compilation of certain Exchange data by the FTX Recovery Trust. (Response ¶ 73.) But conspicuously absent from the Response is any argument regarding the accuracy, completeness, or relevance of this Exchange data. This data is explained in the Coverick Declaration, and the Joint Liquidators deposed Mr. Coverick for nearly 15 hours on the record. They cannot manufacture an evidentiary dispute out of complaints about discovery timing, particularly when they have had every opportunity to present competing evidence or interpretations thereof.

39.    ***Perpetual Futures.***  Perpetual futures contracts (and the notional amount thereof) were not assets that could have been withdrawn or sold by 3AC, and were not part of the Account Balance.  The aggregate notional value of perpetual futures contracts that 3AC opened was $576 million as of June 12, 2022.  (Objection ¶ 150.)  The FTX Recovery Trust presented evidence in the Objection confirming that 3AC could never have withdrawn or maintained a claim for this $576 million aggregate notional value.  (Objection ¶¶ 45, 149-52.)  The evidence in the record today includes primary source Exchange data (*see, e.g.*, Beller Reply Decl., Ex. 8), as well as testimony from Mr. Coverick (Coverick Decl. ¶¶ 29-35) demonstrating that fact.  Having had months to investigate this evidence, and nearly 15 hours to depose Mr. Coverick, the Joint Liquidators still have not presented any evidence suggesting that 3AC could have obtained, withdrawn, or sold this amount.  Several witnesses likewise confirmed that perpetual futures contracts are not assets that have any intrinsic value.[24]  The contemporaneous Net Asset Value Packs (the "NAV Packs") prepared monthly by 3AC's financial advisor Ascent likewise (correctly) do not include any notional amount of futures contracts either as an asset or a liability.[25]  The Joint Liquidators acknowledge this reality in the Response after having wrongly included the notional amount of 3AC's perpetual futures contracts in the amount sought in the Proof of Claim

---

[24]    *See, e.g.*, Beller Reply Decl., Ex. 9, Transcript of September 30, 2025 Deposition of Nils Molina ("Molina Dep. Tr.") 72:12-23 ("A.  The code for calculating that total account balance wouldn't really use the [futures] positions but, over time, positions could impact or change the balance. . . . I know that an open futures position would be associated with a price in the future, and when that price changed, that would affect the account's balance."); *id.* 76:15-21 ("Q.  Do you know if the notional [amount of futures contracts] was incorporated into that overall account balance we were talking about? . . . **A.  Yeah.  The code wouldn't – the code that calculates that wouldn't use that product in that calculation.**") (emphasis added)); *id.*, Ex. 10, Transcript of October 28, 2025 Deposition of Nishad Singh ("Singh Dep. Tr.") 91:23-24 ("One way to think about a futures position is that it represents risk.  It's a bet placed."); Tackett Dep. Tr. 61:24-62:2 ("Q.  Were futures positions assets in a customer's account? . . . A.  No.").

[25]    Beller Reply Decl., Ex. 11, Transcript of December 12, 2025 Deposition of Gregory E. Scheig ("Scheig Dep. Tr.") 112:12-15 ("Q.  Okay.  As we talked about earlier, the Ascent NAV Pack does not refer to futures contracts either as an asset or a liability, right?  A.  Yes.").

(specifically, $581 million of $1.53 billion).[26]  They do not include the notional amount of futures

contracts under any claim articulated in the Response.

40.    Moreover,   the   Challenged   Trades—*i.e.*,   the   "transactions"   the

Joint Liquidators claim are an unfair preference—did not involve perpetual futures contracts.  (*See*

Coverick Decl. ¶¶ 68-72 (describing trading in the 3AC Accounts on June 13 and 14, 2022, which

involved spot BTC, ETH, FTT, GBTC, ETHE, and other tokens, but not futures).)  Thus, the Joint

Liquidators' own theory does not contemplate recovery for perpetual futures contracts.  (*See*

Response ¶ 2 ("Those creditors suffered when the former principals of the 3AC Debtor sold over

$1 billion *in digital assets*" (emphasis added).))

41.    ***3AC Conducted All Trades in the 3AC Accounts Other than the***

***Liquidation.***  The Joint Liquidators no longer argue recklessly that FTX or someone other than

3AC initiated the Challenged Trades on June 13 and 14, 2022, until the Liquidation by FTX.  As

the Joint Liquidators recognize in the Response, "***the 3AC Debtor was responsible for initiating***

***each of the transactions at issue***—other than the liquidation initiated by FTX on June 14 of $82

million worth of Digital Assets, which the 3AC Debtor was responsible for allowing to occur."

(Response ¶ 77 (emphasis added); *see also id.* ¶ 182 ("On the current record, there is no dispute

that the 3AC Debtor 'entered into' each of the June 13-14 Transactions prior to FTX's June 14

Liquidation.").)  Uncontroverted primary source data produced by the FTX Recovery Trust also

confirms that virtually all of the Challenged Trades were conducted using 3AC's own API with

the Exchange.  (*See* Beller Reply Decl., Ex. 12, FTX_3AC_000046131.)

---

[26]    This $581 million figure reflects the pricing applied by the Joint Liquidators.  The primary source data identifies
the notional amount of 3AC's perpetual futures contract as of June 12, 2022 as $576 million, based on the
application of pricing data under the approach described in the Coverick Declaration.  (Coverick Decl. ¶ 7, n.3.)

42.    ***Market Price Declines & Withdrawals Reduced the Account Balance.*** The Account Balance declined from approximately $284 million on June 12, 2022 to approximately $2 million on June 14, 2022 as the result of market price declines and withdrawals by 3AC, and not as the result of the Challenged Trades.  The FTX Recovery Trust already provided an explanation for the source of this decline in the Objection:  (i) $148 million decrease in spot positions, (ii) $74 million in settlement payments under futures contracts, and (iii) $60 million in withdrawals by 3AC.  The Joint Liquidators offer no evidence or argument disputing either the price decline or withdrawal figures.  Nor do they seek to claim damages based on these amounts, as described above.  (*See* Proof of Claim ¶ 43 (excluding from the "Lost Assets" calculation amounts derived from "unrealized losses" and "withdrawals by the 3AC Debtor").)  Indeed, the Joint Liquidators' BVI-law expert, Robert Stuart Levy, K.C., agrees that market price declines and withdrawals from the Exchange could not give rise to a preference claim.  (Levy Dep. Tr. 318:20-323:8.)

43.    ***$82 Million Liquidation.***  The Joint Liquidators agree that the Liquidation, the sole action taken by FTX with respect to the Challenged Trades, occurred at 10:21 p.m. on June 14, 2022, and involved the liquidation of $82 million worth of entitlements to digital assets. (Response ¶¶ 47, 77; *see also* Coverick Decl. ¶¶ 74-80 (describing the Liquidation).)  FTX initiated the Liquidation because the 3AC Accounts were out of compliance with the contractual requirement to maintain an Account Balance of at least $240 million at all times.[27]  (Coverick

---

[27]   The Joint Liquidators argue that "[a]t the time of the June 14 Liquidation, the 3AC Debtor was not in violation of any margin maintenance requirements."  (Response ¶ 49.)  They have no evidence to support that, and it is not true.  Absent the Line of Credit (whose requirement 3AC breached), 3AC was in violation of the margin requirements at approximately 9:00 a.m. on June 13, 2022.  (Coverick Decl. ¶ 74.)  The fact that after the manual liquidations and the removal of the Line of Credit, auto-liquidation kicked in and liquidated the 3AC accounts for an additional $1 million further confirms that by the time of the Liquidation, 3AC was already below required margin levels.  (*Id.* ¶ 77.)

Decl. ¶ 76.)    By the time of the Liquidation, 3AC had fallen out of compliance with that requirement for at least 44 hours, and ignored FTX for more than 19 hours.  (Coverick Decl. ¶¶ 76-77.)  The USD proceeds from these transactions were credited to the 3AC Accounts and did not decrease the Account Balance.

## **ARGUMENT**

### I.    **The Joint Liquidators Have Not Proven the Preference Claim.**

44.    The Joint Liquidators have not proven (and cannot prove) each of the necessary elements of the Preference Claim under BVI law by a preponderance of the evidence. Far from a "classic preference" claim (Response ¶ 1), the Preference Claim is based on a novel theory requiring innovation and expansion of both BVI law and English law.  Indeed, the Joint Liquidators ask this Court to be the very first anywhere to award relief pursuant to a preference claim under the BVI Insolvency Act.  And they ask for more than $1 billion.  But they cannot recover unless the Court accepts the remarkable premise that preference liability exists even where the alleged preference transaction did not impact the recovery of 3AC's creditors in connection with the liquidation of 3AC.  Numerous additional deficiencies also beset the Preference Claim. Beyond those, the extreme nature of the theory the Joint Liquidators ask the Court to adopt demonstrates that this Court should exercise its discretion to determine the appropriate remedy, and should decline to award any relief at the expense of the FTX Recovery Trust's actual creditors under these circumstances.

45.    *First*, the Joint Liquidators cannot prove that FTX was a "creditor" of 3AC under the BVI Insolvency Act.  The Account Balance dictated the entitlement as between 3AC and FTX, and the Account Balance was positive at all relevant times.  Simply put, on June 12, 2022, 3AC (as creditor) could look to FTX (as debtor) for payment, not the other way around.

46.     *Second*, the Joint Liquidators also cannot prove that FTX was placed in a "better position" as a "creditor" of 3AC as a result of the Challenged Trades for multiple, independent reasons.  The Challenged Trades did not deplete or diminish what 3AC could have distributed to its creditors absent those trades—at most, the Account Balance.  The Joint Liquidators attempt to avoid that result by relitigating the interpretation of the Terms of Service and asserting that 3AC had a proprietary interest in digital assets that were possessed by FTX in order to claim that 3AC would otherwise have been able to distribute additional digital assets to 3AC's creditors.  But that position has already been rejected by this Court and is wrong as a matter of law and fact.  In addition, the Joint Liquidators' alternative "benefit" theory—that FTX would have absorbed the $733 million negative USD Balance absent the Challenged Trades—rests on an impossible counterfactual and lacks evidentiary support.  Again, the notion that 3AC could simply walk away with its positive Digital Asset Balance, while leaving behind the negative USD Balance it necessarily developed *to build* that positive Digital Asset Balance, belies common sense and is an attempt to force FTX's creditors to foot the bill for 3AC's own risk-taking.  Furthermore, even if the Joint Liquidators were right that FTX was a creditor of 3AC with respect to the negative USD Balance, FTX exercised a valid contractual right of set-off prior to the liquidation of 3AC that precludes any showing that FTX was placed in a better position as a creditor of 3AC (even *if* 3AC had a proprietary interest in digital assets).  Finally, assuming *arguendo* that 3AC owned the digital assets held by the Exchange, then FTX held a pre-existing valid security interest that independently defeats any showing that FTX was placed in a better position as a creditor by virtue of the Challenged Trades or the application of the USD proceeds thereof to the 3AC Accounts.

47.     *Third*, the Preference Claim would fail even if the Joint Liquidators could prove the required elements because the evidence confirms that the Challenged Trades occurred in the ordinary course of 3AC's business as a cryptocurrency hedge fund.

48.     *Fourth*, the Joint Liquidators appeal to the discretion of this Court to consider remedies for a preference claim, but the appropriate remedy (if any) is a question of Delaware law, and this appeal cannot help the Joint Liquidators when they seek an inequitable result that confers a windfall for 3AC and its creditors at the expense of FTX's creditors.  This Court should not enforce a BVI preference claim where, as here, doing so would upend the central principles of equal treatment of similarly-situated creditors under the Bankruptcy Code.  Indeed, under the circumstances, a BVI court would not grant the relief requested.  3AC caused its own demise, and FTX's creditors should not bear that cost.

A.     **Relevant Legal Framework for the Preference Claim under BVI Law.**

1.     **Elements That the Joint Liquidators Must Prove.**

49.     The Joint Liquidators must prove each of the elements of the Preference Claim under BVI law through admissible evidence:  (i) that 3AC entered into an "insolvency transaction"; (ii) that such "transaction" was "entered into within the vulnerability period," which here is six months prior to the commencement of 3AC's insolvency proceedings in the BVI on June 27, 2022; and (iii) that such "transaction" had "the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into."  (Beller Reply Decl., Ex. 13, BVI Insolvency Act §§ 244, 245(1).)   The parties' respective BVI-law experts—

Mr. Atherton (FTX) and Mr. Levy (3AC)—identify the same general elements, with only minor differences in framing.[28]

50.    The first and third elements—a "transaction" that put a "creditor" into a "better position"—compare the creditor's position as the result of that alleged preference transaction (*i.e.*, what actually happened) on the one hand, to what the creditor's position would have been in a hypothetical liquidation of 3AC (occurring immediately following the transaction) if the alleged preference transaction did not occur (*i.e.*, a counterfactual) on the other hand.  The alleged creditor's position in the hypothetical liquidation is determined by reference to what assets of the debtor's estate would have been available for *pari passu* distribution to the insolvent debtor's creditors had the relevant transaction not occurred.  The inquiry thus focuses on whether the Challenged Trades resulted in FTX being put in a better position as a creditor through the diminution of assets that 3AC could otherwise have distributed to its eligible creditors in 3AC's liquidation.  (Atherton Rebuttal Decl. ¶ 23.)

51.    The Joint Liquidators allege that the Challenged Trades were "insolvency transactions" (Response ¶ 189) and that FTX was a "creditor" put into a better position via the Challenged Trades and the corresponding crediting of the proceeds of those digital asset sales to 3AC's USD Balance (*id.* ¶ 195).  The parties agree that the Challenged Trades took place on June 13 and 14, 2022, and thus occurred within the "vulnerability period" (to the extent that they qualify as "insolvency transactions").  (*Id.* ¶ 192.)

---

[28]    *Compare* Atherton Decl. ¶ 22 *with* Levy Decl. ¶ 42.  Although they use slightly different formulations of these elements, both experts agree that the "transaction" must have been entered into by 3AC.  (*See* Levy Decl. ¶ 75 ("As noted above, an unfair preference claimant must also demonstrate that the relevant transactions were 'entered into' by the company under section 245(1) of the BVI IA.").)

52. The Joint Liquidators must prove, then, that FTX was a creditor of 3AC, and that the Challenged Trades put FTX into a better position as a creditor when compared with a hypothetical liquidation of 3AC in the counterfactual where the Challenged Trades never occurred. In other words, the Joint Liquidators must prove that the Challenged Trades prevented 3AC from distributing some assets (or the full value of those assets) to its creditors as part of a liquidation of 3AC's estate, because they must prove that the Challenged Trades benefitted FTX at the expense of 3AC's other creditors.

53. The BVI Insolvency Act makes clear that only assets owned by the debtor, or in which the debtor had a proprietary interest, are distributable in liquidation.[29]  Property belonging to third parties (or not belonging to the debtor) does not form part of the debtor's estate, and therefore the transfer or diminution of such property (without more) cannot be used to establish that a creditor was put into a better position in the context of a liquidation.

54. If an alleged preference transaction does not transfer a debtor asset or diminish the value of any asset belonging to the debtor, the alleged creditor cannot be placed in a better position in liquidation within the meaning of section 245 of the BVI Insolvency Act. (Atherton Decl. ¶ 27; Atherton Rebuttal Decl. ¶ 25.)  A creditor's position in a liquidation—and whether that creditor benefitted at the expense of other creditors—is determined by reference to what the debtor's estate could have distributed to that creditor on a *pari passu* basis.  (Atherton

---

[29] Section 185 describes the "principal duties" of a liquidator as to "protect and realise the ***assets of the company***" and "to distribute the assets or the proceeds of realisation of the assets in accordance" with the BVI Insolvency Act.  (Beller Reply Decl., Ex. 13, BVI Insolvency Act § 185(1) (emphasis added).)  Section 207(1) provides that "***the assets of a company*** in liquidation shall be applied" to paying costs and expenses, preferential claims, all other claims, and interest.  (*Id.* § 207(1) (emphasis added).)  Property "held . . . on trust for another person" is expressly excluded from the liquidation estate and is "not [an] asset[] of the company," confirming that the property of third parties is not capable of distribution.  (*Id.* §207(4).)  Section 251 of the BVI Insolvency provides that "[a]ny money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 249 are deemed to be ***assets of the company available to pay unsecured creditors of the company***." (*Id.* § 251 (emphasis added).)  And a liquidator's statutory obligations include certifying "that all known ***assets of the company*** have been disclaimed, realised or distributed." (*Id.* § 234(3)(a) (emphasis added).)

Decl. ¶¶ 28-35; Levy Decl. ¶ 67.)    Where a transaction does not involve or affect those distributable assets, no creditor is advantaged and no preference can exist as a matter of law. (Atherton Decl. ¶ 27; Atherton Rebuttal Decl. ¶¶ 23-47.)

55.    The Joint Liquidators appear to suggest that, notwithstanding the text of the BVI Insolvency Act, the "better position" test can be met even if the alleged preference transaction did *not* diminish the value of any asset in which 3AC had an ownership or proprietary interest, and did not have *any* impact on the assets that comprise the 3AC's estate.[30]    (*See* Response ¶ 80.) Although their BVI-law expert, Mr. Levy, declined to answer the question of whether such an effect is required—or, indeed, whether *any* nexus to the debtor's estate is required—he appears to offer the view that there can be an unfair preference in circumstances where the relevant transaction does not deplete or diminish the debtor's estate in any way.[31]

56.    This remarkable position lacks legal support, is inconsistent with the settled purpose of preference law, and is wrong.    As both experts acknowledge, preference powers are "restorative" in nature and are aimed at returning the debtor to the position it occupied before the preference transaction occurred.[32]    A preference claim therefore presupposes that the transaction

---

[30]    The next 75 paragraphs (24% of the 149-page Response) are devoted to an argument that 3AC had such an interest in digital assets that were sold in the Challenged Trades, specifically a trust beneficiary or bailment beneficiary relationship.  The Response is revealing—the Joint Liquidators doth protest too much.

[31]    When asked directly whether a BVI preference claim must "involve the diminution of assets that would be available for distribution in the [debtor's] estate," Mr. Levy refused to accept that diminution is required, answering: "I said just read the act… if there has been a preference, that's what the Court looks at." (Levy Dep. Tr. 195:5-13).  And when shown authority requiring that a preference transaction diminish the debtor's assets (*i.e.*, the *Invest Bank* decision cited in the Response more than 15 times and discussed below), Mr. Levy stated that it would be "very odd . . . that the court should be finding that . . . there should be a diminution in value of the assets of the debtor." (*Id.* 240:12-21).

[32]    As Mr. Atherton explained, a preference claim allows "the Court to set aside the relevant transaction to restore the position to what it would have been if the company had not entered into the relevant transaction."  (Atherton Reply Decl. ¶ 33(d)(i); *see also* Levy Decl. ¶ 43 (describing the remedy for a preference claim as "restoring the position to what it would have been if the company had not entered into the transaction").)  Mr. Levy concurred at his deposition that relief for a potential preference claim under the BVI Insolvency Act is "restorative" in nature.  (Levy Dep. Tr. 156:9-10.)

at issue depleted or diminished value that would otherwise have been available for distribution to the debtor's creditors. (Atherton Decl. ¶ 25.) This is how preference law works in the United States, and this Court should not entertain a different formulation.[33]

57. There is no BVI case supporting the Joint Liquidators' position (including because there has *never* been a successful preference claim under the BVI Insolvency Act). English authorities at the highest level, however, confirm that a preference transaction must deplete or diminish an asset that would otherwise have been capable of distribution by the debtor.[34] As Lord Collins JSC of the U.K. Supreme Court explained in the *Rubin* decision, "[t]he underlying policy is to protect the general body of creditors ***against a diminution of the assets*** by a transaction which confers an unfair or improper advantage on the other party." (Beller Reply Decl., Ex. 14, *Rubin* v. *Eurofinance* [2012] UKSC 46 ("*Rubin*"), at [95] (emphasis added).)[35] Similarly, the English Court of Appeal explained in *Darty* that "the justification for setting aside a disposition of assets made shortly before the onset of insolvency is that, ***by depleting the estate***, the disposition unfairly prejudices creditors." (Beller Reply Decl., Ex. 15, *Darty Holdings SAS* v. *Carton-Kelly* [2023] EWCA Civ 1135, at [31] (emphasis added).)

---

[33]  *See* 11 U.S.C. § 550(a) (providing that recovery under preference claim is "for the benefit of the estate"); *Beiger* v. *IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of ***the debtor's property***." (emphasis added)); 11 U.S.C. § 550(d) (permitting only "single satisfaction" of property that was preferentially transferred, even if more than one creditor benefited).

[34]  Both parties agree that English precedent informs the analysis of a preference claim under the BVI Insolvency Act to the extent the allegations and reasoning are applicable. (*See* Levy Dep. Tr. 65:5-7 ("English law is – forms very much part of the law of the British Virgin Islands.").)

[35]  *See also Rubin* at [94] ("In order to achieve a proper and fair distribution of assets between creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property ***so as to constitute the estate which is available for distribution***." (emphasis added)); *id.* (a liquidator may "where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order ***restoring the position to what it would have been had the transaction not taken place***" (emphasis added)).

58.     The Joint Liquidators offer no contrary authorities, and their reliance on *Invest Bank* is misplaced.  (Austin Decl., Ex. 61, *Invest Bank PSC* v. *El-Husseiny* [2025] 2 WLR 320 ("*Invest Bank*"), at [53].)  That decision did not involve an unfair preference claim under BVI law,[36] and, in any event, the U.K. Supreme Court confirmed that "there must be a depletion or diminution in value of the assets available for enforcement of claims against the debtor."[37]  The Joint Liquidators' reliance on old Australian decisions addressing a subsequently amended statute with meaningfully different text is misplaced as to both substance[38] and relevance.[39]  Such

---

[36]   The *Invest Bank* case involved a claim under Section 423 of the U.K. Insolvency Act 1986 to the effect that the debtor had entered into a transaction with the intent to defraud his creditors.  (Atherton Reply Decl. ¶ 38.)  As Mr. Atherton described, this decision is "concerned with: (i) an entirely different statutory provision; (ii) that is contained in and forms part of an entirely different statute; (iii) which was enacted in and applies in an entirely different jurisdiction; and (iv) concerns a statutory claim that has a very different statutory lineage than s.245 of the Insolvency and is rooted in the laws directed at preventing what historically were referred to as 'fraudulent conveyances'." (*Id.*)  While a BVI court might consider the reasoning of the *Invest Bank* decision, that case would not be binding, and indeed no BVI court ever has considered it.

[37]   The *Invest Bank* case dealt with a transaction that directly reduced the value of the debtor's asset, and therefore reduced the value that could otherwise have been available for distribution to the debtor's creditors absent that transaction.  The debtor caused *his wholly owned company* to transfer a valuable asset *owned by that company* for no consideration at all.  (*Invest Bank* at [5].)  The equity shares of a company that formed part of the debtor's estate were now worth less as the result of the transaction.  (*Id.*)  The parties accepted the "necessary element" that the debtor's assets "had been diminished as a result of the transfer."  (*Id.*)

[38]   *See* Beller Reply Decl., Ex. 16, *G & M Aldridge Pty Ltd* v. *Walsh* [2002] BPIR 482, and Austin Decl. Ex. 63, *Re Emanuel (No. 14) Pty Ltd (In Liquidation)* (1997) 15 ACLC 1099.  In *G & M Aldridge*, the Australian High Court accepted that the funds at issue were available to and for use by the debtor, and therefore the transaction had the effect of depleting assets that would otherwise have been available to the debtor's other creditors.  (*See G & M Aldrige* at [8] ("the assets of [debtor] included the sum of $400,000 held on its behalf by Construction Pty Ltd."); *id.* at [7] ("on behalf of TLL").)  In the *Emanuel* case, among other things, the debtor company "sought to and did procure the partial extinguishment of Blacklaw's debt" by directing that a sum be paid under the Deed.  (*See Emanuel*, at 19.)  In that case, the creditor received the actual benefit of an asset of the insolvent company.

[39]   Indeed, it is unclear whether *G & M Aldridge* as the Joint Liquidators use it would remain viable authority as a matter of Australian law.  (*See, e.g.*, Beller Reply Decl., Ex. 66, *Cant* v. *Mad  Brothers Earthmoving Pty Ltd (in liq)* [2020] VSCA 198, at [103, 112] (referencing *G & M Aldridge* and confirming that the "pertinent issue is whether the assets available for distribution among creditors have been reduced").)  Nor does it appear to have been considered substantively by any reported BVI or English decision.  It was described in the leading textbook *Goode on Principles of Corporate Insolvency Law*, which Mr. Levy cited five separate times in his Declaration, as a "difficult decision" that "may, however, have turned on its own rather special facts and does not, it is thought, reflect the position under the differently worded provisions of s.239 of the [U.K.] Insolvency Act 1986."  (*See* Beller Reply Decl., Ex. 17, Roy Goode, *Goode on Principles of Corporate Insolvency Law* (5th ed. 2018), at 13-85.)  Likewise for Section 245 of the BVI Insolvency Act.

decisions do not represent the law of the BVI, and a BVI court would not look to them as a basis for contravening the reasoning of the *Rubin* and *Darty* decisions discussed above.

59.    Accordingly, there can be no real question that absent depletion or diminution of assets that would otherwise have been available to 3AC for distribution to its creditors, FTX (or any other alleged creditor) was not put into a "better position" relative to what would have happened in a hypothetical or actual liquidation, and thus there is no sustainable BVI Preference Claim.

## 2.    Defenses and Discretion Regarding Relief

60.    The Joint Liquidators must prove each of these required elements, but even if they could (they cannot), the BVI Insolvency Act also provides for a complete defense if "the transaction took place in the ordinary course of business."  (Beller Reply Decl., Ex. 13, BVI Insolvency Act § 245(2).)

61.    Moreover, this Court's equitable discretion extends to determining the appropriate remedy, if any, even in a situation where the technical elements of a foreign-law claim are satisfied.  The question of remedies for this Court is one of U.S. law.  But the BVI Insolvency Act provides similarly broad discretion for a court in the BVI to fashion or decline to provide relief even where the elements may technically be satisfied.  (BVI Insolvency Act § 249; Levy Dep. Tr. 210:10-11 ("the court could decide what relief to grant").)  Thus, even *if* the necessary elements could be established, *and* the defenses could be overcome, any potential relief that might be awarded for the Preference Claim must comport with fairness and equitable principles, which include treating 3AC similarly to other former FTX customers.[40]

---

[40]    Indeed, an English court recently declined to grant relief under Section 423 of the U.K. Insolvency Act 1986 where the claimant established that a transaction occurred at an undervalue because relief might be considered unjust, inequitable, and inconsistent with the power of the court to grant restorative relief.  (Beller Reply Decl., Ex. 65, *Credit Suisse Virtuoso SICAV-SIF* v. *SoftBank Group Corp* [2025] EWHC 2631 (Ch).)

**B.     FTX Was Not a Creditor of 3AC.**

62.     The Joint Liquidators fail to carry their burden to prove that FTX was a creditor of 3AC.  The Terms of Service established a creditor-debtor relationship in which customers like 3AC were the creditors, as Lord Neuberger explained: "[T]o the extent that no trust was established and a quasi-bailment was not achieved, the effect is that FTX Trading is the legal and beneficial owner of the Digital Assets and *customers are merely creditors of FTX Trading* (*i.e.*, there will be a debtor-creditor relationship.)"  (Neuberger Confirmation Decl. ¶ 66 (emphasis added).)

63.     As discussed further below, the evidentiary record—including the code governing the Exchange, primary-source data, applicable agreements, and witness testimony— confirms that a customer's entitlement to value from the Exchange was limited to the Account Balance, and did not extend to isolated sub-balances reflecting higher gross values.  *See* Section I.C.1, *infra.*[41]  Accordingly, a customer in 3AC's position, as a creditor, could seek from FTX only the amount permitted under the Terms of Service—at most, the Account Balance reflected in its Customer Account.

64.     Because 3AC's Account Balance was positive at all relevant times,[42] 3AC had the right to seek its customer entitlement from the Exchange, subject to all applicable terms

---

[41]   As the FTX Recovery Trust showed in the Objection, the Exchange generally did not entitle a Customer Account to have a negative Account Balance at any time.  (Coverick Decl. ¶ 11.)  There were limited exceptions for accounts internal to FTX or its affiliates that are not relevant to 3AC's capacity to withdraw assets.  (*Id.* ¶ 11.)

[42]   The clear, uncontroverted evidence confirms that the 3AC Accounts had a positive Account Balance at all relevant times.  The Joint Liquidators do not seriously dispute this factual question, instead contend only that a single witness—FTX's former Head of Institutional Sales—testified three years after the events in question that he considered the accounts to be "essentially negative" because 3AC was out of compliance with collateral requirements and owed its $120 million Line of Credit to FTX.  (Response ¶ 201 n.31.)  This is an attempt to confuse the record.  Collateral requirements are separate from balances.  Mr. Tackett did not testify that the Account Balance was in fact negative.  And the Joint Liquidators have the data showing the Account Balance, and all transactions, at any point in time, and make *no* argument based on that evidence.

and conditions.  In contrast, FTX could not have stated a claim against 3AC on June 12, 2022 because the 3AC Accounts were in a positive state.  As Mr. Atherton explained, because "the Account Balance was positive before the alleged relevant 'transactions' took place, FTX was 3AC's debtor," and thus "FTX was not a creditor of 3AC under BVI law."  (Atherton Rebuttal Decl. ¶ 58.)  Indeed, FTX *was* a debtor in these bankruptcy proceedings, and millions of its former customers (including 3AC) filed *creditor* claims, and this Court already concluded that the Terms of Service established a creditor-debtor relationship when it rejected arguments that those same Terms of Service created a proprietary interest in respect of digital assets held by the Exchange. (Confirmation Order ¶ 20.)  The same debtor-creditor relationship applies here.

65.    The Joint Liquidators ignore all this and argue that FTX was both a debtor with respect to the positive Digital Assets Balance and a creditor with respect to the negative USD Balance.  As discussed at length in the Objection, there is no factual basis for that position, which, among other things, is contrary to how the "Customer Entitlement Claim" has been calculated for every other customer in these Chapter 11 Cases.

66.    In an attempt to get around that fundamental reality, the Joint Liquidators take the premise established by the FTX Recovery Trust—that the Account Balance is the "comprehensive measure of value for a Customer Account" (Coverick Decl. ¶ 7)—and contort it into a new caricatured position divorced from any argument ever made by the FTX Recovery Trust:  that no individual assets were associated with the 3AC Accounts and that particular sub-balances have no meaning in any context.  (*See* Response ¶¶ 168-73.)  That is not, and has never been, the FTX Recovery Trust's position.  In fact, the FTX Recovery Trust has consistently explained that the Exchange tracked and calculated numerous metrics relating to a customer's

account for various purposes.[43]    Customers could, of course, deal in different assets on the

Exchange.

67.    None of this, however, changes a customer's position vis-à-vis the

Exchange.    FTX's tracking of a customer's individual token balances for various purposes to

determine what customers could do on the Exchange (*e.g.*, trade, borrow, transfer) has no bearing

on what metric is relevant for purposes of determining what customers were entitled to withdraw

*from* the Exchange.    The withdrawal question was answered not by isolated sub-balances that may

be relevant for trading purposes, but by the net, overall position of the Customer Account (again

subject to applicable terms and conditions).    As explained below (Section I.C.1, *infra*), this is

proven by evidence that includes the FTX codebase itself, the primary source Exchange data,

witness testimony, and the Terms of Service.[44]    Indeed, no other customer has had a Customer

Entitlement Claim valued by reference to a component sub-balance for one or more digital assets

rather than an overall, net Account Balance.    The Joint Liquidators' recourse to smoke and mirrors

to confuse the issue simply cannot overcome this evidence.[45]

---

[43]    *See, e.g.*, Objection ¶ 21 (noting sub-balances were, in addition to the Account Balance, visible to a customer); *id.* ¶ 49 (discussing the weight multiplier applied to different assets).  As has been made clear throughout this dispute, customers had sub-balances for each particular asset type.  (Coverick Decl. ¶ 8.)  Customers could trade on margin by borrowing different types of assets from other customers.  (*Id.* ¶ 13.)  And the Exchange imposed Margin Requirements to regulate that leveraged trading, which applied weights to different types of assets based on their risk profiles.  (*Id.* ¶¶ 38-44.)

[44]    *See, e.g.*, Tackett Dep. Tr. 38:9-14, 120:6-9 (testifying that a customer could only "withdraw positive assets as long as you're above your maintenance margin requirements" and that "once you have a negative balance overall, you can't withdraw more"); Beller Reply Decl., Ex. 21, FTX_3AC_000044523 (confirming that 3AC Accounts did not have a setting permitting a negative Account Balance); Terms of Service §§ 10.2, 12.1, 16.2 (provisions limiting customers' ability to withdraw).

[45]    The Joint Liquidators' assertion that the Margin Program and liquidation processes support the segregation of the Digital Asset Balance from the USD Balance is nonsensical.  (Response ¶¶ 171-72.)  Neither the Margin Program nor the liquidation engine provides any evidence that customers could withdraw from the Exchange all digital assets to which they had credits without regard to their debits in other types of assets.  In fact, the Margin Requirements prove just the opposite.

68.     Moreover, 3AC's own contemporaneous financial documents confirm that, when considering what 3AC as a customer could take possession of outside the FTX ecosystem, the relevant consideration was the overall position of the Customer Account—*i.e.*, the Account Balance. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████ 46 ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

69.     Similarly, the Account Balance has been the relevant measure of whether a customer had a Customer Entitlement Claim against the Debtors from the start of the bankruptcy process and is how every single Customer Entitlement Claim is calculated for purposes of allowance under the Plan.  For example, the Debtors' Schedules and Statements (dated June 27, 2023) included negative sub-balances as component parts of the overall position for a Customer

---

46 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

Account (*i.e.*, the Account Balance).[47]  Similarly, the Customer Bar Date Order (dated June 28, 2023) provided that only "holders with net positive balances as of the Petition Date" will receive an auto-generated Customer Proof of Claim Form.[48]  Likewise, the Disclosure Statement (dated June 27, 2024) stated that "the FTX Group had over 2 million customer accounts with ***positive balances*** as of the Petition Date."[49]  At the confirmation hearing on October 7, 2024, this Court similarly recognized that customer recovery would be determined by reference to "the value of your claim based on what it was at the time of the filing of the bankruptcy." (Beller Reply Decl., Ex. 20, Oct. 7, 2024 Hr'g Tr. 175:3-7.)  All of these positions were taken long before the Joint Liquidators moved to amend their Proof of Claim, were not objected to by the Joint Liquidators, and confirm the obvious:  everyone understood that Customer Accounts were valued by reference to the net, overall position of the accounts, *i.e.*, the Account Balance.[50]  This reflects the normal operation of the Exchange, not some "made-for-litigation premise" as the Joint Liquidators wrongly suggest.  (*See* Response ¶ 10.)

70.    The Joint Liquidators throw various arguments against the wall in an attempt to suggest there is circumstantial evidence that FTX was a creditor, but none of it relates to 3AC's negative USD Balance.  The Joint Liquidators point to Section 10.3 of the Terms of

---

[47]  *See, e.g.*, *Amended Schedule F-1: Nonpriority Unsecured Customer Claims* [D.I. 1730]; *Amended Schedule F-13: Nonpriority Unsecured Customer Claims* [D.I. 1742].

[48]  *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793].

[49]  *Disclosure Statement for Debtors' Joint Chapter 11 Plan for Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-in-Possession* [D.I. 19143]  (the "Disclosure Statement"), Section 3(R) (emphasis added).

[50]  The Joint Liquidators' BVI-law expert, Mr. Levy, acknowledged that a Customer Account was worth the Account Balance.  (*See* Levy Dep. Tr. 117:9-18 ("Q.  So is that [overall] balance what the account is worth?  A.  It is – that data is – represents the difference between assets and liabilities.  If you want to say is that [is] what someone is worth, then I don't suppose that's a particularly objectionable way of saying it.").)

Service providing that FTX would have recourse against a customer "[i]f, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance." (Terms of Service § 10.3; *see* Response ¶ 196.)  But their argument fails because there was no "outstanding debit balance," and there was no "demand by FTX."  The Joint Liquidators assume, rather than demonstrate with evidence, that this provision applies to a particular sub-balance rather than the overall Account Balance.  Because the 3AC Accounts had a positive balance, FTX did not make a demand, and this provision did not create any liability for 3AC on June 12, 2022.  The Joint Liquidators cannot salvage their case by saying that a "creditor" may have "contingent liabilities." (*See* Response ¶ 199.)  FTX does not have an *admissible* claim in 3AC's proceedings in the BVI merely because the Joint Liquidators can come up with a hypothetical set of facts, wholly inconsistent with what actually happened, that might give rise to a potential claim (subject to other unknowns).[51]

71.    Nor does the Line of Credit Agreement establish "creditor" status under the BVI Insolvency Act.  The Line of Credit Agreement provided that if 3AC failed to "meet minimum maintenance, collateral requirements or margin calls," then FTX could "sell any assets, top up assets in its discretion, cancel any open order; close any outstanding order; and otherwise take any action deemed necessary to obtain liquidity to comply with collateral requirements with respect to the Indebtedness." (Line of Credit Agreement § 4(c).)  The remedy for breach of these provisions was FTX's ability to take action with respect to assets credited to the 3AC Accounts, which were already assets that FTX owned and were under its control.  Far from proving that FTX could have

---

[51]    The only other provision of the Terms of Service invoked by the Joint Liquidators to try to manufacture "creditor" status is Section 38.7, which provides that customers "shall not set off" any "amount payable by you to FTX Trading." (Terms of Service § 38.7.)  They do not even attempt to argue how this created a claim for FTX against 3AC, much less one that is admissible in 3AC's insolvency proceedings.

filed a claim to recover a negative sub-balance in 3AC's liquidation proceedings, this provision confirms that FTX would never have needed to do so because sub-balances were integrated, inseparable parts of the Account Balance.

72.    Furthermore, the evidence shows that other Exchange customers—not FTX—were 3AC's creditors as to the amounts 3AC borrowed via the Margin Program.[52]  This comprised $631 million of the $733 million negative USD Balance for the 3AC Accounts as of June 12, 2022.  (Coverick Decl. ¶ 49 (3AC would first draw on the $120 million line of credit, then borrow under the Margin Program); Response ¶ 50 (recognizing two elements to the negative USD Balance—the $120 million Line of Credit, and amounts borrowed under the Margin Program).)  FTX was the Exchange, not a lender on the Margin Program, and the Joint Liquidators assert without proving by fact or law that FTX was a "party" to the loans made by other customers or the Challenged Trades themselves.  (Response ¶¶ 219-20.)  But even setting that aside and focusing solely on the bilateral rights and obligations between FTX as Exchange and 3AC as customer, the Terms of Service confirm that FTX was not a creditor of 3AC.

73.    The simple reality is that FTX could not have filed an admissible claim for the negative USD Balance because the 3AC Accounts had a positive Account Balance at the time of the Challenged Trades, and FTX was therefore not a creditor of 3AC.

**C.    Even if FTX Were a Creditor, It Was Not Put Into a Better Position as the Result of the Challenged Trades.**

74.    Even if the Joint Liquidators could prove that FTX was a creditor of 3AC (and it was not), they still cannot prove that the Challenged Trades put FTX into a better position

---

[52]    *See, e.g.*, Tackett Dep. Tr. 60:4-18 ("Q.  When a customer participated or when a customer traded on margin, they borrowed assets from other customers, correct? [ . . . ] [A.]  If you're doing spot margin trading, then, yes, it would be coming from the spot margin market, which was made up by loans from other users on the exchange.").

than it would have been in had the Challenged Trades never occurred.  This independently defeats the Preference Claim.

75.     The Joint Liquidators' theories and arguments are premised on 3AC having a proprietary right in digital assets held by the Exchange.  Absent such a proprietary right to specific assets—and none existed, as this Court has already determined—3AC was left with its rights to assert claims as a creditor against FTX under the Terms of Service.  The Terms of Service did not entitle 3AC or any other customer to withdraw digital assets or other value worth more than the Account Balance.  Nor would the codebase of the Exchange have permitted it.  The Challenged Trades, meanwhile, did not reduce the Account Balance, and therefore did not reduce the value that 3AC could have sought to withdraw from the Exchange.  Thus, without a proprietary right to digital assets, 3AC could not have distributed digital assets involved in the Challenged Trades in its liquidation proceedings (hypothetical or actual), and FTX therefore was not put into a better position as a creditor relative to the position it would have occupied absent the Challenged Trades in the context of any such hypothetical liquidation proceedings.

### 1.     The Challenged Trades Did Not Diminish the Account Balance, Which Was the Most That 3AC Could Have Distributed to Its Creditors in a Hypothetical Liquidation.

76.     The Joint Liquidators' argument in the Response that FTX was put in a better position as a creditor depends on a critical assumption that has no basis in reality:  that 3AC at some point had access to digital assets worth "over $1 billion" and lost that access as the result of the Challenged Trades.  (Response ¶¶ 5-6.)  The Joint Liquidators argue that because there was a Digital Asset Balance of $1.017 billion on June 12, 2022 that no longer existed two days later, then the "3AC Debtor lost well over $1 billion in assets whose value could and should have been

ratably distributed to its creditors."[53]  (*Id.* ¶ 6.)  The Joint Liquidators ignore the fundamental fact that negates the core premise:  *3AC could never have withdrawn, and therefore did not have any right to claim, more than $1 billion in digital assets from the Exchange*.  3AC had access to, at most, the value of its Account Balance, and *never* had the ability to withdraw from the Exchange and distribute more than $1 billion in digital assets (or the proceeds thereof) to its creditors.

77.   *First*, the FTX codebase governed the Exchange and dictated what users could do.[54]  If an attempted withdrawal by a customer was larger than the collateral available in the Customer Account to satisfy applicable Margin requirements, then the Exchange would not allow the withdrawal.

78.   *Second*, primary source Exchange data likewise confirms that customers could not withdraw amounts that would render their Account Balance negative.  The primary source Exchange data included a field titled "allow_negative."  (Beller Reply Decl., Ex. 21, FTX_3AC_000044523 (spreadsheet identifying limited set of accounts with such field).)  This determined whether, among other things, a Customer Account could continue to withdraw assets even if such withdrawal rendered the Account Balance negative.  Only for certain FTX affiliates— and *not* 3AC—where this feature was enabled, would a customer be allowed to withdraw from the Exchange an amount exceeding their Account Balance.  Because this field was never enabled for 3AC (*see id.*), 3AC could not have withdrawn an amount exceeding the collateral available to satisfy its Margin Requirement or an amount exceeding its Account Balance.

---

[53]   This position also highlights the lack of basis for the Joint Liquidators' unprecedented theory that there may be preference liability even if the Challenged Trades had no impact on what otherwise could have been distributed to 3AC's creditors.

[54]   Singh Dep. Tr. 226:12-13 ("In my view, the exchange was a system determined by how the code operated."); Bankman-Fried Dep. Tr. 218:12-15 ("So the code base was the underlying computer code that ran FTX both as a back-end platform and as a front-facing user interface or set of user interfaces across different devices.").

79.     *Third*, witness testimony confirms that the Exchange did not allow customers to withdraw more than their Account Balance.  Mr. Tackett, FTX's former Head of Institutional Sales, testified that "once you have a negative balance overall, you can't withdraw more."  (Tackett Dep. Tr. 120:6-9; *see also id.* 38:9-14 (testifying that you could only "withdraw positive assets as long as you're above your maintenance margin requirements").)  The FTX Recovery Trust testified, via Mr. Coverick, that "customers traditionally had the ability to withdraw assets from the exchange in a variety of manners ***subject to having an available account balance***."  (Beller Reply Decl., Ex. 22, Transcript of September 24, 2025 Deposition of Steven Coverick ("Coverick Day 1 Dep. Tr.") 96:11-15 (emphasis added).)  The Joint Liquidators deposed Mr. Coverick for nearly 15 hours, and offer no challenge to this fact in the Response.

80.     *Fourth*, this evidence is backed by common sense.  An exchange could not function if customers were able to pull from that exchange anything of value while ignoring the overall state of their account, leaving others to foot the bill.  This suggestion is antithetical to the entire concept of margin lending.  Indeed, one of the Joint Liquidators' purported experts, Matthew Lisle, agreed that it is "a basic tenent [*sic*] of exchanges . . . anywhere" that a "debit would have to be satisfied before you're allowed to withdraw" assets from an exchange.  (Beller Reply Decl., Ex. 23, Transcript of December 4, 2025 Deposition of Matthew Lisle ("Lisle Dep. Tr.") 263:4-11.)[55]

---

[55]     Lisle Dep. Tr. 262:24-263:21 ("Q. Okay. And I take it you also understand that as a general matter, a customer could not simply withdraw all his positive sub-account balances and just leave the negative sub-balances behind in the account, right?  A. The way an exchange operates is that it has an agreement with the user that it can use the Exchange as long as it can pay its way, and ***if there was a request to withdraw and there was a debit, that debit would have to be satisfied before you're allowed to withdraw. That would be a basic tenent [sic] of exchanges -- exchanges anywhere***.  Q. As a consequence of that, what I was saying about the positive and negative balances is correct, right?  You couldn't just withdraw all the positives and leave the negatives behind, creating a net negative balance with no positive assets at all?  A. Until you satisfy the negative balance, until you paid it back -- Q. Yes.  A.  -- or satisfied it." (emphasis added).)

81.     Taken together, the code governing operation of the Exchange, the primary source data derived from the Exchange, the governing agreements, unrebutted testimony, and basic common sense demonstrate that 3AC's entitlement to value from the Exchange was limited to, at most, its Account Balance, not the Digital Asset Balance that formed one, isolated component thereof.

82.     The Joint Liquidators do not point to a shred of evidence—whether from Exchange data, code, documents, or witness testimony—that suggests an ability for 3AC to pull from the Exchange digital assets (or any assets) whose value exceeded its Account Balance.  As such, nothing in the record demonstrates that 3AC could have withdrawn the entire Digital Asset Balance or anything remotely approaching "over $1 billion."

83.     Instead, the Joint Liquidators attempt to manufacture the possibility that 3AC could have obtained (and distributed) more than $1 billion in digital assets by speaking into existence some contractual right to do just that.  This attempt fails.  Just as 3AC could not have withdrawn its Digital Asset Balance as a matter of fact, 3AC likewise had no right to do so under the Terms of Service.

84.     The Joint Liquidators identify only one provision of the Terms of Service—Section 8.2.6(C)—to support their assertion that 3AC had a legal right to withdraw more than $1 billion of digital assets.  (Response ¶¶ 103, 106, 164, 226.)  Although Section 8.2.6(C) provides that customers can withdraw digital assets from the Exchange, it expressly conditioned that withdrawal right on compliance with FTX policies, including the rest of the Terms of Service:  "At any time, ***subject to*** outages, downtime, and ***other applicable policies (including the Terms)***, you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."  (Terms of Service § 8.2.6(C) (emphasis added).)

85.    Thus, FTX's policies—including elsewhere in the Terms of Service—are baked into the only express authority for 3AC or other customers to withdraw assets. Unsurprisingly, given the operation of the Exchange, the Terms of Service include numerous other provisions that confirm that withdrawals were not permitted for an account with a negative Account Balance.

86.    Section 10.2 permitted FTX to "suspend your ability to use the Services or close your Account" if the Customer Account has a "total debit balance."  (Terms of Service § 10.2.)  This includes a customer's ability to withdraw assets for which the customer has a positive balance.[56]

87.    Section 12.1 provided that FTX could "in its sole and absolute discretion and at any time, without liability to you or any third party" (i) "refuse to let you open an Account, suspend your Account, or terminate your Account," (ii) "***decline to process any instruction*** or Order submitted by you," and/or (iii) "***limit, suspend or terminate your use*** of one or more, or part ***of, the Services***."  (Terms of Service § 12.1 (emphasis added).)  FTX retained the ability to decline withdrawal requests, or to limit, suspend or terminate a customer's ability to withdraw from the Exchange at any time.  This too qualifies the withdrawal right on which the Joint Liquidators' case depends.

88.    Section 16.2 confirms that FTX had the right to liquidate positions in the event of non-compliance with Margin Requirements.  (*See* Terms of Service § 16.2 ("If the value

---

[56]    The term "total" is facially consistent with an overall position rather than a partial position like a sub-balance, and it is unclear why the Joint Liquidators believe that this provision would have "little meaning" if "total debit balance" refers to the total Account Balance (Response ¶ 165).  There are obvious reasons to liquidate assets that are deteriorating in value even if the liquidation could not bring the account back into a positive overall state. While it is the case that a liquidation trade would not directly increase the Account Balance, a trade that swapped an entitlement to BTC for an entitlement to USD *would* preserve the Account Balance if the price of BTC subsequently declined.  In fact, that is what happened in the case of the 3AC Accounts.

of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account . . . .").)  It is unclear why the Joint Liquidators suggest that this provision—which confirms FTX's right to take action in the event of non-compliance—somehow supports a right of 3AC to withdraw digital assets worth a value in excess of the overall Account Balance.  It plainly does not do so.

89.    3AC was also subject to the provisions of the Line of Credit Agreement, which required 3AC to retain 200% of the value of the line of credit (*i.e.*, $240 million beyond the $120 million LOC) in the 3AC Accounts.  (Line of Credit Agreement § 5.)  This provided another clear limitation on 3AC's right under the Terms of Service to withdraw digital assets.

90.    The Joint Liquidators' own legal experts—Dame Elizabeth and Mr. Levy— both recognized that the right to withdraw assets created by Section 8.2.6(C) was restricted, rather than an unqualified right to withdraw the entirety of the Digital Asset Balance.  Dame Elizabeth was asked whether she viewed Section 8.2.6(C) of the Terms of Service "as giving customers an unconditional right to withdraw assets," and she answered, "No, I do not."  (Beller Reply Decl., Ex. 24, Transcript of November 25, 2025 Deposition of Dame Elizabeth Gloster, DBE ("Gloster Dep. Tr.") 211:18-21.)[57]  Mr. Levy, likewise agreed that the withdrawal right set forth in Section 8.2.6(C) was "restrictive."[58]

---

[57]    *See also* Gloster Dep. Tr. 213:9-19 ("If there is such a term [that limits a customer's ability to withdraw assets], yes.  If it does indeed limit the ability to withdraw assets, then that, subject to looking at the particular provision, would appear to be included within the contemplation of the parenthetical."); 216:20-217:4 (describing Section 16.2 of the Terms of Service pertaining to margin requirements as a potential limitation on 3AC's ability to withdraw digital assets from the Exchange).

[58]    Levy Dep. Tr. 220:18-20 ("I can see that the terms may restrict.  I won't say it is conditional I think it is restrictive but . . . that may be a distinction without a difference.")

91.    The Joint Liquidators cannot simply assume the success of their own arguments by relying, as they do throughout the Response, on the false premise that 3AC had a right to receive more than $1 billion in digital assets from 3AC.  The Joint Liquidators bear the burden of establishing that right, and they cannot do so because the neither the Terms of Service nor any other governing agreements create this right.

92.    Critically, the Challenged Trades did *not* reduce the Account Balance, and thus did not diminish value that 3AC would otherwise have been able to distribute to its creditors in its liquidation proceedings.[59]  The Preference Claim therefore fails because the Challenged Trades did not put FTX into a better position as a creditor.

93.    The Challenged Trades operated like every other customer trade on the Exchange.  When 3AC made a Challenged Trade, it was debited the value of the relevant digital asset and credited the same value of USD (less fees).  (Coverick Decl. ¶¶ 68-69.)  The inverse happened to the counterparty (*i.e.*, another Exchange customer).  This happened roughly 52,000 times on June 13 and 14, 2022.  (*Id.* ¶ 68.)  The same steps occurred during the Liquidation initiated by FTX at the end of the day on June 14, 2022.  (*Id.* ¶ 70.)  At bottom, the Challenged Trades were neutral with respect to the value of the Account Balance because one sub-balance increased by the same amount (measured in USD) as the other sub-balance decreased (also measured in USD), netting out to the same Account Balance (measured in USD).  (*Id.* ¶ 71, tbl. 5.)

---

[59]    As explained in the Objection, the Account Balance for the 3AC Accounts did decrease by approximately $282 million on June 13 and 14, 2022, but not as the result of the Challenged Trades.  3AC withdrew approximately $60 million from the Exchange in the form of digital assets and USD on June 13 and 14, 2022, and price declines decreased the Account Balance by another $222 million on those dates.  (Coverick Decl. ¶¶ 66-67 tbls. 3-4.) None of this resulted from the Challenged Trades, and the Joint Liquidators do not seek to claim this amount. (*See* Proof of Claim ¶ 43 (excluding from the "Lost Assets" calculation amounts derived from "unrealized losses" and "withdrawals by the 3AC Debtor"); *see also* Levy Dep. Tr. 318:20-323:8 (concurring that there can be no "transaction" under the BVI Insolvency Act as the result of withdrawals or market price declines).)

94.     The Joint Liquidators misleadingly frame the Challenged Trades as a "repayment" of loans to concoct a false narrative in which FTX jumped the line at the expense of other creditors.[60]  (Response ¶ 174.)[61]  But the reality is that the Challenged Trades were addressed through the standard, universal procedures of the Exchange, whereby credits and debits were applied to the appropriate Customer Accounts.  There is no dispute that FTX maintained the ledger of customer entitlements, and FTX systematically applied debits and credits to the balances for the respective Customer Accounts.  FTX applied these for the Challenged Trades just as they did with every other trade on the Exchange.  When a customer received an entitlement to USD, the *only* place for those credits to flow was the USD Balance.  This would occur regardless of whether the USD Balance was positive or negative.  This simply reflected the customer receiving what it had agreed to in an arm's-length trade on the Exchange—an event that happened automatically for millions of customers each day.

95.     Thus, because the Challenged Trades did not reduce the Account Balance, and 3AC could only have withdrawn or claimed up to the amount of its Account Balance in a hypothetical liquidation proceeding at the moment before the Challenged Trades, the Challenged Trades did not put FTX into a better position as a creditor, and there could be no Preference Claim.

---

[60]    For example, the Joint Liquidators argue that FTX took "steps" to "protect[] [itself]" in connection with trades on June 13 and 14, 2022, which the Joint Liquidators concede were initiated by 3AC.  (Response ¶ 214.)  3AC initiated the trades, and FTX's involvement was limited to being the Exchange that provided a platform for those trades.

[61]    The Joint Liquidators no longer speculate that anyone other than 3AC conducted the Challenged Trades. (Response ¶ 77, n.15.)

> **2.     3AC Had No Proprietary Interest in Digital Assets, Which Forecloses Any Argument That 3AC Could Have Distributed the Digital Assets at Issue.**

96.     Unable to prove that 3AC would have been entitled to withdraw and distribute to its creditors any amount in excess of the Account Balance, the Joint Liquidators pin their hopes on proving that 3AC (unlike all other customers) had a proprietary interest in digital assets, despite the Court conclusively determining that the Exchange owned the digital assets it held.   Those hopes are futile.   The Court has already rejected these arguments through a final determination of ownership that was not objected to or appealed by the Joint Liquidators.   Even if the argument is considered, the Terms of Service did not create any trust or bailment under English law.

> **a.     This Court Already Determined That Customers Do Not Have a Proprietary Interest in Digital Assets.**

97.     The Court has already determined that digital assets held by the Exchange are property of the FTX Recovery Trust, based on the same contracts, facts, and arguments put at issue by the Joint Liquidators.   The relationship between 3AC and FTX in June 2022 was exactly the same as the relationship between FTX and all other Exchange customers—that of a creditor (3AC) and debtor (FTX).   As a result, the Joint Liquidators' argument that 3AC has a proprietary interest in the digital assets held by the Exchange needed to have been raised when this issue was before the Court at Plan confirmation, and the Joint Liquidators are now precluded from relitigating the issue.

98.     The Joint Liquidators invoke the Terms of Service, a standard form contract applicable to *all* former Exchange customers, to argue that 3AC had a proprietary interest in digital

assets held by the Exchange.[62]  They are far from the first creditor to do so.  On December 28, 2022—less than two months after the Petition Date—an *ad hoc* committee of creditors filed an adversary complaint against the FTX Recovery Trust for a declaratory judgment that "[u]nder the clear and unambiguous language of the FTX.com Terms of Service . . . , title to digital assets on the FTX.com platform remained at all times with the customer and did not transfer to FTX Trading Ltd." (*Complaint for Declaratory Judgment* ¶ 2 [D.I. 328].)  In recognition of this and similar arguments asserted by other creditors, the Debtors acknowledged that "the Plan still needs to resolve the customer property issue  . . . because that issue is relevant to so many people, millions of people" and that the Plan "needs to do so in a uniform way that resolves all of the various customer property litigation claims that we face." (Beller Reply Decl., Ex. 25, June 25, 2024 Hr'g Tr. 11:17-22.)  The Debtors negotiated a Customer Priority Settlement with the major creditor constituencies that was incorporated into the Plan as part of the Global Settlement providing customers prioritization of certain customer entitlement claims, interest at the significant "Consensus Rate," and other rights and interests.  (*See Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26035] ¶¶ 50-52 (the "<u>Confirmation Memorandum</u>"); *see also* Confirmation Order ¶ 41.)

99.     Certain customers disagreed, and objected to the Plan, arguing that the Terms of Service "clearly define that customers retain title and control over their digital assets." (*See, e.g.*, *Objection Of Lidia Favario to Confirmation of the First Amended Joint Chapter 11 Plan*

---

[62]   *See, e.g.*, Proof of Claim ¶ 25 ("Despite such clear terms, FTX now denies that the 3AC Debtor owned those assets as of June 12, 2022."); ¶ 75 ("Importantly, the May 2022 TOS do not disclaim fiduciary duties in connection with FTX's capacity as a custodian of assets."); ¶ 84 ("The 3AC Debtor owned and retained title to the Lost Assets under the explicit terms of the May 2022 TOS.").

*of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26170].)   The Debtors

submitted substantial briefing and evidence in support of the settlement and their arguments that

the customers had no proprietary or other interest in the assets held by the Debtors, including

rebuking the trust and bailment arguments that the Joint Liquidators advance now.  (*See, e.g.*,

Confirmation Memorandum ¶¶ 119-59; *Declaration of Edgar W. Mosley in Support of*

*Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading,*

*Ltd. and Its Debtor Affiliates* [D.I. 26044] (the "Mosley Confirmation Declaration"); Neuberger

Confirmation Decl.)

        100.   This Court necessarily considered these arguments at Plan confirmation.  As

described more fully in the Objection (*see* Objection ¶¶ 108-10), at the confirmation hearing, the

Debtors presented evidence regarding the meaning of the Terms of Service under English law.

This included the expert testimony of Lord Neuberger, who explained that the Terms of Service

"are inconsistent with an intention to create a trustee-beneficiary relationship."  (Neuberger

Confirmation Decl. ¶ 45.)  Rather, in Lord Neuberger's view, the Terms of Service established a

debtor-creditor relationship as to digital assets and fiat currency.  (*Id.* ¶¶ 11.1, 82-86.)

        101.   On October 7, 2024, the Court admitted Lord Neuberger's testimony

without objection and overruled objections that asserted a proprietary interest in digital assets.

(Beller Reply Decl., Ex. 20, Oct. 7, 2024 Hr'g Tr. 46:6-7, 174:8-175:14.)  On October 8, 2024,

based on the evidence presented by the Debtors, this Court issued the Confirmation Order that

determined, among other things, as a matter of law that "[t]he factual record establishes that all

Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property

of the Debtors' Estates."  (Confirmation Order ¶ 20.)  "A confirmation order is *res judicata* as to

all issues decided or which could have been decided at the hearing on confirmation." *Donaldson* v. *Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997).

102.    Accordingly, this fundamental issue—how to interpret the Terms of Service with respect to arguments concerning customer property rights—was previously determined by the Court.  The Response confirms that the Joint Liquidators wish to relitigate that necessary determination.  The Joint Liquidators offer testimony from Dame Elizabeth Gloster that the very same Terms of Service previously evaluated by Lord Neuberger and considered by the Court, which applied to all customers at the time of their execution of the Terms of Service, created a trust or quasi-bailment in favor of 3AC as a customer with respect to digital assets held by the Exchange.  They also offer testimony from Mr. Levy that these same Terms of Service alternatively created a "chose in action," *i.e.*, a breach of contract claim under Section 8.2.6(C) of the Terms of Service, that confers in 3AC a proprietary interest in digital assets held by the Exchange.  (Response ¶ 226.)[63]  If digital assets are the property of FTX, as this Court already determined, then none of those interpretations is possible.

103.    The Joint Liquidators could have raised such arguments when the question of whether the Terms of Service created any proprietary interest was before this Court, but chose not to do so.  In fact, the Joint Liquidators objected to Plan confirmation on other grounds in a self-described "limited objection" and participated in the Plan confirmation process.  (*Limited Objection and Reservation of Rights of the Foreign Representatives of Three Arrows Capital, Ltd. (In Liquidation) to the FTX Debtors' Motion for Entry of an Order Approving the Adequacy of the Plan* [D.I. 23146] ¶ 16; Response ¶¶ 148-55.)  At that time, the Joint Liquidators presented no evidence and offered no argument that the Terms of Service—applicable to every customer,

---

[63]    *See* Levy Dep. Tr. 247:23-25 ("The chose in action is the right pursuant to clause 8.2.6 of the terms of service.").

including 3AC—created any interest for 3AC or any other customer in digital assets, or any response to the analysis of Lord Neuberger and evidence presented by the Debtors.  It is too late to do so now.

104.    The Joint Liquidators cannot escape this Court's findings by arguing that that the Confirmation Order does not apply to them because it addressed ownership as of the Petition Date (rather than on June 12, 2022), or because the Court was evaluating ownership in order to determine whether the Debtors could distribute digital assets under the Plan.  (*See* Response ¶¶ 149-50.)  Neither timing nor procedure change the evidence or the reasoning for the Court's prior findings.

105.    *First*, as a creditor with notice and who actually participated in the Plan confirmation process, those proceedings and the resulting Confirmation Order are binding on the Joint Liquidators.  *See Donaldson*, 104 F.3d at 554.

106.    *Second*, the Court's determination that digital assets held by the Exchange on the Petition Date were property of the Debtors applies with equal force to assets held by the Exchange on June 12, 2022.  The same Terms of Service applied, and the Joint Liquidators concede that they had the same meaning in June 2022 that they had in November 2022.[64]  The same sweeping and commingling practices of the Exchange occurred in June 2022 in the same manner as in November 2022.  (Coverick Decl. ¶¶ 95-111.)  The Joint Liquidators offer no evidence to dispute this clear factual record or suggest that they had the ability to trace assets in June 2022 in a way that was impossible in November 2022.

---

[64]    Dame Elizabeth acknowledges that the meaning of the Terms of Service is identical for all customers who entered the Terms of Service on May 11th, 2022, absent some "special arrangement" between that customer and FTX. (Gloster Dep. Tr. 114:23-115:17.)  There was no such "special arrangement" between FTX and 3AC.

107.    *Third*, the Court's reference to Section 541 of the Bankruptcy Code or the term "estate" does not change (or undermine) the Court's evaluation of the Terms of Service and related facts.    The Joint Liquidators are seeking an Allowed Claim in the FTX bankruptcy proceedings that, like all claims, would be governed by the Plan.    Their purported claims are not entitled to special or different treatment relative to all other FTX customers.    After all, if the Court were to have found that customers like 3AC had proprietary interests in digital assets, this would have imperiled the Plan and necessarily altered the resolution of these Chapter 11 cases.

108.    The Joint Liquidators cannot escape the fact that the bases for the Court's finding of ownership were the Terms of Service entered on May 11, 2022 and the management of digital assets by FTX while the Exchange was operational (not any post-petition management of digital assets by the Debtors).    Indeed, the Joint Liquidators identify no basis to receive treatment different than any other customer:  they did not attempt to trace the assets that 3AC deposited on the Exchange, nor did they identify any special circumstance which would alter the application of the Terms of Service to the 3AC Accounts.    Instead, they assert arguments that are not only flawed, but needed to be raised more than a year ago in connection with Plan confirmation.    The meaning of the Terms of Service and the Exchange's management of digital assets were considered and answered by the Court in reaching its conclusion, and that conclusion binds the Joint Liquidators just as it binds every other FTX customer.[65]  This is fatal to the Preference Claim.

---

[65]    It is unclear why the Joint Liquidators (Response ¶ 150, n.22) treat the additional basis for the Confirmation Order's conclusion that the Court has jurisdiction to approve the distribution of digital assets even if they are not property of the Debtors, as rewriting the Court's conclusion that those digital assets "are property of the Debtors' Estates."  (Confirmation Order ¶ 20.)  The Court reached the conclusions it reached, and additional bases do not render its holding "tentative" in any respect.  (Response ¶ 150, n.22.)

**b.      3AC Was Not the Beneficiary of a Trust Over Digital Assets.**

109.    In the event the Court were inclined to revisit the question (it should not), the evidence demonstrates that the Court got it right the first time:  the Exchange did not hold digital assets as a trustee for customers.

110.    Under English law, a trust exists only if the contract unmistakably demonstrates three "certainties":  (i) the "intended beneficiaries," (ii) the "property to be subject to the trust," and (iii) "the intention of the settlor to create the trust."  (Beller Reply Decl., Ex. 26, *Wilkinson* v. *North* [2018] 4 WLR 41 ("*Wilkinson*"), at [2].)  In assessing those "certainties," the analysis starts and ends with an interpretation of the contractual language.  (*See* Neuberger Confirmation Decl. ¶ 35.6 ("[T]he primary object of interpretation should be the contractual documents."); *see also* Terms of Service § 38.1 ("You agree that the Terms constitute the entire agreement between you and FTX Trading").)[66]

111.    English law does *not* permit the creation or inference of a trust in the absence of the three "certainties."  This rule reflects that "the creation of a trust has significant, and generally irreversible, consequences," including the splitting of ordinary title into equitable and legal title and imposing strict fiduciary obligations on the trustee.  (*See Wilkinson* at [2].)  Critically, a trust relationship is *not* the default under English law when interpreting a contract; it is the exception, it requires evidence of a "clear substantive intention."  (Gloster Decl. ¶ 59 (quotations omitted).)  That burden is even higher in a commercial context, where "special care" is required in creating a trust.  (Neuberger Confirmation Decl. ¶ 37.5 (quoting *Pearson* at [225(ix)]).)  Indeed, English Law is replete with instances where the parties *try* to create a trust but

---

[66]  *Pearson*, cited by both experts, holds that the legal characterization must be "ascertained by an objective assessment of the terms of the agreement or relationship between A and B."  (*See* Austin Decl., Ex. 49, *Pearson, Lomas* v. *Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch) ("*Pearson*"), at [225(v)].)

fail to do so because the three "certainties" were not met.  (*See* Beller Reply Decl., Ex. 35, *Quoine Pte Ltd* v. *B2C2 Ltd* [2020] SGCA(I) 2, at [144] ("an intention is not to be imputed and a trust inferred simply because a court thinks it is an appropriate means of protecting or creating an interest" (quotations omitted)).)

### i.    The Terms of Service Do Not Demonstrate the Required Intention to Create a Trust.

112.    If a contract does not evidence a "clear substantive intention" to create a trust, then no trust was created.  The parties' English-law experts agree that, in assessing whether a contract evidences intent to create a trust, a court "identif[ies] the meaning of the relevant words" in light of (i) their natural and ordinary meaning; (ii) overall purpose of the document; (iii) any other provisions of the document; (iv) the facts known and summed by the parties at the time of execution of the document; and (v) common sense.  (Beller Reply Decl., Ex. 27, Charles Mitchell et al., *Underhill and Hayton: Law Relating to Trusts and Trustees* (20th ed. 2022) at [10.1].) Recent decisions from the English Supreme Court have "underscored the centrality of the wording the parties chose to use." (Neuberger Rebuttal Decl. ¶¶ 6-8.)  Applying these factors—individually and collectively—the Terms of Service do not evidence certainty of intention, and the only conclusion is that no trust was created.

113.    The Joint Liquidators' attempt to evade these settled English-law principles by effectively assuming that the ordinary operation of a cryptocurrency exchange creates a trust, and by relying on documents they do not even contend—and certainly cannot prove with admissible evidence—were shared with 3AC (let alone customers generally).  Those assumptions and materials are irrelevant to interpretation of the Terms of Service.  *See* Section I.C.2.b.ii, *infra.*

114.    English courts have in fact provided clear guidance on how to interpret a contract like the Terms of Service.  Where a contract is a "standard form," "the wording of the

instrument . . . is paramount" and extrinsic factors are not "relevant, except in the most generalised way."[67] (Beller Reply Decl., Ex. 28, *Re Sigma Finance* [2009] UKSC 2 ("*Sigma*"), at [37].)  Dame Elizabeth expressly agreed with this characterization.[68]  The reason is straightforward:  where millions of customers are bound by the same contract, it is impossible to determine the "purpose" with which each customer approached the Terms of Service, the facts known to each customer at execution, or whether each customer would have understood English-law concepts such as legal and equitable title under English property law.[69]

115.    The Terms of Service do not express—though they easily could have—any intention that digital assets be held by FTX on trust for customers.  The word "trust" appears only once across 38 sections and 16 schedules.  Section 9.2 provides that if FTX is unable to contact a customer, then (and only then) "FTX Trading . . . , *as Trustee*, will hold the Unclaimed or Abandoned Property *on your behalf*."  (Terms of Service § 9.2 (emphasis added).)  This is the exception that proves the rule.  Section 9.2 shows that FTX knew how to create a trust when it intended to do so, and it chose not to do so elsewhere.  If "certainty of intention" under English law is to mean anything, this fact alone is dispositive.  (*Wilkinson*; *see also* Beller Reply Decl., Ex. 29, *Wood* v. *Capita Insurance Services Limited* [2017] UKSC 24 ("*Wood*"), at [13].)  After all, Dame Elizabeth herself suggests that it would be "incoheren[t]" for FTX to create a trust

---

[67]    While Lord Neuberger and Dame Elizabeth agree that the Terms of Service are a form or "standard terms" contract, the Joint Liquidators ignore this in the Response.  (Gloster Dep. Tr. 100:14-16 ("Q. Do you consider the dotcom terms to be a standard form contract?  A.  Yes, I do.").)  This silence is telling.

[68]    *See* Gloster Dep. Tr. 103:5-6 ("I agree with what Lord Collins says in paragraph 37" of *Sigma*.)

[69]    "Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them.  In this type of case it is the wording of the instrument which is paramount.  The instrument must be interpreted as a whole in the light of the commercial intention which may be inferred from the face of the instrument and from the nature of the debtor's business."  *Sigma* at [37].

through clear language in Section 9.2 and only via implication elsewhere in the Terms of Service. (Gloster Decl. ¶ 65(c).)[70]

116.    Other express language is inconsistent with the creation of a trust.  A trust imposes fiduciary duties on the trustee, such that it would be impossible for a relationship of trust to exist without the imposition of these core duties.  A trust with no fiduciary duties whatsoever is essentially a contradiction in terms.  *See, e.g.*, Neuberger Confirmation Decl. ¶ 45.1 ("[A]n essential part of a trustee-beneficiary relationship is that the trustee owes fiduciary duties to the beneficiary.").  The Terms of Service are thus inconsistent with any intention to create a trust: Sections 2.1.3, 2.2.2, and 38.6 all ***disclaim*** any fiduciary duties and any fiduciary relationship:

- **Section 2.1.3**:  "FTX Trading is not your broker, intermediary, agent, or advisor and ***has no fiduciary relationship*** or obligation to you in connection with any trades or other decisions or activities effected by you using the Services."  (Terms of Service § 2.1.3 (emphasis added).)

- **Section 2.2.2**:  "We provide no warranty as to the suitability of the Digital Assets traded under the Terms and ***assume no fiduciary duty to you in connection with such use of the Services***."  (Terms of Service § 2.2.2 (emphasis added).)

- **Section 38.6**:  "***Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a*** partnership, association, joint venture, ***fiduciary relationship*** or other co-operative entity between the parties ***for any purpose whatsoever***. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so.  Each party confirms it is acting on its own behalf and not for the benefit of any other person."  (Terms of Service § 38.6 (emphasis added).)

117.    The Joint Liquidators respond that these repeated waivers are not fatal because parties may modify the fiduciary duties of a trustee.  (Response ¶ 117.)  But the Terms of Service do not modify fiduciary duties; they disclaim them altogether.  That express, unequivocal

---

[70]    Even the Joint Liquidators recognize that the use of express language in one part of the Terms of Service militates against reading that language into another part of the Terms of Service.  (*See* Response ¶ 118 (highlighting that "section 2.1.3 shows that the parties knew how to disclaim a fiduciary relationship when they wanted to").)

disclaimer is anathema to a trust relationship and confirms that the contract does not clearly evidence an intention to create a trust.  (*See, e.g.*, Neuberger Confirmation Decl. ¶¶ 45.1-45.6; Neuberger Decl. ¶ 11(a); Neuberger Rebuttal Decl. ¶¶ 14.e, 22.)  The Joint Liquidators' effort to parse these provisions is also unavailing because each applies to use of the "Services," which is defined to include any "use of the Exchange," including to "buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in . . . or list Digital Assets."[71]  (Terms of Services pmbl.)

118.    Unable to identify a clear expression of intent, the Joint Liquidators instead ask the Court to rewrite Section 8.2.6, which states that customers retain "title" to "your" digital assets.  Both English-law experts agree that the natural and ordinary meaning of "title" is legal title, not beneficial ownership alone.  (Gloster Decl. ¶ 54; *see also* Neuberger Rebuttal Decl. ¶ 14(a) ("an unqualified reference to 'title' naturally means legal title.").)  But if a trust existed, the trustee would hold legal title (*i.e.*, FTX on the Joint Liquidators' theory).  Section 8.2.6 therefore is inconsistent with a clear intent to create a trust because it suggests that legal title remains with the customers, not the purported trustee.  (*See* Neuberger Rebuttal Decl. ¶ 16 ("English law adopts an objective approach to the interpretation of contracts which, generally speaking, gives primacy to the wording used by the parties in the contract.").)

119.    To avoid that ordinary meaning, the Joint Liquidators ask the Court to insert the word "beneficial" before each reference to "title" in Section 8.2.6.  (Response ¶ 104.)  That

---

[71]    The Joint Liquidators argue that Section 2.1.3 "is not concerned with the general relationship between the parties" (Response ¶ 118), but that provision expressly covers any "decisions or activities effected by [3AC] using the Services" (including any use of the Exchange) (Terms of Service pmbl. & § 2.1.3).  They argue that Section 2.2 likewise is limited to an advisory relationship merely because it discusses the suitability, complexity, and risks of digital assets (Response ¶ 119), but this provision again applies to use of the "Services" and is *not* limited to some purported role as an "advisor" as the Joint Liquidators suggest.  Finally, they argue that Section 38.6 is "boilerplate" and "disavow[s] any suggestion of a joint venture or the like" because a joint venture is among the disclaimed relationships (*id.* ¶ 120), and offer no support for that reading.

request is improper.  As the English Supreme Court has explained, "a court should be very slow to reject the natural meaning of a provision as correct . . . . Accordingly, when interpreting a contract a judge should avoid re-writing it."  (Beller Reply Decl. Ex. 30, *Arnold* v. *Britton* [2015] UKSC 36, at [20].)  The Joint Liquidators' argument collapses unless the Court takes a contract used by every customer and rewrites it only for 3AC.  They identify no other provisions of the Terms of Service consistent with a trust relationship and no alternative reading of Section 8.2.6 that supports their conclusion.  (*See* Response ¶ 104.)

120.    The Joint Liquidators next invoke the "factual matrix" (*i.e.*, the objective background circumstances known to the parties at the time they entered into the contract) to justify rewriting Section 8.2.6 to add "beneficial" before "title."  (Response ¶ 104.)  Even if such rewriting were generally permitted under English law (it is not), rewriting a standard-form commercial contract based on the factual matrix would still be impermissible.  (*Sigma* at [38]; *Wood* at [13].)  This constraint is particularly important here because the Terms of Service are "standard terms" applicable to all FTX customers.  Where a contract has a standard form, factors outside of the text of the agreement are not "relevant, except in the most generalised way."  (*Sigma* at [37].).

121.    The remainder of the Joint Liquidator's factual matrix analysis rests on three unproven and unreasonable assumptions:  (i) because FTX customers supposedly knew that "FTX kept customer assets in pooled hot wallets, in respect of which FTX held the private keys" *and*, (ii) "FTX customers also understood that, under English law, legal title followed the private keys," *then* (iii) "the only plausible meaning of Section 8.2.6" is rewriting the Section to include "beneficial" before all mentions of title and ownership.[72]  (Response ¶¶ 104-05.)  These

---

[72]    At her deposition, Dame Elizabeth asserted that her "analysis" is dependent on customers' knowledge of FTX's commingling.  (Gloster Dep. Tr. 176:17-177:14; 179:4-11.)  It is not clear on what basis Dame Elizabeth's conclusion that the Terms of Service support a trust relationship between FTX and 3AC if "beneficial" is not read

assumptions are unsupportable.  The notion that many FTX customers, let alone the majority of them, understood the extraordinarily specific consequences of the Terms of Service under a novel and evolving area of English law, is implausible on its face.  So are the Joint Liquidators' assumptions that customers *also* understood that control over keys to an address constitutes legal ownership *and* that is impossible to possess an intangible asset like digital assets.  (*See id.* ¶ 104.) The Joint Liquidators must prove what FTX customers knew with evidence, which is precisely why English law discourages reliance on a factual matrix to rewrite a standard-form contract.  The Joint Liquidators offer no evidence of what 3AC—or other customers generally—understood regarding commingling on the Exchange.[73]

122.   Even worse, the Joint Liquidators' conclusory statement that FTX customers "understood that, under English law, legal title followed the private keys" is not supported with any evidence.  (Response ¶ 104.)  First, English law does not presume that contracting parties have knowledge of specialized areas of law.  (Neuberger Rebuttal Decl. ¶ 11.) Second, the Joint Liquidators cite to no case treating "general law" as part of the factual matrix for a standard-form contract entered by millions of people across the world.  (*See* Beller Reply Decl.,

---

into the Section 8.2.6 through the three-step "factual matrix" described in Paragraphs 104 and 105 of the Response.

[73]   It *should* go without saying that the Joint Liquidators cannot cite to the deposition testimony of the FTX Recovery Trust's English-law expert as evidence of what FTX customers actually knew about the Terms of Service in May 2022.  Yet, that is what the Joint Liquidators try to do.  (Response ¶ 100.)

But beyond this being irrelevant, the Joint Liquidators' references to Lord Neuberger's testimony are outright misleading.  *Compare* Response ¶ 100 ("As the FTX Recovery Trust's English law expert, Lord Neuberger, concedes, FTX customers '[u]ndoubtedly' must have become aware of sweeping 'pretty quickly.'") *with* Beller Reply Decl., Ex. 32, Transcript of November 11, 2025 Deposition of the Rt. Hon. Lord Neuberger of Abbotsbury ("Neuberger Dep. Tr.") 59:21-60:10 ("Q.  Okay.  And is it your understanding that customers were aware that their assets would be swept into a commingled account?  A.  *I am not sure about that*.  Undoubtedly I would have thought they must have become aware.  *What they were told, I do not know.  I was not asked to assume anything*.  I just – no, I did not make an assumption about that.  Q. But you would have thought that they must have become aware that their assets were being swept to a commingled account?  A. I would have thought they must become aware pretty quickly, but, again, *that is a sort of factual matter which I cannot speak of with any confidence*." (emphases added.))

Ex. 31, *Triple Point Technology Inc* v. *PTT Public Co Ltd* [2021] UKSC 29 (considering the "general law" in the context of a contract negotiated by sophisticated parties).)  Third, the only evidence the Joint Liquidators cite is the opinion of three English lawyers about what a reasonable customer would understand about English law.  (Response ¶ 104.)  These lawyers, of course, have no actual evidence regarding customers' knowledge, and performed no analysis on the issue.  It would be neither expected nor "certain" that non-lawyers would be familiar with the distinction between "equitable" and "legal" title, much less how those concepts interact with cryptocurrency.

123.    The Joint Liquidators finally resort to impossibility as justifying rewriting Section 8.2.6 (Response ¶¶ 105-06), but impossibility "is not a particularly strong presumption" (Neuberger Rebuttal Decl. ¶ 10).  Any impossibility-based analysis must yield to contractual language where "the words are clear."  (Neuberger Rebuttal Decl. ¶ 10 (quoting Austin Decl., Ex. 44, *The Epaphus* [1987] 2 Lloyd's Rep 213).)  As explained above, "the English Law of trusts is replete with examples where the declaration of a trust has failed, notwithstanding the parties' intentions." (Neuberger Rebuttal Decl. ¶ 26.)  The Joint Liquidators cite no case where an English court found a trust relationship solely on the basis of impossibility.  Given English law's insistence on certainty before imposing a trust, that lack of authority is unsurprising.

### ii.    FTX's Conduct Is Irrelevant to the Intent Inquiry, and Does Not Show an Intent to Create a Trust.

124.    Unable to prove a trust from the words the parties actually used, the Joint Liquidators raise the unprecedented argument that FTX's "conduct" independently manifested a clear intention to create a trust.  (Response ¶¶ 88-95.)  This contention does not appear in the Gloster Declaration.  It is also wrong.

125.    Where parties have reduced their relationship to a written contract, courts look to the contract itself, not to *post-hoc* conduct, to determine whether the requisite certainty of

intention exists.  (*See Wilkinson* at [2].)  The Joint Liquidators cite no English authority where a court disregarded contractual language and inferred a trust solely from conduct.

126.     The only English case they invoke, *Paul* v. *Constance*, is irrelevant.  (Austin Decl., Ex. 29, [1977] 1 WLR 527.)  There, the court examined repeated oral statements between domestic partners (*e.g.*, money in the bank account was "as much yours as mine"), in the absence of any written agreement, to determine whether an express trust over a specific bank account had arisen.  The court described the case as "borderline."  (*Id.* at 532.)  *Paul* provides no basis to displace written contractual terms—particularly a commercial, standard-form agreement used by millions of customers—based on generalized conduct.

127.     The Joint Liquidators' reliance on the "Digital Assets: Final Report" (the "Law Commission Report") is misplaced and provides no basis for their position.  The Joint Liquidators quote the Law Commission Report as if it suggested that "rights of co-ownership in an equitable tenancy in common" was the "best way" to characterize an interest in digital assets (Response ¶ 87), but this commentary presupposes a proprietary relationship, including because the Law Commission defines a "custodial intermediated holding" as a form of proprietary interest.  (Austin Decl., Ex. 31, at ix.)  The Joint Liquidators thus have the analysis backwards—the language they cite means that *if* there is a trust over commingled digital assets, *then* beneficiaries could be characterized as having rights of co-ownership in an equitable tenancy in common.  The Law Commission Report does not demand the finding of such an interest where the agreement between the parties did not evidence an intent to create one.  In any event, the Law Commission makes recommendations, not binding law.

128.     Unable to ground their conduct theory in English authority, the Joint Liquidators rely heavily on *Ruscoe* v. *Cryptopia*, a decision by a New Zealand trial court premised

on facts not present here.[74]  (*See* Austin Decl., Ex. 30, *Ruscoe* v. *Cryptopia* [2020] NZHC 728

("*Ruscoe*".).)  As Lord Neuberger explained, *Ruscoe* involved a contract with language expressly

stating that pooled assets were "held on trust" for users.  (Neuberger Dep. Tr. 133:5-7; Neuberger

Confirmation Decl. n.77.)  The Terms of Service here contain no such language and instead include

repeated fiduciary-duty waivers fundamentally inconsistent with a trust relationship.[75]  To the

extent that *Ruscoe* looks beyond a trust to demonstrate certainty of intention, that is inconsistent

with English law.

129.    No other court—and, tellingly, no court applying the laws of England or

other Commonwealth countries—has found a trust under a conduct-driven theory:

- In *LMN* v. *Bitflyer Holdings*, the Commercial Court of England accepted a cryptocurrency exchange's assertion that "it does not hold the cryptocurrencies on trust" and rather "it holds cryptocurrency in its own name and, in a manner analogous to conventional banking, owes a personal obligation to pay the relevant amount to each customer."  (Beller Reply Decl., Ex. 33, *LMN* v. *Bitflyer Holdings Inc* [2022] EWHC 2954 (Comm) ("*LMN*"), at [4].)

- In *Gatecoin Ltd (in liq)*, the High Court of the Hong Kong Special Administrative Region Court of First Instance found a cryptocurrency exchange's assets "are *not* held by Gatecoin on trust for the Customers . . . , but are held by Gatecoin in its own right."  (Beller Reply Decl., Ex. 34, *Re Gatecoin Ltd (in liq)* [2023] HKCFI 914 ("*Gatecoin*"), at [41].).  In making its decision, the Hong Kong court first pointed to Gatecoin's terms of service, which never expressly declared a trust and waived fiduciary duties.  (*Id.* at [42]).  The court then noted Gatecoin commingled and treated cryptocurrencies as its own.  (*Id.* at [43]).

- In *Quoine Pte Ltd* v. *B2C2 Ltd*, the Singapore International Court of Appeal found no intention to create a trust over a cryptocurrency exchange's assets because "the process of ascertaining whether the necessary intention to create a trust should be imputed is one of construction of the relevant text or oral dealings in their context," and the terms at issue

---

[74]  The Response uses *Ruscoe* in this novel way untethered from actual expert analysis.  Dame Elizabeth does not assert anywhere in her Declaration that the *Ruscoe* decision supports an argument that conduct (rather than contract) can evidence an intent to create a trust.

[75]  The Joint Liquidators make much of the fact that, in *Ruscoe*, an earlier version of the relevant terms of service did not include an express reference to assets being "held on trust" (Response ¶ 90 n.17), but this decision from New Zealand is easily distinguishable.  The New Zealand court found other evidence of an intent to create a trust in the earlier terms of service (*see* Paragraph 130, *infra*), and noted that the use of trust-specific language in the terms of service existing at the time of Cryptopia's collapse "confirmed what were the existing trusts in operation."  (Ruscoe at [181].)  No such evidence of clear intent is present here.

did not create a trust.  (Beller Reply Decl., Ex. 35, *Quoine Pte Ltd* v. *B2C2 Ltd* [2020] SGCA(I) 02 ("*Quoine*"), at [144] (internal quotations omitted).)

130.    While *LMN*, *Gatecoin*, and *Quoine* involve distinct factual settings, they collectively refute the Joint Liquidators' claim that an English court would treat the ordinary operation of a cryptocurrency exchange as evidencing an intent to create a trust.  *Ruscoe* is best explained by Lord Neuberger in his first declaration submitted in support of Plan confirmation:

> "[E]xplicable on the basis that it was made clear to customers that all digital assets might be '*pooled in our internal accounts with other users' Coins at any time*', and yet '*Each user's entry in the general ledger of ownership of Coins is held by us on trust for that user*'.  No such language is evident in the Dotcom Terms in the present case."

(Neuberger Confirmation Decl. n.77 (emphasis added).)

131.    Even if the Court were to consider conduct, the conduct the Joint Liquidators cite does not evidence a "clear objective intention" by FTX to create a trust.  3AC relies heavily on FTX's financial statements.  (Response ¶¶ 91-93.)  Those statements were fraudulent.  They misrepresented FTX's assets and liabilities, and FTX's auditors settled with the SEC for "misrepresent[ing] its compliance with auditing standards regarding FTX."  (Complaint, *SEC* v. *Pager Metis CPAs LLC*, No. 24-CV-7025 (Sept. 17, 2024, S.D.N.Y.).)  They lack reliability and cannot be used to show intent.  3AC also relies upon a document titled the "FTX Digital Markets Safeguarding Digital Assets Policy."  That document is also fraudulent.  It contains myriad false statements regarding FTX's management of digital assets.[76]  It likewise lacks reliability and cannot be used to show intent.

---

[76]    *Compare, e.g.*, Austin Decl., Ex. 11 at _FTX 3AC 000044448 (noting that "[c]ustomer assets (both fiat and virtual assets) are segregated from [FTX Digital Markets Ltd.'s] own assets") *with Second Interim Report of John J. Ray III to the Independent Directors:  the Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1740-1] at 13 ("[T]he FTX Group appears to have used the FTX DM accounts, like other accounts, on a commingled basis for many purposes, including the cycling of money to and from customers to meet withdrawal requests when necessary and various investments, donations and expenditures.").

132.    In any event, FTX's financial statements and the Safeguarding Digital Assets Policy are irrelevant to an interpretation of the Terms of Service unless they were reasonably known to FTX customers.  Otherwise, they may not be considered in the factual matrix for interpreting the Terms of Service.  (*See* Gloster Dep. Tr. 157:12-17 ("as a matter of English law in my view [the factual matrix] would include the brochures or principles, such as the safeguarding principles, that were, if they were made accessible or available to users before they entered the dotcom terms"); *see also Sigma* at [37] ("Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount.").)  The Joint Liquidators offer no evidence that 3AC (let alone all customers) received or relied on the financial statements or the Safeguarding Digital Assets Policy before agreeing to the Terms of Service.

133.    Finally, the uncontroverted fact of FTX's long-standing and systematic misappropriation of Exchange assets for its own purposes cannot be reconciled with an intent to create a trust over digital assets in favor of customers.  The Joint Liquidators do not attempt to explain away this inconsistency, because it is inexplicable.

### iii.    The Joint Liquidators Cannot Prove Certainty of Subject.

134.    The Joint Liquidators must also independently prove certainty of subject to establish a trust over digital assets.  The specific interest that the Joint Liquidators propose—"an equitable tenancy in common over a percentage of the particular digital assets held in a particular wallet" (Response ¶ 124)—is inconsistent with Section 8.2.6 of the Terms of Service and cannot be squared with the operation of the Exchange, and has *never* been recognized by an English Court. The Joint Liquidators ask this Court to anticipate and be the lead voice as to uncertain

developments in English property law.  The Court should decline to do so because, regardless of what the parties argue might happen next, a bankruptcy court's role "is to determine foreign law as ***currently applied***" by the applicable foreign court.  *In re Nortel Networks*, 469 B.R. at 499 (emphasis added).  There are already serious reasons to question such evolution:  roughly two months ago, in *Yield App Limited (In Liquidation)*, the Supreme Court of the Seychelles (a Commonwealth jurisdiction) held that "any proprietary claim by a user is likely to fail" where digital assets were "swept" into omnibus wallets.  (Beller Reply Decl., Ex. 36, *In the Matter of Yield App Limited (In Liquidation)* [2025] CC 18/2025, at [73].)

135.    The English-law experts agree that "[i]t is necessary for the subject matter of the trust and the beneficiaries' shares in it to be sufficiently certain."  (Neuberger Confirmation Decl. ¶ 37; *see also* Gloster Decl. ¶ 60 ("The test for certainty of subject matter is whether the trust property can be sufficiently identified.").)  Additionally, "[a] trust can be established in favour of one or more beneficiaries over a bulk of unascertained property in respective share as equitable tenants in common."  (Neuberger Confirmation Decl. ¶ 38.2; *see also* Gloster Decl. ¶ 60(d)).

136.    The parties disagree, however, regarding two key points.  *First*, Lord Neuberger explains that the Terms of Service do not identify customers as holding an equitable tenancy in common over a proportionate share of specific digital assets held in a particular wallet, because Section 8.2.6 does not refer to customers owning any "proportionate share " of any assets.  (Neuberger Confirmation Decl. ¶ 47.1.)  Instead, Section 8.2.6 refers to "your Digital Assets" in absolute terms, not as a percentage of an overall pool.  The Joint Liquidators and Dame Elizabeth do not address this mismatch between the legal relationship they propose and the Terms of Service.  They ask this Court to recognize, for the first time under English law, a proprietary interest in a proportionate share of an undivided pool of digital assets, yet the Terms of Service contain no

language suggesting the parties intended that result.  If such a specific relationship had been intended, the contract would say so.  An English court will simply not re-write a contract which fails to lay out terms consistent with a valid trust.  (Neuberger Rebuttal Decl. ¶¶ 6-8.)

137.    *Second*, the Joint Liquidators assert that, because the Exchange ledger tracked customer entitlements, "FTX could determine both the amount of a particular digital asset it held in a wallet, and the percentage that each customer held."  (Response ¶ 128.)  It is true that the Exchange ledger could be used to identify customer entitlements.  But calculating aggregate entitlements of all customers as to each and every asset on the Exchange would be complicated by internal and related party accounts.

138.    More importantly, *none* of the statements by Mr. Coverick or Mr. Molina cited in the Response establish any factual connection between customer entitlements and FTX's real-time knowledge of what digital assets it held in wallets.  The Joint Liquidators seem to assume that FTX maintained one wallet per digital asset and knew the contents at any moment, but that is not how the Exchange operated.  Millions of other customers conducted transactions that changed both entitlements (*e.g.*, any transaction) and holdings (*e.g.*, deposits and withdrawals).  (Disclosure Statement, Section 2(A)(4).)  There was also no factual connection between the exchange ledger and the wallet architecture.  FTX could not readily determine the exact number of Exchange digital assets it held at any moment.  The sweep wallets held Exchange assets and Alameda and other affiliate assets at the same time.  (*See* Mosley Confirmation Decl. ¶ 37.)  Assets were frequently removed and either spent or otherwise misappropriated, creating a deficit between customer entitlements and held assets.  (*Id.* ¶ 67.)  The Joint Liquidators posit that simple math can identify each customer's percentage share, but they ignore the Exchange's complexity and scale, and the shortfall of digital assets held by FTX relative to customer entitlements.  It is the Joint Liquidators'

obligation to prove the trust relationship they propose, and they have offered no factual evidence to do so.

### c.    There Was No Bailment Over Digital Assets.

139.    The Joint Liquidators raise the alternative argument that the Terms of Service created a "quasi-bailment," with FTX allegedly holding digital assets as bailee (Response ¶¶ 140-147) for customers as bailors, but this fallback argument fares no better.

140.    *First*, this Court's conclusion that the digital assets held by the Exchange as of the Petition Date are the property of the FTX Recovery Trust necessarily means that the Court concluded that no bailment was created by the Terms of Service; otherwise, the digital assets could not be "property of the Debtors' Estates" capable of being "distributed pursuant to the Plan." (Confirmation Order ¶ 20.)  As with their trust arguments, the Joint Liquidators invoke the same Terms of Service and the same pre-Petition conduct to argue for a bailment.  (Response ¶ 144.) This Court admitted Lord Neuberger's testimony that the parties "failed to have achieved" any bailment even if one assumes it was intended, including because "[t]he use of pool addresses and the 'sweeping' of Digital Assets from the addresses to which they were deposited by customers meant that any legal interest in those Digital Assets on the part of the customers is likely to have been extinguished (typically upon such sweeping occurring) or to have never arisen."  (Neuberger Confirmation Decl. ¶ 11.1(b).)  Thus, as with their attempt to establish a trust, the Joint Liquidators' half-hearted effort to establish a bailment is too little, too late—they are precluded from relitigating this issue.

141.    *Second*, even if their arguments are considered, this Court should not accept the Joint Liquidators' invitation to make new English law and be the first court anywhere in the world to recognize a bailment over intangible assets under English law (hence the term *"quasi-*bailment").  As explained by Lord Neuberger, "[i]t is both long-established and axiomatic that

something which is not tangible, like a chose in action, cannot be the subject of a bailment." (Neuberger Rebuttal Decl. ¶ 28.)  "That is why, in order for a quasi-bailment to exist over something intangible (like digital assets), an extension of the law would be necessary." (Neuberger Rebuttal Decl. ¶ 28.)  Dame Elizabeth agrees.[77]  The Joint Liquidators assert that it is possible that English law will evolve to recognize a quasi-bailment concept for intangible assets, but it has not done so yet.  (Gloster Decl. ¶ 78; *see* Neuberger Confirmation Decl. ¶¶ 53-56.)  But the fact that no English court has found a quasi-bailment relationship suggests that those courts recognize that a fundamental shift in English property law should be determined by the traditional, incremental process of the common law in the English courts.  (Neuberger Rebuttal Decl. ¶ 30.)

142.   *Third*, the Terms of Service—the operative contract between the parties— do not support the Joint Liquidators' argument that the parties sought to create a bailment over "mixed intangible assets," *i.e.*, the commingled digital assets in wallets controlled by FTX. (Response ¶ 145.)  Proprietary rights relate to specific property.  (Beller Reply Decl., Ex. 37, Michael Bridge et al., *The Law of Personal Property* (3d ed. 2021), at 1-068 ("Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable . . . .") (quotation omitted).)  The Joint Liquidators try to escape this rule by claiming an interest in a portion of the Exchange's commingled digital assets, none of which can be traced to 3AC, but the Terms of Service evidence no intent to establish that right.  As explained above, Section 8.2.6 states that "title" to "Your Digital Assets" shall remain with the customer.  The ordinary meaning is that Section 8.2.6 refers to digital assets associated with (and segregated for) a specific customer, not to digital assets grouped together.  The Terms of Service do not reference

---

[77]   *See* Gloster Dep. Tr. 194:11-16 (Q.  As of today, English Courts have not recognized a bailment over intangible property such as digital assets, correct?  A.  There is not a case to my knowledge where that has happened.").

any pool of digital assets, any share of digital assets that are commingled together, or any right to claim into a particular source of digital assets.

143.    *Fourth*, even *if* a quasi-bailment was intended under the Terms of Service, *and if* a quasi-bailment was possible under English law, *then* the operation of the Exchange *still* prevented any quasi-bailment from forming over digital assets acquired by 3AC on the Exchange. The hallmark of a bailment is superior legal title for the bailor.[78]  3AC never had superior title to digital assets held by FTX in a commingled wallet because it is impossible to trace or follow any digital asset credited to the 3AC Accounts as of June 12, 2022 (*i.e.*, any entitlement comprising part of the Digital Asset Balance) to a deposit of a digital asset by 3AC, as opposed to entitlements acquired via trades on the Exchange.[79]  (Coverick Decl. ¶¶ 100-11.)  In other words, the amount of the Digital Asset Balance is not tied to digital assets that 3AC possessed outside the Exchange ecosystem (and thus had superior title to), and the actual digital assets in which the Joint Liquidators now assert a proprietary interest at all times remained part of a commingled mass controlled by FTX.  3AC can never have acquired superior title to digital assets when it never had title to begin with; title passed from the customer who deposited those digital assets to FTX, and those digital assets were never touched by 3AC.  (Coverick Decl. ¶ 26 ("Spot margin trades resulted in ledger entries (*i.e.*, credits and debits to Customer Accounts), not the movement of digital assets or fiat currency.").)  The Joint Liquidators analogize to certain authorities concerning "consensual mixing of fungible goods" (Response ¶ 145; *see also* Gloster Decl. ¶ 130), but cite to no cases (either in the Response or in the Gloster Declaration) to support the theory in the context

---

[78]    *See, e.g.*, Austin Decl., Ex. 33, Louise Gullifer, Henry Chong & Hin Liu, *Client-Intermediary Relations in the Crypto-Asset World*, Univ. Cambridge Fac. L. Rsch. Paper No. 18/2021 (2021) 12-13 ("The touchstone that distinguishes quasi-bailment on the one hand . . . is the location of legal title.").

[79]    As the Joint Liquidators concede, 3AC's trades on the Exchange did not involve the movement of digital assets, only credits in the Exchange's ledger.

of intangible assets. Lord Neuberger rightly points out the floodgates concerns an English court would have if such an extension of the law were permitted. (Neuberger Rebuttal Decl. ¶ 36(b).)[80]

144.    In sum, the Joint Liquidators cannot salvage their Preference Claim by asserting that a bailment was created. The Court already rejected that argument. The Court would have to develop new boundaries to English law to find in the Joint Liquidators' favor. And neither the Terms of Service nor the facts concerning the operation of the Exchange can support the Joint Liquidators' interpretations.

> **d.    The Joint Liquidators' New Chose in Action Theory Is Circular and Does Not Demonstrate that 3AC Could Have Distributed Digital Assets.**

145.    In recognition that they cannot establish a trust or bailment, the Joint Liquidators now assert—for the first time in the Response—that 3AC nonetheless held a "chose in action" entitling it to digital assets held by the Exchange. (Response ¶ 226.) Under this theory, the contractual entitlement to assets is treated as a proprietary right that, if proven to have diminished in value, could sustain a preference claim. This argument is circular, was waived, and cannot establish that FTX was put into a better position as a creditor as a result of the Challenged Trades.

146.    A chose in action is an intangible right under English law to pursue a claim for money or property, and the parties agree that a chose in action can constitute an asset. (Response ¶ 226.) But the nature of the asserted chose in action is fatal to the Joint Liquidators'

---

[80]    Dame Elizabeth's only response to this fundamental issue is an assumption: "[I]f English law were to develop the concept of a quasi-bailment and the purpose of that development were to accommodate digital asset exchange structures, then an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange. . . ." (Gloster Decl. ¶ 85.) The assumption is guesswork, and unsupported by evidence—there is no guarantee, or even indication, that English bailment law will develop in such a hyper-specific direction. (*See* Neuberger Rebuttal Decl. ¶¶ 35-36.) The Joint Liquidators insist that this Court not only predict that English law will change, but prescribe *how* English law will change.

theory.  They do not contend that 3AC held a chose in action for money under the Terms of Service because, as explained above, any such claim would be capped at the Account Balance and could not support recovery of digital assets exceeding $1 billion.  Instead, the Joint Liquidators necessarily premise their theory on the existence of a right to specific digital assets or their value— that is, on ownership of or a proprietary interest in those assets.[81]

147.    The chose in action theory fails because of the very issue the argument is intended to circumvent, namely that the Joint Liquidators cannot prove that 3AC had a claim to actual digital assets in the amount of the Digital Asset Balance.  As explained above, the Terms of Service did not confer a proprietary interest in digital assets, and withdrawal rights under Section 8.2.6(C) were expressly subject to applicable policies, including those prohibiting withdrawals that would render an account balance negative.  Absent a trust or bailment—which the Joint Liquidators have failed to establish—their chose in action theory collapses into the very proprietary-interest theory this Court has already rejected.

148.    The chose in action theory also fails because 3AC waived any right to assert a claim for digital assets against FTX.  Section 30.2 of the Terms of Service expressly disclaims liability in contract, tort, equity, or statute arising from a customer's use of the Services, including withdrawals.  By agreeing to that provision, 3AC waived any purported intangible right to claim specific digital assets from FTX independent of the Account Balance.

149.    Finally, the Joint Liquidators cannot prove that a chose in action was diminished by the Challenged Trades.  Because 3AC had no proprietary or contractual right to the whole Digital Asset Balance, the only conceivable chose in action was 3AC's right to withdraw

---

[81]    *See* Response ¶ 226 ("[T]he 3AC Debtor legally and beneficially owned its contractual 'entitlements' to those Digital Assets").

or claim value up to its Account Balance.  That balance was approximately $284 million at the relevant time.  (Coverick Decl. ¶ 61.)  It was not reduced by the Challenged Trades. While the Account Balance declined on June 13 and 14, 2022, it did so because of withdrawals by 3AC and market price declines—events the Joint Liquidators concede cannot support a preference claim.

150.    In short, the Joint Liquidators' brief, eleventh-hour chose in action argument does not withstand scrutiny.  It depends on reintroducing a proprietary interest in digital assets through the back door, was waived by contract, and cannot satisfy the requirement that any property right was diminished by the Challenged Trades. The theory fails on its own terms and provides no basis for relief.

### 3.    The Joint Liquidators' Theory that FTX Received a Benefit Lacks Evidentiary Support.

151.    The Joint Liquidators' theory as to the "benefit" that FTX received from the Challenged Trades is meritless on its own terms and is unsupported by evidence.  In the Joint Liquidators' view, but for the Challenged Trades, FTX would have simply absorbed the entirety of the negative $733 million USD Balance without repayment.  (*See* Response ¶ 212.)  Their theory, then, is that FTX benefitted by avoiding having to do so when 3AC sold digital assets for USD, which reduced that negative USD Balance.  (*See id.*)  This theory requires the Joint Liquidators to prove that FTX *would* have done so.

152.    *First*, as an initial matter, the Joint Liquidators cannot prove such a benefit because there could never have been a negative USD Balance existing in isolation that would require FTX (or anyone else) to absorb it.  The evidence presented in support of the Objection demonstrates that 3AC only built the Digital Asset Balance and negative USD Balance in parallel, and that both decreased in parallel. (Coverick Decl. ¶¶ 56-60.) The Joint Liquidators' entire theory is a counterfactual in which the Challenged Trades did not occur, which means that the 3AC

Accounts would still have a $1.017 billion Digital Asset Balance at the relevant time.  Neither

FTX nor anyone else would need to "absorb" the negative $733 million USD Balance because

FTX held all of the relevant digital assets, and would have liquidated 3AC's digital asset

entitlements as a matter of ordinary Exchange operations.  The Response acknowledges that the

Exchange had procedures to liquidate positions (Response ¶¶ 52-54), and those procedures

prevented a scenario where a $733 million negative USD Balance exists as a stand-alone balance.[82]

This evidence alone confirms that FTX would not have absorbed 3AC's negative USD Balance,

and thus this theory fails from the start.

153.    *Second*, the Terms of Service establish that FTX had *no* legal obligation to

absorb or forgive a negative $733 million USD Balance, or indeed any negative sub-balance.

Rather, the Terms of Service expressly provide that the customers who loaned funds bore the risk

of loss if a borrower could not repay:

> "When you lend Assets to other Users, ***you risk the loss of an
> unpaid principal if the borrower defaults*** on a loan and liquidation
> of the borrower's Account fails to raise sufficient Assets to cover
> the borrower's debt. Although we take precautions to prevent
> borrowing Users from defaulting on loans, the high volatility and
> substantial risk of illiquidity in markets means that we ***cannot make
> any guarantees*** to any Users using the Services against default."

---

[82]    Multiple fact witnesses testified that FTX's liquidation procedures operated to reduce positions when Customer
Accounts fell out of compliance, such as by having a negative sub-balance (like USD) without corresponding
positive sub-balances to satisfy Margin Requirements.  (*See, e.g.*, Beller Reply Decl., Ex. 38, Transcript of
September 25, 2025 Deposition of Steven Coverick ("Coverick Day 2 Dep. Tr.") 91:25-92:6 ("In general, the
liquidation engine or the risk engine refers to the algorithm by which FTX will commence automatic liquidation
transactions once an account is out of compliance with the maintenance margin requirement."); Molina Dep. Tr.
35:5-9 ("For each account, there was a liquidation threshold, and when an account was below the liquidation
threshold, generally, it would be liquidated by the code."); Tackett Dep. Tr. 53:19-54:13 ("Spot margin
liquidations would affect account balances because spot margin deals specifically with the account balance. And
so once a spot margin liquidation happened, it would basically sell the positive asset that you have to bring to
reduce the negative asset.  So let's say you are borrowing USD with Bitcoin as collateral, it would sell some of
the Bitcoin in your account to reduce the USD, the negative USD amount. Again, if this could be done in a manner
that would keep them within their maintenance margin requirements, it would be done on a partial basis.").)

(Terms of Service § 16.3 (emphasis added); *see also id.* § 2.4.1 ("When you lend Assets to other Users, *you risk the loss of an unpaid principal* if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.") (emphasis added).)  The Joint Liquidators do not even argue that FTX had any obligation to absorb the $733 negative USD Balance.  (*See* Response ¶ 216.)[83]  The lack of any such obligation eviscerates the Joint Liquidators' theory.  It is the Joint Liquidators' burden to *prove via evidence* that FTX would have *voluntarily* taken a $733 million loss despite no obligation to do so, and they cannot do so.

154.    *Third*, the Joint Liquidators' attempt to stretch cherry-picked witness speculation at depositions into actual evidence of what would happen in this impossible counterfactual is misleading and contradicted by the record.  Not a single witness ever testified that FTX would step in to absorb deficits caused by customers' legitimate trades moving against them.  These witnesses described how FTX would respond to a situation in which a glitch, error, or fraud caused a loss, not how FTX would respond to normal trading.[84]  The Joint Liquidators' reliance on the credibility of testimony from Mr. Bankman-Fried is telling, but Mr. Bankman-Fried did not even say what they claim.  (Response ¶ 55.)  His reference to FTX potentially covering $1 billion in losses related to a situation where "an error that occurred, a mistaken print or something that had to be reversed," not to a situation where, like here, a customer borrowed funds from other customers to bet and then lost.  (Bankman-Fried Dep. Tr. 154:14-155:6.)  They similarly misconstrue testimony from Mr. Singh.  Mr. Singh did not testify that FTX "directly absorbed a nine-figure customer loss" caused by losing trades (Response ¶ 55), but that FTX

---

[83]    Unsurprisingly, the Joint Liquidators' purported expert failed to consider these provisions anywhere, because they are fatal to the Joint Liquidators' concocted scenario.  (*See* Lisle Dep. Tr. 175:2-3 ("Nowhere [in § 2.4.1] does it say that FTX bears that risk."); 176:13-14 ("My opinion does not state Rule 2.4.1, or not rule, provision."); 177:17-178:6 (noting that Mr. Lisle did not discuss § 16.3 in his declaration "anywhere").)

[84]    *See, e.g.*, Bankman-Fried Dep. Tr. 154:14-155:6; Singh Dep. Tr. 53:8-19; Tackett Dep. Tr. 48:14-49:7.

addressed "a suite of accounts that were engaging in some form of exploitative spot margin trading that took advantage of some bad parameters" (Singh Dep. Tr. 53:8-19.).  While Mr. Tackett testified that FTX "usually" would "eat the loss" if there was a negative balance (Tackett Dep. Tr. 228:7-9), he also made clear that customers were generally not allowed to have a negative overall Account Balance (Tackett Dep. Tr. at 55:19-23), and his detailed explanation of FTX's liquidation mechanics—which existed "to ensure that the lenders or the spot margin system doesn't incur any losses"—squarely contradicts the Joint Liquidators' characterization.  (Tackett Dep. Tr at 52:16-54:13.)  The reality is that the Exchange protected itself from suffering customer losses totaling anything near the magnitude of 3AC's negative $733 million USD Balance.  The Joint Liquidators cannot establish what *would* have happened in their counterfactual scenario by reference to generalized statements taken out of context.

155.    Lacking any factual evidence, the Joint Liquidators try to blur the line between evidence and argument by citing to *expert* testimony (specifically, the Lisle Declaration) as if it constituted factual evidence of what FTX did or would actually have done.[85]  Not only is that an inappropriate use of purported expert testimony, but Mr. Lisle did not even review any facts that could possibly support that conclusion—he never spoke to anyone at FTX nor reviewed the code that governed the Exchange.[86]  Instead, Mr. Lisle relied on a curated set of materials prepared by counsel, never asked for any evidence contradicting the excerpted premises, and

---

[85]  *See, e.g.*, Response ¶ 51 (citing paragraph 33 of the Lisle Declaration to argue that "any losses resulting from a borrower's failure to satisfy such a liability would have been (and were) absorbed by FTX, and not by any customer lender"); *id.* ¶ 53 (citing paragraph 35 of the Lisle Declaration to argue that "FTX's Insurance Fund (as defined and explained below) would cover residual losses if the backstop liquidity provider could not absorb the full negative balance"); *id.* ¶ 54 (citing paragraphs 36 and 37 of the Lisle Declaration to support that "the Insurance Fund absorbed losses up to the amount of funding in the Insurance Fund").

[86]  Lisle Dep. Tr. 39:19-22 ("Q.  So we have already talked about the former employees of Three Arrows Capital. Did you speak to anyone else to gather factual information for the purposes of preparing your opinions?  A. No. I did not."); 208:17-19 ("Q.  Again, you are not a programmer yourself and didn't look at the code, right?  A. That's correct.).

merely provided educated guesses as to what *would* have happened.[87]  These statements from so-called experts are not only irrelevant, they do not speak to the point the Joint Liquidators make.

156.    *Fourth*, the general objective that FTX sought to avoid socializing losses or clawing back funds from customers is not evidence that FTX would have actually and voluntarily absorbed a negative $733 million USD Balance (assuming one could exist without a countervailing Digital Asset Balance).  As the Joint Liquidators correctly observe, FTX employed a "multi-tiered risk-mitigation system" to prevent Customer Accounts from going negative.  (Response ¶ 55.)  The uncontroverted evidence is that FTX did not permit negative Account Balances, and set up a system to prevent them.  The notion that FTX might voluntarily cover *small* negative Account Balances that developed because market movements outpaced the liquidation processes says nothing about what FTX would have done in response to a negative balance approaching three-quarters of a billion dollars.  That is precisely why FTX ultimately retained the discretion to decide whether and how much to absorb customer losses, if any at all, as Messrs. Bankman-Fried and Singh emphasized.[88]  Basic common sense confirms that a business would respond differently when there are a few hundred dollars at stake as opposed to $733 million.

---

[87]    Lisle Dep. Tr. 39:4-9 ("Q.  And going back to your selection of materials, you have no way of knowing, I take it, whether the documents that Latham provided are the entirety of relevant documents on a particular topic, do you? A. No way of knowing that."); 191:12-1 (Q.  And you -- you know, you mentioned in response to several of my questions that Latham provided you with the relevant documents and directed you to portions of relevant testimony, right?  A. Latham provided me with documents, and in certain cases where they were lengthy, directed me to the relevant portions of those documents.  Q. Did you ever ask Latham to provide you with documents, if any, that were inconsistent 23 with the opinions you were offering?  A. *I never asked them to provide me with 25 documents that were inconsistent with what they had offered*.") (emphasis added).

[88]    Bankman-Fried Dep. Tr. 217:17-218:11 ("Q.  It is true that -- and I believe you testified that there was not an unlimited amount that FTX would have been willing to backstop out of that fund; correct? A.  That is correct. Q. And so at some number which we did not face, but at some point, presumably, FTX would have been unwilling or could have been unwilling to backstop a position, in which case the customers would have had to bear those losses; correct? A.  That's correct. Q.  *And whether or not to backstop a potential loss out of a customer's account was solely within the discretion of FTX; correct?*  A.  *That is my understanding, yes*.") (emphasis added); Singh Dep. Tr. 226:21-23 ("The insurance fund was a mechanism through which some losses could be absorbed, *but not to an infinite extent and not in all cases*.") (emphasis added).

157.    *Fifth*, the Joint Liquidators' theory that FTX benefited because it would otherwise have needed to absorb 3AC's negative USD Balance to preserve its "reputation" is conclusory and unsupported by any law.  They have no evidence that reputational considerations would have driven such a decision, only speculation.  And they identify no authority where a "reputational" benefit sufficed to establish a foundation for a successful preference claim.[89]

### 4.    FTX's Right of Set-Off Precludes a Preference Claim Even Under the Joint Liquidators' Own Theory.

158.    There is separately no path to recovery on the Preference Claim because, if the Joint Liquidators' own theories are accepted, then FTX necessarily exercised a valid right of set-off before the liquidation of 3AC.  There can be no Preference Claim if the Court (rightly) rejects the (incorrect) premise that (i) each sub-balance is a separate asset or (if negative) liability, *or* the equally incorrect premise that (ii) 3AC had a proprietary interest in digital assets.  But there is no valid Preference Claim in any event because FTX's contractual right of set-off precludes any ability to prove that FTX was put into a better position.

159.    The Joint Liquidators (and their BVI-law expert) do not deny that a contractual right of set-off can negate a preference claim asserted under the BVI Insolvency Act. (Response ¶¶ 245-47; Levy Decl. ¶¶ 152-53.)  A creditor who has exercised a valid right of set-off in connection with an insolvency transaction was not put into a better position than that creditor otherwise would have occupied in a liquidation where the exercised set-off is no more extensive than the automatic, self-executing set-off that arises under Section 150 of the Insolvency Act.  It

---

[89]    The Joint Liquidators cite to *Byers* v. *Chen*, but there, the BVI court did not award any relief on a preference claim, let alone based on the reputational theory that the Joint Liquidators have advanced.  (*See* Beller Reply Decl., Ex. 39, *Byers* v. *Chen* [2021] UKPC 4.)

is, of course, the Joint Liquidators' burden to prove that "better position" element, not the FTX Recovery Trust's burden to negate its existence.

160.    FTX netted sub-balances against one another with respect to trades, withdrawals, and other Exchange activity as part of the normal, everyday operation of the Exchange.  This is established by uncontroverted evidence.[90]  To the extent those sub-balances are treated as separate assets and liabilities, as the Joint Liquidators incorrectly argue they should be, then they necessarily fall within FTX's contractual right of set-off at Section 38.7 of the Terms of Service, as well as the established, everyday operation of the Exchange.

161.    *First*, FTX undoubtedly had a valid right of set-off under the Terms of Service.  Section 38.7.2 provides that "FTX Trading may set off any amounts from which time to time are payable by FTX Trading to you under or by virtue of the Terms of otherwise against any amounts payable by you to FTX Trading under the Terms."  (Terms of Service § 38.7.2.)  The Joint Liquidators do not challenge the validity of Section 38.7.2.  (*See* Gloster Dep. Tr. 82:18-19 ("I would look at clause 38.7, which is the set-off provision."); Levy Dep. Tr. 270:22-25 ("This provides that in certain circumstances FTX may set off amounts which are from time to time due.").)

162.    *Second*, in a scenario where sub-balances are treated as separate assets and liabilities (*i.e.*, under the Joint Liquidators' own theory), then this contractual right of set-off

---

[90]    *See, e.g.*, Coverick Decl. ¶ 8 ("These sub-balances reflected all of the credits and debits for that particular asset associated with the Customer Account since the account was opened, and were interconnected with one another because trades typically involved the exchange of one asset for another."); *id.* ¶ 10 ("The Digital Asset Balance and the USD Balance were interconnected, and changed inversely to one another in connection with any trading activity involving the exchange of USD for digital assets (or vice versa)."); Mosley Confirmation Decl. ¶¶ 28-29 (customers could receive credits for an asset by depositing, receiving a transfer, or entering a trade to buy entitlements to that asset, and debits by withdrawing, making a transfer, or entering a trade to sell entitlements to that asset); *id.* ¶ 30 ("Credits and debits were similarly assigned for deposits, withdrawals, transfers, and trades involving cryptocurrency, fiat currency and stablecoin."); Terms of Service ¶ 16.2 (authorizing seizure or liquidation of "any or all of your positions" for any assets or balance in event of non-compliance with Margin Requirements).

undoubtedly extends to the netting of sub-balances.  Section 38.7.2 references "any amounts" payable from FTX to the customer, and from the customer to FTX.  (Terms of Service § 38.7.2.) *If* positive sub-balances are assets of the customer, *then* they are amounts FTX owes to the customer; *if* negative sub-balances are liabilities of the customer, *then* they are amounts that the customer owes to FTX.  The Joint Liquidators assert that this provision proves their theory, and cannot walk away from the necessary and logical consequences of this provision under their own theory.  (*See* Response ¶ 163 (arguing that Section 38.7.2 is "meaningless" if sub-balances are *not* assets and liabilities, and therefore conceding that sub-balances fall within the scope of Section 38.7.2 if they are treated as assets and liabilities).)

163.    *Third*, FTX necessarily exercised its right to set-off in a scenario where sub-balances are treated as separate assets or liabilities.  For instance, as the FTX Recovery Trust has established, customers such as 3AC could seek to withdraw only up to the value of their Account Balance.  The implication of that limitation is that, in the event of any withdrawal request, FTX netted sub-balances against one another.  If those sub-balances are treated as assets and liabilities, then this netting falls within the scope of the set-off right created for FTX by Section 38.7.2.  Additionally, FTX exercised this set-off right with respect to every trade on the Exchange.  As explained above, when customers trade one asset for another on the Exchange, they incur a debit to one sub-balance and a credit to the other.  (Coverick Decl. ¶¶ 7-11.)  This is true regardless of whether one of the customers has a negative balance.  Thus, the consequence of each and every trade is the application of credits and debits in equal amounts (less fees) that net out to the same Account Balance, whether the netting is considered the application of Section 38.7 of the Terms of Service, or as part of FTX's treatment of sub-balances in connection with the normal, everyday operation of the Exchange.  So too for the Challenged Trades, where 3AC received debits for

digital assets and credits for USD, and the counterparties received credits for digital assets and debits for USD, leaving both counterparties' overall account position unchanged.  (Coverick Decl. ¶¶ 68-71, tbl. 5.)  This netting was the exercise of a set-off if what were netted were in fact assets and liabilities as the Joint Liquidators assert, and it occurred prior to the commencement of 3AC's liquidation proceedings.

164.    The FTX Recovery Trust's BVI-law expert, Mr. Atherton, concluded that the contractual set-off right, or a similar right arising from the ordinary, everyday operation of the Exchange, applied here, and it is unclear why the Response suggests otherwise.  (Response ¶ 246.)[91]  Mr. Atherton explained as much in the Atherton Declaration and the Atherton Rebuttal Declaration, both of which the Joint Liquidators had before deposing Mr. Atherton for seven hours and before they filed the Response:

> "Given that, in my opinion, the ***rights of set-off / combination that were effected*** in relation to 3AC's account with FTX were no more extensive or were co-extensive with the terms and effect of mandatory, automatic and self-executing insolvency set-off, FTX was not and cannot be said to have been placed in a better position than it otherwise would have enjoyed in the event of 3AC's (notional) insolvent liquidation at the date of the exercise of those rights set-off / combination. Therefore, ***FTX cannot be said to have been preferred***."

(Atherton Rebuttal Decl. ¶ 63 (emphasis added).)

---

[91]   To be clear, the FTX Recovery Trust's position is that the right of set-off created by the Terms of Service was exercised by FTX if the sub-balances are characterized as separately owed obligations between 3AC and FTX. The Joint Liquidators' suggestion that FTX has not asserted a set-off defense is wrong.  (*See* Objection ¶ 199 (describing how set-off foreclosed the argument that FTX was put into a better position as a creditor); Atherton Decl. ¶ 50 ("FTX had a right under the FTX Terms of Service which was akin to a contractual right of set-off or a right of combination [].").)  The Joint Liquidators' BVI-law expert even responded to this position.  (Levy Decl. ¶ 152.) Any complaint about a lack of specificity rebounds to the vague, unspecified nature of the preference theory included in the Proof of Claim, which did not define the transactions alleged to have been preferences and instead raised supposed "Takings" by FTX as part of the preference theory.  (Proof of Claim ¶¶ 40, 51.)  The FTX Recovery Trust now specifically addresses what little remains of the Joint Liquidators' original story.

165. The Joint Liquidators' primary argument with respect to contractual set-off appears to be that "FTX did not in fact exercise contractual set-off rights." (Response ¶ 245.) This is stated without evidence or support and is wrong: if the Joint Liquidators' starting premise of separate assets and liabilities is accepted, then set-off occurred through the ordinary, everyday function of the Exchange. Indeed, the Joint Liquidators advance the argument that the "proceeds" of the Challenged Trades were used "to eliminate [3AC's] liabilities to FTX." (*Id.* ¶ 6.) This contradicts their position that no set-off or netting occurred. They offer no authority for the premise that FTX needed to somehow announce that set-off was occurring. To the extent that they consider the concept of netting sub-balances against one another to be unbelievable, then their theory regarding separate assets and liabilities is even more so.

166. *Fourth*, this contractual set-off right precludes the Preference Claim because (i) the set-off right was in fact exercised, and (ii) the exercise of that right did not put FTX into a better position as a creditor because the set-off was no more extensive than the automatic, self-executing statutory set-off under the BVI Insolvency Act. As explained above, the question of whether FTX was put into a "better position" by virtue of the Challenged Trades involves a comparison between what actually happened, and what would have happened if 3AC had entered a liquidation proceeding immediately after the set-off was exercised (but without the set-off having been applied). In connection with that liquidation proceeding, an automatic statutory set-off under BVI law would occur. Because 3AC was at all times able to withdraw at most up to the value of the Account Balance, and the Challenged Trades and related application of credits and debits from those trades by FTX to particular sub-balances did not reduce the Account Balance, then FTX would occupy the same position in both scenarios.

167.    To be clear, FTX's set-off precludes a showing that FTX was put into a better position as a creditor even *if* the Joint Liquidators had some form of proprietary interest in digital assets (and they did not).  If it ever existed, such a proprietary interest would have been destroyed by 3AC when 3AC sold digital assets to the counterparty to the Challenged Trade—the selling and buying customer could not both own the same digital asset (or an overlapping share of a pool of digital assets).  The Joint Liquidators allege that the Challenged Trades constitute a "transaction," but in reality, given their obligation to prove that FTX benefitted as a creditor, the Joint Liquidators complain about FTX's application of the USD credits that 3AC received in the Challenged Trades to 3AC's negative USD Balance.  Otherwise, they have no theory of how FTX benefitted.  This is the set-off or netting that was exercised, to the extent that sub-balances are treated as assets and liabilities, and it occurred once 3AC had given up any interest it had in digital assets to another party (not to FTX) and prior to the commencement of 3AC's insolvency proceedings.  There can be no doubt that the application of USD credits to 3AC's negative USD Balance involved the set-off of two monetary amounts or at most claims reducible to money.

168.    The Joint Liquidators' apparent arguments against set-off relying on the BVI Insolvency Act are entirely circular and without merit:

- ***Mutuality.***  The Joint Liquidators only raise the concept of "mutuality" in the context of the distinct statutory set-off under the BVI Insolvency Act (Response ¶¶ 250-53), but that concept cannot salvage their obligation to prove that FTX was put into a better position as a creditor by the Challenged Trades.  Their argument on this front simply repackages their conclusion that 3AC had a proprietary interest in digital assets—without that, 3AC could only look to its rights under the contract, and that contract did *not* give 3AC an unqualified right to withdraw digital assets for the reasons addressed above.  In any event, there would be no mutuality challenge to FTX's contractual set-off even assuming *arguendo* that 3AC had a proprietary interest in digital assets because the application of credits and debits to set-off (alleged) assets and liabilities occurred once 3AC had sold any interest it did have in digital assets to the counterparties of the Challenged Trades.  Additionally, 3AC waived any right to specific performance in the form of the delivery of digital assets and was therefore only entitled (at most) to advance a money claim in the event that digital assets were not delivered to it.  (Terms of Service § 30.2.)

- ***Assets and Liabilities.***  The Joint Liquidators remarkably argue that set-off cannot apply because of their own strawman "single asset theory." (Response ¶ 244.)  They are correct that there is no need to resort to set-off in a scenario where the Court (rightly) concludes that 3AC could only have withdrawn, and therefore have distributed to its creditors, up to the amount of its Account Balance (at most).  But the exercise of the contractual right of set-off or any other effecting of a set-off and netting right precludes the Preference Claim in any alternative scenario.

- ***Creditor Status.***  The Joint Liquidators also suggest that set-off can only occur if FTX is a creditor.  (Response ¶ 244.)  There can be no Preference Claim because FTX was not a creditor at all, and, *separately*, there can be no Preference Claim because FTX was not put into a better position as a creditor, to the extent one assumes it to have creditor status, in light of the contractual or other right of set-off (among other reasons).  Their feigned confusion is unnecessary—the upshot is that the Preference Claim fails for multiple reasons.

169.    The Joint Liquidators cannot avoid the consequences of 3AC's position on the Exchange.  3AC never had access to "more than $1 billion" in digital assets.  There was a positive Account Balance, and 3AC could not have withdrawn or claimed any amount exceeding the value of that Account Balance.  The Challenged Trades that the Joint Liquidators seek to unwind did not decrease the Account Balance, which only decreased as the result of withdrawals and market price declines outside and separate from the Challenged Trades.  The application of the USD credits about which 3AC complains is a clear example of a set-off of two monetary amounts.  Thus, set-off confirms that there is no path to recovery even if one adopts the Joint Liquidators' (incorrect) view that each sub-balance is a separate asset or liability.

5.    **Even If the Challenged Trades Putatively Constitute a Preference, FTX Did Not Receive More than It Would Have in a Hypothetical Liquidation Because It Held a Valid and Perfected Security Interest Over the Digital Assets and Therefore Was Not Unfairly Preferred.**

170.    The third element of the Preference Claim requires that the Challenged Trades provided FTX as creditor with more than it would otherwise have received in a liquidation of 3AC.  Even assuming that 3AC in fact held a proprietary interest in or other right to digital assets ***and*** that all other requirements were met, the Joint Liquidators have still failed to prove that

FTX was placed in a better position as a creditor because FTX had a valid and perfected security interest in the digital assets and therefore did not receive more than it would have in 3AC's hypothetical liquidation.  To be clear, the FTX Recovery Trust asserts that FTX held a valid and perfected security interest ***only in the alternative***, if the Court disregards the prior conclusion that the Terms of Service did not create a proprietary interest and reaches a different one.[92]

171.    An enforceable security interest under Antiguan law requires (i) attachment, *i.e.*, the creation of a security interest as between debtor and creditor, and (ii) perfection of that security interest, *i.e.*, a further step (such as possession or registration) that constitutes notice of the security interest to third parties.  (Houseman Decl. ¶ 70.)  The requirements of both attachment and perfection are easily met if one assumes, as the Joint Liquidators argue, that 3AC had a proprietary interest in digital assets held by the Exchange.  This is true regardless of how the security is classified—whether as a pledge, lien, fixed charge, or floating charge—because the text of the Line of Credit Agreement[93] and the operational reality of the Exchange satisfy all required elements to establish such security interests.

---

[92]   The Joint Liquidators' assertion that the FTX Recovery Trust "disclaimed" such a security interest is disingenuous—the FTX Recovery Trust expressly stated, in response to a Request for Admission, that it did not have a security interest *because* the FTX Recovery Trust owned the digital assets held by the Exchange.  (Austin Decl., Ex. 14, The FTX Recovery Trust's Resps. & Objs. to the Joint Liquidators of Three Arrows Capital, Ltd.'s (I) Eighth Set of Requests for the Production of Documents; (II) Seventh Set of Interrogatories; and (III) Third Set of Requests for Admission, at 30-31.)  In particular, by the time of that Request for Admission, the Joint Liquidators had not yet articulated any position as to who owned the relevant digital assets, and the FTX Recovery Trust considered the issue settled by the Court's Confirmation Order.  *See* Section I.C.2, *supra*.  Now, in the Response, the Joint Liquidators seek to relitigate this issue and argue that 3AC, not the FTX Recovery Trust, owns those assets, and as such the FTX Recovery Trust is entitled to demonstrate that, were such argument to be accepted, the Joint Liquidators still cannot prove the elements of the *Preference* Claim because FTX would then have held a valid security interest.  The Joint Liquidators even acknowledge this express condition.  (Response ¶ 255.)  There can be no serious argument of waiver.  *See Charpentier* v. *Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991).

[93]   While Mr. Webster treated the two parts of the Line of Credit Agreement—the part under the header "FTX Line of Credit" and the part under the header "FTX Institutional Customers Margin and Line of Credit Agreement"— as "separate but related agreements" in his declaration (Webster Decl. ¶ 20), he acknowledged at deposition that he was "not providing an expert opinion under Antiguan law about whether [the two parts] should be treated as one agreement or two agreements," and, in any event, it does not matter for his opinions.  (Beller Reply Decl.,

### a.   The Opinion Offered by Mr. Webster Is Not Credible and Should Be Given No Weight.

172.    As an initial matter, the Court should give no weight to the opinions of the Joint Liquidators' purported foreign-law expert, Mr. Paul Webster.   Mr. Webster lacks the expertise necessary to assist the Court in determining issues related to a security interest under Antiguan law, as demonstrated by his lack of relevant expertise with respect to secured transactions and security interests under Antiguan law, his fundamental misunderstandings of those areas of Antiguan law revealed in his deposition, and his inability to answer basic questions during his deposition concerning the very areas on which he purports to opine.

173.    While courts may seek the aid of expert witnesses under Fed. R. Civ. P. 44.1, they "are not bound by the determinations of experts and may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities."  *In re Application of Adan* v. *Avans*, 2007 WL 1850910, at *5 (D.N.J. June 25, 2007).  Courts in this circuit and beyond have chosen to reject expert testimony and opinions that are unqualified, unreliable, or inaccurate.  *See, e.g.*, *Marks* v. *Alfa Grp.*, 615 F. Supp. 2d 375, 378 (E.D. Pa. 2009) (discounting expert testimony that "contradict[ed] the underlying law which he cite[d]"); *Nabulsi* v. *Nahyan*, 2009 WL 1658017, *3 (S.D. Tex. June 12, 2009) ("The court may exclude opinions that are unfounded and unreliable."); *Bitumenes Orinoco, S.A.* v. *New Brunswick Power Holding Corp.*, 2007 WL 485617, at *19 n.21 (S.D.N.Y. Feb. 13, 2007) (rejecting testimony of expert when, among other reasons, the expert's deposition testimony contradicted his written declaration).

---

Ex. 40, Transcript of December 9, 2025 Deposition of Paul Anthony Webster K.C. ("Webster Dep. Tr."), 137:9-23.)

i.     **Mr. Webster Lacks Expertise Relevant to Secured Transactions and Security Interests Under Antiguan Law.**

174.     Mr. Webster's lack of relevant experience undermines the credibility of his analysis.  Mr. Webster conceded that, prior to this engagement, he had never submitted an expert report on Antiguan law, let alone on secured transactions under Antiguan law, which he described as only a "secondary area" of his experience.  (Webster Dep. Tr. 69:20-23; 82:6-13)   More glaringly, he could not identify a single opinion he issued as a judge interpreting secured transactions or security interests under Antiguan law.  (*Id.* 67:6-10.)  Mr. Webster may very well be an expert in certain areas of Antiguan law, or an expert in general matters of Antiguan law.  But based on his own words, he does not appear to be an expert in the specific area of law on which he purports to opine (*i.e.*, secured transactions and security interests under Antiguan law).   Courts routinely decline to rely on such foreign-law submissions where the declarant lacks specialized expertise in the pertinent area of law.  *Bitumenes Orinoco, S.A.*, 2007 WL 485617, at *19 n.21 (rejecting foreign-law opinion where expert conceded lack of expertise on specific topics).  Here, Mr. Webster simply lacks the requisite expertise to offer the opinions he is presenting to this Court.

ii.     **Mr. Webster's Deposition Testimony Demonstrates a Lack of Understanding of Core Principles of Antiguan Law Related to Secured Transactions and Security Interests.**

175.     Mr. Webster's testimony—including via the Webster Declaration—is unreliable as a matter of substance.  During his deposition, Mr. Webster repeatedly misstated core principles of Antiguan law related to secured transactions and security interests, and could not answer basic questions regarding the topics at the heart of the opinions he offers to the Court.  As just a few examples, Mr. Webster erroneously testified that, as a matter of Antiguan law:

(1)     **a contractual lien is not a form of security**.  (Webster Dep. Tr. 169:20-171:14.)

> *But see* Beller Reply Decl., Ex. 41, Roy Goode & Louise Gullifer, *Goode and Gullifer on Legal Problems of Credit and Security* (7th ed. 2022) ("Goode & Gullifer"), Chapter 1, 1-43 ("There are only four types of consensual security known to English law: the pledge, ***the contractual lien***, the mortgage, and the charge.").

(2)    **a charge cannot be created over intangible property.** (Webster Dep Tr. 230:15-16; 242:20-243:1.)

> *But see* Beller Reply Decl., Ex. 42, *Re Spectrum Plus Ltd (In Liquidation)* [2005] UKHL 41 (finding a valid floating charge over a company's book debts (which are an intangible property)).

(3)    **a contractual lien arises by operation of law**. (Webster Dep. Tr. 163:16-164:8)

> *But see* Goode & Gullifer, Chapter 1, 1-51 (under the header "Contractual lien," noting that "a possessory lien may also be created by contract.").

(4)    **the "remedies of a chargee" include the power to sell assets**. (Webster Dep. Tr. 234:21-235:4.)

> *But see* Goode & Gullifer, Chapter 1, 1-53 n.200 (noting that a chargee "has no right to obtain foreclosure" or "avail itself of the self-help remedies of sale or appointment of a receiver").

176.    Equally troubling, Mr. Webster could not explain fundamental concepts related to security interests, such as whether the term "indebtedness" refer to the obligation or the collateral (Webster Dep. Tr. 282:8-13, 283:13-284:1), despite being retained to opine on "the enforceability of the security" in the Line of Credit Agreement under Antiguan law (*id.* 52:19-53:3).

177.    Mr. Webster also repeatedly stated that he was not prepared to give answers to core questions of law relevant to this dispute.  For example, Mr. Webster testified that he did not know whether there can be a charge that is neither a fixed charge nor a floating charge. (Webster Dep. Tr. 266:6-19.)   As another example, Mr. Webster could not "give a definitive answer" as to whether "a charge to a security interest can apply to a chose in action." (*Id.* 174:24-175:9.)  These are elementary propositions in secured-transactions law (on which Mr. Houseman

opined), and Mr. Webster's inability to address them confirms that his testimony would not assist the Court.

178.    "In a case involving questions of foreign law, a party owes the court the duty of producing an expert witness whose learning and experience equal or surpass his willingness.  It takes more than some schooling in law, custody of law books, a general interest in the subject, and a willingness to testify on any phase of the laws of any foreign country to make a real expert witness on whose opinions a court can rely with reasonable safety." *Bostrom* v. *Seguros Tepeyac, S. A.*, 225 F. Supp. 222, 230 (N.D. Tex. 1963).  If a foreign-law expert such as Mr. Webster cannot explain rudimentary concepts central to his assignment, his testimony is not helpful to the Court and warrants no weight.  Accordingly, Mr. Webster's testimony should play no role in resolving the legal question before the Court:  whether, under the alternative assumption that 3AC had a proprietary interest in digital assets, the Line of Credit Agreement grants FTX a security interest over the digital assets credited to the 3AC Accounts.  As explained below, it does.

> **b.    The Line of Credit Agreement Grants FTX a Security Interest Over All Assets Associated with the 3AC Accounts.**

179.    The Joint Liquidators do not dispute that Clause 3 of the Line of Credit Agreement expressly grants FTX a pledge and lien.  (Webster Decl. ¶ 13; Houseman Decl. ¶ 9(b.).).[94]  The Joint Liquidators contend, however, that such a pledge or lien was not granted with respect to digital assets associated with the 3AC Accounts because Clause 3 of the Line of Credit Agreement limits any secured assets to "assets *in* all of the FTX accounts of the Customer," (emphasis added) and, according to the Joint Liquidators, "there were no assets in the 3AC Debtor's accounts."  (Response ¶ 257.)  Their position relies on Mr. Webster's opinion that the

---

[94]    As discussed below, the FTX Recovery Trust also asserts that Clause 3 granted a charge in favor of FTX over the digital assets, which the Joint Liquidators dispute.

phrase "FTX accounts of the Customer" refers only to the "segregated wallet for that Customer" (*id.*)—meaning, essentially, to "*wallets associated* with the FTX accounts of the Customer." That opinion is supported by neither factual evidence nor legal authority; it impermissibly reads the words "wallets associated with" into the phrase, despite having no textual basis for doing so. Indeed, during his deposition, Mr. Webster could not articulate any basis for this interpretation beyond circular reasoning,[95] and admitted it was not directly supported by any specific legal authority.[96]

180.    The meaning of the word "account" as used in the Line of Credit Agreement is patently broader than a wallet address associated with the account, and necessarily encompasses the rights and entitlements associated with a customer account.   (*See, e.g.*, Line of Credit Agreement, Clause 4(c) (referencing "deficiency" remaining in the accounts); *id.*, Clause 5 (referencing "balance due" in the customer accounts).)  As Mr. Houseman testified, "a phrase like 'all assets in all of the FTX accounts of the customer' has to be given a sensible meaning . . . based on that immutable context [of customers handing over the private key to crypto].  [I]t is the same thing as credited to or associated with."  (Beller Reply Decl., Ex. 43, Transcript of November 19, 2025 Deposition of Stephen Houseman K.C. ("Houseman Dep. Tr.") 129:8-130:12.)[97]

---

[95]    Webster Dep. Tr. 143:16-144:7 ("Q.  And why do you feel that it's reasonable to interpret that language ["all of the FTX accounts of the customer"] to refer to the customer's individual wallet?  A.  Because the clause reads 'All assets in all of the FTX accounts of the customer are collateral for the indebtedness.'  The customer's wallet – the FTX accounts of the customer refer, in my opinion, to the individual wallet of each, wallet or wallets of each individual customer.  Q.  And what is that opinion based on?  A.  My interpretation of the clause.").

[96]    Webster Dep. Tr. 145:18-164:9 ("Q.  So that interpretation is not based on any Antiguan authority?  A.  It is based on several Eastern Caribbean authorities which say that in interpreting a contract you first look at the words used and if the words used are clear, then that is what the words mean.  So it is based on authorities.  Q.  Well, I think that's some general authority about contract interpretation.  I was asking whether it's based on any specific authority that says that the word account should mean the word wallet.  A.  No, I haven't seen that, no.  I am sorry, if that's your question, no, I haven't seen that.").

[97]    The Joint Liquidators' own allegations confirm that they, too, use "account" in this broader sense.  (*See, e.g.* Response ¶ 6 (the Challenged Trades "culminated in a manual liquidation by FTX of substantially all of the

181.     Likewise, adopting Mr. Webster's interpretation of the phrase as referring to a customer's individual, segregated wallet would render Clause 3—and the entire Line of Credit Agreement—a dead letter.   Mr. Webster admits that "Clause 3 purports to create a security interest."  (Webster Decl. ¶ 49.)  Yet he fails to explain why any reasonable party intending to create a security interest would logically do so with respect to a null-set of property as their only collateral source.  In fact, at deposition, Mr. Webster admitted it would be "reasonable to interpret the language in the Margin Agreement [that refers] to 'all assets in all of the FTX accounts of the Customer' as referring to all assets associated with the FTX accounts of the customer," because "that is what the parties intended."  (Webster Dep. Tr. 153:21-154:5.)

182.     Thus, the natural reading of the Line of Credit Agreement is that it granted a security interest for all digital assets credited to the 3AC Accounts.

###     c.     FTX's Pledge and Lien Over the Digital Assets Were Perfected Through Exclusive Control.

183.     Under Antiguan law, perfection of a lien or pledge over digital assets requires that the creditor have exclusive control over those assets.  (Houseman Decl. ¶¶ 10(ii), 74, 76.)  The Joint Liquidators claim that "[a]s Antiguan law stands today, it is not possible to have a pledge or lien over digital assets, because pledges and liens are possessory forms of security, and one cannot 'possess' intangible property under Antiguan law."   (Response ¶ 269.)   That is a misleading mischaracterization of Antiguan law—although the subject is untested under Antiguan law, no court has ever held as much or indicated that it is impossible under Antiguan law.  (Webster Dep. Tr. 176:2-12; Houseman Dep. Tr. at 203:16-22.).  Tellingly, nowhere in his declaration did

---

remaining **digital assets in the 3AC Debtor's accounts**" (emphasis added)); *id.* Section IV.A ("The 3AC Debtor Had a Beneficial Interest in the **Digital Assets in Its FTX Accounts**" (emphasis added)). The Joint Liquidators' allegations would be rendered meaningless by Mr. Webster's position that "account" means only a segregated wallet.

Mr. Webster offer the categorical opinion that the Joint Liquidators put forward.    What Mr. Webster did expressly state was that "under Antiguan law, perfection of a lien or pledge requires that the creditor have possession or, when dealing with intangible assets, exclusive control of the secured assets from the moment that the security is created through the duration of the security."  (Webster Decl. ¶ 14; *see also id.* ¶ 73.)  FTX clearly did have the requisite exclusive control.

184.    A party has "exclusive control" of a digital asset when it has the ability to prevent others from accessing the asset.  (*See* Beller Reply Decl., Ex. 44, UNIDROIT Principles on Digital Assets and Private Law ("<u>UNIDROIT Principles</u>"), Principle 6.)  Whether control exists "is a matter of fact and does not depend on a legal conclusion." (*Id.* ¶ 6.2.)  Here, the facts—even as assumed by *Mr. Webster himself*—show that FTX held exclusive control of the digital assets.

185.    Most importantly, the Joint Liquidators concede that FTX held the private key to the wallets containing the relevant digital assets (*see, e.g.*, Response ¶ 15), and Mr. Webster himself accepted that a party who holds the private key "can obtain control" over those digital assets.  (Webster Dep. Tr. 217:6-14, *see also* UNIDROIT Principles, ¶ 2.8 ("[A]n individual user does have control over a private key, which allows the individual user to obtain 'control' (as so defined) over a digital asset within the protocol. . . .").)  As the holder of the private key, FTX also had the ability to block withdrawals by its customers and liquidate any and all assets associated with the customer's accounts at any time, which gave FTX the practical ability to exclude others from accessing the assets.

186.    The Joint Liquidators point to only two facts to argue that FTX lacked exclusive control:  (1) Section 8.2.6 of the Terms of Service; and (2) the fact that 3AC withdrew assets from the Exchange.  Neither has any bearing on the issue.  *First*, as explained above,

Section 8.2.6 expressly states that any customer right to request withdrawals is "subject to outages, downtime, and other applicable policies," and is thus restricted and limited.  (Terms of Service, § 8.2.6.)  *Second*, the Joint Liquidators concede that customers—including 3AC—do not have a right to withdraw *specific* digital assets (as opposed to an amount of them) because that is impossible.  (Response ¶ 134 ("[T]he trust here is not over particular traceable assets, but rather over a percentage of an undivided whole.").)  Rather, a withdrawal was effectuated through what is essentially a request made to FTX to transfer unspecified digital assets to the customer.  *Third*, the evidence demonstrates that the Exchange could and did in fact impose limits on withdrawals both automatically via the code and on an *ad hoc* basis, including in the case of 3AC on June 14, 2022 (Austin Decl., Ex. 66, Tackett_3AC_000000158 at -0222).  Thus, 3AC's capacity to make withdrawals from the Exchange was contractual, practically, and actually limited by FTX, and cannot defeat the exclusive control of FTX as the ultimate holder of the private key to wallets containing the assets.

> **d.      The Line of Credit Agreement Also Granted FTX a Charge Over the Digital Assets.**

187.    Clause 3 of the Line of Credit Agreement also created a charge for the benefit of FTX with respect to any digital assets credited to the 3AC Accounts.  An Antiguan court is fundamentally concerned with the nature of the rights and the obligations the parties intended to create.  (*See* Beller Reply Decl., Ex. 45, *Re Avanti Communications Ltd. (in administration)* [2023] EWHC 940 (Ch), at [33]-[38].)  Courts routinely look at the nature of the rights conferred to find that a charge was created, even when the underlying security document used a different label (*e.g.*, "general lien").  (*See, e.g.*, *id.*, Ex. 46, *National Provincial & Union Bank* v. *Charnley* [1924] 1 KB 431, at 449-451; *id.*, Ex. 47, *Re Lehman Brothers International (Europe) (In Administration)*

[2012] EWHC 2997 (Ch), at [38-39, 46].  Mr. Webster also conceded that an agreement does not have to use the term "charge" to create one.  (Webster Dep. Tr. 219:22-25; 220:16-23.)

188.   Here, Clause 3 reads:

> "All assets in all of the FTX accounts of the Customer (the 'Secured Assets') are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on ***and security interest*** in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. ***FTX shall have all the remedies of a chargee*** under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX."

Line of Credit Agreement, Clause 3 (emphasis added).

189.   Clause 3 bears clear hallmarks of a charge.  It grants FTX a "security interest" in the Secured Assets (as defined) supplemental to a pledge and a lien, and—most decisively—gives FTX "all the remedies of a chargee under the laws of Antigua[.]"   As Mr. Houseman explained, where a clause already lists the two possessory forms of security (pledge and lien), the additional phrase "security interest in"—if it is to mean anything—must refer to some other form of security, primarily one of the two forms of non-possessory security:  mortgage or charge.  (Houseman Decl. ¶ 102(ii)).)[98]  Because there is no basis to infer that a mortgage was intended (*id.* ¶ 101; Webster Decl. ¶ 68), the phrase "security interest" can only be intended to create a "charge" (Houseman Decl. ¶ 102(ii)).  That the parties intended to create a charge is further underscored by the next sentence granting FTX "all the remedies of a chargee," as it serves to specify the form of additional security interest referred to in the previous sentence.  (*Id.* ¶ 102(iii).)

---

[98]   Moreover, the language in Clause 3 demonstrates the parties' intention to create as many forms of security interest as legally available, which also include a charge.  (*See* Houseman Dep. Tr. 258:13-159:10, 281:5-18.)

190.    Although Mr. Webster does not address the point in the Webster Declaration, his deposition testimony to the contrary cannot withstand scrutiny.  When asked what the phrase "security interest" could mean other than a charge, he posited that it means "a right of sale,"[99] but identified no doctrinal basis for that view.  (Webster Dep. Tr. 167:2-168:16.)  His reading of the next sentence in Clause 3—the grant of "all the remedies of a chargee"—was even less coherent.  He first asserted that the words were intended merely to "give the lienholder the remedies of a chargee" without creating a charge at all.  (*Id.* 232:1-15.)  But when pressed, he could not identify any additional rights such a lienholder would possess that would distinguish it from an ordinary lienholder.  (*Id.* 238:4-240:14.)  He ultimately conceded that, under his reading, the phrase granting FTX "all the remedies of a chargee" would be "meaningless."  (*Id.* 240:19-241:4.)  That is not a tenable interpretation.  The only plausible reading of Clause 3 is that the parties intended to, and did, create broad security interests for the benefit of FTX over the digital assets credited to the 3AC Accounts, including a pledge, a lien, and a charge.[100]

191.    Once Clause 3 is correctly understood as creating a charge, the only remaining question is the character of that charge.  Where, as here, FTX had "legal and practical control over the Secured Assets," and 3AC was not free to use the digital assets as it would like, the charge is fixed.  (Houseman Decl. ¶ 104.)  Alternatively, if the Court finds that the Secured Assets somehow were part of 3AC's "circulating capital" or were under sufficient level of control

---

[99]    Mr. Webster's testimony on this point is especially confused.  He initially offered the opinion that, despite contrary statements in his declaration, a contractual lien is not a form of security but couldn't point to any specific legal authority.  (Webster Dep. Tr. at 169:20-170:17.)  But somehow, according to Mr. Webster, a contractual lien "can become a security" if it is perfected.  (*Id.* at 171:25-172:5; 173:2-6.)

[100]   It is particularly logical that the parties here would intend to create multiple—and as many as possible—types of security interests since it was unsettled whether digital assets could be subject to a pledge or lien under Antiguan law (though, as discussed above, they could not).

by 3AC, the charge would necessarily be floating because, as Mr. Houseman testified, "it has to be one or the other." (*Id.* ¶ 105; Houseman Dep. Tr. 173:8-14.)

192.    Finally, the Joint Liquidators do not dispute that because the grantor of the charge was 3AC, the law of its place of incorporation—the BVI—governs what is required for perfection. (Webster Decl. ¶ 67.)  Under BVI law, registration is not required to perfect a security interest or to render it enforceable. (Atherton Rebuttal Decl. ¶ 105; Levy Dep. Tr. 335:14-336:21.) Thus, once the charge was created, FTX was not required to take any further steps.[101]  Accordingly, FTX held a valid and enforceable charge against the Digital Assets with priority against all unsecured creditors of 3AC.

> **e.    FTX's Security Interest Would Extend to Digital Assets Under the Joint Liquidators' "Percentage of an Undivided Share" Theory.**

193.    Antiguan law permits a security interest over *any interest*, which would necessarily include a share of assets held in a commingled, undivided bulk. (Beller Reply Decl., Ex. 49, Goode & Gullifer, Chapter 2, 2-07 ("It is not necessary for the debtor to be the absolute owner of the asset given in security.  ***Any interest suffices***. . . ." (emphasis added).)

194.    Importantly, the Joint Liquidators' "percentage of an undivided share" theory was never raised by Mr. Webster in the Webster Declaration (and was only raised by Dame Elizabeth in her declaration), and thus Mr. Houseman had no opportunity to respond on relevant matters of Antiguan law via the Houseman Declaration.  However, when presented with this new theory for the first time at his deposition, Mr. Houseman testified that it does not alter his conclusions.  He testified that "I believe you can get a floating charge" over "an undivided interest

---

[101]    Non-registration affects only the charge's priority as against registered third-party security interests, not its validity, and even an unregistered charge continues to rank ahead of all unsecured creditors. (*See* Atherton Rebuttal Decl. ¶ 105; Beller Reply Decl., Ex. 48, BVI Business Companies Act 2004 (as revised) §§ 161, 163, 166.)

in a pool of assets." (Houseman Dep. Tr. 194:5-9.) He later reiterated that "you could grant a charge" over such an interest (*id.* at 200:2-10),[102] and confirmed that the undivided-share theory would not change his analysis as to a pledge or lien either. (*Id.* at 308:10-24.) Mr. Webster, however, testified only that his opinions did not depend on the validity of that premise. (Webster Dep. Tr. 295:8-13; 299:3-13.) He never testified that a security interest cannot exist as to a percentage of an undivided share; his assumption was that 3AC had "some sort of interest"—and he went no further. (*Id.* 297:16-198:16.) As such, the only evidence before the Court on this issue confirms that a security interest existed in FTX's favor even if the asset is a percentage of an undivided share.

### f. The Line of Credit Agreement Created a Valid Security over Assets Credited to the 3AC Accounts.

195.    In sum, Clause 3 of the Line of Credit Agreement plainly attached to the assets associated with the 3AC Accounts, because "accounts" must be read in its ordinary, plain sense and not as a reference to an empty, segregated wallet associated with the accounts. Clause 3 created a pledge and a lien, which FTX perfected by virtue of its exclusive control over those assets. Clause 3 also created a charge—properly characterized as fixed, or in the alternative, floating—that required no further step for perfection under BVI law. FTX was also clearly identified as the secured creditor in the Line of Credit Agreement.[103] And the Joint Liquidators'

---

[102]  In particular, the Joint Liquidators' assertion that Mr. Houseman "conceded" that "he was not giving any opinions about a charge" flatly misstates the record. (Response ¶ 273.) Mr. Houseman testified that he was not "giving an opinion as to whether the charge granted by clause 3 ***would be fixed or floating*** on that hypothetical premise." (Houseman Dep. Tr. 308:16-19 (emphasis added).) He repeatedly confirmed that a charge could have been granted as to a percentage of an undivided share of digital assets. (Houseman Dep. Tr. 194:5-9; 200:2-10.)

[103]  Although the Joint Liquidators do not themselves argue that FTX was not identifiable as the secured creditor, their expert Mr. Webster did. In his declaration, Mr. Webster asserted that FTX was not "identifiable" as the lender in the Line of Credit Agreement because, based solely on the external facts he assumed, he did not believe FTX was *in fact* a lender to 3AC. (Webster Decl. ¶¶ 93-94.) But at deposition, he conceded that if FTX were owed amounts that "fell under the definition of Indebtedness," those obligations could be secured by assets lent through the Margin Program (Webster Dep. Tr. 280:21-281:25). That concession confirms that the issue of

late-breaking "percentage of an undivided share" theory is not even considered by their own expert and, as Mr. Houseman explained, does not alter the availability or validity of a pledge, lien, or charge.

196.     The Preference Claim fails because 3AC did not have any proprietary interest in any asset that was transferred or diminished.  But even if it had, the claim would *still* fail because FTX would have held a valid and enforceable security interest and therefore (as a secured creditor) it could not have received more than it would in a liquidation of 3AC.  The Challenged Trades did not place FTX in a better position, and the Preference Claim cannot succeed.

**D.     The FTX Recovery Trust Has a Complete Defense to the Preference Claim Because the Challenged Trades Occurred in the Ordinary Course under BVI Law.**

197.     The Joint Liquidators have not met their burden to prove the required elements of the Preference Claim, but even if they had the Preference Claim is precluded by FTX's complete ordinary course of business defense under BVI law.   Section 245(2) of the BVI Insolvency Act provides that "[a] transaction is not an unfair preference if the transaction took place in the ordinary course of business."  (Beller Reply Decl., Ex. 13, BVI Insolvency Act § 245(2).)

198.     The ordinary course defense is a holistic, fact-driven analysis and focuses on the debtor's business.  (Atherton Rebuttal Decl. ¶ 71; Levy Decl. ¶ 170.)  In assessing whether a transaction occurred in the "ordinary course" of 3AC's business, a BVI court would apply an

---

identifiability turns on the operation of the contractual language, not on Mr. Webster's assumptions about what did or did not happen in reality.  And the Line of Credit Agreement repeatedly and unequivocally identifies FTX as the party that holds the enforcement rights.  Clause 2 provides that "FTX may 'call' the Indebtedness."  Clause 3 grants a lien and "security interest in" the Secured Assets to secure "all obligations of Customer to FTX." Clause 10—titled "Lender's Remedies"—empowers FTX to declare amounts immediately due and to enforce the security interest upon default.

objective standard and consider the actual, factual setting in which the relevant transactions took place. (*See* Atherton Rebuttal Decl. ¶ 71; Levy Decl. ¶ 170.) A "BVI court would consider 3AC's business as being a cryptocurrency hedge fund, and [] this business involved the depositing and withdrawing of, and trading in, digital assets on the Exchange[.]" (Levy Decl. ¶ 174.) Relevant considerations include the "size and timing of transactions," as well as the "size and sophistication of 3AC." (Atherton Rebuttal Decl. ¶ 73.)

199.    The fact that 3AC was experiencing financial difficulties does not preclude the defense. (*See* Levy Dep. Tr. 316:22-24 ("I think it would probably be a high bar to say that abnormal financial conditions precluded" the ordinary course defense).) The ordinary course defense—in the context of preference claims—logically and necessarily involve a company that is undergoing or has undergone financial distress. Neither party suggests that simply because a party is insolvent, all transactions during that insolvency would be outside of the ordinary course. (Levy Dep. Tr. 309:19-25.)[104] "[M]arket conditions" may be considered. (Levy Decl. ¶ 173.) And as Mr. Atherton explained, "[t]he fact that a transaction may be regarded as exceptional or unprecedented in the circumstances does not preclude that transaction having been entered into in the ordinary course of that company's business." (Atherton Rebuttal Decl. ¶ 71.) Where "a company trades in particular assets as part of its usual business, then in circumstances where those assets are rapidly declining in value, an attempt to jettison positions in those assets in order to minimise losses could well be considered to be transactions undertaken in the ordinary course of that company's business even though the market conditions faced by the company are exceptional

---

[104]  3AC confusingly suggests that because Mr. Atherton did not speculate as to the Court's assessment of the factual record in light of the legal principles in the BVI and Mr. Levy chose to do so, Mr. Levy's conclusion is "unrebutted" and the FTX Recovery Trust may not bring an ordinary course defense. (Response ¶¶ 240-41, 243.) But this is backwards. It is the Court's role to assess facts and apply law. It is the role of Mr. Atherton and Mr. Levy to describe the foreign law that applies.

or unprecedented." (*Id.* ¶ 72.)  Actions consistent with the pursuit of reward and gain, or to preserve value and avoid losses to maintain the company as a going concern, are included within the potential scope of the defense.  In sum, the Court is permitted to consider all of the facts and circumstances.  The evidence here proves that 3AC's trading on June 13 and 14, 2022 occurred in the "ordinary course."

200.    *First*, as the Joint Liquidators correctly point out, courts assessing the ordinary-course defense "must examine the factual context of the particular transactions." (Response ¶ 238.)[105]  That basic factual context is as follows.  In mid-May 2022, 3AC began opening large long spot-margin positions in BTC.  (Coverick Decl. ¶ 57.)  As a result, 3AC significantly increased its leverage between May and June 12, 2022 to fund an enormous bet that BTC and ETH prices would rise, including by using funds borrowed through the Margin Program and fully utilizing the Line of Credit.  (*Id.* ¶ 58.)  But, importantly, 3AC intentionally increased its positions in BTC *despite* the prices of both BTC and other digital assets like ETH dropping significantly during that period.  (*Id.* ¶ 59.)  The "factual context" is clear:  the Challenged Trades took place as a rational decision to preserve the value of the 3AC Accounts upon the realization that 3AC had placed a bad bet that did not return in its favor.

---

[105]   Despite the Joint Liquidators' emphasis on "factual context" (Response ¶ 238), they apparently failed to convey its importance to one of their purported experts on the question of the ordinary course defense.  Opining on whether the Challenged Trades occurred in the ordinary course of 3AC's business (*see* Lisle Decl. ¶¶ 11-25), Mr. Lisle readily conceded that he did not review any historical trading data of 3AC on the Exchange or any other exchanges during *any* time period (Lisle Dep. Tr. 119:20-24, 120:13-18), nor was he aware of any "particular transactions or details about the [trading] portfolio" of 3AC at any time (*id.* 97:21-98:10), nor did he have any "basis to opine on" whether the number of trades conducted during June 12-14, 2022 was typical for 3AC (*id.* 120:19-22).  Further, despite listing three alleged "more sophisticated strategies" that 3AC could have adopted during June 12-14, 2022 (*see* Lisle Decl. ¶ 23), Mr. Lisle unsurprisingly "do[es] not know if" 3AC had ever implemented any such strategies and "can't point to specific evidence that would show that" (Lisle Dep. Tr. 130:7-131:23).  Failing to define what "ordinary course" means, Mr. Lisle instead opts for "bringing [his] general experience and knowledge" to see "in [his] view what a typical hedge fund would do."  (*Id.* 93:16-94:9.)  That is not the product of reasoned expert analysis; it is an unreliable opinion "based solely on his personal knowledge and experience rather than any methodology, analysis, or factual support."  *Callaway Golf Co.* v. *Dunlop Slazenger Grp. Americas, Inc.*, 2004 WL 1534786, at *4 (D. Del. May 21, 2004).

201.    *Second*, 3AC's decision to exit long positions in digital assets in favor of USD was ordinary course behavior for 3AC, as it would for any cryptocurrency hedge fund seeking to preserve value.  On June 13 and 14, 2022, market conditions moved further against 3AC's bad bet.  (Coverick Decl. ¶ 63, tbl. 1.)  So 3AC did what any cryptocurrency hedge fund would do—it shed its losing positions and leverage, and did so quickly.  (*Id*. ¶¶ 68-71.)  Critically, exiting long positions and simultaneously reducing a large negative USD Balance was commonplace for 3AC.  On numerous occasions before June 13 and 14, 2022, 3AC fully eliminated[106] or significantly reduced[107] a very large negative USD balance in a single day, including during market downturns in May 2021, November 2021, and May 2022.  (*See* Beller Reply Decl., Ex. 8, FTX_3AC_000000038_Amended.)

202.    *Third*, 3AC's trading volume on June 13 and 14, 2022 was also consistent with its past trading patterns.  3AC used an API to process many transactions during short periods of time.  In backing out of its losing positions between June 13 and 14, 2022, 3AC overwhelmingly traded using the same API that conducted its trading in prior periods.  (*See* Beller Reply Decl., Ex. 12, FTX_3AC_000046131.)  3AC's trading on the Exchange long bore indicia of algorithmic activity, such that one of the Joint Liquidators' purported experts, Mr. Lisle, admitted that "it's likely that[] it's an algorithm that is driving" 3AC's trading.  (Lisle Dep. Tr. 123:6-15.)

---

[106]    Beller Reply Decl., Ex. 50, Transcript of December 5, 2025 Deposition of Fotis Konstantinidis ("Konstantinidis Dep. Tr.") 146:9-16 ("A.  So the repayment USD on February 22nd, '21 is 32 million . . . . Q.  And that was a 100% reduction in their negative USD balance?  A.  That's what it shows.").

[107]    Konstantinidis Dep. Tr. 168:11-22 ("Q.  By what percentage did 3AC reduce their negative USD balance on [May 18, 2021]?  A.  It's 90.4 or 5 if you round up there.  Q.  And in terms of absolute value, by how much did 3AC reduce their negative USD balance on [May 18, 2021]?  A.  So the delta liability USD says positive, so it's the same with the repayments column, seems to be [310] million."); 160:2-5 ("Q.  By how much did 3AC reduce its negative USD balance on [November 21, 2021]?  A.  I think the erasure here is 85.9%, rounding up."); 153:21-25 ("Q.  On May 4th, 2022 by how much did 3AC reduce their negative USD position?  A.  If I go by the last column, it's 88.4%.").

Algorithmic trading operates in accordance with preset rules and limits with respect to prices and volumes without the need for contemporaneous human intervention or decision-making.

203.    *Fourth*, the result of the Challenged Trades provides further confirmation that 3AC's activities reflected a rational response to market conditions.  3AC's rapid response to the decline in BTC and ETH prices undoubtedly minimized their losses between June 13 and 14. (Coverick Decl. ¶ 80.)  As the FTX Recovery Trust has demonstrated, if the Challenged Trades (including the Liquidation) had not occurred, the Account Balance for the 3AC Accounts would have been lower than it was at the commencement of 3AC's liquidation proceedings on June 27, 2022.[108]  As a result, and contrary to the Joint Liquidators' mistaken assertion (*see* Response ¶ 242), the Challenged Trades (and the Liquidation) did in fact "benefit the 3AC Debtor's creditor body" by preserving the Account Balance for the 3AC Accounts—the actual amount that 3AC could ever have withdrawn from the Exchange to distribute to its creditors.

204.    *Fifth*, 3AC's trading on other exchanges indicates that 3AC was trying to retain value as a going concern, rather than to simply trade for the sake of it while on the doorstep of collapse.  Unfortunately, the Joint Liquidators failed to produce any documents regarding 3AC's trading strategy and whether the trades that occurred between June 13 and 14 were pursuant to preexisting algorithms, leaving only 3AC's trading on other exchanges to provide clues.  But it appears that 3AC's trading was responsive to the impact of market conditions or its positions on the Exchange, not the fact that 3AC itself was under financial stress.  ██████████████

████████████████████████████████████████████████████████████████████████

---

[108]    Despite continuing to trade up until moments before the Liquidation, 3AC did not move fast enough to avoid the non-compliance that required FTX to initiate the Liquidation.  The FTX Recovery Trust does not argue that the Liquidation was in the ordinary course.  Rather, the Liquidation marks the end of 3AC's ordinary course trading, only after which do the Joint Liquidators point to anything fundamentally different about 3AC's conduct:  "its trading activity substantially ceased."  (Response ¶ 242.)

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ [109]

205.    *Sixth*, there is no evidence suggesting that 3AC would have prioritized the repayment of purported liabilities to FTX.  The Joint Liquidators do not allege any special relationship between FTX and 3AC that would have caused 3AC to conduct trading in order to pay FTX in priority to other (alleged) creditors.  The record confirms that FTX did not drive 3AC to make the Challenged Trades—FTX only discussed with 3AC bringing the 3AC Accounts into compliance with collateral requirements *after* 3AC reached out on June 14, 2022, after most of the Challenged Trades had taken place.  (Austin Decl., Ex. 66, Tackett_3AC_000000158.)   An allegation that 3AC intended to prioritize FTX over other creditors would not necessarily negate the ordinary course defense, but the lack of any evidence explaining *why* 3AC might have intended or sought to prioritize repayment to FTX further demonstrates that the Challenged Trades were entered into the ordinary course of business by 3AC.  The logical inference to draw from the

---

[109]   The analysis performed by Mr. Konstantinidis was limited in scope and does not provide any basis for rejecting the ordinary course defense here.  The Konstantinidis Declaration can be boiled down to the unremarkable observation that 3AC traded more on June 13 and 14 relative to the six-month period before it closed out its long BTC and ETH positions.  Mr. Konstantinidis was clear that his analysis had no connection to BVI law or how it defined ordinary course trading.  (Konstantinidis Dep. Tr. 75:24-76:5 ("Q. So you have no awareness of the arguments either party is making with regard to BVI law and the ordinary course defense available under that law? . . . A. Correct.").  He acknowledged that his repeated references in his declaration to 3AC's trading being "distressed" or "urgent" did not purport to address a legal standard or term.  (*Id.* 111:4-6 ("I'm using . . . distressed the way we use it in plain English.").)  And he explained that he was not providing any opinion on "intent" or why 3AC conducted any trades on June 13 and 14.  (*Id.* 112:8-13.)  Indeed, Mr. Konstantinidis simply failed to engage with the crux of the issue, namely where 3AC's trading was consistent with its ordinary course behavior as a cryptocurrency hedge fund—he testified that none of his conclusions would change "if every time 3AC was faced with deteriorating market conditions it reacted the same way as it did in June 2022."  (*Id.* 172:23-173:8.)  That is not credible.

evidence is that 3AC decided to sell entitlements that were decreasing in value to maintain its business, not as a means to pay FTX.

206.    The Joint Liquidators point to two pieces of "factual context" (Response ¶ 238) which they assert land 3AC's trading outside of the ordinary course:  (i) 3AC traded more in the 3AC Account between June 13 and 14, 2022 relative to the prior six-month period and other exchanges on which it was active (*id.* ¶ 241), and (ii) 3AC was under financial stress between June 13 and 14 (*id.* ¶ 242).  Neither of these pieces of factual context, however, consider the most obvious driver of the Challenged Trades:  the impact of market conditions on the positions held in the 3AC Accounts.  The market drove 3AC to respond, and 3AC responded in a rational manner consistent with a cryptocurrency hedge fund seeking to avoid losses, preserve value, and continue as a going concern.  That it was not enough to avoid falling out of compliance with the Exchange requirements does not undermine the evidence demonstrating that the Challenged Trades constituted ordinary course of business behavior for 3AC in its effort to minimize losses and avoid insolvency.[110]

### E.    The Joint Liquidators' Preference Claim Would Create an Inequitable Result and Should Be Disallowed Under U.S. Equitable Principles.

207.    Finally, this Court should apply core U.S. bankruptcy principles to disallow the Preference Claim even *if* the Joint Liquidators could overcome its many deficiencies under BVI law (they cannot) because the relief they request is inequitable.  The Joint Liquidators seek more than $1 billion based on the same contract, conduct, Exchange mechanics, and arguments

---

[110]    The lone case cited in the Response does not preclude the ordinary course of business defense here.  The *Countrywide* decision involved an insolvent tenant who made payment of substantial and longstanding past due rent payments, and this fact was deemed significant by the New Zealand court, rather than the fact that some payment was required at all.  (Austin Decl., Ex. 65, *Countrywide Banking Corp Limited* v. *Dean* [1998] AC 338, at [344].)  Such payments broke a prior pattern and were thus "of quite a different order" and occurred when the landlord knew the debtor was insolvent (*id.*), whereas 3AC had a record of closing down large negative USD positions and unilaterally took action to make the Challenged Trades without regard to what FTX knew or thought.

applicable to all FTX customers.  Granting that relief would be unfair and inconsistent with the key bankruptcy principle that similarly situated creditors should be treated consistently.  The Court may, and should, exercise its equitable authority to prevent such disparate treatment.

208.     This Court has the authority to decline to award, or to limit, relief on a foreign-law claim where enforcement would result in unfair or inequitable treatment of creditors. "Courts of bankruptcy are essentially courts of equity" and have the "power" and "duty" to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankruptcy estate." *Pepper*, 308 U.S. at 304, 307-08.  Although a claim may arise under foreign law, "its allowance or disallowance is a matter of federal law and is left to the bankruptcy court's exercise of equitable powers." *See In re Shelter Enters., Inc.*, 98 B.R. 224, 229 (Bankr. W.D. Pa. 1989) (subsequent history omitted); *see also Matter of Ford*, 967 F.2d 1047, 1049-50 (5th Cir. 1992) (issue of whether creditor is "allowed to enforce its claim is a matter of federal law and the bankruptcy court's exercise of equitable powers").  Indeed, the principle of equal treatment of creditors cabins the comity afforded to foreign insolvency law throughout the Bankruptcy Code. *See* 11 U.S.C. § 1522(a) (limiting relief to circumstances in which "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected"); *Vertiv, Inc.* v. *Wayne Burt PTE, Ltd.*, 92 F.4th 169, 180-81 (3d Cir. 2024) (identifying the requirement of equal treatment of creditors in the context of recognizing foreign proceedings). Thus, consistent with these principles, bankruptcy courts must preserve parity among similarly situated creditors, and ensure that enforcement of claims or remedies does not distort the distributional framework established by the Bankruptcy Code. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239-42 (3d Cir. 2004), *as amended* (Feb. 23, 2005) (rejecting a bankruptcy plan which failed to treat similarly situated creditors similarly).

209.    Comity cannot and does not mandate the application of foreign law in contravention of these principles.  *See In re Treco*, 240 F.3d 148, 157, 160-61 (2d Cir. 2001) (noting that "principle of comity has never meant categorical deference to foreign proceedings," and reversing turnover order premised on application of Bahamian law that would result in unfair treatment of secured creditor).  As Judge Dorsey observed in denying a motion by liquidators empowered by Bahamian law to lift the stay in these Chapter 11 proceedings, the "most important issue in this case is what's in the best interests of the customers and the creditors" and "getting value back to the customers and the creditors . . . should inform all of my decisions."  (Beller Reply Decl., Ex. 51, June 9, 2023 Hr'g Tr. 162:21-25.)

210.    *First*, the Joint Liquidators' position depends on treating 3AC differently from every other FTX customer.  They have no Preference Claim unless the Court concludes that the Terms of Service created a proprietary interest in digital assets for 3AC—but *only for 3AC*.  Even assuming *arguendo* that such an interpretation was plausible, the Court's equitable authority provides not only a basis, but a responsibility, to resolve the issue in a manner that preserves consistent treatment of creditors operating under the same contract.[111]

211.    The Joint Liquidators' status as liquidators authorized to assert a preference claim under BVI law does not justifying rewriting the Terms of Service solely for 3AC or reaching a different result from the same alleged conduct.  Their authority to sue does not place them above other unsecured creditors or former FTX customers.  Nor does it excuse their failure to raise property-based theories at the appropriate time, when those issues could have been addressed on a

---

[111]   To the extent the Joint Liquidators argue that BVI law does *not* require a proprietary interest in digital assets, this only further confirms why their requested relief is inequitable.  Any relief awarded on that basis is simply a windfall for 3AC and its creditors, and Mr. Levy's apparent position that there can never be a windfall for creditors of an estate simply confirms the inequity of it all.  (*See* Levy Dep. Tr. 196:8-9 ("I don't think the debtor could ever have a windfall.").)

uniform basis applicable to all customers—particularly given the vast majority of creditors lacked the sophistication of and resources available to 3AC and the Joint Liquidators.

212.    *Second*, the requested relief would be inequitable because 3AC's losses resulted from its own risk-taking.  3AC knowingly built the negative USD Balance by borrowing under the Margin Program and taking leveraged positions in volatile digital assets, just as it did throughout the history of the 3AC Accounts.  Losses were a foreseeable consequence if market conditions moved against those positions.  Allocating the consequences of that strategy, adopted by a sophisticated cryptocurrency hedge fund, to other former FTX customers would be inconsistent with basic principles of fairness and risk allocation.  3AC gambled and lost, and the evidence provides no compelling reason to punish other customers for 3AC's risk-taking.

213.    The outcome the Joint Liquidators seek would also create perverse incentives inconsistent with bankruptcy policy and ordinary commercial norms.  Exchanges around the world allow leveraged trading, and not just for digital assets.  Awarding relief here would signal that an exchange user may assume extraordinary risk (*e.g.*, taking significant long positions using borrowed funds), and then invoke insolvency-based remedies to shift losses onto a common creditor pool when those risks materialize.  Such an outcome would not only be unfair and counterproductive, it would also undermine confidence in the *pari passu* treatment of creditors that lies at the core of the bankruptcy system and reward excessive risk taking.

214.    *Third*, the Preference Claim depends on a novel theory that goes beyond any identified application of existing BVI law (or English-law principles that a BVI court might consider).  Neither party has identified a successful preference claim under the BVI Insolvency Act, much less one resulting in a recovery approaching $1 billion.  The Joint Liquidators fail to identify any remotely analogous claim from any Commonwealth jurisdiction.  The Joint

Liquidators ask this Court to layer technicalities, assumptions, and counterfactuals to reach an unprecedented legal outcome.  Equity does not favor using discretionary relief to create such a result, particularly where the result would be unknown to the BVI legal system.[112]

215.    *Fourth*, an exercise of discretion to decline relief by this Court would be consistent with the remedial judicial discretion that would likely be exercised by BVI courts themselves, assuming a BVI court was faced with the determination of whether to grant relief here. Both BVI-law experts agree that a court evaluating a preference claim under the BVI Insolvency Act retains discretion to determine the appropriate remedy based on the facts and circumstances, even where the elements of a claim are satisfied.[113]  Indeed, Mr. Levy confirmed that a BVI court would assess a potential remedy separately from any determination regarding whether a claim has been established.[114]  The exercise of similar discretion here to deny the Joint Liquidators the relief that they seek would therefore accord with, rather than undermine, the BVI law that governs the claim itself, as well as the likely approach that would be adopted by a BVI court in this case.

---

[112]  To be clear, a BVI court would conclude that there is no actionable Preference Claim for the numerous reasons described in this Reply.  But assuming *arguendo* that a BVI court would not require any impact on 3AC's estate and would consider it appropriate to award a windfall, then applying that foreign-law principle would ***not*** provide for the "equal treatment of creditors" and will "be prejudicial to the interest of the United States," *Vertiv, Inc.*, 92 F.4th at 178 (quotations omitted), and would not be the type of foreign law for which comity is appropriate.  *See In re Treco*, 240 F.3d at 160-61 (reversing order where "Bahamian rule that secured creditors do not have priority over administrative expenses threaten[ed] to destroy" a creditor claim).

[113]  *See* Atherton Rebuttal Decl. ¶ 68(f) ("[T]he Court has a wide discretion in this area and may, in appropriate cases and in the exercise of its discretion refuse to grant relief where to do so might be considered to be unjust and inequitable and not consistent with or not reflective of the power of the Court to grant restorative relief."); Levy Decl. ¶ 43 (noting a BVI court has "very broad discretion to fashion an appropriate remedy").

[114]  *See, e.g.*, Levy Dep. Tr. 157:5-158:2 ("Q.  So can a preference claim be used to improve the position of a debtor relative to the debtor's position before the transactions that are challenged as a preference?  A.  The essential features, the essential thing that the court will look for in a preference claim is whether there has been a preference. If there has been a preference, the court can take any steps available to it under Sections 249 and 250.  Q.  So can a preference claim be used to confer a windfall on a debtor?  [Objection to form].  A.  If there has been a preference the court has the jurisdiction under Section 249 and 250.  Whether it exercises that jurisdiction if it were to fall a windfall is another matter.").

216.    In short, the Preference Claim fails on its own terms under BVI law.  But even if it did not, this Court retains equitable authority to decline relief where enforcement would impose 3AC's trading losses on other creditors and distort the distributional framework of the case. Exercising that authority to disallow the Preference Claim is not only fair, it is also necessary under fundamental bankruptcy principles.

## II.    The Alternative Breach Claims Lack Any Coherent Basis.

217.    The Breach Claims cannot salvage the Joint Liquidators' deeply flawed preference theory and, just like the Preference Claim, are without merit.  These purported claims are expressly conditioned on the premise that "the Court determines that FTX's conduct deprived the 3AC Debtor of its ownership rights over the Digital Assets provided by the May 2022 Terms of Service" (Response ¶ 275) and such ownership rights are "necessary to make out a claim" (*id.* ¶ 279).  The alleged "conduct" underlying the asserted breach is no more than FTX's commingling of digital assets.  (*Id.* ¶ 283.)  The Joint Liquidators thus attempt to circumvent their burden with respect to the Preference Claim to prove that the Challenged Trades depleted 3AC's estate by asserting novel Breach Claims.  The Court should reject their attempt to maintain a preference claim through the back door by calling it something else.

218.    To prevail on the Breach Claims, the Joint Liquidators must prove via admissible evidence that:  (i) their Breach Claims were not resolved by the Global Settlement (and are the exception to all other claims for breach premised on the Terms of Service); (ii) a breach by FTX of contract, trust, or fiduciary duty deprived 3AC of a proprietary interest in Exchange digital assets; (iii) the Joint Liquidators would have been able to prove a successful Preference Claim but

for 3AC's lack of a proprietary interest in digital assets held by the Exchange;[115] (iv) English law will evolve to recognize a loss of a potential future claim as allowable damages under a breach theory; (v) even if English law did evolve to recognize this theory, long-standing limitations on damages under English law would not foreclose the Breach Claims; and (vi) even if such damages limitations were inapplicable, the Breach Claims are not foreclosed by the exclusion clause in the Terms of Service.  The Breach Claims fail at each step.[116]

### A.    The Breach Claims Have Been Released and Enjoined Under the Global Settlement.

219.    As a threshold matter, the Breach Claims (like the Unjust Enrichment Claim discussed below) are barred by the Global Settlement approved as part of the Plan confirmed by this Court in October 2024.  The Debtors acknowledged that FTX failed to manage Exchange assets in the manner it represented publicly, and that customers, whose voices have been consistently present in these bankruptcy proceedings, may have attempted to assert claims arising from such failures.  But individualized litigation of such alleged harms to each customer was never a realistic option in these Chapter 11 cases.  The Global Settlement embodied in the Plan was designed precisely to avoid mass costly and value-destructive litigation that would have been counterproductive.  The objective of the Global Settlement was to ensure that no individual customer could augment its claim with theories of generalized harm that could be asserted by all customers arising as a result of prepetition FTX management's conduct.  Likewise, all Customer Entitlement Claims were limited to Account Balances as of the Petition Date and valued in

---

[115]    As explained above, the Preference Claim fails for myriad reasons beyond 3AC's lack of any proprietary interest in digital assets.  These reasons foreclose the conditions in which the Breach Claims could even be relevant.

[116]    The Joint Liquidators use the term "undisputed" eight times in the brief section in the Response regarding the Breach Claims.  It is hard to understand what they mean by that.  To be clear, the FTX Recovery Trust disputes the premise, law, facts, and characterization of this novel theory (or theories) of recovery, which is not spelled out in the Proof of Claim in anything more than superficial terms.

accordance with the Estimation Order.  (Plan § 2.1.47.)  In return, the claims of customers were elevated and received certain priorities and other supplemental consideration.

220.    The Global Settlement, contained in Sections 5.2 and 10.8 of the Plan, was the product of protracted, good faith, and arm's-length negotiations among the Debtors, the Official Committee of Unsecured Creditors, and other stakeholders.  (*See Declaration of Steven P. Coverick in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26041] (the "Coverick Plan Declaration") ¶ 23.)  In exchange for enhanced priority treatment and other consideration, customers released all potential claims relating to the general mismanagement of the FTX exchanges and the misappropriation of certain assets deposited by customers on the FTX exchanges.  (Coverick Plan Decl. ¶ 22.)  That settlement preserved the estate value for all parties in interest—3AC included—by eliminating complex, uncertain, and value-destructive litigation. (*Id.* ¶ 24.)  Following Plan confirmation and the Plan's Effective Date in January 2025, the Global Settlement has been binding on all stakeholders—including the Joint Liquidators.

221.    The Joint Liquidators may not now relitigate claims grounded in the same contracts and conduct applicable to *all* FTX customers in an effort to obtain a windfall at the expense of those other customers.  "In construing a confirmed plan of reorganization, [courts] apply contract principles."  *See In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007). Similarly, under Delaware law applicable to the Plan pursuant to Section 2.2 thereof, "[s]ettlement agreements are interpreted according to 'basic contract principles.'"  *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 706 F.3d 217, 223 (3d Cir. 2013).  "Where a plan (like a contract) is unambiguous, its terms must be enforced as written."  *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022).  Thus, courts "start

by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." *Paul* v. *Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). Courts must "read the contract as a whole" and "endeavor 'to give each provision and term effect' and not render any terms 'meaningless or illusory.'" *Weinberg* v. *Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

222. Applying these principles, Section 5.2 of the Plan is clear and unambiguous. It specifically defines *who* the Global Settlement is applicable to: "stakeholders" of the Debtors who received "classification, treatment, Distributions, releases and other benefits provided by the Debtors." The Joint Liquidators, standing in the shoes of 3AC as an FTX customer, are undoubtedly "stakeholders" whose Claims have been classified and received Plan treatment. Indeed, the Joint Liquidators filed a separate customer proof of claim seeking the value of the 3AC Accounts as of the Petition Date. (Beller Reply Decl., Ex. 52, 3AC's Customer Proof of Claim.)

223. And Section 5.2 specifically defines *what* is released: "Claims, Interests, and Causes of Action" included in an 11-part list clearly stated in Section 5.2. Section 5.2 resolves, among other claims, any claim regarding "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders," including any Claims regarding "***the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange . . . are property of the Debtors' Estates***." (emphasis added).

224. The Joint Liquidators' Breach Claims fall squarely within the express scope of the release in Section 5.2 of the Plan and the injunction in Section 10.8 of the Plan. The Response states that "FTX had contractual obligations and bore trust and fiduciary duties to the 3AC Debtor under the May 2022 Terms of Service" in the first sentence describing the elements of the supposed Breach Claims. (Response ¶ 278.) The Joint Liquidators further argue that the

alleged breach arises from "FTX's commingling." (*Id.* ¶ 283.)  Regardless of labeling, it is clear that the Breach Claims expressly seek a determination regarding "the purported commingling and misuse of customer deposits and corporate funds" and "the effects and consequences of the Debtors' Terms of Service." (Plan § 5.2.)  The Breach Claims are thus plainly unavailable because they are generalized claims for breach of the Terms of Service that could have been asserted by any customer and therefore resolved through the Global Settlement approved by this Court.

225.    The Joint Liquidators demand special treatment where none is available. The Joint Liquidators, like all other creditors, are precluded from asserting released contractual or equitable claims premised on the same prepetition Terms of Service and the same prepetition FTX conduct that affected all former FTX customers.  Any customer could try to assert those same claims, and none is permitted to do so.

226.    The Joint Liquidators confoundingly contend—without any citation or support—that they "were not a party to" the Global Settlement and that the 3AC Debtor was somehow "not on notice."[117]  (Response ¶¶ 152, 154.)  That contention is untenable.  The Joint Liquidators had every opportunity to contest the Global Settlement in connection with Plan Confirmation, and chose not to do so.  *See In re Integrated Health Servs.*, Inc., 344 B.R. 262, 277 (Bankr. D. Del. 2006) ("[Creditor] was well aware of the terms of the Global Settlement . . . . [Creditor] did not object to the Global Settlement and, as it was incorporated in the Plan, [creditor] is bound by it.").  Indeed, the Joint Liquidators filed an objection to the Plan, but chose to limit that objection to other issues and did not challenge the Global Settlement or the scope of the release contained therein.  They cannot now sever the Global Settlement—an integral component of the

---

[117]    One party, ELD Capital, sought and received an express carveout from Section 5.2 to pursue a fraud claim that otherwise would have been released.  The Joint Liquidators did not receive any such carveout.

Plan—from the Plan itself, by which they are bound and from which they seek to benefit.  As sophisticated insolvency professionals represented by experienced bankruptcy counsel, the Joint Liquidators are subject to the same bankruptcy process and requirements as every other creditor.

227.    This Court recently confirmed the principle that creditors, like 3AC, may not relitigate issues that were fully and finally resolved by the Global Settlement.  At the August 12, 2025 hearing, this Court sustained the FTX Recovery Trust's objection to a proof of claim premised on the commingling and misappropriation of customer funds, finding that "[i]f there was a valid claim under some sort of fraud, mismanagement, commingling claim, *it has been compromised through the global settlement under the plan for the good of all creditors and customers of FTX* so that the litigation, with respect to these issues, wouldn't just consume . . . the funds in the trust and destroy all potential recoveries."  (Beller Reply Decl., Ex. 53, Aug. 12, 2025 Hr'g Tr. 39:15-21 (emphasis added).)

228.    In sum, the Joint Liquidators are enjoined from pursuing the Breach Claims (even assuming any could be established) because they have been "settled" pursuant to Section 5.2 of the Plan.  (Plan § 10.8.)  To read Sections 5.2 and 10.8 of the Plan as accomplishing anything less would render them "meaningless or illusory."  *Weinberg*, 294 A.3d at 1044.

**B.    The Joint Liquidators Fail to Identify Any Breach of Duty or Contract.**

229.    Even if the Breach Claims were not released and enjoined pursuant to the Global Settlement (and they are), they would still fail on their merits.  To prove the Breach Claims, the Joint Liquidators must identify a particular provision of the Terms of Service—or any duty or relationship arising from those Terms of Service—that FTX allegedly breached.  They identify none.

230.    As an initial matter, two of the three nebulous "Breach" theories—trust and fiduciary duty—are dead on arrival.  There cannot be a breach of trust without a trust.  As explained

above, this Court has already settled the question of whether the Terms of Service created a trust or any proprietary interest: they do not. (Confirmation Order ¶ 20; *see* Section I.C.2.a, *supra*.)[118] Likewise, there can be no breach of fiduciary duty without fiduciary duties. The Terms of Service expressly disclaimed such fiduciary duties. (Terms of Service §§ 2.1.3, 2.2.2, 38.6.) The Joint Liquidators offer no explanation of how they could have a claim for breach of duties that do not exist.

231.    As to the remaining breach of contract theory, although 3AC did have a contract (*i.e.*, the Terms of Service), the Joint Liquidators must still identify and prove an actionable breach of that contract, and they do not and cannot. They point only to Section 8.2.6 as breached, but offer only a vague musing as to *how* exactly FTX breached this provision: "FTX's commingling" (Response ¶ 283) and "commingling, [] failing to provide ownership and/or control, and/or [] failing to maintain an adequate ledger" (*id.* ¶ 285).[119] None of these formulations withstands scrutiny.

232.    *First*, the Joint Liquidators cannot seriously contend that FTX's "commingling" or "failing to maintain an adequate ledger" *itself* constitutes an actionable breach. They can point to nothing in the Terms of Service that prohibited FTX from the pooling of customer assets or imposed an obligation on FTX to maintain any particular form of ledger.

233.    *Second*, the Joint Liquidators' theory is disproven by their own positions. The Joint Liquidators claim that FTX customers knew about FTX's commingling and management

---

[118]    Although Lord Neuberger testified that commingling of digital assets was inconsistent with 3AC having a proprietary interest because it would destroy certainty of subject *if* a trust existed (Response ¶¶ 283-84), one cannot breach a trust that does not exist.

[119]    The Joint Liquidators seem to have forgone any argument that the Challenged Trades or the June 14, 2022 Liquidation constitutes a breach of contract or breach of trust. Nor do the Joint Liquidators continue to assert any Breach Claims in relation to the "Unknown Alleged Liability" or an alleged misappropriation of assets by FTX. (Response ¶ 77, n.15.)

of assets at the time of contract.  In arguing that the Terms of Service created a trust or quasi-bailment, the Joint Liquidators state the following:

> "FTX customers knew—at least by the time of the May 2022 Terms of Service (if not always)—that FTX pooled its customer assets nearly immediately after customers deposited assets onto the Exchange.  They knew that FTX kept customer assets in pooled hot wallets, in respect of which FTX held the private keys. FTX customers also understood that, under English law, legal title followed the private keys, so, at least after assets were swept, FTX would have had legal title to them."

(Response ¶ 104.)  The Joint Liquidators argue from both sides of their mouths.  Their theories require the Court to accept the factual premise that customers knew that FTX was commingling assets, but that such commingling nonetheless breached an implied promise not to do so.  That makes no sense, and they bring no law or evidence to support their new theory.

234.  *Third*, the assertion that 3AC's loss of "control" over digital assets constituted a breach fares no better.  (Response ¶ 285.)  FTX indisputably held possession of the digital assets at all relevant times—a fact known to customers, who had to deposit to the Exchange, withdraw from the Exchange, and trade on the Exchange.  FTX necessarily controlled the keys to all wallets storing digital assets credited to customer accounts.  The natural and only plausible reading of Section 8.2.6(C) is that customers like 3AC had the ability to request withdrawals from the Exchange, subject to complying with applicable requirements, as explained above.  Customers could and did withdraw from the Exchange.

**C.**    **Principles of English Law Do Not Support the Damages Theory Articulated by the Joint Liquidators.**

235.  The Joint Liquidators bear the burden of proving damages, and they fail to do so for the Breach Claims.

236.  *First*, the Joint Liquidators' assertion that it is "undisputed under English law that the 3AC Debtor may recover as damages the full value of any claims lost as a result of a

breach, including any preference claim," is false.  (Response ¶ 279.)  As an initial matter, the appropriate remedy (if any) is a matter to be determined by this Court, which need not simply apply an English-law remedy that would yield an inequitable result.  *See* Section I.E, *supra*.  In any event, Dame Elizabeth cites to no case which supports such this theory of damages.  (Gloster Decl. ¶¶ 135-39.)  At her deposition, Dame Elizabeth conceded that even though she "looked," she had never identified a case which recognized such a claim.  (Gloster Dep. Tr. 239:23-240:6.)  Recognizing this theory of damages (like recognizing an equitable tenancy in common over digital assets or a quasi-bailment) would mark a significant extension of English law by this Court beyond where it exists today.

237.    This theory also collapses on its own terms.  The Joint Liquidators do not have a valid Preference Claim.  As described above, 3AC could not have withdrawn or claimed the Digital Asset Balance, or the value of the digital assets sold in the Challenged Trades, and the Challenged Trades had no impact on the amount that 3AC *could* have sought to withdraw or claim. The Preference Claim is worthless because it does not exist, and thus the Breach Claims are worth nothing.

238.    *Second*, the Joint Liquidators ignore the proper point in time for assessing damages on a breach of contract claim and instead select an arbitrary date most favorable to their misguided view.  Under English law, the general rule is that damages are assessed at the date of the breach unless justice requires otherwise.  (Beller Reply Decl., Ex. 54, *Johnson* v. *Agnew* [1980] AC 367, at 400-01.)  Here, the alleged breach—whether it was commingling, failing to maintain an adequate ledger, or failing to provide ownership and/or control—necessarily occurred well before June 2022.  At that time, 3AC had initiated no insolvency proceedings and no preference claim existed or could possibly have existed.  Instead of valuing damages at the time of the alleged

breach, the Joint Liquidators cherry-pick June 12, 2022, without providing any legal basis to do so but presumably because they think it inflates their claim to the maximum extent. That approach disregards governing law and seeks an unwarranted windfall.

239. *Third*, even assuming a breach occurred, the Joint Liquidators must still show that the claimed loss was within the reasonable contemplation of the parties at the time of contracting. (Beller Reply Decl., Ex. 55, *Hadley* v. *Baxendale*, (1854) 9 EX 341 ("*Hadley*"), at 354-55.) The parties had to either have (i) knowledge of what happens "in the usual course of things," which is imputed to the parties regardless of knowledge (*Hadley* first element) or (ii) actual knowledge of special circumstances outside the usual course of things but that was communicated to the defendant or otherwise known by the parties, which is often characterized as indirect, consequential or special loss (*Hadley* second element). More recent case law has addressed remoteness by assessing whether a defendant can be said to have assumed responsibility for the losses in question. (*See, e.g.*, Beller Reply Decl., Ex. 56, *Transfield Shipping Inc* v. *Mercator Shipping Inc (The Achilleas)* [2008] UKHL 48.) The value of a hypothetical, future BVI unfair-preference claim, arising only upon 3AC's later insolvency under foreign law, cannot plausibly meet either *Hadley* element. Nothing in the Terms of Service suggests that FTX contemplated—let alone assumed responsibility for—the consequences of a customer's future insolvency in another jurisdiction, particularly when the contract in question applied to *all* FTX customers.

240. *Fourth*, even assuming a breach occurred, the Joint Liquidators do not address 3AC's failure to mitigate its damages. (*See* Beller Reply Decl., Ex. 57, *British Westinghouse Electric and Manufacturing Co Ltd* v. *Underground Electric Railways Co of London Ltd* [1912] AC 673 (HL), at 688-89.) By their own allegations, 3AC—along with other

customers—was aware of commingling while it was trading on the Exchange (Response ¶ 104), thereby accepting any attendant risk as to the legal effects of commingling on the nature of its proprietary interest (if any) in digital assets.  If 3AC believed this conduct breached the Terms of Service, it should have taken steps to mitigate any loss (*e.g.* by raising an objection with FTX at an earlier point in time or by not trading on the platform).  The Joint Liquidators cannot simultaneously assert that customers like 3AC knew about the commingling, and complain that the commingling breached a provision of the Terms of Service—particularly when no contractual provision prohibited commingling.

### D.  The Exclusion Clause in the Terms of Service Precludes the Breach Claims.

241.  Finally, even if the alleged damages were somehow recoverable, Section 30.2 of the Terms of Service independently bars the Breach Claims.  As explained above, that provision provides that neither FTX nor any of the other indemnified parties shall be liable to the customer "***in contract***, tort (including negligence), ***equity***, statute ***or any other cause*** arising out of or in connection with the Terms (or arising out of or in connection with:  your use or inability to use the services" for certain categories of loss, whether direct or indirect (including, but not limited to loss of "profit," "revenue," goodwill," "use," "business or contract," "opportunities," or "savings") and any and all "indirect or consequential loss or damage."  (Terms of Service § 30.2 (emphasis added).)  By its plain terms, the exclusion squarely encompasses the Breach Claims and any other claim for breach of the Terms of Service.  The Joint Liquidators' arguments to the contrary fail for the following reasons.

242.  *First*, the Joint Liquidators—relying on Dame Elizabeth's notes—seek to characterize the Joint Liquidators' purported claim for the value of a lost preference claim as "direct losses." (Beller Reply Decl., Ex. 58, Notes Provided by Dame Elizabeth Gloster DBE at her November 25, 2025 Deposition, § IV(C).)  But that assertion has never been tested under

English law.  Tellingly, Dame Elizabeth cites no legal authority and provides no analysis as to how the speculative value of a hypothetical, future foreign-law preference claim—arising only upon a hypothetical, future foreign-law insolvency proceeding—can sensibly fall within the reasonable contemplation of the parties "in the usual course of things" at the time of contract formation.  (*See Hadley.*)[120]  Dame Elizabeth's assumption that millions of customers reasonably contemplated 3AC's insolvency, followed by FTX's insolvency, is untenable.  Even cursory attention to the FTX bankruptcy proceedings would quickly disabuse that misunderstanding.

243.    *Second*, as it relates to the breach of trust claim, the Joint Liquidators effectively attempt to read the word "equity" out of Section 30.2.  (Response ¶ 292.)  As Lord Neuberger explains, claims for breach of trust are quintessentially equitable claims, and the clause expressly excludes liability in equity.  (Neuberger Rebuttal Decl. ¶¶ 58(b)-(c).)  Nothing in the text supports carving Section 8 out of the exclusion, and modern English law does not favor strained constructions of exclusion clauses.  (*Id.* ¶¶ 56, 58(a).)

244.    *Third,* the Joint Liquidators invoke the "irreducible core" doctrine to argue that liability for breach of trust cannot be excluded.  (Response ¶ 293.)  But as Lord Neuberger explains, that doctrine concerns the duties owed by a trustee; it does not prohibit parties from contractually limiting liability for particular categories of loss.  (Neuberger Rebuttal Decl. ¶ 58(d).)  In the one case cited by Dame Elizabeth (*see* Austin Decl., Ex. 70, *Armitage* v. *Nurse* [1998] Ch 241), the English Court of Appeal held that an exclusion clause would apply so long as there was no dishonesty (*i.e.*, actual fraud) (*id.*).  Here, the Terms of Service do carve out fraud claims from the exclusion at Section 30.2, but the Joint Liquidators do not allege that the commingling—the

---

[120]   This premise is particularly ironic given that neither party is aware of a single successful preference claim under the BVI Insolvency Act.

apparent basis for the purported Breach Claims—was fraudulent, particularly given their own contention that customers (including 3AC) knew about this commingling when they entered into the Terms of Service.  (Response ¶ 104.)  The Breach Claims are barred by the plain language of Section 30.2.

## III.    The Joint Liquidators' Alternative Unjust Enrichment Theory Is Not Supported by Any Evidence, Law, or Established Theory of Recovery.

245.    As another back-up to their doomed Preference Claim and an alternative to their meritless Breach Claims, the Joint Liquidators assert the Unjust Enrichment Claim on the theory that (i) FTX was somehow "enriched" because (ii) 3AC allegedly lost a hypothetical preference claim that it might have asserted (iii) had it retained a proprietary interest in the relevant digital assets.  (*See* Response ¶ 296.)  In other words, the alleged "acts or omissions" by FTX that purportedly gave rise to the Unjust Enrichment Claim were, again, the commingling of digital assets, instead of any of the Challenged Trades.  (*See* Response ¶¶ 285, 296.)  This claim, which receives just five paragraphs of the 301-paragraph Response, is deficient in every conceivable manner.

246.    As with the Breach Claims, the Unjust Enrichment Claim fails unless the Joint Liquidators demonstrate that they would have been able to prove a successful Preference Claim but for 3AC's lack of a proprietary interest in digital assets.  As a result, the failure of the Preference Claim on any of the numerous other grounds identified herein forecloses the Unjust Enrichment Claim.

247.    Additionally, to prevail on the Unjust Enrichment Claim, Joint Liquidators must *also* prove via admissible evidence that:  (i) their Unjust Enrichment Claim was not resolved by the Global Settlement; (ii) the Unjust Enrichment Claim is not barred by the fact that the Terms of Service govern the parties' rights, obligations, and risks; (iii) each of the necessary elements for

unjust enrichment under English law is satisfied; and (iv) they have a cognizable basis for a remedy. The Joint Liquidators cannot meet any of these requirements.

**A.    The Unjust Enrichment Claim Has Been Released and Enjoined Under the Global Settlement.**

248.    Like the Breach Claims, the Unjust Enrichment Claim has been released pursuant to the clear terms of the Global Settlement.

249.    As explained above (Section II.A, *supra*), Section 5.2 of the Global Settlement released all generalized claims common to customers regarding the "actual or purported fraud, ***unjust enrichment***, misappropriation, conversion and misconduct of former Insiders," including any Claims regarding "the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange . . . are property of the Debtors' Estates." (Plan § 5.2 (emphasis added).) The Unjust Enrichment Claim is therefore expressly released. Moreover, the Unjust Enrichment Claim sounds in the Terms of Service, and the Joint Liquidators conceded as much: "English law applies here, because ***the claim arises out of or in connection with the May 2022 Terms of Service***, which designate English law as governing." (Response ¶ 295, n.53 (emphasis added).) As such, the Unjust Enrichment Claim is similarly released through the Global Settlement.

**B.    The Terms of Service Govern the FTX-3AC Relationship and Preclude the Unjust Enrichment Claim.**

250.    An unjust enrichment claim is not available where the parties have elected to define their rights and obligations by contract. (*See* Beller Reply Decl., Ex. 59, *MacDonald* v. *Costello* [2011] EWCA Civ 930, at [23]; *id.*, Ex. 60, *Pan Ocean Shipping Co Ltd* v. *Creditcorp Ltd ("The Trident Beauty")* [1994] 1 WLR 161, at 164.) Here, the parties' relationship was comprehensively governed by the FTX Terms of Service, including any risks arising from 3AC's use of the Exchange. Accordingly, even if the Joint Liquidators could satisfy the elements of

unjust enrichment (which they cannot), the Unjust Enrichment Claim fails as a matter of first principles because the Terms of Service foreclose any restitutionary remedy.

251.    The Joint Liquidators raise no counterargument, only suggesting that the Unjust Enrichment Claim is an "alternative" to the Breach Claims. (Response ¶ 298.) That misses the point. This Court has authority to determine the appropriate remedy (including the lack of one), but if English law were to be applied, the availability of a restitutionary remedy would turn on the existence of a contractual regime governing the parties' relationship—not on whether a breach-of-contract claim is asserted, viable, or successful. (*See The Trident Beauty* at [164E-F] ("[A]s a general rule, the law of restitution has no part to play in the matter; the existence of the agreed regime renders the imposition by the law of a remedy in restitution both unnecessary and inappropriate. Of course, if the contract is proved never to have been binding, or if the contract ceases to bind, different considerations may arise, as in the case of frustration. . . . With such cases as these, we are not here concerned.").) Because the Terms of Service define the parties' rights and obligations here, and the Joint Liquidators concede that the Terms of Service governed the parties' activities during June 13-14, 2022 (Response ¶ 21), an unjust enrichment claim is unavailable regardless of whether a breach claim is alleged at all.

**C.    The Joint Liquidators Have Not Proven the Elements of the Unjust Enrichment Claim.**

252.    Even setting aside those threshold defects, the Joint Liquidators have not carried their burden to establish *any* of the elements for the Unjust Enrichment Claim. Their theory that FTX was "enriched" by 3AC's purported loss of a hypothetical preference claim fails because (i) FTX was not enriched, (ii) any alleged enrichment was not at 3AC's expense, and (iii) no recognized unjust factor exists under English law.

253.    ***No Enrichment.***  The Joint Liquidators fail to allege how FTX was enriched at the time of the alleged enrichment event, *i.e.*, when FTX allegedly deprived 3AC of a proprietary interest in the relevant assets through commingling.  (*See* Beller Reply Decl., Ex. 61, *Benedetti v. Sawiris* [2013] UKSC 50 ("*Benedetti*"), at [14] (finding that "enrichment is to be valued at the time when it was received").)  Indeed, at that earlier point in time, 3AC had no preference claim to lose because, under the BVI Insolvency Act, such claims do not exist pre-liquidation and are exercisable only by a liquidator, not the company.  (BVI Insolvency Act § 244.)  A contingent, future statutory right—dependent on a later insolvency—cannot constitute a cognizable enrichment to FTX at the relevant time.

254.    Moreover, the Joint Liquidators' "enrichment" theory also ignores the impact of the FTX-initiated Liquidation and the 3AC-initiated Challenged Trades, which did not enrich FTX.  As explained above (Section I.C, *supra*), even if neither the Liquidation nor the Challenged Trades had occurred, FTX and 3AC would have been in the same economic position.  Absent any benefit flowing to FTX, the Unjust Enrichment Claim necessarily fails.

255.    ***No Enrichment at "Expense" of 3AC.***  Any alleged enrichment was not "at the expense" of 3AC.  The Joint Liquidators define the supposed enrichment as the loss of a preference claim.  But under the BVI Insolvency Act, a preference claim is a statutory right that vests exclusively in a liquidator.  (BVI Insolvency Act § 244.)  This right could not exist until the commencement of 3AC's liquidation proceedings in the BVI, and the commingling that the Joint Liquidators identify as the basis for the enrichment occurred before those proceedings.

256.    ***No Unjust Factor.***  The Joint Liquidators failed to identify any recognized unjust factor.  English law permits recovery in unjust enrichment in only "a number of discrete factual situations in which enrichment is treated as vitiated by some unjust factor."  (Beller Reply

Decl., Ex. 62, *Lowick Rose LLP (In Liquidation)* v. *Swynson Ltd* [2017] UKSC 32, at [22].)  Those situations include mistake, duress, undue influence, failure of consideration (or failure of basis), necessity and legal compulsion.  (Beller Reply Decl., Ex. 63, *Samsoondar* v. *Capital Insurance Co Ltd* [2020] UKPC 33, at [19].)  A generalized appeal to fairness is insufficient.[121]

257.    Moreover, the Joint Liquidators cannot plausibly claim that the loss of a preference claim would be unjust.  Their argument reduces to the contention that their inability to satisfy one statutory element of a preference claim—purportedly as a result of FTX's alleged commingling—is itself inequitable.  But that premise is flawed.  A preference claim is a creature of statute, not equity, and the failure to establish one or more required statutory elements cannot be recast as giving rise to an actionable equitable injustice.  The Joint Liquidators cannot transform a statutory preference claim into an equitable one simply by asserting that the loss of the claim would in some way be "unjust."

**D.    Remedies, If Any, Must Be Determined by Reference to the Value of the Enrichment.**

258.    As with their other purported claims, it is the Joint Liquidators' burden to prove damages for the Unjust Enrichment Claim.  The Joint Liquidators seek a "personal restitutionary award equal to the preference-equivalent value."  (Response ¶ 299.)  The formulation is extremely unclear, especially as to what the phrase "preference-equivalent value" means.  This Court has the authority to determine the appropriate remedy, but English law (were it to be applied) is clear that the value of the enrichment to be disgorged is its value at the time of the enrichment,

---

[121]    The only arguably relevant factor—"failure of basis" —does not apply.  A failure of basis is where an enrichment has been transferred under a transaction that is or becomes ineffective, and it "must be total" rather than partial. (Beller Reply Decl., Ex. 64, *Dargamo Holdings* v. *Avonwick Holdings* [2021] EWCA Civ 1149 at [102].)  Even if 3AC was deprived of some proprietary interest in the relevant assets as the Joint Liquidators claim, it received (i) the contractual rights to which it agreed and (ii) other services provided by the Exchange contemplated by the Terms of Service.  In other words, the contractual framework operated as intended and enabled 3AC's use of the Exchange.  The supposed or actual "basis" of the relationship as between FTX and 3AC therefore did not fail.

ignoring subsequent increases in value (and not to a hypothetical recovery in a future avoidance action).  (*See Benedetti* at [14].)  Applied here, the Joint Liquidators fail to offer a coherent basis for remedies.  Their unjust enrichment theory is based on the alleged commingling of digital assets on the Exchange, but commingling occurred continuously whenever assets were deposited onto the Exchange.  The Joint Liquidators must identify and prove specific enrichment events, and the ascertainable value of enrichment associated with any such event.  They fail to do so.

## RESERVATION OF RIGHTS

259.    The FTX Recovery Trust expressly reserves all further substantive or procedural objections.  Nothing contained herein is intended or should be construed as:  (i) an admission as to the validity of any claim against the FTX Recovery Trust; (ii) a waiver of the FTX Recovery Trust's rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (v) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (vi) a waiver of the FTX Recovery Trust's rights under the Bankruptcy Code or any other applicable law.

## CONCLUSION

260.    For the reasons set forth in the Objection and in this Reply, the FTX Recovery Trust respectfully requests that the Court enter an order disallowing with prejudice the claims asserted in the Proof of Claim.

Dated:  December 29, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       bellerb@sullcrom.com

*Counsel for the FTX Recovery Trust*