**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF STEPHEN NICHOLAS ATHERTON K.C. IN REBUTTAL**

# Contents

I. INTRODUCTION ............................................................................................................. 3

II. SUMMARY OF CONCLUSIONS ................................................................................. 5

  A. Preliminary Observations ......................................................................................... 5

  B. Conclusions Regarding Specific BVI Claims Asserted by the Joint Liquidators............................ 6

III. BVI PREFERENCE CLAIMS ......................................................................................... 8

  A. Positions in the Levy Declaration Not Articulated in the POC ........................................ 9

  B. A "*Transaction*" for Purposes of a Preference Claim Must Involve a Depletion in the Assets in Which 3AC Had a Proprietary Interest .............................................................................. 11

    i. The Pari Passu Principle ...................................................................................... 13

    ii. Case Authorities.................................................................................................. 18

    iii. Contractual "Entitlements" as Assets of 3AC.................................................... 24

    iv. The Right of FTX to Liquidate ........................................................................... 25

  C. FTX Was Not Put into a Better Position as a Creditor ..................................................... 26

    i. FTX Was Not a Creditor of 3AC on the Facts as I Understand Them ....................... 26

    ii. FTX Was Not Put into a Better Position as a Creditor ............................................ 28

  D. The Transactions Did Not Result in an "Avoidance of Losses" for FTX.......................... 31

  E. FTX Has an Ordinary Course of Business Defence ....................................................... 34

IV. NON-PREFERENCE BVI CLAIMS ............................................................................. 35

  A. BVI Undervalue Transaction Claim ........................................................................... 35

    i. Existence of an Undervalue Transaction ............................................................. 35

    ii. Undervalue Transactions – statutory defence ...................................................... 37

  B. BVI Turnover Claim ................................................................................................. 38

  C. BVI Proprietary Restitutionary Claim ........................................................................ 39

  D. BVI Unjust Enrichment Claim ................................................................................... 41

  E. BVI Conversion Claim .............................................................................................. 42

V. ALTERNATIVE SCENARIO IF FTX IS ASSUMED TO HAVE A SECURITY INTEREST ......... 43

## I.   INTRODUCTION

1.   I am the same Stephen Atherton K.C. who provided a declaration in support of the claim objection of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd., which was executed by me on 20 June 2025 (the "***Original Declaration***").[1]

2.   I have been asked by Sullivan & Cromwell LLP, on behalf of the FTX Recovery Trust, to give my further opinion as to certain relevant aspects of the laws of the BVI as regards the BVI Claims asserted by the Joint Liquidators against the FTX Recovery Trust as articulated in the POC. More specifically, I have been asked to consider and comment upon the views expressed by Robert Stuart Levy K.C. on the laws of the BVI as contained in the declaration executed by him on 21 October 2025 (the "***Levy Declaration***"), which I understand was provided by the Joint Liquidators in support of their effort to assert the BVI Claims. I set out my analysis in this rebuttal declaration (the "***Rebuttal Declaration***").

3.   As previously stated in my Original Declaration, I am being remunerated at the rate of £1,500 *per* hour, which is my standard rate for providing expert opinions on BVI law. My compensation is in no way contingent upon my findings, the testimony I may give, or the outcome of these proceedings. I understand that my duty is to give my honest, objective and independent opinion to the Court, and I have done so.

4.   A list of the legal materials I have reviewed for the purposes of this Rebuttal Declaration is attached as Exhibit A, to the extent that they were not already included in Exhibit A to my Original Declaration. I have also been provided with, and have considered, certain other relevant documents that have been provided to me by the FTX Recovery Trust. These documents are listed below, excluding any documents already included in Exhibit B to my Original Declaration.

5.   Since providing my Original Declaration, I have reviewed and considered, among the other items listed in the Exhibits hereto: (i) the Second Declaration of The Rt. Hon. Lord Neuberger of Abbotsbury, executed on 19 June 2025 (together with the annexes thereto); (ii) the Declaration of Steven P. Coverick, signed by him on 20 June 2025 (together with the exhibits thereto); and

---

[1] In this Supplemental Declaration, I have adopted the same definitions and abbreviations as employed in my Original Declaration.

(iii) the Objection of the FTX Recovery Trust to the Amended Proof of Claim of the Joint Liquidators of 3AC, filed on and dated 20 June 2025.

6.  For the record, I can confirm that nothing in the content of the documents referred to in paragraph 5 above or any other materials I have been provided with has caused me to amend or alter the opinions expressed in, or the content of, my Original Declaration.

7.  In preparing this Rebuttal Declaration, I have been asked to assume the following facts in addition, to those set out at paragraph 13 of my Original Declaration:

    a.  The FTX Recovery Trust (and the FTX Debtors before it) assessed the quantum of creditor claims by former FTX customers in the FTX bankruptcy proceedings on the basis of the entire position of the customer account(s), that is the Account Balance, and did not ignore negative balances in particular assets for determining the size of customer claims;

    b.  The market prices of Bitcoin ("*BTC*") and Ethereum ("*ETH*") declined from the end of the day on 12 June 2022 (UTC) to the end of the day on 27 June 2022 (UTC);

    c.  The transactions occurring in the 3AC Accounts on 13 June 2022 and 14 June 2022 were initiated by 3AC and not FTX, with the exception of the subset of trades comprising the Liquidation on 14 June 2022;

    d.  For each challenged transaction involving the sale of a Digital Asset for USD, the 3AC Accounts received a debit to the Digital Asset Balance (and, more specifically, the balance for the particular Digital Asset) and a credit to the USD Balance that had an equivalent notional value in USD (putting aside trading fees);

    e.  FTX was not legally obligated to absorb amounts of negative balances that were incurred by one customer through borrowing from other customers via the Spot Margin Program; and

    f.  A separate analysis conducted by Stephen Houseman, K.C. concludes that, in the event that a Court were to find that the assets sought by the Joint Liquidators were the property of 3AC and not of FTX, then the March 2022 Line of Credit Agreement created: (i) a possessory security interest (i.e., a pledge or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant

4

assets; and (ii) a non-possessory security interest (by way of a fixed charge, alternatively a floating charge security interest) over those assets. I do not purport to have conducted an analysis of this contract (which is governed by Antiguan law), and for purposes of this Rebuttal Declaration (except as expressly specified) I maintain the assumptions as to proprietary interests used in my Original Declaration, namely:

     i.     By reference to the Declarations of Lord Neuberger, I have been asked to assume that 3AC did not have any form of proprietary interest in the Assets associated within the Account Balance as of the end of 12 June 2022 (or subsequently);[2] and

     ii.    As a consequence (by reference to the Declaration of Lord Neuberger), it is impossible for 3AC to identify, follow or trace any specific Digital Asset or any other Asset associated with the Account Balance as of 12 June 2022 (or subsequently) or any Asset currently held by the FTX Recovery Trust or anything which might be said to represent any relevant Asset.[3]

## II.    SUMMARY OF CONCLUSIONS

### A.    Preliminary Observations

8.    The substance of the views I expressed in my Original Declaration have not altered upon reading and considering the content of the Levy Declaration.[4]

9.    Based on the assumptions I was instructed to make in my Original Declaration,[5] the views contained in the Levy Declaration are, to a significant extent, predicated upon what appear to me to be incorrect assumptions and counterfactual propositions and scenarios that it would seem that Mr Levy has been asked to adopt.[6] In my opinion, this serves to divorce the views expressed by

---

[2] See paragraph 13(q) of my Original Declaration.
[3] See paragraph 13(r) of my Original Declaration.
[4] I have not dealt with each and every criticism of my Original Declaration made by Mr Levy, nor have I dealt with every issue raised by Mr Levy with which I may disagree. To the extent that I have not directly engaged with matters raised or opinions expressed by Mr Levy, this should not be taken as an acceptance by me that those matters or opinions are correct, or that I agree with them.
[5] See paragraph 13 of my Original Declaration.
[6] For example: (i) 3AC has or has retained a proprietary interest in the relevant assets (see paragraph 27 of the Levy Declaration); (ii) FTX over-stated the negative USD Balance in the 3AC Accounts (see paragraph 210 of the Levy Declaration); (iii) on the sale of the relevant assets 3AC was not given full credit for the market value of those sales (see paragraph 210 of the Levy

Mr Levy as to the law of the BVI from the actual facts and circumstances of the case as I understand that they existed at the time, and the actual nature of the relationship as between each of FTX, other users of the Exchange, and 3AC.

10.   In a similar vein, I note that Mr Levy has not addressed the issue raised by me in my Original Declaration that relates to the lack of clarity and the lack of particularity from which the articulation of the BVI Claims in the POC suffers.  As observed in my Original Declaration, this would be an important issue for such claims if they were to be presented to a BVI Court.[7] This issue also has resonance as regards the Levy Declaration in that there are a number of occasions where his views as to the laws of the BVI are expressed in the context of a characterisation or description of certain of the claims which are different to the BVI Claims as articulated in the POC, or which are not reflected in the POC.

11.   For the purposes of considering the legal context of the BVI Claims, there does not appear to me to be any material difference between the rehearsal of the sources of the laws of the BVI and the structure and operation of the Courts and legal system of the BVI as contained in my Original Declaration[8] and the corresponding paragraphs of the Levy Declaration.[9]

   B.   Conclusions Regarding Specific BVI Claims Asserted by the Joint Liquidators

12.   **BVI Preference Claims**:[10] My opinion as to the status and merits of the BVI Preferences Claims is unchanged. The Joint Liquidators BVI Preference Claims will fail: (i) there has not been any relevant "*insolvency transaction*", including because the alleged transactions sought to be impeached did not involve or diminish assets in which 3AC had a proprietary interest; (ii) FTX was not a creditor of 3AC at any relevant time; (iii) FTX was not put in a better position as a creditor as the result of any allegedly relevant transaction to the detriment of other creditors of 3AC (even assuming FTX was a creditor of 3AC); and (iv) in any event, the FTX Recovery Trust

---

Declaration); and (iv) FTX was obligated to discharge the liabilities owed by 3AC to other participants on the Exchange (see paragraph 158 of the Levy Declaration). Similarly, as pointed out below, in certain respects, Mr Levy appears to have adopted formulations of the headline claims contained in the POC that are different to the formulation of those claims as rehearsed in the POC.

[7] See paragraph 19 of my Original Declaration.
[8] See paragraphs 14-17 of my Original Declaration.
[9] See paragraphs 35-40 of the Levy Declaration.
[10] See paragraph 34(a) of the Levy Declaration and paragraph 12(a) of my Original Declaration.

could assert a statutory ordinary course of business defence depending on the evidentiary record before the Court.

13. **BVI Undervalue Transaction Claim**:[11] Any such claim will fail: (i) the factual premises upon which there is said to have been a transaction at an undervalue do not exist, including because the alleged transactions sought to be impeached did not involve or diminish assets in which 3AC had a proprietary interest; (ii) because, as I understand it, there can be no argument that 3AC received no consideration, or significantly less consideration than 3AC provided in relation to the transactions subject to challenge; and (iii) even assuming that the Joint Liquidators were able to establish that there had been undervalue transactions, the FTX Recovery Trust has a statutory defence.

14. **BVI Turnover Claim**:[12] My opinion as to the status and merits of the BVI Turnover Claim, remains the same: the Joint Liquidators could not successfully assert a turnover claim under s.274A(1) of the Insolvency Act. The BVI Turnover Claim, regardless of whether the appropriate procedural vehicle to advance such a claim is s.274A(1) of the Insolvency Act as stated in the POC, is wholly dependent upon 3AC having a proprietary right to or interest in the assets said to be subject to the claim. As stated in my Original Declaration and in reliance on the Declarations of Lord Neuberger, I understand that no such interest can or could be established and therefore the BVI Turnover Claim cannot or could not succeed.

15. **BVI Proprietary Restitutionary Claim**:[13] My opinion as to the status and merits of the BVI Proprietary Restitutionary Claim remains the same: the Joint Liquidators will not be able to successfully assert that 3AC is entitled to a proprietary restitutionary claim against the FTX Recovery Trust or in respect of any assets in the possession of or formerly in the possession of FTX or the FTX Recovery Trust. This claim is dependent upon 3AC having the proprietary right to or interest in the assets subject to the claim – in particular a subsisting legal title to the assets said to be subject to such a claim.[14] As stated in my Original Declaration, and for the reasons there

---

[11] See paragraph 34(b) of the Levy Declaration and paragraph 12(b) of my Original Declaration.
[12] See paragraph 34(c) of the Levy Declaration and paragraph 12(c) of my Original Declaration.
[13] See paragraph 34(d) of the Levy Declaration and paragraph 12(d) of my Original Declaration.
[14] Which contention, as noted below, is inconsistent with the principal assertion of the Joint Liquidators that 3AC possesses a beneficial interest in the relevant assets.

stated, 3AC has no relevant right or interest and therefore the BVI Proprietary Restitutionary Claim cannot succeed.

16. **BVI Unjust Enrichment Claim:**[15] My opinion as to the status and merits of the BVI Unjust Enrichment Claim remains the same. The necessary elements to be able to pursue this cause of action are absent. FTX was not enriched at the expense of 3AC, and even if it can be said that FTX was enriched at the expense of 3AC, any such enrichment was not unjust. Additionally, the general rule is that no unjust enrichment claim will be available where, as here, there subsists a relevant contract as between the relevant parties the terms of which determines the rights and obligations of the parties to that contract – the relevant contract not having been terminated.  In any event, FTX may be found to have a defence of change of position. Therefore, as stated in my Original Declaration, and for the reasons there stated, the BVI Unjust Enrichment Claim cannot succeed.

17. **BVI Conversion Claim:**[16] As stated in my Original Declaration, and as Mr Levy appears to accept, such a claim in relation to intangible property of the type alleged to be subject to this claim is not (at present) known to the common law of the BVI. Therefore, as stated in my Original Declaration, and for the reasons there stated, the BVI Conversion Claim cannot succeed.

## III.    BVI PREFERENCE CLAIMS

18. There does not appear to be any substantive disagreement between Mr Levy and me as to the necessary elements to enable the prosecution of a claim under s.245 of the Insolvency Act to challenge a transaction on the basis that a particular transaction constitutes an unfair preference of a creditor of an insolvent company.[17] However, Mr Levy and I disagree as to the application of those necessary elements for the reasons set out below.

---

[15] See paragraph 34(e) of the Levy Declaration and paragraph 12(e) of my Original Declaration
[16] See paragraph 34(f) of the Levy Declaration and paragraph 12(f) of my Original Declaration.
[17] We agree that one of the necessary elements that 3AC must establish is that 3AC must have been insolvent at the time of the alleged preference transactions, or that it became insolvent as a consequence of the alleged preference transactions. I assumed in my Original Declaration that 3AC was insolvent on and after 12 June 2022, and I have maintained this assumption for the purposes of this Rebuttal Declaration (see paragraphs 36-37 of my Original Declaration). I note briefly that the Levy Declaration does not acknowledge that I made this assumption. As I expect that the Court appreciates, the burden is on the Joint Liquidators to ultimately establish the insolvent position of 3AC at the relevant time. Mr Levy provides a brief exegesis on what is meant by "cash-flow" insolvency as a matter of the law of England, whilst noting that he is not aware of a BVI Court having considered the "cash-flow" test for insolvency in detail. Although I do not raise any issue as regards the solvency or insolvency of 3AC at the relevant time, for the purposes of the BVI Preference Claims and the BVI Undervalue Claim, I am content to accept the summary provided by Mr Levy as being accurate. That said, upon reviewing my Original Declaration, I noticed that I had

A.  <u>Positions in the Levy Declaration Not Articulated in the POC</u>

19.   This may be repetitious, but in my opinion, it is important to have in mind the substance of the BVI Preference Claims as advanced by the Joint Liquidators in the POC. As noted in my Original Declaration, there is a lack of clarity in the POC as to what the Joint Liquidators allege to be the relevant "*transactions*" said to constitute the alleged unfair preferences.[18] The POC defines the "*June 13 Takings*" and "*June 14 Takings*" as, "*a series of liquidations, seizures, or other transfers*" that are alleged to have taken place on those dates.[19] It would appear that the allegation is that the "*June Takings*" are the relevant "*transactions*" giving rise to the BVI Preference Claims.[20]

20.   The nature of the BVI Preferences Claims as described in the Levy Declaration relates to two alleged, "*series of transactions said to constitute an unfair preference*", namely:[21] (i) "*a substantial number of sales and trades of digital assets associated with 3AC's accounts on the Exchange between 13 and 14 June 2022, which the FTX Recovery Trust asserts were initiated by 3AC*"; and (ii) "*the liquidations of digital assets associated with 3AC's accounts on 14 June 2022, which FTX concedes it conducted*". This formulation of the BVI Preference Claims is, in my view, different from the formulation of the BVI Preference Claims as rehearsed in the POC. As expressed in the POC, the BVI Preference Claims are said to have consisted of an unspecified, "*series of liquidations, seizures, or other transfers*" of assets said to be owned by 3AC. Given these differences, the analysis contained in the Levy Declaration appears to go beyond the nature of the claims as asserted in the POC and the premises for those claims also appear to be different, but I understand such issues to be ones for the Court to consider and determine.

---

referred in error to the decision of Mr Justice Adderley in <u>Donna Union Foundation v Koshigi Limited</u> BVIHC (Com) 231 of 2018 (see paragraph 35 and footnote 37 of my Original Declaration). Although the <u>Donna Union</u> case does refer to judicial precedents from the Courts in England (in particular <u>BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3 BL plc</u> [2013] UKSC 28), this decision only deals with the "balance sheet" test for insolvency and not the "cash-flow" test for insolvency. I had intended to refer to the decisions of Mr Justice Wallbank in: <u>PT Ventures SGPS SA v Vitadel Limited</u> [2021] ECSC J0930-3; and <u>PT Ventures SGPS SA v Vitadel Limited</u> [2024] ECSC J0417-4. The decisions in the <u>PT Ventures</u> cases refer to both the <u>Eurosail</u> case and the decision in <u>Re Cheyne Finance plc (No.2)</u> [2008] Bus LR 1562 and (certainly in relation to the latter <u>PT Venture</u> judgment) contain a detailed analysis of the cash-flow test for insolvency and the analysis as rehearsed in the judgments in <u>Eurosail</u> and <u>Re Cheyne Finance</u> as a matter of the law of the BVI.

[18] See paragraphs 25-26 of the Original Declaration.
[19] See paragraph 40 of the POC.
[20] See paragraphs 51-54 of the POC.
[21] See paragraph 79 of the Levy Declaration.

21. Additionally, whereas for the purpose of his analysis Mr Levy has adopted a position that the pursuit of the BVI Preference Claims by the Joint Liquidators does not require there to have been a transaction involving the assets of 3AC (a view with which I disagree as explained in my Original Declaration and further considered below), this is at odds with the nature and bases of the claims actually pursued in the POC:

    a. The section of the POC outlining the giving of an unfair preference to FTX by 3AC is entitled, "*The Dissipation of the 3AC Debtor's Assets*";[22]

    b. Furthermore, paragraph 40 of the POC defines the "*June 13 Takings*", the "*June 14 Takings,*" and the "*June Takings*" by reference to these being dealings with, "*the 3AC Debtor's digital and other asset holdings*";[23]

    c. To this end, the POC includes a chart that purportedly shows that, at the end of the day on 12 June 2022, "*the 3AC Debtor's assets and alleged negative USD balance on the FTX platform*".[24] This inclusion is with a view to evidencing the size of the supposed quantum of the BVI Preference Claims which are defined by reference to them being, "*Lost Assets*";[25] and

    d. Further, as alleged in the first paragraph of the POC, "[o]*n June 12, 2022, the 3AC Debtor had assets on the FTX platform worth approximately $1.59 billion*" and alleged that, "*those assets were transferred to, or otherwise liquidated by or for the benefit of FTX*".[26]

22. On this basis, it is readily apparent to me that, on any fair reading of the BVI Preference Claims as asserted in the POC, the Joint Liquidators have advanced those claims on the grounds that the unfair preference "*transactions*" involved the disposition of assets in which 3AC had a proprietary right or interest. As a result, to the extent Mr Levy seeks to articulate a theory of recovery based upon transactions that involve assets that are the property of a party other than 3AC (e.g., FTX), it may be said that this is a new and different iteration of the BVI Preference Claims and not one

---

[22] See page 15 of the POC at Section V.
[23] See paragraph 40 of the POC.
[24] See paragraph 42 of the POC. As noted in my Original Declaration, I have been instructed to assume that these figures do not accurately reflect the relevant balances held in the 3AC Accounts at the relevant times, although I have not assessed or sought to verify these actual amounts myself.
[25] See paragraph 43 of the POC.
[26] See paragraph 1 of the POC.

identified or contained in the POC. I understand, however, that the scope of what has been asserted in the POC to be a matter for the Court to consider.

B.    A "*Transaction*" for Purposes of a Preference Claim Must Involve a Depletion in the Assets in Which 3AC Had a Proprietary Interest[27]

23.    As a substantive matter of the law of the BVI, I disagree with Mr Levy's position that establishing the existence of an "*insolvency transaction*", a necessary element for an unfair preference claim under the Insolvency Act, "*does not require a proprietary interest in the assets transferred*".[28] In my opinion (as expressed in my Original Declaration[29] and as further expressed below), the Joint Liquidators cannot assert an unfair preference claim arising from "*transactions*" that did not involve a diminution in the value of the assets of 3AC, which assets would otherwise have been available for distribution to 3AC's creditors in the liquidation of 3AC's insolvent estate.

24.    As an initial comment, it appears that Mr Levy seeks to analyse the view I have expressed as being the result of applying a "*narrow*" construction to the words "*transaction*" and "*insolvency transaction*" as they appear in the Insolvency Act. The view I have expressed, and which I maintain, is predicated on what I consider to be an established understanding of the purpose and effect of provisions such as those contained in s.245 of the Insolvency Act[30] and an appropriate interpretation of the relevant statutory wording in its  statutory context. In this sense I cannot agree with Mr Levy's framing of my analysis.

25.    For this reason, it is important to appreciate the nature and extent of the views I expressed in my Original Declaration:

a.    The ability of a liquidator to challenge certain types of transactions that have occurred pre-liquidation exists in order to ensure that a creditor of an insolvent company does not obtain a benefit from a transaction that has served to deplete the assets of the insolvent company, such that there are fewer assets available for distribution to the other creditors of the company;[31]

---

[27] I drew attention to the nature and extent of the debate on this issue in my Original Declaration at footnote 33.
[28] See the heading at Section 3 on page 16 of the Levy Declaration.
[29] See paragraph 27 of my Original Declaration.
[30] In other words, the "*mischief*" at which such provisions are directed and are intended to avoid or prevent.
[31] See paragraph 27 of my Original Declaration.

b.   There was no detriment in the present case to the other creditors of 3AC because there had been no depletion in the assets of 3AC which might otherwise have been available to distribute to its creditors in the course of its liquidation;[32]

c.   Insofar as it was argued, or is now sought to be argued, by the Joint Liquidators that it was not necessary for the transactions sought to be challenged to involve assets that belonged to 3AC for the purposes of whether or not a transaction is an "*insolvency transaction*", such an argument could not succeed as a matter of the law of the BVI;[33]

d.   The policy behind the promulgation of provisions such as s.245 of the Insolvency Act is to permit the reversal of the economic consequences for a company and its creditors of certain types of transaction that are proximately antecedent to a company's insolvent liquidation;[34]

e.   It is generally accepted that transactions entered into by a company before the commencement of winding up and which have the effect of reducing the value of the assets that would otherwise be available to the creditors of a company should be susceptible to challenge, as they serve to adversely affect the statutory regime (as it exists under the law of the BVI) for equal or proportional distribution of a company's assets to its unsecured creditors in the course of a liquidation; and

f.   Given that the assets that are the subject of the alleged "*insolvency transactions*" were not in fact assets of 3AC at the relevant time, the policy that underlies the ability of a liquidator to set aside certain types of antecedent transactions was not engaged, this served to further inform my opinion that the relevant transactions did not involve unfair preference transactions which inured to the benefit of FTX at the expense of the other unsecured creditors of 3AC.

26.   Thus, as I sought to explain in my Original Declaration, and contrary to the principal analysis as contained in the Levy Declaration, the premise underlying the ability of liquidators to challenge transactions as unfair preferences under the Insolvency Act confirms that a "*transaction*" is relevant as a potential unfair preference only insofar as it involves or directly diminishes assets in

---

[32] See paragraph 27 of my Original Declaration.
[33] See paragraph 28 of my Original Declaration.
[34] See paragraph 51 of my Original Declaration.

which the insolvent debtor has some form of proprietary interest. As already stated, the ability of a liquidator to challenge certain types of transactions that have occurred pre-liquidation as unfair preferences is intended to ensure that a creditor of an insolvent company does not obtain a benefit from a transaction that has served to deplete the assets of the insolvent company, such that there is less value available for distribution to the other unsecured creditors of that insolvent company.[35]

27. Mr Levy's contrary opinion is advanced on the following three bases: (i) his articulation of the nature and extent of the *pari passu* principle; (ii) judicial precedents from England and Australia; and (iii) a new argument that dealings that relate to contractual "*entitlements*" enjoyed by 3AC would suffice to establish an unfair preference transaction even though the unfair preference transactions involved assets that were not assets in which 3AC had a proprietary interest. None of these bases has caused me to change the views I have previously expressed as regards the lack of substance in the BVI Preference Claims.

      *i.    The Pari Passu Principle*

28. Although Mr Levy purports to invoke the *pari passu* principle in support of his analysis, in my view a proper understanding and articulation of this principle serves to confirm my analysis of the position in relation to the BVI Preference Claims. For such claims to have any chance of success, in my opinion, the relevant transactions must involve a depletion in the assets of 3AC which would otherwise be available for distribution to its general body of unsecured creditors in liquidation.

29. The quintessence of the *pari passu* rule is the need to ensure that the assets of a company in liquidation (subject to any prior ranking claims) are divided rateably among the unsecured creditors of that company in accordance with the statutory distribution regime.[36] The *pari passu* principle is a rule that is concerned with securing the orderly distribution of a company's assets, thereby ensuring that no unsecured creditor of the company is placed in a better position *vis-vis*,

---

[35] See paragraph 27 of my Original Declaration.
[36] As to which see s.207 of the Insolvency Act (as regards creditor claims against companies) and s.344 (as regards bankrupt individuals). The principle is also reflected in Part XIX of the Insolvency Act (albeit this part of the Insolvency Act is not (as yet) in force), which is concerned with orders that the BVI Courts may make to assist insolvency related proceedings pending before a foreign Court. See in particular ss.467 and 468 of the Insolvency Act and UBS AG New York v Fairfield Sentry Ltd (in Liquidation) [2019] BCLC 1 (cited at footnote 17 of the Levy Declaration and referencing the ability of the Courts in relation to statutory provisions such as those under discussion in this case to make orders which have the effect of annulling certain types of transaction and permitting the grant of restitution and thereby promoting the prevention of preferential dispositions of a company's property and the distribution of a company's property in accordance with the statutory insolvency regime).

or at the expense of, the other unsecured creditors of that company. The principle has been referred to as, the "*fundamental principle of equality*" to achieve justice as between creditors[37] and the, "*most fundamental principle of insolvency law*".[38]

30.   The *pari passu* principle is well-recognised as being the foundation for statutory provisions of the type contained in s.245 of the Insolvency Act.[39] These statutory provisions allow liquidators to impeach transactions entered into prior to the liquidation of a company as being unfair preferences. The fundamental "mischief" at which such statutory provisions are directed is to preserve the assets of an insolvent company in which the unsecured creditors of that company, as a whole, may benefit.[40]

31.   Contrary to what is said in paragraph 67 of the Levy Declaration, the *pari passu* principle is not necessarily contravened in the event that a transaction occurs the result of which is that a creditor of a company, "*is put in a better position than other creditors of equal rank*". Mr Levy's description of the relevant principle might be said to be not entirely accurate or, at least, incomplete. A transaction that does not involve or does not directly affect the assets of the insolvent debtor does not implicate this principle. As stated in my Original Declaration, the provisions of s.245 of the Insolvency Act are directed towards transactions entered into by the relevant company and that involve the assets of that company.[41] Such transactions benefit a particular unsecured creditor of the relevant company at the expense of the other unsecured creditors of that company by disturbing or contravening the equitable or rateable distribution of the assets of that company as between its unsecured creditors (as is provided for by the statutory regime contained in the Insolvency Act).[42]

---

[37] See: Re Lehman Brothers (International) Europe (in Administration) (no.4) [2018] AC 465 at paragraphs [12], [20], [172], and [198]; Rubin v Eurofinance SA [2103] 1 AC 236, in particular at paragraphs [94]-[98]; Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd [2012] 1 AC 383; and see Cleaver v Delta American Reinsurance Co [2001] 2 AC 328.

[38] "Goode on Principles of Corporate Insolvency Law" (5th Ed, 2018), at paragraph 8-02 and generally Chapter 8 (*ibid*). See also "The Law of Insolvency" (Fletcher, 5th Ed, 2017) at paragraph 26-020, where provisions such as ss.245 and 246 of the Insolvency Act are described as having the purpose of ensuring that from the commencement of a company's liquidation the property of the company is preserved intact for the benefit of the general body of its unsecured creditors.

[39] See for example Byers v Chen, *supra*, at paragraph [128] and to the same effect Re Weavering Macro Fixed Income Fund Limited (in Liquidation) 2016 2 CILR 514 – a decision of the Court of Appeal of the Cayman Islands and see in the Privy Council at [2019] UKPC 36.

[40] As I stated in paragraph 27 of my Original Declaration.

[41] See paragraph 27 of my Original Declaration.

[42] See "Goode", *op cit* at paragraph 13-85 and generally Chapter 13 (*ibid*); and "The Law of Insolvency", *op ci*t, at paragraph 26-039 (*ibid*).

32.    By way of example, if one assumes that the assets involved in the so-called "*June Takings*" are assets in which 3AC had no proprietary interest (as I understand to be the case according to the assumptions I have been asked to make), then the "*June Takings*" did not have the effect of diminishing the number or value of assets that would otherwise have been available to 3AC's creditors in liquidation. If the relevant transactions had never occurred, the relevant assets, not being assets in which 3AC had a proprietary interest (as *per* Lord Neuberger's Declarations) would not have formed part of 3AC's liquidation estate and would not therefore have formed part of any fund or asset pool from which distributions to unsecured creditors of 3AC could have been made by the Joint Liquidators.

33.    That this is the actual position is, in my opinion, further supported by at least the following matters:

a.    In my opinion, the wording of s.245(1) of the Insolvency Act plainly implicates that for a transaction to constitute an unfair preference the unfair preference must be given by the relevant company.[43] It follows, in my opinion, that an unfair preference cannot in any genuine or substantive sense be said to have been given by the company in question unless the relevant transaction improves the position of one of the unsecured creditors of that company at the expense of the general body of unsecured creditors by reducing the benefit that the general body of creditors would otherwise have received upon the distribution in the course of the company's liquidation of that part of the company's property that was the subject of the relevant transaction;[44]

b.    An "*insolvency transaction*" is not limited to a transaction that is entered into by the company at the time that it is insolvent, but also includes a transaction that may be said to have caused the company to become insolvent. This, in my opinion, clearly anchors the purpose of the anti-preference provisions contained in s.245 of the Insolvency Act to the avoidance of the actual assets of an insolvent company being depleted in such a way as then leads to the subversion of the *pari passu* principle of distribution of a company assets in a liquidation for the benefit of its general body of unsecured creditors;

---

[43] "*Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction...*".
[44] See "Goode", *op cit* at paragraph 13-85.

15

c.    It further follows, in my opinion, that a payment of one of a company's creditors by a third-party (at a point in time when the company is insolvent) even if that payment is made at the instigation of the relevant company[45] cannot be characterised as an unfair preference[46] of the relevant creditor. That is because the value of the assets available for distribution to the company's other creditors has not been depleted. In fact, in such a scenario, the position would be that the company itself has benefitted in that an alleged liability to which it was subject has been reduced or discharged. Moreover, in the context of an insolvent liquidation of that company its creditors will also have benefitted since the burden on the assets available for rateable distribution as between the unsecured creditors has been reduced by the amount of the alleged liability discharged or reduced as a consequence of the payment made by the third-party. In other words, the assets available for distribution will remain unaffected but will be distributable between fewer creditors or distributable by reference to creditor claims that have been reduced in terms of their aggregate value;

d.    A consideration of the type of remedies which the Court may grant to reverse the effect of an unfair preference transaction[47] is also indicative of the mischief at which s.245 of the Insolvency Act is directed:[48]

    i.    Section 245(1)(a) and (b) of the Insolvency Act permit the Court to set aside the relevant transaction or restore the position to what it would have been if the company had not entered into the relevant transaction. In a scenario of the type referred to above, the granting of such relief would serve only to worsen the position for the company and its other unsecured creditors by reverting to the situation as it existed prior to the repayment of the relevant debt to the relevant creditor by the third-party;

---

[45] Which may or may not be considered to be sufficient to satisfy the requirement that the transaction the subject of challenge is a transaction entered into by the company: see s.245(1) of the Insolvency Act.
[46] Provided that there is no recourse to the company in favour of the third-party or other burden placed on the relevant company's assets as a consequence of the payment made by the third-party.
[47] See s.249(1) and (2) of the Insolvency Act.
[48] Whilst recognising that s.249(2) of the Insolvency Act does not operate and is not intended to delimit the scope of the type of orders the Court can make by reference to the objective of the relief it may grant as expressed in s.249(1)(a) and (b). Reference to the statutory remedies available as an aid to interpretation of the provisions to which those remedies relate is a legitimate course to adopt: Invest Bank PSC v El-Husseiny [2025] 2 WLR 320 at paragraph [59].

ii.     In a scenario of the type referred to above relief in the nature of that referred to in s.249(2)(a) or (b) of the Insolvency Act would in theory be available – but to what end?:

    a.     Payment to the company by the (former) creditor of the company of the monies it had received from the third-party would represent a windfall to the insolvent estate as there would be an accretion to the assets of the company resulting in a swelling of the assets of the insolvent estate to a level greater than had existed at the time of the relevant transaction;

    b.     The granting of such relief could not properly be characterised as being restorative, or restitutionary.[49] To the contrary, the granting of such relief might more appropriately be characterised as penal or punitive from the perspective of the (former) creditor in receipt of the payment from the third-party and indeed from the perspective of the third-party that made the payment – neither of whom can be said to have been involved in any wrongdoing;[50]

iii.    Furthermore, in a scenario of the type referred to above relief in the nature of that referred to in s.249(2)(d) of the Insolvency Act is plainly and obviously inapt given that it requires payment by a person to the liquidator of benefits received by them from the company, which in a scenario of the type referred to above is not what will have occurred.

34.    Finally, I should point out that, I understand the position to be that the manner in which FTX and the FTX Recovery Trusts have treated 3AC's Account Balance and its component parts is identical to the way that the Account Balances of all other customers on the Exchange have been

---

[49] Which is what such relief as provided for by s.249 is plainly intended to be i.e., to restore value to the company for the benefit of its creditors, which would otherwise have been lost by reason of the unfair preference transaction.

[50] True it is, that the Court could prevent any windfall effect and/or ameliorate any actual or perceived penal consequence of granting such relief by making an order in relation to the (former) creditor that it be entitled to submit a claim in the company's liquidation (see s.249(2)(g) of the Insolvency Act) and/or by making an order that the company be required to make a payment to the third-party in the same amount as the amount ordered to be paid to it by the (former) creditor once received (pursuant to s.249(2)(h) of the Insolvency Act). But the granting of such relief in the context under discussion merely serves to reinforce the proposition that the objective of s.245 of the Insolvency Act and nature of the attendant relief that a Court may grant and the mischief to which these provisions are directed are as stated in my Original Declaration and as repeated herein.

dealt with and have had their claims dealt with in these bankruptcy proceedings, and reflects the rights of those parties that participated on the Exchange as they find effect in the context of these bankruptcy proceedings and U.S. federal bankruptcy law.

35. On that basis, the approach sought to be advanced by 3AC in its POC as to how its Account Balance and its component parts should be treated would require the Court to treat 3AC differently (and more favourably) than other former FTX customers who are creditors of the FTX estate. I accept, however, that whether or not this unique treatment of 3AC is appropriate in the context of these bankruptcy proceedings is a matter for the Court to determine.

### ii.    Case Authorities

36. I have reviewed what I consider to be the relevant authorities referenced in the Levy Declaration, and none of those authorities cause me to alter the views expressed by me in my Original Declaration. Nor, in my view, do those authorities provide a basis for a claim that there has been an unfair preference of FTX in the absence of the allegedly relevant transactions serving to reduce the pool of assets that would otherwise have been available to pay a dividend to 3AC's creditors in the course of its liquidation.

### a.    Invest Bank PSC v El-Husseiny

37. I do not see how the opinion I have expressed can be legitimately said to be "*inconsistent with highly persuasive authority*", the authority referred to being the decision of the UK Supreme Court in Invest Bank PSC v El-Husseiny.[51]

38. First, the Invest Bank decision can have only limited (if any) persuasive precedential value in the BVI as regards the proper interpretation of the meaning and effect of ss.245 and 246 of the Insolvency Act. This is due to important contextual differences between the relevant statutory regimes in England and in the BVI. As was made clear at the outset of the judgment in the Invest Bank case, the appeal before the UK Supreme Court was concerned with a single but important point as to the proper construction of s.423 of the Insolvency Act 1986 in England and Wales.[52]

---

[51] *Supra*. See in particular paragraphs 69-72 of my Original Declaration. The decision in the Invest Bank case has recently been the subject of specific consideration and application in the context of a more recent case in the High Court of England and Wales concerning a claim made under s.423 of the Insolvency Act namely: Credit Suisse Virtuoso SICAV-SIF v SoftBank Group Corp [2025] EWHC 2631 (Ch).
[52] See the Invest Bank case at paragraph[1].

As stated in my Original Declaration the <u>Invest Bank</u> judgment is concerned with: (i) an entirely different statutory provision; (ii) that is contained in and forms part of an entirely different statute; (iii) which was enacted in and applies in an entirely different jurisdiction; and (iv) concerns a statutory claim that has a very different statutory lineage than s.245 of the Insolvency and is rooted in the laws directed at preventing what historically were referred to as "*fraudulent conveyances*".

39. No doubt, the judgment in the <u>Invest Bank</u> could be put to and considered by the BVI Courts for purposes of the statutory interpretation of the Insolvency Act in the BVI. However, in my opinion, given these key structural, contextual and policy differences, the Courts in the BVI would ultimately have little regard to the decision in determining the proper interpretation to be applied to ss.245 and 246 of the Insolvency Act in the BVI (and in particular s.245 of the Insolvency Act, which is concerned with transactions said to be unfair preferences – the <u>Invest Bank</u> case was not concerned with any issues that related to the regime for setting aside transactions said to constitute voidable preferences as it applied in England).[53]

40. Secondly, even if one applied the <u>Invest Bank</u> decision notwithstanding these important differences, the reasoning set forth in that decision confirms that, as set forth in my Original Declaration and herein, a transaction must have the effect of depleting the assets that would otherwise be available to the unsecured creditors of a company in the liquidation of that company. Importantly, in the <u>Invest Bank</u> case, the issue of statutory construction considered by the UK Supreme Court (as noted in paragraph 38 above) was to be determined in the context of whether s.423 of the Insolvency Act 1986 can apply to a transaction whereby a debtor agreed to procure a company which the debtor owned to transfer a valuable asset for no consideration or at an undervalue, thereby reducing or eliminating the value of the debtor's shares in that company to the prejudice of his creditors, or whether such a transaction falls outside s. 423 of the Insolvency Act 1986 because the debtor does not personally own the asset that was transferred by the company (albeit that the company was owned by the debtor).[54] The effect of the transaction was thereby to reduce or eliminate the value of the shares owned by the debtor in the company that had disposed of its assets to the prejudice of the debtor's own creditors. The UK Supreme Court

---

[53] At paragraph [74] of the judgment in the <u>Invest Bank</u> case it was recognised that under the Insolvency Act 1986 although they share some common features, the regimes for transactions at an undervalue and for unfair preferences are clearly separate and are aimed at different types of transaction. The same is true for the regimes for unfair preferences and undervalue transactions under the Insolvency Act in the BVI.

[54] *Ibid*, at paragraph [1].

ultimately concluded that a transfer by a solvent company owned by a debtor of a valuable asset owned by the solvent company for no or inadequate consideration necessarily resulted in a diminution in the value of the debtor's assets (i.e., the debtor's shares in the company) and/or assets against which enforcement action against the debtor could ultimately be taken. Consistent with the issue which the UK Supreme Court had to determine,[55] the Court also drew attention to the fact that it had been (correctly) accepted by the claimant in that case that it was a necessary element of its claim that the value of the debtor's assets i.e., his shares in the company, had been in fact diminished as a result of the transfer of the company's own asset because the company was owned by the debtor.[56]

41.  I do not see meaningful parallels between the situation that was under consideration in the <u>Invest Bank</u> case and the case theory sought to be advanced by the Joint Liquidators. As noted above, because the transaction in issue in the <u>Invest Bank</u> involved an asset in which an entity owned and controlled by the insolvent debtor had a proprietary interest, the transaction would have diminished the assets available to the insolvent debtor's creditors because the transaction in issue served to reduce the value of the debtor's own assets even though the relevant transaction did not directly involve an asset owned by the debtor. The <u>Invest Bank</u> decision was not concerned with and therefore did not address a situation in which the relevant transaction involved an asset that was the property of an unaffiliated entity, the disposal of which could not and did not diminish the value of an asset that would otherwise have formed part of a debtor's insolvent estate. To that extent, there is no substantive dichotomy between the decision in the <u>Invest Bank</u> case and the opinion expressed by me in my Original Declaration and herein and the reasons for that opinion.

42.  As to the example referred to at paragraph 61 of the Levy Declaration, this offers nothing beyond the fact pattern that arose in the <u>Invest Bank</u> case: a transaction whereby an insolvent company caused or procured its subsidiary company to transfer assets in which that subsidiary had a proprietary interest to a creditor of the insolvent parent company, in diminution or discharge of a debt owed by the parent company to that creditor. As was recognised in the <u>Invest Bank</u> case, such a transaction would have the effect of reducing the value of the assets of the parent company, which assets would otherwise have been available for distribution amongst the general body of

---

[55] See paragraph 39 above.
[56] <u>Invest Bank</u>, *supra*, at paragraph [35].

the unsecured creditors of the insolvent parent company in the form of the value of the debtor company's shares in its subsidiary.[57] By contrast, the assets in dispute in the present case were never available to 3AC's creditors and were not owned by an affiliated party.[58]

  b.    *Australian Decisions*

43.    Nor do the other authorities from Australia invoked by Mr Levy cause any change to my analysis as contained in my Original Declaration. At paragraph 67 of the Levy Declaration, reference is made to the Australian decision in G & M Aldridge Pty Ltd v Walsh.[59] This case is cited in support of the argument that in any circumstances in which a creditor has been put in a better position than other creditors by reason of a transaction, that is a circumvention of the *pari passu* principle and (other things being equal) constitutes a preference regardless of whether the transaction involves an asset belonging to the relevant insolvent company.

44.    I have dealt above with an explanation of the *pari passu* principle, why the description of that principle by Mr Levy is not accurate or may be regarded as incomplete and why for there to be an unfair preference of a creditor the transaction sought to be impeached must be one that benefited the creditor at the expense of other creditors and involve a depletion of the assets of the company in question.[60]

45.    Specifically, as regards the decision in the case G & M Aldridge, in my opinion this decision is not authority for the principle for which it is cited by Mr Levy and therefore does not affect the views I expressed in my Original Declaration.[61] I make the following observations:

---

[57] At paragraph [60] of the judgment in the Invest Bank case the following was said: that the argument advanced to the effect that a transfer of property owned by a debtor was required for the purposes of s.423 of the Insolvency Act 1986 was "*diluted*" by an acceptance on the part of the claimants that, "*...the release of debt owed to the debtor or the surrender of an interest in property, whether gratuitously or at an undervalue, fell with section 423(1), even though it involved no transfer of property. In the light of the terms of section 423(1) and (3), this concession was in our view unavoidable. The appellants' case must instead be that it is an essential element of any transaction falling within section 423 that it directly involves property owned by the debtor, and not as here property owned by a company which is in turn owned by the debtor*". However, the examples referred to do not in fact take the analysis any further. The transactions referred to are not transfers of property owned by the debtor, but they are plainly transactions that involve assets that are owned by and/or in which the debtor has an interest.

[58] Furthermore, in such a situation, depending on the circumstances (e.g., the size and nature of the insolvent company's shareholding in the subsidiary) the liquidators of the parent company might well be able to take control of the subsidiary and (through legal action for example) recover the assets of the subsidiary for distribution to its creditors and/or its shareholder, namely the insolvent parent company.

[59] [2002] BPIR 482, and which is discussed at paragraph 13-85 of "Goode" *op cit* (see footnote 33 of my Original Declaration).

[60] See paragraphs 28-35 above and paragraph 27 of my Original Declaration.

[61] Which were, in any event, expressed in the context of the Australian jurisprudence.

21

a.   The case is concerned with the interpretation s.122 of the Bankruptcy Act (Australia) and s.451 of the Companies Code (for the State of Victoria). As will be seen upon a comparison between s.122 of the Bankruptcy Act (Australia) and s.451 of the Companies Code (for the State of Victoria) and s.245 of the Insolvency Act, these statutory provisions are in very different terms to the relevant parts the BVI statutory provisions dealing with unfair preferences;[62]

b.   Before the Court of Appeal of the Supreme Court of Victoria there were two issues for determination in the G & M Aldridge case: (i) whether the payments made by the company that held monies on behalf of the insolvent company and from which the relevant payments were (for the purposes of the relevant statutory anti-preference provisions)[63] made by the insolvent company; and (ii) whether the relevant payments had the effect of preferring the recipients who were unsecured creditors of the insolvent company over the other unsecured creditors of the insolvent company.

c.   The Court of Appeal decided that the relevant payments were made for and on behalf of the insolvent company from monies held by a third-party for and on behalf of the insolvent company and that the relevant payments amounted to payments made by the insolvent company on behalf of the insolvent company. This determination was not the subject of any appeal to the High Court of Australia;[64]

d.   Therefore, the issue for determination before the High Court was whether the relevant payments had preferred the recipients of the payments (in their capacity as unsecured creditors of the insolvent company) over other unsecured creditors of the insolvent company;[65]

e.   It was accepted that the monies held on behalf of the insolvent company were subject to a valid fixed charge (an apparently valid floating charge having crystallised).[66] However, as

---

[62] It should also be noted that the provisions under discussion in the G & M Aldridge decision are no longer the relevant statutory anti-preference provisions applicable under Australian law.

[63] Namely, as noted above, s.122 of the Bankruptcy Act Corporations Act (Australia) and s.451 of the Companies Code (for the State of Victoria).

[64] See G & M Aldridge at paragraphs [11]-[15].

[65] Ibid.

[66] However, on a proper analysis of the position there must be significant doubt as to whether there was (as a matter of fact and law) a valid fixed charge security interest in the G&M Aldridge decision. See Re Spectrum Plus Ltd (in Liquidation) [2005] 2

determined by the Court, those of the company's unsecured creditors had received the relevant payments because of the decision by the bank not to enforce its security with the result that the insolvent company was able to and free to make the payments it did to certain of its unsecured creditors but not to others; and

f.   In reality therefore, the payments were made from assets that were in effect assets of the insolvent company, or at least constituted payments made from assets which, on the facts of the case, were and would otherwise have been available for distribution to all of the unsecured creditors *pari passu* in the insolvent liquidation of the relevant company.

46.   It should also be noted that (save as mentioned in the following paragraph) the decision in G & M Aldridge does not appear to have been cited or followed as authority for the proposition for which it is referred to and relied upon by Mr Levy. Indeed, it appears to be the position under Australian law that for the relevant insolvency transaction to constitute an unfair preference, the relevant transaction must involve a depletion in the assets of the insolvent company before there can be a recovery by a liquidator on the grounds that there has been an unfair preference.[67] That is, of course, my view of the relevant law as it applies in the BVI.

47.   At footnote 30 of the Levy Declaration reference is made to the decision of the Federal Court of Australia in Re Emanuel (No 14) Pty Ltd.[68] However, in my opinion, this decision similarly is not supportive of the views expressed by Mr Levy. As was found on the facts of that case (in simple terms), when an insolvent company (A) owes money to one of its creditors (C), and A directs a

---

AC 680, a decision of the House of Lords in England; and see: S Atherton and R Mokal, "Charges over chattels: issues in the fixed/floating jurisprudence" (2005) 26 "Company Lawyer" 10 (referred to with approval in Re Spectrum Plus Ltd (in Liquidation).

[67] See (for example): Cant v Mad Brothers Earthmoving Pty Ltd (in liq) [2020] VSCA 198; Re Western Port Holdings Pty Ltd (receivers and managers appointed) (in liq) [2021] NSWSC 232; BounceLED Pty Ltd v Clear Skies Corp Pty Ltd (in liq) [2023] NSWSC 121; Re Pacific Plumbing Group Pty Limited (in liquidation) [2024] NSWSC 525; and Re Corio Bay Dairy Group Pty Ltd (in liq) [2025] VSC 466. And as noted above and in my Original Declaration, see the discussion at paragraph 13-85 of "Goode" *op cit* (see footnote 33 of my Original Declaration). In Robt Jones Holdings Ltd v McCullagh [2019] NZSC 86, the Supreme Court of New Zealand discussed the relevant Australian authorities (pre-2019) including the decision in G & M Aldridge, *supra*. However, the Supreme Court ultimately concluded that there was no consensus in the Australian decisions (as at the date of the judgment in the Robt Jones) case as to whether a diminution in the company's assets was necessary before a transaction can be set aside as an unfair preference. The decision in the Robt Jones case was considered in Cant v Mad Brothers Earthmoving Pty Ltd (in liq) but not followed. The Court of Appeal for the Supreme Court of Victoria concluded that the decision of the Supreme Court of New Zealand was concerned with a statutory regime that was relevantly different to that applicable in Australia. Moreover, it seems clear that the decision in the Robt Jones case was premised upon a policy change New Zealand in relation to this area of insolvency law which was sought to be given effect to by the promulgation in New Zealand of s.292 of the Companies Act 1993.

[68] (1997) 15 ACLC 1099.

23

third-party (B) which owes money to A, to pay C the money that would otherwise be received by A from B (and C accepts the payment from B in discharge of A's indebtedness), then this can constitute a transaction whereby the insolvent company made a payment using its assets (i.e., monies that would otherwise have been received by A from B) and that such a transaction can constitute an unfair preference of C by A (the insolvent company). As such the money paid to C by B was recoverable by the liquidator of A.[69] In my opinion, assuming all the necessary elements are present, there can be no argument that such a transaction or arrangement can potentially constitute an unfair preference and be set aside. That said, such a fact pattern bears no similarity to the facts in the present case (as I have been given to understand them) and as such is of no relevance to this case.[70]

    *iii.    Contractual "Entitlements" as Assets of 3AC*

48. Finally, at paragraphs 72-74 of the Levy Declaration, Mr Levy appears to raise a new argument i.e., not one that is reflected in the POC (at least as a claim under s.245 of the Insolvency Act). The new argument (so it seems) is intended to provide a platform to advance his thesis that for a transaction to constitute an unfair preference it need not involve a depletion in the assets owned by the insolvent company in question.

49. As I understand what is said by Mr Levy, he argues that even though 3AC did not own any Digital Assets, the relevant purported transactions served to reduce the value of 3AC's contractual entitlement to request delivery of Digital Assets from FTX to the benefit of FTX as a creditor of 3AC, and that therefore FTX was in receipt of an unfair preference. This new argument does not, in my view, assist the Joint Liquidators.

50. First, and assuming the existence of such a contractual entitlement for present purposes, Mr Levy's analysis does appear to assume or contend that the entitlement referred to is, or confers,

---

[69] See: "McPherson & Keay's Law of Company Liquidation" (5th Ed, 2021), at paragraph 11-064. As was noted in Re Emanuel, *supra*, what the creditor received from the insolvent company was the actual benefit of a valuable chose in action that was owned by / was an asset of the insolvent company.

[70] At footnote 33 of the Levy Declaration reference is made to the judgment in Re Hood [2021] 2 WLR 313. That case is not an authority for the proposition advanced by Mr Levy. In any event, the case was concerned with a situation in which a third-party, at the request of the debtor, had made a payment to one of the debtor's creditors to discharge a debt that formed the basis for the presentation of a bankruptcy petition against the debtor and where the debtor had agreed to reimburse / repay the third-party in respect of the amount the third-party had paid to the petitioning creditor. The judge in that case merely passed comment that in such circumstances there might be a case for saying that the payment made to the petitioning creditor constituted an unfair preference under the Insolvency Act 1986.

some form of proprietary right in Digital Assets on the Exchange in favour of 3AC. As previously stated, and by reference to the Declarations of Lord Neuberger, 3AC does not have any proprietary interest in any Digital Assets. Mr Levy offers no basis for his assertion that the contractual entitlement referred to or relied upon constitutes or grants a proprietary right to Digital Assets in favour of 3AC.

51. Secondly, I do accept (again assuming the existence of such a contractual entitlement for present purposes) that a claim to enforce a contractual right to request the delivery of Digital Assets (not embodying any proprietary right or claim) may well constitute an asset of 3AC. However, that cause of action or potential asset would seem to be encapsulated in the breach of contract claim for damages as articulated in paragraphs 55-57 of the POC (I do not offer any opinion on the merits of such a claim). The value of such a potential asset (on the assumption referred to above) would remain intact and available for the benefit of the creditors of 3AC (should such a claim prove successful). Any transactions involving Digital Assets are only potentially relevant in the present context (insofar as they are relevant at all) to an assessment of the possible quantum of a claim for damages for any breach of contract on the part of FTX by reason of its refusal or inability to deliver Digital Assets to 3AC upon a request for such delivery by 3AC. As such, it has no relevance to the analysis of whether or not there is a prosecutable claim for an unfair preference under s.245 of the Insolvency Act. Moreover, as stated above, the type of claim for an unfair preference as formulated by Mr Levy in paragraphs 72-74 is not to be found in the POC.

   *iv.    The Right of FTX to Liquidate*

52. With respect to the Liquidation (a small fraction of the alleged transactions at issue), at paragraphs 84-87 of the Levy Declaration it is argued that although the Liquidation pursued by FTX was an act of FTX and not of 3AC and comprised transactions to which 3AC was not a party and in which 3AC was not involved, there nevertheless may be scope for the Liquidation to be understood as being part of an extended or composite transaction to which 3AC was a party or in which it was involved. Mr Levy argues that because the Liquidation was undertaken pursuant to the terms contained in the FTX Terms of Service dated 13 May 2022 and the March 2022 Line of Credit Agreement, which agreements were entered into within the Vulnerability Period it follows (so it

is said) that the Liquidation was part of a transaction that constituted an insolvency transaction that was entered into by 3AC.[71]

53.    I do not agree with this analysis. First, the FTX Terms of Service dated 13 May 2022 were no more than a renewal of the user agreement that specified the terms of service for the Exchange on and after 13 May 2022. In other words, if 3AC had not entered into this agreement, it would not have been allowed to continue to participate in or continue to have access to the market which the Exchange provided and which was necessary for 3AC to carry on its business. In my opinion, the entry into the FTX terms of service in May 2022 represented a transaction through which 3AC received commensurate consideration i.e., the ability from that date to continue to have access to and participate in and trade on the Exchange. In addition, it may reasonably be inferred that the Terms of Service were entered into by 3AC in May 2022 in the ordinary course of its business and cannot therefore constitute an unfair preference.[72] Essentially the same arguments can be deployed in relation to 3AC's entry into the March 2022 Line of Credit Agreement.[73]

   C.    FTX Was Not Put into a Better Position as a Creditor

        i.    *FTX Was Not a Creditor of 3AC on the Facts as I Understand Them*

54.    I further disagree with Mr Levy's conclusion that FTX was a creditor of 3AC because,[74] as set forth in my Original Declaration, the 3AC Accounts with the Exchange had a positive Account Balance as at the end of the day on 12 June 2022 (as I have been instructed to assume).[75] As such, FTX was a debtor of 3AC, not a creditor. If FTX was not a creditor of 3AC, then there can be no BVI Preference Claim.

55.    Mr Levy contends that, "*a creditor is a person to whom the debtor owes a payment of money, even if that payment obligation is future, contingent or unliquidated*".[76] I do not understand there to be any dispute that, as a matter of fact, the 3AC Accounts did not have a negative Account Balance as at the end of the day on 12 June 2022, or at any relevant point in time. As I understand it, if one considers the relationship between 3AC and FTX at the Joint Liquidators' chosen point

---

[71] As required by s.245(1) of the Insolvency Act and which is a necessary element of any claim that a transaction constituted an unfair preference.
[72] See s.242(2) of the Insolvency Act.
[73] *Ibid*.
[74] See paragraphs 105-135 of the Levy Declaration.
[75] See paragraph 42 of my Original Declaration.
[76] See paragraph 108 of the Levy Declaration.

of time (the end of the day on 12 June 2022), then FTX would have been a debtor of 3AC in the amount of the Account Balance (subject to potential deductions in respect of fees or applicable transaction costs).

56. I am given to understand that, and as reflected in my Original Declaration, a positive Account Balance meant that the account holder had a right to expect payment from FTX and that therefore the account holder in such a situation would be a creditor of FTX, and FTX would be in the position of a debtor in relation to the relevant account holder.[77] As with the other account holders and participants on the Exchange, this is the position that obtained in relation to 3AC as an account holder and as a participant on the Exchange.

57. I note the recitation by Mr Levy of certain of the contractual provisions contained in the agreements entered into between FTX and 3AC.[78] However, in my opinion, none of the provisions Mr Levy has identified alters the nature of the relationship between FTX and 3AC in terms of being a debtor or creditor as at the end of the day on 12 June 2022. For example:

    a.   Mr Levy highlights the existence of the Spot Margin Program, but the existence of this program did not affect whether 3AC could have demanded payment from FTX on the basis of a positive Account Balance;[79]

    b.   Mr Levy notes that a provision of the FTX Terms of Service allowed 3AC (or other customers) to withdraw Digital Assets, but my understanding is that a customer's ability to withdraw assets from the Exchange was limited by reference to the state of the Account Balance;[80]

    c.   Mr Levy argues that a provision of the FTX Terms of Service (clause 10.3.1) authorising the sale of Digital Assets if there was a "*debit balance*" must refer to a negative USD Balance, and not the Account Balance (overall), because otherwise it would be "*entirely meaningless*" because it would be "*impossible to recover the outstanding 'debit balance' from the assets in the Account*".[81] I do not agree insofar as a negative Account Balance (overall) could still

---

[77] See paragraph 43 of my Original Declaration.
[78] See paragraphs 114-134 of the Levy Declaration.
[79] See paragraph 113 of the Levy Declaration.
[80] See paragraph 118 of the Levy Declaration.
[81] See paragraph 120 of the Levy Declaration.

include positive positions in assets for which there would potentially be a reason to liquidate (e.g., to exit a risky, deteriorating position for a more stable one). This argument also speaks to only one consequence of what was a package of rights that FTX benefited from in the event that 3AC had an overall negative Account Balance (e.g., the right to be indemnified or to claim costs incurred from 3AC). I do not see how this provision suggests that something other than the Account Balance determined whether 3AC or FTX was entitled to demand payment form the other;

d.   Mr Levy asserts that the FTX Terms of Service  prevent the FTX Recovery Trust from asserting that 3AC could owe obligations to other parties,[82] but I am aware of no basis for that assertion;

e.   Mr Levy argues that the March 2022 Line of Credit Agreement renders FTX a creditor as to the $120 million Line of Credit, but I understand that this amount was already part of the negative USD Balance that formed part of the Account Balance, such that this amount does not alter which party could demand payment from the other in relation to the 3AC Accounts;[83] and

f.   Mr Levy acknowledges that FTX had a contractual right of set-off via the FTX Terms of Service, which I address below, but suffice to say this provision confirms that creditor status should be assessed by reference to the overall state of the Account Balance.[84]

58.   Given that the Account Balance was positive before the alleged relevant "*transactions*" took place, FTX was 3AC's debtor. As such, my opinion remains that FTX was not a creditor of 3AC under BVI law based upon the facts as I understand them.

   *ii.   FTX Was Not Put into a Better Position as a Creditor[85]*

59.   Even if one assumed that FTX was in fact a creditor of 3AC, my view remains that it cannot be said that FTX was put into a better position as such as the result of the transactions alleged to be unfair preferences by the Joint Liquidators.

---

[82] See paragraphs 122-125 of the Levy Declaration.
[83] See paragraph 129 of the Levy Declaration.
[84] See paragraphs 126-127 of the Levy Declaration.
[85] See paragraphs 45-53 of my Original Declaration.

28

60.    Mr Levy raises what would happen in a "*hypothetical liquidation*" of 3AC as at the end of the day on 12 June 2022 (i.e., had the challenged transactions not taken place on 13 June 2022 and 14 June 2022).[86] The transactions subject to challenge involved 3AC incurring debits to its Digital Asset Balance and credits in an equivalent amount to its (negative) USD Balance.

61.    However, as I sought to explain in my Original Declaration, in the event of a notional liquidation as at the dates of the transactions sought to be challenged, the net effect of a (notional) automatic and self-executing insolvency set-off[87] taking effect as at the date of the notional liquidation would have been the same as that which resulted from the transactions that are the subject of challenge by the Joint Liquidators. That is why I expressed the view that as at the date of such notional liquidation (and assuming FTX to have been a creditor of 3AC as at that date) FTX was not placed in a better position as a result of the transactions sought to be impeached, because the same position would have obtained as a result of and in the context of a notional liquidation as at the same dates. It remains my view that, on an analysis and in the context of a notional liquidation, it can be seen that FTX did not receive a benefit which may be avoided on the basis that it was an unfair preference. The impact of a (notional) automatic statutory set-off under the Insolvency Act that would have to be applied as part of the analysis of what would occur in a notional liquidation would serve to establish that FTX did not received an unfair preference to the detriment of the other unsecured creditors of 3AC; the net effect of the relevant transactions being no more extensive than the net effect of the application of a notional insolvency set-off.[88]

62.    As I sought to explain in my Original Declaration, the application of the proceeds of realisation of the Digital Assets in diminution of the negative USD Balance cannot have been an unfair preference of FTX. This is because:

a.    The contractual rights of set-off or combination took effect prior to the commencement of the liquidation of 3AC;[89]

b.    In such circumstances, the concept of insolvency set-off taking automatic effect as at the date of the actual liquidation of 3AC is of no relevance since insolvency set-off only becomes

---

[86] See paragraphs 137-138 of the Levy Declaration.
[87] See s.150 of the Insolvency Act.
[88] See paragraph 48 of my Original Declaration.
[89] I.e., the time at which the Joint Liquidators were appointed, see: s.160 of the Insolvency Act.

operative from the "*relevant time*" i.e., upon the appointment of the Joint Liquidators and has (and had) no part to play until that moment in time;[90] and

c.  Therefore, the taking effect of the rights of set-off / right of combination that operated in relation to 3AC's accounts with FTX was valid, and their effects and consequences are binding on the Joint Liquidators.[91]

63.  Given that, in my opinion, the rights of set-off / combination that were effected in relation to 3AC's account with FTX were no more extensive or were co-extensive with the terms and effect of mandatory, automatic and self-executing insolvency set-off,[92] FTX was not and cannot be said to have been placed in a better position than it otherwise would have enjoyed in the event of 3AC's (notional) insolvent liquidation at the date of the exercise of those rights set-off / combination. Therefore, FTX cannot be said to have been preferred.[93]

64.  Mr Levy expresses the view in relation to insolvency set-off that, insofar as insolvency set-off under the law of the BVI may be relevant as between FTX and 3AC, such set-off could not operate as a necessary element is lacking in the present case for insolvency set-off to apply namely the need for mutuality.[94] The concept of mutuality is as described at paragraph 146 of the Levy Declaration.[95] Mr Levy's premise for the argument that the necessary mutuality is lacking appears to be by treating the negative USD Balance as a "*monetary claim*", but the positive Digital Asset Balance as a "*proprietary entitlement*".

65.  In my opinion, the necessary facets of insolvency set-off under s.150 of the Insolvency Act, insofar as relevant, are present.  The premise for Mr Levy's argument does not exist if, as I have been instructed to assume and as informed by Lord Neuberger's analysis, 3AC did not have a proprietary right in the assets held by the Exchange, including those reflected in the Digital Asset

---

[90] *Ibid* and s.149 of the Insolvency Act. In any event, as noted in my original Declaration and below, the exercise by FTX of its contractual rights of set-off went no further than the automatic set-off which would have come into operation upon the appointment of the Joint Liquidators and which would have resulted in the netting off of the positive Digital Asset Balance and the negative USD Balance to the same extent.

[91] See: "Goode on Principles of Corporate Insolvency Law" (5th Ed, 2018), at paragraph 9-13; and "Goode and Gullifer on Legal Problems of Credit and Security" (7th Ed, 2022), at paragraph 7-99.

[92] As provided for by s.150 of the Insolvency Act.

[93] See paragraphs 45-53 of my Original Declaration. And see "Goode", *op cit*, at paragraph 13-74 and the attendant foot note 206.

[94] See paragraphs 146-148 of the Levy Declaration.

[95] See also "Goode", *op cit*, at paragraph 9-02.

Balance. In other words, although 3AC might have been able to seek payment from FTX (under the relevant contracts between FTX and 3AC) of an amount equal to the value of the assets reflected in its Digital Asset Balance, 3AC could not validly have asserted a proprietary claim to any specific Digital Assets. The Digital Asset Balance and the USD Balance each represent money claims or claims that legitimately have been reduced to money and therefore mutuality exists as between those claims.

66. It may assist if I were to add that I have been asked to assume that the prices of BTC and ETH (which I understand to be among the assets credited to the 3AC Accounts as at the end of the day on 12 June 2022) continued to decline from 12 June 2022 through 27 June 2022, the date of the application for the appointment of the Joint Liquidators. If that is correct, in the absence of what are said to be the relevant transactions 3AC would ultimately have incurred significant losses resulting in a reduced Digital Asset Balance and resulting in a reduced Account Balance. Such a state of affairs was avoided by virtue of the relevant transactions. Such circumstances, in my view, provide an obvious and plausible reason as to why the relevant transactions were entered into by 3AC and how they can be seen to have inured to its benefit rather than to the benefit of FTX.

   D.  The Transactions Did Not Result in an "Avoidance of Losses" for FTX

67. Paragraphs 156-160 of the Levy Declaration assert that FTX benefitted from the dealings that occurred on 13 and 14 June 2022 on the basis that FTX is said to have been obligated to make good losses suffered by other participants on the Exchange as a consequence of and to the extent that 3AC was unable to discharge its alleged liabilities to those other participants.[96] At paragraph 158 of the Levy Declaration it is stated that: "*If FTX (or affiliated entities) would have absorbed the losses that would otherwise have been borne by other Exchange customers as a result of the non-payment of 3AC's negative USD balance, as I understand FTX's CEO testified, then FTX benefitted from the transactions, to the extent of the losses it avoided incurring.*"[97] On this basis, as I understand it, it is alleged that other market participants, as creditors of 3AC, were the recipients of unfair preferences[98] and insofar as FTX received a benefit from the granting of those

---

[96] See paragraph 52 of the POC.
[97] See paragraph 158 of the Levy Declaration.
[98] Under s.245 of the Insolvency Act.

unfair preferences FTX (even though not a creditor of 3AC) could be made subject to an order by the BVI Court to account to the Joint Liquidators for the benefit it allegedly received.[99]

68.   I do not agree with this analysis:

a.   The factual and legal premise upon which Mr Levy's analysis is based is, I am given to understand, not correct in that FTX was not legally obligated to make good losses suffered by participants on the Exchange as a result of 3AC being unable to discharge its alleged liabilities to other participants on the Exchange. In this regard, I note that the analysis is premised on the assumption that "*If*" FTX had absorbed the losses of other customers of the exchange. In any event, no benefit, in that sense, can therefore have been received by FTX;

b.   Furthermore, in this regard Mr Levy points to no facts suggesting that FTX was legally obligated to make good losses suffered by other participants on the Exchange as a result of 3AC being unable to discharge any alleged liabilities to them. I understand this to be disputed by the parties;

c.   As part of his case theory, Mr Levy also relies on an assertion that there would be a stay imposed by BVI law in the event of a hypothetical liquidation,[100] but such a (hypothetical) stay only applies in relation to any action or steps to enforce rights over assets of the relevant company.[101] Any such stay would not therefore affect assets or property that were not assets or was not property of 3AC;

d.   It is asserted by Mr Levy (but does not form part of any claim as contained in the POC) that insofar as FTX voluntarily (without being under any obligation) decided to discharge 3AC's liabilities to other participants on the Exchange in order to maintain its reputation or avoid reputational damage, it received a benefit for which it may be made to account to the insolvent estate of 3AC. In my opinion, if such a scenario had transpired and assuming that any payments made by FTX were accepted by the other participants on the Exchange (without more) as discharging or reducing 3AC's liabilities to them, the important point to

---

[99] Pursuant to s.249 of the Insolvency Act.
[100] See paragraph 158 of the Levy Declaration.
[101] And I assume that Mr Levy is referring to the stay that would come into effect (albeit hypothetically) is that provided for by s.175(1)(c) of the Insolvency Act.

note is that the principal beneficiary would be 3AC by reason of the reduction in the number and value of the claims against its estate;[102]

e. As determined by the Courts in England, a Court would only exercise its discretion in granting relief against a third party under the equivalent of s.249 of the Insolvency Act if such an order were required as part of the process of restoring the position of the company to what it would otherwise have been and the relevant third-party was in possession of assets applied in making the unfair preference or, had otherwise personally benefited in monetary terms from the unfair preference in some direct and tangible way.[103]

f. Furthermore, and as recently illustrated, the Court has a wide discretion in this area and may, in appropriate cases and in the exercise of its discretion refuse to grant relief where to do so might be considered to be unjust and inequitable and not consistent with or not reflective of the power of the Court to grant restorative relief.[104]

69. Even assuming that the Joint Liquidators were successful in establishing that FTX, as a third-party, had received a benefit from alleged transactions such as those referred to above involving other participants on the Exchange, it would not automatically follow that there was a proper basis upon which a BVI Court might grant relief as against FTX given that FTX would have given value for any alleged benefit allegedly received. This is not least because FTX would arguably be entitled to rely upon the rebuttable presumption that any alleged benefit that it may have received would have been received by it in good faith. Only if that presumption was rebutted (by the Joint Liquidators) on the facts, would the Court be able to exercise its discretion to grant relief under s.249 of the Insolvency Act.[105] The presumption will be rebutted if (insofar as material to the present case) the Joint Liquidators can show that at the time of the relevant transaction FTX had

---

[102] As for the argument relating to whether FTX may have benefited from such payments by being able to maintain its reputation or by avoiding a loss of reputation, there is no authority for the proposition that such a benefit may form the basis for relief whereby a contribution ought to be made by the party who is said to have received such a benefit to the insolvent estate. Even assuming that the receipt of such a benefit is one to which s.249 of the Insolvency Act might respond, in my opinion, the granting of relief by a BVI Court against a person that receives such a benefit must be unlikely. In particular, by reference to s.249(2)(d) of the Insolvency Act, to which specific reference is made in foot note 71 of the Levy Declaration, I ask rhetorically - how might it be said that such a benefit could have been received "*from the company*". I should add that I was the trial counsel for the liquidators in the case of Byers v Chen referred in the Levy Declaration. For completeness, I would also refer to the recent decision of the BVI Court of Appeal in Byers v Chen [2025] ECSC J0620-3 (20 June 2025).

[103] See: Re Oxford Pharmaceuticals Ltd [2009] 2 BCLC 485 and cited with approval by the BVI Court of Appeal in Byers v Chen BVIHCVAP 2015/2011 (12 June 2018).

[104] See: Credit Suisse Virtuoso SICAV-SIF v SoftBank Group Corp, *supra*.

[105] See s.250 of the Insolvency Act.

notice that the transaction was an unfair preference (or a transaction at an undervalue as the case may be). On the information available to me and based upon the allegations contained in the POC, there is nothing to suggest that FTX had notice that 3AC had entered into transactions that constituted unfair preferences (or an undervalue transaction as appropriate).

E.  FTX Has an Ordinary Course of Business Defence

70.    Mr Levy and I disagree as to the approach a BVI Court would take in considering any defence raised by the FTX Recovery Trust that the transactions which the Joint Liquidators seek to impeach were entered into by 3AC in the ordinary course of 3AC's business. Mr Levy takes issue with my analysis on the grounds that 3AC's financial position as at the end of the day on 12 June 2022 meant that the, "*relevant transactions were a response to abnormal financial difficulties.*"[106] In my opinion, the law of the BVI does not wholly foreclose the ability of a party to rely on such a defence or that such a defence might not succeed in circumstances where transactions are being entered into at a time when a company faces abnormal financial difficulties. Where the transactions under challenge involve attempts by a company in financial difficulties to prevent or mitigate trading losses or insolvency, with a view to the survival of the company and its business, this might very well be viewed as a paradigm example of the type of circumstances in which such a defence can properly be deployed and would have a role to play.

71.    As made clear in my Original Declaration, and as noted in the opinion of the Privy Council in the Countrywide Banking case,[107] whether or not a transaction is considered to be in the ordinary course of a company's business requires examination of the actual transaction in its factual setting with the relevant circumstances having to be assessed in each individual case. The fact that a transaction may be regarded as exceptional or unprecedented in the circumstances does not preclude that transaction having been entered into in the ordinary course of that company's business.[108]

72.    For example, where a company trades in particular assets as part of its usual business, then in circumstances where those assets are rapidly declining in value, an attempt to jettison positions in those assets in order to minimise losses could well be considered to be transactions undertaken

---

[106] See paragraph 175 of the Levy Declaration.
[107] [1998] AC 338.
[108] See Koza Ltd v Akcil [2020] 1 All ER (Comm) 301.

34

in the ordinary course of that company's business even though the market conditions faced by the company are exceptional or unprecedented. Exceptional or unprecedented market conditions (without more) cannot, in my opinion, eliminate the applicability of the defence and its potential to be relied upon successfully.

73.   In adopting the position that he does, Mr Levy relies on the argument that the ordinary course of business defence is unavailable because the alleged transactions on 13 June 2022 and 14 June 2022 involved larger volumes and trade sizes, and occurred more quickly than previous transactions involving 3AC on the Exchange.[109] I have not reviewed or assessed what are said to be the relevant facts. I can observe, however, that while size and timing of transactions may be relevant considerations, so would the size and sophistication of 3AC and what might be considered within the industry to be reasonable and appropriate responses on the part of a company confronted with market conditions such as those faced by 3AC and a trading portfolio of the type of assets possessed by 3AC.

## IV.   NON-PREFERENCE BVI CLAIMS

74.   My conclusions remain the same as to the other, non-preference BVI Claims asserted in the POC and addressed in the Levy Declaration, namely that the Joint Liquidators could not make out any of these claims.

### A.   BVI Undervalue Transaction Claim

75.   I see no basis for changing my conclusion that the Joint Liquidators have not articulated a viable BVI Undervalue Transaction Claim.

####     i.     *Existence of an Undervalue Transaction*

76.   As in the case of unfair preferences, it is important to identify the mischief towards which statutory provisions such as those contained in s.246 of the Insolvency Act are directed.

77.   Whereas, the statutory ability of a liquidator to challenge transactions that constitute unfair preferences is aimed at preventing the circumvention of the *pari passu* principle, statutory provisions such as s.246 of the Insolvency Act are directed at impeaching transactions entered into prior to the liquidation and which have the effect of removing an asset of the company that

---

[109] See paragraphs 176-177 of the Levy Declaration.

would otherwise have been available for distribution to creditors, or transactions that serve to diminish the net asset value of a company. Provisions such as s.246 of the Insolvency Act may be considered to be conceptually more closely linked with avoiding contravention of the anti-deprivation rule.[110]

78. As such, this further indicates that the ability of a liquidators to set aside an undervalue transaction is concerned with whether assets in which a company has an interest have been removed or depleted and with the recovery of such assets or the restoration of the value of those assets to the company for the benefit of its creditors. It may further be observed that ordinarily a transaction that constitutes an unfair preference cannot also constitute an undervalue transaction. This may be illustrated by a simple example: where an insolvent company has used its money to pay a creditor in discharge of the debt owed to that creditor (in circumstances that, other things being equal, constitutes that payment as an unfair preference), that transaction cannot also be an undervalue transaction. This is because the company's debt has been discharged and the company has accordingly received full value for the payment made by it to its creditor. Undervalue transactions are concerned with circumstances in which an asset of a company has been the subject of a transaction where the company has received value that in money terms is significantly less than the value of the asset the subject of the transaction.

79. I agree with Mr Levy that the BVI Undervalue Claim could only succeed if a transaction is identified for which 3AC received "*no consideration*" or "*consideration which is significantly less in value than the consideration provided by 3AC.*"[111] Having reviewed the Levy Declaration, I still do not see any basis for the Joint Liquidators' assertion that such a transaction occurred here:

   a. Mr Levy articulates the transactions alleged to occur at an undervalue as involving "*52,000 alleged trades on 13 and 14 June 2022, in which digital assets associated with 3AC's accounts on the FTX Exchange were sold and the proceeds of such sales applied to reduce in absolute value terms 3AC's negative USD balance.*"[112] If 3AC received credits of an

---

[110] See "Goode", *op cit* at paragraph 13-03; and see: Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd, *supra*.
[111] See paragraph 184 of the Levy Declaration. See also the recent judgment in Credit Suisse Virtuoso SICAV SIF v Softbank Group Corp., *supra*.
[112] See paragraph 181 of the Levy Declaration.

equivalent value to the debits provided in such transactions, I do not see how they may be argued to have resulted in no or significantly less consideration being received by 3AC than was given by 3AC. This is particularly true for transactions that occurred at a fair market price; and

b.    To the extent that the basis for the undervalue transaction claim is that the proceeds of the sale of assets alleged to be owned by 3AC were applied to the repayment of fictitious or overstated alleged liabilities said to be owed by 3AC to FTX, I do not opine on the veracity of that factual premise (though it is inconsistent with what I have been asked to assume). However, as reflected in my Original Declaration,[113] insofar as the alleged undervalue transaction(s) involved or resulted in the *pro tanto* reduction in an alleged liability owed by 3AC to FTX, or owed by 3AC to one or more other users of the Exchange then (in my opinion) there cannot have been a transaction at an undervalue since 3AC would have received full value (by reason of the *pro tanto* diminution – or by reason of the discharge – of that alleged liability) as a consequence of the transaction.

80.    Furthermore, just as in relation to the BVI Preference Claims, my opinion remains that the Joint Liquidators cannot assert a BVI Undervalue Transaction Claim without identifying a transaction that involved or diminished the assets in which 3AC had a proprietary interest. I make reference to my discussion in the context of the BVI Preference Claims at Section III.B of this Rebuttal Declaration, and highlight the differences in the undervalue context below.

ii.    *Undervalue Transactions – statutory defence*

81.    As stated in my Original Declaration, on the information available to me and based upon the allegations contained in the POC, there is nothing to suggest that 3AC did anything other than deal with FTX in the belief (on reasonable grounds) that it would benefit from those dealings.

82.    To be clear, in making this statement I was not suggesting that the burden of proving the defence is not with FTX, nor was I suggesting that such a statement is sufficient to establish the statutory defence. Furthermore, in my opinion and on any fair reading of what I said, I cannot be taken to have intended anything of that sort.

---

[113] See paragraph 61 of my Original Declaration, and consequential upon the vagueness of the allegations contained in the POC.

83. I would, however, add the following facts as I understand (and have been asked to assume) them to what I said in my Original Declaration:

   a. 3AC initiated the vast majority of the challenged transactions (save those comprising the Liquidation);

   b. 3AC exited positions that were deteriorating in an attempt to establish more favourable positions in a more stable asset (i.e., USD);

   c. Had the relevant transactions not occurred, then the Account Balance for the 3AC Accounts would have deteriorated and been lower at the time of the initiation of 3AC's insolvency proceedings than it actually was in reality;

   d. Each of the challenged transactions involved the exchange of credits and debits of equivalent amounts / value;

   e. The challenged transactions occurred at a fair market price;

   f. There is nothing to support any of the suppositions made by Mr Levy, as I understand the nature of the allegations contained in the POC, that 3AC knew that any alleged liabilities were fictitious or were overstated (or that any alleged liabilities were in fact fictitious or overstated); and

   g. The circumvention of the objectives of the law of insolvency as referred to in paragraphs 189 of the Levy Declaration is not consistent with or indeed may be said to expose the flaw in any suggestion that s.246 of the Insolvency Act is not concerned with depriving its creditors of the benefit of assets owned by 3AC or in which it had an interest.

   B. BVI Turnover Claim

84. As stated in my Original Declaration, the fundamental point is that the basis for any claim of this nature is that the Joint Liquidators must establish that 3AC has a proprietary right to or interest in the relevant assets which they are seeking to recover. As stated in my Original Declaration, and for the reasons there stated, this they cannot do. [114]

---

[114] See paragraphs 80-81 of my Original Declaration, and paragraph 2025 of the Levy Declaration.

85.   I do not take Mr Levy to disagree with this analysis insofar as he suggests that to succeed in a turnover claim to recover the relevant assets from FTX it would have to be resolved in favour of the Joint Liquidators that 3AC had a proprietary interest in the relevant assets, that those assets were still identifiable (in their original form or in some other form), remain in the possession of FTX, and are capable of being restored to 3AC.[115] However, as stated in my Original Declaration and for the reasons there stated, I understand that the Joint Liquidators will not be able to establish any of the foregoing.[116]

86.   Mr Levy does appear to recognise that in England, recourse to the equivalent provision in the Insolvency Act 1986 is not appropriate for determining complex issues as to entitlements to property.[117] We agree on this much. Moreover, and as I sought to make clear in my Original Declaration, the present case is such a complex case.

C.   BVI Proprietary Restitutionary Claim

87.   It would seem, although it is not entirely clear, that the Joint Liquidators have abandoned this claim and are relying on an assertion that the relevant Digital Assets were held on trust by FTX for the benefit of 3AC (and are therefore relying upon an alleged beneficial interest in the relevant assets persisting in favour of 3AC, rather than relying upon a cause of action that is inconsistent with a persisting beneficial interest in favour of 3AC) to enforce a subsisting legal title in the relevant assets.[118]

88.   Nothing in the Levy Declaration[119] has caused me to alter my conclusion, as expressed in my Original Declaration, or the reasons for that conclusion:[120]

a.   As I stated in my Original Declaration, my understanding is that: (i) the Joint Liquidators cannot establish that 3AC had any proprietary interest in the relevant assets as credited to 3AC's Account Balance as of the end of 12 June 2022 (or anytime thereafter); and (ii) there

---

[115] See paragraph 198 of the Levy Declaration.
[116] See paragraphs 80-81 of my Original Declaration.
[117] See paragraph 196 of the Levy Declaration.
[118] See paragraph 205 of the Levy Declaration.
[119] See paragraphs 200-210 of the Levy Declaration.
[120] See paragraphs 84-92 of my Original Declaration.

is no ability to follow or trace any of the relevant assets that do form or did form part of the 3AC Account Balance as of 12 June 2022 (or anytime thereafter);[121]

b. I further understand the relevant assets were deposited on the Exchange and into 3AC's accounts by 3AC on the terms that were freely entered into as between 3AC and FTX. It cannot legitimately be alleged that the deposit of the relevant assets by 3AC on the terms agreed by 3AC and FTX and the standard operation of the Exchange in relation to the relevant assets that were deposited with the Exchange and that occurred in accordance with those terms was in any way unconscionable or unjustified.[122]

89. I would add:

a. The asserted premise for the BVI Proprietary Restitutionary Claim would appear to be the overstatement of alleged liabilities owed by 3AC and a consequent overpayment to FTX. As noted above, the FTX Recovery Trust takes the position that the amount of the negative USD Balance as at the end of 12 June 2022 was not overstated (and, indeed, that it was not a separate liability but rather one component part of the Account Balance); and

b. As regards the matter raised in paragraph 207 of the Levy Declaration, I have sought to deal with this above. As stated above, the Joint Liquidators may seek to assert a claim for breach of contract, the quantification of the damages in respect of which may be based upon the value of the assets which FTX is alleged in breach of contract to have failed to deliver. But any such claim is not a claim based upon a continuing proprietary interest of whatever nature in the assets said to be relevant to such a claim.

90. Mr Levy notes that he is, "*not aware of any decision of the BVI courts which considers such a proprietary restitutionary claim*"[123] Nor am I. Put simply, in my opinion, the Joint Liquidators have not articulated a viable proprietary restitutionary claim and any such claim would fail before the BVI Courts.[124]

---

[121] See paragraphs 13(q)-13(r) of my Original Declaration.
[122] See paragraph 206 of the Levy Declaration.
[123] See paragraph 204 of the Levy Declaration.
[124] See paragraph 88 of my Original Declaration.

D.  BVI Unjust Enrichment Claim

91.   There is nothing contained in the Levy Declaration[125] which causes me to change the view I expressed in my Original Declaration that there is no basis for a claim against the FTX Recovery Trust founded upon the principle of unjust enrichment.

92.   Further, it seems that this claim is also based upon an alleged overstatement of alleged liabilities owed by 3AC to FTX and an alleged consequent over-payment of what are said to be relevant liabilities owed by 3AC to FTX and/or an alleged failure by FTX to give full credit for the value of the relevant assets in respect of any payment of alleged liabilities owed by 3AC. I understand that these alleged factual premises are not accepted by the FTX Recovery Trust. As already noted above, the FTX Recovery Trust takes the position that the amount of the negative USD Balance as at the end of 12 June 2022 was not overstated (and that the USD Balance was not a separate liability from the Account Balance, which was positive), and that the transactions that occurred on 13 June and 14 June 2022 were conducted at full market value.

93.   In any event, as stated in my Original Declaration, the general rule is that a remedy in unjust enrichment is not available where there exists a relevant contract as between the relevant parties which determines the rights and obligations of the parties to that contract and that contract has not been terminated.[126] Save in respect of the disputed factual premises addressed in the paragraph above (all of which the Joint Liquidators would have the burden of proving), Mr Levy has not otherwise explained why the circumstances of the present case are such as to cause the general rule to not be applicable.

94.   Finally, I maintain my position that a defence of change of position may be available to FTX on the basis that it has not retained the relevant assets the receipt of which it is said caused its alleged enrichment. I went no further than that, nor could I since the availability of such a defence is heavily dependent upon the facts - in particular the manner in which and the reasons for which there may be said to have been a change in the position of the party said to have been enriched unjustly. [127]

---

[125] See paragraphs 211-218 of the Levy Declaration.
[126] See paragraph 96 of my Original Declaration.
[127] See paragraph 97 of my Original Declaration.

41

E.  BVI Conversion Claim

95.    As the common law of the BVI (and England and Wales) presently stands, the BVI Conversion
Claim (as rehearsed in the POC) is not available to the Joint Liquidators since the assets alleged
to be the subject of this claim constitute intangible property and the tort of conversion does not
permit claims or remedies in relation to such assets. As I read the relevant parts of the Levy
Declaration, he acknowledges that this represents the current state of the law in the BVI.[128] He
further states that he is, "*not aware of any decision of the BVI courts which considers the
application of the tort of conversion to digital assets (or to intangible property more
generally)*."[129] Neither am I.

96.    In my Original Declaration, I further observed (among other things) that no viable BVI
Conversion Claim appeared to have been advanced in the POC because FTX took possession of
the relevant assets upon a voluntary and consensual delivery and because 3AC had no proprietary
interest in the relevant assets.[130] Mr Levy raises two potential theories for what he refers to as a
"*tort-based claim analogous to conversion*".[131] Mr Levy further states that the relevant remedy
would be damages calculated on the basis that, "*redelivery of* [the relevant assets are] *themselves
no longer appears to be possible*".[132] However, it may be more apt to characterise the claims he
then describes as being additional or alternative claims for alleged breaches of contract.[133] In any
event, the claims rehearsed take matters no further given that they are premised on 3AC having
proprietary rights to the relevant assets, or are based upon the assertion that there was an
overstatement of the alleged liabilities owed by 3AC to FTX and an alleged consequent
overpayment to FTX, or an alleged failure by FTX to give full credit for the value of the relevant
assets in respect of any alleged payment of alleged liabilities owed by 3AC to FTX.[134]

---

[128] See paragraph 220 of the Levy Declaration.
[129] See paragraph 222 of the Levy Declaration.
[130] See paragraph 100 of my Original Declaration.
[131] See paragraph 223 of the Levy Declaration.
[132] See paragraph 224 of the Levy Declaration.
[133] See paragraph 223 of the Levy Declaration.  At paragraph 223.b. of the Levy Declaration, the claim is described in the
following terms: "*the Liquidation could in my view be said to amount to a conversion of 3AC's digital assets (or contractual
entitlements to such assets)*". That part of the description of the alleged claim that appears in parenthesis is nothing more than a
re-articulation of the new claim proffered the Levy Declaration on which I have already stated my views above.
[134] See paragraphs 223-225 of the Levy Declaration.

97. What is more, Mr Levy appears to be doubtful of the efficacy of the cause of action he attempts to articulate, which in my opinion, is telling.

98. The BVI Conversion Claim (as contained in the POC) is not justiciable under the laws of the BVI. In addition, for my part and in my opinion, the causes of action sought to be advanced in the Levy Declaration and said to be founded upon the tort of conversion have no prospect of success.

## V.    ALTERNATIVE SCENARIO IF FTX IS ASSUMED TO HAVE A SECURITY INTEREST

99. I understand that the FTX Recovery Trust and the Joint Liquidators dispute whether, in the assumed scenario in which a Court determines that 3AC had a proprietary interest in the relevant assets (and not FTX, as I am instructed to assume), FTX would have had a security interest that precludes the BVI Preference Claim and the other BVI claims.

100. I understand that the issue of which party has a proprietary interest in the relevant assets is a question that will be addressed by Lord Neuberger, and indeed that he has already addressed this issue, including in submitting evidence considered by this Court.

101. I also understand that the issue of whether the March 2022 Line of Credit Agreement, which is governed by the laws of Antigua and Barbuda ("*Antigua*") created a security interest in favour of FTX, in the event that the proprietary interest question is assumed to be resolved in 3AC's favour, will be addressed in a rebuttal declaration by Stephen Houseman, KC (the "*Houseman Declaration*"). I am further instructed that the Houseman Declaration has been prepared strictly as an alternative case and without prejudice to the FTX Recovery Trust's positions in this matter.

102. The Houseman Declaration concludes that in the event that a Court were to find that the Assets were the property of 3AC and not of FTX, that the March 2022 Line of Credit Agreement created: (i) a possessory security interest (i.e., a pledge or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant assets; and (ii) a non-possessory security interest (by way of a fixed charge security interest, alternatively a floating charge security interest) over those assets.

103. Whilst I express no view as to Antiguan law, in the event that the Court found that a non-possessory security interest, being a fixed charge or alternatively a floating charge, was created over the assets that are the subject of the BVI Claims, then there is a question as to what (if any)

steps would be required to perfect that security under BVI law (which is the relevant law as 3AC is a company incorporated in the BVI).

104. Having considered Section 161, 163 and 166 of the BVI Business Companies Act 2004 (as revised), the effect of these provisions for current purposes is that, provided the charge is valid and binding in accordance with the laws of Antigua, it would be deemed a valid security interest under BVI law.

105. Whilst there is a security registration system in the BVI, registration in the BVI is voluntary and is not required to perfect a security interest or to render it enforceable. As a result, no further steps would be required to perfect the security under the law of the BVI, and whether registration of such security interest has occurred merely goes to the question of priority as between security interests created by the company in question and not the validity or enforceability of any relevant security interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Liverpool on 3 November 2025

_____

Stephen Atherton K.C.