**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**REBUTTAL DECLARATION OF THE RT. HON. LORD NEUBERGER OF ABBOTSBURY**

---

[1]       The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**Table of Contents**

I.    INTRODUCTION ................................................................................................................ 1

II.   PRINCIPLES OF CONTRACTUAL INTERPRETATION ........................................... 2

III.  CLAUSE 8.2.6 AND THE EXISTENCE OF A TRUST ................................................ 6

IV.   QUASI-BAILMENT ........................................................................................................ 18

V.    SINGLE ASSET THEORY ............................................................................................. 24

VI.   THE REMAINING QUESTIONS .................................................................................. 29

I, Lord Neuberger of Abbotsbury, hereby make this rebuttal declaration ("**Rebuttal**") under penalty of perjury pursuant to § 1746 and state as follows:

**INTRODUCTION**

1. I have had the opportunity to consider the Declaration of the Right Honourable Dame Elizabeth Gloster ("**Dame Elizabeth's Declaration**") in support of the Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital Ltd (in liquidation) ("**3AC**"). Dame Elizabeth's Declaration covers a wider range of questions than I was asked to address in my First and Second Declarations. But, as she recognises at [16] of her Declaration, the "*precise nature of 3AC's interest in digital assets notionally associated with 3AC's 'Account' or Accounts ... on the Exchange is central to the questions that [she has] been asked to address*". I agree.

2. My focus in this Rebuttal, therefore, is on the precise nature of any interest it might be alleged that 3AC has in the Digital Assets notionally associated with the 3AC Accounts on the FTX Exchange. There are two main bases upon which Dame Elizabeth suggests that 3AC might assert an interest over the Digital Assets:

   a. First, Dame Elizabeth suggests on the basis of section 8.2.6 of the Dotcom Terms that FTX is a trustee for 3AC, holding the legal title to Digital Assets on 3AC's behalf while 3AC retains equitable title to those assets. This is on the basis that references to "title" and "ownership" in section 8.2.6 refer only to equitable title to Digital Assets;

   b. Secondly, and in the alternative, Dame Elizabeth states that section 8.2.6 has the effect of creating a quasi-bailment arrangement, such that 3AC had the necessary degree of control to obtain legal title over any Digital Assets acquired on the FTX Exchange.

   On the first basis, 3AC would have an equitable interest in the Digital Assets, whereas on the latter basis, 3AC would have a legal interest in the Digital Assets.

3.  I respectfully disagree with Dame Elizabeth in relation to both those alleged bases. However, there is much we agree about, and I shall try and concentrate on areas of disagreement.

4.  This Rebuttal deals with the following topics:

    a.  The English Law principles of contractual interpretation;

    b.  The question of whether section 8.2.6 created a trust (with FTX as legal owner and 3AC as beneficial owner) over the Digital Assets.

    c.  The question of quasi-bailment, and in particular whether there is the requisite control over Digital Assets purchased by 3AC;

    d.  What Dame Elizabeth describes as "*Question 3*", namely whether 3AC's rights and obligations *vis-à-vis* FTX may properly be reflected as "*a single net figure*"; and

    e.  The remaining questions canvassed in Dame Elizabeth's Declaration.

## PRINCIPLES OF CONTRACTUAL INTERPRETATION

5.  The difference between my summary of the relevant principles and those set out by Dame Elizabeth is one of emphasis and degree, but in the present context it seems to me that it may be significant.

6.  First, I do not consider that her summary of the law sufficiently reflects the weight that is placed on the ordinary meaning of the words which the parties elected to use. In <u>Arnold v Britton</u> [2015] AC 1619, the Supreme Court underscored the centrality of the wording the parties chose to use in the following strong terms at [17]-[20] (emphasis added):

"17 *First, the reliance placed in some cases on commercial common sense and surrounding circumstances … **should not be invoked to undervalue the importance of the language of the provision which is to be construed**. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, **save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision**. [...]*

*18 Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. … **However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the***

> ***natural meaning.*** *If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.*
>
> *19 The third point … Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. […]*
>
> *20 Fourthly,* ***while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed****, even ignoring the benefit of wisdom of hindsight.* ***The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed.*** *… [I]t is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly,* ***when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party****.*"

7. Secondly, Dame Elizabeth makes the point (at paragraph [43(e)]) that the extent to which textualism and contextualism "*will assist the court in its task will vary according to the circumstances of the particular agreement or agreements*". This is a word-for-word extract from [13] of <u>Wood v Capita Insurance Services Ltd</u> [2017] AC 1173, and the words should be seen in their context. The paragraph is in these terms (emphasis added):

> "*Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements.* ***Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance.*** *But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance JSC spoke in Sigma Finance Corpn [2010] 1 All ER 571 , para 12, assists the lawyer or judge to ascertain the objective meaning of disputed provisions.*"

8. Thirdly, where the contract in question is one which is in a "standard form", i.e. one which various counterparties seeking to use particular services sign up to (rather than individually negotiating terms), the weight to be placed on factual matrix and background knowledge

is very constrained. As Lord Collins (with whom Lords Mance and Hope agreed) observed at [36]-[37] of <u>Re Sigma Finance</u> [2010] 1 All ER 571 (emphasis added):

> "*36 Sigma financed its investments over a 13-year period by debt securities issued or guaranteed by it. It entered into liquidity facilities intended to hedge against market liquidity risks. It entered into financial instruments intended to hedge against currency and interest rate risk. Others provided liquidity facilities, or entered into financial hedging instruments. The security trust deed **secures a variety of creditors, who hold different instruments, issued at different times, and in different circumstances**.*
> *37 **Consequently this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way.** I do not consider, therefore, that there is much assistance to be derived from the principles of interpretation restated by Lord Hoffmann in the familiar passage in Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 W.L.R. 896, 912–913. **Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount** …*"

The Dotcom Terms are, as I understand it, the terms which govern the relationship between FTX and, to quote from <u>Sigma</u>, "*a variety of creditors, who hold different instruments, issued at different times, and in different circumstances*".

9. Fourthly, I believe that Dame Elizabeth (at [46]) makes too much of the 'rule against surplusage'. While I agree that the court does lean against surplusage, it is generally regarded as little more than a makeweight point, especially in the case of a standard form. In this connection:

   a. In <u>Total Transport Corporation v Arcadia Petroleum Ltd</u> [1998] CLC 90, Staughton LJ (with whom Auld LJ and Sir John Balcombe agreed) observed at 97 that "*It is well-established law that the presumption against surplusage is of little value in the interpretation of commercial contracts*".

   b. I made similar observations (with which Lords Mance, Sumption, Carnwath and Toulson agreed) in the Privy Council decision of <u>Antigua Power Company Limited v Attorney-General of Antigua and Barbuda</u> [2013] UKPC 23 at [38], that "*on issues of interpretation, arguments based on surplusage are rarely of much force*".

   c. In <u>Re Lehman Brothers International (Europe) (No. 4)</u> [2018] AC 465, I observed in the Supreme Court at [67] that "*… the fact that an expression in a sentence, especially in a very full document, does not, on analysis, have much, if any, effect*

*if it is given its natural meaning is not, at least on its own, a very attractive or a very convincing reason for giving it an unnatural meaning*" and "*if one has to choose between giving a phrase little meaning or an unnatural meaning, then, in the absence of a good reason to the contrary, the former option appears to me to be preferable*".

d.   Even in a situation where the rule against surplusage is given *some* weight, an argument based on surplusage "*cannot justify the attribution of a meaning [to a clause] that the contract, interpreted as a whole, cannot bear*": *Lewison* at [7.35], approved by the Court of Appeal at [39] of <u>Merthyr (South Wales) Limited v Merthyr Tydfil County Borough Council</u> [2019] EWCA Civ 526.

e.   In this case, bearing in mind that the Dotcom Terms are a standard form, surplusage is an especially suspect guide, as "*the presumption against surplusage is unlikely to be useful in interpreting a standard form of contract (see <u>Beaufort Developments (NI) Ltd v Gilbert Ash (NI) Ltd</u> [1999] 1 AC 266)*", as was said in <u>Secretary of State for Defence v Turner Estate Solutions Ltd</u> [2015] EWHC 1150 (TCC) at [62]; *Lewison* at [7.32].

10.   Fifthly, the presumption that a contract does not require performance of the impossible, considered by Dame Elizabeth at [45], is not a particularly strong presumption. In the relatively recent decision of <u>Cuckow v AXA Insurance UK plc</u> [2023] EWHC 701 (KB) at [119], Ritchie J set out his understanding of the principle in <u>The Epaphus</u> in the following terms (emphasis added):

"*I take from this case that the Courts will **try** to avoid construing a contract as requiring one party to perform the impossible, **but where the words are clear the construction will match the words**.*"

11.   Sixthly, Dame Elizabeth suggests at [47] that the contracting parties may be taken to know the general law, and can be assumed to know "*clear and well-known legal principles affecting or incidental to the contractual engagement in question*". I agree, but, as was said in <u>Triple Point Technology Inc v PTT Public Co Ltd</u> [2021] AC 1148 at [35], that assumed knowledge relates to "*the general law*", and does not extend to specialist areas of law, such

as the intricacies of the law of trusts or the laws of bailment, let alone to the law relating to an entirely new class of assets.

12. Seventhly, and in addition to the principles set out by Dame Elizabeth, clear words are necessary in order to create property rights. In particular, a trust will only be found to exist if there is a sufficiently certain intention to create a trust. The test was put this way in the English Court of Appeal: "*Although an intention to create a trust does not require the use of the word trust or similar language, there must be, as Scarman LJ said …[²], 'a clear declaration of trust and that means there must be clear evidence from what is said or done of an intention to create a trust… '*".[3]

## CLAUSE 8.2.6 AND THE EXISTENCE OF A TRUST

13. Dame Elizabeth's conclusion is that the effect of section 8.2.6 is to vest legal title over 3AC's Digital Assets in FTX (or assumes that legal title is vested in FTX) and that equitable ownership is vested in 3AC. She bases this conclusion on a number of factors, which she discusses in paragraphs [50]-[76] and [87]-[90] of her Declaration.

14. In my view, this conclusion is incorrect for a combination of powerful reasons, which I would summarise as follows:

   a. It is contrary to the plain words of section 8.2.6(A) which makes it clear not merely that ownership rests with 3AC, but also that it does not rest with FTX: "*Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading*". As Dame Elizabeth fairly says in [55], section 8.2.6 "*would probably most naturally be read as a reference to legal and equitable title*". I regard that as an understatement: an unqualified reference to "title" naturally means legal title.

   b. The point is reinforced by section 8.2.6(B), which provides that "*None of the Digital Assets in your Account are the property of … FTX Trading*"; on Dame Elizabeth's view, 3AC's Digital Assets are the legal property of FTX Trading: her

---

[2]    Paul v Constance [1977] 1 WLR 527 at 531.

[3]    Wilkinson v North [2018] 4 WLR 41, per David Richards LJ at [48].

reading involves giving a very unnatural meaning to this very simple and apparently unambiguous provision as well.

c.  On Dame Elizabeth's reading, nothing is said about the legal title to 3AC's Digital Assets, which is rather strange. It seems very unlikely that the parties would have taken the trouble to spell out (in unclear terms) their equitable ownership, and fail to refer to their legal ownership. The better reading is that nothing need be said about the equitable title unless and until it is divorced from the legal title (as it does not in practice exist until then).

d.  Given that it must be clear that a trust was intended before the court will conclude that there is indeed a trust, these points are particularly telling.

e.  It is not right to give a provision in a contract an unnatural meaning if it conflicts with the plain intentions of the parties – especially when that intention is expressed in the contract. The notion that legal title is vested in FTX while equitable title is vested in 3AC, such that the Digital Assets are held by FTX on trust for 3AC, is flatly contrary to the plain intention of the parties as revealed in a number of provisions of the Dotcom Terms which make it clear that any intention to create a trustee-beneficiary relationship is firmly rejected – see especially sections 2.1.3, 2.2.2,  and 38.6, and also sections 2.10, 8.2.6, and 9.2.

f.  In a case on which Dame Elizabeth relies, namely in [54] of <u>LBIE</u> (see below at [19]), Briggs J said that "*the presence or absence of an obligation on B (the recipient) to keep the property separate from its own property is a powerful indicator of the presence or absence of a relationship of trustee and beneficiary between B and A*"). No such obligation appears to exist in the Dotcom Terms.

g.  Dame Elizabeth relies on certain factors, namely the so-called rule against surplusage ([56(a)], the factual matrix ([56(b)]), the presumption against impossibility ([56(c)]), and commercial sense ([56(d)]). None of these factors justify giving a meaning to a provision which it does not bear and which is inconsistent with express provisions. Further none of these factors is particularly strong, especially in the context of a standard form agreement relating to technical,

novel arrangements whose workings will not be widely known, and where the law can fairly be described as being abstruse.

h.   Although not necessary for my conclusion, it seems to me that the whole foundation for Dame Elizabeth justifying a departure from the natural meaning of section 8.2.6 is questionable in that the clause does have some meaning if it applies to legal and equitable title, albeit I accept that it is a limited meaning: see in particular paragraphs [21.a.iii] and [26] below.

i.   Quite apart from all the above eight points, I find it hard to see how it can be said that there is the requisite certainty of subject matter for a trust to arise. Insofar as reference can be had to the relevant factual matrix (which is the approach Dame Elizabeth has adopted), the reality of the FTX Exchange, as I understand it, is that it would be an extraordinarily difficult, if not impossible, task for any customer to have identified the actual Digital Assets that Dame Elizabeth argues they had a proprietary interest over. An English court would not ignore such practicalities.

15. What follows in this section of my Rebuttal is a development of the points summarised in the preceding paragraph.

16. Given Dame Elizabeth's reliance on the provision, I start by quoting section 8.2.6:

"*All Digital Assets are held in your Account on the following basis:*
(A) *Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.*

(B) *None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.*

(C) *You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.*"

17. A very strained interpretation of paragraphs (A) and (B) is necessary on the approach taken by Dame Elizabeth. I appreciate that analogies can be dangerous, but to use a simple example, if I were offering to sell "*Title*" to my house such that the purchaser became

"*owner*" of the house and the house became the "*property*" of the purchaser, the purchaser would be unlikely to be satisfied if I then transferred an equitable title.

18. As discussed in the authorities cited at [6]-[12] above, displacing the natural and ordinary meaning of a clause in a contract is not an easy exercise – and that is especially so when the words concerned appear clear, where the contract was professionally drafted, where the contract is a standard form, and where the alternative reading is flatly contrary to the parties' expressed intentions.

19. I do not agree that Dame Elizabeth's view is supported, as she suggests at paragraph 43(d), by what Briggs J said in <u>LBIE v RAB Market Cycles (Master) Fund Limited</u> [2009] EWHC 2545 (Ch) at [53]. First, so far as general principle is concerned, he said that "*the labels used may not be decisive ..., but the language used may be a compelling guide*", which is the normal approach to contractual interpretation. Secondly, he held that the parties in that case had "*used the clearest language to display their intention that securities held by the Prime Broker for the time being continue to belong beneficially to the Counterparty, subject of course to the charge in favour of the Prime Broker*", and it cannot possibly be said that the parties have used "*the clearest language*" to achieve the result which Dame Elizabeth favours. Thirdly, as the passage just quoted shows, Briggs J was not considering only the phrases "*belong to the Counterparty*" and "*do not belong to the Prime Broker*" (which Dame Elizabeth refers to). He was also considering the way in which the relevant provision also described the Prime Broker as the "*custodian*" who held "*custody*" of the securities in question – which are phrases Briggs J specifically identified as being important, but which Dame Elizabeth does not refer to in her treatment of this case. It was on the basis of those phrases (i.e. "*custodian*" and "*custody*") as well that Briggs J concluded that the securities were held by the Prime Broker on trust for the Counterparty.

20. Dame Elizabeth raises four arguments at [56] for rejecting the natural and ordinary meaning, and adopting her preferred meaning, of section 8.2.6:

    a. The rule against surplusage, that "*where multiple interpretations are available, one of which gives content to a term and others which do not, the Court will, if possible,*

*adopt the interpretation that gives the term content, rather than rejecting the provision altogether*": at [56(a)].

b.  The factual matrix, that "*3AC's act of depositing digital assets with FTX for use on the Exchange involved a transfer of control from 3AC to FTX*", and further that "*3AC's digital assets would ultimately be pooled with the digital assets of other customers and held in unsegregated hot wallets such that a withdrawal of digital assets by 3AC would not necessarily (or even likely) lead to the same digital assets being returned*": at [56(b)].

c.  The presumption against impossibility, that it would be "*impossible*" for 3AC to "*h[o]ld the legal title to the digital assets associated with 3AC's customer Account*", and that "*unless and until 3AC took steps to withdraw [assets credited to 3AC's Account], there would never actually be an act of transfer to 3AC, and thus there would be no means by which legal title could transfer to 3AC*": at [56(c)].

d.  The meaning put forward "*makes commercial sense, not least because [the] splitting of legal and equitable interests is achievable as a matter of law*": at [56(d)].

21. I respectfully disagree with the weight which Dame Elizabeth gives to those four arguments:

a.  The Rule Against Surplusage:

    i.  The rule against surplusage carries little weight in the interpretation of commercial contracts. This is *a fortiori* the case where (1) giving effect to a clause which would otherwise be surplusage would offend against the natural meaning of the clause, and (2) one is interpreting a standard form of contract (see[8] and [9] above).

    ii. In any event, even if it wishes to avoid surplusage, the Court will not adopt an interpretation which gives the clause an effect which would be inconsistent with, or would "*pu[t] a red line*" through, another clause, let alone other clauses, in the contract: <u>Costain Ltd v Tarmac Holdings Ltd</u>

[2017] 1 Lloyd's Rep 331 at [43]. As discussed in more detail at [22] below, Dame Elizabeth's reading of section 8.2.6 is inconsistent with a number of other contractual provisions.

iii. In any event, section 8.2.6 is, in my view, not mere surplusage if, as it naturally means, it provides that legal title to 3AC's Digital Assets rests with 3AC, at least at the point that they are deposited, and it then leaves it to the courts to work out the consequences of the dealings with those assets thereafter.

b. Factual Matrix:

i. Dame Elizabeth says at [36] that she has been instructed to "*assume the following facts*" in relation to factual matrix, and I cannot, of course, express a view on the correctness of those assumed facts. All I would say is that if the assumptions are misplaced to any significant extent, that obviously may undermine her analysis and conclusion, even if (contrary to my view) it would otherwise be correct.

ii. In any event, however, and as set out above at [8], the factual matrix is not relevant in a case concerning a contract like the Dotcom Terms "*except in the most generalised way*".

iii. Insofar as the factual matrix is relevant, Dame Elizabeth's own characterisation of the factual matrix, entailing that customer's assets "*were not permanently stored in the segregated wallets*" and were "*transferred to pooled 'hot wallets' owned and controlled by FTX*", would itself be inconsistent with a trustee-beneficiary relationship – see paragraph [14.f] above.

c. Impossibility:

i. The argument that it is "*impossible*" for 3AC to hold the legal title to the digital assets associated with the 3AC Accounts is difficult to reconcile with 3AC's case on quasi-bailment as developed by Dame Elizabeth (see e.g. at

[84] of her Declaration where she suggests that a digital asset acquired by 3AC "*would be treated, as between FTX and 3AC, as 3AC's asset*").

    ii.  In so far as the argument raises questions of fact, they are not for me to address.

    iii.  In any event, impossibility would not warrant a construction which is contrary to the natural and ordinary meaning: see [10] above. It is not as if this is a type of impossibility which would mean that the contract as a whole could not work: it would, even taken at its very highest, merely mean that there was a piece of contractual machinery (out of many in the contract) which may not be able to operate as intended.

  d.  Commercial Sense

    i.  At [56(d)], Dame Elizabeth says that interpreting section 8.2.6 as applying solely to equitable ownership and title gives the clause "*a meaning that makes commercial sense, not least because th[e] splitting of legal and equitable interests is achievable as a matter of law*". With respect, all that is saying is that her interpretation is conceptually possible, which I suggest takes matters no further.

    ii.  I find it hard to see how the interpretation put forward in Dame Elizabeth's Declaration "*is a meaning that is consistent with the factual matrix ... and [is] a meaning that makes commercial sense*" (at [56(d)]), particularly in the light of the other provisions of the Dotcom Terms.

22. I now turn to the other provisions of the Dotcom Terms, I have addressed sections 2.1.3, 2.2.2, 2.10, 8.2.6, 9.2, and 38.6 at [45] of my First Declaration. Dame Elizabeth has sought to address these provisions at [63]-[69] of her Declaration. I disagree with Dame Elizabeth's treatment of these provisions:

Section 2.1.3

  a.  Section 2.1.3 states in terms that "*FTX Trading is not your broker, intermediary, agent, or advisor and has **no fiduciary relationship or obligation to you in***

*connection with <u>any trades or other decisions or activities</u> effected by you using the Services*" (emphasis added).

b.  Dame Elizabeth suggests that "*Clause 2 as a whole is not concerned with the general relationship between the parties but is concerned with trading and risk*", and that section 2.1.3 accordingly disclaims a fiduciary relationship to protect FTX "*against liability for trading and transactional decisions made by 3AC using the Exchange*".

c.  I cannot agree. Section 2.1.3 refers specifically to "*trades **or** other decisions **or** activities*" (emphasis added), and not, as Dame Elizabeth states, "*trading **and** transactional decisions*" (emphasis added). Such unqualified references to "decisions" and "activities" plainly extend beyond mere trading, and to the holding of assets.

d.  The term "*Services*" in section 2.1.3 is also specifically defined in the Dotcom Terms as referring to the User's use of "*(A) the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the "Platform"), as a User to buy, sell, exchange, **hold**, stake, lend borrow, send, receive or otherwise transact in **or list** Digital Assets; (B) the FTX Application Programming Interface; and (C) **any other services offered through the FTX website or any Mobile Application**"* (emphasis added). The emphasised terms make clear that section 2.1.3 applies not only to "*trading and transactional decisions*", but even to purely passive acts like "*hold[ing]*" Digital Assets.

e.  The expansive approach to disclaiming a fiduciary relationship is further apparent from the use in section 2.1.3 of the phrase "*in connection with*", which connotes a wide connecting link: <u>Celestial Aviation Services Limited v Unicredit Bank GmbH</u> [2024] 2 All ER (Comm) 966 at [55]. Thus, even if Dame Elizabeth is correct that section 2.1.3 only concerns a customer's "*trading and transactional decisions*", I do not see how that assists her position given that I understand that there is a direct factual connection between holding assets and such decisions.

-13-

Section 2.2.2

f.   Section 2.2.2 provides that "... *We provide no warranty as to the suitability of the Digital Assets traded under the Terms and* **assume no fiduciary duty to you in connection with such use of the Services**" (emphasis added).

g.   Dame Elizabeth asserts at [69(b)] that section 2.2.2 extends only to excluding liability "*presumably as an advisor, of any fiduciary duty*", and that it is "*separate from the question of the relationship between FTX and the customer when it comes to custody or ownership of customer assets*", which is dealt with in section 8.

h.   Again, I disagree. Section 2.2.2 specifically refers to "*Services*" (as defined), which, as explained in sub-paragraph [d]. above, clearly extends to the holding of Digital Assets. I agree that section 2.2.2 refers in particular to a fiduciary duty "*in connection with such use [i.e. the trading of Digital Assets under the Terms] of the Services*", but, as mentioned in [d]. above, the phrase "*in connection with*" is a broad term which captures purely *factual* connection. Thus, insofar as holding the Digital Assets is *factually* connected to trading, that would be "*in connection with*" use for trading, and the exclusion of fiduciary duty in section 2.2.2 would apply.

Section 2.10

i.   Section 2.10 provides that "*Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection*". As mentioned at [45.3] of my First Declaration, this provision suggests that the parties contemplated the risk of loss on insolvency, such that public or private deposit insurance might otherwise apply to prevent or mitigate the loss. However, if FTX did in fact hold the Digital Assets on trust for 3AC, there would be no risk of loss on insolvency; the Digital Assets would be ring-fenced and excluded from FTX's general pool of assets. While (like section 9.2) this is not as strong a point as sections 2.1.3, 2.2.10 and 38.6, this line of argument is not addressed by Dame Elizabeth at all.

Section 9.2

j.   Section 9.2 provides that if FTX is "*holding*" property and is unable to contact the customer, then "*your Account may be transferred to FTX Trading, or an Affiliate*

*of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf*". This clause shows that the parties knew how to create a trustee-beneficiary relationship in clear terms, and contrasts with the wording used in section 8.2.6. I accept that that is less telling than my reliance on sections 2.2.2, 2.10, and 37.6, but it is of obvious, if limited, relevance.

k.  Dame Elizabeth is rather dismissive of section 9.2 for reasons (in [65]) which appear to me to be inconsistent with the importance she attaches to surplusage and impossibility – e.g. her reliance on drafting inconsistencies to explain away section 9.2 while not referring to such matters when relying on surplusage.

Section 38.6

l.  Section 38.6 provides that "*Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, **fiduciary relationship** or other cooperative entity between the parties for any purpose whatsoever ... Each party confirms it is **acting on its own behalf and not for the benefit of any other person**"* (emphasis added).

m.  Dame Elizabeth's response to this provision (at [66]) is essentially twofold: that it is "*essentially a boilerplate provision*", and that it "*cannot possibly be read as precluding a bare trust relationship in relation to the holding or ownership of Digital Assets across the board, not least because it would then be wholly inconsistent with clause 9.2*".

n.  I know of no rule of interpretation which entitles one to ignore the effect of a term because it can be described as a "*boilerplate*" provision. Indeed, it rather flies in the face of Dame Elizabeth's rejection of surplusage. On one view, if a clause can be described as "*boilerplate*", it could be argued rather to reinforce its importance,

-15-

because its effect is well-known.[4] But to my mind, this clause should be interpreted in the same way as any other clause.

o. As for the inconsistency between section 38.6 and section 9.2, the fact that there is one specific and clear provision which is inconsistent with an equally clear and general provision is common in commercial contracts, and gives rise to the well-known rule that one gives effect to the particular, but otherwise one gives effect to the general, and not that the general somehow becomes invalid. In this case, the inconsistency (which I agree exists as a question of strict logic) is easily explicable in that section 38.6 is dealing with the normal conduct of the relationship between the parties, whereas section 9.2 is dealing with a very specific and unusual event.

23. The fact that Dame Elizabeth's construction of section 8.2.6 cannot be reconciled with several other provisions of the Dotcom Terms weighs heavily against the construction which she puts forward, and which I would anyway reject as a matter of language.

24. Even if my reasoning so far is rejected, I would still be of the view that, on the facts as I understand them (namely the sweeping of all Digital Assets into multiple sweep addresses), no trust under section 8.2.6 could exist because there is no certainty of subject matter. In this regard, Dame Elizabeth asserts (at [60(d)]) that the nature of the beneficiary's interest in the fund is that of a "*beneficial co-ownership share*" rather than its interest in any particular part of the fund, saying that this follows from Briggs J's decision in <u>Pearson, Lomas v Lehman Brothers Finance SA</u> [2010] EWHC 2914 at [227]. Briggs J in that case accepted that a trust of part of a fungible mass without the appropriation of any specific part for the beneficiary would not fail for uncertainty of subject matter, "*provided that the*

---

[4]     I note for completeness the observations of Lord Leggatt at [30] of <u>GEM Management v Firefox Ltd</u> [2022] UKPC 17 at [30], where he stated that it would "*be back to front to allow boilerplate clauses of the kind placed at the forefront of GEM's argument to dictate the meaning of core provisions of the contract*". Nothing of the sort is happening on the present facts. Unlike in <u>GEM</u>, the so-called "boilerplate" terms are entirely consistent with the other provisions I have referred to – and cohere with the natural meaning of the words. It cannot be said that boilerplate is "*dictat[ing] the meaning of core provisions*", in circumstances where all of those indications point the same way.

*mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain*".

25. While I hesitate to step into the facts, I consider that the requirements which Briggs J outlined in <u>Pearson</u> are not satisfied. While Dame Elizabeth's Declaration suggests at [89] the neat example of 3AC having 100 Bitcoin which FTX held in an unsegregated pool of 1,000 Bitcoin, the reality of FTX's sweep addresses, particularly during periods of intensive trading, is very different. While that analysis could be applicable at the moment that the 100 Bitcoin are swept into the pool or "hot wallet", as I have been instructed of the factual position, the analysis becomes problematic immediately thereafter, because thousands of deposits and withdrawals took place every hour in the sweep addresses – before even considering spot, margin, and proprietary trading on the FTX Exchange. Further, because I have been instructed that the FTX Exchange continuously collected trading fees in the form of Digital Assets like Bitcoin, not only were a customer's assets commingled with other customers' assets, they were commingled with the assets of the FTX Exchange. In those circumstances, it must be an "*essentially futile and close to impossible and possibly impossible exercise*" to identify 3AC's proportionate share of the Bitcoin from time to time in FTX's sweep addresses, to quote Trower J in <u>Piroozzadeh v Persons Unknown</u> [2023] EWHC 1024 (Ch) at [8].

26. Dame Elizabeth describes the "*logical terminus*" of my reasoning as being, she says, to "*give clause 8.2.6 no meaning at all*". As I say in paragraph [21.a.iii] above, the clause confirms the intention that legal title is vested in the customer at least at the point the asset is deposited, and militates *against* the existence of a trust in the parties' commercial relationship. This accords with the natural meaning of section 8.2.6, and it is coherent with the other provisions of the Dotcom Terms. But, even if this construction gives section 8.2.6 no independent effect, the argument against that interpretation really boils down, in substance, to an argument against surplusage. The legal weight to be placed on such an argument has been canvassed in paragraph [9] above. But, in any event, contractual construction involves determining the meaning of what the parties have *in fact* said, not what they meant to say, let alone what they would have been well-advised to say. Although not directly in point, the English Law of trusts is replete with examples where the

declaration of a trust has failed, notwithstanding the parties' intentions. There is no reason why this is not one such situation.

27. I would summarise my conclusion on this aspect as being:

   a. The ordinary meaning of the words used in section 8.2.6 is, as Dame Elizabeth effectively admits, against her proposed interpretation, which is at odds with the ordinary meaning of the words the parties specifically chose to adopt.

   b. As stated at paragraph [25] above, I hesitate to step into the facts, but as I understand it, the factual matrix which Dame Elizabeth relies on is (i) one that she has been instructed to assume; (ii) one for which the question of admissibility remains for 3AC to establish; (iii) not all one way; and (iv) could not in any event properly justify overturning the natural and ordinary meaning of the words used to contrive the construction which Dame Elizabeth  supports.

   c. What Dame Elizabeth's construction ultimately seems to turn on is little more than the rule against surplusage. But the legal authorities on that rule make it clear that it is a weak or very weak argument.

   d. It is vital to focus on what the parties actually agreed in their contract, rather than what they might wish they had agreed, or would or should have been advised to agree, and also bearing in mind the other provisions in the contract which they agreed.

   e. Particularly given that clear words are required to give rise to a trust, it is wrong in principle to hold that a trust has been created by giving a clear provision in an agreement an unnatural meaning which is inconsistent with other provisions of the agreement.

## QUASI-BAILMENT

*Introduction*

28. I turn next to the secondary aspect of Dame Elizabeth's analysis, namely a potential extension of the English Law on bailment to digital assets. This would create what has been termed a "*quasi-bailment*". As set out in my First Declaration, the concept of possession is

at the core of bailment. It is both long-established and axiomatic that something which is not tangible, like a chose in action, cannot be the subject of a bailment – at least as the law presently stands. That is why, in order for a quasi-bailment to exist over something intangible (like digital assets), an extension of the law would be necessary.

29. At the risk of speculation, I would imagine that this need for an extension of the law as it presently stands may, at least in part, explain why Dame Elizabeth focuses her analysis on a trust arising.

30. While such an extension has not taken place in any decision of the English (and Commonwealth) Courts, Dame Elizabeth and I are agreed that it is at least conceptually possible that English Law will develop to extend the principle of bailment to quasi-bailments. However, as I imagine any Judge looking to make new law would accept, the precise content of the extension is a point on which views may legitimately differ. That is in many senses unsurprising. Quasi-bailment is a novel area of law, and academic views on the subject diverge. In my view, the precise contours which will shape such a novel development will have to be determined by the traditional, incremental process of the common law in the English courts. Dame Elizabeth and I are, however, agreed as to at least *some* of the elements which are likely to be necessary for a quasi-bailment to arise, namely that:[5]

    a.  For a quasi-bailment to arise, it is necessary (but not necessarily sufficient) that the parties must have intended to create a legal relationship whereby the bailee would obtain control of the digital assets but the bailor would have superior title; and that the bailor did in fact have superior title.

    b.  If digital assets are added to a pool, it might be possible for all the customers depositing into that pool to become legal tenants in common. However, for this to occur, it would be necessary to find an intention that the proprietary interest

---

[5]    See in particular paragraphs [60.1]-[60.5] of my First Declaration, and paragraph [83] of Dame Elizabeth's Declaration.

retained by the customer was only a proportionate interest in the bulk to which he has contributed.

c.  In other words, it must be possible objectively to determine a shared intention between the customer and exchange for the customer to have title to a percentage of all digital assets in a pool, as opposed to the customer having title to a specified number of tokens.

31. I believe that there is, in substance, one point in dispute between Dame Elizabeth and me in relation to quasi-bailment. This point relates primarily to our predictions on how the law of quasi-bailment is likely to develop. Obviously the likelihood of predictions materialising is a matter for the Court, but I respond in brief given that Dame Elizabeth has engaged with it:

a.  At [60.4] of my First Declaration, I stated that if a customer acquires a digital asset on the exchange but never obtains the necessary degree of control, then the customer would not obtain legal title to the digital asset required, and would simply be an unsecured creditor in relation to the asset in question. I went on at [60.5] to consider the degree of control which was likely to be required for the purposes of quasi-bailment, namely that "*a digital asset acquired on the exchange [must be] identified and segregated for the customer*".

b.  Dame Elizabeth states (at [85]) that "*the 'control' provided for under clause 8.2.6 should be construed as a right to request FTX to act in respect of the assets and, specifically, to require FTX to transfer the 3AC Digital Assets to 3AC (or to its order)*", and that this control should suffice for the customer to obtain legal title to the digital asset ("*In my view, if English law were to develop the concept of a quasi-bailment and the purpose of that development were to accommodate digital asset exchange structures, then an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange ...*").

32. With respect, I am unable to agree with Dame Elizabeth. My disagreement is twofold: First, and even assuming that the law of bailment is extended to provide for quasi-bailment, I do

not think it is possible to predict, with any confidence that, as Dame Elizabeth expresses it, "*an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment*" ("**the prediction**"). Second, and on the assumption that the prediction turns out to be correct, I do not see how section 8.2.6 is reflective of what Dame Elizabeth describes as the requisite "*inten[tion] [for] a bailment over the proportionate share*" of the digital assets held by FTX. I elaborate on both these points below.

*Whether the prediction as to the development of English Law will materialise*

33. As a starting point, it is important to be clear precisely what Dame Elizabeth's Declaration asserts about the potential development of English Law. Dame Elizabeth suggests at [85] of her Declaration that "*if English law were to develop the concept of a quasi-bailment **and the purpose of that development were to accommodate digital asset exchange structures**, **then** an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange*" (emphasis added). Thus, her prediction is conditional on English Law developing the concept of a quasi-bailment and – critically – the purpose of that development being to accommodate digital asset exchange structures. I do not understand, nor do I believe it to be likely, that the purpose behind extending the law to create quasi-bailment would solely be in order to accommodate digital asset exchange structures.[6] Rather, the purpose of such a development, if it occurred, would be considerably wider in scope, and to go towards rationalising the potential legal relationships persons may have with digital assets more generally. It seems to me very unlikely that the purpose behind the development of the law of quasi-bailment would be the narrow objective of accommodating digital asset exchange structures.

34. Even setting that questionable conditionality aside, it is important to be clear about what Dame Elizabeth is suggesting. What [85] of her Declaration predicts – in its terms – is that "*the superior control-based interest of a customer [will be] sufficient to justify the existence*

---

[6]     See e.g. Law Commission Final Report at [7.107] on the utility of this development for conflicts of law purposes.

*of a quasi-bailment*", without more. I do not think that there is a sound basis for suggesting that the law will develop in this manner. The academics differ: see e.g. Sheehan, who argues (at pp95-96) that there should be no relativity of legal title in digital assets.[7] Indeed, the Law Commission has specifically noted that the types and degree of control which matter for particular purposes will need to be worked through by the Common Law. The Law Commission has also specifically proposed that a body of experts consider such issues further.[8] While not every proposal by the Law Commission is ultimately acted upon by legislators and Judges there is obvious merit in this particular suggestion.

35. In my view, there are also powerful practical reasons for eschewing Dame Elizabeth's suggestion of control as the sole basis for determining whether a quasi-bailment exists. (This is similar to the point made in part at paragraph [25] above). Put simply, Dame Elizabeth points to a straightforward situation where the only question is – as between two parties – which party has superior title. But the reality of how FTX's sweep addresses were used is, as I have been told, far more complex. I am instructed that the assets of hundreds of thousands of users were commingled on the FTX Exchange, and that over 1,000 transactions took place per hour in June 2022. These transactions included, *inter alia*, margin trades, sales, deposits, withdrawals, conventional futures contracts, fees paid to the FTX Exchange, and liquidations. There is thus real practical difficulty in even identifying a customer's proportionate share over a mixed fungible mass – difficulty akin to that which led Trower J in <u>Piroozzadeh v Persons Unknown</u> [2023] EWHC 1024 (Ch) at [8] to conclude that attempting to trace such assets in the pool was "*an essentially futile and close to impossible and possibly impossible exercise*". In circumstances where even identifying a customer's proportionate share may prove an insurmountable practical hurdle, I have serious doubts as to whether a Court would consider it appropriate to determine (a) whether the parties in fact intended a bailment over the proportionate share; and (b) the right(s) of

---

[7]     Duncan Sheehan, *Digital assets, blockchains and relativity of title* [2024] JBL 78. As mentioned in my original Report, Sheehan appears to be in the minority of commentators on this point – but his view is plainly defensible, and it is worth mentioning that the specific question as to what form the law of quasi-bailment might take is not one which has attracted a large volume of academic commentary.

[8]     Law Commission Final Report, Footnote 19; see also [6.46] and [5.61].

control the parties envisaged over the proportionate share. In those circumstances, I would be surprised if a Court was prepared to adopt a test of control for whether a quasi-bailment arose without more; an English Court would no doubt be concerned with identifying and delimiting the extent of the alleged quasi-bailment.

36. Even apart from the potential practical difficulties, it seems to me that there are at least two conceptual points which militate against Dame Elizabeth's prediction as to how the law of quasi-bailment might develop:

    a.  First, insofar as the value of the unsegregated sweep addresses containing 3AC's Digital Assets may at any time have decreased to zero, there are real conceptual difficulties in identifying any "proportionate share" 3AC might be said to retain, even assuming that the pool later increased in value again.

    b.  Second, doing away with the need for identification or segregation of a digital asset and determining the existence of a quasi-bailment purely on whether a party has some abstract notion of "control" would seem to give rise to real floodgate concerns. Under Dame Elizabeth's approach, there would be a real risk that durable proprietary interests could be too readily created over assets, the identification of which is wholly uncertain, and in circumstances where the assets over which the proprietary interests are said to arise have not been in any way delimited from the unsegregated pool.

37. Bearing these points in mind, I do not share Dame Elizabeth's confidence that the expansion of English Law to provide for quasi-bailments will necessarily take the form she suggests. In this regard, I should not be taken as saying that Dame Elizabeth's prediction will certainly not materialise, merely that an English Court looking to make new law would look very carefully at these (and of course, other) considerations before deciding what course to adopt, and that that course may very well not be that which–Dame Elizabeth suggests.

*If the prediction is correct, whether Dame Elizabeth's test for a quasi-bailment would be satisfied*

38. I now turn to consider whether, assuming the test Dame Elizabeth puts forward for a quasi-bailment to arise does become the law, a quasi-bailment would arise in this case. In

answering this question, it is useful to bear in mind what Dame Elizabeth has stated at [83] of her Declaration, namely that in circumstances where bailments can arise over commingled assets where the goods are mixed by consent, "*the question is whether the parties so intended a bailment over the proportionate share*". Dame Elizabeth suggests (at [84]) that "*clause 8.2.6 of the Terms soundly demonstrates that it was the intention of the parties that any asset acquired on the Exchange by a customer and 'held in [the customer's] Account' would be treated, as between FTX and 3AC, as 3AC's asset*".

39. I disagree with Dame Elizabeth's reading of section 8.2.6 of the Dotcom Terms in [84] of her Declaration. Section 8.2.6 does not, to my mind, demonstrate that the parties "*intended a bailment over the proportionate share*" of the commingled Digital Assets in FTX's sweep addresses. Not only do the Dotcom Terms nowhere state that a quasi-bailment is intended, the Dotcom Terms do not refer to a customer's interest in Digital Assets being in the form of "a proportionate share". Section 8.2.6(C) specifically refers to the customer "*control[ling] the Digital Assets held in [its] Account*", and provides that the customer "*may withdraw [its] Digital Assets by sending them to a different blockchain address*". The reference to the specific Digital Assets held by the customer in its Account, coupled with the reference to "***your** Digital Assets*" (emphasis added) and sending "*them*" to a different blockchain address, sits uneasily with the suggestion that the parties intended a bailment "*over the proportionate share*" of the commingled assets. But, as Dame Elizabeth acknowledges at [83], such an intention would be necessary for a quasi-bailment to arise. If the parties had intended to give 3AC rights over a "*proportionate share*" of the commingled assets, they could have straightforwardly said so. Instead, they chose to refer to "*the Digital Assets held in **your** Account*", "***your** Digital Assets*", and "*sending **them** to a different blockchain address*" (emphasis added). Thus, even assuming that Dame Elizabeth were correct as to the likely requirements for quasi-bailment to arise, I do not think that those requirements are met.

**SINGLE ASSET THEORY**

40. I turn now to what Dame Elizabeth has described as "*Question 3*" in her Declaration, namely whether the provisions of the Dotcom Terms "*support a contention that the extent of 3AC's rights (if any) over the 3AC Assets is limited to a single net figure arrived at by*

*deducting from the value of the 3AC Assets the amount of any liabilities owed by 3AC to FTX*". This is addressed at paragraphs [98]-[109] of her Declaration.

41. Before addressing the support Dame Elizabeth finds in the Dotcom Terms to answering Question 3 in the affirmative, it is necessary to address the assumptions inherent in the phrasing of Question 3.

   a.  One assumption implicit in Question 3 is that English Law is the governing law for the Question.

   b.  Another assumption is that liabilities were "owed by 3AC to FTX" at any time. This point seems noteworthy because I understand that FTX has not filed a claim against 3AC in the Joint Liquidators' liquidation proceedings.

   c.  To the extent liabilities ever did arise, Question 3 does not identify where they arose from: whether under the margin program described in section 16, some other section of the Dotcom Terms, or some other independent source.

   d.  Further, there is the factual issue of whether FTX effected a set-off in respect of the 3AC accounts.

   e.  There is also the legal issue of whether FTX's bankruptcy under BVI Law resulted in an automatic set-off.

   f.  In the face of these issues I, like Dame Elizabeth, centre my discussion of Question 3 on the interpretation of the Dotcom Terms.

42. Dame Elizabeth's treatment of Question 3 centres on the parties' contractual terms. She relies in particular on (a) sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10; (b) section 10; (c) section 16.2; and (d) section 38.7.2.

43. Sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10 are relied upon by Dame Elizabeth as examples which show "*that the customer can deal with its assets*", and which "*rely on the assumption that the customer was entitled to deal with its assets without regard to the net balance on its account*" (at [102]).

a.  In my view, any analysis of the applicability of "single asset theory" to a contractual relationship should begin with the primary means through which, under the relevant contractual terms, a customer may incur a negative balance — in the case of the Dotcom Terms, the margin program discussed in section 16 and schedule 3.

b.  Section 16.2 permits a customer to incur a negative balance in a given asset, but only if the customer agrees "*to maintain a sufficient amount of Assets at all times to meet our margin requirements*". Further, "*[i]f the value of the Assets in [the customer's] Account falls below the margin maintenance requirement*", then FTX may liquidate the customer's positions and assets. As a result, in order to incur a negative balance, a customer consents to the so-called "single asset theory" by way of the Dotcom Terms which in this context refer to the value of all of the customer's "Assets" in their "Account", i.e. the customer's net account balance.

c.  Thus, "*the assumption that the customer was entitled to deal with its assets without regard to the net balance on its account*" (as Dame Elizabeth says at [102], based on sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10) may very well be the case where a customer has not got a negative balance. But section 16.2 makes clear that, if a customer develops a negative balance, then they may cease to be entitled to deal with their assets without regard to the net balance of their account.

d.  Despite section 16.2 providing the contractual starting point to analyse "single asset theory" for customers trading on margin, Dame Elizabeth gives it short shrift, saying that it  "*only work[s] if the customers' Assets were treated as being held separately from their liabilities*". But this ignores, as noted at [43.b] above, the fact that section 16.2 refers to the "*value of the Assets in your Account*" as a whole, not as separate assets and liabilities.

44. I turn next to section 10, which bears setting out in full:

"*10 DEBIT ACCOUNT BALANCE*
*10.1 If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.*

*10.2 If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to*

*withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.*

*10.3 If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:*

> *10.3.1 you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;*
> *10.3.2 you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and*
> *10.3.3 you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable)."*

45. Dame Elizabeth suggests at [104] of her Declaration that the "*only coherent interpretation of the words 'debit balance' in that clause are to a negative USD (i.e. trading) balance*", because "*if debit balance meant overall debit balance (i.e. the single asset theory), there would be no use in liquidating the Assets as described in clause 10.3.1 because that could not effect any reduction of the debit balance; it would just change one asset type into another*". I disagree with Dame Elizabeth's construction of the phrase "*debit balance*" for the following reasons:

   a. As a preliminary matter, section 10 sits outside of the provisions applicable to customers trading on margin (i.e., section 16 and schedule 3 of the Dotcom Terms, dealt with (as relevant) above). Section 10 does not cross refer to section 16; it does not include terms used in section 16 like "margin requirements," "borrow[ing]," or "defaulting on a loan"; and it is phrased in terms of debit owed to "us" (the FTX Exchange) rather than, in section 16, "debts to other Users."

   b. In any event, section 10.3.1 in terms provides that if a customer has not made payment of the outstanding debit balance by the time stated in a demand made by FTX Trading, the customer authorises FTX to "*sell any Digital Assets or redeem any fiat currency or E-money in [the customer's] Account **to recover the outstanding debit balance**". This is different from how Dame Elizabeth characterises section 10.3.1 at [104] of her Declaration, where she suggests that the phrase "*debit balance*" must refer to a negative USD balance because there would otherwise "*be no use in liquidating the Assets as described in clause 10.3.1 because that could not effect any **reduction of the debit balance**". As appears to me clear

from the wording of section 10.3.1, FTX's objective in selling the customer's Assets is not necessarily to *reduce* the debit balance – but rather to *recover* the outstanding debit balance. If that is right, no question of section 10.3.1 needing to achieve the reduction of the debit balance would arise.

c.   Further and in any event, liquidating a customer's Digital Asset *would* help FTX recover (at least part of) the outstanding debit balance. FTX could – as envisaged under section 10 – use the proceeds of the liquidation to offset the debit balance.

d.   I note also Dame Elizabeth's suggestion that liquidating the Assets "*would just change one asset type into another*" (at [104]). The subtext of this suggestion is that there would be no reason to change one asset type into another. But that premise is unfounded. If, for example, the value of the Assets was declining, it might make commercial sense for FTX to sell the Assets to prevent further loss on the Account in question.

e.   I thus do not agree with Dame Elizabeth's characterisation of a "*debit balance*" as referring to a negative USD balance. Rather, the phrase should be given its natural and ordinary meaning, and refer to the customer's (negative) net position.

46.  Finally, Dame Elizabeth points to section 38.7.2, which contains a unilateral right of set-off in favour of FTX. She has been instructed that FTX did not purport to exercise this right (at [106]). Whether or not FTX did so is a question of fact for this Court, and I will not address that point. I note that if this assumption does not hold, then section 38.7.2 provides a further, independent basis to support "single asset theory" outside of the structure set out in sections 16.2 and 10. I also note in passing that I do not agree with Dame Elizabeth's reasoning in suggesting that "*[t]he fact that the right of set-off was unilateral suggests that this is an outcome that FTX would have wished to avoid because it wished to reserve to itself the ability to choose which amounts were subject to the set off*" (at [106]). FTX could well have wished to reserve to itself the ability to choose which amounts were subject to its right of set-off, while at the same time remaining agnostic about whether it "*wished to avoid*" the outcome of setting off.

-28-

47. In summary on this point, the provisions I have canvassed point towards there being a netting off of assets and liabilities. But even if I am wrong on that, it may ultimately not matter, at least insofar as (a) the Court finds, as a question of fact, that FTX did exercise its right of set off; and (b) the Court finds, as a matter of BVI Law, that an automatic set-off arose upon FTX's insolvency.

## THE REMAINING QUESTIONS

48. I turn finally to the four remaining questions Dame Elizabeth addresses. These are:

  a. Question 4: If FTX had carried out or permitted action(s) that resulted in the sale, transfer, or liquidation of some or all of the 3AC Assets between 12 June and 14 June 2022, would the Terms have authorised such action(s)? If not, what claim(s) under English law would 3AC have against FTX (if any) in relation to the wrongful loss of its interest in those assets as a result?

  b. Question 5: To the extent that FTX's conduct deprived 3AC of, or removed, 3AC's ownership rights (if any) to, the 3AC Assets (both in respect of digital assets and fiat currency), would such conduct by FTX give rise, as against FTX, to a breach of contract claim, a claim in restitution, a claim in conversion, a breach of trust claim, and/or a breach of fiduciary duty claim?

  c. Question 6: (a) Assuming your answer to Question 5 is "yes", under English law and the Terms, what remedies would be available to 3AC for such a breach? (b) Additionally, assume that the 3AC Joint Liquidators have no claim against FTX for receiving an unfair preference under the (BVI) Insolvency Act 2003 and the only reason that they do not have that claim is because FTX's breach of the Terms caused 3AC not to have an equitable proprietary interest in the 3AC Assets. Can the loss of an unfair preference claim form part of the damages recoverable by 3AC from FTX for its breach of the Terms?

  d. Question 7: What is the nature of 3AC's interest in the Futures Contracts?

49. As I mentioned at the beginning of this Rebuttal, Dame Elizabeth acknowledged at [16] of her Declaration, the "*precise nature of 3AC's interest in digital assets notionally associated with 3AC's 'Account' or Accounts … on the Exchange is central to the questions that [she*

*has] been asked to address*". I agree. Thus, dismissal of Dame Elizabeth's primary case would, in many senses, be determinative of these remaining questions – or at least large parts of them.[9] I therefore do not propose to go through the remaining questions in granular detail. Instead, I will make brief comments on three relatively standalone issues, namely:

    a.   The proper construction of section 16 and FTX's rights to sell assets in 3AC's Accounts – which relate to Question 4 in particular;

    b.   The proper construction of section 30 and the limitation of FTX's liability – which relate to Question 6 in particular; and

    c.   The suggestion (at [123]) that 3AC might be entitled to damages of the type awarded in <u>Attorney-General v Blake</u> [2001] 1 AC 268.

50. Turning first to Dame Elizabeth's analysis of section 16 of the Dotcom Terms, this is set out at [114] of her Declaration. The relevant part of section 16.2 provides that:

    "*If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account **in order to reduce your leverage or settle your debt to other Users**, in which case, you may sustain a total loss of all Assets in your Account.*" (Emphasis added)

51. Dame Elizabeth suggests at [114] that by virtue of the text highlighted in bold font, section 16 "*did not give FTX a right to liquidate assets for the purposes of settling debts that it considered 3AC may have owed to FTX*". The unspoken assumption in Dame Elizabeth's position is that FTX could only act to "*reduce [3AC's] leverage*" in relation to other Users, and not 3AC's leverage position *vis-à-vis* FTX itself.

---

[9]    See for example Question 7. Dame Elizabeth states at [150] that the Futures Contracts were "*[3AC's] choses in action and its personal property*", and that "*3AC had a proprietary interest in the chose(s) in action arising from the Futures Contracts*". That turns entirely on 3AC having a proprietary interest arising out of Dame Elizabeth's analysis on trusts (since even on Dame Elizabeth's analysis of quasi-bailment, quasi-bailment applies to digital assets and not choses in action).

52. As a preliminary point, Dame Elizabeth appears to assume that the purpose of "*reduc[ing] your leverage*" must be read subject to the qualifier which applies to the second purpose, of "*settl[ing] your debt to other Users*". However, in my view:

   a. In particular, her reading of section 16.2 is not its natural and ordinary meaning. Rather, what section 16.2 appears to refer to is to FTX seizing and / or liquidating a customer's positions and Assets in order to reduce the customer's leverage *generally*, or to settle the customer's debt to other Users. There is no reason for reading "*to other Users*" as a qualifier to the first purpose when no such words were used. I note in this regard that section 16.2 goes on to refer again to settling the customer's debts "*to other Users*", but never uses the phrase "*to other Users*" in conjunction with the reduction of leverage.

   b. The ordinary elements of contractual construction accordingly militate against Dame Elizabeth's view of section 16. This is compounded by my analysis of section 10 above (see [45] above) – and weighs against her characterisation of the circumstances in which FTX was entitled to liquidate any assets 3AC might have had.

53. I turn next to Dame Elizabeth's treatment of the exclusion clause in section 30 of the Dotcom Terms, which is addressed at [140] *et seq* of her Declaration. The key provision is section 30.2, which provides (capitalisation original):

   "*SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE)*, **EQUITY**, *STATUTE* **OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH YOUR USE OR INABILITY TO USE THE SERVICES …**" (Emphasis added)

54. Section 30.1 in turn provides that:

   "*NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:*
   *30.1.1 FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;*

   *30.1.2 FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR*

   *30.1.3 TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.*"

55. Dame Elizabeth states (at [144]) that "*the exclusion provisions in clause 30 do not apply at all to any claim against FTX as trustee*". She further states, at [145], that "*clause 30.2*

-31-

*cannot be construed as purporting to exclude a claim for fraud, bad faith or misappropriation against FTX as trustee*", and that "*use of the word 'EQUITY' [does not suggest] that FTX's obligations as trustee in relation to the preservation of 3AC's equitable ownership of the 3AC Assets are being excluded*".

56. In my view, section 30.1 is clear, and speaks for itself. Only certain specific exceptions from the limitation of liability are provided for, and these are enumerated in sections 30.1.1 to 30.1.3. While it is well-established that will not exclude loss or damage resulting from *actual fraud*, the notion that exclusion clauses in English Law are to be strictly construed is of considerably less force than it used to be. Thus, in <u>South East Water Ltd v Elster Water Metering Ltd</u> [2025] EWCA Civ 287 at [29], Coulson LJ said that although "*[i]t used to be the case that the courts adopted a strict (not to say strained) approach to contractual interpretation if the clause in question was an exclusion clause or one limiting liability*", "*the court has moved away from that approach, particularly in relation to clauses which limit rather than exclude liability*".

57. Coulson LJ went on to explain that "*[t]he modern approach is now summarised by Lord Leggatt in <u>Triple Point Technology Inc v PTT Public Co Limited</u> [2021] AC 1148*", from which he then quoted:

> "*107.The approach of the courts to the interpretation of exclusion clauses (including clauses limiting liability) in commercial contracts has changed markedly in the last 50 years. ….*
>
> *108.The modern view is accordingly to recognise that commercial parties are free to make their own bargains and allocate risks as they think fit, and that the task of the court is to interpret the words used fairly applying the ordinary methods of contractual interpretation. It also remains necessary, however, to recognise that a vital part of the setting in which parties contract is a framework of rights and obligations established by the common law (and often now codified in statute). These comprise duties imposed by the law of tort and also norms of commerce which have come to be recognised as ordinary incidents of particular types of contract or relationship and which often take the form of terms implied in the contract by law. Although its strength will vary according to the circumstances of the case, the court in construing the contract starts from the assumption that in the absence of clear words the parties did not intend the contract to derogate from these normal rights and obligations.*"

58. More specifically, I disagree with Dame Elizabeth's reading of section 30.2. In particular:

a. There is no basis for suggesting that section 8 of the Dotcom Terms should somehow be "*carved out*" from the general exclusions of liability the parties agreed. I cannot identify any terms – whether express or implied – in support of this suggestion, and I disagree with it.

b. In relation to section 30.2, it seems to me that Dame Elizabeth is effectively reading-out the word "*EQUITY*" from the provision. It is trite that trusts are creatures of equity, and that a claim arising out of breach of a trust is equitable in nature. It is not clear what meaning, if any, is to be given to the word "*EQUITY*" if FTX's (alleged) obligations as trustee are carved out of the exclusion clause.

c. Further and in any event, section 30.2 refers not only to "*EQUITY*", but also to "*ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF OR INABILITY TO USE THE SERVICES*". The natural and ordinary meaning of these words is clear – as is the wide ambit given to "*in connection with*" (as to which see [22.e] above).

d. Dame Elizabeth's reference to the "*irreducible core*" of a trust does not assist her analysis. The irreducible core of a trust determines the duties owed by the trustee to the beneficiaries; it does not mean that the parties cannot, by the terms of the trust, exclude liability for certain losses from the trustee's shoulders. Indeed, in <u>Armitage v Nurse</u> [1998] Ch 241, the case which Dame Elizabeth cites in relation to the irreducible core of duties (at [145(b)]), the English Court of Appeal accepted that an exclusion clause *would* apply – so long as there was no dishonesty (in the sense of actual fraud). At 251, Millett LJ (with whom Hutchison and Hirst LJJ agreed) said that:

> "*In my judgment clause 15 exempts the trustee from liability for loss or damage to the trust property no matter how idolent, imprudent, lacking in diligence, negligent or wilful he may have been, so long as he has not acted dishonestly.*"

e. I find it difficult to see how Dame Elizabeth's suggestion that the "*irreducible core*" of duties takes her analysis very far. I accept that liability for fraud and / or dishonesty on the part of the trustee cannot be excluded, and that exclusion clauses must generally be interpreted strictly, but English Law does not go further. Given

the clear wording of section 30.2, I do not see how Dame Elizabeth's position on exclusion of liability is tenable.

59. I turn finally to Dame Elizabeth's invocation of Attorney-General v Blake as a potential basis for liability on the part of FTX. In my view, Dame Elizabeth has not provided the Court with a full or complete picture as to how exceptionally Attorney-General v Blake is regarded in English jurisprudence. In particular:

a.  The facts of the case concerned a former member of the British Secret Intelligence Service. However, in 1951, he became a Soviet spy. He was discovered in 1961 and was imprisoned. He escaped in 1966, and then fled to the Soviet Union. He wrote a book about his experiences as a double agent titled "*No Other Choice*", and received a lucrative publishing contract for its release. The British Crown brought an action for all the profits Mr Blake made on his book, including for profits he had not yet received, and was successful (by a majority) before the House of Lords.

b.  In very simple terms, the facts of Attorney-General v Blake were exceptional. Each Law Lord in the majority referred to the striking policy reasons applicable to that case. Indeed, Lord Nicholls began his judgment with the words "*My Lords, George Blake is a notorious, self-confessed traitor*" (at 275). That should suffice to give this Court an indication of how Attorney-General v Blake is regarded.

c.  Authorities after Attorney-General v Blake have been clear as to its exceptional facts. Attorney-General v Blake has been described by the Supreme Court in One Step (Support) Ltd v Morris-Garner [2019] AC 649 as one concerning "*the notorious traitor George Blake*" (at [64]). It has also been described as "*anomalous*" and "*an exceptional case*" in the recent Supreme Court decision of Recovery Partners GP Ltd v Rukhadze [2025] 2 WLR 529 (at [148] and [278] respectively).

d.  It seems to me self-evident that the present facts fall far short of those involving Cold War-era subterfuge and treachery. I do not think I need to say more on Dame Elizabeth's suggestion that damages pursuant to Attorney-General v Blake might be warranted.

A list of the documents I have considered in drafting this Rebuttal is set out in Annex 1 to this Declaration.  Otherwise, I incorporate all other annexes and disclosures included in my *Second Declaration of Lord Neuberger of Abbotsbury*, as supplemented on October 21, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in London, United Kingdom on 3rd November, 2025

_____

The Rt. Hon. Lord Neuberger of Abbotsbury