**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF STEPHEN HOUSEMAN KC

I, Stephen Houseman KC, state as follows:

### A.    Introduction

1.    I am a barrister and one of His Majesty's Counsel in independent practice in England & Wales. I was Called to The Bar in November 1995 and took silk (Queen's Counsel) in March 2013, becoming King's Counsel upon the accession of King Charles III upon the death of The Late Queen Elizabeth II in September 2022.

2.    I have been requested by Sullivan & Cromwell LLP to provide this Declaration containing my opinion on aspects of Antiguan law (as defined below) in light of and in response to the First Supplemental Declaration of Paul Anthony Webster, KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd. (In Liquidation), dated 31 October 2025 ("**Webster Declaration**"). The Webster Declaration has been filed on behalf of the joint liquidators of Three Arrows Capital Ltd. ("**3AC**") ("**Joint Liquidators**") in Case No. 22-11068 (KBO) in the United States Bankruptcy Court, District of Delaware, against FTX Trading Ltd., et al. It deals with aspects governed by Antiguan law.

3.    My total remuneration for this engagement is £30,000, representing my standard professional rate for the provision of expert opinions on Antiguan law. A more junior member of my chambers has, under my direction, provided assistance in the preparation

1

of this report and will receive remuneration of £22,500 in total. While my fees are to be paid by the FTX Recovery Trust, my compensation is in no way dependent upon my conclusions, the evidence I may give, or the result of these proceedings.

4.      A list of factual materials provided to me by Sullivan & Cromwell LLP that I have considered in preparing this Declaration is attached as **Exhibit A**. A list of the legal materials I have considered is attached as **Exhibit B**.

5.      Capitalised words and phrases, unless appears otherwise, have the defined meanings set out in the Webster Declaration. For the avoidance of doubt, this does not constitute and is not intended to constitute an acceptance on my part of any particular proposition or propositions set out in the Webster Declaration.

6.      I give this opinion on identified aspects of Antiguan law in connection with FTX Recovery Trust's objection filed on 20 June 2025 ("**Objection**") to the Amended Proof of Claim filed by the Joint Liquidators dated 27 March 2025 ("**Proof of Claim**" or "**PoC**"). In the Proof of Claim, the Joint Liquidators assert various claims based on theories that they are entitled to recover approximately $1.53 billion from FTX Trading, Ltd. ("**FTX**").

7.      In particular, I have been asked to address whether, as a matter of Antiguan law (and assuming for present purposes that FTX did _not_ own the assets at issue), the March 2022 Line of Credit Agreement ("**March 2022 LOC**"[1]): (i) created a security interest in favour of FTX under Antiguan law as to the assets (including any relevant rights or

---

[1] The Joint Liquidators have argued that the March 2022 LOC in fact constitutes two separate agreements, which Mr Webster separately defines as the "LOC" and the "Margin Agreement." (Webster Declaration, §20.) The March 2022 Line of Credit Agreement includes two separately named sections, but I am instructed that it is a single document with a common DocuSign ID number issued, which 3AC signed. I am instructed to proceed, for the purposes of preparing the present Declaration, on the basis that the March 2022 Line of Credit Agreement is one, singular agreement. However, given that Mr Webster has analysed the March 2022 LOC as falling into two parts, I refer herein to these two parts as "**March 2022 LOC – Line of Credit**" and "**March 2022 LOC – Margin Agreement**".

interests) credited to 3AC's customer accounts on the FTX.com Exchange at the end of the day on 12 June 2022, and (ii) if so, what form of security it created over such assets.

8.  In addressing these questions of Antiguan law, I consider and respond to the conclusions set out in the Webster Declaration, as summarised at Section II thereof. However, I do not engage with the argument set out at (e.g.) paragraph 13a. of the Webster Declaration, namely that, if FTX owned the relevant assets (as FTX claims), then it follows that the March 2022 LOC did not create any security. This is because I am instructed to offer my analysis strictly on the basis of a contrary assumption that the relevant assets are not the property of FTX Recovery Trust.

9.  For the avoidance of doubt, the analysis and conclusions set out below are strictly without prejudice to (and do not opine on) what I understand on instructions to be FTX's position that FTX Recovery Trust owns the assets held by the Exchange and credited to 3AC's customer accounts, and that 3AC did not have any property interest in those assets as at the end of the day on 12 June 2022. I understand that the Court will receive separate evidence and analysis on this point, which is outside the scope of this Declaration.

10. By way of summary based on the primary assumption outlined above:

    (i)   The March 2022 LOC created a security interest in favour of FTX under Antiguan law as to the assets credited to 3AC's customer accounts on the FTX.com Exchange at the end of the day on 12 June 2022.

    (ii)  Specifically, the March 2022 LOC created: (i) possessory security (a pledge and/or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant assets; and (ii) non-possessory security (a fixed charge, alternatively a floating charge) over those assets. I explain at paragraphs 74 and 93 below what I

understand to be the relevant assets falling within the definition of 'Secured Assets' for these purposes. For the avoidance of doubt, I have only considered and opined on the perfection of the possessory security, as this is a matter of Antiguan law. I have not considered and express no view as to whether the charge so created was duly perfected since this is a matter of BVI law, which I understand will be addressed by Stephen Atherton, KC.

(iii)    Finally, should the Court find that 3AC has incurred any liability to FTX in connection with the Margin Lending Program (as defined below), whatever that liability might be and on whatever basis (as to which I am not qualified to opine), then this liability would qualify as 'Indebtedness' for the purposes of the March 2022 LOC.

11.    The following paragraphs are structured as follows (the present Introduction being **Section A**):

(i)      **Section B:** Professional experience;

(ii)     **Section C:** Summary of Webster Declaration;

(iii)    **Section D:** Factual background;

(iv)     **Section E:** Analysis of Antiguan law;

(v)      **Section F:** Legal effect of the March 2022 LOC.

**B.      Professional Experience**

12.    I have been a member of Essex Court Chambers in London for my entire professional life, commencing on 1 January 1997. My practice involves a broad range of international commercial and modern chancery disputes as summarised in my current curriculum vitae attached as **Exhibit C**. I have a separate profile for other specialist injunctive and arbitral challenge work which I do not exhibit.

13.    I am or have been admitted or registered as advocate in a number of jurisdictions around the world, including: the British Virgin Islands, Cayman Islands, St. Lucia, Antigua & Barbuda, Singapore International Commercial Court (SICC), Dubai International Financial Centre (DIFC), Gibraltar and the Isle of Man.  For simplicity I refer to Antigua & Barbuda as 'Antigua' and hence refer to 'Antiguan law' as shorthand.

14.    I was admitted as an Attorney-at-Law in the Eastern Caribbean Supreme Court ("**ECSC**") in Antigua in 2018. The admission was licensed in order that I could act as lead advocate representing the claimant (minority shareholder) in an action against a company in the High Court in the case of 1Globe Capital LLC v. Sinovac Biotech Ltd. (ANUHVC 2018/0120). That action was brought pursuant to s.122 of the International Business Corporations Act (Cap.122) Revised Laws of Antigua & Barbuda 1992 ("**IBCA**"). I represented the claimant at trial and on appeal. My instructing solicitors were replaced after we obtained special leave to appeal to the Privy Council and so new leading counsel was instructed: see [2025] UKPC 3.

15.    In addition to my practice as a barrister, I was appointed as a Deputy Judge of the High Court in November 2019 by the Lord Chief Justice of England & Wales. My appointment covers both the Chancery Division, where I have sat in the Business List, Insolvency & Companies Court, Property Trusts & Probate List; and (what is now) the King's Bench Division, where I am authorised by the Lord Chancellor and Lord Chief Justice to sit in the Commercial Court. I sit regularly in this capacity as well as taking appointments in international arbitration.

16.    One of the cases I heard and decided sitting as a Deputy High Court Judge is Wang v. Darby [2021] EWHC 3054 (Comm); [2022] Bus LR 121. That case was the first contested hearing in the jurisdiction as to whether a trust exists in respect of

cryptocurrency. I am aware that the reported decision has been cited and followed in different jurisdictions, including Isle of Man and Hong Kong.

17.    Whilst sitting in the Insolvency & Companies Court of the Chancery Division in London, I made orders for final exit relief in one of the largest and highest profile investment bank special administrations yet undertaken in that jurisdiction: see In The Matter of SVS Securities Plc (In Special Administration) [2023] EWHC 585 (Ch). There were approximately 18,600 (mostly retail) clients of SVS at the time it was placed into special administration in August 2019.

18.    During almost 30 years in private practice and almost six years sitting as a Deputy High Court Judge in London, I have considered numerous matters involving security in banking and finance contexts. Former and current clients include: HSBC, Barclays, Morgan Stanley, JP Morgan, CitiBank, UniCredit, ING, Tether and BlackRock, plus many more major institutions or commercial counterparties. I believe this combination of experience qualifies me to give this opinion on Antiguan law.

19.    During the past four years, I have not provided testimony as an expert in any case, whether at trial or by deposition.

**C.    Webster Declaration: Summary**

20.    Mr Webster concludes as follows:

    (i)    First, that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC, which Mr Webster takes as a separate, standalone contract and defines as the "LOC") does not purport to, and did not, provide a security (paragraphs 12, 37-39);

    (ii)    Second, that the March 2022 LOC – Margin Agreement (i.e. the second part of the March 2022 LOC, which Mr Webster takes as a separate, standalone contract

and defines as the "Margin Agreement") could "*in theory*" have created a security, but did not for two reasons:

    a.   First, because FTX owned the assets at issue (i.e. if FTX succeeds on its primary case); and

    b.   Secondly, because any such security did not attach to any Secured Assets.

(paragraphs 13, 47-55);

(iii)    Third, even if the March 2022 LOC – Margin Agreement created a security, it created only a lien or a pledge (not a charge or a mortgage), and FTX did not and cannot perfect the security so created (paragraphs 14, 56-87); and

(iv)    Fourth, even if such security was duly perfected, FTX did not have a valid, perfected security in respect of such lending, because: (i) the Loan Documents did not sufficiently identify FTX as the lender for the Margin Lending Program; and (ii) to the extent Third-Party Lenders made loans to 3AC through the Margin Lending Program, they lacked the privity of contract needed to establish a valid, perfected security (paragraphs 15, 90-100).

21.    I agree with Mr Webster that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC), *per se*, does not create any security. I also agree that, if and to the extent that any Third-Party Lenders made loans to 3AC through the Margin Lending Program, they lacked the privity of contract needed to establish a valid, perfected security over the Secured Assets under the March 2022 LOC. As explained above, I do not engage with the Joint Liquidators' arguments premised on FTX owning the relevant Secured Assets. Subject to these points, and for the reasons explained below, I disagree with Mr Webster's conclusions (as summarised above).

**D.      Factual background**

22.      I do not have personal knowledge of the facts in this case beyond the documents I have reviewed (as listed in **Exhibit A**). I have been instructed to assume the facts set out in the paragraphs below. I set these out in some detail, under a number of headed subsections, since these factual details are relevant to the legal analysis set out in **Sections E & F** below.

(a)      The 3AC Accounts and 3AC's trading on the Exchange

23.      As of April 2022, 3AC was reported to have over $3 billion of assets under its management. While it was functional, 3AC maintained certain customer accounts ("**3AC Accounts**") on the FTX.com exchange ("**Exchange**").

24.      3AC opened the 3AC Accounts in February 2020, and regularly made deposits and withdrawals throughout its time as an Exchange customer. In addition to the regular deposits and withdrawals, 3AC was also a high-volume trader on the Exchange.

(b)      Customer Account Balances

25.      Customer accounts were associated with balances for particular assets to which the customer had a contractual entitlement, which reflected credits for assets they deposited on to the Exchange, bought on the Exchange via a trade with another customer, or received on the Exchange via a transfer from another customer. Like every other customer account, the 3AC Accounts had a balance of all assets held by the Exchange that were credited to the 3AC Accounts ("**Account Balance**").

26.      The Account Balance represented 3AC's total entitlement with respect to the 3AC Accounts based on the value of all assets associated with a customer's account, including cryptocurrency tokens (such as BTC and ETH) and fiat. Although customers could view sub-balances for each asset type, these were simply components of the overall Account Balance, which functioned as a single, integrated total. The Proof of

Claim incorrectly assumes that the digital asset balance ("**Digital Asset Balance**") can be isolated from the USD balance ("**USD Balance**"), when in fact both together make up the Account Balance, and affect each other inversely: for instance, when a customer sold BTC for USD, the Digital Asset Balance decreased and the USD Balance increased by the same amount, leaving the Account Balance unchanged (setting aside any relevant trading fees).

(c)     Margin Trading

27.     The Exchange offered a margin lending program ("**Margin Lending Program**"), which allowed participating customers to increase their exposure to digital asset prices by borrowing assets from other Exchange customers. The Margin Lending Program was a voluntary and competitive peer-to-peer market, which customers opted into by enabling a feature on their customer account. Once the feature was enabled, a customer would automatically access the Margin Lending Program in connection with execution of a trade that, absent leverage accessed through the Margin Lending Program, the customer would not have been permitted to execute.

28.     3AC participated in the Margin Lending Program, like many other customers. In mid-May 2022, 3AC took long positions in BTC and ETH via spot margin trading. Through this activity, 3AC accumulated a larger positive Digital Asset Balance, because it acquired an entitlement based on the value of BTC and ETH; and a larger negative USD Balance, because it paid using funds borrowed through the Margin Program.

(d)     Perpetual Futures Trading

29.     Customers could also open perpetual futures positions on the Exchange. These were essentially contractual bets on the future price of a digital asset that did not require the customer to actually buy or sell the digital asset. 3AC also had a large number of perpetual futures positions.

30.     The perpetual futures contract itself was not an asset that had value—it could not be sold or otherwise transferred for consideration. It was a derivative instrument to create exposure to the price movement of the underlying asset—the opportunity to receive a USD credit or debit depending on whether prices went up or down every 30-second interval.

(e)     Margin Requirements

31.     Customers were required to maintain minimum levels of assets credited to their customer accounts in order to maintain leveraged positions accumulated through spot margin trading or perpetual futures trading. First, customers were required to maintain a minimum value of assets, based on a weighted formula, to open a new position on margin. Second, customers were also required to maintain a minimum leverage ratio, based on a different formula that accounted for the type of asset, throughout the life of the specific position acquired through the use of leverage ("**Maintenance Margin Requirement**").

32.     The margin requirements applicable to the 3AC Accounts were set out in the terms of service governing those accounts. When creating a customer account, each customer agreed to terms of service that governed their use of the Exchange. There are three relevant versions of the terms of service. The "FTX Terms of Service" dated May 13, 2022 ("**TOS**") were in force during the June 2022 period relevant to the Proof of Claim, and until FTX filed for bankruptcy in November 2022.

33.     Based on the terms in the TOS, failure to comply with the Maintenance Margin Requirement gave FTX the right to liquidate assets associated with the customer account to bring it into compliance. Depending on the facts and circumstances, including the customer's trading history, FTX could fully liquidate or close a customer account.

(f)     Line of Credit

34.     Certain customers entered into contracts with FTX that provided them a line of credit. A line of credit had two primary consequences as relevant here. First, the line of credit contributed (in the amount of the line of credit) to the assets credited to the customer account for purposes of assessing compliance with the Maintenance Margin Requirement. In other words, the customer could use the line of credit to take on more leveraged positions. Second, the line of credit provided a source of leverage without requiring the customer to borrow from the Margin Program. In other words, the customer could purchase assets via spot margin trading, and build a positive Digital Asset Balance and negative USD Balance, by first utilizing the line of credit, and only once it was exhausted would the customer then utilize the Margin Program.

35.     3AC was the beneficiary of a Line of Credit, which increased over time through new agreements and stood at $120 million in June 2022 ("**Line of Credit**"). Under the March 2022 LOC, 3AC was required to maintain an Account Balance of 200% of the amount of its Line of Credit that was utilized. In other words, 3AC was subjected to an additional obligation to maintain $240 million in Account Balance at all times.

(g)     FTX's Control over the Assets Credited to the 3AC Accounts

36.     I am instructed to assume the following facts concerning FTX's control with regards to assets deposited by customers on to the Exchange, including those assets credited to the 3AC Accounts:

(i)     FTX held the keys to the addresses in which all digital assets at issue were stored. Possession of private keys for an address amounts to "control" over the digital assets stored in that address in the cryptocurrency context.

(ii)    No customer (including 3AC) could access assets stored in the addresses controlled by FTX, which included all of the digital assets at issue in this dispute.

(iii)   Although 3AC could make withdrawal requests to FTX, withdrawals came from addresses holding commingled digital assets that were deposited by many customers (and by FTX). Customers could not withdraw a specific digital asset (e.g., a BTC they deposited), as opposed to some quantity of the digital asset. Nonetheless, I am instructed to assume for present purposes that 3AC retained proprietary interests in the digital assets thus held in the FTX pooled account and that 3AC held these interests in the 3AC Accounts, and I do not opine on the merits of that assumption.

(iv)    There were restrictions on 3AC's ability to withdraw assets from the Exchange. 3AC could only withdraw if its accounts were in good standing, and in fact FTX turned off withdrawals for 3AC because it breached applicable requirements.

(v)     FTX had the contractual right, under clause 4c. of the March 2022 LOC – Margin Agreement, to liquidate any and all assets associated with the 3AC Accounts should 3AC breach applicable requirements, and in fact did liquidate certain assets. I do not purport to assess whether FTX had additional rights related to liquidations under other contracts, including the TOS.

(h)     Activity in the 3AC Accounts on 13 & 14 June 2022

37.    The Joint Liquidators contend that 3AC is entitled to the full Digital Asset Balance (instead of the Account Balance) of the 3AC Accounts as of the end of the day (measured in UTC) on 12 June 2022, less some adjustment they purport to make premised on withdrawals and market prices. I am instructed that the 3AC Accounts had a total Account Balance of approximately $284 million at the end of 12 June 2022

(measured in UTC). This reflected a positive Digital Asset Balance of approximately $1.017 billion and a negative USD Balance of approximately $733 million. By the end of 14 June 2022 (measured in UTC), the 3AC Accounts had an Account Balance of approximately $2 million.

38.     The Account Balance declined on 13 and 14 June 2022 because the prices of digital assets declined, and because 3AC withdrew assets from the 3AC Accounts. 3AC also sold digital assets for USD via trades on the Exchange on 13 and 14 June 2022. These trades did not reduce the Account Balance because they involved a credit for USD in the same amount as the debit for the digital asset that was sold.

39.     Under the March 2022 LOC, 3AC was required to maintain an Account Balance of $240 million. The 3AC Accounts were in breach of those requirements on June 13, 2022. FTX contacted 3AC multiple times to inform 3AC that it was out of compliance with its agreements, and to warn 3AC that FTX would have to liquidate assets associated with the 3AC Accounts unless 3AC corrected the issue. 3AC ignored FTX's efforts to resolve the issue, and instead of depositing assets, it actually withdrew another $18 million in ETH on 14 June 2022.

40.     FTX turned off withdrawals from the 3AC Accounts at 4:08 p.m. (UTC). Finally, starting at 10:21 p.m. (UTC) on 14 June 2022, FTX initiated a series of liquidating transactions in which digital assets (ETH, FTT, GBTC, and ETHE) were sold for approximately $82 million.

**E.     Analysis of Antiguan Law**

41.     At the risk of repetition, my analysis proceeds on the basis of the assumption that FTX did not own the assets credited to the 3AC Accounts; and it is, of course, without prejudice to FTX's position that these assets were its property.

42.    The analysis below is set out in sub-sections which, in broad terms and for ease of comparison between the two documents, track the structure of the Webster Declaration.

(a)    Sources of law in Antigua & Barbuda

43.    Pursuant to section 2 of the Common Law (Declaration of Application) Act 1705, Cap.92 ("**1705 Act**"), English common law applies (i.e. "*is in force*") in Antigua "*so far as it stands unaltered by any written Laws of these Islands, or some of them*". Accordingly, the common law of England & Wales, and by analogy that of Commonwealth jurisdictions, has full force in Antigua save in so far as altered by local legislation. In the modern context, after the judicature legislation of the late nineteenth century, common law includes principles of equity. I refer to 'common law' in this modern fused sense.

44.    The phrase "*stands unaltered by any written Laws*", as found in section 2 of the 1705 Act, means what it says. The concept of altering the common law arises where a local statute either (i) expressly abrogates or supplants the common law; (ii) provides for a legal consequence that is sufficiently different from the effect of common law; or (iii) subsumes the common law at a certain date and makes clear that there is no scope for reflecting its subsequent evolution into the statutory definition or codification. Short of this being done on the face of a statute, it must be taken to leave the relevant principles of common law intact. There is no scope for implied *general* prohibition or preclusion arising from an instance of *specific* positive prescription. To construe s.2 otherwise would be a charter for legal uncertainty, contrary to the expressed purpose of the 1705 Act.

45.    This approach was applied or assumed by the JCPC, as the apex appellate court for Antigua, in Re Stanford International Bank [2019] UKPC 45. The bank had been run as part of a massive Ponzi scheme. Its liquidators sought to recover funds from those

depositors who had been paid out before the bank ceased trading, i.e. on the basis that such payments constituted fraudulent preferences according to insolvency principles. It was common ground that the IBCA does not contain any provision for the avoidance of fraudulent or wrongful preferences; there was no explanation available for why this was the case. The JCPC stated that "*the common law about fraudulent preference is applicable in the insolvent winding up of an [Antiguan company], in default of any statutory provision <u>which replaces it</u>*…" (see [21], my emphasis added). This is a clear indication of highest authority to the effect that the common law remains in full force in Antigua absent a statute that replaces it.

46.     I am further reinforced in that view by the following:

(i)     In <u>Niyazov v. Maples & Calder</u> [2019] BVI 561 at [31]-[32], the ECCA (BVI) recognised that "*by virtue of [the 1705 Act], the [British] Virgin Islands adopted the English common law, subject to any modifications thereof, enacted either locally or by extension of English enactments.*"

(ii)    In a series of judgments in other legal contexts, the JCPC has applied English equitable doctrines to Antiguan cases, including (a) the equitable doctrine (developed in English law) of proprietary estoppel (<u>Gordon v. Havener</u> [2021] UKPC 26 at [15]); (b) the developing equitable doctrine in English law of an implied constructive trust of property as between unmarried partners, which was applied to divorced spouses in the absence of any specific Antiguan statute providing for property adjustment orders in such situations (<u>Abbott v. Abbott</u> [2007] UKPC 53); and (c) equitable principles by which a vendor or mortgagor can contradict a receipt clause in a deed (<u>Creque v. Penn</u> [2007] UKPC 44).

47.    Accordingly, subject to the detail of the analysis in the foregoing paragraphs, I agree with the analysis and conclusions set out in Section B of the Webster Declaration.

(b)    Rules of contractual interpretation

48.    The common law provides the rules of contractual interpretation in Antigua.

49.    The Eastern Caribbean Court of Appeal has adopted and followed the guidance developed by the English Supreme Court in recent years, such as (notably) the English Supreme Court decision in Rainy Sky v. Kookmin [2011] 1 WLR 2900.

50.    For example, in the Eastern Caribbean Court of Appeal decision in Kenneth Krys & others v. New World Value Fund Ltd. & others BVIHCMAP2013/0017, at [24], Pereira JA followed the English Supreme Court decision in Rainy Sky v. Kookmin [2011] 1 WLR 2900 and held as follows:

"In the case of Rainy Sky SA v Kookmin Bank [fn. 11 - 11 [2011] 1 WLR 2900.] English Supreme Court held that the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant. A reasonable person here is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract. The relevant background knowledge includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man, excluding earlier drafts of the agreement and evidence of the content of pre-contractual negotiations and the parties' subjective intentions."

51.    At paragraph [26] of Kenneth Krys (supra), Pereira JA went on to make the following observations:

*"Rainy Sky was a case where there was an ambiguity. Here, the parties are agreed that there is no ambiguity in the language used. Rather, the opposing parties contend that their interpretation of the clauses in the contract – each leading to a different result – is the only correct one. Where the parties have used unambiguous language, the court must apply it. A court can only consider the commercial purpose where the language used is ambiguous. Further, a court is only justified in departing from the plain meaning of words if it leads to an absurdity – that is, where the court is satisfied that a mistake has been made and is satisfied as to what has to be done to correct it."*

52.    The guidance to contractual interpretation laid down in the English line of cases (including <u>Rainy Sky</u> (supra)) has been followed in many other decisions of the Eastern Caribbean Court of Appeal, including <u>Dickon Mitchell v. Rita Joseph-Olivetti</u> GDAHCVAP 2014/0026; <u>GTAWA v. St. Georges University Ltd.</u> GDAHCVAP 2014/008; and <u>Yang Hsueh Chi Serena & others v. Equity Trustee Ltd.</u> BVIHCMAP 2013/0012.

<u>(c)    Contractual interpretation: security documentation (fixed/ floating classification)</u>

53.    The only forms of consensual security known to English and Antiguan law are (i) the mortgage, which is a security transfer of ownership; (ii) the pledge, which creates a limited legal interest by the delivery of possession; (iii) the contractual lien, which differs from the pledge only in that the creditor's possession was acquired otherwise than for the purpose of security; and (iv) the charge. See <u>In re Cosslett (Contractors) Ltd.</u> [1998] Ch 495, at 508F-G per Millett LJ (with whom Evans Sir Ralph Gibson LJJ agreed); also <u>Goode & Gullifer on Legal Problems of Credit and Security</u> (7th ed.), §1-05.

54.    Security is of two kinds: fixed and floating. Under a fixed charge the asset is appropriated to satisfaction of the debt immediately or upon the debtor acquiring an interest in it. Under a floating charge appropriation is deferred; the chargee's rights attach in the first instance not to specific assets but to a shifting fund of assets, the debtor being left free to manage the fund in the ordinary course of business (it being only when the debtor's management powers are brought to an end that the charge crystallises and fastens on the specific assets then comprised in the fund or subsequently acquired by the debtor). See Goode & Gullifer (supra), §1-10, 4-07, 4-30 to 4-53.

55.    The well-established canon of principles governing the interpretation of contracts are relevant also in the context of classifying the type of security granted as a matter of Antiguan law. In the Privy Council decision in Agnew v. Commissioners of Inland Revenue [2001] UKPC 28 (New Zealand), at [32], Lord Millett described the Court's task in characterising a charge as either floating or fixed in the following way:

"The question is not merely one of construction. In deciding whether a charge is a fixed charge or a floating charge, the court is engaged in a two-stage process. At the first stage it must construe the instrument of charge and seek to gather the intentions of the parties from the language they have used. But the object at this stage of the process is not to discover whether the parties intended to create a fixed or a floating charge. It is to ascertain the nature of the rights and obligations which the parties intended to grant each other in respect of the charged assets. Once these have been ascertained, the court can then embark on the second stage of the process, which is one of categorisation. This is a matter of law. It does not depend on the intention of the parties. If their intention, properly gathered from the language of the instrument, is to grant the company rights in respect of the charged assets which are inconsistent with the nature

*of a fixed charge, then the charge cannot be a fixed charge however they may have chosen to describe it.*

*... in construing a debenture to see whether it creates a fixed or a floating charge, the only intention which is relevant is the intention that the company should be free to deal with the charged assets and withdraw them from the security without the consent of the holder of the charge; or, to put the question another way, whether the charged assets were intended to be under the control of the company or of the charge holder."*

56.  This approach to the interpretation of debentures and security documentation, involving the two-stage process of analysis as described by Lord Millett ("**First Stage**" and "**Second Stage**"), remains applicable at common law (in both England and, in my opinion, Antigua). See the decision of Edwin Johnson J in the English High Court in Re Avanti Communications Ltd. (in administration) [2023] BCC 873, at [25] to [26].

First Stage: Contractual interpretation

57.  The labels used by the parties to denote their rights and obligations are relevant at the First Stage as a guide to what security they objectively intended to create, such as the labels fixed and floating. See Arthur D Little Ltd. (In Administration) v. Ableco Finance LLC [2002] EWHC 701 (Ch); [2002] 3 W.L.R. 1387, at [31].

58.  The court is again fundamentally concerned, at the First Stage, with the nature of the rights and obligations the parties intended to create. See Ashborder BV v. Green Gas Power Ltd. [2004] EWHC 1517 (Ch), at [181].

Second Stage: Legal analysis

59.  Further useful guidance on the differences between fixed and floating charges, which in my opinion also represents the law of Antigua, can be found in the speeches of the members of the House of Lords in Re Spectrum [2005] 2 A.C., at [112]:

"*If, as I think, the hallmark of a floating charge and a characteristic inconsistent with a fixed charge is that the chargor is left free to use the assets subject to the charge and by doing so to withdraw them from the security, how should the charge over book debts granted by the bank's debenture be categorised? The following features of the debenture and the arrangements regarding the bank account into which the collected debts had to be paid need to be taken into account: (1) the extent of the restrictions imposed by the debenture (para 81 above); (2) the rights retained by Spectrum to deal with its debtors and collect the money owed by them (para 81 above); (3) Spectrum's right to draw on its account with the bank into which the collected debts had to be paid, provided it kept within the overdraft limit (para 82 above); (4) the description "fixed charge" attributed to the charge by the parties themselves*.*"*

60.     The nature of the assets in question may also be taken into account. A distinction often drawn in the authorities is between a chargor's circulating capital and its non-circulating capital, the reason being that "*compliance with the terms of a fixed charge on the company's circulating capital would paralyse its business*"; see <u>Agnew</u> at [7]. As Lord Millett further explained in <u>Agnew</u>, at [30], assets forming a company's circulating capital "*are the natural subjects of a floating charge*". In <u>Arthur D Little</u> (supra), Roger Kaye QC (sitting as a Deputy High Court Judge) noted that the charged shares in that case were not part of the chargor's circulating capital. The chargor did not need to sell them, deal with them, or substitute them as part of its ordinary business as a management consultant, nor to improve or assist its cash flow as part of that business. In holding that the shares were subject to fixed charge security, the judge noted as follows, at [41]:

"*None of these impeded the company's ability to trade as a management consultant without recourse to the shares. It is a striking feature of all the relevant cases to which*

*I was referred that a charge over what was regarded as the company's circulating capital was inconsistent with a fixed charge."*

61.     In <u>Ashborder</u> (supra), at [183], the relevance of the nature of the assets in question was said to be limited, where there is an express power for the chargor to dispose of the assets in question. Where there is not, Etherton J (as he then was) recognised that the nature of the assets may well be significant. As Etherton J explained, at [183]:

*"183. Further, there is a danger in the present case in laying too great an emphasis on the nature of the assets in question, namely the Licences and the OGL Shares. The fact that assets are not part of a company's circulating capital or stock in trade, which it needs to sell as part of its ordinary business, can understandably have an important influence in the categorisation of a charge as a fixed charge, rather than a floating charge, in an appropriate case. In the present case, however, unlike, for example, Arthur D Little and Re Yorkshire Woolcombers Association, the parties have agreed an express provision permitting each of the Octagon Group Companies to dispose of assets in the ordinary course of its business. In accordance with Lord Millett's two stage process, what must be ascertained at the first stage, as a matter of standard interpretation of written documents, is whether, on the language used, the express power to dispose of assets in the ordinary course of business was limited to particular assets or applied to all assets of the company. Whilst, of course, the nature of the assets in question forms part of the factual background against which the standard process of documentary interpretation takes place, the ordinary and natural meaning of the words used is the primary touchstone. By contrast, in the absence of an express provision permitting disposals in the ordinary course of business, the nature of the charged assets assumes a much greater significance in the process of establishing whether the intention was to create a fixed charge or a floating charge over the assets in question."*

62.  Regard may also be had to the nature of the business of the chargor when construing the rights and obligations created under the contractual documentation; see Arthur D Little (supra), at [40(2)]:

*"(2) I again remind myself that the company was not trading in shares and no one has suggested it did. The essential nature of its business cannot, in my judgment, be ignored. The shares in CCL were not part of the company's circulating capital and it did not need to sell them, to deal with them, or to substitute them as part of its ordinary business as a management consultant, nor to improve or assist its cash flow as part of that business. The shares were not part of a fluctuating body of assets which changed from time to time in the ordinary course of the company's business."*

63.  Post-contractual conduct is generally irrelevant and inadmissible. However, in this context, it has been noted that if a stipulation in the charging documents is not adhered to in practice, the agreement may be held to be a sham and characterised as a floating charge. See Goode & Gullifer (supra), §4-22.

64.  As regards the Second Stage, the authorities make clear that the critical question is whether the rights and obligations in respect of the relevant assets are consistent, as a matter of law, with fixed charge security or floating charge security. The labels used by the parties are not relevant. The correct characterisation of the relevant instrument of charge is a question of law, having regard to the rights and obligations ascertained at the First Stage.

65.  In Re Yorkshire Woolcombers Association Ltd. [1903] 2 Ch. 284, Romer LJ provided the following description of a floating charge, at p.295:

*"I certainly do not intend to attempt to give an exact definition of the term 'floating charge', nor am I prepared to say that there will not be a floating charge within the*

*meaning of the Act, which does not contain all the three characteristics that I am about to mention, but I certainly think that if a charge has the three characteristics that I am about to mention it is a floating charge. (1) If it is a charge on a class of assets of a company present and future; (2) if that class is one which, in the ordinary course of the business of the company, would be changing from time to time; and (3) if you find that by the charge it is contemplated that, until some future step is taken by or on behalf of those interested in the charge, the company may carry on its business in the ordinary way as far as concerns the particular class of assets I am dealing with."*

66.    In relation to the third characteristic identified by Romer LJ one can see that a critical question, if not the critical question, at the Second Stage is the question of control: who has control of the relevant class of assets, as between chargor and chargee? Returning to the judgment of the Privy Council in <u>Agnew</u>, Lord Millett, after quoting Romer LJ's description of a floating charge in <u>Woolcombers</u>, gave the following further explanation of the third characteristic identified by Romer LJ, at [13]:

*"This [Romer LJ's description] was offered as a description and not a definition. The first two characteristics are typical of a floating charge but they are not distinctive of it, since they are not necessarily inconsistent with a fixed charge. It is the third characteristic which is the hallmark of a floating charge and serves to distinguish it from a fixed charge. Since the existence of a fixed charge would make it impossible for the company to carry on business in the ordinary way without the consent of the charge holder, it follows that its ability to do so without such consent is inconsistent with the fixed nature of the charge."*

67.    In <u>Woolcombers</u>, at [23], Lord Millett added the following, on the question of control:

"*If the chargor is free to deal with the charged assets and so withdraw them from the ambit of the charge without the consent of the chargee, then the charge is a floating charge. But the test can equally well be expressed from the chargee's point of view. If the charged assets are not under its control so that it can prevent their dissipation without its consent, then the charge cannot be a fixed charge.*"

68.    The question of control, and its relationship with the nature of the relevant class of assets subject to the relevant charge was explained by Stanley Burton QC (as he then was) in <u>Re Cimex Tissues Ltd.</u> [1994] B.C.C. 626, in the following terms at p.635:

"*If the crucial difference between a fixed charge and a floating charge is in the nature of the interest of the chargee prior to any event of crystallisation, it would follow that a licence for the chargor to deal to some extent with the charged assets is not necessarily inconsistent with a fixed charge. If, however, the licence to deal given to the chargor is extensive, the charge will be floating, since in these circumstances there is in effect no attachment of the charge to any specific asset: see Goode, Legal Problems of Credit and Security, at p. 56. The extent to which the licence to deal is compatible with a fixed charge must depend on all the circumstances of the case, and in particular on the nature of the charged property. Where the charged property is stock, or book debts - i.e. where the assets are naturally fluctuating - the court will readily conclude that a liberty for the chargor to deal with the charged assets is inconsistent with a fixed charge. Where, as in the present case, the assets are specific and do not necessarily fluctuate, some liberty to release the charged assets may not be inconsistent with a fixed charge. Conversely, however, on this basis a floating charge over present goods, not extending to future goods, is not a conceptual impossibility.*"

(d)  Attachment and perfection of security

69.  The High Court in England recently ruled for the first time at a trial (rather than at an interlocutory state) that a digital asset, in that case USDT, constitutes property: D'Aloia v. Persons Unknown [2025] 1WLR 821. This proposition is consistent with my own prior decision in Wang v. Darby as noted above. It is also correct as a matter of Antiguan law, in my opinion. It follows that a digital asset is capable, in principle, of being made subject to security as collateral for a debtor's indebtedness. I understand that this accords with the opinion expressed in the Webster Declaration at §70.

70.  Attachment denotes the creation of the security interest as between debtor and creditor. The effect of attachment is that the security interest fastens on the asset so as to give the creditor rights in rem against the debtor itself, though not necessarily against third parties. Attachment of a security interest is thus to be distinguished from perfection of a security interest, the latter usually involving a further step (possession, registration, notice, or attornment) which constitutes notice of the security interest to third parties and must be taken if they are to be bound. See Goode & Gullifer (supra), §2-02.

71.  In order for a security interest to attach otherwise than by operation of law the following conditions must co-exist:

*"(1) there must be an agreement for security conforming to any statutory formalities;*

*(2) the asset to be given in security must be identifiable;*

*(3) the debtor must have an interest in the asset or a power to give it in security;*

*(4) there must be some current obligation of the debtor to the holder of the security (or (maybe) to another person which the asset is designed to secure;*

*(5) any contractual conditions for attachment must have been fulfilled; and*

*(6) in the case of a pledge, actual or constructive possession must be given to the creditor."*

(Goode & Gullifer (supra), §2-03)

72.     A pledge requires delivery of possession; an agreement for a pledge which is not accompanied or followed by delivery of possession is a mere contract conferring no real right on the intended pledgee. See Dublin City Distillery Ltd. v. Doherty [1914] A.C. 823, per Lord Atkinson at p.843. Similar considerations apply to a contractual lien, which differs from a pledge only that it arises from the creditor's possession of goods which were delivered to it for some purpose other than security. Goode & Gullifer (supra), §2-10. Indeed, in the context of a pledge or a contractual lien, possession constitutes both attachment and perfection of the security to the collateral.

73.     I note that perfection of a charge is achieved differently. I do not express any opinion in relation to the perfection of any charge created under the terms of the March 2022 LOC. I understand that Mr Atherton, KC will address this topic pursuant to an analysis under the law of the BVI.

74.     In the present case the Secured Assets (as defined in the March 2022 LOC), held in the 3AC Accounts, consisted of both (i) 3AC's interests in the digital assets credited to the 3AC Accounts (albeit the digital assets themselves were swept on a regular basis into the FTX pooled addresses), and (ii) 3AC's rights to withdraw assets from the Exchange, which came from amongst assets stored in the FTX pooled addresses. I accept that the mere rights referred to in (ii) above are not capable of 'possession' for the purposes of a pledge or lien, albeit that they are capable of being subject to security by way of charge. Insofar as (i) is concerned, i.e. 3AC's interests in the digital assets themselves,

these are also not capable of physical possession for the purposes of attachment or perfection of any pledge or contractual lien created under the March 2022 LOC. Accordingly, applying a traditional approach, such assets cannot form the subject matter of a lien or a pledge. However, like Mr Webster and for substantially the same reasons as he gives, I am of the view that these digital assets are nonetheless capable of being subject to security by way of pledge or lien.

75.    The Webster Declaration at §76 concludes that, given the nature of the relevant Secured Assets in the present case, "*FTX would have to establish control of the Secured Assets to prove that it had perfected its security over them*". I concur with this proposition on substantially the same basis as Mr Webster has put it. In particular:

(i)    Mr Webster makes reference to certain BVI decisions addressing an analogous question, namely the <u>location</u> of cryptocurrency, holding that this is determined by the location of the person who controls the relevant crypto wallet by having the private key (<u>Smith & Kardachi v. Torque Group Hotels Ltd. & others</u> BVIHCCOM 2021/0003 (Wallbank J); <u>AQF v. XIO & others</u> BVIHCCOM 2023/0239 (Mangatal J). I agree that these authorities are instructive by analogy, so far as they go.

(ii)    Mr Webster also makes reference in this connection to paragraph 5.10 of the Law Commission Report on Digital Assets that was presented to Parliament in the UK in June 2023 (the "**LC Report**"), where a proposed test was promulgated as to who 'controls' a digital asset as follows: "*[B]roadly speaking, the person in control of a [digital] object at a particular moment in time is the person who is able sufficiently to: (1) exclude others from the [digital] object; (2) put the [digital] object to the uses of which it is capable; and (3) identify themselves as the person with the abilities specified in (1) to (2)*

*above."* Mr Webster also makes reference to the Principles of Digital Assets and Private Law, published by the International Institute for the Unification of Private law (UNIDROIT), at §§6.1 and 6.2 (which promulgates a similar test to that propounded in the LC Report).

(iii)   Mr Webster also refers to the English Court of Appeal decision in <u>Your Response Ltd. v. Datateam Business Media Ltd.</u> [2014] EWCA Civ 281, where it was held that the Claimant did not have the benefit of a lien over a database, mainly because he did not have exclusive control of the database having given the Defendant free access and the password to the database. Moore-Bick LJ confirmed the requirement of "*exclusive control*" for a security, stating as follows at paragraph [31]:

*"Although the contract in the present case contained no express provision for the publisher [defendant] to have access to the data, neither did it contain any provision, express or implied, excluding him from it and the fact that the data manager [claimant] did in fact make access to it freely available by the provision of a password is in my view inconsistent with the conclusion that he was in fact exercising the kind of exclusive control that would equate to the continuing possession required for the exercise of a lien. In view of the other conclusions to which I have come it is not necessary to reach a final decision on this point, but if necessary I would hold that in this case the data manager did not exercise the degree of control necessary to entitle it to exercise a lien."*

76.   On this basis, I agree with the conclusions at §§82-83 of the Webster Declaration that, insofar as the March 2022 LOC created a lien or a pledge over the Secured Assets (i.e. insofar as the pledge and lien are concerned, the interests in the digital assets credited to the 3AC Accounts), attachment of this security to the Secured Assets and perfection

of that security results from FTX acquiring exclusive control over those Secured Assets, which includes the right to prevent others from having access to or receiving benefits from them; and that such control must exist when the security is being created but that, if control was lost by FTX for whatever reason following the creation of the security, that pledge or lien will nonetheless be effective as against 3AC provided that FTX's control had been regained by the time the security came to be enforced.

**F.       Legal Effect of the March 2022 LOC**

(a)       Terms of the March 2022 LOC

77.    Again, the March 2022 Line of Credit Agreement includes two separately named sections. However, I am instructed that it is a single document with a common DocuSign ID number issued, which 3AC signed. I am instructed to proceed, for present purposes, on the basis that the March 2022 Line of Credit Agreement is one, singular agreement. Only because Mr Webster addresses two parts of the March 2022 LOC, I will refer herein to each specifically – both subject to an Antiguan governing law clause – as "**March 2022 LOC – Line of Credit**" and "**March 2022 LOC – Margin Agreement**".

78.    As noted above, under clause 5 of the March 2022 LOC – Line of Credit, 3AC was required to maintain an Account Balance of $240 million. This flowed from the fact that the Line of Credit under the March 2022 LOC stood in the sum of $120 million (Recital of the document), whereas under clause 5 it was provided as follows:

*"Throughout the lifetime of the Line of Credit, at least 200% of the Line of Credit ("Collateral") must be maintained in the Borrower's FTX account, as opened with the email address kyle@threearrowscap.com. Should the Collateral fall below 200% of the Line of Credit at any time, it must immediately, and by no later than twenty four hours*

*of such fall, be reinstated to 200% of the Line of Credit. Borrower agrees that following any failure by it to return Collateral to 200% of the Line of Credit within one day of it falling below such amount, Lender may apply special interest in respect of outstanding amounts under the Line of Credit at that time at an indicative rate of 10% per day."*

79.  Clause 6 of the March 2022 LOC – Line of Credit lists a number of different Events of Default (including, at paragraphs (b) and (c) respectively, 3AC's failure to pay any portion of the Line of Credit when due, and 3AC's insolvency). Clause 7 then provides that, if any Event of Default occurs, "*all obligations outstanding from the Borrower to the Lender shall immediately become due and payable without demand, protest or other notice of any kind, all of which are hereby expressly waived. In the event of such Event of Default, the Lender may proceed to enforce the payment of all obligations of Borrower to Lender and to exercise any and all of the rights and remedies afforded to Lender by law of under the terms of this Line of Credit Agreement or otherwise.*"

80.  I agree with Mr Webster that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC) does not in itself purport to, and did not, provide any security in favour of FTX (Webster Declaration §§12, 37-39).

81.  The preamble to the March 2022 LOC – Margin Agreement records that it is an agreement between FTX and 'Customer', without expressly specifying the identity of or otherwise defining the capitalised term 'Customer'.

82.  The following recital goes on to record as follows: "*WHEREAS, Customer is a customer of the FTX.com cryptocurrency exchange and FTX desires to afford Customer with access to margin trading and potentially discretionary line of credit facilities (together, the "Indebtedness") as set forth herein*". The document is signed, in the signature block at the bottom, by Mr Davies on behalf of 3AC. Against this backdrop it is clear in my

opinion, on a proper interpretation of the March 2022 LOC as a whole, that 3AC is the 'Customer' for the purpose of the March 2022 LOC – Margin Agreement.

83.    The 'Indebtedness', as defined in the recital to the March 2022 LOC – Margin Agreement, refers to the Customer's "*access to margin trading and potentially discretionary line of credit facilities*". In my opinion, to the extent it is assumed that 3AC incurred any liabilities to FTX notwithstanding a positive Account Balance as I have assumed for purposes of this analysis (an assumption on which I do not opine), it is clear that the defined term 'Indebtedness' would refer to any liabilities 3AC might incur under the 2022 March LOC – Line of Credit, as well as to any liabilities 3AC might incur as a consequence of any margin trading activity it might engage in on the Exchange.

84.    Clause 2 of the March 2022 LOC – Margin Agreement ('Payment upon Demand') provides as follows: "*Customer shall at all times be liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement. At any time, FTX may "call" the Indebtedness upon notice to Customer*."

85.    Clause 3 of the March 2022 LOC – Margin Agreement ('Lien') provides as follows:

*"All assets in all of the FTX accounts of the Customer (the "Secured Assets") are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured*

*Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX."*

86.    Clause 4 of the March 2022 LOC – Margin Agreement ('Maintenance of Collateral') sets out a number of provisions in relation to 3AC's obligation to maintain collateral. In particular:

(i)    Clause 4a. ('Amount Required'): "*Customer will at all times maintain such cash, cryptocurrency, or other property in the accounts of the Customer for collateral and/or margin purposes as FTX shall require from time to time via a margin call or other request. Collateral requirements may be established and changed by FTX in its sole discretion and judgement without notice to Customer.*"

(ii)    Clause 4b. ('Collateral Calls'): "*In regard to collateral or margin calls, whether for maintenance or otherwise, in lieu of immediate liquidations, FTX, may permit Customer a period of time to satisfy a call. This time period shall not in any way waive or diminish FTX's right in its sole discretion, to shorten the time period in which Customer may satisfy the call, including one already outstanding, or to demand that a call be satisfied immediately. Nor does such practice waive or diminish the right of FTX to sell out positions to satisfy the call, which can be as high as the full indebtedness owed by Customer.*"

(iii)    Clause 4c. ('Liquidation'): "*Customer acknowledges that the Secured Assets may be liquidated without notice to satisfy minimum maintenance, collateral requirements or margin calls. Customer acknowledges that it is not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements or margin calls. To satisfy minimum maintenance, collateral requirements or margin calls, and without*

*further notice, Customer authorizes FTX to sell any assets, top up assets in its*

*discretion, cancel any open order; close any outstanding order; and otherwise*

*take any action deemed necessary to obtain liquidity to comply with collateral*

*requirements with respect to the Indebtedness. Liquidation is conducted in the*

*orderbooks on FTX or using voluntary liquidity providers. FTX does not itself*

*generally take on the user's positions. Customer shall be liable to FTX for any*

*deficiency remaining in any such accounts in the event of the liquidation thereof,*

*in whole or in part, by FTX or by the undersigned; and, the undersigned shall*

*make payments of such obligations and indebtedness upon demand."*

87.    Clause 6 of the March 2022 LOC – Margin Agreement deals with margin transactions. Sub-paragraph (b) of Clause 6 reiterates that if 3AC's account balance "*drops far enough below initial margin, FTX may liquidate [the Customer's] positions in accordance with Section 4(c)*".

88.    Clause 7 of the March 2022 LOC – Margin Agreement sets out FTX's power to offer lines of credit and confirms that amounts owed under the lines of credit are Indebtedness under the Margin Agreement.

89.    Clause 9 of the March 2022 LOC – Margin Agreement lists the Events of Default and Clause 10 of the March 2022 LOC – Margin Agreement lists FTX's remedies in the event of default. Relevantly, clause 10 ('Lender's Remedies') provides as follows:

*"Upon the occurrence and during the continuation of any Event of Default where Customer is the Defaulting Party, FTX may, at its option: (i) declare any amounts hereunder immediately due and payable with effect upon notice to Customer; (ii) terminate this Agreement upon notice to Customer; and (iii) exercise all other rights and remedies available to FTX hereunder, under applicable law, or in equity, against*

*Customer and/or its Affiliates. On demand, Customer shall pay any balance owing with respect to the Indebtedness, including fees and any costs of collection…"*

(b)    Analysis of March 2022 LOC – Margin Agreement

90.    In my view, to the extent the assumptions I am applying for purposes of this Declaration are determined to be applicable, clause 3 of the March 2022 LOC – Margin Agreement created a security over the "*assets in all of the FTX accounts* [of 3AC]", defining these as the "*Secured Assets*".

91.    Mr Webster offers two separate bases for opining that the March 2022 LOC did not create any valid security.

92.    The first basis proceeds on the footing that FTX's primary case is correct (i.e. that FTX owned the relevant Secured Assets) – my analysis herein, as noted above, proceeds entirely on the basis that one assumes FTX is not the owner of the relevant assets.

93.    The second basis proceeds on the footing that there were no assets held ***in*** the 3AC Accounts referred to in the definition of 'Secured Assets' in clause 3. I am instructed that, in fact, there were substantial Secured Assets (as defined) credited to the 3AC Accounts. Specifically, I am instructed to assume that, whilst digital assets credited to the 3AC Accounts were subject to regular sweeps into pooled addresses controlled by FTX (and, again, I am instructed to assume for present purposes that these digital assets remained at all times 3AC's property notwithstanding FTX's position that they were FTX's property), nonetheless 3AC retained ownership of the digital assets credited to the 3AC Accounts and that the 3AC Accounts also included rights to withdraw assets from the Exchange that were held in pooled addresses controlled by FTX in respect of those digital assets recorded as being credited to 3AC. Accordingly, I proceed on the basis that (i) insofar as the lien and pledge were concerned, the Secured Assets were or

included those digital assets credited to the 3AC Accounts (with FTX's sweeping of these digital assets into the FTX pooled account constituting an integral part of the perfection of that security over those digital assets, but 3AC nonetheless retaining ownership of those digital assets); and (ii) insofar as the charge was concerned, the Secured Assets credited to the 3AC Accounts also included, i.e. in addition to 3AC's proprietary interests in the digital assets credited to the 3AC Accounts, 3AC's rights to withdraw assets from the Exchange that are derived from the FTX pooled addresses (as described above).

94.   The better view, in my opinion, is that security was indeed granted, in respect of 3AC's 'Indebtedness' (as defined), over the 'Secured Assets' (as defined), in favour of FTX pursuant to clause 3 of the March 2022 LOC – Margin Agreement. I consider that the security thereby created was in the nature of a pledge and/or lien (i.e. possessory security), and/or fixed and/or floating charge (i.e. non-possessory security). I take these forms of security in turn below.

Pledge/lien

95.   The better view is that, on the proper interpretation of clause 3 of the March 2022 LOC – Margin Agreement, a pledge or lien was granted in favour of FTX over the Secured Assets and that this grant of security was duly perfected.

96.   Indeed, the language in the second sentence of clause 3 is plain and unambiguous in this regard: "*The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement*". As noted by Pereira JA in the ECCA in Kenneth Krys (supra), where the parties have used

plain language the Court must apply it, with recourse of the commercial purpose of the drafting only being relevant in the case of ambiguity, and with recourse to departing from the plain meaning of words only being permissible where the plain meaning "*leads to an absurdity*".

97.    It would appear that Mr Webster shares this view, i.e. that the plain meaning of the language used in clause 3 drives one to the conclusion that the parties objectively intended for security by way of pledge and lien to be granted over the Secured Assets in FTX's favour, albeit that he takes the view that such security was not duly perfected.

98.    Unlike Mr Webster I am of the view that, having regard to the test for perfecting possessory security by way of lien or pledge in the case of digital assets (i.e. the 'exclusive control' test – Section E(d) above), it is clear that the grant of security by way of lien or pledge was duly perfected.

99.    As noted above, I am instructed that I can and should assume the following facts concerning FTX's control with regards to assets deposited by customers on to the Exchange, including those assets credited to the 3AC Accounts (the Secured Assets for the purposes of clause 3 of the March 2022 LOC – Margin Agreement):

(i)    FTX held the keys to the addresses in which all digital assets at issue were stored. Possession of private keys for an address amounts, as a matter of fact, to "control" over the digital assets stored in that address in the cryptocurrency context. Indeed, as noted above, two BVI first-instance decisions have held that the distinct but analogous matter of the <u>location</u> of cryptocurrency is determined by the location of the person who controls the relevant crypto wallet by having the private key (<u>Smith and Kardachi v. Torque Group Hotels Ltd. & others</u> BVIHCCOM 2021/0003 (Wallbank J); <u>AQF v. XIO & others</u> BVIHCCOM 2023/0239 (Mangatal J)).

(ii)     No customer (including 3AC) could access assets stored in the addresses controlled by FTX, which included all of the assets at issue in this dispute. Whilst 3AC retained its rights to withdraw digital assets that were sourced from those assets held in FTX's pooled addresses (i.e. the Secured Assets for the purposes of clause 3 of the March 2022 LOC – Margin Agreement), it had no direct recourse against any particular identifiable digital assets held in those pooled addresses.

(iii)    Although 3AC could make withdrawal requests to FTX, withdrawals came from addresses holding commingled digital assets of many customers (and FTX's own assets), i.e. the FTX pooled account. They could not withdraw a specific digital asset (e.g., a BTC they deposited) as opposed to some quantity of the digital asset.

(iv)    There were restrictions on 3AC's ability to withdraw anything from the Exchange. Specifically, 3AC could only withdraw if its accounts were in good standing, and in fact FTX turned off withdrawals for 3AC because it breached applicable requirements.

(v)     FTX had the contractual right, under clause 4c. of the March 2022 LOC – Margin Agreement, to liquidate any and all assets associated with the 3AC Accounts should 3AC breach applicable requirements, and in fact it did liquidate certain assets.

100.   In light of the foregoing facts and matters, and applying the 'exclusive control' test for the perfection of possessory security by way of pledge or lien over digital assets, I am of the view that the pledge and/or lien granted under clause 3 of the March 2022 LOC – Margin Agreement was duly perfected as a consequence of FTX acquiring 'exclusive

control' (in the relevant sense) over the Secured Assets (i.e. insofar as the pledge or lien was concerned, the digital assets credited to the 3AC Accounts).

Fixed or floating charge

101.   I agree with Mr Webster that clause 3 of the March 2022 LOC – Margin Agreement did not create a mortgage over the Secured Assets (Webster Declaration §68). However, unlike Mr Webster, I consider that the effect of this provision was to grant a fixed charge, alternatively a floating charge, over the Secured Assets (*contra* Webster Declaration §67).

102.   As to the First Stage of the analysis (using the taxonomy of Lord Millett in <u>Agnew</u> as described above), I consider that the rights and obligations arising from clause 3 of the March 2022 LOC – Margin Agreement, on its proper construction, are in the nature of a charge over the Secured Assets. In particular:

(i)   Clause 3 opens by providing that the Secured Assets are "*collateral for the Indebtedness*", without specifying that the security over this collateral would be limited to possessory security.

(ii)   The second sentence of clause 3 provides as follows (emphasis added): "*The Customer hereby pledges and grants a continuing lien on <u>and security interest in</u>, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement*." Again, this language does not limit the security so granted to possessory security by way of pledge or lien, but is drafted in more general terms. Moreover, if the words "*and security interest in*" are to have any meaning additional to security by way of pledge or lien (the only two possessory forms of consensual security), then they must refer to one of the two <u>non-</u>possessory

forms of consensual security. The more obvious of the two, noting the absence of any of the distinctive incidents of a mortgage (e.g. transfer of title), being a charge rather than a mortgage.

(iii)  The final sentence of clause 3 provides as follows: "*FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX.*" In my view the reference to the '*remedies of a chargee*' serves to specify the form of <u>non-</u>possessory security referred to in the previous sentence, when it was stipulated that 3AC "*hereby pledges and grants a continuing lien on <u>and security interest in</u>, the Secured Assets*" (emphasis added). I do not agree with Mr Webster's view that "*[this] additional stipulation would not be necessary if the remainder of clause 3 were intended to create a charge*" (Webster Declaration §67).

103.  As to the Second Stage of the analysis (again using the taxonomy of Lord Millett in <u>Agnew</u> as described above), I consider that the charge granted under clause 3 is in the nature of a fixed charge over the Secured Assets, alternatively a floating charge.

104.  On the facts as I have been instructed to assume them (see paragraph 93 above), it is clear that 3AC (the chargor) was not left free to use the digital assets subject to the charge and by doing so to withdraw them from the security, nor was it left free to exercise the rights to withdraw assets from the Exchange that were held in the FTX pooled addresses (which, as noted at paragraph 93 above, also constituted Secured Assets for the purposes of the charge under clause 3). In fact, FTX had legal and practical control over the Secured Assets at all times and exercised that control from

time to time. See paragraph 99 above. This militates in favour of holding that the effect of clause 3 was to grant fixed charge security over the Secured Assets in FTX's favour.

105.    Alternatively, if not a fixed charge, then I consider that the effect of clause 3 was to grant a floating charge over the Secured Assets in FTX's favour. However, it is difficult to see how the Court would arrive at that conclusion in circumstances where: (i) 3AC's control over the Secured Assets was minimal, whereas FTX's control over them was effectively exclusive, given that 3AC's rights to withdraw assets from the Exchange that were held in the FTX's pooled addresses were fettered in the various ways set out at paragraph 99 above; and (ii) the Secured Assets were not in any appreciable sense a part, or at least not a core part, of 3AC's "*circulating capital*". Again, whilst 3AC was a high-volume trader on the Exchange, it was reported to have over $3 billion of assets under its management as of April 2022[2] – of which only a small proportion would have been tied up, at any given time, in the form of Secured Assets caught by clause 3 of the March 2022 LOC – Margin Agreement (i.e. 3AC's proprietary interests in their digital assets and their rights to participate in FTX's pooled account of digital assets).

106.    Again, I note that perfection of a charge is achieved differently from perfection of possessory security. I do not express any opinion in relation to these topics. I understand that Mr Atherton, KC will address this topic pursuant to an analysis under the law of the BVI.

(c)    Liabilities under the Margin Lending Program

107.    As stated above, my analysis in this Declaration assumes that the Court has determined that 3AC owed liabilities to FTX, notwithstanding my understanding that 3AC had a

---

[2] Declaration of Russell Crumpler in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief, at ¶ 15, In re Three Arrows Capital Ltd., Case o. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022), D.I. 3, §8.

positive Account Balance; I do not opine on whether that is the case. Subject to that clarification, I understand that, in light of the structure of the Margin Lending Program, there are three potential categories of creditor to whom 3AC might owe liabilities for purposes of this analysis which could (in principle) constitute 'Indebtedness' for the purposes of the March 2022 LOC – Margin Agreement. First, Third-Party Lenders (i.e. other Customers participating in the Margin Lending Program). Second, other entities in the broader FTX Group. Third, FTX itself (i.e. 3AC's counterparty to the March 2022 LOC).

108.   As regards the first two categories (i.e. Lenders under the Margin Lending Program other than FTX itself, and therefore not parties or privies to the March 2022 LOC), I agree with Mr Webster's analysis – based on the English and Eastern Caribbean cases he has cited in support of that analysis (Webster Declaration §§97-98) – that these Lenders cannot, as a matter of Antiguan law, enforce the provisions of the March 2022 LOC because they were not parties to it.

109.   As regards FTX itself, if the Court should find that any liability has been incurred by 3AC to FTX under or in respect of the Margin Lending Program, whatever that liability might be and on whatever basis (as to which I am not qualified to opine), then I consider that this liability would qualify as 'Indebtedness' for the purposes of the March 2022 LOC. Indeed, the recital defining 'Indebtedness' refers to both liabilities in respect of margin trading and liabilities in respect of credit facilities, defining these liabilities "*together*" as 'Indebtedness'. This strongly suggests that any liabilities 3AC might have incurred to FTX itself directly under or in respect of the Margin Lending Program would constitute part of the Indebtedness secured by way of the security provided by clause 3. However, as noted above, I am not qualified to opine on what liabilities might have been incurred by 3AC to FTX under or in respect of the Margin Lending Program,

nor as to the basis on which any such liability might have been incurred, and so I express

no opinion in this regard.

I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

_/s/   S. T. Houseman_                        
Stephen Houseman KC
Essex Court Chambers
24-28 Lincoln's Inn Fields
London WC2A 3EG
England, United Kingdom